Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re                                 :    Chapter 11 Case No.
                                      :
MOTORS LIQUIDATION COMPANY, et al.,   :    09-50026 (REG)
      f/k/a General Motors Corp., et al. :
                                      :
                    Debtors.          :    (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

## NOTICE OF HEARING
## ON DEBTORS' (i) OBJECTION TO PROOFS OF
## CLAIM NOS. 1206, 7587, AND 10162 AND, IN THE ALTERNATIVE,
## (ii) MOTION TO ESTIMATE PROOFS OF CLAIM NOS. 1206, 7587, AND 10162

PLEASE TAKE NOTICE that upon the annexed Objection, dated May 21, 2010

of Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and its affiliated

debtors, as debtors in possession (collectively, the "**Debtors**"), to the allowance of Proofs of

Claim Nos. 1206 and 7587 filed by Tozamile Botha, William Daniel Peters, Msitheli Wellington

Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka,

Mirriam Mzamo, Mncekeleli Henyn Simangentloko, and Hans Langford Phiri and Proof of

Claim No. 10162 filed by Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch,

Elsie Gishi, Lesiba Kekana, Archington Madondo, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile

Sikani (collectively, the "**Apartheid-Related Putative Class Claims**"), as more fully set forth in

the Objection, a hearing will be held before the Honorable Robert E. Gerber, United States

Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the Southern District

of New York, One Bowling Green, New York, New York 10004, on **June 29, 2010 at 9:45 a.m.**

**(Eastern Time),** or as soon thereafter as counsel may be heard.

   PLEASE TAKE FURTHER NOTICE that any responses to the Objection must be

in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of

the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

served in accordance with General Order M-242, and on (i) Weil, Gotshal & Manges LLP,

attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R.

Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o

Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243

(Attn:  Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan

48265 (Attn:  Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP,

attorneys for the United States Department of the Treasury, One World Financial Center, New

York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States Department of the

Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:  Joseph

Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633

Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and

Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory

committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036

(Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Lauren Macksoud, Esq., and Jennifer

Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Diana G. Adams,

Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York,

New York 10007 (Attn:  David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale,

Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related

claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn:  Elihu Inselbuch,

Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005

(Attn:  Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi) Stutzman, Bromberg,

Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as

the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite

2200, Dallas, Texas 75201 (Attn:  Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.);

(xii) Nagel Rice LLP, attorneys for Tozamile Botha, William Daniel Peters, Msitheli Wellington

Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka,

Mirriam Mzamo, Mncekeleli Henyn Simangentloko, and Hans Langford Phiri, 103 Eisenhower

Parkway, Roseland, New Jersey 07068 (Attn:  Diane E. Sammons, Esq.); and (xiii) Hausfeld

LLP, attorneys for Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch, Elsie

Gishi, Lesiba Kekana, Archington Madondo, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile

Sikani, 11 Broadway, Suite 615, New York, New York 10004 (Attn: Steig D. Olson, Esq.), so as

to be received no later than **June 22, 2010 at 4:00 p.m. (Eastern Time)** (the "**Response**

**Deadline**").

    PLEASE TAKE FURTHER NOTICE that if no response is timely filed and

served with respect to the Objection, the Debtors may, on or after the Response Deadline, submit

to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Objection, which order may be entered with no further notice or opportunity to be heard offered

to any party.

Dated: New York, New York
   May 21, 2010

         /s/ Joseph H. Smolinsky
         Harvey R. Miller
         Stephen Karotkin
         Joseph H. Smolinsky

         WEIL, GOTSHAL & MANGES LLP
         767 Fifth Avenue
         New York, New York 10153
         Telephone: (212) 310-8000
         Facsimile: (212) 310-8007

         Attorneys for Debtors
         and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :      Chapter 11 Case No.
                                    :
MOTORS LIQUIDATION COMPANY, et al.,  :      09-50026 (REG)
       f/k/a General Motors Corp., et al. :
                                    :
                    Debtors.        :      (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

## DEBTORS' (i) OBJECTION TO PROOFS OF
## CLAIM NOS. 1206, 7587, AND 10162 AND, IN THE ALTERNATIVE,
## (ii) MOTION TO ESTIMATE PROOFS OF CLAIM NOS. 1206, 7587, AND 10162

# TABLE OF CONTENTS

**Page**

Relief Requested ................................................................................................... 1

Jurisdiction ........................................................................................................... 4

Relevant Facts and the Apartheid-Related Putative Class Claims ....................... 4

    A.    The Bar Date Order ................................................................... 4

    B.    The Botha Putative Class Claims ............................................. 4

    C.    The Balintulo Putative Class Claim ......................................... 6

The Relief Requested Should Be Approved by the Court ...................................... 8

I.    Application of Bankruptcy Rule 7023 to a Class Proof of Claim is Discretionary and Should be Denied in this Case ....................................... 8

    A.    The Plaintiffs Failed to Comply with Bankruptcy Rules 9014 and 2019 ........... 10

    B.    Allowing the Apartheid-Related Putative Class Claims to Proceed as Class Actions Will Not Be Effective or Efficient ........... 13

    C.    The Apartheid-Related Putative Class Claims Were Not Certified Prior to the Commencement Date ........... 15

    D.    Adequate Notice of the Bankruptcy Case and the Bar Date Was Provided to the Members of the Putative Classes ........... 16

II.    The Apartheid-Related Putative Class Claims Cannot Satisfy the Requirements of Rule 23 ........... 18

    A.    The Members of the Putative Classes Are Not Properly Identifiable ........... 19

    B.    Numerous Individual Issues Predominate Over Common Questions ........... 22

    C.    The Plaintiffs Cannot Establish that a Class Action Is Superior to Other Available Methods for Fairly and Efficiently Adjudicating this Controversy ........... 25

    D.    Neither "Commonality" Nor "Typicality" Can Be Established by the Plaintiffs ........... 27

    E.    The Plaintiffs Are Not Adequate Representatives ........... 28

III.    Alternatively, If the Apartheid-Related Putative Class Claims Are Not Expunged, They Should Be Subject to an Immediate Estimation Proceeding ........... 29

    A.    Estimation of Claims ........... 29

    B.    The Apartheid-Related Putative Class Claims Must Be Estimated If the Claims Are Not Expunged ........... 32

Notice ........... 32

i

# TABLE OF AUTHORITIES

## CASES

**Page**

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988)....................................22

*Aguinda v. Texaco, Inc.*,
    142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002)................24, 25

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ........................................................................................22

*In re Am. Reserve Corp.*,
    840 F.2d 487 (7th Cir. 1988), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992)....................................9

*Ansari v. N.Y. Univ.*,
    179 F.R.D 112 (S.D.N.Y. 1998) ....................................................................................27

*In re Apex Oil Co.*,
    107 B.R. 189 (Bankr. E.D. Mo. 1989)............................................................................30

*In re Baldwin-United Corp.*,
    55 B.R. 885 (Bankr. S.D. Ohio 1985)............................................................................31

*In re Baldwin-United Corp.*,
    52 B.R. 146 (Bankr. S.D. Ohio 1985)............................................................................12

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    402 B.R. 616 (Bankr. S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009) ................ 8-10, 15

*Barasich v. Shell Pipeline Co. LP*,
    No. Civ. A. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008)..................................20

*Bersch v. Drexel Firestone, Inc.*,
    519 F.2d 974 (2d Cir. 1975), *cert. denied sub nom.*
    *Bersch v. Arthur Andersen & Co., I.O.S.*, 423 U.S. 1018 (1975) ....................................26

*Bittner v. Borne Chem. Co., Inc.*,
    691 F.2d 134 (3d Cir. 1982) ) ..................................................................................30, 32

*Boughton v. Cotter Corp.*,
    65 F 3d 823 (10th Cir. 1995) ........................................................................................22

*In re Brints Cotton Mktg., Inc.*,
    737 F.2d 1338 (5th Cir. 1984) ...........................................................................29, 30, 31

*Caro v. Procter & Gamble Co.*,
    18 Cal. App. 4th 644 (1993) ...........................................................................28

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ...........................................................................26

*In re CD Realty Partners*,
    205 B.R. 651 (Bankr. D. Mass. 1997) ...........................................................................30

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
    127 F.R.D. 454 (S.D.N.Y. 1989) ...........................................................................26

*In re Charter Co.*,
    876 F.2d 866 (11th Cir. 1989), *cert. dismissed*, 496 U.S. 944 (1990) ...........................8, 9

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993) ...........................................................................29, 33

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993) ...........................19, 27

*Dunnigan v. Metro. Life Ins. Co.*,
    214 F.R.D. 125 (S.D.N.Y. 2003) ...........................................................................21, 22

*Edwards v. McCormick*,
    196 F.R.D. 487 (S.D. Ohio 2000) ...........................................................................28

*In re Elec. Theatre Rests. Corp.*,
    57 B.R. 147 (Bankr. N.D. Ohio 1986) ...........................................................................12

*In re Ephedra Prods. Liab. Litig.*,
    329 B.R. 1 (S.D.N.Y. 2005) ...........................................................................9-12, 15

*Fears v. Wilhelmina Model Agency, Inc.*,
    No. 02 Civ. 4911, 2003 WL 21659373 (S.D.N.Y. July 15, 2003) ...........................19, 20

*In re Ford*, 967 F.2d 1047 (5th Cir.),
    *reh'g denied*, 974 F.2d 1337 (5th Cir. 1992) ...........................................................................30

*In re GAC Corp.*,
    681 F.2d 1295 (11th Cir. 1982) ...........................................................................12

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)......................................................................................................27

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.*,
   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)....................................................22

*Hurd v. Monsanto Co.*,
   164 F.R.D. 234 (S.D. Ind. 1995)....................................................................................27

*Ikonen v. Hartz Mountain Corp.*,
   122 F.R.D. 258 (S.D. Cal. 1988) ...................................................................................28

*In re Interco, Inc.*,
   137 B.R. 993 (Bankr. E.D. Mo. 1992)............................................................................30

*In re Jamesway Corp.*,
   No. 95 B 44821 (JLG), 1997 WL 327105
   (Bankr. S.D.N.Y. June 12, 1997).......................................................................10, 16, 18

*In re Johns-Manville Corp.*, 45 B.R. 823 (S.D.N.Y. 1984)........................................................31

*In re Kaiser Group Int'l, Inc.*,
   278 B.R. 58 (Bankr. D. Del. 2002) ...................................................................................9

*Kpadeh v. Emmanuel*,
   261 F.R.D. 687 (S.D. Fla. 2009).....................................................................................23

*Kurczi v. Eli Lilly & Co.*,
   160 F.R.D. 667 (N.D. Ohio 1995) ..................................................................................27

*In re Lane*,
   68 B.R. 609 (Bankr. D. Ha. 1986) ..................................................................................31

*Mace v. Van Ru Credit Corp.*,
   109 F.3d 338 (7th Cir. 1997) ..........................................................................................27

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)............................................................................................27

*In re Masonsite Corp. Hardboard Siding Prods. Liab. Litig.*,
   170 F.R.D. 417 (E.D. La. 1997)......................................................................................26

*In re Mazzeo*,
   131 F.3d 295 (2d Cir. 1997)............................................................................................30

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ............................................................... 19-22

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ............................................................................18

*In re Mortgage & Realty Trust*,
    125 B.R. 575 (Bankr. C.D. Cal. 1991) ..............................................................13

*In re Nova Real Estate Inv. Trust*,
    23 B.R. 62 (Bankr. E.D. Va. 1982) ...................................................................31

*In re Poole Funeral Chapel, Inc.*,
    63 B.R. 527 (Bankr. N.D. Ala. 1986) ...............................................................31

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    226 F.R.D. 456 (S.D.N.Y. 2005) .................................................................. 22-24

*Reid v. White Motor Corp.*,
    886 F.2d 1462 (6th Cir. 1989) *cert. denied*, 494 U.S. 1080 (1990) .......................8, 9, 12

*In re Ret. Builders, Inc.*,
    96 B.R. 390 (Bankr. S.D. Fla. 1988) .................................................................15

*In re Rhone-Poulec Rohrer Inc.*,
    51 F.3d 1293 (7th Cir.), *cert. denied*, 516 U.S. 867 (1995) ...............................26

*In re Sacred Heart Hosp.*,
    177 B.R. 16 (Bankr. E.D. Pa. 1995) ...............................................8, 10, 15, 16

*In re Seaman Furniture Co. of Union Square, Inc.*,
    160 B.R. 40 (S.D.N.Y. 1993) ............................................................................31

*In re S. Cinemas, Inc.*,
    256 B.R. 520 (Bankr. M.D. Fla. 2000) .............................................................30

*In re Standard Metals Corp.*,
    817 F.2d 625 (10th Cir. 1987), *reh'g granted*, 839 F.2d 1383
    (10th Cir. 1987), *cert. dismissed*, 488 U.S. 881 (1988) ...................................14

*Stephens v. Montgomery Ward*,
    193 Cal. App. 3d 411 (1st Dist. Ct. App. 1987) ..............................................28

*In re Thomson McKinnon Sec. Inc.*,
  133 B.R. 39 (Bankr. S.D.N.Y. 1991),
  *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992) ................................................................. 9, 10, 12, 15

*In re Thomson McKinnon Sec., Inc.*,
  143 B.R. 612 (Bankr. S.D.N.Y. 1992) ................................................................. 29, 31, 33

*In re Thomson McKinnon Sec., Inc.*,
  150 B.R. 98 (Bankr. S.D.N.Y. 1992) ................................................................. 11, 12

*In re Trebol Motors Distrib. Corp.*,
  220 B.R. 500 (B.A.P. 1st Cir. 1998) ................................................................. 15

*In re United Cos. Fin. Corp.*,
  277 B.R. 596 (Bankr. D. Del. 2002) ................................................................. 9

*In re White Farm Equip. Co.*,
  38 B.R. 718 (N.D. Ohio 1984) ................................................................. 31

*In re Windsor Plumbing Supply Co.*,
  170 B.R. 503 (Bankr. E.D.N.Y. 1994) ................................................................. 31

*In re Woodward & Lothrop Holdings, Inc.*,
  205 B.R. 365 (Bankr. S.D.N.Y. 1997) ................................................................. 8-14, 18, 29

*In re Zenith Labs., Inc.*,
  104 B.R. 659 (D.N.J. 1989) ................................................................. 12

## STATUTES, RULES, TREATISES

11 U.S.C. § 105 ................................................................. 31, 32

11 U.S.C. § 502 ................................................................. 1, 16, 29, 30, 32, 33

28 U.S.C. § 157 ................................................................. 4

28 U.S.C. § 1334 ................................................................. 4

28 U.S.C. § 1350 ................................................................. 5

Fed. R. Bankr. P. 2019 ................................................................. 1, 10-13

Fed. R. Bankr. 3001 ................................................................. 13

Fed. R. Bankr. 3003 ................................................................. 16

Fed. R. Bankr. 3007 .................................................................................................1

Fed. R. Bankr. 7001 .................................................................................................8

Fed. R. Bankr. 7023 ................................................................................ 8-10, 13, 18

Fed. R. Bankr. 9007 ...............................................................................................32

Fed. R. Bankr. 9014 ...................................................................................... 2, 8-11

Fed. R. Civ. P. 23 .................................................................................9, 11, 1, 19, 25, 27

Fed. R. Civ. P. 1015 ...............................................................................................32

*3 Newburg on Class Actions* (Class Actions Under the Bankruptcy Laws) § 20.01 ....................13

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") respectfully

represent:

### Relief Requested

1. The Debtors file this objection (the "**Objection**"), pursuant to section 502

of title 11, United States Code (the "**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and this Court's Order Pursuant to Section

502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for

Filing Proofs of Claim (Including Classes Under Bankruptcy Code Section 503(b)(9)) and

Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof (the "**Bar

Date Order**") [Docket No. 4079], establishing November 30, 2009 as the bar date for MLC and

certain of the Debtors (the "**Bar Date**").  Through this Objection, the Debtors seek entry of an

order disallowing and expunging Proofs of Claim Nos. 1206 and 7587 (collectively, the "**Botha

Putative Class Claims**") filed by Tozamile Botha, William Daniel Peters, Msitheli Wellington

Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka,

Mirriam Mzamo, Mncekeleli Henyn Simangentloko, and Hans Langford Phiri  (the "**Botha

Plaintiffs**") and Proof of Claim No. 10162 (the "**Balintulo Putative Class Claim**"), filed by

Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch, Elsie Gishi, Lesiba Kekana,

Archington Madondo, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni,

Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile Sikani (the "**Balintulo Plaintiffs**,"

and with the Botha Plaintiffs, the "**Plaintiffs**").[1]  Copies of the Botha Putative Class Claims and

the Balintulo Putative Class Claim (collectively, the "**Apartheid-Related Putative Class**

**Claims**") are annexed hereto as **Exhibits "A," "B," and "C."**

> 2.      Whether to permit a class claim to proceed lies within the sound discretion

of the bankruptcy court.  The Apartheid-Related Putative Class Claims should be disallowed in

their entirety because, *inter alia*, (i) the Plaintiffs have failed to satisfy the basic procedural

requirements of Bankruptcy Rules 9014 and 2019(a), (ii) the putative classes do not satisfy Rule

23 of the Federal Rules of Civil Procedure ("**Rule 23**"), and (iii) even if the putative classes did

satisfy Rule 23, the benefits that generally support class certification in civil litigation are not

realizable in these chapter 11 cases.  Specifically, the Apartheid-Related Putative Class Claims

do not satisfy Rule 23 because the Plaintiffs are neither typical of the putative classes nor

adequate class representatives, and because numerous issues of fact would predominate over any

common questions.  Indeed, the Honorable Denise Cote of this District has squarely held that

claims for mass crimes against humanity pursuant to the Alien Tort Claims Act asserted on a

class basis – in a case that was strikingly similar to the claims asserted here – are not proper.

Among other reasons, common issues of law and fact cannot predominate over individual issues

peculiar to individualized plaintiffs who allege a startlingly diverse range of injuries, including

extrajudicial killing, torture, and cruel, inhuman, and degrading treatment.

---

[1] It is unclear from the face of the Balintulo Putative Class Claim and the Botha Putative Class Claims whether such claims are asserted merely on behalf of the individual Balintulo Plaintiffs and Botha Plaintiffs, respectively, or if they are also asserted on behalf of all those similarly situated to the Balintulo Plaintiffs and Botha Plaintiffs. (*Compare* Balintulo Putative Class Claim at Rider (listing only individuals as creditors) *with id.* (attaching class action complaint); *compare* Botha Putative Class Claims at attached complaint (bearing caption that does not aver that plaintiffs bring claims on behalf of similarly situated individuals) *with id.* at Rider (listing as creditors certain individuals and a "class of black South African citizens (and heirs and beneficiaries) from 1973-94 who suffered injury as a result of defendants' violations of law of nations by their complicity with South African officials in violation of the law against nations").)  Regardless, for the reasons stated below, the Plaintiffs' claims should be expunged.

3.      Moreover, because the Debtors have provided notice to the members of the putative classes encompassed by the Apartheid-Related Putative Class Claims, it would be unfair and unnecessary to burden the Debtors' estates with the additional cost and associated delay of providing these potential claimants with a second opportunity to assert claims as class claimants.  Allowing the Apartheid-Related Putative Class Claims to proceed could drain the estates' limited resources if additional notice is required to be given by the Debtors to the putative class members, which would appear to consist of each and every black South African citizen.  But even worse, the confirmation of a plan of liquidation and the distribution of the Debtors' assets could be delayed while the Apartheid-Related Putative Class Claims are litigated and liquidated.  Such litigation and resultant delay would further deplete the  pool of assets available for distribution to the Debtors' creditors.  The Apartheid-Related Putative Class Claims should not delay this process.  Indeed, following the anticipated confirmation of the Debtors' plan of liquidation, the Debtors aim to quickly and efficiently distribute all of their remaining assets and wind down their estates in accordance therewith.

4.      Alternatively, if the Apartheid-Related Putative Class Claims are not disallowed in their entirety, they would have a hugely detrimental impact on the Debtors' ability to make distributions to creditors.  Accordingly, in the event that the Court finds it appropriate to permit part or all of the Apartheid-Related Putative Class Claims to proceed as class claims, the claims must be immediately estimated pursuant to section 502(c) of the Bankruptcy Code.  Thus, the Debtors request that an expedited procedure promptly be established to quickly estimate and liquidate such claims.

## Jurisdiction

5.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Relevant Facts and the Apartheid-Related Putative Class Claims

### A.        The Bar Date Order

6.        On September 16, 2009, this Court entered the Bar Date Order which,

among other things, established November 30, 2009 as the Bar Date and set forth procedures for

filing proofs of claim against MLC and certain of the other the Debtors.  The Bar Date Order

requires, among other things, that a proof of claim must "set forth with specificity" the legal and

factual basis for the alleged claim and include supporting documentation or an explanation as to

why such documentation is not available.  (Bar Date Order at 2.)

### B.        The Botha Putative Class Claims

7.        On August 29, 2009, the Botha Plaintiffs filed a proof of claim, and on

October 9, 2009, they filed a second virtually identical proof of claim.  (*Compare* Proof of Claim

No. 1206 (Ex. A) *with* Proof of Claim No. 7587 (Ex. B).)  The Botha Putative Class Claims were

not certified as class actions before June 1, 2009 (the "**Commencement Date**"), when each of

the Debtors commenced these chapter 11 cases, and they remain uncertified.  Further, the Botha

Plaintiffs have not sought class certification from this Court.  The Botha Putative Class Claims

each attach the same purported class action complaint (the "**Botha Complaint**"), originally filed

in the United States District Court of the Southern District of New York, 02 MDL NO. 1499,

which claims jurisdiction in the United States courts under the Alien Tort Claims Act,[2] and

alleges causes of action for (i) "apartheid as a crime against humanity" (*see* Botha Compl. at 47),

---

[2] 28 U.S.C. § 1350.  This provision is alternatively known as the Alien Tort Statute.

(ii) "extrajudicial killing" (*id.* at 49), (iii) "torture" (*id.* at 50), and (iv) "cruel, inhuman or

degrading treatment." (*Id.* at 50.)  These claims purportedly arise from the Debtors' alleged

participation in apartheid in South Africa, which led to the violation of the human rights of black

South Africans, such as the Debtors' production of military vehicles used by the "security forces

. . . in violating the human right of thousands of South Africans" (Botha Compl. ¶¶ 85-88);

retaliation "against employees with anti-apartheid views (*id.* ¶¶ 95-96); suppression of union

activity and collaboration "in the arrest of black GM employees" who were "arrested,

interrogated and tortured because of their union and anti-apartheid activities" (*id.* ¶¶ 89-94);

segregation of GM's work facilities (*id.* ¶¶ 97-99); and "purposeful attempt to evade

international sanctions." (*Id.* ¶ 100.)  The Botha Plaintiffs seek, through their complaint, *inter*

*alia*, (1) compensatory damages, "including general and special damages," (2) punitive damages,

(3) disgorgement of profits, and (4) costs of suit, including attorneys' fees.  (*Id.* ¶ 186.)  The

amount of the Botha Putative Class Claims are "TBD," as "[t]he amount of this claim is

contingent based upon pending litigation as outlined in the attached Complaint."  (Botha Putative

Class Claim at 1, Rider.)

> The Botha Plaintiffs seek this relief on behalf of a putative class of:
>
> [A]ll black South African citizens (and their heirs and
> beneficiaries) who during the period from 1973 to 1994 suffered
> injuries as a result of Defendants' violations of the law of nations
> by their complicity in such violations caused by South African
> state officials, employees or agents or by their actions in
> replicating the apartheid system in their own operations.

(Botha Compl. ¶ 149.)

C.      **The Balintulo Putative Class Claim**

8.      On October 14, 2009, the Balintulo Plaintiffs filed their proof of claim.

Like the Botha Putative Class Claims, the Balintulo Putative Class Claim was not certified as a

class action before the Commencement Date, it remains uncertified, and the Balintulo Plaintiffs

have not sought class certification from this Court.  The Balintulo Putative Class Claim attaches

a so-called "Corrected Second Amended Complaint" (the "**Balintulo Complaint**"), which

claims jurisdiction under the Alien Tort Claims Act, on behalf of four "distinct classes":

- The "**Extrajudicial Killing Class**," defined as "[a]ll persons who were the surviving personal representatives—including parents, spouses, children, siblings, and dependents—of persons who were subject to extrajudicial killing by South African security forces during the period from 1960 to 1994."  (Balintulo Complaint ¶ 36.)  The Balintulo Complaint alleges that the class representatives for this Extrajudicial Killing Class are Sakwe Balintulo, personal representative of Saba Balintulo, Mark Fransch, personal representative of Anton Fransch, and Archington Madondo, personal representative of Mandla Madono.  (*See id.*)

- The "**Torture Class**," defined as "[a]ll persons who were themselves subject to torture and rape by South African security forces during the period from 1960 to 1994."  (*Id.*)  The Balintulo Complaint alleges that the class representatives for this Torture Class are Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani.  (*See id.*)

- The "**Detention Class**," defined as "[a]ll persons who were themselves subject to prolonged unlawful detention by South African security forces during the period from 1960 to 1994."  (*Id.*)  The Balintulo Complaint alleges that the class representatives for this Detention Class are Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thankiwe Shezi, and Thobile Sikani.  (*See id.*)

- The "**Cruel Treatment Class**," defined as "[a]ll persons who were themselves subject to cruel, inhuman, and degrading treatment by South African security forces during the period from 1960 to 1994."  (*Id.*)  The Balintulo Complaint alleges that the class representatives for this Cruel Treatment Class are Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola,

Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile Sikani.  (*See id.*)[3]

9.    The Balintulo Complaint alleges two "counts" against the Debtors.  The first count, on behalf of all four putative classes, is "for the crime of apartheid," and alleges that the Debtors "provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that those activities constituted violations of international norms toward [the Balintulo Plaintiffs] and the classes."  (*See id.* ¶ 316.)  The Balintulo Plaintiffs further allege that the Debtors' "practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities," and that the Debtors "aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime, which committed the alleged crimes."  (*See id.* ¶¶ 317, 320.)

10.    The second count, on behalf of the Extrajudicial Killing Class only, is for "the crime of extrajudicial killing," and makes ***almost identical*** allegations as the first count.  (*See id.* ¶¶ 331-39.)  Specifically, the Balintulo Complaint alleges that the Debtors "provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that those activities constituted violations of international norms toward [the Balintulo Plaintiffs] and the class."  (*See id.* ¶ 334.)  The Balintulo Plaintiffs further allege that the Debtors' "practical assistance . . . to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities," and that the Debtors "aided

---

[3] The classes asserted in the Balintulo Complaint and the Botha Complaint are collectively referred to herein as the "**Putative Classes**."

and abetted, participated in a joint criminal enterprise with, were reckless in dealing with,

participated in a joint venture with, and/or ratified the actions of the Apartheid regime, which

committed the alleged crimes." (*See id.* ¶¶ 335, 338.)

11.    The Balintulo Plaintiffs seek, through their complaint, *inter alia*, (i) a

declaration that "Defendants knowingly and intentionally aided and abetted the commission of a

tort in violation of international law enforceable in this court as federal common law and the law

of nations," (ii) compensatory damages, (iii) punitive damages, and (iv) costs. (*Id.* at 87-88.)

Like the Botha Putative Class Claim, the amount of the Balintulo Putative Class Claim is

"TBD," as "[t]he amount of this claim is contingent based upon pending litigation as outlined in

the attached Complaint." (*See* Balintulo Putative Class Claim at Rider.)

<u>The Relief Requested Should Be Approved by the Court</u>

**I.    <u>Application of Bankruptcy Rule 7023 to a Class Proof of
Claim Is Discretionary and Should Be Denied in This Case</u>**

12.    There is no absolute right to file a class proof of claim under the

Bankruptcy Code. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 619 (Bankr.

S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009); *In re Sacred Heart Hosp.*, 177 B.R. 16, 22

(Bankr. E.D. Pa. 1995) (noting that class action device may be utilized in appropriate contexts,

but should be used sparingly). Application of Bankruptcy Rule 7023 to class proofs of claim[4]

---

[4] Part VII of the Bankruptcy Rules, which includes Bankruptcy Rule 7023, only applies to adversary proceedings.
*See* Fed. R. Bankr. P. 7001. Bankruptcy Rule 9014, however, adopts certain of the rules from Part VII for
application in contested matters. Bankruptcy Rule 7023 is not among them. *See* Fed. R. Bankr. P. 9014. Thus,
plaintiffs seeking the application of Bankruptcy Rule 7023 (and by implication, Rule 23) to a class proof of claim
are required to *move* under Bankruptcy Rule 9014 for a court to apply the rules in Part VII. Fed. R. Bankr. P. 9014;
*accord In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997) (stating that "[f]or a
Class Claim to proceed . . . the bankruptcy court must direct Rule 23 to apply"). *See, e.g., Reid v. White Motor
Corp.*, 886 F.2d 1462, 1470 (6th Cir. 1989) *cert. denied*, 494 U.S. 1080 (1990); *In re Charter Co.*, 876 F.2d 866,
876 (11th Cir. 1989), *cert. dismissed*, 496 U.S. 944 (1990) (holding that proof of claim filed on behalf of class of
claimants is valid, but that "does not mean that the appellants may proceed, without more, to represent a class in

lies within the **sound discretion** of the court.[5]  In determining whether to exercise discretion and

permit a class proof of claim, courts primarily look at (i) whether the class claimant moved to

extend the application of Rule 23 to its proof of claim; (ii) whether the benefits derived from the

use of the class claim device are consistent with the goals of bankruptcy; and (iii) whether the

claims which the proponent seeks to certify fulfill the requirements of Rule 23.  *See In re Bally*

*Total Fitness*, 402 B.R. at 620; *In re Woodward*, 205 B.R. at 369; *see also In re Ephedra Prods.*

*Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005) ("In exercising that discretion, the bankruptcy court

first decides under Rule 9014 whether or not to apply Rule 23, Fed.R.Civ.P., to a 'contested

matter,' *i.e.*, the purported class claim; if and only if the court decides to apply Rule 23, does it

then determine whether the requirements of Rule 23 are satisfied.").

13.    When evaluating these requirements, courts have considered a variety of

factors, including, *inter alia*:

- *whether claimants are in "compliance with the Bankruptcy procedures*
  *regulating the filing of class proofs of claim in a bankruptcy case,"*  *see, e.g.*,
  *In re Thomson*, 133 B.R. at 41 (disallowing class proof of claim where named
  plaintiff failed to file Rule 9014 motion requesting that Rule 7023 apply);

- *whether the debtor intends to liquidate*, *see In re Thomson*, 133 B.R. at 41
  (noting that context of a liquidating chapter 11 plan supports rejection of class
  proofs of claim);

---

their bankruptcy action.  Under the bankruptcy posture of this case, Bankruptcy Rule 7023 and class action
procedures are applied at the discretion of the bankruptcy judge.").

[5] *See, e.g.*, *In re Bally Total Fitness,* 402 B.R. at 620 ("[C]ourts may exercise their discretion to extend Rule 23 to
allow the filing of a class proof of claim."); *In re Thomson McKinnon Sec. Inc.*, 133 B.R. 39, 40 (Bankr. S.D.N.Y.
1991) (Bankruptcy Rule 7023 and Rule 23 "give the court substantial discretion to consider the benefits and costs of
class litigation") (citing *In re Am. Reserve Corp.*, 840 F.2d 487, 488 (7th Cir. 1988)), *aff'd*, 141 B.R. 31 (S.D.N.Y.
1992); *accord In re United Cos. Fin. Corp.*, 277 B.R. 596, 601 (Bankr. D. Del. 2002) ("Whether to certify a class
claim is within the discretion of the bankruptcy court."); *In re Kaiser Group Int'l, Inc.*, 278 B.R. 58, 62 (Bankr. D.
Del. 2002) (same); *Reid*, 886 F.2d at 1469-70 (stating that "Rule 9014 authorizes bankruptcy judges, within their
discretion, to invoke Rule 7023, and thereby Fed. R. Civ. P. 23, the class action rule, to 'any stage' in contested
matters, including, class proofs of claim."); *In re Charter Co.*, 876 F.2d at 876 ("[u]nder the bankruptcy posture of
this case Bankruptcy Rule 7023 and class action procedures are applied at the discretion of the bankruptcy judge.").

- ***whether or not a purported class was previously certified***, *see, e.g.*, *In re Bally Total Fitness*, 402 B.R. at 620 (refusing to allow class proof of claim where class was not certified pre-petition); *In re Sacred Heart Hosp.*, 177 B.R. at 23 (classes certified pre-petition are "best candidates" for class proof of claim);

- ***whether the class claim device will result in "increased efficiency, compensation to injured parties, and deterrence of future wrongdoing by the debtor,"*** *see In re Woodward*, 205 B.R. at 376 (emphasis added and internal citations omitted); *accord In re Thomson*, 133 B.R. at 40 ("Manifestly, the bankruptcy court's control of the debtor's affairs might make class certification unnecessary.");

- ***whether the entertainment of class claims would subject the administration of the bankruptcy case to undue delay***, *see, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5 ("[A] court sitting in bankruptcy may decline to apply Rule 23 if doing so would . . . 'gum up the works' of distributing the estate."); and

- ***whether or not adequate notice of the bar date was afforded to potential class members***, *see In re Jamesway Corp.*, No. 95 B 44821 (JLG), 1997 WL 327105, at *10 (Bankr. S.D.N.Y. June 12, 1997) (refusing to certify class where adequate notice of bar date was afforded to potential class members, and thus to certify class would be "unwarranted, unfair, and possibly violate the due process rights of other creditors") (internal quotations omitted).

14.    "If application of Bankruptcy Rule 7023 is rejected by the bankruptcy court in an exercise of discretion . . . the result will be that class claims will be denied and expunged." *In re Thomson*, 133 B.R. at 40-41.  As set forth below, the Court should exercise its discretion to reject the application of Bankruptcy Rule 7023 and to disallow the Apartheid-Related Putative Class Claims.

### A.    The Plaintiffs Failed to Comply with Bankruptcy Rules 9014 and 2019

15.    A plaintiff who seeks to bring a class proof of claim must comply with the applicable procedural requirements.  *See, e.g.*, *In re Am. Reserve Corp.*, 840 F.2d 487, 494 (7th Cir. 1988) (noting applicability of Bankruptcy Rule 9014 and its procedural requirements); *see In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 6-7 (same).  These procedural requirements are not complicated.  Because a claim "cannot be allowed as a class claim until the bankruptcy court

directs that Rule 23 apply," the putative class representative must file a motion with the

bankruptcy court requesting the application of Rule 23. *In re Woodward*, 205 B.R. at 368, 370

("Rule 23 does not say who must make a timely motion, but the duty ordinarily falls on the

proponent of the class action."). In addition, a purported agent or class representative is required

to file a verified statement of multiple creditor representation pursuant to Bankruptcy Rule 2019.

*See* Fed. R. Bankr. P. 2019.

   16. The requirement that a class claimant timely move under Bankruptcy Rule

9014 to incorporate Rule 23 is intended to protect a debtor's estate from undue delay of the

debtor's plan process. *See In re Thomson McKinnon Sec., Inc.*, 150 B.R. 98, 101 (Bankr.

S.D.N.Y. 1992). In *In re Woodward*, another case in which there was no pre-bankruptcy class

certification, the court stated that the class claim should be disallowed if the putative class

representative did not expeditiously move in the bankruptcy case for certification of its class

claim, as a lengthy certification battle could delay the administration and distribution of the

bankruptcy estate. *See In re Woodward*, 205 B.R. at 370; *see also In re Ephedra Prods. Liab.

Litig.*, 329 B.R. at 5 (disallowing class products liability claim because "it is simply too late in

the administration of this Chapter 11 case to ask the Court to apply Rule 23 to class proofs of

claim.").

   17. Here, almost a year after the Commencement Date and seven months after

the Bar Date, the Plaintiffs have not sought permission of the Court to file a class proof of claim,

or moved for certification of the classes. Moreover, the alleged classes arguably include a

majority of the citizens of a nation of significant size. As a result, if allowed to proceed, the

Apartheid-Related Putative Class Claims and the need to estimate and liquidate these

unliquidated claims would unduly delay the administration of the Debtors' estates and their

ability to consummate a plan of liquidation ("**Plan**") because the adjudication of the claims and

the attendant class-certification issues could take months.  Accordingly, this Court should

enforce these procedural requirements and disallow the Apartheid-Related Putative Class

Claims.  *See, e.g.*, *In re Woodward*, 205 B.R. at 369-71; *In re Thomson*, 150 B.R. at 100-01; *In re Thomson*, 133 B.R. at 41; *In re Zenith Labs., Inc.*, 104 B.R. 659, 664 (D.N.J. 1989); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 6-7.

18.    Further, Bankruptcy Rule 2019(a) requires purported agents representing

more than one creditor to file a verified statement setting forth the basis of that representative's

right to act for the represented creditors.  Among other things, the required verified statement

must list the name and address of the creditors, the nature and amount of the creditors' claims,

the agent's specific authority empowering him to act on behalf of the creditors, and the relevant

facts and circumstances surrounding the employment of the agent.  *See In re Elec. Theatre Rests. Corp.*, 57 B.R. 147, 148-49 (Bankr. N.D. Ohio 1986).

19.    Bankruptcy Rule 2019 is a "comprehensive regulation of representation in

. . . Chapter 11 reorganization cases."  Fed. R. Bankr. P. 2019 (Advisory Committee Note).

Accordingly, noncompliance with the Rule constitutes grounds for not recognizing a class proof

of claim.  *See Reid*, 886 F.2d at 1471 ("Failure to comply with Rule 2019 is cause for denial of

the proof of claim."); *In re Baldwin-United Corp.*, 52 B.R. 146, 148 (Bankr. S.D. Ohio 1985)

(ruling that claimants' failure to comply with Rule 2019(a) barred their ability to file class proof

of claim); *In re GAC Corp.*, 681 F.2d 1295, 1299 (11th Cir. 1982) (affirming disallowance of

class proof of claim filed on behalf of debtor's debenture holders where, among other things,

proposed class representative failed to comply with the predecessor of Rule 2019).

20.    Further, neither the Plaintiffs nor their counsel can qualify as an

authorized agent pursuant to Bankruptcy Rule 3001(b). Assuming *arguendo*, however, that the

Plaintiffs or their counsel could be considered authorized agents, both have failed to file a

verified statement to comply with the requirements of Bankruptcy Rule 2019(a). Accordingly,

the Court should not exercise discretion to apply Bankruptcy Rule 7023 to the Apartheid-Related

Putative Class Claims.

**B.    Allowing the Apartheid-Related Putative Class Claims to Proceed as Class
Actions Will Not Be Effective or Efficient**

21.    For a class action to proceed, "the benefits that generally support class

certification in civil litigation must be realizable in the bankruptcy case." *In re Woodward*, 205

B.R. at 369 (citing *In re Mortgage & Realty Trust*, 125 B.R. 575, 580 (Bankr. C.D. Cal. 1991)).

In this case, neither the purported classes nor the Court would benefit from recognizing the class

proofs of claim and allowing class actions to proceed.

22.    The Apartheid-Related Putative Class Claims do not provide for the most

effective or efficient means of determining the rights of the members of the Putative Classes.

First, a class proof of claim is not appropriate if individual issues of fact would predominate over

any questions common to the members of the putative class, as would be the case with the

Apartheid-Related Class Claims, as explained in further detail below.

23.    Second, in general, the Bankruptcy Code and Bankruptcy Rules can

provide the same benefits and serve the same purposes as class action procedures in normal civil

litigation. *See In re Woodward*, 205 B.R. at 376 ("a bankruptcy proceeding offers the same

procedural advantages as the class action because it concentrates all the disputes in one forum");

*3 Newburg on Class Actions*, Ch. 20 (Class Actions Under the Bankruptcy Laws) § 20.01 at 581

(commenting that "bankruptcy proceedings are already capable of handling group claims, which operate essentially as statutory class actions."); *see also In re Standard Metals Corp.*, 817 F.2d 625, 632 (10th Cir.), *reh'g granted*, 839 F.2d 1383 (10th Cir. 1987), *cert. dismissed*, 488 U.S. 881 (1988) ("The historical reason for allowing a class of individuals to join in filing a common suit is to avoid a multiplicity of suits in a variety of forums . . . But since the bankruptcy court has complete control over the bankrupt's estate, there really is little reason to fear multiple or repetitious litigation.") (internal quotations and citations omitted). Because "[a] bankruptcy proceeding is equipped to resolve multiple claims against that estate," "[t]here is no need for the class to file as a class." *See In re Standard Metals Corp.*, 817 F.2d at 632.

24.    Third, the bankruptcy claims process is, in some respects, superior to class action procedures. As the court observed in *In re Woodward*:

> [W]hile the class action ordinarily provides compensation that cannot otherwise be achieved by aggregating small claims, the bankruptcy creditor can, with a minimum of effort, file a proof of claim and participate in distributions. In addition, there may be little economic justification to object to a modest claim, even where grounds exist. Hence, a creditor holding such a claim may not have to do anything more to prove his case or vindicate his rights.

205 B.R. at 376 (citations omitted). Here, notwithstanding the chance to do so, none of the members of the Putative Classes, save for the named Plaintiffs, filed a claim against the Debtors. As a result, there is no reason to believe that a significant number, if any, would file claims if given a *second* opportunity via the class action notice process. In any event, the Debtors should not be forced to pay for the costs of any additional notice.

25.    The fact that the Plan that is to be filed by the Debtors is a chapter 11 plan of liquidation lends further support for denying allowance of a class proof of claim in these

cases.  *See In re Thomson*, 133 B.R. at 41.  "The costs and delay associated with class actions are

not compatible with liquidation cases where the need for expeditious administration of assets is

paramount so that all creditors, including those not within the class, may receive a distribution as

soon as possible."  *Id.*  "Creditors who are not involved in class litigation should not have to wait

for the payment of their distributive liquidated share while the class action grinds on."  *Id.*  To

have a portion of the Debtors' estates be set aside, without knowing the identity or merit of the

claims held by the members of the Putative Classes, would result in extreme prejudice to the

Debtors' estates and would be unfair to other creditors.  All the Debtors' creditors should not be

forced to wait for payment of their distribution while the Apartheid-Related Putative Class

Claims are litigated and the estates' remaining assets are depleted, particularly where here each

class member's claim would be based on entirely individualized facts and circumstances giving

rise to the alleged injury.

        **C.**      **The Apartheid-Related Putative Class Claims Were Not Certified Prior to
the Commencement Date**

        26.      A number of courts have held that class proofs of claim may be

inappropriate where a class representative was not certified prepetition in a nonbankruptcy

forum.  *See, e.g.*, *In re Trebol Motors Distrib. Corp.*, 220 B.R. 500, 502 (B.A.P. 1st Cir. 1998);

*In re Sacred Heart Hosp.*, 177 B.R. at 23; *In re Ret. Builders, Inc.*, 96 B.R. 390, 391 (Bankr.

S.D. Fla. 1988); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5; *In re Bally Total Fitness*, 402

B.R. at 620.  The court in *Sacred Heart Hospital* held that use of the class proof of claim device

in bankruptcy cases may be appropriate in certain contexts, but "such contexts should be chosen

most sparingly."  *In re Sacred Heart Hosp.*, 177 B.R. at 22.  Specifically, the *Sacred Heart

Hospital* court noted that cases where (i) a class has been certified prepetition by a

nonbankruptcy court, or (ii) a class action has been filed and allowed to proceed as a class action

in a nonbankruptcy forum for a considerable time prepetition, may present appropriate contexts

for recognizing a class proof of claim.  *See id.*

27.    The Putative Classes in the Apartheid-Related Putative Class Claims were

not certified at the time of the Debtors' chapter 11 filing, and they remain uncertified today.

***Moreover, the Debtors have been unable to find a single bankruptcy case within the Second***

***Circuit in which a pre-certification class claim was allowed.***

### D.    Adequate Notice of the Bankruptcy Case and the Bar Date Was Provided to the Members of the Putative Classes

28.    One of the principal goals of the Bankruptcy Code is to ensure that

creditors of equal rank receive equal treatment in the distribution of a debtor's assets.  The

Bankruptcy Code and Bankruptcy Rules, therefore, require creditors to file proofs of claim

before a bar date.  *See* 11 U.S.C. § 502(b)(9); Fed. R. Bankr. P. 3003(c)(3).  Regardless of how

worthy their claims may be, claimants who fail to file before an applicable bar date "shall not be

treated as a creditor with respect to such claim for the purposes of voting and distribution."  Fed.

R. Bankr. P. 3003(c)(2).  These same procedural hurdles must be met by all creditors.

29.    In determining whether a class proof of claim should be allowed, courts

consider whether adequate notice of the bar date was afforded to potential class members.  *See In*

*re Jamesway Corp.*, 1997 WL 327105, at *8.  As that court stated:

> The proper inquiry is whether [the debtor] acted reasonably in
> selecting means likely to inform persons affected by the Bar Date
> and these chapter 11 proceedings, not whether each claimant
> actually received notice . . . [a]s to those plaintiffs who might not
> have received actual notice of the Bar Date, we find that by
> complying with the terms of the Bar Date Order, mailing a Claim
> Package to every known creditor and publishing notice of the Bar
> Date, [the Debtor's] actions satisfy due process."

*Id.* (internal citations omitted).

30.    In this case, the putative members in the Plaintiffs' proposed classes received proper notice of the Debtors' chapter 11 cases and the Bar Date in accordance with the provisions of the Bar Date Order.  At great expense to their estates, the Debtors published notice of the Bar Date internationally in *The Financial Times* (Worldwide Edition – distributed throughout South Africa), *The Wall Street Journal* (Global Edition – distributed throughout South Africa), *USA Today* (Monday through Thursday, distributed throughout South Africa), *The New York Times* (National), *Detroit Free Press, Detroit News, LeJournal de Montreal* (French), *Montreal Gazette* (English), *The Globe and Mail*, (National), and *The National Post*.  (*See* Bar Date Order at 7.)  Providing individual notice to all members of the Putative Classes would be impossible or, at minimum, prohibitively expensive, as the putative members of the Botha Putative Class Claims include a sub-set of "all black South Africans," (*see* Botha Compl. ¶ 149), and, as described in further detail below, it is not possible to identify the members of the Putative Classes in either the Botha Putative Class Claims or the Balintulo Putative Class Claim.

31.    Because the Debtors have provided notice by publication to the members of the Putative Classes encompassed by the Apartheid-Related Putative Class Claims, it would be unfair and unnecessary to burden the Debtors' estates with the additional cost and associated delay of providing these potential claimants with a second notice.  Moreover, the only type of notice the Debtors could reasonably provide these persons today would be another publication notice, effectively duplicating the notice they have already been provided and extending the Bar Date for a particular sub-group of general unsecured creditors who are not entitled to special treatment under the Bankruptcy Code.  Further, the members of the Putative Classes who failed to file proofs of claim could not be said to have relied on the filing of the Apartheid-Related

Putative Class Claims because the Putative Classes were not certified as of the Bar Date.  *See In re Jamesway Corp.*, 1997 WL 327105, at *10 (denying motion for class certification of class claim where "[n]o class was pre-certified such that purported class members who did not chose to file a proof of claim should or could have had any reasonable expectation that they need not comply with the Bar Date Order").  Since not a single such member of the Putative Classes filed an individual claim prior to the Bar Date (save for the named Plaintiffs), it is highly unlikely that many, if any at all, would file claims if given a second opportunity, but the estate would suffer unnecessary costs of notice.

## II.    The Apartheid-Related Putative Class Claims Cannot Satisfy the Requirements of Rule 23

32.    Even if this Court were to permit the Botha Plaintiffs and the Balintulo Plaintiffs to file class claims, the Apartheid-Related Putative Class Claims would not satisfy Rule 23.  To proceed as class claims, the Apartheid-Related Putative Class Claims must also meet all four requirements of subsection (a) of Rule 23 as made applicable to bankruptcy cases by Bankruptcy Rule 7023.  *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). *See also In re Woodward*, 205 B.R. at 371.  Rule 23(a) provides:

(a)  One or more members of a class may sue or be sued as representative parties on behalf of all only if:

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law or fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

33.     In addition, to proceed as a class claim, the Apartheid-Related Putative

Class Claims must satisfy subsection (b)(3) of Rule 23, as the Apartheid-Related Putative Class

Claims seek monetary damages.  *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285,

290 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993).  For purposes of this objection, Rule

23(b)(3) provides in relevant part:

> the court finds that the questions of law or fact common to the
> members of the class predominate over any questions affecting
> only individual members, and that a class action is superior to
> other available methods for the fair and efficient adjudication of
> the controversy.

Fed. R. Civ. P. 23(b)(3).

34.     As set forth below, class treatment is inappropriate because the members

of the Putative Classes are not properly identifiable.  Further, numerous individual issues of fact

would predominate over any common questions, because the Plaintiffs are neither typical of

those in the Putative Classes nor adequate class representatives.  Moreover, class treatment is

neither efficient nor superior in these circumstances.  The Plaintiffs' claims raise a host of

individual issues of fact regarding the right to recovery of each member of the Putative Classes.

These individual issues would require "mini trials" as to each class member's right to relief, a

result that courts have repeatedly found requires denial of class certification.

**A.     The Members of the Putative Classes Are Not Properly Identifiable**

35.     Inherent in Rule 23 is the requirement that a proposed class be

"identifiable" or ascertainable.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*

*Litig.*, 209 F.R.D. 323, 336-37 (S.D.N.Y. 2002).  Class membership should be decided on

"objective criteria that are administratively feasible for the Court to rely on to determine whether

a particular individual is a member of the class."  *Fears v. Wilhelmina Model Agency, Inc.*, No.

02 Civ. 4911, 2003 WL 21659373, at *2 (S.D.N.Y. July 15, 2003) (citing *In re MTBE Prods.*

*Liab. Litig.*, 209 F.R.D. at 336)).  This requirement is not satisfied if a court must conduct a

merits inquiry merely to determine who is included in the proposed class.  For example, the

membership of a class defined as "all individuals harmed by defendants' negligence" would not

be ascertainable, because a court would need to determine if the defendant was negligent and

who was harmed by such negligence merely to identify the putative class members.  *See*

*Barasich v. Shell Pipeline Co., LP*, No. Civ. A. 05-4180, 2008 WL 6468611, at *4 (E.D. La.

June 19, 2008) (striking class allegations of class defined as "[a]ll commercial oystermen whose

oyster leases were contaminated by oil discharged during Hurricane Katrina due to the

negligence of defendants").  The class definitions in the Botha and the Balintulo Complaints

suffer from this precise defect.

36.    The proposed class alleged in the Botha Complaint consists of South

African citizens who "suffered injuries as a result of Defendants' violations of the law of nations

by their complicity in such violations caused by South African state officials . . . or by their

actions in replicating the apartheid system in their own internal operations."  (Botha Compl. ¶

149.)  Thus, to determine class membership, the Court would need to first determine whether the

Debtors violated the law of nations.[6]  This is precisely the type of merits inquiry that is

prohibited.  *See Barasich*, 2008 WL 6468611, at *4.

37.    The proposed classes in the Balintulo Complaint suffer from similar

problems.  The Balintulo Complaint sets out four class definitions — an "extrajudicial killing"

class; a "torture" class; a "detention" class; and a "cruel treatment" class.  (Balintulo Compl. ¶

---

[6] Of course, the inquiry would not stop there.  The Court would then need to determine, *inter alia*, the nature of each
class member's injury and the cause of the alleged injury.

36.)  These class definitions define each class in terms of the very alleged breaches of international law that they ultimately would have to prove in order to prevail; for example, that the "extrajudicial killing" class members each represent someone who was actually subject to an "extrajudicial killing," or that each "torture" class member was actually subject to "torture."

38.  Further, to determine class membership, the Court would be required to ascertain, among other things, (i) the actor who caused each injury to each member of the Putative Classes, (ii) the extent of the Debtors' alleged complicity, if any, in the alleged act resulting in the injury, and, (iii) at least as to the Botha Putative Class Claim, each putative class member's race.  The scope of this task is made stark by considering that the putative class periods span *thirty-four (34) years, from 1960 to 1994*, for the Balintulo Putative Class Claim, and *twenty-one (21) years, from 1973 to 1994,* for the Botha Putative Class Claim[7] and there are, by Plaintiffs' estimate, over 80,000 opponents of apartheid who were detained, (Balintulo Compl. ¶ 37), over 12,000 civilian deaths caused by the South African security forces, (*id.*), over 20,000 civilian injuries caused by the South African security forces,  and, (*id.*), 16.5 million South Africans who were criminalized and harassed, (*id.* ¶ 57), four million people who were forcibly removed from their homes and land, (*id.*), and an estimated 12 million "Blacks [who] were unlawfully arrested and convicted" for violations of South Africa's laws requiring citizens to "produce a passbook on demand."  (*Id.* ¶ 63.)

39.  Accordingly, there are no "objective criteria that are administratively feasible for the Court to rely on to determine whether a particular individual is a member of the class."  *See In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 337, n.20; *Dunnigan v. Metro. Life*

---

[7] *See* Balintulo Compl. ¶ 36 (alleging class period from 1960 to 1994); Botha Compl. ¶  149 (alleging class period from 1973 to 1994).

*Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003).  Thus, the members of the Putative Classes are

not properly ascertainable or identifiable under Rule 23, and the Apartheid-Related Putative

Class Claims should be disallowed.

### B.    Numerous Individual Issues Predominate Over Common Questions

40.    Further, individual issues predominate over common questions of fact or

law.  Plaintiffs essentially allege a mass tort.  *See Presbyterian Church of Sudan v. Talisman*

*Energy, Inc.*, 226 F.R.D. 456, 483 (S.D.N.Y. 2005) (holding claims brought under Alien Tort

Statute for crimes against humanity, extrajudicial killing, torture, rape, and other violations of

international law were analogous to mass tort litigation for purposes of class certification

determinations).  Because mass torts usually involve critical individualized issues, including

causation and damages, "the majority of courts refuse to certify mass tort actions brought

pursuant to Rule 23(b)(3)."  *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 349 (denying

certification of a class of residential well owners whose wells were fouled by MTBE), *citing*

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626-27 (3d Cir. 1996), *aff'd sub nom.*, *Amchem*

*Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997) (affirming decertification of an asbestos injury

class); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084-85 (6th Cir. 1996) (reversing certification

of penile implant liability claims); *Boughton v. Cotter Corp.*, 65 F 3d 823, 827-28 (10th Cir.

1995) (affirming denial of class certification in environmental tort action); *see also In re Agent*

*Orange Prod. Liab. Litig.*, 818 F.2d 145, 164-66 (2d Cir. 1987) (sharply criticizing use of class

action device in mass tort cases due to inherent problems of individualistic causation, resulting

inefficiency and adequacy), *cert. denied*, 484 U.S. 1004 (1988).

41.    In this regard, courts in this District considering whether to certify a class

in cases alleging claims similar to the Apartheid-Related Class Claims have refused to do so.

*See, e.g.*, *Talisman Energy*, 226 F.R.D. at 483 (denying class certification by former residents of

southern Sudan under Alien Tort Claims Act alleging genocide, crimes against humanity, and

other violations of international law); *see also Kpadeh v. Emmanuel*, 261 F.R.D. 687, 690-93

(S.D. Fla. 2009) (denying class certification for claims brought under Alien Tort Claims Act

where inquiries regarding torture and other abuses allegedly committed were necessarily fact and

case specific as to each plaintiff).  In *Talisman Energy*, current and former residents of southern

Sudan brought suit under the Alien Tort Statute against a Canadian energy company and the

government of Sudan, alleging that they were victims of extrajudicial killing, genocide, crimes

against humanity, torture, rape, and other violations of international law, resulting from the

defendants' collaboration to perpetrate ethnic cleansing against the plaintiffs for the purpose of

creating a secure buffer zone that facilitated the development of oil reserves in Sudan.  226

F.R.D. at 457.  The plaintiffs sought certification of a putative class of:

> All non-Muslim, African Sudanese inhabitants of blocks 1, 2 or 4 or Unity
> State as far south as Leer and areas within ten miles thereof at any time
> during the period January 1, 1997 to June 15, 2003, who were injured
> during that period by acts of the Sudanese military or allied militia
> constituting genocide, extra-judicial killing, enslavement, forced
> displacement, attacks on civilians constituting war crimes, confiscation
> and destruction of property, torture or rape.

*Id.* at 458.  The total number of people estimated to fall within the class definition was

from 114,000 to 250,000, and the claims involved hundreds of separate attacks.  *See id.* at

482.

      42.    In *Talisman*, the court denied class certification because the plaintiffs

would have to show with respect to each individual class member that the injuries for which they

are claiming damages were *actually caused* by the campaign of genocide and crimes against

humanity targeting non-Muslim African Sudanese; and, to do that, factual questions that were

individual to each attack would have to be determined.  *Id.* at 482.  Given the need for evidence

of proximate causation, and the allegations involving hundreds of thousands of class members,

hundreds of individual attacks, the massive geographic area involved, and the six-and-a-half year

time period, the court found that "the challenge of presenting that individualized proof on behalf

of thousands of class members, even if it were logically feasible, will quickly dominate the proof

regarding the common issues."  *Id.* at 482-84.

      43.     The parallels between the putative class in *Talisman* that Judge Cote

evaluated and the Putative Classes in the Apartheid-Related Putative Class Claims are plain.  In

both cases, (i) the proposed class definitions link class membership with the merits of plaintiffs'

claims; (ii) the alleged liability of the corporate defendant stems from the alleged activities of a

sovereign nation; (iii) the putative class period spans many years; and (iv) the allegations involve

hundreds (if not thousands or millions, in the case of the Apartheid-Related Putative Class

Claims) of individual attacks.  Here, too, each member of the Putative Classes would be required

to show that the act that caused the harm he or she is alleged to have suffered was the product of

the collaboration between the Debtors and the "Apartheid regime."  The impossibility of this task

is apparent in the face of a class consisting of "many thousands"[8] and perhaps millions of

individuals,[9] alleged to have been injured in separate instances, occurring at different times over

several decades and spread across the entire country of South Africa.

      44.     In *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd*,

303 F.3d 470 (2d Cir. 2002), Judge Rakoff expressed similar doubts under like circumstances.

---

[8] (*See* Botha Compl. ¶ 151 ("Plaintiffs believe there are many thousands of members of the class. . .").)

[9] (*See* Balintulo Compl. ¶ 37 ("The exact number and identities of all class members is [sic] not currently known, but Plaintiffs believe that each proposed class numbers in the thousands.").)

There, citizens of Peru and Ecuador brought suit under the Alien Tort Claims Act alleging that

Texaco polluted rain forests and rivers in connection with its oil operations.  In rejecting

plaintiffs' assertion that *forum non conveniens* dismissal was inappropriate because Ecuador

lacked a class action mechanism, the Court opined that:

> It seems doubtful . . . that the instant cases would qualify for class action
> status even if they were to remain in the United States . . .. It is  . . .
> obvious that the multiplicity of ways in which plaintiffs allege the
> Consortium's activities have directly or indirectly impacted various
> plaintiffs' interests, or will impact them in the future, renders it
> problematic whether questions of law or fact common to the members of
> the class predominate over questions affecting individual members.  Even
> the bare question of liability could not readily be handled as a class action,
> given the multiple causation issues raised by plaintiffs' claims of indirect
> injuries extending over hundreds of miles and dozens of years and
> affecting individual members of the classes . . . in a multitude of different
> ways.

*Id.* at 541.

45.     Each of these cases makes plain that, given the individualized proof

necessary to support each claim for each member of the Putative Classes that he or she was

harmed as a consequence of some action of the Apartheid regime aided and abetted by the

Debtors, common issues of law and fact will *not* predominate over individual issues peculiar to

individual plaintiffs.

### C.     The Plaintiffs Cannot Establish that a Class Action Is Superior to Other Available Methods for Fairly and Efficiently Adjudicating This Controversy

46.     In addition to the requirement that common questions of law or fact must

predominate over individual issues, the Plaintiffs must also establish "that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

R. Civ. P. 23(b)(3).  Given the vast number of individual variations of fact that would be

involved with allowing this case to proceed as a worldwide class action, the action would be

unmanageable as a single trial.  The issue of MLC's liability would have to be litigated in

thousands of trials which, even if logistically feasible, would violate the constitutional mandate

that "entitles parties to have fact issues decided by one jury, and prohibits a second jury from

reexamining those facts and issues."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir.

1996) (denying certification for lack of superiority); *see also In re Rhone-Poulec Rohrer Inc.*, 51

F.3d 1293, 1303 (7th Cir.), *cert. denied*, 516 U.S. 867 (1995) (same); *In re Masonite Corp.*

*Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 427 (E.D. La. 1997) (same).  Given that a

class action is not manageable in this case, it is not superior to other available methods for fairly

and efficiently adjudicating the controversy, and thus the Putative Classes cannot meet the

requirements of Rule 23.

        47.    Moreover, because the members of the Putative Classes overwhelmingly

live outside the United States, the Debtors are vulnerable to being haled into foreign courts by

individuals making claims mirroring those asserted here.  Even if subsequent putative plaintiffs

receive actual notice of this action and the opportunity to opt out of the class, foreign courts will

not enforce a class judgment of this Court, on the grounds that United States class action

procedures that bind putative class members who have not affirmatively manifested their consent

to be bound by the judgment of a United States court are inconsistent with their domestic

policies.  *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975) (directing

that foreign plaintiffs be dropped from class because England, Germany, Switzerland, Italy and

France would not recognize a U.S. judgment as binding on their citizens, even where citizens had

received actual notice of their opt-out right), *cert. denied sub nom. Bersch v. Arthur Andersen &*

*Co., I.O.S.*, 423 U.S. 1018 (1975); *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D.

454, 459 (S.D.N.Y. 1989) (denying class certification because, among other reasons, a British

court would not give effect to a U.S. judgment barring further litigation); *Ansari v. N.Y. Univ.*, 179 F.R.D 112, 117 (S.D.N.Y. 1998) (refusing to certify class where case law demonstrated that at least six prospective class members are residents of countries that would not give preclusive effect to a class action judgment).  In sum, any judgment that this Court ultimately would render will not prohibit all members of the Putative Classes from opting out and litigating their claims based on a timely-filed class claim or extra-territorial jurisdiction.  For this reason, the Apartheid-Related Putative Class Claims should be disallowed.

### D.    Neither "Commonality" Nor "Typicality" Can Be Established by the Plaintiffs

48.    To proceed as a class claim, Rule 23(a)(2) and Rule 23(a)(3) require that the putative class representatives also demonstrate "commonality" and "typicality."  To establish typicality, plaintiffs must show that they are situated similarly to other class members.[10]  The Court cannot "presume" that plaintiffs' claims are typical of other claims.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 160 (1982) ("actual, not presumed, conformance with Rule 23(a) remains, however, indispensable").

49.    The Plaintiffs' claims are not typical of those alleged on behalf of any of their respective Putative Classes.  As described above, due to the sheer number of the individual acts that purportedly caused the alleged injuries, there could be no "typical" plaintiff.  *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678 (N.D. Ohio 1995) (typicality defeated by need for individualized proof of causation); *Hurd v. Monsanto Co.*, 164 F.R.D. 234, 238 (S.D. Ind. 1995)

---

[10] *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (typicality "requires that the claims of the class representative be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each member makes similar arguments to prove the defendant's liability'") (quoting *In re Drexel*, 960 F.2d at 291); *see, e.g., Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997) ("The  typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class").

(typicality not met in proposed class action against manufacturer of PCB because no set of operative facts established liability and no single proximate cause analysis applied to all class members); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 263 (S.D. Cal. 1988) (differences in injury and individualized determinations of proximate cause defeated typicality in products liability action against manufacturer of allegedly poisonous flea and tick spray).

### E.    The Plaintiffs Are Not Adequate Representatives

50.    To establish that it will adequately represent the proposed class, the Plaintiffs also must have common interests with the unnamed members of the classes, and it must appear that the Plaintiffs will vigorously prosecute the interests of the classes through qualified counsel. *See, e.g.*, *Edwards v. McCormick*, 196 F.R.D. 487, 495 (S.D. Ohio 2000). Initially, without evidence of who actually would comprise the class, a court cannot evaluate whether the Plaintiffs have a common interest with the unnamed class members, and any determination of adequate representation would be purely speculative. *Id.* Furthermore, the required elements that the plaintiffs have "claims or defenses typical of the class" and that they can "adequately represent and protect the interests of other members of the class" are intertwined: "to be an adequate representative, plaintiff must show that his claims are typical of the claims of the class." *See, e.g.*, *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 669 (1993) (quoting *Stephens v. Montgomery Ward*, 193 Cal. App. 3d 411, 422 (1st Dist. Ct. App. 1987)). As described above, there can be no "typical" plaintiff and, thus, no adequate representative for any of the Putative Classes.

51.    Moreover, the burden to move expeditiously for class certification and recognition within a bankruptcy proceeding, in compliance with Rule 23(c)(1), falls on the class representative and "the class representative's failure to move for class certification is a strong

indication that he will not fairly and adequately represent the interests of the class." *In re Woodward*, 205 B.R. at 370.

52.     As the Apartheid-Related Putative Class Claims fail to meet the requirements of Rule 23, the Court should not allow them to proceed as class claims, and they should be disallowed.

**III.    Alternatively, If the Apartheid-Related Putative Class Claims Are Not Expunged, They Should Be Subject to an Immediate Estimation Proceeding**

**A.    Estimation of Claims**

53.     In the event that the Court finds it appropriate to permit the Apartheid-Related Putative Class Claims to proceed as class claims in whole or in part, the Debtors request an expedited procedure be established in this Court to quickly liquidate the thousands of unliquidated claims of the black South African citizens and an expedited hearing to estimate the Apartheid-Related Putative Class Claims pursuant to section 502(c) of the Bankruptcy Code.

54.     Section 502(c) of the Bankruptcy Code *mandates* the estimation of all contingent or unliquidated claims which, if otherwise fixed or liquidated, would unduly delay administration of a debtor's case. 11 U.S.C. § 502(c) ("There **shall** be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case…") (emphasis added); *see also In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993); *In re Thomson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992). The estimation process is an expedient method for setting the amount of a claim that may receive a distributive share from the estate. *In re Thomson*, 143 B.R. at 619 (citing *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135-37 (3d Cir. 1982); *In*

*re Interco, Inc.*, 137 B.R. 993, 995 (Bankr. E.D. Mo. 1992). Section 502(c) of the Bankruptcy

Code is designed to (1) avoid the need to await resolution of pending lawsuits to determine

issues of liability or the amount owed by means of anticipating and estimating the likely

outcomes of these actions, and (2) promote fair distribution to creditors through the realistic

assessment of uncertain claims. *See In re S. Cinemas, Inc.*, 256 B.R. 520, 533 (Bankr. M.D. Fla.

2000) (citing *In re Ford*, 967 F.2d 1047, 1053 (5th Cir.), *reh'g denied*, 974 F.2d 1337 (5th Cir.

1992)).

        55.     Bankruptcy Code section 502(c), thus, contains two requirements before a

bankruptcy court must proceed to estimate a claim: (1) the court must determine that the claim is

either contingent or unliquidated, and (2) the court must determine that the time necessary to fix

or liquidate the claim would unduly delay administration of the case. *In re Apex Oil Co.*, 107

B.R. 189, 193 (Bankr. E.D. Mo. 1989). Section 502(c)(1) is drafted in the disjunctive. *See* 11

U.S.C. § 502(c) ("There shall be estimated for purposes of allowance under this section – (1) any

contingent or unliquidated claim…") (emphasis added).[11] "'Liquidated' denotes the ability to

readily and precisely compute the amount due; the test is whether the amount 'is capable of

ascertainment by … a simple computation.'" *Id*. Congress deliberately included unliquidated

claims in the Bankruptcy Code's definition of a claim and made provision for their estimation to

permit the broadest possible relief in the bankruptcy court and to ensure that virtually all

obligations to pay money would be amenable to treatment in bankruptcy. *See In re CD Realty*

*Partners*, 205 B.R. 651, 655-56 (Bankr. D. Mass. 1997).

---

[11] Courts have defined contingent claims as claims where liability attaches and is dependent upon the happening of some future event. *See, e.g.*, *In re Mazzeo*, 131 F.3d 295, 300 (2d Cir. 1997) ("A claim is not contingent if it has come into existence and is capable of being enforced at the time the petition is filed.").

56.    Some courts simply assume that a trial will unduly delay administration of the case and proceed to estimate the creditors' unliquidated claims.  *See, e.g., In re Poole Funeral Chapel, Inc.*, 63 B.R. 527, 528-32 (Bankr. N.D. Ala. 1986).  Other courts examine the size and magnitude of a debtor's contingent and unliquidated claims to determine if a full trial on the claims would unduly delay the chapter 11 cases.  *See, e.g., In re Johns-Manville Corp.*, 45 B.R. 823, 826 (S.D.N.Y. 1984).  Other factors considered by courts include whether discovery in the underlying matter had commenced and the anticipated length of a trial process, including appeals.  *See In re Baldwin-United Corp.*, 55 B.R. 885, 888 (Bankr. S.D. Ohio 1985).

57.    A court may authorize the estimation and approximation of the allowed amount of a contingent or unliquidated claim using "whatever method is best suited to the circumstances" at issue and recognizing that absolute certainty is not possible.  *In re Thomson*, 143 B.R. at 619; *In re Brints Cotton Mktg.*, 737 F.2d at 1341.  Additionally, Section 105 of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 105.  Although a court is bound by the legal rules that govern the ultimate value of the claim, it has wide discretion in establishing the method to be used to arrive at an estimate of the value of a claim or claims.[12]    Whatever procedure the Court chooses to estimate a claim, it must be consistent with the policy underlying chapter 11 that the process be "accomplished quickly

---

[12] *In re Brints Cotton Mktg.*, 737 F.2d at 1341; *see, e.g., In re Windsor Plumbing Supply Co.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) (claim estimated based on review of the documents submitted); *In re Nova Real Estate Inv. Trust*, 23 B.R. 62 (Bankr. E.D. Va. 1982) (claim estimated based on review of pleadings, briefs, and a one-day hearing); *In re Baldwin-United Corp.*, 55 B.R. 885 (approximate $300 million claim estimated at zero in the context of summary trial); *In re Lane*, 68 B.R. 609, 612 (Bankr. D. Ha. 1986) ($5 million claim estimated at $550,000 solely on pleadings and briefs); *In re Seaman Furniture Co. of Union Square, Inc.*, 160 B.R. 40, 42 (S.D.N.Y. 1993) ($50 million claim estimated at $749.07 based on non-binding prepetition arbitration decision); *In re White Farm Equip. Co.*, 38 B.R. 718 (N.D. Ohio 1984) (products liability claim estimated by special master rather than jury).

and efficiently." *See Bittner*, 691 F.2d at 137 (citing 124 Cong. Rec. H. 11101- H. 11102 (daily ed. Sept. 28, 1978)).

**B.     The Apartheid-Related Putative Class Claims Must Be Estimated If the Claims Are Not Expunged**

58.     The Apartheid-Related Putative Class Claims are contingent and unliquidated because their value is not a matter of a simple computation.  As filed, the Apartheid-Related Putative Class Claims seek damages that are "TBD," meaning, apparently, "to be determined," and admit that the amounts of the claims are "contingent based on pending litigation as outlined in the attached complaint" (*see* Balintulo Class Claim at Rider; Botha Class Claim at 1, Rider), and the Debtors dispute the validity of the Apartheid-Related Putative Class Claims.[13]  Due to the potential magnitude of the Apartheid-Related Putative Class Claims, the Plan cannot be confirmed until the Apartheid-Related Putative Class Claims are liquidated. Liquidating the Apartheid-Related Putative Class Claims by methods other than estimation proceedings pursuant to section 502(c) of the Bankruptcy Code would undoubtedly severely delay administration of the Debtors' cases.

59.     Thus, unless the Apartheid-Related Putative Class Claims are disallowed in their entirety, estimation is mandatory.  Further, given the large number of potential Class Members, the Plaintiffs should be required to monetize their claims.

**Notice**

60.     Notice of this Motion has been provided to counsel for the Botha Plaintiffs and counsel for the Balintulo Plaintiffs and to the parties in interest in accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007

---

[13] The Debtors reserve all rights to object to the Apartheid-Related Class Claims on substantive and procedural grounds, including, but not limited to, their failure to state a claim for relief.

Establishing Notice and Case Management Procedures, dated April 29, 2010 [Docket No. 5670].

The Debtors submit that such notice is sufficient and no other or further notice need be provided.

       61.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

       WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
      May 21, 2010

           /s/ Joseph H. Smolinsky
           Harvey R. Miller
           Stephen Karotkin
           Joseph H. Smolinsky
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
MOTORS LIQUIDATION COMPANY, et al.,       :        09-50026 (REG)
     f/k/a General Motors Corp., et al.   :
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
----------------------------------------------------------------x
```

### ORDER GRANTING DEBTORS' OBJECTION
### TO PROOFS OF CLAIM NOS. 1206, 7587, AND 10162

Upon the Objection dated May 21, 2010, (the "**Objection**") to Proofs of Claim

Nos. 1206 and 7587 filed by Tozamile Botha, William Daniel Peters, Msitheli Wellington

Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka,

Mirriam Mzamo, Mncekeleli Henyn Simangentloko, and Hans Langford Phiri, and to Proof of

Claim No. 10162 filed by Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch,

Elsie Gishi, Lesiba Kekana, Archington Madondo, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile

Sikani (collectively, the "**Apartheid-Related Putative Class Claims**") of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to section 502(b) of title 11, United States Code (the

"**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and this Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim

(Including Claims under Bankruptcy Code Section 503(b)(9)), and Procedures Relating Thereto

and Approving the Form and Manner of Notice Thereof [Docket No. 4079], seeking entry of an

order disallowing and expunging claim numbers 1206, 7587, and 10162 because the adjudication

of the Apartheid-Related Putative Class Claims will confer no benefit outside of the bankruptcy

context and hinder the efficiency of the administration of the estate, the claims fail to comply

with Bankruptcy Rules 9014 and 2019 and Federal Rule of Civil Procedure 23, all as more fully

described in the Debtors' Objection; and due and proper notice of the Objection having been

provided, and it appearing that no other or further notice need be provided; and the Court having

found and determined that the relief sought in the Objection is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

forth in the Objection establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

> ORDERED that the relief requested in the Objection is granted as provided

herein; and it is further

> ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the

Apartheid-Related Putative Class Claims are disallowed and expunged in their entirety; and it is

further

> ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated:  New York, New York
        _____, 2010


                                        _____
                                        United States Bankruptcy Judge

## EXHIBIT A

## Botha Putative Class Claim
## Proof of Claim No. 1206

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>General Motors Company | Case Number<br>09-50026 |
|---|---|

NOTE  *This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

| Name of Creditor (the person or other entity to whom the debtor owes money or property)<br>Tozamile Botha, William Daniel Peters, Samuel Zoyisile Mali (continued on attached Rider) | ❒ Check this box to indicate that this claim amends a previously filed claim |
|---|---|
| Name and address where notices should be sent<br>Diane E Sammons, Esq<br>Nagel Rice, LLP<br>103 Eisenhower Parkway, Roseland, New Jersey 07068<br>Telephone number<br>(973) 618-0400 | Court Claim Number _____<br>(If known)<br><br>Filed on _____ |
| Name and address where payment should be sent (if different from above)<br><br>FILED - 01206<br>MOTORS LIQUIDATION COMPANY<br>F/K/A GENERAL MOTORS CORP<br>SDNY # 09-50026 (REG)<br>Telephone number | ❒ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars<br><br>❒ Check this box if you are the debtor or trustee in this case |

| 1  Amount of Claim as of Date Case Filed:        $   TBD* _____ | 5  Amount of Claim Entitled to Priority under 11 U.S.C §507(a)  If any portion of your claim falls in one of the following categories, check the box and state the amount |
|---|---|

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

❒ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

Specify the priority of the claim

❒ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

**2  Basis for Claim:** Violation of Alien Tort Statute
(See instruction #2 on reverse side )

**3  Last four digits of any number by which creditor identifies debtor:** MDL 1499 (SAS)

**3a  Debtor may have scheduled account as** _____
(See instruction #3a on reverse side )

❒ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4)

**4  Secured Claim** (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

**Nature of property or right of setoff**  ❒ Real Estate  ❒ Motor Vehicle  ❒ Other
Describe

**Value of Property $** _____  **Annual Interest Rate** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any $** _____  **Basis for perfection** _____

**Amount of Secured Claim: $** _____  **Amount Unsecured  $** _____

❒ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)

❒ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)

❒ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8)

❒ Other – Specify applicable paragraph of 11 U S C §507 (a)(__)

**Amount entitled to priority:**

$ _____

**6  Credits** The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7  Documents**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (*See instruction 7 and definition of "redacted" on reverse side* )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING  **See attached.**

If the documents are not available, please explain

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment*

| Date:<br>08/19/09 | **Signature.** The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any<br><br>*(signature)*    Diane E  Sammons, Esq | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim*  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

* The amount of this claim is contingent based upon pending litigation
as outlined in the attached Complaint.

# NAGEL RICE, LLP

### COUNSELLORS AT LAW

BRUCE H NAGEL*
JAY J RICE*
ROBERT H SOLOMON
BARRY M PACKIN
DIANE E SAMMONS○

HARRY A MARGOLIS
(1928-2002)

○MEMBER OF NJ & NY BARS

103 EISENHOWER PARKWAY
ROSELAND NEW JERSEY 07068
(973) 618-0400
FAX (973) 618-9194
www nagelrice com

119 MAPLE AVENUE
RED BANK NJ 07701
(732) 933-0900

**PLEASE REPLY TO**
**ROSELAND OFFICE**

230 PARK AVENUE
NEW YORK NY 10169
(212) 551-1465

COUNSEL
HERBERT I WALDMAN*○
WAYNE D GREENSTONE○
LORI I MAYER○
RANDEE M MATLOFF
ELLIOTT LOUIS PELL○
ANDREW L O CONNOR

GREG M KOHN○
MICHAEL R FELDMAN
SUSAN H BERLINER

*CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A CIVIL TRIAL ATTORNEY
○CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A CRIMINAL TRIAL ATTORNEY

August 19, 2009

**Via Federal Express**

The Garden City Group, Inc.
Motors Liquidation Company Claims Agent
P.O. Box 9386
Dublin, OH 43017-4286

      Re:   **Motors Liquidation f/k/a General Motors Chapter 11**
               **Case No. 09-50026**

Dear Sirs

      Enclosed please find my clients' Proof of Claim in the above-referenced matter.

               Very truly yours,

               *NAGEL RICE, LLP*

               Diane E. Sammons

DES jb
Enclosure
CC:   Paul Hoffman, Esq  (Via Email)

## Proof of Claim

### Rider

Name of Creditors (continued)·    Msitheli Wellington Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka, Mirriam Mzamo, Mncekeleli Henyn Simangentloko, Hans Langford Phiri, class of black South African citizens (and heirs and beneficiaries) from 1973-94 who suffered injury as a result of defendants' violations of law of nations by their complicity with South African officials in violation of the law against nations.



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

IN RE SOUTH AFRICAN
APARTHEID LITIGATION

---------------------------------------X

THIS DOCUMENT RELATES TO.

-----------------------------------------X

LUNGISILE NTSEBEZA,
MANTOA DOROTHY MOLEFI,
(individually and on behalf of her deceased
son);
MNCEKELELI HENYN
SIMANGENTLOKO,
TOZAMILE BOTHA;
MPUMELELO CILIBE,
WILLIAM DANIEL PETERS,
SAMUEL ZOYISILE MALI,
MSITHELI WELLINGTON
  NONYUKELA;
JAMES MICHAEL TAMBOER,
NOTHINI BETTY DYONASHE
(individually and on behalf of her deceased
son),
NONKULULEKO SYLVIA
NGCAKA, (individually and on behalf of
her deceased son);
HANS LANGFORD PHIRI;
MIRRIAM MZAMO, (individually and on
behalf of her deceased son),

        Plaintiffs,

  vs

DAIMLER AG, FORD MOTOR
COMPANY; BARCLAYS BANK PLC,
INTERNATIONAL BUSINESS
MACHINES CORPORATION;
GENERAL MOTORS CORPORATION;
and CORPORATE DOES NOS  1 – 100
and their predecessors, successors and/or
assigns,

        Defendants

-----------------------------------------X

02 MDL No. 1499 (JES)

RECEIVED
OCT 2 8 2008
U.S.D.C. S.D. N.Y.

CLASS ACTIONS

CIVIL ACTION # 03 Civ. 1024 (JES)
CIVIL ACTION # 02 Civ. 6218 (JES)
CIVIL ACTION # 02 Civ  4712 (JES)

**NTSEBEZA AND DIGWAMAJE
CONSOLIDATED AND AMENDED
COMPLAINT**

Plaintiffs, by and through their attorneys, bring this action on behalf of themselves and all others similarly situated  Plaintiffs hereby allege, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows·

## INTRODUCTION

1.     Plaintiffs bring this class action to vindicate violations of the law of nations as authorized by the Alien Tort Statute (ATS) on behalf of themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations

2.     Apartheid was an institutionalized regime of racial segregation and systematic oppression implemented in South Africa for the purpose of securing the white minority's hold on power over the country's government and wealth.  The international community universally condemned the apartheid system in South Africa and its systematic discrimination and brutality against blacks (used throughout to refer to black Africans, coloured and Indian individuals) which constituted violations of international law at all times material to the allegations in this complaint.

3     Apartheid, itself a crime against humanity, was enforced by means of international crimes and other violations of the law of nations, including prolonged arbitrary detention, forced exile, forced relocation, revocation of citizenship, forced and exploited black labor and extrajudicial killings, torture and other cruel treatment of opponents.  Exploitation of

1

labor was an essential aspect of the apartheid system. Black workers were denied access to certain classes of jobs and deprived of the right to organize and protest their conditions

4    This system would not have been possible without the active and on-going collaboration of private actors, like Defendants, in every sector of society  Indeed, apartheid's survival was dependent on the resources, products and expertise of foreign corporations

5.    Defendants did not merely do business in apartheid South Africa but rather acted directly or purposefully and/or knowingly provided substantial and/or practical assistance to and acted in concert with the South African government, especially its security forces, including police, military, intelligence, "Special Branch" personnel, all of whom were integral parts of the apartheid security state, in violating Plaintiffs' human rights and the human rights of other similarly situated victims of apartheid.  The apartheid system, supported by the military power of the state and many corporations, including Defendants, systematically discriminated and facilitated violent acts against blacks in violation of international law

6.    Defendants Barclays Bank PLC (Barclays), Ford Motor Company (Ford), General Motors Corporation (GM), Daimler AG (Daimler) and International Business Machines Corporation (IBM) (collectively "Defendants") committed human rights violations in South Africa during apartheid directly and/or were complicit in the human rights violations committed by the apartheid government [1]

7.    Defendant IBM actively implemented apartheid by purposefully and/or knowingly producing race-based identity documents used to: (1) strip Plaintiffs of their

---

[1] This *Ntsebeza* and *Digwamaje* consolidated and amended complaint include the claims made in *In re South Africa Apartheid Litigation, MDL Docket No 1499, Ntsebeza, et al v Citigroup, Inc et al*, Civ Action No 02-CV-4712 (JES) and *Ntsebeza, et al v Holcia, Ltd., et al*, Civ. Action No. 03 Div 1024 (JES); and *Digwamaje, et al v Bank of America Inc, et al*, Civ. Action No. 02-CV-6218 (JES)  Plaintiffs herein were members of the putative classes in those cases.

nationality and citizenship; (2) restrict their travel in and out of South Africa; and (3) facilitate discrimination and the geographic separation and segregation of the races into impoverished and isolated tribal areas known as homelands or "Bantustans "

8      In contravention of the principles of international law and United Nations Security Council sanctions, Defendant automobile companies Daimler, GM and Ford manufactured security force vehicles, in whole or in part, for the apartheid state  These included specialized vehicles, some of them armored, known by various names, including Hippos, Casspirs, Buffels, and UNIMOGs. Defendants thus assisted the state's security forces, which used these vehicles to suppress opposition to the apartheid system and to inflict widespread violence associated with the suppression of anti-apartheid protests protected under international law  The violent suppression inflicted grievous injuries against Plaintiffs and the classes they represent, including the extrajudicial killings of numerous civilians.

9.      Defendant automobile companies, Daimler, GM, and Ford also actively retaliated against employees, including Plaintiffs and the classes they represent, who participated in community organizations and unions that opposed apartheid or expressed anti-apartheid views and subjected them to dismissal, arrest, intimidation, detention, and torture in collaboration with the South African security forces.  In violation of international sanctions, these companies manufactured for the government and security forces military vehicles that were widely known to be used in suppressing the human rights of black South Africans as alleged in this complaint.

10      Defendant Barclays purposefully and/or knowingly participated in the promotion of apartheid's goal to separate the races geographically by systematically denying black employees and applicants, including Plaintiffs and the classes they represent, the opportunity to work in or transfer to offices in predominately white areas

3

11.    Defendants Daimler, GM and Ford directly violated the human rights of Plaintiffs and the classes they represent by creating their own internal system of apartheid imposing within Defendants' operations systematic discrimination against blacks, and ongoing, routine humiliation and assaults on their personal dignity by: 1) maintaining segregated facilities and a humiliating work environment for black employees, 2) grossly underpaying blacks for equal work; and 3) institutionalizing grossly unequal conditions of employment. These conditions actively and intentionally replicated in Defendants' operations the racial separation and white superiority at the heart of the apartheid system. Although some aspects of Defendants' operations were theoretically governed by apartheid laws, these Defendants engaged in these acts in an effort to support and actively participate in the apartheid system based on their own desire to profit from the system and their support of the apartheid government' ideology. In addition, Defendants imposed and maintained an internal apartheid system because of their active collaboration with agents of the security forces and other state officials for the purpose of suppressing anti-apartheid union and political activities and to maintain white minority rule in South Africa.

12.    The allegations brought here address claims exclusively between private persons and corporations and do not involve claims against or on behalf of the government of South Africa. The government of South Africa expressly reserved such claims to the courts during the Truth and Reconciliation process. Indeed, the Truth and Reconciliation Commission (TRC) Chairperson, Archbishop Desmond Tutu and other members of the TRC stated that:

> Litigation seeking individual compensation against multinational corporations for aiding and abetting the commission of gross human rights abuses during apartheid does not conflict, in any manner, with the policies of the South African government, or the goals of the South African people, as embodied in the TRC. To the contrary, such litigation is entirely consistent with these policies and with the findings of the TRC.

4

South Africa did not enact a general amnesty statute  No relief from civil or criminal liability

was enacted for those who did not apply for an obtain amnesty from the TRC.  None of the

Defendants in this action sought and obtained amnesty by the TRC

13     These victims of apartheid deserve to receive fair compensation for the atrocities

committed against them by Defendants for financial gain

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over this case under 28 U S C. § 1331 (Federal

Question Jurisdiction) and 28 U.S C  § 1350 (Alien Tort Statute)   All of Plaintiffs' claims for

relief arise under the law of nations

15.    Venue is proper under 28 U S C  § 1391(a) in this Court because the Defendant

corporations, their subsidiaries, affiliates, alter egos or agents are doing business in this district.

## PARTIES

### PLAINTIFFS

16     Plaintiff LUNGISILE NTSEBEZA is a South African citizen and a resident of

Cape Town, South Africa.  In 1973, when Ntsebeza first inquired about a position with Barclays

in Cape Town, he was told that because he was a Xhosa person (a "Bantu"), he could only apply

in the Eastern Cape (a predominately black area).  Thus, to obtain gainful employment with

Barclays, Ntsebeza was forced to work in the Eastern Cape in a Bantustan branch.  This hiring

practice, not mandated by law at the time, reinforced apartheid's goal of geographically

separating the races.  Thus, Ntsebeza and other Barclays employees were subjected to

employment practices that replicated the systematic exclusions, humiliation and degradation of

blacks in the apartheid system.

17.    Plaintiff TOZAMILE BOTHA is a South African citizen and a resident of Centurion, South Africa   He worked for Defendant Ford in Port Elizabeth from approximately 1978-1980 as a work-study technician.   After he became Chairman of the Port Elizabeth Black Civic Organization (PEBCO), an anti-apartheid community organization, Ford intimidated and retaliated against him solely because of his anti-apartheid activities and views, thus actively participating in and assisting the state's repression of anti-apartheid movements   Because of his political activities, Botha was arrested, detained, questioned and tortured by the security forces Eventually, Botha was forced into exile.   At Ford, Botha was subjected to apartheid practices within the Ford plant including segregation and exploitation of his labor as well as other discriminatory and humiliating treatment

18.    Plaintiff MPUMELELO CILIBE is a South African citizen and a resident of New Brighton near Port Elizabeth, South Africa.   Despite his qualifications for a higher position, because of his race, he was forced to accept a position as a laborer to gain employment at Defendant Ford, where he worked from 1974-1984.   During this period he was subjected to apartheid practices within the Ford plant including segregation and other blatantly discriminatory and humiliating treatment, including training less-qualified whites to be his superior.   As treasurer of a union with a strong anti-apartheid position, Cilibe was harassed and intimidated by Ford management and government forces.   He was also subjected to racial discrimination, including experiencing grossly inferior advancement opportunities and pay, as Ford effectively implemented its own system of apartheid within its plants

19.    Plaintiff WILLIAM DANIEL PETERS is a South African citizen and a resident of Bethelsdorp near Port Elizabeth, South Africa   He worked as a material handler and later as a checker for Defendant Ford from 1980-1985   As chairman of the National Automobile and

Allied Workers Union (NAAWU), a union with anti-apartheid positions, Peters was arrested,
interrogated and tortured by the security forces, including Special Branch, which pursued him
based upon information they had received from Ford regarding his anti-apartheid community and
union activities  He was also subjected to segregation, humiliation and racial discrimination and
grossly unequal pay, as Ford implemented its own system of apartheid within its plants.

20.     Plaintiff JAMES MICHAEL TAMBOER is a South African citizen and a resident
of Bethelsdorp near Port Elizabeth, South Africa  From 1977-1986, he worked for Defendant
GM as a laborer  Because of his activities in NAAWU and his anti-apartheid views and union
activities, Tamboer was arrested, interrogated, tortured and otherwise abused by security forces,
including Special Branch officers who collaborated with Defendant GM and had visited the GM
plant on multiple occasions  As a result, he sustained severe injuries including long-term brain
damage from the torture and other abuse.  At GM, Tamboer was subjected to apartheid practices
within the GM plant including segregation and exploitive labor practices as well as other
blatantly discriminatory and humiliating treatment.

21.     Plaintiff SAMUEL ZOYISILE MALI is a South African citizen and resident of
Kwamagxaki near Port Elizabeth, South Africa.  He worked for Defendant Ford from 1973-
1982, and for Defendant GM from 1982-1986.  After speaking with a Life Magazine reporter
and expressing anti-apartheid sentiments that were published, Mali was called in to speak with
his GM supervisors, who asked him about the article and his political opinions  When Mali
confirmed what he said to the reporter, GM retaliated against him for his anti-apartheid opinions,
effectively firing him by transferring him to a department that was being closed

22.     Plaintiff MSITHELI WELLINGTON NONYUKELA is a South African citizen
and a resident of Zwelitsha near King William's Town, South Africa.  He worked for Defendant

Daimler from 1983-1987, including as a security guard. While at Daimler, he was involved in

union activities, youth organizing and political activities which continued through the end of the

apartheid era. As a consequence of his union and political activities, Nonyukela was arrested,

detained, interrogated and tortured by the South African security forces, including Special

Branch, which acted upon information provided by Daimler in the course of its active

collaboration with South African security services. His union was identified with the anti-

apartheid struggle. Daimler's head of security and Nonyukela's manager played a role in at least

one Special Branch interrogation. At the session where Nonyukela was tortured, the manager

entered the interrogation room and threatened Nonyukela's dismissal from Daimler if he did not

cooperate with the Special Branch.

23      Plaintiff MANTOA DOROTHY MOLEFI brings a claim on behalf of herself and

the estate of her son, Hector Zolile Pieterson. Molefi is a South African citizen and a resident of

Soweto, South Africa. Hector Pieterson, a twelve-year-old schoolboy, was shot and killed by

South African security forces on June 16, 1976, during a protest led by schoolchildren. The

provision of vehicles for security forces manufactured by Ford, GM and/or Daimler provided

substantial and essential assistance to the security force's violent campaign to suppress peaceful

opposition to apartheid, and facilitated the extrajudicial killing of Pieterson and many others.

24      Plaintiff NOTHINI BETTY DYONASHE brings a claim on behalf of herself and

the estate of her deceased son, Vuyani Adonis. Dyonashe is a South African citizen and a

resident of Duncan Village near East London, South Africa. In August 1985, South African

security forces shot and killed her son, Vuyani Adonis. The thirteen-year-old school boy was

making an unannounced visit to see his mother in Duncan Village from Chalumn, where he

stayed with his grandmother and attended school. When he arrived from Chalumn, the home

8

was locked, forcing him to remain outside in the street  Security forces that had arrived in

vehicles supplied by one of the Defendants shot him without justification  The provision of

vehicles manufactured by Ford, GM and/or Daimler provided substantial and essential assistance

to the security forces as they conducted a violent campaign against the community, and

facilitated the extrajudicial killing of Adonis and many others.

25      Plaintiff NONKULULEKO SYLVIA NGCAKA brings a claim on behalf of

herself and the estate of her deceased son, Thembekile Ngcaka.  She is a South African citizen

and a resident of Duncan Village, South Africa.  In August 1985, South African security forces

shot Thembekile, a nine-year-old school boy who was playing outside with friends.  He was shot

by soldiers who fired from a military vehicle manufactured by Defendants Ford, Daimler and/or

GM.  After suffering from his wounds for approximately a year, he died from these injuries.  The

provision of vehicles manufactured by Ford, GM, and/or Daimler provided substantial and

essential assistance to the security forces as they conducted a violent campaign against the

community, and facilitated the extrajudicial killing of Thembekile and many others.

26      Plaintiff MIRRIAM MZAMO brings a claim on behalf of herself and the estate of

her deceased son, Bubele Mzamo.  She is a South African citizen and a resident of Duncan

Village near East London, South Africa.  In March 1986, South African security forces shot and

killed her son, Bubele Mzamo, a fifteen-year-old school boy while he was playing in the street.

He was shot from an armored security forces vehicle manufactured by Defendants Daimler,

Ford, and/or GM.  The provision of vehicles manufactured by Ford, GM, and/or Daimler

provided substantial and essential assistance to the security forces as they conducted a violent

campaign against the community, and facilitated the extrajudicial killing of Bubele and many

others

27.    Plaintiff MNCEKELELI HENYN SIMANGENTLOKO is a South African citizen and a resident of Jongilanga, Kuelerlig, South Africa. While participating in a peaceful march to commemorate International Youth Year in May 1985, in East London, Simangentloko was shot in the arm by security forces, suffering a severe injury that prevented him from working for 23 years. The security forces relied on vehicles manufactured, in whole or in part, by Defendant automobile companies, Ford, Daimler and/or GM, for transportation and protection These vehicles were essential to the security forces' violent suppression of the peaceful protesters.

28.    Plaintiff HANS LANGFORD PHIRI is a South African citizen and a resident of Mafikeng, South Africa As part of the apartheid government's campaign to create "independent countries" within South Africa, Phiri was stripped of his South African citizenship, which was replaced by Bophuthatswana citizenship His South African ID was declared invalid, and he was assigned a Bophuthatswana ID document The latter was produced using IBM machines and software designed to facilitate the government's illegal revocation of the citizenship of large numbers of black South African citizens As a result of this loss of citizenship, Phiri lost the benefits of South African citizenship.

**DEFENDANTS**

29    Defendant BARCLAYS BANK PLC (Barclays) is a banking entity with its headquarters at 1 Churchill Place, London, United Kingdom, and a principal place of business at 200 Park Avenue, New York, New York Barclays does business in the United States and within this jurisdiction through subsidiaries, affiliates and agents, including Barclays Capital Corporation At all times relevant to the facts alleged in this complaint, Barclays operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including Barclays National Bank of South Africa.

10

30    Defendant FORD MOTOR COMPANY (Ford) is an automobile company incorporated under the laws of Delaware with its headquarters at 1 American Road, Dearborn, Michigan Ford does business in the United States and within this jurisdiction through subsidiaries, affiliates and agents. Ford operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa.

31.    Defendant GENERAL MOTORS CORPORATION (GM) is an automobile company incorporated under the laws of Delaware with its headquarters at 300 Renaissance Center, Detroit, Michigan. GM does business in the United States and within this jurisdiction through subsidiaries, affiliates, alter egos and agents At all times relevant to the facts alleged in this complaint, GM operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including GM South Africa (Pty) Ltd

32.    Defendant DAIMLER AG (Daimler) is a publicly traded automobile corporation with its headquarters at 137 Mercedesstrasse, Stuttgart, Germany Daimler was formed and incorporated under the laws of the Federal Republic of Germany Daimler does business in the United States and within this jurisdiction, and elsewhere through subsidiaries, affiliates, alter egos and agents Daimler's U S headquarters are 1000 Chrysler Drive, Auburn Hills, Michigan. At all times relevant to the facts alleged in this complaint, Daimler operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including Daimler South Africa (Pty) Ltd.

33.    Defendant INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM) is an information technology company and manufacturer of computer systems, hardware, software, networking systems, hosting systems, and storage devices It was incorporated under the laws of New York with its headquarters at 1 New Orchard Road, Armonk, New York. IBM

11

does business in the United States and within this jurisdiction through subsidiaries, affiliates,

alter egos and agents   At all times relevant to the facts alleged in this complaint, IBM did

business in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in

South Africa, including IBM South Africa (Pty) Ltd and IBM South Africa Group Ltd

### GENERAL ALLEGATIONS

34.    At all relevant times, the Defendants' actions were part of a pattern and practice

of systematic and widespread attacks and human rights violations against the black population of

South Africa

35    At all relevant times, Defendants knew, or should have known, that their actions,

as alleged herein, provided assistance to the government of South Africa and its agents that had a

substantial effect on the perpetration of the human rights violations alleged in this complaint.

36.    The actions by Defendants described herein were inflicted under the color of law

or official authority or in a conspiracy or a joint criminal enterprise with government officials.

With respect to the internal replication of the apartheid system within their operations,

Defendants Daimler, Ford, GM and Barclays acted in concert with government officials to

suppress anti-apartheid union and political activities and to institutionalize white supremacy.

State officials insinuated themselves into the Defendants' operations to help ensure that apartheid

ideology and practices were maintained in the automobile Defendants' internal operations

37.    Defendants are responsible for Plaintiffs' injuries and the injuries of the Plaintiff

classes because· (1) they were directly responsible for the alleged human rights violations by

their own actions, (2) their agents committed these violations within the scope of their authority,

(3) their co-conspirators or co-participants in joint criminal enterprises committed such

violations, (4) they or their agents actively participated in such violations; and/or (5) they or their

12

agents aided and abetted such violations  Defendants worked jointly with state officials,

employees and agents in perpetuating apartheid and in committing the violations alleged herein.

The Defendants maintained control over their subsidiaries and agents in South Africa at all times

relevant to Plaintiffs' allegations and had knowledge of the human rights violations alleged

herein and the Defendants direct involvement or complicity in these violations  In particular,

Defendants maintained such control over the actions of its subsidiaries in South Africa that they

should be considered as alter egos, joint enterprises and/or as jointly controlled, and it would be

unfair to recognize their separate corporate existence vis-à-vis the claims made by Plaintiffs in

this complaint.

38    As a direct and proximate result of Defendants' actions, Plaintiffs or those they

represent suffered harm, including death, pain and suffering, personal injuries, lost wages and

opportunities, and extreme emotional distress and mental anguish and other injuries.

39    Equitable tolling applies to any of Plaintiffs' claims not within the applicable

statute of limitations because there was no practical, or safe or effective way for Plaintiffs to

bring these claims without risk of retaliation by the apartheid state prior to 1994.  In addition,

Defendants refusal to cooperate with the TRC and provide a full accounting of their connection

to the violations alleged in this complaint tolls the running of the statute of limitations with

respect to Plaintiffs' claims

40.    Although there is no exhaustion of domestic remedies requirement for ATS

claims, there were and are no effective domestic remedies for Plaintiffs to exhaust in South

Africa against these Defendants for these claims

13

## HISTORICAL CONTEXT

**A.**    **International Condemnation of the Apartheid System and Corporate Involvement**

41.    In 1950, shortly after the inception of the apartheid regime, the international community began to condemn the government and its policies as antithetical to the human rights and fundamental freedoms guaranteed by the United Nations Charter and international law.  The United Nations and many of its members, including the United States, took joint and separate action against the apartheid system.  This included restrictive arms embargoes as early as 1963 and various forms of economic sanctions

42.    International condemnation grew in the wake of the Sharpeville Massacre of March 21, 1960 when police killed 69 unarmed individuals, including women and children and those attempting to flee the scene   Several hundred were injured.

43    In 1970, the Security Council, in Resolution 282, condemned South Africa's continuing disregard for international law and reaffirmed its policy of withholding the supply of all vehicles and equipment to South African armed forces and paramilitary organizations

44    In 1977, UN Security Council Resolution 418 underscored the mandatory nature of the arms and military vehicle embargo, which applied to the provision of arms and related materials of all types

45.    Embargoes on providing vehicles and parts to the South African security forces remained in place at all times material to the allegations in this complaint.

46    Further condemnation came from the International Labour Organization (ILO) as early as 1953   That year, ILO's Ad Hoc Committee on Forced Labour described apartheid and its legislative system that created barriers for the black population as "a system of forced labor of significance to the national economy "

14

### B.    Grand Apartheid: Geographic Separation of the Races

47    "Grand Apartheid" was a broad scheme designed to prevent black South Africans from accessing political rights and land by uprooting and forcibly relocating millions to make South Africa a white-majority nation. The scheme culminated in four of the original ten tribal areas (or "Bantustans"), Bophuthatswana, Ciskei, Transkei, and Venda, becoming "independent countries" within South Africa between 1976 and 1981  No country, other than South Africa, recognized these territories as independent states, viewing them as transparent attempts to deny black South Africans the benefits of citizenship

48    A necessary feature of Grand Apartheid was the pass system, which enabled the apartheid regime to restrict and control the movement of black South Africans. Various pass documents were used to control the movement of black South Africans between the Bantustans and white South Africa.   Blacks with invalid pass documents were subject to arrest, imprisonment and/or banishment to the homeland territory assigned to them and their ethnic group.

### C.    Militarization of Apartheid in the 1970s and 1980s

49.    The student-led Soweto Uprising on June 16, 1976, to protest the required use of Afrikaans in schools led to violent suppression by the security forces. Women and children were shot and killed  The violence precipitated a wave of demonstrations throughout the country opposing apartheid  During a six month period, an estimated one thousand black South Africans were killed by security forces, and between ten and twenty thousand were arrested as demonstrations and boycotts touched urban areas throughout the country.

50.    In response, beginning in the late 1970s, the South African government implemented the "total strategy" to coordinate repressive measures in all fields—military,

psychological, economic, political, sociological, technological, diplomatic, ideological and cultural.    This strategy relied on extensive cooperation with the private sector, including Defendants, and led to widespread killings, detentions, and the suppression of any perceived dissent to the apartheid system

51    Some industries were also designated as National Key Points, and as such, there was a particularly close relationship between such corporations and South African security forces  Plaintiffs believe that Defendant automobile corporations were National Key Points.

### DEFENDANTS' PARTICIPATION IN APARTHEID

52.    As recognized by the TRC (Vol 4, Ch 2), "business played a central role in helping to design and implement apartheid policies," and apartheid depended on the active support and assistance of the corporate sector.  The corporate sector benefitted greatly because the system provided a perpetual supply of cheap, acquiescent black labor.  Both by destroying economic opportunities for blacks and by separating them from their families, Grand Apartheid made blacks dependent on white employers, including these Defendants.    Moreover, corporations seeking to exploit black workers could rely on the state and its security apparatus to silence protests by workers and their representatives

53.    In turn, many corporations, including Defendants, provided essential assistance to the apartheid state, beyond what was strictly required by law and practice, knowing that such assistance would lead directly to the violation of the human rights of black South Africans  For example, Defendants retaliated against members of unions and community organizations that opposed apartheid and they actively trained and promoted white employees with less qualifications and seniority than black employees.

16

## AUTOMOBILE DEFENDANTS' PARTICIPATION IN APARTHEID

54    Security forces, including the Special Branch, coordinated their suppression of anti-apartheid labor and political activities with key senior management personnel within Defendant automobile companies.    Coordination was particularly close between the human resource managers and/or senior security personnel at the plants and the security forces of the apartheid state    Human resource managers and senior security personnel at the Defendant automobile companies were often former or active military officers and/or members of the Broederbond.    The Broederbond ("association of brothers"), an elite and powerful Afrikaner organization in South Africa, was dedicated to preserving permanent white, and in particular, supremacy Afrikaner dominance in South Africa and espoused an ideology of radical racism that demanded the exclusion of blacks from white South Africa

### DEFENDANT DAIMLER'S PARTICIPATION IN APARTHEID

55    In 1954, Defendant Daimler opened an office in South Africa.    Beginning in 1958, Defendant Daimler, then known as Daimler-Benz AG, contracted with Car Distributors Assembly (CDA), a South African company, to produce Mercedes vehicles in South Africa.    In 1966, CDA became a wholly-owned subsidiary of United Car and Diesel Distributors (UCDD), a South African company.    In 1967, UCDD acquired a site in the West Bank area of East London, South Africa, and, at all relevant times, built Mercedes vehicles in the plant    In 1984, Defendant Daimler acquired majority ownership and control over UCDD, and then renamed the company Daimler South Africa (Pty) Ltd.    During all relevant times, Defendant Daimler purposefully and/or knowingly controlled and/or oversaw operations at the Mercedes plant located in the West Bank area of East London, South Africa.    Indeed, Daimler's management in Germany was involved in and aware of the activities material to the allegations in this complaint.

**A.    Daimler's Active Collaboration with the Apartheid Regime to Target Trade Union Leaders and Community Organizers**

56.    At all relevant times, South African security forces collaborated with Defendant Daimler's managers and personnel to suppress peaceful labor and anti-apartheid political activities

57.    While employed at Daimler, Plaintiff Nonyukela was subjected to arbitrary arrest, detention, torture and other cruel, inhuman and degrading treatment by the security forces acting in close collaboration with the management of Defendant Daimler.    Daimler management provided information about his anti-apartheid union activities to the security forces and facilitated his arrest, detention and ill-treatment in order to suppress those activities.  Daimler's head of security asked Plaintiff Nonyukela to spy on fellow employees, but he refused, other employees however did provide information to the head of security.

58    One particularly grave example of collaboration between Daimler management and the Special Branch occurred in East London in 1985    Special Branch officers tortured Plaintiff Nonyukela, and the head of Daimler security was involved in the interrogation.  Special Branch officers had detained Plaintiff Nonyukela and later taken him to Daimler premises, where Daimler's head of security accompanied them to get documents from Plaintiff Nonyukela's locker    Returning to the Special Branch station in East London, the officers placed a bag containing water over his head to simulate sensations of suffocation    The Special Branch officers questioned him about the location of other Daimler shop stewards who had allegedly left the country.  They said that his job was at risk if he did not comply with their demands.  Then, the head of security at Daimler entered the interrogation room where torture instruments, including the bag used to simulate suffocation, were plainly visible.  The Daimler head of security then restated the threat to Plaintiff Nonyukela's job if he did not provide the information

18

sought by the Special Branch  After Daimler's head of security left, Special Branch officers then

resumed torturing Plaintiff Nonyukela  That evening, they forced Plaintiff Nonyukela into a car,

where they further tortured him.  The Security Branch officials took Plaintiff Nonyukela to a

dam where they then threatened to kill him by dropping him off a cliff over the reservoir.  They

told him that no one would know of his murder because there would be no evidence

59    Security forces frequently questioned Plaintiff Nonyukela at his home and

elsewhere about union activities  Officers interrogated Nonyukela and his wife in their home,

and they attempted to intimidate him from engaging in union and anti-apartheid activities

Security forces also raided the homes of other Daimler employees, especially other union

leaders

60.    Plaintiff Nonyukela was a leading union member at Daimler in the mid 1980s.

On occasion, Plaintiff Nonyukela would take time to travel to undertake his union duties, and the

union would write to Daimler in advance to provide notice.  On at least one occasion, members

of senior Daimler management demanded information from the union and later from Plaintiff

Nonyukela in person about, *inter alia*, his travel plans. On this occasion, security forces detained

and interrogated Plaintiff Nonyukela about the trip.

61    Daimler's senior management, including those in human resources and the

security department, collaborated with state security forces, including members of the Special

Branch, with respect to Plaintiff Nonyukela and many other employees involved in union and

anti-apartheid activities  For example, during some Special Branch interrogations, questioners

would quote statements Plaintiff Nonyukela had made in closed meetings to senior Daimler

managers related to his union responsibilities.

62      Around 1987, prior to a planned trip by Plaintiff Nonyukela to Germany on union business, he was interrogated by Special Branch who warned him against speaking of work conditions in South Africa  Ignoring this warning, he spoke both about the conditions at Daimler, including the production of vehicles for the security forces, and about living in South Africa  Other shop stewards were shown a video of Nonyukela's statements and asked to disavow them but they refused

63      At other times in the 1980s, there were anti-apartheid union protests at the Daimler plants.  On at least one occasion, senior Daimler management armed and instructed a group of employees to ambush the union members inside the plant.  Special Branch members were nearby and observed without attempting to stop it  Many of the unarmed protestors sustained injuries  After one such ambush, Daimler retaliated against numerous injured union members and shop stewards, including Plaintiff Nonyukela, who had not been involved. Although eventually Daimler agreed to reinstate the other shop stewards, they refused to reinstate Plaintiff Nonyukela because of his union and political activities  Daimler claimed that he was too political to be employed at Daimler

**B.      Daimler's Production of Military Vehicles for the Apartheid Regime: Specialized Military Vehicles.**

64.      Daimler supported the apartheid regime through the provision of vehicles to the South African security forces.   At all relevant times, Defendant Daimler manufactured specialized vehicles, in whole or in part, for the South African security forces in its South African plants, including its East London plant  Such vehicles included heavy trucks, designed for military purposes and armored personnel carriers

65.      Daimler created paperwork that identified these vehicles as being intended for the South African security forces  Some vehicles were painted in the plant to meet security forces'

20

specifications   Officials from security forces, sometimes in uniform, visited the plants on a regular basis to inspect the vehicles.   At all relevant times, Defendant Daimler knew that its products would be used to violently suppress non-violent opponents of apartheid, including Plaintiffs and the classes they represent.   The use of Daimler's vehicles to violate human rights was widely known

66   Daimler's vehicles regularly patrolled the townships   Security forces used them to intimidate, suppress and control both strikers and anti-apartheid activities   The use of Daimler's vehicles by the security forces resulted in injuries and deaths to numerous South Africans   By at least the 1980s, Daimler employees had begun to express opposition to being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities   Daimler management responded by emphasizing that it was a duty of all South Africans to support the security forces.

67   At all relevant times, Daimler knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used Daimler vehicles in violating the human rights of black South Africans.

68   In June 1976, a student protest began in Soweto against the use of Afrikaans as the official language of instruction.   The protesting school children were met with a violent response by the security forces, who arrived in Soweto in vehicles produced for them by Defendants Ford, GM and/or Daimler.   Plaintiff Molefi's twelve-year-old son, Hector Pieterson, was shot and killed by the security forces

## C.   International Youth Year March

69   Plaintiff Simangentloko attended a march marking the launch of International Youth Year in May 1985.   The march proceeded from East London toward Duncan Village

21

When they approached the township, security forces were waiting for the marchers  The security forces stood in front of a line of military vehicles ready to fire and asked the marchers to disperse, but they did not  Then, the security forces opened fire without warning  Plaintiff Simangentloko and others had their arms up in surrender, but security forces still fired at them. Security forces shot Plaintiff Simangentloko in the arm, inflicting an injury which required surgery and the placement of an iron rod in his arm to hold the bones together.  He was unable to work for 23 years because of this injury, and he is still unable to lift heavy objects

## D.    The Duncan Village Massacre

70    In August 1985, the funeral of Mrs  Victoria Mxenge, a human rights attorney whose husband was a slain human rights lawyer, precipitated confrontations in Duncan Village The security forces' violent response to the anti-apartheid unrest lasted through the month of August and became known as the Duncan Village Massacre.  During that time, security forces shot and killed at least nineteen Duncan Village residents, and injured many more  The victims included children, including the sons of Plaintiffs Ngcaka and Dyonashe.

71.    In the early morning during one day of the Duncan Village Massacre, workers arrived at the Daimler plant in East London to find a notice posted saying that the plant was closed for the day.  At that time the road into Duncan Village was open.  During the massacre, entrances to the township were sealed off, and, security forces in vehicles manufactured by Defendants Daimler, Ford and/or GM, patrolled the area

72    At a mass burial service for the victims of the massacre held later in August, security forces once again opened fire on attendees resulting in additional injuries and death Security forces continued to perpetrate violence against Duncan Village residents at least through

1986    Security forces relied on military vehicles manufactured by Defendants Daimler, GM, and/or Ford for transport and protection throughout this time period.

73    In August 1985, Plaintiff Ngcaka's nine-year-old son, Thembekile Ngcaka, and his friends were playing with small toys outside his home in Duncan Village. Security forces shot Thembekile and his friends as they drove past them in heavily armored military vehicles Thembekile suffered numerous wounds to his stomach  Though he survived the initial shooting, Thembekile never fully recovered, and died approximately one year later from his wounds.

74.    During the same month, Plaintiff Dyonashe's thirteen-year-old son, Vuyani Adonis, arrived unexpectedly in Duncan Village at his mothers' home to obtain school supplies. At that time, armored military vehicles, manned by South African soldiers, were patrolling the village.  Security forces shot Adonis multiple times, and he staggered into a neighbor's house and collapsed. He died shortly thereafter from his wounds.

75    In March 1986, Plaintiff Mzamo's fifteen-year-old son, Bubele Mzamo, was playing in the street in Duncan Village when he was shot and killed by South African security forces.  He was shot from an armored vehicle manufactured, in whole or in part, by Defendants Daimler, Ford and/or GM.

76.    Others were shot while attempting to assist and transport the injured to obtain medical care

**E.    Daimler's Collaboration with Apartheid Security Forces**

77    South African security forces operated in coordination and conjunction with top Daimler managers and security personnel who were or had been high-ranking officials in the South African security forces.  At times, armed senior Daimler personnel would enter the plant in their security forces uniforms

23

78    South African security forces conducted armed patrols outside and inside Defendant Daimler's East London plant. The security forces coordinated these patrols with Defendant Daimler's security managers. South African security forces were at times stationed inside Defendant Daimler's East London plant at night.

79    White employees of Defendant Daimler, including the head of security, also served in the South African security forces and patrolled outside the plant in the townships surrounding East London in military vehicles as members of the security forces. At times, white employees would either leave or arrive at Daimler's plant wearing South African military uniforms

80    Workers protested against apartheid practices within the plants from the 1970s through the end of apartheid. On numerous occasions when strikes occurred, Daimler management called the security forces, who sometimes arrived within minutes of the initiation of the strike. They were often transported in vehicles produced by Defendants Daimler, Ford and/or GM, and were armed. Security forces beat union members. Dogs and tear gas were also used by the security forces to attack and subdue striking union members

**F.    Daimler's Active Replication of Apartheid within its Plants**

81.    Daimler took advantage of the apartheid system to engage in pervasive discrimination against black workers in order to maintain a constant supply of cheap labor. Defendant Daimler systematically discriminated against its black employees by maintaining segregated facilities, paying black employees vastly inferior wages and benefits for equal work, and promoting white employees more quickly and at a substantially faster rate than black South African employees

82.    Defendant Daimler forced black workers to use separate dining halls and toilets Black employees routinely trained unskilled or illiterate white employees who were then promoted above them  Defendant Daimler maintained a racially hostile work environment in which black workers were subjected to daily humiliation and degradation.  White employees and supervisors would refer to blacks using derogatory racial slurs, such as "dogs", "Kaffirs" and "coons"

83.    Defendant Daimler systematically treated its black workers in a grossly discriminatory manner in every area of its operations and in its black employees' terms and conditions of work, including salary, promotions, benefits, and human dignity  This systematic discrimination went beyond what was required by law and practice  Defendant Daimler's management in cooperation with government officials took advantage of apartheid law and practice to impose their own harsh brand of apartheid in Daimler's internal operations.

## DEFENDANT GM'S PARTICIPATION IN APARTHEID

84.    GM ran its South African operations through its agent, GM South Africa (Pty) Ltd (GM)  GM was incorporated in 1926 in South Africa  Senior management in South Africa included American personnel at all times material to Plaintiffs' allegations.

### A.    GM's Production of Military Vehicles

85.    GM's operations at its factory in Port Elizabeth included the assembly and marketing of vehicles for the government, including thousands annually to the security forces in the mid-1980s.  GM supported the apartheid regime with the provision of these vehicles  At all relevant times before GM divested, Defendant GM manufactured specialized vehicles, in whole or in part, for security forces in its South African plants.  Such vehicles included heavy trucks designed for military purposes and armored personnel carriers

86      GM created paperwork identifying these vehicles as intended for the South African security forces.   Some vehicles were painted in the plant to meet security forces' specifications   Officials from security forces, sometimes in uniform, visited GM's plants on a regular basis to inspect the vehicles   At all relevant times, Defendant GM knew that its products would be used to violently suppress non-violent opponents of apartheid, including Plaintiffs and the classes they represent.

87      GM's vehicles regularly patrolled the townships.   Security forces used them to intimidate, suppress and control both strikers and anti-apartheid activities   The use of GM's vehicles by the South African security forces resulted in injuries and deaths to numerous South Africans   Employees protested at being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities.   When this occurred, GM management stated that anyone who protested the production of such vehicles would be assumed to be members of the African National Congress (ANC), even without any other evidence, and that anyone who was an ANC member would be fired.

88      At all relevant times, GM knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used GM vehicles in violating the human rights of thousands of black South Africans.   For example, Defendant GM was well aware that its vehicles were used in the state violence at Soweto and Duncan Village and many other similar incidents, the paragraphs 68-76 are thus realleged herein

**B.      Suppression of Trade Unionism and Community Organizing**

89.      GM denied black employees their freedom to assemble and promoted the apartheid regime by relying on the South African security forces to harass and assault its black employees to prevent them from unionizing.   Even when black employees did unionize, GM

26

management prohibited salaried employees from participating in union activities that supported anti-apartheid political organizations. GM allowed security forces onto its premises to help suppress lawful union activities These security forces worked closely with GM management in suppressing union activities. They collaborated in the arrest of black GM employees who participated in union activity. GM human resources employees reported black GM employees involved with unions to the security forces, who in turn arrested certain GM employees at the GM facilities Employees were arrested, interrogated and tortured because of their union and anti-apartheid activities

90     Plaintiff Tamboer was a shop steward in NAAWU. He was required to inform GM when he left work for union activities He was arrested on numerous occasions as a result of providing such notification because of GM's collaboration with the government. For example, on one occasion in 1982 Tamboer was arrested and detained for weeks. During his detention he was interrogated and tortured because of his union's activities at GM. Tamboer was also interrogated about the NAAWU's relationship with MACWUSA, a separate union comprised largely of Xhosa workers. Special Branch officers who participated in the post-arrest interrogations and torture of Tamboer visited the GM plant on multiple occasions. Tamboer saw these individuals on GM's premises speaking to GM's head of personnel. On more than one occasion, GM managers summoned Tamboer and allowed Special Branch officers to question Tamboer about his union activities on GM premises.

91.     GM shared information about union leaders at its plants with the security forces, knowing that the security forces would detain and torture such leaders as a direct result. During interrogations, security forces regularly quoted statements made by Tamboer in discussions with GM management, sometimes verbatim.

27

92      Also in the mid-1980s, GM employees went on strike to demand their pensions before GM's planned divestment from South Africa    GM invited security forces into its premises, where they arrested workers and used dogs and whips to break up strikes.  Many of those arrested were interrogated and tortured to elicit information about their union and anti-apartheid activities.

93      Many members of the union leadership were fired as a result of the strike Plaintiff Tamboer was among those arrested because of his involvement in the strike as a shop steward for NAAWU.   He remained imprisoned for three to four months    During his imprisonment, Tamboer was repeatedly questioned by security forces about strike activity at GM   They choked him and bashed his head against a wall.  Security forces also kicked him in the ribs and stomped on his ankles as part of their torture techniques.   Tamboer suffered permanent brain damage and epilepsy as a result of injuries suffered during his arrest and imprisonment

94      On another occasion, after Tamboer spoke about poor working conditions at GM at a political meeting, security forces arrived at his mother's house, arrested him, and verbally assaulted his mother, declaring that she would never see her son again   She suffered a heart attack as a result of this shock.  Then, security forces took Tamboer in a Special Branch car and told him that he would be disappeared.  However, the officers were interrupted by an order to return to the station before they could carry out their threat.

95      GM also retaliated against employees with anti-apartheid views   For example, GM officials required that Plaintiff Mali accompany a reporter from Life Magazine around the Eastern Cape in 1985.  Mali complied and provided information on the effects of apartheid on black South Africans, as well as information about working conditions at GM.   When Life

28

Magazine published the article, GM management questioned Mali about his political beliefs and expressed their distaste for the ANC. Mali said that he agreed with the ANC's policies because they supported racial equality and fairness for all GM subsequently retaliated against Mali for the content of the article and his belief in equality by transferring him to a department that was in the process of being shut down As a result, Mali lost his job approximately one month later.

96    Senior management in GM included members of the Broederbond. When workers challenged the employment of these individuals, GM management ignored these complaints and accused the employees of being ANC members. Management warned them that they could not be members of groups such as PEBCO or join trade unions.

## C.    GM's Replication of Apartheid within its Plants

97    GM took advantage of the apartheid system to engage in pervasive discrimination and exploitation of black South African workers in order to maintain a constant supply of cheap labor GM violated the human rights of its black South African workers by cooperating with the apartheid regime in systematically and consistently segregating their work facilities, employing them at lower wages for the same work, offering them the lowest positions, and denying them promotions regardless of skill, training, or experience.

98.    GM segregated the facilities at its plants by race at least through 1985 These facilities included canteens and restrooms, GM designated the segregated facilities with signs for "Europeans" and "non-Europeans."

99.    GM consistently hired black South Africans for the lowest positions and refused to promote them On the line, laborer positions were generally filled only by blacks. Upper level positions – group leaders, foremen, general foremen and other "senior" positions – were overwhelmingly filled by white employees Defendant GM maintained systematic humiliating

and discriminatory practices in all of its employment practices toward blacks  Even though it implemented some changes in the 1980s and 1990s, at all times material to Plaintiffs' allegations, Defendant GM continued these practices going beyond what was required by law and practice.  Defendant GM's management, in cooperation with government officials, took advantage of apartheid law and practice to impose their own harsh brand of apartheid in GM's internal operations.

**D.    GM "Divestment"**

100.    As part of an effort to claim divestiture, around January 1, 1987, GM "sold" its operations to a group of investors headed by local management  This effort at "divestiture" was a scam. The local management included no blacks or persons of mixed race  As part of the deal, GM agreed to pay the subsidiary's creditors and likely agreed to delay payment on the sale for 18 months  The sale terms included a buy-back option.  When GM began divesting from South Africa, GM management told Plaintiffs Tamboer and Mali, as well as others that the company was "changing names only"  During the transfer period, GM management prohibited black employees from speaking with reporters.   GM was subsequently renamed Delta Motor Corporation.  GM licensed use of its trademark to Delta Motor Corporation and continued to sell its product through Delta Motor Corporation.  The boxes and all the parts supplied continued to include the GM logo  GM transferred one of its senior management employees, an American with many years of experience at GM, to run Delta.  He had been a GM vice president in the United States shortly before assuming his post as head of Delta  Delta refused to sign the Sullivan Principles,[2] although it stated that it would follow nondiscriminatory employments

---

[2] The Sullivan Principles were a voluntary code of corporate conduct developed by African-American preacher Robert Sullivan in 1977 to demand equal treatment for blacks employed by American companies operating in South Africa.

practices and exercise social responsibility   The new ownership also said that it would "not

preclude" sales to military and police   GM repurchased Delta in 1997   The "divestment"

program was a purposeful attempt to evade international sanctions and to allow the maintenance

of GM's system of internal apartheid

## DEFENDANT FORD'S PARTICIPATION IN APARTHEID

101.   Ford's South African operations were conducted through Ford Motor Co of

South Africa (Pty) Ltd (Ford South Africa)   Ford South Africa was formed in 1933   It was a

wholly-owned subsidiary of Ford Motor Company of Canada, Ltd ("Ford Canada"), which was

itself 76% owned by Ford U.S. Ford South Africa assembled Ford vehicles from parts obtained

locally as well as parts shipped from Ford Canada and Ford England.  These shipments were

intended in part to avoid U S  sanctions that did not permit supplying U S -made parts to South

Africa.

102.   Senior top management in Ford in South Africa included American personnel.

Senior management in Ford included members of the Broederbond   When workers challenged

the employment of these individuals, Ford management ignored these complaints.

103.   In 1985, Ford Motor Co  of South Africa (Pty) Ltd merged with Amcar Motor

Holding, the vehicles operations of Anglo American Corporation.  The resulting entity was

called South African Motor Corporation (SAMCOR)   As a result of the merger, Ford became a

minority owner of the new company, with roughly a 42% interest   At all relevant times, Ford

Motor Co  and SAMCOR acted as agents of Defendant Ford

## A.    Manufacture of Vehicles for Security Forces

104    In its South African plants, Defendant Ford manufactured specialized vehicles for

security forces, including large military trucks, armored vehicles and specialized sedans for the

Special Branch  Ford created paperwork identifying the vehicles as intended for security forces, some of which specifically identified the police or the military as the recipients  Some vehicles were painted in the plant to meet security forces' specifications  High-ranking officials from security forces, sometimes in uniform, visited Ford plants on a regular basis, consulted with Ford management and inspected the vehicles  At all relevant times, Defendant Ford knew that its products would be used to violently suppress blacks and opponents of apartheid, including Plaintiffs and the classes they represent  For example, Defendant Ford was well aware that its vehicles were used in the state violence such as at Soweto and Duncan Village and many other similar incidents; the paragraphs 68-76 are thus realleged herein

105    Ford employees, including Plaintiff Peters, raised concerns with Ford management about Ford's production of security forces' vehicles because they saw these vehicles in black communities on a regular basis. On more than one occasion, Ford management retaliated against black employees who questioned its involvement with the South African security forces, *inter alia*, by shortening the work shifts of black employees

**B.    Ford's Suppression of Anti-Apartheid Dissent**

106.    In October 1979, Plaintiff Botha became Chairman of the Port Elizabeth Black Civic Organization (PEBCO), an organization he helped launch  PEBCO was an anti-apartheid community organization seeking to improve the living conditions of township residents in and around Port Elizabeth  PEBCO received widespread media attention throughout South Africa at the time of its creation, as a result of which Plaintiff Botha was frequently referred to and quoted in newspapers throughout the country

107.    Shortly after PEBCO was launched, a white Ford supervisor called Plaintiff Botha into his office  The supervisor was holding a newspaper and stated that he, as well as the white

management and other white employees at the plant, were unhappy at the publicity about his work with PEBCO. Despite having a good work record, the supervisor told Plaintiff Botha that he was too political and could either continue working at Ford or go and serve his community by working with PEBCO When he refused to cease working with PEBCO, he was dismissed from his job at Ford Only after hundreds of workers at Ford went on strike to demand Botha's reinstatement was he allowed to return to work. During the strike over Botha's dismissal, several employees established a new committee to deal with labor issues, believing that registered unions had collaborated with Ford management.

108    Plaintiff Botha and others formed this committee, which later became known as the Metal and Allied Component Workers Union of South Africa (MACWUSA) Plaintiff Botha was Chair of MACWUSA's Executive Board Plaintiff Cilibe became treasurer of MACWUSA shortly after its formation Upon its founding, a senior manager in human resources, a member of the Broederbond, declared that Ford would not recognize MACWUSA as a multiracial union that was in line with the principles of the ANC Defendant Ford took action to suppress the multiracial union and its activities because of Ford's own desire to impose an apartheid-like system within its own workplace

109    Ford continued to deny black employees' full freedom to assemble and promoted the apartheid regime Ford called in the South African security forces to harass and assault its black employees to limit and prevent union organizing, especially unions seen as anti-apartheid. Ford's ongoing discriminatory policies prompted another strike soon after in 1979. Workers demanded that Ford comply with the Sullivan Principles' non-discriminatory provisions Defendant Ford had committed itself to the Sullivan Principles, which included guarantees to

33

ensure racial equality, equal pay for equal work and the removal of job reservations but it had flagrantly breached those principles

110    On the same evening the strike was settled, Plaintiff Botha was arrested and detained by the South African security forces    The security forces interrogated Botha about the strike at Ford and about who was behind the strike    During his detention, he was subjected to torture, including sleep deprivation, and other physical and mental abuse.

111    Upon his release, following several months of detention and abuse, the South African government placed Botha under a banning order, preventing him from working, attending university, meeting with more than one person at any time, or leaving the house between 6pm and 6am or on weekends or public holidays.    As a result of these restrictions imposed upon him by the banning order, he was driven into exile in Lesotho.

112    Along with Plaintiff Botha, other politically active workers, with good employment records, were dismissed in the early 1980s by Defendant Ford, some lost their work permits and had to return to the homelands as a result.    Even those who were not tortured or driven into exile during the 1979 strikes were severely discriminated against in their employment because of their union and anti-apartheid activities.

113.    There were other strikes at Ford in the early to mid-1980s to protest discrimination by Ford.    Security forces were called on some occasions.    During at least one strike security forces set vicious dogs on the workers    Other employees who participated in the 1979 strikes, as well as later strikes were harassed at home, arrested, detained and questioned about PEBCO or anti-apartheid activities.

114.    Union meetings were monitored by members of the Special Branch and/or police, as well as by informants who were in some instances Ford employees    After meetings, security

34

forces would arrive at the homes of union members, including Plaintiff Cilibe's, to question them about union and strike activities  For example, the officers who interrogated Cilibe in his home made clear that they knew Cilibe worked at Ford in an effort to intimidate him.

115.    Plaintiff Peters became the Chairman of NAAWU in the early 1980s at Ford.  On occasion, Plaintiff Peters would travel because of his duties as a union representative.  Ford received notice of his travel in advance  Ford collaborated with the Special Branch and informed its members of Peters' travel plans     As a result, members of the Special Branch detained Plaintiff Peters to question him about these union activities

116    During interrogations, the security forces attempted to intimidate and pressure Plaintiff Peters, as Chairman of NAAWU, to intervene with workers in order to prevent and end strike actions  When he refused to do so, he was threatened and tortured  When security forces interrogated Plaintiff Peters about his union activities, they regularly quoted statements he had made to Ford management in meetings he attended as part of his union responsibilities, sometimes verbatim.  This reflected the ongoing close cooperation between Ford and the government in suppressing black political activity of any kind.

117    On at least two occasions, Plaintiff Peters was subjected to a form of torture known as "the helicopter": his hands were handcuffed to his ankles, a broomstick was inserted between the wrists and ankles, and he was spun around violently  Some of his torturers were the same Special Branch officials he saw regularly inside the Ford plant speaking with Ford management  During interrogations at the Special Branch office, Plaintiff Peters observed on occasion the head of Ford security inside the building

118    Some members of Ford management were part of the Broederbond   They flaunted their comprehensive insider knowledge of upcoming security forces activities and

collaboration with security officers    At least one Ford manager who was a member of the Broederbond was informed as part of his Ford responsibilities about Plaintiff Peters' union travels.

119.    The head of Ford security often rode through black communities with Special Branch officers in Ford company vehicles as well as Special Branch cars.    Some of these officers, who were regularly inside the Ford plants speaking with Ford management, were involved in the torture and arbitrary detention of union leaders, including Plaintiffs Peters and Tamboer.  Ford facilitated the torture and arbitrary detention of its own workers.

120    On at least two occasions, Plaintiff Peters was interrogated on Ford premises with Ford's cooperation.  In addition to members of the Special Branch, sometimes Ford managers interrogated Peters during these sessions    Several human resources and industrial relations members of management participating in these joint Ford-Special Branch interrogations were also members of the Broederbond.

121.    Special Branch officers worked with Ford management to coordinate efforts to intimidate workers to not get involved in political or union activities    For example, on one occasion a union leader's brother who worked at Ford had been interrogated and detained overnight, and he was brought to a plant the following morning    Accompanied by Special Branch into the plant, he was paraded in handcuffs to deter workers from involvement in political or union activities

122    Members of the class, including Plaintiff Peters, were arrested, detained and tortured by South African security forces as a result of information provided to these forces by Defendant Ford    Ford employees also knew when black employees had been interrogated, even when that information was not public.

36

**C.    Ford's Internal Replication of Apartheid**

123    Ford continuously subjected its black workers to race-based discrimination and humiliation at its plants, such as segregated facilities, grossly unequal pay for equal work, and lack of opportunity for training and promotion    Plaintiffs Botha, Cilibe and Peters each experienced the severe discriminatory, humiliating and degrading internal apartheid system at Ford    These internal apartheid practices went beyond what was require by official apartheid laws and practices.

124    Facilities in Ford plants, including bathrooms, showers, changing rooms, kitchens and cafeterias, were strictly segregated.    In all respects, black employees were given vastly inferior conditions of employment.    This segregation was strictly enforced by Ford's management.

125    Ford maintained segregated and unequal facilities into the 1980s.  Ford engaged in exploitative practices against black workers beyond what was required by law.  For example, class members including Plaintiff Cilibe trained white employees with fewer qualifications, who soon became their superiors.  White employees performing the same jobs as black employees were given a higher title in order to justify higher pay and benefits    Black employees, including Plaintiff Botha, who completed courses with distinction would not be promoted, when whites with poorer marks, or who were illiterate, would be.  This was done on a systematic basis and in a humiliating manner.

126    White workers, including storemen, would obtain three times or more pay for the same work    If black employees did gain a more senior position they were systematically paid much less than their white colleagues at the same level, regardless of ability or experience

These differences were maintained systematically and were based upon the same systematic degradation and humiliation of blacks at the core of apartheid ideology

127     While employed at Ford, Plaintiff Mali was denied promotions in favor of white employees with less education, although he applied to open vacancies. Mali's supervisors also intentionally frustrated his efforts to further his education and advancement. Black workers were systematically relocated to manual labor and other less desirable jobs

**D.      Ford "Divestment"**

128.    While Ford agreed to sell its interest in SAMCOR in 1987, it continued to supply SAMCOR with vehicles, components, management and technical assistance and continued to license the Ford trademark to SAMCOR. Ford transferred 57% of its stake to local employees and the remaining 43% of its stake to Anglo American Corporation. Ford also transferred tens of millions from the payment it received from the sale directly to SAMCOR. Thus, Ford effectively continued to exercise control over its agent, SAMCOR.

## DEFENDANT IBM'S PARTICIPATION IN APARTHEID

**A.      IBM's Active Participation in Maintaining the Apartheid System**

129.    IBM South Africa (Pty) Ltd was incorporated in 1952 in South Africa as a subsidiary of IBM. IBM's largest client in South Africa was the South African government, accounting for about one third of its sales there.

130     At all times relevant to Plaintiffs' allegations, Defendant IBM provided computer technology, systems, software, training and support to facilitate the apartheid governments' control of the majority black population. The maintenance of the complex apartheid system of population control organized by racial classification required sophisticated computer technology and knowledge of the kind provided by Defendant IBM

38

131    In particular, Defendant IBM supplied the technology, know how and support for a key identity document used in South Africa, known as the "Book of Life." Such documents contained, among other things, racial classification, name, sex, date of birth, residence, photos, marital status, driver license number, dates of travel/exit from and/or return to the country, place of work or study and finger prints  The Book of Life worked in conjunction with the influx control system by providing affirmative confirmation of racial classifications beyond simple black or white classifications  It thereby enabled the authorities to identify persons who were classified as Indian, coloured or otherwise, determine their rights in accordance with movement and labor controls, and execute any suppressive force deemed necessary.

**B.    IBM's Production of the Homeland Identity Documents to Facilitate Apartheid's Goals of Racial Separation and De-Naturalization**

132    Bophuthatswana was a designated homeland – essentially excluding blacks from white South Africa under apartheid.  It was accorded nominal independence, as a putatively sovereign state, in 1977

133.    Bophuthatswana established some of the indicia of statehood.  Among these were the capacity to have "citizens," a designation forced upon black South Africans of the Tswana tribe as part of the exercise of de-nationalization that was the basis of Grand Apartheid.  The Bophuthatswana government imposed identity documents and passports among the victims of de-nationalization, a process that was the ultimate culmination of the system of Grand Apartheid.

134.    For this purpose, the Bophuthatswana government used IBM computers and systems, including both hardware and software.  Bophuthatswana government employees working with IBM computers and systems were trained in an IBM-specific programming language  IBM ran training courses for government employees in Johannesburg and Bophuthatswana.  These courses also covered the IBM-specific programming language and the

39

proper use of IBM machines   Programmers who attended these courses were government employees   Some computer programs run by the Bophuthatswana government on IBM machines were developed and written in-house with the assistance of IBM employees.   When government employees encountered difficulty with their machines or with the programs, IBM employees would assist them in troubleshooting and repairing any problems

135   At least by 1978, IBM actively participated in creating a new ID book for the Bophuthatswana government by wholly developing a sub-system to produce the ID book.   IBM developed both the hardware and software – both a machine and a program – used to create the Bophuthatswana ID books   Once IBM had developed the system, it was transferred to the Bophuthatswana government for implementation   IBM employees trained Bophuthatswana employees to use the machine and program to produce ID documents   IBM was contacted when problems arose with the ID book system and IBM employees would attend to fix such problems. The IDs produced for the Bophuthatswana government contained the name, sex, racial classification, ethnic origin and residential address/postal address of the individual. Bophuthatswana residents were required to carry the IDs produced by the Bophuthatswana government with the active participation of IBM.

136.   Plaintiff Phiri suffered as a result of the South African government's campaign to create nominally "independent countries" within South Africa.   Phiri was stripped of his South African citizenship, which was replaced by Bophuthatswana citizenship.   Officials declared his South African ID invalid, and he was assigned a Bophuthatswana ID document.   IBM machines and software were used to produce the Bophuthatswana ID.   Black individuals, including Plaintiff Phiri, were told that they had to apply, or they would lose privileges, such as employment opportunities in Bophuthatswana   Many were forced to return their South African

40

IDs when they applied for the new Bophuthatswana ID. Individuals feared punishment, even jail, or the loss of existing employment if they did not get the new ID. As a result of his loss of citizenship, Plaintiff Phiri also lost the benefits of South African citizenship, including the right to live and work in his own country

137     Other homeland governments, including but not limited to Gazankulu, KwaZulu, Lebowa, Transkei and Venda, also used IBM hardware and software to produce ID documents

138     IBM also actively participated in developing the book-keeping and salary system used by the Bophuthatswana government for all employees, including the police and security forces

## C.     IBM Attempts to Conceal its Active Support of Apartheid

139.     Defendant IBM knew exactly how its substantial assistance to the apartheid government was used and how it facilitated the human rights violations alleged herein. Defendant IBM engaged in subterfuges to disguise its violations of international and U.S sanctions against South Africa so that it could continue to assist the apartheid regime and continue to profit greatly from that collaboration

140     After the U.S. Commerce Department banned the export of all U S -origin products to South African security forces, IBM circumvented that embargo by delivering products to South African security forces that were produced outside the United States, and therefore were not subject to the embargo. Given the widespread media coverage of atrocities committed by apartheid security forces in defense of apartheid, IBM knew that it was substantially assisting the South African government in committing massive human rights violations, as alleged in this complaint, against its people.

**D.      IBM "Divestment"**

141      In 1987, IBM "sold" its South African subsidiary to a company created for the benefit of white IBM South Africa employees.  However, IBM stated that it would provide a loan allowing local investors to buy the subsidiary.  IBM retained a buy-back option to the new company as a term of the sale   The new entity was run by the person who was the general manager of IBM South Africa prior to the sale   IBM continued to sell its products, parts and services through the new company and continued to be the top supplier of computers to South Africa after the "divestiture"   Around 1992, IBM purchased a 24% stake in the local distributor of IBM products.

**DEFENDANT BARCLAYS' PARTICIPATION IN APARTHEID**

142.      Barclays Bank of Britain purchased the National Bank of South Africa in 1924.  It subsequently ran its South Africa operations through this bank, which was renamed Barclays National Bank of South Africa, until it divested in late 1986 or early 1987.  Barclays National Bank of South Africa was a wholly-owned subsidiary of Barclays Bank of Britain until at least 1973   Barclays Bank of Britain subsequently reduced its holdings but remained a majority shareholder Barclays National Bank of South Africa until approximately August 1985.

**A.      Barclays' Enforcement of Grand Apartheid's Geographic Separation of the Races**

143      Defendant Barclays actively supported and perpetuated the forced geographic separation of the races which epitomized apartheid.  Black employees were routinely sent to work in branches in the Bantustans and were largely denied opportunities to work in, or transfer to, offices in major and predominantly white cities, like Cape Town and Johannesburg.

144      In 1973, Plaintiff Ntsebeza was in Cape Town (a predominately white area) with a student pass when he inquired about employment at a Barclays Bank branch in Cape Town

Ntsebeza was told that because he was a Xhosa-speaking person (a "Bantu") he should apply in the Eastern Cape (a predominately black area) and that his application would be sent to a Bantustan branch  As instructed, Ntsebeza applied in the Eastern Cape and was hired and then worked as a clerk for Barclays in Mthatha, in the Transkei Bantustan, from 1973-1974, initially in the savings department and subsequently in the ledgers department.

145    Defendant Barclays systematically denied training and advancement opportunities to black employees who were employed in white areas.  Defendant Barclays maintained segregated facilities in the major cities by staffing branches in black areas solely with black personnel  As a result of Barclays' internal replication of the apartheid system within its facilities, and its refusal to employ black South Africans in predominately white areas, Barclays facilitated the apartheid system and committed widespread systematic discrimination against its black employees and job applicants.  As a result of Barclays' active replication of the apartheid system at its facilities and in its employment practices, Plaintiff Ntsebeza suffered gross humiliation and degrading treatment

**B.    Barclays' "Divestment"**

146    In November 1986, Barclays announced that it was withdrawing from South Africa and selling its subsidiary, Barclays National Bank of South Africa, to a consortium of local mining and insurance companies that were minority owners at the time of the announced sale, including Anglo American, De Beers and Southern Life Association.

147.    At the time of the announced sale, Barclays South Africa employed approximately 25,000 people and had hundreds of branches throughout the country.  Its employees represented approximately 25% of all banking employees in the country and included more than 40% of all black banking employees in South Africa

43

148.    After the sale, Barclays continued to treat its former South African affiliate as a correspondent bank. Barclays had not repatriated the funds obtained for the sale of its shares in Barclays National Bank of South Africa as of at least March 1987

### CLASS ACTION ALLEGATIONS

149.    This action is brought and may properly be maintained as a class action pursuant to the provisions of Fed. R Civ. P 23 Plaintiffs bring this class action as authorized by the Alien Tort Statute (ATS) on behalf of themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of the law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations. Excluded from the class are Defendants, any entity in which Defendants have a controlling interest, and any of Defendants' subsidiaries, affiliates, officers or directors, or the families of any such officers or directors.

150.    Plaintiffs and class members were tortured, extrajudicially killed; stripped of their South African nationality and/or citizenship; suppressed and retaliated against for expressing anti-apartheid sentiments or beliefs or for participating in anti-apartheid organizations or movements; suppressed and retaliated against for their union activities, offered jobs conditioned on moving to another geographic region because of their race, and/or forced to work in an employment environment that replicated the apartheid system by the Defendants acting alone and/or in complicity with the apartheid state.

151.    The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable. Plaintiffs believe that there are many thousands of members

of the class as described above, although the number and identities of individual class members

are presently unknown and can be ascertained only through discovery

152.    There are questions of law and fact common to the class that predominate over

any questions affecting only individual class members.

153    Among the questions of law and fact common to the class are the following:

a.    Whether Defendants actively participated in extrajudicial killing of those who

opposed and/or protested against the South African apartheid state, or subjected

them to other forms of physical violence;

b.    Whether Defendants actively participated in the torture of those who opposed or

protested against the South African apartheid state or against working conditions

as members of union organizations;

c.    Whether the Defendants suppressed and retaliated against those who participated

in anti-apartheid political movements or union activities or expressed similar

views;

d.    Whether the Defendants implemented apartheid by facilitating or participating in

the geographic separation of the races;

e.    Whether Defendants implemented apartheid through de-nationalization,

f.    Whether Defendants internally replicated the system of apartheid in their offices

and/or plants; and

g.    Whether these actions against the class members were committed by the apartheid

state with the complicity of Defendants, either by aiding and abetting or engaging

in a conspiracy or joint criminal enterprise; or whether the actions were

committed directly by the Defendants themselves, or whether each Defendant and the state acted as the agent of the other.

154    Plaintiffs' claims are typical of the claims of the other members of the class, since all such claims arise out of Defendants' actions in actively providing support for the apartheid system and for the elimination of anti-apartheid employees or others and their activities in exploiting the apartheid system to replicate apartheid in their own internal operations   Plaintiffs have no interest antagonistic to the interests of the other members of the class

155.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel with extensive experience in the prosecution of human rights actions and class actions   Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class

156    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action

157.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

158    Although most class members are located in South Africa, this will not hamper the ability to pursue this case as a class action since communication with class members can be made with the assistance of various attorneys and non-governmental organizations operating in South Africa

46

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (APARTHEID AS A CRIME AGAINST HUMANITY)

### (AGAINST ALL DEFENDANTS)

159    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

160    All Plaintiffs, on behalf of themselves and the classes they represent, seek relief from crimes against humanity committed by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise or as agents or committed directly by the Defendants themselves

161.    The crimes against humanity for which Defendants are liable are acts which were knowingly committed as part of widespread or systematic attacks directed against a civilian population.

162.    The acts which form the basis of Defendants' liability for crimes against humanity include apartheid itself as well as murder, deportation or forcible transfer of population, revocation of nationality, imprisonment or other severe deprivation of physical liberty in violation of international law, torture, the persecution against any identifiable group or collectivity on political, racial, national, or ethnic grounds, and/or other inhumane acts of a similar character intentionally causing great suffering or serious injury to body or to mental or physical health

163.    Each single act constitutes a crime against humanity because it was committed within the context of widespread or systematic attacks against a civilian population.  In addition, apartheid itself has been long recognized as a crime against humanity.

164.   Plaintiffs and the members of the class or classes they represent suffered injuries as a result of Defendants' actions.

165.   The Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights   As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant.

## SECOND CLAIM FOR RELIEF

## (DENIAL OF THE RIGHT TO A NATIONALITY)

## (AGAINST DEFENDANT IBM)

166   The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

167   Plaintiff Phiri on behalf of himself and the class he represents seeks relief from the denial of the right to a nationality committed against him by the apartheid state with the complicity of Defendant IBM, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise   Defendant IBM conspired with state actors.   Defendant IBM and the state each acted as the agent of the other.

168.   Plaintiff Phiri and the class he represents were stripped of their South African nationality and citizenship, were restricted in their ability to travel in to, out of and around South Africa, and were discriminated against by being forcibly geographically separated and segregated into homelands on the basis of race

169   Plaintiff Phiri and the class he represents suffered injuries as a result of Defendant IBM's actions

170    Defendant IBM's actions were committed with knowing and callous disregard for Plaintiffs' rights  As a result, Plaintiffs are entitled to an award of punitive damages against Defendant IBM.

### THIRD CLAIM FOR RELIEF

### (EXTRAJUDICIAL KILLING)

### (AGAINST DEFENDANTS DAIMLER, FORD, AND GM)

171    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

172.    Plaintiffs Molefi, Ngcaka, Dyonashe and Mzamo on behalf of themselves and their murdered sons, Hector Pieterson, Thembekile Ngcaka, Vuyani Adonis, and Bubele Mzamo, and the classes they represent, seek relief from extrajudicial killings committed against them by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.  Each Defendant conspired with state actors.  Each Defendant and the state acted as the agent of the other

173.    These Plaintiffs and the class, or classes, they represent suffered injuries as a result of these Defendants' actions

174    These Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights.  As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant

## FOURTH CLAIM FOR RELIEF

### (TORTURE)

### (AGAINST DEFENDANTS DAIMLER, FORD, AND GM)

175   The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

176.   Plaintiffs Botha, Peters, Tamboer, Nonyukela, and Simangentloko, on behalf of themselves and the class, or classes, they represent, seek relief from torture committed against them by the apartheid state with the complicity of these Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.   Each Defendant conspired with state actors   Each Defendant and the state acted as the agent of the other.

177   The tortures described herein were inflicted deliberately and intentionally for purposes that included, among others, punishing the victims or intimidating the victim or third persons.

178.   Plaintiffs and the class, or classes, they represent suffered severe mental and physical injuries as a result of these Defendants' actions

179.   These Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights   As a result, Plaintiffs are entitled to an award of punitive damages against each of these Defendants.

## FIFTH CLAIM FOR RELIEF

### (CRUEL, INHUMAN OR DEGRADING TREATMENT)

### (AGAINST ALL DEFENDANTS)

180   The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

50

181.   All Plaintiffs and the class, or classes, they represent suffered injuries as a result of Defendants' actions that constitute cruel, inhuman or degrading treatment (CIDT).

182   The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

183.   The acts described herein constitute CIDT committed against the Plaintiffs by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise, or committed directly by the Defendants themselves Each Defendant conspired with state actors. Each Defendant and the state acted as the agent of the other

184   All Plaintiffs and the classes they represent suffered injuries as a result of Defendants' actions

185   The Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights. As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant

## PRAYER FOR RELIEF

186.   WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows

        i   for compensatory damages, including general and special damages;

        ii.  for punitive damages,

        iii  for disgorgement of profits,

        iv   for costs of suit, including attorneys fees, and

        v    for such other and further relief as the Court deems appropriate.

SCHONBRUN DESIMONE SEPLOW                NAGEL RICE, LLP
HARRIS & HOFFMAN

By: *Paul Hoffman* PH                    By: *Jay J. Rice* DES
   Paul L. Hoffman (PLH-9867)             Jay J. Rice (JJR-9171)
                                            Diane E Sammons (DES-9029)

723 Ocean Front Walk                     103 Eisenhower Parkway
Venice, California 90291                 Roseland, New Jersey 07068
(310) 396-0731                           (973) 618-0400
Attorneys for Plaintiffs                 Attorneys for Plaintiffs


Judith Brown Chomsky, Esq                Tyler R. Giannini, Esq.
Law Offices Of Judith Brown Chomsky      International Human Rights Clinic, Human
Post Office Box 29726                     Rights Program
Elkins Park, PA 19027                    Harvard Law School
 (215) 782-8367                          Pound Hall 401
Attorneys for Plaintiffs                 1563 Massachusetts Avenue
                                         Cambridge, MA 02138
                                         (617) 495-9362
                                         Attorneys for Plaintiffs


Helen I Zeldes, Esq
Zeldes & Haeggquist, LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
(619) 995-8218
Attorneys for Plaintiffs


52

Adv  Dumisa Buhle Ntsebeza, SC
Duma Nokwe Group of Advocates
Fountain Chambers
Cnr Gwen & Maude Streets
Sandown Village
Sandton 2196
 P O Box 784845
Sandton 2146
Republic of South Africa
Attorneys for Plaintiffs

John Sindiso Ngcebetsha
Gugulethu Oscar Madlanga
Ngcebetsha Madlanga Attorneys
Corner Maude & Fifth Street
Nelson Mandela Square
4th Floor, South Towers
PO Box 544
Randburg 2125
Republic of South Africa
Attorneys for Plaintiffs


Adv. Michael Francis Osborne*
512 Keerom Street Chambers
56 Keerom Street
8001 Cape Town
Republic of South Africa
Attorneys for Plaintiffs
*Attorney Admitted in New York, the
Southern District of New York and the High
Court of South Africa

Medi Mokuena
Mokuena Attorneys
268 Jubiliee Avenue, Extension 12
Halfway House
PO Box 8591
1685 Johannesburg
Republic of South Africa
Attorneys for Plaintiffs


Dated: October 27, 2008

**<u>EXHIBIT B</u>**

**<u>Botha Putative Class Claim</u>**
**<u>Proof of Claim No. 7587</u>**



| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

**Name of Debtor** (Check Only One)    Case No
☒ Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem Inc )    09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item # 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property)    TOZAMILE BOTHA  WILLIAM DANIEL PETERS *

Name and address where notices should be sent
TOZAMILE BOTHA  WILLIAM DANIEL PETERS
SAMUEL ZOYISILE MALI  ET AL
ATTN DIANE E SAMMONS ESQ
NAGEL RICE LLP
103 EISENHOWER PKWY
ROSELAND  NJ 07068-1031

Telephone number  **(973) 618-0400**
Email Address  **dsammons@nagelrice.com**

☐ Check this box to indicate that this claim amends a previously filed claim

**Court Claim Number** _____
(If known)

Filed on _____

Name and address where payment should be sent (if different from above)

**FILED - 07587
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)**

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above  you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount)  If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor you do not need to file this proof of claim form  EXCEPT AS FOLLOWS  If the amount shown is listed as DISPUTED  UNLIQUIDATED, or CONTINGENT  a proof of claim MUST be filed in order to receive any distribution in respect of your claim  If you have already filed a proof of claim in accordance with the attached instructions you need not file again

**1  Amount of Claim as of Date Case Filed, June 1, 2009**    $ __TBD*__

If all or part of your claim is secured, complete item 4 below, however, if all or part of your claim is unsecured, do not complete item 4  If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9), complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

**2  Basis for Claim**  Violation of Alien Tort Statute
(See instruction #2 on reverse side )

**3  Last four digits of any number by which creditor identifies debtor**  MDL-1499-(SAS)

**3a  Debtor may have scheduled account as** _____
(See instruction #3a on reverse side )

**4  Secured Claim** (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

**Nature of property or right of setoff**  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe

**Value of Property** $_____  **Annual Interest Rate** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any** $_____

**Basis for perfection** _____

**Amount of Secured Claim** $_____    **Amount Unsecured** $_____

**6  Credits**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7  Documents**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts  contracts  judgments  mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING
**See attached.**
If the documents are not available, please explain in an attachment

**5  Amount of Claim Entitled to Priority under 11 U S C § 507(a)**
If any  portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages  salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(__)

**Amount entitled to priority**
$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**Date** 1 5
10/5/09

**Signature**  The person filing this claim must sign it  Sign and print name and title  if any  of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney if any

Diane E. Sammons,

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim  Fine of up to $500 000 or imprisonment for up to 5 years or both  18 U S C §§ 152 and 3571*
Modified B10 (GCG) (12/08)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent The Garden City Group Inc. are not authorized and are not providing you with any legal advice.*

## A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL COMPLETED CLAIM FORM AS FOLLOWS: **IF BY MAIL** THE GARDEN CITY GROUP INC ATTN MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING PO BOX 9386 DUBLIN OH 43017-4286 **IF BY HAND OR OVERNIGHT COURIER** THE GARDEN CITY GROUP, INC ATTN MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING 5151 BLAZER PARKWAY SUITE A DUBLIN OH 43017 PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO THE UNITED STATES BANKRUPTCY COURT SDNY ONE BOWLING GREEN ROOM 534 NEW YORK NEW YORK 10004 **ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED**

## THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5 00 PM (PREVAILING EASTERN TIME)

**Court, Name of Debtor, and Case Number**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1 2009 You should select the debtor against which you are asserting your claim
**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR**

**Creditor's Name and Address**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**1  Amount of Claim as of Date Case Filed**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5 Check the box if interest or other charges are included in the claim

**2  Basis for Claim**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed personal injury/wrongful death car loan mortgage note and credit card. If the claim is based on the delivery of health care goods or services limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim

**3  Last Four Digits of Any Number by Which Creditor Identifies Debtor**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor if any

**3a  Debtor May Have Scheduled Account As**
Use this space to report a change in the creditor's name a transferred claim or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor

**4  Secured Claim**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured (See DEFINITIONS below.) State the type and the value of property that secures the claim attach copies of lien documentation and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing

**5  Amount of Claim Entitled to Priority Under 11 U S C § 507(a)**
If any portion of your claim falls in one or more of the listed categories check the appropriate box(es) and state the amount entitled to priority (See DEFINITIONS below.) A claim may be partly priority and partly non-priority. For example in some of the categories the law limits the amount entitled to priority

For claims pursuant to 11 U S C § 503(b)(9) indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1 2009, the date of commencement of these cases (See DEFINITIONS, below) Attach documentation supporting such claim

**6  Credits**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim the creditor gave the Debtor credit for any payments received toward the debt

**7  Documents**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services see instruction 2. Do not send original documents, as attachments may be destroyed after scanning

**Date and Signature**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title if any of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case
The Debtors in these Chapter 11 cases are

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS LLC | |
| (f/k/a Saturn LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc | |
| (f/k/a Chevrolet-Saturn of Harlem Inc ) | 09-1355R (REG) |

**Creditor**
A creditor is the person corporation or other entity owed a debt by the debtor on the date of the bankruptcy filing

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing See 11 U S C § 101(5) A claim may be secured or unsecured

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group Inc as described in the instructions above and in the Bar Date Notice

**Secured Claim Under 11 U S C § 506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be

paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff)

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien

**Claim Entitled to Priority Under 11 U S C § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security individual's

tax-identification, or financial account number all but the initials of a minor's name and only the year of any person's date of birth

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title financing statement or other document showing that the lien has been filed or recorded

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group Inc , please provide a self-addressed stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group Inc

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any sale of such claim is subject to FRBP 3001(e) any applicable provisions of the Bankruptcy Code (11 U S C § 101 et seq ) and any applicable orders of the bankruptcy court

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation com

_____ INFORMATION

# NAGEL RICE, LLP

### COUNSELLORS AT LAW

BRUCE H NAGEL*
JAY J RICE*
ROBERT H SOLOMON
BARRY M PACKIN
DIANE E SAMMONS◇

HARRY A MARGOLIS
(1928 2002)

◇MEMBER OF N J & N Y BARS

103 EISENHOWER PARKWAY
ROSELAND NEW JERSEY 07068
(973) 618-0400
FAX (973) 618-9194
www nagelrice com

119 MAPLE AVENUE
RED BANK NJ 07701
(732) 933 0900

**PLEASE REPLY TO**
**ROSELAND OFFICE**

230 PARK AVENUE
NEW YORK NY 10169
(212) 551 1465

COUNSEL

HERBERT I WALDMAN*◇
WAYNE D GREENSTONE◇
LORI I MAYER◇
RANDEE M MATLOFF
ELLIOTT LOUIS PELL◇
ANDREW L O CONNOR

GREG M KOHN◇
MICHAEL R FELDMAN
SUSAN H BERLINER

*CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A CIVIL TRIAL ATTORNEY
◇CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A CRIMINAL TRIAL ATTORNEY

October 6, 2009

## Via Federal Express

The Garden City Group, Inc
Attn  Motors Liquidation Company Claims Processing
5151 Blazer Parkway, Suite A
Dublin, OH 43017

> **Re:**    **Motors Liquidation f/k/a General Motors Chapter 11
> Case No. 09-50026**

Dear Sirs

    We are in receipt of your Proof of Claim form   Enclosed please find my clients' Proof of Claim in connection with the above-referenced matter

    Very truly yours,

    **NAGEL RICE, LLP**

    Diane E  Sammons

DES jb
Enclosure
CC    Paul Hoffman, Esq  (Via Email)

**Proof of Claim**

**Rider**

<u>Name of Creditors (continued)</u>    Msitheli Wellington Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka, Mirriam Mzamo, Mncekeleli Henyn Simangentloko, Hans Langford Phiri, class of black South African citizens (and heirs and beneficiaries) from 1973-94 who suffered injury as a result of defendants' violations of law of nations by their complicity with South African officials in violation of the law against nations

7    The amount of this claim is contingent based upon pending litigation as outlined in the attached Complaint.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ————————————————X | |
| IN RE SOUTH AFRICAN | 02 MDL No. 1499 (JES) |
| APARTHEID LITIGATION | |
| ————————————————X | |

THIS DOCUMENT RELATES TO.
--------------------------------------------X

| | | |
|---|---|---|
| LUNGISILE NTSEBEZA, | : | |
| MANTOA DOROTHY MOLEFI, | : | CLASS ACTIONS |
| (individually and on behalf of her deceased | · | |
| son); | . | |
| MNCEKELELI HENYN; | · | CIVIL ACTION # 03 Civ. 1024 (JES) |
| SIMANGENTLOKO; | . | CIVIL ACTION # 02 Civ. 6218 (JES) |
| TOZAMILE BOTHA; | . | CIVIL ACTION # 02 Civ  4712 (JES) |
| MPUMELELO CILIBE; | . | |
| WILLIAM DANIEL PETERS; | : | |
| SAMUEL ZOYISILE MALI; | : | |
| MSITHELI WELLINGTON | : | |
|   NONYUKELA; | · | **NTSEBEZA AND DIGWAMAJE** |
| JAMES MICHAEL TAMBOER; | · | **CONSOLIDATED AND AMENDED** |
| NOTHINI BETTY DYONASHE | : | **COMPLAINT** |
| (individually and on behalf of her deceased | : | |
| son), | : | |
| NONKULULEKO SYLVIA | : | |
| NGCAKA, (individually and on behalf of | : | |
| her deceased son); | : | |
| HANS LANGFORD PHIRI; | · | |
| MIRRIAM MZAMO, (individually and on | · | |
| behalf of her deceased son), | | |
| | : | |
|     Plaintiffs, | · | |
|   vs. | : | |
| | · | |
| | : | |
| DAIMLER AG, FORD MOTOR | : | |
| COMPANY; BARCLAYS BANK PLC, | · | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION; | : | |
| GENERAL MOTORS CORPORATION, | : | |
| and CORPORATE DOES NOS  1 – 100 | : | |
| and their predecessors, successors and/or | : | |
| assigns, | : | |
|     Defendants. | : | |
| --------------------------------------------X | | |

RECEIVED
OCT 2 8 2008
U.S.D.C. S.D. N.Y.

Plaintiffs, by and through their attorneys, bring this action on behalf of themselves and all others similarly situated. Plaintiffs hereby allege, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## INTRODUCTION

1.      Plaintiffs bring this class action to vindicate violations of the law of nations as authorized by the Alien Tort Statute (ATS) on behalf of themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations

2.      Apartheid was an institutionalized regime of racial segregation and systematic oppression implemented in South Africa for the purpose of securing the white minority's hold on power over the country's government and wealth. The international community universally condemned the apartheid system in South Africa and its systematic discrimination and brutality against blacks (used throughout to refer to black Africans, coloured and Indian individuals) which constituted violations of international law at all times material to the allegations in this complaint.

3.      Apartheid, itself a crime against humanity, was enforced by means of international crimes and other violations of the law of nations, including prolonged arbitrary detention, forced exile, forced relocation, revocation of citizenship, forced and exploited black labor and extrajudicial killings, torture and other cruel treatment of opponents  Exploitation of

1

labor was an essential aspect of the apartheid system Black workers were denied access to certain classes of jobs and deprived of the right to organize and protest their conditions

4       This system would not have been possible without the active and on-going collaboration of private actors, like Defendants, in every sector of society Indeed, apartheid's survival was dependent on the resources, products and expertise of foreign corporations.

5.      Defendants did not merely do business in apartheid South Africa but rather acted directly or purposefully and/or knowingly provided substantial and/or practical assistance to and acted in concert with the South African government, especially its security forces, including police, military, intelligence, "Special Branch" personnel, all of whom were integral parts of the apartheid security state, in violating Plaintiffs' human rights and the human rights of other similarly situated victims of apartheid The apartheid system, supported by the military power of the state and many corporations, including Defendants, systematically discriminated and facilitated violent acts against blacks in violation of international law

6.      Defendants Barclays Bank PLC (Barclays), Ford Motor Company (Ford), General Motors Corporation (GM), Daimler AG (Daimler) and International Business Machines Corporation (IBM) (collectively "Defendants") committed human rights violations in South Africa during apartheid directly and/or were complicit in the human rights violations committed by the apartheid government.[1]

7       Defendant IBM actively implemented apartheid by purposefully and/or knowingly producing race-based identity documents used to: (1) strip Plaintiffs of their

---

[1] This *Ntsebeza* and *Digwamaje* consolidated and amended complaint include the claims made in *In re South Africa Apartheid Litigation, MDL Docket No. 1499, Ntsebeza, et al v Citigroup, Inc et al*, Civ Action No 02-CV-4712 (JES) and *Ntsebeza, et al v Holcia, Ltd, et al.*, Civ. Action No. 03 Div 1024 (JES), and *Digwamaje, et al v Bank of America Inc, et al*, Civ. Action No 02-CV-6218 (JES) Plaintiffs herein were members of the putative classes in those cases.

nationality and citizenship; (2) restrict their travel in and out of South Africa; and (3) facilitate discrimination and the geographic separation and segregation of the races into impoverished and isolated tribal areas known as homelands or "Bantustans "

8.      In contravention of the principles of international law and United Nations Security Council sanctions, Defendant automobile companies Daimler, GM and Ford manufactured security force vehicles, in whole or in part, for the apartheid state  These included specialized vehicles, some of them armored, known by various names, including Hippos, Casspirs, Buffels, and UNIMOGs.  Defendants thus assisted the state's security forces, which used these vehicles to suppress opposition to the apartheid system and to inflict widespread violence associated with the suppression of anti-apartheid protests protected under international law  The violent suppression inflicted grievous injuries against Plaintiffs and the classes they represent, including the extrajudicial killings of numerous civilians.

9       Defendant automobile companies, Daimler, GM, and Ford also actively retaliated against employees, including Plaintiffs and the classes they represent, who participated in community organizations and unions that opposed apartheid or expressed anti-apartheid views and subjected them to dismissal, arrest, intimidation, detention, and torture in collaboration with the South African security forces  In violation of international sanctions, these companies manufactured for the government and security forces military vehicles that were widely known to be used in suppressing the human rights of black South Africans as alleged in this complaint.

10      Defendant Barclays purposefully and/or knowingly participated in the promotion of apartheid's goal to separate the races geographically by systematically denying black employees and applicants, including Plaintiffs and the classes they represent, the opportunity to work in or transfer to offices in predominately white areas.

3

11    Defendants Daimler, GM and Ford directly violated the human rights of Plaintiffs
and the classes they represent by creating their own internal system of apartheid imposing within
Defendants' operations systematic discrimination against blacks, and ongoing, routine
humiliation and assaults on their personal dignity by: 1) maintaining segregated facilities and a
humiliating work environment for black employees, 2) grossly underpaying blacks for equal
work; and 3) institutionalizing grossly unequal conditions of employment. These conditions
actively and intentionally replicated in Defendants' operations the racial separation and white
superiority at the heart of the apartheid system. Although some aspects of Defendants'
operations were theoretically governed by apartheid laws, these Defendants engaged in these acts
in an effort to support and actively participate in the apartheid system based on their own desire
to profit from the system and their support of the apartheid government' ideology. In addition,
Defendants imposed and maintained an internal apartheid system because of their active
collaboration with agents of the security forces and other state officials for the purpose of
suppressing anti-apartheid union and political activities and to maintain white minority rule in
South Africa.

12.    The allegations brought here address claims exclusively between private persons
and corporations and do not involve claims against or on behalf of the government of South
Africa  The government of South Africa expressly reserved such claims to the courts during the
Truth and Reconciliation process. Indeed, the Truth and Reconciliation Commission (TRC)
Chairperson, Archbishop Desmond Tutu and other members of the TRC stated that

> Litigation seeking individual compensation against multinational corporations for
> aiding and abetting the commission of gross human rights abuses during apartheid
> does not conflict, in any manner, with the policies of the South African
> government, or the goals of the South African people, as embodied in the TRC.
> To the contrary, such litigation is entirely consistent with these policies and with
> the findings of the TRC.

4

South Africa did not enact a general amnesty statute  No relief from civil or criminal liability

was enacted for those who did not apply for an obtain amnesty from the TRC   None of the

Defendants in this action sought and obtained amnesty by the TRC

13.    These victims of apartheid deserve to receive fair compensation for the atrocities

committed against them by Defendants for financial gain

## JURISDICTION AND VENUE

14    The Court has jurisdiction over this case under 28 U S.C  § 1331 (Federal

Question Jurisdiction) and 28 U S C. § 1350 (Alien Tort Statute).  All of Plaintiffs' claims for

relief arise under the law of nations

15.    Venue is proper under 28 U S.C. § 1391(a) in this Court because the Defendant

corporations, their subsidiaries, affiliates, alter egos or agents are doing business in this district

## PARTIES

**PLAINTIFFS**

16    Plaintiff LUNGISILE NTSEBEZA is a South African citizen and a resident of

Cape Town, South Africa.  In 1973, when Ntsebeza first inquired about a position with Barclays

in Cape Town, he was told that because he was a Xhosa person (a "Bantu"), he could only apply

in the Eastern Cape (a predominately black area)  Thus, to obtain gainful employment with

Barclays, Ntsebeza was forced to work in the Eastern Cape in a Bantustan branch.  This hiring

practice, not mandated by law at the time, reinforced apartheid's goal of geographically

separating the races.  Thus, Ntsebeza and other Barclays employees were subjected to

employment practices that replicated the systematic exclusions, humiliation and degradation of

blacks in the apartheid system.

5

17     Plaintiff TOZAMILE BOTHA is a South African citizen and a resident of

Centurion, South Africa. He worked for Defendant Ford in Port Elizabeth from approximately

1978-1980 as a work-study technician. After he became Chairman of the Port Elizabeth Black

Civic Organization (PEBCO), an anti-apartheid community organization, Ford intimidated and

retaliated against him solely because of his anti-apartheid activities and views, thus actively

participating in and assisting the state's repression of anti-apartheid movements. Because of his

political activities, Botha was arrested, detained, questioned and tortured by the security forces.

Eventually, Botha was forced into exile. At Ford, Botha was subjected to apartheid practices

within the Ford plant including segregation and exploitation of his labor as well as other

discriminatory and humiliating treatment.

18     Plaintiff MPUMELELO CILIBE is a South African citizen and a resident of New

Brighton near Port Elizabeth, South Africa. Despite his qualifications for a higher position,

because of his race, he was forced to accept a position as a laborer to gain employment at

Defendant Ford, where he worked from 1974-1984. During this period he was subjected to

apartheid practices within the Ford plant including segregation and other blatantly discriminatory

and humiliating treatment, including training less-qualified whites to be his superior. As

treasurer of a union with a strong anti-apartheid position, Cilibe was harassed and intimidated by

Ford management and government forces  He was also subjected to racial discrimination,

including experiencing grossly inferior advancement opportunities and pay, as Ford effectively

implemented its own system of apartheid within its plants.

19.     Plaintiff WILLIAM DANIEL PETERS is a South African citizen and a resident

of Bethelsdorp near Port Elizabeth, South Africa. He worked as a material handler and later as a

checker for Defendant Ford from 1980-1985. As chairman of the National Automobile and

6

Allied Workers Union (NAAWU), a union with anti-apartheid positions, Peters was arrested,

interrogated and tortured by the security forces, including Special Branch, which pursued him

based upon information they had received from Ford regarding his anti-apartheid community and

union activities He was also subjected to segregation, humiliation and racial discrimination and

grossly unequal pay, as Ford implemented its own system of apartheid within its plants

20      Plaintiff JAMES MICHAEL TAMBOER is a South African citizen and a resident

of Bethelsdorp near Port Elizabeth, South Africa. From 1977-1986, he worked for Defendant

GM as a laborer.  Because of his activities in NAAWU and his anti-apartheid views and union

activities, Tamboer was arrested, interrogated, tortured and otherwise abused by security forces,

including Special Branch officers who collaborated with Defendant GM and had visited the GM

plant on multiple occasions  As a result, he sustained severe injuries including long-term brain

damage from the torture and other abuse. At GM, Tamboer was subjected to apartheid practices

within the GM plant including segregation and exploitive labor practices as well as other

blatantly discriminatory and humiliating treatment.

21      Plaintiff SAMUEL ZOYISILE MALI is a South African citizen and resident of

Kwamagxaki near Port Elizabeth, South Africa  He worked for Defendant Ford from 1973-

1982, and for Defendant GM from 1982-1986  After speaking with a Life Magazine reporter

and expressing anti-apartheid sentiments that were published, Mali was called in to speak with

his GM supervisors, who asked him about the article and his political opinions.  When Mali

confirmed what he said to the reporter, GM retaliated against him for his anti-apartheid opinions,

effectively firing him by transferring him to a department that was being closed

22.      Plaintiff MSITHELI WELLINGTON NONYUKELA is a South African citizen

and a resident of Zwelitsha near King William's Town, South Africa  He worked for Defendant

7

Daimler from 1983-1987, including as a security guard  While at Daimler, he was involved in union activities, youth organizing and political activities which continued through the end of the apartheid era  As a consequence of his union and political activities, Nonyukela was arrested, detained, interrogated and tortured by the South African security forces, including Special Branch, which acted upon information provided by Daimler in the course of its active collaboration with South African security services.  His union was identified with the anti-apartheid struggle.  Daimler's head of security and Nonyukela's manager played a role in at least one Special Branch interrogation.  At the session where Nonyukela was tortured, the manager entered the interrogation room and threatened Nonyukela's dismissal from Daimler if he did not cooperate with the Special Branch.

23.    Plaintiff MANTOA DOROTHY MOLEFI brings a claim on behalf of herself and the estate of her son, Hector Zolile Pieterson  Molefi is a South African citizen and a resident of Soweto, South Africa.  Hector Pieterson, a twelve-year-old schoolboy, was shot and killed by South African security forces on June 16, 1976, during a protest led by schoolchildren.  The provision of vehicles for security forces manufactured by Ford, GM and/or Daimler provided substantial and essential assistance to the security force's violent campaign to suppress peaceful opposition to apartheid, and facilitated the extrajudicial killing of Pieterson and many others.

24    Plaintiff NOTHINI BETTY DYONASHE brings a claim on behalf of herself and the estate of her deceased son, Vuyani Adonis  Dyonashe is a South African citizen and a resident of Duncan Village near East London, South Africa.  In August 1985, South African security forces shot and killed her son, Vuyani Adonis.  The thirteen-year-old school boy was making an unannounced visit to see his mother in Duncan Village from Chalumn, where he stayed with his grandmother and attended school.  When he arrived from Chalumn, the home

was locked, forcing him to remain outside in the street  Security forces that had arrived in

vehicles supplied by one of the Defendants shot him without justification. The provision of

vehicles manufactured by Ford, GM and/or Daimler provided substantial and essential assistance

to the security forces as they conducted a violent campaign against the community, and

facilitated the extrajudicial killing of Adonis and many others

     25     Plaintiff NONKULULEKO SYLVIA NGCAKA brings a claim on behalf of

herself and the estate of her deceased son, Thembekile Ngcaka.  She is a South African citizen

and a resident of Duncan Village, South Africa.  In August 1985, South African security forces

shot Thembekile, a nine-year-old school boy who was playing outside with friends.  He was shot

by soldiers who fired from a military vehicle manufactured by Defendants Ford, Daimler and/or

GM.  After suffering from his wounds for approximately a year, he died from these injuries  The

provision of vehicles manufactured by Ford, GM, and/or Daimler provided substantial and

essential assistance to the security forces as they conducted a violent campaign against the

community, and facilitated the extrajudicial killing of Thembekile and many others

     26     Plaintiff MIRRIAM MZAMO brings a claim on behalf of herself and the estate of

her deceased son, Bubele Mzamo.  She is a South African citizen and a resident of Duncan

Village near East London, South Africa.  In March 1986, South African security forces shot and

killed her son, Bubele Mzamo, a fifteen-year-old school boy while he was playing in the street.

He was shot from an armored security forces vehicle manufactured by Defendants Daimler,

Ford, and/or GM.  The provision of vehicles manufactured by Ford, GM, and/or Daimler

provided substantial and essential assistance to the security forces as they conducted a violent

campaign against the community, and facilitated the extrajudicial killing of Bubele and many

others.

27      Plaintiff MNCEKELELI HENYN SIMANGENTLOKO is a South African citizen and a resident of Jongilanga, Kuelerlig, South Africa. While participating in a peaceful march to commemorate International Youth Year in May 1985, in East London, Simangentloko was shot in the arm by security forces, suffering a severe injury that prevented him from working for 23 years. The security forces relied on vehicles manufactured, in whole or in part, by Defendant automobile companies, Ford, Daimler and/or GM, for transportation and protection. These vehicles were essential to the security forces' violent suppression of the peaceful protesters.

28.     Plaintiff HANS LANGFORD PHIRI is a South African citizen and a resident of Mafikeng, South Africa. As part of the apartheid government's campaign to create "independent countries" within South Africa, Phiri was stripped of his South African citizenship, which was replaced by Bophuthatswana citizenship. His South African ID was declared invalid, and he was assigned a Bophuthatswana ID document. The latter was produced using IBM machines and software designed to facilitate the government's illegal revocation of the citizenship of large numbers of black South African citizens. As a result of this loss of citizenship, Phiri lost the benefits of South African citizenship.

**DEFENDANTS**

29      Defendant BARCLAYS BANK PLC (Barclays) is a banking entity with its headquarters at 1 Churchill Place, London, United Kingdom, and a principal place of business at 200 Park Avenue, New York, New York. Barclays does business in the United States and within this jurisdiction through subsidiaries, affiliates and agents, including Barclays Capital Corporation. At all times relevant to the facts alleged in this complaint, Barclays operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including Barclays National Bank of South Africa.

10

30      Defendant FORD MOTOR COMPANY (Ford) is an automobile company incorporated under the laws of Delaware with its headquarters at 1 American Road, Dearborn, Michigan. Ford does business in the United States and within this jurisdiction through subsidiaries, affiliates and agents. Ford operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa.

31      Defendant GENERAL MOTORS CORPORATION (GM) is an automobile company incorporated under the laws of Delaware with its headquarters at 300 Renaissance Center, Detroit, Michigan. GM does business in the United States and within this jurisdiction through subsidiaries, affiliates, alter egos and agents   At all times relevant to the facts alleged in this complaint, GM operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including GM South Africa (Pty) Ltd

32.     Defendant DAIMLER AG (Daimler) is a publicly traded automobile corporation with its headquarters at 137 Mercedesstrasse, Stuttgart, Germany.  Daimler was formed and incorporated under the laws of the Federal Republic of Germany.  Daimler does business in the United States and within this jurisdiction, and elsewhere through subsidiaries, affiliates, alter egos and agents   Daimler's U S. headquarters are 1000 Chrysler Drive, Auburn Hills, Michigan. At all times relevant to the facts alleged in this complaint, Daimler operated in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in South Africa, including Daimler South Africa (Pty) Ltd.

33      Defendant INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM) is an information technology company and manufacturer of computer systems, hardware, software, networking systems, hosting systems, and storage devices   It was incorporated under the laws of New York with its headquarters at 1 New Orchard Road, Armonk, New York.  IBM

11

does business in the United States and within this jurisdiction through subsidiaries, affiliates,

alter egos and agents. At all times relevant to the facts alleged in this complaint, IBM did

business in South Africa directly and through its subsidiaries, affiliates, alter egos and agents in

South Africa, including IBM South Africa (Pty) Ltd and IBM South Africa Group Ltd

## GENERAL ALLEGATIONS

34.    At all relevant times, the Defendants' actions were part of a pattern and practice

of systematic and widespread attacks and human rights violations against the black population of

South Africa.

35.    At all relevant times, Defendants knew, or should have known, that their actions,

as alleged herein, provided assistance to the government of South Africa and its agents that had a

substantial effect on the perpetration of the human rights violations alleged in this complaint.

36.    The actions by Defendants described herein were inflicted under the color of law

or official authority or in a conspiracy or a joint criminal enterprise with government officials

With respect to the internal replication of the apartheid system within their operations,

Defendants Daimler, Ford, GM and Barclays acted in concert with government officials to

suppress anti-apartheid union and political activities and to institutionalize white supremacy.

State officials insinuated themselves into the Defendants' operations to help ensure that apartheid

ideology and practices were maintained in the automobile Defendants' internal operations

37.    Defendants are responsible for Plaintiffs' injuries and the injuries of the Plaintiff

classes because: (1) they were directly responsible for the alleged human rights violations by

their own actions, (2) their agents committed these violations within the scope of their authority;

(3) their co-conspirators or co-participants in joint criminal enterprises committed such

violations, (4) they or their agents actively participated in such violations; and/or (5) they or their

agents aided and abetted such violations    Defendants worked jointly with state officials,

employees and agents in perpetuating apartheid and in committing the violations alleged herein.

The Defendants maintained control over their subsidiaries and agents in South Africa at all times

relevant to Plaintiffs' allegations and had knowledge of the human rights violations alleged

herein and the Defendants direct involvement or complicity in these violations    In particular,

Defendants maintained such control over the actions of its subsidiaries in South Africa that they

should be considered as alter egos, joint enterprises and/or as jointly controlled, and it would be

unfair to recognize their separate corporate existence vis-à-vis the claims made by Plaintiffs in

this complaint

     38.    As a direct and proximate result of Defendants' actions, Plaintiffs or those they

represent suffered harm, including death, pain and suffering, personal injuries, lost wages and

opportunities, and extreme emotional distress and mental anguish and other injuries.

     39.    Equitable tolling applies to any of Plaintiffs' claims not within the applicable

statute of limitations because there was no practical, or safe or effective way for Plaintiffs to

bring these claims without risk of retaliation by the apartheid state prior to 1994.  In addition,

Defendants refusal to cooperate with the TRC and provide a full accounting of their connection

to the violations alleged in this complaint tolls the running of the statute of limitations with

respect to Plaintiffs' claims.

     40.    Although there is no exhaustion of domestic remedies requirement for ATS

claims, there were and are no effective domestic remedies for Plaintiffs to exhaust in South

Africa against these Defendants for these claims

## HISTORICAL CONTEXT

**A.      International Condemnation of the Apartheid System and Corporate Involvement**

41.      In 1950, shortly after the inception of the apartheid regime, the international community began to condemn the government and its policies as antithetical to the human rights and fundamental freedoms guaranteed by the United Nations Charter and international law.  The United Nations and many of its members, including the United States, took joint and separate action against the apartheid system   This included restrictive arms embargoes as early as 1963 and various forms of economic sanctions

42      International condemnation grew in the wake of the Sharpeville Massacre of March 21, 1960 when police killed 69 unarmed individuals, including women and children and those attempting to flee the scene.  Several hundred were injured.

43.      In 1970, the Security Council, in Resolution 282, condemned South Africa's continuing disregard for international law and reaffirmed its policy of withholding the supply of all vehicles and equipment to South African armed forces and paramilitary organizations

44      In 1977, UN Security Council Resolution 418 underscored the mandatory nature of the arms and military vehicle embargo, which applied to the provision of arms and related materials of all types

45.      Embargoes on providing vehicles and parts to the South African security forces remained in place at all times material to the allegations in this complaint.

46.      Further condemnation came from the International Labour Organization (ILO) as early as 1953   That year, ILO's Ad Hoc Committee on Forced Labour described apartheid and its legislative system that created barriers for the black population as "a system of forced labor of significance to the national economy "

14

**B.**    **Grand Apartheid: Geographic Separation of the Races**

47.    "Grand Apartheid" was a broad scheme designed to prevent black South Africans from accessing political rights and land by uprooting and forcibly relocating millions to make South Africa a white-majority nation  The scheme culminated in four of the original ten tribal areas (or "Bantustans"), Bophuthatswana, Ciskei, Transkei, and Venda, becoming "independent countries" within South Africa between 1976 and 1981.  No country, other than South Africa, recognized these territories as independent states, viewing them as transparent attempts to deny black South Africans the benefits of citizenship

48.    A necessary feature of Grand Apartheid was the pass system, which enabled the apartheid regime to restrict and control the movement of black South Africans.  Various pass documents were used to control the movement of black South Africans between the Bantustans and white South Africa   Blacks with invalid pass documents were subject to arrest, imprisonment and/or banishment to the homeland territory assigned to them and their ethnic group.

**C.**    **Militarization of Apartheid in the 1970s and 1980s**

49    The student-led Soweto Uprising on June 16, 1976, to protest the required use of Afrikaans in schools led to violent suppression by the security forces.  Women and children were shot and killed.  The violence precipitated a wave of demonstrations throughout the country opposing apartheid.  During a six month period, an estimated one thousand black South Africans were killed by security forces, and between ten and twenty thousand were arrested as demonstrations and boycotts touched urban areas throughout the country.

50    In response, beginning in the late 1970s, the South African government implemented the "total strategy" to coordinate repressive measures in all fields—military,

15

psychological, economic, political, sociological, technological, diplomatic, ideological and cultural  This strategy relied on extensive cooperation with the private sector, including Defendants, and led to widespread killings, detentions, and the suppression of any perceived dissent to the apartheid system.

51.    Some industries were also designated as National Key Points, and as such, there was a particularly close relationship between such corporations and South African security forces  Plaintiffs believe that Defendant automobile corporations were National Key Points.

## DEFENDANTS' PARTICIPATION IN APARTHEID

52.    As recognized by the TRC (Vol. 4, Ch. 2), "business played a central role in helping to design and implement apartheid policies," and apartheid depended on the active support and assistance of the corporate sector  The corporate sector benefitted greatly because the system provided a perpetual supply of cheap, acquiescent black labor.  Both by destroying economic opportunities for blacks and by separating them from their families, Grand Apartheid made blacks dependent on white employers, including these Defendants   Moreover, corporations seeking to exploit black workers could rely on the state and its security apparatus to silence protests by workers and their representatives.

53    In turn, many corporations, including Defendants, provided essential assistance to the apartheid state, beyond what was strictly required by law and practice, knowing that such assistance would lead directly to the violation of the human rights of black South Africans.  For example, Defendants retaliated against members of unions and community organizations that opposed apartheid and they actively trained and promoted white employees with less qualifications and seniority than black employees.

16

## AUTOMOBILE DEFENDANTS' PARTICIPATION IN APARTHEID

54      Security forces, including the Special Branch, coordinated their suppression of anti-apartheid labor and political activities with key senior management personnel within Defendant automobile companies.  Coordination was particularly close between the human resource managers and/or senior security personnel at the plants and the security forces of the apartheid state   Human resource managers and senior security personnel at the Defendant automobile companies were often former or active military officers and/or members of the Broederbond.  The Broederbond ("association of brothers"), an elite and powerful Afrikaner organization in South Africa, was dedicated to preserving permanent white, and in particular, supremacy Afrikaner dominance in South Africa and espoused an ideology of radical racism that demanded the exclusion of blacks from white South Africa

## DEFENDANT DAIMLER'S PARTICIPATION IN APARTHEID

55.      In 1954, Defendant Daimler opened an office in South Africa.  Beginning in 1958, Defendant Daimler, then known as Daimler-Benz AG, contracted with Car Distributors Assembly (CDA), a South African company, to produce Mercedes vehicles in South Africa  In 1966, CDA became a wholly-owned subsidiary of United Car and Diesel Distributors (UCDD), a South African company.  In 1967, UCDD acquired a site in the West Bank area of East London, South Africa, and, at all relevant times, built Mercedes vehicles in the plant.  In 1984, Defendant Daimler acquired majority ownership and control over UCDD, and then renamed the company Daimler South Africa (Pty) Ltd.  During all relevant times, Defendant Daimler purposefully and/or knowingly controlled and/or oversaw operations at the Mercedes plant located in the West Bank area of East London, South Africa.  Indeed, Daimler's management in Germany was involved in and aware of the activities material to the allegations in this complaint.

17

**A.** **Daimler's Active Collaboration with the Apartheid Regime to Target Trade Union Leaders and Community Organizers**

56.    At all relevant times, South African security forces collaborated with Defendant Daimler's managers and personnel to suppress peaceful labor and anti-apartheid political activities

57    While employed at Daimler, Plaintiff Nonyukela was subjected to arbitrary arrest, detention, torture and other cruel, inhuman and degrading treatment by the security forces acting in close collaboration with the management of Defendant Daimler.    Daimler management provided information about his anti-apartheid union activities to the security forces and facilitated his arrest, detention and ill-treatment in order to suppress those activities.    Daimler's head of security asked Plaintiff Nonyukela to spy on fellow employees, but he refused, other employees however did provide information to the head of security.

58.    One particularly grave example of collaboration between Daimler management and the Special Branch occurred in East London in 1985.    Special Branch officers tortured Plaintiff Nonyukela, and the head of Daimler security was involved in the interrogation.    Special Branch officers had detained Plaintiff Nonyukela and later taken him to Daimler premises, where Daimler's head of security accompanied them to get documents from Plaintiff Nonyukela's locker.    Returning to the Special Branch station in East London, the officers placed a bag containing water over his head to simulate sensations of suffocation    The Special Branch officers questioned him about the location of other Daimler shop stewards who had allegedly left the country.    They said that his job was at risk if he did not comply with their demands.    Then, the head of security at Daimler entered the interrogation room where torture instruments, including the bag used to simulate suffocation, were plainly visible.    The Daimler head of security then restated the threat to Plaintiff Nonyukela's job if he did not provide the information

18

sought by the Special Branch. After Daimler's head of security left, Special Branch officers then resumed torturing Plaintiff Nonyukela  That evening, they forced Plaintiff Nonyukela into a car, where they further tortured him  The Security Branch officials took Plaintiff Nonyukela to a dam where they then threatened to kill him by dropping him off a cliff over the reservoir.  They told him that no one would know of his murder because there would be no evidence.

59  Security forces frequently questioned Plaintiff Nonyukela at his home and elsewhere about union activities.  Officers interrogated Nonyukela and his wife in their home, and they attempted to intimidate him from engaging in union and anti-apartheid activities  Security forces also raided the homes of other Daimler employees, especially other union leaders.

60.  Plaintiff Nonyukela was a leading union member at Daimler in the mid 1980s.  On occasion, Plaintiff Nonyukela would take time to travel to undertake his union duties, and the union would write to Daimler in advance to provide notice.  On at least one occasion, members of senior Daimler management demanded information from the union and later from Plaintiff Nonyukela in person about, *inter alia*, his travel plans.  On this occasion, security forces detained and interrogated Plaintiff Nonyukela about the trip

61.  Daimler's senior management, including those in human resources and the security department, collaborated with state security forces, including members of the Special Branch, with respect to Plaintiff Nonyukela and many other employees involved in union and anti-apartheid activities.  For example, during some Special Branch interrogations, questioners would quote statements Plaintiff Nonyukela had made in closed meetings to senior Daimler managers related to his union responsibilities

62.    Around 1987, prior to a planned trip by Plaintiff Nonyukela to Germany on union business, he was interrogated by Special Branch who warned him against speaking of work conditions in South Africa. Ignoring this warning, he spoke both about the conditions at Daimler, including the production of vehicles for the security forces, and about living in South Africa. Other shop stewards were shown a video of Nonyukela's statements and asked to disavow them but they refused

63.    At other times in the 1980s, there were anti-apartheid union protests at the Daimler plants. On at least one occasion, senior Daimler management armed and instructed a group of employees to ambush the union members inside the plant. Special Branch members were nearby and observed without attempting to stop it    Many of the unarmed protestors sustained injuries. After one such ambush, Daimler retaliated against numerous injured union members and shop stewards, including Plaintiff Nonyukela, who had not been involved. Although eventually Daimler agreed to reinstate the other shop stewards, they refused to reinstate Plaintiff Nonyukela because of his union and political activities. Daimler claimed that he was too political to be employed at Daimler.

**B.    Daimler's Production of Military Vehicles for the Apartheid Regime: Specialized Military Vehicles.**

64.    Daimler supported the apartheid regime through the provision of vehicles to the South African security forces. At all relevant times, Defendant Daimler manufactured specialized vehicles, in whole or in part, for the South African security forces in its South African plants, including its East London plant. Such vehicles included heavy trucks, designed for military purposes and armored personnel carriers

65.    Daimler created paperwork that identified these vehicles as being intended for the South African security forces. Some vehicles were painted in the plant to meet security forces'

20

specifications   Officials from security forces, sometimes in uniform, visited the plants on a regular basis to inspect the vehicles   At all relevant times, Defendant Daimler knew that its products would be used to violently suppress non-violent opponents of apartheid, including Plaintiffs and the classes they represent   The use of Daimler's vehicles to violate human rights was widely known

66.   Daimler's vehicles regularly patrolled the townships.  Security forces used them to intimidate, suppress and control both strikers and anti-apartheid activities   The use of Daimler's vehicles by the security forces resulted in injuries and deaths to numerous South Africans   By at least the 1980s, Daimler employees had begun to express opposition to being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities.  Daimler management responded by emphasizing that it was a duty of all South Africans to support the security forces.

67   At all relevant times, Daimler knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used Daimler vehicles in violating the human rights of black South Africans

68   In June 1976, a student protest began in Soweto against the use of Afrikaans as the official language of instruction.  The protesting school children were met with a violent response by the security forces, who arrived in Soweto in vehicles produced for them by Defendants Ford, GM and/or Daimler   Plaintiff Molefi's twelve-year-old son, Hector Pieterson, was shot and killed by the security forces

C.   **International Youth Year March**

69   Plaintiff Simangentloko attended a march marking the launch of International Youth Year in May 1985.  The march proceeded from East London toward Duncan Village

21

When they approached the township, security forces were waiting for the marchers. The security forces stood in front of a line of military vehicles ready to fire and asked the marchers to disperse, but they did not  Then, the security forces opened fire without warning  Plaintiff Simangentloko and others had their arms up in surrender, but security forces still fired at them  Security forces shot Plaintiff Simangentloko in the arm, inflicting an injury which required surgery and the placement of an iron rod in his arm to hold the bones together  He was unable to work for 23 years because of this injury, and he is still unable to lift heavy objects

**D.    The Duncan Village Massacre**

70      In August 1985, the funeral of Mrs. Victoria Mxenge, a human rights attorney whose husband was a slain human rights lawyer, precipitated confrontations in Duncan Village. The security forces' violent response to the anti-apartheid unrest lasted through the month of August and became known as the Duncan Village Massacre.  During that time, security forces shot and killed at least nineteen Duncan Village residents, and injured many more  The victims included children, including the sons of Plaintiffs Ngcaka and Dyonashe

71      In the early morning during one day of the Duncan Village Massacre, workers arrived at the Daimler plant in East London to find a notice posted saying that the plant was closed for the day.  At that time the road into Duncan Village was open.  During the massacre, entrances to the township were sealed off, and, security forces in vehicles manufactured by Defendants Daimler, Ford and/or GM, patrolled the area

72      At a mass burial service for the victims of the massacre held later in August, security forces once again opened fire on attendees resulting in additional injuries and death. Security forces continued to perpetrate violence against Duncan Village residents at least through

22

1986. Security forces relied on military vehicles manufactured by Defendants Daimler, GM, and/or Ford for transport and protection throughout this time period

73      In August 1985, Plaintiff Ngcaka's nine-year-old son, Thembekile Ngcaka, and his friends were playing with small toys outside his home in Duncan Village. Security forces shot Thembekile and his friends as they drove past them in heavily armored military vehicles. Thembekile suffered numerous wounds to his stomach. Though he survived the initial shooting, Thembekile never fully recovered, and died approximately one year later from his wounds.

74      During the same month, Plaintiff Dyonashe's thirteen-year-old son, Vuyani Adonis, arrived unexpectedly in Duncan Village at his mothers' home to obtain school supplies. At that time, armored military vehicles, manned by South African soldiers, were patrolling the village. Security forces shot Adonis multiple times, and he staggered into a neighbor's house and collapsed. He died shortly thereafter from his wounds.

75      In March 1986, Plaintiff Mzamo's fifteen-year-old son, Bubele Mzamo, was playing in the street in Duncan Village when he was shot and killed by South African security forces. He was shot from an armored vehicle manufactured, in whole or in part, by Defendants Daimler, Ford and/or GM

76.     Others were shot while attempting to assist and transport the injured to obtain medical care.

E.      **Daimler's Collaboration with Apartheid Security Forces**

77      South African security forces operated in coordination and conjunction with top Daimler managers and security personnel who were or had been high-ranking officials in the South African security forces. At times, armed senior Daimler personnel would enter the plant in their security forces uniforms.

78    South African security forces conducted armed patrols outside and inside Defendant Daimler's East London plant. The security forces coordinated these patrols with Defendant Daimler's security managers. South African security forces were at times stationed inside Defendant Daimler's East London plant at night.

79    White employees of Defendant Daimler, including the head of security, also served in the South African security forces and patrolled outside the plant in the townships surrounding East London in military vehicles as members of the security forces. At times, white employees would either leave or arrive at Daimler's plant wearing South African military uniforms.

80.    Workers protested against apartheid practices within the plants from the 1970s through the end of apartheid. On numerous occasions when strikes occurred, Daimler management called the security forces, who sometimes arrived within minutes of the initiation of the strike. They were often transported in vehicles produced by Defendants Daimler, Ford and/or GM, and were armed. Security forces beat union members. Dogs and tear gas were also used by the security forces to attack and subdue striking union members.

**F.    Daimler's Active Replication of Apartheid within its Plants**

81    Daimler took advantage of the apartheid system to engage in pervasive discrimination against black workers in order to maintain a constant supply of cheap labor Defendant Daimler systematically discriminated against its black employees by maintaining segregated facilities, paying black employees vastly inferior wages and benefits for equal work, and promoting white employees more quickly and at a substantially faster rate than black South African employees

24

82    Defendant Daimler forced black workers to use separate dining halls and toilets
Black employees routinely trained unskilled or illiterate white employees who were then
promoted above them. Defendant Daimler maintained a racially hostile work environment in
which black workers were subjected to daily humiliation and degradation White employees and
supervisors would refer to blacks using derogatory racial slurs, such as "dogs", "Kaffirs" and
"coons."

83    Defendant Daimler systematically treated its black workers in a grossly
discriminatory manner in every area of its operations and in its black employees' terms and
conditions of work, including salary, promotions, benefits, and human dignity. This systematic
discrimination went beyond what was required by law and practice. Defendant Daimler's
management in cooperation with government officials took advantage of apartheid law and
practice to impose their own harsh brand of apartheid in Daimler's internal operations.

## DEFENDANT GM'S PARTICIPATION IN APARTHEID

84.    GM ran its South African operations through its agent, GM South Africa (Pty) Ltd
(GM). GM was incorporated in 1926 in South Africa. Senior management in South Africa
included American personnel at all times material to Plaintiffs' allegations.

**A.    GM's Production of Military Vehicles**

85    GM's operations at its factory in Port Elizabeth included the assembly and
marketing of vehicles for the government, including thousands annually to the security forces in
the mid-1980s. GM supported the apartheid regime with the provision of these vehicles. At all
relevant times before GM divested, Defendant GM manufactured specialized vehicles, in whole
or in part, for security forces in its South African plants. Such vehicles included heavy trucks
designed for military purposes and armored personnel carriers.

25

86    GM created paperwork identifying these vehicles as intended for the South African security forces.   Some vehicles were painted in the plant to meet security forces' specifications   Officials from security forces, sometimes in uniform, visited GM's plants on a regular basis to inspect the vehicles.  At all relevant times, Defendant GM knew that its products would be used to violently suppress non-violent opponents of apartheid, including Plaintiffs and the classes they represent

87    GM's vehicles regularly patrolled the townships   Security forces used them to intimidate, suppress and control both strikers and anti-apartheid activities   The use of GM's vehicles by the South African security forces resulted in injuries and deaths to numerous South Africans   Employees protested at being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities   When this occurred, GM management stated that anyone who protested the production of such vehicles would be assumed to be members of the African National Congress (ANC), even without any other evidence, and that anyone who was an ANC member would be fired.

88.    At all relevant times, GM knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used GM vehicles in violating the human rights of thousands of black South Africans   For example, Defendant GM was well aware that its vehicles were used in the state violence at Soweto and Duncan Village and many other similar incidents; the paragraphs 68-76 are thus realleged herein

**B.    Suppression of Trade Unionism and Community Organizing**

89.    GM denied black employees their freedom to assemble and promoted the apartheid regime by relying on the South African security forces to harass and assault its black employees to prevent them from unionizing.  Even when black employees did unionize, GM

26

management prohibited salaried employees from participating in union activities that supported anti-apartheid political organizations    GM allowed security forces onto its premises to help suppress lawful union activities    These security forces worked closely with GM management in suppressing union activities.    They collaborated in the arrest of black GM employees who participated in union activity    GM human resources employees reported black GM employees involved with unions to the security forces, who in turn arrested certain GM employees at the GM facilities.    Employees were arrested, interrogated and tortured because of their union and anti-apartheid activities.

90.    Plaintiff Tamboer was a shop steward in NAAWU    He was required to inform GM when he left work for union activities.    He was arrested on numerous occasions as a result of providing such notification because of GM's collaboration with the government.    For example, on one occasion in 1982 Tamboer was arrested and detained for weeks    During his detention he was interrogated and tortured because of his union's activities at GM    Tamboer was also interrogated about the NAAWU's relationship with MACWUSA, a separate union comprised largely of Xhosa workers    Special Branch officers who participated in the post-arrest interrogations and torture of Tamboer visited the GM plant on multiple occasions    Tamboer saw these individuals on GM's premises speaking to GM's head of personnel    On more than one occasion, GM managers summoned Tamboer and allowed Special Branch officers to question Tamboer about his union activities on GM premises

91    GM shared information about union leaders at its plants with the security forces, knowing that the security forces would detain and torture such leaders as a direct result.    During interrogations, security forces regularly quoted statements made by Tamboer in discussions with GM management, sometimes verbatim

92      Also in the mid-1980s, GM employees went on strike to demand their pensions before GM's planned divestment from South Africa.  GM invited security forces into its premises, where they arrested workers and used dogs and whips to break up strikes  Many of those arrested were interrogated and tortured to elicit information about their union and anti-apartheid activities

93      Many members of the union leadership were fired as a result of the strike  Plaintiff Tamboer was among those arrested because of his involvement in the strike as a shop steward for NAAWU.  He remained imprisoned for three to four months  During his imprisonment, Tamboer was repeatedly questioned by security forces about strike activity at GM. They choked him and bashed his head against a wall. Security forces also kicked him in the ribs and stomped on his ankles as part of their torture techniques.  Tamboer suffered permanent brain damage and epilepsy as a result of injuries suffered during his arrest and imprisonment

94      On another occasion, after Tamboer spoke about poor working conditions at GM at a political meeting, security forces arrived at his mother's house, arrested him, and verbally assaulted his mother, declaring that she would never see her son again  She suffered a heart attack as a result of this shock  Then, security forces took Tamboer in a Special Branch car and told him that he would be disappeared  However, the officers were interrupted by an order to return to the station before they could carry out their threat.

95.     GM also retaliated against employees with anti-apartheid views  For example, GM officials required that Plaintiff Mali accompany a reporter from Life Magazine around the Eastern Cape in 1985.  Mali complied and provided information on the effects of apartheid on black South Africans, as well as information about working conditions at GM.  When Life

28

Magazine published the article, GM management questioned Mali about his political beliefs and expressed their distaste for the ANC  Mali said that he agreed with the ANC's policies because they supported racial equality and fairness for all  GM subsequently retaliated against Mali for the content of the article and his belief in equality by transferring him to a department that was in the process of being shut down  As a result, Mali lost his job approximately one month later

96     Senior management in GM included members of the Broederbond    When workers challenged the employment of these individuals, GM management ignored these complaints and accused the employees of being ANC members  Management warned them that they could not be members of groups such as PEBCO or join trade unions

## C.     GM's Replication of Apartheid within its Plants

97.     GM took advantage of the apartheid system to engage in pervasive discrimination and exploitation of black South African workers in order to maintain a constant supply of cheap labor.  GM violated the human rights of its black South African workers by cooperating with the apartheid regime in systematically and consistently segregating their work facilities, employing them at lower wages for the same work, offering them the lowest positions, and denying them promotions regardless of skill, training, or experience

98     GM segregated the facilities at its plants by race at least through 1985.  These facilities included canteens and restrooms, GM designated the segregated facilities with signs for "Europeans" and "non-Europeans "

99.     GM consistently hired black South Africans for the lowest positions and refused to promote them.  On the line, laborer positions were generally filled only by blacks  Upper level positions – group leaders, foremen, general foremen and other "senior" positions – were overwhelmingly filled by white employees  Defendant GM maintained systematic humiliating

29

and discriminatory practices in all of its employment practices toward blacks  Even though it implemented some changes in the 1980s and 1990s, at all times materials to Plaintiffs' allegations, Defendant GM continued these practices going beyond what was required by law and practice  Defendant GM's management, in cooperation with government officials, took advantage of apartheid law and practice to impose their own harsh brand of apartheid in GM's internal operations.

**D.    GM "Divestment"**

100    As part of an effort to claim divestiture, around January 1, 1987, GM "sold" its operations to a group of investors headed by local management  This effort at "divestiture" was a scam  The local management included no blacks or persons of mixed race. As part of the deal, GM agreed to pay the subsidiary's creditors and likely agreed to delay payment on the sale for 18 months  The sale terms included a buy-back option. When GM began divesting from South Africa, GM management told Plaintiffs Tamboer and Mali, as well as others that the company was "changing names only"  During the transfer period, GM management prohibited black employees from speaking with reporters.   GM was subsequently renamed Delta Motor Corporation. GM licensed use of its trademark to Delta Motor Corporation and continued to sell its product through Delta Motor Corporation  The boxes and all the parts supplied continued to include the GM logo.  GM transferred one of its senior management employees, an American with many years of experience at GM, to run Delta.  He had been a GM vice president in the United States shortly before assuming his post as head of Delta.  Delta refused to sign the Sullivan Principles,[2] although it stated that it would follow nondiscriminatory employments

---

[2] The Sullivan Principles were a voluntary code of corporate conduct developed by African-American preacher Robert Sullivan in 1977 to demand equal treatment for blacks employed by American companies operating in South Africa.

practices and exercise social responsibility  The new ownership also said that it would "not preclude" sales to military and police.  GM repurchased Delta in 1997  The "divestment" program was a purposeful attempt to evade international sanctions and to allow the maintenance of GM's system of internal apartheid.

## DEFENDANT FORD'S PARTICIPATION IN APARTHEID

101  Ford's South African operations were conducted through Ford Motor Co of South Africa (Pty) Ltd (Ford South Africa)  Ford South Africa was formed in 1933.  It was a wholly-owned subsidiary of Ford Motor Company of Canada, Ltd. ("Ford Canada"), which was itself 76% owned by Ford U S  Ford South Africa assembled Ford vehicles from parts obtained locally as well as parts shipped from Ford Canada and Ford England  These shipments were intended in part to avoid U.S  sanctions that did not permit supplying U S.-made parts to South Africa.

102  Senior top management in Ford in South Africa included American personnel. Senior management in Ford included members of the Broederbond.  When workers challenged the employment of these individuals, Ford management ignored these complaints

103  In 1985, Ford Motor Co. of South Africa (Pty) Ltd merged with Amcar Motor Holding, the vehicles operations of Anglo American Corporation.  The resulting entity was called South African Motor Corporation (SAMCOR).  As a result of the merger, Ford became a minority owner of the new company, with roughly a 42% interest  At all relevant times, Ford Motor Co. and SAMCOR acted as agents of Defendant Ford.

## A.    Manufacture of Vehicles for Security Forces

104.  In its South African plants, Defendant Ford manufactured specialized vehicles for security forces, including large military trucks, armored vehicles and specialized sedans for the

31

Special Branch. Ford created paperwork identifying the vehicles as intended for security forces, some of which specifically identified the police or the military as the recipients  Some vehicles were painted in the plant to meet security forces' specifications.  High-ranking officials from security forces, sometimes in uniform, visited Ford plants on a regular basis, consulted with Ford management and inspected the vehicles.  At all relevant times, Defendant Ford knew that its products would be used to violently suppress blacks and opponents of apartheid, including Plaintiffs and the classes they represent  For example, Defendant Ford was well aware that its vehicles were used in the state violence such as at Soweto and Duncan Village and many other similar incidents, the paragraphs 68-76 are thus realleged herein.

105  Ford employees, including Plaintiff Peters, raised concerns with Ford management about Ford's production of security forces' vehicles because they saw these vehicles in black communities on a regular basis.  On more than one occasion, Ford management retaliated against black employees who questioned its involvement with the South African security forces, *inter alia*, by shortening the work shifts of black employees.

**B.    Ford's Suppression of Anti-Apartheid Dissent**

106   In October 1979, Plaintiff Botha became Chairman of the Port Elizabeth Black Civic Organization (PEBCO), an organization he helped launch  PEBCO was an anti-apartheid community organization seeking to improve the living conditions of township residents in and around Port Elizabeth  PEBCO received widespread media attention throughout South Africa at the time of its creation, as a result of which Plaintiff Botha was frequently referred to and quoted in newspapers throughout the country.

107.   Shortly after PEBCO was launched, a white Ford supervisor called Plaintiff Botha into his office.  The supervisor was holding a newspaper and stated that he, as well as the white

32

management and other white employees at the plant, were unhappy at the publicity about his work with PEBCO. Despite having a good work record, the supervisor told Plaintiff Botha that he was too political and could either continue working at Ford or go and serve his community by working with PEBCO. When he refused to cease working with PEBCO, he was dismissed from his job at Ford. Only after hundreds of workers at Ford went on strike to demand Botha's reinstatement was he allowed to return to work. During the strike over Botha's dismissal, several employees established a new committee to deal with labor issues, believing that registered unions had collaborated with Ford management.

108.    Plaintiff Botha and others formed this committee, which later became known as the Metal and Allied Component Workers Union of South Africa (MACWUSA)  Plaintiff Botha was Chair of MACWUSA's Executive Board. Plaintiff Cilibe became treasurer of MACWUSA shortly after its formation. Upon its founding, a senior manager in human resources, a member of the Broederbond, declared that Ford would not recognize MACWUSA as a multiracial union that was in line with the principles of the ANC. Defendant Ford took action to suppress the multiracial union and its activities because of Ford's own desire to impose an apartheid-like system within its own workplace

109.    Ford continued to deny black employees' full freedom to assemble and promoted the apartheid regime  Ford called in the South African security forces to harass and assault its black employees to limit and prevent union organizing, especially unions seen as anti-apartheid. Ford's ongoing discriminatory policies prompted another strike soon after in 1979.  Workers demanded that Ford comply with the Sullivan Principles' non-discriminatory provisions. Defendant Ford had committed itself to the Sullivan Principles, which included guarantees to

33

ensure racial equality, equal pay for equal work and the removal of job reservations but it had flagrantly breached those principles.

110    On the same evening the strike was settled, Plaintiff Botha was arrested and detained by the South African security forces. The security forces interrogated Botha about the strike at Ford and about who was behind the strike. During his detention, he was subjected to torture, including sleep deprivation, and other physical and mental abuse.

111.    Upon his release, following several months of detention and abuse, the South African government placed Botha under a banning order, preventing him from working, attending university, meeting with more than one person at any time, or leaving the house between 6pm and 6am or on weekends or public holidays. As a result of these restrictions imposed upon him by the banning order, he was driven into exile in Lesotho.

112    Along with Plaintiff Botha, other politically active workers, with good employment records, were dismissed in the early 1980s by Defendant Ford; some lost their work permits and had to return to the homelands as a result. Even those who were not tortured or driven into exile during the 1979 strikes were severely discriminated against in their employment because of their union and anti-apartheid activities.

113    There were other strikes at Ford in the early to mid-1980s to protest discrimination by Ford. Security forces were called on some occasions. During at least one strike security forces set vicious dogs on the workers. Other employees who participated in the 1979 strikes, as well as later strikes were harassed at home, arrested, detained and questioned about PEBCO or anti-apartheid activities.

114    Union meetings were monitored by members of the Special Branch and/or police, as well as by informants who were in some instances Ford employees. After meetings, security

34

forces would arrive at the homes of union members, including Plaintiff Cilibe's, to question them about union and strike activities  For example, the officers who interrogated Cilibe in his home made clear that they knew Cilibe worked at Ford in an effort to intimidate him

115.    Plaintiff Peters became the Chairman of NAAWU in the early 1980s at Ford.  On occasion, Plaintiff Peters would travel because of his duties as a union representative   Ford received notice of his travel in advance. Ford collaborated with the Special Branch and informed its members of Peters' travel plans.    As a result, members of the Special Branch detained Plaintiff Peters to question him about these union activities

116.    During interrogations, the security forces attempted to intimidate and pressure Plaintiff Peters, as Chairman of NAAWU, to intervene with workers in order to prevent and end strike actions   When he refused to do so, he was threatened and tortured.  When security forces interrogated Plaintiff Peters about his union activities, they regularly quoted statements he had made to Ford management in meetings he attended as part of his union responsibilities, sometimes verbatim    This reflected the ongoing close cooperation between Ford and the government in suppressing black political activity of any kind.

117.    On at least two occasions, Plaintiff Peters was subjected to a form of torture known as "the helicopter"  his hands were handcuffed to his ankles, a broomstick was inserted between the wrists and ankles, and he was spun around violently   Some of his torturers were the same Special Branch officials he saw regularly inside the Ford plant speaking with Ford management   During interrogations at the Special Branch office, Plaintiff Peters observed on occasion the head of Ford security inside the building

118.    Some members of Ford management were part of the Broederbond    They flaunted their comprehensive insider knowledge of upcoming security forces activities and

35

collaboration with security officers   At least one Ford manager who was a member of the Broederbond was informed as part of his Ford responsibilities about Plaintiff Peters' union travels

119.    The head of Ford security often rode through black communities with Special Branch officers in Ford company vehicles as well as Special Branch cars   Some of these officers, who were regularly inside the Ford plants speaking with Ford management, were involved in the torture and arbitrary detention of union leaders, including Plaintiffs Peters and Tamboer. Ford facilitated the torture and arbitrary detention of its own workers

120    On at least two occasions, Plaintiff Peters was interrogated on Ford premises with Ford's cooperation. In addition to members of the Special Branch, sometimes Ford managers interrogated Peters during these sessions.  Several human resources and industrial relations members of management participating in these joint Ford-Special Branch interrogations were also members of the Broederbond.

121.    Special Branch officers worked with Ford management to coordinate efforts to intimidate workers to not get involved in political or union activities.  For example, on one occasion a union leader's brother who worked at Ford had been interrogated and detained overnight, and he was brought to a plant the following morning   Accompanied by Special Branch into the plant, he was paraded in handcuffs to deter workers from involvement in political or union activities.

122.    Members of the class, including Plaintiff Peters, were arrested, detained and tortured by South African security forces as a result of information provided to these forces by Defendant Ford   Ford employees also knew when black employees had been interrogated, even when that information was not public.

## C.    Ford's Internal Replication of Apartheid

123    Ford continuously subjected its black workers to race-based discrimination and humiliation at its plants, such as segregated facilities, grossly unequal pay for equal work, and lack of opportunity for training and promotion. Plaintiffs Botha, Cilibe and Peters each experienced the severe discriminatory, humiliating and degrading internal apartheid system at Ford These internal apartheid practices went beyond what was require by official apartheid laws and practices.

124.   Facilities in Ford plants, including bathrooms, showers, changing rooms, kitchens and cafeterias, were strictly segregated. In all respects, black employees were given vastly inferior conditions of employment This segregation was strictly enforced by Ford's management.

125    Ford maintained segregated and unequal facilities into the 1980s. Ford engaged in exploitative practices against black workers beyond what was required by law. For example, class members including Plaintiff Cilibe trained white employees with fewer qualifications, who soon became their superiors. White employees performing the same jobs as black employees were given a higher title in order to justify higher pay and benefits Black employees, including Plaintiff Botha, who completed courses with distinction would not be promoted, when whites with poorer marks, or who were illiterate, would be This was done on a systematic basis and in a humiliating manner

126.   White workers, including storemen, would obtain three times or more pay for the same work. If black employees did gain a more senior position they were systematically paid much less than their white colleagues at the same level, regardless of ability or experience.

37

These differences were maintained systematically and were based upon the same systematic degradation and humiliation of blacks at the core of apartheid ideology.

127.    While employed at Ford, Plaintiff Mali was denied promotions in favor of white employees with less education, although he applied to open vacancies. Mali's supervisors also intentionally frustrated his efforts to further his education and advancement. Black workers were systematically relocated to manual labor and other less desirable jobs.

## D.    Ford "Divestment"

128    While Ford agreed to sell its interest in SAMCOR in 1987, it continued to supply SAMCOR with vehicles, components, management and technical assistance and continued to license the Ford trademark to SAMCOR. Ford transferred 57% of its stake to local employees and the remaining 43% of its stake to Anglo American Corporation. Ford also transferred tens of millions from the payment it received from the sale directly to SAMCOR. Thus, Ford effectively continued to exercise control over its agent, SAMCOR.

## DEFENDANT IBM'S PARTICIPATION IN APARTHEID

## A.    IBM's Active Participation in Maintaining the Apartheid System

129.    IBM South Africa (Pty) Ltd was incorporated in 1952 in South Africa as a subsidiary of IBM. IBM's largest client in South Africa was the South African government, accounting for about one third of its sales there.

130.    At all times relevant to Plaintiffs' allegations, Defendant IBM provided computer technology, systems, software, training and support to facilitate the apartheid governments' control of the majority black population. The maintenance of the complex apartheid system of population control organized by racial classification required sophisticated computer technology and knowledge of the kind provided by Defendant IBM.

131.    In particular, Defendant IBM supplied the technology, know how and support for a key identity document used in South Africa, known as the "Book of Life" Such documents contained, among other things, racial classification, name, sex, date of birth, residence, photos, marital status, driver license number, dates of travel/exit from and/or return to the country, place of work or study and finger prints The Book of Life worked in conjunction with the influx control system by providing affirmative confirmation of racial classifications beyond simple black or white classifications. It thereby enabled the authorities to identify persons who were classified as Indian, coloured or otherwise, determine their rights in accordance with movement and labor controls, and execute any suppressive force deemed necessary.

**B.    IBM's Production of the Homeland Identity Documents to Facilitate Apartheid's Goals of Racial Separation and De-Naturalization**

132.    Bophuthatswana was a designated homeland – essentially excluding blacks from white South Africa under apartheid It was accorded nominal independence, as a putatively sovereign state, in 1977

133    Bophuthatswana established some of the indicia of statehood. Among these were the capacity to have "citizens," a designation forced upon black South Africans of the Tswana tribe as part of the exercise of de-nationalization that was the basis of Grand Apartheid The Bophuthatswana government imposed identity documents and passports among the victims of de-nationalization, a process that was the ultimate culmination of the system of Grand Apartheid

134.    For this purpose, the Bophuthatswana government used IBM computers and systems, including both hardware and software.    Bophuthatswana government employees working with IBM computers and systems were trained in an IBM-specific programming language.    IBM ran training courses for government employees in Johannesburg and Bophuthatswana. These courses also covered the IBM-specific programming language and the

proper use of IBM machines. Programmers who attended these courses were government employees   Some computer programs run by the Bophuthatswana government on IBM machines were developed and written in-house with the assistance of IBM employees   When government employees encountered difficulty with their machines or with the programs, IBM employees would assist them in troubleshooting and repairing any problems

135    At least by 1978, IBM actively participated in creating a new ID book for the Bophuthatswana government by wholly developing a sub-system to produce the ID book. IBM developed both the hardware and software – both a machine and a program – used to create the Bophuthatswana ID books   Once IBM had developed the system, it was transferred to the Bophuthatswana government for implementation   IBM employees trained Bophuthatswana employees to use the machine and program to produce ID documents. IBM was contacted when problems arose with the ID book system and IBM employees would attend to fix such problems. The IDs produced for the Bophuthatswana government contained the name, sex, racial classification, ethnic origin and residential address/postal address of the individual. Bophuthatswana residents were required to carry the IDs produced by the Bophuthatswana government with the active participation of IBM.

136.    Plaintiff Phiri suffered as a result of the South African government's campaign to create nominally "independent countries" within South Africa. Phiri was stripped of his South African citizenship, which was replaced by Bophuthatswana citizenship   Officials declared his South African ID invalid, and he was assigned a Bophuthatswana ID document. IBM machines and software were used to produce the Bophuthatswana ID   Black individuals, including Plaintiff Phiri, were told that they had to apply, or they would lose privileges, such as employment opportunities in Bophuthatswana. Many were forced to return their South African

40

IDs when they applied for the new Bophuthatswana ID. Individuals feared punishment, even jail, or the loss of existing employment if they did not get the new ID. As a result of his loss of citizenship, Plaintiff Phiri also lost the benefits of South African citizenship, including the right to live and work in his own country.

137.    Other homeland governments, including but not limited to Gazankulu, KwaZulu, Lebowa, Transkei and Venda, also used IBM hardware and software to produce ID documents.

138.    IBM also actively participated in developing the book-keeping and salary system used by the Bophuthatswana government for all employees, including the police and security forces.

## C.    IBM Attempts to Conceal its Active Support of Apartheid

139.    Defendant IBM knew exactly how its substantial assistance to the apartheid government was used and how it facilitated the human rights violations alleged herein. Defendant IBM engaged in subterfuges to disguise its violations of international and U.S. sanctions against South Africa so that it could continue to assist the apartheid regime and continue to profit greatly from that collaboration.

140.    After the U.S. Commerce Department banned the export of all U.S.-origin products to South African security forces, IBM circumvented that embargo by delivering products to South African security forces that were produced outside the United States, and therefore were not subject to the embargo. Given the widespread media coverage of atrocities committed by apartheid security forces in defense of apartheid, IBM knew that it was substantially assisting the South African government in committing massive human rights violations, as alleged in this complaint, against its people.

41

**D.**    **IBM "Divestment"**

141    In 1987, IBM "sold" its South African subsidiary to a company created for the benefit of white IBM South Africa employees  However, IBM stated that it would provide a loan allowing local investors to buy the subsidiary  IBM retained a buy-back option to the new company as a term of the sale.  The new entity was run by the person who was the general manager of IBM South Africa prior to the sale  IBM continued to sell its products, parts and services through the new company and continued to be the top supplier of computers to South Africa after the "divestiture"  Around 1992, IBM purchased a 24% stake in the local distributor of IBM products.

<b>DEFENDANT BARCLAYS' PARTICIPATION IN APARTHEID</b>

142.    Barclays Bank of Britain purchased the National Bank of South Africa in 1924.  It subsequently ran its South Africa operations through this bank, which was renamed Barclays National Bank of South Africa, until it divested in late 1986 or early 1987.  Barclays National Bank of South Africa was a wholly-owned subsidiary of Barclays Bank of Britain until at least 1973  Barclays Bank of Britain subsequently reduced its holdings but remained a majority shareholder Barclays National Bank of South Africa until approximately August 1985

**A.**    **Barclays' Enforcement of Grand Apartheid's Geographic Separation of the Races**

143.    Defendant Barclays actively supported and perpetuated the forced geographic separation of the races which epitomized apartheid.  Black employees were routinely sent to work in branches in the Bantustans and were largely denied opportunities to work in, or transfer to, offices in major and predominantly white cities, like Cape Town and Johannesburg.

144    In 1973, Plaintiff Ntsebeza was in Cape Town (a predominately white area) with a student pass when he inquired about employment at a Barclays Bank branch in Cape Town

Ntsebeza was told that because he was a Xhosa-speaking person (a "Bantu") he should apply in the Eastern Cape (a predominately black area) and that his application would be sent to a Bantustan branch. As instructed, Ntsebeza applied in the Eastern Cape and was hired and then worked as a clerk for Barclays in Mthatha, in the Transkei Bantustan, from 1973-1974, initially in the savings department and subsequently in the ledgers department

145.    Defendant Barclays systematically denied training and advancement opportunities to black employees who were employed in white areas.    Defendant Barclays maintained segregated facilities in the major cities by staffing branches in black areas solely with black personnel.    As a result of Barclays' internal replication of the apartheid system within its facilities, and its refusal to employ black South Africans in predominately white areas, Barclays facilitated the apartheid system and committed widespread systematic discrimination against its black employees and job applicants. As a result of Barclays' active replication of the apartheid system at its facilities and in its employment practices, Plaintiff Ntsebeza suffered gross humiliation and degrading treatment.

**B.    Barclays' "Divestment"**

146.    In November 1986, Barclays announced that it was withdrawing from South Africa and selling its subsidiary, Barclays National Bank of South Africa, to a consortium of local mining and insurance companies that were minority owners at the time of the announced sale, including Anglo American, De Beers and Southern Life Association.

147.    At the time of the announced sale, Barclays South Africa employed approximately 25,000 people and had hundreds of branches throughout the country.    Its employees represented approximately 25% of all banking employees in the country and included more than 40% of all black banking employees in South Africa

43

148.    After the sale, Barclays continued to treat its former South African affiliate as a correspondent bank. Barclays had not repatriated the funds obtained for the sale of its shares in Barclays National Bank of South Africa as of at least March 1987.

## CLASS ACTION ALLEGATIONS

149.    This action is brought and may properly be maintained as a class action pursuant to the provisions of Fed R. Civ. P. 23. Plaintiffs bring this class action as authorized by the Alien Tort Statute (ATS) on behalf of themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of the law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations  Excluded from the class are Defendants, any entity in which Defendants have a controlling interest, and any of Defendants' subsidiaries, affiliates, officers or directors, or the families of any such officers or directors.

150    Plaintiffs and class members were tortured; extrajudicially killed, stripped of their South African nationality and/or citizenship, suppressed and retaliated against for expressing anti-apartheid sentiments or beliefs or for participating in anti-apartheid organizations or movements, suppressed and retaliated against for their union activities; offered jobs conditioned on moving to another geographic region because of their race; and/or forced to work in an employment environment that replicated the apartheid system by the Defendants acting alone and/or in complicity with the apartheid state.

151    The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable  Plaintiffs believe that there are many thousands of members

44

of the class as described above, although the number and identities of individual class members are presently unknown and can be ascertained only through discovery.

152    There are questions of law and fact common to the class that predominate over any questions affecting only individual class members.

153    Among the questions of law and fact common to the class are the following:

a.    Whether Defendants actively participated in extrajudicial killing of those who opposed and/or protested against the South African apartheid state, or subjected them to other forms of physical violence;

b.    Whether Defendants actively participated in the torture of those who opposed or protested against the South African apartheid state or against working conditions as members of union organizations;

c    Whether the Defendants suppressed and retaliated against those who participated in anti-apartheid political movements or union activities or expressed similar views;

d.    Whether the Defendants implemented apartheid by facilitating or participating in the geographic separation of the races;

e.    Whether Defendants implemented apartheid through de-nationalization;

f.    Whether Defendants internally replicated the system of apartheid in their offices and/or plants; and

g.    Whether these actions against the class members were committed by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise; or whether the actions were

45

committed directly by the Defendants themselves; or whether each Defendant and the state acted as the agent of the other

154.    Plaintiffs' claims are typical of the claims of the other members of the class, since all such claims arise out of Defendants' actions in actively providing support for the apartheid system and for the elimination of anti-apartheid employees or others and their activities in exploiting the apartheid system to replicate apartheid in their own internal operations  Plaintiffs have no interest antagonistic to the interests of the other members of the class.

155.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel with extensive experience in the prosecution of human rights actions and class actions.  Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class.

156.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action.

157.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation  A class action is superior to other available methods for the fair and efficient adjudication of this controversy

158.    Although most class members are located in South Africa, this will not hamper the ability to pursue this case as a class action since communication with class members can be made with the assistance of various attorneys and non-governmental organizations operating in South Africa.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (APARTHEID AS A CRIME AGAINST HUMANITY)

## (AGAINST ALL DEFENDANTS)

159    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below

160    All Plaintiffs, on behalf of themselves and the classes they represent, seek relief from crimes against humanity committed by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise or as agents or committed directly by the Defendants themselves

161    The crimes against humanity for which Defendants are liable are acts which were knowingly committed as part of widespread or systematic attacks directed against a civilian population.

162    The acts which form the basis of Defendants' liability for crimes against humanity include apartheid itself as well as murder, deportation or forcible transfer of population, revocation of nationality, imprisonment or other severe deprivation of physical liberty in violation of international law, torture, the persecution against any identifiable group or collectivity on political, racial, national, or ethnic grounds, and/or other inhumane acts of a similar character intentionally causing great suffering or serious injury to body or to mental or physical health

163.    Each single act constitutes a crime against humanity because it was committed within the context of widespread or systematic attacks against a civilian population. In addition, apartheid itself has been long recognized as a crime against humanity.

164     Plaintiffs and the members of the class or classes they represent suffered injuries as a result of Defendants' actions.

165     The Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights  As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant

**SECOND CLAIM FOR RELIEF**

**(DENIAL OF THE RIGHT TO A NATIONALITY)**

**(AGAINST DEFENDANT IBM)**

166.     The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

167     Plaintiff Phiri on behalf of himself and the class he represents seeks relief from the denial of the right to a nationality committed against him by the apartheid state with the complicity of Defendant IBM, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.  Defendant IBM conspired with state actors.  Defendant IBM and the state each acted as the agent of the other.

168.     Plaintiff Phiri and the class he represents were stripped of their South African nationality and citizenship, were restricted in their ability to travel in to, out of and around South Africa, and were discriminated against by being forcibly geographically separated and segregated into homelands on the basis of race.

169.     Plaintiff Phiri and the class he represents suffered injuries as a result of Defendant IBM's actions

48

170.    Defendant IBM's actions were committed with knowing and callous disregard for Plaintiffs' rights    As a result, Plaintiffs are entitled to an award of punitive damages against Defendant IBM

### THIRD CLAIM FOR RELIEF

### (EXTRAJUDICIAL KILLING)

### (AGAINST DEFENDANTS DAIMLER, FORD, AND GM)

171    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

172.    Plaintiffs Molefi, Ngcaka, Dyonashe and Mzamo on behalf of themselves and their murdered sons, Hector Pieterson, Thembekile Ngcaka, Vuyani Adonis, and Bubele Mzamo, and the classes they represent, seek relief from extrajudicial killings committed against them by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise    Each Defendant conspired with state actors    Each Defendant and the state acted as the agent of the other

173.    These Plaintiffs and the class, or classes, they represent suffered injuries as a result of these Defendants' actions

174    These Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights    As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant.

## FOURTH CLAIM FOR RELIEF

## (TORTURE)

## (AGAINST DEFENDANTS DAIMLER, FORD, AND GM)

175.    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

176.    Plaintiffs Botha, Peters, Tamboer, Nonyukela, and Simangentloko, on behalf of themselves and the class, or classes, they represent, seek relief from torture committed against them by the apartheid state with the complicity of these Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.  Each Defendant conspired with state actors.  Each Defendant and the state acted as the agent of the other.

177    The tortures described herein were inflicted deliberately and intentionally for purposes that included, among others, punishing the victims or intimidating the victim or third persons

178    Plaintiffs and the class, or classes, they represent suffered severe mental and physical injuries as a result of these Defendants' actions

179.    These Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights.  As a result, Plaintiffs are entitled to an award of punitive damages against each of these Defendants.

## FIFTH CLAIM FOR RELIEF

## (CRUEL, INHUMAN OR DEGRADING TREATMENT)

## (AGAINST ALL DEFENDANTS)

180.    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

181.    All Plaintiffs and the class, or classes, they represent suffered injuries as a result of Defendants' actions that constitute cruel, inhuman or degrading treatment (CIDT)

182    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

183    The acts described herein constitute CIDT committed against the Plaintiffs by the apartheid state with the complicity of Defendants, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise; or committed directly by the Defendants themselves Each Defendant conspired with state actors. Each Defendant and the state acted as the agent of the other.

184    All Plaintiffs and the classes they represent suffered injuries as a result of Defendants' actions

185.    The Defendants' actions were committed with knowing and callous disregard for Plaintiffs' rights   As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant.

### PRAYER FOR RELIEF

186.    WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows

    i    for compensatory damages, including general and special damages;

    ii    for punitive damages,

    iii.    for disgorgement of profits,

    iv    for costs of suit, including attorneys fees, and

    v.    for such other and further relief as the Court deems appropriate

SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN

By: _Paul Hoffman_ PH
　　Paul L. Hoffman (PLH-9867)


723 Ocean Front Walk
Venice, California 90291
(310) 396-0731
Attorneys for Plaintiffs


Judith Brown Chomsky, Esq.
Law Offices Of Judith Brown Chomsky
Post Office Box 29726
Elkins Park, PA 19027
 (215) 782-8367
Attorneys for Plaintiffs


Helen I. Zeldes, Esq.
Zeldes & Haeggquist, LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
(619) 995-8218
Attorneys for Plaintiffs

NAGEL RICE, LLP

By: _Jay J. Rice_ DE
　　Jay J. Rice (JJR-9171)
　　Diane E  Sammons (DES-9029)


103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400
Attorneys for Plaintiffs


Tyler R  Giannini, Esq
International Human Rights Clinic, Human
Rights Program
Harvard Law School
Pound Hall 401
1563 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-9362
Attorneys for Plaintiffs

52

Adv. Dumisa Buhle Ntsebeza, SC
Duma Nokwe Group of Advocates
Fountain Chambers
Cnr Gwen & Maude Streets
Sandown Village
Sandton 2196
P.O Box 784845
Sandton 2146
Republic of South Africa
Attorneys for Plaintiffs

John Sindiso Ngcebetsha
Gugulethu Oscar Madlanga
Ngcebetsha Madlanga Attorneys
Corner Maude & Fifth Street
Nelson Mandela Square
4th Floor, South Towers
PO Box 544
Randburg 2125
Republic of South Africa
Attorneys for Plaintiffs

Adv. Michael Francis Osborne*
512 Keerom Street Chambers
56 Keerom Street
8001 Cape Town
Republic of South Africa
Attorneys for Plaintiffs
*Attorney Admitted in New York, the
Southern District of New York and the High
Court of South Africa

Medi Mokuena
Mokuena Attorneys
268 Jubilice Avenue, Extension 12
Halfway House
PO Box 8591
1685 Johannesburg
Republic of South Africa
Attorneys for Plaintiffs

Dated   October 27, 2008

53

**<u>EXHIBIT C</u>**

**<u>Balintulo Putative Class Claim</u>**
**<u>Proof of Claim No. 10162</u>**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>Motors Liquidation Company (f/k/a General Motors Corporation) | Case Number<br>09-5006 (REG) |
|---|---|

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

| Name of Creditor (the person or other entity to whom the debtor owes money or property)<br>Sakwe Balintulo and others on attached rider | ☐ Check this box to indicate that this claim amends a previously filed claim |
|---|---|
| Name and address where notices should be sent<br>Steig D Olson<br>Hausfeld LLP<br>11 Broadway, Suite 615<br>Telephone number<br>(212) 830-9850    New York, NY 10004 | Court Claim Number _____<br>*(If known)*<br><br>Filed on _____ |
| Name and address where payment should be sent (if different from above)<br><br>FILED - 10162<br>MOTORS LIQUIDATION COMPANY<br>F/K/A GENERAL MOTORS CORP<br>SDNY # 09-50026 (REG)<br><br>Telephone number | THE GARDEN CITY GROUP, INC<br>OCT 14 2009<br><br>☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars<br><br>☐ Check this box if you are the debtor or trustee in this case |

| 1  Amount of Claim as of Date Case Filed    $ TBD (see attached rider) | 5  Amount of Claim Entitled to Priority under 11 U S C §507(a)  If any portion of your claim falls in one of the following categories, check the box and state the amount |
|---|---|
| If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4<br><br>If all or part of your claim is entitled to priority, complete item 5<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges | Specify the priority of the claim<br><br>☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B) |

| 2  Basis for Claim  Violation of the Alien Tort Statute and Federal common law.<br>(See instruction #2 on reverse side ) | |
|---|---|
| 3  Last four digits of any number by which creditor identifies debtor  02 MDL 1499 (SAS)<br>                                                                                                                      03 CV 4529 (SAS)<br>    3a  Debtor may have scheduled account as _____<br>         (See instruction #3a on reverse side ) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4) |
| 4  Secured Claim (See instruction #4 on reverse side )<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information<br><br>Nature of property or right of setoff  ☐Real Estate  ☐Motor Vehicle  ☐Other<br>Describe<br><br>Value of Property $_____  Annual Interest Rate_____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any $_____    Basis for perfection _____<br><br>Amount of Secured Claim  $_____    Amount Unsecured· $_____ | ☐ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)<br><br>☐ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8) |
| 6  Credits  The amount of all payments on this claim has been credited for the purpose of making this proof of claim | ☐ Other – Specify applicable paragraph of 11 U S C §507 (a)(__) |
| 7  Documents·  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side )<br><br>DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING  See attached complaint<br><br>If the documents are not available, please explain | Amount entitled to priority<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment |

| Date·<br>10/13/09 | Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any<br><br>/ STEIG D. OLSON, ESQ. | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim*  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

**HAUSFELD**LLP

212-830-9850 ph
212 480 8560 fax

11 Broadway
Suite 615
New York NY 10004

Steig D Olson
solson@hausfeldllp com

October 9, 2009

**VIA MAIL**

The Garden City Group, Inc
Attn. Motors Liquidation Company Claims Processing,
P O Box 9386
Dublin, OH 43017-4286

Re:    **Motors Liquidation f/k/a General Motors Chapter 11
        Case No. 09-50026**

To whom it may concern

Enclosed please find my clients' Proof of Claim in the above-referenced matter

Very truly yours,

**HAUSFELD LLP**

Steig D Olson

## PROOF OF CLAIM

## RIDER

1. **Name of Creditors:**

    Sakwe Balıntulo

    Dennıs Vıncent Frederıck Brutus

    Mark Fransch

    Elsıe Gıshı

    Lesıba Kekana

    Archıngton Madondo

    Mpho Alfred Masemola

    Mıchael Mbele

    Mamosadı Catherıne Mlangenı

    Reuben Mphela

    Thulanı Nunu

    Thandıwe Shezı

    Thobıle Sıkanı

2. **Amount of Claim:**

    The amount of claım ıs contıngent based on pendıng lıtıgatıon as outlıned ın the attached

complaınt

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAKWE BALINTULO as personal representative of SABA BALINTULO, DENNIS VINCENT FREDERICK BRUTUS, MARK FRANSCH as personal representative of ANTON FRANSCH, ELSIE GISHI, LESIBA KEKANA, ARCHINGTON MADONDO as personal representative of MANDLA MADONDO, MPHO ALFRED MASEMOLA, MICHAEL MBELE, MAMOSADI CATHERINE MLANGENI, REUBEN MPHELA, THULANI NUNU, THANDIWE SHEZI, and THOBILE SIKANI, <br><br> Plaintiffs, <br><br> v. <br><br> DAIMLER AG, FORD MOTOR COMPANY, FUJITSU LTD, GENERAL MOTORS CORPORATION, INTERNATIONAL BUSINESS MACHINES CORPORATION, and RHEINMETALL GROUP AG, <br><br> Defendants. | 03 Civ. 4524 (SAS) <br><br> 02 MDL 1499 (SAS) <br><br> CORRECTED SECOND AMENDED COMPLAINT <br><br> JURY TRIAL DEMANDED <br><br> CLASS ACTION |

Plaintiffs, on behalf of themselves and all other individuals similarly situated, for their Corrected Second Amended Complaint, filed pursuant to the Court's Opinion and Order of April 8, 2009, state as follows

## I.    NATURE OF THE CASE

1    Plaintiffs bring this class action under the Alien Tort Claims Act, 28 U S C § 1350, against corporations that knowingly aided and abetted the South African security forces, as defined herein, or otherwise participated in a joint criminal enterprise in furtherance of the crimes of apartheid, extrajudicial killing, torture, prolonged unlawful detention; and cruel,

inhuman, and degrading treatment in violation of international law  Plaintiffs are the personal representatives of victims of extrajudicial killing, or were themselves direct victims of the aforementioned crimes perpetrated by the security forces of the apartheid regime between 1960 and 1994

2       Defendants—companies that supplied armaments, military vehicles, and computerized racial passbook systems to the security forces—provided not only practical assistance to the South African security forces, but material, logistical, and other means of practical support, which had a substantial effect on the commission of said crimes  The abuses that Plaintiffs suffered were a reasonably foreseeable result of Defendants' collaboration with the security forces of South Africa's apartheid regime  In return, Defendants benefited from apartheid and, consequently, the violence and terror that was used to maintain and enforce it at the expense of Plaintiffs and the members of the proposed classes discussed herein

3       Defendants knew that the actions of the South African security forces constituted violations of international norms toward Plaintiffs and the classes, but nevertheless provided such assistance with the knowledge and/or purpose of facilitating those crimes  Beginning in 1950, the world community condemned apartheid and the acts of violence and terror committed by the South African security forces to enforce and maintain apartheid as crimes in violation of fundamental, internationally-recognized human rights  The world community specifically identified the manufacturers of armaments and military vehicles, the technology corporations that designed and supported the racial passbook systems, and the banks that funded and collaborated with the security apparatus, as closely connected to the South African security forces and their violent acts  Defendants were on notice that their involvement violated international law and constituted knowing participation in and/or aiding and abetting of the

2

crimes of apartheid, extrajudicial killing, torture, prolonged unlawful detention; and cruel, inhuman, and degrading treatment

## II.    JURISDICTION AND VENUE

4        This Court has subject matter jurisdiction pursuant to 28 U S C. § 1350, the Alien Tort Claims Act ("ATCA"), and 28 U S C § 1367 for any additional claims not otherwise covered by the ATCA

5        This matter was originally brought in the Eastern District of New York, where venue was proper pursuant to 28 U S C § 1391

6        The matter was consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and was transferred to the Southern District of New York

## III.    DEFINITIONS

7        Apartheid literally means "separateness "[1] Apartheid is defined by the Rome Statute of the International Criminal Court as "inhumane acts        committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime "[2] Article II of the International Convention on the Suppression and Punishment of the Crime of Apartheid defines apartheid as a system that includes murder, the infliction of serious bodily or mental harm, torture or cruel, inhuman, and degrading treatment, and the institution of measures calculated to prevent a racial group from participation in the political, social, economic and

---

[1]    Robert Ross, *A Concise History of South Africa* 115 (Cambridge University Press  1999)

[2]    Rome Statute of the International Criminal Court, art. 7(1)(j), July 17, 1998, 2187 U N T S 90, 37 I L M  999

3

cultural life of a country, in particular by denying the group or groups basic human rights or freedoms [3] Apartheid is a variant of genocide

8      "Apartheid regime" refers to the country of South Africa during the period 1948 to 1994, when that country was ruled by the National Party

9      "Bantustan" refers to the barren, rural areas where Blacks were restricted or forcibly resettled  These areas were also called "homelands" or rural reserves  "Bantustan" comes from the word "Bantu," an isiXhosa and isiZulu word that was co-opted during apartheid and used by some white South Africans as a derogatory term to refer to Black Africans [4]

10      "Black" refers to all African, Indian, and "Coloured" South Africans unless otherwise indicated

11      "Plaintiffs" includes all named class representatives

12      "Coloured" is used as a synonym for "mixed race "

13      "Genocide" is defined, in part, as "deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part "[5]

14      "SAP" refers to the South African Police

15      "SADF" refers to the South African Defense Force

16      "Security forces" includes the South African military, paramilitary, police, special operations, intelligence, anti-riot, and other security units

---

[3]   International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U N T S 243, art II

[4]   Kevin Danaher, *In Whose Interest? A Guide to U S – South Africa Relations* (Washington, DC  Institute for Policy Studies, 1985) at 107

[5]   Convention on the Prevention and Punishment of the Crime of Genocide Art  2(c), Dec  9 1948, 78 U N T S  277

4

## IV.    PARTIES

### A.    Plaintiffs

17    **Sakwe Balintulo** is the personal representative and brother of **Saba Balintulo**, who was murdered by the SAP on March 15, 1973  On that day, Mr  Balintulo and fifteen friends were walking in the road, when the SAP opened fire on them  Mr  Balintulo was first shot in the leg and then shot three more times in the torso  The gun shots killed Mr  Balintulo as well as his fifteen friends

18    **Dennis Vincent Frederick Brutus** was detained and shot by the SAP   The recipient of a doctoral degree and numerous honorary doctorates, in 1961 Dr  Brutus was banned from teaching, publishing poetry, and attending gatherings  In 1963, Dr  Brutus was arrested in Johannesburg while on his way to attend a meeting of the South African Non-Racial Olympic Committee, of which he was president  The police transported him to a prison in a security vehicle  When released on bail, Dr  Brutus fled to Swaziland and Mozambique, was arrested by the Portugese secret police, and was turned over to the SAP  In September 1963, Dr  Brutus attempted to escape but was shot through his back by the South African Secret Police  He was hospitalized in Fort Prison Hospital until December 1963  Dr  Brutus was sentenced to eighteen months hard labor in Leeuwkop Prison in January 1964, was transferred to Robben Island Prison in March 1965, and in July 1965 was placed under house arrest until July 1966  Dr  Brutus, who has served on the faculties of the University of Denver, Northwestern University, and the University of Pittsburgh, has testified three times before United Nations ("UN") committees on apartheid issues  He still suffers from his injuries.

19    **Mark Fransch** is the personal representative and brother of **Anton Fransch**, who was murdered by the SAP and the SADF in September 1989, when he was 20 years old  Mr  Fransch was a member of the African National Congress ("ANC")  SAP and SADF officers said

5

that Mr Fransch was a "dog" and that they would kill him   When Mr Fransch was staying at a house on Church Street in Crawford, thirty to forty officers, some of whom arrived in a Casspir vehicle, repeatedly shot into the house, killing Mr Fransch and leaving flesh and hair on the wall

20      **Elsie Gishi** was shot by the SAP on December 26, 1976   On that day, as Ms Gishi returned from work, she found a group of youths protesting in her township   There was a heavy police and military presence   The officers kicked in the door of her house and one soldier shot Ms Gishi from a Casspir vehicle   Multiple bullets entered her back and remain lodged in her chest and arms   One bullet lodged in her throat   Another bullet is lodged inside a bone in her left arm and, as a result, she can no longer lift her left arm and the entire left side of her body is lame   She can no longer bathe herself or do other washing   The three remaining bullets cause her respiratory dysfunction and kidney problems   Ms Gishi is permanently disabled and continues to suffer as a result of the shooting

21      **Lesiba Kekana** was tear gassed during numerous student gatherings in 1985 and 1986   Mr Kekana was unlawfully arrested by soldiers driving a Casspir vehicle   He was fingerprinted and detained without trial from June 1986 to February 1987   During his detention, he was tortured   Mr Kekana still suffers from the torture and abuse

22      **Archington Madondo** is the personal representative and father of **Mandla Madondo**, who was murdered by the SADF on July 10, 1986   Mandla Madondo was sent by his father to buy some bread   While he was standing with friends outside the shop, he was shot to death by South African soldiers who were driving down the street in a Casspir vehicle   Mandla Madondo was just 16 years old when he died   His twin brother, Thamsanqa, was arrested shortly after Mandla's murder and was imprisoned for one year without a trial

23      **Mpho Alfred Masemola** was arrested and detained without trial for two months in 1982 for not having a passbook  Between 1982 and 1984, Mr Masemola was monitored and under 24-hour surveillance because of his involvement organizing boycotts and with a banned organization  Mr Masemola was then imprisoned on Robben Island from August 11, 1985 to 1990  During his time in detention, Mr Masemola was beaten so badly that his arm was broken and had to be in a plaster cast for one year  He was also hit with iron bars while in detention for passbook violations  Mr Masemola was tear gassed at school, during riots, and in his prison cell  Mr Masemola spent one year in solitary confinement without treatment for his broken arm  The police also shot Mr Masemola  He still has bullet fragments lodged in his head that cause severe headaches  The bullet fragments cannot be removed  Mr Masemola still suffers from the torture.

24      **Michael Mbele**, born on October 31, 1944, was politically active in a union as a shop steward and was also a United Democratic Front member  Mr. Mbele was arrested twice for passbook violations after moving from the Transkei region of South Africa to KwaZulu Natal in 1973 without appropriate authorization  Then, in 1986, the Special Security Police detained Mr Mbele, transported him by a security vehicle to prison, and tortured him on account of his political activities  For three straight days police beat and shocked Mr Mbele with electric pipes, then choked him with a rubber tire  As a result of his torture, Mr Mbele lost his hearing  Mr Mbele's suffering continued for eleven more months as police placed him in solitary confinement  Mr Mbele still suffers from the torture

25      **Mamosadi Catherine Mlangeni** was arrested, detained, and fined for not having a passbook on as many as eight different occasions  Each time, she would be transported to prison by a security vehicle, detained for a period of days, and forced to pay 200 rand to be

released   There was never a trial for any of these violations   On many of these occasions Ms

Mlangeni was also beaten by the security forces   Ms Mlangeni believes she was monitored

The police would stop her and say things that indicated they knew who she was   Sometimes,

only a day after she was released from jail, the police would re-arrest her   Sometimes it was the

same police officers, while at other times it was their colleagues   Ms Mlangeni was even

stopped and told by the police that they were going to get her or her son, Bheki Mlangeni   In

1984 and again in 1986, Ms Mlangeni was placed under house arrest for two to three months

due to her son's status as an enemy of the state. Ms Mlangeni was constantly harassed by

police, who were trying to capture Bheki Mlangeni   The Security Branch came to her home

once, asking for her son, then hit and kicked her and destroyed her property when she told them

that Bheki Mlangeni was not there   Bheki Mlangeni was murdered in front of his family by a

parcel bomb that was planted in the earphones of a walkman on February 15, 1991   Ms

Mlangeni still suffers from these abuses

26      **Reuben Mphela** was detained and transported by security vehicle to a prison

several times between 1976 and 1982 for failing to produce a passbook   On these occasions, the

SAP came to arrest him at work   He was beaten, kicked, and made to jump like a frog   Mr

Mphela's family was traumatized by his imprisonment   He still suffers as the result of his

injuries

27      **Thulani Nunu** was shot by the SAP in 1985 when he was just six years old and

living in the Nyanga Bush   It was night time and the SAP was raiding houses and shooting at

youth with tear gas and live ammunition from Hippo military vehicles and vans. Panicked by the

noise and the tear gas that filled his house, Mr Nunu ran outside   The police fired at him from a

Hippo vehicle and struck him in the head and hand   As a result of his injuries, Mr Nunu lost

8

60% of the use of his hand   Because of his head wound, Mr Nunu has permanent visual and

hearing impairment   He still suffers from these injuries

28   **Thandiwe Shezi** was tortured and raped by the Security Police   On September 8,

1988, the police stormed into Ms Shezi's home and beat and strangled her in front of her

daughter   They then took Ms Shezi in a security vehicle to the Alexander Police Station where

they tortured her further   She was handcuffed and a wet sack was tied over her head.  She was

then taken to a room where she was electrocuted for twenty minutes   Next she was raped

repeatedly by four police officers   In addition to physical torture, the police also psychologically

tortured Ms Shezi   The police forced Ms Shezi to watch as they smashed another prisoner's

penis in a drawer   When the prisoner screamed out in pain they wanted Ms Shezi to laugh   On

one occasion, the police took Ms Shezi outside, stripped her naked and tied her to a tree   They

smeared her legs with butter, opened them wide, and threw ants all over her   The ants crawled

into her vagina   On at least one occasion, while Ms Shezi was being electrocuted, acid was

poured over her head   Because of the torture, Ms. Shezi could not eat solid food for almost a

month   She still suffers from the physical and mental effects of the torture and sexual assault

29   **Thobile Sikani** was repeatedly detained, tortured, and shot by the SAP   The

police shot Mr Sikani in 1983, while he was attending a funeral for four of his friends   Without

warning, the SAP opened fire on the funeral procession   Mr Sikani was carrying the coffin of

one of his friends when he was shot in the back and the left leg by the SAP   In 1986, the SAP

transported Mr Sikani by a security vehicle and fingerprinted and detained him at the Bishop

Lavis Police Station because he was chairperson of the ANC Youth League.  The SAP officers

beat Mr Sikani for hours and placed his scrotum and testicles in a machine that caused

excruciating pain and made Mr Sikani pass out   The SAP transferred Mr Sikani in a security

vehicle to other facilities where the torture continued   At Bellville-South Police Station, an SAP

officer inserted needles under Mr Sikani's finger nails to coerce Mr Sikani into talking about

the ANC, but Mr Sikani refused   Mr Sikani was then taken to the hospital and treated for his

injuries. After his treatment, the SAP took him back to the Wynberg Police Station where he

was detained for five months without trial   In 1987, Mr Sikani was again detained at the

Wynberg Police Station for two months and tortured   At one or more times during his

detentions, Mr Sikani was transported in a Casspir military vehicle   In 1988, Mr Sikani was

attending a welcome home rally for the ANC leadership when the police shot tear gas with a

pumpgun into Mr Sikani's face   Mr Sikani's stomach swelled up and he was rushed to the

hospital   Mr Sikani still suffers from the torture and abuse

**B.      Defendants**

30      Defendant **Daimler AG** ("Daimler") is a company organized and incorporated

under the laws of Germany with headquarters in Stuttgart, Germany   Daimler manufacturers and

markets a large variety of automobiles and other motor vehicles under the Daimler and

Mercedes-Benz names   Daimler does business in New York State and has offices in New York

State

31      Defendant **Ford Motor Company** ("Ford"), an international automobile giant, is

organized and incorporated under the laws of Delaware   Headquartered in Dearborn, Michigan,

Ford does business in New York State and has offices in New York State

32      Defendant **Fujitsu Ltd.** ("Fujitsu") is the parent company of Fujitsu Services

Ltd , the successor company to International Computers Limited ("ICL")   Fujitsu offers

infrastructure management, networking, systems integration, information technology

outsourcing, and hosting services to a variety of customers   Organized and incorporated under

the laws of Japan with its principal place of business in Tokyo, Japan, Fujitsu does business in New York State and has offices in New York State

33    Defendant **General Motors Corporation** ("General Motors"), a leading automobile manufacturer, is organized and incorporated under the laws of Delaware with its principal place of business in Detroit, Michigan  General Motors does business in New York State and has offices in New York State

34.    Defendant **International Business Machines Corporation** ("IBM") is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics  IBM is headquartered in New York State and does business in New York State

35    Defendant **Rheinmetall Group AG** ("Rheinmetall") is a holding company organized and incorporated under the laws of Germany with headquarters in Dusseldorf, Germany  Rheinmetall operates its armaments business through its division or sector known as Rheinmetall Defence, which directs production, marketing, and sales activities of its various subsidiaries  Rheinmetall and Rheinmetall Defence share the same headquarters, communications and press operations, and, since 2004, Chief Executive Officer ("CEO")  Prior to 2004, the Chair of Rheinmetall Defence's management board concurrently served on Rheinmetall's management board  Rheinmetall, on its own and through controlled entities (including Rheinmetall Defence) entered into contracts and solicited business and investors in the United States  Between 1996 and early 2004, Rheinmetall owned and conducted business through Hirschmann Electronics Inc , a civil electronics firm, which did business in New York State through authorized distributors  Rheinmetall is the parent company of Oerlikon Contraves AG ("Oerlikon"), a Swiss company with its principal place of business in Zurich, Switzerland, and a leader in armaments design and manufacture  Oerlikon was formed in 1989, upon the

11

merger of the Werkzeugmaschinenfabrik Oerlikon-Buhrle and Contraves  Oerlikon has been a

majority-owned subsidiary or division of Rheinmetall since 1999

## V.    CLASS ACTION ALLEGATIONS

36    Plaintiffs bring this action pursuant to Rules 23(a), (b), and (c) of the Federal

Rules of Civil Procedure  Plaintiffs seek certification of the following distinct classes

a    Extrajudicial Killing Class  All persons who are the surviving personal

representatives—including parents, spouses, children, siblings, and dependents—

of persons who were subject to extrajudicial killing by South African security

forces during the period from 1960 to 1994  Class representatives  Sakwe

Balintulo, personal representative of Saba Balintulo, Mark Fransch, personal

representative of Anton Fransch, and Archington Madondo, personal

representative of Mandla Madono,

b    Torture Class  All persons who were themselves subject to torture and

rape by South African security forces during the period from 1960 to 1994.  Class

representatives  Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani,

c    Detention Class  All persons who were themselves subject to prolonged

unlawful detention by South African security forces during the period from 1960

to 1994  Class representatives  Dennis Vincent Frederick Brutus, Lesiba Kekana,

Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni,

Thandiwe Shezi, and Thobile Sikani,

d    Cruel Treatment Class  All persons who were themselves subject to cruel,

inhuman, and degrading treatment by South African security forces during the

period from 1960 to 1994  Class representatives  Elsie Gishi, Lesiba Kekana,

Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben

Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile Sikani

37    The members of each of these classes are so numerous that joinder of all members

is impractical  The exact number and identities of all class members is not currently known, but

Plaintiffs believe that each proposed class numbers in the thousands  For example, according to

the ANC, the South African security forces were responsible for over 12,000 civilian deaths and

20,000 civilian injuries in the period from 1990 to late 1993 alone.[6]  Between 1960 and 1990,

over 80,000 opponents of apartheid were detained for up to three years without trial, including

approximately 10,000 women and at least 15,000 children under the age of 15 [7]  A 1988 report

noted

> Anti-apartheid and human rights groups, such as the Detainee Parents
> Support Committee (DPSC), have accused the security forces of
> widespread brutality, including torture of detainees, assaults, killings and
> rape, as well as, on occasion, the wanton destruction of property  More
> than 3,000 blacks reportedly have died in the violence of the last three
> years, many of them in confrontations with the security forces  More than
> 20,000 political opponents of the white regime have been imprisoned,
> including several thousand children [8]

38    There are questions of law and fact that are common to members of each distinct

class or to members of all classes, including, but not limited to

(a) whether and to what extent Defendants provided assistance to the South African

security forces,

---

[6]   African National Congress First Submission to the Truth and Reconciliation Commission,
Aug 1996, at 25 [hereinafter *First Submission*]

[7]   Kenneth Christie, *The South African Truth Commission* 21-22 (St Martin's Press, Inc , 2000)
Max Coleman (ed ), *A Crime Against Humanity  Analysing the Repression of the Apartheid State*
xi-xii (Mayibube Books, 1998)

[8]   Investor Responsibility Research Center, Inc , Social Issue Service, Proxy Issue Report, *Sales
to Strategic Entities in South Africa* (Feb 23, 1988), at G-10

(b) whether and to what extent Defendants substantially assisted the South African security forces in maintaining and enforcing apartheid through campaigns of violence and terror, including committing the crimes of extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment,

(c) whether and to what extent Defendants knew of the violence and terror perpetrated by the South African security forces, benefited from the system of apartheid and the crimes with and by which it was maintained and enforced, and continued to provide assistance for the purpose of facilitating the commission of those crimes,

(d) whether and to what extent Defendants aided and abetted or otherwise participated in or were liable for the crimes committed by the South African security forces,

(e) whether the system of apartheid enforced by the South African security forces is actionable under the Alien Tort Claims Act as a tort in violation of international law,

(f) whether the conduct of the South African security forces constituted extrajudicial killing, torture, prolonged unlawful detention, and/or cruel, inhuman, and degrading treatment and is actionable under the Alien Tort Claims Act as a violation of international law, and

(g) whether each plaintiff class is entitled to compensatory and/or punitive damages and equitable and/or injunctive relief, and the proper measure thereof.

39    Plaintiffs' claims are typical of those of their respective class(es) in that they (and/or the decedents they represent) were civilians who suffered extrajudicial killing, torture, prolonged unlawful detention, and/or cruel, inhuman, and degrading treatment by reason of the conduct of the South African security forces during the time period in which Defendants provided assistance to those forces

40    Plaintiffs will fairly represent the interests of their respective class(es) because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain    Plaintiffs have no interests that conflict with or are contrary to the interests of other class members

41    Plaintiffs will adequately represent their respective class(es) in that they are represented by counsel with extensive experience in international human rights and class action litigation

42.    Pursuant to Fed R Civ P 23(b)(3), questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy

43    In the alternative, certification of particular issues pursuant to Fed R Civ P 23(c)(4) is appropriate with respect to those issues identified in paragraph 38 and/or other significant common issues as resolution of these issues would significantly and materially advance this litigation, reduce the range of issues in dispute, and promote judicial economy

## VI.    BACKGROUND FACTS APPLICABLE TO ALL COUNTS

44    In 1948, the National Party won control of the South African government, using apartheid as its primary electoral platform [9]    After 1948, the electoral vote was taken away from all groups except the white minority [10]    The National Party then passed a series of laws to implement and institutionalize apartheid

### A.    Apartheid-Era Laws

---

[9]    Steven Debroey, *South Africa  Under the Curse of Apartheid* 188, 191 (University Press of America, Inc , 1990)

[10]    Christie, *supra* note 7, at 12

45      Apartheid is a crime against humanity [11]  It is a system of "inhumane acts committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime "[12]  It is a system that depends on systematic violence and acts of terror, including murder, the infliction of serious bodily or mental harm, torture, or cruel, inhuman, and degrading treatment, as well as institutional methods of disenfranchisement and segregation, for its maintenance and enforcement [13]

46      Apartheid-era laws classified all South Africans according to one of four races— white, "Coloured," Asiatic (Indian), and Native (African)[14]—and then designated specific residential and business areas for the sole use of particular racial groups   The majority of the land was reserved for whites.  As a result, non-whites were forcibly removed from their homes

47      The Bantu Authorities Act of 1951 provided for the establishment of separate rural areas or homelands called "Bantustans" for most Africans to live according to their often bureaucratically-imposed tribal identity [15]  "[T]he dilemma of Bantustan policy in the final analysis was one in which the contradiction of the apartheid attempt to confine black settlement to rural homelands along with the need to secure black, cheap labour power in the cities, created

---

[11]   Rome Statute of the International Criminal Court, art  7(1)(j), July 17, 1998, 2187 U N.T.S. 90, 37 I L M  999

[12]   *Id*  at art  7(2)(h)

[13]   International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U N T S  243, art  II

[14]   Nigel Worden, *The Making of Modern South Africa, Third Edition* 108 (Blackwell Publishers Ltd , 2000)

[15]   Christie, *supra* note 7, at 20

the repression, the hatred and the patterns which would lead to spiraling violence in later years "[16]

48      The government required all Africans over the age of 16 to carry passbooks, which included their Population Registration identity card, their fingerprints, and pages for any history of government opposition, labor control, and employer signatures [17] These regulations were referred to as "pass laws " Without the proper documentation, no African could legally enter or remain in an urban area [18]

49      These laws restricted the freedom of movement of Africans so as to channel workers where employers need cheap labor, facilitated the policing of workers, allowed the "weeding out" of the unemployed and "troublemakers," and confined and barricaded the "surplus population" in the rural slums of the Bantustans [19]

50      The pass laws were an instrument of coercion and control dating to the prior century "to have a hold on the native whom we have brought to the mines    . a most excellent law    which should enable us to have complete control of the Kaffirs "[20]

51      In addition to controlling movement and access to urban areas, the apartheid laws zoned residential and business districts on a racial basis [21] Amenities—including cinemas, restaurants, sports facilities, and public vehicles—were also officially segregated

---

[16] *Id* at 25

[17] *Id* at 5 "Natives Act "

[18] Bentley J Anderson, *The Restoration of the South African Citizenship Act    An Exercise in Statutory Obfuscation*, 9 Conn. J Int'l L  295, 310

[19] Robert Davies, Dan O'Meara and Sipho Dlamini, *The Struggle for South Africa* 171 (Zed Books, 1985)

[20] African National Congress Submission to Special Truth and Reconciliation Commission on the Role of Business, Nov 1997, at 2 (quoting the President of the Chamber of Mines at the end of the last century) [hereinafter *Role of Business*]. "Kaffir" is a derogatory term for Africans

52      Job reservation laws excluded Africans from better paid, more skilled categories of work [22] Master and Servant laws made it a crime—punishable by imprisonment—for Black workers to break an employment contract by, *inter alia*, desertion, insubordination, or refusing to carry out an employer's command [23]

53      Laws banned relations between races [24] The Immorality Amendment Act, barring intercourse between the races,[25] led to the jailing of over 6,000 people between 1950 and 1966 [26] The government also prohibited interracial marriages in 1949

54      The apartheid government also enacted laws to suppress dissent In 1956, the Riotous Assemblies Act was passed, granting the Minister of Justice wide powers to control public gatherings and to prohibit a gathering if he deemed that it posed a threat to the peace [27] The Act further allowed the police to disperse with force any gathering that took place in violation of its prohibition [28]

---

[21]  Davies, et al , *supra* note 19, at 172

[22]  *Id* at 174, *see, e g* Native Building Workers Act (1951), Industrial Conciliation Act (1956)

[23]  *Role of Business, supra* note 20, at 2   The laws remained on the books until 1977

[24]  *See* Worden, *supra* note 14, at 107 An Amendment to the Prohibition of Mixed Marriages Act was passed in 1968 to make void any illegal marriage by a South African, even if it took place outside of South Africa

[25]  The ban on intercourse between whites and Africans already was in place prior to this Act, which extended the ban to all non-whites The Act was further tightened in 1967 Brian Bunting, *The Rise of the South African Reich*, Chapter Nine South Africa's Nuremberg Laws 21 (Penguin Africa Library, 1969)

[26]  *Id* at 3 (discussing statistics of Minister of Justice in Parliament)

[27]  Other related legislation included the Internal Security Act of 1950, the Gatherings and Demonstrations Act of 1973, and the Dangerous Weapons Act of 1968 *See* Janine Rauch and David Storey, *Policing of Public Gatherings and Demonstrations in South Africa 1964-1994*

[28]  *Id* at 9

55    In 1960, the Governor-General gained power under the Unlawful Organizations Act to ban the ANC and the Pan-Africanist Congress [29] Other African organizations later were banned under the Affected Organizations Act[30] and the Internal Security Act, which also banned all political meetings during April 1, 1986 – March 31, 1987 as part of a State of Emergency [31]

**B.    The Violence and Terror of Apartheid**

56    "What was involved (in apartheid) was far more than simply the implementation of what the world regarded as a criminal policy  What was of even greater significance was the use of criminal means to defend apartheid  The massive powers given to the state to control people's lives and deny them their basic rights were not enough  They were supplemented by every species of common law crime, including systematic and organized murder, fraud, kidnapping and torture "[32]

57    "Some 16 5 million South Africans were criminalised and harassed under the pass laws     Four million people were forcibly removed from their homes and land during the heyday of apartheid social engineering  Three hundred apartheid laws were put on the statute books to control and disadvantage black South Africans from the cradle to the grave "[33]

---

[29]  Bunting, *supra* note 25, at 14.  The Unlawful Organizations Act also increased the fines and physical punishment under the Riotous Assemblies Act

[30]  David Webster and Maggie Friedman, *Repression and the State of Emergency  June 1987 – March 1989*  Glenn Moss and I  Obery (eds ), *State and Politics* 26-27 (Ravan Press Ltd , 1989)

[31]  *Id*  at 163  For a list of banned organizations, *see* Webster and Friedman, *supra* note 30 at 26-27

[32]  This quote was taken from the foreword to the Idasa "Truth and Reconciliation in South Africa" 1994 conference proceedings  *See* Christie, *supra* note 7, at 15.

[33]  Paul Connerton, *How Societies Remember* 1-4 (Cambridge University Press, 1989), *see, e g ,* Christie, *supra* note 7, at 13

58     Between 1960 and 1970, almost 2 million people were forcibly moved into the "Bantustans"[34] where they were "reduced to scraping a bare subsistence from eroded, overgrazed land."[35]

59     "An urbanized black population were subject to the whims of a government who could deport them, arrest them and transport them to places of work. On top of this system of forced migration and removal, the regime decided to create townships away from areas of employment, forcing labor to travel often long distances just to get to work."[36]

60     "The Surplus People Project, which      produced the most authoritative documentation of the history and scale of forced removals estimated that between 1960 and 1982 over 3 5 million South Africans were moved as part of this policy. Resistance to forced removals was met with severe repression by the state and resulted in people being killed and jailed."[37]

61     Hundreds of thousands of people were arrested each year for pass law violations. Failure to produce a passbook on demand was an arrestable offense regardless of how legally and how long one may have been living in an urban area. In 1976 alone, 250,000 Africans were arrested under the pass laws and related influx control laws, according to the Africa Fund.

62     According to the apartheid government's own statistics, 2,419,675 people were arrested or prosecuted under the pass laws between 1974 and 1985.[38]

---

[34] Davies, et al, *supra* note 19, at 208

[35] Danaher, *supra* note 4, at 48-9 Francis Wilson, Chpt 2 "Farming, 1866-1966" in Monica Wilson and Leonard Thompson's (eds), *The Oxford History of South Africa* (Oxford Oxford University Press, 1971)

[36] Christie, *supra* note 7, at 25

[37] *First Submission, supra* note 6, at 6

[38] International Defense and Aid Fund for Southern Africa, *Apartheid The Facts* 48-49 (1991)

63    It has been estimated that 12 million Blacks were unlawfully arrested and
convicted in summary trials between 1948 and 1985 for pass violations [39]

64    Resistance to apartheid reached a turning point in 1960  On March 21, 1960, a
crowd of between 7,000 and 20,000 gathered in Sharpeville to protest against the pass laws   The
demonstrators marched to the municipal police station to turn in their pass books  The police
opened fire on the crowd, using machine guns and automatic weapons  Sixty-nine people were
killed and 186 wounded, many of them women and children and most shot in the back as they
ran from the gunfire [40]

65    That same day, police fired on a crowd of 10,000 demonstrators in Langa, killing
two people and wounding 49 others [41]

66    Following Sharpeville, the state called its first State of Emergency   In the three
months following the March 1960 State of Emergency declaration, police detained over 10,000
people and arrested a further 10,000, primarily on the charges of pass violations [42]

67    The ANC described the resistance that began in the 1970s as follows·

The early 1970s witnessed a slowdown in the economy and increased
privations among the black population  Spontaneous as well as organized
mass resistance began to surface for the first time in a decade

Faced with internal mass upsurge, the response of the regime was brute
force  detention, closure of institutions, brutal suppression of
demonstrations and strikes, and in 1976, cold-blooded shooting of
unarmed pupils  The actions of the regime on 16 June 1976, and in the 18

---

[39] Kevin Hopkins, *Assessing The World's Response To Apartheid*, 10 U  Miami Int'l & Comp
L Rev  241, 247 (2001-2002)

[40] Christie, *supra* note 7, at 27-28, Steve Clark (ed ) *Nelson Mandela Speaks  Forging a
Democratic, Nonracial South Africa* 275 (Pathfinder, 1993)

[41] *Id*

[42] Webster and Friedman, *supra* note 30, at 141

months following this eruption, brought out in bold relief the
determination of the apartheid regime to deny human rights at all costs

Notes taken during a Cabinet meeting by Jimmy Kruger, at the time
Minister of Police, reveal an extraordinary level of self-delusion, or the
deliberate denial of reality in order to justify murder

> "10 8 76
> Unrest in Soweto still continues  The
> children of Soweto are well-trained  (  )  The
> pupils/students have established student councils
> The basic danger is a growing black consciousness,
> and the inability to prevent incidents, what with the
> military precision with which they act  The
> Minister proposes that this movement must be
> broken and thinks that police should perhaps act a
> bit more drastically and heavy-handedly which will
> entail more deaths
> Approved

As the decade came to a close, there was an attempt on the part of the state
to employ a new approach grounded in "total strategy", an explicit
commitment to mobilize military, economic, physical and psychological
resources in defense of the existing order  It brought senior police,
Defense Force and intelligence officers directly into the formulation and
implementation of government policy, through the State Security Council
and the National Security Management System  [43]

68    In response to the Sharpeville massacre and the growing trend of government

resistance, the SAP instituted Divisional Anti-Riot Units to deal with crowd control.[44]  In 1975,

the Divisional Anti-Riot Units gave way to new counter-insurgency units, dedicated to crowd

and riot control [45]

---

[43] African National Congress document, *The National Party and the Anatomy of Repression in
South Africa, 1984 – 1994* at 4 6 found at http //www anc org za/ancdocs/misc/trc04 html (last
visited Sept  30, 2008)

[44] Rauch and Storey, *supra* note 27  Furthermore, in 1964, the Defence Amendment Act
provided for the SAP to call upon the Citizen Force and Commandos in the event the police
needed support in suppression of civil unrest  As of 1967, all white 17-year olds would serve in
the Citizen Force or Commandos

[45] *Id*

69    Before 1984, the SAP were primarily responsible for controlling the resistance
But as the unrest spread from the townships around Johannesburg to the rest of the country,
SADF troops were deployed  In July 1985, a State of Emergency was declared in riot torn
targeted areas [46]

70    After 1985, the SADF, supplemented by the SAP, was deployed in most Black
townships  The SADF was responsible for enforcing emergency regulations which included a
ban on protest gatherings  The SADF was also deployed to force Black students who were
boycotting classes back to school [47]

71    On June 12, 1986 Minister of Law and Order Louis La Grange imposed yet
another State of Emergency  By June 1987, 26,000 people had been detained, equaling the total
detained under all previous emergencies and legislation for the past 26 years [48]

72.    In 1991, the Internal Stability Division, a division of the SAP mobilized to handle
racial unrest, was introduced under the government of President Frederick William de Klerk  By
the 1990s, a total of 72 riot units existed, 30 of them dedicated to the homelands [49]

73    These special Internal Stability Division riot units used offensive tactics and
heavy weaponry, such as batons, teargas, automatic weapons, shotguns, and handguns [50]  They
relied heavily on armored vehicles for crowd control [51]  According to a report of the TRC, "the
training and equipment of riot police, and the deployment ratios of these policemen relative to

---

[46]  Investor Responsibility Research Center Inc , *supra* note 5, at G-10

[47]  *Id*

[48]  Webster and Friedman, *supra* note 30, at 142

[49]  Rauch and Storey, *supra* note 27

[50]  Description of Weapons from CSVR, *see* Rauch and Storey, *supra* note 27, at 15–17, Exhibit G

[51]  Rauch and Storey, *supra* note 27

the size of the crowds that they confronted, were all based on the assumption that crowds would be controlled and dispersed through the use of force "[52]

74    The riot units viewed the use of lethal force as an acceptable and routine means of crowd control, and were responsible for most of the apartheid-era killings [53] "As the external environment in which they operated took on the character of a low-intensity civil war, their training, equipment, and methodology became increasingly militarized "[54] The TRC report noted that the riot policing function "was in direct contrast to reforms being made to public order policing methods elsewhere in the democratic world at this time "[55]

75    A panel of doctors from the National Medical and Dental Association who treated detainees after their release found that 83 percent of released detainees exhibited signs of physical abuse, and 25 percent of the released detainees alleged sexual abuse. Of those examined (ranging in age from 14 to 45), 95 percent showed symptoms of post-traumatic stress disorder Detention time ranged from 4 hours to 315 days [56]

76    Evidence from court records and lawyers indicates that the practice of torture to secure admission of guilt was common [57]

---

[52] *Id*

[53] *Id* at 1

[54] *Id*

[55] *Id* at 4

[56] *See* Webster and Friedman, *supra* note 30, at 167-68  Webster further notes that the DPSC (Detainee Parents Support Commission, which was renamed the Human Rights Committee of South Africa in 1995), the organization that created these reports, distinguishes between police custody and detention  Detention referring to those people held under security or state of emergency legislation, while police custody refers to people held under criminal legislation even if the motive for custody ostensibly is for political arrest  *Id* at 168

[57] *Controls on Exports to South Africa  Hearings Before the Subcommittees on International Economic Policy and Trade and on Africa of the H  Comm  on Foreign Affairs*, 97th Cong, 2d

77      The torture of detainees was the result of training and indoctrination, not the work of aberrant individuals  Many women detainees suffered sexual abuse  The families and friends of detainees were frequently subjected to sustained harassment and surveillance [58]

78      The violent, criminal acts committed by the apartheid regime were intended to cause death or serious bodily injury to civilians and the purpose of such acts was to intimidate and coerce the civilian population

79      Systematic violence, including extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment, was an integral and indispensable element of apartheid employed by the security forces to maintain and enforce the system

80      Between 1990 and the end of 1993, over 12,000 civilians were killed and at least 20,000 injured by the security forces of apartheid South Africa.  Many of the victims were women and children  The numbers of assassinations of anti-apartheid leaders also increased, from 28 in 1990, to 60 in 1991 and 97 in 1993 [59]

81.      In 1993, negotiations led to an agreement on the date for non-racial elections, and Nelson Mandela, as leader of the ANC, called for the lifting of economic sanctions

82      Apartheid officially ended in 1994 with the first universal suffrage general election and the election of Nelson Mandela

**C.      Truth and Reconciliation Commission Findings**

83      The South African TRC was set up by the Government of National Unity under the Promotion of National Unity and Reconciliation Act to assess and begin to heal the damage

---

Sess  Feb  9 and Dec  2, 1982 at 21 (statement of Goler Teal Butcher on Behalf of the Lawyers' Committee for Civil Rights Under Law)

[58] *First Submission, supra* note 6, at 2-3

[59] *Id*  at 25

inflicted by apartheid   Led by Archbishop Desmond Tutu, the TRC had a multiracial staff of more than 60, which pursued its mandate through three committees   the Amnesty Committee, the Reparation and Rehabilitation (R&R) Committee, and the Human Rights Violations Committee   The TRC began its hearings on April 15, 1996 and closed in early 2002, although the Amnesty Committee continued to decide cases after that date   The Final Report was released in March 2003

84    The TRC specifically found that "Certain businesses were involved in helping to design and implement apartheid policies   Other businesses benefited from cooperating with the security structures of the former state "[60]

85    The TRC also found that "Business failed in the hearings to take responsibility for its involvement in state security initiatives specifically designed to sustain apartheid rule   This included involvement in the National Security Management System   Several businesses, in turn, benefited directly from their involvement in the complex web that constituted the military industry "[61]

86    The TRC identified as participants in apartheid "businesses that made their money by engaging directly in activities that promoted state repression,"[62]  such as companies that "provided armored vehicles to the police during the mid-1990s,"[63] as would companies in the armaments industry   "the moral case against the armaments industry is essentially that business

---

[60]  Vol 4, Ch 2 of TRC "Institutional Hearing  Business and Labor," Findings Arising out of Business Sector Hearings, ¶ 161

[61]  *Id* at ¶ 166

[62]  *Id* at ¶ 26

[63]  *Id*

willingly (and for profit) involved itself in manufacturing products that it knew would be used to facilitate human rights abuses."[64]

## VII.    NOTICE AND KNOWLEDGE

87    Beginning in 1950, the world community condemned apartheid as a crime against humanity and instituted a variety of sanctions against South Africa  United Nations resolutions reflected this emerging consensus among civilized societies  Individual nations passed laws in response to the resolutions and in conformity with their objectives  Private and transnational organizations took similar steps to implement the objectives of the resolutions

88    These actions over a span of 40 years explicitly placed businesses involved in the financial and economic support of the security forces' abuses of the apartheid government on notice that their involvement violated international law and constituted knowing participation in a crime against humanity

89    For example, in 1960, the U N  Security Council issued a Resolution deploring "the situation arising out of the large-scale killings of unarmed and peaceful demonstrators against racial discrimination and segregation in the Union of South Africa," and called upon South Africa to abandon apartheid[65]

90    On November 6, 1962, the General Assembly called on member states to refrain from exporting arms and ammunition to South Africa, which would be used to increase "ruthlessness involving violence and bloodshed."[66]

---

[64] *Id*  at ¶ 75

[65] S C  Res  134, U N  Doc  S/RES/134  (Apr. 1, 1960)

[66] G A  Res  1761, U N  Doc  A/Res/1761(XVII) (Nov  6, 1962)

91      Less than one year later, on August 7, 1963, the Security Council adopted

Resolution 181 condemning the arms build-up in South Africa and calling on all States and their

domestic corporations to "cease forthwith the sale and shipment of arms, ammunition of all types

and military vehicles to South Africa "[67]

92      In 1968, the General Assembly declared apartheid to be a crime against humanity

> *Reiterates* its condemnation of the policies of apartheid practiced by the
> Government of South Africa as a crime against humanity,
>
> *Expresses its grave concern* over the ruthless persecution of opponents of
> apartheid under arbitrary laws        [68]

93      The General Assembly specifically "condemn[ed]"

> the main trading partners of South Africa, and the activities of those
> foreign financial and other interests, all of which, through their political,
> economic and *military collaboration* with the Government of South Africa
> and contrary to the relevant General Assembly and Security Council
> resolutions, are encouraging that Government to persist in its racial
> policies [69]

94      In 1972, The Security Council passed a Resolution urging Member States to

observe the arms embargo against South Africa [70]

95      The International Conference of Experts for the Support of Victims of

Colonialism and Apartheid in South Africa met in Oslo, Norway, in 1973  The Conference

---

[67] The Security Council reaffirmed this Resolution in December 1963 and included all
shipments of any materials that might be used to build arms or ammunition  The Resolution
again was strengthened in July 1970  Security Council Resolution, *Question Relating to the
Policies of Apartheid of the Government of the Republic of South Africa, See* S C  Res  181, U N
Doc S/RES/181 (Aug  7, 1963), S C  Res ,182 U N  Doc  S/RES/182 (Dec  4, 1963), S C  Res
282, U N  Doc. S/RES/282 (July 23, 1970)

[68]  G A  Res  2396, U N  Doc  A/RES/2396 (XXIII) (Dec  2, 1968)

[69]  *Id* (emphasis added)

[70]  S C  Res  311, U N  Doc  S/RES/311 (Feb  4, 1972)  Also in 1972, the General Assembly
declared that "the United Nations has a vital interest in securing the speedy elimination of
apartheid " *See* G A  Res  2923, U N  Doc  A/RES/2923 E (XXVII) (Nov  15, 1972)

adopted the following program of action

> (68) The international arms embargo should be fully implemented by all
> States, and the Security Council should expose those States which violate
> it, especially France, and secure their compliance The Security Council
> should take further action to prevent the importation or arms from South
> Africa by other States The Security Council should also examine all other
> forms of military co-operation with South Africa and take appropriate
> action [71]

96    Following discussions relating to the Conference's findings, the General

Assembly adopted the International Convention on the Suppression and Punishment of the Crime

of Apartheid [72] The Convention declared apartheid a crime against humanity, and all

participants in apartheid as criminals, whether they were organizations, institutions, or

individuals Article II of the Convention defined apartheid as

> [s]imilar policies and practices of racial segregation and discrimination as
> practiced in southern Africa, shall apply to the following inhuman acts
> committed for the purpose of establishing and maintaining domination by
> one racial group of persons over any other racial group of persons and
> systematically oppressing them
>
> a   Denial to a member or members of a racial group or groups of the right
>     to life and liberty of person
>
>     1   By murder of members of a racial group or groups,
>
>     2   By the infliction upon the members of a racial group or groups
>         of serious bodily or mental harm, by the infringement of their
>         freedom or dignity, or by subjecting them to torture or to cruel,
>         inhuman or degrading treatment or punishment,
>
>     3   By arbitrary arrest and illegal imprisonment of the members of
>         a racial group or groups,

---

[71]  The Programme of Action Adopted by the International Conference of Experts for the
Support of Victims of Colonialism and Apartheid in South Africa (Oslo, April 9-14, 1973), G A
Res 9061, U N Doc A/RES/9061 (May 7, 1973)

[72]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015
U N T S 243

   b   Persecution of organizations and persons, by depriving them of
       fundamental rights and freedoms, because they oppose apartheid

97      Article III of the Convention described who would be held responsible for

committing the acts outlined in Article II

   International criminal responsibility shall apply, irrespective of the motive
   involved, to individuals, members of organizations and institutions and
   representatives of the State, whether residing in the territory of the State in
   which the acts are perpetrated or in some other State, whenever they

   a    Commit, participate in, directly incite or conspire in the
        commission of the acts mentioned in article II of the present
        Convention,

   b.   *Directly abet, encourage or cooperate* in the commission of the
        crime of apartheid [73]

98      Following the submission of the Preliminary Report of July 14, 1976, by the

Special Rapporteur to the Special Committee against Apartheid, the General Assembly adopted a

Resolution condemning "the collaboration of     those foreign economic interests which

maintain and/or continue to increase their collaboration with the racist regimes in southern

Africa, especially in the economic, *military* and nuclear fields "[74]

99      In 1976 and again in 1977, the Security Council by Resolution condemned

apartheid and specifically the South African Government for "its resort to massive violence

against and killings of the African people, including schoolchildren and students and others

---

[73] International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015
U N T S 243, art III (emphasis added)

[74] G A Res 31/33, U N Doc A/RES/31/33 (Nov 30, 1976) (emphasis added)

opposing racial discrimination "[75] The Security Council demanded an end to the violence

against and repression of Black people and to release all political prisoners [76]

100    In 1977, the Security Council once again called for an arms embargo against

South Africa, but this time made it mandatory by invoking Chapter VII of the U N  Charter [77]

101    In November 1979, the United Nations Special Committee Against Apartheid in

South Africa co-sponsored an International Seminar on the Role of Transnational Corporations

in South Africa  The Seminar expressed the view that "transnational corporations bear a major

share of responsibility for the maintenance of the system of apartheid, for *strengthening the*

*repressive and military power* of the racist regime and for the undermining of international

action to promote freedom and human dignity in South Africa "[78]

102.    Following acts of police violence against student demonstrators, the Security

Council adopted a Resolution supporting the arms embargo and condemning the violence in

South Africa

> 1  *Strongly condemn*[ed] the racist régime of South Africa for further
> aggravating the situation and its massive repression against all opponents of
> *apartheid*, for killings of peaceful demonstrators and political detainees and for its
> defiance of General Assembly and Security Council resolutions  . .

> 3  *Reaffirm*[ed] that the policy of *apartheid* is a crime against the
> conscience and dignity of mankind and is incompatible with the rights and dignity
> of man, the Charter of the United Nations and the Universal Declaration of
> Human Rights and seriously disturbs international peace and security,

---

[75]  S C  Res  392, U N  Doc  S/RES/392 (June 19, 1976)

[76]  S C  Res  417, U N  Doc. S/RES/417 (Oct  31, 1977).

[77]  S C  Res  418, U N  Doc  S/RES/418 (Nov  4, 1977)

[78]  Charles Peter Abrahams, *The Doctrine of Odious Debts* (Rijks Universiteit Leiden, Aug
2000) at 79 (citing Transnational Corporations in South Africa and Namibia, The Review –
International Commission of Jurists, No  36-39 (1986-87), at 34) (emphasis added)

31

11 *Request*[ed] the Security Council Committee    to redouble its efforts to secure full implementation of the arms embargo against South Africa by recommending by 15 September 1980 measures to close all loop-holes in the arms embargo, reinforce and make it more comprehensive [79]

103    The U N General Assembly declared by Resolution that.

> *continuing* political economic and *military* collaboration of certain Western states and their transnational corporations with the racist regime of South Africa encourages its persistent intransigence and defiance of the international community and constitutes a major obstacle to the elimination of the inhuman and criminal system of apartheid in South Africa [80]

104    The General Assembly adopted a Resolution in December 1983 "reaffirming that apartheid is a crime against humanity" and strongly condemning the apartheid regime for its repression and brutal acts of torture, murder, and terror   The Resolution specifically criticized "transnational corporations and financial institutions that have increased political, economic and *military collaboration* with the racist minority regime of South Africa despite repeated appeals by the General Assembly    "[81]

105    In 1984, the General Assembly adopted another Resolution "vigorously" condemning

> transnational corporations and other organizations which maintain or continue to increase their *collaboration* with the racist regime of South Africa, especially in the political, economic, *military* and *nuclear* fields, thus encouraging that regime to persist in its inhuman and criminal policy

---

[79]   S C  Res  473, U N  Doc  S/RES/473 (June 13, 1980).

[80]   General Assembly Resolution, *Policies of Apartheid of the Government of South Africa Situation in South Africa*, G A  Res  36/172 A, U N  Doc  A/RES/36/172 A (Dec  17, 1981) Further, the United Nations General Assembly proclaimed the year 1982 as International Year of Mobilization for Sanctions Against South Africa   General Assembly Resolution, *Policies of Apartheid of the Government of South Africa, International Year of Mobilization for Sanctions Against South Africa*, *see also*  G A  Res  36/172 B, U N  Doc  A/RES/36/172 B (Dec  17, 1981) (emphasis added)

[81]   G A  Res, 38/39, U N  Doc  A/RES/38/39 A (Dec  5, 1983) (emphasis added)

of brutal oppression of the peoples of southern Africa and denial of their human rights [82]

106     The Security Council further condemned apartheid as "a system characterized as a crime against humanity" including the "continued massacres of the oppressed people, as well as the arbitrary arrest and detention of leaders and activists of mass organizations" [83]

107     In 1984, the General Assembly again condemned the increasing violence of the Apartheid regime [84]

108     In 1985, the Security Council urged states to prohibit "all sales of computer equipment that may be *used by the South African army and police* "[85]

109     In 1986, the Security Council urged

States to take steps to ensure that components of embargoed items do not reach the *South African military establishment and police* through third countries,

all States to prohibit the export to South Africa of items which they *have reason to believe are destined for the military and/or police forces of South Africa, have a military capacity and are intended for military purposes*, namely, aircraft, aircraft engines, aircraft parts, electronic and telecommunication equipment, computers and four-wheel drive vehicles.[86]

---

[82]   G A Res 39/15, U N Doc.,A/RES/39/15 (Nov 23, 1984) (emphasis added)

[83]   S C. Res 556, U N Doc S/RES/556 (Oct 23, 1984)

[84]   General Assembly Resolution, *Policies of Apartheid of the Government of South Africa Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G A Res 39/72 A, U N Doc A/RES/39/72 A (Dec 13 1984) These voluntary sanctions were renewed in 1985 General Assembly Resolution, *Policies of Apartheid of the Government of South Africa Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G A Res 40/64 A, U N Doc A/RES/40/64 A (Dec 10, 1985)

[85]   S C Res 569, U N Doc S/RES/569 (July 26, 1985) (emphasis added).

[86]   S C Res 591, U N Doc S/RES/591 (Nov 28, 1986) (emphasis added)

110    The General Assembly in 1989 adopted another Resolution regarding the supportive ties of international corporations, including banks, with South Africa, noting that "the maintenance of the *apartheid* economy and *the expansion of military and police expenditures* substantially depend on the supply of further credits and loans by the international financial community    "[87]

111    These United Nations resolutions as well as the accompanying domestic legislation of individual states singled out the manufacturers of armaments and military vehicles, the technology corporations that designed and supported the passbook systems to enforce racial segregation and the suppression of dissent, and the banks that funded and collaborated with the security apparatus and provided specific forewarnings that their assistance to the security forces of the South African apartheid regime knowingly and intentionally aided and abetted torts in violation of international law

112    The United States adopted numerous export regulations to reduce the supply of strategic goods, technologies, and financing to the security forces of the apartheid regime

113    In 1963, the United States adopted an arms embargo against South Africa, except for existing contracts

114    In 1971, the Department of Commerce enacted regulations stating "In conformity with the United Nations Security Council Resolution of 1963, the United States has imposed an embargo on shipments to the Republic of South Africa of arms, munitions, military equipment, and materials for their manufacture and maintenance "[88]

---

[87]  G A Res 44/27, U N Doc A/RES/44/27 (Nov 22, 1989) (emphasis added)

[88]  15 C F R § 385 4 (1971)

115    This ban remained in effect until 1978, when it was expanded to cover a broader

range of goods and technologies destined for use by the apartheid security forces  The revised

regulations stated.

> An embargo is in effect on the export or re-export to the Republic of South
> Africa or Namibia *of any commodity*, including commodities that may be
> exported to any destination in Country Group V under a general license,
> where the exporter or reexporter knows or has reason to know that the
> commodity will be sold to or used by or for military or police entities in
> these destinations or used to service equipment owned, controlled or used
> by or for such military or police entities [89]

116    Under the U S regulations, "A validated export license [was] required for the

export to the Republic of South Africa and Namibia of any instrument and equipment

particularly useful in crime control and detection    "[90]

117    In 1981, the list of commodities subject to the U S  embargo specifically included

> vehicles specially designed for military purposes, such as military mobile
> repair shops, all other specially designed military vehicles, engines,
> including those modified for military use, pneumatic type casings (tires)
> constructed to be bullet proof or to run when deflated, specially designed
> components and parts to the foregoing, [and] pressure refuellers [91]

118    Likewise, the embargo applied to "Specialized machinery, equipment, gear, and

specially designed parts and accessories therefore specially designed for the examination,

manufacture, testing, and checking of the arms, ammunition, appliances, machines, and

implements of war, components and parts for ammunition, nonmilitary shotguns, barrel length

18 inches and over, [and] nonmilitary arms, discharge type "[92]

---

[89]  15 C F R  § 385 4 (1979) (emphasis added)

[90]  15 C F R  § 385 4 (1979)

[91]  15 C F R  § 379 (1981)

[92]  *Id*

119    In the technology sector, the Export Administration Regulations of 1982 provided

that

> An embargo is in effect on the export or reexport to the Republic of South
> Africa or Namibia of technical data    where the exporter or reexporter
> has reason to know that the technical data is for delivery to or use by or for
> the military or policy entities  In addition, users in the Republic of South
> Africa of technical data must be informed in writing at the time of export
> or reexport that the data may not be sold or otherwise made available,
> directly or indirectly, to the military or police entities in these
> destinations [93]

120    Export licenses were required under U S regulations for any computer exported

to government consignees  Licenses were awarded "on a case by case basis for the export of

computers which would not be used to support the South African policy of apartheid "[94]

121    The United States strongly condemned apartheid and restricted exports that would

substantially assist the South African government in maintaining or enforcing apartheid  As the

1983 Export Administration Regulations succinctly stated  "Authorizations for exports,

reexports, sales to or for use by or for military or police entities in the Republic of South Africa

will be denied except for medical supplies and similar goods "[95]

122    To ensure the embargo's efficacy, the Department of Commerce adopted a broad

definition of the term "military or police entities "  Commerce declared that "It is the

Department's position that the following are police or military entities  ARMSCOR, Department

of Prisons, Bureau of State Security, South African Railways Police Force, and certain municipal

and provincial law enforcement officials such as traffic inspectors and highway patrolmen."[96]

---

[93]  15 C.F R  § 385 4 (1982)

[94]  *Id*

[95]  15 C F R  § 385 4 (1983)

[96]  15 C F R  § 385 (1981)

123    The United States maintained broad export restrictions against South Africa until 1994, the year South Africa held its first universal suffrage general elections

124    For decades, Defendants were on notice that the security forces of the apartheid regime in South Africa had placed the Black South African population at an unjustifiably high risk of harm

125    During the relevant period, Defendants knew or should have known of the danger posed by the security forces of the apartheid regime to the Black South African population

126    Defendants acted in conscious disregard of, or with deliberate indifference to, these dangers by providing substantial assistance or encouragement to the security forces of the apartheid regime of South Africa

## VIII.   AIDING AND ABETTING:  KNOWLEDGE, INTENT, AND SUBSTANTIAL ASSISTANCE

127.    The Nuremberg Tribunals confirmed that those who knowingly aid and abet the commission of crimes in violation of international law are liable for those acts

128    The Nuremberg Tribunal held that

> [t]hose who execute the plan do not avoid responsibility by showing that they acted under the direction of the man who conceived it    He had to have the cooperation of statesmen, military leaders, diplomats and *businessmen*  When they, with knowledge of his aims, gave him their cooperation, they made themselves parties to the plan he had initiated They are not to be deemed innocent    if they knew what they were doing[97]

129    For example, the Military Tribunal convicted Emil Puhl, one of the leading executive officials of the Reichsbank, for participating as a banker in the disposal of looted assets

---

[97]  6 F R D  69 at 112 (emphasis added)

> What was done was done pursuant to a governmental policy, and the thefts
> were part of a program of extermination and were one of its objectives  It
> would be a strange doctrine indeed, if, where part of the plan and one of
> the objectives of murder was to obtain the property of the victim, even to
> the extent of using the hair from his head and the gold of his mouth, he
> who knowingly took part in disposing the loot must be exonerated and
> held not guilty as a participant in the murder plan  *Without doubt all such
> acts are crimes against humanity and he who participates or plays a
> consenting part therein is guilty of a crime against humanity* [98]

130   Similarly, Friedrich Flick, the head of a large group of industrial enterprises, was

convicted of slave labor based on his employee's decision to increase company production

quotas knowing that forced labor would be required to meet the increase [99]  Significantly, the

Tribunal held Flick fully responsible although the slave labor program had its origin in and was

operated by the Nazi regime, and he did not "exert any influence or [take] any part in the

formation, administration or furtherance of the slave-labor program "[100]  It was not a requirement

for liability that Flick specifically sought to use forced laborers  In fact, Flick testified that it was

not his intent to use slave labor, and denied full knowledge of slave labor until very late in the

war [101]

131   In addition to aiding and abetting liability, international and domestic law impose

liability for participation in a criminal enterprise where, inter alia, a party acted in furtherance of

a particular system in which the crime is committed by reason of the accused's function, and

with knowledge of the nature of that system and intent to further that system.[102]  Liability is

---

[98]   Ministries Case, Volume XIV at 611 (emphasis added)

[99]   United States of America v  Friedrich Flick, 6 Trials of War Criminals Before the Nuremberg
Military Tribunals Under Control Council Law No. 10 (1952)

[100]   *Id*  at 1198

[101]   *Id*  at 807

[102]   *Prosecutor v  Krnojelac*, IT-97-25, Judgment (Mar  15, 2002)

imposed on all persons who had "the intention to take part in a joint criminal enterprise and to further – individually and jointly – the criminal purposes of that enterprise" and where it is foreseeable that crimes—even crimes that do not constitute the common purpose—will be committed by other members of enterprise [103]

132    Apartheid, in and of itself, is a *jus cogens* violation of international law, on par with genocide and slavery

133    Article III of the International Convention on the Suppression and Punishment of the Crime of Apartheid specifically imposed liability on those who "irrespective of the motive involved . directly abet, encourage or cooperate in the commission of the crime of apartheid "[104]

### A.    Defendants Aided and Abetted and Otherwise Participated in the Commission of International Crimes

134    The security forces of the apartheid regime enlisted the aid of private multinational corporations to provide the means and methods to carry out the violence and terror necessary to maintain and enforce apartheid

135    Apartheid was "more than the programme of one political party."[105] Business interests were

> active participants and initiators in constructing a political and economic system which, in the end, was classified in international law as a crime against humanity    The period of extreme repression, from 1960 onwards, was intended to save the system that protected privilege based on race, thereby continuing to guarantee business its exclusive place in the South African economy and society [106]

---

[103]    *Prosecutor v Tadic*, IT-94-1, Judgment (July 15, 1999)

[104] International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U N T S 243, art III

[105] *Role of Business, supra* note 20, at 1

[106] *Id* The ANC noted that several core measures of apartheid were actively promoted by important business groups

136    The South African security forces depended on foreign sources for advanced technology, materials, goods, and services in three strategic sectors—armaments, technology, and transportation—that substantially assisted the regime to perpetuate apartheid and commit systematic acts of violence and terror against Plaintiffs and members of the classes, including extrajudicial killing, torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment

137    Certain businesses, including Defendants, played an important role in South Africa's defense of Apartheid from "civil unrest," cooperating closely with and providing logistical and other material support to the security forces of the apartheid regime

138    In 1977, P W Botha, then Minister of Defense, discussed the National Security Management System in a Defense White Paper   "The resolution of the conflict in the times in which we now live demands interdependent and coordinated action in all fields  military, psychological, economic, political, sociological, technological, diplomatic, ideological, cultural, etcetera "[107]

139    In May 1980, South African Prime Minister P W Botha appointed business leaders, including officers of Barclays, to a Defense Advisory Board   Botha told the House of Assembly that the Defense Force had succeeded in obtaining the goodwill and cooperation of business leaders and said

> [W]e have obtained some of the top business leaders in South Africa to serve on the Defense Advisory Board in order to advise me from the inside, not only about the armaments industry, but also about the best methods to be applied within the Defense Force   *I want to unite the*

---

[107] *First Submission, supra* note 6, at 9

40

> *business leaders of South Africa, representative as they are, behind the*
> *South African Defense Force* I think I have succeeded in doing so [108]

140    The South African security forces performed the wrongful acts of apartheid, extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment that caused Plaintiffs' injuries Defendants knowingly and substantially assisted the South African security forces in these violations of international law Defendants were aware of their role as part of an overall illegal or tortious activity at the time they provided assistance

141    From the time of the Sharpeville Massacre in 1960 until the fall of apartheid in 1994, it was common knowledge that the security forces of the regime were engaged in violent, criminal acts, that these acts were intended to cause death or serious bodily injury to civilians, and that the purpose of such acts was to intimidate and coerce the civilian population

142    Defendants' assistance to, and encouragement of, the apartheid security forces' acts of violence and terror spanned several decades. During this time, Defendants provided various forms of support to the security forces in a consistent and repeated manner—they made regular deliveries of equipment, provided long-term design and maintenance services, and participated in standing defense committees Defendants persisted in this course of conduct for many years after learning of the violent ends to which their assistance was put, ignoring the well-publicized and universally-condemned atrocities committed by the security forces in South Africa

**B.    The Armaments Sector**

143    The increase in militarism and the corresponding increase in arms production in South Africa were reactions in large measure to the internal social and political climate of the

---

[108] Abrahams, note 78, at 65 (emphasis added)

1950s and 1960s, when South Africans intensified their struggle to abolish the apartheid system In response to the popular struggle, the apartheid regime sought to acquire more modern military weaponry and lobbied heavily to import arms technology to the South African security forces.

144    The United Nations imposed a mandatory arms embargo against South Africa in 1977 with the express purpose of putting an end to the "massive violence against and wanton killings of the African people" by the apartheid regime, as well as "its acts of repression" and "its defiant continuance of the system of apartheid "[109]

145    All members of the United Nations—including Switzerland and Germany—were required to abide by the 1977 arms embargo by "ceas[ing] forthwith any provision to South Africa of arms and related material of all types      "[110]

146    The United States began restricting arms exports to the apartheid regime in 1964 After the mandatory United Nations arms embargo was imposed in 1977, the United States strengthened its export restrictions to prohibit all exports that the exporter knew or had reason to know would be sold to or used by military or police entities in South Africa [111]

147    In South Africa, the Armaments Development and Production ("ARMSCOR") state enterprise was developed by the apartheid regime in the late 1960s to "promote and co-ordinate the development, manufacture, standardisation, maintenance, acquisition, or supply of armaments "[112]

148    Due to the secrecy of these activities, not all facts are presently known  However, it is known that ARMSCOR worked closely with private companies, including Defendant

---

[109]  S C  Res  418, U N  Doc  S/RES/418 (Nov  4 1977)

[110]  G A  Res  1761(XVII), U N  Doc  A/Res/1761(XVII) (Nov  6, 1962)

[111]  *See* 15 C F R  385 4 (1979), *see supra* ¶ 115

[112]  Armaments Development and Production Act 57 of 1968

**Rheinmetall Group AG** ("Rheinmetall") and its subsidiaries and divisions, including Oerlikon Contraves AG ("Oerlikon"), to ensure that the security forces of the apartheid regime acquired the armaments and military equipment it needed to suppress dissent and control the population despite the international arms embargoes   The businesses linked to ARMSCOR also included Defendants IBM and Daimler, among others [113]

149   The ANC noted that many of the companies working with ARMSCOR were foreign "many of the local private sector corporations were not involved in the genuine development of these war materials   They were more often useful conduits for foreign technologies, helping the apartheid state to evade the UN arms embargo "[114]

150   The influx of armaments and related equipment, services, and expertise to ARMSCOR and the rest of the apartheid regime substantially assisted the suppression of dissent, the control and manipulation of the African population, and systematic violence against dissidents and non-whites in violation of international law

151   Defendant Rheinmetall, a top producer of armaments including the MK 20RH 202 (a component of the armored personnel carrier), the MG3 machine gun, and various weapons systems for battle tanks, exported significant quantities of armaments and related equipment and expertise to South Africa, for use by the security forces

152   In the 1970s, Rheinmetall, under fraudulent export declarations, exported a complete ammunition factory to apartheid South Africa to manufacture the 155mm extended range projectiles needed by the South African security forces

---

[113] COSATU Submission to the Truth and Reconciliation Commission Hearings on Business and Apartheid at 17

[114] *Role of Business, supra* note 20, at 8

153    Rheinmetall applied for a license to export a plant to Paraguay using a fictitious

company name, "Sudamerika Paraguay Exportacion-Importacion." When the exported plant

reached port in Brazil, ostensibly bound for Paraguay, the freight was re-loaded onto a ship

bound for Durban, South Africa

154.    The plant was erected in Pretoria and began operations in 1979  The plant made

ammunition at the rate of 80 to 100 rounds per hour

155    In addition to the munitions plant, Rheinmetall aided the South African security

forces in other ways, such as training members of the SADF in the use of certain artillery

systems on its Unterluss test range  Even after a criminal investigation was launched against

Rheinmetall in 1980, Rheinmetall continued these trainings

156    A German tribunal in the mid-1980s found that Rheinmetall had created fictitious

firms in foreign countries in order to disguise their business connections to the security forces of

South Africa, handed in false end-user declarations to the authorities, and concluded fictitious

contracts

157    Oerlikon, a subsidiary to Rheinmetall, is an international purveyor of defense and

space technology  In 1989, the Werkzeugmaschinenfabrik Oerlikon-Bührle and Contraves were

merged to form the present entity, Oerlikon Contraves. In 1999, this entity was sold to

Rheinmetall DeTec AG  Oerlikon is the successor-by-merger of Oerlikon-Buhrle, a company

that provided strategic arms and military technology to the apartheid regime

158    During apartheid, the head of Oerlikon-Buhrle, Dieter Bührle, was a member of

the Swiss-South African Association, a strong pressure and lobby group with enormous

influence on the shape of Swiss policy regarding South Africa  It was noted for inviting

apartheid leaders to Switzerland at a time when they were welcome hardly anywhere in the world

159     Bührle complained to the Swiss government in the mid-1960s that the embargo taking shape in Switzerland was hurting his company's business   When the Swiss government refused to reverse course on the South African embargo, Oerlikon-Buhrle sought to find ways around it

160     For instance, Oerlikon-Buhrle supplied South Africa with arms from its Italian subsidiary   The company also created military production subsidiaries outside Switzerland to serve that purpose

161     Where the supply from such subsidiaries was inadequate to meet the needs of Oerlikon-Buhrle's apartheid-regime clients, the company supplied South Africa with goods using the false end-user certificates   The company secured these false end-user certificates in France and shipped anti-aircraft cannons and ammunition valued at 54 million Swiss francs to South Africa

162     This creative supply to the apartheid security forces caused Oerlikon-Buhrle trouble in the late 1960s and early 1970s with the Swiss government   Oerlikon-Buhrle was tried and convicted of violating the embargo and its export license was suspended for three months Nonetheless, Oerlikon-Buhrle continued to supply illegal arms to the South African security forces.

163     Oerlikon-Buhrle's support of South Africa's security operations was so extensive that in 1978 Deiter Buhrle and others at Oerlikon-Buhrle were honored by the apartheid state and given the highest military honor

164    In the 1980s, Oerlikon-Buhrle focused on the sale of armaments patents and

licenses to South Africa  Throughout the 1980s, Oerlikon-Buhrle applied for numerous patents

on arms components with the objective of establishing Swiss-South African co-productions

This was crucial for South Africa because the apartheid regime sought to create a self-sufficient

armaments industry with ARMSCOR and its subsidiaries, eliminating the need to import

armaments from abroad  In 1987, the United States State Department informed the Swiss

embassy in Washington that Oerlikon-Buhrle had, between 1978 and 1986, applied for the

registration of numerous patents on arms components, such as fuses and artillery components

U S  intelligence advised the Swiss Foreign Ministry to examine the patents registered by

Oerlikon-Buhrle in the South African Patent Office  The Swiss declined  There was no reason,

the director for international organizations wrote in a confidential document, to "wake up this

sleeping dog "[115]

165    The weapons and arms technologies Rheinmetall supplied to the South African

security forces were made to kill, they had an inherent capacity for harm and were particularly

susceptible to harmful and illegal use under international law

166    Rheinmetall knew that the normal market for armaments was the security forces

Any sales or agreements Rheinmetall entered into with general government entities were done

with the understanding that the armaments would ultimately be used by the security forces  In

persisting with voluminous and repetitious sales of weapons and arms technologies to the

apartheid regime despite this knowledge, Rheinmetall turned a blind eye to its role in facilitating

ongoing atrocities in South Africa

---

[115]  Mario Poletti and Martin Stoll, *Kooperation mit den Rassisten*, Facts, (June 27, 2002) at 26

167    Rheinmetall acquired a stake in the criminal venture of the apartheid regime by making profits which it knew could only come from their encouragement of the security forces' illicit operations through the sale of weapons and arms technologies

168    Rheinmetall provided the South African security forces with the armaments and services to commit apartheid, extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that those armaments and services would be (or only could be) used in connection with that purpose

169    Rheinmetall knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law

## C.    The Technology Sector

170    Computers played a central role in the regime's ability to maintain and enforce apartheid since the South African population register was automated in 1955

171    Rep Howard Berman, the sponsor of legislation to ban computer sales to South Africa, testified in 1985 that

> Computers are essential to the South African government's pervasive control over every aspect of existence for every black individual From the age of sixteen, all Africans must carry passbooks indicating where they have permission to live and work and whether they are allowed to live with their families    Computers help in the collection, retrieval and use of this information    As the South African economy and population grew, political leaders became concerned that a growing white manpower shortage would inhibit the implementation of apartheid    Computers have helped solve that problem    Moreover computers have enabled the South African government to strengthen its grip on the population and intensify apartheid enforcement over recent years    Pass law arrests doubled between 1980 and 1982. Political detentions have increased sharply    Armed with more thorough and more readily available information on black residents, the government has accelerated forced removals of whole communities from so-called 'black-spots'—areas where black families

47

have lived for generations, but which the government has declared 'white'.[116]

172    The South African security forces used computers supplied by Defendants **International Business Machines Corp. ("IBM") and Fujitsu Ltd.**[117] ("Fujitsu"), including Fujitsu's subsidiary formerly known as ICL, to restrict Black people's movements within the country, to track non-whites and political dissidents, and to target individuals for the purpose of repressing the Black population and perpetuating the apartheid system

173    South African law required citizens to carry either a passbook or a Book of Life, depending on the person's racial classification  These books were used in conjunction with specially-designed, state-of-the-art electronic databases that stored information on the individual's race, employment status, criminal history, and residence

174    By the late 1970s, the South Africa National Intelligence Service maintained extensive computer files on government opponents

175    Through IBM and ICL systems, these computer files could be accessed instantaneously for research or reference purposes related to government dissidents

176    In 1980, the South African Criminal Bureau launched a computerized suspect tracking system  "Using remote terminal links, police operators at regional centers around the country have immediate access to a secret criminal data bank which stores details about anyone on the government's wanted list  Within minutes after police round up suspects in a raid, stop them for questioning, or pick them up for a violation of the pass laws, computer operators can tell the line officer whether the detainees are wanted."[118] This tracking system ran on ICL equipment

---

[116]  *Testimony of U S  Rep  Howard Berman Before the H  Comm  on Foreign Affairs,* 99th Cong (reprinted in Cong  Rec  Apr  18, 1985)

[117]  In 1990, Fujitsu Ltd  acquired an 80% stake in ICL and by 1998 it had complete ownership of ICL.  In 2001, ICL changed its name to Fujitsu Services Ltd

[118] NARMIC/American Friends Service Committee, *Automating Apartheid-U S  Computer Exports to South Africa and the Arms Embargo* (1982), at 30 (henceforth "*Automating Apartheid*")

177    The electronic databases and equipment supplied by IBM and ICL substantially advanced the government's ability to enforce the pass laws

178    In the early 1980s, an average of more than 70 people were arrested each day for pass law violations  It was foreseeable that these arrests, directly facilitated by Defendants' computer systems and software, would cause many citizens, including numerous Plaintiffs, to be unlawfully detained, tortured, raped, or subjected to cruel and degrading treatment

179    The South African government also used computers supplied by the IBM and ICL in defense research and arms manufacture

180    The South African government used computers supplied by the IBM and ICL to supply ammunition and supplies to military units. For instance, beginning in 1977, the SADF operated an automated military logistics system—using IBM equipment—to supply ammunition and other military supplies to military units

181    The single largest user of computers in South Africa was the apartheid regime

182    In 1965, ICL bid for and won the contract to design, implement, and service the computerized South African racial pass system

183    Pursuant to this contract, ICL developed an automated database of information on South Africa's Black population, including fingerprints, criminal histories, employment information, residency information, and details of political activities against the apartheid government

184    The automated passbook system that ICL sold or leased to the South African government was not a standard-issue product, it was specially designed for the apartheid government with a specific purpose. to facilitate the government's implementation of the racial pass system, the cornerstone of apartheid

185    In 1965, the creation of a fast, efficient, and accurate computer system of this magnitude required a significant amount of design and development time  ICL worked closely

with the South African government to design an automated application for the pass information that had previously not been computerized

186    To run this state-of-the-art system, ICL supplied the South African government with at least 588 computers used by the police, local authorities, and South Africa's defense industry

187    One such ICL computer was installed at the Bantu Reference Bureau in Pretoria in 1967  The Department of Plural Affairs ("DPA"), formerly known as the Bantu Affairs Department, played a key role in the government's regulation of its African population  The DPA operated through a network of 14 Bantu Administration Boards and served as an arm of the apartheid government in Black townships  The DPA's ICL computer network stored fingerprints and personal details on the 16 million South Africans whom the regime classified as "black" and was used to maintain the passbooks that were crucial to "influx control "

188    Influx control was the method by which Black workers were channeled into the labor force and confined to marginal, desolate reserves called "homelands "  In 1978, the DPA had 15 million sets of prints stored in its central computer and issued 900,000 new passbooks and identity documents to Africans  As the DPA noted, the computerized fingerprint record was "absolutely essential because it guarantees positive identification and precludes the possibility of foreign blacks infiltrating into the Republic "[119]

189    ICL's automated passbook system enabled the South African government to control the movement of Black people within the country and to track and target individuals to suppress political dissent

---

[119] NARMIC/American Friends Service Committee, *supra* note 118, at 17

190    ICL's automated passbook system enabled the security forces to centralize and transmit information on Black individuals at a rate and to an extent that would not have been possible without this advanced software and computer equipment

191    The ICL system played a crucial role in sustaining the apartheid government by expediting the detention, intimidation, or elimination of political dissidents and by facilitating the government's control of movements into and out of the homelands.

192    After winning the passbook contract in 1965, ICL continued to improve the design of the automated system and to service the equipment that supported it. In doing so, ICL engaged in ongoing collaboration with the South African government to facilitate and improve the racial pass system and, ultimately, to assist in sustaining apartheid

193    In addition to the automated passbook system, ICL also supplied at least four computers to the Bantu Administration Boards that ran the hostel system that housed African workers and administered the permits and controls that governed the movements of Africans

194    ICL further supplied the SAP with a central processor for their automated "criminal investigation" system In 1976, ICL delivered a more advanced computer to upgrade the police's system When the British press disclosed that the computers would be used to enforce the pass laws, British trade unions, members of the British parliament and anti-apartheid activists urged ICL to withdraw from the sale ICL, however, went ahead with the delivery

195    Following the November 1977 UN resolution and the 1978 tightening of the U S embargo, the sale of computers to South Africa for use by the military or police violated United States export restrictions Computers and related technologies were considered a strategic asset along with armaments and military equipment Nonetheless, ICL provided computers for use by the South African police force

51

196    In order to facilitate the government's ability to procure strategic equipment for the security forces after the mandatory embargo took effect, the apartheid government resorted to the use of a "dummy" front organization to procure sensitive equipment for the security forces Infoplan, a Pretoria-based data processing corporation offered hardware, software, computer training and services, acted as such a conduit   ICL had strong links to Infoplan

197    In 1978, the United States Commerce Department banned the export of all U S -origin products—including computers and other technological equipment—to the South African security forces, including the police, military, ARMSCOR, the Department of Prisons, the Bureau of State Security, the railway police, the traffic police, and in some cases the Bantu affairs agency

198    Despite this embargo, ICL (and IBM) continued to supply the South African security forces with high technology

199    ICL's finances deteriorated during the late-1970s, leading to the appointment of a new management team and the beginning of a relationship with Fujitsu [120]

200    ICL's relationship with Fujitsu began in 1981, with a collaboration between the companies on computer technologies intended to extend over a term of at least twelve years One feature of the collaboration permitted ICL to have access to Fujitsu emerging technologies, typically one year before general availability   ICL began to rely upon Fujitsu's semiconductor technology which was crucial to ICL's continued supply of computers in South Africa and elsewhere   As a result, ICL became increasingly dependent on Fujitsu, and Fujitsu management played an increasing role in directing ICL's business activities

---

[120] This paragraph and the following paragraphs contain supplemental allegations regarding Fujitsu

201    Initially, the collaboration was presented as arm's length, to avoid diluting ICL's credentials as a European and British company  However, this belied the nature of Fujitsu's ever-increasing control over the activities of ICL  Fujitsu's involvement with ICL at both the financial and technical levels increased steadily over two decades, eventually leading to 100% ownership by Fujitsu and then to the full integration of ICL into the Fujitsu company and the dropping of the ICL brand  Fujitsu also implemented elaborate guidelines about procedures to ensure it was knowledgeable about actions taken at ICL

202    In 1982, the United States fined ICL for selling computers to the SAP containing United States-origin disk drives, in violation of U.S. Export Administration Regulations

203    In 1990, Fujitsu acquired a controlling stake (80%) of ICL, paying $1 29 billion  This equity stake was largely redundant of the control Fujitsu already exercised due, in part, to ICL's dependence  The other 20% was retained by the parent STC plc, which was then owned by the Canadian company Northern Telecom  In 1998, Fujitsu purchased the remaining stake and, in 2001, changed ICL's name to Fujitsu Services Ltd

204    Like Fujitsu, Defendant **IBM** and its subsidiary and alter ego, International Business Machines South Africa Limited ("IBM-SA"), were intimately involved in sustaining the apartheid regime through the design, importation, installation, and maintenance of high technology systems for the South African government

205    IBM is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics  IBM Corp  is headquartered in New York State and does business in New York State  The South African subsidiary, IBM-SA, operated as the agent and/or alter ego of IBM Corp. at all times relevant to this complaint

206    IBM was the largest computer supplier in South Africa, with total annual sales

estimated at 300 million rand  Its relationship with the apartheid regime began in 1952, when

IBM-SA received its first order for an "electronic tabulator "  This tabulator was the first step in

the automation and expansion of the population control program, which became increasingly

sophisticated until the collapse of the apartheid regime

207    IBM provided the South African Department of the Interior ("DOI") with a

specially-designed, computerized population registry  IBM supplied the software and database

design as well as the hardware to run the system  Thomas Conrad of the American Friends

Service Committee, an authority on corporate involvement in apartheid, testified that

> for several years IBM has knowingly rented a Model 370 computer system
> to the South African Department of the Interior which is used for the
> regime's national identity system  The IBM machine stores files on seven
> million people the regime has designated as coloreds, Asians, and whites
>     Since IBM owns the equipment and leases it to the government, it
> could withdraw from the arrangement, but has declined to do so [121]

208    During the 1970s, new computers and peripheral equipment were added to expand

and upgrade the system's capability  IBM supplied multiple Model 370/158 mainframe

computers to the DOI  The DOI used the IBM system to process and store a vast quantity of

information about the designated population, including identity numbers, racial classification,

residence, and place of work  The system also contained a history of government opposition

The same IBM computer served as the basis for the "Book of Life," an identity document issued

---

[121] *Controls on Exports to South Africa  Hearings before the Subcomms  on International
Economic Policy and Trade and on Africa of the H  Comm  on Foreign Affairs*, 97th Cong. 72
(1982) (statement of Thomas Conrad, American Friends Service Comm ), *see also Economic
Sanctions and their potential Impact on U S  Corporate Involvement in South Africa  Hearing
before the Subcomm  on Africa of the H  Comm  on Foreign Affairs*, 99th Cong  22 (1985)
(statement of Dr  Jean Sindab, Executive Director, Washington Office on Africa) (testifying that
an IBM computer was used by the regime to maintain the pass system for the "Colored"
population)

to all those covered by the database   The IBM system was used to track racial classifications and movement for security purposes

209    The IBM computerized population registry was specially designed for the South African government   Its function was to assist the government in implementing and enforcing the racial pass laws and other structural underpinnings of the apartheid system, such as the suppression of political dissent   IBM custom-tailored this product to perform that function at the highest level for the apartheid regime

210    As of 1976, at least one third of IBM business in South Africa was done directly with the South African government   IBM computers were used by the Department of Defense, the Department of the Interior, and the Bantu Administration Boards, the local administrators of apartheid   The apartheid government was IBM's largest single customer in South Africa [122]

211    IBM's 370 computer was used by many South African government agencies, including the Department of the Prime Minister, the Department of Statistics, and the Department of Prisons, which was widely known to hold and torture political prisoners without trial   These agencies, which were a significant component of the apartheid state apparatus, relied on IBM computers for their administration

212    After the imposition of the mandatory embargoes in 1977 and 1978, IBM shifted much of its business with the South African government to Infoplan (see supra ¶ 196)   While IBM supplied Infoplan with parts, services, education and technical data which were not covered by the U S embargo, Infoplan in turn transferred this equipment and expertise to the SADF

---

[122] *Automating Apartheid*, at 6

213     Directly and indirectly, IBM was a top supplier for the SADF   The SADF

inventory of IBM computers included model 360s (for instance, a model 360 was installed at the

Simontown Naval Installation) and model 370s

214     IBM rented at least seven computers to Leyland-South Africa, a firm that

produced Land Rovers for the security forces and the police   IBM also rented several computers

to one of Pretoria's top explosives manufacturers, the African Explosives and Chemical

Industries, Ltd ("AECI")   AECI reportedly had specialized in the manufacture of riot control

gas, napalm, and nerve gas that were used against Plaintiffs and class members   At least four

AECI installations use IBM hardware   For instance, AECI employs an IBM computer at its

Modderfontein facility, where the company reportedly made the tear gas used against

demonstrators at the Soweto massacre

215     For much of the equipment leased to the South Africans, IBM provided

maintenance and service on the equipment over the term of the lease   IBM's regular servicing of

the apartheid government's computer systems, in addition to its custom design of certain

products, demonstrates how closely IBM collaborated with the South African government in

implementing and improving the enforcement of the racial pass laws and sustaining the apartheid

system

216     IBM conceded that the equipment and services it supplied to South Africa may be

used for repressive purposes, noting that "It's not really our policy to tell our customers how to

conduct themselves "[123]

---

[123] Erin MacLellan, *U S Business Debates South Africa Ties Limits on Computer Exports are Difficult to Enforce*, Washington Post, Aug 25, 1985

217    IBM was fully aware of Infoplan's relationship to the South African security forces when it supplied equipment and services to Infoplan after the imposition of the 1978 embargo

218    After IBM announced it was leaving South Africa, a letter was sent to customers by the Managing Director of IBM South Africa stating that "there will be no change to the supply of IBM products "[124]

219    Newspapers reported that "[a] letter leaked from IBM's Johannesburg offices reveals that IBM's pull-out from South Africa is not all it seems   Users are being reassured that IBM products and services will be freely available from the company established as a result of IBM selling off its subsidiary   And the letter boasts that the lack of restrictions will leave it free from international pressure       This has been interpreted as evidence that IBM's withdrawal was aimed at dodging international disapproval and as a means of taking political heat off IBM in the US "[125]

220    Anti-apartheid activists noted that the IBM's "pull-out" enabled it to expand its market in South Africa

> While computer firms like IBM are prohibited by U S  sanctions from supplying the South African government, the company's former South African subsidiary (and sole South African distributor), has recently become partners with Reunert Computers, to form a new company, Technology Systems International (TSI)  TSI, in turn, is part of Barlow Rand, Ltd , a giant South African conglomerate and a key part of South Africa's military industrial complex, which, through another Barlow Rand subsidiary, Reunert Technologies Ltd  supplies cluster bombs, components

---

[124] Letter of J F  Clarke, Managing Director, IBM South Africa, entitled "Notice to the Customers and Associates of IBM Throughout South Africa "

[125] *IBM Leak Reveals No Change in SA*, Datalink, Jan 29, 1987, Philip Basset, *Unions claim IBM Operations Still Continuing in South Africa*, Financial Times, Jan 14, 1987 (IBM "has in practice not withdrawn from its South African operations, in spite of its decision last October to disinvest in the country")

> for armored vehicles, electronic fuses for artillery and rocket shells, and military electronic and communications gear to the South African military and police    the new structure further increases the likelihood that IBM products and technology will be used in armaments applications [126]

221    In 1978, a year after the UN Resolution imposing a mandatory arms embargo on South Africa, IBM's South African sales jumped 250%

222    The computer systems and technologies IBM and ICL supplied to the South African security forces were designed to track and monitor civilians with the purpose of enforcing the racist, oppressive laws of apartheid. Moreover, this enforcement was often carried out by violent means. In the hands of their intended user, the apartheid security forces, the equipment and technology supplied by IBM and ICL had an inherent capacity for harm and was particularly susceptible to harmful and illegal use under international law

223    IBM and ICL knew that the normal market for these technologies was the security forces   Any sales or agreements IBM and ICL entered into with general government entities were done with the understanding that all equipment and technology linked to the passbook and Book of Life systems would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means   In persisting with voluminous and repetitious sales of computer equipment and technologies linked to the passbook and Book of Life systems to the apartheid regime despite this knowledge, IBM and ICL turned a blind eye to their role in facilitating ongoing atrocities in South Africa.

224    IBM and ICL made profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of computer equipment

---

[126] *Testimony of Jennifer Davis and Richard Leonard, American Comm on Africa, at the Hearings on the Arms Embargo, Security Council Comm Established by Resolution 421* (1977) Concerning the Question of South Africa, at 3-4

and technologies designed to implement and enforce the oppressive policies of apartheid. By reaping these profits, IBM and ICL acquired a stake in the criminal venture of the apartheid regime.

225    Defendants IBM and Fujitsu provided the South African security forces with the technology and services to commit apartheid, extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that that technology and those services would be (or only could be) used in connection with that purpose.

226    Defendants IBM and Fujitsu knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law.

**SUPPLEMENTAL ALLEGATIONS REGARDING IBM**

227    IBM South Africa (Pty) Ltd was incorporated in 1952 in South Africa as a subsidiary of IBM. IBM's largest client in South Africa was the South African government, accounting for about one third of its sales there.

228    At all times relevant to Plaintiffs' allegations, IBM provided computer technology, systems, software, training, and support to facilitate the apartheid governments' control of the majority black population. The maintenance of the complex apartheid system of population control organized by racial classification required sophisticated computer technology and knowledge of the kind provided by IBM.

229    After the U.S. Commerce Department banned the export of all U.S.-origin products to South African security forces, IBM circumvented that embargo by delivering products to South African security forces that were produced outside the United States, and therefore were not subject to the embargo. Given the widespread media coverage of atrocities

committed by apartheid security forces in defense of apartheid, IBM knew that it was substantially assisting the South African government in committing massive human rights violations, as alleged in this complaint, against its people

230    In 1987, IBM "sold" its South African subsidiary to a company created for the benefit of white IBM South Africa employees  However, IBM stated that it would provide a loan allowing local investors to buy the subsidiary  IBM retained a buy-back option to the new company as a term of the sale  The new entity was run by the person who was the general manager of IBM South Africa prior to the sale  IBM continued to sell its products, parts and services through the new company and continued to be the top supplier of computers to South Africa after the "divestiture"  Around 1992, IBM purchased a 24% stake in the local distributor of IBM products

### D.    The Transportation Sector

231    Military-style vehicles were a vital tool used by the security forces to perpetrate violence  The vehicles were used to patrol African townships, homelands, and other areas, and were instrumental in suppressing dissent and targeting Blacks and political dissidents

232    Defendants **Ford Motor Company** ("Ford"), **Daimler AG** ("Daimler"), and **General Motors Corporation** ("General Motors") knowingly and intentionally supplied vehicles, parts, and other equipment to the apartheid security forces  This equipment was specifically designed for the purposes of, and was in fact used for, transporting, arming, and protecting military personnel in offensive actions against Plaintiffs and class members  The equipment was used to patrol townships to target political opponents, repress the African population, quell public displays of dissent, and brutalize and kill many citizens as described herein

60

233    For instance, Defendant **Daimler** supplied the security forces with essential parts for their personnel carriers and armored vehicles  Daimler sold chassis, engines, transmissions, and other automotive parts to the security forces for use in military SAMIL[127] trucks and SAMAG trucks, army and police armored vehicles such as the "Unimog," "Casspir," "Hippo," "Buffel," and "Duiker", and the armored transporter "Blesbok "

234    Daimler designed and manufactured the military vehicle "Unimog," which was used as a component of many other security-force vehicles  Daimler Benz advertised its Unimog as a "military vehicle" in a March 1965 Portuguese magazine *Journal do Exercito*  The military version can be distinguished from the civilian version because the former has mountings for arms—such as the "Valkiri," a 127mm rocket launcher—gloss paint to avoid infrared detection, a 24-volt battery, and bulletproof tires [128]

235    According to the *Wehrtechnik*, a monthly defense technology journal, in 1976 "the Unimog [was] regarded as the best, small military transporter in Africa "

236    Daimler shipped approximately 6,000 Unimogs to South Africa despite the U N Security Council's mandatory arms embargo

237    The police and security vehicle "Casspir" used the chassis of a Unimog  Similarly, the "Buffel" used the Unimog as a component

238    The Casspir and Buffel were two of the most important vehicles used by the South African security forces  They were used to patrol townships, disburse civilian assemblies,

---

[127] The SAMIL 100 truck was designed in 1980 and production began in 1982

[128] Anti-Apartheid Bewegung Erwiderung  Antwort auf ein Dementi der Bundesregierung zur militärisch-nuklearen Zusammenarbeit Bundersrepublik Deutschland – Sudafrika, Bonn, (1979), at 26

and raid communities in search of political dissidents  The security forces used both the Casspir and Buffel, along with the Hippo, against Plaintiffs and class members [129]

239    The Casspir was designed for extreme durability  The base model Casspir was designed with a machine gun mount and the capacity to withstand gunfire and explosives

240    In addition to the Unimog chassis, Daimler supplied the Casspir's engine—a Mercedes Benz 6-cylinder turbo engine, capable of delivering 124 kilowatts of power at a rotation speed of 2,800 tr/min  The Mercedes Benz engine enabled the Casspir to travel at 90 miles per hour

241    Daimler likewise supplied the Casspir's Mercedes Benz transmission, a five-speed model equipped with two speeds in four-wheel drive

242    These military vehicles were heavily armored and equipped with numerous firing ports, machine guns, and cannons, all of which were employed in the control of South African townships

243    Beyond the Unimog, Casspir, and Buffel, Daimler supplied other vehicles to the South African security forces, such as the Mercedes Benz minibus used by the security forces against the populace during the late 1980s State of Emergency

244    Defendant **Ford** also had a long record of strategic vehicle and parts sales to the South African security forces during apartheid  Ford's vehicles were used by the South African security forces to patrol African townships, homelands, and other areas, as well as to arrest, detain, and assault suspected dissidents, violators of pass laws, and other civilians

245    Ford reported to the U S  Congress that it sold vehicles containing U.S.-made parts to the South African security forces up until the day, February 16, 1978, when such sales

---

[129]  Anti-Apartheid Bewegung, *"Mit Daimler fahrt Apartheid gut"*, op  cit , at 10

were prohibited by the U S Department of Commerce  Between 1973 and 1977, Ford sold 8,191

vehicles to the South African government central purchasing agency, police, and homelands

Ford sold at least 1,582 F series U S -origin trucks to the police [130]

246    In February 1978, the United States Department of Commerce issued regulations

that prohibited Ford from supplying passenger vehicles to the South African security forces,

because some of Ford's passenger vehicles contained U S -made parts [131]  Despite the

prohibitions, Ford continued to supply vehicles to the South African security forces  Ford denied

that its continued sales to the South African security forces ran counter to the U S  prohibitions,

on the basis that the vehicles did not contain parts or technical data of U S  origin [132]

247    Ford claims that it lost some sales to certain South African security forces as a

result of the February 1978 regulations, but the effects of those losses were minimal [133]  Ford's

sales to the South African security forces continued [134]

248    Occasionally these sales were halted by sanctions imposed by foreign

governments  For example

> In the mid-1960s, Ford bid on a contract to supply four-wheel drive
> vehicles to the government  But the Canadian government refused to issue
> an export permit to Ford's Canadian subsidiary, which was to supply the
> vehicles, on the grounds that the items might violate the then non-
> mandatory UN arms embargo against South Africa [135]

---

[130] *Id*

[131] 15 C F.R  § 385 4 (1979), *see supra* ¶ 115

[132] Letter from Sidney Kelly to Shareholder (May 8, 1980) ("Kelly Letter") at 1

[133] Karen Rothmeyer, *U S  Motor Industry in South Africa  Ford, General Motors and Chrysler*,
The Africa Fund 1979, p 8

[134]    Kelly Letter, *supra* note 132, at 1 ("FSA sells a small number of non-US origin civilian
vehicles to the Police and Military")

[135] Rothmeyer, *supra* note 133, at 12

249    In 1986, as justification for its continued sales to the South African security

forces, Ford explained that if it refused to supply military vehicles to the security forces, it could

lose all government sales in South Africa, which could in turn render the company economically

unviable in South Africa [136] Ford was willing to cater to the security forces' demands in order to

protect its other profitable operations with other branches of the apartheid regime

250    Ford sold its products to the South African security forces through a central

government purchasing authority  The central authority purchased vehicles for use by the

security forces

251    Defendant **General Motors** also knowingly and purposefully supplied vehicles

and equipment to the apartheid regime for "Defence Force purposes "[137]

252.    General Motors reported that in 1978 it sold 1,500 units annually to the SAP and

military  General Motors also provided police and transport vehicles for the Department of

Prisons  And, for at least 15 years, GMSA had a contract to supply Bedford trucks to the

SADF [138]

253    The Comprehensive Anti-Apartheid Act of 1986 prohibited any U S entity from

engaging in any form of cooperation with the South African security forces except for activities

that were reasonably designed to facilitate collection of necessary intelligence [139]

---

[136] Rothmeyer, *supra* note 133, at 13, Richard Knight, "Sanctions, Disinvestment, and U S
Corporations in South Africa," in *Sanctioning Apartheid* (1990, Robert E  Edgar, ed )

[137] GM South African – Contingency Plan, at 4-5, attached to memo from L H  Wilking of
General Motors South Africa, July 20, 1977, *GM Drafts Riot Plan for South Africa*, NY Times,
May 19, 1978 at 1, 14

[138] Rothmeyer, *supra* note 133, at 8

[139] White Wheels of Fortune  *Ford and GM in South Africa*, Interfaith Center on Corporate
Responsibility, Vol  8 No  6 1989, at 3A

254   In May 1986, General Motors stated that it would stop selling cars and trucks to police and military agencies in South Africa   Chairman Roger Smith indicated that General Motors would not bid for military or police sales any longer   General Motors also acknowledged that approximately ten percent of the vehicles it sold to the South African government were for police and military use [140]

255   Regulations issued by the United States Department of Commerce in February 1978 kept General Motors from supplying passenger cars to the South African security forces, since its passenger cars contained U S -made parts   But General Motors continued to supply commercial vehicles—primarily small trucks—to the security forces

256   The regulations, moreover, did not prohibit General Motors from selling to South African security forces via a foreign subsidiary   For example, General Motors of West Germany was not affected by the ban   It was also permissible for GM's South African subsidiary to produce General Motors cars in South Africa   General Motors used its foreign subsidiary, GMSA, to build the trucks and other vehicles that it sold to the South African security forces

257   Yet another means for supplying strategic goods to the apartheid security forces was to do so through a seemingly neutral distributor, such as the centralized purchasing agency. In a letter to the Interfaith Center on Corporate Responsibility, Chairman Murphy claimed, "General Motors does not sell directly to any military, para-military or police force in South Africa "   He admitted, however, that General Motors "sells commercial-type vehicles to the centralized purchasing agency of the government " [141]

---

[140]   *G M Cuts Its Sales to Pretoria*, N Y Times (Business Day) May 24, 1986

[141]   Letter from Thomas Murphy to Sister Regina Murphy (Jan 20, 1978) at 1

258    In addition to supplying this strategic security-force equipment, Defendants also assisted with its repair and maintenance

259    For instance, Daimler took on substantial responsibility for repairing military vehicles and their parts, including vehicles used for "the occupation and control of black urban settlements " One Mercedes Benz employee of Stuttgart, Germany, Joachim Jungbeck traveled to various Mercedes Benz factories in South Africa and reported to a July 1, 1988 shareholder meeting

> During a company visit, I was proudly shown aggregates of army vehicles, including huge numbers of axles from armoured vehicles        Storerooms contained large numbers of engines, axles and transmissions for Unimogs and armoured vehicles of the South African police and army  In between were parts for the armoured vehicle "Buffel"  The Buffel was used in the war against Angola and for the occupation and control of black urban settlements [142]

260    Mr. Jungbeck also reported that the maintenance work was "strictly confidential".

> Concerning the scale of maintenance services for the army Jungbecks guide, Mr Hawkey, said that this information was strictly confidential  A large number of army vehicles were being serviced and repaired, but in terms of service promotion the firm would not make use of it [143]

261    In 1989, the Daimler Benz board confirmed that the South African Army had a service and repair agreement with MBEUS [144]  MBEUS serviced and repaired parts for the South African security forces' fleet, including exchange engines, transmissions, axles, turbo chargers, and other truck parts

---

[142]  Application by Jungbeck for "the non-exoneration of the board of management and the supervisory board" and his speech at the shareholder meeting, Stuttgart, 1988

[143]  *Id*

[144]  Stuttgarter Koordinierungskreis der Aktion, Entrüstet Daimler, *Entrustet Daimler Erganzungen zum Geschaftsbericht 1989 der Daimler Benz AG*, Stuttgart (1990) at 8

262    Defendants' cooperation with the South African security forces for the servicing of military vehicles demonstrates how closely they collaborated with the apartheid regime to maintain and enforce apartheid

263    In addition to vehicles, parts, and maintenance, Defendants supplied the South African security forces with the necessary technology and skills to design and improve security force vehicles

264    For example, General Motors continued to supply its technologies and designs for equipment sold to the apartheid security forces even after it sold its South African motor vehicle subsidiary, GMSA, to local management in 1986

265    GMSA was renamed Delta Motor Corporation (Pty) Ltd ("Delta"), but it continued to manufacture General Motors vehicles under license    Under these licenses, General Motors technologies and designs were made available to the apartheid security forces

266    Through lucrative technology and design licenses, General Motors profited from its so-called "disinvestment" from South Africa    News reports noted that "GM earns licensing fees and Delta is doing better than as a subsidiary because it sells GM cars to the police and military,"[145] something General Motors could no longer afford to do after U S export regulations made it illegal

267    Defendants continued to cater to the apartheid regime despite knowing, or having reason to know, that their equipment and technology was being used to commit atrocious violations of international law

---

[145] Jim Jones, *Aftermath of the Exodus of U S Firm's Departure from South Africa hasn't helped Africans*, U S News & World Report, May 1, 1989

268    For example, two General Motors inter-office memoranda dated May 6, 1977 and July 20, 1977, respectively, outlined a contingency plan for GMSA during times of civil unrest All the preparatory work regarding the memoranda was intended to be "carried out quietly and discretely" so as to "avoid giving the impression that [GM] expect these things to happen "[146]

269    Likewise, in a speech before the Daimler shareholder meeting in June 1989 in Berlin, Dr Beyers Naudé addressed Edzard Reuter, then CEO of Daimler Benz

> The police shoot demonstrators, they even shoot mourners at funerals, as happened, for example, in Llanga. They shoot from cars driven by Daimler-Benz engines     Mr Reuter, you asserted that there are moral limits to arms delivery These are, and I quote you "If supplies end up in states which are ever so slightly suspected to intend using them in attacks against others states " I can assure you, Mr Reuter, that these vehicles, for which Daimler-Benz supplies the engines, are being used for aggressive purposes [147]

270    Defendants' support for the security forces of the apartheid regime extended into other areas, as well

271    For instance, to circumvent the increasingly strict embargoes on the importation of strategic military equipment to South Africa, Daimler assisted the apartheid regime in establishing the ADE factory The state-owned Industrial Development Corporation served as major shareholder of the factory (51 percent), and Daimler Benz owned 12 45 percent

272    Foreign competitors were informed that the South African Army would be one of ADE's main customers, and invited competitors to compete for this contract Daimler Benz and Perkins won the licensing agreements in late 1978

---

[146] July 20, 1977 Memo – Cover Page

[147] Dr C Beyers Naudé, Shareholder Meeting, Berlin, Germany (June 28, 1989)

273    Daimler Benz designed the ADE factory in Atlantis, which was completed in 1980 in a town established by the state exclusively for the building of ADE. Daimler was aware of the substantial strategic value of the factory  according to DaimlerChrysler Chairman Jurgen Schrempp, Daimler understood that "the authorities established ADE for strategic reasons "[148]

274    Daimler Benz merged with Messerschmitt-Bolkow-Blohn in 1989, which supplied helicopters to the SAP  Documentary footage from the 1980s shows the SAP using Messerschmitt-Bolkow-Blohn helicopters to control mass demonstrations and to identify and target political dissidents

275    In 1985-86, Daimler Benz bought 56 percent of the capital stock of Allgemeine Elektrizitatsgesellschaft ("AEG")  AEG provided strategic technologies to the apartheid security forces, including "short wave transmitters, relay stations, telephone and telex stations and computerised data processing capability "[149]  This equipment was used to assist "the South African government in its internal security by monitoring the identity and movement of [the] black population "[150]

276    The military vehicles, equipment, and services that Daimler, Ford, and General Motors supplied to the South African security forces were designed to enable the security forces to track and attack civilians, patrol communities, and terrorize the Black population with the purpose of perpetuating the oppressive apartheid regime.  In the hands of the apartheid security forces, the equipment supplied by Daimler, Ford, and General Motors—including armored tanks

---

[148] Interview with South African journal *Leadership* (1986), Anti-Apartheid Bewegung, *supra* note 129, at 7

[149] Ronald W Walters, "U S Policy and Nuclear Proliferation in South Africa." In  Western Massachusetts Association of Concerned African Scholars, Eds , *U S Military Involvement in Southern Africa* (1978) at 182-183

[150] *Id*

equipped with machine gun mounts and other types of military vehicles—had an inherent capacity for harm and was particularly susceptible to harmful and illegal use under international law

277    Daimler, Ford, and General Motors knew that the normal market for these vehicles was the security forces  The vehicles were both pre-equipped with armor and military fixtures and designed for easy modification by the security forces to add additional defensive and offensive features  Daimler, Ford, and General Motors entered into agreements with the apartheid regime with the knowledge that this equipment would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means  The defendant companies persisted with voluminous and repetitious sales of such equipment and service agreements despite this knowledge, turning a blind eye to their role in facilitating ongoing atrocities in South Africa

278    By making profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of vehicles, parts, designs, and services, Daimler, Ford, and General Motors acquired a stake in the criminal venture that was the apartheid regime

279    Defendants Ford, Daimler, and General Motors provided the South African security forces with the vehicles and services to commit apartheid, extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that those vehicles and services would be (or only could be) used in connection with that purpose

280    Defendants Ford, Daimler, and General Motors knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law

## SUPPLEMENTAL ALLEGATIONS REGARDING TRANSPORTATION SECTOR

281    In 1954, Daimler opened an office in South Africa  Beginning in 1958, Daimler, then known as Daimler-Benz AG, contracted with Car Distributors Assembly (CDA), a South African company, to produce Mercedes vehicles in South Africa  In 1966, CDA became a wholly-owned subsidiary of United Car and Diesel Distributors (UCDD), a South African company  In 1967, UCDD acquired a site in the West Bank area of East London, South Africa, and, at all relevant times, built Mercedes vehicles in the plant

282.    In 1984, Daimler acquired majority ownership and control over UCDD, and then renamed the company Daimler South Africa (Pty) Ltd.  During all relevant times, Daimler purposefully and/or knowingly controlled and/or oversaw operations at the Mercedes plant located in the West Bank area of East London, South Africa  Indeed, Daimler's management in Germany was involved in and aware of the activities material to the allegations in this complaint

283    At all relevant times, South African security forces collaborated with Daimler's managers and personnel to suppress peaceful labor and anti-apartheid political activities

284    While employed at Daimler, black South Africans were subjected to arbitrary arrest, detention, torture, and other cruel, inhuman and degrading treatment by the security forces acting in close collaboration with Daimler management  Daimler management provided information about anti-apartheid union activities to the security forces and facilitated the arrest, detention, and ill-treatment of certain employees in order to suppress those activities  Daimler's

head of security asked employees to spy on fellow employees  Daimler security officials also participated in the interrogation of black South Africans by the Special Branch

285    Daimler's senior management, including those in human resources and the security department, collaborated with state security forces, including members of the Special Branch, with respect to employees involved in union and anti-apartheid activities

286    Daimler supported the apartheid regime through the provision of vehicles to the South African security forces  At all relevant times, Daimler manufactured specialized vehicles, in whole or in part, for the South African security forces in its South African plants, including its East London plant.  Such vehicles included heavy trucks, designed for military purposes and armored personnel carriers

287    Daimler created paperwork that identified these vehicles as being intended for the South African security forces  Some vehicles were painted in the plant to meet security forces' specifications  Officials from security forces, sometimes in uniform, visited the plants on a regular basis to inspect the vehicles  At all relevant times, Daimler knew that its products would be used to violently suppress non-violent opponents of apartheid  The use of Daimler's vehicles to violate human rights was widely known

288    Daimler's vehicles regularly patrolled the townships  Security forces used them to intimidate, suppress, and control both strikers and anti-apartheid activities.  The use of Daimler's vehicles by the security forces resulted in injuries and deaths to numerous South Africans  By at least the 1980s, Daimler employees had begun to express opposition to being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities  Daimler management responded by emphasizing that it was a duty of all South Africans to support the security forces

289    At all relevant times, Daimler knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used Daimler vehicles in violating the human rights of black South Africans

290    In June 1976, a student protest began in Soweto against the use of Afrikaans as the official language of instruction   The protesting school children were met with a violent (and in some cases lethal) response by the security forces, who arrived in Soweto in vehicles produced for them by Ford, GM, and/or Daimler

291    In May 1985, black South Africans marched to mark the launch of International Youth Year   The march proceeded from East London toward Duncan Village   When they approached the township, security forces were waiting for the marchers   The security forces stood in front of a line of military vehicles ready to fire and asked the marchers to disperse, but they did not   Then, the security forces opened fire without warning   Although marchers had their arms raised in surrender, the security forces still fired at them

292    In August 1985, the funeral of Mrs Victoria Mxenge, a human rights attorney whose husband was a slain human rights lawyer, precipitated confrontations in Duncan Village   The security forces' violent response to the anti-apartheid unrest lasted through the month of August and became known as the Duncan Village Massacre   During that time, security forces shot and killed at least nineteen Duncan Village residents, and injured many more   The victims included children

293    In the early morning during one day of the Duncan Village Massacre, workers arrived at the Daimler plant in East London to find a notice posted saying that the plant was closed for the day   At that time the road into Duncan Village was open   During the massacre,

entrances to the township were sealed off, and, security forces in vehicles manufactured by

Daimler, Ford, and/or GM, patrolled the area

294    At a mass burial service for the victims of the massacre held later in August,

security forces once again opened fire on attendees resulting in additional injuries and death

Security forces continued to perpetrate violence against Duncan Village residents at least through

1986  Security forces relied on military vehicles manufactured by Daimler, GM, and/or Ford for

transport and protection throughout this time period

295    In 1985 and 1986, security forces shot and killed young black South Africans

from heavily armored military vehicles manufactured, in whole or in part, by Daimler, Ford,

and/or GM

296    GM ran its South African operations through its agent, GM South Africa (Pty) Ltd

(GM)  GM was incorporated in 1926 in South Africa  Senior management in South Africa

included American personnel at all times material to Plaintiffs' allegations

297    GM's operations at its factory in Port Elizabeth included the assembly and

marketing of vehicles for the government, including thousands annually to the security forces in

the mid-1980s  GM supported the apartheid regime with the provision of these vehicles  At all

relevant times before GM divested, GM manufactured specialized vehicles, in whole or in part,

for security forces in its South African plants  Such vehicles included heavy trucks designed for

military purposes and armored personnel carriers

298    GM created paperwork identifying these vehicles as intended for the South

African security forces  Some vehicles were painted in the plant to meet security forces'

specifications  Officials from security forces, sometimes in uniform, visited GM's plants on a

regular basis to inspect the vehicles   At all relevant times, GM knew that its products would be used to violently suppress non-violent opponents of apartheid

299.   GM's vehicles regularly patrolled the townships   Security forces used them to intimidate, suppress, and control both strikers and anti-apartheid activities   The use of GM's vehicles by the South African security forces resulted in injuries and deaths to numerous South Africans   Employees protested at being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities   When this occurred, GM management stated that anyone who protested the production of such vehicles would be assumed to be members of the African National Congress (ANC), even without any other evidence, and that anyone who was an ANC member would be fired

300   At all relevant times, GM knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used GM vehicles in violating the human rights of thousands of black South Africans   For example, GM was well aware that its vehicles were used in the state violence at Soweto and Duncan Village and many other similar incidents

301   GM denied black employees their freedom to assemble and promoted the apartheid regime by relying on the South African security forces to harass and assault its black employees to prevent them from unionizing   Even when black employees did unionize, GM management prohibited salaried employees from participating in union activities that supported anti-apartheid political organizations   GM allowed security forces onto its premises to help suppress lawful union activities   These security forces worked closely with GM management in suppressing union activities   They collaborated in the arrest of black GM employees who participated in union activity   GM human resources employees reported black GM employees

involved with unions to the security forces, who in turn arrested certain GM employees at the GM facilities  Employees were arrested, interrogated, and tortured because of their union and anti-apartheid activities

302    GM shared information about union leaders at its plants with the security forces, knowing that the security forces would detain and torture such leaders as a direct result

303    As part of an effort to claim divestiture, around January 1, 1987, GM "sold" its operations to a group of investors headed by local management  This effort at "divestiture" was a sham  The local management included no blacks or persons of mixed race  As part of the deal, GM agreed to pay the subsidiary's creditors and likely agreed to delay payment on the sale for 18 months  The sale terms included a buy-back option  When GM began divesting from South Africa, GM management stated that the company was "changing names only "  During the transfer period, GM management prohibited black employees from speaking with reporters  GM was subsequently renamed Delta Motor Corporation  GM licensed use of its trademark to Delta Motor Corporation and continued to sell its product through Delta Motor Corporation  The boxes and all the parts supplied continued to include the GM logo  GM transferred one of its senior management employees, an American with many years of experience at GM, to run Delta He had been a GM vice president in the United States shortly before assuming his post as head of Delta  Delta refused to sign the Sullivan Principles,[151] although it stated that it would follow nondiscriminatory employments practices and exercise social responsibility  The new ownership also said that it would "not preclude" sales to military and police  GM repurchased Delta in

---

[151] The Sullivan Principles were a voluntary code of corporate conduct developed by African-American preacher Robert Sullivan in 1977 to demand equal treatment for blacks employed by American companies operating in South Africa

1997  The "divestment" program was a purposeful attempt to evade international sanctions and to allow the maintenance of GM's system of internal apartheid

304    Ford's South African operations were conducted through Ford Motor Co of South Africa (Pty) Ltd (Ford South Africa)  Ford South Africa was formed in 1933  It was a wholly-owned subsidiary of Ford Motor Company of Canada, Ltd ("Ford Canada"), which was itself 76% owned by Ford U S  Ford South Africa assembled Ford vehicles from parts obtained locally as well as parts shipped from Ford Canada and Ford England  These shipments were intended in part to avoid U S  sanctions that did not permit supplying U S -made parts to South Africa

305    Senior top management in Ford in South Africa included American personnel Senior management in Ford included members of the Broederbond  When workers challenged the employment of these individuals, Ford management ignored these complaints

306    In 1985, Ford Motor Co of South Africa (Pty) Ltd merged with Amcar Motor Holding, the vehicles operations of Anglo American Corporation  The resulting entity was called South African Motor Corporation (SAMCOR).  As a result of the merger, Ford became a minority owner of the new company, with roughly a 42% interest  At all relevant times, Ford Motor Co and SAMCOR acted as agents of Ford

307    In its South African plants, Ford manufactured specialized vehicles for security forces, including large military trucks, armored vehicles and specialized sedans for the Special Branch  Ford created paperwork identifying the vehicles as intended for security forces, some of which specifically identified the police or the military as the recipients  Some vehicles were painted in the plant to meet security forces' specifications  High-ranking officials from security forces, sometimes in uniform, visited Ford plants on a regular basis, consulted with Ford

management and inspected the vehicles   At all relevant times, Ford knew that its products would be used to violently suppress blacks and opponents of apartheid   For example, Ford was well aware that its vehicles were used in the state violence such as at Soweto and Duncan Village and many other similar incidents

308    Ford employees raised concerns with Ford management about Ford's production of security forces' vehicles because they saw these vehicles in black communities on a regular basis   On more than one occasion, Ford management retaliated against black employees who questioned its involvement with the South African security forces, *inter alia*, by shortening the work shifts of black employees

309    The head of Ford security often rode through black communities with Special Branch officers in Ford company vehicles as well as Special Branch cars   Some of these officers, who were regularly inside the Ford plants speaking with Ford management, were involved in the torture and arbitrary detention of union leaders   Ford facilitated the torture and arbitrary detention of its own workers

310    Special Branch officers worked with Ford management to coordinate efforts to intimidate workers to not get involved in political or union activities   For example, on one occasion a union leader's brother who worked at Ford had been interrogated and detained overnight, and he was brought to a plant the following morning   Accompanied by Special Branch into the plant, he was paraded in handcuffs to deter workers from involvement in political or union activities

311    Members of the proposed classes were arrested, detained, and tortured by South African security forces as a result of information provided to these forces by Ford   Ford

employees also knew when black employees had been interrogated, even when that information was not public

312    While Ford agreed to sell its interest in SAMCOR in 1987, it continued to supply SAMCOR with vehicles, components, management and technical assistance and continued to license the Ford trademark to SAMCOR   Ford transferred 57% of its stake to local employees and the remaining 43% of its stake to Anglo American Corporation   Ford also transferred tens of millions from the payment it received from the sale directly to SAMCOR   Thus, Ford effectively continued to exercise control over its agent, SAMCOR

## IX.    COUNTS

### FIRST COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of apartheid on behalf of Plaintiffs, all members of the proposed Extrajudicial Killing Class, all members of the proposed Torture Class, all members of the proposed Detention Class, and all members of the proposed Cruel Treatment Class against all Defendants**

313    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein

314    Plaintiffs, all members of the proposed Extrajudicial Killing Class, all members of the proposed Torture Class, all members of the proposed Detention Class, and all members of the proposed Cruel Treatment Class are direct victims of the crime of apartheid

315    The acts described herein constitute the crime of apartheid and offenses committed in furtherance of or ancillary to that crime in violation of the Alien Tort Claims Act (28 U S C  § 1350), international law, and the common law of the United States

316    Defendants provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that those activities constituted violations of international norms toward the Plaintiffs and the classes

317    Defendants' practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities

318    The abuses that Plaintiffs and class members suffered were a reasonably foreseeable result of Defendants' collaboration with South Africa's apartheid regime

319    Defendants benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of Plaintiffs, and the members of the proposed classes discussed herein

320    Defendants are liable to Plaintiffs in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime, which committed the alleged crimes Defendants also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

321    Defendants are liable to Plaintiffs for compensatory and punitive damages, as well as appropriate equitable and injunctive relief

## SECOND COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of extrajudicial killing on behalf of Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal representative of Anton Fransch; Archington Madondo, personal representative of Mandla Madono; and all members of the proposed Extrajudicial Killing Class against Rheinmetall**

322    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein

323    The deliberate killings, under color of law, of Saba Balintulo, represented by

80

**Sakwe Balintulo**, Anton Fransch, represented by **Mark Fransch**, Mandla Madono, represented by **Archington Madondo**, and **all members of the proposed Extrajudicial Killing Class** were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by all civilized peoples

324    The acts described herein constitute extrajudicial killing in violation of the Alien Tort Claims Act (28 U S C § 1350), international law, and the common law of the United States

325    **Rheinmetall** provided substantial assistance to South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class

326    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities

327    The abuses that the Extrajudicial Killing Class and suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime

328    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Extrajudicial Killing Class

329    Rheinmetall is liable to the Extrajudicial Killing Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes   Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

81

330    Rheinmetall is liable to the Extrajudicial Killing Class for compensatory and

punitive damages, as well as appropriate equitable and injunctive relief

## THIRD COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of extrajudicial killing on behalf
of Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal
representative of Anton Fransch; Archington Madondo, personal representative of Mandla
Madono; and all members of the proposed Extrajudicial Killing Class against Daimler,
Ford, and General Motors**

331    Plaintiffs reallege each and every paragraph set forth above as if fully set forth

herein

332    The deliberate killings, under color of law, of Saba Balintulo, represented by

**Sakwe Balintulo**, Anton Fransch, *represented by* **Mark Fransch**, Mandla Madono, *represented*

*by* **Archington Madondo**, and **all members of the proposed Extrajudicial Killing Class** were

not authorized by a lawful judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by all civilized peoples

333    The acts described herein constitute extrajudicial killing in violation of the Alien

Tort Claims Act (28 U S C  § 1350), international law, and the common law of the United States

334    **Daimler, Ford,** and **General Motors** provided substantial assistance to the South

African security forces through material, logistical, financial, and/or other means of practical

support, knowing that the actions of the South African security forces constituted violations of

international norms toward the Plaintiffs and the class

335    The practical assistance of Daimler, Ford, and General Motors to the South

African security forces had a substantial effect on the perpetration of its criminal and tortious

activities and was provided with the purpose of facilitating those activities

82

336     The abuses that the Extrajudicial Killing Class suffered were a reasonably foreseeable result of Daimler, Ford, and General Motors's collaboration with South Africa's apartheid regime

337     Daimler, Ford, and General Motors benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Extrajudicial Killing Class

338     Daimler, Ford, and General Motors are liable to the Extrajudicial Killing Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes  Daimler, Ford, and General Motors also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

339     Daimler, Ford, and General Motors are liable to the Extrajudicial Killing Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief

### FOURTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of torture on behalf of Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani and all members of the proposed Torture Class against Rheinmetall**

340     Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein

341     **Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani,** and **all members of the proposed Torture Class** are victims of torture

342    The acts described herein constitute torture in violation of the Alien Tort Claims Act (28 U S C § 1350), international law, and the common law of the United States.

343    **Rheinmetall** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class

344    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities

345    The abuses that the Torture Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime

346    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Torture Class

347    Rheinmetall is liable to the Torture Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

Rheinmetall is liable to the Torture Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief

## FIFTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of prolonged unlawful detention on behalf of Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola,**

**Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Detention Class against Rheinmetall**

348    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein

349    **Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Detention Class** are victims of prolonged unlawful detention.

350    The acts described herein constitute prolonged unlawful detention in violation of the Alien Tort Claims Act (28 U S C § 1350), international law, and the common law of the United States

351    **Rheinmetall** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class

352    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities

353    The abuses that the Detention Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime

354    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Detention Class

355    Rheinmetall is liable to the Detention Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the

85

alleged crimes  Rheinmetall also acted in the face of an unjustifiably high risk of harm that was

either known or so obvious that it should have been known, in conscious disregard of known

dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

356    Rheinmetall is liable to the Detention Class for compensatory and punitive

damages, as well as appropriate equitable and injunctive relief

## SIXTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of cruel, inhuman and degrading treatment on behalf of Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Cruel Treatment Class against Rheinmetall**

357    Plaintiffs reallege each and every paragraph set forth above as if fully set forth

herein

358    **Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele,**

**Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, Thobile**

**Sikani, and all members of the proposed Cruel Treatment Class** are victims of cruel,

inhuman and degrading treatment

359    **Rheinmetall's** acts caused the Cruel Treatment Class to be placed in fear for their

lives and forced them to suffer severe physical and psychological abuse and agony

360    The acts described herein constitute cruel, inhuman and degrading treatment in

violation of the Alien Tort Claims Act (28 U S C § 1350), international law, and the common

law of the United States

361    Rheinmetall provided substantial assistance to the South African security forces

through material, logistical, financial, and/or other means of practical support, knowing that the

actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class

362    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities

363    The abuses that the Cruel Treatment Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime

364    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Cruel Treatment Class

365    Rheinmetall is liable to the Cruel Treatment Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes   Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm

366    Rheinmetall is liable to the Cruel Treatment Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief


## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against the Defendants as follows

(a)    Granting Plaintiffs class action certification,

87

(b)     Declaring that Defendants knowingly and intentionally aided and abetted the
commission of a tort in violation of international law enforceable in this court as
federal common law and the law of nations

(c)     Awarding Plaintiffs compensatory and punitive damages arising out of the
unlawful behavior of Defendants

(d)     Awarding the costs of bringing this action and

(e)     Granting such other further relief as shall seem just to the Court

## XI    JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable

Dated  May 19, 2009                          Respectfully submitted

                                             Steig D Olson (SO-0414)
                                             HAUSFELD LLP
                                             11 Broadway  Suite 615
                                             New York NY 10004
                                             Telephone  (212) 830-9850
                                             Facsimile  (212) 480-8560
                                             Email  solson@hausfeldllp com

                                             Michael D Hausfeld
                                             HAUSFELD LLP
                                             1700 K Street NW  Suite 650
                                             Washington DC 20006
                                             Telephone  (202) 540-7200
                                             Facsimile  (202) 540-7201
                                             Email  mhausfeld@hausfeldllp com

                                             Charles Peter Abrahams
                                             ABRAHAMS KIEWITZ
                                             Suite 15 Canal Edge Three
                                             Carl Cronje Drive
                                             Tyger Waterfront
                                             Cape Town
                                             South Africa
                                             +27 (21) 914-4842

Robert G Kerrigan
KERRIGAN, ESTESS, RANKIN &
MCLEOD, LLP
627 East Government Street
Pensacola, FL 32502
(850) 444-4402

Matt Schultz
LEVIN PAPANTONIO THOMAS
MITCHELL ECHSNER & PROCTOR, P A
316 South Baylen Street – Suite 600
Pensacola, FL 32502
(850) 435-7140



## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2009 a copy of the foregoing Plaintiffs'

Corrected Second Amended Complaint was delivered via hand delivery to the Clerk's Office of

the United States District Court for the Southern District of New York and mailed to each party

on the attached service list

_Steig D Olson_

## SERVICE LIST
### In re:  South African Apartheid Antitrust Litigation

| | |
|---|---|
| Jerome S Hirsch<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, NY 10036-6522<br><br>**Defendant Daimler A.G.** | Mark D  McPherson, Esq<br>Michael Gerard, Esq<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, New York 10104<br><br>**Defendant Fujitsu Limited** |
| Brian Anderson, Esq<br>O'MELVENY & MYERS LLP<br>1625 I Street, NW<br>Washington, DC 20006<br><br>**Defendant Ford Motor Company** | Jayant W  Tambe, Esq<br>Robert S. Walker, Esq<br>JONES DAY<br>222 East 41st Street<br>New York, New York 10017<br><br>**Defendant General Motors Corp.** |
| Keith R  Hummel, Esq<br>CRAVATH, SWAINE & MOORE LLP<br>825 Eighth Avenue<br>New York, New York 10019<br><br>**Defendant International Business Machines Corp.** | |
| Robert Zimet, Esq<br>Susan L  Saltzstein, Esq<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, NY 10036-6522<br><br>**Defendant Rheinmetall AG** | |