**Hearing Date and Time:  June 29, 2010 at 9:45 a.m. (Eastern)**

Richard M. Cieri
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Ray C. Schrock (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

Mark E. McKane (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA  94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Attorneys for the Creditor*
*NEW UNITED MOTOR MANUFACTURING, INC.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 Case No.:  09-50026 (REG) |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* **f/k/a General Motors Corp.,** *et al.* | (Jointly Administered) |
| **Debtors.** | |

---

**INITIAL RESPONSE TO DEBTORS' OBJECTION TO PROOF OF CLAIM 67357**
**FILED BY NEW UNITED MOTOR MANUFACTURING, INC.**

---

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................4

I.    MLC'S LONGSTANDING COMMITMENT TO NUMMI ............................4
    A.    NUMMI Was An Unprecedented Joint Venture. ...................................4
    B.    MLC Set NUMMI's Production, Funded NUMMI's Capital Needs And
        Benefited Greatly From The Venture. ....................................................7
        1.    The NUMMI Production Process .................................................7
        2.    MLC And TMC Guided NUMMI's Strategic Planning And
            Provided Funding To NUMMI. ..................................................8
        3.    MLC Applied What It Learned Through The NUMMI Venture To
            Other Segments Of Its Business. ................................................9
    C.    The Most Recent, And Last, Production Cycle ....................................10

II.    MLC'S WITHDRAWAL FROM NUMMI .................................................11
    A.    MLC Cancels Pontiac, Signaling The End Of NUMMI's Vibe Production.........11
    B.    MLC, TMC and NUMMI Discuss Alternatives For MLC's Participation in
        NUMMI. ...............................................................................................12
    C.    MLC Jettisons NUMMI Completely. ...................................................13
    D.    NUMMI's Ongoing Wind Down ..........................................................14

PROCEDURAL BACKGROUND ...........................................................................14

LEGAL STANDARD ..............................................................................................15

ARGUMENT ...........................................................................................................16

I.    NUMMI HAS STATED VALID BREACH OF CONTRACT CLAIMS
    AGAINST MLC. ..........................................................................................16
    A.    NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's
        Agreement To Keep NUMMI Viable. ...................................................17
    B.    NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's
        Agreement To Purchase Products On A Continuous And Stable Basis. ...............21
    C.    NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's
        Agreement To Share Equally In NUMMI's Deficit. .............................25
    D.    NUMMI Has Stated A Claim Against MLC For Breach Of The Covenant
        Of Good Faith And Fair Dealing. ..........................................................27

II.    NUMMI HAS STATED A PROMISSORY ESTOPPEL CLAIM BASED ON
    MLC'S COMMITMENTS TO SUPPORT NUMMI'S BUSINESS. ..........................28

III.    MLC CANNOT CONVERT ITS OBJECTION INTO A DE FACTO
    MOTION FOR SUMMARY JUDGMENT AND SIMULTANEOUSLY
    REFUSE TO PROVIDE NUMMI WITH ADEQUATE DISCOVERY.....................30

CONCLUSION .......................................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) *on remand* 574 F.3d 820 (2d Cir. 2009) ............................................. 16

*B.F. Goodrich Co v. Vinyltech Corp.,*
711 F. Supp. 1513 (D. Ariz. 1989) ........................................................................................ 24

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................... 15, 16

*Bleecher v. Conte,*
213 Cal. Rptr. 852 (Cal. 1981) .............................................................................................. 23

*Bovee & Thill LLC v. Pearson Educ., Inc.,*
564 F. Supp. 2d 199 (S.D.N.Y. 2008) ................................................................................... 30

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
277 Cal. Rptr. 40 (Cal. App. 1990) ...................................................................................... 21

*Brinton v. Bankers Pension Servs., Inc.,*
90 Cal. Rptr. 2d 469 (1999) ................................................................................................... 18

*Burgermeister Brewing Corp. v. Bowman,*
38 Cal. Rptr. 3d 597 (Cal. App. 1964) .................................................................................. 19

*Comunale v. Traders & General Ins. Co.,*
328 P.2d 198 (1950) ............................................................................................................... 27

*Cooper v. State Farm Mut. Auto. Ins. Co.,*
99 Cal. Rptr. 3d 870 (Cal. App. 2009) ................................................................................. 30

*Garcia v. World Sav., FSB,*
107 Cal. Rptr. 3d 683 (Cal. App. 2010) ............................................................................... 29

*Gourmet Lane v. Keller,*
35 Cal. Rptr. 398 (1963) ........................................................................................................ 18

*Harm v. Frasher,*
5 Cal. Rptr. 367 (Cal. App. 1960) ......................................................................................... 27

*In re Adelphia Communications Corp.,*
285 B.R. 848 (Bankr. S.D.N.Y. 2002) .................................................................................. 31

*In re Alper Holdings USA, Inc.,*
398 B.R. 736 (S.D.N.Y. 2008) .............................................................................................. 15

*In re Big V Holding Corp.*,
    267 B.R. 71 (Bankr. D. Del. 2001) ........................................................................ 22

*In re Integrated Resources, Inc.*,
    157 B.R. 66 (S.D.N.Y. 1993) ................................................................................. 30

*Kirbyson v. Tesoro Refining and Marketing Co.*,
    No. 09-3999, 2010 WL 761054 (N.D. Cal. Mar. 2, 2010) ..................................... 17

*Midland Pacific Bldg. Corp v. King*,
    68 Cal. Rptr. 499 (Cal. App. 2007) ........................................................................ 19

*Nashville Lodging Co. v. Resolution Trust Corp.*,
    59 F.3d 236 (D.C. Cir. 1995) on remand 934 F. Supp. 449 (D.D.C. 1996) ............ 20

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1040 (C.D. Cal. 2003) .................................................................. 25

*Randolph Equities, LLC v. Carbon Capital, Inc.*,
    No. Civ. 10889, 2007 WL 914234 (S.D.N.Y. Mar. 26, 2007) ................................ 30

*Rescuecom Corp. v. Google Inc.*,
    562 F.3d 123 (2d Cir. 2009) ............................................................................ 16, 23

*Shea-Kaiser-Lockhead-Healy v. Dept. of Water & Power of City of Los Angeles*,
    140 Cal. Rptr. 884 (Cal. App. 1977) ................................................................ 18, 21

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995) *cert. denied* 516 U.S. 861 (1995) ............................ 20

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    122 Cal. Rptr. 2d 267 (2002) ........................................................................... 27, 28

*Texas Indus. v. Brown*,
    218 F.2d 510 (5th Cir. 1955) ................................................................................. 22

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    874 F.2d 1346 (10th Cir. 1989) ............................................................................. 22

*United States v. Panhandle Eastern Corp.*,
    693 F. Supp. 88 (D. Del. 1988) ............................................................................. 24

*Van Hook v. Southern California Waiters Alliance, Local 17*,
    323 P.2d 212 (Cal. App. 1958) .............................................................................. 29

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) .................................................................. 24

## STATUTES

Cal. Civ. Code § 1559 ..................................................................................................... 18

Cal. Civ. Code § 1643 ..................................................................................................... 23

Cal. Civ. Code § 1644 ..................................................................................................... 25

Cal. Civ. Code § 3541 ..................................................................................................... 23

Cal. Civ. Proc. Code § 1856 ........................................................................................... 20

Cal. Com. Code § 2202 ................................................................................................... 20

Cal. Com. Code § 2306(1) ......................................................................................... 19, 22

## OTHER AUTHORITIES

Black's Law Dictionary 433 (8th ed. 2004) ................................................................... 25

Webster's Third New International Dictionary (Unabridged) 592 (1993) ................................... 25

## INTRODUCTION

1.    Claimant New United Motor Manufacturing, Inc. ("**NUMMI**") is the manufacturing joint venture between Motors Liquidation Company ("**MLC**") and its Japanese competitor, Toyota Motor Corporation ("**TMC**").[1] Since its creation in 1983, NUMMI produced over one million MLC vehicles and provided billions of dollars of manufacturing know-how that MLC employed in its facilities around the world.  NUMMI is unlike MLC's other tier-one suppliers; its Proof of Claim is similarly unique and cannot be summarily denied on a motion to dismiss.

