1              IN THE COURT OF COMMON PLEAS OF
              LANCASTER COUNTY, PENNSYLVANIA
2                         CIVIL

3    _____

4    DONNA SODERS, on behalf of           :
     herself and all others              :
5    similarly situated,                  :

6              Plaintiffs                 :

7                                         :
          vs                             :    No. 04255 of 2000
8                                         :
     GENERAL MOTORS CORPORATION,          :
9                                         :
              Defendant                   :
10                                        :

                                          :    **COPY**
11   _____     :

12

13              TRANSCRIPT OF PROCEEDINGS
              SETTLEMENT FAIRNESS HEARING

14        Before:   THE HONORABLE LOUIS J. FARINA

15        Date  :   Tuesday, April 28, 2009

16        Place :   Courtroom Number 10
                    Lancaster County Courthouse
17                  50 North Duke Street
                    Lancaster,  PA  17608-3480

18

19   APPEARANCES:

20        JOSEPH F. RODA, ESQUIRE
          MICHELE BURKHOLDER, ESQUIRE
21        RODA & NAST, P.C.
          801 Estelle Drive
22        Lancaster, PA 17601
               For - the Plaintiffs
23
          JEFFREY A. LIPPS, ESQUIRE
24        CARPENTER & LIPPS, LLP
          280 North High Street 1300
25        Columbus, OH 43215
               For - the Defendant

2

```
 1

 2     APPEARANCES CONTINUED:

 3
          CHRISTOPHER S. UNDERHILL, ESQUIRE
 4        HARTMAN,UNDERHILL & BRUBAKER, LLP
          221 East Chestnut Street
 5        Lancaster, PA 17602
             For - the Defendant
 6
          ROBERT GIBSON, ESQUIRE
 7        GIBSON LAW FIRM
          319 West Front Street
 8        Media, PA 19063
             For - the Objectors
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      P R O C E E D I N G S
2                         (8:58 a.m.)
3              THE COURT:  Mr. Roda, you may proceed.
4              MR. RODA:  Good morning, Your Honor.  May it
5     please the Court.
6              Last summer at a conference that Your Honor
7     convened, one of the many in this case, Your Honor
8     recommended the parties attend mediation and settlement.
9     The parties took that cue, and on October 15 went to
10    Philadelphia for mediation before a highly-regarded
11    professional mediator, Mr. Bennett Picker.
12             We, Plaintiffs' counsel, went to that, recognizing
13    the fiduciary obligation we had to the class to get the
14    best result we could through trial or settlement, under the
15    facts and the law.
16             This case had risk, as any case does, but this
17    case had more risk because it was a case of first
18    impression, and, thus, presented issues that had to be
19    decided for the first time.  This was the first consumer
20    case under the Pennsylvania Board of Vehicles Act.  There
21    had been four dealer cases brought under that act or
22    comparable acts in other states, but this was the first
23    brought by consumers.  And it presented issues, even for a
24    single case, such as standing, statute of limitations, and
25    proof of damage.
```

1        It then presented additional issues because this

2   was not an individual case, this was a class case, and the

3   class issues, especially on proof of damages, compounded

4   the issues that otherwise would have been before the Court.

5        In addition, and most importantly, by the time we

6   went to settlement negotiations in October, there was an

7   issue that one ordinarily does not face, it was the specter

8   of GM's bankruptcy -- potentially imminent bankruptcy.  By

9   that time, mid-October, the economy, of course, was

10  crashing.  But, also, there were daily reports that GM,

11  without an infusion of billions from the government, might

12  not make it to the end of the year, much less substantially

13  into the next.

14       Under those circumstances, we believed that if

15  there was a reasonable settlement attainable, we owed it to

16  the class to pursue that.  We had no judgment, no

17  collectible judgment against GM.  We would first have to

18  win a trial to get that.  We had no trial date.  At that

19  point we did have a final pre-trial conference, scheduled

20  it with Your Honor for December 30, at which time we would

21  have gotten a trial date, which in all likelihood would

22  have been sometime within the first half of this year.

23       If we had won that trial, we would have faced, for

24  certain, an appeal of right to the Superior Court, which

25  would have delayed the entry of a final judgment, if we had

1    won that appeal, by at least another year.  And, in all

2    likelihood, following the pattern that happened in this

3    case, there would have been an attempt by GM for an appeal

4    to the State Supreme Court, which could not be discounted

5    given the novel issues of the case and the potential

6    magnitude of the damages that the case involved.  At a

7    minimum, even if the Supreme Court had denied allocatur, we

8    would have delayed another six months.

9         We, thus, knew if we did not settle, we would have

10   no final judgment for years.  And, under the circumstances,

11   with every indication we had, we did not see how we had the

12   luxury of presuming that amount of time, or anything close

13   to it.  We thought we were working under a clock that was

14   ticking in terms of weeks or months, at most.  If GM filed

15   for bankruptcy and we had no judgment, the case would be

16   over, the class would receive nothing.

17        That changed everything; it changed our leverage.

18   Frankly, it took a great deal of our leverage away.  It

19   mandated the best settlement we thought we could obtain.

20   We wanted -- let's be clear about this to the two class

21   members, or the representatives that are here -- we wanted

22   a cash settlement.  We went into this case with the idea of

23   a cash recovery.

24        But a cash settlement was not an option.  GM made

25   that very clear at the start of the negotiations.  The

1    mediator, in private sessions with us, emphasized this was

2    not posture.  If we insisted on cash settlement, the

3    mediation was over, there would be no settlement.

4         We wanted -- when the discussion turned to

5    certificates, we wanted a certificate that could be used

6    not only for the purchase of a car, but, also, for

7    maintenance, repair, or parts.  That also, unfortunately,

8    was not a negotiable item.

