1

```
 1              IN THE COURT OF COMMON PLEAS
              LANCASTER COUNTY, PENNSYLVANIA
 2                        CIVIL

 3

    ------------------------------:
 4                                 :
    DONNA SODERS, on behalf of     :
 5  herself and all others         :
    similarly situated,            :
 6                                 :
                 Plaintiff         :
 7                                 :
              Vs.                  :
 8                                 :  No. CI-00-04255
                                   :
 9  General Motors Corporation,    :
                                   :
10               Defendant         :
    ------------------------------:
11

12                  Expedited Hearing

13

14       Before:  HONORABLE LOUIS J. FARINA,
                       PRESIDENT JUDGE
15

16       Date  :  Thursday, May 21, 2009

17       Place :  Courtroom No. 10
                  50 North Duke Street
18                Lancaster, Pennsylvania

19

20  APPEARANCES:

21  JOSEPH F. RODA, ESQUIRE
    MICHELE BURKHOLDER, ESQUIRE
22  RodaNast, P.C.
    801 Estelle Drive
23  Lancaster, PA  17601

24       For - The Plaintiff

25  ORDERED: 5/21/09    LODGED:_____    FILED:_____
```

Exhibit 12

```
 1   CHRISTOPHER UNDERHILL, Esquire
     Hartman, Underhill & Brubaker, LLP
 2   221 East Chestnut Street
     Lancaster, PA  17602
 3
          For - The Defendant
 4

 5   ROBERT T. GIBSON, ESQUIRE
     319 West Front Street
 6   Media, PA  19063

 7        For - The Objectors
     I
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX TO WITNESSES

2
Joseph Roda
3    Direct Testimony.................................5
     Cross Examination by Mr. Gibson................13
4    Redirect Testimony............................42
     Recross Examination by Mr. Gibson.............43
5
Robert Gibson
6    Direct Testimony.................................45
     Cross Examination by Mr. Roda..................53
7
Christopher Underhill
8    Direct Examination by Mr. Roda................70
     Cross Examination by Mr. Gibson...............74
9
Michele Burkholder
10    Direct Examination by Mr. Roda................81
     Cross Examination by Mr. Gibson...............89
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# P R O C E E D I N G S
### (1:33 p.m.)

THE COURT: Good afternoon. We're convened on plaintiff's motion for an expedited hearing concerning post-fairness hearing matters. Let's have counsel enter their appearances here.

MR. RODA: Joseph Roda, Your Honor.

MS. BURKHOLDER: Michele Burkholder.

MR. UNDERHILL: Christopher Underhill for GM.

MR. GIBSON: Robert Gibson for the objectors.

MR. RODA: I should also mention and Mr. Underhill can confirm that Mr. Lipps is available by telephone, but GM had concerns about undertaking the expense and the cost to send him out here for this, in light of the communication last week that Mr. Gibson was not going to be here and the question about what would transpire at the hearing. He is prepared, if Your Honor wished at a certain point to hear from him.

THE COURT: Very well. All right. You may proceed, Mr. Roda.

MR. RODA: Your Honor, we asked for this expedited hearing on May 1 as a result of a communication which is outlined in the papers but which

```
 1   I will confirm on the record, which was the intended

 2   purpose for us today.

 3            The final approval hearing before Your Honor

 4   finished a few minutes short of 10:00 on April 28th.

 5            That afternoon, in my office, I discovered

 6   that I had a voicemail, played it.  It was from

 7   Mr. Gibson.

 8            THE COURT:  Are you going to give evidence

 9   at this point?

10            MR. RODA:  As Your Honor thinks appropriate.

11   As an officer of the Court, we consider ourselves

12   under --

13            THE COURT:  No, I think if we're going to

14   get into the allegations made in your petition, which I

15   consider raising serious questions, I think you ought to

16   be under oath and subject to cross examination.

17            MR. RODA:  That's fine.

18
                           JOSEPH F. RODA,
19   called as a witness, having been duly sworn or affirmed,
               was examined and testified as follows:
20
                           DIRECT TESTIMONY
21

22            MR. RODA:  Your Honor, should I proceed from

23   here?

