1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.

        f/k/a General Motors Corporation, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        May 27, 2010

        9:49 AM



B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2    STATUS CONFERENCE re Pretrial Conference in Motors Liquidation

3    Company v. Bayerische Motoren Werke Aktiengesellschaft,

4    Adversary Proceeding No. 10-05006(REG)

5

6    STATUS CONFERENCE re Official Committee of Unsecured Creditors

7    of General Motors Corporation v. JPMorgan Chase Bank, N.A., et

8    al., Adversary Proceeding No. 09-00504 (REG)

9

10   HEARING re Debtors' Thirteenth Omnibus Objection to Claims

11   (Workers' Compensation Claims)

12

13   HEARING re Debtors' Fourteenth Omnibus Objection to Claims

14   (Workers' Compensation Claims)

15

16   HEARING re Debtors' First Omnibus Objection to Claims (Amended

17   and Superseded Claims)

18

19   HEARING re Third Motion of Debtors for Entry of Order Pursuant

20   to 11 U.S.C. § 1121(d) Extending Periods in which Debtors May

21   File Chapter 11 Plan and Solicit Acceptances Thereof

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

```
1

2     A P P E A R A N C E S :

3     WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors and Debtors-in-Possession

5          767 Fifth Avenue

6          New York, NY 10153

7

8     BY:  JOSEPH H. SMOLINSKY, ESQ.

9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for the Official Committee of Unsecured

12          Creditors

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16    BY:  JENNIFER R. SHARRET, ESQ.

17

18

19

20

21

22

23

24

25
```

4

1

2   BUTZEL LONG P.C.

3       Attorneys for the Official Committee of Unsecured

4        Creditors

5       22nd Floor

6       380 Madison Avenue

7       New York, NY 10017

8

9   BY:  ERIC B. FISHER, ESQ.

10       BARRY N. SEIDEL, ESQ.

11

12  U.S. DEPARTMENT OF JUSTICE

13       U.S. Attorney's Office

14       86 Chambers Street

15       New York, NY 10007

16

17  BY:  DAVID S. JONES, DEPUTY CHIEF, CIVIL DIVISION

18

19

20

21

22

23

24

25

5

1

2    KELLEY DRYE & WARREN LLP

3        Attorneys for JPMorgan Chase

4        101 Park Avenue

5        New York, NY 10178

6

7    BY:  JOHN M. CALLAGY, ESQ.

8        NICHOLAS J. PANARELLA, ESQ.

9        MARTIN A. KROLEWSKI, ESQ.

10

11   MAYER BROWN LLP

12       Attorneys for BMW, AG

13       1675 Broadway

14       New York, NY 10019

15

16   BY:  JEAN-MARIE L. ATAMIAN, ESQ.

17

18   MORGAN, LEWIS & BOCKIUS LLP

19       Attorneys for JPMorgan Chase

20       101 Park Avenue

21       New York, NY 10178

22

23   BY:  RICHARD S. TODER, ESQ.

24

25

6

1

2    CAPLIN & DRYSDALE

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5        One Thomas Circle N.W.

6        Suite 1100

7        Washington, DC 20005

8

9    BY:  TREVOR W. SWETT, ESQ.

10        (TELEPHONICALLY)

11

12   GODFREY & KAHN, S.C.

13        Attorneys for Examiner, Brady Williamson

14        One East Main Street

15        Suite 500

16        Madison, WI 53701

17

18   BY:  KATHERINE STADLER, ESQ.

19        MONICA SANTA MARIA, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

7

1

2 KIRKLAND & ELLIS LLP

3      Attorneys for New United Motors Manufacturers, Inc.

4      555 California Street

5      San Francisco, CA 94101

6

7 BY:   JOSHUA HURWIT, ESQ.

8      (TELEPHONICALLY)

9

10 STUTZMAN, BROMBERG, ESSERMAN &

11      Attorneys for Legal Representatives for Future Asbestos

12       Personal Injury Claimants

13      2323 Bryan Street

14      Suite 2200

15      Dallas, TX 75201

16

17 BY:   SANDER L. ESSERMAN, ESQ.

18      JO E. HARTWICK, ESQ.

19      (TELEPHONICALLY)

20

21

22

23

24

25

8

P R O C E E D I N G S

1

2    THE COURT:  Good morning.  General Motors.  I want to

3    deal with the nonadversary proceedings first, then BMW, then

4    the creditors' committee's action against JPMorgan Chase.

5    Mr. Smolinsky, good morning.

6    MR. SMOLINSKY:  Good morning, Your Honor.  Joe

7    Smolinsky of Weil Gotshal & Manges for the debtors.  Moving to

8    the uncontested matters, I think I can handle the thirteenth

9    and fourteenth omnibus objections to claims together.  These

10   are claims objecting to workers' compensation claims in states

11   in which New GM has assumed a liability.

