**HEARING DATE AND TIME: June 29, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 22, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11 Case No.
                                                            :
MOTORS LIQUIDATION COMPANY, *et al.*,                       :    09-50026 (REG)
        f/k/a General Motors Corp., *et al.*                :
                                                            :
                                    Debtors.                :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION**
**OF DEBTORS PURSUANT TO SECTIONS**
**105, 363, AND 365 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING**
**(I) THE SALE OF WILMINGTON ASSEMBLY PLANT TO FISKER**
**AUTOMOTIVE, INC. FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND**
**ENCUMBRANCES, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
**WITH THE SALE, AND (III) MOTORS LIQUIDATION COMPANY'S ENTRY**
**INTO A SETTLEMENT AGREEMENT IN CONNECTION WITH THE SALE**

PLEASE TAKE NOTICE that upon the annexed Motion, dated June 8, 2010 (the

"**Motion**"), of Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), for an order,

pursuant to sections 105, 363, and 365 of title 11, United States Code (the "**Bankruptcy Code**")

and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")

authorizing (i) the sale of real and personal property, including a motor vehicle assembly plant,

located at 801 Boxwood Road, Wilmington, Delaware free and clear of liens, claims,

encumbrances, and other interests to Fisker Automotive, Inc., (ii) the assumption and assignment

of certain executory contracts and unexpired leases in connection with the sale, and (iii) MLC's

entry into a settlement agreement regarding the responsibility for ongoing environmental

remediation of the real property that is the subject of the sale, all as more fully set forth in the

Motion, a hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy

Judge, in Room 621 of the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, New York 10004, on **June 29, 2010 at 9:45 a.m.**

**(Eastern Time),** or as soon thereafter as counsel may be heard.

        PLEASE TAKE FURTHER NOTICE that any responses or objections to this

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit,

Michigan 48243 (Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C.

20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Lauren Macksoud, Esq., and

Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G.

Adams, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin &

Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding

asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn:

Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100,

Washington, DC 20005 (Attn:  Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi)

Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M.

Trafelet in his capacity as the legal representative for future asbestos personal injury claimants,

2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn:  Sander L. Esserman, Esq. and Robert

T. Brousseau, Esq.); and (xii) Orrick, Herrington & Sutcliffe LLP, attorneys for the Purchaser,

Columbia Center, 1152 15th Street, N.W., Washington, D.C. 20005-1706 (Attn:  Robert F.

Lawrence, Esq. and Richard H. Wyron, Esq.) so as to be received no later than **June 22, 2010, at**

**4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

3

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard offered to

any party.

Dated: New York, New York
       June 8, 2010

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : |  |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
---------------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO**
**SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING**
**(I) THE SALE OF WILMINGTON ASSEMBLY PLANT TO FISKER**
**AUTOMOTIVE, INC. FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND**
**ENCUMBRANCES, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
**WITH THE SALE, AND (III) MOTORS LIQUIDATION COMPANY'S ENTRY**
**INTO A SETTLEMENT AGREEMENT IN CONNECTION WITH THE SALE**

# TABLE OF CONTENTS

**Page**

Relief Requested ................................................................................................ 1

Jurisdiction ...................................................................................................... 2

The Property ...................................................................................................... 2

Environmental Issues and the Settlement Agreement ....................................... 3

The Sale Process ............................................................................................... 4

    Marketing of the Property ............................................................................ 4

    The Contract ................................................................................................. 6

    The Sale Hearing .......................................................................................... 7

    Objections to the Sale Motion ...................................................................... 8

Procedure for Assumption and Assignment  of Executory Contracts and
    Unexpired Leases ......................................................................................... 9

The Sale Approval Order Should Be Entered ................................................... 12

    The Time, Place, and Notice Proposed for the  Sale Hearing is Reasonable
        and Should be Approved ...................................................................... 12

    The Sale of the Property is an Exercise of MLC's Sound Business
        Judgment ............................................................................................ 13

    The Property Should be Sold Free and Clear of Liens, Claims,
        Encumbrances, and other Interests ...................................................... 15

    The Purchaser of the Property Should be Afforded All Protections Under
        Section 363(m) as a Good Faith Purchaser ........................................... 17

    The Court Should Waive the Fourteen-Day Stay Period of Rule 6004(h) .......... 18

The Settlement Agreement Should be Approved ............................................. 18

Notice ............................................................................................................ 21

# EXHIBITS

The Contract ....................................................................................Exhibit A

The Settlement Agreement ..............................................................Exhibit B

The Sale Approval Order ..................................................................Exhibit C

# TABLE OF AUTHORITIES
## FEDERAL CASES

**Page**

*Adelphia Commc'ns Corp. v. The Am. Channel (In re Adelphia Comm'ns Corp.),*
    345 B.R. 69 (Bankr. S.D.N.Y. 2006)..................................................................14, 20

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994).............................................17

*In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) .....................................................13

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d
    1063 (2d Cir. 1983).................................................................................................13

*In re Dow Corning*, 198 B.R. 214 (Bankr. E.D. Mich. 1996) ..........................................20

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) ......................19

*In re Integrated Res., Inc.*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3
    F.3d 49 (2d Cir. 1993)............................................................................................13

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993)...........................................19

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) .............................................19

*Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. Inc. (In re Lyondell Chem.*
    *Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009)........................................................14, 20

*Machinery Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d 447
    (6th Cir. 1963).......................................................................................................20

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*
    *Anderson*, 390 U.S. 414 (1968) ...............................................................................19

*In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993).................................19

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ........................................17

*Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert*
    *Group, Inc.)*, 134 B.R. 499 (Bankr. S.D.N.Y. 1991)..................................................19

## FEDERAL STATUTES

11 U.S.C. § 105(a) ..............................................................................................13, 14, 20

11 U.S.C. § 363(b) ...................................................................................................13, 17

11 U.S.C. § 363(f)..............................................................................................15, 16, 17

11 U.S.C. § 363(m) ...................................................................................................17, 18

## FEDERAL RULES

Fed. R. Bankr. P. 2002(a) ..............................................................................................12

Fed. R. Bankr. P. 2002(c) ..............................................................................................12

Fed. R. Bankr. P. 6004(a) ........................................................................................12, 13

Fed. R. Bankr. P. 6004(c) ..............................................................................................12

Fed. R. Bankr. P. 6004(h) ..............................................................................................18

Fed. R. Bankr. P. 9019......................................................................................................1, 19

## MISCELLANEOUS

9 COLLIER ON BANKRUPTCY ¶ 9019.02 (15th ed. rev.) ....................................................19

10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th ed. rev.) ....................................................18

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), respectfully

represent:

## **Relief Requested**

1.      MLC has entered into a Real Estate Purchase Contract (the "**Contract**")

dated June 8, 2010, annexed hereto as Exhibit "A," by and among MLC and Fisker Automotive,

Inc. (the "**Purchaser**") to sell real and personal property, including a motor vehicle assembly

plant (the "**Assembly Plant**"), located at 801 Boxwood Road, Wilmington, Delaware, as more

fully described in the Contract (the "**Property**"), subject to higher or better offers.[1]

2.      By this Motion, MLC requests entry of a sale order (the "**Sale Approval**

**Order**") pursuant to sections 105(a), 363(b), and 365(b) of chapter 11 of title 11 of the United

States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), substantially in the form annexed hereto as Exhibit "C,"

approving, at the Sale Hearing (as defined below), (i) the sale of the Property free and clear of all

liens, claims, encumbrances, and other interests to the Purchaser (the "**Sale**") or a higher or better

bidder (an "**Alternate Purchaser**"), (ii) the assumption and assignment of certain executory

contracts and unexpired leases in connection with the Sale, and (iii) that certain settlement

agreement (the "**Settlement Agreement**"), annexed hereto as Exhibit "B," by and between the

Delaware Department of Natural Resources and Environmental Control (the "**DNREC**") and

---

[1] Due to the voluminous nature of the exhibits to the Contract, such exhibits are not included on Exhibit
"A". Copies of the exhibits to the Contract will be provided by the Debtors upon request.

MLC regarding the responsibility for ongoing remediation of the real property that is the subject

of the Sale (the "**Real Property**").

<u>**Jurisdiction**</u>

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

<u>**The Property**</u>

4.      The Property consists primarily of the Assembly Plant that was

historically used for the production of motor vehicles.  Among other things, the Assembly Plant

is currently equipped with a number of technical and utility systems such as powerhouse

capability, a conveyor system, a waste water treatment facility, and an emissions abatement

system, in addition to numerous other sophisticated vehicle manufacturing systems.

5.      The Assembly Plant is approximately 3.2 million square feet, and the Real

Property on which it sits is approximately 142 acres.  MLC (then known as General Motors

Corporation) opened the Assembly Plant in 1947, and it remained in operation until the Debtors

shut it down in July 2009, shortly after the Commencement Date.  During its period of operation,

the Assembly Plant produced 8,561,451 motor vehicles.

6.      As this Court is aware, on July 5, 2009, the Court approved the sale of

substantially all of the Debtors' assets to NGMCO, Inc. (n/k/a General Motors, LLC), a

purchaser sponsored by the United States Department of the Treasury (the "**363 Transaction**"),

and on July 10, 2009, the 363 Transaction closed.  The Debtors' primary business purpose at this

stage in their chapter 11 cases is to wind down their businesses, liquidate their assets to ensure

the greatest recovery for creditors, and resolve outstanding liability with respect to

environmental issues affecting certain properties.  In furtherance of these goals, and in light of

2

the fact that the Debtors no longer operate as manufacturers of motor vehicles, the Debtors seek

to sell the Property.

**Environmental Issues and the Settlement Agreement**

7.      Portions of the Real Property may have been impacted environmentally as

a result of MLC's historic operations.  The Contract contemplates that MLC, on the one hand,

and the Purchaser on the other, will enter into separate agreements with the DNREC.  Under the

DNREC's agreement with MLC (as described in detail below), MLC will retain the obligation to

remediate existing environmental conditions at the Real Property.  However, the Sale of the Real

Property pursuant to the Contract will not affect the Purchaser's liability under any

environmental laws for any condition or noncompliance that results from the Purchaser's

operations.  As a condition to the Sale, the Purchaser is responsible for entering into a

Brownfields Development Agreement with the DNREC that provides that the Purchaser will not

be liable for any onsite environmental conditions that pre-exist the Purchaser's ownership of the

Property and that requires that the Purchaser undertake a partial site investigation to establish a

baseline of environmental conditions.

8.      In connection with the environmental issues affecting the Real Property,

by this Motion, MLC seeks authority to enter into the Settlement Agreement, which governs the

future allocation of responsibility for environmental remediation of the Real Property.  Pursuant

to the Settlement Agreement (and in furtherance of the terms of the Contract), MLC has agreed

to transfer, pursuant to and subject to the confirmation of a chapter 11 plan, its retained

obligation for environmental conditions on the Real Property to a new entity, likely in the form

of an environmental response trust, the purpose of which will be to receive certain of MLC's

environmental obligations arising with respect to MLC's owned real property.  In exchange for

such transfer, the DNREC will defer the enforcement of Delaware's Hazardous Substance

3

Cleanup Act, 7 Del. C. Chapter 91 and Regulations Governing Hazardous Substance Cleanup at

the Assembly Plant in respect of environmental contamination on the Real Property and the

transfer of MLC's retained obligation to an environmental response trust will be in full

settlement and satisfaction of all claims (totaling not less than $10,527,999.39) against MLC.

The DNREC requested the Settlement Agreement to ensure that its claim relating to the cost to

remediate environmental conditions at the Real Property will not be negatively impacted as a

result of the Sale.  In accordance with the terms of the Contract, MLC's liability relating to

existing environmental conditions at the Real Property will not be affected by the Sale, and

therefore, MLC has agreed to the Settlement Agreement to avoid an objection by the DNREC to

the Sale.

## The Sale Process

### *Marketing of the Property*

9.      Over the past twelve months, MLC has conducted a robust marketing

effort for the Property.  In particular, MLC has conferred with numerous vehicle manufacturers,

including Tesla Motors, Inc., Toyota Motor Corporation, Volkswagen of America, Inc., Elio

Motors, and Bright Manufacturing, as well as other "green" vehicle manufacturers.  None of

these companies have expressed interest in purchasing the Property.

10.      In addition, MLC has contacted real estate brokers at numerous

commercial real estate brokerage firms, including Jones Lange LaSalle, CB Richard Ellis,

Cushman & Wakefield, NAI Global, Holliday Fenoglio Fowler, L.P., Marcus & Millichap, and

Hart Corporation.  This effort produced a few inquiries from demolition/scrap clients that were

interested in removing the Assembly Plant and reselling the land, but no offer was ever

memorialized.

11.     MLC has also marketed the Property on the Debtors' website (www.motorsliquidation.com), which contains a webpage entitled "Real Estate and Asset Sales" that is dedicated entirely to the Debtors' real estate portfolio.  The webpage can be easily accessed by the public and contains a list and description of real property and related assets that the Debtors are seeking to sell as part of their overall liquidation.  The webpage is visited daily, but has only produced nominal inquiries relating to the Property.

12.     MLC was faced with a particularly challenging task in finding a buyer for the Property.  In fact, during the one-year period that has passed since MLC began marketing the Property, only two parties have expressed serious interest in purchasing the Property, one of which is the Purchaser.[2]  Significantly, the Debtors are marketing three additional assembly plants in the United States and, to date, have received only one serious inquiry with respect to one of those plants.  In addition to the assembly plants marketed by the Debtors, there are three other large assembly plants (each in excess of three million square feet) for sale by different owners in the United States.  These properties have been on the market for an extended period of time without a successful sale, due, in part, to the difficulty in adapting such facilities to other uses and the large costs involved in redevelopment.

13.     In this case, the Purchaser is seeking to purchase the Property for use as a manufacturing and assembly plant for plug-in hybrid electric vehicles.  The Purchaser was able to make an offer for the Property as a result of the fact that it is receiving support from the U.S. Department of Energy (the "**DOE**") to aid with the Sale and its future operations.

---

[2] The second party expressing interest in purchasing the Property discussed a proposal that would have required that several difficult conditions be met.  In any case, that party never submitted a formal offer for the Property.

