**Hearing Date and Time: August 6, 2010 at 9:45 a.m.**
**Objection Deadline: June 18, 2010 at 4:00 p.m.**
**Reply Deadline:  July 12, 2010 at 4:00 p.m.**
**Cross-Motion Reply Deadline: August 2, 2010 at 4:00 p.m.**

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Scott E. Ratner
Richard K. Milin

Conflicts Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MOTORS LIQUIDATION COMPANY, | ) | Case No. 09-50026 (REG) |
| *et al.*, | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' OBJECTION TO DEUTSCHE BANK AG'S MOTION
FOR RELIEF FROM AUTOMATIC STAY TO EFFECT
SETOFF AND CROSS-MOTION FOR IMMEDIATE PAYMENT**

# TABLE OF CONTENTS

**PAGE**

**PRELIMINARY STATEMENT** ................................................................................ 1

**FACTUAL BACKGROUND** ..................................................................................... 4

    A.  DB's GM Corporate Bonds ................................................................................. 4

    B.  DB's Termination of the Swap Transactions ..................................................... 5

**ARGUMENT** ............................................................................................................ 8

**POINT I:**    THE MOTION SHOULD BE DENIED BECAUSE IT
SEEKS PERMISSION TO EFFECTUATE AN IMPROPER
SETOFF OF PRE-PETITION BOND OBLIGATIONS
AGAINST POST-PETITION SWAP DEBTS ......................................... 9

**POINT II:**    THE MOTION SHOULD BE DENIED BECAUSE
THE PARTIES' SWAP AGREEMENTS BAR DB'S
PROPOSED SETOFF ............................................................................ 18

**POINT III:**    DB'S MOTION TO SET OFF AGAINST GM BONDS
SHOULD BE DENIED BECAUSE THE INDENTURE
GOVERNING THE U.S.-ISSUED BONDS BARS DB'S
PROPOSED SETOFF AND DB HAS FAILED TO
DEMONSTRATE ITS ASSERTED RIGHT TO SET OFF
AGAINST EURO BONDS ..................................................................... 21

**POINT IV:**    THE DEBTORS' CROSS-MOTION DIRECTING DB TO
PAY THE $24,040,404 DB ADMITS IT OWES UNDER THE
PARTIES' SWAP AGREEMENTS SHOULD BE GRANTED .......... 25

**CONCLUSION** ....................................................................................................... 26

i

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**Cases**</u>

*Aon Financial Products, Inc. v. Societe Generale,*
476 F.3d 90 (2d Cir. 2007) .............................................................. 20, 25-26

*Gore v. United States (In re Gore),* 124 B.R. 75 (Bankr. E.D. Ark. 1990) ................... 13

*In re BOUSA Inc.,* No. 89-B-13380, 2006 WL 2864964
(Bankr. S.D.N.Y. Sept. 29, 2006) ........................................................ 11, 13

*In re Cairns & Assocs.,* 372 B.R. 637 (Bankr. S.D.N.Y. 2007) ................................. 8, 24

*In re Chateaugay Corp.,* 154 B.R. 843 (Bankr. S.D.N.Y. 1995) ................................... 20

*In re Delta Airlines*, 341 B.R. 439 (Bankr. S.D.N.Y 2006) ..................... 9, 15, 16, 17, 18

*In re Delta Airlines,* 359 B.R. 454 (Bankr. S.D.N.Y. 2006) .......................................... 10

*In re Genuity, Inc.,* 323 B.R. 79 (Bankr. S.D.N.Y. 2005)..........................................14-15

*In re Genuity, Inc.,* Case No. 02-43558 (PCB), 2007 WL 1792252
(Bankr. S.D.N.Y. June 20, 2007) ............................................................ 10

*In re Labrum & Doak, LLP*, 237 B.R. 275 (Bankr. E.D. Pa. 1999) ............................... 15

*In re Lehman Brothers Holdings, Inc.,* 404 B.R. 752
(Bankr. S.D.N.Y. 2009) ............................................................. 10, 11, 13, 14

*In re Lehman Brothers Holdings, Inc.,* Case Nos. 08-13555 (JMP),
08-01420 (SIPA), Transcript of Sept. 15, 2009 ........................................ 11

*In re Lehman Brothers Holdings, Inc.,* No. 08-13555 (JMP),
2010 WL 1783395 (Bankr. S.D.N.Y. May 5, 2010).................................... 10

*In re Moore,* 350 B.R. 650 (Bankr. W.D.Va. 2006) ....................................................... 13

*In re Myers,* 362 F.3d 667 (10th Cir. 2004) .................................................................... 14

*In re Sauer,* 223 B.R. 715 (Bankr. D. N.D. 1998)........................................................... 12

*Jackson Nat'l Life Ins. Co. v. Ladish Co.,* No. 92 Civ. 9358,
1993 WL 43373 (S.D.N.Y. Feb. 18, 1993).....................................22-23, 24

*Marta Group, Inc. v. County Appliance Co.,* 79 B.R. 200 (E.D. Pa. 1987) ................... 15

*McMahan & Co. v. Wherehouse Entertainment, Inc.,*
859 F. Supp. 743 (S.D.N.Y. 1994), *rev'd on other grounds,*
65 F.3d 1044 (2d Cir. 1995) ..............................................................23-24

*Scherling v. Hellman Elec. Corp.*, 181 B.R. 730 (Bankr. S.D.N.Y. 1995) ...................... 10

*Seiden Associates, Inc. v. ANC Holding, Inc.*, 959 F.2d 425 (2d Cir. 1992) ................. 20

**Statutes**

11 U.S.C. §§ 101, *et seq.* ................................................................................................. 1

11 U.S.C. § 553(a) ................................................................................................. 10, 15

15 U.S.C. § 77ppp(b) ............................................................................................... 3, 21

Debtor Motors Liquidation Company (f/k/a General Motors Corp-
oration) and its affiliated debtors, as debtors in possession in the above-refer-
enced chapter 11 cases (the "**Debtors**"), respectfully submit this Objection to the
motion (the "**Motion**") of Deutsche Bank AG ("**DB**") for relief from the automat-
ic stay seeking to permit DB to execute a setoff of amounts it claims to be owed
under bonds issued by General Motors Corporation ("**GM**") against amounts it
owes GM as a result of two interest rate swaps.  The Debtors also cross-move for
immediate payment of the full amount DB owes under the swaps.[1]

## PRELIMINARY STATEMENT

1.    DB's Motion should be denied because it asks this Court to permit
a $24 million setoff that is improper for at least three reasons.  First, as discussed
in Point I below, DB's proposed setoff does not satisfy the "mutuality" require-
ment:  DB seeks to set off its *post-petition* obligation to pay GM sums that
became due because of DB's voluntary post-petition termination of the parties'
swap agreements against *pre-petition* obligations under GM corporate bonds.
The Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, does not permit setoffs of pre-
petition obligations against post-petition obligations.

