**Hearing Date and Time:  June 29, 2010 at 9:45 a.m. (Prevailing Eastern Time)**

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------ x : | |
| In re: : | Chapter 11 |
| : | |
| MOTORS LIQUIDATION COMPANY, *et al.,* : | Case No. 09-50026 |
| f/k/a General Motors Corp., *et al.,* : | (Jointly Administered) |
| : | |
| Debtors. : | Honorable Robert E. Gerber |
| : | |
| ------------------------------------------------------ x | |

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION TO
THE FIRST INTERIM FEE APPLICATION OF BAKER & MCKENZIE LLP**

**TO:    THE HONORABLE ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company), appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Report and Statement of Limited Objection* in connection with the *First Interim Application of Baker & McKenzie for Compensation and Reimbursement of Expenses for Services Rendered as Special Counsel for the Debtors for the Period June 1, 2009 Through September 30, 2009* [Docket No. 4454] (the "**First Fee Application**"). With this *Report and Statement of Limited Objection,* the Fee Examiner identifies specific objectionable fees and expenses requested in the First Fee Application, which

requests $1,262,789.76 in fees and $21,619.20 in expenses.  The Fee Examiner respectfully represents:

**SUMMARY STATEMENT**

After manually reviewing the First Fee Application, counsel for the Fee Examiner raised a series of concerns about the application by letter to Baker & McKenzie LLP ("**Baker**") dated April 1, 2010.  On April 26, 2010, as a result of communications between the Fee Examiner's counsel and Baker, the Fee Examiner and Baker stipulated to an adjournment of the April 29, 2010 hearing on the First Fee Application.  The Court granted an adjournment and also granted an extension to the retention of Stuart Maue to enable it to review the First Fee Application as one of the applications subject to a computer-assisted audit by that firm [Docket No. 5671].

As a result of the audit, counsel for the Fee Examiner again raised a series of concerns with Baker about the application by letter dated June 7, 2010.  In a telephone call on June 14, Baker indicated that it would await receipt of a draft report before responding to the Fee Examiner's concerns.  On June 18 and June 21, Baker provided subsequent explanations and documentation to address most, but not all, of the Fee Examiner's concerns.  This *Report and Statement of Limited Objection* summarizes the Fee Examiner's analysis in support of a suggested disallowance of $51,115.59 in fees and expenses.  Most of these recommended reductions are attributable to block billing and billing increments.

**BACKGROUND**

1.      Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated procedurally and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  The Debtors are

2

authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On July 22, 2009, the Debtors filed their *Application of Debtors for Entry of Order Pursuant to 11 U.S.C. § 327(E) and Fed. R. Bankr. P. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel, Nunc Pro Tunc to the Commencement Date* [Docket No. 3283] (the "**Retention Application**"). There were no objections to the Retention Application, and Baker was appointed by this Court's *Order Pursuant to 11 U.S.C. §§ 327(e) and Fed. R. Bankr. P. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel to the Debtors, Nunc Pro Tunc to the Commencement Date* [Docket No. 3634] (the "**Retention Order**").

3. On November 16, 2009, Baker filed the First Fee Application, seeking fees in the amount of $1,262,789.76 and expenses in the amount of $21,619.20, for total requested compensation in the amount of $1,284,408.96 for the period from June 1, 2009 to September 30, 2009. As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"), Baker has previously been paid $970,627.08 in fees and expenses for services provided and expenses incurred during June, July and September 2009 as reflected in records provided by AP Services, LLP.

4. On April 26, 2010, the Fee Examiner and Baker filed a *Stipulation and Order for Adjournment of April 29, 2010 Hearing on First Interim Fee Application of Baker & McKenzie LLP* [Docket No. 5604], and on April 29, 2010, the Court entered the order adjourning the hearing [Docket No. 5671].

