Hearing Date and Time:  June 29, 2010 at 9:45 a.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        :
In re:                                                  :  Chapter 11
                                                        :
MOTORS LIQUIDATION COMPANY, *et al.,*                   :  Case No. 09-50026
   f/k/a General Motors Corp., *et al.,*                :  (Jointly Administered)
                                                        :
                    Debtors.                            :  Honorable Robert E. Gerber
                                                        :
------------------------------------------------------- x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED
OBJECTION TO THE SECOND INTERIM FEE APPLICATION OF
<u>KRAMER LEVIN NAFTALIS & FRANKEL LLP</u>**

**TO:    THE HONORABLE ROBERT E. GERBER
        UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company), appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Report and Statement of Limited Objection* in connection with the *Second Interim Application of Kramer Levin Naftalis & Frankel LLP, as Counsel for the Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional Services Rendered and For Reimbursement of Actual and Necessary Expenses Incurred for the Period from October 1, 2009 Through January 31, 2010* [Docket No. 5296] ("**Original Second Fee Application**") and the *Supplement and Correction to the Second Interim Application of Kramer Levin Naftalis & Frankel LLP, As Counsel for the*

*Official Committee of Unsecured Creditors, For Allowance of Compensation for Professional Services Rendered and For Reimbursement of Actual and Necessary Expenses Incurred for the Period From October 1, 2009 Through January 31, 2010* [Docket No. 5790] ("**Amended Second Fee Application**") (collectively, the "**Second Fee Application**"). With this *Report and Statement of Limited Objection,* the Fee Examiner identifies specific objectionable fees and expenses in the Second Fee Application, which requests $1,148,977.75 in fees and $31,103.29 in expenses. The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

Prior to the Fee Examiner's review of the original Second Fee Application, Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**") asked for the opportunity to supplement its application in light of the Court's rulings on the first interim fee applications. After reviewing the Amended Second Fee Application, counsel for the Fee Examiner raised a series of concerns about the application by letter to Kramer Levin dated June 4, 2010. On June 11, 2010, and in response to counsel's letter, the firm addressed some—but not all—of these concerns. The Fee Examiner and Kramer Levin engaged in additional communications by telephone and email correspondence on June 17 and 18, 2010. This *Report and Statement of Limited Objection* summarizes the Fee Examiner's analysis in support of a suggested disallowance of $58,851.45 in fees and expenses. Most of these recommended reductions are attributable to block billing, and repetitive and vague timekeeping.

## BACKGROUND

1. Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated procedurally and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are

2

authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On November 16, 2009, Kramer Levin filed its first interim fee application [Docket No. 4459], seeking fees and expenses in the amount of $4,678,958.27 ("**First Fee Application**").

3. On April 22, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to First Interim Fee Application of Kramer Levin Naftalis & Frankel LLP*, identifying $520,863.97 in fees and expenses that were objectionable. [Docket No. 5555] That report and statement is incorporated by reference.

4. On April 29, 2010, this Court issued an oral ruling that granted Kramer Levin's first interim fee application in part but required a continued holdback of 10 percent of Kramer Levin's requested fees. On May 21, 2010, in accordance with the specific findings made by the Court in its bench ruling, the Court entered an omnibus order approving a series of interim fee applications, including the application submitted by Kramer Levin. *Order Granting Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from June 1, 2009 through September 30, 2009* (the "**Omnibus Order**") [Docket No. 5834]. The Omnibus Order authorized payment to Kramer Levin of $4,479,062.50 for fees (which included the 10 percent holdback) and $84,569.10 for expenses.

5. On March 17, 2010, Kramer Levin filed its second interim fee application, seeking fees in the amount of $1,149,758.75 and expenses in the amount of $31,383.31. On May 18, 2010, Kramer Levin filed a correction to its second interim fee application, seeking fees in the amount of $1,148,977.75 and expenses in the amount of $31,103.29, for total requested compensation of $1,180,081.04.

3

6. As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"), Kramer Levin reports that as of the date of the Original Second Fee Application, it has previously submitted monthly statements and received payments from the Debtors totaling $858,666.33 for the period covered by the Second Fee Application, consisting of 80 percent of requested fees and 100 percent of requested expenses for the months of October, November and December. Original Second Fee Application, ¶ 17.

7. According to the Debtors, as of the date of this report, Kramer Levin has received payment of $952,486.32 for fees and expenses incurred for the period covered by the Second Fee Application.

