**Hearing Date and Time: June 29, 2010 at 9:45 a.m. (Prevailing Eastern Time)**

Timothy F. Nixon
Eric J. Wilson (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                          :
In re                                                     :    Chapter 11
                                                          :
MOTORS LIQUIDATION COMPANY *et al.,*                      :    Case No. 09-50026 (REG)
          f/k/a General Motors Corp. *et al.,*            :    (Jointly Administered)
                                                          :
                    Debtors.                              :    Honorable Robert E. Gerber
                                                          :
-------------------------------------------------------- x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION**
**TO THE SECOND INTERIM FEE APPLICATION**
**OF WEIL, GOTSHAL & MANGES LLP**

**TO:    THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company),

appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Report and Statement of*

*Limited Objection* in connection with the *Second Application of Weil, Gotshal & Manges LLP,*

*as Attorneys for the Debtors, for Interim Allowance of Compensation for Professional Services*

*Rendered and Reimbursement of Actual and Necessary Expenses Incurred From October 1,*

*2009, Through January 31, 2010* [Docket No. 5295] (the "**Second Fee Application**"). With this

*Report and Statement of Limited Objection*, the Fee Examiner identifies $194,352.31 in fees and

expenses, from a total of $6,302,627.06 requested in the Second Fee Application, that are

objectionable.  The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

A fee applicant bears the burden of proof on all of the elements of a fee application,

including establishing that the services provided were necessary and reasonable and that the

billed expenses were necessary, reasonable and actually incurred.  A fee application must

additionally comply with the format and content requirements in the applicable guidelines and

bankruptcy rules.

After reviewing the Second Fee Application, counsel for the Fee Examiner raised a series

of concerns about the application by letters dated May 25, 2010 and June 4, 2010 to Weil,

Gotshal & Manges LLP ("**Weil**").  Through letters dated June 3, 2010 and June 11, 2010, and in

response to counsel's letters, the firm addressed some of these concerns, which this report has

taken into account.  As summarized in **Exhibit A**, this *Report and Statement of Limited*

*Objection* suggests disallowance of $160,897.25 in fees and $33,455.06 in expenses for a total

suggested reduction of $194,352.31, from a total request of $6,302,627.06 in interim

compensation.  A single component of the recommended fee disallowance—a 50 percent

suggested disallowance for time spent reviewing time entries—accounts for almost 90 percent of

the total recommended fee disallowance.

## BACKGROUND

1.      Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates

("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The

Debtors' chapter 11 cases have been consolidated procedurally and are being jointly administered

pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  The Debtors are authorized to operate

their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C.

§§ 1107(2) and 1108.

2.      On January 13, 2010, Weil filed its first interim fee application [Docket No. 4803],

seeking fees and expenses in the amount of $18,506,169.92.

3.      On April 22, 2010, the Fee Examiner filed the *Fee Examiner's Report and*

*Statement of Limited Objection to the First Interim Fee Application of Weil, Gotshal & Manges*

*LLP* (the "**Fee Examiner's First Report**"), identifying $1,288,820.53 in fees and expenses that

were objectionable [Docket No. 5563].  That report and statement is incorporated by reference.

4.      On April 29, 2010, this Court issued an oral ruling that granted Weil's first interim

fee application in part but required a continued holdback of 10 percent of Weil's requested fees.

On May 21, 2010, in accordance with the specific findings made by the Court in its bench ruling,

the Court entered an omnibus order approving a series of interim fee applications, including the

application submitted by Weil.  *Order Granting Applications for Allowance of Interim*

*Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from*

*June 1, 2009 through September 30, 2009* (the "**Omnibus Order**") [Docket No. 5834].

A.      The omnibus order authorized payment to Weil of $17,686,445.97 for fees

(which included the 10 percent holdback) and $550,260.95 for expenses.

B.      These fees and expenses, to the extent not already paid by the Debtors on

a monthly basis, were to be paid from the amount (approximately $5.9 million according

to Weil) held by Weil as a retainer.

