**Hearing Date and Time: June 29, 2010 at 9:45 a.m. (Prevailing Eastern Time)**

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
MOTORS LIQUIDATION COMPANY, *et al.,*                      :   Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*                  :   (Jointly Administered)
                                                           :
                    Debtors.                               :   Honorable Robert E. Gerber
                                                           :
---------------------------------------------------------- x

**FEE EXAMINER'S SUMMARY AND RECOMMENDATIONS -
SECOND INTERIM FEE APPLICATIONS AND CERTAIN
<u>ADJOURNED FIRST INTERIM FEE APPLICATIONS</u>**

On June 29, 2010, the Court will hear thirteen applications for interim compensation, totaling $14,741,493.49[1] in fees and expenses, most of them for the period from October 1, 2009 through January 31, 2010.[2] With some notable exceptions, the applicants and the Fee Examiner have reached agreement, eliminating much of the need both for argument and a decision by the Court.

No less than they were during the review process for the first interim fee applications, the Fee Examiner and the applicants have been in regular contact—resolving by compromise or

---

[1] On May 18, 2010, Kramer Levin Naftalis & Frankel, LLP filed a *Supplement and Correction to the Second Interim Application* [Docket No. 5790] for a net reduction of its initially requested fees and expenses in the amount of $1,061.02.

[2] This figure does not include charges incurred in the second interim fee period by AP Services, LLC.

through additional supporting material many questions and issues. (The Court approved all of those consensual resolutions for the first interim fee period.) The goal, not always reached, has been to narrow disputed issues to those that warrant the Court's attention either because they are significant in themselves or because, even with small amounts at stake, they involve a broader principle or practice. The ability to resolve fee and expense issues short of a contested hearing stems from a number of factors: this Court's detailed decision on April 29 on the first round of applications, the lessened pace of the proceeding and the reduction in the sheer volume of services provided, the growing acceptance of the U.S. Trustee Guidelines (especially by the consulting firms), and the Fee Examiner's growing familiarity with the proceeding and the applicants.

Nonetheless, problems of substance and process remain that require the Court's attention—though significantly fewer than were associated with the first hearing. Those problems involve the bill review and application process itself, multiple unexplained attendees at meetings and events, the chronic difficulties with vague descriptions of the work performed, imprecise time-keeping, and block billing. In addition, a number of the reported projects undertaken by professionals and requiring a significant amount of time cannot yet be evaluated—for their necessity and value—because they have not yet been completed. The Fee Examiner is also concerned with the degree to which the utilization of environmental professionals exceeds the terms of their retention orders.

This report also reflects fee decisions and points of contention in other cases, including this Court's comments on billing procedures by a special counsel in *In the Matter of Chemtura Corporation, et al.*, No. 09-11233-reg-11 (Bankr. S.D.N.Y.), the positions taken by the Fee Committee in *In re Lehman Brothers Holdings, Inc., et al.*, No. 08-13555-jmp-11 (Bankr.

S.D.N.Y.), and the controversy in *In re Saint Vincents Catholic Medical Centers of New York, et al.*, No. 10-11963-cgm-11 (Bankr. S.D.N.Y.). These cases, and others, have provided useful comparative information on billing practices and, particularly, comparative hourly rates—both within firms and among firms—that warrant further attention. The "market rate" concept is an indispensable part of the foundation for fee and expense analysis, but the concept requires credible facts for its application.

## PROCESS/STANDARDS

The application review followed the process established for the first set of applications. Most of the second interim applications were filed in mid-March, many were submitted to Stuart Maue for a quantitative audit and that, in turn, led to a series of correspondence and conversations between the Fee Examiner and the applicants. On June 15, 2010, each applicant received a draft report, which encouraged additional discussion, and the Fee Examiner filed the eleven individual reports on June 22, 2010. The Fee Examiner's discussions with the applicants no doubt will continue until the hearing next week.

With the applications, the firms submitted more than 3,900 pages of supporting materials, supplementing them either unilaterally or at the Fee Examiner's request. Some of the applications actually cover the first and second interim fee periods because several firms had requested a deferral of a hearing on the first application to gather or submit additional supporting materials.

The Court noted at the April 29 hearing the challenges the professionals faced in the first six weeks of this proceeding.

> Those of us with experience in large matters and large Chapter 11 cases, in this district and elsewhere, know that lawyers on those matters must from time to time work extraordinarily hard. And anyone who was present during the first six weeks of this case knows what was going on during that time.

