## <u>Exhibit B</u>

**Real Estate Purchase Contract**

EXECUTION VERSION

# REAL ESTATE PURCHASE CONTRACT

This Real Estate Purchase Contract (the "**Contract**") is entered into as of the 8th day of June, 2010 (the "**Execution Date**"), by and between Motors Liquidation Company, a Delaware corporation ("**Seller**"), and Fisker Automotive, Inc., a Delaware corporation ("**Purchaser**").

## RECITALS:

A.     On June 1, 2009, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). Seller's chapter 11 case is being jointly administered with the chapter 11 cases of certain of its affiliates under Case No. 09-50026 (REG) (the "**Case**"). Seller is authorized to operate its business and manage its properties as a debtor in possession in accordance with the Bankruptcy Code.

B.     Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, the Property pursuant to Sections 363 and 365 of the Bankruptcy Code on the terms and subject to the conditions set forth herein.

C.     Both Seller and Purchaser acknowledge that this Contract is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids as provided in Section 36 of this Contract.

D.     Purchaser acknowledges that it is the intention of Seller to enter into separate agreements with DNREC (as defined below) to settle claims DNREC has asserted against Seller in the Case and provide for the remediation of pre-existing environmental conditions, and that such settlement may result in the assignment of this Contract to and assumption of this Contract by a successor entity to Seller in connection with the settlement of claims filed by other state agencies, and that the funding for performance of Seller's obligations under this Contract and/or other agreements with DNREC may be provided through such successor.

In consideration of the representations and covenants set forth herein, Purchaser and Seller hereby agree as follows:

1.     **Purchase and Sale**. Seller agrees to sell to Purchaser, and Purchaser agrees to buy from Seller, in accordance with the terms, conditions and stipulations set forth in this Contract and pursuant to the final and non-appealable order approving the sale, in the form attached hereto as <u>Exhibit A</u> or with such changes as are approved by Seller and Purchaser in their reasonable discretion (the "**Sale Approval Order**"), all of Seller's right, title and interest in and to (i) those certain parcels of real property consisting, in the aggregate, of approximately 142 acres of land, located in Christiana Hundred, New Castle County, Delaware, having a street address of 801 Boxwood Road, Wilmington, Delaware, as more particularly described on <u>Exhibit B</u> (the "**Land**"), and any and all buildings and improvements thereon (the "**Improvements**") and appurtenances thereto (collectively, the "**Real Property**"), (ii) the fixtures, equipment and machinery located at the Real Property as of the Execution Date and

owned by Seller and excluding all environmental remediation equipment and systems (collectively, the "**Personal Property**"), (iii) all mechanical and electrical systems and related equipment attached to the Improvements or constituting fixtures on the Real Property on the Execution Date, including, but not limited to, wiring, electrical systems, plumbing systems, heating systems, air conditioning systems, security, alarm and/or entry systems, (iv) all plans and specifications; engineering plans and studies; floor plans and landscape plans pertaining to the Real Property in Seller's possession, if any, (v) all mineral, oil and gas rights, water rights, sewer rights, stormwater and waste treatment facilities and other utility rights associated with the Real Property, if any, (vi) all appurtenances, easements, leases, licenses, privileges and other property interests belonging or appurtenant to the Real Property, (vii) all rights of Seller under governmental permits, authorizations, or approvals relating to the Property or Improvements, to the extent assignable (the "**Permits**"), and (viii) all right, title and interest of Seller in and to any roads, rail spurs, rail tracks, streets and ways, public and private, serving the Real Property, if any (including, without limitation, all rights to develop the Land granted by governmental entities having jurisdiction over said Land) (all of the foregoing items in (i)-(viii) above, collectively, the "**Property**"). With respect to Permits that are not transferable without the consent of a third party, including any governmental authority, the obligation to transfer hereunder shall include the obligation to execute documentation and take such other actions are as reasonably required to secure the transfer to Purchaser of such Permits.

2. **Payment of Purchase Price**. The total purchase price (the "**Purchase Price**") to be paid to Seller by Purchaser for the Property is $20,000,000 (twenty million dollars) in connection with the transfer of title to Purchaser upon satisfaction of all conditions herein (the "**Closing**"). Within five (5) business days after execution of this Contract by both parties, Purchaser shall pay to the Title Company (defined below) to be held in escrow an amount equal to five percent (5%) of the Purchase Price by certified check or wire transfer of immediately available funds (the "**Deposit**"). All interest earned on the Deposit shall be deemed a part of the Deposit. The Deposit shall be nonrefundable, except as expressly set forth herein. At the Closing, the Deposit shall be applied toward the Purchase Price. At the Closing, Purchaser shall remit the remainder of the Purchase Price, plus or minus prorations and other adjustments expressly set forth herein, by wire transfer of immediately available funds to the Title Company for the account of Seller. Seller and Purchaser shall enter into an escrow agreement with Title Company in the form attached hereto as _Exhibit C_ and shall be in conformance with the terms and conditions of this Contract, and which shall govern the holding and disbursement of the Deposit and Purchase Price by the Title Company, and which shall contain terms and conditions standard in the real estate industry for the performance of escrow obligations in a real estate closing of the nature contemplated hereunder.

3. **Title**.

A. Purchaser has retained the First American Title Insurance Company (the "**Title Company**") to deliver a title insurance commitment (the "**Title Binder**"), and a land survey of the Real Property (the "**Survey**"). Purchaser shall have fourteen (14) days after the Execution Date to review title and Survey matters (the "**Title Review Period**"). Purchaser shall provide copies of the Title Binder (with exception documents), as updated by Purchaser from

time to time, and the Survey, to Seller within three (3) days of Purchaser's receipt thereof. Purchaser shall make all objections ("**Title Objections**") to matters shown on the Title Binder and Survey that would adversely affect Purchaser's intended use of the Real Property or prevent the delivery of title in compliance with Section 3.C hereof within the Title Review Period to Seller in writing. Seller shall provide responses to the Title Objections in writing within five (5) business days after receipt, identifying any Title Objections that Seller declines to cure or remove (the "**Declined Objections**"). Within five (5) days of receipt of such notice, Purchaser may terminate this Contract by written notice to Seller and may receive repayment of the Deposit. If Purchaser does not terminate this Contract at such time, then the Declined Objections shall be included among Permitted Exceptions (defined below). If Seller fails to cure or remove the remaining Title Objections (either though the payment of money or purchase of an endorsement) on or before the Closing, Purchaser may elect, in its sole discretion, to terminate this Contract and receive repayment of the Deposit or to proceed to Closing. If Purchaser proceeds to Closing, Seller, Purchaser and Title Company shall agree on a portion of the Deposit, up to $250,000 in the aggregate, which shall be sufficient to remove or cure Title Objections that Seller is obligated to remove or cure under this Section 3.A and which have not been so removed or cured by Seller before the Closing, and Title Company agrees to hold such sum in escrow pending the removal or cure thereof by Title Company. All funds held in such escrow that are not used to effect such removal or cure by the Title Company shall be released to Seller upon the earlier of (i) removal or cure thereof, or (ii) upon lapse of the statute of limitations applicable thereto and the consequent lapse of the ability to bring a claim based on such Title Objection. Purchaser has the right to object to any new matter disclosed in an updated Title Binder after expiration of the Review Period. Any matters as to which Purchaser does not timely provide a Title Objection and all Declined Objections shall be deemed waived and will be "**Permitted Exceptions**."

      B.    Seller shall in any event be obligated to cure and cause to be removed from record any of the following matters: (i) mortgage or deed of trust liens against the Real Property; (ii) recorded agreements and other items that have been placed against the Real Property by Seller or its agents, contractors or employees after the date of this Contract and that are not otherwise permitted pursuant to the provisions hereof; (iii) mechanics' liens against the Real Property; (iv) delinquent liens for real estate taxes and assessments, and (v) judgment liens against Seller, which are recorded against the Real Property (collectively, (i) – (v) above are the "**Removed Exceptions**"). Notwithstanding anything to the contrary contained herein, in no event shall any of the Removed Exceptions be deemed to be included within the definition of Permitted Exceptions.

      C.    At Closing, Purchaser shall obtain a title insurance policy (the "**Title Policy**") from Title Company. The Title Policy shall be an ALTA Extended Coverage 2006 Owner's Policy of Title Insurance in the amount of the Purchase Price, insuring fee simple title to the Land and the Improvements in Purchaser's name, subject only to the Permitted Exceptions. The Title Policy shall provide full coverage against mechanics' and materialmen's liens arising out of the construction, repair or alteration of any of the Improvements including any tenant improvements therein and shall contain such special endorsements as Purchaser may reasonably require (the "**Endorsements**").

4.    **Condition of Property**.

A.    The Property is being sold in "AS IS" condition without any representations and warranties of Seller (other than the limited representations and warranties expressly set forth herein) whatsoever. Seller shall deliver the Property at Closing in materially the same condition as existed on the Execution Date, ordinary wear and tear excepted.

B.    Except as otherwise expressly provided in this Contract, Purchaser hereby releases Seller from and waives all claims, demands, actions, and causes of action against Seller and its estate for damages, losses, expenses or injuries arising out of the condition of the Property.

5.    **Defects in Title**. At Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser all of the Property, free and clear of encumbrances (other than Permitted Exceptions), claims and other interests in the Property. Seller shall convey title to the Property by special warranty deed and pursuant to the Sale Approval Order. The Title Policy issued in accordance herewith shall be a condition to Purchaser's obligation to Close (provided that the inability or unwillingness of the Title Company to issue any requested Endorsement shall not be deemed a failure to issue the Title Policy hereunder except to the extent Title Company's refusal relates to an endorsement Seller agreed to pay for in order to delete the Removed Exceptions). From and after the date hereof and during the term of this Contract, Seller shall not further or otherwise encumber or restrict the title to any of the Property, permit any liens, mortgages, deeds of trust, easements or other encumbrances to be placed against the Property or any part thereof without Purchaser's consent. If Seller does not deliver title as required under this Section 5, Purchaser may, in its sole discretion, proceed with the Closing and waive defects in title, or may terminate this Contract and receive repayment of the Deposit.

6.    **Closing**. The Closing shall occur five (5) business days after the date on which the Seller is authorized to consummate the transaction pursuant to the Sale Approval Order. The Closing shall take place at the offices of Young, Conaway, Stargatt & Taylor, LLP, located at 1000 West Street, Suite 1700, Wilmington, DE 19801, or at another location mutually acceptable to the parties.

7.    **Prorations and Adjustments at Closing.** Real estate, ad valorem and similar taxes assessed against the Property shall be prorated between Seller and Purchaser at the time of Closing on the basis of a 365 day year, with the Purchaser liable for the portion of such taxes assessed against the Property from and after the day of Closing. Any then due but unpaid special assessments, special improvement district or taxing district levies, shall be prorated in the same manner as ad valorem taxes. All delinquent real estate taxes and assessments, interest, penalties or any combination thereof shall be paid by Seller at or before Closing. Seller shall be responsible for the cost of all sewer, water, and utilities used prior to the Closing Date. Seller shall pay prior to Closing all amounts that are Seller's responsibility under this Section 7 or deposit funds with the Title Company for such purposes. If Seller has not paid or provided for payment in such manner, Title Company shall deduct amounts from the Purchase Price sufficient to pay Seller's obligations under this Section 7. The foregoing obligations shall survive the Closing, except to the extent amounts have been deducted from the Purchase Price.

**8.**    **Transaction Costs**.  Seller shall be responsible for the cost of preparing the deed and other Closing Documents.  At Closing, Purchaser shall pay for the cost of the Title Binder, the Survey, the Title Policy (except for the cost of procuring any endorsements required to remove any of the Removed Exceptions, to the extent Seller has agreed in writing to pay for any such endorsements), the state and local recording taxes, sales taxes, recording fees, and transfer taxes, if any, required to be paid.  Each party shall pay its own attorneys', brokers' and consultants' fees.  All transfer taxes associated with the recordation of the special warranty deed, if any, including, without limitation, transfer and recordation taxes and documentary stamps, shall be paid by Purchaser at Closing or, if assessed at any time thereafter, shall be paid promptly by Purchaser following such assessment.  Purchaser and Seller agree to provide each other reasonable assistance in the preparation and filing of any and all required transfer tax returns for or with respect to such transfer taxes with any and all appropriate taxing authorities.  The obligations of the parties under this Section 8 shall survive the Closing.

**9.**    **Special Warranty Deed and Other Documents Required for Closing**.

A.    At the Closing, Seller shall deliver the following (the "**Closing Documents**"):

(i)    A special warranty deed, conveying fee simple title to the Property, in the form annexed hereto as Exhibit D;

(ii)    A duly executed bill of sale conveying the Personal Property, in the form annexed hereto as Exhibit E;

(iii)    Such documents evidencing the legal status, good standing and authority of Seller that may be required by the Title Company for issuance of the Title Policy;

(iv)    An affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and 1984 Tax Reform Act, in the form annexed hereto as Exhibit F;

(v)    A duly executed access agreement permitting Seller access to the Property after the Closing to fulfill its obligations under Section 15 of this Contract, in the form annexed hereto as Exhibit G (the "**Access Agreement**");

(vi)    Intentionally omitted;

(vii)    An owner's affidavit to Title Company sufficient to support the issuance of the Title Policy;

(viii)    Executed releases of the mortgages on the Real Property and the Personal Property that are held by the United States Treasury Department and Export Development Canada;

(ix)    A certified copy of the Sale Approval Order;

(x)     A closing statement; and

(xi)    Such other documents as may be reasonably required to complete the transaction as set forth in this Contract.

B.    At the Closing, Purchaser shall deliver the following:

(i)     The Purchase Price, less any portion of the Deposit that is applied, and plus or minus prorations and other adjustments expressly set forth herein, in cash or immediately available funds;

(ii)    The Access Agreement;

(iii)   Intentionally omitted;

(iv)    Such documents evidencing the legal status, good standing and authority of Purchaser that may be required by the Title Company for issuance of the Title Policy;

(v)     A closing statement; and

(vi)    Such other documents as may be reasonably required to complete the transaction as set forth in this Contract.

C.    Purchaser's obligation to Close is subject to execution by Purchaser and the Delaware Department of Natural Resources and Environmental Control ("DNREC") of a Brownfields Development Agreement ("BDA") regarding the GM Wilmington Assembly Plant pursuant to the Hazardous Substance Cleanup Act, 7 Del. C. Chapter 91, addressing Purchaser's liability for existing contamination of the Real Property and governing Purchaser's performance of environmental investigation of contamination on portions of the Real Property, and the lapse of the statutory twenty (20) day comment period without the receipt of comments requiring material modification of the BDA.

D.    If the Closing has not occurred on or before the one hundred twentieth (120th) day after the Sale Motion (defined in Section 37) has been submitted to the Bankruptcy Court, either party may terminate this Contract, and the Deposit shall be refunded to the Purchaser.

E.    Seller and Purchaser shall each execute and deposit Closing statements, such transfer tax returns, and such other instruments as are reasonably required by the Title Company or otherwise required to close and disburse the escrow and consummate the acquisition of the Property in accordance with the terms hereof. The Title Company shall prepare the Closing statements using the standard form in the State of Delaware. Seller and Purchaser hereby designate Title Company as the "Reporting Person" for the transaction pursuant to Section 6045(e) of the Internal Revenue Code and the regulations promulgated thereunder and agree to execute such documentation as is reasonably necessary to effectuate such designation.

**10.** **Possession**. Possession of the Property shall be delivered to Purchaser by Seller on the day of Closing.

**11.** **Representations and Warranties**.

A.      Seller represents and warrants the following to Purchaser as of the Closing:

(i)      Subject to <u>Sections 35 and 36</u> herein: (a) Seller has the full right, power and authority to sell and convey the Property to Purchaser as provided in this Contract and to carry out Seller's obligations hereunder; (b) all requisite corporate or other actions necessary to authorize Seller to enter into this Contract and to perform its obligations thereunder have been taken; and (c) the execution, delivery and performance by Seller of this Contract will not conflict with or cause a default under any other governmental approval, applicable law, or any agreement.

