**Hearing Date and Time: November 18, 2010 at 9:45 a.m. (Prevailing Eastern Time)**
**Response Deadline: November 15, 2010 at 12:00 p.m. (Prevailing Eastern Time)**
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone:  (212) 818-1110

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Motors Liquidation Company f/k/a General*
*Motors Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                  :
In re                                                             :          Chapter 11
                                                                  :
MOTORS LIQUIDATION COMPANY, *et al.*,                             :          Case No.:  09-50026 (REG)
                                                                  :
                                  Debtors.                        :          (Jointly Administered)
                                                                  :
-----------------------------------------------------------------x

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 818-1110
Fax: (212) 818-0494

*Special Counsel to the Official Committee of*
*Unsecured Creditors of Motors Liquidation*
*Company f/k/a General Motors Corporation*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................2

JURISDICTION AND VENUE ..........................................................................................4

PARTIES ............................................................................................................................4

BACKGROUND .................................................................................................................5

    I.       Corporate Relationships .....................................................................5

    II.      The 2003 Notes Offering .....................................................................6

    III.     The Swaps ............................................................................................6

    IV.    The Intercompany Loans ......................................................................7

    V.      The Nova Scotia Action .......................................................................7

    VI.    The Nova Scotia Response ....................................................................8

    VII.   The Lock-Up Agreement ......................................................................9

          A.  Guarantee Obligation ...................................................................10

          B.  Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy ....................10

          C.  Reversal of Swap Liability .............................................................11

          D.  Consent Fee ..................................................................................11

          E.  Release of Intercompany Loans .....................................................12

    VIII.  Post-Petition Implementation of the Lock-Up Agreement ..................12

    IX.    Assumption of the Lock-Up Agreement ............................................13

    X.      Proofs of Claim ...................................................................................14

BASIS FOR RELIEF REQUESTED ..............................................................................15

          A.  The Claims are Duplicative ...........................................................15

          B.  The Claims Should be Disallowed Under Section 502 of the Bankruptcy Code Because the Lock-Up Agreement is Avoidable Under Section 548 of the Bankruptcy Code .......................................16

          C.  The Claims Should be Disallowed Under Section 502 of the Bankruptcy Code Because the Lock-Up Agreement is Avoidable Under the New York Debtor and Creditor Law .......................................17

          D.  The Claims Should be Disallowed Under Section 502 of the Bankruptcy Code Because the Lock-Up Agreement is Avoidable Under Section 549 of the Bankruptcy Code .......................................18

          E.  The Claims Should be Equitably Subordinated Under Section 510 of the Bankruptcy Code .......................................19

          F.  The Committee is Entitled to Relief Under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure .......................................19

RESERVATION OF RIGHTS ........................................................................................20

NOTICE ...........................................................................................................................20

**Hearing Date and Time: November 18, 2010 at 9:45 a.m. (Prevailing Eastern Time)**
**Response Deadline: November 15, 2010 at 12:00 p.m. (Prevailing Eastern Time)**
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone:  (212) 818-1110

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Motors Liquidation Company f/k/a General*
*Motors Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No.:  09-50026 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
---------------------------------------------------------------x

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC.
## AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA
## FINANCE COMPANY AND MOTION FOR OTHER RELIEF

The Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a

General Motors Corporation (the "**Committee**"), by its attorneys Butzel Long, a professional

corporation, respectfully submits this: (i) objection to claim no. 69551 filed by the holders of

notes (the "**Noteholders**") issued by General Motors Nova Scotia Finance Company ("**Nova**

**Scotia Finance**") against Motors Liquidation Company f/k/a General Motors Corporation ("**Old**

**GM**") and certain of its subsidiaries (collectively, the "**Debtors**") in the amount of

$1,072,557,531.72 (the "**Guarantee Claim**"); (ii) objection to claim no. 66319 filed by Green

Hunt Wedlake, Inc., trustee of Nova Scotia Finance (the "**Nova Scotia Finance Trustee**")

against the Debtors in the amount of $1,607,647,592.49 (the "**Duplicative Claim**," and together

with the Guarantee Claim, the "**Claims**"); and (iii) motion for relief under Rule 60(b) of the

Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure.[1]

In support of this application, the Committee states as follows:

## <u>INTRODUCTION</u>

1.      Although the Duplicative Claim is asserted by the Nova Scotia Finance Trustee,

both Claims objected to herein are, in substance, for the economic benefit of the Noteholders, a

consortium of hedge fund noteholders that exercised undue leverage over Old GM during the

hours before its bankruptcy filing.

