**EXHIBIT D**



CI-00-04255

By: Joseph F. Roda (Atty. I.D. No. 20615)
Michele S. Burkholder (Atty. I.D. No. 78063)
RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000

---

## IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## CIVIL ACTION - LAW

| | | |
|---|---|---|
| DONNA SODERS, on behalf of herself and all others similarly situated, | : | NO. CI-00-04255 |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | JUDGE FARINA |
| vs. | : | |
| | : | |
| GENERAL MOTORS CORPORATION, | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND FOR REIMBURSEMENT OF FEES AND COSTS**

No. CI-00-04255

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. *iii-v*

I.    FACTS ................................................................................. 1

    A.    The Lawsuit Allegations ................................................ 1

    B.    The Litigation ........................................................... 2

    C.    The Settlement ........................................................... 5

II.   NOTICE ............................................................................... 10

III.  APPLICABLE LEGAL STANDARDS ................................................ 13

    A.    The proposed settlement meets the criteria for a
        presumption that it is fair. .......................................... 13

    B.    The proposed settlement also meets the seven factors
        that have been applied by Pennsylvania courts. ................. 16

        1.    The risks of establishing liability and damages. ......... 17

        2.    The "range of reasonableness" in light of the
            best possible recovery. ............................................. 18

        3.    The "range of reasonableness" in light of all of
            the attendant risks of litigation. ............................. 25

        4.    The complexity, expense and likely duration of
            the litigation. ...................................................... 25

        5.    The state of the proceedings and the amount of
            discovery completed. ............................................. 26

        6.    The recommendations of competent counsel. ............. 26

        7.    The reaction of the class to the settlement. ............. 26

    C.    The request for a special payment to the Class
        Representative is reasonable. ....................................... 27

No. CI-00-04255

D.   The request for reimbursement of litigation expenses
     is reasonable. ...................................................................................28

E.   The request for an award of attorneys' fees
     is reasonable. ....................................................................................28

     1.   The time and effort reasonably expended by
          class counsel in the litigation. .....................................................29

     2.   The quality of services rendered. ................................................29

     3.   The results achieved and benefits conferred
          upon the class or public. .............................................................31

     4.   The magnitude, complexity and uniqueness
          of the litigation. .........................................................................32

     5.   The fee was contingent on success. ............................................32

F.   The requested attorneys' fees are reasonable under
     the accepted tests for fees in class actions. ..........................................32

IV.  CONCLUSION ..............................................................................................38

No. CI-00-04255

# TABLE OF AUTHORITIES

## Cases

*Buchanan v. Century Fed. Savings and Loan Ass'n,*
259 Pa. Super. 37, 393 A.2d 704 (1978).................................................................. 16

*Cerbo v. Ford of Englewood, Inc.,*
Nos. BER-L-2871-03, BER-L-2925-03, BER-L-2936-03, BER-L-2937-03,
BER-L-2939-03, BER-L-2954-03, BER-L-2976-03, 2006 WL 177586
(N.J. Super. L. Jan. 26, 2006) .....................................................................................21

*Clement v. American Honda Finance Corp.,*
176 F.R.D. 15 (D. Conn. 1997) ............................................................................ 24-25

*Dauphin Deposit Bank and Trust Co. v. Hess,*
556 Pa. 190, 727 A.2d 1076 (1999)...............................................................13, 16, 18

*Fischer v. Madway,*
336 Pa. Super. 289, 485 A.2d 809 (1984)................................................................16

*Fischel v. Equitable Life Assurance Society of the United States,*
307 F.3d 997 (9th Cir. 2002) .....................................................................................34

*Fleury v. Richemont N. Am., Inc.,*
No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008).........................38

*Gottlieb v. Barry,*
43 F.3d 474 (10th Cir. 1994) .....................................................................................34

*Gregg v. Independence Blue Cross,*
No. 03482 Dec. Term 2000, 00005 Dec. Term 2002, 00002 Dec. Term 2002,
2004 WL 869063 (C.C.P. Phila. Cty. Apr. 22, 2004) .......................................13, 16, 28

*In re AT&T Corp.,*
455 F.3d 160 (3d Cir. 2006).......................................................................................35

*In re Automotive Refinishing Paint Antitrust Litig.,*
MDL Docket No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008).............................28

*In re Cuisinart Food Processor Antitrust Litig.,*
No. MDL 447, 1983 WL 153 (D. Conn. Oct. 24, 1983) .............................................22

No. CI-00-04255

*In re Domestic Air Transp. Antitrust Litig.,*
148 F.R.D. 297 (N.D. Ga. 1993) .................................................................22

*In re Excess Value Ins. Coverage Litig.,*
No. M-21-84 (RMB) (MDL-1339),
2005 WL 6242849 (S.D.N.Y. Nov. 3, 2005)...............................................37

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995)...................................................................23-24

*In re Mid-Alt. Toyota Antitrust Litig.,*
564 F. Supp. 1379 (D. Md.1983) ............................................................22

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions,*
148 F.3d 283 (3d Cir. 1998)...................................................................33

*In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294 (3d Cir. 2005)...............................................................33, 35

*In re Washington Public Power Supply Sys. Sec. Litig.,*
19 F.3d 1291 (9th Cir. 1994) .................................................................34

*Milkman v. American Travellers Life Ins. Co. ("Milkman I"),*
No. 3775, Control 072171, 2001 WL 1807376
(C.C.P. Phila. Cty. Nov. 26, 2001)..........................................................16

*Milkman v. American Travellers Life Ins. Co. ("Milkman II"),*
No. 3775 June Term 2000, 0721711, 011925,
020323, 020324, 020864, 020870, 2002 WL 778272
(C.C.P. Phila. Cty. Apr. 1, 2002)...................13-14, 16, 18, 22-25, 28, 29, 33, 36, 37

*Missouri v. Jenkins,*
491 U.S. 274 (1989) ...........................................................................33

*Nichols v. SmithKline Beecham Corp.,*
No. Civ.A.00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005)....................28

*Ohio Public Interest Campaign v. Fisher Foods, Inc.,*
546 F. Supp. 1 (N.D. Ohio 1982)......................................................21-22, 25

*Pennsylvania Orthopaedic Society v. Independence Blue Cross,*
2005 Pa. Super. 344, 885 A.2d 542 (2005)...........................................13-14

No. CI-00-04255

*Perez v. Asurion Corp.,*
No 06-20734-CIV, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007)....................................38

*Savoie v. Merchants Bank,*
166 F.3d 456 (2d Cir. 1999)............................................................................... 33-34

*Schwartz v. Dallas Cowboys Football Club, Ltd.,*
157 F. Supp. 2d 561 (E.D. Pa. 2001).........................................................................24

*Shaw v. Toshiba Am. Info. Sys., Inc.,*
91 F. Supp. 2d 942 (E.D. Tex. 2000).........................................................................20

*States of New York and Maryland v. Nintendo of Am., Inc.,*
775 F. Supp. 676 (S.D.N.Y. 1991)..............................................................................21

*Western Union Money Transfer Litig.,*
No. CV-01-0335 (CPS), 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) ........................21

## Statutes

63 P.S. § 818.12 ..........................................................................................................1

63 P.S. § 818.29 ..........................................................................................................2

28 U.S.C. § 1712 ................................................................................................... 37-38

## Rules

Pa. R. Civ. P. 1716..................................................................................................29

CI-00-04255

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FOR REIMBURSEMENT OF FEES AND COSTS

Plaintiff submits this memorandum in support of her motion for final approval of the settlement, and for an award of fees and costs. GM does not oppose the relief requested in this motion.

