**Hearing Date and Time:  August 6, 2010 at 9:45 a.m.**
**Cross-Motion Reply Deadline:  August 2, 2010 at 4:00 p.m.**

BINGHAM McCUTCHEN LLP

399 Park Avenue

New York, New York 10022

Telephone:  (212) 705-7000

Facsimile:  (212) 752-5378

Robert M. Dombroff

Jeffrey S. Sabin

Jared R. Clark

Attorneys for Deutsche Bank AG

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ───────────────────────X | | |
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.,* | : | Case No. 09-50026 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| ───────────────────────X | | |

**DEUTSCHE BANK AG'S REPLY IN FURTHER SUPPORT OF THE MOTION FOR
RELIEF FROM AUTOMATIC STAY TO EFFECT SETOFF AND OBJECTION TO
<u>DEBTORS' CROSS-MOTION FOR IMMEDIATE PAYMENT</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

RESPONSE TO OBJECTION AND CROSS-MOTION ............................................ 4

I.    Deutsche Bank's Obligations Under the Swap Agreements Are Pre-Petition ................... 4

    A.    Deutsche Bank's Termination Notice is Not a "Transaction" .............................. 6

    B.    The "Notice of Termination" Did Not Give Rise to Deutsche Bank's Liability to GM, the Swap Transactions Did ......................................................... 8

    C.    A Counterparty's Discretion as to Whether to Terminate a Contract Does Not Convert an Obligation from Pre-Petition to Post-Petition ............................ 9

    D.    The Swap Transactions Were Valid and Enforceable Debts as of the Petition Date .......................................................................................................... 10

II.    The Swap Agreements Are Unambiguous and Provide the Non-Defaulting Party with a Broad Setoff Right ............................................................................................. 12

III.    The GM Indenture's "No Action" Clause Does Not Apply to Deutsche Bank's Setoff Motion and Setoff Should Be Permitted Now....................................................... 14

    A.    Deutsche Bank Does Not Seek to Enforce Rights Under the GM Indenture ...... 14

    B.    Even If Deutsche Bank Did Seek to Enforce Rights Under the GM Indenture, the "No Action" Clause Has Expired ................................................ 16

    C.    Permitting Setoff Now Advances the Strong Policy in Favor of Setoff .............. 17

    D.    Even Should the Court Deny Setoff at this Time, GM Would Have No Right to Destroy Deutsche Bank's Status as a Secured Creditor ....................... 18

    E.    GM Has Shown No Reason to Treat the Euro Bonds Differently Than Other Unsecured Debt, and Setoff Should be Permitted Accordingly ................. 19

IV.    Deutsche Bank Has Sufficiently Evidenced its Bond Holdings .................................... 20

V.    GM's Cross-Motion Requesting Deutsche Bank to Pay $24,040,404 Under the Master Agreement Should Be Denied .......................................................................... 20

CONCLUSION ........................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bohack Corp. v. Borden, Inc.*,
559 F.2d 1160 (2d Cir. 1979) ................................................................................................ 7

*Boston Ins. Co. v. Nogg (In re Yale Express Sys., Inc.)*,
362 F.2d 111 (2d Cir. 1966) ................................................................................................ 18

*Braniff Airways, Inc. v. Exxon Co.*,
814 F.2d 1030 (5th Cir. 1987) .............................................................................................. 4

*Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*,
727 F.2d 1017 (11th Cir. 1984) .......................................................................................... 19

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995) ............................................................................................................... 18

*Contrarian Funds LLC v. Aretex LLC, et al. (In re WestPoint Stevens, Inc.)*,
600 F.3d 231 (2d Cir. 2010) ............................................................................................... 19

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983), *remanded to* 744 F.2d 237 (2d Cir. 1984) ......................................... 20

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992) *remanded to* No. 87-cv-973, 1993 WL 481395
(N.D.N.Y. Nov. 18, 1993) .................................................................................................. 14

*In re Bennett Funding Group, Inc.*,
146 F.3d 136 (2d Cir. 1998) ............................................................................................... 17

*In re Bennett Funding Group, Inc.*,
212 B.R. 206 (2d Cir. BAP 1997), *aff'd* 146 F.3d 136 (2d Cir. 1998) ........................... 17-18

*In re Bennett Funding Group, Inc.*,
255 B.R. 616 (Bankr. N.D.N.Y. 2000) ............................................................................... 19

*In re BOUSA, Inc.*,
No. 89-B-13380, 2006 WL 2864964 (Bankr. S.D.N.Y. Sept. 29, 2006) .................. 6, 7, 8, 10

*In re Delta Airlines*,
341 B.R. 439 (Bankr. S.D.N.Y. 2006) ................................................................................ 11

*In re Genuity, Inc.*,
323 B.R. 79 (Bankr. S.D.N.Y. 2005) ........................................................................ 11, 17, 18

*In re Lehman Brothers Holdings, Inc.*,
  404 B.R. 752 (Bankr. S.D.N.Y. 2009) ...............................................................6, 7, 8, 9, 10

*In re Quigley Co., Inc.*,
  383 B.R. 19 (Bankr. S.D.N.Y. 2008) ................................................................................ 9

*In re Sauer*,
  223 B.R. 715 (Bankr. D.N.D. 1998)........................................................................6, 7, 8, 10

*In re Young Broadcasting Inc.*,
  No. 09-B-10645, 2010 WL 1544401 (Bankr. S.D.N.Y. Apr. 19, 2010)........................... 14

*Jackson Nat'l Life Ins. Co. v. Ladish Co., Inc.*,
  No. 92 Civ. 9358, 1993 WL 43373 (S.D.N.Y. Feb. 18, 1993) .....................................16, 17

*Koninklijke Philips Electronics N.V. v. Cinram Intern. Inc.*,
  603 F. Supp. 2d 735 (S.D.N.Y. 2009) ............................................................................ 14

*LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*,
  53 F.3d 478 (2d Cir.), *cert. denied sub nom.*, 516 U.S. 913 (1995) .................................... 12

