- 1 -

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026-reg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9        f/k/a General Motors Corporation, et al.,

10

11        Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15        United States Bankruptcy Court

16        One Bowling Green

17        New York, New York

18

19        June 29, 2010

20        9:50 AM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

- 2 -

1

2    HEARING Second Application of Weil, Gotshal & Manges LLP, as

3    Attorneys for the Debtors, for Interim Allowance of

4    Compensation for Professional Services Rendered and

5    Reimbursement of Actual and Necessary Expenses Incurred from

6    October 1 2009 through January 31, 2010

7

8    HEARING re  Second Interim Application of FTI Consulting, Inc.

9    for Allowance of Compensation and for Reimbursement of Expenses

10   for Services Rendered in the Case for the Period October 1,

11   2009 through January 31, 2010

12

13   HEARING re Second Application of Butzel Long, a Professional

14   Corporation, as Special Counsel to the Official Committee of

15   Unsecured Creditors of Motors Liquidation Company, f/k/a

16   General Motors Corporation, for Interim Allowance of

17   Compensation for Professional Services Rendered and

18   Reimbursement of Actual and Necessary Expenses Incurred from

19   October 1, 2009 through January 31, 2010

20

21

22

23

24

25

- 3 -

1

2    HEARING re Second Interim Application of Kramer, Levin Naftalis

3    & Frankel LLP, as Counsel for the Official Committee of

4    Unsecured Creditors, for Allowance of Compensation for

5    Professional Services Rendered and for Reimbursement of Actual

6    and Necessary Expenses Incurred from the Period from October 1,

7    2009 through January 31, 2010

8

9    HEARING re First Interim Application of LFR Inc. for Allowance

10   of Compensation and for Reimbursement of Expenses for Services

11   Rendered in the Case for the Period June 1, 2009 through

12   September 30, 2009

13

14   HEARING re First Interim Application of Baker & McKenzie for

15   Compensation and Reimbursement of Expenses for Services

16   Rendered as Special Counsel for the Debtors for the Period June

17   1, 2009 Through September 30, 2009

18

19   HEARING re Application for Interim Professional Compensation

20   and Reimbursement of Expenses for the Analysis of the First

21   Interim Fee Applications of the Selected Case Professionals,

22   the First Interim Fee Application of Weil Gotshal & Manges LLP,

23   and Expenses Requested in the First Interim Fee Application of

24   FTI Consulting, Inc. for Stuart Maue, Consultant

25

- 4 -

1

2      HEARING re Fee Examiner's Application to Authorize the Extended

3      Retention and Employment of the Stuart Maue Firm as Consultant

4      to the Fee Examiner

5

6      HEARING re Second Interim Fee Application of Jenner & Block LLP

7      for Allowance of Compensation for Services Rendered and

8      Reimbursement of Expenses

9

10     HEARING re Second Interim Application of Jones Day, Special

11     Counsel to the Debtors and Debtors-in-Possession, Seeking

12     Allowance of Compensation for Professional Services Rendered

13     and for Reimbursement of Actual and Necessary Expenses for the

14     Period from October 1, 2009 through January 31, 2010

15

16     HEARING re Second Interim Application of The Claro Group, LLC

17     for Allowance of Compensation and Reimbursement of Expenses for

18     the Period October 1, 2009 through January 31, 2010

19

20     HEARING re First Interim Fee Application of Brownfield

21     Partners, LLC as Environmental Consultants to the Debtors for

22     Allowance of Compensation and Reimbursement of Expenses for the

23     Period from June 1, 2009 Through September 30, 2009

24

25

- 5 -

1

2    HEARING re Second Interim Fee Application of Brownfield

3    Partners, LLC as Environmental Consultants to the Debtors for

4    Allowance of Compensation and Reimbursement of Expenses for the

5    Period from October 1, 2009 through January 31, 2010

6

7    HEARING re First Application of Plante & Moran, PLLC, as

8    Accountants for the Debtors, for Interim Allowance of

9    Compensation for Professional Services Rendered and

10   Reimbursement of Actual and Necessary Expenses Incurred from

11   October 9, 2009 through January 31, 2010

12

13   HEARING re Motion of Debtors Pursuant to Sections 105, 363, and

14   365 of the Bankruptcy Code and Bankruptcy Rule 9019 for an

15   Order Authorizing (I) the Sale of Wilmington Assembly Plant to

16   Fisker Automotive, Inc. Free and Clear of Liens, Claims,

17   Interests, and Encumbrances, (II) the Assumption and Assignment

18   of Certain Executory Contracts and Unexpired Leases in

19   Connection with the Sale, and (III) Motors Liquidation

20   Company's Entry into a Settlement Agreement in Connection with

21   the Sale

22

23   HEARING re Debtors' Thirteenth Omnibus Objection to Claims

24   (Workers' Compensation Claims) as to Claim Nos. 69600 and 69597

25   Only

- 6 -

1

2    HEARING re Debtors' Fourteenth Omnibus Objection to Claims

3    (Workers' Compensation Claims) as to Claim Nos. 69594, 69595,

4    69596, 69598, and 69599 Only

5

6    HEARING re Debtors' Fifteenth Omnibus Objection to Claims

7    (Amended and Superseded Claims)

8

9    HEARING re Debtors' Sixteenth Omnibus Objection to Claims

10   (Satisfied Tax Claims)

11

12   HEARING re Debtors' Seventeenth Omnibus Objection to Claims

13   (Tax Claims Assumed by General Motors, LLC)

14

15   HEARING re Debtors' Eighteenth Omnibus Objection to Claims (Tax

16   Claims Assumed by General Motors, LLC)

17

18   HEARING re Debtors' Nineteenth Omnibus Objection to Claims (Tax

19   Claims Assumed by General Motors, LLC)

20

21   HEARING re Debtors' Twentieth Omnibus Objection to Claims (Tax

22   Claims Assumed by General Motors, LLC)

23

24   HEARING re Debtors' Twenty-First Omnibus Objection to Claims

25   (Tax Claims Assumed by General Motors, LLC)

- 7 -

1

2      HEARING re Debtors' Twenty-Second Omnibus Objection to Claims

3      (Amended and Superseded Claims)

4

5      HEARING re Motion of Debtors for Entry of Supplemental Order

6      Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007

7      Establishing Supplemental Rules and Authority for Filing

8      Omnibus Objections to Certain Debt Claims

9

10     HEARING re Debtors' Third Omnibus Objection to Claims

11     (Duplicate Claims)

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

- 8 -

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtor

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  STEPHEN KAROTKIN, ESQ.

9         JOSEPH H. SMOLINSKY, ESQ.

10

11   JENNER & BLOCK LLP

12        Attorneys for Motors Liquidation Co.

13        919 Third Avenue

14        37th Floor

15        New York, NY 10022

16

17   BY:  PATRICK J. TROSTLE, ESQ.

18

19

20

21

22

23

24

25

- 9 -

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5         1177 Avenue of the Americas

6         New York, NY 10036

7

8   BY:  ROBERT T. SCHMIDT, ESQ.

9

10   BUTZEL LONG P.C.

11        Special Counsel to the Official Committee of Unsecured

12         Creditors

13         22nd Floor

14         380 Madison Avenue

15         New York, NY 10017

16

17   BY:  ERIC B. FISHER, ESQ.

18

19

20

21

22

23

24

25

- 10 -

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          33 Whitehall Street

5          Suite 2100

6          New York, NY 10004

7

8    BY:  LINDA A. RIFFKIN, AUSA

9          BRIAN MASUMOTO, ESQ.

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12          U.S. Attorney's Office

13          86 Chambers Street

14          3rd Floor

15          New York, NY 10007

16

17   BY:  JOSEPH N. CORDARO, DEPUTY CHIEF, AUSA

18

19

20

21

22

23

24

25

- 11 -

```
 1

 2    GODFREY & KAHN, S.C.

 3         Attorneys for the Fee Examiner, Brady C. Williamson

 4         One East Main Street

 5         Suite 500

 6         Madison, WI 53701

 7

 8    BY:  BRADY C. WILLIAMSON, ESQ.

 9         KATHERINE STADLER, ESQ.

10         CARLA O. ANDRES, ESQ.

11         ERIC J. WILSON, ESQ.

12

13    BAKER & MCKENZIE LLP

14         Attorneys for Baker & McKenzie LLP

15         One Prudential Plaza

16         Suite 3500

17         130 East Randolph Drive

18         Chicago, IL 60601

19

20    BY:  ANDREW MCDERMOTT, ESQ.

21

22

23

24

25
```

- 12 -

1

2     DICONZA LAW, PC

3          Attorneys for LFR, Inc.

4          630 Third Avenue

5          New York, NY 10017

6

7     BY:  GERARD DICONZA, ESQ.

8

9     ORRICK, HERRINGTON & SUTCLIFFE LLP

10         Columbia Center

11         1152 15th Street, NW

12         Washington, DC 20005

13

14    BY:  RICHARD H. WYRON, ESQ.

15         ROBERT F. LAWRENCE, ESQ.

16

17    MCCARTER & ENGLISH, LLP

18         Attorneys to Brownfield Partners

19         Four Gateway Center

20         100 Mulberry Street

21         Newark, NJ 07102

22

23    BY:  JEFF T. TESTA, ESQ.

24         (TELEPHONICALLY)

25

- 13 -

1

2    LAW OFFICE OF EDWARD S. DONINI

3         Attorneys for Creditors, Richard & Elise Birdsall

4         P.O. Box 605

5         New Smyrna Beach, FL 32170

6

7    BY:  EDWARD S. DONINI, ESQ.

8         (TELEPHONICALLY)

9

10

11

12   ALSO PRESENT:

13        MICHAEL EISENBAND, CPA, FTI Consulting

14        MAUREEN F. LEARY, New York State Department of Law

15        (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25

MOTORS LIQUIDATION COMPANY, et al.

- 14 -

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  Have seats, please.  Okay.

3    We're here on Motors Liquidation Company formerly known as GM.

4    Another round of fee applications.

5          Here's how we're going to proceed, folks.  First, I

6    would like somebody, either the fee examiner or his counsel or

7    a representative of the applicants, to tell me what has been

8    consensually resolved since the filing of all of the briefs

9    that I got and the issues that remain.  Then, as we did last

10   time, I'm going to deal with the issues conceptually.  And I'm

11   not going to micromanage the process by getting down to

12   individual time charges or dinner bills, but instead will focus

13   on the underlying principles for that which is compensable and

14   that which isn't; how to deal with noncompliance; and how to

15   deal with uniquely factual matters such as the prevalence of

16   half hour billing increments that's difficult for anyone with a

17   knowledge of statistics to understand.

18         I do have some tentatives on the issues, the

19   underlying principles, the ground rules, based on my reading of

20   the briefs which I'll announce after knowing what issues have

21   been consensually resolved and which issues remain.  So may I

22   first get a report on that?  And then I'll ask everybody to sit

23   down.  I think at this point, I know practically everybody.

24   And I'm going to deal with the tentatives which are --

25   tentatives, California style, which are inclinations I have

- 15 -

1   based on my reading of the briefs but which, of course, are

2   subject to your assistance in oral argument and which are

3   substantially less than rulings at this point in time.

4           Mr. Karotkin and Mr. Williams -- and you're both

5   rising.  Either one yield to the other guy?

6           MR. KAROTKIN:  Stephen Karotkin, Weil Gotshal &

7   Manges for the debtors.  If I can impose, Your Honor, there is

8   one matter -- or a couple of matters on the calendar unrelated

9   to fees which are uncontested, one of which is the motion

10  seeking authority for the sale of a former operating plan of GM

11  in Wilmington, Delaware to Fisker.  That is uncontested.  There

12  were no objections filed, no other bids filed.  And I know that

13  there are a few people in the room who are here on that in

14  support of it.  And if we could dispose of it -- if I could

15  impose on Your Honor to dispose of that before we get to the

16  fee applications, I think that would be in the interest of

17  economy.

18          THE COURT:  Forgive me, Mr. Karotkin.  I had

19  concentrated on the disputed matters.  That's been duly

20  noticed.  No objections were filed.  And the time for filing

21  objections has passed.  Am I correct?

22          MR. KAROTKIN:  That is correct, Your Honor.  There

23  were no other bids for the property.  We do have a proposed

24  order.  I don't know if you would like me to make a quick offer

25  of proof.

- 16 -

1              THE COURT:  No.  Under my case management order,

2      we'll save you the expense especially on a fee app day of

3      running up more expense on something that's undisputed.

4              MR. KAROTKIN:  I thought of that myself, Your Honor.

5              THE COURT:  Motion granted.

6              MR. KAROTKIN:  All right.  We will present an order.

7              THE COURT:  Anything else of that character, Mr.

8      Karotkin?

9              MR. KAROTKIN:  I think Mr. Smolinsky --

10             THE COURT:  Mr. Smolinsky?

11             MR. KAROTKIN:  -- may have some matters.  Can the

12     people here on Fisker be dismissed, sir?

13             THE COURT:  Absolutely.

14             MR. KAROTKIN:  Okay.

15             THE COURT:  Anybody who's here solely on that matter

16     is excused if he or she wants to leave.

17             MR. KAROTKIN:  Thank you, sir.

18             MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

19     Smolinsky of Weil Gotshal & Manges for the debtors.  We have a

20     number of uncontested matters that I think I could run through

21     quickly.

22             THE COURT:  Yes, sir.

23             MR. SMOLINSKY:  I'm starting with item I on the

24     agenda.  Mississippi Workers' Comp Individual Self-Insured

25     Guaranty Association had filed several objections on behalf of

- 17 -

1    individual workers' comp claimants to the thirteenth and

2    fourteenth omnibus objections.  They have received some

3    documents and have withdrawn their objection.  So we're ready

4    to go forward and submit an order with respect to omnibus

5    motions 13 and 14.

6            THE COURT:  Very well.  That's approved.

7            MR. SMOLINSKY:  Next, we have the fifteenth omnibus

8    objection to claims amended and superseded.  We received two

9    objections.  We've carved those out of the order, adjourned

10   them to July 14th.  We'd like to --

11           THE COURT:  Okay.

12           MR. SMOLINSKY:  -- move forward with the balance.

13   Then we have omnibus objections number 16 through 21, tax

14   claims either satisfied or assumed by new GM.  As you can see

15   from the agenda, there have been a number of taxing authorities

16   who have filed requests for additional information.  We're

17   working through those.  Again, we'd like to enter orders with

18   respect to the nonobjectors and adjourn the balance to July

19   14th.

20           THE COURT:  The standard drill.  Granted.

21           MR. SMOLINSKY:  Your Honor, there's a matter of the

22   third omnibus objection to claims.  We're now ready to close

23   out that motion.  ALCO Remediation Group was the last objector.

24   We've entered into a stipulation with them withdrawing that

25   claim.  So we can submit that to chambers.  And that would

- 18 -

1      close out the balance of that motion.

2              THE COURT:  That's fine.

3              MR. SMOLINSKY:  The last thing, Your Honor, is a

4      motion to establish supplemental rules and authorities for

5      filing omnibus objections.  I know that's uncontested but I

6      know Your Honor has a lot to say on that topic.  If you want me

7      to run through it now, we can.

8              THE COURT:  Take a couple of seconds to do it, Mr.

9      Smolinsky, and focus, in particular, on my concerns.  I want to

10     find that sweet spot between saving the estate money and not

11     running up a lot of either mailing para or lawyer time as part

12     of the process.  But I want each person or entity who gets an

13     objection to understand in baby talk that the reason he, she or

14     it is getting it is because their ox can be gored if they don't

15     agree with what you're proposing to do.  And I've come up with

16     some language in other cases to try to find that sweet spot and

17     that's what I want to accomplish again.

