UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY., *et al.,* | ) | |
| f/k/a General Motors Corp., *et al.* | ) | Case No. 09-50026 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |

_____


BENCH DECISION[1] AND ORDER ON
RETROACTIVITY OF CAPLIN & DRYSDALE
RETENTION AND COMPENSATION

Appearances:

CAPLIN & DRYSDALE, CHARTERED
*Attorneys for Official Committee of Unsecured Creditors*
  *Holding Asbestos-Related Claims*
375 Park Avenue, 35th Floor
New York, New York 10152-3500
By:     Elihu Inselbuch, Esq.
        Rita C. Tobin, Esq.


-and-

One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
By:     Trevor W. Swett III, Esq. (argued)
        Kevin C. Maclay, Esq.

UNITED STATES TRUSTEE
33 Whitehall Street, Suite 2100
New York, New York 10004
By:     Andrew Velez-Rivera, Esq. (argued)

---

[1]     I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate
in open court, but where the circumstances do not permit more polished discussion.  Because they
often start as scripts for decisions to be dictated in open court, they typically have a more
conversational tone.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

Under an earlier order, I granted a wholly uncontroversial application by the

Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the

"**Asbestos Claims Committee**") for authority to retain the law firm of Caplin &

Drysdale Chartered ("**C&D**") as its counsel.  But this otherwise straightforward

application became controversial when I was called upon to address the date to which my

order should be retroactive—or, more fundamentally, from which C&D could be

compensated for the work it performed.[2]

While not otherwise objecting to C&D's retention, the United States Trustee

("**UST**") objected to any approval order being *nunc pro tunc* (*i.e.*, retroactive) to any date

before the Asbestos Claims Committee officially was formed by the UST—

approximately five months after the need for asbestos claimant group representation,

originally proposed to be achieved by a subcommittee, was identified.  The UST further

argued that assuming, *arguendo*, that I had the power to authorize retroactive retention or

compensation under the Second Circuit's *Keren Partnership* decision,[3] discussed below,

the "exceptional circumstances" required under *Keren Partnership* here were lacking.

C&D, not surprisingly, disagreed.

Since C&D's retention was otherwise wholly uncontroversial, I ruled that C&D

should be retained *nunc pro tunc* back at least to March 5 of this year, when the Asbestos

---

[2]     Both sides argued the matter on an apparent assumption that the effective date of retention and the
date after which services were compensable had to be the same.  That is the manner by which
issues of this character have traditionally been discussed.  But upon my review of the statutory
scheme, I'm not sure that such an assumption was necessarily correct.  Ultimately, I don't need to
decide that, because as discussed below, it doesn't matter.

[3]     *See In re Keren Ltd. P'ship,* 189 F.3d 86 (2d Cir. 1999) (*per curiam*) ("**Keren Partnership,**" and
where desirable for clarity, "**Keren Partnership-Circuit**"), *aff'g* 225 B.R. 303 (S.D.N.Y. 1998)
(Parker, J., then a district judge) ("**Keren Partnership-District**").

Claims Committee was officially formed, and I took under advisement, with the opportunity to provide further evidence and argument, the extent to which C&D's retention order should be retroactive further.  Both sides submitted further letter briefs, but agreed that the facts were undisputed, and that the record on the controversy should now be deemed to be closed.[4]

After consideration of the further briefs, and for the reasons that follow, I conclude that there is no statutory or caselaw proscription against compensating C&D for services it performed for the proposed subcommittee of asbestos claims creditors before the UST formally established an Asbestos Claims Committee instead.  I also conclude that this is a paradigmatic example of the "exceptional circumstances" that justify retroactivity under *Keren Partnership*.  I believe, for reasons related to the different language and structure of sections 1103 and 328 of the Code, which ultimately control this controversy, that C&D's retention could remain effective March 5, 2010, with C&D still having the right to be compensated, under section 328 of the Code, for otherwise reasonable services before that date.  But as that would represent a departure from the way matters of this character traditionally have been considered, I'll simply order that to the extent necessary under existing law, C&D's retention shall be *nunc pro tunc* to the

---

[4]    At oral argument, I asked C&D and the UST why C&D's services wouldn't be the paradigmatic example of a "substantial contribution" to the GM case, for which C&D could simply be compensated under section 503(b)(3)(D) of the Code, obviating the need for me to devote the time necessary to decide an issue of first impression.  The UST acknowledged that C&D's compensation likely could be paid on this basis.  But in the UST's view, giving C&D comfort in this respect now would be premature, and C&D should wait to be paid until the end of the GM case for the five months it served before the Asbestos Claims Committee was officially formed.  As this would put C&D at risk of nonpayment, and at the least, delay in payment, for services performed many months earlier, C&D was reluctant to rely on an ultimate entitlement under 503(b)(3)(D).  And the UST's Office told me, in oral argument, that it considers this issue to be an important one.  Thus the two sides asked me to decide the dispute now.

time in October 2009 that it was first asked to provide services to the then-contemplated subcommittee.

