Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9           f/k/a General Motors Corporation, et al.,

10

11          Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              July 6, 2010

20              2:33 PM

21

22   B E F O R E:

23   HON. ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re Second Fee Application - Oral Decision

3

4    HEARING re Objection to Authorize the Extended Retention and

5    Employment of the Stuart Maue Firm as Consultant to the Fee

6    Examiner - Oral Decision

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sara Bernstein

Page 3

1

2   A P P E A R A N C E S :

3   KRAMER LEVIN NAFTALIS & FRANKEL LLP

4        Attorneys for the Official Committee of Unsecured

5        Creditors

6        1177 Avenue of the Americas

7        New York, NY 10036

8

9   BY:   ROBERT T. SCHMIDT, ESQ.

10        (TELEPHONICALLY)

11

12

13   WEIL, GOTSHAL & MANGES LLP

14        Attorneys for Debtor

15        767 Fifth Avenue

16        New York, NY 10153

17

18   BY:   JOSEPH H. SMOLINSKY, ESQ.

19        STEPHEN KAROTKIN, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

Page 4

 1

 2    GODFREY & KAHN, S.C.

 3         Attorneys for the Fee Examiner, Brady C. Williamson

 4         One East Main Street

 5         Suite 500

 6         Madison, WI 53701

 7

 8    BY:    KATHERINE STADLER, ESQ.

 9         ERIC J. WILSON, ESQ.

10         (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2          THE COURT:  Good afternoon.  This is Robert Gerber.

3   Do I have one or more of the lawyers for the debtors for Weil?

4          (No audible response)

5          Hello?

6          (No audible response)

7          Do I have anybody here on behalf of Weil?

8          (No audible response)

9          Do I have anybody here on behalf of Kramer Levin?

10         (No audible response)

11         COURT CALL OPERATOR:  Your Honor, we do have Robert

12   Schmidt from Kramer Levin.

13         THE COURT:  Okay.  Do I have anybody here on behalf of

14   Weil?

15         MR. SMOLINSKY:  Yes, Your Honor, it's Steve Karotkin

16   and Joe Smolinsky.

17         THE COURT:  Okay.  For the Butzel Long firm?

18         (No audible response)

19         No, all right.  Fee examiner, Ms. Stadler?

20         MS. STADLER:  We --

21         THE COURT:  I beg your pardon?

22         MS. STADLER:  Also attorney Eric Wilson, another --

23   the fee examiner's attorney.

24         THE COURT:  Okay and a rep of the U.S. trustee's

25   office?

Page 6

1          (No audible response)

2          All right.  Mr. Karotkin, I'd appreciate it if you

3    would, in due course, order a transcript of this and provide it

4    to folks who weighed in on the fee application issues who

5    aren't on the call today.

6          Ladies and gentlemen, in the Chapter 11 cases of

7    Motors Liquidation Corporation, formerly known as General

8    Motors and affiliates, I have four remaining contested matters

9    before me, the remainder, having been consensually resolved or

10   easily ruled on, relating to the fee examiner's objections to

11   the three fee applications of Weil Gotshal, Kramer Levin,

12   Butzel Long and objections to the fee examiner's motion to

13   extend the retention of his fees statistical consultant, Maue.

14         On these motions and applications, the fee examiner's

15   objections are sustained in part and overruled in part.  And

16   the Maue firm's retention will be extended for one more fee

17   period, with the need for its further continuation to be

18   reviewed after that time, but with the species of rebuttable

19   presumption that by that time, the need for Maue's services

20   will have come to an end.  The specifics of my rulings and the

21   bases for the exercise of my discretion in connection with

22   these matters follow.

23         Turning first to the application by Weil, the

24   principal issue, accounting for nearly ninety percent of the

25   recommended fee adjustments, is the extent to which Weil can

Page 7

1      recover for time "entries, for time spent in connection with

2      the preparation of fee statements and fee applications".

3      That's Weil reply at 2 which is, as a practical matter, means

4      the cost of reviewing time entries "for compliance with" or

5      "pursuant to" the U.S. trustee guidelines.  See fee examiner

6      objection at 7.  Issues here exist with respect to the

7      underlying conceptual issue as to the extent to which that is

8      compensable and to the extent it is, whether any Weil time

9      spent on that task was excessive.  The fee examiner recommends

10     that fifty percent -- five - zero percent -- reduction in the

11     compensation for that activity.  All parties agree with the

12     general principle that I noted in my tentative ruling that

13     after it's associated with the fee application process that are

14     required by bankruptcy law and rules are compensable and those

15     that would be done for any client, including clients in a non-

16     bankruptcy context, are not.  See, for example, CF&I 131 B.R.

17     at 482 to 489.

18          The devil is in the details and this is the first of

19     the "head-scratchers" that we identified in oral argument

20     because the services in question here are in the grey zone

21     between the two extremes.  As relevant here for Weil and also

22     to the other two firms whose applications I have before me

23     today, there are time-checking services being done by the same

24     person, at the same time, that in material part, serve both

25     non-bankruptcy needs and special needs unique to bankruptcy

1    cases.  Though it wasn't expressly stated, I think we all agree

2    that this is another matter of first impression.  While there

3    are decisions from other courts dealing with the broad

4    parameters and what I'll call the easy circumstances,

5    certainly, no applicable statutory language or case law

6    authority has been cited to me that answers the question I now

7    need to address.  And after about ten years on the bench and

8    thirty-seven years doing bankruptcy work generally, I'm aware

9    of none.  So I decide the matter based on my knowledge and

10   experience with bankruptcy and the practice of law generally,

11   issuing what's ultimately a discretionary ruling grounded in

12   those years of experience and in implementing bankruptcy

13   policy.

14        At the outer extremes, the decision is easy.  Drafting

15   the narrative that is part of any fee app and preparation of

16   the application itself and tables and proposed orders that

17   accompany the application or follow it are activities that are

18   unique to the bankruptcy process and are plainly compensable.

