HEARING DATE AND TIME: August 6, 2010 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 30, 2010 at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                            :
**In re**                                   :    Chapter 11 Case No.
                                            :
**MOTORS LIQUIDATION COMPANY**, *et al.*,    :    09-50026 (REG)
     f/k/a **General Motors Corp.**, *et al.*    :
                                            :
                    **Debtors.**            :    (Jointly Administered)
                                            :
-----------------------------------------------------------x
                                            :
**BOYD BRYANT**, on behalf of himself and   :    Adversary No. 09-00508 (REG)
     all others similarly situated,         :
                                            :
                    **Plaintiffs,**         :
                                            :
**vs.**                                     :
                                            :
**MOTORS LIQUIDATION COMPANY**, *et al.*,    :
     f/k/a **General Motors Corp.**, *et al.*    :
                                            :
                    **Defendants.**         :
                                            :
-----------------------------------------------------------x

**NOTICE OF HEARING ON DEBTORS' MOTION FOR**
**PRELIMINARY APPROVAL OF SETTLEMENT, INCLUDING CLAIMS**
**ESTIMATION, FOR CONDITIONAL**
**CERTIFICATION OF SETTLEMENT CLASS, TO APPROVE CASH**
**DISBURSEMENT AND FORMS OF NOTICE, AND TO SET FAIRNESS HEARING**

PLEASE TAKE NOTICE that, upon the annexed Motion for Preliminary

Approval of Class Settlement, for Conditional Certification of Settlement Class, to Approve

Cash Disbursement and Forms of Class Notice, and To Set Fairness Hearing, dated July 23,

2010, of Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated

debtors, as debtors in possession (the "**Debtors**"), pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 23 of the Federal Rules of Civil

Procedure (the "**Federal Rules**"), as made applicable by Rule 7023 of the Bankruptcy Rules, for

entry of an order preliminarily approving that certain settlement agreement (the "**Settlement**

**Agreement**"), by and between the Debtors and class action plaintiff, Boyd Bryant, on behalf of

himself and a nationwide class of similarly-situated automobile owners (collectively, the

"**Settlement Class**"); estimating the Class Claim (as defined in the Settlement Agreement);

conditionally certifying the Class (as defined in the Settlement Agreement) and approving the

forms of class notice; approving of a cash disbursement in the amount of one hundred thousand

dollars ($100,000.00) from the Debtors' bankruptcy estates to defray the cost of administration

expenses, including class notice; and setting a date for a fairness hearing (the "**Motion**"), a

hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in

Room 621 of the United States Bankruptcy Court for the Southern District of New York, One

Bowling Green, New York, New York 10004, on **August 6, 2010 at 9:45 a.m. (Eastern Time)**,

or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit,

Michigan 48243 (Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C.

20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and

Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G.

Adams, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin &

Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding

asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn:

Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100,

Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi)

Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M.

Trafelet in his capacity as the legal representative for future asbestos personal injury claimants,

2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert

T. Brousseau, Esq.); and (xii) Bailey/Crowe & Kugler, LLP, 6550 Bank of America Plaza, 901

Main Street, Dallas, Texas 75202 (Attn: David W. Crowe and John W. Arnold) and Wyly-

Rommel, PLLC, 2311 Moores Lane, Texarkana, Texas 75503 (Attn: James C. Wyly and Sean F.

Rommel), class counsel, so as to be received no later than **July 30, 2010 at 4:00 p.m. (Eastern**

**Time)** (the "**Objection Deadline**"). Additionally, direct notice is being provided to counsel for

the following: La Ronda Hunter and Robin Gonzales, by and through their attorneys of record,

Ira Spiro, Esq., and Mark Moore, Esq., Spiro Moss Barnes Harrison & Barge, LLP, 11377 W.

Olympic Boulevard, Fifth Floor, Los Angeles, California 90064-1683.

      PLEASE TAKE FURTHER NOTICE that, if no objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard offered to

any party.

Dated: New York, New York
      July 23, 2010

          /s/ Joseph H. Smolinsky
          Harvey R. Miller
          Stephen Karotkin
          Joseph H. Smolinsky
          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone: (212) 310-8000
          Facsimile: (212) 310-8007

          Attorneys for Debtors
          and Debtors in Possession

HEARING DATE AND TIME: August 6, 2010 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 30, 2010 at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                            :

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | 09-50026 (REG) |
|     f/k/a **General Motors Corp.**, *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------x
                            :

| | | |
|---|---|---|
| **BOYD BRYANT**, on behalf of himself and | : | Adversary No. 09-00508 (REG) |
|     all others similarly situated, | : | |
| | : | |
|         Plaintiffs, | : | |
| vs. | : | |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | |
|     f/k/a **General Motors Corp.**, *et al.* | : | |
| | : | |
|         Defendants. | : | |

------------------------------------------------------------x

## DEBTORS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, INCLUDING CLAIMS ESTIMATION, FOR CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS, TO APPROVE CASH DISBURSEMENT AND FORMS OF NOTICE, AND TO SET FAIRNESS HEARING

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

# TABLE OF CONTENTS

Page

Relief Requested .................................................................................................................... 6

Jurisdiction............................................................................................................................ 7

Relevant Background............................................................................................................ 7

    A.      The Arkansas Action and the Bryant Adversary Proceeding ............................... 7

    B.      The Settlement Agreement ................................................................................. 11

The Settlement Agreement Is In the Best Interest of the Estate Under Rule 9019, and the
    Cash Disbursement Should Be Approved...................................................................... 15

The Settlement Class Should Be Conditionally Certified, and the Settlement Agreement
    Preliminarily Approved Under Rule 23 ........................................................................ 19

    A.      Conditional Certification Is Proper Under Rules 23(a) and 23(b)...................... 20

    B.      The Settlement Agreement Satisfies Rule 23(e)................................................ 22

The Proposed Method and Forms of Notice Should Be Approved ........................................... 25

Notice .................................................................................................................................. 28

Page

## TABLE OF AUTHORITIES

### CASES

*In re AMC Realty Corp.*,
    270 B.R. 132 (Bankr. S.D.N.Y. 2001)...............................................................................20

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................................................21

*In re Baldwin-United Corp.*,
    105 F.R.D. 475 (S.D.N.Y. 1984) ......................................................................................29

*Bourlas v. Davis Law Assocs.*,
    237 F.R.D. 345 (E.D.N.Y. 2006) ......................................................................................24

*In re Craft*,
    321 B.R. 189 (Bankr. N.D. Tex. 2005).............................................................................22

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)..............................................................................................21

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993)................................17

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)...........................................................................................................27

*Frelin v. Oakwood Homes Corp.*,
    No. CIV-2001-53-3, 2002 WL 31863487 (Ark. Ct. App. Nov. 25, 2002) ........................21

*Gross v. Wash. Mut. Bank, F.A*,
    No. 02 Civ. 4135 (RML), 2006 WL 318814 (E.D.N.Y. Feb. 8, 2006)..............................23

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975)...............................................26

*Handschu v. Special Servs. Div.*,
    787 F.2d 828 (2d Cir. 1986)..........................................................................................26, 27

*In re Indep. Energy Holdings PLC*,
    No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090
    (S.D.N.Y. Sept. 29, 2003) .................................................................................................23

**Page**

*In re Initial Pub. Offering Sec. Litig.,*
    226 F.R.D. 186 (S.D.N.Y. 2005) .................................................................23, 26

*In re Ionosphere Clubs, Inc.,*
    156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994)....................25

*In re Iridium Operating LLC,*
    478 F.3d 452 (2d Cir. 2007).............................................................................17

*Leung v. Home Boy Rest. Inc.,*
    No. 07 Civ. 8779, 2009 U.S. Dist. LEXIS 12556 (S.D.N.Y. Feb. 18, 2009) ..................24

*In re Luxottica Group S.p.A. Sec. Litig.,*
    233 F.R.D. 306 (E.D.N.Y. 2006) .....................................................................23

*In re Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 46 (S.D.N.Y. 1993) ........................................................................23

*In re Nasdaq Market-Makers Antitrust Litig.,*
    176 F.R.D. 99 (S.D.N.Y. 1997) .................................................................23, 24

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968), *reh'g denied*, 391 U.S. 909 (1968) ................................16

*In re Prudential Sec. Inc. Ltd. P'Ships Litig.,*
    163 F.R.D. 200 (S.D.N.Y. 1995) ...............................................................24, 28

*In re Ret. Builders, Inc.,*
    96 B.R. 390 (Bankr. S.D. Fla. 1988)................................................................22

*In re Sacred Heart Hosp. of Norristown,*
    177 B.R. 16 (Bankr. E.D. Pa. 1995) ................................................................22

*Schroeder v. City of N.Y.,*
    371 U.S. 208 (1962)..........................................................................................27

*Thompson v. Metro. Life Ins. Co.,*
    216 F.R.D. 55 (S.D.N.Y. 2003) .......................................................................26

*Vaughn v. Drexel Burnham Lambert Group, Inc.*
    *(In re Drexel Burnham Lambert Group, Inc.),*
    134 B.R. 499 (Bankr. S.D.N.Y. 1991)..............................................................16

Page

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76, 107 (S.D.N.Y. 2007),
    *reconsideration denied in part*, 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) ...............27

*W. Va. v. Chas. Pfizer & Co.*,
    440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971).............................................27

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir.), *cert. denied*, 544 U.S. 1044 (2005).........................................20, 26

*Weigner v. City of N.Y.*,
    852 F.2d 646 (2d Cir. 1988), *cert. denied*, 488 U.S. 1005 (1989).....................................27

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983)...................................23, 28

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)............................................................................................................20

*Williamson v. Sanofi Winthrop Pharm., Inc.*,
    60 S.W.3d 428 (Ark. 2001)...............................................................................................21

## STATUTES/RULES

11 U.S.C. § 105(a) ..............................................................................................................18

11 U.S.C. § 502(c) ..............................................................................................................25

28 U.S.C. § 157....................................................................................................................8

28 U.S.C. § 1334..................................................................................................................8

Fed. R. Bankr. P. 3007 ...................................................................................................18, 20

Fed. R. Bankr. P. 7023 ........................................................................................................7

Fed. R. Bankr. P. 9019 .................................................................................................7, 16, 18

Fed. R. Civ. P. 23 ......................................................................................................7, 21, 26

## OTHER

9 Collier on Bankruptcy 9019.02 (15th ed. rev. 2001) ...................................................16

iv

**Page**

4 Newberg On Class Actions § 11:27 (4th ed.) ............................................................20

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), respectfully

represent:

### Relief Requested

1.    This matter concerns a purported nationwide class action based on an

allegedly defective parking brake found in 1999-2002 GMC and Chevrolet pickups and/or

SUVS.  The action was removed and transferred to this Court from an Arkansas bankruptcy

court and stems originally from an Arkansas state court action where—following extensive

discovery, briefing, and an evidentiary hearing on class certification—the Arkansas state court

certified (and the Arkansas Supreme Court subsequently upheld certification of) a nationwide

class of automobile owners as set forth more fully herein.

2.    Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rule 23 of the Federal Rules of Civil Procedure (the "**Federal**

**Rules**"), as made applicable by Rule 7023 of the Federal Rules of Bankruptcy Procedure, the

Debtors request entry of an (i) order for preliminary approval of that certain settlement

agreement (the "**Settlement Agreement**"), by and between the Debtors and class action plaintiff,

Boyd Bryant ("**Bryant**"), on behalf of himself and a nationwide class of similarly-situated

automobile owners (collectively, the "**Settlement Class**," and, together with the Debtors, the

"**Parties**"); (ii) estimating the Class Claim[1] for plan purposes; (iii) for conditional certification of

the Class (as defined in the Settlement Agreement) and approval of forms of class notice; (iv) for

approval of a cash disbursement in the amount of one hundred thousand dollars ($100,000.00)

from the Debtors' bankruptcy estates to defray the cost of administration expenses, including

---

[1] All capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them in the
Settlement Agreement.

class notice; and (v) to set a date for a fairness hearing. The Settlement Agreement resolves

disputes involving the class action lawsuit brought by Bryant against General Motors

Corporation ("**GM**") and the related Claim Nos. 58625, 58626, and 58627 (collectively, the

"**Bryant Proofs of Claim**"). The Settlement Agreement is attached hereto as **Exhibit "A"** and

the draft orders related to same (the "**Orders**") are attached hereto as **Exhibit "B and C."**

3.     Entry of the Order is in the best interest of the Debtors and its creditors in

that the underlying Settlement Agreement contemplates resolution of the Bryant Proofs of Claim,

which are in excess of $1 billion, for an "Allowed Claim" of twelve million dollars, and

consensual resolution through the Settlement Agreement significantly minimizes the financial

burden, time, and uncertainty associated with litigating the matter through the time of trial.

Moreover, the Settlement Agreement and Order are the result of a collaborative effort between

the Parties and the statutory committee of unsecured creditors (the "**Creditors' Committee**") in

these chapter 11 cases and is submitted to the Court for approval with the Creditors'

Committee's support and consent.

## Jurisdiction

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relevant Background

### A.    The Arkansas Action and the Bryant Adversary Proceeding

5.     On February 4, 2005, Bryant, on behalf of himself and a purported

nationwide class of similarly-situated persons, filed his original Class Action Complaint (as

amended, the "**Complaint**") against GM (the "**Arkansas Action**") in the Circuit Court for Miller

County, Arkansas (the "**Arkansas State Court**"), alleging that the parking brakes installed in

certain of GM's automatic transmission trucks and utility vehicles for model years 1999 through

2002 were defective. Bryant sought to represent a nationwide class of owners or subsequent

owners of said vehicles.

6. Following discovery, extensive class certification briefing, and a

September 28, 2006 evidentiary hearing on class certification, the Arkansas State Court certified

a nationwide class to proceed in the Arkansas Action. (*See* Ark. Action Certification Order,

dated Jan. 11, 2007 (the **"Certification Order"**), a true and correct copy of which is attached

hereto as **Exhibit "D".**) Specifically, the Arkansas Court certified the following nationwide

class:

> Any *"owner"* or *"subsequent owner"* of 1999-2002 1500 Series pickups
> and utilities originally equipped with an automatic transmission and a PBR
> 210x30 Drum-in-Hat parking brake system utilizing a high-force spring
> clip retainer,[2] that registered his vehicle in any state in the United States.

Excluded from the class are the following individuals or entities:

> (a) Any and all federal, state, or local governments, including, but not
> limited to, their departments, agencies, divisions, bureaus, boards,
> sections, groups, counsels, and/or subdivisions;

> (b) Any currently sitting Arkansas state court judge or justice in the
> current style and/or any persons within the third degree of
> consanguinity to such judge or justice;

> (c) Any person who has given notice to GM, by service of litigation
> papers or otherwise, and alleged he or she has suffered personal
> injury or collateral property damage due to an alleged defect in any
> braking component, including the parking brake, in 1999-2002
> 1500 Series pickups and utilities originally equipped with an

---

[2] The term "1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a
PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer" refers to the following
GM model-year and model coded vehicles equipped with automatic transmissions:

| | |
|---|---|
| 1500 Series Pickups: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer; and

(d)    Any person, *"owner"*, or *"subsequent owner"* whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005.

7.    In so doing, the Arkansas Court determined that all requirements of Rule 23(a) and (b) of the Arkansas Rules of Civil Procedure had been satisfied, including that: (i) the class was so numerous that joinder of all members was impracticable; (ii) there were questions of law or fact common to the class; (iii) Bryant's claims were typical of the claims of the absent class members; (iv) Bryant would fairly and adequately assert and protect the interests of the class; (v) common questions of fact and law predominated over individualized questions specific to Bryant and absent class members; and (vi) proceeding as a class was superior to other available methods of adjudication. *(See id.)*

8.    In the Certification Order, the Arkansas Court appointed Boyd as the class representative (the **"Class Representative"**) and also appointed David W. Crowe and John W. Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F. Rommel of Wyly-Rommel, PLLC as lead counsel (**"Class Counsel"**) for the class.

9.    On June 19, 2008, the Arkansas Supreme Court unanimously affirmed the Certification Order. A true and correct copy of the Arkansas State Supreme Court Opinion is attached hereto as **Exhibit "E."**

10.    On September 4, 2008, the Arkansas Supreme Court stayed issuance of its mandate in order to permit GM to further appeal the Certification Order to the United States Supreme Court. On January 12, 2009, GM's *writ of certiorari* was denied, and, on January 22, 2009, the Arkansas Supreme Court lifted the stay of mandate, thereby returning jurisdiction to the Arkansas Court.

11.    The commencement of these chapter 11 cases on June 1, 2009 stayed all proceedings relating to the Arkansas Action.

12.    On July 9, 2009, the Debtors removed the Arkansas Action to the United States Bankruptcy Court for the Western District of Arkansas (the "**Arkansas Bankruptcy Court**"). On August 8, 2009, Plaintiffs filed a Motion to Abstain and Remand (the "**Remand Motion**"), which the Debtors opposed, and, on September 3, 2009, the Debtors filed a Motion to Transfer the Arkansas Action (the "**Transfer Motion**") to this Court. On October 1, 2009, the Arkansas Bankruptcy Court granted the Transfer Motion, and, on October 14, 2009, the Arkansas Action was transferred to this Court as Adversary Proceeding No. 09-00508 (the "**Bryant Adversary Proceeding**").

13.    On September 16, 2009, the Court entered its Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Rule 3003(c)(3) of the Bankruptcy Procedure Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof [Docket No. 4079], in which it established November 30, 2009 at 5:00 p.m. (Eastern Time), as the deadline in which to file proofs of claim against certain of the debtors based on prepetition claims.

14.    On November 27, 2009, Bryant filed the Bryant Proofs of Claim, which cite to and attach the Complaint. The Bryant Proofs of Claim assert—in total—unsecured prepetition claims in the amount of $1,479,613,746.06 (collectively, the "**Claim**") relating to the Bryant Adversary Proceeding. (*See* true and correct copies of the Bryant Proofs of Claim, attached hereto as **Exhibits "F"-"H"**.) In that regard, the Claim seeks allowance, on behalf of

Bryant's purported nationwide class, for all amounts associated with the class-wide claims for

relief set forth in the Complaint.

## B.    The Settlement Agreement

15.    Subject to this Court's approval and as further set forth in the Settlement

Agreement, the Parties desire to compromise and settle all issues regarding the Bryant Adversary

Proceeding, the Arkansas Action, and the Claim.  In that regard, the Parties have engaged in

extensive, arm's-length and good faith negotiations and discussions concerning the subject

matter of the Settlement Agreement.  Through the Settlement Agreement, the Parties

acknowledge and agree that the compromise and settlement reflected in the Settlement

Agreement constitute the exchange of reasonably equivalent value between the Parties to settle

the matters among them.

16.    The principal terms of the Settlement Agreement include the following:[3]

A.    Cash Settlement Fund and Cash Disbursement.  Within five (5)
business days of the Preliminary Approval Date, and as partial
consideration for the Settlement Agreement, the Debtors shall
deposit the sum of one hundred thousand dollars ($100,000.00)
cash into an Escrow Account established by either Plaintiffs or the
Claims Administrator at a financial institution that is agreeable to
the Parties, which amount may be utilized by Class Counsel, on
behalf of the Class, for the sole purpose of defraying
Administration Expenses, and Class Counsel shall, upon written
request, and within ten (10) days after such written request, be
required to account to Debtors for all disbursements or payments
therefrom.  Any unused portion of this $100,000.00 shall be
returned to the Debtors within thirty (30) days after the duties of
the Claims Administrator have been concluded.

B.    Mailed Notice and Published Notice.  The Debtors will obtain
from New GM, to the extent available, the last known address and
other data reasonably necessary for the Debtors to send out, at their
cost and expense, the Mailed Notice within five (5) business days

---

[3] This Motion contains a summary of the terms of the Settlement Agreement.  To the extent that the summary
contained herein differs from the Settlement Agreement, the terms of the applicable Settlement Agreement shall
govern in all respects.

after the Preliminary Approval Date. The Debtors shall bear the full cost of the Mailed Notice.[4] Additionally, Bryant and Class Counsel shall publish the Published Notice, as defined in the Settlement Agreement, in the USA Today on three (3) separate days, any Monday through Thursday, beginning as soon as it is reasonably feasible to do so after the Preliminary Approval Date. The cost of Published Notice shall, to the extent possible, be satisfied and paid from the one hundred thousand dollar ($100,000.00) cash payment from Debtors to the Escrow Account described in Paragraph 2.2(b) of the Settlement Agreement. In the event the cost of Published Notice exceeds one hundred thousand dollars ($100,000.00), any additional cost of Published Notice shall be satisfied, paid, or reimbursed from the Cash Settlement Fund as per the sequence set forth in Paragraph 1.29 of the Settlement Agreement.

C.      Opt-Out Procedure and Objections. Any Class Member wishing to opt out must send his or her written request, by certified mail, return receipt requested, to Class Counsel and the Debtor's Counsel, no later than thirty (30) days after the date of the Order of Preliminary Approval, as set forth more fully in both the Mailed and Published Notices. Any Class Member wishing to object to the Settlement Agreement must file a written statement with this Court's clerk and provide a copy of that objection to Class Counsel and the Debtors' Counsel, such that it is received no later than thirty (30) days after the date of the Order of Preliminary Approval. Those Class Members filing objections may then be heard at the ultimate Fairness Hearing, which the Parties seek through this Motion to have set as soon as practicable after the opt out period discussed above. It is to be made clear in the Notice of Settlement that pursuant to the Bar Date Order, the claims bar date of November 30, 2009 has expired and, accordingly, any Class Member electing to opt out of the Settlement Agreement will likely be barred from filing proofs of claim in the chapter 11 cases and will effectively be barred from pursuing further litigation against the Debtors.

D.      The Allowed Claim. Upon Final Judgment following the Fairness Hearing, the Settlement Class shall have an allowed general unsecured claim against MLC in the amount of twelve million dollars ($12,000,000.00) (the "**Allowed Claim**"). The claim will be immediately estimated pursuant to 11 U.S.C. § 502(c) in the amount of twelve million dollars ($12,000,000.00) for all purposes under any chapter 11 plan for the Debtors, including for plan confirmation and distribution purposes, and subject only to the

---

[4] It is currently contemplated that the Mailed Notice will be transmitted to approximately 17,000 persons.

Parties' reservation of rights pursuant to 11 U.S.C. § 502(j). The conveyance to and receipt of the Allowed Claim by the Settlement Class constitutes partial consideration for the Settlement Agreement. The Parties expressly reserve their rights, claims, defenses, and/or counterclaims in connection with the Claim, the Motion to File Class Proof of Claim, the Adversary Proceeding, the Settled Case, the Settled Claims, the Miller County Action, including Unknown Claims, and/or any right to seek de-certification of the Class, pending the entry of the Judgment, in the event the Bankruptcy Court fails to enter the Judgment after the Fairness Hearing.

E.    Reimbursement Claim Forms and Final Claims Deadline. Within eighty (80) days after the date on which the Order is signed, members of the Settlement Class must have postmarked for mailing or electronically transmitted their Reimbursement Claim Forms to the Claims Administrator. The Settlement Agreement defines the Reimbursement Claim Form as the form to be sent to each Class Member that receives the Mailed Notice or sent to each Class Member who, after having seen the Published Notice, requests such form in writing, via the website, or orally via the 1-800 number.

F.    Cash Distributions from the Cash Settlement Fund. A Cash Settlement Fund will be created to include either: (i) the cash proceeds resulting from any sale of shares, in the open market or otherwise, of New GM stock distributed from the Debtors' bankruptcy estates to satisfy the Allowed Claim, or (ii) the cash proceeds resulting from any sale and/or assignment of the Allowed Claim to any third party. Cash distributions to members of the Settlement Class will be made on a pro rata basis and are allocated by the establishment of three settlement tiers. The amount of distribution to each tier varies based on when the alleged parking brake defect was experienced in relation to expiration of the vehicle's written warranty, and when out-of-pocket expenditures for parking brake repairs were actually made.

G.    Cash Settlement Fund Administration. With the assistance of the Claims Administrator, the Settlement Class, represented by Class Counsel, shall be solely responsible for administering the Cash Settlement Fund, and, subject only to the exceptions set forth in 2.2 (b) and (c) (concerning Mailed Notice by the Debtors and the initial Cash Distribution amount for administrative expenses), shall be solely responsible for paying all Administration Expenses. Upon creation of the Cash Settlement Fund, Class Counsel shall be entitled to pay, out of the Cash Settlement Fund, any Administration Expenses in excess of the one hundred thousand

dollars ($100,000.00) cash that the Debtors pay into the Escrow Account. Further, as set forth in the Settlement Agreement, in no event are the Debtors responsible or liable for the administration of or distributions to the Settlement Class, the Cash Settlement Fund, or any Administration Expenses.

H.    Mutual Release. Upon the Effective Date, members of the Settlement Class, on behalf of themselves, their successors, heirs, and assigns, do release, discharge, and promise not to sue all Released Parties and will be deemed to have released, discharged, and promised not to sue any and all Released Parties with respect to all Settled Claims.

I.    Payment of Attorneys' Fees, Costs, and An Incentive Award. Through the Settlement Agreement, Class Counsel requests approval of their entitlement to, under their contingency fee agreement and based on the work performed in this matter, to an Attorney Fee Award in an amount not to exceed thirty-three percent (33%) of the Allowed Claim or $4,000,000.00 cash, whichever is greater. The process by which Class Counsel is paid is set forth in the Settlement Agreement, whereby Class Counsel will initially be paid thirty-three percent (33%) of the Cash Settlement Fund, which shall be the cash proceeds of the Allowed Claim; thereafter, in the event a Final Unclaimed Fund exists, and Class Counsel's initial attorney fee payment was less than $4,000,000.00 cash, and members of the Settlement Class with approved claims have been, to the extent possible, made one hundred percent (100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs, Class Counsel may then receive up to the difference between the initial attorney fee payment and $4,000,000.00 cash. Pursuant to the Settlement Agreement, Class Counsel additionally requests approval of reimbursable costs and expenses of two hundred ninety thousand dollars ($290,000.00) cash, and approval of an incentive award to Bryant of ten thousand dollars ($10,000.00) cash. The Debtors agree not to object to the Attorney Fee Award as proposed in the Settlement Agreement, or the requested reimbursable costs and expenses and Incentive Award for Bryant in the amounts set forth above and in the Settlement Agreement.

J.    Disposition of the Final Unclaimed Fund. The Settlement Agreement contemplates that, if any member of the Settlement Class fails to endorse a Distribution Check and to present it to a payor bank within thirty (30) days after the Distribution Date, the Claims Administrator shall stop payment of that Distribution Check and the amount represented by that Distribution Check shall constitute part of the Final Unclaimed Fund. And, within thirty

(30) days after the Distribution Date, the Claims Administrator
shall certify to the Parties the amount in the Final Unclaimed Fund,
including all funds unused for the payment of claims, plus all
interest accrued. The Parties further agree in the Settlement
Agreement to the concept of this Court vesting in the Arkansas
Court the exclusive right, ability and power to issue orders,
judgments, or decrees affecting the distribution of the Final
Unclaimed Fund.

### The Settlement Agreement Is In the Best Interest of the Estate Under Rule 9019, and the Cash Disbursement Should Be Approved

17.    Rule 9019 of the Bankruptcy Rules ("**Rule 9019**") provides, in relevant
part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court
may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). This rule empowers
bankruptcy courts to approve settlements "*if they are in the best interests of the estate.*" *Vaughn
v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R.
499, 505 (Bankr. S.D.N.Y. 1991) (emphasis added). A decision to accept or reject a compromise
or settlement is within the sound discretion of the Court. *Id.*; *see also* 9 Collier on Bankruptcy
9019.02 (15th ed. rev. 2001). Moreover, the settlement need not result in the best possible
outcome for the debtor; rather, it simply must not "*fall below the lowest point in the range of
reasonableness.*" *Drexel Burnham Lambert Group*, 134 B.R. at 505 (emphasis added).

18.    Relying on guiding language from the Supreme Court's decision in
*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390
U.S. 414, 424 (1968), *reh'g denied*, 391 U.S. 909 (1968), courts in this Circuit utilize the
following factors when weighing the reasonableness of a proposed settlement:

(1)    The probability of success in the litigation;

(2)    The difficulties associated with collection;

(3)    The complexity of the litigation, and the attendant
expense, inconvenience, and delay; and

(4)    The paramount interests of the creditors.

*See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993); *accord In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). For the reasons set forth below, the Debtors respectfully submit that the Settlement Agreement meets this standard and should be finally approved at the Fairness Hearing. They further submit that the Court should approve the Cash Disbursement at this time.

19.    While the Parties dispute factual and legal issues relevant to the disposition of the Bryant Adversary Proceeding and the Claim, the Settlement Agreement represents a fair compromise of the same. The Parties already have expended significant resources litigating the matter before the Arkansas Court, and settlement at this stage avoids the expense, inconvenience, uncertainty, and delay that would be caused by relitigating, among other things, certification-related issues decided by the Arkansas Court and upheld on appeal to the Arkansas Supreme Court. It also permits prompt and efficient resolution of the Claim, resolution of which would be protracted and expensive.

20.    A nationwide class had been certified by the Arkansas Court (and that certification upheld on appeal to the Arkansas Supreme Court), and Bryant has alleged there to be approximately four million (4,000,000) members in the class.[5] If litigated, the Debtors would have sought to have that class certification ruling reconsidered. But the prospect of certification of the class remaining intact and a class victory upon trial on the merits that conceivably could yield a class judgment of considerable amount factored heavily in favor of early and reasonable compromise. In that regard, the Debtors believe that the settlement is a favorable development for these chapter 11 cases, as it resolves numerous complicated legal and factual issues arising

---

[5] The identity of the approximately four million potential members of the class are unknown to the Parties. Accordingly, notice of the settlement is being mailed to the approximately 17,000 persons known to have had repairs made and notice will be published for the remainder of the potential class.

from the Bryant Adversary Proceeding and Bryant Proofs of Claim. Absent authorization to

enter into and consummate the transactions contemplated by the Settlement Agreement, the

Parties would require extensive judicial intervention to resolve their disputes, and a favorable

and successful resolution by the Debtors in the Bryant Adversary Proceeding or with regard to

the Bryant Proofs of Claim would be uncertain. Such litigation would be costly, time

consuming, and distracting to management and employees alike. In contrast, the certainty

resulting through approval of the Settlement Agreement and as to the estates' potential exposure

is of substantial benefit to all stakeholders.

21.    Moreover, approval by the Court of the Settlement Agreement and the

specific component of the Allowed Claim comports with this Court's October 6, 2009 Order

Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 3007 and 9019(b) Authorizing the Debtors

to (I) File Omnibus Claims Objections and (II) Establish Procedures for Settling Certain Claims

(the "**De Minimis Order**"), [Docket No. 4180]. The De Minimis Order states, in relevant part,

the following:

> If the Settlement Amount for a Claim is not a De Minimis Settlement
> Amount *but is less than or equal to $50 million*, the Debtors will submit
> the proposed settlement to the Creditors' Committee. Within five (5)
> business days of receiving the proposed settlement, the Creditors'
> Committee may object or request an extension of time within which to
> object. If there is a timely objection made by the Creditors' Committee,
> the Debtors may either (a) renegotiate the settlement and submit a revised
> notification to the Creditors' Committee or (b) file a motion with the Court
> seeking approval of the existing settlement under Bankruptcy Rule 9019
> on no less than 10 days' notice. *If there is no timely objection made by the
> Creditors' Committee or if the Debtors receive written approval from the
> Creditors' Committee of the proposed settlement prior to the objection
> deadline (which approval may be in the form of an email from counsel to
> the Creditors' Committee), then the Debtors may proceed with the
> settlement.*

22.    In accordance with this De Minimis Order, the Settlement Agreement,

including the Allowed Claim, was submitted to the Creditors' Committee, which informed the

Debtors that it has no objection to either the Settlement Agreement as a whole or to the Allowed

Claim component of the Settlement Agreement, thereby providing another basis for the Court to

approve of the same as reasonable.

23.    Finally, the one hundred thousand dollar ($100,000.00) cash disbursement

(the "**Cash Disbursement**") component of the Settlement Agreement also is reasonable and

necessary to the resolution of this purported nationwide class action, and should be approved.

The Debtors do not view the Cash Disbursement as settlement consideration creating a disparity

in the treatment of claims, but rather, the Cash Disbursement is considered an agreement to pay

certain expenses incurred in connection with the implementation of the settlement.

24.    As to the Cash Disbursement, the Settlement Agreement contains the

following term:

> Within five (5) business days of the Preliminary Approval Date, and as
> partial consideration for this Settlement Agreement, Class Counsel shall
> be paid by Debtors the sum of one hundred thousand dollars
> ($100,000.00) cash, non-refundable, which may be utilized by Class
> Counsel, on behalf of the Settlement Class, and at Class Counsel's sole
> discretion, to defray Administration Expenses. This payment shall be
> deposited into the Escrow Account, and Class Counsel shall, upon written
> request, and within a reasonable time after such written request, be
> required to account to Debtors for all disbursements or payment
> therefrom.

(Agmt. 2.2(b).)

25.    The Cash Disbursement amount is relatively insignificant in the context of

Debtors' chapter 11 cases. But advance approval for the disbursement is necessary in order to

permit Bryant and his counsel to assist with the requisite notice component of Rule 23 of the

Federal Rules ("**Rule 23**"), along with payment of other administration expenses associated with

the claims administration process contemplated in the Settlement Agreement. The Settlement

Agreement cannot be finally approved without providing reasonable notice to absent class

members, and the Cash Disbursement amount is necessary for such notice to be effected.

Accordingly, the modest Cash Disbursement amount does not diminish the reasonableness of the

Settlement Agreement, and the Order approving of it should be granted.

### The Settlement Class Should Be Conditionally Certified, and the Settlement Agreement Preliminarily Approved Under Rule 23

26.     Rule 23, as made applicable by Rule 7023 of the Bankruptcy Rules, does

not expressly provide for certification of settlement-only classes, but federal courts derive their

authority to do so from Rule 23(d) of the Federal Rules, which authorizes this Court to "issue

orders that [] determine the course of proceedings." *See* 4 Newberg On Class Actions § 11:27

(4th ed.).  As an overlay to this authorization, federal courts have long expressed a preference for

the negotiated resolution of litigation, particularly with respect to class actions.  *See Williams v.*

*First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the

courts."); *accord In re AMC Realty Corp.*, 270 B.R. 132, 145-46 (Bankr. S.D.N.Y. 2001)

(recognizing that "settlements are favored in federal law and the prompt resolution of claims and

disputes makes the compromise of claims of particular importance in the bankruptcy

reorganization") (internal quotation marks omitted); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,

396 F.3d 96, 116 (2d Cir.) ("We are mindful of the 'strong judicial policy in favor of settlements,

particularly in the class action context.'") (citation omitted and emphasis added), *cert. denied*,

544 U.S. 1044 (2005).  In furtherance of this strong policy and for settlement purposes only, the

Court should recognize and conditionally reaffirm the certification of the class by the Arkansas

Court and the appointment of Bryant as Class Representative and Messrs. Crowe, Arnold, Wyly,

and Rommel as Class Counsel.

A.    **Conditional Certification Is Proper Under Rules 23(a) and 23(b)**

27.    "Before certification is proper for any purpose—settlement, litigation, or

otherwise—a court must ensure that the requirements of Rule 23(a) and (b) have been met."[6]

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006). But "Rule 23(a) and (b)

standards apply equally to certifying a class action for settlement or for trial, with one

exception." Manual for Complex Litigation § 21.132 (4th ed. 2004) (emphasis added).

"Confronted with a request for settlement-only class certification, a district court need not

inquire whether the case, if tried, would present intractable management problems," under Rule

23(b)(3)(D). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

28.    Important to satisfaction of Rule 23(a) and (b) is the Certification Order of

the Arkansas Court pursuant to Rule 23 of the Arkansas Rules of Civil Procedure. Arkansas

Rule of Civil Procedure 23 is patterned after and significantly similar to Rule 23, and Arkansas

courts are instructed to "interpret[] [Arkansas] Rule 23 in the same manner as the federal courts

interpret the federal counterpart." *Williamson v. Sanofi Winthrop Pharm., Inc.*, 60 S.W.3d 428,

434 (Ark. 2001); *see also Frelin v. Oakwood Homes Corp.*, No. CIV-2001-53-3, 2002 WL

31863487, at *5 (Ark. Ct. App. Nov. 25, 2002) ("Authorities construing Federal Rule of Civil

Procedure 23 are highly persuasive in Arkansas courts on class certification issues.").

29.    To this end, the Arkansas Court's Certification Order makes specific

findings that are consistent with Rule 23 and should be adopted by this Court for purposes of

conditional certification of the proposed Settlement Class, including the following:

- The class is so numerous that joinder of all members was impracticable;

---

[6] Rule 23(a) requires that the Class meet certain numerosity, commonality, typicality, and adequacy requirements, and Rule 23(b) requires that, as to this Rule 23(b)(3) Class, questions of law or fact common to the Settlement Class predominate over any questions affecting only individual members and that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(a), (b).

- There are questions of law or fact common to the class;

- Bryant's claims are typical of the claims of the absent class members;

- Bryant will fairly and adequately assert and protect the interests of the absent class members;

- Questions of law and fact common to the class predominate over any questions affecting only individual members; and

- Proceeding as a class is superior to other available methods for the fair and efficient adjudication of the controversy.

(*See* Certification Ord. (Ex. D).)

30.     In similar contexts—where a class action has been certified prepetition—bankruptcy courts have deemed it unnecessary to conduct a class certification analysis. *See, e.g.,* *In re Craft*, 321 B.R. 189 (Bankr. N.D. Tex. 2005); *In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) ("If the F.R.Civ.P. 23 or like requirements have been deemed satisfied by a nonbankruptcy forum, it seems likely that the class representatives will be deemed by the bankruptcy court to meet those requirements as well. The issue may even be deemed res judicata."); *In re Ret. Builders, Inc.*, 96 B.R. 390, 392 (Bankr. S.D. Fla. 1988). The Court should follow these well-reasoned decisions here, particularly given that the Parties stipulate in the Settlement Agreement that, solely for the purposes of settlement, the Class meets the standards of Rule 23(a) and 23(b) and the Certification Order.

31.     Because the Arkansas Court has already certified a class inclusive of the Settlement Class and found that Bryant should be appointed as Class Representative and Messrs. Crowe, Arnold, Wyly, and Rommel as Class Counsel, and also because the Parties have stipulated that this Certification Order should be fully acknowledged and reaffirmed by the Court for settlement purposes only, the Court should: (i) conditionally certify the Class, as defined in the Settlement Agreement, which mirrors the definition in the Certification Order, and (ii)

provisionally designate Bryant as Class Representative and Messrs. Crowe, Arnold, Wyly, and

Rommel as Class Counsel for purposes of effecting notice to the Class.

**B.      The Settlement Agreement Satisfies Rule 23(e)**

32.      Rule 23(e) requires court approval of a class action settlement.  The

standard for reviewing the proposed settlement of a class action in the Second Circuit, as in other

circuits, is whether the proposed settlement is *"fair, reasonable and adequate."*  *In re Luxottica*

*Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) (emphasis added); *see In re*

*Indep. Energy Holdings PLC*, No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090, at *9

(S.D.N.Y. Sept. 29, 2003).  Further, in reviewing the reasonableness of a proposed class action

settlement, courts are cautioned against substituting their judgment for that of the parties who

negotiated the settlement or conducting a mini-trial on the merits of the action.  *See Weinberger*

*v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983); *In re Milken &*

*Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993).  Thus, "[w]here the proposed settlement

appears to be the product of serious, informed, non-collusive negotiations, has no obvious

deficiencies, does not improperly grant preferential treatment to class representatives or

segments of the class and falls within the reasonable range of approval, preliminary approval

should be granted."  *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y.

1997); *accord In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 191 (S.D.N.Y. 2005).

33.      Here, there can be no doubt that this standard is met.  The Settlement

Agreement is "the product of 'serious, informed, non-collusive negotiations' by experienced

counsel."  *In re Initial Pub. Offering*, 226 F.D.R. at 194 (quoting *In re Nasdaq*, 176 F.R.D. at

102); *see also Gross v. Wash. Mut. Bank, F.A*, No. 02 Civ. 4135 (RML), 2006 WL 318814, at *5

(E.D.N.Y. Feb. 8, 2006).  And there is no evidence that the proposed settlement accords

"improper[] . . . preferential treatment" to any member in or portion of the class.  *In re Nasdaq*,

176 F.R.D. at 102; *see also Bourlas v. Davis Law Assocs.*, 237 F.R.D. 345, 356 (E.D.N.Y. 2006).

Rather, the Settlement Agreement is the "product of extensive, arms-length negotiations

conducted by experienced counsel with input from the parties." *Leung v. Home Boy Rest. Inc.*,

No. 07 Civ. 8779, 2009 U.S. Dist. LEXIS 12556, at *1 (S.D.N.Y. Feb. 18, 2009). It follows

from active litigation in the underlying Arkansas Action, in which the Certification Order was

appealed by GM all the way to the United States Supreme Court and dueling transfer and remand

motions were filed and, as to the remand motion, appealed by Bryant. Indeed, the litigation has

been ongoing since February 2005, and it has involved two mediation sessions, extensive

document and deposition discovery, the retention of experts, significant certification and transfer

briefing, and the retention of specialized bankruptcy and appellate counsel.

      34.    Moreover, there are no "obvious deficiencies" in the Settlement

Agreement warranting denial of preliminary approval. *In re Nasdaq*, 176 F.R.D. at 102; *see also*

*In re Prudential Sec. Inc. Ltd. P'Ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("At this

stage of the proceeding, the Court need only find that the proposed settlement fits within the

range of possible approval, a test that the settlement here easily satisfies."). Instead, distributions

to members of the Settlement Class will be made on a *pro rata* basis and will be allocated fairly

through the establishment of three tiers associated with member-specific and objective traits.

Specifically, the amount of distribution made to members of the Settlement Class varies based on

when the alleged parking brake defect was experienced in relation to expiration of the vehicle's

written warranty and when out-of-pocket expenditures for parking brake repairs were actually

made.

      35.    Finally, the settlement amount falls within a reasonable range for purposes

of preliminary approval. Through the Settlement Agreement, the Settlement Class will receive

an Allowed Claim from MLC, and the Claim will immediately be estimated in the amount of $12

million pursuant to 11 U.S.C. § 502(c)(3). This amount represents roughly one percent of the

claimed $1.4 billion Claim, but the Debtors' bankruptcy filing and their successful transfer of the

Arkansas Action to this Court over Bryant's strenuous opposition and appeal have caused

unexpected delays and serious uncertainty for Bryant and the Class Counsel.[7] Moreover, if the

Settlement Agreement is *not* approved, the Debtors have made clear that they will vigorously

oppose any allowance of Bryant's class-wide Claim and, in so doing, will move to decertify the

purported class certified in Arkansas, as the Debtors believe there is good precedent for denying

class-wide relief in this bankruptcy context. Regardless of which party ultimately will prevail in

the claims reconciliation process and with regard to Bryant's purported class-wide Claim, there

is uncertainty on both sides and, should the Debtors prevail, members of the purported class

could be without a remedy from the Debtors for the alleged defective parking brakes. In these

circumstances, the amount of settlement in the Settlement Agreement falls within a reasonable

range for purposes of preliminary approval. *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427

(S.D.N.Y. 1993) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not

amount to a hundredth or even a thousandth part of a single percent of the potential recovery."),

*aff'd*, 17 F.3d 600 (2d Cir. 1994). Further, Class Representative and Class Counsel submit that

payment of attorneys' fees, costs, and an incentive award to Bryant are in the range of those

customarily awarded in similar circumstances. And these amounts, as well as those certain

notice and administration expenses, potential taxes, if any, and distributions to be made to the

Settlement Class will be made either with cash obtained from the sale of New GM shares or with

cash raised by virtue of the sale or assignment of the Allowed Claim.

---

[7] It is anticipated that prior to the August 6, 2010 hearing, Class Counsel will file supporting papers showing that the settlement is in the best interest of the Class.

36.    Accordingly, the Court should preliminarily approve the Settlement

Agreement pursuant to Rule 23.

### The Proposed Method and Forms of Notice Should Be Approved

37.    After granting preliminary approval, the Court "must direct the

preparation of notice of the certification of the settlement class, the proposed settlement and the

date of the final fairness hearing." *In re Initial Pub. Offering*, 226 F.R.D. at 191. Further, that

directed notice must meet both dissemination and content requirements. *See* Fed. R. Civ. P.

23(e)(1); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir.) ("By virtue of the fact

that an action maintained under Rule 23 has res judicata effect on all members of the class, due

process requires that notice of a proposed settlement be given to the class.") (citation omitted),

*cert. denied*, 423 U.S. 864 (1975). The dual form of notice proposed by the Parties in the

Settlement Agreement satisfies both of these requirements.

38.    When certifying a class under Rule 23(b)(3), as the Parties ask the Court

to do solely for settlement purposes here, the Court has significant discretion in determining the

method of directing "appropriate notice to the class." Fed. R. Civ. P. 23(c)(2)(A); *accord*

*Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986) ("[T]he [Court] has virtually

complete discretion as to the manner of giving notice to class members."). While there are no

rigid rules to determine the adequacy of notice in a class action, the standard is generally that of

reasonableness. *See Wal-Mart*, 396 F.3d at 113-14; *Thompson v. Metro. Life Ins. Co.*, 216

F.R.D. 55, 67 (S.D.N.Y. 2003) ("Although no rigid standards govern the contents of notice to

class members, the notice must fairly apprise the prospective members of the class of the terms

of the proposed settlement and of the options that are open to them in connection with [the]

proceedings."). In that regard, notice need not be perfect, but need be only the best notice

practicable under the circumstances, and each and every class member need not receive actual

notice, so long as class counsel acted reasonably in choosing the means likely to inform potential

class members. *See Weigner v. City of N.Y.*, 852 F.2d 646, 649 (2d Cir. 1988), *cert. denied*, 488

U.S. 1005 (1989).

        39.     The Settlement Agreement contemplates two forms of notice to absent

class members: Mailed Notice and Published Notice. The Mailed Notice will be transmitted by

Debtors, by first class mail, to absent class members that have an accessible warranty database

record or other record reasonably accessible to the Debtors, including with New GM, revealing

they paid out-of-pocket for parking brake repairs. (*See* Agmt. 1.26; 1.31; 1.37 (Ex. A).) This

notice method clearly is "*appropriate*" and "*reasonable*" under Rule 23(c)(2)(a) and 23(e)(1).

*See Schroeder v. City of N.Y.*, 371 U.S. 208, 212-13 (1962) ( requiring mailing of notice to class

members whose addresses are known or easily ascertainable); *accord Eisen v. Carlisle &*

*Jacquelin*, 417 U.S. 156, 175 (1974).

        40.     Notice by publication is appropriate where individual notice would be

burdensome or expensive. *Handschu*, 787 F.2d at 832-33; *W. Va. v. Chas. Pfizer & Co.*, 440

F.2d 1079, 1090 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971). That is, "when class members'

names and addresses may not be ascertained by reasonable effort, publication notice has been

deemed adequate to satisfy due process." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 107

(S.D.N.Y. 2007), *reconsideration denied in part*, 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009).

The Debtors do not possess the names and mailing addresses of original or current owners of

vehicles that do not have an accessible warranty database record, as such information would

have to be acquired through a VIN search by a third-party vendor, which costly procedure is

estimated to exceed one million dollars ($1,000,000.00). In view of these circumstances and the

Debtors' condition in bankruptcy, the alternative and additional Published Notice proposed by
the Parties in the Settlement Agreement is likewise necessary and acceptable.

41.    To that end, Bryant and Class Counsel have committed to publish, three
times in the Monday-Thursday Edition of *USA Today*, on one-sixteenth (1/16) of a page, a
summary form of notice that concisely explains the nature of the settlement and directs readers to
a settlement website and to a 1-800 telephone number. (*See* Agmt. (Ex. A) (attaching form of
Published Notice.) The full Settlement Agreement, the Mailed Notice, and the Reimbursement
Claim Forms will be posted on the website, and the 1-800 telephone number will allow persons
interested in the Settlement Agreement to order a copy of the full Settlement Agreement, the
Mailed Notice, and/or a copy of the Reimbursement Claim Form. The Published Notice will
prove a useful supplement to the individually-mailed Mailed Notice because it will be easily
viewable by all of the purchasers of the relevant vehicles. *See Weinberger*, 698 F.2d at 71
(approving plan of individual and publication notice); *In re Prudential Sec. Inc. Ltd. P'ships
Litg.*, 163 F.R.D. at 210-11 (same). In sum, the dual form of notice is the best practicable notice
under the circumstances and satisfies the notice standards in Rule 23(e).

42.    Regarding the content included in the proposed forms of notice, the notice
required under Rule 23(c)(2)(A) need not include the entire text of the proposed settlement but,
rather, may describe it in general terms. *See Weinberger*, 698 F.2d at 70. Here, the content of
the Mailed Notice and Published Notice is clearly adequate in that it informs the Class, in easily
understandable language, about: (i) the nature of the Bryant Adversary Proceeding and the
Claim, including the claims asserted; (ii) the definition of the conditionally certified class; (iii)
the terms of the Settlement Agreement in summary; (iv) the specific benefits being provided to
the Settlement Class; (v) the nature and extent of the released claims; (vi) the process for making

an objection; (vii) the date, time, and location of the Fairness Hearing; and (viii) the

ramifications of not objecting to certification of the Class or approval of the Settlement

Agreement. (*See* Agmt. Ex. A (form of Mailed Notice and Published Notice).) Finally, both

forms of notice provide a specific electronic mail inquiry address to which requests for further

information may be directed to Class Counsel. (*See id.*)

43.    In summary, the manner and content of the Mailed and Published Notices

satisfies the requirements of Rule 23 and due process for notifying absent class members of the

conditional certification of the Class and preliminary approval of the Settlement Agreement. *See*

*In re Baldwin-United Corp.*, 105 F.R.D. 475, 485 (S.D.N.Y. 1984) (approving notice of

certification of a settlement class that described pendency of the class action, terms of the

proposed settlement, status of proceedings, legal effect of the settlement, rights to opt-out or

object, and the right to appear at the fairness hearing.); *see also* Manual For Complex Litig. §§

21.31, 21.311 (4th ed. West 2004).  Accordingly, the Court should approve the Mailed and

Published Notices and order the dissemination of the same in accordance with the terms of the

Settlement Agreement.

## Notice

44.    Notice of this Motion for Preliminary Approval of Class Settlement, for

Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of

Class Notice, and To Set Fairness Hearing has been provided to David W. Crowe and John W.

Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F. Rommel of Wyly-

Rommel, PLLC; and (ii) parties in interest in accordance with the Third Amended Order

Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and

Case Management Procedures, dated April 29, 2010 [Docket No. 5670].  Additionally, Notice of

this Motion for Preliminary Approval of Class Settlement, for Conditional Certification of

Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and To Set

Fairness Hearing has been provided to La Ronda Hunter and Robin Gonzales, by and through

their attorneys of record, Ira Spiro, Esq., and Mark Moore, Esq., Spiro Moss Barnes Harrison &

Barge, LLP, 11377 W. Olympic Boulevard, Fifth Floor, Los Angeles, California 90064-1683.

The Debtors submit that such notice is sufficient and no other or further notice need be provided.

45.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
       July 23, 2010

                                   /s/ Joseph H. Smolinsky
                                   Harvey R. Miller
                                   Stephen Karotkin
                                   Joseph H. Smolinsky
                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007

                                   Attorneys for Debtors
                                   and Debtors in Possession

## EXHIBIT A

**Settlement Agreement**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                       :
**In re**                                              :    **Chapter 11 Case No.**
                                                       :
**MOTORS LIQUIDATION COMPANY,** *et al.,*              :    **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*    :
                                                       :
          **Debtors.**   :    **(Jointly Administered)**
                                                       :
-------------------------------------------------------x
                                                       :
**BOYD BRYANT, on behalf of himself and**              :    **Adversary No. 09-00508 (REG)**
                                                       :
    **all others similarly situated,**            :
          **Plaintiffs,**   :
**vs.**                                                :
                                                       :
**MOTORS LIQUIDATION COMPANY,** *et al.,*              :
    **f/k/a General Motors Corp.,** *et al.*    :
                                                       :
          **Defendant.**   :
-------------------------------------------------------x

### SETTLEMENT AGREEMENT

    A.    This Settlement Agreement ("Settlement Agreement") is made and entered into

by and between Plaintiff Boyd Bryant, individually and as class representative of the Class

("Plaintiffs," as defined below) and Debtors (as defined below) (collectively the "Parties").

B.    This document and the exhibits hereto set forth in their entirety the terms of the Parties' Settlement Agreement. This Settlement Agreement was reached after arms-length, good-faith negotiations among counsel for the Parties, the Parties, and representatives for the Parties.

C.    In executing this Settlement Agreement, the Parties have all considered the unique, case-specific aspects of their dispute regarding the Parking Brake, including, without limitation: a) the fact that the Class, on January 11, 2007, was certified under Ark. R. Civ. P. 23 by the trial judge in the Miller County Action; b) that this class certification was affirmed on appeal to the Supreme Court of Arkansas; c) that the United States Supreme Court, in January 2009, denied Debtors' petition for writ of *certiorari* based on that affirmance; d) that Debtors, since June 1, 2009, have been in bankruptcy; e) that Debtors removed the Miller County Action to an Arkansas bankruptcy court, then transferred venue of it to the Bankruptcy Court in New York; f) that Debtors, presently still in bankruptcy, have limited assets to satisfy the Claim; g) that Debtors could oppose Plaintiffs' Motion to File Class Proof of Claim; and h) that protracted litigation regarding Plaintiffs' Motion to File Class Proof of Claim, and other pending issues in the Bankruptcy Court, could lead to uncertain results for the Parties.

D.    Finally, all Parties are mindful of the many general risks inherent in litigation and bankruptcy, including, but not limited to, those associated with trial, confirmation of Debtors' chapter 11 plan, and potential lengthy appeals resulting from those activities.

E.    Plaintiffs are prepared to vigorously prosecute the claims raised in this litigation against Debtors. Debtors deny each of the claims alleged and are prepared to vigorously defend against those claims. Nevertheless, Plaintiffs and Debtors now desire to effectuate the settlement provided for in this Settlement Agreement in order to avoid the further expense, burden and risks

of protracted litigation, of Debtors' bankruptcy, and to put to rest further controversy between the Parties.

F.      Subject to final approval by the Bankruptcy Court of this Settlement Agreement, the entry of Judgment, and the Judgment becoming a Final Judgment, as defined herein, the Settled Claims shall be settled, compromised, and dismissed with prejudice as per the following terms and conditions:

## 1. DEFINITIONS

As used throughout this Settlement Agreement and the Exhibits hereto, the following terms have the meanings specified below:

1.1     Administration Expenses. "Administration Expenses" means

 (a) the reasonable expenses incurred in providing notice to Class Members, including but not limited to (i) costs of printing the Mailed Notice, (ii) costs of mailing the Mailed Notice, and (iii) costs of publishing the Published Notice;

 (b) the reasonable expenses associated with creating and maintaining both a settlement-related website and 1-800 telephone number;

 (c) the reasonable expenses incurred in reviewing and processing Reimbursement Claim Forms completed and returned by Class Members;

 (d) the reasonable expenses incurred in (i) printing and mailing the Distribution Checks to the Class Members and (ii) printing and duplicating any notices or letters accompanying the Distribution Checks; and

 (e) any additional expenses, reasonably incurred, to facilitate the timely and efficient administration of the Settlement Agreement, if approved, for the benefit of the Class;

The responsibility for paying the costs of Administration Expenses as generally but not exclusively described in (a) through (e) above, is set forth in Paragraphs 1.26, 1.41, and 2.2(a-c) herein.

1.2     Adversary Proceeding.  "Adversary Proceeding" means all claims, actions, rights of action, causes of action, and issues that are the subject of and identified in the cause number "Adversary No. 09-00508 (REG)" in the Bankruptcy Court.

1.3     Allowed Claim.  "Allowed Claim" means an allowed general unsecured claim against MLC (as defined below) in the amount of twelve million dollars ($12,000,000.00) in Debtors' bankruptcy proceedings in the Bankruptcy Court; provided, however, that the parties agree that twelve million dollars ($12,000,000.00) is the estimated claim amount for the Settled Case for all purposes, including for plan confirmation and distribution purposes, subject to the Parties' reservation  of rights pursuant to 11 U.S.C. § 502(j). The conveyance to and receipt of the Allowed Claim by the Class constitutes partial consideration for this Settlement Agreement.  The Parties expressly reserve their rights, claims, defenses, and/or counterclaims in connection with the Claim, the Motion to File Class Proof of Claim, the Adversary Proceeding, the Settled Case, the Settled Claims, the Miller County Action, including Unknown Claims, and/or any right to seek de-certification of the Class, pending the entry of the Judgment, in the event the Bankruptcy Court fails to enter the Judgment after the Fairness Hearing.

1.4     Attorney Fee Award.  "Attorney Fee Award" means any award of attorneys' fees to Class Counsel that is approved by the Bankruptcy Court and included in the Final Judgment.

1.5     Bankruptcy Court.  "Bankruptcy Court" means the court in which Debtors' bankruptcy proceedings are pending: the United States Bankruptcy Court for the Southern District of New York, Hon. Robert E. Gerber presiding.

1.6    Cash Settlement Fund. "Cash Settlement Fund" means either: a) the cash proceeds resulting from any sale of shares, in the open market or otherwise, of General Motors Company ("New GM") stock distributed from the Debtors' bankruptcy estate to satisfy the Allowed Claim; or b) the cash proceeds resulting from any sale and/or assignment of the Allowed Claim to any third party.

1.7    Claim. "Claim" means the Miller County Action, the Adversary Proceeding, proofs of claim nos. 58625, 58626, and 58627, and each and every claim, action, right of action, or cause of action asserted against Debtors by Plaintiffs in the Miller County Action, in the Adversary Proceeding, and via proofs of claim nos. 58625, 58626, and 58627, except that "Claim" does not mean any claim, action, right of action, or cause of action asserted by Plaintiffs in the Complaint, in the Miller County Action, in the Adversary Proceeding, and/or via proofs of claim nos. 58625, 58626, and 58627, for which liability, past, present, or future, has been transferred to or assumed by New GM (i) due to entry of the Sale Order or (ii) by, through, or on account of that certain Master Sale and Purchase Agreement dated July 10, 2009, by and between Debtors and New GM and/or their predecessors, successors, and/or affiliates.

1.8    Claims Administrator. "Claims Administrator" means the organization or entity whom the Parties agree may handle notice and administrative issues related to this Settlement Agreement and distribution of the Net Cash Settlement Fund, including, but not limited to, mailing and other provision of notice and Reimbursement Claim Forms, creation and maintenance of a 1-800 number and settlement-related website, receipt and review of Reimbursement Claim Forms, establishment and maintenance of the Escrow Fund, and processing, payment, and denial of claims as documented in Reimbursement Claim

Forms. "Claims Administrator," if responsible for controlling or supervising the Escrow Account, may also be responsible for making the disbursements resulting in creation of the Net Cash Settlement Fund as set forth in Paragraph 1.29 below.

1.9    Class Counsel. "Class Counsel" means Plaintiffs' appointed class counsel of record in the Miller County Action: David W. Crowe and John W. Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F. Rommel of Wyly-Rommel, PLLC. It also means any and all partners, associates, employees, agents, or representatives of Bailey/Crowe & Kugler, LLP and Wyly-Rommel, PLLC. It is acknowledged by the Parties that Messrs. Crowe, Arnold, Wyly, and Rommel, and their respective law firms, were appointed class counsel in the Miller County Action, and that such appointment shall not be disturbed in connection with matters related to this Settlement Agreement.

1.10    Class. "Class" means the following class certified in the Miller County Action under Ark. R. Civ. P. 23:

> *Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer[1], that registered his vehicle in any state in the United States.*

Excluded from the Class are the following individuals or entities:

(a)    Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

---

[1] The term "1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer" is referring to the following GM model-year and model coded vehicles equipped with automatic transmissions:

| | |
|---|---|
| 1500 Series Pickups: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

(b)     Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

(c)     Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

(d)     Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer; and

(e)     Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005.

1.11    Class Members. "Class Members" means any and all individuals who are members of the Class as defined in Paragraph 1.10.

1.12    Class Representative. "Class Representative" means Boyd Bryant, acting in his capacity as the appointed representative of the Class, as defined in Paragraph 1.10. It is acknowledged by the Parties that Mr. Bryant was appointed the class representative in the Miller County Action, and that such appointment shall not be disturbed in connection with matters related to this Settlement Agreement.

1.13    Complaint. "Complaint" means Plaintiff's First Amended Class Action Complaint, on file in Cause No. CV-2005-51-2, *Boyd Bryant, on behalf of himself and all other similarly situated v. General Motors Corporation, et al.* in the Circuit Court of Miller County, Arkansas.

1.14    Debtors. "Debtors" means and includes Motors Liquidation Company ("MLC") and its affiliated debtors, as debtors in possession. For avoidance of doubt, New GM does not fall within this definition of "Debtors."

1.15   Debtors' Counsel. "Debtors' Counsel" means the firms of Weil, Gotshal & Manges
LLP, Haltom & Doan, LLP, and Jones, Walker, Waechter, Poitevent, Carrére &
Denégre, LLP; and any and all partners, associates, employees, agents, or
representatives of Weil, Gotshal & Manges LLP, Haltom & Doan, LLP, and/or Jones,
Walker, Waechter, Poitevent, Carrére & Denégre, LLP.

1.16   Distribution Check. "Distribution Check" means a check payable to a Class Member to
accomplish distribution of the amount that is payable to such Class Member pursuant to
the Plan of Allocation. A transmittal notice shall accompany the Distribution Check and
shall be in substantial compliance with the description set forth in Exhibit A.

1.17   Distribution Date. "Distribution Date" means the date(s), as soon as practicable after
the Final Claims Deadline, and also after the first monies are deposited into the Escrow
Account, as per Paragraph 2.5 below, creating the Cash Settlement Fund, on which the
Distribution Checks will be mailed to the Settlement Class.

1.18   Effective Date. "Effective Date" means the date on which the Judgment becomes a
Final Judgment.

1.19   Escrow Account.   "Escrow Account" means an escrow account to be established by
either Plaintiffs or the Claims Administrator at a financial institution that is agreeable to
the Parties, and for the purpose of receiving any consideration whatsoever resulting
from or created by the Allowed Claim, including, without limitation, cash, stock,
warrants, or cash proceeds therefrom.

1.20   Fairness Hearing.   "Fairness Hearing" means the hearing to be held before the
Bankruptcy Court to determine whether the Settlement Class should be finally certified,
whether this Settlement Agreement, including the Plan of Allocation and other Exhibits,

should be finally approved as fair, adequate, and reasonable; whether the Judgment should be entered; whether the application of Class Counsel for payment of the Attorney Fee Award and Reimbursable Costs and Expenses Awarded should be finally approved; and whether any application for Incentive Award to Boyd Bryant, as class representative, should be finally approved.

1.21    Final Claims Deadline. "Final Claims Deadline" shall mean the day that is eighty (80) days after the date on which the Order of Preliminary Approval is signed, and which is the deadline by which Participating Class Members and/or the Settlement Class must have postmarked for mailing or electronically transmitted their Reimbursement Claim Forms to the Claims Administrator.

1.22    Final Judgment. If no appeal from the Judgment has been filed, the Judgment shall become a "Final Judgment" upon the expiration of the time allowed under law for filing an appeal from the Judgment. If an appeal from the Judgment is filed, the Judgment shall become a "Final Judgment" when the Judgment has been finally affirmed on appeal or all appeals from the Judgment and all motions for rehearing have been dismissed, and the time for filing any further appeal, motion for rehearing, or petition for writ of certiorari with any state or federal court has expired.

1.23    Final Unclaimed Fund. "Final Unclaimed Fund" means the Net Cash Settlement Fund, less the amount of money represented by those Distribution Checks which are endorsed and presented for payment by Class Members within thirty (30) days after the Distribution Date, plus interest, if any, that has accrued on the amount of money in the Final Unclaimed Fund.

1.24    Incentive Award to Boyd Bryant. "Incentive Award to Boyd Bryant" shall mean any class-representative incentive award to Boyd Bryant that is approved by the Bankruptcy Court and included in the Final Judgment, which shall be paid solely from the Cash Settlement Fund.

1.25    Judgment. "Judgment" means the judgment to be rendered by the Bankruptcy Court in substantially in the form of Exhibit B hereto.

1.26    Mailed Notice. "Mailed Notice" means a direct mail Notice of Class Action Certification and Settlement substantially in the form attached hereto as Exhibit C (all of Exhibit C except the last page), to be printed and mailed by Debtors, by first-class mail, to Class Members who can be identified with reasonable effort by Debtors at the last known addresses of the Class Members, via examination of Debtors' records, or those of New GM, to the extent presently available. The cost of preparing and mailing the Mailed Notice shall be borne solely by Debtors. The Parties agree that Debtors shall not be responsible for the accuracy or completeness of any records or information provided by outside sources, including New GM, with regard to Mailed Notice. Debtors estimate that the number of Class Members who can be identified with reasonable effort as set forth herein number seventeen thousand (17,000) or fewer.

1.27    Motion to File Class Proof of Claim. "Motion to File Class Proof of Claim" means "Plaintiffs' Motion to Allow Plaintiffs to File a Class Proof of Claim and Alternative Motion, Subject to Motion for an Order Allowing Plaintiffs to File a Class Proof of Claim, For the Application of Federal Rule of Bankruptcy Procedure 7023 Pursuant to Federal Rule of Bankruptcy Procedure 9014," which is presently on file in the Bankruptcy Court [Docket No. 4560].

1.28    Miller County Action. "Miller County Action" means the lawsuit in the Circuit Court of Miller County, Arkansas in which the Complaint is filed, and bearing the cause number set forth in the style of the Complaint.

1.29    Net Cash Settlement Fund. "Net Cash Settlement Fund" means the Cash Settlement Fund, less payment of the following sums or monies, in the following sequence, for: a) the Attorney Fee Award; b) the Reimbursable Costs and Expenses Awarded; c) any Administration Expenses in excess of the one hundred thousand dollars ($100,000.00) cash that Debtors will place into the Escrow Account as per Paragraph 2.2(b) herein; d) any Incentive Award to Boyd Bryant; and e) any applicable taxes relating to or arising from the creation or maintenance of the Cash Settlement Fund, which shall be considered a cost of administration of this Settlement Agreement, and which may be paid without prior order of the Bankruptcy Court.

1.30    New GM. "New GM" means General Motors Company, or its successors in interest.

1.31    Notice of Settlement. "Notice of Settlement" means the Mailed Notice substantially in the form of Exhibit C hereto, except for the last page of Exhibit C hereto, and the Published Notice substantially in the form of the last page of Exhibit C hereto.

1.32    Order of Preliminary Approval. "Order of Preliminary Approval" means an order issued by the Bankruptcy Court, substantially in the form of Exhibit D hereto, granting the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing.

1.33    Order of Estimation. "Order of Estimation" means an order issued by the Bankruptcy Court, substantially in the form of Exhibit E hereto, granting the Order of Estimation.

1.34    Parking Brake.  "Parking Brake" means the PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer installed as original equipment in the vehicles described in the Class definition in Paragraph 1.10.

1.35    Participating Class Member.  "Participating Class Member" means Boyd Bryant, individually, and all Class Members who do not opt out of the Class after the Notice of Settlement is disseminated, and the deadline to opt out is expired.

1.36    Plaintiffs.  "Plaintiffs" means Plaintiff Boyd Bryant, individually and as appointed class representative of the Class, the Class, and/or Class Members.

1.37    Plan of Allocation.  "Plan of Allocation" is the plan attached as Exhibit F hereto, pursuant to which the Net Cash Settlement Fund and the Final Unclaimed Fund, if appropriate, will be distributed among the members of the Settlement Class whose Reimbursement Claim Forms have been submitted, reviewed, and approved by the Claims Administrator

1.38    Plan of Notice.  "Plan of Notice" means the following plan for providing notice to Class Members:

    (a)    Direct Mail Notice:

        The Mailed Notice will be printed and mailed by Debtors, by first-class mail, to Class Members who can be identified with reasonable effort by Debtors at the last known addresses as more specifically set forth in Paragraph 1.26 above.

    (b)    Notice Through Paid Media:

        The Published Notice will be published in three Monday-Thursday Editions of USA Today, one-sixteenth (1/16) page.

1.39    Preliminary Approval Date.  "Preliminary Approval Date" means the later of:

    (a)    the date upon which the Order of Preliminary Approval is entered by the Bankruptcy Court; or

(b)     the date on which the Bankruptcy Court enters an order setting the Fairness Hearing to occur.

1.40    Pronoun.    To simplify presentation in referring to Class Members, Plaintiff, and Debtors, the pronoun "he" may be used herein to mean "he, she, or it."

1.41    Published Notice.    "Published Notice" means the Notice of Class Action Certification and Settlement substantially in the form of the last page of Exhibit C hereto that is to be published in accordance with the Plan of Notice.  The cost of Published Notice shall, to the extent possible, be satisfied and paid from the one hundred thousand dollar ($100,000.00) cash payment from Debtors to the Escrow Account described in Paragraph 2.2(b) below.  In the event the cost of Published Notice exceeds one hundred thousand dollars ($100,000.00), any additional cost of Published Notice shall be satisfied, paid, or reimbursed from the "Cash Settlement Fund" as per the sequence set forth in Paragraph 1.29.

1.42    Reimbursable Costs and Expenses Awarded.    "Reimbursable Costs and Expenses Awarded" shall mean any award of reimbursable costs and expenses to Class Counsel approved by the Bankruptcy Court and included in the Final Judgment, which shall be paid solely from the Cash Settlement Fund.

1.43    Reimbursement Claim Form.    "Reimbursement Claim Form" means the form to be sent to each Class Member that receives Mailed Notice, or sent to each Class Member who, after having seen the Published Notice, requests a Reimbursement Claim Form in writing, via the website, or orally via the 1-800 number.  In any case, the Reimbursement Claim Form, and any associated attachments, documents, or receipts, must be completed and returned to the Claims Administrator by no later than the Final Claims Deadline.

1.44   Released Parties. "Released Parties" means Debtors, their officers, directors, agents, employees, attorneys, administrators, affiliates, and estates. It is expressly understood and acknowledged by the Parties that New GM does not fall within any definition of "Released Parties" in this Settlement Agreement.

1.45   Sale Order. "Sale Order" means that particular order entered by the Bankruptcy Court on July 5, 2009 [Docket No. 2968] in bankruptcy case No. 09-50026 in the Bankruptcy Court, styled "Order Granting (i) Authorizing Sale Of Assets Pursuant To Amended And Restated Master Sale And Purchase Agreement with Ngmco, Inc., A U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection With The Sale; and (iii) Granting Related Relief," or any amendments or supplements thereto entered by the Bankruptcy Court.

1.46   Settled Case. "Settled Case" means the Miller County Action, the Adversary Proceeding, and the Claim brought or asserted by the Settlement Class, and only as against Debtors. "Settled Case" does not mean, as to New GM, the Miller County Action, the Adversary Proceeding, and the Claim. It is expressly understood and acknowledged by the Parties that Plaintiffs, including but not limited to the Class, are settling nothing as to New GM, and Plaintiffs reserve all of their rights and abilities to substitute New GM into these proceedings, or into other proceedings, and to litigate against New GM as they may desire in the Miller County Action, or elsewhere.

1.47   Settled Claims. "Settled Claims" means the Claim against the Released Parties asserted by the Settlement Class, and any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions,

fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, disputes, and controversies of any kind, nature, or description whatsoever, under federal, state, or foreign common law, statute, or regulation, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, whether direct, indirect, derivative, individual, representative, legal, equitable, or of any other type, or in any other capacity, related to or derived from the Claim, including but not limited to claims for breach of express warranty, breach of the implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, unjust enrichment, and fraudulent concealment. "Settled Claims" does not mean the Claim, or any portion thereof, that can or may be asserted by Plaintiffs against New GM. It is expressly understood by the Parties that Plaintiffs are settling nothing as to New GM, and reserve all of their rights and abilities to substitute New GM into these proceedings, or into other proceedings, and to litigate against New GM as they may see fit in the Miller County Action, or elsewhere.

1.48    Settlement Class. "Settlement Class" means all Participating Class Members.

1.49    Settling Parties. "Settling Parties" means Boyd Bryant, the members of the Settlement Class, and Released Parties, severally and collectively.

1.50    Unknown Claims. "Unknown Claims" means any and all Settled Claims that any Settlement Class Member does not know or suspect to exist in his, her, or its favor upon the Effective Date, which if known by him, her, or it, might have affected his, her, or its decision(s) with respect to the Settlement Agreement. With respect to any and all

Settled Claims, the members of the Settlement Class stipulate and agree that upon the Effective Date, the members of the Settlement Class shall expressly, and each Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, waived any and all provisions, rights, and benefits conferred by any law, rules, or regulations of any state or territory of the United States or any other country, or principle of common or civil law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The members of the Settlement Class may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Settled Claims, but the members of the Settlement Class shall expressly have and each Settlement Class member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Settled Claims and Unknown Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, without regard to the subsequent discovery or existence of such different or additional facts.   However, notwithstanding the foregoing, this definition of "Unknown Claims" does not include any personal injury claims under any legal theory, claim, or cause of action arising or accruing either before or after the Effective Date, and that may be asserted by or on

behalf of members of the Settlement Class. The Settling Parties acknowledge, and the

members of the Settlement Class shall be deemed by operation of the Judgment to have

acknowledged, that the foregoing waiver was separately bargained for and a material

element of the settlement of which this release is a part.

## 2.    RIGHTS, OBLIGATIONS, AND DUTIES OF SETTLING PARTIES

2.1    Responsibilities of Settling Parties.

   (a)    The Settling Parties will jointly seek Bankruptcy Court approval of
          this Settlement Agreement, and seek to secure any factual findings
          or legal conclusions necessary to effectuate the purposes and goals
          of this Settlement Agreement and final approval thereof.

   (b)    In particular, the Debtors will file Debtors' Motion for Preliminary
          Approval of Settlement, for Conditional Certification of Settlement
          Class, to Approve Cash Disbursement and Forms of Class Notice,
          and to Set Fairness Hearing. This motion must contain a
          stipulation by Debtors that they do not object to Plaintiffs' Motion
          to File Class Proof of Claim, but only to the extent the relief sought
          in that motion is the Allowed Claim and the one hundred thousand
          dollars ($100,000.00) cash payment addressed in Paragraph 2.2(b)
          below and only to the extent this Settlement Agreement is
          approved and the Judgment becomes Final. Further, under the
          terms of this Settlement Agreement, the only relief sought by the
          Class is the Allowed Claim and the one hundred thousand dollar
          ($100,000.00) cash payment addressed in Paragraph 2.2(b) below,
          and no other claims or amounts are sought from Debtors or
          asserted by the Class against Debtors, including, but not limited to,
          pursuant to Plaintiffs' Motion to File Class Proof of Claim. The
          Parties stipulate herein (and the Debtors will include such
          stipulation in the motion) that, for purposes of the Bankruptcy
          Court approving this Settlement Agreement only, the Parties
          acknowledge and stipulate to the validity of the Class's
          certification in the Miller County Action and that this certification
          is sufficient under Fed. R. Civ. P. 23 solely in the context of this
          Settlement Agreement. If the Court does not approve this
          Settlement Agreement, or the Judgment does not become Final,
          Debtors shall have the right to seek de-certification of the Class. If
          the Court does not approve this Settlement Agreement, or the
          Judgment does not become Final, the Parties expressly reserve
          their rights, claims, defenses, and/or counterclaims in connection
          with the Claim, the Motion to File Class Proof of Claim, the
          Adversary Proceeding, the Settled Case, the Settled Claims, the

Miller County Action, including Unknown Claims, and/or any right to seek decertification of the Class, pending the entry of the Judgment, in the event the Bankruptcy Court fails to enter the Judgment after the Fairness Hearing. Finally, the Parties stipulate herein (and the Debtors will include such stipulation in the motion) that twelve million dollars ($12,000,000.00) is the estimated claim amount for the Settled Case for all purposes, including for plan confirmation and distribution purposes, subject to the Parties' reservation of rights pursuant to 11 U.S.C. § 502(j), and the Parties will request the Court enter the Order of Estimation, granting as such.

(c)    At the Fairness Hearing, the Parties will seek and obtain from the Bankruptcy Court a Judgment substantially in the form of Exhibit B.

(d)    Boyd Bryant agrees he will not opt out of the Class and further agrees he will not solicit or encourage any Class Members to opt out.

(e)    Class Counsel agrees they will not solicit or encourage any potential Class Members to opt out.

(f)    Debtors agree that they will not impair, impede, or contest any effort or attempt by Plaintiffs or the Class to: i) at any time, move the Bankruptcy Court to substitute New GM into the Adversary Proceeding, or to obtain similar or related relief; ii) once New GM is so substituted, move the Bankruptcy Court to sever Plaintiffs' action against New GM, or to obtain similar or related relief; iii) once the action against New GM is so severed, move the Bankruptcy Court to remand the action against New GM to the Circuit Court of Miller County, Arkansas, as a continuation of the Miller County Action, or to obtain similar or related relief, under the Sale Order or otherwise; iv) at any time, seek clarification, interpretation, or declaration from the Bankruptcy Court as to which claims, causes or action, or controversies set forth in the Complaint have been transferred to and/or assumed by New GM, or to obtain similar or related relief; or v) seek relief from the Bankruptcy Court's automatic stay, if necessary, to permit any action Plaintiffs choose to maintain against New GM to proceed. Notwithstanding anything in this subparagraph, in this Settlement Agreement, or in the related documents, Debtors shall not be precluded in any manner from fully performing all of its obligations under the Sale Order and/or that certain Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition

Holdings LLC, a purchaser sponsored by the U.S. Treasury, as Purchaser, dated as of June 26, 2009, it is agreed and acknowledged that New GM is not a party to this agreement and has asserted that it has no liability to the Plaintiffs and nothing herein should be deemed to be an acknowledgement by the Debtors or New GM that any such liability exists. The Debtors are not aware of any liability that New GM would have to the Plaintiffs. Nothing herein shall constitute a waiver or any and all defenses or claims that New GM may have in connection with the pursuit of any claims against it.

2.2    Settlement Administration.

(a)    With the assistance of the Claims Administrator, the Settlement Class, represented by Class Counsel, shall be solely responsible for administering the Settlement Class, and, subject only to the exceptions in 2.2 (b) and (c) below, the Settlement Class, out of the Cash Settlement Fund, shall solely be responsible for paying all Administration Expenses. In no event are the Debtors responsible or liable for the administration of the Class or the Cash Settlement Fund or any Administration Expenses.

(b)    Within five (5) business days of the Preliminary Approval Date, and as partial consideration for this Settlement Agreement, Debtors shall deposit the sum of one hundred thousand dollars ($100,000.00) cash, which may be utilized by Class Counsel, on behalf of the Settlement Class, for the sole purpose of defraying Administration Expenses, into the Escrow Account, and Class Counsel shall, upon written request, and within ten (10) days after such written request, be required to account to Debtors for all disbursements or payments therefrom. Any unused portion of this Escrow Account shall be returned to the Debtors within thirty (30) days after the duties of the Claims Administrator have been concluded.

(c)    Debtors will obtain from New GM, to the extent available, the last known address and other data reasonably necessary for Debtors to send out, at their cost and expense, the Mailed Notice within five (5) business days after the Preliminary Approval Date. Debtors shall bear the full cost of the Mailed Notice.

2.3    Mutual Intent to Implement this Settlement Agreement Promptly. It is the mutual intent of the Parties to consummate and implement this Settlement Agreement promptly. They

agree to cooperate and to exercise their best efforts to the extent necessary to effectuate

and implement all of its terms and conditions as quickly as possible.

(a)    The Parties shall promptly submit this Settlement Agreement, including the Exhibits hereto, to the Bankruptcy Court for preliminary approval.

(b)    In proceedings before the Bankruptcy Court (and before any appellate courts, if necessary), the Settling Parties shall affirmatively present their support for final approval of this Settlement Agreement.

2.4    Mailing and Publication of Notice. Within five (5) business days after the Preliminary

Approval Date, Debtors shall mail out the Mailed Notice. In addition, Plaintiffs shall

publish the Published Notice in the USA Today, as per the Plan of Notice, on three (3)

separate days of Class Counsel's choosing, during Monday-Thursday of any given

week, but all such publications to occur within two (2) weeks after the Preliminary

Approval Date, subject to USA Today ad-space availability.

2.5    Creation of the Cash Settlement Fund. Class Counsel is authorized, following the

Effective Date and without any additional approval from the Bankruptcy Court, to (i)

sell, transfer, assign, and/or otherwise monetize the Allowed Claim, either individually

or through a broker, and/or (ii) monetize any shares, warrants, options or other property

received from Debtors as part of any chapter 11 plan in any commercially reasonable

manner. The resulting cash proceeds from the foregoing activities shall be utilized to

create the Cash Settlement Fund and shall be placed in the Escrow Account, and the

Claims Administrator shall account for any and all disbursements from the Escrow

Account.

2.6    Distribution of Attorney Fee Award. Upon creation of the Cash Settlement Fund, Class

Counsel shall be entitled to payment, out of the Cash Settlement Fund, of the Attorney

Fee Award not to exceed thirty three percent (33%) of the Cash Settlement Fund. Further, in the event a Final Unclaimed Fund exists, Class Counsel shall be entitled to payment of an additional Attorney Fee Award as described in Paragraph 4.1.

2.7     Distribution of Reimbursable Costs and Expenses Awarded. Upon creation of the Cash Settlement Fund, Class Counsel shall be entitled to payment, out of the Cash Settlement Fund, of the Reimbursable Costs and Expenses Awarded.

2.8     Distribution of Excess Administration Expenses. Upon creation of the Cash Settlement Fund, Class Counsel shall be entitled to pay, out of the Cash Settlement Fund, any Administration Expenses in excess of the one hundred thousand dollars ($100,000.00) cash that Debtors will pay into the Escrow Account as per Paragraph 2.2(b) herein.

2.9     Distribution of Incentive Award to Boyd Bryant. Upon creation of the Cash Settlement Fund, Class Counsel shall be entitled to pay, out of the Cash Settlement Fund, the Incentive Award to Boyd Bryant.

2.10    Distribution for Payment of Any Applicable Taxes. Upon creation of the Cash Settlement Fund, Class Counsel shall be entitled to pay, out of the Cash Settlement Fund, any applicable taxes relating to or arising from the creation or maintenance of the Cash Settlement Fund.

2.11    Distribution of Net Cash Settlement Fund. As soon as practicable after the date the first funds are deposited into the Escrow Account to create the Cash Settlement Fund, the Claims Administrator shall begin to distribute the Net Cash Settlement Fund on a pro rata basis to those members of the Settlement Class who properly complete and return the enclosed Reimbursement Claim Form by the Final Claims Deadline, and whose

Reimbursement Claim Forms are approved by the Claims Administrator in accordance

with the Plan of Allocation that is attached as Exhibit E hereto.

(i)    Each Distribution Check shall be accompanied by a transmittal notice in substantially the form described in Exhibit A hereto.

(ii)    In order to obtain payment of any amount from the Net Cash Settlement Fund, members of the Settlement Class must endorse a Distribution Check and present it to a payor bank within thirty (30) days after the Distribution Date.

(iii)    Failure of a Settlement Class Member to endorse a Distribution Check or to present it to a payor bank shall not relieve such Settlement Class Member from the binding effect of the Final Judgment dismissing the Settled Claims with prejudice, or affect such' release of Settled Claims.

(iv)    No Settlement Class Member shall have any claim against the Settling Parties, Class Counsel, or Debtors' Counsel, based on distributions made substantially in accordance with this Settlement Agreement (including the Plan of Allocation) and any orders of the Bankruptcy Court.

2.12    Disposition of the Final Unclaimed Fund.    If any Settlement Class Member fails to

endorse a Distribution Check and to present it to a payor bank within thirty (30) days

after the Distribution Date, the Claims Administrator shall stop payment of that

Distribution Check and the amount represented by that Distribution Check shall

constitute part of the Final Unclaimed Fund, as provided in Paragraph 1.23.    Within

thirty (30) days after the Distribution Date, the Claims Administrator shall certify to the

Parties the amount in the Final Unclaimed Fund, including all funds unused for the

payment of claims, plus all interest accrued.    The Parties will stipulate in the Debtors'

Motion for Preliminary Approval of Settlement, for Conditional Certification of

Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set

Fairness Hearing that they agree to the concept of the Bankruptcy Court vesting in the

Circuit Court of Miller County, Arkansas where the Miller County Action was

originally filed the exclusive right, ability and power to issue orders, judgments, or

decrees effecting the distribution of the Final Unclaimed Fund. Further, regardless of whether the Circuit Court of Miller County, Arkansas ultimately obtains the exclusive right, ability, and power to issue orders, judgments, or decrees effecting the distribution of the Final Unclaimed Fund, the Final Unclaimed Fund may be distributed in the manner described in Paragraph 4.1, and Debtors will not oppose such a distribution.

2.13    Entry of Judgment Dismissing Settled Claims. In tandem with the Bankruptcy Court's final approval of this Settlement Agreement, the Settling Parties agree to entry of the Judgment dismissing with prejudice the Settled Claims. The Judgment shall substantially be in the form of Exhibit B, which shall contain findings that the Bankruptcy Court has jurisdiction to resolve by settlement and entry of the Judgment all of the Settled Claims; and that entry of such Judgment is intended to be and shall be a dismissal with prejudice with respect to all Settled Claims, by all members of the Settlement Class and their successors and assigns, as against the Released Parties. The Judgment shall extinguish any and all liability of the Released Parties with respect to Settled Claims, but shall not extinguish any liability of New GM to Plaintiffs whatsoever. Finally, the Judgment shall contain language vesting in the Circuit Court of Miller County, Arkansas the exclusive right, ability, power, and jurisdiction to issue orders, judgments or decrees effecting the distribution of the Final Unclaimed Fund, as per Paragraph 2.12 above.

2.14    Continuing Jurisdiction. The Settling Parties agree that (i) the Judgment shall provide that, notwithstanding the entry of the Judgment, the Bankruptcy Court shall retain continuing jurisdiction over the Settling Parties, but only with respect to the matters between the Settling Parties addressed in the Judgment; (ii) the Bankruptcy Court's

continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing, and interpreting this Settlement Agreement, as provided in the attached form of Judgment; and (iii) entry of Judgment substantially in that form attached as Exhibit B, is a condition of this Settlement.

2.15    Boyd Bryant and the Participating Class Members' Release of Settled Claims.

   (a)    Upon the Judgment becoming a Final Judgment, the members of the Settlement Class, on behalf of themselves, their successors, heirs, and assigns, do release, discharge, and promise not to sue all Released Parties and will be deemed to have released, discharged, and promised not to sue any and all Released Parties with respect to all Settled Claims.

   (b)    The foregoing release shall apply to the members of the Settlement Class, their successors, heirs, and assigns, regardless of whether or not any individual member of the Settlement Class receives, cashes, or deposits a Distribution Check.

   (c)    Class Counsel agree that the foregoing release of Settled Claims by the members of the Settlement Class also releases all claims of Class Counsel against the Released Parties with respect to or arising from the Settled Claims.

## 3. EFFECT OF SETTLEMENT AGREEMENT DISAPPROVAL

3.1    The Bankruptcy Court must approve this Settlement Agreement based on the terms, consideration, and allocations provided herein. This Settlement Agreement shall be null and void in the event that the Settlement Agreement is not preliminarily or finally approved in its current form or in a substantially similar form acceptable to the Parties; provided however, that no order of the Court or modification or reversal on appeal of any order concerning the Attorney Fee Award, Reimbursable Costs and Expenses Awarded, or Incentive Award to Boyd Bryant shall constitute grounds for cancellation or termination of the Settlement Agreement or affect its terms including the releases, or

affect or delay the finality of the Judgment approving the Settlement Agreement. In the event this Settlement Agreement is nullified or voided due to lack of Bankruptcy Court approval, or based on other factors or events, the Parties are deemed to revert back to the status they occupied immediately before executing this Settlement Agreement and/or before any orders addressing any aspect of this Settlement Agreement were entered by the Bankruptcy Court, and the state of affairs between the Parties will be, in all respects, as though the Settlement Agreement had never been executed.

3.2    The Settled Case must be fully and finally dismissed with prejudice, as to the rights of the Settlement Class, with all rights to appeal having been exhausted. This Settlement Agreement shall be null and void in the event that the Settled Case is not fully and finally dismissed with prejudice, with all rights to appeal having been exhausted. This Settlement Agreement shall be null and void in the event the Judgment does not become a Final Judgment.

## 4. ATTORNEYS' FEES AND EXPENSES

4.1    Attorneys' Fees. Class Counsel submits they are entitled under their contingency fee agreement, and based on the work performed in this matter, to an Attorney Fee Award in an amount not to exceed thirty three percent (33%) of the Allowed Claim, or $4,000,000 cash, whichever is greater. Debtors agree to not object to any motion by Class Counsel seeking an Attorney Fee Award of an amount not to exceed the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, payable to Class Counsel as described in this Paragraph. Class Counsel will apply to the Bankruptcy Court for an Attorney Fee Award to be paid as follows: (1) thirty three percent (33%) of the Cash Settlement Fund in the sequence described in Paragraph 1.29; (2) in the event a Final Unclaimed Fund exists, members of the Settlement Class that have submitted and

had approved by the Claims Administrator a Reimbursement Claim Form will, to the extent possible (but, if necessary, subject to pro rata reduction) be made one hundred percent (100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs. If, after these additional "make whole" payments are made, additional Final Unclaimed Fund monies exist, and if Class Counsel's initial attorney fee payment was less than the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, then Class Counsel shall be entitled to receive additional monies from the Final Unclaimed Fund as an Attorney Fee Award, but never to exceed a total Attorney Fee Award of 33% of the Allowed Claim, or $4,000,000 cash, whichever is greater.

4.2    Reimbursable Costs and Expenses. Class Counsel submits they are entitled to reimbursable costs and expenses of two hundred ninety thousand dollars ($290,000.00) cash. Debtors agree to not object to any motion by Class Counsel seeking Reimbursable Costs and Expenses Awarded of two hundred ninety thousand dollars ($290,000.00) cash.

4.3    Incentive Award. Class Counsel submits Boyd Bryant is entitled to an incentive award of ten thousand dollars ($10,000.00) cash. Debtors agree to not object to motion by Class Counsel seeking an Incentive Award for Boyd Bryant of ten thousand dollars ($10,000.00) cash.

## 5.  NO ADMISSION OF LIABILITY

5.1    No Admission. The settlement embodied in this Settlement Agreement is made to compromise and settle the Settled Claims without further litigation. It is not, nor should it be interpreted as an admission of any liability or wrongdoing by Debtors, or any Released Party, nor should it be construed as an admission of any strength or weakness

in the Settled Claims against Debtors. Debtors deny any wrongdoing or liability. No statement appearing in the Plan of Allocation or any other exhibit to this Settlement Agreement is, or should be interpreted as, an admission by Plaintiffs, Debtors, any Released Party, or by any of their counsel.

## 6.  MISCELLANEOUS PROVISIONS

6.1     Advice of Counsel.  Each of the Settling Parties has relied upon his own counsel's advice in entering into this Settlement Agreement and not upon the advice of any other party's counsel.

6.2     Incorporation by Reference.  All of the Exhibits to this Settlement Agreement are material and integral parts hereof, and they are fully incorporated herein by reference.

6.3     Amendment and Modification.   This Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of the Settling Parties or their successors in interest.

6.4     Multiple Counterparts.   This Settlement Agreement may be executed in multiple counterparts.  Parties need not be signatories to the original or the same counterpart. Attachment of a facsimile copy of a signed signature page shall be effective the same as an original signed signature page.

6.5     Integration and Entirety; No Third Party Beneficiaries.  This Settlement Agreement and the Exhibits hereto constitute the entire agreement among the Settling Parties and supersede any and all prior agreements, representations, warranties, or covenants, whether oral or written.  The Settlement Agreement is not intended to confer any rights or remedies upon any persons or entities other than the Settling Parties and Released Parties.

6.6    Severability.  If any provision of this Settlement Agreement is held to be illegal, invalid, or unenforceable: (i) such provision will be fully severable; (ii) this Settlement Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised part of this Settlement Agreement; and (iii) the remaining provisions of this Settlement Agreement will remain in full force and affect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Settlement Agreement.

6.7    Construction, Interpretation, and Venue.  This Settlement Agreement (including the Exhibits hereto) and all documents relating hereto shall be construed and interpreted under the substantive laws of the State of New York.  Venue to enforce the Settlement Agreement shall be in the Bankruptcy Court.  Governing procedural law shall be either the Federal Rules of Civil Procedure, and/or the Federal Rules of Bankruptcy Procedure, except to the extent the Bankruptcy Court may determine, in whole or in part, that Ark. R. Civ. P. 23 applies to and governs any class certification or class settlement issues or aspects related to this Settlement Agreement.  This Settlement Agreement (including the Exhibits hereto) and all documents relating hereto shall be deemed to have been mutually prepared by the Parties and shall not be construed against any of them by reason of authorship.

6.8    No Transfer or Assignment.  Plaintiffs represent and warrant that no portion of the Settled Case or Released Claims has heretofore been assigned, encumbered or in any manner transferred in whole or in part.  This provision, however, does not affect the right or ability of members of the Settlement Class, or Class Counsel, to create the Cash

Settlement Fund by assigning or selling the Allowed Claim, once received, to a third party.

6.9    Costs. Except as otherwise explicitly provided in this Settlement Agreement, each of the Settling Parties shall bear its own costs with respect to the Settled Case.

6.10    As a condition precedent to any obligations or liabilities of the Parties, Plaintiffs expressly represent and warrant to the Released Parties that (a) they are the lawful owners of the claims and the potential claims released in this Settlement Agreement and general release; (b) subject to the approval of the Bankruptcy Court, they have full capacity and authority to settle, compromise, and release their claims and potential claims and to enter into this Settlement Agreement and general release; and (c) no other person or entity has acquired or has been assigned, or will in the future acquire or have any right to assert, against any of the releasees any portion of the claims or potential claims released in this Settlement Agreement and general release. The representations and warranties contained in this Paragraph 6.10 shall survive the execution of this Settlement Agreement indefinitely.

6.11    Notice. If notice need be given to the Parties for purposes of this Settlement Agreement, any performance thereunder, or any motions or orders related to the Settlement Agreement, under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or otherwise, the Parties will stipulate in the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing that said notice need be transmitted as follows:

If to Mr. Boyd Bryant, delivered or faxed to:

David W. Crowe                     James C. Wyly
John W. Arnold                     Sean F. Rommel
Bailey/Crowe & Kugler, LLP         Wyly-Rommel, PLLC
6550 Bank of America Plaza         2311 Moore's Lane
901 Main Street                    Texarkana, Texas 75503
Dallas, Texas 75202-5605

If to Debtors, delivered or faxed to:

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

6.12    Authority to Execute.  The undersigned each represents that he or she is fully authorized

to execute this Settlement Agreement on behalf of the Settling Parties for which he or

she signs.

THE UNDERSIGNED WARRANT THAT THEY HAVE READ THE TERMS OF THIS
SETTLEMENT, HAVE HAD THE ADVICE OF COUNSEL OR THE OPPORTUNITY
TO OBTAIN SUCH ADVICE IN CONNECTION WITH READING, UNDERSTANDING
AND EXECUTING THIS STIPULATION, AND HAVE FULL KNOWLEDGE OF THE
TERMS, CONDITIONS, AND EFFECTS OF THIS SETTLEMENT.

MOTORS LIQUIDATION COMPANY
AND AFFILIATED DEBTORS

By: _____

Print Name: _Ted Stenger_

Title: _EVP_

Dated: _July 22_____, 2010
        Detroit, Michigan

By: _____

Print Name: _Carrianne Basler_

Title: _Vice President_

Dated: _July 22____, 2010
        Detroit, Michigan

BOYD BRYANT, ON BEHALF OF HIMSELF
AND THE CLASS

By: _____

Print Name: _____

Title: _____

Dated: _____, 2010
        Texarkana, Arkansas

**THE UNDERSIGNED WARRANT THAT THEY HAVE READ THE TERMS OF THIS SETTLEMENT, HAVE HAD THE ADVICE OF COUNSEL OR THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH READING, UNDERSTANDING AND EXECUTING THIS STIPULATION, AND HAVE FULL KNOWLEDGE OF THE TERMS, CONDITIONS, AND EFFECTS OF THIS SETTLEMENT.**

MOTORS LIQUIDATION COMPANY
AND AFFILIATED DEBTORS

By: _____

Print Name:_____

Title:_____

Dated: _____, 2010
      Detroit, Michigan


By: _____

Print Name:_____

Title:_____

Dated: _____, 2010
      Detroit, Michigan


BOYD BRYANT, ON BEHALF OF HIMSELF
AND THE CLASS

By: _Boyd Bryant_____

Print Name:__Boyd Bryant_____

Title:_On Behalf of Himself and the Class

Dated: _____July 23_____, 2010
      Texarkana, Arkansas

# EXHIBIT A

EXHIBIT "A"

**Description of Transmittal Notice to Accompany Distribution Checks.**

Each Distribution Check mailed to a member of the Settlement Class shall be accompanied by a Transmittal Notice containing the following language, or its substantial equivalent as approved by the Court:

**TRANSMITTAL NOTICE**

To:    CLASS MEMBERS IN THE CLASS ACTION DESCRIBED BELOW

Re:    Distribution of settlement proceeds in the following class action: *Boyd Bryant, On Behalf of Himself and All Others Similarly Situated v. Motors Liquidation Company, et al.*; **Adversary No. 09-00508 (REG); In the United States Bankruptcy Court for the Southern District of New York** (the "**Action**").

PLEASE READ THIS NOTICE CAREFULLY. AS SET FORTH BELOW, YOU WILL NOT BE ABLE TO CASH THE ENCLOSED CHECK IF IT IS NOT ENDORSED AND PRESENTED FOR PAYMENT WITHIN 30 DAYS AFTER THE DATE OF THE CHECK.

Following the entry by the Court on _____, 2010, of an Order of Preliminary Approval, a Notice of Class Action Settlement was sent to you, and a summary form of that notice was also published in three (3) weekly editions of *USA Today*. The Notice of Class Action Settlement contained a Reimbursement Claim Form, which you properly completed and returned within eighty (80) days after the date on which the Order of Preliminary Approval was signed, which was on _____, 2010. The Court has now approved the settlement of the Action, and it has entered a Judgment dismissing the Settled Claims in the Action.

This Transmittal Notice is being sent to all members of the Settlement Class who properly completed and returned the Claim Form within eighty (80) days of the date on which the Order of Preliminary Approval was signed.

The enclosed check ("**Distribution Check**") effects the distribution of that portion of the Net Cash Settlement Fund that is allocated to the payee(s) named on the check. Distribution Checks are being sent to Class Members who properly completed and returned the Claim Form within eighty (80) days after the date on

which the Order of Preliminary Approval was signed which was on
_____, 2010.

**NO AMOUNT OF THE NET CASH SETTLEMENT FUND IS
PERMITTED TO BE DISTRIBUTED TO A MEMBER OF THE
SETTLEMENT CLASS WHO DOES NOT ENDORSE AND PRESENT THE
DISTRIBUTION CHECK FOR PAYMENT <u>WITHIN 30 DAYS</u> AFTER THE
DATE OF THE DISTRIBUTION CHECK.    THEREAFTER, ANY
DISTRIBUTION CHECK THAT HAS NOT BEEN PRESENTED FOR
PAYMENT WILL BE VOID.**

As stated in the Notice of Class Action Settlement, the complete
terms of the settlement are set forth in the Settlement Agreement.

If you are not a member of the Settlement Class who has or could
assert a Settled Claim, then you are not entitled to negotiate the
enclosed check, and you should return it to the Claims
Administrator at the following address:

**[ADDRESS OF CLAIMS ADMINISTRATOR]**

# EXHIBIT B

HEARING DATE AND TIME: _____ 2010 at 9:45 a.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                          :
In re                                     :    **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY**, *et al.*, :    **09-50026 (REG)**
          f/k/a **General Motors Corp.**, *et al.* :
                                          :
              **Debtors.**                :    **(Jointly Administered)**
                                          :
-----------------------------------------------------------x
                                          :
**BOYD BRYANT**, on behalf of himself and :    **Adversary No. 09-00508 (REG)**
          all others similarly situated,  :
                                          :
              **Plaintiffs,**             :
**vs.**                                   :
                                          :
**MOTORS LIQUIDATION COMPANY**, *et al.*, :
          f/k/a **General Motors Corp.**, *et al.* :
                                          :
              **Defendants.**             :
-----------------------------------------------------------x

## JUDGMENT

That certain settlement agreement (the "**Settlement Agreement**"), by and

between the Debtors and class action plaintiff, Boyd Bryant ("**Bryant**"), on behalf of himself and

a nationwide class of similarly situated persons, which has been executed by counsel on behalf of

the Parties[1] to this action, provides for the resolution of disputes between the Debtors and the

Settlement Class, subject to final approval by this Court of its terms and to the entry of this

judgment (the "**Judgment**"). In that Settlement Agreement, the Debtors deny any wrongdoing,

fault, violation of law, or liability for damages or relief of any sort, and they object to the

certification of any class except certification of the Settlement Class for settlement purposes

---

[1] All capitalized terms used in this Judgment shall have the same meaning as defined in the Settlement Agreement.

only.

Pursuant to the Order of Preliminary Approval, dated _____ __, 2010, the Court

approved of the Mailed Notice and Published Notice to be delivered in accordance with the

Settlement Agreement and as set forth in that Order of Preliminary Approval, and also

preliminarily approved the Settlement Agreement, conditionally certified the Class, approved of

a cash disbursement in the amount of one hundred thousand dollars ($100,000.00) from the

Debtors' bankruptcy estates, and set a date for a Fairness Hearing.

The Parties have applied to the Court for final approval of the Settlement

Agreement, and the Parties have submitted this Judgment for entry. A Fairness Hearing was

held before this Court on _____ ___, 2010 to consider, among other things, whether the

Settlement Agreement should be finally approved by this Court as fair, reasonable, and adequate

under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

whether the Settlement Class should be finally certified pursuant to Rules 23(a) and 23(b)(2) of

the Federal Rules of Civil Procedure (the "**Federal Rules**").

After considering: (i) the memoranda submitted by the Debtors, Bryant, and

provisionally designated Class Counsel on behalf of the Parties; (ii) the Settlement Agreement

and all exhibits thereto; (iii) the record of this proceeding, including the evidence presented at the

Fairness Hearing; (iv) the representations and arguments of counsel for the respective Parties;

and (v) the relevant law based upon the findings of fact and law identified below and implicit in

this Judgment,

It is hereby ORDERED, ADJUDGED, AND DECREED that:

1.      The Settlement Agreement is the product of good faith, arm's-length

negotiations by the Parties, each of whom was represented by experienced counsel.

A.      **Certification of the Settlement Class.**

2.      The Court, solely for purposes of this settlement, finds as follows:

    (i)     The members of the Settlement Class are all so numerous that joinder of all members would be impracticable;

    (ii)    Questions of law and fact exist that are common to the claims of the members of the Settlement Class;

    (iii)   The claims and defenses of Bryant are typical of the claims of the Settlement Class;

    (iv)   Bryant has fairly and adequately protected the interests of the Settlement Class and has fairly and adequately represented the Settlement Class;

    (v)    Class Counsel are adequate, qualified, experienced, and competent to protect the interests of the Settlement Class, and in fact have fairly and adequately represented the interests of the Settlement Class;

    (vi)   a class action is superior to other available methods for the fair and efficient adjudication of the action; and

    (vii)  there are questions of law and fact common to the Settlement Class which predominate over any individual questions.

    3.    In addition, where a class action has been certified prepetition, bankruptcy courts have deemed it unnecessary to conduct a class certification analysis. While this Court has conducted a certification analysis, the prepetition certification in the present case and the Parties' stipulations in the Settlement Agreement, and solely for the purposes of this settlement, support the Court's findings for approval of the settlement. Accordingly, this Court finds that the Settlement Class, as proposed in the Settlement Agreement, meets all of the requirements for certification of a settlement class under Rules 23(a) and 23(b)(2) of the Federal Rules, and, the Court, therefore, hereby finally certifies the Settlement Class composed of:

Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer,[2] that registered his vehicle in any state in the United States.

Excluded from the Settlement Class are the following individuals or entities:

      (i)     Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

      (ii)     Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

      (iii)     Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

      (iv)     Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer; and

      (v)     Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005.

      4.     The Court specifically finds that no excessive compensation award has

been proposed for Class Counsel and that Class Counsel are fair and adequate representatives of

the interests of the Class. Accordingly, the Court finally approves the designation of David W.

---

[2] The term "1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer" refers to the following GM model-year and model coded vehicles equipped with automatic transmissions:

| 1500 Series Pickups: | C-K15703 (MY 99-02) |
| --- | --- |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

Crowe and John W. Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F.

Rommel of Wyly-Rommel, PLLC, as Class Counsel.

5.    The Court specifically finds that Bryant, as Class Representative, has not

received unduly preferential treatment and that Bryant, as Class Representative, is a fair and

adequate representative of the interests of the Class with claims typical of members of the Class.

Accordingly, the Court finally approves the designation of Bryant as the appointed Class

Representative.

B.    **Notice to the Settlement Class Members.**

6.    In accordance with the Settlement Agreement and the Order of

Preliminary Approval, the Debtors mailed, at their cost and expense, the approved Mailed Notice

in accordance with the terms of that Order of Preliminary Approval. The Class Representative

and Class Counsel, in association with the Claims Administrator, further published the approved

Published Notice in accordance with the Order of Preliminary Approval. The Class

Representative and Class Counsel, in association with the Claims Administrator, also established

a website and 1-800 number, which was identified in the approved Mailed and Published Notice,

for the purpose of enabling members of the Class to obtain copies of the notice and to make

inquiries with respect to the Settlement Agreement. The Court reaffirms and specifically finds

that this notification was in full compliance with the notice requirements of due process, federal

law, the Constitution of the United States, and any other applicable law.

C.    **Approval of the Settlement Agreement under Rule 9019 of the Bankruptcy
Rules and Rule 23(e) of the Federal Rules.**

7.    Pursuant to Rule 9019 of the Bankruptcy Rules and Rule 23(e) of the

Federal Rules, the Court finally approves the Settlement Agreement and all terms set forth

therein and specifically finds that the Settlement Agreement, in all respects:

(i)    Is fair, reasonable, and adequate;

(ii)    Is in the best interests of the Debtors' estates and of all members of

the Settlement Class;

(iii)    Is the product of serious, informed, non-collusive negotiations;

(iv)    Resulted from extensive arm's-length negotiations;

(v)    Has no obvious deficiencies;

(vi)    Does not improperly grant preferential treatment to the Class

Representative or segments of the class; and

(vii)    Falls within the reasonable range of approval.

8.    Accordingly, the relief to be provided to the Settlement Class contained in

the Settlement Agreement is hereby approved pursuant to and within the meaning of Rule 9019

of the Bankruptcy Rules and Rule 23 of the Federal Rules, and Plaintiffs are hereby granted an

allowed general unsecured claim against MLC in the amount of twelve million dollars

($12,000,000.00).

### D.    Cash Settlement Fund and Distributions to the Settlement Class.

9.    Pursuant to the Order of Preliminary Approval and the terms of the

Settlement Agreement, the Debtors deposited the sum of one hundred thousand dollars

($100,000.00) cash into an Escrow Account established by Plaintiffs to be utilized by Class

Counsel, on behalf of the Class, for the sole purpose of defraying Administration Expenses.

10.    With respect to the Cash Settlement Fund and distributions to the

Settlement Class, the Court specifically authorizes and directs Class Counsel and the Settlement

Class to further administer the Cash Settlement Fund and otherwise make distributions to the

Settlement Class in accordance with the Settlement Agreement as follows:

(i)    Class Counsel is authorized to (1) sell, transfer, assign, and/or

otherwise monetize the Allowed Claim, either individually or through a broker,

and/or (2) monetize any shares, warrants, options, or other property received from

Debtors as part of any chapter 11 plan in any commercially reasonable manner. The resulting cash proceeds from the foregoing activities shall be placed in the Escrow Account, and the Claims Administrator shall account for any and all disbursements from the Escrow Account.

(ii)     Additionally, that Cash Settlement Fund will include either: (1) the cash proceeds resulting from any sale of shares, in the open market or otherwise, of New GM stock distributed from the Debtors' bankruptcy estates to satisfy the Allowed Claim, or (2) the cash proceeds resulting from any sale and/or assignment of the Allowed Claim to any third party.

(iii)     Cash distributions to members of the Settlement Class will be made on a *pro rata* basis from that Net Cash Settlement Fund and will be allocated by the establishment of and in accordance with the following three settlement tiers:

- **Tier One.** On a pro rata basis, up to the amount of money actually spent by any Class Member to repair the defective Parking Brake within the warranty period (which is 3 years/36,6000 miles, but a longer warranty period applies for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

- **Tier Two.** On a pro rata basis, up to $150.00 for any Class Member who actually spent money to repair the defective Parking Brake up to two (2) years beyond expiration of the vehicle's warranty period (which is 3 years/36,6000 miles, but a longer warranty period applies for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

- **Tier Three.** For any Class Member who actually spent money to repair the defective Parking Brake more than two (2) years beyond the expiration of the vehicle's limited warranty period (which is 3 years/36,6000 miles, but a longer warranty period applies for Cadillacs), on a pro rata basis, a payment of up to $75.00, but proof of expenditure

for Parking Brake repairs is required in order to receive this reimbursement.

(iv)    Each Distribution Check shall be accompanied by a transmittal notice as more fully set forth in the Settlement Agreement. In order to obtain payment of any amount from the Net Cash Settlement Fund, members of the Settlement Class must endorse a Distribution Check and present it to a payor bank within thirty (30) days after the Distribution Date.

(v)    If any member of the Settlement Class fails to endorse a Distribution Check and to present it to a payor bank within thirty (30) days after the Distribution Date, the Claims Administrator shall stop payment of that Distribution Check and the amount represented by that Distribution Check shall constitute part of the Final Unclaimed Fund, as provided in the Settlement Agreement.

(vi)    Failure of a member of the Settlement Class to endorse a Distribution Check or to present it to a payor bank shall not relieve such member of the Settlement Class from the binding effect of the Final Judgment dismissing the Settled Claims with prejudice, or affect such member of the Settlement Class's release of Settled Claims.

(vii)    No member of the Settlement Class shall have any claim against the Settling Parties, Class Counsel, or Debtors' Counsel, based on distributions made substantially in accordance with the Settlement Agreement (including the Plan of Allocation) and any orders of this Court.

(viii)    Within thirty (30) days after the Distribution Date, the Claims Administrator shall certify to the Parties the amount in the Final Unclaimed Fund, including all funds unused for the payment of claims, plus all interest accrued.

(ix)    The Circuit Court of Miller County, Arkansas will have the

exclusive right, ability and power to issue orders, judgments, or decrees effecting

the distribution of the Final Unclaimed Fund.

(x)    As set forth more fully in the Settlement Agreement, Class

Counsel shall, upon written request, and within ten (10) days after such written

request, be required to account to Debtors for all disbursements or payments from

the Escrow Account.  Any unused portion of the $100,000.00 placed in the

Escrow Account, that was used to defray Administrative Expenses, shall be

returned to the Debtors within thirty (30) days after the duties of the Claims

Administrator have been concluded.

### E.    Objections to the Settlement Agreement and Proposed Settlement.

11.    Any and all objections to the Settlement Agreement have been considered

and are hereby found to be without merit and overruled.

### F.    Release and Dismissal.

12.    As of the Effective Date, all members of the Settlement Class, on behalf of

themselves, their successors, heirs, and assigns, shall be deemed to have released all of their

Settled Claims, and shall be forever barred from prosecuting any action against the Released

Parties based on or arising out of the Settled Claims.  The release, as more fully set forth in the

Settlement Agreement releases and discharges the Released Parties from the Settled Claims and

any all liability of the Released Parties with respect to Settled Claims.

13.    This release, effective as of the Effective Date, of Settled Claims by the

members of the Settlement Class also releases all claims of Class Counsel against the Released

Parties with respect to or arising from the Settled Claims.

14.    Subject to Paragraphs 1.7, 1.44, 1.47, and 2.1(f) of the Settlement Agreement, the Court hereby dismisses with prejudice all Settled Claims by all members of the Settlement Class and their successors and assigns as against the Released Parties.

15.    This Section F shall apply to the members of the Settlement Class, their successors, heirs, and assigns, regardless of whether or not any individual member of the Settlement Class receives, cashes, or deposits a Distribution Check.

G.    **Appeal.**

16.    This Judgment is a final decision and is appealable pursuant to 28 U.S.C. § 1291.

H.    **Continuing Jurisdiction.**

17.    Notwithstanding the entry of this Judgment, the Court shall retain continuing jurisdiction over the Settling Parties, but only with respect to the matters between the Settling Parties addressed in the Judgment.

18.    The Court's continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing, and interpreting the Settlement Agreement.

19.    Notwithstanding the foregoing, the Circuit Court of Miller County, Arkansas, shall have the exclusive right, ability, power, and jurisdiction to issue orders, judgments, or decrees effecting the distribution of the Final Unclaimed Fund.

I.    **Attorney Fee Award, Costs, and Incentive Award.**

20.    Subject to the terms of the Settlement Agreement and those restrictions further set forth in this Paragraph 20, Class Counsel is entitled to an Attorney Fee Award not to exceed the amount of 33 percent (33%) of the Allowed Claim or four million dollars ($4,000,000.00) cash, whichever is greater. The Court approves the process by which Class Counsel is paid as set forth in the Settlement Agreement, whereby Class Counsel will initially be

paid thirty-three percent (33%) of the Cash Settlement Fund, which shall be the cash proceeds of

the Allowed Claim; thereafter, in the event a Final Unclaimed Fund exists, and Class Counsel's

initial attorney fee payment was less than $4,000,000.00 cash, and members of the Settlement

Class with approved claims have been, to the extent possible, made one hundred percent (100%)

whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs, Class

Counsel may then receive up to the difference between the initial attorney fee payment and

$4,000,000.00 cash.  The Court specifically finds this Attorney Fee Award to be reasonable and

within in the range of attorney fee awards customarily awarded in similar circumstances and

hereby finally approves of the same.

      21.    Class Counsel is entitled to reimbursable costs and expenses of two

hundred ninety thousand dollars ($290,000.00) cash, which the Court finds is reasonable and

within in the range of reimbursable costs and expenses customarily awarded in similar

circumstances.

      22.    Bryant is entitled to an Incentive Award of ten thousand dollars

($10,000.00) cash, which the Court finds is reasonable and within in the range of incentive

awards customarily awarded in similar circumstances.

**J.**     **Material Modification.**

      23.    In the event that the terms of the Settlement Agreement or this Judgment

are materially modified upon any appeal, either Party may seek to set aside this Judgment upon

application to this Court within twenty (20) days of such material modification.

Dated: New York, New York
       _____, 2010

 

                           _____
                           United States Bankruptcy Judge

# EXHIBIT C

**EXHIBIT "C"**

**NOTICE OF CLASS ACTION SETTLEMENT**

THIS NOTICE IS SENT TO YOU BECAUSE CERTAIN RECORDS REVEAL THAT, FOR A PERIOD OF TIME, YOU MAY HAVE OWNED A 1999 THROUGH 2002 CHEVROLET, GMC, OR CADILLAC PICKUP TRUCK OR SPORT UTILITY VEHICLE ("SUV") EQUIPPED WITH AN AUTOMATIC TRANSMISSION AND MANUFACTURED BY GENERAL MOTORS CORPORATION ("GM").

THIS NOTICE MAY AFFECT YOUR RIGHTS SO PLEASE READ IT CAREFULLY. THIS NOTICE RELATES TO A PROPOSED SETTLEMENT OF A CLASS ACTION UNDER TERMS OF A SETTLEMENT AGREEMENT ("THE SETTLEMENT AGREEMENT"). IF YOU ARE A CLASS MEMBER, THIS NOTICE CONTAINS IMPORTANT INFORMATION AS TO YOUR RIGHTS CONCERNING THE SETTLEMENT.

**WHO IS IN THE CLASS?**

*Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer,[1] that registered his vehicle in any state in the United States.*

Excluded from the Class[2] are the following individuals or entities:

a.      Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

b.      Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c.      Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

---

[1] These automatic-transmission vehicles are: 1500 Chevrolet Silverado pickups; 1500 GMC Sierra pickups; 1500 Chevrolet Tahoes; 1500 Chevrolet Suburbans; 1500 GMC Yukons; 1500 GMC Yukon XLs; and 1500 Cadillac Escalades, model-year and model-coded as follows:

| 1500 Series Pickup: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

[2] All capitalized terms used herein shall have the same meaning as defined in the Settlement Agreement.

d.      Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

e.      Any person, "owner," or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005;

(the "**Class**").

## CHOICES OF SETTLEMENT CLASS MEMBERS

▪       *Remain in the Class.* You can participate in the settlement, without objecting to it.  If the Bankruptcy Court finally approves the proposed Settlement Agreement, you are an eligible member of the Class, you properly follow the instructions below as to how to submit the enclosed Reimbursement Claim Form, and the contents of the Reimbursement Claim Form are deemed valid, you will receive the monetary benefits of the settlement.  You will then be bound by the terms of the Settlement Agreement, any Final Judgment that is entered, and any release of the Class's claims against the Released Parties, which includes MLC.

▪       *Object to the Class.* You can remain in the Class and file written objections asking the Bankruptcy Court to not approve the proposed Settlement Agreement.  Any such objection must contain the information set forth in the "Your Right to Object and Appear" section below, and it also must be mailed or delivered so as to be received by the deadline set forth in that same section.  If the Bankruptcy Court does not approve the proposed Settlement Agreement, the lawsuit would continue against MLC and no Class Member would receive payment under the proposed Settlement Agreement.  In such a case, your participation in any recovery that may be obtained from MLC through a trial or later settlement will depend on the results of the lawsuit, or the terms of any later settlement.

▪       *Opt Out of the Class.* You can opt out of the Class and be excluded from participation in the Settlement Agreement, if it is approved.  A Class Member who elects to opt out and be excluded from participation in the settlement will receive no settlement payment under the Settlement Agreement, or under any later resolution of the lawsuit if the Settlement Agreement is not approved.  A Class Member who opt outs and is excluded from the settlement will not be bound by the Settlement Agreement or any Final Judgment entered in the lawsuit, and will not release any claims against the MLC.  *__However, as explained below, MLC is presently involved in bankruptcy proceedings.  In those proceedings, the Bankruptcy Court, via its Bar Date Order, established a claims bar date of November 30, 2009 at 5:00 EST.  Because that date is now expired, any Class Member electing to opt out of the Settlement Agreement will likely be barred from filing proofs of claim in MLC's bankruptcy, and thus will effectively be barred from pursuing further litigation against MLC relating to the alleged defect in the Parking Brake.__*  In order to opt out and be excluded from the settlement, a Class Member must complete and submit a request for exclusion, discussed below, and the request for exclusion must be mailed or delivered so as to be received by the deadline set forth in the Opt Out/Exclusion from the Class section below.

If a Class Member wishes, he may hire his own attorney, at his own expense, to represent his interests in connection with the proposed Settlement Agreement, or the lawsuit involving the Class Member's claims against MLC.  If a Class Member remains in the Class but does not hire his own

2

attorney, Class Counsel and the representative plaintiff, Mr. Boyd Bryant ("**Mr. Bryant**"), will represent the interests of the Class Member(s) in this lawsuit. You are advised that Mr. Bryant, David W. Crowe, and John W. Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F. Rommel of Wyly-Rommel, PLLC ("**Class Counsel**") believe the proposed Settlement Agreement is in the best interest of the Class. Accordingly, they intend to support the proposed Settlement Agreement at the scheduled Fairness Hearing. Unless you retain your own attorney, you will not be responsible for any attorneys' fees, court costs, litigation expenses, or administrative expenses in connection with the Settlement Agreement (or any continuation of the lawsuit if the Settlement Agreement is not approved), except as those amounts may be deducted from the Cash Settlement Fund upon approval of the Settlement Agreement by the Bankruptcy Court (or from any other ultimate recovery if the Settlement Agreement is not approved).

The foregoing options are explained more fully below.

**DESCRIPTION OF THE LAWSUIT**

On February 4, 2005, Boyd Bryant, on behalf of himself and all others similarly situated ("Plaintiffs") filed an original Class Action Complaint styled *Boyd Bryant, on behalf of himself and all others similarly situated v. General Motors Corporation d/b/a Chevrolet, GMC, Cadillac, Buick and Oldsmobile* in the Circuit Court for Miller County, Arkansas (the "**Miller County Action**"). The Miller County Action is a purported nationwide class action based on an alleged defective Parking Brake in 1999-2002 Chevrolet, GMC, Cadillac pickups and/or SUVs. The Class Action Complaint, as amended, alleges causes of action for: 1) breach of express warranty; 2) breach of the implied warranty of merchantability; 3) violation of the Magnuson-Moss Warranty Act ("**MMWA**"), 15 U.S.C. § 2301 *et seq.*; 4) unjust enrichment; and 5) fraudulent concealment.

After reviewing evidence submitted by Plaintiffs and GM, and oral argument concerning class certification, the Circuit Court for Miller County, Arkansas (the "**Miller County Court**"), on January 11, 2007, certified the Miller County Action as a nationwide class action pursuant to Ark. R. Civ. P. 23. The Miller County Court also appointed Mr. Bryant as the class representative and charged him with "all duties such an appointment entails." Finally, the Miller County Court appointed counsel from Bailey/Crowe & Kugler, LLP and Wyly-Rommel, PLLC as Class Counsel. GM appealed the class certification order to the Arkansas Supreme Court, which ultimately affirmed the order in June 2008. GM then filed a petition for *writ of certiorari* to the United States Supreme Court. The United States Supreme Court, however, denied the petition in January 2009.

The commencement of chapter 11 cases by GM on June 1, 2009, before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), stayed all proceedings related to the Miller County Action. Shortly thereafter, GM filed a motion pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Federal Rule of Bankruptcy Procedure 2002, 6004, and 6006 to essentially sell its assets and transfer certain liabilities to Vehicle Acquisition Holdings, LLC ("**VAH**"), which has now changed its name to General Motors Company ("**New GM**"). New GM is a Delaware corporation.

On July 5, 2009, the Bankruptcy Court issued an order approving the asset-sale motion ("**Sale Order**"). Of relevance to this matter, the Sale Order transferred some of GM's liabilities to New GM, while transferring other liabilities to Motors Liquidation Company ("**MLC**"). Mr. Bryant, on behalf of the Class, has taken the position that liability for all claims or causes of action asserted in the Miller County Action, except for unjust enrichment and fraudulent concealment, has been transferred to New GM under the Sale Order.

3

On or about July 9, 2009, and over Plaintiffs' strenuous objection, MLC removed the Miller County Action to the United States Bankruptcy Court for the Western District of Arkansas (the "**Arkansas Bankruptcy Court**"). Despite a motion for abstention and remand having been filed, the Arkansas Bankruptcy Court transferred venue of the removed Miller County Action to the Bankruptcy Court. The removed case is docketed in the Court as Adversary No 1:09-ap-508. *Its specific style is as follows: Boyd Bryant, On Behalf of Himself and All Others Similarly Situated v. Motors Liquidation Company, et al.; Adversary No. 09-00508 (REG); In the United States Bankruptcy Court for the Southern District of New York.*

On or about September 16, 2009, the Bankruptcy Court entered its Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof) (the "**Bar Date Order**"). The Bar Date Order, *inter alia*, set November 30, 2009 at 5:00 EST as the deadline for any person or entity to file a proof of claim against MLC to assert any claim, as defined by Section 101(5) of the Bankruptcy Code, that arose prior to or as of June 1, 2009. Section 101(5) defines "claim" as follows:

> The term "claim" means—
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Bar Date Order further provides that "any holder of a Claim against MLC that is required but fails to file a Proof of Claim in accordance with this Bar Date Order on or before the applicable Bar Date shall be forever barred, stopped, and enjoined from asserting such Claim against MLC.

In view of this Bar Date deadline, and his status as appointed representative of the Class, Mr. Bryant, on November 27, 2009, filed proofs of claim nos. 58625, 58626, and 58627 asserting MLC's bankruptcy estate should compensate him and the Class for the defective Parking Brakes based on theories of (i) unjust enrichment and (ii) fraudulent concealment (the "**Claim**"). In addition, Mr. Bryant filed with the Bankruptcy Court a Motion For An Order Allowing Plaintiffs To File a Class Proof of Claim And For The Application of Federal Rule of Bankruptcy Procedure 7023 Pursuant to Federal Rule of Bankruptcy Procedure 9014. That motion remains pending before the Bankruptcy Court and has not yet been ruled upon. MLC has indicated it will oppose this motion.

## PRELIMINARY SETTLEMENT CLASS CERTIFICATION

Mr. Bryant, on behalf of himself and the Class, has now agreed with MLC to resolve the "**Settled Claims**," which are defined in the Settlement Agreement, Paragraph 1.47, as follows:

> Settled Claims. "Settled Claims" means the Claim against the Released Parties asserted by the Settlement Class, and any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, disputes, and controversies of any kind, nature, or description

4

whatsoever, under federal, state, or foreign common law, statute, or regulation, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, whether direct, indirect, derivative, individual, representative, legal, equitable, or of any other type, or in any other capacity, related to or derived from the Claim, including but not limited to claims for breach of express warranty, breach of the implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., unjust enrichment, and fraudulent concealment. "Settled Claims" does not mean the Claim, or any portion thereof, that can or may be asserted by Plaintiffs against New GM. It is expressly understood by the Parties that Plaintiffs are settling nothing as to New GM, and reserve all of their rights and abilities to substitute New GM into these proceedings, or into other proceedings, and to litigate against New GM as they may see fit in the Miller County Action, or elsewhere.

On _____, 2010 the Bankruptcy Court entered an Order of Preliminary Approval preliminarily approving of the Settlement Agreement. In that order and for settlement purposes only, the Bankruptcy Court adopted the prior Class certification in the Miller County Action, and preliminarily determined all relevant Rule 23 settlement factors had been satisfied. The Bankruptcy Court will make a final determination of whether to finally approve of the Settlement Agreement following the Fairness Hearing, which date and time is set forth below.

**RELIEF AVAILABLE TO CLASS MEMBERS**

Under the Settlement Agreement, Class Members, if they participate and do not opt out of the Class after the Notice of Settlement is disseminated, and the deadline to opt out is expired ("**Participating Class Members**"), may receive the benefit of a twelve million dollar ($12,000,000) Allowed Claim in MLC's bankruptcy ("**the Allowed Claim**"). Because the Allowed Claim is not received in the form of cash, it will have to be converted to cash in order to pay Participating Class Members as per the three reimbursement tiers below. Under the Settlement Agreement, the Allowed Claim may be converted to cash by: i) selling, transferring, assigning, and/or otherwise monetizing the Allowed Claim, either individually or through a broker; and/or ii) selling any New GM shares, warrants, options, or other property of MLC as part of any chapter 11 plan in any commercially reasonable manner. Once the Allowed Claim is converted to cash or monetized in this manner, Participating Class Members may obtain the following reimbursement benefit upon submission of proper documentation:

**TIER ONE:**   On a *pro rata* basis, up to the amount of money actually spent by any Participating Class Member to repair the defective Parking Brake within the warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

**TIER TWO:**   On a *pro rata* basis, up to $150.00 for any Participating Class Member who actually spent money to repair the defective Parking Brake up to two (2) years beyond expiration of the vehicle's warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

5

**TIER THREE:** For any Participating Class Member who actually spent money to repair the defective Parking Brake more than two (2) years beyond the expiration of the vehicle's limited warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs), on a *pro rata* basis, a payment of up to $75.00, but proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

The *pro rata* nature of the reimbursement payments under each of these three tiers is based on the nature of the Net Cash Settlement Fund, whose definition and creation is discussed in Settlement Agreement, Paragraphs 1.29, and 2.5-2.10. The Net Cash Settlement Fund could lack funds sufficient to pay all properly submitted Class Member claims on a 100% basis, especially once deductions from the Cash Settlement Fund (to create the Net Cash Settlement Fund) are made for an initial attorney fee payment, Reimbursable Costs and Expenses, Administration Expenses, an Incentive Award to Bryant, and applicable taxes, if any, all as set forth in the Settlement Agreement. However, if there exists a Final Unclaimed Fund (defined below), then it is possible for some Class Members that have submitted an approved Reimbursement Claim Form to receive additional reimbursement for their Parking Brake repairs, as discussed in Settlement Agreement, Paragraph 4.1. In relevant part, Settlement Agreement, Paragraph 4.1 reads as follows:

> (2) in the event a Final Unclaimed Fund exists, members of the Settlement Class that have submitted and had approved by the Claims Administrator a Reimbursement Claim Form will, to the extent possible (but, if necessary, subject to *pro rata* reduction) be made one hundred percent (100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs; if, after these additional "make whole" payments are made, additional Final Unclaimed Fund monies exist, and if Class Counsel's initial attorney fee payment was less than the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, then Class Counsel shall be entitled to receive additional monies from the Final Unclaimed Fund as an Attorney Fee Award, but never to exceed a total Attorney Fee Award of 33% of the Allowed Claim, or $4,000,000 cash, whichever is greater.

Under the Settlement Agreement, Paragraph 1.23, the term **"Final Unclaimed Fund"** means the Net Cash Settlement Fund, less the amount of money represented by those Distribution Checks which are endorsed and presented for payment by Participating Class Members within thirty (30) days after the Distribution Date, plus interest, if any, that has accrued on the amount of money in the Final Unclaimed Fund.

Under the Settlement Agreement, Paragraph 2.12, within thirty (30) days after the Distribution Date, the Claims Administrator shall certify to the Parties the amount in the Final Unclaimed Fund, including all funds unused for the payment of claims, plus all interest accrued. The Parties will stipulate in the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing that they agree to the concept of the Bankruptcy Court vesting in the Circuit Court of Miller County, Arkansas where the Miller County Action was originally filed the exclusive right, ability, and power to issue orders, judgments or decrees effecting the distribution of the Final Unclaimed Fund.

*Only those Participating Class Members who properly complete and return the enclosed Reimbursement Claim Form within 80 days after the date on which the Order of Preliminary Approval was signed, which was on _____, 2010, and whose Reimbursement Claim Forms are approved by the Claims Administrator, will be eligible for Reimbursement. Reimbursement to Participating Class Members will occur only after the Effective Date. Class Members that elect to opt out or exclude themselves are not eligible for reimbursement.*

6

**DISMISSAL AND RELEASE OF ALL CLAIMS**

If the proposed Settlement Agreement is ultimately approved by the Bankruptcy Court, the Judgment is entered by the Bankruptcy Court, and the Judgment becomes a Final Judgment, the Settled Claims against MLC will be dismissed with prejudice, and the Settled Claims asserted by the Settlement Class against MLC will be released. Once the dismissal with prejudice and release occur, no Settled Claims may thereafter be asserted by anyone in the Settlement Class against MLC. If the Bankruptcy Court does not approve the Settlement Agreement, the Settlement Agreement will terminate, shall be null and void, and the Miller County Action, as removed and transferred to the Bankruptcy Court, shall remain pending.

**HOW WILL I KNOW IF THE SETTLEMENT HAS BEEN APPROVED?**

The Bankruptcy Court has scheduled a date to conduct a Fairness Hearing and consider final approval of the Settlement Agreement. On the date or after the Fairness Hearing is conducted, the Bankruptcy Court will issue an order either granting or denying final approval of the Settlement Agreement. If the Bankruptcy Court grants final approval, and if no appeal or post-judgment motion is filed within thirty (30) days after entry of Judgment, the Settlement Agreement will become final and the reimbursement benefits, as described in this notice, will become available to Settlement Class members whose Reimbursement Claim Forms are timely submitted, reviewed, and approved. In the event the Bankruptcy Court grants a final approval, but an appeal is filed, the reimbursement benefits may become available, depending on how the appeal is decided. If you remain in the Settlement Class and wish to know the status of the final approval and the availability of reimbursement, you may call 1-800-_____ to listen to a recorded message about the status of the approval.

**OPT OUT/EXCLUSION FROM THE CLASS**

To request opt-out/exclusion from the Class, you must send a written request, via certified mail, return receipt requested, to each of the following individuals:

> ***Settlement Class Counsel***
> David W. Crowe
> John W. Arnold
> BAILEY/CROWE & KUGLER, LLP
> 6550 Bank of America Plaza
> 901 Main Street
> Dallas, TX 75202
>
> James C. Wyly
> Sean F. Rommel
> WYLY ROMMEL, PLLC
> 2311 Moores Lane
> Texarkana, Texas 75503
>
> Rakhee V. Patel
> Pronske & Patel, P.C.
> 2200 Ross Avenue
> Suite 5350
> Dallas, TX 75201

US_ACTIVE:\43447781\05\72240.0639

*Counsel for MLC*
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Vance L. Beagles
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201

You must include in your request for exclusion, in clear, easily understood writing and language:
1) your name, address, and telephone number; 2) a statement that you want to be excluded from the Class;
3) the style of this lawsuit in the Bankruptcy Court (*see* bolded text in section entitled "Description of the
Lawsuit" above); and 4) your signature.

If you exclude yourself from the Class, you will not be eligible for any settlement relief or be
permitted to participate in the proposed Settlement Agreement. Your written request for exclusion must
be postmarked no later than thirty (30) days after the date of the Order of Preliminary Approval or you
will lose your right to request exclusion, and you will be bound by the settlement and by all orders,
judgments, and releases as contemplated in the Settlement Agreement, even if you have pending or
subsequently attempt to initiate litigation against MLC relating to any of the Settled Claims. *Moreover,
as discussed, given the Bankruptcy Court's Bar Date Order, you will, in any event, likely be barred
from pursuing further litigation against Debtors relating to or arising from the Settled Claims.*

## FAIRNESS HEARING DATE, TIME AND PLACE

The date, time and place for this Fairness Hearing is as follows:

**Date:** _____

**Time:** _____

**Place:** Courtroom 621, One Bowling Green, New York, NY 10004-1408.

The Fairness Hearing will occur in the courtroom (Courtroom 621, Sixth Floor) of the Hon. Robert E.
Gerber, United States Bankruptcy Judge.

## YOUR RIGHT TO OBJECT AND APPEAR

You have the right to remain in the Class and object to the proposed Settlement Agreement.
Persons who desire to object must file a written statement with the Bankruptcy Court clerk and provide a
copy of that objection to Class Counsel and counsel for MLC no later than thirty (30) days after the date
of the Order of Preliminary Approval. The written statement must contain the following information:

1)     A heading referring to the Class case number and to the United States
       Bankruptcy Court for the Southern District of New York;

8

2)     A statement as to whether the objector intends to appear at the Fairness Hearing, either in person or through counsel, and, if through counsel, identifying counsel by name, address and telephone number;

3)     A detailed statement of the specific legal and factual basis for each and every objection;

4)     A list of any witnesses the objector may call at the Fairness Hearing, together with a brief summary of each witness's expected testimony;

5)     A list and copies of any exhibits which the objector may seek to use at the Fairness Hearing;

6)     A list of any legal authority the objector may present at the Fairness Hearing;

7)     The objector's current address;

8)     The objector's current telephone number; and

9)     The objector's signature.

10)    If an objector intends to appear at the Fairness Hearing, a certification that he is willing to present himself for deposition no later than ten (10) days before the Fairness Hearing, and a statement of where and when he would prefer that his deposition occur.

**ANY MEMBER OF THE SETTLEMENT CLASS WHO FAILS TO TIMELY FILE SUCH WRITTEN STATEMENT AND PROVIDE THE REQUIRED INFORMATION WILL NOT BE PERMITTED TO PRESENT ANY OBJECTIONS AT THE FAIRNESS HEARING.**

Once again, your written statement containing your objection must be received by the court clerk for filing no later than thirty (30) days after the date of the Order of Preliminary Approval. The mailing address of the court clerk is as follows:

Vito Genna
Clerk of the Court
United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, NY 10004

Complete copies of your written objection must be mailed (certified mail, return receipt requested) or delivered to the following individuals such that they are received no later than thirty (30) days after the date of the Order of Preliminary Approval.:

David W. Crowe
John W. Arnold
BAILEY/CROWE & KUGLER, LLP
6550 Bank of America Plaza
901 Main Street
Dallas, TX 75202

9

James C. Wyly
Sean F. Rommel
WYLY ROMMEL, PLLC
2311 Moores Lane
Texarkana, Texas 75503
Rakhee V. Patel
Pronske & Patel, P.C.
2200 Ross Avenue
Suite 5350
Dallas, TX 75201

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Vance L. Beagles
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201

If you remain in the Class and object to the settlement agreement, but the Bankruptcy Court overrules you and approves the Settlement Agreement, you will still receive any benefits allocated to you under the Settlement Agreement, and will still be bound by the Settlement Agreement and any Judgment or Final Judgment dismissing the Settled Claims.

## ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD

As noted, the Bankruptcy Court has preliminarily approved the request by Class Counsel, lawyers from Bailey/Crowe & Kugler, LLP and Wyly-Rommel, PLLC, for an Attorney Fee Award that is described in Paragraph 4.1 of the Settlement Agreement. That paragraph, in relevant part, reads as follows:

Attorneys' Fees. Class Counsel submits they are entitled under their contingency fee agreement, and based on the work performed in this matter, to an Attorney Fee Award in an amount not to exceed thirty three percent (33%) of the Allowed Claim, or $4,000,000 cash, whichever is greater. Debtors agree to not object to any motion by Class Counsel seeking an Attorney Fee Award of an amount not to exceed the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, payable to Class Counsel as described in this Paragraph. Class Counsel will apply to the Bankruptcy Court for an Attorney Fee Award to be paid as follows: (1) thirty three percent (33%) of the Cash Settlement Fund in the sequence described in Paragraph 1.29; (2) in the event a Final Unclaimed Fund exists, members of the Settlement Class that have submitted and had approved by the Claims Administrator a Reimbursement Claim Form will, to the extent possible (but, if necessary, subject to pro rata reduction) be made one hundred percent (100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs. If, after these additional "make whole" payments are made, additional Final Unclaimed Fund monies exist, and if Class Counsel's initial attorney fee payment was

10

less than the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, then Class Counsel shall be entitled to receive additional monies from the Final Unclaimed Fund as an Attorney Fee Award, but never to exceed a total Attorney Fee Award of 33% of the Allowed Claim, or $4,000,000 cash, whichever is greater

In addition, the Bankruptcy Court has preliminarily approved requested reimbursed litigation costs to class counsel of two hundred ninety thousand dollars ($290,000,00), and a requested incentive award for Mr. Bryant of ten thousand dollars ($10,000.00). Upon final approval, the amount of attorneys' fees, reimbursed litigation costs, and the incentive award will be deducted from the Cash Settlement Fund or the Final Unclaimed Fund in the sequence and manner described above.

## AVAILABILITY OF ADDITIONAL INFORMATION

This Notice of Class Action Settlement contains only a summary of the proposed Settlement Agreement. For more detailed information about it, you are referred to the pleadings and orders in the Bankruptcy Court's file, which may be inspected during regular business hours at the Office of Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004. If you would like to review the proposed Settlement Agreement, a copy is attached as an exhibit to the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing, which is also on file there. In addition, you may review the Settlement Agreement at the following web address: www._____.com.

You may also obtain a copy of the Settlement Agreement from Class Counsel by requesting it from Class Counsel either by mail or telephone. Further, if you wish to address further questions to Class Counsel, you may contact them by mail or telephone. Class Counsel's contact information is as follows:

David W. Crowe
John W. Arnold
BAILEY/CROWE & KUGLER, LLP
6550 Bank of America Plaza
901 Main Street
Dallas, TX 75202

James C. Wyly
Sean F. Rommel
WYLY ROMMEL, PLLC
2311 Moores Lane
Texarkana, Texas 75503

Rakhee V. Patel
Pronske & Patel, P.C.
2200 Ross Avenue
Suite 5350
Dallas, TX 75201

You may, of course, seek the advice and guidance of your own attorney if you desire. **PLEASE DO NOT TELEPHONE THE COURT, THE COURT CLERK'S OFFICE OR MLC'S COUNSEL FOR INFORMATION.**

11

The form, content and method of delivery of this Notice of Class Action Settlement have been approved by order of the Hon. Robert E. Gerber, United States Bankruptcy Judge.

Dated: _____

_____
CLERK OF COURT
UNITED STATES BANKRUPTCY JUDGE

12

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| BOYD BRYANT, on behalf of himself and | : | Adversary No. 09-00508 (REG) |
| all others similarly situated, | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------x

## Reimbursement Claim Form

VEHICLE OWNER NAME:    _____


VEHICLE OWNER ADDRESS,
TELEPHONE AND EMAIL:    _____

_____

_____

_____

_____

**VEHICLE MAKE/MODEL YEAR:** _____

**VEHICLE VIN NUMBER:** _____

**TRUE COPY OF VEHICLE**
**REGISTRATION (required):**      **ATTACHED/NOT ATTACHED (circle one)**

**DATE PARKING BRAKE**
**REPAIRS COMPLETED:**      _____

**TRUE COPY OF PAID PARKING**
**BRAKE REPAIRS**
**INVOICE (required):**      **ATTACHED/NOT ATTACHED (circle one)**

I hereby swear under penalty of perjury that I am over age eighteen (18), that I am competent to make the assertions herein, and that I have personal knowledge of any facts comprising those assertions. I further swear under penalty of perjury that I have read the Class definition set forth in Paragraph 1.10 of the Settlement Agreement, that I am a member of the Class, and that I do not fall within any description of those excluded from the Class. Finally, I swear under penalty of perjury that the foregoing information is true and correct.

_____
**VEHICLE OWNER (PRINTED)**

_____
**VEHICLE OWNER (SIGNATURE)**

_____
**DATE**

**Attention: 1999-2002 GMC, Chevrolet, Cadillac Pickup and SUV Owners**

If you originally purchased or now own a model-year 1999-2002 GMC, Chevrolet, or Cadillac pickup truck or SUV, you may have rights in a class-action settlement regarding a defective parking brake in your vehicle. Preliminary approval of the class action settlement was made by the Hon. Robert Gerber, United States Bankruptcy Judge for the Southern District of New York in the following matter: *Boyd Bryant, On Behalf of Himself and All Others Similarly Situated v. Motors Liquidation Company et al; Adversary No. 09-00508 (REG); In the United States Bankruptcy Court for the*

**Southern District of New York. If you are a Class Member who, since 1998 has paid out of pocket for parking brake repairs on your** model-year 1999-2002 GMC, Chevrolet, or Cadillac pickup truck or SUV, and possess proof of such payment, you may be entitled to *pro rata* cash reimbursement under the terms of a Settlement Agreement. If you are a Class Member, you may i) remain in the Class and send in your Reimbursement Claim Form ("RCF"); ii) remain in the Class, but object to it; or iii) opt out of the Class and be excluded from participating in

the Settlement Agreement. To view the steps necessary to submit an RCF, to object to the Settlement Agreement, or to opt out of the Class; to view the terms of the Settlement Agreement; or to view the full version of this Notice, please call (800) _____ (toll free), or visit www_____.com. A final hearing to approve the Settlement Agreement will occur on _____, 2010 at ___ a.m. before the Hon. Robert Gerber. Objections and opt outs are due by _____, 2010; RCFs must be submitted by no later than _____, 2010.

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                             :

In re                        :      Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.*,  :      09-50026 (REG)
      f/k/a General Motors Corp., *et al.*  :

               Debtors.     :      (Jointly Administered)
                             :
------------------------------------------------------x
                             :

BOYD BRYANT, on behalf of himself and  :     Adversary No. 09-00508 (REG)
    all others similarly situated,      :
                Plaintiffs,  :
vs.                         :
                             :

MOTORS LIQUIDATION COMPANY, *et al.*,  :
      f/k/a General Motors Corp., *et al.*  :

            Defendants.    :
------------------------------------------------------x

## [PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT, CONDITIONALLY CERTIFYING SETTLEMENT CLASS, APPROVING CASH DISBURSEMENT AND FORMS OF NOTICE, AND SETTING FAIRNESS HEARING

Upon the Motion, dated July 23, 2010 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and Rule 23 of the Federal Rules of Civil Procedure (the

"**Federal Rules**"), for entry of an order (the "**Order**") preliminarily approving the agreement

(the "**Settlement Agreement**"), attached to the Motion as **Exhibit "A,"** by and between the

Debtors, Plaintiff Boyd Bryant ("**Bryant**"), on behalf of himself and a nationwide class of others

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Where the terms of the Motion and the Settlement Agreement conflict, the Settlement Agreement shall govern.

similarly situated (the "**Settlement Class**"), conditionally certifying the Class and approving of

the forms of class notice; approving of a cash disbursement in the amount of one hundred

thousand dollars ($100,000.00) from the Debtors' bankruptcy estates; and setting a date for a

fairness hearing; and the Court having found and determined that the relief sought in the Motion

is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and the

Court having preliminarily found and determined that the settlement and Settlement Agreement

are fair, reasonable, adequate, and in the best interest of the Class as a whole; and the Court

having conditionally found that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein, and after due deliberation and sufficient cause appearing, it is,

therefore, and hereby

> ORDERED that the Motion is granted as provided herein; and it is further
>
> ORDERED that this Court has jurisdiction to consider this matter; and it is further
>
> ORDERED that the Settlement Agreement, and the settlement contemplated

thereby, are preliminarily approved as being in the best interests of the Debtors, their estates,

creditors, and all parties in interest, including as to all members of the Class, and as including a

settlement amount that is within the range of reasonableness pursuant to and within the meaning

of Rule 9019 of the Bankruptcy Rules and Rule 23 of the Federal Rules. In so ordering, the

Court specifically finds that: (i) the Settlement Agreement resulted from extensive arm's-length

negotiations, and (ii) the settlement evidenced by the Settlement Agreement is sufficient to

warrant notice thereof to members of the Settlement Class, as well as a full hearing. The Court

makes no finding on the ultimate issues to be determined at the Fairness Hearing, but it also

specifically approves the establishment and funding of the Cash Settlement Fund under the

Court's jurisdiction in accordance with the terms of the Settlement Agreement, including the

payment by the Debtors to Class Counsel (defined below) in the amount of one hundred thousand dollars ($100,000.00) cash disbursement to defray Administration Expenses pursuant to the Settlement Agreement and otherwise directs the Parties to proceed with said settlement pursuant to the terms and conditions of the Settlement Agreement and exhibits thereto, subject to this Court's authority to determine whether to finally approve said settlement; and it is further

ORDERED that because the Miller County Action was certified prepetition as a nationwide class under the requirements of Arkansas Rule of Civil Procedure 23, and the Arkansas Court appointed Mr. Bryant class representative and his counsel, Messrs. David Crowe, John Arnold, Jim Wyly, and Sean Rommel, as class counsel, and because the Parties to the Settlement Agreement have stipulated, solely for purposes of settlement and entry of this Order, that the Arkansas class certification can be fully acknowledged and adopted by the Court, the Court conditionally certifies, for settlement purposes only, the following Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules:

> ***Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer, that registered his vehicle in any state in the United States.***

Excluded from the Class are the following individuals or entities:

a.  Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

b.  Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c.  Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

d.    Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

e.    Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005;

and it is further

ORDERED that Mr. Bryant is provisionally designated as the appointed Class Representative, and Messrs. Crowe, Arnold, Wyly, and Rommel as appointed Class Counsel. In so ordering, the Court preliminarily finds Mr. Bryant, as Class Representative, has not received unduly preferential treatment, that no excessive compensation award has been proposed for Class Counsel, and that the Class Representative and Class Counsel are fair and adequate representatives of the interests of the Class with, as to the Class Representative, claims typical of members of the Class.

This conditional certification of the Class is for settlement purposes only and shall not constitute, nor be construed as, an admission on the part of the Debtors that this litigation, or any other proposed or certified class action, is appropriate for class treatment pursuant to Rule 23 of the Federal Rules or any similar class action statute or rule. If the Settlement Agreement is terminated or is not consummated for any reason, the foregoing conditional certification of the Class and provisional designation of Class Representative and Class Counsel shall be void and of no further force and effect; and it is further

ORDERED that the Court approves, as to both form and content, the Mailed Notice and the Published Notice, and finds that each meets the requirements of Rule 23 and due

process, is appropriate notice to the Class, and shall constitute due and sufficient notice to all

persons entitled thereto, and complies fully with the requirements of federal law, the United

States Constitution, and any other applicable law. Accordingly, the Debtors shall mail, at their

cost and expense, the Mailed Notice, in the form annexed hereto as **Exhibit A**, via first class

mail and within five (5) business days after the date of entry of this Order, to the last known

address of members of the Class that they can reasonably obtain through Class member warranty

information or other data reasonably accessible and from either their own records or from those

of New GM, to the extent reasonably available. The Class Representative and Class Counsel, in

association with the Claims Administrator, shall publish the Published Notice, as defined in the

Settlement Agreement and in the form annexed hereto as **Exhibit B**, in *USA Today* on three (3)

separate days, any Monday through Thursday, beginning as soon as it is reasonably feasible to

do so after the date of entry of this Order. The Class Representative and Class Counsel, in

association with the Claims Administrator, also shall establish a website and 1-800 number,

which shall be identified in the Mailed Notice and Published Notice, for the purpose of enabling

members of the Class to obtain copies of the Mailed Notice and Published Notice and to make

inquiries with respect to the Settlement Agreement. It shall be the responsibility of Class

Counsel, in connection with the Claims Administrator, to respond to inquiries of Class Members

as appropriate; and it is further

      ORDERED that non-substantive changes necessary to correct any inconsistency

between the forms of Mailed Notice and Published Notice approved by the Court and the

Settlement Agreement may be made by the mutual agreement of Class Counsel and Debtor's

Counsel without further order of this Court; and it is further

ORDERED that the Clerk of the Court is authorized, directed, and ordered to sign and date the Mailed Notice and Published Notice approved by this Order, with such modifications as may be authorized by this Order; and it is further

ORDERED that any member of the Class may enter an appearance in the above-referenced action, at their own expense, individually or through counsel of their own choice. If they do not enter an appearance or otherwise opt out (as set forth below), they will be represented by Class Counsel and be part of the Settlement Class; and it is further

ORDERED that any member of the Class wishing to object to the Settlement Agreement must file a written statement with the Clerk of Court and provide a copy of that objection to Class Counsel and the Debtors' Counsel no later than thirty (30) days after the date of entry of this Order. The written statement must contain the following information:

a) A heading referring to the adversary proceeding case number and to the United States Bankruptcy Court for the Southern District of New York;

b) A statement as to whether the objector intends to appear at the Fairness Hearing, either in person or through counsel, and, if through counsel, identifying counsel by name, address, and telephone number;

c) A detailed statement of the specific legal and factual basis for each and every objection;

d) A list of any witnesses the objector may call at the Fairness Hearing, together with a brief summary of each witness's expected testimony;

e) A list and copies of any exhibits which the objector may seek to use at the Fairness Hearing;

f) A list of any legal authority the objector may present at the Fairness Hearing;

g) The objector's current address;

h) The objector's current telephone number;

i)   The objector's signature; and

j)   If an objector intends to appear at the Fairness Hearing, a
     certification that he/she is willing to present himself for deposition
     no later than ten (10) days before the Fairness Hearing, and a
     statement of where and when he/she would prefer that his/her
     deposition occur.

Any member of the Class who fails to timely file such written statement and provide the required

information will not be permitted to present any objections at the Fairness Hearing; and it is

further

ORDERED that as further set forth in the Mailed Notice, any member of the

Class that requests to opt out and be excluded from the Class must send a written request, via

certified mail, return receipt requested, pursuant to the instructions in the Mailed Notice no later

than thirty (30) days after the date of entry of this Order; and it is further

ORDERED that within eighty (80) days of the date of entry of this Order,

members of the Class who do not opt out and wish to receive a disbursement under the

Settlement Agreement must complete and return a Reimbursement Claim Form to the Claims

Administrator, as more fully set forth in the Mailed Notice; and it is further

ORDERED that Class Counsel and/or Debtors' Counsel shall file and serve upon

each other all papers in support of their request for final approval of the Settlement Agreement at

least seven (7) days before the Fairness Hearing; and it is further

ORDERED that a Fairness Hearing shall be held in this Court on _____ at

_____ __.m. to determine (i) whether the proposed Settlement Agreement is fair, reasonable, and

adequate and should be finally approved by the Court; (ii) whether the Settled Claims should be

dismissed with prejudice as to the Debtors pursuant to the terms of the Settlement Agreement;

(iii) whether members of the Settlement Class should be bound by the release of the Settled

Claims as set forth in the Settlement Agreement; (iv) the amount of Class Counsel's Attorney

Fee Award and Reimbursable Costs and Expenses Awarded; (v) the amount of any Incentive

Award to Mr. Bryant as class representative; and (vi) any other matter that may be relevant to

approving the Settlement Agreement; and it is further

ORDERED that the Court reserves the right to adjourn the date of the Fairness

Hearing without further notice to the Class members and retains jurisdiction to consider all

further applications arising out of or connected with the proposed settlement. The Court may, at

the Fairness Hearing, approve the Settlement Agreement, with such modifications as may be

agreed to by the Parties, if appropriate, without further notice to the Class; and it is further

ORDERED that, unless and until the Settlement Agreement is terminated

pursuant to its provisions and/or the Settled Case dismissed in the Judgment, all discovery,

motions, pleadings, and other activity in the Settled Case affecting the Parties shall be stayed

except to the extent necessary to effectuate the Settlement Agreement; and it is further

ORDERED that the Settlement Agreement and all papers in support thereof shall

be available for inspection at the office of the Clerk of the Court.

Signed this _____ day of _____, 2010.

Dated: New York, New York
       [_____], 2010

_____

United States Bankruptcy Judge

# EXHIBIT A

EXHIBIT "C"

## NOTICE OF CLASS ACTION SETTLEMENT

THIS NOTICE IS SENT TO YOU BECAUSE CERTAIN RECORDS REVEAL THAT, FOR A PERIOD OF TIME, YOU MAY HAVE OWNED A 1999 THROUGH 2002 CHEVROLET, GMC, OR CADILLAC PICKUP TRUCK OR SPORT UTILITY VEHICLE ("SUV") EQUIPPED WITH AN AUTOMATIC TRANSMISSION AND MANUFACTURED BY GENERAL MOTORS CORPORATION ("GM").

THIS NOTICE MAY AFFECT YOUR RIGHTS SO PLEASE READ IT CAREFULLY. THIS NOTICE RELATES TO A PROPOSED SETTLEMENT OF A CLASS ACTION UNDER TERMS OF A SETTLEMENT AGREEMENT ("THE SETTLEMENT AGREEMENT"). IF YOU ARE A CLASS MEMBER, THIS NOTICE CONTAINS IMPORTANT INFORMATION AS TO YOUR RIGHTS CONCERNING THE SETTLEMENT.

## WHO IS IN THE CLASS?

*Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer,[1] that registered his vehicle in any state in the United States.*

Excluded from the Class[2] are the following individuals or entities:

a.     Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

b.     Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c.     Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

---

[1] These automatic-transmission vehicles are: 1500 Chevrolet Silverado pickups; 1500 GMC Sierra pickups; 1500 Chevrolet Tahoes; 1500 Chevrolet Suburbans; 1500 GMC Yukons; 1500 GMC Yukon XLs; and 1500 Cadillac Escalades, model-year and model-coded as follows:

| | |
|---|---|
| 1500 Series Pickup: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

[2] All capitalized terms used herein shall have the same meaning as defined in the Settlement Agreement.

d.    Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

e.    Any person, "owner," or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005;

(the "**Class**").

## CHOICES OF SETTLEMENT CLASS MEMBERS

▪    ***Remain in the Class.***  You can participate in the settlement, without objecting to it.  If the Bankruptcy Court finally approves the proposed Settlement Agreement, you are an eligible member of the Class, you properly follow the instructions below as to how to submit the enclosed Reimbursement Claim Form, and the contents of the Reimbursement Claim Form are deemed valid, you will receive the monetary benefits of the settlement.  You will then be bound by the terms of the Settlement Agreement, any Final Judgment that is entered, and any release of the Class's claims against the Released Parties, which includes MLC.

▪    ***Object to the Class.***  You can remain in the Class and file written objections asking the Bankruptcy Court to not approve the proposed Settlement Agreement.  Any such objection must contain the information set forth in the "Your Right to Object and Appear" section below, and it also must be mailed or delivered so as to be received by the deadline set forth in that same section.  If the Bankruptcy Court does not approve the proposed Settlement Agreement, the lawsuit would continue against MLC and no Class Member would receive payment under the proposed Settlement Agreement.  In such a case, your participation in any recovery that may be obtained from MLC through a trial or later settlement will depend on the results of the lawsuit, or the terms of any later settlement.

▪    ***Opt Out of the Class.***  You can opt out of the Class and be excluded from participation in the Settlement Agreement, if it is approved.  A Class Member who elects to opt out and be excluded from participation in the settlement will receive no settlement payment under the Settlement Agreement, or under any later resolution of the lawsuit if the Settlement Agreement is not approved.  A Class Member who opt outs and is excluded from the settlement will not be bound by the Settlement Agreement or any Final Judgment entered in the lawsuit, and will not release any claims against the MLC.  *__However, as explained below, MLC is presently involved in bankruptcy proceedings.  In those proceedings, the Bankruptcy Court, via its Bar Date Order, established a claims bar date of November 30, 2009 at 5:00 EST.  Because that date is now expired, any Class Member electing to opt out of the Settlement Agreement will likely be barred from filing proofs of claim in MLC's bankruptcy, and thus will effectively be barred from pursuing further litigation against MLC relating to the alleged defect in the Parking Brake.__*  In order to opt out and be excluded from the settlement, a Class Member must complete and submit a request for exclusion, discussed below, and the request for exclusion must be mailed or delivered so as to be received by the deadline set forth in the Opt Out/Exclusion from the Class section below.

If a Class Member wishes, he may hire his own attorney, at his own expense, to represent his interests in connection with the proposed Settlement Agreement, or the lawsuit involving the Class Member's claims against MLC.  If a Class Member remains in the Class but does not hire his own

2

attorney, Class Counsel and the representative plaintiff, Mr. Boyd Bryant ("**Mr. Bryant**"), will represent the interests of the Class Member(s) in this lawsuit. You are advised that Mr. Bryant, David W. Crowe, and John W. Arnold of Bailey/Crowe & Kugler, LLP, and James C. Wyly and Sean F. Rommel of Wyly-Rommel, PLLC ("**Class Counsel**") believe the proposed Settlement Agreement is in the best interest of the Class. Accordingly, they intend to support the proposed Settlement Agreement at the scheduled Fairness Hearing. Unless you retain your own attorney, you will not be responsible for any attorneys' fees, court costs, litigation expenses, or administrative expenses in connection with the Settlement Agreement (or any continuation of the lawsuit if the Settlement Agreement is not approved), except as those amounts may be deducted from the Cash Settlement Fund upon approval of the Settlement Agreement by the Bankruptcy Court (or from any other ultimate recovery if the Settlement Agreement is not approved).

The foregoing options are explained more fully below.

**DESCRIPTION OF THE LAWSUIT**

On February 4, 2005, Boyd Bryant, on behalf of himself and all others similarly situated ("**Plaintiffs**") filed an original Class Action Complaint styled *Boyd Bryant, on behalf of himself and all others similarly situated v. General Motors Corporation d/b/a Chevrolet, GMC, Cadillac, Buick and Oldsmobile* in the Circuit Court for Miller County, Arkansas (the "**Miller County Action**"). The Miller County Action is a purported nationwide class action based on an alleged defective Parking Brake in 1999-2002 Chevrolet, GMC, Cadillac pickups and/or SUVs. The Class Action Complaint, as amended, alleges causes of action for: 1) breach of express warranty; 2) breach of the implied warranty of merchantability; 3) violation of the Magnuson-Moss Warranty Act ("**MMWA**"), 15 U.S.C. § 2301 *et seq.*; 4) unjust enrichment; and 5) fraudulent concealment.

After reviewing evidence submitted by Plaintiffs and GM, and oral argument concerning class certification, the Circuit Court for Miller County, Arkansas (the "**Miller County Court**"), on January 11, 2007, certified the Miller County Action as a nationwide class action pursuant to Ark. R. Civ. P. 23. The Miller County Court also appointed Mr. Bryant as the class representative and charged him with "all duties such an appointment entails." Finally, the Miller County Court appointed counsel from Bailey/Crowe & Kugler, LLP and Wyly-Rommel, PLLC as Class Counsel. GM appealed the class certification order to the Arkansas Supreme Court, which ultimately affirmed the order in June 2008. GM then filed a petition for *writ of certiorari* to the United States Supreme Court. The United States Supreme Court, however, denied the petition in January 2009.

The commencement of chapter 11 cases by GM on June 1, 2009, before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), stayed all proceedings related to the Miller County Action. Shortly thereafter, GM filed a motion pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Federal Rule of Bankruptcy Procedure 2002, 6004, and 6006 to essentially sell its assets and transfer certain liabilities to Vehicle Acquisition Holdings, LLC ("**VAH**"), which has now changed its name to General Motors Company ("**New GM**"). New GM is a Delaware corporation.

On July 5, 2009, the Bankruptcy Court issued an order approving the asset-sale motion ("**Sale Order**"). Of relevance to this matter, the Sale Order transferred some of GM's liabilities to New GM, while transferring other liabilities to Motors Liquidation Company ("**MLC**"). Mr. Bryant, on behalf of the Class, has taken the position that liability for all claims or causes of action asserted in the Miller County Action, except for unjust enrichment and fraudulent concealment, has been transferred to New GM under the Sale Order.

3

On or about July 9, 2009, and over Plaintiffs' strenuous objection, MLC removed the Miller County Action to the United States Bankruptcy Court for the Western District of Arkansas (the "**Arkansas Bankruptcy Court**"). Despite a motion for abstention and remand having been filed, the Arkansas Bankruptcy Court transferred venue of the removed Miller County Action to the Bankruptcy Court. The removed case is docketed in the Court as Adversary No 1:09-ap-508. **Its specific style is as follows: *Boyd Bryant, On Behalf of Himself and All Others Similarly Situated v. Motors Liquidation Company, et al.*; Adversary No. 09-00508 (REG); In the United States Bankruptcy Court for the Southern District of New York.**

On or about September 16, 2009, the Bankruptcy Court entered its Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof) (the "**Bar Date Order**"). The Bar Date Order, *inter alia*, set November 30, 2009 at 5:00 EST as the deadline for any person or entity to file a proof of claim against MLC to assert any claim, as defined by Section 101(5) of the Bankruptcy Code, that arose prior to or as of June 1, 2009. Section 101(5) defines "claim" as follows:

> The term "claim" means—
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Bar Date Order further provides that "any holder of a Claim against MLC that is required but fails to file a Proof of Claim in accordance with this Bar Date Order on or before the applicable Bar Date shall be forever barred, stopped, and enjoined from asserting such Claim against MLC.

In view of this Bar Date deadline, and his status as appointed representative of the Class, Mr. Bryant, on November 27, 2009, filed proofs of claim nos. 58625, 58626, and 58627 asserting MLC's bankruptcy estate should compensate him and the Class for the defective Parking Brakes based on theories of (i) unjust enrichment and (ii) fraudulent concealment (the "**Claim**"). In addition, Mr. Bryant filed with the Bankruptcy Court a Motion For An Order Allowing Plaintiffs To File a Class Proof of Claim And For The Application of Federal Rule of Bankruptcy Procedure 7023 Pursuant to Federal Rule of Bankruptcy Procedure 9014. That motion remains pending before the Bankruptcy Court and has not yet been ruled upon. MLC has indicated it will oppose this motion.

## PRELIMINARY SETTLEMENT CLASS CERTIFICATION

Mr. Bryant, on behalf of himself and the Class, has now agreed with MLC to resolve the "**Settled Claims**," which are defined in the Settlement Agreement, Paragraph 1.47, as follows:

> Settled Claims. "Settled Claims" means the Claim against the Released Parties asserted by the Settlement Class, and any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, disputes, and controversies of any kind, nature, or description

4

whatsoever, under federal, state, or foreign common law, statute, or regulation, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, whether direct, indirect, derivative, individual, representative, legal, equitable, or of any other type, or in any other capacity, related to or derived from the Claim, including but not limited to claims for breach of express warranty, breach of the implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., unjust enrichment, and fraudulent concealment. "Settled Claims" does not mean the Claim, or any portion thereof, that can or may be asserted by Plaintiffs against New GM. It is expressly understood by the Parties that Plaintiffs are settling nothing as to New GM, and reserve all of their rights and abilities to substitute New GM into these proceedings, or into other proceedings, and to litigate against New GM as they may see fit in the Miller County Action, or elsewhere.

On _____, 2010 the Bankruptcy Court entered an Order of Preliminary Approval preliminarily approving of the Settlement Agreement. In that order and for settlement purposes only, the Bankruptcy Court adopted the prior Class certification in the Miller County Action, and preliminarily determined all relevant Rule 23 settlement factors had been satisfied. The Bankruptcy Court will make a final determination of whether to finally approve of the Settlement Agreement following the Fairness Hearing, which date and time is set forth below.

## RELIEF AVAILABLE TO CLASS MEMBERS

Under the Settlement Agreement, Class Members, if they participate and do not opt out of the Class after the Notice of Settlement is disseminated, and the deadline to opt out is expired ("**Participating Class Members**"), may receive the benefit of a twelve million dollar ($12,000,000) Allowed Claim in MLC's bankruptcy ("**the Allowed Claim**"). Because the Allowed Claim is not received in the form of cash, it will have to be converted to cash in order to pay Participating Class Members as per the three reimbursement tiers below. Under the Settlement Agreement, the Allowed Claim may be converted to cash by: i) selling, transferring, assigning, and/or otherwise monetizing the Allowed Claim, either individually or through a broker; and/or ii) selling any New GM shares, warrants, options, or other property of MLC as part of any chapter 11 plan in any commercially reasonable manner. Once the Allowed Claim is converted to cash or monetized in this manner, Participating Class Members may obtain the following reimbursement benefit upon submission of proper documentation:

**TIER ONE:**    On a *pro rata* basis, up to the amount of money actually spent by any Participating Class Member to repair the defective Parking Brake within the warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

**TIER TWO:** On a *pro rata* basis, up to $150.00 for any Participating Class Member who actually spent money to repair the defective Parking Brake up to two (2) years beyond expiration of the vehicle's warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

5

**TIER THREE:** For any Participating Class Member who actually spent money to repair the defective Parking Brake more than two (2) years beyond the expiration of the vehicle's limited warranty period (which is for 3 years/36,000 miles, but longer warranty period for Cadillacs), on a *pro rata* basis, a payment of up to $75.00, but proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

The *pro rata* nature of the reimbursement payments under each of these three tiers is based on the nature of the Net Cash Settlement Fund, whose definition and creation is discussed in Settlement Agreement, Paragraphs 1.29, and 2.5-2.10. The Net Cash Settlement Fund could lack funds sufficient to pay all properly submitted Class Member claims on a 100% basis, especially once deductions from the Cash Settlement Fund (to create the Net Cash Settlement Fund) are made for an initial attorney fee payment, Reimbursable Costs and Expenses, Administration Expenses, an Incentive Award to Bryant, and applicable taxes, if any, all as set forth in the Settlement Agreement. However, if there exists a Final Unclaimed Fund (defined below), then it is possible for some Class Members that have submitted an approved Reimbursement Claim Form to receive additional reimbursement for their Parking Brake repairs, as discussed in Settlement Agreement, Paragraph 4.1. In relevant part, Settlement Agreement, Paragraph 4.1 reads as follows:

> (2) in the event a Final Unclaimed Fund exists, members of the Settlement Class that have submitted and had approved by the Claims Administrator a Reimbursement Claim Form will, to the extent possible (but, if necessary, subject to *pro rata* reduction) be made one hundred percent (100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake repairs; if, after these additional "make whole" payments are made, additional Final Unclaimed Fund monies exist, and if Class Counsel's initial attorney fee payment was less than the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, then Class Counsel shall be entitled to receive additional monies from the Final Unclaimed Fund as an Attorney Fee Award, but never to exceed a total Attorney Fee Award of 33% of the Allowed Claim, or $4,000,000 cash, whichever is greater.

Under the Settlement Agreement, Paragraph 1.23, the term **"Final Unclaimed Fund"** means the Net Cash Settlement Fund, less the amount of money represented by those Distribution Checks which are endorsed and presented for payment by Participating Class Members within thirty (30) days after the Distribution Date, plus interest, if any, that has accrued on the amount of money in the Final Unclaimed Fund.

Under the Settlement Agreement, Paragraph 2.12, within thirty (30) days after the Distribution Date, the Claims Administrator shall certify to the Parties the amount in the Final Unclaimed Fund, including all funds unused for the payment of claims, plus all interest accrued. The Parties will stipulate in the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing that they agree to the concept of the Bankruptcy Court vesting in the Circuit Court of Miller County, Arkansas where the Miller County Action was originally filed the exclusive right, ability, and power to issue orders, judgments or decrees effecting the distribution of the Final Unclaimed Fund.

*Only those Participating Class Members who properly complete and return the enclosed Reimbursement Claim Form within 80 days after the date on which the Order of Preliminary Approval was signed, which was on _____, 2010, and whose Reimbursement Claim Forms are approved by the Claims Administrator, will be eligible for Reimbursement. Reimbursement to Participating Class Members will occur only after the Effective Date. Class Members that elect to opt out or exclude themselves are not eligible for reimbursement.*

6

## DISMISSAL AND RELEASE OF ALL CLAIMS

If the proposed Settlement Agreement is ultimately approved by the Bankruptcy Court, the Judgment is entered by the Bankruptcy Court, and the Judgment becomes a Final Judgment, the Settled Claims against MLC will be dismissed with prejudice, and the Settled Claims asserted by the Settlement Class against MLC will be released. Once the dismissal with prejudice and release occur, no Settled Claims may thereafter be asserted by anyone in the Settlement Class against MLC. If the Bankruptcy Court does not approve the Settlement Agreement, the Settlement Agreement will terminate, shall be null and void, and the Miller County Action, as removed and transferred to the Bankruptcy Court, shall remain pending.

## HOW WILL I KNOW IF THE SETTLEMENT HAS BEEN APPROVED?

The Bankruptcy Court has scheduled a date to conduct a Fairness Hearing and consider final approval of the Settlement Agreement. On the date or after the Fairness Hearing is conducted, the Bankruptcy Court will issue an order either granting or denying final approval of the Settlement Agreement. If the Bankruptcy Court grants final approval, and if no appeal or post-judgment motion is filed within thirty (30) days after entry of Judgment, the Settlement Agreement will become final and the reimbursement benefits, as described in this notice, will become available to Settlement Class members whose Reimbursement Claim Forms are timely submitted, reviewed, and approved. In the event the Bankruptcy Court grants a final approval, but an appeal is filed, the reimbursement benefits may become available, depending on how the appeal is decided. If you remain in the Settlement Class and wish to know the status of the final approval and the availability of reimbursement, you may call 1-800-_____ to listen to a recorded message about the status of the approval.

## OPT OUT/EXCLUSION FROM THE CLASS

To request opt-out/exclusion from the Class, you must send a written request, via certified mail, return receipt requested, to each of the following individuals:

*Settlement Class Counsel*
David W. Crowe
John W. Arnold
BAILEY/CROWE & KUGLER, LLP
6550 Bank of America Plaza
901 Main Street
Dallas, TX 75202

James C. Wyly
Sean F. Rommel
WYLY ROMMEL, PLLC
2311 Moores Lane
Texarkana, Texas 75503

Rakhee V. Patel
Pronske & Patel, P.C.
2200 Ross Avenue
Suite 5350
Dallas, TX 75201

7

*Counsel for MLC*
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Vance L. Beagles
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201

You must include in your request for exclusion, in clear, easily understood writing and language: 1) your name, address, and telephone number; 2) a statement that you want to be excluded from the Class; 3) the style of this lawsuit in the Bankruptcy Court (*see* bolded text in section entitled "Description of the Lawsuit" above); and 4) your signature.

If you exclude yourself from the Class, you will not be eligible for any settlement relief or be permitted to participate in the proposed Settlement Agreement. Your written request for exclusion must be postmarked no later than thirty (30) days after the date of the Order of Preliminary Approval or you will lose your right to request exclusion, and you will be bound by the settlement and by all orders, judgments, and releases as contemplated in the Settlement Agreement, even if you have pending or subsequently attempt to initiate litigation against MLC relating to any of the Settled Claims. *Moreover, as discussed, given the Bankruptcy Court's Bar Date Order, you will, in any event, likely be barred from pursuing further litigation against Debtors relating to or arising from the Settled Claims.*

## FAIRNESS HEARING DATE, TIME AND PLACE

The date, time and place for this Fairness Hearing is as follows:

**Date:** _____

**Time:** _____

**Place:** Courtroom 621, One Bowling Green, New York, NY 10004-1408.

The Fairness Hearing will occur in the courtroom (Courtroom 621, Sixth Floor) of the Hon. Robert E. Gerber, United States Bankruptcy Judge.

## YOUR RIGHT TO OBJECT AND APPEAR

You have the right to remain in the Class and object to the proposed Settlement Agreement. Persons who desire to object must file a written statement with the Bankruptcy Court clerk and provide a copy of that objection to Class Counsel and counsel for MLC no later than thirty (30) days after the date of the Order of Preliminary Approval. The written statement must contain the following information:

1)      A heading referring to the Class case number and to the United States Bankruptcy Court for the Southern District of New York;

8

2)    A statement as to whether the objector intends to appear at the Fairness Hearing, either in person or through counsel, and, if through counsel, identifying counsel by name, address and telephone number;

3)    A detailed statement of the specific legal and factual basis for each and every objection;

4)    A list of any witnesses the objector may call at the Fairness Hearing, together with a brief summary of each witness's expected testimony;

5)    A list and copies of any exhibits which the objector may seek to use at the Fairness Hearing;

6)    A list of any legal authority the objector may present at the Fairness Hearing;

7)    The objector's current address;

8)    The objector's current telephone number; and

9)    The objector's signature.

10)   If an objector intends to appear at the Fairness Hearing, a certification that he is willing to present himself for deposition no later than ten (10) days before the Fairness Hearing, and a statement of where and when he would prefer that his deposition occur.

**ANY MEMBER OF THE SETTLEMENT CLASS WHO FAILS TO TIMELY FILE SUCH WRITTEN STATEMENT AND PROVIDE THE REQUIRED INFORMATION WILL NOT BE PERMITTED TO PRESENT ANY OBJECTIONS AT THE FAIRNESS HEARING.**

Once again, your written statement containing your objection must be received by the court clerk for filing no later than thirty (30) days after the date of the Order of Preliminary Approval. The mailing address of the court clerk is as follows:

Vito Genna
Clerk of the Court
United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, NY 10004

Complete copies of your written objection must be mailed (certified mail, return receipt requested) or delivered to the following individuals such that they are received no later than thirty (30) days after the date of the Order of Preliminary Approval.:

David W. Crowe
John W. Arnold
BAILEY/CROWE & KUGLER, LLP
6550 Bank of America Plaza
901 Main Street
Dallas, TX 75202

9

James C. Wyly
Sean F. Rommel
WYLY ROMMEL, PLLC
2311 Moores Lane
Texarkana, Texas 75503
Rakhee V. Patel
Pronske & Patel, P.C.
2200 Ross Avenue
Suite 5350
Dallas, TX 75201

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Vance L. Beagles
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201

If you remain in the Class and object to the settlement agreement, but the Bankruptcy Court overrules you
and approves the Settlement Agreement, you will still receive any benefits allocated to you under the
Settlement Agreement, and will still be bound by the Settlement Agreement and any Judgment or Final
Judgment dismissing the Settled Claims.

## ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD

As noted, the Bankruptcy Court has preliminarily approved the request by Class Counsel, lawyers
from Bailey/Crowe & Kugler, LLP and Wyly-Rommel, PLLC, for an Attorney Fee Award that is
described in Paragraph 4.1 of the Settlement Agreement. That paragraph, in relevant part, reads as
follows:

Attorneys' Fees. Class Counsel submits they are entitled under their contingency fee
agreement, and based on the work performed in this matter, to an Attorney Fee Award in
an amount not to exceed thirty three percent (33%) of the Allowed Claim, or $4,000,000
cash, whichever is greater. Debtors agree to not object to any motion by Class Counsel
seeking an Attorney Fee Award of an amount not to exceed the greater of thirty three
percent (33%) of the Allowed Claim or $4,000,000 cash, payable to Class Counsel as
described in this Paragraph. Class Counsel will apply to the Bankruptcy Court for an
Attorney Fee Award to be paid as follows: (1) thirty three percent (33%) of the Cash
Settlement Fund in the sequence described in Paragraph 1.29; (2) in the event a Final
Unclaimed Fund exists, members of the Settlement Class that have submitted and had
approved by the Claims Administrator a Reimbursement Claim Form will, to the extent
possible (but, if necessary, subject to pro rata reduction) be made one hundred percent
(100%) whole with respect to their claimed out-of-pocket expenditures for Parking Brake
repairs. If, after these additional "make whole" payments are made, additional Final
Unclaimed Fund monies exist, and if Class Counsel's initial attorney fee payment was

10

less than the greater of thirty three percent (33%) of the Allowed Claim or $4,000,000 cash, then Class Counsel shall be entitled to receive additional monies from the Final Unclaimed Fund as an Attorney Fee Award, but never to exceed a total Attorney Fee Award of 33% of the Allowed Claim, or $4,000,000 cash, whichever is greater

In addition, the Bankruptcy Court has preliminarily approved requested reimbursed litigation costs to class counsel of two hundred ninety thousand dollars ($290,000,00), and a requested incentive award for Mr. Bryant of ten thousand dollars ($10,000.00). Upon final approval, the amount of attorneys' fees, reimbursed litigation costs, and the incentive award will be deducted from the Cash Settlement Fund or the Final Unclaimed Fund in the sequence and manner described above.

## AVAILABILITY OF ADDITIONAL INFORMATION

This Notice of Class Action Settlement contains only a summary of the proposed Settlement Agreement. For more detailed information about it, you are referred to the pleadings and orders in the Bankruptcy Court's file, which may be inspected during regular business hours at the Office of Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004. If you would like to review the proposed Settlement Agreement, a copy is attached as an exhibit to the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement and Forms of Class Notice, and to Set Fairness Hearing, which is also on file there. In addition, you may review the Settlement Agreement at the following web address: www._____.com.

You may also obtain a copy of the Settlement Agreement from Class Counsel by requesting it from Class Counsel either by mail or telephone. Further, if you wish to address further questions to Class Counsel, you may contact them by mail or telephone. Class Counsel's contact information is as follows:

> David W. Crowe
> John W. Arnold
> BAILEY/CROWE & KUGLER, LLP
> 6550 Bank of America Plaza
> 901 Main Street
> Dallas, TX 75202
>
> James C. Wyly
> Sean F. Rommel
> WYLY ROMMEL, PLLC
> 2311 Moores Lane
> Texarkana, Texas 75503
>
> Rakhee V. Patel
> Pronske & Patel, P.C.
> 2200 Ross Avenue
> Suite 5350
> Dallas, TX 75201

You may, of course, seek the advice and guidance of your own attorney if you desire. **PLEASE DO NOT TELEPHONE THE COURT, THE COURT CLERK'S OFFICE OR MLC'S COUNSEL FOR INFORMATION.**

11

The form, content and method of delivery of this Notice of Class Action Settlement have been approved by order of the Hon. Robert E. Gerber, United States Bankruptcy Judge.

Dated: _____

                                        _____
                                        CLERK OF COURT
                                        UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE:\43447781\05\72240.0639

# EXHIBIT B

**Attention: 1999-2002 GMC, Chevrolet, Cadillac Pickup and SUV Owners**

If you originally purchased or now own a model-year 1999-2002 GMC, Chevrolet, or Cadillac pickup truck or SUV, you may have rights in a class-action settlement regarding a defective parking brake in your vehicle. Preliminary approval of the class action settlement was made by the Hon. Robert Gerber, United States Bankruptcy Judge for the Southern District of New York in the following matter: *Boyd Bryant, On Behalf of Himself and All Others Similarly Situated v. Motors Liquidation Company et al;* **Adversary No. 09-00508 (REG); In the United States Bankruptcy Court for the**

**Southern District of New York. If you are a Class Member who, since 1998 has paid out of pocket for parking brake repairs on your** model-year 1999-2002 GMC, Chevrolet, or Cadillac pickup truck or SUV, and possess proof of such payment, you may be entitled to *pro rata* cash reimbursement under the terms of a Settlement Agreement. If you are a Class Member, you may i) remain in the Class and send in your Reimbursement Claim Form ("RCF"); ii) remain in the Class, but object to it; or iii) opt out of the Class and be excluded from participating in

the Settlement Agreement. To view the steps necessary to submit an RCF, to object to the Settlement Agreement, or to opt out of the Class; to view the terms of the Settlement Agreement; or to view the full version of this Notice, please call (800) _____ (toll free), or visit www_____.com. A final hearing to approve the Settlement Agreement will occur on _____, 2010 at ___ a.m. before the Hon. Robert Gerber. Objections and opt outs are due by _____, 2010; RCFs must be submitted by no later than _____, 2010.

# EXHIBIT E

HEARING DATE AND TIME: August 6, 2010 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 30, 2010 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
MOTORS LIQUIDATION COMPANY, *et al.*,     :      09-50026 (REG)
      f/k/a General Motors Corp., *et al.*  :
                                          :
                      Debtors.            :      (Jointly Administered)
                                          :
------------------------------------------------------x
                                          :
BOYD BRYANT, on behalf of himself and     :      Adversary No. 09-00508 (REG)
                                          :
      all others similarly situated,      :
                      Plaintiffs,         :
                                          :
vs.                                       :
                                          :
MOTORS LIQUIDATION COMPANY, *et al.*,     :
      f/k/a General Motors Corp., *et al.*  :
                                          :
                      Defendant.          :
------------------------------------------------------x

## ORDER OF ESTIMATION

On July 23, 2010, Motors Liquidation Company (f/k/a General Motors

Corporation)[1] and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"),

filed their Motion for Preliminary Approval of Settlement, for Conditional Certification of

Settlement Class, to Approve Cash Disbursement and Forms of Notice, and to Set Fairness

Hearing (the "**Motion**"), concerning the agreement (the "**Settlement Agreement**"), attached to

the Motion as **Exhibit "A,"** by and between Debtors and class action plaintiff, Boyd Bryant, on

behalf of himself and a nationwide class of similarly situated persons, as more fully set forth in

the Motion; and due and proper notice of the Motion having been provided, and it appearing that

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Settlement Agreement.

no other or further notice need be provided; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all

parties in interest; and that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

it is

ORDERED that the Motion is granted as provided herein with respect to the

estimation of the Proofs of Claim Nos. 58625, 58626, and 58627 (the "**Proofs of Claim**"); and it

is further

ORDERED that pursuant to 11 U.S.C. § 502(c)(3), the Proofs of Claim shall be

estimated in the amount of twelve million dollars ($12,000,000.00) (the "**Estimated Amount**")

for all purposes, including for plan confirmation and establishing reserves for distribution,

subject to the Parties' reservation of rights pursuant to 11 U.S.C. § 502(j), until such time as the

Proofs of Claim are allowed pursuant to the Settlement Agreement and approval of this Court.

In no event shall the Proofs of Claim be allowed in excess of the Estimated Amount; and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation, and/or enforcement of this

Order.

Dated: New York, New York
        [_____], 2010

_____
United States Bankruptcy Judge

2

# EXHIBIT F

EXHIBIT "F"

## PLAN OF ALLOCATION

**RELIEF AVAILABLE TO CLASS MEMBERS:**    Under the Settlement Agreement, members of the Settlement Class, if they participate and do not opt out, may obtain the following reimbursement benefit upon submission of proper documentation:

> **TIER ONE:**   On a *pro rata* basis, up to the amount of money actually spent by any members of the Settlement Class to repair the defective Parking Brake within the warranty period (which is 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

> **TIER TWO:**   On a *pro rata* basis, up to $150.00 for any members of the Settlement Class who actually spent money to repair the defective Parking Brake up to two (2) years beyond expiration of the vehicle's warranty period (which is 3 years/36,000 miles, but longer warranty period for Cadillacs). Must be an actual out-of-pocket expense, and proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

> **TIER THREE:**   For any members of the Settlement Class who actually spent money to repair the defective Parking Brake more than two (2) years beyond the expiration of the vehicle's limited warranty period (which is 3 years/36,000 miles, but longer warranty period for Cadillacs), on a *pro rata* basis, a payment of up to $75.00, but proof of expenditure for Parking Brake repairs is required in order to receive this reimbursement.

The *pro rata* nature of the reimbursement payments under each of these three tiers is based on the nature of the Net Cash Settlement Fund, whose definition and creation is discussed in Settlement Agreement, Paragraphs 1.29, and 2.5-2.10. The Net Cash Settlement Fund could lack funds sufficient to pay all properly submitted members of the Settlement Class claims on a 100% basis, especially once deductions from the Cash Settlement Fund (to create the Net Cash Settlement Fund) are made for an Attorney Fee Award, Reimbursable Costs and Expenses Awarded, Administration Expenses, an Incentive Award to Boyd Bryant, and applicable taxes, if any. However, if there exists a Final Unclaimed Fund, then it is possible for members of the Settlement Class in any of the three (3) settlement tiers that have submitted an approved Reimbursement Claim Form to receive additional reimbursement for their Parking Brake repairs, as discussed in Settlement Agreement, Paragraph 4.1.

Under the Settlement Agreement, Paragraph 1.23, the term "Final Unclaimed Fund" means the Net Cash Settlement Fund (which is the Cash Settlement Fund, less the payments described in the previous paragraph) less the amount of money represented by those Distribution Checks which are endorsed and presented for payment by members of the Settlement Class within thirty (30) days after the Distribution Date, plus interest, if any, that has accrued on the amount of money in the Final Unclaimed Fund.

Under the Settlement Agreement, Paragraph 2.12, within thirty (30) days after the Distribution Date, the Claims Administrator shall certify to the Parties the amount in the Final Unclaimed Fund, including all funds unused for the payment of claims, plus all interest accrued. The Parties will stipulate in the Debtors' Motion for Preliminary Approval of Settlement, for Conditional Certification of Settlement Class, to Approve Cash Disbursement, and Forms of Class Notice, and to Set Fairness Hearing that they agree to the concept of the Bankruptcy Court vesting in the Circuit Court of Miller County, Arkansas

where the Miller County Action was originally filed the exclusive right, ability and power to issue orders, judgments or decrees effecting the distribution of the Final Unclaimed Fund.

Only those Participating Settlement Class members who properly complete and return the enclosed Reimbursement Claim Form within eighty (80) days from the date of the Order of Preliminary Approval, and whose Reimbursement Claim Forms are approved by the Claims Administrator, will be eligible for Reimbursement. Reimbursement to Participating Class Members will occur only after final approval of the Settlement Agreement. Members of the Settlement Class that elect to opt out or exclude themselves are not eligible for reimbursement.

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                                    :    **Chapter 11 Case No.**
                                                         :
**MOTORS LIQUIDATION COMPANY**, *et al.*,                :    **09-50026 (REG)**
        f/k/a General Motors Corp., *et al.*             :
                                                         :
                Debtors.                                 :    **(Jointly Administered)**
                                                         :
------------------------------------------------------------x
                                                         :
**BOYD BRYANT**, on behalf of himself and                :    **Adversary No. 09-00508 (REG)**
        all others similarly situated,                   :
                        Plaintiffs,                      :
vs.                                                      :
                                                         :
**MOTORS LIQUIDATION COMPANY**, *et al.*,                :
        f/k/a General Motors Corp., *et al.*             :
                                                         :
                Defendants.                              :
------------------------------------------------------------x

## [PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT, CONDITIONALLY CERTIFYING SETTLEMENT CLASS, APPROVING CASH DISBURSEMENT AND FORMS OF NOTICE, AND SETTING FAIRNESS HEARING

Upon the Motion, dated July 23, 2010 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and Rule 23 of the Federal Rules of Civil Procedure (the

"**Federal Rules**"), for entry of an order (the "**Order**") preliminarily approving the agreement

(the "**Settlement Agreement**"), attached to the Motion as **Exhibit "A,"** by and between the

Debtors, Plaintiff Boyd Bryant ("**Bryant**"), on behalf of himself and a nationwide class of others

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Where the terms of the Motion and the Settlement Agreement conflict, the Settlement Agreement shall govern.

similarly situated (the "**Settlement Class**"), conditionally certifying the Class and approving of

the forms of class notice; approving of a cash disbursement in the amount of one hundred

thousand dollars ($100,000.00) from the Debtors' bankruptcy estates; and setting a date for a

fairness hearing; and the Court having found and determined that the relief sought in the Motion

is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and the

Court having preliminarily found and determined that the settlement and Settlement Agreement

are fair, reasonable, adequate, and in the best interest of the Class as a whole; and the Court

having conditionally found that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein, and after due deliberation and sufficient cause appearing, it is,

therefore, and hereby

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that this Court has jurisdiction to consider this matter; and it is further

ORDERED that the Settlement Agreement, and the settlement contemplated

thereby, are preliminarily approved as being in the best interests of the Debtors, their estates,

creditors, and all parties in interest, including as to all members of the Class, and as including a

settlement amount that is within the range of reasonableness pursuant to and within the meaning

of Rule 9019 of the Bankruptcy Rules and Rule 23 of the Federal Rules. In so ordering, the

Court specifically finds that: (i) the Settlement Agreement resulted from extensive arm's-length

negotiations, and (ii) the settlement evidenced by the Settlement Agreement is sufficient to

warrant notice thereof to members of the Settlement Class, as well as a full hearing. The Court

makes no finding on the ultimate issues to be determined at the Fairness Hearing, but it also

specifically approves the establishment and funding of the Cash Settlement Fund under the

Court's jurisdiction in accordance with the terms of the Settlement Agreement, including the

payment by the Debtors to Class Counsel (defined below) in the amount of one hundred thousand dollars ($100,000.00) cash disbursement to defray Administration Expenses pursuant to the Settlement Agreement and otherwise directs the Parties to proceed with said settlement pursuant to the terms and conditions of the Settlement Agreement and exhibits thereto, subject to this Court's authority to determine whether to finally approve said settlement; and it is further

ORDERED that because the Miller County Action was certified prepetition as a nationwide class under the requirements of Arkansas Rule of Civil Procedure 23, and the Arkansas Court appointed Mr. Bryant class representative and his counsel, Messrs. David Crowe, John Arnold, Jim Wyly, and Sean Rommel, as class counsel, and because the Parties to the Settlement Agreement have stipulated, solely for purposes of settlement and entry of this Order, that the Arkansas class certification can be fully acknowledged and adopted by the Court, the Court conditionally certifies, for settlement purposes only, the following Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules:

> *Any "owner" or "subsequent owner" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer, that registered his vehicle in any state in the United States.*

Excluded from the Class are the following individuals or entities:

a.    Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

b.    Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c.    Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

d.    Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

e.    Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin issued during 2005;

and it is further

ORDERED that Mr. Bryant is provisionally designated as the appointed Class Representative, and Messrs. Crowe, Arnold, Wyly, and Rommel as appointed Class Counsel. In so ordering, the Court preliminarily finds Mr. Bryant, as Class Representative, has not received unduly preferential treatment, that no excessive compensation award has been proposed for Class Counsel, and that the Class Representative and Class Counsel are fair and adequate representatives of the interests of the Class with, as to the Class Representative, claims typical of members of the Class.

This conditional certification of the Class is for settlement purposes only and shall not constitute, nor be construed as, an admission on the part of the Debtors that this litigation, or any other proposed or certified class action, is appropriate for class treatment pursuant to Rule 23 of the Federal Rules or any similar class action statute or rule.  If the Settlement Agreement is terminated or is not consummated for any reason, the foregoing conditional certification of the Class and provisional designation of Class Representative and Class Counsel shall be void and of no further force and effect; and it is further

ORDERED that the Court approves, as to both form and content, the Mailed Notice and the Published Notice, and finds that each meets the requirements of Rule 23 and due

process, is appropriate notice to the Class, and shall constitute due and sufficient notice to all

persons entitled thereto, and complies fully with the requirements of federal law, the United

States Constitution, and any other applicable law. Accordingly, the Debtors shall mail, at their

cost and expense, the Mailed Notice, in the form annexed hereto as **Exhibit A**, via first class

mail and within five (5) business days after the date of entry of this Order, to the last known

address of members of the Class that they can reasonably obtain through Class member warranty

information or other data reasonably accessible and from either their own records or from those

of New GM, to the extent reasonably available. The Class Representative and Class Counsel, in

association with the Claims Administrator, shall publish the Published Notice, as defined in the

Settlement Agreement and in the form annexed hereto as **Exhibit B**, in *USA Today* on three (3)

separate days, any Monday through Thursday, beginning as soon as it is reasonably feasible to

do so after the date of entry of this Order. The Class Representative and Class Counsel, in

association with the Claims Administrator, also shall establish a website and 1-800 number,

which shall be identified in the Mailed Notice and Published Notice, for the purpose of enabling

members of the Class to obtain copies of the Mailed Notice and Published Notice and to make

inquiries with respect to the Settlement Agreement. It shall be the responsibility of Class

Counsel, in connection with the Claims Administrator, to respond to inquiries of Class Members

as appropriate; and it is further

ORDERED that non-substantive changes necessary to correct any inconsistency

between the forms of Mailed Notice and Published Notice approved by the Court and the

Settlement Agreement may be made by the mutual agreement of Class Counsel and Debtor's

Counsel without further order of this Court; and it is further

ORDERED that the Clerk of the Court is authorized, directed, and ordered to sign and date the Mailed Notice and Published Notice approved by this Order, with such modifications as may be authorized by this Order; and it is further

ORDERED that any member of the Class may enter an appearance in the above-referenced action, at their own expense, individually or through counsel of their own choice. If they do not enter an appearance or otherwise opt out (as set forth below), they will be represented by Class Counsel and be part of the Settlement Class; and it is further

ORDERED that any member of the Class wishing to object to the Settlement Agreement must file a written statement with the Clerk of Court and provide a copy of that objection to Class Counsel and the Debtors' Counsel no later than thirty (30) days after the date of entry of this Order. The written statement must contain the following information:

a) A heading referring to the adversary proceeding case number and to the United States Bankruptcy Court for the Southern District of New York;

b) A statement as to whether the objector intends to appear at the Fairness Hearing, either in person or through counsel, and, if through counsel, identifying counsel by name, address, and telephone number;

c) A detailed statement of the specific legal and factual basis for each and every objection;

d) A list of any witnesses the objector may call at the Fairness Hearing, together with a brief summary of each witness's expected testimony;

e) A list and copies of any exhibits which the objector may seek to use at the Fairness Hearing;

f) A list of any legal authority the objector may present at the Fairness Hearing;

g) The objector's current address;

h) The objector's current telephone number;

i)    The objector's signature; and

j)    If an objector intends to appear at the Fairness Hearing, a certification that he/she is willing to present himself for deposition no later than ten (10) days before the Fairness Hearing, and a statement of where and when he/she would prefer that his/her deposition occur.

Any member of the Class who fails to timely file such written statement and provide the required information will not be permitted to present any objections at the Fairness Hearing; and it is further

ORDERED that as further set forth in the Mailed Notice, any member of the Class that requests to opt out and be excluded from the Class must send a written request, via certified mail, return receipt requested, pursuant to the instructions in the Mailed Notice no later than thirty (30) days after the date of entry of this Order; and it is further

ORDERED that within eighty (80) days of the date of entry of this Order, members of the Class who do not opt out and wish to receive a disbursement under the Settlement Agreement must complete and return a Reimbursement Claim Form to the Claims Administrator, as more fully set forth in the Mailed Notice; and it is further

ORDERED that Class Counsel and/or Debtors' Counsel shall file and serve upon each other all papers in support of their request for final approval of the Settlement Agreement at least seven (7) days before the Fairness Hearing; and it is further

ORDERED that a Fairness Hearing shall be held in this Court on _____ at ____ __.m. to determine (i) whether the proposed Settlement Agreement is fair, reasonable, and adequate and should be finally approved by the Court; (ii) whether the Settled Claims should be dismissed with prejudice as to the Debtors pursuant to the terms of the Settlement Agreement; (iii) whether members of the Settlement Class should be bound by the release of the Settled Claims as set forth in the Settlement Agreement; (iv) the amount of Class Counsel's Attorney

Fee Award and Reimbursable Costs and Expenses Awarded; (v) the amount of any Incentive

Award to Mr. Bryant as class representative; and (vi) any other matter that may be relevant to

approving the Settlement Agreement; and it is further

ORDERED that the Court reserves the right to adjourn the date of the Fairness

Hearing without further notice to the Class members and retains jurisdiction to consider all

further applications arising out of or connected with the proposed settlement. The Court may, at

the Fairness Hearing, approve the Settlement Agreement, with such modifications as may be

agreed to by the Parties, if appropriate, without further notice to the Class; and it is further

ORDERED that, unless and until the Settlement Agreement is terminated

pursuant to its provisions and/or the Settled Case dismissed in the Judgment, all discovery,

motions, pleadings, and other activity in the Settled Case affecting the Parties shall be stayed

except to the extent necessary to effectuate the Settlement Agreement; and it is further

ORDERED that the Settlement Agreement and all papers in support thereof shall

be available for inspection at the office of the Clerk of the Court.

Signed this _____ day of _____, 2010.

Dated: New York, New York
        [_____], 2010

_____
United States Bankruptcy Judge

# EXHIBIT C

09-50026-mg    Doc 6414    Filed 07/26/10    Entered 07/26/10 10:16:59    Main Document
HEARING DATE: Pg 139 of 210. August 6, 2010 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE:  July 30, 2010 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                         :

In re                              :      Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.*,  :      09-50026 (REG)
     f/k/a General Motors Corp., *et al.*  :

              Debtors.     :      (Jointly Administered)
                                      :

------------------------------------------------------------x
                                         :

BOYD BRYANT, on behalf of himself and  :      Adversary No. 09-00508 (REG)
                                 :
     all others similarly situated,      :
              Plaintiffs,       :
vs.                               :

MOTORS LIQUIDATION COMPANY, *et al.*,  :
     f/k/a General Motors Corp., *et al.*  :

              Defendant.   :
------------------------------------------------------------x

## ORDER OF ESTIMATION

On July 23, 2010, Motors Liquidation Company (f/k/a General Motors

Corporation)[1] and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"),

filed their Motion for Preliminary Approval of Settlement, for Conditional Certification of

Settlement Class, to Approve Cash Disbursement and Forms of Notice, and to Set Fairness

Hearing (the "**Motion**"), concerning the agreement (the "**Settlement Agreement**"), attached to

the Motion as **Exhibit "A,"** by and between Debtors and class action plaintiff, Boyd Bryant, on

behalf of himself and a nationwide class of similarly situated persons, as more fully set forth in

the Motion; and due and proper notice of the Motion having been provided, and it appearing that

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Settlement Agreement.

no other or further notice need be provided; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all

parties in interest; and that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

it is

ORDERED that the Motion is granted as provided herein with respect to the

estimation of the Proofs of Claim Nos. 58625, 58626, and 58627 (the "**Proofs of Claim**"); and it

is further

ORDERED that pursuant to 11 U.S.C. § 502(c)(3), the Proofs of Claim shall be

estimated in the amount of twelve million dollars ($12,000,000.00) (the "**Estimated Amount**")

for all purposes, including for plan confirmation and establishing reserves for distribution,

subject to the Parties' reservation of rights pursuant to 11 U.S.C. § 502(j), until such time as the

Proofs of Claim are allowed pursuant to the Settlement Agreement and approval of this Court.

In no event shall the Proofs of Claim be allowed in excess of the Estimated Amount; and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation, and/or enforcement of this

Order.

Dated: New York, New York
[_____], 2010


_____
United States Bankruptcy Judge

# EXHIBIT D



IN THE CIRCUIT COURT OF MILLER COUNTY, ARKANSAS

| | | |
|---|---|---|
| BOYD BRYANT, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFFS;<br><br><br>VS.<br><br>GENERAL MOTORS CORPORATION D/B/A CHEVROLET, GMC, CADILLAC, BUICK AND OLDSMOBILE,<br><br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. CV-2005-051-4 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CLASS CERTIFICATION, AND ORDER CERTIFYING CLASS

### I.

### Introduction

This is a proposed nationwide class action brought by Plaintiff Boyd Bryant, a resident of Fouke, Arkansas. Relying mostly on admissions in Defendant GM's own documents, Mr. Bryant, the owner of a 2002 Chevrolet Tahoe Z-71 sport utility vehicle, claims the parking brakes on nearly four million model year 1999 through 2002 GM pickup trucks and utility vehicles equipped with automatic transmissions are defectively designed in that, due to an improperly engineered spring clip retainer, they do not permit the parking brake lining to adequately float inside the parking brake drum. Mr. Bryant claims this defect exists the very moment each class vehicle rolls off its assembly line, and is persistent. That is, it reveals itself in the form of inadequate lining float each time a class vehicle is driven. Mr. Bryant further claims this lack of adequate lining float can cause additional problems relating to parking brake functionality, most significantly brake "self application" or "self energizing." Mr. Bryant

- 1 -

P2458

describes this condition as the parking brake lining – due to the inadequate float problem – sticking out of position and making contact with the spinning parking brake drum. Mr. Bryant asserts this contact grinds down the linings to such a degree that the space between the lining and drum becomes too wide. This results in the linings and drum making no or insufficient contact when the parking brake pedal is depressed.

Mr. Bryant has asserted claims for breach of express and implied warranty of merchantability, both under the Uniform Commercial Code ("UCC") and the federal Magnusson-Moss Warranty Act. 15 U.S.C. §2301 *et seq*. He has also brought claims for unjust enrichment and fraudulent concealment because, he claims, GM knew about the defective parking brake, yet knowingly concealed its existence from class members, including class members that had not yet purchased class vehicles. Mr. Bryant believes GM concealed the alleged defect so that the limited warranties on certain GM vehicles would expire, facilitating non-payment of warranty claims.

Claiming the parking brakes on his own Tahoe Z-71 are defective and will not hold his vehicle on a hill, and further that he was defrauded by GM, Mr. Bryant has moved for class certification. The Court has received briefing from Mr. Bryant in support of his motion. It has also received briefing from GM in support of its position that Mr. Bryant's case is not suitable for class certification. Attached to the briefing filed by both Mr. Bryant and of GM is extensive documentary evidence, nearly all of which consists of GM's own documents produced in this litigation. At the September 28, 2006 class certification hearing, over no objection from the parties, the Court admitted into evidence all documents attached to the parties' briefing. It also admitted into evidence GM's responses to Mr. Bryant's requests for admission; a GM-produced CD containing written limited warranties applicable to class vehicles; affidavits from Mr.

– 2 –

P2459

Bryant and William Coleman[1], an expert witness retained by Mr. Bryant; and a document containing the National Highway Traffic and Safety Administration's (NHTSA) finding that it would not further entertain a recall of class vehicles. Moreover, the Court received stipulations from the parties that Mr. Bryant currently owns his 2002 Chevrolet Z-71 Tahoe, that his vehicle is registered in Arkansas, and that Mr. Bryant received a typical GM three year/36,000 mile written limited warranty at the time he purchased his vehicle. Finally, GM stipulated to the Rule 23(a)(1) class-certification element of numerosity. The parties called no live witnesses to testify at the class-certification hearing.

The Court has been asked by GM to make written findings of fact and conclusions of law in connection with ruling on Mr. Bryant's motion for class certification. *See* Ark. R. Civ. P. 52. The Court has carefully taken notice of and reviewed the pleadings currently on file, the briefing and evidence submitted by the parties, and evaluated their respective oral arguments made at the September 28, 2006 hearing. The Court, exercising its discretion to do so, determines this matter is suitable for class certification under Ark. R. Civ. P. 23(a) and (b) and orders that it be certified as a class action. Its Rule 52 findings of fact and conclusion of law supporting this ruling and order are set forth herein as follows.

## II.

### Findings of Fact

1.    Defendant General Motors Corporation ("GM") manufactured and sold through dealers throughout the United States the following vehicles:

i)    Model-year 1999-2004 C/K 15 Series pickup trucks with a Gross Vehicle Weight Rating ("GVWR") of less than or equal to 6400 lbs. (with the exception of 2003-2004 Silverado SS model);

---

[1]    Attached to Mr. Coleman's affidavit were authenticated pictures of Mr. Bryant's parking brakes, as well as a DVD containing a roll demonstration involving Mr. Bryant's vehicle conducted by Mr. Bryant and Mr. Coleman.

—3—

P2480

ii)    Model-year 1999-2004 C/K 15 Series SUV/UUVs with a GVWR of less than or equal to 7200 lbs.;

iii)    Model-year 2002 K15706 Cadillac Escalade and 2002 K15936 Cadillac Escalade.

P. Exh. "1", p. 1. The "C" signifies two-wheel drive, while "K" signifies four-wheel drive. P. Exh. "22", p. 101, lines 14-23.

2.    GM collectively describes these vehicles as "1500 Series pickups and utilities." P. Exh. 2, *passim;* Exh. 9, *passim;* P. RFA Answers 1-5. GM also refers to these vehicles as "GMT 800 1500 Series vehicles."[2]

3.    All 1500 Series pickups and utilities were originally equipped, manufactured and sold by GM with a single shoe, PBR 210x30 Drum-in-Hat parking brake system. P. Exh. "2", GM000036104 ("The entire population of 1500 Series vehicles is equipped with the PBR single-shoe parking brake system with the exception of certain crew cab models."); P. RFA Answers 1-5.

4.    GM is responsible for integrating the PBR 210x30 Drum-in-Hat park brake system into these vehicles. P. Exh. "2", GM000036113; P. Exh. "9", p. 11 of 13; P. Exh. "23", p. 34 (lines 5-9).

5.    The PBR 210x30 Drum-in-Hat parking brake system in 1500 Series pickups and utilities is operated by foot pedal near the vehicle floor to the left of the accelerator pedal and service brake. It has an intended use as a parking assist device to be used in conjunction with the transmission in its "park" position (automatic transmission) or in reverse gear (manual transmission). P. Exh. "8", GM000036753; P. Exh. "15", GM000025715; P. Exh. "22", p. 145 (lines 18-25); 146 (lines 1-11); P. Exh. "23", p. 88 (lines 4-9).

---

[2]    The Court will adopt GM's terminology and refer to the vehicles described in paragraph 1. above as "1500 Series pickups and utilities".

— 4 —

P2481

6.    In numerous places in its owners' manuals for 1500 Series pickups and utilities, GM cautions "[i]t is dangerous to get out of your vehicle if the shift lever is not fully in PARK (P) with the parking brake firmly set. Your vehicle can roll." P. Exh. "24", pp. 2-32; 2-39; 2-41; 2-42; 4-89; P. Exh. "15", GM000025718. Given this language -- which makes no distinction between manual and automatic transmission vehicles -- the Court finds the parking brake, even on automatic transmission vehicles, is not a superfluous item as GM seems to suggest in its briefing.[3]

7.    GM expects people will use their owner's manuals. The information is there for their benefit in how to maintain their vehicle and how to operate their vehicle. P. Exh. "22", p. 127 (lines 10-18). GM owners' manuals, as a general proposition, prescribe how GM believes 1500 Series pickups and utilities should ordinarily be used by their owners or operators. P. RFA Answer 54.

8.    Most vehicles with automatic transmissions experience infrequent parking brake application by their owners, drivers, or users in normal operations. P. RFA Answer 56.

9.    The parking brake's linings, made of a friction material known as T103, sit inside a hollow metal cylinder or drum attached to the inboard portion of the vehicle's wheel. Exh.

---

[3]    As additional support for the idea that parking brakes on GM vehicles are not unnecessary, even on automatic transmission vehicles, the GM Vehicle Technical Specifications (VTS) for model-year 1999-2002 1500 Series pickups and utilities specify the park brake *shall* hold the vehicle stationary at Gross Vehicle Weight (GVW) with the transmission in neutral. P. Exh. "15", GM000025714; P. Exh. "19", VTS 3.2.1.13.7.1 "Vehicle Parking Gradeability" ("The park brake shall hold the vehicle stationary at GVW, with the transmission in neutral."); P. Exh. "23", p. 46 (line 25); p. 47 (lines 1-20). Moreover, without distinguishing between manual and automatic transmission vehicles, the GM VTS applicable to the model-year 1999-2002 1500 Series pickups and utilities require the PBR 210x30 Drum-in-Hat parking brake system to enable and endure a total of 20 simulated police style U-turns without loss of function. P. Exh. "19", VTS 3.2.1.5.7.2 "Simulated Police-Style U-turns". The applicable VTS also require the parking brake system to enable and endure 4 dynamic stops at 60 mph without loss of function. P. Exh. "19", VTS 3.2.1.5.7.3 "Dynamic Park Brake Stop". Finally, federal motor vehicle safety regulations governing vehicles such as model-year 1999-2002 1500 Series pickups and utilities state such vehicles "shall be manufactured with a parking brake system of a friction type with a solely mechanical means to retain engagement." P. Exh. "20". GM has admitted that if its vehicles do not meet federal safety standards, it cannot sell such non-compliant vehicles. P. Exh. "23", p. 49 (lines 2-5)

-- 5 --

P2482

"23", p. 94 (lines 20-24). When the wheel turns, the drum (also referred to as a "rotor") likewise turns. When the parking-brake foot pedal is depressed a cable-actuated piston causes the parking brake's linings to travel or expand outward and contact the inner portion of the drum. *See* P. Exh. "8", GM000036753. The design intent is that the contact of the parking brake's lining with the drum will, as a matter of friction and torque, prevent the wheel from turning and hold the vehicle motionless while parked, even if the transmission is in neutral or out of gear. *Id.*

10.     The PBR 210x30 Drum-in-Hat parking brake system on 1999-2002 model-year 1500 Series pickups and utilities was originally assembled and distributed with what GM calls a "high-force spring clip retainer." P. Exh. "6", GM000036718.

11.     The specific GM model codes for the 1999-2002 model-year 1500 Series pickups and utilities containing parking brakes with high-force spring clip retainers are as follows:

| 1500 Series Pickup: | C-K15703 (MY 99-02) |
|---|---|
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| | |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

P. Exh. "6", GM000036718. In light of GM's 2005 recall of manual transmission vehicles, discussed *infra*, the automatic-transmission versions of these vehicles are the only ones at issue in Mr. Bryant's proposed class action. That is, the automatic-transmission versions of these model-coded vehicles are the class vehicles.[4]

---

[4]     GM manufactured 3,905,481 model-year 1999-2002 1500 Series pickups and utilities vehicles with automatic transmissions and equipped with parking brakes containing high-force spring clip retainers. P. Exh. "2", GM000036106.

-- 6 --

P2463

12.    The function of the spring-clip retainer is to ensure the parking brake linings, when not in use, are retracted and properly positioned -- concentric with the drum -- such that when the foot pedal is depressed and the linings travel outward, they are properly centered and make contact with the correct place on the interior of the drum. P. Exh. "8", GM000036754.

13.    GM admits the high-force spring clip retainer installed on model-year 1999-2002 1500 Series pickups and utilities does not function properly in that it exerts more retaining force than aligning forces tending to center the parking brake linings in relation to the drum. P. Exh. "2", GM000036107; P. Exh. "8", GM000036754; P. Exh. "9", p. 2 of 13; P. Exh. "23", p. 77 (lines 1-18); p. 78 (lines 1-7).

14.    The exertion of excessive retaining force is also characterized by GM as the high-force spring clip retainer not allowing the brake shoe and attached linings to "float" inside the drum and remain concentric with the drum. P. Exh. "2", GM000036102; P. Exh. "9"; P. Exh. "30", GM000038052; P. Exh. "3", GM000036624. Mr. Bryant contends this alleged inadequate shoe/lining float problem is the principle result of the defectively designed high-force spring clip retainer. Mr. Bryant claims the inadequate shoe/lining float problem exists the very moment each class vehicle rolls off its assembly line, and is persistent. That is, it reveals itself each time a class vehicle is driven. Based on a review of Mr. Bryant's cited evidence, and the evidentiary record as a whole, the Court agrees with Mr. Bryant and finds the high-force spring clip retainer, if it is indeed defectively designed (an issue ultimately to be determined by the trier of fact), to create a common, inadequate shoe/lining float problem in all class vehicles, which is persistent, which occurs each time a class vehicle is driven, and which exists, if at all, from the time class vehicles roll off their respective assembly lines.

-- 7 --

P2464

15.    This exertion of excessive retaining force by the high-force spring clip retainer can result in a loss of concentricity between the linings and drum. P. Exh. "2", GM000036102; P. Exh. "9", p. 4 of 13 This loss of concentricity, which may be prompted by inertia-induced movement of the parking-brake linings during vehicle travel, rough road inputs, and/or axle deflection occurring during certain vehicle cornering or loading conditions[5], can also allow or further result in unintended, intermittent contact between the parking brake linings and drum during vehicle travel. P. Exh. "2", GM000036107; P. Exh. "8", GM000036754; P. Exh. "9", pp. 1 and 2 of 13; P. Exh. "15, GM000025715; Exh. "23" (lines 3-22)(". . . .[a] severe pothole or some other intertial event [] would move the park brake out of its center position, and then this original clip might not allow it to return back to that center position as readily."); P. RFA Answer 35.

16.    This unintended, intermittent contact between the linings and drum during travel – a condition GM has termed parking brake "self-application" or "self-energizing" -- essentially grinds down the parking brake lining and promotes excessive, premature lining wear. *See* P. Exh. "2", GM000036102; P. Exh. 3, GM000036624 ("Park brakes are wearing out due to 'self energizing.'"); P. Exh. "8", GM000036754 ("Relative motion of the drum during driving acts to self-energize the brake so as to maintain drum/lining contact and may occur even in the absence

---

[5]    With regard to inertia-induced movement of the parking-brake linings, and how it affects parking brake performance on 1999-2002 model-year 1500 Series pickups and utilities, GM has further admitted to additional design-related shortcomings regarding the PBR 210x30 Drum In Hat parking brake system. First, it has admitted to design failure in that load-induced axle shaft deflection under high-g cornering was not comprehended as a cause of potential parking brake lining wear in the Design Failure Mode Effects Analysis (DFMEA), and that such failure to comprehend is something representing a process non-existent, inadequate or missed by GM. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13. Similarly, GM has admitted design failure in that the Subsystem Technical Specification (STS) for 1999 through 2002 model year 1500 Series pickups and utilities did not contain a maximum allowable limit for axle shaft deflection, and that such omission is something representing a process non-existent, inadequate or missed by GM. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13. Finally, GM has admitted design failure in that in the pre-production design phase it did not adequately test or perform durability validation with respect to the PBR 210x30 Drum-in-Hat parking brake system in 1999 through 2002 model year 1500 Series pickups and utilities vehicles. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13.

of a parking brake application."); P. Exh. "9", p. 2 of 13; P. Exh. "15, GM000025715; P. Exh. "23", p. 83 (lines 6-16) ("The self-energizing is where you get contact between the linings and the rotor that, due to the direction of rotation of the rotor, it tends to pull the lining in. It creates more contact rather than pushing it away.").

17.     Excessive lining wear results in too large of a gap between the lining and the drum such that depressing the park brake will not cause the lining to travel far enough to make sufficient contact with the drum and hold the vehicle motionless. P. Exh. "2", GM000036107; P. Exh. "9", pp. 1 and 2 of 13. In GM's own words, parking brake "[l]ining wear can increase the clearance between the linings and the parking brake drum to a point where the required apply lever travel and associated shoe travel exceed the design capabilities of the apply system, reducing its ability to generate sufficient park brake torque to hold the vehicle motionless." P. Exh. "2", GM000036107; P. Exh. "9", pp. 1 and 2 of 13; P. Exh. "15, GM000025716.

18.     GM has also admitted the design of the PBR 210x30 Drum-in-Hat parking brake system with the high force spring clip retainer is ". . . .less than optimal because it is overly sensitive to proper lining-to-drum clearances." P. Exh. "2", GM000036107; P. Exh. "7"; P. Exh. "9", p. 11 of 13. The Court finds this admission to describe an additional potential design defect in the PBR 210x30 Drum-in-Hat parking brake system in model year 1999-2002 1500 Series pickups and utilities. This potential defect is significant, given GM's apparent position, based on the affidavit of Jason Petrie, that the parking brake linings on Mr. Bryant's vehicle were not excessively worn, but rather were merely out of adjustment and gapped too far away from the brake drum. Even if GM is correct (the Court does not believe it is, especially based on the contents of William Coleman's affidavit and measurements on Mr. Bryant's vehicle Mr. Coleman made), the Court finds the condition of the PBR 210x30 Drum-in-Hat parking brake

—9—

. P2466

system being overly sensitive to proper lining to drum clearances is yet another example of a universal, alleged defect in all class vehicles that persistently exists and is actionable on a class-wide basis.

19.     GM maintains a Problem Resolution Tracking System ("PRTS"). P. Exh. "22", p. 63, lines 17-25. The PRTS was triggered regarding the parking brake due to higher-than-expected-warranty claims. *Id.* at 64, lines 15-19.

20.     The PRTS regarding the defective parking brakes "was initiated at the end of 2000 and was assigned to engineering in early 2001." P. Exh. "22", p. 64, lines 20-25; p. 65, lines 1-5.

21.     The GM Truck Group began 5-Phase Action plan CK800U0331 regarding defective parking brakes on January 29, 2001. P. Exh. 29. In the written document corresponding to that plan, GM noted the park brake "[s]ystem was found in many cases to not be able to hold after a low amount of miles (2500-6000). This condition was found in the system 2A and 2B park brakes."[6] *Id.*, GM000037499.

22.     The component manufacturer of the parking brake, PBR Banksia ("PBR"), performed testing on the PBR 210x30 Drum-in-Hat parking brake system originally utilized in 1999 through 2002 model year 1500 Series pickups and utilities. From its testing it concluded that at 10,048 miles the defective parking brakes needed a first adjustment and that at 27,273 miles the defective parking brakes' linings wear to steel. P. Exh. "10" (bar chart entitled "Wear Life Comparison, Original T800, Low Load, Twin Clip"); P. Exh. "23", p. 23 lines 3-25; p. 24 (entire); p. 25 (lines 1-10); p. 26 (lines 22-25); p. 27 (lines 1-10). PBR has actually estimated the parking brake lining life in 1999-2002 model year 1500 Series pickups and utilities, due to

---

[6]     The "system 2A and 2B park brakes" are in essence the PBR 210x30 Drum-in-Hat parking brake system. P. Exh. "1".

-- 10 --

P2487

the alleged defect, to be a mere 30,000 to 35,000 miles, only 1/5 of the expected life of such

vehicles, and before expiration of the 36,000 mile written limited warranty provided by GM to

vehicle purchasers. P. Exh. "11" ("Lining Life Estimates: Original design = 30-35,000 miles");

P. Exh. "25", p. 7 (Section entitled "1999 General Motors Corporation New Vehicle

Warranty").

23.    GM expects the life of all 1500 Series pickups and utilities to be 10 years of exposure or

150,000 miles. P. Exh. "19", VTS 3.2.1.1 "Target Life"; P. Exh. "22", p. 124 (lines 11-14); P.

Exh. "23", p. 27 lines 23-25; p. 28 (lines 1-4). No criteria or performance standards concerning

expected mileage or months of service of the parking brake, including parking brake linings, is

set forth in the GM Vehicle Technical Specification (VTS) or GM Sub-System Technical

Specification (SSTS) for 1500 Series pickups and utilities. P. Exh. "15", GM000025714; P.

Exh. "16", GM000029872; P. Exh. "19"; P. Exh. "22", p. 66 (lines 1-17). Similarly, the VTS

for 1500 Series pickups and utilities indicates parking brake linings are not considered items

that will "wear out" or are "wear out items". Exh. "19", VTS 3.2.3.1."Wearout Items"; VTS

3.2.3.1.1 "Brake Wearout Items"; Exh. "22", p. 72 (lines 18-25);  p. 73 (line 1)("The park brake,

if adjusted correctly and maintained, I believe the expectation is that they will not wear out

based on them not being on this wear-out item matrix."); Exh. 23, p. 28 (lines 2-7)(Question: "Is

it your understanding that the park brake linings are supposed to last [the 150,000 mile target

life of the vehicles]?"  Answer: "Yes").  On the other hand, a performance standard of 40,000

miles for the service brake linings is prescribed in the GM Vehicle Technical Specification

(VTS) for 1500 Series pickups and utilities. Exh. "19", VTS 3.2.3.1.1 "Wearout Items"; Exh.

"22", p. 66 (lines 18-25; 67 lines 1-10; p. 70, lines 12-22).  In the Court's mind, the only

inference that can be drawn from these omissions and the existence of a specific standard for

-- 11 --

P2468

service brakes is that GM has always expected the parking brake linings on these vehicles to last the expected vehicle life, ie. 10 years of exposure or 150,000 miles. Indeed, GM's own VTS confirms this, stating the "Target Life" of the parking brake is essentially 10 years of exposure of 150,000 miles. P. Exh. "19", 3.2.3.1 "Target Life".

24.    In October 2001 GM concluded the design of the parking brake, including its spring clip retainer, was faulty. P. Exh. "2", GM000036102; P. Exh. 9, p. 4 of 13.

25.    On October 19, 2001 GM initiated an Engineering Work Order (EWO) to release a spring clip retainer with lower retaining force. P. Exh. "2", GM000036102, GM000036106, GM000036109; P. Exh. "9", p. 4 of 13. This release was effective with 2003 model year start of production. Id. ; P. RFA 82 Answer.

26.    GM believed the reduced force spring clip retainer would ". . . .minimize the lining self energizing by allowing the lining to float easier and not "stick" to the inside of the rotor during operation on rough roads." P. Exh. "30", GM000038052.

27.    The implementation of the low-load or reduced force spring clip retainer beginning with model year 2003 1500 Series pickups and utilities has effectively eliminated the intermittent contact condition between the parking brake lining and the parking brake surface or drum during vehicle travel. P. Exh. "9", p. 4 of 13 ("Implementation was effective with 2003 start of production, after which the warranty repair rate due to lining wear became insignificant."); P. Exh. "23", p. 77 (lines 1-18); p. 78 (lines 1-7).

28.    All 1999 through 2002 model year 1500 Series pickups and utilities are covered by a GM bumper-to-bumper new vehicle warranty for three (3) years or 36,000 miles. P. Exh "15", GM000025710 ("The subject vehicles, with the exception of the Cadillac vehicles, are covered by a bumper-to-bumper new vehicle limited warranty for three years or 36,000 miles whichever

— 12 —

P2469

-Add 579-

occurs first.); P. Exh. "16", GM000029865 ("The subject vehicles, with the exception of the

Cadillac vehicles, are covered by a bumper-to-bumper new vehicle limited warranty for three

years or 36,000 miles whichever occurs first. The Cadillac subject vehicles are covered by a

bumper-to-bumper new vehicle limited warranty for four years or 50,0000 miles whichever

occurs first."); Exh. "25", pp. 7-11 (Section entitled "1999 General Motors Corporation New

Vehicle Warranty"); GM CD containing warranty booklets admitted into evidence at the class-

certification hearing. In relevant part, the limited warranty language regarding coverage is as

follows:

### WHAT IS COVERED

#### WARRANTY APPLIES

THIS WARRANTY IS FOR GM VEHICLES REGISTERED IN THE UNITED STATES NORMALLY OPERATED IN THE UNITED STATES OR CANADA, AND IS PROVIDED TO THE ORIGINAL AND ANY SUBSEQUENT OWNERS OF THE VEHICLE DURING THE WARRANTY PERIOD.

#### REPAIRS COVERED

THE WARRANTY COVERS REPAIRS TO CORRECT ANY VEHICLE DEFECT RELATED TO MATERIALS OR WORKMANSHIP OCCURRING DURING THE WARRANTY PERIOD. NEEDED REPAIRS WILL BE PERFORMED USING NEW OR REMANUFACTURED PARTS.

#### WARRANTY PERIOD

THE WARRANTY PERIOD FOR ALL COVERAGES BEGINS ON THE DATE THE VEHICLE IS FIRST DELIVERED OR PUT IN USE AND ENDS AT THE EXPIRATION OF THE COVERAGE PERIOD.

#### BUMPER-TO-BUMPER COVERAGE

THE COMPLETE VEHICLE IS COVERED FOR 3 YEARS OR 36,000 MILES, WHICHEVER COMES FIRST. . . .
NO CHARGE

WARRANTY REPAIRS, INCLUDING TOWING, PARTS AND LABOR, WILL BE MADE AT NO CHARGE, LESS ANY APPLICABLE DEDUCTIBLE.

OTHER TERMS: THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

GENERAL MOTORS DOES NOT AUTHORIZE ANY PERSON TO CREATE FOR IT ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH THESE VEHICLES. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY. PERFORMANCE OF REPAIRS AND NEEDED ADJUSTMENTS IS THE EXCLUSIVE REMEDY UNDER THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY. GENERAL MOTORS SHALL NOT BE LIABLE FOR

-- 13 --

P2470

INCIDENTAL OR CONSEQUENTIAL DAMAGES (SUCH AS, BUT NOT LIMITED TO, LOST WAGES OR
VEHICLE RENTAL EXPENSES) RESULTING FROM THE BREACH OF THIS WRITTEN WARRANTY OR
ANY IMPLIED WARRANTY.

The Court finds this coverage language is identical in material respects for all 1999 through 2002
model year 1500 Series pickups and utilities. *Id.*

29.    On September 17, 2002 (eleven months after issuance of the GM engineering work order
to re-engineer the high-force spring clip retainer) GM released technical service bulletin #02-05-
26-011 to its dealers. P. Exh. "22", p. 46, lines 2-7. In this bulletin it was noted "[a] rear
parking brake retaining spring clip kit has been released for service." Significantly, however, it
also stated "Important – The spring clip kits mentioned in this bulletin do not address any
parking brake concerns." Exh. "13" The Court finds, as Mr. Bryant has argued, that this
language is troubling and can be construed as an effort on GM's part to conceal – to the
detriment of all class members -- its responsibility for problems with the PBR 210x30 Drum-in-
Hat parking brake system to avoid paying warranty claims. To begin with, the Court does not
understand why GM waited eleven (11) months after it re-engineered the high-force spring clip
retainer on October 19, 2001 to issue a bulletin regarding vehicles that had been manufactured
with the high-force clip. For the bulletin to then contain this language, in the Court's view, is
triable evidence GM wanted to conceal its responsibility for the design problem from all class
members. The fact the three-year GM limited warranties were beginning to expire in August
2001 only reinforces the Court's view that GM's conduct may have been inappropriate,
designed either to avoid paying warranty claims or to induce prospective sales of class vehicles.

30.    On January 28, 2003 – roughly two years after GM engineering received notice of
parking brake problems -- GM published technical service bulletin 02-05-26-002A and sent it to
dealers. It was in this service bulletin that GM first acknowledged to outside entities such as

– 14 –

P2471

dealers that scraping noise from the rear of vehicles "may [sic] due to the parking brake shoe contacting the drum in hat rotor without the parking brake being applied, causing premature wear on the shoe lining." P. Exh. "2", GM000036109; P. Exh. "14"; P. Exh. "22", p. 46.

31.    In December 2003 the National Highway Traffic and Safety Administration (NHTSA) issued Preliminary Evaluation Information Request ("IR") PE03-057 regarding allegations of parking brake ineffectiveness on model year 1999-2003 full-size pickup trucks built on the GMT 800 platform and equipped with manual transmissions and drum-in-hat parking brakes. P. Exh. "2", GM000036103; P. Exh. "9", p. 4 of 13

32.    In mid-February 2004 GM provided a response to the NHTSA IR and thereafter engaged in vehicle testing regarding the defective parking brake. P. Exh. "2", GM000036103; P. Exh. "15".

33.    On November 18, 2004 NHTSA issued engineering analysis IR EA04-011, which expanded the scope of the initial IR to include all model year 1998-2004 full-size pickup trucks and utilities built on either the GMT 400 or GMT 800 platform and equipped with either a manual or automatic transmission. P. Exh. "2", GM000036102.

34.    The primary concern of the NHTSA investigation directed at the PBR 210x30 Drum-in-Hat parking brake system in 1999 through 2002 model year 1500 Series pickups and utilities was vehicle rollaways. P. Exh. "8", GM000036756.

35.    On April 18, 2005, after the issue of the defective parking brake was presented to the Senior Management Committee, GM's Field Action Decision Committee decided to conduct a safety recall. P. Exh. "17", p. 2

36.    On April 20, 2005 GM sent NHTSA written notification of this decision. P. Exh. "17" In that correspondence GM stated "General Motors has decided that a defect, which relates to

— 15 —

P2472

motor vehicle safety, exists in certain 1999-2002 C/K Series (PBR parking brake system). . . .pickups with manual transmissions. Some of these vehicles have a condition in which the parking brake friction linings may wear to an extent where the parking brake can become ineffective in immobilizing a parked vehicle." P. Exh. "17", p. 1

37.    In July 2005 GM issued Recall Bulletin 05042, which applied only to manual transmission versions of 1999-2002 1500 Series pickups and utilities. P. Exh. "18".

38.    GM projected the cost to recall only 1999-2002 1500 Series pickups and utilities manual transmission vehicles with defective parking brakes to be $6,645,793. P. Exh. "4", GM000036679-80.

39.    In contrast, GM projected the cost to recall both the manual and automatic transmission version of such vehicles to be fifty (50) times greater, or $350,083,047. P. Exh. "4", GM000036679-80.

40.    To date GM has neither contacted owners of nor recalled any of the 3,905,481 model-year 1999-2002 1500 Series pickups and utilities with automatic transmissions, the class vehicles here, based on parking brake concerns. Exh. "22", p. 39, lines 13-17; p. 42, lines 7-10.

41.    The PBR 210x30 Drum-in-Hat park brake system utilized in manual transmission 1999-2002 1500 Series pickups and utilities is identical to the PBR 210x30 Drum-in-Hat park brake system installed on automatic-transmission 1999-2002 1500 Series pickups and utilities. Moreover, "the same physical parking brake wear mechanism is also present on vehicles with automatic transmissions. . . ." P. Exh. "5"; P. Exh. "22", p. 43, lines 5-9; P. P. Exh. "23", p. 36 (lines 20-25); p. 37 (lines 1-25); p. 38 (lines 1-8).

42.    The remedy in Recall Bulletin 05042 is that GM instructs dealers to "inspect the parking brake lining thickness on both rear brakes, and depending on the amount of lining remaining,

-- 16 --

P2473

install either a reduced force parking brake retainer spring clip on both rear brakes or parking

brake shoe kits, which includes the reduced force clip." P. Exh. "18", p. 1.

43.    In all cases GM's recall remedy is to supply a reduced force spring clip retainer. *Id.*

This is consistent with GM's belief that implementation of the low-load or reduced force spring

clip retainer beginning with model year 2003 1500 Series pickups and utilities effectively

eliminates the intermittent contact condition between the parking brake lining and the parking

brake surface or drum during vehicle travel.

44.    GM's recall test for excessive lining wear is that the parking brake lining thickness must

equal or exceed 1.5 millimeters (.06 inches) in at least 6 places on each side of the vehicle. P.

Exh. 2, GM000036108; P. Exh. "18", p.4. As per GM's recall materials, in the event parking

brake lining thickness is less than 1.5 millimeters (.06 inches) on any of at least 6 places on each

side of the vehicle, GM instructed its dealers to install a new parking brake lining on both sides

of the vehicle. Exh. 2, GM000036108; Exh. "18", p.4.

45.    In sum, if the linings are not sufficiently worn, Recall Bulletin 05042 only entails

installation of a reduced force parking brake retainer spring clip on both rear brakes. However,

if the linings are excessively worn, the recall requires both the replacement of the linings and a

reduced force spring clip retainer.

46.    GM's dealer sales and service agreement requires its dealers nationwide to perform

recall-related repairs. P. RFA Answer 157.

47.    GM has estimated .9 hours per vehicle at an hourly labor rate of $71.19 to represent

labor costs in terms of dealers inspecting and correcting the parking brake defect. P. Exh. "2",

GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 153.

-- 17 --

P2474

48.    GM has estimated $4.93 to represent its cost for corrective parts, per vehicle, in terms of dealers inspecting and correcting the parking brake defect. P. Exh. "2", GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 154.

49.    GM has estimated $1.00 per initial notice letter per vehicle (First Class Mail) and $0.36 for "customer follow up" per vehicle as administrative costs associated with dealers inspecting and correcting the parking brake defect. P. Exh. "2", GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 155.

50.    On May 10, 2005 NHTSA's Office of Defect Investigations (ODI) issued an "ODI Resume" and "Engineering Analysis Closing Report" closing its engineering analysis Investigation EA 04-011 regarding the defective parking brakes. P. Exh. "8"

51.    NHTSA closed the investigation because it determined vehicle rollaways – again, the primary concern of the investigation – would be prevented by GM's recall of manual-transmission 1999-2002 1500 Series pickups and utilities. P. Exh. "8", GM000036756-000036757.

52.    In closing its investigation NHTSA stated, "The Engineering Analysis is closed because GM's recall action will remedy the defect condition in the MY 1999-2003 C/K 1500 pickup trucks equipped with manual transmissions." P. Exh. "8", GM000036757.

53.    As demonstrated by responses to NHTSA and the recall campaign in general, GM has the ability to conduct a Vehicle Identification Number (VIN) search within its internal databases and identify the name, address and telephone number of each original purchaser or owner of 1999 through 2002 model year 1500 Series pickups and utilities. P. Exh. "15", GM000025708; *see also* P. RFA Answers 97-101.

-- 18 --

P2475

-Add 585-

54.    In addition, on-line internet access at GM's owner website, www.mygmlink.com, provides a way for owners of 1999 through 2002 model year 1500 Series pickups and utilities to obtain personalized information for their specific vehicles. GM controls the format and content of this website, with some limitations. P. Exh. "17", p. 16; *see also* P. RFA Answers 159-161.

55.    GM also has the ability to obtain contact information (name and address) for current or used vehicle owners by contacting an "outside supplier" and having it obtain registration information for all desired or affected VINs. P. Exh. "22", p. 38, lines 14-25.

56.    On April 4, 2002 Plaintiff Boyd Bryant, at the time and currently a resident of Fouke, Miller County, Arkansas, purchased and took delivery of a new 2002 Chevrolet Tahoe Z-71, VIN 1GNEK13282R268414 ("the Bryant vehicle") from Tom Morrick Chevrolet, Inc. in Ashdown, Arkansas. P. Exh. "26". By stipulation of the parties, Mr. Bryant received a standard GM three-year/36,000 mile written limited warranty (as identified and discussed above) at the time he purchased the Bryant vehicle.

57.    Mr. Bryant presently owns the Bryant vehicle; it has approximately 81,000 miles on it.

58.    The Bryant vehicle falls within the description of 1999 through 2002 model year 1500 Series pickups and utilities and, more particularly, is one of the "utilities" in that description.

59.    The Bryant vehicle was originally equipped with a PBR 210x30 Drum-in-Hat park brake system utilizing high-force spring clip retainers. P. Exh. "28", p. 8 (". . . the parking brake on Mr. Bryant's vehicle was a PBR parking brake."). The Bryant vehicle is still equipped with a PBR 210x30 Drum-in-Hat park brake system utilizing high-force spring clip retainers. *See* photographs attached to William Coleman's affidavit.

60.    Plaintiff's engineer expert, William Coleman, measured the parking brake lining thickness on the Bryant vehicle, and in at least one place on the passenger side it is less than 1.5

-- 19 --

P2478

-Add 586-

millimeters (.06 inches). *See* William Coleman affidavit; photographs attached to and authenticated by Mr. Coleman's affidavit. Based on this measurement, the Court finds the Bryant vehicle is exhibiting lining wear consistent with the inadequate lining float Mr. Bryant alleges is associated with GM's use of the high-force spring clip retainers.

61.    Mr. Coleman also tested the Bryant vehicle for parking brake functionality. With the parking brake fully depressed and the transmission in neutral, the Bryant vehicle rolls on both steep and lesser hills or grades. William Coleman affidavit; *see* DVD containing videotaped footage of the hill testing of the Bryant vehicle. Accordingly, the Bryant vehicle[7] is exhibiting lack-of-parking-brake functionality consistent with the presence of the defect associated with GM's use of the high-force spring clip retainers.

62.    As per his affidavit, Mr. Bryant has reviewed the original and amended pleadings in this matter, and understands the allegations against GM. He also understands his duties and obligations as a class representative and has testified that he has complied with them by, among

---

[7]    According to GM, the 1500 Series utilities like the Bryant vehicle (ie. sport utility vehicles such as Chevrolet Tahoes and Suburbans, and GMC Yukons and Yukon XLs) have experienced the defect-related premature lining wear more than any other category of vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles. P. Exh. "5". By GM's own admission, the reason the 1999-2002 1500 series utilities are more prone to poor parking brake performance is that 1500 Series utilities have the following unique design characteristics or traits:

　　Small axle shaft diameters relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles;

　　The highest GVW ratings relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles;

　　The greatest unladen weights relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles.

　　They have coil-spring suspensions with unique spring and shock absorber calibrations compared to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles.

P. Exh. "2", GM000036106; Exh "5". These factors subject the 1500 Series utilities to greater parking brake shoe inertia and axle shaft deflection, resulting in accelerated parking brake lining wear. *Id.*

-- 20 --

P2477

other things, giving a deposition in this case, assisting with written discovery answers, and by staying in touch with representative counsel during this litigation to keep aware of status and progress of this lawsuit. In that vein, the Court notes Mr. Bryant not only participated in at least two inspections of Z-71 Tahoe, as well as a roll test of this vehicle, but he also attended part of the class-certification hearing, even though it occurred on one of his off days from his employment.

63.    Mr. Bryant further agrees to fairly and adequately represent other members of any designated class with similar claims and damages because of the importance that all benefit from this lawsuit equally.

64.    Finally, he states there is no collusion or conflicting interest between members of the proposed class and him.

### III.

### Conclusions of Law

A.    Mr. Bryant's Class Definition.

1.    Before the six (6) criteria for class certification under Rule 23 are analyzed, the trial court must determine whether a class, in fact, exists. *E.g. State Farm Fire & Cas. Co. v. Ledbetter*, 355 Ark. 28, 129 S.W.3d 815 (2003). A class must be susceptible to precise definition. Its description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class, and the identity of the class members must be ascertainable by reference to objective criteria. *Arkansas Blue Cross and Blue Shield v. Hicks*, 349 Ark. 269, 78 S.W.3d 58 (2002). Part of the "objective criteria" requirement is that a class may not be defined in a manner that would require the trial

-- 21 --

P2478

court to inquire into the merits of each class member's case in order to determine whether he is a suitable class member. *Ledbetter*, 355 Ark. at 37.

2.    Mr. Bryant has moved under Ark. R. Civ. P. 23 for certification of the following nationwide class of GM vehicle owners:

> *"Owners" or "subsequent owners" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer[8], that registered his vehicle in any state in the United States.*

Excluded from Mr. Bryant's proposed class are the following individuals or entities:

   a.    Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

   b.    Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

   c.    Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

   d.    Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

---

[8]    The term "1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer" as utilized in his class definition refers to the following GM model-year and model-coded vehicles equipped with automatic transmissions:

| | |
|---|---|
| 1500 Series Pickup: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| | |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

-- 22 --

P2479

e.    Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin that have previously been issued.

3.    The Court concludes the nationwide class for which Mr. Bryant seeks certification both exists and is susceptible to precise definition. The terms "owners" and "subsequent owners" are taken from GM's own warranty publications. Thus GM cannot complain of the class not being susceptible to precise definition, nor of it not being ascertainable by reference to objective criteria. Moreover, GM has admitted it has the ability to provide personal information (name, address, telephone number) regarding original vehicle purchasers via its warranty database, as well as current vehicle owners via third party vendors that conduct VIN searches. Finally, the fact GM has conducted a recall on the manual-transmission versions of class vehicles demonstrates it is administratively feasible for GM not only to identify class members, but also to contact them.

4.    GM contends the class is not susceptible to precise definition because class member status is dependent upon "when the alleged damage (parking brake failure) occurred." GM also contends Mr. Bryant's class definition is flawed because it "continu[es] to shift on a daily basis as large numbers of the four million vehicles are sold. . . ." Both of GM's arguments lack merit. First, the Court has concluded the "failure" as alleged by Mr. Bryant -- the inadequate lining float -- occurs from day one off the assembly line. Consequently, all "owners" and "subsequent owners" experienced the "failure" at delivery and are continuing to experience it, if it is ultimately proven to exist. There is no single post-purchase date of "failure" which might taint Mr. Bryant's class definition here. As for GM's other argument, there will obviously be some daily shift in class vehicle ownership that may occur. But this would be the case in most any products-based class action. The Court fails to see how this shift in product ownership, alone,

-- 23 --

P2480

provides any basis to attack Mr. Bryant's class definition. GM has admitted its warranty database provides the identity of and contact information for all original owners of class vehicles. In addition, GM personnel have admitted third-party firms can conduct VIN searches and obtain a snapshot regarding present owners of class vehicles. So there are numerous ways to objectively determine the individuals that are members of Plaintiff's proposed class. GM's concerns are unwarranted.

**B.     Rule 23(a)(1) Numerosity.**

5.      As noted, GM has stipulated to the Rule 23 element of numerosity. The Court accepts this stipulation and concludes the nationwide class proposed by Mr. Bryant is sufficiently numerous to satisfy Ark. R. Civ. P. 23(a)(1).

**C.     Rule 23(a)(2) Commonality.**

6.      The second requirement, set forth in Rule 23(a)(2), is commonality. As written by Professor Newberg, a legal scholar frequently cited by the Arkansas Supreme Court in class action opinions,

> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the rule 23(a)(2) prerequisite is ... that is there need be only a single issue common to all members of the class... When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.

Herbert B. Newberg, *Newberg on Class Actions*, § 3.10 (3d ed. 1993); *BPS, Inc. v. Richardson*, 341 Ark. 34, 20 S.W.3d 403, 407 (2000.

7.      These common issues of law and fact asserted to exist by Mr. Bryant arise principally from Mr. Bryant's allegation that the class vehicles contain defectively designed PBR 210x30 Drum-in-Hat parking brake systems, and that GM engaged in a cover up to avoid paying

-- 24 --

P2481

warranty claims.   Among others, Mr. Bryant believes the common issues of law and fact

satisfying Rule 23(a)(2) in this matter are:

> **BREACH OF EXPRESS WARRANTY:** Whether, based on the terms of GM's
> written limited warranty, the alleged design flaw in the parking brakes in class
> vehicles constitutes a "vehicle defect related to materials or workmanship
> occurring during the Warranty Period."

> **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY:**
> Whether the alleged design flaw in the parking brakes on class vehicles has
> rendered those vehicles "not fit for [their] ordinary purpose."

> **MAGNUSON-MOSS WARRANTY ACT:** Whether GM, by virtue of the
> parking brake's allegedly defective design, has failed to comply with its own
> "written warranty" or an "implied warranty."

> **UNJUST ENRICHMENT:** Whether GM, by allegedly defectively designing
> the parking brake and concealing the defect to avoid paying warranty claims, has
> unjustly retained benefits that it should restore to Plaintiff and class members.

> **FRAUDULENT CONCEALMENT:** Whether GM, once it acquired knowledge
> of the parking brake's defect in late 2000 (or sometime later), was clothed with a
> duty to speak to existing owners of class vehicles so they could obtain warranty
> relief.  In addition, whether GM, once it acquired knowledge of the parking
> brake's defect in late 2000 (or some time later), owed a duty to speak to
> prospective purchasers of class vehicles, alerting them to the existence of the
> defect.

> **DAMAGES:** Whether Mr. Bryant and the class members have suffered and are
> entitled to damages.

> **RESTITUTION:**   Whether Mr. Bryant and class members are entitled to
> restitution based on, without limitation, GM's unjust-enrichment-related
> misconduct and/or having previously paid for repairs to the defective parking
> brakes.

8.      In view of its factual findings regarding the alleged defective parking brake and GM's

alleged cover up, and Mr. Bryant's pleadings, the Court agrees with Mr. Bryant and concludes

the foregoing issues of law and fact are sufficiently common to establish Rule 23(a)(2)'s element

of commonality.

-- 25 --

P2482

**D.    Rule 23(a)(3) Typicality.**

9.    The Arkansas Supreme Court has also cited Professor Newberg's work in defining the

contours of typicality required by Rule 23(a)(3):

> Typicality determines whether a sufficient relationship exists between the injury
> to the named plaintiff and the conduct affecting the class, so that the court may
> properly attribute a collective nature to the challenged conduct. In other words,
> when such a relationship is shown, a plaintiff's injury arises from or is directly
> related to a wrong to a class, and that wrong includes the wrong to the plaintiff.
> Thus, a plaintiff's claim is typical if it arises from the same event or practice or
> course of conduct that gives rise to the claims of other class members, and if his
> or her claims are based on the same legal theory. When it is alleged that the same
> unlawful conduct was directed at or affected both the named plaintiff and the
> class sought to be represented, the typicality requirement is usually met
> irrespective of varying fact patterns which underlie individual claims. [Footnotes
> omitted.]

*Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240, 243 (1991)(citing H. Newberg,

*Class Actions*, § 3.13 (2d ed. 1985)); *Cheqnet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911

S.W.2d 956, 959 (1995); *Mega Life & Health Ins. Co. v. Jacola*, 330 Ark. 261, 954 S.W.2d 898,

904 (1997). When analyzing typicality, the focus should be "upon the defendant's conduct and

not the injuries or damages suffered by the plaintiffs." *Jacola*, 954 S.W.2d at 904. Similarly,

"even if allegations about injuries or damages are different, claims are typical when they 'arise

from the same wrong allegedly committed against the class.'" *Farm Bureau Mutual Ins. Co. of*

*Ark., Inc. v. Lee*, 323 Ark. 706, 918 S.W.2d 129, 131 (1996)(citing *Cheqnet Systems, Inc.*, 911

S.W.2d at 959); *THE/FRE, Inc. v. Martin*, 349 Ark. 507, 78 S.W.3d 723, 729 (2002)("Our case

law is clear that the essence of the typicality requirement is the conduct of the defendants and

not the varying fact patterns and degree of injury or damage to individual class members".).

10.    With regard to defenses GM may raise, the Arkansas Supreme Court has repeatedly

refused to examine such defenses at the certification stage, especially in the course of evaluating

typicality. *See Lee*, 918 S.W.2d at 130 (Characterizing as "false" appellee's premise that a

— 26 —

P2483

plaintiff "'individually must have a claim before he can seek certification of a class.'"); *Jacola*, 954 S.W.2d at 905 (explicit refusal to consider merits-based argument that Jacolas were inadequate representatives because they did not read their insurance policy); *BNL Equity Corp. v. Pearson*, 340 Ark. 351, 10 S.W.2d 838, 841 (2000) (accusing defendant of "plowing old ground" in arguing potential defenses against the putative class representatives should be examined in the course of, among other things, addressing typicality); *Direct General Ins. Co. v. Lane*, 328 Ark. 476, 944 S.W.2d 528, 531 (1997)("Moreover, it is apparent that Direct Insurance, by asserting that Ms. Lane has not suffered any damages, has attempted to defeat class certification by delving into the merits of the case. That is inappropriate."); *USA Check Cashers of Little Rock, Inc. v. Island*, 349 Ark. 71, 76 S.W.3d 243, 248 (2002)("Moreover, this court has repeatedly held that we will not look either to the merits of the class claims or to the appellant's defenses in determining the procedural issue of whether the Rule 23 factors are satisfied.").

11.    The Court is satisfied a sufficient relationship exists between the alleged injury to Mr. Bryant and GM's alleged conduct affecting the class to satisfy the requirement of typicality. Mr. Bryant purchased and currently owns a class vehicle. He has also received GM's written limited warranty with his purchase. Mr. Bryant has suffered the alleged parking brake problem this litigation concerns. The wrong allegedly committed against the class – GM designing and implementing a defectively designed parking brake into class vehicles, then engaging in a cover up -- is the precise wrong Mr. Bryant contends he has suffered, especially because he purchased his vehicle in April 2002, which is after October 21, 2001 but before the issuance of GM's January 28, 2003 service bulletin.    Finally, because the damages sought in this matter appear to be essentially uniform, there is no concern Mr. Bryant's damages are any different from or at

– 27 –

P2484

odds with those of other class members (which is not a concern the Arkansas Supreme Court would entertain anyway). In fact, the apparent uniformity of damages here does nothing but strengthen the case for typicality and for fulfillment of the other Rule 23 requirements.

12.    GM contends Mr. Bryant is subject to "unique defenses" that defeat typicality because he didn't give pre-suit notice to GM, and he didn't maintain his vehicle according to his owner's manual. The Court disagrees. First, if the notice issue has any significance whatsoever (the Court believes it does not, *see* footnote 16, *infra*), it only affects the warranty claims asserted by Mr. Bryant and class members. Mr. Bryant has asserted claims other than for breach of warranty. Lack of notice will not be a defense, let alone a "unique defense" to those claims. Second, Mr. Bryant's assertion of parking brake "failure", with which the Court agrees, negates GM's lack-of-maintenance argument. Not even daily maintenance could cure the alleged parking brake defect and the "failure" it allegedly produces. Third, and finally, even assuming Mr. Bryant is subject to GM's lack of notice and failure-to-maintain defenses, then a population of class members will almost certainly be as well. If class representatives and class members have potential exposure to the same defenses, such defenses are not sufficiently "unique" to defeat typicality. *Barnes*, 349 Ark. at 529, 78 S.W. 3d at 736; *USA Check Cashers of Little Rock, Inc.*, 349 Ark. at 81; 76 S.W.3d at 248. GM's lack of typicality argument based on these factors is rejected. The Court concludes Mr. Bryant has established Rule 23(a)(3) typicality.

**E.    Rule 23(a)(4) Adequacy of Representation.**

13.    Rule 23(a)(4)'s requirement of adequacy of representation was first addressed in the Arkansas Supreme Court's decision in *First National Bank of Fort Smith* as follows:

> The elements of the requirement are: (1) the representative counsel must be qualified experienced and generally able to conduct the litigation; (2) that there be no evidence of collusion or conflicting interest between the representative and the class; and (3) the representative must display some minimal level of interest

— 28 —

P2485

in the action, familiarity with the practices challenged, and ability to assist in decision making as to the conduct of the litigation.

*First National Bank of Fort Smith v. Mercantile Bank*, 304 Ark. 196, 801 S.W.2d 38, 40-41 (1990)(citing *Gentry v. C&D Oil Co.*, 102 F.R.D. 490, 493 (W.D. Ark. 1984)).

14.    As for the first element, absent a showing to the contrary, it is presumed that the representative's attorney will vigorously and competently pursue the litigation. *BPS, Inc.*, 20 S.W.3d at 408 (citing *Jacola*, 954 S.W.2d at 904).    Mr. Bryant's counsel has entered their firm resumes into evidence detailing their various backgrounds and experiences handling complex civil litigation, including class actions.    Representative counsel have also vigorously pursued this litigation, diligently conducting voluminous discovery, hiring expert witnesses, seeking class certification, and preparing for trial on the merits.    This first element is established.

15.    With regard to the second element, there is no evidence that collusion or conflicting interests exist between Mr. Bryant and the class.    That element is easily satisfied.

16.    Third, and finally, Mr. Bryant owns a class vehicle, alleges he has been harmed by GM's misconduct affecting all class members, and has educated himself concerning GM's alleged practices bringing about that harm.    He is very much interested in obtaining relief for himself and class members both in Arkansas and throughout the United States.    He is not at all reluctant to assist with written discovery requests, participate in oral discovery, and generally assist representative counsel with the decisions that need to be made during the course of this litigation.

17.    All in all, Mr. Bryant has satisfied the Court that he is an adequate class representative. The Rule 23(a)(4) element of adequacy is met.

– 29 –

P2486

F.    Rule 23(b) Predominance.

18.    Mr. Bryant, as noted, has established the existence of common issues of law and fact as required by Rule 23(a)(2). *BPS, Inc.*, 20 S.W.3d at 408 ("We have held that the starting point for our examination of the predominance issue is whether a common issue of law or fact exists in the case for all class members."); *Lenders Title Co. v. Chandler*, No. 04-41, 2004 Ark. LEXIS 399 *15 (Ark. June 17, 2004)("Lender's II"). Accordingly,

> the next issue is whether the common question predominates over individual questions. When deciding whether common questions predominate over other questions affecting only individual members, [the Arkansas Supreme Court] does not merely compare the number of individual versus common claims. [*BPS, Inc.*, 20 S.W.3d at 408] Rather, [it] decides if the issues common to all class members "predominate over" the individual issues, which can be resolved during the decertified stage of a bifurcated proceeding. *Id.* Thus, the mere fact that individual issues and defenses may be raised regarding the recovery of individual members cannot defeat class certification where there are common questions concerning the defendant's alleged wrongdoing that must be resolved for all class members. *USA Check Cashers*, 349 Ark. 71, 76 S.W.3d 243.

*Id.* It is the element of Rule 23(b) predominance that GM contends is most lacking in this case. The Court will address GM's contentions in turn.

    1.    Individual Inspections and Use Factors.

20.    GM principally argues predominance is lacking because each class member's vehicle must be inspected in order to determine whether a parking brake "failure" has occurred, and because individual-use factors such as related component failure, rough road conditions, excessive dirt in the brake, owner modification, lack of service or maintenance, overloading, error by third-party service technician, or prior accident all may contribute to parking brake "failure". GM attempts to shore up these arguments by claiming parking brake "failure" can only be defined in ultimate, safety-related terms -- that is, as the parking brake's linings excessively wearing to the point of not being able to hold a vehicle on a hill or grade. GM also

-- 30 --

P2487

cites two Arkansas cases – *Mittry* and *Baker* – as establishing a rule that "where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member" Rule 23(b) predominance cannot be found. *Mittry v. Bancorpsouth Bank*, No. 04-829, 2005 Ark. LEXIS 6 (Ark. Jan. 6, 2005); *Baker v. Wyeth-Aherst Labs Division*, 338 Ark. 242, 992 S.W.2d 797, 800 (1999).

21.     The Court disagrees that Rule 23(b) predominance is lacking due either to a requirement of individual vehicle inspections, or the individual-use factors alleged by GM. Both Mr. Bryant's pleadings and the evidence adduced demonstrate the primary alleged "failure" in the parking brake is the allegedly defective high-force spring clip retainer not permitting the shoe and attached linings to adequately float inside the brake drum. The Court has seen nothing to convince it that this alleged defect is not present in all class vehicles, or that it doesn't occur or manifest itself each time a class vehicle is used. To the contrary, and as stressed by Mr. Bryant a the class certification hearing, the alleged inadequate float problem appears to be something that is present in all class vehicles and which occurs each time a class vehicle is used. This is because all class vehicles utilize the PBR 210x30 Drum-in-Hat park brake system, and GM has admitted in numerous documents, with little to no equivocation, that the inadequate float problem regarding that brake system is a real one.

22.     As for *Mittry* and *Baker*, even if those cases stand for what GM says they stand for, the presence of this common inadequate float problem negates GM's argument that there is no one set of operative facts that establishes liability, or no single proximate cause that equally applies

– 31 –

P2488

to each potential class member. For that reason, neither *Mittry* nor *Baker* gives the Court any pause whatsoever.[9]

23.     Even assuming *arguendo* the parking brake "failure" should, as GM says, be defined more broadly such that individual inspections for lining wear and/or consideration of individual use factors might be necessary, Rule 23(b) predominance still exists. The Court views any need for individual inspections and/or the individual use factors merely as individual determinations relating to right to recovery or damages that pale in comparison to the common issues surrounding GM's alleged defectively designed parking brake and cover up to avoid paying warranty claims. In *Seeco*, the Arkansas Supreme Court discussed the significance of such individual, right-to-recover determinations as follows:

> Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.

*Seeco, Inc. v. Hales,* 330 Ark. 402, 954 S.W.2d 234, 238 (1997) *quoting* 1 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 4.26, at 4-104 (3d ed. 1992).[10]

24.     The predominance concerns arising from individual use factors or inspections are no different from the ones the Arkansas Supreme Court in recent years addressed and rejected in

---

[9]     As discussed in paragraph 18 of the Court's findings of fact, GM has also admitted the design of the PBR 210x30 Drum-in-Hat parking brake system with the high force spring clip retainer is ". . . .less than optimal because it is overly sensitive to proper lining-to-drum clearances." P. Exh. "2", GM000036107; P. Exh. "7"; P. Exh. "9", p. 11 of 13. In the Court's view, this is yet another potential defect in the parking brake system that existed from day one off the assembly line in all class vehicles, and which reveals itself each time class vehicles are driven. This alleged defect also defeats GM's argument that there is no common defect that uniformly harms Mr. Bryant and class members.

[10]     The identical excerpt from Professor Newberg's treatise is also cited for the same proposition in both *USA Check Cashers* and *Tay-Tay, Inc.* in support of the Arkansas Supreme Court's affirming the trial court's finding of predominance. *See USA Check Cashers of Little Rock, Inc.,* 76 S.W.3d at 249-250; *Tay-Tay, Inc. v. Young,* 349 Ark. 675, 80 S.W.3d 365, 372 (2002).

-- 32 --

P2489

. . . . . .

*Seeco* and other cases.[11]  Mr. Bryant relies on these cases in his briefing, and rightly so.  GM has

not convinced the Court these cases should not have direct bearing on the predominance

analysis in this case.

25.      In fact, it appears the Arkansas Supreme Court in *Snowden* addressed and rejected an

argument nearly identical to GM's regarding the need for individual inspections as they pertain

to wrecked cars.[12]  The inspections of wrecked cars in         *Snowden* were required to make an

assessment of diminished value.  The *Snowden* inspections, in the Court's view, are more

individualized that anything that may be required in this case, as they required not only

individual inspections, but individual, case-by-case damage calculations based on what was

seen.  By contrast, the Court understands Mr. Bryant to allege that new, non-defective low-force

---

[11]      *See Jacola*, 954 S.W.2d at 903; *Seeco*, 954 S.W.2d at 238; *Fraley v. Williams Ford Tractor & Equip. Co.*,
339 Ark. 322, 5 S.W.3d 423, 438 (1999); *BNL Equity*, 10 S.W.3d at 842-843; *Arkansas Blue Cross and Blue Shield
v. Hicks*, 349 Ark. 269, 78 S.W.3d 58, 63 (2002); *Lenders II*, 2004 Ark. LEXIS 399 at **16-17; *American Abstract
& Title Co. v. Rice*, No. 03-754, 2004 Ark. LEXIS 401 at **12-14 (July17, 2004); *Farmers Ins. Co., Inc. v.
Snowden*, No. 05-527, 2006 Ark. LEXIS 298 at *19 (April 13, 2006).

[12]      In *Snowden* the plaintiff filed class action against defendant auto insurer claiming it had breached
insurance contracts by refusing to pay, in addition to cost of repairs, diminished value of policyholders' automobiles
that had endured collision damage.  The trial court determined two predominating issues existed: 1) whether the
Arkansas Personal Auto Policy in issue obligated the defendant to compensate insureds for diminished value; and 2)
whether Plaintiff and class members had any obligations other than presenting their claim to Farmers to receive
compensation for diminished value.  In affirming the trial court's finding, the Court wrote

> In the instant case, the class is made up of insureds who all had the same policy with Farmers.
> The overarching issue is whether the policy owned by all the insureds bound Farmers to pay
> proper claims for diminished value, which is a question that does not rely on factors such as
> meeting of the minds or when the contract was created.  It is a question on which this case turns
> and is a strict question of Arkansas law and contract interpretation.

*Snowden*, 2006 Ark. LEXIS 298 at *19.  In addressing the insurer's complaint that the damages each aggrieved
policyholder suffered would be vastly different and thus defeat predominance, the Court responded,

> As previously noted, the common questions in the instant case do not rely on individualized
> factors, rather they turn on Arkansas law and contract interpretation.  The individualized factors,
> including the factors discussed by appellant's expert, are only relevant to the issue of damages,
> determining whether or not a certain insured has a valid claim for diminished value and is entitled
> to that compensation from Farmers.

*Id.* at **21-22.

-- 33 --

P2490

-Add 600-

spring retaining clips are necessary for all class members. No individual inspections are required for class members to obtain that relief. GM's inspection concern arises only because Mr. Bryant's contends that if the alleged defect has cause excessive lining wear as per GM's service bulletin or recall criteria, then lining replacement is also necessary. But the inspection of brake linings can occur in conjunction with the clip replacement, requires only a few measurements, and is a task Mr. Bryant asserts must occur anyway, incidental to the clip replacement. Moreover, the cost of new parking brake linings appears to be certain or fixed, unlike the diminution-in-value damages assessment discussed in *Snowden*. In sum, because the Arkansas Supreme Court found no unconquerable predominance problems in *Snowden* on the basis of individual inspections, the Court will find none in this case.

### ii.    Potential Application of Multiple States' Laws.

26.    GM also insists that the potential application of multiple states' laws to create predominance concerns. The Court disagrees.

27.    First, beginning with *In re Prempro*, the cases GM cites for the proposition that application of multiple states' laws is necessary are all federal cases requiring a "rigorous analysis" of Fed. R. Civ. P. 23 class-certification factors, including the impact state-law variations has on predominance.[13] Importantly, the Arkansas Supreme Court requires no such "rigorous analysis". *Lenders II*, 2004 Ark. LEXIS 399 at *7-8 ("As stated in *Lenders I*, [Ark. R. Civ. P. 23] does not require the trial court to conduct a rigorous analysis; rather, the trial court

---

[13]    *E.g. In re Prempro Prod. Liab. Litig.*, 230 F.R.D. 555, 565 (E.D. Ark. 2005)("A class should not be certified until the district court has found through rigorous analysis, that all the prerequisites of Rule 23(a) have been satisfied.")(internal quotes omitted); *Zinser v. Accuflex Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001)("Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."); *Spence v. Glock*, 227 F.3d 308, 313 (5th Cir. 2000)("Before *Castano*, then-Judge Ginsburg wrote that class action plaintiffs must provide an 'extensive analysis' of state law variations to reveal whether these pose 'insuperable obstacles' to certification."); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996)("The Supreme Court has required district courts to conduct a rigorous analysis into whether the prerequisites of Rule 23 are met before certifying a class.")

— 34 —

P2491

must undertake enough of an analysis to enable [the reviewing court] to conduct a meaningful review of the certification issue."); *Lender's Title Co. v. Chandler*, 353 Ark. 339, 107 S.W.3d 157 (2003)("Lender's I"); *Jacola*, 330 Ark. 261, 954 S.W.2d 901 ("We have not, as argued by the dissent, previously required the court to enter into the record a detailed explanation of why it concluded that certification was proper, and we refuse to impose such a requirement on the trial court at this time."). The Court prefers to follow Arkansas Supreme Court precedent in determining whether class certification is appropriate. GM's attempt to engraft a "rigorous analysis" requirement onto the elements of class certification under Ark. R. Civ. P. 23 is not well taken and is rejected.

28.     Second, the Court agrees with Mr. Bryant that trial judges in Arkansas have wide discretion to certify class actions. It also agrees with Mr. Bryant that trial courts have wide discretion to *manage* class actions. *BNL Equity Corp.*, 10 S.W.3d at 838. *BNL Equity* was a securities class action which, by all accounts, would require complex and individual inquiries into the level of knowledge each class member possessed about a fraudulent investment. The appellants, similar to GM regarding application of multiple states' laws here, "rais[ed] the spectre that with the potential for individual suits splintering on issues like investor knowledge, trial of the class action could unravel and turn into a procedural nightmare." *Id.* at 844. The Arkansas Supreme Court, however, viewed appellants' concern as no deterrent to predominance or superiority, or to class certification in general:

> We will not speculate on this eventuality. We simply hold that at this stage there is a common issue related to the appellants' conduct and liability that predominates over individual questions and renders a class action the superior method for litigating the matter.

*Id.* The Court in *BNL Equity* then observed:

-- 35 --

P2492

This court has recognized that the ability to manage and guide a class action is a necessary part of a trial court's decision to certify. *See International Union of Elec., Radio & Mach. Workers v. Hudson, supra.* We further have alluded to the substantial power in the trial court to manage a class action. *Id.; see also Summons v. Missouri Pac., R.R., supra.*

We have also noted the ability of the trial court to decertify should the action become too unwieldy. Rule 23 specifically contemplates that circumstance when it states: "An order under this section may be conditional and it may be altered or amended before the decision on the merits." Ark. R. Civ. P. 23(b). In the recent case of *Fraley v. Williams Ford Tractor & Equip. Co., supra,* we quoted from *Newberg On Class Actions* regarding the decertification option and the fact that this flexibility in the trial court is vital to "judicious use of the class device." *See I Newberg On Class Actions* § 7.47, at 146 (3d ed. 1992).

We have no hesitancy in placing the management of this class action in the trial court. That is what the rule contemplates, and, as already described, real efficiencies can be obtained by resolving common issues, both for the plaintiff class and the appellants. Were we, on the other hand, to speculate on class management or direct the trial court at this stage to present the parties with a management plan, we would be interfering in matters that clearly fall within the trial court's bailiwick.

*Id.* at 845. *BNL Equity's* message is that an important component of a trial court's discretion to certify class actions is its autonomy or "substantial powers" to manage them. Thus trial courts are not required to justify their certification decisions by, for example, rigorously analyzing the Rule 23 certification elements. *Lenders II, Lender's I, Jacola, supra.* Nor are they required to justify certification decisions by creating detailed "management plan[s]" addressing how a case may be managed and tried. *BNL Equity, supra.*

29.     Importantly, the Arkansas Supreme Court alluded to trial court autonomy and "substantial [class management] powers" in addressing the precise issue GM now raises: application of multiple states' laws. *Security Benefit Life Ins. Co. v. Graham,* 306 Ark. 39, 810 S.W.2d 943 (1991). *Graham* involved a potential class of 1,419 annuitants residing in thirty-nine (39) different states. The annuitants claimed Security Benefit remained liable for annuity obligations because it never provided notice another company, now insolvent, had assumed the

-- 36 --

P2493

obligations. Security Benefit argued, in part, the doctrine of novation might provide it a

defense, and claimed ".... the law of thirty-nine states relative to novation would have to be

explored and [] would splinter the class action into individual lawsuits," thus creating Rule

23(b) predominance concerns. *Id.* at 945. The Court rejected the defendant's argument:

> The mere fact that choice of law may be involved in the case of some claimants
> living in different states is not sufficient in and of itself to warrant a denial of
> class certification. *C.f., Sun Oil Co. v. Wortman*, 486 U.S. 717 (1988). And
> though we are not convinced at this stage that reference to the laws of thirty-
> nine states will be necessary, should it be required, this does not seem a
> particularly daunting or unmanageable task for the parties or for the trial court.

*Id.* at 946. In footnote 18 of its Brief In Opposition GM contends *"Security Benefit* does not

help Plaintiff. In that matter, the court determined that 'Arkansas law is the law to be applied'

under the contract at issue." GM's contention is wrong. The choice of law issue confronted by

the Court in *Graham* concerned novation; it did not, as GM says, center on a contractual term.

*Id.* In any event, the Court in *Graham* clearly saw potential application of many states' laws as

not germane to class certification. It instead viewed choice of law as a task for the trial court to

undertake later in the course of exercising its autonomy and "substantial powers" to manage the

class action.

30.    This leads the Court to its third reason why Arkansas law does not support GM's

argument, especially GM's suggestion the Court must resolve the apparent choice of law

dispute before class certification. Arkansas trial courts are not permitted to delve into the

merits of a case in deciding whether to certify it as a class action. *BNL Equity, Fraley, supra.*

In truth, there is no greater merits-intensive determination than the one regarding choice of law.

Choice of law has everything to do with a case's merits. In many cases it is not briefed,

analyzed and determined until the litigation's later stages. So it would be premature for the

Court, at this stage in the case, to make the call on choice of law.

-- 37 --

P2494

31.   Fourth, and finally, it is not as if a decision to certify this matter as a class without

resolving the choice of law issue will create incurable problems. The Arkansas Supreme Court

has repeatedly stated ". . . .a circuit court can always decertify a class should the action become

too unwieldy." *THE/FRE, Inc.*, 78 S.W. 3d 723; *USA Check Cashers of Little Rock, Inc. v.*

*Island*, 349 Ark. 71, 76 S.W.3d 243, 248 (2002); *The Money Place v. Barnes*, 349 Ark. 518, 78

S.W. 3d 730 (2002); *F&G Fin. Servs. v. Barnes*, 349 Ark. 675, 80 S.W. 3d 365 (2002).   If

application of multiple states' laws is eventually required here, and it proves too cumbersome or

problematic, the Court can consider decertifying the class. As noted in the Arkansas Supreme

Court's *Fraley* decision:

> Rule 23 of the Arkansas Rules of Civil Procedure specifically states that "an
> order under this section may be conditional and it may be altered or amended
> before the decision on the merits." Ark. R. Civ. P. 23; *See also* NEWBERG ON
> CLASS ACTIONS, § 7.47. Class rulings are often reconsidered, and
> subsequently affirmed, altered, modified, or withdrawn. *Id.*
>
> > Although the court's initial decision under Rule 23(c)(1) that an
> > action is maintainable on a class basis in fact may be the final
> > resolution of the question, it is not irreversible and may be
> > altered or amended at a later date. This power to change the
> > class certification decision has encouraged many courts to be
> > quite liberal in certifying a class when that decision is made at
> > an early stage, noting that the action always can be decertified or
> > the class description altered if later events suggest that it is
> > appropriate to do so.
>
> WRIGHT, MILLER & KANE: FEDERAL PRACTICE & PROCEDURE 2D §
> 1785 at pp. 128-31 (2d Ed. 1986)(citations omitted). "The ability of a court to
> reconsider its initial class rulings . . . is a vital ingredient in the flexibility of
> courts to realize the full potential benefits flowing from the judicious use of the
> class device." NEWBERG ON CLASS ACTIONS, § 7.47 at pp. 7-146. Class
> action certification is necessarily an ongoing process in light of Rule 23's opt-
> out and decertification provisions.

*Fraley*, 5 S.W.3d at 438-39 (1999).   A trial court's ability to decertify class actions is an

additional component of its wide discretion to manage class actions. These flexible standards

-- 38 --

P2495

likely frustrate GM, particularly as to its assertion that application of multiple states' laws will create Rule 23(b) predominance problems and frustrate management of this case. However, Mr. Bryant filed this case in an Arkansas state court, not in federal court. GM is therefore bound by Ark. Civ. P. 23 and the Arkansas Supreme Court decisions interpreting it.

        **iii.    GM's Issues With Mr. Bryant's Proposed Trial Plan.**

32.    Further contesting Rule 23(b) predominance and other Rule 23(b) elements, manageability in particular, GM contends Mr. Bryant's trial plan does not feasibly deal with potential state law variations, or supposed individual class member issues such as: notice of warranty breach; whether an individual's parking brake has been repaired under warranty; expiration of factory warranty based on mileage; individual knowledge of parking brake defect; fraud-related materiality and reliance; the entity to recover with regard to leased vehicles; application of statutes of limitation; comparative fault, if available; and the damages a given class member can recover. GM argues all these factors create incurable Rule 23(b) predominance, superiority and manageability concerns. The Court disagrees with GM.

33.    As just discussed, now is not the time to decide whether the laws of multiple states will apply. Neither is Mr. Bryant required, at this juncture, to submit a detailed trial plan which the Court must analyze and adopt, reject or modify in determining whether class certification is proper. Nevertheless, for the sake of addressing GM's criticism of Mr. Bryant, the Court, in the past, has examined many of the variations in state warranty, fraudulent concealment and unjust enrichment laws GM contends here to be insurmountable. While some legal variations may exist amongst different states, the Court does not perceive them to create any barrier to class certification. Second, in the event application and additional analysis of multiple states' laws yields a concern, it is important to note that Arkansas trial courts have multiple tools at their

-- 39 --

P2496

disposal to negotiate matters such as state-law variations, as well as the supposed individual

issues GM complains of. Many of those tools, such as the option to decertify, have already

been discussed. But perhaps the most useful tool, not yet discussed, is case bifurcation:

> This court has repeatedly recognized that conducting a trial on the common issue in a representative fashion can achieve judicial efficiency. *See Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240 (1991); *International Union of Elect., Radio & Mach. Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81 (1988). Moreover, this court has routinely found the bifurcated process of class actions to be consistent with Rule 23(d), which allows the trial court to enter orders necessary for the appropriate management of the class action. *Mega Life*, 330 Ark. 261, 954 S.W.2d 898; *Hudson*, 295 Ark. 107, 747 S.W.2d 81. In fact, this court has expressed its approval for the bifurcated approach to the predominance element by allowing trial courts to divide the case into two phases: (1) certification for resolution of the preliminary, common issues; and (2) decertification for the resolution of the individual issues. *Mega Life*, 330 Ark. 261, 954 S.W.2d 898. The bifurcated approach has only been disallowed where the preliminary issues to be resolved were individual issues rather than common ones. *See Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995).

*Arkansas Blue Cross & Blue Shield v. Hicks*, 349 Ark. 269, 286, 78 S.W. 3d 58, 68 (2002). In

this case, numerous common issues exist and are suitable to resolve in a "phase I" trial. The

Court has previously described many of those issues, all centering on GM's alleged defective

design and subsequent cover up to avoid paying warranty claims.

34.     First, as Mr. Bryant discusses in his trial plan, given the identical wording in GM's

written warranty to him and class members, GM's express-warranty liability can be litigated

unconstrained by variations in state law warranty defect standards. In addition, despite what

GM argues, the Uniform Commercial Code ("UCC") as adopted and applied by all states except

Louisiana does provide uniform legal standards governing the sales of goods.[14] In particular, it

---

[14]     *See e.g. Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998)("In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws.'"); *Cheminova Am. Corp. v.*

-- 46 --

P2497

provides a nearly universal defect standard for implied warranties: whether the defect renders the good in issue "fit for its ordinary purpose."[15] The issue of whether the parking brake defect meets or falls short of that standard is perfectly suitable for a "phase I" trial. Warranty causation can also be addressed during "phase I", especially given Mr. Bryant's contention, with which the Court agrees, that the parking brake "failure" at issue is the inadequate lining float. Because inadequate lining float is alleged to occur in each GM vehicle owned by class members, the causation question should be a universal, class-wide one. Finally, during "phase II" individual warranty-related concerns, if any, can be litigated. These include, without limitation, whether an individual class member has provided notice[16]; when, if at all, a class member's warranty expired due to mileage; the type of ownership a given class member

_Corker_, 779 So. 2d 1175, 1180 (Ala. 2000)("The principles of the Uniform Commercial Code ("U.C.C.") can be easily applied on a classwide basis. Under U.C.C. Article 2, some version of which has been adopted in all states except Louisiana, a description of a product on a label creates an express warranty."); _Tesauro v. Quigley Corp._, No. 1011, Control 051340, 2002 WL 372947 at * 5-6, 9 (Pa. Com. Pl. Jan. 25, 2002)(certifying nationwide class of consumers who purchased "Cold-Eze" under implied warranty and unjust enrichment theories); _Shaw v. Toshiba Am. Info. Sys., Inc._, 91 F. Supp. 2d 942, 957 (E.D. Tex. 2000)(recognizing the law under the UCC is uniform and that "[f]or decades, courts have certified [national] product defect class actions.").

[15]     As noted by one group of legal scholars:

    A multistate class action based on breach of implied warranty of merchantability need not be further subclassed because after the exclusion of relatively few states that still require vertical privity for economic loss claims (and also excluding used goods and business purchasers in a few other states), state implied warranty law under UCC §2-314(2)(c) (whether the product is "fit for the ordinary purposes") is uniform as incorporated by Magnuson-Moss (15 U.S.C. §2301(7), both in terms of statutory language and judicial interpretation.

Brantley, Logan, and Moore, _Class Action Reports_, "Commonality of Applicable State Law In Nationwide or Multistate Class Actions – Breach of Implied Warranty", 1. Introduction, p. 2 of 58 (2000).

[16]     However, because GM had actual notice of the parking brake issue in late 2000, well before Mr. Bryant and many class members purchased their vehicles, the Court does not agree with GM's contention that individual notice under UCC §2-607 is a required showing in this case, especially now that Mr. Bryant has given additional notice by filing suit. E.g. _Prutch v. Ford Motor Co._, 618 P.2d 657, 661 (Colo. 1980)("When, as here, the purposes of the notice requirement have been fully served by actual notice, the notice provision should not operate as a technical procedural barrier to deny claimants the opportunity to litigate the case on the merits."); _City of Wichita v. U.S. Gypsum Co._, 828 F. Supp. 851, 857 (D. Kan. 1993)("For example, "[a] comparably strict application of the notice requirement . . . may not be appropriate in a case involving a consumer's claim of breach.") _rev'd on other grounds_, 72 F.3d 491 (10th Cir. 1996); _Shooshanian v. Wagner_, 672 P.2d 455, 462 (Alaska 1983)("We . . . are of the opinion that a complaint filed by a retail consumer within a reasonable period after goods are accepted satisfies the statutory notice requirement.").

— 41 —

P2498

possesses (eg. purchase v. lease); and limitations-related issues. Warranty damages – which the Court believes will be essentially uniform -- can also be addressed during a "phase II" trial.

35.    Next, as to Mr. Bryant's fraudulent concealment claim, during "phase I" Mr. Bryant can present evidence not only of GM's defective design, but also concerning GM's alleged later cover up to avoid paying warranty claims. Mr. Bryant may then submit jury interrogatories[17], appropriately accounting for state-law variations, if any, concerning non-individualized elements of fraudulent concealment, ie. GM's knowledge of the defect and its *scienter* (ie. whether its withholding of knowledge was done with the fraudulent purpose to induce class members to buy defective vehicles or avoid paying warranty claims). The more individualized issues of whether GM owed a given class member a duty to disclose or whether a particular class member relied on GM's failure to disclose can be reserved for a "phase II" trial. The issue of damages can also be reserved for "phase II".

36.    Finally, Mr. Bryant envisions trying nearly all elements of unjust enrichment in "phase I". The Court, at this point, cannot say this would be an altogether impossible task. During such a trial Mr. Bryant may present evidence not only of GM's alleged defective design, but also of its alleged cover up. Mr. Bryant may then submit jury interrogatories, appropriately accounting for state-law variations, if any, concerning the basic liability issue of whether GM was unjustly enriched by its alleged conduct. Mr. Bryant also believes that during "phase I" it can ask the jury, for purposes of disgorgement, to calculate the sum of money GM wrongfully retained. The jury in "phase I" may also make individual fault determinations regarding class members residing in states, if any, which recognize comparative fault or the like as a defense to unjust

---

[17]    "We have consistently held that the question of submitting special interrogatories to a jury is within the sound discretion of the trial court." *Shearer v. Morgan*, 240 Ark. 616, 623, 401 S.W.2d 21, 23 (1966) (citing *Missouri Pacific Transportation Co. v. Parker*, 200 Ark. 620, 140 S. W. 2d 997 (1940)).

— 42 —

P2499

enrichment. Finally, the equitable division of the disgorged sum amongst deserving class members can be reserved for a "phase II" trial.

37.    GM attacks Mr. Bryant's bifurcated trial plan as unconstitutional under *Castano* and similar cases. *See Castano v. The American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996). GM cites *Castano* for the Seventh Amendment "mandate" that "parties [] have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues." *Castano*, 84 F.3d at 750. The Court agrees *Castano* provides authority for this general rule. *See also In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir.), *cert. denied*, 133 L.Ed. 2d 122, 116 S.Ct. 184 (1995)("The right to a jury trial . . . is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and no reexamined by another finder of fact.") But the court in *Castano* also noted bifurcated trials are permissible when ". . . .[the] issues are so separable that the second jury will not be called upon to reconsider findings of fact by the first[.]" *Id.* GM is not in a position argue Mr. Bryant's trial plan in this case is unconstitutional. The reason is obvious: the final trial plan, if one is even required, has not been developed by the Court. The issue is simply not ripe for determination. Still, the trial plan Mr. Bryant has described, in the Court's view, creates no constitutional concerns at all. Mr. Bryant contemplates trying fundamental or core liability issues in "phase I", leaving "phase II" for the individualized issues such as GM's affirmative defenses, reliance and the like. In some cases damages may also be tried in "phase II." The issues tried in each phase will be sufficiently separable; there will be no risk the jury in "phase II" will reconsider findings by the "phase I" jury. The Court is confident it can, as Judge Posner described in *Rhone-Poulenc*, "carve at the joint" in such a way that the same issues are not reexamined by different juries.

-- 43 --

P2500

-Add 610-

38.    In sum, Mr. Bryant's trial plan, while not necessary at this stage, is appropriate and adequately accounts for potential application of multiple states' laws. GM's arguments to the contrary are rejected.    The Court concludes Mr. Bryant has established Rule 23(b) predominance.

**G.    Rule 23(b) Superiority.**

39.    Rule 23(b) requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. Ark. R. Civ. P. 23(b); *see USA Check Cashers*, 349 Ark. at 71, 76 S.W.3d at 243. The superiority requirement is satisfied if class certification is the more efficient way of handling the case, and it is fair to both sides. *Id.* The Arkansas Supreme Court has held that where a cohesive and manageable class exists, "real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues, if necessary." *BPS, Inc.*, 20 S.W.3d at 410; *Lender's II*, 2004 Ark. LEXIS at *18. The Court, for several reasons, concludes Mr. Bryant has satisfied the Rule 23(b) requirement of superiority.

40.    First, the Arkansas Supreme Court affirmed the trial court's finding of superiority in *Jacola, Seeco, Fraley, BNL Equity, Hicks, Lenders II, American Abstract & Title Co.*, and *Snowden* cases cited in footnote 11, *supra*. This speaks volumes to the wide discretion trial judges possess in deciding class certification issues, managing class trials, to superiority being found even where numerous individualized issues exist, and to the fact real efficiency can be gained by disposing of basic liability questions on a class-wide basis. *See Chequet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956, 960 (1995)("The question of predominance of common questions *and of superiority* are 'very much related to the broad discretion conferred on a trial court faced with them.'")(Citation omitted)(Emphasis added).  In its first modern-era

-- 44 --

P2501

-Add 611-

class action opinion, *Hudson*, the Arkansas Supreme Court addressed all of these concepts

thusly:

> By limiting the issue to be tried in a representative fashion to the one that is common to all, the trial court can achieve real efficiency. The common question here is whether the unions can be held liable for the actions of their members during the strike. If that question is answered in the negative, then the case is over except for the claims against the named individual defendants which could not be certified as a class action. If the question is answered affirmatively, then the trial court will surely have "splintered" cases to try with respect to the damages asserted by each member of each of the subclasses, but efficiency will still be achieved, as none of the plaintiffs would have to prove the unions' basic liability.
>
> Is that unfair? It is not unfair to the unions, as they will be able to defend fully on the basic liability claim, and they will have the opportunity to present individual defenses to the claims of individual class members if their liability has been established in the first phase of the trial. They lose nothing. Would it be fair to the class members to require them to sue individually? The evidence so far shows that each putative class member has a claim that is too small to permit pursuing it economically. If they cannot sue as a class, the chances are they will not sue at all. We agree with the unions' argument that the sole fact that the claims are small is not a reason to permit a class action, but it is a consideration which has appeared when other courts, as we must do, have considered whether the class action is superior to other forms of relief. *See* C. Wright, A. Miller, and M. Kane, *supra*, § 1779, n. 21, citing *Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978), affirmed on other grounds, sub nom. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980); *Werfel v. Kramarsky*, 61 F.R.D. 674 (D.C.N.Y. 1974); and *Buchholtz v. Swift & Co.*, 62 F.R.D. 581 (D.C. Minn. 1973).
>
> We recognize that the trial court has substantial power to manage a class action even though the directions given in our Rule 23 are not as extensive as those given in the comparable federal rule. This power to manage the action contributes to the discretion we find in the trial court to determine whether a class should be certified. We conclude there was no abuse in this case.

*Int'l Union of Electrical, Radio, and Machine Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81,

87 (1988).

41.    Second, the uniform relief sought by Mr. Bryant and the class is relatively small if

sought on an individual basis. Accordingly, it is not economically feasible for members of the

class to pursue GM on an individual basis. The Arkansas Supreme Court has recognized real

-- 45 --

P2502

efficiencies and benefits inure to plaintiffs and class members in small-individual-damages cases. *Lenders II*, 2004 Ark. LEXIS 399 at *18 ("The smallness of the claims is a factor to be considered in deciding superiority; however, it may not be the sole basis for certifying a class.")[18]; *BNL Equity*, 10 S.W.3d at 844.

42.    Third, the Arkansas Supreme Court has identified the possibility of multiple trials supplying inconsistent results and wasting judicial resources as a factor supporting rather than detracting from superiority. *Lenders II*, 2004 Ark. LEXIS 399 at *18 (". . . .we think it is apparent from the context that the inconsistent results envisioned by the trial court are those that would arise from the individual cases having to be tried in different courts, by different judges and juries. In this respect, the trial court's finding supports its conclusion on the criterion of superiority."); *BNL Equity*, 10 S.W.3d at 844 ("Furthermore, here the alternative to a class action would be numerous joinders, wholesale intervention, and several hundred small lawsuits which would be totally inefficient and wholly unmanageable. Surely, neither the parties nor the judicial system would benefit from a legion of lawsuits that are numerous, duplicative, and time consuming.").

43.    Fourth, the Arkansas Supreme Court has expressed concern that absent certification of a class "numerous meritorious claims might go unaddressed." *BNL Equity*, 10 S.W.3d at 844 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 86 L.Ed. 2d 628, 105 S.Ct. 2965 (1985). This principle is of unique importance here since, by GM's own admission, some population of owners of automatic-transmission class vehicles may not regularly use their parking brake and thus be aware of the defect. If nothing else, this class action will serve to alert class members

---

[18]    The fact attorney fees may be recoverable as a component of one or more asserted causes of action does not, in general, affect the superiority analysis. *Lender's II*, 2004 Ark. LEXIS 399 at *20 ("However, we do not view the availability of attorney's fees, standing alone, as negating the trial court's analysis on superiority.").

-- 46 --

P2503

that their parking brakes may be defective and need service. It would indeed be unfortunate for one or more class members to be deprived notice of the defect. Such deprivation could have harmful consequences.

44.    Fifth, even GM may derive substantial benefit from class certification. In *BNL Equity*, the Court wrote,

> We also note that there is a real benefit to the appellants in a class action in that they have the opportunity to nip multiple claims in the bud with common defenses such as the investors' knowledge of the investment purchased, lack of the appellants' knowledge concerning the misrepresentations, and statute of limitations. We conclude that the superiority requirement has been met.

*BNL Equity*, 10 S.W.3d at 844. There is no reason to believe GM cannot potentially achieve some of the same benefits the defendant in BNL achieved, post-certification.

45.    GM challenges Rule 23(b) superiority on manageability grounds. Apart from the potential application of multiple states' laws, which the Court has addressed, GM raises manageability concerns arising from the prospect of 4,000,000 individual trials having to be conducted in this matter.

46.    First, the Court does not believe for one moment that 4,000,000 individual, phase II trials will be conducted in this case. Among other things, potential opt outs and claims dismissed under a summary disposition procedure that can be developed will greatly reduce the number of potential phase II trials.

47.    Second, *Lenders II* concerned a class of 50,000 potential members and the Arkansas Supreme Court took no issue with it proceeding as a class action. *Lenders Title Co. v. Chandler*, No. 04-41, 2004 Ark. LEXIS 399 (Ark. June 17, 2004)("Lender's II"). In the Court's view, the prospect of trying 50,000 cases is no different, from a manageability standpoint, than trying a potentially greater number of cases.

-- 47 --

P2504

48.    Third, the fact GM's allegedly defective design has adversely affected so many consumers is not Mr. Bryant's fault. Mr. Bryant and the class should not be penalized for the widespread nature of GM's alleged defect and subsequent cover up. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-661 (7th Cir. 2004)("But although the district judge might have said more about manageability, the defendants have said nothing against it except that there are millions of class members. That is no argument at all. The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $ 15 to $ 30.").

49.    Finally, in at least in the context of discussing class definition, the Arkansas Supreme Court has rejected lack of administrative feasibility as an excuse to avoid class certification. *Lenders II*, 2004 Ark. LEXIS 399 at *11-12)("We are not persuaded by the argument that it is not administratively feasible for Lenders to have to manually review each of the more than 50,000 closing files to identify the class members. Instead, we agree with Chandler that Lenders should not be allowed to defeat class certification by relying on its inadequate filing and record system."). The Court believes the Arkansas Supreme Court would similarly reject GM's similar argument that class size, alone, counsels against a finding of Rule 23(b) predominance.

50.    GM also argues the NHTSA recall process is superior to Mr. Bryant's proposed class action. However, none of the cases GM's cites hold the availability of a NHTSA recall remedy *ipso facto* negates superiority. *See Amalgamated Workers Union v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3rd Cir. 1973)("As we view it, it would appear [Federal Rule 23(b)(3)'s superiority component] was not intended to weigh the superiority of a class action

-- 48 --

P2505

against possible administrative relief."). Rather, the courts in each of these cases determined the class wasn't certifiable for other reasons, then mentioned – in dicta -- that the class members could still petition NHTSA.

51.     Here, there are multiple reasons why a class action is a superior method to resolve the claims of Mr. Bryant and the class. Moreover, as brought to light at the class certification hearing, the record reveals frustrated consumers have at least twice (most recently in mid 2006) petitioned NHTSA about the alleged parking brake defect in automatic transmission vehicles, and NHTSA rejected the petitions. Accordingly, the Court does not understand why GM believes NHTSA will provide a superior remedy to Mr. Bryant and class members. The Court concludes GM's NHTSA-based superiority argument has no merit. Mr. Bryant has established Rule 23(b) superiority.

**H.     The *Wallis* Matter.**

52.     The Court also takes note of GM's assertion in its briefing that Mr. Bryant's claims concerning the allegedly defective parking brake are not cognizable because they, at most, assert a "no injury" case against GM barred under the Arkansas Supreme Court's *Wallis* case. *Wallis v. Ford Motor Company*, No. 04-506, 2005 Ark. LEXIS 301 (May 12, 2005). The Court, however, is unwilling to rule on that assertion at this time for two reasons.

53.     First, the proper mechanism by which to raise such an assertion is either a motion to dismiss or motion for summary judgment. GM previously filed a motion to dismiss based on *Wallis*, among other things. But that motion is now moot, given the fact Mr. Bryant amended his pleadings before the class certification hearing.

54.     Second, the determination of whether class certification is appropriate is essentially procedural in nature. *BNL Equity Corp.*, 340 Ark. at 356-57, 10 S.W.3d at 841. Accordingly,

— 49 —

P2506

neither the trial court nor an appellate court may delve into the merits of the underlying claim when deciding whether the requirements of Rule 23 have been met. *Id.*; *Fraley,* 339 Ark. at 335, 5 S.W.3d at 431. The Court views the *Wallis* "no injury" issue to be inherently merits oriented and thus irrelevant to the class certification motion at hand.

## IV.

### Conclusion and Order

On the basis of the foregoing findings of fact and conclusions of law establishing Mr. Bryant has satisfied all class-certification elements in Ark. R. Civ. P. 23, the Court hereby GRANTS IN ALL THINGS Mr. Bryant's motion for class certification and ORDERS that the nationwide class of individuals described above (in paragraph III. A. 2.) is certified as a class for purposes of litigating this matter under Ark. R. Civ. P. 23. Mr. Bryant is appointed as class representative of the certified class and shall adhere to all duties such an appointment entails. In addition, the law firms of Patton, Roberts, McWilliams, & Capshaw, L.L.P. (James C. Wyly and Sean F. Rommel) and Bailey/Crowe & Kugler, L.L.P. (David Crowe and John Arnold) are appointed representative counsel to represent Mr. Bryant and the class in prosecuting this matter to final judgment. The Court, by separate order, will at some time in the near future issue a briefing schedule regarding the manner in which notice of class certification is to be given under Ark. R. Civ. P. 23(c) and/or (d).

Finally, the evidence the Court had before it in ruling on the issue of class certification was evaluated only in the context of considering the elements of Mr. Bryant's underlying claims in order to determine, for example, whether questions arising from those claims are common to the class and whether they will resolve the issue. *E.g. Williamson v. Sanofi Winthrop Pharmaceuticals, Inc.,* 347 Ark. 89, 98, 60 S.W.3d 428, 432 (2001). The Court has fully

— 50 —

P2507

complied with the general rule that trial courts are not to delve into the merits of the underlying claims in determining whether class certification is appropriate. *BNL Equity, Fraley, supra.* In ordering that class certification is appropriate in this case, the Court has not, in any way, made findings of fact or conclusions of law regarding the merits of the claims or causes of action Mr. Bryant has asserted in his pleadings.

**IT IS SO ORDERED** this 11th day of January, 2007.

JIM HUDSON, PRESIDING JUDGE

FILED
2007 JAN 11 P 4: 10
MARY PANKEY CIRCUIT CLERK
BY
DEPUTY

5'1

P2508

# EXHIBIT E

Page 1

 LexisNexis·

LEXSEE 2008 ARK. LEXIS 413

**GENERAL MOTORS CORPORATION, D/B/A CHEVROLET, GMC, CADIL-
LAC, BUICK, AND OLDSMOBILE, APPELLANT, VS. BOYD BRYANT, ON
BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, APPEL-
LEE**

No. 07-437

SUPREME COURT OF ARKANSAS

*374 Ark. 38; 2008 Ark. LEXIS 413*

June 19, 2008, Opinion Delivered

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCU-
MENT IS SUBJECT TO CHANGE PENDING RE-
LEASE OF THE FINAL PUBLISHED VERSION.

**SUBSEQUENT HISTORY:** US Supreme Court certi-
orari denied by *GMC v. Bryant, 173 L. Ed. 2d 107, 2009
U.S. LEXIS 498 (U.S., Jan. 12, 2009)*

**PRIOR HISTORY:** [**1]
APPEAL FROM THE MILLER COUNTY CIRCUIT
COURT, NO. CV-2005-051-2, HON. JAMES SCOTT
HUDSON, JR., JUDGE.

**DISPOSITION:** AFFIRMED.

**JUDGES:** PAUL E. DANIELSON, Associate Justice.
Special Justice LANE STROTHER joins. CORBIN and
IMBER, JJ., concur. GUNTER, J., not participating.

**OPINION BY:** PAUL E. DANIELSON

**OPINION**

[*40] **PAUL E. DANIELSON, Associate Justice**

Appellant General Motors Corporation d/b/a Che-
vrolet, GMC, Cadillac, Buick, and Oldsmobile appeals
interlocutorily from the circuit court's order granting
class certification to appellee Boyd Bryant, on behalf of
himself and all other similarly situated persons. General
Motors asserts four points on appeal: (1) that extensive
legal variations in state laws defeat predominance; (2)
that extensive factual variations in the millions of claims

defeat predominance; (3) that class certification is not
superior under *Arkansas Rule of Civil Procedure 23(b)*;
and (4) that the class definition is imprecise and over-
broad. We affirm the circuit court's order granting class
certification.

On September 5, 2006, Bryant filed a first amended
class-action complaint in which he alleged that some
4,000,000 pickup trucks and sport utility vehicles sold by
General Motors were equipped with defectively designed
parking [**2] brakes. Specifically, Bryant alleged that
the vehicles, model years 1999 through 2002:

> contain parking brakes whose linings,
> due to a defectively designed high force
> spring clip, do not adequately float inside
> the parking brake drums. This failure,
> alone, is problematic and harms Plaintiff
> and Class members. But inadequate lining
> float, by GM's own admission, also causes
> the parking brakes to "self-energize" and
> experience excessive lining wear after
> only 2,500 to 6,000 miles in use.

Bryant alleged that General Motors discovered the defect
in late 2000, redesigned the defective spring clip in Oc-
tober 2001, and withheld from dealers admission of re-
sponsibility for the defect until January 28, 2003. Bryant
alleged that General Motors's actions permitted it to
avoid paying millions of dollars in warranty claims. He
further stated that, while General Motors recalled ma-
nual-transmission trucks with the defective parking
brakes in 2005, the recall only involved about [*41]
60,000 vehicles and did not include the nearly 4,000,000

374 Ark. 38, *; 2008 Ark. LEXIS 413, **

automatic-transmission vehicles owned by himself and the members of the class. For his causes of action, Bryant alleged the following: breach of express warranty, breach [**3] of implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, unjust enrichment, and fraudulent concealment/failure to disclose. Finally, Bryant sought damages "in an amount necessary to remedy the defective parking brakes[,]" or, alternatively, out-of pocket money damages for those who had previously paid for repairs, or, alternatively, disgorgement and restitution. After a hearing on a motion for class certification filed by Bryant, the circuit court issued a fifty-one page order in which it concluded that Bryant had satisfied each of the requirements for class certification set forth in *Ark. R. Civ. P. 23* and defined the class as follows:

> "Owners" or "subsequent owners" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer [footnote omitted], that registered his vehicle in any state in the United States.

General Motors now appeals, challenging the circuit court's findings as to predominance, superiority, and the class definition itself.

*I. Standard of Review*

Rule 23 of the Arkansas Rules of Civil Procedure governs class actions [**4] and provides, in pertinent part:

> (a) *Prerequisites to Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties and their counsel will fairly and adequately protect the interests of the class.

> (b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other [*42] available methods for the fair and efficient adjudication of the controversy. At an early practicable time after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. For purposes of this subdivision, "practicable" means reasonably capable of being accomplished. An order [**5] under this section may be altered or amended at any time before the court enters final judgment. An order certifying a class action must define the class and the class claims, issues, or defenses.

*Ark. R. Civ. P. 23(a-b)* (2007). Our law is well-settled that the six requirements for class-action certification include: (1) numerosity, (2) commonality, (3) typicality, (4) adequacy, (5) predominance, and (6) superiority. *See THE/FRE, Inc. v. Martin, 349 Ark. 507, 78 S.W.3d 723 (2002).* In reviewing an order granting class certification, we use the following standard for review:

> We begin by noting that it is well settled that this court will not reverse a circuit court's ruling on a class certification absent an abuse of discretion. *See, e.g., Arkansas Blue Cross & Blue Shield v. Hicks, 349 Ark. 269, 78 S.W.3d 58 (2002).* In reviewing a lower court's class certification order, "this court focuses on the evidence in the record to determine whether it supports the trial court's conclusion regarding certification." *Arkansas Blue Cross & Blue Shield, 349 Ark. at 279, 78 S.W.3d at 64.* We have held that "neither the trial court nor the appellate court may delve into the merits of the underlying claim [**6] in determining whether the elements of *Rule 23* have been satisfied." *Id.* Our court has said on this point that "*a trial court may not consider whether the plaintiffs will ultimately prevail, or even whether they have a cause of action.*" *Id.* We, thus, view the propriety of a class action as a procedural question. *See id.*

*Carquest of Hot Springs, Inc. v. General Parts, Inc., 367 Ark. 218, 223, 238 S.W.3d 916, 919-20 (2006)* (quoting *Van Buren Sch. Dist. v. Jones, 365 Ark. 610, 613, 232 S.W.3d 444, 447-48 (2006)*) (emphasis added)).

## II. Predominance

### A. Choice of Law

General Motors initially argues that the significant variations among the fifty-one motor-vehicles product-defect laws defeat predominance and prevent certification in the instant case. It [*43] contends that a choice-of-law analysis must be conducted prior to certification of the class and that the circuit court's failure to conduct such an analysis at this juncture permits due-process considerations to evade this court's review. Bryant responds that the circuit court correctly adhered to this court's precedent, which he claims does not require a rigorous choice-of-law analysis prior to class certification. He further contends that the [**7] circuit court's predominance finding should be affirmed as this court has previously recognized a circuit court's broad discretion to certify and manage a class action, which includes the circuit court's ability to conduct a choice-of-law analysis subsequent to class certification. General Motors replies that the elements of each of Bryant's claims must be examined so that the basic requirements of *Rule 23* can be objectively determined.

Here, the circuit court provided four reasons for its finding that the potential application of multiple states' law did not create predominance concerns. First, the circuit court noted, the cases relied upon by General Motors were federal cases that required a "rigorous analysis" of *Fed. R. Civ. P. 23*'s class-certification factors "including the impact state-law variations had on predominance." Because this court required no such rigorous analysis, the circuit court rejected General Motors's attempt to engraft such an analysis requirement into *Ark. R. Civ. P. 23* and preferred, instead, to follow this court's precedent "in determining whether class certification [was] appropriate." Second, the circuit court found that Arkansas circuit courts have wide [**8] discretion to manage class actions and, pursuant to *Security Benefit Life Insurance Co. v. Graham, 306 Ark. 39, 810 S.W.2d 943 (1991)*, the potential application of many states' laws was not germane to class certification. Instead, the circuit court opined, this court "viewed choice of law as a task for the trial court to undertake later in the course of exercising its autonomy and 'substantial powers' to manage the class action."

For its third reason, the circuit court found that there was "no greater merits-intensive determination than the one regarding choice of law." With that in mind, the circuit court stated, "[I]t would be premature for the Court, at this stage in the case, to make the call on choice of law." Finally, the circuit court observed, a decision to certify the matter as a class without resolution of the choice-of-law issue would not create incurable problems in that, if application of multiple states' laws was even-

tually required, and it [*44] proved too cumbersome or problematic, the circuit court could always consider decertifying the class.

We cannot say that the circuit court abused its discretion in rejecting General Motors's argument on this issue as to predominance. [**9] We have held that the starting point in examining the issue of predominance is whether a common wrong has been alleged against the defendant. *See Chartone, Inc. v. Raglon, 373 Ark. 275, 283 S.W.3d 576, 2008 Ark. LEXIS 278 (2008)*. If a case involves preliminary, common issues of liability and wrongdoing that affect all class members, the predominance requirement of *Rule 23* is satisfied even if the circuit court must subsequently determine individual damage issues in bifurcated proceedings. *See id.* We have recognized that a bifurcated process of certifying a class to resolve preliminary, common issues and then decertifying the class to resolve individual issues, such as damages, is consistent with *Rule 23*. *See id.* In addition, we have said that:

> [t]he predominance element can be satisfied if the preliminary, common issues may be resolved before any individual issues. In making this determination, we do not merely compare the number of individual versus common claims. Instead, we must decide if the issues common to all plaintiffs "predominate over" the individual issues, which can be resolved during the decertified stage of bifurcated proceedings.

*Id. at 286, 283 S.W.3d at ___* (quoting *Georgia-Pacific Corp. v. Carter, 371 Ark. 295, 301, 265 S.W.3d 107 (2007))*. [**10] Our inquiry is whether there is a predominating question that can be answered before determining any individual issues.

We hold that there is. Whether or not the class vehicles contain a defectively designed parking-brake system and whether or not General Motors concealed that defect are predominating questions. That various states' laws may be required in determining the allegations of breach of express warranty, breach of implied warranty, a violation of the Magnuson-Moss Warranty Act, unjust enrichment, fraudulent concealment, damages, and restitution does not defeat predominance in the instant case.

We recently noted in *FirstPlus Home Loan Owner 1997-1 v. Bryant, 372 Ark. 466, 277 S.W.3d 576, S.W.3d (2008)*, that the mere fact that choice of law may be involved in the case of some parties living in different states is not sufficient in and of itself to warrant a denial of class certification, citing our prior decision of

*Security* [*45] *Benefit Life Insurance Co. v. Graham, supra.* In *Security Benefit,* we observed that Security Benefit's main argument "appear[ed] to center on the fact that the law of thirty-nine states relative to novation would have to be explored and that this would splinter the [**11] class action into individual lawsuits." *306 Ark. at 44, 810 S.W.2d at 945.* We rejected its argument, holding that "resolution of the common questions of law or fact would enhance efficiency for all parties, even if individual claims still remained to be adjudicated." *Id., 810 S.W.2d at 945.* We then observed:

> The mere fact that choice of law may be involved in the case of some claimants living in different states is not sufficient in and of itself to warrant a denial of class certification. *Cf., Sun Oil Co. v. Wortman, 486 U.S. 717, 108 S. Ct. 2117, 100 L. Ed. 2d 743 (1988). And though we are not convinced at this stage that reference to the laws of thirty-nine states will be necessary, should it be required, this does not seem a particularly daunting or unmanageable task for the parties or for the trial court.*
>
> Because Arkansas is the home state for First Pyramid and because Arkansas law is the law to be applied under the Master Policy, it is the logical situs for this action. Actions in thirty-nine states, even with considerable joinder, would be inefficient, duplicative, and a drain on judicial resources. *Denial of class action status could well reduce the number of claims brought in this matter, but that result is hardly* [**12] *in the interest of substantial justice.*

*Id. at 44-45, 810 S.W.2d at 945-46* (emphasis added).

Thus, we have suggested that multistate class actions are not per se problematic for Arkansas courts. A question of first impression still remains, however, as to whether an Arkansas circuit court must first conduct a choice-of-law analysis before certifying a multistate class action. In examining that question, we must keep in mind that we have been resolute that the circuit court is afforded broad discretion in matters regarding class certification. *See Chartone, Inc. v. Raglon, supra; Johnson's Sales Co., Inc. v. Harris, 370 Ark. 387, 260 S.W.3d 273 (2007).* In addition, we have held that "[t]he mere fact individual issues and defenses may be raised by the [defendant] regarding the recovery of individual members cannot defeat class certification where there are common

questions concerning the defendant's alleged wrongdoing which must be resolved for all class members." *FirstPlus Home Loan Owner 1997-1, 372 Ark. at 483, ___ S.W.3d ___.*

As already stated, there are clearly common questions concerning General Motors's alleged wrongdoing that will have to be [*46] resolved for all class members, and we [**13] view any potential choice-of-law determination and application as being similar to a determination of individual issues, which cannot defeat certification. *See, e.g., THE/FRE, Inc. v. Martin, supra.* Other courts may disagree. *See, e.g., In re Prempro Prods. Liab. Litig., 230 F.R.D. 555 (E.D. Ark. 2005)* (observing that when class certification is sought in a case based on common-law claims, the question of which law governs is crucial in making a class-certification decision); *Washington Mut. Bank, FA v. Superior Court, 24 Cal. 4th 906, 926, 15 P.3d 1071, 1085, 103 Cal. Rptr. 2d 320, 335 (2001)* (noting its favor in adopting the type of burdens articulated in federal decisions and holding that "a class action proponent must credibly demonstrate, through a thorough analysis of the applicable state laws, that state law variations will not swamp common issues and defeat predominance"); *Beegal v. Park West Gallery, 394 N.J. Super. 98, 925 A.2d 684 (2007)* (holding that a class-action motion court has a duty to conduct a choice-of-law analysis before deciding whether the predominance element is satisfied and that, although conflict-of-law issues do not per se foreclose certification of a multistate [**14] class, a thorough analysis of state laws is particularly important where a possibility exists that common issues could be subsumed by substantive conflicts in state laws; *but,* advising that a trial court should undertake a rigorous analysis to determine if the requirements of the class-certification rule have been met); *Compaq Computer Corp. v. Lapray, 135 S.W.3d 657, 672 (Tex. 2004)* (holding that "when ruling on motions for class certifications, trial courts must conduct an extensive choice of law analysis before they can determine predominance, superiority, cohesiveness, and even manageability"; *but,* also requiring that its courts perform a rigorous analysis before ruling on class certification to determine whether all prerequisites to certification have been met). However, those decisions do not bind this court, nor do they dictate that were we to permit a choice-of-law analysis after class certification, such a decision would be erroneous.

Moreover, we are simply not persuaded by the reasoning of these courts as we have previously rejected any requirement of a rigorous-analysis inquiry by our circuit courts. *See,* [*47] *e.g., Beverly Enters.-Arkansas, Inc. v. Thomas, 370 Ark. 310, 259 S.W.3d 445 (2007).* [**15] *See also Mega Life & Health Ins. Co. v. Jacola, 330 Ark. 261, 954 S.W.2d 898 (1997).* Instead, we have

given the circuit courts of our state broad discretion in determining whether the requirements for class certification have been met, recognizing the caveat that a class can always be decertified at a later date if necessary. *See, e.g., Beverly Enters.-Arkansas v. Thomas, supra; Farmers Ins. Co., Inc. v. Snowden, 366 Ark. 138, 233 S.W.3d 664 (2006); Tay-Tay, Inc v. Young, 349 Ark. 675, 80 S.W.3d 365 (2002).* As our rule so clearly provides, "[a]n order under this section may be altered or amended at any time before the court enters final judgment." *Ark. R. Civ. P. 23(b).*

Indeed, it is possible that other states' laws might be applicable to the class members' claims. However, we cannot say that our class-action jurisprudence requires an Arkansas circuit court to engage in a choice-of-law analysis prior to certifying a class, as we have not hesitated to affirm a finding of predominance so long as a common issue to all class members predominated over individual issues. While General Motors argues that a failure to require such an analysis precertification allows that analysis to evade review, [**16] it is mistaken. Upon a final order by the circuit court, General Motors would be able to challenge the circuit court's choice of law, just as in any other case. *See, e.g., Ganey v. Kawasaki Motors Corp., U.S.A., 366 Ark. 238, 234 S.W.3d 838 (2006)* (reviewing a circuit court's decision to apply Louisiana law in an appeal from an order of dismissal in a products-liability case). Moreover, were we to require the circuit court to conclude at this time precisely which law should be applied, such a decision could potentially stray into the merits of the action itself, which we have clearly stated shall not occur during the certification process. *See, e.g., Carquest of Hot Springs, Inc. v. General Parts, Inc., supra.* For these reasons, we cannot say that the circuit court abused its discretion in finding that the predominance requirement was not precluded by the potential application of other states' laws.

*b. Factual Variations*

General Motors next asserts that many factual variations preclude a finding of predominance. It claims that the following questions are individualized and predominate over any common question: (1) does a class member's parking brake have a defect; (2) if a parking brake [**17] failed, how will causation be determined; (3) with regard to the alleged "cover up," what did General Motors know and when, and what did General Motors disclose and when; (4) was a parking brake repaired already under warranty and, if not, why not; (5) when did a class member's warranty expire; (6) did a class member first provide General Motors with notice of breach; (7) did a class member have knowledge about a potential parking-brake [*48] problem at the time of purchase; (8) did a class member rely on General Motors's alleged misrepresentation; (9) were the alleged misrepresenta-

tions or omissions material to a class member; (10) for leased vehicles, is General Motors liable to the lessor or the lessee; (11) is a class member's claim barred by the statute of limitations; (12) is a class member's claim barred by various affirmative defenses, such as comparative negligence; and (13) what the appropriate remedy, if any, is for any particular class member. Bryant responds that the central common issues in the case can be decided first and that any potential individualized issue raised by General Motors can be dealt with after deciding the common predominating issues. General Motors replies, [**18] in essence, that where there are numerous individualized issues, they can be better resolved on a case-by-case basis.

We cannot say that the circuit court abused its discretion in its finding that factual variations did not preclude a finding of predominance. Here, the circuit court found that:

> the alleged inadequate float problem appears to be something that is present in all class vehicles and which occurs each time a class vehicle is used. This is because all class vehicles utilize the PBR 210x30 Drum-in-Hat park brake system, and GM has admitted in numerous documents, with little to no equivocation, that the inadequate float problem regarding that brake system is a real one.

It further found that:

> the presence of this common inadequate float problem negates GM's argument that there is no one set of operative facts that establishes liability, or no single proximate cause that equally applies to each potential class member. . . . 23. Even assuming *arguendo* the parking brake "failure" should, as GM says, be defined more broadly such that individual inspections for lining wear and/or consideration of individual use factors might be necessary, *Rule 23(b)* predominance still exists. The Court [**19] views any need for individual inspections and/or the individual use factors merely as individual determinations relating to right to recovery or damages that pale in comparison to the common issues surrounding GM's alleged defectively designed parking brake and cover up to avoid paying warranty claims.

> . . .

374 Ark. 38, *; 2008 Ark. LEXIS 413, **

We have repeatedly recognized that conducting a trial on the common issue in a representative fashion can achieve judicial efficiency. *See Arkansas Blue Cross & Blue Shield v. Hicks, supra.* [*49] Furthermore, we have routinely found the bifurcated process of class actions to be consistent with *Rule 23(d)*, which allows the circuit court to enter orders necessary for the appropriate management of the class action. *See id.* In fact, we have expressed our approval for the bifurcated approach to the predominance element by allowing circuit courts to divide a case into two phases: (1) certification for resolution of the preliminary, common issues; and (2) decertification for the resolution of the individual issues. *See id.* The bifurcated approach has only been disallowed where the preliminary issues to be resolved were individual issues rather than common ones, *see id.,* which is not the situation [**20] in the instant case.

As already stated, the common issue that predominates here over any other potential issue is whether the parking-brake system installed in the class members' vehicles was defective and whether General Motors attempted to conceal any alleged defect. These overarching issues can be resolved before the circuit court reaches any of the individualized questions raised by General Motors. *See, e.g., Asbury Auto. Group, Inc. v. Palasack, 366 Ark. 601, 237 S.W.3d 462 (2006).* We have held that the mere fact that individual issues and defenses may be raised by the defendant regarding the recovery of individual class members cannot defeat class certification where there are common questions concerning the defendant's alleged wrongdoing that must be resolved for all class members. *See FirstPlus Home Loan Owner 1997-1 v. Bryant, supra.* Moreover, we have observed that challenges based on the statutes of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability. *See* [**21] *id.* (quoting *SEECO, Inc. v. Hales, 330 Ark. 402, 413, 954 S.W.2d 234, 240 (1997)* (quoting 1 Herbert B. Newberg, *Newberg on Class Actions* § 4.26, at 4-104 (3d ed. 1992))). Accordingly, we cannot say that the circuit court abused its discretion in its finding of predominance.

### III. Superiority

For its third point on appeal, General Motors contends that the circuit court erred in its finding on superiority. It urges that the superior method of handling a claim that particular vehicles are defective is by petition to the National Highway Traffic Safety Administration (NHTSA). It submits that a class action would be [*50] unmanageable and unfair, arguing further that certification of the instant class would be unconstitutional, should

bifurcation take place. Bryant responds that where the NHTSA has already denied relief to the proposed class members, NHTSA's process can in no way be superior to a class action. He further asserts that a class action would be manageable and fair and that, because it is not yet known whether bifurcation would be required, this court should not address General Motors's constitutional claim.

*Rule 23(b)* requires "that a class action is superior to other available methods [**22] for the fair and efficient adjudication of the controversy." This court has repeatedly held that the superiority requirement is satisfied if class certification is the more efficient way of handling the case, and it is fair to both sides. *See Chartone, Inc. v. Raglon, supra.* Where a cohesive and manageable class exists, we have held that real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues, if necessary. *See id.* This court has further stated that when a circuit court is determining whether class-action status is the superior method for adjudication of a matter, it may be necessary for the circuit court to evaluate the manageability of the class. *See id.* Furthermore, the avoidance of multiple suits lies at the heart of any class action. *See id.*

In the instant case, the circuit court concluded that a class was the superior method to resolve the claims of Bryant and the proposed class. With respect to manageability, the circuit court stated:

> 46. First, the Court does not believe for one moment that 4,000,000 individual, phase II trials will be conducted in this case. Among other things, [**23] potential opt outs and claims dismissed under a summary disposition procedure that can be developed will greatly reduce the number of potential phase II trials.
>
> 47. Second, *Lenders II [358 Ark. 66, 186 S.W.3d 695 (2004)]* concerned a class of 50,000 potential members and the Arkansas Supreme Court took no issue with it proceeding as a class action. [Citation omitted.] In the Court's view, the prospect of trying 50,000 cases is no different, from a manageability standpoint, than trying a potentially greater number of cases.
>
> 48. Third, the fact GM's allegedly defective design has adversely affected so many consumers is not Mr. Bryant's fault. Mr. Bryant [*51] and the class should not be penalized for the widespread nature

of GM's alleged defect and subsequent cover up. [Citation omitted.]

49. Finally, in at least the context of discussing class definition, the Arkansas Supreme Court has rejected lack of administrative feasibility as an excuse to avoid class certification. [Citation omitted.] The Court believes the Arkansas Supreme Court would similarly reject GM's similar argument that class size, alone, counsels against a finding of *Rule 23(b)* predominance.

With respect to the propriety of a class [**24] action versus the NHTSA, the circuit court found:

Moreover, as brought to light at the class certification hearing, the record reveals frustrated consumers have at least twice (most recently in mid 2006) petitioned NHTSA about the alleged parking brake defect in automatic transmission vehicles, and NHTSA rejected the petitions. Accordingly, the Court does not understand why GM believes NHTSA will provide a superior remedy to Mr. Bryant and class members. The Court concludes GM's NHTSA-based superiority argument has no merit. Mr. Bryant has established *Rule 23(b)* superiority.

Here, the proposed class of approximately 4,000,000 members makes it at least likely that without a class action, numerous meritorious claims might go unaddressed. We have held that to be a factor in determining superiority. *See, e.g., Lenders Title Co. v. Chandler, 358 Ark. 66, 186 S.W.3d 695 (2004).* In addition, the circuit court found that the uniform relief sought by Mr. Bryant and the class was relatively small if sought on an individual basis, and, thus, it was not economically feasible for members of the class to pursue General Motors on an individual basis. While not the sole basis for certifying the class, [**25] the smallness of the claims is another factor to be considered in deciding superiority. *See id.* It is evident that the circuit court thoroughly considered the manageability of the proposed class. For that reason, we cannot say that the circuit court abused its discretion in finding that the class was manageable. And again, as to manageability, this court has made it abundantly clear that a circuit court can always decertify a class should the action become too unwieldy. *See Tay-Tay, Inc. v. Young, supra.*

Nor can we say that a class action is not superior to having the matter addressed by the NHTSA. As noted by the circuit court, NHTSA has twice rejected petitions dealing with the [*52] allegations made in the instant case. Clearly, resolution by that agency cannot be superior to a class action when the agency has made such a rejection. Moreover, it has been recognized that the Motor Vehicle Safety Act and NHTSA itself do not in any way preempt a plaintiff's right to bring common-law claims against the manufacturer of an allegedly defective part. *See, e.g., Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998)* (citing *49 U.S.C. § 30103*); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332 (D.N.J. 1997)* [**26] (citing *49 U.S.C. § 30103*). *See also Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp., 478 F.2d 540, 543, 10 V.I. 575 (3d Cir. 1973)* ("As we view it, it would appear that *[Fed. R. Civ. P. 23(b)(3)]* was not intended to weigh the superiority of a class action against possible administrative relief. The 'superiority requirement' was intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts."). With this in mind, we hold that the circuit court did not abuse its discretion in finding that a class-action suit was superior to resolution by the NHTSA.

Nor does the possibility of bifurcation render the instant class certification unconstitutional. As we have previously held, we do not know at the point of certification whether more than one jury would ultimately be necessary, and we will not speculate on the question of the inevitability of bifurcated trials or issue an advisory opinion on an issue that well may not develop. *See, e.g.,* [**27] *BNL Equity Corp. v. Pearson, 340 Ark. 351, 10 S.W.3d 838 (2000).*

*IV. Class Definition*

General Motors, for its final point, argues that the instant class definition is both overbroad and amorphous, arguing that the definition in no way distinguishes between "owners" and "subsequent owners" and that the class definition includes categories of individuals that have not been harmed in any fashion. [1] Bryant responds that the circuit court correctly determined that the class was subject to precise definition and was not overbroad.

1   For example, General Motors suggests the following categories: "owners who have never had a problem, those who have already had a warranty repair, those who experienced a problem after the expiration of the warranty, those

374 Ark. 38, *; 2008 Ark. LEXIS 413, **

who chose never to seek the warranty repair, those who sold their vehicles before a problem occurred, those who acquired vehicles after a repair had already occurred, and those who experienced parking brake failures that were caused by something other than wear condition."

[*53] With respect to class definition, it is axiomatic that for a class to be certified, a class must exist. *See Asbury Auto. Group, Inc. v. Palasack, supra.* The definition of the [**28] class to be certified must first meet a standard that is not explicit in the text of *Rule 23*, that the class be susceptible to precise definition. *See id.* This is to ensure that the class is neither "amorphous" nor "imprecise." *See id.* Concurrently, the class representatives must be members of that class. *See id.* Thus, before a class can be certified under *Rule 23*, the class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class. *See id.* Furthermore, for a class to be sufficiently defined, the identity of the class members must be ascertainable by reference to objective criteria. *See id.*

Here, the circuit court defined the class in a precise, objective manner. The class definition clearly states that the class includes any owner or subsequent owner of a 1999-2002 1500 Series pickup or utility vehicle that was originally equipped with an automatic transmission and the specified parking-brake system. Thus, the identity of the class members can be ascertained without an investigation into the merits of each individual's claim. *See, e.g., Lenders Title Co. v. Chandler, supra.* [**29] Moreover, the circuit court found that the terms "owners" and "subsequent owners" were terms taken from General Motors's own warranty publications and that General Motors admitted it had the ability to provide personal information regarding the original vehicle purchasers via its warranty database, as well as current vehicle owners via vehicle-identification-number searches conducted by third-party vendors. In addition, the circuit court further pointed to the fact that General Motors had previously conducted a recall on its manual-transmission version of the class vehicles, which demonstrated the administrative feasibility of General Motors's ability to not only identify class members, but also its ability to contact them. We simply cannot say that the class definition is in any way overbroad.

Nor do any individual issues among potential class members raised by General Motors render the definition imprecise. As already made clear, such issues cannot defeat class certification [*54] where there are common questions concerning the defendant's alleged wrongdoing that must be resolved for all class members. *See FirstPlus Home Loan Owner 1997-1 v. Bryant, supra.* We hold, therefore, that the class [**30] is identi-

fiable from objective criteria, specifically, ownership of the specified vehicles so specifically equipped, and that the circuit court did not abuse its discretion in finding that the class definition was sufficiently precise.

For the foregoing reasons, we affirm the circuit court's order granting class certification.

Affirmed.

Special Justice LANE STROTHER joins.

CORBIN and IMBER, JJ., concur.

GUNTER, J., not participating.

**CONCUR BY:** IMBER

**CONCUR**

IMBER, J., concurring. While I concur in the result on the facts presented by this case, I write separately because I believe the majority's analysis of General Motors's argument on the choice-of-law issue reaches a conclusion that is overbroad. The majority declares that addressing any choice-of-law argument at the class-certification stage goes beyond our required analysis of the elements of certification and is, therefore, never indicated. Such a declaration extends far past the holdings of our prior case law addressing class certification and forecloses analysis that could conceivably be required.

*Prior Case Law*

The majority cites *FirstPlus Home Loan Owner 1997-1 v. Bryant, 372 Ark. 466, 277 S.W.3d 576, S.W.3d (2008),* and *Security Benefit Life Ins. Co. v. Graham, 306 Ark. 39, 810 S.W.2d 943 (1991),* [**31] and quotes them as holding the mere fact that choice-of-law may be involved in the case of some parties living in different states is not sufficient in and of itself to warrant a denial of class certification, and multi-state class actions are not per se problematic for our state's courts. From that holding, the majority then goes on to conclude that "*any* potential choice-of-law determination and application" is "similar to a determination of individual issues, which cannot defeat certification." (Emphasis added.)

In *Security Benefit Life Ins. Co. v. Graham, 306 Ark. 39, 810 S.W.2d 943 (1991),* owners of certain single-premium, deferred [*55] annuities filed a complaint against an insurer, alleging breach of contract. The circuit court granted a motion for certification of a class of plaintiffs defined as all present owners of individual insurance certificates issued by the insurer under one certain master policy. *Id. at 41, 810 S.W.2d at 944.* The insurer appealed class certification, alleging, inter alia,

374 Ark. 38, *; 2008 Ark. LEXIS 413, **

that common issues of law did not predominate over individual issues because the certificate holders resided in thirty-nine states. *Id. at 43, 810 S.W.2d at 945.* We rejected the argument [**32] that application of the law of thirty-nine states relative to a defense of novation defeated the predominance element of class certification, concluding that a class action would resolve several common questions more efficiently than joinder of plaintiffs, and it did not "seem a particularly daunting or unmanageable task for the parties or the trial court" to apply the laws of multiple states to determine whether the insurer could avail itself of a defense of novation against the class members who resided in the respective states. *Id.* Thus, similar to the instant case, the choice-of-law issue presented in *Security Benefit* was related to plaintiffs' individual recoveries and corresponding defenses the defendant could maintain against those plaintiffs. We did not, however, conclude in *Security Benefit* that the circuit court was prohibited from considering any choice-of-law issues at the class-certification stage.

The majority also cites *THE/FRE, Inc. v. Martin, 349 Ark. 507, 78 S.W.3d 723 (2002),* for the proposition that "any potential choice-of-law determination and application [is] similar to a determination of individual issues, which cannot defeat certification." In *THE/FRE,* we affirmed [**33] the circuit court's grant of class certification against the appellants' assertion that issues related to recovery of individual class members and defenses that may be raised by the appellants predominated over common questions of law or fact. To the extent that choice-of-law issues in the instant case go to potential recovery of individual class members or potential defenses that GM may raise, I agree with the majority's reasoning. The circuit court in *THE/FRE,* however, did not consider any choice-of-law issues. Thus, I fail to see any logic or authority that will span the gap between our conclusion in the *THE/FRE* case and the majority's conclusion in the instant case. A conclusion here that choice-of-law issues not related to recovery or defenses will never predominate over common questions of law or fact is one that I find to be impermissibly overbroad.

### [*56] *Rigorous Analysis*

Next, the majority holds that a choice-of-law analysis is foreclosed at the class-certification stage because "we have previously rejected any requirement of a rigorous-analysis inquiry by our circuit courts." As support for this proposition, the majority cites federal court decisions, all of which hold that the trial [**34] court must conduct a "thorough" or "rigorous" analysis of the choice of governing state law before certifying a case as a class action. While it may be a necessary element of "thorough" or "rigorous" analysis in other jurisdictions that a court analyze applicable state laws as a prerequisite to class certification, the converse proposition-any consideration of choice-of-law issues at class certification stage amounts to a "thorough" and "rigorous" analysis--is not necessarily true. In fact, there may be circumstances where the trial court should undertake a choice-of-law analysis to enable us to conduct a meaningful review of the certification issue on appeal. *Lenders Title Co. v. Chandler, 353 Ark. 339, 107 S.W.3d 157 (2003).*

### *Choice-of Law and Analysis on the Merits*

Newberg specifically endorses choice-of-law considerations at the certification stage, but, at the same time, states that it is not permissible to go to the merits of the case upon deciding a motion for class certification. *Newberg on Class Actions* §4.26 (3d ed. 1992). Thus, it is clear that Newberg does not equate a choice-of-law analysis with an impermissible examination of the merits of the plaintiff's claims. The majority [**35] cites *Carquest of Hot Springs, Inc. v. General Parts, Inc., 367 Ark. 218, 238 S.W.3d 916 (2006),* for the proposition that requiring the circuit court to conclude at class certification which law should apply potentially strays into the merits of the action itself. In *Carquest,* the defendant/counterclaimant alleged that General Parts had engaged in an illegal tying arrangement and violated the Arkansas Franchise Practices Act. *Id. at 220, 238 S.W.3d at 917-18.* The circuit court found that it did not have jurisdiction over Carquest's illegal-tying claim because that claim was based on the federal Sherman Anti-Trust Act, and in so, finding, the court failed to consider whether the same claim could fall within the purview of the Arkansas Unfair Practices Act (AUPA). We held that discarding Carquest's AUPA claim amounted to a ruling that the state claim could not prevail, and that ruling constituted an impermissible consideration of the merits of Carquest's state claim. *Id. at 224, 238 S.W.3d at 920.* This holding does not support the majority's statement equating a choice-of-law analysis with an examination of the [*57] merits of the case. Therefore, I believe the majority's contention that *Carquest* precludes choice-of-law considerations [**36] at the class-certification stage is flawed.

### *GM's Choice-of-Law Argument*

Here, Bryant's complaint includes claims of breach of express warranty, breach of implied warranty of merchantability, violation of the federal Magnuson-Moss Warranty Act, and fraudulent concealment of a product defect. General Motors argues that the circuit court erred in failing to consider the conflicts of laws present among the states in which GM has sold the trucks and SUVs alleged to have the parking brake defect. Before the hearing on class certification, GM presented the court with a thorough analysis of conflicts of laws regarding

the state-law fraud claims, breach of warranty, applicable statutes of limitations, and unjust enrichment. It appears from a thorough reading of the circuit court's fifty-one page class certification order that the court in fact reviewed and considered GM's choice-of-law arguments, but, nevertheless, found that Bryant had satisfied the class-certification element of predominance. The circuit court went on to declare as a matter of law that our court has interpreted *Rule 23 of the Arkansas Rules of Civil Procedure* as precluding a choice-of-law analysis at the class-certification [**37] stage and stated without citation that "[i]n truth, there is no greater merits-intensive determination than the one regarding choice of law. Choice of law has everything to do with a case's merits."

The majority opinion ratifies the circuit court's declaration and thereby cuts off any future possibility that a conflict of laws could defeat a finding of predominance. With this I cannot agree.

*Class Certification Order*

From my reading of the class certification order, I believe that the circuit court properly considered the conflict of laws argument GM presented to the court and found that the issues of law and fact common to the members of the class predominate over individual issues of law and fact. The court determined from the evidence presented at the class-certification hearing that Bryant alleges a product defect that is present at the time of manufacture on all of a set of vehicles defined in the class definition. Similarly, all class members received identical express warranties from GM, and all class members seek the same warranty remedies. Bryant presented extensive documentation of initial reports to GM [*58] of a potential defect, GM's testing and verification of the alleged product [**38] defect, and procedures by which GM addressed the alleged defect with respect to vehicles equipped with manual transmissions,

while at the same time electing not to address the alleged defect with respect to vehicles equipped with automatic transmissions. Specifically, the circuit court stated that it saw "nothing to convince it that this alleged defect is not present in all class vehicles, or that it doesn't occur or manifest itself each time a class vehicle is used." With respect to potential state-law variations, the vast majority relate to defenses raised by GM regarding the recovery of individual members, such as: application of statutes of limitations; fraud-related materiality and reliance; individual knowledge of parking brake defect; whether an individual's parking brake has been repaired under warranty; notice of warranty breach; expiration of factory warranty based on mileage; and comparative fault. The mere fact that individual issues and defenses may be raised by a company regarding the recovery of individual members cannot defeat a class certification where there are common questions concerning the defendant's alleged wrongdoing which must be resolved for all class members. [**39] *Lenders Title Co. v. Chandler, supra; Seeco Inc. v. Hales, 330 Ark. 402, 954 S.W.2d 234 (1997).* Here, the circuit court concluded that the "individual determinations relating to recovery or damages . . . pale in comparison to the common issues surrounding GM's allegedly defectively designed parking brake and cover up to avoid paying warranty claims." Based on the circuit court's extensive review of the evidence and its thorough findings of fact and conclusions of law, it is clear that the circuit court acted within its discretion in certifying the class of plaintiffs as defined in the court's order.

For these reasons, I concur with the majority's opinion that the circuit court did not abuse its discretion in finding that Bryant has met the requirements of *Rule 23*; likewise, I would affirm the circuit court's order of class certification.

CORBIN, J., joins this concurrence.

Page 1



LEXSEE 173 L.ED.2D 107

**General Motors Corporation, Petitioner v. Boyd Bryant, Individually and on Behalf of All Others Similarly Situated.**

**No. 08-349.**

**SUPREME COURT OF THE UNITED STATES**

*173 L. Ed. 2d 107; 2009 U.S. LEXIS 498; 77 U.S.L.W. 3396*

**January 12, 2009, Decided**

**PRIOR HISTORY:** *GMC v. Bryant, 374 Ark. 38, 2008 Ark. LEXIS 413 (Ark., 2008)*

**JUDGES:** [*1] Roberts, Stevens, Scalia, Kennedy, Souter, Thomas, Ginsburg, Breyer, Alito.

**OPINION**

Petition for writ of certiorari to the Supreme Court of Arkansas denied.

# EXHIBIT F

7014136

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor (Check Only One)**

☒ Motors Liquidation Company (f/k/a General Motors Corporation) — Case No 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn LLC) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc ) — 09-13558 (REG)

*Your Claim is Scheduled As Follows*

NOTE This form should not be used to make a claim for an administrative expense arising after the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

Name of Creditor (the person or other entity to whom the debtor owes money or property) **BOYD BRYANT**

Name and address where notices should be sent
**BOYD BRYANT**
C/O PRONSKE & PATEL, P C
2200 ROSS AVE
SUITE 5350
DALLAS TX 75201

Telephone number
Email Address

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(If known)

Filed on _____

Name and address where payment should be sent (if different from above)

**FILED - 58625
MOTORS LIQUIDATION COMPANY
f/k/a GENERAL MOTORS CORP
SDNY # 09-50026 (REG)**

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount ) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor you do not need to file this proof of claim form EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED UNLIQUIDATED or CONTINGENT a proof of claim MUST be filed in order to receive any distribution in respect of your claim If you have already filed a proof of claim in accordance with the attached instructions you need not file again

**1** Amount of Claim as of Date Case Filed, June 1, 2009 **$ 378 83**

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured do not complete item 4 If all or part of your claim is entitled to priority complete item 5 If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9) complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges

**2** Basis for Claim **See Exhibit A and attachments thereto**
(See instruction #2 on reverse side )

**3** List four digits of any number by which creditor identifies debtor _____

3a Debtor may have scheduled account as _____
(See instruction #3a on reverse side )

**4** Secured Claim (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff   ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe

Value of Property $_____ Annual Interest Rate___%

Amount of arrearage and other charges as of time case filed included in secured claim, if any $_____

Basis for perfection

Amount of Secured Claim $_____    Amount Unsecured $_____

**6** Credits The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7** Documents Attach redacted copies of any documents that support the claim, such as promissory notes purchase orders, invoices itemized statements or running accounts contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary (See instruction 7 and definition of redacted on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available please explain in an attachment

**5** Amount of Claim Entitled to Priority under 11 U S C § 507(a)
If any portion of your claim falls in one of the following categories check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2 425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(__)

Amount entitled to priority

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**Signature** The person filing this claim must sign it Sign and print name and title, if any of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney, if any

Date **11/24/09**

*Boyd Bryant*

FOR COURT USE ONLY

Penalty for presenting fraudulent claim Fine of up to $500 000 or imprisonment for up to 5 years or both 18 U S C §§ 152 and 3571

Modified B10 (GCG) (12/08)

4378172471

# EXHIBIT G

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor** (Check Only One)

☒ Motors Liquidation Company (f/k/a General Motors Corporation) — Case No. 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn LLC ) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem  Inc (f/k/a Chevrolet-Saturn of Harlem  Inc ) — 13-13558 (REG)

NOTE  This form should not be used to make a claim for an administrative expense arising after the commencement of the case  but may be used for purposes of asserting a claim under 11 U S C  §503(b)(9)  (see Item # 9)  All other requests for payment of an administrative expense should be filed pursuant to 11 U S C  § 503

Name of Creditor (the person or other entity to whom the debtor owes money or property) BOYD BRYANT, ON BEHALF OF OTHERS SIMILARLY SITUATED RESIDING IN CALIFORNIA

Name and address where notices should be sent
BOYD BRYANT, ON BEHALF OF OTHERS SIMILARLY SITUATED
RESIDING IN CALIFORNIA
C/O PRONSKE & PATEL, P C
2200 ROSS AVE, SUITE 5350
DALLAS, TX 75201

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(If known)

Filed on _____

Telephone number
Email Address

Name and address where payment should be sent (if different from above)

**FILED - 58626**
**MOTORS LIQUIDATION COMPANY**
**F/K/A GENERAL MOTORS CORP**
**SDNY # 09-50026 (REG)**

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

1 **Amount of Claim as of Date Case Filed, June 1, 2009**    $ Undetermined

If all or part of your claim is secured  complete item 4 below  however, if all of your claim is unsecured, do not complete item 4  If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is secured pursuant to 11 U S C  § 503(b)(9)  complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

2 **Basis for Claim** __See Exhibit A and attachments thereto__
(See instruction #2 on reverse side )

3 **Last four digits of any number by which creditor identifies debtor** _____

    3a Debtor may have scheduled account as _____
    (See instruction #3a on reverse side )

4 **Secured Claim** (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff   ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe

Value of Property $_____   Annual Interest Rate ____%

Amount of arrearage and other charges as of time case filed included in secured claim  if any  $_____

Basis for perfection _____

Amount of Secured Claim $_____       Amount Unsecured $_____

6 **Credits** The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7 **Documents** Attach redacted copies of any documents that support the claim such as promissory notes  purchase orders  invoices  itemized statements of running accounts  contracts, judgments  mortgages  and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available  please explain in an attachment

**Amount of Claim Entitled to Priority under 11 U S C § 507(a)** If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business  whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2 425* of deposits toward purchase  lease  or rental of property or services for personal  family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9)(in 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(___)

Amount entitled to priority

$

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**Signature** The person filing this claim must sign it  Sign and print name and title  if any  of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney  if any

Date 11/24/09

_Boyd Bryant_

| | FOR COURT USE ONLY |
|---|---|

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years  or both  18 U S C §§ 152 and 3571

Modified B10 (GCG) (12/08)

# EXHIBIT H

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | | PROOF OF CLAIM |
|---|---|---|

Name of Debtor (Check Only One)
☒ Motors Liquidation Company (f/k/a General Motors Corporation) — Case No 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn LLC) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem Inc (f/k/a Chevrolet-Saturn of Harlem Inc) — 09-13558 (RFG)

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item 4 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

Your Claim is Scheduled As Follows.

Name of Creditor (the person or other entity to whom the debtor owes money or property) BOYD BRYANT, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED

Name and address where notices should be sent
BOYD BRYANT, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED
C/O PRONSKE & PATEL, P C
2200 ROSS AVE, SUITE 5350
DALLAS, TX 75201

Telephone number
Email Address

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(if known)

Filed on _____

Name and address where payment should be sent (if different from above)

FILED - 58627
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor you do not need to file this proof of claim form EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED UNLIQUIDATED or CONTINGENT a proof of claim MUST be filed in order to receive any distribution in respect of your claim If you have already filed a proof of claim in accordance with the attached instructions you need not file again

1 Amount of Claim as of Date Case filed June 1, 2009    $ 1,479,513,367 23

If all or part of your claim is secured complete item 4 below however if all of your claim is unsecured do not complete item 4 If all or part of your claim is entitled to priority, complete item 5 If all of your claim is unsecured asserted pursuant to 11 U S C § 503(b)(9) complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges

2 Basis for Claim    See Exhibit A and attachments thereto
(See instruction #2 on reverse side)

3 Last four digits of any number by which creditor identifies debtor _____

3a Debtor may have scheduled account as _____
(See instruction #3a on reverse side)

4 Secured Claim (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe

Value of Property $ _____  Annual Interest Rate ____%

Amount of arrearage and other charges as of time case filed included in secured claim if any $ _____

Basis for perfection _____

Amount of Secured Claim $ _____  Amount Unsecured $ _____

6 Credits The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7 Documents Attach redacted copies of any documents that support the claim such as promissory notes purchase orders invoices itemized statements of running accounts contracts judgments mortgages and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary (See instruction 7 and definition of redacted on reverse side)

DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available please explain in an attachment

5 Amount of Claim Entitled to Priority under 11 U S C § 507(a) If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)
☐ Wages salaries or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business whichever is earlier — 11 U S C § 507(a)(4)
☐ Contributions to an employee benefit plan — 11 U S C § 507(a)(5)
☐ Up to $2 425* of deposits toward purchase lease or rental of property or services for personal, family or household use — 11 U S C § 507(a)(7)
☐ Taxes or penalties owed to governmental units — 11 U S C § 507(a)(8)
☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case — 11 U S C § 503(b)(9) § 507(a)(2))
☐ Other — Specify applicable paragraph of 11 U S C § 507(a)(__)

Amount entitled to priority

*Amounts are subject to adjustment on 4/1 10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

Signature The person filing this claim must sign it Sign and print name and title if any of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney if any

Date 11/24/09

*Boyd Bryant*

FOR COURT USE ONLY

Penalty for presenting fraudulent claim Fine of up to $500,000 or imprisonment for up to 5 years or both 18 U S C §§ 152 and 3571
Modified B10 (GCG) (12/08)