# 2002 TRUST DISTRIBUTION PROCESS

## A.    <u>Overview.</u>

The goal of the Manville Personal Injury Settlement Trust (the "Trust") is to treat all claimants equitably.  This Trust Distribution Process ("TDP") furthers that goal by including procedures for processing and evaluating claims generally on an impartial, first-in-first-out ("FIFO") basis with the intention of paying all claimants over time as equivalent a share as possible of their claims' values.  This TDP also establishes a Schedule of Asbestos-Related Disease Categories and Values that will enable many claims to be resolved more quickly, while retaining for each claimant the right to elect individual claim evaluation.

The process for determining the liquidated value of any claim to be paid from the assets of the Trust includes an initial determination of whether the claim meets the Categorization Criteria for one of eight Scheduled Diseases that are listed on the Schedule of Asbestos-Related Disease Categories and Values described in Section D below.  The Scheduled Diseases are Other Asbestos Disease (Cash Discount Payment, Level I), Asbestosis/Pleural Disease (Level II), Asbestosis/ Pleural Disease (Level III), Severe Asbestosis Disease (Level IV), Other Cancer (Level V), Lung Cancer (One, Level VI), Lung Cancer (Two, Level VII), and Mesothelioma (Level VIII).  In general, if the claim qualifies for categorization, the claimant will be offered the Scheduled Value for the Scheduled Disease.  The Scheduled Values for the Scheduled Diseases are based on the Trust's experience settling claims using the factors set forth in the Claims Resolution Procedures (the "CRP Factors") attached as Annex B to the Trust Agreement,[1] and on liquidated values of recent settlements experienced in the United States tort system.

If a claim does not meet the Categorization Criteria for a Scheduled Disease, or the claimant decides to reject the Scheduled Value for a Scheduled Disease, and in certain other circumstances, the claimant may elect to have the claim individually evaluated by the Trust based on the CRP Factors.  All unresolved disputes over categorization and valuation of claims will be subject to arbitration under procedures described below, and claimants whose valuation disputes are not resolved by non-binding arbitration may enter the tort system.  However, if and when a claimant enters the tort system, the claimant's judgment will be payable out of a pool of funds with respect to which the payment, as provided in Section G below, will be limited to the Maximum Value for the Disease Category in which the claim is placed by the Trust or by arbitration, except for an Extraordinary Claim, as defined below.  The excess amount, if any, of any judgment will be payable from a second pool of funds which will not be available until all claimants have received 50 percent of the liquidated value of their claims.

---

[1]  All capitalized terms used herein and not otherwise defined have the meanings assigned to them in Exhibit A to the Manville Corporation Second Amended and Restated Plan of Reorganization.

- 2 -

After the liquidated value of a claim is determined by reference to a Scheduled Value, by individual evaluation, by arbitration, or by litigation, with the exception of claimants who accept a Cash Discount Payment pursuant to Section D, Level I, the claimant will receive a pro rata share of that value based on a percentage set by the Trust with the concurrence of the Selected Counsel for the Beneficiaries (the "SCB") and the Legal Representative of Future Claimants (the "Legal Representative"), after consultation with the Special Advisor to the Trust (the "Special Advisor").  The pro rata share may be adjusted upwards or downwards from time to time to reflect current estimates of the Trust's assets, its liabilities, and the estimated value of pending and future claims.  When the TDP was adopted in 1995, it contained a provision that to the extent that the pro rata share increases over time, claimants whose claims were liquidated in prior periods under this TDP will receive additional payments so as to equalize over time each claimant's pro rata share of the liquidation value of their claims.  When that provision was adopted, it was not anticipated that circumstances might later be such, as they are now, that changes in the pro rata share might be accompanied by changes in categorization criteria and a decrease in the Scheduled Values for some claims.  Given this change in circumstances, additional payments to claimants who have already received ten percent (10%) of the liquidated value of their claims are increasingly unlikely and may no longer serve this TDP's goal to treat all claimants equitably.  If the pro rata share is increased to more than ten percent (10%), the Trust, the SCB and the Legal Representative will review the impact of this provision as part of the periodic pro rata review required by Section H.1(d).  Because it is difficult to predict the number and severity of future claims, and the amount of the Trust's assets, no guaranty can be made of any pro rata share of a claim's liquidated value.

Indemnity Claims (except for claims processed using a Distributor Indemnity Claim percentage, as described in Section I.7, below) and Contribution Claims will be subject to the same categorization, evaluation, pro rata share, and payment provisions of this TDP applicable to all other Trust Claims.

## B. **Ordering and Categorizing of Claims.**

**1.      Ordering of Claims**.  Claims will be ordered for processing on a FIFO basis.  A claimant's position in the FIFO queue will be determined by the earlier of (i) the date of receipt by the Trust of an acceptable proof of claim form with the Trust or (ii) the date of filing a lawsuit for an asbestos-related injury against the Trust or any other defendant.

**2.      Categorizing of Claims by Disease**.

(a)      As a proof of claim is reached in the FIFO queue, the Trust will evaluate it to determine whether the claim meets the Categorization Criteria for a Scheduled Disease and

shall advise the claimant of its determination. If a Scheduled Disease is determined, except for Non-Standard Claims, the Trust shall tender to the claimant an offer of payment of the Scheduled Value for the Scheduled Disease, together with a form of release. If the claimant accepts the Scheduled Value and returns the release properly executed, the Trust shall disburse payment within 30 days thereafter, subject to the terms of Section H.3 below.

(b)     If the claimant does not respond to the Trust's offer within 360 days, the claim will be deactivated. If the claim remains in a deactivated status for two years, it will be deemed to be withdrawn and a new claim will have to be filed if claimant later wishes to pursue the claim. During the period of deactivation, Claimant may request that the claim be reactivated solely for the purpose of accepting the Trust's last offer. A claimant may also elect to withdraw a claim at any time. A claim that is withdrawn or deemed to have been withdrawn may be re-filed at any time, and shall be ordered in the FIFO queue based on the date of receipt by the Trust of the re-filed claim. A claimant can also request that the processing of his or her claim be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO processing queue.

(c)     If the Trust determines that a claim does not meet the Categorization Criteria for a Scheduled Disease, or determines the claim is a Non-Standard Claim as defined in Section C, or if a claimant disagrees with the Scheduled Disease determination made by the Trust, the claimant may dispute the determination. Upon receipt of written advice from the claimant of such a dispute, coupled with the claimant's written statement of the basis for the dispute and any supporting documentation, the Trust shall reevaluate the claim in light of all then available documentation and advise the claimant of its determination. If on reevaluation the Trust determines that the claim qualifies for placement in a Scheduled Disease Category or in a different Scheduled Disease Category than the Trust originally determined, the Trust shall tender an offer in the amount of the Scheduled Value for the Scheduled Disease so determined, together with a form of release. If the claimant accepts the Scheduled Value and returns the release properly executed, the Trust shall tender payment within 30 days thereafter, subject to the terms of Section H.3 below.

(d)     If the claimant still disputes the Trust's categorization of the claim or denial of categorization, the claimant may elect arbitration of the categorization or individual evaluation. If arbitration is elected, the arbitrator shall decide, solely on the basis of the documentation in the claim file when the claim was categorized, whether the claim should be categorized as a Scheduled Disease. If the arbitrator agrees with the claimant's position, the decision shall be binding upon the claimant and the claimant shall not be entitled to any individual evaluation. If the claimant returns the release properly executed, the Trust shall tender payment of the Scheduled Value for the Scheduled Disease within 30 days thereafter, subject to

the terms of Section H.3 below.  If the arbitrator does not agree with the claimant's position, the claimant may elect individual evaluation, as described below.

**C.**    **Individual Evaluation of Claims.**

Following the claims categorization process described above, any claimant, including one whose claim was not placed in a Scheduled Disease category, may elect to have his/her claim individually evaluated by the Trust.  However, because the Scheduled Values represent an equitable settlement value for most claims that meet the criteria of a corresponding Scheduled Disease, and because individual evaluation will be costly and time-consuming, resulting in significant delay in claim payment, the Trust will not value a claim for a liquidated amount in excess of its Scheduled Value unless a higher value is clearly justified.  Moreover, if a claimant elects individual evaluation, and the Trust's final offer, or a subsequent arbitration award or judgment, is lower than the Scheduled Value for the claimant's Scheduled Disease category, the claimant cannot elect to receive a previously offered higher Scheduled Value.

**1.**    **Valuation of Non-Standard Claims**.

(a)    The Schedule of Asbestos-Related Diseases and Values set forth herein is based (i) on diseases that are generally recognized to be caused in part or in whole by asbestos, and (ii) on values that reflect (A) the Trust's experience in liquidating claims for such diseases using the CRP Factors and (B) the liquidated values of current settlements in the tort system.

(b)    The Trust anticipates it may be presented with claims involving new or different causation and valuation factors not reflected in the Schedule of Asbestos-Related Diseases and Values set forth herein, including claims filed on behalf of claimants whose asbestos exposure took place outside the United States and Canada.  In the event the Trust determines that a claim(s) involves new or different causation and valuation factors, such claim(s) will not be eligible for valuation under the Schedule of Asbestos-Related Diseases and Values.  Instead, such claims will be individually evaluated in accordance with the CRP Factors when they come up for processing in the FIFO queue.  In evaluating such claims, the Trust may gather or request the claimant(s) to provide supplementary information, including the nature of the disease and the tort law, litigation practice, and liquidated values currently experienced in settlements and verdicts for similar claims in the jurisdiction in which the claim arose.  The Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, may also use such information to develop separate Scheduled Values and new Disease Categories for such Non-Standard Claims.

