UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
: 
In re: :
: Chapter 11
MOTORS LIQUIDATION COMPANY, et al. :
    f/k/a General Motors Corp., et al. : Case No. 09-50026 (REG)
:
                                 Debtors. : (Jointly Administered)
:
------------------------------------------------------------------- x

## DECLARATION OF JOHN L. MEKUS

JOHN L. MEKUS, pursuant to Title 28, United States Code § 1746, hereby declares under penalty of perjury as follows:

1.     I am the Executive Director of the Delaware Claims Processing Facility (the "DCPF"), a Delaware limited liability company formed in 2006 to administer and process asbestos-related personal injury claims on behalf of multiple asbestos personal injury settlement trusts. Those trusts presently include the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust; the Celotex Asbestos Settlement Trust; the Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust; the Owens Corning/Fibreboard Asbestos Personal Injury Trust; the DII Industries, LLC Asbestos PI Trust; and the United States Gypsum Asbestos Personal Injury Settlement Trust (collectively, the "Trusts"). I have personal knowledge of the facts set forth in this declaration.

### Relevant Background

2.     The Trusts are non-profit entities established pursuant to Section 524(g) of Chapter 11 of the Bankruptcy Code. Their creation was the result of confirmed plans of reorganization requiring the creation and funding of trusts to compensate asbestos claimants.

Consistent with those plans of reorganization, Section 524(g), and the specific Trust Distribution Procedures (the "TDPs") that govern the various Trusts' payment of claims, the Trusts are charged with the responsibility of ensuring that claimants are treated fairly, equitably, and reasonably in light of the limited assets available to satisfy qualified asbestos personal injury claims.

3.      As qualified settlement trusts under Section 524(g), the central purpose of the Trusts is to process and, when appropriate, settle asbestos personal injury claims filed by claimants. DCPF presently performs many of those functions on behalf of the Trusts.

4.      As part of the claims process, asbestos claimants submit medical and other records to the Trusts for review and analysis by DCPF personnel. Those materials include proofs of claim, medical records, discovery responses, tax records, deposition transcripts, and affidavits, and are maintained by DCPF for each of the Trusts. At present, most claims are submitted to the Trusts using DCPF's proprietary electronic filing system, Trust On-line. However, many of the earlier claims against one of the trusts, the Celotex Asbestos Settlement Trust, were submitted in paper form. Claimants still have the option of submitting their claims in paper form.

5.      The materials submitted by claimants and their legal representatives are highly personal and confidential. All claims include medical records, which can disclose sensitive information such as histories of drug and alcohol abuse, HIV status, and other highly personal details regarding claimants' personal histories and medical conditions. The materials submitted by claimants often include confidential information regarding claimants' personal finances, Personally Identifiable Information (such as social security numbers), or information concerning their family members. For example, economic loss reports may often contain descriptions of claimants' children, including dependents' mental and/or physical disabilities or drug addiction.

6. In addition to medical and financial data, claims files frequently include social security numbers and other confidential information from non-claimants, including spouses, children, other third parties (including co-workers), and administrators or executors of trusts and estates. Moreover, DCPF periodically communicates with the Trusts and their respective counsel with regard to the processing and settlement of claims. Documents reflecting those communications may be contained within the claim files maintained by DCPF on behalf of the Trusts.

7. Pursuant to DCPF's agreements with the Trusts, DCPF is obligated to maintain the confidentiality of these materials. Moreover, pursuant to the standard Electronic Filer Agreements that govern submission of electronic claims to the Trusts by asbestos claimants' counsel, any claims-related materials submitted to DCPF and the Trusts are considered confidential information submitted for settlement purposes only. DCPF personnel evaluate claimants' submissions in light of individual Trust instructions for the purpose of determining whether settlement is appropriate. In addition, each trust's claims information is maintained in confidence by DCPF and not shared by DCPF with the other trusts.

8. The TDPs, which are made publicly available to claimants, set forth the basic guidelines for processing and paying all claims against the Trusts. These TDPs generally require that all submissions to the Trusts be treated as confidential and made in the course of settlement discussions. The TDPs also generally state that claimants' submissions shall be protected by all applicable state and federal privileges -- including those privileges directly applicable to settlement discussions. Finally, the TDPs generally permit a Trust to disclose information submitted by a claimant only if the claimant authorizes the disclosure or in response to a valid order issued by the bankruptcy court. Consistent with the mission given to the Trusts by the

bankruptcy courts that approved plans of reorganization, DCPF therefore undertakes to preserve the confidentiality of claimant files in its work for the Trusts.

