**Hearing Date and Time:  August 9, 2010 at 9:45 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  August 2, 2010 at 8:00 p.m. (Prevailing Eastern Time)**

Elihu Inselbuch, Esq.
Rita C. Tobin, Esq.
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY  10152-3500
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

Trevor W. Swett III, Esq.
James P. Wehner, Esq.
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle
Washington, D.C.  20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Attorneys for the Official Committee of*
*Unsecured Creditors Holding Asbestos-Related Claims*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
|  |  |
|---|---|
| In re | ) Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a GENERAL MOTORS CORP., *et al.*, | ) |
| | ) Case No. 09-50026 (REG) |
| Debtors. | ) Jointly Administered |

-------------------------------------------------------------X

**RESPONSE AND LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS HOLDING ASBESTOS-RELATED CLAIMS TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 DIRECTING PRODUCTION OF DOCUMENTS BY (I) THE CLAIMS PROCESSING FACILITIES FOR CERTAIN TRUSTS CREATED PURSUANT TO BANKRUPTCY CODE SECTION 524(g) AND (II) GENERAL MOTORS LLC AND THE DEBTORS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

PRELIMINARY STATEMENT .................................................................. 1

ARGUMENT ........................................................................................ 4

I.    ESTIMATION MUST BE FOCUSED ON ITS CORE PURPOSE
      AND THE DEBTORS' OWN CLAIMS HISTORY ................................. 4

      a.    The proper scope of estimation is the Debtors' aggregate liability,
            not the merits of individual cases ............................................. 4

      b.    The Debtors' own claims history is the touchstone for estimation ........ 7

II.   DISCOVERY FROM OTHER ASBESTOS PERSONAL INJURY
      TRUSTS IS IRRELEVANT TO ESTIMATION IN THIS CASE ............... 10

      a.    Claims submitted to trusts responsible for entities other than GM
            are not relevant to Old GM's liability ...................................... 11

      b.    Trust payment amounts for non-GM exposure are not relevant to
            GM's liability ................................................................. 15

III.  THE PROPOSED DISCOVERY AND THE ESTIMATION PLAN
      IT IMPLIES WOULD DELAY CONFIRMATION SIGNIFICANTLY ....... 16

      a.    The history of asbestos estimation shows that firm control of the
            discovery process will result in a speedy and fair proceeding ........... 16

      b.    Unchecked discovery and attempts to make individual claims
            determinations will take the estimation process off track for
            months and perhaps years .................................................... 19

CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

In re Armstrong World Industrial, Inc., 348 B.R. 111 (D. Del. 2006)..... 4, 7,8, 9, 16

In re Bakalis, 199 B.R. 443 (Bankr. E.D.N.Y. 1996) ...................................3

Barnes v. Owens-Corning Fiberglas Corp., 201 F.3d 815 (6th Cir. 2000) ............ 13

Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973) ........... 12

Cadlo v. Metalclad Insulation Corp., 61 Cal. Rptr. 3d 104 (Ct. App. 2007).......... 13

In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702 (Bankr. S.D.N.Y.
        1991)...........................................................................................3

In re Eagle-Picher Industrial, Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995)..........5, 8

In re Federal-Mogul Global Inc., 330 B.R. 133 (D. Del.
        2005)...................................................... 4, 5, 6, 8, 9, 10, 16, 17

Jones v. John Crane, Inc., 35 Cal. Rptr. 3d 144 (Ct. App. 2005) ...................... 13

In re La Rouche Industrial, Inc., 307 B.R. 774 (D. Del. 2004) .......................5, 6

Owens Corning v. Credit Suisse First Boston (In re Owens Corning), 322 B.R.
        719 (D. Del. 2005)................................................... 4, 5, 8, 9, 17, 18

Raleigh v. Illinois Department of Revenue, 530 U.S. 15 (2000) .........................5

In re Roman Catholic Archbishop of Portland, 339 B.R. 215 (Bankr. D. Or.
        2006).............................................................................................6

Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,
        549 U.S. 443 (2007) vacated and remanded to 525 F.3d 885 (9th Cir.
        2008) .........................................................................................5

Wilson v. John Crane, Inc., 97 Cal. Rptr. 2d 240 (Ct. App. 2000).................... 13

## DOCKETED CASES

In re Chemtura, Case No. 09-11233 (Bankr. S.D.N.Y.) ........................ 4, 5, 6, 7

In re Owens Corning, Case Nos. 00-3837-3854 (Bankr. D. Del.) .............. 8, 17, 18

In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del.) ............ 19, 20, 21, 22

## FEDERAL STATUTES AND RULES

11 U.S.C. § 524(g) ...................................................... 1, 5, 12, 15, 16, 19

28 U.S.C. § 1411(a) ................................................................ 6

Fed. R. Bankr. P. 2004 ..................................................... 3, 23

Fed. R. Civ. P. 26(b)(1) ........................................................ 3

## MISCELLANEOUS

Restatement (Second) of Torts § 431 ..................................... 12

TO:     THE HONORABLE ROBERT E. GERBER
        UNITED STATES BANKRUPTCY COURT

The Official Committee of Unsecured Creditors Holding Asbestos-Related Claims ("**ACC**") against the above captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**" or "**Old GM**"), by and through its undersigned counsel, hereby responds to the motion of the Official Committee of Unsecured Creditors ("**Creditors Committee**") for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing the service of subpoenas compelling the production of documents by (i) the claims processing facilities for certain trusts created pursuant to the Bankruptcy Code § 524(g), and (ii) General Motors LLC ("**New GM**") and the Debtors (the "**Motion**").

