# **EXHIBIT J**

**EXHIBIT D-1**

# OWENS CORNING/FIBREBOARD

## ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

**Revised February 2, 2010**

{D0173073}

**EXHIBIT D-1**

## OWENS CORNING/FIBREBOARD

**ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES**

### TABLE OF CONTENTS

Page

SECTION I — Introduction ........................................................................ 1

   1.1    Purpose .......................................................................... 1
   1.2    Interpretation ................................................................. 1


SECTION II — Overview ........................................................... 2

   2.1    PI Trust Goals ................................................................ 2
   2.2    Claims Liquidation Procedures ..................................... 3
   2.3    Application of the Payment Percentage ........................ 6
   2.4    Determination of the Maximum Annual Payment and
         Maximum Available Payment .................................... 8
   2.5    Claims Payment Ratio .................................................. 9
   2.6    Indemnity and Contribution Claims ............................ 12

SECTION III — TDP Administration ....................................... 12

   3.1    PI Trust Advisory Committee and Future Claimants'
         Representative .......................................................... 12
   3.2    Consent and Consultation Procedures ......................... 13


SECTION IV — Payment Percentage; Periodic Estimates .......................... 13

   4.1    Uncertainty of OC's and Fibreboard's Total Personal Injury
         Asbestos Liabilities ................................................... 13
   4.2    Computation of Payment Percentage ........................... 13
   4.3    Applicability of the Payment Percentage ..................... 15

{D0173073}

**Revised 2/2/10**

SECTION V — Resolution of PI Trust Claims ............................................... 19

5.1    Ordering, Processing and Payment of Claims ........................................ 19
       (a)    Ordering of Claims ...................................................... 19
              (1)    Establishment of the FIFO Processing Queues............... 19
              (2)    Effect of Statutes of Limitations and Repose ................. 20
       (b)    Processing of Claims..................................................... 21
       (c)    Payment of Claims ...................................................... 21
5.2    Resolution of Pre-Petition Liquidated PI Trust Claims ......................... 22
       (a)    Processing and Payment .................................................. 22
       (b)    Marshalling of Security .................................................. 24
5.3    Resolution of Unliquidated PI Trust Claims ................................... 25
       (a)    Expedited Review Process ................................................ 26
              (1)    In General ......................................................... 26
              (2)    Claims Processing under Expedited Review .................. 27
              (3)    Disease Levels, Scheduled Values
                     and Medical/Exposure Criteria ........................................ 28
       (b)    Individual Review Process ................................................ 32
              (1)    In General ......................................................... 32
                     (A)    Review of Medical/Exposure Criteria ................ 33
                     (B)    Review of Liquidated Value................................ 34
              (2)    Valuation Factors to be Considered in
                     Individual Review ........................................ 35
              (3)    Processing and Payment Limitations for Claims
                     Involving Disease Levels III and II ............................. 36
                     (A)    Disease Level III Claims ...................................... 36
                     (B)    Disease Level II Claims ...................................... 36
              (4)    Scheduled, Average and Maximum Values .................... 37
5.4    Categorizing Claims as Extraordinary
       and/or Exigent Hardship ............................................ 38
       (a)    Extraordinary Claims ...................................................... 38
       (b)    Exigent Hardship Claims .................................................. 39
5.5    Secondary Exposure Claims ...................................................... 40
5.6    Indirect PI Trust Claims ...................................................... 40
5.7    Evidentiary Requirements ...................................................... 43
       (a)    Medical Evidence ...................................................... 43
              (1)    In General ......................................................... 43
                     (A)    Disease Levels I – IV............................................. 43
                     (B)    Disease Levels V – VIII......................................... 44
                     (C)    Exception to the Exception for Certain
                            Pre-Petition Claims ........................................ 45
              (2)    Credibility of Medical Evidence ........................................ 45
       (b)    Exposure Evidence............................................................. 46
              (1)    In General ......................................................... 46
              (2)    Significant Occupational Exposure ............................. 47
              (3)    OC or Fibreboard Exposure ........................................ 47
5.8    Claims Audit Program ...................................................... 48

- ii -

5.9     Second Disease (Malignancy) Claims ................................................ 49
5.10    Arbitration ...................................................................................... 49
        (a)     Establishment of ADR Procedures ............................................ 49
        (b)     Claims Eligible for Arbitration .................................................... 50
        (c)     Limitations on and Payment of Arbitration Awards.................... 51
5.11    Litigation ........................................................................................ 51


SECTION VI — Claims Materials    ....................................................... 51

6.1     Claims Materials  ............................................................................ 51
6.2     Content of Claims Materials ............................................................ 52
6.3     Withdrawal or Deferral of Claims .................................................... 52
6.4     Filing Requirements and Fees .......................................................... 53
6.5     Confidentiality of Claimants' Submissions ........................................ 53


SECTION VII — General Guidelines for Liquidating and Paying Claims .................... 54

7.1     Showing Required ............................................................................ 54
7.2     Costs Considered  ............................................................................ 55
7.3     Discretion to Vary Order and Amounts of Payments in
        Event of Limited Liquidity ............................................................... 55
7.4     Punitive Damages ............................................................................ 56
7.5     Sequencing Adjustment .................................................................... 57
        (a)     In General................................................................................ 57
        (b)     Unliquidated PI Trust Claims .................................................... 57
        (c)     Liquidated Pre-Petition Claims.................................................. 58
7.6     Suits in the Tort System.................................................................... 58
7.7     Payment of Judgments for Money Damages ...................................... 59
7.8     Releases .......................................................................................... 60
7.9     Third-Party Services  ....................................................................... 60
7.10    PI Trust Disclosure of Information .................................................... 60

SECTION VIII — Miscellaneous    ....................................................... 60

8.1     Amendments  ................................................................................... 60
8.2     Severability   ................................................................................... 61
8.3     Governing Law ................................................................................ 61

**Revised 2/2/10**

# OWENS CORNING/FIBREBOARD

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The Asbestos Personal Injury Trust Distribution Procedures ("TDP") contained herein provide for resolving all Asbestos Personal Injury Claims for which Owens Corning ("OC") and/or its wholly owned subsidiary, Fibreboard Corporation ("Fibreboard"), and their predecessors, successors, and assigns have legal responsibility (respectively, OC Asbestos Personal Injury Claims ("OC Claims") and FB Asbestos Personal Injury Claims ("Fibreboard Claims"), which terms are defined in the Sixth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession (As Modified) ("Plan") (hereinafter collectively referred to in this TDP as "PI Trust Claims"). The Plan and the Asbestos Personal Injury Trust Agreement ("PI Trust Agreement") establish the Owens Corning/Fibreboard Asbestos Personal Injury Trust (the "PI Trust"). The Trustees of the PI Trust ("Trustees") shall implement and administer this TDP in accordance with the PI Trust Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement.

## SECTION I

### Introduction

**1.1     Purpose.** This TDP has been adopted pursuant to the PI Trust Agreement. It is designed to provide fair, equitable, and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2     Interpretation.** Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits, if

{D0173073}

any, provided herein to holders of PI Trust Claims shall vest in such holders as of the Effective Date.

## SECTION II

### Overview

2.1    **PI Trust Goals.** The goal of the PI Trust is to treat all holders of PI Trust Claims equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code. To achieve that goal, the PI Trust consists of two separate Sub-Accounts, an OC Sub-Account for payment of OC Claims and a Fibreboard Sub-Account for payment of Fibreboard Claims (together the "PI Trust Sub-Accounts").

A claimant may assert separate claims against the OC Sub-Account and the Fibreboard Sub-Account based on separate exposures to asbestos or asbestos-containing products manufactured or distributed by OC and Fibreboard, respectively ("Multiple Exposure Claims"); however, all such Multiple Exposure Claims must be filed by the claimant at the same time.  To the extent that the OC Sub-Account and the Fibreboard Sub-Account each has separate liability to a claimant based on Multiple Exposure Claims, each Sub-Account shall pay the claimant the liquidated value of the separate claim for which it is liable, subject to applicable Payment Percentage, Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio limitations set forth below.

