# IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

COPY

SHERIF RAFIK KODSY

**PLAINTIFF**

VS.                                                    CASE NO:09-CA-011174

GENERAL MOTORS CORPORATION

**DEFENDANT**

## AMENDED TRIAL DE NOVO PLEADING

HEREBY, PLAINTIFF PLEADS AND AMENDS THE TRIAL DE-NOVO PROCEEDING, AND STATES THAT THIS ACTION IS FOR AN ACCESS OF 1-5 MILLIONS, IN DAMAGES, NOT INCLUDING LEGAL FEES AND COSTS....

'The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. [Citation]' " Schawk, Inc. v. Zehnder, 326 Ill. App. 3d 752, 755, 761 N.E.2d 192, 194 (2001). In divining intent, we presume the legislature did not intend to create absurd, inconvenient, or unjust results. In re B.L.S., 202 Ill. 2d 510, 514, 782 N.E.2d 217, 220 (2002). " 'The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. [Citation]' " Schawk, 326 Ill. App. 3d at 755, 761 N.E.2d at 194. " 'The statute should be evaluated as a whole, with each provision construed in connection with every other section. [Citation]' " Schawk, 326 Ill. App. 3d at 755, 761 N.E.2d at 194. "' If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids. [Citation.] ' " Schawk, 326 Ill. App. 3d at 755, 761 N.E.2d at 194. "Sections of the same statute should be considered *in pari materia* and each section should be construed with every other part or section of the statute to produce a harmonious whole." St. Paul Fire & Marine Insurance Co. v. Smith, 337 Ill. App. 3d 1054, 1060, 787 N.E.2d 852, 856 (2003).

THE 2009 FLORIDA STATUTES , 320.61{5}STATES THAT,  Any manufacturer, distributor, or importer, who obtains a license under this section, is engaged in business in this state and is subject to the jurisdiction of the courts of this state pursuant to chapter 48. Any manufacturer not licensed under this section, who is a manufacturer of motor vehicles of a recognized line-make which are sold or leased in this state pursuant to a pian, system, or channel of distribution established, approved, authorized or known to the manufacturer, shall be subject to the jurisdiction of the courts of this state in any action seeking relief under or to enforce any of the remedies or penalties provided in ss. 320.60-320.70.

## COUNT I
## FRAUD

A- THE DEFENDANT'S GENERAL MOTORS CORPORATION AND

ITS CONSPIRING AGENTS FROM CORAL CADILLAC INC. THE

SELLING DEALER, DID COMMIT FRAUD ACCORDING TO THE

2009 FLORIDA STATUTES, IN TORT 768.042 OF THE FLORIDA

STATUTES, FOR A VIOLATION OF RULE 1.120. PLEADING SPECIAL

MATTERS; (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit. Malice, intent, knowledge, mental attitude, and other condition of mind of a person may be averred generally.

IT WAS FURTHER ADMITTED BY DEFENDANTS' THAT THE

VEHICLE ASSERTED HEREIN WAS SOLD AS 'USED',

CONTRARY TO THE MEANING OF THE TERM USED.

SECTION 320.60{13}"Used motor vehicle" means any motor vehicle the title to which has been transferred, at least once, by a manufacturer, distributor, importer, or dealer to an ultimate purchaser.

SEE ATTACHED, CERTIFICATE OF ORIGIN FOR A VEHICLE.,

2

AND USED BUYER'S ORDER, FROM CORAL CADILLAC, INC.
BY SELLING THE 2008 HUMMER H2, VIN #5GRGN23878H107653,
AS USED, WITHOUT DISCLOSURES OF ITS PRIOR LEASED
USE, AND DEFECTS, WAS A VIOLATION OF FLORIDA LAW.
B- FURTHER, THERE WAS NO PRIOR DISCLOSURE FOR THE
ELEVATED VIBRATIONS IN RESPECT TO THE VEHICLE DESIGN
AS TO ITS OFFROAD CAPABILITIES AND AGGRESSIVE DESIGN,
WITH THE ELEVATED ENGINE RPM'S, SLIPPING TRANSMISSION,
HESITANT ENGINE MISS AND SQUEELING BRAKES.. IF THERE
WAS A DISCLOSURE, THE PLAINIFF WOULD HAVE NOT
PURCHASED THE MOTOR VEHICLE. PLAINTIFF WAS NOT
ALERTED OR WARNED ABOUT THE ELEVATED PERFORMANCE
DESIGN, PRODUCING VIBRATIONS AND HIGH PITCHED ENGINE
NOISES, IT REFLECTS SHOW TRUCK CHARACTERISTICS WHICH
WAS UNFORSEEN TO THE CONSUMER AT THE TIME OF THE
PURCHASE. "THE MANUFACTURER, DID ADMIT REPEATEDLY
THAT THE PRESENCE OF THE VIBRATIONS IN THE SUBJECT
VEHICLE WAS INHERENT IN THE DESIGN OF THE VEHICLE", SEE
LEMON LAW TRANSCRIPT, PAGES 77-79., SEE THE ROBERT A
DITMAN LETTERS, AND THE CORAL CADILLAC WORK ORDERS.

