**Revised Hearing Date and Time: August 9, 2010 at 9:45 a.m. (Eastern Time)**
**Revised Objection Deadline: August 2, 2010 at 8:00 p.m. (Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Philip Bentley
David Blabey, Jr.

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
In re:                                                       :    Chapter 11 Case No.:
                                                             :
MOTORS LIQUIDATION COMPANY., et al.,                         :    09-50026 (REG)
f/k/a General Motors Corp., et al.                           :
                                                             :
                              Debtors.                       :    (Jointly Administered)
                                                             :
------------------------------------------------------------ X

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOTORS LIQUIDATION COMPANY IN FURTHER
SUPPORT OF ITS MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY
RULE 2004 DIRECTING PRODUCTION OF DOCUMENTS BY (I) THE
CLAIMS PROCESSING FACILITIES FOR CERTAIN TRUSTS CREATED
PURSUANT TO BANKRUPTCY CODE SECTION 524(g) AND
<u>(II) GENERAL MOTORS LLC AND THE DEBTORS</u>**

# TABLE OF CONTENTS

Preliminary Statement..................................................................................................................1

Argument ....................................................................................................................................3

    I.  The Information Sought from the Trusts is Necessary to an Estimation of
        GM's Aggregate Asbestos Liabilities................................................................................3

        A.  The Requested Discovery is Vital to an Understanding of Whether
            or Not the Value of Future Claims Against GM Would Likely Revert
            to 1990's Levels......................................................................................................4

        B.  The Requested Discovery is Also Needed to Fill in Significant Gaps
            in the Debtors' Asbestos Claims Database ...........................................................8

    II.  The Creditors' Committee's Requests, as Modified, Raise Minimal Issues
        of Burden and Confidentiality ..........................................................................................8

    III. The Remaining Objections Lack Merit...........................................................................13

        A.  The Information Sought by the Creditors' Committee is Properly
            Sought by Way of a Motion Pursuant to Rule 2004 ..........................................13

        B.  Production of the Requested Information Does Not Implicate Rule 408 ........14

# TABLE OF AUTHORITIES

## CASES

*In re Chemtura Corp.*,
    Case No. 09-11233 (Bankr. S.D.N.Y. March 16, 2010)..................................................6, 13, 14

*In re Chemtura Corp.*,
    Case No. 09-11233 (Bankr. S.D.N.Y. April 5, 2010).............................................................5, 13

*Congoleum Corp. v. Ace American Ins. Co.*,
    Case No. 09M-01-084, memo op. at 3 (Del. Sup. Ct. Aug. 4, 2009) ..........................9, 11, 12

*In re Enron Corp.*,
    281 B.R. 836 (Bankr. S.D.N.Y. 2002).........................................................................................14

*Griffin v. Mashariki*,
    Case No. 96 Civ. 6400, 1997 WL 756914 (S.D.N.Y. Dec. 8, 1997)......................................14

*In re Initial Public Offering Securities Litig.*,
    Case No. 21 MC 92, 2004 WL 60290, *2 (S.D.N.Y. Jan. 12, 2004) .....................................14

*In re Mirant Corp.*,
    326 B.R. 354 (Bankr. N.D. Tex. 2005)......................................................................................14

*Owens Corning v. Credit Suisse First Boston*,
    322 B.R. 719 (D. Del. 2005).........................................................................................................6

*Pasquale v. Speed Prods. Engineering*,
    166 Ill. 2d 337 (Ill. 1995)..............................................................................................................7

*In re W.R. Grace & Co.*,
    Case No. 01-1139 (Bankr. D. Del. Oct. 3, 2007) ....................................................................13

## STATUTES

740 Ill. Comp. Stat. § 100/2(c) .............................................................................................................7

Tex. Civ. Prac. & Rem. Code Ann. §33.013 ......................................................................................7

W. Va. Code § 55-7-24..........................................................................................................................7

## MISCELLANEOUS

Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 Rev. of Litig. 501 (Spring 2009) ............................................................................................................................. 7

