# **<u>EXHIBIT A</u>**

# The Need For Transparency Between the Tort System and Section 524(g) Asbestos Trusts

WILLIAM P. SHELLEY, JACOB C. COHN, AND JOSEPH A. ARNOLD

Since 2000, dozens of companies have sought to use the trust provisions of §524(g) of the Bankruptcy Code to globally resolve their asbestos liabilities.[1] At this point, the litigation has forced over 85 employers into bankruptcy,[2] "including nearly all major manufacturers of asbestos-containing products"[3]—the companies that historically were considered to be the most culpable by reason of the types of products that they sold (i.e., thermal insulation products).[4]

As the recent bankruptcy proceedings conclude, 524(g) trusts with assets exceeding $30 billion have begun (or will soon begin) receiving, evaluating, and paying claims.[5] Together with trusts created through earlier bankruptcies in the 1980s and 1990s, these trusts collectively represent a major source of funding for asbestos claimants that exists outside the tort system. Trusts already are paying hundreds of thousands of dollars to the most seriously injured victims, those suffering from mesothelioma,[6] and will pay even more as additional trusts begin operating.[7]

William Patrick Shelley is Chairman of Cozen O'Connor's National Insurance Department. He serves as counsel for insurers in many major asbestos coverage cases as well as associated bankruptcy proceedings around the country. He earned his law degree from Rutgers University School of Law—Camden (J.D., 1979) and his undergraduate degree from Rutgers—New Brunswick (B.A., with highest honors, 1976). Jacob C. Cohn is a Member in Cozen O'Connor's Insurance Department and represents insurers in many asbestos-related bankruptcy proceedings pending around the country as well as in major asbestos and other mass tort coverage cases. He earned his law degree, cum laude, from the University of Pittsburgh School of Law (1988), where he served as associate editor of the University of Pittsburgh Journal of Law and Commerce. He earned his undergraduate degree from the University of Pennsylvania (1985). Joseph A. Arnold is an associate in Cozen O'Connor's Insurance Department. He earned his law degree, cum laude, Order of the Coif, from Seton Hall University School of Law (2003), where he received the Raymond Del Tufo Constitutional Law Award and served as the symposium editor of the Seton Hall Law Review. He earned his undergraduate degree from Penn State University (2000). Mr. Arnold clerked for the Hon. Joel A. Pisano, U.S. District Court for the District of New Jersey, for the 2004-2005 term.

© 2008 by Thomson/West.

In response to the departure of the major asbestos product manufacturers from the tort system, plaintiffs' counsel began targeting defendants whose involvement with asbestos was increasingly peripheral with regard to market share and/or the types of products manufactured (such as products where only minor amounts of asbestos was used or where any asbestos ordinarily was completely encapsulated).[8] Notwithstanding these defendants' often de minimus contribution to claimants' exposure, claimants have argued, with great success, that they should face liability because their conduct was a "substantial contributing factor" in causing the claimants' injuries.[9] Claimants have further sought to use the joint and several liability rules of a number of states to hold these defendants liable for their entire award, even where such defendants' respective shares of liability were comparatively minor in terms of dust exposure. Recent tort reform efforts have resulted in some limitation on these unfair joint and several liability rules in a number of key states,[10] but the plaintiff bar's leverage against de minimus defendants through the use of joint and several liability principles has by no means disappeared.

Given that the 524(g) trusts are answering for the liability of many of the most culpable companies and are, in fact, paying significant sums, the emergence and expansion of these alternative compensation mechanisms should result in a significant reduction in the liabilities of the remaining solvent defendants in the tort system. Yet, as has been the case throughout much of the history of asbestos litigation in the U.S., attempts to "game the system" are inhibiting efforts to achieve fairness in allocating liability to defendants.

The asbestos plaintiffs' bar has gone to significant lengths to try to prevent defendants in the tort system from obtaining information concerning both the claims that plaintiffs are making against the trusts and the details of those trust claims, as well as the amounts that these plaintiffs have received or will receive from the trusts. A clear goal of such efforts is to hamper the ability of defendants in the tort system to obtain judgment reductions, credits, and/or offsets that they should in all fairness receive in light of the relative culpability of the bankrupt entities and the payments being made to victims by their trusts.

Another effect of this lack of transparency is to encourage dishonest claiming practices such as those uncovered by an Ohio trial court in *Kananian v. Lorillard Tobacco Company,*[11] discussed below. There, discovery from 524(g) trusts demonstrated a pattern of repeated trust submissions that asserted claims about the plaintiff's exposure history that were inconsistent, indeed mutually contradictory, with each other and with the claims that were being asserted in the tort system.[12] The ap-

© 2008 by Thomson/West.

parent motive for these false representations was to induce each 524(g) trust to conclude that the victim had been exposed to products manufactured or distributed by the trust's predecessor company and therefore was qualified to receive compensation as a beneficiary of that trust.[13] Such behavior becomes more tempting given trust provisions permitting increased recovery where a claimant alleges that his injury was primarily induced by exposure to one company's products.

This article analyzes the causes of the disconnect between these parallel systems of compensation for asbestos victims from both the 524(g) trust and the tort sides of the divide, the resulting repercussions for defendants in the tort system, and the steps that should be taken to prohibit, or at least minimize, overpayments by solvent tort defendants and double recoveries by current claimants (all of which ultimately threatens the ability of future claimants to receive full compensation for their claims). The first section explores the ways in which many trusts are purposefully designed and operated to stymie efforts to obtain claims and payment information concerning claimants who are also suing solvent defendants in the tort system, thereby undermining the integrity of the judicial process. This section shows how this lack of transparency is used not only to unfairly increase the financial burden upon solvent defendants but to shield dishonest claiming practices where claimants try to recover seriatim from trusts and tort defendants based upon falsified claims of exposure history.

While the 524(g) trusts operate in a privately managed system outside the tort arena, plaintiffs' lawyers are able to exploit the peripheral asbestos defendants in the civil tort system. The second section of this article examines the joint and several liability rules of several key asbestos jurisdictions, highlighting recent tort reforms designed to normalize the apportionment of liability between solvent asbestos defendants and those in bankruptcy. This section also addresses the right of tort defendants to seek and obtain a reduction of their own liabilities by taking into account the relative fault of bankrupt companies as well as the substantial payments that are being made by trusts established to answer for these entities. The various means by which such reductions are being or could be accomplished are discussed, including inclusion of bankrupt entities on verdict sheets for purposes of assessing fault, judgment reduction credits for amounts paid by trusts, and whether a tort defendant's putative ability to pursue an indemnity or contribution claim against a trust constitutes a realistic avenue for reallocating liability.

After shedding light on the apparent disconnect between the civil liability and 524(g) trust compensation systems, the third section focuses on efforts by tort defendants to bridge the information gap. Defendants

© 2008 by Thomson/West.

frequently attempt to obtain discovery concerning claims that tort plaintiffs have made or will make against trusts and the amount of payments from the trusts. This section analyzes decisional law as well as the salutary emerging trend of courts requiring disclosure of such information by asbestos claimants.

The final section of this article proposes a number of reforms to improve transparency between the trust and the tort systems. This section addresses ways to remedy the lack of communication between and among trusts and the courts to ensure that the tort liability of solvent defendants is not artificially inflated by the absence of the bankrupt companies from the tort system. This section further proposes that additional steps be implemented to discourage attempts by plaintiffs to improperly collect from defendants and trusts by embellishing or falsifying their asbestos exposure histories. Lastly, this article shows why it is inappropriate for bankruptcy courts to interfere in issues concerning state court discovery from 524(g) trusts by purporting to retain postconfirmation jurisdiction over the issuance of subpoenas to such trusts in violation of fundamental limitations upon the scope of bankruptcy jurisdiction.

## I. FOXES IN THE HENHOUSE—HOW CONTROL OF THE TRUST FORMATION PROCESS BY CLAIMANTS' COUNSEL LEADS TO INSCRUTABLE TRUSTS AND TDPS

### A. THE DEVELOPMENT OF TDPS AND THEIR CONFIDENTIALITY PROVISIONS

A 524(g) trust is intended to address a bankrupt company's asbestos tort liabilities. The aims and operations of trusts, however, are fundamentally different from those of companies defending themselves in the tort system. Corporations are run by managers whose goal is to maximize profit for the company's shareholders. Corporate defendants view asbestos claimants as adversaries. They seek whenever possible to defeat their claims or at least to minimize the amounts paid as compensation. This adversarial system encourages the rigorous testing of the validity of claims. This, in turn, discourages the assertion of marginal or spurious claims.

Trusts, on the other hand, do not have officers or shareholders. They instead have trustees and beneficiaries. A trust is charged with: (1) maximizing the value of its assets (typically comprised of a majority ownership stake in the reorganized debtor, proceeds of insurance settlements, and other contributions of cash or securities) and (2) compensating qualified beneficiaries as completely as practicable, while (3) seeking to ensure that the trust has sufficient assets to compensate current and

© 2008 by Thomson/West.

future claimants in a substantially similar manner. Claimants are not adversaries but potential beneficiaries. Once a claimant satisfies certain threshold criteria for demonstrating entitlement to compensation, he is recognized as a beneficiary to whom the trustees have a fiduciary obligation as well as a duty to compensate.

Trusts operate on the basis of trust distribution procedures (TDPs). Each TDP has a schedule of diseases, along with exposure and medical criteria. Once a claimant establishes that he is a trust beneficiary by satisfying the TDP's disease and exposure criteria, the claimant is entitled to have his claim valued at a pre-established presumptive compensation amount.[14] If a claimant believes that he is entitled to special treatment, he may request an individualized evaluation. If the claimant can demonstrate, for example, that the majority of his exposure was to asbestos-containing products manufactured by Celotex Corporation, the Celotex Trust might offer him a multiple of the presumptive compensation amount, up to the maximum authorized by the TDPs for that disease.[15]

The dynamics of the bankruptcy process tend to lead to trust agreements and TDPs that are largely written by counsel for the asbestos claimants themselves.[16] After the competing creditor constituencies reach agreement with the asbestos creditors on the broad terms of the division of the assets of a bankrupt company's financial estate, there is little incentive for them to become involved in deciding how asbestos claimants choose to divide their own piece of the economic pie. If anything, since 75% of asbestos claimants must vote to approve a 524(g) plan, other parties are far more concerned about getting the needed votes than about whether TDPs are too lenient or seek to give the claimants advantages over tort system defendants by seeking to prevent discovery of claims information.

The asbestos claimants and their contingency-fee attorneys have a strong incentive to design "user-friendly" TDPs that easily dispense funds in order to permit claimants to withdraw as much money as possible from the trusts as quickly as possible.[17] Moreover, the selection of the trustees and members of the trust advisory committees (TACs) that oversee the operation of the trusts is heavily influenced, if not controlled outright, by counsel for the asbestos claimants.[18] While, in theory, court-appointed future claimants' representatives (FCRs) should push for more stringent TDPs and anti-fraud protections to help ensure that sufficient monies remain to pay anticipated future claims, in practice, FCRs possess relatively weak bargaining power and have proven an unsatisfactory counterweight to the current claimants' influence.[19] Bankruptcy courts and the U.S. Trustees thus far have taken a largely hands-off approach to these matters.

© 2008 by Thomson/West.

Predictably, when asbestos claimants and their attorneys write their own compensation rules, the results are TDPs containing lax medical and exposure criteria that pay claims that would not be compensable in the tort system, such as those brought by asymptomatics who likely will never become sick and those whose claims otherwise would be barred by the statute of limitations.[20] Notably absent from TDPs is any regimen for obtaining or sharing claiming information with other trusts or with defendants in the tort system. Of course, such lowered qualifications for payment and reduced scrutiny of claims also invites fraudulent "double-dipping" and other abuses.[21]

More recently, efforts have been made by asbestos claimants and trusts to affirmatively shield information concerning claims to the trusts and payments made to these claimants from outside scrutiny—especially from disclosure to solvent defendants in the tort system. Thus, in several cases, asbestos constituencies have drafted TDPs that attempt to prevent discovery of such information in connection with other proceedings. These TDPs purport to deem all of the claimants' submissions to and communications with the trusts, including medical and exposure evidence and payment information, to be confidential and provided in the context of settlement discussions. The TDPs rely on this language and other privilege theories (such as work product, attorney-client, claimants' federal Health Insurance Portability and Accountability Act (HIPAA) rights, claimants' state law physician-patient privilege as to medical records) to provide bases for trusts' refusal to produce information requested by other asbestos defendants—even though the claimant himself has placed such information at issue by suing the tort defendants.

Some TDPs go so far as to attempt to foreclose state courts from ordering disclosure of information by trusts. These TDPs instead purport to reserve jurisdiction in the bankruptcy court and require parties seeking discovery of such materials to seek and obtain a subpoena from the bankruptcy court.

The TDPs proposed by the plan proponents in the *Federal Mogul* bankruptcy case are typical of this trend. They provide that all trust submissions "shall be treated as made in the course of settlement discussions between the holder and the U.S. Asbestos Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions."[22] The trust is directed to:

> preserve the confidentiality of such claimant submissions, and [to] disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal

© 2008 by Thomson/West.

injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court.[23]

Further, the Trust is directed to "take all necessary and appropriate steps to preserve said privilege before the Bankruptcy Court and before those courts having appellate jurisdiction related thereto."[24] The confidentiality provisions in certain other TDPs already approved by bankruptcy courts are almost identical to the language quoted above.[25]

Significantly, certain tort system defendants have begun to raise objections to these efforts to stymie discovery from 524(g) trusts. As a result of such objections in the *Federal Mogul* bankruptcy case, the above-quoted provisions were modified somewhat in the TDPs that ultimately were approved in November 2007 as part of the confirmed plan of reorganization. Under these modified provisions, the bankruptcy court no longer purports to exercise exclusive control over the issuance of subpoenas to the trust. Instead, the trust now is expected to comply with valid subpoenas "issued by the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware."[26]

## B. ABUSE OF TRUSTS UNMASKED: THE *KANANIAN* CASE

The potential for abuse of an easy-pay system that is sparsely policed and cloaked in secrecy should be self-evident. The dangers are well-illustrated by recent events in the case of *Kananian v. Lorillard Tobacco Company*.[27]

Harry Kananian died of mesothelioma in 2000. His estate sued Lorillard Tobacco in Ohio state court, alleging that his mesothelioma was caused by asbestos-containing "Micronite" filters in Kent cigarettes that Kananian allegedly smoked in the 1950s. The estate also lodged claims with a number of asbestos bankruptcy trusts alleging that their products caused Kananian's disease.

When Lorillard sought the discovery of Kananian's submissions to the trusts in order to determine Kananian's work history, exposure, pathology, and the amount of any recoveries from those trusts, Kananian's attorneys, from California's Brayton Purcell firm, embarked on a campaign to prevent Lorillard from obtaining or using this information.[28] Among other tactics, Kananian's counsel encouraged the Celotex Trust to object to Lorillard's discovery requests while simultaneously telling the court that he would "welcome" disclosures from the trusts.[29] Kananian's counsel further objected to the admissibility of claim forms by questioning their accuracy.[30]

© 2008 by Thomson/West.

As it turns out, Kananian's lawyers had submitted contradictory claims information to different trusts to maximize the estate's recoveries. They told the Manville Trust that Kananian had been a shipyard worker in World War II and the Eagle-Picher Trust that he was exposed to asbestos insulation as a pipe welder for a year. Kananian's lawyers told the UNR Trust that Kananian handled Unibestos insulation at the San Francisco Naval Shipyard. In actuality, the only time that he had passed through that shipyard was as a rifleman on his way to board a troopship to Japan. They even claimed to the Celotex Trust that Kananian "made and handled tools of asbestos." The trusts already had paid the estate as much as $700,000 on the basis of these wildly inconsistent claims. Privately, Brayton Purcell attorneys admitted that these trust submissions, including those prepared by another law firm, Early Ludwick & Sweeney of Connecticut, were "rife with outright fabrications."[31] To the court, Kananian's lawyers conceded that the trust forms were inaccurate and misleading. Ironically enough, they sought to keep the trust claim forms from being considered by a jury on those grounds, an argument that the court flatly rejected unless the Kananian family agreed to return all of the money that it had obtained from the trusts on the basis of these bogus claim forms.

Eventually, the Ohio court began to choke on counsel's brazen conduct and revoked the pro hac vice privileges of Kananian's California lead counsel.[32] The court, however, declined to dismiss Kananian's case, stating that there was no evidence that the Kananian family itself had taken part in its attorneys' misconduct.[33]

*Kananian* represents a remarkable lesson on the mischief that inevitably results from the lack of transparency between and among trusts and the tort system.[34] Especially with the recent proliferation of new trusts flush with cash, there is a significant economic impetus for claimants and their lawyers to assert inconsistent claims against different trusts in order to be qualified by each trust for payment. Likewise, the incentive exists to conceal the existence of actual or pending trust payments—or delay submitting trust claims altogether—while claimants prosecute civil tort claims against solvent defendants and argue that all trust-related information is protected from discovery as confidential settlement communications.

Fortunately, *Kananian* has a silver lining in addition to the sanctioning of plaintiff's counsel. There, the court approved the requested discovery from trusts and demonstrated a willingness to permit the defendant to introduce evidence of the Kananian estate's inconsistent claiming history and trust recoveries before the jury at trial.

Beyond the paramount danger of undermining the judicial process through misrepresentations and fraud, the effective concealment of claims to, and payments by, the 524(g) trusts prejudices tort defendants

© 2008 by Thomson/West.

by depriving them of information that they need to effectively invoke their state-law rights to apportionment of fault and/or judgment reduction credits. As a result, the burden upon solvent defendants is increased. This is unfair not only to current tort defendants but also encourages the trend of seeking out ever more peripheral companies to add as new defendants in asbestos lawsuits.[35]

## II. STACKING THE DECK—THE INTERPLAY BETWEEN THE LACK OF TRANSPARENCY AND THE CIVIL TORT SYSTEM CREATES INEQUITIES FOR PERIPHERAL DEFENDANTS

While the 524(g) trusts operate in a privately managed system outside the tort arena, plaintiffs' lawyers historically have been able to exploit the peripheral asbestos defendants in the civil tort system through joint and several liability.[36] Full compensation of victims has always been a primary goal of the tort system. In the context of multiple tortfeasors, historically there has been a tendency by courts to ensure full compensation for plaintiffs even if that may mean that some tortfeasors are forced to pay more than their allocable share of damages. In many states, this led to imposition of joint and several liability without consideration of the comparative fault of each defendant. As a result, defendants could be held liable for 100% of the total award irrespective of whether they were 99% responsible or only 1% responsible for the claimant's injuries. In those situations, the existence of other responsible but insolvent parties would not diminish the liability of the solvent defendants.

Standing alone, joint and several tort liability has always been something of a blunt instrument for achieving societal goals of victim compensation. This especially is the case in asbestos litigation, where arguments prevail for expansive interpretations of when exposure to a company's asbestos-containing products constitutes a "substantial contributing factor" of a plaintiff's injuries (with some plaintiffs' attorneys asserting that even a single asbestos fiber can trigger injury and therefore liability).[37] As a result, joint and several liability has led to manifestly unjust results in the context of asbestos litigation.[38] Moreover, the combination of joint and several liability with lax standards (real or perceived) for imposition of tort liability has encouraged the asbestos plaintiffs' bar to drag ever more peripheral companies into mass tort litigation as the main players exited the tort arena for bankruptcy.[39]

Fortunately, the pendulum is swinging back toward the center with the enactment of tort reform in a number of key states. As a result, while joint and several liability still remains the rule in some jurisdictions, most states have either eliminated the doctrine of joint and several liability altogether or at least modified it to eliminate its most oppressive

© 2008 by Thomson/West.

applications. In states that completely eliminated joint and several liability, defendants must only pay the percentage of liability assigned to them by the jury.

Many states have chosen a middle ground where a finding of a threshold percentage of responsibility triggers joint and several liability. Even then, some states limit imposition of joint and several liability to objectively measurable economic losses. For instance, in the asbestos litigation hotbed of Ohio, the legislature enacted tort reform in 2003 barring joint and several liability for defendants found to be less than 50% liable and barring joint and several liability altogether for the recovery of noneconomic losses.[40] In light of these reforms, access to claiming and settlement information from trusts is more important than ever to defendants in the tort system.

The following is a summary of tort reforms in some of the most significant asbestos litigation forums.[41]

**Mississippi**:[42] In Mississippi, the legislature passed tort reform in 2004 that eliminated joint and several liability altogether and adopted what can be termed as a rule of "pure proportional liability." No defendant is liable for more than its share of responsibility (with an exception for intentional tort claims and conspiracy claims), and all potentially responsible tortfeasors appear on the verdict sheet.[43] Under the current statute, therefore, a defendant is not responsible for more than its direct percentage of fault, and fault must be allocated to all responsible parties, even if one or more of the parties' liability may be barred or limited under the law. Under Mississippi's "pure proportional approach," a defendant may not bear more than its proportionate share of liability for a claimant's asbestos-related injuries.

On the flip side, it appears that Mississippi's proportional liability rule may have displaced its prior judgment reduction rules such that solvent defendants would receive no further judgment reduction on the basis of a claimant's larger-than-expected recoveries from various bankruptcy trusts. As Mississippi's court of appeals held, the "pure proportional liability" rule is absolute.

> [While i]t has long been the practice in Mississippi that… defendants who proceed to trial and suffer a judgment against them are entitled to credit on that judgment for those amounts received in settlement from entities not party to the litigation… the law now contemplates that the jury will apportion liability on a formula that includes consideration of the percentage of 'fault' attributable to the various entities, whether or not some particular entity is a party to the litigation and without regard to the terms of any pretrial settlement.[44]

© 2008 by Thomson/West.

While the amount of a settlement may not be used to effect a judgment reduction, the fact and amount of such a settlement nevertheless may provide important evidence for a jury's consideration on the issue of comparative fault.[45]

**Ohio**: In 2003, Ohio barred imposition of joint and several liability for economic losses on defendants found to be less than 50% liable (unless the defendant committed an intentional tort) and entirely barred joint and several liability for noneconomic damages.[46] Ohio law also allows a jury to allocate responsibility to nonparties.[47] A solvent asbestos defendant can identify absent potential tortfeasors through affirmative defenses and can continue to do so at any time before trial.[48]

Although there are no published Ohio cases interpreting these particular provisions, at least one trial judge has rejected a bid by an asbestos plaintiff to strike the defendant's identification of 120 other entities potentially responsible in its affirmative defenses.[49] The plaintiff argued that the defendant was required to designate specific percentages of fault attributable to each such entity.[50] The trial judge orally denied the plaintiff's motion to strike the affirmative defenses, ruling that the specific percentages would be borne out by the evidence presented by the defendant at trial. Moreover, the judge ruled that the bankrupt entities would be included on the apportionment form presented to the jury.[51] As demonstrated by the discovery rulings and standing orders discussed in the next section, Ohio courts have already recognized the importance of the discovery of trust claiming information to assist tort defendants in identifying other potentially responsible parties and demonstrating their relative culpability.

**Texas**:[52] The Texas Legislature passed House Bill 4 in 2003 specifically to target the inequitable results produced by its joint and several threshold of 15% in toxic tort cases (including asbestos).[53] The new statute implemented two critical changes. First, the threshold for joint and several liability for toxic tort defendants was increased to 50%.[54] Second, a jury can consider the culpability of bankrupt entities when allocating liability to "any responsible third parties."[55]

In addition to limiting a solvent asbestos defendant's liability to its proportionate share (if less than 50%), the Texas statute also allows defendants a dollar-for-dollar settlement credit to reduce the plaintiff's total verdict.[56] When applying these two provisions together, the Texas Supreme Court has recognized that, "although related, the two sections pose separate inquiries. Section 33.012 controls the claimant's total recovery, while Section 33.013 governs the defendant's separate liability."[57] For example, if the jury awarded damages of $1 million but found that the plaintiff was 10% at fault, the total recoverable amount would be

© 2008 by Thomson/West.

reduced to $900,000, and if the plaintiff had received $400,000 in settlements, the recoverable amount would further be reduced to $500,000. However, a defendant found 10% liable could still be forced to pay up to $100,000 of the total recoverable amount of $500,000 since that defendant is liable for "the percentage of damages found by the trier of fact," i.e., the total $1 million found as damages by the jury prior to reductions. Contribution among the remaining defendants thus may reduce each defendant's share if there are multiple nonsettled defendants. However, where a single defendant goes to trial, settlement credits will have no impact on that defendant's liability until the sum of all reductions reduces the total recoverable amount below the remaining defendant's proportionate share of the damages found by the jury pursuant to section 33.013.66.[58] In such a case, a further credit would be required to reduce the remaining defendant's ultimate liability.

**West Virginia**: In April 2005, West Virginia eliminated joint and several liability for defendants who are found to be 30% or less at fault.[59] In such situations, defendants pay only the percentage of fault as determined by the jury. Unlike many other tort reform states, West Virginia's law allows a court to reallocate any uncollectible damages among all defendants whose proportional share of liability exceeds 10% according to their respective percentages of fault.[60] If a defendant falls below the 10% reallocation threshold, then its share of the reallocation likewise is reallocated to the remaining defendants.[61]

The West Virginia statute instructs the jury to determine "the proportionate fault of each of the parties in the litigation."[62] This is potentially problematic because the statute fails to account on its face for the apportionment of liability to absent tortfeasors. Nevertheless, prior West Virginia caselaw held that a jury could allocate fault among all persons contributing to an injury, irrespective of whether they are a party to the action,[63] and nothing in the legislative history of the new statute suggests an intention to alter this result. This issue has not yet been definitively addressed by West Virginia courts.

In addition, solvent asbestos defendants may be able to obtain significant relief from the potential harshness of the "thirty percent joint and several liability/ten percent reallocation" thresholds through verdict reductions. West Virginia courts allow verdict reductions to reflect good faith settlements with any liable parties.[64] This includes settlements with bankrupt asbestos entities who are not parties to the lawsuit.[65]

**New York**: Joint and several liability was partially eliminated by statute, CPLR §1601, in 1986. Defendants found to be less than 50% liable are jointly liable for economic damages but are only severally liable for noneconomic damages. The statute, however, contains a potentially sig-

© 2008 by Thomson/West.

nificant limitation that threatens to swallow the rule in asbestos litigation: "[T]he culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he or she was unable to obtain jurisdiction over such person in said action (or in a claim against the state, in a court of this state)."[66] Thus while Rule 1601 permits asbestos-supplying tortfeasors to be included on the verdict sheet for purposes of allocating shares of responsibility, if a bankrupt entity were considered to be a culpable party over which the plaintiff could not obtain jurisdiction, solvent defendants might not be permitted to factor in the shares of the bankrupt entities' responsibility and might be forced to effectively reallocate those shares among themselves. With large shares of responsibility often attributable to bankrupt entities in the asbestos industry, an inability to include them on verdict sheets could result in a large increase of the responsibility of otherwise minor defendants and could even result in the solvent defendants' shares being artificially inflated beyond the 50% threshold for joint and several liability for noneconomic damages.

While earlier cases appeared to favor this plaintiff-friendly result,[67] in 2002, the New York trial court presiding over New York City's asbestos litigation ruled that, for purposes of CPLR §1601(1), "the culpability of a bankrupt, nonparty tortfeasor will be included when calculating the defendant tortfeasors' exposure" (unless the plaintiff proves that she was unable to obtain personal jurisdiction over the bankrupt entity).[68] In issuing its ruling, the court was cognizant that it was addressing a "critical issue about judgment molding that affects… tens of thousands of cases now pending before [it]" and was specifically concerned about "the noteworthy differences between the bankrupt defendants and those that are still solvent," namely that the bankrupt entities represented the "traditional" asbestos defendants who bear the largest share of responsibility.[69]

New York's judgment reduction system is also quite important to the analysis. While CPLR §1601 introduced proportionality into the allocation of liability for noneconomic losses, New York General Obligations Law §15-108 requires a reduction of the judgment against nonsettling tortfeasors of the *greater* of: (1) the amount stipulated in the release, (2) the amount actually paid for the release, or (3) the amount of the settling defendant's equitable share of the damages.[70] Therefore, to the extent that a claimant settles with a bankruptcy trust for more than that entity's proportionate share, the verdict will be reduced accordingly. In the case of multiple recoveries from asbestos defendants, New York courts follow an aggregate approach, reducing the verdict by the greater of all settlement payments received by plaintiff or the total dollar value of percentage of fault allocated to all settling tortfeasors.[71]

© 2008 by Thomson/West.

While Mississippi, Ohio, Texas, and New York represent state-level efforts to remedy the inherent unfairness of joint and several liability in a mass tort situation where the majority of targeted defendants are in bankruptcy, there remains a minority of states, including some significant asbestos litigation jurisdictions, where tort reform has not been implemented. Pennsylvania, for instance, remains a joint and several liability state. Pennsylvania's legislature enacted legislation, the Fair Share Act of 2002, that would have abolished joint and several liability in the recovery of damages against all defendants found to be less than 60% liable (with an exception for intentional torts and environmental hazards).[72] The Commonwealth Court of Pennsylvania, however, ruled the Fair Share Act unconstitutional in 2005.[73] Therefore, Pennsylvania law, for now, has reverted to joint and several liability, a large step back for a state much in need of tort reform.[74]

With the demise of the Fair Share Act, the only relief for solvent asbestos defendants from joint and several liability in Pennsylvania is through verdict reductions to reflect recoveries from bankruptcy trusts. In Pennsylvania, a release of one tortfeasor does not discharge the others but "reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."[75] In the asbestos context, a Pennsylvania court has applied a settlement with the Manville Trust to set-off a claimant's verdict against solvent asbestos defendants.[76] Moreover, in *Andaloro v. Armstrong World Indus., Inc.*, the Pennsylvania Superior Court extended the set-off rule to instances where the underlying asbestos exposure case reached a verdict prior to the plaintiffs' settlement with the Manville Trust.[77] *Andaloro* is the only decision to allow for a set-off of amounts that plaintiffs have yet to recover from bankruptcy trusts. In that case, the Superior Court held that tort defendants were entitled to pro tanto judgment reduction in the amount of the presumptive award for the plaintiff's disease category as prescribed by the Manville Trust TDPs multiplied by the payment percentage in effect at the time that the state court judgment was entered. The court rejected the defendants' argument for pro rata judgment reduction as contrary to the full compensation goals of Pennsylvania's joint and several liability regime. The Manville Trust's TDP is particularly amenable to such a holding because it provides a specific formula to determine the set-off for unresolved claims. In principle, there is no reason why the *Andaloro* holding should not apply with equal force to unresolved claims against other trusts, although determining the amount of the set-off may not be as clear cut.

© 2008 by Thomson/West.

SECTION 524(G) ASBESTOS TRUSTS                                                        **271**

Perhaps the worst state for defendants is Illinois. The Illinois statute that modified joint and several liability specifically excludes asbestos cases, and therefore solvent asbestos defendants can still be held joint and severally liable despite minimal responsibility for the plaintiff's injuries.[78] To make matters even worse, under the *Lipke* Rule,[79] Illinois currently is the only state where a defendant cannot introduce evidence of exposure to other asbestos products in the defense of its claim to establish a lack of proximate cause. While *Lipke* is currently under review by the Illinois Supreme Court after both a trial court and a justice of the Illinois Appellate Court criticized the rule,[80] for now, designations of Illinois as a "judicial hellhole"[81] remain particularly apt for asbestos defendants.[82]

Even in Illinois, however, peripheral asbestos defendants may be entitled to an appropriate set-off for recoveries from bankruptcy trusts. According to the Joint Tortfeasor Contribution Act, a good faith settlement "reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater."[83]

Another potential avenue of relief for peripheral asbestos defendants that are unable to apportion damages to a culpable bankrupt entity or otherwise receive a proper settlement credit is to pursue a contribution claim against the 524(g) trusts. The pursuit of contribution claims against various culpable trusts, however, does not appear to be a viable option. A peripheral defendant will find the process of submitting contribution claims to numerous trusts in accordance with each trust's TDPs time consuming and expensive, and most of the TDPs require these "indirect claimants" to prove that they have fully satisfied the trust's obligation to the claimant and obtained a signed release from the claimant forever releasing the trust from future liability.[84] The release condition is especially troublesome, as many claimants who have not fully resolved their trust claims or who intentionally delayed the submission of trust claims will not provide the requisite release.

Only the Manville Trust has TDPs containing express provisions regarding contribution claims of codefendants and the valuation thereof.[85] The Manville TDPs provide that the Manville Trust may be listed on a verdict form and that a codefendant may file a third party complaint against or join the Manville Trust in an asbestos personal injury action pending in the tort system.[86] In exchange for limiting the contribution claims of codefendants against the Manville Trust to the procedures set forth in the TDPs, the Manville Trust consents to being treated as a "legally responsible tortfeasor under applicable law, without the introduction of further proof."[87] A codefendant can choose one of two ways to resolve its contribution claim against the Manville Trust: (Option 1) the codefendant can file a contribution claim against the Trust, which

© 2008 by Thomson/West.

will then be processed and paid by the Trust in accordance with the Manville TDPs or (Option 2) the codefendant can opt to receive a credit at trial for the amount of its contribution claim.[88] The Manville Trust prefers the trial credit as opposed to having to evaluate and liquidate a contribution claim filed against it.[89] The trial credit option is also more beneficial to the codefendant, because, rather than pay the amount of its contribution claim to the plaintiff and avail itself of the claims process with the trust, the codefendant instead can essentially get paid on its contribution claim right away and reduce the amount of cash that it must pay to the plaintiff.

