- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026 (REG)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.,

9    f/k/a General Motors Corp., et al.,

10

11            Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15                U.S. Bankruptcy Court

16                One Bowling Green

17                New York, New York

18

19                August 6, 2010

20                9:49 AM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

- 2 -

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. Section 363 Authorizing the Debtors to Amend the Terms

4    of Their Engagement Letter with AP Services, LLC [Docket No.

5    6362]

6

7    HEARING re Application by AP Services, LLC as Crisis Managers

8    to the Debtors for Approval of the Success Fee [Docket No.

9    6363]

10

11   HEARING re Motion of Julie and David Brittingham for Relief

12   from the Automatic Stay to allow the Completion of a Pending

13   Personal Injury Action [Docket No. 6332]

14

15   HEARING re Motion of Debtors for Entry of Order Pursuant to

16   Fed. R. Bankr. P. 9019 Approving Stipulation and Agreed Order

17   Between the Debtors, Wilmington Trust Company, and Citibank,

18   N.A. Solely in its Capacity as Paying Agent, Regarding Proofs

19   of Claim Nos. 47871, 47872, 65729, 65793, and 66723 [Docket No.

20   6249] ("Stipulation Motion")

21

22   HEARING re Motion of Debtors for Entry of Order Pursuant to

23   Fed. R. Bankr. P. 9019 and Fed. R. Civ. P. 23 Approving

24   Agreement Resolving Proof of Claim No. 44887 and Implementing

25   Class Settlement [Docket No. 6331] ("Soders Motion")

- 3 -

1

2    HEARING re Debtors' Motion for Preliminary Approval of

3    Settlement, Including Claims Estimation, for Conditional

4    Certification of Settlement Class, to Approve Cash Disbursement

5    and Forms of Notice, and to Set Fairness Hearing in the Boyd

6    Bryant v. Motors Liquidation Company Adversary Proceeding

7    [Docket No. 44]

8

9    HEARING re Debtors' Fifteenth Omnibus Objection to Claims

10   (Amended and Superseded Claims) [Docket No. 5731]

11

12   HEARING re Debtors' Seventeenth Omnibus Objection to Claims

13   (Tax Claims Assumed by General Motors, LLC) [Docket No. 5908]

14

15   HEARING re Debtors' Twentieth Omnibus Objection to Claims (Tax

16   Claims Assumed by General Motors, LLC) [Docket No. 5912]

17

18   HEARING re Debtors' Twenty-Fifth Omnibus Objection to Claims

19   (Amended and Superseded Claims) [Docket No. 6232]

20

21   HEARING re Debtors' Twenty-Sixth Omnibus Objection to Claims

22   (Duplicate Claims) [Docket No. 6233]

23

24   HEARING re Debtors' Twenty-Seventh Omnibus Objection to Claims

25   (Incorrectly Classified Claims) [Docket No. 6250]

- 4 -

1

2    HEARING re Debtors' Twenty-Eighth Omnibus Objection to Claims

3    (Incorrectly Classified Claims) [Docket No. 6251]

4

5    HEARING re Debtors' Twenty-Ninth Omnibus Objection to Claims

6    (Incorrectly Classified Claims) [Docket No. 6252]

7

8    HEARING re Debtors' Thirtieth Omnibus Objection to Claims

9    (Incorrectly Classified Claims) [Docket No. 6253]

10

11    HEARING re Debtors' Thirty-First Omnibus Objection to Claims

12    (Incorrectly Classified Claims) [Docket No. 6254]

13

14    HEARING re Debtors' Thirty-Second Omnibus Objection to Claims

15    (Incorrectly Classified Claims) [Docket No. 6255]

16

17    HEARING re Debtors' Thirty-Third Omnibus Objection to Claims

18    (Claims with Insufficient Documentation) [Docket No. 6256]

19

20    HEARING re Debtors' Thirty-Fourth Objection to Claims (Claims

21    with Insufficient Documentation) [Docket No. 6257]

22

23    HEARING re Debtors' Thirty-Fifth Omnibus Objection to Claims

24    (Claims with Insufficient Documentation) [Docket No. 6258]

25

- 5 -

1

2    HEARING re Debtors' Thirty-Sixth Omnibus Objection to Claims

3    (Claims with Insufficient Documentation) [Docket No. 6259]

4

5    HEARING re Debtors' Thirty-Seventh Omnibus Objection to Claims

6    (Claims with Insufficient Documentation) [Docket No. 6260]

7

8    HEARING re Debtors' Thirty-Eighth Omnibus Objection to Claims

9    (Tax Claims assumed by General Motors, LLC) [Docket No. 6261]

10

11   HEARING re Motion of Dean M. Trafelet, Future Claimants'

12   Representative, for an Order Clarifying the Order Appointing

13   Him as Legal Representative for Future Asbestos Personal Injury

14   Claimants and Directing Payment of His Fees and Expenses, or in

15   the Alternative, Awarding an Administrative Expense Pursuant to

16   Section 503(a) or (b) of the Bankruptcy Code [Docket No. 6262]

17

18   HEARING re Motion of Debtors for Entry of Order Pursuant to

19   Sections 105(a) and 363(b) of the Bankruptcy Code Approving

20   Settlement Agreements with Respect to (A) the International

21   Association of Machinists and Aerospace Workers, and (B) the

22   International Brotherhood of Teamsters [Docket No. 6341]

23

24   Transcribed By:  Clara Rubin

25

- 6 -

1

2    A P P E A R A N C E S:

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   JOSEPH H. SMOLINSKY, ESQ.

9

10   WEIL, GOTSHAL & MANGES LLP

11        Attorneys for the Debtors

12        200 Crescent Court

13        Suite 300

14        Dallas, TX 75201

15

16   BY:   ANGELA C. ZAMBRANO, ESQ.

17        LIANI KOTCHER, ESQ. (TELEPHONICALLY)

18

19   BINGHAM MCCUTCHEN LLP

20        Attorneys for Deutsche Bank AG

21        399 Park Avenue

22        New York, NY 10022

23

24   BY:   JARED R. CLARK, ESQ.

25

- 7 -

```
1

2    GIBSON, DUNN & CRUTCHER LLP

3          Attorneys for Wilmington Trust Company

4          200 Park Avenue

5          New York, NY 10166

6

7    BY:   KEITH R. MARTORANA, ESQ.

8

9    KLESTADT & WINTERS, LLP

10         Attorney for the Brettinghams

11         292 Madison Avenue

12         17th Floor

13         New York, NY 10017

14

15   BY:   SAMIR "SAM" GEBRAEL, ESQ.

16

17   KRAMER LEVIN NAFTALIS & FRANKEL LLP

18         Attorneys for the Official Committee of Unsecured

19          Creditors

20         1177 Avenue of the Americas

21         New York, NY 10036

22

23   BY:   JENNIFER R. SHARRET, ESQ.

24         THOMAS MOERS MAYER, ESQ.

25
```

- 8 -

```
 1

 2    PRONSKE & PATEL, P.C.

 3          Attorneys for Boyd Bryant, on Behalf of Himself and All

 4           Others Similarly Situated

 5          2200 Ross Avenue

 6          Suite 5350

 7          Dallas, TX 75201

 8

 9    BY:   RAKHEE V. PATEL, ESQ.

10

11    RODANAST, P.C.

12          Attorneys for Creditors in Settlement Agreement in Soders

13           v. General Motors Corp. and RodaNast, P.C.

14          801 Estelle Drive

15          Lancaster, PA 17601

16

17    BY:   JOSEPH F. RODA, ESQ.

18

19    WYLY-ROMMEL, PLLC

20          Attorneys for Boyd Bryant

21          2311 Moores Lane

22          Texarkana, TX 75503

23

24    BY:   SEAN F. ROMMEL, ESQ.

25
```

- 9 -

1

2    U.S. DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          33 Whitehall Street

5          21st Floor

6          New York, NY 10004

7

8    BY:   ANDREW D. VELEZ-RIVERA, ESQ.

9

10   U.S. DEPARTMENT OF JUSTICE

11         U.S. Attorney's Office

12         86 Chambers Street

13         New York, NY 10007

14

15   BY:   DAVID S. JONES, AUSA

16

17   GODFREY & KAHN S.C.

18         Attorneys for the Examiner, Brady Williamson

19         333 Main Street

20         Suite 600

21         Green Bay, WI 54307

22

23   BY:   BRADY C. WILLIAMSON, ESQ. (TELEPHONICALLY)

24         CARLA O. ANDRES, ESQ. (TELEPHONICALLY)

25

- 10 -

1

2    GODFREY & KAHN S.C.

3          Attorneys for the Examiner, Brady Williamson

4          One East Main Street

5          Suite 500

6          Madison, WI 53701

7

8    BY:   KATHERINE STADLER, ESQ. (TELEPHONICALLY)

9

10

11   MORGENS, WATERFALL, VITIADIS & CO.

12         Interested Party

13   BY:   MICHELE WHALEN (TELEPHONICALLY)

14

15

16   SONNENSCHEIN NATH & ROSENTHAL LLP

17         Attorneys for Citibank

18         New York, NY

19

20   BY:   LOUIS A. CURCIO, ESQ. (TELEPHONICALLY)

21

22

23

24

25

- 11 -

1

2    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

3         Attorneys for Future Asbestos Personal Injury Claimants

4         2323 Bryan Street

5         Suite 2200

6         Dallas, TX 75201

7

8    BY:   SANDER L. ESSERMAN, ESQ. (TELEPHONICALLY)

9         JACOB L. NEWTON, ESQ. (TELEPHONICALLY)

10

11   YOUNG CONAWAY STARGATT & TAYLOR, LLP

12        Attorneys for Delaware Claims Processing Facility

13        The Brandywine Building

14        1000 West Street

15        17th Floor

16        Wilmington, DE 19801

17

18   BY:   EDWIN J. HARRON, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

- 12 -

1           P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  All right, have seats please.

4      (Pause)

5           THE COURT:  Folks, I'm going to take unopposed and

6      administrative matters first, then I'm going to take the AP

7      Services issues, and then I'm going to take the Brittinghams'

8      motion for relief from the stay.  After we take care of the

9      unopposed stuff, you can then sit down, as I'm going to have

10     one or two preliminary comments or matters that I'll want you

11     all to help me with as we then go forward.

12           Okay, who's going to take the lead?  That being you,

13     Mr. Smolinsky?

14           MR. SMOLINSKY:  Good morning, Your Honor.  Joe

15     Smolinsky of Weil, Gotshal & Manges, for the debtor.

16           Your Honor, before we launch into the unopposed or

17     uncontested matters, I think it would be helpful to give a

18     minute or two of an update on where we are in the case.  I

19     think it's helpful --

20           THE COURT:  Good.  That'll help me with the creditors'

21     committee's response also.

22           MR. SMOLINSKY:  Yes, Your Honor.  It's also helpful to

23     periodically report to the Court and, in that way, the public

24     about where we stand.

25           Your Honor, I think the big key message for today is

MOTORS LIQUIDATION COMPANY, et al.

- 13 -

1   that the debtors currently intend to file within the next two

2   weeks a plan and disclosure statement and will be targeting a

3   disclosure statement hearing towards the end of September.

4        As we see it, there continue to be two gating issues

5   in the case, but I'm happy to report that one of the gating

6   issues, the issue of the debtors' obligations with respect to

7   environmental matters on owned and managed sites, has

8   progressed significantly.

9        THE COURT:  Pause please, Mr. Smolinsky.

10      (Pause; judge and clerk confer)

11       THE COURT:  I'm sorry, Mr. Smolinsky.  Ms. Blum tells

12  me we need to call into CourtCall.

13       MR. SMOLINSKY:  Very good, Your Honor.

14       THE COURT:  I thought they were already on.

15      (Pause; telephonic parties being dialed in)

16       THE COURT:  Okay, Mr. Smolinsky, would you continue,

17  please?

18       MR. SMOLINSKY:  Sure.  Let me just back up for those

19  that are on the phone.  Just by way of background and case

20  update generally, we are planning to file a plan and disclosure

21  statement within the next two weeks, and we are targeting a

22  disclosure statement hearing at the end of September.

23       As we see it, there are two gating issues in the case

24  that continue; the first is the debtors' obligations with

25  respect to environmental matters on owned and managed sites.

- 14 -

1    There's been significant progress in that regard, and we're

2    happy to report that it's our understanding that the construct

3    of the environmental trust that will be set up under the plan,

4    as well as the amount of money that's going to be used to fund

5    those trusts, have now been agreed to not only by the U.S.

6    States government in all branches but by all of the states that

7    are impacted by those sites.  And we expect that settlement

8    agreement -- well, the settlement documents, which have had

9    many iterations over the last several weeks, will be in a

10   position to where they would be finalized as included with the

11   plan when it's filed.

12           THE COURT:  Pause, Mr. Smolinsky, because you may have

13   just hit the one question I would have had.  Would you be

14   weaving your settlement into the plan, or would you be doing it

15   by a separate 9019, whose consequences would then be addressed

16   as part of the liquidation that I assume you're going to

17   implement by the plan?

18           MR. SMOLINSKY:  We were actually not contemplating

19   treating it as a 9019 but, rather, part of the regular

20   feasibility analysis as part of plan confirmation.  These are

21   administrative expense claims, and how we treat them under the

22   plan is part of the very nature of the plan and the fabric of

23   the plan as opposed to settlement.  I understand your question.

24   It's a little bit complicated because we are, effectively,

25   overfunding that trust using Treasury's money as part of a

- 15 -

1    settlement with the states, but we weren't anticipating

2    treating it specifically under 9019.

3        THE COURT:  Um-hum.  Continue, please.

4        MR. SMOLINSKY:  The other gating issue, the estimation

5    of asbestos liabilities for current and future claims,

6    continues to run its course.  Your Honor, I'm sure, is aware of

7    recent filings of 2004 examination requests by the unsecured

8    creditors' committee, the creditors' committee for asbestos

9    claimants, and the future claims representative.

10        THE COURT:  Yes, I am.

11        MR. SMOLINSKY:  Well, a hearing has been scheduled for

12    this coming Monday.  The issues have been resolved with the

13    asbestos committee as well as the future claims representative.

14    Pursuant to an agreement that's been executed, it involves the

15    significant cooperation of New GM.  They've been very helpful

16    in getting us to that agreement.

17        With respect to the -- and those 2004 requests have

18    been withdrawn on the record.

19        With respect to the unsecured creditors' committee

20    request, similarly, with the help of New GM, we have reached

21    agreement with the unsecured creditors' committee.  So, there

22    are no outstanding issues between the committee and New GM or

23    the debtors.  There still remain some issues related to third

24    parties, which I imagine will be heard on Monday -- Monday's

25    hearing.

- 16 -

1    So we hope to begin settlement discussions in earnest

2    with the various constituencies regarding the asbestos

3    liability in the very near future.  The parties, I think, are

4    all aware and understand that, in the absence of an agreement

5    relatively soon, there would be expected to be an estimation

6    hearing before Your Honor in connection with confirmation of a

7    plan.

8    On the claims front, we continue to make significant

9    progress.  I think we're up to omnibus claims motion number 38,

10   and we intend to file dozens of additional motions -- or

11   objections in the next thirty days so that we'll be in a

12   position to make meaningful distributions on and after the

13   effective date.

14   Looking ahead, I think we're really positioned to

15   confirm a plan by year end; that's certainly our goal and our

16   target.  I imagine it's going to take a substantial effort of

17   all the parties and more than some accommodations on the part

18   of Your Honor.  As we've tried to, we'll continue to work with

19   chambers to try and minimize the disruption to your calendar,

20   but we may in fact be asking for several days for the asbestos

21   estimation, if that is necessary, and various other hearings as

22   we move towards confirmation.

23   THE COURT:  Okay.  Thank you.

24   MR. SMOLINSKY:  Moving to the uncontested matters, I

25   believe the first matter on the agenda is a motion seeking

MOTORS LIQUIDATION COMPANY, et al.

- 17 -

1     approval of a stipulation with Wilmington Trust.  Wilmington

2     Trust, Your Honor may recall, is the indentured trustee for all

3     of MLC's public indentures.  We are, under the stipulation,

4     allowing claims in the aggregate of approximately 23.5 billion

5     dollars.  We are getting rid of duplicative claims and we're

6     providing for the allowance and treatment of claims for fees

7     incurred by the indentured trustee as well as the paying agent.

8           Of equal importance, it paves the way for what's been

9     previewed for this Court, the objection of claims filed by

10    individual bondholders, which are essentially duplicative of

11    the trustee's claims.  In that regard, I'd like to draw Your

12    Honor's attention to the declaration of David Vanaskey, which

13    was filed in connection with the stipulation.  It's always been

14    the goal of the debtors and the indentured trustee to make sure

15    that individual bondholders were aware of what was going on.

16    As set forth in the declaration, once we filed this

17    stipulation, a notice was sent out to all of the bondholders,

18    which is attached to the declaration.  They've established a

19    Web site which contains a variety of information, including the

20    motion, stipulation, objection deadlines.  They've set up a

21    call center.  And the declaration sets out that notice, and we

22    believe that that notice was the best and most reasonable way

23    of notifying parties as to the pendency of these matters.

24          We did, Your Honor, need to revise the stipulation

25    slightly.  Initially we had thought that Citibank's fees were

- 18 -

1    $173,063.43.  It turns out that in fact the fees are lower than

2    that at $162,333.71.  So we went ahead and re-executed a

3    revised stipulation reflecting that change, and we would

4    propose to submit that for approval and entry.

5         There was one objection filed by Deutsche Bank.

6    Deutsche Bank is currently in the midst of a litigation with

7    MLC over certain obligations that Deutsche Bank has to the

8    estate, as well as certain setoff rights that Deutsche Bank has

9    asserted for any obligation that it owes to the estate against

10   its bonds.  We have no idea what the timeline of that

11   litigation will be, but we always envisioned to try not to

12   prejudice them.  In fact, you would see in the stipulation the

13   fact that we provided that, if there are any setoff rights of

14   any of the individual bondholders, that the amount of the

15   allowed claim of Wilmington Trust would be reduced to reflect

16   the fact that there would be no distributions on account of

17   those claims.

18        Of course the trick is in the detail, because they of

19   course are claiming to be beneficial bondholders.

20   Distributions are made through record holders.  So the

21   mechanics of actually withholding distributions to a record

22   holder on behalf of a beneficial holder is difficult, but the

23   parties will --

24        THE COURT:  Especially if that record holder

25   presumably is holding in street name for multiple bondholders,

- 19 -

1    I imagine.

2            MR. SMOLINSKY:  That's right, Your Honor.  So we

3    really have no fix for that, but we'll work with Deutsche Bank

4    to come up with a mechanic for figuring all that out in

5    connection with the plan.  But for now I think it's everyone's

6    view that no rights are prejudiced by the stipulation with

7    respect to Deutsche Bank's asserted setoff right.

