HEARING DATE AND TIME: September 24, 2010 at 9:45 a.m. (Eastern Time)
RESPONSE DEADLINE: September 17, 2010 at 4:00 p.m. (Eastern Time)

---

**PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIM(S)**

---

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                    :
In re                               :        **Chapter 11 Case No.**
                                    :
**MOTORS LIQUIDATION COMPANY,** *et al.,*  :        **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.*  :
                                    :
                    **Debtors.**    :        **(Jointly Administered)**
                                    :
------------------------------------------------------------x

## <u>NOTICE OF DEBTORS' THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS</u>
### (Dealership Claims)

**PLEASE TAKE NOTICE** that on August 13, 2010, Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(the "**Debtors**"), filed their thirty-ninth omnibus objection to claims (the "**Thirty-Ninth**

**Omnibus Objection to Claims**"), and that a hearing (the "**Hearing**") to consider the Thirty-

Ninth Omnibus Objection to Claims will be held before the Honorable Robert E. Gerber, United

States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004, on **September 24,**

**2010 at 9:45 a.m. (Eastern Time),** or as soon thereafter as counsel may be heard.

**PARTIES RECEIVING THIS NOTICE SHOULD REVIEW THE THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN EXHIBIT "A" ANNEXED THERETO.**

**PLEASE TAKE FURTHER NOTICE** that any responses to the Thirty-Ninth

Omnibus Objection to Claims must be in writing, shall conform to the Federal Rules of

Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the

Bankruptcy Court (a) electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system,

and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard

copy delivered directly to Chambers), in accordance with General Order M-182 (which can be

found at www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on

(i) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New

York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky,

Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400,

Detroit, Michigan 48243 (Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance

Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader,

Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World

Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United

States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington,

D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export

Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael

J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP,

attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.), so as to be received no later than **September 17, 2010 at 4:00 p.m. (Eastern Time)** (the "**Response Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Thirty-Ninth Omnibus Objection to Claims or any claim set forth thereon, the Debtors may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Debtors' Thirty-Ninth Omnibus Objection to Claims, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
      August 13, 2010

                  /s/ Joseph H. Smolinsky
                  Harvey R. Miller
                  Stephen Karotkin
                  Joseph H. Smolinsky
                  WEIL, GOTSHAL & MANGES LLP
                  767 Fifth Avenue
                  New York, New York 10153
                  Telephone: (212) 310-8000
                  Facsimile: (212) 310-8007

                  Attorneys for Debtors
                  and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                   :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

### DEBTORS' THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS
#### (Dealership Claims)

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM. CLAIMANTS RECEIVING THIS OBJECTION SHOULD LOCATE THEIR NAMES AND CLAIMS ON THE EXHIBIT ANNEXED TO THIS OBJECTION.**

---

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

        Motors Liquidation Company (f/k/a General Motors Corporation) and its

affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), respectfully represent:

#### Relief Requested

        1.    The Debtors file this thirty-ninth omnibus objection to claims (the

"**Thirty-Ninth Omnibus Objection to Claims**") pursuant to section 502(b) of title 11, United

States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), and this Court's order approving procedures for the filing of

omnibus objections to proofs of claim filed in these chapter 11 cases (the "**Procedures Order**")

[Docket No. 4180], seeking entry of an order disallowing and expunging from the claims register

those certain Dealership Claims (as hereinafter defined) listed on **Exhibit "A"** annexed hereto.[1]

2.       The Debtors have examined the proofs of claim identified on Exhibit "A"

and have determined that the proofs of claim listed under the heading "*Claims to be Disallowed

and Expunged*" seek recovery of amounts for which the Debtors are not liable.  As discussed in

more detail below, each proof of claim (collectively, the "**Dealership Claims**") identified on

Exhibit "A" is a claim filed by General Motors Corporation ("**GM**") dealerships (the "**Dealers**")

who, pursuant to their entry into either a Wind-Down Agreement or Deferred Termination

Agreement (as both terms are hereinafter defined), have expressly released the Debtors from any

and all claims, including any Dealership Claims.  Thus, pursuant to the Procedures Order, the

Dealership Claims should be expunged in their entirety as "the [c]laims seek recovery of

amounts for which the Debtors are not liable."  (Procedures Order at 2.)

