**HEARING DATE AND TIME: September 7, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: August 30, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re                                 :    Chapter 11 Case No.
                                      :
MOTORS LIQUIDATION COMPANY, et al.,   :    09-50026 (REG)
    f/k/a General Motors Corp., et al.:
                                      :
                      Debtors.        :    (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

NOTICE OF HEARING ON
MOTION OF DEBTORS PURSUANT TO
SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY
CODE FOR AN ORDER AUTHORIZING (I) THE DEBTORS
TO ENTER INTO THE STOCK PURCHASE AGREEMENT WITH
GENERAL MOTORS HOLDINGS, S.L., AND (II) THE ASSUMPTION AND
ASSIGNMENT OF THE BMW CONTRACT IN CONNECTION WITH THE
DEBTORS' ENTRY INTO THE STOCK PURCHASE AGREEMENT

PLEASE TAKE NOTICE that upon the annexed Motion, dated August

13, 2010 (the "**Motion**"), of Motors Liquidation Company (f/k/a General Motors

Corporation) ("**MLC**") and its affiliated debtors, as debtors in possession (collectively,

the "**Debtors**"), for an order, pursuant to sections 105, 363, and 365 of title 11, United

States Code (the "**Bankruptcy Code**") authorizing (i) the Debtors to enter into the Stock

Purchase Agreement with General Motors Holdings, S.L, and (ii) the assumption and

assignment of the BMW Contract in connection with the Debtors' entry into the Stock

Purchase Agreement, all as more fully set forth in the Motion, a hearing will be held

before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Room 621 of

the United States Bankruptcy Court for the Southern District of New York, One Bowling

Green, New York, New York 10004, on **September 7, 2010 at 9:45 a.m. (Eastern

Time),** or as soon thereafter as counsel may be heard.

       PLEASE TAKE FURTHER NOTICE that any responses or objections to

this Motion must be in writing, shall conform to the Federal Rules of Bankruptcy

Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the

Bankruptcy Court (a) electronically in accordance with General Order M-242 (which can

be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing

system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable

Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with a hard copy delivered directly to Chambers), in accordance with General

Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance

with General Order M-242, and on (i) Weil, Gotshal & Manges LLP, attorneys for the

Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq.,

Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o Motors

Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243

(Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center, Detroit,

Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World

C:\DOCUMENTS AND SETTINGS\ROBERTSA\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\T9B4K2ZL\US_ACTIVE_NOTICE OF MOTION_ GMS 363 SALE_43463743_1 (2).DOC

2

Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the

United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312,

Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys

for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York

10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin

Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors,

1177 Avenue of the Americas, New York, New York 10036 (Attn:  Thomas Moers

Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.);

(viii) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis,

Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x)

Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors

holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York

10152-3500 (Attn:  Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas

Circle, N.W., Suite 1100, Washington, DC 20005 (Attn:  Trevor W. Swett III, Esq. and

Kevin C. Maclay, Esq.); and (xi) Stutzman, Bromberg, Esserman & Plifka, A

Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal

representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite

2200, Dallas, Texas 75201 (Attn:  Sander L. Esserman, Esq. and Robert T. Brousseau,

Esq.), so as to be received no later than **August 30, 2010, at 4:00 p.m. (Eastern Time)**

(the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed

and served with respect to the Motion, the Debtors may, on or after the Objection

Deadline, submit to the Bankruptcy Court an order substantially in the form of the

proposed order annexed to the Motion, which order may be entered with no further notice

or opportunity to be heard offered to any party.

Dated:  New York, New York
        August 13, 2010

                                        /s/ Stephen Karotkin
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

C:\DOCUMENTS AND SETTINGS\ROBERTSA\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\T9B4K2ZL\US_ACTIVE_NOTICE OF MOTION_ GMS 363 SALE_43463743_1 (2).DOC

