UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
: 
In re : Chapter 11 Case No.
:
MOTORS LIQUIDATION COMPANY, et al., : 09-50026 (REG)
f/k/a General Motors Corp., et al. :
:
Debtors. : (Jointly Administered)
:
-----------------------------------------------------------x

## DECLARATION OF ALBERT A. KOCH IN SUPPORT OF MOTION TO AMEND THE TERMS OF THE ENGAGEMENT LETTER OF AP SERVICES, LLC

Albert A. Koch, declares, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am the President and Chief Executive Officer of Motors Liquidation Company (f/k/a General Motors Corporation, "**MLC**", the "**Debtor**" or the "**Company**"). I submit this declaration in support of the *Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 363 Authorizing the Debtors to Amend the Terms of Their Engagement Letter with AP Services, LLC* (the "**Motion**") [Docket No. 6362] and to assist the Court and other parties in interest to understand the circumstances leading up to the Debtors' Third Amendment (the "**Third Amendment**") to its engagement letter with AP Services, LLC ("**APS**") as well as to describe why the Third Amendment is in the best interest of the Debtors' estates and stakeholders. This declaration also addresses the observations of this Court at a hearing on the Motion held on August 6, 2010 at 9:45 a.m.

2. I also am Vice Chairman and Managing Director of AlixPartners, LLP ("**AlixPartners**"), which is an affiliate of APS, an entity for which I am an Authorized

Representative. This declaration explains, from the perspective of APS, why it supports the Third Amendment to its engagement letter as being in the best interests of APS and AlixPartners as well as MLC and other parties in interest.

3. Except as otherwise indicated, this declaration is based upon my personal knowledge and experience acquired in the ordinary course of my profession and my work with the Debtors both before and after the sale of substantially all of their assets, my review of relevant documents and information supplied to me by members of MLC's management team or professionals retained by the Company. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

4. The Motion seeks approval of the Third Amendment to the Engagement Letter between APS and MLC dated May 29, 2009 (the "**Engagement Letter**") and as amended by that First Amendment dated July 23, 2009 (the "**First Amendment**"). The First Amendment provided for hourly rate reductions along with incentive payments, including (i) a percentage recovery to APS on monies returned to the United States Treasury (the "**U.S. Treasury**"); and (ii) an incentive payment tied to confirmation of a plan of liquidation in May of 2010.

5. The economic terms of the First Amendment were negotiated between a member of the Presidential Task Force on the Auto Industry (the "**Automotive Task Force**") and APS, with participation and input by the Official Committee of Unsecured Creditors (the "**Committee**"). The First Amendment was presented to the Board of Directors of MLC (the "**Board**") and approved by that Board on July 24, 2009.

6. On August 18, 2009 this Court entered an order approving the First Amendment to the Engagement Letter. The economic terms of the First Amendment became effective as of July 10, 2009, which is the date of closing of the sale of substantially all of the

2

assets of MLC under section 363 of the Bankruptcy Code to NGMCO, Inc., a new company controlled by the U.S. Treasury ("**New GM**").

7. When the First Amendment was negotiated the following three factors were deemed to be of highest importance by the Automotive Task Force: (1) speedy confirmation of a Plan of Liquidation ("**POL**"); (2) prompt distribution of stock and warrants of New GM that were earmarked for distribution to the unsecured creditors; and, (3) return of the maximum amount of MLC's $1.175 billion nonrecourse DIP loan to the U.S. Treasury, which would represent monies provided to MLC by the U.S. Treasury that were not required to effectuate the administration of the chapter 11 cases and the POL.

8. In order to provide an incentive for APS to accomplish the foregoing objectives the First Amendment provided a number of economic incentives, including:

   a. A bonus ranging from $2.5 million to $5.0 million if total unsecured claims were between $35 billion and $42 billion;

   b. A bonus of $2.5 million if a POL was confirmed by May 28, 2010;

   c. A bonus of $2.5 million if 70% of the common stock and warrants of New GM that were earmarked for the unsecured creditors was distributed within 60 days of the effective date of the POL;

   d. A bonus of 5% to the extent that priority claims were less than $100 million with no such bonus payable on the first $25 million; and

   e. A bonus of 15% of all other monies returned to the U.S. Treasury.

