**Hearing Date and Time: September 7, 2010, 9:45 a.m. (Eastern Time)**
**Objection Deadline: September 1, 2010**

Jean-Marie L. Atamian (jatamian@mayerbrown.com)
Frederick D. Hyman (fhyman@mayerbrown.com)
Mayer Brown LLP
1675 Broadway, 19th Floor
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

*Counsel for Bayerische Motoren Werke Aktiengesellschaft*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                                         :
                                                               :     Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY, *et al.*,                          :
 f/k/a General Motors Corp., *et al.*                          :     09-50026 (REG)
                                                               :
              Debtors.                                         :     (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT'S
OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO
SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE
AUTHORIZING, AMONG OTHER THINGS, THE ASSUMPTION AND
ASSIGNMENT OF THE BMW CONTRACT IN CONNECTION WITH THE
DEBTORS' ENTRY INTO A STOCK PURCHASE AGREEMENT WITH
<u>GENERAL MOTORS HOLDINGS, S.L.</u>**

**Table of Contents**

|  | PAGE |
|---|---|
| Preliminary Statement | 1 |
| I. The Motion | 2 |
| II. Request for Evidentiary Hearing to the Extent Required | 2 |
| III. Statement of Relevant Facts | 3 |
|     A. The Delivery Agreement | 3 |
|     B. Debtor's Inability to Perform Under the Delivery Agreement | 4 |
|     C. The Adversary Proceeding (Adv. No. 10-05006) | 8 |
|     D. Debtor's Breach of the Confidentiality Agreement | 9 |
| IV. Argument | 11 |
|     A. Debtor Can Neither Cure its Defaults Nor Provide Adequate Assurance of Future Performance As Required by Section 365(b) | 11 |
|     B. The Debtor Cannot Provide Adequate Assurance of Future Performance by the Assignee Under Section 365(f) | 15 |
| V. Reservation of Rights | 16 |
| VI. Conclusion | 17 |

# Table of Authorities

PAGE

**Cases**

In re DBSI Inc., 405 B.R. 698 (Bankr. D. Del. 2009)                   12,15

In re Empire Equities Capital Corp., 405 B.R. 687 (Bankr. S.D.N.Y. 2009)    12,13

In re Fleming Companies, Inc., 499 F.3d. 300 (3d Cir. 2007)            14,15,16

In re Metromedia Fiber Network, Inc., 335 B.R. 41 (Bankr. S.D.N.Y. 2005)    14,15


**Other Authorities**

11 U.S.C. § 365(b) and (f)                                             1,11-16

Collier on Bankruptcy ¶ 365.06 (16th ed. rev. 2010)                    12,14,15

8B C.J.S. Bankruptcy § 931 (2010)                                      12

31 Williston on Contracts § 78:56 (4th ed. 2010)                       13

**PRELIMINARY STATEMENT**

Bayerische Motoren Werke Aktiengesellschaft ("**BMW**"), by its undersigned counsel, respectfully submits this Objection to Part II of the Motion of Debtors Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for an Order Authorizing (I) the Debtors to Enter into a Stock Purchase Agreement with General Motors Holdings, S.L., and (II) the Assumption and Assignment of the BMW Contract in Connection with the Debtors' Entry into the Stock Purchase Agreement, dated August 13, 2010 (the "**Motion**").[1]

Debtor seeks to assume a contract pursuant to which it is required to manufacture and sell certain transmissions to BMW, which transmissions must meet BMW's ongoing technical and timing specifications. Fatal to Debtor's Motion is the plain fact that there exist material, incurable defaults under the agreement it seeks to assume. Debtor does not have any proposed cure or any assurance that either it, or the proposed assignee, has the wherewithal to prospectively perform the underlying agreement as required under 11 U.S.C. § 365(b). Accordingly, Debtor's motion to assume should be denied.

Moreover, assuming *arguendo* that this Court allows Debtor to assume the subject agreement, 11 U.S.C. § 365(f) precludes any attempt by Debtor to assign the agreement because there has not been -- and indeed there cannot be -- any assurance that the proposed assignee can adequately perform under the agreement.

