**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
| In re: | : | |
| | : | Chapter 11 Case No. |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | |
| f/k/a General Motors Corp., *et al.* | : | 09-50026 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------x

### **DECLARATION OF DR. JOHANN WIELAND**

Dr. Johann Wieland, pursuant to 28 U.S.C. § 1746, declares:

1.  I am the Senior Vice President of Purchasing for Bayerische Motoren Werke Aktiengesellschaft's ("BMW") Powertrain Group and have personal knowledge of the facts set forth herein.

2.  I submit this declaration in support of BMW's Objection to Part II of the Motion of Debtors Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for an Order Authorizing (I) the Debtors to Enter into a Stock Purchase Agreement with General Motors Holdings, S.L., and (II) the Assumption and Assignment of the BMW Contract in Connection with the Debtors' Entry into the Stock Purchase Agreement, dated August 31, 2010 (the "Objection").

**The Delivery Agreement and the Confidentiality Agreement**

3.  On or about May 6, 2004, BMW entered into a contract with General Motors Corporation, acting through its Powertrain Group ("GMPT") (collectively, the "Parties"). Under the contract, referred to in BMW's Objection as the "6L45 Development and Delivery Agreement", the "Delivery Agreement" or the "BMW Contract," BMW was to purchase from GMPT, and GMPT was to manufacture and sell to BMW, certain transmissions ("Contract Goods").

4. GMPT authorized GM Strasbourg SAS ("GM Strasbourg"), a company organized and existing under the laws of France, to perform its obligations under the Delivery Agreement. Delivery Agreement, at § 1.1.

5. In connection therewith, the Parties entered into a Confidentiality Agreement on May 6, 2004, requiring that all information pertaining to the 6L45 Automatic Transmission System, including, inter alia, the know-how, description of the project, time schedules, target requirements, and any other nonpublic information, be kept strictly confidential. The Confidentiality Agreement is included as an exhibit to, and incorporated into, the Delivery Agreement.

**Debtor's Inability to Perform Under the Delivery Agreement**

6. I was involved in the negotiations about Debtor's non-performance under the Delivery Agreement since 2008.

7. Under the Delivery Agreement, BMW was to purchase from Debtor, and Debtor was to manufacture and sell to BMW, certain transmissions. The Delivery Agreement contained purchase volume requirements, *always provided that* Debtor could timely supply BMW with transmissions meeting BMW's technical specifications. Delivery Agreement, at § 2.3.3.

8. Is it axiomatic that in an agreement whereby an auto manufacturer agrees to purchase, and a supplier (also an auto manufacturer) agrees to supply, transmissions for a **10 year period** that the technology and specifications of those transmissions will change over time. Delivery Agreement, at § 2.3.3 and § 4.

9. Given the highly competitive nature of the automotive industry and customer demand, BMW not only must keep up with current trends, technologies and regulations -- BMW must stay *ahead* of the proverbial curve to maintain its competitiveness against other premium automotive manufacturers.

10. The importance of Debtor's being able to meet changing technology and specifications to enable BMW to remain competitive in the marketplace was recognized by the Parties in the Delivery Agreement. For example, Section 2.3.3 of the Delivery Agreement required that: "An essential prerequisite to this agreement is the competitiveness of GMPT's product regarding quality, technical functions and price at least compares to suitable competitors. Another such prerequisite is GMPT['s] ability to provide sufficient production and delivery capabilities." Delivery Agreement, at § 2.3.3.

11. The Delivery Agreement required that Debtor provide transmissions with updated, current technology pursuant to BMW's changing and ongoing specifications, a requirement of which Debtor was well aware. Delivery Agreement, at § 5.1.2.

12. It defies logic to suggest that BMW would enter into an agreement in 2005 which would require it to purchase the original -- inevitably and eventually outdated -- technology for the next 10 years, which is precisely why the Delivery Agreement required that Debtor meet BMW's ongoing and changing technical requirements over the course of the agreement. Section 5.1.2 of the Delivery Agreement expressly says that Debtor "shall provide BMW with development services for ongoing series support and future development." Delivery Agreement, at § 5.1.2.

13. From 2004 until the end of 2007, the Parties enjoyed a mutually beneficial arrangement under the Delivery Agreement. During that time, Debtor provided BMW with the requested transmissions as agreed in the Delivery Agreement, for which Debtor was paid in full.

14. Not surprisingly, in 2008, various factors required BMW to update the specifications for the transmissions Debtor was to provide.

15. By way of example, in Europe, auto manufacturers began to implement "Start-Stop" technology which, in effect, turned off the vehicle's engine while the vehicle was stopped -- thus, reducing the carbon output associated with operating a vehicle.

