

Motors Liquidation Company
500 Renaissance Center
Suite 1400
Detroit, MI 48243
Phone: 313.486.4044
Fax: 313.486.4258

August 30, 2010

Mr. Guido Dumarey
Mr. Marc Maes
Punch Metals et. al.
Nobelstraat 2
3930 Hamont-Achel
Belgium

Gentlemen:

Thank you for your letter (the "**Punch Offer Letter**") of August 27, 2010 expressing continuing interest in purchasing the shares of General Motors Strasbourg S.A.S. ("**GMS**").

As you are aware, Motors Liquidation Company ("**MLC**") has entered into a definitive stock purchase agreement (the "**SPA**") dated July 30, 2010 with General Motors Automotive Holdings, S.L., a wholly owned subsidiary of General Motors, LLC ("**New GM**"), for the sale of 100% of the shares of capital stock in GMS (the "**Pending Transaction**"). A sale hearing (the "**Sale Hearing**") seeking approval of the Pending Transaction is scheduled for September 7, 2010 and under the terms of the SPA, the Pending Transaction is required to close on or before September 30, 2010.

As you are further aware, the Pending Transaction materialized following a robust marketing process conducted by investment bank Merrill Lynch & Co., which lasted approximately one year and included contacting more than 50 potential buyers (the "**Sale Process**"). Indeed, during the Sale Process, MLC engaged in extensive negotiations with Punch concerning a potential sale. However, after many months of back and forth, Punch was unable to reach a satisfactory accommodation with New GM with respect to a definitive supply agreement and other matters and decided to withdrew its interest in GMS by way of email dated May 26, 2010. It is

only on the eve of MLC seeking Bankruptcy Court approval of the Pending Transaction that Punch has now expressed a renewed interest in pursuing a potential transaction with GMS.

After almost a year of intense marketing and failed negotiations with Punch and other potential buyers, it became clear that the stock of GMS could not be sold for an amount that would make a meaningful difference in the funds available for distribution to MLC's creditors which hold claims in the tens of billions of dollars. Accordingly, the focus of the sale turned to avoidance of the potential exposure for GMS that would occur upon a shutdown of its operations. The fully committed and executed deal with New GM accomplishes this goal and has the support of the relevant French authorities and Works Council. When closed, the Pending Transaction will remove significant material risks for both GMS and MLC. Namely, absent a completed sale of the shares in GMS to New GM, there is material risk that the GMS plant will close, its employees would be permanently laid off and the assets of the facility would be sold or otherwise liquidated and its remaining liabilities settled. Our detailed estimates put any such wind-down costs of GMS at approximately €200 million. Therefore, continuing forward with the Pending Transaction will preserve the jobs of 1,200 French workers and also completely mitigate the risk of plant closure and MLC and/or GMS having to litigate with the plant's customers over wind down costs.

On the other hand, if MLC were to elect to proceed with a potential transaction with Punch and that transaction failed to close, then GMS would again be facing a potential net cost of €200 million to wind down its operations and terminate its workforce. While it is the opinion of MLC that under French law, a major share, if not all, of any wind down costs would normally be borne by the plant's two major customers – New GM and BMW– it is unclear whether New GM and BMW still could be required to pay the wind down costs if they resulted from MLC failing to pursue and close the Pending Transaction (where such transaction mitigated in its entirety any potential wind down costs). The proposed purchase price of €3 million does not adequately compensate MLC for the significant increased risk associated with pursuing a transaction with Punch.

2 | Page

Accordingly, MLC has concluded, based on the exercise of its business judgment, that before it will consider any alternative offer from Punch (a "**Punch Transaction**") as being superior to the Pending Transaction, it must have absolute assurance that Punch will be unequivocally responsible for any wind down costs incurred as a result of pursuing a Punch Transaction, whether or not such transaction is consummated. Therefore, MLC would require as part of any Punch Transaction that it be preceded by an unconditional escrow of €200 million that would be used to pay wind down costs should the Punch Transaction fail to close for any reason whatsoever other than failure of the Bankruptcy Court to approve the Punch Transaction. The escrow would be released at closing of the transaction. As the Pending Transaction has a drop dead date of September 30, 2010 and the Bankruptcy Court has limited availability, we would need this escrow to be in place by September 7, 2010.

In addition to this request for an unconditional escrow, MLC notes the following additional concerns, among others, that create perceived material risks to close with respect to any Punch Transaction:

- Prior to the close of a Punch Transaction, GMS and Punch would need to obtain the receipt of a French Works Council opinion with respect to any Punch Transaction. The issuance of any such opinion typically requires several months to obtain, if the Works Council agrees to issue it at all. The Pending Transaction has already received a favorable Works Council opinion thereby allowing for a September 30, 2010 proposed close.

- Prior to the close of a Punch Transaction, GMS and Punch would need to complete the Conciliation process, pending final approval by the French Commercial court, which also could take an unknown amount of time. The Pending Transaction has already completed this process and filed with the French Commercial court.

- The Punch Offer Letter is based on the recently negotiated collective bargaining agreement with the Works Council; however, such agreement is contingent upon the Pending Transaction closing and would no longer be binding in the event

> MLC pursued an alternative Punch Transaction. Accordingly, a collective bargaining agreement would still need to be negotiated if MLC pursues a Punch Transaction.
>
> - The Punch Offer Letter assumes assignment of the BMW contract and litigation in connection therewith to Punch. However, MLC would need Bankruptcy Court approval to assume the BMW contract and assign it to Punch. BMW may object to such assumption and assignment and, among other possible objections, demand "adequate assurance" that Punch can perform through the expiration of the BMW contract.
>
> - If the BMW contract were assumed and assigned to Punch then any "cure costs" successfully sought by BMW under the contract would need to be assumed by Punch as part of the transaction. We are unaware of any existing defaults but BMW may not agree with that and could pursue contract default damages which, if successful, would need to be paid by Punch before the contract could be assumed and assigned.

Again, we thank you for expressing continuing interest in purchasing the shares of GMS. If you are willing to proceed with an unconditional escrow of €200 million as part of any proposed Punch Transaction please let us know immediately so that we may continue to evaluate your offer. Nevertheless, please be aware that, after taking into consideration the risks and costs associated with pursuing an alternative transaction, we do not consider the current Punch offer to be materially better than the Pending Transaction.

Yours sincerely,

*[signature]*

A. A. Koch
President and Chief Executive