2.    In 1983, during a time of financial hardship for MLC, MLC and TMC partnered as joint venturers to form NUMMI.  Operating the last auto assembly plant on the West Coast, NUMMI was a fertile testing ground for MLC that charted new territory in the industry by combining a Japanese production model with an American workforce.  Recognizing what it could gain from NUMMI, MLC made key contractual and other commitments to ensure NUMMI's viability.  MLC promised to support NUMMI's business, buy tens of thousands of NUMMI's vehicles per year and be responsible for NUMMI's financial needs.  And MLC was handsomely rewarded for participating in NUMMI with award-winning vehicles and immense manufacturing know-how, until the whole venture came to sudden stop last year.

3.    In mid-2009, MLC chose to cease production at NUMMI, remove its board of directors appointees, and end its active participation in NUMMI.  Those decisions breached MLC's commitments to NUMMI and sounded its death knell.  Without MLC's involvement, the key overarching purpose of the NUMMI joint venture ceased.  MLC's pullout precipitated the closure of the NUMMI plant, eliminating over 4,500 jobs in Fremont, California and tens of

---

[1]    For the sake of clarity, NUMMI uses the term "MLC" even though it participated in the NUMMI joint venture as General Motors Corporation.

thousands of supplier and support jobs in the surrounding communities. As the direct result of MLC's abandonment of NUMMI, NUMMI is now winding down its business.

4.     In its Proof of Claim, NUMMI seeks compensatory damages for the fatal consequences of MLC's decision to jettison the joint venture. NUMMI seeks the benefit of its bargains, which include its gross margin for the discontinued Pontiac Vibe (the "**Vibe**")—the most recent MLC vehicle produced by NUMMI—and the amount of its unrecovered capital expenditures related to a 2006 Memorandum Of Understanding between MLC, TMC and NUMMI (the "**2006 MOU**"). In addition, because MLC crippled NUMMI's long-term viability, halted the joint venture and forced NUMMI to be wound down, NUMMI seeks damages for MLC's contractual share of its costs to wind down.

5.     Rather than acknowledge its role in NUMMI's demise, in its Objection, MLC asserts that NUMMI's claim is "completely lacking in merit" and argues that NUMMI has failed to satisfy a standard similar to Federal Rule of Civil Procedure 12(b)(6). (Objection ¶ 4.) In doing so, MLC ignores the express agreements it made with and the promises it made to NUMMI. NUMMI's claim is based upon specific allegations of wrongdoing that state at least five causes of action:

- *First*, MLC breached the 2006 MOU and NUMMI's chartering documents, which required MLC to use its "best efforts" to "ensure that NUMMI will remain viable."

- *Second*, MLC breached its promise to purchase vehicles from NUMMI on a "continuous and stable basis." Under the Vehicle Supply Agreement ("**VSA**"), MLC, TMC and NUMMI negotiated a yearly production plan, committed to monthly allocations and completed weekly purchase orders. Additionally, in the 2006 MOU,

MLC agreed to purchase approximately 65,000 Vibes each year from 2008 through 2012.

- **Third**, MLC breached its commitment to pay its share of NUMMI's wind down obligations. In their first Memorandum Of Understanding (the "**1983 MOU**"), MLC and TMC agreed that "[a]ny surplus or deficit of the JV as at termination of the JV will be shared equally by [TMC] and [MLC], in line with [TMC's] and [MLC's] ownership."

- **Fourth**, MLC breached the covenant of good faith and fair dealing by suddenly reversing its promise to remain a joint venturer in NUMMI. MLC's complete abandonment of the venture, coupled with its refusal to assist NUMMI through its wind down, violates this covenant.

- **Fifth**, in the alternative, MLC breached its promises to buy enough Vibes to sustain NUMMI through 2012, giving rise to a promissory estoppel claim.

Each of these contractual breaches and broken promises directly harmed NUMMI. Without MLC, the NUMMI joint venture lost its fundamental purpose and was forced to shut its plant. NUMMI has not recovered its capital expenditures and gross margin related to the Vibe and has not secured adequate financial support to cover its deficit during its wind down.

6.    While NUMMI has no choice but to accept that MLC elected to end the NUMMI venture, NUMMI is entitled to recoup the benefit of its bargains with MLC. For over two and a half decades, MLC derived billions of dollars from the commitments the parties made to each other. NUMMI did its part, including investing hundreds of millions of dollars to supply MLC with updated Vibes. MLC cannot now escape its obligations to (1) compensate NUMMI for the losses that its departure caused and (2) fulfill its contractual duty to share equally in NUMMI's

3

deficit during wind down.   Neither the Bankruptcy Code nor the equities allow MLC to

completely wash its hands of NUMMI.  NUMMI's Proof Of Claim must proceed.

## FACTUAL BACKGROUND[2]

7.      To understand NUMMI's claims and how MLC destroyed the joint venture, it is

necessary to review NUMMI's origins and MLC's course of dealing with NUMMI.  MLC's

commitments to NUMMI are rooted in NUMMI's founding documents and 25 years of

collaboration, and were reaffirmed in 2006 when MLC agreed to purchase the Pontiac Vibe from

NUMMI through at least 2012.  All of this suddenly changed last year when MLC announced it

would no longer purchase any Vibes from NUMMI and walked away from the joint venture.

## I.      MLC'S LONGSTANDING COMMITMENT TO NUMMI

8.      There are three contracts that best define the scope of MLC's obligations to

NUMMI.  The first is the 1983 MOU, which created NUMMI and made MLC and TMC partners

in the NUMMI joint venture.  The second is the VSA, in which MLC agreed to buy NUMMI's

cars and to collaborate with both NUMMI and TMC to set prices and production volumes that

would keep NUMMI viable.   The third is the 2006 MOU, in which MLC renewed its

commitment to NUMMI by initiating a new production cycle for the Vibe that was supposed to

last through at least 2012.

### A.      NUMMI Was An Unprecedented Joint Venture.

9.      In 1982, MLC shut its manufacturing plant in Fremont, California as part of

company-wide downsizing due to severe economic losses and production problems.  (McKane

Decl. ¶¶ 2-4, Exs. A, B, C.)  Not long thereafter, MLC and TMC began discussions about a joint

---

[2]    NUMMI's original Proof Of Claim sufficiently pleaded breach of contract claims against MLC.  Through this
Initial Response, NUMMI further supports its claims with the Declaration of Mitsunori Tsuzuki In Support Of
Initial Response To Debtors' Objection To Proof Of Claim 67357 Filed By New United Motor Manufacturing,
Inc. ("**Tsuzuki Decl.**") and the Declaration of Mark E. McKane In Support Of Initial Response To Debtors'
Objection To Proof Of Claim 67357 Filed By New United Motor Manufacturing, Inc. ("**McKane Decl.**").

venture that would restart automobile manufacturing at the Fremont plant and provide vehicles for the American market. NUMMI's purpose, though, was not just to produce cars. The NUMMI venture was designed as a way for MLC to learn Japanese manufacturing methods from TMC, which was famous for its own cars and manufacturing plants. (Tsuzuki Decl. ¶ 7.) TMC agreed to share sensitive technical information with MLC ranging from engineering drawings and part specifications, to plant layout and assembly line procedures.[3] NUMMI would also incorporate Japanese business practices, including a teamwork-based environment based on values such as *kaizen* ("improvement") and *genchi genbutsu* ("go and see" or the principle that in order to understand and improve production processes, one needs to closely observe and study them). (Tsuzuki Decl. ¶ 11.) The NUMMI venture therefore extended beyond its walls: it was a way to introduce successful Japanese production systems to MLC's entire business.

10.     The 1983 MOU between MLC and TMC was the foundational agreement for NUMMI. It covered all aspects of the joint venture, including its formation, its manufacturing goals, its marketing plans and its termination. NUMMI was a true joint venture—owned 50/50. Both TMC and MLC pledged their support to NUMMI by promising to:

- "increase its production to the maximum extent possible[;]"

- price its vehicles "to provide a reasonable profit" to NUMMI;

- "take necessary measures" if NUMMI was "endanger[ed];" and

- provide guarantees to NUMMI's lenders as needed.

(Tsuzuki Decl. ¶ 8, Ex. A.) In addition, MLC and TMC agreed that "*[a]ny surplus or deficit of the JV as at termination of the JV will be shared equally by [TMC] and [MLC], in line with*

---

[3]     The parties entered into various agreements to memorialize the information that TMC would provide to the venture. (Tsuzuki Decl. ¶ 10, Exs. C, D, E.) For example, the Vehicle License Agreement states that one type of "technical assistance" that TMC agreed to contribute was "[k]now-how and services concerning plant design (process planning, building design, layout, equipment planning and similar matters)." (Tsuzuki Decl. Ex. C at § 3.1(b).)