9         And I have cleared with GM's counsel the ability

10   to say this, notwithstanding the cloak of privilege that

11   was over the settlement negotiations.  We wanted to be

12   clear to the class and to the public how the settlement

13   that we did agree to was arrived at.

14        The only settlement that GM would agree to was

15   this certificate settlement that has been presented to the

16   Court.  We, under the circumstances, all things considered,

17   we did not think we could responsibly walk away from that,

18   given the imminent specter of bankruptcy that had every

19   indication of being a reality, a very near reality,

20   something we, as class counsel, could not ignore.  That is

21   the first reason we agreed to the certificate settlement.

22        The second was that we knew even if we could have

23   gotten a cash settlement from GM, which they said they

24   wouldn't, that would have had little, if any, practical

25   value to class members in the event of a bankruptcy.  It

1    would not -- it would have just been another unsecured debt

2    that GM owed, it would have had no enhancement value to GM

3    in terms of reorganization going forward.  It just would

4    have been a drain on its resources.

5            By contrast, the certificate settlement,

6    certificate for the purchase of cars, we believed had the

7    chance, even in the event of bankruptcy, of surviving,

8    because it would serve the interests of GM's

9    reorganization.  It would serve the interest of GM's going

10   forward.

11           Reason three that we agreed to this settlement we

12   did, the certificate settlement had a value well within the

13   dollar value that a trial could have won for class members.

14   If the case had gone to trial based on the evidence we

15   have, the class members' recoveries would have ranged

16   between $150 and $200 per purchase.

17           But the class -- that would have been the gross,

18   but the class members would not have received a gross, had

19   we obtained that through a trial and the collection of that

20   fund.  The class members would have had responsibility for

21   deduction for a proportionate share of costs and fees,

22   which, in the event of a trial, would normally have been

23   between 25 percent and one-third of the amount recovered.

24           The net, therefore, to class members, in the event

25   of a trial, a successful trial, successful appeal, would

1   have ranged at the one-third level, between $100 and about

2   $160 per vehicle, the net.

3           By contrast, the certificates had a value of $200

4   net. Any fees and costs were to be borne by GM over and

5   above the value of the certificate. The certificates also

6   had a cash value. They could be transferred for full value

7   to a member of one's household. Not just a blood relative,

8   but a member of a household. After a year they could be

9   transferred to anyone for 75 percent of the value. That --

10  or $150.

11          That compares favorably, again, with the net

12  amount, the best-case recovery potential for the class.

13  Many of the class members would have been below the best-

14  case $250 recovery. They would have been at the lower end

15  of it. The certificates could also be stacked by those who

16  get them in the first instance with another certificate,

17  and the certificates for everyone, including transferees,

18  can be stacked with other GM discount programs with several

19  exceptions, one being an employee discount program, unless,

20  as the industry has been doing of late, that is extended to

21  the public generally.

22          The certificates also came -- this can't be

23  emphasized too much -- without the risk of a trial. The

24  certificates were a guaranteed thing as part of a

25  guaranteed settlement. In addition, there was the

1    practical problem of going to trial against GM in the

2    climate we would have gone to trial against them in.

3        It would have been impossible to get a jury not

4    aware of GM's dire financial condition.  It would have been

5    impossible, I think, notwithstanding every intonation of

6    every admonition Your Honor gave nightly to a jury if they

7    weren't sequestered, for them not to be exposed when they

8    went home to more news about GM's dire condition.

9        And it would be folly, I think, for one in our

10   position to assume that would have done anything but hurt

11   our case in front of a jury in a case of this type, a

12   strictly economic injury case, not a quadriplegic or burn

13   victim, personal injury, something which has emotional

14   appeal value.  That only compounded the risk we thought we

15   faced under the circumstances that had arisen through no

16   fault of our own.

17       For all of these reasons, the settlement we

18   reached, we believe, with its actual value, both in the use

19   of the certificates and their redeemable cash value, was a

20   reasonable decision under the time, under the

21   circumstances.

22       It was not the ideal, of course, but we did not

23   have the ideal situation.  That has to be emphasized.  The

24   settlement had a potential value to the class, potential

25   under this Court, if one multiplied the number -- the

1    certificate value by the number of vehicles we were told

2    was in the class, between 700,000 and 800,000, that

3    settlement had a potential value class-wide of between $140

4    and $160 million.  Even at a 10 percent redemption rate, we

5    would have been talking about $14 million to $16 million of

6    value.  Five percent, you do the math, seven to eight.

7            It is wrong, we suggest, notwithstanding the

8    popular conception, to regard all certificate settlements

9    without more, as, per say, suspect, questionable, bad,

10   whatever you want to call it.

11           Certificate settlements are not all, quote, the

12   same, any more than a cash settlement.  All cash

13   settlements are not the same.  They have to be looked at on

14   their facts and under their circumstances.

15           GM's imminent bankruptcy in our case distinguished

16   our case from every case that has disallowed or disapproved

17   of a certificate settlement.  That includes the GM pick-up

18   case that is cited in our papers and in Mr. Gibson's papers

19   on behalf of his client objectors.

20           In none of those cases, unlike our case, was the

21   Defendant on the verge of bankruptcy.  By contrast, in

22   those cases where financial solvency or viability was an

23   issue, the Courts have approved a certificate settlement

24   mentioning that factor.  We mentioned two of the cases in

25   our briefs:  The Ohio Public Interest Campaign, cited at

1    Pages 21 and 25 of our brief, and the Milkman Two case,

2    cited at Page 25 of our brief.