24            THE COURT:  That's all right with me.

25            MR. RODA:  That's fine.  As I was saying,
```

1    shortly after noon, I discovered a voicemail, listened

2    to it.  It was from Mr. Gibson.  He was asking me to

3    call him.  I asked Ms. Burkholder to come down to listen

4    to the call.

5            For the record, I had never spoken with

6    Mr. Gibson nor met him before that morning here at the

7    final approval hearing.

8            MR. GIBSON:  Your Honor, I apologize for

9    interrupting.

10           THE COURT:  Are you objecting to something?

11           MR. GIBSON:  It's not an objection.  Miss

12   Burkholder, I also would like to cross-examine her since

13   she was a party to the telephone conversation.  I would

14   ask that she be sequestered from the room while Mr. Roda

15   testifies so that then I can cross-examine her without

16   her hearing Mr. Roda's testimony.

17           MR. RODA:  If that is the case, that's fine,

18   but I believe that Mr. Kairis, Mr. Gibson's client, is

19   in the room.  Since I will want to put him on the stand,

20   I ask that he be sequestered.

21           MR. GIBSON:  That's not him.

22           THE COURT:  Let's ask this.  Is that a

23   witness?

24           MR. GIBSON:  No, Your Honor.

25           MR. SINK:  I'm just an observer.

1          MR. RODA:  We should note for the record,

2     Your Honor, which the record would not reflect, that

3     even though your order did direct that Mr. and

4     Mrs. Kairis be here, they are not.

5          THE COURT:  Were they parties to the

6     conversation?

7          MR. RODA:  No, they were not, but they were

8     represented because the representation that I will get

9     into was purportedly made for them.

10          MR. GIBSON:  I'm prepared to address that,

11     Your Honor.

12          THE COURT:  Well, we'll get to that.  If the

13     necessary party isn't here that should be here, there

14     are inferences that can be drawn by their absence

15     without reasonable explanation or excuse.

16          MR. GIBSON:  I will reserve my right for

17     that.

18          THE COURT:  You may, I understand.

19          MR. UNDERHILL:  Let me add something, if I

20     may, Your Honor.  I'm here for General Motors, but I

21     believe Mr. Roda is going to ask me to testify, as well,

22     to a subsequent telephone conversation, a conference

23     call.

24          So if you're going to exclude

25     Ms. Burkholder, you might as well throw me out, too, if

1   that's what Mr. Gibson wants.

2           THE COURT:  It's not uncommon to sequester

3   witnesses.  But I think under the circumstances and

4   given the seriousness of the allegations, I should do

5   that.

6           MR. UNDERHILL:  I'd like to state for the

7   record that it will leave General Motors unrepresented

8   at this point, but I will waive any argument that might

9   be made that I should be here as counsel, even though I

10  may be called as a witness.

11          THE COURT:  We can deal with that later, if

12  the need arises.

13          Mr. Roda, I have no objection if you sit

14  down.

15          MR. RODA:  Very well, Your Honor.  Thank

16  you.  Picking up where I left off.

17          I asked Miss Burkholder to come down before

18  I placed the call.  I placed the call and reached

19  Mr. Gibson.  I believe, in fact, he answered the phone.

20          I said who I was.  I said that

21  Ms. Burkholder was in the room with me.  I said that he

22  was -- that we were operating by speakerphone so that

23  Miss Burkholder could hear.

24          The conversation went essentially like this:

25  After that introduction, Mr. Gibson said that he was

1   going to file an appeal unless we could get it worked

2   out or resolved, words to that effect.  I believe the

3   word was resolved.

4           I said what did he mean.  He said something

5   to the effect of, you know what I'm talking about.  And

6   I said no, I don't, what do you mean?

7           He paused, best I recall, and then he said

8   that he was demanding $100,000 not to file an appeal.

9   The $100,000, he said, I can't recall whether it was in

10  response to a question from me or not, was to be divided

11  between him and his clients pursuant to an agreement

12  between them, the terms of which he declined to

13  disclose.

14          The -- he said further that -- I asked him

15  how in the world could he justify that when his clients,

16  even if this case had gone forward, would have stood to

17  recover several hundred dollars, max.

18          He said that they had conferred a benefit on

19  the class by getting the fees reduced.  I said that was

20  not true, we had reduced the fees voluntarily,

21  independent of his objection.

22          I further said that even if what he said

23  were true, that none of the fees that were voluntarily

24  reduced went to the benefit of the class.  They weren't

25  distributed to the class, so that no benefit had been

1    conferred on them; to which he then said something to

2    the effect of that his clients had conferred a benefit

3    on class actions generally, on consumers generally.

4              The conversation pretty much -- then he said

5    that he thought that since we had already voluntarily

6    reduced our fee, that GM should pay the $100,000.

7              The conversation ended, I believe, at that

8    point, at which I promptly called both Mr. Underhill and

9    Mr. Lipps to report the conversation.  It was our

10   unanimous agreement that the demand was outrageous.

11             I arranged to have a conference call the

12   next day with Mr. Gibson so that he could hear from

13   them -- they could hear from him directly this demand

14   and confirm what I had represented.

15             We had that call.

16             THE COURT:  You said it was the next day?

17             MR. RODA:  The next day, Messrs. Lipps,

18   Underhill, Miss Burkholder, Mr. Gibson and I were the

19   parties to that call.

20             I opened the call by telling Mr. Gibson that

21   the others -- who was on the line, that I had reported

22   the conversation of the day before, specifically that he

23   had demanded $100,000 in order not to file the appeal,

24   that he had said he believed that GM should pay it, and

25   that he believed, which was the reason for the call,

1   that he should convey that directly to GM and explain

2   his reasoning.

3           Mr. Gibson said to the effect that he didn't

4   care who paid the demand, that everybody were able

5   lawyers, something to that effect, and they could decide

6   who would pay it; but everybody knew what his demand

7   was, and the decisions could be made accordingly.

8           He said that he was going to file his appeal

9   by the end of the week.  This was a Wednesday, I

10  believe, because our hearing, I think, was on Tuesday.

11          He was going to file the appeal by the end

12  of the week, absent a deal.  The conversation -- I

13  believe Mr. Lipps said something to him that in GM's

14  view, GM had a binding settlement agreement, the

15  implication being that there was not going to be

16  anything further paid.

17          I believe he was interrupted at that point

18  by Mr. Gibson, who said something to the effect that he

19  didn't care, everybody knew what his demand was, he

20  didn't care who paid it, but he was going to file an

21  appeal if it wasn't paid.

22          I also believe that in the beginning of

23  that, I reaffirmed at the beginning of that call what he

24  had said, that he was going to split that $100,000 with

25  his clients pursuant to an agreement that they had, the

1    terms of which he had declined to disclose.

2         I should add that the day before when he

3    said that he was going to split it, I asked him how much

4    to each.  He said that, in effect, that was between him

5    and his clients and not for me.

6         The call that second day with GM's counsel

7    pretty much ended at that point, to the best of my

8    recollection.

9         We then filed our motion for the expedited

10   hearing two days later on May 1.  And that is the

11   essence of the calls that we had with Mr. Gibson.

12        THE COURT:  For completeness, you should add

13   that you called the Court and had a conference call with

14   Mr. Lipps, yourself, and me, at which you made this

15   report and said you wanted to file a motion.  I said you

16   have to show me the authority to do so in the motion.

17        MR. RODA:  That is correct.  That was on, I

18   believe, April 30th, because we then filed the motion

19   the next day.  We've made that call, I should add, to

20   Your Honor, after discussing it with counsel for GM

21   because all of us believed this was a very -- that the

22   demand had raised a very serious matter at several

23   levels.

24        One was having to do with class action and

25   the rules that the Court is to approve these or payments

1    to class members.  We thought it raised issues under the

2    Disciplinary Code, all three counsel.

3            I should say that it was also discussed

4    among us whether it raised issues under both the

5    criminal and the federal and state laws of extortion.

6    And we believe that it was in that vein that we placed

7    the call to the Court, reporting what we believed as

8    officers of the Court needed to be reported to the Court

9    and seeking the Court's guidance as to what was

10   appropriate at that point.

11           Your Honor did tell us that you needed to

12   see a motion, you needed to consider it.  We filed a

13   motion.  The order emanated.

14               THE COURT:  Mr. Gibson?

15                   CROSS EXAMINATION

16   BY MR. GIBSON:

17       Q.  Mr. Roda, you just mentioned that you had

18   concerns that my actions raised serious issues regarding

19   violations of the Pennsylvania Disciplinary Code.  Are

20   you aware that it's a violation of the Disciplinary Code

21   to engage in ex parte communications with the Court?

22       A.  We did not believe this was an ex parte

23   communication with the Court.

24       Q.  What --

25       A.  Please let me finish.  All counsel who were of

1    record in this case were on that call, and we believed

2    that because it involved a potential criminal matter,

3    that we were right in reporting it to the Court first

4    and seeking the Court's guidance without involving the

5    subject of the potential criminal matter.

6        Q.   Could you have done that by a letter and copied

7    me, Mr. Roda?

8        A.   Could we have done that?

9        Q.   That was my question.

10       A.   Perhaps, sure.

11       Q.   Mr. Roda, are you aware, and I'm going to show

12   you a document that I would like to have marked as K-1

13   for identification.

14            MR. GIBSON:   Your Honor, it's my entry of

15   appearance in the case.

16            THE COURT:   Where do you get K?   Where does

17   the K come from?

18            MR. GIBSON:   Kairis.

19   BY MR. GIBSON:

20       Q.   I'm going to hand you a copy of my entry of

21   appearance in the case.

22            Can you tell the Court, does that have a time

23   stamp on it?

24       A.   Sure, it's April 9.   It's -- I'm sorry, April 6

25   of this year.

1      Q.   And I want you to also look, there's a

2    certificate of service attached to that entry of

3    appearance.   Is your name on that certificate of

4    appearance, Mr. Roda?

5      A.   Yes it is.

6      Q.   Did you receive a copy of an entry of appearance

7    in April of this year?

8      A.   I don't recall seeing it.   That doesn't mean that

9    I didn't, my office didn't receive it.   I don't see

10   every piece of paper that comes in on that case.   I see

11   those things I need to be aware of.

12     Q.   You remember me being at the final fairness

13   hearing, don't you, Mr. Roda?

14     A.   I just mentioned that in my own narrative.

15          MR. GIBSON:   I would like to have that

16   placed into -- the entry of appearance placed into

17   evidence.   Should I save my exhibits until the end, Your

18   Honor?

19          THE COURT:   Yes.

20   BY MR. GIBSON:

21     Q.   How long was your telephone conversation -- when

22   was your telephone conversation with the Court,

23   Mr. Roda?

24     A.   I said I believe it was April 30th,

25   reconstructing the days.   The hearing was on the 28th,

1   the conference call that you were involved with with

2   counsel for GM and our office was the next day, the

3   29th.

4        I believe that the discussion with the Court was

5   on the 30th because we filed our motion for expedited

6   hearing on the 1st.

7   Q.   And whose -- who was present on that call,

8   Mr. Roda?

9   A.   GM's two counsel, Messrs. Lipps and Underhill;

10  Miss Burkholder and I; Judge Farina.

11  Q.   Was anyone else from Judge Farina's chambers on

12  the call?

13  A.   I have no knowledge of that.

14  Q.   Well, you were on the call.  I'm asking you, was

15  anyone else?

16  A.   I don't know that because no one other than Judge

17  Farina spoke.

18  Q.   Who initiated the call to Judge Farina?

19  A.   I believe we lined it up by a conference call,

20  call-in number for the participants.

21  Q.   Who initiated the call?

22  A.   Let me finish.  I believe my office undertook to

23  initiate the call-in numbers and circulate them among

24  the participants.

25  Q.   So you arranged that through what, through a

1    service like AT&T or something like that?

2        A.    Something like that.  Our office does routinely

3    conference calls, and I just did it the same way.

4        Q.    Sure you did.  Your office initiated this call to

5    the Court?

6        A.    In the manner I just described, yes.

7        Q.    How long did the telephone call with the Court

8    last?

9        A.    Not long.  I believe it was -- it was between, to

10   the best of my memory, five and less than ten minutes.

11       Q.    Between five and ten minutes is your

12   recollection?

13       A.    Best recollection, yes.

14       Q.    What did you say to the Court during -- what did

15   you state during that conversation?

16       A.    I reported what I stood up and reported here.  I

17   reported that we were -- and I believe I was the first

18   one to talk after everyone was on the line.

19           I said that we had asked for this because it was

20   a serious matter.  I believe that was my phrasing, that

21   it had arisen immediately after the final approval

22   hearing.

23           I then related to Judge Farina the sequence of

24   events that I related here in court a moment ago.  First

25   your call, your voicemail, my return, what you said,

1    specifically the demand for $100,000, the statement that

2    it was going to be divided between you and your clients,

3    the conversation that we had the next day when Messrs.

4    Lipps and Underhill were on the line.  I think that was

5    it.  That was the preface.

6        Q.  Did Miss Burkholder speak during that discussion?

7        A.  No, she did not.  She did not.

8        Q.  Did Mr. Lipps speak during the conversation?

9        A.  I believe he did, but I believe it was very, very

10   brief.  I don't believe that he and Mr. Underhill said

11   too much.  I think they each spoke, but I can't recall

12   the specifics of what each said.

13       Q.  What did Judge Farina say during this -- during

14   this telephone conversation, was the issue ever raised

15   as to whether or not I should be included on any

16   conference call with the Court?

17       A.  You have asked --

18       Q.  During this conference call.

19       A.  You have asked two questions.  You said first,

20   what did Judge Farina say.  And then you said, was the

21   issue ever raised about whether you should be on.  Which

22   one should I answer?

23       Q.  Take them as two and start with the first.

24       A.  Judge Farina did speak during the call, after

25   listening to what I said, and I believe the concurrence,

1    however brief it was, that Messrs. Lipps and Underhill

2    may have offered.

3        Judge Farina then said in essence what were we

4    asking for.  I said we were asking for -- or we --

5    because it was with the concurrence of GM's counsel, we

6    were asking for an expedited hearing to put your demand

7    and the sequence of events on the record.

8        Judge Farina responded in essence that he would

9    need a motion to consider before taking that action.

10   And that was essentially the give and take on the call

11   because we concluded with saying we would be filing such

12   a motion.

13       I do not recall there being a question raised as

14   to whether you should be on the line.  I believe that I

15   may have said that we had placed -- I'm sure I said we

16   are placing this call because of the seriousness that

17   we, the counsel on both sides, believe that your demand

18   raised.

19       I do not believe we expressly addressed not

20   including you in the call.  I think that was implicit

21   for reasons that I mentioned here earlier.

22       Q.  Mr. Roda, did you request of the Court in your

23   request for -- during your conference call with the

24   Court, did you request that the expedited hearing be

25   held in May so that it occurred prior to GM's June 1st

1  bankruptcy deadline filing?

2      A.   The bankruptcy deadline filing did not come up in

3  the conversation.  We did not make that link.  We just