12   We received, in connection with these motions, two

13   replies, in each case by the Mississippi Workers' Compensation

14   Individual Self-Insurer Guaranty Association.  The sum and

15   substance of that response was that they thought that it was

16   improper that we would transfer the liability to New GM and

17   take away surety bonds that we had posted -- that GM had posted

18   prior to the bankruptcy.  We've provided them now with all of

19   the necessary documents to demonstrate that the surety bond was

20   transferred to New GM as part of the sale.  And they're now

21   going through the steps that they need to withdraw their

22   objection.  So we're going to adjourn the objection -- the

23   motion with respect to those claims that were filed on behalf

24   of individuals in Mississippi and go forward with the rest of

25   the motion.

1        We also received a statement in support by the Ohio

2   Bureau of Workers' Compensation so I don't think that we need

3   to address that here.

4        And finally, a letter by Aretha Smiley which was

5   sent, I believe, in response to omnibus motion number 14.

6   Well, I think most of the letter was addressed to Your Honor

7   rather than the debtors.  We'd be certainly prepared to send

8   her a letter explaining that to the extent that she has

9   recourse remedies, appeals, that she could pursue those

10  remedies against New GM.  And we've spoken to New GM and they

11  certainly understand and agree that that would be the right

12  course of action.

13       THE COURT:  I think that'd be helpful, Mr. Smolinsky.

14  So please do that.  I'm going to suggest it but not order it.

15  And am I correct that as insofar as you've kicked those two

16  aspects to allow them to do their thing to satisfy themselves

17  that they're taking care of the motion, it's otherwise

18  unopposed?

19       MR. SMOLINSKY:  That's correct.

20       THE COURT:  It's granted.

21       MR. SMOLINSKY:  Thank you.  That's both 13 and 14?

22       THE COURT:  Right.  Okay.  Then I got an exclusivity?

23       MR. SMOLINSKY:  Before we get to exclusivity, there's

24  the first omnibus objection to claim which we're now finally

25  ready to close out.  There were two claims, one filed by del

10

1    Norte Chevrolet and one claim filed by Larry Allen.  They were

2    co-obligors -- co-entitlers to the claim, identical claims.  We

3    had objected to both.  And we've now worked out a stipulation

4    whereby they understand that they're going to interpose just

5    one claim.  They will take care of allocating the proceeds in

6    the way that they see fit.  And they will deliver to us the

7    name and the tax id number of the party that they wish to be

8    designated to receive the distributions.

9         We're prepared to hand up that stipulation which we

10   can deliver to chambers.  And that would close out omnibus

11   motion number 1.

12        THE COURT:  That's fine.  So just have one of your

13   folks drop it off across the hall when we're done today.

14        MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor,

15   the final uncontested matter on today is the debtors' third

16   request for extension of exclusivity.  We're requesting an

17   addition four day -- four month period to file and solicit

18   acceptances to the plan.  As Your Honor is aware, these cases

19   were commenced on June 1st, 2009.  A lot has been accomplished

20   and we're moving quickly to position ourselves for the next

21   important phase of this case which is the filing of a plan of

22   liquidation which hopefully will be on a largely consensual

23   basis.

24        We don't often have the opportunity to report on a

25   more macro basis, so what I'd like to do is just spend a minute

11

1     or two going through some of the recent events.  And this will

2     supplement what we think is a fulsome discussion in the motion

3     about the things that we've been doing to put ourselves in that

4     position.  And hopefully, this will also satisfy the

5     committee's request for more public information about what

6     has -- the progress that's been made to date.

7               Your Honor, we've reported to you in the past that

8     there are two gaiting issues to the filing of the plan.  The

9     first is the treatment of future obligations with respect to

10    real estate that was retained by MLC after the sale.

11              THE COURT:  Much of which may have environmental

12    issues.

13              MR. SMOLINSKY:  That's correct, Your Honor.  Not all,

14    but many of the properties do have issues.  The goal has always

15    been to obtain the consent of each and every federal agency in

16    each and every affected state and local municipality to a

17    proposed real estate mediation program.  As Your Honor will

18    recall, as part of the sale, Treasury left behind funds that

19    were to be used to achieve that result and to conduct a wind-

20    down of the affairs of Motors Liquidation Company.

21              We continue to believe that those funds are more than

22    sufficient to satisfy those obligations.  And it's been our --

23    but it has not been our desired approach to use those funds in

24    a contentious manner to litigate over whether or not those

25    funds would be sufficient but rather to gain consensus to our

12

1   proposal.  And we could finally report that there has been some

2   tangible and meaningful progress that's been made in that

3   arena.

4           A week or so ago, the Obama administration announced

5   that they're proposing a trust fund of approximately 800

6   million dollars to pay for not only the cleanup but for the

7   development of the ninety or so properties that MLC continues

8   to own in fourteen states.  Of that amount, 536 million dollars

9   approximately is slated for remediation.  The balance of the

10  funding will support an ambitious program not only to

11  administer and maintain the properties but also to prepare them

12  for redevelopment.  And that is a major benefit for state and

13  local governments to the extent that they go along with the

14  proposal.