14.    Following an extensive negotiation period with the Purchaser and the DNREC, among other parties, MLC entered into the Contract with the Purchaser.  The Contract is conditioned on, among other things, approval by the Court, the Debtors' retention of environmental remediation liability in respect of the Real Property, and execution by the Purchaser and the DNREC of a Brownfields Development Agreement.

**_The Contract_**

15.    The principal terms and conditions of the Contract are as follows:[3]

i.    Assets.  The right, title and interest in and to those certain parcels of real property consisting, in the aggregate, of approximately 142 acres of land, located in Christiana Hundred, New Castle County, Delaware, having a street address of 801 Boxwood Road, Wilmington, Delaware, as more particularly described on Exhibit "B" to the Contract, and any and all buildings and improvements thereon and appurtenances thereto and all machinery, equipment, and other personal property located on the Real Property.

ii.    Purchase Price.  $20,000,000.00 (the "**Purchase Price**") to be paid at the Closing.

iii.    Deposit.  $1,000,000, to be deposited in escrow within 5 business days after the Contract is signed.[4]

iv.    Competing Bids.  MLC is permitted to consider higher or better competing bids for the Property prior to the Sale Hearing.  In the event that MLC elects to enter into an agreement for the sale of the Property to a party that submits such a competing bid, MLC may terminate the Contract with no penalty or break-up fee.

v.    Termination of Purchase Agreement.  The Contract may be terminated at any time prior to the Closing Date upon the occurrence of either of the following: (i) by the Purchaser if following the Title Review Period, MLC provides notice that MLC will not cure any defects objected to by the Purchaser within the time permitted, (ii) by either party upon a default of the other

---

[3] This paragraph is intended only as a summary of certain principal terms of the Contract.  To the extent there are any inconsistencies between the summary description of the Contract contained herein and the terms and conditions of the Contract, the terms of the Contract control.  Capitalized terms used in this paragraph, but not defined herein, shall have the meanings ascribed to such terms in the Contract.

[4] The Deposit has already been funded by the Purchaser.

party which is not cured within 7 business days following notice of the default, including a failure to close, or (iii) by either party if the Closing has not occurred within 120 days of submitting this Motion to the Bankruptcy Court.  The non-defaulting party may waive the default and proceed to closing with no reduction in the Purchase Price, may terminate and receive the Deposit, or if the Purchaser, may seek specific performance through the Bankruptcy Court.

vi.    "As Is".  The Sale, other than specific provisions with respect to existing environmental matters, is an "as is, where is" sale, with no representations or warranties of any kind with respect to the Property, and no recourse to the Seller.

vii.    Environmental Conditions.  MLC shall agree to remediate preexisting environmental conditions on the Real Property as of the Closing, the nature and scope of which shall be agreed between MLC and the DNREC; otherwise, all risk and liability for environmental conditions on the Real Property shall become the Purchaser's at closing, subject to any limitations upon that liability that the DNREC may permit in the Brownfields Development Agreement.

viii.    Conditions to Purchaser's Obligation to Close.  The Purchaser's obligation to close is subject to execution by the Purchaser and the DNREC of a Brownfields Development Agreement.

ix.    Transfer Taxes, Closing Costs.  Each party pays its own closing costs, and in addition, the Purchaser pays for the Purchaser's Title Policy, the Survey, recording taxes, sales taxes, and transfer taxes.  MLC and the Purchaser pro rate the current real property taxes and all utilities.

### *The Sale Hearing*

16.    MLC will seek approval of the Sale Motion, the Contract, and the Settlement Agreement at a hearing scheduled on June 29, 2010 at 9:45 a.m. (the "**Sale Hearing**").  The Purchaser has submitted the highest, best, and *only* formal offer received for the Property during the extensive marketing period.  MLC believes that any potential buyers have had ample opportunity over the past twelve months to submit offers and the failure of any other party to do so is indicative that no other offers will be submitted prior to the Sale Hearing.  As such, by this Motion, MLC seeks to schedule the Sale Hearing without a formal bidding process.  However, MLC will publish a notice of the Sale in the *Delaware News Journal* and will accept

competing offers for the Property until the Sale Hearing.  In the event that MLC receives a

higher or better offer than that contemplated by the Contract, MLC intends to schedule an

auction for the Property and, if necessary, adjourn the Sale Hearing.  If MLC does not receive

any higher or better offers for the Property prior to the Sale Hearing, MLC will seek approval of

the Sale to the Purchaser at the Sale Hearing.

### *Objections to the Motion*

17.     The Debtors propose that objections or responses, if any, to the Sale

Motion shall be filed with this Court and served so as to be **received** no later than 4:00 p.m.

(Eastern Time) on June 22, 2010 (the "**Objection Deadline**").  In addition, all objections must be

in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the

Bankruptcy Court for the Southern District of New York, be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and be served in accordance with General Order M-242, and on (i)

Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New

York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky,

Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400,

Detroit, Michigan 48243 (Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance

Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader,

Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World

Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United

States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington,

D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export

Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael

J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP,

attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New

York, New York 10036 (Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Lauren

Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004

(Attn: Diana G. Adams, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street,

Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler,

Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured

creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York

10152-3500 (Attn:  Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle,

N.W., Suite 1100, Washington, DC 20005 (Attn:  Trevor W. Swett III, Esq. and Kevin C.

Maclay, Esq.); (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation,

attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos

personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn:  Sander L.

Esserman, Esq. and Robert T. Brousseau, Esq.); and (xii) Orrick, Herrington & Sutcliffe LLP,

attorneys for the Purchaser, Columbia Center, 1152 15th Street, N.W., Washington, D.C. 20005-

1706 (Attn:  Robert F. Lawrence, Esq. and Richard H. Wyron, Esq.).

        18.    MLC further requests that the failure of any person or entity to timely file

an objection to the Sale Motion shall bar the assertion, at the Sale Hearing or thereafter, of any

objection to the Sale Motion or the consummation of the Sale contemplated by the Contract,

including the transfer of the Property free and clear of any liens, claims, encumbrances, and

interests.

**Procedure for Assumption and Assignment
of Executory Contracts and Unexpired Leases**

19.     In connection with the sale of the Property, MLC will assume and assign

to the Purchaser (or an Alternate Purchaser) certain executory contracts and unexpired leases

(each, a "**Contract**" or "**Lease**" and collectively, the "**Contracts and Leases**") as set forth on

Exhibit "J" to the Contract and pay any related cure amounts under section 365(b)(1)(A) of the

Bankruptcy Code (the "**Cure Amounts**").  MLC does not believe that there are any Cure

Amounts outstanding under any Contract or Lease.  However, counterparties to the Contracts

and Leases have been provided with notice of this Motion and have the opportunity to file an

objection, prior to the Objection Deadline, to (i) the Debtors' ability to assume and assign the

Contracts and Leases, (ii) the proposed Cure Amounts, and/or (iii) the ability of the Purchaser to

provide adequate assurance of future performance of the Contracts and Leases.

20.     MLC will request that any party submitting a higher or better offer for the

Property provide MLC with evidence of adequate assurance of future performance with respect

to the Contracts and Leases it is seeking to purchase (an "**Adequate Assurance Package**").  If

MLC ultimately determines to sell the Property to an Alternate Purchaser, then MLC will file

with the Court and serve on all counterparties to the Contracts and Leases a notice that MLC is

seeking to assume and assign such Contracts and Leases to the Alternate Purchaser.

Counterparties to the Contracts and Leases will have two business days from receipt of the notice

of Alternative Purchaser to request an Adequate Assurance Package in respect of the Alternative

Purchaser and an additional two days from such request to object to the assumption and

assignment of any Contract or Lease solely on the basis of the Alternative Purchaser's failure to

10

evidence adequate assurance of future performance.  With respect to all other objections relating to the assumption and assignment of the Contracts and Leases, the Objection Deadline will continue to apply.

21.    MLC intends to cooperate with the counterparties to the Contracts and Leases to attempt to reconcile any differences in Cure Amounts.  If no objections are timely filed, then the Cure Amounts shall be binding upon the non-Debtor parties to the respective Contracts or Leases for all purposes in these cases and will constitute the final determination of the total Cure Amounts required to be paid by MLC in connection with the assumption of such Contracts and Leases and assignment to the Purchaser or Alternate Purchaser, as applicable.  In addition, each non-debtor party to a Contract or Lease that fails to timely object to the proposed assumption and assignment of a Contract or Lease shall be forever barred from objecting to the assumption and assignment of such Contract or Lease.

22.    If a timely objection to a Cure Amount is filed and such objection cannot otherwise be resolved by the parties, the Court may schedule a hearing, which hearing may be the Sale Hearing, and, if MLC and the Purchaser or Alternate Purchaser, as applicable, elect to close the Sale prior to such hearing, the Cure Amount shall be deposited into escrow pending agreement of the parties or further order of the Court.  If MLC and the Purchaser or Alternative Purchaser, as applicable, elect to close the Sale, the pendency of a dispute relating to Cure Amounts will not prevent or delay the closing, including the assumption and assignment of any Contracts and Leases.

23.    The Contract also provides for a ninety-day period following the closing date of the Sale during which the Purchaser may identify other contracts and/or leases that have not yet been assumed or rejected by MLC that the Purchaser believes to be reasonably necessary

for the operation of the Property.  If the Purchaser identifies any such contracts and/or leases,

MLC has agreed to seek Court authority to assume and assign such contracts and/or leases to the

Purchaser.  Further, the Purchaser has agreed to indemnify MLC for any losses, other than

attorneys' fees and expenses, in connection with MLC's effort to assume and assign such

contracts and/or leases post-closing.

## The Sale Approval Order Should Be Entered

### *The Time, Place, and Notice Proposed for the Sale Hearing is Reasonable and Should be Approved*

24.     Bankruptcy Rule 6004 prescribes the notice that must be given of a

proposed sale of property pursuant to section 363(b) of the Bankruptcy Code.  Pursuant to

Bankruptcy Rule 6004(a), notice must be given of a proposed use, sale, or lease of property, not

in the ordinary course of business, which satisfies the requirements of Bankruptcy Rule

2002(a)(2) and (c)(1), among others.

25.     Bankruptcy Rule 2002(a) requires that "the clerk, or some other person as

the court may direct," give "the debtor, the trustee, all creditors and indenture trustees at least 21

days' notice by mail of: . . . (2) a proposed use, sale, or lease of property of the estate other than

in the ordinary course of business. . . ."  Fed. R. Bankr. P. 2002(a).  Bankruptcy Rule 2002(c)

requires that this notice include "the time and place of any public sale, the terms and conditions

of any private sale and the time fixed for filing objections."  *Id*. at 2002(c).

26.     Bankruptcy Rule 6004(c) requires that a motion pursuant to section 363(f)

of the Bankruptcy Code for authority to sell property free and clear of liens or other interests

"shall be served on the parties who have liens or other interest in the property to be sold."  *Id*. at

6004(c).

27.     As noted, MLC proposes that the Sale Hearing be held on June 29, 2010.
This will provide parties with ample notice of the Sale Hearing.  As set forth above, in the event
that a higher or better offer is submitted for the Property prior to the Sale Hearing and MLC
selects an Alternate Purchaser, MLC will provide notice of such Alternate Purchaser prior to the
Sale Hearing and may adjourn the Sale Hearing, if necessary or appropriate, to ensure that all
parties in interest receive adequate notice of same.

28.     MLC submits that these procedures satisfy the requirements of
Bankruptcy Rule 6004 and should be approved.  MLC submits that no other or further notice
need be given.

**The Sale of the Property Is an**
**Exercise of MLC's Sound Business Judgment**

29.     Bankruptcy Code section 363(b) governs transactions outside the ordinary
course of business involving property of the debtor's estate.  Specifically, that section provides,
in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than
in the ordinary course of business, property of the estate. . . ."  11 U.S.C. § 363(b).

30.     Under applicable case law, a transaction must represent a reasonable
exercise of business judgment on the part of the debtor in possession to be approved under
section 363(b) of the Bankruptcy Code.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir.
1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071
(2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application
expressly find from the evidence presented before him at the hearing a good business reason to
grant such an application."); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y.
1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ("the business judgment rule 'is a presumption
that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action was in the best interests of the company,'"

which has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858,

872 (Del. 1985)).

31.    In addition, the Bankruptcy Code grants bankruptcy courts authority to

"issue any order, process, or judgment that is necessary or appropriate" to ensure that bankruptcy

cases are "handled expeditiously and economically."  11 U.S.C. §§ 105(a), (d)(2);  *see also*

*Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R.

571 (Bankr. S.D.N.Y. 2009); *Adelphia Commc'ns Corp. v. The Am. Channel (In re Adelphia

Comm'ns Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides broad

equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the

[chapter 11] process.").

32.    The proposed sale of the Property is well within MLC's sound business

judgment.  The Contract is the product of an extensive marketing campaign undertaken by MLC

and good faith, arm's-length negotiations with the Purchaser and constitutes the highest, best,

and *only* offer for the Property that MLC's efforts have produced.  The purpose of the Debtors'

continuing operations is to wind down the estates, liquidate their assets to provide the greatest

recovery for creditors and parties in interest, and resolve outstanding environmental liability with

respect to environmental issues affecting certain properties.  MLC is no longer using the

Property and MLC's retention of the Property serves only as a drain on the estate's assets.

Because of the heavy carrying costs associated with the Property, which are in excess of $3

million per year, it is particularly detrimental to the estate to retain the Property.  On the

contrary, conveying the Property to the Purchaser will add value in connection with distributions

to creditors.

33.     As discussed above, MLC engaged in an extensive marketing process for the Property for more than a year and was unable to obtain a single other offer for the Property, even one for much less than the $20 million the Purchaser has agreed to pay.  As such, MLC does not believe that any further marketing or formal bidding procedures will likely yield additional value to the estate.  However, any concern that MLC may be able to sell the Property on better terms than those provided for in the Contract should be allayed by the fact that MLC is permitted to continue to solicit offers and will publish notice of the Sale in the *Delaware News Journal*.  Under the Contract, should MLC receive a competing higher or better offer prior to the Sale Hearing, MLC has the right to have an auction and ultimately sell the Property to an Alternate Purchaser with no penalty or break-up fee required to be paid by MLC.

34.     If the Sale is not consummated and MLC is unable to find an Alternative Purchaser, MLC's only alternative will be to demolish the Assembly Plant and attempt to sell the Real Property as a redevelopment site.  MLC believes that the cost associated with this course of action would be extensive and any proceeds received from such a sale would lead to a much lower value to the Debtors' estates than the Sale to the Purchaser.  As such, consummating the Sale is MLC's best option in disposing of the Property and, therefore, is an exercise of MLC's sound business judgment.