2.    The Debtors recognize that swap agreements that terminate ***auto-
matically*** upon a party's bankruptcy can be treated as pre-petition obligations.
When automatic termination occurs, all of the elements of liability are already in
place as of the debtor's petition date.  Here, however, DB made an affirmative

---

[1] Debtor Motors Liquidation Company and New General Motors Corporation are currently
finalizing an agreement concerning their respective rights to DB's payment.  Debtors have agreed
to place DB's payment in a segregated account pending Court approval of the agreement.

1

decision to terminate its swap transactions, *voluntarily and in its discretion,*

*after* GM's bankruptcy filing.  Because DB's swap obligations resulted from post-

petition *discretionary* actions that were not mandated by pre-petition agree-

ments – and because DB's swap obligations were not valid and enforceable debts

owing as of the petition date – they are post-petition obligations that cannot be

set off against GM's pre-petition debts.

3.    Second, as discussed in Point II below, it is well established that a

party can only effectuate a setoff in bankruptcy if it can demonstrate that it has a

right of setoff under state law.  DB does not have such a right.  In fact, the ISDA

Master Agreement, Schedule and swap confirmations that DB entered into with

GM (together, the "**GM-DB Swap Agreements**") require DB to pay all sums it

owes "without setoff or counterclaim" unless certain specified conditions are

met.

4.    DB has failed to show, and so far as the Debtors are aware cannot

show, that its proposed setoff would satisfy the necessary conditions.  The con-

tractual provision that DB relies on to justify its setoff is materially incomplete:

the provision states only that DB can set off "any or all amounts [] to the Non-

Defaulting Party."  (Empty brackets added.)  Unless words are inserted in the

brackets to fill the gap between the words "amounts" and "to" in this provision,

or the provision is changed in other ways, it makes no sense and cannot justify

any setoff at all.

5.    DB has not shown, however, what the missing terms should be.

For example, DB has not shown that it should be permitted to set off "all

amounts *owed* to the Non-Defaulting Party" as opposed to "all amounts *owed*

2

*under derivative transactions* to the Non-Defaulting Party."  The latter, of course, would preclude setoffs against GM's bond obligations.

6.    Third, as discussed in Point III below, DB has no right to set off the sums it owes against GM bonds.  As an initial matter, DB cannot properly effectuate its proposed setoff against the approximately $12.75 million in U.S.-issued bonds it claims to own because the governing bond indenture prohibits the setoff.  The indenture, which is based on the Trust Indenture Act of 1939, requires bondholders to pursue their rights to payment of any sums that became due because of acceleration collectively and through the Indenture Trustee.  Individual bondholders are restricted:  they can only collect principal or interest after the maturity dates stated in their coupons or bonds.  Yet, DB seeks to exercise a setoff against the full principal amount of bonds before their stated maturity date, which individual bondholders are not allowed to do.  DB's setoff, which would favor DB's individual interest but potentially reduce the sums available to pay other bondholders, would also violate the indenture's prohibition on "enforc[ing] any right … except … for the equal, ratable and common benefit of all Holders of Securities and coupons."

7.    Further, DB has failed to demonstrate that it has a genuine right to set off against its GM European-issued bonds.  DB has not shown whether it owns temporary or permanent global notes, which entity is the owner of record for the notes, or whether the notes have been accelerated in compliance with their terms.  Unless DB sustains its burden of demonstrating its right to set off, it cannot be excused from its multi-million dollar obligation to pay GM sums due.

3

8.     Finally, because DB admits it owes GM a swap payment of more than $24 million, and because DB has no valid right of setoff, the Debtors move the Court to order DB to pay the full sum it owes forthwith – "without setoff or counterclaim" as the Swap Agreements require.

## FACTUAL BACKGROUND

9.     On June 1, 2009, GM and certain of its affiliated debtors commenced voluntary cases in this Court under chapter 11 of the Bankruptcy Code.

### A.     DB's GM Corporate Bonds

10.     According to DB, it owns three issues of GM corporate bonds having an aggregate face value of $24,073,200.  (Motion ¶¶ 7-8.)  First, DB states that it owns $3,900,000 in 9.4% unsecured bonds maturing on July 15, 2021 and bearing CUSIP number 370442AN5.  Second, DB states that it owns $8,850,000 in 9.45% unsecured bonds maturing on November 1, 2011 and bearing CUSIP number 37045EAS7.  Third, DB states that it owns $11,323,200 in 7.25% unsecured bonds issued in euros (the "**Euro Bonds**") maturing on July 3, 2013 and bearing ISIN number XS0171942757.  (*Id.*)  DB further states that it purchased all of its bonds between November 2004 and January 2006.  (*Id.*)

11.     DB has not provided copies of its bonds or the governing indenture to the Court, perhaps because, among other things, the indenture for the U.S.-issued bonds contains the following "no action" clause:

> no one or more Holders of Securities or coupons appertaining to such Securities shall have any right in any manner whatever by virtue of or by availing himself of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder of Securities or coupons appertaining to such Securities, or to obtain or seek to obtain priority over or

4

> preference to any other such Holder or to enforce any right
> under this Indenture, except in the manner herein provided
> and for the equal, ratable and common benefit of all Holders
> of Securities and coupons.