5. By correspondence dated April 1, 2010 and again on June 7, 2010, counsel for the Fee Examiner provided Baker with an analysis of the fees requested in the First Fee Application, inviting Baker to submit any additional information it desired. The preliminary analysis included information related to:

    A. Currency conversions;

    B. Transition issues;

    C. Prepetition fees;

    D. Overcharges and undercharges;

    E. Double billing;

    F. Summer associates;

    G. Non-working travel time;

    H. Clerical and administrative tasks;

    I. Block billing;

    J. Billing increments;

    K. Billing and retention matters;

    L. Vague tasks and vague communications; and

    M. Expenses.

Baker did not provide information in response to this preliminary analysis, electing instead to await receipt of a draft report.

6. On June 15, 2010, the Fee Examiner sent Baker a draft of this *Report and Statement of Limited Objection* (the "**Draft Report**"), offering yet another opportunity for discussion. Baker provided further information by telephone conference on June 18, 2010 and

4

again by written correspondence dated June 21, 2010.  All of the information provided by Baker has been considered by the Fee Examiner.

## APPLICABLE STANDARDS

7.  The Fee Application has been evaluated for compliance with the *Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-104 (Bankr. S.D.N.Y. June 20, 1991), and the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-151 (Bankr. S.D.N.Y. April 19, 1995) (collectively, the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order—including the extent, if any, that variation has been expressly permitted by order.

## COMMENTS

8.  **Transition**.  The Fee Examiner noted that in Baker's initial retention documents, in its amended and restated declaration in support of retention, and in the fee application itself some confusion surrounded the assignment of responsibility for the payment of Baker's bills. Responsibility for billings to the "Project Beam" transaction, for example, ultimately fell to NewGM after the July 10, 2009 closing of the section 363 sale.

9.  Uncertainty also surrounded responsibility for the fees related to the Delphi Steering Acquisition, "Project Two" and "Project Three," matters as well as the fees arising from Baker's work on federal tax matters.  Billings for these matters comprise the vast majority of Baker's $1.2 million fee request.  Baker has disclosed that $35,774.37 of fees initially submitted

5

to the Debtors were subsequently determined to be the responsibility of NewGM. The invoices for those fees have been submitted to NewGM for payment.

*Voluntary adjustment to fee request in light of subsequent billing arrangements: $35,774.37.*

10. **Currency Conversions**. Baker professionals from nearly two dozen offices across the United States and abroad actively worked on matters covered by the First Fee Application. Those professionals billed their time in U.S. dollars, Australian dollars and Euros. The professionals' rates in U.S. dollars as supplied by Baker–and Baker's total fees and expenses requested–are based on currency conversions done on various dates and not on the date of the First Fee Application. *See* First Fee Application, Ex. B, Summary of Professionals & Paraprofessionals Rendering Services (the "**Attorney Summary**"). Baker did not provide the actual currency conversions it used nor did it describe the source of those conversions in detail. Pursuant to a local order, fee applicants are required to use the currency conversion in effect on the date the fee application is filed. *Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals*, General Order M-348 (Bankr. S.D.N.Y. Mar. 21, 2008).

11. The auditor recalculated the fees and expenses requested using the currency conversions between U.S. dollars and Euros and Australian dollars published by the Federal Reserve Bank on November 16, 2009. *See* Board of Governors of The Federal Reserve, 4.10 Foreign Exchange Rates (weekly) (Nov. 23, 2009). Those conversion rates, $1.4977 USD = 1€ and $.9369 USD = 1 AUD, result in modest changes to the fees and expenses requested. When calculated using the November exchange rates, the First Fee Application supports a fee request of $1,260,444.69 and an expense request of $21,785.99.[1] *See* **Exhibit A-1, A-2**. Unless

---

[1] This expense figure includes what appears to be a voluntary reduction of approximately $7,670 by Baker.

6

otherwise noted, the figures used throughout this report have been calculated using the November 16, 2009 currency conversions stated above. Baker has agreed to a voluntary reduction of $2,178.40 in fees to account for the currency discrepancies.

*Voluntary reduction for currency discrepancies: $2,178.40.*

12.     **Project Staffing**. Services provided by Baker have been provided by four position titles for attorneys and at least ten position titles for non-attorneys.

13.     Baker provided a summary sheet identifying each professional who provided services to the Debtors during the first interim fee period along with their title and billing rate converted to U.S. dollars. Baker did not provide the professionals' billing rate in the original currency. The highest billing partner provided services at $1,157.77 an hour.