8. By correspondence dated June 4, 2010, counsel for the Fee Examiner provided Kramer Levin with a summary of his preliminary analysis of the fees requested in the Second Fee Application, inviting Kramer Levin to submit any additional information it desired. The preliminary analysis included information related to:

    A. Billing rates;

    B. Overcharges and double billing;

    C. Clerical and administrative tasks;

    D. Block billing;

    E. Billing and retention matters;

    F. Repetitive and vague tasks descriptions; and

    G. Expenses.

Kramer Levin provided information in response to this preliminary analysis by correspondence dated June 11, 2010.

9. On June 15, 2010, the Fee Examiner sent Kramer Levin a draft of this *Report and Statement of Limited Objection* (the "**Draft Report**") with a limited objection to Kramer Levin's fees, offering yet another opportunity for discussion to which Kramer Levin responded by telephone and email on June 17 and 18, 2010. All of the information provided by Kramer Levin has been considered by the Fee Examiner.

## APPLICABLE STANDARDS

10. The Fee Application has been evaluated for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order—including the extent, if any, that variation has been expressly permitted by order.

## COMMENTS

11. **Billing rates**. During the first interim fee period, certain Kramer Levin timekeepers' rates increased. In response to the Fee Examiner's inquiry, Kramer Levin disclosed that those increases reflected associates' advancement to the next year's class, for example, an associate moving from being a third-year associate to being a fourth-year associate. *See* Email from Jennifer Sharret to Katherine Stadler (Apr. 19, 2010). The Fee Examiner considered the

5

response, and finding it generally reasonable, did not raise an objection to Kramer Levin's fees for the first interim fee period on this basis.[1]

12.    The Second Interim Fee Application discloses a second set of rate increases effective January 1, 2010.  In response to the Fee Examiner's inquiry, Kramer Levin stated that effective January 1, 2010 of each year, all professionals "are generally increased in accordance with market practices and to reflect increases in expenses."  Letter from Thomas Moers Mayer to Katherine Stadler (June 11, 2010), at 2 ("**Kramer Levin Letter**"); *see also* Original Second Fee Application, ¶ 8.  The result of the double increases is that certain associates' rates have increased twice and substantially in a four month period, for a total percentage increase of as much as 14.8 percent for one bankruptcy associate.  The Fee Examiner questions the market basis for multiple rate increases occurring during the same calendar year.  In general, it will be difficult to justify rate increases more than once a year—if that.[2]

13.    The Fee Examiner also raised specific questions about Kramer Levin's rates, noting that some Kramer Levin bankruptcy professionals are billing at rates higher than those of their peers on other teams.  For example, one lead bankruptcy attorney on this case, admitted to the bar in 1982, billed at a rate of $930 to $950 per hour whereas a corporate team member admitted to the bar the same year, billed at a rate of $775 to $795 per hour.  Similarly, the bankruptcy paralegals who provided services during the second interim fee period did so at an hourly rate $15 to $20 higher than their corporate and litigation team peers.

---

[1] The Fee Examiner notes, however, that this explanation does not explain all rate increases that occurred during the first interim fee period.  Specifically, two Special Counsel—with bar admission dates of 1982 and 1994—also increased their rates during this period.  One increase was modest, from $695 to $700 (0.1 percent), but the other was not, from $685 to $890 (29.9 percent).

[2] The Fee Committee in the Lehman Brothers case apparently has recommended that professionals' rates in that case be frozen at 2009 levels.

6

14.     Kramer Levin, in response, stated that it does not charge a premium for its work in this case or any other bankruptcy case, that multiple factors go into a billing rate, and that in particular, the bankruptcy partner whose billing rate the Fee Examiner questioned reflects his status as a "nationally recognized Bankruptcy practitioner." Kramer Levin Letter at 2-3. Kramer Levin did, however, voluntarily agree to standardize its paralegal billing rate to $260 for work done in 2009 and to $275 for work done in 2010. Kramer Levin additionally supplied the Fee Examiner with a chart comparing the rate of the partner the Fee Examiner questioned to the rates of "bankruptcy partners at other large firms with significant Bankruptcy practices." That chart, however, does not address whether Kramer Levin's professionals in the bankruptcy practice group charge more—as a whole—than their colleagues in other practice groups. Kramer Levin did not provide a chart comparing the rates for professionals in the bankruptcy practice group and in other groups. The question of market rates, which is a fundamental tenet of compensation in bankruptcy, continues to warrant further review.