5.      On March 17, 2010, Weil filed the Second Fee Application, seeking fees in the

amount of $5,903,901.25 and expenses in the amount of $398,725.81, for total requested

3

compensation of $6,302,627.06 for the period from October 1, 2009, through January 31, 2010

(the "**Second Compensation Period**").[1]

6.    As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331*

*Establishing Procedures for Interim Compensation and Reimbursement of Expenses of*

*Professionals* [Docket No. 3711] (the "**Compensation Order**"), Weil reports it has previously

submitted monthly statements and received payments from the Debtors totaling $1,600,470.32 for

the Second Compensation Period, consisting of 80 percent of the requested fees and 100 percent of

the requested expenses invoiced for October 2009.  *See* Second Fee Application, ¶ 12.  As of the

date of the Second Fee Application, Weil reported it had not yet received payment for the fees or

expenses invoiced for November 2009, December 2009, or January 2010.  *Id.*

7.    After reviewing the Second Fee Application and supporting documentation, counsel

for the Fee Examiner sent Weil a letter dated May 25, 2010 (the "**May 25 Letter**") that sought

additional information regarding the following issues:

> A.    Confirmation regarding employment status of law clerks;
>
> B.    Non-working travel time;
>
> C.    Time billed to review time records;
>
> D.    Time billed in half-hour and whole-hour increments;
>
> E.    Time entries billed with vague task descriptions;
>
> F.    Legal research tasks;
>
> G.    Document delivery services performed by Weil paralegals;
>
> H.    Time entries billed for call log maintenance;

---

[1] Although the Second Fee Application states that it seeks compensation for fees attributable to tasks performed after October 1, 2009, the application also includes $27,928.50 of fees attributable to tasks performed before that date, during the first compensation period.  *See* **Exhibit B**.  In addition, the Second Fee Application includes expenses of $261,563.27 incurred in the first compensation period.

I.    Pre-petition expenses;

J.    Potential double billing;

K.    Airfare, hotel and meal expenses;

L.    Local transportation expenses;

M.    Certain expenses that appeared to be administrative overhead;

N.    Moving and storage expenses; and

O.    Outside printing expenses.

Weil provided information in response to these requests by correspondence dated June 3, 2010 (the "**June 3 Letter**").

8.    By correspondence dated June 4, 2010, counsel for the Fee Examiner asked Weil to provide invoices for specific photocopying expenses performed by an outside vendor. Weil provided copies of those invoices as enclosures to a letter dated June 11, 2010.

9.    On June 15, 2010, the Fee Examiner sent Weil a draft of this *Report and Statement of Limited Objection* with a limited objection to Weil's fees, offering further opportunity for discussion. All of the information provided by Weil has been evaluated by the Fee Examiner.

**APPLICABLE STANDARDS**

10.    The Fee Application has been reviewed for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second**

**Advisory**"), as well as this Court's Compensation Order—including the extent, if any, that

variation has been expressly permitted by order.

## COMMENTS

11.    **Project Staffing**.  Services provided by Weil reflect three position titles for

attorneys (partner, counsel and associate) and various titles for non-attorneys (law clerks,

paralegals, clerks, library staff and "other non-legal staff").  The hourly billing rate for partner-

level attorneys ranged from $430 to $1,000—with a blended rate of $869.61 for all 40 partner-

level attorneys providing services in the Second Compensation Period.  *See* **Exhibit C**, at 2.  The

hourly billing rate for counsel-level attorneys ranged from $650 to $720—with a blended rate of

$663.93 for all four counsel-level attorneys providing services during the same period.  *See id.*

The hourly billing rate for associate-level attorneys ranged from $227.50 to $765—with a blended

rate of $483.09 for all 79 associate-level attorneys providing services during the same period.  *See

id.* at 5. The hourly billing rate for the non-attorneys providing services ranged from $85 to $260.

*See id.* at 5-8.

12.    As a general matter, Weil continued to distribute work during the Second

Compensation Period appropriately between timekeepers of varying seniority levels.  As outlined

in Exhibit C, 19.22 percent of the hours billed during the Second Compensation Period were at

partner-level rates.  *See id.* at 2.  In contrast, 54.92 percent of the hours billed during the same time

frame were at associate-level rates.  *See id.* at 5.  The overall blended rate for all timekeepers

during the Second Compensation Period was $508.16, which represents a slight increase from the

$487.12 blended rate during the first interim fee application period.  *See id.* at 8; Fee Examiner's

First Report, Ex. B at 16.