3

*In re Motors Liquidation Company*, First Interim Fee Hr'g Tr. 21:8-14, No. 09-50026 (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 P.M.) [Docket No. 5699].

The extraordinary nature of the section 363 sale and the professionals' collective ability to bring it to a conclusion effectively and efficiently were significant factors in the Fee Examiner's evaluation of the applications and, in turn, the evaluations by the U.S. Trustee's office and the Court itself.  However, to the extent any proceeding of this magnitude with this much national impact can be characterized, this case is becoming if not "normal" then at least more traditional.  Accordingly, time management, record keeping practices and expenses that were acceptable in the first interim period are no longer given the deference that, in hindsight surely, the first weeks of the case required.  As the Court noted,

> [T]here's going to be a one-bite rule, kind of like you learn in freshman torts and then I am going to hold people to a higher standard once they know what I am going to be ruling.
>
> Now it is true that the second interim fee apps were done when people didn't have the benefit of my thinking but—and I am going to take that into account and if there is a third round of fee apps, I am especially going to take failures to comply with my statements of my expectation into account.

Tr. 4-29-2010, A.M., at 98:25-99:7 [Docket No. 5696].  Consulting firms that had little or no experience with the statutory and administrative requirements of corporate reorganization now have that experience.

## ISSUES

One application contained entries, for a single day, of 25.9 and 26.9 hours.  They are noteworthy not because, on their face, they are incredible and not compensable but because they illustrate a familiar problem.  In large measure, professionals continue to submit applications that do not comply with the U.S. Trustee's guidelines and, now, this Court's decision in this proceeding.  Standing alone that is reason enough for concern, but it is compounded by the

4

extraordinary amount of time billed to the Debtors for compiling and reviewing time records and applications.

The firm that reported the "long" days, when questioned about the entries, said that it had mistakenly grouped multiple timekeepers into those entries. Fair enough. Yet the same firm reported spending 157 hours to review its time records. The point is not to single out a few entries by one firm, but to note that the amount of time being spent on billing has not resulted in a proportionate reduction in the amount of time required to audit those records or correct even obvious mistakes or shortcomings. This is particularly true in the second compensation period, when the amount of time spent on professionals' initial retention applications and supporting materials should have decreased markedly.

Altogether, the professionals in this proceeding have billed just over $2 million for their own retention and for keeping, reviewing and submitting time records. (This does not include the firms that are paid a fixed monthly amount though they, too, keep time records that will help the Court evaluate their final fee applications.) While the bankruptcy code authorizes the estate's payment for the preparation of the fee application, 11 U.S.C. § 330(a)(6), courts have distinguished that activity from the review and editing of the professional's time records:

> Time records are used for a variety of reasons unrelated to the allowance of fee applications and any additional requirement imposed by the court should have been known in advance. Keeping time records is an integral aspect of bankruptcy representation and is not entitled to additional compensation.

*In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 484 (Bankr. D. Utah 1991).

> Some courts have denied compensation for time spent reviewing bills....Once again, it clarifies the issue to determine the purpose of the review. A review that is in reality an edit for accuracy is a clerical function and not compensable. When the review is undertaken in order to evaluate competent utilization of firm resources, is a matter usually not billed to nonbankruptcy

5

> clients, and is done for internal and firm management purposes, it should not be billed to the estate.

*Id.* at 486 (citations omitted).

> If errors have been made, entries are incomplete or inconsistent with those of other professionals, and time records require editing to comply with court standards, such editing services are clerical functions and not compensable, even though they may be performed by a professional.

*Id.* at 485; *In re SonicBlue Inc.*, Nos. 03-51775, 03-51776, 03-51777, 03-51778, 2006 WL 2067882 (Bankr. N.D. Cal. July 24, 2006) ("While time expended to prepare a fee application, including drafting the narrative, is compensable, time expended to review and edit time entries is not. Where the time entries require revision to conform to the court's standards, the editing services are administrative functions that are not compensable even if they are performed by a professional.") (citing *CF & I Fabricators*, 131 B.R. at 485); *In re Dimas, LLC*, 357 B.R. 563, 591 (Bankr. N.D. Cal. 2006) (same); *In re Moss*, 320 B.R. 143, 159 (Bankr. E.D. Mich. 2005) (no compensation for professional's time spent reconstructing time records that were not maintained contemporaneously or for an assistant's assembling of time records). More generally,