(ii)      Subject to <u>Sections 35 and 36</u> herein, the person executing this Contract on behalf of Seller is duly empowered to do so and thus authorized to bind Seller to perform in compliance with the Contract.

B.      Purchaser represents and warrants to Seller, as a material condition to Seller's obligations pursuant to the Contract, the following as of the date hereof and as of the date of Closing:

(i)      Purchaser has the full right, power and authority to purchase the Property as provided in this Contract and to carry out Purchaser's obligations hereunder.  If Purchaser is corporation, partnership, trust or limited liability company, all requisite corporate or other actions necessary to authorize Purchaser to enter into this Contract and to perform its obligations thereunder have been taken.  The execution, delivery and performance by Purchaser of this Contract will not conflict with or cause a default under any other agreement.

(ii)      If Purchaser is corporation, partnership, trust or limited liability company, Purchaser is duly organized, validly existing and in good standing in the state of its incorporation, formation or organization, as applicable, and is, or will be at Closing, qualified to do business in the State of Delaware.

(iii)      The person executing this Contract on behalf of Purchaser is duly empowered to do so and thus authorized to bind Purchaser to perform in compliance with this Contract.

Notwithstanding the foregoing or any other provision of this Contract, in the event that Seller or Purchaser has actual knowledge of such facts or disclosure of circumstances that are at variance with any of the other party's representations or warranties, and if Purchaser and Seller thereafter consummate Closing, Purchaser and Seller shall be deemed to have accepted such variant facts and circumstances and the applicable party's representations and warranties shall be deemed excised or modified to comport with such variant facts and circumstances.

12. **Default**. If Seller is in default hereunder for failure to comply with any one or more of the material terms or conditions of this Contract and such failure continues for more than seven (7) business days after receipt of written notice, Purchaser at its sole option may: (i) terminate this Contract by written notice delivered to Seller on or before the Closing, in which event Purchaser shall be entitled to full return of the Deposit, (ii) waive such defaults and proceed to Closing, or (iii) specifically enforce this Contract in the Bankruptcy Court. If Purchaser is in default hereunder for failure to comply with any one or more of the material terms or conditions of this Contract and such failure continues for more than seven (7) business days after receipt of written notice, then Seller at its sole option may: (i) terminate this Contract and retain the Deposit as full liquidated damages, or (ii) waive such defaults and proceed to Closing. Seller and Purchaser agree that upon a default by Purchaser the damages that would be sustained by Seller will be uncertain and not readily ascertainable, but agree that the amount of the Deposit is a reasonable estimate of such damage.

13. **No Representations**.

A. PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER (OTHER THAN AS EXPRESSLY SET FORTH IN THIS CONTRACT OR PROMISES, COVENANTS AND AGREEMENTS CONTAINED IN THE CLOSING DOCUMENTS OTHER THAN THE DEED), WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES THAT PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES; OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION, OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS, OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY, OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT, OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.

B. SUBJECT TO THE TERMS AND CONDITIONS OF THIS CONTRACT, THE PROVISIONS OF THIS SECTION 13 SHALL SURVIVE CLOSING OR ANY TERMINATION HEREOF.

14.    **Risk of Loss.**

A.    If, prior to the Closing, action is initiated to take any of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Contract, or (b) consummate the Closing, in which latter event all of Seller's assignable right, title and interest in and to the award of the condemning authority shall be assigned to Purchaser at the Closing and there shall be no reduction in the Purchase Price.

B.    Seller self-insures the property for damage and destruction. Seller retains all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If the Property, or any part thereof, suffers any damage prior to the Closing from fire or other casualty, Seller shall notify Purchaser thereof in writing identifying the damage and advising whether Seller, at its sole option, will or will not repair such damage prior to Closing. In the event Seller elects to repair such damage, Seller shall cause such repair to be done prior to Closing and the sale contemplated hereunder shall proceed. If Seller elects not to repair such damage, Purchaser may elect to (i) consummate the Closing with no reduction in the Purchase Price, and the sale contemplated hereunder shall proceed, or (ii) terminate this Contract without penalty, in which event, the Purchaser shall be deemed to have waived all claims, damages, actions and causes of action of whatever kind and nature (including any claims for attorney's fees), whether known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated or otherwise, arising from, related to, or concerning the Contract; provided, however, that the Purchaser does not waive its right to recover its Deposit.

15.    **Environmental**.

A.    Purchaser covenants and agrees that neither Purchaser, nor any subsidiary, affiliate or agent of Purchaser, shall conduct any sampling and analysis or monitoring (provided that monitoring for this purpose shall not include monitoring of contamination after it has been discovered) of soil, sediment, surface water or groundwater ("**Sampling**") after the Closing, and until the creation of the Environmental Trust (as defined in Section 16) except to the extent such Sampling is: (i) required by Environmental Laws, (ii) required by an enforceable order, directive or demand of a governmental authority, (iii) reasonably necessary to defend against or otherwise respond to a third-party claim, or (iv) required under the BDA. Sampling required under the BDA shall be conducted pursuant to the BDA to establish a baseline of pre-existing conditions at the Property (the "**Baseline Investigation**"), and no report shall be prepared nor any data obtained as a result of any Sampling done in connection with the Baseline Investigation or provided to DNREC until the creation of the Environmental Trust or the one (1) year anniversary of the Closing, whichever occurs first. Purchaser shall (i) provide Seller with a document indicating the locations of any Sampling activities planned in connection with the Baseline Investigation sixty (60) days prior to any planned Sampling and afford Seller with the opportunity to comment on such Sampling activities and (ii) notify Seller of, and afford Seller the opportunity to participate in, meetings between Purchaser and DNREC regarding the Baseline Investigation.

B.      Purchaser and Seller acknowledge that Seller is attempting to resolve certain of its liabilities under Environmental Laws with DNREC and other governmental authorities through a multilateral settlement agreement to be filed in the Case and subject to Bankruptcy Court approval ("**Global Settlement Agreement**"). Seller's obligation under Environmental Laws with respect to the Property shall be limited to its performance of any Remedial Action required under the Global Settlement Agreement. Purchaser shall grant to Seller the access to the Real Property provided in the Access Agreement to allow Seller (and its successors, if any) to comply with obligations it may have to DNREC under the Global Settlement Agreement. Seller shall (i) except as may otherwise be required by DNREC, conduct any Remedial Action at the Real Property without unreasonably interfering with the Purchaser's operations thereon or creating an unreasonable risk to property or persons at the Real Property and (ii) control any and all communication regarding the Remedial Actions with governmental authorities having jurisdiction over the Remedial Actions; provided that Seller shall provide Purchaser with periodic reports on the progress and resolution of the Remedial Actions and provide documentation to that effect. Purchaser shall cooperate with Seller in undertaking such Remedial Action and Purchaser shall use commercially reasonable efforts to assist Seller in obtaining no further action determinations or similar determinations from the applicable governmental authority indicating that no additional Remedial Action is required. Following the creation of the Environmental Trust, Seller shall (i) afford Purchaser the opportunity to comment on the planning and execution of any Remedial Actions and (ii) notify Purchaser of, and afford Purchaser the opportunity to participate in, meetings between Seller and DNREC regarding any Remedial Actions.

C.      **PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT AS OF THE CLOSING, PURCHASER SHALL WAIVE, RELEASE AND FOREVER DISCHARGE ANY CLAIMS, DEMANDS, SUITS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS EMPLOYEES, AGENTS, REPRESENTATIVES, CONSULTANTS, CONTRACTORS, COUNSEL, SUBSIDIARIES, AFFILIATES, OR OTHER ENTITIES CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY: (I) THIS CONTRACT AND THE SALE BY SELLER OF THE PROPERTY; (II) THE PROPERTY, EITHER APPARENT OR LATENT DEFECTS AND CONDITIONS THEREOF, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT CONSISTENT WITH THE INVESTIGATIONS PREVIOUSLY CONDUCTED AT OR ABOUT THE PROPERTY; (III) COMPLIANCE OR NONCOMPLIANCE WITH ANY LAND USE CONTROLS OR ANY APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, BUILDING, ZONING, LAND USE OR ENVIRONMENTAL PROTECTION LAWS, RULES, REGULATIONS OR REQUIREMENTS, (IV) ANY AND ALL CLAIMS, LOSSES, DAMAGES, ACTIONS OR CAUSES OF ACTION IN ANY WAY RELATING TO, OR IN CONNECTION WITH THE PROPERTY WHICH HAVE ARISEN PRIOR TO THE DATE HEREOF; _PROVIDED, HOWEVER_, THAT NOTHING IN THIS _SECTION 15(C)_ SHALL WAIVE, LIMIT OR OTHERWISE AFFECT THE RIGHTS OR OBLIGATIONS OF SELLER AND PURCHASER REGARDING THOSE LIABILITIES OR OBLIGATIONS WHICH ARE EXPRESSLY PROVIDED TO**

**SURVIVE THE CLOSING. SELLER SHALL WAIVE, RELEASE AND FOREVER DISCHARGE ANY CLAIMS, DEMANDS, SUITS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST PURCHASER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONSULTANTS, CONTRACTORS, COUNSEL, SUBSIDIARIES, AFFILIATES, OR OTHER ENTITIES CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH CONTAMINATION THAT EXISTS AT, ON OR UNDER THE REAL PROPERTY AS OF THE CLOSING; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 15(C) SHALL IMPACT SELLER'S OR PURCHASER'S RIGHT TO ENFORCE THE PROVISIONS OF THIS CONTRACT. PURCHASER HEREBY AGREES TO INDEMNIFY SELLER FOR ANY LOSSES, CLAIMS OR DAMAGES INCURRED BY SELLER TO THE EXTENT RESULTING FROM (I) INJURIES THAT ARE SUFFERED BY SELLER'S PERSONNEL OR ITS AGENTS WHILE SELLER IS PERFORMING ITS OBLIGATIONS AT THE SITE AFTER CLOSING AND THAT ARE CAUSED BY PURCHASER'S NEGLIGENT OR WILLFUL MISCONDUCT, OR (II) ENVIRONMENTAL CONDITIONS ON THE REAL PROPERTY CAUSED EXCLUSIVELY BY PURCHASER, OR (III) EXACERBATION OF PRE-EXISTING CONDITIONS EXCLUSIVELY AS A RESULT OF PURCHASER'S NEGLIGENCE OR WILLFUL MISCONDUCT, PROVIDED HOWEVER THAT PURCHASER'S OBLIGATIONS (UNDER THIS CLAUSE (III)) SHALL BE LIMITED TO THE RESTORATION OF THE PROPERTY TO SUBSTANTIALLY THE CONDITION OF THE PROPERTY IMMEDIATELY PRECEDING SUCH EXACERBATION AND IN NO EVENT SHALL PURCHASER'S OBLIGATIONS HEREUNDER EXCEED ITS OBLIGATIONS UNDER THE BDA. IN THE EVENT THAT PURCHASER SHALL CAUSE AN ENVIRONMENTAL CONDITION FOR WHICH PURCHASER INDEMNIFIES SELLER UNDER CLAUSE (II) OR (III), AND THE INVESTIGATION OR REMEDIATION THEREOF IS COMMINGLED WITH A PRE-EXISTING ENVIRONMENTAL CONDITION, PURCHASER'S LIABILITY TO SELLER SHALL BE REDUCED BY THE AMOUNT OF ANY INVESTIGATION OR REMEDIATION OF PRE-EXISTING CONDITIONS PERFORMED BY PURCHASER.**

       D.    Purchaser hereby agrees to record deed restrictions, covenants, conditions, restrictions, reservations, engineering controls, institutional controls, easements or rights of way or agreements affecting the future use of the Property and relating to the ongoing environmental remediation of soils and/or groundwater on or under the Property and limiting the use and/or development of the Property for uses other than industrial uses (the "**Intended Use**") (collectively, the "**Land Use Controls**") to the extent that such Land Use Controls are required by and approved by DNREC and are consistent with Purchaser's ownership, use and operation of and on the Real Property (which includes the reconstruction and conversion of the existing facility on the Land into a facility for the manufacture and assembly of plug-in hybrid electric vehicles and the operation thereof). It is understood that Seller reserves the sole right to consult and negotiate with applicable governmental authorities as to the Land Use Controls that will be imposed on the Property, subject to the limitations and requirements in this Contract. Seller shall deliver to Purchaser copies of the Land Use Controls to be imposed on the Property as soon as

            

the same are available and agreed to by Seller. Purchaser represents, warrants and covenants that it will take all actions required to ensure that the Property will be used only in accordance with any Land Use Controls.

E.    Seller represents that it has provided Purchaser with access to all material documents, reports and assessments regarding environmental conditions at the Real Property in Seller's possession, all of which are listed on Exhibit I hereto.

F.    The obligations, duties, liabilities, releases, indemnities and waivers of the parties under this Section 15 shall survive the Closing of this Contract.

G.    For purposes of this Section 15, the following terms shall have the meanings set for the below:

"Environmental Law" means any and all applicable federal, national, state or local laws, rules, regulations, directives, decrees, treatises, principles (including principles of common law) or statutes relating to the environment or to the regulation or remediation of Hazardous Materials.

"Hazardous Materials" means any substance, material or waste that is regulated, classified, defined or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, and polychlorinated biphenyls.

"Remedial Action" means all actions including any capital expenditures undertaken to (i) clean up, remove, treat or in any other way address Hazardous Materials; or (ii) prevent the release or threat of release, or minimize the further release of any Hazardous Materials.

**16.    Assignment and Assumption.** Except as provided in this Section 16, Purchaser shall not have the right to assign its interest in this Contract without the prior written consent of Seller, which consent may be granted or withheld in Seller's reasonable discretion, and any such assignment without such consent shall be null and void and of no force and effect. Notwithstanding any assignment of this Contract, Purchaser shall at all times remain primarily obligated, and not be relieved of any liabilities, hereunder. Seller acknowledges that financing for the acquisition of the Property will be provided by the U.S. Department of Energy ("**DOE**") and the Federal Financing Bank, and, under the terms of such financing, Midland Loan Services, Inc., serves as Collateral Agent (together with any successors in such capacity, the "**Collateral Agent**") for DOE, the Federal Financing Bank, and certain other lenders which may provide financing to Purchaser from time to time. Consistent with the terms of the financing with DOE, Seller hereby consents to the assignment by Purchaser of this Contract and Purchaser's rights under Section 15 hereof to the Collateral Agent and to the Collateral Agent's exercising and enforcing any of Purchaser's rights thereunder following the Closing, provided such assignment shall not be deemed to cure any Purchaser default that exists at the time of the assignment. To the extent Collateral Agent shall exercise or seek to enforce Purchaser's rights as permitted

hereunder, Purchaser may not exercise or seek to enforce its rights hereunder. With the approval of the Bankruptcy Court, Seller may assign its interests in this Contract to an entity or trust created pursuant to the Case to address certain of Seller's cleanup obligations related to the remediation of Seller's owned real property (the "**Environmental Trust**"), provided that the Environmental Trust also assumes Seller's obligations hereunder. In the event that Seller assigns its interest in this Contract to the Environmental Trust and the Environmental Trust assumes the Seller's obligations hereunder, (i) Purchaser shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had or may have against Seller, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Contract, and the Environmental Trust shall be entitled to, but not limited to, all of the benefits and protections afforded Seller under this Contract, and (ii) Seller shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had, or may have against Purchaser, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Contract.