2.      The Claims arise out of a settlement agreement, known as the "**Lock-Up**

**Agreement**," with a number of the Noteholders[2] entered into on June 1, 2009, the same day that

Old GM filed for bankruptcy.  The Lock-Up Agreement was grossly one-sided,

disproportionately benefiting the Noteholders and leaving Old GM's estate depleted to the

detriment of its creditors.

3.      Before entering into the Lock-Up Agreement, the Noteholders had an

approximately one billion dollar claim against Nova Scotia Finance, a subsidiary of Old GM, for

Notes (defined below) issued by that entity.  The Notes were guaranteed by Old GM.  The

---

[1]      The Committee respectfully requests the Court's permission, pursuant to Rule 3007(b) of the
Federal Rules of Bankruptcy Procedure, to join these objections to the Claims in a single filing because
the Claims were asserted for the benefit of the same entities and involve the same facts and
circumstances.

[2]      The noteholders party to the Lock-Up agreement are Aurelius Capital Partners, LP, Aurelius
Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, Elliot
International, L.P., FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, The

proceeds from issuance of the Notes were loaned by Nova Scotia Finance to General Motors of Canada Limited ("**GM Canada**") in documented intercompany transactions.  Through the Lock-Up Agreement, the Lock-Up Noteholders colluded to extract value from Old GM well beyond the value of their maximum one billion dollar claim under the Old GM guarantee.

4.      First, the Lock-Up Agreement provided that Old GM would allow and not contest two claims – the Guarantee Claim and the Duplicative Claim – with a combined face amount of approximately $2.6 billion for the benefit of the Noteholders, even though such Claims represent well over two times the face value of the Notes.

5.      Second, taking further advantage of Old GM during the hours before its bankruptcy petition was filed, the Lock-Up Noteholders also extracted for themselves an exorbitant "consent fee" in excess of $360 million, funded by Old GM.  In fact, this "consent fee" was a disguised principal payment on the Notes that should have been credited against the amount owed on the Notes, thereby reducing the total exposure on Old GM's guarantee of the notes to approximately $640 million.

6.      Third, under the Lock-Up Agreement, GM Canada's intercompany obligations to Nova Scotia Finance were released.  Consequently, pursuant to the terms of the Lock-Up Agreement, Old GM became obligated to pay amounts owed on the Notes without any contribution from GM Canada.

7.      In sum, the Lock-Up Agreement transformed what should have been, at the very most, a $640 million claim based upon Old GM's guarantee of the Notes into claims against the

---

Liverpool Limited Partnership, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund LP, and are hereinafter referred to as the "**Lock-Up Noteholders**."

estate that exceed $2.6 billion, all in addition to a $360 million cash payment to the Lock-Up Noteholders.

8.        In exchange for incurring all of the above obligations, Old GM received only a release from certain trumped up litigation claims filed by certain Noteholders, which posed minimal litigation risk to Old GM.

9.        The circumstances surrounding the Lock-Up Agreement and the terms thereof demonstrate that the Lock-Up Noteholders behaved inequitably, attempting to opt out of the consequences of Old GM's bankruptcy filing and this Court's scrutiny by virtue of a private, pre-bankruptcy agreement that benefited the Noteholders at the expense of Old GM's creditors.  For the reasons set forth herein, the Claims violate applicable law and should be disallowed.

## JURISDICTION AND VENUE

10.        The Committee seeks the relief requested herein under 11 U.S.C. §§ 105(a), 502 and 510, Rule 60(b) of the Federal Rules of Civil Procedure, and Rules 3007 and 9024 of the Federal Rules of Bankruptcy Procedure.

11.        This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (B) and (O).

## PARTIES

12.        The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on June 1, 2009 (the "**Petition Date**") in the United States Bankruptcy Court for the Southern District of New York.

4

13.     On June 3, 2009, the United States Trustee for the Southern District of New York appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

14.     The Nova Scotia Finance Trustee was appointed bankruptcy trustee of the estate of Nova Scotia Finance on October 9, 2009.