## I.    FACTS

### A.    The Lawsuit Allegations

Plaintiff, Donna Soders, brought this class action on behalf of herself and all others who purchased certain new General Motors ("GM") vehicles from dealers in Pennsylvania between 1988 through 1999. The action involves GM's Marketing Initiative programs, which were in effect at various points during those years.[1] Under those programs, GM required its dealers to pay an additional 1% of the Manufacturer's Suggested Retail Price ("MSRP") for each new vehicle they bought, with few exceptions, to finance advertising for new GM vehicles.

Plaintiff alleges that:

- by imposing this charge, GM required its new vehicle dealers to participate monetarily in advertising campaigns, which is prohibited by the Pennsylvania Board of Vehicles Act ("PBVA"), 63 P.S. § 818.12; and

---

[1] These programs were implemented on (a) September 1, 1988 for Chevrolet and GMC Truck vehicles; (b) July 1, 1989 for Cadillac and Oldsmobile vehicles; (c) July 1, 1990 for Pontiac vehicles; and (d) August 1, 1990 for Buick vehicles. These programs were terminated on March 31, 1999.

1

- GM's new vehicle dealers passed on that additional cost, as they passed on other costs, to the purchasers of the vehicles, who were thereby damaged by GM's conduct.

Plaintiff sought reimbursement of these added costs for herself and a class of all other persons who purchased GM vehicles during the Marketing Initiatives, pursuant to the PBVA provision that allows any person who is or may be injured by a violation of the Act to bring an action for damages. *See* 63 P.S. § 818.29.

GM initially estimated that the class encompassed 1.1 million vehicles, but subsequently adjusted its estimate to 700,000 to 800,000 because its prior estimate included vehicles not covered by this action (e.g., employee purchase plan purchases, leases, purchases of Geo vehicles, etc.). Plaintiff uses the average of these numbers, 750,000, for purposes of this memorandum.

GM has denied any wrongdoing, and contends that the 1% amount was a legal wholesale price increase to its dealers, and that dealers did not necessarily pass on the 1% amount to their customers.

## B.    The Litigation

This case was one of first impression. Other cases challenging the mandatory 1% payments under the Marketing Initiatives had been brought by dealers against GM. This was the first case, however, and as far as Plaintiff is aware, the only case, that has ever been brought by *consumers* under the PBVA or any other similar state statute.

2

The parties waged this litigation intensely for nine years. As described below, it included three sets of requests for interlocutory appeals, almost two dozen discovery requests, over a dozen motions, numerous hearings, and analysis of over 100,000 pages of documents.

At the outset, Plaintiff sought class certification and approval of her class certification notice plan. GM strenuously opposed both requests. When this Court granted class certification and approved Plaintiff's notice plan, GM sought to appeal both rulings to the Pennsylvania Superior and Supreme Courts.

Then, when discovery was completed, GM moved to decertify the class, which Plaintiff successfully opposed. GM then petitioned, unsuccessfully, to appeal the denial of that motion to the Pennsylvania Superior Court.

Plaintiff, through class counsel, served GM with seventeen sets of interrogatories and requests for production and two sets of requests for admission. Plaintiff responded to four sets of GM's interrogatories and requests for production and one set of its requests for admission. Class counsel produced more than 3,000 pages of discovery materials, and analyzed over 100,000 pages of documents produced by GM. The document analysis required multiple trips to Ohio, where the majority of the documents were located.

The parties submitted briefs, and in many instances, presented oral argument, on twelve discovery motions before this Court, as well as discovery motions before courts in Minnesota and Ohio relating to the production of

CI-00-04255

documents from dealer class actions in those states regarding the Marketing Initiatives.

The parties took or defended twenty-three depositions, including expert depositions. Class counsel also analyzed testimony in seventy-two related deposition transcripts, and two trial transcripts, in the dealer class actions involving the Marketing Initiatives.

The parties, between them, retained ten expert witnesses, each of whom presented reports, and all but one of whom was deposed.

GM twice moved for summary judgment. These summary judgment motions required extensive legal and factual research and significant briefing efforts.

The parties also participated in multiple case management and status conferences before this Court, and prepared and submitted memoranda and other materials for each conference.

Throughout these nine years, class counsel devoted 6,285 hours to this case. To date, class counsel has received no compensation for any of that time, dating back to 2000. Class counsel also advanced costs of $437,416.92 to prosecute the case, and again, not a penny of the costs that have been submitted with this petition have been reimbursed. Those costs, too, began to accrue nine years ago. About half of these costs were for the initial class notice, after the Court certified the case as a class action. Another substantial portion of the costs that class counsel advanced was for the experts class counsel retained to address issues that required expert testimony.

4

CI-00-04255

Over the nine years that this litigation continued, and especially in the latter years of this period, GM's financial picture declined steadily and increasingly, to the point that in 2008, there was substantial discussion in the media about a GM bankruptcy, a concept that once would have been unimaginable for the anchor of the American automobile industry.

## C.    The Settlement

In July 2008, while GM's financial problems were increasingly worsening, the Court set a final pretrial conference date of December 30, 2008, and advised that trial would likely commence sometime in the first half of 2009. In August 2008, after discussions about settlement at a conference with the parties, the Court recommended that the parties seek the assistance of a mediator to see if that could achieve a settlement. The parties agreed to do so, and in September 2008, they retained a professional mediator, Bennett G. Picker, Esquire, of Stradley Ronon Stevens & Young LLP, a very experienced and highly regarded mediator, as evidenced by the materials attached as Exhibit 1.

The mediation that followed involved telephone conferences with Mr. Picker, written submissions to him, and a full day of negotiations with him and GM's counsel, which lasted well into the evening.

If the case had gone to trial, Plaintiff had won, the case had survived on appeal, and GM had been able to pay the judgment, those class members who could prove that they had purchased a GM vehicle during the class period, and who were not barred by the statute of limitations, could have recovered up to 1% of the MSRP

CI-00-04255

on their vehicle, which Plaintiff's expert has advised would have ranged between $154 and $244,[2] minus their proportionate deductions for the costs of the case and for attorney fees, which for a case like this could have ranged, under the law, to between 25% and one-third of the recovery. Their net recoveries for each vehicle purchased could thus have ranged between approximately $100 and $170.

In the settlement negotiations, the parties first negotiated what GM would agree to give the class. Class counsel sought a cash payment for class members, but GM, in its current financial condition, would not agree to this. It made this clear at the outset of the negotiations.