*Marta Group, Inc. v. County Appliance Co.*,
  79 B.R. 200 (E.D. Pa. 1987) .......................................................................................... 12

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  859 F. Supp. 743 (S.D.N.Y. 1994), *aff'd in part, rev'd in part*,
  65 F.3d 1044 (2d Cir. 1995), *cert. denied*, 517 U.S. 1190 (1996)..................................16, 17

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990)........................................................................................... 13

*Moore v. United States Dept. of Housing and Urban Dev. (In re Moore)*,
  350 B.R. 650 (Bankr. W.D. Va. 2006) ........................................................................... 8, 9

*Myers v. Myers (In re Myers)*,
  362 F.3d 667 (10th Cir. 2004)......................................................................................... 12

*Official Comm. Of Unsecured Creditors, on behalf of the Estate of
  Labrum & Doak (In re Labrum & Doak, LLP)*,
  237 B.R. 275 (Bankr. E.D. Pa. 1999).............................................................................. 12

*Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods. Corp.)*,
  209 F.3d 125 (2d Cir. 2000)............................................................................................. 4

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)............................................................................................ 13

*Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods. Corp.)*,
 225 B.R. 862 (Bankr. S.D.N.Y. 1998),
 *aff'd*, 209 F.3d 125 (2d. Cir. 2000) ................................................................. 12

*Ross-Viking Merch. Corp. v. Am. Cyamid Co., Lederle Div.*
 *(In re Ross-Viking Merch. Corp.)*, 151 B.R. 71 (Bankr. S.D.N.Y. 1993) ............................ 16

*Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.)*,
 893 F. 2d 720 (5th Cir. 1990) ........................................................................ 10-11

*Stair v. Hamilton Bank of Morristown (In re Morristown Lincoln-Mercury, Inc.)*,
 42 B.R. 413 (Bankr. E.D. Tenn. 1984) ............................................................... 4

*United States v. Gerth*,
 991 F.2d 1428 (8th Cir. 1993) ................................................................. 4, 7, 10

*United States v. Gore (In re Gore)*,
 124 B.R. 75 (Bankr. E.D. Ark. 1990) ............................................................ 9, 10

*United States v. Maxwell*,
 157 F.3d 1099 (7th Cir. 1998) ........................................................................ 18

*Watson v. Parker (In re Parker)*,
 313 F.3d 1267 (10th Cir. 2002) ....................................................................... 4

*Winter v. Glaze (In re Glaze,)*
 169 B.R. 956 (Bankr. D. Ariz. 1994) .............................................................. 20

*Westinghouse Credit Corp. v. D'Urso*,
 278 F.3d 138 (2d Cir. 2002), *on subsequent appeal*,
 371 F.3d 96 (2d Cir. 2004) ........................................................................ 15-16

## STATUTES

11 U.S.C. § 363(e) .................................................................................... 19

11 U.S.C. § 506(a)(1) ................................................................................ 18

11 U.S.C. § 560 ................................................................................... 5, 6

11 U.S.C. § 362(d)(1) ................................................................................. 1

11 U.S.C. § 362(d)(2) ................................................................................. 1

11 U.S.C. § 553 ................................................................................ 11, 18

11 U.S.C. § 558 ................................................................................... 11

**OTHER AUTHORITIES**

5 Collier on Bankruptcy ¶ 553.01[1] (16th ed. 2009) .......................................................... 4-5, 9

Deutsche Bank AG ("**Deutsche Bank**"), by and through its undersigned attorneys,

respectfully submits this response (the "**Response**") in opposition to the *Debtors' Objection to*

*Deutsche Bank AG's Motion for Relief from Automatic Stay to Effect Setoff and Cross-Motion*

*for Immediate Payment* [Doc. No. 6067] (the "**Objection**"), and in further support of its Motion

for Relief from Automatic Stay to Effect Setoff [Doc. No. 4529] (the "**Motion**"), as follows:[1]

## PRELIMINARY STATEMENT

1.      Deutsche Bank has a $24 million claim against General Motors Corporation

("**GM**") on certain GM bonds (the "**GM Bonds**") secured by a $24 million obligation owed to

GM pursuant to two swap agreements (the "**Swap Agreements**").  Because these mutual

obligations meet the standards for setoff under sections 362(d)(1) and (2) of the Bankruptcy

Code, Deutsche Bank moved for relief from the automatic stay to effectuate setoff and conclude

the matter.

2.      By the Objection, GM advances three unavailing arguments in an attempt to defeat

Deutsche Bank's Motion and strip Deutsche Bank of its rights as a secured creditor.  As

explained more fully below, none of GM's arguments can defeat Deutsche Bank's right to setoff

because:

- Contrary to GM's novel assertion, under well-settled law the claim and obligations at issue are both pre-petition;

- The Swap Agreements are unambiguous and provide broad setoff rights to Deutsche Bank as the non-defaulting party;

- Deutsche Bank's setoff rights are unaffected by a purported "no action" clause in the Indenture (the "**GM Indenture**") governing the issuance of certain of the GM Bonds; and

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion or the Objection, as applicable.

- There can be no credible dispute that Deutsche Bank holds the GM Bonds.

**Deutsche Bank Owes GM a Pre-Petition Debt**

3.      GM argues that the claim and obligations at issue here lack mutuality because Deutsche Bank's post-petition termination of the swaps allegedly converted the resulting payment obligations by Deutsche Bank into post-petition obligations.  Not so.  Black letter law holds that where, as here, a party incurs an obligation prior to the petition date, the obligation is pre-petition in nature, regardless of whether as of the petition date the obligation remains contingent on a post-petition event.  Were the Court to adopt GM's proposed rule, all debtors would owe each "in the money" swap counterparty administrative claims upon the post-petition termination of the swaps, provided those counterparties promptly terminated the swaps (as they certainly would).