18             MR. SMOLINSKY:  Your Honor, in view of your prior

19     comments rather than seek omnibus authority to change the

20     procedures with respect to large groups, we've decided to

21     tackle it on a case by case basis.  This involves debt claims

22     that are covered under proofs of claim that are filed by

23     indenture trustee, in this case, Wilmington Trust Company.  In

24     the next few days, we'll be filing a stipulation which will be

25     fixing Wilmington Trust's claims in an amount in excess of

- 19 -

1    twenty-three billion dollars.  As part of that process, as soon

2    as we file the stipulation, the indenture trustee will be

3    sending out to all bondholders a several page letter which

4    we've reviewed and commented on which advise those bondholders,

5    all bondholders, of what the stip does, what the impact of that

6    stip is and how that impacts their claims and informs them that

7    for those 18,000 bondholders that filed claims that there will

8    be an objection to their claim because it is duplicative of the

9    indenture trustee's claim.

10        THE COURT:  Fine.  And conversely, unless some

11   individual bondholder thought that his or her indenture trustee

12   wasn't appropriately carrying the ball, that bondholder's ox

13   wouldn't be gored because Wilmington Trust would have taken

14   care of it on behalf of the individual bondholder, if I heard

15   you right.

16        MR. SMOLINSKY:  That's right, Your Honor.

17        THE COURT:  Yeah.  Very good.

18        MR. SMOLINSKY:  So now the next step is to come up

19   with an efficient procedure to resolve and expunge those 18,000

20   claims.  We will be setting up a separate website --

21        THE COURT:  Time out, Mr. Smolinsky.  Did I hear you

22   right that there are 18,000 individual claims on bonds even

23   though the indenture trustee is carrying the ball for those

24   folks?

25        MR. SMOLINSKY:  That's correct, Your Honor.

- 20 -

1          THE COURT:  Okay.

2          MR. SMOLINSKY:  So we will be setting up a separate

3   website for debtholders that will contain the Wilmington Trust

4   stip, the Wilmington Trust proofs of claim, all of the motions

5   objecting to the debtholders' claims as well as other

6   documents.  And we propose in our procedures to send a notice

7   which is attached to our motion which is an individualized

8   motion to each -- individualized notice to each noteholder that

9   says what the claim is, explains who the indenture trustee is,

10  refers them to the website so that they could look up the

11  stipulation, the motions and could get all the information.

12  And it really renders the motion itself superfluous.  And we

13  think that it's a much better and much more efficient and will

14  provide more information to an individual bondholder than

15  sending out a twenty-page motion and schedule.

16          THE COURT:  I hear you.  Well done.  Certainly.

17          MR. SMOLINSKY:  If you review the notice -- and we

18  did, actually, get some comments from the indenture trustee,

19  some minor comments, which we've incorporated in a blackline

20  which I have which will be attached to the order.  It does

21  follow many of your -- the language that you used in your

22  previous cases dealing with this type of matter.  And we think

23  that the notice is really designed to be in plain language and

24  inform them of what they need to know.  We've also simplified

25  the procedures for responding so that they don't have to send

- 21 -

1    their response to twenty different parties.  And in addition to

2    that, we propose that on the envelope that goes to them with

3    the notice, we would stamp it "Official court document" so that

4    they would know that it's not spam or junk mail.

5              THE COURT:  Okay.  I'll need to check out the

6    specifics, but nothing you said troubles me.  And if I need to

7    revise it in any way, subject to anybody's right or claim or

8    desire or reservation of rights to object, I would detail a law

9    clerk to express any concerns I have so that your firm can tell

10   us if what we're inclined to do doesn't make sense in any way.

11             MR. SMOLINSKY:  And, Your Honor, we're not in any

12   immediate rush because, as I said, we wouldn't intend to go out

13   with this notice until after the Wilmington stip is approved.

14   So you have some days to sit and review the notice.

15             What I'd like to do is hand up a blackline notice

16   that reflects the indenture trustee's comments.

17             THE COURT:  Sure.  And, Your Honor, of course we're

18   available if you have any questions --

19             THE COURT:  Okay.

20             MR. SMOLINSKY:  -- during your review.  Your Honor, I

21   forgot to just mention the twenty-second omnibus objection to

22   claims.  That's amended and superseded claims.  We received no

23   objections to that motion and we'd like to go forward and enter

24   that order.

25             THE COURT:  Granted.

- 22 -

1           MR. SMOLINSKY:  Thank you, Your Honor.

2           THE COURT:  Okay.  Are we --

3           MR. DONINI (TELEPHONICALLY):  (Indiscernible)

4           THE COURT:  You  may be heard but you're not audible.

5    Can I ask you to speak up?  It's very hot in the courtroom and

6    we need to keep our hundred year old air conditioning going at

7    full speed.

8           MR. DONINI:  Thank you, Your Honor.  Judge, I am the

9    debtors' attorney in the fifteenth omnibus objection to claims.

10          THE COURT:  A debtor's attorney?

11          MR. DONINI:  Yes.  For (indiscernible) day one on the

12   amended agenda filed yesterday.  And I didn't want to interrupt

13   Mr. Smolinsky when you referred to us.  But my claim,

14   (indiscernible) the Birdsalls, is based on product liability

15   and (indiscernible) my client.  And we're creditors of this

16   (indiscernible).  The matter was adjourned to July 14th, as

17   Your Honor can see, but I had plans to be away with my family

18   on that week.  I haven't had vacation in two years.  But the

19   great amount of my response is not only that but I believe,

20   based on my conversations with debtors' counsel after filing

21   our response, that they are going to consent to our response.

22   It was a misnomer actually where the debtor has thought we had

23   submitted subsequent claims.  And actually my filing on

24   November 24th and November 27th of 2009 were just medical

25   records in support of the original proofs of claim which have

- 23 -

1    been filed on behalf of Mr. and Mrs. Birdsall on October 9,

2    2009.  So I believe that my conversations with debtors' counsel

3    yesterday, they were going to object to my motion to

4    (indiscernible) those misnomered claim numbers into the

5    original claim numbers stemming from the October 9th filing.

6    And if that's correct then there's probably no need for us to

7    be scheduled for July 14th if we're going to do a

8    (indiscernible) order or stipulation to our (indiscernible).

9           THE COURT:  All right.  Mr. Smolinsky?

10          MR. SMOLINSKY:  Your Honor, there are two claims.

11    One of the claims has certain documents attached.  The other

12    one has others.  He wants to make sure that all of the

13    documents are -- continue to be relevant to the continuing

14    surviving claim.  We will work out the matter.  What I propose

15    is to adjourn that claim to August 6th.  And I'm sure that in

16    the meantime, we'll finalize that agreement.

17          THE COURT:  All right.  Does that skin the cat for

18    you, sir?

19          MR. DONINI:  Yes, sir.  Thank you, sir.

20          THE COURT:  Very good.  You're excused from the call

21    if you wish to be.

22          MR. DONINI:  Yes, Your Honor.  Thank you.

23          MR. SMOLINSKY:  Your Honor, one more matter -- and I

24    know we need to get on to important issues.  In my haste to go

25    through the omnibus response motion for debtholder claims, I

- 24 -

1    failed to mention one of the changes is that we seek to

2    increase the number of claims subject to objections from one

3    hundred to five hundred.  In a perfect world, we would just

4    file one motion for all because we don't think that there's a

5    need for debtholders.  If they do want to go back to the

6    website to look at the whole motion to look for their name in

7    thirty-six motions as opposed to one, certainly better than 180

8    motions, but, Your Honor, we'll defer to your view on that.

9    We --

10           THE COURT:  Well, whether that'll work or not will

11   depend on how much the piece of paper that the creditor gets

12   helps them understand.  I'm going to talk gender neutral when I

13   use him -- helps him understand his ox may be gored.  If it

14   does that then the incremental change from one hundred to five

15   hundred, although it seems like a lot, wouldn't be material.  I

16   want to see what the particularized disclosure is like.  And if

17   I'm comfortable that the creditor gets a sufficient due

18   process, it won't trouble me, Mr. Smolinsky.  But I can't

19   decide it just this second.

20           MR. SMOLINSKY:  That's absolutely fine, Your Honor.

21   We want you to be comfortable with the procedures we've

22   outlined.

23           THE COURT:  Okay.

24           MR. SMOLINSKY:  Thank you.

25           THE COURT:  All righty.  Mr. Williamson, were you

- 25 -

1  going to help me understand what I still have on my plate on

2  fee apps and those matters that have been consensually

3  resolved?

4          MR. WILLIAMSON:  Good morning, Your Honor.  And the

5  answer is yes, I am.  Brady Williamson, Godfrey & Kahn, as the

6  fee examiner.  Your Honor, this is the second round of

7  applications, generally covering the period October through

8  January.  We started with thirteen applications.  We have, for

9  the Court's consideration this morning, disagreements over only

10 four of those.  That would be Weil Gotshal, Kramer Levin,

11 Butzel, FTI and perhaps, although we haven't heard from, Baker

12 & McKenzie.  But that would be four, perhaps five, depending on

13 whether a representative of Baker is here this morning.

14         THE COURT:  Okay.  Thank you.  Mr. Williamson, I have

15 no memory of getting a Baker & McKenzie written reply.  Did

16 you?

17         MR. WILLIAMSON:  We did not, Your Honor.

18         THE COURT:  Okay.  I said reply; I meant response.

19 But you knew what I was talking about.

20         MR. WILLIAMSON:  Yes.

21         THE COURT:  Okay.  Sir, are you from Baker &

22 McKenzie?

23         MR. MCDERMOTT:  I am.

24         THE COURT:  You want to come up, please?  I know most

25 of the people in the case but I don't know you.  May I get your

- 26 -

1 name, please?

2   MR. MCDERMOTT:  Andrew McDermott on behalf of Baker &

3 McKenzie.

4   THE COURT:  Okay, Mr. McDermott.  Is there a

5 consensual resolution with the fees then?

6   MR. MCDERMOTT:  There is --

7   THE COURT:  There is.

8   MR. MCDERMOTT:  There is.  Baker & McKenzie does not

9 have any objection to the reductions recommended by the fee

10 examiner.

11   THE COURT:  Okay.  Very good.  Then we're down to

12 four issues.  Thank you, Mr. McDermott.  You're excused if you

13 choose to be --

14   MR. MCDERMOTT:  Thank you, Your Honor.

15   THE COURT:  -- but you can stay if you prefer.

16   All right, Mr. Williamson, I think you answered the

17 immediate question I have and I would invite you and everybody

18 else to have a seat for a second while I share my thinking with

19 you and tell you what I want you all to address.

20   As I indicated, I have several tentatives, California

21 style.  And I'll hear your respective arguments as to whether

22 my sense, based on my reading of your briefs, should remain or

23 should be revised.  On several of these issues, as in the case

24 of issues that we've dealt with before, there is little, if

25 any, case law on it, not even scripts or transcripts of

- 27 -

1    dictated decisions.  So in a very real sense, I'm talking about

2    how I would be inclined to exercise my discretion in the

3    absence of any case law.

4            One of the major bones of contention seems to be on

5    compensation associated with getting compensated.  Now we're

6    beyond the stage where people are talking about getting

7    retained.  And we're talking about people's efforts to get

8    paid.  And as I understand it, you've got a bone of contention

9    as to what I'll call the incremental cost of getting paid in

10   this case.  And it seems to me, subject to your rights to be

11   heard, but only as a tentative, that the general standard for

12   getting paid in a bankruptcy system should be to compensate the

13   law firm or other professional for the incremental cost of

14   complying with the hoops that we require as part of the

15   bankruptcy system.  And therefore, that if the service sought

16   that's the subject of a request for compensation would be

17   required to serve any client, inside or outside of bankruptcy,

18   that would be more appropriately regarded as overhead and not

19   compensable.  Matters of that character would be making up a

20   bill, telling the client how much is owed, providing a general

21   description of the services and checking the time entries and

22   totals to make sure that it's accurate.

23           Conversely, it seems to me that when we in the

24   bankruptcy system impose additional hoops, such as preparing a

25   fee application or any incremental detail that would be

- 28 -

1    required beyond that which is normally required of clients as a

2    whole, that the prior case law considering that stuff

3    compensatable, if that's a word -- or compensable, which is

4    probably a better word, should remain.  I will, however, hear

5    argument on that.

6           Now, I sense that FTI is still a matter of some

7    contention.  My -- not just memory because in preparation for

8    today, I read the transcript of my earlier rulings, none of

9    which I'm of a mind to divert from, both because I think I got

10   them right and I believe in precedent -- so for those folks,

11   like FTI, who are compensated on a monthly fixed fee, I'm

12   scratching my head to figure out why any services that FTI

13   performed or didn't perform would be a subject of dispute.

14   Putting it differently, I don't see a basis, subject to your

15   rights to be heard, to dock FTI when it's getting a fixed

16   monthly fee anyway.  Now if, at the end of the case, we look at

17   the totality of FTI's services to see whether it got a windfall

18   then it would seem to me that you folks might be heard to see

19   if that should be a basis for a distinction.  But I don't see

20   that as an issue now.  So if, by way of example, FTI spent too

21   much time doing one thing or another, performed unnecessary

22   services or another, I don't see why this is any different than

23   my earlier ruling.

24          Now, on the meal charge, my tentative is FTI can eat

25   the extra charge on the meal charge.  And if I missed other

- 29 -

1    things, you guys can tell me.

2         A major matter of contention seems to be vagueness in

3    time entries.  My tentative on that, subject to your rights to

4    be heard, is that if the reason for the vague entries is

5    sensitivity or privilege that for time periods before you knew

6    how I would deal with this, you can give me a detailed

7    supplementation in camera.  But that after today, the entries

8    would need to be provided in the normal detail.  And if there

9    are privilege or confidentiality issues, the applicant would

10   have to redact them, but that the underlying source data will,

11   from this moment on, have to be provided in the usual detail.

12        As a general conceptual matter, folks, subject to

13   your rights to be heard, I would think the way to do it is by

14   redaction rather than not giving us the appropriate information

15   to start with.

16        Now, on Butzel Long, the last of my tentatives, we

17   were dealing with a situation that Butzel is engaged, and, so

18   far as I'm aware, it's still engaged.  It's in the middle of a

19   heavy briefing schedule, in fact, on a very major matter where

20   the services it performed are accelerating and had not fully

21   ramped up by the end of this time period which, if I'm not

22   mistaken, ends around January of thereabouts.  I ruled

23   previously that the cost of Butzel Long getting retained was

24   appropriate.  And I had some related comments about if you

25   think there ain't going to be enough work for them to do, you

- 30 -

1   should think about retaining them in the first place.  And I

2   wonder if that same principle applies to that which relates to

3   getting yourself compensated once you've been retained.  Now,

4   folks, I have to wonder whether this is a tempest in a teapot

5   because if, as I suspect, Butzel is spending more than minimal

6   time on a billion and a half dollar lawsuit, or whatever the

7   exact amount might equate to be, I have some difficulties

8   seeing how charges in the low tens of thousands that were

9   incurred in time period 2 couldn't be offset by the time

10  charges that are incurred during time period 3.  Subject to

11  your rights to be heard, it would seem to me that the same

12  legal principle should apply to the Butzel application

13  notwithstanding that the particular types of services related

14  to the compensation process are technically different.  But

15  I'll hear what each side has to say on that.

16          Finally, I have no tentative on the Maue matters.

17  Well, my tentative on the Maue compensation is to simply say

18  that there not having been any particularized objection, those

19  are approved.  But on the matter of Maue going forward, I have

20  no tentative on that issue.  I want to know how much Maue has

21  cost us -- cost the estate.  And I also want to know that in

22  the context of what the fee examiner is costing the estate.  So

23  I can determine the prong of the wisdom of keeping Maue on only

24  after I know how much it's costing us all.  I will then also

25  consider, if, as I sense, the fee examiner wants to make that

MOTORS LIQUIDATION COMPANY, et al.

- 31 -

1    point, whether Maue is worth the money even if it doesn't save

2    itself or save the estate, I should say, what it costs the

3    estate to have a number cruncher assisting the fee examiner.  I

4    look to the fee examiner for the professional judgment which

5    I've seen so far.  But I don't have the same degree of

6    confidence that I get that level of professional judgment out

7    of Maue or whether I should be expecting it.