My Findings of Fact and Conclusions of Law in connection with this determination follow.

Findings of Fact[5]

Since the filing of GM's chapter 11 case, Mark Butitta, administrator of the Estate of Salvatore Butitta, has been a creditor of GM (now Motors Liquidation Co.), asserting a claim for asbestos related personal injuries and/or wrongful death. Mr. Butitta has been represented by John D. Cooney, Esq. in the prosecution of his claims against GM. From June 4, 2009, Mr. Cooney and C&D represented Mr. Butitta in GM's chapter 11 case.

Early in the case, Mr. Butitta was appointed to the Creditors' Committee. He was the only holder of an asbestos-related claim who was so appointed. Mr. Butitta served on the Creditors' Committee until March 2010, at which time he resigned from the Creditors' Committee and instead joined the Asbestos Claims Committee when the UST formed the latter and appointed him to it.[6]

Back in October 2009, the Debtors and Creditors' Committee still had a goal of confirming a plan of liquidation by April 2010. To facilitate that, counsel for the Debtors and the Creditors' Committee proposed to Mr. Cooney that he (as counsel to Mr. Butitta) serve as a subcommittee of the Creditors' Committee for the purpose of representing the interests of creditors holding asbestos-related personal injury or wrongful death claims, and that the approval of the UST and the bankruptcy court be sought for the formation of

---

[5]     Pursuant to the parties' agreement and the provisions of Case Management Order #1, all of the facts (but not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true.

[6]     Inselbuch Decl. ¶¶ 8,9.

-4-

such subcommittee and for its retention of separate counsel.[7]  Counsel for the Debtors
and for the Creditors' Committee advised that they'd also promptly seek the appointment
of a representative for unknown future personal injury claimants.[8]  Mr. Cooney asked
C&D to serve as counsel for the subcommittee, with the understanding that the
subcommittee would seek approval to retain the firm *nunc pro tunc*.[9]

C&D was under pressure to begin work for the benefit of asbestos claims holders
immediately, because, as noted, the parties then hoped to confirm a plan by April 2010.
The Debtors and the Creditors' Committee recognized that formulating such a plan would
require estimation of any liability on the part of GM for asbestos claims so that the parties
and the bankruptcy court could determine what portion of the estates' assets should be
distributed to an asbestos trust.  The Debtors' goal for the timing of confirmation was
highly ambitious, and could only be met if the parties acted quickly.[10]

Thus, with the knowledge and encouragement of counsel for the Debtors and the
Creditors' Committee, C&D began to work in that capacity immediately.  It did so
because time was of the essence, and matters bearing on the interests of the proposed
subcommittee's constituency required immediate attention.[11]

As noted, the formation of such a subcommittee was not the desire solely of Mr.
Butitta or Mr. Cooney, or, for that matter, other asbestos claimants.  Rather the need for
such a subcommittee was recognized by the Debtors and the Creditors' Committee, each
of whom needed a fiduciary, or at least a representative, with whom to negotiate to

---

[7]     Inselbuch Decl. ¶ 12.

[8]     Inselbuch Decl. ¶ 12.

[9]     Inselbuch Supp. Decl. ¶ 11.

[10]    Inselbuch Supp. Decl. ¶ 3.

[11]    *Id.*

provide for the upcoming plan treatment for asbestos related claims.  They not only

consented to the formation of such a subcommittee; they encouraged it.

But at a time not fleshed out in the existing record, the UST became

uncomfortable with the idea of there being a subcommittee of an official committee.

Starting at a point between October 2009 and March 2010, the Debtors, the Creditors'

Committee and the UST engaged in prolonged discussions of the subcommittee proposal.

C&D and Messrs. Cooney and Batitta were not parties to these discussions.

Ultimately, the Creditors' Committee and the Debtors agreed with the UST that

holders of asbestos claims would be represented by a separate official committee (once

more, in contrast to a subcommittee of the Creditors' Committee), and thus that an

official Asbestos Claims Committee should formed.  On March 5, 2010, approximately

five months after the Subcommittee's creation, the UST created the Asbestos Claims

Committee and appointed its three members, Mr. Butitta, Ms. Sally Maziarz and Mr.

Charles Cantrell.  The Asbestos Claims Committee has represented the similar (if not

identical) constituency of claimants with existing asbestos claims, and has performed

tasks similar (if not identical) to those that had been performed, and presumably would

have continued to be performed, by the proposed subcommittee.[12]

On March 5, 2010 (after the UST issued notice of the appointment of the

Asbestos Claims Committee on that same day), the Asbestos Claims Committee informed

C&D that it had been selected to serve as the Asbestos Claims Committee's counsel,[13]

---

[12]    Though there was some initial confusion as to this in the briefing before me, it was thereafter
clarified that C&D never presumed to speak for future claimants.  *See* Inselbuch Supp. Decl. ¶ 6;
*accord* ¶ 9.  With the benefit of the clarification, I see no past or present conflict on C&D's part
with respect to any possible disputes between present and future asbestos claimants, or in any
other respect.