19   We have a fair body of law saying that.

20        On the other hand, preparing timesheets in the first

21   instance and preparing a bill for the client are services that

22   are required for any client, bankruptcy or non-bankruptcy, and

23   are plainly not compensable.  We have a fair body of law saying

24   that as well.

25        But we're left with the services in the middle, most

Page 9

1    significantly, the cost for checking time entries, following up

2    to investigate and correct apparent errors or failures to

3    provide the requisite detail and to screen for privileged or

4    otherwise confidential matter.

5         Weil makes three major points stating that purposes of

6    the timesheet checking include ensuring that the time entries

7    comply with applicable rules and guidelines, comply with

8    earlier rulings on the part of the judge in the case, like

9    those I issued back on April 29 and help avoid the disclosure

10   of matter covered under the attorney/client privilege.  Weil

11   further argues that these needs are unique to bankruptcy and

12   aren't applicable to the typical non-bankruptcy client.

13        I agree with Weil in several of these respects, though

14   not wholly.  And I also believe, as I'll note momentarily, that

15   there are relevant factors as well.  Weil's privilege point is

16   well-taken.  In the typical non-bankruptcy situation in which a

17   law firm bills its client, no privilege screening is necessary

18   because there are no privilege concerns when the privileged

19   communication is disclosed solely to the client which owns the

20   privilege itself.  But in bankruptcy, time records are

21   available to the public.  Also, a matter may not technically be

22   privileged but may, nevertheless, be confidential so that

23   public disclosure is damaging to the estate.

24        How best to deal with privileged matter in a fee app

25   context is a matter upon which reasonable people and judges can

GENERAL MOTORS CORPORATION

```
 1    differ.  And in fact, my views on this have evolved on this

 2    subject over the years and indeed, in recent weeks.  Options

 3    include making time entries in detail but then keeping the

 4    application under seal, doing the same but redacting sensitive

 5    time entries, which until recently, was my preference, allowing

 6    the redacted time entries to be exposed to a public file and

 7    finally, although there may be other options that didn't occur

 8    me, permitting sensitive time entries to be in lesser detail,

 9    eliminating or reducing the need for and resulting expense of

10    redactions or further measures.

11          I think that depending on the facts of a particular

12    case, any of the three approaches, if utilized by counsel,

13    would be reasonable unless and until the judge orders

14    otherwise.  The idea after all, is to get more money into the

15    pockets of creditors and to keep administrative expenses down.

16    Since the cost of the review and redaction process must be

17    borne by the estate, I think it's at least appropriate to

18    consider whether the third option best serves creditors' needs,

19    since in the relatively few cases where the difference in

20    detail matters, we can devise ways to provide the U.S. Trustee

21    a fee examiner or fee committee, or a reviewing judge with

22    supplemental detail to provide the necessary comfort that the

23    estate's money has been satisfactorily spent.

24          Thus, after some thought to the matter, I concluded

25    that on balance, it isn't necessary in all cases that time
```

Page 11

1   entries be detailed to the point of revealing arguably

2   privileged matter when the time entries go public, because if

3   they were that detailed, redaction would be essential and the

4   costs of reviewing and redacting the time entries for privilege

5   could, in many if not most cases, exceed the incremental

6   benefits of the greater detail.

7       But people didn't know my thinking on this before this

8   ruling and understandably made their time entries in detail

9   that would reveal confidential and privilege matter.  When, as

10  here, the time entries are that detailed or some of them are,

11  that makes review of the time entries to redact for privileged

12  matter essential and review of the time sheets to screen for

13  privileged matter therefore must be compensable.

14      While it's also correct that firms should ensure that

15  their timekeeping practice keep up with refinements in the law,

16  as evidenced most obviously by rulings by the judge on any

17  earlier fee apps.  It's at least appropriate if not also

18  essential that firms submitting fee apps ensure that they're

19  consistent with any ruling issued earlier in the case that may

20  determine what's compensable or reimbursable or not, and what

21  levels of detail or other formality are required as part of the

22  data underlying the fee application.  While we all agree, of

23  course, that for the time period at issue here, October 2009

24  through January 2010, there was no occasion to check for

25  compliance with my earlier rulings which were issued only on

Page 12

1    April 29, my rulings now must also address circumstances that

2    are foreseeable and will come up in the future in this case.

3    And while this factor isn't relevant now, it will be relevant

4    just a few months from now.

5         The third factor requiring screening for timekeeping

6    compliance with applicable bankruptcy rules and guidelines

7    requires a more nuanced analysis.  Outside of bankruptcy,

8    lawyers needn't record their time in tenth of an hour

9    increments, record their time in the detail we require, avoid

10   bunching their time entries or otherwise comply with the more

11   rigid requirements we impose in the bankruptcy system.  That

12   would tend to make the effort reviewing time entries

13   compensable or at the least, if we should allocate, make a

14   material percentage of that effort compensable.  But there are

15   other factors to consider, which cut the other way and cause me

16   ultimately to rule that not all of the time charges for this

17   kind of work should be paid for by an estate.

18        The first is one argued by the fee examiner, that the

19   time entries underlying any bill and not just a bill in a

20   bankruptcy case, must still be reviewed as a matter of

21   professional responsibility.  I agree with that, though I think

22   the necessary depth of review isn't the same.

23        But the second is a more basic one, implementing needs

24   and concerns of the bankruptcy system.  Lawyers providing

25   services in a bankruptcy case should comply with the

GENERAL MOTORS CORPORATION

Page 13

1  timekeeping rules and guidelines, getting it right the first

2  time.  While mistakes and failures in compliance are

3  foreseeable and perhaps inevitable, the issue isn't whether

4  correcting them is necessary or appropriate, it's whether the

5  estate should be pay for the necessary corrections.  Of course

6  corrections must be made, but if the lawyers or paralegals

7  working on the matter don't do it right the first time, this

8  consideration requires that the law firm and not the estate

9  bear the expense of correcting what should have been done right

10  in the first place.