**2.**    **Failure to Meet Criteria for a Scheduled Disease**.  A claimant's right to assert a valid claim for the liquidated value of an asbestos-related disease is not prejudiced by failure to

meet the Categorization Criteria for a Scheduled Disease.  There are no standard definitions or criteria that could fairly include or compensate all meritorious claims involving asbestos-related diseases.  It is therefore assumed that many claims will be individually evaluated based on the CRP Factors, with no adverse presumption that the liquidated values of these claims are more or less than the Scheduled Value.

3.    **Evaluation Factors**.  All claims must present evidence of an asbestos-related injury resulting from exposure to Manville asbestos that will sustain a cause of action under applicable law.  Individual evaluations of claims will be based on the CRP Factors affecting the amount of damages, including without limitation, disease, age, current settlements and verdicts in the tort system in the claimant's jurisdiction, Manville's relevant market share, whether the claimant is living or dead (as of the earlier of the filing of the claim or a lawsuit involving the claim), disability, dependency, special damages, pain and suffering, and evidence that the claimant's damages were (or were not) related to asbestos exposure (for example, alternative causes, strength of documentation of injuries).  For these purposes, the claimant may elect as the "claimant's jurisdiction" either (a) the jurisdiction in which the claimant resides at the time of diagnosis or when the claims is filed with the Trust; or (b) a jurisdiction in which the claimant had exposure to Manville asbestos.

4.    **Maximum Values**.  The Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, has established a Maximum Value for each Scheduled Disease category.  These Maximum Values are set forth on Attachment A to this TDP.  The liquidated value of an individually evaluated claim may be higher or lower than the Scheduled Value for the Scheduled Disease category into which the claim would otherwise be placed, or which the claim most closely fits.  However, unless the claim meets the standards of an Extraordinary Claim set forth below, the liquidated value of an individually evaluated claim is limited to the Maximum Value for the relevant Scheduled Disease.  Moreover, the Maximum Value will only be offered to those claimants who present the most severe combinations of factors to be anticipated within the category, and will provide the upper limit of a claim that will enter Pool A as described below.  For purposes of determining the Maximum Value of any claim, the Trust will evaluate the claim and place it in the Scheduled Disease category with respect to which the claim most closely meets the categorization criteria.  Any dispute over the Trust's determination of the closest Scheduled Disease category will be subject to arbitration as provided in Section F below.

5.    **Claims Liquidated After November 19, 1990**.  Claimants who liquidated a Trust Claim after November 19, 1990, under the original proposed Trust Distribution Process, may elect either to retain that liquidated value and be paid immediately under this process, or to have their claims placed at the front of the FIFO queue and be processed under the procedure set forth below.

**6.**    **Second (Malignant) Injury Claims**.  Unless a general release was executed, a claimant may file a Second Injury Claim against the Trust for additional damages if the claimant subsequently develops an asbestos-related malignant disease.  A Second Injury Claim shall be ordered in the FIFO queue based upon the date of receipt by the Trust of the Second Injury Claim, and shall be treated as a new claim to be categorized or individually evaluated, and paid, under this TDP.  If the earlier claim for a non-malignant disease was liquidated after November 19, 1990, the amount already received and to be received, if any, from the Trust for the non-malignancy claim will not be deducted as a set-off against amounts payable for the Second Injury Claim, unless the malignancy was diagnosed prior to the date on which the non-malignancy claim was settled.  However, if the claimant liquidated his/her non-malignancy claim against the Trust on or before November 19, 1990, any amounts paid or to be paid pursuant to such liquidation shall be set-off against the liquidated amount arrived at hereunder for the Second Injury Claim.

**7.**    **Supporting Medical Evidence**.  The Trust will categorize or individually evaluate claims based on the medical evidence already submitted to the Trust as part of the claimant's proof of claim.  A claimant may, but need not, supplement this information with more current medical evidence.  Where the claimant has filed an incomplete proof of claim for categorization or individual evaluation, the Trust will notify the claimant of the need for additional information and the Trust need not process the claim until the file is complete.  In addition to such medical evidence as claimants are required to submit under the CRP, the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, may require that additional kinds of medical evidence be provided.

**8.**    **Audit Procedures**.  In all cases, the Trust may require that medical x-rays, tests, laboratory examinations and other medical evidence comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable. The Trust may develop methods for auditing the reliability of medical evidence, including independent reading of x-rays.  If its audits show an unacceptable level of reliability for medical evidence submitted by specific doctors or medical facilities, the Trust can refuse to accept medical evidence from such doctors or facilities.  In addition, the Trust may develop methods for auditing other types of evidence necessary to support a claim.

**9.**    **Extraordinary Claims**.  In extraordinary situations such as where a claimant was exposed only to Manville asbestos products, or where Manville asbestos products constituted the overwhelming majority of the claimant's asbestos exposure, or where special damages are exceptionally large, the Trust may individually evaluate and liquidate a claim for an amount that exceeds the Maximum Value for the particular Scheduled Disease asserted by the claimant.  Any dispute as to Extraordinary Claim status shall be submitted to arbitration by a special

- 7 -

Extraordinary Claims Panel established by the Trust with the concurrence of the SCB and the Legal Representative after consultation with the Special Advisor.

10.    **Exigent Health and Extreme Hardship Claims**.  Notwithstanding the FIFO order processing rules, the Trust may categorize or individually evaluate, and pay, Extreme Hardship Claims and Exigent Health Claims.

(a)    For Exigent Health claims:  (i) there will be an irrebuttable presumption that there is substantial medical doubt that living Trust claimants with confirmed mesothelioma will survive beyond six months and thus, if they settle their Trust claim, they qualify for Exigent Health treatment; and, (ii) there will be a rebuttable presumption to be exercised at the discretion of the Trust that there is substantial medical doubt that living Trust claimants with confirmed lung cancer caused by exposure to asbestos will survive beyond six months and thus, if they settle their Trust claim, they qualify for Exigent Health treatment.

(b)    All other living Trust claimants can qualify for Exigent Health treatment by providing:  (i) documentation that a physician has diagnosed the claimant as having an asbestos-related illness and (ii) a declaration or affidavit made under penalty of perjury from a physician who has examined the claimant within one hundred twenty (120) days of the date of the declaration or affidavit of which states that the physician believes there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit.

(c)    A claim qualifies for payment as an Extreme Hardship Claim if the Trust, in its sole discretion, determines there is a causal connection between a claimant's financial condition and an asbestos-related disease, and the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income.

D.    **Schedule of Asbestos-Related Disease Categories and Values**

For eight asbestos-related diseases, the Trust, the SCB and the Legal Representative, after consultation with the Special Advisor, have established the following Schedule of Asbestos-Related Disease Categories and Values.  The Scheduled Values are based on extensive review of the current settlement and litigation environment and on the Trust's historic experience settling claims using the CRP Factors, and are believed by the parties to represent equitable settlement values for most of the claims that meet the criteria of a corresponding Scheduled Disease.

- 8 -

| Level | Scheduled Disease | Scheduled Value |
|-------|-------------------|-----------------|
| I | Other Asbestos Disease<br>(Cash Discount Payment) | $   600 |
| II | Asbestosis/Pleural Disease | $ 12,000 |
| III | Asbestosis/Pleural Disease | $ 25,000 |
| IV | Severe Asbestosis Disease | $ 95,000 |
| V | Other Cancer | $ 45,000 |
| VI | Lung Cancer (One) | None |
| VII | Lung Cancer (Two) | $ 95,000 |
| VIII | Mesothelioma | $350,000 |

**Categorization Criteria.**  The criteria that a claim must meet to receive an offer for the Scheduled Value for one of the eight Scheduled Disease categories are as follows:

**Level I:  Other Asbestos Disease (Cash Discount Payment)**
**(Scheduled Value:    $ 600)**

1.  Diagnosis[2] of a Bilateral Asbestos-Related Nonmalignant Disease[3] or an asbestos-related malignancy (except mesothelioma),and

2.  Exposure to Manville asbestos products prior to December 31, 1982.

**Level II:  Asbestosis/Pleural Disease (Scheduled Value:  $ 12,000)**

1.  Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and

2.  Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus five years cumulative occupational exposure to asbestos.

**Level III:  Asbestosis/Pleural Disease (Scheduled Value:  $25,000)**

1.  Diagnosis of asbestosis with ILO of 1/0 or greater or asbestosis determined by pathology[4], or bilateral pleural disease of B2[5] or greater, plus (a) TLC less than 80%, or (b) FVC less than 80% plus FEV1/FVC ratio greater than or equal to 65%,

---

[2]  The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section E.1.(a), below.

[3]  Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" (or "Markers") means a report submitted by a qualified physician stating that the claimant has or had an x-ray reading of 1/0 or higher on the ILO scale, or bilateral pleural plaques or pleural thickening (or, if an ILO reading is not available, a chest x-ray reading that indicates bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques or bilateral pleural thickening consistent with, or compatible with, a diagnosis of asbestos-related disease).