9. In addition to the above-referenced confidentiality restrictions regarding the materials submitted by claimants and their representatives, both the Trusts and DCPF consider the claims resolution process to be protected work product and the databases utilized by DCPF to be highly confidential and proprietary. For example, Trust On-line is a proprietary electronic claims filing system developed -- at significant expense -- in order to effectively manage the claims it has been tasked to process for the Trusts. All information and materials submitted by claimants to the Trusts, together with all other information and materials relating to the resolution of those claims by the Trusts, are maintained in DCPF's proprietary computer system. In particular, the structure of the databases themselves, including the logically defined relationships between relational and various object data fields, is considered proprietary business information.

10. DCPF uses sophisticated software to organize and maintain a master database containing information related to claims filed against each of the Trusts. The master database comprises a collection of "virtual" databases containing each Trust's data. Pursuant to the agreement by which DCPF licenses its software, DCPF owns any and all derivative works it generates from the software, including all modifications and upgrades. DCPF has modified and upgraded the software as it relates to the organization, categorization, and storage of data relating to claims against the Trusts.

11. The Trusts' claims databases, including the Trust On-line processing system, constitute proprietary information and are treated as trade secrets by DCPF. Production of the Trusts' claims databases could reveal confidential research, development, or commercial

information relating to the collection, sorting, processing, and storing of claims data by the Trusts and/or DCPF to DCPF's competitors. DCPF would suffer serious competitive injury in the event that its systems and internal claims management processes were disclosed to competing claims processing providers. For this reason, the standard-form Electronic Filer Agreements supplied by the Trust and DCPF to claimants' representatives stipulate that the Trust On-line system shall be the exclusive proprietary property of DCPF and that both the software and any reports generated by Trust On-line will be maintained in confidence by the filing firm.

12. In sum, the Trusts and DCPF have already invested considerable time, money, and energy in order to implement and protect the confidentiality of material submitted by claimants. Among other things, these efforts have included software audit trails, internal processes, engaging third-party vendors to test and strengthen security, data security integrity testing, complying with ISO 27002 standards relating to information security and control, systemic personal controls over data access, and using appropriate firewalls and encryption technology.

**The Proposed Subpoena Sought by the Official Committee of
Unsecured Creditors and its Impact on DCPF's Operations**

13. I have reviewed the Notice of Hearing filed by the Committee of Unsecured Creditors (the "Creditors Committee" or the "Committee") on July 20, 2010, including the proposed subpoena attached to that application as Exhibit D. Based on my experience with the Trusts and understanding of DCPF's operations, complying with such a subpoena would impose an extraordinary burden on DCPF. Moreover, given the limited resources available to the Trusts and DCPF -- both in terms of financial resources and available personnel -- requiring the Trusts and DCPF to respond to such a subpoena would also directly impact the many asbestos claimants whose claims remain pending before the various Trusts.

14. Separate and apart from the confidentiality considerations discussed above and the costs associated with actually producing responsive documents, there are several distinct burdens associated with responding to a request along the lines proposed by the Committee.

15. The first category of documents sought by the Creditors Committee consists of asbestos claimant files maintained by the Trusts and DCPF. To the extent that the Committee's first proposed request asks for "[a]ny and all claims forms and other Documents submitted by each of the Claimants to each of the Trusts" for approximately 7,400 mesothelioma claims filed against GM prior to its bankruptcy filing, there are multiple steps that would need to be performed by each of the six Trusts[1] to comply with the subpoenas. Because DCPF maintains the Trusts' claims databases and (particularly in the case of Celotex) any paper claims files, the Trusts' responses to the Subpoenas would necessitate a search and review by DCPF of a vast number of documents.

16. First, DCPF personnel would need to search for the potential claim files of the 7,400 individuals for each of the Trusts. This task is made exponentially more difficult because each individual name would need to be confirmed against multiple potential entries. Moreover, without detailed identifying information regarding each GM claimant (including but not limited to social security numbers and first, middle, and last names) the results of such a search would be wholly unreliable and DCPF would have no way to ensure that the information it retrieves from each of the six Trusts' claims databases in fact relates to one or more of the GM mesothelioma claimants. The total number of potentially responsive claim files that would need to be searched is likely to far exceed 7,400.

---

[1] Although there are six different Trusts involved here, Owens Corning and Fibreboard maintain separate subaccounts with separate proofs of claim and claimants.