## PRELIMINARY STATEMENT

If the Debtors, the ACC, the legal representative for holders of future asbestos personal injury claims (the "**Future Claimants' Representative**") and the Creditor's Committee cannot reach an agreement regarding the approximate value of the Debtors' aggregate asbestos-related liability, this Court will need to estimate that liability for the limited purposes of formulating a confirmable plan of reorganization. Such an estimation is properly a high-level, macroeconomic analysis of what it would cost the Debtors to resolve all present and future asbestos claims against them had the Debtors never entered bankruptcy. As a result, estimation must be focused on the Debtors' own claims history – its experience in receiving and resolving claims in the tort system.

To conduct this estimation, the parties and the Court will need information about how and why Old GM resolved asbestos personal injury claims, including the

complete databases Old GM used to track claims and information about the trends and context in which Old GM resolved those claims. Some of this GM-specific information has been provided by the Debtors, but additional materials are needed. Indeed, the ACC itself has sought discovery from the Debtors narrowly tailored to further the purposes of aggregate estimation.[1] And to that part of the Creditors Committee's request directed to New GM and the Debtors, the ACC has no objection.

Now, however, the Creditors Committee seeks leave to subpoena vast amounts of additional information entirely unrelated to the aggregate estimation of the Debtors' liability from each of seven trusts established as a result of *other* asbestos bankruptcies. The Creditors Committee claims that, in order for the estimation expert it has retained to accurately value the universe of asbestos claims against the Debtors, it requires "any and all claims forms and other filings submitted to each of the Trusts by the plaintiffs in each of the pre-petition asbestos personal injury actions against Old GM in which the plaintiffs alleged they suffered from mesothelioma" and "the amounts paid by each of the Trusts to the plaintiffs in the Mesothelioma Cases."[2] This request includes the seven trusts' claim files and settlement payment history for more than 7000 individuals — potentially encompassing hundreds of thousands of pages of individuals' detailed

---

[1]    *See* Application of the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims for an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Taking of Document Discovery and Deposition Testimony from the Debtors and from General Motors LLC, Its Subsidiaries and Affiliate Companies [Dkt. No. 6382].

[2]    Motion of the Official Committee of Unsecured Creditors of Motors Liquidation Company for an Order Pursuant to Bankruptcy Rule 2004 Directing Production of Documents By (I) the Claims Processing Facilities for Certain Trusts Created Pursuant to Bankruptcy Code Section 524(g), and (II) General Motors LLC and the Debtors [Dkt. No. 6383] ("**Motion**") at 2.

medical files and evidence of exposure to asbestos-containing products of other companies. The discovery sought by the Creditors Committee raises serious practical and legal concerns, and threatens to jeopardize the efficiency and utility of the estimation proceeding.

Rule 2004 requires the Court to weigh the relevance of and necessity for the information sought by examination. In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). Rule 2004 may not be used to "stray into matters not relevant to the basic inquiry." In re Bakalis, 199 B.R. 443, 448 (Bankr. E.D.N.Y. 1996). Cf. Fed. R. Civ. P. 26(b)(1) (for good cause, the court may order discovery relevant to the subject matter involved in the action). Here, the mass of information the Creditors Committee seeks from the trusts is irrelevant and unnecessary to estimation, and leads the estimation process down a path that will result in delay and error. As a practical matter, the Creditors Committee's request will quickly overwhelm the available time and resources available for creating an asbestos trust. From the outset of this bankruptcy case, speed has been the watchword, and the Debtors, the United States Treasury, and other parties in interest have aspired to an expedited schedule for plan formulation and confirmation. Wading through tens of thousands of individual claim files relating to the liability of entities other than the Debtors would delay estimation and confirmation for months or, more likely, years. This Court should therefore deny the Creditors Committee's Rule 2004 motion to the extent it seeks trust materials.