This TDP sets forth procedures for processing and paying all PI Trust Claims from the two Sub-Accounts generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims

- 2 -

**Revised 2/2/10**

based on historical values for substantially similar claims in the tort system.[1] To this end, this

TDP establishes a single schedule of eight asbestos-related diseases ("Disease Levels"), seven

of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria")

that are applicable to both OC and Fibreboard Claims, as well as two separate schedules with

liquidated values ("Scheduled Values"), anticipated average values ("Average Values"), and

caps on liquidated values ("Maximum Values") that are applicable to OC Claims and

Fibreboard Claims, respectively.

These Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values

and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected

and derived with the intention of achieving a fair allocation of the assets held by the separate

OC and Fibreboard Sub-Accounts as among their respective claimants suffering from different

disease processes in light of the best available information considering the settlement histories

of OC and Fibreboard, and the rights that OC and Fibreboard claimants would have in the tort

system absent the bankruptcy.

    **2.2**    **Claims Liquidation Procedures.** PI Trust Claims shall be processed based on

their place in separate FIFO Processing Queues to be established for each of the two PI Trust

Sub-Accounts pursuant to Section 5.1(a) below.  The PI Trust shall take all reasonable steps to

resolve OC and Fibreboard Claims as efficiently and expeditiously as possible at each stage of

claims processing and arbitration. To this end, the PI Trust, in its sole discretion, may conduct

settlement discussions with claimants' representatives with respect to more than one claim at a

time, provided that the claimants' respective positions in the FIFO Processing Queues are

---

[1]    As used in this TDP, the phrase "in the tort system" shall not include claims asserted
against a trust established pursuant to section 524(g) and/or section 105 of the Bankruptcy Code
or any other applicable law.

- 3 -

**Revised 2/2/10**

maintained, and each claim is individually evaluated pursuant to the valuation factors set forth

in Section 5.3(b)(2) below. The PI Trust shall also make every effort to resolve each year at

least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and

the Maximum Available Payment for Category A and Category B claims, as those terms are

defined below.

 The PI Trust shall liquidate all OC and Fibreboard Claims except Foreign Claims (as

defined in Section 5.3(b)(1) below) that meet the presumptive Medical/Exposure Criteria of

Disease Levels I – V, VII and VIII under the Expedited Review Process described in Section

5.3(a) below.  PI Trust Claims involving Disease Levels I – V, VII and VIII that do not meet the

presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI

Trust's Individual Review Process described in Section 5.3(b) below.  In such a case,

notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the

relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value

of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that

would be cognizable and valid in the tort system.

 In lieu of liquidating such claimant's claim under the Expedited Review Process, OC

and Fibreboard claimants holding PI Trust Claims involving Disease Levels II - VIII may

alternatively seek to establish liquidated values for their claims that are greater than their

Scheduled Values by electing the PI Trust's Individual Review Process. However, the

liquidated values of PI Trust Claims that undergo the Individual Review Process for valuation

purposes may be determined to be less than the Scheduled Values, and in any event shall not

exceed the respective Maximum Values for the Disease Levels set forth for OC and Fibreboard

Claims in Section 5.3(b)(4) below, unless the claims qualify as Extraordinary Claims as defined

- 4 -

**Revised 2/2/10**

in Section 5.4(a) below, in which case their liquidated value cannot exceed the Maximum Values specified in that provision for such claims. OC and Fibreboard Level VI (Lung Cancer 2) Claims and all Foreign Claims may be liquidated[2] only pursuant to the PI Trust's Individual Review Process.

Based upon OC 's and Fibreboard's claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(4) for OC and Fibreboard Claims, respectively, have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to mandatory *pro bono* evaluation and mediation and then to binding or non-binding arbitration pursuant to Section 5.10 below, at the election of the claimant, under the ADR Procedures that are provided in Attachment A hereto. PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below. However, if and when an OC or Fibreboard claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

    **2.3    Application of the Payment Percentage.** After the liquidated value of an OC or Fibreboard Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash

---

[2] For purposes of this TDP, "liquidated" means approved and valued by the PI Trust.

**Revised 2/2/10**

Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant will ultimately receive a pro-rata share of that value based on the Payment Percentages separately set for OC and Fibreboard Claims pursuant to Section 4.2 below. These Payment Percentages shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments pursuant to Section 7.5 below.

The Initial Payment Percentage for the OC Sub-Account has been set at forty percent (40%), and the Initial Payment Percentage for the Fibreboard Sub-Account has been set at twenty-five percent (25%). These Initial Payment Percentages shall apply to all OC and Fibreboard PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust with the consent of the PI Trust Advisory Committee ("TAC") and the Legal Representative for Future Asbestos Claimants ("Future Claimants' Representative") (who are described in Section 3.1 below) pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event an Initial Payment Percentage for a Sub-Account is changed.

The term "PI Trust Voting Claims" includes (i) Pre-Petition Liquidated Claims as provided in Section 5.2 below; (ii) OC and Fibreboard Claims filed against OC and/or Fibreboard in the tort system or actually submitted to OC and/or Fibreboard pursuant to an administrative settlement agreement prior to the Petition Date of October 5, 2000; and (iii) all asbestos claims filed against another defendant in the tort system prior to the date the Plan was first filed with the Bankruptcy Court (January 17, 2003 (the "Plan Filing Date")), provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures

Revised 2/2/10

established by the Bankruptcy Court unless such holder certifies to the satisfaction of the Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's principal place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her PI Trust Voting Claim, and (2) the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date as defined in Section 5.1(a) below.

The Initial Payment Percentages for the OC and Fibreboard Sub-Accounts set forth above have been calculated on the assumption that the Average Values set forth in Section 5.3(b)(4) below will be achieved with respect to existing present claims and projected future claims involving Disease Levels II – VIII. However, either or both of these Payment Percentages may be adjusted upwards or downwards from time to time pursuant to Section 4.2 below by the PI Trust with the consent of the TAC and the Future Claimants' Representative to reflect then-current estimates of the assets and liabilities allocable to OC and Fibreboard Claims, respectively, as well as the then-estimated value of pending and future OC and Fibreboard Claims. However, any adjustment to the Initial Payment Percentages shall be made only pursuant to Section 4.2 below. If the Payment Percentage for either the OC or Fibreboard Sub-Account is increased over time, claimants whose OC or Fibreboard Claims were liquidated and paid in prior periods under the TDP will receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future claims, and the amount of the PI Trust's assets, no guarantee can be made of any Payment Percentage for either OC or Fibreboard Claims.

Revised 2/2/10

**2.4    Determination of the Maximum Annual Payment and Maximum Available Payment.** For each of the OC and the Fibreboard Sub-Accounts, the PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over the entire life of the Sub-Account to ensure that amounts will be available to treat all holders of OC and/or Fibreboard Claims as similarly as possible, given the assets and liabilities allocable to each of the two Sub-Accounts. In each year, for each Sub-Account, the PI Trust will be empowered to pay out all of the income earned during the year by the Sub-Account (net of taxes payable with respect thereto), together with a portion of the Sub-Account's principal, calculated so that the application of the Sub-Account's assets over its life shall correspond with the needs created by the anticipated flow of claims to the Sub-Account (the "Maximum Annual Payment"), taking into account the Payment Percentage provisions set forth in Section 2.3 above and Sections 4.2 and 4.3 below.  The PI Trust's distributions from each Sub-Account to all holders of claims against the Sub-Account for that year shall not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment from each Sub-Account, the PI Trust shall first allocate the amount in question to outstanding Pre-Petition Liquidated Claims (as defined in Section 5.2(a) below) against the Sub-Account, and to liquidated claims against the Sub-Account involving Disease Level I (Cash Discount Payment), in proportion to the aggregate value of each group of claims. The remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, shall then be allocated and used to satisfy all other previously liquidated PI Trust Claims against the Sub-Account, subject to the Claims Payment Ratio for the Sub-Account set forth in Section 2.5 below.

- 8 -

In the event there are insufficient amounts in any year to pay the total number of outstanding Pre-Petition Liquidated Claims and/or previously liquidated Disease Level I Claims against the Sub-Account, the available amounts allocated to that group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their Sub-Account's FIFO Payment Queue. Claims in either group for which there are insufficient amounts in the Sub-Account shall be carried over to the next year and placed at the head of the FIFO Payment Queue for that Sub-Account. If there is a decrease in the Payment Percentage prior to the payment of such claims, any such Pre-Petition Liquidated Claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment.