3

THE VEHICLE WAS SOLD UNDER FALSE PRETENSES, TO

CONCEAL ITS DEFECTS, AND ITS PRIOR THIRD PARTY USE OF

THE MOTOR VEHICLE, INDICATING MALICE, AND FRAUD

ACCORDING TO FLORIDA LAW. NO DISCLOSURES.........

THE VEHICLE WAS A SOUP'D UP <u>SHOW TRUCK</u>, NOT INTENDED

FOR PUBLIC USE, …….. A FRONT LINE REJECT…….

## COUNT II
## **BREACH OF WARRANTY**

PLAINTIFF ASSERTS THAT THE MANUFACTURER BREACHED ITS

EXPRESSED AND IMPLYED WARRANTIES TO CONFORM THE

SUBJECT VEHICLE TO COMPARABLE MOTOR VEHICLES

STANDARDS OF SAFETY DESIGN AND EXPECTATIONS.

ACCORDING TO THE MACHINERY DIRECTIVE, FIRST

INTRODUCED IN 1989, IT WAS INTENDED TO REMOVE

BARRIERS TO TRADE. [STRICT MECHANICAL COMPLIANCES].

IT PUTS DUTIES ON MANUFACTURERS AND SUPPLIERS WHO

PLACE MACHINERY ON THE EUROPEAN MARKET TO DESIGN

THEIR PRODUCTS TO ELIMINATE OR REDUCE RISKS TO HEALTH

AND SAFETY AND TO WARN THE USER OF ANY RESIDUAL

RISKS, PROVIDING INFORMATION REQUIRED FOR SAFE USE

(FOR EXAMPLE, OPERATOR TRAINING, MAINTENANCE AND SELECTION OF CONSUMABLES). THERE ARE SPECIFIC REQUIREMENTS FOR MINIMISING RISK FROM VIBRATION IN THE DESIGN AND CONSTRUCTION OF THE MACHINE AND, IN THE CASE OF HAND HELD, HAND GUIDED AND MOBILE MACHINES, FOR DECLARING THE VIBRATION EMISSION. IF THE DECLARED EMISSION OF A MACHINE IS REPRESENTATIVE OF THE VIBRATION IN THE REAL-WORLD USE, IT CAN BE ADEQUATE TO INFORM THE USER OF RESIDUAL VIBRATION RISKS. THE HARMONIZED STANDARDS DEFINE SAFETY REQUIREMENTS FOR VARIOUS CATEGORIES OF MACHINE (INCLUDING THE PROVISION OF USER INFORMATION); CONFORMITY WITH THE RELEVANT STANDARD CARRIES A PRESUMPTION OF CONFORMITY WITH THE DIRECTIVE.

1- THE MANUFACTURER THROUGH ITS LIMITED AGENTS FAILED TO IMPLEMENT  PEAK VIBRATION READINGS IN THE SUBJECT VEHICLE AND DID NOT PRODUCE TACHOMETER READINGS OR ANY SORT OF READINGS WHAT SO EVER.

SEE INVOICES #540280, #541007, #541391, #443188, #443510, AND #543204. THE ELEVATED VIBRATIONS WAS DOCUMENTED TO

5

HAVE HAD EXISTED, <u>TO REQUIRE A SERVICE</u>, NO TECHNICAL

DATA WAS GENERATED FROM TESTING OF THE SUBJECT

VEHICLE TO DOCUMENT CONFORMITIES OR NON

CONFORMITIES OF VIBRATION LEVELS ACCORDING TO THE

INDUSTRY STANDARDS AND EXPECTATIONS. **ACCORDING TO**

**THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, THE**

**CENTERS FOR DISEASE CONTROL AND PREVENTION, AND**

**THE NATIONAL INSTITUTE OF OCCUPATIONAL SAFETY AND**

**HEALTH.**

THE RULE OF THREE STRIKES, YOUR OUT, MORE THAN APPLIES,

IN THIS INSTANT CASE AS THE MANUFACTURER WAS ALLOWED

TO PROVIDE CONFORMITIES SERVICES TO THE SUBJECT

VEHICLE ON EIGHT DIFFERENT VISITS, AND OVER A YEAR PAST

TO RECALL THE SUBJECT SUV., SEE THE LEMON LAW

TRANSCRIPT, PAGE #81- #85{19-25) AND PG. #86(1-3). MR.

BARDILL ADMITED TO OTHER CO-EXISTANT DEFECTS, THAT

PROVIDES VIBRATION EXPOSURES TO THE VEHICLE

OCCUPANTS, (A RAIL SHAKE).... PLAINTIFF DID NOT COMPLAIN

ABOUT A RAIL SHAKE AS IT IS NOT NORMAL TO EXIST IN A

HUMMER H2. LIKE THE SUBJECT VEHICAL, AND HE FURTHER

6

STATED THAT THERE IS NOTHING ELSE THAT CAN BE DONE.....

NO FURTHER WARRANTIES...NO REMEDIES, NO CODES...ETC.