Lloyd Dixon, et al, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, at xvi-xvii, 38-40, 43 (Rand Corporation 2010) ............................................................................................................. 2

William P. Shelley, et al, *The Need For Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 J. Bankr. L. & Prac. 2 Art. 3, at 261 (2008) ...................... 2

TO:   THE HONORABLE ROBERT E. GERBER,
      UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of the above captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**" or "**Old GM**"), by and through its undersigned counsel, hereby submits this reply (the "**Reply**") to the objections (the "**Objections**") filed by (i) the Manville Personal Injury Settlement Trust (the "**Manville Trust**") and Claims Resolution Management Corporation, (ii) certain other trusts created pursuant to Bankruptcy Code § 524(g) (the "**Other Trusts**"; together with the Manville Trust, the "**Trusts**") and the claims processing facility for these trusts, and (iii) the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**Asbestos Committee**"; together with the Trusts, the "**Objectors**") to the Creditors' Committee's motion (the "**2004 Motion**") for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing the service of subpoenas compelling the production of documents by the Trusts, Claims Processing Facilities, Debtors, and New GM.[1]

**Preliminary Statement**

As explained in our 2004 Motion, the discovery we seek from the Trusts' claims processing facilities goes to the heart of the issues that will be before this Court in its estimation of the Debtors' asbestos liabilities. Moreover, because the great bulk of the requested information is available in electronic form from state-of-the-art data processing facilities, its production should entail neither substantial burden nor any meaningful delay.

Not surprisingly, however, our Motion is vigorously opposed both by the Asbestos Committee and by its allies, the Trusts, who have filed voluminous objections. The

---

[1] As set forth in the responses filed by the Debtors and by General Motors LLC ("**New GM**"), we have reached an agreement with those two parties resolving their potential objections to the discovery we seek from them.

Asbestos Committee takes sharp issue with the relevance of the requested discovery, contending that it is inconsistent with the sort of "high-level, macroeconomic analysis" that the Court should undertake in its estimation decision, and that it would substantially delay confirmation. The Trusts, for their part, complain of the supposedly enormous burdens and invasions of privacy that they say the discovery would entail.

As we explain below, these objections lack merit. The requested discovery is *not* sought in support of a claim-by-claim litigation over the merits of asbestos claims; rather, it is a necessary component of exactly the sort of "macroeconomic" analysis that all parties to this proceeding endorse. Moreover, the discovery is needed to enable the parties and the Court to understand core factual issues that the Asbestos Committee itself recognizes will need to be addressed.

At the same time, the proposed discovery can readily be provided without any undue burden, any impingement on legitimate confidentiality concerns, or any delay to the estimation process. To this end, although we believe that the scope of discovery proposed in our 2004 Motion was entirely proper – and although the Trusts (in contrast to the Debtors and New GM) have ignored the offer made in our Motion to negotiate a resolution of any asserted burdens or other issues[2] – we have voluntarily scaled back the scope of our requested discovery, in an

---

[2] It bears note that the Trusts' goal in objecting to the 2004 Motion may have less to do with any actual burden than with a desire to assist the asbestos plaintiffs' bar in keeping confidential information viewed as harmful to the plaintiffs' cause. It is widely recognized that "the selection of the trustees and members of the trust advisory committees that oversee the operation of [section 524(g)] trusts is heavily influenced, if not controlled outright, by counsel for the asbestos claimants." *See* William P. Shelley, et al, *The Need For Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 J. Bankr. L. & Prac. 2 Art. 3, at 261 (2008), attached hereto as **Exhibit A**; *see also* Lloyd Dixon, et al, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, at xvi-xvii, 38-40, 43 (Rand Corporation 2010) (describing role played by leading asbestos law firms as TAC members, and of Caplin & Drysdale – the ACC's counsel in the present case – as the TACs' counsel, at selected section 524(g) trusts) (available at http://www.rand.org/pubs/technical_reports/2010/RAND_TR872.pdf). Moreover, it is not uncommon for section 524(g) trusts to join with the asbestos plaintiffs' bar in seeking "to affirmatively shield

2

attempt to respond to the burden and confidentiality concerns raised in the Trusts' Objections. We believe that these voluntary concessions should render moot virtually all of the objections raised by the Trusts. We invite the Trusts to reach out to us in advance of Monday's hearing to attempt to resolve any remaining issues.