Outside of the Manville Trust, however, it is quite burdensome and difficult for a peripheral defendant to seek relief from the trusts through contribution claims.

### III. CREATING TRANSPARENCY THROUGH DISCOVERY TO PREVENT WINDFALL RECOVERIES AND PROTECT TORT DEFENDANTS FROM DISPROPORTIONATE LIABILITY

Asbestos claimants regularly sue a literal A-to-Z list of companies that allegedly manufactured or sold asbestos-containing products for use in a variety of different industries and likewise present claims to numerous bankruptcy trusts.[90] Assuming that a plaintiff has genuinely suffered an asbestos-related injury, he still must prove that the defendants that he has sued are culpable for his injuries, which, at a minimum, requires proving that he was meaningfully exposed to a defendant's products.

To properly defend itself, or at least attempt to obtain proper allocation of liability among codefendants or appropriate judgment reduction credits, it is imperative that a defendant have full access to information concerning the plaintiff's claims against and recoveries from codefendants or other potentially culpable parties like the trusts. However, the current disconnect between the trusts and the civil tort system, and even among the trusts themselves, is facilitating claimants' efforts to collect compensation from a number of different sources without disclosing those recoveries. To combat improper "double-dipping," tort system defendants increasingly are seeking this information through discovery, both directly from the plaintiffs and from the trusts. In both cases, these efforts are meeting substantial resistance.

### A. COMPELLING DISCOVERY FROM CLAIMANTS

Predictably, the plaintiffs' asbestos bar has heavily mobilized in a concerted effort to prevent tort defendants from obtaining discovery, even from the plaintiffs themselves, about their claims against and re-

© 2008 by Thomson/West.

coveries from 524(g) trusts. Thus far, however, it seems that many courts are inclined to permit such discovery from the plaintiffs, although experiences such as the *Kananian* case teach that discovery of claiming information directly from the trusts provides an important check on the veracity and completeness of plaintiff self-disclosures.

Around the time that the Brayton Purcell firm was seeking to prevent discovery of claiming information from trusts in the *Kananian* action in Ohio, the same firm represented a California plaintiff seeking to stymie discovery of similar information from the plaintiff in *Volkswagen of America, Inc. v. Superior Court*,[91] an effort that was flatly rejected by California's Court of Appeal. In this bellwether opinion, the court framed the critical question as follows: "Are documents submitted to bankruptcy trusts by a plaintiff's attorney in support of claims for compensation for alleged asbestos-related injuries discoverable in similar litigation against another entity?"[92] The court answered that question in the affirmative, ruling that claim forms and supporting factual information such as medical records submitted to bankruptcy trusts are within the scope of discovery in California.

In *Volkswagen*, the plaintiff, Buddy Rusk, Sr., sued Volkswagen and 66 other defendants. During discovery, Volkswagen requested the production of "all documents submitted to a bankruptcy trust administering assets of" any of 72 designated companies.[93] After Rusk failed to produce any responsive documents, Volkswagen brought a motion to compel the production of documents submitted to the Manville Trust and in the *Kaiser* bankruptcy, as well as "all documents related to plaintiff's submissions to bankruptcy trusts for his alleged asbestos-related disease."[94] In opposition, Rusk characterized the information as "confidential settlement information packets" and argued that "all documents relating to plaintiff's claims filed with these Trusts contain both plaintiff's and the Trust's efforts to negotiate a settlement."[95]

The trial court ordered the disclosure of all settlement amounts and declarations signed by the trust claimant (or the real party in interest). Volkswagen sought a writ of mandate from the appellate court to reverse the portion of the trial court's decision that deemed documents signed by Rusk's attorneys not discoverable.[96] The court of appeal granted the writ and directed the trial court to vacate its prior order. Emphasizing that discoverability is not dependent on ultimate admissibility of the information sought but on whether the requested discovery "appears reasonably calculated to lead to the discovery of admissible evidence," the court of appeal held that the trial court erred in allowing Rusk to withhold documents signed by his attorneys.[97] While acknowledging that "a heightened standard of discovery may be justified when dealing with

© 2008 by Thomson/West.

information which, though not privileged, is sensitive or confidential," there was no need for "heightened protection" here, the court opined, because Rusk's work history and medical condition were "plainly relevant and not confidential" and had been placed "directly at issue."[98] Moreover, "Volkswagen has good reason to ascertain what Rusk has told others about these issues…. Since each party who shares responsibility for any asbestos-related disease from which a claimant suffers is liable only for its proportionate share of non-economic damages, each will understandably be concerned to determine whether the claimant has overstated its share of responsibility."[99]

A growing number of courts are recognizing defendants' legitimate interest in discovering information about plaintiffs' trust claims. In New York, a court ordered that claim submissions be produced to defendants remaining in the tort system:

> [W]hile the proofs of claims are partially settlement documents, they are also presumably accurate statements of the facts concerning asbestos exposure of the plaintiffs. While they may be filed by the attorneys, the attorneys do stand in the shoes of the plaintiffs and an attorney's statement is an admission under New York law. Therefore, any factual statements made in the proofs of claim about alleged asbestos exposure of the plaintiff to one of the bankrupt's products should be made available to the defendants who are still in the case.[100]

A number of trial court judges in Ohio have ordered asbestos claimants to produce trust information to the defendants.[101] Likewise, Texas trial courts are granting motions to compel responses to interrogatories directed to asbestos claimants regarding claims and settlements made or expected to be made with any bankruptcy trust.[102] In New Jersey, a discovery master for the court overseeing that state's consolidated asbestos docket recommended that production of claim forms be directed, explaining that, whether or not ultimately admissible in evidence, such documents reveal discoverable factual information regarding plaintiffs' alleged exposure to asbestos-containing products.[103]

## B. MANDATORY DISCLOSURES BY CLAIMANTS

Several jurisdictions have gone even further, establishing standing case management orders governing all asbestos cases filed within a county or a state and requiring plaintiffs to disclose certain bankruptcy-related information as a matter of course. The Circuit Court of Kanawha County, West Virginia (where the state-wide asbestos docket is administered) issued an amended global case management order on December

© 2008 by Thomson/West.

9, 2003, to govern all asbestos personal injury litigation in the State of West Virginia. The order provides:

> Section VIII: Bankruptcy Proceeding Affidavit
>
> Each Plaintiff or his/her personal representative shall execute a sworn affidavit at least (60) days before the discovery deadline identifying those Defendants against which he/she or his/her estate has or will be filing the necessary documents in any bankruptcy proceeding to seek compensation for his/her asbestos-related personal injury…. When requested, the Plaintiff shall provide the documents filed in any or all bankruptcy proceedings. These affidavits shall be used by any purpose by the parties…When appropriate, the Court can require each Plaintiff to disclose the total amount received or expected to be received from the bankruptcy proceedings.[104]

Similarly, in Delaware, the Superior Court of New Castle County issued an amended case management order requiring asbestos plaintiffs to automatically disclose, within 30 days of initiating an action, all claim forms and related information submitted to bankruptcy trusts. The relevant provision requires the following disclosures:

> Copies of all claim forms and related materials related to any claims made by plaintiff to any insurance carrier, employer, governmental agency, trust, entity or person related to or in any way involved with asbestos claims, or other agency, entity or person wherein plaintiff directly or indirectly asserts, suggests, advocates, or requests investigation into potential entitlement to compensation or benefits of any type as a result of such exposure to and/or injury related to asbestos. This shall include, but is not limited to, copies of all materials related to applications for Social Security benefits, worker's compensation benefits, military service benefits, disability benefits, and claims made to trusts for bankrupt asbestos litigation defendants.[105]

Claimants must continue to supplement the disclosure up until the date of trial.

Ohio's case management order requires plaintiffs to produce claim forms and supporting documentation presented to any bankruptcy trust and further requires plaintiffs to furnish authorizations permitting defendants to seek information directly from the trusts.[106] In Texas, the Master Discovery to All Plaintiffs in asbestos cases throughout the state requires production of claiming information submitted to the trusts.[107] Massachusetts and Jefferson County, Kentucky are also examples of

© 2008 by Thomson/West.

jurisdictions with master interrogatories and document requests that require the production of claims information.[108]

### C. DISCOVERY FROM THE TRUSTS

Defendants also seek discovery of plaintiffs' trust submissions directly from the trusts themselves. Frequently, this requires requesting and obtaining commissions to serve out-of-state subpoenas and obtaining the cooperation of sister states in issuing the requested subpoenas. Dominated as they are by asbestos claimants' attorneys, some trusts have resisted these efforts.

The Celotex Asbestos Settlement Trust, for example, takes the position that all documents submitted to it by claimants are confidential.[109] The Trust resists production of electronically stored claims information, claiming that it is proprietary and that responding to individual requests for information is unduly burdensome.

Certain trusts have resisted discovery in bankruptcy cases as well. In connection with proceedings to estimate W.R. Grace's liabilities for asbestos personal injury claims, the debtor sought discovery of claims submitted to a number of trusts by claimants who also asserted exposure to W. R. Grace's products. Several trusts, including the Celotex Trust, opposed the debtor's subpoenas.[110] Based on the language in the Celotex Claims Resolution Procedures purporting to provide that "[a]ll materials, records and information submitted by claimants… are confidential, submitted solely for settlement purposes" and asserting both attorney-client privilege and work product immunity, the Celotex Trust refused to produce any documents.[111] The Dresser Trust also refused to produce any documents requested by Grace, in part, relying on similar confidentiality language in [section 8.4] of the Dresser TDPs. The court ruled that Grace was entitled to production of such information, subject to confidentiality restrictions, for use in connection with the estimation of W.R. Grace's asbestos personal injury liability for plan feasibility purposes.[112]

A singular exception is the Manville Trust. Its new TDPs (in effect since 2002) provide that the Trust shall provide verification of settlement information in response to a codefendant request. No later than the start of jury selection in the trial of an action by the claimant against the codefendant, the Trust will verify the fact of any settlement or any filing by the claimant of a claim with the Trust and shall provide information regarding the amount and terms of any such settlement at the time and with the detail required by applicable law.[113]

Viewing the practices uncovered in *Kananian* as the exception rather than the rule, peripheral defendants still may be able to discover more complete and accurate information from the individual trusts than from

© 2008 by Thomson/West.

SECTION 524(G) ASBESTOS TRUSTS                                         **277**

the parties themselves. However, pursuant to the confidentiality provisions of various trusts' TDPs and the trusts' general unwillingness to release individual claims information, many trusts will refuse to produce such information absent a court order.[114]

## IV. PRACTICAL STEPS TO RESTORE FAIRNESS BY ENSURING TRANSPARENCY BETWEEN THE TRUST AND TORT SYSTEM

Under the comparative fault rules now prevalent in a substantial majority of states, defendants' access to evidence of the existence and culpability of other responsible but insolvent parties and recoveries from 524(g) trusts is crucial, especially where states allow solvent asbestos defendants to effectively bring bankrupt entities before the jury for purposes of allocating comparative responsibility. This is especially so both because these absent defendants may well bear paramount culpability for the claimant's injuries and because the claimant has a right to monies from their bankruptcy trusts. Indeed, if juries are prevented from meaningful consideration of the culpability of bankrupt entities, solvent defendants might unfairly be assigned liability exceeding the joint and several thresholds of some states. Moreover, even in the remaining joint and several liability states, defendants generally are entitled to judgment reduction credits for a claimant's settlements with joint tortfeasors.[115]

As nonbankruptcy courts are increasingly recognizing, fundamental fairness requires that tort system defendants be afforded access to claiming and payment information concerning the 524(g) trusts. From the liability perspective, tort defendants should be permitted to access and use this information to help to demonstrate that they do not bear legal liability for a plaintiff's injuries or, where liability is established to some degree, to put into perspective their relative fault in relation to the overall culpability of all tortfeasors. Additionally (or, in some states, alternatively), defendants should be allowed dollar-for-dollar credit for the payments made (or to be made) to claimants by the 524(g) trusts.

To restore integrity to the claiming processes in both the trust and tort systems, 360-degree disclosure of trust claiming and payment information both to tort defendants and the trusts will provide much-needed illumination of the entire claiming process. Peripheral defendants will be able to better establish their correct liability in the tort system, and the unseemly claiming abuses against the trusts, epitomized by the *Kananian* case, will be discouraged. Certainly, neither system should tolerate, much less encourage, the compensation of claimants based upon shifting or contradictory accounts of their asbestos exposure or of the seriousness of their claimed diseases.

© 2008 by Thomson/West.

## A. MANDATORY DISCLOSURES BY ALL ASBESTOS PLAINTIFFS

When an asbestos claimant files a lawsuit in the tort system, by definition he places at issue his medical condition and employment/exposure history. Likewise, the compensation that he has received or may receive from other allegedly responsible parties is placed at issue by his filing suit. It is only fair, therefore, that such a claimant be required to provide full disclosure and facilitate full access to relevant information at the outset of any lawsuit. It is not unusual for courts to require an asbestos plaintiff to provide a detailed work history and statement of products to which he claims to have been exposed, along with evidence of medical diagnoses. While this may be a good start, it does not go nearly far enough.

Whether by statute, court rule, or standing order, asbestos plaintiffs should be required to make the following automatic mandatory disclosures at the outset of any tort case:

1.   The plaintiff should be required to identify all 524(g) trusts against which the plaintiff has made or intends to assert[116] a claim for compensation.[117] This should specifically include any claims that were submitted to a trust but subsequently were withdrawn.[118]

2.   The plaintiff should be required to identify all sums received from each 524(g) trust to which the plaintiff has made a claim. In addition, the plaintiff should be required to identify all recoveries that he anticipates receiving from any trust.

3.   The plaintiff should be required to identify and produce copies of all claims submissions and other communications sent by or on behalf of the plaintiff to any 524(g) trust.

4.   The plaintiff should be required to produce all communications concerning the payment, nonpayment, or status of claims submitted to a 524(g) trust.

5.   The plaintiff should be required to identify all pending bankruptcies in which the plaintiff has asserted or plans to assert a claim against one or more debtors. This should include identification of all cases in which the plaintiff's interests are being represented by any law firm together with production of copies of any statements filed by such counsel pursuant to Fed. R. Bankr. P. 2019.[119]

6.   The plaintiff should be required to identify any other entities from which he has recovered or expects to recover money for his alleged injuries. For example, certain companies have "inventory deals" with certain plaintiff lawyers pursuant to which they

© 2008 by Thomson/West.

privately pay to settle claims on the basis of pre-agreed criteria and are not named as defendants in the plaintiff's lawsuits.

7. The plaintiff should be required to identify any other attorney or law firm other than counsel of record that represents or previously has represented him in connection with efforts to recover for his alleged injuries.

Both the plaintiff (or legal representative if deceased) and his counsel should be required to verify under oath the accuracy and completeness of the disclosures. To prevent evasion, courts should take such steps as conditioning a plaintiff's ability to commence discovery or to secure a trial listing upon compliance with plaintiff's disclosure obligations.

Plaintiffs also should be required to provide the defendants with blanket written authorizations to facilitate the production of potentially relevant information from sources that otherwise are likely to resist on confidentiality grounds. In addition to authorizing access to medical, hospital, and employment records, such an authorization would permit defendants to obtain claims submission and payment information from 524(g) trusts (as well as any other nondefendant from which the plaintiff had sought or obtained compensation for his alleged injuries).

## B. TRUSTS SHOULD BE SUBJECT TO THE SAME OBLIGATIONS TO PROVIDE EVIDENCE AS ANY ENTITY

First-party discovery is normally the primary focus in any case. Third-party discovery is also important, both as a source of discovery of additional potentially relevant information and as a means of testing the completeness and accuracy of a party's discovery responses. If anything, third-party discovery takes on added importance in asbestos litigation where plaintiffs themselves frequently rely on third-party discovery to reconstruct work histories and the presence of a defendant's products at a work site.

Section 524(g) trusts are fertile sources of potentially relevant information regarding claims made by trust beneficiaries who also are suing solvent defendants in the tort system. Accordingly, the trusts, like any other entity, should be subject to the law's demands for the production of "every man's evidence."[120] Like any other third party subject to a subpoena, there are rules and procedures in every court to ensure that the trusts are not subject to undue burden and expense. Likewise, whatever confidentiality concerns may exist can be addressed by stipulation or order.

Thus there is no justification for trusts to incorporate into trust agreements or TDPs artificial barriers to such discovery. Moreover, attempts

© 2008 by Thomson/West.

to provide for continuing bankruptcy jurisdiction over discovery requests directed toward 524(g) trusts are improper and, indeed, in our view, exceed the extremely limited subject matter jurisdiction of bankruptcy courts postconfirmation. Each of the trusts is a creature of state (usually Delaware) law. Just like the reorganized corporate debtor, upon confirmation of the plan of reorganization, bankruptcy court jurisdiction over it shrinks dramatically.[121] It shrinks still further once the plan is consummated.[122]

Whatever limited jurisdiction may properly be reserved to the bankruptcy courts to continue to oversee matters of trust governance, bankruptcy courts may not properly meddle in matters such as discovery subpoenas issued by a state court to a trust organized under state law.[123] "A court cannot write its own jurisdictional ticket."[124] Yet this is exactly what bankruptcy courts are attempting to do when they approve TDPs, such as the proposed Federal Mogul TDPs (quoted above) and similarly worded TDPs, that purport to require anyone seeking trust discovery to obtain subpoenas from the bankruptcy court. Bankruptcy courts should refuse to place their imprimatur on such naked, and improper, attempts to stymie legitimate legal process issued by state courts that, unlike the bankruptcy courts, have general jurisdiction. Fortunately, in light of the above-described success of the Federal Mogul objectors in obtaining modifications to such TDP provisions, the authors foresee tort system defendants raising additional challenges to efforts by the asbestos claimants to insert similar provisions into TDPs in other bankruptcy cases.

Moreover, trusts clearly are on notice that their beneficiaries are likely to be suing tort system defendants for the same injuries for which they collected from the trusts. Indeed, some are doubtless represented by the law firms whose partners sit on the trusts' TACs. Trusts therefore should be subject to the same obligations as anyone else to preserve potential evidence and should be subject to the same sanctions for spoliation. Courts also should take a dim view of any trust that is found to have improperly instituted opportunistic document/data destruction policies.

## C. TRUSTS AND THEIR TDPS SHOULD BE REFORMED TO ENCOURAGE TRANSPARENCY AND GUARD AGAINST IMPROPER CLAIMING

Trustees of the 524(g) trusts owe a fiduciary duty to deny improper claims that dilute the payments to the true beneficiaries and diminish assets available to pay future claimants. As shown, the 524(g) trusts currently are ill-suited to combat dubious claims submissions. It would behoove the trusts to establish a clearinghouse for sharing information about the disease and exposure information being submitted to the trusts

© 2008 by Thomson/West.

by each claimant. Such a clearinghouse would permit trusts to quickly identify and weed out claimants such as Harry Kananian, whose false claims induced hundreds of thousands of dollars in improper trust payouts. Likewise, it is within the power of the trustees to amend TDPs on a trust-by-trust basis to require claimants to submit information concerning their claims against other trusts. Failure to establish such simple checks on inconsistent claiming merely invites continued abuses.

Due at least in part to the opacity of the trust claiming system, trusts for years paid tens of thousands of dubious claims on the basis of x-ray reports signed by a small group of "B-reader" doctors that attested that claimants had asbestos-related diseases. It was not until a number of these doctors and the attorneys and "screening" firms that paid them branched out into "diagnosing" silicosis in massive numbers of claimants (many of whom were repeat customers, having previously recovered from asbestos trusts by claiming to suffer from asbestosis)[125] that a federal court judge, Judge Janis Jack, carefully scrutinized their conduct. In a scathing 249-page opinion, Judge Jack concluded that there was no growing silicosis epidemic but instead an "epidemic" of plaintiffs' lawyers, "medical screening" companies, and complicit doctors "diagnosing for dollars" to manufacture spurious silicosis claims on a grand scale.[126]

The broad media reporting of Judge Jack's exposure of widespread bogus claiming sparked criminal and congressional inquiries at which the suspect doctors refused to testify, invoking their Fifth Amendment rights.[127] In the wake of all this, some trusts finally have begun their own crackdown on claims submitted on the strength of B-reads performed by the discredited doctors.[128] Claims Resolution Management Corporation, the manager of the Manville Personal Injury Settlement Trust, announced in September 2005 that it would no longer accept medical reports prepared by the suspect doctors and screening companies. Several other trusts, including the Eagle-Picher, Celotex, Halliburton (DII Industries), and Keene Creditors Trusts, later followed Manville's lead.[129] Such actions are welcome news. Yet one cannot help but wonder whether these bogus claiming patterns might have been ferreted out years earlier had a mechanism existed for the sharing of claims information among the trusts, preventing untold millions from being diverted from the truly sick to pay spurious claims.

Bankruptcy courts must also do their part to avoid the creation of structural impediments to legitimate inquiries by tort system defendants into the claiming histories of the plaintiffs who are suing them. Bankruptcy courts should refuse to approve plan provisions that purport to

© 2008 by Thomson/West.

interfere with legitimate state court discovery efforts directed toward the 524(g) trusts. Further, bankruptcy courts should strike provisions that artificially attempt to define trust claim submissions as "settlement communications" in an effort to shield them from discovery and admissibility against the plaintiffs in the tort system.

## D. PLAINTIFFS SHOULD NOT BE PERMITTED TO PROFIT IN THE TORT SYSTEM BY MANIPULATING THE TIMING OF TRUST SUBMISSIONS

While the evidence is only anecdotal at this point, there most certainly is at least some incentive for plaintiffs to delay their submission of claims to trusts while they pursue solvent defendants in the tort system. The goal is to maximize the damage recovery from tort defendants by preventing a judgment reduction on account of recoveries from 524(g) trusts. Along with arguments of privilege, delaying trust submissions is the other primary method used by plaintiffs' attorneys to prevent tort defendants and the courts from discovering trust submissions and recoveries.[130] There is no legitimate reason, however, why courts cannot account for these recoveries, which are highly predictable on the basis of the TDPs of the various 524(g) trusts.

Even including the trusts that are anticipated to be formed in the pending bankruptcies, the number of 524(g) trusts will number fewer than 100. Each has TDPs that are publicly available, many on the Internet. While the specific disease and product identification criteria vary somewhat from trust to trust, it is generally possible to identify the trusts against which a plaintiff qualifies for compensation by comparing information gleaned from his claimed exposure and illness and supporting work and medical records. If the evidence supports a finding that a plaintiff qualifies for a payment from a trust, the tort defendants that he is suing should be entitled to a judgment reduction in the amount of the presumptive payment from that trust whether or not the plaintiff has asserted a claim. Courts therefore should permit defendants to obtain judgment reductions by submitting appropriate evidence of a plaintiff's entitlement to compensation from a trust.[131]

Moreover, in situations where tort defendants have not been permitted to adjust their liability to account for trust recoveries, those defendants should be subrogated to the plaintiff's rights to future recoveries from 524(g) trusts. Such subrogation rights should be declared in any judgment such that the defendants can notify each of the 524(g) trusts of their interest in any future claim by that plaintiff.

© 2008 by Thomson/West.

# CONCLUSION

Substantial strides have been made through state tort reform legislation toward establishing tort compensation systems that more closely match the financial liability of a tort defendant to its relative culpability for a claimant's injuries. Such reforms are especially appropriate in asbestos litigation because large numbers of the most culpable defendants have exited the tort system through bankruptcy. Further, as more and more trusts come online, a parallel compensation system now exists through which these bankrupt entities are in fact paying significant amounts.

As has been shown, open communication between the two systems is necessary on a number of levels. First, discovery of claiming information against trusts provides an important source of potential evidence for defendants in comparative liability jurisdictions. Second, discovery of trust payments provides defendants with a basis for seeking judgment reduction credits, even in those states retaining joint and several liability rules. Third, as "[s]unlight is said to be the best disinfectant,"[132] transparency discourages claimants from falsifying their exposure histories in an effort to expand the number of tort defendants and 524(g) trusts against which they assert claims. Preventing such efforts to game the system will provide an important disincentive to efforts to impose grossly disproportionate liability upon ever more peripheral defendants in the tort system. Further, it will help to prevent "double-dipping" in the trust system which unfairly reduces compensation to meritorious present and future claimants.

## NOTES

1.    Stephen J. Carroll et al., Asbestos Litigation xxvii (RAND Inst. for Civil Justice 2005), available at http://www.rand.org/publications/MG/MG162 [hereinafter RAND Rep.] ("Between 2000 and mid-2004, there were 36 bankruptcy filings, more than in either of the prior two decades"). Enacted by Congress in 1994, 11 U.S.C.A. §524(g) authorizes companies plagued by mass asbestos claims to establish and fund a trust to address and pay all present and future claims while the reorganized company is discharged from further liability to the claimants.

2.    See Martha Neil, Backing Away from the Abyss, ABA J., Sept. 2006, at 26, 29; see also In re Combustion Engineering, Inc., 391 F.3d 190, 201, 43 Bankr. Ct. Dec. (CRR) 271, Bankr. L. Rep. (CCH) P 80206 (3d Cir. 2004), as amended, (Feb. 23, 2005) ("For some time now, mounting asbestos liabilities have pushed otherwise viable companies into bankruptcy").

3.    Am. Acad. of Actuaries' Mass Torts Subcomm., Overview of Asbestos Claims and Trends 5 (Aug. 2007), at http://www.actuary.org/pdf/casualty/asbestos_aug07.pdf [hereinafter Am. Acad. of Actuaries' Mass Torts Subcomm.].

4.    These debtors include Armstrong World Industries (Armstrong), Federal Mogul, G-I Holdings, Kaiser Aluminum, Owens Corning Corp./Fibreboard (OCF), Pittsburgh-Corning, USG Corp. (USG), W.R. Grace, and Babcock & Wilcox Co. For an in-depth review of these and other companies that have sought bankruptcy protection, see Mark D. Plevin et al., Where Are They Now, Part Four: A Continuing History of the Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims, 6:4 Mealey's Asbestos Bankr. Rep. (Feb. 2007).

© 2008 by Thomson/West.

5.   For example, in 2006, courts confirmed plans for OCF, USG, and Babcock & Wilcox, establishing trusts with estimated values of $4.99 billion, $4 billion and $2.11 billion, respectively, while Babcock & Wilcox's plan, confirmed in December 2005, resulted in a trust worth approximately $1 billion. See Plevin, 6:4 Mealey's Asbestos Bankr. Rep. (Feb. 2007) at 5-6.

6.   Mesothelioma claimants paid at the payment percentage of the scheduled value will receive the following payouts: $86,000 from the OCF Asbestos Personal Injury Settlement Trust, see http://www.ocfbasbestostrust.com/default.asp (follow "More Downloads" and "Instructions for Filing a Claim"); $69,750 from the USG Asbestos Personal Injury Trust, see http://www.usgasbestostrust.com/ (follow "More Downloads" and "Instructions for Filing a Claim); $30,600 from the Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust, see http://www.bwasbestostrust.com/ (follow "Instructions for Filing"); $26,750 from the Kaiser Asbestos Personal Injury Trust, see http://www.kaiserasbestostrust.com/ (follow "Resources" and "Instructions for Filing a Claim"); $22,000 from the Armstrong Asbestos Trust, see http://www.armstrongworldasbestostrust.com/ (follow "Instructions for Filing"). Claimants filing an Individualized Review Claim under the Celotex Asbestos Settlement Trust can receive a scheduled value of $100,000 and a maximum allowed claim of $250,000, subject to a 12% payment percentage. See http://www.celotextrust.com/default.asp (follow "Resources" and "Downloads" and "Instructions for Filing a Claim"). The average value for mesothelioma claims under the Individualized Review Claims process in the DII Industries, LLC Asbestos Personal Injury Trust is $28,700 for Halliburton entities and $68,400 for Harbison-Walker entities. The maximum values are $95,700 and $228,000, respectively. See http://www.diiasbestostrust.org/ (follow "IR Claim Values").

7.   Indeed, some economists have suggested that the 524(g) trusts collectively may provide full compensation to asbestos claimants. See Charles E. Bates & Charles H. Mullin, Having Your Tort and Eating It Too?, 6:4 Mealey's Asbestos Bankr. Rep. 1 (Nov. 2006) ("For the first time ever, trust recoveries may fully compensate asbestos victims").

8.   See Griffin B. Bell, Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis, 6:6 Briefly 4 (Nat'l Legal Center for the Pub. Interest June 2002); Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L. Rev. 331 (2002); Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1 (2001).

9.   See, e.g., Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 4 Envtl. L. Rep. 20133 (5th Cir. 1973) (landmark case allowing construction workers injured by asbestos exposure to file product liability suits against manufacturers in addition to workers compensation claims against their employers). The targeting of peripheral defendants in recent years has resulted in substantial jury verdicts in asbestos personal injury claims. In November 2006, a New York jury awarded $25 million in damages to a brake repairman who contracted mesothelioma as a result of exposure to asbestos while stripping and relining brakes in an auto repair shop. D'Ulisse v. DaimlerChrysler, No. 113838/04 (N.Y. County Sup. Ct.). In Hernandez v. Kelly-Moore Paint Co. Inc., No. 2000-3559 (Tex. El Paso County Dist. Ct. Aug. 30, 2001), a Texas jury ordered a paint manufacturer to pay a mesothelioma plaintiff $55.5 million, which included $15 million in punitive damages. In Hutcheson v. Shell Wood River Refining Co., No. 99L450 (Ill. Dist. Ct. May 19, 2000), an Illinois jury ordered Shell Oil to pay $34.1 million to a roofer who developed mesothelioma from exposure to asbestos contained in roofing materials on Shell-owned buildings. A popular asbestos defendant in recent years, John Crane Inc.—a former manufacturer of asbestos pump and valve packing and a distributor of asbestos gaskets—has suffered notable verdicts of $5.5 million (of a $9 million total verdict) and $3.4 million (of a $10.4 million total verdict) in Virginia (see Oney v. John Crane, Inc., No. 00301TF (Va. Newport News Cir. Ct. Apr. 2007) and John Crane, Inc. v. Jones, No. 062164 (Va. Newport News Cir. Ct. July 2006), respectively) and $22 million in New York, see In re New York Asbestos Litigation, 28 A.D.3d 255, 812 N.Y.S.2d 514 (1st Dep't 2006) (affirming December 2004 verdict but finding award excessive).

10.   For example, important tort reforms were passed in 2003 in Ohio (see Ohio Rev. Code §2307.22)) and Texas (see Tex. Civ. Prac. & Rem. Code §33.013), in 2004 in Mississippi (see Miss. Code Ann. §85-5-7), and in 2005 in West Virginia (see W. Va. Code Ann. §55-7-24). These and other reforms that eliminated or modified joint and several liability are discussed in

© 2008 by Thomson/West.

more detail in section II, infra. For a general discussion of improvements in the tort system over the past several years, see Mark A. Behrens & Phil Goldberg, The Asbestos Litigation Crisis: The Tide Appears to Be Turning, 12 Conn. Ins. Law J. 477 (2006).

11. Kananian v. Lorillard Tobacco Company, No. CV 442750 (Ohio Cuyahoga County Com. Pl. Jan. 18, 2007).

12. See Thomas J. Sheeran, Ohio Judge Bans Calif. Lawyer in Asbestos Lawsuit, Cin. Post, Feb. 20, 2007, at A3, available at 2007 WLNR 3452493; see also Editorial, Going Too Far, Columbus Dispatch, Feb. 7, 2007, at 8A, available at 2007 WLNR 2355381.

13. See Peter Geier, Allegations of Conflicting Claims in Tobacco Case, 28:34 Nat'l L.J. 6 (May 1, 2006); Kimberly Strassel, Editorial, Trusts Busted, Wall St. J., Dec. 5, 2006, at A18, abstract available at 2006 WLNR 21034229; Editorial, Cuyahoga Comeuppance, Wall St. J., Jan. 22, 2007, at A14, abstract available at 2007 WLNR 1291484; Matthew Hirsch, Judge: Firm Submitted Fraudulent Claim Forms, 235: 14 Legal Intelligencer 4 (Jan. 22, 2007).

14. Actual payments are based upon a fractional payment percentage, which may be varied periodically, and is designed to ensure that the corpus of the trust is not depleted prematurely, leaving future claimants with nothing. By way of example, if a mesothelioma claim is valued by a trust at $100,000 and the trust's payment percentage is 40%, the claimant will receive $40,000 in satisfaction of his claim against the trust.

15. While a claimant theoretically could wind up suing a trust in the tort system, as a practical matter, this rarely happens because a claimant must first go through multiple layers of claims evaluation by the trust and then faces significant limitations on his ability to actually collect on any eventual verdict.