8            THE COURT:  Mr. Smolinsky, pause.  I see a gentleman

9    behind Ms. Riffkin standing.

10           Are you counsel for Deutsche Bank?  And are you going

11   to want to be heard on this?

12           MR. CLARK:  Very briefly, Your Honor, just to

13   reiterate what Mr. Smolinsky --

14           THE COURT:  All right, you're not near a microphone.

15           Mr. Smolinsky, do you mind yielding for a second to

16   allow him to be heard, please?

17           MR. CLARK:  Thank you, Your Honor.  Jared Clark,

18   Bingham McCutchen, for Deutsche Bank AG.

19           THE COURT:  Was that Clark?

20           MR. CLARK:  Clark, Your Honor.

21           THE COURT:  Yes.

22           MR. CLARK:  As detailed in the limited objection filed

23   by Deutsche Bank, Deutsche Bank has filed a secured proof of

24   claim in respect of amounts that, on information and belief,

25   overlap with amounts also claimed by the indentured trustee in

- 20 -

1    its representative capacity.  Deutsche Bank has also filed a

2    motion to set off those amounts, among others, against

3    obligations owed by Deutsche Bank.

4         That motion, that setoff motion, was calendared to be

5    heard today and, at the debtors' request, the setoff motion has

6    been adjourned to September 24th.  Deutsche Bank has agreed

7    with the debtors and Wilmington Trust that approval of the

8    stipulation presently before the Court will be without

9    prejudice to any rights Deutsche Bank may have to setoff or as

10   a secured creditor.  With this reservation of rights agreed and

11   on the record, Deutsche Bank does not object to the Court's

12   approval of the stipulation.

13        THE COURT:  Okay.

14        MR. CLARK:  Thank you, Your Honor.

15        THE COURT:  Mr. Smolinsky, back to you.

16        MR. SMOLINSKY:  Unless Your Honor has any questions on

17   Wilmington Trust, we'd ask that that stipulation be submitted

18   for approval.

19        THE COURT:  Of course it will be, Mr. Smolinsky; it's

20   in the interest of everybody.  And I'll just leave it to you

21   and Deutsche Bank and the record owner to tee things up so you

22   can simplify things and not prejudice other bondholders by

23   reason of the Deutsche Bank issues.

24        I guess one thought is maybe stuff that's held in

25   street name can be transferred to record ownership so the

- 21 -

1    remainder can be -- of the bondholders cannot be prejudiced by

2    this little dispute.  But any way you guys want to deal with it

3    is fine with me.

4              MR. SMOLINSKY:  It's an excellent suggestion, Your

5    Honor.

6              The next uncontested matter is a settlement with the

7    Soders class action.  I'd like to yield the podium to my

8    colleague Angela Zimbrano.

9              THE COURT:  Sure.

10             Was that Ms. Zimbrano?

11             MS. ZAMBRANO:  (No audible response).

12             THE COURT:  Thank you.  Good morning.

13             MS. ZAMBRANO:  Angela Zimbrano from Weil, Gotshal &

14   Manges, also on behalf of the debtors, for the record.

15             As Mr. Smolinsky said, I'm here today to seek approval

16   of a class action proof of claim.  Not surprisingly, there have

17   been a number of purportedly filed class action proofs of

18   claims.  The majority of these claims, Your Honor, are filed on

19   behalf of putative classes, in other words, classes that have

20   not been certified prior to the petition date.  And we actually

21   have a motion to expunge that type of claim, a putative class

22   action claim that is pending before the Court and will be heard

23   next month.

24             We are here today asking the Court to approve two

25   class actions settlements, both of which were certified prior

- 22 -

1   to the petition date.  Now, of course the Court knows that Rule

2   23 does not automatically apply in bankruptcy such that a class

3   plaintiff can continue to represent a class once a bankruptcy

4   petition has been filed.  Rather, it is in Your Honor's

5   discretion as to whether to permit -- to apply -- direct that

6   Rule 23 apply, and we are asking that you do so in connection

7   with these limited circumstances, because it's both fair to the

8   class and to the debtors.

9        I'm going to address the Soder settlement first, but

10  the next item on the agenda is actually another settlement of a

11  class action that Mr. Smolinksy's going to handle also, called

12  the Bryant settlement.  Both of those, as I say, are class

13  action proofs of claims that relate to certified classes.

14       Turning first to the settlement of the Soders case,

15  the Soders case was not only certified, Your Honor, prior to

16  the petition date; it was actually -- the parties had actually

17  reached a settlement of the class claims.  And the Court -- the

18  Pennsylvania court there had finally approved the settlement.

19  Notice went out to the class, the whole thing.  The only reason

20  we are here today on this matter is because, although the Court

21  was provided -- excuse me, the class was provided notice, and

22  the state court finally approved the settlement, there was an

23  appeal of the settlement that stopped the distribution of the

24  settlement prior to the petition date.  Thus, Mr. Roda, who's

25  here today, filed a proof of claim on behalf of the class

MOTORS LIQUIDATION COMPANY, et al.

- 23 -

1   against MLC for the following things:  attorneys' fees of

2   approximately 843,000 dollars; reimbursement of out-of-pocket

3   costs, primarily for the notice to the class, of approximately

4   473,000 dollars; a 5,000 dollar payment for the class rep; and,

5   here's the kicker, rebate certificates for 200 dollars for the

6   purchase of new GM vehicles on behalf of all the class members.

7   Well, the problem of course is that MLC doesn't have any rebate

8   certificates.  Therefore, we've negotiated in good faith to try

9   to find a resolution that would, in our words, implement the

10  settlement that had been reached and had been approved by the

11  Court below.

12        So, looking at the class and the notice process, of

13  course they were required to submit claims forms to participate

14  in the class consideration.  Approximately 1,800, actually

15  1,878, class members had completed class (sic) forms, and each

16  of these claims forms asserted 1.6 claims.  Now, the reason

17  that I say it that way is that these claims forms -- on these

18  claims forms, you were permitted to file more than one claim if

19  you had purchased more than one GM vehicle during the class

20  period.  And the reason that I say "on average" is that --

21        THE COURT:  Some did and some didn't.

22        MS. ZAMBRANO:  Some did and some didn't, but also

23  these claims forms have not been fully vetted, and that means

24  of course that Garden City got the claims forms, but upon the

25  petition date of course they stopped.  So then we had to figure

- 24 -

1   out how do you translate that into class consideration.  We did

2   a sampling of 200 of the claims forms and came up with the 1.6

3   average.  What we did then is multiply that 1.6 times the 1,800

4   claims forms that had been submitted, to get to a total of

5   three hundred -- excuse me, 3,166 claims that had been filed in

6   connection with the class settlement.  We took that number; we

7   multiplied it by 175.  Not the 200 dollar rebate; 175,

8   considering where we are.  And when you multiply those numbers,

9   you get 554,000 dollars, approximately.  That is the amount of

10  the class consideration that we're asking Your Honor to approve

11  as part of the settlement, an unsecured claim in the amount of

12  554,000 for the class.

13         Now, I want to note just for the record that of course

14  we are not -- the settlement is not that each class member that

15  participated and submitted a claim would get an unsecured claim

16  in the amount of 175 dollars.  I want to make that very clear

17  for Your Honor but also for any class members that are

18  participating today, because what the settlement is, because we

19  had to do it on averages, we took that number, we created

20  the -- or we got to that 554,000 dollar general unsecured

21  claim.  Mr. Roda, as part of the settlement, would have the

22  ability to liquidate that claim and distribute it pro rata to

23  the class participants that filled out claims forms.

24         So that's the class consideration.  That was the rub

25  in trying to get this settlement implemented in this bankruptcy

- 25 -

1    setting.  And we think we've accomplished that as fairly as we

2    can, both for the debtors and for the class.

3              Regarding attorneys' fees, Mr. Roda's firm had

4    previously been awarded 843,000 dollars, approximately, by the

5    Pennsylvania court, but he has agreed to settle with the

6    debtors' estate for a general unsecured claim of approximately

7    526,000 dollars.  If the Court has any questions, of course,

8    about the reasonableness of that fee, they should -- Mr. Roda's

9    here and can answer those.  I will say that the debtors have

10   agreed to that award as part of the settlement and that it's

11   reasonable as part of this settlement.

12             The third --

13             THE COURT:  I assume that that settlement will be

14   received in the same currency that all other general unsecured

15   creditors get --

16             MS. ZAMBRANO:  That's correct.

17             THE COURT:  -- their distributions.

18             MS. ZAMBRANO:  That's correct.  It's a general

19   unsecured claim for that amount, not an agreement to pay that

20   amount in cash.

21             THE COURT:  Okay.  Continue, please.

22             MS. ZAMBRANO:  But I will get to cash as part of the

23   settlement, because it is a key point for the debtors'

24   perspective.

25             A third part of the settlement was to make that class

MOTORS LIQUIDATION COMPANY, et al.

- 26 -

1    representative payment and to reimburse Mr. Roda for the notice

2    costs of approximately 437 dollars.  The debtors agreed to

3    resolve those aspects of the proofs of claim for general

4    unsecured claims in their respective amounts.  So --

5            And then finally speaking of the cash, the parties

6    resolved the issue also of what to do with approximately 1.2

7    million dollars that was sitting in GM's defense counsel's

8    trust account, because, as I had mentioned, the settlement was

9    fully effected -- finally approved, and in fact it had been

10   fully funded by GM and had just been funded within ninety days

11   of the petition date.  So it has been sitting there in the GM

12   defense counsel's trust account.  As part of this settlement,

13   that cash would come back into the debtors' estate for the

14   benefit of the creditors.

15           That is the settlement, Your Honor.  We think it's

16   fair and reasonable and in the best interest of the estates.

17   And as we have explained in our papers, we ask that the Court

18   approve it under both Rule 9019 and Federal Rule of Civil

19   Procedure Rule 23.

20           Now, before I sit down, I do want to note two things

21   that are unusual here.  First regarding notice, as I mentioned,

22   the class here was noticed previously at a substantial expense:

23   over 400,000 dollars.  And the debtors did not want to pay for

24   any additional notice.  But of course under Rule 23, the Rule

25   does speak to notice to the class.  So the question then of

- 27 -

1    course is, is additional notice necessary here.  The debtors

2    submit, and have provided authority to the Court, including

3    authority in this jurisdiction, that additional notice is not

4    required.  If the Court has any questions in that regard, I can

5    answer them.  It's addressed in --

6            THE COURT:  I understand the issue.

7            MS. ZAMBRANO:  Okay.

8            THE COURT:  And I take it that, like something I've

9    only had to do once or twice over the ten years I've been on

10   this job, in addition, I have to approve the settlement not

11   only from its fairness to the estate, a class 9019 analysis,

12   but I have to do 23 -- Civil Rule 23 analysis to make sure that

13   the members of a class aren't being sold down the river.

14           MS. ZAMBRANO:  You're correct, Your Honor.  And we

15   would ask that the Court -- well, we believe the Court can rely

16   heavily on the state court findings in that regard.  There are

17   substantial findings that are in the record here for Your

18   Honor.  Our proposed order presumes that you could do that.  If

19   you have any other questions, though, Mr. Roda is available to

20   answer those.

21           THE COURT:  No, I understand.  And am I also correct

22   that I have no objections to the settlement?

23           MS. ZAMBRANO:  That is correct, Your Honor.

24           THE COURT:  Yes.  I'm going to give you the findings

25   you need from both perspectives, Ms. Zambrano, and approve the

- 28 -

1    settlement.  And in light of the lack of objection, I'm not

2    going to speak at length on this.

3              While requests to approve settlements of the character

4    we have here are not common, they're not unheard of.  I think

5    they go way back to the Wedtech case, if I'm not mistaken, and

6    I've had to do it a couple of times.  A settlement of this type

7    requires me to conclude that it's within the realm of

8    reasonableness and that the estate isn't giving away the store

9    and, at the same token, as I put it colloquially before, that

10   the members of the class aren't being sold down the river.

11             Given the practical difficulties in implementing the

12   earlier settlement in any meaningful way in this court,

13   considering you can't stick New GM with this obligation, and

14   the limits on providing value to the class members, it's also

15   very fair to them.  I noted the prior approval in the

16   Pennsylvania court system, and find that this settlement is in

17   the sweet spot of being fair both to the estate and to class

18   members.

19             You can submit your order to my chambers at your

20   convenience.

21             MS. ZAMBRANO:  Thank you, Your Honor.  There is one

22   other part of this that actually relates to the objection.  As

23   you probably noted from our agenda, there was an objection that

24   was resolved and of course disclosed in the papers.  That is

25   not the type of settlement that, under Your Honor's orders on

- 29 -

1    approval of 9019 motions, is required to be submitted to the

2    Court.  But in the interest of full disclosure and notice to

3    the Court, I have copies of that settlement, or I can describe

4    it for Your Honor if you would like me to.

5              THE COURT:  Frankly, with so many people in the

6    courtroom, I don't want to burden either you or run so many

7    meters while you do it.

8              MS. ZAMBRANO:  Okay.

9              THE COURT:  So I'm waiving that opportunity.

10             MS. ZAMBRANO:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             Mr. Smolinsky?

13             MR. SMOLINSKY:  Thank you, Your Honor.  Again, Joe

14   Smolinsky on behalf of the debtors.

15             Like Soders, the next matter, the Bryant class action,

16   is the settlement of a class action.  But unlike Soders, the

17   Bryant class action is not yet subject to a settlement or a

18   fairness hearing.  The class, however, has been certified, and

19   that certification has been brought to and upheld by the

20   Arkansas Supreme Court as well as certiorari denied by the

21   United States Supreme Court.

22             In the Bryant case, in the context of this settlement

23   and this settlement only, we're prepared to respect the class

24   certification and not challenge but, rather, support the filing

25   of a class claim.  That in part feeds into the amount of the

- 30 -

1    settlement, among other things.  But under the settlement, we

2    are resolving claims that have been asserted against the estate

3    in the amount of approximately one and a half billion dollars

4    in exchange for a settlement pool equal to a general unsecured

5    claim of twelve million dollars.

6          As usual, Your Honor is well ahead of us.  The debtors

7    clearly believe that this settlement is above the lowest point

8    on the range of reasonableness under Trailer Ferry, Adelphia,

9    with respect to the estate.  But Your Honor is also obligated

10   to consider under Rule 23, which is enabled by Bankruptcy Rule

11   7023, to examine the settlement as it affects the class

12   members.

13         To assist Your Honor in assessing the fairness of the

14   class, class counsel has filed a memorandum of law which

15   attaches some evidentiary support which assesses the settlement

16   from the class perspective.

17         Just to spend a minute on the claims, the -- in the

18   Bryant case, the class, which has already been certified, is a

19   class of owners or subsequent owners of 1999 through 2002

20   1500-Series pickups and utilities originally equipped with

21   automatic transmission and a PBR 210 by 30 drum-in-hat parking

22   brake system utilizing a high-force spring-clip retainer that

23   registered this vehicle in any state in the United States.

24   There are certain opt-outs which are in the papers; I won't --

25   or exclusions from that class, which I won't go through.

- 31 -

1          Under the settlement framework, a class will get a

2    total unsecured claim of twelve million dollars.  Also, because

3    we're going to do this in two steps because the settlement has

4    never been approved, we're going to have an initial preliminary

5    hearing and then we're going to have a final fairness hearing

6    at a future date.  We've agreed that the Court would estimate

7    today the claim, for bankruptcy purposes, at twelve million

8    dollars so we can plan for that under our plan, subject of

9    course to parties' rights under 502(j) if the settlement

10   ultimately proves not confirmable.

11          THE COURT:  So this would be not just for the purpose

12   of a distribution reserve but also subject to 502(j) for class

13   allowance -- for claim allowance?

14          MR. SMOLINSKY:  That's correct, Your Honor.

15          THE COURT:  Okay.

16          MR. SMOLINSKY:  And we would ask that the Court enter

17   a separate order estimating this claim.

18          Now, like Soders, the claims here are fairly small.

19   And therefore we're concerned that if we just made a

20   distribution to class members that, because of fractional share

21   issues, they would get nothing.  So what we've created is an

22   authorization of class counsel to either sell the claim once it

23   gets allowed, or to sell the securities that come out of --

24          THE COURT:  In essence, to monetize the claim and make

25   it more capable of being distributed in small checks to

- 32 -

1   small -- to regular people --

2          MR. SMOLINSKY:  That's right.

3          THE COURT:  -- ordinary people?

4          MR. SMOLINSKY:  That's right, Your Honor.

5          THE COURT:  Um-hum.

6          MR. SMOLINSKY:  So the claim pool will be established,

7   the cash pool.  We are also providing 100,000 dollars in cash

8   to defray the costs of noticing.  Under the settlement, we're

9   going to provide the individual specialized notice to class

10  members but, in terms of publication and other administration,

11  we're going to provide class counsel with 100,000 dollars of

12  cash.  To the extent that that cash is not needed, it would be

13  returned to the estate after the class has been administered.

14         In terms of fees and costs, class counsel is entitled,

15  under an engagement letter, to a third of any settlement, or

16  four million dollars, whichever is greater.  The way the fees

17  are going to work, if Your Honor's inclined to approve this

18  settlement, is that they would get a third of the cash pool

19  that's created.  To the extent that all claimants get paid in

20  full, and by "full" I don't mean the amount that's initially

21  capped but their full claim, and I'll go through that in a

22  minute, then in that case they would seek to receive additional

23  fees up to the four million dollars if there's money left over.

24         Your Honor, it's in the papers, I won't belabor it,

25  but under the settlement framework, there are three different

- 33 -

1     tiers of claims:  some people who actually expended money out

2     of pocket during the warranty period, and those are not subject

3     to any cap; there's a second tier of those within the two years

4     after the warranty expired that incurred expenses, and those

5     claims are capped by 150 dollars; and then those that incurred

6     out-of-pocket expenses after two years after the warranty

7     expired, and they would be capped at 75 dollars.  The reason

8     why those tiers were put into place, it was part of a

9     mediated -- an attempt to mediate the resolution, and everyone

10    thought that that was a fair way to adjust for people who were

11    early on in the warranty period that incurred those costs.

12    But, again, those caps, the 75 and 150, don't count for

13    purposes of seeing whether class counsel could get additional

14    funds.  Those claims would have to be satisfied in full before

15    class counsel could receive any more compensation.

16         So, Your Honor, we are planning on making a -- after

17    this -- after the preliminary approval, we're planning on

18    sending notice to approximately 17,000 potential class members.