3.       Further, as this Court is aware, the Wind-Down Agreements and Deferred

Termination Agreements are executory contracts that have been assigned to, and all obligations

thereunder assumed by, General Motors, LLC ("**New GM**") pursuant to that certain Amended

and Restated Master Sale and Purchase Agreement and related agreements (the "**MSPA**"), dated

as of June 26, 2009, by and among GM, Saturn LLC, Saturn Distribution Corporation,

---

[1]       Creditors can obtain copies of the cover page of any proof of claim filed against the Debtors' bankruptcy estates on the Debtors' claims register on the website maintained by the Debtors' claims agent, www.motorsliquidation.com.  A link to the claims register is located under the "Claims Information" tab.  Creditors without access to the Internet may request a copy of the cover page of any proof of claim by mail to The Garden City Group, Inc., Motors Liquidation Company Claims Agent, P.O. Box 9386, Dublin, Ohio 43017-4286 or by calling The Garden City Group, Inc. at 1-703-286-6401.

Chevrolet-Saturn of Harlem, Inc., and New GM.  Therefore, to the extent any of the Dealership Claims seek payment for amounts due under the terms of a Wind-Down Agreement or Deferred Termination Agreement, such claims have been expressly assumed by New GM and are not the liability of the Debtors.

## Jurisdiction

4.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## General Background

5.    On June 1, 2009, four of the Debtors (the "**Initial Debtors**")[2] commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code, and on October 9, 2009, two additional Debtors (the "**Realm/Encore Debtors**")[3] commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code, which cases are jointly administered with those of the Initial Debtors under Chapter 11 Case Number 09-50026 (REG).

6.    On June 1, 2009, the Debtors filed a motion with the Court [Docket No. 92], requesting, *inter alia*, an order (the "**Sale Order**") [Docket No. 2968], pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k) and (m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets pursuant to the terms of the MSPA, free and clear of liens, claims, encumbrances, and other interests, (ii) the assumption and assignment of certain executory contracts and unexpired leases of personal property and of nonresidential real property, and (iii)

---

[2]    The Initial Debtors are Motors Liquidation Company (f/k/a General Motors Corporation), MLCS, LLC (f/k/a Saturn, LLC), MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation), and MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.).

[3]    The Realm/Encore Debtors are Remediation and Liability Management Company, Inc., Ch. 11 Case No. 09-50029 and Environmental Corporate Remediation Company, Inc., Ch. 11 Case No. 09-50030.

the approval of the UAW Retiree Settlement Agreement (as defined in the Sale Order), subject to higher or better offers (the "**363 Transaction**").

7.      On September 15, 2009, the Initial Debtors filed their schedules of assets and liabilities and statements of financial affairs, which were amended on October 4, 2009.  On October 15, 2009, the Realm/Encore Debtors filed their schedules of assets and liabilities and statements of financial affairs.

8.      On September 16, 2009, this Court entered an order [Docket No. 4079] establishing November 30, 2009, as the deadline for each person or entity to file a proof of claim in the Initial Debtors' cases, including governmental units.  On December 2, 2009, this Court entered an order [Docket No. 4586] establishing February 1, 2010, as the deadline for each person or entity to file a proof of claim in the Realm/Encore Debtors' cases (except governmental units, as defined in section 101(27) of the Bankruptcy Code, for which the Court established June 1, 2010 as the deadline to file a proof of claim).

9.      On October 6, 2009, this Court entered the Procedures Order, which authorizes the Initial Debtors, among other things, to file omnibus objections to no more than 100 claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007 and those additional grounds set forth in the Procedures Order.

## Relevant Background to the Dealership Claims

10.      As this Court is well aware, in connection with the Debtors' prepetition rationalization of its dealer network and in conjunction with the 363 Transaction, the Debtors offered all of the Dealers an opportunity to enter into either a participation agreement (a "**Participation Agreement**") to continue with New GM on a long term basis or a wind-down agreement (a "**Wind-Down Agreement**") which provided for the orderly liquidation and closing of non-retained GM dealerships over an extended period of time.  Dealers who sold discontinued

GM brands, such as Saturn and Hummer, were offered deferred termination agreements (the "**Deferred Termination Agreements**") in place of Wind-Down Agreements. [4]

11.     All of the Dealership Claims were filed by Dealers who entered into either a Wind-Down Agreement or Deferred Termination Agreement with the Debtors.  In exchange for receiving the benefits associated with entering into these agreements, which included, among other things, dealership rent payments, payments for remaining vehicle inventory and continuing GM warranty coverage, each of the Dealers expressly agreed to a broad release (set forth below) of claims against the Debtors, including all of the Dealership Claims.