4

**HEARING DATE AND TIME: September 7, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: August 30, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re                               :     Chapter 11 Case No.
                                    :
MOTORS LIQUIDATION COMPANY, et al., :     09-50026 (REG)
       f/k/a General Motors Corp., et al.   :
                                    :
              Debtors.              :     (Jointly Administered)
                                    :
------------------------------------------------------------x
```

**MOTION OF DEBTORS PURSUANT TO**
**SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY**
**CODE FOR AN ORDER AUTHORIZING (I) THE DEBTORS**
**TO ENTER INTO THE STOCK PURCHASE AGREEMENT WITH**
**GENERAL MOTORS HOLDINGS, S.L., AND (II) THE ASSUMPTION AND**
**ASSIGNMENT OF THE BMW CONTRACT IN CONNECTION WITH THE**
**DEBTORS' ENTRY INTO THE STOCK PURCHASE AGREEMENT**

# TABLE OF CONTENTS

**Page**

Relief Requested ............................................................................................ 1

Jurisdiction .................................................................................................... 2

The Company ................................................................................................ 2

The Sale Process ........................................................................................... 4

    Marketing of the Company ..................................................................... 4

    The Stock Purchase Agreement ............................................................. 6

    The Sale Hearing..................................................................................... 9

    Objections to the Motion ...................................................................... 10

Procedures for Assumption and Assignment  of the BMW Contract............................ 11

The Sale Approval Order Should Be Entered............................................... 12

    The Time, Place, and Notice Proposed for the  Sale Hearing is Reasonable and Should be Approved....................................................... 12

    The Sale of the Transferred Stock and Assumption and Assignment  of the BMW Contract Is an Exercise of MLC's Sound Business Judgment ................................................................................ 14

    The Transferred Stock in the Company Should be Sold  Free and Clear of Liens, Claims, Encumbrances, and Other Interests ................................. 16

    The Purchaser of the Property Should Be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser............................................. 17

    The Court Should Waive The Fourteen-Day Stay Period of Bankruptcy Rule 6004(h) .......................................................................... 19

Notice ......................................................................................................... 19

# EXHIBITS

The Stock Purchase Agreement .........................................................Exhibit A

The Sale Approval Order ...................................................................Exhibit B

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adelphia Commc'ns Corp. v. The America Channel (In re Adelphia Comm'ns Corp.)*, 345 B.R. 69 (Bankr. S.D.N.Y. 2006) .........................................................15

*Allstate Insurance Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994)................................18

*In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) ................................................14

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983)................................................................................................14

*In re Helm*, 335 B.R. 528 (Bankr. S.D.N.Y. 1996)......................................................15

*In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ............................................................................14

*In re Lavigne*, 114 F.3d 379 (2d Cir. 1997) .............................................................14

*Lyondell Chemical Co. v. Centerpoint Energy Gas Services Inc. (In re Lyondell Chemical Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009)..............................................15

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)..............................................14, 15

*Nostas Associates v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18 (2d Cir. 1996) ............................................................................................................15

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) ...........................15

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) .....................................18

### STATE CASES

*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985).........................................................2

### FEDERAL STATUTES

11 U.S.C. § 105...............................................................................................1, 13
11 U.S.C. § 363.............................................................................1, 12, 12, 14, 17, 18
11 U.S.C. § 365.............................................................................................1, 12, 14
28 U.S.C. §§ 157..................................................................................................2

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**")

and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"),

respectfully represent:

**Relief Requested**

1.    MLC has entered into a Stock Purchase Agreement (the "**SPA**")

dated July 30, 2010, annexed hereto as **Exhibit "A"**[1], by and among MLC and General

Motors Automotive Holdings, S.L. (the "**Purchaser**"), to sell all of the issued and

outstanding shares of common stock (the "**Transferred Stock**") of General Motors

Strasbourg S.A.S., a French *societe par actions simplifiée*, having its registered office at

81, rue de la Rochelle, Strasbourg 67026 cedex, France (the "**Company**").  The Company

is a wholly-owned subsidiary of MLC and is primarily engaged in the business of

developing and manufacturing automatic transmissions for luxury and performance light

automotive vehicles.

2.    By this Motion, MLC requests entry of an order (the "**Sale**

**Approval Order**") pursuant to sections 105(a), 363(b), and 365(b) of chapter 11 of title 11

of the United States Code (the "**Bankruptcy Code**") and Rules 2002 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), substantially in the

form annexed hereto as **Exhibit "B"**, approving, at the Sale Hearing (as defined below), (i)

the sale of the Transferred Stock to the Purchaser pursuant to the SPA (the "**Sale**"), and (ii)

---

[1]  Capitalized terms used in this Motion but not otherwise defined herein shall have the meaning ascribed to
them in the SPA.

the assumption and assignment of the BMW Contract (as defined below) to the Company

in connection with the Sale.

## Jurisdiction

3.      This Court has jurisdiction to consider this matter pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Company

4.      As noted above, the Company develops and manufactures advanced

technology automatic transmissions for luxury passenger vehicles sold in North America,

Europe, South Africa, China, and Australia (the "**Business**").  The Company's primary

products are two versions of 6-speed rear wheel drive ("**RWD**") automatic transmissions.

Established in 1967, the Company currently employees approximately 1,200 individuals,

and is a wholly owned subsidiary of MLC.

5.      The Company's primary asset is an engineering, manufacturing, and

die-cast facility located near the French/German border in Strasbourg, France (the

"**Manufacturing Plant**").  The Manufacturing Plant is 40,000 m$^2$ (430,000 ft$^2$) under roof

and employs approximately 1,060 assembly workers and managers.  Adjacent to the

Manufacturing Plant, the Company operates a foundry facility that supplies machined

aluminum die-cast products to support its automatic transmission manufacturing

operations.  The Company manufactures approximately 1,300 to 1,400 transmissions per

day at the Manufacturing Plant, which results in approximately 270,000 to 300,000

automatic transmissions produced each year.

6.      In addition, the Company also owns and operates an advanced

Engineering and Technical center, which is co-located with the Manufacturing Plant.  Built

in 1996, the Engineering and Technical Center is 8,700 m$^2$ (94,000 ft$^2$) under roof and

2

employees approximately 140 engineers and technicians.  The Engineering and Technical

Center provides ongoing application, calibration, design, development, and manufacturing

and process support for automatic transmissions manufactured globally.

       7.      The Company manufactures automatic transmissions and provides

technical services for two main customers, Bayerische Motoren Werke Aktiengesellschaft

("**BMW**") and General Motors, LLC ("**New GM**"), which together are projected to

account for over 95% of the Company's 2010 revenue.  The Company has enjoyed a

strong, mutually beneficial relationship with BMW for almost 25 years.  Over that time,

the Company has supplied approximately 2.5 million transmission units for various BMW

applications across North America, Europe, Asia, and the Middle East.  Currently, BMW

accounts for over 65% of the Company's unit volume sales.  The contract under which

automatic transmissions are supplied to BMW by the Company is between BMW and

MLC, and therefore, as a condition of the Sale, the BMW Contract must be assigned to the

Company. [2]

       8.      As a wholly owned subsidiary of MLC, the Company has been a

long time supplier of transmission units for MLC's, and now New GM's, global

powertrain platforms.  The Company began producing automatic transmissions for MLC in

1967 primarily for MLC's European platforms, and now is focused on producing products

for New GM's North American and Pacific operations.  Since 1967, the Company has

supplied over 5 million transmission units to MLC and New GM.  Unlike BMW, neither

MLC, nor New GM, has an executed long-term supply agreement with the Company.

---

[2] As the Court is aware, MLC has commenced an adversary proceeding against BMW (the "**BMW Litigation**") seeking a declaratory judgment to enforce BMW's purchase obligations under that certain 6L45 Development and Delivery Agreement between MLC and BMW, dated as of May 6, 2004 (including all related, ancillary and supplemental agreements, if any, the "**BMW Contract**").

Rather, the Company supplies automatic transmissions to New GM on a purchase order basis.

## The Sale Process

9.      As this Court is aware, on July 5, 2009, the Court approved the sale of substantially all of the Debtors' assets to NGMCO, Inc. (n/k/a General Motors, LLC), a purchaser sponsored by the United States Department of the Treasury (the "**363 Transaction**"), and on July 10, 2009, the 363 Transaction closed.  The Debtors' primary business purpose at this stage in their chapter 11 cases is to wind down their businesses, liquidate their remaining assets and propose a plan which, among other things, appropriately addresses their environmental obligations with respect to certain properties the Debtors continue to own.  In furtherance of these goals, and in light of the fact that the Debtors no longer operate as manufacturers of motor vehicles or component parts such as automatic transmissions, the Debtors undertook a substantial effort to sell the Company following the close of the 363 Transaction.

### *Marketing of the Company*

10.      Over approximately the past 12 months, MLC has conducted a robust marketing effort for the Company.  In particular, in the fall of 2009, investment bank Merrill Lynch & Co. ("**Merrill Lynch**") was retained to market and seek a buyer for the Company (the "**Sale Process**").  The Sale Process was positioned as a stock purchase whereby any potential buyer would acquire 100% of the common stock of the Company, including all rights and obligations as owner thereof.  By December 2009, Merrill had contacted over 50 potential buyers, including strategic and private equity firms from around the world (Europe, Asia, and North America), of which only 16 agreed to receive an information memorandum about the Company.  By late January of 2010, seven firms

responded to a call for preliminary offers and only four invested time to visit the

Manufacturing Plant in February of 2010.

11.    After the onsite visits to the Manufacturing Plant, the pool of

potential buyers shrank to only 2 candidates.  Both candidates submitted non-binding

offers of one euro (€1) for the common stock of the Company, but these offers contained

specific conditions and proposed new projects that MLC and the Company concluded were

fraught with risk.  In particular, MLC and the Company had serious concerns about the

ability of both potential purchasers to support, from a financial and an operational

perspective, the design and manufacture of proposed new products by the Company, while

at the same time maintaining and building upon the relationships with the Company's two

largest customers, New GM and BMW.   Additionally, the offer conditions of both buyers

included incremental amendments to the established business terms between the Company

and New GM in relation to future business and intellectual property access, which were

unacceptable to New GM, despite extensive negotiations between the parties.

Accordingly, both parties withdrew their interest in purchasing the Company and

negotiations with these two parties ceased, leaving no potential buyers for the Company

remaining.

12.    Subsequently, New GM proposed to MLC terms under which New

GM would purchase the shares of the Company for a purchase price of one euro (€1), the

same price that had been offered by the two previous potential buyers.  Such a transaction

appeared as the best, and indeed only, option for the sale of the Company.  On May 26,

2010, New GM and MLC entered into a term sheet setting forth the principal terms of the

transfer of the Company's share capital to a subsidiary of New GM.  The SPA was signed

approximately two months later on July 30, 2010, with closing of the Sale contingent on

the approval of this Motion, among other conditions.[3]

### *The Stock Purchase Agreement*

13.    The principal terms and provisions of the SPA are as follows:[4]

i.    <u>Purchaser of the Transferred Stock.</u>  General Motors Automotive Holdings, S.L., a wholly owned subsidiary of New GM.

ii.    <u>Stock</u>.  MLC shall sell, assign and transfer or cause to be sold, assigned and transferred to Purchaser all of the Transferred Stock, free and clear of all Liens of any kind, other than Permitted Liens.

iii.    <u>Purchase Price</u>.  One Euro (€1.00) (the "**Purchase Price**") to be paid at the Closing.

iv.    <u>Representations and Warranties of MLC</u>.  To the Seller's Knowledge, there has been no breach of the BMW Contract which first occurred after July 10, 2009 that would require payment of any cure amounts upon the assignment of the BMW Contract from MLC to the Company.

v.    <u>Closing Deliverables of MLC</u>.   At the Closing MLC shall deliver the following to the Purchaser: (i) certified copies of the resolutions of the competent corporate body of MLC authorizing and approving the Transactions; (ii) duly executed stock transfer forms in respect of the Transferred Stock duly executed by MLC in favor of the Purchaser; (iii) the up-to-date share transfer register and the up-to-date shareholders' accounts of the Company showing the transfer of the

---

[3] It should be noted that in connection with the negotiation of the SPA, the Debtors and New GM agreed to clarify and resolve two unrelated matters with respect to the Amended and Restated Master Sale and Purchase Agreement (the "**MSPA**") entered into in connection with the 363 Transaction, as follows: (i) it was agreed that certain properties located in or around Bedford, Indiana shall constitute "Excluded Assets" and "Retained Liabilities" under and as defined in the MSPA.  Notably, the Debtors' negotiations with Federal and State Governmental Authorities with respect to the treatment of the Debtors' environmental obligations under a plan always have included such properties; and (ii) to the extent that obligations of a non-debtor party to a prepetition interest rate swap with MLC in the approximate amount of $25 million are not subject to setoff by such party, any proceeds received shall be divided between MLC and New GM, with MLC receiving the first $9 million of such proceeds and the balance to be divided evenly between MLC and New GM.  To the extent the right of setoff is validated, the swap obligation shall be an Excluded Asset under the MSPA.

[4] This section is intended only as a summary of certain principal terms of the SPA.  To the extent there are any inconsistencies between the summary description of the SPA contained herein and the actual provisions of the SPA, the terms of the SPA control.  Capitalized terms used in this section, but not otherwise defined herein, shall have the meanings ascribed to such terms in the SPA.

Transferred Stock; (iv) the tax transfer forms No. 2759 in respect of the transfer by MLC to the Purchaser of the Transferred Stock, duly signed by MLC; (v) minutes for all shareholder meetings and the shareholders' register of the Company reflecting actions that have taken place after July 9, 2010; (vi) (A) if there are no BMW Cure Amounts, then evidence of the termination of the BMW Litigation, without prejudice, with such termination to be effective as of the Closing Date; or (B) if there are BMW Cure Amounts, then the assignment of MLC's rights in the BMW Litigation to the Purchaser or its designated Affiliate, with such assignment to be effective as of the Closing Date; and (vii) the assignment of the BMW Contract from MLC to the Company (it being understood and agreed that the Bankruptcy Court Order authorizing and approving, among other things, the assignment of the BMW Contract from MLC to the Company shall be sufficient to satisfy this deliverable).

vi.    <u>Closing Deliverables of Purchaser.</u>  At the Closing the Purchaser shall deliver the following to MLC: (i) certified copies of the resolutions of the competent corporate body of Purchaser authorizing and approving the Transactions; (ii) the tax transfer forms No. 2759 in respect of the transfer by MLC to Purchaser of the Transferred Stock, duly signed by Purchaser; and (iii) evidence of the Company making payment of $2,115,191.50 to Merrill Lynch as payment in full under the Merrill Lynch Contract.

vii.   <u>Cure Amounts</u>.  At Closing, the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults, if any, under the BMW Contract, shall be paid by Purchaser.

viii.  <u>Conditions to Closing of the Parties.</u>  The respective obligations of MLC and the Purchaser to consummate the Transactions are subject to satisfaction at or prior to the Closing of several conditions, including the following: (a) no action, suit or proceeding shall have been instituted by any Person which seeks to prohibit, restrict, or delay consummation of the Transactions or any of the conditions material to consummation of the Transactions; (b) there must not be in effect any Law or any Governmental Order entered, issued, made, or rendered by any Governmental Entity that (i) prohibits the consummation of the Transactions, and (ii) has been adopted or issued, or has otherwise become effective, since the date of the SPA; (c) the Bankruptcy Court shall have issued the Bankruptcy Court Order; (d) the Parties shall have filed (and the Purchaser shall have caused the Company to file) a motion with the Court of Strasbourg for the purpose of obtaining approval of the Transactions; and (e) the representations and warranties of MLC contained in the SPA shall have been true and correct in all material respects on and as of the date of the execution of

the SPA and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i) those representations and warranties that are made as of a specific date shall be determined as of such date and (ii) those representations and warranties that are qualified or limited as to materiality or Material Adverse Effect shall be true and correct in all respects, and the Purchaser shall have received a certificate to such effect signed by an authorized officer of MLC.

ix.    <u>Indemnification by Purchaser</u>.  From and after the Closing, the Purchaser agrees to reimburse, indemnify and hold harmless MLC and its respective Directors, officers, representatives, employees and Subsidiaries (collectively, the "**MLC Indemnified Parties**") from, against and in respect of any and all Losses incurred by any MLC Indemnified Party resulting from, or that exist or arise due to, any of the following (collectively, the "**MLC Claims**"): (i) any inaccuracy of any representation or the breach of any warranty made by the Purchaser in the SPA or in any Ancillary Document; and (ii) the breach by the Purchaser of any covenant or agreement under the SPA or any Ancillary Document.  Notwithstanding anything contained in the SPA to the contrary, the obligations of the Purchaser shall (i) not apply to any MLC Claims until, and then only to the extent that, the Losses incurred by all MLC Indemnified Parties exceeds the Basket (as defined below), (ii) be limited to, and shall not exceed, the Cap (as defined below), and (iii) terminate upon the later to occur of (A) December 31, 2010, and (B) the effective date of a chapter 11 plan with respect to the Debtors (the "**Indemnification Expiration Date**").

x.     <u>Indemnification by MLC</u>.  From and after the Closing, MLC agrees to reimburse, indemnify and hold harmless the Purchaser, its directors, officers, representatives, employees and Subsidiaries (each, a "**Purchaser Indemnified Party**") from, against and in respect of any and all Losses incurred by any Purchaser Indemnified Party resulting from, or that exist or arise due to, any of the following (collectively, "**Purchaser Claims**"): (i) any inaccuracy of any representation or the breach of any warranty made by MLC in the SPA or in any Ancillary Document; and (ii) the breach by MLC of any covenant or agreement under the SPA or any Ancillary Document.  Notwithstanding anything contained in the SPA to the contrary, the obligations of MLC shall: (i) not apply to any Purchaser Claims until, and then only to the extent that, the Losses incurred by all Purchaser Indemnified Parties exceeds €250,000 (the "**Basket**"); (ii) be limited to, and shall not exceed, the aggregate amount of €1,000,000 (the "**Cap**"); and (iii) terminate upon the Indemnification Expiration Date.