9. In exchange for such bonuses, the Automotive Task Force requested and received a reduction in regular hourly fees charged by APS equal to 15% of the first $60 million of hourly fees and 25% of hourly fees in excess of $60 million.

10. Among many other activities of APS during the summer and fall of 2009 was a concerted effort on the part of APS to meet with environmental regulators with respect to

3

the properties owned by MLC and how such properties would be addressed in a POL – an issue absolutely critical to the implementation of any POL. These meetings occurred with the home office and regional offices of the United States Environmental Protection Agency and related federal regulatory agencies (the "**EPA**") as well as with state governmental agencies having jurisdiction over the affected properties (the "**State Agencies**"). Additionally APS had extensive meetings with the environmental consultants that were retained by the EPA. APS' objective was to position the Debtors to be able to confirm a plan with the State Agencies' consent but also providing for a confirmable plan in the event that consensus could not be reached.

11. APS made reasonable progress in this regard and MLC believed that it was on track to file a POL by January 31, 2010. In early January 2010, however, MLC was requested by the U.S. Treasury not to file a POL until such time as the relevant agencies in the United States Government could come to full consensus on environmental remediation dollars required as well as the structure by which the post confirmation entity created by the POL would be governed.

12. The U.S. Treasury explained to MLC that the process of gaining consensus would take additional time but the benefits of reaching full consensus would be, in the U.S. Treasury's view, well worth the additional time. At the same time the U.S. Treasury acknowledged that MLC was deferring the filing of a POL at the U.S. Treasury's request and that the APS Engagement Letter, as modified by the First Amendment, would need appropriate revision since the $2.5 million bonus for confirming a POL by May 28, 2010 no longer would be capable of being earned. APS agreed to the U.S. Treasury's request, which included deferring until a later date any discussion about a revised compensation structure for APS.

4

13. In February 2010 at an update meeting at the U.S. Treasury that was attended both by the undersigned and Ted Stenger, MLC's Executive Vice President, we were advised by U.S. Treasury that the incentive bonuses of 5% and 15% of monies returned to the U.S. Treasury was proving to be a significant obstacle in reaching a consensus with respect to the treatment of environmental remediation obligations for the properties under a POL. The obstacle was evident both with the EPA and State Agencies as they viewed such bonus to potentially conflict with their objectives of maximizing funds available for the property trust under the POL. Although consensus on a POL was believed by the U.S. Treasury to be within reach, we were advised that in order to gain such acceptance the incentive payments under the First Amendment based on a percentage of monies returned to the U.S. Treasury needed to be eliminated. It was always understood that any elimination of the 5% to 15% interest in monies returned would have to be part of an alternative fee structure that would reasonably offset such loss in compensation.

14. APS was requested by the U.S. Treasury to authorize it to represent to the EPA and the State Agencies that all such bonuses had been eliminated from the terms of the APS retention. In the interest of time, the U.S. Treasury requested APS to give such authorization even though a specific amendment had not yet been negotiated. APS agreed to this request.

15. Soon thereafter a consensus was reached within all relevant federal government agencies, including the EPA, and most, if not all, State Agencies on the amount of remediation and the general structure of the post confirmation entity to be created under the POL.

16. It should be noted here that the structure of the post confirmation entity including the remediation monies and how they are to be allocated, as well as assurances that are being provided to State Agencies and the provision of contingency funds for remediation and site

5

management and development has never before been done. This post-confirmation entity structure was recommended by MLC and, with the U.S. Treasury's significant support, was advanced because it offers significant benefits to the affected State Agencies. Those benefits include the U.S. Treasury funding of a "cushion" for unanticipated environmental remediation requirements; provision of monies to demolish structures not deemed to be saleable; and provision for payment of other post-confirmation expenses. In exchange for such additional monetary benefits, however, the State Agencies are giving up the autonomy of managing individual remediation trusts that are typically associated with such environmental trust arrangements.