---

[1] At the outset, BMW notes that it expressly reserves and does not waive any jurisdictional, venue or other defenses or other rights with respect to this action or any other action or proceeding in this Court or any court in the United States. As explained below, Debtors have commenced an Adversary Proceeding against BMW, in defense of which BMW intends to show, among other things, that the action must be dismissed because: (i) this Court lacks personal jurisdiction over BMW; (ii) a mandatory forum selection clause designates Germany as the exclusive forum for any dispute arising under the Delivery Agreement; and (iii) the action has no connection (alleged or otherwise) to New York, or the United States, and thus should be dismissed on *forum non conveniens* grounds. We note that Debtor's counsel, Weil Gotshal & Manges ("Weil"), has represented BMW in numerous actions initiated in the United States and in connection therewith has successfully challenged the jurisdiction of courts in the United States over BMW. BMW hereby reserves it right to challenge Weil's representation of Debtor as against BMW.

1

In support of this Objection, BMW respectfully represents as follows:

## I. THE MOTION

1. Motors Liquidation Company ("**MLC**" or the "**Debtor**") [2] has filed its Motion for an order authorizing the Debtor to enter into a Stock Purchase Agreement ("**SPA**") with General Motors Automotive Holdings, S.L. (the "**Purchaser**"), a wholly owned subsidiary of General Motors, LLC ("**New GM**"), with respect to the stock of General Motors Strasbourg, S.A.S. (for the purposes of this Objection, collectively, the "**Assignee**").

2. The Motion also requests approval of the assumption and assignment of MLC's contract with BMW to Assignee.

3. The Motion provides that BMW may file an objection by August 30, 2010. By stipulation between the parties, BMW filed this timely Objection by September 1, 2010.

## II. REQUEST FOR EVIDENTIARY HEARING TO THE EXTENT REQUIRED

4. Pursuant to Southern District of New York Bankruptcy Local Rule 9014-2, the first scheduled hearing in a contested matter (*e.g.,* a Motion and an Objection to a Motion), as with the hearing scheduled for September 7, 2010 in connection with this Motion, cannot be an evidentiary hearing at which witnesses may testify unless the contested matter falls within certain delineated exceptions, none of which is applicable here.

5. In the likely event that this Court shall require an evidentiary hearing to reach a determination on the instant Motion and Objection, BMW respectfully requests that this Court schedule an evidentiary hearing on a date no earlier than September 30, 2010, thus allowing sufficient time for BMW witnesses (all of whom are located in Germany) to travel to New York and, to the extent necessary, the translation of German-language documents.

---

[2] The Debtor filed a voluntary petition for relief on June 1, 2009.

2

## III. STATEMENT OF RELEVANT FACTS

**A.     The Delivery Agreement**

6. On or about May 6, 2004, BMW entered into a contract with General Motors Corporation, acting through its Powertrain Group ("**GMPT**") (collectively, the "**Parties**"). Under the contract, referred to herein as the "**6L45 Development and Delivery Agreement**," the "**Delivery Agreement**" or the "**BMW Contract**," BMW was to purchase from GMPT, and GMPT was to manufacture and sell to BMW, certain transmissions ("**Contract Goods**").[3]

7. GMPT authorized GM Strasbourg SAS ("**GM Strasbourg**"), a company organized and existing under the laws of France, to perform its obligations under the Delivery Agreement. Delivery Agreement, at § 1.1.

8. In connection therewith, the Parties entered into a Confidentiality Agreement on May 6, 2004, requiring that all information pertaining to the 6L45 Automatic Transmission System, including, *inter alia*, the know-how, description of the project, time schedules, target requirements, and any other nonpublic information, be kept strictly confidential. Confidentiality Agreement, at 2. The Parties further agreed that such information "shall neither be released to any third party nor misused in any other way." Id. The Confidentiality Agreement is included as an exhibit to, and incorporated into, the Delivery Agreement. (see Section III.D for discussion of Debtor's defaults specific to the Confidentiality Agreement).

---

[3]     As explained herein (see Section III.C), the Delivery Agreement (and Confidentiality Agreement, which is an exhibit thereto) were attached as an exhibit to the original adversary complaint filed by Debtor on January 25, 2010. By order dated February 2, 2010, the complaint and exhibits were restricted from view. BMW has not attached the Delivery Agreement to this Objection due to the confidentiality of that agreement, and notes that the agreement is already part of this Court's docket.