16. In addition, members of the European Manufacturers Association -- including BMW -- faced monetary penalties if they did not take certain steps to reduce carbon output of their engines.

17. It is well-known in the automotive industry that a critical component of achieving a reduction of the carbon output of vehicle engines is to improve the efficiency of the transmissions (e.g., by the utilization of Start-Stop technology).

18. Simultaneous to the increasing awareness of customers worldwide towards fuel-economy and of global warming, legislators on every continent, including but not limited to the United States National Highway Traffic Safety Administration (NHTSA) and the European Commission, forced vehicle manufacturers to implement radical fuel economy strategies and ambitious technical solutions.

19. Technically the remaining potential for fuel-saving measures in transmissions is enormous. The new technologies requested by BMW from the Debtor would have materially reduced the fuel-consumption by BMW vehicles.

20. For these reasons and others, in 2008, BMW notified Debtor that "Start-Stop" technology, in conjunction with the "Shift-by-Wire"/ETRS technology also required by the Delivery Agreement, would be required for all future vehicle/engine applications for transmissions supplied to BMW pursuant to the Delivery Agreement beginning with August 2011.

21. Indeed, *inter alia*, BMW made clear to Debtor that BMW intended to use the transmissions supplied by Debtor (with the required ETRS and Start-Stop technology) in its new

4

vehicle line, which vehicle line had a non-negotiable Start of Production date ("SoP") of August 2011.

22. Following this notification, Debtor proposed certain purported solutions to BMW. However, those proposals were unacceptable to BMW for various reasons, *inter alia*, the technologies could not be integrated into BMW's new vehicle line, were not commercially competitive, and could not meet BMW's deadlines for its August 2011 SoP of the new vehicle line. In addition, some of Debtor's proposals would have required BMW to make complex and costly changes to its vehicle architecture.

23. Despite the exchange of numerous letters and in-depth discussions, ultimately, by letter dated November 19, 2009, BMW notified Debtor that none of Debtor's proposals provided BMW with a "competitive solution regarding timing, technology and cost." (the "**November 19 Letter**").

**Debtor's Breach of the Confidentiality Agreement**

24. In blatant disregard, and in breach, of the Confidentiality Agreement (attached to, and incorporated in, the Delivery Agreement) on January 25, 2010, Debtor publicly filed the Complaint and Confidential Exhibits -- which contained highly confidential and proprietary information.

25. Copies of those documents remained accessible to the public after the Complaint and Confidential Exhibits were placed under restricted view.

26. For example, on March 9, 2010, BMW was able to access the Complaint and Confidential Exhibits by conducting a basic search on the Google search engine.

27.     Moreover, and in further violation of the Confidentiality Agreement, Debtor failed to file the Amended Complaint under seal and, thus, this document remains readily accessible to the public.

28.     Debtor's publication of highly sensitive and confidential information to the public, including BMW's competitors and suppliers, has caused and will continue to cause severe and irreparable damage to BMW.

29.     For instance, on February 9, 2010, BMW was contacted by Bosch Automotive ("Bosch") -- with whom it had been engaged in negotiation for a purchasing agreement regarding several powertrain components -- and informed that Bosch had analyzed the details of BMW's agreement with Debtor and now demanded more favorable commercial conditions.

30.     Similarly, on February 3, 2010, BMW was contacted by ZF Friedrichshafen AG ("ZF") -- with whom it had been engaged in lengthy negotiation for the prices of transmissions -- and informed that ZF had also analyzed BMW's agreement with Debtor in detail. Since then, ZF was no longer willing to concede more favorable pricing. It is BMW's belief that several transmission suppliers, including ZF, also obtained a copy of the Delivery Agreement and attachments thereto. Several of their executives contacted BMW management and commented on the content of the Delivery Agreement.

31.     Similarly, shortly after the confidential information being made publicly available by Debtor, BMW was contacted by Aisin AW -- with whom it had also been engaged in lengthy negotiations for the purchase of transmissions -- and indicated that Aisin had also analyzed BMW's agreement with Debtor in detail.

32.     It is also BMW's belief that competitors obtained a copy of the Delivery Agreement and attachments thereto and will take actions causing damage to BMW's future earnings.

6

33. Although BMW is still in the process of assessing the economic impact of Debtor's wrongful action, it believes that its damages will be a minimum of € 59,000,000.00. Moreover, now that this confidential information concerning pricing and specifications is in the public domain, BMW will be subjected to irreparable damage – indefinitely.

I declare under penalty of perjury under the laws of the United States of America and to the best of my knowledge that the foregoing is true and correct.

Executed August 30, 2010
Munich, Germany

_____
Dr. Johann Wieland