*[TMC's] and [MLC's] ownership*."[4]    (Tsuzuki Decl. Ex. A at 10.)  In other words, MLC and

TMC agreed to keep NUMMI viable until termination, and at termination MLC and TMC would

equally enjoy any remaining surplus or equally be responsible for any deficit.

11.    With this agreement in place, NUMMI incorporated in 1984.    Under the

Shareholders' Agreement signed in 1984, MLC and TMC each had a 50% ownership stake and,

until MLC abandoned its board seats, NUMMI's board of directors consisted of four MLC

appointees and four TMC appointees, with NUMMI's president serving as the ninth director.

(Tsuzuki Decl. ¶ 9, Ex. B.)

12.    After NUMMI incorporated, MLC continued to treat NUMMI as a joint venture

with a special relationship different than other tier-one suppliers.  The Shareholders' Agreement

did not alter, but rather reaffirmed, MLC's commitments in the 1983 MOU.  For example:

- Section 3.1(b) states that MLC and TMC "shall assist [NUMMI] in increasing its production to the maximum extent possible . . .";

- Section 6.2 provides that the parties will work together to set vehicle prices to "provide a reasonable profit" to NUMMI; and

- Section 4.2 repeats MLC's and TMC's promise to sign guarantees as needed to provide NUMMI financing and support its creditworthiness.

(Tsuzuki Decl. Ex. B.)

13.    In addition, the Shareholders' Agreement did not alter the promise in the 1983

MOU that any "deficit of the JV as at termination of the JV will be shared equally by [TMC] and

[MLC]." (Tsuzuki Decl. Ex. A at 10.)  Although Section 4.3 of the Shareholders' Agreement

states that NUMMI is "responsible for the payment of all of its own expenses[,]" this provision

specifically and expressly applies "[e]xcept as otherwise provided in any agreement or

instrument to which the parties' signatory hereto are parties . . . ." (Tsuzuki Decl. Ex. B at §

---

[4]    Emphasis reflected in quotations is added unless otherwise noted.

4.3.)  So although NUMMI was responsible for its expenses, at termination, MLC and TMC remained responsible for any NUMMI deficit (or would be the beneficiaries of any surplus).

14.    Consistent with these provisions and its conduct described below, MLC called NUMMI its "joint venture," recognizing its special relationship with NUMMI and referring to its "partnership" and "friendship" with TMC until the very end.  (Tsuzuki Decl. ¶¶ 7, 31, 33, Exs. L, O.)  In fact, in its Objection, MLC acknowledges this special relationship by itself referring to NUMMI as a joint venture.  (Objection ¶ 10.)

**B.     MLC Set NUMMI's Production, Funded NUMMI's Capital Needs And Benefited Greatly From The Venture.**

1.    The NUMMI Production Process

15.    NUMMI operated as a true joint venture.  Though NUMMI had its own management, it was under "the joint control of" MLC and TMC.  (Tsuzuki Decl. ¶ 17, Ex. F at 1.)  Frequent "three-party meetings" between MLC, TMC and NUMMI set NUMMI's operations.  At the three-party meetings, they discussed NUMMI's financial results, vehicle specifications, productivity, capital projects and labor issues.  (Tsuzuki Decl. ¶ 20.)

16.    Within this three-party framework, MLC, TMC and NUMMI implemented a production plan.  The plan started with the 1984 VSA, which provides "***[MLC] shall purchase [NUMMI-produced vehicles] on a continuous and stable basis.***"  (Tsuzuki Decl. Ex. F at § 4.1(b).)  More specifically, the VSA set a target that NUMMI's production would exceed 200,000 vehicles per year.  (Tsuzuki Decl. Ex. F at § 4.1(b).)  MLC made this commitment to support the immense capital investments that would be necessary for NUMMI to develop production lines to build new generations of vehicles for MLC.  For the latest generation of vehicles that NUMMI made for MLC and TMC, for example, these expenditures exceeded

7

hundreds of millions of dollars for machinery and equipment, platform tooling and computer hardware and software, collectively.  (Tsuzuki Decl. ¶ 25.)

17.    The VSA provided a collaborative process for NUMMI's production.  The specific procedure was contained in the Manual Of Allocation and the Purchase Procedures Manual (both of which were expressly incorporated into the VSA), and worked as follows: every year, MLC, TMC and NUMMI agreed on an annual production level that was consistent with the overall target for NUMMI to produce more than 200,000 vehicles per year.  (Tsuzuki Decl. ¶ 18, Ex. G at § III.A.)  At three-party meetings, the parties revisited the projections and set purchase levels three months in advance so NUMMI could anticipate MLC's and TMC's production requirements.  (Tsuzuki Decl. Ex. G at III.B(1).)  Then, on a weekly basis, MLC and TMC submitted orders for the upcoming eleven-week period.  (Tsuzuki Decl. ¶ 18, Ex. H at III.A(4).)  These orders tracked the previously agreed-to volumes and provided the specifications (engine size, transmission type, etc.) that NUMMI used to finalize production.  Each time MLC submitted its weekly eleven-week schedule, it formed an individual sales contract for the first week of that period.  (Tsuzuki Decl. Ex. H at III.A(4).)  In this way, MLC and NUMMI formed individual sales contracts every week under the VSA.  Thus, while the VSA states that "[NUMMI] has no obligation to supply and [MLC] has no obligation to purchase any Products until the parties enter [into individual sales contracts,]" this provision simply reflects one step in a long-running, sophisticated production and allocation process.  (Tsuzuki Decl. Ex. F at § 4.2(a).)

           2.    <u>MLC And TMC Guided NUMMI's Strategic Planning And Provided Funding To NUMMI.</u>

18.    In addition to steering NUMMI's production and allocation process, MLC helped to develop NUMMI's long-term business plan.  For example, MLC provided and reviewed

extended projections for the models that NUMMI produced.  These four- to five-year projections were a key input for NUMMI's financial projections and strategic planning.  (Tsuzuki Decl. ¶ 21.)

19.     Further, MLC found solutions when NUMMI encountered difficulties and kept NUMMI viable.  In 1989, when NUMMI incurred losses well beyond shareholders' equity, MLC and TMC each contributed an additional $30 million.  (Tsuzuki Decl. ¶ 22, Ex. I.)  In 1992, NUMMI again needed additional capital and MLC and TMC provided another $25 million each.  (Tsuzuki Decl. ¶ 22, Ex. J.)  In this way, MLC did not act as a mere NUMMI shareholder; it understood its contractual obligations to the joint venture and acted accordingly.

3.     MLC Applied What It Learned Through The NUMMI Venture To Other Segments Of Its Business.

20.     As planned, MLC benefited immensely from NUMMI in ways other than the vehicles it purchased.  MLC placed a "high value on the relationship with [TMC]" and repeatedly acknowledged that its participation in NUMMI was the "root," "centerpiece" and "the *guiding light* for the improvement in [MLC's own] manufacturing quality."  (McKane Decl. ¶¶ 6, 7, 8, 10, Exs. E, F, G, I.)  NUMMI showed MLC that "the capability of [its] workers ha[d] not been tapped."  (McKane Decl. ¶ 5, Ex. D.)  MLC also learned techniques to improve labor relations and managerial efficiency.  As one MLC vice president said in 2004, "NUMMI has been a great training ground for our executives to learn more about the importance of individual team members in the production process and the benefits of a common production system."  (McKane Decl. ¶ 9, Ex. H.)  MLC invariably described NUMMI as a "positive[,]" "beneficial" and "lucrative partnership for us."  (McKane Decl. ¶¶ 11, 12, Exs. J, K.)  At a special meeting in 2009, MLC summarized its history with NUMMI by stating that it had gained "billions of dollars worth of learnings" from NUMMI.  (Tsuzuki Decl. ¶ 30.)

### C.    The Most Recent, And Last, Production Cycle

21.    Throughout the course of the NUMMI venture, the parties developed a base vehicle model every four years.  In 2006, MLC, TMC and NUMMI embarked on what would be their final model, which MLC marketed as the new Pontiac Vibe.  The parties memorialized their respective obligations in the 2006 MOU.  Critically, the parties agreed that a key purpose of the Vibe production for 2008 through 2012 was "***to help ensure that all Parties remain viable.***" (Tsuzuki Decl. ¶ 26, Ex. K.)  The parties emphasized their commitment to NUMMI's continued viability throughout the agreement:

- "The Parties understand the importance of realizing annual production volume of 230,000 units of the Products.  Both TMC and [MLC] will make ***best effort to maximize the production volume during the model life in consideration of maintaining the stability of operations at NUMMI.***"  (Tsuzuki Decl. Ex. K at § 1(2).)