3         In both of those cases, the Courts mentioned the

4    questionable viability, questionable ability to pay the

5    cash settlement as a reason for approving the certificate

6    settlement proposed in that case.

7         There is another case, the In Re:  Domestic

8    Airlines case, where the Court, in a combination cash and

9    certificate settlement, predominantly certificate,

10   mentioned the same thing as one of its considerations for

11   finding the settlement reasonable.

12        Now, the question of costs.  We have filed our

13   petition for costs with Your Honor; there has been no

14   objection to our seeking of the costs.  It was

15   approximately $437,000 that we have laid out over the nine

16   years of this case, to keep the case alive, to provide the

17   class notice in the first instance after Your Honor granted

18   certification, at a cost of approximately $200,000, to

19   retain the multiple experts that were necessary, either on

20   our initiative that we thought were in response to the

21   multiple experts GM retained, to depose those experts and

22   others, to defend depositions all over the state that GM

23   took, et cetera.  They are documented, we have the receipts

24   in the back of them.  I don't think there is a question

25   about those.

1        On our fees, we ask for the payment of a

2   reasonable fee for the work done that has led to this

3   settlement.  As we have detailed in our petition, our

4   office, over the nine years of this case, which I think

5   probably sets a record for duration, have invested more

6   than 6,000 hours.  That time was spent, which I know sounds

7   considerable, but Your Honor has lived with this case as we

8   have.  I have these pages of our computer printout fee

9   records, lest there be any question about how the time was

10  spent.

11       That time was invested in obtaining class

12  certification, which was very hard fought, which was

13  appealed, not only to the Superior Court, but to the

14  Supreme Court, fighting the attempt to decertify the class

15  last year, which was, again, hard fought, keeping the case

16  alive against the repeated efforts at summary judgment, two

17  of them by GM, which had to be taken seriously, briefed

18  seriously, reviewing and analyzing the tens of thousands of

19  documents this case involved, a review and analysis that

20  took place not only here, at our offices, but also in Ohio

21  at GM's counsel's office where the documents were made

22  available to us, traveling all over the state, as I

23  mentioned, to defend or take the depositions GM sought, and

24  receive permission from the Court to take from a selected

25  group of absent class members.

1           We could not have gotten the settlement that is

2    here before the Court today without the investment of this

3    time.   It was necessary to our ability to be where we are

4    today.

5           Fees and class actions are approached through

6    courts by either of two methods, which we mentioned, one,

7    percentage of the fund; second, the loan star approach.

8           In certificate settlements, the Courts have

9    differed on whether or how to use the percentage

10   appropriately.   Some regard to use it based on the

11   potential value; others look at redemption rates,

12   et cetera.   I mentioned before that if we were to value the

13   settlement at only five to ten percent of the potential

14   value, it would be at five percent of the seven to eight

15   million dollar value in the case.

16          GM has agreed, based on what our current loan star

17   was at the time in October, as it is customarily

18   determined, to pay up to $1.86 million in fees.   We do not

19   request that.   We have not requested interest, we have not

20   requested a multiplier, we are not requesting the fee at

21   our current rates.   We are requesting -- in our petition we

22   requested the fee only at our historic rates, the rates

23   that were in place and being billed in class actions at the

24   time in these nine years.

25          That is $200,000 less than what GM has agreed to

1    pay in the case.  But, Your Honor, and I say this without

2    having discussed this with GM or with anyone else, we have

3    made a further decision at our office on this, the powers

4    that be, so to speak, at the office.

5            We watch the same news everybody else watches.  We

6    read the same papers everybody else watches.  We are aware,

7    as everyone is, of this very unfortunate perfect storm that

8    has hit the economy, and GM in particular.  You know, you

9    can't but help but feel bad for people who are losing their

10   jobs, who are having their pay cut, et cetera, because of

11   that.

12           In view of that, notwithstanding the work that

13   went into this case, the work that brings us here today, we

14   have come to the Court and say we are asking for a fee that

15   is half our historic rates.  We have decided to cut our fee

16   request by the factor of half from the one point six.  We

17   are asking for half of that, which is about $843,000, with

18   our costs.

19           We believe the other request would have been

20   reasonable, but, under the circumstances, in an effort to

21   be eminently reasonable, we have decided to make that

22   request --

23           THE COURT:  What does that result in your historic

24   rate being?

25           MR. RODA:  It would be -- it would be a blended

15

1  rate of $134 an hour.

2  Your Honor, I believe that I have covered the

3  objections that have been made.  There have been, as we

4  mentioned in our papers, only nine objections filed.  Seven

5  timely, two untimely, but we have considered all of those.

6  The objections have a common theme, cash, as

7  opposed to the certificates.  As I have explained, cash

8  would have been our preference.  This should -- our

9  position should not be understood as having gone and sought

10  a certificate settlement, or loosely agreeing to a

11  certificate settlement.

12  Our position was we wanted a cash settlement.  We

13  could not get a cash settlement.  Had we held out for cash

14  settlement, there would be no settlement, and, in all

15  likelihood, the class would receive nothing.

16  One can criticize the value of the certificates,

17  but they do have a value.  They have a real value.  And,

18  again, one has to look at their value, not in the abstract,

19  as if at trial we could have gotten something many

20  multiples of that value, but in relation to what a class

21  member could have hoped to obtain.

22  THE COURT:  When the certificates become

23  transferable to anyone after a year to anyone --

24  MR. RODA:  Yes.

25  THE COURT:  -- is there a market?

1           MR. RODA:  It will depend, Your Honor.

2           Fortunately, we are in the internet-age.  We are

3    in the age where it is probably -- there is unprecedented

4    ease in establishing markets of any kind for people.

5           THE COURT:  Because you could put them on Ebay for

6    that matter.