4  asked for an expedited hearing to put what we thought

5  was a very serious matter of record as soon as possible.

6      Q.   Very serious.

7          Again, just so I'm sure, that call was between

8  five and ten minutes?

9      A.   My best recollection.  Could it have been a few

10  minutes beyond ten minutes?  Maybe.  But it was a very

11  brief call.

12      Q.   So it could have been beyond ten minutes?

13      A.   If it was, it would not have been by much.

14      Q.   You gave lengthy direct testimony about your two

15  telephone conversations with me.  Isn't it true, and I

16  can certainly imagine getting the phone records -- isn't

17  it true that each of our telephone conversations only

18  lasted a couple of minutes?

19      A.   I don't recall -- your voicemail was very brief.

20  Our conversation on the 28th lasted four minutes and 54

21  seconds.  I know that because we have the telephone

22  record here.

23      Q.   Time on that one, okay.

24      A.   The conversation the next day with Messrs. Lipps

25  and Underhill I believe was of equal short duration.

1    Q.   Isn't it true that during -- first focus on my

2   first telephone conversation with you, which included

3   you and Michele Burkholder.

4        Isn't it true that during that conversation, that

5   I explained to you the objectors' position, that the

6   objection had conferred a benefit upon the class

7   specifically and the public in general; that it defeated

8   the public perception that class action lawyers

9   unreasonably profit from unreasonable settlements, or as

10   close along the lines to that effect?

11   A.   What I -- to repeat what I said, I first asked

12   you how your clients could justify that kind of money

13   when they could have stood to receive only several

14   hundred dollars each.

15        You then replied to that, they had conferred a

16   benefit on the class.  The implication being that they

17   were entitled to much more than they would have stood to

18   recover as class members.  I then said, but they didn't

19   convey --

20   Q.   Just what I said.

21   A.   I'm just telling you the sequence of it because

22   in order to understand what you said --

23            THE COURT:  Let him go, Mr. Gibson.  Let him

24   continue.

25            THE WITNESS:  I replied to that, your

1    clients had not conferred a benefit because the fees

2    that we had waived, voluntarily, and I said it was not

3    because of your objection, which we had known about

4    before we filed the written fee petition earlier; that

5    that reduced portion did not go to the class.  They

6    didn't receive a dollar of it.

7           Thus, even if there were a causal

8    relationship between your objection and the reduction of

9    the fee, that did not inure to the benefit of the class.

10          That was when you came up with the second

11   explanation that they had conferred a benefit on the

12   public generally or consumers generally or class action

13   practice in general, generally.

14          I do not recall your making the statement

15   that was at the end of your question about the public

16   looking askance, as it was, at class action practice or

17   class action lawyers.

18   BY MR. GIBSON:

19     Q.  Let me just cut to the chase.  Isn't it true that

20   whether you disagree with this or not, isn't it true

21   that I took the position on the phone call that the

22   objection conferred a benefit on the class, counsel's

23   fees being reduced by one million dollars; isn't that

24   true?

25     A.  I think that's true.  I think in response to my

1   questions, that was what you said.  I would hasten to

2   say that was not mentioned until I asked how you could

3   justify that.  That was not mentioned before you asked

4   for the $100,000.  You linked the $100,000 to nothing

5   other than your not filing an appeal.

6       Q.  My question was, was that mentioned during the

7   telephone call?

8       A.  In response to my questions as to how you could

9   purport to justify that.

10          THE COURT:  And what was that justification,

11   as you recall it?

12          THE WITNESS:  His first justification was

13   that it conferred a benefit on the class.  When I said

14   they had not because the class wasn't receiving the

15   reduced portion of the fee, he said, well, they have

16   conveyed on the consuming public generally.

17   BY MR. GIBSON:

18       Q.  Mr. Roda, isn't it also true that you took the

19   position during our telephone conversation that the

20   objection -- after hearing my position, that the

21   objection resulted in your fee being reduced by a

22   million?  Didn't you take the position that that wasn't

23   true?

24       A.  I said your objection did not cause the

25   reduction, yes.  The fee had been reduced by a million.

1  I said it had not been because of your objection.

2      Q.  And in fact, five days before the final fairness

3  hearing, you had filed a fee petition requesting that

4  your fee be reduced five days beforehand from 1.8

5  million to 1.6 million; is that true?

6      A.  That's absolutely true, as I said moments ago.

7  At which point we had had your objection for months

8  before we filed that petition.

9      Q.  I realize that.  And you never served me with a

10  copy.  Just like you didn't include me in the phone

11  call, you never served me with a copy of your fee

12  petition, did you, Mr. Roda?

13      A.  We did not -- after researching the rules, we

14  found no obligation in the rules of procedure or in case

15  law to serve you with a copy of our fee petition.

16          It was a matter of public record.  You knew from

17  the Court notice, which had prompted you to file the

18  objection, what the timetable was for the submission of

19  the petition for final approval, just as we did when you

20  asked for it in court.

21          Had you asked us for a copy with the same phone

22  call that you placed asking me to call you about the

23  demand, we would have gladly emailed you a copy of the

24  petition instantly.

25      Q.  This is a simple yes or no question.  Did you

1    serve me with a copy of your fee petition prior to the

2    final fairness hearing?

3        A.  I said no.

4        Q.  That's sort of a long answer, it got lost in

5    there.

6        At the final fairness hearing, I did request a

7    copy of your fee petition, didn't I?

8        A.  You did.  You leaned over the railing, asked, and

9    I gave you one right away.

10       Q.  After you gave me a copy of the fee petition,

11    that was when you for the first time voluntarily told

12    the Court about your voluntary reduction of your fee by

13    another 800,000; isn't that true, Mr. Roda?

14       A.  The sequence that you mention in terms of strict

15    time is true, but only because we had not -- yes,

16    because I hadn't had a chance to speak to the Court

17    before giving you that fee petition.

18       I can assure you that handing that fee petition

19    to you over the rail had nothing to do with what I said

20    to the Court after, that I came into court preparing to

21    make that reduction.

22       Q.  Well, isn't it true you had another four days

23    after you filed your fee petition before the hearing to

24    file something further reducing it, Mr. Roda?

25       A.  Could have filed something further?

1    Q.  Yeah.

2    A.  I guess that's possible.  I believe we filed our

3    fee petition on Thursday, so there would have been the

4    Friday and Monday in between there.  Yes.  Could we have

5    filed?  Yes, we could have.

6    Q.  You tried to ask me -- during our conversation, I

7    had indicated to you that we were willing to settle the

8    case for $100,000; is that correct?

9    A.  Oh, you made that very clear.  You said, My

10    demand is $100,000.

11    Q.  And you then tried to inquire as to how that

12    would be divided.  I never suggested anything along

13    those lines, did I?

14    A.  I said, how would that be -- you either

15    volunteered that it would be divided before I asked

16    that.  I know I asked what the split would be, and you

17    declined to give that.  You said, in effect, That's not

18    your business, that's between my clients and me.

19    I believe you volunteered that it would be split

20    between you and your clients.

21    Q.  I don't have that recollection, because that's

22    not true.  But I certainly did not divulge to you the

23    terms of my retainer agreement with my client, did I?

24    A.  No, I just said you declined to do that.

25    Q.  Okay.  And during our telephone conversation,

1   while a number was suggested and while the various

2   arguments were going back and forth about the benefits

3   conferred on the class, you never suggested that a

4   settlement in a class action case needs Court approval,

5   did you?

6       A.   That a settlement in a class action needs Court

7   approval?

8       Q.   Um-hum.   That --

9       A.   I don't believe that topic came up in our brief

10  conversation.

11      Q.   We never got that far, did we?

12      A.   I don't recall that coming up.

13      Q.   I don't either.   You have, however, subsequent to

14  that call, raised the issue that you believe that it is

15  unethical to enter into a private settlement in a class

16  action case without Court approval, haven't you?

17      A.   No.   I have said it is against the rules to

18  request -- what I have said is that under the law, if

19  the Court approves fees in class actions, and I have

20  said that -- I don't know if I have raised it insofar as

21  with what you filed before Judge Farina.

22          I know we intend to raise it with the Superior

23  Court, that it is against the Code of Professional

24  Conduct for an attorney to share fees with a

25  non-attorney.

1    Q.  Did I ever tell you I was sharing fees with a

2  non-attorney, Mr. Roda?

3    A.  (No audible response.)

4    Q.  Simple question.

5    A.  Give me a moment.  I don't know that you,

6  yourself, characterized the $100,000 as a fee.  But the

7  $100,000 by definition could be either a fee or a

8  non-fee if it's a --

9    Q.  You're not responding to my question.

10   A.  I don't believe you raised the issue of whether

11  you characterize it as a fee, the $100,000 that you were

12  demanding.

13   Q.  I never characterized it as a fee, did I?

14   A.  I don't think you expressly characterized that.

15   Q.  Is there any other way to characterize it?

16   A.  Well, by necessary implication, what could it be

17  to you as an attorney other than a fee?

18   Q.  You know, you're going to have a chance to

19  cross-examine me at length, and I can explain it to you,

20  Mr. Roda, but right now it's my turn to ask the

21  questions.

22       Mr. Roda, isn't it true that your firm is

23  involved in -- your firm is RodaNast; is it not?

24   A.  It is.

25   Q.  And you're a named partner, obviously, and your

1  wife, Dianne, is also a partner; is that true?

2      A.   Yes.

3      Q.   Are you familiar with the class action case of

4  Nichols versus SmithKline Beecham, the Paxil anti-trust

5  case?

6      A.   I'm aware of the Paxil case.

7      Q.   Wasn't your firm lead counsel in that case,

8  Mr. Roda?

9      A.   Our firm was in that case.  I don't recall if we

10  were lead counsel.  I was not involved in that case.

11      Q.   It's on your website.  You don't know if your

12  firm was lead counsel?

13      A.   As I sit here today, I could not with a hundred

14  percent confidence say we were lead counsel.  I would

15  not be surprised if we turned out to be lead counsel.

16      Q.   Are you aware that in that case there were --

17  your wife, I can tell you since you don't have a good

18  recollection, was counsel in that case.  But there were

19  several objections filed in that case.

20      A.   I don't recall that.

21      Q.   Are you aware that those objections were

22  overruled by the trial court?

23      A.   Honestly, as I sit here today, I can't say that I

24  have a personal recollection of that.

25      Q.   If I told you that was the case, would you have

1   any reason to dispute me?

2      A.  If you told me, I might well have a reason to

3   dispute it.

4              MR. GIBSON:  Objection, Your Honor.

5              THE COURT:  You asked the question.  You

6   just didn't like the answer.  Just ask another one.

7              MR. GIBSON:  Make I make a statement?

8              THE COURT:  Ask another question.  Look, I

9   understand this is not a friendly hearing.

10  BY MR. GIBSON:

11     Q.  So I have in front of me a copy of the docket

12  indicating that appeals were taken of those objections,

13  okay?  Are you aware that those objections were

14  subsequently privately settled, Mr. Roda?

15     A.  I am not aware of that.

16     Q.  Well, if I told you that they were privately

17  settled, would you have any evidence to dispute that?

18             MR. RODA:  Your Honor, I'm not sure about

19  this hypothetical question, if he told me, as I sit here

20  today.

21             THE COURT:  As he sits here, he's telling

22  you he doesn't know.

23             Just a minute, I'm speaking.  If he doesn't

24  know, he doesn't know.  If you have something that you

25  can present to the Court that's relevant on this, you

1   will be able to do it.

2           MR. GIBSON:  I have a document as K-2, and I

3   will submit that into evidence as well.

4   BY MR. GIBSON:

5       Q.  If I told you that I had telephone conversation

6   with local counsel for the objector and that he told me

7   that there was a private settlement, would you have any

8   evidence to dispute that?

9       A.  As I say, I was not involved in the Paxil case.

10  I have no personal knowledge of that.

11      Q.  And are you aware that there was no Court

12  approval of that private settlement, Mr. Roda?

13      A.  I am not aware.

14      Q.  Well, do you consider your wife to be unethical,

15  Mr. Roda?

16      A.  My wife is very ethical.

17      Q.  That certainly leads to the question, now,

18  doesn't it?

19      A.  No, it doesn't, sir.

20      Q.  Mr. Roda, you can't cite to me a single case that

21  states that a settlement of a private objection requires

22  Court approval in Pennsylvania, can you?

23      A.  As I sit here, I can't cite a case.

24      Q.  Well, you have had ample time to brief it; isn't

25  that true?

1              THE COURT:    I didn't hear that question.

2    BY MR. GIBSON:

3        Q.   I said you've had ample time to brief that issue.

4    Haven't you opportunity to brief that issue, Mr. Roda?

5        A.   Have we had time, opportunity?  I suppose, yes.

6        Q.   Mr. Roda, are you involved in other class actions

7    besides this Soders class action?

8        A.   Oh, yes.  Do you mean me personally or our firm?

9        Q.   You meaning you.

10       A.   I have been and am.

11       Q.   Is your firm, which you are a named partner, also

12   extensively involved in class action litigation?

13       A.   We are involved in many class actions.

14       Q.   Mr. Roda, isn't it true that you're aware of

15   other instances where objections in class action cases

16   have been settled, private objections have been settled,

17   without Court approval?

18       A.   I am not personally aware of any.

19       Q.   And I know we were discussing the Paxil case.

20   Are you not aware of the ongoings of any of the cases

21   that your wife is involved in?

22       A.   I'm aware of ongoings.  I am aware of many of

23   them.

24       Q.   You mentioned that you are involved in other

25   class actions.  Another class action case that you were

1   involved with was the Highland Tank case, which I think

2   was actually in front of Judge Farina; wasn't it?

3       A.  Both parts of your question are correct.

4       Q.  And in this case, there was an issue raised as to

5   whether -- in addition to the Highland Tank case, you

6   were also involved in a similar bad faith class action

7   against Erie Insurance Company in Philadelphia; isn't

8   that true?

9           THE COURT:  Highland Tank was not bad faith,

10  as I recall, not strictly speaking.

11          MR. GIBSON:  Well, it involved insurance,

12  but you certainly would know.

13          THE COURT:  That is true.

14          MR. GIBSON:  Much better than I.

15  BY MR. GIBSON:

16      Q.  At the time Highland Tank was also going on, you

17  were also involved in the case of Foltz versus Erie

18  Insurance Company?

19      A.  Correct.

20      Q.  There's an issue that came up, and it was

21  addressed in the class certification motion in this case

22  that your client, Donna Soders, was an employee of

23  Hagelgans & Veronis; is that correct?

24      A.  Correct.

25      Q.  Did you ever disclose to this Court during the

1   class certification process that when -- actually, I

2   will withdraw that.

3          One of the areas inquired about during class

4   certification was the fact that Miss Soders was employed

5   at a local law firm; wasn't it?

6      A.   There was inquiry.  It was asked at her

7   deposition, if that's what you mean.

8      Q.   Was it not -- and I can hand you a copy --

9   addressed in the analysis of whether or not Miss Soders

10  was an adequate representative in the order granting

11  class certification in this case?

12     A.   It's mentioned in the bottom paragraph.  It is

13  mentioned in the bottom paragraph of the Court's opinion

14  on page 7.