15          Why is this announcement so important?  Well, number

16  one, it's the first time that the federal government has spoken

17  with one voice.  Not only the auto task force but now, the

18  entire federal government, including the Environmental

19  Protection Agency, have worked with the materials that we've

20  provided to them.  We've had many meetings in a very intense

21  effort and period of cooperation.  And now, they've all

22  indicated their support.  This signifies the coming together of

23  all the agencies and now they're no longer hopefully voicing

24  independent views about the future.

25          Number two, there's now a consensus between the

13

1   federal government and the company on the amount of money

2   necessary to implement the remediation as well as deal with any

3   potential unforeseen costs that may come up.  The 536 million

4   dollars has significant cushions in that to deal with any

5   unforeseen contingency.

6           So there's been a tremendous amount of work to get to

7   the point where there's been a sharing of information, hundreds

8   of meetings, calls, site visits.  To give you a sense of the

9   magnitude of what we're talking about, these ninety properties

10  cover about seven thousand acres and comprise about forty-eight

11  million square feet under roof.  So this is not a small amount

12  of real estate that we're talking about.

13          The third significance is that the Administration has

14  supported a framework for a trust to be set up in order to

15  implement this.  And this falls right within what we

16  anticipated and contemplated as far as our plan of liquidation.

17  So from this point forward, it won't take too much to

18  incorporate that into our plan concept although we do need to

19  sit down with the federal government now and talk about the

20  details of that trust.

21          So the next step, Your Honor, is to --

22          THE COURT:  Pause, please, Mr. Smolinsky.  The

23  general idea being that the estate, and perhaps with

24  supplemental funding by the U.S. government, would put money or

25  assets into the trust and then the trust would do its thing for

14

1     the remediation and the estate would move on.

2             MR. SMOLINSKY:  That's correct, Your Honor.  And

3     they'll see eventually will dissolve and will leave the trust

4     there that will be prepared to maintain and manage the

5     properties for decades, if necessary.

6             THE COURT:  Continue, please.

7             MR. SMOLINSKY:  So, Your Honor, the next step is to

8     get the states on board.  We're not starting from step 1.  The

9     states have been involved that every step of the way have been

10    provided with all the information that the government has been

11    provided with.  There have been various meetings between the

12    states and the federal government.  So that process is well

13    along.  And we anticipate at this point of getting the support

14    of most, if not all, of the states.

15            To the extent of any holdouts, we don't intend to

16    stay in bankruptcy forever.  At that point, we would have no

17    choice but to go forward and seek to estimate those claims,

18    those obligations as part of moving forward with the plan

19    process.

20            The other gaiting issue, Your Honor, is asbestos.

21    And well, we believe that a plan can be confirmable based

22    purely on estimation of those liabilities.  We would prefer to

23    solicit a plan which has the support of both the current and

24    future asbestos claimants as well as the creditors' committee

25    as to how much of the remaining assets will be set aside for

15

1    present and future claims.

2         We continue to provide significant information to the

3    creditors' committee, their experts, the future claim

4    representative, the official committee of asbestos claimants.

5    And hopefully, that data will help them assess our estimates

6    and participate meaningfully in settlement discussions.

7         In addition to those gaiting issues, we continue to

8    make progress on other fronts as well.  Where claims are

9    concerned, we filed numerous claim objections, as Your Honor

10   was aware.  To date, we focus primarily on procedural

11   objections and individual large claims.  But now, in order to

12   move into the plan process, we are ready to tackle many

13   additional claims.

14        As indicated in our motion, we're faced with over

15   70,000 claims totaling 274 billion dollars.  Those claims have

16   been whittled down substantially and we gave some detail in the

17   motion about the progress that we've made to date.  But over

18   the next month or two, we intend to object to approximately

19   4300 claims that are filed by employees whose obligations have

20   been satisfied or will be satisfied by New GM.  18,000 claims

21   asserted by beneficial holders of debt instruments that are

22   duplicative of claims that have been filed by the respective

23   indenture trustees.  And you'll be seeing papers shortly

24   reconciling those claims with the respective trustees.

25        We have 2,000 late filed claims that we have a

16

1     process for objecting to as well as 400 claims of taxing

2     authorities that we believe have been satisfied.

3            Your Honor, we are going to be coming before you with

4     a request to implement a procedure to deal with these tens of

5     thousands of claims in a more productive manner than filing

6     motions at a hundred a cliff.  We're not asking Your Honor to

7     prejudge that and we'll bring that before Your Honor and --

8            THE COURT:  That's fine.  Mr. Smolinsky, hopefully

9     this may save you some work.  Yesterday, I approved but only

10    conditionally an uncontested motion for sending out bulk

11    notices of claims.  Bankruptcy judges around the country,

12    including me, have been troubled with what it does to a

13    creditor to get one of these piles of things which lists more

14    than a hundred claimants.  And we've been scratching our heads

15    as to how to reconcile the fact that you don't want to

16    dissipate all of the assets of the estate in giving out many,

17    many claim objections but that for a lot of creditors,

18    especially mom and pops, getting the stuff that historically

19    has been dumped on them is totally useless and is scary and

20    incomprehensible.