35.     For the reasons set forth above, MLC's sale of the Property pursuant to the Contract is within MLC's sound business judgment and warrants approval by the Court.

***The Property Should be Sold Free and Clear***
***of Liens, Claims, Encumbrances, and Other Interests***

36.     The Contract requires that the Property be transferred free and clear of all liens, claims, and encumbrances.  MLC seeks authority to sell the Property "free and clear"

pursuant to section 363(f) of the Bankruptcy Code, with any liens, claims, encumbrances, and

interests to attach to the proceeds of the Sale.  Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if – applicable nonbankruptcy law
> permits sale of

> (1)    such property free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property is to be
>        sold is greater than the aggregate value of all liens on such
>        property;

> (4)    such interest is in bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable proceeding,
>        to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.    The consent of the lenders (the "**DIP Lenders**") under that certain

Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated as

of July 10, 2009, among Motors Liquidation Company (f/k/a General Motors Corporation), as

Borrower, the Guarantors party thereto, and the Lenders party thereto from time to time is not

required to sell assets of the Debtors' estates.  Accordingly, the DIP Lenders are deemed to have

consented to the sale of their collateral and the Purchaser will take title to the Property free and

clear of the DIP Lenders' liens, claims, encumbrances, and other interests, pursuant to section

363(f)(2), with the DIP Lenders' liens attaching to the proceeds of the sale pursuant to section

363(e).

38.    MLC is not aware of any other liens on the Property.  However, to the

extent there are other liens on the Property, the Property can be sold free and clear of such liens

pursuant to section 363(f)(2) of the Bankruptcy Code.  In addition, because any holder of a lien,

claim, encumbrance or interest in the Property could be compelled to accept money in

satisfaction of that interest, the Court may authorize the sale "free and clear" pursuant to section

363(f)(5) of the Bankruptcy Code.  In any case, all parties will be adequately protected by the

fact that any liens, claims, and encumbrances will attach to the proceeds of the Sale with the

same priority, validity, and effect as they had on the Property prior to the Sale.

39.    Accordingly, MLC requests that the Court authorize the Sale free and

clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the

Bankruptcy Code and, furthermore, bar, prohibit, and permanently enjoin all persons holding any

lien, claim, encumbrance, or other interest in the Property from asserting such lien, claim,

encumbrance, or other interest against the Purchaser, its successors or assigns, or their property.

***The Purchaser of the Property Should Be Afforded***
***All Protections Under Section 363(m) as a Good Faith Purchaser***

40.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from the debtor notwithstanding that the order approving the sale

conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section

363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] … does not affect the validity of a sale … to an
> entity that purchased … such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("Section 363(m) … provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of

the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990)

17

("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale

on appeal unless there is a stay pending appeal").

       41.    As set forth above, the Contract is the result of a comprehensive marketing

process and arm's-length, good faith negotiations.  The Purchaser was selected by MLC after

MLC's analysis of its bid, extensive negotiations, and MLC's determination that the Contract

was a favorable offer for the Property.

       42.    The Purchaser is not an "insider" of MLC, as that term is defined in

section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling

stockholders exists between the Purchaser and MLC.

       43.    Accordingly, MLC requests that the Court make a finding that the

Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the

Bankruptcy Code and that the Purchaser has not engaged in any conduct, by any action or

inaction, that constitutes a violation of, or would cause or permit the Sale to be avoided under

section 363(n) of the Bankruptcy Code.

       44.    To the extent that MLC decides to pursue a transaction with an Alternate

Purchaser, MLC will seek a finding from the Court at the Sale Hearing that the Alternate

Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the

Bankruptcy Code.

***The Court Should Waive***
***The Fourteen-Day Stay Period of Bankruptcy Rule 6004(h)***

       45.    Pursuant to Bankruptcy Rule 6004(h), an order authorizing the sale of

property other than cash collateral is automatically stayed for fourteen days after entry of the

order.  Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide

sufficient time for an objecting party to appeal before the order is implemented.  *See* Fed. R. Bankr. P. 6004(h), advisory committee's note.

46.      Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators suggest that the stay period be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th ed. rev.).

47.      Because no party will be prejudiced by waiver of the stay period, MLC respectfully requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h).

## The Settlement Agreement Should Be Approved

48.      Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id; see also* 9 COLLIER ON BANKRUPTCY ¶ 9019.02 (15th ed. rev).  The settlement need not result in the best possible outcome for the debtor but must not "fall below the lowest point in the range of reasonableness."  *In re Drexel Burnham Lambert Group*, 134 B.R. at 505.

49.      Relying on the guiding language of *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968), courts in this Circuit have set forth the following factors regarding the reasonableness of such settlements:

(1)      the probability of success in the litigation;

(2)      the difficulties associated with collection;

19

(3)    the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(4)    the paramount interests of the creditors.

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). The decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court. *Machinery Terminals, Inc. v. Woodward* (*In re Albert-Harris, Inc.*), 313 F.2d 447, 449 (6th Cir. 1963). It is the responsibility of the court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness." *In re Dow Corning*, 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996). For the reasons set forth below, the Debtors respectfully submit that the Settlement Agreement meets this standard.

      50.    Further, as stated above, the Bankruptcy Code grants bankruptcy courts authority to "issue any order, process, or judgment that is necessary or appropriate" to ensure that bankruptcy cases are "handled expeditiously and economically." 11 U.S.C. §§ 105(a), (d)(2). *See also Adelphia Commc'ns Corp. v. The Am. Channel (In re Adelphia Comm'ns Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the [chapter 11] process."); *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009).

      51.    The Settlement Agreement falls within the range of reasonableness, as it is it fair and equitable and in the paramount interest of MLC and its creditors. The Settlement Agreement provides that MLC, pursuant to a chapter 11 plan, will transfer certain environmental obligations related to the Real Property into a new entity, the purpose of which will be to

remediate environmental conditions at real property owned by MLC.  The DNREC will defer the

enforcement of Delaware's Hazardous Substance Cleanup Act, 7 Del. C. Chapter 91 and

Regulations Governing Hazardous Substance Cleanup at the Plant in respect of environmental

contamination on the Real Property and the transfer will be in settlement and full satisfaction of

all claims (totaling not less than $10,527,999.39) against MLC.

        52.      The Settlement Agreement is in the paramount interest of MLC and its

creditors as it is necessary to obtain the DNREC's approval of the sale of the Real Property.  The

DNCREC expressed concern that, if the sale of the Real Property occurs prior to the transfer of

MLC's retained obligation for environmental conditions at the Real Property to the new entity,

the DNREC's existing claim relating to the cost to remediate environmental conditions at the

Real Property will be negatively impacted.  As a result, the DNREC demanded the Settlement

Agreement as a condition to its consent to the Sale.  MLC believes that the Settlement

Agreement merely documents what would happen to its obligations with respect to the Real

Property regardless of whether the Sale occurred.  MLC intends, pursuant to a plan, to transfer

all environmental liabilities with respect to its owned real property to a trust which will handle

the obligation to perform appropriate remediation.  As such, MLC is not prejudiced by the

Settlement Agreement and believes it is in MLC's best interests to cooperate with the DNREC

with respect to both the Sale and MLC's remaining environmental obligations relating to the

Real Property.

        53.      Accordingly, MLC believes that the Settlement Agreement falls well

within the range of reasonableness, is in the best interests of its estate and creditors, and should

be approved as an exercise of MLC's sound business judgment.

## **Notice**

54.     Notice of this Motion has been provided to (i) all entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in or on the Property, (ii) all parties who expressed interest in purchasing the Property within the last six (6) months, (iii) the state Attorney General for the state in which the Real Property to be sold is located, (iv) the treasurer or other appropriate representative of the local taxing jurisdiction or governmental unit in which the Property to be sold is located, (v) the counterparties (or such counterparty's counsel) to all executory contracts or unexpired leases related to the Property that the Debtors are seeking to assume and assign to the Purchaser of the assets, or reject, and (vi) parties in interest entitled to receive notice under the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010 [Docket No. 5670].

55.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  New York, New York
         June 8, 2010

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**The Contract**

EXECUTION VERSION

# REAL ESTATE PURCHASE CONTRACT

This Real Estate Purchase Contract (the "**Contract**") is entered into as of the 8th day of June, 2010 (the "**Execution Date**"), by and between Motors Liquidation Company, a Delaware corporation ("**Seller**"), and Fisker Automotive, Inc., a Delaware corporation ("**Purchaser**").

## RECITALS:

A.      On June 1, 2009, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). Seller's chapter 11 case is being jointly administered with the chapter 11 cases of certain of its affiliates under Case No. 09-50026 (REG) (the "**Case**"). Seller is authorized to operate its business and manage its properties as a debtor in possession in accordance with the Bankruptcy Code.

B.      Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, the Property pursuant to Sections 363 and 365 of the Bankruptcy Code on the terms and subject to the conditions set forth herein.

C.      Both Seller and Purchaser acknowledge that this Contract is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids as provided in Section 36 of this Contract.

D.      Purchaser acknowledges that it is the intention of Seller to enter into separate agreements with DNREC (as defined below) to settle claims DNREC has asserted against Seller in the Case and provide for the remediation of pre-existing environmental conditions, and that such settlement may result in the assignment of this Contract to and assumption of this Contract by a successor entity to Seller in connection with the settlement of claims filed by other state agencies, and that the funding for performance of Seller's obligations under this Contract and/or other agreements with DNREC may be provided through such successor.

In consideration of the representations and covenants set forth herein, Purchaser and Seller hereby agree as follows:

1.      **Purchase and Sale**. Seller agrees to sell to Purchaser, and Purchaser agrees to buy from Seller, in accordance with the terms, conditions and stipulations set forth in this Contract and pursuant to the final and non-appealable order approving the sale, in the form attached hereto as Exhibit A or with such changes as are approved by Seller and Purchaser in their reasonable discretion (the "**Sale Approval Order**"), all of Seller's right, title and interest in and to (i) those certain parcels of real property consisting, in the aggregate, of approximately 142 acres of land, located in Christiana Hundred, New Castle County, Delaware, having a street address of 801 Boxwood Road, Wilmington, Delaware, as more particularly described on Exhibit B (the "**Land**"), and any and all buildings and improvements thereon (the "**Improvements**") and appurtenances thereto (collectively, the "**Real Property**"), (ii) the fixtures, equipment and machinery located at the Real Property as of the Execution Date and

owned by Seller and excluding all environmental remediation equipment and systems (collectively, the "**Personal Property**"), (iii) all mechanical and electrical systems and related equipment attached to the Improvements or constituting fixtures on the Real Property on the Execution Date, including, but not limited to, wiring, electrical systems, plumbing systems, heating systems, air conditioning systems, security, alarm and/or entry systems, (iv) all plans and specifications; engineering plans and studies; floor plans and landscape plans pertaining to the Real Property in Seller's possession, if any, (v) all mineral, oil and gas rights, water rights, sewer rights, stormwater and waste treatment facilities and other utility rights associated with the Real Property, if any, (vi) all appurtenances, easements, leases, licenses, privileges and other property interests belonging or appurtenant to the Real Property, (vii) all rights of Seller under governmental permits, authorizations, or approvals relating to the Property or Improvements, to the extent assignable (the "**Permits**"), and (viii) all right, title and interest of Seller in and to any roads, rail spurs, rail tracks, streets and ways, public and private, serving the Real Property, if any (including, without limitation, all rights to develop the Land granted by governmental entities having jurisdiction over said Land) (all of the foregoing items in (i)-(viii) above, collectively, the "**Property**"). With respect to Permits that are not transferable without the consent of a third party, including any governmental authority, the obligation to transfer hereunder shall include the obligation to execute documentation and take such other actions are as reasonably required to secure the transfer to Purchaser of such Permits.

2.    **Payment of Purchase Price**. The total purchase price (the "**Purchase Price**") to be paid to Seller by Purchaser for the Property is $20,000,000 (twenty million dollars) in connection with the transfer of title to Purchaser upon satisfaction of all conditions herein (the "**Closing**"). Within five (5) business days after execution of this Contract by both parties, Purchaser shall pay to the Title Company (defined below) to be held in escrow an amount equal to five percent (5%) of the Purchase Price by certified check or wire transfer of immediately available funds (the "**Deposit**"). All interest earned on the Deposit shall be deemed a part of the Deposit. The Deposit shall be nonrefundable, except as expressly set forth herein. At the Closing, the Deposit shall be applied toward the Purchase Price. At the Closing, Purchaser shall remit the remainder of the Purchase Price, plus or minus prorations and other adjustments expressly set forth herein, by wire transfer of immediately available funds to the Title Company for the account of Seller. Seller and Purchaser shall enter into an escrow agreement with Title Company in the form attached hereto as <u>Exhibit C</u> and shall be in conformance with the terms and conditions of this Contract, and which shall govern the holding and disbursement of the Deposit and Purchase Price by the Title Company, and which shall contain terms and conditions standard in the real estate industry for the performance of escrow obligations in a real estate closing of the nature contemplated hereunder.

3.    **Title**.

A.    Purchaser has retained the First American Title Insurance Company (the "**Title Company**") to deliver a title insurance commitment (the "**Title Binder**"), and a land survey of the Real Property (the "**Survey**"). Purchaser shall have fourteen (14) days after the Execution Date to review title and Survey matters (the "**Title Review Period**"). Purchaser shall provide copies of the Title Binder (with exception documents), as updated by Purchaser from

time to time, and the Survey, to Seller within three (3) days of Purchaser's receipt thereof. Purchaser shall make all objections ("**Title Objections**") to matters shown on the Title Binder and Survey that would adversely affect Purchaser's intended use of the Real Property or prevent the delivery of title in compliance with Section 3.C hereof within the Title Review Period to Seller in writing. Seller shall provide responses to the Title Objections in writing within five (5) business days after receipt, identifying any Title Objections that Seller declines to cure or remove (the "**Declined Objections**"). Within five (5) days of receipt of such notice, Purchaser may terminate this Contract by written notice to Seller and may receive repayment of the Deposit. If Purchaser does not terminate this Contract at such time, then the Declined Objections shall be included among Permitted Exceptions (defined below). If Seller fails to cure or remove the remaining Title Objections (either though the payment of money or purchase of an endorsement) on or before the Closing, Purchaser may elect, in its sole discretion, to terminate this Contract and receive repayment of the Deposit or to proceed to Closing. If Purchaser proceeds to Closing, Seller, Purchaser and Title Company shall agree on a portion of the Deposit, up to $250,000 in the aggregate, which shall be sufficient to remove or cure Title Objections that Seller is obligated to remove or cure under this Section 3.A and which have not been so removed or cured by Seller before the Closing, and Title Company agrees to hold such sum in escrow pending the removal or cure thereof by Title Company. All funds held in such escrow that are not used to effect such removal or cure by the Title Company shall be released to Seller upon the earlier of (i) removal or cure thereof, or (ii) upon lapse of the statute of limitations applicable thereto and the consequent lapse of the ability to bring a claim based on such Title Objection. Purchaser has the right to object to any new matter disclosed in an updated Title Binder after expiration of the Review Period. Any matters as to which Purchaser does not timely provide a Title Objection and all Declined Objections shall be deemed waived and will be "**Permitted Exceptions**."