(Indenture (the "**GM Indenture**"), included in Proofs of Claim Nos. 47871 and

65793, annexed to the Declaration of Richard K. Milin dated May 25, 2010 (the

"**Milin Decl.**") as Exhibit 1, at § 6.04.)

12.    Wilmington Trust, as Indenture Trustee for the U.S.-issued bonds

that DB seeks to set off, has filed Proofs of Claim Nos. 47871 and 65793 for the

full accelerated amount of those bonds on behalf of all bondholders.

**B.    DB's Termination of the Swap Transactions**

13.    DB states that, after GM's bankruptcy filing on June 1, 2009, DB

sent GM a letter dated the same day with reference to the "ISDA Master Agree-

ment (as amended, modified or supplemented from time to time and together

with all schedules attached thereto, and all confirmations entered into in connec-

tion therewith, the "Master Agreement") dated as of September 19, 2002."  (Dec-

laration of Matthew Tilove dated November 23, 2009, annexed to DB's Motion

(the "**Tilove Decl.**") ¶ 8 & Exh. C.)  DB's letter stated that "Deutsche Bank hereby

notifies Counterparty that an Event of Default has occurred and is continuing

under Section 5(a)(vii) of the Master Agreement."  (Tilove Decl., Exh. C.)

14.    DB's letter further stated that it "constitutes notice designating an

Early Termination Date pursuant to Section 6(a) of the Master Agreement" and

that it "designates June 1, 2009 as the Early Termination Date with respect to all

Transactions and Confirmations pursuant to the Master Agreement."  (*Id.*)  DB's

letter added that DB "will calculate the amount owing under Section 6(e) of the Master Agreement and will notify Counterparty." (*Id.*)

15.    The evidence DB has submitted with its Motion does not establish that its letter was actually sent on June 1, 2009. DB's declarant says that it was, but he also indicates that his Declaration is based upon sources other than his own personal knowledge. (*See* Tilove Decl., ¶¶ 1, 8.)

16.    DB states that it sent GM a second letter concerning its swap termination on June 10, 2009. (*See* Tilove Decl., ¶ 10 & Exh. D.) The second letter stated that "the amount payable pursuant to Section 6(e)(i)(3) is equal to the amount of USD (24,040,404.)." (Tilove Decl., Exh. D.) DB added, however, that: "[t]his amount is subject to Set-off under Section 6(e) and Part 5(1) of the Master Agreement. Accordingly, Deutsche Bank will Set-off the full amount owed under the Master Agreement against other amounts owed to Deutsche Bank by the Counterparty." (*See id.*)

17.    DB's letter included a calculation of the sums it owed GM under the swaps. (*See id.*)

18.    DB states that its counsel sent GM's general bankruptcy counsel a third letter dated August 20, 2009. (*See* Tilove Decl., ¶ 14 & Exh. E.) DB's third letter stated that DB owned GM corporate bonds that it intended to set off against DB's swap obligations to GM: "Because the aggregate face amount of the bonds … exceeds the Settlement Amount by $32,797 (such amount, the "Setoff Deficiency"), Deutsche Bank hereby reserves its right to file a general unsecured claim for the Setoff Deficiency." (*See* Tilove Decl., Exh. E.) DB's letter also asked GM to agree to allow DB to set off its bonds against its swap obligations. (*See id.*)

6

19.    GM and DB entered into two ISDA Master Agreements, one dated

August 11, 1998 (*see* Milin Decl., Exh. 2), and one dated September 19, 2002

(Tilove Decl., Exh. A).  The 2002 ISDA Master Agreement (the "**ISDA Master**"),

which appears to govern here, indicates on the bottom right of each page that it

follows the 1992 ISDA form Master Agreement.  The Schedule to the 2002 GM-

DB ISDA Master is dated as of the same date as the ISDA Master itself.

20.    The Schedule to the ISDA Master records GM's and DB's agree-

ment that their transactions would ***not*** terminate automatically after a party's

bankruptcy.  Section 6(a) of the ISDA Master allows parties to specify that "Auto-

matic Early Termination" will apply, in which case, "an Early Termination Date

in respect of all outstanding Transactions will occur immediately upon the

occurrence" of specified events of default, including a bankruptcy filing.  (ISDA

Master, §§ 5(a)(vii), (6)(a).)  Part I of the GM-DB Schedule, however, is entitled

"Termination Provisions" and states that, "The 'Automatic Early Termination'

provision of Section 6(a) will not apply to Party A [DB] or Party B [GM]."

(Schedule, Part I, Tilove Decl., Exh. B.)

21.    In addition, the Schedule to the ISDA Master contains the following

setoff provision:

> Without affecting the provisions of this Agreement requiring
> the calculation of certain net payment amounts, all payments
> under this Agreement will be made without setoff or
> counterclaim, except that each party to this Agreement (such
> party, "Party X") agrees that, upon an Early Termination
> Date resulting from an event of Default or a Credit Event
> Upon Merger with respect to Party X the other party hereto
> (such other party, the "Non-Defaulting Party" or the "Non-
> Affected Party", as the case may be) may reduce any or all
> amounts owing to Party X under this Agreement or any
> other transactions between Party X and the Non-Defaulting
> Party or the Non-Affected Party or any Affiliate of such

7

> Party (whether or not then due) by setting off against such
> amounts any or all amounts [] to the Non-Defaulting Party
> or the Non-Affected Party or any Affiliate of such Party by
> Party X (whether or not then due).

(*Id.*, Part 5, ¶ 1 (Empty brackets inserted).)

22.     DB's Motion states that the two swap transactions at issue here were entered into in April 2004 and March 2005, some years after GM and DB entered into the ISDA Master.  (Motion, ¶ 5.)  Further, the swap transactions were not scheduled to terminate until 2013 and 2016, respectively.  (*Id.*)

23.     Although DB did not submit the trade confirmations by which the parties entered into the swap transactions at issue with its Motion papers, DB provided the Debtors with copies of the confirmations after it made its Motion. The confirmations, copies of which are annexed to the Milin Declaration as Exhibit 3, do not alter the Schedule's setoff provision.