14.     Baker's professional services were provided at a blended rate of $506.80 per hour for attorneys with a total blended rate including paraprofessionals of $479.68 per hour. These blended rates appear to correspond to rates charged by mid-level associates to lower-rate partners at Baker. The Fee Examiner reviewed the individual professionals' time entries; however, due to the vagueness of many task descriptions, the Fee Examiner was at times unable to determine whether certain tasks were properly delegated to less experienced professionals capable of completing the task at a lower billing rate or whether professionals had duplicated their efforts.

15.     For example, one 2004 Corporate Commercial associate billed significant amounts of time at rates ranging from $404.38 to $482.91 an hour for drafting various agreements on the Project Beam matter; a Corporate Commercial partner billing at $688.94 an hour also billed significant amounts of time for drafting the same documents. The Fee Examiner also noted that certain partners billed for work that might have been more appropriately assigned to a paraprofessional, such as reviewing the docket and filings, or for work that does not appear to have resulted in any work product, such as time spent reviewing correspondence. In the

7

absence of extenuating circumstances brought to the attention of the Fee Examiner, the preferred practice is for tasks to be managed by senior personnel with tasks performed at the lowest appropriate billing rate by less senior personnel.

16.     Having considered the extraordinary circumstances surrounding the initial period of this engagement as well as the other recommended fee reductions contained in this report, the Fee Examiner does not recommend a reduction for project staffing.

*Suggested disallowance for project staffing:  none.*

17.     **Rate Increases**.  Baker disclosed that certain timekeepers' rate information contains more than one rate due to "traditional increases of the Biller's general rate," whereas other timekeepers appear to have multiple rates due to fluctuations in the currency conversion rates used by Baker.  Attorney Summary at 9.

Stuart Maue reconstructed Baker's undisclosed currency conversion rates to the extent possible given the lack of transparency in the First Fee Application.  After reviewing Stuart Maue's analysis, the Fee Examiner concludes that Baker's use of multiple currency conversions does not explain all rate increases.  In light of Baker's disclosure that its future fee request(s) will contain billing data only for its U.S. offices—and thus, that all future rate increases will be transparent—and in light of other recommended disallowances contained in this report, the Fee Examiner does not recommend any further inquiry or reductions on this basis.[2]

*Suggested disallowance for rate increases:  none.*

18.     **Prepetition and Post Sale Fees**.  The Fee Examiner identified $4,381.50 in charges to the estate for pre-retention work.  *See* **Exhibit B**.  This work is not compensable under the bankruptcy code.  In addition, Baker charged $416.50 to the Special Tax Counsel matter after

---

[2] Fee applicants are reminded, however, that rate increases in fee applications subject to mandatory fee review should be transparent given the central role that market rates play in the bankruptcy compensation structure.

8

July 10, when responsibility for such billing was to transfer to NewGM. *See* **Exhibit C**. In response to the Fee Examiner's inquiry, Baker has agreed to a voluntary reduction in the full amount of the questioned charges.

*Suggested disallowance for non-compensable fees: $4,798.00.*

19. **Overcharges and Undercharges**. The Fee Examiner identified several billing discrepancies that appear to have resulted in a net undercharge to the estate of $563.34.

*Suggested disallowance for billing discrepancies: none.*

20. **Double Billing**. The Fee Examiner identified some overcharges as a result of double billing that total $62.63. *See* **Exhibit D**. Baker has agreed to a voluntary reduction in the amount of the questioned charges.

*Voluntary reduction for double billing: $62.63.*

21. **Law Clerks and Other Similar Paraprofessionals**. Baker billed 137 hours, representing $27,020.39 in fees, for work performed by one summer associate, four law clerks, one "International Clerk," and three trainee solicitors. The summer associate's work accounted for $2,445 in fees. *See* **Exhibit E**. This Court has ruled that services provided by law students who do not yet have a law degree are not compensable. *In re Motors Liquidation Company*, First Interim Fee Hr'g Tr., 19-20 No. 09-50026 (Bankr. S.D.N.Y. April 29, 2010, 5:24 P.M.). In contrast, services provided by law clerks and other law school graduates who are in the process of being admitted to the bar are compensable. *Id.* In response to the Fee Examiner's inquiry, Baker disclosed that the paraprofessionals identified as law clerks, international clerks or trainee solicitors generally are law school graduates. Baker agreed to a voluntary reduction for charges incurred by a summer associate.