*Voluntary reduction for billing rates: $1,178.*

*Suggested additional disallowance for billing rates: none at this time.*

15.     **Billing discrepancies**. The Fee Examiner identified $649 in overcharges due to the total hours billed for a given timekeeper entry being higher than the individual bracketed time entries in the timekeeper's description of the tasks performed on that day. The Fee Examiner also identified $2,170 in fees for entries that appear to have been billed twice. *Id.* In response to the Fee Examiner's inquiry, Kramer Levin voluntarily reduced its fee request by the total amount questioned, $2,819.

*Voluntary reduction for billing discrepancies: $2,819.*

*Suggested additional disallowance for billing discrepancies: none.*

16.     **Clerical and administrative tasks**.  The Fee Examiner identified 13.4 hours, representing $6,805.50 in fees, in tasks that appear to be administrative or clerical and that might have been more appropriately treated as overhead.  *See* **Exhibit A**.  Included in that figure are 12.9 hours by one partner and two associates for time devoted to reviewing the firm's monthly invoices before sending them to the Debtors for payment.  *Id.*  In response to the Fee Examiner's inquiry, Kramer Levin responded that because a partner ultimately certifies the Fee Application, which incorporates the monthly statements, reviewing the monthly invoices is appropriate and compensable, and not an administrative task.  Kramer Levin Letter, at 4.

17.     Kramer Levin additionally notes that the monthly reports undergo three to four levels of review before being submitted to the Debtors:  first by a paralegal; then by a junior associate; then by a senior associate, if necessary; and finally by a partner.  *Id.*  Kramer Levin explained, for example, that

> [The junior associate] conducted a second-round and final review
> of the bill to ensure time billed to appropriate matters and
> privileged info. is not disclosed, etc.

Kramer Levin Mark-up to Fee Examiner's Draft Exhibit K (June 11, 2010) (email attachment to Kramer Levin Letter).  Time spent to ensure billing is to the correct matter and includes the appropriate level of detail is an administrative task—whether such time is spent by the timekeeper preparing his or her daily time sheet or by a junior associate reviewing the bill after the fact.

18.     Under the bankruptcy code, a fee applicant may seek reimbursement for time spent preparing the fee application, commensurate with the level and skill reasonably required for the task.  11 U.S.C. § 330(a)(6). Fee applicants, however, must demonstrate that the tasks for which they claim compensation are directly related to compliance with the bankruptcy code and are not merely tasks related to every attorney's professional duty to disclose the basis of the fees

8

charged and the accuracy of their bills.  In response to the Fee Examiner's inquiry, Kramer Levin agreed to voluntarily reduce the billing rate for associates' time spent reviewing monthly invoices to a first-year associate rate of $385 (2009) and $390 (2010).  This rate change results in a reduction of $1,541 in fees.  The Fee Examiner accepts this reduction, but notes that the more general issue of the compensability of time spent reviewing professionals' time records remains very much at issue.

19.    Fee applicants may wish to explain the case-related reason for multiple rounds of review of monthly invoices to ensure that excessive or duplicative charges are not billed to the estate and to ensure that such review—when compensable—is billed at a rate commensurate with the skill required to complete the task.

20.    The Fee Examiner also notes that a substantial percentage of the hours objected to both in this fee application and the first involve similar entry-level summaries and review of motions and filings, performed by the same 2009 associate.  *See* **Exhibit B**.  The Court sustained the Fee Examiner's recommendation as to the first interim fee application that the associate's tasks, although compensable, were compensable only at a paralegal rate.  In response to the Fee Examiner's inquiry as to these seemingly similar fees in the second interim period, Kramer Levin responded that these tasks "required a legal understanding of the 363 sale issues and could not have been performed by a paralegal."  In light of Kramer Levin's explanation, the Fee Examiner does not recommend any further disallowance on this basis.

*Voluntary reduction for invoice-review:  $1,541.*

*Suggested additional disallowance for clerical and administrative tasks:  none at this time.*

21.    **Block Billing**.  Pursuant to the UST Guidelines, time entries for multiple tasks in excess of 0.5 hours in aggregate time must identify the amount of time spent on each discrete

9

task.  The audit identified $28,572.75 in blocked-billed entries in the Second Fee Application and provided Kramer Levin with an itemization of the questioned entries.  *See* **Exhibit C**.  In response to the Fee Examiner's inquiry, Kramer Levin made an effort to explain why each entry should not be viewed as a "block" or, in the alternative, segregated the time spent on each discrete task within the questioned block.  The Fee Examiner is unconvinced by either of Kramer Levin's explanations.