*Suggested disallowance for project staffing:  None.*

09-50026-mg    Doc 6095    Filed 06/22/10    Entered 06/22/10 13:14:55    Main Document
Pg 7 of 21

13.    **<u>Firm Retention and Compensation</u>**.  As outlined in **<u>Exhibit D</u>**, for the Second

Compensation Period, Weil billed approximately $276,766 on matters relating to its own

compensation.  The amount billed to these matters represents approximately 4.7 percent of the

total fees billed by Weil during the Second Compensation Period.  During the first interim fee

application period, Weil billed under two percent of its fees to similar matters.

14.    In his report on the First Fee Application, the Fee Examiner noted his concern

regarding the amount of time spent by Weil timekeepers (and timekeepers at other firms)

reviewing their own time records.  For example, during the first interim fee application period,

26 different Weil timekeepers (almost all paralegals) billed 940 hours to reviewing time records

for "compliance with" or "pursuant to" the UST Guidelines.  *See* Fee Examiner's First Report,

¶ 28.  Given the extraordinary level of activity during the first few weeks of the bankruptcy, the

Fee Examiner elected not to challenge the time spent reviewing time records in the First Fee

Application.  The Fee Examiner noted his expectation, however, that this process would be more

efficiently managed prospectively.  *Id.*

15.    During the Second Compensation Period, Weil continued to spend an inordinate

amount of time reviewing its own time records.  When printed out by the fee auditor, the time and

expense entries submitted by Weil in connection with the Second Fee Application spanned

784 pages.  As outlined in **<u>Exhibit E</u>**, 15 separate Weil timekeepers billed 670.40 hours examining

these entries for compliance with applicable guidelines.[2]

A.    To spend the amount of time that Weil timekeepers logged reviewing their

own billing statements for compliance with the guidelines, one would have to look at

*each page* of these time and expense entries for more than 50 minutes.

---

[2] All of the time entries appearing in Exhibit E (listing fees billed reviewing time entries for compliance with
guidelines) also appear in Exhibit D (listing fees billed for tasks relating to firm compensation).

B.      Viewed another way, if one person worked 40 hours each week doing

nothing but reviewing the Weil time records for compliance with the guidelines, that

person would need to work for nearly four months straight to spend the amount of time

that Weil timekeepers logged to this task in the Second Fee Application.

16.     Prior to filing this report, counsel for the Fee Examiner brought these concerns to

Weil's attention, pointing out that the number of tasks in the Second Fee Application decreased by

48 percent from the First Fee Application, while the review of those tasks decreased by only

28 percent.  May 25 Letter, at 1-2.  In response, Weil stated:

> It appears from your letter that you are applying purely a
> mathematical formulaic approach.  We do not believe this is
> appropriate or applicable.  The fact that there are fewer tasks does
> not necessarily mean the number of hours required to review the
> same should reduce proportionately.  As I am sure you know,
> individual time records vary in length and detail and are not
> subject to the mathematical analysis on which you base your
> objection.  We believe the time records are accurate and properly
> reflect the time expended.

June 3 Letter at ¶ 3.  There is no apparent reason to quarrel with the literal accuracy of these time

records.  The Fee Examiner does, however, object to the total amount of time spent.  While no

one disputes that time entries vary in length and detail, the total of all time entries spanned fewer

than a thousand pages, and Weil should not have spent more than 40,000 minutes examining

them.

17.     Furthermore, regardless of the amount of time spent, some billing tasks, including

the generation of monthly billing statements and their associated review and editing, generally

should be considered part of a firm's overall administrative expense.  In light of this, and the

amount of time billed to these tasks, the Fee Examiner recommends a 50 percent reduction.

*Suggested disallowance for time billed to firm compensation:  $138,383.*

18.    **Non-Working Travel Time**.  Non-working travel time is compensable at 50 percent.  *See In re Fibermark, Inc.*, 349 B.R. 385, 406 (Bankr. D. Vt. 2006) (travel time should be billed at one-half the professional's customary rate); *Wilder v. Bernstein*, 975 F. Supp. 276, 283-84 (S.D.N.Y. 1997) ("courts in this circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rates") (citations omitted).