> [T]hose portions of the billing process common to billing both bankruptcy clients and non-bankruptcy clients are not compensable under § 330 because they are part of the professional's overhead. They are not separately charged to non-bankruptcy clients and no additional effort is required to complete them for a bankruptcy client. For example, maintaining time records does not require additional effort. Lawyers and accountants maintain the same time records in non-bankruptcy matters as in bankruptcy matters….Nor do lawyers or accountants charge for preparing their bills. Bills must be prepared for non-bankruptcy matters as well as bankruptcy matters….Only those aspects of preparing a bankruptcy fee application that require additional—not merely different—efforts are compensable under § 330(a)(6).

6

*In re Computer Learning Ctrs., Inc.*, 285 B.R. 191, 219-20 (Bankr. E.D. Va. 2002) (discussing *CF & I Fabricators*, 131 B.R. at 483-88).

Up to now, the Fee Examiner has taken a tolerant view of fee applicants' inclusion of monthly fee-review in their requests for compensation. As the exigencies of the case lessen, and as the amount and complexity of the substantive work changes or decreases, the significance of addressing this matter increases.

The Court will note, across the applications as a whole, that the Fee Examiner has recommended wholesale reductions for some categories of guideline violations: 25 percent for block billing, 15 percent for vague entries, and 15 percent or more for inordinate amounts of time on billing and record-keeping.[3] The recommendations are generally based on exhibits prepared by Stuart Maue, and they do not require a line by line review to speak for themselves. One entry for a few tenths of an hour to "review email" does not warrant anyone's concern. But these are not isolated instances, nor is it sufficient for a professional to explain the practice by saying "it takes as much time to record the task as to accomplish it." As the Court has noted,

> I accept as true [the] response that the entries were made when the time pressure and number of matters that required immediate attention were extraordinary, but timekeeping is something that should be routine for a bankruptcy lawyer, and nonbankruptcy lawyers working on bankruptcy matters must learn to do it right as well or suffer the consequences of failing to do so, especially if they work at firms that have major bankruptcy practices.

Tr. 4-29-2010, P.M., at 21:17-24.

The volume of vague entries and block billings has decreased but so has any justification for them. The percentage reductions established by the Court on April 29 should be a floor not a ceiling and, in subsequent reports, the percentage reductions recommended will increase. As the

---

[3] A chart summarizing the applications and the recommended reductions accompanies this report.

7

Court noted on April 29, there are consequences for the persistent failure to adhere to the guidelines.

> I agree with the fee examiner that failures to comply with the guidelines must have at least some consequences. In this case, I agree with the fee examiner that many of the entries are too vague, including enough to support the fee examiner's recommendation that fifteen percent of the time charges supported by the allegedly vague entries be the subject of fee reductions.

Tr. 4-29-2010, P.M., at 22:6-12.

The guidelines also leave no doubt that time must be recorded in tenths of an hour. That reflects a judgment that time should not be "rounded" or estimated. The number of entries for 0.5 and 1.0 is remarkable. So, too, are the occasions in which the total time worked in a day happens to be an even number divisible by a half-hour.

## PRECEDENTS

The Court established several benchmarks at the April 29 hearing that should continue in force. The professionals that hold "retainers," however defined, should continue to draw against them, until they are exhausted, for any and all fee and expense awards in this period. In addition, 10 percent of the amounts awarded should not be paid by the Debtors but, rather, held back until the conclusion of the case or, pending that, a further order.

The Court has ordered the exclusivity period in this proceeding extended to September 27, 2010. Assuming the Debtors have filed a plan by then and assuming as well that the confirmation process evolves without significant controversy, the environmental issues and the claims process (including those related to asbestos) suggest that the proceeding will not be resolved this year or even next. The Court may determine before then that the quality and reliability of the fee and expense applications have improved to the point where an auditing process is no longer necessary or, for that matter, that the Fee Examiner is no longer necessary.

8

Until that point, however, the involvement of Stuart Maue remains indispensable.  Indeed, as the amount of work focused on environmental and asbestos issues increases, so does its importance—if only because of the number of professionals that will be working on those discrete projects, raising the prospect of duplicative or unnecessary services by some.  With its proprietary software, Stuart Maue is able to correlate data from thousands of pages of time records, to isolate problems and to identify common weaknesses and strengths in a way that no few people could do by hand.  On June 29, the Court will hear the application to extend Stuart Maue's retention at least through the next fee period, and it should do so.  It also may hear Stuart Maue's fee application; that application, too, reflects discussions with the Fee Examiner that have reduced the amount requested.