17.    **Reporting of Foreign Investment**. Purchaser agrees to comply with any and all reporting requirements applicable to the transaction which is the subject of this Contract which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including but not limited to The International Investment Survey Act of 1976, The Agricultural Foreign Investment Disclosure Act of 1978, The Foreign Investment in Real Property Tax Act of 1980 and the Tax Reform Act of 1984.

18.    **No Offer; Execution Date**. The submission of this Contract to Purchaser for review does not constitute an offer or option to sell the Property. Subject to the provisions of Sections 35 and 36, this Contract is not binding until (i) original counterparts of this Contract have been executed and delivered by Seller and Purchaser to the Title Company and (ii) the Deposit is delivered in good funds to the Title Company by Purchaser. Title Company shall notify Seller immediately that Purchaser has delivered an executed counterpart of this Contract to the Title Company with the Deposit.

19.    **Notices**. All notices and other communications hereunder shall be in writing and shall be delivered personally against receipt or shall be sent by certified United States Mail service, postage prepaid and return receipt requested, or by nationally utilized overnight delivery service, addressed to the parties as follows:

As to Seller:                  Motors Liquidation Company
                               500 Renaissance Drive, 14th Floor
                               Detroit, Michigan 48265
                               Facsimile: 313-486-4259
                               Attn: Kyle Braden, Secretary

| | |
|---|---|
| With a copy to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Facsimile: 212-310-8007<br>Attn: Stephen Karotkin, Esq. |
| And a copy to: | Weil, Gotshal & Manges LLP<br>1300 Eye Street NW, Suite 900<br>Washington, D.C. 20005<br>Facsimile: 202-857-0940<br>Attn: David R. Berz, Esq. |
| And a copy to: | Weil, Gotshal & Manges LLP<br>200 Crescent Court, Suite 300<br>Dallas, Texas 75201<br>Facsimile: 214-746-7777<br>Attn: Leslie Steele Smith, Esq. |
| As to Purchaser: | Fisker Automotive Inc.<br>19 Corporate Park<br>Irvine, California 92606<br>Facsimile: 949-757-4240<br>Attn: Frank Faga |
| With a copy to: | Orrick, Herrington & Sutcliffe LLP<br>1152 15th St. NW<br>Washington, DC 20005<br>Facsimile: 202-339-8500<br>Attn: Robert Lawrence |
| And a copy to: | Director<br>Advanced Technology Vehicles Manufacturing Loan Program<br>CF-1.4<br>United States Department of Energy<br>1000 Independence Avenue, SW<br>Washington, DC 20585<br>Telephone: 202-586-8146<br>Facsimile: 202-586-7809<br>Email: fiskeratvmtransaction@hq.doe.gov |
| And a copy to: | Office of the General Counsel<br>GC-1<br>United States Department of Energy<br>1000 Independence Avenue, SW<br>Washington, DC 20585<br>Telephone: 202-586-5281 |

Facsimile: 202-586-1499
Email: fiskeratvmtransaction@hq.doe.gov

Any notice in accordance herewith shall be deemed received when personal, nationally utilized overnight delivery service, or courier delivery is received or refused. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery services for overnight delivery on the day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission.

20.  **Survival**. The representations and warranties set forth herein shall expire and be of no further force and effect hereunder upon Closing, unless otherwise expressly provided herein.

21.  **Parties Bound**. This Contract shall be binding upon and inure to the benefit of Seller and Purchaser, their respective successors and permitted assigns.

22.  **Governing Law**. The laws of the State of Delaware shall govern the validity, construction, enforcement and interpretation of this Contract, provided, however, and consistent with Section 34, that the Bankruptcy Court shall retain jurisdiction over any and all disputes arising under or otherwise relating to the construction and enforcement of the Sale Approval Order and the transactions consummated thereunder.

23.  **Brokers**. Each of Seller and Purchaser represent and warrant to the other that it has not hired or engaged any broker in connection with this Contract or the transactions contemplated hereunder. If any broker should make a claim for a commission based upon the actions of Seller, Seller shall indemnify, defend and hold Purchaser harmless from such claim. If any broker should make a claim for a commission based upon the actions of Purchaser, Purchaser shall indemnify, defend and hold Seller harmless from such claim. The provisions of this Section 23 shall survive the Closing and delivery of the deed.

24.  **Multiple Counterparts**. This Contract may be executed in a number of identical counterparts. If so executed, each of such counterparts shall, collectively, constitute one agreement, but in making proof of this Contract, it shall not be necessary to produce or account for more than one such counterpart. Neither this Contract nor any memorandum thereof shall be recorded.

25.  **Time of the Essence**. The parties hereto expressly agree that time is of the essence with respect to this Contract.

26.  **Entire Contract**. This Contract, together with the exhibits attached hereto, the existing confidentiality agreement between the parties and the existing access agreement between the parties, embodies the entire agreement of the parties with respect to the transaction herein contemplated, superseding all prior agreements and communications whether oral or written. Any amendments hereto shall be in writing and executed by the party against whom enforcement of the modification is sought.

**27.    Non-Business Days**.  If the date of Closing or the date for delivery of a notice or performance of some other obligation of a party falls on a Saturday, Sunday or legal holiday in the State in which the Property is located, then the date for Closing or such notice or performance shall be postponed until the next business day.

**28.    Confidentiality**.  Purchaser shall treat all materials and information provided by Seller as confidential information, and shall distribute same only to Purchaser's affiliates, lenders, partners, shareholders, employees, agents and representatives who have a need to know and to third party consultants and professionals retained by Purchaser.  Purchaser shall instruct all of its affiliates, lenders, partners, shareholders, employees, agents, representatives, and third party consultants and professionals as to the confidentiality of all such information as well as the existence or terms of this Contract.  Purchaser may also provide such information to DOE and the Collateral Agent.

**29.    Effect of Title Insurance**. The issuance of the Title Policy shall be in lieu of any express or implied warranty of Seller concerning title to the Property, whether made herein or in the deed or in any other document delivered at or in connection with the Closing.  Purchaser acknowledges and agrees that, from and after the Closing, its only remedy for damages incurred by reason of any defect in title to the Property shall be against the issuer of the Title Policy.  The provisions of this Section 29 shall survive the Closing.

**30.    Severability**.  If any provision of this Contract or application to any party or circumstances shall be determined by the Bankruptcy Court to be invalid and unenforceable to any extent, the remainder of this Contract or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**31.    Waiver**.  The failure of a party to insist in any one or more instance upon the strict performance of any one or more of the obligations under this Contract, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this agreement or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach or omission.

**32.    Recordation**.  Purchaser agrees not to record this Contract or any memorandum hereof.  To the extent that such filing is made in violation of this Contract, Purchaser shall indemnify and defend the Seller against any damages incurred by such parties in connection therewith.  The provisions of this Section 32 shall survive the termination of this Contract.

**33.    WAIVER OF JURY TRIAL**.    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS CONTRACT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**34.    BANKRUPTCY COURT JURISDICTION**.  UNTIL THE CASE IS CLOSED, THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE

JURISDICTION OVER ALL DISPUTES ARISING UNDER THIS CONTRACT RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS CONTRACT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO, (ii) THE PROPERTY, (iii) ANY ASSUMED LIABILITIES, AND (iv) ANY OBLIGATIONS OF A PARTY THAT MAY SURVIVE CLOSING, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.   AFTER THE CASE IS CLOSED, DISPUTES INVOLVING THE ENVIRONMENTAL TRUST SHALL REMAIN SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT TO THE EXTENT PERMITTED UNDER APPLICABLE LAW.   EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE, AFTER THE CASE IS CLOSED, ALL DISPUTES ARISING UNDER THIS CONTRACT SHALL BE RESOLVED IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN DELAWARE.

    **35.**   **Bankruptcy Matters**.  The parties shall use commercially reasonable efforts to cooperate, assist and consult with each other to consummate the transactions contemplated by this Contract.  Neither Seller nor Purchaser shall, without the prior written consent of the other party, file, join in, or otherwise support in any manner whatsoever, any motion or other pleading relating to the sale of the Property that is inconsistent with this Contract.  Seller shall comply with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Contract, including serving on all required persons a notice of the Sale Motion.  The parties agree to comply in all material respects with the terms of the Sale Approval Order and agree that to the extent there is a conflict between this Contract and the Sale Approval Order, the Sale Approval Order shall govern in all respects.

    **36.**   **Competing Transaction**.  This Contract is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "**Competing Bid**") that may be solicited by the Seller prior to the hearing held by the Bankruptcy Court to consider the Sale Motion (defined below).  The Purchaser acknowledges that the Seller may establish a date by which Competing Bids must be submitted by bidders and any other procedures that the Seller may, in its sole discretion, implement.  From the date hereof (and any prior time) and until the transaction contemplated by this Contract is consummated, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Property.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Seller to prospective purchasers.  In the event that the Seller elects to enter into an agreement with a party that submits a Competing Bid or if the Bankruptcy Court does not enter the Sale Approval Order or if such Sale Approval Order is modified or reversed on appeal, either party may terminate this Contract upon written notice to the other party.  Upon such termination, Seller shall return the Deposit to the Purchaser.

37.    **Bankruptcy Court Filings**.  As promptly as practicable following the execution of this Contract, Seller shall file with the Bankruptcy Court a motion seeking entry of the Sale Approval Order (the "**Sale Motion**"), which filing shall be in form and substance reasonably acceptable to Purchaser.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Approval Order.

38.    **Assignment of Associated Contracts**.  Seller shall assume and assign to the Purchaser at the Closing the agreements set forth in Exhibit J, including without limitation any lease or operating agreement with Delmarva Power and Light Company or its successors.  At Closing, Seller shall pay any cure amounts related to the assigned contracts and required by the Sale Approval Order.  Seller shall receive return in full of all security deposits held by counterparties under all assigned contracts, and Purchaser shall make arrangements with the other party or parties to the assigned contracts to replace such security deposits, if required by the applicable counterparty, as a condition to the assumption and assignment of each such contract, provided, however, that any deposits the repayment of which is disputed shall not be paid or credited to Seller as provided in this Section 38.  In the event Purchaser receives credit from the counterparty, or repayment of, any security deposit subject to such a dispute for which Seller has not previously been paid or credited, Purchaser shall pay to Seller such recovered deposit.  If, at any time during the period that begins on the Execution Date and ends on the date that is ninety (90) days following the Closing, Purchaser identifies one or more executory contracts or unexpired leases to which Seller is a party that Purchaser believes to be reasonably necessary for the operation of the Property (each, a "**Post-Closing MLC Agreement**"), Seller shall use commercially reasonable efforts to assign, and if necessary, to obtain approval from the Bankruptcy Court to assign to Purchaser each Post-Closing MLC Agreement.  Purchaser agrees to indemnify Seller for any losses Seller incurs (other than attorneys' fees and expenses) that arise solely as a result of the assignment of any Post-Closing MLC Agreements.  Furthermore, to the extent that Seller is obligated to pay any "cure" or other amounts pursuant to 11 U.S.C. 365(b)(1) as a result of the assignment of a Post-Closing MLC Agreement to Purchaser, Purchaser agrees to reimburse Seller for such amounts; provided, however, that, nothing in this Section 38 shall prohibit Seller from rejecting, assuming, or assuming and assigning any contract or lease that has not been identified as a Post-Closing MLC Agreement; provided, further, that in the event that Seller seeks to reject at any time prior to the date that is ninety (90) days following the Closing any contract or lease related to the Property that has not been identified as a Post-Closing MLC Agreement, Seller will provide adequate notice of the proposal to reject those contracts or leases to Purchaser.  Notwithstanding the foregoing, in no instance shall Purchaser be obligated to pay, or to indemnify Seller for, any of the prorated costs for which Seller is responsible pursuant to Section 7 of the Contract, including, without limitation, the cost of all sewer, water, and utilities services for periods prior to the Closing Date.

*Signatures on Next Page*

IN WITNESS WHEREOF, the parties hereto have, by their duly authorized representatives, executed this Contract as of the date indicated above.

**WITNESS:**

**SELLER**

**MOTORS LIQUIDATION COMPANY,**

a Delaware corporation

By: _Ted Stenger_

Name: _TED STENGER_

Title: _EVP_

Date: _6/18/2010_, 2010

**WITNESS:**

**PURCHASER**

**FISKER AUTOMOTIVE INC.,**

a Delaware corporation

By: _____

Name: _____

Title: _____

Date: _____, 2010

IN WITNESS WHEREOF, the parties hereto have, by their duly authorized representatives, executed this Contract as of the date indicated above.

**WITNESS:**

 

**SELLER**

**MOTORS LIQUIDATION COMPANY,**

a Delaware corporation

By: _____

Name:

Title:

Date: _____, 2010

**WITNESS:**

_JULIE A KIERNAN_____

**PURCHASER**

**FISKER AUTOMOTIVE INC.,**

a Delaware corporation

By: _____

Name: _BERNHARD KOEHLER_

Title: _COO_

Date: _7 JUNE_____, 2010

**EXHIBITS**

| | | |
|---|---|---|
| EXHIBIT A | - | Copy of Sale Approval Order |
| EXHIBIT B | - | Description of the Property |
| EXHIBIT C | - | Form of Escrow Agreement |
| EXHIBIT D | - | Form of Special Warranty Deed |
| EXHIBIT E | - | Form of Bill of Sale |
| EXHIBIT F | - | Form of FIRPTA Affidavit |
| EXHIBIT G | - | Form of Access Agreement |
| EXHIBIT H | - | Intentionally Omitted |
| EXHIBIT I | - | Environmental Documents |
| EXHIBIT J | - | Contracts to be Assumed and Assigned |

# EXHIBIT A

## FORM OF SALE APPROVAL ORDER

OHS East:160709396.17

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
In re:                                          :    Chapter 11
                                                :
MOTORS LIQUIDATION COMPANY, *et al.*, :    Case No.  09-50026 (REG)
     f/k/a General Motors Corp., *et al.*     :
                                                :    Jointly Administered
                              Debtors.          x
------------------------------------------------------- 

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER UNDER 11 U.S.C. §§ 105, 363 AND 365 AUTHORIZING AND APPROVING (I) THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO THE TERMS OF THE REAL ESTATE PURCHASE CONTRACT BETWEEN THE DEBTOR AND FISKER AUTOMOTIVE, INC., (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (III) THE DEBTOR'S ENTRY INTO A SETTLEMENT AGREEMENT IN CONNECTION WITH THE SALE

     This matter having come before the Court on the motion dated _____, 2010 (the

"**Sale Motion**")[1] of Motors Liquidation Company, a debtor and debtor-in-possession in the

above captioned cases (collectively with the other debtors and debtors-in-possession in the above

captioned cases, the "**Debtor**" or "**Seller**"), seeking authority (i) to sell to Fisker Automotive,

Inc. (the "**Purchaser**"), certain assets of the Debtor's estate (as defined in the Contract (as

defined herein), the "**Property**") free and clear of all liens, claims, encumbrances and interests

pursuant to 11 U.S.C. § 363(f) (the "**Sale**"), (ii) to assume and assign to the Purchaser certain

executory contracts and unexpired leases identified on <u>Exhibit J</u> to the Contract, and (iii) to enter

into that certain settlement agreement (the "**Settlement Agreement**"), annexed hereto as <u>Exhibit</u>

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion or the Contract.

A, by and between the Delaware Department of Natural Resources and Environmental Control (the "**DNREC**") relating to the Property.

Due notice of the Sale Motion, the Sale Hearing (as defined herein), and the list of executory contracts and unexpired leases to be assumed and assigned pursuant to the Contract and the related cure amounts (the "**Cure Amounts**") has been given to all parties entitled to notice, as evidenced by the certificate of service and notices previously filed with this Court. The Debtor provided adequate notice and an opportunity to non-debtor parties to object to the Debtor's proposed assumption and assignment of identified executory contracts and unexpired leases, which notice contained a conspicuous statement of what the Debtor believed to be the monetary cure amount that the non-debtor parties are due under their respective executory contracts and/or unexpired leases.