15.     The Lock-Up Noteholders are those entities listed in footnote 2 above, all of which are parties to the Lock-Up Agreement.

## BACKGROUND

### I.     Corporate Relationships

16.     The settlement reflected in the Lock-Up Agreement involved the Lock-Up Noteholders, Old GM and various entities related to Old GM, including Nova Scotia Finance, General Motors Nova Scotia Investments Limited ("**Nova Scotia Investments**") and GM Canada.  At all relevant times, Old GM was a publicly-traded corporation incorporated under the laws of Delaware and engaged in the automotive business.

17.     At all relevant times Nova Scotia Finance was a Nova Scotia unlimited liability company whose sole shareholder was Old GM.  Nova Scotia Finance was organized on September 28, 2001 and was a direct, wholly-owned subsidiary of Old GM.

18.     At all relevant times Nova Scotia Investments was a Nova Scotia limited company whose sole shareholder was Old GM.

19.      At all relevant times GM Canada was a Canadian corporation whose sole shareholder was Old GM.

## II.    The 2003 Notes Offering

20.     On July 10, 2003, Nova Scotia Finance issued £350,000,000 principal amount of

8.375% guaranteed notes due December 7, 2015 (the "**2015 Notes**") and £250,000,000 principal

amount of 8.875% guaranteed notes due July 10, 2023 (the "**2023 Notes**" and together with the

2015 Notes, the "**Notes**") to certain beneficial owners.

21.     The Notes were guaranteed by Old GM and issued under a fiscal and paying

agency agreement dated July 10, 2003 among Nova Scotia Finance as issuer, Old GM as

guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Générale du

Luxembourg S.A., as paying agent.

22.     The July 9, 2003 disclosure provided in connection with issuance of the Notes

(the "**Offering Circular**") stated that the proceeds therefrom would be provided, directly or

indirectly, to Old GM as part of an overall effort to improve Old GM's balance sheet.

## III.    The Swaps

23.     Upon issuance of the Notes, Nova Scotia Finance entered into two currency swap

transactions with Old GM on July 10, 2003, whereby Old GM exchanged pounds sterling for

Canadian dollars on such date.  One swap transaction was related to the 2015 Notes, for

£350,000,000/CDN$778,204,000, and would expire in 2015 (the "**2015 Swap**").  The other swap

transaction was related to the 2023 Notes, for £250,000,000/CDN$555,860,000, and would

expire in 2023 (the "**2023 Swap**," and together with the 2015 Swap, the "**Swap Transactions**").

24.     In general, the Swap Transactions contemplated annual exchanges of interest

payments between the parties based upon then-existing currency rates.  Upon termination,

assuming appreciation of the Canadian dollar, Old GM would be in the "winning" position and

would be "in the money."  In other words, in the event that the Canadian dollar appreciated as to

the pound sterling, Nova Scotia Finance would be liable to Old GM based on the Swap

Transactions (the "**Swap Liability**").

## IV.    The Intercompany Loans

25.    Upon issuance of the Notes and conversion of the proceeds from pounds sterling

to Canadian dollars, Nova Scotia Finance loaned such proceeds to GM Canada pursuant to two

loan agreements dated July 10, 2003.  Pursuant to one loan agreement, Nova Scotia Finance

loaned GM Canada CDN$778,204,000, at an annual interest rate of 9.42%, which principal

amount would be due and payable on December 7, 2015 (the "**2015 Intercompany Loan**").

Pursuant to the other loan agreement, Nova Scotia Finance loaned GM Canada

CDN$555,860,000 at an annual interest rate of 10.20%, which principal amount would be due

and payable on July 10, 2023 (the "**2023 Intercompany Loan**," and together with the 2015

Intercompany Loan, the "**Intercompany Loans**").

## V.    The Nova Scotia Action

26.    During 2009, Lock-Up Noteholders Aurelius Capital Partners, LP, Aurelius

Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF

UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd.,

Thoroughbred Master Ltd. and Thoroughbred Fund LP, owning approximately 62-64% of the

Notes, became concerned about collecting the principal balance of their Notes upon maturity.