What GM would agree to give class members was a $200 rebate certificate for each new Buick, Cadillac, Chevrolet, GMC Truck, Oldsmobile or Pontiac vehicle that a class member bought during the class period. The mediator, after lengthy sessions with both sides together and individually, urged that this concept be pursued, and it was ultimately adopted.

Only after this concept was agreed to, and the parties agreed to all other terms – such as how long the certificates would be valid, what would constitute sufficient proof of a claim, and how the certificates could be assigned – did the parties turn to the issue of reimbursement to class counsel for out-of-pocket costs they had incurred in prosecuting this case, and the payment of a reasonable attorneys' fee.

The parties spent two more months negotiating and preparing the language of the Settlement Agreement and the various notice materials, exchanging more

---

[2] *See* Neville chart, attached as Exhibit 2.

6

CI-00-04255

than seventy drafts of those documents in the process. On December 15, 2008, the

parties signed the Settlement Agreement that is attached as Exhibit 3.

Under this Agreement, class members will be provided with one $200 rebate

certificate for each new Buick, Cadillac, Chevrolet, GMC Truck, Oldsmobile or

Pontiac vehicle that they bought during the class period. *Id.* at ¶¶ 1.2, 1.8, 3.1. The

rebate certificates may be used toward the purchase or lease of a new Chevrolet,

Cadillac, Buick, Pontiac or GMC Truck vehicle, *id.* at ¶ 1.2, and will be valid for

three years. *Id.* at ¶ 3.11.

Class members may "stack" two rebate certificates toward the purchase of a

single vehicle, and also stack those rebate certificates with other available discount

programs (including the GM Employee Discount Programs, if those programs are

being extended to all customers at the time of purchase). *Id.* at ¶ 3.10.

Class members who do not want to use the rebate certificates may transfer

them, for full value, during the entire three-year period that the certificates are

valid, to their immediate household members, parents or children. *Id.* at ¶ 3.12.

During the last two years that the certificates are valid, class members may also

transfer them to any other person, for seventy-five (75%) of their full value ($150).

*Id.* at ¶¶ 1.2.a, 3.13. While the $150 certificates may not be stacked with another

certificate, they may be stacked with other available discount programs (including

GM's Employee Discount Programs, if those programs are being extended to all

customers). *Id.* at ¶¶ 3.10, 3.13.

7

CI-00-04255

Class members qualify for rebate certificates by producing documents showing that they purchased the vehicle listed on their claim forms. The documents may consist of copies of the retail invoice, finance documents, a title, insurance documentation, a cancelled check, or any other document sufficient to reasonably establish that the class member purchased a vehicle that is subject to the settlement. *Id.* at ¶ 1.18.

Class members may also qualify, even without producing supporting documents, if their names are included on the new vehicle delivery lists that GM produced in this case. *Id.* at ¶ 3.3. While GM cannot guarantee that the lists are all-inclusive, it has said that it is confident that the lists reflect most of the class member purchases.

If more than one person is listed as the purchaser of a vehicle, claims will be accepted if the claimant lists the co-purchaser on the claim form, the name of the co-purchaser is on the delivery lists, and only one claim is submitted for that vehicle. *Id.* at ¶¶ 3.3, 3.4. If more than one person submits an otherwise valid claim for the same vehicle, the certificate would be provided: (1) to the person whose name appears on the delivery lists, or (2) if none of their names appear on the lists, to the person whose name first appears on the purchase documents; or (3) if none of their names appear and no purchase documents are produced, to the purchaser with the earliest postmark date for his or her claim form. *Id.* at ¶ 3.4.

GM has also agreed to provide certificates to claimants who provide VINs that match new and previously untitled vehicles bought during the class period,

CI-00-04255

even if the claimants do not completely fill out the claim form or produce supporting documents. *Id.* at ¶ 3.3. Even if the class members no longer have documents relating to their purchases, they will be able to get their VIN information from their titles, if they still own their vehicles, or from contacting the companies that insured or financed their vehicles.

In addition, for those claimants who cannot qualify under the above criteria, certificates would still be given if the claimant can provide basic information about the vehicle purchase – including make, model, model year, purchase year, and name and location of dealership where purchased – so long as the total number of claims that fall into this category does not exceed 10% of all claims received. *Id.* at ¶ 3.5.

If the total number of such claims does exceed 10%, but not more than 20%, GM will provide half-value ($100) certificates for claims in this category. *Id.* at ¶¶ 1.2.b, 3.5. These certificates may be transferred for full value to household members, parents and children, and for 75% of the full value ($75) to others after one year. *Id.* at ¶¶ 1.2.a, 1.2.b, 3.5, 3.12. GM has the option to reject this category of claims only if the claims exceed 20% of all claims received. *Id.* at ¶ 3.5.

GM may refuse a claim only if GM or the Claims Administrator has evidence that the claim is not valid, such as evidence that the claimant leased (rather than purchased) the vehicle, or purchased the vehicle under a GM Employee Purchase Plan or as a fleet or government purchaser, or is counsel of record in this case. *See id.* at ¶¶ 1.8, 3.3.

CI-00-04255

GM has also agreed to pay:

- costs of claims administration, *id.* at ¶ 3.15;

- the cost of providing notice of the settlement, *id.* at ¶ 3.16;

- the fee of class counsel, *id.* at ¶ 3.17 (see below);

- the documented costs advanced by class counsel, *id.* at ¶ 3.18 (see below); and

- a payment to the Class Representative for devoting the substantial amount of effort that she spent representing the class. *Id.* at ¶ 3.14.

On December 19, 2008, after presiding over this case for nine years, this Court conducted a hearing and entered an order preliminarily approving the proposed Settlement Agreement and Notice Plan, scheduling the final fairness hearing for April 28, 2009, and setting the deadline of five days prior to the hearing (i.e., April 23, 2009) for the filing of this memorandum.

## II.  NOTICE

In accordance with the proposed Settlement Agreement and the Court's Preliminary Approval Order, Hilsoft Notifications ("Hilsoft") published a Court-approved Publication Notice once in the Pennsylvania edition of *Newsweek,* twice in the Pennsylvania edition of *People,*[3] and three times each in the seventy-eight daily mainstream newspapers in Pennsylvania, circulating into each of the sixty-seven

---

[3] The Publication Notice was supposed to appear in *People* once, but because of an error on the part of *People,* it was published a second time at no additional cost. *Id.* at ¶ 13. Because of the delay involved with publishing the notice in *People,* the parties agreed to extend the deadline for objections and notices to appear by one month, from March 6, 2009 to April 6, 2009. *Id.* The new deadline was added to the case website and the Detailed Notice that is linked to the website. *Id.*

10

CI-00-04255

counties of the state. *See* Exhibit 5, Hilsoft Affidavit, at ¶¶ 6, 12-13. Placements were sought near news articles and editorial features to increase readership and the likelihood of "noticing" the Notice. *Id.* at ¶ 14. This effort alone caused notice to be provided to an estimated 81.71% of the class an estimated 2.47 times each. *Id.* at ¶¶ 8(a), 26-27, 30.