4.      GM contends that this need not be so, and suggests that the Court could find "in the money" (to a creditor) swaps to be pre-petition, while holding all "out of the money" swaps to be post-petition, even where both swaps were terminated by notices given by the counterparty post-petition, thereby creating a situation where a debtor can "have its cake and eat it too."  The authority cited by GM does not support this unfair and illogical result.

**The Swap Agreements Are Unambiguous and Do Not Limit the Types
of Obligations that Can Be Offset by a Non-Defaulting Party**

5.      GM argues that the language in the Swap Agreements that specifically allows setoff "makes no sense" unless additional terms are read into the provision.  Objection ¶ 4.  This is wishful thinking on GM's part.  The most logical reading of the provision is the very one Deutsche Bank advances:  all obligations owed by the defaulting party can be netted against any amounts owed under the swaps by the non-defaulting party.  Moreover, basic rules of contract interpretation teach that a contract reading that makes sense prevails over one that does not.  GM's attempt to create ambiguity therefore fails.

-2-

**The GM Indenture's "No Action" Clause Does Not Apply**

6.      GM argues that the GM Indenture's "no action" clause applies here.  It does not.

Deutsche Bank does not seek to enforce rights under the GM Indenture, it seeks to enforce setoff

rights under the Swap Agreements.  Consequently, GM's argument based on the language of the

GM Indenture is a red herring.  The setoff rights under the Swap Agreements provide that

payment obligations under the swaps can be reduced by amounts owed by the defaulting party,

"whether or not then due."  These setoff rights certainly have not been reserved to the trustee

under the GM Indenture -- indeed they could not be, since an indenture trustee holds the bonds in

a representative capacity, not as a beneficial holder.  So effectively, GM is asking this Court to

strip all bondholders of their setoff rights arising under separate contracts with debtors.  This

radical result would squarely contradict the presumption in favor of setoff, and because GM has

cited no authority whatsoever in support of this proposed rule, it should be rejected.[2]

7.      Even assuming the "no action" clause somehow did preclude setoff now (and it

does not), setoff would simply be postponed until the GM Bonds mature -- GM still would have

no right to destroy Deutsche Bank's security interest.

**Deutsche Bank Holds the GM Bonds**

8.      Deutsche Bank has provided sufficient evidence of its bond holdings, and has also

supplied GM with all of the informal discovery GM sought.  Even so, Deutsche Bank will readily

supplement the proof of its bond holdings if the Court so requires.

9.      Because all of GM's arguments fail to overcome this Circuit's strong policy in

favor of permitting setoff, where, as here, the appropriate showing has been made, Deutsche

---

[2]      As explained more fully below, even if Deutsche Bank did seek to enforce rights under the GM Indenture,
it could do so, because the relevant bonds have already been accelerated.

Bank's Motion should be granted, and GM's cross-motion for payment of the swap obligations should be denied.

## RESPONSE TO OBJECTION AND CROSS-MOTION

I.    **Deutsche Bank's Obligations Under the Swap Agreements
      Are Pre-Petition.**

10.    In an unsuccessful attempt to manufacture grounds to defeat the setoff right that Deutsche Bank demonstrated in the Motion, GM first argues that the claim and obligations at issue lack mutuality because Deutsche Bank's obligations under the Swap Agreements should for some reason be considered post-petition.  To the contrary, black-letter law holds that pre-petition contract obligations give rise to pre-petition claims, even where those claims remain contingent on a subsequent event as of the petition date.  *See, e.g., Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.)*, 209 F.3d 125, 128-30 (2d Cir. 2000) (pre-petition indemnification agreement created pre-petition obligation notwithstanding contingency triggering indemnification had not occurred as of petition date); *Watson v. Parker (In re Parker)*, 313 F.3d 1267, 1270 (10th Cir. 2002) (claim arises when underlying conduct occurred, not when cause of action accrued), *cert. denied*, 540 U.S. 965 (2003); *United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir. 1993) (dependence on a post-petition event does not prevent a debt from arising pre-petition); *Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1036 (5th Cir. 1987) ("The character of a claim is not transformed from pre-petition to post-petition simply because it is contingent, unliquidated, or unmatured when the debtor's petition is filed" (quoting *Stair v. Hamilton Bank of Morristown (In re Morristown Lincoln-Mercury, Inc.)*, 42 B.R. 413, 418 (Bankr. E.D. Tenn. 1984))); *see also* 5 Collier on Bankruptcy ¶ 553.01[1] (16th ed. 2009) ("[T]he general rule is that an obligation is considered to have arisen before the commencement of

the case if the obligation was incurred before the petition date, regardless of whether the

obligation becomes due, fixed or liquidated after the petition date.").

11.     GM concedes that the parties negotiated and entered into the Swap Agreements

years before the petition date.  All elements necessary for liability were in place long ago.  The

only contingent event remaining upon the filing of GM's petition was how the Swap Agreements

would terminate.  Deutsche Bank terminated them on the petition date.

12.     Despite the weight of authority holding that obligations under pre-petition

contracts under these circumstances are pre-petition in nature, GM makes a surprising argument:

the post-petition election to terminate by a counterparty somehow converts an obligation on a

pre-petition swap agreement into a post-petition obligation -- but only when the counterparty

owes money on the swap!  Thus, according to GM:

(i)     if the swaps terminated automatically upon the bankruptcy filing:  a pre-petition

claim would have accrued (Objection ¶ 32);

(ii)    if GM had rejected the ISDA Master Agreement:  again, a pre-petition claim

would have accrued (Objection ¶ 49); and

(iii)   GM also suggests that if Deutsche Bank had terminated the swaps, but had been

owed money on them:  somehow still a pre-petition claim would have accrued.  *Id.*

13.     According to GM, only when a counterparty elects to terminate a swap post-

petition and that counterparty happens to ***owe a debtor*** money on the swap does termination

convert the obligation from pre-petition to post-petition.  Congress precluded such a rule when it

enacted the safe harbor provisions of Bankruptcy Code Section 560, including, among others,

protection for the right of a counterparty to terminate a swap agreement with a debtor post-

petition and exercise any contractual right to offset any amounts due under that agreement. *See, e.g.*, 11 U.S.C. § 560.[3]

14.     In an attempt to justify this impermissible rule, GM reprises essentially the same argument four times, in each case citing authority that, as shown below, either does not stand for the proposition asserted, or in fact supports Deutsche Bank's position.