8             So with that said, I will take the respective

9    applications.  I'm shifting around the order slightly from the

10   agenda.  I want to hear Weil first, whether that's Mr. Karotkin

11   or Mr. Smolinsky, then Kramer Levin.  I see you there, Mr.

12   Schmidt.  And then, to the extent that there's anything left,

13   I'll hear FTI and then Butzel Long.

14            And I think it would be helpful to me, folks, and

15   indulge me on this, after Mr. Karotkin, you deal with the Weil

16   issues, and then before I hear other applicants, I'm going to

17   want to get the response of Mr. Williamson or one of his

18   colleagues to Weil so that I can keep all of my consideration

19   of your respective positions together per applicant even though

20   there may well be an overlap on some of these matters from a

21   conceptual perspective.

22            MR. TESTA (TELEPHONICALLY):  Your Honor?

23            THE COURT:  Yes.  Who's on the phone, please?

24            MR. TESTA:  Your Honor, this is Jeffrey Testa from

25   McCarter & English on behalf of Brown Field Partners which is

MOTORS LIQUIDATION COMPANY, et al.

- 32 -

1    uncontested.  May I please be excused from the call?

2              THE COURT:  Yes, sir, you may.

3              MR. TESTA:  Thank you, Your Honor.

4              THE COURT:  Is there anybody else who would like to

5    similarly be excluded or excused?  All righty.  Go ahead,

6    please, Mr. Karotkin.

7              MR. KAROTKIN:  Thank you, sir.  Stephen Karotkin,

8    Weil Gotshal & Manges for my firm in connection with its second

9    interim fee application.  As the fee examiner notes in his

10   objection to our second fee application, ninety percent of his

11   recommended adjustments relate to one item.  And that is the

12   time dedicated to the preparation of monthly statements fee

13   applications, reviewing time records in connection with that

14   effort.  And the fee examiner takes issue that, basically, an

15   inordinate amount of time was spent in his view.  He sets forth

16   some big numbers to express his view.  And he, essentially,

17   compares the amount of time spent on that task in our second

18   round of fee applications to the amount that was spent in our

19   first round and says it's disproportionate.  And we've replied

20   to that.  We don't believe it's -- it may be disproportionate

21   but I don't think that, as we indicated, Your Honor, you can

22   use a purely formulaic approach.

23             Now, addressing what you indicated in your tentative

24   rulings, this is time expended to deal with issues unique to

25   bankruptcy cases.  The time records have to be reviewed in

- 33 -

```
 1    order to make sure they're in compliance with the fee

 2    guidelines, to make sure they're in compliance with the rulings

 3    that you have made in connection with fee applications.  And

 4    perhaps most importantly, to make sure that there is no

 5    privileged information inadvertently set forth in the time

 6    records.  This is a painful time consuming task.  It is not

 7    something that you would want to spend your days doing.  We

 8    have tried to relegate those tasks, for the most part, to

 9    paralegals who are obviously billing at rates much lower than

10    attorneys.  Obviously, it does however require a fair amount of

11    attorney time to make sure that we are in compliance, Your

12    Honor, and, again, to make sure that no privileged information

13    is contained in the time record which, of course, are public

14    records.  And a paralegal cannot do that type of review with

15    respect to privilege.

16             We believe the time is appropriately spent.  We

17    believe it's appropriately catalogued.  We don't think that it

18    is misbilled.  I think part of the issue that Mr. Williamson

19    had is that one of the paralegals who billed in certain of her

20    time and certainly not all of her time in incremental time

21    records of either a half an hour or an hour.  But we don't

22    think a fifty percent reduction is appropriate.  I don't think

23    there's any objective basis for a fifty percent reduction.  And

24    I think that Mr. Williamson has -- I'm sorry -- the fee

25    examiner has come up with an arbitrary number, I guess, to be
```

- 34 -

1    either somewhat punitive or to act as a deterrent.

2         THE COURT:  Let me ask you something, Mr. Karotkin.

3    You identified three things, if I heard you right, that's done:

4    that the time records have to be reviewed for compliance with

5    the special rules we have in bankruptcy, such as one-tenth of

6    an hour increments and requisite specificity; my earlier

7    rulings; and screening out the privileged stuff.  My earlier

8    rulings would be a factor for time periods 3 and on but

9    wouldn't be, strictly speaking, relevant now because, if I

10   recall correctly, I ruled roughly in the May time -- excuse me.

11   April 29th was the day I issued my ruling.

12        MR. KAROTKIN:  That's correct.

13        THE COURT:  But I take it what we're trying to drive

14   for is to get a clear set of ground rules for everybody in the

15   room going forward.  So you didn't say expressly but you

16   implied that I should be thinking about implications going

17   forward.

18        Privilege is important in bankruptcy but it's not

19   important when you bill your own client because, normally, if

20   you bill your own client, your client gets access to privileged

21   information and/or has the ability to waive it.  How do you

22   think when I have overlapping factors, like you got to review

23   time records to make -- timesheets to make sure that they

24   comply with the special bankruptcy hoops.  But you never want

25   to rip off your client even outside of bankruptcy and you've

09-50026-mg    Doc 6357    Filed 07/01/10    Entered 07/16/10 12:41:40    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 105

- 35 -

1    got to do some checking there.  How do you think a guy in my

2    position should deal with the overlap and how you deal with

3    that overlap in the sense of trying to implement my tentative?

4              MR. KAROTKIN:  Well, Your Honor, we certainly don't

5    bill the estate for the daily preparation of time records.

6    Like, to the extent that attorneys do time records on a daily

7    basis, that amount of time spent is not billed to the client.

8    The only part that is billed to the client or to these estates

9    is the review in connection with what is submitted in the

10   monthly fee statements and what is submitted in connection with

11   the filing of interim fee applications.  So I think that's

12   addressed appropriately.  So I don't think there's any overlap

13   there.  And I think what we have here is time totally devoted

14   to the special circumstances imposed by the fact that we are

15   retained professionals in the Chapter 11 cases and subject to

16   the public disclosure of our time records and the other

17   guidelines.

18              And as you indicated, of course, Your Honor, there is

19   not an issue of privilege outside of the bankruptcy context

20   when we're billing our client.  We're not concerned about those

21   issues.  And, as I said, it is a -- and I'm sure you know.  You

22   were in practice.  It is a very painful time consuming process.

23   Now, we will endeavor to be as economic as we can.  As you

24   said, we didn't have the benefit of your thoughts on this until

25   April 29th when you ruled on the first fee applications.  Our

- 36 -

1    second fee application, as I recall, Your Honor, was filed

2    before your ruling.  We will certainly, and have been, mindful

3    of how you have ruled, what you ruled on April 29th.  And

4    hopefully, we can try to be more efficient and more attentive

5    to that.  But we are certainly not engaged in an effort to

6    increase the amount of time to address these tasks.  It is just

7    time consuming.

8            THE COURT:  Mr. Karotkin, one thing I meant to say to

9    everybody in the room when I announced my tentatives that

10   there's one thing that I'd like people to include as part of

11   what they address to me.  And I think you just did in part.

12   But I want to lay out the question before I forget and invite

13   you to supplement if you choose to.  And that is, I would like

14   everybody in the room to discuss how we should be dealing with

15   time entries and other practices that took place before I ruled

16   on the 29th of April when people didn't have the benefit of my

17   thinking on that subject.  Now, some things for bankruptcy

18   practitioners would have been, I think fair to say, part of the

19   existing law.  But I think some might consider that I laid out

20   principles that were matters of first impression.

21           I don't know if you want to supplement what you said.

22   You touched on that, of course, in this issue of the expense

23   for getting yourselves paid.  But if you want to supplement it

24   now that you know something that is causing me to scratch my

25   head, I'm going to give you that chance.

- 37 -

1           MR. KAROTKIN:  Your Honor, certainly on issues of

2    vagueness and what some people consider to be vague and others

3    don't consider to be vague, we are certainly aware and

4    certainly were aware of those issues of being involved in cases

5    before bankruptcy courts for a long, long time.  We don't think

6    that the descriptions in our fee application -- and we know

7    your views on this -- are vague.  We think we have been

8    attentive to that prior to your rulings.  And we don't think

9    that anything should change as a consequence of that.  We think

10   that with respect, for example, to taxi charges and hotels or

11   that type of thing that that was something new to us as of

12   April 29th.  And notwithstanding the fact that, again, our fee

13   application for the second period was filed prior to your

14   ruling, in our response to the fee examiner, we have taken into

15   account your ruling and suggested what we believe is an

16   appropriate adjustment.  And I think reviewing what you said on

17   April 29th, I'm not sure that you were saying that there ought

18   to be a wholesale disallowance of taxi charges.

19           Addressing what the fee examiner has asserted are

20   vague entries, Your Honor, there has to be, as you know, some

21   degree of practicality in what we do on a daily basis.  And as

22   we indicated in our response, in a case like this where people

23   virtually get close to hundreds of e-mails, particularly during

24   the first several months of these cases and have to respond to

25   hundreds of e-mails, and it may only take a tenth of an hour,

- 38 -

1    to put a detailed description down of exactly what the e-mail

2    was about and exactly what your response was about is silly.

3    And I think everybody ought to recognize that that's silly.

4    And that would encompass more expense to these estates than is

5    appropriate.  And we don't think it's appropriate to do that.

6    Everybody knows that you get a lot of e-mails in cases like

7    these and you have to respond.  And to require a detailed

8    description or to be penalized for not having a detailed

9    description or for having a description in a time record, Your

10   Honor, that says "follow-up on a previous time entry", we think

11   that's just plainly unfair and we ought not be penalized for

12   that.

13          As I said, we have to be practical about certain

14   things.  And perhaps the fee examiner doesn't agree with that.

15   But at the end of the day, and I think Your Honor alluded to it

16   earlier in talking about the motion to extend the retention of

17   Stuart Maue's firm, let's do some sort of a cause benefit

18   analysis.  Let's not just willy nilly apply rules where they

19   don't make any sense.  The point of this -- I don't think the

20   point of this exercise is to be punitive.  The point of this

21   exercise ought to be to be practical.  And that's what we're

22   trying to do and that's what we have tried to do in our time

23   records in how we bill these estates.  We think that we have --

24   frankly, Your Honor, we think that we have performed admirably.

25   We think we have saved these estates enormous amounts of money

MOTORS LIQUIDATION COMPANY, et al.

- 39 -

 1   and generated enormous amounts of money in connection with this

 2   enterprise.  And we think we're doing it efficiently and

 3   expeditiously.  And based on what is in the objection, we think

 4   we are in full compliance with the rules.  As I said, going

 5   forward, we certainly will be mindful of your rulings,

 6   obviously.  We will certainly address what you said with

 7   respect to privilege matters although I think that, to a large

 8   extent, that already is addressed in the way we do our time

 9   records.  Although we don't formally redact, they are

10   appropriately addressed to make sure that privileged matters

11   aren't disclosed.

12           THE COURT:  Do you think it would help if I told you

13   and the other professionals in the case that you have authority

14   for me to redact?

15           MR. KAROTKIN:  Yes.  I think that would help.

16           THE COURT:  Well, that's very easy for me to do.  And

17   to the extent I need to say it, I'll say it right now.

18           MR. KAROTKIN:  But even putting that aside, the way

19   we described those entries are perfectly descriptive of what

20   we're doing.  I mean, I think it's fair to say that anyone

21   reading those can get an idea of the nature of the research

22   we're doing in connection with tax matters related to the plan,

23   in connection with how an environmental trust might work under

24   the plan or what the issues are.  There's nothing mysterious

25   about that.  And, particularly, in view, Your Honor --

MOTORS LIQUIDATION COMPANY, et al.

- 40 -

1          THE COURT:  Well, that's right, Mr. Karotkin.  And

2     let me interrupt you, because as we know from the law of

3     evidence, while the substance of a communication is subject to

4     the privilege, the subject matter isn't anyway.  And normally

5     you can meet the needs of the bankruptcy system by describing

6     the subject matter of the research without disclosing the

7     substance of it except for those relatively rare instances when

8     disclosing subject matters can amount to disclosing substance.

9          MR. KAROTKIN:  Yes, sir.

10          THE COURT:  Okay.

11          MR. KAROTKIN:  So again, I think the substance of the

12     dispute with the fee examiner really, as again the fee examiner

13     indicates, relates to the time spent on the fee application.

14     And it's not just -- again, I think that the response suggests

15     that all of that time was spent reviewing time records.  But

16     that's not the case.  It was reviewing time records.  It was

17     preparing monthly statements.  And it was preparing the fee

18     applications.  And again, I think we're entitled to be

19     compensated for that.  I don't think we are asking to be

20     compensated for any amounts that, as you indicated, Your Honor,

21     are part of the normal billing to nonbankruptcy clients.  And I

22     think our response speaks for itself and I would request that

23     the amount we've requested be allowed.

24          We have agreed to certain adjustments some of which I

25     don't think are appropriate.  But in the interest of time and

- 41 -

1    expense and cost to the estate rather than arguing about it,

2    we've agreed to them.

3              I will note, Your Honor, just in passing, to my issue

4    on practicality, I was given an e-mail trail from the fee

5    examiner to AlixPartners about a two-cent discrepancy.  And

6    this is from the attorneys for the fee examiner to AlixPartners

7    about a two-cent discrepancy in how much was paid to a

8    professional.  Now, I don't know how much time they devoted to

9    that but -- I mean, this is the ultimate in not being

10   practical.

11             And, as I said, I think that, Your Honor, it's

12   incumbent on everybody here to view these fee applications

13   pragmatically.  And I would request that our application be

14   allowed.

15             THE COURT:  All right.  Thank you.  Mr. Williamson or

16   one of your colleagues?

17             MR. WILSON:  Good morning, Your Honor.  Eric Wilson

18   from Godfrey & Kahn on behalf of the fee examiner.  I will just

19   rely on our papers for most of our submission but I want to

20   respond to Mr. Karotkin on a couple of issues.  First of all,

21   with regard to the compensation issues, we anticipated that the

22   Court would view it the way that, in fact, you have which is to

23   separate out those issues that relate specifically to the hoops

24   that must be jumped through for bankruptcy court and those

25   issues that are common to all matters.  And we think we've done

- 42 -

1    that.  In fact, attached to the report are two separate

2    exhibits.  Exhibit D was the fees charged for compensation

3    issues generally which includes fee application matters; and

4    then Exhibit E lists only those entries relating to reviewing

5    time entries.  And respectfully, we think that there is support

6    in the case law for viewing the review of time entries even for

7    compliance with the UST guidelines as a separate matter and

8    noncompensable.  And that exhibit, Exhibit E --

9           THE COURT:  To -- I must confess to you, Mr. Wilson,

10   that I did not read the underlying cases.  But to what extent

11   do those cases analytically drill down, as I did, in trying to

12   ascertain the extent to which the service would be necessary

13   for any client and the service is unique to bankruptcy.  For

14   instance, I have some difficulty seeing how billing to any

15   client outside of the bankruptcy system would have any occasion

16   to cause review of whether you've got it down to six minute

17   increments or have that incremental level of specificity.

18           Now, I'll confess to you, Mr. Wilson, that my

19   experience is informed by the fact that in the thirty years

20   before I was on the bench, I had nineteen years as a general

21   purpose litigator doing bankruptcy along with other stuff.  And

22   it was only in the last eleven that I was immersed in the

23   bankruptcy system.  But unless things have changed since 1970,

24   there is a big difference between how much detail you give to a

25   client in the nonbankruptcy context and that which you got to

- 43 -

1    do in our tent.