[13]    Inselbuch Supp. Decl. ¶ 2.

and on March 18, 2010, the Asbestos Claims Committee filed its application to retain
C&D.  I find (without controversy as to this) that the Asbestos Claims Committee and
C&D acted promptly in seeking the latter's retention.

The UST filed a limited objection to the retention of C&D, which was the only
objection to C&D's retention.  The UST had no problem with C&D's retention, and
consented to retention *nunc pro tunc* to March 5, 2010, but the UST objected to the
Asbestos Claims Committee's request that the *nunc pro tunc* date be October 6, 2009.

From October 6, 2009 through March 5, 2010, C&D's time charges totaled
approximately $100,000, and its disbursements totaled approximately $3,500.[14]   C&D
charged approximately $8,000 from October 6, 2009 through December 31, 2009, and
charged the remainder between January 1, 2010 and March 5, 2010.[15]

Based on the foregoing, I make certain findings of fact relevant to factors that, as
discussed in the legal discussion that follows, inform the exercise of discretion by a
bankruptcy court on a motion of this character in this Circuit and District:

1. The Asbestos Claims Committee and C&D bore responsibility
for applying for approval, but neither could do so until the Asbestos
Claims Committee was formally established, at which time each acted
promptly and diligently;

2. C&D was under time pressure to begin service without
approval;

3. The "amount of delay after the applicant learned that initial
approval had not been granted" is not applicable here, as there was no

---

[14]     Inselbuch Decl. ¶ 14.

[15]     Inselbuch Supp. Decl. ¶ 5.

delay by C&D, and the "delay," if any, in its retention application coming before this Court was occasioned by the time it took the UST, the Creditors' Committee and the Debtors to determine that they would go the official committee route, rather than the subcommittee route, and the time it took the UST to establish the Asbestos Claims Committee as a formal committee;

4.   Compensation to C&D would not prejudice innocent third parties (such as creditors), as the work performed by C&D needed to be done in any event, and if not done for the benefit of the subcommittee would have to be done for the Asbestos Claims Committee, or vice-versa; and

5.   Other relevant factors bearing on the retention are that C&D served what was effectively the predecessor of the Asbestos Claims Committee; C&D served the same constituency of asbestos claimants under a different name, and only a slightly different structure; the request was made of C&D to render services for the benefit of the constituency of asbestos claimants; the initial proposal that this be done through a subcommittee of the Creditors' Committee; the pressures on C&D to commence work without awaiting the official formation of such an entity; the delays occasioned by the UST's eventual insistence that the entity be formed not as a subcommittee, but rather as a full-fledged committee (albeit one serving the same constituency); and that parties with an actual stake in the future of this case—the Creditors' Committee and the

Debtors—recognized the need for C&D to act, and as early as C&D did,

affirmatively asked C&D to do so, and support C&D's application.[16]

Finally, based on the foregoing, I make certain ultimate findings of fact (or mixed

questions of fact and law):

A.  This is one of those narrow situations where *nunc pro tunc*

approval of compensation to (and, to the extent necessary, retention of)

C&D is appropriate.

B.  The facts set forth above represent extraordinary circumstances

within the meaning of *Keren Partnership* and similar decisions by other

circuit courts of appeals.

C.  It would be inequitable to deny C&D compensation for services

it performed when it was asked to act under the time pressures then in the

case.

D.  It would be inequitable to deny C&D compensation for

services it performed for an asbestos claims subcommittee when it was

later determined that it would be preferable to protect those same

creditors' interests by an official Asbestos Claims Committee.

## Discussion

The UST contends first, in substance, that section 1103 of the Code, which

authorizes official committees to retain professionals, gives rise to a temporal wall—the

time at which the UST forms the committee—before which the committee's

---

[16]        *See* Inselbuch Decl. ¶¶ 8-18; Inselbuch Supp. Decl. ¶¶ 4-11.

professionals cannot under any circumstances be retained—or, as more relevant here,

compensated.  The UST further argues that section 328 of the Code, upon which C&D

relies, does not deal with retention, but rather deals with compensation, and hence is

irrelevant to the issues before me.  The UST finally argues that, either way, C&D's

request fails to pass muster under *Keren Partnership*.

I agree with the UST's contention that sections 1103 and 328 deal with different

matters; that section 328 deals only with compensation, not retention; and that section

328 does not trump or otherwise provide a gloss on section 1103.  But I disagree with the

UST's contention that the language of section 1103 is in any way determinative, and

conclude, to the contrary, that, upon an appropriate showing, section 328 of the Code

authorizes a request of the type C&D makes here.  I also find the facts here to easily pass

muster under *Keren Partnership*.

## I.

## Power to Compensate

As a threshold matter, I need first to determine whether there is in actuality the

argued-for temporal wall, establishing a time before which a bankruptcy court lacks the

power to permit compensation for services for an official committee.