11        As Judge Baldin (ph.) noted in CF&I, "If errors have

12  been made, entries are incomplete or inconsistent with those of

13  other professionals and time records require editing to comply

14  with court standards, such editing services are clerical

15  functions and not compensable even though they may be performed

16  by a professional."  We then need to put those countervailing

17  considerations together to come up with an appropriate weighing

18  that isn't arbitrary and is on a principled basis.  The need to

19  review to address privilege and confidentiality concerns is, in

20  my view, undebatable.  And so is the need to take in to account

21  the judge's later rulings or otherwise to adjust to refinements

22  in the law.  But while bankruptcy does indeed require checking

23  for compliance with its more rigorous timekeeping requirements

24  tending to make the incremental effort compensable, a material

25  part of the underlying effort is required as a matter of

1    professional responsibility outside of bankruptcy as well as in

2    it.  And consistent with the case law, for example, I can't

3    approve saddling an estate with the cost of correcting errors

4    that could and should have been avoided in the first place.

5          Dealing with these concerns, which cut against each

6    other, requires some kind of allocation, analogous,

7    analytically, to what we do with compensation for nonworking

8    travel time in bankruptcy, where the professional on the plane

9    is unavailable to work on other matters yet is not doing

10   anything that directly benefits the client.  And where, as a

11   consequence, we provide that travel time be compensable at the

12   rate of fifty percent.  A similar approach is necessary here.

13         On balance, and recognizing that some of the work that

14   was done in this category would be unique to bankruptcy, some

15   of the work would be done for any client and that costs of

16   fixing mistakes shouldn't be borne by the estate, I believe

17   that under normal circumstances and going forward, an

18   adjustment of fifty percent, five-zero percent, as we do with

19   travel time, would be appropriate.  But the law in this area

20   has been evolving in increasing detail.  And with increasing

21   limitations and I think that it's unfair to the professionals

22   to make them take a full hit in such am amount retroactively.

23         For this time period, recognizing that much of what I

24   said is not new and could be inferred by, for example, by

25   review of CF&I and SonicBlue, I think that a reduction of only

Page 15

1   thirty-five percent for this kind of review during this time

2   period would be appropriate, a percentage reduction that would

3   apply to each of Weil, Kramer Levin and Butzel Long with

4   respect to their respective services in this category.

5         But apart from the conceptual matter, there is in

6   Weil's case an issue of excessive effort on the task.   In

7   comments that Weil did not dispute, the fee examiner observed

8   that fifteen Weil timekeepers, almost all paralegals, billed

9   670 hours examining the time entries, which ran about 784

10  pages.  The fee examiner further observed that to spend the

11  amount of time that Weil timekeepers did in engaging in that

12  time sheet review, one would have to look at each page of the

13  time and expense entries for more than fifty, five - zero,

14  minutes.  This, too, Weil did not dispute.  Weil states that

15  this amounts to a "mathematical formulaic approach" contending

16  that such is neither appropriate nor applicable.

17        But any analysis must start with the facts with

18  respect to which attention to the math is inescapable.  As a

19  general rule, I leave parties with the better knowledge of what

20  is necessary and goes on behind the scenes to determine whether

21  a task, while appropriate to be performed, took too much time

22  to do.  But there are some matters where the time spent is so

23  plainly inappropriate that it cries out for judicial control.

24  This is one such matter.  An additional reduction of fifteen

25  percent must be made for this reason, which fifteen percent

GENERAL MOTORS CORPORATION

Page 16

1    adjustment might even be insufficient if I weren't already

2    taking off thirty-five percent by reason of the discussion

3    above.

4          Without suggesting a breakdown as a consequence of

5    this positions on the two conceptual issues, underlying this

6    disputed area with respect to Weil, the fee examiner seeks a

7    reduction of fifty percent, five - zero percent, of the Weil

8    time spent in this area.  For the reasons discussed above, the

9    fee examiner's request is granted.

10         The fee examiner also objects to the time charged for

11   a Weil paralegal for alleged violation of the rules requiring

12   booking of time in increments of a tenth of an hour.  The fee

13   examiner observes that fifty-three percent of the paralegal's

14   time entries happen to be in increments of exact hours or half

15   hours and argues that this is strong evidence of a disregard of

16   the rules.  I agree.  Anyone with a knowledge of probability

17   would understand that if the time entries were genuinely

18   random, they'd be in increments of half an hour, that is

19   exactly one hour or one half hour, only two times out of ten or

20   twenty percent of the time.  I'd of course tolerate some

21   variance from that, especially with a modest sample size but

22   here, in a sample that's quite large, almost 300 time entries,

23   the half hour increments are more than two and half times the

24   expected frequency.

25         In the absence of any affidavit explaining the reasons

GENERAL MOTORS CORPORATION

1   for this statistically improbable occurrence, I must conclude

2   and I now find that the paralegal gave insufficient attention

3   to the requirements for billing in tenth of an hour increments.

4   The fee examiner seeks a reduction in the fee request to the

5   extent of ten percent of the paralegal's time.  That is very

6   reasonable under the circumstances.  The objection is

7   sustained.

8          The fee examiner also expresses concerns as to the

9   time of a paralegal who made twelve entries, totaling twenty-

10  three hours to "research" that a "proposed order" was pending.

11  The order in question was on a motion to dismiss the appeal

12  from the 363 sale approval order that was then pending in the

13  District Court where an application to stay the 363 sale had

14  earlier been denied.  After the facts became known, it appeared

15  that much of the time was for nonworking travel.  While

16  initially proposed in what I'd understand to be a kind of

17  compromise offer, a seventy-five percent downward adjustment of

18  that time to correspond to the nonworking travel rate, but the

19  fee examiner considered a greater downward adjustment to be

20  appropriate, suggesting that the order could have been checked

21  electronically without travel or alternatively, absorbed as

22  overhead.