[4]  Proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

[5]  "[B]ilateral pleural disease of B2" is defined as chest wall pleural thickening or plaque with a maximum width of at least 5mm and a total length of at least one quarter of the projection of the lateral chest wall.  William S. Cole, M.D., *The Classification of Radiographs of Pneumoconiosis, in* A STUDY SYLLABUS FOR CLASSIFICATION OF RADIOGRAPHS OF PNEUMOCONIOSES 21 – 24, footnote 13 (W. J. Tuddenham, M.D. ed., NIOSH April 1983) (a study guide for the application of the ILO radiographic classification system; prepared by the Division of Respiratory Disease Studies, NIOSH Centers for Disease Control and Prevention, Morgantown, W.V.).

2.    Six months occupational exposure to Manville asbestos products prior to December 31, 1982 plus Significant Occupational Exposure to asbestos,[6] and

3.    Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary condition in question.

**<u>Level IV:  Severe Asbestosis <u>(Scheduled Value:  $95,000)</u></u>**

1.    Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathology, plus (a) TLC less than 65% or (b) FVC less than 65% plus FEV1/FVC ratio greater than 65%,

2.    Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure to asbestos, and

3.    Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary condition in question.

**<u>Level V:  Other Cancer (Scheduled Value: $45,000)</u>**

1.    Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,

2.    Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure, and

3.    Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question.

**<u>Level VI:  Lung Cancer (One) (Scheduled Value: None)</u>**

1.    Diagnosis of a primary lung cancer,

2.    Occupational exposure to Manville asbestos products prior to December 31, 1982, and

3.    Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

---

[6]  "Significant Occupational Exposure" is defined in Section  E.2.(b), below.

Lung Cancer (One) (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Two) (Level VII) claims.  All claims in this Disease Level will be individually evaluated.  The estimated anticipated average of the individual evaluation awards for this category is $40,000, with such awards capped at $50,000.

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a Smoker.[7]  In any event, no presumption of validity will be available for any claims in this category.

**Level VII:  Lung Cancer (Two) (Scheduled Value: $95,000)**

> 1.      Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,

> 2.      Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure to asbestos, and

> 3.      Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

**Level VIII:  Mesothelioma (Scheduled Value: $350,000)**

1.      Diagnosis of mesothelioma and

2.      Credible evidence of exposure to Manville asbestos products prior to December 31, 1982.

**E.      Evidentiary Requirements**

---

[7]  There is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII)(Markers and Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Trust.  In such a case, it is anticipated that the liquidated value of the claim might well exceed the $95,000 Scheduled Value for Lung Cancer (Level VII) shown above.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

1.  **Medical Evidence.**

    (a)    **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  All diagnoses of a nonmalignant asbestos-related disease (Disease Levels 1-IV) shall be based (i) in the case of a claimant who was living at the time the claim was filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis; (B) an x-ray reading by a certified B-reader, and (C) on pulmonary function testing[8] in the case of Asbestosis/Pleural Disease (Level III) and Severe Asbestosis (Level IV);[9] and (ii) in the case of a claimant who was deceased at the time the claim was filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis, or (B) pathological evidence of the non-malignant asbestos-related disease, or (C) an x-ray reading by a certified B reader.  Diagnoses of a malignant asbestos-related diseases (Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis, or (ii) on a diagnosis of such a malignant Scheduled Disease by a board-certified pathologist.  A finding by the diagnosing physician that a claimant's disease is "consistent with" or "compatible with" asbestosis will be treated by the Trust as meeting the standard of a reasonable degree of medical probability.

    (b)    **Credibility of Medical Evidence.**  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  The Trust may require the submission of x-rays, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable.

2.    **Exposure Evidence.**

    (a)  **In General.**  To qualify for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product produced by Manville prior to December 31, 1982 together with additional asbestos exposure requirements where provided.

---

[8]  "Pulmonary Function Testing" shall mean spirometry testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.

[9]  All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the Trust may rebut such presumptions.

(b) **Significant Occupational Exposure.** "Significant Occupational Exposure" means employment for a cumulative period of at least five years, in an industry and an occupation in which the claimant (i) handled raw asbestos fibers on a regular basis; (ii) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (iii) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (iv) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (i), (ii) and/or (iii).

(c) **Exposure Evidence.** The claimant must demonstrate meaningful and credible exposure to asbestos or asbestos-containing products supplied or manufactured by Manville in accordance with the exposure requirements described above. That meaningful and credible exposure may be established by an affidavit of the claimant, by an affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant (providing the Trust finds such evidence reasonably reliable), by invoices, construction or similar records, or by other credible evidence. The specific exposure information required by the Trust to process a claim is set forth on the proof of claim form to be used by the Trust. The Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

F.      **Resolution of Categorization and Valuation Disputes**.

1. **Contestable Matters**. Except for Non-Standard or Extraordinary Claims, if a claim otherwise meets the Categorization Criteria for a Scheduled Disease, the Trust will pay the Scheduled Value for that disease in accordance with the provisions of this TDP. If a claimant chooses individual evaluation, and if the claim is eligible to be placed in one of the Scheduled Disease Levels, and is supported by appropriate evidence, the Trust will not dispute the culpability of Manville's conduct, or, as a general proposition, that asbestos exposure caused such disease. Instead, the Trust will have the right to contest only the following matters:

-- the type and seriousness of the claimant's injuries;
-- the claimant's exposure to Manville asbestos products;
-- other causation-in-fact issues;
-- the amount of damages; and
-- applicability of statutes of limitation as set forth in the following subsection 1(a).

Nothing in this paragraph is intended to amend or alter the contestable issues the Trust is permitted to assert as defined in the Claims Resolution Procedures and the Trust Agreement.

      (a)    All Manville Trust claims arising from exposure to asbestos in the United States must meet the applicable federal or state statute of limitations that was in effect at the time of filing with the Trust.  In addition, irrespective of the application of any relevant federal or state statute of limitations or repose, any claims may be filed with the Trust within three years after date of diagnosis or, if later, date of asbestos-related death.  All Manville Trust claims arising from exposure to asbestos outside the United States must be filed with the Trust within three years after the date of diagnosis or, if later, date of asbestos-related death.  This subsection F.1(a) will become effective on January 1, 2011.

      **2.  <u>Arbitration</u>**.  Even a flawless claims resolution procedure may not always fairly meet a claimant's perceived deserved disease categorization or claims valuation.  Accordingly, the Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, will institute binding and non-binding arbitration procedures for resolving disputes over disease categorization for Scheduled Values and Maximum Values, individual evaluation of claims, and Extraordinary Claim status.  These procedures may be modified by the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.

As provided in Section B above, a claimant may initially elect arbitration of categorization.  Except for such arbitration of categorization, a claimant must first choose individual evaluation and the individual evaluation must be completed before the claimant can elect arbitration.  Individual evaluation is completed when the claim has been individually reviewed by the Trust, the Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the individual evaluation, and the claimant has notified the Trust of the rejection in writing.

Arbitrators may determine whether a disease falls in a higher or lower category of Scheduled Disease for purposes of determining both Scheduled Values and Maximum Values.  After a claim is individually evaluated, arbitrators may also determine a liquidated value which may be higher or lower than the Scheduled Value for the claim.  However, except in the case of an Extraordinary Claim (as determined by the Trust or by the Extraordinary Claims Panel), arbitrators may not return an award in excess of the Maximum Value for the appropriate Scheduled Disease category.  In the case of individual evaluations, a claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who had accepted the Trust's original valuation of the claim and will be deemed to have released the Trust from any liability beyond the liquidated value determined by the arbitrator.

      **3.  <u>Litigation</u>**.  Only claimants who, following individual evaluation, elect non-binding arbitration and then reject their arbitral awards retain the right to trial against the Trust of the liquidated value, if any, of their claims.  A judgment creditor is eligible for payment from the Trust's available cash, as provided below, 30 days after the judgment is final and non-appealable.

However, under no circumstances shall the Trust pay any punitive damages which may be awarded to a claimant.

**G.    Creation of Two Pools.**

  **1.    Pool A**.  Trust Beneficiaries will be compensated through two pools of funds.  A Trust Beneficiary who accepts an offer from the Trust based on (i) a Scheduled Value for a Scheduled Disease, (ii) a value based on individual evaluation by the Trust, or (iii) an arbitration award, will receive a pro rata share of that liquidated value from Pool A.  A Trust Beneficiary who rejects an award in non-binding arbitration, and who returns to the tort system and obtains a judgment for money damages, will also enter Pool A after the claim has been reduced to a final, non-appealable judgment.  The liquidated value of a judgment creditor's claim entered in Pool A, however, will not exceed (i) the Maximum Value for the judgment Scheduled Disease, or (ii) such higher amount as may have been offered by the Trust or awarded through arbitration with respect to an Extraordinary Claim as described in Section C above.

  **2.    Pool B**.  Judgment creditors with verdicts in excess of the limits set forth above and Trust Beneficiaries who have received less than 100 percent of the liquidated value of their claims entered in Pool A will enter Pool B where they may receive compensation for the excess amount of their respective verdicts and claims after all claims entered in Pool A have been paid 50 percent of their liquidated value.

  **3.    Distribution of Trust Funds Between the Pools**.  The Trust's available cash for general distribution to Trust Beneficiaries shall be held by the Trust for distribution to Beneficiaries with liquidated Pool A claims until all such Beneficiaries have received 50 percent of the liquidated value of their claims entered in Pool A.  Pool B shall not receive any funds available for distribution until all claims entered in Pool A have been paid 50 percent of the liquidated value of their claims.  It is doubtful that Pool B will ever be funded.