17. Second, and more importantly, producing the claims files sought by the Committee would require DCPF and its counsel to print and review all documents from the identified files to ensure that the files produced actually match the GM claimants referenced and that any inadvertently-included or privileged materials are redacted from any claims files produced. Given the scale of the materials maintained in claimant files, this could require the review of hundreds of thousands of documents even for those files that are presently maintained in electronic form.

18. Moreover, because the Celotex Trust still maintains a large quantity of unscanned paper files, locating and retrieving the relevant claimant files for that particular Trust would require the manual retrieval of files from storage boxes. The locations of individual Celotex claimant files are only specified by box. This means that DCPF personnel would need to retrieve an entire box for each potentially responsive file and review the contents of the box just to locate the appropriate file. Most of those files – consisting of roughly 40,000 boxes -- are archived offsite and DCPF is charged a fee for their retrieval. Additionally, the Celotex paper files also likely contain documents authored by DCPF claims reviewers that cannot be considered "[d]ocuments submitted by each of the Claimants to each of the Trusts." These and other documents would need to be manually extracted as part of any production of claimant submissions.

19. Third, under most of the Trusts' TDPs and Electronic Filer Agreements, the Trusts and DCPF are required to notify claimants of any subpoena seeking their confidential records so that they may have an opportunity to object. Identifying and notifying appropriate counsel for each of the relevant claimants will impose additional costs and take valuable time away from the DCPF personnel whose responsibility it is to evaluate pending claims.

20. Based on my experience with the databases for all of the settlement Trusts serviced by DCPF, I anticipate that the process of searching for, reviewing, redacting and producing information relating to the 7,400 GM mesothelioma claimants referenced by the Creditors Committee would consume considerable time and resources. Based upon DCPF's experience, I estimate that a DCPF employee would need to retrieve each Trust claim file, review it in its entirety, and prepare it for production as set forth above. Repeating these steps for the total number of claimants and seven distinct Trust claims files amounts to a considerable burden for DCPF and its personnel.

21. Separate and apart from the tasks required to locate, review, and produce claimants' own submissions to the Trusts, the Creditors Committee's proposed subpoena also calls for documents "relating to payments made or to be made to each of the [GM mesothelioma] Claimants by each of the Trusts, or reflecting decisions or resolutions concerning the Claimants' claims against the Trusts." As drafted, this request appears to require the production of significant amounts of material -- maintained both in electronic and paper format -- reflecting DCPF's own assessment and analysis of the merits and value of asbestos claims submitted for settlement.

22. For example, the individual claims files overseen by DCPF for the Trusts frequently reflect the work product and analysis of DCPF personnel regarding the settlement of particular claims. In addition to internal work product generated by DCPF staff, these materials can also include legal advice received from counsel to the various trusts regarding liability issues.

23. Thus, fully complying with the Committee's second proposed subpoena request would require DCPF, the Trusts, and their counsel to review far more than just claimant files.

The burdens associated with this undertaking are impossible to estimate at present, but I anticipate that they would be considerable. In addition, the work product called for by that request would necessarily reveal confidential information regarding the manner in which each Trust evaluates and (if applicable) settles asbestos claims.

24. In sum, responding to a subpoena calling for the documents requested in Exhibit D to the Creditors' Committee's Rule 2004 application would impose significant financial costs on DCPF and the Trusts. While the Trusts have been funded with significant sums by the Bankruptcy Courts to process and pay qualifying claims, those funds are nonetheless limited when compared against the Trusts' present and future asbestos liabilities. As a result, each Trust's TDP is periodically revised to apply set "payment percentages" that are well short of 100 percent in order to safeguard trust assets for future claimants. Every dollar spent on document review and production is thus a dollar less for qualifying claimants.

25. Moreover, even setting aside the financial burdens discussed above, having DCPF's staff conduct the review and production requested here would necessarily impact the processing of pending claims. Collectively, the Trusts have hundreds of thousands of claims pending against them. Each year DCPF processes hundreds of thousands of claims for the Trusts, but additional claims continue to be filed against the Trusts on a continual basis.

26. At present, the entirety of DCPF's staff is fully engaged in reviewing claims or performing other necessary functions. DCPF does not maintain a staff of clerical employees that are available to gather and review files. Requiring DCPF's staff to be retasked on document review and production would hamper the ongoing claims process, delay the compensation of individuals who have been waiting to have their claims reviewed, and run counter to the Trusts' fundamental mission under the relevant TDPs and confirmed plans of reorganization.

27. I declare under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, Delaware
August 2, 2010

_____/s/ John L. Mekus_____