## **ARGUMENT**

I. **ESTIMATION MUST BE FOCUSED ON ITS CORE PURPOSE AND THE DEBTORS' OWN CLAIMS HISTORY**

> a. **The proper scope of estimation is the Debtors' aggregate liability, not the merits of individual cases**

Estimation of asbestos-related liability is an integral step in the process of formulating and confirming a plan of reorganization in an asbestos bankruptcy and allocating the value of the estate among the competing stakeholders. *See, e.g.*, In re Federal-Mogul Global Inc., 330 B.R. 133, 154 (D. Del. 2005) (the objective of an estimation proceeding is to establish the estimated value of asbestos-related claims in order to formulate a plan); Owens Corning v. Credit Suisse First Boston (In re Owens Corning), 322 B.R. 719, 722 (D. Del. 2005) (the aim of aggregate estimation is to measure the overall value of claims and demands upon the estate held by asbestos victims as a group, so that the entitlement of this constituency can be compared to those of any rival creditors and the shareholder in order to formulate a confirmable plan of reorganization); *see also* In re Chemtura Corp., Case No. 09-11233 (Bankr. S.D.N.Y. April 7, 2010) (Hearing Transcript at 38) (Ex. 1) ("**Chemtura Hr'g Tr.**") (the "estimation procedure, as I've understood it, has about four purposes: feasibility, voting, reserves, and crafting a plan").

Rightly conceived, estimation is of the Debtors' aggregate liability only. The Court must determine how the present and future asbestos claims as a whole "would have been valued in the state court system had the debtor never entered bankruptcy." In re Armstrong World Indus., Inc., 348 B.R. 111, 123 (D. Del. 2006) (citing Owens

Corning, 322 B.R. at 722)); Federal-Mogul, 330 B.R. at 155; In re Eagle-Picher Indus., Inc., 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995). *See also* Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) (claims in bankruptcy must be given the value they would have under applicable non-bankruptcy state law); Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450-51 (2007) *vacated and remanded to* 525 F.3d 885 (9th Cir. 2008) ("the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (citations and internal quotations omitted)).

Estimation must respect the individual rights of asbestos claimants. Federal-Mogul, 330 B.R. at 154-55 (an estimation does not implicate the procedural rights of the individual claimants). An estimation proceeding does not and can not decide "how much each claimant will actually be entitled to receive." Owens Corning, 322 B.R. at 722. Merits determinations must await ultimate distribution procedures. *See* Eagle-Picher, 189 B.R. at 683 (distinguishing an estimation for purposes of allowance from estimation for purposes of distribution under 11 U.S.C. § 524(g)); Chemtura Hr'g Tr. at 34, 73-74 (recognizing that the purpose of the estimation hearing was to estimate the debtor's aggregate liability rather than to determine the validity or value of any individual claim). If estimation is used as a vehicle for litigating the merits of claims, whether individually or in categories, it would give rise to important constitutional considerations, including due process rights and the right to trial by jury. *See, e.g.*, In re La Rouche Indus., Inc., 307 B.R. 774, 781 (D. Del. 2004) (estimating claims for

allowance purposes without providing the necessary notice and hearing to each individual claimant would violate due process); In re Roman Catholic Archbishop of Portland, 339 B.R. 215, 223 (Bankr. D. Or. 2006) (where estimation is in effect for purposes of distribution, due process requires individualized estimation); Federal-Mogul, 330 B.R. at 154 ("the focus is on [the debtor's] aggregate personal injury liability for the creation of a trust, not the merits of individual or class of individuals claims. . . . the latter[] would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of fact a trial by jury"); 28 U.S.C. § 1411(a) ("this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim").

As this Court has noted, an aggregate liability estimate implies that the estimation process is fundamentally a high-level economic analysis that avoids becoming mired in evaluating, or re-evaluating, individual cases. *See* Chemtura Hr'g Tr. at 26 ("[A]n estimation . . . is a macroeconomic process which is intended to avoid the very kinds of prolonged litigation that at least some of the people in the room may have in mind."). Indeed, in the Chemtura bankruptcy case, where this Court agreed to estimate the debtor's aggregate diacetyl-related liability, the Court noted that it would not be realistic to do a merits-based analysis of the 375 pending individual diacetyl claims, and, moreover, that such an analysis would be "the exact opposite" of what the Court intended to achieve – *i.e.*, a proper aggregate estimation. Chemtura Hr'g Tr. at

34; *see also id.* (acknowledging that the aggregate estimation is not about the allowance of individual claims). This Court also indicated that it would not allow "merits-based discovery" unless it were "consistent with the macroeconomic approach," because the Court was not deciding "the individual entitlements of any particular injured party against the estate" and it had "material doubts" as to how any merits-based discovery "would advance the ball" in such an estimation. *Id.* at 77.

Here, tens of thousands of individual asbestos-related claims have been asserted against Old GM and many more will be asserted over the course of several decades to come. Even more so than in Chemtura, an analysis of the merits or demerits of these thousands of individual claims in connection with approximating the debtor's aggregate liability is neither realistic nor in keeping with the proper purpose of estimation. Any attempt at individual merits determinations would result in an essentially unmanageable situation that would destroy the efficiencies that an aggregate estimation is meant to achieve and would seriously hinder plan formulation and confirmation. It is thus vital to maintain an appropriate focus on the debtor's *aggregate* liability, as opposed to litigating the merits of individual or categories of claims. As it did in Chemtura, this Court should refuse to allow discovery that does not relate to aggregate estimation.