2.5    **Claims Payment Ratio.** Based upon OC 's and Fibreboard's claims settlement history and analysis of present and future claims, a single Claims Payment Ratio has been determined for both Sub-Accounts, which, as of the Effective Date, has been set at 65% for Category A claims, which consist of PI Trust Claims against OC and/or Fibreboard involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Petition Date, and at 35% for Category B claims, which are PI Trust Claims against OC and/or Fibreboard involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Petition Date. However, the Claims Payment Ratio shall not apply to any Pre-Petition Liquidated Claims or to any claims for Other Asbestos Disease (Disease Level I - Cash Discount Payment) payable from either OC or Fibreboard Sub-Accounts.

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 65% of that amount will be available to pay Category A claims and 35% will

- 9 -

Revised 2/2/10

be available to pay Category B claims that have been liquidated since the Petition Date. In the event there are insufficient amounts in either the OC or Fibreboard Sub-Accounts in any year to pay the liquidated claims within either or both of the Categories, the available amounts allocated to the particular Category within the Sub-Account shall be paid to the maximum extent to claimants in that Category based on their place in the Sub-Account's FIFO Payment Queue described in Section 5.1(c) below, which will be based upon the date of claim liquidation.

Claims for which there are insufficient amounts allocated to the relevant Category within a Sub-Account shall be carried over to the next year where they will be placed at the head of the Sub-Account's FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio. If there are excess amounts in either or both Categories within a Sub-Account, because there is an insufficient amount of liquidated claims to exhaust the respective Sub-Account's Maximum Available Payment amount for that Category, then the excess amounts for either or both Categories will be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 65%/35% Claims Payment Ratio and its rollover provision shall apply to all OC and Fibreboard PI Trust Voting Claims as defined in Section 2.3 above (except Pre-Petition Liquidated Claims and Other Asbestos Claims (Disease Level I – Cash Discount Payment)) and shall not be amended until the third anniversary of the date the PI Trust first accepts for processing proof of claim forms and other materials required to file a claim with the PI Trust. Thereafter, the Sub-Account's Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating

- 10 -

**Revised 2/2/10**

amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims against one or both Sub-Accounts resulting from the application of the Claims Payment Ratio, shall not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B claims against a Sub-Account beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions for either Sub-Account, the Trustees should also consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories of OC and Fibreboard that gave rise to its calculation, and the foreseeability or lack of the foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants from either Sub-Account.

In any event, no amendment to the Claims Payment Ratio to reduce the percentage allocated to Category A claims may be made without the unanimous consent of the TAC members and the consent of the Future Claimants' Representative, and the percentage allocated to Category A claims may not be increased without the consent of the TAC and the Future Claimants' Representative. In case of any amendments to the Claims Payment Ratio, consents shall be governed by the consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement. The Trustees, with the consent of the TAC and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in

- 11 -

either Category A or Category B against either Sub-Account in return for prompter payment by the Sub-Account (the "Reduced Payment Option").

    **2.6**    **Indemnity and Contribution Claims.**  As set forth in Section 5.6 below, PI Trust Claims for indemnity and contribution (defined in the Plan as OC Indirect Asbestos Personal Injury Claims and Fibreboard Indirect Asbestos Personal Injury Claims, and hereinafter referred to as "Indirect PI Trust Claims") against either the OC or the Fibreboard Sub-Accounts, if any, will be subject to the same categorization, evaluation, and payment provisions of this TDP as all other OC and Fibreboard Claims.

## SECTION III

### TDP Administration

    **3.1**    **PI Trust Advisory Committee and Future Claimants' Representative.**

Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present PI Trust Claims against OC and Fibreboard, and the Future Claimants' Representative, who represents the interests of holders of PI Trust Claims against OC and/or Fibreboard that will be asserted in the future.  The Trustees shall obtain the consent of the TAC and the Future Claimants' Representative on any amendments to these Procedures pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement.  The Trustees shall also consult with the TAC and the Future Claimants' Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement. The initial members of the TAC and the initial Future Claimants' Representative are identified in the PI Trust Agreement.

Revised 2/2/10

**3.2    Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees will provide written notice to the TAC and the Future Claimants' Representative of the specific amendment or other action that is proposed. The Trustees will not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, respectively.

## SECTION IV

### Payment Percentage; Periodic Estimates

**4.1    Uncertainty of OC's and Fibreboard's Total Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding OC's and Fibreboard's total asbestos-related tort liabilities, as well as the total value of the assets available to the OC and Fibreboard Sub-Accounts to pay PI Trust Claims asserted against each Sub-Account. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims will receive.  To seek to ensure substantially similar treatment of all present and future PI Trust Claims against either the OC or the Fibreboard Sub-Accounts, the Trustees must determine from time to time the percentage of full liquidated value that holders of PI Trust Claims against the Sub-Account will be likely to receive, *i.e,* the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2    Computation of Payment Percentage.**  As provided in Section 2.3 above, the Initial Payment Percentage for claims against the OC Sub-Account shall be forty percent (40%), and for claims against the Fibreboard Sub-Account twenty-five percent (25%). These percentages shall apply to all OC and Fibreboard PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Future Claimants'

- 13 -

Representative, determine that the Initial Payment Percentage for one or both Sub-Accounts should be changed to assure that the PI Trust will be in a financial position to pay holders of unliquidated and/or unpaid PI Trust Voting Claims and present and future PI Trust Claims against the OC and Fibreboard Sub-Accounts, respectively, in substantially the same manner. In making any such adjustment, the Trustees, the TAC and the Future Claimants' Representative shall take into account the fact that the holders of PI Trust Voting Claims voted on the Plan relying on the findings of experts that the Initial Payment Percentage for each Sub-Account represented a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of PI Trust Voting Claimants that the Initial Payment Percentage would be applied to their PI Trust Claims.

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage for either the OC or the Fibreboard Sub-Accounts shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees determine that an adjustment is required. No less frequently than once every three years, commencing with the first day of January occurring after the Plan is consummated, the Trustees shall reconsider the then applicable Payment Percentage for each of the OC and Fibreboard Sub-Accounts to assure that the respective percentage is based on accurate, current information and may, after such reconsideration, change the Payment Percentage for either Sub-Account if necessary with the consent of the TAC and the Future Claimants' Representative.

The Trustees shall also reconsider the then applicable Payment Percentages for either or both Sub-Accounts at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Future Claimants' Representative. The Trustees must base

- 14 -

their determination of the Payment Percentage on current estimates of the number, types, and

values of present and future PI Trust Claims against the respective Sub-Accounts, the value of

the assets then available to the respective Sub-Accounts for their payment, all anticipated

administrative and legal expenses of the respective Sub-Accounts, and any other material matters

that are reasonably likely to affect the sufficiency of the respective Sub-Accounts' assets to pay a

comparable percentage of full value to all holders of claims against the Sub-Accounts.  When

making these determinations, the Trustees shall exercise common sense and flexibly evaluate all

relevant factors. The Payment Percentage applicable to Category A or Category B claims against

the respective Sub-Accounts may not be reduced to alleviate delays in payments of claims in the

other Category; both Categories will receive the same Payment Percentage, but the payment

from either or both Sub-Accounts may be deferred as needed pursuant to Section 7.3 below, and

a Reduced Payment Option may be instituted for either Sub-Account as described in Section 2.5

above.