2- THE ALLEGED BRAKES REPLACEMENT WAS PERFORMED ON

NOVEMBER 12TH 2008, THE INVOICE STATED,"SPECIAL ORDER

PART ON BACK ORDER", THAT HOWEVER DOES NOT INDICATE

WHY IT WAS REQUIRED TO REPLACE ??? IT MAY SOUND GOOD

AS A SOLUTION FOR THE SQUEEL NOISE !!!! ACCORDING TO THE

" *ALL TECHNICAL SERVICE BULLETINS, RECALL # 07V373000*:

ABS WHEEL SPEED SENSOR WIRING". INDICATING POTENTIAL

NUMBER OF UNITS AFFECTED: **363** , SPEED SENSOR WIRING

SHOULD HAVE BEEN CHECKED AND REPLACED INSTEAD OF

REPLACING NEW PADS........ AND THEN ACCORDING TO THE

INVOICE OF DECEMBER 23RD 2008, PAGE 1, FRONT BRAKES PADS,

DISC BRAKE FRONT R&R OR REPLACE, IT STATED FRONT

BRAKES SQUEEL NEC. TO REPLACE FRONT PADS, BUT IT DID

NOT STATE WHY SUCH A SERVICE IS REQUIRED WITH 6526

MILES ON THE NEW PADS OR THE CAUSE FOR SUCH A

CONCLUSION ??? FALSE DIAGNOSIS , {AN INSTRUMENT FOR

MEASURING VIBRATION OF VEHICLE BRAKE PADS (SQUEEL),

WAS NOT USED TO DETERMINE HOW BADLY A VEHICLE BRAKE

7

SQUEELS, AND MR JOE BARDIL ADMITED THAT THE ROTORS
WERE SCUFFED WITH A GRINDER, WITHOUT CARE OR
DISCLOSURES, CONTRARY TO COMMON STANDARDS OR
PRACTICES, SINCE ROTORS ARE USUALLY PRECISELY
MACHINED, THIS FAULTY SERVICE WAS DISCOVERED BY THE
GOODYEAR GEMINI DIAGNOSTIC CHECK ON MARCH 13TH 2009,
WITH FURTHER RECOMMENDATIONS FOR THE VIBRATIONS,
WITH REFERENCE TO A GENERAL MOTORS TECHNICAL SERVICE
BULLETIN ISSUED DECEMBER 10TH 2007, **REFERENCE(S):03-06-
04-030F** , TITLED, " VARIOUS DRIVEABILITY SYMPTOMS DUE TO
CLOGGED FUEL INJECTORS, {CONTRIBUTES TO VIBRATIONS}.
3- THE UNDER-CARRAIGE RUST WAS A BREACH OF WARRANTY
AS ONLY FRONT AXLE AND TIE ROD ENDS WERE PAINTED
AFTER DISASSEMBLY OF THOSE ITEMS TO CONFORM WITH THE
5 YEAR WARRANTY OF ANTI BODY CORROSION (UNDERBODY
PROTECTION) CLAUSE. THERE ARE OTHER AREAS THAT WAS
NEGLECTED WHICH WAS NOT ADDRESSED AND ARE EXISTANT
IN THE SUBJECT VEHICLE. THE SERVICE MANAGER, MR JOE
BARDILL, FOR CORAL CADILLAC INC., STATED THAT THIS WAS
COMMON TO HAVE RUST IN NEW VEHICLES.THE REFUSAL TO

8

PROPERLY PROVIDE FURTHER WARRANTIES TO ADDRESS A

COMPLAINT WAS A BREACH OF WARRANTY BY ITSELF, YET

THERE WAS OTHER REPAIRS PERFORMED TO CONFORM

WITHOUT A SUCCESSFUL RESOLUSION .

4- AN IMPROVEMENT TO THE TRANSMISSION WAS NOT A

CONFORMITY RESOLUTION AS IT STILL SLIPS BUT LESS THAN IT

WAS, IT IS NOT SUPPOSED TO SLIP AT ALL............ AFTER

THREE ATTEMPTED REPAIRS, INV.# 541391, INV.#540280,

INV.#541007. THEY WERE UNABLE TO FIX SLIPPING 100%.

5- THE VIBRATIONS WAS CONFIRMED TO EXIST EVEN WITH THE

FLYWHEEL DISCONECTED, NO FURTHER REPAIRS WERE

EXTENDED EXCEPT DETACH AND RESET ONLY, THE VIBRATION

MAGNITUDE AND TRANSMISSIBILITY WAS NOT INVESTIGATED

BY A TIME FREQUENCY (T-F) ANALYSIS, WHICH CAN PROVIDE A

BETTER CHARACTERIZATIONS OF SUCH HIGHLY TRANSIENT

VIBRATIONS. THE ANALYTIC WAVELET TRANSFORM (AWT) IS

AN IDEAL T-F ANALYSIS TOOL BECAUSE IT POSSESSES THE

ADVANTAGES OF BOTH THE FOURIER TRANSFORM AND THE

WAVELET TRANSFORM. THE OBJECTIVE OF THIS STUDY WAS

TO EXPLORE THE APPLICATION OF THE AWT METHOD FOR

CHARECTERIZING THE VIBRATIONS AND ASSESSING THEIR

EXPOSURE RISK, NO MONITORING WITH AN ECONOMICAL

VIBRATION METER, WAS PERFORMED…

A breach occurs when a party repudiates the contract before performance Is

due. Repudiation may consist of a statement reasonably interpreted to mean

that the party will not or cannot perform the contract. It may also consist of a

voluntary affirmative act which renders the party unable to perform.