## Argument

I. **The Information Sought from the Trusts is Necessary to an Estimation of GM's Aggregate Asbestos Liabilities**

  1. As our 2004 Motion explained, the discovery sought from the Trusts is essential to the estimation of GM's asbestos liabilities in two distinct respects. *First*, the discovery is needed to resolve what is expected to be the central issue of the estimation case: Had Old GM remained in the tort system rather than filing for bankruptcy, would the value of the mesothelioma claims against it have continued to fall from their 2002-03 peak, back to or toward the claim values that prevailed in the 1990's (as the Creditors' Committee believes), or would claim values have remained at their elevated post-2000 levels or gone even higher (as the Asbestos Committee is expected to argue)? (*See* 2004 Motion at ¶¶ 5-13, 25.) *Second*, the requested discovery is needed to fill in a number of significant gaps in the information contained in the Debtors' asbestos claims database, including each claimant's age and diagnosis date. (*See id.* at ¶ 26.)

  2. The Asbestos Committee's Objection undercuts neither of these showings.

---

information concerning claims to the trusts and payments made to these claimants from outside scrutiny – especially from disclosure to solvent defendants in the tort system." William P. Shelley, et al, *supra,* at 262-63; see also id., at 276-77.

    **A.    The Requested Discovery is Vital to an Understanding of Whether or Not the Value of Future Claims Against GM Would Likely Revert to 1990's Levels**

    3.    The Asbestos Committee takes issue with none of the central facts that, as explained in our 2004 Motion (at ¶¶ 5-13), form the necessary context for this estimation proceeding:

- Throughout the 1990's, as in prior decades, Old GM and other automobile manufacturers were peripheral defendants in asbestos litigation – a reflection of the plaintiff bar's recognition of their peripheral (or non-existent) role in causing any asbestos-based disease. Between 1990 and 1999, fewer than 40 mesothelioma claims per year, on average, were filed against Old GM, and its average annual asbestos-related indemnity expenditures were less than $2 million per year.

- This pattern changed dramatically over the past decade. In the years 2000 through 2003, virtually all of the traditional asbestos defendants that had not previously filed for bankruptcy did so. As a result, asbestos claimants began to name new defendants, and once-peripheral defendants such as Old GM increasingly became "target" defendants.

- The consequence was a sharp spike in Old GM's asbestos-related expenditures in the early 2000's, which peaked in 2003 before declining part of the way back to 1990's levels. Between 2002 and 2008, an average of more than 850 mesothelioma claims per year were filed against Old GM (a more than 20-fold increase over 1990's levels), and Old GM's annual average asbestos-related indemnity expenditures exceeded $30 million (a more than 15-fold increase).

- However, the disappearance of codefendants from the tort system that triggered this spike in GM's asbestos expenditures was temporary. Between 2004 and 2009, most of these codefendants returned to the scene, in the form of well-funded section 524(g) trusts. These trusts, together with others soon to be created, are expected to have total funding of between $30 and $60 billion.

    4.    In light of these facts, we argued, a central question in the estimation will be: Had Old GM remained in the tort system, would the value of the mesothelioma claims against it have continued to decline from their 2002-03 peak, back to or toward the claim values that prevailed in the 1990's? Stated differently, would the return to the tort system of the codefendants whose absence triggered the post-2000 spike in claim values result in a return to pre-2000 claim values?