16. These problems are particularly acute in "pre-packaged" bankruptcies, as critiqued in detail in Mark D. Plevin et al., Pre-Packaged Asbestos Bankruptcies, A Flawed Solution, 44 S. Tex. L. Rev. 883 (2003); cf. Ronald Barliant, Dimitri G. Karcazes & Anne M. Sherry, From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies, 12 Am Bankr. Inst. L. Rev. 441 (2004).

17. Deposition Transcript of Perry Weitz dated September 2, 2003, p. 309, Congoleum Corp. v. ACE Am. Ins. Co., No. MID-L-8908-01 (N.J. Super. Ct. Law Div.) (on file with authors).

18. Lawyers with the plaintiffs' law firm of Baron & Budd sit on at least nine bankruptcy trusts and the New York firm Weitz & Luxenberg are involved in at least seven. See Daniel Fisher, Double-Dippers, Forbes, Sept. 4, 2006, at 136, available at 2006 WLNR 14713659.

19. In practice, the FCR is nominated by the claimant and debtor constituencies. This is "problematic because having a weak futures representative is in the interest of both the debtor and the current claimants." Francis E. McGovern, Asbestos Legislation II: Section 524(g) Without Bankruptcy, 31 Pepp. L. Rev. 233, 248 (2004); see also Frederick Tung, The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry, 3 Chap. L. Rev. 43, 60 (2000). This also creates a due process problem, as another commentator aptly noted in the class action context: "If, as was implicit in *Amchem* and fleshed out expressly in *Ortiz*, the normal adversarial processes are an important guarantor of noncollusion in binding class action settlements, then the absence of a truly adversarial relation between the parties dooms this important guarantee that representation will be adequate." Samuel Issacharoff, Governance and Legitimacy in the Law of Class Actions, 1999 Sup. Ct. Rev. 337, 388 (1999); see also Mark D. Plevin et al., The Future Claims Representative in Prepackaged Asbestos Bankruptcies: Conflicts of Interest, Strange Alliances and Unfamiliar Duties for Burdened Bankruptcy Courts, 62 N.Y.U. Ann. Surv. Am. L. 271 (2006).

20. Deposition Transcript of Perry Weitz dated June 25, 2004, pp. 73-82, In re Congoleum Corp., No. 03-5124 (Bankr. D.N.J.) (on file with authors); see generally Victor E. Schwartz et al., Defining the Edge of Tort Law in Asbestos Bankruptcies: Addressing Claims Filed by the Non-Sick, 14:1 J. Bankr. L. & Prac. 61 (2005).

21. The current TDPs for the Johns Manville Trust are at least a partial exception to the rule. Approved by the supervising judge in 2002, these TDPs replaced far laxer TDPs that attracted tens of thousands of claims annually, many of dubious provenance, that threatened to exhaust the trust's assets decades prematurely. The adoption of the 2002 TDPs was followed by a drop in annual claims against the trust from 100,900 in 2003 (the last year claimants could rely upon the

© 2008 by Thomson/West.

prior 1995 TDPs) to 14,600 claims in 2004. See http://www.mantrust.org (follow "State of the Trust—Summary of the Quarterly Filings to the Court," and "Year Ended December 31, 2004"). This decline continued in subsequent years. See http://www.mantrust.org (follow "State of the Trust—Summary of the Quarterly Filings to the Court," and "Year Ended December 31, 2005").

22.   Section 6.5 of the proposed Federal-Mogul TDPs (on file with authors).

23.   Section 6.5 of the proposed Federal-Mogul TDPs (on file with authors).

24.   Section 6.5 of the proposed Federal-Mogul TDPs (on file with authors).

25.   These include the TDPs of Babcock & Wilcox, DII Industries, LLC (f/k/a Dresser Industries, Inc.) (Dresser), USG, and Armstrong.

26.   Section 6.5 of the final Federal-Mogul TDPs (on file with authors). Additional helpful modifications were made to clarify that the TDPs are not intended to shield asbestos plaintiffs from compliance with their own discovery obligations in the tort system: "Nothing in the TDP, the Plan, or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in an underlying civil action regarding his or her compensation of factual information to the Trust for the purpose of obtaining compensation for asbestos-related injuries from the Trust." Section 6.5 of the proposed Federal-Mogul TDPs (on file with authors).

27.   Kananian v. Lorillard Tobacco Company, No. CV 442750 (Ohio Cuyahoga County Com. Pl. Jan. 18, 2007).

28.   Kananian v. Lorillard Tobacco Company, No. CV 442750 (Ohio Cuyahoga County Com. Pl. Jan. 18, 2007).

29.   Kananian v. Lorillard Tobacco Company, No. CV 442750 (Ohio Cuyahoga County Com. Pl. Jan. 18, 2007), slip op. at 9-10.

30.   Kananian v. Lorillard Tobacco Company, No. CV 442750 (Ohio Cuyahoga County Com. Pl. Jan. 18, 2007), slip op. at 5-9.

31.   This statement was recorded in a March 22, 2006 e-mail from Brayton Purcell lawyer Christopher Andreas to partner Alan Brayton. See Fisher, Forbes, Sept. 4, 2006, at 136, available at 2006 WLNR 14713659; see also James F. McCarty, Judge Becomes National Legal Star, Cleveland Plain Dealer, Jan. 25, 2007, at B1, available at 2007 WLNR 1527886. Indeed, internal e-mails between Kananian's counsel reflected their knowledge that their client had accepted payments from entities to which he was not exposed. See E-mail from Brayton Purcell's Ohio counsel, Bruce Carter, to Brayton Purcell lawyer Christopher Andreas, in Exhibit 3 to Lorillard's Motion to Dismiss, or in the Alternative, to Disqualify Chris Andreas and the Brayton Purcell Firm (Ohio Cuyahoga County Com. Pl.) (motion filed Nov 13, 2006) (on file authors).

32.   Kananian, slip op. at 18-19. Ohio's Eighth District Court of Appeals and the Ohio Supreme Court dismissed Brayton Purcell's appeal as moot. See Kananian v. Lorillard Tobacco Co., No. 89528 (Ohio Ct. App. July 13, 2007), review denied, No. 2007-16770 (Ohio Dec. 26, 2007).

33.   In the latest twist, the Kananian estate has sued Brayton Purcell and Early Ludwick and Sweeney for malpractice, alleging that the estate's claims against Lorillard were devalued as a result of the submission of fraudulent trust claims by these law firms. See Kananian v. Brayton Purcell, LLP, CV 07 637691 (Ohio Cuyahoga County Com. Pl.).

34.   In another example of a mesothelioma claimant's asserting inconsistent exposure stories to trusts and in court, James Dunford, represented by Weitz & Luxenberg of New York, claimed in a lawsuit against auto parts manufacturers that his disease was caused by exposure to auto friction products during a two-year stint working at gas stations. Earlier, however, Dunford had recovered from several bankruptcy trusts of former building-supplies manufacturers by claiming that his disease was due to his exposure as a construction worker. After discovering that Dunford and his counsel had improperly failed to disclose his claiming history against the trusts, a Loudoun County, Virginia, judge threw out Dunford's suit. See Fisher, Forbes, Sept. 4, 2006, at 136, available at 2006 WLNR 14713659.

35.   The Congressional Budget Office observed that asbestos suits have expanded "from the original manufacturers of asbestos-related products to include customers who may have used those products in their facilities." Congress of the United States, Congressional Budget Office, The Economics of U.S. Tort Liability: A Primer 8 (Oct. 2003). Many of these defendants

© 2008 by Thomson/West.

SECTION 524(G) ASBESTOS TRUSTS                                                287

are familiar household names. See Susan Warren, Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps, Wall St. J., Apr. 12, 2000, at B1, abstract available at 2000 WLNR 2042486. Other defendants include small businesses facing potentially devastating liability. See Susan Warren, Plaintiffs Target Companies Whose Premises Contained Any Form of Deadly Material, Wall St. J., Jan. 27, 2003, at B1. At least one company in nearly every U.S. industry is now involved in asbestos litigation. See Am. Acad. of Actuaries' Mass Torts Subcomm., at http://www.actuary.org/pdf/casualty/asbestos_aug07.pdf, at 5. Nontraditional defendants now account for more than half of asbestos expenditures. See RAND Rep., available at http://www.rand.org/publications/MG/MG162, at 94. One well-known plaintiffs' attorney has described the litigation as an "endless search for a solvent bystander." 'Medical Monitoring and Asbestos Litigation'—A Discussion with Richard Scruggs and Victor Schwartz, Mealey's Litig. Rep.: Asbestos, Vol. 17, No. 3, at 5 (Mar. 1, 2002) (quoting Mr. Scruggs).

36.   In explaining the historical development of claims against peripheral defendants in asbestos litigation, one commentator opined that the "key for [plaintiffs' lawyers] has been to focus on the bad acts of culpable parties like Manville to establish liability against new defendants while simultaneously avoiding any reduction in awards that would reflect the 'absence' of these dominant defendants." James L. Stengel, The Asbestos End-Game, 62 N.Y.U. Ann. Surv. Am. L. 223, 237 (2006).

37.   See, e.g., Bartel v. John Crane, Inc., 316 F. Supp. 2d 603, 611 (N.D. Ohio 2004), aff'd, 424 F.3d 488, 2005 A.M.C. 2425, 2005 FED App. 0400P (6th Cir. 2005) (rejecting single fiber theory as inconsistent with prevailing scientific evidence); Borg-Warner Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007) (rejecting single fiber theory as insufficient to satisfy "substantial factor" requirement for imposition of liability).

38.   See Richard L. Cupp, Jr., Asbestos Litigation and Bankruptcy: A Case Study for Ad Hoc Public Policy Limitations on Joint and Several Liability, 31 Pepp. L. Rev. 203 (2004).

39.   Indeed, the departure of defendants from the tort system via bankruptcy has created a vortex dragging more and more defendants into bankruptcy and ever more peripheral companies into the tort system as defendants. See Christopher Edley, Jr. & Paul C. Weiler, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. on Legis. 383, 392 (1993) (each time that a defendant declares bankruptcy, "mounting and cumulative" financial pressure is placed on the "remaining defendants, whose resources are limited").

40.   See Ohio Rev. Code §2307.22.

41.   For additional information concerning tort reforms in these and other states, see Steven B. Hantler et al., Is the "Crisis" in the Civil Justice System Real or Imagined?, 38 Loy. L.A. L. Rev. 1121, 1147-50 (2005) [hereinafter Hantler et al.].

42.   Prior to the enactment of tort reform, Mississippi had been a highly popular jurisdiction for asbestos claimants. More than 13% of all asbestos claims around the country were filed in Mississippi from 1998 to 2000, and the "prospect of hitting the jackpot in Mississippi had reportedly attracted over 49,000 plaintiffs to the state by 2002." Patrick M. Hanlon & Anne Smetak, Asbestos Changes, 62 N.Y.U. Ann. Surv. Am. L. 525, 550-52 (2007) [hereinafter Hanlon & Smetak].

43.   See Miss. Code Ann. §85-5-7. The relevant provisions state:

Section 85-5-7(2)—"the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tortfeasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault."

Section 85-5-7(5)—"In actions involving joint tortfeasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault without regard to whether the joint tortfeasor is immune from damages. Fault allocated under this subsection to an immune tortfeasor or a tortfeasor whose liability is limited by law shall not be reallocated to any other tortfeasor."

44.   Brown v. N. Jackson Nissan, Inc., 856 So.2d 692, 697 (Miss. App. 2003).

45.     For further discussion of the impact of tort reform in Mississippi, see Mark A. Behrens & Cary Silverman, Now Open for Business: The Transformation of Mississippi's Legal

© 2008 by Thomson/West.

Climate, 24 Miss. C. L. Rev. 393 (2005); David Maron & Walker W. (Bill) Jones, Taming an Elephant: A Closer Look at Mass Tort Screening and The Impact of Mississippi Tort Reforms, 26 Miss. C.L. Rev. 253 (2007); James A. Henderson, Jr., Asbestos Litigation Madness: Have the States Turned a Corner?, 3:7 Mealey's Tort Reform Update 23 (Jan. 18, 2006).

46.    Ohio Rev. Code Ann. §2307.22.

47.    Ohio Rev. Code Ann. §2307.23(A)(2).

48.    Ohio Rev. Code Ann. §2307.23(C).

49.    Transcript of January 29, 2007 argument and ruling by Judge Leo M. Spellacy at 33-35, Chester Link v. A-Best Prods., Co., CV-56305 (Ohio Cuyahoga County Com. Pl.) (on file with authors).

50.    Ohio Rev. Code Ann. §2307.23(C) states as follows:

For purposes of division (A)(2) of this section, it is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action. Any party to the tort action from whom the plaintiff seeks recovery in this action may raise an affirmative defense under this division at any time before the trial of the action.

51.    Transcript of January 29, 2007 argument and ruling by Judge Leo M. Spellacy at 33-35, Chester Link v. A-Best Prods., Co., CV-56305 (Ohio Cuyahoga County Com. Pl.) (on file with authors).

52.    Texas historically has been a popular jurisdiction for asbestos claimants. During the time period from 1993 through 1997, a staggering 44% of all asbestos claims were filed in Texas. See Hanlon & Smetak, 62 N.Y.U. Ann. Surv. Am. L. at 550.

53.    This state's 2003 tort reform further helped to level the scales of justice in what previously had been a highly unfavorable system for solvent asbestos defendants. While 1995 amendments to Texas tort law instituted a 50% minimum liability threshold for imposition of joint and several liability, an exception was made for toxic tort claims. Toxic tort defendants could be held jointly and severally liable if found more than 15% liable. See Former Tex. Civ. Prac. & Rem. Code §33.013(c)(2). Moreover, while a jury could consider "responsible third parties" when apportioning liability, bankrupt entities and worker's compensation employers were expressly ineligible for inclusion on the verdict sheet. See Former Tex. Civ. Prac. & Rem. Code §33.011(6). Thus, solvent asbestos defendants were placed at a serious disadvantage in trying to appropriately limit their share of liability.

54.    See Tex. Civ. Prac. & Rem. Code §33.013 (stating in relevant part: "(a) Except [when a defendant is jointly and severally liable], a liable defendant is liable to a claimant only for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed").

55.    Tex. Civ. Prac. & Rem. Code §33.013. The Texas statute is unique in that it also sets out the procedure for a defendant to identify responsible nonparties. Solvent asbestos defendants may file a motion for leave to designate a responsible third party "on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date" and establishes a presumption that the motion should be granted. See Tex. Civ. Prac. & Rem. Code §33.004.

56.    See Tex. Civ. Prac. & Rem. Code §33.012 ("(a)… the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility; (b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements").

57.    Roberts v. Williamson, 111 S.W.3d 113, 123 (Tex. 2003).

58.    Roberts v. Williamson, 111 S.W.3d at 123 n.7.

© 2008 by Thomson/West.

SECTION 524(G) ASBESTOS TRUSTS                                           **289**

59.    W. Va. Code §55-7-24. Relief from joint and several liability does not apply to: (1) alleged intentional tortfeasors; (2) alleged co-conspirators, (3) defendants who caused "the unlawful emission, disposal or spillage of a toxic or hazardous substance," or (4) defendants found strictly liable for the manufacture and sale of a defective product. W. Va. Code §55-7-24(b)(1)-(4).

60.    W. Va. Code §55-7-24(c)(4)(B).

61.    W. Va. Code §55-7-24(c)(6).

62.    W. Va. Code §55-7-24(a)(1).

63.    See Louk v. Isuzu Motors, Inc., 198 W. Va. 250, 479 S.E.2d 911, 927 n.14 (1996); Bowman v. Barnes, 168 W. Va. 111, 282 S.E.2d 613 (1981).

64.    See Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc., 182 W. Va. 597, 390 S.E.2d 796, 59 Ed. Law Rep. 1179 (1990).

65.    See Smith v. Monongahela Power Co., 189 W. Va. 237, 429 S.E.2d 643 (1993) (citing Cline v. White, 393 S.E.2d 923 (W. Va. 1990)).

66.    CPLR §1601(1).

67.    See In re Brooklyn Navy Yard Asbestos Litigation, 971 F.2d 831, Prod. Liab. Rep. (CCH) P 13245 (2d Cir. 1992) (claimants lacked jurisdiction over the responsible bankrupt entities due to the automatic stay provision of the Bankruptcy Code). See also Matter of New York City Asbestos Litigation, 175 Misc. 2d 819, 670 N.Y.S.2d 735 (Sup 1998).

68.    In re New York City Asbestos Litigation, 194 Misc. 2d 214, 750 N.Y.S.2d 469, 479 (Sup 2002), order aff'd, 6 A.D.3d 352, 775 N.Y.S.2d 520 (1st Dep't 2004).

69.    New York City Asbestos Litigation, 750 N.Y.S.2d at 471, 473-74.

70.    New York General Obligations Law §15-108 provides, in relevant part:

a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

71.    Didner v. Keene Corp., 188 A.D.2d 15, 593 N.Y.S.2d 238 (1st Dep't 1993), aff'd as modified, 82 N.Y.2d 342, 604 N.Y.S.2d 884, 624 N.E.2d 979 (1993); New York City Asbestos Litigation, 188 A.D.2d 214, 593 N.Y.S.2d 43 (1st Dep't 1993), order aff'd, 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993).

72.    Act of June 19, 2002, P.L. 394 (Act 57). The Act sought to amend the Comparative Negligence Act, 42 Pa. C.S. §7102. Under the Fair Share Act, a trial court would have had to enter a separate judgment against each defendant for the defendant's proportionate share of the total damages. The Fair Share Act also provided that a jury could be requested to apportion some liability to non-parties that had already entered into a release with the claimant.

73.    See DeWeese v. Weaver, 880 A.2d 54 (Pa. Commw. Ct. 2005), order aff'd, 588 Pa. 738, 906 A.2d 1193 (2006). The court found the Act unconstitutional on the ground that it violated a requirement of the Pennsylvania Constitution that legislative enactments be limited to a single subject (here, the changes to the comparative negligence provision were added as an amendment to a bill addressing DNA testing of sex offenders).

74.    Pennsylvania does not appear to be attracting significant numbers of new cases "migrating" from tort reform states, perhaps owing to the fact that Pennsylvania long has barred compensation to asymptomatics, Giffear v. Johns-Manville Corp., 429 Pa. Super. 327, 632 A.2d 880, 884, Prod. Liab. Rep. (CCH) P 13704 (1993), judgment aff'd, 543 Pa. 664, 674 A.2d 232, Prod. Liab. Rep. (CCH) P 14600 (1996), and to the judgment reduction rules next described. Pennsylvania's pure joint and several liability neighbor to the south, tiny Delaware, on the other hand, reportedly has experienced a significant upswing in cases filed by plaintiffs with no nexus to that state. See American Tort Reform Foundation, Judicial Hellholes 2006, at 25-26, available at http://www.atra.org/reports/hellholes/report.pdf (reporting on surge of asbestos personal injury filings in Delaware beginning in 2005) [hereinafter Judicial Hellholes Rep.].

© 2008 by Thomson/West.

In November 2007, the Delaware State Chamber of Commerce issued a letter to the President Judge of the Delaware Superior Court expressing growing concern over the alarming number of toxic-tort personal injury cases being filed in Delaware Superior Court by out-of-state law firms on behalf of out-of-state plaintiffs having no connection to Delaware. In response, the judge appointed a Special Committee on Superior Court Asbestos Litigation to examine the Chamber's concerns, review the current procedures for toxic tort claims, provide all interested parties an opportunity to provide input, and ultimately make recommendations to the court. That process has been underway since December 2007. (Correspondence and filings regarding these developments in Delaware are on file with the authors.)

75.     The relevant provision is found in Pennsylvania's Uniform Contribution Among Tortfeasors Act, 42 Pa.C.S. §§8321-27 (UCATA), at §8326. The Pennsylvania Supreme Court identified three set-off scenarios provided by UCATA. Baker v. ACandS, 562 Pa. 290, 755 A.2d 664, 667-68, Prod. Liab. Rep. (CCH) P 15841 (2000). "First, if the settlement agreement is silent, the set-off mechanism defaults to a pro tanto set-off and the nonsettling defendant is entitled to have the verdict reduced by the amount of consideration paid by the settling tortfeasor." Baker v. ACandS, 562 Pa. 290, 755 A.2d at 667-68. Second, UCATA will always enforce a designation in the settlement agreement for a pro tanto set-off. Third, where the agreement specifies a form of set-off other than pro tanto, such as a pro rata set-off, the non-settling defendant would be entitled to reduce the verdict in accordance with the settling defendant's apportioned share of liability. However, the pro rata election will only apply if it would yield a higher set-off than the actual settlement paid. Baker v. ACandS, 562 Pa. 290, 755 A.2d at 667-68. Because a claimant and a settling tortfeasor have the option to designate a pro rata set-off, courts have noted that a jury must consider the proportional share of damages of settling defendants. See Herbert v. Parkview Hosp., 2004 PA Super 287, 854 A.2d 1285, 1289-90 (2004).

76.     Baker v. ACandS, 562 Pa. 290, 755 A.2d at 668. Pennsylvania defaults to a pro rata set-off, meaning the remaining defendants must reallocate among them any shortfall of the settling defendant's proportionate share.

77.     Andaloro v. Armstrong World Industries, Inc., 2002 PA Super 112, 799 A.2d 71 (2002). In Andaloro, the trial court molded the verdicts to reflect the dismissal or absence of certain defendants, divided the verdict equally among the remaining defendants, and apportioned a pro rata share to the Manville Trust. Plaintiff appealed the assignment of verdict shares to non-settling defendants who were either dismissed pretrial or unrepresented, and argued for a pro tanto set-off for the share assigned to the Manville Personal Injury Settlement Trust. The Superior Court agreed, holding that "where the Manville Trust has not settled a plaintiff's claim prior to entry of a verdict against other joint tortfeasors, the value of the set-off available to the joint tortfeasors based on the Trust's unliquidated contribution, shall be calculated under the… TDP and applied to the verdict pro tanto." Andaloro, 2002 PA Super 112, 799 A.2d at 82; see also Donoughe v. Lincoln Elec. Co., 2007 PA Super 309, 936 A.2d 52 (2007) (reiterating that settlement with Manville Trust results in pro tanto set-off).

78.     See 735 Ill. Comp. Stat. 5/2-1117-1118. That statute provides that all defendants are jointly and severally liable for all past and future medical and medically related expenses. However, "[a]ny defendant whose fault, as determined by the trier of fact, is less than twenty-five percent of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages."

79.     See Lipke v. Celotex Corp., 153 Ill. App. 3d 498, 106 Ill. Dec. 422, 505 N.E.2d 1213, Prod. Liab. Rep. (CCH) P 11402 (1st Dist. 1987), appeal dismissed, 536 N.E.2d 71 (Ill. 1989). Under Lipke, if the plaintiff presents evidence that creates a jury question regarding exposure to the defendant's product, the court may presume as a matter of law that the exposure caused the plaintiff's injury, and any evidence of other exposure is irrelevant and inadmissible.

80.     See Nolan v. Weil-McLain, 365 Ill. App. 3d 963, 303 Ill. Dec. 383, 851 N.E.2d 281, 293 (4th Dist. 2006), appeal allowed, 222 Ill. 2d 577, 308 Ill. Dec. 326, 861 N.E.2d 657 (2006) (Steigmann, J., dissenting) ("only in Illinois would evidence of the other asbestos exposures in this case be precluded").

81.     The American Tort Reform Foundation's annual Judicial Hellholes report evaluating "America's most unfair jurisdictions" consistently ranks various Illinois counties in the top five. See Judicial Hellholes Rep., at 25-26, available at http://www.atra.org/reports/hellholes/report.pdf.

82.     For a detailed discussion of the travails of tort defendants in Madison County, Illinois, see Victor E. Schwartz et al., Asbestos Litigation in Madison County, Illinois: The Challenge

© 2008 by Thomson/West.

Ahead, 16 Wash. U. J. L. & Pol. 235 (2004); Hanlon & Smetak, , 62 N.Y.U. Ann. Surv. Am. L. at 552-55. Illinois' plaintiff-friendly reputation and, more particularly, that of Madison County makes it a desired destination for forum-shopping asbestos claimants from around the country. See Griffin B. Bell, Asbestos & The Sleeping Constitution, 31 Pepp. L. Rev. 1, 8 (2003).

83.     740 Ill. Comp. Stat. 100/2(c). See Betts v. Manville Personal Injury Settlement Trust, 225 Ill. App. 3d 882, 167 Ill. Dec. 1063, 588 N.E.2d 1193 (4th Dist. 1992) (allowing a set-off of a judgment against the Manville Trust based on earlier settlements entered into between the plaintiff's estate and other tortfeasors).

84.     The contribution provisions are usually found in section 5.5 or 5.6 of the various TDPs, including those of USG, Babcock & Wilcox, Armstrong, Federal-Mogul, Congoleum, OCF, Pittsburgh Corning, and Kaiser.

85.     See Manville TDPs, §I, pp. 18-26. (the Manville TDPs can be accessed at http://www. mantrust.org/FTP/C&DTDP.pdf (last visited Dec. 5, 2007)).

86.     See Manville TDPs, §I(1)(c).

87.     Manville TDPs, §I(1)(d). In addition to conceding its liability for the plaintiff's injuries, the Manville Trust will comply with applicable rules of discovery and disclose the amount that the plaintiff recovered from the Trust. See Manville TDPs, §I(1)(e), (f).

88.     See Manville TDPs, §I (2)(a).

89.     See Manville TDPs, §I (2)(a). The Manville TDPs contain detailed provisions regarding the calculation of the contribution claims. See Manville TDPs, §I (3)(a) to (f).

90.     Indeed, it is not unusual for an asbestos claimant to assert claims against 60 to 70 different defendants and bankruptcy trusts based on exposure to asbestos-containing products. See Lester Brickman, Ethical Issues in Asbestos Litigation, 33 Hofstra Law Rev. 833, 895 (2005); see also Hantler et al., 38 Loy. L.A. L. Rev. at 1151 (since 1982, number of asbestos defendants had increased from 300 to over 8,500).

91.     Volkswagen of America, Inc. v. Superior Court, 139 Cal. App. 4th 1481, 43 Cal. Rptr. 3d 723 (1st Dist. 2006).

92.     Volkswagen, 139 Cal. App. 4th at 1485.

93.     Volkswagen, 139 Cal. App. 4th at 1486. Volkswagen's request was based on knowledge that Rusk had submitted a claim to the Manville Trust and in the Chapter 11 proceedings involving Kaiser.

94.     Volkswagen, 139 Cal. App. 4th at 1486.

95.     Volkswagen, 139 Cal. App. 4th at 1486.

96.     The trial court reasoned that the documents signed by the attorneys were confidential settlement documents that would not be admissible at trial.

97.     Volkswagen, 139 Cal. App. 4th at 1490. Volkswagen's request "encompass[ed] all materials submitted on Rusk's behalf to the trust, including the amount of his claim, information concerning his work history and medical condition… and settlement proposals and statements that may have been made in connection with settlement negotiations." Volkswagen, 139 Cal. App. 4th at 1489-90.

98.     Volkswagen, 139 Cal. App. 4th at 1492. The court also rejected any arguments that putative privacy concerns of the trusts themselves existed to justify restricting the scope of the requested discovery, stating that "in this case no one has suggested that the bankruptcy trusts have any independent privacy concerns other than protecting the privacy interests of the claimants themselves, and the materials that Volkswagen seeks relate solely to Rusk." Volkswagen, 139 Cal. App. 4th at 1492, n.9.

99.     Volkswagen, 139 Cal. App. 4th at 1495. Finally, the court ruled that because true settlement proposals are inadmissible, "any such materials are subject to discovery only if Volkswagen can articulate another basis for admissibility or for reasonably believing they may lead to the discovery of evidence that is admissible." Volkswagen, 139 Cal. App. 4th at 1496. The parties would have to make a specific showing on an itemized basis as to whether such proposals are discoverable.

        Shortly after issuing the *Volkswagen* decision, the Court of Appeal again faced a petition for a writ of mandate from an asbestos defendant seeking to compel the production of trust information. Seariver Maritime, Inc. v. Super. Ct., 2006 Unpub. LEXIS 6596 (Cal. Ct. App. July 28, 2006). In Seariver, the trial court granted Seariver's motion to compel claim forms

that the plaintiff had submitted to eight bankruptcy trusts but ruled that "unverified" documents were privileged and constituted "inadmissible settlement information." Relying on Volkswagen, the court of appeals ruled that the claim forms were admissible, and the trial court had no basis to distinguish between verified and unverified claim forms. Because Seariver is unpublished, however, it is not citable in California state courts.

100.  Negrepont v. A.C.&S., Inc., No. 120894/01 (NY Sup. Ct., Dec. 11, 2003) (on file with authors); see also Drabczyk v. Amchem Prods., Inc., No. 2005/1583 (NY Sup. Ct., Jan. 18, 2008) (ordering the plaintiff to produce proof of claims forms submitted to bankruptcy trusts and holding that, regardless of their admissibility at trial, proof of claims forms are likely to lead to the discovery of admissible facts); Malcolm v. A.W. Chesterton Co., No. 2002-10666 (NY Sup. Ct. Dec. 30, 2005) (on file with authors).

101.  Link v. Ahlstrom Pumps, LLC, No. CV-05-565305 (Ohio Cuyahoga County Com. Pl. Dec. 1, 2006); In re Asbestos/Tireworker Litig. (Rachel Walk), No. ACV-90-02-0630 (Ohio Summit County Com. Pl.) (on file with authors). Judge Hanna also ordered proof of claim forms to be produced in Kananian v. Lorillard Tobacco Company, No. CV 442750.

102.  Duncan v. A.W. Chesterton, No. 2004-07671 (Tex. Harris County Dist. Ct. Dec. 14, 2006) ("the information and documents related to plaintiff's bankruptcy claims are discoverable"); Brassfield v. Alcoa, No. 2006-08035 (Tex. Harris County Dist. Ct. Nov. 22, 2006) (oral ruling that "[t]he Defendants are entitled to production of the applications from the trusts in order to introduce them into evidence at the trial of the case") (on file with authors).

103.  In re Stark: Frankowski v. A-B Elec. Supply Co., No. L-12453-97 (N.J. Middlesex County Super. Ct. Nov. 15, 2006) (on file with authors). Trial courts from other states have also ordered the production of trust submissions in asbestos exposure civil tort cases. See Miller v. PECO Energy Co., No. 50-07034450, 51-07014451 (Pa. Ct.Comm.Pl. April 16, 2007); Alvey v. 999 Quebec, Inc., No. 04CV200183 (Mo. Circuit Ct. March 19, 2007); Casper v. Dow Chemical Co., Cause No. 49D02-9801-MI-001-295 (Ind. Marion Superior Ct. Oct. 5, 2005); Poole v. ACandS, Inc., No. 24X04000077 (Md. Circuit Ct. Jan. 6, 2005) (on file with authors).

104.  In re Asbestos Pers. Injury Litig., Master File Civil Action No. 03-C-9600 (W. Va. Kanawha County Cir. Ct.) (on file with authors).

105.  In re Asbestos Litig., No. 77C-ASB-2, Standing Order No. 1, ¶ 7(l) (Del. Newcastle County Super. Ct.) (on file with authors).

106.  In re All Asbestos Cases, CV-073958 (Ohio Cuyahoga County Com. Pl., May 8, 2007).

107.  In re Asbestos Litig., No. 2004-03964 (Tex. Harris County Dist. Ct.) (on file with authors). Texas also has a procedural rule requiring the disclosure of settlement agreements. Texas Rule of Civil Procedure 194.2(h): a party may request disclosure of "any settlement agreements described in Rule 192.3(g)." Rule 192.3(g) defines the scope of discovery and provides: "(g) Settlement agreements. A party may obtain discovery of the existence and contents of any relevant portions of a settlement agreement. Information concerning a settlement agreement is not by reason of disclosure admissible in evidence at trial."

108.  See In re Asbestos Pers. Injury Litig., March 6, 2002 Master Order (Ky. Jefferson County Cir. Ct.); In re Massachusetts State Court Asbestos Litig., Special Master Order of April 12, 1994, overruling plaintiff's objections to Standard Interrogatories and Request for Production of Documents which included production of claim forms (on file with the authors).

109.  Motion Transcript at 32-33, Chester Link v. Ahlstrom Pumps, LLC, 06M-10-061 MMJ (Del. New Castle County Super. Ct. Dec. 7, 2006).

110.  The Manville Trust/Claims Resolution Management Corporation and W.R. Grace agreed to a protective order under which the Manville Trust provided certain electronic files to Grace on the condition that such material only be used by W.R. Grace in its bankruptcy case and otherwise be kept confidential (on file with authors).

111.  Celotex Claims Resolution Procedures, §VI, pp. 18-19. The Celotex Claims Resolution Procedures can be accessed at http://www.celotextrust.com/default.asp (follow "Claims Resolution Procedures").

112.  In re W.R. Grace & Co., No. 01-01139 (Bankr. D. Del. Oct. 3, 2007) (on file with authors).

113.  Manville TDP §I (1)(f). In light of the historical ubiquity of Manville's products, the Manville trust concedes exposure. See Manville TDPs, §I(1)(d). In addition to conceding its liability for the plaintiff's injuries, the Manville Trust will comply with applicable rules of

© 2008 by Thomson/West.

discovery and disclose the amount that the plaintiff recovered from the Trust. See Manville TDPs, §I(1)(e), (f).