19    That information, that list, was derived by New GM in

20    connection with parties who in our system would show that they

21    had warranty claims during that period.  We had thought that

22    we'd have the list by now; we don't.  We expect to have it

23    soon.  And as a result, we have to adjust the timeline and the

24    noticing so that we're not required to send out notice within

25    the next few days.  It'll all be triggered off when we have the

- 34 -

1    list, and we'll set up the fairness hearing to provide enough

2    notice.

3              THE COURT:  Which is, in substance, a mailing list

4    that you're going to get the stuff from New GM that enables you

5    to do that?

6              MR. SMOLINSKY:  That's right, Your Honor.

7              THE COURT:  Um-hum.

8              MR. SMOLINSKY:  And as I said, we're going to be

9    responsible for sending out those approximately 17,000 notices.

10   Class counsel will be responsible for publication notice, which

11   will be published three times in the Monday to Thursday edition

12   of USA Today.  It's a one-sixteenth page ad for the class.

13             Your Honor, I have a chart of the timeline for the

14   settlement.  It may make sense to just hand it up and quickly

15   walk through it.

16             THE COURT:  Sure.

17        (Pause)

18             MR. SMOLINSKY:  What we would anticipate is, upon

19   receiving the preliminary approval, we would pay the 100,000

20   dollars into escrow, and class counsel would establish a 1-800

21   number for class members.  We would then mail and publish the

22   notice as soon as practicable but at least forty days before

23   the fairness hearing that we'll have before Your Honor, and by

24   publication within fourteen days.  And we'll include in that

25   notice the fairness hearing date.

- 35 -

1          There'll also be a period of time for parties/

2     claimants to file claims, and they'll have up to thirty days

3     after the fairness hearing, whenever that's scheduled, in order

4     to complete the submission of claims.  There'll be a fairness

5     hearing, at which time -- we were hoping that it would be

6     September 24th but, in view of the delay in getting the list,

7     we would seek the date from chambers for that hearing.

8          And then finally we would have a distribution date,

9     assuming that there's a final approval of the settlement.  As

10    soon as practicable after the claims deadline is over, we would

11    start mailing checks to claimants after the claim has been

12    monetized.

13         So that's the anticipated timeline.  We believe that

14    this settlement is a very fair settlement under the

15    circumstances:  It provides the potential claimants with a

16    distribution; it avoids for them the significant risks of

17    decertification under CAFA and other federal certification

18    rules; and it spares the estate from a significant amount of

19    cost that would otherwise be spent in litigating this class

20    action.

21         THE COURT:  Okay.  And am I correct that there's no

22    objection to this, at least insofar as we've gotten to this

23    point?

24         MR. SMOLINSKY:  That's correct, Your Honor.

25         THE COURT:  Okay.  It's approved.  It's fine.

- 36 -

1           MR. SMOLINSKY:  Okay.  Okay, I'm now going to quickly

2    run through the general omnibus claims matters on the docket.

3    E on the agenda is the seventh omnibus objection.  We had one

4    remaining claim, Casmalia Resources.  We've entered into a

5    stipulation and we'll be handing it up to Your Honor right

6    after the hearing, and that fully resolves omnibus motion

7    number 7.

8           With respect to the debtors' fifteenth omnibus

9    objection, there were two remaining outstanding matters; one is

10   Birdsall, and that will be adjourned, although we do have a

11   resolution of Birdsall and we'll be submitting a stip when it

12   becomes available.  With respect to the IRS claims, they have

13   agreed to withdraw those claims pursuant to a stipulation.

14   That will resolve and lead to the elimination of approximately

15   two and a half billion dollars of claims that were asserted by

16   the IRS --

17           THE COURT:  With a B?

18           MR. SMOLINSKY:  With a B.

19           THE COURT:  Um-hum.

20           MR. SMOLINSKY:  -- as a result of that withdrawal.

21   And after submission of the Birdsall stip, that motion will be

22   resolved.  But as I said, we're going to adjourn it until the

23   Birdsall stip is finalized.

24           G is the debtors' seventeenth omnibus.  We have a

25   variety of responses -- these are tax claims -- a variety of

- 37 -

1   responses that still remain, one of them dealing with the state

2   of Pennsylvania.  They finally agreed that we could expunge

3   their claims, so we'll be submitting an order with respect to

4   the Pennsylvania claims, and the rest of the motion will be

5   adjourned as we continue to work through the tax issues.

6        Number -- letter H is the debtors' twentieth omnibus.

7   Again, that involves the state of Pennsylvania as the only

8   remaining claim.  They've agreed that we could enter an order,

9   and that will fully resolve the twentieth omnibus objection.

10        I is the debtors' twenty-first omnibus.  We've

11   resolved our issue through the withdrawal of a claim by

12   Tomball.  So, actually that motion could just go off calendar;

13   it's fully addressed.

14        Now we get to the new motions that are on for the

15   first time today.  J is the twenty-fifth omnibus objection.

16   There are no responses, so we would like to go ahead and have

17   an order entered.

18        THE COURT:  Granted.

19        MR. SMOLINSKY:  K, twenty-sixth omnibus, no responses

20   again.  We'd like to get it entered.

21        The twenty-seventh omnibus objection, there are a

22   number, as you could see on the agenda, of responses.  We'd

23   like to go forward, except with respect to those that have

24   formally or informally responded.

25        THE COURT:  All right, so --

- 38 -

1          MR. SMOLINSKY:  And the rest will be adjourned.

2          THE COURT:  -- so you're going to kick those which

3     were the subject of responses, and you win by default on the

4     remainder?

5          MR. SMOLINSKY:  That's correct, Your Honor.

6          THE COURT:  Yep, you got it.

7          MR. SMOLINSKY:  Same with -- and the twenty-eighth

8     objection, adjourning it with respect to Acument and the rest,

9     we'd like default.

10          Debtors' twenty-ninth objection, there are two

11     responses.  Again, we're going to adjourn with respect to those

12     two.

13          The thirtieth omnibus objection, same thing.

14          P, the thirty-first omnibus objection, no responses;

15     thus, we'd like that order entered.

16          Debtors' thirty-second omnibus, too, is to be

17     adjourned.

18          Thirty-third omnibus objection, no responses.

19          Thirty-fourth we've withdrawn with respect to one

20     claimant who submitted additional information about the claim.

21     And the rest, we ask that an order be entered.

22          Thirty-fifth omnibus, again, one that's been -- we're

23     going to withdraw the motion as to -- and move forward with the

24     others.

25          Thirty-sixth omnibus, no responses.

- 39 -

1          Thirty-seventh omnibus, we've agreed to withdraw the

2    motion with respect to England and Reynolds.  The remaining

3    matter will go forward.  And it'll be adjourned with respect to

4    the other two objectors; all reflected in the agenda.

5          And finally, the thirty-eighth omnibus objection,

6    adjourned with respect to the formal and informal responses.

7          THE COURT:  Okay.  That game plan's acceptable across

8    the board.

9          MR. SMOLINSKY:  Thank you, Your Honor.  The next

10   matter on the calendar, it's letter X, is the motion of Dean

11   Trafelet, future claims representative, for payment of fees and

12   expenses.

13         THE COURT:  All right, do I see Mr. Esserman on the

14   phone?

15         MR. ESSERMAN:  Yes, Your Honor.  This is Sandy

16   Esserman.  I have a very brief presentation.

17         THE COURT:  Go ahead.

18         MR. ESSERMAN:  Dean Trafelet, a retired district court

19   judge, was appointed FCR by this Court's order dated April 8th,

20   which was the date of his appointment.  GM had approached

21   Retired Judge Trafelet in November of 2009 to serve as future

22   claims representative.  He started serving in that capacity and

23   he incurred fees and expenses from November till deployment by

24   court order dated April 8th.  The total amount of unpaid fees

25   and expenses were $21,587.50, expenses of $1,464.22.  Most of

- 40 -

1    those expenses were incurred in state court with him coming to

2    the hearing of his appointment, and most -- the vast bulk of

3    the expenses -- of the fees were incurred in the calendar year

4    2010 and not in 2009.  There's only 2.2 hours that were

5    incurred in November and December of 2009.

6            So the request, which I believe is an unopposed

7    request by GM, I think they felt they couldn't pay him without

8    court order, and I think that GM is correct on that, to either

9    enter an order establishing November 13th, 2009 as the

10   effective date of his appointment or presently award him that

11   fee under 2 -- under 503(a) or (b).  Thank you.

12           THE COURT:  All right.  Mr. Esserman, I'm correct that

13   I have no objection?

14           MR. ESSERMAN:  You are correct.

15           THE COURT:  All right, any desire on the part of the

16   U.S. Trustee's Office to be heard?  Mr. Velez-Rivera, good

17   morning.

18           MR. VELEZ-RIVERA:  Good morning, Your Honor.  We take

19   no position with respect to this request.

20           THE COURT:  Okay.  I'm going to approve the request.

21   I think I should do it consistently with the ruling I issued on

22   the somewhat analogous issues involve the Caplin & Drysdale

23   firm.

24           Mr. Esserman, give me a simple order that says -- try

25   to fashion it so that it stays true to what I ruled before.

- 41 -

1   But as long as it's not inconsistent with that, I'll give you a

2   little leeway for doing it.  This is a focused discussion --

3   decision on my part but, given the lack of objection, I'm not

4   going to speak at length to it today.

5           MR. ESSERMAN:  Thank you, Your Honor.  We will so

6   prepare and so submit.

7           THE COURT:  Very good.  Thank you.  Oh, needless to

8   say, it's got to be run past the U.S. Trustee's Office before

9   it's submitted to me.

10          MR. ESSERMAN:  And we'll run it by GM, as

11  historically, also.

12          THE COURT:  Fair enough.  Thank you.

13          MR. ESSERMAN:  Thank you.

14          THE COURT:  Okay, Mr. Smolinsky.

15          MR. SMOLINSKY:  Your Honor, that leaves one remaining

16  uncontested matter.  This is a motion to approve a settlement

17  with the International Association of Machinists and Aerospace

18  Workers, and the International Brotherhood of Teamsters.  Your

19  Honor is aware of the splinter union motions that have been

20  before Your Honor before.  These two unions have elected to opt

21  into the prior settlement which allows them to share in a one

22  billion dollar unsecured claim pool, as well as to get reduced

23  but continuing retiree benefits and life insurance from New GM.

24          So these settlements have already been contemplated by

25  the overall splinter union settlement, and this agreement was

- 42 -

1    procured in good faith and at arm's length and we'd ask that it

2    be approved.

3           THE COURT:  You bet.  I'm very glad that you were able

4    to find a way to come to a meeting of the minds with those guys

5    and so they wouldn't be left out.  Absolutely approved.

6           MR. SMOLINSKY:  Thank you, Your Honor.

7           THE COURT:  Okay, are we now up to AP Services?

8        (No audible response)

9           THE COURT:  All right, folks, I have no tentatives on

10   either of these motions, although most of the time I do, and

11   here's why:  Turning first to the unpaid portion of the

12   incentive payment, given the case law in this district and

13   elsewhere on incentive payments of this type, even in much

14   smaller cases, and I think the original motion showed nine of

15   them involving smaller requests where quite substantial amounts

16   were awarded in cases which for the most part were materially

17   smaller, this request by AP Services should have been a slam

18   dunk, but there was at least seeming noncompliance with earlier

19   orders, the deficiencies of which were articulated by the U.S.

20   Trustee's Office.  And while it now appears that the

21   information that should have been provided at an earlier time

22   was provided at least to the U.S. Trustee's Office, if I read

23   the papers right, that was only eight days ago and 4,000 pages

24   were then delivered to the U.S. Trustee's Office for their

25   review in a period of only eight days.

- 43 -

1            Now, the debtors raised a pretty good point in their

2    reply, which is, do we indeed have to review time entries after

3    the sale when the reward is for services that were at least

4    seemingly earned at the time of the sale in July 2009.  I'll

5    need you folks, especially any objectors, to focus on that, to

6    the extent that I deal with it today.  But I guess the question

7    that I need people to help me with is should I and other judges

8    be saying never mind to the requirements of retention offers --

9    orders, excuse me, whenever a professional does a good job,

10   which at least seemingly is the case in most of the

11   applications that I have.

12           So even though, subject to your rights to be heard, AP

13   Services did at least a very good job, and arguably announced

14   an outstanding job and earned its pay, to what extent should I

15   be dealing with this matter today when compliance came so late,

16   if in fact it's been complied with even to this point vis-a-vis

17   the public filing of what the order required?

18           On the second matter, I'm going to give you all my

19   concerns now, although I think I want to deal with the motions

20   separately.  I have a situation that I haven't had to encounter

21   too much where the papers say to me that the rewriting of the

22   existing agreement isn't going to come at the expense of the

23   unsecured creditor community.  And I'll certainly hear the

24   creditors' committee's concerns, but I would have assumed that

25   the kind of status report that we got today, especially if like

- 44 -

1    status reports were to come forward in the future by the

2    debtors or counsel, which is probably better capable of

3    reporting to the creditor community than AP Services would be,

4    would make the creditors' committee's concerns turn out to have

5    been satisfactorily resolved.

6            But, you know, I looked at those motion papers even

7    with the reply, even with that chart, those couple of pages,

8    which, to be candid, I could follow to only a very limited

9    extent.  I have difficulty seeing how I have anything in the

10   record to understand the debtors' business judgment.  And while

11   presumably the deficiency could be cured by an affidavit or if

12   everybody who was involved consented to some resolution, my

13   case management order says that when a factual matter is put in

14   dispute, I need declarations.  Probably wouldn't need an

15   evidentiary hearing, unless people wanted to cross-examine.

16   But I cannot, for the life of me, see how -- based on anything

17   that's been submitted to me, how the estate is saving the money

18   that it proposes to be saved.

19           So unless the fact that the government picking up the

20   tab for it makes my review function academic, I think I need a

21   supplemental affidavit and I have to continue the motion, but

22   help me on that.

23           By the way, when you're helping me on that, we got a

24   double entendre.  Talking about the amended agreement, when you

25   got two agreement -- two amendments that were -- took place

- 45 -

1    that aren't material to this, let's just talk about the present

2    arrangement in the proposal.  Right now in the state of play,

3    it looks to me like a discount that was going to be given has

4    been proposed to be eliminated, which at least seemingly would

5    result in something in the ballpark of 5.3 million being

6    retroactively awarded to Alix -- excuse me, AP Services.  And

7    I've been told that that's going to be made up for, but I don't

8    understand how.  And I don't have an explanation of the

9    business judgment.  It could very well be that there's a quite

10   a good one.  But unless I can just say it's somebody else's

11   problem, because the government is picking up the tab and it's

12   not going to affect the creditors in this case, I need help in

13   that.

14          Now, if my questions are not based on the most current

15   state of play, by all means tell me that.  And if I'm being

16   unduly cautious, you can tell me that as well.  But that's what

17   I need parties to address.

18          Who's going to take the lead on this?  Mr. Smolinsky,

19   come on up, please.

20          MR. SMOLINSKY:  Your Honor, let me just have one

21   moment?

22          THE COURT:  Yes, certainly.

23          Mr. Mayer, I'm going to hear you at some point.  Do

24   you want to take a second, though, after Mr. Smolinksy's talk,

25   to determine whether your remarks come before or -- better come

                                                                - 46 -

1    before or after his?

2              MR. MAYER:  Your Honor, I just want to confirm your

3    understanding that the disclosures made did in fact satisfy our

4    objection.

5              THE COURT:  Okay.  Thanks.

6              MR. WILLIAMSON:  Your Honor, this is Brady Williamson.

7    Just a note that I'm appearing by phone.  In this little

8    interlude here, I wanted to remind the Court of that.

9              THE COURT:  Okay.  I saw you on the list, Mr.

10   Williamson.  Before we're done, I'll give you a chance to be

11   heard if you want to be.

12             MR. WILLIAMSON:  Thank you.

13             THE COURT:  Okay, Mr. Smolinsky.

14             MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky

15   for the debtors.

16        (Noise broadcasting over loudspeakers)

17             MR. SMOLINSKY:  Let me begin by just introducing Mr.

18   Al Koch who's in the courtroom, and Ted Stenger --

19             THE COURT:  Did I hear your testimony on the

20   liquidation analysis about a year ago?

21             MR. KOCH:  Yes, sir.

22             THE COURT:  Yeah, I remember that.  Thank you.

23        (Noise broadcasting over loudspeakers)

24             THE COURT:  I do need quiet on the phone, for those

25   people who are that way.  The wrestling of the papers gets

- 47 -

1    magnified when it's heard here.

2        (Noise from phones broadcasting over loudspeakers)

3        THE COURT:  And it's continuing.

4        Go ahead, Mr. Smolinsky.

5        MR. SMOLINSKY:  Thank you, Your Honor.  Maybe I could

6    start with the amendment issue and the move to the success fee.

7        (Noise from phones broadcasting over loudspeakers)

8        MR. SMOLINSKY:  With respect --

9        THE COURT:  You know, pause please, Mr. Smolinsky.

10        CourtCall, are you on my phone?

11        (No audible response)

12        THE COURT:  CourtCall, I want you to mute everybody

13    until it's time for Mr. Williamson to speak.

14        Go ahead, Mr. Smolinsky.

15        MR. SMOLINSKY:  Your Honor, with respect to the

16    amendment, I'd like to just provide a bit of background.  And I

17    understand that if there are questions about the truthfulness

18    of this, we can move beyond to affidavits or an evidentiary

19    hearing, but I just wanted to provide Your Honor with a bit of

20    background.

21        It's been clear from almost the inception of the case

22    that the fee arrangement that was negotiated between AP

23    Services and U.S. Treasury during the sale process contained

24    incentives that were unhealthy to the dynamics of the case

25    moving forward.  And in fact, Treasury came to the

- 48 -

1    understanding that the fee arrangement that was reached was

2    actually an obstacle to closing out the wind-down, for two

3    primary reasons.  First, the states didn't like the fact that

4    AP Services were getting paid on a percentage of monies that

5    were returned to the U.S. Treasury.  Thus, from their

6    perspective, less contributed to the environmental trust.

7    Second, the bonus that was paid if the case was confirmed by

8    May of 2010 created anxiety among the states that they had to

9    rush to a settlement or they would find themselves in the

10   center of litigation.

11        So Treasury actually had -- initially they had desire

12   to incentivize AP Services to resolve the case as quickly as

13   possible and return the maximum amount of money to the federal

14   government.  That ultimately didn't necessarily end up being

15   the goals, and therefore U.S. --

16        THE COURT:  Well, this sounds like a reprise of

17   something that I think I raised with the counsel for the U.S.

18   government a year ago when I said 'Whose hat are you wearing?

19   You wearing the EPA's hat?  You wearing Treasury's hat?'  And I

20   was told 'All of the above,' and they seem to be inconsistent

21   with each other.