<u>**The Release Provisions**</u>

12.     Section 5(a) of the Wind-down Agreement (*Release; Covenant Not to Sue; Indemnity*) provides in pertinent part:

> (a)     Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates, or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any

---

[4]     Copies of a form Wind-Down Agreement and Deferred Termination Agreement are annexed hereto as **Exhibit "B"** and **Exhibit "C,"** respectively.

facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE funds due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) – (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates.  GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination and cancellation, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

Section 5(a) of the Deferred Termination Agreement (*Release; Covenant Not to Sue; Indemnity*)

similarly provides in pertinent part:

(a)    Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through

or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties") arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE payments due the Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from the Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) – (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

None of the Dealership Claims fall within any of the exceptions to the above releases, which, as set forth above, include unpaid warranty claims, amounts owing with respect to a Dealer's Open Account (as defined in the MSPA) or for incentive payments, or Section 17.4 of the Dealer

Agreement (as defined in the MSPA), and therefore the Dealership Claims are expressly released

pursuant to the above provisions.

13.     Because the Dealership Claims seek recovery on claims which have been

expressly released, the Debtors seek to have the Dealership Claims expunged in their entirety.

### The Wind-Down Agreements and Deferred Termination Agreements Were Assigned to New GM Pursuant to the MSPA

14.     Further, under the terms of the MSPA, all Wind-Down Agreements and

Deferred Termination Agreements were assigned to New GM and all obligations thereunder

were assumed by New GM.  Therefore, to the extent any of the Dealership Claims seek payment

for amounts due under the terms of a Wind-Down Agreement or Deferred Termination

Agreement, such claims have been expressly assumed by New GM and are not the liability of the

Debtors.

15.     The MSPA provides, at Article II (*Purchase and Sale*), Section 2.1

(*Purchase and Sale of Assets; Assumption of Liabilities*):

> On the terms and subject to the conditions set forth in this Agreement, other than as set forth in Section 6.30, Section 6.34 and Section 6.35, at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

16.     Section 2.2(a) of the MSPA (*Purchased and Excluded Assets*) provides in

pertinent part:

> (a)     The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial

ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

(x)     . . . all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt . . . (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date.

Neither the Wind-Down Agreement or Deferred Termination Agreement is an Excluded

Contract as that term is defined in section 2.2(b)(vii) of the MSPA.

17.     Section 2.3(a) of the MSPA (*Assumed and Retained Liabilities*) provides

in pertinent part:

(a)     The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(ii)     all Liabilities under each Purchased Contract;

(iv)     all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

18.     The term "Liabilities" is defined in the recitals to the MSPA as follows:

"Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

19.     Pursuant to the MSPA, New GM has assumed all liabilities and

obligations relating to Purchased Contracts (as defined in the MSPA), which include any

Dealership Claims for amounts due under the terms of a Wind-Down Agreement or Deferred

Termination Agreement.

20.    Because the Dealership Claims seek recovery on claims which have been expressly released or are now the responsibility of New GM, the Debtors seek the Dealership Claims to be expunged in their entirety.

## The Relief Requested Should Be Approved by the Court

21.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Peter J. Solomon Co. v. Oneida Ltd.*, No. 09-CV-2229 (DC), 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

22.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Moreover, the Procedures Order provides that the Debtors may file omnibus objections to claims that "seek recovery of amounts for which the Debtors are not liable." (Procedures Order at 2.) Further, paragraph 26 of the Order approving the MSPA [Docket No. 2968] provides that:

> Except as provided in the [MSPA] or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the [MSPA], and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, and their estates.

None of the Dealership Claims relate to Cure Amounts (as defined in the MSPA), and, therefore, holders of the Dealership Claims are barred from the continued assertion and prosecution of the subject claims.

23.    As stated above, the Dealership Claims seek recovery of amounts for which the Debtors are not liable.  The Debtors have either been expressly released from the Dealership Claims under the terms of the Wind-Down Agreement or Deferred Termination Agreement, or any liability arising from the Dealership Claims has been transferred to New GM pursuant to the MSPA.

24.    To avoid the possibility of improper recovery against the Debtors' estates and for the benefit of the proper creditors of the Debtors, the Debtors request that the Court disallow and expunge in their entirety the Dealership Claims.  Further, the Debtors reserve all their rights to object to any Dealership Claims as to which the Court does not grant the relief requested herein on any other basis.