xi.    <u>Termination of SPA</u>.  The SPA may be terminated at any time prior to the Closing: (a) by mutual consent of the Purchaser and MLC; or (b)

8

by the Purchaser or MLC, upon written notice to the other Party, if the Transactions contemplated by the SPA have not been consummated on or prior to September 30, 2010; provided, however, that the right to terminate the SPA is not available to any Party whose failure to perform or observe any of its obligations under the SPA has been the cause of, or resulted in, the failure of the Transactions contemplated by the SPA to be consummated by such date.

xii.    Expenses.  Except as expressly provided in the SPA, each of the Parties shall bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the SPA and the Transactions, whether or not such Transactions are consummated. Notwithstanding the foregoing, Purchaser shall bear the cost of any transfer taxes and other expenses related to the transfer of property in connection with the Transactions.

### *The Sale Hearing*

14.    MLC will seek approval of the Sale Motion, ratification of the parties' entry into the SPA and assumption and assignment of the BMW Contract to the Company at a hearing scheduled on September 7, 2010 at 9:45 a.m. (the "**Sale Hearing**"). The Purchaser has submitted the highest, best, and only satisfactory offer received for the Transferred Stock during the extensive marketing period described above.  MLC believes that, in view of the marketing effort, any potential buyers have had ample opportunity over approximately the past twelve months to submit offers and that any requirement that any further marketing be undertaken would serve no logical purpose and merely would result in the incurrence of needless costs and expenses.  As such, by this Motion, MLC seeks to hold the Sale Hearing without a formal bidding process or auction procedures.  Of course, to the extent any party comes forward at or prior to the Sale Hearing with a credible offer, MLC will fully consider the same.  Additionally, MLC will provide notice of the Sale Hearing to all parties contacted by Merrill Lynch during the Sale Process.

### *Objections to the Motion*

15.     The Debtors propose that objections or responses, if any, to the Sale

Motion shall be filed with this Court and served so as to be **received** no later than 4:00

p.m. (Eastern Time) on August 30, 2010 (the "**Objection Deadline**").  In addition, all

objections must be in writing, conform to the Federal Rules of Bankruptcy Procedure and

the Local Rules of the Bankruptcy Court for the Southern District of New York, be filed

with the Bankruptcy Court (a) electronically in accordance with General Order M-242

(which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably

in Portable Document Format (PDF), WordPerfect, or any other Windows-based word

processing format (with a hard copy delivered directly to Chambers), in accordance with

General Order M-182 (which can be found at www.nysb.uscourts.gov), and be served in

accordance with General Order M-242, and on (i) Weil, Gotshal & Manges LLP, attorneys

for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller,

Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o Motors

Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243

(Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan

48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP,

attorneys for the United States Department of the Treasury, One World Financial Center,

New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington,

D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export

Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:

Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis &

Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracey Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.); and (xii) Dykema Gossett PLLC, attorneys for the Purchaser, 400 Renaissance Center, Detroit, Michigan 48243 (Attn: J. Michael Bernard).

16.     MLC further requests that the failure of any person or entity to timely file an objection to the Sale Motion shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion or the consummation of the Sale contemplated by the SPA.

### Procedures for Assumption and Assignment
### of the BMW Contract

17.     As stated, in connection with the sale of the Transferred Stock, MLC will assume and assign to the Company the BMW Contract, and the Purchaser has agreed,

11

subject to the terms of the SPA, to pay any related cure amounts pursuant to section

365(b)(1)(A) of the Bankruptcy Code (the "**Cure Amount**") related thereto.  MLC does

not believe that there is any Cure Amount outstanding under the BMW Contract.

However, BMW has been provided with notice of this Motion and has the opportunity to

file an objection, prior to the Objection Deadline, to (i) the Debtors' ability to assume and

assign the BMW Contract, and (ii) assert that a Cure Amount exists.

18.    If no objections are timely filed, then the Cure Amount shall be

binding upon BMW with respect to the BMW Contract for all purposes in these cases and

will constitute the final determination of the total Cure Amount required to be paid by the

Purchaser in connection with the assumption of the BMW Contract by MLC and

assignment to the Company.  In addition, if BMW fails to timely object to the proposed

assumption and assignment of the BMW Contract by the Objection Deadline, it shall be

forever barred from objecting to the assumption and assignment of the BMW Contract.

## The Sale Approval Order Should Be Entered

### *The Time, Place, and Notice Proposed for the Sale Hearing is Reasonable and Should be Approved*

19.    Bankruptcy Rule 6004 prescribes the notice that must be given of a

proposed sale of property pursuant to section 363(b) of the Bankruptcy Code.  Pursuant to

Bankruptcy Rule 6004(a), notice must be given of a proposed use, sale, or lease of

property, not in the ordinary course of business, which satisfies the requirements of

Bankruptcy Rule 2002(a)(2) and (c)(1), among others.

20.    Bankruptcy Rule 2002(a) requires that "the clerk, or some other

person as the court may direct," give "the debtor, the trustee, all creditors and indenture

trustees at least 21 days' notice by mail of: . . . (2) a proposed use, sale, or lease of property

of the estate other than in the ordinary course of business, unless the court for cause shown

shortens the time or directs another method of giving notice ." Fed. R. Bankr. P. 2002(a).

Bankruptcy Rule 2002(c) requires that this notice include "the time and place of any public

sale, the terms and conditions of any private sale and the time fixed for filing objections."

*Id*. at 2002(c).

      21.    Bankruptcy Rule 6004(c) requires that a motion pursuant to section

363(f) of the Bankruptcy Code for authority to sell property free and clear of liens or other

interests "shall be served on the parties who have liens or other interest in the property to

be sold." *Id*. at 6004(c).

      22.    As noted, MLC proposes that the Sale Hearing be held on

September 7, 2010. This will provide the notice parties with ample notice of the Sale

Hearing. In addition, the Debtors will serve this Motion on and provide notice of the Sale

Hearing to (i) all entities known by the Debtors to have asserted any lien, claim, interest, or

encumbrance in or on the Transferred Stock of the Company, (ii) all parties who were

contacted by Merrill Lynch during the Sale Process, (iii) counsel to BMW, (iv) counsel to

the Purchaser, and (v) parties in interest entitled to receive notice under the Third

Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007

Establishing Notice and Case Management Procedures, dated April 29, 2010 [Docket No.

5670].

      23.    MLC submits that these procedures satisfy the requirements of

Bankruptcy Rules 2002 and 6004 and should be approved, and that no other or further

notice need be given.

***The Sale of the Transferred Stock and Assumption and Assignment
of the BMW Contract Is an Exercise of MLC's Sound Business Judgment***

24.     Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of the debtor's estate. Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b).

25.     Under applicable case law, a transaction must represent a reasonable exercise of business judgment on the part of the debtor in possession to be approved under section 363(b) of the Bankruptcy Code. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

26.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *see also In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). "[T]he purpose behind allowing the assumption or rejection of executory contracts is to

permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.' " *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).  In determining whether to approve a debtor in possession's assumption of an executory contract, courts will similarly evaluate whether such an assumption represents a reasonable exercise of business judgment on the part of the debtor in possession.  *See Bildisco & Bildisco*, 465 U.S. at 523 (recognizing the "business judgment" standard used to approve the assumption or rejection of executory contracts and unexpired leases); *Nostas Assocs. v. Costich* (*In re Klein Sleep Products, Inc.*), 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment" standard used to approve the assumption and rejection of executory contracts).  The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract will benefit the debtor's estate.  *See In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 1996)

       27.     In addition, the Bankruptcy Code grants Bankruptcy Courts authority to "issue any order, process, or judgment that is necessary or appropriate" to ensure that bankruptcy cases are "handled expeditiously and economically."  11 U.S.C. §§ 105(a), (d)(2);  *see also Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009); *Adelphia Commc'ns Corp. v. The Am. Channel (In re Adelphia Comm'ns Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the [chapter 11] process.").

28.     The proposed sale of the Transferred Stock and assumption and assignment of the BMW Contract are well within MLC's sound business judgment. The SPA is the product of an extensive marketing campaign undertaken by MLC and good faith, arm's-length negotiations with the Purchaser, and constitutes the highest, best, and only viable offer for the Transferred Stock of the Company. As stated, no other prospective purchaser has come forward with an offer that can be effectively consummated. The Sale will preserve the ongoing operation of the Company and the employment of more than 1,200 people who currently work for the Company. The Sale will also further the administration of these estates and eliminate the substantial time and resources that MLC has had to devote to the Company and its disposition.

29.     As noted above, the BMW Contract generates a significant portion of the Company's annual revenue and therefore has been included as part of the Sale. Indeed, the assumption by MLC and assignment to the Company of the BMW Contract is a closing requirement under the SPA. Accordingly, MLC's assumption and assignment of the BMW Contract to the Company is necessary to effectuate the Sale and therefore represents a sound exercise of its business judgment.

30.     For the reasons set forth above, MLC's sale of the Transferred Stock of the Company and assumption and assignment of the BMW Contract to the Company pursuant to the SPA is within MLC's sound business judgment and warrants approval by the Court.

### *The Transferred Stock in the Company Should be Sold Free and Clear of Liens, Claims, Encumbrances, and Other Interests*

31.     The SPA requires that the Transferred Stock in the Company be transferred free and clear of all liens, claims, and encumbrances, except for certain

16

Permitted Liens.  MLC therefore seeks authority to sell the Property "free and clear"

pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code

provides:

> The trustee may sell property under subsection (b) or (c) of
> this section free and clear of any interest in such property of
> an entity other than the estate, only if –
>
> (1)    applicable non-bankruptcy law permits the sale of such
>        property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is
>        to be sold is greater than the aggregate value of all liens on
>        such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable
>        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.    MLC is not aware of any liens on the Transferred Stock.

Accordingly, MLC requests that the Court authorize the Sale free and clear of all liens

(except the Permitted Liens), claims, encumbrances, and other interests pursuant to section

363(f) of the Bankruptcy Code and, furthermore, bar, prohibit, and permanently enjoin all

persons holding any lien (except the Permitted Liens), claim, encumbrance, or other

interest in the Transferred Stock in the Company from asserting such lien, claim,

encumbrance, or other interest against the Purchaser, its successors or assigns, or their

property.

### *The Purchaser of the Property Should Be Afforded*
### *All Protections Under Section 363(m) as a Good Faith Purchaser*

33.    Section 363(m) of the Bankruptcy Code protects a good faith

purchaser's interest in property purchased from the debtor notwithstanding that the order

approving the sale conducted under section 363(b) is later reversed or modified on appeal.

Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("Section 363(m) … provides that good faith transfers of property will not be affected by

the reversal or modification on appeal of an unstayed order, whether or not the transferee

knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr.

S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected

from the reversal of a sale on appeal unless there is a stay pending appeal").

      34.      As set forth above, the SPA is the result of a comprehensive

marketing process and arm's-length, good faith negotiations between MLC and the

Purchaser.  The Purchaser was selected by MLC after extensive negotiations between the

parties, and MLC's determination that the SPA was the most favorable, and indeed the

only viable, offer for the Transferred Stock or with respect to the Company.

      35.      The Purchaser is not an "insider" of MLC, as that term is defined in

section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling

stockholders exists between the Purchaser and MLC.

      36.      Accordingly, MLC requests that the Court make a finding that the

Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the

Bankruptcy Code and that the Purchaser has not engaged in any conduct, by any action or

inaction, that constitutes a violation of, or would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

***The Court Should Waive***
***The Fourteen-Day Stay Period of Bankruptcy Rule 6004(h)***

37.    Pursuant to Bankruptcy Rule 6004(h), an order authorizing the sale of property is automatically stayed for fourteen days after entry of the order.  Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  *See* Fed. R. Bankr. P. 6004(h), Advisory Committee's Note.

38.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators suggest that the stay period be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th ed. rev. 2009).

39.    Because no party will be prejudiced by waiver of the stay period and the SPA contains a strict closing deadline of September 30, 2010, MLC respectfully requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h).

**Notice**

40.    Notice of this Motion has been provided to (i) all entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in or on the Transferred Stock of the Company, (ii) all parties who were contacted by Merrill Lynch during the Sale Process, (iii) counsel to BMW, (iv) counsel to the Purchaser, and (v) parties in interest entitled to receive notice under the Third Amended Order Pursuant to 11

U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case

Management Procedures, dated April 29, 2010 [Docket No. 5670].

41.    No previous request for the relief sought herein has been made by

the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated: New York, New York
        August 13, 2010

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**The Stock Purchase Agreement**

Execution Version

# STOCK PURCHASE AGREEMENT

dated as of

July 30, 2010

between

# GENERAL MOTORS AUTOMOTIVE HOLDINGS, S.L.

and

# MOTORS LIQUIDATION COMPANY

# TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINITIONS ........................................................................................... 2
    *Section 1.1    Definitions* ......................................................................................... 2
    *Section 1.2    Interpretation* .................................................................................. 10

ARTICLE II    PURCHASE AND SALE; CLOSING ..................................................... 11
    *Section 2.1    Purchase and Sale of Transferred Stock*.................................... 11
    *Section 2.2    Closing; Closing Date* .................................................................. 11
    *Section 2.3    Purchase Price* .............................................................................. 12
    *Section 2.4    Closing Deliveries.* ....................................................................... 12
    *Section 2.5    Cure Amounts* ............................................................................... 13
    *Section 2.6    Allocation.* ..................................................................................... 13

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF SELLER ..................... 13
    *Section 3.1    Organization; Subsidiaries and Investments.* ............................. 13
    *Section 3.2    Authorization of Transaction.* ...................................................... 14
    *Section 3.3    Noncontravention; Consents.* ....................................................... 14
    *Section 3.4    Company Financial Statements; Absence of Undisclosed Liabilities*........................ 15
    *Section 3.5    Capitalization* ............................................................................... 15
    *Section 3.6    Title to Transferred Stock* ............................................................ 15
    *Section 3.7    Absence of Certain Changes*........................................................ 16
    *Section 3.8    Title and Sufficiency of Assets* ................................................... 16
    *Section 3.9    Contracts.* ...................................................................................... 16
    *Section 3.10    Real Property.* ............................................................................. 17
    *Section 3.11    Permits*........................................................................................ 17
    *Section 3.12    Intellectual Property.* ................................................................. 18
    *Section 3.13    Legal Compliance.* ..................................................................... 18
    *Section 3.14    Litigation* .................................................................................... 18
    *Section 3.15    Employees and Employee Benefits.* ............................................ 19
    *Section 3.16    Environmental Matters* .............................................................. 19
    *Section 3.17    Tax Matters.*................................................................................ 20
    *Section 3.18    Customers and Suppliers* ........................................................... 21
    *Section 3.19    Debt* ............................................................................................. 21
    *Section 3.20    Product Liability* ........................................................................ 21
    *Section 3.21    Bank Accounts; Delegation of Powers.* ..................................... 21
    *Section 3.22    Brokers' Fees.* ............................................................................. 21
    *Section 3.23    LIMITATIONS ON REPRESENTATIONS AND WARRANTIES* ...... 21

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF THE BUYER................................. 22
    *Section 4.1    Organization*............................................................................... 22
    *Section 4.2    Authorization of Transaction.*..................................................... 22
    *Section 4.3    Noncontravention; Consents.* ...................................................... 22
    *Section 4.4    Litigation* ..................................................................................... 23
    *Section 4.5    Brokers' Fees*............................................................................... 23

i

ARTICLE V      COVENANTS .......................................................................................... 23
    Section 5.1      General .......................................................................................... 23
    Section 5.2      Agreements Regarding Tax Matters ........................................... 23
    Section 5.3      Court Approval of Conciliation Agreement ............................... 24
    Section 5.4      Environmental Matters .............................................................. 24
    Section 5.5      Interim Operations of the Company .......................................... 25
    Section 5.6      BMW Litigation .......................................................................... 25

ARTICLE VI     REMEDIES ............................................................................................. 25
    Section 6.1      Survival ....................................................................................... 25
    Section 6.2      Indemnification by Seller ........................................................... 26
    Section 6.3      Indemnification by Buyer ............................................................ 26
    Section 6.4      Procedures for Indemnification of Third Party Claims ............. 27
    Section 6.5      Certain Limitations ..................................................................... 28
    Section 6.6      Exclusive Remedy ....................................................................... 29
    Section 6.7      Mitigation ................................................................................... 29
    Section 6.8      Equitable Relief .......................................................................... 29
    Section 6.9      Tax Treatment of Indemnity Payment ....................................... 29