17.  Beginning in March 2010 APS conducted negotiations with the U.S. Treasury on the elements of a revision to the First Amendment of APS' Engagement Letter. At the U.S. Treasury's request, APS made a specific proposal for revision, provided supporting data and analysis for the U.S. Treasury's review and subsequently met at the U.S. Treasury to discuss APS' proposal in detail. At that meeting the U.S. Treasury acknowledged the proposal's structure as being fair and reasonable, and after discussion of the various elements being requested, APS and the U.S. Treasury reached agreement.

18.  In essence, APS was being asked to "turn back the clock" and enter into an amendment that would significantly reduce its expected compensation where such expected compensation was based upon detailed projections that had been updated through early 2010. APS was aware that its ultimate compensation would, by entering into this amendment, be reduced (at the mid-point of our estimates) by $6.3 million after netting out the various components that were either eliminated, added or modified. One of the components of this new

arrangement was that fee discounts incurred up through the date of receiving Bankruptcy Court approval be paid at that time and that future billings would be at regular rates.

19. Elimination of the 5% to 15% interest in monies returned to U.S. Treasury would reduce APS' compensation for these elements of our current compensation structure by $15.0 to $21.6 million. APS could not reasonably be expected to agree to such an accommodation without reasonably equivalent compensation including the elimination of the discount in hourly fees and a plan confirmation bonus. As previously stated, even with the elimination of the discount and the other agreed upon adjustments, total compensation is likely to be reduced by an amount ranging between $1million and $11.6 million, with a midpoint of $6.3 million.

20. A question has been raised as to whether it is appropriate to retroactively eliminate the hourly discount. But this component of the Third Amendment cannot be looked at in isolation. This adjustment in rates is simply part of an overall arrangement that, in the aggregate, will still result in a decrease in fees over the course of the engagement. In the absence of this critical element of the arrangement, APS would prefer to retain the terms of the existing deal negotiated with the U.S. Treasury back in 2009. Again, it should also be noted that this rate discount was not negotiated for the benefit of the creditors of these estates as they would not share in or otherwise benefit by any savings. This discount was solely for the benefit of the U.S. Treasury. Therefore, the U.S. Treasury is in the best position to assess the fairness and costs and benefits of the Third Amendment.

21. Attached as Exhibit A to this declaration is a summary that was presented to the U.S. Treasury in March 2010, which reflects the agreement that is referred to in the preceding paragraphs. The left half of the schedule presents the compensation expected to be

earned by APS under the First Amendment, which is presently in effect. The right half of the schedule presents what APS expects to earn under the Third Amendment, which is presently before this Court for approval. Our current projections are tracking to the mid-point of the ranges that are presented in Exhibit A.

22. The right half of Exhibit A reflects expected compensation to APS under the Third Amendment on an "apples to apples" comparison of elements being eliminated and elements being added or modified. It does not purport to show total compensation to be earned by APS during the pendency of this Chapter 11 case. It demonstrates that the Third Amendment restores APS billing rates to 100% of standard rates retroactively to July 10, 2009 and substitutes a $7 million fixed bonus payable upon confirmation of a POL in exchange for APS foregoing $15.0 million to $21.6 million of fees that would be earned as a percentage of monies to be returned over time to the U.S. Treasury. Exhibit A also reflects that the $2.5 million bonus for confirming a POL by May 28, 2010 will not be earned.

23. As previously noted, the negotiation with the U.S. Treasury on the Third Amendment began in March 2010. Subsequent thereto, APS prepared a draft of the Third Amendment and reviewed its content with the U.S. Treasury. It also shared that Third Amendment draft with the Committee. Finally, it was presented in final form to the Board of MLC. At that time the facts set forth in this declaration were presented to the Board along with APS' recommendation that the MLC Board approve the Third Amendment as being overall of lower cost to the estate as well as an important element of gaining a fully consensual POL with all relevant affected State and Federal Agencies.