3

B. **Debtor's Inability to Perform Under the Delivery Agreement**

9. Under the Delivery Agreement, BMW was to purchase from Debtor, and Debtor was to manufacture and sell to BMW, certain transmissions. The Delivery Agreement contained purchase volume requirements, *always provided that* Debtor could timely supply BMW with transmissions meeting BMW's technical specifications. Delivery Agreement, at § 2.3.3; Declaration of Dr. Johann Wieland, at ¶ 7, attached hereto as Exhibit A ("Wieland Decl.").

10. Is it axiomatic that in an agreement whereby an auto manufacturer agrees to purchase, and a supplier (also an auto manufacturer) agrees to supply, transmissions for a **10 year period** that the technology and specifications of those transmissions will change over time. Delivery Agreement, at § 2.3.3 and § 4; Wieland Decl. ¶ 8.

11. Given the highly competitive nature of the automotive industry and customer demand, BMW not only must keep up with current trends, technologies and regulations -- BMW must stay *ahead* of the proverbial curve to maintain its competitiveness against other premium automotive manufacturers. Wieland Decl. ¶ 9.

12. The importance of Debtors being able to meet changing technology and specifications to enable BMW to remain competitive in the marketplace was recognized by the Parties in the Delivery Agreement. For example, Section 2.3.3 of the Delivery Agreement required that: "An essential prerequisite to this agreement is the competitiveness of GMPT's product regarding quality, technical functions and price at least compared to suitable competitors. Another such prerequisite is GMPT['s] ability to provide sufficient production and delivery capabilities." Delivery Agreement, at § 2.3.3; Wieland Decl. ¶ 10.

13. The Delivery Agreement required that Debtor provide transmissions with updated, current technology pursuant to BMW's changing and ongoing specifications, a requirement of which Debtor was well aware. Delivery Agreement, at § 5.1.2; Wieland Decl. ¶ 11.

4

14. It defies logic to suggest that BMW would enter into an agreement which would require it to purchase the original -- inevitably and eventually outdated -- technology for the next 10 years, which is precisely why the Delivery Agreement required that Debtor meet BMW's ongoing and changing technical requirements over the course of the agreement. Section 5.1.2 of the Delivery Agreement expressly says that Debtor "shall provide BMW with development services for ongoing series support and future development." Delivery Agreement, at § 5.1.2; Wieland Decl. ¶ 12.

15. From 2004 until the end of 2007, the Parties enjoyed a mutually beneficial arrangement under the Delivery Agreement. During that time, Debtor provided BMW with the requested transmissions as agreed in the Delivery Agreement, for which Debtor was paid in full. Wieland Decl. ¶ 13.

16. Not surprisingly, in 2008, various factors required BMW to update the specifications for the transmissions Debtor was to provide. Wieland Decl. ¶ 14.

17. By way of example, in Europe, auto manufacturers began to implement "Start-Stop" technology which, in effect, turned off the vehicle's engine while the vehicle was stopped -- thus, reducing the carbon output associated with operating a vehicle. Wieland Decl. ¶ 15.

18. In addition, members of the European Manufacturers Association -- including BMW -- faced monetary penalties if they did not take certain steps to reduce carbon output of their engines. Wieland Decl. ¶ 16.

19. Simultaneous to the increasing awareness of customers worldwide towards fuel-economy and of global warming, legislators on every continent, including but not limited to the United States National Highway Traffic Safety Administration (NHTSA) and the European Commission, forced vehicle manufacturers to implement radical fuel economy strategies and ambitious technical solutions. Wieland Decl. ¶ 18.

5

20. The new technologies requested by BMW from the Debtor would have materially reduced the fuel-consumption by BMW vehicles.  Wieland Decl. ¶ 19.

21. It is well-known in the automotive industry that a critical component of achieving a reduction of the carbon output of vehicle engines is to improve the efficiency of the transmissions (*e.g.*, by the utilization of Start-Stop technology).  Wieland Decl. ¶ 17.

22. For these reasons and others, in 2008, BMW notified Debtor that "Start-Stop" technology, in conjunction with the "Shift-by-Wire"/ETRS technology also required by the Delivery Agreement, would be required for all future vehicle/engine applications for transmissions supplied to BMW pursuant to the Delivery Agreement beginning with August 2011.  Wieland Decl. ¶ 20.