- "[T]he Parties agree that they will annually review all the contents described herein to ***ensure that NUMMI will remain viable***, and that the results from NUMMI's operations continue to be acceptable to TMC and [MLC]."  (Tsuzuki Decl. Ex. K at § 7.)

Under the 2006 MOU, MLC anticipated that it would purchase 65,000 Vibes per year.  (Tsuzuki Decl. Ex. K at § 1(3).)

22.    Based on this commitment, NUMMI invested significant resources to develop new equipment, machinery and tooling to produce the Vibe, purchase raw materials, install a new production line for the Vibe and train employees.  (Tsuzuki Decl. ¶ 25.)  Because of MLC, over $120 million of NUMMI's capital expenditures for the Vibe have not been recouped. (Tsuzuki Decl. ¶ 41.)

23.    MLC understood its obligations under the 2006 MOU and performed them into 2009.  It purchased approximately 60,000 Vibes in 2006, 50,000 Vibes in 2007 and over 70,000 Vibes in 2008.  (Tsuzuki Decl. ¶ 28.)  Moreover, MLC recognized its duty to purchase Vibes and

keep NUMMI viable.  For example, when NUMMI informed MLC and TMC in early 2008 that the Vibe was losing money for NUMMI, MLC agreed to help close the gap by increasing the "transfer price" it paid for each Vibe by $1,000—a $65 million increase annually that may have been against MLC's economic interest but was consistent with its obligations to keep NUMMI viable.  (Tsuzuki Decl. ¶ 29.)

## II.    MLC'S WITHDRAWAL FROM NUMMI

24.    Contrary to its assertions, MLC's decision to withdraw from NUMMI in June 2009 was not the natural consequence of the global economy and declining market demand for the Pontiac brand.  (Objection ¶¶ 27-28.)  Rather, it was a blunt change of course from how MLC had treated NUMMI previously.  As MLC itself acknowledged in the spring of 2009, there were ways to continue the joint venture and, more importantly, MLC was required to pursue them. NUMMI and TMC were willing to repackage the Vibe for another MLC brand or find other solutions to keep NUMMI viable.  Without a willing partner, however, their efforts could not succeed.

### A.    MLC Cancels Pontiac, Signaling The End Of NUMMI's Vibe Production.

25.    In April 2009, in the midst of MLC's, TMC's and NUMMI's efforts to execute a "viability plan" for the venture, MLC informed NUMMI that it was considering eliminating the Pontiac brand, which could terminate Vibe production.  (Tsuzuki Decl. ¶ 31, Ex. L.)  If it decided to cancel Pontiac, MLC warned, the parties would have to consider "1.) if we can reposition the Vibe to another brand, and 2.) the impact to NUMMI."  (Tsuzuki Decl. Ex. L.) Yet MLC told NUMMI that it "remain[ed] committed to our partnership and NUMMI joint venture . . . .  [A]s partners we wanted to provide an advanced warning and as much time as possible to pull together contingency plans in the event the Pontiac brand is discontinued." (Tsuzuki Decl. Ex. L.)

26.     On April 27, 2009, MLC announced that it was discontinuing Pontiac.  (Tsuzuki Decl. ¶ 32.)  "Notwithstanding the decision on Pontiac," MLC wrote to NUMMI on May 4 "to assure [it] that [MLC] remain[ed] committed to work with NUMMI and [TMC] to seek alternatives to assist NUMMI as it transitions out of the production of the Pontiac Vibe that would be beneficial to all parties."  (Tsuzuki Decl. ¶ 32, Ex. M.)  Indeed, MLC stated that "the long phase out period for the Pontiac brand was largely driven by [MLC]'s desire to provide flexibility for sale of Vibes in support of NUMMI."  (Tsuzuki Decl. Ex. M.)  In the May 4 letter, MLC pledged to find solutions for the shortfall that the Vibe cancellation would create for NUMMI.

**B.      MLC, TMC and NUMMI Discuss Alternatives For MLC's Participation in NUMMI.**

27.     After its Pontiac decision, MLC reaffirmed its commitment to NUMMI in subsequent letters to TMC.  On May 11, 2009, for example, MLC informed TMC that it had "been working [on] a plan to repurpose the Pontiac Vibe to a GMC Vibe" and was "also reviewing additional options to support NUMMI . . . ."  (Tsuzuki Decl. ¶ 33, Ex. N.)  On May 14, MLC again stated that it was "currently working to develop a replacement for the Vibe, and look[s] forward to seeing an exciting new product from NUMMI that will work well with the [MLC] line."  (Tsuzuki Decl. ¶ 33, Ex. O.)

28.     Only a week later, however, MLC revealed that "the continuation of the Vibe or a like product will not meet our needs."  (Tsuzuki Decl. ¶ 35, Ex. P.)  Instead, MLC proposed that NUMMI build "a [MLC] badged derivative" of the Toyota Tacoma—an award-winning light truck that NUMMI had been building for TMC since 1995—and made an agreement on a MLC version of the Tacoma a precondition to NUMMI's continued existence.  (Tsuzuki Decl. Ex. P.)

MLC stated that without an agreement on the Tacoma, MLC and TMC "will need to work together to discuss the dissolution of [MLC]'s interest in NUMMI."  (Tsuzuki Decl. Ex. P.)

29.    At this point, MLC still acknowledged that, under the 1983 MOU and the Shareholders' Agreement, it was equally responsible with TMC for supporting NUMMI's creditworthiness and that NUMMI's surplus or deficit at dissolution would be shared equally by MLC and TMC.  MLC explained to TMC that because of MLC's bankruptcy, it could not provide guarantees to satisfy NUMMI's lenders as required under the Shareholders' Agreement. It understood that if TMC provided guarantees on its own, TMC "would have preferential treatment" at NUMMI's dissolution.  (Tsuzuki Decl. Ex. P.)  In other words, while MLC's bankruptcy had changed its ability to support NUMMI's creditworthiness, it had not changed MLC's obligations in the joint venture.

### C.    MLC Jettisons NUMMI Completely.

30.    On June 4, 2009, as the parties discussed MLC's Tacoma proposal, MLC informed TMC and NUMMI that it would discontinue Vibe purchases in August 2010.  (Tsuzuki Decl. ¶ 36.)  Only eight days later, on June 12, MLC moved that date up to August 2009. (Tsuzuki Decl. ¶ 36, Ex. Q.)  MLC also set a June 25 deadline for a decision on the MLC Tacoma.  (Tsuzuki Decl. ¶ 36.)  NUMMI told MLC that, regardless of the Tacoma project, it was unlikely to remain viable without Vibe production.  (Tsuzuki Decl. ¶ 37.)  Even with this warning, MLC confirmed its "intention to continue the NUMMI business as a joint venture." (Tsuzuki Decl. ¶ 38, Ex. R.)

31.    On June 26, 2009, MLC changed course and announced that it would withdraw from NUMMI.  NUMMI produced its last Vibe in the beginning of August and MLC's board appointees (4/9ths of the board) resigned on August 12, 2009.  (Tsuzuki Decl. ¶ 39.)  MLC did

not appoint new board members to replace those that resigned, and since MLC has not participated in NUMMI's operations or provided it with any funding.  (Tsuzuki Decl. ¶ 40.)

### D.    NUMMI's Ongoing Wind Down

32.    With MLC's withdrawal, one of NUMMI's 50 percent owners had abandoned it and it was no longer a viable joint venture.  Its function as a venue for MLC and TMC to exchange expertise ended and, without MLC, its collaborative production and allocation procedures needed to be replaced.  (Tsuzuki Decl. ¶ 42.)  There was no alternative but to wind down NUMMI.  Two weeks after MLC's board members resigned from NUMMI, TMC announced that it would stop ordering vehicles from NUMMI in March 2010.  (Tsuzuki Decl. ¶ 43.)

33.    NUMMI produced its last automobile on April 1, 2010.  Over 4,500 employees have lost or will lose their jobs.  (Tsuzuki Decl. ¶ 44.)  NUMMI is currently working to meet its obligations to its employees by ensuring that its pension program is appropriately funded. (Tsuzuki Decl. ¶ 44.)  NUMMI's total wind down obligations potentially could be well in excess of $500 million, with MLC's allocated portion likely to exceed $200 million.  (Tsuzuki Decl. ¶ 45.)