7           MR. RODA:  They can be -- well, as I say, the

8    initial person may stack two of them to purchase.  They may

9    -- everybody may stack them on top of any other discount

10   program which is attainable at the time.  And even $150 is

11   nothing to sneeze at if you are going in to buy a car.

12          If the dealer were on his own initiative to come

13   out and say I am going to cut it another $150 for you,

14   people would be pleased about that.

15          But, again, in relation to what the class members

16   could have achieved, if we had won a trial and sustained

17   this through appeal and GM were not bankrupt by the time it

18   came to collect on that judgment, it is a good value.  It

19   is a good value.

20          It is a compromise to be sure.  But that is the

21   definition of a settlement.

22          THE COURT:  Was Mr. Lipps aware of your

23   reduction --

24          MR. RODA:  No, he was not.  We have not asked --

25   we have not asked that.

1          We did discuss -- I raised, for the first time

2     with Mr. Lipps over the weekend, the idea, perhaps, of

3     extending the time for the class period.  It runs until

4     June 15.  There is still the better part of two months for

5     this.

6          But, of course, GM has had other things to deal

7     with in the past hours, the past days, literally.  The

8     convergence of events just from the time we filed our fee

9     petition last week until today just magnifies the things to

10    which we refer.

11         THE COURT:  It struck me yesterday as I watched

12    the news.

13         MR. RODA:  It is really unfortunate.  One only

14    hopes, as I said to counsel at GM when we concluded the

15    settlement negotiations, independent, not lawyer-to-lawyer,

16    but just person-to-person, we got to wish the best for all

17    these folks.  These are real lives, et cetera.

18         THE COURT:  I don't mean it struck for the first

19    time.  But it struck me as particularly poignant yesterday

20    as the current announcements were being made as to the

21    plant closings, the loss of the Pontiac brand, some 21,000

22    jobs being cut, realizing we were coming here today to

23    consider this.

24         MR. RODA:  And I learned here today just coming

25    down that those people who keep their jobs are all having

1    some very significant pay cuts to go along with it, too.

2           So you can't stand here and not take cognizance of

3    that, and we are trying to do that.

4           THE COURT:  According to what I've read, it is not

5    a done deal.  If the bondholders don't agree, it is

6    bankruptcy.  At least that's what the news reports.  But I

7    am sure Mr. Lipps can fill us in about that.

8           MR. RODA:  Right.

9           And the agreement has been that there will be --

10   as per the terms of the settlement agreement, GM is going

11   to transfer the funds to Mr. Lipps to be held in his IOLTA

12   account pending the clocking of the days from the time,

13   whenever that is, that Your Honor would enter an order on

14   this.

15          I would be happy to answer questions, Your Honor,

16   or respond to anything that is said either by Mr. Lipps or

17   by the one class member who is here, or Mr. Gibson who is

18   representing two class members.

19          THE COURT:  Mr. Lipps.

20          MR. LIPPS:  I don't really have much to say, Your

21   Honor, and I would likewise answer any questions.

22          I will say I've represented GM for 28, 29 years

23   now, and this is perhaps the most difficult phase they have

24   gone through, and they are continuing to fight day and

25   night.

1          So it certainly puts a color on what is going on

2     here.  I am in a little awkward spot because I don't want

3     to disclose any nonpublic information, so I am not going to

4     talk about where they are at right now, other than, as Your

5     Honor noted, it is a convergence of events right now with

6     respect to whether or not the bondholders will agree, there

7     is union, and, of course, the government.  So there are any

8     number of things that are going on that will impact where

9     GM's at right now.

10          This -- I do agree with Joe that this was a case

11    not only of first impression, but one that was very hardly

12    litigated.  And I want the Court to remember, from GM's

13    perspective there were some very serious legal issues that

14    even a trial wouldn't resolve, that ultimately would be

15    heard perhaps not -- they weren't willing to take it on the

16    interlocutory basis but were confident --

17          THE COURT:  They definitely would have been

18    considered on direct appeal.

19          MR. LIPPS:  And the other thing is we did try one

20    of these cases, and we were essentially, back when we tried

21    it, it was a dealer case.  But when we tried it, we were

22    facing a class without a class because of collateral

23    estoppel.

24          So I would say this was one that was right at the

25    core of General Motors, in terms of its principle wanting

1   to defend this.  The other thing I would say, we did come

2   in with some very serious constraints and took Your Honor's

3   suggestion and went to mediation.

4          Fortunately, Joe and I were able to agree on a

5   mediator who had, in my estimation, a dazzling array of

6   talents to be able to take those boundaries and work with

7   what Joe needed to be able to deliver a real benefit to the

8   class.  And he accomplished something that none of us, at

9   least on my side, ever expected to have accomplished when

10  we walked into that room.

11         And I do agree that this is a real value to the

12  class.  I think it is a fair, reasonable, and adequate

13  settlement, given the risks that were apparent in the case,

14  not only on the legal issues we've raised, but, also, the

15  injury issue.  There are other aspects of it, which

16  included the dealer case settlement, which Your Honor had

17  not really had to deal with, but how that impacted what the

18  class really had, damages, together with the way the

19  program was structured.  There was some money that would go

20  directly back to the dealer.

21         So there were a whole array of issues that would

22  have made this a case that no one could be assured there

23  would be at the end of the day, even with a verdict, much

24  of a recovery for the class members on an individual basis.

25  And I think this settlement gives them value.

1          And as Your Honor noted in questioning about the

2     market, we really are in an internet age, and, of course,

3     the elephant in the room is the dealers.  The dealers, of

4     course, know about it, and they could certainly ask their

5     customers or others whether or not they have taken

6     advantage of a certificate or whatever.