15         Specifically, the Court says while Mrs. Soders is

16  employed as a secretary in the local law firm, she does

17  not work for any of the firms or attorneys involved in

18  this case.

19         The firm for which she works is not involved as

20  counsel in this case; thus, we find her occupation

21  irrelevant to the inquiries here.

22     Q.   Did you ever disclose to the Court or counsel for

23  GM that James Hagelgans was your co-counsel in the Foltz

24  versus Erie class action, which was pending at the same

25  time as the Soders class action?

1    A.   I don't recall disclosing it, nor would I have

2    seen any reason to do so.

3    Q.   Okay.  And you would agree with me that's the

4    same Hagelgans of Hagelgans & Veronis that Mrs. Soders

5    worked at?

6    A.   It is.  I think they were listed as counsel on

7    the complaint.

8    Q.   And that was pending at the same time as this

9    case?

10   A.   I don't recall the sequence.  Erie was the auto

11   parts, the aftermarket auto parts case.

12        This case pended so long, I guess it is true, a

13   lot of cases were pending at the same time as this case,

14   so could they have overlapped.

15   Q.   Isn't it true that Mr. Hagelgans shared in part

16   of the fee of the Foltz versus Erie Insurance Company

17   class action case?

18   A.   I think he probably did.  I don't have a specific

19   recollection, but I think he probably did.  He was

20   referring counsel.

21   Q.   And you never disclosed that to this Court or to

22   counsel for GM; isn't that true?

23   A.   I don't think I ever mentioned it.  I don't think

24   there was any occasion to mention it or any requirement

25   to mention it.

1           THE COURT:  I am going to ask you the

2   relevance of that.  I wasn't counting on being here all

3   afternoon, but I guess I'm going to be, so since there's

4   nobody here to make relevance objections --

5           MR. GIBSON:  I could connect the dots.

6           THE COURT:  Please.

7           MR. GIBSON:  Here's -- Mr. Roda has raised

8   issues of improper conduct on behalf of attorneys, which

9   I'm happy to stand here and address any allegation that

10  he makes, although normally someone who is going to make

11  those kinds of allegations would make sure that they

12  haven't done anything themselves.

13          If it was an issue in this case as to

14  whether or not Miss Soders had a conflict of interest as

15  far as being a class representative, that was an issue.

16  The fact that she was associated with Hagelgans &

17  Veronis was an issue as to whether or not she was an

18  adequate rep, okay?

19          Now, if he knew the whole time that

20  Hagelgans & Veronis was his co-counsel in another case

21  and that they had a financial stake in another case

22  working with Mr. Roda, that's evidence that would have

23  been relevant to the Court and should have been

24  disclosed to the Court.  Under the Professional Rules of

25  Conduct, when an attorney knows facts that --

1          THE COURT: No, that's the dot you have to

2    connect for me.  Why would that be relevant for the

3    Court to know?

4          MR. GIBSON: Well, if her firm is going to

5    benefit from its relationship with RodaNast, then

6    perhaps her adequacy as a class representative --

7          THE COURT: Wait a minute, wait a minute.

8    Are you suggesting her firm was going to benefit in this

9    case?

10         MR. GIBSON: Indirectly through the other

11   case.  In other words, if her firm has a financial stake

12   in being affiliated with RodaNast and she's a class rep,

13   then she's potentially compromised in her judgment as

14   far as going against what class counsel --

15         THE COURT: I guess if anybody needed to

16   know that, if anybody did, it would be GM.

17         MR. GIBSON: Yes, and that's the Rules of

18   Professional Conduct requiring one to disclose that, and

19   that's my point.

20         THE COURT: I said if.  The dot is pretty

21   obscure to me in this case.  If your suggestion is

22   because he had a relationship with the law firm in

23   another case, then --

24         MR. GIBSON: Which the class rep worked for,

25   which was an issue in this case.  Her adequacy was an

1   issue in this case.

2          THE COURT:  If she was -- if Hagelgans &

3   Veronis was associated as counsel, yes.  But there's no

4   suggestion of that.

5          MR. GIBSON:  Well, does James Hagelgans

6   routinely get involved in class action work?

7          THE WITNESS:  I don't know.  I don't believe

8   so.

9          THE COURT:  Probably not, through the

10  limited knowledge that I have.

11         MR. GIBSON:  Well, then I certainly imagine

12  that GM's counsel would want to inquire as to

13  Mr. Hagelgans, who is not a class action lawyer, was

14  permitted to share in fees in another class action case

15  where his employee was a class rep in another case.  I

16  would think that would be highly relevant to GM.

17         THE WITNESS:  Your Honor, if I may, since I

18  am unrepresented, as Your Honor well knows?

19         MR. GIBSON:  You had a chance.

20         THE COURT:  Let him go.  You are going to be

21  in the same boat soon.

22         MR. GIBSON:  I'm fine.

23         THE WITNESS:  GM had, if anything, ample

24  opportunity to inquire of any aspect of this case.  And

25  they did throughout the nine years that it was

1    litigated.

2              THE COURT:  I'm well aware of that.

3              MR. GIBSON:  That doesn't relieve counsel of

4    their obligations.

5              THE COURT:  Let's move on.

6              MR. GIBSON:  I have made my point.

7    BY MR. GIBSON:

8       Q.  Mr. Roda, are you aware that there has -- I know

9    that we had a disagreement as to whether or not the

10   objection conferred a benefit on the class.  I think

11   that that's fair to say, right, that we disagreed on

12   that?

13      A.  Yes, and we do.

14      Q.  Are you aware after the final fairness hearing

15   that there has been local media coverage of this

16   settlement?

17      A.  Sure, and I object, Your Honor, to the relevance

18   of that.

19              THE COURT:  Make your point, and I will

20   determine what it is.  I remember there was an article.

21   BY MR. GIBSON:

22      Q.  Well, isn't it true that there's an article

23   called Unsettling Settlement, class action lawsuit

24   brings a coupon good only for a new GM car to customers

25   who were overcharged 200 to $250.  Law firm gets

1    $844,000.  Do you recall seeing that article?

2        A.  I do recall seeing that article.

3              MR. GIBSON:  I sent it to you.

4              Mr. Roda is sitting here accusing me of

5    having a baseless and frivolous appeal, and when I say

6    that the benefit I conferred was improving the public's

7    perception by reducing attorney fees in this case by a

8    million dollars for class counsel, who gets grossly

9    overpaid for an atrocious settlement, this cuts right to

10   the core.

11             THE COURT:  I already told you what my

12   feeling was on your premise.  One, he wasn't grossly

13   overpaid.  I applauded his reduction under the

14   circumstances.  Two, it wasn't an atrocious settlement.

15             MR. GIBSON:  Your Honor, I mean no

16   disrespect to the Court.  Then I will call it

17   unreasonable.

18             THE COURT:  As a matter of appeal, the

19   Superior Court will ultimately decide that.

20   BY MR. GIBSON:

21       Q.  Let me just suffice it to say, are you aware, and

22   I won't read them into the record, but I certainly would

23   like to submit this into evidence as well, that there

24   are other instances, Mr. Roda, of public outcry over

25   this settlement?  Are you aware of that?

1             THE COURT:  I'm only aware of one article.

2    Were there more?

3             MR. GIBSON:  I'm just asking Mr. Roda.  I'm

4    sorry, Your Honor.

5             THE WITNESS:  I don't know what you mean by

6    public outcry.  I am aware of the articles that were

7    brought to my attention about this.  I'm aware of two.

8             One ran, I believe, on Friday or Saturday in

9    the Lancaster New Era.  Or perhaps it was a Saturday,

10   would have been the combination paper now.

11            Another ran in the Sunday News.  The article

12   that you mentioned a moment ago, which I was not aware

13   that you had sent to me, I saw it on my own.

14            MR. GIBSON:  Your Honor, if I could just

15   have another minute to check my notes?  I think I'm

16   going to wrap up.

17            THE COURT:  Sure.

18            MR. GIBSON:  I think that's all I have, Your

19   Honor.  I did want to address some preliminary

20   housekeeping things that came up.  I don't know if I

21   should wait until the end of the presentation of

22   Mr. Roda's case.

23            THE COURT:  At this point, we should do

24   that.

25            Mr. Roda, anything you want to say on

1   redirect?

2          MR. RODA:  Yes, it's a hybrid comment here.

3   I guess I would mention this, Your Honor.  We do not

4   contest the right of an objector to file an appeal in

5   this case or in any other.

6          What we are here about is objectors' counsel

7   demanding $100,000 to walk away from that appeal, an

8   appeal that he purports to be in the best interest of

9   the class; and $100,000 that would be shared in no way,

10  shape, or form with the class.  That is the issue that

11  his filing an appeal was conditioned on or not filing an

12  appeal was conditioned on, getting a payment of

13  $100,000.  Frankly, it is -- it has the ring of judicial

14  hush money.

15         I would also raise this question

16  procedurally.  This is certainly a first for me.

17         THE COURT:  And me.

18         MR. RODA:  We have had the sequestering,

19  which is fine.  I did not mind that.  But we have a

20  situation here where the person who has asked for the

21  sequestering and who is going to examine the next

22  witness is himself going to be a witness.

23         THE COURT:  I don't know how you avoid that.

24         MR. RODA:  We can't sequester him.  What I

25  would like as a compromise is to have him testify now

1    before he hears what the others say. And if he wants to

2    make any rebuttal after they testify, he can do that.

3    But I'd like to have at least some uninfluenced

4    testimony on his part.

5               MR. GIBSON:  I'm fine with that, Judge.  I

6    just have one brief recross question based on his

7    redirect.

8               If I may, for the Court, my intention is not

9    to have us here all afternoon either.  I believe the

10   testimony of Mr. Roda is the most key, and I don't

11   believe that the other witnesses are at least on my end

12   going be very long.  It's Mr. Roda's testimony which

13   was --

14               THE COURT:  Okay.  Do your recross.

15                    RECROSS EXAMINATION

16   BY MR. GIBSON:

17       Q.  Mr. Roda, you made a brief little speech as your

18   redirect, stating that the settlement was -- the upshot

19   was that the settlement was $100,000, without conferring

20   any benefit on the class; is that correct?

21       A.  Correct.

22       Q.  And once again, isn't it true, Mr. Roda, that I

23   repeatedly took the position during our telephone

24   conversation, although you may disagree with it, I took

25   the position that the objection resulted in among other

1  things the fee being reduced by one million; isn't that

2  true?

3      A.   You took that position only after demanding the

4  $100,000 without any explanation or justification for it

5  other than you were going to file an appeal.  If we paid

6  you the hundred thousand, you wouldn't file an appeal.

7          You didn't mention your justifications until

8  asked about it.  You didn't mention the public benefit

9  until it was mentioned by me that not a dime of the

10  reduced fees were going to go to the class.

11 BY MR. GIBSON:

12     Q.   Once again, didn't I mention it during our

13 telephone conversation?

14     A.   In that sequence, yes.

15          MR. GIBSON:  I have nothing further, Judge.

16          THE COURT:  All right, put Mr. Gibson under

17 oath.

18          MR. RODA:  Your Honor, I just might ask

19 this.  Mr. Gibson just said that he didn't believe the

20 presentation of his witnesses, plural, would take --

21          THE COURT:  How many witnesses do you have?

22          MR. RODA:  What other witnesses do you have?

23          MR. GIBSON:  When I said witnesses, I meant

24 cross examination of Miss Burkholder and --

25          THE COURT:  So you don't have anybody else

1    besides yourself?

2               MR. GIBSON:  I have affidavits from the

3    Kairises, and that's what I wanted to address in

4    housekeeping with the Court.  It's also germane to my

5    testimony, so I think it might behoove if we could

6    bring --

7               THE COURT:  Let's hear your testimony.

8               MR. GIBSON:  Fine.

9               THE COURT:  Tell whatever you want to say,

10   or do you want to be called as Mr. Roda's witness?

11              MR. GIBSON:  No, I'll testify on direct.  My

12   throat is dry.  If I could take a quick drink of water.

13              THE COURT:  He could call you as on cross, I

14   presume, but he'll get that opportunity.

15              MR. GIBSON:  Thank you.

16

17                     ROBERT GIBSON,
     called as a witness, having been duly sworn or affirmed,
18              was examined and testified as follows:

19                     DIRECT TESTIMONY

20              MR. GIBSON:  Your Honor, as you are aware, I

21   appeared at the final fairness hearing and strenuously

22   objected to this settlement.

23              I guess as part of being an advocate, if I

24   use -- and the Court approved that settlement.  And part

25   of my job as an advocate, sometimes I use words that are

1    strong.  I mean no affront to the Court when I

2    characterized the settlement as unfair.

3              THE COURT:  I understand.

4              MR. GIBSON:  I understand the Court's

5    reasons for entering it, and I have other legal views.

6    I just want to make sure that the Court is aware of

7    that.

8              I did have a telephone conversation with

9    Mr. Roda following the final fairness hearing, and I

10   indicated to Mr. Roda that it was my position that our

11   objection had conferred a benefit upon the class by

12   having attorneys' fees reduced by one million dollars.

13             I explained to Mr. Roda that my rationale

14   was that after the objection was filed, he reduced his

15   fee.  Mr. Roda said that he thought that the objection

16   didn't have the effect of reducing the -- his fee by a

17   million dollars, that he did that, quote, unquote,

18   voluntarily.

19             I disagreed with Mr. Roda and told him that

20   it was telling that he hadn't cut his fee in half until

21   I showed up at the final fairness hearing and requested

22   a copy of the fee petition, which he never even served

23   on me.  And then he seemed quite suspicious.  Then

24   spontaneously he reduced his fee by or voluntarily

25   reduced his fee by half only after that occurrence, when

1   he had time beforehand to do that.

2              I also explained to Mr. Roda that it further

3   benefitted the class by and the public in general by

4   guarding against the perception that class action

5   attorneys are the only winners in class action cases,

6   and that essentially that the consumers get left holding

7   the short end of the stick.

8              I believe that my belief in that benefit

9   later has been sort of confirmed, that there has been

10  public outcry -- even if there's public outcry over the

11  fact that the firm got 884,000, I can only imagine the

12  outcry if they got two million for this settlement.

13             It even warranted an article in the local

14  Sunday newspapers.  It didn't take attorneys to pick up

15  on this, this is just common people.

16             It was never discussed -- after -- and I

17  indicated that since the fee was reduced by a million

18  dollars and that we conferred a benefit, that our demand

19  to settle the case was $100,000.

20             Mr. Roda then -- I didn't volunteer

21  anything.  Mr. Roda then asked how that would be split.

22  And I said -- I didn't tell him -- I didn't give him --

23  he did tell the truth, that I didn't give him an answer.

24  I told him I have an agreement with my clients, and

25  that's between me and my clients.

1          It was never -- and this was a short

2    telephone conversation.  As Mr. Roda now suggests that

3    it's required to have Court approval for a settlement in

4    a class action case, I mean I still am waiting to hear a

5    case that says that.

6          But as Mr. Roda admitted on direct -- or

7    pardon me, on cross examination, we never even got that

8    far as to whether or not any settlement would require

9    Court approval.  So that was never even discussed or

10   contemplated during our brief telephone conversation.

11          Mr. Roda -- after that conversation, I got a

12   call, I think, late that afternoon from Mr. Roda,

13   leaving me a telephone message asking him -- or telling

14   me that he would call me back the next day.  So I did

15   not call him back.

16          The following morning, Michele Burkholder

17   called me, told me she was calling at Mr. Roda's

18   direction, and they wanted to set up a call for, I