21           I am groping for the sweet spot but chance are, I am

22    not going to permit a wholesale waiver of the hundred creditor

23    limit, which was put in to deal with this problem, and will

24    want something along the lines of something in baby talk, and I

25    mean really baby talk, that has two or three boldfaced

17

1    paragraphs that says you're getting this because this affects

2    you.  And you better do something if you don't like what we

3    propose to do to you.

4         I would suggest that you have one of your associates

5    look at what I am entering in DBSD which is a case which would

6    normally be thought of as a big case.  Obviously, it's not as

7    big as this one -- which reflects my latest thinking on getting

8    the sweet spot between not dissipating all of the assets of the

9    estate and bureaucracy and giving fair notice to creditors.

10        MR. SMOLINSKY:  Your Honor, I think we've been fairly

11   creative in this case in trying to deal with the magnitude of

12   the issues that we have.  Hopefully, you'll find that

13   creativity in our motion.  We've tried to recognize that

14   individuals who are used to getting important packages in large

15   envelopes with stacks of paper that will now only hopefully a

16   letter-size envelope with information about their particular

17   claim with, obviously, reference to the entire motion.  We've

18   tried to incorporate things like stamping the envelope with a

19   red stamp.  It says "Official Court Document".  Trying to do

20   things that might alleviate some of your concerns.  But we'll

21   certainly look at that motion and --

22        THE COURT:  I'll -- fair enough.  And I'll hear what

23   you have to say, Mr. Smolinsky.  But I want you to be on notice

24   in advance that, in my view, what has been done in this court

25   up to this point has been insufficient.  So we're going to have

18

1    to do better.

2            MR. SMOLINSKY:  Understood, Your Honor.

3            THE COURT:  Okay.

4            MR. SMOLINSKY:  As reported in our motion, the ADR

5    process continues to pay dividends and reduce the number of

6    litigations that may ultimately be before this Court or another

7    Court for adjudication.  The extra period that we are asking

8    for we expect it to be used productively to get us to as

9    consensual a plan with as little friction as possible.

10           Your Honor, I'm happy to address any questions you

11   have.  There have been a number of statements that have been

12   filed by the various committees.  I think that, on balance,

13   they're all in support.  There was a statement in the Trafelet

14   objection about some documents that  they thought were missing.

15   But --

16           THE COURT:  Objection to exclusivity on that ground?

17           MR. SMOLINSKY:  Your Honor, we were not offended

18   because I think it is important to give everyone an opportunity

19   to be heard about issues that they see in front of them.  But

20   as you see in the corrected notice, that information was made

21   available.  And hopefully that alleviates any concerns.

22           THE COURT:  All right.  Creditors' committee.

23           MS. SHARRET:  Jennifer Sharret from Kramer Levin on

24   behalf of the official committee of unsecured creditors.  The

25   official committee supports the extension of exclusivity and we

19

1    appreciate the public disclosure they add in the motion and at

2    the record today.  And while we hope that the debtors can reach

3    a consensus with all the parties, we want them to still propose

4    a plan of liquidation as expeditiously as possible and to keep

5    apprised in the public as much as they can about the public

6    timeline.

7           In addition, we just would note that we have been

8    working with counsel for the debtors on process for objections

9    to claims particularly late filed claims.  And we'll continue

10   to work with the debtors on a new process to deal with claims

11   objections.

12          THE COURT:  All right.  Fair enough.  Anybody else

13   wish to be heard before I rule?  Record will reflect no

14   response.

15          The motion for the extension of exclusivity will be

16   granted.  And in light of the lack of meaningful opposition to

17   this motion, I'm not going to make extensive findings of fact

18   and conclusions of law.  I'll take just a moment for the

19   explanation of the bases for the exercise of my discretion in

20   this regard.

21          It's obvious to me, having seen this case on my

22   watch, that the debtors are, as they say, making excellent

23   progress in this case.  And it's also to obvious to anyone in

24   the world who's looked at this case that despite what has been

25   accomplished so far, most significantly as a consequence of the

20

1    363 sale, this is still a very, very large case with some very,

2    very major issues, the most important of which Mr. Smolinsky

3    articulated which have the potential, at least, of presenting

4    gaiting issues before the plan an be formulated.

5          This is exactly the paradigmatic example of a case in

6    which an extension of exclusivity is appropriate.  It's obvious

7    that the extension is not sought to feather the debtor's nest

8    and I don't think I need to say more.  Motion granted.