        B.    Seller shall in any event be obligated to cure and cause to be removed from record any of the following matters: (i) mortgage or deed of trust liens against the Real Property; (ii) recorded agreements and other items that have been placed against the Real Property by Seller or its agents, contractors or employees after the date of this Contract and that are not otherwise permitted pursuant to the provisions hereof; (iii) mechanics' liens against the Real Property; (iv) delinquent liens for real estate taxes and assessments, and (v) judgment liens against Seller, which are recorded against the Real Property (collectively, (i) – (v) above are the "**Removed Exceptions**"). Notwithstanding anything to the contrary contained herein, in no event shall any of the Removed Exceptions be deemed to be included within the definition of Permitted Exceptions.

        C.    At Closing, Purchaser shall obtain a title insurance policy (the "**Title Policy**") from Title Company. The Title Policy shall be an ALTA Extended Coverage 2006 Owner's Policy of Title Insurance in the amount of the Purchase Price, insuring fee simple title to the Land and the Improvements in Purchaser's name, subject only to the Permitted Exceptions. The Title Policy shall provide full coverage against mechanics' and materialmen's liens arising out of the construction, repair or alteration of any of the Improvements including any tenant improvements therein and shall contain such special endorsements as Purchaser may reasonably require (the "**Endorsements**").

4.     **Condition of Property**.

A.     The Property is being sold in "AS IS" condition without any representations and warranties of Seller (other than the limited representations and warranties expressly set forth herein) whatsoever.  Seller shall deliver the Property at Closing in materially the same condition as existed on the Execution Date, ordinary wear and tear excepted.

B.     Except as otherwise expressly provided in this Contract, Purchaser hereby releases Seller from and waives all claims, demands, actions, and causes of action against Seller and its estate for damages, losses, expenses or injuries arising out of the condition of the Property.

5.     **Defects in Title**.  At Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser all of the Property, free and clear of encumbrances (other than Permitted Exceptions), claims and other interests in the Property.  Seller shall convey title to the Property by special warranty deed and pursuant to the Sale Approval Order.  The Title Policy issued in accordance herewith shall be a condition to Purchaser's obligation to Close (provided that the inability or unwillingness of the Title Company to issue any requested Endorsement shall not be deemed a failure to issue the Title Policy hereunder except to the extent Title Company's refusal relates to an endorsement Seller agreed to pay for in order to delete the Removed Exceptions).  From and after the date hereof and during the term of this Contract, Seller shall not further or otherwise encumber or restrict the title to any of the Property, permit any liens, mortgages, deeds of trust, easements or other encumbrances to be placed against the Property or any part thereof without Purchaser's consent.  If Seller does not deliver title as required under this Section 5, Purchaser may, in its sole discretion, proceed with the Closing and waive defects in title, or may terminate this Contract and receive repayment of the Deposit.

6.     **Closing**.  The Closing shall occur five (5) business days after the date on which the Seller is authorized to consummate the transaction pursuant to the Sale Approval Order.  The Closing shall take place at the offices of Young, Conaway, Stargatt & Taylor, LLP, located at 1000 West Street, Suite 1700, Wilmington, DE 19801, or at another location mutually acceptable to the parties.

7.     **Prorations and Adjustments at Closing.**  Real estate, ad valorem and similar taxes assessed against the Property shall be prorated between Seller and Purchaser at the time of Closing on the basis of a 365 day year, with the Purchaser liable for the portion of such taxes assessed against the Property from and after the day of Closing.  Any then due but unpaid special assessments, special improvement district or taxing district levies, shall be prorated in the same manner as ad valorem taxes.  All delinquent real estate taxes and assessments, interest, penalties or any combination thereof shall be paid by Seller at or before Closing.  Seller shall be responsible for the cost of all sewer, water, and utilities used prior to the Closing Date.  Seller shall pay prior to Closing all amounts that are Seller's responsibility under this Section 7 or deposit funds with the Title Company for such purposes.  If Seller has not paid or provided for payment in such manner, Title Company shall deduct amounts from the Purchase Price sufficient to pay Seller's obligations under this Section 7.  The foregoing obligations shall survive the Closing, except to the extent amounts have been deducted from the Purchase Price.

**8.**     **Transaction Costs**.  Seller shall be responsible for the cost of preparing the deed and other Closing Documents.  At Closing, Purchaser shall pay for the cost of the Title Binder, the Survey, the Title Policy (except for the cost of procuring any endorsements required to remove any of the Removed Exceptions, to the extent Seller has agreed in writing to pay for any such endorsements), the state and local recording taxes, sales taxes, recording fees, and transfer taxes, if any, required to be paid.  Each party shall pay its own attorneys', brokers' and consultants' fees.  All transfer taxes associated with the recordation of the special warranty deed, if any, including, without limitation, transfer and recordation taxes and documentary stamps, shall be paid by Purchaser at Closing or, if assessed at any time thereafter, shall be paid promptly by Purchaser following such assessment.  Purchaser and Seller agree to provide each other reasonable assistance in the preparation and filing of any and all required transfer tax returns for or with respect to such transfer taxes with any and all appropriate taxing authorities.  The obligations of the parties under this Section 8 shall survive the Closing.

**9.**     **Special Warranty Deed and Other Documents Required for Closing**.

A.     At the Closing, Seller shall deliver the following (the "**Closing Documents**"):

(i)     A special warranty deed, conveying fee simple title to the Property, in the form annexed hereto as Exhibit D;

(ii)     A duly executed bill of sale conveying the Personal Property, in the form annexed hereto as Exhibit E;

(iii)     Such documents evidencing the legal status, good standing and authority of Seller that may be required by the Title Company for issuance of the Title Policy;

(iv)     An affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and 1984 Tax Reform Act, in the form annexed hereto as Exhibit F;

(v)     A duly executed access agreement permitting Seller access to the Property after the Closing to fulfill its obligations under Section 15 of this Contract, in the form annexed hereto as Exhibit G (the "**Access Agreement**");

(vi)     Intentionally omitted;

(vii)     An owner's affidavit to Title Company sufficient to support the issuance of the Title Policy;

(viii)     Executed releases of the mortgages on the Real Property and the Personal Property that are held by the United States Treasury Department and Export Development Canada;

(ix)     A certified copy of the Sale Approval Order;

(x)     A closing statement; and

(xi)     Such other documents as may be reasonably required to complete the transaction as set forth in this Contract.

B.     At the Closing, Purchaser shall deliver the following:

(i)     The Purchase Price, less any portion of the Deposit that is applied, and plus or minus prorations and other adjustments expressly set forth herein, in cash or immediately available funds;

(ii)     The Access Agreement;

(iii)     Intentionally omitted;

(iv)     Such documents evidencing the legal status, good standing and authority of Purchaser that may be required by the Title Company for issuance of the Title Policy;

(v)     A closing statement; and

(vi)     Such other documents as may be reasonably required to complete the transaction as set forth in this Contract.

C.     Purchaser's obligation to Close is subject to execution by Purchaser and the Delaware Department of Natural Resources and Environmental Control ("**DNREC**") of a Brownfields Development Agreement ("**BDA**") regarding the GM Wilmington Assembly Plant pursuant to the Hazardous Substance Cleanup Act, 7 Del. C. Chapter 91, addressing Purchaser's liability for existing contamination of the Real Property and governing Purchaser's performance of environmental investigation of contamination on portions of the Real Property, and the lapse of the statutory twenty (20) day comment period without the receipt of comments requiring material modification of the BDA.

D.     If the Closing has not occurred on or before the one hundred twentieth (120th) day after the Sale Motion (defined in Section 37) has been submitted to the Bankruptcy Court, either party may terminate this Contract, and the Deposit shall be refunded to the Purchaser.

E.     Seller and Purchaser shall each execute and deposit Closing statements, such transfer tax returns, and such other instruments as are reasonably required by the Title Company or otherwise required to close and disburse the escrow and consummate the acquisition of the Property in accordance with the terms hereof.  The Title Company shall prepare the Closing statements using the standard form in the State of Delaware.  Seller and Purchaser hereby designate Title Company as the "Reporting Person" for the transaction pursuant to Section 6045(e) of the Internal Revenue Code and the regulations promulgated thereunder and agree to execute such documentation as is reasonably necessary to effectuate such designation.

**10.** **Possession**. Possession of the Property shall be delivered to Purchaser by Seller on the day of Closing.

**11.** **Representations and Warranties**.

A.    Seller represents and warrants the following to Purchaser as of the Closing:

(i)    Subject to <u>Sections 35 and 36</u> herein: (a) Seller has the full right, power and authority to sell and convey the Property to Purchaser as provided in this Contract and to carry out Seller's obligations hereunder; (b) all requisite corporate or other actions necessary to authorize Seller to enter into this Contract and to perform its obligations thereunder have been taken; and (c) the execution, delivery and performance by Seller of this Contract will not conflict with or cause a default under any other governmental approval, applicable law, or any agreement.

(ii)    Subject to <u>Sections 35 and 36</u> herein, the person executing this Contract on behalf of Seller is duly empowered to do so and thus authorized to bind Seller to perform in compliance with the Contract.

B.    Purchaser represents and warrants to Seller, as a material condition to Seller's obligations pursuant to the Contract, the following as of the date hereof and as of the date of Closing:

(i)    Purchaser has the full right, power and authority to purchase the Property as provided in this Contract and to carry out Purchaser's obligations hereunder.  If Purchaser is corporation, partnership, trust or limited liability company, all requisite corporate or other actions necessary to authorize Purchaser to enter into this Contract and to perform its obligations thereunder have been taken.  The execution, delivery and performance by Purchaser of this Contract will not conflict with or cause a default under any other agreement.

(ii)    If Purchaser is corporation, partnership, trust or limited liability company, Purchaser is duly organized, validly existing and in good standing in the state of its incorporation, formation or organization, as applicable, and is, or will be at Closing, qualified to do business in the State of Delaware.

(iii)    The person executing this Contract on behalf of Purchaser is duly empowered to do so and thus authorized to bind Purchaser to perform in compliance with this Contract.

Notwithstanding the foregoing or any other provision of this Contract, in the event that Seller or Purchaser has actual knowledge of such facts or disclosure of circumstances that are at variance with any of the other party's representations or warranties, and if Purchaser and Seller thereafter consummate Closing, Purchaser and Seller shall be deemed to have accepted such variant facts and circumstances and the applicable party's representations and warranties shall be deemed excised or modified to comport with such variant facts and circumstances.

**12.    Default**.  If Seller is in default hereunder for failure to comply with any one or more of the material terms or conditions of this Contract and such failure continues for more than seven (7) business days after receipt of written notice, Purchaser at its sole option may: (i) terminate this Contract by written notice delivered to Seller on or before the Closing, in which event Purchaser shall be entitled to full return of the Deposit, (ii) waive such defaults and proceed to Closing, or (iii) specifically enforce this Contract in the Bankruptcy Court.   If Purchaser is in default hereunder for failure to comply with any one or more of the material terms or conditions of this Contract and such failure continues for more than seven (7) business days after receipt of written notice, then Seller at its sole option may: (i) terminate this Contract and retain the Deposit as full liquidated damages, or (ii) waive such defaults and proceed to Closing.  Seller and Purchaser agree that upon a default by Purchaser the damages that would be sustained by Seller will be uncertain and not readily ascertainable, but agree that the amount of the Deposit is a reasonable estimate of such damage.

**13.    No Representations**.

A.    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE AND DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER (OTHER THAN AS EXPRESSLY SET FORTH IN THIS CONTRACT OR PROMISES, COVENANTS AND AGREEMENTS CONTAINED IN THE CLOSING DOCUMENTS OTHER THAN THE DEED), WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES THAT PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES; OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION, OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS, OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.   ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY, OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT, OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.

B.    SUBJECT TO THE TERMS AND CONDITIONS OF THIS CONTRACT, THE PROVISIONS OF THIS SECTION 13 SHALL SURVIVE CLOSING OR ANY TERMINATION HEREOF.

14. **Risk of Loss.**

A.    If, prior to the Closing, action is initiated to take any of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Contract, or (b) consummate the Closing, in which latter event all of Seller's assignable right, title and interest in and to the award of the condemning authority shall be assigned to Purchaser at the Closing and there shall be no reduction in the Purchase Price.

B.    Seller self-insures the property for damage and destruction. Seller retains all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If the Property, or any part thereof, suffers any damage prior to the Closing from fire or other casualty, Seller shall notify Purchaser thereof in writing identifying the damage and advising whether Seller, at its sole option, will or will not repair such damage prior to Closing. In the event Seller elects to repair such damage, Seller shall cause such repair to be done prior to Closing and the sale contemplated hereunder shall proceed. If Seller elects not to repair such damage, Purchaser may elect to (i) consummate the Closing with no reduction in the Purchase Price, and the sale contemplated hereunder shall proceed, or (ii) terminate this Contract without penalty, in which event, the Purchaser shall be deemed to have waived all claims, damages, actions and causes of action of whatever kind and nature (including any claims for attorney's fees), whether known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated or otherwise, arising from, related to, or concerning the Contract; provided, however, that the Purchaser does not waive its right to recover its Deposit.

15. **Environmental**.