24.     DB made its Motion seeking to effectuate a setoff of its swap obligations against its GM bonds on November 24, 2009.

## **ARGUMENT**

25.     DB, as the party seeking to effectuate a setoff, "'bears the burden of proving a right of setoff and must establish the following three criteria:  (1) the debtor must owe a debt to the creditor which arose pre-petition;  (2) the debtor must have a claim against the creditor which arose pre-petition;  and (3) the debt and claim must be mutual.'"  *In re Cairns & Assocs.*, 372 B.R. 637, 660 (Bankr. S.D.N.Y. 2007) (quoting *In re Bennett Funding Group*, 212 B.R. 206, 212 (2d Cir. BAP 1997)).

8

26.     In addition, DB must establish that it has a pre-petition right to set off under state law.  *See, e.g., In re Delta Airlines*, 341 B.R. 439, 443-45 (Bankr. S.D.N.Y 2006) ("if no right of setoff under state law existed before commence-ment of the case, none exists under Section 553.") (citing numerous cases).

27.     DB cannot sustain its burden for at least three reasons.  First, DB seeks to effectuate an improper, non-mutual setoff of a post-petition claim of the Debtors against a pre-petition debt.  Second, DB seeks to effectuate a setoff with-out demonstrating a state law contractual right to do so.  Third, DB seeks to effectuate a setoff against bonds that is prohibited by the indenture governing the U.S. bonds DB seeks to set off and without demonstrating a genuine right to set off against the Euro Bonds.  Significantly, DB does not cite, and research has not disclosed, any bankruptcy court decision approving a setoff against publicly issued corporate bonds.

28.     The GM-DB Swap Agreements require DB to pay the $24 million it owes to GM "without setoff or counterclaim" unless DB can show a valid right of setoff that meets specified conditions.  For the foregoing reasons, DB has made no such showing.  Accordingly, the Debtors' cross-motion should be granted, and DB should be ordered to pay the Debtors in full forthwith.

## POINT I

### The Motion Should Be Denied Because It Seeks
### Permission To Effectuate an Improper Setoff of Pre-Petition
### Bond Obligations Against Post-Petition Swap Debts

29.     The setoff that DB seeks to effectuate is improper because DB pro-poses to set off GM's pre-petition obligations to DB under GM corporate bonds

9

against approximately $24 million that DB owes GM as a post-petition debt
under the GM-DB Swap Agreements.

30.    The Bankruptcy Code only allows setoffs of pre-petition obligations
against *pre-petition* debts.  *See, e.g., In re Lehman Brothers Holdings, Inc.*, 404 B.R.
752, 762 (Bankr. S.D.N.Y. 2009) (hereinafter "*LHBI*") (holding that the mutuality
requirement of 11 U.S.C. § 553 only allows setoffs of pre-petition debts);  *In re
Genuity, Inc.*, Case No. 02-43558 (PCB), 2007 WL 1792252 at *4 (Bankr. S.D.N.Y.
June 20, 2007) ("pre-petition claims may only be setoff against pre-petition
claims");  *In re Delta Airlines*, 359 B.R. 454, 466 (Bankr. S.D.N.Y. 2006) ("The
Bankruptcy Code does not permit a creditor to set off a pre-petition claim against
a post-petition liability owed to the debtor.");  *Scherling v. Hellman Elec. Corp.*, 181
B.R. 730, 739 (Bankr. S.D.N.Y. 1995) ("a pre-petition debt cannot offset a post-
petition debt.");  11 U.S.C. § 553(a) (preserving the right to set off a creditor's
debts against its claims only if they both "arose before the commencement of the
case").

31.    GM's bond obligations, DB admits, are pre-petition debts.  *(See
Motion ¶ 18.)*

32.    In contrast, DB's swap obligations to GM are ***post-petition*** debts.
The Debtors recognize that, if a party's bankruptcy automatically "triggers" a de-
fault under a swap agreement, the resulting swap obligations have been treated
as pre-petition.  (*See In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (JMP), 2010
WL 1783395 at *3 (Bankr. S.D.N.Y. May 5, 2010)).  But here, DB terminated its
swap transactions with GM by an affirmative act, ***voluntarily and in its discre-
tion, <u>after</u>*** GM's bankruptcy filing.  Until DB did so, no party owed the other

10

anything, and until the final sums due were calculated based on market condi-
tions as of DB's designated Early Termination Date, it was not clear whether
either party – or neither – would owe a payment to the other.  Indeed, on a net
basis, GM might have owed DB instead of the reverse.

33.    Further, in negotiating their agreements, GM and DB expressly
chose to opt out of the ISDA Master Agreement's provision allowing for auto-
matic swap terminations upon a party's bankruptcy.  (*See* Schedule to ISDA
Master, Part 1.)  The decision to opt out allowed DB, as the "Non-Defaulting
Party," to choose to terminate the swaps long after GM's bankruptcy – and thus
potentially to continue its bet with GM that interest rates would rise.  *Cf. In re*
*Lehman Brothers Holdings, Inc.*, Case Nos. 08-13555 (JMP), 08-01420 (SIPA), Trans-
cript of Sept. 15, 2009 at 105-10, Milin Decl. Exh. 4 (noting that debtor's counter-
party did not terminate its swap agreement and was "riding the market for the
period of one year" after the petition date).

34.    Given these facts, and for four main reasons, DB's payment obliga-
tions under the GM-DB swap agreements are post-petition debts and thus
ineligible for setoff.