*Voluntary reduction for summer associates: $2,445.00.*

9

22. **Non-Working Travel Time**. Unproductive travel time is compensable at half the professional's usual hourly rate. *In re Fibermark, Inc.*, 349 B.R. 385, 406 (Bankr. D. Vt. 2006); *Wilder v. Bernstein*, 975 F. Supp. 276, 283-84 (S.D.N.Y. 1997) (holding in a non-bankruptcy context that "courts in this circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rates") (citations omitted). The Fee Examiner identified $4,579.38 in charges for apparently unproductive travel time that was billed at the professional's full rate. *See* **Exhibit F**. In response to the Fee Examiner's inquiry, Baker explained that some of the charges included working time that was not properly segregated and agreed to a voluntary reduction of 25 percent of the charges identified by the Fee Examiner.

*Voluntary reduction for non-working travel time: $1,145.00.*

23. **Clerical and Administrative Tasks**. Clerical, administrative, and overhead expenses are not compensable. The audit identified 29.3 hours of potential administrative and clerical tasks provided at professional rates that might more appropriately have been considered overhead. *See* **Exhibits G, H**. After reviewing the description of services provided, the Fee Examiner recommended to Baker that the fees might be more appropriately compensated at a paralegal rate of $250 per hour and Baker agreed that a reduction was appropriate.

*Voluntary reduction for clerical and administrative tasks: $3,472.00.*

24. **Internal Communications**. Baker professionals spent significant time corresponding, reviewing correspondence and emails, and conferring more generally. The Fee Examiner notes, for example, that some professionals in one overseas office describe much of their time as "reviewing emails" rather than producing or aiding in the production of work product or strategy of benefit to the estate. There are occasions when more than one person needs to participate in conference calls, internal meetings or must otherwise keep abreast of developments in a project, particularly at the outset of retention or when a project involves issues

10

related to the law of multiple jurisdictions. The Fee Examiner encourages professionals to explain such circumstances in their fee applications.

25. Notwithstanding the extraordinary circumstances of the time period in question, the Fee Examiner recommends that some fee reduction is reasonable and appropriate. However, because the Fee Examiner is already recommending a substantial fee reduction for other deficiencies that overlap to some degree with the entries discussed here, no additional disallowance for internal communications is suggested.

*Suggested disallowance for excessive internal communications: none.*

26. **Events Staffing/Unexplained Travel**. The Fee Examiner's review specifically addressed Baker's practice of staffing events with multiple professionals. Such staffing can result in unnecessary charges for duplicative work being billed to the estate. "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." UST Guidelines at (b)(4)(v). The Fee Examiner in particular notes one 2006 Corporate Commercial associate who traveled three times from the London office to Zurich and back to attend negotiations on Project Beam that were also staffed by two Baker partners. The cost for those trips, on June 14 to 15, July 6 and July 8 was $23,453.98 in fees and $5,657.79 in travel-related expenses. In response to the Fee Examiner's inquiry, Baker explained the associate's need to attend these meetings as a primary drafter of the Opel stock purchase agreement. The Fee Examiner considered Baker's explanation, and finding it generally reasonable and adequate, does not recommend a reduction in fees or expenses on this basis.

*Suggested disallowance for fees for unexplained travel: none*

*Suggested disallowance for expenses for unexplained travel: none.*

27. **Billing for Firm Retention and Compensation Matters**. Baker billed $127,145.05 in fees, or approximately 10 percent of its fee request, on matters identified as

11

relating to Baker's Retention and Fee Applications, including $40,523.25 for tasks related to the review and revision of invoices to comply with the bankruptcy code. *See* **Exhibit K**. Baker has also disclosed that going forward, *all* fees and expenses submitted in future fee applications will be for retention or billing matters only. The Fee Examiner and Baker have had productive discussions on this issue, and have agreed to defer treatment of this issue until Baker's final fee application, when the full scope of billing and retention activities, in relation to the work Baker performed, will be more apparent.