22.     In response to the Fee Examiner's inquiries about both the First and Second Fee Applications, Kramer Levin has argued that certain entries—such as an entry describing both researching and drafting—are a single task whose component elements need not be segregated.  Thus, Kramer Levin argues that an entry that reads: "attn to asbestos claims motion; reviewed precedent cases (1.6)" is not block billing because "[t]he cases reviewed were cited in the claims motion and part of the review-work done on that motion—a single task."  Kramer Levin Mark-up to Fee Examiner's Draft Exhibit L (June 11, 2010) (sent as email attachment to Kramer Levin Letter).

23.     Reasonable minds may disagree as to what activities are so fluid that they cannot be reasonably broken out into their component parts.  Research and drafting, however, are not such activities.  Arguably, one of the principal benefits of the prohibition against block billing is that it allows the fee reviewer—be that the client, the U.S. Trustee or the Court—to evaluate a fee applicant's staffing decisions and effort expended.

24.     If Kramer Levin's formulation of block billing were adopted, the following entries would be indistinguishable because the individual bracketed times would not be required:

| Timekeeper/Hourly Rate | A | B |
|---|---|---|
| Partner/$800 | Attn to asbestos claims motion (0.3); reviewed precedent cases (1.3) | Attn to asbestos claims motion (1.3); reviewed precedent cases (0.3) |
| Junior Associate/$440 | Attn to asbestos claims motion (0.3); reviewed precedent cases (1.3) | Attn to asbestos claims motion (0.3); reviewed precedent cases (1.3) |

The time breakdown, as illustrated above, is central to the reasonableness inquiry. In the examples in column A, a fee reviewer might question why a partner was performing extensive case law review on an apparently simple motion. The examples in column B, on the other hand, appear to show appropriate staffing for possibly non-duplicative services, with the partner providing strategy analysis and the associate providing the underlying research analysis.

25.     A more extreme example is:

- Research case law (1.0); draft motion (19.0)

- Research case law (19.0); draft motion (1.0)

Kramer Levin's proposed definition of block billing would eliminate the distinction between these two time entries. A precise quantification of time spent on the component tasks of certain work product may be difficult; however, such difficulty does not excuse the need for a good faith effort to supply a reasonable estimate so as to facilitate the statutorily-mandated review for reasonableness.

26.     Of the $28,572.75 in fees the Fee Examiner identified as block billed, $5,386.50 are the subject of Kramer Levin's argument that the entries represent a single task. Of the remaining $23,186.25 in questioned fees, "Kramer Levin has broken out certain tasks when possible for other entries." Kramer Levin Letter, at 4. In fact, Kramer Levin has identified the amount of time spent on each discrete task for every questioned entry not subject to its argument

11

that the questioned entry describes a single task, but did not explain why that information was not included in the original or amended applications.

27.   This additional time-segregation comes more than half a year after the original application was drafted and after amending the fee petition once, which raises questions about the accuracy of the reconstructions. In response to the Fee Examiner's inquiry, Kramer Levin agreed to voluntarily reduce its fee request by five percent of the questioned entries. The Fee Examiner, however, does not believe this reduction adequately addresses Kramer Levin professionals' repeated non-compliance with this guideline.[3]

28.   Compliance with the UST Guidelines is not voluntary. In the future, the Fee Examiner may recommend greater percentage disallowances to fee applicants who continue to not comply with this—or any other—mandatory guideline. Fee applicants should also take note that the Fee Examiner's willingness to accept the applicants' explanations about the accuracy of untimely reconstructions of time entries will not be indefinite.

*Voluntary reduction for block billing: $1,428.63.*

*Suggested additional disallowance for block billing: $2,857.28 (bringing the total percentage disallowance to 15 percent of all questioned entries).[4]*

29.   **Billing and Retention Matters**. Kramer Levin billed $48,091.75 in fees for the preparation of its monthly bills and the first interim fee application, not including the specific entries questioned by the Fee Examiner in ¶¶ 16-18.[5]  *See* **Exhibit D**.

---

[3] The Court disallowed $50,000 in Kramer Levin's fees during the first interim fee period because they were block-billed.

[4] The Fee Examiner recommended a 25 percent reduction for block billed entries in the first interim fee period. The Fee Examiner did not include in that calculation entries for which the fee applicant provided a reasonable—though untimely—explanation or time segregation in response to the Fee Examiner's inquiry. In contrast, the 15 percent calculation above includes all block-billed entries—whether or not subsequently detailed.