19.    In accordance with this authority, Weil used a special project code for non-working travel time and billed time recorded under this code at half its normal billing rates.  Two time entries for non-working travel were not billed to this code, however, resulting in charges at full rates.  **Exhibit F** shows questionably coded time entries billed at full rates, which totaled $2,355.00.  If properly coded, those entries would have been billed at half the normal billing rate, for a total of $1,177.50.

20.    Counsel for the Fee Examiner has brought these issues to Weil's attention, and Weil has agreed to reduce its fee application accordingly.  June 3 Letter, ¶ 2.

*Agreed disallowance for non-working travel time:  $1,177.50.*

21.    **Time Increments**.  The UST Guidelines require time entries to be recorded in tenths of an hour.  *See* UST Guidelines, (b)(4)(v).  During the first interim fee application period, several Weil timekeepers recorded their time entries in half-hour or whole-hour increments with unusual frequency, a fact noted by the Fee Examiner in his report.  *See* Fee Examiner's First Report, ¶ 32.

22.    In the Second Fee Application, this issue was far less prevalent.  At least one Weil timekeeper, however, continued to submit time entries that appear problematic:

A.    During the first interim fee application period, one Weil paralegal billed 684.00 hours in 360 separate billed tasks.  Of these billed tasks, more than half (53 percent) were billed in half-hour or whole-hour increments.

B.      During the second interim fee application period, this same paralegal

billed 561.70 hours in 287 separate billed tasks, for a total of $103,142 in fees.  *See*

**Exhibit G**.  Again, almost half (47 percent) of the entries were billed in half-hour or

whole-hour increments, representing $56,800 in fees.  *See id*.  Compounding the issue is

the fact that the paralegal often bills time vaguely, leaving the accuracy of time entries

difficult to assess.  Moreover, approximately 20 percent of this paralegal's recorded time

during the second interim fee period corresponded to the review of Weil time records for

compliance with the UST Guidelines, an effort that appears to have duplicated work done

by other paralegals.

23.     Counsel for the Fee Examiner brought the timekeeping issues with this paralegal to

Weil's attention.  In response, Weil stated:

> [W]e do not agree that the entries are vague or improper.  First,
> [the timekeeper] was a paralegal.  Her time records are in varying
> increments and the fact that many are in half or whole hour
> increments does not warrant the conclusion that they are in any
> way inaccurate or inappropriate.  If all of her time records were in
> such increments, then perhaps your concern might be justified.
>
> Additionally, we do not agree that the time records are vague based
> on the nature of the services rendered by [the paralegal] and her
> position; and also do not agree that her services were in any way
> duplicative.  Indeed, we believe her time records are more than
> sufficiently descriptive of the services rendered.

June 3 Letter, at ¶ 4.

24.     The issue can be reduced to one of probability.  Out of the ten possible time

increments for a given task (*e.g.*, 0.1, 0.2, 0.3), two of them—or 20 percent—are either in

half-hour or whole-hour increments.  Given a large enough sample size, and assuming a random

distribution of time entries, one would expect roughly 20 percent of the entries to be recorded in

half-hour or whole-hour increments.  The sample size here is relatively large—almost 300 time

entries.  The likelihood is small that the paralegal would have randomly recorded 47 percent of those time entries in either half-hour or whole-hour increments.

25.    The more probable explanation is that the paralegal frequently recorded tasks in half-hour and whole-hour increments when in fact she worked less (or more) on the task.  The Fee Examiner does not assume that any professional inflates time; rather, it appears probable that this paralegal frequently recorded her time inaccurately—either greater or less than the time she actually worked.  To encourage accurate time recording, the Fee Examiner suggests that the Court disallow 10 percent of the $56,800 in fees recorded in half-hour and full-hour increments by this paralegal during the Second Compensation Period

*Suggested disallowance for time increments:  $5,680 (10 percent of fees recorded in half-hour and whole-hour increments) .*

26.    **Long Billing Days**.  Frequent long billing days by the same professional can raise questions about project staffing and efficiency and the credibility of the application process.  In addition, long billing days that do not correspond to time periods of high activity in the case raise questions about the necessity of the services provided.

27.    Accordingly, counsel for the Fee Examiner examined the time entries accompanying the Second Fee Application for instances of abnormally long billing days, particularly when those days occurred consecutively.  Although Weil attorneys continued to work hard during the Second Compensation Period, the Fee Examiner does not recommend any disallowance due to long billing days.