     The amount of public and media attention being paid to professional fees in major corporate reorganization cases is increasing.  That may be inevitable—given the size of the cases and the state of the national economy—but the code requirements and the U.S. Trustee Guidelines are not variable with the times or with the size of the cases.  The Fee Examiner's eleven individual reports for the second interim fee period again attempt to apply the guidelines consistently and with common sense to help the U.S. Trustee and the Court evaluate the fee applications.[4]  With the second hearing on fees next week, the Court will be current with the application process.  No applications have yet been filed for the third interim period, February through May 2010.

---

[4] The U.S. Trustee, in a response dated June 17, 2010 [Docket No. 6065], has generally endorsed the Fee Examiner's recommendations, as she did the first set of reports.

Dated: Madison, Wisconsin
June 23, 2010.

                              GODFREY & KAHN, S.C.

By:    /s/ *Katherine Stadler*
Katherine Stadler (KS 6831)
Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
E-mail: kstadler@gklaw.com
         tnixon@gklaw.com

*Attorneys for Fee Examiner*

5097849_2

10

SECOND INTERIM FEE APPLICATIONS AND CERTAIN ADJOURNED FIRST INTERIM FEE APPLICATIONS
NOTICED FOR HEARING ON JUNE 29, 2010 AT 9:45 A.M. (PREVAILING EASTERN TIME)

MOTORS LIQUIDATION COMPANY, *et al.*, DEBTORS
CHAPTER 11 CASE NO. 09-50026 (REG)

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS[1] 80% OF FEES AND 100% OF EXPENSES | | AMOUNTS ALLOWED BY THE COURT | | HOLDBACK ON FEES (10% RECOMMENDED) | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| 1. Baker McKenzie[2] | 11/16/2009 [4454] | 06/01/2009-09/30/2009 | 1,262,789.76 | 21,619.20 | 51,115.59 | 0.00 | 949,007.88 | 21,619.20 | | | | | 04/22/2010 [5543] 06/22/2010 [6080] |
| 2. Brownfield Partners, LLC[2] | 11/16/2009 [4457] | 06/01/2009-09/30/2009 | 213,914.75 | 16,294.80 | 1,389.00 | 1,525.81 | 169,961.19 | 16,294.80 | | | | | 04/22/2010 [5565] 06/22/2010 [6084] |
| 3. Brownfield Partners, LLC | 3/17/2010 [5291] | 10/01/2009-01/31/2010 | 381,757.40 | 27,480.81 | 9,789.75 | 2,631.31 | 305,405.92 | 27,352.92 | | | | | 06/22/2010 [6084] |
| 4. Butzel Long, PC | 3/17/2010 [5293] | 10/01/2009-01/31/2010 | 258,825.50 | 12,188.98 | 27,171.86 | 1,079.28 | 207,060.40 | 12,188.98 | | | | | 06/22/2010 [6081] |
| 5. FTI Consulting, Inc. | 3/16/2010 [5279] | 10/01/2009-01/31/2010 | 2,066,666.00 | 18,756.18 | 173,922.87 | 67.95 | 1,653,333.00 | 18,756.18 | | | | | 06/22/2010 [6082] |
| 6. Jenner & Block LLP | 3/15/2010 [5263] | 10/01/2009-01/31/2010 | 45,662.50 | 6,208.97 | 5,619.00 | 694.29 | 28,446.76 | 6,208.97 | | | | | 06/22/2010 [6086] |
| 7. Jones Day | 3/17/2010 [5285] | 10/01/2009-01/31/2010 | 10,297.00 | 1,232.09 | 0.00 | 0.00 | 8,237.60 | 1,232.09 | | | | | 06/22/2010 [6087] |
| 8. Kramer Levin Naftalis & Frankel LLP[3] | 3/17/2010 [5296] 5/18/2010 [5790] | 10/01/2009-01/31/2010 | 1,148,977.75 | 31,103.29 | 36,768.60 | 1,311.44 | 921,383.03 | 31,103.29 | | | | | 06/22/2010 [6091] |

---

[1] These figures include additional payments made by the Debtors subsequent to the submission of the first and second interim fee applications but *does not* include any of the payments reported in rounded numbers in the Debtors' Monthly Operating Reports.