The Debtor conducted a robust marketing effort prior to the filing of the Sale Motion and determined that the Contract submitted by the Purchaser is the highest or best offer for the Property. Subsequent to the filing of the Sale Motion, the Debtor further marketed the Property and solicited competing offers for the Property. The Debtor did not receive any other offers for the Property. The sale of the Property to the Purchaser pursuant to the terms of the Contract (as defined herein) is supported by the Debtor's business judgment, is fair and reasonable, and constitutes the highest and best offer for the Property.

This Court held a hearing on ____, 2010 (the "**Sale Hearing**"), to consider (i) the Sale Motion and any objections thereto, (ii) whether to approve and authorize the Sale to the Purchaser pursuant to the Real Estate Purchase Contract dated _____, 2010 between the Debtor and the Purchaser (the "**Contract**"), a copy of which is attached hereto as Exhibit B, (iii) any objections to the proposed assumption and assignment of executory contracts and unexpired

A-3

leases identified on <u>Exhibit J</u> of the Contract as being assumed by the Debtor and assigned to the Purchaser in connection with the Sale (the "**Assigned Leases and Assigned Contracts**"), including to the proposed Cure Amounts, and (iv) the Debtor's entry into the Settlement Agreement, at which time all creditors, interest holders, parties to executory contracts and unexpired leases, and other parties in interest were afforded an opportunity to be heard.

The Court having reviewed and considered (i) the Sale Motion and any objections thereto, (ii) the Contract, (iii) the Settlement Agreement, and (iv) the arguments of counsel made, and the evidence proffered and adduced, at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor's estate and creditors and other parties in interest; and upon the record of the Sale Hearing and all proceedings in these cases; and after due deliberation thereon; and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

### Jurisdiction, Venue and Grounds for Relief

A.  The Court has jurisdiction over the Sale Motion and over the property of the Debtor and its estate, pursuant to 28 U.S.C. §§ 157 and 1334.  These matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409(a).

B.  The statutory predicates for relief sought in the Sale Motion are 11 U.S.C. §§ 105(a), 363(b), (f) and (m), and 365, and Bankruptcy Rules 2002, 6004, 6006 and 9014.

### Notice of the Sale Motion, the Sale, the Assumption and Assignment of the Assigned Leases and Assigned Contracts, and the Cure Amounts

C.  Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale, and the assumption and assignment of the Assigned Leases and Assigned Contracts and the Cure Amounts, has been provided in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014, and such notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion, the Sale, the assumption and assignment of the Assigned Leases and Assigned Contracts, or the Cure Amounts is or shall be required.

D.  The Debtor has served the Sale Motion, which sets forth the Cure Amounts upon each non-debtor counter-party to each of such Assigned Leases and Assigned Contracts that the

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Debtor seeks to assume and assign to the Purchaser on the Closing Date. The service of the Sale Motion was good, sufficient and appropriate under the circumstances and no further notice needs to be given in respect of establishing the Cure Amounts for the respective Assigned Leases and Assigned Contracts. Non-debtor counter-parties to the Assigned Leases and Assigned Contracts have had an opportunity to object to the Cure Amounts.

E.   A reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) all entities known to have expressed an interest in acquiring the Property; (ii) all entities known to have an interest in the Property; (iii) all non-debtor parties to the Assigned Leases and Assigned Contracts to be assumed and assigned pursuant to the Contract; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a known interest in the relief requested; (v) all known parties holding or asserting liens or encumbrances on the Property; and (vi) parties entitled to notice under the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated March 19, 2010 [Docket No. 5670].

## Good Faith of Purchaser

F.   The Purchaser is not an "insider" of the Debtor, as that term is defined in 11 U.S.C. § 101(31).

G.   The Purchaser is purchasing the Property in good faith within the meaning of 11 U.S.C. § 363(m), and is entitled to all of the protections afforded thereby. The Debtor and the Purchaser negotiated, proposed, and entered into the Contract at arm's length, in good faith, and without collusion. The Debtor and the Purchaser have fully disclosed all consideration to be given by the Purchaser under the Contract, and all other agreements or arrangements entered into by the

A-6

Purchaser in connection with the Sale. The Purchaser has not engaged in any conduct, by any action or inaction, that constitutes a violation of, or would cause or permit the Sale to be avoided under 11 U.S.C. § 363(n). No common identity of directors or controlling stockholders exists between the Purchaser and the Debtor. The parties to the Contract will be acting in good faith in closing the Sale pursuant to the Contract.

### The Sale is Fair and Reasonable and in the Exercise of Sound Business Judgment

H.  The aggregate consideration to be received by the Debtor under Section 2 of the Contract is fair and reasonable, constitutes the highest and best offer for the Property, constitutes reasonably equivalent value and fair consideration for the Property, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. No other person or entity has offered to purchase the Property for greater value to the Debtor's estate than the Purchaser. The Debtor's process for marketing and selling the Property, the Debtor's determination to enter into the Contract, and the Debtor's determination that the consideration to be received by the Debtor's estate is fair and reasonable each constitutes a valid and sound exercise of the Debtor's business judgment. Moreover, the consideration received under the Contract constitutes reasonably equivalent value and fair consideration for the Property.

I.  Approval of the Contract by the Court and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

### Validity of Transfer

J.  The Debtor has full power and authority to execute and deliver the Contract and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the Contract.

K.  The transfer of the Property to the Purchaser will be, as of the Closing, the legal, valid and effective transfer of such assets, and will vest the Purchaser with all right, title, and interest of the Debtor or the Debtor's estate to the Property, as of the Closing, free and clear of all Liens and Claims[3] accruing, arising or relating to any time prior to the Closing Date.  Any provisions in any agreement that prohibit or condition the sale or transfer of the Property are void and of no force and effect.  There shall be no fees or charges (apart from any applicable sales and use taxes and the costs described in Sections 7 and 8 of the Contract) imposed upon the Purchaser or the Debtor's estate as a result of the sale of the Property to the Purchaser.  The Seller will retain certain obligations regarding the Property as described in Section 15 of the Contract.

### Section 363(f) is Satisfied

L.  The Debtor may sell the Property free and clear of all Liens and Claims, because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  **[The parties that objected to the Sale or the Sale Motion fall within one or more of subsections (1) through (5) of 11 U.S.C. § 363(f), and are adequately protected by having their Liens and Claims, if any, attached to the proceeds of the Sale.  Accordingly, all objections to the Sale or the Sale Motion are resolved as set forth herein and/or in a stipulation filed with the Court, or are overruled.]**  All non-debtor parties asserting interests in the Property that did not object, or that withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale on the terms set forth herein and in the Contract pursuant to 11 U.S.C. §§ 363(f)(2) and 365.

---

[3] For purposes of this Order, the phrase "**Liens and Claims**" means any or all interests in or relating to any of the Property, including liens (as defined in 11 U.S.C. § 101(37) and claims (as defined in 11 U.S.C. § 101(5)).

### Assumption and Assignment of the Assigned Leases and Assigned Contracts

M. The assumption and assignment of the Assigned Leases and Assigned Contracts pursuant to the terms of this Order are integral to the Contract and are in the best interests of the Debtor and its estate, creditors and other parties in interest, and represent the exercise of reasonable business judgment by the Debtor. The assumption by the Debtor of the Assigned Leases and Assigned Contracts is hereby approved, and the assignment of the Assigned Leases and Assigned Contracts to the Purchaser is hereby approved, as all statutory requirements for such assumption and assignment are satisfied.

N. The Debtor has (i) cured and/or provided adequate assurance of prompt cure to all defaults existing prior to the Closing Date under each of the Assigned Leases and Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A); and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under each of the Assigned Leases and Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B).

O. The Purchaser has provided adequate assurance of its future performance under the Assigned Leases and Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

P. The Assigned Leases and Assigned Contracts shall, as of the Closing Date, be valid and binding on the Purchaser and the non-debtor counter-parties thereto, and in full force and effect and enforceable in accordance with their respective terms. Following such assignment from and after the Closing Date, the Debtor and the estate shall be relieved, pursuant to 11 U.S.C. § 365(k), from any further liability under the Assigned Leases and Assigned Contracts.

### Compelling Circumstances for an Immediate Transfer

Q.  To maximize and preserve the value of the Debtor's estate and the Property, it is essential that the Sale of the Property occur within the time constraints set forth in the Sale Motion and the Contract.  Time is of the essence in consummating the Sale.

### The Settlement Agreement is Reasonable

R.  The Debtor's entry into the Settlement Agreement is in the best interests of the Debtor and its estates.

S.  The terms of the Settlement Agreement are within the range of reasonableness.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### General Provisions

1.  The relief requested in the Sale Motion is granted and approved, and the transaction contemplated thereby is authorized and approved as set forth in this Order.

2.  The assumption and assignment of the Assigned Leases and Assigned Contracts is authorized and approved as set forth in this Order.

3.  All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objectors have been otherwise satisfied or adequately provided for. Without limiting the generality of the foregoing:

a.      **[insert if applicable]**  The objection to the _____ Motion filed by _____ is hereby overruled in its entirety.

b.      **[insert other objections, if appropriate]**

## **Approval of the Contract**

4.   The Contract and all ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.   The Debtor is authorized and empowered to, and shall take any and all actions necessary or appropriate to (i) consummate the Sale of the Property to the Purchaser pursuant to and in accordance with the terms and conditions of the Contract, (ii) close the Sale as contemplated in the Contract and this Order, and (iii) execute and deliver, perform and consummate the Contract.

6.   The terms and provisions of this Order shall be binding in all respects upon, and shall inure to the benefit of, the Purchaser, the Debtor, the Debtor's estate and their respective successors and assigns (including any entity or trust created to address certain of Seller's cleanup obligations related to the remediation of Seller's owned real property), and shall be binding in all respects upon any affected third parties including, but not limited to, any person or entity asserting any interest (including any Liens and Claims) with respect to the Property, all non-debtor counter-parties to the Assigned Leases and Assigned Contracts, and all creditors, equity holders and parties-in-interest in these cases.

7.   The Debtor is authorized and empowered to request any and all governmental or regulatory approvals, and to make any governmental or regulatory filings or notifications contemplated by the Contract and is further authorized to keep confidential any information related to such approvals or filings.

## **Transfer of the Property**

8.  Pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Debtor is authorized and empowered to, and subject to the terms of the Contract, shall transfer the Property to the Purchaser on the Closing Date.  Such transfer shall constitute a legal, valid, binding and effective transfer of the Property to the Purchaser.  Any provisions in any agreement that prohibit or condition the sale or transfer of the Property are void and of no force and effect.  Upon the Closing, the Property shall be transferred to the Purchaser free and clear of all Liens and Claims.  Such transfer shall vest in the Purchaser all right, title and interest of the Debtor in and to the Property.  Purchaser shall not be liable in any way for any Liens and Claims that any person or entity may have against the Debtor, any of its assets, or the Property.  The Seller will retain certain obligations regarding the Property as provided in Section 15 of the Contract.

9.  All entities that are in possession of any of the Property on the Closing Date are hereby directed to surrender possession of all such Property to the Purchaser or its assignee at the Closing.

10. All alleged Liens and Claims on the Property shall be transferred, affixed and attached to the proceeds of the Sale, with the same validity, priority, force and effect as such Liens and Claims had immediately prior to the Closing.  Nothing in this Order will determine the value of any of the Property or the validity, priority or amount of any Claims or Liens.

11. The filing of a certified copy of this Order with the appropriate clerk and/or recording with the recorder shall act to cancel any Liens and Claims and any other encumbrances of record.

12. If any person or entity which has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens and Claims on any of the Property has not delivered to the Debtor, at the Debtor's or Purchaser's request, in proper form

for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of Liens and easements, and any other documents necessary for the purpose

of documenting the release of all Liens which the person or entity has or may assert with respect

to the Property, then, at or after Closing, each of the Debtor and the Purchaser is hereby

authorized to execute and file such statements, instruments, releases and other documents on

behalf of such person or entity with respect to the Property.

## Assigned Leases and Assigned Contracts

13.  Pursuant to 11 U.S.C. §§ 105(a) and 365, upon the Closing of the Sale, the Debtor is

authorized and empowered to, and shall assume each of the Assigned Leases and Assigned

Contracts and assign each of the Assigned Leases and Assigned Contracts to the Purchaser.  The

payment of the applicable Cure Amounts shall, with respect to each Assigned Lease and

Assigned Contract, (i) effect a cure of all defaults existing thereunder as of the Closing Date, (ii)

compensate all non-debtor parties for any and all losses resulting from such default, and (iii)

together with the assumption of the Assigned Leases and Assigned Contracts by the Purchaser,

constitute adequate assurance of future performance thereof.  The Purchaser shall then have

assumed the Assigned Leases and Assigned Contracts and, pursuant to 11 U.S.C. § 365(f), the

assignment by the Debtor of such Assigned Leases and Assigned Contracts shall not be a default

thereunder.

14. The Debtor shall pay all Cure Amounts due under such Assigned Leases and Assigned

Contracts.

15. After the Debtor's payment of the relevant Cure Amounts, (i) the Debtors shall have no

further liability or obligation of any kind whatsoever with respect to any Assigned Lease and

Assigned Contract and (ii) neither the Debtor nor its estate, the Purchaser nor their successors

and assigns shall have any further liability or obligation with respect to any default arising or accruing under any Assigned Leases and Assigned Contracts on or prior to the Closing Date and shall have no further liabilities to the non-debtor parties to the Assigned Leases and Assigned Contracts (and none of the non-debtor parties to the Assigned Leases or Assigned Contracts shall have any rights or claims with respect to such defaults, liabilities or obligations) other than the Purchaser's obligations under the Assigned Leases and Assigned Contracts that first accrue and become due and payable, or are first required to be performed, after the Closing Date.

16. Any provisions in any Assigned Lease and Assigned Contract or in any other agreement that prohibit or condition the assignment of such Assigned Lease or Assigned Contract or allow the non-debtor party to such Assigned Lease or Assigned Contract to terminate, recapture, impose any penalty, condition any renewal or extension or modify any term or condition upon the assignment of such Assigned Lease or Assigned Contract or any similar provision, constitute unenforceable anti-assignment provisions that are void and of no force and effect. There shall be no payment accelerations, assignment fees, or any other fees or charges imposed upon the Purchaser or the Debtor's estate as a result of the assumption and assignment of the Assigned Leases and Assigned Contracts.

17. The Purchaser has provided adequate assurance of its future performance under the Assigned Leases and Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

18. All other requirements and conditions under 11 U.S.C. §§ 363 and 365 for the assumption by the Debtor and assignment to the Purchaser of the Assigned Leases and Assigned Contracts have been satisfied. Upon the Closing, in accordance with 11 U.S.C. §§ 363 and 365,

the Purchaser shall be fully and irrevocably vested with all rights, title and interest of the Debtor under each of the Assigned Leases and Assigned Contracts.

19. Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, all parties to the Assigned Leases and Assigned Contracts and any other parties are forever barred and enjoined from raising or asserting against the Debtor or the Purchaser any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment arising under or related to the Assigned Leases and Assigned Contracts existing as of the Closing or arising by reason of the Closing.

### The Settlement Agreement

20. The Debtor's entry into the Settlement Agreement is authorized, ratified and directed and the Debtor is authorized to take all steps necessary and appropriate to consummate and otherwise effectuate the terms of the Settlement Agreement without further order of this Court.