27.    In an attempt to secure payment on their Notes by any means possible, such

Noteholders filed a lawsuit (the "**Nova Scotia Complaint**") against Old GM, Nova Scotia

Finance, Nova Scotia Investments, GM Canada and certain individual officers and directors of

such entities in the Supreme Court of Nova Scotia (the "**Nova Scotia Action**").

28.     The crux of the Nova Scotia Complaint was directed at Nova Scotia Finance, alleging that the ability of Nova Scotia Finance to satisfy its obligations under the Notes was dependent upon Nova Scotia Finance's receipt of amounts owed to it by Nova Scotia Investments and GM Canada.  The Nova Scotia Complaint alleged, among other things, oppressive conduct by the defendants named therein.

29.     As to Old GM, the claims asserted in the Nova Scotia Complaint lacked a strong legal basis.  The Nova Scotia Complaint challenged the legality of various transfers from Nova Scotia Finance and Nova Scotia Investments to Old GM resulting in Old GM's alleged unjust enrichment, despite the clear language in the Offering Circular that the proceeds of the Notes were intended to benefit Old GM.

30.     Specifically, the Nova Scotia Complaint challenged, among other transactions, two May 22, 2008 transfers, of CDN$16,000,000 and $500,000 respectively, from Nova Scotia Finance to Old GM and another May 22, 2008 transfer of CDN$576,672,670 from Nova Scotia Investments to Old GM (collectively, the "**May 22, 2008 Transfers**").

## VI.    The Nova Scotia Response

31.     As set forth in the April 21, 2009 amended statement of defense filed by the defendants in the Nova Scotia Action (the "**Nova Scotia Response**"), the allegations contained in the Nova Scotia Complaint were without merit.  In particular, as noted in the Nova Scotia Response, the Offering Circular expressly advised the Noteholders that all or substantially all of the proceeds from the Notes would be used to benefit Old GM.  Furthermore, Nova Scotia Finance had no legal obligation to maintain any level of assets or share capital, and was not required to satisfy any test of solvency before making the May 22, 2008 Transfers.  Accordingly, Old GM's financial exposure from the Nova Scotia Action was minimal.

8

VII.    **The Lock-Up Agreement**

32.    Although notice of the May 22, 2008 Transfers was publicly filed at the Registry of Joint Stock Companies of Nova Scotia on May 27, 2008, such Noteholders waited until Old GM was in an extremely precarious position before suing, in an attempt to extract disproportionate value from Old GM.  These Noteholders succeeded in this tactic, preying upon Old GM's vulnerable position to negotiate an outrageous settlement of the Nova Scotia Action.

33.    On June 1, 2009, the same day that Old GM filed for bankruptcy protection, the settlement negotiations between Old GM and these Noteholders resulted in an agreement with the Lock-Up Noteholders, Nova Scotia Finance, GM Canada and Nova Scotia Investments identified as the "Lock-Up Agreement."  The Lock-Up Agreement was an attempt by the Lock-Up Noteholders to avoid the impending automatic stay and obtain preferential treatment from Old GM.  Although the Lock-Up Agreement was executed on Old GM's Petition Date, it was contingent upon the passage of an "extraordinary resolution" by Nova Scotia Finance to be voted upon by all Noteholders, which vote could not occur until June 25, 2009.  (A copy of the Lock-Up Agreement is annexed hereto as Exhibit A.)

34.    As described below, under the Lock-Up Agreement, the Lock-Up Noteholders agreed to settle the Nova Scotia Action based on Old GM incurring a slew of obligations out of all proportion to the limited benefit conferred on Old GM by the Lock-Up Noteholders.  The obligations incurred by Old GM under the Lock-Up Agreement included, among others, (a) allowing and not contesting a guarantee claim for the full amount of the Notes in excess of $1 billion; (b) consenting to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) allowing Nova Scotia Finance, through a trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the

Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (d) funding a consent fee

to the Lock-Up Noteholders in an amount in excess of $360 million; and (e) releasing

intercompany loans that, if not released, would have substantially reduced Old GM's exposure

on its guarantee.  These obligations are summarized below:

### A.    Guarantee Obligation

35.    Notwithstanding the substantial additional consideration conveyed to the Lock-Up

Noteholders under the Lock-Up Agreement, Old GM agreed to acknowledge that the

Noteholders' claim based on Old GM's guarantee of the Notes would be enforceable, valid and

allowed when asserted in its full amount without reduction (the "**Guarantee Obligation**").