In addition, on January 19, 2009, Hilsoft issued a party-neutral, Court-approved informational release to approximately 165 press outlets throughout Pennsylvania. *Id.* at ¶ 16. This served a valuable role by providing additional notice exposure beyond that which was provided by the paid media. *Id.*

Hilsoft also updated the case website – www.onepercentcase.com – to reflect the settlement and its terms and deadlines. *Id.* at ¶ 17. By logging on to the website, a person could (and still can) view and download a copy of the Detailed Notice, the Claim Form, the Settlement Agreement, the Preliminary Approval Order, the Complaint and GM's Answer. *Id.* Hilsoft also posted a list of common questions and answers to help class members understand the proposed settlement and its terms. *Id.*

Hilsoft prominently displayed the website's URL in all of the notice documents, and on January 26, 2009, it registered keywords with hundreds of search engines, including Google, Yahoo!, WebCrawler and AltaVista, to help the website appear at or near the top of search lists. *Id.* at ¶ 18. As a result, class members could easily obtain more information about the proposed settlement through simple keyword searches. *Id.*

CI-00-04255

In addition, also in accordance with the proposed Settlement Agreement and the Court's Preliminary Approval Order, the Claims Administrator, Garden City Group ("GCG"), supplemented the notice program described above by causing a Notice Packet (consisting of a Court-approved Detailed Notice and Claim Form) to be mailed to each class member who (1) received the Absent Class Member Questionnaire in connection with discovery in this case, or (2) had made direct contact with class counsel, or (3) was otherwise identifiable as having a specific interest in this case (and having a current address on file). *See* Exhibit 6, GCG Affidavit, at ¶¶ 3-4.

GCG promptly re-mailed any Notice Packet that was returned by the Post Office with forwarding information. *Id.* at ¶ 5. GCG also attempted to locate a valid address for each Notice Packet that was returned as undeliverable and/or unclaimed by running a search through the National Change of Address database. *Id.* at ¶ 6.

GCG also set up a toll-free telephone helpline to answer questions, and it will continue to run that helpline throughout the settlement process. *Id.* at ¶ 8. Callers may select from a menu of options and hear specific recorded information about the proposed settlement twenty-four hours a day, or may speak to an operator from 8:00 a.m. to 6:00 p.m. Eastern Standard Time from Monday through Friday. *Id.* As of April 19, 2009, GCG received 2,583 calls to the helpline, and 2,086 of those calls were handled by an operator. *Id.*

CI-00-04255

Hilsoft has determined that the notice plan described above is "the best notice practicable under the circumstances of this case, and satisfied due process." *See* Exhibit 5, at ¶ 10. This encompassed the content of the notices, which were "designed to be noticeable, clear, simple, substantive, and informative," and include all significant and required information. *Id.* at ¶ 8(d).

## III.    APPLICABLE LEGAL STANDARDS

"[S]ettlements are favored in class action lawsuits." *Dauphin Deposit Bank and Trust Co. v. Hess,* 556 Pa. 190, 197, 727 A.2d 1076, 1080 (1999); *Milkman v. American Travellers Life Ins. Co.,* No. 3775 June Term 2000, 0721711, 011925, 020323, 020324, 020864, 020870, 2002 WL 778272, at *4 (C.C.P. Phila. Cty. Apr. 1, 2002) ("*Milkman II*").

### A.    The proposed settlement meets the criteria for a presumption that it is fair.

A proposed class action settlement may be presumed to be fair if: (1) the settlement has been arrived at by arms-length bargaining; (2) sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently; (3) the proponents of the settlement are counsel experienced in similar litigation; and (4) the number of objectors or interests they represent is not large when compared to the class as a whole. *Gregg v. Independence Blue Cross,* No. 03482 Dec. Term 2000, 00005 Dec. Term 2002, 00002 Dec. Term 2002, 2004 WL 869063, at *31 (C.C.P. Phila. Cty. Apr. 22, 2004), *aff'd sub nom., Pennsylvania*

13

*Orthopaedic Society v. Independence Blue Cross,* 2005 Pa. Super. 344, 885 A.2d 542
(2005) (*citing Milkman II,* 2002 WL 778272, at *5).

The settlement in this case meets each of these criteria. The first two – that
the settlement was arrived at through arms-length bargaining, and that sufficient
discovery has been taken or investigation completed to enable counsel and the court
to act intelligently – are addressed in the facts related above. The parties spent
months negotiating the settlement, with the assistance of an experienced mediator,
after becoming fully informed of the factual and legal issues through nine years of
hard-fought litigation involving over 100,000 pages of discovery materials, twenty-
three depositions, ten experts, two class certification motions followed by efforts to
immediately appeal the decisions in favor of certification, a notice motion followed
by another attempt to seek interlocutory appeal, and two motions for summary
judgment.

The third factor – that the proponents of the settlement are counsel
experienced in similar litigation – is also met. The fairness of the settlement
process and proposed agreement was shaped by the experience of counsel for both
parties. GM's counsel has handled not only this class action against GM, but also
the four class actions filed by dealers under the PBVA and the one individual action
brought under that statute. GM's counsel is thus deeply immersed in all issues that
this case presents.

Class counsel are "quite capable of representing the interests of this class," as
this Court noted in its October 3, 2001 class certification opinion. Class counsel

14

**B.    The proposed settlement also meets the seven factors that have been applied by Pennsylvania courts.**

A settlement may be approved if, after an initial presumption of fairness is made, the settlement satisfies the "likelihood of success" test. *See Milkman II*, 2002 WL 778272, at *5. The court should make its evaluation with an eye toward the seven factors set forth in *Dauphin Deposit*.[5] *See Milkman v. American Travellers Life Ins. Co.*, No. 3775, Control 072171, 2001 WL 1807376, at *12 (C.C.P. Phila. Cty. Nov. 26, 2001) (*"Milkman I"*). The settlement in this case meets each of these.

The seven *Dauphin Deposit* factors are: (1) the risks of establishing liability and damages; (2) the range of reasonableness of the settlement in light of the best possible recovery; (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation; (4) the complexity, expense and likely duration of the litigation; (5) the state of the proceedings and the amount of discovery completed; (6) the recommendations of competent counsel; and (7) the reaction of the class to the settlement. *Dauphin Deposit*, 556 Pa. at 197, 727 A.2d at 1079-80; *Fischer v. Madway*, 336 Pa. Super. 289, 296, 485 A.2d 809, 812 (1984); *Buchanan v. Century Fed. Savings and Loan Ass'n*, 259 Pa. Super. 37, 46, 393 A.2d 704, 709 (1978); *Gregg*, 2004 WL 869063, at *35; *Milkman II*, 2002 WL 778272, at *12.

---

[5] Plaintiff and the class in *Dauphin Deposit* sought the right to terminate a certificate of deposit ("CD") that had been available for individual retirement accounts after the bank sought to replace the accounts with other investment vehicles paying a lower rate. *Id.* at 192, 727 A.2d at 1077. The Pennsylvania Supreme Court affirmed the Superior Court's determination that the trial court had erred in refusing to approve a settlement that would have provided replacement CDs with more favorable terms than the current CDs, including a right to withdraw the money without penalty. *Id.* at 193-97, 727 A.2d at 1078-79.