**A.     Deutsche Bank's Termination Notice is Not a "Transaction."**

15.     GM argues that Deutsche Bank's election to terminate the swap transactions was itself a "transaction giving rise to liability." *See* Objection ¶¶ 29-59.  The election to terminate is not a "transaction" -- the swaps are transactions.  GM attempts to support its argument by relying upon *In re Lehman Brothers Holdings, Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009) ("***LBHI***"), *In re BOUSA, Inc.*, No. 89-B-13380, 2006 WL 2864964 (Bankr. S.D.N.Y. Sept. 29, 2006), and *In re Sauer*, 223 B.R. 715 (Bankr. D.N.D. 1998).  *See* Objection ¶ 35.  Such reliance is misplaced, as one case is totally distinguishable (it involved a post-petition transfer of funds) and the other two support Deutsche Bank's position, not GM's.

16.     In *LBHI*, a bank, DnB NOR, held a claim against LBHI under a revolving credit facility in an amount not less than the funds held in the LBHI account (a general deposit account LBHI had at DnB NOR).  *LBHI*, 404 B.R. at 755.  That case presented the question of whether certain funds were transferred on day 1 (pre-petition) or day 2 (post-petition), where the transfer instructions were received after 6:00 p.m. on day 1 and contained a value date of day 2.  *Id.* at 754-56.  The court held that the funds were transferred on day 2 (post-petition), and were

---

[3]     Section 560(a) of the Bankruptcy Code provides in pertinent part that "[t]he exercise of **any contractual right** . . . to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements **shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court** or administrative agency in any proceeding under this title."  11 U.S.C. § 560(a) (emphasis added).

therefore post-petition for purposes of setoff.  *Id*. at 758-61.  Those circumstances bear no

resemblance to those present here.

17.     GM cites *BOUSA* for the proposition that, "[f]or purposes of setoff, a debt arises

when all transactions necessary for liability have occurred."  Objection ¶ 35.  GM, however, omits

the full quote in *BOUSA,* which reads "[f]or purposes of setoff, a debt arises when all transactions

necessary for liability have occurred, **regardless of whether the claim was contingent when the**

**petition was filed**."  *BOUSA*, 2006 WL 2864964 at *3 (citing *Gerth*, 991 F.2d at 1433)

(emphasis added).  The *BOUSA* decision goes on to read "dependency on a postpetition event

does not prevent a debt from arising prepetition  . . . [a] debt can be absolutely owing prepetition

even though that debt would never have come into existence except for postpetition events."  *Id.*

at *3.  The *BOUSA* court held that the "debt to BOUSA is properly considered a prepetition

obligation, despite the fact that it did not become fixed until entry of a post-petition judgment"

because the act required for the liability to occur had been performed before the petition date.  *Id.*

In *BOUSA*, Judge Peck also recites the familiar rule that "[e]quity favors setoff and thus a

creditor's valid setoff right should not be disallowed 'unless compelling circumstances require it .

. . [t]he statutory remedy of setoff should be enforced unless the court finds after due reflection

that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as

a whole.'"  *Id*. at *9 (quoting *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir.

1979)).

18.     GM cites *Sauer*, 223 B.R. 715 (Bankr. D.N.D. 1998) as holding that "the crucial

factor, then, is simply 'whether the genesis of each debt was pre-petition, that is, whether the

events giving rise to the debt occurred before bankruptcy.'"  Objection ¶ 35.  In allowing setoff,

however, the court in *Sauer* also held that dependency on post-petition events does not prevent

debt from arising pre-petition for setoff purposes. *Sauer,* 223 B.R. at 725. And the *Sauer* court

goes on to explain that "it is not without significance that the statute preserves in eligible creditors

a *right of setoff.* The term 'right' connotes entitlement. Once a creditor in a reorganization case

has established the necessary preconditions to a right of setoff, his right should ordinarily be

enforced." *Id.* at 726 (emphasis in original). So *BOUSA* and *Sauer* both strongly support

Deutsche Bank's position that: (i) the swap obligations are clearly pre-petition notwithstanding

dependency on post-petition events; and (ii) setoff should be allowed accordingly.

> **B.      The "Notice of Termination" Did Not Give Rise to Deutsche
> Bank's Liability to GM, the Swap Transactions Did.**

19.      GM next contends that Deutsche Bank's notice of termination was an "act" that

gave rise to liability, and that Deutsche Bank's debt to GM and the amount of that debt both

resulted **exclusively** from the termination. Objection ¶¶ 38, 39. GM cites *LBHI, BOUSA* and

*Moore v. United States Dept. of Housing and Urban Dev.* (*In re Moore*), 350 B.R. 650 (Bankr.

W.D. Va. 2006) to support that argument. But clearly, Deutsche Bank's liability in fact arose

from the swap transactions as a whole, not solely from the termination. The cited authorities

accordingly provide no support for GM's argument.