2         MR. WILSON:  Right.  And the cases do not drill down

3    like Your Honor is attempting to do to try to separate out the

4    overlapping factors.  And undoubtedly, there are.  Undoubtedly,

5    there are time entries in that exhibit that list the review of

6    time entries that relate to simply the review of time entries

7    generally without regard to whether or not the UST guidelines

8    have been complied with or not.  And there is -- if Your Honor

9    goes through it, I mean, there really is no good way to

10   separate out which of those time entries are related solely to

11   figuring out whether the time entries are billed in one-tenths

12   of an hour and which of those entries are related to have we

13   described this entry with adequate specificity quite apart from

14   the guidelines.

15        THE COURT:  I hear you which is causing me to do

16   my -- a little bit of head scratching in this regard.  In

17   essence, what you're doing then is that you recommend some

18   percentage -- in your case, I think it was fifty percent --

19        MR. WILSON:  Right.

20        THE COURT:  -- on this contested item to try to get

21   your arms around that overlapping type of issue.

22        MR. WILSON:  That's right.  And quite -- and it

23   doesn't only relate to the sort of overhead nature, Your Honor,

24   of reviewing time entries.  The basis for our recommended

25   disallowance not only related to that but also related to the

- 44 -

1    sheer excessiveness, in our view, of how much time was spent on

2    those matters.  In the first fee application, over 900 hours

3    was spent solely reviewing time entries.  And at the time,

4    given the exigencies that existed during that first fee

5    application period, we did not recommend any disallowance but

6    we noted that we would expect that that process be managed more

7    efficiently in the future.  And this time around, we've pointed

8    it out that Mr. Karotkin referred to it as hyperbole, but it's

9    the facts, which are that even though separated out time

10   entries amount to ten weeks worth of time over 40,000 minutes

11   solely reviewing time entries.  That doesn't include anything

12   related to fee applications or anything else.  And we just

13   think that that's excessive to spend that much time reviewing

14   what amounts to a few hundred pages of time entries.  It's a

15   lot of data to go through but we respectfully submit that it

16   could have been done more efficiently.  So that was the basis

17   for the fifty percent recommended disallowance there.

18          With regard to the vagueness issues, Your Honor, we

19   would respectfully disagree with Mr. Karotkin that the issues -

20   - or the entries are sufficient.  With regard to recording time

21   on what e-mails related to, all attorneys have an obligation to

22   record their time quite apart from the United States trustee

23   guidelines.  The United States trustee's guidelines impose an

24   independent obligation when submitting time to, if there's

25   correspondence, to describe the nature of that correspondence

MOTORS LIQUIDATION COMPANY, et al.

- 45 -

1    and who it's with.  That was not done here.  Mr. Karotkin

2    regards imposing some sort of requirement in this regard as

3    silly.  We did not -- we would note that this is not an issue

4    across the entire law firm.  The fee examiner took out a few

5    examples that we regarded as egregious.  These aren't examples,

6    if Your Honor reviews the accompanying exhibit, of .1, .1, .1.

7    These are .5, .4, .6, .3 of reviewed and responded to e-mails.

8    Respectfully, that's not sufficient to determine whether that

9    time spent was reasonable.

10           And with regard to the taxi charges, Your Honor, our

11    interpretation of your ruling from the first interim fee period

12    was that for charges incurred after July 10th that those would

13    be viewed as overhead.  On Friday afternoon, Weil Gotshal did

14    send us a response to our report suggesting that any taxi

15    charges incurred on days where the attorney spent less than six

16    hours on a matter should not be compensated.  We have checked

17    that math and we -- a couple hundred dollars off but their

18    suggested disallowance is accurate there.  We would

19    respectfully suggest that imposing an arbitrary bright line

20    rule like that is not appropriate and that if you look at the

21    examples that they themselves have cited, there are multiple

22    cases in there, and we've done this analysis as well, where

23    attorneys are billing .1, .2 an hour to the GM matter, yet

24    charging the estate for a taxi ride home.  And we respectfully

25    suggest that those sorts of expenses should be disallowed.  And

- 46 -

1    the best way to do it, we would recommend, is to disallow all

2    of those expenses as overhead.  Thank you.

3           THE COURT:  Pause, please, Mr. Wilson.

4           MR. WILSON:  Sure.

5           THE COURT:  If you're talking about the .1, .2 and

6    then charging the estate for the cab, that's a no-brainer.  But

7    there comes to be a gray zone where the lawyer does x hours of

8    work.  And I am uncomfortable about knowing how I draw the line

9    in that gray zone.

10          MR. WILSON:  Well -- are you finished?  Sorry.

11          THE COURT:  No.

12          MR. WILSON:  I don't want to interrupt.

13          THE COURT:  No.  I --

14          MR. WILSON:  Okay.

15          THE COURT:  I pretty much exhausted my ability to

16   contribute to the dialogue.  Let's see what you have to

17   suggest.

18          MR. WILSON:  Well, as Mr. Williamson suggested the

19   last time we were before Your Honor, the issue is not whether

20   that attorney who works twelve hours on a day ought to, as a

21   matter of safety or common decency, get their cab ride home

22   paid for.  I think everyone agrees that they should, that they

23   should not have to pay for that.  The question is who pays for

24   it.  And we would respectfully suggest that that should be an

25   overhead expense borne by Weil Gotshal and not by the estate.

MOTORS LIQUIDATION COMPANY, et al.

- 47 -

1           THE COURT:  Even for a twelve hour day?

2           MR. WILSON:  Yes.

3           THE COURT:  In New York where people don't drive to

4    work --

5           MR. WILSON:  Yes.

6           THE COURT:  -- except the fattest of the fat cats?

7           MR. WILSON:  Yes, Your Honor.  That -- if the Court

8    is going to draw a line, that's certainly the least arbitrary

9    line to draw.

10          THE COURT:  Okay.  Thank you, Mr. Wilson.

11          MR. WILSON:  Thank you.

12          THE COURT:  All right.  Mr. Karotkin, do you need any

13   time for a reply?

14          MR. KAROTKIN:  Yes.  Just one point.  I really don't

15   know what Mr. Wilson's referring to on the .1, .2 on the taxis.

16   Those are exactly the things we eliminated in our proposal

17   where we suggested six hours.  So in our reply what's reflected

18   in what we believe was an appropriate reduction, it takes into

19   account exactly the items he said.  And we would not charge the

20   estate for that.  And -- I mean -- Your Honor, I don't think

21   you flatly ruled that taxis were not reimbursable.

22          THE COURT:  No, I did not.  But where I --

23          MR. KAROTKIN:  In fact, quite the opposite.

24          THE COURT:  -- was vague was how I draw the line.

25   And I'm still trying to get my arms around how I draw the line.

- 48 -

1          MR. KAROTKIN:  Okay.  Well, we think we have made a

2    more than appropriate suggestion in that regard.  Thank you,

3    sir.

4          THE COURT:  Okay.  Thank you.  Okay.  Kramer Levin.

5    Mr. Schmidt?

6          MR. SCHMIDT:  Good morning, Your Honor.  For the

7    record, Robert Schmidt, Kramer Levin Naftalis, committee

8    counsel.  Your Honor, I thought I had escaped the case but I

9    guess not.  And I'm happy to be back.

10          Your Honor, we did engage in a quite meaningful

11    dialogue with the fee examiner, at least two rounds where we

12    did agree to a series of concessions.  We made a settlement

13    proposal on the balance of the remaining items which the fee

14    examiner elected to treat as a voluntary reduction as opposed

15    to what it was, a settlement proposal.  We certainly don't

16    think that's an appropriate way to deal with settlement

17    proposals.  Having said that, as we noted in our papers, we're

18    prepared to stand by those concessions that we offered up.

19          There are, as the Court is aware, a series of

20    familiar topics that remain outstanding and I'll try not to

21    retread over the ground that Mr. Karotkin capably handled.  But

22    we certainly do agree with his arguments with respect to the

23    billing and fee app matters.

24          THE COURT:  Pause, please, Mr. Schmidt.  How much of

25    the disputed matter is affected by the -- on Kramer Levin is

- 49 -

1    affected by the legal principle that I thrashed out with Mr.

2    Karotkin and Mr. Wilson?

3            MR. SCHMIDT:  In terms of the timing of the fee app

4    versus the timing of your ruling?

5            THE COURT:  Am I correct that there is a dispute that

6    affects Kramer Levin on the same issue that I dealt with Mr.

7    Karotkin and Mr. Wilson on?

8            MR. SCHMIDT:  That's correct, Your Honor.

9            THE COURT:  And what kind of money are we talking

10   about there?

11           MR. SCHMIDT:  On the billing and retention matters,

12   it's approximately 7,200 dollars.

13           THE COURT:  So you have the same concept but a much

14   smaller amount in controversy?

15           MR. SCHMIDT:  Absolutely the same context.  We follow

16   a very similar process that the Weil Gotshal firm follows in

17   terms of the manner in which we review the time details for

18   compliance with guidelines, privilege and confidentiality and

19   the like.  We believe that we've gotten it down to a pretty

20   good process right now that's streamlined.  Nonetheless, it's

21   laborious.  It takes time.  And it's not something that can

22   readily -- all aspects of which can be readily turned over to a

23   paralegal.  We believe that attorney review is required.

24           THE COURT:  Continue, please.

25           MR. SCHMIDT:  Certainly, Your Honor.  So the other

- 50 -

1    matters that remain open are a series of objections to

2    repetitive -- what the examiner calls a repetitive and

3    uninformative entries.  And they primarily relate to entries by

4    my partner, Mr. Rogoff, who until recently, was the partner

5    level traffic cop, for lack of a better word, on the case.  He

6    directed all case related activities, interacted with partners

7    in other departments.  He fielded hundreds, if not thousands,

8    of calls and e-mails during this time pe -- 'cause he was the

9    name on the masthead for the creditors' committee.  During this

10   time period, the bar date took place which generated a

11   substantial number of calls and e-mails.  We have a log of

12   every call that came in that Ms. Sharret maintains and I

13   believe it was well into the thousands.

14        So there were very routine tasks that took place --

15        THE COURT:  Pause, please, Mr. Schmidt, because I

16   assume that the log would show the caller, date and approximate

17   time.  But would it show the lawyer or para who fielded the

18   call?  And if so, would it show the amount of time that the

19   lawyer or para has spent in dealing with it?

20        MR. SCHMIDT:  I would have to confirm that, Your

21   Honor.  With respect to calls, we had a GM hotline number set

22   up.  Calls came into that hotline.  They were monitored.  The

23   hotline -- a message box was monitored on a daily basis and the

24   responsibility was doled out amongst various attorneys.  But in

25   terms of this category, a number of calls mean those came in

MOTORS LIQUIDATION COMPANY, et al.

- 51 -

1    directly to Mr. Rogoff who dealt with them as expeditiously as

2    possible on a daily basis.

3            THE COURT:  So you're saying that some came into the

4    hotline and some may have somehow found their way to Rogoff

5    without going through the hotline.

6            MR. SCHMIDT:  Precisely, Your Honor.

7            THE COURT:  All right.  Continue, please.

8            MR. SCHMIDT:  So, Your Honor, with respect to that

9    category of objections, and the amount is 17,355 for a fifty

10   percent reduction being sought, we offered to -- well, what we

11   thought in conversation was a logical approach.  The fee

12   examiner's counsel questioned why this type of task was being

13   done by somebody at Mr. Rogoff's seniority level.  What we

14   offered to do as a compromise was to basically across the board

15   in that category, reduce Mr. Rogoff's hourly rate to the rate

16   of a first year partner at the firm.  So we do believe it was

17   partner level responsibility work but we reduced it down to the

18   lowest partner level hourly rate which I believe was 680

19   dollars.

20           THE COURT:  The problem that I have, Mr. Schmidt,

21   another head scratch.  If you're talking about fielding a call

22   from a creditor, with the benefit of hindsight, you might know

23   that this was such an easy question the creditor was asking.

24   Let's just take an example:  so what's the bar date?  What's

25   the date that I mail my proof of claim into?  That you could

MOTORS LIQUIDATION COMPANY, et al.

- 52 -

1    deal with it with a second year para.  But other things might

2    be of the level that they would require not just a lawyer but

3    even a lawyer at the partner level.  And I -- how do I deal

4    with the situation that you don't know what level of staffing

5    is required until you know the exact issue that the caller is

6    raising?

7              MR. SCHMIDT:  Well, that -- Your Honor, we can only

8    be as practical and judicious as we can be.  I know if I get a

9    call on something similar, like how do I file a proof of claim,

10   what do I do, I'll refer it to either a junior associate or a

11   paralegal where possible.  Sometimes it takes more time to

12   delegate things out; it's sometimes easier to do it yourself

13   and field the call yourself.  So I don't know that there's any

14   real --

15             THE COURT:  Yeah.  You hit on another thing.  To go

16   through the ritual of farming out an inquiry rather than

17   dealing with it yourself has costs associated with it also.

18             MR. SCHMIDT:  That's absolutely correct, Your Honor.

19   So it really is incumbent on the attorney to be judicious and

20   be practical wherever possible as Mr. Karotkin noted in his

21   argument.  There's no magical line of demarcation.  You just

22   have to do your best.

23             THE COURT:  I hear you.  Continue, please.

24             MR. SCHMIDT:  So, Your Honor, so we thought our

25   proposal to reduce that category of time by 7,800 dollars was

- 53 -

1    appropriate and reflective of a responsible way to deal with

2    the matter.

3            Moving on, Your Honor, vague entries was obviously

4    another topic that the fee examiner objected to.  Mr. Karotkin

5    handled that quite well.  I will just note just because an

6    entry has a word like "follow-up on" or "attention to", that

7    seems to be a magical buzz word for the fee examiner's --

8            THE COURT:  Well, you know, funny you said that, Mr.

9    Schmidt because on "follow-up", I can agree with you.  But I

10   have seen "attention to" or "attention to matter" since the

11   first bill I saw which I probably saw as an associate and not a

12   partner.  And it's always been like chalk on the blackboard to

13   me.  I really hated when people described their services that

14   way because it doesn't tell the reviewer or even the client a

15   blessed thing.  So how much of that do we have here?

16           MR. SCHMIDT:  I don't have a breakdown on that, Your

17   Honor.  I think the vague entry challenges were a variety of

18   different categories.  For example, Your Honor, one area of

19   notice would be where two lawyers, to use an example, in our

20   environmental group are having a conversation in recorded in

21   the environmental matter, the complaint was well, they didn't

22   say what they were talking about.  Well, it's two environmental

23   lawyers and the time is charged to the environmental matter.

24   Most of the topics that they would be discussing would be

25   subject to confidentiality because they religiously avoid

- 54 -

1    disclosing references to any particular sites that may have

2    issues.

3              THE COURT:  Why is discussing the site that has an

4    issue so sensitive?

5              MR. SCHMIDT:  Just for confidentiality purposes, Your

6    Honor.  There's a lot of speculation as to what's going on with

7    different sites.  People are very keenly focused on the

8    environmental --

9              THE COURT:  Doesn't everybody in the western world

10   know that we've got a polluted site in upstate New York that's

11   been the subject of loud -- not loud but forceful and

12   articulate complaints by both the New York AG and the St. Regis

13   Mohawk tribe?

14             MR. SCHMIDT:  Your Honor, certainly, I think most

15   people do know about it but most people don't know what's going

16   to happen about it.

17             THE COURT:  Right.  But the fact that two Kramer

18   Levin lawyers are talking about that site -- and forgive me if

19   I forgot its exact name -- that isn't giving away the nuclear

20   launch codes.

21             MR. SCHMIDT:  That's correct, Your Honor.  I would

22   agree with that.  Having said that, in an abundance of caution,

23   they've been very careful with their timekeeping records.  I

24   will note, as I should have at the onset, in our first response

25   to the fee examiner's initial letter, we did provide

- 55 -

1    substantial additional and supplemental information with

2    respect to the time entries.  The annotations of the time

3    detail were attached to some of the letter correspondence.