As usual, I start with textual analysis.[17]  Section 1103 of the Code, captioned

"Powers and duties of [official] committees," provides, in relevant part:

> (a) At a scheduled meeting of a committee
> appointed under section 1102 of this title, at which a
> majority of the members of such committee are

---

[17]  *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463, 486 (Bankr. S.D.N.Y. 2009), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010), and --- B.R. ---, 2010 WL 1730802 (S.D.N.Y. 2010); *In re DBSD North America, Inc.*, 418 B.R. 179, 205 (Bankr. S.D.N.Y. 2009); *Alta Partners Holdings LDC v. Credit Suisse First Boston LLC (In re Global Crossing Ltd),* 385 B.R. 42, 66 (Bankr. S.D.N.Y. 2008).

> present, and with the court's approval, such
> committee may select and authorize the
> employment by such committee of one or more
> attorneys, accountants, or other agents, to represent
> or perform services for such committee.

The remainder of section 1103 goes on to describe other powers of an official

committee,[18] and, with respect to a professional retained under section 1103(a), what

such professional may or may not do in light of the conflicts that might exist or appear to

exist in a chapter 11 case.[19]

From the statutory language quoted above, the UST argues that section 1103(a)

"clearly and unambiguously provides that counsel to an official committee cannot be

selected at any date earlier than the date upon which such committee meets and makes

such selection."[20] The UST further argues that section 1103 makes clear that court

approval is required;[21] and that approval by the court "wards off 'volunteers' attracted to

the kitty, and avoids duplication of effort."[22]

The UST is right in each of those respects, but they are truisms that don't address

the real issue. Obviously, a committee cannot "select and authorize" employment of its

professionals until it exists and has a meeting. And the court cannot provide "the court's

approval" until the court has been asked for such and any requisite notice has been given,

and unless the committee seeking to retain professionals has acted consistently with any

---

[18]    *See* section 1103(c).

[19]    *See* section 1103(b).

[20]    UST Br. at 1-2.

[21]    *Id.* at 6.

[22]    *Id.* The UST also observes that Fed.R.Bankr.P. 2014 dictates the manner in which a professional
is to be retained, *id.* at 7, but it is undisputed that the Asbestos Claims Committee and C&D
complied with the requirements of Fed.R.Bankr.P. 2014 in connection with the request to retain
C&D, and this does not present an issue.

other applicable constraints, such as those under Fed.R.Bankr.P. 6003(a).[23]  But the

statutory text of section 1103(a) speaks to the power to *retain*, not to the power to

*compensate*, and is silent with respect to the timing of either.  The statutory language

does not speak, one way or another, to the time at which a committee's selection of its

counsel becomes effective, or the time at which the "court's approval" does so.  Nor does

any other section of the Code so provide.  It is to fill vacuums in the Code of the type just

described that courts look to caselaw, such as the *Keren Partnership* cases and similar

decisions by other circuit courts of appeals and lower courts.

Section 1103(a) likewise does not speak to the times for which service by a duly

retained counsel is compensable, and times for which it is not.  That is not particularly

surprising, since section 1103(a) can and should be understood consistent with its

catchline, "powers and duties" of an official committee in a chapter 11 case, which

include the power to select counsel.  Matters relating to compensation are addressed in a

different chapter of the Code, chapter 3, "Case Administration," and chapter 3's

subchapter II, "Officers," and its sections 327 through 331, in particular.

So while the UST relies on the asserted "clear and unambiguous terms of the

statute,"[24] and "its inherent temporal logic,"[25] the "clear and unambiguous terms of the

---

[23]    To provide for appropriate notice, Fed.R.Bankr.P. 6003(a) provides that except to the extent
necessary to avoid immediate and irreparable harm, an application to retain a professional can't be
heard in the first 21 days of a case.  But in nearly every chapter 11 case, counsel for the debtor
must begin work from the very day the case was filed, and counsel for a creditors' committee must
begin work immediately after selection.  Certainly the first need, and often the second, comes
within the first 21 days of the case.  While bankruptcy judges have the power under Rule 6003 to
approve retentions on an emergency basis, we more commonly authorize such counsel to
immediately appear and file papers to meet their constituency's needs and concerns, and later
authorize the retentions, after Rule 6003's 21 days have passed, making the approval orders *nunc
pro tunc* to the day counsel first did any necessary work.  Thus retention orders are almost always
retroactive to some extent.

[24]    UST Obj. at 11.

[25]    *Id.*

statute" are silent as to the real issues before me now, and any "inherent temporal logic,"

insofar as it's argued to exist here, is unsupported by any actual language in the Code.