23         While I'd agree that when a docket can be checked

24  electronically, more expensive means of checking it should

25  generally not be compensable, I don't find that general rule to

1   be relevant here, when I combine my knowledge of this case with

2   my knowledge of the ways of the District Court.  A review of

3   the time entries shows that the paralegal was sent to check the

4   District Court's M-47 docket, which is well known to bankruptcy

5   judges.  The M-47 docket isn't a regular docket.  The M stands

6   for Miscellaneous and it's a special docket where documents of

7   many different types are to be found, including, as relevant

8   here, matters that began with emergency stay applications.  The

9   M-47 docket isn't individual to a particular case and the

10  docket contains entries for hundreds of different cases, if not

11  more.  And this single docket has been used for filing all of

12  the documents in all of those cases for years.  Unlike most

13  dockets at the District Court, it can't be checked

14  electronically.  And neither judges nor, to my knowledge,

15  attorneys get electronic notifications of orders granting or

16  denying stays or of other filings on the M-47 docket.

17          That's a fact we bankruptcy judges have been painfully

18  aware of for many years.  Also, when a matter starts on the M-

19  47 docket, as it does when the first filing at the District

20  Court is a stay application, it can remain there for a while

21  even when different things, such as the motion to dismiss the

22  appeal that was also pending in the District Court and

23  ultimately considered by different judges, are later filed

24  there.

25          We also have to remember that the 363 order was the

Page 19

```
 1   single most important order I entered in the case and its

 2   implementation was a matter involving literally billions of

 3   dollars.  So I well understand why Weil would do whatever it

 4   took to know what was happening at the District Court with

 5   respect to it.  Sending a paralegal to the District Court on a

 6   matter of this type was entirely reasonable.  If I were still a

 7   lawyer and the partner in charge of this matter, I would have

 8   done exactly the same thing.

 9        With that said, it was appropriate if not essential

10   for Weil to not only to make an adjustment for nonworking

11   travel time, but to record its time accurately.  I'm more than

12   a little concerned, to put it mildly, that every one of the

13   twelve time entries was in increments of a half hour and that

14   ten of the twelve were for exactly two hours.  That can't be a

15   coincidence.  Those entries were, at the least, not compliant

16   with the time increment rules and they scream out for an

17   inference that the time recorded was arbitrary, if not also

18   padded.  Those entries exemplify how not to record time.  I'm

19   disallowing all twelve of those entries, not because the work

20   was unnecessary, but because of the particular circumstances I

21   just described and because young lawyers and especially legal

22   assistants, paraprofessionals, must understand that disregard

23   of the rules has consequences.  If there are further instances

24   of this kind of timekeeping, I'll likewise disallow all of each

25   offending lawyer's or paralegal's recorded time.
```

GENERAL MOTORS CORPORATION

Page 20

1        The fee examiner also objects to the compensation for

2   time documented by a number of time entries that are said to be

3   excessively vague or general, especially with respect to

4   responding to e-mails.  While response that in considering

5   objections of that character, we have to be practical and that,

6   given the task to be performed and especially the volume of the

7   e-mails in question, the detail in the time entries was

8   reasonable.  With respect to Weil's point that we have to

9   practical in looking at issues of this character, I agree.

10  Anyone with any knowledge of what it takes to be counsel for a

11  debtor in a large Chapter 11 case, knows how one has to run

12  from task to task to deal with issues that can come up

13  literally from minute to minute.  And recording the time

14  associated with that, while essential, must nevertheless be

15  performed in a way that gives due account to the underlying

16  responsibilities to be performed and the fact that those

17  underlying responsibilities ultimately are more important than

18  incremental detail in timekeeping.

19        That isn't an excuse for not recording the time or

20  doing so contemporaneously, but it can and should inform the

21  discretion of those like fee examiners and fee committees, the

22  U.S. Trustee and judges who might otherwise complain about the

23  level of detail.  When a task goes on for a while, there's no

24  reason why the normal level of detail can't be provided.  But

25  when events are very short and there are several within a small

Page 21

1    time increment, or when things are going crazy, there's room in

2    the bankruptcy system to look at the matter with some common

3    sense.

4         As the fee examiner appropriately recognizes, "some

5    leeway may well be appropriate in describing numerous tasks

6    taking a short period of time."  He goes on to say, however,

7    that alleged failures to provide appropriate detail principally

8    on tasks that took longer periods of time, were present here

9    beyond that.  For the most part, however, I find that the level

10   of detail was satisfactory, especially when we look at it in

11   the context of the length of the matters then described.  The

12   questioned area has generally involved descriptions of the

13   general subject matter on legal research which for the most

14   part was satisfactory and would be satisfactory under any

15   circumstances.  Though some of these description involve

16   subject matters that, by their nature, could apply to many

17   different things such as "estimation of claims," "tax issues".

18   Another challenged series of descriptions involve "follow-up",

19   which, when coupled with a description of what was being

20   followed up, would not be a model of best practices, but would

21   not be materially deficient.

22        The fee examiner seeks a downward adjustment of

23   fifteen, one - five, percent of the challenged time in this

24   area.  As a general matter, describing the subject matter of

25   research should be sufficient.  But when the area researched is

Page 22

1   inherently broad, greater detail is appropriate and greater

2   detail could have provided, in some of the areas researched

3   here, including, by way of example, research on "tax issues."

4   However, this issue interlocks of course with the privilege and

5   confidentiality concerns I discussed above and I'm not of a

6   mind to impose a hard and fast rule requiring more detail in

7   descriptions of potentially privileged or confidential matter,

8   if the price of imposing that rule is a hit to creditors for

9   the incremental cost of reviewing and redacting the resulting

10   time entries.  Finding as a fact that the detail was for the

11   most part satisfactory but that more than a few areas more

12   detail should have been provided, I direct a reduction of eight

13   percent.