  **4.    Extinguishment of Unpaid Trust Claims.**  Upon the termination of the Trust in accordance with the provisions of the Trust Agreement and/or upon the distribution of all Trust Assets, any and all Trust Claims shall be extinguished.

**H.**    **Payment of Claims**.

**1.  Pro Rata Share to be Paid**.

(a)    With the exception of claimants accepting a Cash Discount Payment pursuant to Section D, Level I, it is intended that all Trust Beneficiaries shall share in the Trust estate on a pro rata basis, with each Trust Beneficiary receiving a pro rata share of his or her claim's liquidated value, arbitration award, or judgment as equivalent as possible to the pro rata share received by all other Trust Beneficiaries under this TDP.

(b)    The initial pro rata share has been set at ten percent (10%) by the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor. To determine the initial pro rata share, the Trust has forecast its anticipated annual sources and uses of cash until the last projected future claim has been paid or assets have been reserved for its payment.  The Trust has calculated the appropriate pro rata share for all claims so that the Trust will have no remaining assets or liabilities after the last Trust Beneficiary has received his or her pro rata share.

(c)    The initial pro rata share is based on information both with respect to valuations of the Trust's assets and expectations about the value of present and future Trust liabilities.  It may be possible to make additional payments in the future to previously settled Trust Beneficiaries while simultaneously protecting future claimants from unreasonable risks.

(d)    In order to ensure, as best as possible, that the basic assumptions which underlie this TDP remain valid so that all Trust Beneficiaries will be treated equally, the Trust shall, at least every 3 years, but as often and for so long as the Trust, the SCB, or the Legal Representative deem necessary, re-estimate the values of its total assets and its total liabilities and determine whether a revised pro rata percentage should be applied to past, present or future claims.

(e)    The Trust shall determine (i) if the anticipated values of assets have been so reduced and/or the expectation of the value of present or future claims so increased that a new lower pro rata share should be applied to all future claim payments, or (ii) if the anticipated values of assets have been so increased and/or the expectation of the value of present or future claims so reduced that a new higher pro rata share should be applied to all future claim payments, as well as any past settlements paid a lower pro rata share.

(f)    Estimates have been and shall be performed in a flexible and pragmatic manner that considers the circumstances of the present claimants, the future claimants, the practical limitations imposed by the inability to predict with precision the future assets and liabilities of the Trust and the risks to all Trust Beneficiaries in not reaching agreement.

**2. Equalization of Pro Rata Shares**.

(a)     Payment of pro rata amounts may be limited from time to time by available cash. When the TDP was adopted in 1995, it contained a provision that in such case, or in the event a new higher pro rata share is applied, the Trust shall make, as cash is available, a subsequent additional pro rata payment to all Trust Beneficiaries with liquidated claims whose previous cumulative pro rata share was less than the existing or the new higher estimate.  When that provision was adopted, it was not anticipated that circumstances might later be such, as they are now, that changes in the pro rata share might be accompanied by changes in categorization criteria and a decrease in the Scheduled Values for some claims.  Given this change in circumstances, additional payments to claimants who have already received ten percent (10%) of the liquidated value of their claims are increasingly unlikely and may no longer serve this TDP's goal to treat all claimants equitably.  If the pro rata share is increased to more than ten percent (10%), the Trust, the SCB and the Legal Representative will review the impact of this provision as part of the periodic pro rata review required by Section H.1(d).  The purpose of such payment shall be to equalize Trust Beneficiaries' cumulative pro rata share.  However, the Trust shall not be obligated to make such a catch-up pro rata adjustment more than once a year, or if in the judgment of the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, the amount of any such catch-up pro rata adjustment is so small as not to justify its administrative burden.

(b)     The Trust shall provide the SCB, the Legal Representative, and the Special Advisor with any proposal for adjusting the pro rata share supported by the results of the Trust's analysis and any valuations prepared by the Trust's investment bankers and other consultants.  The proposal(s) shall take effect upon the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.

**3. Order of Payment**.  The Trust shall pay claims in the order in which the claims are liquidated, each such payment occurring within 30 days of the Trust's receipt of an executed release from the subject claimant.  If at any time the Trust has insufficient available funds to pay any claim, payment shall be suspended until such time as the Trust monetizes additional assets.  No Trust Claim shall be preferred over any other for purposes of payment, regardless of which processing queue the Trust Claim is in.

**4. Management of Assets**.

(a)     The Trust shall manage its assets in a manner consistent with its obligation to preserve and enhance the value of the Trust estate and further the prompt, fair and equitable distribution of Trust assets to all present and future Trust Beneficiaries.

(b)      If in the future the SCB or the Legal Representative disagree with or are dissatisfied with the advice received from the Trust's financial or investment advisors concerning any matter as to which the SCB or the Legal Representative have concurrence rights, the SCB or the Legal Representative may notify the Trust in writing that they are withholding concurrence with respect to such matter on such ground, setting forth the reasons for such disagreement or dissatisfaction. Thereafter, either the Trust, on the one hand, or the SCB or the Legal Representative, on the other hand, shall have the right to request that the dispute with respect to such concurrence be resolved pursuant to the procedure set forth in Section K.3 below.  If it is determined in such dispute resolution procedure that there is a reasonable basis for the disagreement or dissatisfaction of the SCB or the Legal Representative with such financial or investment advice, the SCB or the Legal Representative shall have the right to appoint their own financial or investment advisor to review the disputed issue, and in such case, the reasonable fees and expenses of such financial or investment advisor shall be paid for by the Trust; provided, however, that in any case where both the SCB and the Legal Representative withhold concurrence on the ground that they disagree or are dissatisfied with the financial or investment advice received by the Trust on a matter as to which they both have concurrence rights and it is determined in the dispute resolution procedure that there is a reasonable basis for such disagreement or dissatisfaction by both the SCB and the Legal Representative, the Trust shall have the right to have determined in such dispute resolution procedure the issue of whether it is reasonable and necessary for the Trust to bear the fees and expenses of separate financial or investment advisors for the SCB and for the Legal Representative or whether instead the Trust's obligations in such case shall be limited to paying the fees and expenses of a single financial or investment advisor that may be consulted jointly or separately by both the SCB and the Legal Representative.

**5.  Access to Financial Information**.  Subject to entry into an appropriate confidentiality agreement where applicable, the Trust shall make available to the SCB, the Legal Representative, and the Special Advisor any other investment banking or other financial, accounting or statistical information available to the Trust relating to issues to be discussed with and/or as to which concurrence is required of the SCB or the Legal Representative.

**6.  Amendments to Procedures Involving the Pro Rata Share**.  The procedures set forth herein governing the pro rata share may be amended, altered, or adjusted to reflect changed circumstances, greater information, and/or improved procedures, with the concurrence of the Trust, the SCB, and the Legal Representative, after consultation with the Special Advisor.

**7.  Resolution of Disputes Involving the Pro Rata Share**.  Any dispute among or between the Trust, the SCB, and the Legal Representative, regarding any matter on which the Legal Representative's concurrence is required, shall be resolved in accordance with the dispute resolution process in Section K, and the Legal Representative shall have a role in the dispute resolution procedures equal to that of the SCB on such matters.

## I.    All Trust Beneficiaries Treated Alike.

In order to conserve the assets of the Trust, except as set forth below, Trust Beneficiaries – both plaintiffs and defendants – will dismiss, without prejudice, all present cases, are enjoined from filing future litigation against Manville[10] or the Trust, and are required to pursue their claims against the Trust only as provided in this TDP.  Except as provided in Section F above and subsection 1(c) below, the Trust will make no appearance in any court, and no Trust Beneficiary will be permitted to proceed in any manner against the Trust or Manville in any state or federal court.

### 1.    Litigation between Trust Beneficiaries.

(a)    **Section I Applicable Only to Trust Beneficiaries.**  The provisions of this Section I, including those relating to set-offs, are applicable only to Trust Beneficiaries. Asbestos health plaintiffs who are not Trust Beneficiaries because they were not exposed to Manville asbestos or asbestos-containing products shall not be subject to any of the provisions of this Section I and judgments they obtain against defendants shall not be governed by the provisions of this Section I, including the provisions relating to set-offs.  Any dispute over whether an asbestos health plaintiff is a Trust Beneficiary whose claim is governed by this Section I shall be resolved by the trial court hearing the asbestos health plaintiff's case against defendants. The parties shall retain whatever rights of appellate review may be available under applicable law in respect of such ruling.

(b)    **Right to introduce evidence.**  In any litigation between Trust Beneficiaries, all Beneficiaries shall retain their respective rights provided by applicable law to introduce evidence at trial in state or federal court.