### b. The Debtors' own claims history is the touchstone for estimation

Because the objective of an estimation of a debtor's aggregate asbestos-related liability is how the claims "would have been valued in the state court system had the debtor never entered bankruptcy," Armstrong, 348 B.R. at 123, estimation should focus on the debtor's own claims resolution history. No source of information other

- 7 -

than the debtor's claims history provides a comparable window into the claims against the debtor and how those claims fared in the tort system.  *See, e.g.*, Owens Corning, Case No. 00-3837-3854 (Bankr. D. Del. Aug. 19, 2004) (Order) [Dkt. No. 12520] (Ex. 2) (the court set a truncated case management order for the estimation proceeding that did not provide fact discovery deadlines, and stated that "the data now available – the Debtor's claim history, the experience in other cases, etc. – viewed in light of the expert testimony at the scheduled hearing, should probably suffice for Claims Estimation purposes").

Like the matter before this Court, the Owens Corning, Armstrong, Federal-Mogul, and Eagle-Picher cases all involved an estimate of a debtor's aggregate asbestos-related liability for purposes of formulating a plan.  In each case the aggregate estimation was largely based on each debtor's past claims resolution and settlement history, combined with actuarially-based estimates of future claims tied to the overall projected asbestos disease incidence in the United States.  Eagle-Picher, 189 B.R. at 686; Armstrong, 348 B.R. at 123-24; Owens Corning, 322 B.R at 722; Federal-Mogul, 330 B.R. at 157.  *See also* Eagle-Picher, 189 B.R. at 686 ("In valuation, the only sound approach is, if possible, to begin with what is known").[3]

---

[3]        These estimation cases establish that the key considerations that should enter into a court's estimate of a debtor's aggregate asbestos liability are: (1) the past claims resolution history of the debtor company; and (2) *foreseeable* trends in the incidence of asbestos related diseases and in the real world litigation landscape in which the claims would have been resolved, but for the bankruptcy.  *See* Armstrong, 348 B.R. at 123-24; Owens Corning, 322 B.R at 721-25; Federal-Mogul, 330 B.R. at 155; Eagle-Picher, 189 B.R. at 690-92.

In the present case, Old GM had a great deal of experience litigating asbestos claims in the tort system before resorting to bankruptcy. That history generated a body of data that, when provided to the ACC, the FCR, and the Creditors Committee, will make it possible to estimate the Debtors' remaining liability in an objective way, as was done in the asbestos estimation cases described above. Each asbestos defendant is stuck, for better or for worse, with the data that can be extracted from their individual history in the tort system, and that data provides the *only* realistic starting point for deriving a reasonable estimate of that defendant's remaining asbestos-related liability. Inevitably, any estimate of Old GM's remaining asbestos liability must be informed by its *own* actual history in receiving and resolving asbestos claims. The pending unresolved claims and those that will be asserted in the future grow out of that real-world context. There is no alternative source of data from which any realistic and non-speculative estimate can be derived of what it would cost Old GM to resolve *its* pending and future asbestos claims if there were no bankruptcy, which is the ultimate determination that must be made.

This is not to say that estimation is some kind of "black box" into which a debtor's historical claims resolution data is injected to produce automatically a numerical estimation. Estimation "by definition, is an approximation" and "mathematical precision cannot be achieved in the prediction being undertaken." Federal-Mogul, 330 B.R. at 156. *See also* Owens Corning, 322 B.R. at 725. "The task, therefore, cannot be to simply determine which expert makes a more compelling argument as to a particular variable in their formula, insert the most credible figure,

and then continue with the calculus" rather, "[a]fter consideration of the expert reports in this matter, it is evident that the Court must make reasonable adjustments based on the record created at trial and embrace the methodology it finds more reliable, while remaining vigilant to the potential bias that a party's expert may have on his or her estimation figures." Federal-Mogul, 330 B.R. at 156.

The Creditors Committee can fully and fairly develop its estimation of the Debtors' aggregate liability by using the Debtors' claims resolution history and discovery aimed at illuminating how the Debtors dealt with the claims in the tort system and the dynamics that shaped their claims-handling practices, coupled with the testimony of experts who are appropriately qualified and rest their opinions on an adequate foundation. Other parties can respond in kind. This Court can then consider the competing estimates and make any adjustments warranted by the evidence. *See* Federal-Mogul, 330 B.R. at 155 ("similar to Owens Corning . . . this estimation did not involve the discovery of individual claims, but rather focused on [the debtor's] historical claims-handling practices, and expert testimony on trends and developments in the asbestos tort system."). That informational process, as other courts have found, provides the appropriate basis for aggregate estimation.