   **4.3      Applicability of the Payment Percentage.**  Except as set forth below in this

Section 4.3 with respect to supplemental payments, no holder of a PI Trust Voting Claim other

than a PI Trust Voting Claim for Other Asbestos Disease (Disease Level I - Cash Discount

Payment) as defined in Section 5.3(a)(3) below shall receive a payment that exceeds the PI

Trust's determination of the Initial Payment Percentage for the relevant Sub-Account of the

liquidated value of the claim. Except as otherwise provided (a) in Section 5.1(c) below for PI

Trust Claims involving deceased or incompetent claimants for which court or probate approval

of the PI Trust's offer is required and (b) in the paragraph below with respect to Released

Claims, no holder of any other PI Trust Claim shall receive a payment that exceeds the Payment

Percentage for the respective Sub-Account in effect at the time of payment; provided, however,

**Revised 2/2/10**

that if there is a reduction in the Payment Percentage for a Sub-Account, the Trustees, in their

sole discretion, may cause the PI Trust to pay a PI Trust Claim based on the Payment Percentage

that was in effect prior to the reduction if such PI Trust Claim was filed and actionable with the

PI Trust with respect to such Sub-Account ninety (90) days or more prior to the date the Trustees

proposed the new Payment Percentage in writing to the TAC and the Future Claimants'

Representative (the "Proposal Date") and the processing of such claim was unreasonably delayed

due to circumstances beyond the control of the claimant or the claimant's counsel, but only if

such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.  PI Trust

Claims involving Other Asbestos Disease (Disease Level I - Cash Discount Payment) shall not

be subject to such Sub-Account's Payment Percentage, but shall instead be paid the full amount

of their Scheduled Value as set forth in Section 5.3(a)(3) below.

    If a redetermination of the respective Sub-Account's Payment Percentage has been

proposed in writing by the Trustees to the TAC and the Future Claimants' Representative but has

not yet been adopted, the claimant shall receive the lower of such Sub-Account's current

Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment

Percentage for such Sub-Account was the lower amount but was not subsequently adopted, the

claimant shall thereafter receive the difference between the lower proposed amount and the

higher current amount.  Conversely, if the proposed Payment Percentage for such Sub-Account

was the higher amount and was subsequently adopted, the claimant shall thereafter receive the

difference between the lower current amount and the higher adopted amount.  Notwithstanding

anything contained herein, if the proposed Payment Percentage for a Sub-Account is lower than

the current Payment Percentage for such Sub-Account, a claimant whose PI Trust Claim was

- 16 -

Revised 2/2/10

liquidated prior to the Proposal Date and who either (a) transmitted[3] an executed release to the PI Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the PI Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to here in as the "Released Claims") shall be paid based on the current Payment Percentage (the "Released Claims Payment Percentage"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the PI Trust transmits a release electronically, the release shall be deemed to have been received on the date the PI Trust transmits the offer notification, and (c) if the PI Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the Future Claimants' Representative a change in the Payment Percentage for a Sub-Account, the Trustees shall issue a written notice to claimants or claimants' counsel indicating that the Trustees are reconsidering such Payment Percentage. During the period of time when the Trustees are contemplating a change in the Payment Percentage for a Sub-Account, the PI Trust shall continuing processing claims and making offers in a manner consistent with its normal course of business.

---

[3] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

Revised 2/2/10

There is uncertainty surrounding the amount of the PI Trust's future assets. There is also uncertainty surrounding the totality of the PI Trust Claims to be paid over time as well as the extent to which changes in existing federal and state law could affect the PI Trust's liabilities under this TDP. If the value of the PI Trust's future assets increases significantly and/or if the value or volume of PI Trust Claims actually filed with the PI Trust is significantly lower than originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustees, with the consent of the TAC and the Future Claimants' Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the PI Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

- 18 -

Revised 2/2/10

## SECTION V

### Resolution of PI Trust Claims.

**5.1**     **Ordering, Processing and Payment of Claims**.

  **5.1(a)  Ordering of Claims.**

    **5.1(a)(1)  Establishment of FIFO Processing Queues.**  The PI Trust will order separately all OC and Fibreboard Claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queues"). For all claims filed on or before the date six months after the date that the PI Trust first makes available proof of claim forms and other claims materials required to file a claim with the PI Trust (the "Initial Claims Filing Date"), a claimant's position in either FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against OC or Fibreboard in the tort system or was actually submitted to OC or Fibreboard pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with OC or Fibreboard; (iii) the date after the Petition Date but before the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date after the Petition Date but before the Effective Date the claimant filed a proof of claim form in OC's and/or Fibreboard's Chapter 11 proceeding; or (v) the date after the Petition Date the claimant submitted a ballot in OC's Chapter 11 proceeding for purposes of voting on the Plan pursuant to the voting procedures approved by the Bankruptcy Court.

- 19 -

Following the Initial Claims Filing Date, the claimant's position in one of the two FIFO

Processing Queues shall be determined by the date the claim was filed with the PI Trust. If any

claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be

determined by date of the claimant's diagnosis of asbestos-related disease. If any claims are filed

and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be

determined by the date of the claimant's birth, with older claimants given priority over younger

claimants.

**5.1(a)(2)   Effect of Statutes of Limitations and Repose.** All

unliquidated PI Trust Claims must meet either, (i) for claims first filed in the tort system against

OC or Fibreboard, respectively prior to the Petition Date, the applicable federal, state and foreign

statute of limitation and repose that was in effect at the time of the filing of the claim in the tort

system, or (ii) for claims that were not filed against either OC or Fibreboard in the tort system

prior to the Petition Date, the applicable federal, state or foreign statute of limitation that was in

effect at the time of the filing with the PI Trust.

However, the running of the relevant statute of limitation shall be tolled as of the earliest

of (A) the actual filing of the claim against OC or Fibreboard prior to the Petition Date, whether

in the tort system or by submission of the claim to OC or Fibreboard pursuant to an

administrative settlement agreement; (B) the tolling of the claim against OC or Fibreboard by an

agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the

Petition Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding

sentence and the claim was not barred by the applicable federal, state or foreign statute of

limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed

Revised 2/2/10

with the PI Trust within three (3) years after the Initial Claims Filing Date.  In addition, any

claims that were first diagnosed after the Petition Date, irrespective of the application of any

relevant federal, state or foreign statute of limitation or repose, may be filed with the PI Trust

within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims

Filing Date, whichever occurs later.  However, the processing of any PI Trust Claim by the PI

Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b)    Processing of Claims.**  As a general practice, the PI Trust will review

its claims files on a regular basis and notify all claimants whose claims are likely to come up in

either the OC or Fibreboard FIFO Processing Queue in the near future.

**5.1(c)    Payment of Claims.**  PI Trust Claims against the OC and/or

Fibreboard Sub-Accounts that have been liquidated under the provisions of this TDP by the

Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review

Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or

by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order from

the relevant Sub-Account based on the date their liquidation became final (the "FIFO Payment

Queue"), all such payments being subject to the applicable Payment Percentage, the Maximum

Annual Payment, the Maximum Available Payment, the Claims Payment Ratio, and the

sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.

Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the

Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum

Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or

her claim must be approved by a court of competent jurisdiction or through a probate process

- 21 -

prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust

on the claim shall remain open so long as proceedings before that court or in that probate process

remain pending, provided that the PI Trust has been furnished with evidence that the settlement

offer has been submitted to such court or probate process for approval. If the offer is ultimately

approved by the court or through the probate process and accepted by the claimant's

representative, the PI Trust shall pay the claim from the relevant Sub-Account in the amount so

offered, multiplied by the Payment Percentage in effect for such Sub-Account at the time the

offer was first made.

If any claims are liquidated on the same date, the claimant's position in a Sub-Account's

FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-

related disease. If any claims are liquidated on the same date and the respective holders'

asbestos-related diseases were diagnosed on the same date, those claimants' positions in the Sub-

Account's FIFO Payment Queue shall be determined by the PI Trust based on the dates of the

claimants' birth, with older claimants given priority over younger claimants.

### 5.2    Resolution of Pre-Petition Liquidated PI Trust Claims.

**5.2(a)    Processing and Payment.** As soon as practicable after the Effective

Date, the PI Trust shall pay, upon submission by the claimant of the appropriate documentation,

all PI Trust Claims that were liquidated (i) by a binding settlement agreement for the particular

claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii)

after the Petition Date according to the terms of a binding settlement agreement entered into

prior to the Petition Date (a "Pre-Petition Agreement"), (iii) by a jury verdict or non-final

judgment in the tort system obtained prior to the Petition Date, or (iv) by a judgment that became

final and non-appealable prior to the Petition Date (collectively "Pre-Petition Liquidated

- 22 -

Claims"). In order to receive payment from the PI Trust, the holder of a Pre-Petition Liquidated

Claim must submit all documentation necessary to demonstrate to the PI Trust that the claim was

liquidated in the manner described in the preceding sentence, which documentation shall include

(A) a court authenticated copy of the jury verdict (if applicable), non-final judgment (if

applicable) or final judgment (if applicable), and (B) the name, social security number and date

of birth of the claimant and the name and address of the claimant's lawyer; provided, however,

that such documentation shall not be required with respect to any Pre-Petition Liquidated Claim

that OC or Fibreboard has identified to the PI Trust as a Pre-Petition Liquidated Claim as to

which all conditions to payment under the applicable agreement, jury verdict or judgment have

been satisfied. OC and Fibreboard shall deliver to the PI Trust a list of the Pre-Petition

Liquidated Claims that OC and Fibreboard have approved for payment (the "Approved Pre-

Petition Liquidated Claims"), which claims shall be entitled to rely upon the exception set forth

in the preceding sentence.