## COUNT III
## BAD FAITH

1-THE MR. JORGE R. LOPEZ GONZALEZ, WAS THE LAST PERSON

TO INSPECT THE SUBJECT MOTOR VEHICLE FROM GENERAL

MOTORS CORPORATION, DESPITE THE DEFECTS AT TIME OF

INSPECTION MR. GONZALEZ DENIED ALL ALEGATIONS TO

LATER ADMIT THROUGH THE LETTER DATED MARCH

26TH 2009, HE RECOGNIZED THE INDEPENDENT DIAGNOSTIC

CHECK, PERFORMED BY THE BOCA RATON GOODYEAR/GEMINI

STORE IN BOCA RATON FLORIDA. AND REFERENCED THE

**(SECTION 06-ENGINE/PROPULSION SYSTEM),** HOWEVER MR.

BARDILL FROM CORAL CADILLAC SERVICE DEPARTMENT

REFUSED TO PERFORM ANY FURTHER INSPECTIONS, TESTING,

DIAGNOSTICS OR REPAIRS, ONCE CONTACTED, AS REFERENCED

10

IN THE LETTER.

2-THE GENERAL MOTORS HUMMER DIVISION IN DETROIT
WAS CONTACTED MORE THAN A HALF DOZEN TIMES BY
TELEPHONE ON DIFFERENT OCCASIONS ABOUT THE
VIBRATIONS, AND THEY DID INFACT CORRESPOND BY
SENDING TWO LETTERS CONFIRMING THE SET
APPOINTMENT TO ADDRESS THE VIBRATIONS,
ATTACHED LETTERS, ON THE DATE OF INSPECTION
INVOICE# 543204 , PAGE 1 SECTION-C-, IT STATES " ROAD
TESTED 6 MILES, VEHICLE EXHIBITS NORMAL IDLE QUALITY
FOR 6.2 LITRE ENGINE, PREVIOUSLY COMPARED WITH LIKE
VEHICLE". NO INSTRUMENTAL TESTING OF ANY SORT WAS
USED, ONLY A STATEMENT WITHOUT BASIS, BY A NON
EXPERT FOR THE HUMMER BRAND, AS IT WAS CONDUCTED
AT THE CORAL CADILLAC SERVICE DEPARTMENT IN
POMPANO BEACH FLORIDA. WITHOUT ANY DATA LOGGING
INSTRUMENTATION, OR WAS THERE ANY CONCERNS
ALERTED, AFTER EXTENSIVE ATTEMPTED REPAIRS TO
CONFORM... SEE INVOICES ATTACHED. AND INDEPENDENT
INSPECTIONS.

11

3-THE MR THORNTON, THE DISTRICT SERVICE MANAGER FOR GEOGRAPHY THAT COVERS BROWARD COUNTY AND DELRAY, SPECIFICALLY STATED, IN THE LEMON LAW TRANSCRIPT, PAGE #77, THAT THE TIRES ON THE SUBJECT VEHICLE ARE SOLELY A GREAT SOURCE OF A NON-CONFORMITY , THE MANUFACTURER SHOULD HAVE PROVIDED A SAFER MORE CONFORMED TIRE BRAND TO REDUCE THE DISORDERS FELT IN THE VEHICLE. SEE INVOICE DATED DECEMBER 8TH 2008, BY SCHUMACKER HUMMER SERVICE DEPARTMENT, THREE NEW TIRES WERE PROVIDED TO REPLACE EXISTING, WITHOUT A REASON AS TO WHY THIS WAS NEEDED, SINCE THE SAME BRAND WAS SUPPLIED, AS PRE-EXISTING TO REPLACE. NO IMPROVEMENT WHAT SO EVER WAS EVER INTENDED OR ACHIEVED FROM THIS SERVICE, A WASTE OF TIME AND MONEY, A TRICK OR A SHAM??

COUNT IV
CONSPIRACY

THE MANUFACTURER CONSPIRED WITH THE DEALERS INVOLVED TO PASS ON A NONCONFORMED VEHICLE AS

12

**NORMAL FOR THAT TYPE OF VEHICLE, AS USED, WITHOUT**

**TRUTHFUL AND HONEST DISCLOSURES, AND POOR SERVICE,**

**WITH LACK OF KNOWLEDGE AND RESOURCES......**

Florida law defines the crime of conspiracy as occurring where a person "agrees, conspires, combines, or confederates with another person or persons to commit any offense[.]" §777.04(3), Fla. Stat. (2003). "The=2 0crime of conspiracy involves an express or implied agreement between two or more people to commit a criminal offense." **State v. Russell, 611 So. 2d 1265, 1267 (Fla. 2d DCA 1992).**