4

5. The Asbestos Committee does not dispute that the Court will need to answer this question, or that the answer will have an enormous impact on the Court's estimate of the Debtors' aggregate asbestos liabilities (given that future claims typically account for a substantial majority of any debtor's estimated asbestos liabilities). However, the Asbestos Committee appears to contend that third-party discovery should not be employed to aid the parties and the Court in answering this key question, because such discovery would somehow convert the estimation proceeding into a "claim-by-claim" litigation of the merits of individual asbestos claims, rather than a "high-level, macroeconomic" analysis of the Debtors' aggregate asbestos liabilities. This contention is entirely unfounded. The Creditors' Committee agrees with the Asbestos Committee that an aggregate, or "macroeconomic," approach to estimation, rather than a claim-by-claim approach, is appropriate – and that is precisely the sort of approach that the requested discovery is intended to serve. Specifically, the requested discovery is needed to lay the foundation for a statistical analysis of the likely future values of asbestos claims against GM had it remained in the tort system, a key component of any estimation of GM's aggregate asbestos liabilities.

6. Indeed, this Court recently recognized the need for comparable third-party discovery in the context of an aggregate estimation in the bankruptcy proceedings of Chemtura Corporation (a case repeatedly cited by the Asbestos Committee). In that case, in anticipation of a proceeding to estimate their diacetyl liabilities, the debtors filed a Rule 2004 motion seeking discovery from a plaintiffs' law firm regarding the value of settlements obtained by the firm's clients from non-debtor defendants in diacetyl personal injury litigation. The Court granted the Rule 2004 motion. See Order Granting Rule 2004 Discovery, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. April 5, 2010), attached hereto as **Exhibit B**. The Court's comments at

5

the hearing made clear that it considered individual claimant data important even in the context of a "macroeconomic" estimation analysis. Hearing Transcript at 55, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. March 16, 2010), attached hereto as **Exhibit C**. The Court noted that, although the requested information was not "relevant to the rights of an individual tort claimant to recover from the Chemtura estate," it was "clearly relevant to the estimation process." Hearing Transcript at 59, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. March 16, 2010). *See also, e.g., Owens Corning v. Credit Suisse First Boston,* 322 B.R. 719, 722-24 (D. Del. 2005) (noting, as part of estimation of Owens Corning's asbestos liabilities, that certain elements of the company's litigation history had "been skewed by factors which can and should be avoided in the future," including venue-shopping, mass-screenings, over-payment to "unimpaired" claimants, and awards of substantial punitive damages).

       7.     The Asbestos Committee appears to contend that, in addressing the central question in this estimation – the value of future claims against GM had it remained in the tort system – the Court should consider only Old GM's claims payment history, and no other data. But the Asbestos Committee gives no good reason why the Court should confine its consideration so narrowly. The Committee's principal argument on this point appears to be that amounts paid by other defendants (or trusts) are irrelevant because Old GM's assessment of its codefendants' respective shares of responsibility for asbestos claimants' injuries was already reflected in, or "baked into," GM's historical settlement values. This argument simply ignores a fundamental (and undisputed) fact: Throughout the greater part of the past decade, most of Old GM's codefendants were in the middle of bankruptcy proceedings and, as a result, were making no payments to asbestos claimants. With no contributions being made by its former codefendants, GM was forced to pay correspondingly higher settlement amounts. Now,

6

however, these defendants have emerged from bankruptcy and, through their section 524(g) trusts, have resumed making payments to asbestos claimants – including, as we believe the requested discovery will show, large payments to the population of GM claimants. Were GM still in the tort system, this fundamental change in the playing field – in essence, this return to the conditions of the 1990s – would have had profound consequences for the amounts that GM would be willing to pay to settle asbestos claims against it.