114.   Not only will the Trusts themselves resist discovery, but plaintiffs may also try to prevent a defendant from serving a subpoena on a Trust by filing a motion to quash. In at least one notable jurisdiction, a court concluded that, absent a claim of privilege, a plaintiff has no standing to object to the subpoena of a non-party. Brothag v. A.W. Chesterton, Inc., No. 582979 (Ohio Cuyahoga County Com. Pl. Jan. 23, 2007) (on file with authors).

115.   Likewise, a defendant is entitled to assert indemnity/contribution claims against other jointly responsible parties. However, as discussed in section III, defendants will encounter numerous difficulties in the pursuit of contribution claims against trusts (other than Manville).

116.   See In re Asbestos Pers. Injury Litig., Master File Civil Action No. 03-C-9600 (W. Va. Kanawha County Cir. Ct.) (on file with authors), revealing that West Virginia's asbestos case management order already requires plaintiffs to "identif[y] those Defendants against which he/she or his/her estate… will be filing… in any bankruptcy proceeding."

117.   The duty of disclosure should be continuing such that a plaintiff must update his disclosures in the event that subsequent discovery reveals grounds to assert claims against additional trusts. Moreover, the disclosures should not be limited to 524(g) trusts but should encompass "true and complete copies of any application(s) for compensation for any alleged pneumoconiosis and/or any asbestos-related disease that have been filed by or behalf of the Plaintiff with any bankruptcy trusts." See Ohio's recent amendment to the asbestos case management order, In re All Asbestos Cases, CV-073958 (Ohio Cuyahoga County Com. Pl. May 8, 2007). As evidenced by the findings and conclusions of Judge Janis Graham Jack in the Texas federal court silica MDL proceedings, the extent of fraudulent claiming practices is not limited to the asbestos context. See In re Silica Products Liability Litigation, 398 F. Supp. 2d 563 (S.D. Tex. 2005). Among various disturbing findings, Judge Jack noted that the same physician who had diagnosed scores of plaintiffs with asbestosis (and not silicosis) in connection with prior asbestos litigation now diagnosed those same plaintiffs, years later, with silicosis. In re Silica Products Liability Litigation, 398 F. Supp. 2d at 608 ("This volume of reversals… simply cannot be explained as intra-reader variability"); see also Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 723 (D. Del. 2005) (many X-ray interpreters (called "B Readers") hired by plaintiffs' lawyers are "so biased that their readings [are] simply unreliable"); American Bar Association Commission on Asbestos Litigation, Report to the House of Delegates (2003), available at http://www.abanet.org/leadership/full_report.pdf (litigation screening companies find X-ray evidence that is "consistent with" asbestos exposure at a "startlingly high" rate, often exceeding 50% and sometimes reaching 90%); Joseph N. Gitlin et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 Acad. Radiology 843 (Aug. 2004) (B Readers hired by plaintiffs claimed asbestos-related lung abnormalities in 95.9% of the X-rays sampled, but independent B Readers found abnormalities in only 4.5% of the same X-rays).

118.   Absent express detailed requirements, claimants and their lawyers will continue to avoid disclosing their trust claiming histories and to resist their admissibility at trials in the tort system. In Bakkie v. Union Carbide Corp., No. A116231 & A116462, 2007 Cal. App. Unpub. LEXIS 9622 (Cal. App. Nov. 29, 2007), the defendant subpoenaed the Manville Trust seeking discovery of information submitted to the Trust. In the wake of the then newly-decided Volkswagen case, Bakkie (who, like the plaintiffs in Volkswagen and Kananian, was represented by the Brayton Purcell firm) withdrew the claim that he had submitted to the Manville Trust in an effort to avoid discovery of the claiming information. Although the defendant obtained the claim information, the trial court refused to admit the withdrawn claim into evidence. Unfortunately, the appellate court affirmed, invoking the deferential harmless error standard to avoid a principled discussion of the evidentiary point or the plaintiff's efforts to manipulate the discovery process.

119.   Bankruptcy Rule 2019 requires any law firm representing more than one creditor to "file a verified statement setting forth [inter alia] (1) the name and address of the creditor or equity security holder; [and] (2) the nature and amount of the claim." This rule (along with the requirement that creditors file proofs of claim pursuant to 11 U.S.C.A. §502(a)), has been honored mainly in the breach in asbestos bankruptcies where asbestos plaintiffs' attorneys typically have filed neither Rule 2019 disclosures nor proofs of claim for their clients. In recent years, in response to objections by certain parties in interest, Rule 2019 statements have been required by some courts, most notably in the numerous cases pending in Delaware and the

© 2008 by Thomson/West.

Western District of Pennsylvania presided over by Judge Judith Fitzgerald. In those cases, however, Judge Fitzgerald has permitted these firms to shield the details of their Rule 2019 disclosures by instructing the clerk of court not to permit access to anyone other than the debtor without leave of court which, to the authors' knowledge, has yet to be granted despite a number of requests by diverse parties in several of Judge Fitzgerald's cases.

120.   "'For more than three centuries it has now been recognized as a fundamental maxim that the public… has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" Jaffee v. Redmond, Jaffee v. Redmond, 518 U.S. 1, 9, 116 S. Ct. 1923, 135 L. Ed. 2d 337, 44 Fed. R. Evid. Serv. 1 (1996) (quoting United States v. Bryan, 339 U.S. 323, 331 (1950) (quoting 8 J. Wigmore, Evidence §2192, p. 64 (3d ed. 1940))).

121.   "[A]ll courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks." In re General Media, Inc., 335 B.R. 66, 73, 45 Bankr. Ct. Dec. (CRR) 271 (Bankr. S.D. N.Y. 2005) (citing North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944); see also Falise v. American Tobacco Co., 241 B.R. 48, 58 (E.D. N.Y. 1999) ("bankruptcy jurisdiction is extremely limited after a plan has been confirmed").

122.   "[C]onfirmation and substantial consummation of the Debtor's Joint Plan means that this Debtor's estate no longer exists." In re Atlantic Computer Systems, Inc., 163 B.R. 704, 706, 25 Bankr. Ct. Dec. (CRR) 333 (Bankr. S.D. N.Y. 1994). "Because there is presently no bankruptcy estate, there can be no continuing jurisdiction over that non-existent estate." Falise v. American Tobacco Co., 241 B.R. at 58.

123.   "Ordinarily, bankruptcy courts do not have jurisdiction over disputes between non-debtor parties where the dispute does not involve property of the estate, does not affect administration of the estate, or will not affect recovery of creditors under a confirmed plan." In re Schwinn Bicycle Co., 210 B.R. 747, 754 (Bankr. N.D. Ill. 1997), aff'd, 217 B.R. 790 (N.D. Ill. 1997)).

124.   Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 164, 25 Bankr. Ct. Dec. (CRR) 965, 30 Collier Bankr. Cas. 2d (MB) 1763, Bankr. L. Rep. (CCH) P 75862 (7th Cir. 1994).

125.   It has been reported that 72% of the claimants before Judge Jack had filed asbestos-related claims, see Editorial, Trial Bar Cleanup, Wall St. J., Feb. 11, 2006, at A8, abstract available at 2006 WLNR 2515792; see also Asbestos: Mixed Dust and FELA Issues, Hearing Before the Senate Comm. on the Judiciary, 109th Cong. (Feb. 2, 2005) (statement of Professor Lester Brickman) (stating that 60% of silica MDL claimants had filed asbestos claims with the Manville Trust), even though it is "statistically speaking, nearly impossible" to suffer from both asbestosis and silicosis. Carlyn Kolker, Spreading the Blame: The So-Called Phantom Epidemic of Silicosis Has Become a Hot Potato for the Plaintiffs' Bar, 27:10 Am. Law., Oct. 2005, at 24.

126.   In re Silica Products Liability Litigation, 398 F. Supp. 2d at 632 ("the court is confident that Dr. Friedman was correct when he testified that the 'epidemic' of some 10,000 cases of silicosis 'is largely the result of misdiagnosis'").

127.   Grand juries in New York and Texas were convened to consider criminal charges arising out of the federal court silica litigation. See Jonathan D. Glater, Civil Suits Over Silica in Texas Become a Criminal Matter in New York, N.Y. Times, May 18, 2005, at C5, abstract available at 2005 WLNR 7889661; Jonathan D. Glater, Lawyers Challenged on Asbestos, N.Y. Times, July 20, 2005, at C1, available at 2005 WLNR 11332864; Peter Geier, Silica Cases Drawing Resistance; Fallout From Key Texas Case Continues with Grand Jury, Legislation, 28:16 Nat'l L.J., Dec. 19, 2005, at 7. The United States House of Representatives Energy & Commerce Subcommittee on Oversight & Investigations also held hearings on the subject in 2006. See Julie Creswell, Testing for Silicosis Comes Under Scrutiny in Congress, N.Y. Times, Mar. 8, 2006, at C3, abstract available at 2006 WLNR 3870056. According to The Wall Street Journal, several doctors and the owners of two screening companies refused to answer congressional questions, invoking their Fifth Amendment rights. See Editorial, Silicosis Clam-up, Wall St. J., Mar. 13, 2006, at A18, abstract available at 2006 WLNR 4210261; see also Doctors Refuse to Testify at Silicosis Hearing; Others Recount Diagnoses 'Manufactured for Money,' US Fed News, Mar.

© 2008 by Thomson/West.

SECTION 524(G) ASBESTOS TRUSTS                                    **295**

9, 2006, available at 2006 WLNR 4049125; Lawyers Questioned Over Faulty Silicosis Claims, US Fed. News, July 26, 2006, available at 2006 WLNR 13106184.

128.   Dr. Ray Harron reportedly diagnosed disease in 51,048 Manville claims and supplied 88,258 reports in support of other claims. In one day, Dr. Harron reportedly diagnosed 515 people, or the equivalent of more than one a minute in an eight-hour shift. Dr. James Ballard provided 10,700 primary diagnoses and another 30,329 reports in support of asbestos claims. See Editorial, Silicosis Clam-up, Wall St. J., Mar. 13, 2006, at A18, abstract available at 2006 WLNR 4210261. According to Manville Trust records, Dr. Jay Segarra "participated in almost 40,000 positive diagnoses for asbestos-related illnesses over the last 13 years, or about eight per day, every day, including weekends and holidays. There were about 200 days on which Dr. Segarra rendered positive diagnoses for more than 20 people, and 14 days with more than 50." Adam Liptak, Defendants See a Case of Diagnosing for Dollars, N.Y. Times, Oct. 1, 2007, at A 14, available at 2007 WLNR 19170105.

129.   See Behrens & Goldberg, 12 Conn. Ins. Law J. 477 (2006), at 494. Judge Jack's findings have impacted, and will continue to impact, asbestos litigation. Judge Jack's decision also has had repercussions in the tort system. For example, an Ohio trial court dismissed all asbestos cases supported solely by doctors who refused to testify before Congress, on the ground that they "are currently unlikely to testify at any hearing or trial in these matters." In re Cuyahoga County Asbestos Cases, Special Docket No. 73958 (Ohio Cuyahoga County Com. Pl. Mar. 22, 2006) (on file with authors); see also Lester Brickman, On the Applicability of the Silica MDL Proceeding to Asbestos Litigation, 12 Conn. Ins. L.J. 289 (2006).

130.   The New York Supreme Court recently rejected efforts by Weitz & Luxenburg to delay filing bankruptcy claims on behalf of its clients until after their state court cases have concluded. Cannella v. Abex, No. 1037729/07 (NY Sup. Ct. Jan. 24, 2008) (on file with authors). The operative case management order requires plaintiffs to file all bankruptcy claims that they intend to file within 90 days of the commencement of trial. The plaintiffs' lawyers argued that they could not comply because they did not know which trusts they intended to make claims against. The court was unpersuaded by their explanation and threatened to vacate any resulting trial verdict if the court discovered that a plaintiff thereafter had filed claims against 524(g) trusts following the conclusion of trial.

131.   However, in Garcia v. Duro Dyne Corp., 2007 Cal. App. LEXIS 1715 (Cal. Ct. App. Oct. 16, 2007), the California Court of Appeals recently refused to allow a setoff of the economic damages portion of a jury verdict (California does not allow setoffs for noneconomic damages because it follows a pure proportional liability rule) where the settlement monies had not been actually tendered to the plaintiff. Instead, the court amended the judgment to include a reservation of jurisdiction to award future credits in the event that settlement payments were made. The court's decision is distinguishable from the authors' point above, as the uncertainty of collecting settlement monies is not at issue with prospective trust recoveries, which are both ascertainable and recoverable. Thus the *Garcia* decision does not run contrary to the entitlement of a peripheral tort defendant to setoffs for unclaimed trust recoveries, especially in light of some claimants' efforts to recover a windfall by delaying trust submissions.

132.   Louis D. Brandeis, What Publicity Can Do, Other People's Money, Ch. 5 at 92 (1932) (first published in Harper's Wkly., Dec.20, 1913).

© 2008 by Thomson/West.

# **<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09-11233 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER DIRECTING PRODUCTION OF DOCUMENTS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE WITH RESPECT TO HUMPHREY, FARRINGTON & MCCLAIN, P.C.

Upon the application (the "**Application**") of Chemtura Corporation ("**Chemtura**") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), directing Humphrey, Farrington & McClain, P.C. ("**Humphrey Farrington**") to produce certain documents described herein; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, it appearing that no other or further notice need be provided; and upon the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

arguments presented at the hearing before the Court; and any objections to the Application

having been withdrawn, resolved or overruled on the merits; and after due deliberation and

sufficient cause appearing therefore, it is **ORDERED** that:

1.    The Application is granted, in part, subject to the qualifications listed below.

2.    Humphrey Farrington is hereby ordered to produce a chart    (the "**Chart**"),

substantially in the form of Exhibit 1, attached hereto, setting forth the value of each and every

settlement concerning claims alleging injury from exposure to diacetyl and/or acetonin initiated

by clients of Humphrey Farrington (the "**Settlement**" and, collectively, the "**Settlements**").  The

Chart shall set forth:

(a)    by a randomly assigned unique number, each claimant who is party to a Settlement (without disclosing any identifying information);

(b)    the $FEV1/FVC^2$ ratio for each claimant or injured party, to the extent Humphrey Farrington is in possession of such ratios;

(c)    whether the claimant or injured party had received a diagnosis of bronchiolitis obliterans;

(d)    whether the claimant's claim is based upon loss of consortium; and

(e)    the individual Settlement values for each and every Settlement that each claimant received (without disclosing any identifying information of the defendant who paid such Settlement).  Individual Settlement values shall be grouped by claimant to permit the calculation of the total Settlement amount paid to each claimant, as indicated in the Chart attached as Exhibit 1.

The Chart shall be designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES

ONLY" under the Attorneys'-Eyes-Only Protective Order and shall be delivered to (i) Kirkland

& Ellis LLP, 300 N. LaSalle St., Chicago, IL 60657, Attn: Alyssa A. Qualls; (ii) Akin Gump

Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn:  Meredith A Lahaie;

---

[2]    The FEV1/FVC ratio means the proportion of the forced vital capacity exhaled in the first second for that settled claimant.

(iii) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York 10036-6522,

Attn:  David M. Turetsky; and (iv) Shearman & Sterling LLP, 599 Lexington Avenue, New

York, NY 10022, Attn:  Fredric Sosnick  no later than ten (10) days after the entry of this Order.

3.    Humphrey Farrington shall provide a sworn verification attesting to the

completeness and accuracy of the Chart upon delivery of the Chart to bankruptcy counsel for the

Debtors, counsel to the Official Committee of Unsecured Creditors (the "**Creditors'**

**Committee**"), proposed counsel to the Committee of Equity Security Holders (the "**Equity**

**Committee**"), and counsel to the Debtors' postpetition and prepetition secured lenders (the

"**Lenders**").

4.    To the limited extent necessary to comply with the terms hereof, this Order

modifies any confidentiality provision, requirement, or agreement associated with the

Settlements, including, but not limited to, any provision contained in the settlement agreements

themselves that would otherwise prohibit Humphrey Farrington from disclosing such

information.

5.    Humphrey Farrington is not required by this Order to provide the Debtors, the

Creditors' Committee, the Equity Committee, or the Lenders (collectively, the "**Parties**") with

access to the individual settlement agreements.  However, this Order does not foreclose the

Debtors from renewing their request to this Court, upon reasonable notice to the Parties and the

Objecting Parties (hereinafter defined), to obtain access to the settlement agreements should the

Chart fail to provide information required by the Debtors to reasonably estimate their diacetyl

liability.  The Order also does not foreclose the Creditors' Committee, the Equity Committee, or

the Lenders, upon reasonable notice to all Parties and the Objecting Parties, from seeking access

to additional settlement agreements or related documentation from this Court if the information

provided is insufficient for the Creditors' Committee, the Equity Committee, or the Lenders to perform their analysis of the Debtors' diacetyl liability. The Objecting Parties reserve their rights to object and be heard if any of the Parties seek access to the settlement agreements. Further, notice shall be given to the Parties and the Objecting Parties if Humphrey Farrington is requested to provide Chemtura's experts and/or any experts retained by the Creditors' Committee, the Equity Committee, and the Lenders with certain settlement agreements in order to audit and verify the settlement information provided. Counsel for the Debtors, counsel for the Creditors' Committee, proposed counsel for the Equity Committee, counsel for the Lenders, and Humphrey Farrington shall establish a protocol for auditing the Chart should the Parties request such an audit. The terms of such audit must be consistent with this Order but are otherwise left to the discretion of Humphrey Farrington and the Parties.

6.    The objections filed by Humphrey Farrington, International Flavors & Fragrances, Inc. and Bush Boake Allen, Inc., Polarome International, Inc., Givaudan Flavors Corporation, Berje Incorporated, and Firmenich Incorporated (collectively, the "**Objecting Parties**") are overruled. The Objecting Parties shall be entitled to consult with the Parties and Humphrey Farrington with respect to establishing a protocol to audit the Chart, but shall not have the right to veto any agreement reached by the Parties and Humphrey Farrington with respect to such protocol.

7.    Humphrey Farrington does not object to Citrus and Allied Essences, Ltd. ("**Citrus**"), Flavor Concepts, Inc. ("**Flavor Concepts**"), or any other party that asserted a proof of claim for indemnity and contribution based upon prior settlement payments (the "**Third Party Claimant**") from disclosing their settlement agreements to the Debtors, the Creditors' Committee, the Equity Committee, and the Lenders, provided that the producing parties redact

4

the identifying information of the settling plaintiff and/or injured party. This Order supersedes any confidentiality provision, requirement, or agreement associated with the Settlements involving Citrus, Flavor Concepts, or any Third Party Claimant, including, but not limited to, any provision contained in the settlement agreements themselves that would otherwise prohibit Humphrey Farrington or any other party thereto from disclosing such information.

8.    The proposed Protective Order governing information sought by the Parties, attached hereto as Exhibit 2, shall be entered by this Court and shall apply to the Chart and any other discovery produced pursuant to this Order. Pursuant to this Order, only the Debtors' bankruptcy counsel, counsel for the Creditors' Committee, proposed counsel for the Equity Committee, counsel for the Lenders, and their respective retained claims valuation experts are authorized to receive copies of the Chart or other information produced pursuant to this Order.

9.    The Chart and any other discovery produced in accordance with this Order shall be used only for purposes of claims' estimation in the Debtors' chapter 11 cases.

10.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

11.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including any discovery disputes that may arise between or among the parties.

12.    Notwithstanding any applicable Bankruptcy Rule, this Order shall be effective and enforceable immediately upon entry.

13.    This Order is without prejudice to the rights of the Debtors or any other party in
interest to apply for further discovery of Humphrey Farrington or of any individual or entity.


New York, New York
Date:  ***April 5, 2010***                          _____

                                                    ***s/ Robert E. Gerber***
                                                    Robert E. Gerber
                                                    United States Bankruptcy Judge

# Exhibit 1

**Form of Chart**

# Exhibit 2

**Protective Order**

## UNITED STATES BANKRUPTCY COURT
### Southern DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHEMTURA CORPORATION, *et al.*,[3] | ) Case No. 09-11233 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ATTORNEYS'-EYES-ONLY PROTECTIVE ORDER
## GOVERNING INFORMATION SOUGHT BY THE DEBTORS

Chemtura Corporation ("**Chemtura**") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") seeks the disclosure of information, relating to settlements of personal injury claims involving exposure to diacetyl and/or acetoin.  Recognizing that this type of information was not intended to be disclosed by the parties to the settlement agreements and that such information requires a higher level of protection than is provided by typical protective orders, the Court hereby **ORDERS** as follows:

1. A producing party may designate discovery material as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" if such Producing Person believes in good faith that such discovery material discloses the material terms of individual settlement agreements relating to settlements of personal injury claims involving exposure to diacetyl

---

[3] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

and/or acetoin ("**Confidential Settlement Information**").    The Chart referenced in the Court's Order on the Debtors' Rule 2004 application to Humphrey, Farrington & McClain, P.C. is Confidential Settlement Information.

2.    The producing party shall redact from the Confidential Settlement Information the names and identifying information of the settling parties.

3.    Confidential Settlement Information and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" shall be disclosed only to the persons identified in paragraph 4 below, shall be used only in strict accordance with this Order, and shall only be used for prosecuting or defending this bankruptcy action.

4.    Confidential Settlement Information and documents designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" may only be shown or communicated to: (a) counsel at Kirkland & Ellis LLP representing Chemtura in this bankruptcy action; (b) counsel for the Committee of Unsecured Creditors (the "**Creditors' Committee**"), proposed counsel for the Committee of Equity Security Holders (the "**Equity Committee**"), and counsel for the Debtors' postpetition and prepetition secured lenders (the "**Lenders**"); (c) the Court and its staff; and (d) any testifying and consulting experts retained by Chemtura, the Creditors' Committee, the Equity Committee, or the Lenders, provided that such expert executes Exhibit A and agrees to be bound by the terms of this Order.

5.    Confidential Settlement Information and documents designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" shall NOT be shown to, produced, or used in any way that would allow it to become known to any persons other than those identified in paragraph 4, including other parties in this bankruptcy action, counsel for any tort defendants,

including counsel representing Chemtura in the underlying tort litigation, or any nonparties or the general public.

6.      If Confidential Settlement Information and/or documents designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" are filed with the Court pursuant to the applicable rules and procedures of the United States Bankruptcy Court for the Southern District of New York, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Second Circuit, the sealed envelope or other sealed container shall also contain a statement in substantially the following form:

CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY
**HIGHLY CONFIDENTIAL**
SUBJECT TO ATTORNEYS'-EYES-ONLY PROTECTIVE ORDER
ENTERED [DATE OF ENTRY] IN CASE NO. 09-11233
UNITED STATES BANKRUPTCY COURT- S.D.N.Y.

7.      Any service copies of documents filed pursuant to paragraph 6 above shall have all Confidential Settlement Information redacted from the document prior to service.

8.      No reference shall be made to any Confidential Settlement Information in open court by any party or witness in this bankruptcy action.  To the extent that any Confidential Settlement Information or documents marked as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" must be discussed at any hearing, the Court shall hear such discussions *in camera* in the presence of only Court staff, bankruptcy counsel for Chemtura, and counsel for the Creditors Committee, the Equity Committee and the Lenders, and representatives of the producing party. However, nothing in this Order shall prevent the Debtors, the Creditors' Committee, the Equity Committee, and the Lenders from publicly disclosing aggregate values or estimates of the Debtors' potential liability for personal injury claims involving diacetyl and/or acetoin, including in or in connection with a Disclosure Statement, Plan of Reorganization, or related documents.

9.      At the conclusion of these bankruptcy proceedings, all Confidential Settlement Information and copies thereof will either be returned to the producing party or destroyed.  Written confirmation shall be provided by each party who had access to the Confidential Settlement Information to the producing parties and International Flavors & Fragrances, Inc., Bush Boake Allen, Inc., Polarome International, Inc., Givaudan Flavors Corporation, Berje Incorporated, and Firmenich Incorporated that all Confidential Settlement Information and copies thereof have been returned to the producing party and/or destroyed.

10.      This Order, and the narrowly limited attorneys'-eyes-only use of Confidential Settlement Information and/or documents or information designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" for the purpose described herein, shall not be deemed a waiver of the confidentiality provisions contained in the settlement agreements.

11.      This Order shall remain in effect after the conclusion of this case, and this Court shall retain concurrent jurisdiction to enforce the terms of this protective order.

**SO ORDERED**:


New York, New York
Date: _____, 2010                    _____
                                                Robert E. Gerber
                                                United States Bankruptcy Judge

## EXHIBIT A

**Undertaking To Be Bound By Protective Order**

I, _____, have been retained on behalf of _____, with respect to the estimation and/or resolution of all diacetyl-related actions and/or claims against Chemtura in the chapter 11 cases captioned as *In re Chemtura Corporation*, Case No. 09-11233 (REG) (Jointly Administered), currently pending in the United States Bankruptcy Court for the Southern District of New York (the "**Chapter 11 Cases**").  I have reviewed the terms of the Protective Order (the "**Order**"); I have been advised of the requirements contained therein for, *inter alia*, maintaining the confidentiality of Confidential Settlement Information; and I agree without reservation to abide by all of the Order's terms and requirements.

_____

[INSERT SIGNATURE]

**Diacetyl and/or Acetoin Settlements by Current or Past Humphrey Farrington Clients**

| Settled Party | FEV1/FVC Ratio | Diagnosis of Bronchiolitis Obliterans (YES/NO) | Claim for Loss of Consortium (YES/NO) | Individual Settlement Values* | | Aggregate Total of All Settlement Payments to Settled Party |
|---|---|---|---|---|---|---|
| | | | | | | |
| 001 | | | | 001A | $ - | $ - |
| | | | | 001B | $ - | |
| | | | | 001C | $ - | |
| | | | | 001D | $ - | |
| 002 | | | | 002A | $ - | $ - |
| | | | | 002B | $ - | |
| | | | | 002C | $ - | |
| | | | | 002D | $ - | |
| 003 | | | | 003A | $ - | $ - |
| | | | | 003B | $ - | |
| | | | | 003C | $ - | |
| | | | | 003D | $ - | |
| 004 | | | | 004A | $ - | $ - |
| | | | | 004B | $ - | |
| | | | | 004C | $ - | |
| | | | | 004D | $ - | |
| 005 | | | | 005A | $ - | $ - |
| | | | | 005B | $ - | |
| | | | | 005C | $ - | |
| | | | | 005D | $ - | |
| 006 | | | | 006A | $ - | $ - |
| | | | | 006B | $ - | |
| | | | | 006C | $ - | |
| | | | | 006D | $ - | |
| (list all claimants) | | | | | $ - | $ - |
| | | | | | $ - | |
| | | | | | $ - | |
| | | | | | $ - | |

*This includes *all* settlements entered into by each claimant.  Please add additional rows as necessary.

# **EXHIBIT C**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11233(REG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHEMTURA CORPORATION, et al.


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          March 16, 2010

          10:31 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re Debtors' Application for an Order Directing Oral

3      Examination and Production of Documents Pursuant to Rule 2004

4      of the Federal Rules of Bankruptcy Procedure with Respect to

5      Humphrey, Farrington & McClain, P.C.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Lisa Bar-Leib

3

1

2   A P P E A R A N C E S :

3   KIRKLAND & ELLIS, LLP

4        Attorneys for Debtors and Debtors-in-Possession

5        300 North LaSalle

6        Chicago, IL 60654

7

8   BY:   DAVID J. ZOTT, ESQ.

9

10   KIRKLAND & ELLIS, LLP

11        Attorneys for Debtors and Debtors-in-Possession

12        601 Lexington Avenue

13        New York, NY 10022

14

15   BY:   M. NATASHA LABOVITZ, ESQ.

16

17   AKIN GUMP STRAUSS HAUER & FELD, LLP

18        Counsel for Official Committee of Unsecured Creditors

19        One Bryant Park

20        New York, NY 10036

21

22   BY:   PHILIP C. DUBLIN, ESQ.

23        MEREDITH A. LAHAIE, ESQ.

24

25

4

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for Equity Committee

4         Four Times Square

5         New York, NY 10036

6

7    BY:   DAVID M. TURETSKY, ESQ.

8

9    HUMPHREY, FARRINGTON & MCCLAIN, P.C.

10        Attorneys for Certain Diacetyl Claimants

11        221 West Lexington

12        Suite 400

13        Independence, MO 64050

14

15   BY:   KENNETH B. MCCLAIN, ESQ.

16

17   CAPLIN & DRYSDALE, CHARTERED

18        Local Counsel for Certain Diacetyl Claimants

19        375 Park Avenue

20        New York, NY 10152

21

22   BY:   ELIHU INSELBUCH, ESQ.

23        RITA C. TOBIN, ESQ.

24

25

5

1

2    MORGAN, LEWIS & BOCKIUS LLP

3        Attorneys for Givaudan Flavors Corporation

4        101 Park Avenue

5        New York, NY 10178

6

7    BY:   JOHN M. VASSOS, ESQ.

8

9    DECHERT LLP

10       Attorneys for Firmenich Incorporated

11       2929 Arch Street

12       Philadelphia, PA 19104

13

14   BY:   JULIET SARKESSIAN, ESQ.

15       SEAN WAJERT, ESQ.

16       BRUCE CLARK, ESQ.

17       ABRAHAM REIN, ESQ.

18

19

20

21

22

23

24

25

6

1

2   LANDMAN CORSI BALLAINE & FERD, P.C.

3         Attorneys for Berje Incorporated

4         120 Broadway

5         27th Floor

6         New York, NY 10271

7

8   BY:   MELANIE K. SUHRADA, ESQ.

9         KEVIN TAM, ESQ.

10

11

12   FOX ROTHSCHILD LLP

13         Attorneys for International Flavors & Fragrances, Inc.

14          and Bush Boake Allen, Inc.

15         100 Park Avenue

16         Suite 1500

17         New York, NY 10017

18

19   BY:   YANN GERON, ESQ.

20

21

22

23

24

25

7

1

2     DINSMORE & SHOHL LLP

3          Attorneys for International Flavors & Fragrances, Inc.

4           and Bush Boake Allen, Inc.

5          255 East 5th Street

6          1900 Chemed Center

7          Cincinnati, OH 45202

8

9     BY:   DANIEL L. JONES, ESQ.

10

11    HINSHAW & CULBERTSON LLP

12         Attorneys for Creditor Polarome International, Inc.

13         780 Third Avenue

14         4th Floor

15         New York, NY 10017

16

17    BY:   PHILIP TOUITOU, ESQ.

18         CONCEPCION A. MONTAYA, ESQ.

19

20    EDWARDS ANGELL PALMER & DODGE LLP

21         Attorneys for Citrus & Allied Essences

22         750 Lexington Avenue

23         New York, NY 10022

24

25    BY:   PAUL J. LABOV, ESQ.

8

1

2   SIMPSON THACHER & BARTLETT LLP

3        425 Lexington Avenue

4        New York, NY 10017

5

6   BY:   ALEXANDER SIMKIN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

P R O C E E D I N G S

1

2      THE COURT:  Have seats, please.  Okay.  Chemtura.  We

3   have the 2004 application.  I want to get people's appearances

4   on this matter and then I want everybody to sit down.  I'm

5   going to have some preliminary comments.

6      Right.  For the debtors.  That going to be you, Mr.

7   Zott, today?

8      MR. ZOTT:  Yes, Your Honor.

9      THE COURT:  All right.  And I see the committee, Mr.

10   Dublin.  And, forgive me, for the equity committee?

11      MR. TURETSKY:  David Turetsky of Skadden Arps.

12      THE COURT:  Okay, Mr. Turetsky.  And for the diacetyl

13   plaintiffs, for the Humphrey Farrington firm, and then for the

14   co-defendants.

15      MR. MCLAIN:  Kenneth McClain, Your Honor.

16      THE COURT:  McClain is it?

17      MR. MCCLAIN:  Yes.

18      THE COURT:  Okay.  Thank you, Mr. McClain.  And

19   various co-defendants.

20      MR. LABOV:  Your Honor, Paul Labov, Citrus & Allied

21   Essences.

22      THE COURT:  That was Labov?

23      MR. LABOV:  Yes, Your Honor.

24      MR. TOUITOU:  Philip Touitou and Charles --

25      THE COURT:  I can't hear you.  You don't have the

10

1   benefit of the microphone and you're -- yes.  Would you come

2   up, please?

3           MR. TOUITOU:  It's Touitou from Hinshaw and Culbertson

4   from Polarome.

5           THE COURT:  Forgive me.  You didn't put your name up

6   in the corner of the motion and -- your name again?

7           MR. TOUITOU:  My name is Philip.  Last name is

8   Touitou, T-O-U --

9           THE COURT:  Touitou.  Okay.  I see it on the back of

10  your papers.  Mr. Touitou, please remember the requirements of

11  my case manager order that require counsel's names to be on the

12  front page of the corner.  This is exactly the reason.

13          MR. TOUITOU:  Very well.

14          THE COURT:  Thank you.  Okay.  Yes, sir?

15          MR. VASSOS:  Stand up, Your Honor, then?  'Cause we're

16  going to have the same problem.  John Vassos from Morgan, Lewis

17  & Bockius for Givaudan.