22        MR. SMOLINSKY:  That's correct, Your Honor.  So it was

23   actually the federal government who came back to us and said we

24   need to change the fee structure.  So, so as this Court's not

25   left with the impression that this fee arrangement was

- 49 -

1    negotiated in the last few weeks, this amendment has been

2    floating around for a long time.  After those conversations in

3    the very early part of 2010, terms were finally reached with

4    Treasury in the March time frame.  And it's our understanding

5    that, at the time, Treasury notified the states that these

6    changes were being made in order to remove the tensions that

7    existed.

8         It was then formally presented to the board of MLC,

9    who considered it and approved it.  Then it was circulated to

10   the committee for their comments, and the committee approved

11   it, and then to Weil Gotshal to process.

12        In the interim, AP Services had previewed the terms of

13   the amendments to the U.S. Trustee in an in-person meeting that

14   was held in May, and then again at an in-person meeting between

15   the debtors and U.S. Trustee in July.  They again -- this was

16   after the motion was filed.  They spoke to the U.S. Trustee and

17   offered them the opportunity to discuss any concerns that they

18   had.

19        There doesn't seem to be any substantive objection to

20   the amendment, although there's a lot of focus on the

21   retroactive adjustment to the discount.

22        THE COURT:  Well, if the retroactive adjustments to

23   the discount were offset by other savings, assuming that I got

24   the responsibility to deal with it if it doesn't gore the ox of

25   anybody other than Treasury, that could be addressed; it's just

09-50026-mg    Doc 6640    Filed 08/09/10    Entered 08/12/10 15:20:04    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 50 of 124

- 50 -

1    that I don't know yet how that happens.

2            MR. SMOLINSKY:  Well, let me premise my comments by

3    saying that I have never once, throughout the whole history of

4    the case, saw AP Services do anything that was not clearly in

5    the best interests of the estate.  But --

6            THE COURT:  Nor have I.  But basically what I have

7    here is a business judgment decision, assuming that I got to

8    make a business judgment decision, and that simply requires the

9    estate, on a relatively easy hurdle to climb, to give me the

10   showing.

11           MR. SMOLINSKY:  Your Honor, maybe we can walk through

12   the chart that was attached to the reply.

13           THE COURT:  Give me a minute.

14       (Pause)

15           THE COURT:  Okay.

16           MR. SMOLINSKY:  What this chart does is it compares

17   the incentive fee proposal from what had existed, on the left

18   side, to how it's being revised.  So if you look at the

19   first -- that nine- to ten million dollars, that's additional

20   payments out to AlixPartners, and that's a projection as to

21   what the fifteen percent would be through December of 2010.

22   That's an extension of the 5.8 million or 5.6 million through

23   March of 2010.

24           The next was a bonus based on where unsecured claims

25   came out; that hasn't been changed.  The bonus, if we confirm

- 51 -

1    by May -- we've talked about that -- that was agreed by

2    Treasury and Alix -- AP Services to be eliminated.

3            THE COURT:  Well, wait.  For not having confirmed by

4    May 28th?

5            MR. SMOLINSKY:  That's right.  And you have to

6    understand, Your Honor, that U.S. Treasury came to the debtors

7    and said 'Please don't do anything.  We'd much rather have a

8    consensual deal.  We want to spend more time talking to the

9    states.  We think we can get there.  We understand that it's

10   going to -- that we're asking you to take away a significant

11   bonus that you would have earned had you immediately moved into

12   the confirmation stage of the case.'  And that was part of the

13   ongoing dialogue between the debtors and Treasury.

14           THE COURT:  But where I'm confused, Mr. Smolinsky, is

15   that, while that provision was being excised, I thought there

16   would be an alternative payment of a new fee upon confirmation

17   which, barring something unforeseen, is going to happen

18   sometime in the fall of this year.

19           MR. SMOLINSKY:  That's right, Your Honor.  So if you

20   see on the right side, you'll see that there's an addition of

21   seven million dollars which is paid on confirmation of the

22   plan.

23           THE COURT:  All right, so the 2.5 that would have been

24   triggered by May 28th gets replaced by 7.0 that will be paid,

25   let's say for sake of argument, on December 31st?

MOTORS LIQUIDATION COMPANY, et al.

- 52 -

1           MR. SMOLINSKY:  That's fair, if you want to compare

2     that to -- the big elimination was a provision which was really

3     the quid pro quo for AP Services to discount their fees.

4     They're not usually in the habit of discounting the fees, but

5     the quid pro quo, and this goes back to the initial view of

6     Treasury that they wanted to get back as much money as

7     possible, was that they would -- AP Services would get fifteen

8     percent of any dollars that went back to Treasury.  And based

9     on what the estimates are of money that will go back to

10    Treasury either at confirmation or on the effective date or

11    after when it's not used for the wind-down, the estimate is

12    that that 15 percent will equal 15 million on the low end to

13    21.6 on the high end.

14          And, Your Honor, I would -- you know, I would propose

15    that that's somewhat of a conservative number, because, in

16    reality, when you look at what actually the estate believes the

17    environmental numbers to be, if it was left to simply an

18    estimate of the administrative claims for environmental

19    remediation, that that number that would be returned to the

20    Treasury could be significantly higher.  And so I think the

21    21.6 on the high end may actually be conservative.

22          But if you look at the range and you look at the 13

23    million to 26.1 million that's being eliminated, and you take

24    the midpoint, the midpoint of that range is 19.6 million

25    dollars.  If you add up all of the incentives under the new

- 53 -

1    proposal, the total range goes from 12 million to 14.5.  The

2    midpoint of that is 13.3 million.

3            So that is why the conclusion was reached and MLC, in

4    its business judgment, determined that this new proposal, the

5    amendment, was not disadvantageous to the estate, assuming that

6    what happens to the estate is necessarily the relevant part as

7    opposed to the parties paying for it.  But there is a

8    significant savings in this case if you use the midpoint 6.3

9    million dollars that the estate is saving, by moving off of the

10   original fee schedule to the new one.

11           So just stepping back to the almost daily calls

12   between U.S. Treasury and the debtors, you know, at some point

13   when Treasury came to MLC and said 'Good news:  We think we

14   could resolve the environmental claims and get the states on

15   board, but we're going to have to put tens of millions of

16   dollars into redevelopment property,' which arguably is not a

17   requirement of the estate, AP had every reason to say 'Wait a

18   minute, fifteen percent of that money is mine.  And we're not

19   agreeing to spend that money for that purpose; we'd rather give

20   it back to Treasury.'  But of course that response never came,

21   and the reason why it never came is because on both sides they

22   were consummate professionals, both at Treasury and at AP

23   Services, and they understood that what was important was

24   getting a deal done.  But what was also important is to have

25   some sense of fundamental fairness as to how the process would

- 54 -

1    play out, and that in fact led to the terms upon which we

2    believe the ultimate payouts would be less, but the entire

3    structure of the incentives fees would be changed.

4          Looking ahead, we're now in the weeds of the plan

5    process.  The creditors' committee will say 'We need X millions

6    of dollars to pursue this litigation, and Y millions of dollars

7    to pursue that litigation.'  And the fact that, under the

8    existing agreement, AP Services gets fifteen percent of

9    anything that's not spent creates an unnecessary friction in

10   trying to get to the right answer.

11         THE COURT:  So this gives the creditors' committee a

12   little extra liquidity to do the things they think they need to

13   do?

14         MR. SMOLINSKY:  Subject of course to U.S. Treasury's,

15   you know, say on that, because ultimately it is their money.

16   This is all of their money.  But U.S. Treasury is working

17   cooperatively with us to get to the right result.  And MLC is

18   agreeing to put more money into the environmental remediation

19   than is necessary, in order to get a deal done, and, under the

20   original fee agreement, that would be a hit to AP Services.

21   And the committee is asking for things under the plan which

22   cost money, and that impacts AP Services.

23         So that's why the dynamic -- and, you know, we've been

24   before Your Honor on claims reconciliation forever, and we'll

25   continue to be for the next year or two.  And while I've --

- 55 -

1    again, I've never seen AP Services be impacted at all by the

2    notion that if they spend a dollar on litigating a claim, it's

3    less money that they have in their pockets.  And there's a

4    total disconnect under our plan between dollars that are spent

5    in litigating, and ultimately distributions that go out,

6    because the distributions -- the cost of litigation is not

7    netted out of the claims distribution.

8            So everyone's trying to be fair.  And this type of

9    provision where fifteen percent of every dollar that is spent

10   on claims reconciliation goes into the hands of AP Services is

11   just inappropriate.  So -- and we've recognized this forever.

12   It hasn't impacted the case, but there's no reason why that

13   type of dynamic should stay in place.

14           So, you know, hopefully with this explanation of the

15   savings and the appropriateness of taking those types of

16   incentives and dynamics out of the picture, clearly it supports

17   the business judgment of doing this deal.  And I noted in our

18   reply that of course while AP Services is managing the affairs

19   of MLC, the board, which are all independent members, are

20   involved in these issues, have weighed on them and have

21   approved them, in the debtors' business judgment.

22           So I think that's all I really have to say on the

23   amendment.

24           THE COURT:  Let's give other people a chance to be

25   heard on the amendment, since you focused solely on that, and

- 56 -

1  since I want to stay focused, and then I'm going to ask you to

2  come up again to deal with the -- you or AP, to deal with the

3  remainder of its success fee.  I want to hear first from the

4  U.S. Trustee's Office; then I'll hear from Mr. Williamson.

5           Mr. Velez-Riv --

6           Oh, forgive me.  Mr. Mayer, I think you should

7  probably come in now.

8           MR. MAYER:  Thank you, Your Honor.  First, I want to

9  confirm what Mr. Smolinsky said and give a little background

10 which may help the Court.  The original terms of the AP

11 Services retention were negotiated in a three-way discussion,

12 and one of the ways was with the creditors' committee itself.

13 We were very concerned about deadlines for exiting the case,

14 and that May 28th, 2010 date was important to us.  And we were

15 among the constituents who were convinced that the May 28th

16 deadline wouldn't be met, through no fault of Alix's, that that

17 was entirely Treasury-driven.  And the problem with a deadline

18 that can't be met is it becomes kind of meaningless.

19          Mr. Smolinsky's description of the discussion on the

20 fifteen percent issue is absolutely correct.  And to just put a

21 little meat on the bones, there are three substantial areas

22 that are right now currently under negotiation; we've started

23 talking with Treasury about them in terms of a final budget for

24 post-effective date feasibility; one is, if asbestos litigation

25 is continuing post-reorganization, which it might, that's an

- 57 -

1    area where Treasury is vitally concerned as well, because in a

2    sense we're playing with some of their money.  There's a

3    provision in the deal where, if claims exceed a certain amount,

4    an additional two percent of GM -- New GM equity is allocated

5    to unsecured creditors to partially offset the dilution.  So

6    that's a live issue.  That makes the asbestos litigation a

7    potential source of expense that must be funded, to the extent

8    it happens after confirmation.  We hope we'll get a settlement

9    or resolution before then, but you don't know.

10       Second is the term loan litigation; that's before Your

11   Honor sub judice.  I won't deal with that except to note that

12   that's a real litigation.  And no creditors' committee can walk

13   away from a billion-five avoidance action; it just can't

14   happen.  My firm isn't handling that; I won't address it

15   further.

16       The third is the objection to the Nova Scotia ULC

17   claim, which is about a billion dollar claim.  And again my

18   firm isn't handling that either.

19       But those are the three, sort of, big-ticket items

20   whose budgets need to be negotiated over the course of the next

21   month.

22       THE COURT:  Forgive me, Mr. Mayer.  I know well about

23   the billion and a half buck avoidance action, which Butzel Long

24   is handling.  But I don't think I've heard about the other one

25   since back in the days of the original sale hearing.  That

- 58 -

1    involved -- or if there has been, I'm not paying enough

2    attention to matters on my desk.  That involved a payment to

3    some bondholders shortly before the filing, if I'm not

4    mistaken?

5            MR. MAYER:  Well, the exact date is still, I think, a

6    matter of some contention.  This is a claim objection, Your

7    Honor, because there were three -- there were several elements

8    to what happened with the Nova Scotia bondholders:  One was a

9    payment that we are not seeking to recover; the other was a

10   stipulated agreement on the allowed amount of their claims

11   against the estate, and an objection to the allowed amount of

12   their claims has been filed by the creditors' committee, and I

13   believe there is a hearing set down in November on that matter.

14           THE COURT:  Uh-huh.  And you got a special counsel for

15   the creditors' committee carrying the ball on that one?

16           MR. MAYER:  Well, yes, Your Honor.  One of the major

17   participants in that litigation was Aurelius, and I felt it was

18   inappropriate for Kramer Levin to appear adversarially --

19           THE COURT:  Well, I certainly understand that.  But

20   maybe it's because I don't read briefs until a few weeks before

21   they're teed up for an argument, but do you know the -- I know

22   you're not carrying the ball on that.  Do you know what the

23   state of the briefing is on that?

24           MR. MAYER:  I don't know that briefs have been filed.

25   This is in the nature of a 502(d) objection and equitable

- 59 -

1    subordination count.  It will be briefed.  I don't -- I think

2    it's inappropriate for me to comment.

3              THE COURT:  Okay.

4              MR. MAYER:  So, returning to the theme of today's

5    matter, the committee -- the committee's real concern was that

6    we used to have a date that people in the outside world could

7    look at and say 'Okay, that gives me some sense as to when

8    things might happen.'  That date slipped; nobody's fault.  And

9    we were concerned that there was nothing out in the public

10   domain, telling people when things might happen.  And yesterday

11   we had a meeting with Debtors' counsel; it was very productive,

12   and they told us what they were going to say on the record

13   today.  We view the prediction of a filing in the next couple

14   of weeks, a hoped-for hearing at the end of September, and a

15   hoped-for confirmation hearing at the end -- by the end of the

16   year -- those were the disclosures we were looking for, and it

17   satisfies the issues that we raised with our objection.  And

18   therefore we have no objection to the Alix fees.  We think Alix

19   has done a good job.

20             THE COURT:  Okay.  Thank you.

21             Now, Mr. Velez-Rivera, it's going to be your turn

22   next.  Actually, before you speak, and I'm making you pop up

23   and down like a yo-yo --

24             Mr. Jones, you're U.S. Attorney's Office and I'm

25   assuming that, just as in the past, you represent the hydra-

- 60 -

1    headed United States government.

2        MR. JONES:  That's correct, Your Honor.

3        THE COURT:  Did anything anybody said about any of

4    your heads in your hydra, especially Treasury -- was it either

5    inaccurate or incomplete?

6        MR. JONES:  Your Honor, nothing -- first off, let me

7    say, I was authorized and instructed to come here and simply

8    say that the government, including Treasury, has no objection

9    to the fee request.  That has been aired within the government

10   and is specifically simply not objected to.

11       I will say I'm not in a position to vouch for or

12   dispute the detailed recitation that Mr. Smolinsky provided.

13   Nothing jumped out at me as incorrect.  And I --

14       THE COURT:  Well, if you knew anything was incorrect,

15   I -- irrespective of what Secretary Geithner or anybody else

16   tells you to say or not say, I would ask you -- if you knew

17   something he said was inaccurate, you got to tell me.

18       MR. JONES:  Your Honor, I absolutely would.  I

19   absolutely would.  I'm just saying I can't vouch for all the

20   details, but the thrust of it is correct.  And I think, most

21   fundamentally, for purposes of the application, the fifteen

22   percent discount mechanism that was in place, I can confirm,

23   did become a source of, at least, incentives that didn't match

24   ultimately where the government felt this case needed to go.

25       The one thing that gave me pause in Mr. Smolinsky's

- 61 -

1    recitation is the suggestion that there's a governmental desire

2    to fund the environmental settlement trust that is being

3    contemplated at a level higher than is required.  And I think

4    really the way to look at it, and the way we do look at it, is

5    to say that the government has a strong view as to the degree

6    of cleanup and remediation and associated activities that are

7    required.  Often that's a purely adversarial and contentious

8    situation with a debtor that has no governmental involvement,

9    and here there is a governmental interest in having a bit more

10    of a collaborative relationship.  And certainly the government

11    doesn't want to instigate an incentive to increase the degree

12    of pushback that the debtor, in exercising its fiduciary

13    duties, should appropriately exercise.

14        THE COURT:  Yeah, and as you have a little mini-

15    conflict in that area, so do I as a judge, because I have

16    several federal statutes and several federal interests that

17    need to be accommodated.

18        MR. JONES:  Your Honor, that's absolutely correct.  I

19    also want to comment on just that:  the concern that the Court

20    has raised previously and again suggested today that the

21    government has to navigate competing interests.  Certainly we

22    represent EPA, which has a very powerful remediation interest,

23    and Treasury.

24        We continue -- the answer to the question "Who do we

25    represent" continues to be both, as well as other federal

- 62 -

1    agencies.  And I want to assure the Court we're navigating that

2    with extreme care.  Both agencies, because it is predominantly

3    those two, have a very active engagement and full

4    participation, and we're operating at a very carefully worked-

5    out consensus basis among those two agencies.  The process has,

6    as I said, been very intensive, very involved; a lot of very

7    active interaction.  And since we are a unitary government

8    after all, answerable to -- you know, ultimately answerable to

9    the President, we have taken great pains to ensure that

10   consensus is reached and then a position advanced that speaks

11   for all of the United States government.  That remains the case

12   both with respect to the fee application and all other aspects

13   of the case.

14          So, I mean, that's a high-level comment, but it's

15   something I really want to underscore for the Court and for all

16   parties to understand.  I'm not sure -- Your Honor, other than

17   that, the -- you know, I'm not familiar with all details that

18   Mr. Smolinsky recited, but it is accurate or consistent with

19   everything I know.  And, again, just to come back to the

20   particular position I was authorized to say is a much more

21   narrow, which is simply we have no objection to this proposed

22   fee arrangement, and I think implicit in that is an assessment

23   that it is an appropriate response and financial incentivizing

24   consistent with the status and needs of the case today.

25          THE COURT:  All right, thank you.  Thank you.

09-50026-mg    Doc 6640    Filed 08/09/10    Entered 08/12/10 15:20:04    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 63 of 124

- 63 -

1           Now, Mr. Velez-Rivera, subject to your rights and Mr.

2    Williamson's rights to get what Mr. Smolinsky and what Mr.

3    Mayer said in an acceptable form from an evidentiary

4    perspective and to cross-examine, those explanations, if backed

5    up satisfactorily, would at least seemingly support an adequate

6    business judgment finding.

7           And we have an irony here that if I put the estate or

8    the creditors' committee to the expense of preparing the

9    affidavits, it would be taking money out of the pockets of the

10   very people we're helping.  But you do have the right to get

11   that in a satisfactory evidentiary form and to cross-examine, I

12   think, if you wanted.  And in addition to whatever else you

13   want to tell me, I want you to focus on whether you want it.