### Notice

25.    Notice of the Thirty-Ninth Omnibus Objection to Claims has been provided to each claimant asserting a Dealership Claim on Exhibit "A" and parties in interest in accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010 [Docket No. 5670].  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

26.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
August 13, 2010

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**Exhibit A**

*CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|
| BOB MAGUIRE CHEVROLET INC<br>C/O LOWENSTEIN SANDLER PC<br>ATTN  ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVENUE<br>ROSELAND, NJ 07068 | 66212 | Motors Liquidation Company | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| | | | Unliquidated | | |
| COLLIN COUNTY AUTOMOTIVE PRODUCTS<br>GAINES STANLEY<br>1413 S PRESTON RD<br>CELINA, TX 75009 | 67821 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$180,365.00  (U)<br>$180,365.00  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| CORAL CADILLAC INC<br>C/O RAPPAROT OSBORNE & RAPPAPORT P L<br>1300 N FEDERAL HWY SUITE 300<br>BOCA RATON, FL 33432 | 58892 | MLC of Harlem, Inc. | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$2,220,930.10  (U)<br>$2,220,930.10  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| CORAL CADILLAC INC<br>C/O RAPPAPORT OSBORNE & RAPPAPORT P L<br>1300 N FEDERAL HWY SUITE 300<br>BOCA RATON, FL 33432 | 58893 | MLCS Distribution Corporation | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$2,220,930.10  (U)<br>$2,220,930.10  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| CORAL CADILLAC INC<br>C/O RAPPAPORT OSBORNE & RAPPAPORT P L<br>1300 N FEDERAL HWY SUITE 300<br>BOCA RATON, FL 33432 | 58894 | MLCS, LLC | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$2,220,930.10  (U)<br>$2,220,930.10  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| CORAL CADILLAC INC<br>C/O RAPPAPORT OSBORNE & RAPPAPORT P L<br>1300 N FEDERAL HWY SUITE 300<br>BOCA RATON, FL 33432 | 58895 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$2,220,930.10  (U)<br>$2,220,930.10  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and reflect any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".

(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit A**

## *CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|---|
| GARDNER CHEVROLET-OLDSMOBILE-CADILLAC, INC.<br>C/O JOHN GARDNER<br>270 ROUTE 72 E<br>MANAHAWKIN, NJ 08050 | 23187 | Motors Liquidation Company | $0.00<br>$0.00<br>$0.00<br>$1,891,120.00<br>$1,891,120.00 | (S)<br>(A)<br>(P)<br>(U)<br>(T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| GRAYSON COUNTY AUTOMOTIVE PRODUCTS, LLC<br>GAINES STANLEY<br>3314 TEXOMA PKWY<br>SHERMAN, TX 75090 | 67819 | Motors Liquidation Company | $0.00<br>$0.00<br>$0.00<br>$190,399.00<br>$190,399.00 | (S)<br>(A)<br>(P)<br>(U)<br>(T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| GXS, INC.<br>BY VENABLE LLP<br>ATTN: EDWARD A. SMITH<br>1270 AVENUE OF THE AMERICAS ROCKEFELLER CENTER<br>NEW YORK, NY 10020 | 64625 | Motors Liquidation Company | $0.00<br>$0.00<br>$0.00<br>$545,545.00<br>$545,545.00 | (S)<br>(A)<br>(P)<br>(U)<br>(T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| HILL COUNTY AUTOMOTIVE PRODUCTS LLC DBA MIKE CRAIG CHEVROLET HILLSBORO<br>C/O HILL COUNTY AUTOMOTIVE PRODUCTS LLC<br>306 SW I- 35<br>HILLSBORO, TX 76645 | 67822 | Motors Liquidation Company | $0.00<br>$0.00<br>$0.00<br>$132,621.00<br>$132,621.00 | (S)<br>(A)<br>(P)<br>(U)<br>(T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| IMMEL MOTORS<br>1279 US HIGHWAY 87<br>FREDERICKBURG, TX 78624 | 64848 | Motors Liquidation Company | $0.00<br>$1,031,339.00<br>$0.00<br>$0.00<br>$1,031,339.00 | (S)<br>(A)<br>(P)<br>(U)<br>(T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".