ARTICLE VII    CONDITIONS TO CLOSING ................................................................. 29
    Section 7.1      Conditions to Obligations of the Parties ................................... 29
    Section 7.2      Conditions to Obligations of the Buyer ..................................... 30
    Section 7.3      Conditions to Obligations of the Seller ..................................... 30

ARTICLE VIII   TERMINATION ....................................................................................... 30
    Section 8.1      Termination ................................................................................. 30
    Section 8.2      Effect of Termination .................................................................. 31

ARTICLE IX     MISCELLANEOUS ................................................................................. 31
    Section 9.1      Notices ......................................................................................... 31
    Section 9.2      Expenses; No Offset ................................................................... 32
    Section 9.3      Seller Disclosure Schedules ....................................................... 33
    Section 9.4      Assignment; Successors and Assigns .......................................... 33
    Section 9.5      Amendment; Waiver .................................................................... 33
    Section 9.6      Severability .................................................................................. 33
    Section 9.7      Counterparts ............................................................................... 34
    Section 9.8      No Third-Party Beneficiaries ...................................................... 34
    Section 9.9      Governing Law ............................................................................ 34
    Section 9.10     Forum Selection; Consent to Service of Process; Waiver of Jury Trial .... 34
    Section 9.11     Entire Agreement ........................................................................ 34
    Section 9.12     Confidentiality; Public Announcement ....................................... 34
    Section 9.13     Relationship of the Parties .......................................................... 35
    Section 9.14     Governing Language ................................................................... 35

ii

## SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Seller's Knowledge |
| Schedule 3.1 | Organization; Subsidiaries and Investments |
| Schedule 3.4(a) | Company Financial Statements |
| Schedule 3.5 | Capitalization |
| Schedule 3.9(a) | Material Contracts |
| Schedule 3.10(a) | Owned Real Property |
| Schedule 3.10(b) | Leased Real Property |
| Schedule 3.11(a) | Permits |
| Schedule 3.11(b) | Permits |
| Schedule 3.12(b) | Certain Company Intellectual Property |
| Schedule 3.12(e) | Intellectual Property Licenses |
| Schedule 3.14 | Litigation |
| Schedule 3.15(a)(i) | Collective Bargaining Agreements |
| Schedule 3.15(a)(ii) | Strikes, Work Stoppages or Material Labor Disputes |
| Schedule 3.15(d) | Matters Relating to Covered Employees |
| Schedule 3.16 | Environmental Matters |
| Schedule 3.18 | Customers and Suppliers |
| Schedule 3.19 | Debt |
| Schedule 3.21 | Bank Accounts and Delegations of Power |
| Schedule 5.2(d) | Tax Settlements |
| Schedule 5.5 | Interim Operations of the Company |

AA01\249952.10
ID\UA - 106010/0001

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of July 30, 2010, is made between among GENERAL MOTORS AUTOMOTIVE HOLDINGS, S.L., a corporation incorporated under the laws of Spain (the "Buyer"), and MOTORS LIQUIDATION COMPANY, a Delaware corporation formerly known as General Motors Corporation (the "Seller").

### Recitals

A.    The Buyer is an indirect wholly-owned subsidiary of General Motors Company, a Delaware corporation (the "GM Parent").

B.    The Seller is operating under the jurisdiction of the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court"), in a matter captioned *In Re Motors Liquidation Company, et al., f/k/a General Motors Corp., et al* (Case No. 09-50026 (REG)) (the "Bankruptcy Case").

C.    Seller is the sole stockholder of all of the issued and outstanding shares of common stock (the "Transferred Stock") of General Motors Strasbourg S.A.S, a French *société par actions simplifiée* with a share capital of 28 000 000 Euros, having its registered office at 81, rue de la Rochelle, Strasbourg 67026 cedex, and registered with the Registry of Commerce under number 542 094 750 RCS STRASBOURG (the "Company").

D.    The Company is engaged in the business of developing and manufacturing Automatic Transmissions for luxury and performance light automotive vehicles (the "Business").

E.    Promptly following the execution of this Agreement, the Seller will file a motion with the Bankruptcy Court seeking approval of this Agreement and the consummation of the Transactions.

F.    The local works council representing the Covered Employees of the Company (the "Works Council") has issued an opinion relative to the consummation of the Transactions in accordance with applicable Laws.

G.    The Parties have received evidence of the required Governmental Approval with respect to the applicable antitrust or competition Laws in Germany.

H.    The Seller, the Buyer and the Company are simultaneously executing and delivering the conciliation agreement, dated even date herewith, among the Seller, the Buyer and the Company with respect to the Transactions evidencing the transformation of the *mandataire ad hoc* proceeding, previously initiated by the Court of First Instance (*Tribunal de grande instance*) of Strasbourg in its decision dated 11 February 2010, into a conciliation proceeding (the "Conciliation Agreement").

1

I.     The Seller desires to sell to Buyer, and Buyer desires to purchase from the Seller, all of the Transferred Stock on the terms and subject to the conditions of this Agreement.

Agreements

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

*Section 1.1     Definitions.*  For purposes of this Agreement, the following terms have the meanings set forth below:

"Action" means any claim, charge, grievance, suit, inquiry, proceeding or investigation by or before any Governmental Entity or any arbitrator with legal and binding authority over such matter.

"Affiliates" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Agreed Accounting Conventions" means French GAAP applied on a basis consistent with the past practices of the Company.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.6.

"Ancillary Documents" means each agreement or document executed by the Parties pursuant to this Agreement and each certificate and other document to be delivered by the Parties pursuant to the terms hereof.

"Article" means, except as otherwise expressly indicated herein, an article of this Agreement.

"Automatic Transmission" means an electro/mechanical/hydraulic mechanism that transmits torque from the prime mover in a vehicle or off-road vehicle to propel the vehicle without power interruption to the drive wheels during shifting between gear ranges and that changes gear ranges automatically without any vehicle operator input required beyond depressing the accelerator pedal, and specifically excludes automatic manual transmissions.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Court Order" means an order of the Bankruptcy Court approving the Transactions (including the assignment of the BMW Contract from the Seller to the Company at

2

the Closing and, if so required by Section 2.4(a)(vi)(B), the assignment of the BMW Litigation to the Buyer or its designated Affiliate), which order shall be in full force and effect and not subject to any stay.

"Basket" has the meaning set forth in Section 6.2(b).

"Benefit Plans" means (i) all collective employee benefits, including any non mandatory, supplementary employee pension benefit plans *(plans de retraite sur-complémentaire)*, and (ii) any material individual employee benefits, including any bonus, incentive, compensation, vacation, severance, employment or supplementary pension benefit plan, program or agreement, provided that, for each of clauses (i) and (ii), such individual employee benefit exceeds €10,000 in total when due or per year, and such benefit would not result from or be pursuant to any Collective Bargaining Agreements or requirements of Law, in each case that are sponsored, maintained or contributed to by the Company for the benefit of current or former employees of the Company.

"BMW Contract" means the 6L45 Development and Delivery Agreement, dated May 6, 2004, as amended, between Bayerische Motoren Werke Aktiengesellschaft and the Seller.

"BMW Cure Amounts" has the meaning set forth in Section 2.5.

"BMW Litigation" means the Seller's Action against Bayerische Motoren Werke Aktiengesellschaft in relation to the BMW Contract (Adversary No. 10-5006) in the Bankruptcy Court.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in (i) New York City, New York, (ii) Paris, France, or (iii) Strasbourg, France.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Claims" has the meaning set forth in Section 6.2(a).

"Buyer Indemnified Party" has the meaning set forth in Section 6.2(a).

"Buyer Material Adverse Effect" has the meaning set forth in Section 4.1.

"Buyer Service Agent" has the meaning set forth in Section 9.10.

"Cap" has the meaning set forth in Section 6.2(b).

"Claim" means any administrative, regulatory, or judicial (including criminal or civil) action, proceedings, litigation, suit, petition, complaint, appeal, demand, notice, notice of noncompliance or violation, information request, investigation, proceeding, Governmental Order, mediation, or other legal proceedings of any nature commenced, served or expressly threatened in writing by any Governmental Entity or any other third party.

3

"Closing" has the meaning set forth in Section 2.2.

"Closing Date" has the meaning set forth in Section 2.2.

"Collective Bargaining Agreements" means the national-branch collective bargaining agreements *(conventions collectives nationales de branche)*, group-level, company or site-level agreements *(conventions ou accords collectifs nationaux, de groupe, d'entreprise ou d'établissement)*, including any agreements with the personnel representatives (including non-accredited representatives) applicable to the Covered Employees *(accords atypiques au niveau de l'entreprise ou au niveau européen)*.

"Company Financial Statements" has the meaning set forth in Section 3.4(a).

"Company Intellectual Property" means any Intellectual Property created or obtained by the Company since July 10, 2009.

"Conciliation Agreement" has the meaning set forth in the Recitals.

"Confidentiality Agreement" means that certain confidentiality agreement dated May 26, 2010, between General Motors LLC and the Seller.

"Contracts" means any contracts, agreements, arrangements, leases, licenses, obligations, commitments and undertakings that are binding, or purport to be binding by their terms, on the parties thereto, and any outstanding bids or proposals (which bids or proposals if accepted by the recipient thereof would result in a binding contract), in each case, whether written or oral, express or implied.

"Copyrights" means copyright registrations and applications.

"Covered Employee" means the Company's employees.

"Debt" means, with respect to the Company, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of the Company (a) for borrowed money (including overdraft facilities), (b) evidenced by notes, bonds, debentures or similar Contracts, (c) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the ordinary course of business), (d) under capital leases (in accordance with French GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for Contracts relating to interest rate protection, swap agreements and collar agreements and (g) in the nature of guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Dollars" and the sign "$" each means lawful money of the United States of America.

"Environment" means the following media (whether individually or commingled): air (ambient air and indoor air), water, surface water, groundwater (whether an aquifer or water below the surface of the ground), ground, soils, subsurface soils and ground, and all organisms, ecosystems, flora, and natural resources.

4

"Environmental Laws" means any Laws and Governmental Orders applicable to the conduct and the operation of the Business and relating to: (i) pollution of the Environment, (ii) the protection of the Environment, (iii) regulating or governing the use, storage, treatment, generation, transportation, processing, handling, removal, management, release, spilling, discharge, cleanup, remediation, or disposal of any Hazardous Materials, or (iv) protection of human health from environmental hazards, excluding workplace health and safety laws. Without limiting the generality of the foregoing, the term shall encompass the French Environmental Code and the regulations promulgated thereunder, as amended.

"Environmental Liabilities" means all Liabilities of the Seller relating to compliance with Environmental Laws or releases of Hazardous Materials, including Liabilities of the Company arising under Environmental Laws, contracts, common law, civil law, or equity, and including, without limitation, any obligations under Law related to asset retirement.

"Environmental Permits" means any licenses, permits, authorizations (*autorisation* or *déclaration*), easements, variances, exemptions, or approvals issued by any Governmental Entity and required to be obtained or possessed by the Company under applicable Environmental Laws.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, whether located at a Real Property or in the possession of Seller, relating to: (i) the use, storage, treatment, generation, transportation, processing, handling, removal, management, release, spilling, discharge, cleanup, remediation, or disposal of any Hazardous Materials in, on, about, or under the Real Property, whether historic, during Seller's ownership and operation, or during the Company's use of or operations at any part of the Real Property; (ii) the environmental condition of the Real Property; (iii) compliance with Environmental Laws by Seller or the Company in relation to the Real Property; and (iv) any decommissioning or wind down activities by Seller or the Company in relation to the Real Property.

"Euros" and the sign "€" each means lawful currency used by certain members of the European Union and several other countries.

"Exhibit" means an exhibit to this Agreement that is attached hereto in accordance with the terms hereof.

"France" means the country of France, including its territories and possessions.

"French GAAP" means generally accepted accounting principles, as in effect in France as of the date of this Agreement.

"French Environmental Code" means any Law codified in the Environmental Code applicable in France (*Code de l'environnement*).

5

"Germany" means the Federal Republic of Germany, including its territories and possessions.

"GM Parent" has the meaning set forth in the Recitals.

"Governmental Approvals" means all approvals or consents from Governmental Entities required to consummate the Transactions.

"Governmental Entity" means any supranational, national, federal, state, provincial, country, municipal or local government, foreign or domestic, or the government of any political subdivision of any of the foregoing, or any entity, authority, agency, ministry or other similar body exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including any authority or other quasi-governmental entity established by a Governmental Entity to perform any of such functions, including the Mandataire and any supranational organization of sovereign states exercising such functions for such sovereign states such as the European Union.

"Governmental Order" means any judgment, order (including any consent order), writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Entity and binding on the Company or affecting the Business.

"Hazardous Materials" means any element, mixture, chemical, hazardous substance, hazardous constituent, waste, hazardous waste, toxic substance, pollutant, contaminant, or material including petroleum or petroleum-based or petroleum-derived substances, polychlorinated biphenyls, asbestos-containing materials, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous), which are regulated under or can give rise to Environmental Liability under an Environmental Law or under an Environmental Permit.

"Income Taxes" means any income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth or gross receipts taxes, including any estimated tax, interest, penalties or additions to tax or additional amounts in respect of the foregoing, and any transferee or secondary liability for any such tax, and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or of being included or required to be included in any Tax Return relating thereto.

"Indemnification Claims" has the meaning set forth in Section 6.3(a).

"Indemnification Expiration Date" means the later to occur of (i) December 31, 2010, and (ii) the effective date of a Chapter 11 plan in the Bankruptcy Case.

"Indemnified Party" has the meaning set forth in Section 6.4(a).

"Indemnifying Party" has the meaning set forth in Section 6.4(a).

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world:  (i) Patents; (ii) Marks; (iii) Copyrights; and (iv) Technology.

6

"Law" means any applicable international, European Union, federal, provincial, state or local binding treaty, statute, common law, rule, directive, regulation, decision, ordinance, permit, order, writ, injunction, circular, guidelines, judgment or, decree or ministerial orders (*arrêtés*) of any Governmental Entity.

"Leased Real Property" has the meaning set forth in Section 3.10(b).

"Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet or otherwise, or due or to become due, including, but not limited to, those arising under or in connection with any Environmental Law.

"Lien" means any pledge, security interest, encumbrance or lien.

"Losses" means any claims, causes of action, liabilities, losses, grievances, damages, penalties, fines, amounts paid in settlement, costs and expenses (including reasonable and documented attorneys' fees and disbursements).

"Mandataire" means the mediator (*mandataire ad hoc*) or conciliator, as the case may be, appointed by the Court of First Instance (*Tribunal de grande instance*) of Strasbourg in its decision dated 11 February 2010, such being Maître Claude-Maxime Weil.

"Marks" means any and all trademarks, service marks, certification marks, trade names, corporate names, domain names, logos, trade dress, or other indicia of source or origin, and all registrations of and applications to register the foregoing, in each case in any jurisdiction throughout the world.

"Material Adverse Effect" means a material adverse effect on the business, results of operations or financial condition of the Company, provided, however, that the term "Material Adverse Effect" does not, and shall not be deemed to, include any of the following: (i) changes or effects that generally affect the industry or industries in which the Company operates; (ii) changes in securities markets, interest rates or general economic, regulatory or political conditions, including acts of terrorism or the commencement or escalation of any war, whether declared or undeclared, or other hostilities; (iii) changes or effects arising out of, or attributable to, the announcement of the execution of this Agreement or the identity of the Buyer; (iv) changes or effects due to changes (or proposed or prospective changes) in any Laws affecting the Company; (v) changes in applicable accounting regulations and principles or the interpretation thereof; (vi) the failure of the Company to meet any internal projections or forecasts; (vii) the fact that the Bankruptcy Case exists or any change or effect arising directly from any decision or order of the Bankruptcy Court in the Bankruptcy Case; (viii) the fact that the Mandataire was appointed or any change or effect arising directly from any action taken by the Mandataire; (ix) any changes or effects relating to the relationship between GM Parent (and its Affiliates) and/or the Company, on the one hand, and BMW, on the other hand, arising from the filing of the BMW Litigation; (x) any changes or effects relating to the Company's existing relationship with GM Parent or Shanghai GM (A) that result solely from the taking of any action by GM Parent or Shanghai GM, as the case may be, (B) with respect to the existing loan between

7

GM Parent and the Company or any default thereunder, or (C) with respect to intellectual property or the supply of products; or (xi) any changes or effects arising out of, or attributable to, matters in existence prior to July 10, 2009, except to the extent that the magnitude of such change or effect was directly increased by an act or omission of the Company since July 10, 2009 and except to the extent that the Seller obtained Knowledge since July 10, 2009 of facts and circumstances which occurred prior to July 10, 2009 but that manifested themselves for the first time only after July 10, 2009.

"Material Contracts" has the meaning set forth in Section 3.9(a) and includes, for the avoidance of doubt, the BMW Contract.

"Merrill Lynch" means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"Merrill Lynch Contract" means the letter agreement, dated November 11, 2009, between Merrill Lynch and the Company to act as exclusive financial advisor in connection with a potential transaction, such as the Transactions contemplated herein.

"Offset Amount" has the meaning set forth in Section 6.5(c).

"Owned Real Property" has the meaning set forth in Section 3.10(a).

"Parties" means the Seller and the Buyer together, and "Party" means any of the Seller, on the one hand, or the Buyer, on the other hand, as appropriate and as the case may be.

"Patents" means any and all patents, patent applications, inventions, invention disclosures and statutory invention registrations.

"Permits" has the meaning set forth in Section 3.11.