24. At that same meeting, speaking as an authorized representative of APS, the undersigned shared with the MLC Board that APS had considered the Third Amendment and

8

believed it to be in the best business interest of both APS and MLC, for a number of business reasons many of which are set forth in this declaration.

25. The Board of MLC unanimously approved the Third Amendment and it was executed by Stephen Case, the Chairman of the Board on June 16, 2010. Thereafter it was presented to Weil, Gotshal & Manges, Debtors' counsel, for filing with and approval by this Court.

26. In summary, it is my opinion that the Third Amendment will represent a lower cost to the estate than would be the case under the existing engagement letter by approximately $6.3 million assuming confirmation of a POL on or about December 31, 2010 as is currently anticipated. The U.S. Treasury and not the creditors will be impacted by the new arrangement. In addition, the elimination of certain incentives contained in the existing fee arrangement enabled affected State Agencies and all relevant Federal agencies, including the EPA, to reach consensus on the post confirmation entity including its funding, structure and governance that may not have occurred in the absence of the Third Amendment.

27. Based on the foregoing, APS believes that this Court's approval of the Third Amendment is in the best interest of the Debtors and their estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Albert A. Koch, President and CEO of Motors Liquidation Company and an Authorized Representative of AP Services, LLC

**EXHIBIT A**

**ALIXPARTNERS**
Incentive Fee Proposal to US Treasury
March 25, 2010
(millions of US dollars)

PROPOSED TO U.S. TREASURY - MARCH 2010

| Existing Agreement | Potential Outcome | | Proposed Revisions | Potential Outcome | | Comments |
|---|---|---|---|---|---|---|
| | Low | High | | Low | High | |
| Hourly Rate Discount 85% to $60 million in total fees 75% above $60 million | (10.0) | (9.0) | 100% Effective Retroactively | | | Approximately $5.5 million thru 3/31/10 Discount estimate at $9 to $10 million thru Dec. 2010 |
| Unsecured Claims Less than $35 billion = $5 million $35 to $42 billion = $2.5 million More than $42 billion = $0 | 2.5 | 5.0 | No change other than to clarify that between $35 and $42 billion is pro rata | 2.5 | 5.0 | |
| Confirm POR by 5/28/10 | 0.0 | 2.5 | Eliminate | | | Time driven date may incent behavior that does not benefit the estate or the US Treasury |
| Distribution of 70% of stock and warrants within 60 days of Effective Date of POR | 2.5 | 2.5 | No change; appropriate for creditors | 2.5 | 2.5 | |
| Reduction of Priority Claims from $100 million 5% of excess over $25 million | 3.0 | 3.5 | Eliminate | | | Estimate $85 to $95 million returned |
| Reduction of all other Wind-Down Costs 15% of amounts returned to UST million at Effective Date(range of $16 million to $106 million) NPV of 15% on funds returned in out years (range of $124 million to $59 million) | 2.4 12.6 | 15.9 5.7 | Fixed bonus payable upon confirmation of POR | 7.0 | 7.0 | Estimated assuming intial funding for remediation ranges from $460 (High) to $550 (Low) including a range of monies for settlement of alleged administrative liabilities at 9 sites. Funds returned in High case results in significantly higher return of funds to UST at closing. The Low case has a lower amount returned and it is shifted to the out years. |
| Sub total | 15.0 | 21.6 | | 7.0 | 7.0 | |
| **Total Range of Original Terms** | **13.0** | **26.1** | **Total Range of Proposed Revised Terms** | **12.0** | **14.5** | |
| *Memo Only:* Previously court approved incentive fee payable July 2010 | 6.5 | 6.5 | No change | 6.5 | 6.5 | Previously earned and listed here for full disclosure |