23. Indeed, *inter alia*, BMW made clear to Debtor that BMW intended to use the transmissions supplied by Debtor (with the required ETRS and Start-Stop technology) in its new vehicle line, which vehicle line had a non-negotiable Start of Production date ("SoP") of August 2011.  Wieland Decl. ¶ 21.

24. Following this notification, Debtor proposed certain purported solutions to BMW. However, those proposals were unacceptable to BMW for various reasons, *inter alia*, the technologies could not be integrated into BMW's new vehicle line, were not commercially competitive, and could not meet BMW's deadlines for its August 2011 SoP of the new vehicle line.  In addition, some of Debtor's proposals would have required BMW to make complex and costly changes to its vehicle architecture.  Wieland Decl. ¶ 22.

25. Despite the exchange of numerous letters and in-depth discussions, ultimately, by letter dated November 19, 2009, BMW notified Debtor that none of Debtor's proposals

provided BMW with a "competitive solution regarding timing, technology and cost." (the "**November 19 Letter**");[4] Wieland Decl. ¶ 23.

26. In the November 19 Letter, BMW referenced the various correspondence between the Parties documenting Debtor's "failure to offer BMW technologically advanced products" and noted that "[Debtor] finally confirmed during the conference call on [February 11, 2009] that ETRS and Start-Stop technology will not be available for BMW's SoP L7 (*i.e.* the new car line) in 08/2011." November 19 Letter, at 2. Thus, BMW explained that it was "forced by [Debtor] to revise the 6L45 volume planning as the 6L45 transmissions cannot be utilized in the L7 (*i.e.* the new car line)." Id.

27. In addition, BMW noted that "[n]either the proposed [Debtor] SoP in 7/2012 nor the proposed technical solution which is probably commercially not competitive and can only be integrated with further extensive changes to the BMW vehicle architecture [was] acceptable for BMW." Id.

28. In the November 19 Letter, BMW also reminded Debtor that pursuant to the Delivery Agreement it was essential "that [Debtor] produces and delivers BMW technologically advanced products at competitive pricing" and that "[i]t is clear in the Agreement that [Debtor's] inability to do so would result in a decrease in volume." Id.

29. Finally, BMW notified Debtor that it should expect a reduction in volume due to Debtor's "inability to meet the 'quality, technical functions and price at least compared to suitable competitors' as required by Section 2.3.3 of the [Delivery] Agreement." Id.

---

[4]  The November 19 Letter was attached as an exhibit to the original adversary complaint filed by Debtor on January 25, 2010. By order dated February 2, 2010, the complaint and exhibits were restricted from view. BMW has not attached the November 19 Letter to this Objection due to the confidentiality of that document, and notes that the letter is already part of this Court's docket. To the extent this Court would like to review other correspondence between the Parties, BMW will file such letters in a subsequent submission and request that the Court restrict such documents from public view.

C.      **The Adversary Proceeding (*Adv. No. 10-05006*)**

30. On January 25, 2010, and in a material breach of the Confidentiality Agreement (see Section III.A and D), Debtor publicly filed an adversary complaint in the Bankruptcy Court for the Southern District of New York against BMW ("**Complaint**"), attaching the Delivery Agreement, with exhibits (including the Confidentiality Agreement) and certain letters between the Parties concerning the Delivery Agreement (collectively, the "**Confidential Exhibits**").

31. Because these documents were not filed under seal, they were readily accessible to the public. Debtor, in apparent recognition as to the magnitude of its breach, obtained an Order restricting from view the Complaint and Confidential Exhibits, which order was entered on or about February 2, 2010.

32. On February 3, 2010, Debtor filed a First Amended Adversary Complaint (the "**Amended Complaint**"), without exhibits, against BMW. The Amended Complaint also contains nonpublic information that is subject to the Confidentiality Agreement.

33. In the adversary proceeding, Debtor seeks a declaratory judgment that it has fully performed all of its obligations under the Delivery Agreement and either an order requiring BMW to specifically perform its alleged contractual obligations or damages for the alleged breach of contract.