34.    TMC is fulfilling its role during NUMMI's wind down.  Its representatives are assisting in the plant closure and TMC has provided financial assistance to NUMMI.  (Tsuzuki Decl. ¶ 46.)  MLC refuses to contribute anything to NUMMI's wind down.

### PROCEDURAL BACKGROUND

35.    NUMMI filed its timely Proof of Claim on November 24, 2009.  It asserted breach of contract claims based on the contracts explained above, as well as claims for breach of fiduciary duty, misrepresentation and indemnification.  NUMMI began good faith negotiations with MLC about its claims, but MLC filed its Objection on April 1, 2009 without advance

notice.  Since then, NUMMI has conducted additional diligence, focused its claims and reached

out to MLC to restart a dialogue to potentially resolve this dispute.[5]

36.    NUMMI also sought the production of limited documents and interrogatories

from MLC regarding the agreements and conduct underlying NUMMI's claim.  NUMMI seeks,

for example, MLC's projections that supported the 2006 MOU, documents regarding MLC's

decision not to rebrand the Vibe and information about MLC's decision to withdraw from

NUMMI.  MLC has refused to respond to NUMMI's interrogatories.  MLC has produced less

than 100 documents, which consist of a few contracts between the parties and communications

between MLC's and NUMMI's restructuring advisors after MLC's withdrew from NUMMI.

MLC has not produced documents related to (1) its decision to discontinue Vibe production, (2)

its analysis underlying the discussions with NUMMI and TMC in 2009 and (3) its decision to

exit the NUMMI venture entirely.    MLC has refused to produce documents related to the

resignation of its board appointees.

## **LEGAL STANDARD**

37.    Disallowing a claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a

claim under Federal Rule of Civil Procedure 12(b)(6), and the same legal standards govern.  *See*

*In re Alper Holdings USA, Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008).  Federal pleading rules

require "only a short and plain statement of the claim showing that the pleader is entitled to

relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation

marks omitted).    Thus, to survive a motion to dismiss, a complaint must simply "contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[5]    Kirkland & Ellis LLP was substituted as counsel for NUMMI on April 13, 2010, and worked with NUMMI to
reevaluate its claim.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) *on remand* 574 F.3d 820 (2d Cir. 2009) (quoting

*Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a probability

requirement . . . ." *Iqbal*, 129 S. Ct. at 1949. A court must "accept as true all of the factual

allegations set out in plaintiff's complaint, draw inferences from those allegations in the light

most favorable to plaintiff, and construe the complaint liberally."[6] *Rescuecom Corp. v. Google*

*Inc.,* 562 F.3d 123, 127 (2d Cir. 2009) (internal quotation marks and citation omitted).

## ARGUMENT

38.     NUMMI's contract claims and promissory estoppel claim are supported with far

more than enough factual allegations to survive MLC's attempt to expunge them. NUMMI has

pleaded viable contract claims against MLC for NUMMI's capital expenditures and deficit at

wind down based on the 2006 MOU, the VSA, the 1983 MOU and the covenant of good faith

and fair dealing that is inherent in each of these agreements. NUMMI's promissory estoppel

claim is based on its reasonable reliance on MLC's clear promises to support the venture through

2012. In its Objection, MLC maintains that NUMMI's positions are "completely lacking in

merit." (Objection ¶ 4.) But MLC ignores the clear language in the parties' contracts,

misconstrues the provisions that it does acknowledge and dismisses the parties' longstanding and

close relationship. MLC's misdirection and counter-factual arguments should be rejected. They

provide no grounds for disallowing NUMMI's claims.

## I.    NUMMI HAS STATED VALID BREACH OF CONTRACT CLAIMS AGAINST MLC.

39.     NUMMI has sufficiently pleaded all elements of its contract claims:   (1) the

existence of a contract, (2) NUMMI's performance (3) MLC's breach and (4) damages. *See*

---

[6]    Even when a complaint falls short of these standards, a court should freely give leave to amend. "Thus, in a
bankruptcy case, amendment to a claim is freely allowed where the purpose is to . . . describe the claim with
greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim." *In re
Integrated Resources, Inc.*, 157 B.R. 66, 70 (S.D.N.Y. 1993).

*Kirbyson v. Tesoro Refining and Marketing Co.*, No. 09-3999, 2010 WL 761054, at *8 (N.D. Cal. Mar. 2, 2010) (applying California law, stating that detailed allegations on each element are not required as long as the defendant has "notice of the nature of the claim" and denying a motion to dismiss despite plaintiff's failure to quote specific contractual language).[7]  NUMMI alleges that MLC breached four separate contractual commitments by cancelling the Vibe and abandoning NUMMI:

> A.    MLC breached the 2006 MOU and NUMMI's chartering documents, which required MLC to use its "best efforts" to "ensure that NUMMI will remain viable."
>
> B.    MLC breached the VSA, which required the purchase of NUMMI's vehicles on a "continuous and stable basis."
>
> C.    MLC breached the 1983 MOU, which required MLC to share any NUMMI "deficit" at "termination."
>
> D.    MLC breached the covenant of good faith and fair dealing by pulling out of NUMMI without earnestly pursuing alternatives to support NUMMI's production.

(Proof of Claim ¶¶ 1, 12.)  NUMMI has also adequately pleaded that it performed under these agreements and that each of MLC's breaches has caused damages.[8]  (Proof of Claim ¶¶ 5, 12.) None of NUMMI's contract claims can be disallowed.

**A.    NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's Agreement To Keep NUMMI Viable.**

40.    NUMMI has adequately alleged that MLC agreed to keep NUMMI viable.  The express purpose of the 2006 MOU was to set "the production and pricing of new car models to be produced at NUMMI from January 2008 to December 2012 . . . to help ensure that all Parties remain viable."  (Tsuzuki Decl. Ex. K.)  Further, the parties singled out ***NUMMI's viability*** two

---

[7]    The agreements are governed by California law.

[8]    NUMMI was willing and able to continue performing under its contracts with MLC had MLC fulfilled its obligations to NUMMI.  (Tsuzuki Decl. ¶ 37.)

more times in the same contract:  first, MLC agreed to "make best effort[s] to maximize the
production volume during the model life in consideration for maintaining the stability of
operations for NUMMI" and set a target of "at least 65,000" Vibes per year;  second, the parties
agreed to review their production targets annually based on market conditions "to ensure that
NUMMI will remain viable."[9]    (Tsuzuki Decl. Ex. K at §§ 1(2)-(3), 7.)    Through these
provisions, the 2006 MOU reiterated the VSA's purpose of combining target production levels
and a flexible review process so that the parties could respond to changing conditions in order to
keep NUMMI successful.  Finally, MLC's duty to keep NUMMI viable is firmly grounded in
NUMMI's founding documents.  The Shareholders' Agreement incorporated MLC's and TMC's
commitments in the 1983 MOU to "increase [NUMMI's] production to the maximum extent
possible[,]" provide adequate pricing for NUMMI and guarantee NUMMI's debts.[10]    (Tsuzuki
Decl. Ex. B at §§ 3.1(b), 4.2, 6.2.)

41.    MLC's commitments are undeniably enforceable.  The viability clauses in the
2006 MOU were pegged to a concrete production benchmark—*i.e.*, the requirement for MLC to
purchase "at least 65,000" Vibes every year through 2012—that guided the parties' expectations
and is consistent with MLC's intent to support NUMMI.  *See* Cal. Com. Code § 2306(1); *Shea-
Kaiser-Lockhead-Healy v. Dept. of Water & Power of City of Los Angeles*, 140 Cal. Rptr. 884,
888-90 (Cal. App. 1977) (holding that a quantity estimate in a requirements contract was
enforceable under section 2306(1)).    Further, California courts have repeatedly enforced

---

[9]    Similarly, section 6 of the 2006 MOU requires the parties to meet and "determine countermeasures" if the need
to adjust the "model life" of the Vibe arose.  (Tsuzuki Decl. Ex. K at § 6.)