7          So there is a source of information that's out

8     there, that is ready, and the dealers have an interest in

9     making the deals.  So I do think it is a real value to the

10    class, and we would urge the Court approve it.

11         THE COURT:  All right.  Thank you.

12         I'll now hear from any objectors or class members,

13    either for or against.

14         Good morning.

15         MS. SPRADLIN:  Good morning.  I'm Debora Spradlin.

16         All I hear is numbers being thrown around.  GM is

17    still in business, they still --

18         THE COURT:  I'm sorry, did you get the name?

19         THE COURT REPORTER:  I got the first name.

20         MS. SPRADLIN:  Linda Spradlin.

21         THE COURT REPORTER:  Could you spell that?

22         MS. SPRADLIN:  S-P-R-A-D-L-I-N.

23         THE COURT REPORTER:  Thank you.

24         THE COURT:  Did you -- did you file a written

25    objection as well?

1          MS. SPRADLIN:  Yes, I did.

2          MR. RODA:  Your Honor, for the record, it is

3    No. 13.

4          THE COURT:  Yes, okay.

5          MS. SPRADLIN:  If it was illegal for them to take

6    the money, then I would like my money back.  Giving me a

7    certificate to buy one of their cars is not doing me any

8    good.  I still have the car.

9          Why should I get a certificate in return to buy a

10   car from them when they already done something wrong they

11   shouldn't have done?  Two wrongs don't make right in my

12   book.  I had to pay extra cash for it, I want my cash back.

13   I don't think it is fair I get some kind of certificate

14   that I can get some kind of cash value sometime, but it is

15   not doing me any good now.

16         THE COURT:  All right.

17         MS. SPRADLIN:  I can give them a certificate to

18   buy a car --

19         THE COURT:  Does counsel care to respond?

20         MR. RODA:  I don't wish to belabor the point.  I

21   understand completely.

22         As I told Miss Spradlin in the hallway when I met

23   her this morning, I wish we could have gotten a cash

24   settlement.  We could not get a cash settlement for you.

25   And if we had not gotten this settlement for you in the

1    class, in all likelihood there would have been nothing

2    achieved.  It was a matter of the possible, not the ideal.

3         THE COURT:  All right.  Thank you, Miss Spradlin.

4         MS. SPRADLIN:  Thank you.

5         THE COURT:  Anyone else?

6         MR. GIBSON:  Yes, Your Honor.

7         THE COURT:  Are you Mr. Gibson?

8         MR. GIBSON:  Yes, I am Bob Gibson.  Nice to meet

9    you.

10        THE COURT:  I have seen your objections.

11        MR. GIBSON:  Okay.

12        THE COURT:  That's the reason I know the name.

13        MR. GIBSON:  Judge, I am not going to belabor the

14   Court with going through -- if you've already read my

15   written objections, but there are a few points that Mr.

16   Roda raised in his argument that support of the settlement

17   and in support of his fees that I'd like to address.

18        There is no question, Judge, that GM is suffering.

19   But there is also no question that consumers -- all

20   consumers in Pennsylvania are suffering as well.  And there

21   has been, and Mr. Roda argued, that the reason for this

22   coupon settlement was, I believe, what he called the

23   imminent specter of bankruptcy by GM last October.  And

24   listening to the news driving to the courthouse this

25   morning, all indications are that GM is not going to file

1   for bankruptcy.  And I think the Court can take judicial

2   notice of that.

3          THE COURT:  Frankly, that is -- I don't think

4   that's at all clear.  What I recall reading is that if the

5   government, the union, and the bondholders don't agree,

6   bankruptcy is the next step.

7          And that from the article I read, the real problem

8   is that the bondholders feel the union is getting treated

9   too much better than they, because their stake would only

10  be something like 11 percent of the company, versus the

11  union getting 39 percent and the government getting 50

12  percent.

13         So my sense of the article is this bankruptcy

14  could occur if the bondholders -- and the report I read was

15  the bondholders are not favoring their deal.  And if they

16  don't go along, what's next?  That's my -- so in terms of

17  your request I take judicial notice, that's how I respond.

18         MR. GIBSON:  Fair enough, Judge.

19         Let me focus on deficiencies of the settlement,

20  which the settlement calls for coupons to individuals that

21  purchased GM vehicles, as the Court is aware.  And the

22  coupons have a value of $200, $100, or nothing, depending

23  on the documentation that the purchaser of the vehicle has.

24         In order to reap the benefit of this $200 coupon,

25  consumers in this difficult economy, who also are facing

1    bankruptcies, are required to make a purchase of $20,000 or

2    $30,000 in order to get their $200 benefit for what they

3    overpaid for a vehicle before.  And in this economy, that

4    is an atrocious settlement.

5         And one of the factors is, and Mr. Roda continued

6    to argue that there was -- that he went to GM, talked to

7    GM, and said this is the best I can do.  This is a case, as

8    class counsel said, already was certified, was appealed,

9    the certification was held up on appeal, they tried to get

10   it decertified, it couldn't be decertified.

11        Class counsel had tremendous leverage with GM to

12   negotiate some kind of settlement, even in the form of this

13   $200 that could be used for services for a vehicle or parts

14   or repair for a vehicle, for Pennsylvania consumers who are

15   also facing bankruptcy.

16        Instead, these same consumers who are going

17   through bankruptcy right now, not just facing imminent

18   specter of bankruptcy, but are going through actual

19   bankruptcies right now, are required to purchase a vehicle

20   between $20,000 and $30,000 in order to get a $200 or $100

21   benefit from GM.