19   believe, it was 3:30 that afternoon.

20          During that telephone call, Mr. Roda asked

21   me to reiterate my basis for the figure that I had

22   requested in our previous conversation.  I had told

23   Mr. Roda, and this is my -- I can't say verbatim, but my

24   best characterization, that I had asked him to relate

25   that to GM's counsel and that I'm sure that he had done

49

1    that and I was not going to sit around and repeat --

2    repeat myself, and that they were aware of it.

3            GM's counsel then asked me why should they

4    have to pay anything, if anything.  Again, this is --

5    I'm trying to generally reconstruct it.

6            I said, really, that's on your end, that's

7    not -- the upshot of what I said was consistent with

8    what Mr. Roda testified, that's really between the other

9    end of the -- the parties on the other end of the call.

10           I am not aware -- I'm still not aware of any

11   Pennsylvania case that says that you cannot have a --

12   settle a private objection without Court -- that it is

13   required to have Court approval.  I still have not found

14   a case myself.  I haven't gotten one from Mr. Roda.

15           That being said, it never came up that that

16   would be a requirement.  In other words, Mr. Roda never

17   said, for instance, on the phone call, well, we would

18   like to address the settlement but we believe that we

19   need Court approval.  It never got that far, Your Honor.

20           I still am of the position, and I know that

21   Mr. Roda disagrees with me and claims that his reduction

22   was voluntary, that our objection reduced -- caused the

23   million dollar reduction in attorneys' fees and the

24   benefit to the class.

25           We are willing to settle -- we were willing

1    to settle the case to avoid the risks of further -- I

2    believe that we had a strong argument for getting

3    further benefits on appeal.  Specifically I mean the

4    attorneys' fees issue I believe we prevailed on when we

5    were attacking the attorneys' fees.  But we had also

6    attacked the reasonableness of the settlement and

7    specifically in the sense that Mr. Roda's claiming that

8    because of the pending bankruptcy, that this had to be

9    done.

10              But there's not even a provision in the

11   settlement agreement that these coupons are not

12   dischargeable in bankruptcy.

13              And then there's also the major issue of the

14   fact that these coupons couldn't be used for

15   lesser-priced GM products, such as parts and service,

16   only for big ticket items, which as the Court knows is

17   warranted against.

18              This was a negotiation for a settlement

19   knowing that there are risks on appeal.  I believe that

20   we have very meritorious claims, but not me, not

21   Mr. Roda, not Your Honor knows what the outcome of an

22   appeal would be.

23              So the whole purpose of a settlement is that

24   we have conferred this benefit and would like to settle.

25   But if there was no discussion of settlement, that we

1   will proceed with the appeal.  We believe that we have a

2   strong legal case to gain even more benefits for the

3   class and come back to the Court and request instead of

4   awards and attorneys' fees and the like.

5              And so this was in the context of a brief,

6   cut-short settlement negotiation where a lot of the

7   sectors that Mr. Roda is trying to raise never even came

8   to be discussed.

9              I think that I believe that the motivation

10  behind this is the pending bankruptcy for GM and for

11  Mr. Roda to collect his fee before the bankruptcy goes

12  through.  And I think that that is as transparent as can

13  be.

14             I want to review my notes and see if there's

15  anything else I need to get into the record for direct,

16  and then I'm ready for cross-examination, Judge.

17             Your Honor, also simply because Mr. --

18  there's been issues raised as far as propriety of

19  settlements, of private settlements in class action

20  cases.

21             I have dockets in two cases, and I have seen

22  others online where there have been private settlements

23  in class action cases where Mr. Roda's counsel was

24  either lead counsel or counsel in the case.

25             THE COURT:  Private settlements with

1   objectors, you mean?

2           MR. GIBSON:  Private settlements with

3   objectors, where there's no indication on the dockets

4   whatsoever that there was any hearing required for

5   approval of those settlements.

6           THE COURT:  But the docket reveals that

7   there was settlement?

8           MR. GIBSON:  The docket speaks for itself.

9   What the docket reveals is that there were appeals

10  taken.   And then that by agreement of the parties, the

11  appeals were voluntarily dismissed.

12          In the Nichols case, I specifically spoke

13  with John Weston, who was local counsel for the

14  objectors, and who confirmed that there was a financial

15  payment.  And I have the dockets for that and I have for

16  the Nichols case.

17          And then I also have a docket in the

18  Reinhouse versus GlaxoSmithKline case.  And there are

19  others, but these are two examples that I wanted to

20  submit into the record because I am aware that

21  Mr. Roda's firm has been involved in class action cases

22  where there have been private settlements, and that I

23  have the dockets to show that there's no reflection in

24  the dockets at all that there's any type of hearing,

25  that those settlements required Court approval.

1          MR. RODA:  Please note my objection to the

2    hearsay statement about what Mr. Watson, I believe his

3    name is, said.

4          MR. GIBSON:  Weston.

5          MR. RODA:  Mr. Weston said.

6          THE COURT:  So noted.  And to the extent it

7    becomes more relevant, I'm sure we may have to hear more

8    in this case.

9          MR. GIBSON:  Okay.  And I believe that

10   that's all that I have on my direct testimony.

11         THE COURT:  You may cross, Mr. Roda.

12                    CROSS EXAMINATION

13   BY MR. RODA:

14   Q.  Mr. Gibson, are you an attorney in good standing

15   in Pennsylvania?

16   A.  Yes.

17   Q.  Have you ever been suspended by the Pennsylvania

18   Supreme Court for any offense?

19   A.  Yes.

20   Q.  How many times?

21   A.  Once.

22   Q.  For how long?

23   A.  One year.

24   Q.  For what conduct?

25   A.  I was involved in -- ten years ago I was --

1    before my children were born, I was involved in a bar

2    fight, and police responded to the bar fight.  And as a

3    result, when the police responded, I was extremely

4    intoxicated.  And one of the officers was struck.

5         As a result of that, I was convicted of assault

6    and related charges and sought substantial help for my

7    drinking problem.  Like I said, that was before my

8    children were born.  That was ten years ago.

9         Even though it had nothing to do with the

10   practice of law, my license was suspended for one year,

11   and it was immediately reinstated.  And I have been in

12   good standing ever since.

13   Q.  Before April 28, 2009, had you and I ever met or

14   spoken?

15   A.  When?

16   Q.  Before the final approval fairness hearing in

17   this case on April 28, 2009, had you and I ever met or

18   spoken?

19   A.  I had sent you correspondence on March 6, which

20   consisted of the objection and my notice of intent to

21   appear by certified mail return receipt, which I believe

22   I got copies back from your firm.

23        Then on April 6, again, before the final fairness

24   hearing, I filed my entry of appearance with the Court

25   and I mailed you a time-stamped copy, I believe again

1    certified, of my entry of appearance and then also

2    refiled so they were time-stamped, the objection and the

3    notice of intention to appear.

4        Q.   My question is, had we ever met or spoken?

5        A.   No.   I mean I have corresponded with you, but I

6    have never spoken with you.

7        Q.   You said at the final fairness hearing, final

8    approval hearing, I believe is the quote, I do a lot of

9    class action work.   In what cases have you ever been

10    named as class counsel?

11        A.   I participated in the In Re Bridgestone Firestone

12    case.   And I also -- this is going back, believe I

13    participated in the -- I was listed in the In Re Bake

14    All products liability, if that's the name of the --

15        Q.   You say you participated.   Are you counsel of

16    record in either of those cases?

17        A.   I should be.

18        Q.   What was your participation?

19        A.   I participated in depositions.   I participated in

20    briefing.

21        Q.   Who was your client in those cases?

22        A.   Geez, we're going back several years.   I can find

23    that out.   I just don't know off the top of my head.

24        Q.   Have you ever filed an objection to any class

25    action settlement other than this one?

1    A.   This is the only one.

2    Q.   Do you have a fee agreement, a retainer

3  agreement, an attorney-client agreement with Mr. and

4  Mrs. Kairis for your representation of them in this

5  case?

6    A.   I have a retainer agreement, yes.

7    Q.   Did it -- does it provide for the distribution of

8  any amount you recovered in this case for them or

9  yourself?

10    A.   Could you repeat the question?  I'm sorry.

11    Q.   Yes.  Would it apply to any payment that you had

12  received if we had agreed to pay you?

13    A.   Well, that implies that the payment was only to

14  me, not to the clients and to me.  So I don't know if I

15  can really answer that question, but I can perhaps cut

16  to the chase.

17       Attached to the affidavits that I have from Mr.

18  and Mrs. -- actually, I have been mispronouncing it.

19  It's pronounced Kairis.

20       I have attached the retainer agreement, which

21  speaks for itself, if that would be -- I think that

22  would be helpful to counsel and the Court, but I have

23  copies for everybody that I brought with me.

24    Q.   I will look at that.  Did they know of your call

25  to me after the final fairness hearing, the one where

1    you left a voicemail?

2        A.  Were they aware of my telephone call with you?

3        Q.  Did they know that you were going to make a call

4    to me or that you did make a call to me?

5        A.  I believe so.

6        Q.  Are you sure?

7        A.  That's as sure as I can be.

8        Q.  Did you tell them what you were going to demand?

9        A.  Again, I'm not represented by counsel.

10               THE COURT:  Neither was he.

11               MR. GIBSON:  I know.  No, no, I'm just

12    prefacing.  But I'm going to have to object to any

13    communications my clients -- and they also state this in

14    their affidavits -- have not waived the attorney-client

15    privilege.  I am not permitted to waive the privilege

16    for them, and I cannot divulge my strategic discussions

17    with my clients.

18    BY MR. RODA:

19        Q.  Did you report to them our conversation?

20        A.  Did I report to them?

21        Q.  Yes.  The first day, did you tell them of the

22    telephone call that I placed to you and what was said in

23    that call?

24        A.  The first call when you called me back?

25        Q.  April 28, yes.

1      A.   I spoke to them subsequent to that, I don't

2    remember exactly when.

3      Q.   Was it the same day?

4      A.   I don't recall.

5      Q.   Did you report to them the call of the next day,

6    the one in which GM's counsel participated?

7      A.   I did report to them.  I don't recall when.

8      Q.   Did they authorize you to demand $100,000?

9      A.   Again, I'm going to have to object, and I can't

10   waive the privilege for them.

11     Q.   Do they know -- did they know of the Court's

12   order directing them to appear here today?

13     A.   Yes.

14     Q.   Did they choose not to appear today, or did you

15   advise them not to appear?

16     A.   They were unable to appear because they are both

17   employed and work in the Scranton area and were not able

18   to come the five-hour trip because of their jobs to be

19   here.

20          And that was why in the interest of fact-finding

21   and justice, I prepared these affidavits, which I

22   believe cover what is -- what the Court would need to

23   conduct this evidentiary hearing.

24     Q.   So you made the determination on your own to

25   proceed by affidavit rather than have them appear?

1    A.  No.

2    Q.  You made the determination on your own to bring

3    their affidavits rather than ask the Court if you could

4    proceed that way?

5    A.  No, I did not.  I advised -- the clients were

6    aware that there was the hearing.

7    Q.  Were the clients aware of the letter that you

8    sent to the Court on May 15, saying that you were not

9    going to appear and that you were advising the Court of

10   that as a professional courtesy?

11   A.  That the objectors were not going to appear, yes.

12   Q.  You're saying your letter said the objectors

13   would not appear, as opposed to you?

14   A.  I believe it says objectors do not intend to

15   appear, my best recollection.  I don't have it in front

16   of me, but if you want to put it in front of me.

17   Q.  I have it here.

18   A.  I have it.

19            THE COURT:  Objectors do not intend to

20   appear.  Frankly, I took that to mean you weren't coming

21   either, but obviously you're here.

22            MR. GIBSON:  Yes, I intended to be here.

23            THE COURT:  It was a distinction I missed,

24   counsel for objectors.

25

BY MR. RODA:

Q.   When you stood up to speak to the Court, did you believe -- which was after I spoke, did you believe you and your objection had caused a reduction in the attorneys' fees?

A.   Repeat that question again.

Q.   When you stood up at the final fairness hearing to speak, which was after I spoke, did you believe that your objection had caused the reduction in the counsel fee and under your theory had benefitted the class?

A.   Yes.

Q.   Did you -- you would agree, you did not when you stood up to speak ask for any fee or payment to your clients?

A.   I don't believe that that would have been the appropriate time.

Q.   When I called you back, did I identify that Ms. Burkholder was in the room?

A.   You did.

Q.   Did I identify that you were on speaker?

A.   You did.

Q.   Did you first mention the $100,000 as a demand to me -- strike that.

Did you first say that you were going to file an appeal unless we could get this resolved?

1    A.   I don't believe -- I don't believe that that --

2    again, I don't have a chronology of it, but I don't

3    believe that would even make sense because I -- if we

4    could get it resolved, I don't know if we would be

5    discussing logically.

6    Q.   Whether it makes sense or not isn't my question.

7    Did you say to me after I introduced who was there, that

8    we were on speaker, did you say that you were going to

9    file a notice of appeal unless we could get the matter

10   resolved or worked out or settled?

11   A.   I do not believe that those were my exact words,

12   no.

13   Q.   What were your words; were they to that effect?

14   A.   No.  The upshot of my conversation with you

15   was --

16   Q.   The opening conversation, not the entire

17   conversation, the opening statement after the

18   introduction, the first thing you said.

19   A.   It was a less than a five-minute conversation.

20   The first thing I said to you fully, if I recall the

21   conversation correctly, that I was interested in

22   discussing settlement or resolution.

23        First thing you said to me was, well, how can we

24   do that, the Court's already approved settlement, it's a

25   done deal.

1    Q.  And did I ask you --

2    A.  That's my recollection.

3    Q.  Did I ask you what you were talking about, what

4  you had in mind, what you meant?  Did I not then ask

5  that after you just -- after the opening statement?

6    A.  Repeat that again.

7    Q.  Did I ask you what you had in mind, what the

8  purpose of your call had been?

9    A.  I told you that we were interested in resolving

10  the case.  You said, What?  I told you the figure, and

11  you said, How do you justify that?

12       And I told you that we conferred a benefit on the

13  class by having the fees reduced by a million and for

14  all the reasons I have already stated that you already

15  admitted that I said.

16    Q.  How would the $100,000 have been split between

17  you and your clients?

18    A.  I have the fee agreement.

19    Q.  Tell us what it says.

20       THE WITNESS:  Would you like me to hand a

21  copy up to the Court?

22       THE COURT:  Go ahead and just tell him.

23       THE WITNESS:  It's a letter addressed to

24  Karen and George Kairis.  Dear Karen and George --

25       THE COURT:  Dated?

63

1            THE WITNESS:  March 13, 2009.

2            MR. RODA:  Your Honor, could we have the

3 copies?  Let me take a look at it, maybe I can direct a

4 pointed question as opposed to having the whole thing

5 read.

6            THE COURT:  Yes, give me one.

7            MR. RODA:  Your Honor, I would like to have

8 this packet identified for the record as an exhibit, and

9 I believe -- how would Your Honor like it?  We had K-1.

10           THE COURT:  You don't have a 1 yet, do you?