9          Mr. Smolinsky, you or one of your guys settle an

10   order -- forgive me.  Submit an order.  You don't need to

11   settle it -- in accordance with that ruling at your earliest

12   convenience.

13         MR. SMOLINSKY:  Thank you, Your Honor.  We will.

14         That takes us to the two pretrial conferences.  I

15   could handle BMW and then --

16         THE COURT:  Would you, please?

17         MR. SMOLINSKY:  -- gladly sit down.

18         THE COURT:  Do you have an opponent who would be

19   coming up on this?

20         MR. SMOLINSKY:  I believe --

21         MR. ATAMIAN:  Yes, Your Honor.  Jean-Marie Atamian

22   from Mayer Brown.

23         THE COURT:  Couldn't hear you.  You want to come up

24   to a microphone, please?  May I get your name again?

25         MR. ATAMIAN:  Thank you, Your Honor.  Jean-Marie

21

1    Atamian from Mayer Brown.

2            THE COURT:  Kamen?

3            MR. ATAMIAN:  Atamian, A-T-A-M-I-A-N.  First name

4    J-E-A-N dash M-A-R-I-E from Mayer Brown on behalf of BMW AG.

5            THE COURT:  Okay.  Thank you.  Have a seat for a

6    minute, please, Mr. Atamian.

7            MR. ATAMIAN:  Thank you, Your Honor.

8            MR. SMOLINSKY:  Your Honor, BMW's time to respond to

9    the complaint has been extended to June 15th.  This may be one

10   of those rare circumstances where the difficulties of

11   international service over the course of months may ultimately

12   pay off.  We are addressing the possibility of taking some

13   steps which would allow us to dismiss this adversary.  So we're

14   hopeful that this adversary won't be before you too much

15   longer.  There are some things that have to be worked out but

16   we expect to work on those issues as quickly as possible.

17           THE COURT:  Mr. Atamian, may I get your perspective,

18   please?

19           MR. ATAMIAN:  Yes, Your Honor.

20           THE COURT:  Would it be easier for you if you came to

21   the main lectern where you don't have to --

22           MR. ATAMIAN:  That'll be fine.

23           THE COURT:  -- crouch over so much?

24           MR. ATAMIAN:  Disadvantages of being tall.

25           THE COURT:  I've never had to confront that issue.

22

1          MR. ATAMIAN:  Your Honor, a few months -- a few weeks

2     ago, we were contacted by counsel for MLC and we were asked

3     whether we'd be interested in entering into a stipulation that

4     would, in effect, freeze this litigation -- that the litigation

5     would be dismissed and that if the settlement or resolution

6     couldn't be reached, there would be a refiling a couple of

7     months down the road.

8          We drafted a stipulation and forwarded it on to

9     debtors' counsel.  Did not hear back on the stipulation.  I

10    understand that they were tied up on issues involving the

11    adversary and had more pressing matters to deal with.  I did

12    get a call from debtors' counsel yesterday advising us that

13    they were working in Europe and Germany and France on some

14    matters and some issues were being addressed there that might

15    result in their dismissing this action without prejudice in the

16    next few weeks.

17         I'd just like to correct one comment that debtors'

18    counsel made.  He said that we had somehow been given an

19    extension.  We did move for an extension.  We submitted a

20    letter to Your Honor which Your Honor endorsed asking for

21    clarification on when an answer date would be due or a date to

22    otherwise move a few weeks ago when it made sense to do that.

23         In view of the call --

24         THE COURT:  Pause, please, Mr. Atamian.  My

25    recollection of what I said in my order was that you could have

23

1    the time to answer but I wanted to see you guys in the

2    conference.

3           MR. ATAMIAN:  That's correct.  But we asked for

4    clarification because it wasn't clear to us when the answer or

5    the date to otherwise move would be and we didn't want to risk

6    being in default.

7           Based on the call that we've gotten yesterday, and we

8    do hope that this gets resolved in the next few weeks, we don't

9    believe that it makes a lot of sense for our client to pay for

10   us -- and I'll let the cat out of the bag.  If we have to

11   respond, we will make a motion to dismiss.  We don't think it

12   makes a lot of sense for them to fund that type of effort in

13   the next two weeks.  We've obviously started but would have to

14   expend a fair amount of time before June 15 to work on our

15   papers and finalize our papers.  And it would also require us,

16   in all likelihood, to hire a German expert, an expert on German

17   law, in making our motion to dismiss.

18          So we would ask that the June 15th date be vacated

19   and that the date to answer or otherwise move be adjourned sine

20   die.  And hopefully, we will have a resolution in the next few

21   weeks.

22          THE COURT:  Mr. Smolinsky, further comments?  Stand

23   just to the side, please -

24          MR. ATAMIAN:  Sure.  I'm sorry.

25          THE COURT:  -- Mr. Atamian, to let Mr. Smolinsky be

24

1    heard.