A.    Purchaser covenants and agrees that neither Purchaser, nor any subsidiary, affiliate or agent of Purchaser, shall conduct any sampling and analysis or monitoring (provided that monitoring for this purpose shall not include monitoring of contamination after it has been discovered) of soil, sediment, surface water or groundwater ("**Sampling**") after the Closing, and until the creation of the Environmental Trust (as defined in Section 16) except to the extent such Sampling is: (i) required by Environmental Laws, (ii) required by an enforceable order, directive or demand of a governmental authority, (iii) reasonably necessary to defend against or otherwise respond to a third-party claim, or (iv) required under the BDA. Sampling required under the BDA shall be conducted pursuant to the BDA to establish a baseline of pre-existing conditions at the Property (the "**Baseline Investigation**"), and no report shall be prepared nor any data obtained as a result of any Sampling done in connection with the Baseline Investigation or provided to DNREC until the creation of the Environmental Trust or the one (1) year anniversary of the Closing, whichever occurs first. Purchaser shall (i) provide Seller with a document indicating the locations of any Sampling activities planned in connection with the Baseline Investigation sixty (60) days prior to any planned Sampling and afford Seller with the opportunity to comment on such Sampling activities and (ii) notify Seller of, and afford Seller the opportunity to participate in, meetings between Purchaser and DNREC regarding the Baseline Investigation.

B.     Purchaser and Seller acknowledge that Seller is attempting to resolve certain of its liabilities under Environmental Laws with DNREC and other governmental authorities through a multilateral settlement agreement to be filed in the Case and subject to Bankruptcy Court approval ("**Global Settlement Agreement**"). Seller's obligation under Environmental Laws with respect to the Property shall be limited to its performance of any Remedial Action required under the Global Settlement Agreement.  Purchaser shall grant to Seller the access to the Real Property provided in the Access Agreement to allow Seller (and its successors, if any) to comply with obligations it may have to DNREC under the Global Settlement Agreement.  Seller shall (i) except as may otherwise be required by DNREC, conduct any Remedial Action at the Real Property without unreasonably interfering with the Purchaser's operations thereon or creating an unreasonable risk to property or persons at the Real Property and (ii) control any and all communication regarding the Remedial Actions with governmental authorities having jurisdiction over the Remedial Actions; provided that Seller shall provide Purchaser with periodic reports on the progress and resolution of the Remedial Actions and provide documentation to that effect.  Purchaser shall cooperate with Seller in undertaking such Remedial Action and Purchaser shall use commercially reasonable efforts to assist Seller in obtaining no further action determinations or similar determinations from the applicable governmental authority indicating that no additional Remedial Action is required.  Following the creation of the Environmental Trust, Seller shall (i) afford Purchaser the opportunity to comment on the planning and execution of any Remedial Actions and (ii) notify Purchaser of, and afford Purchaser the opportunity to participate in, meetings between Seller and DNREC regarding any Remedial Actions.

C.     **PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT AS OF THE CLOSING, PURCHASER SHALL WAIVE, RELEASE AND FOREVER DISCHARGE ANY CLAIMS, DEMANDS, SUITS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS EMPLOYEES, AGENTS, REPRESENTATIVES, CONSULTANTS, CONTRACTORS, COUNSEL, SUBSIDIARIES, AFFILIATES, OR OTHER ENTITIES CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY: (I) THIS CONTRACT AND THE SALE BY SELLER OF THE PROPERTY; (II) THE PROPERTY, EITHER APPARENT OR LATENT DEFECTS AND CONDITIONS THEREOF, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT CONSISTENT WITH THE INVESTIGATIONS PREVIOUSLY CONDUCTED AT OR ABOUT THE PROPERTY; (III) COMPLIANCE OR NONCOMPLIANCE WITH ANY LAND USE CONTROLS OR ANY APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, BUILDING, ZONING, LAND USE OR ENVIRONMENTAL PROTECTION LAWS, RULES, REGULATIONS OR REQUIREMENTS, (IV) ANY AND ALL CLAIMS, LOSSES, DAMAGES, ACTIONS OR CAUSES OF ACTION IN ANY WAY RELATING TO, OR IN CONNECTION WITH THE PROPERTY WHICH HAVE ARISEN PRIOR TO THE DATE HEREOF; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 15(C) SHALL WAIVE, LIMIT OR OTHERWISE AFFECT THE RIGHTS OR OBLIGATIONS OF SELLER AND PURCHASER REGARDING THOSE LIABILITIES OR OBLIGATIONS WHICH ARE EXPRESSLY PROVIDED TO**

SURVIVE THE CLOSING. SELLER SHALL WAIVE, RELEASE AND FOREVER DISCHARGE ANY CLAIMS, DEMANDS, SUITS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST PURCHASER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONSULTANTS, CONTRACTORS, COUNSEL, SUBSIDIARIES, AFFILIATES, OR OTHER ENTITIES CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH CONTAMINATION THAT EXISTS AT, ON OR UNDER THE REAL PROPERTY AS OF THE CLOSING; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 15(C) SHALL IMPACT SELLER'S OR PURCHASER'S RIGHT TO ENFORCE THE PROVISIONS OF THIS CONTRACT. PURCHASER HEREBY AGREES TO INDEMNIFY SELLER FOR ANY LOSSES, CLAIMS OR DAMAGES INCURRED BY SELLER TO THE EXTENT RESULTING FROM (I) INJURIES THAT ARE SUFFERED BY SELLER'S PERSONNEL OR ITS AGENTS WHILE SELLER IS PERFORMING ITS OBLIGATIONS AT THE SITE AFTER CLOSING AND THAT ARE CAUSED BY PURCHASER'S NEGLIGENT OR WILLFUL MISCONDUCT, OR (II) ENVIRONMENTAL CONDITIONS ON THE REAL PROPERTY CAUSED EXCLUSIVELY BY PURCHASER, OR (III) EXACERBATION OF PRE-EXISTING CONDITIONS EXCLUSIVELY AS A RESULT OF PURCHASER'S NEGLIGENCE OR WILLFUL MISCONDUCT, PROVIDED HOWEVER THAT PURCHASER'S OBLIGATIONS (UNDER THIS CLAUSE (III)) SHALL BE LIMITED TO THE RESTORATION OF THE PROPERTY TO SUBSTANTIALLY THE CONDITION OF THE PROPERTY IMMEDIATELY PRECEDING SUCH EXACERBATION AND IN NO EVENT SHALL PURCHASER'S OBLIGATIONS HEREUNDER EXCEED ITS OBLIGATIONS UNDER THE BDA. IN THE EVENT THAT PURCHASER SHALL CAUSE AN ENVIRONMENTAL CONDITION FOR WHICH PURCHASER INDEMNIFIES SELLER UNDER CLAUSE (II) OR (III), AND THE INVESTIGATION OR REMEDIATION THEREOF IS COMMINGLED WITH A PRE-EXISTING ENVIRONMENTAL CONDITION, PURCHASER'S LIABILITY TO SELLER SHALL BE REDUCED BY THE AMOUNT OF ANY INVESTIGATION OR REMEDIATION OF PRE-EXISTING CONDITIONS PERFORMED BY PURCHASER.

D.      Purchaser hereby agrees to record deed restrictions, covenants, conditions, restrictions, reservations, engineering controls, institutional controls, easements or rights of way or agreements affecting the future use of the Property and relating to the ongoing environmental remediation of soils and/or groundwater on or under the Property and limiting the use and/or development of the Property for uses other than industrial uses (the "**Intended Use**") (collectively, the "**Land Use Controls**") to the extent that such Land Use Controls are required by and approved by DNREC and are consistent with Purchaser's ownership, use and operation of and on the Real Property (which includes the reconstruction and conversion of the existing facility on the Land into a facility for the manufacture and assembly of plug-in hybrid electric vehicles and the operation thereof). It is understood that Seller reserves the sole right to consult and negotiate with applicable governmental authorities as to the Land Use Controls that will be imposed on the Property, subject to the limitations and requirements in this Contract. Seller shall deliver to Purchaser copies of the Land Use Controls to be imposed on the Property as soon as

the same are available and agreed to by Seller. Purchaser represents, warrants and covenants that it will take all actions required to ensure that the Property will be used only in accordance with any Land Use Controls.

E.    Seller represents that it has provided Purchaser with access to all material documents, reports and assessments regarding environmental conditions at the Real Property in Seller's possession, all of which are listed on Exhibit I hereto.

F.    The obligations, duties, liabilities, releases, indemnities and waivers of the parties under this Section 15 shall survive the Closing of this Contract.

G.    For purposes of this Section 15, the following terms shall have the meanings set for the below:

"Environmental Law" means any and all applicable federal, national, state or local laws, rules, regulations, directives, decrees, treatises, principles (including principles of common law) or statutes relating to the environment or to the regulation or remediation of Hazardous Materials.

"Hazardous Materials" means any substance, material or waste that is regulated, classified, defined or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, and polychlorinated biphenyls.

"Remedial Action" means all actions including any capital expenditures undertaken to (i) clean up, remove, treat or in any other way address Hazardous Materials; or (ii) prevent the release or threat of release, or minimize the further release of any Hazardous Materials.

**16.    Assignment and Assumption.** Except as provided in this Section 16, Purchaser shall not have the right to assign its interest in this Contract without the prior written consent of Seller, which consent may be granted or withheld in Seller's reasonable discretion, and any such assignment without such consent shall be null and void and of no force and effect. Notwithstanding any assignment of this Contract, Purchaser shall at all times remain primarily obligated, and not be relieved of any liabilities, hereunder. Seller acknowledges that financing for the acquisition of the Property will be provided by the U.S. Department of Energy ("**DOE**") and the Federal Financing Bank, and, under the terms of such financing, Midland Loan Services, Inc., serves as Collateral Agent (together with any successors in such capacity, the "**Collateral Agent**") for DOE, the Federal Financing Bank, and certain other lenders which may provide financing to Purchaser from time to time. Consistent with the terms of the financing with DOE, Seller hereby consents to the assignment by Purchaser of this Contract and Purchaser's rights under Section 15 hereof to the Collateral Agent and to the Collateral Agent's exercising and enforcing any of Purchaser's rights thereunder following the Closing, provided such assignment shall not be deemed to cure any Purchaser default that exists at the time of the assignment. To the extent Collateral Agent shall exercise or seek to enforce Purchaser's rights as permitted

hereunder, Purchaser may not exercise or seek to enforce its rights hereunder. With the approval of the Bankruptcy Court, Seller may assign its interests in this Contract to an entity or trust created pursuant to the Case to address certain of Seller's cleanup obligations related to the remediation of Seller's owned real property (the "**Environmental Trust**"), provided that the Environmental Trust also assumes Seller's obligations hereunder. In the event that Seller assigns its interest in this Contract to the Environmental Trust and the Environmental Trust assumes the Seller's obligations hereunder, (i) Purchaser shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had or may have against Seller, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Contract, and the Environmental Trust shall be entitled to, but not limited to, all of the benefits and protections afforded Seller under this Contract, and (ii) Seller shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had, or may have against Purchaser, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Contract.

17.    **Reporting of Foreign Investment**. Purchaser agrees to comply with any and all reporting requirements applicable to the transaction which is the subject of this Contract which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including but not limited to The International Investment Survey Act of 1976, The Agricultural Foreign Investment Disclosure Act of 1978, The Foreign Investment in Real Property Tax Act of 1980 and the Tax Reform Act of 1984.

18.    **No Offer; Execution Date**. The submission of this Contract to Purchaser for review does not constitute an offer or option to sell the Property. Subject to the provisions of Sections 35 and 36, this Contract is not binding until (i) original counterparts of this Contract have been executed and delivered by Seller and Purchaser to the Title Company and (ii) the Deposit is delivered in good funds to the Title Company by Purchaser. Title Company shall notify Seller immediately that Purchaser has delivered an executed counterpart of this Contract to the Title Company with the Deposit.

19.    **Notices**. All notices and other communications hereunder shall be in writing and shall be delivered personally against receipt or shall be sent by certified United States Mail service, postage prepaid and return receipt requested, or by nationally utilized overnight delivery service, addressed to the parties as follows:

> As to Seller:        Motors Liquidation Company
> 500 Renaissance Drive, 14th Floor
> Detroit, Michigan 48265
> Facsimile: 313-486-4259
> Attn: Kyle Braden, Secretary

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Facsimile: 212-310-8007
Attn: Stephen Karotkin, Esq.

And a copy to:

Weil, Gotshal & Manges LLP
1300 Eye Street NW, Suite 900
Washington, D.C. 20005
Facsimile:  202-857-0940
Attn:  David R. Berz, Esq.

And a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Facsimile: 214-746-7777
Attn:  Leslie Steele Smith, Esq.

As to Purchaser:

Fisker Automotive Inc.
19 Corporate Park
Irvine, California 92606
Facsimile: 949-757-4240
Attn: Frank Faga

With a copy to:

Orrick, Herrington & Sutcliffe LLP
1152 15th St. NW
Washington, DC 20005
Facsimile: 202-339-8500
Attn: Robert Lawrence

And a copy to:

Director
Advanced Technology Vehicles Manufacturing Loan Program
CF-1.4
United States Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585
Telephone: 202-586-8146
Facsimile: 202-586-7809
Email: fiskeratvmtransaction@hq.doe.gov

And a copy to:

Office of the General Counsel
GC-1
United States Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585
Telephone: 202-586-5281

Facsimile: 202-586-1499
Email: fiskeratvmtransaction@hq.doe.gov

Any notice in accordance herewith shall be deemed received when personal, nationally utilized overnight delivery service, or courier delivery is received or refused. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery services for overnight delivery on the day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission.

20.     **Survival**. The representations and warranties set forth herein shall expire and be of no further force and effect hereunder upon Closing, unless otherwise expressly provided herein.

21.     **Parties Bound**. This Contract shall be binding upon and inure to the benefit of Seller and Purchaser, their respective successors and permitted assigns.

22.     **Governing Law**. The laws of the State of Delaware shall govern the validity, construction, enforcement and interpretation of this Contract, provided, however, and consistent with Section 34, that the Bankruptcy Court shall retain jurisdiction over any and all disputes arising under or otherwise relating to the construction and enforcement of the Sale Approval Order and the transactions consummated thereunder.