35.    *First*, the key transaction necessary to trigger DB's liability did not
take place until after GM filed its bankruptcy petition.  Bankruptcy courts in this
District examine whether "all transactions necessary for liability have occurred
… when the petition was filed" to determine whether a debt is pre- or post-peti-
tion.  *See LBHI*, 404 B.R. at 759 (quoting *In re BOUSA Inc.*, No. 89-B-13380, 2006
WL 2864964 at *3 (Bankr. S.D.N.Y. Sept. 29, 2006)).  *See also BOUSA* at *3 (holding
that, "[f]or purposes of setoff, a debt arises when all transactions necessary for

11

liability have occurred"); *In re Sauer*, 223 B.R. 715, 725 (Bankr. D. N.D. 1998) ("the crucial factor, then, is simply 'whether the genesis of each debt was prepetition, that is, whether the events giving rise to the debt occurred before bankruptcy.'") (quoting l David G. Epstein *et al.*, *Bankruptcy* § 6-40, at 671 (1992)) (citing *Braniff Airways, Inc. v. Exxon Co. U.S.A.*, 814 F.2d 1030, 1036 (5th Cir.1987)).

36.     Here, in contrast to swap agreements that terminate automatically upon bankruptcy, a key transaction necessary for liability did not occur until after the petition date:  DB's decision to issue a notice designating an "Early Termination Date."  Absent DB's affirmative step of terminating the swap by issuing the notice, DB would not have owed GM $24 million – and indeed, on a net basis and depending on market conditions, might not have owed anything at all.  Instead, the parties' swap transactions with their attendant payment obliga-tions would have continued until July 2013 under one of the swaps, and April 2016 under the other, unless they were properly terminated first.  (*See* Swap Con-firmations, Milin Decl., Exh. 3.)  Also, each party would have owed interest payments to the other at a specified rate on annual, semi-annual or quarterly "Payment Dates" specified in the swap confirmations.  (*Id.*)  As of GM's June 1 Petition Date, however, no party owed the other anything under the swaps.  (*Id.*)

37.     In addition, the $24 million liability that DB seeks to set off was not a regular swap payment but instead a special termination value calculated by a method specified in the ISDA Master and Schedule for events of default.  DB's voluntary termination of the parties' swaps was, therefore, necessary if DB was to incur the liability it seeks to set off – and its termination of the parties' swaps undeniably occurred post-petition.  Even the choice of Early Termination Date,

12

which in part determined the amount DB owed GM, was discretionary – the ISDA Master states only that the designated Early Termination Date must be "a day not earlier than the day such notice is effective." (*See* ISDA Master, ¶ 6.)

38.     *Second*, DB's swap obligations are post-petition debts because DB's voluntarily issuance of a notice of termination was an act giving rise to liability that occurred after the petition date.  In determining whether a post-petition transaction gave rise to liability, courts in this District have also examined wheth-er "all *acts* giving rise to liability arose before the petition date." *LBHI*, 404 B.R. at 759 (emphasis added).  *See also BOUSA*, 2006 WL 28694 at *3; *In re Moore*, 350 B.R. 650, 653-654 (Bankr. W.D.Va. 2006) (in the Fourth Circuit, courts are to apply the so-called "conduct test" to determine if the acts committed giving rise to the claim occurred pre-petition.).

39.     DB's decision to send a notice of termination to GM was plainly an "act giving rise to liability" just as it was a transaction giving rise to liability. DB's debt to GM, and the amount of that debt, both resulted exclusively from DB's post-petition actions in terminating the parties' swaps.  Accordingly, DB's swap obligations arose post-petition for purposes of setoff.

40.     *Third*, DB's obligations arose post-petition because they arose from *discretionary* post-petition actions.  The courts have recognized that, if a party retains discretion after the petition date to decide whether to perform a contract, then the contract must be classified as post-petition for setoff purposes.  *See, e.g., Gore v. United States (In re Gore)*, 124 B.R. 75, 78 (Bankr. E.D. Ark. 1990) (holding that certain payments were post-petition for setoff purposes because the debtors-in-possession could fail to perform, and fail to earn the payments, post-petition).

13

41.     The Court recently recognized this principle in *LBHI,* in which the Court determined that a debtor's transfer of funds to a different bank account, though initiated pre-petition, created a post-petition debt that was ineligible for setoff.  *See LBHI,* 404 B.R. at 762.  The recipient bank argued that the transferred funds were available for setoff before the petition date because the transfer was initiated pre-petition and merely ministerial acts were necessary to complete the transfer after the debtor's bankruptcy petition was filed.  *See id.* at 759-60.  The Court rejected the bank's argument, however, holding in part that the transfer was post-petition for setoff purposes because the debtor had discretion – which it did not exercise – to terminate the transfer in the interval after its bankruptcy petition was filed but before the transfer was complete.  *See id.*

42.     *LBHI* mandates denial of DB's Motion.  In *LBHI,* a party's mere **power** to exercise post-petition discretion converted a pre-petition funds transfer into a post-petition transfer.  Yet here, a party's **actual** exercise of post-petition discretion created the liability that it seeks to set off.  Because DB's liability to GM arose from a post-petition exercise of discretion, the liability too is post-petition and therefore ineligible for setoff by DB.

43.     **Fourth**, DB's swap obligations arose post-petition because they were not valid and enforceable debts owing as of the petition date.  Numerous courts in this District and elsewhere have held that a debt must be considered post-petition if it is not "absolutely owed" or a "valid and enforceable" "debt owing" until after the petition date.  *See, e.g., In re Myers,* 362 F.3d 667, 673 (10th Cir. 2004) ("a debt arises pre-petition for set-off purposes when some 'right to payment' exists pre-petition");  *In re Genuity, Inc.,* 323 B.R. 79, 84 (Bankr. S.D.N.Y.

14

2005) (denying request to set off deposits that were not "'debts' due and owing"
before the petition date).  *See also In re Labrum & Doak, LLP*, 237 B.R. 275, 299-300
(Bankr. E.D. Pa. 1999) (debt was post-petition because, as of the petition date,
there was no "debt owing") (quoting 11 U.S.C. § 553(a));  *Marta Group, Inc. v.
County Appliance Co.*, 79 B.R. 200, 203 (E.D. Pa. 1987) ("A claim which arises only
as a consequence of the decision to seek bankruptcy protection does not arise
pre-petition and, therefore, falls outside the statute");  11 U.S.C. § 553(a) (permit-
ting setoff only of "a mutual debt owing…that arose before commencement of
the case").