*Suggested disallowance for billing and retention matters: none at this time.*

28.    **Block Billing**. The U.S. Trustee guidelines prohibit "lumping" or block billing. To be compensable, all time entries must be sufficiently detailed to allow a party reviewing them to determine their compliance with applicable codes, rules, standards, and guidelines. "Services should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry." UST Guidelines at (b)(4)(v). A substantial number of Baker timekeepers routinely billed their time in un-segmented blocks. The Fee Examiner raised the issue with Baker and provided Baker an exhibit itemizing $220,145.59 in block-billed entries. *See* **Exhibit L**. In response, Baker agreed that some disallowance for block billing was warranted and agreed to a voluntary reduction of $22,014.56.

Baker additionally disclosed that it had provided a billing memorandum to all Baker professionals expected to provide services to the estate in this matter world-wide, but due to the widely varying billing practices at foreign offices, to many of its foreign professionals' unfamiliarity with U.S. bankruptcy practice, and to the exigencies of the early stages of its retention in these cases, Baker was unable to secure full compliance with this guideline. In light of this explanation, the exigencies of the first interim fee period, and Baker's voluntary reduction, the Fee Examiner does not recommend any additional reduction in fees on this basis.

12

*Voluntary reduction for block billing: $22,014.56.*

29. **Billing Increments**. The applicable guidelines require professionals to bill in increments of one-tenth of an hour. Numerous Baker professionals failed to abide by this requirement. The Fee Examiner raised the issue with Baker in the context of one specific timekeeper who billed nearly all her time in half-hour increments, totaling $78,547.25 in fees. *See* **Exhibit M**. This practice disregards the guideline requirement of billing in one-tenth of an hour increments and appears to reflect "rounding" of time, rather than an accurate billing based on contemporaneous records. Baker agreed that a reduction in fees on this basis was warranted, and voluntarily reduced its request by $10,000.

*Voluntary reduction for billing increments: $10,000.*

30. **Vague Entries**. Task descriptions must be sufficiently detailed to allow a reviewer to determine the reasonableness of the time spent on that task. Similarly, entries describing communications should identify all participants and the subject matter of the communication. The audit identified $37,467.68 in vaguely-described communications (*see* **Exhibit N**) and $7,406.33 in vaguely-described tasks (*see* **Exhibit O**). Baker agreed that many, but not all, of the questioned entries were vague, and supplied additional explanation for some entries. In a telephone conference with the Fee Examiner, Baker initially agreed to a voluntary reduction of $5,000, but subsequently amended the amount by letter to $2,243.70 (approximately five percent). The Fee Examiner does not believe that such percentage reduction adequately addresses the matter and recommends a total reduction of $5,000 is appropriate.

*Voluntary reduction for vague entries: $2,243.70.*

*Suggested additional disallowance for vague entries: $2,756.30 (constituting a total disallowance of $5,000).*

31. **Expenses**.  The Fee Examiner requested information from Baker regarding charges for local travel, documentation for out-of-town travel, and other expenses.  Notable among these types of charges are "Local Tax" and "Value Added Tax."  In response to the Fee Examiner's inquiry, Baker responded with additional documentation to support the questioned expenses.

*Suggested disallowance for improper and improperly documented expenses: none.*

*Voluntary adjustment due to NewGM billing:  $35,774.37.*

*Total fees suggested for disallowance:  $51,115.59.*

*Total expenses suggested for disallowance:  none.*

*Total fees and expenses recommended for disallowance:  $51,115.59.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Second Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on subsequent interim fee applications or on final fee applications.  All professionals subject to the Fee Examiner's review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Second Fee Application.

Dated: Madison, Wisconsin
June 22, 2010.

                                    GODFREY & KAHN, S.C.

By:     /s/ *Katherine Stadler*
Katherine Stadler (KS 6831)
Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: kstadler@gklaw.com
           tnixon@gklaw.com

*Attorneys for Fee Examiner*

5056027_1

15