[5] Kramer Levin spent an additional $44,090 during the first interim fee period preparing, reviewing and serving its monthly statements, as well as negotiating the terms of the order appointing the Fee Examiner.

30.     Again, some billing tasks, including the generation of monthly billing statements and their associated review and editing, generally should be considered part of a firm's overall administrative expense. In response to the Fee Examiner's inquiry, Kramer Levin responded that "work on the monthly bills is work on the fee application." Kramer Levin Letter, p. 5. The Fee Examiner respectfully disagrees. All legal professionals are charged with the preparation of accurate monthly bills. Because monthly billing is an activity that is independent of any bankruptcy code requirements, the associated review of those bills is properly characterized as administrative overhead. In addition, the monthly billing inures almost solely to the firm's benefit: it triggers the 80 percent monthly payment.

31.     In addition, this is not Kramer Levin's first bite at the apple. The Fee Examiner raised significant questions about Kramer's first interim fee application (the charges for which appear on the Second Fee Application) and the Fee Examiner questions the expenditure of nearly $50,000 in legal fees for the review of invoices and preparation of a first interim fee application containing numerous deficiencies with respect to established guidelines and statutory requirements, significantly, by a firm with extensive experience in bankruptcy. In response, Kramer Levin stated that it did not believe a fee reduction was warranted merely because the Fee Examiner had previously "raised issues with the time detail and substantive issues in Kramer Levin's First Interim Fee Application." *Id.* Again, the Fee Examiner respectfully disagrees. Approximately 69.7 percent of the fees the Court disallowed from Kramer Levin's First Fee Application were consequences of the firm's noncompliance with established prohibitions against block billing and vague entries.[6] In light of the fact that so many of the deficiencies in

---

[6] The remaining disallowances were for clerical and administrative tasks performed at attorney rates (approximately 15.6 percent) and for billing by summer associates (approximately 14.7 percent).

13

the First Fee Application were on established points of law, a reduction in fees is appropriate and reasonable.

*Suggested disallowance for billing and retention matters: $7,213.76 (constituting 15 percent of the charges for billing and retention).*

33. **Repetitive and Uninformative Time Entries**. During the second interim fee period, one partner billed more than 60 hours, representing $50,316.75 in fees, on tasks described variously as "attention to staffing and project allocation," "review correspondence re: case," "e-mails…regarding case administration issues," "attention to case administration," "calls to creditors regarding status of case," "attention to environmental issues for remaining properties," "attention to insurance issues," and "attention to plan structure issues." *See* **Exhibit E**. The repeated use of the same vague time description on a nearly daily basis raises questions about the necessity of the services provided. During the first interim fee period, because of the timing exigencies involved, the Court treated such billing entries with relative lenience. However, the Court did advise that "the circumstances at the time the services are performed and the practicalities of perfect compliance" were relevant to a determination of an appropriate penalty for noncompliance. *In re Motors Liquidation Co.*, First Interim Fee Hr'g Tr., 31:6-8, No. 09-50026 (Bankr. S.D.N.Y. April 29, 2010, 5:24 P.M.) [Docket No. 5699].

33. In response, Kramer Levin stated that the time descriptions were not repetitive: "On a daily basis, [partner] spent time on staffing and project allocation, reviewing correspondence on the case, focusing on environmental and insurance issues impacting the progress of the case, and devoting time to plan structure issues." Kramer Levin Letter at 6. Providing after-the-fact, general explanations of the timekeeper's role in the case is not a substitute for complying with the UST Guideline that "[s]ervices should be noted in detail." UST Guidelines at (b)(4)(v). Indeed, each fee applicant is required to certify compliance with

14

the guidelines: "Each application for fees and disbursements must contain a certification…[that] the fees and disbursements sought fall within these Amended Guidelines and the UST Guidelines." Local Guidelines, at 1.

34. Kramer Levin agreed to reduce the billing rate at which the questioned services were provided to a junior partner rate of $680, resulting in a voluntary reduction of $7,803.15 in fees. The Fee Examiner, however, does not believe that Kramer Levin's explanation provides sufficient detail about the partner's services to sustain Kramer Levin's burden to show that the services are being billed at a rate commensurate with the skill required to complete the tasks. *See* 11 U.S.C. § 330(a)(3)(D).