*Suggested disallowance for long billing days:  None.*

28.    **Transient Billers**.  Several Weil professionals billed fewer than ten hours during the Second Compensation Period.  In ordinary circumstances, tasks performed by timekeepers like these could be unnecessary in light of efforts by the many others devoted to the case full-time or

might reflect contributions that were not meaningful.  Accordingly, counsel for the Fee Examiner

examined the time entries entered by timekeepers who billed fewer than ten hours during the fee

period.  The Fee Examiner does not recommend any disallowance.

29.     The Fee Examiner notes, however, that Weil has again grouped several timekeepers

together in the summary sheet of the Second Fee Application, when those timekeepers each billed

fewer than ten hours.  The UST Guidelines require a summary sheet that lists the hours billed for

"each person" who billed time during the fee period.  *See* UST Guidelines, at (b)(3)(iv).  In

subsequent fee applications, to comply with the UST Guidelines, Weil should identify "each"

timekeeper in its summary sheet.  The Fee Examiner made this request in his report on the First

Fee Application as well.  *See* Fee Examiner's First Report, ¶ 40.

        *Suggested disallowance for transient billers:  None.*

30.     **Law Clerks**.  During the Second Compensation Period, Weil billed 310.30 hours,

representing $62,372.50 in fees, for work performed by seven timekeepers described as "law

clerks," most of whom appear to have worked in foreign offices with hourly billing rates ranging

from $175 to $225.  In response to a request, Weil has confirmed that all of these law clerks have a

law degree and were working full time during the Second Compensation Period.  June 3 Letter,

¶ 1.  The work performed by these law clerks appeared reasonable and necessary.  Accordingly,

the Fee Examiner does not seek any disallowance of their fees.

        *Suggested disallowance for law clerks:  None.*

31.     **Clerical and Administrative Tasks**.  Counsel to the Fee Examiner identified

$3,782.50 in fees billed by Weil timekeepers to deliver documents to locations in Manhattan.  *See*

**Exhibit H**.  Weil has agreed to withdraw these fees as an overhead expense.  June 3 Letter, ¶ 7.

32.     In addition, the time entries submitted with the Second Fee Application included

12 separate entries totaling 23 hours and $3,220 in fees in connection with a Weil paralegal

recording time to "research" that a "proposed order" was pending.  *See* **Exhibit H** at 3-4.  Because of the vague nature of these entries,[3] counsel to the Fee Examiner sought clarification from Weil. In response, Weil explained that the entries "relate[d] in part to traveling to the U.S. District Court in Manhattan, which was necessary in order to monitor the docket for Judge Kaplan's [*sic*] decision with respect to an appeal of the 363 Transaction."  June 3 Letter, ¶ 6.[4]  Weil further stated:  "Approximately 75% of each time entry was for non-working travel."  *Id.*  Therefore, Weil proposed reducing 75% of these entries (or 17.25 hours) to the non-working travel rate, with a resulting credit of $1,207.50.  *Id.*

33.    While the Fee Examiner appreciates Weil's willingness to review these entries, the Fee Examiner recommends that the Court disallow the fees for all of the entries.  Sending a paralegal to the courthouse to check the docket for the same filing on 12 separate days appears to be unreasonable, or even if reasonable, an administrative and clerical expense properly absorbed as overhead—or checked electronically without travel.

*Suggested disallowance for clerical and administrative tasks:  $7,002.50*

34.    **Vague Entries.**  To be compensable, all time entries must be sufficiently detailed to allow the Court to determine their compliance with applicable codes, rules, standards, and guidelines.  Counsel for the Fee Examiner sent Weil a list of entries that did not appear to meet this standard.  In response, Weil supplemented the time entries for one timekeeper, providing further explanation for individual emails on six separate dates.  June 3 Letter, ¶ 5(a).  With regard to all of the other entries, however, Weil maintained that they were appropriate.  The Fee Examiner

---

[3] In addition to being vague, every one of the 12 entries was in a half-hour or whole-hour increment, raising concern about their accuracy.

[4] It is unclear to which decision Weil refers here; Judge Kaplan did not decide the appeal of the 363 sale in this case.

continues to perceive these other entries as insufficient.  Enclosed as **Exhibit I** is a chart of these

remaining time entries, totaling $57,695 in fees.