[2] The first interim fee application of Baker McKenzie, Brownfield Partners, LLC, and LFR, Inc. were adjourned by stipulation.

[3] Kramer Levin Naftalis & Frankel LLP ("**Kramer**") filed a Second Interim Fee Application on March 17, 2010 [Dkt. No. 5296] in the amount of $1,149,758.75 for fees and $31,383.31 in expenses. On May 18, 2010 Kramer filed a Supplement and Correction to its Second Interim Fee Application ("**Kramer Supplement**") [Dkt. No. 5790]. The adjusted fees and expenses requested in the Kramer Supplement are listed above.

| Name of Retained Professional | Date Fee Application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested Fees | Amounts Requested Costs | Amounts Recommended For Disallowance / Status Fees | Amounts Recommended For Disallowance / Status Costs | Amounts Already Paid to Retained Professionals[1] 80% of Fees and 100% of Expenses Fees | Amounts Already Paid to Retained Professionals[1] 80% of Fees and 100% of Expenses Costs | Amounts Allowed by the Court Fees | Amounts Allowed by the Court Costs | Holdback on Fees (10% recommended) Fees | Holdback on Fees (10% recommended) Costs | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9. LFR, Inc.[2] | 11/12/2009 [4436] | 06/01/2009- 9/30/2009 | 633,772.80 | 43,447.98 | 3,556.27 | 19,605.24 | 507,017.84 | 43,447.98 | | | | | 04/22/2010 [5566] 06/22/2010 [6088] |
| 10. LFR, Inc. | 3/15/2010 [5270] | 10/01/2009- 01/31/2010 | 1,034,548.40 | 182,730.34 | Adjourned by Stipulation | Adjourned by Stipulation | 158,605.12 | 49,811.94 | | | | | 06/22/2010 [6088] |
| 11. Plante & Moran, PLLC | 3/17/2010 [5294] | 10/09/2009- 01/31/2010 | 354,195.70 | 5,247.32 | 0.00 | 94.77 | 283,356.56 | 5,247.32 | | | | | 06/22/2010 [6092] |
| 12. The Claro Group, LLC | 3/17/2010 [5290] | 10/01/2009- 01/31/2010 | 652,010.50 | 9,138.41 | 15,856.80 | 0.00 | 449,291.11 | 9,138.41 | | | | | 06/22/2010 [6094] |
| 13. Weil, Gotshal & Manges LLP | 3/17/2010 [5295] | 10/01/2009- 01/31/2010 | 5,903,901.25 | 398,725.81 | 160,897.25 | 33,455.06 | 4,704,292.18 | 398,725.81[4] | | | | | 06/22/2010 [6095] |
| **TOTAL SECOND INTERIM FEE APPLICATIONS AND CERTAIN ADJOURNED FIRST INTERIM FEE APPLICATIONS:** | | | **$13,967,319.31** | **$774,174.18** | | | | | | | | | |

| Quarterly Reports | | Period covered by Quarterly Report | Fees | Expenses | | | |
|---|---|---|---|---|---|---|---|
| AP Services, LLC | 01/15/2010 [4828] | 09/01/2009- 11/30/2009 | 11,863,361.58 | 825,743.93 | | | |
| | 04/14/2010 [5505] | 12/1/2009 – 2/28/2010 | 9,347,167.12 | 673,813.62 | | | |
| | | **TOTAL QUARTERLY REPORTS:** | **$21,210,528.70[5]** | **$1,499,557.55** | | | |

5066161_2

---

[4] Weil Gotshal & Manges LLP ("**WGM**") reports payments from the Debtors totaling $1,600,470.32 in the Second Compensation Period for fees ($1,501,731.60) and expenses ($98,738.72) invoiced for October 2009. *See* Second Fee Application ¶ 12. AP Services, LLC reports payments to WGM of $4,704,292.18 in fees and $398,725.81 in expenses for the Second Compensation Period.

[5] The scope of the April 14, 2010 Quarterly Report Exceeds the Second Interim Fee Period (October 1, 2009 through January 31, 2010) by one month. The fees incurred by AP Services during the Second Fee Period are $13,393,945.45 plus expenses of $895,521.26 (for a total of $14,289,466.71). AP Services has received payment of all fees and expenses reported in the Second Fee Period.

2