21. Upon entry of this Order, all terms and conditions of the Settlement Agreement shall become effective.

### Other Provisions

22. All persons and entities, including without limitation all governmental, tax and regulatory authorities, lenders, trade and other creditors, interest holders and other parties-in-interest, holding any Liens and Claims of any kind or nature whatsoever (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under, out of, in connection with or in any way relating to the Debtor, the Property, the operation of the Debtor's business or the transfer of any of the Property to the Purchaser, are hereby forever barred, prohibited and permanently enjoined from asserting any of such Liens and Claims in any manner whatsoever against the Purchaser, its successors or assigns, or their property (including the Property).

23. The Purchaser shall not have any liability or other obligation of the Debtor arising under or related to the Property.  Without limiting the generality of the foregoing, the Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, including, but not limited to, any theory of antitrust, environmental, successor or purchaser liability, labor law, de facto merger or substantial continuity, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor, any obligations of the Debtor, or the Property, arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the ownership of the Property prior to the Closing Date, or the transfer of the Property to the Purchaser.

24. Nothing in this Order, the Settlement Agreement, the Contract, the Assigned Leases and Assigned Contracts, or any agreement entered into under this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order, except, as to DNREC, to the extent expressly agreed by DNREC in the Settlement Agreement.

25. The transactions contemplated by the Contract are undertaken by the Purchaser without collusion and in good faith, within the meaning of 11 U.S.C. § 363(m), and accordingly, the reversal or modification on appeal of this Order shall not affect the validity of the Sale to the Purchaser (including the assumption and assignment of the Assigned Leases and Assigned Contracts) or the other relief granted hereby, unless the effectiveness of this Order is duly stayed.

The Purchaser is a good faith buyer within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the full protections of that provision.

26. In accordance with Section 8 of the Contract, at Closing, the Purchaser shall pay state and local recording taxes, sales and use taxes, recording fees, and transfer taxes, if any, required to be paid.  All transfer taxes associated with the recordation of the special warranty deed (as described in the Contract), if any, including, without limitation, transfer and recordation taxes and documentary stamps, shall be paid by Purchaser at Closing or, if assessed at any time thereafter, shall be paid by Purchaser promptly following such assessment.

27. No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Sale.

28. There are no brokers involved in consummating the Sale and no brokers' commissions are due.

29. The failure specifically to include any particular provision of the Contract in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Contract be authorized and approved in its entirety.

30. The Contract and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

31. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Contract, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to

which the Debtor is a party, or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, the Contract, or this Order.

32. To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs the entry of judgment as set forth in this Order. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the effectiveness of this Order shall not be stayed and this Order shall be effective immediately.

Dated: _____, 2010

_____
United States Bankruptcy Judge

## Exhibit A

## Settlement Agreement

**Exhibit B**

**Real Estate Purchase Contract**

# EXHIBIT B

## DESCRIPTION OF THE PROPERTY

801 Boxwood Road, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.10-055) and 0 Terry Place, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.20-010).

**Parcel 1 - 801 Boxwood Road, a/k/a 95 & 97 Dodson Avenue – Tax Parcel No.: 07-042.10-055:**

**BEGINNING** at an iron with cap set on the easterly right of way line of Centreville Road and the southerly boundary line of the railroad lands, said point being the northwest corner of the herein described parcel; THENCE, leaving said point and running with the southerly boundary line of the said railroad lands the following six courses, (1) North 81°20'15" East a distance of 2514.76' to an iron pipe found; THENCE, (2) North 74°01'04" East a distance of 320.14' to an iron pipe found; THENCE, (3) North 81°17'50" East a distance of 949.59' to an iron pipe found; THENCE, (4) North 77°54'05" East a distance of 248.70' to a point; THENCE, (5) South 04°16'40" East a distance of 23.73' to an iron rod with cap set; THENCE, (6) South 20°26'16" West a distance of 141.33' to a concrete monument found on the westerly property line of the other lands of the General Motors Corporation (Deed Record B, Volume 74, Page 120); THENCE, running with the westerly property line of the other lands, (7) South 20°26'16" West a distance of 941.28' to a concrete monument found on the northerly property line of Paul Riebel (Instrument Number 20070727-0066682); THENCE, running with the northerly property line of the said Riebel lands and the northerly property lines of the Santos, McKay, Boxwood Coal Corp. and Reybold Venture Group lands, (8) North 80°52'43" West a distance of 696.65' to a pk nail found at the northerly end of Dodson Avenue; THENCE, running with the northerly end of Dodson Avenue, (9) North 81°46'56" West a distance of 20.01' to a pk nail found; THENCE, running with the westerly right of way line of Dodson Avenue, (10) South 08°25'33" West a distance of 1506.77' to an iron rod with cap set and a curve deflecting to the right with an arc length of 47.61', and a radius of 30.00'; THENCE, with the said curve the following chord bearing, (11) South 53°53'36" West, and chord length of 42.77' to a point on the northerly right of way line of Boxwood Road; THENCE, running with the northerly right of way line of Boxwood Road the following twenty three courses, (12) North 80°38'22" West a distance of 428.30' to a point; THENCE, (13) North 09°21'38" East a distance of 15.00' to a point; THENCE, (14) North 80°38'22" West a distance of 25.00' to a point; THENCE, (15) North 09°21'38" East a distance of 30.00' to a point; THENCE, (16) North 80°38'22" West a distance of 103.00' to a point; THENCE, (17) South 09°21'38" West a distance of 30.00' to a point; THENCE, (18) North 80°38'22" West a distance of 20.00' to a point; THENCE, (19) South 09°21'38" West a distance of 15.00' to a point; THENCE, (20) North 80°38'22" West a distance of 381.05' to a point and a curve deflecting to the left with an arc length of 274.04', and a radius of 3154.28'; THENCE, with the said curve the following chord bearing, (21) North 83°07'42" West, and a chord length of 273.95' to a point; THENCE, (22) North 85°37'02" West a distance

of 79.52' to a point; THENCE, (23) North 04°22'58" East a distance of 15.00' to a point; THENCE, (24) North 85°37'02" West a distance of 13.00' to a point; THENCE, (25) North 04°22'58" East a distance of 20.00' to a point; THENCE, (26) North 85°37'02" West a distance of 106.00' to a point; THENCE, (27) South 04°22'58" West a distance of 20.00' to a point; THENCE, (28) North 85°37'02" West a distance of 30.00' to a point; THENCE, (29) South 04°22'58" West a distance of 15.00' to a point; THENCE, (30) North 85°37'02" West a distance of 259.00' to a point; THENCE, (31) North 04°22'58" East a distance of 13.00' to a point; THENCE, (32) North 85°41'01" West a distance of 270.00' to a point, THENCE, (33) North 63°52'56" West a distance of 53.85' to a concrete monument found; THENCE, (34) North 83°59'56" West a distance of 170.07' to a point and the easterly right of way line of Centreville Road; THENCE, running with the easterly right of way line of Centreville Road the following eight courses, (35) North 45°51'15" West a distance of 88.74' to a point; THENCE, (36) North 06°58'23" West a distance of 472.00' to a concrete monument found; THENCE, (37) North 39°57'27" East a distance of 62.97' to a point; THENCE, (38) North 06°58'23" West a distance of 90.00' to a concrete monument found; THENCE, (39) North 55°14'59" West a distance of 48.97' to a concrete monument found; THENCE, (40) North 10°23'47" West a distance of 143.44' to a concrete monument found; THENCE, (41) North 21°05'16" West a distance of 305.27' to a concrete monument found and a curve deflecting to the left with an arc length of 399.49', and a radius of 1960.00'; THENCE, with the said curve the following chord bearing, (42) North 26°55'37" West, and a chord length of 398.80' to an iron rod with cap set and the place of beginning.

## Parcel 2 - 0 Terry Place - Tax Parcel No.: 07-042.20-010:

**BEGINNING** at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and on the easterly property line of the herein described parcel; THENCE, running with the westerly right of way line of Winston Place, (1) South 08°31'36" West a distance of 40.00' to an iron rod with cap set at the northeast property corner of the lands of James Cammock (Instrument Number 20040628-0070557); THENCE, leaving the westerly right of way line of Winston Place and running with the said Cammock lands the following two courses, (2) North 81°28'24" West a distance of 100.13' to an iron pipe found; THENCE, (3) South 08°31'38" West a distance of 100.00' to an iron rod with cap set on the northerly property line of the lands of Kenneth Norris (Instrument Number 20060821-0080039); THENCE, running with the northerly property line of the said Norris lands and the northerly property lines of the Stetka, Witkowski, CFC Properties, Kosinsk, Sandford, Casale, Testa, Buckley, Posczasy, and Riebel lands, (4) North 81°32'55" West a distance of 1085.59' to a concrete monument found and the easterly property line of the other lands of General Motors Corp. (Deed Book 45, Page 579); THENCE, running with the easterly property line of the other lands of General Motors Corp., (5) North 20°26'16" East a distance of 941.28' to a concrete monument found on the railroad lands; THENCE, with said railroad lands (6) North 87°22'44" East a distance of 104.01' to a point and the centerline of Little Mill Creek; THENCE, running with the centerline of Little Mill Creek the following six courses, (7) South 25°35'24" East a distance of 196.06' to a point; THENCE, (8) South 54°52'57" East a distance of 78.50' to a point; THENCE, (9) North 79°46'43" East a distance of 117.68' to a point; THENCE, (10) South 41°57'33" East a distance of 121.61' to a point; THENCE, (11) South 62°40'27" East

a distance of 185.52' to a point; THENCE, (12) South 76°31'00" East a distance of 245.01' to a point; THENCE, leaving the centerline of Little Mill Creek, (13) South 08°39'00" East a distance of 170.82' to a concrete monument found on the northerly property line of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and a non tangent curve deflecting to the right with an arc length of 37.29', and a radius of 691.25'; THENCE, continuing with the Crestmoor Swim Club the following six courses, with the said curve the following chord bearing, (14) North 88°02'12" West, and a chord length of 37.29' to a iron rod with cap set and a curve deflecting to the right with an arc length of 305.46', and a radius of 423.42'; THENCE, with the said curve the following chord bearing, (15) North 65°29'35" West, and a chord length of 298.88' to an iron pipe found and a curve deflecting to the left with an arc length 51.47', and a radius of 1035.90'; THENCE, with the said curve the following chord bearing, (16) North 46°14'58" West, and a chord length of 51.46' to an iron rod with cap set and a non tangent curve deflecting to the left with an arc length of 162.94', and a radius of 325.00'; THENCE, with the said curve the following chord bearing, (17) South 22°51'32" West, and a chord length of 161.24' to an iron rod with cap set; THENCE, (18) South 08°31'33" West a distance of 270.00' to an iron rod with cap set; THENCE, (19)  South 81°28'24" East a distance of 440.13' to a concrete monument found and the place of beginning.

## Parcel 3 - 0 Terry Place -  Tax Parcel No.: 07-042.20-010:

BEGINNING at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and being the southeast corner of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and the southwest corner of the herein described parcel; THENCE, running with the easterly property line of the said Crestmoor Swim Club lands the following three courses, (1) North 08°32'53" East a distance of 110.00' to an iron rod with cap set and a curve deflecting to the left with an arc length of 196.34', and a radius of 654.11'; THENCE, with the said curve the following chord bearing, (2) North 00°03'03" West, and a chord length of 195.60' to a point; THENCE, (3) North 08°38'58" West a distance of 12.94' to a point and a non tangent curve deflecting to the left with an arc length of 120.79', and a radius of 177.56'; THENCE, with the said curve the following chord bearing, (4) South 28°07'02" East, and a chord length of 118.47' to a iron rod with cap set on the westerly property line of the lands of Helen Lank (Deed Record G, Volume 126, Page 56) and a non tangent curve deflecting to the right with an arc length of 49.65', and a radius of 514.29'; THENCE, with the said curve the following chord bearing, (5) South 05°46'16" West, and a chord length of 49.63' to a point; THENCE, running with the said Lank lands and the westerly property line of the lands of Stephanie Vaughn (Instrument Number 20010425-0029946), (6) South 08°32'53" West a distance of 171.21' to an iron rod with cap set on the northerly right of way line of Summit Road; THENCE, running with the northerly right of way line of Summit Road, (7) North 81°22'59" West a distance of 40.08' to a concrete monument found and the place of beginning.

**EXHIBIT C**

**FORM OF ESCROW AGREEMENT**

OHS East:160709396.17

# ESCROW AGREEMENT

| | |
|---|---|
| Escrow Agent: | First American Title Insurance Company |
| Seller: | Motors Liquidation Company, Debtor in Possession |
| Purchaser: | Fisker Automotive Inc. |
| Property: | Approximately 142 acres at 801 Boxwood Road, Wilmington, Delaware |
| Case #: | Not Applicable |

Concurrently with executing this Escrow Agreement, Seller and Purchaser are depositing with Escrow Agent:

(1)    Real Estate Purchase Contract dated May ____, 2010, between the Seller and Purchaser ("Purchase Agreement"); and

(2)    The Deposit, in the amount of $1,000,000.00, as that term is defined in the Purchase Agreement ("Escrow Funds").

The Escrow Funds represent the earnest money deposit recited in the Purchase Agreement. Escrow Agent will hold the Escrow Funds in an interest bearing account, insured by FDIC, for the benefit of Purchaser (whose tax identification or social security number is 26-0689075), for delivery under the following terms and conditions.  Capitalized terms not defined herein shall have the meaning given them in the Purchase Agreement.

Disbursement at Closing.  At the Closing, the Escrow Agent is authorized and directed to release the Escrow Funds as part of the Purchase Price to the Seller when the Escrow Agent is in receipt of satisfactory closing statements executed by Seller and Purchaser in consummation of the Purchase Agreement, and upon written instructions from Weil, Gotshal & Manges LLP (on behalf of Seller), and Orrick, Herrington & Sutliffe LLP (on behalf of Purchaser).

Disbursement to Purchaser on Certain Terminations of the Purchase Agreement.  The Escrow Agent is authorized and directed to release the Escrow Funds to Purchaser when the Purchaser certifies to Escrow Agent that Purchaser has terminated the Purchase Agreement pursuant to the provisions of the Contract including Sections 3A (Declined Objections or Failure to Cure), 5 (Defects in Title), 9D (Failure to Close), 12 (Default), 14 (Risk of Loss), or 36 (Competing Transaction). Escrow Agent will not release the Escrow Funds until receipt of the same certification from Seller.  If such certification from Seller is not provided, then Escrow Agent shall not release the Escrow Funds, and the provisions set forth in subparagraph F "Disagreement Between Parties" will be invoked.

Disbursement to Seller on Certain Terminations of the Purchase Agreement.  The Escrow Agent is authorized and directed to release the Escrow Funds to Seller when the Seller certifies

to Escrow Agent that Seller has terminated the Purchase Agreement because of a Purchaser Default and that Seller is entitled to the Deposit pursuant to the provisions of the Contract including Section 12 (Default) of the Purchase Agreement. Escrow Agent will not release the Escrow Funds until receipt of the same certification from Purchaser. If such certification from Purchaser is not provided, then Escrow Agent shall not release the Escrow Funds, and the provisions set forth in subparagraph F "Disagreement Between Parties" will be invoked.

Holdback of Escrow. The Escrow Agent is authorized and directed to release an amount of the Escrow Funds up to $250,000 to the Title Company if the Escrow Agent receives a certification signed by Purchaser, Seller, and Title Company stating that Seller has failed to cure Title Objections pursuant to Section 3A of the Purchase Agreement.

Disbursement on Written Instructions. **The Escrow Agent is authorized and directed to release the Escrow Funds in accordance with any written instructions signed by both Seller and Purchaser.** It is understood and agreed that such written instructions shall clearly indicate the payee, method of delivery, and amount of payment.