### B.    Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy

36.    As a means of providing a double recovery to the Noteholders on the same

principal value due under the Notes, Nova Scotia Finance consented, under the Lock-Up

Agreement, to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act.

Pursuant to that order, a bankruptcy trustee was to be appointed in order to assert an allowed

claim for contribution against Old GM, as sole shareholder of Nova Scotia Finance, based on

Nova Scotia Finance's structure as an unlimited liability company.

37.    This provision of the Lock-Up Agreement was designed to enable the Lock-Up

Noteholders to claim the amounts owed on the Notes from Old GM through the Nova Scotia

Finance Trustee, not as an alternative route to recovery, but as a "doubling up" on the Guarantee

Obligation.  In fact, an internal Old GM accounting memorandum dated as of July 20, 2009

states that "[r]ecognition of a guarantee liability in addition to the original bond payable would

effectively double-count the obligation."  As creditors of Nova Scotia Finance, the Noteholders

had no direct recourse against Old GM, except under the Guarantee Obligation. Nevertheless, by consenting to the Canadian bankruptcy proceeding mentioned above, Old GM voluntarily opened itself up to liability on the Nova Scotia Finance Trustee's claim for contribution for any amounts unpaid to the Noteholders without correspondingly reducing its exposure on the Guarantee Obligation.

### C.    *Reversal of Swap Liability*

38.    In addition to the Nova Scotia Finance Trustee's contribution claim on the Notes, Old GM also agreed to allow the Nova Scotia Finance Trustee to assert a claim against Old GM for the Swap Liability in the approximate amount of $564 million and any corresponding offset by Old GM was subordinated until the Lock-Up Noteholders received payment in full on the Notes. Through this artifice, the Swap Liability was transformed from an amount owed to Old GM into an amount payable from Old GM, ultimately for the benefit of Nova Scotia Finance's creditors – the Noteholders.

39.    In order to effectuate this reversal of the Swap Liability, Old GM agreed to subordinate its right to offset the Swap Liability against any claim asserted by the Nova Scotia Finance Trustee. Had Old GM not agreed to allow this claim against it and not subordinated its right to assert an offset with respect to the Swap Liability, Old GM would have had a claim against Nova Scotia Finance for approximately $564 million. Instead, as a result of the Lock-Up Agreement, Old GM not only lost the benefit of this claim against Nova Scotia Finance, but also affirmatively agreed to incur an obligation in that same amount.

### D.    *Consent Fee*

40.    Under the Lock-Up Agreement, the Lock-Up Noteholders also received a "consent fee" of £223,303,500 (or approximately $369 million) plus reimbursement of their legal

11

costs (the "**Consent Fee**"). Although these amounts were putatively to be paid by Nova Scotia

Finance, in reality, it was Old GM that funded the Consent Fee and legal costs based on a

transfer of funds on May 29, 2009 to GM Canada just three days before Old GM filed its

bankruptcy petition. Notwithstanding that Old GM was the ultimate source of funds and that

those funds had already been transferred to GM Canada "to be held in trust" for Nova Scotia

Finance, Old GM's June 1, 2009 8-K stated only that GM Canada would provide the funding for

the Consent Fee.

41.      Although the Consent Fee is exorbitant on its face and plainly constitutes a thinly-

disguised payment towards the principal amount owed on the Notes, the Lock-Up Agreement

provides that the Consent Fee would not reduce, limit or impair the outstanding principal on the

Notes, Old GM's Guarantee Obligation or Old GM's "deficiency claim."

### E.    Release of Intercompany Loans

42.      Under the Lock-Up Agreement, GM Canada was released by Nova Scotia

Finance from its obligation to repay the Intercompany Loans it owed to Nova Scotia Finance.

As a result of this release, Old GM became the sole source of funds available to Nova Scotia

Finance to pay its debts, further eliminating any possibility that the obligations under the Notes

would be borne by any parties other than Old GM's creditors.