These factors weigh heavily in favor of approving the proposed settlement.

### 1.    The risks of establishing liability and damages.

As noted above, this is a case of first impression.  It is the first *consumer* case filed under this state's (or any other state's) dealer act.  It presents issues and risks as to liability (i.e., whether the 1% surcharge violated the PBVA), the statute of limitations, and damages (both in the fact and amount of damages).

In addition, as already noted above, the case presented the risk that even if it could be won at trial, the class would recover nothing because of a GM bankruptcy intervening before the class could recover any judgment that was obtained.  Indeed, when the parties entered into settlement negotiations with Mr. Picker, there was a very real, and increasing, risk that the parties might not even make it to trial before a GM bankruptcy.  Even if they did, there was the risk that the massive, prolonged and continuing publicity about GM's financial condition could impair the ability to empanel an impartial jury, and influence – no matter what instructions the Court gave the jury – their ultimate verdict.

The settlement has a realistic chance of surviving a GM bankruptcy because even with a bankruptcy, GM would still want, and need, to sell cars, and the settlement, with its rebate certificates, would serve that objective.  A cash verdict and judgment, by contrast, or a promised cash payment in a settlement, would not serve that objective, and may not survive a bankruptcy, at least not in anything more than a fraction of the amount awarded.

17

CI-00-04255

## 2.    The "range of reasonableness" in light of the best possible recovery.

The issue is whether the settlement provides an "adequate" advantage for the class in exchange for the surrender of the class members' litigation rights. *Dauphin Deposit,* 556 Pa. at 196, 727 A.2d at 1079. The settlement does not have to provide the best possible advantage for the class. *Id.* "[I]t is important that the Settlement and the Class's expectations be viewed not in a vacuum where each of the Complaint's allegations are treated as fact, but rather in the context of the risks of continuing litigation, the likelihood of a successful prosecution of the Class's claims and the length and complexity of further litigation." *Milkman II,* 2002 WL 778272, at *4.

The settlement in this case falls within a range of reasonableness. If this case were to go to trial and Plaintiff were to win, the best possible recovery that a class member could receive would be 1% of the MSRP for each vehicle that the class member bought while the Marketing Initiatives were in effect, *less* that class member's proportionate share of fees and costs. As stated above, according to the conservative estimate of Plaintiff's expert, Richard Neville, the 1% surcharge on vehicles bought by class members would range from $154 to $244. The recovery to the class member could be less than the full 1%, however, even before deduction for fees and costs, if the jury determined, as GM argued in the alternative, that the dealer passed on less than the total 1% surcharge to the customer.

The $200 value being offered in this settlement is thus well within the value that class members could receive after trial, verdict and successful appeal, even

18

*before* deduction for: (1) costs, which currently are $437,416.92 and would increase

considerably with a trial and appeal, and with the costs of notice and the

administration of a class distribution; and (2) attorneys' fees, which could be as

much as 25% to 33.3%, based on typical fee awards.

In the settlement, by contrast, class members pay nothing for fees and costs.

GM has agreed to separately pay these amounts. Thus, the rebate certificates have

a value, $200, that for many, if not most, class members would exceed the dollar

amount that they could hope to receive through a judgment at trial.

Also, if the case were to be tried, a recovery would be had by only those class

members who could establish a right to recover (by proving the purchase of a vehicle

covered by the case). The latter consideration is no small matter, given how long

ago the class member transactions took place. If the action were resolved through a

trial, recovery could be dependent on a class member's name being included on the

new vehicle delivery lists, or his or her submission of supporting documents or a

supporting VIN. Under the settlement, by contrast, class members who might not

be able to meet either of these criteria are still eligible to recover, if their co-

purchaser's name is listed, or if the percentage of undocumented claims does not

exceed 20% of all claims. Thus, the settlement potentially provides more people

with an opportunity to recover through the lawsuit.

Finally, as noted above, the value for the class in the settlement must be

compared not just to the abstract value of what the class might win at trial, but also

In *Western Union Money Transfer Litig.,* No. CV-01-0335 (CPS), 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004), the court approved a settlement involving certificates with features similar to those here: the ability to transfer the certificates and use them immediately after receiving them and for almost three years thereafter, at many different locations, with other discounts. *Id.* at *12-13. The court rejected the argument that a certain redemption rate should be required, citing other certificate settlements with no redemption rate requirements. *Id.* at *15.

In *States of New York and Maryland v. Nintendo of Am., Inc.,* 775 F. Supp. 676 (S.D.N.Y. 1991), the court approved a similar settlement, which provided a $5.00 rebate for video games. The court noted, *inter alia,* that the certificates were freely transferable and thus could be rendered cash equivalents. *See id.* at 681.

In *Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F. Supp. 1 (N.D. Ohio 1982), the court approved a settlement that was to provide food purchase certificates to class members based in part on its recognition that the defendant could not and would not pay cash to settle the claims. *See id.* at 11. The same type of situation exists here, where GM is in a tenuous financial condition.

In *Cerbo v. Ford of Englewood, Inc.,* Nos. BER-L-2871-03, BER-L-2925-03, BER-L-2936-03, BER-L-2937-03, BER-L-2939-03, BER-L-2954-03, BER-L-2976-03, 2006 WL 177586 (N.J. Super. L. Jan. 26, 2006), the court approved a mixed settlement, which included freely-transferable certificates valued at $100 or 10% off a purchase for other class members. *See id.* at *18.

21

A settlement with certificate qualities was also approved in *Milkman II*,

where the court noted that "[c]ourts have often found non-pecuniary settlements to

merit final approval." *See* 2002 WL 778272, at *7. *Milkman II* involved allegations

of fraud in relation to the sale of and subsequent premium increase on long-term

care and home health care insurance policies. *Id.* at *1. The court approved a

settlement allowing class members with current policies to select: (1) a replacement

policy at a discounted rate; (2) an exchange of a sum equal to all premiums paid less

all claims paid for home health or nursing home care; or (3) maintenance of the

same policy with a right to request a refund of all premiums paid less claims paid if

premiums increase above a set percentage. *Id.* at *3, 5. Class members with lapsed

policies could choose: (1) a refund of all premiums paid less claims paid; or (2) a

company match on premiums for annuity or life insurance policies. *Id.* at *3, 6.

As the court noted in *Milkman II*:

> Courts have often found non-pecuniary settlements to
> merit final approval. *See, e.g., In re Domestic Air Transp.
> Antitrust Litig.*, 148 F.R.D. 297 (N.D.Ga.1993) (approving
> class action settlement awarding cash and discount travel
> certificates); *In re Mid-Alt. Toyota Antitrust Litig.*, 564
> F.Supp. 1379 (D.Md.1983) (approving class action
> settlement awarding up to $135.00 in cash or up to
> $250.00 in retail value goods, services or trade-in
> allowance); *In re Cuisinart Food Processor Antitrust
> Litig.*, No. MDL 447, 1983 WL 153 (D.Conn. Oct. 24, 1983)
> (approving class action settlement in which each class
> member received a coupon entitling the user to up to
> $100.00 in product discounts); *Ohio Public Interest
> Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1 (N.D.Ohio
> 1982) (approving class action settlement awarding
> injunctive relief and food purchase certificates).