20.      As previously noted, in *LBHI* the court found that a transfer of funds was

completed post-petition. *LBHI,* 404 B.R. at 758-62. Also as discussed above, in *BOUSA*, the

court found that all transactions necessary for liability **did** occur pre-petition, thereby allowing

setoff, despite the fact that the liability did not become fixed until after the petition date. *BOUSA*,

2006 WL 2864964 at *3.

21.      GM cites *Moore* as holding that "in the Fourth Circuit, courts are to apply the so-

called 'conduct test' to determine if the acts committed giving rise to the claim occurred pre-

petition." Objection ¶ 38. The conduct test focuses on whether the liability underlying the claim

arose from conduct that occurred primarily before the commencement of the debtor's bankruptcy

case.  If it did, the claim is considered pre-petition.  *See* 5 Collier on Bankruptcy 553.03[1][b][ii]

(16th ed. 2009).  While the conduct test is primarily used in the tort context (*see, e.g., In re*

*Quigley Co., Inc.*, 383 B.R. 19, 25-27 (Bankr. S.D.N.Y. 2008)), should the Court choose to

apply it, this test also would find Deutsche Bank's payment obligations under the Swap

Agreements -- negotiated and entered into years prior to the petition date  -- to be pre-petition

obligations.  Thus, the conduct test applied in *Moore* ultimately supports Deutsche Bank's

position as well.

### C.    A Counterparty's Discretion as to Whether to Terminate a Contract Does Not Convert an Obligation from Pre-Petition to Post-Petition.

22.    GM argues that if a debtor's counterparty retains discretion after the petition date

to decide whether to terminate a contract, the contract is classified as post-petition if the

counterparty terminates post-petition **and** the counterparty happens to owe the debtor money.

Objection ¶ 40 and ¶ 49.  GM cites *United States v. Gore  (In re Gore)*, 124 B.R. 75, 78 (Bankr.

E.D. Ark. 1990) and *LBHI*, 404 B.R. at 759-60, 762 to support its argument.  Objection ¶¶ 40,

41.  Here again, the authority GM cites does not support its position.

23.    *In re Gore* concerned a claim the court found to be based on an executory contract

that the debtors assumed post-petition, such that the post-petition payments under the executory

contract would accrue only as the debtor's obligations were performed.  *Gore*, 124 B.R. at 76-78.

The executory contract could be terminated post-petition if the debtor failed to perform under the

contract.  *Id.* at 77-78.  Because the debtor's right to receive future payments under the contract

was contingent on the debtor's continued post-petition performance under the contract, the

payments were not owed pre-petition, as they had yet to be earned, and therefore could not be set off against a pre-petition claim of the creditors.  *Id.* at 78.

24.     While there may be a split of authority on whether assumption of a contract changes the nature of a pre-petition contract,[4] that issue need not be reached here because GM did not assume the Swap Agreements, and no further performance by GM was required in order for payment obligations under them to arise.  Nor does *LBHI* support GM's contention.  As discussed above, that case concerned whether a transfer was received post-petition, regardless of any exercise of discretion.  Furthermore, the *BOUSA* and *Sauer* decisions relied upon by GM both allowed setoff despite the fact that the post-petition contingent event involved discretionary acts: in *BOUSA* the discretionary post-petition act was prosecution of litigation and in *Sauer* the discretionary act was compliance with the terms of certain pre-petition farming contracts.  *BOUSA*, 2006 WL 2864964 at *4; *Sauer,* 223 B.R. at 725 n.4.  Thus, GM's argument fails here as well.

> ### D.    The Swap Transactions Were Valid and Enforceable Debts as of the Petition Date.

25.     Finally, GM contends that Deutsche Bank's swap obligations were not valid and enforceable debts owing as of the petition date.  *See, e.g.,* Objection ¶ 43.  GM is wrong.  Indeed, GM ignores settled case law holding that a debt can be absolutely owing pre-petition even though that debt would never have come into existence except for post-petition events.  *See, e.g., Gerth*, 991 F.2d at 1433-34  (citing *Sherman v. First City Bank of Dallas (In re United Sciences of Am.,*

---

[4]      For example, in *Gerth* -- a decision GM cites repeatedly in the Objection -- the 8th Circuit disagreed with *Gore*, stating "[*Gore*] found that when a debtor-in-possession assumes an executory contract, it becomes a post-petition contract . . . . [w]e agree with *Mattieson* and the cases which follow it, and hold that mere assumption of an executory contract does not alter when the obligations under the contract arose."  *Gerth,* 991 F.2d at 1430-31 (internal citations omitted).

*Inc.),* 893 F.2d 720, 724 (5th Cir. 1990)).  And again, the cases cited by GM are all clearly

distinguishable.

26.        GM relies on *In re Genuity, Inc.*, 323 B.R. 79 (Bankr. S.D.N.Y. 2005), which

concerned a request by the debtors to offset pre-petition security deposits against post-petition

cure obligations, a request the court denied.  *Genuity*, 323 B.R. at 80-82.  The *Genuity* debtors

argued that their post-petition outstanding cure obligations were governed by Bankruptcy Code

§ 558, and that the limitation placed on the mutuality of obligations under Bankruptcy Code § 553

should not apply where a debtor seeks the setoff.  *Id.* at 83.  That situation is clearly inapplicable

here, where no cure payments are proposed to be offset.

27.        GM's reliance on *In re Delta Airlines*, 341 B.R. 439 (Bankr. S.D.N.Y. 2006) is

similarly misplaced.  In *Delta*, the court rejected a motion for setoff for two reasons.  First, the

court found that "credits" (which did not include any monetary funds changing hands and were

not permitted to be used for setoff purposes in the agreements between the parties) were not

"debt" for purposes of setoff where the debtor-airline was entitled to "credits" against its

obligation for rent under its lease during the next business year only if the airport operated at a

profit.  *Delta,* 341 B.R. at 450.  Second, the court found that even assuming the "credits" to

which the debtor-airline was entitled could be regarded as debt owing from the airport authority

to the debtor-airline, it was a debt which arose only post-petition, at the conclusion of the

airport's business year, when determination could be made as to whether the airport had operated

at a profit.  *Id.*

28.        Here, Deutsche Bank's obligation is not in "credits," but in monetary funds, as is

GM's pre-petition claim, nor was Deutsche Bank's debt contingent upon a determination of

profitability (or anything else) that could not be made on the petition date.  To the contrary, the

-11-

final contingency necessary to Deutsche Bank's payment obligation becoming fixed occurred

when Deutsche Bank terminated the swaps on the petition date and Deutsche Bank has computed

the payment obligations as of that date.[5]