4    Having provided that supplemental information, the examiner is

5    still intent on pressing its objection.  We just don't think

6    it's appropriate.  We think we've provided the additional

7    information with the guidance of the April ruling.  The next

8    round, I believe -- the next round of fee apps will hopefully

9    be substantially improved that we think, with that, that the

10   offer that we've made to reduce the vague entry category by

11   five percent was an appropriate "penalty" for whatever flaws

12   the fee examiner and the Court still believe exists.

13            THE COURT:  Okay.  Continue, please.

14            MR. SCHMIDT:  Your Honor, on expenses, I won't spend

15   too much time on this because it's so de minimis.  I will note

16   that in the entire fee period, Kramer Levin charged the estate

17   for fourteen cars and eighteen late night meals which, I think,

18   in the scheme of this case is de minimis, and in each case was

19   perfectly appropriate and was as a result of pressing matters,

20   pressing committee business that needed to take place late into

21   the evening.  And we also provided the fee examiner with

22   specifics of each of those instances.  But as I said, it is a

23   fairly modest expense at this point in time.  But we do think

24   it's appropriate and compensable.

25            THE COURT:  Okay.

- 56 -

1          MR. SCHMIDT:  Your Honor, I guess the last item that

2     I inadvertently skipped over was block billing which is also de

3     minimis in the context of this case.  We provided substantial

4     supplemental information to the fee examiner.  We went through

5     the complaint of time entries and supplemented them where we

6     can by going back and looking at things like meeting minutes

7     and notes, e-mail and traffic and the like to assist in

8     reconstructing the time entries that the fee examiner

9     complained about.  With that, we also offered up a five percent

10    reduction in that time.  The examiner is seeking fifteen

11    percent.

12         THE COURT:  I ruled on block billing last time if I

13    recall because I seem to remember agreeing with the point --

14    was it Mr. Mayer? -- had made about the purpose of the block

15    billing limitation?  Do you remember the percentage that I

16    applied to the block billing objection thing in the Kramer

17    Levin context?

18         MR. SCHMIDT:  I would have to double check, Your

19    Honor.  I don't remember the precise percentage even though I

20    read the transcript this morning.

21         THE COURT:  I'm looking at page 30 of the transcript.

22    "I agree with Kramer Levin's contention that the purpose of the

23    block billing rule is to correct abuse where it might appear

24    that lawyers are running the clock fill idle hours."  And then

25    I talk about if I ever saw that, what would happen.  The

- 57 -

1    discussion goes on for several pages.  I may have to look at

2    this again, Mr. Schmidt, but I'm inclined to go back and see

3    what I said at that time and to try to be consistent.

4            MR. SCHMIDT:  That's fair enough, Your Honor.  My

5    point on that is I believe the time was substantially in better

6    shape than the prior application.  The fee exam --

7            THE COURT:  That would seemingly be only by reason of

8    the fact that things were less crazed and hectic because you

9    still didn't have my ruling at that point.

10           MR. SCHMIDT:  That's certainly correct, Your Honor.

11   Things obviously, after the closing, substantially -- the

12   emergent nature of the work subsided.  There was still a lot of

13   work but it just was not at the frantic and hectic pace.  So

14   presumably, it was -- people had more time to accurately record

15   time as opposed to when they're working twenty hours a day on

16   an emergency.

17           THE COURT:  Okay.  Does that take care of it?

18           MR. SCHMIDT:  I think I covered all the items, Your

19   Honor.  Unless you have any questions, I'll --

20           THE COURT:  Okay.  I'll hear from counsel for the

21   examiner now.

22           MS. STADLER:  Thank you, Judge.  Katherine Stadler,

23   Godfrey & Kahn, appearing for the fee examiner, Brady

24   Williamson.  We've got the transcript from April 29th and are

25   looking for your treatments of block billing to answer that

                                                                    - 58 -

1    last question.  And I should have that for you by the end of my

2    remarks.

3              THE COURT:  Okay.

4              MS. STADLER:  In response to Mr. Schmidt's

5    statements, I want to first address this issue of the

6    settlement proposal and the evidentiary question presented.

7    The fee examiner and as his counsel, we have viewed this

8    process as somewhat unique and different from an ordinary

9    litigant in a bankruptcy contested matter.  The fee examiner

10   was appointed by the Court as an adjunct to the Court's own

11   process of fee review and, as you noted in our last hearing, to

12   assist in releasing some of the burden on the United States

13   trustee's office.  While we understand the Rules of Evidence

14   and the purpose of Federal Rule of Evidence 408 as applied in

15   the bankruptcy court, we view our role here as to report to the

16   Court on the efforts the fee examiner is undergoing to both

17   resolve issues and ensure compliance with the Code and the

18   guidelines.  To the extent that the Court believes that such

19   offers of compromise and communications from professionals, as

20   the one that we incorporated into our report, should be viewed

21   as privileged and not fair fame for inclusion in a report, we

22   can certainly abide by that ruling.  That was not how we

23   understood the fee examiner's role in preparation of this

24   report.  Specifically, we can certainly amend the report that

25   we have filed on Kramer Levin to recharacterize the

- 59 -

1    recommendations as recommendations rather than voluntary

2    reductions and we are happy and able to do that on very short

3    notice.  So just guidance from the Court on that point and we

4    can remedy that problem if it is a problem.

5              To address the sub --

6              THE COURT:  Well, Ms. Stadler --

7              MS. STADLER:  Yes?

8              THE COURT:  -- since everybody in the room and

9    especially you folks wants to -- no.  I think I should say

10   especially you folks and me wants to save money, is there any

11   reason why I just can't chalk it up to a misunderstanding and

12   look at the issues afresh from my own perspective?

13             MS. STADLER:  No reason whatsoever.

14             THE COURT:  Okay.

15             MS. STADLER:  On billing and retention, you asked Mr.

16   Schmidt what the dollar amount was.  And I'm not sure if there

17   was a miscommunication but Mr. Schmidt said the billing and

18   retention issue for Kramer Levin was a 7500 dollar issue.

19             THE COURT:  Yeah.  I heard him in the same way.

20             MS. STADLER:  That's the percentage reduction that

21   we're proposing for Kramer Levin.  That is fifteen percent of

22   the total charge for billing and retention.

23             THE COURT:  Fifteen percent of the gross for that

24   matter --

25             MS. STADLER:  Correct.

MOTORS LIQUIDATION COMPANY, et al.

- 60 -

1          THE COURT:  -- resulting in a 7500 dollar write-off,

2     so to speak.

3          MS. STADLER:  Right.  Right.  The gross was 48,000

4     dollars and the details of that are in paragraph 29 of our

5     report.  Paragraph 16 of our report notes an additional 6,000

6     dollars in items that we flagged as clerical but that are also

7     related to time entry and not included in the 48,000 so, in

8     total, were over 50,000 dollars for fee application matters for

9     Kramer Levin.

10          On the issue of the partner -

11          THE COURT:  Pause, please, Ms. Stadler.

12          MS. STADLER:  Yes.

13          THE COURT:  The fifteen percent of the 48,000 buck

14     gross which led to 7500, was that a -- the gross amount of the

15     adjustment that your folks had requested or was that what

16     Kramer Levin had proposed in the way of a write-off to

17     consensually resolve the matter from the way Mr. Schmidt

18     described it?

19          MS. STADLER:  That is our recommended reduction.  I

20     am not aware that Kramer Levin agreed -- or conceded to any

21     reduction in that category.

22          THE COURT:  Thank you.  Okay.

23          MS. STADLER:  On the vague and repetitive

24     communications --

25          THE COURT:  Pause, please, Ms. Stadler.

- 61 -

1           MS. STADLER:  Yes.

2           THE COURT:  And if you need to, consult with one of

3    your colleagues on this.  If I heard it correctly, you were

4    recommending a fifteen percent reduction on the amount claimed

5    for post-retention getting yourself compensated services, if I

6    can use that expression --

7           MS. STADLER:  Correct.

8           THE COURT:  -- is that fifteen percent the same or

9    different than that recommended for other law firms similarly

10   situated such as Weil and perhaps Butzel --

11          MS. STADLER:  There's a difficulty there, talk about

12   a head scratcher, finding two law firms that are similarly

13   situated.  The situation of Weil and the scope of the services

14   provided there versus the creditors' committee versus a special

15   counsel like Butzel Long, it's very hard, in the fee examiner's

16   view, to find, as you said, the sweet spot, what the right

17   number is without taking into consideration the nature of the

18   engagement, the kind of work that was being performed in the

19   fee period.

20          THE COURT:  So basically, you were more fact specific

21   in terms of recommending a particular reduction --

22          MS. STADLER:  Yes.

23          THE COURT:  -- as compared and contrasted to saying

24   fifteen percent is always the appropriate adjustment to be made

25   for the cost of getting yourself compensated after the filing

- 62 -

1     of a case?

2              MS. STADLER:  That's correct.  There was no bright

3     line applied to professionals on this.

4              THE COURT:  Okay.  Continue.

5              MS. STADLER:  The issue of the partner billing in

6     excess of 50,000 dollars for repetitive tasks, I want to be

7     clear on the source of the fee examiner's concern about these

8     entries.  It is not, or at least it wasn't initially, that the

9     timekeeper was doing work that was below his pay grade.  If you

10    look at tab E to the fee examiner's report, there is a detail

11    of 50,000 dollars in time entries that --

12             THE COURT:  Ms. Stadler, I'm going to have to

13    apologize to you.  So that I can leave this stuff in varying

14    places and when I can, I don't always take all of the exhibits

15    with me.  So while I read your master report, if I can call it

16    that, plus each of the individual objections, I did it without

17    the benefit of the attachments.  So if there's something that

18    you want me to see, I'll trust you to characterize it.  But if

19    you think I actually have to eyeball it, I need you to hand it

20    up to me.

21             MS. STADLER:  Okay.  I don't think you actually need

22    to eyeball it.

23             THE COURT:  Okay.

24             MS. STADLER:  I think I'll characterize it for you

25    and if you disagree, I'd be happy to hand up a set for the

MOTORS LIQUIDATION COMPANY, et al.

- 63 -

1    Court.

2            The descriptions that are objected to -- I can't even

3    find an instance flipping through.  Well, I guess there are

4    calls to creditors regarding status of case.  That shows up

5    over and over again:  .2, .5, .3.  But it also includes

6    "attention to staffing and project allocation", "attention to

7    staffing and project allocation", "attention to sale",

8    "attention to real estate issue", "attention to" -- again --

9    "project staffing".  First of all, not all of it is fielding

10   creditor calls.  And, second of all, the nature of the fee

11   examiner's criticism of this biller's time entries, which,

12   incidentally, is not the first time we've seen it, is that

13   there's no way to tell exactly what that timekeeper was doing

14   in that time.  If he was fielding a call from a creditor who

15   saw his name on a pleading and was asking about the bar date

16   for a proof of claim, there's no way to know that.  And whether

17   it is or isn't in his pay grade, the point is the descriptions

18   we're getting for that timekeeper's work, which is substantial,

19   doesn't allow us to determine whether that timekeeper is adding

20   value to the estate at any billing rate but particularly when

21   that billing rate is over 800 dollars an hour.  And again, this

22   is not the first time we've seen this infirmity with this

23   particular timekeeper.  And unlike the other professionals,

24   Kramer Levin did have a chance to fix the fee application after

25   the April 29th ruling because they specifically called the fee

- 64 -

1    examiner, asked if we had an objection to their providing a

2    supplement.  And we said no, of course we didn't.  So they did

3    fix it once.  And these are the infirmities that remain after

4    having the application reviewed and revised in light of Your

5    Honor's April 29th ruling.

6         At some point, as you've been saying all day, a line

7    has to be drawn.  And we think that it is reasonable to draw a

8    line and cut the time of a timekeeper who is failing to

9    disclose the value they're adding to the process at fifty

10   percent.

11        You also asked Mr. Schmidt how much of the time is

12   attention to the exhibits that include those vague

13   communications and vague tasks, those two categories there.

14   The "attention to" appears in the "Vague Tasks" category.  And

15   flipping through, it's a substantial portion.  That is

16   something that we can easily quantify with the help of Stuart

17   Maue.  If the Court is interested, we'd be happy to provide a

18   supplemental filing that quantifies the "attention to" entries.

19        On the expenses, the issue has been discussed.  And I

20   don't want to belabor it.

21        THE COURT:  Pause, please, Ms. Stadler.

22        MS. STADLER:  Yes.

23        THE COURT:  What's the gross amount of the vague

24   category and the net amount for which you're asking for a

25   reduction?

- 65 -

1            MS. STADLER:  Exclusive --

2            THE COURT:  I mean, I assume it's in your --

3            MS. STADLER:  -- of the repetitive entries that I

4    just discussed, which is about 50,000, we have 23,000 dollars

5    in "Vague Communications".  That is, communications where the

6    subject matter and the recipient of the communication isn't

7    identified.  And 70,000 dollars in "Vague Tasks".  Plus an

8    additional 50,000 in --

9            THE COURT:  Wait.  I lost you.  Can you either repeat

10   yourself or flesh out what you just said because I didn't

11   understand the difference between the 23,000 --

12           MS. STADLER:  Okay.  "Vague" --

13           THE COURT:  - bucks and the 70,000 bucks.

14           MS. STADLER:  Yes.  I'm sorry about that.  "Vague

15   Tasks" would be tasks that are described by timekeepers other

16   than the specific one that we singled out, too vaguely to

17   determine what the value provided was.  That total is

18   $70,185.50.  "Vague Communications" are communications that

19   have not identified the subject matter or the recipient of the

20   communication.  And that total is $23,237.83.  And then there's

21   a third category of "Repetitive Task Entries" which also are

22   vague but are not included in those other numbers.  This is the

23   Rogoff problem which is a 50,000 dollar problem on this second

24   fee application.  So all told, 110,000.

25           THE COURT:  And you were --

- 66 -

1          MS. STADLER:  The reduction --

2          THE COURT:  Yes.  Forgive me.

3          MS. STADLER:  That was the second part of your

4     question.  The reduction, we recommended for the repetitive

5     tasks of the individual timekeeper.  In other words, the

6     staffing and allocation of work was a fifty percent reduction

7     of the 50,000 dollar category.  So approximately, 25,000.

8          The reduction we have recommended for the vague

9     timekeeping -- give me a second -- is, I believe, fifteen

10    percent.  Yes.  Fifteen percent of vaguely described services

11    or a total of about 15,000 dollars.  And then what --

12         THE COURT:  That being roughly fifteen percent of

13    93,000 bucks?

14         MS. STADLER:  Fifteen percent would be the proposal,

15    yes.

16         THE COURT:  Okay.  And then what we haven't discussed

17    is the block billing which, as Mr. Schmidt said, was a smaller

18    problem.  That was about a 30,000 dollar problem on this fee

19    application.  And we suggested a similar but maybe a little bit

20    higher reduction for the block billing.  Oh, we suggested a

21    fifteen percent reduction of the -- on the block billing as

22    well.  So that would be another 3,000.

23         Now, to answer the question we started with, in the

24    first interim fee period, Your Honor disallowed 30,000 dollars

25    of Kramer Levin billing for vague entries and 50,000 dollars of

MOTORS LIQUIDATION COMPANY, et al.

- 67 -

1    disallowances for block billing.  And of the total fee

2    applications --

3                THE COURT:  Like Professor Kingsfield, every question

4    leads to another question.

5                MS. STADLER:  Yeah.

6                THE COURT:  What kind of percentages was I talking

7    about there?

8                MS. STADLER:  I'm going to have to pull this first

9    fee application and answer that in a moment.

10               THE COURT:  Okay.

11               MS. STADLER:  Something less than twenty-five and

12   fifteen 'cause we had recommended twenty-five and fifteen last

13   time and thirty and fifty was less than that.  But I don't know

14   what the exact percentage is.

15               On the expenses, I think the car services and meals

16   have been discussed ad nauseum.  I will just add that in terms

17   of drawing lines, on behalf of the fee examiner, I am confused

18   by how a six-hour spent on a project during the day justifies a

19   late night cab because if a professional works six hours on one

20   case and six hours on this case, why is the cab being billed to

21   the estate and not the other client?