More to the point with respect to the power to compensate, and integral to any

textual analysis with respect to that issue, is the different section of the Code upon which

C&D relies.  Section 328 of the Code (one of the provisions of chapter 3 to which I

previously made reference) provides, in relevant part:

> (a) The trustee, or a committee appointed under
> section 1102 of this title, with the court's approval,
> may employ or authorize the employment of a
> professional person under … 1103 of this title, as
> the case may be, *on any reasonable terms and
> conditions of employment,* including on a retainer,
> on an hourly basis, on a fixed or percentage fee
> basis, or on a contingent fee basis….[26]

The most common kind of judicial determinations that judges make under section

328 are those approving the *structure* of the compensation mechanism—*e.g.*, whether the

professional is to be paid on an hourly basis; by contingent fee; under a monthly flat rate;

and/or with some kind of success fee.[27]  But the "terms and conditions" that the court

may (and ultimately must) find to be reasonable are not statutorily limited to those

inherent in determinations of the type I just mentioned.  The statutory language—"any

reasonable terms and conditions of employment"—is very broad, and not in any way

ambiguous.  And by its plain language, section 328 permits judicial determinations at the

time of retention with respect to not just the structure of the compensation mechanism,

but anything else involving the basis under which the professional will be paid, so long as

---

[26]    Emphasis added; references to section 327, which authorizes the retention of counsel by a trustee or debtor in possession, deleted.

[27]    Additionally, bankruptcy judges sometimes see litigation over other language in section 328 not quoted above, as it isn't relevant here—dealing with the bankruptcy court's power to modify the previously authorized basis for compensation because it later turns out to have been improvident.

-13-

it is reasonable.  Under familiar principles, when a statute is clear and unambiguous in its

application, judicial inquiry is complete.[28]

C&D is correct when it states[29] that "the effective date of retention is one of the

'terms and conditions … of counsel's employment.'"  So is the time from which

counsel's compensation may be paid.  Either is plainly encompassed within the "terms

and conditions … of counsel's employment" under any commonly understood use of

those words.  Indeed, they are among the most important of the "terms and conditions" of

employment that anyone could name.  Caselaw, such as the *Keren Partnership* cases,

discussed above and below, can guide bankruptcy courts in deciding what is reasonable

in that respect.

Thus, after textual analysis, I find that, subject to any caselaw to the contrary, a

bankruptcy court has the power, under section 328, to determine the date from which a

committee professional's services may appropriately be compensable, just as the

bankruptcy court can fix other aspects of the terms and conditions of the professional's

employment.[30]

I then would look to the caselaw to see if there were any caselaw gloss on the

words of the statute, or any basis for reading the Code in any way other than its plain

---

[28]   *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).  *See also Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing Ltd.)*, 385 B.R. 52, 69 & nn. 37, 39-41 (Bankr. S.D.N.Y. 2008), in which the Supreme Court's many "plain meaning" pronouncements were discussed.

[29]   C&D Ltr. of 5/11/10, at 1.

[30]   Of course, by the plain words of the statute, any "terms and conditions" must be reasonable—and the court can approve them only after being satisfied that they are.  And requests for retroactive retention, and compensation, may be subject to abuse.  It is understandable that the UST has strong interests in preventing such, and the underlying concerns are concerns that I share.  (See Part IV below.)  They can, however, be satisfactorily addressed by inquiry of the type directed by the Second Circuit in *Keren Partnership*, discussed below, and by the court otherwise considering any facts bearing on whether, and to what extent, retroactive compensation is "reasonable" as that term is used in section 328.

meaning.  But though each side has cited to me caselaw providing general guidance on statutory construction, and other uncontroversial matter, neither side has provided me with any caselaw particularly relevant to the issue here—or, especially, providing any basis for ruling in a manner based on anything other than what sections 1103 and 328 say.

Accordingly, I rule that under appropriate circumstances, a bankruptcy court has the power to authorize compensation for services for the benefit of an official committee, even before its official formation, in those circumstances where such is reasonable.  Because the concerns of the UST, which I share, are very legitimate, I think that those circumstances will be very rare.  But neither the statute nor any applicable caselaw provides that there can't be any.

## II.

## Exercise of that Power

But to say that courts have the power to compensate for services for the benefits of a committee before its official formation is not also to say whether courts should exercise that power.[31]  As noted above, if terms and conditions of employment of

---

[31]     *See In re Triangle Chemicals, Inc.,* 697 F.2d 1280 (5th Cir. 1983):

> We thus find that neither bankruptcy statute nor rule preclude the bankruptcy judge in the exercise of its sound discretion, and as a court of equity administering equitable principles, from entering an order nunc pro tunc authorizing the employment of an attorney for the debtor in possession….

> In so holding, we decide only the narrow issue that a bankruptcy judge *does* have this discretion, rejecting the present trier's determination that as a matter of law he could never exercise such discretionary power.  We do not intend to intimate whether, on remand, he should or should not exercise that discretion.

*Id.* at 1289 (emphasis in original; discussion of circumstances justifying *nunc pro tunc* order deleted).

professionals are to be approved under section 328, they must be reasonable.  And if, as here, a professional seeks compensation for services preceding the date of filing of its motion seeking retention, such a request, while permissible, requires extra scrutiny.

Traditionally, authorizing compensation for a professional's chapter 11 case services prior to the date the bankruptcy court issues its order authorizing the retention has been accomplished by making the retention approval order *nunc pro tunc* to an earlier date.  That earlier date has traditionally been either the date of filing of the motion seeking approval (or, in the case of debtors' counsel, the filing of the case, which, for conscientious counsel, is normally the same thing),[32] or, for an official committee, the date its counsel was selected and began to serve.