14          The fee examiner also objects to disbursements by Weil

15   for its reimbursement of late night cabs, noting that in my

16   rulings on the first round of fee apps, I had disapproved

17   reimbursement for such after the closing of GM's Section 363

18   sale.  Though I may share a responsibility for the

19   misunderstanding, that miscomprehends my ruling.  I so ruled

20   then, merely on the basis of my understanding that there was

21   then a calm after the storm, making the need for late night

22   cabs go away.  As I noted in my rulings back on April 29, very

23   few people in New York travel to work by car and this very few

24   of those working in New York have the luxury of going home late

25   at night with their own cars.  It's at least reasonable, if not

1   essential, for firms to pay the cost of their personnel's

2   transportation home by cab or car service as an alternative to

3   making those personnel take the subway or commuter trains late

4   at night, or worse still, in the middle of the night assuming

5   that the trains are still running at that hour.

6        So the issue is whether the firm can be reimbursed for

7   its own reimbursement or initial payment of those costs or

8   whether the firm must absorb those costs as overhead.  I think

9   that the answer to that is easy at the two extremes, where a

10  lawyer or paralegal for a debtor or official committee has

11  worked a very long day for that single client, charging the

12  estate is hardly inappropriate.  Conversely, if the late effort

13  or the time worked for the debtor or the committee has been

14  minimal, I'm uncomfortable with the estate being tagged with

15  the expense even though somebody should bear the cost of

16  covering the employee's late cab.

17       Which side of the divide that you come out on in the

18  gray areas, when several clients are worked for during the day

19  or a lesser number of hours but more than a few has been worked

20  on matters relating to the estate is another of the areas that

21  we refer to as a "head-scratcher" in oral argument.  Any hard

22  and fast rule could legitimately be criticized as arbitrary and

23  imposing no standards or rule at all would be an invitation to

24  bickering.

25       But I must say that I thought that Weil's proposal for

GENERAL MOTORS CORPORATION

Page 24

 1    what amounts to a safe harbor, if six hours or more were

 2    worked, was quite sensible.  If the total work has been done,

 3    which will be apparent from the time sheets, I think it's

 4    reasonable to assume that by reason of lawyers and paralegals

 5    basic professionalism and the serious consequences if there

 6    ever were an abuse, the estate will rarely get a raw deal.  But

 7    parties could nevertheless present actual facts and I'd

 8    nevertheless disallow reimbursement in a heartbeat,

 9    notwithstanding the six hours worked, if the facts revealed any

10    kind of abuse.  And conversely, I'd nevertheless permit

11    compensation even in a case of lesser total work if the facts

12    revealed any special circumstances such as a crisis that arose

13    late in the day.  You can and should compute the appropriate

14    reimbursement for the local transportation requests under these

15    more fully articulated standards.

16         Finally, with respect to Weil, I've disallowed fees

17    and expenses, reimbursements here, but lest my comments be

18    taken out of context, I should note that the aspects of Weil's

19    fee requests that were questioned by the fee examiner were

20    quite a small percentage of Weil's aggregate request and that

21    Weil made a fair number of adjustments in its request in the

22    form of reductions after mistakes were called to its attention

23    or another response to fee examiner concerns.

24         Like most judges, I here dealt only with those matters

25    requiring judicial analysis or where commenting on particular

GENERAL MOTORS CORPORATION

Page 25

```
 1    practices required explicit discussion.  While I've made

 2    reductions in furtherance of my responsibility to GM's

 3    stakeholders to ensure that the professional fees are

 4    reasonable and appropriate, I fully recognize Weil's very major

 5    efforts on this case.

 6           Turning now to Kramer Levin, you'll notice the

 7    similarity in several of the issues here with those I

 8    previously addressed in connection with Weil.  And I won't

 9    repeat that discussion here.  I'm satisfied with the consensual

10    adjustments Kramer Levin proposed to moot particular issues

11    where the fee examiner did not ask me to do more.  And other

12    adjustments sought by the fee examiner fall within the

13    parameters of the adjustments I'd require under general

14    principles applicable to lawyers generally that I described

15    above in the Weil ruling such as those relating to "billing and

16    retention matters" where the fee examiner seeks a reduction of

17    fifteen percent, one-five percent, which I'll grant without

18    further discussion.  So I'll limit my discussion to differences

19    that remain.

20           The biggest matter in dispute with respect to Kramer

21    Levin's fee app in both percentage and absolute terms relates

22    to alleged repetitive and uninformative time entries including

23    matters described as "Attention to" staffing and project

24    allocation, review correspondence re case, e-mails regarding

25    case administration issues, attention to case administration,
```

GENERAL MOTORS CORPORATION

Page 26

1   calls to creditors regarding the status of the case, attention

2   to environmental issues for remaining properties, attention to

3   insurance issues and attention to plan structure issues.  In

4   many respects, the fee examiner's objections here are well

5   taken though the fact-specific issues with a lot of these

6   entries and the fact that, as I noted above, we must be

7   practical require a more nuanced analysis.

8        As I noted in oral argument, task descriptions

9   beginning with "Attention to" are like chalk on a blackboard to

10  me, principally because of the inherent vagueness of that term,

11  how uninformative it is and how it could cover such a wide

12  spectrum of different levels of concentration and effort and

13  resulting benefit to the estate.  The fee examiner argues that

14  "The repeated use of the same vague time description on a

15  nearly daily basis raises questions about the necessity of the

16  services provided."  I do have concerns in this area but would

17  state my concerns differently.  Entries of that character raise

18  threshold issues as to just what was done.  However, one

19  articulates the concerns, such time entries are indeed, as the

20  fee examiner argues, uninformative, to say the least.

21       Repetitive time entries can nevertheless be

22  appropriate if the underlying work was really that repetitive.

23  But professional work, at least at the lawyer and especially

24  partner level, will rarely be so repetitive that it can fairly

25  be described with identical descriptions especially with such

Page 27

1    frequency.  They are a red flag to anyone reviewing the

2    entries.  Of course, Kramer Levin is right when it says that

3    the guidelines don't require professionals to be "creative" in

4    their time entries, but the guidelines in case law do require

5    time entries to be minimally descriptive.  Once more, I share

6    the fee examiner's concerns.