(c)    **Where third-party claims permissible.**  Third-party claims may be asserted against the Trust for the sole purpose of listing the Trust on a verdict form or otherwise as necessary to ensure that any verdict reduction in respect of the Manville (or Trust) liability share is made pursuant to applicable law.  No objection shall be made by the Trust or the claimant to the filing by a Co-Defendant of a third-party complaint or to the joinder of the Trust

---

[10]    As used herein, Manville shall mean the Debtors, their successors, and their subsidiaries and affiliates.  To the extent that Trust Beneficiaries assert claims against third parties which a court of competent jurisdiction determines by order give rise to Indemnification Liabilities on the part of the Trust, those Trust Beneficiaries agree to reduce such claims and/or judgments on such claims, on a dollar-for-dollar basis, to the full extent necessary to extinguish any such Indemnification Liabilities.  Provided, however, that this provision is not intended to otherwise restrict or interfere with the rights of Trust Beneficiaries to proceed against third parties.

as a party for this limited purpose only.  However, the Trust shall not be required to enter an appearance as to third-party or any other claims, nor shall it be subject to party discovery or to default judgment or levy and execution on any judgment.  Under no circumstances shall the Trust be required to pay claims, whether for asbestos-related conditions or for contribution or indemnification, except in accordance with this TDP.  Without enlarging any substantive rights accorded them by this TDP, Co-Defendants shall have such procedural rights (relating to procedural issues not expressly dealt with by this TDP) reasonably necessary to pursue or defend rights accorded them by this TDP.

(d)    **Status of the Trust**.  In return for limiting the right of Co-Defendants to implead the Trust, except under the circumstances described in subsection 3(d)(ii)(B), below, the Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof.  Under no circumstances shall the Trust be treated as a bankrupt unless:

(i)    formal bankruptcy, liquidation or insolvency proceedings are commenced by the Trust; or

(ii)    such proceedings are commenced against the Trust and applicable law provides for treating the Trust as a bankrupt in such circumstances.

(e)    **Discovery and informational issues**.  The Trust shall comply with the rules of discovery pertaining to non-parties under applicable law.

(f)    **Verification of settlement information**.  In response to a Co-Defendant request, the Trust and the claimant shall promptly verify, no later than the start of jury selection in the trial of an action by the claimant against the Co-Defendant, the fact of any settlement or any filing by the claimant of a claim with the Trust; and shall provide information regarding the amount and terms of any such settlement at the time and with the detail required by applicable law.

2.    **Co-Defendant Contribution Claims against the Trust**.

(a)    **General principles**.  Co-Defendant Contribution Claims against the Trust may be satisfied in two ways:  (i) in the circumstances set forth in subsection 4, below, Contribution Claims may be brought against the Trust and processed in accordance with this TDP and subsection 4, below, or (ii) Co-Defendants may receive credit at trial for the Trust (or Manville) share in the form of a set-off (defined herein as a reduction in the amount of a judgment) under the circumstances described in subsection 3, below, and calculated pursuant to applicable law.  Except as described below, in order to preserve the Trust's assets for payment of claims asserted by asbestos health claimants and to limit transaction costs of all parties, set-off

credit shall be the preferred method of satisfying Co-Defendant claims, regardless of whether the Trust and claimant have liquidated the underlying claim.

      **3.**      **Calculation of set-off.**  The manner of calculating set-off shall be based on whether the claim has been liquidated by the Trust and the applicable law of contribution and verdict reduction or settlement credit.

      **(a)**      **Calculation of Trust's payment.**  In situations where the amount of the Trust's payment or expected payment to a claimant is relevant to the set-off calculation, that amount shall be determined as follows:

      **(i)**      **For liquidated claims.**  Where the underlying claim has been liquidated, the amount of the Trust's payment to the claimant (the "Liquidated Trust Payment") shall be (a) the actual amount received to date by the claimant or (b) if no funds have yet been received, the amount of the liquidated value agreed to by the claimant and the Trust, multiplied by the pro rata share in effect at the time the set-off is being applied (as described above in Section H).

      **(ii)**      **Unliquidated claims.**  Where the claim has not been liquidated, the amount of the Trust's payment to the claimant (the "Unliquidated Trust Payment") shall be the amount of the Scheduled Value, as further described in this TDP, for the applicable disease category, multiplied by the pro rata share in effect at the time the set-off is being applied (as described above in Section H).

   **(iii)**  **Entitlement to subsequent Trust payment.** Where the amount of a set-off is calculated on the basis of subsection 3(a)(i) or (ii), above, and a Co-Defendant has paid a judgment based on joint and several liability or entered into a post-judgment settlement with the claimant, the Co-Defendant shall receive that portion of any future payment made by the Trust in respect of the underlying asbestos health claim which is:  1) beyond the amount of the set-off calculated pursuant to subsections 3(a)(i) or (ii); and 2) attributable to that part of claims tried against the Co-Defendant for which the Trust is jointly and severally liable.  The Co-Defendant shall have no entitlement to subsequent Trust payments when the amount of a set-off is calculated on the basis of the Trust's pro rata share or its allocated liability share.

  **(b)**  **Pro tanto states.** Pro tanto states are those in which any judgment against a non-settling defendant is reduced by the amount paid or agreed to be paid by a released party.

   **(i)**  **Liquidated claims.** Where the underlying claim has been liquidated, the amount of set-off shall be the Liquidated Trust Payment.

   **(ii)**  **Unliquidated claims.** Where the claim has not been liquidated, the amount of set-off shall be the Unliquidated Trust Payment.

  **(c)**  **Pro rata states.** In pro rata states, total liability is divided equally among all defendants found by the fact finder to be legally responsible tortfeasors (or agreed by the parties to be legally responsible tortfeasors, if applicable law so provides), including released parties.  In such states, judgments against nonsettling defendants are reduced, as provided by applicable law, by either the pro rata share attributable to released parties or the amount paid or agreed to be paid by released parties.  Solely for the purposes of obtaining a set-off in a pro rata state pursuant to this subsection 3(c), regardless of whether the Trust has been given a release, or the wording of any such release, claimants in pro rata states shall be deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co-Defendants against the Trust arising from a judgment obtained by such claimants.

   **(i)**  **Liquidated claims.** Where the underlying claim has been liquidated, the set-off amount shall be either (A) the Liquidated Trust Payment, or (B) the Trust's pro rata share of the judgment, as provided by applicable law.

   **(ii)**  **Unliquidated claims.** Where the underlying claim has not been liquidated, the set-off amount shall be either (A) the Unliquidated Trust Payment, or (B) the Trust's pro rata share of the judgment, as provided by applicable law.

(d)    **Allocation or apportionment states.**  Allocation or apportionment states provide that the amount of any judgment shall be reduced with reference to the apportioned share of released or absent parties.  The burden of proving the percentage liability share of the Trust or Manville shall be allocated as provided by applicable law.

(i)    **Liquidated claims.**  Where the underlying claim has been liquidated, the set-off shall be the larger of (a) the Liquidated Trust Payment, or (b) the liability share allocated by the fact finder to the Trust or Manville.

(ii)    **Unliquidated claims.**  Where the underlying claim has not been liquidated, the claimant shall make the following election:

(A)    To pursue his or her claim against the Trust, in which event any Co-Defendant(s) against whom a judgment is returned shall receive a set-off equal to the larger of (I) the Unliquidated Trust Payment, or (II) the liability share allocated by the fact finder to the Trust or Manville. If there are multiple settling tortfeasors, state law shall govern whether the set-offs attributable to such settlements are calculated in the aggregate or individually for each settling tortfeasor; or

(B)    To agree not to pursue his or her claim against the Trust in which event there shall be no set-off in respect of the Trust, except in the circumstances set forth in subsection 3(d)(ii)(E), below.  At such time as a Co-Defendant remaining at verdict[11] pays the resulting judgment or enters into a post-verdict or post-judgment settlement with the claimant, the Co-Defendant shall have the right to bring a Contribution Claim against the Trust, as set forth in subsection 4, below. Nothing in this paragraph shall modify the several liability of the Trust or Co-Defendants in jurisdictions providing for several liability as set forth by subsection 3(e) below.

(C)    The election required under this subparagraph shall be made by the claimant either (I) in open court on the record, or (II) in writing to the Trust and to those Co-Defendants then remaining at trial no later than the point in time described in subsection 3(d)(ii)(D), below.

---

[11]    As used in this Section I, the term "post-verdict settlement," shall refer to a settlement reached after the fact-finder has rendered a verdict establishing the amount of the claimant's compensatory damages.

(D)    The election required under this subparagraph shall be made after the completion of jury selection and before opening argument, unless the claimant chooses to make the election earlier.  In the case of bifurcated or multiphase trials, the claimant shall make the required election before opening argument (or, if no opening argument is had as to that phase, before the presentation of evidence commences) in the first trial phase addressing any issue, such as damages, product exposure or identification, or specific causation, which is individual to that claimant.  For this purpose, issues such as Co-Defendant negligence, product defect and liability for punitive damages shall not be considered issues individual to a particular claimant.

(E)    Notwithstanding any other provision of this subparagraph, a claimant may elect to pursue his or her claim against the Trust following a previous election not to do so if any of the Co-Defendants that went to judgment declare bankruptcy before paying the judgment or entering into a post-judgment settlement with the claimant.  The plaintiff shall be required to make such election within 60 days of the Co-Defendant's bankruptcy filing and shall notify the Trust and the Co-Defendant of such election in writing.  If the claimant makes such an election, any other nonbankrupt Co-Defendant(s) that went to judgment shall receive a set-off pursuant to subsection 3(d)(ii)(A) above, except that a nonbankrupt Co-Defendant which had previously paid the judgment or entered into a post-judgment settlement prior to the plaintiff's revised election shall retain its rights to make a Contribution Claim against the Trust under subsection 4, below.