## II.    DISCOVERY FROM OTHER ASBESTOS PERSONAL INJURY TRUSTS IS IRRELEVANT TO ESTIMATION IN THIS CASE

In its motion, the Creditors Committee proposes to stray from the proper scope of estimation and issue discovery against seven asbestos personal injury trusts relating to approximately 7400 individuals' claims not against GM, but against the bankrupt

defendants that are the predecessors of those trusts. Specifically, the Creditors Committee seeks:

> 1. Any and all claims forms and other Documents submitted by each of the Claimants to each of the Trusts.

> 2. All Documents relating to payments made or to be made to each of the Claimants by each of the Trusts, or reflecting decisions or resolutions concerning the Claimants' claims against the Trusts.

Motion at Ex. D. Their requests appear to call for every scrap of paper submitted by these 7400 claimants and every document reflecting the deliberations of the trusts and their ultimate settlements of these claims.

The materials demanded are irrelevant to estimating the Debtors' aggregate liability based on its own claims history. Claims made upon an asbestos trust asserting the liability of a bankrupt manufacturer other than GM cannot retrospectively erase or reduce GM's own liability. Any resulting settlement payments reflect not GM's liability, but the bankrupt's, and are further shaped by a variety of factors having nothing to do with GM's liability. As a result, obtaining and processing a massive quantity of materials on these subjects from non-party trusts will simply squander time and resources.

### a. Claims submitted to trusts responsible for entities other than GM are not relevant to Old GM's liability

The Creditors Committee suggests that, if the Court permits it to obtain claims submissions from numerous section 524(g) trusts, it will be able to divine the "true" value of claims against old GM and show that the actual values at which GM historically resolved its claims were wrong. Motion at 8. While the Creditors

Committee does not fully explain its theory, it offers a few hints. For example, the Motion submits that many of claimants who settled with Old GM have since filed claims against new section 524(g) trusts. *Id.* The Creditors Committee posits that Old GM's litigation defenses would have been stronger against claimants who subsequently made a claim against such a trust, and so it apparently proposes to airbrush such claimants out of Old GM's claims history, or re-evaluate their claims.

Such revisionist history is logically and practically flawed. Logically, Old GM's liability does not depend on whether another defendant also exposed the claimant to asbestos. Old GM is subjected to liability when exposure to asbestos-containing products of Old GM is a "substantial contributing factor" to causation of claimants' illnesses. In 1973, Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973), confirmed this basic "substantial contributing factor" framework for determining "cause in fact" in asbestos personal injury cases. While courts since Borel have wrestled with how to determine whether, in an asbestos case, exposure to a particular defendant's product was a "substantial contributing factor" in causing a claimant's injury, and some have adopted variations on the test, Borel remains the benchmark for asbestos personal injury claims across the country and is fully consistent with general tort law. *E.g.*, Restatement (Second) of Torts § 431 ("The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.").

Consistent with Borel, asbestos personal injury plaintiffs often allege, and courts and juries often find, that an individual's injury was caused by exposure to asbestos-containing products from more than one defendant. No court has held that an asbestos personal injury plaintiff can recover from a particular defendant only if he or she can establish that he or she was exposed *solely* to the products of that one defendant. Indeed, courts have repeatedly sustained verdicts in asbestos personal injury cases against particular defendants whose contributions, on a percentage basis, to overall causation were relatively low. *See, e.g.*, Cadlo v. Metalclad Insulation Corp., 61 Cal. Rptr. 3d 104, 108 (Ct. App. 2007) (3 percent); Jones v. John Crane, Inc., 35 Cal. Rptr. 3d 144, 149 (Ct. App. 2005) (1.95 percent); Barnes v. Owens-Corning Fiberglas Corp., 201 F.3d 815, 817 (6th Cir. 2000) (2 percent); Wilson v. John Crane, Inc., 97 Cal. Rptr. 2d 240, 244 (Ct. App. 2000) (2.5 percent). Thus, it is entirely consistent with Old GM's liability that a person injured by asbestos exposure may also claim against other parties.

Practically, moreover, Old GM's historical settlement values already reflect Old GM's assessment of the likelihood that other parties were responsible for any given claimant's injury. That assessment is "baked into" GM's own claims history. Historical settlement values represent Old GM's best contemporaneous evaluation, with the guidance of its experienced risk managers and counsel, of Old GM's individual share of liability in any given case. It bears emphasis that, in regard to channeled asbestos claims, each trust stands in the shoes of a former defendant that was litigating alongside Old GM in the tort system and was available for discovery as Old GM

- 13 -

received and resolved its cases and thereby built up the claims data now available. In each case, Old GM had the ability to obtain information about any individual claimant's exposure to asbestos-containing products from other manufacturers in discovery. Knowing what other sources of recovery might be available to an individual claimant, or at least having the opportunity to develop alternative exposure evidence from the claimant or co-defendants, Old GM bought peace with individual claimants by fixing its own share of liability. The Creditors Committee offers no explanation of why a claimant's pursuit of redress from the other defendants – claims delayed by the other defendants' bankruptcies but known or knowable to Old GM back when it resolved its own liability — would change anything.