     The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the

amount agreed to in the binding settlement agreement or Pre-Petition Agreement, the unpaid

portion of the amount awarded by the jury verdict or non-final judgment, or the unpaid portion of

the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on

that amount in accordance with the terms of a binding settlement agreement or Pre-Petition

Agreement, if any, or under applicable state law for settlements or judgments as of the Petition

Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-

Petition Liquidated Claim shall not include any punitive or exemplary damages. In addition, the

amounts payable with respect to such claims shall not be subject to or taken into account in

consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but

- 23 -

shall be subject to the Maximum Annual Payment and Payment Percentage provisions. In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between a claimant and the PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

The PI Trust shall pay the Approved Pre-Petition Liquidated Claims as expeditiously as possible. The other Pre-Petition Liquidated Claims shall be processed and paid from the OC and/or Fibreboard Sub-Accounts in accordance with their order in separate FIFO queues to be established for each Sub-Account by the PI Trust based on the date the PI Trust received all required documentation for the particular claim. If any Pre-Petition Liquidated Claims are filed with the PI Trust on the same date, the claimant's position in the Sub-Account's FIFO queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Claims are both filed with the PI Trust and liquidated by a Sub-Account on the same dates, those claimants' positions in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2(b)   Marshalling of Security**. Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

**5.3   Resolution of Unliquidated PI Trust Claims**. Within six months after the establishment of the PI Trust, the Trustees with the consent of the TAC and the Future

- 24 -

Claimants' Representative shall adopt procedures for reviewing and liquidating all unliquidated PI Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require claimants seeking resolution of unliquidated PI Trust claims to first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the PI Trust shall provide an initial response to the claimant within six months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her OC and/or Fibreboard Claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, each OC and/or Fibreboard Claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claim shall be placed in the relevant OC and/or Fibreboard FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above. The PI Trust shall provide the claimant with six-months notice of the date by which it expects to reach the claim in the FIFO Processing Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(b) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level. If a claimant fails to respond

- 25 -

to the PI Trust's notice prior to the reaching of the claim in the FIFO Processing Queue, the PI Trust will process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

### 5.3(a)    Expedited Review Process.

**5.3(a)(1)    In General.** The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all OC and Fibreboard Claims (except those involving Lung Cancer 2 - Disease Level VI and all Foreign Claims, which must be liquidated pursuant to the PI Trust's Individual Review process) where the claim can easily be verified by the PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing PI Trust Claims than does the Individual Review Process described in Section 5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value (or Values in the case of Multiple Exposure Claims) for such Disease Level set forth in Section 5.3(a)(3) below. However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth herein. Claimants holding OC and/or Fibreboard Claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure

Revised 2/2/10

Criteria for the relevant Disease Level may elect the PI Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8, the claimant's eligibility to receive the Scheduled Value for his or her PI Trust Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

**5.3(a)(2)  Claims Processing under Expedited Review.**  All claimants seeking liquidation of an OC and/or Fibreboard Claim pursuant to Expedited Review shall file the PI Trust's proof of claim forms provided in Attachment B hereto.  As a proof of claim form is reached in the OC or Fibreboard FIFO Processing Queue, the PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination.  If a Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment from the relevant OC or Fibreboard Sub-Account of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the PI Trust. If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the Sub-Account's FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**5.3(a)(3)  Disease Levels, Scheduled Values and Medical/Exposure Criteria.**  The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each, and the separate OC and Fibreboard Scheduled Values for the seven (7) Disease Levels eligible for Expedited Review, are set forth below. These Disease Levels,

- 27 -

**Revised 2/2/10**

Scheduled Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims

(other than Pre-Petition Liquidated Claims) filed with the PI Trust on or before the Initial Claims

Filing Date provided in Section 5.1 above for which the claimant elects the Expedited Review

Process. Thereafter, for purposes of administering the Expedited Review Process and with the

consent of the TAC and the Future Claimants' Representative, the Trustees may add to, change

or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop

subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine

that a novel or exceptional asbestos personal injury claim is compensable even though it does not

meet the Medical/Exposure Criteria for any of the then current Disease Levels.

| Disease Level | OC/Fibreboard Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $215,000/$135,000 | (1) Diagnosis[4] of mesothelioma; and (2) credible evidence of OC or Fibreboard Exposure (as defined in Section 5.7(b)(3) below) |
| Lung Cancer 1 (Level VII) | $ 40,000/$27,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[5], (2) |

---

[4] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[5] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest x-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, written radiology report or a pathology report). Solely for asbestos claims filed against OC or Fibreboard or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification, consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a "Bilateral Asbestos-Related

- 28 -

six months OC or Fibreboard
Exposure prior to December 31,
1982, (3) Significant Occupational
Exposure to asbestos,[6] and (4)
supporting medical documentation
establishing asbestos exposure as a
contributing factor in causing the
lung cancer in question.

Lung Cancer 2 (Level VI)        None

(1) Diagnosis of a primary lung
cancer; (2) OC or Fibreboard
Exposure prior to December 31,
1982, and (3) supporting medical
documentation establishing asbestos
exposure as a contributing factor in
causing the lung cancer in question.

Lung Cancer 2 (Level VI) claims are
claims that do not meet the more
stringent medical and/or exposure
requirements of Lung Cancer (Level
VII) claims. All claims in this
Disease Level will be individually
evaluated. The estimated likely
Average Value of the individual
evaluation awards for this category
for OC Claims is $20,000 and for
Fibreboard Claims is $12,000, with
such awards capped at a Maximum
Value of $50,000 for OC Claims and
$30,000 for Fibreboard Claims,

---

Nonmalignant Disease" for purposes of meeting the presumptive medical requirements of
Disease Levels I, II, III, V and VII. Pathological evidence of asbestosis may be based on the
pathological grading system for asbestosis described in the Special Issue of the Archives of
Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3
(October 8, 1982). For all purposes of this TDP, a "Qualified Physician" is a physician who is
board certified (or in the case of Canadian claims or Foreign Claims, a physician who is certified
or qualified under comparable medical standards or criteria of the jurisdiction in question) in one
or more relevant specialized fields of medicine such as pulmonology, radiology, internal
medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8,
that the requirement for board certification in this provision shall not apply to otherwise qualified
physicians whose x-rays and/or CT scan readings are submitted for deceased holders of PI Trust
Claims.

[6]        "Significant Occupational Exposure" is defined in Section 5.7 below.

**Revised 2/2/10**

unless the claim qualifies for Extraordinary Claim treatment (discussed in Section 5.4 below).

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a Smoker.[7] In any event, no presumption of validity will be available for any claims in this category.

|  |  |  |
|---|---|---|
| Other Cancer (Level V) | $ 22,000/$12,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $ 42,000/$29,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence |

---

[7]    There is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Values for Lung Cancer (Level VII) claims against OC and Fibreboard, respectively, shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

- 30 -

Revised 2/2/10

of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

Asbestosis/
Pleural Disease (Level III)    $ 19,000/$11,500

(1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

Asbestosis/
Pleural Disease (Level II)    $ 8,000/$4,500

(1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months OC or Fibreboard Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos.

Other Asbestos Disease (Level I -
Cash Discount Payment)    $   400/$240

(1) Diagnosis of a Bilateral Asbestos- Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) OC or Fibreboard Exposure prior to December 31, 1982.