**THE PLAINTIFF PROVIDED THE INDEPENDENT INSPECTIONS**

**AFTER THE GENERAL MOTORS CORPORATION AGENTS**

**CLAIMED THAT THE REPAIRS WERE SUCCESSFUL.**

**TRANSCRIPT PG.#37., SEE ATTACHED INSPECTION DOCS,**

**1-THE PROGRESSIVE INSURANCE INSPECTION, DATED**

**12/26/2008**

**2-THE HAGEN RANCH TEXACO, INSPECTION, DATED 01/02/2009**

**3-THE PALM BEACH GARAGE, INSPECTION, DATED 02/20/2009**

**4-THE BOCA RATON GOODYEAR/GEMINI, DIAGNOSTIC,**

**CHECK, WITH RECOMMENDATIONS TO TREAT THE**

**VIBRATIONS SYMPTOMS, DATED 03/13/2009.**

**ALL THE INDEPENDENT INSPECTIONS IDENTIFIED A**

**RESIDUAL FROM VIBRATIONS EXPOSURE PRESENSE AND**

**ALERTED TO RETURN TO DEALER/MANUFACTURER FOR A**

13

RESOLUTION DIRECTIVE. INSTEAD THE GENERAL MOTORS

CORPORATION CONSPIRED THROUGH ITS OUTLET

DEALERS TO PUSH THE DEFECTS TOWARDS THE VEHICLE

TRAITS AND DESIGN TO REFUSE SERVICE TO FURTHER

AMELIORATE THE PROBLEMS/ISSUES, QUOTED IN THE

ROBERT A. DITMAN LETTER, A REGISTERED AGENT OF

CORAL CADILLAC INC. DATED FEBRUARY 5TH 2009.

COUNT V
NEGLIGENCE AND STRICT LIABILITY

MCPHERSON V. BUICK MOTOR CO., 111 N.E. 1050 (N.Y. 1916),
 If the nature of a thing is such that it is reasonably certain to place life and limb in
peril when negligently made, it is then a thing of danger. Its nature gives warning of
the consequence to be expected. If to the element of danger there is added
knowledge that the thing will be used by persons other than the purchaser, and used
without new tests, then, irrespective of contract, the manufacturer of this thing of
danger is under a duty to make it carefully. That is as far as we need to go for the
decision of this case . . . . If he is negligent, where danger is to be foreseen, a liability
will follow.
 See Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660,
666 (N.J. 1985)

ACCORDING TO ABSTRACTS # 911053 , #911065, AND #911079,

DATED MAY 1991, PUBLISHED BY THE SAE INTERNATIONAL ,

FOR MOTOR VEHICLES AND PASSENGER CARS,

HIGHLIGHTING THE IMPORTANCE OF NOISE AND

VIBRATION CONTROL MEASURES IN THE POWERTRAIN OF

PASSENGER CARS AND THE MOST RECENT PROCEEDINGS OF

14

THE FIRST AMERICAN CONFERENCE ON HUMAN VIBRATION.
AND HUMAN EXPOSURES TO VIBRATIONS ABSTRACTS,
ATTACHED, THE VIBRATION IN MOTOR VEHICLES HAD BEEN
AN IMPORTANT FACTOR. PROLONGED, EXTENSIVE
EXPOSURE TO HAND-TRANSMITTED VIBRATION COULD
CAUSE A SERIES OF VIBRATION-INDUCED DISORDERS IN THE
VASCULAR, SENSORINEURAL, AND MUSCULOSKELETAL
STRUCTURES OF THE HUMAN HAND ARM SYSTEM, WHICH
HAVE BEEN COLLECTIVELY CALLED HAND ARM VIBRATION
SYNDROME (HAVS). LACK OF QUALITY AWARENESS BY
THE GENERAL MOTORS CORPORATION AND THEIR AGENTS
CONSTITUTE NEGLIGENCE, AND GREAT DISREGARD FOR
HUMAN HEALTH AND SAFETY FROM ITS DESIGN, AS IT WAS
NOT EVEN ABLE TO PROVIDE A QUANTITATIVE
INVESTIGATION TO EVALUATE THE VIBRATIONS
TRANSMITTED, TO PREVENT INJURY(IES) TO OCCUPANTS.
FELDMAN V. LEDERLE LABORATORIES, 97 N.J. 429, 452, (1985):
"NEGLIGENCE AND STRICT LIABILITY IN WARNING CASES MAY
BE DEEMED TO BE FUNCTIONAL EQUIVALENTS...
CONSTRUCTIVE KNOWLEDGE EMBRACES KNOWLEDGE THAT

15

SHOULD HAVE BEEN KNOWN BASED ON INFORMATION THAT

WAS REASONABLY AVAILABLE OR OBTAINABLE AND SHOULD

HAVE ALERTED A REASONABLY PRUDENT PERSON TO ACT. PUT

ANOTHER WAY, WOULD A PERSON OF REASONABLE

INTELLIGENCE OR OF THE SUPERIOR EXPERTISE OF THE

DEFENDANT CHARGED WITH SUCH KNOWLEDGE CONCLUDE

THAT DEFENDANT SHOULD HAVE ALERTED THE CONSUMING

PUBLIC?.