8. The Asbestos Committee also argues that the existence of codefendants has no impact on GM's liability under applicable tort law. However, the Committee's description of the governing law is partial and highly misleading. As an initial matter, the Asbestos Committee's discussion of the "substantial contributing factor" test fails to mention the very substantial steps taken by the courts in recent years to limit the liability of defendants, such as automobile manufacturers, whose contributions to claimants' asbestos exposure are *de minimis*. *See generally* Mark A. Behrens, *What's New in Asbestos Litigation*, 28 REV. LITIG. 501, 528-533 (2009), attached as Exhibit C to the 2004 Motion. Also not mentioned in the Asbestos Committee's legal survey are the tort reform statutes recently enacted by many jurisdictions, many of which abandon traditional principles of joint and several liability in favor of regimes that impose liability only to the extent of a defendant's several share of liability. *See, e.g.*, W. Va. Code § 55-7-24 (several liability if thirty percent or less at fault); Tex. Civ. Prac. & Rem. Code Ann. §33.013 (several liability if fifty percent or less at fault). Additionally, in many jurisdictions a settlement by one defendant serves to reduce the liability of its co-defendants. *See, e.g.*, 740 Ill. Comp. Stat. § 100/2(c); *Pasquale v. Speed Prods. Engineering*, 166 Ill.2d 337 (Ill. 1995). For these and other reasons described in our 2004 Motion (at ¶ 12), claims filed by GM claimants against section 524(g) trusts, as well as payments received from these trusts, can

7

be expected to have enormous impact on the settlement amounts that GM would be prepared to pay to these claimants, were it still in the tort system.

### B. The Requested Discovery is Also Needed to Fill in Significant Gaps in the Debtors' Asbestos Claims Database

9. As noted in our 2004 Motion (at ¶ 26), the information requested from the Trusts is needed not only to enable the parties and the Court to assess future claim values; this information is also needed to cure significant deficiencies in the Debtors' asbestos claims database, which fails to provide important information often contained in such databases, such as the age of each claimant and the date on which his or her asbestos-related disease was diagnosed. The Asbestos Committee does not dispute the existence or importance of these database deficiencies. To the contrary, the Asbestos Committee agrees that additional information is needed, and notes that the Rule 2004 motion that it has filed seeks to cure these information deficiencies. (*See* Objection at pp. 1-2.) What the Asbestos Committee fails to note is that the discovery it has requested from the Debtors and New GM is, for the most part, available only in "hard copy," not electronic, form and, for that reason, will be burdensome to produce. The electronic data that we have requested from the Trusts is a vastly more efficient and less burdensome means of curing the information deficiencies in the Debtors' claims database.

### II. The Creditors' Committee's Requests, as Modified, Raise Minimal Issues of Burden and Confidentiality

10. The Creditors' Committee believes that the original information requests contained in the 2004 Motion were appropriate and non-burdensome. Nevertheless, to address the Trusts' asserted concerns regarding burden and confidentiality – and taking advantage of the auspicious fact (now admitted by the Trusts) that all of the requested information other than that held by the Celotex Trust is available in electronic form – the Creditors' Committee is prepared to scale back its original requests significantly. Specifically, we are prepared to accept a

8

production consisting of nothing more than an electronic file or files, in searchable form, containing the following information (the "**Revised Request**"):

    (a)    The information supplied on the claim forms (including riders thereto, but not any supporting documents) submitted by the Mesothelioma Claimants (the "**Claim Forms**")[3];

    (b)    The amounts paid to each of the Mesothelioma Claimants by the Trusts; and

    (c)    The claim status of each Mesothelioma Claimant who has filed a claim against the Trusts but has received no recovery (i.e., whether that claim is still pending or has instead been dismissed).

In addition, in light of the Other Trusts' representation that the files of the Celotex Trust are maintained predominantly in paper,rather than electronic, form, the Creditors' Committee is prepared to withdraw its request for any documents from that trust.

    11.    These revisions to our Rule 2004 requests render moot the great bulk of the Trusts' objections regarding burden and confidentiality:

- The Trusts contend that the Creditors' Committee should not be permitted to obtain documents relating to the Trusts' internal evaluations of claims, or to negotiations or other communications with claimants. We agree, and our initial requests were not intended to cover such documents. Our revisions eliminate any possible ambiguity on this issue.