18          THE COURT:  Is that Vassos?

19          MR. VASSOS:  Vassos, V, as in Victor, A-S, as in Sam,

20  S again, O and S one more time.

21          THE COURT:  Okay.  And I don't see your name along

22  with Mr. Herman's and Mr. Shanker's names.

23          MR. VASSOS:  Right.  When this got postponed, they

24  were unable to do it and asked me to cover.

25          THE COURT:  Sure.  Okay.  Thank you.  All right.  Yes,

11

1    sir?

2        MR. JONES:  Yes, Your Honor.  Daniel Jones, Dinsmore &

3    Shohl for a second non-party, International Flavors &

4    Fragrances and Bush Boake Allen, Incorporation.

5        THE COURT:  All right.  Let me call out your objection

6    in just a second.  I see you there.  Thank you, Mr. Jones.

7        All right.  Folks, make your presentations as you see

8    fit, starting with you, Mr. Zott.  But I have problems with

9    both sides' positions and I want you to help me with the

10   following questions and concerns.

11       It appears to me after all of your briefs that while

12   the information that's requested is not relevant to the

13   particular claim of a particular individual diacetyl claimant,

14   it seems to me extraordinarily relevant to the debtor's need to

15   get its arms around the totality of the universe of its

16   diacetyl claims so that it can establish a mechanism in its

17   plan for satisfying them and so that it can get its arms around

18   the feasibility of its plan and for a host of plan related

19   reasons not the least of which would be determining whether we

20   have anything left to ultimately make a distribution to equity

21   as well as the creditors community which would, of course, be

22   ahead of equity.

23       It seems to me that the real issue here is one of

24   addressing prejudice to parties other than the debtors,

25   prejudice from diacetyl claimants who want to maximize their

12

1    recovery within the balance of the law and, to the extent

2    relevant, to co-defendants.  Now, subject to your rights to be

3    heard, it seems to me that those needs and concerns are

4    different.

5           Co-defendants, presumably, if they want to get

6    indemnification and their contribution from the estate would

7    have to provide information to me and presumably the debtors

8    sooner or later anyhow unless I'm missing something.  How else

9    am I going to know what to give you in the way of a claim for

10   indemnification and contribution?  So -- and the fact that

11   people stick into a settlement agreement a provision for

12   confidentiality, while I can understand why it would be

13   respected in the tort world out there, I'm not sure if those

14   considerations either carry over analytically or are binding on

15   a bankruptcy judge when the information is being used for a

16   wholly different purpose and, where appropriate, protective

17   measures are put in place.

18          With that said, I'm not sure whether or not we have

19   enough in the way of protections for anybody.  I do believe,

20   frankly, that the Humphrey firm's objection may have been a

21   little disingenuous when it seemed to be talking about

22   prejudice to everybody except its own litigants.  I would have

23   thought that what it would be telling me is judge, we don't

24   want our opponent to know what we settled these for in other

25   contexts because we think that's going to impair our ability to

13

1   get the maximum recovery for any particular claimant.  But if

2   that's the point you're making, why don't you just tell me that

3   and then let's deal with those particular concerns?

4         Now, the problem I have is balancing my belief --

5   again, I've read the briefs but I'll hear you guys tell me if I

6   read the briefs wrong.  And I think I understand the issues.

7   Subject to your rights to be heard, it seems to me that the

8   estate has a pretty good reason for wanting this information

9   and that the real issue is protecting not so much the co-

10   defendants, because they've already written out their checks

11   and their entitlements in this case will depend in most

12   respects on what they've shelled out as part of their own

13   settlements, but in terms of protecting the tort litigants.

14   The tort litigants of the future are those that are now being

15   represented by the Humphrey firm -- in terms of their own

16   claims.  And I am not sure, Mr. Zott, when we get to your

17   remarks, as to whether the mechanisms you have are or are not

18   satisfactory in terms of protecting their legitimate needs and

19   concerns.  My tentative subject to people's rights to be heard

20   is to say there's going to be discovery in this area but we've

21   got to work and put our noodles together to come up with a more

22   protective regime.

23         One of the problems that I'm having is a mechanical

24   one.  It appears to me that to determine what you're going to

25   have to write out, what the estate is going to have to write

14

1   out in checks, it's going to require something more than just

2   knowing what's been paid in the past because I assume that

3   these settlements depend on individual assessments of exposure,

4   risk and the like.  And I don't see how you do that, on the one

5   hand, when the folks who settled are kept anonymous on the

6   other.  So I don't see how you do the matching.  That's why I'm

7   not sure if I should be micromanaging the discovery or whether

8   I should be laying out general ground rules and then say you

9   guys got to put something together on your own that addresses

10  everybody's needs and concerns either by using experts as some

11  kind of intermediary or what?  I think at the very least I

12  would be uncomfortable with anything that provides lawyers

13  either defending toward claims on the merits or settling those

14  tort claims on an individual one-off basis from having this

15  information because I think it's in that area where the

16  Humphrey firm's needs and concerns are the strongest.

17           Now, this is more complicated than a lot of the

18  matters that I've addressed in this and other cases over the

19  last several years so I'm going to let you folks talk it out.

20  And if you think that my understandings based on my reading of

21  the briefs are wrong, you can diplomatically tell me so.  But

22  that's what I need you to address.  Okay?

23           Mr. Zott, I'll start with you.  Main lectern, please.

24           MR. ZOTT:  Thank you, Your Honor.  Good morning, Your

25  Honor.  Let me say that I don't think your understanding is

15

1   wrong in any really -- in any aspect based on the comments you

2   made.  And what I'd like to do is walk through the presentation

3   but spend most of my time on the points you raised and not a

4   lot of time on the -- I think the areas where the Court has

5   already reached its preliminary conclusions.

6          First, the background I think Your Honor is familiar

7   with, that we're dealing with many diacetyl proofs of claims,

8   375 or so.  For us to determine the approximate value or fair

9   value of those claims is an important -- very important to our

10  ability to move forward and develop a plan of reorganization

11  and emerge from bankruptcy.  Your Honor mentioned one of the

12  reasons which is whether or not there would be any potential

13  recovery for equity and that does, in part, depend upon the

14  value of these claims.  So that's one issue.  Our other

15  creditors would need to know the value of these claims so they

16  know what they would potentially recovery and how a plan could

17  be structured.  So it's an important issue for us to try and

18  get a better handle on and to try to get a better

19  understanding.  We have worked hard to get information

20  informally and we've been quite successful in getting

21  information without actually going to try each individual

22  diacetyl claim.  And we have entered into stipulations so we've

23  gotten basic information on things such as the exposure of the

24  claimants' -- what we call their FVC scores, which is a measure

25  of their lung performance, and product identification related

16

1   issues all which will help us to determine if the claimants

2   actually have a claim against Chemtura and to determine what

3   their level of injury is if they have injury.

4        THE COURT:  Pause, please, Mr. Zott.  The third of

5   those major individual factors you described was product

6   identification.  Help me better understand that.  Does that

7   mean what kinds of products Chemtura might have sold that

8   ultimately led to injuries or something wholly different?

9        MR. ZOTT:  In Chemtura's case, Chemtura ultimately was

10  responsible for only really one product, I think, at issue here

11  which is diacetyl.  So it's more --

12       THE COURT:  Oh.  But it's the products that the

13  diacetyl found itself going into?

14       MR. ZOTT:  Correct.  And whether the claimants

15  actually worked, for example, at a facility that was supplied

16  by our -- ultimately supplied through the supply chain that we

17  were part of.  So they could have very well been supplied by

18  another supplier of diacetyl.  We weren't the only one.  That's

19  an example of product identification.

20       So the issue then is while we're getting information,

21  we have very little information on the value of these claims.

22  That is, how you'd go about actually valuing the claim.  This

23  is an early tort, as I mentioned, and we've mentioned in

24  various briefs there's very little public information.  There's

25  been some settlements but not a great deal.  And whatever there

17

1    is out there publicly we've gathered, we've ourselves settled

2    only two cases for very disparate values.  And there's some

3    verdict history but also a limited verdict history.

4              At the same time, the Humphrey Farrington firm has

5    been dealing with these claims for a long -- some time.

6    They've had several hundred claims that they filed.  And we

7    believe that they've settled a very substantial number of

8    claims.  So they have access to a body of information that

9    would allow us to determine the value that these claims have

10   settled.  And that is very relevant.  And on the issue of

11   relevance, I think Your Honor put your finger right on it,

12   which is we agree completely that if we were going to try a

13   particular claim, like Karen Smith's claim, we would not be

14   able to introduce settlement value to try to show the value of

15   that claim or to show liability or lack thereof.  That would be

16   clearly prohibited under the Rules of Evidence.  That's some of

17   the cases they cite.  What we're talking about is something

18   totally different here, which is trying to measure the

19   aggregate exposure of the debtor to the whole set of these

20   claims, not litigating any particular claim.  And in that

21   context, this information is clearly relevant.  It's been

22   recognized as relevant in the analogous context of the asbestos

23   type litigation where we cite numerous cases that have looked

24   at precedent settlement histories as one of the foundations for

25   how to measure the value of these claims, starting with the

18

1    Eagle Pitcher.  That was the first case.  And that case then

2    led to a whole series of cases that I'm sure Your Honor is

3    familiar with:  Federal Mogul, Owens Corning, et cetera.  So we

4    are looking at trying to measure the aggregate exposure of the

5    estate to a set of claims.  And in that context, this type of

6    information is some of the most probative information to try to

7    determine the value of those claims.

8          I won't spend much time on it.  We've noted in our

9    brief that the Second Circuit doesn't even impose a heightened

10   standard for legitimate settlement related discovery, even

11   under Rule 26.  We're under Rule 2004 which is generally

12   considered broader.  But we certainly have, I think, a

13   compelling case that this information is relevant and

14   therefore, subject to appropriate protections, should be

15   discovered.

16         Now, Your Honor, the issue then, I think, is -- but

17   before -- let me address then -- you did mention the issue of

18   confidentiality and protection and there are sort of two sets

19   of interests.  One is the settling defendants and then the

20   other is the claimants.  And you are correct that some --

21   certainly some defendants have asserted cross-claims or

22   indemnification or contribution against the estate.  And an

23   example would be Citrus that clearly has asserted those claims.

24   They actually would like to turn over, I believe, this

25   settlement information.  They know it's part of their

19

1  affirmative burden, really, for their claim, but they can't do

2  so absent some order that would permit this to be produced

3  given the existence of certain confidentiality agreements.

4  They've asked, as I understand it, the plaintiff's counsel to

5  allow them to turn that over.  They haven't been able to do

6  that.  There are other companies, like Givaudan, who did assert

7  cross-claims, claims for contribution for both past settlements

8  as well as future settlements and they have dropped -- a couple

9  of companies, Givaudan and Polarome, either have or are in the

10  process of dropping their claims for past settlements in order

11  to try to avoid this discovery.  And while that may be a

12  solution for certain parties, it's not going to be a solution

13  for all parties and for all purposes.

14         In terms of the prejudice, we did begin with the basic

15  proposition that parties cannot shield information from

16  discovery by agreeing as confidential among themselves.

17  There's certainly a lot of law that says, you know, there's a

18  right to information.  And the appropriate way to deal with

19  confidentiality issues is through a protective order.  And then

20  the question becomes the level of protection.

21         For now, I just -- a couple things.  We propose that

22  the information would only be -- first we'd propose for now

23  only a production of the settlement agreements themselves where

24  the parties are redacted -- the names of the parties.

25  Secondly, that that can be provided only to designated

20

1    bankruptcy counsel for the debtor, so not their tort counsel,

2    as well as designated counsel for the committees, and then any

3    of their experts.  We've already retained an expert on this

4    issue of valuing these claims and the expert has told us you

5    have to go and get this settlement information 'cause that is

6    one of the key determinants of value.

7         So we've proposed redacting those settlement

8    agreements.  And all we're asking for is that plus

9    corresponding to those settlements would be what we call and

10   FVC score which is really a measure of the level of impairment.

11   Your Honor asked earlier how you would do this by redacting the

12   names and don't you really need to somehow cross-reference the

13   settlement amount with the claimant.  And what we've -- at

14   least the way we've thought about it is to do that anonymously.

15   We don't need to know who the defendant or who the plaintiff

16   is.  What we do need to know is for that dollar amount, what is

17   the corresponding proof of level of injury so that we can begin

18   to stride a  --

19        THE COURT:  Well, that's what is at the bottom of my

20   confusion, Mr. Zott, because thinking of it as a problem in

21   high school math, don't you need to find the dollars per FVC

22   score or something like that?  In other words, you have to

23   determine what kind of FVC scores are out there and then

24   determine the liability by settlement that is the consequence

25   of any such score.  But then don't you, in addition, need to

21

1   know the universe of FVC scores that are out there so that if

2   you have kind of a ratio, you can then apply it to the FVC

3   scores you have out there and the number of people that have

4   them.

5          MR. ZOTT:  Right.

6          THE COURT:  I have trouble seeing how you do that with

7   anonymity.

8          MR. ZOTT:  Well, we have already received for the

9   proofs of claims -- we've received a -- charts that would tie

10  these claimants -- those that have submitted proofs of claims

11  against us.  We have, through agreement, received information

12  on their FEV scores and their -- it's FEV/FVC which is another

13  measure of lung impairment.  So we do have -- so at least for

14  the named claimants, we've got, for those that are available,

15  we've got information on that one measure of the level of

16  impairment.  Now -- and then if we set that information aside

17  and now we get information on the settlement that are out -- I

18  don't know how many.  Let's just say there are fifty

19  settlements and here's the dollar amount.  And then there's a

20  corresponding FEV/FVC score.

21         THE COURT:  So anonymity is only partial anonymity.

22  The matching has been revealed to you.  And that presumably --

23  it's consensually from the Humphrey firm?

24         MR. ZOTT:  Right.  For those that have filed proofs of

25  claim, we do know -- we know their scores if they have a score.

22

1   What we wouldn't know is for the settling parties.  We wouldn't

2   know their identity.  But their identity doesn't matter.  All

3   we really --

4        THE COURT:  Finish your thought.

5        MR. ZOTT:  Yeah.  All we really need to do is see

6   here's the dollar value of their settlement and here's their

7   corresponding FEV score which is their level of impairment

8   approximately --

9        THE COURT:  All right.  Well, I think I'm keeping up

10  with you.  But then if the Humphrey firm has already given you

11  that, why do you need it again?

12       MR. ZOTT:  No.  We haven't gotten the settlement

13  information.  What we've gotten so far is for the claimants

14  that have asserted claims.  We have --

15       THE COURT:  You know their scores?

16       MR. ZOTT:  We know their scores if they have a score,

17  right.

18       THE COURT:  So what you need to work with that is to

19  get what I primitively refer to as the ratio so that you can

20  determine the theoretical settlement value for a universe of

21  people who have those scores.

22       MR. ZOTT:  Yeah.  In other words, what we have -- we

23  know their -- the scores for the claimants but we have no idea

24  how that score translates into a dollar amount, in the

25  marketplace basically, for settling a claim.  That's what we

23

1   don't know.  So we need to be able to take a database of prior

2   settlements where similar claimants that have a range of

3   scores, what are they actually receiving in payment for their

4   claims because that's really how we value it.

5        THE COURT:  So you need for those settlements, putting

6   aside their names, you need the dollars that were given in the

7   settlement agreement coupled with the levels of impairment or

8   the scores that each of those guys have.

9        MR. ZOTT:  Right.

10        THE COURT:  Is there a way by which you can get that

11   by something analogous to interrogatories or by information

12   sufficient to determine types of document request as contrasted

13   to all documents relating to document requests?

14        MR. ZOTT:  What we've thought about is -- the way

15   we've narrowed -- our request has already been narrowed to the

16   point where we're just asking for the actual settlement

17   agreements themselves with redacted names and then the

18   corresponding FEV/FVC score.  I have talked to Mr. McClain

19   about another even a more limited proposal that I think would

20   work for us which is if we don't even get the actual agreements

21   but we simply received a chart that would lay out the dollar

22   amounts and the corresponding FEV/FVC score and then we ask

23   that they be -- while they're anonymous, the claims be grouped

24   so that all the settlements relating to a particular claimant

25   be grouped and then the next claimant be grouped because, here,

24

1   a single claimant may sue ten defendants.  And to figure out

2   the value of their claim -- they may have had ten different

3   settlements or five different settlements.  So you really need

4   to figure out the total amount that they were paid.  I told him

5   if we could do that on an anonymous -- a chart like that and

6   then signing some interrogatories or some sort of verification

7   that these are all the settlements and this is a fair portrayal

8   so that we know that they're not cherry picking the best

9   settlements, the highest dollar.  We need some mechanism to

10  know that these are the settlements.  That and perhaps coupled

11  with if our expert wanted to actually take a look at those

12  settlements to verify any information, they could do that, not

13  even make copies of them, but just look at them, fly to St.

14  Louis, look at them, don't copy them, don't bring them back.

15  And that that would be available to any other expert.  So only

16  the experts --

17        THE COURT:  As kind of an audit type role as

18  contrasted to an information gathering role?

19        MR. ZOTT:  To make sure that that information is

20  accurate, yeah.

21        THE COURT:  In other words, to satisfy you that he's

22  being honest with you.

23        MR. ZOTT:  Right.  That -- that's right.  And there

24  may be information in those settlements that would be relevant

25  to them in terms of valuation but where the attorneys don't

25

1     have to see that at all and it can only be the expert.  I know

2     one of the parties, Polarome, suggested that the way to do this

3     is to hire an expert and then to have the expert only see this

4     information and no attorneys.  Well, this is pretty close to

5     that where we just get a chart, a verification, that that's

6     accurate and reflects all the settlements.  And then the

7     ability of our expert and, obviously, if the committee has an

8     expert or equity has an expert that they can actually look

9     at -- in an audit sort of function, look at that -- those

10    actual settlements, not take them with them, sign a protective

11    order that they won't disclose that information.  And then we

12    would have to, obviously, when it comes time for any kind of

13    reports, we would need to deal with that on a sealed type

14    highly protected basis.

15            THE COURT:  What kind of a wall do you envision would

16    be set up to give the claimants comfort that you're going to

17    use it only on the plan side and you're not going to use it

18    against them on the litigation or settlement side in the

19    context of the one on one type of negotiation and/or litigation

20    that tort claimants would, at least seemingly, have the right

21    to?

22            MR. ZOTT:  Well, the proposal that we had in mind

23    would be that, first of all, the information would only be

24    disclosed in the first instance.  Even the chart, I'm talking

25    about, would only be disclosed to designated counsel on the

26

1   bankruptcy.  So the tort litigant -- the tort lawyers who are

2   representing the debtor in the tort litigation would not have

3   access to it.  So they wouldn't be aware of it as a first

4   level.

5        And then a second level is, you know, we -- in a way,

6   we should take a step back because even the rule, which Your

7   Honor is actually correct that we couldn't use these

8   settlements to try to prove invalidity of a particular claim.

9   Even then, the Courts say it doesn't mean it's not

10  discoverable.  So that information is generally discoverable.

11  But when you go to trial, you wouldn't be able to introduce it

12  into evidence.

13       THE COURT:  Yeah.  But there's a difference between

14  what's relevant in the trial in the Section 402 sense, a Rule

15  402 sense.  And in terms of the negotiating chemistry before

16  you ever get to the admissibility of something in trial, I

17  assume, subject to people's rights to be heard, that it's a no-

18  brainer that this stuff is inadmissible at trial.

19       MR. ZOTT:  Right.

20       THE COURT:  I mean, that's classic Rule 408 stuff as

21  well as 402 stuff.

22       MR. ZOTT:  Absolutely.

23       THE COURT:  But if you know what your opponent has

24  taken in the past, it is of tactical value in terms of making a

25  settlement offer to your opponent.  I guess your opponent could

27

1   always tell you to pound sand and tell you I ain't going to

2   accept it.  But I mean, on the one hand, I can see how it

3   shortens the settlement process because you're using the

4   earlier settlements as a template for settling this one,

5   getting money in the victim's pocket and moving on.  But on the

6   other hand, it is something that if I were a plaintiff's

7   lawyer, I prefer my opponent not to have.  My negotiating

8   opponent as well as my in-the-courtroom opponent.

9         MR. ZOTT:  Right.  Right.  Well, the -- and I agree

10  with that.  And it's a fair and legitimate concern.  The best

11  that we could come up with is given the structure I propose,

12  even the bankruptcy lawyers would see only a chart that would

13  tell them values of past settlements associated with FEV

14  scores.  They obviously wouldn't tie to a particular claimant.

15  But the tort lawyers wouldn't have access even to that.  I

16  mean, they would have no ability.  They wouldn't be discovered

17  to them.  We'd be under protective order obligations not to

18  disclose it to them.  So -- and then, beyond that, the --

19  whatever tactical advantage might exist is certainly mitigated

20  by that process.  I'll point out, I mean, Givaudan did put in

21  to their annual report -- they put in the fact that in the

22  aggregate they settled approximately fifty or so claims for

23  forty-four million dollars.  So you could also -- I mean, you

24  could do the math on that and figure out at least --

25         THE COURT:  Well, I know how to do the division --

28

1          MR. ZOTT:  Yeah.

2          THE COURT:  -- that my kid learned in third grade.

3    But what I don't know is how to consider that as related or

4    nonrelated to levels of injury.

5          MR. ZOTT:  Correct.  That's right.  And that would be

6    anonymously correlated on the chart I'm talking about which

7    would not be available to tort claimants.  And I think at that

8    point it's just a subject that we're bound by that protective

9    order and we have to comply with it.

10         THE COURT:  I assume you have tort lawyers in Missouri

11   and other states that are actually on the firing line with this

12   litigation or at least were until the automatic stay went into

13   place?

14         MR. ZOTT:  We do have -- I know we have national tort

15   counsel, which is -- the Mayer Brown firm is handling the

16   diacetyl litigation.  And in terms of exactly what they have on

17   the ground, I'm not sure.  But I know they have national tort

18   counsel.

19         THE COURT:  Okay.  But those are people who are

20   different than -- you're a litigator but you're not a tort

21   litigator?

22         MR. ZOTT:  Well, I -- we have never represented

23   Chemtura in connection with the underlying defense of those

24   claims.  I mean, obviously, our firm does that kind of work.

25   But we don't do that work for them and we never have.

29

1          THE COURT:  All right.  I'll give you a chance to

2     reply.  But do you have other thoughts before I hear from Mr.

3     McClain?

4          MR. ZOTT:  No.  I don't, Your Honor.  I think that in

5     the end, we probably will need to move forward.  I think we're

6     planning soon to file a motion, an estimation motion, at least

7     to get the process start to eventually estimate -- our goal, if

8     we could settle these claims consensually, we'd love to do that

9     and provide everyone with certainty.  But we need to understand

10    the value either for settlement or if we need to estimate them

11    and for plan purposes, either way, this information is

12    information that is not just going -- it will ultimately be

13    helpful, I think, for the Court in reaching a fair and

14    reasonable value for these claims.

15         THE COURT:  If you want to hand off to Ms. Labovitz on

16    this or if you yourself know, either way, it's fine.  But the

17    estimation motion would be for purposes of necessary reserves

18    feasibility but not what any individual tort litigant would

19    get?

20         MR. ZOTT:  Correct.  That's right.

21         THE COURT:  Okay.

22         MR. ZOTT:  Exactly right.

23         THE COURT:  Would it be for any purposes other than

24    the two that I identified?

25         MR. ZOTT:  I think it would be -- I'll hand off.

30

1          THE COURT:  Ms. Labovitz, can you help me on this?

2    Because -- answer it, Ms. Labovitz.  But you know my next

3    question which is am I in 157 territory or not?

4          MS. LABOVITZ:  I do know that next question.  Your

5    Honor, the precise outlines of the plan are under discussion

6    but certainly are not developed enough for me to answer your

7    question with specificity.  But at a high level, you are

8    absolutely right that the purpose of the estimation would be to

9    establish reserves and to prove feasibility of a plan.  We

10   recognize that that estimation may take some time.  We don't

11   necessarily want to do it right on the eve of confirmation.

12   And as a result, we think that it's appropriate to file an

13   estimation motion and kick off that process now with the caveat

14   that without a plan before us, the precise outlines of the

15   estimation will, at the very beginning stages of that, perhaps

16   be fuzzier on the edges.  But we know what the discovery will

17   need to be.

18         THE COURT:  And I think you answered it either

19   expressly or implied.  But what you're telling me is that

20   estimation would not be used that would be putting me in

21   dangerous ground on 157(b)(2).  I'm not sure if I have the

22   subsection right.  I would not be trying to go by estimation to

23   determine any particular litigant's entitlement.

24         MS. LABOVITZ:  That's precisely correct, Your Honor.

25   We would be seeking estimation on an aggregate basis based on

31

1   statistical or actuarial measures and not based on the merits

2   of any individual's claim.

3          THE COURT:  All right.  Thank you.  Mr. Zott, anything

4   from you before I hear from Mr. McClain?

5          THE COURT:  Mr. McClain, please.

6          MR. MCCLAIN:  Your Honor, the -- Mr. Zott laid out --

7   he and I have been involved in several levels of discussions

8   while I tried to work through some workable arrangement in

9   regard to this information and met with the insurers as well.

10  But I need to be clear.  The defendants who have made these

11  agreements with my firm are still objecting to disclosing any

12  of this information.  And so, my official position must be that

13  I, too, object.  I am contractually bound to do that.  But if

14  the Court's directing me to give you my thoughts, I'd be happy

15  to do so.

16         THE COURT:  Well, I am going to direct you to give me

17  your thoughts.  And I may have to issue a ruling that somebody

18  in the courtroom doesn't like.  But I think I telegraphed my

19  thinking.  I think the principle prejudice to be protected here

20  is against the 300 -- I don't know how many clients you have.

21  But --

22         MR. MCCLAIN:  356, I think.

23         THE COURT:  Okay.  356.  I want to do something that

24  enables me to be in a position where Chemtura can be

25  reorganized and your individual 356 people get whatever their

32

1    legal entitlements are.  No more, no less.  And -- but I have a

2    practical need as a bankruptcy judge to have my estate set up

3    reserves that are appropriate, again, no more, no less, for

4    satisfying the estimated liability.  And then obviously, I love

5    settlements.  You'd either agree on appropriate amounts for

6    your individual folks or agree to disagree and tee them up for

7    determination.  Just the --

8         If there is an individual prejudice to you that Mr.

9    Zott's game plan or some massaged version of it wouldn't

10   satisfactorily address, I need your help in that regard.  I'll

11   hear from your defendants next.  But, frankly, I think that

12   with appropriate safeguards, their concerns don't trouble me as

13   much as your individual 356 folks do.

14        MR. MCCLAIN:  Well, Your Honor, as Mr. Zott laid out,

15   the proposal that he made to me yesterday, which has this

16   anonymous process -- we've already given him a good bit of

17   information so that he understands the nature of the claims

18   that are in front of him, these 356 people, in terms of their

19   physical impairment.  What he needs, as you've pointed out, is

20   some kind of matrix by which to value those levels of

21   impairment based on past settlements.  And there are a

22   substantial number of past settlements, something over 150.  So

23   there's a good basis of -- to make such settlements.

24        The method that he outlines here of an anonymous

25   matrix that my firm would prepare is something that's very

33

1    feasible for us to do.  And I think that the suggestion that we

2    have then the settlement agreements available to confirm

3    exactly what -- you know, the basis of the chart that we

4    prepare is a workable one.  And I think that if in fact it's

5    limited to the experts involved on all sides, whether it's for

6    the debtor or for the claimants or for the indemnity claimants,

7    I think that that is a good fairly safeguarded system.  And

8    with the protection in place that only the bankruptcy lawyers

9    would see them with some sufficient penalties if it's disclosed

10   to the tort claimants in any circumstance without leave of

11   court, I think that is about the best that I can come up with

12   in terms of an overall framework.  As you know, it needs to be

13   massaged somewhat, and we need to go through and work out some

14   language that will clearly define these roles, but in general I

15   think that it's a workable framework for us.

16          In regard to the question regarding our objection to

17   Citrus and Allied, we do not have an objection to a similar

18   procedure in terms of Citrus & Allied turning over their

19   information in terms of their aggregate payouts tied to FEV

20   scores with the settlement agreements being able to be viewed

21   by the experts in the same fashion.

22          THE COURT:  Well, theirs is a hybrid of that.  And

23   maybe I should be putting it to their counsel, but, I mean,

24   they're going to say, or I would have thought they would say,

25   they wrote out a check to one of your clients or to you on

34

1    behalf of your clients -- I'll allow him to be heard in a

2    minute -- and they're presumably going to say I wrote out a

3    check to one of the Humphrey's guys and now you got to write

4    out a check to me.  I don't know if that'll be a straight

5    indemnification or whether that'll be based on some

6    determination of relative fault or something or relative injury

7    for which more detail would be required.  Do you have anything

8    to bring to the table on that confusion I have, or should I

9    wait until I hear from Citrus' counsel?

10          MR. MCCLAIN:  Yeah, I think that they're better to

11   address it.  I'll -- I will simply say that I don't object to

12   them disclosing the amount they paid to my client or what the

13   FEV score of the client was that they paid.  I mean, those are

14   clearly helpful in regard to this indemnity claim.  And if

15   there's additional information that Chemtura needs, I'm sure we

16   can work that through, kind of, in the same fashion that we've

17   talked about in regard to the 356.

18          So I think that there's the framework of a deal that

19   has adequate protections for all sides and does in fact satisfy

20   the legitimate needs of Chemtura to fashion an estimation of

21   what these claims are worth.

22          THE COURT:  All right, well, thank you, Mr. McClain.

23          I'll now start hearing from counsel for the

24   codefendants.

25          MR. LABOV:  Good morning, Your Honor.  Paul Labov,

35

1    Edwards Angell Palmer & Dodge, for Citrus & Allied Essences.

2         Your Honor, you hit the nail right on the head, at

3    least with respect to Citrus, when you talked about

4    codefendants in the indemnification and contribution claims.  I

5    really don't need to say any more.  You presumed exactly what

6    Citrus will say; that is, simply to the extent that we've paid

7    out to Mr. McClain's clients, they're now going to seek

8    contribution and indemnity from Chemtura.  I don't know another

9    way to do that other than to provide Chemtura with the amount

10   of the claim for the particular claimant.  There's just no

11   other way to add them up.

12        And so while we agree with the aggregate proposal and

13   we agree with the ratios, generally speaking, subject to

14   certain protections which will be worked out, there's certainly

15   an issue with respect to those claims, and right now I believe

16   there are two or three of them, four total, two or three with

17   Mr. McClain's clients; the fourth one, the underlying tort

18   defendant did not object to releasing that.  I believe we

19   provided that to Mr. Zott, or Ms. Qualls of his office.

20        But with respect to the others, we'll need to move

21   forward with our claims at some point in time.  And so in

22   addition to being held for the aggregate, we'll need to protect

23   our own interest and turn that over, whether that's by court

24   order or agreement between the parties, or a combination of

25   both.

36

1          So other than that -- oh, and with respect to your

2     question on relative fault, I believe that that is actually an

3     issue wherever these claims are sitting throughout the country,

4     to be determined by tort counsel in those locales.

5          THE COURT:  All right.  Thank you, Mr. Labov.

6          Other codefendants wish to be heard?

7          Come on up, please.

8          Everybody'll be heard sooner or later, so just set up

9     a queue that you find most convenient.

10         MR. JONES:  Good morning, Your Honor.  Again, Daniel

11    Jones on behalf of IFF and BBA, against International Flavors

12    and Fragrances, and Bush Boake Allen.

13         I want to touch on a couple of the points that you

14    raised at the outset, and in conjunction with that I'd also

15    like to distinguish my two clients from, I think, some of the

16    others that are here today; specifically, IFF and BBA are

17    nonparties.  What I mean by that is we've never made a third-

18    party claim against Chemtura; we've never sought contribution,

19    indemnity; we've never made a cross-claim; we've never -- and

20    we -- nor have we made a proof of claim in this matter.  We

21    have nothing to do -- we've, in no way, shape or form,

22    interjected ourselves into this matter and, as such, we've not

23    interjected our settlement agreements into this matter.

24         We've probably settled probably over a hundred cases

25    with clients represented by Humphrey Farrington.  So we have a

37

1    very, very vested interest in the disclosure of the settlement

2    amounts.

3           I need to also inform the Court, we are different from

4    Chemtura in that we don't make diacetyl.  We used to make

5    butter flavors.  Our liability, if any, in the case is based on

6    the manufacturing of butter flavors.  I don't -- we don't even

7    know if Chemtura was ever in -- or I should -- strike that.

8           We don't know if diacetyl manufactured by Chemtura was

9    even in any of our butter flavors.

10          THE COURT:  Pause, please, Mr. Jones.  Help me keep up

11   with you.  If that is so, and if you were sued for butter

12   flavoring and not for diacetyl, why would the Humphrey firm or

13   you, if somebody were trying to subpoena you directly, be

14   giving out information that didn't relate to diacetyl suits?