14          MR. VELEZ-RIVERA:  I do want it, Your Honor.  You're

15   reading my mind.  My office naturally, as an agency of the

16   government, does not --

17          THE COURT:  I have another agency of the government

18   that is acting at cross-purposes here.

19          MR. VELEZ-RIVERA:  Not cross-purposes, Your Honor.  I

20   have a different purpose.  And for various reasons, the

21   packaging, as you mentioned, it matters.  First of all, it's

22   taxpayer money.  Your Honor, it's a lot of money.  Our

23   projections are that AP Services, assuming confirmation by the

24   end of the year, will bring in a bill exceeding a hundred

25   million dollars.

- 64 -

1        There's an 800-pound gorilla in the room that we

2   haven't talked about today.  And what's before you, Your Honor,

3   is but a small piece of a larger compensation package that --

4   it's fancy, it has several parts, but it's still only a small

5   piece.  We're talking today about AP Services bonuses, for want

6   of a better term.  The hourly component is much larger.  And of

7   that 106 million dollar project of my office, what we're

8   talking about today is only about 20 percent of that 106

9   million dollar bill that we see at the end of the day.  So this

10  matters.

11       We still have questions, Your Honor, my office has

12  questions, and I think we're getting much close to a fuller

13  understanding about whether the entire compensation structure

14  is better for the estate.  The missing piece is whether the

15  hourly fee component actually raises the bill or not.  It's for

16  an understanding of that missing piece and for a clear

17  understanding of everything that's been discussed today that we

18  would ask Your Honor to ask the debtors to file an affidavit

19  after all.  And the reason I also ask for better packaging,

20  Your Honor, is that it is in compliance with your case

21  management order at the end of the day.

22       We would -- we may not need an evidentiary hearing or

23  further opportunity for cross-examination, but I don't know

24  that until I see an explanation in prose rather than a table

25  at -- an unsworn table, I should say, at the last minute.  But

09-50026-mg   Doc 6640   Filed 08/09/10   Entered 08/12/10 15:20:04   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 65 of 124

- 65 -

1    we can get there when we can get there.

2          THE COURT:  All right, thank you.

3          MR. VELEZ-RIVERA:  Thank you, Judge.

4          THE COURT:  Okay, Mr. Williamson?

5          MR. WILLIAMSON:  Your Honor, echoing the comments of

6    the Assistant U.S. Trustee, my concerns are not so much the

7    evidentiary form but the compliance with the Court's July 2nd,

8    '09 order and the colloquy that we all had in front of Your

9    Honor on April 29th as to how AP Services in the aggregate, not

10   just month by month, would be addressed.  Our request, as we

11   noted in our papers, is simply to defer both requests, because

12   we don't think that the Court has before it, and not just in a

13   formulary sense, the informational material it needs.

14         And with respect -- we don't think the standard is

15   just what's disadvantageous to the estate, or even the business

16   judgment rule; it's the requirements of the Code as amplified

17   by the Court's July 2nd, '09 order and the April 29th hearing

18   in which we discussed AP Services' compensation as a retained

19   professional.

20         THE COURT:  Okay.  Anything else, Mr. Williamson?

21         MR. MAYER:  No.

22         THE COURT:  Very well.  Thank you.

23         Is there anybody in the hearing who wants to be heard

24   who I haven't given the chance to, before I give Mr. Smolinsky

25   a chance to reply?

- 66 -

1         (No response)

2              THE COURT:  Let the record reflect no response.

3              Come on up please, Mr. Smolinsky, if you'd care to

4    reply.

5              MR. SMOLINSKY:  Your Honor, I would just note in

6    response to the fee examiner, I believe the initial AP Services

7    arrangement was approved under 363.  I recognize -- and that's

8    a business judgment standard.  I recognize, in connection with

9    the success fee, there was an agreement reached, I think it was

10   on the 25th of June of 2009 when we were before Your Honor

11   approving that agreement, that we had agreed that the second

12   half of the success fee would be approved under standards of

13   330, 331, of reasonableness.  But I just wanted to make sure

14   the record is clear --

15             THE COURT:  So your point being that the July 2009

16   order or orders affected only the retention component as

17   contrasted to the 363 modifying the retention going forward --

18             MR. SMOLINSKY:  That's right, Your Honor.

19             THE COURT:  -- component?  I understand your point.

20             MR. SMOLINSKY:  Otherwise, I didn't hear anything

21   different in the comments.  I understand the fee examiner wants

22   more time.  I understand that the U.S. Trustee wants

23   confirmation of things that I've talked about today.  Unless

24   there are questions, I don't think I need to say anything

25   further.

- 67 -

1           THE COURT:  Okay.  Then I'm going to rule on this, and

2    I think I telegraphed my thinking in my colloquy to counsel.

3    I'm going to say now, even though it's more relevant to the

4    second motion before me, that this has nothing to do with the

5    quality of AP Services, which, although I haven't seen all of

6    them, those that I've seen are really outstanding.  But on a

7    business judgment matter that has the number of zeros after it

8    in terms of its consequences, I think that I do need an

9    appropriate evidentiary basis to make the business judgment

10   finding that a motion of this character requires.  Accordingly,

11   I am going to continue this motion, neither grant it nor deny

12   it, pending submission of the direct testimony affidavits or

13   declarations that are typically used in a contested matter

14   before me where matters of a factual nature have been put in

15   dispute.

16           To be frank, folks, if what Mr. Smolinsky said were

17   supported by affidavit or declaration, especially if

18   supplemented by what Mr. Mayer said, I would need either

19   additional facts or facts contradicting what those two guys

20   told me, for me to no longer be in a position to find it to be

21   an appropriate exercise of business judgment.  But that's what

22   procedural due process is all about, and that's what being

23   careful with an estate's money is all about.

24           I fully recognize that putting the debtors and the

25   creditors' committee to the expense of these affidavits costs

- 68 -

1   money and takes it out of the pockets of the creditors we're

2   trying to help.  But I can't, I think, criticize the U.S.

3   Trustee's for asking me to go by the book on a matter of this

4   character.

5          Mr. Smolinsky, I don't know if you're in a position to

6   answer this on the spot, and, if you want to beg off because

7   it's an unfair question, I'm going to give you that

8   opportunity.  But how much time would you want to get in the

9   one, two or three affidavits that would seemingly be required

10  on a matter of this type?

11         MR. SMOLINSKY:  Your Honor, Joe Smolinsky.

12         I think we can certainly file something within a

13  week's time.

14         THE COURT:  All righty.  Now, it would seem to me,

15  then, that orderly procedure and not taking more money out of

16  the pockets of creditors would call for the U.S. Trustee's

17  Office and the fee examiner to have the opportunity to read the

18  direct testimony affidavits and advise you and ultimately me of

19  whether they want to put in their own affidavits and/or cross-

20  examine.

21         And Mr. Velez-Rivera, my question to you would be how

22  much time would you need, after you got affidavits from Mr.

23  Smolinsky -- an affidavit or affidavits -- to make that kind of

24  determination?  Or do you think I'm seeing it the wrong way?

25         MR. VELEZ-RIVERA:  No, Your Honor, you're seeing it

- 69 -

1    the right way.  Within a week following Mr. Smolinsky's

2    submission, we should be able to assess whether there's

3    sufficient -- evidentiary sufficiency from my office's

4    perspective.

5            THE COURT:  Mr. Williamson, you in the same boat?

6            MR. WILLIAMSON:  Yes, Your Honor, but I'd like to ask

7    the Court a follow-up question that's directly related.

8            THE COURT:  You may.

9            MR. WILLIAMSON:  Your Honor, if the materials are

10   submitted and if the Court is satisfied, then, under the

11   applicant's request, it would receive a virtually immediate

12   payment of 5.3 million dollars, give or take.  If all those

13   things occur, then we will be at a point that we have not been

14   before, which is asking whether the work underlying that

15   additional payment is subject to the fee examiner's review --

16   and believe me I'm not asking for it, I got everything else

17   that's pending -- whether it's, under the Court's order,

18   subject to fee examiner review.  And that takes us back to our

19   April 29th colloquy.

20           THE COURT:  I'm not sure if I'm in a position to

21   answer that based either on my memory or without giving

22   opponents an opportunity to be heard on that.

23           MR. WILLIAMSON:  I --

24           THE COURT:  I think I need, subject to your rights to

25   be heard, to separate these issues and first ascertain whether

- 70 -

1   I'm going to approve those aspects of the motion other than

2   when the check is going to get written out, and then to provide

3   procedural due process for people to be heard vis-a-vis any

4   other concerns they may have.

5           MR. WILLIAMSON:  I'm fine with that.

6           THE COURT:  Mr. Velez-Rivera, do you want to weigh in

7   on that issue too?

8           MR. VELEZ-RIVERA:  No.  It's fine with us too.

9           THE COURT:  You're just standing up here waiting to

10  hear what we're going to do next?

11          MR. VELEZ-RIVERA:  I'm waiting to here whether Mr.

12  Williamson was done.

13          THE COURT:  I understand.  Okay.

14          MR. WILLIAMSON:  He is.

15          THE COURT:  All right, he is.

16          Here's what I want to do, folks:  If you need a little

17  extra time, I'm going to give it to you, Mr. Smolinsky, but I

18  sense, from the way you articulated it, you'd like to keep this

19  thing moving forward without material delay.  So I'm going to

20  give you a week, subject to extension for cause, to come up

21  with whatever direct testimony affidavit or affidavits you

22  regard as appropriate.  And I'm going to give Mr. Velez-Rivera,

23  on behalf of the U.S. Trustee's Office, and Mr. Williamson, an

24  additional week to come up with any other affidavits they want

25  to submit, if they choose, and also to advise the debtor,

- 71 -

1    creditors' committee, U.S. Attorney's Office in its many hats,

2    and my chambers, as to whether there's a desire to cross-

3    examine.  If there is, I'm going to hold whatever evidentiary

4    hearing needs to be held as soon as practical after Labor Day,

5    although I got to caution you that another one of my cases,

6    which in another environment might be considered material since

7    it's got over a billion bucks in debt, has a contested

8    confirmation hearing at that time and a basketful of issues,

9    including estimation hearings on tort claims.  And I'll deal

10   with any vestigial argument that I need to hear.

11            I also need you people to see if you can agree upon

12   what is agreed upon vis-a-vis when, if I were to approve this,

13   payment would be forthcoming, in whole or in part; and teeing

14   up, if you have to agree to disagree, on a recommended

15   mechanism for me to deal with open issues.  I think that's as

16   far as I can or should rule today on the first motion.

17            And since we've been sitting now for almost two hours

18   without an opportunity for anybody to go to the facilities, I'm

19   going to take a ten-minute break.  And then we'll continue with

20   the matter of the remaining six and a half million bucks to be

21   paid of the fee request.  We're in recess until twenty-five

22   till twelve.

23            MR. MAYER:  Your Honor, I expect to leave the balance

24   of the hearing to my colleague, Ms. Sharetta.  I hope that's

25   okay?

- 72 -

1          THE COURT:  Certainly.

2      (Recess from 11:27 a.m. until 11:37 a.m.)

3          THE COURT:  Have seats, everybody.

4          All right.  We have the remaining AP matter.  And I

5     think I telegraphed my thinking on this before, which is, that

6     based on everything I've seen, AP Partners (sic) has done an

7     outstanding job, and that the numbers its talking about don't

8     seem out of the ballpark in the context of others that have

9     been approved, but that I have a failure up to this point to

10    comply with the 2009 -- July 2009 order.  So I'm wondering how

11    I should be dealing with it.

12         Mr. Smolinsky, are you or somebody from AP going to be

13    arguing this one?

14    MR. SMOLINSKY:  Joe Smolinsky on behalf of the

15    debtors.

16         I don't know if anyone is going to be arguing it

17    today.  But I'm happy to make some remarks on behalf of the

18    debtors to hopefully --

19         THE COURT:  Of course, of course.

20    MR. SMOLINSKY:  -- move this along.  And I take it

21    that you've noted that the application, although we served it

22    out, is not prepared by Weil.

23         THE COURT:  Yes, I noticed that AP signed the original

24    application.  But I also noticed that you submitted the reply.

25    MR. SMOLINSKY:  That's correct, Your Honor.  I was

                                                                    - 73 -

1    just trying to be efficient.  We had one day to file a reply

2    and we thought we'd just --

3              THE COURT:  No, and I'm grateful --

4              MR. SMOLINSKY:  -- in there.

5              THE COURT:  -- for that.  And I'm grateful for

6    anything you may have done in terms of helping get information

7    exchanged.  But I think I telegraphed what I need both sides to

8    address on this.

9              MR. SMOLINSKY:  Yes, Your Honor.  First of all, I'd

10   like to say that from AP Services' perspective, they think that

11   they've complied with all of the protocols that are required of

12   them under the various orders relating to their engagement,

13   with maybe one exception; and that's the inclusion of time

14   records with their application for the balance of the success

15   fee.  I don't know -- I don't think that there's a dispute --

16   and I guess it's mea culpa -- that at the hearing in June -- on

17   June 25th of 2009, when there was a deal worked out with the

18   U.S. Trustee, that there was an agreement that the second half

19   of the fee would be deferred for one year, that there would be

20   an application filed, which there was, but it says that time

21   records would be included.  We could all debate --

22             THE COURT:  Why would you need to give me a mea culpa

23   on that?

24             MR. SMOLINSKY:  Because I don't believe that AP

25   Services did that when they filed the application.  It wasn't

- 74 -

1    till later that they submitted their time records to the U.S.

2    Trustee.  But I think, other than that, they've complied with

3    all of their obligations, not only with respect to the second

4    half of the success fee, but with respect to their ongoing

5    monthly payments.

6              THE COURT:  Um-hum.  Continue.

7              MR. SMOLINSKY:  I guess it's sua culpa, not mea culpa.

8              THE COURT:  Yeah, I thought mea was you taking

9    responsibility.

10             MR. SMOLINSKY:  The --

11             THE COURT:  I'm not looking for culpa, but I'm looking

12   to do what I need to do.

13             MR. SMOLINSKY:  Yes.  I mean, I guess there's -- there

14   could be a disagreement -- I'm not sure how relevant it is --

15   but certainly there could be a disagreement about the relevance

16   of over a year-worth of invoices in connection with a success

17   fee that was specifically related to a sale transaction.

18             THE COURT:  Indeed there is.  And that's something I

19   want Mr. Velez-Rivera to address.

20             MR. SMOLINSKY:  But nevertheless, I don't step back

21   from the statement -- and I've read the transcripts -- that it

22   was agreed that those would be provided.

23             Speaking to AP Services prior to -- during the break,

24   I guess we have a suggestion.  Nobody is here looking to

25   railroad the U.S. Trustee in reviewing time records in a matter

- 75 -

1    of a few days.  We tried to be responsive to their request for

2    more information and provided the information as quickly as

3    possible.  But to the extent that they need more time to review

4    those, AP Services is not in a position to say tough luck.  I

5    think they should have that opportunity.  Again, there's a

6    question about relevance.  But that could be addressed at a

7    future time.

8            So perhaps what the answer is, is that we track this

9    along the same way as the amendment and give the U.S. Trustee

10   an opportunity to see whether the time records for this lengthy

11   period of time impacts their decision as to whether the success

12   fee is reasonable.  Again, I didn't see anything in the

13   objection to suggest that they think that it's unreasonable;

14   that they didn't comply other than with respect to the time

15   records; that they didn't do the work that was the precondition

16   to the entitlement to that success fee.  But to the extent that

17   they have an issue on those fee applications, we could have

18   that same hearing utilized for that purpose.  And I think AP

19   wants to move forward and try to get those fees awarded and

20   paid as quickly as is reasonably possible.

21           THE COURT:  Okay.  Thank you.

22           Mr. Velez-Rivera?

23           MR. VELEZ-RIVERA:  Your Honor, our concerns are with

24   compliance with your order from last year.  We believe, as we

25   stated in our objection to this motion, that the time records,

- 76 -

1    indeed, should be filed.  That was a negotiated term.  It's an

2    ordered term.  And AP Services, naturally, isn't above an order

3    of this Court.

4           We could use further time to scrutinize the time

5    records that are at issue.  And I should be clear.  The success

6    fee was earned as of July of last year.  What my office needs

7    more time to scrutinize aren't the full 4,000 pages that were

8    submitted to my office, but rather just the ones that apply to

9    the period of time to which the success fee itself applies.

10          THE COURT:  Um-hum.

11          MR. VELEZ-RIVERA:  So, Your Honor, I think we're with

12   the Court.  We'd like to see the relevant time records filed.

13   And we could certainly use a little bit more time to look at

14   them.

15          THE COURT:  All right.  Mr. Williamson?

16          MR. WILLIAMSON:  Thank you, Your Honor.  We did not

17   yet receive the 4,000 pages of time records.  And the same

18   question that I raised before the break remains before us.

19   While, obviously there's an important disclosure component to

20   filing the time records, the question remains, whether AP

21   Services' time, whether for six weeks or the last year and a

22   half, weren't reviewed by the fee examiner.  Because under the

23   Court's prior order, AP Services is a retained professional.

24          And again, this is not an assignment that we

25   campaigned for.  But like everyone else, we read the Court's

09-50026-mg    Doc 6640    Filed 08/09/10    Entered 08/12/10 15:20:04    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 77 of 124

- 77 -

1    July 2nd order and it specifically says a reasonableness

2    review, time records in increments; and of course, one of the

3    relevant cases, all of us agree is XO, which says that time

4    records, order or not, are a relevant factor in a

5    reasonableness review.

6            THE COURT:  I'm not sure if I understand what you're

7    saying.  You're saying that -- you're obviously saying that

8    their time records have to be filed.  But are you then also

9    saying that the matter must be kicked for the incremental time

10   for you to review their services, either for the period up to

11   the time of the sale or for the last year and a quarter of the

12   case?

13           MR. WILLIAMSON:  As I suggested before the break, Your

14   Honor, that's inevitably a question if we're talking about

15   fifteen percent retroactive increase.  It necessarily raises

16   the question of what is the fifteen percent an increase from.

17   And that kicks us back to the question we all left unanswered

18   on April 29th.

19           THE COURT:  Well, I'm not sure if it is the same

20   question or not, Mr. Williamson, because long before you

21   entered into the case, I determined that if the conditions

22   associated with the incentive payment had been satisfied, and

23   their services would -- turned out to be reasonable, or at

24   least subject to a reasonableness test, which ultimately would

25   seemingly be a judicial determination, thrust in my lap, if

- 78 -

1    certain conditions were satisfied, among which were that there

2    be a sale and  that I considered the fees to be reasonable,

3    then they would get their fee; or impliedly, if the conditions

4    were satisfied, but to the extent that I found them reasonable,

5    if it was less than a hundred percent, they would get the fee,

6    except to the extent of a hundred percent.