(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit A**

## *CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|
| KEN NELSON AUTO MALL, INC<br>MEGAN G HEEG ESQ<br>EHRMANN GEHLBACH BADGER & LEE<br>PO BOX 447<br>DIXON, IL 61021 | 65703 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$328,200.00   (U)<br>$328,200.00   (T)<br><br>Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| KEN NELSON AUTO PLAZA, INC.<br>MEGAN G HEEG ESQ<br>EHRMANN GEHLBACH BADGER & LEE<br>PO BOX 447<br>DIXON, IL 61021 | 65701 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$328,200.00   (U)<br>$328,200.00   (T)<br><br>Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| M & J AUTOMOTIVE, INC.<br>MICHAEL THOMPSON<br>1435 N HERMITAGE RD<br>HERMITAGE, PA 16148 | 28389 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$2,846,481.00   (U)<br>$2,846,481.00   (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| M.W.T., INC.<br>MICHAEL THOMPSON<br>1127 W MAIN ST<br>KENT, OH 44240 | 28386 | Motors Liquidation Company | $0.00   (S)<br>$0.00   (A)<br>$0.00   (P)<br>$9,776,939.00   (U)<br>$9,776,939.00   (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| MCCANN MOTORS INC<br>MELAINE MCCANN<br>6411 20TH ST E<br>FIFE, WA 98424 | 64030 | Motors Liquidation Company | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".
(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

## Exhibit A

### *CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|---|
| MONTROSE BUICK PONTIAC GMC CADILLAC PO BOX 1030 HERMITAGE, PA 16148 | 28388 | Motors Liquidation Company | $0.00 (S) $0.00 (A) $0.00 (P) $2,846,481.00 (U) $2,846,481.00 (T) | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| MONTROSE CHEVROLET 1127 W MAIN ST KENT, OH 44240 | 28385 | Motors Liquidation Company | $0.00 (S) $0.00 (A) $0.00 (P) $9,776,939.00 (U) $9,776,939.00 (T) | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| PARKWAY OLDSMOBILE-CADILLAC-GMC TRUCK, INC. P. BAKSHI 24075 MAGIC MOUNTAIN PARKWAY VALENCIA, CA 91355 | 59633 | Motors Liquidation Company | $0.00 (S) $0.00 (A) $0.00 (P) $1,880,041.55 (U) $1,880,041.55 (T) | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| PHD MOTORS, INC. DAN CUTRUBUS 843 W RIVERDALE RD OGDEN, UT 84405 | 49490 | Motors Liquidation Company | $0.00 (S) $0.00 (A) $0.00 (P) $5,140,941.54 (U) $5,140,941.54 (T) Unliquidated | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| ROYAL MOTOR SALES, INC D/B/A EXPRESSWAY CHEV JONES WALLACE, LLC ATTN PAUL J WALLACE 420 MAIN ST, SUITE 1600 EVANSVILLE, IN 47708 | 15269 | Motors Liquidation Company | Unliquidated | | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".

(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit A**

## CLAIMS TO BE DISALLOWED AND EXPUNGED

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|
| SALAS AUTOMOTIVE GROUP INC<br>ERVIN COHEN & JESSUP LLP<br>ATTN PETER JAZAYERI<br>9401 WILSHIRE BOULEVARD NINTH FLOOR<br>BEVERLY HILLS, CA 90212 | 58632 | Motors Liquidation Company | $0.00   (S)<br><br>$0.00   (A)<br><br>$0.00   (P)<br><br>$1,308,572.00  (U)<br><br>$1,308,572.00  (T)<br><br><br>Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SALAS AUTOMOTIVE GROUP INC<br>ERVIN COHEN & JESSUP LLP<br>ATTN: PETER JAZAYERl<br>9401 WILSHIRE BOULEVARD NINTH FLOOR<br>BEVERLY HILLS, CA 90212 | 65864 | Motors Liquidation Company | $0.00   (S)<br><br>$0.00   (A)<br><br>$0.00   (P)<br><br>$1,308,572.00  (U)<br><br>$1,308,572.00  (T)<br><br><br>Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SATURN OF BORDENTOWN INC<br>LOWENSTEIN SANDLER PC<br>ATTN ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVE<br>ROSELAND, NJ 07068 | 66200 | MLCS, LLC | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SATURN OF BORDENTOWN INC<br>LOWENSTEIN SANDLER PC<br>ATTN ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVE<br>ROSELAND, NJ 07068 | 66201 | MLCS Distribution Corporation | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".
(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit A**