"Permitted Liens" means any: (i) mechanics', materialmens' and similar Liens imposed by Law with respect to amounts not yet due and payable or the validity of which is being contested in good faith; (ii) Liens for Taxes or Income Taxes not yet due and payable or the validity of which is being contested in good faith; (iii) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (iv) easements, rights-of-way, restrictive covenants and servitudes and other similar rights and any subdivision, development, servicing, site plan or other similar agreement; (v) Liens encumbering any of the Real Property that do not materially interfere with the present use thereof by the Company, including any matters or exceptions that would be disclosed by a current title commitment and/or current surveys of the applicable Real Property; (vi) Liens encumbering any of the Company's assets that do not materially interfere with their present use; (vii) such other encumbrances or imperfections in or failure of title that would not have a Material Adverse Effect; (viii) any Liens in favor of Buyer or any of its Affiliates; and (ix) right of first refusal of the Strasbourg Port in relation to the Owned Real Property pursuant to the terms of the Sale Agreement, dated April 5, 1967, between the Company and Strasbourg Port.

AA01\249952.10
ID\UA - 106010/0001

"Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Entity.

"Purchase Price" has the meaning set forth in Section 2.3.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Recent Balance Sheet" has the meaning set forth in Section 3.4(a).

"Schedule" means a schedule to this Agreement (including each of the Seller Disclosure Schedules), all of which Schedules are incorporated herein by reference.

"Section" means, except as otherwise expressly indicated herein, a section of this Agreement.

"Seller" has the meaning set forth in the Preamble.

"Seller Claims" has the meaning set forth in Section 6.3(a).

"Seller Disclosure Schedules" means the Schedules pertaining to, and corresponding to the Section references of, Article III of this Agreement, initialed by the Parties hereto, as updated and supplemented in accordance herewith.

"Seller Indemnified Parties" has the meaning set forth in Section 6.3(a).

"Seller Liquidation Date" means the final liquidation of the Seller acting under the jurisdiction and authority of the Bankruptcy Court.

"Seller's Knowledge" means the actual knowledge of the individuals listed on Schedule 1.1, as to the matters represented, as of the date the representation is made.

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than 50 percent of the stock or other equity interests the holder of which is generally entitled to vote for the election of the board of directors or other governing body of such corporation, partnership or other legal entity.

"Tax" or "Taxes" means a tax or taxes of any kind or nature, or however denominated, including any federal, provincial, state, local or foreign sales, use, transfer, registration, business and occupation, value added, excise, severance, stamp, premium, windfall profit, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee tax or other withholding, including any estimated tax, interest, penalties or additions to tax or additional amounts in respect of the foregoing, including any transferee or secondary liability for any such tax, and any tax liability assumed by Contract or arising as a result of being or ceasing to be a member of any affiliated group, or of being

9

included or required to be included in any Tax Return relating thereto; provided, however, that "Tax" or "Taxes" shall not include any Income Taxes, except that, for purposes of Section 5.2, "Tax" and "Taxes" shall include any gross receipts tax imposed by reason of the sale, assignment, transfer and delivery of the Transferred Stock.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Tax Returns" means, with respect to any Tax or Income Tax, any information return for such Tax or Income Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Tax or Income Tax including any schedule or attachment thereto or amendment thereof.

"Technology" means unpatented technology, trade secrets, know-how and other confidential and proprietary information including, but not limited to, financial, business, scientific, technical, economic, materials, manufacturing or engineering information, including data, patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

"Third Party Claim" has the meaning set forth in Section 6.4(a).

"Transactions" means the transactions contemplated by this Agreement and all the Ancillary Documents.

"Transaction Documents" means collectively this Agreement, the Ancillary Documents and all other agreements and instruments executed and delivered or to be executed and delivered by Seller and caused by Seller to be delivered and executed by certain of its Affiliates and the Buyer or its Affiliates or the Company in connection therewith.

"Transferred Stock" has the meaning set forth in the Recitals.

"United States" or "U.S." means the United States of America, including its territories and possessions.

"Works Council" has the meaning set forth in the Recitals.

Section 1.2    Interpretation.    In this Agreement, except to the extent that the context otherwise requires:

(a)    when a reference is made to an Article, Section, Exhibit, or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

10

(c)    whenever the words "include," "includes," or "including" are used in this Agreement, they are deemed to be followed by the words "but not limited to";

(d)    the words "hereof," "herein," "hereunder," and words of similar import, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    a reference to the singular includes the plural and *vice versa*, and a gender includes the other genders;

(g)    references to a Person are also to its permitted successors and assigns;

(h)    no rule of construction applies to the disadvantage of the Party preparing the Agreement on the basis that it put forward the Agreement or any part of it;

(i)    any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified, or supplemented, including by a succession of comparable successor Laws;

(j)    any reference to "writing" or similar terms includes a reference to a cable, facsimile transmission, e-mail, or other comparable means of communication  that is capable of being printed by the recipient;

(k)    the use of the word "or" is not intended to be exclusive unless expressly indicated otherwise; and

(l)    any Exhibits and Schedules to this Agreement are incorporated into and form an integral part of this Agreement.  If an Exhibit or Schedule is a form of agreement, such agreement, when executed and delivered by the parties thereto, constitutes a document independent of this Agreement.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

Section 2.1    *Purchase and Sale of Transferred Stock.*  On the terms and subject to the conditions set forth in this Agreement, at the Closing:

(a)    the Seller shall sell, assign and transfer or cause to be sold, assigned and transferred to the Buyer all of the Transferred Stock, free and clear of all Liens of any kind, other than Permitted Liens; and

(b)    the Buyer shall purchase and acquire the Transferred Stock and shall pay and deliver the Purchase Price to the Seller.

Section 2.2    *Closing; Closing Date.*  The closing of the Transactions (the "Closing") shall occur at the offices of GM Parent, 300 Renaissance Center, 37th Floor, Detroit,

11

Michigan, commencing at 10:00 a.m., local time, on August 31, 2010 or, if any of the conditions set forth in ARTICLE VII is not satisfied by such date, then on the third (3rd) Business Day after the satisfaction of such condition(s), or at such other location, time or date or in such other manner as may be mutually agreed upon between the Buyer and the Seller, with such date referred to in this Agreement as the "Closing Date". Except as otherwise expressly provided in this Agreement, the Closing shall for all purposes be deemed effective as of 11:59 p.m., Strasbourg, France time, on the Closing Date.

Section 2.3    Purchase Price.    On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer shall pay to the Seller an aggregate amount equal to one (1) Euro (€1.00) (the "Purchase Price") in cash by delivery of a regular company check, by wire transfer of immediately available funds to the account designated in writing by the Seller or in such other manner mutually agreed upon by the Parties.

Section 2.4    Closing Deliveries.

(a)    At the Closing the Seller shall deliver the following to the Buyer:

(i)    certified copies of the resolutions of the competent corporate body of the Seller authorizing and approving the Transactions;

(ii)    duly executed stock transfer forms (ordre(s) de mouvement de titres) in respect of the Transferred Stock duly executed by the Seller in favor of the Buyer;

(iii)    the up-to-date share transfer register and the up-to-date shareholders' accounts of the Company showing the transfer of the Transferred Stock;

(iv)    the tax transfer forms No. 2759 in respect of the transfer by the Seller to the Buyer of the Transferred Stock, duly signed by the Seller;

(v)    minutes for all shareholder meetings and the shareholders' register of the Company reflecting actions that have taken place after July 9, 2010;

(vi)    (A) if there are no BMW Cure Amounts, then evidence of the termination of the BMW Litigation, without prejudice, with such termination to be effective as of the Closing Date; or (B) if there are BMW Cure Amounts, then the assignment of the Seller's rights in the BMW Litigation to the Buyer or its designated Affiliate, with such assignment to be effective as of the Closing Date; and

(vii)    the assignment of the BMW Contract from the Seller to the Company (it being understood and agreed that the Bankruptcy Court Order authorizing and approving, among other things, the assignment of the BMW Contract from the Seller to the Company shall be sufficient to satisfy this deliverable).

(b)    At the Closing the Buyer shall deliver the following to the Seller:

12

(i)    certified copies of the resolutions of the competent corporate body of Buyer authorizing and approving the Transactions;

(ii)    the tax transfer forms No. 2759 in respect of the transfer by Seller to Buyer of the Transferred Stock, duly signed by Buyer; and

(iii)    evidence of the Company making payment of $2,115,191.50 to Merrill Lynch as payment in full under the Merrill Lynch Contract.

Section 2.5    *Cure Amounts*.  At Closing, the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have results from such defaults, if any, under the BMW Contract, shall be paid by Buyer (the "BMW Cure Amounts").

Section 2.6    *Allocation*.  The parties hereto acknowledge that the Company is a disregarded entity for U.S. federal income tax purposes.  Therefore, following the Closing, Buyer shall prepare and deliver to the Seller a proposed allocation of the Purchase Price and other consideration paid or deemed paid in exchange for the Transferred Stock, prepared in accordance with Section 1060 of the Tax Code (the "Allocation").  The Seller shall have thirty (30) days after the delivery of the Allocation to review and consent to the Allocation in writing, which consent shall not be unreasonably withheld, conditioned or delayed.  If the Seller consents to the Allocation, the Seller and Buyer shall use such Allocation to prepare and file in a timely manner all appropriate Tax or Income Tax filings, including the preparation and filing of all applicable forms in accordance with applicable Law, including Form 8594, with their respective Tax Returns for the taxable year that includes the Closing Date and shall take no position in any Tax Return that is inconsistent with such Allocation; provided, however, that nothing contained herein shall prevent the Seller and Buyer from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such Allocation, and neither the Seller nor Buyer shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Allocation.  If the Seller does not consent to such Allocation, the Seller shall notify Buyer in writing of such disagreement within such thirty (30) day period, and thereafter, the Seller and Buyer shall attempt in good faith to promptly resolve any such disagreement.  The Seller shall provide Buyer, and Buyer shall provide the Seller, with a copy of any information described above required to be furnished to any Governmental Entity in connection with the Transactions.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in, and in all cases subject to, the Seller Disclosure Schedules, the Seller represents and warrants to the Buyer as follows:

Section 3.1    *Organization; Subsidiaries and Investments*.

(a)    Except as disclosed in Schedule 3.1, to the Seller's Knowledge, the Company is validly existing and in good standing under the Laws of France.  The Company has not expanded or changed the Business such that the identity of the jurisdictions in which the

13

character of the properties owned or leased by it has changed since July 10, 2009. Except as disclosed in Schedule 3.1, the Company has all requisite corporate or other organizational power and authority to carry on its business as currently conducted and to own, lease or use, as the case may be, its properties and assets. The Company has not been dissolved nor is in the process of being dissolved. To Seller's Knowledge, no request for the invalidity or the dissolution of the Company, or any equivalent procedure, has been notified in writing to the Seller. To Seller's Knowledge and except for the appointment of the Mandataire, no insolvency proceedings have been opened over the assets of the Company.

(b)    Except as disclosed in Item 4 of Schedule 3.1, the Company does not beneficially own, directly or indirectly, any outstanding voting stock, membership interests, partnership interests or equity of any other corporation, limited liability company, partnership or other entity, nor is the Company a party to or involved with any partnership, joint venture, limited liability company or other entity in which the Company, directly or indirectly, has, or pursuant to any agreement has or will have the right to acquire by any means, an interest or investment representing an equity, profit or voting interest entitling the Company or any Subsidiary of the Company to vote for or appoint the management of such entity.

(c)    Since July 10, 2009, neither the Seller nor the Company has elected or appointed any new directors or officers of the Company as stated in the company register (*Kbis*).

Section 3.2    *Authorization of Transaction*.    The Seller has all requisite corporate or other organizational power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Documents and to consummate the Transactions. This Agreement constitutes, and each Ancillary Document when executed and delivered by the Seller, shall constitute, a valid and legally binding obligation of the Seller (assuming that this Agreement and such Ancillary Documents constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with its terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

Section 3.3    *Noncontravention; Consents*.

(a)    The execution and delivery by the Seller of this Agreement and the Ancillary Documents to which its is a party, and the consummation by the Seller of the Transactions, do not: (i) violate any Law to which the Seller or the Company is subject; (ii) conflict with or result in a breach of any provision of the certificates of incorporation, bylaws or other organizational documents of the Seller or the Company; (iii) create a breach, default, termination, cancellation or acceleration of any obligation of the Company under any Material Contracts; or (iv) result in the creation or imposition of any Lien, other than any Permitted Liens, upon any property or assets of the Company, except for any of the foregoing in the case of clauses (i) and (iii) that would not have a Material Adverse Effect.

(b)    No further notices, Permits, consents, approvals, authorizations, qualifications or orders of the Bankruptcy Court or other Governmental Entities are required for

14

the consummation by the Seller of the Transactions, other than such of the foregoing that, if not given or obtained, would not have a Material Adverse Effect or have a material adverse effect upon the ability of the Seller to consummate the Transactions and discharge its obligations under this Agreement and the Ancillary Documents.

Section 3.4    *Company    Financial    Statements;    Absence    of    Undisclosed Liabilities.*

(a)    Set forth on Schedule 3.4(a) is a copy of (i) the audited financial statements of the Company as of and for the year ended December 31, 2009, and (ii) an unaudited balance sheet of the Company as of June 30, 2010 (the "Recent Balance Sheet") and the related unaudited statement of operations for the six (6) month period then ended (collectively, the foregoing, the "Company Financial Statements").    The Company Financial Statements were prepared in accordance with the Agreed Accounting Conventions and present fairly in all material respects the financial condition and the results of operations of the Company as of the date and for the periods indicated therein.    The Company Financial Statements have been derived from the books and records regularly maintained by management of the Company used to prepare financial statements of the Company.    The unaudited Company Financial Statements are subject to normal year-end adjustments (including Tax, Income Tax adjustments, pricing adjustments or corporate costs recharges with GM Parent, its Affiliates or Shanghai GM, or pricing adjustments in relation to the BMW Contract) and do not include footnotes and other presentation items.

(b)    The Company does not have any liabilities or obligations of any nature that would be required to be stated on a balance sheet prepared in accordance with the Agreed Accounting Conventions, whether absolute, accrued, contingent or otherwise, other than liabilities and obligations (i) that are disclosed, reflected or reserved against on the Recent Balance Sheet, (ii) incurred in the ordinary course of business since the date of the Recent Balance Sheet, (iii) disclosed in or contemplated by this Agreement, the Seller Disclosure Schedules or any Ancillary Document, (iv) that are executory in nature and incurred under Contracts entered into by the Company in the ordinary course of business (but excluding liabilities and obligations that result from, arise out of, or relate to any breach or violation thereof, or default thereunder), or (v) that would not have a Material Adverse Effect.

Section 3.5    *Capitalization.*  Assuming that the Seller was the sole stockholder of all of the issued and outstanding shares of capital stock of the Company as of July 10, 2009, (a) the Transferred Stock constitutes, at Closing, all of the issued and outstanding capital stock of the Company, and (b) Schedule 3.5 sets forth (i) all of the authorized capital stock of the Company, (ii) all issued and outstanding shares of such capital stock and (iii) all holders of all such shares of capital stock.

Section 3.6    *Title to Transferred Stock.*  Since July 10, 2009, (i) Seller has not (x) transferred, sold or otherwise disposed of any of its interests in the Transferred Stock, (y) granted any Liens on the Transferred Stock, or (z) entered into any agreements that limit or restrict its ability and right to transfer the Transferred Stock to Buyer pursuant to this Agreement, and (ii) the Company has not issued any shares of its capital stock, any securities convertible into

15

or exchangeable for shares of its capital stock or any option, right or warrant to purchase or subscribe for any such shares.

Section 3.7    *Absence of Certain Changes.*  Between July 1, 2010 and the date of this Agreement, (a) there has not been any change in the financial position, operations or results of operations of the Company, other than any such changes that occurred in the ordinary course of business or that would not have a Material Adverse Effect, and (b) the Company has conducted its operations in the ordinary course of business, except with respect to matters that would not have a Material Adverse Effect.

Section 3.8    *Title and Sufficiency of Assets.*  Assuming that, to the extent assets reflected in the Recent Balance Sheet associated with 6-speed transmission production were acquired prior to July 10, 2009, the Company had, as of July 10, 2009, good title to, a valid leasehold interest in, or other legal rights to possess or use such assets associated with 6-speed transmission production, then, as of the Closing, the Company has good title to, a valid leasehold interest in, or other legal rights to possess or use all of the material tangible personal property reflected in the Recent Balance Sheet associated with 6-speed transmission production, free and clear of all Liens, except for Permitted Liens.  Since July 10, 2009, the Company has not sold or otherwise disposed of any of the material tangible assets with respect to the manufacturing or remanufacturing of 6-speed transmissions necessary to conduct the ongoing business of the Company.

Section 3.9    *Contracts.*

(a)    Schedule 3.9(a) lists all of the purchasing Contracts entered into on or after July 10, 2009 by the Company which (i) are the top twenty-one Contracts of the Company based on annual spend from the Company to third parties (not including GM Parent or its Affiliates), (ii) were not entered into through the purchasing department of GM Parent or its Affiliates, and (iii) continue in effect after the Closing Date (collectively, the "Material Contracts").  Except as prohibited by Law, by the terms of such Material Contract or under any confidentiality agreement, the Seller has made available to the Buyer a correct and complete copy or summary of each Material Contract.

(b)    Each Material Contract is a valid, binding and enforceable obligation of the Company and the Seller, as the case may be, and, to the Seller's Knowledge, of the other party or parties thereto, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing, and to the Seller's Knowledge, each Material Contract is in full force and effect.

(c)    Neither the Company nor, to the Seller's Knowledge, any other party thereto is in breach of or default under any term of any Material Contract or has repudiated any term of any Material Contract, except for such breaches, defaults or repudiations that would not have a Material Adverse Effect.

16

(d)     The Company has not received any written notice of termination, cancellation or non-renewal that is currently in effect with respect to any Material Contract.

(e)     To the Seller's Knowledge, there has been no breach of the BMW Contract which first occurred after July 10, 2009 that would require the payment of any cure amounts upon the assignment of the BMW Contract from the Seller to the Company.

(f)     The Bankruptcy Court Order authorizing and approving, among other things, the assignment of the BMW Contract from the Seller to the Company shall effect a valid and binding assignment of the BMW Contract; provided, however, that this representation shall not be deemed to address the enforcement or the non-enforcement of any such Bankruptcy Court Order by a court of foreign jurisdiction.

*Section 3.10    Real Property.*