34. Pursuant to the choice of law provision in the Delivery Agreement, each of Debtor's claims is governed by German law. Delivery Agreement, at § 12.1.[5]

---

[5]    Both the Delivery Agreement and Confidentiality Agreement contained choice of law provisions requiring the application of German law to any dispute arising thereunder. Delivery Agreement, at § 12.1; Confidentiality Agreement, at ¶ 7. Moreover, in connection with disputes arising under both the Delivery Agreement and Confidentiality Agreement, the Parties submitted to the exclusive jurisdiction of the German judicial system. Delivery Agreement, at §12.3; Confidentiality Agreement, at ¶ 7.

8

35. Because BMW is located in Germany, MLC was required to serve the Amended Complaint pursuant to the Hague Convention. On May 6, 2010, MLC filed a Certificate of Service indicating that, on April 23, 2010, service had been effected upon BMW pursuant to the Hague Convention.

36. By Endorsed Order dated May 17, 2010, this Court established BMW's time to answer or move as June 15, 2010 and further ordered that a pre-trial conference be held on May 27, 2010.

37. Pursuant to this Court's ruling at the May 27, 2010 conference, the Parties entered into a stipulation, so ordered by this Court on June 17, 2010, extending BMW's time to answer or otherwise move to October 8, 2010, following a September 17, 2010 conference.

**D.    Debtor's Breach of the Confidentiality Agreement**

38. In blatant disregard, and in breach, of the Confidentiality Agreement (attached to, and incorporated in, the Delivery Agreement) on January 25, 2010, Debtor publicly filed the Complaint and Confidential Exhibits -- which contained highly confidential and proprietary information. Wieland Decl. ¶ 24.

39. Copies of those documents remained accessible to the public after the Complaint and Confidential Exhibits were placed under restricted view. Wieland Decl. ¶ 25.

40. For example, on March 9, 2010, BMW was able to access the Complaint and Confidential Exhibits by conducting a basic search on the Google search engine.[6] Wieland Decl. ¶ 26.

---

[6]    BMW notified Debtor of this fact by letter dated March 9, 2010, to which Debtor responded that it did not believe it had breached the Confidentiality Agreement, but nonetheless would contact the entity that posted the Complaint and request that the Complaint be removed.

9

41. Moreover, and in further violation of the Confidentiality Agreement, Debtor failed to file the Amended Complaint under seal and, thus, this document remains readily accessible to the public. Wieland Decl. ¶ 27.

42. Debtor's publication of highly sensitive and confidential information to the public, including BMW's competitors and suppliers, has caused and will continue to cause severe and irreparable damage to BMW. Wieland Decl. ¶ 28.

43. For instance, on February 9, 2010, BMW was contacted by Bosch Automotive ("Bosch") -- with whom it had been engaged in negotiation for a purchasing agreement regarding several powertrain components -- and informed that Bosch had analyzed the details of BMW's agreement with Debtor and now demanded more favorable commercial conditions. Wieland Decl. ¶ 29.

44. Similarly, on February 3, 2010, BMW was contacted by ZF Friedrichshafen AG ("ZF") -- with whom it had been engaged in lengthy negotiation for the prices of transmissions -- and informed that ZF had also analyzed BMW's agreement with Debtor in detail. Since then, ZF was no longer willing to concede more favorable pricing. It is BMW's belief that several transmission suppliers, including ZF, also obtained a copy of the Delivery Agreement and attachments thereto. Several of their executives contacted BMW management and commented on the content of the Delivery Agreement. Wieland Decl. ¶ 30.

45. Similarly, shortly after the confidential information being made publicly available by MLC, BMW was contacted by Aisin AW -- with whom it had also been engaged in lengthy negotiations for the purchase of transmissions -- and indicated that Aisin had also analyzed BMW's agreement with Debtor in detail. Wieland Decl. ¶ 31.

10

46. It is also BMW's belief that competitors obtained a copy of the Delivery Agreement and attachments thereto and will take actions causing damage to BMW's future earnings. Wieland Decl. ¶ 32.

47. Although BMW is still in the process of assessing the economic impact of Debtor's wrongful action, it believes that its damages will be a minimum of € 59,000,000.00. Moreover, now that this confidential information concerning pricing and specifications is in the public domain, BMW will be subjected to irreparable damage -- indefinitely. Wieland Decl. ¶ 33.