[10]    NUMMI is entitled to enforce these agreements as a third party beneficiary.  *See* Cal. Civ. Code § 1559 ("A
contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties
thereto rescind it."); *Brinton v. Bankers Pension Servs., Inc.*, 90 Cal. Rptr. 2d 469, 474 (1999) ("A third party
may qualify as a contract beneficiary where the contracting parties must have intended to benefit that
individual . . . ."); *see also Gourmet Lane v. Keller*, 35 Cal. Rptr. 398, 399-400 (1963) (allowing incorporated
association to enforce pre-incorporation agreements among its members as a third-party beneficiary).

contracts with "best efforts" clauses like section 1(2) of the 2006 MOU. *See Midland Pacific Bldg. Corp v. King*, 68 Cal. Rptr. 499, 507 (Cal. App. 2007); *see also Burgermeister Brewing Corp. v. Bowman*, 38 Cal. Rptr. 3d 597, 601 (Cal. App. 1964) (enforcing a best efforts clause in a contract that had been in effect for nearly two decades and rejecting defendant's argument that the best efforts clause lacked mutuality). The promises to maximize production and provide reasonable profits in the 1983 MOU and the Shareholders' Agreement are similarly enforceable as valid best efforts clauses.

42.     MLC ignores the 2006 MOU's overall meaning and does not address the relevant portions of the Shareholders' Agreement and the 1983 MOU. Instead, MLC selectively quotes from section 7 of the 2006 MOU to argue that "changes in market conditions" excuse its obligation to support NUMMI. (Objection ¶ 47.) But section 7 should be read as a whole:

> The Parties understand that changes in the market conditions for the Products might make the contents described in [the 2006 MOU] inconsistent with the continued viability of NUMMI and the profitability on sales of the Products. Therefore, the Parties agree that they will annually review all the contents described herein to ensure that NUMMI will remain viable, and that the results from NUMMI's operations continue to be acceptable for TMC and [MLC].

When section 7 is read as a whole, it is clear that it was not an escape hatch for MLC (or TMC), but recognized that MLC and TMC may need to increase their purchase or pricing commitments to NUMMI if market conditions change. In this way, it was a promise to find solutions for NUMMI regardless of the economic climate and consistent with MLC's overarching commitment to keep NUMMI viable. Given the purported billion dollars in know-how that MLC gained from NUMMI, it is not surprising that MLC agreed to keep NUMMI viable.

43.     Indeed, the parties' course of performance clearly shows that MLC recognized its contractual duty to proactively support NUMMI. Under California contract law, a written agreement "may be explained or supplemented by course of dealing, course of performance or

19

usage of trade." Cal. Com. Code § 2202; Cal. Civ. Proc. Code § 1856 (same). So "[u]nder section 2202 of California's Commercial Code, terms of a contract involving the sale of goods may be explained or supplemented . . . by course of performance." *Sicor Ltd. v. Cetus Corp*., 51 F.3d 848, 857 (9th Cir. 1995) *cert. denied* 516 U.S. 861 (1995) (internal quotation marks omitted). MLC previously performed its duty to keep NUMMI viable. For example, at times when NUMMI suffered losses, MLC infused millions of dollars of additional capital into NUMMI through amendments to its Subscription Agreement with TMC in order to keep NUMMI afloat. (Tsuzuki Decl. Exs. I, J.) Then, when NUMMI was losing money on the Vibe in 2008, MLC agreed to assume a substantial portion of the gap by increasing the price it paid for each Vibe by $1,000. (Tsuzuki Decl. ¶ 29.) This was not the conduct of a party confident that it had satisfied its "limited obligations" to a "distinct legal entity." (Objection ¶¶ 13, 16.) This was the conduct of a party whose "intention [was] to continue the NUMMI business as a joint venture" and recognized its obligation to remain "committed to [its] partnership [with TMC] and the NUMMI joint venture . . . ." (Tsuzuki Decl. Exs. L, R.)

44.    NUMMI has also alleged that MLC breached its agreement to continue the NUMMI venture and that MLC's withdrawal has caused damages. MLC's decisions in 2009 to stop Vibe production, to not re-badge it as a GMC vehicle, to end its active participation in NUMMI and to remove its board appointees marked the end for NUMMI. Without MLC's involvement, the key overarching purpose of the NUMMI joint venture ceased. With respect to damages, NUMMI seeks to recoup the benefit of its bargain, which include its gross margin for the Vibe and the amount of its unrecovered capital expenditures related to the 2006 MOU. *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 246 (D.C. Cir. 1995) on remand 934 F. Supp. 449 (D.D.C. 1996) (holding that the plaintiff could recover expenses incurred

during the contractual relationship on account of defendant's promises). And, given that MLC's actions severely damaged NUMMI's long-term viability, thus defeating the entire purpose of the joint venture and requiring it to be wound down, NUMMI is entitled to damages for the MLC's share of NUMMI's deficit. *See Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 40, 56 (Cal. App. 1990) (holding that contract damages include those that are foreseeable).

**B.      NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's Agreement To Purchase Products On A Continuous And Stable Basis.**

45.      NUMMI has a separate and independent cause of action for MLC's breach of its commitment to purchase NUMMI's vehicles on a "continuous and stable basis." (Tsuzuki Decl. Ex. F at § 4.1(b).) The VSA, which had an initial twelve-year term and was renewed repeatedly, was implemented without issue until 2009. While NUMMI's production levels were allowed to fluctuate under the VSA, they never fell significantly below the 200,000 vehicles-per-year benchmark. (Tsuzuki Decl. ¶ 17.) The 2006 MOU continued the "framework" for 2008 to 2012. (Objection ¶ 18.) Consistent with the VSA's production target of 200,000 vehicles per year, the 2006 MOU set a production benchmark of 230,000 vehicles per year through 2012, of which at least 65,000 were to be MLC vehicles. (Tsuzuki Decl. Ex. K.)

46.      The VSA, as supplemented and continued by the 2006 MOU, was an enforceable requirements contract. A "requirements contract" simply "measures the quantity [to be produced by] the seller" by "the requirements of the buyer." *See* Cal. Com. Code § 2306(1). No fixed amount is needed. *Id.* Thus, while MLC stated its estimate of "at least 65,000" Vibes from 2008 through 2012 in the 2006 MOU, MLC was obligated to purchase NUMMI's vehicles in quantities not "unreasonably disproportionate to [that] estimate" for that time period. Cal. Com. Code § 2306(1); *Shea-Kaiser-Lockhead-Healy*, 140 Cal. Rptr. at 888-90 (enforcing a

requirements contract containing a minimum estimate).[11]  Its refusal to continue the agreement

entitles NUMMI to damages based on the capital expenditures discussed above.  *See, e.g.*, *Tri-*

*State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346

(10th Cir. 1989) (ruling that a buyer could not discontinue a requirements contract where the

seller had incurred debt obligations to build facilities to meet the buyer's needs); *Texas Indus. v.*

*Brown*, 218 F.2d 510, 511-12 (5th Cir. 1955) (holding that a buyer could not abandon a

requirements contract where the seller had built a new plant to service the contract); *In re Big V*

*Holding Corp.*, 267 B.R. 71, 110 (Bankr. D. Del. 2001) (requiring a withdrawing member of a

cooperative based on a requirements contract to "live up to its obligations . . . and if not, to

compensate remaining members who bear the economic burden associated with a withdrawing

member").

47.    MLC asserts two arguments in response to NUMMI's VSA claim.  First, MLC

claims that it "had no obligation to purchase *any* vehicles from NUMMI" because section 4.1(b)

stated that "market demands for the Products . . . will govern the purchase commitments of the

parties" and section 4.2 stated that "[MLC] has no obligation to purchase any Products until the

parties enter [an individual sales contract]."  (Objection ¶¶ 43, 44 (emphasis in original).)  Again,

MLC breaks the relevant provisions into pieces and takes them out of context.  The reference to

"market conditions" in section 4.1(b) reflected the parties' decision to create "flexibility" for

their business.  (Tsuzuki Decl. Ex. F at § 4.1(c).)  It never preempted the primary duty in section

4.1(b):  for MLC to purchase vehicles on a "continuous and stable basis."  This ability to adjust

to market demands is inherent in requirements contracts.

---

[11]    In the absence of an estimate, this section requires the buyer to purchase a quantity not "unreasonably
disproportionate to . . . any normal or otherwise comparable prior output or requirements."  Cal. Com. Code
§ 2306(1).

48.    Similarly, Section 4.2 explained that the exact shipment and payment schedule for vehicles to be purchased in a given week would only be definitively established after MLC and NUMMI created an "individual sales contract" through agreed-upon weekly procedures.[12] (Tsuzuki Decl. Exs. G, H.)  In contrast to this sensible and enforceable scheme, under MLC's interpretation, the VSA was an illusory contract—a dead letter—that two sophisticated car manufacturers just happened to live by for over 25 years.  That, of course, violates the basics of contract law.  *See Bleecher v. Conte*, 213 Cal. Rptr. 852, 854-855 (Cal. 1981) (stating the rule that a contract is unenforceable where the agreement lacks mutuality of obligation but finding that a party's promise to "proceed with diligence" was enforceable); *see also* Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."); Cal. Civ. Code § 3541 ("An interpretation which gives effect is preferred to one which makes void.").  MLC's argument is not only nonsensical, but it also directly contradicts NUMMI's factual allegations about how the VSA operated.  *See Rescuecom Corp.*, 562 F.3d at 127 ("When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.") (internal quotation marks omitted).