22        And, Your Honor, it doesn't take much to see this

23   is a completely inadequate settlement.  And not only does

24   it not take much common sense, but, Your Honor, there was a

25   similar case, the GM pick-up case back in 1995, in which

1    Mr. Roda's wife was class counsel, that had similar

2    problems.  And I believe what they called it was a

3    marketing -- tremendous sales bonanza for GM.  And that's

4    exactly what is going on here, Judge.

5            I am not going to belabor the other defects --

6            THE COURT:  Was that the case that was settled

7    within four months of being filed?

8            MR. GIBSON:  Your Honor, I don't know the

9    disposition.  Perhaps --

10           THE COURT:  I believe that's what your memo or

11   response would indicate.  This is a little different than

12   that.

13           MR. GIBSON:  Every case has its different nuances.

14           THE COURT:  Well, nine years versus four months of

15   hard-fought litigation, with multiple, substantial issues

16   that are still much alive for purposes of appeal is totally

17   different than a four-month period between the filing of

18   suit and settlement.

19           MR. GIBSON:  I would agree.

20           THE COURT:  The criticisms of that GM

21   settlement --

22           MR. GIBSON:  I would agree with that.

23           THE COURT:  -- are entirely not valid.

24           MR. GIBSON:  I would agree with that, Your Honor,

25   but for the fact in that case -- and I do a fair amount of

1    class work -- and I am not as familiar with the case as

2    class counsel.

3              Was that case certified?

4              MR. RODA:  Yes, there was a class certified.

5              MR. GIBSON:  As part of the settlement, though?

6              MR. RODA:  Right.

7              MR. GIBSON:  This was a case that, Your Honor,

8    that case was settled -- they had a bigger risk in

9    litigation in that GM case.  They hadn't even been

10   certified yet.

11             In this case, Judge, they actually have been

12   certified, it's been up on appeal, and they lost.  Once

13   again, the risk of litigation in this case for class

14   counsel is low as compared to the other GM case.  So I

15   think that even warrants more so a better settlement for

16   members of the class.

17             The other -- and I'd like to incorporate all the

18   objections I made in my written objection.

19             THE COURT:  You may.

20             MR. GIBSON:  The one-time transfer restriction,

21   that there is no guaranteed cash value, are also components

22   of the settlement that are just completely inadequate.  And

23   it is not surprising the National Association of Consumer

24   Advocates, and it is telling when they warned that coupon

25   settlements such as this should be avoided.  They

1    specifically state, quote, this situation is at its most

2    aggravated when a certificate requires a purchase of a new

3    car or other, quote on quote, big ticket items.

4         Now, with respect to class counsel's fees, and,

5    Your Honor, I received just at my request a copy of

6    Plaintiffs' memo in support of the motion for final

7    approval and for reimbursement of fees, which evidently was

8    filed on April 23.  I am not on the certificate of service,

9    I never got a copy, so I haven't had a chance to review it

10   at length, and respectfully request a reasonable amount of

11   time to respond if there is anything I need to respond to

12   in here from the Court.

13        Class counsel mentioned that he is reducing his

14   attorneys' fees.  I know the initial attorneys' fee

15   requested was roughly $1.8 million and they have now

16   reduced that.

17        THE COURT:  First reduced it to one-six, and now

18   eight-four.

19        MR. GIBSON:  It is clear to me that class counsel

20   is involved in a case that has dragged on for nine years

21   and is trying to cut his losses, which is understandable.

22   But that doesn't excuse their responsibility to members of

23   the class not to agree to a settlement that is just

24   completely inadequate, provides no benefit to any members

25   of the class, unless they purchase -- a minuscule benefit,

1    only if they purchase, in this horrible economy, if

2    consumers purchase a $20,000 or $30,000 big-ticket item can

3    they get their $100 or $200.

4              And I think the fact that GM is facing bankruptcy,

5    which, again, I haven't seen any indication they are going

6    the bankruptcy route as of the news today, it just -- it

7    smacks of a conflict of interest that class counsel is

8    recouping their costs and that the consumers are getting

9    nothing.

10             And, like I mentioned, Judge, I would request a

11   reasonable period of time to respond to the motion for

12   final approval and fees.

13             And I know that class counsel mentioned, and he

14   held up a stack of documents, that they spent approximately

15   6,000 hours on the case and they are now reducing their

16   fee.  I would request that be marked into evidence so those

17   time sheets could be reviewed.

18             THE COURT:  All right.  Counsel, do you have

19   any --

20             MR. RODA:  Yes, Your Honor.

21             THE COURT:  -- response?

22             MR. RODA:  A couple points.

23             Even if one could stand here today and say there

24   is no indication that GM faces bankruptcy, which, frankly,

25   one cannot say today, the question is not what the picture

1    looks like today.  The question is what the picture looked

2    like in October, October 15 specifically, when, at the

3    Court's strong suggestion, we convened for settlement

4    negotiation.

5              At that point, and if we harken back to

6    pre-election, the News Daily said GM has only enough cash

7    to make it, at most, to the end of this year.  It couldn't

8    have been clearer.  And that, but for an infusion, it will

9    have to declare bankruptcy.  At that point there was no

10   certainty the government would infuse anything into them,

11   much less how much or much less enough to get them more

12   than a month or whatever.

13             We, as class counsel, had to make a call.  And we

14   made the call at the time that we needed to get the best

15   settlement that we could, not hold out for something that

16   would be ephemeral under every indication we had there.  We

17   sought to get everything he mentioned, and GM said they

18   would not do it.  We would have -- the mediator told us

19   privately, and we believed him, emphatically, you cannot

20   get those things.  If that is it, the mediation is over.

21   We had to believe that.  We had to make a call under those

22   circumstances.