11           MR. RODA:  We do not.  Or Soders 1.

12           MR. GIBSON:  If it makes the record clear.

13           THE COURT:  I want to make it clear because

14 there are a lot of exhibits if this thing is going up.

15           MR. GIBSON:  We intend to submit these

16 anyway, so if you want to keep them.

17           MR. RODA:  They could be Court exhibits.

18           THE COURT:  E.H., extradited hearing, S-1.

19           MR. RODA:  E.H.S. 1.

20           THE COURT:  Which is Expedited Hearing

21 Soders.

22           MR. RODA:  Very good.

23 BY MR. RODA:

24   Q.  So Mr. Gibson, under this, you would have

25 received $90,000 of a $100,000 payment; correct?

1    A.   It contemplates two scenarios, which we never got

2    to discuss, okay?   It says if there is a settlement

3    pertaining to the objection, which you now said can't be

4    done, you will receive 10 percent of any such

5    settlement.

6         Then it also contemplates if the Court approval

7    is required, if there's no settlement but the Court

8    sustains the objection, I will petition the Court for

9    payment of my attorneys' fees as well as incentive

10   awards for you.   But that was never discussed during our

11   conversation.

12   Q.   My question is, if the $100,000 payment had been

13   made, you would under this have received $90,000;

14   correct?

15   A.   You are asking me a hypothetical question if

16   there was a private settlement.

17   Q.   If there had been a payment of the type you

18   demanded, you would have received $90,000, 90 percent of

19   that; correct?

20   A.   Not necessarily.   We never addressed the issue.

21   You take two positions.   You say, one, we can't have a

22   private settlement or we have to have Court approval.

23   So it was the hundred thousand.   Then we would have to

24   go to the Court.   And part of that would have to be

25   requested as attorneys' fees, I imagine, and part of

1    that would have to be requested as an incentive award,

2    but that was never discussed.

3        Q.  You see the sentence in here that says if there

4    is a settlement pertaining to the objection, you will

5    receive 10 percent of any such settlement?

6        A.  I see that.

7        Q.  My question again, under that sentence, you would

8    have received $90,000 of the $100,000 payment that you

9    demanded; correct?

10       A.  If there was a private settlement, yes.

11   Similarly, if there was a $50,000 settlement, I would

12   have received 45.

13                THE COURT:  And what would the class get?

14                MR. GIBSON:  Pardon me?

15                THE COURT:  What would the class get?

16                MR. GIBSON:  As I have already stated, the

17   benefit to the class is their reduction in the

18   attorneys' fees.

19                THE COURT:  Class wasn't getting any benefit

20   of that.

21                MR. GIBSON:  Well, there's -- as I read and

22   even under the rule, Mr. Roda cites to Rule 1714

23   somewhere in one of his briefs.  Pardon me, 1716.

24                It talks about fees and factors.  And one of

25   them, it says the results achieved and benefits

1   conferred upon the class or upon the public.

2            THE COURT: Your position is that applies to

3   objectors as well as the --

4            MR. GIBSON: My position is that there's

5   been a benefit upon class members that that perception

6   of counsel benefitting from unreasonable fees in certain

7   types of settlements and also the public, and I made

8   that very clear to Mr. Roda during our telephone

9   conversation, which he acknowledges.

10            THE COURT: So it's the public benefit that

11   you are claiming?

12            MR. GIBSON: Well, class also.

13            THE COURT: Well, again, where did the

14   class --

15            MR. GIBSON: Well, members of the class may

16   also. I mean there was that lady that came in here who

17   was --

18            THE COURT: What did she get? What was she

19   going to get if he would have said or GM would have

20   said, okay, here's $100,000.

21            MR. GIBSON: She gets the same.

22            THE COURT: What does she get out of it?

23            MR. GIBSON: She gets the same benefit that

24   members of the public get, that there isn't a perception

25   that Mr. Roda gets two million dollars for giving them

1   nothing.  At least he gets significantly less.

2              THE COURT:  How does she even know?  How

3   does anybody even know?  If what I'm hearing is the

4   case, you would have not appealed then if everything

5   went away.  Who knows what --

6              MR. GIBSON:  Say again, I'm sorry.

7              THE COURT:  The settlement would be 100,000.

8   You don't appeal; is that right?

9              MR. GIBSON:  The position was that we have

10  conferred this benefit on the class.  At this stage,

11  we're willing to settle.

12             And that benefit and reduced fee and part of

13  my objection -- and this was not a boilerplate

14  objection.  If the Court recalls, there was a lot of

15  case law.

16             THE COURT:  Oh, I know that.

17             MR. GIBSON:  I'm not a professional

18  objector.  This is --

19             THE COURT:  I'm only talking now about where

20  the posture of the case is.  The settlement is no

21  appeal.

22             MR. GIBSON:  Well, if we settle at this

23  point, one of the major things we attacked was the

24  reasonableness of the settlement and the reasonableness

25  of the fee.

1          My position has always been that we

2     conferred a benefit by having the fee reduced by one

3     million dollars.

4          THE COURT:  Again, on who, other than you're

5     saying the public as a whole?

6          MR. GIBSON:  And including members of the --

7     well, class members are members of the public, but yes.

8          THE COURT:  So there's no direct pecuniary

9     benefit to the class of this --

10          MR. GIBSON:  No, and I'm not arguing that

11    that money went to the class.  There's a different issue

12    that Mr. Roda has a fiduciary duty instead of giving

13    that back to GM, should have used that to the benefit of

14    the class.  And that's a different issue.

15          Hundred thousand was for conferring the

16    benefit of the reduced attorneys' fees by one million

17    dollars.  We felt, and it is stated in our objection,

18    there were other defects with the settlement.

19          But there's risks on appeal.  That's why

20    this was a settlement negotiation or attempt at a

21    settlement negotiation.

22          THE COURT:  All right, I have interrupted.

23          MR. GIBSON:  We're going to proceed with the

24    appeal, and we have other areas.  We will bear the risks

25    of litigation.  If that's -- if we can't settle, there's

1   other areas we think that we have a legitimate basis for

2   approval.

3   BY MR. RODA:

4     Q.   Mr. Gibson, you just mentioned your perception

5   that our firm had a fiduciary obligation to take the

6   money as a fee and distribute it to the class.   You have

7   never raised that in any of our discussions until just

8   now; isn't that correct?

9     A.   I mentioned your fiduciary duty.   Mr. Roda, I

10   have had two very brief discussions with you.   In our

11   discussions, no, but it's been mentioned in my briefing.

12         MR. RODA:   I just asked in the discussions,

13   you have concurred that you never mentioned it.

14         Your Honor, that's all that I have at this

15   point.

16         THE COURT:   Anything else you want to say on

17   redirect?

18         MR. GIBSON:   Simply that for instance, the

19   case had -- you know, Judge, there's nothing else I need

20   to say.

21         MR. RODA:   I will bring the others in.

22         THE COURT:   Yes.

23         MR. RODA:   Your Honor, I will ask

24   Mr. Underhill, since his will be shorter, to speak

25   first.

1              THE COURT:  Go up.

2              MR. GIBSON:  Your Honor, if I may before, I

3     also have a case that speaks about creating a public

4     benefit.

5              THE COURT:  You will get an opportunity.

6              MR. GIBSON:  If I may, I don't have it.

7     It's either in my paperwork or --

8              THE COURT:  Let's conclude the testimony,

9     and then we'll talk about the other issues.

10

11              CHRISTOPHER UNDERHILL,
      called as a witness, having been duly sworn or affirmed,
              was examined and testified as follows:

12

13                  DIRECT EXAMINATION

14    BY MR. RODA:

15        Q.  Mr. Underhill, I think the Court can take

16    judicial notice, you are an attorney here in Lancaster?

17        A.  I am.

18        Q.  How long?

19        A.  January 19 -- in Lancaster, I started before I

20    got admitted before the Supreme Court because my car

21    broke down on the way to get admitted.  So I have been

22    here since September of 1966, but I was admitted before

23    the Supreme Court January 1967.

24        Q.  And you are counsel with Hart, Underhill, and

25    Brubaker?

1     A.   I am.

2     Q.   And you have been local counsel for GM throughout

3   the Soders versus GM litigation, have you not?

4     A.   I have been.

5     Q.   You were at the fairness hearing on April 28,

6   were you not?

7     A.   I was.

8     Q.   That afternoon, did you receive a call from me?

9     A.   I did.

10     Q.   Could you tell His Honor, please, to your best

11   recollection of what was said between you and me in that

12   call.

13     A.   I was advised that Mr. Roda had received a

14   telephone call from Mr. Gibson saying that he was going

15   to take an appeal from the order approving the

16   settlement unless some kind of arrangement or settlement

17   could be made between Mr. Gibson and Mr. Roda, where

18   money would go to Mr. Gibson's clients.

19          Presumably, whatever money did not go to the

20   clients would go to him.  And the number I was told, it

21   was $100,000.

22          Oh, and then Mr. Roda told me that Mr. Gibson had

23   suggested perhaps GM would pay the hundred thousand.

24     Q.   What happened next in the sequence of events

25   involving that matter, Mr. Gibson's discussion with me,

1    to your recollection?

2        A.   As I recall, we then had a three-way conversation

3    between myself, you, and Mr. Lipps, to discuss the

4    demand from Mr. Gibson, and we agreed to talk to

5    Mr. Gibson to confirm what you had related to us --

6        Q.   Okay.  What was your --

7        A.   -- that took place.

8        Q.   What was your reaction, if I might ask you to

9    recall, when I reported Mr. Gibson's demand?

10       A.   I thought it was outrageous.

11       Q.   What to your recollection was Mr. Lipps'

12   reaction?

13       A.   The same.

14       Q.   Was that discussed, to your recollection, among

15   the three of us when we talked?

16       A.   It was discussed.  I don't think I can recall the

17   details, except we were all in agreement that it was an

18   outrageous demand and something ought to be done.

19       Q.   What do you recall next then after that

20   discussion first between you and me and then the

21   three-way with Mr. Lipps moving to the next day?  Was

22   there a discussion that involved Mr. Gibson?

23       A.   Yes.

24       Q.   Would you please tell His Honor your best

25   recollection of that.

1      A.   Well, it was a four-way telephone conversation.

2  Mr. Roda, myself, Mr. Lipps, and Mr. Gibson, in which we

3  attempted to pin down the accuracy of what had been

4  reported to Mr. Lipps and to me by Mr. Roda and

5  Mr. Gibson.

6      When we asked him, did you want GM to pay this,

7  he said, That's up to you.  But he confirmed the

8  $100,000 figure, that that was the settlement price to

9  avoid an appeal of your decision, Your Honor.

10     Q.   What, if anything, do you recall about Mr. Gibson

11  giving us a timeline or a deadline?

12     A.   What I recall is he said he would do it by the

13  end of the week.  I'm not sure I remember exactly which

14  day of the week we had that conversation, but I think it

15  might have been a Wednesday.

16     Q.   What happened next in terms of the steps?

17  Specifically, do you recall a conversation that we

18  placed to Judge Farina?

19     A.   Yes.

20     Q.   For the record, could you tell us your

21  recollection of that conversation.

22     A.   It was essentially we advised the Court of the

23  telephone conversations with Mr. Gibson and said that we

24  wanted to bring the matter to the Court's attention.

25     The Court just said that they recommended that we

1    move for an expedited hearing, which is what you did.

2      Q.   Since that -- strike that.

3           For the record, have you prepared an affidavit or

4    declaration?

5      A.   Yes.

6      Q.   Handing you a copy of it which we will mark as

7    E.H.S.-2.  Is that your declaration?

8      A.   Yes.

9      Q.   And your signature?

10     A.   Absolutely.  No one else could write like this.

11               MR. RODA:  That's all I have.  Thank you.

12               THE COURT:  Mr. Gibson?

13               MR. RODA:  Just for the record, is your

14   declaration accurate?

15               THE WITNESS:  Yes.

16               MR. RODA:  Thank you.

17                    CROSS EXAMINATION

18   BY MR. GIBSON:

19     Q.   Good afternoon, Mr. Underhill.

20          You testified about two conversations that you

21   had with Mr. Roda, the first conversation that you had

22   with Mr. --

23     A.   Strictly speaking, there were three conversations

24   in which Mr. Roda and I were involved.

25     Q.   I understand; you're right.  You're right.

1          Regarding the first conversation where Mr. Roda

2    called you?

3      A.   Yes.

4      Q.   And he gave you his version of our telephone

5    conversation?

6      A.   Yes.

7      Q.   In that conversation, he mentioned that the

8    settlement demand by the objectors was a hundred

9    thousand?

10     A.   He said that you had demanded on behalf of the

11   objectors a hundred thousand.

12     Q.   And did he mention that counsel for objectors had

13   taken the position that the objection had conferred a

14   benefit on the class by having class counsel fees

15   reduced by a million dollars?  Did he mention that?

16     A.   I don't recall if he mentioned it in the first

17   conversation or the second, when Mr. Lipps participated,

18   but that suggestion arose.

19     Q.   During your conversation with Mr. Roda?

20     A.   Either the first or the second.  I don't remember

21   which one.

22     Q.   But I was not a party to either of those

23   conversations; is that true?

24     A.   You were not.

25     Q.   So the version of the rationale for the

1  settlement you didn't receive from me, you received from

2  Mr. Roda; is that correct?

3    A.  I wouldn't have called it a rationale, I would

4  have called it a settlement demand.

5    Q.  No.  But I mean as far as the benefit conferred

6  upon the class, Mr. Roda communicated that to you, not

7  me?

8    A.  That's correct.

9    Q.  In fact, when we had our one and only telephone

10  call -- first of all, that call was extremely short, was

11  it not?

12    A.  Which one?

13    Q.  We only had one phone call.

14    A.  I'm sorry, where you participated?

15    Q.  Yes.

16    A.  I'd call it short.  I don't know about extremely.

17    Q.  Less than five minutes?

18    A.  That seems about right.

19    Q.  As you say here in your affidavit, when Mr. Roda

20  asked me to re-explain the rationale, I stated on the

21  call that I wasn't going to reiterate my rationale, that

22  I already conveyed it to Mr. Roda and I presumed he

23  conveyed it to you.  Is that true?

24    A.  I think that's correct.  You certainly said you

25  weren't going to explain anything in detail.

1    Q.   Again, did I indicate that I had explained it to
2    Mr. Roda and that --
3    A.   I don't remember.
4    Q.   You don't remember, okay.
5         Was it Mr. Roda's decision to call Judge Farina?
6    A.   I wouldn't call it a decision.  There was a
7    discussion with the three of us about what, if anything,
8    should be done about the -- what Mr. Roda reported to us
9    about his conversation with you.
10        I would say it was a consensus.  I can't remember
11   specifically any one of us saying, well, we got to go
12   see Judge Farina.  But certainly that was the outcome of
13   the call.
14   Q.   Who initiated the phone call?
15   A.   You have to understand, I have a lot of
16   conversations with Mr. Lipps.  And on one of them
17   recently, there was a conference call that didn't end
18   up -- whoever initiated it first, we lost it and we had
19   to call back.  I don't think it was that one, so I think
20   it was Mr. Roda, but I'm not positive.
21   Q.   Approximately how long did that telephone
22   conversation last?
23   A.   With the three of us?
24   Q.   Well, no, with the four of you; right?  You,
25   Mr. Roda, Mr. Lipps, and Judge Farina.

1      A.   That was short, by your definition.  I think not

2   more than five minutes.

3      Q.   So you don't think it could have been ten minutes

4   or longer?

5      A.   I don't think it could be longer.  It could be

6   between five and ten.

7      Q.   Okay.  In April of this year, did you receive my

8   time-stamped entry of appearance in this case?

9      A.   I believe so.

10      Q.   You were involved in negotiations with Mr. Roda