2           MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky

3    for the debtors.  Just to give Your Honor a little bit more

4    color, you haven't heard much about Strasbourg.  Strasbourg is

5    a subsidiary of MLC which are the only remaining operations.

6    We have a fully functional transmission plant in Strasbourg

7    which has to be dealt with.  And that is part and parcel of the

8    issues that we're dealing with here today.  In view of what we

9    hope will be a global resolution of everything pertaining to

10   Strasbourg, we have no objection to putting this on a holding

11   pattern until we work this out.

12          THE COURT:  Okay.  Here's what we're going to do,

13   gentlemen, because nothing would please me more than making the

14   matter go away.  But there are steps that I or any other judge

15   would have to do in the exercise of ordinary case management to

16   protect the needs and concerns of the Courts.

17          First, the time to answer, move or otherwise respond

18   will be kicked but not eliminated in an amount of time to be

19   agreed upon by the two of you which is then to be papered and

20   presented to me by means of a stip or consent order which will

21   be subject to amendment for cause.  And if there are productive

22   discussions going on between you or if the debtor, for that

23   matter, is doing things on its own that makes a response

24   premature, that'll, of course, be good cause as well.  But I

25   don't want balls falling between the outfielders and I don't

25

1    want anything done sine die.

2         Secondly, I've been doing this for a while.  I've

3    been a judge for ten years and I was a lawyer for thirty years

4    before that.  And I've got a sense as to when 12(b)(6)s make

5    sense and I've got a sense as to when people file them and then

6    I conclude after I've worked for hours and hours on them and

7    the lawyers have worked even more on them they've been a waste

8    of time.  If all of the things that might make this go away

9    fall apart, and you guys agree to disagree and to proceed with

10   either this litigation or any successor litigation, if the

11   defendant isn't happy to present its defenses, by answer as

12   contrasted to motion, we're to have a pre-argument conference

13   at which time I can decide whether I think the 12(b)(6) is a

14   good use of our time or not.  Historically, I've found that

15   when cases are capable of being disposed of on motion, more

16   often than not summary judgment is the time rather than

17   12(b)(6), because in my experience when plaintiffs are

18   represented by competent counsel, which they obviously are

19   here, they're smart enough to know how to frame a complaint.

20   And on a lot of the stuff that we do in this court, it's hard.

21   And something before summary judgment may or may not be

22   productive.  Classic example of that is what happened in

23   Adelphia where I got a 12(b)(6) on fraudulent conveyance type

24   of stuff and, of course, I had to deny it.  Then Larry McKenna

25   up in the district court granted the motion and he just got

26

1    affirmed by the circuit underscoring the differences between

2    12(b)(6)s, on the one hand, and Rule 56s on the other.

3         This is to save both sides, but, frankly, I care more

4    about saving the side of the estate money in silly and

5    unnecessary litigation.  It may be that I will say, yeah, go

6    ahead, if you want to make a 12(b)(6), you can.  But we're

7    going to do a stop, look and listen before we do so.

8         So for now, everything you said is fine with me, Mr.

9    Smolinsky and Mr. Atamian.  But if you get to the point where

10   we have to go forward, we're going to have to do some case

11   management stuff before we put trains on tracks that we can't

12   stop.

13        I'd like to get recommendations from each of you as

14   to a good time for a continued status conference.

15        MR. SMOLINSKY:  Your Honor, would it make sense to

16   provide in the stipulation that we set a status conference and

17   then provide a number of days after that status conference to

18   file responsive pleadings?

19        THE COURT:  Might very well but I want to hear from

20   Mr. Atamian as to his perspective before I answer that.

21        MR. ATAMIAN:  Yes, Your Honor.  It seems to me that

22   it probably makes sense to kick this out.  I heard Your Honor

23   loud and clear.  You're not a believer in sine die adjournments

24   and I can understand that.  I am not in control of what is

25   going on in Europe so I can't really tell Your Honor today how

27

1   long would be an appropriate time to see if all of this can be

2   resolved in such a way that the action against my client is

3   dismissed.  I would think forty-five or sixty days of breathing

4   space should give us enough time.  If you think it will take

5   longer or less time, I'd be happy to know.

6        THE COURT:  Mr. Smolinsky, do you think a longer or

7   lesser time would be better?

8        MR. SMOLINSKY:  Well, I just spoke to my client and

9   we anticipate a six to eight week period to work out the things

10  that we have to work out.  So perhaps it makes sense to set

11  something for shortly thereafter, something maybe a little bit

12  shy of three months.

13       THE COURT:  Little shy of three months.  Okay.  Mr.

14  Atamian, I didn't hear you objecting to that.

15       MR. ATAMIAN:  No objection, Your Honor.

16       THE COURT:  And since you're a defendant -- I'm

17  sorry?