23.     **Brokers**. Each of Seller and Purchaser represent and warrant to the other that it has not hired or engaged any broker in connection with this Contract or the transactions contemplated hereunder. If any broker should make a claim for a commission based upon the actions of Seller, Seller shall indemnify, defend and hold Purchaser harmless from such claim. If any broker should make a claim for a commission based upon the actions of Purchaser, Purchaser shall indemnify, defend and hold Seller harmless from such claim. The provisions of this Section 23 shall survive the Closing and delivery of the deed.

24.     **Multiple Counterparts**. This Contract may be executed in a number of identical counterparts. If so executed, each of such counterparts shall, collectively, constitute one agreement, but in making proof of this Contract, it shall not be necessary to produce or account for more than one such counterpart. Neither this Contract nor any memorandum thereof shall be recorded.

25.     **Time of the Essence**. The parties hereto expressly agree that time is of the essence with respect to this Contract.

26.     **Entire Contract**. This Contract, together with the exhibits attached hereto, the existing confidentiality agreement between the parties and the existing access agreement between the parties, embodies the entire agreement of the parties with respect to the transaction herein contemplated, superseding all prior agreements and communications whether oral or written. Any amendments hereto shall be in writing and executed by the party against whom enforcement of the modification is sought.

OHS East:160709396.17                                                                 15

**27.** **Non-Business Days**. If the date of Closing or the date for delivery of a notice or performance of some other obligation of a party falls on a Saturday, Sunday or legal holiday in the State in which the Property is located, then the date for Closing or such notice or performance shall be postponed until the next business day.

**28.** **Confidentiality**. Purchaser shall treat all materials and information provided by Seller as confidential information, and shall distribute same only to Purchaser's affiliates, lenders, partners, shareholders, employees, agents and representatives who have a need to know and to third party consultants and professionals retained by Purchaser. Purchaser shall instruct all of its affiliates, lenders, partners, shareholders, employees, agents, representatives, and third party consultants and professionals as to the confidentiality of all such information as well as the existence or terms of this Contract. Purchaser may also provide such information to DOE and the Collateral Agent.

**29.** **Effect of Title Insurance**. The issuance of the Title Policy shall be in lieu of any express or implied warranty of Seller concerning title to the Property, whether made herein or in the deed or in any other document delivered at or in connection with the Closing. Purchaser acknowledges and agrees that, from and after the Closing, its only remedy for damages incurred by reason of any defect in title to the Property shall be against the issuer of the Title Policy. The provisions of this Section 29 shall survive the Closing.

**30.** **Severability**. If any provision of this Contract or application to any party or circumstances shall be determined by the Bankruptcy Court to be invalid and unenforceable to any extent, the remainder of this Contract or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**31.** **Waiver**. The failure of a party to insist in any one or more instance upon the strict performance of any one or more of the obligations under this Contract, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this agreement or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach or omission.

**32.** **Recordation**. Purchaser agrees not to record this Contract or any memorandum hereof. To the extent that such filing is made in violation of this Contract, Purchaser shall indemnify and defend the Seller against any damages incurred by such parties in connection therewith. The provisions of this Section 32 shall survive the termination of this Contract.

**33.** **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS CONTRACT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**34.** **BANKRUPTCY COURT JURISDICTION**. UNTIL THE CASE IS CLOSED, THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE

JURISDICTION OVER ALL DISPUTES ARISING UNDER THIS CONTRACT RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS CONTRACT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO, (ii) THE PROPERTY, (iii) ANY ASSUMED LIABILITIES, AND (iv) ANY OBLIGATIONS OF A PARTY THAT MAY SURVIVE CLOSING, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.  AFTER THE CASE IS CLOSED, DISPUTES INVOLVING THE ENVIRONMENTAL TRUST SHALL REMAIN SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT TO THE EXTENT PERMITTED UNDER APPLICABLE LAW.  EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE, AFTER THE CASE IS CLOSED, ALL DISPUTES ARISING UNDER THIS CONTRACT SHALL BE RESOLVED IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN DELAWARE.

35.     **Bankruptcy Matters**.  The parties shall use commercially reasonable efforts to cooperate, assist and consult with each other to consummate the transactions contemplated by this Contract.  Neither Seller nor Purchaser shall, without the prior written consent of the other party, file, join in, or otherwise support in any manner whatsoever, any motion or other pleading relating to the sale of the Property that is inconsistent with this Contract.  Seller shall comply with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Contract, including serving on all required persons a notice of the Sale Motion.  The parties agree to comply in all material respects with the terms of the Sale Approval Order and agree that to the extent there is a conflict between this Contract and the Sale Approval Order, the Sale Approval Order shall govern in all respects.

36.     **Competing Transaction**.  This Contract is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "**Competing Bid**") that may be solicited by the Seller prior to the hearing held by the Bankruptcy Court to consider the Sale Motion (defined below).  The Purchaser acknowledges that the Seller may establish a date by which Competing Bids must be submitted by bidders and any other procedures that the Seller may, in its sole discretion, implement.  From the date hereof (and any prior time) and until the transaction contemplated by this Contract is consummated, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Property.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Seller to prospective purchasers.  In the event that the Seller elects to enter into an agreement with a party that submits a Competing Bid or if the Bankruptcy Court does not enter the Sale Approval Order or if such Sale Approval Order is modified or reversed on appeal, either party may terminate this Contract upon written notice to the other party.  Upon such termination, Seller shall return the Deposit to the Purchaser.

**37.    Bankruptcy Court Filings**.  As promptly as practicable following the execution of this Contract, Seller shall file with the Bankruptcy Court a motion seeking entry of the Sale Approval Order (the "**Sale Motion**"), which filing shall be in form and substance reasonably acceptable to Purchaser.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Approval Order.

**38.    Assignment of Associated Contracts**.  Seller shall assume and assign to the Purchaser at the Closing the agreements set forth in Exhibit J, including without limitation any lease or operating agreement with Delmarva Power and Light Company or its successors.  At Closing, Seller shall pay any cure amounts related to the assigned contracts and required by the Sale Approval Order.  Seller shall receive return in full of all security deposits held by counterparties under all assigned contracts, and Purchaser shall make arrangements with the other party or parties to the assigned contracts to replace such security deposits, if required by the applicable counterparty, as a condition to the assumption and assignment of each such contract, provided, however, that any deposits the repayment of which is disputed shall not be paid or credited to Seller as provided in this Section 38.  In the event Purchaser receives credit from the counterparty, or repayment of, any security deposit subject to such a dispute for which Seller has not previously been paid or credited, Purchaser shall pay to Seller such recovered deposit.  If, at any time during the period that begins on the Execution Date and ends on the date that is ninety (90) days following the Closing, Purchaser identifies one or more executory contracts or unexpired leases to which Seller is a party that Purchaser believes to be reasonably necessary for the operation of the Property (each, a "**Post-Closing MLC Agreement**"), Seller shall use commercially reasonable efforts to assign, and if necessary, to obtain approval from the Bankruptcy Court to assign to Purchaser each Post-Closing MLC Agreement.  Purchaser agrees to indemnify Seller for any losses Seller incurs (other than attorneys' fees and expenses) that arise solely as a result of the assignment of any Post-Closing MLC Agreements.  Furthermore, to the extent that Seller is obligated to pay any "cure" or other amounts pursuant to 11 U.S.C. 365(b)(1) as a result of the assignment of a Post-Closing MLC Agreement to Purchaser, Purchaser agrees to reimburse Seller for such amounts; provided, however, that, nothing in this Section 38 shall prohibit Seller from rejecting, assuming, or assuming and assigning any contract or lease that has not been identified as a Post-Closing MLC Agreement; provided, further, that in the event that Seller seeks to reject at any time prior to the date that is ninety (90) days following the Closing any contract or lease related to the Property that has not been identified as a Post-Closing MLC Agreement, Seller will provide adequate notice of the proposal to reject those contracts or leases to Purchaser.  Notwithstanding the foregoing, in no instance shall Purchaser be obligated to pay, or to indemnify Seller for, any of the prorated costs for which Seller is responsible pursuant to Section 7 of the Contract, including, without limitation, the cost of all sewer, water, and utilities services for periods prior to the Closing Date.

*Signatures on Next Page*

IN WITNESS WHEREOF, the parties hereto have, by their duly authorized representatives, executed this Contract as of the date indicated above.

**WITNESS:**                                            **SELLER**

**MOTORS LIQUIDATION COMPANY,**

a Delaware corporation

By: _Ted Stenger_

Name: _TED STENGER_

Title: _EVP_

Date: _6/18/2010_, 2010

**WITNESS:**                                            **PURCHASER**

**FISKER AUTOMOTIVE INC.,**

a Delaware corporation

By: _____

Name: _____

Title: _____

Date: _____, 2010

IN WITNESS WHEREOF, the parties hereto have, by their duly authorized representatives, executed this Contract as of the date indicated above.

**WITNESS:**

**SELLER**

**MOTORS LIQUIDATION COMPANY,**

a Delaware corporation

By: _____

Name:

Title:

Date: _____, 2010

**WITNESS:**

**PURCHASER**

**FISKER AUTOMOTIVE INC.,**

a Delaware corporation

_JULIE A KIERNAN_____

By: _____

Name: _BERNHARD KOEHLER_

Title: _COO_

Date: _7 JUNE_____, 2010

**EXHIBITS**

| | | |
|---|---|---|
| EXHIBIT A | - | Copy of Sale Approval Order |
| EXHIBIT B | - | Description of the Property |
| EXHIBIT C | - | Form of Escrow Agreement |
| EXHIBIT D | - | Form of Special Warranty Deed |
| EXHIBIT E | - | Form of Bill of Sale |
| EXHIBIT F | - | Form of FIRPTA Affidavit |
| EXHIBIT G | - | Form of Access Agreement |
| EXHIBIT H | - | Intentionally Omitted |
| EXHIBIT I | - | Environmental Documents |
| EXHIBIT J | - | Contracts to be Assumed and Assigned |

## Exhibit B

**The Settlement Agreement**

SETTLEMENT AGREEMENT

WHEREAS, the Delaware Department of Natural Resources and Environmental Control ("**DNREC**") is charged with the enforcement of the Delaware Hazardous Substance Cleanup Act, 7 <u>Del</u>. <u>C</u>. Chapter 91 ("**HSCA**") and Regulations Governing Hazardous Substance Cleanup ("**Regulations**"), relating to the remediation of releases of hazardous substances; and

WHEREAS, DNREC has determined that there have been releases of hazardous substances at the former General Motors Wilmington Assembly Plant, located in Wilmington, Delaware ("**Wilmington Plant**") which will require a remedy under HSCA; and

WHEREAS, on June 1, 2009, Motors Liquidation Company ("**MLC**"), formerly known as General Motors Corporation ("**GM**"), the owner and operator of the Wilmington Plant, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). MLC's chapter 11 case is being jointly administered with the chapter 11 cases of MLC of Harlem, Inc., MLCS, LLC, MLCS Distribution Corporation, Remediation and Liability Management Company, Inc., and Environmental Corporate Remediation Company, Inc. ("**Related Debtors**") under Case No. 09-50026 (REG) (the "**Bankruptcy Case**"). MLC is authorized to operate its business and manage its properties as a debtor in possession in accordance with the Bankruptcy Code; and

WHEREAS, MLC is the owner of numerous properties located in various states (the "**Owned Properties**"), which may require environmental investigation and remediation under federal and state laws to address potential environmental contamination on the Owned Properties. The Wilmington Plant is currently an Owned Property; and

WHEREAS, MLC, as part of the Bankruptcy Case, is currently negotiating with various states and the federal government (the "**National Negotiations**") regarding the costs required to address potential environmental contamination at the Owned Properties, and the procedures to be used to accomplish this work; and

WHEREAS, MLC has been provided with funding from the United States Treasury Department to address potential contamination at the Owned Properties as part of the National Negotiations; and

WHEREAS, as part of the National Negotiations, it currently is expected that a separate and new entity, likely in the form of an environmental response trust (the "**Environmental Trust**"), will be created pursuant to a chapter 11 plan (the "**Plan**") to receive ownership of the Owned Properties and assume certain cleanup obligations of MLC for the Owned Properties under state and federal law, as well as funding from MLC to address certain cleanup obligations

RSK10016.doc

1

at the Owned Properties, and that MLC will receive customary covenants not to sue for its cleanup obligations at the Owned Properties; provided, however, that DNREC is reserving its right to seek a claim for natural resource damages related to operations at the Wilmington Plant; and

WHEREAS, MLC acknowledges that it is currently attempting to sell the Wilmington Plant to Fisker Automotive, Inc., or another potential purchaser subject to approval of the Bankruptcy Court (the "Sale"), and that the Sale may occur prior to the creation of the Environmental Trust in the Bankruptcy Case; and

WHEREAS, in the event the Sale occurs prior to the creation of the Environmental Trust, DNREC and MLC desire to have certain cleanup obligations of MLC for the Wilmington Plant (the "Cleanup Obligations") assumed by the Environmental Trust so that, under the Bankruptcy Case, the Cleanup Obligations are treated in the same manner as similar cleanup obligations with respect to the other Owned Properties, and are not treated as general unsecured claims; and

WHEREAS, in consideration for the assumption of the Cleanup Obligations by the Environmental Trust, along with the transfer thereto of the funding by MLC for the Cleanup Obligations, DNREC is willing to defer the enforcement of HSCA at the Wilmington Plant until after the creation of the Environmental Trust, and the assumption of the Cleanup Obligations thereby.

NOW THEREFORE, for the purposes set forth above and in consideration of the recitals and mutual promises herein contained, MLC and DNREC, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, hereby agree as follows, in each case subject to the approval of the Bankruptcy Court:

1.  DNREC and MLC agree that nothing in this Settlement Agreement shall constitute an admission of liability or any adjudication on any issue of fact or law with respect to the subject matter discussed herein.