44.     Here, DB's $24 million in swap obligations to GM were not abso-
lutely owed, valid and enforceable, or debts owing prior to the Petition Date.  As
of the Petition Date, each party had a contractual obligation to make future annu-
al, semi-annual or quarterly swap payments which were to be calculated based
on specified interest rates.  The next payments were not due until July 2009, how-
ever, and those payments were different in both nature and amount from DB's
$24 million termination payment.  Accordingly, DB's $24 million was not abso-
lutely owed, valid or enforceable pre-petition, and it was not a pre-petition debt.

45.     This conclusion is further supported by this Court's decision in *In
re Delta Airlines*, 341 B.R. 439, 450 (Bankr. S.D.N.Y 2006).  In *Delta*, the Court was
called upon to decide whether more than $4 million in credits accrued by the
debtor could be set off against rejection damages.  The Court held that the credits
could not be set off for several reasons, one of which is directly relevant here:  the
credits were post-petition, the Court ruled, because neither whether any credits

15

would exist, nor their amount, could be determined until after the debtor's petition date.  *Id.*

46.    The Court described the credits as follows:

> GOAA is a non-profit organization. Pursuant to the Leases, if the Airport has generated a net revenue surplus by the end of a fiscal year, that surplus is credited after the close of the fiscal year on a pro rata basis to each of the Signatory Airlines (the "Credits"). The Leases provide that as soon as practical following the close of each fiscal year, GOAA must give each Signatory Airline a preliminary estimate of that Airline's allocated share of the surplus.

> *Id.* at 441-42.

47.    The Court held that, because the credits could not be calculated until after the close of the fiscal year – and consequently after the debtor's petition date – they constituted a post-petition debt.  The Court explained:

> the Credits did not "arise" and were not "owing" before the September 30 end of GOAA's 2005 Fiscal Year. Under the Lease, the Credits do not come into existence until the end of GOAA's Fiscal Year. Indeed, as a conceptual matter it cannot be determined whether there will be any Credits until the stroke of midnight on September 30, the cut-off for the receipts, expenditures and accruals comprising the debits and credits which will determine whether GOAA has any surplus income to return to the Airlines in the form of Credits.

> In this particular case, Delta filed for bankruptcy two weeks before the close of FY2005.  Had Delta filed, say, ten months before September 30, 2005, it becomes quite plain that GOAA could not claim that the FY2005 Credits should be deemed a pre-petition debt that "arose" before the bankruptcy filing. But there is no principled distinction between a filing ten months or two months or two weeks or two days before Fiscal Year end. The fact remains that ***the Credits are a function of a calculation that cannot be made before the close of the Fiscal Year and therefore cannot exist or "arise" before close of the Fiscal Year.***

> *Id. at 450* (emphasis added).

16

48.     Here, as in *Delta*, the parties could not determine whether a liability would exist, or the amount of that liability, until DB terminated the swap transactions based on GM's bankruptcy filing.  Moreover, whereas the credits in *Delta* arguably differed from ordinary contingent liabilities only in that they could have been non-existent, the liability under the GM-DB swaps actually could have run from GM to DB instead of the other way around.  Also, as discussed above, the liability at issue here was incurred – unlike the liability in Delta – only because of a post-petition discretionary act that terminated the parties' swap transactions.  Thus, for the reasons stated in *Delta* -- and based on *any* of the tests discussed above that the courts have employed to determine whether obligations were pre-petition -- DB's swap obligations to GM are post-petition debts and ineligible for a valid setoff.

49.     It should be emphasized, moreover, that the question addressed here is a narrow one:  whether termination payments owed to a chapter 11 debtor under swap agreements that a counter-party terminated in its discretion by affirmative, post-petition acts are post-petition obligations for purposes of determining rights of setoff.  Questions such as what priority should be afforded to a hypothetical swap obligation owed by, instead of to, a debtor raise a variety of different issues not present here.  Among other things, termination of a swap agreement immediately or soon after the petition date would not benefit the debtor's estate so as to justify administrative priority, and debtors retain the right to reject swap agreements, rendering any resulting debt pre-petition.

50.     In addition, because the swap obligations here are properly characterized as post-petition under all four of the lines of cases discussed above, the

17

Court is not required to choose among them. DB's post-petition acts, transactions and exercise of discretion – as well as its lack of a debt due and owing before the Petition Date – all mandate the conclusion that DB's swap obligation is post-petition and cannot be set off against GM bonds. The Motion should be denied, and the Debtors' cross-motion should be granted.

## POINT II

### The Motion Should Be Denied Because the
### Parties' Swap Agreements Bar DB's Proposed Setoff

51.    DB has no right under the parties' swap agreements to effectuate its proposed setoff. It is well established that, "if no right of setoff under state law existed before commencement of the case, none exists under Section 553." *In re Delta Airlines*, 341 B.R. 439, 443-45 (Bankr. S.D.N.Y 2006). Because DB has no state law right of setoff, its Motion should be denied.

52.    DB relies on the GM-DB Swap Agreements to provide a state law justification for its proposed setoff. As the record stands, however, those Agreements actually bar the proposed setoff. The GM-DB Swap Agreements require the parties to pay all sums due "without setoff or counterclaim" unless specified conditions are met, and DB has failed to show that its proposed setoff would satisfy the Agreements' conditions.

53.    The Schedule to the GM-DB ISDA Master provides, in relevant part: "all payments under this Agreement will be made without setoff or counterclaim, except that each party to this Agreement (such party, "Party X") agrees that, upon an Early Termination Date … the other party … may reduce … amounts owing to Party X under this Agreement … by setting off against such

18

amounts any or all amounts *[]* to the Non-Defaulting Party … (whether or not then due)."  (Schedule to ISDA Master, Part 5 (empty brackets inserted).)  The full provision (the "**Setoff Provision**") reads:

> Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim, except that each party to this Agreement (such party, "Party X") agrees that, upon an Early Termination Date resulting from an event of Default or a Credit Event Upon Merger with respect to Party X the other party hereto (such other party, the "Non-Defaulting Party" or the "Non-Affected Party", as the case may be) may reduce any or all amounts owing to Party X under this Agreement or any other transactions between Party X and the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party (whether or not then due) by setting off against such amounts any or all amounts [] to the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party by Party X (whether or not then due).