*Voluntary reduction for repetitive time entries: $7,803.15.*

*Suggested additional disallowance for repetitive time entries: $17,355.23 (for a total suggested disallowance of 50 percent of the questioned entries).*

35. **Vague Entries**. To be compensable, all time entries must be sufficiently detailed to allow a party reviewing them to determine their compliance with applicable codes, rules, standards, and guidelines. "Services should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry." UST Guidelines at (b)(4)(v). "Time entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication," *id.*, and—again—all time entries require sufficient detail to demonstrate compliance with the standards set forth in 11 U.S.C. § 330.

36. In addition to the vague and repetitive time entries noted above, the audit revealed additional vaguely described communications and tasks by Kramer Levin professionals totaling more than $93,423.33. *See* **Exhibits F, G.** Kramer Levin disputes that the questioned entries are vague. For certain entries, Kramer Levin has supplied additional detail about the questioned

15

entry. For other entries, Kramer Levin asserts that in the context of the matter description title, the entry is not vague. Kramer Levin, however, has agreed that some reduction for vague timekeeping is warranted and has agreed to voluntarily reduce its fee request by five percent of the challenged entries.

37. The Fee Examiner again questions why Kramer Levin did not supply all the information it had in its possession regarding the services it provided at the time it filed the Amended Second Fee Application, and respectfully disagrees that the matter description title is an adequate substitute for a detail in the time entries. In light of the fact that Kramer Levin already has received an opportunity to re-submit the supporting documentation for the second interim fee application, the Fee Examiner suggests an additional reduction for vague timekeeping.

*Voluntary reduction for vague entries: $4,671.17.*

*Suggested additional disallowance for vague entries: $9,342.33 (for a total suggested disallowance of 15 percent of vaguely described services).*[7]

38. **Expenses**. The Second Fee Application seeks reimbursement for $1,829.27 in cab fares, almost all for local travel. The Fee Examiner inquired of Kramer Levin about the case-related reason for the expense, and noted the Court's oral ruling that "after the closing with New GM, charging the estate for local transportation would be inappropriate." Tr. 4-29-2010, P.M. at 24:13-14. Kramer Levin, however, responded that these charges reflect its policy to provide local transportation to attorneys who live in the five boroughs and who work past 10:00 p.m. Kramer Levin Letter at 7. Kramer Levin agreed to write-off transportation charges incurred by professionals who record less than six hours to this case during that particular day, unless otherwise noted. *Id.* Kramer Levin calculated the value of the voluntary reduction as

---

[7] This percentage recommendation is the same percentage recommendation proposed for first interim fee applications with vague timekeeping deficiencies.

16

$849.52. In light of the Court's ruling on this matter, however, and in the absence of any case-related reason for any local transportation charges to the estate now that the exigencies of the first weeks are over, the Fee Examiner recommends complete disallowance of the local transportation charges.

39.     Similarly, the Second Fee Application seeks $812.63 in reimbursement for in-house meals. Kramer Levin agreed to voluntarily reduce its request by $339.92, the amount attributable to meals by attorneys working late who recorded fewer than six hours to the case on that day. Kramer Levin Letter at 7. Again, in the absence of a detailed case-related reason for the expenses now that the exigencies of the first weeks are over, the Fee Examiner recommends complete disallowance of the in-house meal charges.

*Voluntary reductions for unnecessary expenses: $1,330.46.*[8]

*Suggested additional disallowance for unnecessary expenses: $1,311.44.*

40.     **Research Services**. The Fee Examiner identified $1,904.00 in research services charged as expenses that should more properly have been itemized as fees. Kramer Levin agreed to do so.

*Voluntary reduction of expenses: $1,904.*

*Additional request for fees: $1,904.*

> ***Total (net) voluntary reduction in fees: $17,536.95.***
>
> ***Total voluntary reduction in expenses: $3,234.46.***
>
> ***Total additional fees suggested for disallowance: $36,768.60.***
>
> ***Total additional expenses suggested for disallowance: $1,311.44.***
>
> ***Total fees and expenses recommended for disallowance: $58,851.45.***

---

[8] This calculation, which may be incorrect, is Kramer Levin's own calculation for its voluntary reductions for local transportation and in-house meals.

17

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Second Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on subsequent interim fee applications or on final fee applications.  All professionals subject to the Fee Examiner's review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Second Fee Application.

Dated: Madison, Wisconsin
June 22, 2010.

GODFREY & KAHN, S.C.


By:   */s/ Katherine Stadler*
Katherine Stadler (KS 6831)
Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: kstadler@gklaw.com
         tnixon@gklaw.com

*Attorneys for Fee Examiner*

5065401_2