35.     Several of the entries are vaguely described email tasks with descriptions such as

"review and reply to various emails" and "review emails."  *See* Exhibit I at 2-7, 12-14.  With

respect to those entries, Weil stated:

> The time entries relating to reviewing and replying to emails are
> appropriate.  First, many of the time entries are for a small amount
> of time (e.g., .1) and it would neither be efficient nor economical to
> document each one, particularly in view of the number of emails
> received and addressed on a daily basis.  Indeed, the time required
> to do this would exceed the time associated with the actual task.
> For instance, if an attorney responds to several emails relating to
> General Case Strategy in a 0.1 hour of time, it would be inefficient
> and unnecessarily expensive to require the attorney to describe, in
> detail the nature of every email reviewed and response thereto.
> Furthermore, the task code categorization helps to add clarification
> to each of these time entries.

June 3 Letter, ¶ 5(a).  Notably, despite this objection, Weil provided further detail for several

emails from one timekeeper—and, consequently, the Fee Examiner no longer objects to those

entries.  Weil did not, however, provide any further explanation for the email descriptions for the

other timekeepers.

36.     While some leeway may well be appropriate in describing numerous tasks taking a

short period of time, the time entries at issue here were logged vaguely on a frequent and routine

basis, and they provide no basis to evaluate the reasonableness of the tasks performed.  Moreover,

the UST Guidelines plainly require:  "Time entries for telephone calls, letters, and other

communications should give sufficient detail to identify the parties to and the nature of the

communication."  UST Guidelines, (b)(4)(v).  The entries at issue do not comply with the UST

Guidelines; a reduction is appropriate.  Consistent with the Court's ruling on the First Fee

Application, the Fee Examiner recommends a 15 percent reduction.  For future fee applications,

however, the Fee Examiner will recommend a more substantial disallowance for vague entries.

37.     Another Weil timekeeper routinely recorded entries with the description "follow

up."  *See* Exhibit I at 14-17.  With respect to these entries, Weil stated that they "involved

reviewing emails, documents and client notes relating to the matters described in the adjoining

time entries."  June 3 Letter, ¶ 5(c).  Weil maintained that the entries "are not at all vague."  *Id.*

The Fee Examiner disagrees and, consistent with the Court's ruling on the First Fee Application,

recommends a 15 percent reduction.  For future fee applications, however, the Fee Examiner will

recommend a more substantial disallowance for vague entries.

38.     Three other Weil timekeepers provided insufficient descriptions for legal research,

as follows:  (a) a junior associate billed 12.8 hours and $7,551.50 in fees for 17 separate entries

described as researching "tax issues," s*ee* Exhibit I at 8-10; (b) a mid-level associate billed

57.2 hours and $20,986.00 in fees for 24 separate entries described as researching "trust structure,"

*see id*. at 10-12; and (c) a junior associate billed 16.7 hours and $6,930.50 in fees over two

consecutive days reaching and preparing a memorandum on "estimation," *see id*. at 7.

39.     With respect to the junior associate (with a 2009 bar admission date) billing

$7,551.50 in fees researching "tax issues," Weil has stated that these entries "involved matters

protected by attorney/client privilege and disclosing more detail would be inappropriate."  June 3

Letter, ¶ 5(b).  If this is the case, Weil should ask the Court for permission to omit the privileged

information that would otherwise allow the entries to contain sufficient detail.  *See* Local

Guidelines, ¶ B ("Confidentiality Requests").  If the Court grants such a request, the Court may

require Weil to furnish the Court with unredacted time records for *in camera* inspection.  *Id.*  There

is insufficient information to evaluate the reasonableness of the time entries, and the Fee Examiner

continues to recommend an appropriate reduction of the corresponding fees based on the vague

nature of the entries.  Consistent with the Court's ruling on the First Fee Application, the Fee

Examiner recommends a 15 percent reduction.

40.     With respect to the mid-level associate (with a 2004 bar admission date) who billed

$20,986.00 in fees researching "trust structure," Weil replied that the entries "involved an

application of section 468B and other provisions of the Internal Revenue Code to a proposed

chapter 11 plan structure involving several trusts."  June 3 Letter, ¶ 5(b).  This explanation does

not provide detail sufficient to justify 24 separate entries that totaled 57.2 hours and $20,986.00 in

fees.  The Fee Examiner continues to recommend an appropriate reduction based on the vague

nature of the entries.  Consistent with the Court's ruling on the First Fee Application, the Fee

Examiner recommends a 15 percent reduction.