Disagreement between Parties. In the event of any disagreement between the parties hereto resulting in conflicting instructions to or adverse claims or demands upon Escrow Agent with respect to the release of the Escrow Funds, the Escrow Agent shall refuse to comply with any such instructions, claim or demand so long as such disagreement shall continue, and in so refusing the Escrow Agent shall not release the Escrow Funds. The Escrow Agent shall not be or become liable in any way for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands (except in the event of any gross negligence or willful misconduct on the part of Escrow Agent), and it shall be entitled to continue to refrain from acting until such conflicting instructions or adverse claims or demands: (1) shall have been adjusted by agreement and the Escrow Agent shall have been notified in writing thereof by Seller and Purchaser, or (2) shall have finally been determined by the Bankruptcy Court. The Escrow Agent, at its sole discretion, may file an interpleader action with the Bankruptcy Court. Upon depositing the Escrow Funds with the Bankruptcy Court, Escrow Agent shall be released from any further liability under this Agreement (except in the event of any gross negligence or willful misconduct on the part of Escrow Agent). In the event of a dispute, charges for reasonable attorneys' fees and court costs of Escrow Agent may be deducted from the Escrow Funds before the Escrow Funds are released to anyone or any court, under this paragraph (except in the event of any gross negligence or willful misconduct on the part of Escrow Agent).

Additional Provisions.

The term "Escrow Funds" as used in this Agreement includes all interest earned on the Escrow Funds. The Parties acknowledge and agree that the Escrow Funds held by Escrow Agent hereunder shall be deemed a "deposit account," as set forth in 13 PA CSA §9102 and/or as set forth in Cal. Com. Code §9102 (revised Article 9 of the Uniform Commercial Code). It is the intention of all Parties that Escrow Funds be maintained in a "deposit account" over which Escrow Agent has sole and total control, and that the depository institution receiving the "deposit account" shall follow any and all instructions originated by Escrow Agent as the secured party directing the disposition of the Escrow Funds in the "deposit account" without further consent by

Seller or Purchaser. Seller and Purchaser further acknowledge and agree that Escrow Agent shall be the sole signatory on the "deposit account" notwithstanding that the Escrow Funds are being held for the benefit of the Purchaser as set forth above. It is further agreed that a security interest in favor of Escrow Agent in the Escrow Funds is perfected by Insurer taking possession of the Escrow Funds.

As between Escrow Agent and the parties to the Purchase Agreement, in the event the Escrow Agent's duties under this Agreement shall conflict with any provision of the Purchase Agreement, this Escrow Agreement shall control.

Upon making delivery as required in this Agreement whether to Closing, or as agreed by the parties under paragraph F above, or into Bankruptcy Court in an Interpleader Action or as directed by the Bankruptcy Court, and performance of all other services included above, Escrow Agent shall thereupon be released and acquitted from any further liabilities concerning the Escrow Funds, it being expressly understood that such liability is in any event limited by the terms and conditions set forth here. Escrow Agent shall have no liability or responsibility to account to the Bankruptcy Court in the event the Escrow Funds are released to Seller under paragraph C or F above. By acceptance of this Escrow Agreement, the Escrow Agent is in no way assuming responsibility for the validity or authenticity of any documents or notices provided by Seller or Purchaser. Escrow Agent shall not be responsible for the loss of funds due to bank negligence or failure.

Seller and Purchaser agree, jointly and severally, to indemnify and hold harmless Escrow Agent from and against all losses including but not limited to reasonable attorneys' fees, and court costs which Escrow Agent may in good faith incur or sustain in connection with this Escrow Agreement, and waive any claim based on any reasonable and customary delay in the electronic wire transfer of funds (if applicable), except in each instance any losses incurred by Escrow Agent or Seller or Purchaser as a result of the gross negligence or willful misconduct of Escrow Agent, for which no right to make a claim is waived by Seller or Purchaser, and for which no indemnity is given hereunder.

These Escrow Instructions may be signed in counterpart and electronically delivered. Notices and instructions regarding these Escrow Instructions containing signed writings may be delivered electronically.

No additions, deletions or amendments may be made to this Escrow Agreement without the signed acceptance of Seller, Purchaser and Escrow Agent.

In the event the transaction does not close with the Escrow Agent named herein and/or a title insurance policy is not issued by the Escrow Agent named herein in connection with this transaction, then at the termination of this Escrow Agreement a fee of $250.00 is due and payable and may be deducted from the Escrow Funds for the services of the Escrow Agent under this Agreement upon the disbursement of the balance of the Escrow Funds in accordance with the Purchase Agreement, for which, (i) in the event of a termination of the Purchase Agreement, Seller agrees to reimburse Purchaser $125.00 provided the termination is not made by Seller as a result of a default by Purchaser under the Purchase Agreement, or for which Seller

agrees to reimburse Purchaser $250.00 provided the termination is made by Purchaser based on a default by Seller under the Purchase Agreement, or (ii) in the event of a Closing of the sale transaction under the Purchase Agreement, Purchaser agrees to reimburse Seller $125.00, in each case such reimbursement to be made within 15 days after such termination or closing, as applicable.

[signatures on page following]

**SELLER:**                                    **PURCHASER:**

**Motors Liquidation Company,**                **Fisker Automotive Inc. a Delaware corporation**
**a Delaware corporation,**
**Debtor In Possession**


By: _____      By: _____
Its: _____      Its: _____


**ESCROW AGENT:**

**First American Title Insurance Company**


By: _____
Its: _____


**NOTE: ESCROWED FUNDS WILL BE INVESTED IN AN INTEREST BEARING ACCOUNT UPON RECEIPT BY ESCROW AGENT OF A FULLY EXECUTED ESCROW AGREEMENT AND A W-9**

## EXHIBIT D

## SPECIAL WARRANTY DEED

## [SPECIAL LIMITED WARRANTY ON LOCAL FORM TO BE PREPARED; THIS FORM WILL BE MODIFIED FOR LOCAL LAW REQUIREMENTS]

| | | |
|---|---|---|
| STATE OF _____ | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF _____ | § | |

THAT, MOTORS LIQUIDATION COMPANY, a Delaware corporation ("Grantor"), whose address is _____, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, has GRANTED, SOLD AND CONVEYED and by these presents does hereby GRANT, SELL and CONVEY unto FISKER AUTOMOTIVE INC., a Delaware corporation ("Grantee"), whose address is 19 Corporate Park, Irvine, California 92606, the property more fully described on Exhibit A attached hereto and incorporated herein for all purposes by this reference (the "Property"), together with any and all improvements located thereon and all rights and appurtenances thereto in any wise belonging to Grantor.

Grantor and certain of its affiliates filed a voluntary petition on June 1, 2009, for relief commencing a case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (jointly administered under case no. 09-50026 (REG), and is conducting its business as a debtor-in-possession in accordance with the Bankruptcy Code, and on August 18, 2009, the Bankruptcy Court entered an order (the "Order"), authorizing Grantor to sell certain assets, of which the Property is part, a certified copy of which Order is attached hereto as Exhibit B and incorporated herein for all purposes by this reference.

TO HAVE AND TO HOLD the above-described Property, together with all and singular the rights and appurtenances thereto in any wise belonging to Grantor, unto the said Grantee, its successors and assigns FOREVER, and Grantor does hereby bind itself and its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto the said Grantee, its successors and assigns, against every person whomsoever, lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

NOTWITHSTANDING THE FOREGOING, the issuance of the owner's policy of title insurance for Grantee shall be in lieu of any express or implied warranty of Grantor concerning title to the Property, and Grantee acknowledges and agrees that its only remedy for damages incurred by reason of any defect in title to the Property shall be against the issuer of its policy of title insurance.

## SIGNATURES ON PAGE FOLLOWING

OHS East:160709396.17

EXECUTED to be effective as of the _____ day of _____, 2010.

WITNESSES:                              GRANTOR:

                                        MOTORS LIQUIDATION COMPANY,
_____         a Delaware corporation
Name:


                                        By:_____
Name:_____            _____,
                                             _____


STATE OF _____        §
                               §
COUNTY OF _____          §

     I, the undersigned, a notary public in and for said county, in said state, hereby certify that _____, whose name as the _____ of Motors Liquidation Company, a Delaware corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such _____, and with full authority, executed the same voluntarily for and as the act of said corporation.

     Given under my hand and official seal, this the _____ day of _____, 2010.


                                        _____
                                        Notary Public

(PERSONALIZED SEAL)          Commission Expires:

OHS East:160709396.17

## EXHIBIT A

## to the Special Warranty Deed

## Description of Property

801 Boxwood Road, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.10-055) and 0 Terry Place, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.20-010).

## Parcel 1 - 801 Boxwood Road, a/k/a 95 & 97 Dodson Avenue – Tax Parcel No.: 07-042.10-055:

**BEGINNING** at an iron with cap set on the easterly right of way line of Centreville Road and the southerly boundary line of the railroad lands, said point being the northwest corner of the herein described parcel; THENCE, leaving said point and running with the southerly boundary line of the said railroad lands the following six courses, (1) North 81°20'15" East a distance of 2514.76' to an iron pipe found; THENCE, (2) North 74°01'04" East a distance of 320.14' to an iron pipe found; THENCE, (3) North 81°17'50" East a distance of 949.59' to an iron pipe found; THENCE, (4) North 77°54'05" East a distance of 248.70' to a point; THENCE, (5) South 04°16'40" East a distance of 23.73' to an iron rod with cap set; THENCE, (6) South 20°26'16" West a distance of 141.33' to a concrete monument found on the westerly property line of the other lands of the General Motors Corporation (Deed Record B, Volume 74, Page 120); THENCE, running with the westerly property line of the other lands, (7) South 20°26'16" West a distance of 941.28' to a concrete monument found on the northerly property line of Paul Riebel (Instrument Number 20070727-0066682); THENCE, running with the northerly property line of the said Riebel lands and the northerly property lines of the Santos, McKay, Boxwood Coal Corp. and Reybold Venture Group lands, (8) North 80°52'43" West a distance of 696.65' to a pk nail found at the northerly end of Dodson Avenue; THENCE, running with the northerly end of Dodson Avenue, (9) North 81°46'56" West a distance of 20.01' to a pk nail found; THENCE, running with the westerly right of way line of Dodson Avenue, (10) South 08°25'33" West a distance of 1506.77' to an iron rod with cap set and a curve deflecting to the right with an arc length of 47.61', and a radius of 30.00'; THENCE, with the said curve the following chord bearing, (11) South 53°53'36" West, and chord length of 42.77' to a point on the northerly right of way line of Boxwood Road; THENCE, running with the northerly right of way line of Boxwood Road the following twenty three courses, (12) North 80°38'22" West a distance of 428.30' to a point; THENCE, (13) North 09°21'38" East a distance of 15.00' to a point; THENCE, (14) North 80°38'22" West a distance of 25.00' to a point; THENCE, (15) North 09°21'38" East a distance of 30.00' to a point; THENCE, (16) North 80°38'22" West a distance of 103.00' to a point; THENCE, (17) South 09°21'38" West a distance of 30.00' to a point; THENCE, (18) North 80°38'22" West a distance of 20.00' to a point; THENCE, (19) South 09°21'38" West a distance of 15.00' to a point; THENCE, (20) North 80°38'22" West a distance of 381.05' to a point and a curve deflecting to the left with an arc length of 274.04', and a radius of 3154.28'; THENCE, with the said curve the following chord bearing, (21) North 83°07'42"

D-3

West, and a chord length of 273.95' to a point; THENCE, (22) North 85°37'02" West a distance of 79.52' to a point; THENCE, (23) North 04°22'58" East a distance of 15.00' to a point; THENCE, (24) North 85°37'02" West a distance of 13.00' to a point; THENCE, (25) North 04°22'58" East a distance of 20.00' to a point; THENCE, (26) North 85°37'02" West a distance of 106.00' to a point; THENCE, (27) South 04°22'58" West a distance of 20.00' to a point; THENCE, (28) North 85°37'02" West a distance of 30.00' to a point; THENCE, (29) South 04°22'58" West a distance of 15.00' to a point; THENCE, (30) North 85°37'02" West a distance of 259.00' to a point; THENCE, (31) North 04°22'58" East a distance of 13.00' to a point; THENCE, (32) North 85°41'01" West a distance of 270.00' to a point, THENCE, (33) North 63°52'56" West a distance of 53.85' to a concrete monument found; THENCE, (34) North 83°59'56" West a distance of 170.07' to a point and the easterly right of way line of Centreville Road; THENCE, running with the easterly right of way line of Centreville Road the following eight courses, (35) North 45°51'15" West a distance of 88.74' to a point; THENCE, (36) North 06°58'23" West a distance of 472.00' to a concrete monument found; THENCE, (37) North 39°57'27" East a distance of 62.97' to a point; THENCE, (38) North 06°58'23" West a distance of 90.00' to a concrete monument found; THENCE, (39) North 55°14'59" West a distance of 48.97' to a concrete monument found; THENCE, (40) North 10°23'47" West a distance of 143.44' to a concrete monument found; THENCE, (41) North 21°05'16" West a distance of 305.27' to a concrete monument found and a curve deflecting to the left with an arc length of 399.49', and a radius of 1960.00'; THENCE, with the said curve the following chord bearing, (42) North 26°55'37" West, and a chord length of 398.80' to an iron rod with cap set and the place of beginning.

## **Parcel 2 - 0 Terry Place - Tax Parcel No.: 07-042.20-010**:

      **BEGINNING** at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and on the easterly property line of the herein described parcel; THENCE, running with the westerly right of way line of Winston Place, (1) South 08°31'36" West a distance of 40.00' to an iron rod with cap set at the northeast property corner of the lands of James Cammock (Instrument Number 20040628-0070557); THENCE, leaving the westerly right of way line of Winston Place and running with the said Cammock lands the following two courses, (2) North 81°28'24" West a distance of 100.13' to an iron pipe found; THENCE, (3) South 08°31'38" West a distance of 100.00' to an iron rod with cap set on the northerly property line of the lands of Kenneth Norris (Instrument Number 20060821-0080039); THENCE, running with the northerly property line of the said Norris lands and the northerly property lines of the Stetka, Witkowski, CFC Properties, Kosinsk, Sandford, Casale, Testa, Buckley, Posczasy, and Riebel lands, (4) North 81°32'55" West a distance of 1085.59' to a concrete monument found and the easterly property line of the other lands of General Motors Corp. (Deed Book 45, Page 579); THENCE, running with the easterly property line of the other lands of General Motors Corp., (5) North 20°26'16" East a distance of 941.28' to a concrete monument found on the railroad lands; THENCE, with said railroad lands (6) North 87°22'44" East a distance of 104.01' to a point and the centerline of Little Mill Creek; THENCE, running with the centerline of Little Mill Creek the following six courses, (7) South 25°35'24" East a distance of 196.06' to a point; THENCE, (8) South 54°52'57" East a distance of 78.50' to a point; THENCE, (9) North 79°46'43" East a distance of 117.68' to a point; THENCE,

D-4

(10) South 41°57'33" East a distance of 121.61' to a point; THENCE, (11) South 62°40'27" East a distance of 185.52' to a point; THENCE, (12) South 76°31'00" East a distance of 245.01' to a point; THENCE, leaving the centerline of Little Mill Creek, (13) South 08°39'00" East a distance of 170.82' to a concrete monument found on the northerly property line of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and a non tangent curve deflecting to the right with an arc length of 37.29', and a radius of 691.25'; THENCE, continuing with the Crestmoor Swim Club the following six courses, with the said curve the following chord bearing, (14) North 88°02'12" West, and a chord length of 37.29' to a iron rod with cap set and a curve deflecting to the right with an arc length of 305.46', and a radius of 423.42'; THENCE, with the said curve the following chord bearing, (15) North 65°29'35" West, and a chord length of 298.88' to an iron pipe found and a curve deflecting to the left with an arc length 51.47', and a radius of 1035.90'; THENCE, with the said curve the following chord bearing, (16) North 46°14'58" West, and a chord length of 51.46' to an iron rod with cap set and a non tangent curve deflecting to the left with an arc length of 162.94', and a radius of 325.00'; THENCE, with the said curve the following chord bearing, (17) South 22°51'32" West, and a chord length of 161.24' to an iron rod with cap set; THENCE, (18) South 08°31'33" West a distance of 270.00' to an iron rod with cap set; THENCE, (19)  South 81°28'24" East a distance of 440.13' to a concrete monument found and the place of beginning.