43.      Thus, through the Lock-Up Agreement, Old GM wrongfully ensured that debts

and obligations of GM Canada and Nova Scotia Finance would be satisfied on the backs of Old

GM's creditors.

## VIII.    Post-Petition Implementation of the Lock-Up Agreement

44.      All of the transactions that were key to implementing the Lock-Up Agreement

occurred post-petition. On June 25, 2009, nearly a month after the Petition Date, the

extraordinary resolution authorizing the Lock-Up Agreement was passed.  On that same date,

escrow funds that had been committed by Old GM for payment of the Consent Fee were released

to the Lock-Up Noteholders.

45.     Also on June 25, 2009, as contemplated by the Lock-Up Agreement, Nova Scotia

Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans.

As already explained above, as a result of the release of these Intercompany Loans, GM Canada

extricated itself from financial responsibility for any amounts due to the Noteholders, thereby

burdening Old GM with liability for the Notes pursuant to the Guarantee Claim and the

Duplicative Claim.

## IX.    Assumption of the Lock-Up Agreement

46.     On July 5, 2009, upon the Debtors' motion, this Court approved the sale of

substantially all of the Debtors assets to General Motors LLC in the Order (I) Authorizing Sale

of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II)

Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

in Connection with the Sale; and (III) Granting Related Relief (Docket No. 2968) (the

"**Assumption Order**").

47.     Among other things, the Assumption Order provides that the Debtors are

authorized and directed to assume and assign to the purchaser ("**New GM**") those assumable

executory contracts that have been designated by New GM for assumption.

48.     Upon information and belief, at some time thereafter, Old GM purported to

assume the Lock-Up Agreement and assign it to New GM.  The Committee was not provided

with any notice of Old GM's intention to assume the Lock-Up Agreement, even though the

Lock-Up Agreement substantially and detrimentally affects the interests of Old GM's unsecured

creditors.  These actions were intended to improperly insulate the Lock-Up Agreement from meaningful scrutiny by Old GM's creditors and this Court.

49.    Given the extraordinary scope and unusual nature of the Lock-Up Agreement, Old GM should have been required to make a showing that the Lock-Up Agreement was an executory contract under the Bankruptcy Code susceptible to being assumed, and that assumption of the Lock-Up Agreement was a proper exercise of Old GM's sound business judgment and in the best interests of its estate.  Old GM made no such showing.

50.    The Committee anticipates that the Noteholders and the Nova Scotia Finance Trustee will assert that Old GM's assumption of the Lock-Up Agreement bars, in whole or in part, the Committee's current objection to the Claims, as well as future objections and litigation potentially to be filed by the Committee.  While such a defense would be without merit, in an abundance of caution, the Committee hereby requests that this Court void the Assumption Order under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto, including those concerning the Swap Transactions.

## X.    <u>Proofs of Claim</u>

51.    On November 30, 2009, the Nova Scotia Finance Trustee filed the Duplicative Claim[3] based on purported obligations that were manufactured under the Lock-Up Agreement for the benefit of the Noteholders.  More than one billion dollars of the Duplicative Claim relates to the principal amount owed by Nova Scotia Finance to the Noteholders.  The remainder of the

---

[3]    The Duplicative Claim is referred to in the Lock-Up Agreement as the "Deficiency Claim."

Duplicative Claim relates to the Swap Liability described above, which became a purported

obligation of Old GM only by virtue of the Lock-Up Agreement.

52.    Approximately ten days later, on December 10, 2009, the Noteholders filed the

Guarantee Claim.  The Guarantee Claim concerns Old GM's guarantee of the principal amount

of the Notes, and thus the Claims are entirely duplicative of one another.  In addition, the

Guarantee Claim fails to account for the fact that, on the eve of bankruptcy, Old GM paid the

Lock-Up Noteholders more than $360 million.

## BASIS FOR RELIEF REQUESTED

53.    Pursuant to sections 105, 502 and 510 of the Bankruptcy Code, Rules 3007 and

9024 of Federal Rules of Bankruptcy Procedure and Rule 60(b) of the Federal Rules of Civil

Procedure, the Committee hereby seeks entry of an order disallowing the Claims in full or, in the

alternative, reducing the Claims in an amount to be determined at the hearing on this objection.