*Id.* at *7.[6]

Cases where certificate settlements have been rejected involved facts and terms not present in our case.

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir. 1995) was a different case and a different settlement than the present case. It involved a diminution in the value of pick-up trucks because of an alleged safety defect, not an allegedly unlawful advertising surcharge on the wholesale price of a vehicle. The court believed the settlement should be rejected, in part, because it did not make arrangements for correcting the defects, which were alleged to have been life-threatening. *See id.* at 806-07.

In addition, the certificates in the *GM Pick-Up* settlement were redeemable for only fifteen months, *id.* at 780, versus the three years in the present case. The certificates could be transferred for full value only to immediate family members or persons who purchased the vehicles for which the coupons were provided, and for only half-value to non-family members, *id.,* whereas the certificates in the present case may be transferred for full value to family members or anyone who lives in the same residence with a class member, even if not a family member, and for three-quarters of their value to others. The certificates in that case also could not be used

---

[6] While the court in *Milkman II* mentioned proposed guidelines from the National Association of Consumer Advocates about certificate settlements, one of which concerned the use of certificates for the purchase of "major, large ticket items," *id.* at *8; that reference by the court was *dicta,* at most, since that issue was not before the court in that case, and the court's opinion does not say that the court would not approve the use of certificates for such items in a case where the court, having examined the settlement against the particular facts of that case, believed the use of certificates for such purpose to be fair and reasonable.

CI-00-04255

in conjunction with other incentives, *id.,* while the certificates in the present case can.

In addition, the court of appeals rejected the settlement in *GM Pick-Up Truck* in part because, even though thousands of documents from personal injury cases involving the trucks that were at issue in *GM Pic-Up* had been evaluated by class counsel, it was concerned that only four months had passed between the filing of the consolidated complaint and the settlement. *See id.* at 813-14. The court of appeals also based its decision on the fact that the district court had not made the findings required by Rule 23 to certify the class. *See id.* at 800.

In addition, the court of appeals did not categorically reject the *GM Pick-Up Truck* settlement. It left "open the possibility . . . that the district court on remand might develop the record more fully, properly approve the settlement, in either its original or a re-negotiated form, and, following the guidance offered by [its] opinion, certify the settlement class." *Id.* at 819.

The settlement that was rejected in *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F. Supp. 2d 561 (E.D. Pa. 2001), like *GM Pick-Up Truck,* also had a short redemption period that expired at the end of the calendar year, and no provision for remedying the violation that was the subject of the lawsuit. *See id.* at 573-74. In this case, by contrast, the offending program had already been terminated by March 1999.

Similarly, in *Clement v. American Honda Finance Corp.,* 176 F.R.D. 15 (D. Conn. 1997), the certificates were rejected in part because some expired in only two

24

CI-00-04255

years, and they could not be transferred to anyone residing outside of the class member's household. *See id.* at 21.

No such issues exist in this case.

### 3.  The "range of reasonableness" in light of all the attendant risks of litigation.

This is dealt with in the discussions above about the risks of litigation, not just on the merits, but also given the potential of a GM bankruptcy filing. This is a case in which the defendant has been on the verge of bankruptcy since settlement negotiations began. That could not be ignored. It dictated obtaining the best reasonable settlement that could be obtained, and not walking away from a settlement that was offered and was within reason. The ideal world was not, and is not, at Plaintiff's disposal. The apparent inability of a defendant to survive and make payment on a significant judgment is an appropriate consideration in evaluating a settlement. *See Milkman II,* 2002 WL 778272, at *17; *Ohio Public Interest Campaign,* 546 F. Supp. at 11.

### 4.   The complexity, expense and likely duration of the litigation.

As noted above, this class action has been immensely complex and expensive. It has lasted nine years already, and if not settled, promised to continue for years to come – through a trial and the appellate courts, if it were not ended by a GM bankruptcy. The case has involved substantial discovery and substantive disputes from the outset, including multiple motions relating to class certification and notice that were the subject of a total of five petitions for immediate appeal, two motions

25

for summary judgment, and multiple case management and status conferences. Those issues were not about to end if the case did not settle: they would only have increased with new issues that would arise with a trial. A trial would also have increased the expense of the case considerably, with no certainty of result for the class. Plaintiff has so far incurred $437,416.92 in out-of-pocket costs. Trying the case would significantly increase that amount, including costs of expert witnesses, trial preparation, exhibits and court reporting services.

**5.    The state of the proceedings and the amount of discovery completed.**

This has been addressed in detail above. The parties came to settlement only after nine years of hard litigation. They were more than sufficiently informed about the essential evidence and issues involved in this litigation to adequately appreciate the merits.

**6.    The recommendations of competent counsel.**

This is also addressed above. Counsel on both sides of this case have substantial experience in this type of case. They have spent nine years developing the facts of this case, analyzing the law and evaluating the risks. They believe that the settlement is reasonable – indeed, likely the best resolution that could be achieved – under the circumstances.

**7.    The reaction of the class to the settlement.**

As addressed above, only nine class members – 0.0012% of the class – have objected to the proposed settlement.

CI-00-04255

The objections take issue with the provision of rebate certificates rather than cash payments (or, as one class member suggested, a maintenance voucher). As noted above, cash or maintenance vouchers, while they would have been preferable, were not available, given GM's current financial situation.

One class member objected to receiving notice during the settlement period via publication. *See* Exhibit 7, Objection from Mr. and Mrs. Sheppard. The notice plan, however, was approved by this Court, was reasonable under the circumstances, and worked: *These objectors received notice, as evidenced by their objection.*

One class member has objected to the attorneys' fees and costs requested, which objection is addressed below. The requested fees and costs are justified in light of the benefit achieved by the efforts of class counsel in this case, and are actually less than the fees and costs typically awarded in similar class action settlements.

C.   **The request for a special payment to the Class Representative is reasonable.**

The Settlement Agreement provides for a separate payment to the Class Representative from the Settlement Fund, subject to Court approval, in the amount of $5,000, in light of her active involvement in this litigation, including her production of numerous documents, the participation of both her and her husband in depositions, her regular communications with class counsel, and her attendance at hearings before this Court. It is noteworthy that no class member has objected to this payment for her efforts in representing those class members.

27

This is a modest payment for a case that has lasted nine years: larger payments have been entered in many other class actions. *See, e.g., Gregg,* 2004 WL 869063, at *9 (approving settlement including class representative payments of up to $20,000); *In re Automotive Refinishing Paint Antitrust Litig.,* MDL Docket No. 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (awarding $15,000); *Milkman II,* 2002 WL 778272, at *32 (approving class representative payments of $5,000, $7,500 and $10,000); *Nichols v. SmithKline Beecham Corp.,* No. Civ.A.00-6222, 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (awarding $5,000 and citing larger awards from other actions).