29.     At this point, GM has gone so far as to argue that valid, binding pre-petition swap

contracts somehow are not valid and enforceable obligations as of the petition date.  Surely GM

cannot really intend for this to be the rule, since it would preclude GM from collecting on swap

contracts where it is owed money, so long as the counterparty terminates prior to assumption of

the contract at issue.  GM **again** has cited no authority that actually supports its argument, which

fails in the face of the well-settled law holding that a pre-petition contract yields a pre-petition

claim.  *See, e.g., Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods. Corp.)*, 225

B.R. 862, 866 (Bankr. S.D.N.Y. 1998) ("[A] claim will be deemed pre-petition when it arises out

of a relationship recognized in, for example, the law of contracts…" (quoting *LTV Steel Co., Inc.*

*v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir.), *cert. denied sub nom.*, 516 U.S.

913 (1995)), *aff'd*, 209 F.3d 125 (2d. Cir. 2000).

**II.     The Swap Agreements Are Unambiguous and Provide the Non-
Defaulting Party with a Broad Setoff Right.**

30.     The Schedule to the ISDA Master Agreement does not limit the kinds of debt

Deutsche Bank, as the non-defaulting party, can offset against obligations it owes under the Swap

Agreements.  The Schedule reads:

---

[5]       The remaining authorities GM cites for support are even less persuasive.  *See, e.g., Myers v. Myers (In re Myers)*, 362 F.3d 667, 673 (10th Cir. 2004) (no pre-petition debt owing for setoff purposes at time debtors filed their *second* bankruptcy petition because contract at issue terminated upon debtor filing its *first* bankruptcy petition); *Official Comm. Of Unsecured Creditors, on Behalf of the Estate of Labrum & Doak v. Bechtle, et al. ( In re Labrum & Doak, LLP)*, 237 B.R. 275, 299-300 (Bankr. E.D. Pa. 1999) (former law firm partners' debt to debtor law firm was not owing until at least the administrator's post-petition filing of deficiency proceedings seeking to hold partners jointly and severally liable for deficiencies in debtor's estate); *Marta Group, Inc. v. County Appliance Co.*, 79 B.R. 200, 203 (Bankr. E.D. Pa. 1987) (no mutuality where creditor's rights were subordinate to

> Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim, except that each party to this Agreement (such party, "Party X") agrees that, upon an Early Termination Date resulting from an Event of Default or a Credit Event Upon Merger with respect to Party X the other party hereto (such other party, the "Non-Defaulting Party" or the "Non-Affected Party", as the case may be) may reduce any or all amounts owing to Party X under this Agreement or any other transactions between Party X and the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party (whether or not then due) by setting off against such amounts any or all amounts to the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party by Party X (whether or not then due).

Tilove Decl., Ex. B., Part 5, ¶ 1.

31.     In its Objection, GM inserts empty brackets between the words "amounts" and "to" in the third-to-last line (as written above) and argues that the Schedule "makes no sense" unless additional words are inserted.  Objection ¶¶ 4, 21.  In order even to present evidence on this point (which GM does not), GM would need to show that the Schedule is ambiguous, because absent such a showing, the terms of the contract as written govern.  *See, e.g., Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable."); *see also PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir. 1996) (intent of the subscribing parties governs, words and phrases are given their plain meaning and the contract is construed so as to give full meaning and effect to all of its provisions).

---

the general creditors' rights under Pennsylvania statutory law and setoff would be inconsistent with statutory scheme).

32.      Deutsche Bank submits that the Schedule means that any amounts owed by the

non-defaulting party under the swaps can be offset against any and all amounts owed by the

defaulting party, without limitation.  This makes sense.  And under New York law, contracts are

interpreted so that they make sense.  *Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.*, 603 F.

Supp. 2d 735, 739 (S.D.N.Y. 2009) ("The presumption in commercial contracts is that the parties

were trying to accomplish something rational . . . . [c]ommon sense is as much a part of contract

interpretation as is the dictionary or the arsenal of canons.") (citations omitted); *see also Galli v.*

*Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract

that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred

and will be avoided if possible.") (citation omitted), *remanded to* No. 87-cv-973, 1993 WL

481395 (N.D.N.Y. Nov. 18, 1993); *In re Young Broadcasting Inc.*, No. 09-B-10645, 2010 WL

1544401, at *9 (Bankr. S.D.N.Y. Apr. 19, 2010) ("[T]he terms of the contract are considered in

the context of the obligation as a whole and the intention of the parties as shown by the words

selected.  A court must discern 'a sensible meaning' for the words selected.") (internal citations

omitted).

33.      Accordingly, GM's attempt to insert new terms into the Swap Agreements fails.[6]

## III.    The GM Indenture's "No Action" Clause Does Not Apply to Deutsche Bank's Setoff Motion and Setoff Should Be Permitted Now.

### A.      Deutsche Bank Does Not Seek to Enforce Rights Under the GM Indenture.

34.      GM and Wilmington Trust Company as indenture trustee under the GM Indenture

argue that the GM Bonds were issued pursuant to an indenture that contains a "no action" clause,

---

[6]      Even if GM succeeded in showing ambiguity here -- and it cannot -- GM cannot prevail on its cross-motion because GM has made no admissible showing as to the parties' intentions.  The parties would need in that case to agree on a discovery schedule with an evidentiary hearing date to take place in the future.

and that clause prevents Deutsche Bank from exercising a right to setoff its pre-petition debts to

GM against GM's pre-petition debts to Deutsche Bank.[7]  The "no action" clause provides:

> no one or more Holders of Securities or coupons appertaining to
> such Securities shall have any right in any manner whatever by
> virtue of or by availing himself of **any provision of this indenture**
> to affect, disturb or prejudice the rights of any other Holder of
> Securities or coupons appertaining to such Securities, or to obtain
> or seek to obtain priority over or preference to any other such
> Holder or to enforce any right under this Indenture, except in the
> manner herein provided and for the equal, ratable and common
> benefit of all Holders of Securities and coupons.