22               THE COURT:  Well, I hear you.  But the difficult part

23   is if you do the six hours on your other client the first time

24   and you spend six hours at night, you might get one result.

25   But that also is a function of somebody perhaps deciding when

MOTORS LIQUIDATION COMPANY, et al.

- 68 -

 1    he or she is going to do the work.  On the other hand,

 2    sometimes you can't do the work until the surrounding legal

 3    life you have permits you or requires you to do the work.

 4              MS. STADLER:  Right.

 5              THE COURT:  And anybody who's been an associate in a

 6    law firm, and I suspect there are some associates in the room,

 7    know that some partners have a knack for telling you to do the

 8    work at 4:00 in the afternoon or thereafter.

 9              MS. STADLER:  Right.

10              THE COURT:  And again, I got a head scratcher, Ms.

11    Stadler.

12              MS. STADLER:  I agree with you.  I think the easy

13    answer is to, as we did with the initial phase of this case,

14    acknowledge the exceptional nature of the time period, assume

15    that the late night cabs that were taken and the car services

16    and the meals that were taken in the six weeks were due to long

17    billing days that were required by the exigencies of the case.

18    During mis -- shall we call it a period of lower or more

19    manageable work loads make the assumption that none of them are

20    and perhaps when plan confirmation time comes around or some

21    other big issue comes around where the volume of work picks up

22    again, we can create another amnesty period and maybe hope that

23    it washes out.  It's not an easy question to answer.  The fee

24    examiner raises the issue in light of the Court's comments at

25    the last hearing and seeks the Court's guidance on how we

- 69 -

1    should be treating those matters going forward.

2              THE COURT:  Okay.

3              MS. STADLER:  I'll get you an answer on the

4    percentages on the --

5              THE COURT:  That's fine.

6              MS. STADLER:  Thank you.

7              THE COURT:  Okay.  Mr. Schmidt, I'll take brief

8    reply.

9              MR. SCHMIDT:  Your Honor, as I was sitting there

10   listening to Ms. Stadler, she used the word professional

11   several times.  And we can't lose sight of the fact that we are

12   professionals.  Lawyers are professionals.  They have ethical

13   rules that they need to abide by.  And I think it really delves

14   into extreme micromanagement to get too concerned over whether

15   a professional decides at 10:00 in the evening they do want to

16   take a car home as opposed to the subway.  I think we really

17   spent --

18             THE COURT:  Oh, I would not for half a second suggest

19   to anybody who lives in the New York metropolitan area that he

20   or she needs to take the subway at 10:00.  But it's complicated

21   by the fact that the issue is whether the law firm which

22   presumably is getting more than the -- for whom the firm is

23   getting 200, 400, 600, 800 or 1,000 bucks an hour for the

24   lawyer's professional time absorbs the cost of that lawyer's

25   cab ride or puts it on the estate.

- 70 -

1         MR. SCHMIDT:  Fair enough, Your Honor.  But I think

2    you have to rely on the professionals to know if they're

3    working till 9, 10 on a GM-related matter that it's an

4    appropriate expense to bill through.  Your Honor is correct,

5    you don't always know what your schedule is.  You don't always

6    know when issues are going to arise, when you're going to have

7    to work late.  You don't always have the luxury of saying,

8    okay, I'm going to work on Chrysler in the morning and GM in

9    the evening, or vice versa.  Sometimes out of all of our

10   control.  That's the only point there, Your Honor.  And it is,

11   as I noted in our application, a fairly minor element of the

12   expenses sought.

13        Your Honor, we did spend upon getting the examiner's

14   report, a fair bit of time supplementing the time detail and

15   providing explanations.  They seem to largely have been ignored

16   which is somewhat frustrating.  We certainly will be more

17   vigilant in the upcoming fee applications in light of Your

18   Honor's rulings.  We do believe that the time detail is

19   accurate and clearly shows what work was being done and why it

20   was being done.

21        So, on that front, Your Honor, I can only say we just

22   disagree with where the fee examiner is coming out.  We believe

23   the voluntary reductions that we have offered up are

24   appropriate.  And we would rest on the argument in the papers.

25        Oh, and on the 408 point, Your Honor, I'm happy to

- 71 -

1   chalk that up to a misunderstanding.  I do think that this

2   process should be a cooperative process.  You should be able to

3   speak freely and have a dialogue without it coming back to bite

4   you.  But we will work on that on the next go-around.

5          THE COURT:  Well, I totally agree that people should

6   speak freely.  By the same token, I think that any offer

7   requires an acceptance.  And I assume you can live with me

8   giving everything a fresh look and saying no hard feelings to

9   the extent either side mischaracterized the other's position.

10  It was just a misunderstanding.

11         MR. SCHMIDT:  That's absolutely correct, Your Honor.

12         THE COURT:  Very well.  Okay.

13         MR. SCHMIDT:  Thank you.

14         THE COURT:  How much do I need to deal with on FTI?

15  Is there somebody here on behalf of FTI?

16         MR. EISENBAND (TELEPHONICALLY):  Your Honor, Michael

17  Eisenband is on the phone.

18         THE COURT:  All right.  Mr. Eisenband -- frankly, Mr.

19  Eisenband, since you were ahead on the tentative except for

20  having to eat charges on meals, I'm going to ask the fee

21  examiner's rep or counsel to speak first and you can respond,

22  Mr. Eisenband.

23         MR. EISENBAND:  Thank you, Your Honor.

24         THE COURT:  Come on up, please.

25         MS. ANDRES:  Thank you, Your Honor.  Carla Andres of

- 72 -

1    Godfrey & Kahn.  I've had the privilege of speaking with Mr.

2    Eisenband in vigorous debate over the past few weeks.  And

3    essentially, the bottom line on this, Your Honor, is that the

4    fee examiner is not requesting specific disallowances in

5    connection with any of the fee applications, the interim fee

6    applications of FTI.  Instead --

7             THE COURT:  Do you want simply a reservation of

8    rights come final fee app time?

9             MS. ANDRES:  Exactly, Your Honor.  And we believe

10   absent further guidance from the Court that the appropriate way

11   in which to evaluate that is on a going forward basis as we

12   received each fee application to make that something that we

13   can evaluate in a manageable manner at a time when it's still

14   fresh in the minds of FTI and their professionals as well when

15   we have questions and concerns.  As you can see from their

16   report, there were certainly many, many issues which we were

17   able to raise and work through a resolution of which addressed

18   our concerns.  And I believe that was necessary and appropriate

19   as part of the process.

20            THE COURT:  All right.  In light of that, do you need

21   to say anything, Mr. Eisenband?

22            MR. EISENBAND:  I do not, Your Honor.

23            THE COURT:  Okay.  I can rule on this one on the spot

24   then.  You have the reservation of rights as, of course, does

25   Mr. Eisenband and his firm.  And Mr. Eisenband, you're going to

MOTORS LIQUIDATION COMPANY, et al.

- 73 -

1    have to eat the incremental charge over the standard amount.

2              MR. EISENBAND:  That's fine.

3              THE COURT:  Okay.  Butzel Long.

4              MS. ANDRES:  I have Butzel Long as well, Your Honor.

5              THE COURT:  Okay.  On this one, however, I need to

6    think for a second as to the order.  Since Butzel Long is ahead

7    on the tentative, I think I want to hear from you while you're

8    up there, Ms. Andres.

9              MS. ANDRES:  Thank you.  I also will keep Butzel Long

10   brief.  As you're aware, it's a very narrow issue.  On the

11   first interim fee application, the fee examiner had raised

12   concern regarding the time related to compensation.  And we

13   certainly have the Court's remarks on that and the benefit of

14   those.  And as we understand it, we've reached an agreement

15   that it takes a certain amount of time in which to deal with

16   retention issues regardless of how much time is or isn't

17   billed.  We do not believe, however, that the issue of billing

18   and fee applications is necessarily something that should come

19   out in the wash.  Both the first fee application and the second

20   interim fee application were in the approximate range of

21   250,000 dollars.  Sixteen percent of the time billed on the

22   second interim fee application was related to billing and fee

23   application.  We also had broken out time that was identified

24   as administrative and clerical time much of which was reviewing

25   invoices, communicating with the accounting department

09-50026-mg    Doc 6357    Filed 07/01/10    Entered 07/16/10 12:41:40    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 74 of 105

- 74 -

1    regarding the pro formas and similar issues.  We did not

2    request a disallowance in connection with the administrative

3    and clerical issues, which fell into two general categories,

4    not solely invoicing, but instead identified the fact that

5    because we were requesting a disallowance in connection with

6    the billing and fee application process that those amounts be

7    subsumed in the more general disallowance.

8                We did request a four percent across the board

9    ceiling, if you will, on fee application, not for a particular

10    reason but in light of the fact that we are aware in Lehman, as

11    you are, that one percent was a suggested number looking --

12                THE COURT:  Well, pause there, Ms. Andres.

13                MS. ANDRES:  Sure.  Absolutely.

14                THE COURT:  I saw at page 7 of your brief "A one

15    percent cap for compensation in ongoing billing matters has

16    been suggested in Lehman Brothers."  And when I read that, I

17    scratched my head.  Passive voice.  Doesn't say who it was

18    suggested by.  It doesn't give me the statement as to whether

19    it was a judge, on the one hand, or an advocate on the other.

20    And it doesn't give me the transcript of the ruling or any

21    written opinion by which the ruling was articulated.  Parties

22    quoted me early and often from the April 29th transcript.  But

23    there was no comparable quotation from a judge vis-à-vis this.

24    Frankly, I don't know how I deal with that statement unless

25    there was something in your submission that I missed.

09-50026-mg    Doc 6357    Filed 07/01/10    Entered 07/16/10 12:41:40    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 75 of 105

- 75 -

1          MS. ANDRES:  No, Your Honor.  There was not anything

2    in the submission that you missed.  That recommendation or

3    suggestion, if you will, came from the fee committee.  I'm not

4    aware -

5          THE COURT:  From an advocate?

6          MS. ANDRES:  Yes, absolutely, Your Honor.  And we are

7    not advocating that one percent is appropriate.  We simply have

8    provided that as a range of which has been discussed.  We chose

9    four percent looking more at what appears to be reasonable in

10   light of the work that has been performed.  As Ms. Stadler

11   spoke earlier, each fee application we have reviewed on its own

12   individual basis as well.  And the work that has been performed

13   by Butzel, which has been requested and has been admirably

14   done, the billing for that work is fairly routine, fairly

15   straightforward and not complicated.  And again, sixteen

16   percent of that time which amounted to approximately 36,000

17   dollars was spent reviewing the fee application, reviewing the

18   invoices and preparing the fee application.  So the four

19   percent was proposed as an alternative.  Certainly, if there

20   are other ways -- there are certainly other ways to evaluate

21   what an appropriate cap should be or whether simply making a

22   disallowance for services that would have been provided to any

23   other client for billing or invoicing matters should be

24   disallowed.

25          THE COURT:  Okay.  Am I right that that's really the

- 76 -

1    major bone of contention --

2            MS. ANDRES:  That is the major bone of contention --

3            THE COURT:  -- between you and Butzel?

4            MS. ANDRES:  -- in this particular case, yes.

5            THE COURT:  Okay.  Mr. Fisher?

6            MR. FISHER:  Good morning, Your Honor.  Eric Fisher

7    from Butzel Long, special counsel to the creditors' committee.

8    As Your Honor indicated in the tentative ruling, the principle

9    here is similar to the principle that Your Honor addressed with

10   regard to the Butzel fees at the earlier hearing.  And that is,

11   where the fees incurred for substantive work are relative to

12   the case modest, is it appropriate to apply a percentage cap

13   when considering fees incurred in connection with getting

14   compensated or the earlier ruling related to fees related to

15   getting retained?  And we think, here, that the four percent

16   cap that's been applied is arbitrary.  There is a certain

17   minimum amount of work that needs to be done in order to

18   responsively prepare fee applications that comply with the

19   guidelines and comply with the orders in this case.  And we've

20   done that.  The amount came to, as the fee examiner indicated,

21   approximately 35,000 dollars, fees related to getting

22   compensated.  We believe that, overwhelmingly, those fees

23   relate to the incremental cost associated with what needs to be

24   done to get compensated in a bankruptcy case such as this and

25   do not relate to routine billing matters that we would not

MOTORS LIQUIDATION COMPANY, et al.

- 77 -

1      typically pass along to a client.

2              The disallowance here, with regard to 35,000 dollars

3      of fees incurred related to compensation matters, the fee

4      examiner seeks to disallow approximately 25,000 dollars of

5      that.  And that would be the implication of the four percent

6      cap.  There's no basis for the four percent cap.  There's no

7      reason to think that the four percent cap in any way roughly

8      approximates the distinction that Your Honor was trying to make

9      between the costs that ordinarily would be incurred in

10     preparing a bill for a client and the incremental cost of

11     preparing a fee application in bankruptcy court.  If the

12     analysis were merits-based, as I indicated, overwhelmingly, the

13     35,000 dollars relates to fees incurred specifically because

14     this is a bankruptcy case and there are specific tasks that

15     need to be done in order to present our monthly fee statements

16     and fee applications in a manner that complies with all the

17     guidelines.

18             THE COURT:  Mr. Fisher, I assume that you're in the

19     middle of, for lack of a better word -- I'm sure there are a

20     ton of better words -- combat with Mr. Callagy now on the

21     underlying controversy for which you were hired?

22             MR. FISHER:  Yes.

23             THE COURT:  Am I correct in assuming that your fees

24     for that battle with counsel for the bank or for the banks

25     affected by your underlying adversary are likely to be

MOTORS LIQUIDATION COMPANY, et al.

- 78 -

1    relatively substantial?

2         MR. FISHER:  I think they are, Your Honor.  I believe

3    they'll continue to be extremely reasonable.  But I don't --

4    but they'll likely be more than they were during this last fee

5    application.

6         THE COURT:  We talking about hundreds of thousands of

7    dollars?

8         MR. FISHER:  Your Honor, I'm not sure.  I'm not sure

9    if that's the order of magnitude.

10        THE COURT:  Plus your point is that apart from me

11   choosing the time period which would be the metric for applying

12   any formula, the underlying concept that I articulated in April

13   29th rulings remains applicable here.

14        MR. FISHER:  Yes, Your Honor.  And to your point, I

15   do expect that the fees for substantive work will increase as a

16   result of work that we're doing on the JPMorgan term loan

17   litigation and other litigation related work that we're now

18   performing.  As a result, this may not become an issue in the

19   future.

20        THE COURT:  Oh,  you're doing work besides the

21   JPMorgan combat?

22        MR. FISHER:  Yes.

23        THE COURT:  Okay.  Anything else?

24        MR. FISHER:  No, Your Honor.

25        THE COURT:  Okay.  Ms. Andres, any reply?

- 79 -

1        MS. ANDRES:  Not in connection with that, Your Honor.

2    I would, at your convenience, like to address Mr. Karotkin's

3    concern about the two-cent e-mail as well just to keep that

4    issue --

5        THE COURT:  Now you're up.  Why don't you do it now?

6        MS. ANDRES:  Your Honor, rather than to leave a

7    statement like that dangling out there and everyone wondering,

8    we have been preparing, in anticipation of the Court's ruling,

9    a summary of the amounts that have been paid by the debtor to

10   the professionals and the amounts that the professionals'

11   records show that they have received.  That was a process which

12   took a bit of time subsequent to the hearing last time simply

13   because numbers would be off by a few dollars, many dollars, a

14   few cents.  And in any circumstance, all of the parties believe

15   that their numbers are correct and want an opportunity to

16   respond to that.  We were able to flag one of those issues as

17   we were preparing the fee application and simply sent an e-mail

18   on to AlixPartners to make them aware of the discrepancy so

19   that we could have that clarified in connection with the order.