The power of bankruptcy courts in the Second Circuit to approve retention *nunc pro tunc* was confirmed in *Keren Partnership-Circuit*.  And standards for doing so were fleshed out in *Keren Partnership-Circuit* and, especially, *Keren Partnership-District*, which was affirmed by the Second Circuit for "substantially the reasons stated by the district court."[33]  Each noted that granting *nunc pro tunc* approval of a professional's retention is discretionary with the bankruptcy court, and reviewed for an abuse of discretion.[34]

---

[32]    Retention motions by professionals are sometimes not considered at the earliest possible moment for reasons apart from the diligence of the processionals involved.  It is customary—and consistent with "best practices"—for professionals to vet their retention applications with the UST before filing, and the consideration of retention motions is not infrequently deferred until any concerns that the UST might have are addressed.  As we judges welcome, and prefer, that kind of vetting, the last thing we would want to do would be to be to penalize the professionals for the delay that vetting sometimes entails.

[33]    189 F.3d at 88.

[34]    *See Keren Partnership-Circuit*, 189 F.3d at 88; *Keren Partnership-District*, 225 B.R. at 306.

-16-

The power to grant *nunc pro tunc* approval in appropriate cases arises from the bankruptcy court's equitable powers.[35]  As stated by the Third Circuit in *Arkansas Company*:

> We now express our agreement with those circuits that hold that the bankruptcy courts have the power to authorize retroactive employment of counsel and other professionals under their broad equity power. ... The bankruptcy courts have traditionally been governed by equitable principles rather than statutory technicalities. …  Where equitable concerns weigh in favor of granting retroactive approval to enable deserving professionals to recover compensation for work actually done, we see nothing in the statute that denies the bankruptcy court the power to grant such retroactive approval.[36]

But there are significant limits on the bankruptcy court's exercise of its discretion to grant *nunc pro tunc* approval of a professional's retention.  As stated in *Keren Partnership-Circuit*:

> *Nunc pro tunc* approval should only be granted in narrow situations and requires that (i) if the application had been timely, the court would have authorized the appointment, and (ii) the delay in seeking court approval resulted from extraordinary circumstances.[37]

---

[35]    *See In re Arkansas Co.,* 798 F.2d 645, 648 (3d Cir. 1986) (quoted above); *Triangle Chemicals,* 697 F.2d at 1282 ("we prefer to adopt the rationale of those decisions, principally of the Seventh and Ninth Circuits, that would permit nunc pro tunc relief in exceptional circumstances, such as the present, under the bankruptcy court's exercise of its powers as a court in equity.").

[36]    798 F.2d at 648 (citations, including one to *Bank of Marin v. England,* 385 U.S. 99, 103 (1966), omitted).  While these decisions predated *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206-207 (1988), which stated, among other things, that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code, they here are not being used to trump any provision of the Code, and rather would be used to implement one of its provisions, section 328.

[37]    189 F.3d at 87 (citing, with a "*see, e.g.,*" *In re Jarvis,* 53 F.3d 416, 420-421 (1st Cir. 1995)). Many other cases, at the circuit level alone, hold similarly.  *See In re Singson,* 41 F.3d 316, 319 (7th Cir. 1994); *In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105-108 (3d Cir. 1988); *In re Arkansas Co.,* 798 F.2d 645, 648 (3d Cir. 1986); *Lavender v. Wood Law Firm*, 785 F.2d 247, 248-249 (8th Cir. 1986) (*per curiam*).  Some of the cases diverge, in their implementation of that

Standards for the exercise of discretion in granting *nunc pro tunc* approval were laid out in *Keren Partnership-District*, without modification by the Circuit when it affirmed for substantially the reasons set forth by the district court. In exercising its discretion regarding the existence of "extraordinary circumstances," a bankruptcy court considers factors such as:

> [W]hether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors.[38]

This list is not exhaustive but useful.[39]

Here, in light of my Findings of Fact, C&D's request for *nunc pro tunc* retention easily passes muster under these criteria. While the Asbestos Claims Committee and C&D were responsible for applying for approval, and they did so (and did so promptly), their ability to apply for C&D's retention at the time that they did so was constrained, and delayed, by the time it took to resolve whether the needs and concerns of asbestos claim creditors could be achieved by simply creating a subcommittee of the Creditors' Committee to meet the needs of this subset of the unsecured creditor community, or whether a separate official committee would be required.[40]

---

standard, when determining whether the extraordinary circumstances properly should include various kinds of neglect, but it's undisputed that there was no C&D neglect here.

[38]    225 B.R. at 306-307, citing *F/S Airlease*, 844 F.2d at 105-106, and *Arkansas Co.*, 798 F.2d at 650.

[39]    *Id.* at 307, citing *Jarvis*, 53 F.3d at 421.