7         So I hope and expect that I'll never see time entries

8    of this type again.  But the issue now is the extent to which

9    Kramer Levin's fee entitlement should be decreased on this

10   ground since I assume, in the absence of any evidentiary or

11   even rhetorical suggestion to the contrary, that real work was

12   indeed done.  In large Chapter 11 cases, it's important, for

13   example, to put in the necessary effort or to put in the effort

14   necessary to coordinate the efforts of large teams.  For cost

15   to the estate in terms of duplication or, worse, balls falling

16   between the outfielders would be far more than the cost of the

17   coordination or especially any incremental cost of imprecisely

18   described time.  Phone calls have to be answered even if

19   they're imperfectly documented.  And here, as before, we have

20   to be practical and recognize what can go on in a large active

21   Chapter 11 case.

22        The fee examiner asked for a very major reduction and

23   allowance here, fifty, five-zero, percent.  As my earlier

24   comments make clear, I find the time entries in question to be

25   hardly a model for other lawyers to emulate.  And I continue to

GENERAL MOTORS CORPORATION

Page 28

1   feel, as I've stated repeatedly, that failures to comply with

2   required billing practices must have consequences.  But I think

3   that a fifty percent reduction is excessive as I think it's

4   probably that the deficiencies are in timekeeping practices

5   rather than doing the work.  I will impose a twenty-five

6   percent reduction here.

7         Again, with respect to this time period, I have

8   objections by the fee examiner to allegedly vague time entries

9   with a requested reduction of fifteen, one-five, percent of the

10  value of the allegedly vaguely described time.  For the most

11  part, these are communications where the parties to

12  communications or the subject matter were not fully described.

13  Kramer Levin supplied additional information with respect to

14  the specifics of those communications, but I can't tell from

15  the parties' submissions on this dispute whether it did so with

16  respect to all of the challenged time entries.

17        The objection flags failures to fully comply with the

18  U.S. trustee guidelines, a matter that even if cured was cured

19  very late.  But the combination of the supplementation and the

20  original entries is sufficient to give me confidence that the

21  work really was done.  The issue here isn't so much one of

22  protecting the estate but of encouraging full compliance with

23  the applicable requirements.  I note that these time entries

24  were prepared before I issued my ruling with respect to the

25  prior round of fee apps which gave professionals further

1   guidance in this area.  Because I believe that failures to

2   comply should have some consequences but because I believe that

3   the work actually was done, I'll direct a reduction of ten

4   percent.

5        The fee examiner also objects to compensation in full

6   with respect to time entries evidencing alleged block billing

7   and seeks a fifteen percent reduction as a consequence of the

8   alleged violations here.  Kramer Levin provided supplementation

9   to "unblock" certain entries though its ability accurately to

10  do so, after the fact, is questioned by the fee examiner.  And

11  in some cases, principally with respect to research and

12  drafting, Kramer Levin contended that applicable rules against

13  block billing weren't violated at all because the work was a

14  single task.  They proposed a five percent reduction with

15  respect to the disputed entries in this category to settle

16  complaints as to its practices in this regard.

17       What constitutes a single task is debated by the

18  parties.  But like so many other thing I've been asked to deal

19  with today, it's clear only at the extremes.  I agree with

20  Kramer Levin that reviewing precedent cases as part of

21  "Attention to" an asbestos claim motion is sufficiently

22  distinct, but I agree with the fee examiner that research and

23  drafting are separate issues at least if "research" is defined

24  as finding all of the applicable authorities.  And I also agree

25  with the fee examiner that compliance with the block billing

Page 30

1    rules allows the fee reviewer to evaluate staffing decisions

2    and effort expended.

3           But as the fee examiner also acknowledges, there are

4    some activities that are so fluid they can't be reasonably

5    broken out into their component parts.  And the debate as to

6    particular services and their related time entries underscores

7    the difficulty in clearly drawing the line.  I'm not of a mind

8    to penalize lawyers for differences in opinion with respect to

9    the gray areas because I don't think that Kramer Levin's block

10   billing deficiencies are as bad as the fee examiner says they

11   are.  The adjustment in this area will be not the recommended

12   fifteen percent but rather eight percent.

13          Finally, I note that of the Kramer Levin adjustments

14   that I'm requiring, some are more and some are less, in

15   percentage terms, than those I directed for those particular

16   categories of deficiencies last time.  That's a function of the

17   particular failures that I encountered in each time period and

18   the differences and pressures in the case in the two time

19   periods.

20          Finally, I have a fee examiner objection to late night

21   travel.  The standards and safe harbor that I articulated with

22   respect to Weil will apply here as well.

23          Turning next to the fee application of creditors'

24   committee special counsel, Butzel Long, the fee examiner

25   objects to the Butzel Long time spent on compensation matters.

 1    Noting that approximately sixteen percent of Butzel Long's

 2    billed hours related to fee applications, the fee examiner

 3    contends that such was excessive and he seeks to disallow

 4    compensation for that to the extent it exceeds four percent.

 5            In support of the low four percent cap, the fee

 6    examiner's counsel says that "A one percent cap for

 7    compensation and ongoing billing matters has been suggested" in

 8    the Lehman case.  But what he did not say, though he should

 9    have, was who suggested it and that it was not a judicial

10    ruling.  Such a cap was suggested by a fee committee there, his

11    counterpart in that case.  And such a cap was not, so far as

12    the record here reflects, ever judicially determined to be

13    appropriate.

14            The problem here arises, as it did with respect to the

15    first fee period, because Butzel Long's services, while they're

16    likely to be substantial, ramped up in a fashion so its

17    services in the earliest two fee periods, one of which is now

18    before me, were modest.  As I know from my management of the

19    nonfee-related matters on my watch, Butzel Long is now in the

20    middle of a briefing schedule on cross-motions for summary

21    judgment that could have a 1.5 billion dollar effect on the

22    unencumbered assets available to unsecured creditors here.