(F)    The beneficiaries of the Trust disagree as to whether the provisions of this TDP will render the Trust a party over whom plaintiffs are unable to obtain jurisdiction within the meaning of NY CPLR § 1601.  To resolve this controversy, the parties stipulate and agree for themselves and all members of their respective classes, that in cases to which the limitation on joint liability provided by NY CPLR § 1601 would apply they shall divide the Trust's or Manville's share of liability among themselves as follows, notwithstanding any contrary provision of this Section I (including subsection 1(d) above to the extent, if any, it may be deemed to be contrary to this subsection), law or judicial decision: 80% of the Trust's or Manville's share shall be allocated as if the Trust were a party over whom jurisdiction could not be obtained, and the other 20% shall be borne by the plaintiffs.  The burden of proving the Trust's or Manville's share of liability shall be allocated as provided by applicable law.

(e)    **Several liability states.**  Where the applicable state or other law provides for several liability (as distinguished from joint and several liability) for all or part of a cause of action, applicable law shall determine the effect of the several liability of the Trust and/or the Co-Defendants on the amount of any set-off and the entitlement of Co-Defendants to future payments from the Trust.  In such jurisdictions, claimants shall retain their claims against the Trust to the extent those claims are based on several liability regardless of the other provisions of this Section I, and Co-Defendants shall bear no responsibility for the several liability of the Trust, except as mandated by applicable law.

**(f)**    **States with multiple set-off rules**.  In some states, different set-off rules (<u>pro tanto</u>, <u>pro rata</u> or apportionment) govern different causes of action or parts thereof or different elements of damages.  In such states, applicable law shall govern which set-off rules apply to each cause of action or part thereof and each element of damages.

**(g)**    **Application of set-off to claims tried and categories of damages.**  Where the judgment against Co-Defendant(s) resolves only a portion of the claimant's Trust Claim (for example, personal injury as distinct from wrongful death claims), the dollar amount of the Liquidated Trust Payment used in calculation of any reduction or set-off shall reflect any apportionment made by the Trust and the claimant reasonably and in good faith with regard to rights of the Co-Defendants under this TDP, <u>provided</u> that the Co-Defendants shall retain any rights available to them under applicable law to challenge such apportionment.  If the claimant has not liquidated his or her Trust Claim, the trial court shall allocate the Unliquidated Trust Payment between claims tried and not tried for purposes of calculating the set-off.  In addition, wherever applicable law calls for apportionment of economic and non-economic damages, the value assigned to the set-off in respect of the Trust's share shall be allocated between economic and non-economic damages in the same proportion that the judgment or underlying verdict against the Co-Defendant allocated such damages, notwithstanding any apportionment set forth in individual settlement documents between the Trust and the claimant.

**(h)**    **Determination of disease category.**  Unless the plaintiff elects otherwise prior to the time the verdict is returned, the disease category to be used for purposes of calculating set-off shall be as set forth below:

> (i).  If the plaintiff claimed at trial that the disease was mesothelioma, Level VIII;

> (ii).  If the plaintiff claimed at trial that the disease was lung cancer, Level VII;

> (iii).  If the plaintiff claimed at trial that the disease was other cancer, Level V;

> (iv).  If the plaintiff claimed at trial that the disease was a non-malignant condition caused by asbestos, Level III.

In the event the plaintiff claimed two diseases at trial, the categorization shall be that of the disease with the higher Scheduled Value, unless the jury specifically finds that the plaintiff does not have that disease.

If the plaintiff elects not to follow the procedure set forth above for determining the disease category to be used in calculating set-off, the following procedures shall govern.  At or before the verdict molding stage, Co-Defendant and claimant Beneficiaries shall use their best efforts to agree on the appropriate disease category for purposes of establishing the Unliquidated Trust Payment of a claim.  In the event of disagreements, the issue shall be decided by the trial court, based on the disease criteria set forth at Section D and the medical records and testimony submitted by plaintiff at trial.  The parties shall give notice to the Trust of the agreed-upon disease category or of the submission of the issue to the trial court. The Trust shall be bound by the court's ruling or the parties' agreed-upon determination.

### 4.     **Contribution Claims**.

 **(a)** **Right to pursue Contribution Claims retained.**  Co-Defendants shall have the right to pursue Contribution Claims (i) in connection with claims arising under the circumstances described in subsection 3(d)(ii)(B) above; and (ii) in any circumstance where no set-off credit is allowed by the trial court although this TDP would provide for a set-off.  In addition, in cases where the claimant and the Trust have not liquidated the claim, a Co-Defendant may, at its sole discretion, pursue a Contribution Claim against the Trust, rather than taking a set-off credit, provided that if the Co-Defendant chooses to appeal the judgment in respect of the claim, the Co-Defendant shall have first paid an amount equal to the Unliquidated Trust Payment to the claimant.  Any such choice by a Co-Defendant need not be made until the amount of the set-off credit is calculated by the trial court, and the Co-Defendant shall not be eligible to make the Contribution Claim until it has paid the judgment or
 entered into a post-judgment or post-verdict settlement with the claimant.  Under no circumstances shall the right to make any Contribution Claim under this TDP be lost by virtue of the fact that a Co-Defendant has paid the judgment against it or entered into a post-judgment or post-verdict settlement with the claimant.

 **(b)** **Notification of Contribution Claims.**  If a claimant accepts a Trust settlement, having obtained a verdict establishing the amount of the claimants' compensatory damages and one or more of Co-defendants' liability therefor, or a judgment against Co-defendant(s), and thereafter the Trust pays a Contribution Claim arising from such verdict or judgment, the claimant shall be liable to the Trust for the amount of the Trust payment to the claimant.  Co-defendants shall notify the Trust within 60 days of the return of a verdict or a judgment in favor of a claimant on which they may base a Contribution Claim.  If a Co-defendant fails to notify the Trust within the 60-day period, the Co-defendant's right to be paid with respect to the Contribution Claim is preserved only if such notice is received by the Trust prior to the Trust making a payment to the claimant who obtained the verdict or judgment against Co-defendant(s).  The Trust shall notify Co-defendants of the asbestos health claimants to whom it intends to make offers no later than 60 days before such offers are made.

**(c)** **Processing, valuation and payment of Contribution Claims.**  Contribution Claims made to the Trust based on payment or settlement of a judgment shall be processed in FIFO order of their receipt by the Trust, without reference to any queue established for claims of asbestos health claimants.  Contribution Claims shall be processed in the same fashion as claims of asbestos health claimants except that all arbitrations of Contribution Claims shall be binding.  Such claims shall be valued as if the Co-Defendant(s) had stepped into the shoes of the claimant whose verdict against Co-Defendant(s) gave rise to the claim for contribution; all Co-Defendant(s) with valid Contribution Claims shall therefore be entitled to recover from the Trust on their Contribution Claim(s) the same amount, in aggregate, the claimant could have recovered from the Trust.  In determining the value of the claim, the Trust may take into account the size of the verdict returned against the Co-Defendant(s).  Contribution Claims shall be paid in the same manner as claims of asbestos health claimants are paid pursuant to Sections G and H, above, and shall be subject to the same pro rata share provisions applicable to all other claims by Trust Beneficiaries.  Any information submitted by a Co-Defendant to the Trust pursuant to this subsection 4 shall be kept confidential by the Trust and shall not be disclosed to any other Beneficiary.

**(d)** **Co-Defendants' Contribution Claims pursued jointly.**  All Co-Defendants with Contribution Claims arising from the same judgment by a claimant shall use their best efforts to pursue such contribution claims in a coordinated fashion.

**5.** **Right to make individual allocation agreements.**  Nothing in this Section I shall prevent claimants and Co-Defendants from agreeing in writing in individual cases to allocate their respective claims against the Trust in such manner as they deem appropriate.

**6.** **Indemnity Claims.**  Any Trust Beneficiary holding an Indemnity Claim valid under applicable law, which was not waived pursuant to the applicable provisions of the Co-Defendants' Procedures, and who is not a Distributor within the meaning of subsection 8 below, may assert such Indemnity Claim either in the Cases, as provided by the Co-Defendants' Procedures, or may present it to the Trust.  If a Beneficiary elects to present an Indemnity Claim to the Trust, it shall be processed in the same fashion as Contribution Claims are processed under subsection 4, above.  Indemnity Claims shall be valued by the Trust as provided by applicable law and shall be subject to the provisions relating to payment and pro rata shares that are set forth in Sections G and H, above.

**7.** **Distributor Indemnity Claims.**  Any Trust Beneficiary that is a Distributor may present Distributor Indemnity Claims to the Trust for processing and payment pursuant to the provisions of this subsection 7.

    **(a)**    **Definitions.**  A Distributor is any entity that:  (i) was engaged in the business of distributing Manville asbestos or asbestos-containing products; (ii) was not engaged in the business of mining asbestos or manufacturing asbestos-containing products; and (iii) is not a member of the MacArthur Subclass.  A Distributor Indemnity Claim means any Indemnity Claim by a Distributor which constitutes a valid claim for indemnification under applicable law.  Distribution means the purchase, shipment, storage, sale and delivery of asbestos or asbestos-containing products which were not remanufactured, altered, re-labelled or installed by the Distributor.

    **(b)**    **Distributor Indemnity Claims Not Waived.**  No Distributor shall be deemed to have waived Distributor Indemnity Claims by any of the following:  (i) failing to comply with the provisions of Sections II and III.D.1 of the Co-Defendants' Procedures, including not filing a timely proof of claim for Indemnity in the Cases; (ii) the making of the Contribution Claim Election; or (iii) the expungement of any Proof of Claim for Indemnity by the Bankruptcy Court.