Nor are the actual claim documents on file with the various trusts likely to provide any significant quantity of material relevant to the estimation of Old GM's liability. An asbestos trust is charged with paying, in an efficient and fair manner, only the asbestos liabilities of the entity whose bankruptcy occasioned that trust's creation. Such trusts therefore adapt their claim processing procedures to establish that individual claimants who present claims have offered evidence sufficient to meet the criteria for approval of the claim at the claimed disease level. They do not generally request the totality of a claimants' exposure against all potential defendants. For example, the current medical and exposure requirements for an expedited review mesothelioma claim to the USG Asbestos Personal Injury Trust include (1) a diagnosis of mesothelioma, and (2) "meaningful and credible exposure" to USG asbestos-containing products before December 31, 1982 or A.P. Green asbestos-containing products before January

2, 1968.  *See* USG Asbestos PI Trust Distribution Procedures (Mar. 29, 2010 rev.)
§ 5.3(a)(3), 5.7(b)(3).[4]  The Creditors Committee cannot therefore expect to find in the
submissions by claimants to such trusts information about any claimant's exposure to
Old GM asbestos-containing products.  The fact that the information required by the
trusts is not comprehensive also limits any inferences that may be drawn from this data
as a whole.

> **b.    Trust payment amounts for non-GM exposure are not relevant to
> GM's liability**

Nor will the amounts asbestos trusts paid individual claimants who had exposure
to other manufacturer's asbestos-containing products assist the Court in conducting this
estimation.  First, a section 524(g) trust pays no more to any individual than the several
share of liability attributable to the bankrupt entity whose asbestos liability that trust has
assumed.  They do not make determinations about the value of any individual's asbestos
personal injury claim as a whole, against all possible defendants, or attempt to ascertain
the "true value" of other potential or actual co-defendants' shares of liability.

Second, the trust payment itself rarely reflects the full value of even the
bankrupt's share of liability.  A section 524(g) trust typically pays only a fraction of its
several share of liability, because the funds available to each trust are only a fraction of
the bankrupt entity's estimated liability, and because the trust is required to conserve
resources for future claimants.  This fraction has nothing to do with the individual
merits of any claim, but is instead a function of limited funding.  Thus, the amount

---

[4]      The USG TDP are available at http://www.usgasbestostrust.com/files/
USGTDP.pdf.

actually paid by a trust generally differs from the full theoretical several share of the bankrupt entity.

## III.    THE PROPOSED DISCOVERY AND THE ESTIMATION PLAN IT IMPLIES WOULD DELAY CONFIRMATION SIGNIFICANTLY

The Creditors Committee's request demonstrates that they, like others before them in the history of asbestos bankruptcies, hope to convert what should properly be a macro-level, aggregate estimation into an "alternative tort system" in which thousands of individuals' claims are evaluated against new criteria dreamed up by experts in an effort to reduce liability.    History has shown, however that such attempts lead to massive costs and delays and ultimately collapse.    This Court should not permit this proceeding to be shunted down that path.

### a.    The history of asbestos estimation shows that firm control of the discovery process will result in a speedy and fair proceeding

Estimation proceedings can be efficient, fair and beneficial, provided the focus is maintained on the aggregate liability, and the discovery and trial are tailored to serve the limited goals of estimation in the aggregate.    For example, in the Federal-Mogul bankruptcy case, the district court held a five-day estimation hearing, and, less than three months later, issued a decision estimating the company's aggregate asbestos-related liability in the United States at 9 billion dollars.    *See* Federal-Mogul, 330 B.R. at 135, 164.[5]    The Federal-Mogul court found that the estimation proceeding was "fruitful" and furthered the Bankruptcy Code's goals of "speedy and efficient"

---

[5]    *See also* Armstrong, 348 B.R. at 123 (after a three day hearing, the court estimated the debtor's aggregate asbestos-related liability as "at least" $3.1 billion).

reorganization because the estimation focused on the debtor's aggregate asbestos-related liability, rather than the merits of individual claims or classes of claims.  *Id.* at 154-55. The court also stressed that "similar to Owens Corning . . . this estimation did not involve the discovery of individual claims, but rather an inquiry focused on [the debtor's] historical claims-handling practices, and expert testimony on trends and developments in the asbestos tort system."  *Id.* at 155.  The court cautioned that "[t]o do otherwise [*i.e.*, to focus on the merits of claims, or to involve the discovery of individual claims] *would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create*." *Id.* (emphasis added).

As noted in the Federal-Mogul estimation decision, attempts to perform discovery beyond the scope of aggregate estimation were struck down in Owens Corning, resulting in an efficient estimation proceeding.  An agent of holders of bank debt, Credit Suisse First Boston ("**Credit Suisse**"), applied to the court to establish a procedure to obtain a random sampling of the medical records of the 1000 asbestos personal injury claimants who have asserted nonmalignant claims against Owens Corning.  Credit Suisse was constrained to inform the court that even its relatively narrow sample would require postponing the estimation hearing by "a period of six months to a year."  In re Owens Corning, Case Nos. 00-3837-3854 (Bankr. D. Del. Nov. 22, 2004) (Memorandum and Order at 1) [Dkt. No. 13407] (Ex. 3).