- 31 -

**Revised 2/2/10**

### 5.3(b)    Individual Review Process

5.3(b)(1)  **In General.** Subject to the provisions set forth below, an OC or Fibreboard Claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above. In addition or alternatively, an OC or Fibreboard claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision. However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims shall be established pursuant to the PI Trust's Individual Review Process. PI Trust Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("Canadian Claims") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "Foreign Claim" is a PI Trust Claim with respect to which the claimant's exposure to an asbestos-containing product for which OC and or Fibreboard has legal responsibility occurred outside of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The PI Trust shall determine the liquidated value of Foreign

- 32 -

Revised 2/2/10

Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review process, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to Foreign Claims; provided, however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may also establish a separate valuation matrix for such Foreign Claims based on that data.

5.3(b)(1)(A)    **Review of Medical/Exposure Criteria.** The PI Trust's Individual Review Process provides an OC or Fibreboard claimant with an opportunity for individual consideration and evaluation of a PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I – V, VII or VIII. In such a case, the PI Trust shall either deny the claim, or, if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value for such a claim.

- 33 -

Revised 2/2/10

**5.3(b)(1)(B) Review of Liquidated Value.** Claimants

holding claims involving Disease Levels II – VIII shall also be eligible to seek Individual

Review of the liquidated value of their OC and Fibreboard Claims, as well as of their

medical/exposure evidence. The Individual Review Process is intended to result in payments

from the OC and/or Fibreboard Sub-Accounts equal to the full liquidated value for each claim

multiplied by the Payment Percentage; however, the liquidated value of any OC or Fibreboard

Claim that undergoes Individual Review may be determined to be less than the Scheduled Value

the claimant would have received under Expedited Review. Moreover, the liquidated value for a

claim involving Disease Levels II – VIII shall not exceed the Maximum Value for the relevant

Disease Level set forth in Section 5.3(b)(4) below, unless the claim meets the requirements of an

Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot

exceed the Maximum Value set forth in that provision for such claims. Because the detailed

examination and valuation process pursuant to Individual Review requires substantial time and

effort, claimants electing to undergo the Individual Review Process may be paid the liquidated

value of their PI Trust Claims later than would have been the case had the claimant elected the

Expedited Review Process.  Subject to the provisions of Section 5.8, the PI Trust shall devote

reasonable resources to the review of all claims to ensure that there is a reasonable balance

maintained in reviewing all classes of claims.

**5.3(b)(2)    Valuation Factors to be Considered in Individual Review.**

The PI Trust shall liquidate the value of each OC and Fibreboard Claim that undergoes

Individual Review based on the historic liquidated values of other similarly situated claims in the

tort system for the same Disease Level. The PI Trust will thus take into consideration all of the

factors that affect the severity of damages and values within the tort system including, but not

- 34 -

limited to credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure to an asbestos-containing product prior to December 31, 1982 for which OC or Fibreboard has legal responsibility (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlements and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against OC or Fibreboard in the tort system prior to the Petition Date. If the claim was not filed against OC or Fibreboard in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product for which OC or Fibreboard has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of

- 35 -

law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant, and, to the extent the PI Trust seeks recovery from any entity that provided insurance coverage to OC and or Fibreboard, the Alabama Wrongful Death Statute shall govern.

**5.3(b)(3)  Processing and Payment Limitations for Claims Involving Disease Levels III and II.** The PI Trust shall administer Individual Review for Disease Levels III and II so that Individual Review does not reduce payments to claimants electing the Scheduled Value for such PI Trust Claims under Expedited Review. As one means of implementing this requirement, the following shall apply for Disease Levels III and II claims:

**5.3(b)(3)(A)  Disease Level III Claims.** No more than 13% or 9% of Disease Level III claims paid in any year from either the OC or the Fibreboard Sub-Account, respectively, shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level III claims allowed under Individual Review shall be no more than 17% or 13% of payments to all Disease Level III claimants from either the OC or Fibreboard Sub-Account, respectively, during any year.

**5.3(b)(3)(B)  Disease Level II Claims.** No more than 15% or 20% of Disease Level II claims paid in any year from either the OC or the Fibreboard Sub-Account, respectively, shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level II claims allowed under Individual Review shall be no more than 24% or 33% of payments to all Disease Level II claimants from either the OC or Fibreboard Sub-Account, respectively, during any year.

- 36 -

**Revised 2/2/10**

**5.3(b)(4)  Scheduled, Average and Maximum Values.**  The Scheduled, Average and Maximum Values for the Disease Levels compensable under this TDP from the OC and Fibreboard Sub-Accounts are the following:

## OC SUB-ACCOUNT

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $215,000 | $270,000 | $650,000 |
| Lung Cancer 1 (Level VII) | $ 40,000 | $ 50,000 | $150,000 |
| Lung Cancer 2 (Level VI) | None | $ 20,000 | $ 50,000 |
| Other Cancer (Level V) | $ 22,000 | $ 25,000 | $ 60,000 |
| Severe Asbestosis (Level IV) | $ 42,000 | $ 50,000 | $150,000 |
| Asbestosis/Pleural Disease (Level III) | $ 19,000 | $ 20,000 | $ 35,000 |
| Asbestosis/Pleural Disease (Level II) | $ 8,000 | $ 9,000 | $ 20,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $    400 | None | None |

Revised 2/2/10

### FIBREBOARD SUB-ACCOUNT

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $135,000 | $180,000 | $450,000 |
| Lung Cancer1 (Level VII) | $ 27,000 | $ 35,000 | $ 90,000 |
| Lung Cancer 2 (Level VI) | None | $ 12,000 | $ 30,000 |
| Other Cancer (Level V) | $ 12,000 | $ 15,000 | $ 36,000 |
| Severe Asbestosis (Level IV) | $ 29,000 | $ 30,000 | $ 90,000 |
| Asbestosis/Pleural Disease (Level III) | $ 11,500 | $ 12,000 | $ 21,000 |
| Asbestosis/Pleural Disease (Level II) | $ 4,500 | $ 5,400 | $ 12,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $ 240 | None | None |

These OC and Fibreboard Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the PI Trust, with the consent of the TAC and the Future Claimants' Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

### 5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship

5.4(a)  **Extraordinary Claims**. "Extraordinary Claim" means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II - VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominately as the result of working in a manufacturing facility of OC or Fibreboard during a period in which OC or Fibreboard was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of

- 38 -

Revised 2/2/10

exposure to an asbestos-containing product for which OC or Fibreboard has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a Maximum Value of five (5) times the Scheduled Value for claims qualifying for Disease Levels II – V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel to be established by the PI Trust with the consent of the TAC and the Future Claimants' Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the Trust's FIFO Queue ahead of all other PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I (Other Asbestos Disease) Claims and Exigent Hardship Claims, which shall be paid first in that order in said Queue, based on its date of liquidation and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

5.4(b)  **Exigent Hardship Claims.** At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP. An Exigent Hardship Claim, following its liquidation, shall be placed first in the relevant Sub-Account's FIFO Payment Queue ahead of all other liquidated claims except Pre-Petition Liquidated Claims and Disease Level I (Other Asbestos Disease) Claims, and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above. A PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the

- 39 -

Revised 2/2/10

Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related

malignancy (Disease Levels V-VIII), and the PI Trust, in its sole discretion, determines (i) that

the claimant needs financial assistance on an immediate basis based on the claimant's expenses

and all sources of available income, and (ii) that there is a causal connection between the

claimant's dire financial condition and the claimant's asbestos-related disease.

     **5.5**    **Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease

resulting solely from exposure to an occupationally exposed person, such as a family member,

the claimant must seek Individual Review of his or her OC and/or Fibreboard Claim pursuant to

Section 5.3(b) above.  In such a case, the claimant must establish that the occupationally exposed

person would have met the exposure requirements under this TDP that would have been

applicable had that person filed a direct claim against the PI Trust.  In addition, the claimant with

secondary exposure must establish that he or she is suffering from one of the eight Disease

Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise

compensable under this TDP, that his or her own exposure to the occupationally exposed person

occurred within the same time frame as the occupationally exposed person was exposed to

asbestos products produced by OC or Fibreboard, and that such secondary exposure to OC or

Fibreboard products was a cause of the claimed disease. The proof of claim form included in

Attachment B hereto contains an additional section for Secondary Exposure Claims.  All other

liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

     **5.6**    **Indirect PI Trust Claims.** Indirect PI Trust Claims asserted against either the OC

or Fibreboard Sub-Accounts based upon theories of contribution or indemnification under

applicable law, shall be treated as presumptively valid and paid by the PI Trust subject to the

applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for

- 40 -

such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under these Procedures (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has paid the claim of a Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the

- 41 -

Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant as of the effective date of this TDP. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR procedures provided in Section 5.10 below and set forth in Attachment A hereto. If such dispute is not resolved by said ADR procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 above and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the

- 42 -

holders of the underlying valid PI Trust Claims. Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

### 5.7    Evidentiary Requirements

#### 5.7(a)    Medical Evidence.

5.7(a)(1)    **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the PI Trust as a diagnosis.[8]

5.7(a)(1)(A).  **Disease Levels I-IV.**  Except for asbestos claims filed against OC, Fibreboard or another defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. In addition, all living claimants must provide (i) for Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii) for

---

[8]    All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the PI Trust may refute such presumptions.