**... FURTHER A MANUFACTURER IS HELD TO THE STANDARD**

**OF AN EXPERT IN THE FIELD....[EMPHASIS ADDED]. A**

**MANUFACTURER SHOULD KEEP ABREAST OF SCIENTIFIC**

**ADVANCES."**

**SEE ALSO CEPEDA V. CUMBERLAND ENGINEERING, 76 N.J. 152, 163 (1978):**

"KNOWLEDGE OF THE DANGEROUS POTENTIALITY OF A
MACHINE DESIGN AS REFLECTED BY THE EVIDENCE AT TRIAL
IS IMPUTABLE TO THE MANUFACTURER, AND THE REMAINING
DETERMINITIVE QUESTION AS TO AFFIRMITIVE LIABILITY IS
WHETHER A REASONABLY PRUDENT MANFACTURER WITH
SUCH FOREKNOWLEDGE WOULD HAVE PUT SUCH A PRODUCT
INTO THE STREAM OF COMMERCE AFTER CONSIDERING THE
HAZZARDS AS WELL AS THE UTILITY OF THE MACHINE..."

**THE PLAINTIFF HAS SHOWN BY A PREPONDERANCE OF**

**EVIDENCE, THAT THERE WERE EXCESSIVE VIBRATIONS**

**FELT IN THE SUBJECT VEHICLE, FROM INDEPENDENT**

16

CREDIBLE INSPECTIONS THAT WERE CONDUCTED AFTER

THE GENERAL MOTORS REPAIR OUTLETS , [CORAL

CADILLAC INC. AND SCHUMACKER HUMMER] HAD

CONCLUDED THEIR LIMITED SUMMARIZED INVOICES

WITHOUT FURTHER CONCERNS, OR DUTY.

<u>EXCESSIVE VIBRATIONS PRESENCE WAS NOT AS EXPECTED</u>

<u>AND IT WAS NOT A COMMON TRAIT TO BE FOUND IN A</u>

<u>CONFORMED PASSENGER MOTOR VEHICLE .</u>

<u>COUNT VI</u>
<u>PERSONAL INJURY</u>

ACCORDING TO A DOCUMENTED STUDY BY THE NATIONAL

INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH THE

PLAINTIFF RESTS ITS COMPOUNDED COMPLAINTS  BY

PROVIDING THE CUMILATIVE DATA SHOWCASED WITH

RESULTS OF THE STUDY(IES) USING HUMAN AND ANIMAL

SUBJECTS WITH THE VIBRATION EXPOSURES, THERE

WAS SEVERAL STUDIES PERFORMED AND COLLECTIVELY

CONDUCTED IN OBSERVANCE OF WHOLE BODY VIBRATIONS,

AND HAND ARM VIBRATIONS, INDEPENDENTLY AND

COLLECTIVELY, RESEARCHED, TO ILLUMINATE

17

**OPPORTUNITIES FOR THEIR DIAGNOSES, TREATMENT, AND**

**PREVENTION. SEE EXHIBIT ATTACHED DATED JUNE 2006,**

**PROCEEDINGS OF THE FIRST AMERICAN CONFERENCE ON**

**HUMAN VIBRATION}, SEE TRANSCRIPT, PG. 48 AND PG. 49.,**

A CASE STUDY OF WHOLE-BODY VIBRATION EXPOSURES

ASSOCIATED WITH ORDINARY PASSENGER AND

RECREATIONAL VEHICLES DUE TO THE EXTENDED EXPOSURES

OF VIBRATIONS FELT IN A MOTOR VEHICLE. THE PROLONGED

EXPOSURES IDENTIFIED ON PAGE 156, HIGHLIGHTS AN ANIMAL

STUDY WITH APPROX. TIME FOR INJURY(IES) OR DISORDERS TO

COMENCE AND DEVELOP BY REPEATED EXPOSURE SESSIONS,

WITH AND WITHOUT VIBRATION, WERE CONDUCTED 4HR/DAY 5

DAYS/WEEK FOR 5 WEEKS, THE VIBRATION EXPOSED GROUP

SHOWED SIGNS OF PROLONGED VASOCONSTRICTION

FOLLOWING REPEATED VIBRATION EXPOSURES, IN AS LITTLE

AS A FIVE WEEK EXPOSURE, OTHER ABSTRACTS STATE

INJURY(IES) COULD OCCOUR IN AS LITTLE AS TWO DAYS, THE

PLAINTIFF WAS EXPOSED TO ELEVATED VIBRATIONS FOR

MONTHS, WITH A HERNIETED BACK AND NECK, PAIN AND

SUFFERING SINCE AUGUST 19, 2008., AND IN APRIL 2009

PLAINTIFF SUSTAINED A PERMENANT INJURY(IES), AND WAS

EXPERIENCING MIGRAIN HEADACHS, WEAKNESS AND LACK OF

DESIRE. THE PLAINTIFF SUSTAINED MANY DISCOMFORTS AND

ULTIMATLY WAS PERMENANTLY INJURED, ACCORDING TO THE

MRI IMPRESSION RESULTS, 1- STRAIN/ PARTIAL TEAR MCL. 2-

TORN POSTERIOR HORN MEDIAL MENISCUS. 3- SMALL JOINT

EFFUSION WITH SUBCUTANEOUS EDEMA., DATED APRIL 16TH

2009. SEE ATTACHED MEDICAL DOCUMENTS.

SEE ATTACHED **NIOSH TRANSCRIPT** SEE PAGES # 55-56,

PAGE # 64, PAGE # 91 AND PAGES # 70, 72, 73, PAGES # 104, 105,

AND PAGE # 148.