- The Trusts express concern that the Creditors' Committee's requests seek production of sensitive medical and financial information concerning claimants and their family members. We submit that this concern is substantially overstated; courts generally require production of even the most sensitive medical or financial records, when the documents are relevant and a proper confidentiality order is in place.[4] Nevertheless, our revisions render

---

[3] Notably, our revised request does *not* seek exhibits to the Claim Forms, such as medical and financial records. Rather, we request production only of attachments that set forth claimants' answers to the questions posed in the claim forms (in much the same way that proofs of claim filed in bankruptcy proceedings will typically set forth details of the claim in an attached rider, rather than in the form provided).

[4] For example, in connection with insurance litigation related to the Congoleum Corporation bankruptcy, certain section 524(g) trusts were ordered to produce substantially the same information as we initially requested in our 2004 Motion, notwithstanding the trusts' arguments (strikingly similar to those asserted here) regarding burden and confidentiality. *See Congoleum Corp. v. Ace American Ins. Co.*, No. 09M-01-

9

this concern moot, as we now request only the information supplied by claimants on their claim forms, and not also supporting medical or financial records. An example of a typical claim form is attached hereto as **Exhibit E**.

- The Trusts object to the production of the Social Security Numbers of non-claimants, contending that in some circumstances such numbers will be contained in claimants' submissions to the Trusts. The Creditors' Committee has no need for the Social Security Numbers of third parties and would accept a production with such information redacted.

- The Trusts argue that the Creditors' Committee's requests would lead to the revelation of proprietary commercial information regarding the Trusts' storage, processing, maintenance or organization of claims. But the Creditors' Committee has no interest in obtaining such information, nor do our requests (particularly as revised) threaten to lead to its discovery. The Creditors' Committee has not asked the Trusts to turn over their databases wholesale; rather, we merely seek specified information contained *within* the databases.

12.     Whatever remaining concerns exist relating to confidentiality are properly addressed by a confidentiality agreement. As stated in the 2004 Motion, the Creditors' Committee is prepared to enter into a confidentiality agreement with the Trusts. In furtherance of this objective, the Creditors' Committee on August 2 circulated to the Trusts, the Debtors and New GM a proposed confidentiality agreement in the form annexed hereto as **Exhibit F**.

13.     The burden imposed by the Revised Request is not undue. By the Other Trusts' own admission, their files – with the sole exception of the Celotex Trust's files – are organized and maintained in electronic form by "sophisticated software."[5] Opposition of Other Trusts, ¶ 11. Production requires not a painstaking search of hard copy files, but merely the running of queries through sophisticated electronic databases. Moreover, the Revised Requests

---

084, memo op. at 3 (Del. Sup. Ct. Aug. 4, 2009) (ordering production of "the claimants' submissions, *including supporting materials*," "documents identifying the resolutions of the claims and allowance decisions," and "computer data conveying this information") (emphasis added), attached hereto as **Exhibit D**.

[5] The Other Trusts state that "[a]ll information and materials submitted by claimants to the Trusts, together with all other information and materials relating to the resolution of those claims, are maintained in [the Delaware Claims Processing Facility's] proprietary computer system." Objection of Other Trusts, ¶ 10. The Celotex Asbestos Settlement Trust is apparently an exception to this rule. As noted above, the Creditors' Committee is prepared to withdraw its request for documents from the Celotex Trust.

eliminate any ambiguity as to what documents and information are being sought. The Trusts need not search for *all* information or documents relating to broad subject matters; instead, they need only produce *specified* electronic information – namely, the information contained on the Mesothelioma Claimants' claim forms, together with the amounts paid to and the claim status of these claimants.