15          MR. JONES:  I'm not sure I understand your question,

16   Your Honor.

17          THE COURT:  If you were peddling product that had

18   diacetyl in it, I don't see how your settlement agreements fall

19   into the database that's a matter of concern and that we've

20   been talking about so far.

21          MR. JONES:  I don't think they are either, but they

22   are based on the broad request that was made to Humphrey

23   Farrington.  It did not distinguish in any way, shape or form

24   which settlement agreements would be subject to the subpoena

25   that was attached.

38

1            THE COURT:  Well, I'll give everyone in the room a

2    chance to be heard, but I'm wondering why this couldn't be

3    clarified and made moot by a phone call.  I'll -- I may be

4    missing something.  You guys are ahead of me on this.  But I'm

5    trying to meet legitimate needs and concerns of everybody who

6    has a legally cognizable need and concern.

7            Mr. McClain is rising and I think he's offering to be

8    of help to me.  Do you mind yielding to him for a second, Mr.

9    Jones?

10           MR. JONES:  I do not, Your Honor.

11           MR. MCCLAIN:  Your Honor, maybe it's unclear.  The

12    settlements with Mr. Jones did involve injuries from butter

13    flavor, but the active ingredient that was at issue in the

14    butter flavor is diacetyl.  And the diacetyl supplied to Mr.

15    Jones' client was in large part, in regard to the artificial

16    diacetyl, was manufactured by Chemtura; that's what the proof

17    shows.

18           So the settlements in regard to the butter flavor

19    were --

20           THE COURT:  The butter flavor came in part from

21    diacetyl?

22           MR. MCCLAIN:  Yeah, the butter flavor entirely comes

23    from diacetyl; it is what makes butter -- diacetyl is found in

24    natural butter; it is what makes butter smell like butter and

25    taste like butter.  It is distilled chemically from various

39

1    sources, sometimes from butter itself, sometimes from other

2    chemicals, but then it is used to manufacture what we call

3    artificial butter flavor.

4         So it is the sine qua non of the lawsuits.  Without

5    diacetyl, there is no damage that we can detach from butter

6    flavors.  In fact, that's the central issue in terms of the

7    experiments that have been done on animals and everything else:

8    that the diacetyl is the active ingredient causing the damage.

9    So it all comes back to the nature and character of the same

10   claims being asserted here.  We are asserting that the damage

11   comes from diacetyl supplied by Chemtura.  So, if that helps.

12        THE COURT:  All right.

13        Well, Mr. Jones, I sense a difference in perspective

14   between you and Mr. McClain on that issue.

15        MR. JONES:  On the first point, I would only -- with

16   respect to diacetyl being a component of butter flavoring, I

17   would agree insofar as that is concerned.  Mr. McClain's

18   experts during these trials referred to these as a toxic soup

19   for many other different ingredients as well.  Now, was

20   diacetyl considered as one of the causative agents?  Yes, but

21   there were others as well.

22        Having said that, I very much disagree with him, with

23   respect, that there is any evidence at all that suggests

24   Chemtura was in our butter flavor -- Chemtura diacetyl was in

25   our butter flavors.  Indeed, we don't know; we don't.  So

40

1    there's no -- Your Honor, we've not made any third-party

2    claims, in part for that very reason, because we didn't know

3    whose diacetyl was in our butter flavors.  So without that

4    knowledge, we made the strategic decision that we didn't have a

5    leg to stand on with respect to making such a claim.

6         So, again, I need to reinforce the notion, we've not

7    interjected ourselves into this matter.  Our settlement

8    agreements --

9         THE COURT:  No, I understood that the first time --

10        MR. JONES:  Okay.

11        THE COURT:  -- you told it to me, Mr. Jones.  The

12   problem I have -- I was a commercial lawyer back in my first

13   life, I wasn't much of a tort lawyer, in fact I didn't call

14   myself a tort lawyer at all, but I always thought that the guy

15   who's standing at the side of a car wreck, even if he hasn't

16   injected himself in it, if he has relevant information he

17   provides it.  If he knows whether the light was red or green,

18   he tells the Court what he knows.  If you are invoking my

19   court's jurisdiction or not, if you have information that's

20   relevant to something that I as a judge or the Court as a court

21   must adjudicate, I'm not aware of there being a Get Out of Jail

22   Free card on a matter of civic responsibility of that

23   character.

24        MR. JONES:  Well, the only thing I would say to that,

25   and we've touched on this somewhat but I need to emphasize the

41

1    point, as a litigator, which is what I am, a party gains

2    significant leverage when they have another party's information

3    from prior settlements.

4         THE COURT:  A matter that I think, in the colloquy

5    between Mr. Zott and I, there seems to be quite a bit of

6    agreement on.

7         MR. JONES:  And so with that in mind, that is

8    definitely part and parcel of the fact that it was a

9    confidential settlement agreement that we reached with Mr.

10   McClain's clients, coupled with the fact that, again, that

11   there is the concern of the leverage that would be gained by

12   Chemtura, and the other parties for that matter who may gain

13   such information.  Our brief touched on -- we mentioned it,

14   referenced it as a Pandora's Box.  We're concerned that once

15   that information gets out, it's out and it's not coming back.

16   And that's basically where -- you know, where our position

17   lies.

18        THE COURT:  Thank you, Mr. Jones.

19        MR. JONES:  You're welcome.

20        THE COURT:  Who's on deck?

21        Just give me a moment, please.

22   (Pause)

23        THE COURT:  Yes, sir.

24        MR. TOUITOU:  It's Philip Touitou from Hinshaw and

25   Culbertson for Polarome International.

42

1          I think the issues that have already been discussed

2     before -- the Court has clearly recognized what are the main

3     concerns; of course, that is future settlements with tort

4     claimants.  And I won't belabor the issues there.

5          The one suggestion I might have is what happens to the

6     proposed chart?  We might agree, for example, and I know that

7     there are discussions going on -- I think they've already been

8     alluded to with my client and obviously with others -- about

9     how to try and resolve the issue.  But I think maybe one of the

10    concerns is what happens to the chart.  And it's typical in

11    other agreements that a chart or information like that might be

12    destroyed after it's used.  Since what we're talking about here

13    is really a sampling that the debtor needs in order to estimate

14    their claim, we might include a provision whereby, after a

15    period of time when they've had a chance to verify whatever

16    information is provided, that those charts will not be copied

17    and they'll be destroyed after a certain point.  It might

18    give -- you know, we know there are photocopiers, but it might

19    give some additional assurance to those of us who are concerned

20    that it might fall into the wrong hands and be used in a manner

21    that's not contemplated by the Court.

22          And one other point that I wanted to mention is, for

23    our clients, our clients did provide some information with

24    regard to the public information that's available concerning

25    verdicts in this area.  And the one concern I had in listening

43

1    to the arguments today was whether -- how reliable a sampling

2    of settlements will be in estimating the debtor's potential

3    liability here.  If I were one to estimate potential liability

4    of a client, I might want to look at what the jury verdicts

5    have been in this area.  And our letter to Chemtura's counsel

6    outlined, you know, a number of publicly known verdicts.  And

7    I'm not sure I understand the reason why they haven't looked at

8    the scores in those cases.  They easily have the numbers; those

9    are publicly available.  And perhaps giving those somewhat

10   greater weight in evaluating what their potential liability is,

11   since --

12        THE COURT:  Well, pause, please, Mr. Touitou, because

13   I would have thought, as a relatively ignorant outsider, that

14   an expert testifying on how much I should reserve, whether the

15   plan is feasible, whether there's anything left in this estate

16   for equity, would want to look at all relevant sources of

17   information and would come up with a weighting or a view as to

18   whether data should be included or excluded as part of the

19   ultimate conclusion, and then he or she would be cross-examined

20   by anybody who had a different view in the world, and that

21   would be the way by which a judge would make the determination.

22        MR. TOUITOU:  I suspect that that's how, if this gets

23   resolved, it will go.  And I'm not here to say that

24   settlements, you know, don't have any relevance for the

25   purposes that have been stated here.  But I am saying there is

44

1    public information out there that shouldn't be discounted, and

2    I'm not certain to what extent, you know, it might ameliorate

3    or at least limit the kind of the other settlement-type

4    information they need, because settlements are voluntary; they

5    don't necessarily fully measure a party's liability.  And we --

6         THE COURT:  Well, I don't know if they measure a

7    party's liability in the legal sense at all, but they do

8    measure a basis upon which two people with very different views

9    of the world came to an agreement that would be reasonably

10   satisfactory to each of them.  There are cliches about nobody

11   being totally happy with a settlement.

12        MR. TOUITOU:  Sure.

13        THE COURT:  But I think it's fair to say also that

14   when people reach a settlement, nobody's totally unhappy with

15   it or they wouldn't have agreed to it in the first place.

16        MR. TOUITOU:  Right.  So, at any rate, I agree that

17   that is so.

18        And undoubtedly, as we've heard here today, a

19   number -- a good number of these cases have been settled, and I

20   think even we heard today, based on what we've heard, that

21   about 200 or so of these cases have been settled with the

22   plaintiffs' counsel here.

23        So I'm going to keep my remarks short here and just

24   simply say that there is public information out there too;

25   we'll leave it to the experts to determine how those should be

45

1    weighted.  But it's not as if the debtor doesn't have a

2    ready -- some significant body of information to work with.

3              THE COURT:  All right.  Thank you very much.

4              MR. VASSOS:  Good morning, Your Honor.  John Vassos

5    from Morgan Lewis, on behalf of Givaudan.

6              I'm a little worried.  I don't want to belabor

7    arguments that have already been made, and I have a number of

8    them that have been made, but I'm going to touch on a couple of

9    them.  But let me jump right to one that I don't think has been

10   made, and that's the issue of what I would call false

11   math/false science.  It is tempting to sit here and say we can

12   get the numbers, the scores, dollar amount, come up with a

13   mathematical formula and that gives us information.  I'm not

14   sure it really does.  One of the arguments that I read in the

15   brief that was put forward here was what they needed was not

16   only information about the settlement amount but the rationale.

17   And that last part of it is very key.

18             For example, Givaudan is also a manufacturer of butter

19   flavoring.  They are a defendant that is different in kind than

20   Chemtura.  Part of the thinking that goes into any settlement

21   they do is indemnification claims that they may have against a

22   manufacturer such as Chemtura.  That will factor in.  There are

23   a series of individual issues and questions --

24             THE COURT:  Pause, please.

25             MR. VASSOS:  Of course.

46

1          THE COURT:  In other words, if you think that while

2     you're writing out the check now you may get part or more than

3     part of what you've written out, that can inform your exercise

4     of discretion as a tort lawyer defending that claim when you

5     decide how much you're going to write out a check to Mr.

6     McClain's client.

7          MR. VASSOS:  Sure.  All kinds of things factor in.

8     You may look at issues of collateral estoppel; is it the first

9     case in a particular jurisdiction; is that a favorable

10    jurisdiction to me or an unfavorable jurisdiction to me?  There

11    are a series of factors that go in.  And the idea that suddenly

12    you can just pluck out a number and say I now know everything I

13    need to know and that's going to inform the settlement, I

14    think, is very misleading.  And I worry very much --

15         THE COURT:  Well, it's an analytic matter --

16         MR. VASSOS:  I'm sorry.

17         THE COURT:  I understand what you're saying, Mr.

18    Vassos, but taken to its logical conclusion, that would mean

19    that you can never use history to estimate an estate's claims

20    exposure.  And I'm wondering if that proves too much.  We have

21    the asbestos cases as a more than minimal amount of yardstick

22    or precedent, which tells us that looking at past experience is

23    pretty much the traditional way of getting our arms around

24    these liabilities.

25         MR. VASSOS:  No one's going to deny, and certainly I'm

47

1    not, that past settlements will have some value.  But I really

2    do question whether a settlement from a defendant that's

3    different in kind, a different place in the chain, as opposed

4    to the manufacturer -- you don't know who the plaintiffs are;

5    you don't know how they were exposed to the chemical; you don't

6    know warnings they may have read about, the impacts of the

7    chemicals or any notice that they were on.  There are a series

8    of factors that would go into it that would have to be weighed

9    out.

10        And I'm very worried about the slippery slope.  I'm

11   very worried when someone says to me, yes, we're going to

12   aggregate your confidentiality provision but, don't worry,

13   we're going to give you a confidentiality provision.  That

14   seemed almost counterintuitive, because if my first

15   confidentiality provision wasn't enough to protect the

16   information, what confidence can I possibly have on behalf of

17   my client that, no matter how hard we try, any other

18   confidentiality provision's going to give me protection?

19        I would also add, we are -- just as the plaintiffs are

20   in a position where they don't want negotiating information out

21   there, we are defending a series of these cases; there are

22   hundreds of them left that we are a defendant in.  And having

23   information out there about the type of settlements we have

24   done in the past is equally prejudicial to us.  And I

25   understand --

48

1          THE COURT:  Well, pause, please --

2          MR. VASSOS:  Yeah, of course.

3          THE COURT:  -- Mr. Vassos.

4          MR. VASSOS:  Sure.

5          THE COURT:  I assume that either you or your tort

6    lawyer co-counsel have had Mr. McClain on the other side of the

7    table maybe 350 times or 550 times, or many, many times.

8          MR. VASSOS:  I would have to believe it's many, many

9    times, Your Honor.  Since it's not what I do, I can't speak

10   honestly, but I would --

11         THE COURT:  Well, doesn't Mr. McClain --

12         MR. VASSOS:  -- I'd have to assume many, many times.

13         THE COURT:  All right, well, I'm asking you, but the

14   question's going to sound like you're reading the mind of

15   another guy, but wouldn't Mr. McClain have a pretty good

16   knowledge, from having himself been on the firing line, of what

17   your guys have been willing to write out in the way of checks?

18         MR. VASSOS:  That is actually absolutely true, Your

19   Honor.  I think that's a very fair point.  But he is not the

20   only plaintiff's lawyer in the world and not the only

21   plaintiff's lawyer handling this.  So there's still an issue, I

22   think, about maintaining the confidentiality of our

23   settlements.  And we have the right to try and protect that,

24   understandably.  Debtor has recognized that in their papers

25   that there is an important concern in protecting

49

1    confidentiality.

2         So the idea, though, that you're going to aggregate

3    that important concern to give information that doesn't

4    translate may be an apples-to-oranges comparison given the

5    differences between the defendants, given the differences

6    possibly between the plaintiffs and how the plaintiffs were

7    situated.  It seems to me you're going to be getting into the

8    old garbage-in-garbage-out if you're only getting a limited

9    information that doesn't provide the full context and

10   rationale.  And you can't get that without, frankly, getting a

11   privileged communication from my client.

12        I question whether or not this is really giving the

13   value debtor says they're getting from -- they're hoping to get

14   from it, keeping in mind the debtor has already settled two

15   cases without this information.  They were able to come to an

16   assessment based on scores, information from plaintiffs and

17   other information that they had as to what -- how they valued

18   the claim.  They've done it already without the benefit of the

19   information they're asking for.  And they have more

20   information.  They do have some trial information, which gives

21   them some additional information to factor in; that should be

22   enough.  They're skilled counsel.  They've been down the path.

23        THE COURT:  Well, as a matter of freshman's

24   statistics -- I don't know if you've -- you're holding yourself

25   out as a statistician --

50

1          MR. VASSOS:  I am not.

2          THE COURT:  -- I am not, but I think I learned in my

3     freshman statistics course that a database with 200 or so data

4     points is a lot better than a database with 2 data points.

5          MR. VASSOS:  There is no disputing, and I cannot

6     dispute, the basic thesis:  More information is better than

7     less.  But I do question the quality of the information,

8     whether it is truly an apples-to-apples comparison, but even

9     more importantly, the offsetting importance of protecting

10    confidential settlement information, the potential chilling

11    effect upon settlements if people have to worry that this

12    information is going to be discoverable, notwithstanding

13    confidentiality, confidentiality which was highly bargained for

14    and very important to the parties.

15          So it's a balancing test.  I don't think anyone would

16    say, and I am not standing here and saying, the information may

17    not have some relevance, but I seriously question how much

18    relevance.  Is it really on point given the differences between

19    the positions of the defendants, certainly at least my client,

20    who is not a manufacturer like Chemtura of the product but is

21    in fact a manufacturer of butter flavoring?  That's further

22    down in the process.  We are in divergent positions.

23          So I seriously question whether the value that they

24    say they're going to be getting from this information offsets

25    the prejudice to my client of having confidential settlement

51

1    information that they bargained to be confidential turned over,

2    and the risk that it will be disclosed further down the chain.

3    I mean, certainly if we get to the point where Your Honor -- I

4    understand where Your Honor was leaning, and if we get to that

5    point, which I hope we won't, we would want to have

6    conversations and be heard on what those protections are, how

7    limited the information is, the kind of things other counsel

8    have raised.  But I believe sincerely that we should even be

9    excluded from the process.  I don't think they're going to get

10   anything more out of this process than they can get from their

11   experts and the information they already have.

12          If they know, for example, that they have been willing

13   to pay settlement to somebody with a score of X, and they know

14   from the plaintiff, and Plaintiffs are willing to give them the

15   information, what are those scores for all the plaintiffs in

16   the group?  My information at best that they're asking for is

17   cumulative to a theory and a process they've already come up

18   with that their experts are paid to do and that tort counsel is

19   paid to do every day.  In the twenty-five years I've been

20   practicing, that's the first question a client asks me:  What's

21   my risk; what's my exposure; how much is it going to cost me to

22   defend this action; what would be a reasonable settlement?

23   Those are things that are constantly in our minds, constantly

24   being asked for and constantly being arrived at, without

25   benefit of this kind of information.  And to get people's

52

1    confidential business information to give a little bit of help

2    and a little bit of an advantage seems unfairly burdensome on

3    defendants who acted in good faith in entering into

4    confidential settlement agreements, and not nearly probative or

5    valuable enough to the debtor.

6         THE COURT:  All right.  Thank you.

7         I think I heard from all the parties who filed briefs.

8    Anybody else before I give Mr. Zott a chance to reply?

9        (No response)

10        THE COURT:  Go ahead, Mr. Zott, if you wish.

11        MR. ZOTT:  Thank you, Your Honor.  Let me just suggest

12   sort of the two main objections we've heard; one is the sort of

13   relevance or probative value, and that's the objection we just

14   heard now.  And I think there's a little bit of confusion here

15   in the sense that the arguments I just heard being made were

16   that -- weren't really arguments that go to discovery.  Those

17   are really arguments that go to, when you get this information,

18   will it ultimately prove to be probative for value in

19   Chemtura's liability.  And I'm sure that we're going to have

20   experts, and other parties may have experts, that will tussle

21   about that issue.

22        But in terms of the relevance, that is, where we're

23   talking about the same claims -- I mean, the same complaints,

24   the same claims, the same alleged injury, the same causal

25   connection, oftentimes the defendants -- same set of defendants

53

1    in the same case, and then they settle a claim which is, for

2    all intents and purposes, exactly the same claim that is being

3    brought against us, it's clearly relevant for discovery

4    purposes.

5         In terms of whether ultimately there are

6    distinguishing features between, say, a Givaudan and a

7    Chemtura, that's an issue that the experts will have to hash

8    out, who are the experts; they can value and they can draw

9    those distinctions.  But it's not a reason to cut off the

10    process of getting that information in order to make those

11    determinations.

12         In terms of the -- he refers to the fact that we may

13    have enough information, and the truth is we simply don't have

14    enough information.  I mean, that's why we're here, because we

15    ultimately settled two claims; beyond that, we really have --

16    we have some public information, what's been reported in an

17    annual report, and we've received a few settlements through

18    this process voluntarily.  But we don't have any kind of a

19    database that would tie settlement values to levels of injury,

20    and that's the critical piece we're missing.

21         So in terms of going -- the suggestion to go and hire

22    an expert, well, we have done that and the expert said you need

23    to go and get this information because this is very, very

24    probative to our ability to reliably and fairly estimate the

25    value of these claims.  And that's the reason that we're here

54

1    today.

2         In terms of the -- just the confidentiality point, the

3    bottom line there is the law says that there is a balance, and

4    then the law strikes that balance so that where parties have

5    legitimate needs for confidentiality, it doesn't mean that the

6    information is therefore rendered undiscoverable in our system

7    of justice; it means that appropriate protections have to be

8    put in place.  And that's true for trade secrets, for patents,

9    for things that are really at the core of the whole -- of an

10   ability of a firm to profit and stay in business.  Even at that

11   level, the law says protective orders are the way to go.

12        We're not talking about anything nearly that

13   sensitive.  And we're talking about trying to reach a fair

14   balance.  And in terms of that fair balance, I think the

15   framework that I laid out earlier and that Mr. McClain, I

16   believe, largely, you know, with -- obviously, we're going to

17   have to work out some nuances, but I think he also agreed in

18   the main that that's a fair framework.

19        There was one suggestion about destroying the chart

20   when we're done with this process.  I think that's fine,

21   because that's typically done where you will destroy

22   confidential information or else return it to the other party.

23   I have no issue with that.

24        So the bottom line here is this information is clearly

25   relevant under the broad standards.  I think it will be helpful

55

1    to the Court and to the parties to have more reliable better

2    estimates.  And in terms of confidentiality, we're certainly

3    willing to do anything within reason to make sure that the

4    legitimate concerns of the parties are protected.  And I

5    believe what we've proposed today, Your Honor, goes a long way

6    to doing that.

7            THE COURT:  All right.  Thank you.

8            MR. ZOTT:  Thank you.

9            THE COURT:  All right, folks, we're going to take a

10   recess.  I can't guarantee you exactly how long I'll be.  I

11   would like everybody back in the courtroom in fifteen minutes.

12   We're in recess.

13        (Recess from 11:40 a.m. until 12:10 p.m.)

14           THE COURT:  All right.  Ladies and gentlemen, the

15   debtors' motion is going to be granted in part and, at

16   Chemtura's option, either continued in part or denied without

17   prejudice in part.  I'm going to tell you what we're going to

18   do and the bases for the exercise of my discretion in this

19   regard.

20           Mr. Zott and Mr. McClain are to establish a protocol

21   for providing, subject to safeguards, information on what you

22   might refer to as a macroeconomic basis, generally in

23   accordance with Mr. Zott's proposal as articulated to me in

24   oral argument, and as it might be refined by the further

25   comments that Mr. McClain put up in terms of massaging or

56

1    improving upon that proposal in accordance with the remarks

2    that he made when he had a chance to speak.  After each of them

3    or their designees establish that protocol, the Humphrey firm

4    will then provide the information in accordance with the

5    agreed-upon protocol.  The general objective being to address

6    each sides' legitimate needs and concerns, plus those of the

7    tort defendants, who also have an interest in this process.

8         The tort defendants will have the ability to consult

9    with Mr. Zott and Mr. McClain on developing the protocol, but

10   will not have a veto over its provisions.  However, if after

11   negotiations they have material concerns as to the way Mr. Zott

12   and Mr. McClain put it together, they can arrange for a

13   conference call with me, in which case I'll consider any of

14   their specific concerns.

15        Somewhat more specifically, Mr. McClain will, after

16   resolving the specifics of the protocol, prepare some kind of

17   chart or matrix or as otherwise agreed between him and Mr.

18   Zott, that provides on an overall and anonymous basis,

19   settlement amounts and the injury levels for those settlement

20   amounts.  Presumably, Mr. Zott -- excuse me -- Mr. McClain will

21   have done so by reference to settlement agreements.  But he

22   will be able to do so without fear that he'll be violating any

23   confidentiality provisions in those agreements.

24        In the first instance -- and this is one area where

25   Mr. Zott's motion is at this point granted only in part -- it

57

1    will be without actually handing over the settlement

2    agreements, in the absence of any later ruling by me upon a

3    future showing of need, if it were to be determined that the

4    matrix or chart or alternate method isn't satisfactory.  So in

5    the first instance, I would like to see if you guys can work

6    out a mechanism by which the information can be provided

7    without actually handing over the agreements.  But it's without

8    prejudice to the estate's ability to say hey, we tried, but

9    this method isn't working, and we actually need to see the

10   agreements.  I don't think the actual agreements themselves

11   would be necessary, but I'm giving each side a reservation of

12   rights in that respect.

13          The protocol and approval order are to provide, in

14   addition, that the information will be used only for the claims

15   estimation process, not for the defense of individual claims,

16   and that the information provided, which will initially go only

17   to experts and nontort lawyers for the debtors and the two

18   official committees, shall not be shared with any others,

19   including, without limitation, tort lawyers defending

20   individual diacetyl claims or other plaintiffs' lawyers.  A

21   violation of the protocol and the order, will of course, be

22   punishable by contempt.  The Humphreys firm, Mr. McClain, and

23   Mr. Zott, are authorized to put in any other safeguards that

24   either side might reasonably request of the other, to maintain

25   the confidentiality of the information provided.

58

1    The parties also are to agree upon an auditing

2 mechanism, using experts or any other mechanism that you agree

3 upon, so everybody in the room will have confidence in the

4 integrity of the process.  By auditing mechanism, I should

5 clarify that, because I think I stated it imperfectly.  Since

6 the Humphreys firm will not, at least in the first instance, be

7 providing the settlement agreements, the auditing process is to

8 provide a means, presumably by an independent expert or by

9 experts with the ability to look over each others' shoulders,

10 either by spot checking or by looking at the overall databases,

11 to provide comfort that Mr. McClain is playing it straight,

12 which I'm confident he will.

13    I'm not looking for anything too elaborate here.  I'm

14 looking for something sufficient to give the party getting the

15 information, which in this case is the estate and its

16 committees, comfort that it's getting accurate information.

17 But I don't care too much how you do it, consistent with the

18 other things that I said.

19    I am expressly ruling that with the confidentiality

20 protections that will be in the protocol and the order having

21 been put into place, the objections of the codefendants to the

22 litigation brought by the Humphrey firm are overruled; that my

23 order authorizing this limited disclosure trumps any

24 contractual provisions in the settlement agreements to the

25 contrary; and that the Humphreys firm may produce the data

59

1   whose disclosure I'm ordering, without fear of any liability to

2   the counterparties to its settlement agreements.  In the spirit

3   of that overruled ruling, the Humphreys firm may, if it is so

4   advised, put in more specific language that gives it the

5   comfort it needs to know that it is not subjecting itself to

6   liability to those counterparties.

7          Now, for the legal underpinnings of that and the bases

8   for the exercise of my discretion.  Of course the information

9   of the character that I am ordering production of today isn't

10  relevant to the rights of an individual tort claimant to

11  recover from the Chemtura estate.  But that isn't the point.

12  The requested information is clearly relevant to the estimation

13  process, which requires, for the good of the thousands or -- of

14  Chemtura creditors, or exactly however many there might be, and

15  the need to reorganize this case; to get our arms around the

16  estate's aggregate exposure; to estimate these claims for the

17  purpose of creating the necessary reserves; for determining the

18  feasibility of any reorganization plan; and at least arguably

19  in determining what it will take to satisfy creditor claims so

20  that if there's money or value in the estate available after

21  that, we can provide for a distribution to equity.

22          Needless to say, the allocation of value in this

23  estate as between the creditor community and the equity

24  committee -- or the equity community -- is not something I'm

25  determining today.  But I'm stating the obvious, that to

60

1    determine that down the road, we need basic information from

2    which the debtors can propose a plan that meets their

3    obligations in accordance with federal bankruptcy law.

4          I assume, without deciding, that other factors beyond

5    those whose disclosure I described, including some that Mr.

6    Vassos identified, would in many if not most, if not all cases,

7    be relevant to the decision of parties when they reached

8    settlements in the past.  If such information can be shared as

9    informing the ultimate estimation process, so much the better.

10   But the failure to provide that goes to the persuasiveness of

11   the ultimate estimation result, not the usefulness of this

12   information, as the critical starting point in enabling us to

13   estimate the claims in the Chemtura case, in the diacetyl

14   liability area.  Experts, once they have that critical first-

15   step information, can then argue, if they have a mind to, and

16   if they have different perspectives, as to how to weight or

17   consider the information that's been provided, just as experts

18   in a valuation dispute argue about the weighting of discounted

19   cash flow, comparable companies analysis, comparable

20   transactions analysis, or other expert -- other methods experts

21   use in providing the Court with subjective views as to how the

22   Court should rule.  But it's plain that this information is

23   relevant.

24         So therefore, what we're really talking about is

25   balancing the estate's need to get critically important

61

1   information with avoiding prejudice or at least minimizing it

2   and keeping it within acceptable limits, to those whose ox

3   might be gored if the information were made public.  Plainly,

4   it should not be made public, and most significantly, it should

5   not be made public or available to the tort lawyers who are

6   fighting the one-off battles as to liability for any particular

7   injured party's claim.  But I'm comfortable that especially

8   with Mr. Zott and Mr. McClain putting their noodles together,

9   and giving the codefendants the consultation rights that I'm

10  directing, we're going to come up with a method that

11  appropriately eliminates material prejudice.

12       The objections of the co-defendants are accordingly

13  overruled.  For those like Citrus, who have filed claims, they

14  will need to show me what they've had to write out in the way

15  of checks to tort litigants in any event, to get their claims

16  allowed.  And frankly, I didn't understand Citrus to be

17  objecting to that notion, once it would know that it's not

18  acting violative of any duties it has by contract.  In any

19  event -- and I'm now going to give Citrus, just like I'm giving

20  the Humphreys firm the comfort order each would need.

21       Some other parties -- and I think it was Mr. Jones who

22  was the person who was commenting on this -- have not filed

23  claims against the estate, but nevertheless, the information

24  that impacts upon their asserted rights is not analytically

25  different from the information that is provided by any third-

62

1   party witness, even if he or she did not inject himself or

2   herself into the litigation fray; just like the person who's

3   the witness at the site of a car wreck and provides relevant

4   information as to whether the light was red or green.

5        I reject the notion that for all purposes, parties

6   may, by contract, protect information that they have that is

7   relevant to legal issues from judicial scrutiny.  Of course

8   they may have needs and concerns that depending upon the legal

9   context in which they're asserting them, may deserve protection

10  under particular circumstances, or as much protection as we can

11  give them, most significantly, by protective order.  But the

12  needs of the federal courts cannot be made hostage to the

13  rights of parties that they give each other in contracts.

14       Of course, when we're talking about something that has

15  broad significance to thousands of creditors or equity holders,

16  as we have here in Chemtura, that is quite different than

17  parties trying to get that information for their private

18  advantage in one-off tort litigations.  In general, if not in

19  the great bulk of cases, I assume that state and federal courts

20  will honor parties' legitimate concerns when information of the

21  character sought to be protected is improperly to be used for

22  one-off litigation advantage.  But those considerations do not

23  apply here.  Likewise, when I underscore the importance of

24  creating the appropriate reserves and determining feasibility

25  in the Chemtura plan context, my earlier ruling, cited by many

63

1   in their objections, under materially different facts, is

2   plainly distinguishable.

3           Mr. Zott, I'm going to leave it to you and your

4   colleagues to think about the mechanics of implementing my

5   order.  It may be most appropriate for you to work with Mr.

6   McClain in consultation with the other guys to come up with a

7   protocol for getting the information you're going to get, and

8   then to put an order on top of the protocol that both approves

9   the order and grants your motion, to the extent I granted it.

10  Any other approach that you and Mr. McClain agree upon is

11  likely to be acceptable to me.

12          But the important aspect of this ruling is that you're

13  entitled to the information you're asking for, but we want to

14  do it in a way that minimizes the prejudice to the 356 diacetyl

15  individual claimants, and that provides reasonable protections

16  in the confidentiality range, both for them and for the tort

17  litigants -- excuse me -- the codefendants in the tort actions

18  who are also impacted by this motion.

19          All right.  Thank you, folks.  Have a good day.  We're

20  adjourned -- oh, yes?  Come on up, please, Mr. Vassos, to a

21  microphone.

22          MR. VASSOS:  Just one housekeeping matter that I

23  wanted to note on the record.  I noted during the discussion

24  earlier that my client indicated they would withdraw certain

25  indemnification claims in hope of avoiding this discovery

64

1    issue.  I've informed debtors' counsel that we will take that

2    issue up with them.  We may want to reinstitute those claims.

3    And I just wanted to state that on the record.

4            THE COURT:  All right.  Each of you has whatever

5    rights you had vis-a-vis that.  And I'm not going to decide

6    that today.

7            MR. VASSOS:  Understood, Your Honor.  Thank you, Your

8    Honor.

9            THE COURT:  Thank you.  Have a good day.  We're

10    adjourned.

11        (Whereupon these proceedings were concluded at 12:29 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

1

2                    I N D E X

3

4                    R U L I N G S

5    DESCRIPTION                              PAGE    LINE

6    Debtors' Rule 2004 motion granted in part,    55      16

7    continued in part or denied without prejudice

8    in part as delineated on the record

9    Co-defendants' objection overruled           61      13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

1

2                        C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB (CET**D-486)

9       AAERT Electronic Certified Transcriber

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, New York 11501

15

16      Date:  March 17, 2010

17

18

19

20

21

22

23

24

25

# **EXHIBIT D**

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| CONGOLEUM CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | Misc. No. 09M-01-084 |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY (f/k/a/ CIGNA | ) | |
| INSURANCE COMPANY), *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Date Submitted: July 9, 2009
Date Decided: August 4, 2009

**MEMORANDUM OPINION**

Joanne B. Wills, Esquire, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, counsel for petitioners First State Insurance Company and Twin City Fire Insurance Company

Bernard George Conaway, Esquire, Campbell & Levine LLC, counsel for respondents / cross movants Babcock & Wilcox Company Asbestos PI Trust, Owens Corning / Fibreboard Asbestos Personal Injury Trust, and United States Gypsum Asbestos Personal Injury Trust.