7              I don't remember the scope of your responsibilities

8    under your retention order to review, Mr. Williamson, vis-a-vis

9    an issue of this character.  Can you refresh my recollection in

10   that regard?

11             MR. WILLIAMSON:  Yes, with one prefatory note, which

12   is, we are happy not to review any of AP Services detailed time

13   records.  But the retention order, Your Honor, to answer your

14   question directly, spoke in terms of retained professionals.

15   And AP Services, for, you know, better or worse, was listed as

16   a retained professional long before we came onto the scene.

17             THE COURT:  All right.  Anything further from your

18   perspective, Mr. Williamson?

19             MR. WILLIAMSON:  No, sir.

20             THE COURT:  Mr. Smolinsky, do you want to be heard

21   either vis-a-vis what Mr. Williamson said or otherwise?

22             MR. SMOLINSKY:  Yes, Your Honor.  I really believe

23   that the fee examiner is mixing apples and oranges.  The

24   monthly compensation order defined retained professionals so

25   that retained professionals can get paid.  What the fee

- 79 -

1    examiner is suggesting is that any other order or any other

2    motion or any other pleading filed any time in the future

3    during the case that uses the same defined term goes back to

4    the original definition.

5           So I think we take issue at the notion that just

6    because they were considered in the definition of retained

7    professional for one purpose, that that gets bootstrapped into

8    how it's defined under the fee examiner's engagement letter.  I

9    understand that that's not an issue for today, I just want to

10   make clear that I don't think that AP Services was under ---

11   ever under the notion that they were supposed to be included in

12   the context of the monthly fee review that would be undertaken.

13          With respect to the success fee, we're happy to

14   provide the fee statements to the fee examiner with respect to

15   that period of time relating to the sale, but I know what's

16   going to happen.  The fee examiner's going to review it.  He's

17   going to say these monthly fee statements should be subject to

18   across-the-board discount of five percent, and we're going to

19   be arguing about something that's not before the Court at this

20   instant, which is the success fee and whether the success fee

21   is warranted.

22          So I understand we have to take up the issue as to

23   whether the fee examiner is going to be responsible for going

24   through all of Alix -- all of AP Services' fee statements for

25   the entire case.  But that's not really what we're talking

- 80 -

1   about here.  And I think he's trying to slowly creep into a

2   different area.

3           MR. WILLIAMSON:  Actually, I'm trying to creep away

4   from that area.  But just I wanted to raise the issue and be

5   clear.

6           THE COURT:  All right.  Well, if you're willing to

7   creep away from it, that avoids a decision that I need to make.

8   I have a skilled U.S. Trustee's Office in this district.  And

9   the issue that may warrant further discussion later, but I'm

10  not creeping to look for more controversy -- I've got plenty of

11  controversy -- is whether stuff that is on an hourly basis is

12  susceptible to that.  It seems to me that the U.S. Trustee's

13  Office can and is quite able to decide whether, as Mr. Velez-

14  Rivera observed in comments that I was inclined to agree with

15  him on and I still am inclined to agree with him on, that his

16  review was for the period through the time of the sale, and we

17  would look to see the extent to which, based upon the work up

18  to the time that triggered the entitlement, the fee was

19  reasonable or not.

20          So here's what we're going to do.  Mr. Smolinsky, I'm

21  going to require that the time sheets, to the extent required

22  under the July -- and I forget the date in 2009 -- 2nd?

23          MR. SMOLINSKY:  I believe it was June 25th was the

24  hearing date, I don't know what --

25          THE COURT:  Well, June 25, 2009, all right.  To the

- 81 -

1    extent required under my earlier order, that order's going to

2    be complied with.  And if that requires time sheets being

3    filed, they'll be filed.  I also want them informally

4    provided -- since they have to be filed anyway, I want them

5    provided in a convenient way to the fee examiner.  I am not

6    going to decide today the extent to which the fee examiner has

7    the authority or that it's desirable for it to review fee apps

8    or time charges for services after the sale.  But at least I

9    want them provided to the fee examiner so that we all know what

10   we're talking about.

11            And I concur with your idea, Mr. Smolinsky, that if we

12   can put this on a parallel track with the other, we try to do

13   that.  I would hope that neither of the two matters that are

14   left with AP Partners would tend to slow down the other.  But

15   we can worry about that if and when there's a risk of that

16   happening.

17            All right.  Not by way of reargument, are there things

18   I failed to consider, Mr. Smolinsky?

19            MR. SMOLINSKY:  Your Honor, I'm looking at the

20   transcript from that hearing, and it talks about --

21            THE COURT:  The hearing back in '09, or --

22            MR. SMOLINSKY:  Yes, Your Honor.

23            THE COURT:  Okay.

24            MR. SMOLINSKY:  It talks about the filing of an

25   application attaching time records.  It doesn't speak as to

- 82 -

1    which time records.  What I'd like to do is to file with the

2    Court the time records for the period from the petition date

3    through the sale closing, which I think are the relevant time

4    sheets in connection with the success fee.  I don't know if

5    Your Honor was contemplating anything different, but that's

6    what I would envision.

7           THE COURT:  Mr. Velez-Rivera, do you want to be heard

8    on that issue?

9           MR. VELEZ-RIVERA:  That's exactly what I was thinking,

10   Your Honor.

11          THE COURT:  I'm sorry?

12          MR. VELEZ-RIVERA:  That's exactly what I was thinking.

13   That same time period is --

14          THE COURT:  Okay.

15          MR. VELEZ-RIVERA:  -- exactly what we had in mind.

16          MR. SMOLINSKY:  Thank you, Your Honor.

17          MR. VELEZ-RIVERA:  Thank you.

18          THE COURT:  Fair enough.  All right.  Then can we talk

19   to the relief from stay motion?

20          MR. WILLIAMSON:  Your Honor, this is Brady Williamson

21   again.  May I raise one scheduling matter just as an

22   observational matter, as long as we're on the subject of dates?

23          THE COURT:  Yeah, sure.

24          MR. WILLIAMSON:  As of yesterday, Your Honor, we began

25   getting fee applications for the third round.  And because of

- 83 -

1    the relatively recent involvement of the asbestos professionals

2    and the environmental professionals, we suspect there will be

3    upwards of twenty, as opposed to a dozen or fourteen, fee

4    applications in this next round.  And in the interests of

5    everyone's sanity, not to mention the Court's schedule, it is

6    our intention to divide those into two tranches and to ask for

7    two separate hearing dates; one in September, one in October,

8    so that A) we can get our work done; B) everybody gets due

9    process; and C) everybody's sanity is preserved.

10          THE COURT:  That doesn't offend me as a matter of

11    concept, Mr. Williamson.  But I wonder if I can make a final

12    decision on that without -- I would be surprised if Mr.

13    Esserman's still on the phone.  I don't know if I have anybody

14    from Caplin & Drysdale here at all.

15          MR. ESSERMAN:  Your Honor, this is Sandy Esserman.  I

16    still am on the phone.

17          THE COURT:  How does that sound to you, Mr. Esserman?

18    Are you okay with that?

19          MR. ESSERMAN:  Yes, it's fine.

20          THE COURT:  All right.  Then I'm going to approve it,

21    subject to giving to reconsideration in the event Caplin &

22    Drysdale wants to be heard.  But is there anyone in the

23    courtroom who thinks that isn't a good idea?  I don't hear a

24    response.

25          All right, Mr. Williamson, it sounds like your idea

MOTORS LIQUIDATION COMPANY, et al.

- 84 -

1    may make sense.  So why don't you tentatively proceed that way.

2    Maybe you or one of your partners can pick up the phone to

3    Caplin & Drysdale, tell them what you have in mind, and tell

4    them that I said that if they want to be heard on the matter,

5    I'm not going to foreclose them.

6            MR. WILLIAMSON:  That's fine.  We'll do that, Your

7    Honor.  And then logistically, we'll simply check with your

8    staff about appropriate dates, one in September, one in

9    October.

10           THE COURT:  Fair enough.

11           MR. WILLIAMSON:  All right.  Thank you.

12           THE COURT:  Thank you.

13           All right.  Everybody who's here for matters other

14   than the relief from stay is now free to go, if you choose to.

15           IN UNISON:  Thank you, Your Honor.

16           THE COURT:  And I'll hear the Brittinghams matter.

17       (Pause)

18           THE COURT:  And I have a couple of remarks here too.

19   Let me get appearances on this first.  First from the Klestadt

20   firm.

21           MR. GEBRAEL:  Good afternoon, Your Honor.  Samir

22   Gebrael from Klestadt & Winters on behalf of the Brittinghams.

23           THE COURT:  Okay, Mr. Gebrael.  And are you going to

24   be arguing that for the estate, Mr. Smolinsky, or one of your

25   colleagues?

- 85 -

1          MR. SMOLINSKY:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. SHARRET:  Your Honor, Jennifer Sharret from Kramer

4    Levin on behalf of the committee.

5          THE COURT:  Right, Ms. Sharret.

6          Folks, I don't know how many relief from stay motions

7    I've had so far, but this one appears to be materially closer

8    than most and at least seemingly creates a stronger cause for

9    relief from the stay.  But it caused me to scratch my head in

10   the context of one or both of the sets of papers reflecting

11   months of dialogue on this; and presumably, occasioned by the

12   uncertainty of the level of insurance and/or the uncertainty of

13   getting a recovery from parties other than this estate in the

14   form of an unsecured claim, which to my disappointment, is not

15   going to put a lot of money into the pockets of creditors, even

16   if the lawsuit is won.

17         Was it really so impossible to work out a consensual

18   resolution on this?

19         MR. GEBRAEL:  Yes, Your Honor.  Initially we actually

20   had in mind to waive our claim against the debtor.  As you can

21   see, we had withdrawn that motion, and now we're not doing so.

22   And with that in mind, I don't think the MLC really entertained

23   the idea of allowing us to proceed without releasing the MLC.

24   And I can explain further, Your Honor, why --

25         THE COURT:  I don't want hear --

- 86 -

1           MR. GEBRAEL:  -- we had that change.

2           THE COURT:  -- 408 stuff.  If you're both telling me

3    I've got to decide it, I'm going to decide it.  And one of you

4    is going to be unhappy.

5           MR. GEBRAEL:  Correct.

6           THE COURT:  Mr. Smolinsky?

7           MR. SMOLINSKY:  Your Honor, I'd like to provide some

8    background to this matter, because I think it would be helpful

9    to put it into context.

10          As I think Your Honor is aware, the Brittinghams

11   originally filed a motion to lift stay, as indicated, where

12   they agreed to release the debtors from the state court

13   litigation.  At the last minute -- and we did have a

14   resolution -- they withdrew that motion, filed another motion

15   seeking to continue that state court action and to preserve

16   their rights to assert a claim against MLC.  This is a jury

17   trial in Ohio.  We think that to the extent that they are

18   seeking to assert a claim against MLC, we should have the right

19   under the mandatory mediation program, to see if we can resolve

20   it, short of paying to defend an action.

21          There are significant issues as to whether there is

22   anything to pursue by way of Delphi.  There's also factual

23   issues.  They believe that Delphi's insurance company was

24   defending MLC.  We don't believe that was the case.  We believe

25   that Delphi was actually providing defense.  And once Delphi

- 87 -

1    was in bankruptcy, they stopped providing that defense and in

2    fact, the Brittinghams didn't file a proof claim against Delphi

3    even though the assertion in their papers is that Delphi had

4    assumed employee liability.

5          The interesting element here is that MLC is not the

6    only defendant.

7          THE COURT:  I understand.  But if you're going into

8    the merits of your argument, which, of course, you're going to

9    have the opportunity to do, I'll take the argument in the

10   traditional way.

11         Your bottom line is that both sides failed to

12   consensually resolve this?

13         MR. SMOLINSKY:  Yes, Your Honor.  I think before the

14   estate is subject to incurring the cost of participating in a

15   jury trial in Ohio, and of course, the slippery slope of other

16   similar motions, we did want to bring this to the attention of

17   the Court, because we don't necessarily think that that's a

18   good expenditure of the estate's assets.

19         THE COURT:  All right.  Okay, Mr. Gebrael, I'll hear

20   your argument.

21         MR. GEBRAEL:  Good afternoon, Your Honor.  First, I do

22   want to highlight the fact that this trial -- this Ohio state

23   trial has been going on for nine and a half years.

24         THE COURT:  I thought it said eight in your papers.

25   Is it now up to nine and a half?

- 88 -

1          MR. GEBRAEL:  It was filed in 2001 -- February 2001,

2     so in fact, as of 2001 -- this February 2011, it will be ten

3     years.

4          THE COURT:  Well, we're not in 2011 yet.  So I --

5          MR. GEBRAEL:  Sorry --

6          THE COURT:  -- advocacy still has to stay true to the

7     facts.

8          MR. GEBRAEL:  -- right.

9          THE COURT:  Don't fudge them, okay?

10         MR. GEBRAEL:  Sorry, Your Honor.  That's why it's

11    actually nine and a half years.  And I also want to highlight

12    the fact that in those nine and a half years, the Delphi

13    insurance carrier had defended Dr. Stull in this Ohio

14    litigation -- Dr. Stull and the MLC.  And they only stopped

15    their defense, and I guess this claim that there is any

16    insurance by Delphi, when the GM bankruptcy stay was filed on

17    June 1st of 2009.  And when we were first approached by the

18    Brittinghams, our initial reaction, of course, was before

19    having the debtor spend any costs in -- you know, before even

20    approaching the idea of whether we were going to lift the stay

21    or not, we thought the first step would be to file the 2004

22    application.

23         And as a response to our 2004 application, the MLC's

24    counsel, their first reaction was to send us the Delphi policy

25    and to say here's the applicable policy, go away, go after

- 89 -

1    Delphi, why are you coming after us.  And again, I'm not saying

2    anything disparaging against MLC's counsel, but it's

3    interesting because they sent us a Delphi policy three months

4    after supposedly there was an amendment to the Delphi plan that

5    would have terminated that indemnification agreement.  It just

6    seems to -- it seems a little bit strange that even the MLC's

7    counsel was not aware that there was some kind of amendment to

8    the Delphi plan, that this indemnification was terminated.  But

9    again, that's no way disparaging MLC's counsel.  They have --

10   they did try to work with us and try to provide us with

11   whatever documents that we had requested pursuant to the 2004

12   application.

13          The other set of documents that we received, and

14   again, I would like to thank Mr. Smolinksy for providing us

15   with letters directly from the New -- from New GM, stating that

16   Dr. Stull will be represented by New GM in the Ohio State

17   Court.

18          I think the next step is to jump right into these

19   factors, Your Honor.  And there was -- on November 5, 2009,

20   there was actually, I think in the -- his name was

21   Mr. Lawrence -- a lift stay by Mr. Lawrence that you had

22   denied.  But I think that it's very telling to look through

23   that transcript and to see some of your comments there.  And

24   I'd like to play off that.  And you had said that the three

25   most important factors -- and I'm going to start with those --

- 90 -

1    are the factors -- the second, the seventh and the twelfth.

2    And the second and the seventh are basically whether or not

3    this is going to interfere with the bankruptcy case and whether

4    this would affect or prejudice the other creditors of the

5    debtors.

6            Your Honor, this case has been going on for nine and a

7    half years.  This is trial ready --

8            THE COURT:  Was it filed in May 2002?

9            MR. GEBRAEL:  February 2001.  That's --

10           THE COURT:  Why does the certificate of --

11           MR. GEBRAEL:  That's the amended --

12           THE COURT:  -- service that I have show May 30, 2002?

13           MR. GEBRAEL:  -- that's the amended complaint, Your

14    Honor.  The initial complaint was filed in February 2001.  We

15    had filed on the docket as an exhibit the amended complaints.

16           THE COURT:  So it was filed in February of '01?

17           MR. GEBRAEL:  Of '01, correct, Your Honor.

18           THE COURT:  Okay.

19           MR. GEBRAEL:  We already have -- from New GM, we

20    already have a letter stating they're going to defend Dr.

21    Stull.  Whatever arguments that New GM -- maybe this is a bit

22    speculative, and I don't know the exact amounts -- but whatever

23    arguments that New GM is going to bring are very much going to

24    be in line with the arguments that the MLC are going to have.

25    So there's going to be a lot of overlap and there's not going

- 91 -

1    to be a lot of costs that the MLC are going to have to spend.

2         The ML -- also, Your Honor, it's very important to

3    point out, the MLC has already told us, they don't have any

4    discoverable information.  They don't have anybody that we can

5    depose.  Again, their involvement's going to be very, very

6    small.

7         And, Your Honor, in light of the fact that under

8    Section 157(b)(5), this kind of claim, since it is a personal

9    injury claim, it would be transferred to the district court.

10   We are going to have to litigate this case.  And so what I

11   don't understand is that their argument that we're trying to

12   save costs, how are they going to save costs?  They're going to

13   have to litigate this case in district court.  Then why not

14   allow it to proceed in Ohio State Court?  And in fact, the

15   opposite is true, because if they do allow it to proceed in

16   Ohio State Court, they would actually save costs for all the

17   other creditors, because it's, again, nine and a half years in.

18        The state court knows the facts.  It's ready.  In

19   fact, August 11th, next Wednesday, they are hoping -- they're

20   having a pretrial conference call, and they're hoping to set

21   the trial dates, Your Honor.

22        I'd like to address --

23        THE COURT:  Say -- when is -- say that again slower.

24   What is being done in the trial court?

25        MR. GEBRAEL:  August --

- 92 -

1          THE COURT:  My thinking was that if I granted your

2    motion at all, I would nevertheless require you to proceed with

3    ADR, at least to take care of your claim against GM or Old GM,

4    and then let you proceed if the ADR weren't successful.

5          MR. GEBRAEL:  Your Honor, in terms of proceeding with

6    the ADR, there's several issues there.  First, the ADR order

7    does not have jurisdiction over the New GM, so --

8          THE COURT:  No, but what's wrong with you getting

9    whatever you're going to get out of GM and then going against

10   the other guys?

11         MR. GEBRAEL:  The problem, Your Honor -- and we've

12   asked this question to the MLC and we've asked it -- how do you

13   isolate the liability?  And nobody seems to know.  We've

14   asked -- the MLC contacted us and said, you want to take part

15   in the ADR, and we said sure.  How do you isolate the

16   liability?  And they said, that's your problem.  I said no,

17   that's -- well, I guess that is our problem, and that's why

18   we're trying to lift the stay.  So nobody has been able to

19   answer that question.  And our three tort lawyers that are

20   dealing with this have not been able to answer that question,

21   and that's why we're here today.