## *CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|
| SATURN OF TOMS RIVER INC<br>LOWENSTEIN SANDLER PC<br>ATTN ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVE<br>ROSELAND, NJ 07068 | 66202 | MLCS, LLC | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SATURN OF TOMS RIVER INC<br>LOWENSTEIN SANDLER PC<br>ATTN  ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVE<br>ROSELAND, NJ 07068 | 66203 | MLCS Distribution Corporation | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SATURN OF TOMS RIVER INC<br>C/O LOWENSTEIN SANDLER PC<br>ATTN ANDREW DAVID BEHLMANN<br>65 LIVINGSTON AVENUE<br>ROSELAND, NJ 07068 | 68489 | MLCS Distribution Corporation | Unliquidated | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| SERRA CHEVROLET, INC<br>MAX A MOSELEY, JOHNSTON BARTON PROCTOR & ROSE LLP<br>569 BROOKWOOD VILLAGE SUITE 901<br>BIRMINGHAM, AL 35209 | 69381 | Motors Liquidation Company | $0.00  (S)<br>$0.00  (A)<br>$0.00  (P)<br>$1,950,800.00  (U)<br>$1,950,800.00  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| STAGG CHEVROLET INC DBA CAPE COD AUTO MALL<br>ATTN CHRISTOPHER W PARKER<br>RUBIN & RUDMAN LLP<br>50 ROWES WHARF<br>BOSTON, MA 02110 | 64815 | Motors Liquidation Company | $0.00  (S)<br>$0.00  (A)<br>$0.00  (P)<br>$1,045,291.00  (U)<br>$1,045,291.00  (T) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".
(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit A**

## *CLAIMS TO BE DISALLOWED AND EXPUNGED*

| Name and Address of Claimant | Claim # | Debtor | Claim Amount and Priority (1) | | Grounds For Objection | Objection Page Reference |
|---|---|---|---|---|---|---|
| STEPHEN J LABELLE/LABELLE CHEVEROLET<br>PAUL M HARRIS ESQ<br>MURTHA CULLINA LLP<br>99 HIGH STREET<br>BOSTON, MA 02110 | 60990 | Motors Liquidation Company | $0.00 | (S) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| | | | $0.00 | (A) | | |
| | | | $0.00 | (P) | | |
| | | | $5,500,000.00 | (U) | | |
| | | | $5,500,000.00 | (T) | | |
| SWEETWATER MOTOR PRODUCTS L P<br>603 SW GEORGIA AVE<br>SWEETWATER, TX 79556 | 67820 | Motors Liquidation Company | $0.00 | (S) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| | | | $0.00 | (A) | | |
| | | | $0.00 | (P) | | |
| | | | $157,240.00 | (U) | | |
| | | | $157,240.00 | (T) | | |
| WEST COVINA MOTORS, INC.<br>ZIAD ALHASSEN<br>BAC: 166894, DEALER CODE: 25870<br>1932 E GARVEY AVE S<br>WEST COVINA, CA 91791 | 59084 | Motors Liquidation Company | $0.00 | (S) | No Liability; Claims seek recovery of amounts for which the Debtors are not liable | Pgs. 1-5 |
| | | | $0.00 | (A) | | |
| | | | $0.00 | (P) | | |
| | | | $3,750,000.00 | (U) | | |
| | | | $3,750,000.00 | (T) | | |
| *CLAIMS TO BE DISALLOWED AND EXPUNGED* | 33 | | $0.00 | (S) | | |
| | | | $1,031,339.00 | (A) | | |
| | | | $0.00 | (P) | | |
| | | | $59,768,468.49 | (U) | | |
| | | | $60,799,807.49 | (T) | | |

(1)  In the "Claim Amount and Priority" column, (S) = secured claim, (A) = administrative expense claim, (P) = priority claim, (U) = unsecured claim and (T) = total claim. The amounts listed are taken directly from the proofs of claim, and thus replicate any mathematical errors on the proofs of claim. Where the claim amount is zero, unliquidated, unidentified, or otherwise cannot be determined, the amount listed is "0.00".
(2)  Claims on the exhibit are sorted in alphabetical order based on the creditor name as listed on proof of claim form.