(a)     Except as set forth on Schedule 3.10(a), as of Closing, (i) the Company owns fee simple title to the real property set forth on Schedule 3.10(a) (including all buildings, structures and improvements thereon and appurtenances thereto, the "Owned Real Property"), free and clear of any Lien, except for Permitted Liens; (ii) no third party has been granted since July 10, 2009 any option or right of first refusal to acquire the Owned Real Property; and (iii) there are no Persons (other than the Company, Buyer or their respective Affiliates) in possession of the Owned Real Property.

(b)     As of Closing, the Company leases the real property set forth on Schedule 3.10(b) (the "Leased Real Property"). As to each respective lease underlying the Leased Real Property: (i) such lease constitutes the entire agreement to which the Company is a party with respect to the Leased Real Property leased thereunder; (ii) the Company has not assigned, sublet, transferred or conveyed any interest in the leasehold since July 10, 2009; and (iii) the Company is not in receipt from and after July 10, 2009 of any written notice of default with respect to such lease.

(c)     To the Seller's Knowledge, no parcel of Owned Real Property or Leased Real Property is subject to any pending or threatened condemnation Action.

*Section 3.11    Permits.*  Schedule 3.11(a) identifies each license, permit, receipt of declaration franchise, certificate of authority or order, or any waiver of the foregoing, issued by any Governmental Entity exclusively with respect to the conduct of the Company's business or to any of the Real Property (the "Permits") which have been issued since July 10, 2009. Except as set forth on Schedule 3.11(b), to the Seller's Knowledge, since July 10, 2009, the Company is in compliance with all Permits that are required by any Governmental Entity to conduct its business as presently conducted (excluding the Environmental Laws which are the subject of Section 3.16).

17

Section 3.12    *Intellectual Property.*

(a)    To the Seller's' Knowledge, (i) the operation of the Company's business as it is presently conducted by the Company does not infringe or misappropriate in any material respect any Intellectual Property of third parties (other than GM Parent or its Affiliates), and (ii) the Company has not received, since July 10, 2009, any written charge, complaint, claim, demand or notice alleging any infringement or misappropriation of Company Intellectual Property.

(b)    Except as set forth on Schedule 3.12(b), the Company has not, since July 10, 2009, (i) applied for or received issuance of any Patents, or (ii) created, developed or otherwise obtained any materially significant Intellectual Property, except in the ordinary course of business consistent with past practices.

(c)    To the Seller's Knowledge, (i) no third party is currently in any material respect infringing or misappropriating any Company Intellectual Property or any of the Intellectual Property of the Buyer or its Affiliates, (ii) none of the Company Intellectual Property is invalid or unenforceable, and (iii) the Company has not received, since July 10, 2009, any written charge, complaint, claim, demand or notice challenging the validity or enforceability of any of the Company Intellectual Property or any of the Intellectual Property of the Buyer or its Affiliates.

(d)    As of the Closing Date, all Company Intellectual Property is assigned to and/or is solely owned by the Company without any Liens whatsoever.

(e)    To the Seller's Knowledge, except as set forth on Schedule 3.12(e), the Company does not have a license to any Intellectual Property owned by any third party other than the Buyer.  If any such license exists the Seller agrees to cooperate in good faith to facilitate the prompt assignment of said license to the Buyer.

(f)    Notwithstanding anything to the contrary in this Agreement, this Section 3.12 contains the sole and exclusive representations and warranties of the Seller with respect to Intellectual Property, including any arising under any Laws regarding infringement, misappropriation or other unauthorized use of Intellectual Property.

Section 3.13    *Legal Compliance.*  Since July 10, 2009, (a) the Company has been at all times in material compliance with all applicable Laws (excluding Laws applicable to the Benefit Plans and the Environmental Laws, which are the subject of Section 3.15(b) and of Section 3.16, respectively), except for such noncompliance as would not have a Material Adverse Effect.

Section 3.14    *Litigation.*  Except as set forth on Schedule 3.14, as of the date of this Agreement, there are no Actions pending or, to the Seller's Knowledge, threatened, (a) against the Company that would have a Material Adverse Effect or (b) that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Seller in connection with this Agreement or any of the Ancillary Documents, other than such of the foregoing that would not have a Material Adverse Effect.

18

AA01\249952.10
ID\UA - 106010/0001

Section 3.15    *Employees and Employee Benefits.*

(a)    Schedule 3.15(a)(i) sets forth a list of all currently effective Collective Bargaining Agreements, or other labor agreements with labor organizations concluded at the company-level representing the Covered Employees, including any agreements between the Company and the personnel representatives (including non-accredited representatives) applicable to the Covered Employees.  With respect to the conduct of the Company's business, and except as set forth on Schedule 3.15(a)(ii), there are no strikes, work stoppages or material labor disputes pending, or to the Seller's Knowledge, threatened, that involve any of the Covered Employees.

(b)    Since July 10, 2009, all Benefit Plans have been in compliance and have been administered in form and in operation, in all material respects, in accordance with their terms, the terms of any applicable Collective Bargaining Agreements and with all applicable requirements of Law, except for any claims or charges by Covered Employees arising in the ordinary course of business that would not have a Material Adverse Effect.

(c)    The Seller has made available to the Buyer a correct and complete list of the ten (10) most highly paid Covered Employees and their respective annual salaries as of 30 June, 2010, including, if applicable, any severance package for such Covered Employees which differs from the terms of the Collective Bargaining Agreement.

(d)    Except as set forth on Schedule 3.15(d), as required by Law, or in the ordinary course of business, to the Seller's Knowledge, since July 10, 2009, the Company has not:

(i)    increased or agreed to increase the compensation, severance or benefits payable to any Covered Employee by more than €10,000 per annum;

(ii)    commenced any claim or proceeding against any Covered Employee;

(iii)    received any claims or been a party to any proceedings made by any Covered Employee or former employee of the Company, other than any such claims or proceedings (A) set forth on Schedule 3.14, (B) covered by and the subject of Section 3.15(b), and (C) arising in the ordinary course of business that would not have a Material Adverse Effect; or

(iv)    committed or agreed to do any of the foregoing.

Section 3.16    *Environmental Matters.*  Except as set forth on Schedule 3.16:

(a)    To the Seller's Knowledge, since July 10, 2009, the Business has been in compliance with Environmental Laws and with Environmental Permits applicable to the Business and the Real Property;

19

(b)    To the Seller's Knowledge, since July 10, 2009, no lien, restrictive covenant, engineering and/or institutional control, or other land or resource use restriction has been recorded against or imposed upon the Real Property under Environmental Laws or in connection with or settlement of any Claim under any Environmental Laws;

(c)    Since July 10, 2009, Seller has not received, and has no Knowledge of, any Claim from a Governmental Entity or any other third party alleging that the Business has been or is currently being used or operated in violation of any Environmental Laws or Environmental Permits;

(d)    Since July 10, 2009, Seller has not received, and has no Knowledge of, any Claim from a Governmental Entity or any other third party alleging that the use or operations of any portion of the Real Property by a tenant or other occupier has been or is as currently being used or operated in violation of any Environmental Laws or Environmental Permits;

(e)    Since July 10, 2009, Seller has not received, and has no Knowledge of, the issuance of any Claim under Environmental Law with respect to the Real Property;

(f)    To the Seller's Knowledge, since July 10, 2009, the Business has obtained and maintains in full force and effect all Environmental Permits required for the operation of the Business and occupancy of the Real Property;

(g)    To the Seller's Knowledge, all Environmental Records created or obtained by the Company since July 10, 2010 are located, maintained and preserved at the Real Property and, to the Seller's Knowledge, since July 10, 2009, neither Seller nor the Company has destroyed, altered or permanently removed from the Real Property any Environmental Records; and

(h)    To the Seller's Knowledge, no Environmental Permits are required under Environmental Law to be transferred, assigned or reissued to the Company in connection with the Transactions; and

*Section 3.17    Tax Matters.*

(a)    The Company has filed all Tax Returns that it was required to file since July 10, 2009.  All material Taxes or material Income Taxes shown on such Tax Returns as owing have been paid in a timely fashion.

(b)    There are no Liens for Taxes or Income Taxes upon the assets of the Company, other than Permitted Liens, arising from Tax Returns that the Company was required to file since July 10, 2009.

(c)    Since July 10, 2009, the Company has not waived any statute of limitations with respect to Taxes or Income Taxes, or agreed to any extension of time with respect to an assessment or deficiency of Taxes or Income Taxes, in each case, other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business.

20

Section 3.18    *Customers and Suppliers.*  Schedule 3.18 sets forth a complete and correct list of all of the customers and the ten largest suppliers (measured by Euro volume of purchases) of the Company as of and for the six month period ended December 31, 2009 and the six month period ended June 30, 2010, and the amount of such business done (by Euro volume of purchases) with each such customer or supplier as of and for each such period.

Section 3.19    *Debt.*  Except as disclosed on Schedule 3.19, the Company does not have any liabilities in respect of Debt.

Section 3.20    *Product Liability.*  Excluding any matters that have previously been disclosed to the Buyer pursuant to the Company's normal quality control procedures, to the Seller's Knowledge, since July 10, 2009, there have not been any material manufacturing or remanufacturing defects or manufacturing or remanufacturing deficiencies (excluding, for the avoidance of doubt, any design-related items) in any of the products manufactured or sold by the Company or in the services provided by the Company that would result in a claim or claims against the Company that are reasonable likely to have a Material Adverse Effect.

Section 3.21    *Bank Accounts; Delegation of Powers.*

(a)    Schedule 3.21 lists the bank accounts and safety deposits in the name of the Company, and sets out the authorized signatories as well as the required conditions in particular in relation to joint signatories, for the operation of the accounts and access to the safety deposits.

(b)    Schedule 3.21 contains a list of all nominated signatories, delegations of power, proxies and authorizations of whatever nature and form granted by the Company to any Person with respect to the Company's bank accounts.

Section 3.22    *Brokers' Fees.*  Except for the Merrill Lynch Contract, none of the Seller nor any of its Affiliates has engaged or has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Transactions for which the Buyer, the Company or their respective Affiliates would become liable.  The total amount due from the Company to Merrill Lynch under the Merrill Lynch Contract in connection with the consummation of the Transactions is $2,115,191.50.

Section 3.23    *LIMITATIONS ON REPRESENTATIONS AND WARRANTIES.* EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III, SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN CONNECTION WITH OR WITH RESPECT TO THE COMPANY, THE TRANSFERRED STOCK OR OTHERWISE, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO THE BUYER, INCLUDING WITH RESPECT TO ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE, NON-INFRINGEMENT, OR ENVIRONMENTAL MATTERS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, IT IS UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS OR OTHER PREDICTIONS, ANY DATA, ANY FINANCIAL INFORMATION AND ANY MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS DO NOT AND MAY

21

NOT BE DEEMED TO BE OR TO INCLUDE REPRESENTATIONS OR WARRANTIES OF THE SELLER, EXCEPT TO THE EXTENT OTHERWISE EXPRESSLY STATED IN THIS ARTICLE III. NO PERSON HAS BEEN AUTHORIZED BY THE SELLER TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO THE TRANSACTIONS, EXCEPT AS SET FORTH IN THIS ARTICLE III AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE SELLER. ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III, THE SELLER IS SELLING, ASSIGNING AND TRANSFERRING THE TRANSFERRED STOCK TO THE BUYER ON AN "AS-IS, WHERE-IS" BASIS.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

*Section 4.1    Organization.* The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation. The Buyer is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction where such qualification or license is required, except where the failure to be so qualified or be so licensed would not have a material adverse effect on the Buyer's ability to consummate the Transactions and discharge its obligations under this Agreement and the Ancillary Documents (a "Buyer Material Adverse Effect"). The Buyer has all requisite corporate power and authority to carry on its business as currently conducted and as proposed to be conducted after the Closing.

*Section 4.2    Authorization of Transaction.* The Buyer has all requisite corporate power and authority to execute, deliver and perform this Agreement and each of the Ancillary Documents to which it is a party. This Agreement constitutes, and each of the Ancillary Documents when executed and delivered by the Buyer shall constitute, a valid and legally binding obligation of the Buyer (assuming that this Agreement and such Ancillary Documents constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with its terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing. The Buyer is not a disregarded entity for U.S federal income tax purposes.

*Section 4.3    Noncontravention; Consents.*

(a)    The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation by the Buyer of the Transactions, do not: (i) violate any Law to which the Buyer or its assets is subject; (ii) conflict with or result in a breach of any provision of the organizational documents of the Buyer; or (iii) create a breach, default, termination, cancellation or acceleration of any obligation under any Contract to which the Buyer is a party or by which the Buyer or any of its assets or properties are bound or subject, except for any of the foregoing in the case of clauses (i) and (iii) that would not have a Buyer Material Adverse Effect.

22

(b)    No notices, permits, consents, approvals, authorizations, qualifications or orders of Governmental Entities are required for the consummation by the Buyer of the Transactions, other than such of the foregoing that, if not given or obtained, would not have a Buyer Material Adverse Effect.

Section 4.4    *Litigation.*  As of the date of this Agreement, there are no Actions pending or, to the knowledge of the Buyer, threatened, that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Buyer in connection with this Agreement or any of the Ancillary Documents, other than such of the foregoing that would not have a Buyer Material Adverse Effect.

Section 4.5    *Brokers' Fees.*  Except for the Merrill Lynch Contract, neither the Buyer nor any of its Affiliates has engaged or has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Transactions for which any of the Seller, the Company or their respective Affiliates would become liable.

**ARTICLE V**
**COVENANTS**

The Buyer and the Seller agree to the following:

Section 5.1    *General.*  In the event that at any time after the Closing Date any further action is reasonably necessary to carry out the purposes of this Agreement and otherwise consummate the Transactions, each of the Parties shall take such further action (including the execution and delivery of such further instruments and documents) as the other Party may reasonably request, at the sole cost and expense of the requesting Party (unless otherwise specified herein).

Section 5.2    *Agreements Regarding Tax Matters.*  With respect to the period following the Closing Date:

(a)    The Company, under the direction and control of the Seller, shall prepare and timely file all Tax Returns required to be filed by the Company for all Tax or Income Tax periods ending on or prior to the Closing Date.  The Buyer shall cause the Company to prepare and timely file all other Tax Returns that are required to be filed by the Company for all Tax or Income Tax periods ending after the Closing Date.

(b)    The Seller and the Buyer shall provide each other with such assistance and non-privileged information relating to the Transactions as may reasonably be requested in connection with the preparation of any Tax Return or the performance of any audit, examination or any other proceeding by any taxing authority relating to any Tax Return, whether conducted in a judicial or administrative forum.  The Seller and the Buyer shall retain and provide to the other Party all non-privileged records and other information which may be relevant to any such Tax Return, audit, examination or any other proceeding.

(c)    Notwithstanding anything to the contrary contained in <u>Section 6.4</u>, the Buyer shall exercise exclusive control over the handling, disposition and settlement of any

23

inquiry, examination or proceeding by a Governmental Entity (or that portion of any inquiry, examination or proceeding by a Governmental Entity) that could result in a determination with respect to Taxes or Income Taxes with respect to Tax or Income Tax periods ending on or prior to the Closing Date.  The Seller and its Affiliates shall cooperate with the Buyer, as the Buyer may reasonably request, in any such inquiry, examination or proceeding.  With respect to any settlement of such an inquiry, examination or proceeding that is proposed prior to the Seller Liquidation Date, the Seller shall have the chance to review such settlement, and to the extent such settlement affects the Buyer Claims, such settlement shall be subject to the Seller's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)    Except as set forth on Schedule 5.2(d), neither Party (nor any Affiliate of such Party) shall agree to settle any Tax liability or compromise any claim with respect to Taxes or Income Taxes, which settlement or compromise may affect the liability for Taxes or Income Taxes hereunder (or right to Tax or Income Taxes benefit) of the other Party, without the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(e)    Notwithstanding anything else contained herein, the Buyer shall (i) pay all amounts that are required to be paid in respect of any transfer, sales, use, recording, value-added or similar Taxes (including any registration and/or stamp Taxes, levies and duties) that may be imposed by reason of the Transactions, including by reason of the sale, assignment, transfer and delivery of the Transferred Stock; and (ii) timely file all Tax Returns required to be filed in connection with the payment of such Taxes (and the Buyer shall be responsible for all penalties and interest related to a late filing or error in filing related to such Tax Returns).

(f)    Except to the extent provided in Section 6.2, the Company shall be responsible for the payment of all Taxes and Income Taxes attributable to periods ending on or prior to the Closing Date.

Section 5.3    *Court Approval of Conciliation Agreement*.  As soon as practicable after the date of this Agreement, the Parties shall (and the Buyer shall cause the Company to) file a motion with the Court of Strasbourg for the purpose of obtaining approval (*homologuer*) of the Conciliation Agreement.  From and after the date of this Agreement, each of the Parties shall (and the Buyer shall cause the Company to) take such actions as may be reasonably necessary to obtain from the Court of Strasbourg such approval (*homologuer*) of the Conciliation Agreement.

Section 5.4    *Environmental Matters*.  Effective as of the Closing Date, the Seller waives, to the extent it has a legal right to do so, any conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to the Buyer or the Company or disclosure of information to the Buyer or the Company by any employee, consultant to, attorney for, advisor to, or any other third party who has worked with or for the Seller or the Company with respect to any Environmental Law related matter involving the Business or the Real Property, including any actual or potential Governmental Claims or Environmental Liabilities, for which the Buyer or the Company may be required to respond or act; provided, however, that Seller does not waive, and this Section 5.4 shall in no way affect, (a) any protection afforded under the attorney-client privilege or attorney

24

work product privilege with respect to Weil, Gotshal & Manges LLP, and (b) any conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict to the extent that Buyer or the Company seeks to employ any such attorney or legal advisor for purposes of filing any Claim against Seller in the Bankruptcy Court, under this Agreement, or otherwise. In addition, effective on the Closing Date, the Seller hereby provides its consent that all such consultants, attorneys, advisors, or other third parties who have worked with or for the Seller or the Company with respect to any Environmental Law related matter affecting the Business or the Real Property may perform services directly to the Buyer or the Company and agrees that they may provide the Buyer or the Company with all information and documents relating to any Environmental Law-related matter for which the Buyer or the Company may be required to respond or act and no additional waiver or consent documentation is needed to effectuate such waiver and consent; provided, however, that (x) Seller does not waive, and this Section 5.4 shall in no way affect, any protection afforded under the attorney-client privilege or attorney work product privilege with respect to Weil, Gotshal & Manges LLP, and (y) Seller does not consent to the provision of services, information or documents by such attorneys or legal advisors to the extent that such services, information or documents are to be used for purposes of filing any Claim against Seller in the Bankruptcy Court, under this Agreement, or otherwise.