## IV. ARGUMENT

**A.    Debtor Can Neither Cure its Defaults Nor Provide Adequate Assurance of Future Performance As Required by Section 365(b)**

48. Pursuant to 11 U.S.C. § 365(b)(1):

> [i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

11

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1)(A-C); <u>see also</u>, Collier on Bankruptcy ¶ 365.06[3] (16th ed. rev. 2010).

49. Section 365(b)(1) of the Bankruptcy Code permits a debtor to assume an executory contract *only if* it: (a) cures defaults under the agreement; (b) compensates the non-debtor for actual pecuniary losses; and (c) provides adequate assurance of future performance. <u>See</u> 11 U.S.C. § 365(b)(1). Debtor cannot satisfy even one of these requirements.

50. The above-referenced grounds "are intended to provide the non-debtor party with the benefit of its bargain by assuring substantial compliance with the terms of the contract." <u>In re Empire Equities Capital Corp.</u>, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) (citation omitted).

51. Prior to assuming a defaulted executory contract, the Debtor must cure any defaults and compensate the non-debtor party (here, BMW) for any actual pecuniary losses resulting from the defaults. <u>See</u>, e.g., 8B C.J.S. Bankruptcy § 931 (2010); <u>see also</u> <u>In re DBSI Inc.</u>, 405 B.R. 698, 704 (Bankr. D. Del. 2009). The non-debtor party to a defaulted contract is entitled to actual pecuniary losses resulting from debtor's default that it is able to prove, that are authorized by the parties' agreement, and that are reasonable. <u>See id.</u>

52. The amount of compensation to which a non-debtor is entitled is referred to as the "cure amount." To establish the cure amount, "[c]ourts examine the provisions of the underlying contract and non-bankruptcy law to determine the nature of a default and the cure it requires, for the purposes of § 365." <u>In re Empire Equities Capital Corp.</u>, 405 B.R. at 691 (citations omitted).

53. Although the statute provides for a cure payment in some instances, certain defaults nonetheless "preclude[] assumption of an executory contract under 365 if it is both incurable

12

and material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange." In re Empire Equities Capital Corp., 405 B.R. at 691 (finding debtor's failure to take action within time provided for by contract was incurable and contract could not be assumed) (citations omitted); 31 Williston on Contracts § 78:56 (4th ed. 2010) (where a default is non-monetary, is not curable, and is material or causes substantial economic detriment, debtor is precluded from assuming the contract).

54. Here, as an initial matter, the assumption must be prohibited because the material, non-monetary defaults are inherently incurable.

55. With respect to Debtor's default under the Confidentiality Agreement (see Section III.D), it is impossible to quantify the damages BMW has, and will, suffer as a result of Debtor's breach of that agreement. Debtor has disseminated to the public highly sensitive and confidential information which can, will and indeed has been used by third parties, such as competitors and other suppliers, to the detriment of BMW. BMW acknowledges that a cure amount theoretically could be ascertained with respect to the several suppliers that have already obtained the specifications of the Delivery Agreement and demanded more favorable pricing; however, it is indisputable that the extent, scope and nature of ongoing and future detriment threatening BMW simply cannot be calculated.

56. As to Debtor's performance defaults under the Delivery Agreement, Debtor's refusal or inability to provide the transmissions required by BMW does not readily lend itself to the calculation of a monetary cure. Rather, the appropriate remedy is a non-monetary cure (a reduction of the volume requirements in the Delivery Agreement), thus providing support for BMW's argument that the Delivery Agreement cannot be assumed and assigned. Should this Court determine that it is possible to calculate a cure amount for Debtor's performance default under the Delivery Agreement, BMW respectfully submits that the Court hold an

13

evidentiary hearing to determine any alleged amount. However, BMW notes that even if a cure amount could be ascertained with respect to Debtor's performance defaults, a failure to cure the defaults under the Confidentiality Agreement -- a part of the Delivery Agreement -- should nonetheless preclude the assumption of the Delivery Agreement as a whole.

57. In any event, even if this Court were to determine that Debtor could somehow cure its defaults under the Delivery Agreement and Confidentiality Agreement, the assumption of the agreement must nonetheless be barred because Debtor cannot possibly provide adequate assurance of future performance under the Delivery Agreement.