49.    Second, MLC argues that its performance was excused under the VSA's "Force Majeure" clause.  MLC's reasoning is circular and wrongheaded.  It claims that because there was a "discontinuation . . . of the manufacture of the Products ordered[,]" it was no longer

---

[12]    As explained above, under the Manual Of Allocation and the Purchase Procedures Manual—which expressly stated that they implemented the VSA—MLC and NUMMI continually updated production levels based on annual and quarterly projections and formed individual sales contracts each week.  (Tsuzuki Decl. Exs. G, H.)  The VSA refers to the establishment of these procedures in section 3.4 (providing for the creation of "a purchase procedures manual"), section 4.1 (discussing "supply and purchase arrangements") and section 4.7 (referring to the parties' "separately agreed upon" payment procedure).  (Tsuzuki Decl. Ex F.)

required to buy Vibes. (Objection ¶ 45.) But NUMMI's production was only discontinued because MLC stopped its orders! MLC's decision to discontinue the Vibe cannot be a force majeure event for MLC because, under the VSA, "the performance of any party hereunder shall be excused if and to the extent caused by occurrences beyond such party's control . . . ." (Tsuzuki Decl. Ex. F at § 6.1.) The decision to stop buying Vibes within MLC's control and discretion. *See Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1110 (C.D. Cal. 2001) (denying motion to dismiss under a force majeure clause because a plant shutdown had to be "beyond the reasonable control of either party"). To allow MLC to manufacture its own force majeure would be to allow MLC to manufacture its own "out" under the contract. Any response that MLC's decision to cancel the Pontiac brand arose from market conditions and its bankruptcy makes no difference. Courts have consistently rejected parties' attempts convert market conditions or decisions within their own control into an excuse under a force majeure clause. *See B.F. Goodrich Co v. Vinyltech Corp.*, 711 F. Supp. 1513, 1518-19 (D. Ariz. 1989) (holding the force majeure clause at issue did not extend "to severe price fluctuations and/or changes in market conditions"); *United States v. Panhandle Eastern Corp.*, 693 F. Supp. 88, 96 (D. Del. 1988) (noting that "American courts have routinely refused to excuse performance [due to market fluctuation], even where the force majeure clause . . . presents potential ambiguities").

50.    For these reasons, MLC's legally and factually flawed attempts to disallow this aspect of NUMMI's Proof Of Claim should be denied. NUMMI has adequately pleaded that MLC's decision to stop purchasing Vibes breached the clear and lasting commitments it made to NUMMI in the VSA and the 2006 MOU.

**C.      NUMMI Has Stated A Claim For Breach Of Contract Based On MLC's
Agreement To Share Equally In NUMMI's Deficit.**

51.      NUMMI also has a valid contract claim against MLC based on MLC's refusal to
contribute equally with TMC to fund NUMMI's deficit during its wind down.   In the 1983
MOU, MLC and TMC agreed that "[a]ny surplus or ***deficit*** of the JV as at termination of the JV
will be shared equally by [TMC] and [MLC], in line with [TMC's] and [MLC's] ownership."[13]
(Tsuzuki Decl. Ex. A at 10.)   Deficit is not defined in the agreement and as a result, it is
reasonable to infer a common meaning of the term.   Cal. Civ. Code § 1644 ("The words of a
contract are to be understood in their ordinary and popular sense, rather than according to their
strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning
is given to them by usage, in which case the latter must be followed."); *Nat'l Rural Telecomm.
Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1057 (C.D. Cal. 2003) (citing Cal. Civ. Code
§ 1644 and using a dictionary to define a contract term).   Deficit means "an excess of debit over
credit items" or "a loss in business operations."   Webster's Third New International Dictionary
(Unabridged) 592 (1993); *see also* Black's Law Dictionary 433 (8th ed. 2004) (defining deficit
as "[a]n excess of expenditures or liabilities over revenues or assets").   MLC agreed to share
equally (with TMC) NUMMI's excess liabilities.   TMC has implicitly recognized its obligation
to share in NUMMI's deficit and is taking steps to contribute to NUMMI's wind down, including
by providing financial support.   (Tsuzuki Decl. ¶ 46.)   Though it withdrew its board members,
MLC remained obligated under the 1983 MOU and is therefore required to share in whatever
excess liabilities remain during NUMMI's wind down, including assisting NUMMI in meeting
deficits in payments to NUMMI's employees and creditors.

---

[13]      Again, NUMMI is entitled to enforce this provision as a third party beneficiary.  *See supra* n. 10.

52.     While it does not address the 1983 MOU directly, MLC argues that it has no obligation to assist with NUMMI's wind down because NUMMI was incorporated and became "responsible for the payment of all its own expenses." (Objection ¶ 13.) Thus, MLC contends, the 1984 Shareholders' Agreement extinguished the commitments in the 1983 MOU. This is not so. The provision that MLC cites provides, *in full*, that:

> *Except as otherwise provided in any agreement or instrument to which the parties signatory hereto are parties*, [NUMMI] shall be responsible for the payment of all of its own expenses.

(Tsuzuki Decl. B at § 4.3.) The 1983 MOU is an agreement or instrument within the first clause of section 4.3 of the Shareholders' Agreement and so it is specifically excluded from section 4.3's reach. Even with its corporate form, NUMMI remained a unique joint venture and MLC remains responsible for its share of NUMMI's deficit.

53.     The parties' course of performance also contradicts MLC's position. When NUMMI faced deficits in the past, MLC recognized its duty to provide NUMMI with additional funding. In 1989, MLC and TMC amended their Subscription Agreement and each made an additional $30 million capital contribution to NUMMI. (Tsuzuki Decl. Ex. I.) They did it again 1992, this time providing $25 million each. (Tsuzuki Decl. Ex. J.) MLC's obligation to support NUMMI in those instances stems from the same fundamental obligation that requires it to contribute to NUMMI's wind down now: it was a joint venturer in NUMMI and a beneficiary of NUMMI's production and know-how for over 25 years. MLC has only recently decided to conveniently ignore this history. (Tsuzuki Decl. Ex. L (April 2009 letter from MLC to NUMMI stating that "We remain committed to our partnership and the NUMMI joint venture . . .").)

54.     NUMMI estimates that its wind down expenses may exceed $500 million. (Tsuzuki Decl. ¶ 45.) NUMMI faces significant potential claims from federal and state agencies and from third party vendors and needs MLC to fulfill its contractual obligation to satisfy

NUMMI's deficit in line with its ownership interest.  Neither the 1983 MOU nor the Bankruptcy

Code allows MLC to avoid all responsibility to NUMMI.

      **D.**      **NUMMI Has Stated A Claim Against MLC For Breach Of The Covenant Of Good Faith And Fair Dealing.**

      55.      NUMMI has valid claim against MLC for breaching the covenant of good faith

and fair dealing that exists "in every contract [so] that neither party will do anything which will

injure the right of the other to receive the benefits of the agreement."  *Comunale v. Traders &*

*General Ins. Co.*, 328 P.2d 198, 200 (1950).  The implied covenant imposes upon each party the

"duty to do everything that the contract presupposes that he will do to accomplish its purpose."

*Harm v. Frasher*, 5 Cal. Rptr. 367, 374 (Cal. App. 1960).  Here, the covenant of good faith

supports a separate contract claim because MLC did not "do everything . . . to accomplish [the]

purpose" of the 2006 MOU and the VSA.  *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,

122 Cal. Rptr. 2d 267, 283 n.15 (2002) (explaining that a breach of the covenant of good faith

and fair dealing can give rise to a separate contract claim).  Specifically, when MLC cancelled

the Pontiac Vibe, it did not act in good faith to find a vehicle for NUMMI to produce as an

alternative to the Pontiac Vibe so that MLC could continue to make continuous purchases from

NUMMI and keep NUMMI viable.