23             This -- and to look at the value now is wrong

24   because those certificates can be used for up to three

25   years.  Well, a lot can happen in three years.  The

1    picture, it can change within three years.  It takes little

2    to get the certificate, relatively speaking.  The

3    settlement has been very flexible in terms of proof of it.

4    The worst that happens is they elect not to use them or

5    not to transfer them over the internet or to somebody or

6    not to make a gift of them or whatever.

7           The National Association of Consumer Advocates, as

8    cited in Mr. Gibson's papers, were well aware of it.  It is

9    cited in certain opinions.  Their guidelines don't address

10   an imminent bankruptcy situation.  Their guidelines address

11   the preferable situation, the one we would like, which is a

12   solvent Defendant knows if it won't agree to what we think

13   is reasonable, we are going to trial and may well get a

14   verdict.  That is not our situation.

15          The deadline for filing our brief was in the class

16   settlement papers and in the notice.  It was available

17   here.  It was public record.  We do not -- we received no

18   request from Mr. Gibson for a copy of that brief, which, as

19   I gave it today to him, I would have given him then.  We do

20   not believe there should be a delay for him to get

21   something in.  He is here, he can mention the specifics of

22   it at this point.

23          We had -- we have brought our papers, which are,

24   frankly, for the Court's view.  There is work product in

25   that.  We would do what Your Honor said about that, but

1    there is work product in it.

2            If I am here telling Your Honor that every hour we

3    said we worked in there, we got it in detail, we worked on

4    this case.  And even if you were to shave it remarkably

5    based on the reduction we have voluntarily made here today,

6    it would still be reasonable.  $134 an hour blended rate

7    for work with this risk for that period of time is, we

8    think, under any stretch of the imagination, a very

9    reasonable rate to ask.

10            So with -- and there is -- there is a criticism

11    Mr. Gibson did not make here at the stand but he made it in

12    his papers, that we are trying rush this through.  We want

13    -- we have been seeking assiduously to get final approval

14    for the settlement and all necessary parts of it before any

15    bankruptcy.

16            Your Honor knows we sought to get the earliest

17    deadlines we could consistent with the Court's schedule,

18    and for that reason to -- because if a bankruptcy were to

19    occur without that final approval, end of discussion and

20    value for the class.

21            For all of those reasons, and the reality of the

22    situation with which we, through no fault of our own, had

23    to work with, we believe the settlement is a reasonable one

24    and it should be approved, and that our request for costs,

25    which have not been contested, should be approved, and that

1   the voluntarily reduced request for a reasonable fee should

2   be approved.

3           We all know we are looking at June 1 as the much-

4   advertised deadline for GM to make its decision, and it

5   could come sooner.

6           THE COURT:  All right.  Anything further?

7           MR. GIBSON:  May I respond, Your Honor?

8           THE COURT:  One time, yes.

9           MR. GIBSON:  Thank you, Judge.

10          MR. RODA:  Your Honor, I am told I misspoke.  The

11  date for the filing of our brief and petition was in Your

12  Honor's preliminary approval order, which, of course, was a

13  matter of public record, and has been.

14          THE COURT:  Yes.

15          MR. GIBSON:  Uh, Your Honor, as I sit here and

16  listen, it seems to me that Mr. Roda is speaking out of

17  both sides of his mouth.  He says that this settlement must

18  be considered at the time it was made in October, before GM

19  got its infusion of cash, and that was a big risk, that

20  they weren't going to get the infusion of cash, but then he

21  turns and said but this Court should also consider things

22  can improve as far as using these coupons over the next

23  three years.  And I find that completely inconsistent, and

24  I think if things have changed, perhaps the parties should

25  go back to the table -- GM has gotten its infusion of cash

```
 1       -- and come up with some sort of settlement that gives some

 2       type of benefit to Pennsylvania consumers.

 3              With respect to -- I find it -- I don't know the

 4       right word to use, and I don't want to use a word too

 5       strong -- but it is surprising to me class counsel would

 6       demonstrate to this Court that they spent 6,000 hours on

 7       this case and hold up a stack of documents to this Court,

 8       basically parading to the Court saying here, look, we did

 9       it, then when I asked to have it marked into evidence, all

10       of a sudden objects to having it marked into evidence.

11              I find that troublesome, especially in light of

12       the fact they are asking this Court, and suggesting to this

13       Court, they are using a reduced rate, but how can this

14       Court tell -- I don't know if they are sending -- and I am

15       not -- I have no idea whether they are sending one

16       associate to depositions, or whether there is six

17       associates at depositions.

18              If there are six associates sitting in the same

19       deposition at $135 an hour, that is more than one person

20       who could be handling the deposition.  So I just don't

21       know.  And I find it -- again, I don't want to use words

22       too strong -- but I find it peculiar class counsel would

23       parade that in front of the Court as justification for

24       their hours, then when asked to submit it into evidence,

25       now is trying to obstruct that.
```

1          Also, lastly, with regard to the fact that Mr.

2    Roda's response was filed with the Court, I filed with Mr.

3    Roda -- I initially sent, I copied Mr. Roda the objection,

4    and then when the period -- the last day of the period, not

5    only did I copy Mr. Roda, who I was only required to copy

6    under the settlement agreement, I also, as a courtesy, as

7    an attorney in this case, copied GM's local counsel, as

8    well as GM's counsel of record on the docket, and it is

9    surprising to me that someone who's been around so long as

10   Mr. Roda would not copy me.

11         He clearly knew I filed my intent, filed with the

12   Court, which I wasn't required to do, and served an

13   additional copy on him, that I wouldn't be served of a copy

14   of his motion for final approval and motion for fees.  And,

15   again, I would renew my request that I have a reasonable

16   period of time to respond to that 30-some odd page brief.