11   regarding his fee, and I know that GM ultimately agreed

12   not to object to a fee roughly of 1.8 million; is that

13   correct?

14            MR. RODA:  Objection, Your Honor, the

15   statement about him being -- first part of that

16   question.

17            THE WITNESS:  I will answer.  No, I did not

18   participate in the mediation.

19   BY MR. GIBSON:

20      Q.   Were you aware of the ongoings of the mediation?

21      A.   No, I just learned the outcome after it was over

22   from Mr. Lipps.

23      Q.   Did you know what Mr. Roda's initial demand was

24   for attorneys' fees before?

25      A.   No.

79

1      Q.   Would you assume it was higher than the 1.8

2   million?

3      A.   I wouldn't assume it, no.

4      Q.   Mr. Lipps, you have been practicing --

5                MR. RODA:   It's Underhill.

6   BY MR. GIBSON:

7      Q.   You have been practicing in Pennsylvania for a

8   lot longer than I have, and you mentioned it.  How long

9   have you been practicing in Pennsylvania?

10     A.   It will be 43 years this September.

11     Q.   Is the large part of your practice devoted to

12  class action work?

13     A.   No, very little.

14     Q.   Are you involved in any other class action cases

15  besides the Soders class action case?

16     A.   Not right now.

17     Q.   Is your firm involved in any other class action

18  cases besides --

19     A.   Not that I know of, but that doesn't mean we

20  aren't, I just don't know of everything.

21     Q.   Is it possible your firm was local counsel in the

22  Highland Tank case?

23     A.   Yes, yes, now that you mention the name.

24     Q.   And that was a class case also?

25     A.   I believe so.

1     Q.  Mr. Underhill, are you aware of any Pennsylvania

2    cases that -- just as you sit here today -- that state

3    that there cannot be a settlement of a private objection

4    in a class action case without Court approval?

5          MR. RODA:  Objection, Your Honor.  For what

6    it's worth, it's beyond the scope of direct.

7          THE COURT:  He can answer if he is aware or

8    not.  Go ahead.  Are you aware, Mr. Underhill?

9          THE WITNESS:  State the question again.  I

10   want to make sure I understand it.

11   BY MR. GIBSON:

12     Q.  Are you aware of any cases in Pennsylvania that

13   state that you cannot have a private -- settlement of a

14   private objection in a class action case without Court

15   approval?

16     A.  I'm not aware one way or the other.

17     Q.  So that's a no?

18     A.  Yes.

19         MR. GIBSON:  I'm just going to check my

20   notes.  I don't think I have much more.  You are short.

21         THE WITNESS:  Whatever.

22         MR. GIBSON:  With the Court's permission,

23   I'm going to take a minute to read the affidavit.

24         I don't have anything further.

25         MR. RODA:  Thank you, Mr. Underhill, I have

1    nothing further.

2              THE COURT:  You may remain in the courtroom

3    now, Mr. Underhill.

4                    MICHELE BURKHOLDER,
5    called as a witness, having been duly sworn or affirmed,
              was examined and testified as follows:

6                    DIRECT EXAMINATION

7

8    BY MR. RODA:

9        Q.  Miss Burkholder, you are an attorney with

10   RodaNast?

11       A.  Yes, I am.

12       Q.  And you have been an attorney with RodaNast for

13   how long?

14       A.  Almost 11 years.

15       Q.  And you have been on the case of Soders versus

16   General Motors from its inception?

17       A.  Correct.

18       Q.  Turning to April 28, 2009, what is the first

19   thing that you recall about a conversation or a call

20   from Mr. Gibson to me?

21       A.  I received a call from you saying that you had

22   received a voicemail message from Mr. Gibson.  You asked

23   me to come to your office to listen in on a telephone

24   conversation.

25       Q.  Did you do that?

1    A.    Yes, I did.

2    Q.    It has been confirmed that we advised Mr. Gibson

3    that you were in the room and that he was on

4    speakerphone.    During that conversation, did you take

5    notes?

6    A.    Yes, I did.

7    Q.    After that conversation, at my request, did you

8    put your notes into a memo?

9    A.    Yes, immediately afterwards.

10    Q.    I'm going to show you a document that I have

11    marked as E.H.S.-3.    Do you recognize that?

12    A.    Yes, I do.

13    Q.    Is that the memorandum that you prepared?

14    A.    Yes, it is.

15    Q.    Now, to clarify immediately the question that may

16    arise with the date showing of May 20th, 2009, would you

17    please explain to His Honor why this memorandum that you

18    prepared immediately after has a date of May 20th on it?

19    A.    Our computer system has an automated system where

20    it puts the date in on the memo.    So whenever you print

21    out a memo, that's the date that that appears on the

22    memo, as opposed to the date when it was drafted in the

23    first place.

24    Q.    When did you draft this into the computer in the

25    first place?

1    A.   Immediately after we had the telephone

2  conversation.

3    Q.   If you could take us --

4         THE COURT:   Again, that date was what?

5         THE WITNESS:   It was April 28th.   It was

6  approximately two hours after we had our hearing here.

7  BY MR. RODA:

8    Q.   Are the statements in your memorandum here, which

9  we have marked as E.H.S.-3, correct?

10    A.   Yes, they are.

11    Q.   Now, would you take us through with your best

12  recollection, and if you need to refer to the

13  memorandum, fine.

14         Could you tell His Honor what you recall about

15  that conversation when you came down to my office?

16    A.   After Mr. Roda told Mr. Gibson that I was on the

17  telephone call --

18         MR. GIBSON:   Objection, Your Honor.   If she

19  needs to refresh her recollection, she's permitted to

20  refresh her recollection then.   But she's not permitted

21  to read the document.

22         MR. RODA:   I object to him saying what she's

23  permitted to do.   She's confirmed this is accurate.   My

24  question to her is clear.   I think Your Honor has the

25  discretion of what she's permitted to do.

1          THE COURT:  You have confirmed that it's

2    accurate.

3          THE WITNESS:  Yes, I have.

4          THE COURT:  I will permit her to use it to

5    the extent that you need it in your testimony.  You say

6    it's accurate as to what you heard at the time?

7          THE WITNESS:  Correct.

8          THE COURT:  As you need it in your

9    testimony, you may use it to refresh your recollection.

10         THE WITNESS:  Okay.  Mr. Gibson said that he

11   obviously planned to file an appeal.  He said that he

12   called Joe because he wanted to resolve this.

13         Joe asked Mr. Gibson what he meant by that.

14   Mr. Gibson said, Fine, I will go ahead and file a notice

15   of appeal.  Joe asked him to wait.  He said that he

16   wanted to explore it to make sure that he understood

17   what Mr. Gibson was asking for.

18         Joe said that the settlement had already

19   been approved, so he wasn't sure how they could resolve

20   it.  And he asked Mr. Gibson what he had in mind.

21   Mr. Gibson then said, Do you understand what I am

22   getting at, Joe?

23         Joe said, I'm trying to understand what you

24   are proposing.  Mr. Gibson then said that he proposed

25   that we enter into a settlement agreement with his

1   client.  He said that the clients would be willing to

2   settle their objection for a specific sum and attorneys'

3   fees.

4          Joe asked what that amount would be, and

5   Mr. Gibson said that his clients demanded a total of

6   $100,000 to be split between his clients and him and

7   that GM should pay this because of the savings that it

8   gained from not having to pay the full amount in

9   attorneys' fees.

10          Joe paused, and then he said that he doesn't

11   remember how many cars the client -- Mr. Gibson's

12   clients had purchased, but their recovery would only be

13   in the hundreds, so he wasn't sure how this -- how that

14   amount was determined.

15          He asked how much would go to the client and

16   how much would go to Mr. Gibson.  Mr. Gibson said that

17   it would be divided pursuant to an agreement that he had

18   with his clients.  He would not disclose what that

19   agreement was and what that split would be.

20          Joe said that it sounded like a large amount

21   and he needed to understand how Mr. Gibson came up with

22   it.  Mr. Gibson said that it was for the benefit that he

23   conferred to the class by the objection that he had

24   filed.  Joe asked what benefit, because the settlement

25   would just benefit his clients, how would that benefit

1    the class?

2              Mr. Gibson said that because of his

3    objection, we reduced our fee by $800,000.  Joe said

4    that the objection had nothing to do with his fee

5    reduction and that he already said that at the hearing.

6    Mr. Gibson said that he finds this hard to believe and

7    the timing is suspect.

8              Joe said that even for the purposes of

9    discussion if we were to assume that the objection was

10.  responsible for the reduction in fee, how would that

11   benefit the class because the amount of money that was

12   being paid for the fee was not going to come from any

13   funds that would be paid by the class.

14             Mr. Gibson said that there were two reasons

15   for that.  First, it would set a precedent so that

16   attorneys would not profit from weak settlements at the

17   detriment of consumers; and second, GM won't have to pay

18   the fee, which will benefit consumers.

19             Joe then asked Mr. Gibson if he wanted him

20   to set up a conference call with GM to talk about this.

21   Mr. Gibson said that he didn't care and it could be

22   through a conference call or that he could convey the

23   message to GM.  Then Mr. Gibson again repeated that GM

24   should pay most, if not all, of the amount because of

25   what it was saving.

1    Q.   Showing you a document marked as E.H.S.-4 and ask

2    if you recognize that.

3    A.   Yes, I do.

4    Q.   What is it, please?

5    A.   It's the memorandum of a conversation that was

6    held between me, you, Chris Underhill, Jeff Lipps, and

7    Mr. Gibson on April 29.

8    Q.   Would your explanation as to the May 20th date on

9    this be the same as what you gave for E.H.S.-3?

10   A.   Correct.

11   Q.   Okay.

12   A.   Yes.

13   Q.   Are the entries in this memorandum correct?

14   A.   Yes, they are.

15   Q.   Could you give us, as you just did with the

16   E.H.S.-3, your best recollection of the conversation

17   that day with Mr. -- the next day, April 29?

18   A.   Once Mr. Roda had identified who was on the call,

19   he advised Mr. Gibson that he conveyed to Mr. Lipps and

20   Mr. Underhill what the demand was and his belief that GM

21   should take it and pay it.

22        He said he wanted to give Mr. Gibson a chance to

23   explain.  He also said that he conveyed to Mr. Lipps and

24   Mr. Underhill that the demand was for $100,000.

25        Mr. Gibson said that he would not reiterate his

1   demand.  He said that they were both very experienced,

2   good lawyers, as is Joe, and they all understand the

3   risks that are inherent in an appeal.

4       He said that he plans on taking an appeal unless

5   we were able to work out something else.  He said that

6   he would not repeat his demand, we know what his demand

7   is, and he will not play games and go back and forth on

8   this.

9       Mr. Roda then noted that Mr. Gibson said that GM

10   should pay his demand of $100,000, and he repeated that

11   he wanted to give Mr. Gibson a chance to explain.

12   Mr. Gibson said his demand was $100,000, and who pays it

13   is not up to him.

14       Mr. Underhill then said what Joe had previously

15   said about the fact that Mr. Gibson had demanded

16   $100,000 and said that GM should pay it.  Mr. Gibson

17   interrupted him and said he's not part of the process of

18   deciding who should pay the money, and he said that we

19   have to agree to that amount ourselves.

20       Mr. Lipps started to say that we have a

21   settlement, but Mr. Gibson cut him off and said he

22   understands what is going on and we do, too.  He said we

23   understand his demand, and we can make a business

24   judgment as far as what to do.

25       He said he plans to file the notice of appeal

1    that week and if we want to make a deal, it would be

2    helpful for us to do it that week before he filed his

3    notice of appeal.

4                    MR. RODA:  Very good.  I have no further

5    questions, Your Honor.

6                    THE COURT:  Cross-examine.

7                    Let me get the numbering straight here.  The

8    memo of the call on 4/28 is E.H.S. what?

9                    MR. RODA:  Three.

10                   THE COURT:  And then the April 29 one is 4?

11                   MR. RODA:  Yes.

12                   THE COURT:  All right, Mr. Gibson.

13                         CROSS EXAMINATION

14   BY MR. GIBSON:

15       Q.  Miss Burkholder, you are employed as an associate

16   at RodaNast; is that true?

17       A.  Yes, I am.

18       Q.  And how long have you worked at RodaNast?

19       A.  Almost 11 years.

20       Q.  So you spent your entire -- almost your entire

21   legal career at RodaNast?

22       A.  Not my entire.  I clerked for a judge in Monroe

23   County for two years.

24       Q.  And then you went straight to RodaNast?

25       A.  Correct.

1    Q.    So Mr. Roda has been your boss for the last 11

2    years?

3    A.    Correct.

4    Q.    You would agree with me that these two

5    memorandums I have, these aren't verbatim transcripts of

6    the telephone conversations, are they?

7    A.    Not verbatim word for word, no.

8    Q.    Mr. Roda asked you on direct and you testified

9    that you have taken notes.  Do you have those notes?

10    A.    Yes, I do.

11    Q.    Where are those notes?

12    A.    I have them with me.

13    Q.    May I see them, please?

14          MR. RODA:    Let the record reflect that we

15    use scrap paper, Your Honor, that's why there is

16    printing on the other side.

17          MR. GIBSON:    I'd like to have these notes

18    also marked as exhibits.  I don't know what we are up to

19    as far as the numbers.

20          MR. RODA:    I would be happy to mark them

21    E.H.S. 5 and 6.  Let's have her identify which is which.

22          MR. GIBSON:    Well, I can identify them on

23    here.  It says one call.  So as the other call, this is

24    the first one.  So let's mark this as whatever -- I'm

25    using them.

1          MR. RODA:   Just mark them then so the notes

2    of the 28th will be E.H.S.-5.   The notes of the 29th

3    would be E.H.S.-6.

4    BY MR. GIBSON:

5        Q.   And you would agree with me, Miss Burkholder,

6    that these notes that you took are less inclusive than

7    these memorandums I have, the corresponding memorandums;

8    is that true?

9        A.   Yes, they are.

10       Q.   Are these the original notes that you took?

11       A.   Yes, they are.

12       Q.   You didn't recopy anything?

13       A.   No.

14       Q.   You were present during the first telephone

15   conversation that I had with Mr. Roda on April 28th; is

16   that correct?

17       A.   Yes, I was.

18       Q.   Is it true that during that conversation I

19   explained to Mr. Roda that the objectors were of the

20   position that we had conferred a benefit on the class

21   and on the public by eliminating the perception that

22   attorneys unduly profit from unreasonable settlements?

23       A.   Something to that effect; correct.

24       Q.   Did I make that very clear?

25       A.   Correct.

1    Q.   During the telephone conversation, the first

2    telephone conversation that was just me, Mr. Roda, with

3    you present, it was never discussed as to whether or not

4    the settlement needed Court approval, was it?

5    A.   No, it was not..

6    Q.   That --

7    A.   Well, Joe did mention that the settlement had

8    already been approved, so he wasn't sure what kind of

9    agreement we could enter into with you because the

10    settlement had been approved.

11    Q.   I'm talking about any settlement agreement with

12    the objectors, that it was never discussed as to whether

13    or not that would need Court approval, was it?

14    A.   That is correct.

15    Q.   Have you participated during the 11 years that

16    you have worked at RodaNast -- do you primarily report

17    to Mr. Roda?

18    A.   For the most part.

19    Q.   Have you been involved in any other class action

20    cases?

21    A.   Yes, very many.

22    Q.   Which class actions cases have you been involved

23    in?

24    A.   Oh --

25    Q.   Just to the best of your recollection.

1    A.   There was one against Bell Atlantic, one against

2  Educators Mutual.

3    Q.   Is that the carpet?

4    A.   Correct, Certified Carpet.   There was one against

5  Educators Mutual Life.   Brooks was the plaintiff in that

6  action.

7    Q.   Where was that?

8    A.   Correct, that was in the Eastern District of

9  Pennsylvania.

10    Q.   Okay.

11    A.   There was the Crossgates case that was filed

12  here, it was Lape versus Murray.

13    Q.   L-a-p-e?   Class case here in Lancaster County?

14    A.   Correct.   There's an aspartame litigation.

15    Q.   Sure, in the Eastern District of PA, I think it