18       MR. ATAMIAN:  No objection, Your Honor.

19       THE COURT:  Yeah.  Since you're a defendant, later is

20  usually quite satisfactory for defendants.  Mr. Smolinsky, get

21  yourself a date from my courtroom deputy, Ms. Blum, convenient

22  to Mr. Atamian in that three-month range you were talking

23  about.  It's going to be a conference.  And since any answer

24  might depend on whether stuff that might otherwise be done by

25  motion will have to be done by answer first, I like your idea

28

1    of having the conference and allowing a reasonable time to

2    respond after the conference.  See if you guys can paper

3    something that tentatively works and is subject to adjustment

4    for cause.

5         MR. SMOLINSKY:  Thank you.  We will, Your Honor.

6         THE COURT:  Very good.

7         MR. ATAMIAN:  Thank you, Your Honor.

8         THE COURT:  All right.  Thank you, folks.

9         Okay.  Creditors' committee against JPMorgan Chase.

10    (Pause)

11         THE COURT:  I know many of you.  I don't know

12    everybody.  Mr. -- is that Mr. Callagy?

13         MR. CALLAGY:  John Callagy from Kelley Drye for

14    JPMorgan Chase.

15         THE COURT:  Right.  I've heard you on the phone.  I

16    think this is the first time I've seen you in person.  Okay.

17    Mr. Toder, who do you have?

18         MR. TODER:  Also representing JPMC, Your Honor.

19    You'll recall we were involved pretty actively in the

20    bankruptcy part and we're assisting Mr. Callagy in this regard.

21         THE COURT:  Forgive me if I don't remember that, but

22    okay.  And next to --

23         MR. TODER:  I'm a very forgettable person as Your

24    Honor is well aware.

25         THE COURT:  Yes.  Next to you, please, Mr. Toder?

29

1          MR. PANARELLA:  Nicholas Panarella from Kelley Drye

2    also representing JPMorgan.

3          THE COURT:  Okay.  So you're with Mr. Callagy, Mr.

4    Panarella?

5          MR. PANARELLA:  That's correct, Your Honor.

6          THE COURT:  Okay.  Mr. Seidel and --

7          MR. SEIDEL:  Good morning, Your Honor.

8          THE COURT:  -- Mr. Fisher?

9          MR. FISHER:  Good morning, Your Honor.

10         THE COURT:  Okay.  All right.  Gentlemen, I've read

11   Mr. Callagy's letter of March 29.  And putting aside Mr.

12   Callagy's perception of what he thinks to be relevant facts as

13   a matter as to which Mr. Seidel and Mr. Fisher might have

14   different views.  Mr. Seidel or Mr. Fisher, you remain of the

15   view, as Mr. Callagy states, that you still think that motions

16   for summary judgment in each direction would be productive?

17         MR. FISHER:  We do, Your Honor.

18         THE COURT:  Mr. Fisher?

19         MR. FISHER:  We do, Your Honor.  And just to make

20   sure that the Court has a complete record, we submitted a

21   letter to Your Honor on April 7th, 2010 responding to Mr.

22   Callagy's letter indicating that it was still both parties'

23   view that summary judgment would be appropriate.

24         THE COURT:  Well, I apologize to you, Mr. Fisher,

25   that my bundle doesn't include your letter.  But given what you

30

1    just said, I'm not sure if I need it.  And I assumed that you

2    wouldn't agree with Mr. Callagy's view of the world on the

3    underlying facts.

4              MR. FISHER:  That's correct.

5              THE COURT:  Okay.  All right.  Gentlemen, I'm going

6    to grant what now appears to be the joint request that you be

7    permitted to file the summary judgment papers without, of

8    course, expressing any view on the merits of the parties'

9    underlying positions.

10             I sensed from your second letter, Mr. Callagy, the

11   one on March 29, that at least at one time, there was an

12   agreement on what discovery was appropriate.  And you even had

13   agreed at one time on a briefing schedule.  To what extent in

14   your view, Mr. Callagy, and I'm going to ask Mr. Fisher for his

15   view in a minute, is it still the case that no further

16   discovery is necessary?  And to what extent, if any, do we need

17   to do anything other than having you guys update your briefing

18   schedule based, of course, on the fact that we're now

19   addressing it some weeks after this matter originally came up?

20             MR. CALLAGY:  Yes, Your Honor.  With respect to the

21   issues addressed by summary judgment motion, we have no need

22   for further discovery.  And the only thing we need to do is to

23   get our papers in shape as you suggest.

24             THE COURT:  Mr. Fisher, do you agree?

25             MR. FISHER:  Yes, I agree, Your Honor.  From the

31

1    outset of this case, we conducted it anticipating that the key

2    question, which is the effectiveness of the termination

3    statement, would likely be amenable to early dispositive

4    motions.  And so we conducted all the discovery relevant to

5    that limited issue.  And there's no discovery needed on that

6    issue, Your Honor.

7            THE COURT:  Okay.  Now, I don't care who speaks

8    first.  I assume that you folks have to update your earlier

9    understanding on a briefing schedule.  But do you think you can

10   work out something amongst yourselves for a recommendation to

11   me?