2.  In the event that the Sale occurs prior to the creation of the Environmental Trust, MLC agrees to transfer the Cleanup Obligations, and the funding therefor, to the Environmental Trust so that those Cleanup Obligations are retained and addressed by the Environmental Trust in the same manner as similar cleanup obligations with respect to the other Owned Properties, and not as general unsecured claims, in the Bankruptcy Case. MLC further agrees to petition the Bankruptcy Court to approve the assumption of the Cleanup Obligations by, and the transfer of the funding for the Cleanup Obligations to, the Environmental Trust, pursuant to this Settlement Agreement. DNREC agrees that the assumption of the Cleanup Obligations by, as well as the transfer of the funding from MLC for the Cleanup Obligations to, the

RSK10016.doc

2

Environmental Trust shall be in settlement and full satisfaction of all claims that have been filed, or could have been filed, by or on behalf of DNREC for the Cleanup Obligations in the Bankruptcy Case;

3. In the event that the Sale does not occur prior to creation of the Environmental Trust, MLC agrees, once the Environmental Trust is formed, to transfer the Wilmington Plant, along with the Cleanup Obligations, and the funding from MLC to address the Cleanup Obligations to the Environmental Trust in the same manner as agreed to in the National Negotiations with respect to the other Owned Properties. DNREC agrees that the transfer of the Wilmington Plant, along with the funding for the Cleanup Obligations, to the Environmental Trust shall be in settlement and full satisfaction of all claims that have been filed, or could have been filed, by or on behalf of DNREC for the Cleanup Obligations in the Bankruptcy Case.

4. DNREC reserves its right to seek a claim for natural resource damages related to the operations of the Wilmington Plant; provided, however, that this reservation shall not limit or impair any objection or defense MLC or Related Debtors may have to such claim, and DNREC agrees that such claim for natural resource damages will not be paid out of the funds transferred to the Environmental Trust to pay for Cleanup Obligations in the Bankruptcy Case.

5. DNREC agrees to defer the enforcement of HSCA and the Regulations at the Wilmington Plant until (1) after the transfer of MLC's Cleanup Obligations to the Environmental Trust, in the event the Sale occurs prior to the creation of the Environmental Trust, or (2) after the transfer of the Wilmington Plant, along with MLC's Cleanup Obligations, to the Environmental Trust, in the event the Sale occurs after the creation of the Environmental Trust. Further, in either event, DNREC agrees not to oppose in the Bankruptcy Case the transfer of MLC's Cleanup Obligations, and the funding therefore, for the Wilmington Plant, or the Wilmington Plant along with its Cleanup Obligations, and the funding therefor, to the Environmental Trust; provided, however, that nothing in this paragraph will prevent DNREC from negotiating, as part of the National Negotiations, an environmental cost estimate for addressing potential contamination at the Wilmington Plant, or the form or substance of, or procedures to be used by, the Environmental Trust, or other successor entity to MLC, in addressing contamination at the Wilmington Plant.

6. As part of the Sale, DNREC and Fisker Automotive, Inc. ("**Fisker**") have negotiated a Brownfields Development Agreement ("**BDA**") to protect Fisker from incurring certain environmental liabilities under HSCA when it purchases and conducts operations at the Wilmington Plant. As part of its obligation under the BDA, Fisker is

RSK10016.doc

3

required to perform a preliminary environmental investigation to establish the baseline environmental condition of the Wilmington Plant (the "**Baseline Investigation**"). DNREC, as part of its authority under HSCA and the BDA, has approved of, and may require additional amendments to, a Work Plan to be performed by Fisker in implementing the Baseline Investigation. DNREC agrees to notify MLC of, and afford MLC the opportunity to participate in, any meetings between DNREC and Fisker regarding the Baseline Investigation.

7.  Notwithstanding the requirements of paragraph 5, above, DNREC and MLC agree that DNREC may continue its oversight of Fisker's performance of the Baseline Investigation as part of the Sale and as required by the BDA, and that such oversight by DNREC will not constitute "enforcement" of HSCA, as referred to in paragraph 5 above; provided, however, that DNREC's oversight of Fisker's performance of the Baseline Investigation shall not include, and DNREC personnel shall not conduct or be present for, any site investigation, including any subsurface sampling, at the Wilmington Plant until after the creation of the Environmental Trust in the Bankruptcy Case; provided, further, however, that this prohibition shall not apply if DNREC determines that new information about the Wilmington Plant indicates the existence of an imminent threat to public health, welfare, or the environment, in which case DNREC may use any of its authority to immediately enter the Wilmington Plant property and take any action it deems appropriate to address such threat. DNREC further agrees not to require Fisker to submit to DNREC a report of the Baseline Investigation, or the data upon which such report may be based, until after the creation of the Environmental Trust in the Bankruptcy Case or the one (1) year anniversary of the date of the Closing, as such term is defined in the Real Estate Purchase Contract between MLC and Fisker governing the sale of the Wilmington Plant, whichever occurs first.

8.  As part of the BDA, DNREC is required to reimburse Fisker for the cost of performing the Baseline Investigation. MLC agrees that the cost of performing the Baseline Investigation, and DNREC's oversight thereof, shall be included in the estimated costs of addressing the Cleanup Obligations at the Wilmington Plant which, as part of the National Negotiations, are to be paid for by the Environmental Trust. DNREC acknowledges that investigation costs are included in DNREC's estimate of the cost of addressing the Cleanup Obligations at the Wilmington Plant, which have been developed as part of the National Negotiations, and DNREC agrees that its estimation of the cost of addressing the Cleanup Obligations at the Wilmington Plant shall not increase as a result of this Settlement Agreement.

RSK10016.doc

4

9.  DNREC and MLC acknowledge that the National Negotiations on the form and
content of the Environmental Trust have not yet been completed. Nothing in this
Settlement Agreement shall prevent DNREC from being afforded all of the rights as
to the Wilmington Plant that are provided with respect to the other Owned Properties
through the Environmental Trust as approved in the Bankruptcy Case.


Delaware Department of National Resources
   and Environmental Control

_____          Date: <u>6/8/09</u>_____

Collin P. O'Mara, Secretary



Motors Liquidation Company


_____          Date: _____

Ted Stenger
Executive Vice President



RSK10016.doc

5

9.  DNREC and MLC acknowledge that the National Negotiations on the form and content of the Environmental Trust have not yet been completed. Nothing in this Settlement Agreement shall prevent DNREC from being afforded all of the rights as to the Wilmington Plant that are provided with respect to the other Owned Properties through the Environmental Trust as approved in the Bankruptcy Case.

Delaware Department of National Resources
and Environmental Control


_____          Date: _____

Collin P. O'Mara, Secretary




Motors Liquidation Company


_____          Date: __6/8/2010_____

Ted Stenger
Executive Vice President

RSK10016.doc

5

**<u>Exhibit C</u>**

**The Sale Approval Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
In re:                             :    **Chapter 11**
                                      :
**MOTORS LIQUIDATION COMPANY,** *et al.,* :   **Case No.  09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*     :
                                      :    **Jointly Administered**
                         **Debtors.**      x
-----------------------------------------------------------

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER UNDER 11 U.S.C. §§ 105, 363 AND 365 AUTHORIZING
AND APPROVING (I) THE SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO THE TERMS
OF THE REAL ESTATE PURCHASE CONTRACT BETWEEN THE DEBTOR
AND FISKER AUTOMOTIVE, INC., (II) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE, AND (III) THE DEBTOR'S ENTRY INTO
A SETTLEMENT AGREEMENT IN CONNECTION WITH THE SALE**

This matter having come before the Court on the motion dated June 8, 2010 (the "**Sale**

**Motion**")[1] of Motors Liquidation Company, a debtor and debtor-in-possession in the above

captioned cases (collectively with the other debtors and debtors-in-possession in the above

captioned cases, the "**Debtor**" or "**Seller**"), seeking authority (i) to sell to Fisker Automotive,

Inc. (the "**Purchaser**"), certain assets of the Debtor's estate (as defined in the Contract (as

defined herein), the "**Property**") free and clear of all liens, claims, encumbrances and interests

pursuant to 11 U.S.C. § 363(f) (the "**Sale**"), (ii) to assume and assign to the Purchaser certain

executory contracts and unexpired leases identified on Exhibit J to the Contract, and (iii) to enter

into that certain settlement agreement (the "**Settlement Agreement**"), annexed hereto as Exhibit

A, by and between the Delaware Department of Natural Resources and Environmental Control

(the "**DNREC**") relating to the Property.

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to
them in the Sale Motion or the Contract.

Due notice of the Sale Motion, the Sale Hearing (as defined herein), and the list of executory contracts and unexpired leases to be assumed and assigned pursuant to the Contract and the related cure amounts (the "**Cure Amounts**") has been given to all parties entitled to notice, as evidenced by the certificate of service and notices previously filed with this Court. The Debtor provided adequate notice and an opportunity to non-debtor parties to object to the Debtor's proposed assumption and assignment of identified executory contracts and unexpired leases, which notice contained a conspicuous statement of what the Debtor believed to be the monetary cure amount that the non-debtor parties are due under their respective executory contracts and/or unexpired leases.

The Debtor conducted a robust marketing effort prior to the filing of the Sale Motion and determined that the Contract submitted by the Purchaser is the highest or best offer for the Property.  Subsequent to the filing of the Sale Motion, the Debtor further marketed the Property and solicited competing offers for the Property.  The Debtor did not receive any other offers for the Property.  The sale of the Property to the Purchaser pursuant to the terms of the Contract (as defined herein) is supported by the Debtor's business judgment, is fair and reasonable, and constitutes the highest and best offer for the Property.

This Court held a hearing on June 29, 2010 (the "**Sale Hearing**"), to consider (i) the Sale Motion and any objections thereto, (ii) whether to approve and authorize the Sale to the Purchaser pursuant to the Real Estate Purchase Contract dated June 8, 2010 between the Debtor and the Purchaser (the "**Contract**"), a copy of which is attached hereto as Exhibit B, (iii) any objections to the proposed assumption and assignment of executory contracts and unexpired leases identified on Exhibit J of the Contract as being assumed by the Debtor and assigned to the Purchaser in connection with the Sale (the "**Assigned Leases and Assigned Contracts**"),

including to the proposed Cure Amounts, and (iv) the Debtor's entry into the Settlement

Agreement, at which time all creditors, interest holders, parties to executory contracts and

unexpired leases, and other parties in interest were afforded an opportunity to be heard.

The Court having reviewed and considered (i) the Sale Motion and any objections

thereto, (ii) the Contract, (iii) the Settlement Agreement, and (iv) the arguments of counsel made,

and the evidence proffered and adduced, at the Sale Hearing; and it appearing that the relief

requested in the Sale Motion is in the best interests of the Debtor's estate and creditors and other

parties in interest; and upon the record of the Sale Hearing and all proceedings in these cases;

and after due deliberation thereon; and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

**Jurisdiction, Venue and Grounds for Relief**

A.   The Court has jurisdiction over the Sale Motion and over the property of the Debtor and

its estate, pursuant to 28 U.S.C. §§ 157 and 1334.  These matters are core proceedings pursuant

to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue in this District is proper under 28 U.S.C. §§

1408 and 1409(a).

B.   The statutory predicates for relief sought in the Sale Motion are 11 U.S.C. §§ 105(a),

363(b), (f) and (m), and 365, and Bankruptcy Rules 2002, 6004, 6006 and 9014.

**Notice of the Sale Motion, the Sale, the Assumption and Assignment
of the Assigned Leases and Assigned Contracts, and the Cure Amounts**

C.   Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale, and the

assumption and assignment of the Assigned Leases and Assigned Contracts and the Cure

Amounts, has been provided in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365 and

Bankruptcy Rules 2002, 6004, 6006 and 9014, and such notice was good and sufficient, and

appropriate under the particular circumstances, and no other or further notice of the Sale Motion,

the Sale, the assumption and assignment of the Assigned Leases and Assigned Contracts, or the

Cure Amounts is or shall be required.

D.   The Debtor has served the Sale Motion, which sets forth the Cure Amounts upon each

non-debtor counter-party to each of such Assigned Leases and Assigned Contracts that the

Debtor seeks to assume and assign to the Purchaser on the Closing Date.  The service of the Sale

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Motion was good, sufficient and appropriate under the circumstances and no further notice needs to be given in respect of establishing the Cure Amounts for the respective Assigned Leases and Assigned Contracts. Non-debtor counter-parties to the Assigned Leases and Assigned Contracts have had an opportunity to object to the Cure Amounts.

E.   A reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) all entities known to have expressed an interest in acquiring the Property; (ii) all entities known to have an interest in the Property; (iii) all non-debtor parties to the Assigned Leases and Assigned Contracts to be assumed and assigned pursuant to the Contract; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a known interest in the relief requested; (v) all known parties holding or asserting liens or encumbrances on the Property; and (vi) parties entitled to notice under the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated March 19, 2010 [Docket No. 5670].

### Good Faith of Purchaser

F.   The Purchaser is not an "insider" of the Debtor, as that term is defined in 11 U.S.C. § 101(31).

G.   The Purchaser is purchasing the Property in good faith within the meaning of 11 U.S.C. § 363(m), and is entitled to all of the protections afforded thereby. The Debtor and the Purchaser negotiated, proposed, and entered into the Contract at arm's length, in good faith, and without collusion. The Debtor and the Purchaser have fully disclosed all consideration to be given by the Purchaser under the Contract, and all other agreements or arrangements entered into by the Purchaser in connection with the Sale. The Purchaser has not engaged in any conduct, by any

5

action or inaction, that constitutes a violation of, or would cause or permit the Sale to be avoided

under 11 U.S.C. § 363(n).  No common identity of directors or controlling stockholders exists

between the Purchaser and the Debtor.  The parties to the Contract will be acting in good faith in

closing the Sale pursuant to the Contract.

### The Sale is Fair and Reasonable and in the Exercise of Sound Business Judgment

H.  The aggregate consideration to be received by the Debtor under Section 2 of the Contract

is fair and reasonable, constitutes the highest and best offer for the Property, constitutes

reasonably equivalent value and fair consideration for the Property, and will provide a greater

recovery for the Debtor's estate than would be provided by any other available alternative.  No

other person or entity has offered to purchase the Property for greater value to the Debtor's estate

than the Purchaser.  The Debtor's process for marketing and selling the Property, the Debtor's

determination to enter into the Contract, and the Debtor's determination that the consideration to

be received by the Debtor's estate is fair and reasonable each constitutes a valid and sound

exercise of the Debtor's business judgment.  Moreover, the consideration received under the

Contract constitutes reasonably equivalent value and fair consideration for the Property.

I.  Approval of the Contract by the Court and the consummation of the transactions

contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other

parties in interest.

### Validity of Transfer

J.  The Debtor has full power and authority to execute and deliver the Contract and all other

documents contemplated thereby, and no further consents or approvals are required for the

Debtor to consummate the transactions contemplated by the Contract.