(Schedule to ISDA Master, Part 5, ¶ 1 (empty brackets inserted).)

54.    The Setoff Provision is materially incomplete because it is missing a key term where the empty brackets have been inserted.  It is possible that the parties intended to specify broadly that they would be allowed to set off all amounts "owing" to the Non-Defaulting Party.  It is also possible, however, that the parties intended to specify that the Non-Defaulting Party could only set off *some* amounts owing to the Non-Defaulting Party, such as amounts "owing under this or any other ISDA Master Agreement" or amounts "owing in connection with derivative transactions."  These narrower versions of the Setoff Provision would allow DB to set off amounts owed under either of two ISDA Master Agreements between GM and DB, but not to set off GM bonds.  The Setoff Provision's missing terms could also be supplied in numerous other ways, some of which might allow DB's proposed setoff, and others of which would not.

19

55.     It is well established under New York law, which the GM-DB swap agreements specify as controlling (*see* Schedule to ISDA Master, Part 4), that the courts will enforce unambiguous contracts according to their terms. *See Aon Financial Products, Inc. v. Societe Generale*, 476 F.3d 90, 96 (2d Cir. 2007).

56.     When a contract is ambiguous, however, the courts must consider evidence concerning the parties' intent. *See, e.g., Seiden Associates, Inc. v. ANC Holding, Inc.*, 959 F.2d 425, 426 (2d Cir. 1992) ("Where the language used creates an ambiguity, a reviewing court must permit the receipt of evidence in order to see what was in the drafters' minds."); *In re Chateaugay Corp.*, 154 B.R. 843, 848 (Bankr. S.D.N.Y. 1995) ("If contract terms are ambiguous, evidence of the parties' intent at the time of contracting must be received.").

57.     Crucially, DB never mentions the Setoff Provision's incompleteness in its Motion and has provided no evidence whatsoever to show what DB and GM intended.  Instead, DB uses a partial quotation, out of context, to misrepresent the Provision.  *See* Motion ¶ 4 (stating that the Setoff Provision allows a setoff of "'any or all amounts' the defaulting party owed it") (combining four neutral words quoted from the Setoff Provision with an unsupported interpretation).

58.     Further, the Debtors' understanding is that parties to swap transactions can, and sometimes do, restrict the right of setoff in their swap agreements.  At a minimum, DB cannot rely on mere unsupported assumptions to justify a $24 million setoff for which it bears the burden of proof.

59.     For the foregoing reasons, DB's Motion should be denied.  DB bears the burden of demonstrating its right to effectuate its proposed setoff, and DB has failed to meet that burden.

20

## POINT III

### DB's Motion To Set Off Against GM Bonds Should Be Denied Because the Indenture Governing the U.S.-Issued Bonds Bars DB's Proposed Setoff and DB Has Failed To Demonstrate Its Asserted Right To Set Off Against Euro Bonds

60.     DB's Motion to set off $12.75 million in U.S.-issued GM bonds should be denied because the setoff would violate the governing GM Indenture. The U.S.-issued GM bonds, like most American corporate bonds, were issued pursuant to an indenture that contains a "no action" clause substantially identical to Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b).  (*See* GM Indenture, annexed to Wilmington Trust Proofs of Claim, Milin Decl. Exh. 1.)

61.     The "no action" clause provides that only the Indenture Trustee can pursue remedies under the Indenture in most instances and bars bondholders from taking individual actions that "affect, disturb or prejudice the rights of any other Holder of Securities or coupons."  (GM Indenture, § 6.04.)  The "no action" clause also bars attempts to "enforce any right … except … for the equal, ratable and common benefit of all Holders of Securities and coupons."  (*Id.*)

62.     Further, although an exception to the "no action" clause allows individual bondholders to claim overdue principal or interest "on or after the respective due dates" expressed in their securities or coupons, that is not what DB seeks to do.  Rather, DB seeks to recover and set off the full, accelerated, "total face amount" of its bonds even though the bonds will not reach their stated maturity dates until late 2011 and 2021 respectively.  (*See* Motion ¶¶ 7-9.)

63.     DB's motion states that it owns and seeks to set off $3.9 million in 9.4% unsecured GM bonds maturing on July 15, 2021, bearing CUSIP number

370442AN5, and $8.85 million in 9.45% unsecured GM bonds maturing on

November 1, 2011, bearing CUSIP number 37045EAS7.  (*See* Motion ¶¶ 7-8.)

64.    The "no action" clause in the GM Indenture states:

> No Holder of any Security … shall have any right … by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture … or for any other remedy hereunder, unless [certain procedures are followed including making a] … written request upon the Trustee to institute such action or proceedings …. and the Trustee … shall have failed to [do so]….

> [N]o one or more Holders of Securities or coupons appertaining to such Securities shall have any right in any manner whatever by virtue of or by availing himself of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder of Securities or coupons appertaining to such Securities, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of Securities and coupons.

> (GM Indenture, § 6.04.)

65.    The exception to the "no action" clause in the GM Indenture states:

> Notwithstanding any other provisions in this Indenture, however, the right of any Holder of any Security to receive payment of the principal of (and premium, if any) and interest, if any, … on such Security or coupon, on or after the respective due dates expressed in such Security or coupon … shall not be impaired or affected without the consent of such Holder.

> *Id.*

66.    DB's attempt to obtain one hundred cents on the dollar for its

bonds by exercising a setoff requires it to avail itself of the acceleration provi-

sions of the GM Indenture.  Acceleration is a remedy provided in indentures, not

in bonds.  *See, e.g., Jackson Nat'l Life Ins. Co. v. Ladish Co.*, No. 92 Civ. 9358, 1993

WL 43373 at *6 (S.D.N.Y. Feb. 18, 1993) ("acceleration is a collection remedy provided in the Indenture"); GM Indenture § 6.01.