41.     With respect to the junior associate (with a 2009 bar admission date) who billed

$6,930.50 in fees researching and preparing a memorandum on "estimation" issues, counsel asked

Weil:  "What was the issue he researched, how detailed was the memorandum that he prepared,

and how was it used?"  May 25 Letter at 2-3.

A.     In response, Weil stated that the associate "conducted legal research

regarding estimation of claims in the context of the tens of thousands of claims filed in

these cases."  June 3 Letter, ¶ 6(a).  Weil further stated that the "nature of the research is

privileged but was undertaken to determine whether a procedure could be implemented

that would facilitate more expeditious distributions to holders of allowed claims under a

plan."  *Id.*  Weil did not provide any information on the memorandum that the associate

prepared or how it was used.

B.      If Weil wishes to submit information in support of its fee application that

is less than complete due to privilege concerns, the Local Guidelines require Weil to ask

permission from the Court to do so.  *See* Local Guidelines, ¶ B ("Confidentiality

Requests").

Without knowing more about the nature of the research or the memorandum that was prepared,

the Court cannot assess the reasonableness of the entries.  Consequently, the Fee Examiner

recommends an appropriate reduction.  Consistent with the Court's ruling on the First Fee

Application, the Fee Examiner recommends a 15 percent reduction.

*Suggested disallowance for vague entries:  $8,654.25 (15 percent of the total amount of
vague entries).*

42.      **Appellate Briefs**.  During the Second Compensation Period, Weil attorneys filed

briefs in opposition to two separate appeals to the United States District Court of the section 363

sale, one filed in *Callan Campbell et al. v. Motors Liquidation Co. et al.*, No. 09 CV 6818 (the

"**Campbell Appeal**"), and the other filed in *Oliver Addison Parker et al. v. Motors Liquidation
Co. et al.*, No. 09 CV 7794 (the "**Parker Appeal**").

43.      In the Campbell Appeal, at least nine Weil attorneys billed an aggregate total of

more than 200 hours researching and writing one 28-page appellate brief.  *See* **Exhibit J**.  As

would be expected, aspects of this brief addressed issues already litigated—and briefed—

extensively by Weil in the proceedings before this Court.  Weil also had the benefit of an extensive

opinion from this Court, which Weil understandably quoted from liberally in its brief.

44.      In the Parker Appeal, at least a dozen Weil attorneys billed more than 300 hours

researching and writing one 53-page appellate brief.  *See* **Exhibit K**.  Like the brief filed by Weil

in opposition to the Campbell Appeal, the brief filed in opposition to the Parker Appeal also relied

extensively on arguments already researched and argued extensively before this Court.

17

45.    Because both of these appeals are still active before either the District Court or the Court of Appeals, the Fee Examiner will not make any recommendation at this time regarding whether the time expended was reasonable but may recommend an appropriate adjustment after the appeals' final disposition.  No one doubts the singular legal or practical importance of the bankruptcy code issues on appeal.  But that does not immunize the fees charged from review.

46.    **Multiple Attendees at Meetings**.  During the Second Compensation Period, Weil conducted weekly team meetings attended by several different attorneys.  The attendance at these meetings appeared to be limited to those timekeepers with direct and substantial responsibility on this bankruptcy matter.  Counsel to the Fee Examiner conducts similar meetings and recognizes their value.  Accordingly, the Fee Examiner does not suggest any disallowance for these entries at this time.

47.    The UST Guidelines provide:  "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." UST Guidelines, (b)(4)(v).  To the extent that any professional seeks payment of fees for more than one timekeeper at a hearing or meeting, the professional should provide an explanation regarding the necessity for the multiple attendees.

48.    **Pre-Petition Expenses**.  **Exhibit L** identifies $18,386.88 in expenses in the Second Fee Application that appear to have been incurred prior to the filing of the bankruptcy petition on June 1, 2009.  Weil has agreed to credit these amounts against its retainer.  June 3 Letter, ¶ 9.