**Parcel 3 - 0 Terry Place -  Tax Parcel No.: 07-042.20-010**:

      **BEGINNING** at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and being the southeast corner of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and the southwest corner of the herein described parcel; THENCE, running with the easterly property line of the said Crestmoor Swim Club lands the following three courses, (1) North 08°32'53" East a distance of 110.00' to an iron rod with cap set and a curve deflecting to the left with an arc length of 196.34', and a radius of 654.11'; THENCE, with the said curve the following chord bearing, (2) North 00°03'03" West, and a chord length of 195.60' to a point; THENCE, (3) North 08°38'58" West a distance of 12.94' to a point and a non tangent curve deflecting to the left with an arc length of 120.79', and a radius of 177.56'; THENCE, with the said curve the following chord bearing, (4) South 28°07'02" East, and a chord length of 118.47' to a iron rod with cap set on the westerly property line of the lands of Helen Lank (Deed Record G, Volume 126, Page 56) and a non tangent curve deflecting to the right with an arc length of 49.65', and a radius of 514.29'; THENCE, with the said curve the following chord bearing, (5) South 05°46'16" West, and a chord length of 49.63' to a point; THENCE, running with the said Lank lands and the westerly property line of the lands of Stephanie Vaughn (Instrument Number 20010425-0029946), (6) South 08°32'53" West a distance of 171.21' to an iron rod with cap set on the northerly right of way line of Summit Road; THENCE, running with the northerly right of way line of Summit Road, (7) North 81°22'59" West a distance of 40.08' to a concrete monument found and the place of beginning.

D-5

# EXHIBIT B

## to the Special Warranty Deed

<u>Order</u>

OHS East:160709396.17

EXHIBIT E

FORM OF BILL OF SALE

### KNOW ALL MEN BY THESE PRESENTS:

That Motors Liquidation Company, a Delaware corporation, having an address at
_____ ("**Seller**"), a debtor and debtor in possession in a jointly
administered case pending under chapter 11 of title 11 of the United States Code (No. 09-50026
(REG)) in the United States Bankruptcy Court for the Southern District of New York (the
"**Bankruptcy Court**"), for and in consideration of the sum of Ten Dollars ($10.00) and other
good and valuable consideration paid to Seller by Fisker Automotive Inc., a Delaware
corporation, having an address at 19 Corporate Park, Irvine, California 92606 ("**Purchaser**"), the
receipt and sufficiency of which are hereby acknowledged, does hereby sell, grant, convey and
transfer to Purchaser all of Seller's right, title and interest in and to all the fixtures, machinery,
equipment, mechanical and electrical systems and related equipment, inventory, supplies and
other articles of personal property (collectively, the "**Personal Property**") which are attached or
appurtenant to, or used in connection with, the real property more particularly described in
Schedule 1 annexed hereto and made a part hereof (the "**Premises**"), in "AS IS" condition,
subject to all faults.

**TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns,
forever, from and after the date hereof.

Purchaser hereby unconditionally waives any and all claims, actions, and causes of action
of any nature whatsoever it may now or hereafter have against Seller, Seller's estate, or any
disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, principal,
parent, subsidiary or other person or entity affiliated with Seller (collectively, "**Seller's
Affiliates**"), and hereby unconditionally and irrevocably fully releases Seller, Seller's estate, and
Seller's Affiliates from any and all liability whatsoever which may now or hereafter accrue in
favor of Purchaser against Seller, Seller's estate, or Seller's Affiliates, in connection with or
arising out of the Personal Property.

This Bill of Sale is made pursuant to an order entered by the Bankruptcy Court on
[_____], authorizing Seller to sell certain real property and surplus assets, of which the
Premises and Personal Property are part.

**IN WITNESS WHEREOF,** Seller and Purchaser have executed this Bill of Sale as of
_____ ___, 2010.

**SELLER:**

MOTORS LIQUIDATION COMPANY,
a Delaware corporation

By:
Name:
Title:

**PURCHASER:**

FISKER AUTOMOTIVE, INC.
a Delaware corporation

By:
Name:
Title:

E-2

Schedule 1

Premises

OHS East:160709396.17

**EXHIBIT F**

**FIRPTA AFFIDAVIT**
**NON-FOREIGN AFFIDAVIT UNDER**
**INTERNAL REVENUE CODE**
**SECTION 1445(b)(2)**

STATE OF _____  )
                   ) ss:
COUNTY OF _____  )

_____, being first duly sworn deposes and states under penalty of perjury:

1.    That he is the _____ of Motors Liquidation Company, a Delaware corporation, the transferor of the property located at _____.

2.    That the transferor's office address is at _____ _____.

3.    That the United States taxpayer identification number for the transferor is _____.

4.    That the transferor is not a "**foreign person**" as that term is defined in Section 1445(f) of the United States Internal Revenue Code of 1986, as amended (the "**Code**").

This affidavit is given to Fisker Automotive Inc., a Delaware corporation, the transferee of the property described in paragraph 1 above, and to First American Title Insurance Company, for the purpose of establishing and documenting the nonforeign affidavit exemption to the withholding requirement of Section 1445 of the Code. The transferor understands that this affidavit may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

MOTORS LIQUIDATION COMPANY,
a Delaware corporation

By:
Name:
Title:

Subscribed and sworn to
before me this ___ day of
_____, 2010.

Notary Public: _____

# EXHIBIT G

## FORM OF ACCESS AGREEMENT

**TAX PARCEL NUMBERS:**
**07-042.10-055; and**
**07-042.20-010**

**PREPARED BY AND WHEN**
**RECORDED MAIL TO:**

Orrick, Herrington & Sutcliffe
1152 15th Street NW
Washington DC 20005
Attn.: Robert Lawrence, Esq.

Space above this line for recorder's use only

### ENVIRONMENTAL ACCESS AND EASEMENT AGREEMENT

dated as of _____, 2010

between

Fisker Automotive, Inc.,

and

Motors Liquidation Company

THIS ENVIRONMENTAL ACCESS AND EASEMENT AGREEMENT (this "**Agreement**") is made as of the _____ day of _____, 2010, between Fisker Automotive Inc., a Delaware corporation ("**Grantor**"), and Motors Liquidation Company, a Delaware corporation ("**Grantee**").

## R E C I T A L S

A.    WHEREAS, Grantor has purchased certain real property located in New Castle County, Delaware  , as more particularly described on **Exhibit A** annexed hereto (the "**Property**"), from Grantee.

B.    WHEREAS, on June 1, 2009, Grantee filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). Grantee's Chapter 11 case is being jointly administered with the Chapter 11 cases of certain of its affiliates under Case No. 09-50026 (REG) (the "**Case**"). Grantee is authorized to operate its business and manage its properties as a debtor in possession in accordance with the Bankruptcy Code.

C.    WHEREAS, Grantor and Grantee acknowledge that Grantee is attempting to resolve certain of its liabilities under environmental laws with the Delaware Department of Natural Resources and Environmental Control ("**DNREC**") and other governmental authorities through a multilateral settlement agreement to be filed in Grantee's bankruptcy Case No. 09-50026 (REG) ("**Global Settlement Agreement**") and that Grantee agreed to assume the obligation to perform any remedial action at the Property to the extent required of it under the Global Settlement Agreement.

D.    WHEREAS, Grantor and Grantee are parties to a Real Estate Purchase Contract with respect to the Property pursuant to which certain rights and obligations relating to post-closing access are set forth (the "**Purchase Contract**").

E.    WHEREAS, Grantor now wishes to grant to Grantee access to the Property to conduct such remedial action at the Property as may be necessary in order to comply with the Global Settlement Agreement.

NOW THEREFORE, for the purposes set forth above and in consideration of the recitals and mutual promises herein contained, Grantee and Grantor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, hereby agree as follows:

1.    EASEMENT.

A.    <u>Grant of Easement.</u>  Grantor, on behalf of itself, its divisions, subsidiaries and affiliates, tenants, and its and their respective successors and assigns, hereby grants to Grantee

and its successors and assigns, a non-exclusive right, power and easement of access, ingress and egress to enter upon, occupy and use the Property (the "**Easement**"), rent free, for the limited purposes set forth in Paragraph 1.B, subject to all the terms and conditions set forth herein. Grantee's easement rights hereunder may be exercised by Grantee's employees, agents, contractors, sub-contractors, invitees, and licensees (collectively, "**Agents and Contractors**"), and shall include such access as is lawfully required by governmental agencies, including the United States Environmental Protection Agency, to supervise and oversee Grantee's activities described in Paragraph 1.B.

B.    <u>Limitation of Purpose.</u>  The Easement rights and powers granted to Grantee in this Agreement do not, and shall not be interpreted to, obligate Grantee to exercise any of such rights and powers for any reason.  Nonetheless, Grantee may enter upon, occupy and use the Property or any portion thereof solely to perform any and all remedial actions required under the Global Settlement Agreement and for incidental purposes related thereto.  Activities permitted under this Agreement (to the extent authorized or required by the Global Settlement Agreement) shall include, but not be limited to: (i) performing general inspections, environmental sampling, tests, borings, surveys, engineering studies, soil studies, soil sampling, and/or groundwater studies; and (ii) other activities associated with investigation and/or remediation including, without limitation, excavations or cleanup operations, the installation, operation, maintenance and use of equipment, and installation of engineering controls, and withdrawal, treatment and re-injection of groundwater.

C.    <u>Equipment.</u>  Grantee shall be responsible for ensuring that all equipment and other personal property utilized by and on behalf of Grantee at the Property will be used and stored safely and in compliance with this Agreement.

2.    DURATION AND TERMINATION.

A.    Grantee's rights hereunder shall be enforceable as a nonexclusive easement running with the land subject hereto, coupled with an interest, and enforceable against all tenants, licensees, successors and assigns of Grantor or third parties claiming an interest in the Property. It is intended that the rights, easements, covenants, agreements and promises set forth in this Agreement shall be construed as both covenants and conditions and that they shall run with the land and be affirmatively enforceable against the owners and users and occupiers of the Property. Any person claiming by, through or under Grantor, of all or a portion of the Property, shall automatically be deemed by acceptance of title thereto to have assumed all rights and obligations of Grantor created under this Agreement pertaining to such lands.  In the event of any conveyance of title to any of the Property, whether voluntarily or by operation of law, the Grantor (and any other granting party) shall be free and relieved of all obligations thereafter accruing hereunder.

B.    Grantee's rights and obligations hereunder shall automatically terminate upon the occurrence of any one of the following:

(i)    all investigative and remedial activities required of Grantee at or about the Property have been completed, Grantee has removed its personal property from the

Property, and the earlier of (x) DNREC issues a certificate of completion of remedy pursuant to the Delaware Hazardous Substance Cleanup Act and Grantee has completed all operations and maintenance activities, and/or (y) DNREC otherwise waives in writing as against Grantee, or releases in writing Grantee from, any and all further obligations for environmental remediation of the Property;

           (ii)     Grantee terminates its rights and obligations hereunder by delivering ten (10) days' advance written notice to Grantor, or

           (iii)    Grantee materially breaches its obligations hereunder and such breach is not cured within 180 days after receipt of written notice from Grantor to Grantee of such breach.

Within thirty (30) days following such termination, Grantee shall provide to Grantor an executed and acknowledged termination agreement in form acceptable to Grantor and Grantee for recordation in the Office of the Recorder of Deeds, in and for New Castle County, Delaware.

      3 .    ACCESS AND ASSISTANCE.  Grantee's access to the Property shall be exercisable on reasonable advance notice to Grantor, but generally unrestricted during normal business hours or in the event of an emergency, and upon at least twenty-four (24) hours prior notice during non-business hours and shall include, without limitation, access, egress, ingress to and across all improvements, structures and facilities located on the Property to which access is reasonably required in connection with the Global Settlement Agreement solely for the purposes described in Section 1.B hereof.  Grantee and its Agents and Contractors shall not unreasonably interfere with Grantor's or its tenants' (or any future owner's, assignee's or successor's) access to or use of the Property, and shall comply with reasonable procedures established by Grantor to avoid interference with such operations.  Grantee and its tenants, licensees and Agents and Contractors shall conduct all activities on the Property in such manner and with reasonably appropriate safeguards undertaken by Grantee so as not to unreasonably interfere with the business activity of Grantor or to create a dangerous condition at the Property.  Grantor shall not impede, prevent or unreasonably interfere with Grantee's remedial activities that comply with this Agreement.  Except as set forth in this Section 3, Grantor is under no obligation to assist Grantee, and under no circumstances is Grantor required to expend any money to assist Grantee in the exercise of Grantee's rights hereunder.

      4.     GENERAL TERMS.

      A.     <u>Liens.</u>  Grantee agrees to keep the Property free and clear of any liens resulting from Grantee's activities at the Property.

      B.     <u>Insurance.</u> Grantee shall maintain, and cause all of its Agents and Contractors to maintain, customary insurance appropriate for the activities being conducted at the Property, including standard liability and property and casualty policies covering personal injury and property damage in amounts of at least $1,000,000 per occurrence and $2,000,000 in the aggregate.  Grantor and any trustee or beneficiary under any deed of trust encumbering any portion of the Property of whom Grantee is given written notice shall each be named as

           

additional insured on such insurance policy or policies.  Grantee shall provide Grantor with evidence of such insurance promptly following the request therefore by Grantor.  DNREC shall not be named as an additional insured under any such insurance policies.

        C.      <u>Limitation.</u>  Grantee shall be liable to Grantor by reason of its activities under this Agreement solely for actual and direct damages. In no event shall Grantee be liable to Grantor for consequential damages or lost income, value or profits, or punitive or treble damages, or extraordinary damages, or penalties of any type or manner.

        D.      <u>Restoration.</u>  Following the earlier of the termination of this Agreement or the date on which any piece of equipment or personal property is no longer required to be used on the Property by Grantee, Grantee shall remove all equipment and other personal property placed on the Property by Grantee hereunder after the date hereof, and shall restore any portion of the Property which has been disturbed by Grantee's actions as reasonably practicable to substantially the condition existing prior to the date of such disturbance.

        E.      <u>Governing Law.</u>  This Access Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles.

        F.      **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

        G.      **BANKRUPTCY COURT JURISDICTION**.  THE PARTIES AGREE THAT, SO LONG AS THE GRANTEE HEREUNDER IS MOTORS LIQUIDATION COMPANY OR IS THE SUBJECT OF OR A PARTY TO ANY DISPUTE HEREUNDER, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES ARISING UNDER THIS AGREEMENT RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT, AND (ii) ANY LIABILITY OF ANY PARTY HEREUNDER, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

        H.      <u>Entire Agreement.</u>  This Agreement contains the entire agreement between the parties concerning its subject matter, and supersedes and replaces all prior agreements and understandings with respect to Grantee's access to the Property.

        I.      <u>Paragraph Headings.</u>  The paragraph headings appearing herein are for the convenience of the parties and are not to be used or construed so as to modify the terms and conditions of this Agreement in any fashion.