54.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be

deemed allowed where a party in interest objects.  If an objection refuting at least one of the

claim's essential allegations is asserted, the claimant has the burden of demonstrating the validity

of the claim.

55.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim

may not be allowed to the extent it is unenforceable against a debtor under any agreement or

applicable law.  The Claims are unenforceable against the Debtors under applicable law.

### A.    *The Claims are Duplicative*

56.    The Duplicative Claim should not be allowed because it is duplicative of the

Guarantee Claim.  It is well established that multiple recoveries for the same injury are generally

disallowed in bankruptcy.  To allow the Noteholders to double-dip by recovering on duplicative

15

claims against Old GM would be wholly at odds with fundamental bankruptcy policy favoring equality of distribution among similarly-situated creditors. Both the Duplicative Claim and the Guarantee Claim seek an identical recovery for an identical injury, namely, the amount necessary to satisfy payment obligations to the Noteholders under the Notes. Because the Duplicative Claim is premised on the same underlying obligation as the Guarantee Claim, it should be disallowed in its entirety.

> **B.**     **The Claims Should be Disallowed Under Section 502 of the Bankruptcy Code Because the Lock-Up Agreement is Avoidable Under Section 548 of the Bankruptcy Code**

57.     The Claims are unenforceable against the Debtors under section 548 of the Bankruptcy Code. Section 548 of the Bankruptcy Code provides that any transfer of an interest of the debtor in property and any obligation incurred by the debtor on or within two years before the petition date is avoidable if the debtor (a) received less than reasonably equivalent value in exchange for such transfer or obligation or (b) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud creditors.

58.     Here, Old GM did not receive reasonably equivalent value in exchange for the obligations it incurred under the Lock-Up Agreement. As explained above, in exchange for a release from litigation that posed minimal risk to Old GM, Old GM agreed to (a) allow and not contest a guarantee claim for the full amount of the Notes in excess of $1 billion; (b) consent to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) allow Nova Scotia Finance, through the Nova Scotia Finance Trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (d) fund a consent fee to the

16

Lock-Up Noteholders in an amount in excess of $360 million; and (e) release intercompany

loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee.

59.    Further, Old GM incurred the obligations under the Lock-Up Agreement with

actual intent to hinder, delay, or defraud its creditors, which intent can be inferred from the

"badges of fraud" surrounding Old GM's entry into the Lock-Up Agreement.  For example, Old

GM entered into the Lock-Up Agreement on the same day that it filed for bankruptcy, incurring

duplicative and exorbitant obligations for the benefit of the Noteholders out of all proportion to

any benefit received by Old GM.

60.    Because the Lock-Up Agreement is avoidable under section 548 of the

Bankruptcy Code, the Duplicative Claim and the Guarantee Claim, which arise thereunder,

should be disallowed.

C.    **The Claims Should be Disallowed Under Section 502 of the Bankruptcy
      Code Because the Lock-Up Agreement is Avoidable Under the New York
      Debtor and Creditor Law**

61.    The Claims are unenforceable against the Debtors under sections 273, 276 and

278 of the New York Debtor and Creditor Law (the "**NYDCL**").  The NYDCL provides that

every conveyance made and obligation incurred by an insolvent entity is fraudulent as to

creditors and therefore avoidable if such conveyance is made or obligation is incurred (a) without

fair consideration (NYDCL §§ 273 and 278) or (b) with actual intent to hinder, delay or defraud

either present or future creditors (NYDCL §§ 276 and 278).

62.    Here, Old GM did not receive fair consideration in exchange for the obligations it

incurred under the Lock-Up Agreement.  As explained above, in exchange for a release from

litigation that posed minimal risk to Old GM, Old GM agreed to (a) allow and not contest a

guarantee claim for the full amount of the Notes in excess of $1 billion; (b) consent to a

duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same

Notes; (c) allow Nova Scotia Finance, through the Nova Scotia Finance Trustee, to assert a claim

against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap

Liability was, in fact, owed by Nova Scotia Finance to Old GM; (d) fund a consent fee to the

Lock-Up Noteholders in an amount in excess of $360 million; and (e) release intercompany

loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee.

63.    Further, Old GM incurred the obligations under the Lock-Up Agreement with

actual intent to hinder, delay, or defraud its creditors, which intent can be inferred from the

"badges of fraud" noted above.