### D.    The request for reimbursement of litigation expenses is reasonable.

Class counsel seeks a recovery of costs in this action in the amount of $437,416.92. These costs are itemized on the summary that is attached as Exhibit 16. These costs are common benefit costs that were reasonably necessary to bring this litigation to a successful conclusion, and include substantial advances for notice and expert fees. No class member had objected to this payment.

### E.    The request for an award of attorneys' fees is reasonable.

Class counsel know the duties they have in requesting a fee award from the Court: a fiduciary duty to the members of the class; a duty to the Court, of which they are officers; and a duty to the judicial process that permits the class action procedure.

The factors to be considered in awarding fees in class action cases in state courts in Pennsylvania are set forth in Pa. R. Civ. P. 1716. *Milkman II*, 2002 WL 778272, at *24. They consist of: (1) the time and effort reasonably expended by the attorney in the litigation; (2) the quality of the services rendered; (3) the results achieved and benefits conferred upon the class or public; (4) the magnitude, complexity and uniqueness of the litigation; and (5) whether the receipt of a fee was contingent on success. *Id.* All five of these factors weigh in favor of the fee requested by class counsel and agreed upon by GM.

### 1.    The time and effort reasonably expended by class counsel in the litigation.

As addressed above, class counsel have devoted nine years and 6,285 hours to this litigation, and have invested $437,416.92 in out-of-pocket costs. That is a considerable expenditure of time and costs under any measure. All of those hours, and all of those costs, could have been devoted to other matters. All of those hours, and all of those costs, have led to conferring a benefit upon the class.

### 2.    The quality of services rendered.

Class counsel would prefer, if they had a choice, not to have to speak of their own work, and leave it to others to judge. The rules governing class actions and fee petitions, however, do not allow that. Counsel must address what they did, and why they deserve a fee.

GM does not litigate easily, especially where its damages could be as substantial as they were in this case, and even more where, as in this case, it had a

CI-00-04255

multitude of issues on which to make a stand, many of them of first impression. The complexity of this case was then compounded by the fact that it was a class action, which is a specialized area of practice.

This case has reached the point of settlement because class counsel has diligently and successfully pursued it, at great time and expense, for nine hard years. The case could have been lost at any of a number of turns, whether on class certification, summary judgment or discovery matters, all of which were renewed by GM multiple times, but defeated.

In this regard, counsel incorporate by reference the detail given at pages two through four above:  the multiple efforts by GM to deny class certification, or to have the case dismissed on summary judgment, or to have a substantial portion of the class denied any benefits because of statute of limitations issues; the multiple appeals that GM tried to take on the class certification and class certification notice issues; the tens of thousands of pages of documents, records and transcripts from other cases that class counsel sought and reviewed, in many occasions on trips to Ohio, where the documents were kept; the scores of depositions taken or defended, all over Pennsylvania; the many conferences and hearings that the case involved; and the many expert witnesses consulted, retained and deposed.  If there is to be a fee awarded in this case, it is one that was earned, at great expense, over almost a decade.

CI-00-04255

### 3.    The results achieved and benefits conferred upon the class or public.

As described above, the settlement offers a real, tangible benefit to the class. In dollar amounts, it is substantial in its potential cost to GM: a rebate certificate of $200 for each of the 700,000 to 800,000 GM vehicles purchased by consumers in Pennsylvania during the class period. In dollar amount, it is also greater than the dollar award that each class member could have achieved at a trial: the average amount of the 1% surcharge for advertising would have ranged – before deduction for costs and fees – between about $150 and $250, with the net to class members ranging from $100 to $170.

It is a real and certain benefit, versus the potential benefit that might have been achieved through trial – *if* a trial could have been reached, a verdict won, and an appeal successfully completed, all before a GM bankruptcy – and *if* statute of limitations issues, or the inability to prove a purchase, had not prevented a recovery for what could have been a substantial portion of the class.

It is a result that has a realistic chance of surviving, even if GM does declare bankruptcy. Even if GM were to declare bankruptcy, it will still want to sell cars, a bankruptcy court will want it to do so, and the settlement, with its rebate certificates toward the purchase of a GM vehicle, would serve that goal. A cash award at trial, by contrast, or the promise of a cash payment in a settlement, would likely not have survived a GM bankruptcy, or at least not in anything more than a fraction of its amount.

31

Is the settlement a compromise against a dollar award, because it is a rebate certificate rather than cash? Yes, of course, but a settlement is by definition a compromise. In return for avoiding the risk of getting nothing by holding out for a cash award at a trial, the class has obtained the certainty of the benefit that GM has agreed to extend. It is a benefit that, even though in the first instance is a certificate, can also be transferred into cash, through sale by a class member, as the settlement agreement provides.

### 4. The magnitude, complexity and uniqueness of the litigation.

As described above, in detail that need not be repeated, this was anything but a simple case. It was unique, complex and protracted, substantially so, under any definition of those terms.

### 5. The fee was contingent on success.

Class counsel took this case on a contingency basis, and have prosecuted it for nine years, at a considerable investment of time (6,285 hours as of this writing) and money ($437,416.92). Having achieved a settlement with value to class members, counsel deserve to be fairly compensated for the risk they took and the investment they made.

### F. The requested attorneys' fees are reasonable under the accepted tests for fees in class actions.

There are two basic methods of calculating attorneys' fees in class actions: (1) the percent-of-the-fund approach, which is generally favored in cases involving a

common fund; and (2) the lodestar approach. *See In re Rite Aid Corp. Sec. Litig.,*

396 F.3d 294, 300 (3d Cir. 2005); *In re Prudential Ins. Co. of Am. Sales Practice*

*Litig. Agent Actions,* 148 F.3d 283, 333 (3d Cir. 1998).

     The percentage approach is self-explanatory, and is customarily in the range

of 25% to one-third of the settlement value. The lodestar approach takes the hours

reasonably spent on the litigation and multiplies them by the hourly rates charged,

yielding an amount that the court in its discretion may supplement by adding a

"multiplier," if it believes it appropriate, in consideration of: (1) the risk of bringing

the action, including the risk of taking the case on a contingency basis; (2) the result

obtained in the action; (3) the attorneys' contribution to a prompt or delayed

resolution of the action; and (4) the delay in receiving attorneys' fees. *See Milkman*

*II,* 2002 WL 778272, at *26-27.

     The lodestar and multiplier approach is generally applied in a fee-shifting

case or when the nature of the recovery does not readily allow a determination of

the settlement value, into which category this case could be said to fall. The

lodestar approach was used and approved in the certificate-like settlement in

*Milkman II. See id.* at *7.

     In a lodestar approach, to compensate for the delay in payment to counsel,

the courts allow the use of "current" rates for all hours worked in the case, or the

adjustment of "historic" rates (i.e., the rates in effect at various times throughout

the years of the case) to reflect their present value, often through using interest.