GM Indenture at § 6.04 (emphasis added).

35.    As the language in bold above indicates, the "no action" clause pertains only to

rights arising from provisions of the GM Indenture.  Contrary to GM's assertion, Deutsche Bank

does not seek to avail itself of any rights under the GM Indenture -- the setoff rights arise under

the Swap Agreements, and under statutory and common law.  While GM concedes that the

dollar-denominated bonds have been accelerated (Objection ¶¶ 12, 67), acceleration is not

necessary to Deutsche Bank's setoff right, because the Swap Agreements expressly provide that

the non-defaulting party can setoff its debts against obligations owed to it by the defaulting party

"whether or not then due."  Tilove Decl., Ex. B, Part 5(1).

36.    Nor could Deutsche Bank's setoff rights be construed as rights reserved to the

indenture trustee under the GM Indenture, because a trustee stands in a different capacity than a

beneficial holder, and so cannot exercise setoff rights with respect to the holder's interest.  *See,*

*e.g., Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149-50 (2d Cir. 2002), *on subsequent*

*appeal*, 371 F.3d 96 (2d Cir. 2004); *Ross-Viking Merch. Corp. v. Am. Cynamid Co., Lederle Div.*

---

[7]    The Indenture Trustee filed a Limited Joinder of Wilmington Trust Company as Indenture Trustee to
Debtors' Objection to Deutsche Bank AG's Motion for Relief From Automatic Stay to Effect Setoff and Cross-
Motion for Immediate Payment on June 25, 2010 [Doc. No. 6129].

(*In re Ross-Viking Merch. Corp.*), 151 B.R. 71, 74 (Bankr. S.D.N.Y. 1993).  Because the

indenture trustee cannot exercise the setoff rights of bondholders, GM effectively espouses a rule

that would strip all bondholders of setoff rights.  GM has cited no authority for this unwarranted

result.

> **B.    Even If Deutsche Bank Did Seek to Enforce Rights Under the
> GM Indenture, the "No Action" Clause Has Expired.**

37.    Even were Deutsche Bank seeking to pursue rights under the GM Indenture

(which it is not), the "no action" clause should not apply, because the indenture contains the

following exception:

> **Notwithstanding any other provisions in this Indenture,**
> however, the right of any holder of any Security to receive payment
> of the principal of (and premium, if any) and interest, if any, . . . on
> such Security or coupon, on or after the respective due dates
> expressed in such Security or coupon shall not be impaired or
> affected without the consent of such Holder.

Objection ¶ 65 (emphasis added).

38.    The bonds under the GM Indenture have already been accelerated by the indenture

trustee.  Objection ¶¶ 12, 67.  Accordingly, the bonds are now due and bondholders should be

able to enforce their rights under the GM Indenture.  GM relies upon two cases for the

proposition that an accelerated due date does not count for purposes of determining when

bondholders cease to be bound by a "no action" clause: *McMahan & Co. v. Wherehouse Entm't,*

*Inc.*, 859 F. Supp. 743 (S.D.N.Y. 1994), *aff'd in part and rev'd in part*, 65 F.3d 1044 (2d Cir.

1995), *cert. denied*, 517 U.S. 1190 (1996) and *Jackson Nat'l Life Ins. Co. v. Ladish Co., Inc.*,

No. 92 Civ. 9358, 1993 WL 43373 (S.D.N.Y. Feb. 18, 1993).  *McMahan* addressed certain

bondholders' attempts to tender shares even where no acceleration had occurred.  *McMahan*, 859

F. Supp. at 745-48.  In that case, the court found that section 316(b) of the Trust Indenture Act

precluded the restriction on bondholders' ability to sue to enforce the payment of principal or

interest "where a company has failed to pay out on an indenture security after its maturity date or

after an explicit date on which it has come due–in other words, **when the right to payment**

**becomes absolute and unconditional**." *Id.* at 748 n.1 (emphasis added, citation omitted).

While that had not happened in the *McMahan* case, it has happened here by virtue of the dollar-

denominated bonds' acceleration.[8]

### C.    Permitting Setoff Now Advances the Strong Policy in Favor of Setoff.

39.      Permitting setoff here is in keeping with this Circuit's strong policy in favor of

enforcing rights of setoff, notwithstanding the fact that other creditors, including bondholders,

may not have setoff rights.  In the *Genuity* case cited by GM, Judge Beatty points out to the

debtors at the end of her decision, in this respect, "inequality is inherent in the very nature of

setoff."  *In re Genuity*, 323 B.R. at 85 (citation omitted).  Judge Beatty goes on to say that "[t]he

greater inequity, however, lies in the core of the Debtors' argument [that the security deposits in

that case should not be used for their pre-petition purpose]."  *Id.*

40.      Put differently, a court is "not required to deprive [a] financial institution of its

rights in order to increase the chance of recovery of other equally innocent creditors."  *In re

Bennett Funding Group, Inc.*, 146 F.3d 136, 141 (2d Cir. 1998); *see also In re Bennett Funding

Group, Inc.*, 212 B.R. 206, 216 (2d Cir. BAP 1997) (rejecting the argument "that it would be

inequitable to allow the Bank to exercise a right of setoff because the Bank would be receiving

money at the expense of thousands of other individual investors . . . ."), *aff'd*, 146 F.3d 136 (2d

---

[8]      In *Jackson Nat'l*, the court found that there might be a "material dispute concerning whether an acceleration of the Notes also constitutes an acceleration of the 'due dates *expressed*' in the Notes" and did not reach that issue.  *Jackson Nat'l*, 1993 WL 43373 at *6 (emphasis in original).  If the Court found such dispute here, discovery would be necessary on this issue.  But as noted above, the Court need not reach this issue and can

Cir. 1998); *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998) ("'The argument that

setoff should be denied to avoid the inequity of preferential treatment is an argument against the

very concept of setoff, not an argument against its application to the facts of this case.'")