20   I just wanted the Court to be aware of that.

21       THE COURT:  All right.  Let's turn now, folks, to

22   Maue -- or if I'm mispronouncing it, somebody correct me.  It

23   seems to me that the matter of Maue's compensation is, for what

24   it's already done for which I've already retained it, doesn't

25   require a judicial decision.  But I want to hear argument on

- 80 -

1    whether I should continue to have Maue for services beyond the

2    second fee period, the one I'm ruling on by reason of today's

3    arguments.  And for that, I need to know what kind of bang for

4    the buck I'm getting here.  I guess I need to hear from

5    somebody from the fee examiner on that first.

6              MR. WILLIAMSON:  Thank you, Your Honor.  I will do

7    that.  But with the Court's permission, I'll take forty-five

8    seconds to give you some of the data you requested.

9              THE COURT:  Sure.

10             MR. WILLIAMSON:  And several transitional matters

11   that I think will take us from where we've been to where the

12   Court wants to go.

13             First, you had asked about the percentages that the

14   Court applied with respect to Kramer in the first period.  For

15   block billing, it was seven percent.  And for vagueness, it was

16   eighteen percent.  Now, to be precise, that was not our

17   recommendations.  Those were the Court's conclusions.

18             I can give the Court the precise numbers but I think

19   the Court can --

20             THE COURT:  Mr. Schmidt, before we're done, I'm going

21   to give you a chance to be heard even if it's a correction.

22   But I want Mr. Williamson to continue for now.

23             MR. WILLIAMSON:  Your Honor, Ms. Stadler has already

24   corrected me.  It was seven percent for block billing and ten

25   percent for vagueness.

- 81 -

1          THE COURT:  All right.  Pause, Mr. Williamson.  Is

2    that what you were about to correct -- to say, Mr. Schmidt?

3          MR. SCHMIDT:  A slight variation on that, Your Honor.

4    Our numbers aren't putting on repetitive and vague.  We had

5    four and a half percent is what -- what our records show.  And

6    at this point, on repetitive, the fees that we're seeking,

7    fifty percent and -- on repetitive and fifteen percent on

8    vague.  In each of those categories, we voluntarily offered up

9    a five percent reduction.

10          THE COURT:  All right.  Fair enough.  There is a

11    little bit of a disconnect here.  I'm not of a mind to find

12    either side in bad faith.  But as a preview of what I'm going

13    to tell you after we deal with Maue, I'm not going to be able

14    to dictate a decision today because of a conflict I have this

15    afternoon that's going to cause me to want you guys to stay for

16    a dictated in-court ruling.  And we're going to have to arrange

17    for an on-the-record conference call for me to deliver my

18    ruling which I don't think I can do today.

19          So I would like you, Mr. Williamson, or one of your

20    colleagues to put your noodle together with Mr. Schmidt or one

21    of his folks to see if you can come up with a joint answer to

22    me on what you apparently have a difference of.  And if

23    possible, I would like it in the next twenty-four hours.

24          MR. WILLIAMSON:  Fine, Your Honor.

25          THE COURT:  Okay.

MOTORS LIQUIDATION COMPANY, et al.

- 82 -

1           MR. WILLIAMSON:  I had three points to make on your

2    three head scratchers --

3           THE COURT:  Yes, please.

4           MR. WILLIAMSON:  -- which are not in -- by way -- not

5    by way of rebuttal but simply observations.

6           First, with respect to transportation home, it seems

7    to me that the hours spent on General Motors during the day has

8    to be a factor.  And it seems to me that the hour of the day

9    has to be a factor because a partner or an associate who works

10   from 10 a.m. to 4 p.m., even straight, on this matter, one

11   would think would not have an exigent need for either safety

12   reasons or dignity reasons or any other reasons to charge the

13   estate for going home.  If the work is from 4 to 10 p.m.,

14   obviously, it's a different matter.  That's point one.

15          The second, Your Honor, on this question of reviewing

16   time records, put aside bankruptcy, my experience has been that

17   clients generally have become far more demanding for lots of

18   reasons about the detail of lawyers' bills, the precision of

19   lawyers' bills and the clarity of lawyers' bills.  And if I'm a

20   responsible partner in a nonbankruptcy case and my three

21   colleagues work on that case, and they write down their time

22   contemporaneously and diligently, I still review their time.

23   So it is not sufficiently nuance to say well, we're viewing

24   time records, we're viewing billing entries, is compensable.  I

25   don't think it is because as a supervising lawyer on a matter

MOTORS LIQUIDATION COMPANY, et al.

- 83 -

1    that goes with the territory.  That's what clients expect and I

2    would argue that's what the ethics rules generally expect.  So

3    the literal review of the record begs the question.

4              Third and last point.  This question about vagueness.

5    And the Court talked about the environmental matter in upstate

6    New York.  Why does it matter?  Well, it matters because two

7    weeks or two months or two years from now, it would be nice to

8    be able to aggregate all of the work done on that environmental

9    matter for that site to see if the lawyers, as a whole, given

10   the amount of time they spent added value.

11             THE COURT:  I hear you, Mr. Williamson, but wonder if

12   it's more complicated than that because I am not an

13   environmental lawyer but like most practitioners, and certainly

14   as a judge, I've seen it on my watch.  Certain underlying

15   principles can cut across multiple sites.  By way of example,

16   whether claims are pre-petition or post-petition, whether

17   they're dischargeable or not.  And sometimes that kind of

18   mathematical aggregation is going to be helpful.  And sometimes

19   it's going to be either unhelpful or misleading.  So I got like

20   a fourth or a fifth head scratcher, or whatever we're up to in

21   our count.  And you're nodding but other than saying you don't

22   grossly disagree with me --

23             MR. WILLIAMSON:  No.  I --

24             THE COURT:  -- you're kind of acknowledging that

25   that's another head scratcher?

- 84 -

1          MR. WILLIAMSON:  Absolutely, Your Honor.  But it goes

2     to a point the Court has made repeatedly which is the

3     application of judgment, judgment by the professionals who are

4     billing, judgment by the fee examiner, judgment by the U.S.

5     trustee and by the Court.  But one thing is certain.  If we

6     don't have the data to aggregate, we can't make a judgment.

7     It's simply not possible to make a judgment.  And I -- perhaps

8     the representative of IMC but the number of sites that require

9     environmental attention is legion.  And I think we are going to

10    spend an awful lot of time down the road on environmental

11    issues and asbestos issues.  And knowing at least the site, it

12    strikes me, is fairly important.  And that would be true both

13    for asbestos and for environmental.  The Court, I'm sure, will

14    be delighted to know that it hasn't begun to see the

15    applications from professionals involved in the asbestos

16    process.  But we've been getting monthly --

17          THE COURT:  Well, my delight depends on whether the

18    issues are going to go away or I should be thankful that I

19    didn't have to deal with them so far.

20          MR. WILLIAMSON:  Both.  Last point, Your Honor,

21    before we get to Stuart Maue on the question of professionalism

22    and trust.  And, of course, the people we are dealing with are

23    professionals.  Of course they are to be trusted.  But at the

24    risk of using a political analogy, it's also a trust but verify

25    which is why the U.S. trustee has its job and why the Court has

- 85 -

1    its job and why the Court, so far at least, has chosen to ask

2    for and receive the assistance of the fee examiner.  But human

3    nature and professionalism coexist.  And as a result of that,

4    this last group of applications, there was 18,000 dollars for

5    pre-petition expenses.  There were --

6            THE COURT:  Which I assume was voluntarily corrected

7    when you identified it.  But you're saying the Maues of the

8    world are needed to ascertain that.

9            MR. WILLIAMSON:  Absolutely.  We had two instances

10   where the number of hours in a day exceeded twenty-four.

11           THE COURT:  Which was later explained because, by

12   error, multiple professionals had been bundled together?

13           MR. WILLIAMSON:  Absolutely.  But again, my point, as

14   I stated in our summary, was not to --

15           THE COURT:  But any reasonable person would ask a

16   question once that fact became known?

17           MR. WILLIAMSON:  Right.  And any reviewing

18   supervising attorney or, in the case of a non-law firm, a

19   supervising partner, one hopefully would have seen 25.6 and

20   say, wait a minute, this isn't right.  And that kind of review,

21   that kind of catch has nothing to do with bankruptcy.  It has

22   to do with making sure that a professional's fee applications

23   are accurate and descriptive and meets the client's needs.

24           So those were my generic observations on head-

25   scratchable issues.

MOTORS LIQUIDATION COMPANY, et al.

- 86 -

1          THE COURT:  All right.

2          MR. WILLIAMSON:  We can move to Stuart Maue if the

3     Court would like.

4          THE COURT:  Yes.  However, I thought your point about

5     trust but verify was a Maue point.

6          MR. WILLIAMSON:  Your Honor, it was but --

7          THE COURT:  I understood the scratches you were

8     commenting on to be on transportation, on clients being more

9     demanding -- as relevant to how I compartmentalize the review

10    process.  You're saying the clients are more demanding in the

11    non-bankruptcy context and the third issue being that more

12    detail is required in time sheets to facilitate aggregation

13    analysis --

14         MR. WILLIAMSON:  Right.

15         THE COURT:  -- and things of that sort.

16         MR. WILLIAMSON:  Correct, using Mohawk as an example.

17         THE COURT:  Okay.  But the trust but verify point was

18    an early comment on Maue?

19         MR. WILLIAMSON:  Yes, Your Honor, but it also goes to

20    the concern here, and it's across the board, in how much time

21    is being spent on fee applications.  If all that time meant we

22    no longer saw twenty-five hour days, if it meant that we no

23    longer saw first-class airfares, we still see that, if it meant

24    that we no longer saw prepetition expenses, then it would be

25    easier to say four percent is too draconian we're getting bang

MOTORS LIQUIDATION COMPANY, et al.

- 87 -

1    for our buck because these fee applications are terrific.

2            But I don't think we're quite there yet, Your Honor,

3    and maybe we will reach a point but we haven't yet, where we

4    can deemphasize the verify because of the long shadow cast by

5    the trust.

6            THE COURT:  Continue please, Mr. Williamson.

7            MR. WILLIAMSON:  Well, let me give the Court some

8    specifics on Stuart Maue and then my co-counsel will give you

9    some more detail.

10           Just to give you the balls for, the Court approved,

11   if I understood it correctly, 197,000 in the fee application by

12   Stuart Maue.  That covered the initial 85,000 dollar cap.  The

13   Court will recall that was a condition of the initial retention

14   of Stuart Maue.  And then the additional 110 to bring us to

15   roughly 197.

16           THE COURT:  Which covers services through January

17   31st time period?

18           MR. WILLIAMSON:  Roughly, Your Honor, but a little

19   bit more and the reason is because of the fact that some of the

20   initial fee applications were deferred.  The Court will recall,

21   some were deferred to today and we combined them.  So we didn't

22   quite use a linear, chronological approach to Stuart Maue.

23   But, taking the 197 as approved, if we brought Stuart Maue's

24   services to today, probably not counting the travel and the

25   time here, it would be an additional 230, with an important

09-50026-mg    Doc 6357    Filed 07/01/10    Entered 07/16/10 12:41:40    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 88 of 105

- 88 -

1    caveat.  Mr. Karotkin asked, rhetorically, whether the fee

2    examiner had applied the same stringent standards to Stuart

3    Maue that it was applying to the other professionals and the

4    answer is yes.

5            The 197 for which Stuart Maue has applied was a

6    reduced amount based on a negotiation.  The 230 for which

7    Stuart Maue will apply, will be a lesser number, I suspect,

8    because of the approach that we will take to its second round.

9            THE COURT:  Continue, please.

10           MR. WILLIAMSON:  So that's where we would be with

11   Stuart Maue, as of today, in the neighborhood of 400,000

12   dollars.  Again, assuming a ten or fifteen percent reduction,

13   not counting hold backs or any of those other items.

14           Now Stuart Maue, like the fee examiner, has the same

15   dynamic that all of these other professionals have.  That is to

16   say, the startup has increased cost at the beginning.  The

17   value of the fee examiner and Stuart Maue cannot be judged

18   today, any more than the value of Weil Gotshal or Kramer Levin

19   or any of the other fine firms convened, Judge, today.

20           What I think is indisputable, at least to me because

21   I'm the one with the responsibility given to me by the Court,

22   is that this job in a case of this dimension, and I think we're

23   now at eighty million dollars in fees, can't be done without

24   the assistance of Stuart Maue in particular or failing Stuart

25   Maue a firm like Stuart Maue.

- 89 -

1          Now the Court made an observation about the Lehman

2     Brothers case, we made an observation and the Court picked up

3     on it.  The fee process in Lehman Brothers has followed a

4     different path.  The bankruptcy court in Lehman Brothers has

5     not provided on-the-record guidance in quite the same way that

6     this Court has provided on-the-record guidance.  That's

7     obviously not a criticism, it simply --

8          THE COURT:  He has a lot of operational and legal

9     issues on his plate that in GM I've been spared from for a

10    number of months, although I have a fear that it's a comma in

11    the storm.

12         MR. WILLIAMSON:  But there is no doubt that the fee

13    committee, of which Ken Feinberg is only one member, has had,

14    since the outset, a great deal of concern about the amount of

15    money that it takes to submit fee applications.

16         And it's no secret that Mr. Feinberg and his staff

17    and I talk on occasion because, for better or for worse, these

18    two cases get a lot of attention.  And I think the issues that

19    have arisen in St. Vincent's, Lehman Brothers, Chemtura, all of

20    which we ought to be aware of and most of us are, are

21    informative.  There has been no ruling, no imposition of a

22    sealing on fees on fees in Lehman Brothers, but I suspect that

23    day will come and I know the committee has a very hard position

24    on that and it is their recommendation, it has not been a

25    ruling.

1          THE COURT:  Continue.

2          MR. WILLIAMSON:  Well, I think that provides the

3    context, Your Honor.  We have a representative of Stuart Maue

4    here.  The process they use is not only useful but it's

5    fascinating because it's not just off-the-shelf computer ware

6    that they use to do the analysis that they do.  And all of the

7    exhibits that have been produced and provided to professionals

8    were produced and provided by Stuart Maue.

9          THE COURT:  Well, I'm not sure if that's necessary,

10   Mr. Williamson because, subject to people's rights to be heard,

11   I'm most concerned with what it gets us in terms of either

12   savings and/or prophylactic benefits that aren't subject to

13   quantification and what it costs.

14          So I don't hear there being an issue of fact relating

15   to the technical aspects of how Maue does it's job and I'm

16   going to assume, for the sake of the discussion, subject to

17   your opponent's rights to be heard, that you're certainly

18   benefitting from it and what you said in your brief is the ways

19   by which you benefit from it.

20          There is one other thing I need to know, though.  You

21   mentioned that there had been approximately eighty million

22   dollars in fees and I guess the record will reflect, although I

23   don't know it off the top of my head, how much has been secured

24   by reason of either consensual reductions and requested fees or

25   me ruling on the fact that there had to be reductions by reason

- 91 -

1    of your folks' efforts.

2              In the context of that eighty million dollars in

3    fees, do you have, in rough terms, what the fee examiner's

4    costs have been?  You and your firm?

5              MR. WILLIAMSON:  Through -- I made that inquiry, Your

6    Honor, and the amount, again subject to adjustment,

7    reduction --

8              THE COURT:  Of course.

9              MR. WILLIAMSON:  -- through the end of May, is about

10   700,000.

11             THE COURT:  All righty.  Thank you.  Anything else

12   before I give Mr. Karotkin and/or others a chance to reply?

13             MR. WILLIAMSON:  No, except that Mr. Wilson will

14   probably do any rebuttal based on the observations of the

15   debtors' counsel.

16             THE COURT:

17             Okay.  Thank you.  Mr. Karotkin.

18             MR. KAROTKIN:  Stephen Karotkin, Weil Gotshal, for

19   the debtors.