[40]    It would have been simpler, quicker and cheaper to form a subcommittee, and if I'd been asked to weigh in on the matter (as in a chambers conference), I would have noted that such was my preference. Apparently the UST felt that the formation of a subcommittee was inappropriate, presumably because it wasn't expressly authorized under the Code. I express no view as to whether the UST was right or not in this regard, though I am more than a little troubled that the

Then, C&D was under time pressure to begin service right away.  In fact, C&D was requested to do so not only by its own constituency, but the Debtors and the Creditors' Committee, who needed to address "gating issues" required to formulate GM's reorganization plan as quickly as possible, to get plan consideration out to the creditor community.

Then, the "amount of delay after the applicant learned that initial approval had not been granted" is not applicable here, as there was no delay by C&D, and the "delay," if any, in its retention application coming before this Court was occasioned by the time it took the parties in the case to determine that they would go the official committee route, rather than the subcommittee route, and the time it took the UST to establish the Asbestos Claims Committee as a formal committee.  This is not a case, like most of those where *nunc pro tunc* approval has been sought (and generally denied) after the passage of long periods of time, where the professional forgot to get itself retained, or otherwise was guilty of any kind of neglect.

Then, compensation to C&D would not prejudice innocent third parties (such as creditors), as the work performed by C&D needed to be done in any event, and if not done for the benefit of the subcommittee would have to be done for the Asbestos Claims Committee, or vice-versa.

Finally, other relevant factors bearing on the retention are that C&D served what was effectively the predecessor of the Asbestos Claims Committee; C&D served the same constituency of asbestos claimants under a different name, and only a slightly

---

desire to form a second committee occasioned the need for me to render an opinion on an issue of this character and, more importantly, a five-month delay.  It's sufficient for our purposes here to note that the delay in resolving this issue, and ultimately forming the official Asbestos Claims Committee, was not in any way C&D's fault.

different structure; the request was made of C&D to render services for the benefit of the

constituency of asbestos claimants; the initial proposal that this be done through a

subcommittee of the Creditors' Committee; the pressures on C&D to commence work

without awaiting the official formation of such an entity; the delays occasioned by the

UST's eventual insistence that the entity be formed not as a subcommittee, but rather as a

full-fledged committee; and that parties with an actual stake in the future of this case—

the Creditors' Committee and the Debtors—recognized the need for C&D to act, and as

early as C&D did, affirmatively asked C&D to do so, and support C&D's application.

Normally, any court engaging in a discretionary analysis would weigh the factors

tending to favor a grant of the requested relief against any factors tending to go the other

way. But here there are *no* factors tending to go the other way.[41] While, if there were

evidence of any of the abuses that the UST justifiably fears, I'd give them great weight

(and very possibly deny *nunc pro tunc* approval by reason of a single one of them), here

there is no indication of any abuses whatever.

Accordingly, under the *Keren Partnership* cases, retroactive retention is wholly

appropriate. In an easy ruling delivered orally from the bench, I immediately authorized

C&D's appointment, upon C&D's timely application (without objection from any

stakeholder in the GM case or the UST), thereby satisfying the first of *Keren

Partnership's* two enumerated factors. Upon the present request that I make my earlier

authorization order retroactive to a degree greater than I initially did so, I find that the

---

[41]     In an initial brief, the UST suggested that C&D might have acted adversely to the interests of the present Asbestos Claims Committee by previously acting to benefit future asbestos claimants. *See* UST Br. at 11. But C&D thereafter established by declaration that it represented only present asbestos claimants, and that the interests of future claimants were always to be represented by a future claims representative—one that I've now appointed. *See* n.12 above.

"delay" in seeking court approval did indeed result from extraordinary circumstances, thereby satisfying the second of *Keren Partnership's* two enumerated factors.

In fact, it may be possible to make a *Keren Partnership* showing with much less than what we have here. It may take me another ten years on the bench before I see another case where counsel served what was effectively the predecessor of an official committee formed in a case on my watch; where it later served the same constituency, under a different name, and only a slightly different structure; provided services to meet the needs not only of its constituency, but other constituencies in the case; and where the only reason for the delay in its getting its retention approved was the delay in determining whether it would represent a subcommittee of a duly formed official committee or a second official committee, and in appointing the official committee that would turn out to be its client. This is a case where the *Keren Partnership* standards for *nunc pro tunc* retention have been easily satisfied, and *nunc pro tunc* retention is appropriate here.

<u>III.</u>

<u>*Nunc pro tunc* Retention, Compensation, or Both?</u>

*Nunc pro tunc* retention permits compensation for services on and after the *nunc pro tunc* date, and before the date the bankruptcy court issues its order approving the retention. That's why professionals care about it, and why it has been opposed, from time to time, by stakeholders or UST representatives contending that *nunc pro tunc* retention is inappropriate under the facts there presented.

Historically, the cases have addressed the matter of compensation for past services by making the date of retention retroactive. With a *nunc pro tunc* retention date, all agree that it is permissible to compensate for services from the *nunc pro tunc* date on, subject to the usual reasonableness requirements. The *Keren Partnership* cases, even

-21-

though they ultimately affirm determinations denying *nunc pro tunc* treatment, look at

the issues the same way.  They all authorize compensation for past services, or deny it, by

adjusting, or denying adjustment to, the official date of retention.