23    While the briefs haven't yet been filed with me and, of course,

24    I have no view as to the underlying merits of the controversy,

25    I'm aware of its general parameters.  And it's obvious to

Page 32

1    anyone that this is a very major matter.  If the time spent on

2    compensation matters had occurred in the present fee period

3    rather than its predecessor, I would have been surprised if the

4    same objection had even been raised.

5         In any event, as we discussed in oral argument, the

6    issue here is analytically no different than the one I ruled on

7    with respect to the first period when Butzel Long sought

8    compensation for the costs of its getting retained in the first

9    place.  I ruled then, in substance, that as the cost of getting

10   retained was a requirement of the bankruptcy system, it is

11   compensable to the extent it is not otherwise inappropriate on

12   grounds of reasonableness or other factors.

13        That's equally true with respect to the costs of fee

14   applications.  Once more I suggest to the bankruptcy community

15   that if the cost of what the bankruptcy system requires of

16   professionals are material to them, they consider those costs

17   before professionals are hired.  Of course, when counsel was

18   hired to prosecute a 1.5 billion dollar action it hardly

19   surprises me when I see that the creditors' committee

20   considered the administrative costs of fee review not to be

21   material.

22        Accordingly, I must decline to impose any automatic

23   cap, which by its nature must be arbitrary, of one percent or

24   four percent or any other number based on the remainder of the

25   fee application.  Rather, Butzel Long's fees in this area

Page 33

1    should be found to be appropriate to the extent -- though only

2    the extent -- that they're reasonable under the traditional

3    factors considered in fee applications generally.  The Butzel

4    Long fees for doing tasks other than securing judicial approval

5    of its fees are not relevant to its request for compensation in

6    this area, but its fees within this task obviously are.

7            In that connection, I note the comments I made at the

8    outset of this ruling with respect to Weil.  There are services

9    that were engaged in, that related in varying degrees, to the

10   fee application process that are appropriate for compensation

11   from the estate.  There are also others that are not.  Butzel

12   Long's requested fees in this area are appropriate for

13   allowance in light of the standards I articulated above.

14   Considering, by way of example, the extent to which they were

15   for tasks that would be performed anyway, for a non-bankruptcy

16   client, the extent to which it would be necessary or

17   appropriate for confidentiality screening with respect to the

18   creditors' committee's battle against its secured lenders, or

19   in any other matters, and the extent to which the Butzel Long

20   efforts were reasonable, on the one hand, or excessive, on the

21   other.  But as I noted, and for the avoidance of doubt, the

22   time Butzel Long spent in other categories for its services

23   don't bear on the compensability of this component.

24           In the Weil case, I determined that before taking into

25   account a fifteen percent reduction for excessive effort in the

GENERAL MOTORS CORPORATION

Page 34

1    fee application process, a thirty-five percent reduction was

2    appropriate.  Since here there is no suggestion that Butzel

3    Long spent excessive effort on its fee application process, a

4    reduction of fifteen percent alone is the only adjustment

5    that's necessary.  So for the same reasons I discussed before,

6    Butzel Long's fee request for application matters will likewise

7    be reduced by thirty-five percent.  It will otherwise be

8    allowed.

9          Before concluding this area, I need to reiterate

10   something I said the very -- said the first time we addressed

11   fee applications in this case.  The amounts sought are still

12   quite large by reason of the needs as to work to be done in

13   this case, one of the largest in American history.  The task

14   for a judge in my shoes is to balance the need to compensate

15   lawyers and others fairly for the considerable work they did

16   while at the same time ensuring that the estate gets its

17   money's worth for the fees charged and that there be

18   consequences for failures to comply with the applicable rules.

19   As this very lengthy discussion indicates, I've tried very hard

20   to achieve the appropriate balance.

21          For the foregoing reasons, the fee examiner's

22   objections are sustained in part and overruled in part.  I'm

23   not going to micromanage the further proceedings by getting

24   involved in individual time entries.  You're to apply the

25   rulings and principles I articulated to the fee apps involved

GENERAL MOTORS CORPORATION

Page 35

1    and agree on the fees that are payable in accordance with those

2    rulings.  If you somehow can't agree, we can address any issues

3    by conference call.  Except as disallowed as a consequence of

4    my rulings described above, the professionals can and should be

5    paid up to the level of the U.S. trustee holdback that I'll

6    turn to next.

7            Then, as before, the US Trustee requests a ten percent

8    deferral of payment or "holdback" of fees.  The US Trustee's

9    request is granted for the same reason I granted a similar

10   request last time.  I see no need to repeat that discussion

11   now.  Also as before, however, this ruling is without prejudice

12   to a request that I reduce the holdback to five percent when

13   the issues remaining to be resolved for a plan are settled or

14   judicially resolved.

15           Last time, I spoke of the need to address

16   environmental issues; the only issue that I then thought of is

17   material in that context.  Now I'm also more aware of the need

18   to address asbestos issues.  I can't tell how material they are

19   or whether in the scheme of things they could actually block or

20   slow confirmation.

21           If counsel for the debtors and the creditors'

22   committee would like me to further reduce the holdback, they

23   can simply advise me as to what's left to be done when they

24   make any such request.  As before, I'll reduce the holdback to

25   zero percent when the debtors have resolved all material issues

Page 36

1    and have filed a plan with creditors' committee support.

2         Lastly, the fee examiner asked me to extend the

3    retention and employment of its consultant, Stuart Maue

4    Associates (sic), which helps the fee examiner review the fees

5    data.  Noting that this case is no longer all that different

6    from most Chapter 11 cases, or most large ones at least, the

7    debtors oppose an extension at this time requesting that there

8    be a further showing that the costs of the Maue firm's services

9    are worth the money.  But the fee examiner contends without any

10   significant discussion of the cost-benefit ratio that the Maue

11   services are worth the cost and that irrespective of the cost

12   they're worth it as a prophylactic matter.