    **(c)**    **Distributor Indemnity Claim Percentage.**  The Distributor Indemnity Claim percentage is the proportion of a Distributor's asbestos-related loss in any particular case which shall be treated by the Trust as constituting a Distributor Indemnity Claim.  Distributors who meet the following two requirements shall have the right to process Indemnity Claims against the Trust using the Distributor Indemnity Claim percentage described below:  (i) 35% or more of the asbestos or asbestos-containing products purchased by the Distributor were distributed by it; and (ii) 35% or more of the asbestos or asbestos-containing products distributed by the Distributor were purchased from Manville.

    Except as specifically provided otherwise in the Stipulation of Settlement, the Distributor Indemnity Claim percentage shall be equal to the product of:  (i) the percentage of asbestos or asbestos-containing products distributed by the Distributor that it purchased from Manville; (ii) the percentage of asbestos or asbestos-containing products purchased by the Distributor which were distributed by it; and (iii) 95% if the Distributor filed a proof of claim for indemnity in Manville's bankruptcy which was not expunged and 86% otherwise.[12]  Thus, by way of example only, a Distributor that purchased 50% of the asbestos it dealt in from Manville, and which distributed 50% of the asbestos it purchased, and that filed a timely proof of claim would be assigned a Distributor Indemnity Claim percentage of 23.75% (50% x 50% x 95%).

    **(d)**    **Setting a Distributor Indemnity Claim Percentage.**  The Distributor Indemnity Claim percentage applicable to a particular Distributor shall be determined by the following procedures.

---

[12]  These three factors are hereinafter referred to as the components of the Distributor Indemnity Claim percentage.

First, a Distributor must make a written submission to the Trust setting forth its position concerning the proper Distributor Indemnity Claim percentage for that Distributor and each component of that percentage. The Trust shall promptly notify the SCB of the Distributor's submission, the proposed Distributor Indemnity Claim percentage and each component thereof. The SCB may share such information only with those persons necessary to enable the SCB to respond to the Distributor's submission. The SCB shall have 45 days from receipt of such notice to make its own written submission to the Trust concerning the proper Distributor Indemnity Claim percentage for the Distributor, together with such supporting documents as the SCB deems appropriate.

By the same date the SCB's submission is due, the Distributor shall submit to the Trust all documents in support of its position it wishes the Trust to consider. Such information provided by the Distributor shall be kept confidential by the Trust and shall not be shared with any other Beneficiary. Within 10 days following the date the SCB's submission is due, the Trust shall determine the Distributor Indemnity Claim percentage, and shall notify the Distributor and the SCB of its determination. If either is dissatisfied, they may present the issue to the Special Advisor for mediation.

The Special Advisor shall receive copies of all submissions presented to the Trust. If the Special Advisor is unable to resolve the issue through mediation, it shall be resolved by binding arbitration. The Special Advisor shall nominate three potential arbitrators (none of whom shall be counsel representing any Trust Beneficiary), each party shall strike one and the remaining nominee shall be the arbitrator. If both parties strike the same nominee, the Special Advisor shall select the arbitrator from the remaining two nominees. The arbitrator shall determine the procedures for the arbitration. The arbitrator's determination of the appropriate Distributor Indemnity Claim percentage shall be final and binding on the Distributor, the Trust and the SCB.

If this process results in a determination that less than 35% of the asbestos purchased by a Distributor was distributed by it or less than 35% of the asbestos or asbestos-containing products it purchased was from Manville, the Distributor shall not have the right to process its claims using a Distributor Indemnity Claim percentage (unless special circumstances are presented to and accepted by the Trust, as described below) and shall instead process its claims on a case-by-case basis as provided by subsection 7(f), below. Upon demonstration of special circumstances warranting such treatment, the Trust may in its discretion permit a Distributor to process its claims using a Distributor Indemnity Claim percentage even if the Distributor fails to meet the requirement set forth in the preceding sentence.

(e)    **Processing Distributor Indemnity Claims with a Percentage.**  Once a Distributor Indemnity Claim percentage has been established for a Distributor, the Distributor shall make any Distributor Indemnity Claims by submitting proof to the Trust that it has sustained an asbestos-related loss in a case which has been finally resolved by settlement, judgment or otherwise. Upon proof of such a loss, the Trust shall process and pay, in accordance with the procedures set forth in Section G, an amount equal to the Distributor Indemnity Claim percentage of such loss times the same pro rata share applicable to all Trust Claims, as described in Section H.

Distributor Indemnity Claims shall be processed and paid by the Trust in FIFO order in a queue separate from the queues for other Trust Claims.  The Trust, in consultation with counsel for the Manville Distributors Subclass, shall establish appropriate forms and procedures for processing Distributor Indemnity Claims.

(f)    **Processing Distributor Indemnity Claims With No Percentage**.  Distributors who do not have the right to process claims using a Distributor Indemnity Claim percentage shall present any Indemnity Claims to the Trust on a case-by-case basis.  The Distributor must establish that the particular loss it suffered gives rise to a right of indemnity against the Trust under applicable law. The Trust shall value such claims as provided by applicable law.  They shall be processed and paid their pro rata share in FIFO order, in accordance with the procedures set forth in Sections G and H. The Trust, in consultation with counsel for the Manville Distributors Subclass, shall establish appropriate forms and procedures for processing such Distributor Indemnity Claims.

(g)    **Distributor Information Confidential.**  Any information submitted by a Distributor to the Trust pursuant to this subsection 7 (other than a proposed Distributor Indemnity Claim percentage and the components thereof) shall be kept confidential by the Trust and shall not be disclosed to any other Beneficiary.

8.    **No Modifications Without Consent.**  The terms of this Section I of this TDP may not be modified without the concurrence of the SCB and the Legal Representative.  In addition, subsections 1-5 and 8-9 of this Section I may not be modified without the concurrence of counsel for the Co-Defendant Manufacturers Subclass and subsections 7-10 may not be modified without the concurrence of counsel for the Manville Distributors Subclass.  In addition, any changes to subsections 1-5 of this Section I which would explicitly treat members of the Manville Distributors Subclass less favorably than members of the Co-defendant Manufacturers Subclass shall also require the concurrence of counsel for the Manville Distributors Subclass.  No procedures relating to arbitration of Trust Claims, to be established pursuant to Section E of this TDP, shall be instituted or modified without the concurrence of counsel for the Co-Defendant Manufacturer Subclass; such counsel shall also receive the same notice, in the same form and at the same time, given to the SCB and the Legal Representative with respect to any matter for which the Trust must consult with, or seek the concurrence of, the SCB and the Legal Representative.

**9.    Applicable Claims.**  The provisions of this Section I shall apply to all Contribution Claims and Indemnity Claims except those resolved pursuant to the Stipulation of Settlement, executed on July 25, 1994.  The set-off provisions of this Section I, set forth in subsection 3, shall apply with respect to all cases tried among Trust beneficiaries after the effective date of this TDP, regardless of whether the plaintiff's Trust Claim was liquidated or otherwise resolved by the Trust prior to or after that date.

**10.    Concurrence and Consultation Procedures.**  The procedures set forth in Section K shall apply with respect to any matter as to which counsel for the Co-Defendant Manufacturers Subclass or the Manville Distributors Subclass have concurrence or consultation rights under this Section I.

**J.    Attorneys' Fees.**

Attorneys' fees payable in connection with Trust Claims liquidated and paid through this TDP after this TDP is finally approved by the Courts, where calculated as a percentage of recovery, shall be the lower of the fee provided in the contract between claimant and counsel or 25%, exclusive of costs chargeable to the claimant.  The recovery shall be measured by the actual payments from the Trust to the claimant, not the liquidated value of the claim.  Legal fees shall be paid as payments to claimants are made by the Trust.

**K.**     **Consultation Procedures; Concurrence Procedures; Resolution of Disputes Involving Concurrence of the SCB and the Legal Representative.**

     **1.**     **Consultation Procedures**.  With respect to any matter relating to the Trust as to which the SCB and the Legal Representative have expressly been given the right to be consulted, the Trust shall provide to the SCB, through their counsel, and the Legal Representative as much advance notice of such matter as is reasonably practicable in the circumstances.  Upon such notice, the Trust will provide the SCB and the Legal Representative with such reasonable access to experts retained by the Trust and to the Trust staff as the SCB and the Legal Representative may reasonably request during the time that the Trust is considering such matter and will provide the SCB and the Legal Representative with the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with one or more Trustees and senior management of the Trust.  In determining when to give such advance notice to the SCB and the Legal Representative with respect to a matter as to which the SCB and the Legal Representative have such consultation rights, the Trust will take into consideration the time required for the SCB and the Legal Representative, if they so wish, to engage and consult with their own independent financial or investment advisors as to such matter and to ask the Trust whether the Trust would be willing to bear the cost of such engagement and consultation (it being expressly understood and agreed that the Trust shall have no obligation or duty of any kind whatsoever to bear any such cost or otherwise to provide any such independent financial or investment advice).  Unless the Trust shall, in its sole and absolute discretion, expressly elect in writing to bear some or all of such cost, any such engagement of or consultation with financial or investment advisors shall be at the SCB's and the Legal Representative's sole cost and expense.