District Judge John P. Fullam denied Credit Suisse's request and rejected the proposed discovery on the grounds that "no useful purpose would be served by further

delaying matters, and running up additional legal bills, to prove what is already reasonably well known." *Id.* at 2.  He observed:

> The relevant data have been available for analysis for many years. The conclusions drawn by experts have long been debated, and will be fully aired at the January hearing.  In the unlikely event that the information now available proves insufficient to enable a reasonably correct estimate of future claims, that issue, too, will be considered at the hearing in January.

*Id.* at 1-2.

Rather than undertaking Credit Suisse's proposed sample of 1000 individual claims, the parties engaged in a streamlined discovery process lasting only a few months.  As a result of this discipline, the estimation hearing ultimately held in <u>Owens Corning</u> lasted only six days, and, less than three months later, the court handed down a Memorandum and Order estimating Owens Corning's liability for present and future asbestos claims at 7 billion dollars.  *See* <u>Owens Corning</u>, 322 B.R. 719.  The court viewed its task as one of applying informed judgment to historical facts regarding the tort system, based on a review of Owens Corning's claims litigation and resolution history and the testimony of experts proffered by the several parties.  *See id.* at 721-22. The court did not endeavor to infer what Owens Corning's liability would have been if the tort system had been different than it was, but grounded its analysis on the realities confronting Owens Corning at the time it filed for bankruptcy, as well as developments and trends in the tort system that are likely to influence the value of anticipated future claims.  *Id.*

**b.**       **Unchecked discovery and attempts to make individual claims determinations will take the estimation process off track for months and perhaps years**

Conversely, estimations performed in other asbestos bankruptcies teach that if the scope of discovery and trial are permitted to stray from the limited purpose of aggregate estimation into the merits of claims or whether settlement values are appropriate, the efficiencies an estimation is intended to provide are eviscerated, and fruitless delays and enormous costs result.  For example, in the W.R. Grace bankruptcy case, on which the Creditors Committee relies (*see* Motion at 12), the debtor sought extensive discovery from numerous collateral sources, including several trusts established pursuant to section 524(g).  As a result, the estimation discovery phase in W.R. Grace spanned more than three years, the evidentiary hearing on estimation was originally scheduled to take up nearly twenty days of the court's time over several months (a number that swelled as the proceeding unfolded), and the entire estimation process consumed inordinate financial and judicial resources.

In 2005, at the urging of the debtor, the bankruptcy court ordered all claimants with current claims against W.R. Grace to answer a detailed, multi-page questionnaire about their claims, disclosing medical and exposure information.  *See* In re W.R. Grace & Co., Case. No. 01-1139 (Bankr. D. Del. Aug. 29, 2005) (Case Management Order for the Estimation of Asbestos Personal Injury Liabilities) [Dkt. No. 9301] (Ex. 4). The current claimants ultimately submitted over 100,000 responses to the questionnaires, with voluminous corroborating documentary evidence attached, all at enormous cost to that constituency.  The court was forced to extend the discovery

deadlines and the estimation hearing no fewer than eleven times.[6]  The process took the

better part of two years and gave rise to numerous discovery motions that took months

to resolve, eventually leading Judge Fitzgerald to declare that she had "had this

questionnaire until the cows come home" and "would never do this again" because it

was a "nightmare."  In re W.R. Grace & Co., Case No. 01-01139 (Bankr. D. Del.

---

[6]      *See* In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. Dec. 21,
2005) (Order Modifying the Case Management Order for the Estimation of Asbestos
Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond
to Questionnaires and to Designate Non-Expert Witnesses) [Dkt. No. 11403]; In re
W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. Jan. 10, 2006) (Revised Order
Modifying the Case Management Order for the Estimation of Asbestos Personal Injury
Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires
and to Designate Non-Expert Witnesses) [Dkt. No. 11515]; In re W.R. Grace & Co.,
Case No. 01-1139 (Bankr. D. Del. Jan. 31, 2006) (Amended Case Management Order
for the Estimation of Asbestos Personal Injury Liabilities) [Dkt. No. 11697]; In re
W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. Feb. 21, 2006) (Order
Modifying the Case Management Order for the Estimation of Asbestos Personal Injury
Liabilities Regarding the Extension of Time for Claimants to Respond to
Questionnaires) [Dkt. No. 11885]; In re W.R. Grace & Co., Case No. 01-1139 (Bankr.
D. Del. Mar. 27, 2006) (Amended Case Management Order for the Estimation of
Asbestos Personal Injury Liabilities) [Dkt. No. 12151]; In re W.R. Grace & Co., Case
No. 01-1139 (Bankr. D. Del. April 27, 2006) (Order Modifying the Case Management
Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the
Extension of Time for Claimants to Respond to Questionnaires) [Dkt. No. 12314]; In re
W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. July 24, 2006) (Amended Case
Management Order for the Estimation of Asbestos Personal Injury Liabilities) [Dkt.
No. 12858]; In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. Dec. 19,
2006) (Order Regarding Amended Case Management Order for the Estimation of
Asbestos Personal Injury Liabilities) [Dkt. No. 14079]; In re W.R. Grace & Co., Case
No. 01-1139 (Bankr. D. Del. Apr. 2, 2007) (Order Regarding Amended Case
Management Order for the Estimation of Asbestos Personal Injury Liabilities) [Dkt.
No. 15078]; In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. June 1,
2007) (Newly Amended Case Management Order for the Estimation of Asbestos
Personal Injury Liabilities) [Dkt. No. 15923]; In re W.R. Grace & Co., Case No. 01-
1139 (Bankr. D. Del. July 9, 2007) (Modified Second Newly Amended Case
Management Order for the Estimation of Asbestos Personal Injury Liabilities) [Dkt.
No. 16260] (the amended case management orders are attached collectively as Ex. 5).