**Revised 2/2/10**

Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing.[9]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

5.7(a)(1)(B).  **Disease Levels V – VIII.** All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

---

[9]    "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.  PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing.  If the PFT was not performed in a JCAHO accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party in the form provided by the PI Trust certifying that the PFT was conducted in material compliance with ATS standards.

**Revised 2/2/10**

**5.7(a)(1)(C). Exception to the Exception for Certain Pre-Petition Claims.** If the holder of a PI Trust Claim that was filed against OC, Fibreboard or another defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Section 5.7(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the claimant with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the diagnosing physician was engaged by the holder or his or her law firm, the holder shall provide such medical evidence to the PI Trust notwithstanding the exception in Sections 5.7(a)(1)(A).

**5.7(a)(2)     Credibility of Medical Evidence.** Before making any payment to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to OC  to settle for payment similar disease cases prior to OC 's bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to

- 45 -

the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system involving another defendant, other than any findings of fact, a verdict, or a judgment, may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

### 5.7(b)   Exposure Evidence

**5.7(b)(1)   In General.** As set forth in Section 5.3(a)(3) above, to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured or distributed by OC or Fibreboard. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product produced by OC or Fibreboard are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, OC or Fibreboard Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months OC or Fibreboard Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months OC or Fibreboard Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below. If the claimant cannot meet the relevant

- 46 -

presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) above of his or her exposure to an asbestos-containing product for which by OC or Fibreboard has legal responsibility.

5.7(b)(2)    **Significant Occupational Exposure.** "Significant Occupational Exposure" means employment for a cumulative period of at least five (5) years, with a minimum of two (2) years prior to December 31, 1982 in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

5.7(b)(3)    **OC or Fibreboard Exposure.** All PI Trust claimants must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by either OC or Fibreboard, and/or any entity, including an OC or Fibreboard contracting unit, for which OC or Fibreboard has legal liability ("OC/Fibreboard Exposure"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the

- 47 -

proof of claim form to be used by the PI Trust. The PI Trust can also require submission of other

or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of OC/Fibreboard Exposure is for the sole benefit

of the PI Trust, not third parties or defendants in the tort system. The PI Trust has no need for,

and therefore claimants are not required to furnish the PI Trust with evidence of, exposure to

specific asbestos products other than those for which OC or Fibreboard has legal responsibility,

except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to

identify OC or Fibreboard products in the claimant's underlying tort action, or to other

bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided

the claimant otherwise satisfies the medical and exposure requirements of this TDP.

5.8    **Claims Audit Program.** The PI Trust with the consent of the TAC and the

Future Claimants' Representative may develop methods for auditing the reliability of medical

evidence, including additional reading of X-rays, CT scans and verification of pulmonary

function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to

asbestos-containing products manufactured or distributed by OC or Fibreboard prior to

December 31, 1982. In the event that the PI Trust reasonably determines that any individual or

entity has engaged in a pattern or practice of providing unreliable medical evidence to the Trust,

it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided

to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by disallowing the

PI Trust Claim and/or by other means including, but not limited to, requiring the source of the

fraudulent information to pay the costs associated with the audit and any future audit or audits,

reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of

Revised 2/2/10

scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.9      Second Disease (Malignancy) Claims.**  Notwithstanding the provision of Section 2.1 that provides that a claimant may not assert more than one PI Trust Claim hereunder, the holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may file a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V – VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

**5.10    Arbitration.**

**5.10(a)      Establishment of ADR Procedures.**  The PI Trust, with the consent of the TAC and the Future Claimants' Representative, shall institute binding and non-binding arbitration procedures in accordance with the ADR Procedures included in Attachment A hereto for resolving disputes concerning whether a Pre-Petition settlement agreement with OC or Fibreboard is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I – VIII.  Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a

- 49 -

claim involving Disease Levels II – VIII as well as disputes over OC's or Fibreboard's share of

the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes

over the validity of an Indirect PI Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary

requirements that are set forth in Section 5.7 above. In the case of an arbitration involving the

liquidated value of a claim involving Disease Levels II – VIII, the arbitrator shall consider the

same valuation factors that are set forth in Section 5.3(b)(2) above. In order to facilitate the

Individual Review Process with respect to such claims, the PI Trust may from time to time

develop a valuation model that enables the PI Trust to efficiently make initial liquidated value

offers on these claims in the Individual Review setting. In an arbitration involving any such

claim, the PI Trust shall neither offer into evidence or describe any such model nor assert that any

information generated by the model has any evidentiary relevance or should be used by the

arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying

data that was used to create the model may be relevant and may be made available to the arbitrator

but only if provided to the claimant or his/her counsel ten (10) days prior to the arbitration

proceeding. With respect to all claims eligible for arbitration, the claimant, but not the PI Trust,

may elect either non-binding or binding arbitration. The ADR Procedures set forth in Attachment

A hereto may be modified by the PI Trust with the consent of the TAC and the Future Claimants'

Representative. Such amendments may include adoption of mediation procedures as well as

establishment of an Extraordinary Claims Panel to review such claims pursuant to Section 5.4(a)

above.

    **5.10(b)    Claims Eligible for Arbitration.** In order to be eligible for arbitration,

the claimant must first complete the Individual Review Process set forth in Section 5.3(b) above,

**Revised 2/2/10**

as well as either the Pro-Bono Evaluation or the Mediation processes set forth in the ADR

Procedures included in Attachment A, with respect to the disputed issue. Individual Review will

be treated as completed for these purposes when the claim has been individually reviewed by the

PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value

resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in

writing. Individual Review will also be treated as completed if the PI Trust has rejected the claim.

      **5.10(c)    Limitations on and Payment of Arbitration Awards.** In the case of a

non-Extraordinary Claim involving Disease Levels II – VIII, the arbitrator shall not return an

award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section

5.3(b)(4) above, and for an Extraordinary Claim involving one of those Disease Levels, the

arbitrator shall not return an award greater than the maximum extraordinary value for such a claim

as set forth in Section 5.4(a) above.  A claimant who submits to arbitration and who accepts the

arbitral award will receive payments in the same manner as one who accepts the PI Trust's original

valuation of the claim.

      **5.11    Litigation**.  Claimants who elect non-binding arbitration and then reject their

arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust

pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment

for monetary damages obtained in the tort system from the PI Trust's available cash only as

provided in Section 7.7 below.

**SECTION VI**

**<u>Claims Materials</u>**

      **6.1    Claims Materials.** The PI Trust shall prepare suitable and efficient claims

materials ("Claims Materials") for all PI Trust Claims, and shall provide such Claims Materials

- 51 -

upon a written request for such materials to the PI Trust.  The proof of claim form to be

submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which

the claim qualifies at the time of filing, and shall include a certification by the claimant or his or

her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil

Procedure.  In developing its claim filing procedures, the PI Trust shall make every reasonable

effort to provide claimants with the opportunity to utilize currently available technology at their

discretion, including filing claims and supporting documentation over the Internet and

electronically by disk or CD-rom.  The proof of claim forms to be used by the PI Trust shall be

developed by the PI Trust and submitted to the TAC and the Future Claimants' Representative

for approval.  The proof of claim forms may be changed by the PI Trust with the consent of the

TAC and the Future Claimants' Representative.