Florida's dangerous instrumentality doctrine originated in
the case of Southern Cotton Oil Co. v. Anderson, 80 Fla.
441,468, 86 So. 629, 638 (1920) one who authorizes and
permits an instrumentality that is peculiarly dangerous in
its operation to be used by another on the public highway,
is liable in damages for injuries to third persons caused
by the negligent operation of such instrumentality on the
highway by one so authorized by the owner.

COUNT VII
PUNITIVE DAMAGES

THE PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES RELIES ON

THE 2009 FLORIDA STATUTE 768.72 (2)(A),(B), (3)(A,B,C)

TO PREVENT FUTURE INJURIES TO HUMANS EXPOSED TO

ELEVATED VIBRATIONS IN MOTOR VEHICLES.....

**Perlman v. Prudential Ins. Co. of America, 686 So. 2d 1378 (Fla. 3d DCA 1997),** requires, as a matter of law, punitive damages wherever a fraud claim has been alleged.

In *Schropp v Crown Eurocars, Inc.,* **654 So.2d 1158 (Fla. 1995),** the supreme court reviewed the law concerning corporate liability for punitive damages, and established a clear distinction between vicarious and direct liability. In order to hold a corporation liable for vicarious liability for punitive damages, there must be a willful and malicious act on the part of an employee as well as a finding of independent negligent conduct by the corporation. *Id.* at 1159; *see also* ***Mercury Motors Express, Inc. v Smith,* 393 So.2d 545 (Fla. 1981).** In order to impose direct liability for punitive damages on a corporation, there must be a showing of willful and malicious action on the part of a managing agent of the corporation. *Id.; see also* ***Bankers Multiple Line Ins. Co. v Farish,* 464 So.2d 530 (Fla. 1985).** Under the vicarious liability theory, there is no requirement that the independent negligent conduct by the corporation be attributed to a managing agent. *Id.* at 1160-61.

768.72 (2)(a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

(b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

3) In the case of an employer, principal, corporation, or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent meets the criteria specified in subsection (2) and:(a) The employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct;

(b) The officers, directors, or managers of the employer, principal, corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct; or

(c) The employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss,

damages, or injury suffered by the claim.

20

## SUMMARY JUDGEMENT REQUEST:

SUMMARY JUDGEMENT IS PROPER IF THERE IS NO GENUINE
ISSUE OF MATERIAL FACT IF THE MOVING PARTY IS
ENTITLED TO A JUDGEMENT AS A MATTER OF LAW.
MENENDEZ V. PALMS WEST CONDOMINIUM ASS'N, 736 SO.2D
58 (FLA. 1ST DCA 1999). THUS THE STANDARD OF REVIEW IS DE
NOVO. THE FIRST PRONG OF THE SUMMERY JUDGEMENT
STANDARD IS EASILY ESTABLISHED IN THE INSTANT CASE ,
BECAUSE NO FACTUAL DISPUTES EXIST. ALTHOUGH
THE PARTIES'DISAGREE ABOUT HOW MUCH VIBRATION WAS
PRODUCED AND FOR HOW LONG, THE DISPUTE
ESSENTIALLY PERTAINS TO A QUESTION OF LAW. INDEED,
"[W]HERE THE DETERMINATION OF THE ISSUES OF A
LAWSUIT DEPENDS UPON THE CONSTRUCTION OF A
WRITTEN INSTRUMENT AND THE LEGAL EFFECT TO BE
DRAWN THEREFROM, THE QUESTION AT ISSUE IS
ESSENTIALLY ONE OF LAW ONLY AND DETERMINABLE BY
ENTRY OF SUMMARY JUDGEMENT." COX V. CSX
INTERMODEL, INC., 732 SO.2D 1092, 1096 (FLA. IST DCA) (QUOTING
ANGELL V. DON JONES INS. AGENCY, 620 SO.2D 1012,1014 (FLA.

**2ND DCA, 1993),** It is well settled that legislative intent is the polestar that guides a court's statutory construction analysis. See State v. Rife, 789 So. 2d 288, 292 (Fla. 2001); McLaughlin v. State, 721 So. 2d 1170, 1172 (Fla. 1998). In determining that intent, we have explained that "we look first to the statute's plain meaning." Moonlit Waters Apartments, Inc. v. Cauley, 666 So. 2d 898, 900 (Fla. 1996). Normally, "[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984) (quoting A.R.Douglass, Inc., v. McRainey, 137 So. 157, 159 (Fla. 1931)).

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**320.60 Definitions for ss. 320.61-320.70.--Whenever used in ss. 320.61-320.70, unless the context otherwise requires, the following word s and terms have the following meanings:**

**(1) "Agreement" or "franchise agreement" means a contract, franchise, new motor vehicle franchise, sales and service agreement, or dealer agreement or any other terminology used to describe the contractual relationship between a manufacturer, factory branch, distributor, or importer, and a motor vehicle dealer, pursuant to which the motor vehicle dealer is authorized to transact business pertaining to motor vehicles of a particular line-make.**

**(2) "Common entity" means a person:**

(a) Who is either controlled or owned, beneficially or of record, by one or more persons who also control or own more than 40 percent of the voting equity interests of a manufacturer; or

(b) Who shares directors or officers or partners with a manufacturer.