14. In addition, the Revised Requests significantly reduce, if not entirely eliminate, any possibility that privileged documents will be produced, thereby eliminating the potential burden of a privilege review. Claim Forms by their very nature cannot be privileged. As a result, while the Trusts may choose to conduct a privilege review before producing documents, there is no need to do so (and any privilege review would be modest, as the universe of documents to be produced under the Revised Request is now narrowly circumscribed). To eliminate any possible need for the Trusts to conduct such a privilege review, the Creditors' Committee is prepared to stipulate to procedures regarding the return of any material that might be inadvertently produced. In particular, the Creditors' Committee would agree that (i) it will notify the relevant producing party of its discovery of any document that is or may be privileged; (ii) it will return, upon request of a producing party, any inadvertently-produced privileged material; and (iii) prior to using any document in a pleading or at trial, it will notify the producing party of its intent to use the document, so as to enable that party to review and (if warranted) pull back that document.[6]

15. The Trusts contend that they are required – either by their internal procedures or under the terms of applicable Trust Distribution Procedures – to notify claimants

---

[6] Similar procedures were implemented in *Congoleum* in connection with discovery from certain section 524(g) trusts. *See Congoleum Corp. v. Ace American Ins. Co.*, No. 09M-01-084, memo op. at 11 (Del. Sup. Ct. Aug. 4, 2009). A copy of the *Congoleum* decision is attached hereto as **Exhibit D**.

11

in the event they are served with a subpoena, and that providing such notification would impose an undue burden. But the Trusts, by their own admission, maintain their files in electronic form. The "sophisticated" databases the Trusts employ undoubtedly permit them to match each claimant with his or her counsel (including counsel's email address) and to prepare and send a mass email to all such counsel.[7]

16.     Finally, the Trusts have suggested that the Creditors' Committee might obtain the information it requests through other, less burdensome, means – namely, by seeking the information directly from the 7400 Mesothelioma Claimants themselves. This suggestion is surprising, to say the least, given the enormous additional burdens that would befall the claimants themselves were the Creditors' Committee to issue subpoenas to all 7400 individuals, rather than seeking the information, as we have done, from the centralized electronic databases maintained by the Trusts. *See See Congoleum Corp. v. Ace American Ins. Co.,* No. 09M-01-084, memo op. at 12 (Del. Sup. Ct. Aug. 4, 2009) (noting that "Insurers' decision to issue seven subpoenas to entities with electronic files containing information sought as to 122,000 claimants is reasonable, and may well be more convenient, less burdensome, and less expensive overall than issuing subpoenas to each of the claimants or the firms that represent them").

17.     In light of the foregoing, the burden on the Trusts is modest, and any associated expense should be relatively minor. However, to the extent the Court deems appropriate, the Creditors' Committee would have no objection to an order providing that the cost of production will be borne by the Debtors' estates, as a necessary cost of the estimation

---

[7] The Manville Trust suggests that the burden of giving notice could be avoided entirely if the Creditors' Committee were to avail itself of the trust's licensing policy, under which notice to individual claimants is not required. Objection of Manville Trust, ¶ 32. As the Manville Trust notes, however, the Creditors' Committee sought the requested information through the Manville Trust's licensing procedures more than five weeks ago, and it has yet to receive a response.

12

proceeding. *See, e.g.,* Order Granting Discovery, *In re W.R. Grace & Co.,* No. 01-1139 (Bankr. D. Del. Oct. 3, 2007) (ordering the debtors to bear the cost incurred by the Celotex Trust in complying with the discovery order), attached hereto as **Exhibit G**.

### III.   The Remaining Objections Lack Merit

18.   For the reasons set forth below, the remaining objections to the 2004 Motion are without merit and should be overruled.