Carl N. Kunz, III, Esquire, Morris James LLP, counsel for respondents / cross movants Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust and Celotex Asbestos Trust

Daniel K. Hogan, Esquire, The Hogan Firm, counsel for respondent / cross movant Combustion Engineering 524(g) Asbestos PI Trust

Rebecca L. Butcher, Esquire, Landis Rath & Cobb LLP, counsel for respondent / cross movant Kaiser Aluminum & Chemical Corp. Asbestos Personal Injury Trust

**Matthew F. Boyer, Special Master**

On May 1, 2009, First State Insurance Company and Twin City Fire Insurance Company (the "Insurers") filed a motion to compel pursuant to Superior Court Civil Rule 45 seeking to enforce seven subpoenas issued by this Court on or about January 28, 2009. The subpoenas were directed to seven asbestos personal injury trusts created pursuant to Bankruptcy Code provisions (the "Trusts").[1] *E.g.*, 11 U.S.C. § 524(g). The Trusts filed oppositions to the motion to compel and motions to quash or modify the subpoenas. On July 9, 2009, the Court heard argument. For the following reasons, I grant the Insurers' motion to compel subject to the conditions specified below.

## BACKGROUND

The subpoenas were issued pursuant to commissions from the New Jersey Superior Court in a coverage action filed by Congoleum Corporation against several insurance companies including the Insurers (the "Coverage Action").[2] One issue in the Coverage Action is "whether the insurers are obligated to provide coverage under the policies at issue in this litigation, for any and all [asbestos]

---

[1] The Trusts are: (1) the Armstrong World Industries, Inc. Asbestos Settlement Trust ("Armstrong Trust"); (2) the Babcock & Wilcox Co. Asbestos PI Trust ("B&W Trust"); (3) the Celotex Asbestos Settlement Trust ("Celotex Trust); (4) the Combustion Engineering 524(g) Asbestos PI Trust ("CE Trust"); (5) the Kaiser Aluminum & Chemical Corp. Asbestos Personal Injury Trust ("Kaiser Trust"); (6) the Owens Corning / Fibreboard Asbestos Personal Injury Trust ("OCF Trust"); and (7) the United States Gypsum Asbestos Personal Injury Trust ("USG Trust").

[2] *Congoleum Corp. v. ACE American Ins. Co. et al.,* Dkt. No. L-8908-01 (N.J. Super. Ct., Middlesex County).

claims" against Congoleum.[3]  Approximately 122,000 persons have filed asbestos

exposure claims against Congoleum.  To test the validity of the claims against

Congoleum, the Insurers seek documents relating to other claims that the same

122,000 persons filed with the Trusts alleging injuries caused by other asbestos

exposure.

In support of their motion to compel, the Insurers contend that the

Congoleum claimants' submissions to the Trusts are relevant to their claims

against Congoleum because submissions to the Trusts might reveal inaccuracies or

even fraud in the Congoleum claims.[4]  The Trusts object primarily on grounds of

undue burden, contending that the time required to review the enormous number of

documents sought would cripple their operations, and the costs involved would

unfairly decrease the funds from which they can pay valid claims.  The Trusts also

assert the availability of alternative sources for the information (*i.e.*, the claimants

and their lawyers), lack of relevance, overbreadth, confidentiality, trade secrets,

settlement negotiation protection, and the attorney-client privilege.

---

[3] *Congoleum,* letter op. at 4 (N.J. Super. Ct. Dec. 12, 2008) (D.I. 5, Ex. 3).
[4] The Insurers rely on a letter ruling by the discovery master in the Coverage Action, recommending that commissions for the seven subpoenas issue because, *inter alia*, there is "more than anecdotal support that some trust claimants have filed inconsistent factual information with trust administrators." *Congoleum,* No. L-8908-01, letter op. at 3 (N.J. Super. Ct. Dec. 12, 2008) (D.I. 5, Ex. 3).  The ruling also stated that issuance of the commissions was warranted because "[t]here is nothing more pertinent to the question of coverage for an individual claim than whether the claimant was exposed to an insured's product during a given period of coverage provide by an insurer." *Id.*

2

To alleviate undue burden concerns, the Insurers have offered to narrow the scope of the subpoenas and share the costs. The Insurers now seek, not the entire file for each Congoleum claimant who submitted claims with the Trusts, but only (i) the claimants' submissions, including supporting materials, (ii) documents identifying the resolutions of the claims and allowance decisions, and (iii) computer data conveying this information.[5] The Insurers have agreed to limit the scope of their request to those persons for whom they can provide the Trusts with partial social security numbers. As of July 9, 2009, the Insurers had identified numbers for approximately 70,000 of the 122,000 Congoleum claimants. Finally, the Insurers have provided evidence *via* affidavit that a computer program could be written to extract the information sought so that the Trusts would not be required to search their data bases manually. The Insurers have offered to pay the reasonable costs of programming.[6]

## ANALYSIS

The cross motions to compel and quash present three questions. First, should this Court exercise jurisdiction over the motions as to certain of the Trusts, notwithstanding language in their trust distribution procedures ("TDP's") that appears to require a subpoena from a bankruptcy court? Second, do the subpoenas impose an undue burden on the Trusts? And third, do any of the Trusts' numerous

---

[5] D.I. 33 (July 9 Hrg. Tr. at 9-10) ("Hrg. Tr.").
[6] Hrg. Tr. at 23-24.

other objections warrant either denying the motion to compel or granting it with conditions?

## A.    Jurisdiction

After oral argument, the Court raised *sua sponte* a question concerning its authority to compel the production of claimant submissions with respect to five of the seven Trusts (all but the Celotex and CE Trusts).    The concern arose from restrictive language in the TDP's for the five Trusts.    Section 6.5 of the Armstrong Trust TDP, for example, states:

> The PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, [i] with the permission of the claimant, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or other applicable law, [ii] to such persons as authorized by the claimant, or [iii] *in response to a valid subpoena of such materials issued by the Bankruptcy Court.*[7]

The TDP's for the B&W, Kaiser, OCF, and USG Trusts similarly limit the Trusts' authority to disclose claimant submissions to circumstances in which the claimants give permission or "in response to a valid subpoena of such materials issued by the Bankruptcy Court."[8]    Inasmuch as these provisions can be read to require that the

---

[7] Armstrong TDP at § 6.5 (5/6/08) (emphasis added).

[8] See B&W Trust TDP at § 6.5 (1/4/08); Kaiser Trust Third Amended TDP at § 6.5; OCF Trust TDP § 6.5 (1/30/08); and USG Trust TDP § 6.5 (1/30/08).    As noted above, the Celotex and CE trust TDP's and electronic filing agreements ("EFA") do not contain such a limitation.    See Celotex Law Firm EFA § 5.2 (electronic submissions "will not be submitted to any third-party except in response to a valid subpoena or upon written consent of the claimant"); CE Trust TDP

Trusts disclose claimant submissions "only" with the permission of the holder "or in response to a subpoena issued by the Bankruptcy Court," and inasmuch as the Trusts are creatures of bankruptcy law, see 11 U.S.C. § 524(g), the question arose, at least in my mind, as to whether enforcing state court subpoenas might run contrary to the bankruptcy courts' direction and therefore be inadvisable as a matter of comity, if not preemption.

None of the parties contends that the bankruptcy subpoena provisions so limit this Court's authority and, upon reflection, I agree. Principles of comity generally require that courts respect the decisions of courts in another jurisdiction.[9] But here, the bankruptcy courts have not clearly spoken against state court jurisdiction over subpoenas directed at Trusts. The United States Bankruptcy Court for the District of Delaware approved TDP's for the Armstrong and Kaiser Trusts that did not contain bankruptcy subpoena provisions. These provisions were added later, by amendment to the TDP's, without court involvement. The bankruptcy courts approved TDP's for the B&W, OCF, and USG Trusts that

§ 7.11 First Amendment adopted 7/18/07) (authorizing disclosure "as required in discovery in any litigation").

[9] Comity is "neither a matter of absolute obligation, on one hand, nor of mere courtesy and good will, upon the other." *Taylor v. LSI Logic Corp.*, 715 A.2d 837, 842 (Del. 1998). In the context of relations between courts of different nations, comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id. See also Black's Law Dictionary*, at 262 (7th ed. 1999) (defining judicial comity as "[t]he respect a court of one state or jurisdiction shows to another state or jurisdiction in giving effect to the other's laws and judicial decisions").

included bankruptcy subpoena provisions, but the orders gave no indication that such provisions were required.[10]  The bankruptcy courts approved the Celotex and CE Trusts TDP's without such provisions.  And in one unrelated case, the United States Bankruptcy Court for the District of Delaware (which approved TDP's for four of the five Trusts with bankruptcy subpoena provisions),[11] approved a stipulation that amended a TDP specifically to permit subpoenas to be issued by a Delaware state court.[12]  The bankruptcy subpoena provisions are better read, not as orders purporting to eliminate state court jurisdiction, but rather as housekeeping measures proposed by parties and approved by the courts as exhibits to a plan of reorganization.  As such, principles of comity do not require this Court to refrain from exercising jurisdiction over the subpoenas issued to any of the seven Trusts.

For similar reasons, principles of preemption do not warrant abstention. Congress has not expressed a "clear intent" to preempt traditional state court

---

[10] See B&W TDP, Ex. B to plan approved on Jan 6, 2006, at § 6.5 ("The PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only in response to a valid subpoena of such materials issued by the Bankruptcy Court."); OCF TDP, Ex. D-1 to plan approved on Sept. 26, 2006, at § 6.5 (permitting disclosure only with permission of holder of claim "or in response to a valid subpoena of such materials issued by the Bankruptcy Court"); USG Trust TDP, exhibit to plan approved June 15, 2006, at § 6.5 (same).

[11] The U.S. Bankruptcy Court for the District of Delaware approved the TDP's for the Armstrong, Kaiser, OCF, and USG Trusts; the U.S. Bankruptcy Court for the Eastern District of Louisiana approved the TDP for the B&W Trust.

[12] *In re Federal-Mogul Global, Inc.,* No. 01-10578 (Bankr. D. Del.), Order Approving Stipulation By and Among Plan Proponents and Owens-Illinois, Inc. (Oct. 25, 2007) (amending TDP to permit discovery pursuant to subpoena from bankruptcy court, district court, or "a Delaware State Court").

6

jurisdiction over ancillary issues of subpoena enforcement.[13]   Nor does § 524(g) indicate by implication that Congress left "no room" for traditional state court jurisdiction over subpoenas directed to asbestos trusts.[14]   And because all the TDP's envision that the Trusts will be required to comply with subpoenas, this Court's exercise of subpoena jurisdiction does not "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[15] "Although state trial judges are duty-bound to respect the supremacy of federal law within its expansive sphere and to respect congressional decisions to preempt our law, we are not duty-bound to go out of our way to look for reasons to preempt our own state's law."[16]

## B.    Undue Burden

Parties to litigation generally may obtain discovery regarding any matter, not privileged, if it is "relevant to the subject matter in the pending action" or if the information sought "appears reasonably calculated to lead to the discovery of admissible evidence."[17]   Discovery may be limited if it "is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive," or if "the discovery is unduly

---

[13] *See Roberts v. Delmarva Power & Light Co.*, 2009 WL 222985, at *5 (Del. Super. Jan. 30, 2009) quoting *O'Malley v. Boris*, 742 A.2d 845, 848 (Del. 1999) (internal citations omitted).
[14] *Roberts,* at *5.
[15] *Id.*
[16] *Milford Power Co. LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 756 (Del. Ch. 2004).
[17] Super. Ct. Civ. R. 26(b)(1).

burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation."[18]    With respect to third-party discovery, an order to compel production "shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded."[19]    The Court "shall quash or modify" the subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies," or "subjects a person to undue burden."[20]    Further, if a subpoena requires "disclosure of a trade secret or other confidential research, development, or commercial information," the Court may quash or modify the subpoena, or "if the party in whose behalf the subpoena is issued shows a substantial need for the ... material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the Court may order ... production only upon specified conditions."[21]    "If the nonparty has no interest in the underlying litigation, a court may allocate part or all of the costs incurred in producing the subpoenaed electronically stored information."[22]

---

[18] *Id.*

[19] Super. Ct. Civ. R. 45(c)(2)(B).

[20] Super. Ct. Civ. R. 45(c)(3)(A).

[21] Super. Ct. Civ. R. 45(c)(3)(B).

[22] 7 *Moore's Federal Practice*, § 37A.27 (3d ed.).  Factors considered in allocating such costs are "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance." *Id.* at § 37A.28.

The Trusts' chief argument is that compliance with the subpoenas would impose on them an undue burden and expense. As noted above, the Insurers have taken several steps that will lessen the burden that the Trusts originally anticipated, by: (i) narrowing their requests so as to seek only the claimant submissions, resolutions, and electronic data conveying the same information; (ii) limiting the requests to claimants for which they can supply the Trusts with partial social security numbers; and (iii) agreeing to pay for a computer programmer to write a program that will extract the information sought from the Trusts' databases. The Insurers also agree that the information could be produced subject to a confidentiality order entered in the Coverage Action, which would protect the information from broad dissemination.

Nevertheless, the Trusts maintain that the subpoenas are still unduly burdensome because, no matter how precise the computer program, the Trusts will always be required to do what they apparently have always done in responding to a subpoena for a single claimant's file: *i.e.*, to review each document before it goes out to the door to ensure that no privileged or non-responsive information is inadvertently produced.[23] While neither claimant submissions sent to the Trusts, nor resolution letters sent back to the claimants, could contain communications as

---

[23] D.I. 22 at 3 (Joint Response of Armstrong / Celotex) ("each claim file must be retrieved from the [claims administrator's] computer system ...., and individually reviewed to make certain that the files do not contain privileged or proprietary information, or information that is not responsive").

to which the Trusts could properly claim attorney-client privilege, the Trusts fear that a privileged document might be attached to a claim submission or resolution letter by mistake. And, the Trusts insist it is their duty to review each document before it is produced to prevent such a mistake. Given the sheer magnitude of the review required here, the Trusts contend that "to misdirect funds from the payment of claims to the payment of the costs of responding to this discovery presents an undue hardship."[24]

In balancing these arguments, two key facts are at this time unknowable. First, how often does a mistake occur? If only very rarely, then the Insurers are right that a computer program that extracts the submissions and resolutions by definition avoids intrusion into the Trusts' privileged communications. Second, how often will the Insurers find, amidst a sea of non-Congoleum claims, a "smoking gun" that they will actually use in the Coverage Action? If only very rarely, then the Trusts are correct that they should not finance, at the expense of their present and future claimants, an elaborate Insurers' fishing expedition.

In order to accommodate the Trusts' legitimate concerns regarding the burden of review, while avoiding any undue burdens on the Trusts, the Court will permit discovery to go forward subject to levels of protection that will culminate in an opportunity for the Trusts to review each document that the Insurers actually

---

[24] D.I. 20 at 4 (Kaiser Response).

decide to use in the Coverage Action. First, the Insurers will be required to write, at their expense but in consultation with the Trusts, computer program(s) that will include search terms designed to identify potentially privileged information (e.g., a memorandum with a legend, "privileged attorney-client communication"). Second, the limited number of persons permitted to review the documents produced, under the terms of a confidentiality order, will be required to notify the Trusts of any document that the person "knows or reasonably should know ... was inadvertently sent" so that a pull-back procedure can be invoked.[25] Finally, before any document produced pursuant to this subpoena is used in the Coverage Action, the receiving party will be required to notify the Trusts so as to enable them to review and (if warranted) pull back that document.

## C.   Other Objections

The Trusts raise several other objections to the subpoenas that do not warrant quashing the subpoenas in their entirety but confirm the importance of protecting the Trusts from undue burden and costs.

1.   <u>Alternative Sources.</u>   Some Trusts object that the information sought is available from others sources, *i.e.*, the Congoleum claimants and their lawyers. Unlike the Trusts, the claimants have an interest in the Coverage Action because

---

[25] *See* Delaware Lawyers' Rules of Professional Conduct, Rule 4.4(b); *see also, e.g.*, ABA Model Rules of Professional Conduct, Rule 4.4(b).

the resolution of coverage issues may affect the payout to them.[26]   Still, while discovery may be denied if it is "obtainable from some other source that is more convenient, less burdensome, or less expensive,"[27] the Insurers decision to issue seven subpoenas to entities with electronic files containing information sought as to 122,000 claimants is reasonable, and may well be more convenient, less burdensome, and less expensive overall than issuing subpoenas to each of the claimants or the firms that represent them.   Although the parties appear to agree that six law firms represent 68 percent of the Congoleum claimants, the Trusts do not suggest how the Insurers could as efficiently obtain claim information from the remaining 32 percent.

This Court's ruling in *Chester Link et al. v. Ahlstrom Pumps, LLC, et al.*,[28] denying a defendant's motion to compel production from an asbestos trust, does not compel a ruling in the Trusts' favor.   In *Link*, Owens-Illinois asked this Court to enforce a subpoena to the Celotex Trust requesting the claim forms and supporting documentation that Mr. Link had submitted to that Trust.   But on the day of the hearing, counsel learned that the judge in the underlying personal injury case, in Ohio, had already ordered Mr. Link's lawyers to give Owens-Illinois the same information.   Still, Owens-Illinois argued that the Court should enforce the

---

[26] D.I. 20 at 2 (Kaiser Response).
[27] Super. Ct. Civ. R. 26(b)(1)(i).
[28] 06-M-10-061 (Del. Super. Dec. 7, 2006) (White, Comm.).

subpoena "to just make sure that the information we get from the plaintiffs' lawyers is complete."[29]  In denying the motion, the Court ruled that the case was an "easy one" because plaintiffs' attorneys in Ohio had already been ordered to provide duplicates of the same documents that Owens-Illinois was seeking from the Trust.[30]  Nothing in *Link* suggests that the Court will never enforce a subpoena directed to an asbestos trust, or that a party is always required to subpoena large numbers of claimants' lawyers when the same information is available from a few sources.  As in *Link*, the Trusts here acknowledge that they routinely produce documents in response to subpoenas; the difference is "just the magnitude" of the requests.[31]

Nevertheless, the subpoenas threaten to impose significant, unfair expense by shifting the expense of responding to discovery from the Congoleum claimants to non-party asbestos trusts with no stake in the Coverage Action.  The Insurers may therefore fairly be required to pay the costs of foregoing claimant-directed discovery in favor of obtaining information from the Trusts.

2.   Relevance.  Certain Trusts contend that the information sought would have no bearing on the Coverage Action because the Trusts do not require their claimants to submit evidence of exposure to other companies' products, such as

---

[29] *Link,* transcript of hearing on Dec. 7, 2006, at 7 (attached as Ex. A to D.I. 15) (B&W /OCF / USG Motion to Quash).

[30] *Link*, Tr. at 40.

[31] Hrg. Tr. at 94; see also 58.

Congoleum's.[32]  It is difficult to gainsay, however, that a Congoleum claimant's

inconsistent factual statement, as to work history, for example, could be relevant to

a claim against Congoleum.  Standing Order No. 1, which governs this Court's

asbestos docket, suggests that the relevance of such information is beyond dispute;

it requires that an asbestos plaintiff shall serve upon the defendants "copies of all

claim forms and related materials related to any claims made by plaintiff to …

trusts," including "claims made to trusts for bankrupt asbestos litigation

defendants."[33]  And in the *Link* case upon which the Trusts rely, the Court ruled

"[i]f it's an issue of relevance, that issue has been argued and decided here in

Delaware.    Those documents [claim forms and supporting materials] are

relevant."[34]

    3.    Overbreadth.  The Trusts object that the subpoenas are overly broad,

arguing that they seek "any document that could in any conceivable way relate to

any one of the 122,000 persons or their claims."[35]  This argument fails because the

Insurers have narrowed their requests to seek only (i) the claims filed by any of the

Congoleum claimants with the Trusts, including supporting documents, (ii)

information on the resolution of the claim and the amount awarded, and (iii)

electronic data conveying this information.

---

[32] D.I. 22 at 4 (Joint Response of Armstrong / Celotex); see also D.I. 13 at 3 (CE Motion to Quash) ("The Subpoena Does Not Seek Evidence Relevant to the Coverage Action").

[33] *In Re Asbestos Litigation*, C.A. no. 77C-ASB-2, at 5-6 (Amended as of December 21, 2007).

[34] See *Link,* Tr. at 39.

[35] D.I. 15 at 2 (B&W / OCF/ USG Motion to Quash).

4. <u>Trade Secrets.</u> The Trusts contend that their method of storing and sorting claims data constitutes proprietary information that, if disclosed, could reveal trade secrets of the Trusts and/or their claims processors."[36] Again, however, a protective order can be crafted to limit the disclosure of claims storing and sorting methods to those on a "need to know" basis, perhaps limited to the consultant computer programmers who would design a program to extract the claims materials and resolutions. The Insurers' programmers have a "substantial need" for access to the database protocols to craft a time-saving program, and, as the Trusts have pointed out, attempting to search the databases without such access would impose undue hardship. Under these circumstances, Rule 45 permits the Court to order production "upon specified conditions."[37]

5. <u>Confidentiality.</u> The Trusts contend that the claims filed with them, with supporting materials, are confidential and thus immune from discovery. Most prominently, the CE Trust contends that, according to its TDP, information relating to asbestos claims against CE must be treated as confidential. Because its TDP was approved a bankruptcy court, the CE Trust claims that it cannot produce the information requested."[38]

---

[36] D.I. 22 at 4 (Joint Response of Armstrong / Celotex); see also D.I. 20 at 3 (Kaiser Response); D.I. 15 at 3 (B&W / OCF / USG Motion to Quash).
[37] Super. Ct. Civ. R. 45(c)(3)(B).
[38] D.I. 14 at 1-2 (CE Response). The CE Trust's TDP states, as to confidentiality, that "All submissions ... by a holder of a TDP Claim shall be treated as made in the course of settlement discussions between the holder and the [CE Trust] and intended by the parties to be confidential

Neither of the cases relied upon by the CE Trust supports this contention. The recent decision of the U.S. Supreme Court in *Travelers Indemnity Co. v. Bailey*[39] holds that (i) a federal bankruptcy court's injunction barring claims against Johns-Manville's insurers, as part of the company's 1986 reorganization plan, was broad enough to bar state-law actions against one such insurer, Travelers, based on allegations of its own wrongdoing while acting as Manville's insurer; and that (ii) principles of res judicata barred the Court from revisiting today whether the bankruptcy court had exceeded its jurisdictional authority in entering the injunction in 1986.[40] Here, no bankruptcy court order exempts the Trusts entirely from obligations imposed by valid subpoenas.  On the contrary, all the TDP's envision that the Trusts may be required produce documents in response to valid subpoenas.  If the assertion of confidentiality was intended to immunize the Trusts from discovery obligations, the TDP's would have had no reason to disclose that production would be required in response to valid subpoenas.

The bankruptcy court in *Western Asbestos*[41] also did not view an assertion of confidentiality as a trump card to block production.  In that case, the court held that a settlement agreement did not give the Hartford insurance company access to the

---

and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions."  Similar language appears in the TDP's for all the Trusts.

[39] -- U.S. --, 129 S. Ct. 2195 (2009).

[40] 129 S. Ct. at 2203, 2205-2006.

[41] *Renfrew v. Hartford Accident & Indemn. Co. (In re: Western Asbestos Co.)*, 2008 WL 1734577 (Bankr. N.D. Cal. Apr., 11, 2008).

debtor company's documents for use in third-party litigation. While commenting that confidentiality considerations weighed against Hartford's interpretation of the agreement, the court added that such considerations were not "determinative."[42] Instead, the court concluded that the language of the agreement, read in light of extrinsic evidence, did not authorize Hartford to use the information as it proposed. Further, the court specifically noted that Hartford could seek the information for use in litigation by way of third-party discovery.[43] That is what the Insurers seek to do here.

6.    Settlement Negotiations.    Several Trusts contend that claimant submissions and materials related thereto are protected because they were created in the course of settlement discussions between the claimants and the Trusts.[44] Even if the documents now sought—claimant submissions and resolutions— qualified as settlement negotiation material, they would not be protected from discovery altogether. Delaware Rule of Evidence (DRE) 408 provides, *inter alia*, that evidence of statements made in compromise negotiations is ... not admissible" to prove liability for in invalidity of any claim or its amount, but does not require exclusion "of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." DRE 408 does not create a discovery

---

[42] *Id.* at *7 n.8.

[43] *Id.* at *8.

[44] D.I. 22 at 2 (Joint Response of Armstrong / Celotex); D.I. 20 at 3 (Kaiser Response) ("the electronic claim files contain privileged communications regarding the settlement of claims").

privilege but, rather, addresses whether evidence relating to settlement discussions is admissible at trial.[45]   As this Court is not in a position to determine in advance the importance of the information that the Insurers seek to obtain, the better approach is to allow production to occur, subject to provisions that will protect confidentiality, and to ensure that the costs of the production fall on the Insurers who seek the information, not on the Trusts who are bystanders to the Coverage Action.

7.    <u>Attorney-Client Privilege.</u>    Finally, certain Trusts object to the subpoenas on the grounds that the claimant files contain the notes of their attorneys, which are protected from discovery by the attorney-client privilege.[46] This objection is blunted by the Insurers' willingness to forego seeking access to the entire claimant file.   As noted above, the claimant submissions, supporting material, and notice of resolution should not contain attorney-client communications over which the Trusts could assert a privilege.   But even if the Trusts' privileged communications could somehow find their way into these materials by mistake, this risk would not operate as a total bar to discovery. Instead, measures should be taken to avoid any waiver of the privilege through inadvertence or human error.

---

[45] *See, e.g., Block Drug Co., Inc. v. Sedona Laboratories, Inc.*, 2007 WL 1183828, *1 (D. Del. 2007) ("evidence of settlement negotiations may be discoverable under Rule 26's broad provisions"); *citing Lesal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 561 (D.N.J. 1994).

[46] D.I. 20 at 2-3 (Kaiser Response; D.I 22 at 2 (Armstrong / Celotex Response).

## CONCLUSION

For the reasons discussed above, the Insurers' motion to compel is granted upon the following conditions:

1.    The Insurers shall retain, at their own expense, a computer programmer to write the necessary computer program(s) to extract the information that the Insurers seek and to screen out privileged documents. The Trusts shall be required to cooperate with these efforts, including providing copies of databases for the programmer to use so as not to disrupt the business of the Trusts or their claims processors. Access to the databases shall be strictly limited to the computer programmer, with input from the Insurers' counsel and others assisting them as needed to ensure that the program is properly written to obtain the claimant submissions, supporting documents, claim resolutions, and data conveying same.

2.    Prior to delivery of responsive documents to the Insurers' counsel and those assisting them in the Coverage Action, the Trusts shall be given an opportunity to review, at their own expense, a sampling of files for privilege and other issues. To the extent that further refinements to the computer program are required following such review, the Insurers shall absorb the costs of these programming refinements.

3.    The parties will be asked to meet and confer to stipulate to a form of order that will set forth (i) a definition of confidential information as applied to the

information sought, (ii) the persons permitted to gain access to information designated confidential, and (iii) a procedure for challenging designations of confidentiality. After the review process set forth in paragraph 2, but prior to delivery of responsive documents to the Insurers' counsel for full review, the Trusts shall be given an opportunity to designate documents as confidential. Documents designated confidential shall be produced to Insurers with the following (or similar) legend: "Subject to Restrictions Imposed by the Delaware Superior Court in Misc. No. 09M-01-084." The Insurers shall pay the reasonable costs associated with labeling and production. In the event of a challenge as to the confidentiality of the documents produced pursuant to this order, the Insurers shall bring the challenge to this Court for resolution.

4.    Upon receipt and review of the documents produced pursuant to this order, the Insurers and any other recipient shall promptly notify the Trusts of any document that the recipient knows or reasonably should know was inadvertently produced, as well as any document designated privileged, regardless whether the recipient agrees that the document is privileged. At that point, the recipient will either destroy or return the document, or the Trusts will relinquish any claim of privilege, or the parties will bring the dispute to this Court for resolution.

5.    If any recipient intends to use any document produced pursuant to this ruling in the Coverage Action, the recipient must first make the document available

20

for review by the applicable Trust.  Privileged and non-responsive documents will be returned to the Trusts and not used in the Coverage Action.  In the event of any dispute over any document and/or to apply for consideration of fee-shifting with respect to the attorneys' fees incurred by the Trusts in their review of such documents, the Trusts may apply to this Court for relief.  The documents shall not be used in the Coverage Action until the resolution of any dispute regarding privilege.

6.    The recipient shall be prohibited from using documents produced pursuant to this order in connection with any proceeding other than the Coverage Action and in connection with any dispute relating to this Action.  The recipient is also required to destroy all produced documents within 30 days after the conclusion of the Coverage Action.

Counsel for the parties are requested to submit an appropriate form of order within ten business days.

**IT IS SO ORDERED.**

/s/ Matthew F. Boyer
Special Master

21

# EXHIBIT E

**Owens Corning/Fibreboard**
**ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

Submit completed claims to:
**Owens Corning/Fibreboard Asbestos Personal Injury Trust**
**P.O. Box 1072**
**Wilmington, Delaware 19899-1072**

### Instructions for the Claim Form

**File your claim more efficiently.  Submit and manage your claim electronically through the Owens Corning/Fibreboard ("OCFB") Asbestos Personal Injury Trust's (the "Trust") website.  Visit www.ocfbasbestostrust.com for more information.**

**Note: It is possible that claim data previously submitted to the Celotex Asbestos Settlement Trust, the Babcock & Wilcox Asbestos Settlement Trust, the USG Asbestos Settlement Trust and the Armstrong World Industries Asbestos Settlement Trust can be used to expedite the preparation and review of claims for the Trust.  Doing so will reduce the work necessary to file a claim and minimize the time it takes to review the claim.  Please visit the Trust's website (www.ocfbasbestostrust.com) for information on how to make use of this data. Presumptive Significant Occupational Exposure Occupation Ratings are available on the Trust's website www.ocfbasbestostrust.com .**

Otherwise, complete this claim form as thoroughly and accurately as possible.  Please type or print neatly. Should there be insufficient space to list all relevant information, please attach additional sheets.  In addition to filing this form, please ensure the following are enclosed:

- Death Certificate (if applicable)
- Certificate of Official Capacity or other estate documentation (if personal representative is filing form) if applicable per state law
- Medical records as required by the Trust Distribution Procedures and as requested in instructions
- Proof of Owens Corning and/or Fibreboard Exposure, as applicable (i.e., qualifying exposure to OCFB Products/Operations, as defined below and as set out in the instructions)
- Documentation of Economic Loss (if applicable – see Part 8 below)
- Completed Form W-9 if using release that does not include W-9 language (if applicable)

---

**Choice of Claim Process**

Please choose the applicable claim process **(check only one)**:
☐     Expedited Review ("ER") (not available for Level VI, Lung Cancer 2, or Foreign Claims)
☐     Individual Review ("IR")

Please identify the applicable entity that you are claiming against **(check one or both)**:
☐     Owens Corning ("OC")
☐     Fibreboard ("FB")

---

070604 v2

{D0090373.1 }

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Representation**

If counsel represents claimant, please print or type the following information:

1. Attorney Name: _____ _____ _____
                                    (Last)                             (First)       (MI)

2. Name of Law Firm: _____

3. Firm Address: _____
                            _____

4. Attorney Phone: (     ) _____ Fax: (     ) _____ Email: _____

5. Paralegal or Contact Name: _____ _____ _____
                                           (Last)                          (First)
(MI)

6. Contact Phone: (     ) _____ Fax: (     ) _____ Email: _____

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 1: Injured Party Information**

1. Name: _____  _____  ____
                                (Last)                                (First)                    (MI)

2. Social Security Number:  _____-_____-_____

3. Gender: Male _____ Female _____          4. Date of Birth:  _____/_____/_____
                                                                                            (month)    (day)      (year)

5. Is injured party living? Yes_____ No _____

6. If injured party is deceased, please complete the following: **(Death Certificate must be enclosed)**

    6a. Date of death: _____/_____/_____
                                   (month)      (day)        (year)

    6b. Was death asbestos-related? Yes _____ No _____

7. If injured party is living and not represented by counsel, please complete the following:

    7a. Mailing address: _____
                                                            (street/PO Box)

                                    _____
                                                            (city/state/zip)

    7b. Daytime Phone: (      ) _____-_____

    7c. Email Address: _____

8. If injured party is deceased or has a personal representative or heir other than, or in addition to, his/her attorney, please indicate the following for the representative. **(Certificate of Official Capacity or other estate documentation must be enclosed if applicable per state law.)**

8a. Name: _____  _____  ____
                            (Last)                                (First)                    (MI)

    8b. Social Security Number: _____-____- _____   , or Tax ID Number: _____

    8c. Mailing Address: _____
                                                        (street/PO Box)

                                 _____
                                                        (city/state/zip)

    8d. Daytime Phone: (      ) _____ - _____

    8e. Email Address: _____

    8f. Relationship to injured party: _____
                                                                    (spouse, child, etc.)