22         And I'd like to also address something that they had

23   in their objection about this floodgates argument.  I looked at

24   the docket very carefully, Your Honor.  On November 5, 2009,

25   there was this Reynolds litigation.  And in that litigation you

- 93 -

1    had allowed the modification of the stay.  After that

2    modification of the stay, there has not been --

3            THE COURT:  Pause, please, Mr. Gebrael --

4            MR. GEBRAEL:  Yes.

5            THE COURT:  -- because I thought that -- if I were to

6    grant your motion, it would be the first.  I don't remember

7    having granted one before.

8            MR. GEBRAEL:  Your Honor, the Reynolds lift stay was

9    allowed.  And it was a tort litiga -- it was tort litigation

10   also.  They were farther ahead in the process.  They had a

11   judgment that they had to somehow -- I believe there was an

12   appeal on the judgment, and they were still figuring out -- I

13   don't know all the details, but I'm pretty sure this will not

14   be the first.  In fact, I counted, and there's about ten or

15   eleven as of last night.  Five of them -- I believe five of

16   them have been approved lift stay on limited -- on limited

17   grounds.  And again, this is -- our modification of the stay

18   would only be on limited grounds.

19           We would still have to come back to the bankruptcy

20   court with an unsecured claim.  We would still be in line with

21   all the other unsecured creditors.  So this argument that just

22   because you allow one modification of the stay, a flood of

23   other claimants are waiting in the wings, simply is not true.

24   It has not happened.  I counted.  There's about ten or eleven

25   that have been filed.

- 94 -

1        The other fact -- this floodgate argument, again.  We

2   were in front of Your Honor eight months ago in a 2004

3   application.  And I don't want to bring up another completely

4   different issue, but again, the same argument was said that a

5   flood of 2004 applicants would be allowed if we were --

6        THE COURT:  Is that the one from the German soldier

7   who was injured --

8        MR. GEBRAEL:  Exactly.

9        THE COURT:  -- while in training here in the U.S.?

10       MR. GEBRAEL:  Exactly, Your Honor.  And I counted as

11   of last night, Your Honor.  There's not a 2004 application

12   flood.  There's, in fact, a drought.  I think I counted three

13   of them.  So this issue that once we decide this one lift stay

14   there's all these other claims, it's simply not true.  The

15   Sonnax factors, in fact, allows us to look at each individual

16   claimant, case-by-case basis, Your Honor.

17       The other factor is -- that you had stated is very

18   important is the twelfth factor, the balancing of the harms.  I

19   think I've already articulated, I'm not going to go through

20   what the harm is to the debtor.  And I believe there is no

21   harm.  But we'll look at the other side of the equation here.

22   And it is -- it's a very, very somber issue, because we have

23   expert testimony from the Ohio State Court that says that Ms.

24   Brittingham has, in fact, a fifty percent chance to survive

25   four more years without a lung transplant -- a double lung

- 95 -

1    transplant.  She has a fifty percent chance to survive five

2    more years with a lung transplant.

3             And I focus on that because, in fact, in your

4    transcript, Your Honor, of November 5, 2009, when you were

5    discussing the Lawrence lift stay here, you had mentioned

6    that -- and I'd like to quote:  "Nobody's going to be depriving

7    Mr. Lawrence of his day in court.  The issue rather is, which

8    court will decide the issues."  And that's why you had denied

9    that lift stay motion.

10            But in fact, here, Your Honor, somebody will be

11   denying Ms. Brittingham's day in court.  Ms. Brittingham,

12   unfortunately, will probably not survive the gauntlet of

13   eighty-odd procedures that they want us to wait out.

14            I'd like to go on to the fourth factor in discussing

15   whether or not there's a specialized tribunal.  Technically,

16   the Ohio State Court is not a specialized tribunal.  But if

17   anything comes close to it, I would say the Ohio State Court is

18   a specialized tribunal.  The fact that they've dealt with this

19   case for nine and a half years; the fact that it's personal

20   injury issues; the fact that it has nothing to do with any

21   federal laws, it's purely Ohio state law, makes it the

22   tribunal -- makes it the court where this case should be heard

23   and should be left to be heard.

24            Further, Your Honor, in relation to the fourth factor,

25   I'd like to address something that the MLC had stated in their

- 96 -

1    objection.  They stated that, "Should the need to conduct a

2    jury trial in the movants' claim against the debtors arise,

3    such litigation could occur in District Court for the Southern

4    District of New York or the district court in Ohio."  Again, I

5    think I alluded to this earlier.  But why are they arguing that

6    they're trying to save costs, if they're actually mentioning,

7    right in their objection, that this case -- at the time of

8    their choosing, should be heard in district court?  There could

9    be no cost saving.  They'll have to litigate it in district

10   court.  Let's allow this claim then to proceed in Ohio State

11   Court.

12          Another issue that they brought up in their objection

13   that I'd like to address.  They said that the Ohio court does

14   not have a particularized expertise that this court does not

15   have.  This court will not even be hearing this claim, Your

16   Honor.  Under 157(b)(5), it would be the district court.

17          Finally, they're saying that the decision of where to

18   try the multitudes of the personal injury claims does not have

19   to be made at this juncture.  I think I alluded to this

20   earlier.  This is -- this is the time for Ms. Brittingham, Your

21   Honor.  Maybe for other claimants they can wait, but not for

22   Ms. Brittingham.  And second, again, this is not about all the

23   other personal injury claims.  Based on the Sonnax factors, we

24   are just looking at Ms. Brittingham's claim.

25          In terms of the interests of judicial economy, I think

- 97 -

1    it would be a grave understatement to say that it would not be

2    the most economical judicially to allow this case to proceed in

3    Ohio State Court.  After nine and a half years, we're --

4    they're going to set the court date for the end of this year if

5    not the beginning of next year.  It definitely would be in the

6    interests of judicial economy to allow it to proceed in Ohio

7    State Court.

8         I would also refer back to the Lawrence lift stay

9    hearing, where you had stated that the economical way of doing

10   prepetition litigation would be to allow the claims process to

11   proceed, as for all the other thousands of claims against the

12   estate.  And I think Mr. Smolinsky mentioned -- I think was

13   referring to the other motion today -- that this claims

14   process, he said, we'll be here for a couple more year.  We

15   don't have those couple more years, Your Honor.

16        And they also mention in their objection that the

17   estate has minimized costs by following the ADR procedures.

18   Referring back to your statement, Your Honor, in that Lawrence

19   lift stay hearing, you also mentioned that the reason why you

20   couldn't lift the stay, because this is a garden-variety claim,

21   referring to the Lawrence claim.  This was -- the Lawrence

22   claim, I believe, was just old wages, and they were filing a

23   claim to get paid.

24        THE COURT:  Lawrence was a nontort action?

25        MR. GEBRAEL:  It was not -- exactly.  This is not a

- 98 -

1    garden-variety claim, Your Honor.  By no means is this a

2    garden-variety claim.  And in fact, Your Honor, when they

3    address that the ADR procedure's going to save a lot of costs,

4    that is probably true, but not for this claim.  And in fact,

5    the ADR procedures allows for this type of claim, this tort

6    litigation, where there is a pending action.  It sets it out in

7    section II(e)(2) through (4).  And it sets out that if the

8    Court -- the bankruptcy court can't hear it, then it will be

9    allowed to proceed in the state court, of course, subject to

10   their rights to file a motion to transfer, which we cannot take

11   away.

12         The eleventh -- factor number 11, Your Honor, the

13   parties are ready for trial.  I think I've already stated that

14   they are.  Relief would result in complete resolution of claim.

15   It would.  All the parties would be presented -- represented at

16   that hearing.

17         And I'd like to address something that they stated in

18   their objection.  They said that they don't believe the

19   Brittinghams need a judgment against the MLC to pursue third

20   parties.  It was an unsubstantiated statement.  In fact, we do

21   need that judgment.  And there's the issue that brings Delphi

22   back in.  Although --

23         THE COURT:  Wait.  Time out.

24         MR. GEBRAEL:  Yes.

25         THE COURT:  If that doctor -- I forgot his name -- if

- 99 -

1    that doctor did --

2              MR. GEBRAEL:  Stull.

3              THE COURT:  -- Stull, okay.  If that doctor did

4    something bad, you can't get a judgment directly against him?

5              MR. GEBRAEL:  Your Honor, because of the fact that the

6    MLC was the -- was acting as his employer at the time, and they

7    are a necessary party, we need to apportion the liability

8    between the doctor and the MLC.  And so we could possibly just

9    go after the doctor.  But then what have we done?  We would get

10   a judgment against the doctor with a certain amount against a

11   party that was not represented at the trial.  Could that

12   judgment then --

13             THE COURT:  I would have thought that -- you know, I

14   was a general purpose litigator for thirty years before I went

15   into the -- no, twenty years -- before the thirty -- I finished

16   the thirty before I came here.  But I would have thought that

17   employer and bad-acting doctor would be jointly and severally

18   liable, and that if the employer were on the hook because the

19   doctor screwed up in the performance of his job, it would be

20   the doctor who would be found at fault.  And although the

21   employer might be jointly and severally liable to the

22   plaintiff, as between the doctor and the employer pointing at

23   each other, the doctor who got the employer into trouble would

24   be on the hook.  Is my understanding of freshman tort law

25   incorrect?

MOTORS LIQUIDATION COMPANY, et al.

- 100 -

1      MR. GEBRAEL:  Well, Your Honor, my understanding is,

2   and again, I'm not a tort lawyer, but if that is true that we

3   would proceed to have a jury trial and they would find both

4   parties jointly and severally liable, as you had stated, then

5   would that even be binding, though, on the party -- on

6   basically the employer that was not even present?  Wouldn't

7   that prejudice the MLC for not even being present at the trial

8   where they were found jointly and severally liable?  That

9   would -- what it would cause, actually, it would cause the

10   Brittinghams to retry the case against the party that was not

11   there at the time.  And in fact, then, what we have done, is

12   not really saved any costs at all.  We would have to -- poor

13   Ms. Brittingham has to go through now trial number one, come

14   back and say okay, we'll we're going to have another jury trial

15   to see whether or not the doctor that was not present at the

16   first -- sorry, the employer that was not present at the first

17   one, is now liable and what portion of the liability.  We feel

18   that that would just be extra costs.  And that wouldn't save

19   the debtor any money, Your Honor.

20      In terms of whether or not we would need to liquidate

21   the claim first and get a judgment in order to pursue Delphi,

22   it is pursuant to Ohio case law -- sorry, Ohio statute, Section

23   2721(2)(b) that states very clearly -- and the Ohio referring

24   counsel have done the proper research on this -- that we would

25   first need to liquidate the judgment, before then going to

- 101 -

1    Delphi and trying to figure out the question of how did Delphi

2    disclaim coverage after nine and half years of being present.

3    But we're not here, really, to answer that question.

4         That's a question that they'll have to answer.  And of

5    course, through the guidance of this Court, after we get the

6    judgment, we can then look into -- we can then look into that

7    question.  And Delphi's counsel, in fact, has already

8    approached us and said that Delphi's plan, although confirmed,

9    there's a Delphi plan injunction that we might have to address.

10   And again, let's take it step by step.  When we get to that

11   point, we'll come back and we'll figure out how to pursue

12   Delphi's insurance carrier.

13        In terms of the fifth factor, whether there's

14   applicable insurance to defend the debtor, I've already stated,

15   Your Honor, that the applicable insurance here clearly is --

16   I'm sorry, in terms of whether there's insurance at all,

17   there's New GM defending Dr. Stull, and perhaps, there is

18   applicable insurance through Delphi that we'll have to address

19   at a later time.

20        In terms of the sixth factor, whether the action

21   involved third parties, I think I've gone over that.  But I

22   wanted to address something in their objection.  It says,

23   "Movants should sever the MLC or waive their claim against the

24   debtors."  We don't have -- we're not required to do any --

25   we're not required to waive our claim against the debtors.  And

- 102 -

1    again, I think we've already gone over this, that the MLC is a

2    necessary party.  Nobody has been able to answer the question

3    of how do you isolate their liability.  And again, the

4    Brittinghams would have to bring the case twice, which I feel

5    would be a grave injustice to the Brittinghams.

6            And again, if we do sever the MLC, then we still have

7    that problem where, well, the Delphi's insurance carrier is

8    going to say, well, you didn't have the Del -- you didn't have

9    the MLC at the Ohio State Court, so how is it that you're going

10   to go after the insurance carrier, where they were not even

11   present.  So we'll even have that extra kind of hoop to jump

12   through.

13           Quickly, Your Honor.  One of the things I really want

14   to point out that we're not going through -- we're not trying

15   to override any of the orders that Your Honor has entered.  In

16   fact, the ADR procedures, if you go through it step-by-step, it

17   sets out that -- and I'll read from -- just a small part of it:

18   "As soon as reasonably practicable, upon completion of the ADR

19   procedures, if the claim is not resolved in ADR," which we see

20   here that it cannot, "it would then proceed to bankruptcy

21   court."

22           And we've already determined that it cannot proceed

23   through bankruptcy court because of 157(b)(5).  Thus the next

24   step would be -- the next step in the ADR procedures would be

25   to go to section II(e)(3), which says that according -- "if the

- 103 -

1    claim was pending at a nonbankruptcy forum," which it is, "then

2    subject to the debtors' right to seek removal or transfer of

3    venue," which were not taken away, "the case will proceed in

4    nonbankruptcy forum."

5         That's all we're asking for.  This is exactly what you

6    have set out in the order -- what they had set out in the

7    order, and that's what we're asking for today, Your Honor.

8         THE COURT:  All right.

9         MR. GEBRAEL:  Thank you.

10         THE COURT:  Thank you.  Mr. Smolinsky?

11         MR. SMOLINSKY:  Your Honor, Joe Smolinsky for the

12    debtors.  Once again, I think Your Honor cut right to the heart

13    of it.  It may very well be that Dr. Stull and MLC are jointly

14    and severally liable.  I have never heard anyone intimate --

15    and let's break up the two different potential sources of

16    recovery here -- no one has ever said that MLC was a necessary

17    party to a continued litigation against Dr. Stull.  Dr. Stull

18    is being defended, even though Dr. Stull is no longer an

19    employee of New GM.  She continues to be indemnified by New GM

20    under the MSPA.  As indicated in their papers, there's a ten

21    million dollar fronting policy, which is available to provide

22    for recovery in the event that New GM fails to make good.

23         So the fact that it's joint and severally liable, the

24    only reason to come after the debtors would be in the event

25    that that judgment was not viable.  So we don't understand why

MOTORS LIQUIDATION COMPANY, et al.

- 104 -

1     they can't proceed.  I also don't understand why a trial date

2     is being set in a case that's been stayed for all this time.

3     But we have no problem with them continuing to pursue Dr.

4     Stull.

5             The issue that I understand that requires MLC to be

6     involved, is the issue relating to the Delphi policy.  We don't

7     believe that there is any coverage under any Delphi policy.

8     Opposing counsel said that we would take the judgment against

9     MLC and go to Delphi.  But Delphi would say we have a

10    bankruptcy discharge, don't come looking at us.  We can't

11    default in the state court trial because there's a residual

12    claim against MLC.  So given the fact that it's highly unlikely

13    that there's any insurance to protect Delphi, why shouldn't we

14    have the opportunity to utilize the ADR procedures with respect

15    to the claim against the estate, before we have to sit through

16    a jury trial and participate in a jury trial, to prevent a

17    potential joint tortfeasor?

18            This case, as Your Honor noted, relates to a pre-

19    employment medical exam conducted by Dr. Stull.  Dr. Stull is

20    the one who's liable for anything that was done improperly.  We

21    don't believe that we're necessary to continue that case.  And

22    if there's a time factor, they should proceed in due course.

23            In terms of some of the other lift stays that were

24    discussed, I just want to note, the Reynolds lift stay that was

25    mentioned before, that was a situation where it was on appeal.

- 105 -

1    There was an appellate bond that was posted.  New GM purchased

2    that appeal bond under the MSPA, under the sale and purchase

3    agreement.  And they wanted to proceed.  They were undertaking

4    the appeal on our behalf and paying for the whole appeal in

5    order to seek to get that appeal bond back.

6          The Federal Republic of Germany we talked about, and

7    the related employee, Heinrich, who have claims.  I believe

8    that those claims are going to ADR in the short -- in the near

9    future.  We have no problem --

10         THE COURT:  Well, I'm glad that they're going to ADR.

11   But did I grant relief from the stay?

12         MR. SMOLINSKY:  I don't believe so.  Those are going

13   through mandatory mediation.

14         THE COURT:  Um-hum.

15         MR. SMOLINSKY:  Yes, we will be going through claims

16   issues for a long time in this case.  However, we're happy to

17   designate these claims now, if that addresses the time concern.

18   But before the estate is required to potentially, unnecessarily

19   participate, because at the end of the day, it may be that the

20   doctor is jointly liable, I think we should let that play out.

21         THE COURT:  Okay.  Thank you.  Mr. Gebrael -- oh, the

22   creditors' committee.

23         MS. SHARRET:  Jennifer Sharret from Kramer Levin on

24   behalf of the creditors' committee.  We support the debtors in

25   opposing this lift stay motion.  We have been working with them

                                                              - 106 -

1    very closely throughout the ADR procedures, which have been

2    very successful.  As -- we've been notified whenever they

3    submit claims settlement amounts, but through the quarterly

4    statements they file of de minimis settlements, you'll see that

5    there are now many of these pre-petition litigation claims that

6    are being settled.  And we think that this is a claim that

7    could be funneled through that process and to take up -- if the

8    debtors can do that, to designate it sooner to accommodate this

9    particular claimant's time issue.  Thank you.

10          THE COURT:  Thank you.  All right, Mr. Gebrael, I'll

11   take brief reply.

12          MR. GEBRAEL:  Just briefly, Your Honor.  They are a

13   necessary party.  There's all kinds of questions about how does

14   the procedures, the policies that the MLC had at that time, how

15   did it affect what the doctor had to report back.  What were

16   those procedures?  How is it that they weren't reported to Ms.

17   Brittingham, right away?  Was there a duty under those

18   procedures?  All kinds of questions that makes them a necessary

19   party, Your Honor.

20          And through the -- another question about the ADR

21   procedures nobody's been able to answer:  they want us to cap

22   the claim.  How do you cap the claim when you have these two

23   parties that nobody can isolate where the liability's going to

24   be?  And they said that this is not required -- a judgment's

25   not required to go after Delphi.  It is, under Ohio State

MOTORS LIQUIDATION COMPANY, et al.