**Exhibit B**

**Wind-Down Agreement**

## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the ▮▮
day of ▮▮ 2009, by and between ▮▮▮▮▮▮▮▮▮▮▮ ("Dealer"), and GENERAL MOTORS
CORPORATION ("GM")

### RECITALS

A       Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer
Agreement") for ▮▮▮▮ motor vehicles (the "Existing Model Line")  Capitalized terms not otherwise
defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement

B       GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case")
pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy
Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the
"Bankruptcy Code")    No trustee has been appointed and GM is operating its business as
debtor-in-possession

C       GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363
Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363
Sale"), subject to approval by and order of the Bankruptcy Court

D       GM has considered moving and may, at its option, move to reject the Dealer Agreement
in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this
Agreement to GM on or before June 12, 2009.

E       In return for the payments set forth herein and GM's willingness not to pursue the
immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this
Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly
fashion (specifically including the sale of all of Dealer's new Motor Vehicles), (ii) to provide for Dealer's
voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to
Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer
Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and
(iii) to provide for Dealer's release of GM and its related parties from any and all liability arising out of or
connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between
GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the
terms and conditions set forth herein

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants
contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as
follows

1    Assignment-363 Sale.  Dealer acknowledges and agrees that GM has the right, but not the
obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363
Acquirer   As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the
Dealer Agreement and this Agreement to the 363 Acquirer   If GM elects to exercise its option to assign
the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not
to object to or protest any such assignment

2. <u>Termination of Dealer Agreement</u>  Subject to the terms of Section 1 above

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14 2 thereof, such termination to be effective on October 31, 2010  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party  In addition, and notwithstanding the foregoing, 1. Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3. <u>Payment to Dealer</u>

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14 2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of ▆▆▆▆▆▆ (the "Wind-Down Payment Amount"), subject to the terms herein  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred. (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time

periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)    In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4    Complete Waiver of All Termination Assistance Rights.    In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives

(a)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever

(b)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)    Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to the either GM or the 363 Acquirer, as applicable Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations   Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations   Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws

3

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement

(f) The terms of this Section 4 shall survive the termination of this Agreement

5.  Release, Covenant Not to Sue, Indemnity

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17 4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates  GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination and cancellation, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected.  In this regard, Dealer hereby

4

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof  Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Section 17 4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement  As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7  In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement   "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses   "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(f) The terms of this Section 5 shall survive the termination of this Agreement

5

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

6    Subject Dealership Operations    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above)

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12 2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person, provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12 2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6 1 and 6 3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12 2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution)

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect

7    No Protest

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line

6

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(b) Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected  In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof  Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein .

(d)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7  Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage

(e)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach  As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7  In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance

8    Due Authority  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement

7

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

9    Confidentiality    Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions

10    Informed and Voluntary Acts    Dealer has reviewed this Agreement with its legal, tax, or other advisors. and is fully aware of all of its rights and alternatives  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11    Binding Effect.    This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns  Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12    Effectiveness    This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**

13    Continuing Jurisdiction    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce. and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto  The terms of this Section 13 shall survive the termination of this Agreement

14.    Other Agreements

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable. and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable    In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise)  Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," 'Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase ' Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a ' Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc , a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the

8

terms of such agreements with AHI) Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case  By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement  Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates

15 Governing Law  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan

16 Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement

17 Breach.  In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18 Complete Agreement of the Parties  This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties

*[Signature Page Follows]*

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written

By _____

Name _____
Title _____

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

13 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

**Exhibit C**

**Deferred Termination Agreement**

**EXHIBIT J-3**

## FORM OF DEFERRED TERMINATION AGREEMENT FOR NON-SATURN AND NON-HUMMER DISCONTINUED BRAND DEALER AGREEMENTS AND EXCLUDED CONTINUING BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between *[DEALER ENTITY CORPORATE NAME]* ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for *[BRAND WINDING DOWN]* motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.  Assignment-363 Sale. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer. If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2.  Termination of Dealer Agreement. Subject to the terms of Section 1 above:

(a) Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Dealer has sold all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b) Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  Payment to Dealer.

(a) Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $_____ (the "Deferred Termination Payment Amount"), subject to the terms herein. This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b) GM shall pay twenty-five percent (25%) of the Deferred Termination Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM

2

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

or the 363 Acquirer, as applicable, shall pay the balance of the Deferred Termination Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Deferred Termination Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)    In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Deferred Termination Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Deferred Termination Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Deferred Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.    <u>Complete Waiver of All Termination Assistance Rights</u>. In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)    Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the

3

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Deferred Termination Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d)  Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e)  Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f)  The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM and the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM

4

or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. Subject Dealership Operations.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the

5

future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c)  Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement.  Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d)  In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e)  Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7.  No Protest.