Section 5.5    *Interim Operations of the Company*. From the date of this Agreement until the Closing Date or the earlier termination of this Agreement, except (i) as contemplated by this Agreement, (ii) as required by Law, or (iii) as set forth on Schedule 5.5, the Seller shall (a) cause the Company to conduct its operations in the ordinary course of business consistent with past practices since July 10, 2009, (b) cause the Company to use its commercially reasonable efforts to preserve intact its current business organization, keep available the services of its current officers, employees, and agents, and maintain the relations and good will with suppliers, customers, employees, agents, and others having business relationships with the Company, (c) confer with the Buyer concerning operational matters of a material nature, and (d) otherwise report periodically to the Buyer concerning the status of the business, operations, and finances of the Company to the extent material in nature.

Section 5.6    *BMW Litigation*. From the date of this Agreement until the Closing Date or the earlier termination of this Agreement, the Seller will not take any action with respect to the BMW Litigation except upon the prior written consent of the Buyer or except as otherwise expressly set forth in this Agreement. If the BMW Litigation is assigned to the Buyer or its designated Affiliate as part of the Closing in accordance with Section 2.4(a)(vi)(B), the Seller will take (and will cause its representatives and agents to take) such actions as may be reasonably necessary to carry out such assignment of the BMW Litigation (including the execution and delivery of such instruments and documents) as the Buyer may reasonably request.

## ARTICLE VI
## REMEDIES

Section 6.1    *Survival*. The representations and warranties of the Parties contained in this Agreement and in the Ancillary Documents shall survive until the first anniversary of the Closing Date, except for the representations and warranties in Section 3.2

25

(Authorization of Transaction), Section 3.6 (Title to Transferred Stock), Section 3.22 (Brokers' Fees), Section 3.23 (Limitations on Representations and Warranties), Section 4.2 (Authorization of Transaction), which shall survive indefinitely, and in Section 3.17 (Tax Matters), which shall survive until the expiration of the applicable statute of limitations. The covenants or agreements of the Parties contained in this Agreement and the Ancillary Documents shall survive the Closing indefinitely, except that those covenants and agreements that by their terms are to be performed or complied with for a shorter period of time shall survive only until the expiration of such shorter time period. Notwithstanding anything to the contrary, no claim may be made with respect to any representations or warranties under this Agreement or any Ancillary Document after the expiration of the applicable survival period set forth in this Section 6.1.

Section 6.2    *Indemnification by Seller.*

(a)    Subject to the terms and conditions of this ARTICLE VI, from and after the Closing, the Seller agrees to reimburse, indemnify and hold harmless the Buyer, its directors, officers, representatives, employees and Subsidiaries (each, a "Buyer Indemnified Party") from, against and in respect of any and all Losses incurred by any Buyer Indemnified Party resulting from, or that exist or arise due to, any of the following (collectively, "Buyer Claims"):

(i)    prior to its expiration in accordance with Section 6.1, any inaccuracy of any representation or the breach of any warranty made by the Seller in this Agreement or in any Ancillary Document; and

(ii)    prior to its expiration in accordance with Section 6.1, the breach by the Seller of any covenant or agreement under this Agreement or any Ancillary Document (subject to any express limitations therein).

(b)    Notwithstanding anything contained herein to the contrary, the obligations of the Seller pursuant to Section 6.2(a)(i) shall:  (i) not apply to any Buyer Claims until, and then only to the extent that, the Losses incurred by all Buyer Indemnified Parties exceeds €250,000 (the "Basket"); and (ii) be limited to, and shall not exceed, the aggregate amount of €1,000,000 (the "Cap").

(c)    Notwithstanding anything contained herein to the contrary, the obligations of the Seller pursuant to Section 6.2(a) shall terminate upon the Indemnification Expiration Date.

(d)    No Losses shall be asserted pursuant to Section 6.2(a)(i) arising from or related to any condition, act, omission or occurrence, whether known or unknown, to the extent explicitly related to the reorganization activity of the Seller and its then Affiliates during the period of April 1, 2009 through July 10, 2009.

Section 6.3    *Indemnification by Buyer.*

(a)    Subject to the terms and conditions of this ARTICLE VI, from and after the Closing, the Buyer agrees to reimburse, indemnify and hold harmless the Seller and its respective directors, officers, representatives, employees and Subsidiaries (collectively, the "Seller Indemnified Parties") from, against and in respect of any and all Losses incurred by any

26

Seller Indemnified Party resulting from, or that exist or arise due to, any of the following (collectively, "Seller Claims," and together with Buyer Claims, "Indemnification Claims"):

(i)     prior to its expiration in accordance with Section 6.1, any inaccuracy of any representation or the breach of any warranty made by the Buyer in this Agreement or in any Ancillary Document; and

(ii)     prior to its expiration in accordance with Section 6.1, the breach by the Buyer of any covenant or agreement under this Agreement or any Ancillary Document.

(b)     Notwithstanding anything contained herein to the contrary, the obligations of the Buyer pursuant to Section 6.3(a)(i) shall (i) not apply to any Seller Claims until, and then only to the extent that, the Losses incurred by all Seller Indemnified Parties exceeds the Basket, and (ii) be limited to, and shall not exceed, the Cap.

(c)     Notwithstanding anything contained herein to the contrary, the obligations of the Buyer pursuant to Section 6.3(a) shall terminate upon the Indemnification Expiration Date.

*Section 6.4     Procedures for Indemnification of Third Party Claims.*

(a)     No Party shall be liable for any Claim for indemnification under this ARTICLE VI unless written notice of a Claim for indemnification is delivered by the Party seeking indemnification (the "Indemnified Party") to the Party from whom indemnification is sought (the "Indemnifying Party") prior to the expiration of the applicable survival period, if any, set forth in Section 6.1. If any third party notifies the Indemnified Party with respect to any matter that may give rise to a Claim for indemnification (a "Third Party Claim") against the Indemnifying Party under this ARTICLE VI, then the Indemnified Party shall notify the Indemnifying Party promptly thereof in writing and in any event within 15 days after receiving notice from a third party; provided that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder except to the extent the Indemnifying Party is materially prejudiced thereby. All notices given pursuant to this Section 6.4 shall describe with reasonable specificity the Third Party Claim and the basis of the Indemnified Party's Claim for indemnification. Upon the Indemnified Party giving notice of the Third Party Claim to the Indemnifying Party, the Indemnifying Party shall be entitled to participate therein and, to the extent desired, to assume the defense thereof with counsel of its choice. If the Indemnifying Party provides the Indemnified Party with notice of its determination to assume the defense of such Third Party Claim, the Indemnified Party may nevertheless participate in (but not control) such defense, but the Indemnifying Party shall not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense of the Third Party Claim, other than reasonable costs of investigation, unless the Indemnifying Party does not actually assume the defense thereof following notice of such election. Unless and until the Indemnifying Party notifies the Indemnified Party that it is assuming the defense of such Third Party Claim, the Indemnified Party shall have the right to undertake the defense of such Third Party Claim, by counsel or other representatives of its own choosing, on behalf of and for the account and risk of the Indemnifying Party (subject to the limitations on the Indemnifying Party's obligations to

27

indemnify as set forth in this ARTICLE VI and the right of the Indemnifying Party to assume the defense of or opposition to such Third Party Claim at any time prior to settlement, compromise or final determination thereof).

(b)    Neither the Indemnified Party nor the Indemnifying Party shall consent to the entry of any judgment or enter into any settlement of any Third Party Claim that might give rise to liability of the other Party under this ARTICLE VI without such Party's consent, which consent shall not be unreasonably withheld, conditioned or delayed.  If the Indemnifying Party proposes to settle any such Third Party Claim, and the Indemnified Party refuses to consent to such compromise or settlement, then the liability of the Indemnifying Party to the Indemnified Party in respect of such Third Party Claim shall be limited to the amount offered by the Indemnifying Party in compromise or settlement.

*Section 6.5    Certain Limitations.*

(a)    OTHER THAN IN RESPECT OF A "THIRD PARTY CLAIM" (AS DEFINED HEREIN), AN INDEMNIFYING PARTY SHALL NOT BE LIABLE UNDER THIS ARTICLE VI IN RESPECT OF ANY CLAIM FOR DIMINUTION OF VALUE OR INCIDENTAL, EXEMPLARY, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING CONSEQUENTIAL DAMAGES RESULTING FROM BUSINESS INTERRUPTION, LOST TAX OR INCOME TAX BENEFITS, INCREASED INSURANCE PREMIUMS OR LOST PROFITS.

(b)    The obligations of the Indemnifying Party to provide indemnification under this ARTICLE VI shall be terminated, modified or abated as appropriate to the extent that the underlying Claim (i) would not have arisen but for a voluntary act that is carried out by or at the express written request of, or with the express written approval or concurrence of, or with the knowing assistance of, the Indemnified Party or (ii) is based, in whole or in part, on the bad faith or willful misconduct of the Indemnified Party.

(c)    The amount of any indemnification payable under this ARTICLE VI shall be reduced by an amount (the "Offset Amount") equal to the proceeds actually received by the Indemnified Party under any insurance policy or from any third-party in respect of such Claim less all out-of-pocket costs and expenses incurred by such Indemnified Party in connection with obtaining such insurance proceeds or third-party recovery (including reasonable attorneys' fees). An Indemnified Party shall use reasonable best efforts to pursue any insurance recovery or third-party recovery available to it with respect to any Claim for which such Indemnified Party seeks indemnification pursuant to this ARTICLE VI.  The amount of Losses for which indemnification is provided under this ARTICLE VI shall be reduced to take account of any net Tax or Income Tax benefit realized by the Indemnified Party arising from the payment of such Losses when and as such Tax or Income Tax cost or benefit is actually realized through a reduction in Taxes or Income Taxes otherwise due.  If an Indemnified Party receives a payment for Losses under any insurance policy or from a third-party, or receives any Tax or Income Tax benefit as described in this Section 6.5(c), at any time subsequent to receiving any indemnification payment by the Indemnifying Party pursuant to this ARTICLE VI, then such Indemnified Party shall promptly

28

reimburse the Indemnifying Party for any payment made by the Indemnifying Party related thereto.

Section 6.6    *Exclusive Remedy.*    Except as set forth in Section 6.8, from and after the Closing, the remedies provided in this ARTICLE VI shall be the sole and exclusive remedies of the Parties (and all Indemnified Parties) for all disputes arising out of or relating to this Agreement, and shall supersede and replace all other rights and remedies that any of the Parties may have under any Law.

Section 6.7    *Mitigation.*    Each Party agrees to use commercially reasonable efforts to mitigate any Loss that forms the basis of an Indemnification Claim hereunder.

Section 6.8    *Equitable Relief.*    Each Party acknowledges and agrees that the other Party may be irreparably damaged if any provision of this Agreement is not performed in accordance with its terms or otherwise is breached.  Accordingly, each Party agrees that the other Party may be entitled, subject to a determination by a court of competent jurisdiction, to non-monetary injunctive relief to prevent any such failure of performance or breach and to enforce specifically this Agreement and any of the terms and provisions hereof.

Section 6.9    *Tax Treatment of Indemnity Payment.*    The Seller and the Buyer agree to treat any indemnity payment made pursuant to this ARTICLE VI as an adjustment to the Purchase Price for all Income Tax purposes.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    *Conditions to Obligations of the Parties.*    The respective obligations of the Seller and the Buyer to consummate the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions:

(a)    no action, suit or proceeding shall have been instituted by any Person which seeks to prohibit, restrict or delay consummation of the Transactions or any of the conditions material to consummation of the Transactions;

(b)    there must not be in effect any Law or any Governmental Order entered, issued, made, or rendered by any Governmental Entity that (i) prohibits the consummation of the Transactions, and (ii) has been adopted or issued, or has otherwise become effective, since the date of this Agreement;

(c)    the Bankruptcy Court shall have issued the Bankruptcy Court Order; and

(d)    the Parties shall have filed (and the Buyer shall have caused the Company to file) a motion with the Court of Strasbourg for the purpose of obtaining approval (*homologuer*) of the Conciliation Agreement.

29

Section 7.2    *Conditions to Obligations of the Buyer.*  The obligations of the Buyer to consummate the Transactions are subject, at the discretion of the Buyer, to the satisfaction at or prior to the Closing of each of the following conditions:

(a)    the representations and warranties of the Seller contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i) those representations and warranties that are made as of a specific date shall be determined as of such date and (ii) those representations and warranties that are qualified or limited as to materiality or Material Adverse Effect shall be true and correct in all respects, and the Buyer shall have received a certificate to such effect signed by an authorized officer of the Seller;

(b)    all of the agreements and covenants that the Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects, and the Buyer shall have received a certificate to such effect signed by an authorized officer of the Seller; and

(c)    since the date of this Agreement, there shall not have occurred a Material Adverse Effect, or any events, changes, developments or effects which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 7.3    *Conditions to Obligations of the Seller.*  The obligations of the Seller to consummate the Transactions are subject, in the discretion of the Seller, to the satisfaction at or prior to the Closing of each of the following conditions:

(a)    the representations and warranties of the Buyer contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i) those representations and warranties that are made as of a specific date shall be determined as of such date and (ii) those representations and warranties that are qualified or limited as to materiality or Material Adverse Effect shall be true and correct in all respects, and the Seller shall have received a certificate to such effect signed by an authorized officer of the Buyer; and

(b)    all of the agreements and covenants that the Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects, and the Seller shall have received a certificate to such effect signed by an authorized officer of the Buyer.

## ARTICLE VIII
## TERMINATION

Section 8.1    *Termination.*  This Agreement may be terminated at any time prior to Closing:

(a)    by mutual consent of the Buyer and the Seller; or

30

(b)     by the Buyer or the Seller, upon written notice to the other Party, if the Transactions contemplated by this Agreement have not been consummated on or prior to September 30, 2010; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b) is not available to any Party whose failure to perform or observe any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Transactions contemplated by this Agreement to be consummated by such date.

Section 8.2     Effect of Termination.     In the event of termination of this Agreement by either the Buyer or the Seller, as provided above, this Agreement shall forthwith terminate and there shall be no liability on the part of either the Seller or the Buyer or the Buyer's officers or directors, except that (a) this Section 8.2 and ARTICLE VIII shall survive any such termination and (b) nothing herein shall relieve any Party from liability for any breach of this Agreement prior to the termination hereof.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1     Notices.     Any notice, request, instruction or other document to be given hereunder shall be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by facsimile or electronic mail, according to the instructions set forth below.  Such notices shall be deemed given: at the time delivered by hand, if personally delivered; one Business Day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered, certified or electronic mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

(a)     If to the Buyer:

General Motors Automotive Holdings, S.L.
Adam Opel House (N60)
Friedrich-Lutzmann-Ring
Russelsheim, Hessen
D-65423
Attention:  Marc Schiff
Facsimile No.:  +49 6142 753165
Email:  marc.schiff@gm.com

with copies (which shall not constitute notice) to:

General Motors Company
300 Renaissance Center, 37th Floor
Detroit, Michigan 48265
Attention: Alain Genouw, Finance Director,
New Business Development & Alliance Support
Facsimile No.:  (313) 667-5216
Email:  alain.genouw@gm.com

31

and:

General Motors Company
300 Renaissance Center, 24th Floor
Detroit, Michigan 48265
Attention: Andrew Segovia, Legal Staff
Facsimile No.: (313) 665-4960
Email: andrew.segovia@gm.com

and:

Dykema Gossett PLLC
400 Renaissance Center
Detroit, Michigan 48243
Attention:  J. Michael Bernard
Facsimile No.:  (313) 568-6832
Email: jbernard@dykema.com

(b)    If to the Seller:

Motors Liquidation Company
500 Renaissance Center, Suite 1400
Detroit, Michigan 48243
Attention:  Christian B. Cook
Facsimile No.: (248) 204-0674
Email: ccook@alixpartners.com

with copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Stephen Karotkin and
             Raymond O. Gietz
Facsimile No.: (212) 310-8007
Email:  stephen.karotkin@weil.com and raymond.gietz@weil.com

or to such other address or to the attention of such other Party that the recipient Party has specified by prior written notice to the sending Party in accordance with the preceding.

Section 9.2    Expenses; No Offset.    Except as expressly provided in this Agreement, each of the Parties shall bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Agreement and the Transactions, whether or not such Transactions are consummated.    Notwithstanding the foregoing, Buyer shall bear the cost of any transfer taxes and other expenses related to the transfer of property in connection with the Transactions.    Neither Party may make any offset

32

against amounts due to the other Party or any of the other Party's Affiliates pursuant to this Agreement, the Ancillary Documents or otherwise.

Section 9.3    *Seller Disclosure Schedules.*  The representations and warranties of the Seller set forth in this Agreement are made and given subject to the disclosures contained in the Seller Disclosure Schedules.  The Seller shall not be, and shall not be deemed to be, in breach of any such representations and warranties (and no Buyer Claim may be made in respect thereof) in connection with any such matter so disclosed in the Seller Disclosure Schedules.  Where only brief particulars of a matter are set out or referred to in the Seller Disclosure Schedules, or a reference is made only to a particular part of a disclosed document, full particulars of the matter and the full contents of the document are deemed to be disclosed.  Inclusion of information in the Seller Disclosure Schedules shall not be construed as an admission that such information is material to the business, operations or condition (financial or otherwise) of Company, or as an admission of liability or obligation of the Seller to any third party.  The specific disclosures set forth in the Seller Disclosure Schedules have been organized to correspond to Section references in this Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in the Seller Disclosure Schedules shall apply to and shall be deemed to be disclosed for the purposes of the entire Agreement.  In the event that there is any inconsistency between this Agreement, as the case may be, and matters disclosed in the Seller Disclosure Schedules, information contained in the Seller Disclosure Schedules shall prevail and shall be deemed to be the relevant disclosure.

Section 9.4    *Assignment; Successors and Assigns.*  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party;  provided, however, that  the Parties may assign their respective rights under this Agreement to a Subsidiary, but such assignment shall not relieve the Party of its obligations or liabilities under this Agreement.   Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 9.5    *Amendment; Waiver.*  This Agreement may be amended only by a written instrument executed and delivered by the Parties.  At any time prior to the Closing, the Parties may extend the time for performance of or waive compliance with any of the covenants or agreements of the other Party to this Agreement, and may waive any breach of the representations or warranties of such other Party.  No agreement extending or waiving any provision of this Agreement shall be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.  No waiver of any term or provision of this Agreement, consent with respect to any matter hereunder, or excuse of any breach by any Party constitutes a waiver of, consent to, or excuse of any other, different, or subsequent term, provision, matter or breach.