58. 11 U.S.C. § 365(b)(1)(C) requires the trustee to provide "adequate assurance of future performance" under the terms of the contract or lease to be assumed. 11 U.S.C. § 365(b)(1)(C); See also generally Collier on Bankruptcy ¶ 365.06 (16th ed. rev. 2010); see also In re Fleming Companies, Inc., 499 F.3d. 300, 307 (3d Cir. 2007) (where debtor sought to assign agreement that required shipment of goods from specific warehouse, court found that "'supply ... from the [particular facility]' is both a material and an economically significant term of the contact, and [debtor] by its own actions, cannot give adequate assurance of performance").

59. "[T]he Bankruptcy Code adopted the phrase 'adequate assurance of future performance' from Uniform Commercial Code § 2-609(1), which provides that 'when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance ....'" In re Fleming Companies, Inc., 499 F.3d at 305 (quoting UCC § 2-609(1)); see also In re Metromedia Fiber Network, Inc., 335 B.R. 41 (Bankr. S.D.N.Y. 2005) (where debtor sought to assume a contract for the lease of dark optical fiber strands in various cities in the United States, non-debtor lessee successfully objected on the basis that the debtor could not provide adequate

14

assurance of future performance where the debtor had not yet constructed the fiber backbone network in multiple metropolitan areas); In re DBSI Inc., 405 B.R. at 708 (finding adequate assurance of future performance was not proven).

60. Here, Debtor has not -- and indeed cannot -- provide adequate assurance of future performance under the Delivery Agreement because Assignee will continue to operate the Strasbourg facility and will not, as it has already established and indeed admitted, be able to meet BMW's technical specifications, let alone accommodate the new vehicle line SoP in 2011. Moreover, Debtor, in correspondence to, and communications with, BMW, has made it crystal clear that it cannot, and will not, provide the required technology to BMW, thus barring assumption here. See e.g., In re Metromedia Fiber Network, Inc., 335 B.R. at 68 ("Any doubt as to [party's] future performance is laid to rest by the unequivocal testimony of its trial witness that [party] has no plans to undertake any further construction of the backbone networks.").

### B. The Debtor Cannot Provide Adequate Assurance of Future Performance by the Assignee Under Section 365(f)

61. Even assuming, *arguendo*, that this Court does not find that Debtor has defaulted under the Delivery Agreement and Confidentiality Agreement such that Section 365(c) would prohibit the assumption thereof, this Court should nonetheless deny Debtor's motion to assign the Delivery Agreement pursuant to Section 365(f) of the Bankruptcy Code.

62. Section 365(f)(2) provides that: "The trustee may assign an executory contract or unexpired lease of the debtor only if . . . (B) **adequate assurance of future performance by the assignee of such contract or lease is provided whether or not there has been a default in such contract or lease.**" 11 U.S.C. § 365(f)(2) (emphasis added); see also Collier on Bankruptcy ¶ 365.09[1] (16th ed. rev. 2010) ("[e]ven if the contract is not in

15

default adequate assurance of future performance must be provided before the trustee can assign an executory contract or lease."); In re Fleming Companies, Inc., 499 F.3d. at 308.

63. For those reasons explained above in connection with Section 365(b)(1)(C) (see Section IV.A, *supra*), MLC has not -- and indeed cannot -- provide adequate assurance of future performance by the Assignee because it would continue to operate the existing Strasbourg facility and will not be able to meet BMW's technical specifications, let alone accommodate the new vehicle line SoP in 2011.

## V. RESERVATION OF RIGHTS

64. BMW reserves the right to: (a) amend, supplement, or otherwise modify this Objection as necessary or proper; and (b) raise such other and further objections to any proposed assumption and assignment, and/or the cure amount with respect to the proposed assumption and assignment.

## VI. CONCLUSION

65. Based on the foregoing, BMW respectfully requests that this Court enter an Order sustaining this Objection in its entirety and providing BMW with such other and further relief as is appropriate.

Dated:  New York, NY
        August 31, 2010

Respectfully submitted,

MAYER BROWN LLP

By: /s/ Frederick D. Hyman

Jean-Marie L. Atamian (jatamian@mayerbrown.com)
Frederick D. Hyman (fhyman@mayerbrown.com)
1675 Broadway, 19th Floor
New York, New York 10019
Tel:  (212) 506-2500
Fax:  (212) 262-1910