      56.      Again, MLC acknowledged its obligation in 2009.  After deciding to cancel the

Pontiac brand in April 2009, MLC wrote to "assure" NUMMI that it was "committed to work

with NUMMI and [TMC] to seek alternatives to assist NUMMI as it transitions out of the

production of the Pontiac Vibe . . . ."  (Tsuzuki Decl. Ex. M.)  Then MLC began "working to

develop a replacement for the Vibe" and stated that it was "look[ing] forward to seeing an

exciting new product from NUMMI that will work well with the [MLC] line."  (Tsuzuki Decl.

Ex. O.)  NUMMI acted in good faith to assist MLC, and the parties began discussing the

possibility of "repurposing" the Vibe from Pontiac to another MLC brand.  (Tsuzuki Decl. ¶ 34, Ex. N.)  NUMMI was actively pursuing this project when MLC changed course and proposed that NUMMI produce a MLC-badged Tacoma truck.  (Tsuzuki Decl. ¶ 35.)  MLC stated that if TMC and NUMMI did not accept its Tacoma proposal, including MLC's non-negotiable pricing for the Tacoma, NUMMI would have to be dissolved.  (Tsuzuki Decl. ¶ 35, Ex. P.)  This "all or nothing" proposal was unworkable.  Shifting all of NUMMI's MLC allocation under the 2006 MOU from cars to trucks still would have left a hole in NUMMI's production levels and NUMMI believes that discovery will show that MLC was aware of this.  (Tsuzuki Decl. ¶ 37.)

57.    MLC did not pursue or properly evaluate the possibility of continuing the NUMMI venture in the manner that its contractual obligations required.[14]  Instead, MLC used its impending withdrawal as leverage to extract an MLC-badged Tacoma truck from TMC at an unreasonably low price.  When this proposal faltered, MLC just walked away.  This conduct supports NUMMI's claim for damages for both its capital expenditures related to the Vibe (which could have been put to use producing a replacement vehicle from MLC) and for MLC's share of NUMMI's deficit at termination (which is the result the MLC's failure to find a solution to keep NUMMI afloat).

## II.    NUMMI HAS STATED A PROMISSORY ESTOPPEL CLAIM BASED ON MLC'S COMMITMENTS TO SUPPORT NUMMI'S BUSINESS.

58.    In addition to its contract claims, NUMMI has adequately pleaded a promissory estoppel claim based on the significant capital expenditures NUMMI made because MLC promised to buy enough Vibes to support NUMMI through 2012.  To state a promissory estoppel

---

[14]  "[T]he implied covenant of good faith and fair dealing has both a subjective and an objective component—subjective good faith and objective fair dealing.  A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable.  The covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." *Storek & Storek, Inc.*, 122 Cal. Rptr. 2d at 282 n. 13.  NUMMI believes that the parties could have reached a beneficial agreement on a substitute for the Vibe.  (Tsuzuki Decl. ¶ 34.)

claim, the plaintiff must allege (1) that the defendant made a promise to the plaintiff; (2) that the plaintiff relied on that promise, (3) that the plaintiff's reliance was reasonable and foreseeable; (4) that the plaintiff was harmed by its reliance on the defendant's promise; and (5) that the defendant was responsible for the plaintiff's damages. *See Van Hook v. Southern California Waiters Alliance, Local 17*, 323 P.2d 212, 220 (Cal. App. 1958). NUMMI has satisfied each of these elements.

59.    First, NUMMI has identified multiple promises that MLC made regarding the Vibes it would purchase during the 2006-2012 production cycle. At a three-party meeting in December 2005 (prior to the 2006 MOU), MLC promised to maintain high enough production levels to keep NUMMI viable through 2012. Specifically, MLC represented that it would purchase approximately 325,000 Vibes from 2008 to 2012. (Tsuzuki Decl. ¶ 24.) MLC made similar promises when the parties discussed production projections. For example, in 2006 when MLC asked for pricing support, MLC promised to maintain a sales level of at least 47,000 vehicles per year for 2007 and 2008. (Tsuzuki Decl. ¶ 28.)

60.    Second, NUMMI reasonably relied on MLC's promises. "The vital principle [of estoppel] is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted." *Garcia v. World Sav., FSB*, 107 Cal. Rptr. 3d 683, 692 (Cal. App. 2010) (quotation marks and citation omitted). Here, based upon MLC's promises to purchase Vibes through 2012, NUMMI invested hundreds of millions of dollars re-purposing and expanding its facilities and developing new production capabilities. (Tsuzuki Decl. ¶ 25.) It also spent considerable amounts to hire and train employees. (Tsuzuki Decl. ¶ 25.) MLC cannot claim that these expenditures were not reasonable or foreseeable because Vibe production

depended on them and NUMMI had always recouped its capital expenditures for new models in the past.

61.    With respect to the third and fourth promissory estoppel elements, there is no question that NUMMI has been harmed as a result of MLC's failure to honor its promise.  Thus, NUMMI is entitled to recovery because "[t]he contract measure of damages applies to claims based upon promissory estoppel."  *Cooper v. State Farm Mut. Auto. Ins. Co.*, 99 Cal. Rptr. 3d 870, 888 (Cal. App. 2009).  With Vibe production halted, over $120 million of NUMMI's capital outlays have not been recouped and MLC has refused to make up the difference.  (Tsuzuki Decl. ¶ 41.)  NUMMI is entitled to these reliance damages.  For these reasons, NUMMI's promissory estoppel allegations support its Proof Of Claim and cannot be disallowed.[15]

## III.    MLC CANNOT CONVERT ITS OBJECTION INTO A DE FACTO MOTION FOR SUMMARY JUDGMENT AND SIMULTANEOUSLY REFUSE TO PROVIDE NUMMI WITH ADEQUATE DISCOVERY.

62.    NUMMI has properly pleaded its claims and has submitted further evidence to support them through this Initial Response.  Even if MLC's strained interpretations of its contracts with NUMMI deserved any weight, because there are legitimate disputes about the contracts, NUMMI's Proof Of Claim cannot be dismissed at this stage.  *See Bovee & Thill LLC v. Pearson Educ., Inc.*, 564 F. Supp. 2d 199, 201 (S.D.N.Y. 2008) (denying a motion to dismiss where the parties offered differing interpretations of contractual provisions).  To the extent the Court believes further elaboration is necessary, NUMMI should be allowed to re-plead.  *See In re Integrated Resources, Inc.*, 157 B.R. at 70 ("[I]n a bankruptcy case, amendment to a claim is freely allowed where the purpose is to . . . describe the claim with greater particularity . . . .").

---

[15]    NUMMI understands that its promissory estoppel claim may become redundant if it prevails on its contract claims.  NUMMI has pleaded promissory estoppel as an alternative theory of liability because MLC is claiming that none of its contracts with NUMMI are enforceable or entitle NUMMI to relief.  *See Randolph Equities, LLC v. Carbon Capital, Inc.*, No. Civ. 10889, 2007 WL 914234, at *6 (S.D.N.Y. Mar. 26, 2007) (allowing promissory estoppel and contract claims to proceed simultaneously).

63.    Since filing its Objection, MLC has stated that full discovery is not necessary because it has asserted sufficient facts to defeat NUMMI's claims.  MLC has only produced a small set of documents that are tangentially related to NUMMI's claims, has not produced communications or other documents about its decision to exit the NUMMI venture and has refused to respond to NUMMI's interrogatories.   Its position on discovery is absolutely inconsistent with its argument that NUMMI cannot state any legal claim.  MLC cannot transform its Objection into a motion for summary judgment without providing NUMMI with appropriate discovery.  *See In re Adelphia Communications Corp.*, 285 B.R. 848, 857 n.21 (Bankr. S.D.N.Y. 2002) (noting "that parties in interest do have the right, in contested matters in umbrella cases, to discovery, and without first obtaining leave of court").   Thus, while NUMMI would like to resolve this dispute as quickly and efficiently as possible (and has offered to participate in mediation this summer to facilitate that resolution), if MLC is unwilling to acknowledge the bases for NUMMI's claim, NUMMI must proceed with litigation and is entitled to discovery to prove its allegations.

## CONCLUSION

64.    For the foregoing reasons, NUMMI's Proof Of Claim should not be expunged. NUMMI has asserted four valid breach of contract claims and a valid promissory estoppel claim.

New York, New York.
Dated:  May 24, 2010

Respectfully Submitted,

KIRKLAND & ELLIS LLP

By:    */s/ Mark E. McKane*
      Richard M. Cieri
      Ray C. Schrock (admitted *pro hac vice*)
      Mark E. McKane (admitted *pro hac vice*)

*Attorneys for the Creditor*
*NEW UNITED MOTOR MANUFACTURING, INC.*