17         Thank you, Judge.

18         THE COURT:  Thank you.

19         MR. RODA:  Just so the record it is clear, Your

20   Honor, and Mr. Lipps will attest to it, I worked on this

21   case, Miss Burkholder, sitting next to me, worked on this

22   case.  There were never multiple people at depositions.

23         MR. GIBSON:  I am not accusing you of that.  I

24   just don't -- I am not accusing you of that.  I said that

25   before I said that.  But I was saying without the time

1    records, no one knows.  There could have been -- I don't

2    know if there was one, two, no one knows.  And I would

3    renew my request those would be entered into evidence as

4    well, Judge.

5           THE COURT:  Thank you for your comments.

6           MR. GIBSON:  Thank you.

7           THE COURT:  Miss Spradlin.

8           MS. SPRADLIN:  What I want to know and understand

9    is why he can get paid cash all these thousands and

10   thousands and thousands of dollars, when I only want $230

11   in cash, what was taken from me illegally, that what's the

12   big deal.

13          It is just unbelievable.  Give him coupons.  Why

14   don't you accept coupons for your deal with him?  You guys

15   can talk all nice and friendly and stuff out in the

16   hallway, but it comes down to the little person like me,

17   like every other Tom, Dick, and Harry on the street that

18   ain't making the income these gentlemen are making.

19          $230 to these guys is nothing, but it is a lot to

20   me.  And to give me a certificate to go buy another car

21   they deceived me on, made me pay more for, all these years

22   I've been paying for that car.

23          THE COURT:  I understand.

24          MS. SPRADLIN:  It is not right.  It is just not

25   right.

1          THE COURT:  I hear you.

2          MS. SPRADLIN:  And I won't ever buy another GM,

3    period, for that reason.

4          THE COURT:  All right.

5          I've lived with this case for nine years.  I know

6    what work was done on it.  I know the issues that are

7    involved, the difficulty of those issues.  And there is no

8    certainty here that the verdict would be for the Plaintiff

9    in the amounts that everybody is suggesting are going to so

10   readily flow.

11         This case -- I've been a judge for 24 years; this

12   is the hardest-fought case I have experienced in that time.

13   And it has been the best-lawyered case I have experienced

14   from both sides.  So I know what's involved.  I know how

15   much work went into it.  And I know the only lawyers I've

16   seen for the Plaintiff are Mr. Roda and Miss Burkholder.

17         Though I am totally and completely satisfied that

18   attorneys' fees requested here are extremely reasonable,

19   and certainly the reimbursement for costs is reasonable,

20   the issue of the adequacy of the settlement in terms of

21   certificates, of course certificates are not by any means

22   the ideal.

23         I am satisfied, however, that given all the

24   uncertainties of the litigation, all the uncertainties of

25   what is going on within the real world, that this is as

1       good as can be expected under the circumstances.

2              Accordingly, I will approve the settlement.  And I

3       applaud Mr. Roda's reduction of his fee by one-half.  The

4       rate of $134 per hour is astounding, and it recognizes the

5       very real position that the Plaintiff needs to recognize,

6       that this litigation isn't about an attorneys' fee, it is

7       about the class.  He is not asking for fees that would make

8       this a suit just for attorneys.

9              Under the circumstances, over nine hard-fought

10      years of intense work, this is extremely reasonable and I

11      will approve it.

12             Mr. Gibson, your request is denied.

13             MR. GIBSON:  For the admission -- for submission

14      of the time records?

15             THE COURT:  Yes.  I am totally satisfied.  As

16      having lived with this litigation for nine years, and all

17      the times we've been together, and knowing all the

18      discovery issues that went through --

19             MR. GIBSON:  I just note my objection.

20             THE COURT:  Given all the time, there is no need

21      for any further review by me of those records to know that

22      the fee request in this case is totally beyond reasonable,

23      to the extent it is unreasonable to Plaintiffs, and they do

24      it under the recognition.  I accept what he says.

25             MR. GIBSON:  Your Honor --

```
 1                THE COURT:  I'll finish.

 2                The recognition that, under the circumstances, to

 3     take anymore in view of the Plaintiffs being left with a

 4     certificate, and we recognize, too, they do have the

 5     ability to turn that into cash after a year.

 6                So, with that, these proceedings are concluded.

 7                MR. GIBSON:  Your Honor, may I address the Court?

 8                THE COURT:  For what purpose?

 9                MR. GIBSON:  I would just like to note my

10     objection for the record --

11                THE COURT:  And you may appeal.

12                MR. GIBSON:  Yeah, I realize that.

13                And I also, I just wanted to clarify the record as

14     well.

15                When Your Honor said there is no need for further

16     review of those time records --

17                THE COURT:  By me.

18                MR. GIBSON:  Does that mean the Court has reviewed

19     them already?

20                THE COURT:  No.

21                MR. GIBSON:  So there is no need -- okay.

22                Thank you, Judge.

23                THE COURT:  No, I am satisfied with the fee

24     request based upon what I understand has gone on in this

25     case for nine years, and the amount of work that has gone
```

1    on.

2         The Order will be issued in due course, the formal

3    Order.

4         (9:53 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

REPORTER'S CERTIFICATE

    I HEREBY CERTIFY that I was present at the
hearing of the above-entitled matter and reported
stenographically the proceedings held and the testimony
produced; and I further certify that the foregoing is a
true and correct copy of my said stenographic notes.

    In testimony whereof, I have hereunto subscribed
my hand this 29th day of April , 2009.




                 ANGELA N. KILBY
                 Official Court Reporter



                 O R D E R


    AND NOW, this       day of
2009, this transcript is approved and ordered to be filed.




                 Louis J. Farina, Judge