16  is?

17    A.   Honestly, I don't even know.

18    Q.   Which are the ones here in Lancaster County?

19    A.   Those are the ones that I can think of.

20    Q.   I have Lape, okay.

21        Are you aware of any objections that were filed

22  in any of the class action cases that you have

23  participated in while at RodaNast?

24    A.   Yes.

25    Q.   And are you aware that any of those have settled

1    privately?

2       A.    Not that I am aware of.    Not any that I have

3    personally been involved in with discussions.

4       Q.    Now, I'm not asking if you were involved in the

5    settlement process, but are you aware of any objections

6    that were privately settled, even if -- just are you

7    aware of that?

8       A.    No, I have no direct knowledge of anything like

9    that.    I'm aware that this goes on in other actions.

10   I've heard rumors that it's gone on in other actions,

11   but I don't have any knowledge of anything.

12      Q.    Have you heard of other instances where

13   objections have been privately settled?

14      A.    Yes, I have.

15      Q.    Has anyone ever told you that that's criminal?

16      A.    No, but what I was told is that in those

17   situations, the objectors had conferred a benefit on the

18   class, so they had earned what the fees were.

19      Q.    You are aware of other instances of private

20   settlements in class cases?

21      A.    Correct.

22      Q.    And you have never reported those to the

23   Disciplinary Board, I take it?

24      A.    No.

25                 MR. GIBSON:    I have nothing further.    Thank

1    you.

2              MR. RODA:  Nothing further.

3              Your Honor, at this point, as I mentioned

4    earlier, Mr. Lipps is available by telephone if Your

5    Honor deemed it appropriate.  He has also prepared and

6    signed an affidavit which we have here.

7              We leave it to Your Honor's discretion as to

8    whether you would like to have him sworn in and testify

9    by phone as a telephone deposition would proceed.  It

10   would be brief.

11             MR. GIBSON:  I'm assuming that Mr. Lipps'

12   affidavit contains the thrust of his testimony, so I am

13   not looking to inconvenience Mr. Lipps or make him come

14   here or anything like that.

15             If I could just review his declaration?  As

16   long as there's nothing that I really feel compelled --

17             THE COURT:  Well, this may be what's good

18   for the goose is good for the gander.  How do you feel

19   about his affidavit of his clients which he wants me to

20   look at?

21             MR. RODA:  Your Honor, my preference would

22   be to hook Mr. Lipps up, if that is possible from the

23   telephone that Your Honor has here.

24             THE COURT:  It may or may not be, I don't

25   know.  I think it's supposed to be able to be

1    conferenced.

2              MR. RODA:  Or from any phone that would

3    allow a speaker.  That's all we need.  It would be very

4    brief.  That would be my preference.

5              THE COURT:  Can we do the same with your

6    clients?

7              MR. GIBSON:  Your Honor, I have the

8    affidavits, and I'm happy to give them to the Court and

9    to counsel, which set forth the retainer agreement.  I

10   think the quandary is going to be with the clients.

11   Aside from the trek here and that they are both employed

12   is the majority of any other testimony outside of these

13   affidavits would be -- just as I couldn't answer on my

14   cross examination, would be protected by the

15   attorney-client privilege.

16             So this was done in an effort to give the

17   Court the facts that I think would only be able to be

18   gotten anyway.  Certainly if there's other follow-up, I

19   would be happy to either support --

20             THE COURT:  Are there things beyond the

21   affidavit that you believe you have the right to

22   inquire?

23             MR. RODA:  I haven't had the chance to see

24   them.  I note for the record, Your Honor, that there are

25   exceptions to the attorney-client privilege, one of them

1    being crime or fraud.

2              MR. GIBSON:  Well, there's no crime or fraud

3    proven here.  This is just baseless, so I don't think

4    that that can even remotely apply.

5              THE COURT:  Crime or fraud would require

6    demonstration of just what crime you're talking about.

7              MR. RODA:  Understood.

8              THE COURT:  And that there is a probable

9    cause to believe that those elements are met by the

10   conduct.

11             MR. RODA:  I mention it merely so as not to

12   leave the Court with the impression that attorney-client

13   eliminates the possibility of any substantive testimony

14   from them.  That would be a matter for further inquiry.

15             THE COURT:  If that's the only thing.  If

16   what you would inquire into would be areas of privilege

17   that was legitimate objection to privilege, then as far

18   as I'm concerned I can look at their affidavit and look

19   at Mr. Lipps' affidavit.

20             MR. GIBSON:  We would be fine with that.

21             THE COURT:  Is that acceptable?

22             MR. RODA:  Yes.  Mr. Lipps' affidavit will

23   not add anything beyond what Mr. Underhill has already

24   presented.

25             THE COURT:  I think he's probably cumulative

1    because all the conversations were all together.

2                  MR. RODA:  Right.

3                  THE COURT:  Is that acceptable to you?

4                  MR. GIBSON:  That sounds fine, Your Honor.

5                  THE COURT:  Then I will look at the

6    affidavits of the Kairises and of Mr. Lipps.

7                  MR. RODA:  Your Honor, we should for the

8    record identify these notes.  If I may write on them?

9                  THE COURT:  The 4/28, E.H.S.-5; and the

10   4/29, E.H.S.-6.  And the Kairis is E.H.S.-1.  So what's

11   the other gentleman's name?

12                 MR. GIBSON:  George.

13                 THE COURT:  He would be E.H.S.-7.

14                 MR. GIBSON:  We have 1 and 2 already.  Those

15   were --

16                 THE COURT:  Do we have exhibits marked for

17   you yet, Mr. Gibson?

18                 MR. GIBSON:  You know, I was trying to do a

19   bunch of things at once.  I have my entry of appearance.

20   I have my dockets.  And in the cases where the

21   objections were privately settled, I have --

22                 THE COURT:  Well, let's mark Mr. Lipps as

23   E.H.S.-7.  That puts it in sequence with the testimony

24   of witnesses.  And then you tell me what you want to do

25   with the Kairis affidavits.

1          MR. GIBSON:  Sequentially put them in the

2    case at the end of the other K exhibits, if that's

3    acceptable to the Court.

4          THE COURT:  Let me read this, Mr. Lipps'

5    declaration.  All right.

6          MR. RODA:  Your Honor, for the record, I'm

7    looking to reconstruct what is E.H.S.-1.

8          THE COURT:  Affidavit of Karen Kairis.  You

9    had marked that when you were questioning Mr. Gibson

10   about --

11         MR. RODA:  Thank you, Your Honor.

12         Your Honor, as a housekeeping matter, we did

13   not bring copies of Ms. Burkholder's notes.  I would

14   propose one of several things.

15         THE COURT:  I will permit you to make copies

16   and circulate them and substitute copies for the

17   originals.

18         MR. RODA:  The original we will forward to

19   the Court.

20         THE COURT:  Matters not to me.  I will

21   permit substitution of copies for the original.

22         MR. RODA:  And the record will show that

23   E.H.S.-6 is two pages.  E.H.S.-5 is one.

24         THE COURT:  I don't know that we have

25   numbered yet the George Kairis affidavit.

1        MR. GIBSON:  I will make a point of that.

2        THE COURT:  All right.

3        MR. RODA:  So that would just be 8?

4        THE COURT:  Well, see what he wants.

5        MR. GIBSON:  I don't have copies either,

6   although one of these is a 103-page federal docket.  I

7   could either -- I have flagged the portions where the

8   appeals were.

9        THE COURT:  Well, I don't want them all.  I

10  think what you do there is you pull out the relevant

11  portions of the docket.  We don't want any more trees to

12  die for this.

13       MR. GIBSON:  So I'm going to mark, I

14  believe, the first exhibit was the entry of appearance,

15  which I will mark K-1.

16       THE COURT:  EHK-1, Expedited Hearing K-1.

17       MR. GIBSON:  Again, I don't remember my

18  order, but I think number 2 was the docket in Nichols

19  versus SmithKline Beecham, which I will mark as EHK-2.

20  The other one is the docket in Reinhouse versus

21  GlaxoSmithKline, which is EHK-3.

22       THE COURT:  These are all court dockets?

23       MR. GIBSON:  EHK-2 and 3 are court dockets

24  from the district courts and then also are from the

25  circuit courts.

1    EHK-4 is the newspaper article. Even though

2  it's redundant, if the Court likes, I can mark EHK-5,

3  Karen's affidavit, or go straight to George.

4    THE COURT: Keep them together to remark it

5  EHK-5.

6    MR. GIBSON: That's Karen Kairis' affidavit.

7  And EHK-6 is George Kairis' affidavit. And again, just

8  to make sure for my own personal benefit so I don't

9  forget, I have already -- and I know I indicated to the

10  Court that I object to the hearing. But just for the

11  record as far as jurisdiction is concerned, I place my

12  objection --

13    THE COURT: So noted.

14    Is the testimonial portion and exhibit

15  portion concluded?

16    MR. GIBSON: Actually, this goes with -- I

17  have one more that goes with that. I need to remove my

18  notes. Should I make copies, Judge, of these dockets

19  and trim them down to what you need? I will do that.

20    THE COURT: That's what I would suggest.

21  Send copies to Mr. Roda.

22    MR. GIBSON: I will. They are also on

23  PACER, but I will send copies. The versions can also be

24  seen on PACER by counsel.

25    THE COURT: All right. So now the

1    evidentiary portion is concluded.  Let me ask counsel,

2    how do they believe I should proceed here?  Mr. Roda,

3    it's your motion, you go first.

4              MR. RODA:  Yes, Your Honor.  I believe that

5    we can go one of two ways.

6              One, Your Honor can proceed right to his

7    1925 statement.  I mention in that that I believe Your

8    Honor had issued an order.

9              THE COURT:  It's due today.

10             MR. RODA:  That it is due today for the

11   statement.

12             THE COURT:  Do you have it by chance,

13   Mr. Gibson?

14             MR. GIBSON:  Your Honor, what I was planning

15   on requesting today is that under Rule 1925 (B), the

16   rule changed.  It used to be -- you had given me 15

17   days, and the rule used to be 14 days.  It was amended,

18   and now it's 21 days.

19             THE COURT:  You want another seven?

20             MR. GIBSON:  And I would request the time

21   permitted under the rule to flesh out the issues.

22             THE COURT:  All right.  I will grant you

23   what the rule allows, the 21 days, which also is a

24   useful period for both of you perhaps to submit to me

25   what you believe ought to happen as a result of what I

1   have heard.

2           MR. RODA:  Very good.

3           MR. GIBSON:  May I request, should it be in

4   the form --

5           THE COURT:  What I will say, Mr. Roda, his

6   21st day, 1925 doesn't include this.  It's the things

7   that he's -- the errors he's complaining of as to the

8   order that I issued.  So I think his 1925 is just going

9   to be that.

10          You ought to go first on what you believe

11  should happen as a result of this.  Because we are in

12  the period, and I believe I said for you ten days to

13  respond to his 1925.  Frankly, now I'm not sure what the

14  rule says.  It might not even say a response time, but

15  I'd like to get the response.

16          So we could bifurcate this in a way that by

17  his 21 days, you respond to me about this matter.  Then

18  I would give you -- do you need more than ten to respond

19  to his 1925?  I presume you both have an interest of

20  this being expeditiously dealt with.

21          MR. RODA:  We do.  But I was going to say,

22  Your Honor, I would like to see his 1925 because it

23  could bear upon how we see what has transpired today

24  weaving into his appeal.

25          THE COURT:  Well, he's either done something

1  censurable by either the rules or by the Court or not.

2  So what he says in his 1925 hardly matters as to that.

3          MR. RODA:  We will be guided, Your Honor,

4  and I will get it in whatever timetable you need.

5          THE COURT:  I don't see they are related

6  except to the extent I know your motion contends that

7  this is -- that his alleged conduct bears on the bona

8  fide nature of his appeal and whether or not the appeal

9  is frivolous.  But beyond that, it does nothing as to

10  the merits.

11          MR. RODA:  That's fine, Your Honor.  We will

12  have it in under whatever timetable Your Honor would

13  like.

14          THE COURT:  And I also need this:  To what

15  extent is this something I should be doing.  I think he

16  has a position that I shouldn't be doing it at all.  And

17  you have a position that I should.

18          It has relevance on the issue of how I react

19  to his 1925, even beyond whatever he has to say about

20  any errors in the fairness hearing approval process.

21          Am I right, Mr. Gibson?

22          MR. GIBSON:  I would agree with that, yes,

23  Your Honor.

24          THE COURT:  So seven more days for your

25  1925, give him your position on this hearing.  Then you

1  will have -- how many days do you want?  I gave you ten;

2  is that still good?

3          MR. RODA:  To his 1925?  That's fine.

4          THE COURT:  You respond to the 1925 in ten,

5  and you respond to his position in ten.  So everything

6  is coming to me from both of you on the same days.  All

7  right?  Any question?

8          MR. RODA:  No.  Just alert the Court, Your

9  Honor, this is not directly related to this, but so Your

10  Honor is aware of the schedule, we do intend to move to

11  quash his appeals, the appeals that he took from Your

12  Honor's order today.

13          THE COURT:  You mean for me or Superior

14  Court?

15          MR. RODA:  No, to the Superior Court.  He

16  took appeals from your orders setting this hearing, and

17  that's the basis he claims you do not have jurisdiction.

18  We will be moving with the Superior Court to quash that.

19  Didn't want that to come as a surprise to Your Honor.

20          THE COURT:  So when I get the notification

21  of that appeal, I won't say what's this.

22          MR. UNDERHILL:  Your Honor, can I just put

23  on the record for General Motors, we are parties to

24  this, after all.

25          THE COURT:  You are welcome to make the same

1    submission.

2              MR. UNDERHILL:  I don't view General Motors

3    as being directly involved in the motion filed by

4    Mr. Roda with regard to the settlement because GM's

5    position is that it is not going to pay a penny and --

6              THE COURT:  Well, but GM has a position, I

7    think, on the issue of whether it was a fair settlement.

8              MR. UNDERHILL:  It does.  And that may come

9    to the 1925.  And so we would like the same ten days.

10             THE COURT:  Oh, yes, absolutely.  You have

11   ten days after his response is due, which is seven days

12   from now.  And both of your responses are due ten days

13   after his response on the seven days.

14             MR. UNDERHILL:  I don't anticipate doing

15   anything with respect to today's hearing.  We will leave

16   that to Mr. Roda.

17             THE COURT:  I assumed that would be the

18   case.

19             MR. UNDERHILL:  One other thing I would like

20   to bring up.

21             THE COURT:  Yes.

22             MR. UNDERHILL:  Earlier we asked who this

23   gentleman was, and he was identified as a spectator, but

24   he clearly is more than that.

25             THE COURT:  He does appear to be more than

1   that.   Is he an associate?

2            MR. SINK:   I'm a friend of Mr. Gibson's, and

3   I'm a member of the Bar, and I don't think that I have

4   done anything improper.

5            THE COURT:   Of course you have not.   I don't

6   think Mr. Underhill suggested that, and I didn't either,

7   but I am curious because you have conferred.

8            MR. SINK:   And we share office space.   Rob

9   Sink.   I know your firm.   I know Michele.   We have been

10  in class cases together.

11           THE COURT:   Thank you.

12           (The hearing adjourned at 3:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3          I hereby certify that I was present upon

4  the hearing of the above-entitled matter and there

5  reported stenographically the proceedings had and the

6  testimony produced; and I further certify that the

7  foregoing is a true and correct transcript of my said

8  stenographic notes.

9          In testimony whereof, I have hereunto

10 subscribed my hand this _26th_ day of _May_ 2009.

11

12

13

14          _____
           Cathy S. Mertz, RMR
           Official Court Reporter

15

16

17

18

19     AND NOW, _____, _____, this

20 transcript is approved and ordered to be filed.

21

22

23          _____
           Louis J. Farina, President Judge

24

25