12           MR. CALLAGY:  I believe we can, Your Honor.  I don't

13   think that that'll be a problem at all.

14           THE COURT:  What kind of sequence did you have in

15   mind when it appeared that both sides were looking for summary

16   judgment against the other?

17           MR. CALLAGY:  Actually, as I recall, there was

18   probably a -- I think there was a simultaneous filing for

19   filing the motion for summary judgment which can be what we do

20   now or we can do it in sequence, as the Court sees fit.

21           THE COURT:  Frankly, I would prefer that you folks

22   put your noodles together and come to a view, preferably a

23   joint view, as to what you think better skins the cat.  And if

24   it's reasonable, I'll approve it.  The one and only thing that

25   is nonnegotiable from my perspective is that I need a

32

1    satisfactory time between the filing of the last brief, which,

2    if you're doing by that simultaneous concept, would presumably

3    be a reply, but which, if you did them by some kind of seriatim

4    arrangement, might be a surreply in the time of oral argument.

5    I think  you also have to assume that on a matter of this

6    nature, you're not likely to get a ruling from the bench which

7    has the advantage, I suppose, that I don't have to do the work

8    that normally has to get done so I can dictate a ruling off the

9    bench at or very shortly after the time of an argument but

10   which has the flipside that you have to wait for me to write on

11   the issue.  I have assumed, subject to revision when I read

12   your stuff, that this will warrant a written decision.  And

13   I've also assumed that whoever loses is going to take me up on

14   it.  I think there's just too much money and too much at stake

15   to have any assumption to the contrary.

16          Further thoughts, Mr. Callagy?

17          MR. CALLAGY:  In terms of -- I'm sorry.  In terms of

18   whether or not there would --

19          THE COURT:  Anything you want to tell me.

20          MR. CALLAGY:  No.  I think we can easily work out a

21   schedule.  I would assume that we would probably do the same

22   kind of a simultaneous filing and then we would work out a

23   briefing schedule and submit it to Your Honor for approval.

24   And obviously, from the standpoint of the hiatus between the

25   last brief and the court hearing obviously is up to Your Honor.

33

1    And as far as the appeal is concerned, Your Honor, I would hope

2    that we would be successful.  I don't know what they will do.

3            THE COURT:  Somehow I don't hear you waiving your

4    right to appeal if you're not.  Mr. Fisher, different view?

5            MR. FISHER:  I agree entirely, Your Honor, except I

6    would say I would hope we would be successful.

7            THE COURT:  Okay.  Then here's what I want you guys

8    to do.  I want you to caucus amongst yourselves, agree upon a

9    way to tee this all up for judicial determination, paper it in

10   a stip or consent order.  It's got to be subject to Court

11   approval but if it's reasonable, I'm not going to give you a

12   hard time on it.  And take it through the submission of the

13   last brief.  And, based on the date of your submission of the

14   last brief, I'll then give you a most likely firm date for oral

15   argument.  Although, am I correct that you guys are all in New

16   York and therefore I don't have people coming in from out of

17   town?

18           MR. CALLAGY:  That's correct, Your Honor.

19           THE COURT:  Any of you otherwise engaged in trials or

20   matters before other judges that are going to have material

21   impact on your availability?

22           MR. FISHER:  Yes and no, Your Honor.  I think --

23   we'll accommodate Your Honor's schedule.  I mean, I don't have

24   anything that's presently scheduled.  But I think there will be

25   things that could come up in terms of trials that I'm

34

1    responsible for which could happen in the next six months.  But

2    I don't know of a matter, Your Honor.

3            THE COURT:  Okay.  Take your stip through the

4    submission of the last brief.  And obviously, I'm not going to

5    schedule the oral argument for a time at which any major player

6    can't be present.

7            All righty.  Anything else?  Any side?  Anybody?

8            MR. FISHER:  Nothing, Your Honor.

9            THE COURT:  Mr. Fisher?

10           MR. FISHER:  No, thank you.

11           THE COURT:  Mr. Callagy?

12           MR. CALLAGY:  No, Your Honor.  Thank you.

13           THE COURT:  All right, folks.  Thank you.  Have a

14   good day.  We're adjourned.

15       (Whereupon these proceedings were concluded at 10:31 a.m.)

16

17

18

19

20

21

22

23

24

25

35

1

2                                    I N D E X

3

4                                  R U L I N G S

5    DESCRIPTION                                      PAGE    LINE

6    Debtors' thirteenth and fourteenth omnibus         9      20

7    objection to claims granted

8    Stipulation approved re debtors' first omnibus    10      12

9    objection to claims

10   Debtors' third request for extension of           19      18

11   exclusivity granted

12   Joint request by creditors' committee and         30       8

13   JPMorgan Chase to file summary judgment

14   papers granted

15

16

17

18

19

20

21

22

23

24

25

36

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  May 28, 2010

17

18

19

20

21

22

23

24

25