K.  The transfer of the Property to the Purchaser will be, as of the Closing, the legal, valid and effective transfer of such assets, and will vest the Purchaser with all right, title, and interest of the Debtor or the Debtor's estate to the Property, as of the Closing, free and clear of all Liens and Claims[3] accruing, arising or relating to any time prior to the Closing Date.  Any provisions in any agreement that prohibit or condition the sale or transfer of the Property are void and of no force and effect.  There shall be no fees or charges (apart from any applicable sales and use taxes and the costs described in Sections 7 and 8 of the Contract) imposed upon the Purchaser or the Debtor's estate as a result of the sale of the Property to the Purchaser.  The Seller will retain certain obligations regarding the Property as described in Section 15 of the Contract.

### Section 363(f) is Satisfied

L.  The Debtor may sell the Property free and clear of all Liens and Claims, because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  **[The parties that objected to the Sale or the Sale Motion fall within one or more of subsections (1) through (5) of 11 U.S.C. § 363(f), and are adequately protected by having their Liens and Claims, if any, attached to the proceeds of the Sale.  Accordingly, all objections to the Sale or the Sale Motion are resolved as set forth herein and/or in a stipulation filed with the Court, or are overruled.]**  All non-debtor parties asserting interests in the Property that did not object, or that withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale on the terms set forth herein and in the Contract pursuant to 11 U.S.C. §§ 363(f)(2) and 365.

### Assumption and Assignment of the Assigned Leases and Assigned Contracts

---

[3] For purposes of this Order, the phrase "**Liens and Claims**" means any or all interests in or relating to any of the Property, including liens (as defined in 11 U.S.C. § 101(37) and claims (as defined in 11 U.S.C. § 101(5)).

7

M.  The assumption and assignment of the Assigned Leases and Assigned Contracts pursuant to the terms of this Order are integral to the Contract and are in the best interests of the Debtor and its estate, creditors and other parties in interest, and represent the exercise of  reasonable business judgment by the Debtor.  The assumption by the Debtor of the Assigned Leases and Assigned Contracts is hereby approved, and the assignment of the Assigned Leases and Assigned Contracts to the Purchaser is hereby approved, as all statutory requirements for such assumption and assignment are satisfied.

N.  The Debtor has (i) cured and/or provided adequate assurance of prompt cure to all defaults existing prior to the Closing Date under each of the Assigned Leases and Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A); and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under each of the Assigned Leases and Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B).

O.  The Purchaser has provided adequate assurance of its future performance under the Assigned Leases and Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

P.  The Assigned Leases and Assigned Contracts shall, as of the Closing Date, be valid and binding on the Purchaser and the non-debtor counter-parties thereto, and in full force and effect and enforceable in accordance with their respective terms.  Following such assignment from and after the Closing Date, the Debtor and the estate shall be relieved, pursuant to 11 U.S.C. § 365(k), from any further liability under the Assigned Leases and Assigned Contracts.

**<u>Compelling Circumstances for an Immediate Transfer</u>**

Q.  To maximize and preserve the value of the Debtor's estate and the Property, it is essential that the Sale of the Property occur within the time constraints set forth in the Sale Motion and the Contract.  Time is of the essence in consummating the Sale.

### The Settlement Agreement is Reasonable

R.  The Debtor's entry into the Settlement Agreement is in the best interests of the Debtor and its estates.

S.  The terms of the Settlement Agreement are within the range of reasonableness.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### General Provisions

1.  The relief requested in the Sale Motion is granted and approved, and the transaction contemplated thereby is authorized and approved as set forth in this Order.

2.  The assumption and assignment of the Assigned Leases and Assigned Contracts is authorized and approved as set forth in this Order.

3.  All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objectors have been otherwise satisfied or adequately provided for. Without limiting the generality of the foregoing:

a.    **[insert if applicable]**  The objection to the _____ Motion filed by _____ is hereby overruled in its entirety.

b.    **[insert other objections, if appropriate]**

**Approval of the Contract**

4.    The Contract and all ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.    The Debtor is authorized and empowered to, and shall take any and all actions necessary or appropriate to (i) consummate the Sale of the Property to the Purchaser pursuant to and in accordance with the terms and conditions of the Contract, (ii) close the Sale as contemplated in the Contract and this Order, and (iii) execute and deliver, perform and consummate the Contract.

6.    The terms and provisions of this Order shall be binding in all respects upon, and shall inure to the benefit of, the Purchaser, the Debtor, the Debtor's estate and their respective successors and assigns (including any entity or trust created to address certain of Seller's cleanup obligations related to the remediation of Seller's owned real property), and shall be binding in all respects upon any affected third parties including, but not limited to, any person or entity asserting any interest (including any Liens and Claims) with respect to the Property, all non-debtor counter-parties to the Assigned Leases and Assigned Contracts, and all creditors, equity holders and parties-in-interest in these cases.

7.    The Debtor is authorized and empowered to request any and all governmental or regulatory approvals, and to make any governmental or regulatory filings or notifications contemplated by the Contract and is further authorized to keep confidential any information related to such approvals or filings.

**Transfer of the Property**

8.    Pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Debtor is authorized and empowered to, and subject to the terms of the Contract, shall transfer the Property to the Purchaser on the Closing Date.  Such transfer shall constitute a legal, valid, binding and effective transfer of the

10

Property to the Purchaser.  Any provisions in any agreement that prohibit or condition the sale or transfer of the Property are void and of no force and effect.  Upon the Closing, the Property shall be transferred to the Purchaser free and clear of all Liens and Claims.  Such transfer shall vest in the Purchaser all right, title and interest of the Debtor in and to the Property.  Purchaser shall not be liable in any way for any Liens and Claims that any person or entity may have against the Debtor, any of its assets, or the Property.  The Seller will retain certain obligations regarding the Property as provided in Section 15 of the Contract.

9.   All entities that are in possession of any of the Property on the Closing Date are hereby directed to surrender possession of all such Property to the Purchaser or its assignee at the Closing.

10. All alleged Liens and Claims on the Property shall be transferred, affixed and attached to the proceeds of the Sale, with the same validity, priority, force and effect as such Liens and Claims had immediately prior to the Closing.  Nothing in this Order will determine the value of any of the Property or the validity, priority or amount of any Claims or Liens.

11. The filing of a certified copy of this Order with the appropriate clerk and/or recording with the recorder shall act to cancel any Liens and Claims and any other encumbrances of record.

12. If any person or entity which has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens and Claims on any of the Property has not delivered to the Debtor, at the Debtor's or Purchaser's request, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Property, then, at or after Closing, each of the Debtor and the Purchaser is hereby

11

authorized to execute and file such statements, instruments, releases and other documents on

behalf of such person or entity with respect to the Property.

### Assigned Leases and Assigned Contracts

13.  Pursuant to 11 U.S.C. §§ 105(a) and 365, upon the Closing of the Sale, the Debtor is

authorized and empowered to, and shall assume each of the Assigned Leases and Assigned

Contracts and assign each of the Assigned Leases and Assigned Contracts to the Purchaser.  The

payment of the applicable Cure Amounts shall, with respect to each Assigned Lease and

Assigned Contract, (i) effect a cure of all defaults existing thereunder as of the Closing Date, (ii)

compensate all non-debtor parties for any and all losses resulting from such default, and (iii)

together with the assumption of the Assigned Leases and Assigned Contracts by the Purchaser,

constitute adequate assurance of future performance thereof.  The Purchaser shall then have

assumed the Assigned Leases and Assigned Contracts and, pursuant to 11 U.S.C. § 365(f), the

assignment by the Debtor of such Assigned Leases and Assigned Contracts shall not be a default

thereunder.

14. The Debtor shall pay all Cure Amounts due under such Assigned Leases and Assigned

Contracts.

15. After the Debtor's payment of the relevant Cure Amounts, (i) the Debtors shall have no

further liability or obligation of any kind whatsoever with respect to any Assigned Lease and

Assigned Contract and (ii) neither the Debtor nor its estate, the Purchaser nor their successors

and assigns shall have any further liability or obligation with respect to any default arising or

accruing under any Assigned Leases and Assigned Contracts on or prior to the Closing Date and

shall have no further liabilities to the non-debtor parties to the Assigned Leases and Assigned

Contracts (and none of the non-debtor parties to the Assigned Leases or Assigned Contracts shall

12

have any rights or claims with respect to such defaults, liabilities or obligations) other than the Purchaser's obligations under the Assigned Leases and Assigned Contracts that first accrue and become due and payable, or are first required to be performed, after the Closing Date.

16. Any provisions in any Assigned Lease and Assigned Contract or in any other agreement that prohibit or condition the assignment of such Assigned Lease or Assigned Contract or allow the non-debtor party to such Assigned Lease or Assigned Contract to terminate, recapture, impose any penalty, condition any renewal or extension or modify any term or condition upon the assignment of such Assigned Lease or Assigned Contract or any similar provision, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  There shall be no payment accelerations, assignment fees, or any other fees or charges imposed upon the Purchaser or the Debtor's estate as a result of the assumption and assignment of the Assigned Leases and Assigned Contracts.

17. The Purchaser has provided adequate assurance of its future performance under the Assigned Leases and Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

18. All other requirements and conditions under 11 U.S.C. §§ 363 and 365 for the assumption by the Debtor and assignment to the Purchaser of the Assigned Leases and Assigned Contracts have been satisfied.  Upon the Closing, in accordance with 11 U.S.C. §§ 363 and 365, the Purchaser shall be fully and irrevocably vested with all rights, title and interest of the Debtor under each of the Assigned Leases and Assigned Contracts.

19. Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, all parties to the Assigned Leases and Assigned Contracts and any other parties are forever barred and enjoined from raising or asserting against the Debtor or the Purchaser any assignment fee, default, breach, claim,

pecuniary loss, or condition to assignment arising under or related to the Assigned Leases and

Assigned Contracts existing as of the Closing or arising by reason of the Closing.

### The Settlement Agreement

20. The Debtor's entry into the Settlement Agreement is authorized, ratified and directed and

the Debtor is authorized to take all steps necessary and appropriate to consummate and otherwise

effectuate the terms of the Settlement Agreement without further order of this Court.

21. Upon entry of this Order, all terms and conditions of the Settlement Agreement shall

become effective.

### Other Provisions

22. All persons and entities, including without limitation all governmental, tax and regulatory

authorities, lenders, trade and other creditors, interest holders and other parties-in-interest,

holding any Liens and Claims of any kind or nature whatsoever (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or non-contingent, senior or

subordinated) arising under, out of, in connection with or in any way relating to the Debtor, the

Property, the operation of the Debtor's business or the transfer of any of the Property to the

Purchaser, are hereby forever barred, prohibited and permanently enjoined from asserting any of

such Liens and Claims in any manner whatsoever against the Purchaser, its successors or assigns,

or their property (including the Property).

23. The Purchaser shall not have any liability or other obligation of the Debtor arising under

or related to the Property.  Without limiting the generality of the foregoing, the Purchaser shall

not be liable for any claims against the Debtor or any of its predecessors or affiliates, and the

Purchaser shall have no successor or vicarious liabilities of any kind or character, whether

known or unknown as of the Closing Date, including, but not limited to, any theory of antitrust,

14

environmental, successor or purchaser liability, labor law, de facto merger or substantial

continuity, now existing or hereafter arising, whether fixed or contingent, with respect to the

Debtor, any obligations of the Debtor, or the Property, arising prior to the Closing Date,

including, but not limited to, liabilities on account of any taxes arising, accruing or payable

under, out of, in connection with, or in any way relating to the ownership of the Property prior to

the Closing Date, or the transfer of the Property to the Purchaser.

24. Nothing in this Order, the Settlement Agreement, the Contract, the Assigned Leases and

Assigned Contracts, or any agreement entered into under this Order releases, nullifies, or enjoins

the enforcement of any liability to a governmental unit under police and regulatory statutes or

regulations that any entity would be subject to as the owner or operator of property after the date

of entry of this Order, except, as to DNREC, to the extent expressly agreed by DNREC in the

Settlement Agreement.

25. The transactions contemplated by the Contract are undertaken by the Purchaser without

collusion and in good faith, within the meaning of 11 U.S.C. § 363(m), and accordingly, the

reversal or modification on appeal of this Order shall not affect the validity of the Sale to the

Purchaser (including the assumption and assignment of the Assigned Leases and Assigned

Contracts) or the other relief granted hereby, unless the effectiveness of this Order is duly stayed.

The Purchaser is a good faith buyer within the meaning of 11 U.S.C. § 363(m) and, as such, is

entitled to the full protections of that provision.

26. In accordance with Section 8 of the Contract, at Closing, the Purchaser shall pay state and

local recording taxes, sales and use taxes, recording fees, and transfer taxes, if any, required to be

paid.  All transfer taxes associated with the recordation of the special warranty deed (as

described in the Contract), if any, including, without limitation, transfer and recordation taxes

15

and documentary stamps, shall be paid by Purchaser at Closing or, if assessed at any time

thereafter, shall be paid by Purchaser promptly following such assessment.

27. No bulk sales law or any similar law of any state or other jurisdiction shall apply to the

Sale.

28. There are no brokers involved in consummating the Sale and no brokers' commissions

are due.

29. The failure specifically to include any particular provision of the Contract in this Order

shall not diminish or impair the effectiveness of such provision, it being the intent of the Court

that the Contract be authorized and approved in its entirety.

30. The Contract and any related agreements, documents or other instruments may be

modified, amended or supplemented by the parties thereto, in a writing signed by both parties

and in accordance with the terms thereof, without further order of the Court, provided that any

such modification, amendment or supplement does not have a material adverse effect on the

Debtor's estate.

31. The Court shall retain jurisdiction to, among other things, interpret, implement, and

enforce the terms and provisions of this Order and the Contract, all amendments thereto and any

waivers and consents thereunder, and each of the agreements executed in connection therewith to

which the Debtor is a party, or which has been assigned by the Debtor to the Purchaser, and to

adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, the

Contract, or this Order.

32. To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal

Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly

finds that there is no just reason for delay in the implementation of this Order, and expressly

directs the entry of judgment as set forth in this Order.  This Order constitutes a final order

within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and

6006(d), the effectiveness of this Order shall not be stayed and this Order shall be effective

immediately.


Dated:  _____, 2010                    _____

                                                United States Bankruptcy Judge