67.    Consequently, DB's proposed setoff would violate the GM Inden–ture's "no action" clause in at least three ways. First, allowing GM's setoff would allow it to claim sums due under the Indenture which only the Indenture Trustee has the right to pursue. (*See* GM Indenture, § 6.04.) In fact, the Trustee has alrea-dy filed proofs of claim for the full face amount of DB's and other bondholders' GM bonds. (*See* Wilmington Trust Proofs of Claim, Milin Decl., Exh. 1).

68.    Second, DB's proposed setoff would clearly "affect, disturb or pre-judice the rights" of other holders of GM securities and coupons (*see* GM Inden-ture, § 6.04) because it could further reduce the limited sums available from the Debtors to pay other bondholders.

69.    Third, the proposed setoff would be for DB's benefit, not for the "common benefit of all Holders" – it would allow DB to obtain the full face amount of its bonds when other bondholders were receiving much less. Conse-quently, the "no action" clause in the GM Indenture bars DB's proposed setoff unless DB can show that the setoff fits within the narrow exception to the Indenture's "no action" clause.

70.    DB's proposed setoff does not fit within the exception to the Inden-ture's "no action" clause. Although the exception permits bondholders to collect "principal … and interest … after the respective due dates expressed in [the rele-vant] Security or coupon," case law establishes that the exception does not per-mit collection of ***accelerated*** amounts. *See, e.g., McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743, 748 (S.D.N.Y. 1994), *rev'd on other grounds*, 65

23

F.3d 1044 (2d Cir. 1995) (granting summary judgment dismissing claims for payment of debentures because "Plaintiffs' right to tender prior to the due date expressed in the Debenture is analogous to an acceleration," which is "a collection remedy provided in the Indenture" and subject to the Indenture's No Action Clause); *Ladish*, 1993 WL 43373 at *6-*7 (holding, in interpreting an Indenture provision substantially identical to GM's, that "Section 6.04(b), interpreted in accord with the plain meaning of its terms as well as judicial authority, permits suit only to recover for payment defaults" whereas acceleration "may not properly be considered a 'payment default'").  Consequently, DB has no right to effectuate a set off against U.S.-issued GM bonds.

71.    DB's Motion also fails to justify its proposed setoff against $11.25 million in Euro Bonds.  As shown above, DB bears the burden of demonstrating its right to setoff, yet it has failed to provide any genuine evidence to prove that the entity that owes a swap payment to GM is the owner of record of the bonds or owns the bonds in a capacity that would satisfy the mutuality requirement for a valid setoff.  DB's Tilove Declaration states only that DB "purchased" and "continues to hold" the bonds without adding for whom or in what capacity and, even so, the Declaration admits that it is based in part on hearsay.  (*See* Tilove Decl. ¶¶ 1, 11-13.)  In addition, DB has provided no evidence to show whether it owns temporary or permanent global notes, no evidence to show that the notes have been accelerated in compliance with their terms, and no case law authorizing a setoff against European-issued bonds.  Accordingly, DB has failed to provide the Court with any legitimate basis for concluding that DB's Euro Bonds excuse it from paying more than $11 million that it admittedly owes to GM.  *Cf.*,

24

*e.g.*, *In re Cairns & Assocs.*, 372 B.R. 637, 660 (Bankr. S.D.N.Y. 2007) (quoting *In re Bennett Funding Group*, 212 B.R. 206, 212 (2d Cir. BAP 1997)).  Further, although the terms of the GM Indenture would preclude DB from effectuating a setoff even if it had demonstrated an otherwise valid right of setoff, DB's has failed to provide the Court with sufficient facts to establish such a right for its U.S.-issued bonds as well.

72.     For the foregoing reasons, the Court should deny DB's Motion to set off the sums DB claims to be due under both its U.S.-issued and its European-issued GM bonds.

## POINT IV

### The Debtors' Cross-Motion Directing DB To Pay the $24,040,404 DB Admits It Owes Under the Parties' Swap Agreements Should Be Granted

73.     DB admits in its Motion that "Deutsche Bank owes GM a debt of approximately $24 million on interest rate swaps entered into in 2004 and 2005 under the 1992 International Swap Dealers Master Agreement …" (Motion ¶ 1.) DB's Motion also calculates the sum it owes more precisely to be $24,040,404. (*See* Motion ¶¶ 5, 9.)

74.     The Schedule to the ISDA Master Agreement that DB refers to states, as discussed above, that the parties must pay the sums they owe "without setoff or counterclaim" unless they have a valid right of setoff that meets speci-fied conditions.  For the reasons discussed in Points I, II and III, however, DB does not have a valid right of setoff.  Consequently, the Court should enforce the terms of the parties' unambiguous contracts and enter an order directing DB to pay GM $24,040,404 forthwith. *See, e.g., Aon Financial Products, Inc. v. Societe*

25

*Generale*, 476 F.3d 90, 96 (2d Cir. 2007) (enforcing unambiguous contract in accord with its terms).

## CONCLUSION

75.     For the foregoing reasons, DB's Motion should be denied in all respects, and the Debtors' cross-motion should be granted.

## NOTICE

76.     Notice of this Objection and Cross-Motion has been provided to parties in interest in accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010 [Docket No. 5670]. The Debtors submit that such notice is sufficient and no other or further notice need be provided.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

Dated:   New York, New York
         June 18, 2010

                         MOTORS LIQUIDATION COMPANY (f/k/a
                         GENERAL MOTORS CORPORATION)
                         By its Conflicts Counsel
                         TOGUT, SEGAL & SEGAL LLP
                         By:


                            /s/ Scott E. Ratner
                         ALBERT TOGUT
                         SCOTT E. RATNER
                         RICHARD K. MILIN
                         One Penn Plaza, Suite 3335
                         New York, New York  10119
                         Telephone:   (212) 594-5000
                         Facsimile:    (212) 967-4258