*Agreed disallowance for pre-petition expenses:  $18,386.88.*

49.    **Airfare Expenses**.  Weil seeks reimbursement for two airfare expenses that were not coach fare, and which totaled $1,203.79 and $587.20, respectively.  Each expense was for travel between New York City and Detroit.   With respect to the first expense for $1,203.79, Weil maintains that coach fare was $989.59, and has agreed to credit the difference.  June 3 Letter,

¶ 11(b). With regard to the second expense for $587.20, Weil maintains that coach fare "is generally $900," so it posits that any reduction is inappropriate. June 3 Letter, ¶ 11(c).

50.    The issue, however, is not what coach fare normally would have cost, but what a coach fare would have cost on that particular flight. If an upgraded airfare cost $587.20, then coach fare would have cost less. *See* UST Guidelines, at (b)(5)(i) ("first class and other luxurious travel mode or accommodations will normally be objectionable"). A reduction is still appropriate. The Fee Examiner recommends a 15 percent reduction, which totals $88.08.

*Suggested disallowance for airfare expenses: $302.28.*

51.    **Hotel Expenses**. In response to a request, Weil submitted information about certain hotel expenses, including a two-night stay at the Jumeirah Essex House in New York City that cost $1,087.34. June 3 Letter, ¶ 12. When this issue arose during the first interim fee application period, the Court instructed that professionals should receive reimbursement for the "going rate for business traveler-type hotels." *In re Motors Liquidation Company*, First Interim Fee Hr'g Tr., 23:10-11 No. 09-50026 (Bankr. S.D.N.Y. April 29, 2010, 5:24 P.M) [Docket No. 5699]. Weil suggests that this rate in New York City was $400 per night, and it has agreed to credit the difference of $287.34. The Fee Examiner concurs with this suggestion.

*Agreed disallowance for hotel expenses: $287.34.*

52.    **Meal Expenses**. The enclosed **Exhibit M** outlines $1,083.84 of meal expenses charged in excess of the $20/person limit.

*Suggested disallowance for meal expenses: $1,083.84.*

53.    **Local Transportation Expenses**. Under most circumstances, as the Court acknowledged in its ruling on the First Fee Application, expenses associated with firm personnel taking a taxi or car service home after hours should be characterized as overhead. The Fee Examiner readily acknowledged that the need for such travel during the initial phase of this

engagement may have exceeded the amount that should be reasonably included as overhead.  After the sale confirmation, however, the extraordinary need for chargeable local travel should have declined substantially.

54.    Attached as **Exhibit N** is a chart showing $12,346.83 in overtime transportation expenses incurred after July 10, 2009.  Counsel to the Fee Examiner has asked for information about the project-related needs for such travel after July 10, 2009, but has not received a response.  Accordingly, the Fee Examiner recommends disallowance of these expenses in their entirety.

*Suggested disallowance for local transportation expenses:  $12,346.83.*

55.    **Administrative Expenses**.  **Exhibit O** outlines $1,047.89 in expenses that appear to be more properly considered overhead.  These expenses include $252.89 for various binding expenses, $30 for a library loan, and $765 for hardbound printing.  Weil has agreed to withdraw these expenses as overhead, with the exception of the binding expenses, for which Weil proposes to deduct half of the expense.  The Fee Examiner recommends disallowance of all these expenses as administrative overhead.

*Suggested disallowance for administrative expenses:  $1,047.89.*


*Total fees suggested for disallowance:  $160,897.25.*

*Total expenses suggested for disallowance:  $33,455.06.*

*Total fees and expenses recommended for disallowance:  $194,352.31.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on future interim fee applications or on final fee applications.  All

professionals subject to the Fee Examiner's review should be aware, as well, that while the Fee

Examiner has made every effort to apply standards uniformly across the universe of

professionals in this case, some degree of subjective judgment will always be required.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of*

*Limited Objection* to the Second Fee Application.

Dated:  Madison, Wisconsin
June 22, 2010.

GODFREY & KAHN, S.C.

By:      /s/ *Eric J. Wilson*
Timothy F. Nixon (TN 2644)
Eric J. Wilson (EW 1047241)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: tnixon@gklaw.com
ewilson@gklaw.com

*Attorneys for Fee Examiner*

5008048_3