        J.      <u>Successors, Assigns.</u>  This Agreement and the rights and obligations created as a result hereof shall run with the land and be binding upon and/or inure to the benefit of the parties hereto, as applicable, and their respective heirs, successors and assigns.  The easements granted hereunder are non-exclusive easements in personam and shall be freely assignable by

Grantee solely to an entity or trust created pursuant to the Case to address certain of Grantee's cleanup obligations related to the remediation of Grantee's owned real property (the "**Environmental Response Trust**"), provided that the Environmental Response Trust also assumes Grantee's obligations hereunder.  In the event that Grantee assigns its interest in this Agreement to the Environmental Response Trust, (i) Grantor shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had or may have against Grantee, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Agreement, and the Environmental Response Trust shall be entitled to, but not limited to, all of the rights, title and interests, and benefits and protections afforded Grantee under this Agreement, and (ii) Grantee shall waive, release and forever discharge any claims, demands, suits, counterclaims, actions and causes of action it has, might have had, or may have against Grantor, its directors, officers, shareholders, members, managers employees, agents, representatives, consultants, counsel, subsidiaries, affiliates, or other entities controlling, controlled by or under common control with respect to, arising out of or in connection with, directly or indirectly, this Agreement.

      K.     <u>Notice.</u>  All notices and other communications hereunder shall be in writing and shall be delivered personally against receipt or shall be sent by certified United States Mail service, postage prepaid and return receipt requested, or by nationally utilized overnight delivery service, addressed to the parties as follows:

|  |  |
|---|---|
| As to Grantee: | Motors Liquidation Company<br>500 Renaissance Drive, 14th Floor<br>Detroit, Michigan 48265<br>Facsimile: 313-486-4259<br>Attn: Kyle Braden, Secretary |
| And a copy to: | Weil, Gotshal & Manges LLP<br>1300 Eye Street NW, Suite 900<br>Washington, D.C. 20005<br>Facsimile:  202-857-0940<br>Attn:  David R. Berz, Esq. |
| As to Grantor: | Fisker Automotive Inc.<br>19 Corporate Park<br>Irvine, California 92606<br>Facsimile: 949-757-4240<br>Attn: Frank Faga |
| With a copy to: | Orrick, Herrington & Sutcliffe LLP<br>1152 15th St. NW<br>Washington, DC 20005<br>Facsimile: 202-339-8500<br>Attn: Robert Lawrence |

Any notice made in accordance herewith shall be deemed received when personal, nationally utilized overnight delivery service, or courier delivery is received or refused. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery services for overnight delivery on the day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.


**WITNESS:**                                           **GRANTEE**

                                                        **MOTORS LIQUIDATION COMPANY,**

                                                        a Delaware corporation

_____          By: _____

                                                        Name:

                                                        Title:

**WITNESS:**                                           **GRANTOR**

                                                        **FISKER AUTOMOTIVE INC.,**

                                                        a Delaware corporation

_____          By: _____

                                                        Name:

                                                        Title:

STATE OF _____

                  **SS:**

COUNTY OF _____

      On the _____ day of _____ , 20 , before a Notary Public in and for the State and County aforesaid, personally appeared _____ , who acknowledged himself to be the _____ of _____ , a _____ corporation, and that he, being authorized to do so, executed the foregoing Environmental Access and Easement Agreement for the purposes therein contained by signing the name of the corporation by himself as such officer

      WITNESS my hand and seal the day and year aforesaid.


                             Print Name:_____

                             My commission expires on: _____

STATE OF _____

                SS:

COUNTY OF _____

On the _____ day of _____, 20_, before a Notary Public in and for the State and County aforesaid, personally appeared _____ , who acknowledged himself to be the _____ of Motors Liquidation Company, debtor in possession, a Delaware corporation, and that he, being authorized to do so, executed the foregoing Environmental Access and Easement Agreement for the purposes therein contained by signing the name of the company by himself as such officer.

WITNESS my hand and seal the day and year aforesaid.

Print Name:_____

My commission expires on: _____

**Exhibit A**
**The Property**

801 Boxwood Road, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.10-055) and 0 Terry Place, Wilmington, DE 19804 (being designated as Tax Parcel Number 07-042.20-010).

**Parcel 1 - 801 Boxwood Road, a/k/a 95 & 97 Dodson Avenue – Tax Parcel No.: 07-042.10-055:**

   **BEGINNING** at an iron with cap set on the easterly right of way line of Centreville Road and the southerly boundary line of the railroad lands, said point being the northwest corner of the herein described parcel; THENCE, leaving said point and running with the southerly boundary line of the said railroad lands the following six courses, (1) North 81°20'15" East a distance of 2514.76' to an iron pipe found; THENCE, (2) North 74°01'04" East a distance of 320.14' to an iron pipe found; THENCE, (3) North 81°17'50" East a distance of 949.59' to an iron pipe found; THENCE, (4) North 77°54'05" East a distance of 248.70' to a point; THENCE, (5) South 04°16'40" East a distance of 23.73' to an iron rod with cap set; THENCE, (6) South 20°26'16" West a distance of 141.33' to a concrete monument found on the westerly property line of the other lands of the General Motors Corporation (Deed Record B, Volume 74, Page 120); THENCE, running with the westerly property line of the other lands, (7) South 20°26'16" West a distance of 941.28' to a concrete monument found on the northerly property line of Paul Riebel (Instrument Number 20070727-0066682); THENCE, running with the northerly property line of the said Riebel lands and the northerly property lines of the Santos, McKay, Boxwood Coal Corp. and Reybold Venture Group lands, (8) North 80°52'43" West a distance of 696.65' to a pk nail found at the northerly end of Dodson Avenue; THENCE, running with the northerly end of Dodson Avenue, (9) North 81°46'56" West a distance of 20.01' to a pk nail found; THENCE, running with the westerly right of way line of Dodson Avenue, (10) South 08°25'33" West a distance of 1506.77' to an iron rod with cap set and a curve deflecting to the right with an arc length of 47.61', and a radius of 30.00'; THENCE, with the said curve the following chord bearing, (11) South 53°53'36" West, and chord length of 42.77' to a point on the northerly right of way line of Boxwood Road; THENCE, running with the northerly right of way line of Boxwood Road the following twenty three courses, (12) North 80°38'22" West a distance of 428.30' to a point; THENCE, (13) North 09°21'38" East a distance of 15.00' to a point; THENCE, (14) North 80°38'22" West a distance of 25.00' to a point; THENCE, (15) North 09°21'38" East a distance of 30.00' to a point; THENCE, (16) North 80°38'22" West a distance of 103.00' to a point; THENCE, (17) South 09°21'38" West a distance of 30.00' to a point; THENCE, (18) North 80°38'22" West a distance of 20.00' to a point; THENCE, (19) South 09°21'38" West a distance of 15.00' to a point; THENCE, (20) North 80°38'22" West a distance of 381.05' to a point and a curve deflecting to the left with an arc length of 274.04', and a radius of 3154.28'; THENCE, with the said curve the following chord bearing, (21) North 83°07'42" West, and a chord length of 273.95' to a point; THENCE, (22) North 85°37'02" West a distance of 79.52' to a point; THENCE, (23) North 04°22'58" East a distance of 15.00' to a point; THENCE, (24) North 85°37'02" West a distance of 13.00' to a point; THENCE, (25) North

G-12

04°22'58" East a distance of 20.00' to a point; THENCE, (26) North 85°37'02" West a distance of 106.00' to a point; THENCE, (27) South 04°22'58" West a distance of 20.00' to a point; THENCE, (28) North 85°37'02" West a distance of 30.00' to a point; THENCE, (29) South 04°22'58" West a distance of 15.00' to a point; THENCE, (30) North 85°37'02" West a distance of 259.00' to a point; THENCE, (31) North 04°22'58" East a distance of 13.00' to a point; THENCE, (32) North 85°41'01" West a distance of 270.00' to a point, THENCE, (33) North 63°52'56" West a distance of 53.85' to a concrete monument found; THENCE, (34) North 83°59'56" West a distance of 170.07' to a point and the easterly right of way line of Centreville Road; THENCE, running with the easterly right of way line of Centreville Road the following eight courses, (35) North 45°51'15" West a distance of 88.74' to a point; THENCE, (36) North 06°58'23" West a distance of 472.00' to a concrete monument found; THENCE, (37) North 39°57'27" East a distance of 62.97' to a point; THENCE, (38) North 06°58'23" West a distance of 90.00' to a concrete monument found; THENCE, (39) North 55°14'59" West a distance of 48.97' to a concrete monument found; THENCE, (40) North 10°23'47" West a distance of 143.44' to a concrete monument found; THENCE, (41) North 21°05'16" West a distance of 305.27' to a concrete monument found and a curve deflecting to the left with an arc length of 399.49', and a radius of 1960.00'; THENCE, with the said curve the following chord bearing, (42) North 26°55'37" West, and a chord length of 398.80' to an iron rod with cap set and the place of beginning.

## Parcel 2 - 0 Terry Place -  Tax Parcel No.: 07-042.20-010:

**BEGINNING** at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and on the easterly property line of the herein described parcel; THENCE, running with the westerly right of way line of Winston Place, (1) South 08°31'36" West a distance of 40.00' to an iron rod with cap set at the northeast property corner of the lands of James Cammock (Instrument Number 20040628-0070557); THENCE, leaving the westerly right of way line of Winston Place and running with the said Cammock lands the following two courses, (2) North 81°28'24" West a distance of 100.13' to an iron pipe found; THENCE, (3) South 08°31'38" West a distance of 100.00' to an iron rod with cap set on the northerly property line of the lands of Kenneth Norris (Instrument Number 20060821-0080039); THENCE, running with the northerly property line of the said Norris lands and the northerly property lines of the Stetka, Witkowski, CFC Properties, Kosinsk, Sandford, Casale, Testa, Buckley, Posczasy, and Riebel lands, (4) North 81°32'55" West a distance of 1085.59' to a concrete monument found and the easterly property line of the other lands of General Motors Corp. (Deed Book 45, Page 579); THENCE, running with the easterly property line of the other lands of General Motors Corp., (5) North 20°26'16" East a distance of 941.28' to a concrete monument found on the railroad lands; THENCE, with said railroad lands (6) North 87°22'44" East a distance of 104.01' to a point and the centerline of Little Mill Creek; THENCE, running with the centerline of Little Mill Creek the following six courses, (7) South 25°35'24" East a distance of 196.06' to a point; THENCE, (8) South 54°52'57" East a distance of 78.50' to a point; THENCE, (9) North 79°46'43" East a distance of 117.68' to a point; THENCE, (10) South 41°57'33" East a distance of 121.61' to a point; THENCE, (11) South 62°40'27" East a distance of 185.52' to a point; THENCE, (12) South 76°31'00" East a distance of 245.01' to a point; THENCE, leaving the centerline of Little Mill Creek, (13) South 08°39'00" East a distance

of 170.82' to a concrete monument found on the northerly property line of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and a non tangent curve deflecting to the right with an arc length of 37.29', and a radius of 691.25'; THENCE, continuing with the Crestmoor Swim Club the following six courses, with the said curve the following chord bearing, (14) North 88°02'12" West, and a chord length of 37.29' to a iron rod with cap set and a curve deflecting to the right with an arc length of 305.46', and a radius of 423.42'; THENCE, with the said curve the following chord bearing, (15) North 65°29'35" West, and a chord length of 298.88' to an iron pipe found and a curve deflecting to the left with an arc length 51.47', and a radius of 1035.90'; THENCE, with the said curve the following chord bearing, (16) North 46°14'58" West, and a chord length of 51.46' to an iron rod with cap set and a non tangent curve deflecting to the left with an arc length of 162.94', and a radius of 325.00'; THENCE, with the said curve the following chord bearing, (17) South 22°51'32" West, and a chord length of 161.24' to an iron rod with cap set; THENCE, (18) South 08°31'33" West a distance of 270.00' to an iron rod with cap set; THENCE, (19)  South 81°28'24" East a distance of 440.13' to a concrete monument found and the place of beginning.

## Parcel 3 - 0 Terry Place -  Tax Parcel No.: 07-042.20-010:

**BEGINNING** at a concrete monument found at the intersection of Summit Road and Winston Place, said point being at the northwesterly corner of the intersection and being the southeast corner of the lands of Crestmoor Swim Club (Deed Record I, Volume 65, Page 568) and the southwest corner of the herein described parcel; THENCE, running with the easterly property line of the said Crestmoor Swim Club lands the following three courses, (1) North 08°32'53" East a distance of 110.00' to an iron rod with cap set and a curve deflecting to the left with an arc length of 196.34', and a radius of 654.11'; THENCE, with the said curve the following chord bearing, (2) North 00°03'03" West, and a chord length of 195.60' to a point; THENCE, (3) North 08°38'58" West a distance of 12.94' to a point and a non tangent curve deflecting to the left with an arc length of 120.79', and a radius of 177.56'; THENCE, with the said curve the following chord bearing, (4) South 28°07'02" East, and a chord length of 118.47' to a iron rod with cap set on the westerly property line of the lands of Helen Lank (Deed Record G, Volume 126, Page 56) and a non tangent curve deflecting to the right with an arc length of 49.65', and a radius of 514.29'; THENCE, with the said curve the following chord bearing, (5) South 05°46'16" West, and a chord length of 49.63' to a point; THENCE, running with the said Lank lands and the westerly property line of the lands of Stephanie Vaughn (Instrument Number 20010425-0029946), (6) South 08°32'53" West a distance of 171.21' to an iron rod with cap set on the northerly right of way line of Summit Road; THENCE, running with the northerly right of way line of Summit Road, (7) North 81°22'59" West a distance of 40.08' to a concrete monument found and the place of beginning.

# EXHIBIT H

## Intentionally Omitted

# EXHIBIT I

## ENVIRONMENTAL DOCUMENTS

**Documents provided by MLC**
**Former GM Boxwood Road Plant**

| Title of Report/Document | Date of Report | Author |
|---|---|---|
| Draft RCRA Facility Assessment | 12/23/1988 | CDM |
| Letter to confirm RCRA Closure | 10/9/1992 | DNREC |
| Liability Assessment Report | 8/20/1996 | GM |
| Title V Air Permit | 10/1/1999 | DNREC |
| NPDES Permit and Fact Sheet | 9/15/2003 | DNREC-Div of Water Resources |
| Letter to GM RE: Report of Findings for OU-1 Soils | 1/15/2004 | DNREC-SIRB |
| OU-2 Bulk Product Tank Area Soils Investigation | 2/1/2006 | CRA |
| Wastewater Discharge Permit WDP 76-018 | 7/1/2006 | NCC - Dept of Special Services |
| UST - AST Certificate of Insurance | 9/1/2007 | unknown |
| Encore Project Summary Form | 5/30/2008 | unknown |
| Proposed Plan of Remedial Action | 11/1/2008 | DNREC |
| Waste Water Discharge Permit | 1/12/2009 | New Castle County - Dept. of Special Services |
| GW RI/FS OU-2 Bulk Product Tank Area | 1/26/2009 | CRA |
| UST Certificate of Insurance | 4/1/2009 | unknown |
| OU-2 GW Data Map | 4/1/2009 | CRA |
| DNREC to GM letter RE: Future Work | 5/29/2009 | DNREC |
| AST Closure Document -4 ASTs | 8/1/2009 | CRA |
| GM to DNREC response to 5/29/09 letter | 8/11/2009 | GM |
| DNREC AST NFA for Tanks A, B, C | 9/25/2009 | DNREC |
| Tank F Investigation Work Plan | 11/11/2009 | CRA |
| Phase I Environmental Site Assessment | 2/1/2010 | CRA |
| Tank F Investigation Report | March 2010 | CRA |

**EXHIBIT J**

**CONTRACTS TO BE ASSUMED AND ASSIGNED**

Agreement between Delmarva Power & Light Company and General Motors Corporation for the Supply of Electrical Energy and Substation Facilities, dated April 27, 1972.

Lease between General Motors Corporation and Delmarva Power & Light Company, dated January 24, 1973.