64.    Because the Lock-Up Agreement is avoidable under the NYDCL, the Duplicative

Claim and the Guarantee Claim, which arise thereunder, should be disallowed.

**D.    The Claims Should be Disallowed Under Section 502 of the Bankruptcy
Code Because the Lock-Up Agreement is Avoidable Under Section 549
of the Bankruptcy Code**

65.    The Claims are unenforceable against the Debtors under section 549 of the

Bankruptcy Code.  Section 549 of the Bankruptcy Code provides that a transfer of property of

the estate that occurs after the petition date and that is not authorized by the Court is avoidable.

66.    Here, implementation of the Lock-Up Agreement required several post-petition

transfers of estate property that were not authorized by the Court.  As explained above, on June

25, 2009, nearly a month after the Petition Date, (a) the extraordinary resolution authorizing the

Lock-Up Agreement was passed, (b) escrow funds that had been committed by Old GM for

payment of the Consent Fee were released to the Lock-Up Noteholders, and (c) Nova Scotia

Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans.

67.    Further, to the extent that the settlement reflected in the Lock-Up Agreement occurred post-petition, the settlement was unauthorized under Rule 9019 of the Federal Rules of Bankruptcy Procedure for lack of notice and court approval.

68.    Because the Lock-Up Agreement is avoidable under section 549 of the Bankruptcy Code, the Duplicative Claim and the Guarantee Claim, which arise thereunder, should be disallowed.

### E.    The Claims Should be Equitably Subordinated Under Section 510 of the Bankruptcy Code

69.    The Claims should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code.  As set forth above, the Lock-Up Noteholders engaged in, and benefited from, inequitable conduct that resulted in injury to Old GM's creditors and conferred an unfair advantage upon the Noteholders.  This inequitable conduct will result in diminished recoveries to creditors of Old GM.  The Lock-Up Noteholders' conduct has been inequitable, unconscionable and outrageous and has harmed Old GM's creditors and other stakeholders.  In equity and good conscience, the Claims should be equitably subordinated and/or disallowed to the fullest extent permitted by law.

### F.    The Committee is Entitled to Relief Under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure

70.    Finally, for the reasons already set forth above in paragraphs 48 to 50, the Committee requests an order voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors to assume and/or assign the

Lock-Up Agreement and any other obligations incident thereto, including those concerning the Swap Transactions.

## **RESERVATION OF RIGHTS**

71.     The Committee respectfully reserves all of its rights under federal, state and Canadian law with respect to the Claims and all other claims asserted by, or for the benefit of, the Lock-Up Noteholders, including but not limited to the right to seek standing from this Court to file an adversary proceeding concerning such claims and seek recovery of all payments made to, or for the benefit of, the Lock-Up Noteholders.  The Committee further reserves its right to supplement or amend this application based upon information learned through discovery in this matter.

## **NOTICE**

72.     The Committee has provided notice of this application to parties-in-interest in accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010 (Docket No. 5670).  The Committee submits that such notice is sufficient and further notice need not be provided.  No previous request for the relief sought in this application has been made by the Committee to this or any other court.

**WHEREFORE**, the Committee requests entry of an order (a) sustaining the Committee's objection to the Claims and disallowing and expunging the Claims; (b) suspending any and all payments to the Nova Scotia Finance Trustee and the Noteholders until all avoidable transfers to the Noteholders have been repaid; (c) voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors to assume the

20

Lock-Up Agreement and any other obligations incident thereto, including those concerning the

Swap Transactions; and (d) granting the Committee such other and further relief as the Court

deems just and proper.

Dated: New York, New York
      July 2, 2010

Respectfully submitted,

BUTZEL LONG, a professional corporation


By:    /s/ Eric B. Fisher
        Barry N. Seidel
        Eric B. Fisher
        Katie L. Cooperman
        380 Madison Avenue, 22nd Floor
        New York, New York 10017
        Tel: (212) 818-1110
        Fax: (212) 818-0494

*Special Counsel to the Official Committee
of Unsecured Creditors of Motors
Liquidation Company f/k/a General
Motors Corporation*

## EXHIBIT A

### LOCK-UP AGREEMENT