*See Missouri v. Jenkins,* 491 U.S. 274, 281-84 (1989); *Savoie v. Merchants Bank,* 166

F.3d 456, 464 (2d Cir. 1999); *Fischel v. Equitable Life Assurance Society of the United States,* 307 F.3d 997, 1010 (9th Cir. 2002); *In re Washington Public Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1305 (9th Cir. 1994); *Gottlieb v. Barry,* 43 F.3d 474, 490 (10th Cir. 1994)

Class counsel conducts a national class action practice, litigating cases in state and federal courts throughout the United States. *See* Exhibit 17, Roda Affidavit. As noted above, class actions are a highly specialized area of the law, and courts throughout the country have recognized favorably the work of class counsel's firm in class actions, have regularly appointed attorneys from that firm to leadership roles in class actions, and have awarded the firm fees based on rates comparable to those charged by firms throughout the country doing similar work.

As noted below, however, the fee that class counsel seeks in this case is substantially *below* what traditional approaches to fee awards might warrant.

According to a survey of nationwide billing rates reported by *The National Law Journal* in December 2008, rates for partners at leading firms across the nation range as high as $1,260, with rates above $700 not uncommon. *See* Exhibit 18. In the Philadelphia area, where class counsel litigate the greatest number of their cases, the reported rates for top partners are as high as $840, and average nearly $700. *See id.,* and Exhibit 19, a list of Philadelphia billing rates distilled from Exhibit 18. The blended rates used by class counsel in this action fall well within those parameters.

CI-00-04255

In this case, class counsel's annual lodestar at current rates is $2,089,738.00, divided as follows:

- 2000: $238,923.00
- 2001: $340,474.50
- 2002: $25,251.50
- 2003: $127,912.50
- 2004: $93,406.50
- 2005: $87,828.00
- 2006: $198,934.50
- 2007: $387,163.50
- 2008: $540,873.00
- 2009: $48,971.00

The blended hourly rate at current rates is $332 for all attorneys and paralegals who worked on the case. The "blended" rate is determined by dividing the firm's total lodestar by total hours worked on the case. The blended rate for attorneys, at current rates, is $457 and for paralegals is $135. The blended rate is an accepted, and in some cases preferred, approach for the courts in evaluating attorney fees. *See In re AT&T Corp.,* 455 F.3d 160, 164 n.3 (3d Cir. 2006); *In re Rite-Aid,* 396 F.3d at 306.

At historic rates, class counsel's annual lodestar is $1,687,858.75, divided as follows:

35

CI-00-04255

- 2000: $136,714.00

- 2001: $217,431.25

- 2002: $15,990.00

- 2003: $81,000.00

- 2004: $74,205.00

- 2005: $74,358.50

- 2006: $168,885.50

- 2007: $351,788.50

- 2008: $518,515.00

- 2009: $48,971.00

The blended hourly rate at historic hourly rates for all attorneys and paralegals is $269.

In this case, GM has agreed to pay class counsel up to $1.886 million, based on what class counsel's total lodestar was, at current rates, prior to the mediation conference. That amount included no multiplier or enhancement, even though, as noted above, it would have been within the discretion of the Court to award such if it thought it appropriate, under the four *Milkman II* factors listed above.

Notwithstanding what GM has agreed to pay, and what established jurisprudence would allow, class counsel does not request a multiplier, or even its full lodestar at current rates, for the long delay in obtaining payment for professional services rendered many years ago. Rather, class counsel believe it appropriate, under current economic circumstances, to reduce their requested fee to

36

CI-00-04255

the amount of their historic lodestar – $1,687,858.75, a reduction of $200,000 from

what it could reasonably request and what GM has agreed to pay.

As noted above, only one of the 750,000 class members has objected to the

attorneys' fees. This objection suggests that attorneys' fees should be based on a

percentage of the settlement fund, equivalent to only the value of the coupons that

are redeemed, *see* Exhibit 8 at 4, the objection rests on an inaccurate reading of a

single, unpublished case from a federal district court in New York. First, the

opinion cited says only that the trend in the federal Second Circuit is toward the

percentage method of awarding fees. *See In re Excess Value Ins. Coverage Litig.*,

No. M-21-84 (RMB) (MDL–1339), 2005 WL 6242849, at *4 (S.D.N.Y. Nov. 3, 2005).

This case is not in the Second Circuit.

Second, the federal court in that case was bound by the federal Class Action

Fairness Act ("CAFA"), which applies only to cases in federal court, and which says

that if a proposed settlement provides for a recovery of coupons to class members,

the portion of the fee award that is attributable to the award of the coupons shall be

based on the value of coupons redeemed. *See id.* (citing 28 U.S.C. § 1712(a)).

CAFA does not apply in Pennsylvania state court, nor does any Pennsylvania

state court opinion available on Westlaw mention it. At least one Pennsylvania

state court has suggested the opposite of CAFA, noting that the value of a class

action settlement should not be determined by the cost to the defendant because the

option of participating in the settlement is available to all class members, and if

37

there is a low level of participation, that is attributable to an individual's choice not to participate. *See Milkman II,* 2002 WL 778272, at *6.

Third, the provision cited by the objector is not the only one that could apply, even if the CAFA were used. The provision that follows, at 28 U.S.C. § 1712(b)(1), provides that if a proposed settlement provides for a recovery of certificates to class members, and a portion of the recovery of the coupon is not used to determine the fee to be paid, the fee shall be based on the amount of time class counsel reasonably spent working on the action (i.e., the lodestar method). At least two courts have relied on this provision in applying the lodestar method to award fees in cases providing certificate-like benefits. *See Fleury v. Richemont N. Am., Inc.,* No. C-05-4525 EMC, 2008 WL 3287154, at *3 (N.D. Cal. Aug. 6, 2008); *Perez v. Asurion Corp.,* No. 06-20734-CIV, 2007 WL 2591180, at *1-2 (S.D. Fla. Aug. 8, 2007).

As a cross-check on the reasonableness of Plaintiff's fee requested, the fee requested represents only about 1% of the potential settlement fund available to the class (between $140 million and $160 million, i.e., 700,000 to $800,000 claims at $200 each).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant final approval to the proposed settlement, and award the requested payment to the Class Representative and the requested fees and costs to class counsel.

CI-00-04255

Respectfully submitted,

JOSEPH F. RODA
Atty. I.D. No. 20615

MICHELE S. BURKHOLDER
Atty. I.D. No. 78063

RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000

*Attorneys for Plaintiff*

DATED:  April 23, 2009

39

CI-00-04255

## CERTIFICATE OF SERVICE

I hereby certify that I am this day causing the foregoing document to be

served upon the persons and in the manner indicated below:

Service in person as follows:

The Honorable Louis J. Farina (717) 295-3525
Lancaster County Courthouse
50 North Duke Street
Lancaster, Pennsylvania 17602
    (Assigned Judge)

Christopher S. Underhill, Esquire (717) 299-7254
Hartman Underhill & Brubaker, LLP
221 East Chestnut Street
Lancaster, Pennsylvania 17602
    (Counsel for Defendant General Motors Corporation)

Service by UPS overnight delivery:
Jeffrey A. Lipps, Esquire (614) 365-4100
Carpenter & Lipps LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
    (Counsel for Defendant General Motors Corporation)

JOSEPH F. RODA

DATED: April 23, 2009