(citations omitted).

41.    Judge Beatty also reminds us that "[t]he right of setoff is a remedy as old as

bankruptcy itself.  Its initial recognition in American bankruptcy law was in the Act of 1800 and it

has been incorporated into every one of the Nation's subsequent bankruptcy acts, as well as the

current Bankruptcy Code."  *In re Genuity*, 323 B.R. at 82 (citations omitted).  According to the

Second Circuit Bankruptcy Appellate Panel in *In re Bennett Funding*, "[w]ith respect to the

Bankruptcy Code's goals and objectives, given the inherent premium on notions of equity, 'the

right of set off . . . allows entities that owe each other to apply their mutual debts against each

other, thereby avoiding 'the absurdity of making A pay B when B owes A.'''"  *In re Bennett*

*Funding Group, Inc.*, 212 B.R. at 212 (quoting *Citizens Bank of Maryland v. Strumpf*, 516 U.S.

16, 19 (1995) and affirming a creditor's right to setoff notwithstanding a challenge by the trustee).

> **D.    Even Should the Court Deny Setoff at this Time, GM Would
> Have No Right to Destroy Deutsche Bank's Status as a Secured
> Creditor.**

42.    Allowing setoff now also promotes judicial efficiency, as follows.  By law, a valid

setoff right preserved under section 553 is secured.  *See* 11 U.S.C. § 506(a)(1).  Indeed, a valid

setoff right is "security of the most perfect kind."  *Boston Ins. Co. v. Nogg (In re Yale Express*

*Sys., Inc.)*, 362 F.2d 111, 114 (2d Cir. 1966).  Neither GM nor Wilmington Trust Company cites

to any authority that would give GM the right to strip Deutsche Bank of its "perfect" security,

even if the "no action" clause would preclude the exercise of Deutsche Bank's setoff right until

---

authorize setoff now, since Deutsche Bank is not in fact seeking to enforce provisions of the GM Indenture.

the original maturity dates of the bonds.  In that event, GM still could not recover on its cross

motion, and Deutsche Bank would simply need to wait until the original bond maturity dates.

43.    Until then, GM would have no right to use the $24 million it seeks unless it

provides Deutsche Bank with adequate assurance of protection under section 363(e) of the

Bankruptcy Code.  Section 363(e) provides that "at any time, on request of an entity that has an

interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee,

the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is

necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e); *see also*

*Contrarian Funds LLC v. Aretex LLC, et al. ( In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 260

(2d Cir. 2010) (a secured creditor ordinarily has a statutory right to adequate protection payments

to protect its interests against the diminution in value of its security); *Chrysler Credit Corp. v.*

*Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.),* 727 F.2d 1017, 1019 (11th Cir.

1984) (security interests are "property rights" protected by Fifth Amendment from public taking

without just compensation and therefore bankruptcy court cannot allow secured interest to be

threatened by improper use of cash proceeds by a Chapter 11 debtor); *In re Bennett Funding*

*Group, Inc.*, 255 B.R. 616, 643 (Bankr. N.D.N.Y. 2000) (a "secured creditor has a constitutional

right to have the value of its secured claim on the petition date preserved.") (citation omitted).

> ### E.    GM Has Shown No Reason to Treat the Euro Bonds Differently Than Other Unsecured Debt, and Setoff Should be Permitted Accordingly.

44.    GM argues that Deutsche Bank has not cited authority for the ability of a party to

effect setoff against European-issued bonds.  Deutsche Bank submits that it has met its burden on

setoff for all of the bonds, and moreover that a different denomination for the Euro Bonds

changes nothing.  Claims of different denominations can be setoff where they otherwise meet the

requirements for setoff.  *See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) *remanded to* 744 F.2d 237 (2d Cir. 1984); *Winter v. Glaze (In re Glaze)*, 169 B.R. 956 (Bankr. D. Ariz. 1994).

**IV.    Deutsche Bank Has Sufficiently Evidenced its Bond Holdings.**

45.    Deutsche Bank has presented *prima facie* evidence of its bond holdings and is prepared to present witness testimony at an evidentiary hearing on this matter.  Moreover, Deutsche Bank has consented to six months of adjournment requests from GM while simultaneously honoring GM's informal discovery requests in the interim.  Should the Court find further evidence of GM's bond holdings to be necessary to an adjudication of any of the issues raised by the Objection, Deutsche Bank respectfully requests a status conference to discuss an appropriate discovery calendar.

**V.    GM's Cross-Motion Requesting Deutsche Bank to Pay
        $24,040,404 Under the Master Agreement Should Be Denied**

46.    For the reasons set forth above, because Deutsche Bank has valid and enforceable right to setoff its debts to GM against GM's debts to Deutsche Bank, Deutsche Bank submits that the cross-motion must be denied on that basis.  Deutsche Bank further notes that GM bears the burden on its cross motion, and has presented no evidence at all on the evidentiary issues it has attempted to raise.

47.    However, here again, should the Court find further evidence to be necessary to an adjudication of any of the issues raised by the cross motion, Deutsche Bank requests a status conference to discuss an appropriate discovery calendar.

## CONCLUSION

**WHEREFORE**, Deutsche Bank respectfully requests that this Court:  (i) overrule GM's

Objection and deny its cross-motion; (ii) grant Deutsche Bank's Motion for relief from the

provisions of the automatic stay to effect setoff up to the Settlement Amount of $24,040,404; and

(iii) grant such other relief as this Court deems just and proper.

Dated: New York, New York
        July 12, 2010

BINGHAM McCUTCHEN LLP

By:  /s/ Robert M. Dombroff
      Robert M. Dombroff
      Jeffrey S. Sabin
      Jared R. Clark
      399 Park Avenue
      New York, NY 10022
      (212) 705-7000

Attorneys for Deutsche Bank AG