20             A couple of observations on Mr. Williamson's

21   observations about transportation.

22             THE COURT:  Sure.

23             MR. KAROTKIN:  I suppose now he's saying that in

24   addition to normal time, my colleague should be tracking the

25   exact time of day when they're doing the work on behalf of GM

- 92 -

1    in order for transportation to be reimbursable.

2            Again, Your Honor, let's have pragmatics.  It, kind

3    of, evens out at the end of the day.  Sometimes, as you

4    indicated, it might be charged to General Motors when that much

5    time is spent, sometimes it would be charged to another client.

6    And let's just not get lost in the forest over this type of

7    issue; we've proposed a reasonable --

8            THE COURT:  Well pause please, Mr. Karotkin.  I mean,

9    on the one hand we have to be practical and we have to use

10   common sense but on the other hand, doesn't it make a ton of

11   difference between whether the -- and I recognize you can't put

12   Humpty Dumpty back together again for time records that have

13   already been maintained and disbursements that have already

14   been recorded, but it would, at least seemingly, make a huge

15   difference between, take his example, between whether the

16   services are performed between 10 and 4 on the one hand and are

17   performed between 4 and 10 on the other.

18           MR. KAROTKIN:  Well first of all, Your Honor,

19   services could be performed at various times during the day.

20   There could be two hours in the morning, there could be an hour

21   in the afternoon and there could be three hours in the evening.

22   It's not always a block of time, as you know, you were involved

23   in the practice of law.

24           Again, Your Honor, we can spend more money in doing

25   the time records to address these issues then it's all worth at

- 93 -

1    the end of the day.  What we've done is we have submitted a

2    pragmatic solution and we would ask the Court to accept that as

3    a reasonable way to proceed.  And I think, Your Honor, frankly

4    we spent enough time on this issue, perhaps more than it's

5    worth at the end of the day.

6           As to the reviewing of time records, as I indicated

7    with normal non-bankruptcy clients the review is completely

8    different.  Not all clients, in fact most clients do not expect

9    the same type of detail that we are required to do in

10   connection with cases.  And in some instances, Your Honor, some

11   clients don't require time records at all, as you know.

12          With respect to the vagueness issue and how it's

13   important for the fee examiner and Mr. Maue to know how much

14   time relates to an individual environmental site, frankly Your

15   Honor, that escapes me.  There are probably seventy sites we're

16   going to have to deal with in the environmental owned property

17   issues that will be dealt with under a plan.  All of these

18   issues are related, as has been reported in the newspapers.  We

19   are hopeful and it is our current expectation that there should

20   largely be a global resolution and we are hopeful we get a

21   global resolution of the environmental issues and that parade

22   of horribles that Mr. Williamson is alluding to will not be

23   before Your Honor.

24          Frankly, from my perspective, I expect the same thing

25   if people are rational with respect to the asbestos liability

- 94 -

1    and how that will be addressed in the context of the aggregate

2    amount of claims that have to be addressed in these case.

3            It is certainly my hope, and based on conversations

4    I've had, that people will be pragmatic on how we deal with

5    those issues, of course I can't guarantee that.

6            Now turning to Mr. Maue and what the fee examiner

7    says he needs with respect to Mr. Maue, and he alluded to this

8    18,000 dollar disbursement which was prepetition.  And in fact

9    that was our disbursement.  That was a mistake.

10           I don't know that you need Mr. Maue to find that

11   mistake.  Mr. Williamson's firm is deeply involved in this

12   process and I am sure is perfectly capable of reviewing a fee

13   application and determining whether there are inadvertent

14   errors.

15           Now I will note, Your Honor, that Mr. Williamson

16   alluded to startup costs for Mr. Maue and that there are more

17   startup costs involved and certainly -- I guess what he is

18   saying is that Mr. Maue's initial fees, I guess for the first

19   fee application which you just approved, will be higher than

20   his fees on an ongoing basis.  Well, that's just not the case.

21   In fact his initial fee application covered January 22nd

22   through April 22nd, which was for 200,000 dollars.  And the

23   amount that Mr. Williamson said that he would be charging for

24   April 23rd to today is 230,000 dollars.  So it's frankly a lot

25   more.  It's, I think, a third more than the first period.  So I

- 95 -

1    really don't understand that analysis.

2           I would also say, Your Honor, this case, and again as

3    the fee examiner alludes to in either his statement, his

4    overarching statement about what's going on here as to fees or

5    in connection with Mr. Maue's -- with the application to extend

6    the employment of Mr. Maue, these cases are not really complex

7    anymore.  They're not really that difficult. They're, kind of,

8    normal.

9           This, Your Honor, is kind of a normal liquidating

10   Chapter 11 case now.  To compare this to Lehman Brothers, as

11   you alluded to, is completely inappropriate.  This is not

12   Lehman Brothers.  We do not have the same issues as Lehman

13   Brothers.  We have a rather normal liquidating Chapter 11 case

14   moving forward.

15          Now as we indicated in our reply and as you also

16   mentioned, it's necessary to do a cost benefit analysis of

17   what's going on here.  We don't have the facts to do that.  For

18   the first time today, we heard how much the fee examiner and

19   his firm are expected to charge the estate for the services

20   rendered.  And again, that's not withstanding the fact that

21   each of the fee examiner and his attorneys and Mr. Maue have an

22   obligation to submit monthly statements, none of which, since

23   their retention and the retention of each of them have been

24   filed.  So this is the first information we have today about

25   what the fee examiner has incurred in connection with these

- 96 -

1     cases.  And we think it's appropriate to have time to look at

2     that, to analyze that, to get figures, as you indicated, as to

3     how much has been saved in these cases on account of these

4     services.

5             So we think it's appropriate to set this down for

6     another hearing so that we can have an appropriate time to look

7     at that.  And I'd also note that, Your Honor, we haven't seen

8     any time records from the fee examiner or his law firm to

9     determine --

10            THE COURT:  Pause, Mr. Karotkin.  This may be the

11    biggest case on my watch but it's not the only case on my

12    watch.  And I have, maybe, as many as another ten cases which

13    also have a billion or more in debt.  Do I really need another

14    hearing on this issue, given the other things I have on my

15    plate?

16            MR. KAROTKIN:  I think, Your Honor, we're entitled to

17    analyze that information.  We can make a submission.  It's

18    obviously up to you.  I don't think another hearing on this

19    would take very long but if Your Honor doesn't believe that

20    we're entitled to that, that's fine.

21            I will point out, Your Honor; again, we haven't seen

22    the time records from the fee examiner.  We don't know if

23    there's duplication of effort between what his firm is doing

24    and what Mr. Maue's firm is doing.  We have no idea of knowing

25    that.  And I also noted that when I looked at the fee

- 97 -

1    application of Mr. Maue, that of the 712 hours expended by his

2    firm for the period January 22nd to April 22nd, eighty-five

3    percent of that, nearly 600 hours, was attorney time, attorney

4    time.  The balance was, I think, one accountant.  And I

5    question, why is he having attorneys when we have three or four

6    or five or half a dozen attorneys from the fee examiner doing

7    work and I think we're entitled to look at that before we go

8    ahead and extend Mr. Maue's retention.

9            Frankly, Your Honor, these cases have reached a stage

10   where number one we question the need for a fee examiner

11   altogether.  I think that the professionals here are cognizant

12   of your rulings, certainly now.  They're cognizant of the way

13   they ought to be proceeding with the fee applications.  We

14   think the Office of the United States Trustee and Your Honor

15   are more than capable of reviewing these fee applications, as

16   they do in other cases.  And certainly to extend Mr. Maue's

17   retention under the circumstances today, based on the facts we

18   know today, we don't believe that that is an appropriate

19   expenditure of these estate's assets.

20           THE COURT:  All right.  Thank you.  I'll take reply.

21   Mr. Wilson?

22           MR. WILSON:  Thank you, Your Honor.  Eric Wilson on

23   behalf of the fee examiner.

24           Just to address some of the points that Mr. Karotkin

25   made.  First of all, with respect to the monthly statements the

- 98 -

1    requirement to file monthly statements is something provided

2    and required by the interim compensation order for those

3    professionals who voluntarily submit to the procedures, whereby

4    they get paid eighty percent on a monthly basis.  Neither

5    Stuart Maue nor the fee examiner have voluntarily submitted to

6    that.  And so we would submit that neither the fee examiner nor

7    Stuart Maue are required to file monthly statements as required

8    by the interim compensation order.

9           Should the Court feel that those would be helpful,

10   certainly the fee examiner nor Stuart Maue has any objection to

11   do so.  But I just wanted to address Mr. Karotkin's point in

12   that regard.

13          With regard to the dollars expended and comparing the

14   dollars spent in assessing and analyzing the first compensation

15   period versus the second compensation period, I just wanted to

16   draw the Court's attention to a couple of factors.  And that as

17   the Court is aware from the fee application on file, Stuart

18   Maue is seeking 197,000 dollars in fees associated with its --

19   and expenses associated with its review of the first

20   compensation period.

21          As Mr. Williamson stated, the fees and expenses not

22   subject to that fee application are approximately 230,000

23   dollars.  However, that amount includes approximately 30,000

24   dollars spent by Stuart Maue analyzing Backer McKenzie's first

25   interim fee application.  And it also includes the 230,000

- 99 -

1    dollar number, also includes amounts related to Stuart Maue's

2    fee application and its retention and also travel by

3    representatives of Stuart Maue to these hearings.

4         So the 230,000 dollar number isn't just related to

5    the second interim fee period and in fact the time spent on the

6    second interim fee period is less, as you would expect, then it

7    was in the first interim fee period.

8         The other factor that I should mention is, as you'll

9    recall -- as the Court will recall, the initial retention of

10   Stuart Maue was limited to select case professionals to give

11   the fee examiner an opportunity to determine whether those

12   services would be useful and helpful and necessary.  When the

13   fee examiner made that determination it cited to direct Stuart

14   Maue to analyze Weil Gotshal's first fee application.  However,

15   when those directions were given it was basically an

16   abbreviated review necessitated by a short period of time that

17   Stuart Maue had to review the first fee applications.  So the

18   amount of time spent on Weil's fee application from the first

19   period was a disproportionately small amount of time given the

20   abbreviated amount of time that they had to review it.

21        With regard to what Stuart Maue does, I heard Your

22   Honor to suggest that you have no quarrel with the proposition

23   that the Stuart Maue firm, it's not Mr. Maue it's the Stuart

24   Maue firm is indispensible or is helpful to the work of the fee

25   examiner.  It's not just that, Your Honor, though.  To give a

- 100 -

```
 1    small example, but it's illustrative of how they work in the

 2    process, on Friday we were -- one of the responses to our

 3    reports included an analysis of the local transportation

 4    charges.  That analysis was enabled by that firm coming to us

 5    and asking us can you please give us an Excel spreadsheet that

 6    analyzes the local transportation charges?  Yes, of course we

 7    will.  We went to the Stuart Maue firm to get that.

 8            Then when that firm, Weil Gotshal, submitted their

 9    analysis cutting off at six hours, we were able to contact

10    Stuart Maue and within an hour had an analysis back that said

11    yes those -- the analysis that Weil Gotshal did was accurate.

12    That is something that would have -- a fee examiner and his

13    counsel could not have conducted that analysis nearly as

14    efficiently as Stuart Maue did.

15            So the point of the example is, Your Honor, just to

16    suggest that it is not only the fee examiner who is assisted by

17    Stuart Maue's presence in this case.  In fact the professionals

18    and the trustee can rely on their services as well, if, albeit,

19    indirectly.

20            The other point, Your Honor, that I wanted to

21    address, based on what Mr. Karotkin suggested is he said

22    there's no way of knowing whether there is any effort that's

23    been duplicated.  In the application we have suggested and we

24    have said to the Court that that is in fact not the case.  And

25    we will represent to the Court again that the efforts that
```

09-50026-mg   Doc 6357   Filed 07/01/10   Entered 07/16/10 12:41:40   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 101 of 105

- 101 -

1    Stuart Maue does do not duplicate the efforts that counsel for

2    the fee examiner undertake.

3           With respect to the attorneys at Stuart Maue, those

4    aren't attorneys providing legal advice to Stuart Maue.  Those

5    are attorneys conducting the review who happen to have law

6    degrees and are hired because they have a legal background to

7    do the auditing function.  So they are serving an auditing role

8    even though they have law degrees.

9           And then, I think, the last point, Your Honor, that's

10   a most important point, which is that the Court has suggested

11   previously that in order to rule on this pending application

12   there needs to be some sort of cost benefit analysis done that

13   surely we shouldn't charge the estate for these efforts if

14   they're not worth the cost.  And that, of course, makes perfect

15   sense.  It's certainly relevant when deciding whether or not we

16   should continue to retain the services of Stuart Maue to see

17   whether the value their providing the estate is worth the cost.

18          We would suggest that the fees that they have charged

19   to date are certainly reasonable but apart from that, Your

20   Honor, we would also suggest that the analysis is a bit more

21   nuanced than that.  That one can't just look at the fees and

22   expenses disallowed and hold that up against the fees and

23   expenses charged by the fee examiner and his consultant and

24   determine whether or not the fee examiner and his consultant

25   were, "worth the cost".

- 102 -

1          Just as a state trooper sitting on the highway might

2     not write any tickets, the mere presence of that state trooper

3     there serves, as we've pointed out in our papers, a

4     prophylactic role that's important.  And in fact, as the

5     professionals and the fee examiner and Stuart Maue become more

6     accustomed, in this case, to the Court's rulings, one would

7     expect that the suggested disallowances would decline.  But

8     that doesn't necessarily mean the amount of time and resources

9     necessary to review the applications will decline by a

10    proportionate amount.

11         I think the last point worth making, Your Honor, is

12    that one factor that sets this case apart and that makes it not

13    a normal bankruptcy case is that tax dollars are at issue here.

14    And so we respectfully suggest that the prophylactic role that

15    the fee examiner and his consultant serve in this case is

16    especially important.

17         THE COURT:  All right.  Thank you.  All right, here's

18    what we're going to do folks:  There are one or two things

19    where I need you to jointly provide me information; I've given

20    you twenty-four hours to do it.  As a practical matter, even on

21    conceptual matters because of other obligations I have through

22    the lunch hour and through most of the afternoon, I wouldn't be

23    in a position to dictate a ruling now.

24         I don't contemplate writing on this any more than I

25    wrote on the prior one but I'll try to give you a dictated

- 103 -

1    decision as soon as that is possible which, because of a trial

2    I have tomorrow, may or may not be tomorrow.  We'll try to get

3    it out in the next couple of days, although sometimes I've

4    found that with the other cases on my watch I don't always keep

5    my promises.

6           I would like you to notify my law clerks and my

7    courtroom deputy of any times that you'll be unavailable to

8    hear a dictated ruling, which I would contemplate doing by a

9    conference call at which you would call in, which will be

10   transcribed initially by our electronic court recording

11   capability and then followed by a transcript in due course.

12          If there's any time at which you're both unavailable

13   and can't delegate a colleague to listen to what the ruling is,

14   let my chambers know.

15          At this point I thank you for your efforts,

16   especially on the head scratchers and we're in recess.

17          (Whereupon these proceedings were concluded at 12:17 p.m.)

18

19

20

21

22

23

24

25

- 104 -

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion seeking authority for sale of former operating plan of GM in Wilmington, Delaware to Fisker granted | 16 | 5 |
| Debtors' thirteenth and fourteenth objections to claims approved | 17 | 6 |
| Debtors' omnibus objections number 16 through 21, tax claims either satisfied or assumed by new GM approved | 17 | 20 |
| Debtors' twenty-second omnibus objection to claims, amended and superseded claims approved | 21 | 25 |
| Interim fee application of FTI Consulting, Inc. approved subject to reservation of rights by fee examiner to final fee app and excluding incremental charges above standard amount | 72 | 24 |

- 105 -

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  July 1, 2010

17

18

19

20

21

22

23

24

25