      With so many cases having done so, adjusting the official date of retention (or

declining to do so) has become the conventional way of permitting (or forbidding)

compensation for services provided before the bankruptcy court approved retention.

Consistent with past practice, I could do likewise.

      Alternatively, I could keep the date of retention as is, and use my section 328

power to say that compensation for services performed by C&D before I ruled on its

retention a few weeks ago is permissible to the extent such compensation is reasonable

(which section 328 requires me to find)—and then consider the *Keren Partnership* cases,

which speak to the same underlying concerns, to determine the extent to which

compensation for the past services is reasonable.  Such an approach is at least arguably

truer to the language of the Code.

      Either way, of course, C&D can be paid for its services between October and

March, to the extent that they benefitted the Asbestos Claims Committee and were

otherwise reasonable.  I so hold now.  On one or more future fee applications, C&D will

be free to seek compensation for services it performed before the date that committee was

officially formed.  It will have to show, of course, all of the things that a professional

must show on any other fee application, and will have to show, with respect to any

services predating the official creation of the Asbestos Claims Committee, that they were

for the benefit of the Asbestos Claims Committee, were reasonably necessary to meet the

needs of asbestos claimants as a whole, and were not done solely as a volunteer.

Since C&D can be compensated either way, do I need to change the *nunc pro tunc*

date (*i.e.*, March 5) that I previously set when I authorized C&D to serve?  I think not,

because I think that the same factors that satisfy *Keren Partnership* and permit

compensation for past services by adjustment of the *nunc pro tunc* date make terms and

conditions of employment permitting compensation for past services "reasonable," as

required under section 328.  And I think that sticking with the original March 5 *nunc pro

tunc* date, while finding compensation for services back to October 2009 to be

reasonable, would more comfortably mesh with the text of sections 1103 and 328.   But

on balance, I don't believe that I should be diverging from the traditional way of

authorization for compensation for past services.[42]  As I find the requirements of *Keren

Partnership* to have been satisfied, I'll grant the exact same relief that *Keren Partnership*

authorized me to grant:  C&D will be retained *nunc pro tunc* to October 6, 2009.

## IV.

### UST Concerns

While I can't agree with the UST's statutory analysis, I fully understand the

UST's institutional concerns in less technical respects.  The UST is quite right in

expecting that professionals be duly retained as a precondition to being paid for their

work, and that except in exceptional circumstances (or in the very first days of the

retention, where approval is impractical or would be violative of Fed. R. Bankr. P.

6003(a)), approval come before the services are performed.  That ensures, among other

things, that the bankruptcy court can be comfortable that the professional has no adverse

---

[42]  I note, in this connection, that both sides argued this matter in terms of adjusting the *nunc pro tunc* date (and neither argued for the alternate way of looking at the issues as discussed in this section), and that C&D, while making the point that section 1103 does not limit my power under section 328, simply asks me to adjust the *nunc pro tunc* date.

interests (and, where required, is disinterested), that there be a need for the services, and

that the compensation terms be appropriate and consistent with the needs of the estate.

The UST also is right in caring that professionals not feed off estates, that they not

be "officious meddlers" or "volunteers attracted to the kitty," that their services genuinely

be needed, that they not be duplicative, and, where the services are to be justified for an

official committee, that they be for the benefit of, and not be adverse to, the interests of

the entire committee, and not just a single creditor or subset of the committee's members.

But acceptance of the legalistic arguments the UST makes here, which are

insufficiently grounded in the Code or caselaw, is unnecessary to address the UST's

otherwise valid concerns. Rather, these concerns can and should simply be addressed by

consideration of the standards articulated in the *Keren Partnership* (and similar) cases—

being mindful, as each of them makes abundantly clear, that the hurdle for securing

compensation for services provided before court approval has been granted is very high.

The legitimate needs and concerns of the UST are not in jeopardy here, and to the

extent this case becomes a precedent going forward, they will not be in jeopardy in the

future, either.

Conclusion

For the reasons set forth above, it is ORDERED:

1.  The retention of C&D, for all services described in its retention application,

continues to be approved.

2.  C&D is authorized to seek reasonable compensation for legal services

benefiting the Asbestos Claims Committee that were performed on and after October 6,

2009. Nothing in this Order shall be deemed to constitute any expression of views as to

the extent to which any C&D services benefited the Asbestos Claims Committee, or were

reasonable.  Nor shall anything in this Order be deemed to constitute any expression of

views as to whether C&D's fees should be allowed or disallowed for any other reason.

3.  To the extent necessary for C&D to be compensated for services it performed

that benefited the Asbestos Claims Committee during the period October 6, 2009 to

March 5, 2010, C&D's retention shall be, and hereby is, *nunc pro tunc* to October 6,

2009.

SO ORDERED.

Dated: New York, New York              ___*s/Robert E. Gerber*___
      July 16, 2010              United States Bankruptcy Judge