13        It should be obvious from my rulings last time and now

14   that I've regarded the professionals' fees overwhelmingly to be

15   fair.  But it's also true, as the fee examiner has argued, that

16   this is a high-profile case and one where American taxpayers,

17   as well as creditors, have a strong interest.

18        Data analysis assistant to the fee examiner has proved

19   to be useful so far though, ironically, the data analysis

20   assistance is itself expensive and has cost the estate 197,000

21   dollars in fees that I've already approved and another 230,000

22   dollars that is before me on an unopposed basis today.  Thus, I

23   will not continue Maue indefinitely.  I will continue Maue for

24   one more fee period and will hear argument after that, if the

25   fee examiner still wants Maue, why I shouldn't then bring

1    Maue's services to an end.

2        The fee examiner has asserted generally that Maue is

3    worth the cost, though he hasn't argued that by reason of

4    anything that one would regard as a traditional cost-benefit

5    analysis.  I haven't been given exact figures on the fees the

6    Maue efforts saved and even if I had been presented with

7    figures as to the total fees I disallowed, it would be

8    difficult, if not impossible, to separate those that resulted

9    from Maue efforts from those that resulted from the efforts of

10   the fee examiner or, for that matter, the professionals

11   themselves when the fee examiners called errors to the

12   professionals' attention.

13       The fee examiner, saying "trust but verify", argues

14   that apart from fees and disbursements disallowed I should

15   consider the prophylactic effect of having someone looking at

16   the fees.  But having a fee examiner in the case already

17   accomplishes that.  And before adding a second entity to do

18   that -- that is Maue as the desired numbers cruncher, I think

19   that it's plainly appropriate, if not essential, to consider

20   the cost for that second entity.

21       I agree that the case has been evolving into one more

22   like the Chapter 11 cases that while very large, are not

23   extraordinary by large Chapter 11 case standards.  As the

24   professionals' level of activity is decreasing, as is the

25   number and size of the fee applications objections, Maue's

1    importance is decreasing as well and will soon be at the point,

2    if we're not there already, where Maue's not worth the cost.

3          The underlying goal, as I've said many times, is to

4    get more money into the pockets of creditors.  And I think it's

5    essential, then, as the debtors argue, that we approach this

6    retention, like other retentions, with a cost-benefit analysis.

7    Some unusually important matters are still on the

8    professionals' plates:  the environmental issues, the asbestos

9    issues and the Butzel Long litigation.  Work in each of those

10   areas is now underway.  And while the matter is close, I think

11   the fees associated with getting the work done in those areas

12   are high enough to continue the Maue support for the fee

13   examiner for an additional fee period.

14         But while I have no reason to believe that the

15   underlying issues will wholly go away within only one more time

16   period -- or one more time period relating to fees, this case

17   will by then evolve, if it's not there already, into a case

18   that's no longer extraordinary by large Chapter 11 standards

19   and that Maue's services will thus, and at that time, become an

20   unnecessary expense.

21         Thus, perhaps in an excess of caution, I'll authorize

22   retention of Maue for one more fee period.  There will then be

23   a species of rebuttable presumption that Maue's services will

24   then come to an end.  This ruling isn't with prejudice to a

25   request to continue Maue further, but if any further request is

1   made, I'll need comfort that Maue is worth the cost before I'll

2   approve its retention beyond that time.

3          Folks, you are to caucus amongst yourself to compute

4   the amounts that are due consistent with my rulings.  I would

5   then ask the debtors to settle one or more orders implementing

6   all of the rulings that I've set forth today and authorizing

7   and directing the expenditure of any incremental amounts

8   necessary to provide compensation to the professionals to the

9   extent that the interim fees have been awarded under this

10  opinion.

11         Not by way of re-argument, are there any open issues

12  or ambiguities in what I described this afternoon?

13         I hear none.  Then we're adjourned.  Have a good day.

14         (Proceedings concluded at 3:43 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 40

1

2                            I N D E X

3

4                          R U L I N G S

5    DESCRIPTION                                  PAGE    LINE

6    Adjustments to Weil Gotshal's fee entitlement

7    with respect to:

8    (i)timesheet review, reduction of fifty percent  16      9

9    (ii)time spent doing timesheet review,          17      7

10   reduced to the extent of ten percent of the

11   paralegal's time

12   (iii)twelve time entries of a paralegal,        19      23

13   disallowed

14   (iv)vaguely described time entries, reduction   22      13

15   of eight percent

16   (v)late night travel - safe harbor             24      15

17   provisions applicable

18

19   Adjustments to Kramer Levin's fee entitlement

20   with respect to:

21   (i)billing and retention matters, reduction of  25      18

22   fifteen percent

23   (ii)repetitive/uninformative time entries,      28      6

24   reduction of twenty-five percent

25   (iii)vague time entries, reduction of ten percent 29     4

Page 41

1    (iv)block billing - reduction of eight percent    30      12

2    (v)late night travel - safe harbor               30      22

3    provisions

4

5    Adjustments to Butzel Long's fee entitlement

6    with respect to:

7    (i)application matters, reduction of thirty-five 34      7

8    percent

9    (ii)fee applications, professionals paid up to   35      6

10   the level of the U.S. trustee holdback

11

12   Adjustments to U.S. trustee's fee entitlement

13   with respect to:

14   (i) request for ten percent deferral of payment  35      10

15   or "holdback" of fees, granted

16

17   Retention of Stuart Maue Premier Cost Management, 38      22

18   Authorized for one more fee period

19

20

21

22

23

24

25

Page 42

1

2                        C E R T I F I C A T I O N

3

4

5        I, Sara Bernstein, certify that the foregoing transcript is a

6        true and accurate record of the proceedings.

7

8        _____

9        SARA BERNSTEIN

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  July 7, 2010

17

18       Date:_____

19

20

21

22

23

24

25