     **2.**     **Concurrence Procedures**.  "Concurrence" means the unconditional consent (expressed to the Trust in writing, if requested by the Trust, in form and substance reasonably satisfactory to the Trust) to a Trust action or decision as described by the Trust in its request for such concurrence.  In any circumstance hereunder where the Trust makes a decision with respect to matters which require the concurrence of the SCB and the Legal Representative, the Trust shall:

     (i)     provide the SCB, the Legal Representative and the Special Advisor with reasonable access to experts retained by the Trust and Trust staff during such time as the decision is being made;

     (ii)     bring the proposed decision to the attention of the SCB, the Legal Representative and the Special Advisor; and

     (iii)     provide the SCB and the Legal Representative no fewer than 45 days to comment with respect to such proposed decision.

In the event the SCB or the Legal Representative disagree with the Trust's decision, they shall express their views as fully as possible to the Trust and make such counterproposal as may be appropriate. The Trust, the SCB and the Legal Representative shall thereupon consult together with the Special Advisor in an effort to reach concurrence.

3.      **Dispute Resolution**.

(a)      While it is anticipated that the mutual interests of the Trust, the SCB and the Legal Representative together with the sharing of information which is envisioned under this TDP, are likely to yield concurrence whenever called for under this TDP, there may be situations where a genuine disagreement arises which would have the effect of preventing or permitting steps to be taken to which the Trust, the SCB or the Legal Representative do not agree. In such event, the Trust, the SCB or the Legal Representative may request that the dispute be resolved and, pending resolution of the dispute, the actions in questions shall remain in abeyance.

(b)      If and when the Trust, the SCB or the Legal Representative shall ask that a dispute be resolved, the following procedure shall be applied:

(i) the Trust, the SCB and the Legal Representative may agree upon an individual to serve as a dispute resolver;

(ii) if there is no agreement, the Special Advisor shall nominate four separate individuals to serve as the dispute resolver, selecting them based upon the Special Advisor's knowledge of the issues in dispute and of the competencies of the individuals to be selected;

(iii)      the Trust shall strike one of the four nominees;

(iv)      the SCB shall next strike one of the remaining three nominees;

(v)      the Legal Representative shall next strike one of the remaining two nominees; and

(vi)      the remaining nominee shall serve as the dispute resolver and his/her decision shall be final and binding on the Trust, the SCB and the Legal Representative.

(c)  If the dispute resolver finds in favor of the Trust, the SCB and/or the Legal Representative shall be deemed upon the issuance of such finding to have given their concurrence to the matter for which their concurrence had been sought and had been withheld, and the SCB and the Legal Representative will execute and deliver such documents, and take such other action, as the Trust may reasonably request to evidence or confirm such concurrence.

(d)  In such a dispute resolution process, the Trust, the SCB and the Legal Representative shall have an opportunity to fully explain their positions to the dispute resolver and the Special Advisor shall be available to assist.  The dispute resolver shall be empowered to engage such expert advice as he/she shall deem appropriate.

(e)  In the event that a dispute involves distribution of Trust funds, any distribution of amounts covered by the dispute shall await conclusion of the dispute resolution process.

(f)  Any dispute relating to concurrence with respect to an amendment of the Trust Agreement, or the Amended and Restated Supplemental Agreement dated as of November 15, 1990 between the Trust and the Company (the "Amended and Restated Supplemental Agreement"), will be resolved in accordance with, and will otherwise be subject to, the special provisions with respect to such disputes set forth in Section L below.

## L.    **Miscellaneous.**

1.    Except as provided in the next sentence and in Section H, all aspects of this TDP may be amended, altered or adjusted by the Trust to reflect changed circumstances, greater information and/or to improve procedures with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.  The procedures set forth herein governing the pro rata share, the Scheduled Diseases, Categorization Criteria, and Scheduled Values set forth in Section D above, and the Maximum Values set forth in Attachment A, may be amended, altered or adjusted to reflect changed circumstances, greater information and/or improved procedures by the Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.

2.    Any amendment of the Trust Agreement or the Amended and Restated Supplemental Agreement will require the concurrence of the SCB and the Legal Representative, which concurrence shall not be unreasonably withheld or delayed.  If the Trust believes that the SCB and the Legal Representative are unreasonably withholding or delaying such concurrence, the Trust shall have the right, at its option, either:

(a)    to seek an Order from the Courts permitting the Trust to make such amendment without the concurrence of the SC and the Legal Representative, and if such Order is granted and becomes final and non-appealable, the Trust shall have the right to make such amendment without such concurrence; or

(b)     to request that the dispute be resolved pursuant to the procedure for final and binding resolution of disputes involving concurrence of the SCB and the Legal Representative provided in Section K above; and in the case of a request pursuant to this clause (ii), the following terms shall apply:

(i)     the SCB, the Legal Representative, the Trust and the Special Advisor shall cause the dispute resolver to be selected within five days after such request is made, in accordance with subsection K.3(b)(i)-(v) above;

(ii)    it shall be a condition to the selection of such dispute resolver that he/she agree to render his/her determination within ten days of his/her selection to act as dispute resolver for such dispute; and

(iii)   the SCB, the Legal Representative and the Trust shall jointly direct such dispute resolver (and shall each use best efforts to cause and assist such dispute resolver) to make his/her final and binding determination, and to notify the parties thereof, within ten days after such selection is made.

3.     In the event that the positions of the SCB are no longer filled as described in the Manville Corporation Second Amended and Restated Plan of Reorganization, the appointment of three attorneys to fill that role shall be made from time to time by the President of the Association of Trial Lawyers of America or his/her designee.  The Special Advisor shall be appointed from time to time by the Trust with the concurrence of the SCB and the Legal Representative.  Initially, that role shall be filled by Mark Peterson, Esq.

4.     Subject to the terms of subsection H.4, the reasonable expenses of the SCB and the Legal Representative, together with the reasonable fees and expenses of their counsel, and the reasonable charges and expenses of the Special Advisor and of any dispute resolver, shall be borne by the Trust; provided, however, that if the Trust believes that any concurrence with respect to an amendment of the Trust Agreement or the Amended and Restated Supplemental Agreement is being unreasonably withheld or delayed, the Trust reserves the right to refuse to pay the fees and expenses of counsel to the SCB and the Legal Representative in connection therewith (including, without limitation, counsel fees and expenses incurred in connection with any opposition or challenge by the SCB, their client, or the Legal Representative to the action(s) with respect to which such concurrence is being withheld or delayed).  However, if the SCB or the Legal Representative obtain an Order from the Courts directing the Trust to pay such fees and expenses on the ground that the Trust's refusal to do so is improper, and such Order becomes final and nonappealable (or if the Trust elects to have the dispute concerning such concurrence resolved pursuant to the Section K ADR Process as provided in subclause 2(b) of this Section L and the dispute is resolved in favor of the SCB or the Legal Representative), the Trust will pay such fees and expenses as are specified in such final and nonappealable Order (or in the determination made by the dispute resolver).

5.      Solely with respect to those issues on which their concurrence is required under this TDP or on which the Trust is required to consult them, the Trust shall bear the reasonable fees and expenses of counsel for the Co-Defendant Manufacturers Subclass and the Manville Distributors Subclass subject to the same reservation applicable to the fees and expenses of the SCB and the Legal Representative set forth in Section L.4 above.

6.      No one acting in his/her capacity as one of the Trustees, the SCB, the Legal Representative, the Special Advisor, and/or dispute resolver shall be liable to any entity or person except for his/her own gross negligence or willful misconduct.  Solely to the extent they are exercising their concurrence or consultation rights under this TDP, counsel for the Manville Distributors Subclass and the Co-Defendant Manufacturers Subclass shall have the same limitation on their liability.

## M.     Transition Provisions.

1.      All claims with dates of diagnosis after August 31, 2002 are subject solely to the provisions of this TDP.  Claimants who have previously filed claims with the Trust and who have dates of diagnosis prior to September 1, 2002 but who have FIFO numbers greater than 445,000 may elect to refile their claims and be treated under this TDP.  However, any payments they have previously received from the Trust shall be offset against any amounts they would otherwise receive under this TDP.

2.      All claimants whose claims are resolved pursuant to this TDP will be subject to any increase (or decrease) in the pro rata share that may be determined from time to time applicable to claims resolved pursuant to this TDP.

## ATTACHMENT A -- MAXIMUM VALUES

The Maximum Values listed below for each of the eight Scheduled Diseases represent a ceiling or upward limit on the liquidated value of any claim settled by individual evaluation or by arbitration, except for Extraordinary Claims as described in Section C.9.  In addition, if a claimant litigates a claim and obtains a judgment in excess of the Maximum Value, any pro rata payment with respect to the excess amount will be made only from Pool B, which, as described in Section G, may never contain funds from which such payment can be made.

| Level | Scheduled Disease | Maximum Value |
|-------|-------------------|---------------|
| I | Other Asbestos Disease Cash Discount Payment) | $      600 |
| II | Asbestosis/Pleural Disease | $  30,000 |
| III | Asbestosis/Pleural Disease | $  40,000 |
| IV | Severe Asbestosis Disease | $400,000 |
| V | Other Cancer | $200,000 |
| VI | Lung Cancer (One) | $  50,000 |
| VII | Lung Cancer (Two) | $400,000 |
| VIII | Mesothelioma | $750,000 |