Sept. 25, 2006) (Hearing Transcript at 197, 200) (Ex. 6). Even after this extreme delay and expense, the debtor never used more than a small fraction of the information. Instead, the debtor complained that simply *coding* all the information submitted by each claimant would take another *eight years*.[7]

In 2007, the debtor in the W.R. Grace bankruptcy subpoenaed numerous asbestos trusts, including the Celotex Asbestos Trust. This subpoena also resulted in protracted motion practice, culminating in the bankruptcy court ordering the Celotex Asbestos Trust to produce the data contained in claimants' responses to just certain sections of the trust's claim form. *See* Motion at 12 (citing to In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. Oct. 3, 2007) (Order Regarding W.R. Grace & Company's Motions to Compel Discovery Materials from the Celotex Asbestos Settlement Trust) (a copy was attached as Ex. F to the Motion)). The debtor made little use of this information. It warrants emphasis, moreover, that the information the court ordered the Celotex Trust to produce in W.R. Grace (selected fields from claim forms) was far narrower in scope that what the Creditors Committee demands here (complete claims forms, all claims submissions, all payment information, and all documents reflecting the claims evaluation discussions of seven different trusts).

Eventually, the estimation trial was finally set down for approximately 18 hearing days between January and April of 2008. *See* In re W.R. Grace & Co., Case

---

[7]     In re W.R. Grace & Co., Case No. 01-01139 (Bankr. D. Del. Mar. 26, 2007) (Response to Emergency Motion of The Official Committee of Asbestos Claimants and David T. Austern the Court Appointed Legal Representative for Future Asbestos Personal Injury Claimants to Compel Production of Complete Navigable Database) [Dkt. No. 14973] at 9 (Ex. 7).

No. 01-1139 (Bankr. D. Del. July 9, 2007) (Modified Second Newly Amended Case Management Order for the Estimation of Asbestos Personal Injury Liabilities) [Dkt. No. 16260] (Ex. 8). Over the course of the hearings, the court contemplated setting aside even more time for the estimation trial. *See* In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del. April 1, 2008) (Hearing Transcript at 167-72) (Ex. 9). Ultimately, W.R. Grace abandoned its scheme for a mass evaluation of the entire claimant population, and the parties settled before the estimation proceeding was completed, with the debtor agreeing to pay several billion dollars into a settlement trust to resolve its asbestos liabilities.

The Creditors Committee's proposed discovery against the trusts threatens to turn estimation into a multi-year estimation fiasco along the lines of the W.R. Grace proceeding. If it is permitted to force the targeted trusts to produce their claim forms, supporting claimant submissions, payment information and deliberative records for 7400 mesothelioma claimants, it would take years to obtain, review and use that information. And if the Creditors Committee did use the information, other parties would have no choice but to delve into that material as well. Such a diversion would not only be legally inappropriate but practically disastrous from the standpoint of conducting estimation swiftly and efficiently in the manner most conductive to the formulation and confirmation of a suitable plan.

## CONCLUSION

The Creditors Committee's request to serve discovery on trusts threatens to turn what should be a relatively efficient estimation proceeding into a long, unwieldy battle. Discovery that would not lead to any admissible evidence, including discovery aimed at gathering information regarding the merits of individual claims or settlements with non-GM entities, should not be permitted.  The Rule 2004 Motion should be denied.

Date:  August 2, 2010

CAPLIN & DRYSDALE, CHARTERED

By:  /s/ Trevor W. Swett III
Trevor W. Swett III
Kevin C. Maclay
James P. Wehner
One Thomas Circle, N.W.
Washington, D.C.  20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

Elihu Inselbuch (EI-2843)
Rita C. Tobin
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY  10152-3500
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

*Attorneys for the Official Committee of
Unsecured Creditors Holding Asbestos-
Related Claims*