      **6.2**    **Content of Claims Materials.**  The Claims Materials shall include a copy of this

TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  If

feasible, the forms used by the PI Trust to obtain claims information shall be the same or

substantially similar to those used by other asbestos claims resolution organizations.  If requested

by the claimant, the PI Trust shall accept information provided electronically.  The claimant

may, but will not be required to, provide the PI Trust with evidence of recovery from other

asbestos defendants and claims resolution organizations.

      **6.3**    **Withdrawal or Deferral of Claims**.  A claimant can withdraw a PI Trust Claim

at any time upon written notice to the PI Trust and file another claim subsequently without

affecting the status of the claim for statute of limitations purposes, but any such claim filed after

withdrawal shall be given a place in the FIFO Processing Queue based the date of such

subsequent filing. A claimant can also request that the processing of his or her PI Trust Claim by

- 52 -

the PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's PI Trust Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust Claim for which deferral status has been granted, a claim will be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the PI Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the PI Trust may extend either the deferral or withdrawal period for an additional six (6) months.

6.4    **Filing Requirements and Fees**. The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, (a) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the PI Trust and (b) whether a filing fee should be required for any PI Trust Claims.

6.5    **Confidentiality of Claimants' Submissions.** All submissions to the PI Trust by a holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the PI Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions. The PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the

- 53 -

benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the

Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in

response to a valid subpoena of such materials issued by the Bankruptcy Court. Furthermore, the

PI Trust shall provide counsel for the holder a copy of any such subpoena immediately upon

being served. The PI Trust shall on its own initiative or upon request of the claimant in question

take all necessary and appropriate steps to preserve said privilege before the Bankruptcy Court

and before those courts having appellate jurisdiction related thereto. Notwithstanding anything

in the foregoing to the contrary, with the consent of the TAC and the Future Claimants'

Representative, the PI Trust may, in specific limited instances, disclose information, documents,

or other materials reasonably necessary in the PI Trust's judgment to preserve, litigate, resolve,

or settle coverage, or to comply with an applicable obligation under an insurance policy or

settlement agreement within the OC Asbestos Personal Injury Liability Insurance Assets;

provided, however, that the PI Trust shall take any and all steps reasonably feasible in its

judgment to preserve the further confidentiality of such information, documents and materials,

and prior to the disclosure of such information, documents or materials to a third party, the PI

Trust shall receive from such third party a written agreement of confidentiality that (a) ensures

that the information, documents and materials provided by the PI Trust shall be used solely by

the receiving party for the purpose stated in the agreement and (b) prohibits any other use or

further dissemination of the information, documents and materials by the third party.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1    Showing Required.** To establish a valid PI Trust Claim, a claimant must meet

the requirements set forth in this TDP. The PI Trust may require the submission of X-rays, CT

- 54 -

Revised 2/2/10

scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the PI Trust Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2    **Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above.

7.3    **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing and Liquidation Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP from the OC and/or Fibreboard Sub-Accounts promptly as monies become available and as claims are liquidated, while maintaining sufficient assets within each Sub-Account to pay future valid claims in substantially the same manner.

- 55 -

**Revised 2/2/10**

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment for claims against either Sub-Account. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the PI Trust, the established allocation of monies to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision. In the event that either or both of the OC or the Fibreboard Sub-Accounts face temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Future Claimants' Representative, (a) suspend the normal order of payment from such Sub-Account, (b) temporarily limit or suspend payments from such Sub-Account altogether, (c) offer a Reduced Payment Option for the Sub-Account as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

7.4    **Punitive Damages.** Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated PI Trust Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice

- 56 -

of law provision in Section 7.4 herein applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the PI Trust seeks recovery from any entity that provided insurance to OC or Fibreboard, the Alabama Wrongful Death Statute shall govern.

**7.5      Sequencing Adjustment.**

**7.5(a)      In General.**  Except for PI Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a sequencing adjustment shall be paid on all PI Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.  The sequencing adjustment factor for each year shall be the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the first auction of 5-year Treasury Notes occurring in such year.

**7.5(b)      Unliquidated PI Trust Claims.**  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements of Disease Levels II – V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No sequencing adjustment shall be paid on any claim involving Disease Level I, or on any claim liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below. The sequencing adjustment on an unliquidated PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Sequencing adjustments on all such unliquidated claims shall be measured from the date of

- 57 -

payment back to the earliest of the date that is one (1) year after the date on which (a) the claim

was filed against OC or Fibreboard prior to the Petition Date; (b) the claim was filed against

another defendant in the tort system on or after the Petition Date but before the Effective Date; or

(c) the claim was filed with the PI Trust after the Effective Date.

7.5(c)    **Liquidated Pre-Petition Claims.**  A sequencing adjustment shall also

be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section

5.2(a) above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment,

the sequencing adjustment shall be measured from the date of payment back to the date that is

one (1) year after the date that the verdict or judgment was entered.  In the case of Pre-Petition

Liquidated Claims liquidated by a binding, judicially enforceable settlement, the sequencing

adjustment shall be measured from the date of payment back to the date that is one (1) year after

the Petition Date.

7.6    **Suits in the Tort System.**  If the holder of a disputed claim disagrees with the PI

Trust's determination regarding the Disease Level of the claim, the claimant's exposure history

or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding

arbitration as provided in Section 5.10 above, the holder may file a lawsuit in the Claimant's

Jurisdiction as defined in Section 5.3(b)(2) above.  Any such lawsuit must be filed by the

claimant in her or her own right and name and not as a member or representative of a class, and

no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with

respect to the PI Trust, all defenses which could have been asserted by OC or Fibreboard) shall

be available to both sides at trial; however, the PI Trust may waive any defense and/or concede

any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint

was filed or on the date the proof of claim was filed with the PI Trust, the case will be treated as

- 58 -

**Revised 2/2/10**

a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7     **Payment of Judgments for Money Damages.**  If and when an OC or Fibreboard claimant obtains a judgment in the tort system, the claim shall be placed in the relevant FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the OC or Fibreboard Sub-Account an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the PI Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration.  The claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provisions set forth above in effect on the date of the payment of the subject installment).

In the case of non-Extraordinary claims involving Disease Levels II - VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(4).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the Maximum Value for such claims set forth in Section 5.4(a) above.  In the case of claims involving Disease Level I, the total amounts paid shall not exceed the Scheduled Value of such claims.  Under no circumstances shall either a sequencing adjustment be paid pursuant to Section 7.5 or interest be paid under any statute on any judgments obtained in the tort system pursuant to Sections 5.11 and 7.6 above.

**Revised 2/2/10**

**7.8    Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the PI Trust.  As a condition to making any payment to a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the PI Trust, shall constitute such a release.

**7.9    Third-Party Services.**  Nothing in this TDP shall preclude the PI Trust from contracting with another asbestos claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10    PI Trust Disclosure of Information.**  Periodically, but not less often than once a year, the PI Trust shall make available to claimants and other interested parties, the number of claims by Disease Levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system, indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

### Miscellaneous

**8.1    Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in

- 60 -

**Revised 2/2/10**

circumstances), provided they first obtain the consent of the TAC and the Future Claimants'

Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the PI

Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the

restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by

Section 4.2 above. Nothing herein is intended to preclude the TAC or the Future Claimants'

Representative from proposing to the Trustees, in writing, amendments to this TDP. Any

amendment proposed by the TAC or the Future Claimants' Representative shall remain subject

to Section 7.3 of the PI Trust Agreement.

    **8.2**    **Severability.**  Should any provision contained in this TDP be determined to be

unenforceable, such determination shall in no way limit or affect the enforceability and operative

effect of any and all other provisions of this TDP. Should any provision contained in this TDP

be determined to be inconsistent with or contrary to OC's or Fibreboard's obligations to any

insurance company providing insurance coverage to OC and/or Fibreboard in respect of claims

for personal injury based on exposure to asbestos-containing products manufactured or produced

by OC or Fibreboard, the PI Trust with the consent of the TAC and the Future Claimants'

Representative may amend this TDP and/or the PI Trust Agreement to make the provision of

either or both documents consistent with the duties and obligations of OC or Fibreboard to said

insurance company.

    **8.3**    **Governing Law.**  Except for purposes of determining the liquidated value of any

PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance

with, the laws of the State of Delaware. The law governing the liquidation of PI Trust Claims in

the case of Individual Review, arbitration or litigation in the tort system shall be the law of the

Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

**Revised 2/2/10**