(3) "Demonstrator" means any new motor vehicle that is carried on the records of the dealer as a demonstrator and is used by, being inspected or driven by the dealer or his or her employees, or driven by prospective customers for the purpose of demonstrating vehicle characteristics in the sale or display of motor vehicles sold by the dealer.

(4) "Department" means the Department of Highway Safety and Motor Vehicles.

(5) "Distributor" means a person, resident or nonresident, who, in whole or in part, sells or distributes motor vehicles to motor vehicle dealers or who maintains distributor representatives.

(6) "Factory branch" means a branch office maintained by a manufacturer, distributor, or importer for the sale of motor vehicles to distributors or to motor vehicle dealers, or for directing or supervising, in whole or in part, its representatives in this state.

(7) "Importer" means any person who imports vehicles from a foreign country into the United States or into this state for the purpose of sale or lease.

(8) "Licensee" means any person licensed or required to be licensed under s. 320.16.

(9) "Manufacturer" means any person, whether a resident or nonresident of this state, who manufactures or assembles motor vehicles or who manufactures or installs on previously assembled truck chassis special bodies or equipment which, when installed, form an integral part of the motor vehicle and which constitute a major manufacturing alteration. The term "manufacturer" includes a central or principal sales corporation or other entity through which, by contractual agreement or otherwise, it distributes its products.

23

(10)  "Motor vehicle" means any new automobile, motorcycle, or truck, including all trucks, regardless of weight, including "heavy truck" as defined in s. 320.01(1) and "truck" as defined in s. 320.01(9), the equitable or legal title to which has never been transferred by a manufacturer, distributor, importer, or dealer to an ultimate purchaser; however, when legal title is not transferred but possession of a motor vehicle is transferred pursuant to a conditional sales contract or lease and the conditions are not satisfied and the vehicle is returned to the motor vehicle dealer, the motor vehicle may be resold by the motor vehicle dealer as a new motor vehicle, provided the selling motor vehicle dealer gives the following written notice to the purchaser: "THIS VEHICLE WAS DELIVERED TO A PREVIOUS PURCHASER." The purchaser shall sign an acknowledgment, a copy of which is kept in the selling dealer's file.

(11)(a)  "Motor vehicle dealer" means any person, firm, company, corporation, or other entity, who,

1.  Is licensed pursuant to s. 320.27 as a "franchised motor vehicle dealer" and, for commission, money, or other things of value, repairs or services motor vehicles or used motor vehicles pursuant to an agreement as defined in subsection (1), or

2.  Who sells, exchanges, buys, leases or rents, or offers, or attempts to negotiate a sale or exchange of any interest in, motor vehicles, or

3.  Who is engaged wholly or in part in the business of selling motor vehicles, whether or not such motor vehicles are owned by such person, firm, company, or corporation.

(b)  Any person who repairs or services three or more motor vehicles or used motor vehicles as set forth in paragraph (a), or who buys, sells, or deals in three or more motor vehicles in any 12-month period or who offers or displays for sale three or more motor vehicles in any 12-month period shall be prima facie presumed to be a motor vehicle dealer. The terms "selling" and "sale" include lease-purchase transactions.

(c)  The term "motor vehicle dealer" does not include:

1.  Public officers while performing their official duties;

24

2. Receivers, trustees, administrators, executors, guardians, or other persons appointed by, or acting under the judgment or order of, any court;

3. Banks, finance companies, or other loan agencies that acquire motor vehicles as an incident to their regular business; or

4. Motor vehicle rental and leasing companies that sell motor vehicles to motor vehicle dealers licensed under s.320.27.

(12) "Person" means any natural person, partnership, firm, corporation, association, joint venture, trust, or other legal entity.

(13) "Used motor vehicle" means any motor vehicle the title to which has been transferred, at least once, by a manufacturer, distributor, importer, or dealer to an ultimate purchaser.

(14) "Line-make vehicles" are those motor vehicles which are offered for sale, lease, or distribution under a common name, trademark, service mark, or brand name of the manufacturer of same.

(15) "Sell," "selling," "sold," "exchange," "retail sales," and "leases" includes any transaction where the title of motor vehicle or used motor vehicle is transferred to a retail consumer, and also any retail lease transaction where a retail customer leases a vehicle for a period of at least 12 months. Establishing a price for sale pursuant to s 320.64(24) does not constitute a sale or lease.

(16) "Service" means any maintenance or repair of any motor vehicle or used motor vehicle that is sold or provided to an owner, operator, or user pursuant to a motor vehicle warranty, or any extension thereof, issued by the licensee.

25

## CERTIFICATE OF SERVICE

**ALL ASSERTIONS MADE IN THE FOREGOING REQUEST, ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF AND THAT A COPY WAS FILED AND SENT TO THE DEFENDANTS ATTORNEY OF RECORD, BY EMAIL AND U.S. MAIL ON OCTOBER 7TH , 2009.**

..................................
**SHERIF RAFIK KODSY**
Individual/pro'se
**15968 LAUREL OAK CIRCLE**
**DELRAY BEACH FLORIDA 33484**
**561-737-8998 / 800-379-8648**

26