#### A.   The Information Sought by the Creditors' Committee is Properly Sought by Way of a Motion Pursuant to Rule 2004

19.   The Other Trusts contend that the 2004 Motion is procedurally improper because (i) the information sought is not related to the liability of the Debtors, (ii) the information is sought from third parties, and (iii) Rule 2004 does not apply to contested matters. These contentions are meritless. *First*, as explained above, the requested information is directly relevant to the estimation of the Debtors' estimation liabilities. *Second*, discovery under Rule 2004 is not limited to parties to the controversy at issue. *See, e.g.,* Order Granting Rule 2004 Discovery, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. April 5, 2010) (ordering third-party law firm to produce certain documents). *Third*, there is not yet a contested matter pending concerning the estimation of the Debtors' asbestos liability. (The Creditors' Committee understands that the Debtors intend to seek estimation of their asbestos liabilities as part of the confirmation hearing on a plan.) To delay discovery until the commencement of a contested matter would serve no useful purpose. Moreover, the fact that an estimation proceeding may eventually be commenced does not mean that a Rule 2004 motion is inappropriate in advance of such a proceeding. *See* Rule 2004 Hearing Transcript at 29, *In re Chemtura Corp.* No. 09-11233 (Bankr. S.D.N.Y. March 16, 2010) (Court granted debtors' Rule 2004 motion even where debtors' counsel represented to the Court that "I think we're planning soon to file a motion, an

estimation motion"); *In re Mirant Corp.,* 326 B.R. 354, 356-57 (Bankr. N.D. Tex. 2005) (rejecting the proposition that "production ought not to occur under Rule 2004 when it is to aid litigation which is sure to be filed").[8] The Asbestos Committee and the Future Claims Representative – each of which has filed a Rule 2004 motion of its own – would appear to concur with this proposition.

### B.  Production of the Requested Information Does Not Implicate Rule 408

20.  The Other Trusts argue that Rule 408 of the Federal Rules of Evidence shields from disclosure and use the information that the Creditors' Committee seeks in the 2004 Motion. This argument fails for two independent reasons. First, we are at present merely seeking discovery of the alleged settlement materials, not their admission into evidence at a trial. Courts have not hesitated to order production of even materials protected by Rule 408 when they are relevant to the subject matter of the action. *See, e.g.,* Rule 2004 Hearing Transcript at 62, *In re Chemtura Corp.* No. 09-11233 (Bankr. S.D.N.Y. March 16, 2010) (ordering production of settlement materials).[9] Second, the requested information clearly is not protected by Rule 408. That rule, by its terms, only prohibits the admission of information relating to settlement negotiations to the extent the information is "offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." The Creditors' Committee does not intend to offer any of the information obtained from the Trusts to prove the liability of the

---

[8] The *Enron* decision relied upon by the Other Trusts is inapposite. In *Enron,* the court refused to permit plaintiffs in a class action pending in a non-bankruptcy forum to use Rule 2004 to obtain documents potentially relevant to the class action in an effort to circumvent a discovery stay that had been imposed in the class action. *In re Enron Corp.,* 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002).

[9] *See also In re Initial Public Offering Securities Litig.,* Case No. 21 MC 92, 2004 WL 60290, *2 (S.D.N.Y. Jan. 12, 2004) (holding that the discovery of settlement materials is governed by the same relevance standard as discovery of other documents under the Federal Rules of Civil Procedure); *Griffin v. Mashariki,* Case No. 96 Civ. 6400, 1997 WL 756914, *2 (S.D.N.Y. Dec. 8, 1997) ("Rule 408 does not limit disclosure of settlement materials during discovery.").

14

Trusts on a disputed claim.  Nor, for that matter, does the Creditors' Committee intend to offer any of the information obtained from the Trusts to prove the liability of GM on any *particular* claim – but rather only to assist in the estimation of GM's liabilities on an aggregate basis.  For this reason, as the Court well knows, settlement amounts and related information are routinely considered at estimation proceedings and, indeed, often constitute the principal source of information on which the courts' estimation decisions are based.

WHEREFORE, the Creditors' Committee respectfully requests that this Court (i) overrule the Objections, (ii) grant the 2004 Motion, as modified, and (iii) grant such other and further relief as the Court deems just and proper.

Dated:    August 5, 2010
          New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:  /s/ Philip Bentley
Thomas Moers Mayer
Philip Bentley
David Blabey, Jr.
1177 Avenue of the Americas
New York, New York 10036
Phone: (212) 715-9100
Fax: (212) 715-8000

Counsel for the Official Committee
of Unsecured Creditors of Motors Liquidation
Company , et al.

15