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 2: Diagnosed Asbestos-related Injuries**

1. Place an X next to the highest level (most serious) asbestos-related Disease Category that has been diagnosed for the injured party and for which medical documentation is attached to this claim form.  See instructions for a list of specific medical criteria and records that must be enclosed for each Disease Category.  **(Check only the most serious)**

| | Level | Scheduled Disease |
|---|---|---|
| ☐ | VIII | **Mesothelioma** |
| ☐ | VII | **Lung Cancer I** |
| ☐ | VI | **Lung Cancer 2**<br>(Individual Review Only) |
| ☐ | V | **Other Cancer     (Please specify: _____)** |
| ☐ | IV | **Severe Asbestosis**<br>(ILO of 2/1 or greater, or asbestosis determined by pathology plus (a) TLC less than 65% or (b) FVC less than 65% plus FEVl/FVC ratio greater than 65%) |
| ☐ | III | **Asbestosis/Pleural Disease**<br>(Bilateral Asbestos-Related Non-Malignant Disease plus (a) TLC less than 80% or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%) |
| ☐ | II | **Asbestosis/Pleural Disease**<br>(Bilateral Asbestos-Related Non-Malignant Disease) |
| ☐ | I | **Other Asbestos Disease**<br>(Cash Payment Discount, not subject to the Payment Percentage) |

2. Date of Diagnosis: _____/_____/_____
         (month)    (day)    (year)

**The claims must meet the relevant medical criteria and be supported by appropriate medical documentation as defined in the Asbestos Personal Injury Trust Distribution Procedures. The presumptive medical criteria for the Disease Categories set forth above are included in the instructions.**

☐  For claims filed against OCFB or any other asbestos defendant in the tort system prior to the Petition Date (October 5, 2000), please check this box if you have a report of a diagnosing physician who conducted the physical exam of the claimant, or you have filed such a report with OCFB or another defendant in the tort system or another asbestos-related personal injury settlement trust. (see Sections 5.7(a)(1)(a) and 5.7(a)(1)(c) of the TDP)

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 3: Exposure to Asbestos Operations, Activities or Products**

Proof of Significant Occupational Exposure ("SOE") to asbestos-related products as well as proof of OCFB Exposure *(i.e., qualifying exposure to OC and/or FB Products/Operations, as defined below and as set out in the instructions)* must be enclosed as required by Asbestos Personal Injury Trust Distribution Procedures sections 5.3 and 5.7(b). (See instructions) ***Please photocopy this section and list separately each company site, industry, and occupation combination upon which you rely to meet the exposure requirements of the TDP.***

"OC and/or FB Products/Operations" means asbestos or asbestos-containing products manufactured, produced, distributed, sold, fabricated, installed, released, maintained, repaired, replaced, removed, and/or handled by OC, FB or any entity, including an OC or FB contracting entity, for which OC or FB is responsible.

**Please include detail concerning all asbestos exposure (not just OCFB Exposure) which you think is sufficient to meet the criteria for approval of the claim at the claimed disease level.  List each site, industry and occupation combination separately.**

*For OCFB Exposure, a list of approved OC and FB sites is available on the Trust website (**www.ocfbasbestostrust.com**).  Please reference this list and enter the Approved OCFB Site Code in item #1 below.*

*If the site where you are alleging exposure to OC and/or FB Products/Operations is not on the approved OCFB site list, provide independent documentation of meaningful and credible evidence of exposure to such OC and/or FB Products/Operations.  This may be established by documentation including, but not limited to, the following:*

- *An affidavit of the injured party (an example is included on the Trust website)*
- *An affidavit of a co-worker*
- *An affidavit of a family member in the case of a deceased claimant*
- *Invoices*
- *Construction or similar records*
- *Sworn statement, interrogatory answers, sworn work history, or deposition*

1.     Site/Plant where exposure occurred:
       **Be sure that the site list is consistent with the entity you are claiming against - OC or FB.**

       Name of Site/Plant of Asbestos Exposure:    _____

       Or, if this site is on the approved OCFB site list, enter the Site Code from Exhibit A (available on web)

                                    Site Code:  _____

       If a Site Code is entered, please skip to question 2, otherwise provide:

                                    City:  _____

                              State/Province:  _____    Country:  _____

       If this exposure involved products manufactured, produced, distributed, sold, fabricated, installed, released, maintained, repaired, replaced, removed, and/or handled by OCFB or any entity, including an OCFB contracting entity, for which OCFB is responsible, identify the products and provide the evidentiary basis for the claim that these products  were at that site.

       _____

       _____

2.     Date Exposure Began: _____/_____        Date Exposure Ended: _____/_____
                            (month)    (year)                              (month)    (year)

3.     Occupation at Time of Exposure (*e.g.*, Boilermaker, Laborer, etc.): _____

## OCFB ASBESTOS PERSONAL INJURY TRUST
### PROOF OF CLAIM FORM

4.    Industry in which exposure occurred: _____ (Industry codes listed below)

   If Code 37 - Other, please describe: _____

---

**Industry Codes**

| | |
|---|---|
| 10. Asbestos mining | 24. Petrochemical |
| 11. Aerospace/aviation | 25. Insulation |
| 12. Asbestos abatement | 27. Railroad |
| 13. Automobile/mechanical friction | 30. Shipyard-construction/repair |
| 16. Chemical | 31. Textile |
| 17. Construction trades | 32. Tire/rubber |
| 18. Iron/steel | 33. Utilities |
| 19. Longshore | 34. Asbestos products manufacturer |
| 20. Maritime | 36. Building occupant |
| 21. Military | 37. Other |
| 23. Non-asbestos products manufacturing | |

---

5.    If your occupation does not appear on the list of Presumptive SOE Occupations Ratings list (available at **www.ocfbasbestostrust.com**.), please advance directly to question 6. If it does appear on the list, indicate circumstances of exposure to asbestos products or activities (check all applicable):

☐    Injured party handled raw asbestos fibers on a regular basis

☐    Injured party fabricated asbestos-containing products such that the injured party in the fabrication process was exposed on a regular basis to raw asbestos fibers

☐    Injured party altered, repaired or otherwise worked with an asbestos-containing product such that the injured party was exposed on a regular basis to asbestos fibers

☐    Injured party was employed in an industry or occupation such that the injured party worked on a regular basis in close proximity to workers who did one or more of the above three activities

☐    None of the above

6.    If the injured party's occupation **does not** appear on the list of Presumptive SOE Occupations Ratings list, or "None of the above" was checked in question 5 above, provide a description of how the injured party was exposed to asbestos.

_____

_____

7.    **Company Exposure**  Every claimant must submit evidence of exposure to OC/FB asbestos products or activities.

   a.    To demonstrate exposure to OC/FB products or activities, check the applicable box below. If you check box 5, answer Question 7(b). If any of the first four boxes are checked, proceed to question #8. (check one box only)

☐    1.    The site is on the relevant OC or FB approved site list, and the injured party worked there during the appropriate time period (if there is no date on the site list, please answer the question 7(b) below); or

☐    2.    Claimant's answer to Question #1 is the injured party's personal identification of exposure to OC or FB asbestos products/activities; or

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

☐    3.    Claimant's answer to Question #1 otherwise identifies OC or FB asbestos products/activities at this site (e.g. coworker affidavit), and also identifies the injured party by name; or

☐    4.    The answer to Question #1 provides evidence that OC or FB asbestos products or activities were at this site and further sets forth that the injured party worked at this site within a year of having demonstrated that the asbestos products or activities were present at the site; or

☐    5.    None of the above apply.

b.    If the box 5 was checked, or if the box 1 was checked and there is no date on the site list, provide a description of the injured party's exposure to the type of asbestos products or activities that you have attributed to OC/FB at this site:

_____
_____
_____
_____

8.    If this exposure is in support of *Exposure to an Occupationally Exposed Person* from Part 4, please enter the name of the occupationally exposed individual:

_____    _____    _____
                  (Last)                                              (First)                          (MI)

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 4: Exposure from an Occupationally Exposed Person**

**Note: If a claimant alleges an asbestos-related disease resulting solely or in part from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Sections 5.3(b) and 5.5 of the Trust Distribution Procedures.  See Choice of Claim Process box on first page of this claim form.**

1. Is the claimant alleging an asbestos-related disease resulting in whole or in part from another person's occupational exposure, such as a family member (spouse, father, sister, etc.)?

    Yes_____ No_____

    If yes, Part 3 must also be completed for each occupationally exposed person.

2. Date exposure to other person began:        _____/_____
                                                               (month)    (year)

3. Date exposure to other person ended:        _____/_____
                                                               (month)    (year)

4. Relationship to occupationally exposed individual:

    _____
                                (brother, son, spouse, etc.)

5. Social Security Number of occupationally exposed individual:  _____-_____-_____

6. Describe how injured party was exposed through the occupationally exposed individual to the OCFB products or conduct:

    _____

    _____

    _____

    _____


**Reminder: Part 3 <u>must</u> be completed for the occupationally exposed person.  If the injured party also had direct, occupational exposure to asbestos, Part 3 must also be completed for that exposure.**

## OCFB ASBESTOS PERSONAL INJURY TRUST
## PROOF OF CLAIM FORM

**Part 5: Litigation/Claims History**

1. Has an asbestos-related lawsuit ever been filed on behalf of the injured party?        Yes_____ No_____

    a.        Was Owens Corning named as a defendant? Yes_____ No_____

            Was Fibreboard named as a defendant?        Yes_____ No_____

    b. State in which the suit was originally filed: _____

    c. Name of court in which the suit was originally filed: _____

    d. Case number: _____

    e. Date the suit was originally filed: _____/_____/_____
                                (month)    (day)      (year)

    f. Have you received money from Owens Corning or Fibreboard regarding this suit?
                                                                  Yes_____ No_____

    g. Did you sign a release releasing Owens Corning or Fibreboard regarding this suit?
                                                                  Yes_____ No_____

2. If the answer to question 1(a) above is No, in which state/jurisdiction would the claimant have elected to file suit against OCFB ? _____ [see section 5.3(b)(2)]
                                  (state)

3. Was a tolling agreement for the injured party ever in effect with respect to the claim(s) against Owens Corning or Fibreboard?        Yes_____ No_____

    a. Date the tolling agreement began: _____/_____/_____
                                        (month)    (day)      (year)

    b. Date the tolling agreement ended: _____/_____/_____
                                        (month)    (day)      (year)

**If your answer to Question 3 is "Yes", please enclose a copy of the tolling agreement with this Claim Form.**

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 6: Financial Dependents**

List any other persons who may have rights associated with this claim.  Be sure to include the injured party's spouse and/or any other financial dependents who derive (or who derived at the time of diagnosis of the asbestos-related disease claimed) at least one-half of their financial support from the injured party. *This must be completed for IR claims only.*

If additional space is required, please photocopy this page and insert after current page.

---

1. Name: _____ 2. Date of Birth: _____/_____/_____
       (Last)          (First)          (MI)                              (month)
(day)      (year)

3. Relationship:  ☐ Spouse                          4. Financially Dependent:      ☐ Yes
                 ☐ Child                                                          ☐ No
                 ☐ Heir
                 ☐ Other _____

---

1. Name: _____ 2. Date of Birth: _____/_____/_____
       (Last)          (First)          (MI)                              (month)
(day)      (year)

3. Relationship:  ☐ Spouse                          4. Financially Dependent:      ☐ Yes
                 ☐ Child                                                          ☐ No
                 ☐ Heir
                 ☐ Other _____

---

1. Name: _____ 2. Date of Birth: _____/_____/_____
       (Last)          (First)          (MI)                              (month)
(day)      (year)

3. Relationship:  ☐ Spouse                          4. Financially Dependent:      ☐ Yes
                 ☐ Child                                                          ☐ No
                 ☐ Heir
                 ☐ Other _____

---

1. Name: _____ 2. Date of Birth: _____/_____/_____
       (Last)          (First)          (MI)                              (month)
(day)      (year)

3. Relationship:  ☐ Spouse                          4. Financially Dependent:      ☐ Yes
                 ☐ Child                                                          ☐ No
                 ☐ Heir
                 ☐ Other _____

---

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 7: Smoking History**

For each item, indicate whether the injured party has smoked.  Please indicate the dates cigarettes or cigars were used, and the amount per day.  Indicate fractional packs or fractional cigars as appropriate, *e.g.*, three and one-half packs would be entered as 3.5. ***This need only be completed for IR claims alleging disease Levels II through VII.***

---

1. Has the injured party ever **Smoked Cigarettes?**          Yes_____   No_____

    1a. From: _____/_____                    To: _____/_____
           (month)    (year)                              (month)   (year)

    1b. Packs per day:_____ (use decimal)

---

1. Has the injured party ever **Smoked Cigars?**          Yes_____   No_____

    1a. From: _____/_____                    To: _____/_____
           (month)    (year)                              (month)   (year)

    1b. Cigars per day:_____ (use decimal)

---

**OCFB ASBESTOS PERSONAL INJURY TRUST**
**PROOF OF CLAIM FORM**

**Part 8: Employment Information for Economic Loss**

*This is to be completed for IR claims only.*

1. Current Employment Status of the injured party:
   ☐ Full-time, outside the home
   ☐ Full-time, within the home
   ☐ Part-time, outside the home
   ☐ Part-time, within the home
   ☐ Retired
   ☐ Disabled
   ☐ Deceased

2. Amount of last annual wages: $_____

3. Date of last wage received: _____/_____
                                (month)    (year)

(Enter current date if currently earning work-related compensation.)

**If economic losses are being claimed, you must enclose an economic report, IRS Form W-2, the first page of IRS Form 1040, or other relevant supporting documentation.**

## OCFB ASBESTOS PERSONAL INJURY TRUST
## PROOF OF CLAIM FORM

**Part 9: Signature Page**

**All claims must be signed by the claimant, or the person filing on his/her behalf (such as the personal representative or attorney).**

If signed by the claimant or the personal representative, I (the claimant or personal representative) have reviewed the information submitted on this claim form and all documents submitted in support of this claim. Upon information and belief, I hereby certify, under penalty of perjury, the information submitted is accurate.

If signed by the claimant's counsel, upon information and belief, I hereby certify, under penalty of perjury, that the information submitted is accurate.

_____

Signature of claimant, personal representative, or claimant's counsel.

_____

Please print the name and relationship to the claimant of the signatory above.

Date: _____/_____/_____
       (month)  (day)   (year)

**Please review your submission to ensure it is complete and includes the following documents as applicable.**

☐ Death Certificate (if applicable)

☐ Certificate of Official Capacity or other estate documentation (if personal representative is filing form) if applicable per state law.

☐ Medical Records as required by the Trust Distribution Procedures and as requested in the instructions

☐ Proof of OCFB exposure and Significant Occupational Exposure as required in the Trust Distribution Procedures and requested in the instructions, including affidavits from the injured party or others.

☐ Copy of the tolling agreement (if applicable in Part 5)

☐ Documentation of Economic Loss (if Part 8 is applicable)

**If you are filing an IR claim and have additional information (see TDP section 5.3(b)(2)) you want the Trust to consider in evaluating your claim, please include these documents with the Claim Form.**

# **EXHIBIT F**

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is hereby entered into, as of the date set forth below, by and between the Official Committee of Unsecured Creditors (the "Creditors' Committee") of Motors Liquidation Company and its affiliated debtors and debtors-in-possession (the "Debtors"), the Delaware Claims Processing Facility and Claims Resolution Management Corporation (together, the "Claims Processing Facilities"), the Debtors, and General Motors LLC ("New GM" and together with the Claims Processing Facilities and the Debtors, the "Producing Parties").

WITNESSETH

WHEREAS, on August _, 2010, the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "2004 Order") granting the Creditors' Committee's Motion for an Order Pursuant to Bankruptcy Rule 2004 Directing Production of Documents by (i) the Claims Processing Facilities for Certain Trusts Created Pursuant to Bankruptcy Code Section 524(g), and (ii) General Motors LLC and the Debtors (the "2004 Motion");[1]

WHEREAS, pursuant to the 2004 Motion, the Creditors' Committee has requested the following general categories of information from the Claims Processing Facilities and, if necessary, the Trusts (the "Trust Information"): (i) any and all claims forms and other documents submitted to each of the Trusts by each of the plaintiffs in the Mesothelioma Cases; and (ii) all documents relating to payments made or to be made to each of the plaintiffs in the Mesothelioma Cases by each of the Trusts, or reflecting decisions or resolutions concerning such plaintiffs' claims against the Trusts;

WHEREAS, pursuant to the 2004 Motion, the Creditors' Committee has requested the following general categories information from New GM and the Debtors (together with the Trust Information, the "Requested Information"): (i) the last four digits of the social security numbers of the plaintiffs who filed pre-petition asbestos personal injury actions against Old GM (the "SSN Information"); and (ii) the complaints, case-specific interrogatory responses submitted by plaintiffs, and transcripts of the depositions of plaintiffs in the Mesothelioma Cases (the "Case File Information");

WHEREAS, the Creditors' Committee seeks the Requested Information in order to evaluate the Debtors' asbestos liability for purposes of settlement and, if necessary, in connection with a hearing to establish the estimated amount of the Debtors' asbestos liability (the "Estimation Proceeding");

WHEREAS, the SSN Information is personal and confidential in nature, certain of the Trust Information may be personal and confidential in nature, and certain portions of the Case File Information may have been marked as confidential in the underlying proceedings in

---

[1]    All capitalized terms not herein defined shall have the same meaning as ascribed to them in the 2004 Order or the 2004 Motion.

the Mesothelioma Cases (all such documents and information, to the extent designated as confidential by a Producing Party, the "Confidential Estimation-Related Information");

WHEREAS, as of the date of this Agreement, the following professionals retained by the Creditors' Committee will be assisting the Creditors' Committee in evaluating the Debtors' asbestos liability: Kramer Levin Naftalis & Frankel, LLP, FTI Consulting, Inc. and Bates Whites LLC (as may be supplemented, the "Retained Professionals");

WHEREAS, this Agreement is intended to facilitate the delivery of the Requested Information from the Producing Parties to the Creditors' Committee and to establish the Creditors' Committee's obligations with respect to the confidentiality of such information;

NOW THEREFORE, in consideration of the foregoing, and as a condition to the Producing Parties providing the Requested Information to the Creditors' Committee, the Producing Parties and the Creditors' Committee hereby agree as follows:

1.      The Confidential Estimation-Related Information must be maintained in a confidential manner and used only in connection with the Estimation Proceeding, provided that the Creditors' Committee may disclose summaries or redacted versions of the Confidential Estimation-Related Information in accordance with the terms of this Agreement, and provided further that the Creditors' Committee may disclose the SSN Information to the Claims Processing Facilities, the Trusts, and other similar sources of information in accordance with the terms of this Agreement.

2.      All Confidential Estimation-Related Information will be maintained by the Retained Professionals on a "professionals eyes' only" basis, provided that if the Creditors' Committee retains additional professionals in connection with the Estimation Proceeding, the Creditors' Committee will so notify the Producing Parties, and such additional professionals will have access to the Confidential Estimation-Related Information.

3.      If Confidential Estimation-Related Information is used, revealed or inquired about at any deposition, any Confidential Estimation-Related Information contained in transcripts of such deposition shall be marked "CONFIDENTIAL" and shall be subject to the terms of this Agreement.

4.      The Retained Professionals may not disclose the Confidential Estimation-Related Information to the members of the Creditors' Committee, but may prepare and disclose to the members of the Creditors' Committee (i) summary reports of the Confidential Estimation-Related Information (the "Summary Information") and (ii) individual clamant data provided that names and other identifying details have been redacted (the "Redacted Information").

5.      In seeking information about GM claimants from other sources, the Creditors' Committee may share and disclose the SSN Information to the Claims Processing Facilities, the Trusts, and any other similar sources of information, solely for the purpose of enabling such Claims Processing Facilities, Trusts, or other sources of information to identify the claimants about whom the Creditors' Committee is inquiring, provided that each such party executes an acknowledgment, in the form of Exhibit A hereto, agreeing to be bound by the terms of this Agreement.

6.      The Creditors' Committee may share and disclose the Confidential Estimation-Related Information with other parties in connection with the Estimation Proceeding, provided that each party executes an acknowledgment, in the form of Exhibit A hereto, agreeing to be bound by the terms of this Agreement.

7.      With respect to Confidential Estimation-Related Information disclosed under this Agreement, the Creditors' Committee shall:

> a.      hold the Confidential Estimation-Related Information in confidence, exercising a degree of care not less than the care used by receiving party to protect its own proprietary or confidential information that it does not wish to disclose;

> b.      restrict disclosure of the Confidential Estimation-Related Information solely to the Retained Professionals (as may be supplemented, as indicated in paragraph 1) including the Retained Professionals' partners and employees with a need to know and not disclose it to any other person; and

> c.      advise those persons to whom the Confidential Estimation-Related Information is proposed to be disclosed of their obligations with respect to the Confidential Estimation-Related Information.

8.      The Confidential Estimation-Related Information shall be deemed the property of the Producing Party producing such information and, after the later of (a) entry of a final non-appealable order in the Estimation Proceeding and (b) the effective date of a plan of liquidation in the Debtors' bankruptcy case, upon written request, the Creditors' Committee and its Retained Professionals shall return, destroy or erase all Confidential Estimation-Related Information, except in each case as required by law, rule, regulation or internal document retention policies for compliance purposes.

9.      The Creditors' Committee shall have no obligation to preserve the proprietary or confidential nature of Requested Information that

> a.      was lawfully in the Creditors' Committee's possession at the time of the disclosure and was obtained free of any obligation to keep it confidential;

> b.      is or becomes publicly available other than by a breach of this Agreement;

c.     is developed by or on behalf of the Creditors' Committee or its Retained Professionals independent of any Requested Information produced by any of the Producing Parties;

d.     is received from one of the Producing Parties whose disclosure to the knowledge of the party, after due inquiry, does not violate any confidentiality obligation; or

e.     is disclosed in accordance with and subject to paragraph 10 hereof, pursuant to the requirement or request of a duly empowered governmental, regulatory or supervisory agency or authority or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation, rule or court order.

10.     In the event that the Creditors' Committee (or one of its agents or professionals) is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena or any other process employed in connection with a judicial, investigatory or administrative proceeding) to disclose any Requested Information, and subject in all cases to the second sentence of this paragraph, it is agreed that the party will give the Producing Parties notice of any such request or requirement within five (5) calendar days so that the Producing Parties may seek an appropriate protective order or other remedy to assure that the Requested Information will be accorded confidential treatment in compliance with this Agreement.  Nothing herein shall prevent disclosure of Requested Information if such disclosure is permitted or required by an administrative or judicial order.

11.     In testimony and filings with the Bankruptcy Court (or any other court), the Creditors' Committee may not divulge Confidential Estimation-Related Information except when the following conditions are met: (i) such information is directly relevant to the Estimation Proceeding and (ii) there is no reasonable manner to provide such directly relevant information without disclosing Confidential Estimation-Related Information.  In the event that the Creditors' Committee seeks or intends to offer into evidence or otherwise use Confidential Estimation-Related Information for the foregoing reasons, then the Creditors' Committee shall first seek an order providing that such information shall be filed under seal and shall give notice of such motion to the Producing Parties.  Notwithstanding the foregoing, the Creditors' Committee may disclose the Summary Information and Redacted Information in public filings before the Court in connection with the Estimation Proceeding.

12.     This Agreement shall benefit and be binding upon the parties hereto and with each party's written consent their respective successors and assigns.

13.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to choice of law principles and shall be subject to the jurisdiction of the Bankruptcy Court.

14.    This Agreement shall become effective as of the date executed by all parties to the Agreement and shall terminate upon the earlier of the closing or dismissal of the Debtors' cases, except as may otherwise be ordered by the Bankruptcy Court.

15.    The parties acknowledge that in the event of an unauthorized disclosure, the damages incurred by the Producing Parties may be difficult if not impossible to ascertain, and that the Producing Parties may seek injunctive relief as well as monetary damages against the Creditors' Committee for breaches this Agreement.

16.    The Creditors' Committee acknowledges that it is aware and will advise its representatives that the United States securities laws restrict persons with material non-public information about a company obtained directly or indirectly from that company from purchasing or selling securities of such company and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

17.    This Agreement constitutes the entire understanding between the parties with respect to the Requested Information provided hereunder.  No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and executed on behalf of each party by its duly authorized representative.

18.    This Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Facsimile signatures to this Agreement shall be deemed to be binding upon the parties.

19.    Each party represents that it has caused this Agreement to be executed on its behalf as of the date written below by a representative empowered to bind that party with respect to the undertakings and obligations contained herein.

Executed and effective as of this ____ day of _____, 2010.

_____

_____

# **EXHIBIT G**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 16175, 16336, 16337,** |
| | ) | **and 16415  and 16946** |

## ORDER REGARDING W.R. GRACE & COMPANY'S MOTIONS TO COMPEL DISCOVERY MATERIALS FROM THE CELOTEX ASBESTOS SETTLEMENT TRUST

Upon consideration of the Debtors' Motion to Compel the Celotex Asbestos Settlement Trust (the "Celotex Trust") to produce documents and appear at a deposition, at docket number 16175 (the "Motion") and all Objections, Oppositions, Responses and other filings related thereto; and all argument on the Motion; upon due deliberation:

THE COURT HEREBY INCORPORATES the findings of facts and conclusions of law announced at the August 29, 2007 hearing on the Motion (Transcript at docket number 16747) as if they are fully set forth in this Order.

IT IS HEREBY ORDERED THAT:

1.  Grace's Motion to Compel the Celotex Trust to Produce Documents and to Appear at a Deposition is granted in part and denied in part. Specifically, the Celotex Trust is ordered to produce, in electronic form, those portions of its databases and electronic files that contain or reflect the data gathered through the responses to portions of Parts 1 which include claimant-identifying information, including name, date of birth and last 4 digits of social security number, and all of Parts 4 and 5 of its Individualized Claim Review Form for the 73,745 claimants the Celotex Trust identified as responsive to Exhibits 1 through 6 of Subpoena Request No. 7 in footnote 3 of the Celotex Trust's Opposition to the Motion (Docket No. 16337), within 14 days of entry of this Order; it is further ORDERED that

2.  Nothing in paragraph 1 of this Order shall relieve the Celotex Trust from its obligation to produce those materials that it agreed to produce prior to the resolution of the Motion, provided that all materials produced by the Celotex

Trust pursuant to this paragraph are also covered by the protective provisions of this Order; it is further ORDERED that

3.    The Celotex Trust shall produce a witness for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) in response to Grace's subpoena within 30 days of entry of this Order; it is further ORDERED that

4.    Grace shall bear the cost incurred by the Celotex Trust in complying with this Order, consistent with this Court's August 29, 2007 rulings. In addition, Grace shall pay a reasonable fee for the use of the electronic data. Specifically, Grace shall pay the Celotex Trust a fee of $10,000 in advance of production of the electronic data; it is further ORDERED that

5.    The electronic datasets, claimant information, claims processing information or other information that the Celotex Trust provides, pursuant to paragraphs 1, 2 or 3 (the "Protected Information") shall be used only in connection to the Estimation Proceeding. As a precautionary measure, but not as a precondition to protection, any confidential materials separate from the electronic database designated as Protected Information shall be stamped as "CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER." The Protected Information must be maintained in a confidential manner, and shall be made available only to "Authorized Individuals." Authorized Individuals are: (1) counsel of record to the Debtor or an Official Committee involved in the Estimation Proceeding (the Debtor and Official Committee are generically referred to as "Party"), including attorneys, secretaries and legal assistants and paralegals in the regularly employment of the counsel of record who are personally involved in rendering services to a Party in the Estimation Proceeding, (2) officers, directors, agents and employees of the Debtor who are personally involved in rendering services to the Debtor in the Estimation Proceeding, (3) outside consultants or experts who are retained by a counsel of record for the purpose of assisting in the Estimation Proceeding and for whom a Party believes access to the Protected Information is appropriate in order to provide their services to the Party, and (4) witnesses, and their counsel, in preparation for testimony in the Estimation Proceeding; it is further ORDERED that

6.    The Parties and the Authorized Individuals are prohibited from using the Protected Information for any purpose not directly related to the Estimation Proceeding; it is further ORDERED that

7.    For each entity that obtains access pursuant to paragraph 6 of this Order to the electronic data or other Protected Information produced by the Celotex Trust, a person with authority to bind that entity must sign an acknowledgement of the confidentiality provisions described in this Order. The Confidentiality Agreement Acknowledgment form is attached hereto as Exhibit 1. Copies of the signed Confidentiality Agreement Acknowledgement shall be filed with the Court in camera. Any Party filing such Acknowledgements with the Court shall

2

contemporaneously serve the Celotex Trust redacted copies with alphanumeric codes identifying the persons who sign the Acknowledgements which correspond to the Acknowledgements filed with the Court in camera.    Following the conclusion of the Bankruptcy Proceeding (as specified in paragraph 13 below), each party will file in camera with the Court a Certification from each person who received the Protected Information confirming that the Protected Information has been returned to the Celotex Trust or destroyed as required in this Order.    The Parties shall contemporaneously serve the Celotex Trust redacted versions of such Certifications with the same alphanumeric codes corresponding to the original Acknowledgement.    The Celotex Trust may, upon notice to the Parties, request an in camera view of all the Acknowledgements and Certifications if the Celotex Trust believes the confidentiality provisions of this Order may have been violated.; it is further ORDERED that

8.    In testimony and filings with the Court, the Parties and Authorized Individuals may not divulge information regarding individually identifiable Celotex Trust claimants derived from the Protected Information that if revealed would cause the individual's identity to be ascertained ("Individually-Identifiable Protected Information") except when the following conditions are met:    (1)    such information is directly relevant to the Estimation Proceeding, (2) there is no reasonable manner to provide such directly relevant information without identifying individual Celotex Trust claimants; it is further ORDERED that Any filing containing, disclosing or revealing any Individually-Identifiable Protected Information  shall be filed separately in a sealed envelope or container on which shall be endorsed a general description of the envelope's contents and a statement in the following form:

> **Filed Under Seal Pursuant to Stipulation and Protective Order:**  This envelope [or container] is sealed pursuant to an order of this Court, and contains protected information and is not to be opened or its contents thereof displayed or revealed except by order of the Court or pursuant to the written permission of the Celotex Trust.

Such envelope or container shall not be opened without further order of this Court or pursuant to the written consent of the Celotex Trust; it is further ORDERED that

9.    If any Individually-Identifiable Protected Information is used, revealed or inquired about at any deposition the initial transcript of any deposition, and any exhibits thereto, of (1) any employee or agent of the Celotex Trust or (2) in which Protected Information is used, revealed or inquired about shall constitute Protected Information and shall be stamped "CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER" by the court reporter.    The Party conducting such deposition shall be responsible for providing contemporaneous notice to the Celotex Trust as to the use of such Individually-Identifiable Protected Information

3

and for insuring that the terms of this paragraph are complied with and shall provide the Celotex Trust a copy of such deposition within seven (7) days after the court reporter delivers the initial transcript. Within twenty-one (21) days after the court reporter delivers the initial transcript, the deponent and the Parties may designate the transcript of the deposition and any exhibits thereto as Protected Information in whole or in part. Such designation shall be made by written notice to the court reporter and to Lead Counsel for the Parties. At the conclusion of the twenty-one (21) day period, the court reporter shall prepare the final version of the transcript (unless the Parties agree that no final version is necessary), in which pages and exhibits designated as Protected Information shall be bound separately from pages and exhibits not so designated. All pages of the transcript and exhibits designated as Protected Information shall be stamped "CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER." It is further ORDERED that

10.     The Protected Information and all knowledge obtained therefrom may not be publicly disclosed in any way or used as an undisclosed source in any article, study, research, editorial, publication or scholarly work; it is further ORDERED that

11.     Within sixty days of the conclusion of the Bankruptcy Proceeding, either through entry of a final non-appealable order of confirmation or otherwise, the Parties and Authorized Individuals must return all copies of Protected Information and all reports, compilations, documents, files, or databases containing or based upon Protected Information to the Trust, or at the option of the Trust, destroy them, and provide the Trust with confirmation of such destruction; it is further ORDERED that

12.     The attorneys of record are responsible for and will use best efforts to employ reasonable measures to ensure compliance with this Order and to control duplication of, access to, and distribution of the Protected Information consistent with this Order; and it is further ORDERED that

13.     The termination of the Bankruptcy shall not terminate paragraphs 5 through 13 of this Order, nor shall it relieve any person who received or was given access to the Protected Information pursuant to this Order from the continuing obligation of maintaining the Protected Information in a confidential manner.

SO ORDERED AND ADJUDGED this the __3rd__ day of ___October___, 2007.

_Judith K. Fitzgerald_
Judith K. Fitzgerald            **rmab**
United States Bankruptcy Court Judge

91100-001\DOCS_DE:131421.1