- 107 -

1    Court, unfortunately.

2        We wouldn't be going through these lengths, you know,

3    this trouble if it wasn't required that we get the judgment

4    first.  We would have gone after the insurance policies first,

5    Your Honor.  Believe me, nobody wants to waste any money of the

6    debtors -- the debtors' money here, Your Honor.

7        Thank you.  That's it.

8        THE COURT:  All right.  Everybody sit in place for a

9    minute.

10       (Pause)

11       THE COURT:  As the facts with immaterial exceptions

12   are undisputed, I'm not going to burn the record with my

13   findings of fact.  And instead, I'm going to go straight to the

14   bases for the exercise of my discretion on this motion.  And in

15   the exercise of my discretion, I'm granting relief from the

16   stay to the extent of permitting the Brittinghams permission to

17   liquidate their claim in the Ohio court system, with it

18   expressly being understood that if they prevail in the Ohio

19   court system, they will then have to come back to the Court to

20   get any distribution on account of the claim, and will continue

21   to be prohibited from utilizing any judgment enforcement

22   mechanisms against the assets of the estate.

23       The following being the basis for the exercise of my

24   discretion in this regard, where I will, then, talk about facts

25   that informed the exercise of my discretion.  Both sides agree

- 108 -

1    that a matter of this character is subject to my discretion.

2    And when parties seek leave to proceed with litigation and

3    relief from the automatic stay to that extent that it's

4    governed by the Second Circuit's decision in Sonnax Industries,

5    and in particular 907 F.2d at page 1288, under which a very

6    fact-specific inquiry weighing a number of factors is required.

7          Sonnax identified twelve factors which are considered.

8    And I'm going to go into them now.  The first is whether relief

9    would result in a partial or complete resolution of the issues.

10   There is debate as to the extent to which the debtors are a

11   necessary party to the Ohio litigation.  And I am not deciding

12   that issue here and now.  Ultimately, I think that is a

13   question of a Ohio law.  But what is clear is that if the

14   litigation is successful against Dr. Stull, there likely will

15   be liability under agency doctrine that transfers over to Old

16   GM.  And while it is possible that Old GM might be liable on

17   grounds -- or for wrongful conduct, apart from agency doctrine,

18   a matter as to which I express no view -- it is clear that the

19   facts in the two matters are closely related.

20         If Dr. Stull is found not to have done anything wrong,

21   although it's theoretically possible that there might be some

22   alternative basis to tag GM with a judgment, that strikes me as

23   unlikely.  Finding out whether Mrs. Brittingham was, in fact,

24   injured by reason of any wrongful debtor conduct, is likely to

25   result in very nearly complete, if not totally complete,

- 109 -

1    resolution of the claim.  And therefore this factor favors the

2    movants.

3          The factor of no interference with the bankruptcy case

4    tilts in favor of the estate, in favor of Old GM, but not to a

5    very dramatic degree.  This is, as both sides recognize, one of

6    hundreds if not thousands of claims asserted against Old GM.

7    And the interference with the bankruptcy case, to the extent

8    there's likely to be that, is of two principal types.  One is

9    the cost of defending the litigation, which presumably would

10   have to be paid for in post-petition administrative expense

11   dollars; which does adversely affect the estate.  The second is

12   distraction upon Old GM management.  But the fact is that there

13   isn't much left of Old GM, and that all the records are with

14   New GM, which is defending this litigation anyway.

15         This matter could not, under any circumstances, be

16   tried before me.  So what is normally a factor, which is if it

17   diverts material judicial resources away from dealing with the

18   greater concerns of the case, is not much of a factor here.

19   Other things that deal with this come up more in the context of

20   judicial efficiency, and to a lesser extent, specialized

21   tribunal.  So I'll say them there.

22         Obviously, once the claim is liquidated, it'll be

23   treated the same way as the remainder of the claims of the

24   unsecured creditors' community.  And we're not talking about

25   getting a leg up over other creditors, which if it were

- 110 -

1   present, would be a material concern.  But we're not talking

2   about that under any circumstances.

3          Another factor is whether or not the debtor is a

4   fiduciary.  I disagree with the stated analysis by the

5   Brittinghams in their brief vis-a-vis this issue.  This has

6   nothing to do with whether the debtor is charged with liability

7   as a fiduciary.  And it can't be addressed by the Brittinghams

8   claiming that the debtors had a fiduciary duty to Mrs.

9   Brittingham.  What it does do is that in cases -- not this

10  one -- where the debtor is holding property as a fiduciary,

11  that's not subject to creditor claims, that would have a lesser

12  effect on the remaining creditor community.  And if that set of

13  facts were applicable, that would be a factor favoring relief

14  from the stay. But it has nothing to do with this case.  It

15  certainly doesn't help the Brittinghams, or, frankly, does its

16  absence help the debtor.  It's a non-factor.

17         Specialized tribunal is, to my understanding, based on

18  the forty years I've been doing this now, a little different.

19  If you had a patent dispute, where maybe litigating it in

20  ordinary federal court, like the Eastern District of Texas,

21  might give you some benefits, that might tell you something.

22  Or of course, if it were a matter involving a particular

23  specialized kind of claim, where a particular kind of tribunal

24  might be able to fix liability, such as the NLRP or something

25  like that, specialized tribunal would apply.  It doesn't here.

- 111 -

1    But there are first cousins to that argument that do, which get

2    into the area of judicial economy, which I'll deal with at that

3    time.

4            This factor, in other words, if it were present, it

5    would support relief from the stay on this ground.  It's not

6    present here.  There are some similar strong arguments for

7    judicial economy, but not on specialized tribunal.

8            Insurance defense is murky, because we have, both

9    because of retained limits and insurance companies making some

10   of the arguments we hear from time to time that they're not

11   liable, it's not clear one way or the other.  Somehow, I

12   suspect if it were clear, that there were insurance coverage,

13   which an acceptably low retained limit, the debtor would have

14   just shrugged its shoulders and said you can go against the

15   insurers, and the plaintiff's side would have said great, let

16   us go against the insurers.  And in fact, we enter into -- or

17   parties enter into stips of that substance -- I'm exaggerating

18   slightly when I say all the time -- and we judges approve them

19   all the time.  But I think it's because of the uncertainty as

20   to the insurance coverage that we don't have a deal of that

21   character here.

22           It may be that there is insurance coverage here.  And

23   to the extent there is, it will favor relief from the stay.

24   I'm not insensitive to the point that there may have been

25   coverage for eight and a half or nine and a half years, with

- 112 -

1    late disclaimers of coverage.  I'm not going to express any

2    views as to whether arguments recognizing that fact have merit

3    or not.

4            To the extent there is insurance, it favors granting

5    relief.  But I'm not going to place great reliance on it,

6    because I'm not sure whether or not that coverage is there and

7    is enforceable.

8            The action primarily involves third parties, is one

9    which has some relevance, and more than minimal relevance here,

10   because you've got an action against Dr. Stull now being

11   defended by New GM.  And while it is theoretically possible

12   that GM might be on the hook for something bad that it did,

13   apart from something Dr. Stull did, for the most part, this

14   litigation looks like it's an effort -- involves Dr. Stull's

15   conduct, right or wrong, and that GM is on the hook for Dr.

16   Stull's conduct, right or wrong.

17           It is true, as the movant suggests, that one of the

18   main purposes of the Ohio litigation is to determine the

19   culpability -- I'm going to insert the words "if any" -- of Dr.

20   Stull's action.  And it appears to be undisputed that New GM or

21   its carrier, has assumed Dr. Stull's defense.  I think I can

22   appropriately find that this factor applies and that it favors

23   relief from the stay.

24           The pending litigation would not affect or prejudice

25   the other creditors of the debtors, slightly, but only

09-50026-mg   Doc 6640   Filed 08/09/10   Entered 08/12/10 15:20:04   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 113 of 124

                                                              - 113 -

1    slightly, tilts in opposition to granting the motion.  Other

2    creditors will be affected, of course, by the dilutive effect

3    of an allowed claim, but I don't think that by itself is enough

4    to find the prejudice within the meaning of this factor.  More

5    importantly, they're going to be tagged with the expense of

6    defending the claim.  But because so much of it involves

7    whether Dr. Stull did anything right or wrong, and because New

8    GM is going to be defending that, it seems to me that the

9    incremental defense burden on New GM -- excuse me -- Old GM,

10   Motors Liquidation Company, is likely to be materially less

11   than it would be if it were the only one with either knowledge

12   of the litigation or principal responsibility for defending it.

13   So for those reasons, I think that while the pending litigation

14   would affect other creditors of the debtors, it would do so

15   only to an acceptable and modest extent.

16          The interests of judicial economy is a major factor

17   here, because as the Brittinghams argue, and I ultimately

18   agree, if this claim can't be settled, an outcome devoutly to

19   be wished, it's going to have to be liquidated somewhere.  And

20   then the issue is whether I should allow it to be liquidated in

21   the Ohio court system or whether I should stick it on a

22   district judge in this district.

23          If a district judge in this district has to liquidate

24   this claim, he or she is going to have to take a case that's

25   now nine and a half years old and start over.  And while

- 114 -

1    district judges in this district certainly have the ability to

2    try PI actions, in fact, they have a statutory responsibility

3    for doing so under 157 of the judicial code, it is not the best

4    use of a district judge's time to try a case of this character

5    when that exact case has been pending for nine years in the

6    state court system, and where state courts hear these PI cases

7    all the time, and our district judges have federal question

8    cases and criminal case loads and more complex litigation,

9    soaking up their time, all the time.

10          Additionally, starting over in a court which -- where

11   another litigation is either ready for trial or practically so,

12   and which has been going on in that other court system for nine

13   years, is nuts.  It's not just unbalanced better, it's nuts.

14   And I think I would need to be nuts to send one of the district

15   judges in this district a litigation that has been going on for

16   nine years in the state court system and which is practically

17   ready for trial.

18          That, of course, merges right into the next factor,

19   the parties are ready for trial.  I don't quite take it a

20   hundred percent as given that you could start a trial on this

21   case tomorrow and that the parties are absolutely ready for

22   trial in Ohio, but they've got a nine year head start, and

23   they're very close, and I think it's fair to say that the

24   uncertainties as to this issue are the principal impediment to

25   that case being put on the trial calendar and being ready to

09-50026-mg    Doc 6640    Filed 08/09/10    Entered 08/12/10 15:20:04    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 115 of 124

- 115 -

1    go.

2            It is undisputed, as a matter of fact, that this case

3    was in the final stages of readiness for trial when the action

4    was stayed.  And while final stages of readiness is subject to

5    multiple interpretations, I think it's very different from any

6    number of relief from stay matters that I've had where a

7    complaint has been filed and little if anything further has

8    gone on.

9            Balancing of harms is another factor, and it's very

10   important.  Of course, the fact is that after more than eight

11   years of litigation, Mrs. Brittingham is still waiting for her

12   lung transplant.  Her health is continuing to deteriorate.  And

13   although nobody can guarantee that either her case will be

14   tried or that any judgment, if otherwise abstained would be

15   payable before she gets sicker, it's undisputed that she's in

16   serious straits and apparently that she's still waiting for her

17   lung transplant.

18           This case is very different than others that I've

19   dealt with where somebody's got an employment discrimination

20   claim, wants to get a little extra money into his or her

21   pocket.  This is at the more extreme end of prejudice to a

22   litigant.

23           Now, I cannot and will not assume that the litigant's

24   going to prevail in that tort litigation in Ohio, and it may be

25   that even if the case is tried in Ohio, that's not going to

09-50026-mg   Doc 6640   Filed 08/09/10   Entered 08/12/10 15:20:04   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 116 of 124

- 116 -

1   solve her problems.  But nevertheless, considering that here,

2   basically what I have is the relatively modest incremental cost

3   for the estate in defending a litigation that New GM is going

4   to be defending anyway by reason of its duties to defend Dr.

5   Stull, and where Old GM's liability is principally as a

6   consequence of agency doctrine, I think the balancing of harms

7   tips materially in favor of the movant.

8           For the following reasons I determine that on balance,

9   the Sonnax factors tip in favor of granting the stay, to the

10  extent I stated, not totally; and to that extent, that motion's

11  to be granted.

12          Mr. Gebrael, you're to settle an order in accordance

13  with the foregoing, stating that in substance, for the reasons

14  set forth on the record, the motion is granted to the extent,

15  but only the extent that I granted it.  Time to appeal or move

16  for leave to appeal from this determination, to run from the

17  time of the entry of the order, and not from the time of this

18  dictated decision.

19          Not by way of reargument, do we have any further

20  business?  Okay, we're adjourned.

21          MR. SMOLINSKY:  Thank you, Your Honor.

22          THE COURT:  Oh.  Everybody sit down.  One thing that I

23  did not discuss, but that I should.  Every motion of this

24  character has floodgates implications.  And I've considered

25  those before issuing this ruling and talking about the other

09-50026-mg    Doc 6640    Filed 08/09/10    Entered 08/12/10 15:20:04    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 117 of 124

- 117 -

1    things.  But not having previously discussed the floodgates,

2    there was implicit in that that I did not consider it a

3    material factor here, but I should just state the reasons for

4    that.

5            I continue to believe every time that I decide a

6    motion of this character in a large case, that there are

7    potential floodgates issues, but I've considered that by reason

8    of the unique circumstances of this one, they're not of a

9    material -- sufficiently material concern to cause me to

10   consider that floodgates concerns alone should cause me to a

11   different result.

12           For the avoidance of doubt, because I know, every time

13   I even dictate a decision, that somebody tries to remind me of

14   it the next one that comes down the pipe, it's only because of

15   the extraordinary balance in the facts of this one that I'm

16   engaging in the Sonnax analysis and granting relief from the

17   stay here, because floodgates concerns do continue to be of

18   concern to me.  It's just that I don't think this one's going

19   to be that material to the next.

20           Okay, now we're adjourned.

21       (Proceedings concluded at 12:57 PM)

22

23

24

25

- 118 -

1                          I N D E X

2

3                         R U L I N G S

4      DESCRIPTION                          PAGE      LINE

5      Motion of Debtors for Entry of Order      20       19

6      Approving Stipulation and Agreed Order

7      Between the Debtors, Wilmington Trust

8      Company, and Citibank, N.A. Solely in

9      its Capacity as Paying Agent, re: Proofs

10     of Claim Nos. 47871, 47872, 65729, 65793,

11     and 66723, approved.

12

13     Motion of Debtors for Entry of Order      27       25

14     Approving Agreement Resolving Proof of

15     Claim No. 44887 and Implementing Class

16     Settlement, approved.

17

18     Debtors' Motion for Preliminary Approval   35       25

19     of Settlement, Including Claims Estimation,

20     for Conditional Certification of Settlement

21     Class, to Approve Cash Disbursement and

22     Forms of Notice, and to Set Fairness Hearing

23     in the Boyd Bryant v. Motors Liquidation

24     Company Adversary Proceeding, approved.

25

- 119 -

1

2                           R U L I N G S (cont'd.)

3      DESCRIPTION                                PAGE        LINE

4      Debtors' Seventeenth Omnibus Objection       39          7

5      to Claims, granted, and adjourned as to

6      Hawaii, Ohio, Michigan, the IRS, and

7      Connecticut.

8

9      Debtors' Twenty-Fifth Omnibus Objection      37         18

10     to Claims, granted.

11

12     Debtors' Twenty-Sixth Omnibus Objection      38          6

13     to Claims, granted.

14

15     Debtors' Twenty-Seventh Omnibus Objection    38          6

16     to Claims, granted, and adjourned as to

17     responses of Echols, Johnson, Kulis, Carmack,

18     Dilks, Jones, and Buckley.

19

20     Debtors' Twenty-Eighth Omnibus Objection     39          7

21     to Claims, granted by default, and adjourned

22     as to response of Acument.

23

24

25

- 120 -

1

2                         R U L I N G S (cont'd.)

3    DESCRIPTION                              PAGE        LINE

4    Debtors' Twenty-Ninth Omnibus Objection      39          7

5    to Claims, granted, and adjourned as to

6    responses of VTI and Demassi.

7

8    Debtors' Thirtieth Omnibus Objection to      39          7

9    Claims, granted, and adjourned as to

10   responses of VTI and Demassi.

11

12   Debtors' Thirty-First Omnibus Objection      39          7

13   to Claims, granted.

14

15   Debtors' Thirty-Second Omnibus Objection     39          7

16   to Claims, granted, and adjourned as to

17   responses of VTI, Demassi and First United.

18

19   Debtors' Thirty-Third Omnibus Objection      39          7

20   to Claims, granted.

21

22   Debtors' Thirty-Fourth Objection to          39          7

23   Claims, granted, except as to withdrawn

24   response of Szejna.

25

- 121 -

1

2                    R U L I N G S (cont'd.)

3    DESCRIPTION                        PAGE      LINE

4    Debtors' Thirty-Fifth Omnibus Objection    39       7

5    to Claims, granted, except as to withdrawn

6    response of Mahoney.

7

8    Debtors' Thirty-Sixth Omnibus Objection    39       7

9    to Claims, granted.

10

11   Debtors' Thirty-Seventh Omnibus Objection   39       7

12   to Claims, granted, except as to withdraw

13   responses of England Reynolds, and adjourned

14   as to responses of Clark and Hayman.

15

16   Debtors' Thirty-Eighth Omnibus Objection    39       7

17   to Claims, granted, and adjourned as to

18   responses of Georgia, New York State and New

19   York City.

20

21   Motion of Dean M. Trafelet for an Order     40       20

22   Clarifying the Order Appointing Him as Legal

23   Representative for Future Asbestos Personal

24   Injury Claimants and Directing Payment of His

25   Fees and Expenses, granted.

- 122 -

1

2                    R U L I N G S (cont'd.)

3    DESCRIPTION                              PAGE      LINE

4    Motion of Debtors for Entry of Order       42        5

5    Approving Settlement Agreements with Respect

6    to (A) the International Association of

7    Machinists and Aerospace Workers, and (B)

8    the International Brotherhood of Teamsters,

9    granted.

10

11   Motion of Debtors for Entry of Order        67       11

12   Authorizing the Debtors to Amend the Terms

13   of Their Engagement Letter with AP Services,

14   LLC, continued.

15

16   Application by AP Services, LLC as Crisis   67       11

17   Managers to the Debtors for Approval of

18   the Success Fee, continued.

19

20   Time sheets of AP Services will be filed    80       21

21   and provided to the examiner.

22

23

24

25

- 123 -

1

2                    R U L I N G S (cont'd.)

3     DESCRIPTION                              PAGE      LINE

4     Motion of Julie and David Brittingham for    107       14

5     Relief from the Automatic Stay to allow the

6     Completion of a Pending Personal Injury

7     Action, granted to the extent described on

8     the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- 124 -

1

2                          C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date: August 9, 2010

17

18

19

20

21

22

23

24

25