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b)    Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7.  Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7.  Dealer expressly intends that it shall be forever deprived of any such claim, demand,

6

cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach.  As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7.  In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8.    Due Authority.  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9.    Confidentiality.  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10.    Informed and Voluntary Acts.  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11.    Binding Effect.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns.  Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12.    Effectiveness.  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13.    Continuing Jurisdiction.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 13 shall survive the termination of this Agreement.

14.    Other Agreements.

(a)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.  In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

7

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. <u>Breach</u>. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. <u>Complete Agreement of the Parties</u>. This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written

8

instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

9

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

*[DEALER ENTITY CORPORATE NAME]*

By:_____

Name:_____

Title:_____

**GENERAL MOTORS CORPORATION**

By:_____
    Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

10

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766870

## EXHIBIT A

## SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

C.    **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between **[GM or the 363 Acquirer]** and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**
1766870

2.   Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Deferred Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.] Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.   Due Authority.  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.   Confidentiality.  Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.   Informed and Voluntary Acts.  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.   Binding Effect.  This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7.   Continuing Jurisdiction.  By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 7 shall survive the termination of this Agreement.

8.   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9.   No Reliance.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

.

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                        :

In re                        :        Chapter 11 Case No.
                        :

MOTORS LIQUIDATION COMPANY, *et al.*,  :       09-50026 (REG)
    f/k/a General Motors Corp., *et al.*    :

                        :

              Debtors.     :        (Jointly Administered)
                        :

------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS
### (Dealership Claims)

        Upon the thirty-ninth omnibus objection to claims, dated August 13, 2010 (the

"**Thirty-Ninth Omnibus Objection to Claims**"),[1] of Motors Liquidation Company (f/k/a

General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to section 502(b) of title 11, United States Code (the "**Bankruptcy**

**Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

and this Court's order approving procedures for the filing of omnibus objections to proofs of

claim filed in these chapter 11 cases (the "**Procedures Order**") [Docket No. 4180], seeking

entry of an order disallowing and expunging the Dealership Claims on the grounds that such

claims seek recovery of amounts for which the Debtors are not liable, all as more fully described

in the Thirty-Ninth Omnibus Objection to Claims; and due and proper notice of the Thirty-Ninth

Omnibus Objection to Claims having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Thirty-Ninth Omnibus Objection to Claims is in the best interests of the Debtors, their estates,

---

[1]       Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Thirty-Ninth Omnibus Objection to Claims.

creditors, and all parties in interest and that the legal and factual bases set forth in the Thirty-

Ninth Omnibus Objection to Claims establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Thirty-Ninth Omnibus Objection to

Claims is granted as provided herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the claims

listed on **Exhibit "A"** (the "**Order Exhibit**") annexed hereto under the heading "*Claims to be*

*Disallowed and Expunged*" are disallowed and expunged from the claims registry; and it is

further

ORDERED that, if applicable, the Thirty-Ninth Omnibus Objection to Claims is

adjourned with respect to the claims listed on the Order Exhibit annexed hereto under the

heading "*Objection Adjourned*" (the "**Adjourned Claims**") to the date indicated on the Order

Exhibit, subject to further adjournments (such actual hearing date, the "**Adjourned Hearing**

**Date**"), and the Debtors' response deadline with respect to the Adjourned Claims shall be 12:00

noon (Eastern Time) on the date that is three (3) business days before the Adjourned Hearing

Date; and it is further

ORDERED that, if applicable, the Thirty-Ninth Omnibus Objection to Claims is

withdrawn with respect to the claims listed on the Order Exhibit annexed hereto under the

heading "*Objection Withdrawn*"; and it is further

ORDERED that, if applicable, the Thirty-Ninth Omnibus Objection to Claims is

withdrawn with respect to the claims listed on the Order Exhibit annexed hereto under the

heading "*Claim Withdrawn*," as those claims have been withdrawn by the corresponding

claimant; and it is further

ORDERED that this Order has no res judicata, estoppel, or other effect on the

validity, allowance, or disallowance of, and all rights to object on any basis are expressly

reserved with respect to, any claim listed on Exhibit "A" annexed to the Thirty-Ninth Omnibus

Objection to Claims under the heading "*Claims to be Disallowed and Expunged*" that is not

disallowed or expunged; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2010

_____
United States Bankruptcy Judge