Section 9.6    *Severability.*  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be prohibited by or invalid under Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder

33

of this Agreement.    The invalidity, illegality or unenforceability of any provision of this Agreement in any jurisdiction does not invalidate or render illegal or unenforceable such provision in any other jurisdiction.

Section 9.7    *Counterparts.*    This Agreement may be executed in two or more counterparts, including by facsimile transmission or electronic signature as permitted by applicable Law, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same Agreement.

Section 9.8    *No Third-Party Beneficiaries.*    This Agreement does not confer any rights or remedies upon any Person or entity, other than the Parties hereto and their respective successors and permitted assigns and the Buyer Indemnified Parties and the Seller Indemnified Parties under ARTICLE VI.

Section 9.9    *Governing Law.*    THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK TO BE APPLIED, GOVERN ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.

Section 9.10    *Forum Selection; Consent to Service of Process; Waiver of Jury Trial.*    Each Party hereby irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court in any Action arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such Action may be heard and determined only in such court, (iii) hereby waives any claim of inconvenient forum or other challenge to venue in such court, and (iv) agrees not to bring any Action arising out of or relating to this Agreement in any other court.    The Seller agrees to cause the Seller Indemnified Parties, and the Buyer agrees to cause the Buyer Indemnified Parties, to comply with the foregoing as though such Indemnified Party was a Party to this Agreement.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS INDEMNIFIED PARTIES TO IRREVOCABLY WAIVE, ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS AND/OR THE TRANSACTIONS.

Section 9.11    *Entire Agreement.*    This Agreement and the Ancillary Documents collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 9.12    *Confidentiality; Public Announcement.*    Effective as of the Closing, the Confidentiality Agreement shall terminate solely with respect to Confidential Information (as defined therein) of the Company; provided that the Buyer acknowledges and agrees that any and all other Confidential Material (as defined in the Confidentiality Agreement) shall remain subject to the terms and conditions of the Confidentiality Agreement from and after the Closing, which shall otherwise survive the Closing in full force and effect.    Notwithstanding the foregoing, neither Party shall disclose the terms of this Agreement or any of the Transactions,

34

including by issuance of any press release or public announcement relating to the subject matter of this Agreement, without the prior written consent of the other Party; provided that either Party may make any public disclosure it believes in good faith is required by Law or any listing agreement concerning its publicly-traded securities, in which case the disclosing Party shall use its commercially reasonable efforts to advise and consult with the other Party prior to making such disclosure and shall disclose the minimum information necessary to comply with such requirement, including seeking "confidential treatment" of items requested to be so treated by the other Party.

Section 9.13    *Relationship of the Parties.*    Nothing in this Agreement or any circumstances associated with it or its performance gives rise to any relationship of agency, partnership, joint venture, or employer and employee among the Parties or between any Party and another Party's agents, employees or subcontractors.    Except as expressly provided in this Agreement or the Ancillary Documents, no Party has any authority to act or make representations on behalf of any other Party, nor to create contractual liability to a third party on behalf of (or otherwise contractually bind) any other Party.

Section 9.14    *Governing Language.*    This Agreement, the Ancillary Documents, the Exhibits, the Schedules and all written or electronic documents referred to herein are in the English language and the English language version of any of the foregoing shall control any issue concerning interpretation or enforcement of the terms.    All information to be provided under this Agreement and all communications between the Parties in relation to it will be in the English language.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

35

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement on the date first written above.

**GENERAL MOTORS AUTOMOTIVE HOLDINGS, S.L.**

By: _____

Name: Scott Mackie

Title: Executive Director
New Business Development
Corporate Planning & Alliances

**MOTORS LIQUIDATION COMPANY**

By: _____

Name: Christian Cox

Title: Vice President of Manufacturing

*Signature Page to Stock Purchase Agreement*

## <u>Exhibit B</u>

### The Sale Approval Order

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                    :
In re                               :        Chapter 11 Case No.
                                    :
MOTORS LIQUIDATION COMPANY, et al., :        09-50026 (REG)
       f/k/a General Motors Corp., et al.  :
                                    :
                    Debtors.        :        (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER UNDER SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE AUTHORIZING (I) THE DEBTORS TO ENTER INTO THE STOCK PURCHASE AGREEMENT WITH GENERAL MOTORS HOLDINGS, S.L., AND (II) THE ASSUMPTION AND ASSIGNMENT OF THE BMW CONTRACT IN CONNECTION WITH THE <u>DEBTORS' ENTRY INTO THE STOCK PURCHASE AGREEMENT</u>

Upon consideration of the Motion dated August 13, 2010 (the "**Sale Motion**")[1] of

Motors Liquidation Company ("**MLC**" or "**Seller**"), a debtor and debtor in possession in the

above captioned cases (collectively with the other debtors and debtors in possession in the above

captioned cases, the "**Debtors**"), seeking authority for (i) the sale of the Transferred Stock to the

Purchaser pursuant to the SPA (the "**Sale**"), and (ii) the assumption and assignment of the BMW

Contract to the Company in connection with the Sale; and notice of the Sale Motion and the

relief requested therein having been given pursuant to Federal Rules of Bankruptcy Procedure

2002 and 6004 to (i) all entities known by the Debtors to have asserted any lien, claim, interest,

or encumbrance in or on the Transferred Stock, (ii) all parties who were contacted by Merrill

Lynch during the Sale Process, (iii) attorneys for BMW, (iv) attorneys for the Purchaser, and (v)

parties in interest entitled to receive notice under the Third Amended Order Pursuant to 11

U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case

Management Procedures, dated April 29, 2010 [Docket No. 5670], and it appearing that no other

or further notice need be provided; and a hearing having been held on September 7, 2010 (the

"**Sale Hearing**") to consider the Sale Motion; and upon the Court's findings of facts and

conclusions of law with respect to the Sale Motion as set forth herein and on the record of the

Hearing; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the SPA, as applicable.

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Jurisdiction, Venue, and Grounds for Relief**

A.      The Court has jurisdiction over the Sale Motion and over the property of the Debtors and

their estates, pursuant to 28 U.S.C. §§ 157 and 1334.  These matters are core proceedings

pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue in this District is proper under 28

U.S.C. §§ 1408 and 1409(a).

B.      The statutory predicates for relief sought in the Sale Motion are sections 105(a), 363(b),

(f) and (m), and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

**Notice of the Sale Motion, the Sale, and the Assumption
and Assignment of the BMW Contract**

C.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale, and the

assumption and assignment of the BMW Contract and the Cure Amount associated therewith,

has been provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy

Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, and such notice was good and sufficient

and appropriate under the particular circumstances, and no other or further notice of the Sale

Motion, the Sale, the assumption and assignment of the BMW Contract, or the Cure Amount

associated therewith is or shall be required.

D.      A reasonable opportunity to object and be heard with respect to the Sale Motion and the

relief requested therein has been afforded to all interested persons and entities, including:  (i) all

entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in or on

the Transferred Stock, (ii) all parties who were contacted by Merrill Lynch during the Sale

Process, (iii) the attorneys for BMW, (iv) the attorneys for the Purchaser, and (v) parties in

interest entitled to receive notice under the Third Amended Order Pursuant to 11 U.S.C. § 105(a)

and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures,

dated April 29, 2010 [Docket No. 5670].

### Good Faith of Purchaser

E.      The Purchaser is not an "insider" of MLC, as that term is defined in section 101(31) of

the Bankruptcy Code.

F.      The Purchaser is purchasing the Transferred Stock in good faith within the meaning of

section 363(m) of the Bankruptcy Code, and is entitled to all of the protections afforded thereby.

The Seller and the Purchaser negotiated, proposed, and entered into the SPA at arm's length, in

good faith, and without collusion.  The Seller and the Purchaser have fully disclosed all

consideration to be given by the Purchaser under the SPA, and all other agreements or

arrangements entered into by the Purchaser in connection with the Sale.  The Purchaser has not

engaged in any conduct, by any action or inaction, that constitutes a violation of, or would cause

or permit the Sale to be avoided under, section 363(n) of the Bankruptcy Code.  No common

identity of directors or controlling stockholders exists between the Purchaser and the Seller.  The

Purchaser and Seller will be acting in good faith in closing the Sale pursuant to the SPA.

### The Sale Is Fair and Reasonable and in the Exercise of MLC's Sound Business Judgment

G.      The aggregate consideration to be received by MLC under the SPA is fair and reasonable,

constitutes the highest and best offer for the Transferred Stock, constitutes reasonably equivalent

value and fair consideration for the Transferred Stock, and will provide for a better recovery and

outcome for MLC's estate than would be provided by any other available alternative.  No other

person or entity has offered to purchase the Transferred Stock for greater value to MLC's estate

than the Purchaser.  MLC's process for marketing and selling the Transferred Stock, MLC's

determination to enter into the SPA, and MLC's determination that the consideration to be

received by MLC's estate is fair and reasonable each constitutes a valid and sound exercise of the MLC's business judgment.  Moreover, the consideration received under the SPA constitutes reasonably equivalent value and fair consideration for the Transferred Stock.

H.      Approval of the SPA by the Court and the consummation of the transactions contemplated thereby is in the best interests of MLC, its creditors, its estate and other parties in interest.

## Validity of Transfer

I.       MLC has full power and authority to execute and deliver the SPA and all other documents contemplated thereby, and no further consents or approvals are required for MLC to consummate the transactions contemplated by the SPA.

J.       The transfer of the Transferred Stock to the Purchaser will be, as of the Closing, the legal, valid and effective transfer of such assets and will vest the Purchaser with all right, title, and interest of MLC or MLC's estate to the Transferred Stock, as of the Closing, free and clear of all Liens (except Permitted Liens) and Claims[3] accruing, arising or relating to any time prior to the Closing Date.  Any provisions in any agreement that prohibit or condition the sale or transfer of the Transferred Stock are void and of no force and effect.

## Section 363(f) is Satisfied

K.      MLC may sell the Transferred Stock free and clear of all Liens (except Permitted Liens) and Claims, because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  No non-debtor party has asserted any interests in the

---

[3] For purposes of this Order, the phrase "**Liens and Claims**" means any or all interests in or relating to any of the Property, including liens (as defined in section 101(37) of the Bankruptcy Code) and claims (as defined in section 101(5) of the Bankruptcy Code).

Transferred Stock and none has objected to the Sale or the Sale Motion.  Accordingly, all non-debtor parties are deemed to have consented to the Sale on the terms set forth herein and in the SPA pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.

## Assumption and Assignment of the BMW Contract

L.    The assumption and assignment of the BMW Contract pursuant to the terms of this Order are integral to the SPA and are in the best interests of MLC and its estate, creditors and other parties in interest, and represent the exercise of reasonable business judgment by MLC.  The assumption by MLC of the BMW Contract is hereby approved, and the assignment of the BMW Contract to the Company is hereby approved, as all statutory requirements under section 365 of the Bankruptcy Code and otherwise for such assumption and assignment are satisfied.

M.    MLC, the Purchaser, or the Company, as applicable, has cured and/or provided adequate assurance of prompt cure of all defaults, if any, existing prior to the Closing Date under the BMW Contract, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.

N.    Each of the Company and the Purchaser, as applicable, has provided adequate assurance of its future performance under the BMW Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

O.    The BMW Contract shall, as of the Closing Date, be valid and binding on the Company and BMW, and in full force and effect and enforceable in accordance with its terms.  Following such assignment from and after the Closing Date, MLC shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the BMW Contract.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The relief requested in the Sale Motion is granted and approved, and the transaction

contemplated thereby is authorized, approved and ratified as set forth in this Order.

2.      The assumption and assignment of the BMW Contract to the Company is authorized and

approved as set forth in this Order.

**Approval and Ratification of the SPA**

3.      The SPA and all ancillary documents, and all of the terms and conditions thereof, are

hereby approved and ratified.

4.      MLC is authorized and empowered, and shall take any and all actions necessary or

appropriate, to (i) consummate the Sale to the Purchaser pursuant to and in accordance with the

terms and provisions of the SPA, (ii) close the Sale as contemplated by the SPA and this Order,

and (iii) execute and deliver, perform under and consummate the SPA.

5.      The terms and provisions of this Order shall be binding in all respects upon, and shall

inure to the benefit of, the Purchaser, MLC, MLC's estate and their respective successors and

assigns, and shall be binding in all respects upon any affected third parties including, but not

limited to, any person or entity asserting any interest (including any Liens and Claims) with

respect to the Transferred Stock, BMW in its capacity as a non-debtor counterparty to the BMW

Contract, and all creditors, equity holders and parties in interest in these cases.

6.      MLC is authorized and empowered to request any and all governmental or regulatory

approvals, and to make any governmental or regulatory filings or notifications contemplated by

the SPA and is further authorized to keep confidential any information related to such approvals

or filings.

## **Transfer of the Transferred Stock to Purchaser**

7.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, MLC is authorized and

empowered to, and subject to the terms of the SPA, shall, transfer the Transferred Stock to the

Purchaser on the Closing Date.  Such transfer shall constitute a legal, valid, binding and effective

transfer of the Transferred Stock to the Purchaser.  Any provisions in any agreement that prohibit

or condition the sale or transfer of the Transferred Stock are void and of no force and effect.

Upon the Closing, the Transferred Stock shall be transferred to the Purchaser free and clear of all

Liens (except for Permitted Liens) and Claims.  Such transfer shall vest in the Purchaser all right,

title and interest of MLC in and to the Transferred Stock.  Purchaser shall not be liable in any

way for any Liens (except for Permitted Liens) and Claims that any person or entity may have

against MLC, any of its assets, or the Transferred Stock.

8.      All alleged Liens (except for Permitted Liens) and Claims on the Transferred Stock, if

any, shall be transferred, affixed and attached to the proceeds of the Sale, with the same validity,

priority, force and effect as such Liens and Claims had immediately prior to the Closing.

Nothing in this Order shall determine the value or the validity, priority, or amount of any Claims

or Liens.

9.      The filing of a certified copy of this Order with the appropriate clerk and/or recording

with the recorder shall act to cancel any Liens (except for Permitted Liens) and Claims and any

other encumbrances of record with respect to the Transferred Stock.

## **Assumption and Assignment of the BMW Contract**

10.      Pursuant to sections 105(a) and 365 of the Bankruptcy Code, as part of the Closing of the

Sale, MLC is authorized and empowered to assume the BMW Contract and assign the BMW

Contract to the Company.

11.     As of the date of the entry of this Order, (i) no Cure Amount is due or owing under the

BMW Contract, (ii) no defaults by Seller exist under the BMW Contract, and (iii) no

compensation is due or owing to BMW by Seller for any losses resulting from any default by

Seller under the BMW Contract.

12.     The Purchaser shall pay any Cure Amount, if any, due under the BMW Contract.

13.     After the assignment of the BMW Contract to the Company, neither MLC nor its estate

shall have any further liability or obligation of any kind whatsoever with respect to the BMW

Contract and BMW shall have no rights or claims of any kind whatsoever against the Debtors or

their estates with respect to the BMW Contract.

14.     Any provisions in the BMW Contract or in any other agreement that prohibit or condition

the assignment of the BMW Contract or allow BMW to terminate, recapture, impose any

penalty, condition any renewal or extension or modify any term or condition upon the

assignment of the BMW Contract or any similar provision, constitute unenforceable anti-

assignment provisions that are void and of no force and effect.

15.     The Company has provided adequate assurance of its future performance under the BMW

Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

16.     All other requirements and conditions under sections 363 and 365 of the Bankruptcy

Code for the assumption by MLC and assignment to the Company of the BMW Contract have

been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Company shall be fully and irrevocably vested with all rights, title and interest of MLC

under the BMW Contract.

17.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, BMW and any other

parties are forever barred and enjoined from raising or asserting against MLC, the Purchaser or

the Company any assignment fee, default, breach, claim, pecuniary loss, or condition to

assignment arising under or related to the BMW Contract existing as of the Closing or arising by

reason of the Closing.

## Other Provisions

18.     The transactions contemplated by the SPA are undertaken by the Purchaser without

collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of this Order shall not affect the validity of

the Sale to the Purchaser (including the assumption and assignment of the BMW Contract to the

Company) or the other relief granted hereby, unless the effectiveness of this Order is duly stayed.

The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy

Code and, as such, is entitled to the full protections of that provision.

19.     The failure specifically to include any particular provision of the SPA in this Order shall

not diminish or impair the effectiveness of such provision, it being the intent of the Court that the

SPA and the Debtors' entry into the SPA is authorized and approved in its entirety.

20.     The SPA and any related agreements, documents or other instruments may be modified,

amended or supplemented by the parties thereto, in a writing signed by both parties and in

accordance with the terms thereof, without further order of the Court, provided that any such

modification, amendment or supplement does not have a material adverse effect on the Debtors'

estates.

21.     The Court shall retain jurisdiction to, among other things, interpret, implement, and

enforce the terms and provisions of this Order and the SPA, all amendments thereto and any

waivers and consents thereunder, and each of the agreements executed in connection therewith to

which any of the Debtors are party, or which has been assigned by the Debtors to the Company,

and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale,

the SPA, or this Order.

22.      To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal

Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly

finds that there is no just reason for delay in the implementation of this Order, and expressly

directs the entry of judgment as set forth in this Order.  This Order constitutes a final order

within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and

6006(d), the effectiveness of this Order shall not be stayed and this Order shall be effective

immediately.


Dated:  _____, 2010                    _____

                                               United States Bankruptcy Judge