# EXHIBIT E

**KANE, BALLMER & BERKMAN**
Murray O. Kane, Bar No. 48082 - mkane@kbblaw.com
Donald P. Johnson, Bar No. 61630 - djohnson@kbblaw.com
Douglas G. Chapman III, Bar. No. 113086
515 South Figueroa Street, Suite 1850
Los Angeles, California 90071
Telephone:    (213) 617-0480
Facsimile:    (213) 625-0931

*Exempt from Filing Fees Per Govt. Code §6103*

Attorneys for Plaintiffs
CITY OF PALMDALE and COMMUNITY
REDEVELOPMENT AGENCY OF THE CITY OF PALMDALE

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

AUG 11 2010

John A. Clarke, Executive Officer/Clerk
BY_____, Deputy
JUDITH-CLAYTON

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

BC443280

| | |
|---|---|
| CITY OF PALMDALE, a municipality; and COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF PALMDALE, a public body, corporate and politic, <br><br>Plaintiffs and Petitioners<br><br>vs.<br><br>CITY OF LANCASTER, a municipality; LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic; LANCASTER CITY COUNCIL, a public body: R. REX PARRIS, an individual; RONALD D. SMITH, an individual; MARVIN CRIST, an individual; KEN MANN, an individual,; SHERRY MARQUEZ, an individual; ALL PERSONS INTERESTED IN THE MATTERS OF LANCASTER REDEVELOPMENT AGENCY RESOLUTION NO. 16-10 AND CITY OF LANCASTER RESOLUTION NO. 10-62 ADOPTED ON AUGUST 10, 2010 AND RELATED AGREEMENTS TO PROVIDE FINANCIAL ASSISTANCE TO A RELOCATING VEHICLE DEALER; and DOES 1 through 50, inclusive<br><br>Defendants and Respondents | **CASE NO.**<br><br>**COMPLAINT TO DETERMINE VALIDITY OF CERTAIN AGREEMENTS, PETITION FOR WRIT OF ORDINARY MANDATE, PETITION FOR ADMINISTRATIVE MANDATE, AND COMPLAINT FOR DECLARATORY RELIEF, PETITION FOR ORDINARY MANDATE AND DECLARATORY RELIEF RELATING TO BROWN ACT VIOLATIONS; TEMPORARY AND PERMANENT INJUNCTIVE RELIEF SOUGHT**<br><br>**(Deemed Verified - Code Civ. Proc. §446)** |

KANE, BALLMER
& BERKMAN

1

COMPLAINT AND PETITION FOR WRITS

1  GENERAL MOTORS COMPANY, a Delaware corporation;

2  GENERAL MOTORS, LLC, a Delaware limited liability company;

3  JUAN LOU GONZALES, also known as Lou Gonzales, an individual;

4  HAWSE AUTOMOTIVE PROPERTIES, LLC, a California limited liability company;

5  JCH AUTOMOTIVE PROPERTIES, LLC, a California limited liability company;

6  7 JAYS, LLC, a California limited liability company;

7  ANTELOPE VALLEY CHEVROLET, INC., a California corporation;

8  and DOES 51 through 100, inclusive,

9

10              Real Parties In Interest.

11       Plaintiffs City of Palmdale and the Community Redevelopment Agency of the City of

12  Palmdale allege for their complaint and petition as follows:

13                          **THE PARTIES**

14       1.     Plaintiff and petitioner City of Palmdale is a municipality located within Los Angeles

15  County. Because City of Palmdale is a public entity, this complaint is deemed verified pursuant to

16  Code of Civil Procedure section 446.

17       2.     Plaintiff and petitioner Community Redevelopment Agency of the City of Palmdale is

18  a public body, corporate and politic, duly formed and existing under the Community Redevelopment

19  Law, Health and Safety Code section 33000, *et seq*. Pursuant to Health and Safety Code section

20  33515(d), plaintiff City of Palmdale is filing and maintaining this action on behalf of the City of

21  Palmdale and the Community Redevelopment Agency of the City of Palmdale, and no funds of the

22  Community Redevelopment Agency of the City of Palmdale are used, either directly or indirectly, on

23  behalf of this action.

24       3.     Defendant and respondent City of Lancaster ("Lancaster") is a municipality located

25  within Los Angeles County.

26       4.     Defendant and respondent Lancaster Redevelopment Agency is a public body,

27  corporate and politic, duly formed and existing under the Community Redevelopment Law, Health

28  and Safety Code section 33000, *et seq*.

5.      Defendant and respondent Lancaster City Council is a public body through which the City of Lancaster takes action and has taken the action that is the subject of this case.

6.      Defendants and respondents R. Rex Parris, Ronald D. Smith, Marvin Crist, Ken Mann, and Sherry Marquez are all individuals residing in the City of Lancaster, and are members of the Lancaster City Council and the Lancaster Redevelopment Agency Board of Directors who participated in the approvals and actions that are the subject of this case. They are sued herein in their official capacities.

7.      Defendants named herein as "All Persons Interested in the Matter of Lancaster Redevelopment Agency Resolution No. 16-10 and City of Lancaster Resolution No. 10-62 Adopted on August 10, 2010, and Related Agreements to Provide Financial Assistance to a Relocating Vehicle Dealer" are persons whose names are unknown to plaintiffs at this time, and whose rights and interests will be determined in this action. These defendants are named pursuant to Code of Civil Procedure sections 863 and 861.1.

8.      Real party in interest General Motors Company is a Delaware corporation doing business in Los Angeles County.

9.      Real party in interest General Motors, LLC, is a Delaware limited liability company doing business in Los Angeles County. Real parties in interest General Motors Company and General Motors, LLC are collectively referred to herein as "General Motors."

10.      Real Party in interest Juan Lou Gonzales, known as Lou Gonzales, is an individual who resides in Los Angeles County.

11.      Real Party in interest Hawse Automotive Properties, LLC ("Hawse") is a California limited liability with its principal place of business in Los Angeles County.

12.      Real Party in interest JCH Automotive Properties, LLC ("JCH") is a California limited liability with its principal place of business in Los Angeles County. Real parties in interest Hawse and JCH are related entities in that they share the same principal owner.

13.      Real Party in interest 7 Jays, LLC ("7 Jays") is a California limited liability with its principal place of business in Los Angeles County. 7 Jays is owned in whole or substantial part by real party in interest Lou Gonzales.

KANE, BALLMER
& BERKMAN

COMPLAINT AND PETITION FOR WRITS

14.    Real Party in interest Antelope Valley Chevrolet, Inc. is or is going to be a California corporation with its principal place of business in Los Angeles County. Antelope Valley Chevrolet, Inc. is or is going to be owned in whole or substantial part by real party in interest Lou Gonzales.

15.    The identity of the defendants and/or respondents named as Doe defendants is not currently known by plaintiffs. Does 1 through 50 are defendants and/or respondents who are liable for the approvals and actions that are the subject of this case. Does 51 through 100 are parties whose interests may be affected by this case. This complaint and petition will be amended to identify those defendants when their identity is ascertained.

## FACTS

16.    For the preceding twenty years, the Rally Auto Group, Inc. ("Rally") has been a Vehicle Dealer in the Antelope Valley Auto Mall (the "AV Auto Mall") located in Palmdale. Rally currently sells Cadillac, Buick, GMC, and Chevrolet brand automobiles from two facilities in the AV Auto Mall.

17.    In 2009, Rally was informed by General Motors that it was going to be terminated as a General Motors Vehicle Dealer, and that Gonzales may replace Rally as the Chevrolet Vehicle Dealer in Palmdale.

18.    Rally filed for binding arbitration of General Motors' decision that Rally's retail automotive franchise would be terminated, pursuant to Section 747 of the Consolidated Appropriations Act of 2010, Public Law 111-117. A binding arbitration was heard. On June 8, 2010, the arbitrator issued his decision, a true and correct copy of which is attached as **Exhibit 1**. By that decision, the arbitrator determined that Rally would continue to operate as a Cadillac, Buick and GMC Vehicle Dealer, but that Gonzales would become the Chevrolet Vehicle Dealer effective November 1, 2010. As a result of that decision, Rally will vacate one of its existing retail automotive facilities in the AV Auto Mall, and continue to operate as a Vehicle Dealer in its other existing retail automotive facility in the AV Auto Mall.

19.    Since 2002, Gonzales has been a Vehicle Dealer in the AV Auto Mall. Gonzales partially owns and operates Antelope Valley Saturn, which will cease to operate on October 31, 2010, when General Motors terminates its Saturn brand. Therefore, the Saturn facility in the AV Auto Mall

KANE, BALLMER
& BERKMAN

COMPLAINT AND PETITION FOR WRITS

1   will become vacant on or about November 1, 2010.

2       20.    As a result of the arbitration decision, a larger Rally facility in the AV Auto Mall will

3   become available on November 1, 2010.  Therefore, City of Palmdale Staff commenced discussions

4   with Gonzales and Rally to ensure that Gonzales would continue to operate as a Vehicle Dealer in the

5   AV Auto Mall in Palmdale. Gonzales made certain price and terms demands regarding his lease of the

6   Rally facility, which Rally initially rejected. City of Palmdale Staff negotiated with Gonzales and

7   Rally, and Rally eventually offered to lease the soon-to-be-vacant Rally facility at the price and terms

8   demanded by Gonzales.

9       21.    In June 2010, defendant Lancaster Redevelopment Agency was prepared to enter into

10  an agreement with Adventurecorp for the facility that Gonzales now intends to relocate to. A true and

11  correct copy of the agreement with Adventurecorp is attached as **Exhibit 2**. In that agreement, it is

12  stated that real party JCH is indebted to the Lancaster Redevelopment Agency in the sum of

13  $1,121,230,000 relating to the property that is the subject of this action.

14      22.    On July 27, 2010, the Lancaster City Council and the Lancaster Redevelopment

15  Agency Board, which are composed of the same individuals, jointly met in closed session to confer

16  regarding real property negotiations with real parties Hawse and JCH. A true and correct copy of the

17  agenda for that meeting is attached as **Exhibit 3**. That agenda fails to comply with applicable

18  provisions of the Brown Act, Government Code section 54950, *et seq.*, in that it failed to identify the

19  address of the property that was the subject of the negotiation.

20      23.    On July 30, 2010, Gonzales informed Palmdale that it would not be opening as a

21  Chevrolet Vehicle Dealer in the AV Auto Mall in Palmdale. A true and correct copy of the email

22  received by Palmdale from Gonzales is attached as **Exhibit 4**.

23      24.    On August 5, 2010, the Lancaster City Council and the Lancaster Redevelopment

24  Agency, through their Staff, caused to be made public a Staff Report (the "Staff Report") relating to a

25  Chevrolet Vehicle Dealer to be located in the Lancaster Auto Mall, a true and correct copy of which is

26  attached **Exhibit 5**. That staff report identifies Gonzales and 7 Jays as the Chevrolet Vehicle Dealer in

27  Lancaster.

28  ///

KANE, BALLMER
& BERKMAN

COMPLAINT AND PETITION FOR WRITS

25. The Staff Report recommends that Lancaster and the Lancaster Redevelopment Agency pay $20,000 per month to 7 Jays, and therefore to Gonzales, beginning November 1, 2010, for a period of 12 months and thereafter, for the following 16 months, a monthly payment in an amount equal to 50% of the monthly sales tax revenue generated by Antelope Valley Chevrolet, in a total sum not to exceed $604,000, in exchange for a covenant that Antelope Valley Chevrolet will operate in the Lancaster Auto Mall for a minimum of 10 years. These payments amount to direct financial assistance to relocate Mr. Gonzales as a Vehicle Dealer from the AV Auto Mall in Palmdale to the Lancaster Auto Mall in Lancaster.

26. The Staff Report also recommends that the Lancaster Redevelopment Agency approve the transfer of bond funds of $1,100,000 to JCH for the purchase of property located in the Lancaster Auto Mall in Lancaster, and assume an existing loan in an undisclosed amount relating to that property. Lancaster purports to purchase the property which is located in the Lancaster Auto Mall for public parking for a public park. Through the proposed agreement with Adventurecorp, attached as **Exhibit 2**, it is apparent that JCH owes the Lancaster Redevelopment Agency approximately $1,100,000, which the Lancaster Redevelopment Agency may intend to eliminate as debt through this transaction. This payment amounts to indirect financial assistance to relocate Gonzales as a Vehicle Dealer from the AV Auto Mall in Palmdale to the Lancaster Auto Mall in Lancaster.

27. At the public meeting on August 10, 2010, plaintiffs' representatives appeared at the joint meeting of the Lancaster City Council and Lancaster Redevelopment Agency Board and objected to recommendations made in the Staff Report, on the grounds that the financial assistance being offered to Gonzales through 7 Jays, directly through sales tax rebates and indirectly through JCH and Hawse, violates applicable provisions of the Government Code and Health and Safety Code, as alleged hereinbelow. Plaintiffs' representatives also objected on the grounds that the closed session meeting on July 27, 2010 and the agenda and staff report relating to the August 10, 2010 meeting violated applicable provisions of the Brown Act, as alleged hereinbelow, and demanded cure of their violation of the Brown Act. True and correct copies of the demands for cure as to the Brown Act violations and other objections made and exhibits offered on behalf of plaintiffs are attached collectively as **Exhibit 6**. During the meeting on August 10, 2010, counsel for the City of Lancaster

1    and the Lancaster Redevelopment Agency admitted that there were errors in the posted agendas

2    relating to the identification of the subject property, and stated that the error relating to the August 10,

3    2010 error had been corrected within twenty-four (24) hours of the meeting, which "correction" could

4    not be located in any public record. Counsel instructed the City Council and the Redevelopment

5    Agency Board to cure the Brown Act errors by voting on the subject resolutions.

6        28.    On August 10, 2010, the Lancaster City Council approved Resolution 10-62 and the

7    Lancaster Redevelopment Agency Board approved Resolution No. 16-10 that authorized the

8    negotiation and execution of agreements to provide financial assistance to Gonzales through 7 Jays, a

9    Vehicle Dealer as defined in Vehicle Code section 285, to relocate from the AV Auto Mall in

10    Palmdale to the Lancaster Auto Mall in Lancaster, in violation of applicable law as alleged

11    hereinbelow. True and correct copies of Resolution No. 10-62 and Resolution No. 16-10, which have

12    not yet been signed, are attached as **Exhibits 7 and 8**, respectively.

13        29.    Plaintiffs are informed and believe and thereon allege that the City of Lancaster and

14    the Lancaster Redevelopment Agency will enter into the agreements approved by the Lancaster City

15    Council and the Lancaster Redevelopment Agency Board unless restrained by this court. At the

16    hearing on August 10, 2010, counsel for the City of Lancaster and the Lancaster Redevelopment

17    Agency stated that such agreements would be available for execution with two or three days.

18    ### FIRST CAUSE OF ACTION

19    ### AGAINST CITY OF LANCASTER AND LANCASTER REDEVELOPMENT AGENCY

20    ### TO INVALIDATE CERTAIN AGREEMENTS

21        30.    The allegations contained in paragraphs 1 through 29 above are incorporated by this

22    reference as though set forth in full.

23        31.    Government Code section 53084(a) prohibits a city from providing direct or indirect

24    financial assistance to a Vehicle Dealer to relocate from another city in the same market area.

25    Palmdale and Lancaster are located in the same market area.

26        32.    Health and Safety Code section 33426.7(a) prohibits a redevelopment agency from

27    providing direct or indirect financial assistance to a Vehicle Dealer to relocate from another city in the

28    same market area.

KANE, BALLMER
& BERKMAN

7

33.     The financial assistance of $604,000 being provided directly to 7 Jays is for the sole purpose of enticing Gonzales to relocate as a Vehicle Dealer from Palmdale to Lancaster within the provisions of Government Code section 53084(b)(5) and Health and Safety Code section 33426.7(b)(5).

34.     The financial assistance being provided to Hawse and JCH is for the benefit of Gonzales and 7 Jays, so Gonzales will relocate as a Vehicle Dealer from Palmdale to Lancaster within the provisions of Government Code section 53084(b)(5) and Health and Safety Code section 33426.7(b)(5).

35.     The financial assistance being provided by the City of Lancaster and the Lancaster Redevelopment Agency is prohibited by law, therefore the agreements entered into or to be entered into by the City of Lancaster and the Lancaster Redevelopment Agency should be declared invalid, void, and of no effect pursuant to Code of Civil Procedure sections 860 and 863.

## SECOND CAUSE OF ACTION

## FOR WRIT OF ORDINARY MANDATE

36.     The allegations contained in paragraphs 1 through 35 above are incorporated by this reference as though set forth in full.

37.     A writ of ordinary mandate pursuant to Code of Civil Procedure section 1085 should issue, directing respondents City of Lancaster and the Lancaster Redevelopment Agency to set aside their approvals of the resolutions adopted on August 10, 2010 and set aside any resulting agreements by and between the City of Lancaster and/or the Lancaster Redevelopment Agency, on the one hand, and 7 Jays, Gonzales, Hawse, and/or JCH, on the other hand, in that those resolutions and resulting agreements violate applicable provisions of the Government Code and/or Health and Safety Code and are therefore invalid, illegal, and of no force or effect.

## THIRD CAUSE OF ACTION

## FOR WRIT OF ADMINISTRATIVE MANDAMUS

38.     The allegations of paragraphs 1 through 35 above are incorporated by this reference as though set forth in full.

39.    A writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 should issue, directing respondents City of Lancaster and the Lancaster Redevelopment Agency to set aside their approvals of the resolutions adopted on August 10, 2010 and set aside any resulting agreements by and between the City of Lancaster and/or the Lancaster Redevelopment Agency, on the one hand, and 7 Jays, Gonzales Hawse, and/or JCH, , on the other hand, in that those resolutions and resulting agreements violate applicable provisions of the Government Code and/or Health and Safety Code and are therefore invalid, illegal, and of no force or effect.

## FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## AS TO VALIDITY OF FINANCIAL ASSISTANCE AGREEMENTS

40.    The allegations of paragraphs 1 through 35 above are incorporated by this reference as though set forth in full.

41.    Plaintiffs contend that the resolutions adopted and approved by defendants on August 10, 2010 and any agreements by and between the City of Lancaster and/or the Lancaster Redevelopment Agency, on the one hand, and 7 Jays, Gonzales, Hawse, and/or JCH, on the other hand, violate applicable provisions of the Government Code and/or Health and Safety Code and are therefore invalid, illegal, and of no force or effect. Plaintiffs believe and therefore allege that defendants deny those contentions.

42.    Pursuant to Code of Civil Procedure section 1060, plaintiffs seek a declaration from this court determining that the subject resolutions and resulting agreements are invalid, illegal, and of no force or effect.

## FIFTH CAUSE OF ACTION
## FOR WRIT OF MANDATE RELATING TO BROWN ACT VIOLATION

43.    The allegations of paragraphs 1 through 35 above are incorporated by this reference as though set forth in full.

44.    In consideration in closed session of purported real property negotiations with real parties Hawse and JCH on July 27, 2010, respondents City of Lancaster through its City Council and

KANE, BALLMER
& BERKMAN

COMPLAINT AND PETITION FOR WRITS

1    the Lancaster Redevelopment Agency through its Board violated the provisions of the Brown Act,

2    Government Code section 54956.8, by failing to identify the real property which the negotiations may

3    concern. At the hearing on August 10, 2010, counsel for the City of Lancaster and the Lancaster

4    Redevelopment Agency admitted that such violation had occurred, and instructed the City Council

5    and Redevelopment Agency Board to cure the violation by voting on the subject resolutions, which

6    the City Council and Redevelopment Agency Board did.

7         45.    In consideration of the resolutions to enter into agreements to provide direct and

8    indirect financial assistance to Gonzales through 7 Jays, on August 10, 2010, respondents City of

9    Lancaster through its City Council and the Lancaster Redevelopment Agency through its Board

10    violated the provisions of the Brown Act, Government Code section 54954.2, by inaccurately

11    identifying the real property which was the subject of the action to be taken. Further, the proposed

12    agreements were not made available at the hearing on August 10, 2010. At the hearing on August 10,

13    2010, counsel for the City of Lancaster and the Lancaster Redevelopment Agency admitted that such

14    violation had occurred, and instructed the City Council and Redevelopment Agency Board to cure the

15    violation by voting on the subject resolutions, which the City Council and Redevelopment Agency

16    Board did. Further, counsel for the City of Lancaster and the Lancaster Redevelopment Agency stated

17    that the subject agreements would be available for review within two or three days of the hearing.

18         46.    A writ of ordinary mandate pursuant to Code of Civil Procedure section 1085 should

19    issue, directing respondents City of Lancaster and the Lancaster Redevelopment Agency to set aside

20    their actions taken on July 27, 2010 and August 10, 2010 and comply with the applicable provisions

21    of the Government Code.

22

23    **SIXTH CAUSE OF ACTION**

24    **FOR DECLARATORY RELIEF RELATING TO BROWN ACT VIOLATION**

25         47.    The allegations of paragraphs 1 through 35, 44, and 45 above are incorporated by this

26    reference as though set forth in full.

27         48.    Plaintiffs contend that the City of Lancaster through its City Council and the Lancaster

28    Redevelopment Agency through its Board violated the Brown Act on July 27, 2010 for the reasons

1    alleged above. Plaintiffs are informed and belief and therefore allege that defendants deny those

2    contentions.

3        49.    Plaintiffs contend that the City of Lancaster through its City Council and the Lancaster

4    Redevelopment Agency through its Board violated the Brown Act on August 10, 2010 for the reasons

5    alleged above. Plaintiffs are informed and belief and therefore allege that defendants deny those

6    contentions.

7        50.    Plaintiffs contend that the City of Lancaster through its City Council and the Lancaster

8    Redevelopment Agency through its Board violated the Brown Act on August 10, 2010 by

9    impermissibly delegating the negotiation of the substance of the subject agreements to City and

10    Agency Staff, thereby abnegating their legislative authority and responsibility, and that the Brown Act

11    requires the subject agreements be made public before their approval by the City Council and the

12    Redevelopment Agency Board and subsequent execution. Plaintiffs are informed and believe and

13    therefore allege that defendants deny those contentions.

14        51.    Pursuant to Code of Civil Procedure section 1060, plaintiffs seek a declaration from

15    this court determining that because the defendants violated the Brown Act on July 27, 2010 and

16    August 10, 2010, any action they took relating to the subject resolutions and agreements is invalid,

17    illegal, and of no force or effect.

18        WHEREFOR, plaintiffs and petitioners City of Palmdale and the Community Redevelopment

19    Agency of the City of Palmdale seek judgment as follows:

20        1.    For judgment in their favor and against defendants and respondents City of Lancaster

21        and the Lancaster Redevelopment Agency;

22        2.    For judgment that the agreements between the City of Lancaster and/or the Lancaster

23        Redevelopment Agency, on one hand, and real parties in interest Gonzales, 7 Jays,

24        Hawse, and/or JCH, on the other hand, are invalid pursuant to Code of Civil Procedure

25        sections 860 and 863;

26        3.    For a writ of ordinary mandate pursuant to Code of Civil Procedure section 1085

27        directing respondents City of Lancaster and the Lancaster Redevelopment Agency to

28        set aside their approvals of the resolutions adopted on August 10, 2010 and the

KANE, BALLMER
& BERKMAN

COMPLAINT AND PETITION FOR WRITS

resulting agreements by and between the City of Lancaster and/or the Lancaster Redevelopment Agency, on one hand, and real parties in interest Gonzales, 7 Jays, Hawse, and/or JCH, on the other hand, and comply with applicable law;

4.    For a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 directing respondents City of Lancaster and the Lancaster Redevelopment Agency to set aside their approvals of the resolutions adopted on August 10, 2010 and the resulting agreements between the City of Lancaster and/or the Lancaster Redevelopment Agency, on one hand, and real parties in interest Gonzales, 7 Jays, Hawse, and/or JCH, on the other hand, and comply with applicable law;

5.    For a declaratory judgment that the agreements between the City of Lancaster and/or the Lancaster Redevelopment Agency, on one hand, and real parties in interest Gonzales, 7 Jays, Hawse, and/or JCH, on the other hand, are illegal, unlawful, and of no force and effect;

6.    For interim and permanent injunctive relief against the defendants taking any action pursuant to the resolutions adopted on August 10, 2010, including but not limited to negotiating or entering into any resulting agreements by and between the City of Lancaster and/or the Lancaster Redevelopment Agency, on one hand, and real parties in interest Gonzales, 7 Jays, Hawse, and/or JCH, on the other hand;

7.    For reasonable attorneys' fees;

8.    For costs of suit; and

9.    For such other and further relief as the court deems just and proper.

Dated: August 11, 2010                    KANE, BALLMER & BERKMAN

By: _____
     Donald P. Johnson
     Attorneys for Plaintiffs CITY OF
     PALMDALE and the COMMUNITY
     REDEVELOPMENT AGENCY OF THE
     CITY OF PALMDALE

KANE, BALLMER
& BERKMAN

12

# EXHIBIT 1

# AMERICAN ARBITRATION ASSOCIATION
## AUTOMOBILE INDUSTRY SPECIAL BINDING ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Re: 72 532 01370 09
 Rally Auto Group, Inc.
 VS
 General Motors, LLC

---

## Written Determination of Arbitrator

I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act"), enacted December 16, 2009, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby make my Written Determination pursuant to the Act.

### Background

The Act affords a "covered dealership" (as defined in Section 747(a)(2)) the right to challenge by binding arbitration the decision of a "covered manufacturer" (as defined in Section 747(a)(1)(A) and (B)) to terminate, or not to assign, renew or continue, the covered dealership's franchise agreement. This case was filed in accordance with the Act's provisions and I held hearings and heard testimony on May 13, 14 and 17, 2010. The parties submitted closing briefs on May 28, 2010, and the arbitrator determined that the case had been fully submitted as of May 28, 2010. Set forth below is my "written determination" (as provided for in 747(d) of the Act) of the issue to be decided under the Act, namely "whether or not the covered dealership should be added to the dealer network of the covered manufacturer." This Determination is being issued within seven (7) business days after the case was fully submitted.

### I.   The Parties

This proceeding concerns the automobile dealership known as Rally Auto Group located at 39012 Carriage Way Palmdale, California 93551 ("Rally"). Rally is a "covered dealership" as defined in Section 747(a)(2).

The "covered manufacturer" for purposes of this arbitration is General Motors, LLC, which is the current owner of the General Motors automobile manufacturing business. For convenience, the terms "General Motors" and "GM" is refers to both General Motors, LLC and General Motors Corporation.

II.    Determination

Rally, the covered dealership described above in Section I, shall be added to the dealer network of General Motors, LLC, as to the Cadillac, Buick and GMC brands, in the manner provided for by the Act and in accordance with the terms and conditions of the Act.

Rally, the covered dealership described above in Section I, shall not be added to the dealer network of General Motors, LLC, with respect to the Chevrolet brand.

III.    Key Facts Relied on by the Arbitrator in Making the Determination

In accordance with Section 747, I considered the following factors:

1.    The covered dealership's profitability in 2006, 2007, 2008 and 2009;

2.    The covered manufacturer's overall business plan;

3.    The covered dealership's current economic viability;

4.    The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

5.    The demographic and geographic characteristics of the covered dealership's market territory;

6.    The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and

7.    The length of experience of the covered dealership.

In making the determination, I relied upon the following key facts:

General Motors' overall business plan includes reducing the total number of GM dealers nationwide, for the purpose of increasing the sales volumes ("throughput"), and thus the profitability, of the remaining GM dealers. The plan anticipates that this increase in dealer profitability will enable dealers to invest in better facilities, provide better customer service and, in general, compete more effectively with non-GM brands. General Motors' plan for the Palmdale area is to replace Rally as the Chevrolet dealer with a dealership owned and operated by Lou Gonzalez, operator of a successful Saturn dealership in Palmdale, which is being wound down with the elimination by GM of the

Saturn brand. GM plans to remove the Cadillac, Buick and GMC brands from the Palmdale GM dealership.

Rally has many years of experience as a General Motors dealer in Palmdale, California, and has been operated by its current owner/operator, Larry Mayle, for around 20 years. It currently sells the Cadillac, Buick, GMC and Chevrolet brands, from two facilities. Rally's facilities are adequate, and it is currently economically viable. It has sufficient working capital, availability of inventory financing and adequate staffing. During the years 2006 through 2009 Rally's operations were profitable. (See below for further discussion of 2008 profitability).

The Dealer Sales and Service Agreement between Rally and General Motors, which is the applicable franchise agreement, establishes a variety of performance objectives. (Ex. 1) In Article 5.1(f) of the agreement Rally agreed "to comply with the retail sales standards established by General Motors, as amended from time to time." Ex. 1, p. 6. Article 9 of the agreement ("Review of Dealer's Sales Performance") provides that "Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100." Ex. 1, p. 17. The Retail Sales Index ("RSI") is the ratio of a dealer's reported retail sales to the sales necessary to equal the state average expected market share for the brand in question in the dealer's Area of Primary Responsibility ("APR"), adjusting for the popularity of various types and sizes of vehicles in the APR.

Rally did not achieve an RSI of 100 for any of its Chevrolet, Cadillac, Buick and GMC brands for the years 2006 through 2008, except for an RSI of 102.82 for Cadillac in 2008. These RSI scores ranked Rally low in sales performance as compared with other General Motors dealers. Rally's RSI has been particularly low for the Chevrolet brand. For Chevrolet its RSI in 2006 was 53.60, in 2007 was 50.36, and in 2008 was 53.07.

During 2006-2008, and in prior years, General Motors regularly communicated to Rally that General Motors considered Rally's levels of sales, particularly Chevrolet, to be inadequate and in need of substantial improvement. (Exs. 88, 201-203). After Rally received a "wind down" letter from General Motors in May 2009,[1] its sales performance improved, but that performance, under threat of termination, may not be as indicative of future performance as is Rally's historical sales record.

The demographic factors in Rally's area of principal responsibility ("APR") include high levels of unemployment, a working population that largely commutes "down the hill" to the greater Los Angeles area, with long commuting times. Rally contends that

---

[1]    In its "wind down" letter to Rally dated May 14, 2009, GM advised Rally that it did not expect its contractual relationship with Rally to continue past October 2010. The wind down letter was followed by a Wind Down Agreement, allowing Rally to operate its GM dealership through October 31, 2010, but imposing certain restrictions, including inability of Rally to purchase new GM vehicles from GM.

these factors make the state-wide RSI scores misleading as applied to Rally. However, the comparatively high sales levels and RSI scores of the General Motors dealership in Victorville, California, a community comparable in many respects to Palmdale, tends to show that the RSI scores, based on General Motors' state-wide market share for various vehicle categories, provide a realistic measure for dealer sales performance in the Palmdale market. The Palmdale Saturn dealership, operated by Lou Gonzalez, also has consistently achieved high RSI scores, again confirming that General Motors' RSI measure is applicable in Rally's market.

One of the criteria used by GM in deciding to terminate or not assign a dealer's franchise agreement is the Dealer Performance Score ("DPS"). This score measures the dealer's performance in four categories, which are weighted as follows:

| | |
|---|---|
| Sales | 50% |
| Customer Satisfaction Index | 30% |
| Capitalization | 10% |
| Profitability | 10% |

GM treats a score of 100 as average, and a score below 70 as poor performance. GM publicly stated that "Dealers with a score less than 70 received a wind-down agreement." (Ex. 26).

For 2008, GM calculated a DPS score for Rally of 55.27. (Ex. 31). The evidence showed, however, that this score depended on using an estimated LIFO adjustment to Rally's profits for 2008, rather than pre-LIFO profits or the actual, not estimated, LIFO profits. Using the latter two profit figures, Rally's DPS score was approximately 85.

## IV. Balance of Economic Interests

The balance of economic interests of the covered dealership, of the covered manufacturer and of the public supports this determination for the reasons set forth below.

General Motors' decision to replace Rally as a Chevrolet dealer with a dealership operated by GM's former Saturn dealer in the Palmdale market is consistent with General Motors' plan to develop a stronger dealer network. Although there is no assurance of the new dealers' success, there is a reasonable basis, based on prior performance, for concluding that General Motors will obtain significantly stronger representation in the Palmdale area through that dealer than through Rally. The public will benefit by having a more active and aggressive Chevrolet sales effort in that market. In addition, there is some basis in Rally's customer satisfaction scores to conclude that customer service from the new Chevrolet dealer will be improved.

In the arbitrator's view, the balance of economic interests supports a determination that Rally should be able to retain its dealership for the Cadillac, Buick and GMC brands. Rally has a long history as a GM dealer, with millions of dollars invested in its business and facilities. Its sales performance has been somewhat better for these

brands than for the Chevrolet brand. The public will benefit by continuing to be able to purchase these brands in Palmdale, without having to drive at least 37 miles to the nearest dealer selling these brands. Because General Motors has decided to retain one GM dealer in the Palmdale area, it will likely not achieve the cost savings in that area that it expects to achieve by large-scale reductions in the number of its dealers. The evidence did not show a benefit to either GM or the public by eliminating these brands from the Palmdale market. Also, the evidence showed that there is some uncertainty about the physical capacity of the new Chevrolet dealer to provide parts and service for the full range of GM brands, and the public will benefit by the continued availability of parts and service from Rally.

## VI. Costs

In accordance with the statute, the administrative fees and expenses, and the arbitrator's fees and expenses, shall be borne equally.

This Award is in full settlement of all claims submitted to this arbitration.

Date: June 8, 2010.

Richard Mainland, Arbitrator

# EXHIBIT 2

# AGREEMENT

This AGREEMENT (the "Agreement") is entered into this _____ day of June, 2010, by and among the LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic ("Agency"), ADVENTURECORP, a California corporation ("Dealer"), and HAWSE AUTOMOTIVE PROPERTIES, LLC., a California limited liability company (the "Hawse"), and JCH Automotive Properties, LLC, a California limited liability company ("JCH") (collectively, the "parties"), with reference to the following facts:

WHEREAS, the Agency is authorized and empowered by the Community Redevelopment Law of the State of California, Chapter 1 of Division 24 of the California Health and Safety Code, to enter into agreements for the acquisition, disposition and development of real property and otherwise to assist in the redevelopment of real property within a redevelopment project area in conformity with a redevelopment plan adopted for such area; to acquire real and personal property in redevelopment project areas; to receive consideration for the provision by the Agency of redevelopment assistance; to make and execute contracts and other instruments necessary or convenient to the exercise of its powers; and to incur indebtedness to finance or refinance redevelopment projects; and

WHEREAS, the Redevelopment Plan for the Amargosa Redevelopment Project has been approved and adopted by the City of Lancaster, California (the "City"), by Ordinance No. 321, on October 17, 1983; and

WHEREAS, Hawse currently owns certain real property located within the Lancaster Auto Mall at 43301 12th Street which is described in Exhibit "A 1" (the "Toyota Property"), upon which JHH Motorcars, Inc. dba Sierra Toyota (the "Auto Dealer"), operates a Toyota dealership known as Sierra Toyota; and

WHEREAS, the Agency and JCBB, LLC, a California limited liability company ("JCBB") previously entered into a Disposition and Development Agreement dated as of October 22, 2002 (the "Hawse Automotive Agreement") which provided for the development of the property located at 1160 West Motor Lane which is described on Exhibit "A 2" (the "Mitsubishi Property") upon which the Auto Dealer operated a dealership known as Lancaster Mitsubishi; and

WHEREAS, pursuant to the Hawse Automotive Agreement, JCBB executed that certain Dealer Note dated November 15, 2002, in the original principal amount of $1,406,116, to the order of the Agency (the "Hawse Automotive Note"); and

WHEREAS, pursuant to that certain Assignment Assumption and Release Agreement recorded on April 30, 2003, as Instrument No. 03-121928, in the Official Records, JCBB assigned to Hawse all of its rights, obligations and interest in, and Agency released JCBB from its obligations under the Hawse Automotive Note, the deed of trust securing such note and the Hawse Automotive Agreement; and

WHEREAS, the Agency and JCH entered into a Disposition and Development Agreement dated as of July 11, 2006 (the "JCH Automotive Agreement"), which provided for, among other things, the conveyance by the Agency to JCH of certain unimproved real property adjacent to the Mitsubishi Property and Toyota Property and located within both the Lancaster Auto Mall and the Amargosa Redevelopment Project Area (the "New Site"); and

WHEREAS, in connection with its acquisition of the New Site and pursuant to the JCH Automotive Agreement, JCH has executed that certain Dealer Note dated July 11, 2006, in the principal amount of $1,121,230.00, to the order of the Agency (the "JCH Automotive Note"); and

WHEREAS, Hawse and JCH have entered into an Agreement with Dealer (the "Dealer Agreement") pursuant to which Hawse agrees to sell the Mitsubishi Property and JCH agrees to sell the New Site to Dealer (the Mitsubishi Property and New Site, collectively referred to as the "Site"); and

WHEREAS, subject to the terms of this Agreement, Dealer has agreed to assume the liability of Hawse under the Hawse Automotive Note and JCH under the JCH Automotive Note.

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    USE OF THE SITE AND TOYOTA PROPERTY; OPTION

    1.1    <u>Agency Consent</u>. Subject to the terms of this Agreement, the Agency hereby consents to the assignment of the Hawse Automotive Note and the JCH Automotive Note to Dealer and the assumption of the obligations thereunder by Dealer. Dealer and Agency agree that current outstanding aggregate amount of two notes is $1,942,379 ("Note Amount"). Dealer agrees to repay the Note Amount together with interest at the rate of six percent (6%) per annum, amortized over fifteen (15) years as provided in Paragraph 2 hereof. The Agency agrees to release Hawse from all obligations under the Hawse Automotive Agreement and JCH from all obligations under the JCH Automotive Agreement upon receipt of the fully executed Guaranty, Dealer Note and recordation of the Deed of Trust (as defined in Paragraph 2).

    1.2    <u>Use of the Site; Operating Covenant</u>. From and after the effective date of this Agreement, and in compliance with the terms of this Section 1.2 the Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site, that the Site shall be occupied and used solely for automotive uses relating to a new automobile, recreational vehicle and truck dealership activities, including automobile, recreational vehicle and truck servicing, used automobile, used recreation vehicles, used truck sales, and repair of vehicles and ancillary uses reasonably related and connected to new automobile, recreational vehicles and truck dealerships. The Site and all improvements constructed and maintained thereon shall be used and operated by the Dealer for the uses permitted herein and for no other use or purpose; all such use shall be in compliance with the Auto Center CC&R's which were adopted on June 13, 1989 as thereafter amended. The Dealer shall not use or permit any other person to use the Site, or any part thereof, for any purposes tending to injure the reputation thereof or for any improper or offensive use or to constitute a nuisance; and the Dealer shall at all times during said terms conform to, and cause all persons using or occupying any part of the Site to comply with, all public laws, ordinances, and regulations from time to time applicable thereto and to all operations thereon. The Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site to continue to operate the Adventurecorp Dealership, or such other dealership which may be approved by the Agency pursuant to this Section 1.2, upon the Site for a period of not less than twenty-five (25) years following the effective date of the Agreement, and, except with the prior written consent of the Agency for each instance, which consent may be granted or withheld in the Agency's sole and absolute discretion, the failure of the Dealer or an operator approved by the Agency pursuant to this Section 1.2 to operate such a dealership for ninety (90) consecutive days shall, at the Agency's option, constitute a default

2



hereunder, but upon submission of proof satisfactory to Agency in its sole and absolute discretion that Dealer is diligently pursuing acquisition of a new vehicle franchise for the Site or attempting to reopen the existing franchise following a natural disaster, Agency may grant an additional ninety (90) days to Dealer to recommence operation of a dealership before considering the failure to operate a default. Notwithstanding the foregoing, in the event that the balance due and owing on the Dealer Note or prior to the seventh (7th) anniversary of the date of this Agreement, the terms of the Operating Covenant shall be reduced to fifteen (15) years from date of this Agreement.

The parties acknowledge that the Agency has negotiated the terms of this Agreement in contemplation of the Sales Tax Revenues to be generated by the continued operation of the Adventurecorp Dealership upon the Site. The Dealer may operate a dealership other than the Adventurecorp Dealership or may thereafter operate dealerships in addition to or in replacement of the Adventurecorp Dealership on the Site, but only with the prior express written consent of the Agency. Any request to operate an additional or replacement automobile dealership on the Site must be presented by the Dealer to the Agency in written form. The Agency shall approve or disapprove the Dealer's written request within thirty (30) days of the Agency's receipt of all materials necessary to review the request and the Agency will not unreasonably withhold its approval of any change in dealership(s) if such change is reasonable, taking into consideration the Sales Tax Revenues and such other factors as Agency determines. If the Agency disapproves or fails to approve the Dealer's written request, the Agency shall provide the Dealer with a written statement of the reason(s) why the Agency disapproved or failed to approve such request, as well as the Agency's opinion of any information which the Dealer might provide in order to obtain the Agency's approval. Upon the Dealer's submission to the Agency of such additional information in written form, the Agency shall thereafter have thirty (30) days to provide the Dealer with a written statement of the Agency's approval or disapproval of the Dealer's request. In the event the Agency fails to provide any such written statement within the times set forth in this Section 1.2, the Dealer's request for such change of dealership shall be deemed approved. Notwithstanding the foregoing, if the Agency lawfully delegates the decision regarding a replacement of the Adventurecorp Dealership to Agency staff, the thirty (30) day review periods set forth in this paragraph shall be shortened to twenty (20) days.

    1.3   <u>Maintenance Covenant</u>. The Dealer shall maintain the Site and all improvements thereon in good condition and in accordance with the custom and practice generally applicable to a "first class" new automobile dealership, and shall keep the Site free from any accumulation of debris or waste materials.

The Dealer shall also maintain the landscaping required to be planted under the Auto Center CC&R's in a healthy condition. If at any time the Dealer fails to maintain said landscaping, and said condition is not corrected after expiration of thirty (30) days from the date of written notice from the Agency, either the Agency or the City may perform the necessary landscape maintenance and the Dealer shall pay such costs as are reasonably incurred for such maintenance.

    1.4   <u>Rights of Access Covenant</u>. The Agency, for itself and for the City and other public agencies, at their sole risk and expense, reserves the right to enter the Site or any part thereof at all reasonable times for the purpose of construction, reconstruction, maintenance, repair or service of any public improvements or public facilities located on the Site. Any such entry shall be made only after reasonable notice to the Dealer and the Agency shall indemnify and hold the Dealer harmless from any costs, claims, damages or liabilities pertaining to any entry. Dealer covenants and agrees to allow such entry onto the Site pursuant to this Section.

3

1.5     <u>Nondiscrimination Covenant</u>.  The Dealer covenants by and for itself and any successors in interest that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, handicap, national origin or ancestry in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Site, nor shall the Dealer or any person claiming under or through it or them establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the Site.  The foregoing covenants shall run with the land.

The Dealer shall refrain from restricting the rental, sale or lease of the Site on the basis of race, color, creed, religion, sex, marital status, handicap, national origin or ancestry of any person.  All such deeds, leases or contracts shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

(a)     In deeds:  "The grantee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises herein conveyed, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

(b)     In leases:  "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions:

"That there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sublessees, subtenants, or vendees in the premises herein leased."

(c)     In contracts:  "There shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises which are the subject of this Agreement, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, number, use or occupancy of tenants, lessees, subtenants,

4

sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

1.6    <u>Use of Toyota Property</u>.  From and after the effective date of this Agreement, and in compliance with the terms of this Section 1.2 the Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site, that the Site shall be occupied and used solely for automotive uses relating to a new automobile, recreational vehicle and truck dealership activities, including automobile, recreational vehicle and truck servicing, used automobile, used recreation vehicles, used truck sales, and repair of vehicles and ancillary uses reasonably related and connected to new automobile, recreational vehicles and truck dealerships.  The Site and all improvements constructed and maintained thereon shall be used and operated by the Dealer for the uses permitted herein and for no other use or purpose; all such use shall be in compliance with the Auto Center CC&R's which were adopted on June 13, 1989 as thereafter amended.  The Dealer shall not use or permit any other person to use the Site, or any part thereof, for any purposes tending to injure the reputation thereof or for any improper or offensive use or to constitute a nuisance; and the Dealer shall at all times during said terms conform to, and cause all persons using or occupying any part of the Site to comply with, all public laws, ordinances, and regulations from time to time applicable thereto and to all operations thereon.  The Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site to continue to operate the Hawse Dealership, or such other dealership which may be approved by the Agency pursuant to this Section 1.2, upon the Site for a period of not less than two (2) years following the effective date of the Agreement, and, except with the prior written consent of the Agency for each instance, which consent may be granted or withheld in the Agency's sole and absolute discretion, the failure of the Dealer or an operator approved by the Agency pursuant to this Section 1.2 to operate such a dealership for ninety (90) consecutive days shall, at the Agency's option, constitute a default hereunder, but upon submission of proof satisfactory to Agency in its sole and absolute discretion that Dealer is diligently pursuing acquisition of a new vehicle franchise for the Site or attempting to reopen the existing franchise following a natural disaster, Agency may grant an additional ninety (90) days to Dealer to recommence operation of a dealership before considering the failure to operate a default.  Notwithstanding the foregoing, in the event that the balance due and owing on the Dealer Note or prior to the seventh (7th) anniversary of the date of this Agreement, the terms of the Operating Covenant shall be reduced to fifteen (15) years from date of this Agreement.

1.7    <u>Effect of Violation of the Terms and Provisions of this Agreement</u>.  The Agency is deemed the beneficiary of the terms and provisions of this Agreement and of the covenants running with the land, for and in its own right and for the purposes of protecting the interests of the community and other parties, public or private, in whose favor and for whose benefit this Agreement and the covenants running with the land have been provided, without regard to whether the Agency has been, remains or is an owner of any land or interest therein in the Site.  The Agency shall have the right, if the Agreement or covenants are breached, to exercise all rights and remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breaches to which it or any other beneficiaries of this Agreement and covenants may be entitled.  The covenants contained in this Agreement shall remain in effect for the term of the Redevelopment Plan, except for the following:

(a)    The covenant pertaining to the use and operation of Adventurecorp Dealership set forth in Section 1.2(a) shall remain in effect for a period of not less than twenty-five (25) years from the effective date of this Agreement, that is until June __, 2035.

(b)     The covenant pertaining to the use and operation of Toyota Dealership set forth in Section 1.6 shall remain in effect for a period of not less than two (2) years from the effective date of this Agreement, that is until June __, 2012.

(c)     The covenants against discrimination, as set forth in Section 1.5 shall remain in effect in perpetuity.

1.8     <u>Option to Purchase Expansion Site</u>.  The Agency will consider granting to Dealer the option to purchase the real property consisting of approximately 19.75 acres located at the northeast corner of 15th Street West and Avenue K-8 in accordance with the terms set forth in the option letter attached hereto as Exhibit G.

1.9     <u>Emergency Vehicle Use</u>.  Dealer and Hawse, respectively, agree that in event of the occurrence of a natural disaster or a state of emergency, Dealer and Hawse, respectively, will use their best effort to make available to the Agency or City for the duration of the disaster or emergency Dealer's inventory of used motor homes or Hawse's inventory of used trucks for use by the Agency or City in dealing with the disaster or state of emergency.  The Agency and City agree to indemnify and hold Dealer and Hawse and their officers, employees and agents, harmless from and against all claims, demands, suits, damages, judgments, costs, expenses and fees arising from or related to the use of any of Dealer's or Hawse's inventory pursuant to the terms of this Section 1.9 Agency and City further agree to reimburse Dealer and/or Hawse for and loss of value of vehicle used based on Kelly Blue Book.

2.     SALES TAX GUARANTIES

2.1     <u>Sales Tax Revenue</u>.  As used in this Agreement, "Sales Tax Revenues" shall mean that portion of taxes derived and received by the City from the imposition of the Bradley Burns Uniform Local Sales and Use Tax Law commencing with Section 7200 of the Revenue and Taxation Code of the State of California, as amended, or its equivalent, arising from all businesses and conducted on the applicable property in accordance herewith from time to time, which are subject to such Sales and Use Tax Law.  As used herein, the term "Sales Tax Revenues" shall also mean sales tax and use tax revenues generated from all lease transactions consummated during the applicable Guaranty Period (as hereinafter defined) which occur on or with respect to the Adventurecorp Dealership located on the Site which the City is entitled to receive and does in fact receive, as confirmed and listed in the quarterly report to the state Board of Equalization and shall be deemed to include taxable sales or leases which occur elsewhere, in the event that said taxable sales and leases are initiated from the Site and in the event that the point of sale or lease is within the City.

Sales Tax Revenues shall be determined in the first instance based upon sales tax receipts from all businesses and activities conducted on the applicable property in accordance herewith and delivered to the Agency and/or the City, as shown on the Dealer's monthly sales tax report to the State of California and certified by the Dealer to be true and correct.  Thereafter, the amount of Sales Tax Revenues shall be adjusted (as provided below) to reflect any difference between the amount thereof based upon such certified sales tax reports and the amount thereof based upon the final audited sales tax figures released from time to time by the State of California.  Agency shall use reasonable efforts to confirm and ensure receipt of sales taxes on lease transactions generated on the Site, and Dealer shall provide to Agency a list of all banks and other financial institutions with which Dealer transacts leasing business from the Site.

6

For purposes of this Agreement, "Sales Tax Revenues" shall mean all those sales tax revenues derived from taxable sales and leases generated on the Site and which are reported to the Agency as hereinafter provided.

The Dealer shall timely file quarterly reports of taxable sales and lease transactions from the Dealership on the Site or Expansion Site with the State Board of Equalization (the "Quarterly Reports") within fifteen (15) business days after the end of each calendar quarter, and shall provide copies of the Quarterly Reports to the Agency concurrently with the filing thereof.

2.2    <u>Guaranteed Sales Tax Generation from Dealership</u>.  The Dealer guarantees (the "Dealership Sales Tax Guaranty") to the Agency and the City (the City shall be deemed to be an intended third party beneficiary of this guaranty) that the Adventurecorp Dealership (or other dealership approved by the Agency for operation on the Site) shall generate minimum Sales Tax Revenue in an amount not less than $2,959,420 (the "Total Guaranty Amount") during the fifteen years following the date of approval of this Agreement by the Agency.  Guaranty Year shall commence on the first day of the calendar quarter next following the date of approval of this Agreement by the Agency and then annually thereafter.

In the event the Dealer has generated an amount less than (i) 33% of the Total Guaranty Amount by the fifth anniversary of the Date of this Agreement; (ii) 66% of the Total Guaranty Amount by the tenth anniversary of the Date of this Agreement; and (iii) 100% of the Total Guaranty Amount by the fifteenth anniversary of the Date of this Agreement (each of the forgoing periods referred to as the "Guaranty Period"), the Dealer shall pay to the City, in cash, within twenty (20) days of the Dealer's receipt of written notification from the Agency, an amount equal to the difference between the minimum Dealership Sales Tax Revenues required to be generated for that Guaranty Period and such Dealership Sales Tax Revenues determined by the Agency to have actually been generated directly by and paid to the City in reference to all businesses and activities conducted by the Dealership for that Guaranty Period to the City, based upon the final audited sales tax figures released from time to time by the State of California (the "Dealership Sales Tax Revenue Shortfall Amount").  Interest at the rate of six percent (6%) per annum shall be charged on any Dealership Sales Tax Revenue Shortfall Amount which has not been paid in full by the Dealer within the time set forth in this Section 2.2 and interest shall commence to accrue as of the date that is twenty (20) days from the date of the Dealer's receipt of written notification from the Agency of the Dealer's obligation to pay the applicable Dealership Sales Tax Revenue Shortfall Amount; provided, however, in no event shall the interest charged under this Section 2.2 exceed the maximum rate of interest which may legally be charged by redevelopment agencies.  Dealer's obligation to pay the Dealership Sales Tax Revenue Shortfall Amount shall be evidenced by the Dealer Note substantially in the form attached hereto as Exhibit D in the initial principal amount of $1,942,379, and secured by a First Lien Deed of Trust, substantially in the form attached hereto as Exhibit E on the Site.

2.3    <u>Guaranty</u>.  The Dealer's obligation to pay any and all sums constituting the Dealership Sales Tax Guaranty including Dealership Sales Tax Shortfall Amount shall be personally guaranteed by Samuel L. Key as evidenced by the Guaranty attached hereto as Exhibit F.  Except as otherwise provided herein, the Dealer Note shall not be subject to assignment, alienation, or transfer by the Dealer, and any such assignment, alienation, or transfer by the Dealer shall be invalid and of no legal force or effect.  Notwithstanding the foregoing, Dealer may assign the Dealer Note and the obligations thereunder incidental to a conveyance of the Site and/or Dealership with the consent of the Agency, as permitted in Paragraph 6.1 of this Agreement, and, effective as of the date of any such assignment, the Dealer shall be released from any further obligation to pay any Dealership Sales Tax



Shortfall Amounts and Samuel L. Key shall be relieved and released from any further obligations under the Guaranty and said Guaranty shall terminate.

2.4    Subordination of Deed of Trust. The Dealer agrees that, except as hereafter provided, the Agency shall not be required to subordinate its lien under the Deed of Trust. Notwithstanding the foregoing, the Agency will agree to subordinate its lien under the Deed of Trust if by the second anniversary of the Agreement, Dealer shall have produced Sales Tax Revenues in an amount equal to at least fifty percent (50%) of the Dealership Sales Tax Guaranty plus interest accrued through such date. After the fifth anniversary of this Agreement, the Agency will consider subordinating its lien under the Deed of Trust upon request of Adventurecorp in connection with any loan with respect to the Site.

3.    HAZARDOUS MATERIALS.

3.1    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Environmental Claims" shall mean any clams by third parties for personal injury (including sickness, disease or death), or for injury to property or natural resources or the environment, including, without limitation, lost profits, consequential damages, diminution of property value or loss of use of property, or for any violation or alleged violation of, or noncompliance with, the requirements of any Environmental Law.

(b)    "Environmental Cleanup Liability" shall mean any cost or expense incurred to investigate, monitor, remove, remediate, treat, clean up, abate or otherwise respond to any Release or threatened Release of Hazardous Materials, including, without limitation , the cost of obtaining Site closure from applicable governmental agencies and the cost of restoring the affected property upon completion of responsive action.

(c)    "Environmental Compliance Costs" shall mean any cost or expense necessary to enable the affected property to comply with all applicable Environmental Laws.

(d)    "Environmental Law" shall mean any applicable federal, California, regional or local law, statute, ordinance, rule, regulation or order for the protection of human health or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601, et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.); the Clean Air Act (42 U.S.C. § 7401 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300f et seq.); the Emergency Planning and Community Right-To-Know Act of 1986 (42 U.S.C. § 11001 et seq.); the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.); the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.); the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health and Safety Code § 25300 et seq.); the Hazardous Waste Control Law (Health and Safety Code § 25100 et seq.); the Hazardous Waste Disposal Land Use law (Health and Safety Code § 25220 et seq.); the Porter-Cologne Water Quality Control Act (Water Code § 13000 et seq.); Hazardous Materials Release Response Plans and Inventory (Health and Safety Code § 25500 et seq.); Underground Storage of Hazardous Substances (Health and Safety § 25280 et seq.) ; The Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65) (Health and Safety Code § 25249.5-25249.13); the Asbestos Notification Law (Health and Safety Code § 25915 et seq.); the

8

California Occupational Safety and Health Act (Labor Code § 6300 et seq.); Chapters 10 and 11, Division 4.5, Title 22, California Code of Regulations; and any law or regulation implementing, amending or succeeding any of the foregoing, and any similar laws or regulations at any time in effect having any of the purposes designated above.

(e)    "Hazardous Materials" shall mean any pollutant, contaminant, hazardous or toxic substance, material or waste which is or becomes identified, listed or regulated as such under any Environmental Law by the United States government, the State of California or any regional or local governmental authority having jurisdiction over the Dealer, Parcel or the Site.

(f)    "Release" shall mean the release, as defined in Health and Safety Code §§ 25320 and 25321, of a Hazardous Material or Hazardous Materials.

3.2    <u>Dealer Indemnity</u>. Effective upon the Close of Escrow, the Dealer agrees to indemnify, protect, defend, reimburse and hold the City and its Council members, any other elected or appointed officials, agents, employees and attorneys, harmless from and against any and all claims, actions, proceedings, lawsuits, orders, costs, liabilities, judgments, damages, fines, encumbrances, liens, penalties, punitive damages, losses and expenses (including without limitation all costs and expenses reasonably incurred to investigate and defend claims, whether or not such claim is ultimately defeated, and costs and expenses reasonably incurred for consultants, court fees, administrative fees, expert witness fees, and attorneys' fees) of whatever kind or nature, contingent or otherwise, matured or not matured, foreseeable or unforeseeable, any of which are suffered or incurred by said indemnified parties, or assessed, levied or asserted by any person or entity (whether governmental or private) against said indemnified parties (collectively, "Liabilities"), after the Close of Escrow and relating to the following:

Environmental Claims, Environmental Cleanup Liability and Environmental Compliance Costs arising from the Release or threatened Release of Hazardous Materials in or onto the soil or groundwater in, on, under or from the Site as a result of the use, generation, discharge, storage, handling or disposal of Hazardous Materials by Dealer at the Site whether before or after the Close of Escrow. The indemnification obligations set forth in this paragraph shall run with the land, and shall be subject to the provisions of Section 12 hereof. This provision shall survive the Close of Escrow.

4.    CONDITIONS PRECEDENT.

4.1    <u>Conditions Precedent to Dealer's Performance</u>. The obligation of the Dealer to consummate the transactions contemplated hereunder, is contingent upon satisfaction or written waiver by Dealer of each of the following:

(a)    There is no litigation pending or threatened challenging the validity of any provision of this Agreement or that may have a material adverse effect on the Site or Dealer's intended development or use thereof.

(b)    Dealer has obtained all approvals and permits required by the City, or government entity, for the operation of the Dealership;

4.2    <u>Conditions Precedent to Agency's Performance</u>. The obligation of the Agency to consummate the transactions contemplated hereunder, is contingent upon satisfaction or written waiver by the Agency of each of the following:

9

(a)    Dealer shall have performed and complied in all material respects, with all agreements and covenants required by this Agreement to be performed or complied with by it within the time periods required hereunder.

(b)    No litigation is pending or threatened challenging the validity of any provision of this Agreement or that may have a material adverse effect on the Site or Dealer's intended use thereof and all of the Dealer's representations and warranties shall be true and correct as of the Close of Escrow.

(c)    Dealer has confirmed that all of Dealer's conditions set forth in Section 4.1 have been satisfied or are waived and Dealer is unconditionally prepared to proceed with the terms of the Agreement.

(d)    Dealer has submitted to the City evidence satisfactory to Agency that all conditions set forth in the agreement between Dealer and Hawse and JCH with respect to the Site remains in full force and effect.

5.    DEFAULTS AND REMEDIES.

5.1    Occurrence of any or all of the following shall constitute a default ("Default") under this Agreement:

(a)    Dealer's default of any of its obligations under the Covenant.

(b)    City's default of any of its obligations under Paragraph 2 hereof.

(c)    The filing of a petition in bankruptcy by or against the Dealer or appointment of the receiver or trustee of any property of the Dealer, or an assignment by the Dealer for the benefit of creditors, or adjudication that the Dealer is insolvent by a court, and a failure of the Dealer to cause such petition, appointment or assignment to be removed or discharged within sixty (60) days.

In the event of any default under the terms of this Agreement, the nondefaulting party shall give written notice to the defaulting party. The defaulting party shall commence and diligently thereafter pursue the curing of said default to completion within thirty (30) days after receipt of notice of such default; provided, however, if such a cure cannot reasonably be affected within such thirty (30) day period, such failure shall not be a Default so long as such party promptly commences a cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion. Failure to cure, as specified above, shall be a "Default" hereunder. Nothing herein is intended to limit or restrict whatever specific performance or other equitable remedies either party may have in accordance with applicable law; provided, that City shall not be entitled to seek specific performance of Dealer's obligations hereunder.

In the event that any of the Conditions Precedent are not satisfied and are not waived (without regard to force majeure) then either party who is not then in default can terminate this Agreement without any further rights, obligations or liabilities to the other except as to Section 1.5 hereof which shall survive termination as set forth herein.

(d)    Representations and Warranties of the Parties. The Parties hereby represent and warrant as follows:

10

(i)    <u>Litigation</u>. There is no action, suit, proceeding, or formal or informal claim, demand, or request for information that affects the Site or would affect City's ability to perform its obligations under this Agreement, pending or being prosecuted in any court or by or before any federal, state, county or municipal department, commission, board, bureau or City or other governmental instrumentality, nor has any such action been threatened.

(ii)    <u>No Breach of Other Agreements</u>. The entering into of this Agreement will not constitute or result in any default or event that with notice or the lapse of time, or both, would be a default, breach, or violation of any lease, mortgage, deed of trust, or other agreement, instrument, or arrangement to which any party is a party.

6.    ASSIGNMENT AND ASSUMPTION.

6.1    The terms, covenants, and obligations of Dealer pursuant to this Agreement shall run with the Site and be binding upon Dealer's lessees, successors and assigns to the Site. It is understood that it is possible that the identity of the fee owner of the Site (the "Owner") or portions thereof may be different from the Dealer. During the Covenant Period, the Dealer shall include reference to this Agreement in any lease or operating agreement respecting the Site, and each lessee must, in such lease or operating agreement, acknowledge and agree (i) that its interests, rights and obligations are subject to this Agreement, and (ii) that it must comply, or enable the Dealer to comply, with all terms and provisions of this Agreement applicable and in force and effect following the effective date of such lease or operating agreement.

If the Dealer desires to assign its interests in the Site and/or the Dealership during the Covenant Period, the consent of the Agency (which shall not be unreasonably withheld, conditioned or delayed) shall be required for each such assignment or transfer, and such consent shall be granted if (i) the proposed assignee expressly assumes, in writing, Dealer's unexecuted obligations hereunder as to times following the effective date of the assignment (in which event Dealer shall thereafter be released from such assumed obligations); (ii) the proposed assignee has demonstrated to the reasonable satisfaction of the Agency that such person or entity has adequate financial capacity and operating experience to own the Site or operate the Dealership, as the case may be; and (iii) no default exists under the Agreement. The Agency's consent rights under this Paragraph 6 shall terminate and be of no further force or effect upon the expiration or earlier termination of the Covenant Period, and Dealer's right thereafter to assign, transfer or otherwise alienate its interest in the Site or Dealership shall be unrestricted. Nothing herein shall prohibit Dealer from contracting with or causing any third party or parties to perform any of Dealer's obligations hereunder, provided that in such event Dealer shall remain fully responsible to Agency for the performance of the Covenant during the Covenant Period. Effective upon the date of any assignment permitted hereunder or consented to in writing by the Agency, and provided that after such assignment Dealer no longer holds any interest in the Site, or in the Dealership, as the owner or Dealer, Dealer shall be released from any further liability or obligation to pay to the City and/or Agency any Dealership Sales Tax Revenue Shortfall Amount and Dealer's obligations under this Agreement and under the Promissory Note, together with the obligations of Samuel L. Key under the Guaranty, shall each terminate and be of no further force or effect.

11

7.    NOTICES.

7.1    All notices under this Agreement shall be given in writing by personal delivery, or by certified mail or registered United States Mail, return receipt requested, postage prepaid, or by facsimile and shall be deemed communicated when received if given by personal delivery or upon receipt or rejection if mailed as provided above or upon receipt by facsimile on a business day during business hours in the location where received, and if not then on the next business day, as the case may be.  Mailed notices shall be addressed as set forth below, but either party may change its address by giving written notice thereof to the other in accordance with the provisions of this article:

| | |
|---|---|
| Agency: | Lancaster Redevelopment Agency<br>44933 N. Fern Avenue<br>Lancaster, California  93534<br>Attn:    City Manager |
| With a copy to: | Stradling Yocca Carlson & Rauth<br>660 Newport Center Drive, Suite 1600<br>Newport Beach, California  92660<br>Attn:  David R. McEwen, Esq. |
| To the Dealer: | Adventurecorp<br>40624 Champion Way<br>Palmdale, CA 93551<br>Attn:  Samuel L. Key |
| To Hawse: | JCH Automotive Properties, LLC<br>43301 12th Street West<br>Lancaster, CA 93534<br>Attn:  James H. Hawse |

8.    MISCELLANEOUS.

8.1    This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings written and oral.  This Agreement may not be modified or amended except in a writing signed by all parties hereto.  In the event any litigation is necessary to enforce or interpret any provisions of this Agreement, the prevailing party in such litigation shall be entitled to recover its court costs and attorneys' fees.

DOCSOC/1411244v3/022087-0189

9.    BROKERAGE COMMISSIONS.

9.1    City and Dealer (as "Indemnitor") shall each indemnify, defend and hold the other party (as "Indemnitee") harmless from and against any and all cost, liabilities, losses, damages, claims, causes of action or proceedings which may result from the Indemnitor's dealing with any broker, agency or finder, license or otherwise in connection with the transaction covered by this Agreement.

10.    CONSTRUCTION.

10.1    The parties agree that each party and its counsel have reviewed and revised this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement or any amendments or exhibits to this Agreement.

11.    FORCE MAJEURE.

11.1    Time for performance hereunder shall be extended by any period of delay caused by circumstances beyond the reasonable control of the party claiming the delay despite the party's diligent efforts, other than financial ability, provided the party claiming the delay, provides written notice to the other party within a reasonable period following commencement of any such circumstances which circumstances shall include, without limitation, fire/casualty losses; dealer protests; strikes; litigation; unusually severe weather; inability to secure necessary labor, materials, or tools; environmental remediation; including governmental review and processing of environmental remediation; delays of any contractor, subcontractor, or supplier; delay caused by the other party, and acts of God (collectively, "force majeure").

12.    INTERPRETATION.

12.1    In this Agreement the neuter gender includes the feminine and masculine, and singular number includes the plural, and the words "person" and "party" include corporation, partnership, firm, trust, or association where the context so requires.

13.    TIME OF THE ESSENCE.

13.1    Time is of the essence of this Agreement and all parties' obligations under this Agreement.

14.    AUTHORITY TO EXECUTE.

14.1    The person or persons executing this Agreement on behalf of the Dealer warrant and represent that they have the authority to execute this Agreement on behalf of their corporation, partnership or business entity and warrant and represent that they have the authority to bind the Dealer to the performance of its obligations hereunder.

13

15.    WARRANTY AGAINST PAYMENT OF CONSIDERATION FOR AGREEMENT.

15.1    The Dealer warrants that it has not paid or given, and will not pay or give, to any third person, any money or other consideration for obtaining this Agreement, other than normal costs of conducting business and costs of professional services such as architects, engineers and attorneys.

16.    RELEASE OF AGENCY OFFICIALS.

16.1    No member, official, agent, employee, or attorney of the Agency shall be personally liable to the Dealer, or any successor in interest of the Dealer, in the event of any default or breach by the Agency or for any amount which may become due to the Dealer or its successors, or on any obligations under the terms of this Agreement. The Dealer hereby waives and releases any claim it may have personally against the members, officials, agents, employees consultants, or attorneys of the Agency with respect to any default or breach by the Agency or for any amount which may become due to the Dealer or its successors, or on any obligations under the terms of this Agreement. The Dealer makes such release with full knowledge of Civil Code Section 1542, and hereby waives any and all rights thereunder to the extent of this release, if such Section 1542 is applicable California Civil Code Section 1542 provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

17.    HEADINGS.

17.1    The headings to the paragraphs of this Agreement have been inserted for convenience reference only and shall not to any extent have the effect of modifying, amending or changing the expressed terms and provisions of this Agreement.

18.    VENUE.

18.1    In the event of any litigation under this Agreement, all such actions shall be instituted in the Superior Court of the County of Los Angeles, State of California, or in an appropriate municipal court in the County of Los Angeles, State of California.

19.    APPLICABLE LAW.

19.1    The laws of the State of California shall govern the interpretation and enforcement of this Agreement.

20.    SUCCESSORS AND ASSIGNS.

20.1    The provisions of this Agreement constitute covenants running with the land and shall be binding upon, and inure to the benefit of, the Agency and the Dealer and their permitted successors and assigns as the case or context may require. The obligations set forth herein shall be binding upon Dealer and Dealer's heirs, successors and assigns who become fee owners of the Site, or any portion thereof; provided, however, that if Dealer or any successor fee owner of the Site, or any portion thereof, transfers any portion or all of its interests in and to the Site such that the transferee becomes liable hereunder as a fee owner, the transferor shall thereupon be released and

14

discharged from any and all further obligations under this Agreement or the Memorandum of Agreement in connection with the interests transferred by it, but only as to the interests transferred and only as to such obligations accruing and to be performed from and after the date of such transfer, it being understood that such transfer does not release obligations accrued prior to such transfer.

21.    NO JOINT VENTURE.

21.1    Nothing contained in this Agreement shall be construed to render the Agency in any way or for any purpose a partner, joint venture, or associated in any relationship with Dealer, nor shall this Agreement be construed to authorize any party to act as agent for the other.

22.    WAIVER.

22.1    The waiver by the Agency, or the Dealer of any breach by the other Party of any term, covenant, or condition in this Agreement contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained.  Any Party's acceptance of any performance by the other Party after the due date of such performance shall not be deemed to be a waiver by any Party or any preceding breach by the other Party of any term, covenant, or condition of this Agreement, regardless of such Party's knowledge of such preceding breach at the time of acceptance of such performance.

23.    COUNTERPARTS.

23.1    This Agreement may be executed and acknowledged in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one (1) Agreement, binding on the parties hereto.

24.    RECORDATION OF THE MEMORANDUM.

24.1    The Memorandum shall be recorded concurrently with the recordation of the Deed of Trust.  Thereafter the parties shall cooperate in reasonable requests to remove of record the Agreement, or portions thereof that have been fully performed.

15

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first written above.

AGENCY:

LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic

By:_____

Its: _____

ATTEST:


_____

Agency Secretary



APPROVED AS TO FORM:
STRADLING YOCCA CARLSON & RAUTH


By:_____


DEALER:

ADVENTURECORP, a California corporation


By:_____

Its: _____President_____


HAWSE:

JCH AUTOMOTIVE PROPERTIES, LLC, a limited liability company


By:_____

       James H. Hawse

Its:_____

16

EXHIBIT A

LEGAL DESCRIPTION OF "SITE"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcels 8, 9 and 13 of Parcel Map No. 20314, in the City of Lancaster, County of Los Angeles, State of California, as per map recorded in book 216 page(s) 80 through 82 inclusive of parcel maps, in the Office of the County Recorder of said County.

A-1

EXHIBIT B

SITE MAP



B-1

EXHIBIT C

MEMORANDUM OF AGREEMENT

RECORDING REQUESTED BY          )
AND WHEN RECORDED MAIL TO:      )
                                )
Lancaster Redevelopment Agency  )
44933 N. Fern Avenue            )
Lancaster, California 93534     )
Attn: Community Development Director )

_____
[Space above for Recorder.]
This document is exempt from the payment of a recording fee
pursuant to Government Code Section 6103.

MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT ("Memorandum"), dated for identification purposes as of _____, 2010 is entered into by and between the LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic ("Agency"), ADVENTURECORP, a California corporation ("Dealer"), and HAWSE AUTOMOTIVE PROPERTIES, LLC., a California limited liability company (the "Hawse"), and JCH Automotive Properties, LLC, a California limited liability company ("JCH") (collectively, the "parties")

1.      Agreement. Agency and Dealer have entered into an Agreement ("Agreement"), dated as of _____, 200_, which provides for the assumption of the obligation under certain promissory notes and the Agreement to operate an RV Dealership on certain real property located in the City of Lancaster, County of Los Angeles, State of California, more fully described in Attachment No. 1 attached hereto and incorporated herein by this reference (the "Site"). All of the terms, conditions, provisions and covenants of the Agreement with respect to the Site are incorporated in this Memorandum by reference as though written out at length herein, and the Agreement and this Memorandum shall be deemed to constitute a single instrument or document. All capitalized terms used herein and not otherwise defined in this Memorandum shall have the meanings ascribed to such terms in the Agreement.

2.      Operating, Construction, Restrictive Covenant. This Memorandum is being recorded against the Site to evidence, among other provisions of the Agreement, the provisions of Paragraph 1 of the Agreement applicable to the Site.

(a)     Use of the Site; Operating Covenant. From and after the effective date of this Agreement, and in compliance with the terms of this Section 1.2 the Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site, that the Site shall be occupied and used solely for automotive uses relating to a new automobile, recreational vehicle and truck dealership activities, including automobile, recreational vehicle and truck servicing, used automobile, used recreation vehicles, used truck sales, and repair of vehicles and ancillary uses reasonably related and connected to new automobile, recreational vehicles and truck dealerships. The Site and all improvements constructed and maintained thereon shall be used and operated by the Dealer for the

C-1

uses permitted herein and for no other use or purpose; all such use shall be in compliance with the Auto Center CC&R's which were adopted on June 13, 1989 as thereafter amended. The Dealer shall not use or permit any other person to use the Site, or any part thereof, for any purposes tending to injure the reputation thereof or for any improper or offensive use or to constitute a nuisance; and the Dealer shall at all times during said terms conform to, and cause all persons using or occupying any part of the Site to comply with, all public laws, ordinances, and regulations from time to time applicable thereto and to all operations thereon. The Dealer covenants and agrees for itself, its successors, assigns and any successors in interest to the Site to continue to operate the Adventurecorp Dealership, or such other dealership which may be approved by the Agency pursuant to Section 1.2, upon the Site for a period of not less than twenty-five (25) years following the effective date of the Agreement, and, except with the prior written consent of the Agency for each instance, which consent may be granted or withheld in the Agency's sole and absolute discretion, the failure of the Dealer or an operator approved by the Agency pursuant to Section 1.2 to operate such a dealership for ninety (90) consecutive days shall, at the Agency's option, constitute a default hereunder, but upon submission of proof satisfactory to Agency in its sole and absolute discretion that Dealer is diligently pursuing acquisition of a new vehicle franchise for the Site or attempting to reopen the existing franchise following a natural disaster, Agency may grant an additional ninety (90) days to Dealer to recommence operation of a dealership before considering the failure to operate a default. Notwithstanding the foregoing, in the event that the balance due and owing on the Dealer Note or prior to the seventh (7th) anniversary of the date of this Agreement, the terms of the Operating Covenant shall be reduced to fifteen (15) years from date of this Agreement.

The parties acknowledge that the Agency has negotiated the terms of this Agreement in contemplation of the Sales Tax Revenues to be generated by the continued operation of the Adventurecorp Dealership upon the Site. The Dealer may operate a dealership other than the Adventurecorp Dealership or may thereafter operate dealerships in addition to or in replacement of the Adventurecorp Dealership on the Site, but only with the prior express written consent of the Agency. Any request to operate an additional or replacement automobile dealership on the Site must be presented by the Dealer to the Agency in written form. The Agency shall approve or disapprove the Dealer's written request within thirty (30) days of the Agency's receipt of all materials necessary to review the request and the Agency will not unreasonably withhold its approval of any change in dealership(s) if such change is reasonable, taking into consideration the Sales Tax Revenues and such other factors as Agency determines. If the Agency disapproves or fails to approve the Dealer's written request, the Agency shall provide the Dealer with a written statement of the reason(s) why the Agency disapproved or failed to approve such request, as well as the Agency's opinion of any information which the Dealer might provide in order to obtain the Agency's approval. Upon the Dealer's submission to the Agency of such additional information in written form, the Agency shall thereafter have thirty (30) days to provide the Dealer with a written statement of the Agency's approval or disapproval of the Dealer's request. In the event the Agency fails to provide any such written statement within the times set forth in Section 1.2, the Dealer's request for such change of dealership shall be deemed approved. Notwithstanding the foregoing, if the Agency lawfully delegates the decision regarding a replacement of the Adventurecorp Dealership to Agency staff, the thirty (30) day review periods set forth in this paragraph shall be shortened to twenty (20) days.

(a)    Maintenance Covenant.    The Dealer shall maintain the Site and all improvements thereon in good condition and in accordance with the custom and practice generally applicable to a "first class" new automobile dealership, and shall keep the Site free from any accumulation of debris or waste materials.

C-2

(b) <u>Rights of Access Covenant</u>. The Agency, for itself and for the City and other public agencies, at their sole risk and expense, reserves the right to enter the Site or any part thereof at all reasonable times for the purpose of construction, reconstruction, maintenance, repair or service of any public improvements or public facilities located on the Site. Any such entry shall be made only after reasonable notice to the Dealer and the Agency shall indemnify and hold the Dealer harmless from any costs, claims, damages or liabilities pertaining to any entry. Dealer covenants and agrees to allow such entry onto the Site pursuant to this Section.

(c) <u>Nondiscrimination Covenant</u>. The Dealer covenants by and for itself and any successors in interest that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, handicap, national origin or ancestry in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Site, nor shall the Dealer or any person claiming under or through it or them establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the Site. The foregoing covenants shall run with the land.

The Dealer shall refrain from restricting the rental, sale or lease of the Site on the basis of race, color, creed, religion, sex, marital status, handicap, national origin or ancestry of any person. All such deeds, leases or contracts shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

(i) *In deeds*: "The grantee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises herein conveyed, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

(ii) *In leases*: "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions:

"That there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation

C-3



with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sublessees, subtenants, or vendees in the premises herein leased."

(iii) *In contracts*: "There shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises which are the subject of this Agreement, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

3.      Compliance With Governmental Requirements.

a.      The Dealer shall carry out the design and construction of the improvements on the Site in conformity with all applicable laws, including all applicable state laws, the City zoning and development standards, building, plumbing, mechanical and electrical codes all other provisions of the City's Municipal Code, and all applicable disabled and handicapped access requirements, including without limitation the Americans With Disabilities Act, 42 U.S.C. Sections 12101, et seq., California Government Code Sections 4450, et seq., California Government Code Sections 11135, et seq., and the Unruh Civil Rights Act, California Civil Code Sections 51, et seq., and all applicable state labor and work safety laws and regulations, including, to the extent applicable, the provisions of Labor Code Sections 1770, et seq. relating to prevailing wages as to which neither the City nor the City makes any representation.    Dealer agrees to hold the City and the City harmless and to indemnify and defend the City and the City from any claims arising under the provisions of Labor Code Sections 1720, et seq., including but not limited to the provisions of Labor Code Section 1726 and 1781.  Dealer expressly waives any rights it may have under Labor Code Sections 1726 or 1782. It shall be the sole responsibility of the Dealer to determine the applicability of such laws to the development of the Site.  Dealer agrees to hold harmless, indemnify and defend the City from any claim or liability in connection with the requirements of this section.

b.      The Dealer certifies and agrees that all persons employed or applying for employment by it, its affiliates, subsidiaries, or holding companies, and all subcontractors, bidders and vendors, are and will be treated equally by it without regard to, or because of race, color, religion, ancestry, national origin, sex, age, pregnancy, childbirth or related medical condition, medical condition (cancer related) or physical or mental disability, and in compliance with Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000, et seq., the Federal Equal Pay Act of 1963, 29 U.S.C. Section 206(d), the Age Discrimination in Employment Act of 1967, 29 U.S.C. Sections 621, et seq., the Immigration Reform and Control Act of 1986, 8 U.S.C. Sections 1324b, et seq., 42 U.S.C. Section 1981, the California Fair Employment and Housing Act, California Government Code Sections 12900, et seq., the California Equal Pay Law, California Labor Code Sections 1197.5, California Government Code Section 11135, the Americans with Disabilities Act, 42 U.S.C. Sections 12101, et seq., and all other anti-discrimination laws and regulations of the United States and the State of California as they now exist or may hereafter be amended.  Dealer shall provide the Agency with copies of any complaints filed pursuant to the above.

DOCSOC/1411244v3/022087-0189

c.    The requirements set forth in paragraph 2 is referred to in this Agreement as the "Governmental Requirements."

4.    Covenants Run With Land; Assignment and Assumption.  If the Dealer desires to assign its interests in the Site and/or the Dealership during the Covenant Period, the consent of the Agency (which shall not be unreasonably withheld, conditioned or delayed) shall be required for each such assignment or transfer, and such consent shall be granted if (i) the proposed assignee expressly assumes, in writing, Dealer's unexecuted obligations hereunder as to times following the effective date of the assignment (in which event Dealer shall thereafter be released from such assumed obligations); (ii) the proposed assignee has demonstrated to the reasonable satisfaction of the Agency that such person or entity has adequate financial capacity and operating experience to own the Site or operate the Dealership, as the case may be; and (iii) no default exists under the Agreement.  The Agency's consent rights under this Paragraph 4 shall terminate and be of no further force or effect upon the expiration or earlier termination of the Covenant Period, and Dealer's right thereafter to assign, transfer or otherwise alienate its interest in the Site or Dealership shall be unrestricted.  Nothing herein shall prohibit Dealer from contracting with or causing any third party or parties to perform any of Dealer's obligations hereunder, provided that in such event Dealer shall remain fully responsible to Agency for the performance of the Covenant during the Covenant Period.  Effective upon the date of any assignment permitted hereunder or consented to in writing by the Agency, the assignor shall have no liability for obligations under this Agreement that arise from and after the date of such assignment; provided that such assignor after such assignment will no longer hold any interest as Dealer.  In the event the Agency consents to an assignment of a fee interest in the Site during the period in which the Agency is obligated to provide consideration pursuant to Section 3a, the right to receive such consideration from and after such assignment with respect to the Site shall be transferred to the approved assignee of the fee interest therein.

5.    Indemnity.  The Dealer agrees to and shall indemnify, defend, protect, and hold harmless the Agency (and the Agency's Representatives) from and against any and all third party claims, losses, proceedings, damages, causes of action, liability, costs and expenses (including reasonable attorneys' fees) arising from or in connection with or caused by (i) any act, omission or negligence of the Dealer or any lessee of the Dealer, or their respective contractors, licensees, invitees, agents, sublessees, servants or employees, wheresoever on or adjacent to the Site that the same may occur; and (ii) any use of the Site, or any accident, injury, death or damage to any person or property occurring in, on or about the Site, or any part of the Site occurring after the date of this Agreement, or from the conduct of the Dealer's business or from any activity, work or thing done, permitted or suffered by the Dealer or its sublessees, contractors, employees, or invitees, in or about the Site (other than to the extent arising as a result of the Agency's act or omission or to the extent of any sole negligence or willful misconduct of the Agency), including without limitation, any action brought by any third party challenging the validity of any provision of this Agreement.

The Dealer shall be released from all obligations under this indemnification provision for any and all liabilities caused by or resulting from or arising in whole or in part out of events, acts, or omissions occurring on a portion of the Site after said portion of the Site has been assigned, transferred or conveyed.

6.    Binding Effect.  The provisions of this Memorandum constitute covenants running with the land and shall be binding upon, and inure to the benefit of, the Agency and the Dealer and their permitted successors and assigns as the case or context may require. The obligations set forth herein shall be binding upon Dealer and Dealer's heirs, successors and assigns who become fee

C-5

owners of the Site, or any portion thereof; provided, however, that if Dealer or any successor fee owner of the Site, or any portion thereof, transfers any portion or all of its interests in and to the Site such that the transferee becomes liable hereunder as a fee owner, the transferor shall thereupon be released and discharged from any and all further obligations under this Memorandum or the Agreement in connection with the interests transferred by it, but only as to the interests transferred and only as to such obligations accruing and to be performed from and after the date of such transfer, it being understood that such transfer does not release obligations accrued prior to such transfer.

7.    Purpose of Memorandum.  This Memorandum is prepared for recordation purposes only, and in no way modifies the terms, conditions, provisions and covenants of the Agreement.  In the event of any inconsistency between the terms, conditions, provisions and covenants of this Memorandum and the Agreement, the terms, conditions, provisions and covenants of the Agreement shall prevail.

DOCSOC/1411244v3/022087-0189

The parties have executed this Memorandum of Agreement on the dates specified immediately adjacent to their respective signatures.

AGENCY:

LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic

By:_____

Its: _____

ATTEST:

_____
Agency Secretary

APPROVED AS TO FORM:

STRADLING YOCCA CARLSON & RAUTH

By:_____
     David R. McEwen

DEALER:

ADVENTURECORP, a California corporation

By:_____

Its: ___President_____

HAWSE:

JCH AUTOMOTIVE PROPERTIES, LLC, a limited liability company

By:_____
     James H. Hawse

Its:_____

C-7



ATTACHMENT NO. 1
TO EXHIBIT C

SITE LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS: THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcels 8, 9 and 13 of Parcel Map No. 20314, in the City of Lancaster, County of Los Angeles, State of California, as per map recorded in book 216 page(s) 80 through 82 inclusive of parcel maps, in the Office of the County Recorder of said County.

ATTACHMENT NO. 1
TO EXHIBIT C

EXHIBIT D

DEALER NOTE

Lancaster, California _____, 2010

1.    FOR VALUE RECEIVED, the undersigned ("Maker") promises to pay to the order of the LANCASTER REDEVELOPMENT AGENCY ("Holder"), at 44933 North Fern Avenue, Lancaster, California 93534 or such other place as the Holder may from time to time designate in writing, the "Note Amount" (as herein defined), in lawful money of the United States of America, together with other charges as set forth below, until fully paid.

2.    This Promissory Note is made and delivered pursuant to and in implementation of a Agreement by and between the Holder and the Maker dated _____, 200_ (the "Agreement"), copies of which are on file as public records with the Holder and are incorporated herein by reference. The Agreement provides for the disposition and development of real property and the operating covenant. The Promissory Note is made to assure payment of the Dealership Sales Tax Guaranty under the Agreement, and to provide security for the Holder as to such payment. The Maker acknowledges that but for the execution of this Promissory Note, the Holder would not enter into the Agreement. Unless definitions of terms are expressly set out at length herein, each term shall have the same definition as set forth in the Agreement.

3.    Pursuant to the Agreement, the Maker shall pay to the Holder an amount equal to the Dealership Sales Tax Revenue Shortfall Amount (as defined in the Agreement) generated during the Guaranty Period (the "Note Amount") as payment for the Dealership Sales Tax Guaranty pursuant to Section 2.2 of the Agreement.

4.    The failure of the Maker to pay in full within the time provided in Section 2.2 of the Agreement the "Note Amount" (as defined above) shall constitute a default of Maker under the terms of this Promissory Note. In the event the Maker fails to timely pay in full when due the Note Amount, any portion which is not timely paid in full shall accrue interest at the rate of six percent (6%) per annum.

5.    This Note is secured by a Deed of Trust With Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing (the "Subordinate Deed of Trust") dated as of the same date as this Note.

6.    The Note Amount shall be paid in full within thirty (30) days of the end of the Guaranty Period.

D-1

7.    Upon payment in full of the Note Amount, the Holder shall return this Promissory Note to the Maker.

ADVENTURECORP, a California corporation

By:_____

Its:____President_____

DOCSOC/1411244v3/022087-0189

EXHIBIT E

DEED OF TRUST

Order No.

Escrow No.

Loan No.

WHEN RECORDED MAIL TO:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# DEED OF TRUST WITH ASSIGNMENT OF RENTS
## (SHORT FORM)

This DEED OF TRUST, _____between

Lancaster Honda, Inc., herein called TRUSTOR,

whose address is _____,
　　　　　　　　　　　(Number and Street)　　　　　　　(City)　　　　　　　　　　(State)

FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called TRUSTEE, and

LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic created and existing pursuant to the Community Redevelopment Law, herein called BENEFICIARY,

WITNESSETH: That Trustor grants to Trustee in trust, with power of sale, that property in the

together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits for the purpose of securing (1) payment of the sum of $_____ according to the terms of the Promissory Note executed by Lancaster Honda, Inc. and dated as of _____, 20__, payable to order of Beneficiary, and extensions or renewals thereof, (2) the performance of each agreement of Trustor incorporated by reference or contained herein and (3) payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Subordinate Deed of Trust.

To protect the security of this Deed of Trust, and with respect to the property above described, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in subdivision A, and it is mutually agreed that each and all of the terms and provisions set forth in subdivision B of the fictitious deed of trust recorded in Orange County August 17, 1964, and in all other counties August 18, 1964, in the book and at the page of Official Records in the office of the county recorder of the county where said property is located, noted below opposite the name of such county, namely:

(continued on reverse side)

E-1

| COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alameda | 1288 | 556 | Kings | 858 | 713 | Placer | 1028 | 379 | Sierra | 38 | 187 |
| Alpine | 3 | 130-31 | Lake | 437 | 110 | Plumas | 166 | 1307 | Siskiyou | 506 | 762 |
| Amador | 133 | 438 | Lassen | 192 | 367 | Riverside | 3778 | 347 | Solano | 1287 | 621 |
| Butte | 1330 | 513 | Los Angeles | T-3878 | 874 | Sacramento | 5039 | 124 | Sonoma | 2067 | 427 |
| Calaveras | 185 | 338 | Madera | 911 | 136 | San Benito | 300 | 405 | Stanislaus | 1970 | 56 |
| Colusa | 323 | 391 | Marin | 1849 | 122 | San Bernardino | 6213 | 768 | Sutter | 655 | 585 |
| Contra Costa | 4684 | 1 | Mariposa | 90 | 453 | San Francisco | A-804 | 596 | Tehama | 457 | 183 |
| Del Norte | 101 | 549 | Mendocino | 667 | 99 | San Joaquin | 2855 | 283 | Trinity | 108 | 595 |
| El Dorado | 704 | 635 | Merced | 1660 | 753 | San Luis Obispo | 1311 | 137 | Tulare | 2530 | 108 |
| Fresno | 5052 | 623 | Modoc | 191 | 93 | San Mateo | 4778 | 175 | Tuolumne | 177 | 160 |
| Glenn | 469 | 76 | Mono | 69 | 302 | Santa Barbara | 2065 | 881 | Ventura | 2607 | 237 |
| Humboldt | 801 | 83 | Monterey | 357 | 239 | Santa Clara | 6626 | 664 | Yolo | 769 | 16 |
| Imperial | 1189 | 701 | Napa | 704 | 742 | Santa Cruz | 1638 | 607 | Yuba | 398 | 693 |
| Inyo | 165 | 672 | Nevada | 363 | 94 | Shasta | 800 | 633 | | | |
| Imperial | 3756 | 690 | Orange | 7182 | 18 | San Diego | SERIES 5 Book 1964, Page 149774 | | | | |

shall inure to and bind the parties hereto, with respect to the property above described.  Said agreements, terms and provisions contained in said subdivisions A and B, (identical in all counties, and printed on pages 3 and 4 hereof) are by the within reference thereto, incorporated herein and made a part of this Subordinate Deed of Trust for all purposes as fully as if set forth at length herein, and Beneficiary may charge for a statement regarding the obligation secured hereby, provided the charge therefor does not exceed the maximum allowed by law.

The undersigned Trustor, requests that a copy of any notice of default and any notice of sale hereunder be mailed to him at his address hereinbefore set forth.

<em>Signature of Trustor</em>

STATE OF CALIFORNIA        }
COUNTY OF _____}ss
On _____ before me, _____

_____, _____

personally appeared

_____    _____

personally known to me ( or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/here/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.    _____

WITNESS my hand and official seal.

Signature _____

(This area for official notarial seal)

(continued on next page)

E-2

**DO NOT RECORD**

The following is a copy of Subdivisions A and B of the fictitious Subordinate Deed of Trust recorded in each county in California as stated in the foregoing Subordinate and incorporated by reference in said Subordinate Deed of Trust as being a part thereof as if set forth at length therein.

A.    **To protect the security of this** Subordinate Deed of Trust, Trustor agrees:

(1)    To keep said property in good condition and repair, not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon, not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2)    To provide, maintain and deliver to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon any indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3)    To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

(4)    To pay; at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary of Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may; make or do the same is such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defeat any action purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5)    To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B.    **It is mutually agreed:**

(1)    That any aware in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(2)    That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3)    That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed and said not for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon, or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4)    That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

(5)    That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or be a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collecting of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6)    That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

E-3

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of said having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for case in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of trustee and of this Trust, including costs of evidence of title in connection with sale, Trustee shall apply to proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7)     Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(8)     That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(9)     That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Subordinate Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

(10)    Notwithstanding anything herein to the contrary, the Beneficiary agrees to subordinate its lien under this Subordinate Deed of Trust and the Promissory Note to the lien of any financial institution providing construction or permanent financing for the Dealer Improvements; provided that such subordination shall not apply to any refinancing of such construction or permanent financing without the Beneficiary's prior written consent.

**<u>DO NOT RECORD</u>**                                     REQUEST FOR FULL RECONVEYANCE

TO FIRST AMERICAN TITLE INSURANCE COMPANY, TRUSTEE:

The under signed is the legal owner and holder of the note and of all indebtedness secured by the foregoing Subordinate Deed of Trust. Said note, together with all other indebtedness secured by said Subordinate Deed of Trust, have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Subordinate Deed of Trust, to cancel said note above mentioned, an all other evidences of indebtedness secured by said Subordinate Deed of Trust delivered to you herewith, together with the said Subordinate Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Subordinate Deed of Trust, all the estate now held by you under the same.

Dated _____              _____

                                                   _____

Please mail Subordinate Deed of Trust,
Note and Reconveyance to _____

*<u>Do Not lose or destroy this</u> Subordinate Deed of Trust <u>OR THE NOTE</u> which it secures. Both must be delivered to the Trustee for cancellation before reconveyance will be made.*

E-4

**ATTACHMENT NO. 1**
**TO EXHIBIT E**

**PROPERTY DESCRIPTION**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcels 8, 9 and 13 of Parcel Map No. 20314, in the City of Lancaster, County of Los Angeles, State of California, as per map recorded in book 216 page(s) 80 through 82 inclusive of parcel maps, in the Office of the County Recorder of said County.

ATTACHMENT NO. 1
TO EXHIBIT E



**EXHIBIT F**

**GUARANTY**

Dated as of _____, 2010

In order to induce the LANCASTER REDEVELOPMENT AGENCY, a public body, corporate and politic (the "Agency") to enter into the Agreement dated June ___, 2010 ("Agreement") with ADVENTURECORP, a California corporation ("Dealer"), and in consideration thereof, _____ (hereinafter referred to as the "Guarantor") executed this Guaranty ("Guaranty") in favor of the Agency. This Guaranty is made, in part, with reference to the following relevant facts:

RECITALS

A.    The Agency and Dealer entered into the Agreement with respect to the Site. All capitalized terms not defined herein shall have the meaning set forth in the Agreement unless the context dictates otherwise.

B.    Dealer has agreed to pay the Dealership Sales Tax Shortfall Amount in accordance with Section 2.2 of the Agreement (the "Dealer Obligation").

NOW, THEREFORE, in consideration of the covenants exchanged herein, and as part of the consideration for the Agency to enter into the Agreement with Dealer, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties agree as follows:

1.    Guarantor absolutely, unconditionally, and irrevocably guarantees and promises to fully, completely and punctually satisfy the Dealer Obligation in accordance with the terms of this Guaranty.

2.    Notwithstanding any contrary provision in this Guaranty, the Agency shall not have the right to enforce this Guaranty against Guarantor, unless Dealer is in Default of its obligations under Section 2.2 of the Agreement.

3.    This Guaranty is an absolute guaranty of payment and not of collection and shall survive termination of the Agreement. Guarantor expressly agrees that until the Dealer Obligation is paid in full, Guarantor shall not be released by or because of any waiver, extension, modification, forbearance, delay, or other act or omission of the Agency, or Agency's failure to proceed promptly against Dealer or Guarantor.

4.    Guarantor agrees that (i) it is directly and primarily liable to the Agency, (ii) the Dealer Obligation is independent of the obligations of Dealer, and (iii) a separate action or actions may be brought and prosecuted against Guarantor whether or not Dealer is joined in any such action or actions. Guarantor agrees that the liability of Guarantor under this Guaranty shall in no way be limited by (a) the release or discharge of Dealer in any creditor proceeding, receivership, bankruptcy or other similar proceeding, (b) the impairment, limitation or modification of the liability of Dealer or of any remedy for the enforcement of Dealer's liability, resulting from the operation of any present or future provision of Title 11 of the United States Code, as amended, or any other statute or proceeding affecting creditors' rights generally, (c) the rejection or disaffirmance of the any Dealer Obligation or

F-1

any portion thereof in any such proceeding, or (d) the cessation, from any cause whatsoever, whether consensual or by operation of law, of the liability of Dealer to the Agency. In the event that bankruptcy, insolvency, receivership or similar creditors rights proceedings are instituted against Dealer, Guarantor hereby waives any rights of indemnification and/or subrogation it may have against Dealer.

6.       Guarantor hereby waives any right to assert against the Agency as a defense, counterclaim, set-off or cross-claim any defense (legal or equitable), set-off, counterclaim, and/or claim which Guarantor may now or at any time hereafter have against Dealer.

7.       Guarantor hereby waives all presentments, demands for payment and/or performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notice of acceptance of this Guaranty, diligence in collection, and all other notices or formalities to which Guarantor may be entitled or notices which may be required in order to charge Guarantor with liability hereunder.

8.       Without limiting the generality of any of the foregoing waivers or any other provision of this Guaranty, Guarantor further waives any waiver by Agency of any of Agency's rights under California Civil Code Section 2822. Guarantor further waives any rights, defenses and benefits which might otherwise be available to Guarantor under California Civil Code Sections 2787 to 2855, inclusive, (including, without limitation, California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2848, 2849 and 2850) 2899 and 3433, and any successor sections. Guarantor acknowledges and agrees that all waivers of defenses arising from any impairment of Guarantor's rights of subrogation, reimbursement, contribution and indemnification and waivers of any other rights, privileges, defenses or protections available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code are intended by Guarantor to be effective to the maximum extent permitted by applicable law.

9.       Guarantor agrees that it shall file all claims against Dealer in any bankruptcy or other similar proceeding in which the filing of claims is required by law on any indebtedness of Dealer to Guarantor, and will assign to the Agency, all rights of Guarantor. If Guarantor does not file such claim, the Agency, as attorney-in-fact for Guarantor, is authorized to do so in the name of Guarantor to the extent of amounts guaranteed hereunder or, in the Agency's discretion, to assign the claim and to file a proof of claim in the name of the Agency or the Agency's nominee. In all such cases, whether in bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the Agency the full amount of any such claim, and, to the full extent necessary for that purpose, Guarantor assigns to the Agency all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled. All monies or other property of Guarantor at any time in the possession of the Agency may be held by the Agency as security for any and all obligations of Guarantor to the Agency no matter how or when arising, whether absolute or contingent, whether due or to become due, and whether under this Guaranty or otherwise.

F-2

10.    Guarantor is presently informed of the financial condition of Dealer and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment or nonperformance of the Dealer Obligation. Guarantor hereby covenants that it will continue to keep itself informed of Dealer's financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Dealer Obligation. Guarantor hereby waives its rights, if any, to require, and the Agency is relieved of any obligation or duty to disclose to Guarantor any information which the Agency may now or hereafter acquire concerning such condition or circumstances.

11.    Except as hereinafter provided, this Guaranty shall continue in full force and effect until the Dealer Obligation is fully paid or otherwise discharged. Notwithstanding the foregoing, in the event the Dealer assigns its interest in the Site and/or the Dealership with the consent of the Agency, as permitted in Paragraph 6.1 of the Agreement, then this Guaranty shall terminate and be of no further force or effect from and after the effective date of said assignment.

12.    This Guaranty shall be binding upon the successors and assigns of Guarantor and shall inure to the benefit of the Agency's successors and assigns.

13.    No modification of this Guaranty shall be effective for any purpose unless it is in writing and executed by an officer of the Agency authorized to do so.

14.    If: (a) this Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (b) an attorney is retained to represent Agency in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Agency in any proceedings whatsoever in connection with this Guaranty and Agency prevails in any such proceedings, then Guarantor shall pay to Agency upon demand all attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding or multiple proceedings brought to enforce this Guaranty.

15.    The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable,  that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Agency under the remainder of this Guaranty shall continue in full force and effect.

16.    TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY AGENCY. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), AGENCY AND GUARANTOR IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL

F-3

COURTS HAVING JURISDICTION IN THE CITY OF LANCASTER, COUNTY OF LOS ANGELES AND STATE OF CALIFORNIA, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS GUARANTY SHALL PRECLUDE AGENCY FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. AGENCY AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY CALIFORNIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF LANCASTER OR COUNTY OF LOS ANGELES AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

17.    Guarantor shall deliver to the Agency all financial information regarding Guarantor as and when required by the Agreement.

18.    All acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California. Guarantor consents to the jurisdiction of the State of California and consents to service of process by any means authorized by California law, including, without limitation, service of process by mail.

19.    Guarantor herein warrants and represents that, as of the date hereof, it has net assets of at least Three Million Dollars ($3,000,000.00) exclusive of any other contingent obligations and will maintain such financial condition during the term hereof.

20.    Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

Guarantor:        Samuel L. Key
                  43245 Business Center Parkway #107
                  Lancaster, CA 93534
                  Telephone       _____
                  Facsimile       _____

F-4

Agency:              Lancaster Redevelopment Agency
                     44933 N. Fern Avenue
                     Lancaster, CA 93534
                     Telephone      (661) 723-6100
                     Facsimile      (661) 723-6141

With a copy to:      Stradling Yocca Carlson & Rauth
                     660 Newport Center Drive, Suite 1600
                     Newport Beach, CA 92660
                     Telephone      (949) 725-4000
                     Facsimile      (949) 725-4100

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

F-5

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the date first above written.

_____

_____

WITNESSED HERETO BY THE AGENCY:

LANCASTER REDEVELOPMENT AGENCY, a
public body, corporate and politic

By: _____
Name:_____
Title:_____

F-6

**EXHIBIT G**



| | |
|---|---|
| R. Rex Parris | Mayor |
| Ronald D. Smith | Vice Mayor |
| Ken Mann | Council Member |
| Sherry Marquez | Council Member |
| Ed Sileo | Council Member |
| Mark V. Bozigian | City Manager |

March 31, 2010

Mr. Samuel L. Key
Adventurecorp
40624 Champion Way
Palmdale, CA 93551

Dear Mr. Key:

Thank you for providing your business plan and site plans for the Adventurecorp RV Sales project planned for the Lancaster Auto Mall. This information has been very helpful in developing an understanding of this unique RV Sales and Service Center and its place in the Lancaster Auto Mall and the City of Lancaster business community. City Economic Development staff and the members of the Lancaster Auto Mall Association will utilize this material to move the project forward in the approval process.

The City of Lancaster understands that the business prospectus includes an expansion need for additional property to house RV units. The City holds title to a 19.75 acre parcel west of the Auto Mall which could be a solution to the expansion needs of Adventurecorp. With this in mind, the City will consider entering into an option agreement on the 19.75 acre property which is located at the northeast corner of 15th St. West and West Ave. K-8, subject to negotiation of the agreement as detailed below and approval by the City Council.

If sufficient sales tax receipts from the RV Sales and Service Center exist or can be reasonably expected to grow to an acceptable level based on sales volume, a sales tax note can be considered. Otherwise, more conventional style purchase options will be pursued. The sales price will be based on an appraisal that will occur when the option is exercised. The developer of the dealership will be required to obtain a Conditional Use Permit in order to receive a certificate of occupancy to proceed with use of the acreage. The purchase option will be for two years with the possibility of three one year extensions if sales tax goals are accomplished. Additionally, the developer will be required to show the ability to finance the expansion project.

I hope this letter provides the necessary information to initiate continued discussion concerning an expansion option viable for the development of the Adventurecorp RV Sales Lancaster project and I look forward to speaking with you in detail should you decide to move forward with this offer.

Sincerely,

Vern Lawson
Economic Development Director

VL:sg

44933 Fern Avenue · Lancaster, CA 93534 · 661.723.6000
www.cityoflancasterca.org

G-1

# EXHIBIT 3

# Meeting, Agendas and Minutes

City Council/Redevelopment Agency Meeting
Date: 7/27/2010 5:00 PM
Location: Lancaster City Hall Council Chambers
44933 N. Fern Avenue
Lancaster, California 93534
Add to my Outlook Calendar



44933 North Fern Avenue, Lancaster, CA 93534
Mayor /Chairman R. Rex Parris
Vice Mayor/Vice Chairman Ronald D. Smith
Council Member/Agency Director/Authority Member Marvin Crist
Council Member/Agency Director/Authority Member Ken Mann
Council Member/Agency Director/Authority Member Sherry Marquez

**CITY COUNCIL/REDEVELOPMENT AGENCY/**
**FINANCING AUTHORITY**
**REGULAR MEETING**
**AGENDA**

**Tuesday**
**July 27, 2010**
Regular Meeting – **5:00 p.m.**
Council Chambers – Lancaster City Hall
The City Clerk/Agency/Authority Secretary hereby declares the agenda was posted
by 5:00 p.m. on Friday, July 23, 2010
at the entrance to the Lancaster City Hall Council Chambers.

## CALL TO ORDER

## ROLL CALL
Council Members/Agency Directors/Authority Members: Crist, Mann, Marquez; Vice
Mayor/Vice Chairman Smith; Mayor/Chairman Parris

**INVOCATION**

Father Leo Dechant of Father Serra Parish

**PLEDGE OF ALLEGIANCE**

**PRESENTATIONS**

Mayor's Athlete of the Month – Todd Davis, Paraclete High School
Presenter: Mayor Parris

Presentation from Los Angeles County – MACC

Presentation from Los Angeles County Housing Authority

**AGENDA ITEMS TO BE REMOVED**

Sometimes it is necessary to remove items from the agenda. We apologize for any inconvenience this may cause you.

**PUBLIC BUSINESS FROM THE FLOOR - AGENDIZED ITEMS**

Any person who would like to address the City Council/Redevelopment Agency on any agendized item is requested to complete a speaker card for the City Clerk/Agency Secretary and identify the agenda item you would like to discuss. Each person will be given an opportunity to address the City Council/Redevelopment Agency at the time such item is discussed. Speaker cards are available at the rear of the Council Chambers and your speaker card must be filled out prior to the agenda item being called. We respectfully request that you fill the cards out completely and print as clearly as possible. Following this procedure will allow for a smooth and timely process for the City Council/Redevelopment Agency meeting and we appreciate your cooperation. ***Individual speakers are limited to three (3) minutes each.***

**AGENCY ACTIONS**

**CONSENT CALENDAR** - The Redevelopment Agency Consent Calendar may be acted upon with one motion, a second and the vote.

**RCC 1.** See CC 2 for the approval of the Regular Redevelopment Agency Meeting minutes of July 13, 2010.

**RCC 2. A.** Approve an amendment to the Option and Sale Agreement between the Agency and County for Parcel "A" extending the existing contract term by six (6) months to acquire the site located at the northeast corner of 3rd Street East and Avenue I and further authorize the Agency's Executive Director to administratively approve future extensions.

**B.** Approve an amendment to the Option and Sale Agreement between the Agency and County for Parcel "B" authorizing the Agency's Executive Director to administratively approve up to three additional three month extensions for the site generally located at the northwest corner of 5th Street East and Avenue I.

- RCC 2
- RCC 2 Attachment

## AGENCY NEW BUSINESS

**RNB 1.** Condemnation Proceedings – Acquisition of Leasehold Interest, 548 West Avenue I, Lancaster, California 93534, APN: 3134-003-001 and 002

- RNB 1
- RNB 1 Attachment

Recommendation:
Adopt **Resolution No. 15-10**, directing and authorizing the condemnation of a leasehold interest in and certain improvements on certain real property in the City of Lancaster, California and declaring the public necessity therefore (APN: 3134-003-001 and 002).

## COUNCIL ACTIONS

**CONSENT CALENDAR** - The **City Council Consent Calendar** may be acted upon with one motion, a second and the vote.

**CC 1.** Waive further reading of any proposed ordinances. (This permits reading the title only in lieu of reciting the entire text.)

**CC 2.** Approve the City Council/Redevelopment Agency/Financing Authority Regular Meeting minutes of July 13, 2010.

- CC 2

**CC 3.** Approve the Check and Wire Registers for June 20, 2010 through July 10, 2010 in the amount of $10,473,841.03.

- CC 3
- CC 3 Attachment

**CC 4.** Adopt **Resolution No. 10-55**, authorizing and providing for the Fiscal Year 2010/2011 levy of a special tax within Community Facilities District No. 89-1, a District established to finance the acquisition and construction of regional water system improvements in various locations in the City.

- CC 4
- CC 4 Attachment

**CC 5.** Adopt **Resolution No. 10-56**, authorizing and providing for the Fiscal Year 2010/2011 levy of a special tax within Community Facilities District No. 90-1, a District established to finance the construction of regional street and storm drain improvements in the area of Lancaster Boulevard and 25th Street West.

- CC 5
- CC 5 Attachment

**CC 6.** Adopt **Resolution No. 10-57**, authorizing and providing for the Fiscal Year 2010/2011 levy of a special tax within Community Facilities District No. 91-1, a District established to finance the construction of regional water and sewer improvements for Quartz Hill II & III.

- CC 6
- CC 6 Attachment

**CC 7.** Adopt **Resolution No. 10-58**, authorizing and providing for the Fiscal Year 2010/2011 levy of a special tax within Community Facilities District No. 91-2, a District established to finance the construction of regional street, sewer and storm drain improvements in the Lancaster Business Park Phase III.

- CC 7
- CC 7 Attachment

**CC 8.** Approve the monumentation work for Parcel Map No. 062728, located on the Southeast corner of 15th Street West and Avenue L-12, Owner: Kathy Blodgett.

- CC 8
- CC 8 Attachment

**CC 9.** Accept the work constructed by Taft Electric Company, for **Public Works Construction Project No. 09-003, Traffic Signals at Avenue L-8 and 30th Street**

West, Avenue L and 35th Street West, and Various Signal Modifications ESPL 5419-(023); direct the City Clerk to file the Notice of Completion for the project; authorize payment of the 10 percent retention 35 days after recordation, provided no stop notices, as provided by law, have been filed.

- CC 9
- CC 9 Attachment

**CC 10.** Reject all bids for **Public Works Construction Project No. 09-005, 2009 Pavement Management Program.**

- CC 10

**CC 11.** Approve the extension of the Landscape Maintenance Contract, as outlined in the original agreement for an additional year. No increase to the current contract rates have been requested or considered.

- CC 11

**CC 12.** Award **Request for Proposal No. 554-10, Master Plan for Trails and Bikeways,** to Ryan Snyder Associates in the amount of $143,970.00 and authorize the City Manager, or his designee to sign all documents upon the execution of the RENEW Grant Funding Agreement with Los Angeles County Department of Health.

- CC 12
- CC 12 Attachment

**CC 13.** Award **Housing and Neighborhood Revitalization Construction Project No. 10-HNRD204, North Downtown Transit Village Pedestrian Project** to Hondo Engineering, Inc. in the amount of $146,230.00, plus a 20% contingency and authorize the City Manager, or his designee, to sign all documents.

- CC 13

**CC 14.** Approve an agreement for acquisition of real property between the City of Lancaster and Milton Hudson for property located at 43640 Foxton Avenue, as part of the approved Neighborhood Stabilization Program (NSP).

- CC 14
- CC 14 Attachment

**CC 15.** Approve an agreement for acquisition of real property between the City of Lancaster and Wells Fargo Bank N.A., as trustee for property located at 350 E. Nugent Street, as part of

the approved Neighborhood Stabilization Program (NSP).

- CC 15
- CC 15 Attachment

**CC 16.** Approve an agreement for acquisition of real property between the City of Lancaster and Federal National Mortgage Association for property located at 616 Eston Place, as part of the approved Neighborhood Stabilization Program (NSP).

- CC 16
- CC 16 Attachment

**CC 17.** Approve an agreement for acquisition of real property between the City of Lancaster and Wells Fargo Bank, N.A. for property located at 639 E. Pillsbury Street, as part of the approved Neighborhood Stabilization Program (NSP).

- CC 17
- CC 17 Attachment

**CC 18.** Concur with the Agency's action to amend the Option Agreements extending the existing contracts to acquire Agency-owned property to develop a Multi-specialty Ambulatory Care Center ("MACC") at 3rd Street East and Avenue I, and approve waiving application fees in an amount not to exceed $7,313.00 for the required Tentative Parcel Map for the purpose of re-subdividing the subject Agency-owned Property.

- CC 18
- CC 18 Attachment

**CC 19.** Approve an agreement for acquisition of real property between the City of Lancaster and HSBC Bank USA for property at 1114 West Avenue J-7, as part of the approved Neighborhood Stabilization Program (NSP).

- CC 19
- CC 19 Attachment

## PUBLIC HEARING

**PH 1.** Congestion Management Program (CMP)

- PH 1
- PH 1 Attachment

## Recommendation:

Adopt Resolution No. 10-59, nding the City to be in conformanc ith the Congestion Management Program (CMP) and adopting the 2010 CMP Local Development Report, in accordance with California Government Code Section 65089.

## NEW BUSINESS

**NB 1.** Palmdale Power Plant

- NB 1

Recommendation:
Receive report on Palmdale Hybrid Power Plant's impact to future development, impact on public health, business risks, and steps the City of Lancaster can take to intervene in the permitting process if the City Council so chooses.

## CITY MANAGER'S / EXECUTIVE DIRECTOR'S ANNOUNCEMENT

## CITY CLERK /AGENCY/AUTHORITY SECRETARY ANNOUNCEMENT

## PUBLIC BUSINESS FROM THE FLOOR - *NON-AGENDIZED ITEMS*

This portion of the agenda allows an individual the opportunity to address the City Council/Redevelopment Agency on any item **NOT ON THE AGENDA** regarding City/Agency business and speaker cards must be submitted *prior* to the beginning of this portion of the Agenda. Please complete a speaker card for the City Clerk/Agency Secretary and identify the subject you would like to address. We respectfully request that you fill the cards out completely and print as clearly as possible. Following this procedure will allow for a smooth and timely process for the City Council/Redevelopment Agency meeting and we appreciate your cooperation. State law prohibits the City Council/Redevelopment Agency from taking action on items not on the agenda and your matter will be referred to the City Manager/Executive Director. *Individual speakers are limited to three (3) minutes each.*

## COUNCIL / AGENCY COMMENTS

## LANCASTER FINANCING AUTHORITY

No action required at this time.

## CLOSED SESSION

1) CONFERENCE WITH LEGAL COUNSEL-EXISTING LITIGATION

(Government Code sect 54956.9(a))
Mongols Nation Motorcycle Club v. City of Lancaster, et al
Case No. BC439791

2) CONFERENCE WITH REAL PROPERTY NEGOTIATORS
(Government Code 54956.8)
548 West Ave I
Negotiating Party: Mr. Rami Darghalli
Agency Negotiator: Executive Director, Mark Bozigian
Negotiations concerning price and terms of payment

3) CONFERENCE WITH REAL PROPERTY NEGOTIATORS
(Government Code 54956.8)
Negotiating Parties: Hawse Automotive Properties, LLC and JCH Automotive Properties, LLC
Agency Negotiator: Executive Director, Mark Bozigian
Negotiations concerning price and terms of payment

## ADJOURNMENT (Agency, Council and Authority)
Next Regular Meeting:
**Tuesday, August 10, 2010 - 5:00 p.m.**

## MEETING ASSISTANCE INFORMATION
In compliance with the Americans with Disabilities Act, if you need special assistance to participate in this meeting, please contact the City Clerk Department at (661)723-6020. Services such as American Sign Language interpreters, a reader during the meeting, and/or large print copies of the agenda are available. Notification 48 hours prior to the meeting will enable the City to make reasonable arrangements to ensure accessibility to this meeting.

## AGENDA ADDENDUM INFORMATION
On occasion items may be added after the agenda has been mailed to subscribers. Copies of the agenda addendum item will be available at the City Clerk's Department and are posted with the agenda on the windows of the City Council Chambers. For more information, please call the City Clerk's Department at (661) 723-6020.

Add to my Outlook Calendar

# EXHIBIT 4

## Steve Williams

**From:** Lou Gonzales [pma4lou@saturnav.com]
**Sent:** Friday, July 30, 2010 10:44 AM
**To:** Steve Williams; Laurie Lile; Danny Roberts; David Walter; Mike Dispenza; Jim Ledford
**Subject:** Business decision for Antelope Valley Chevrolet Inc.

Mr. Steve Williams
City Manager

Mr. Williams,

After taking some time to evaluate the City of Palmdale's position on our proposal, we have made a decision regarding our business future. Unfortunately
It will not be in the Antelope Valley Auto Center.

Both my wife and I were disappointed that the City of Palmdale rejected our proposal for our new business venture Antelope Valley Chevrolet Inc.
As the President of Saturn of Antelope Valley I have prospered greatly here in the Antelope Valley Auto Center over the past 10 years. It will be a sad day
on October 31st 2010 when we have to close our Saturn store per our termination agreement with General Motors.

My wife and I are very proud of the business success we have enjoyed here in the City of Palmdale. We are also very proud of the many charities and other
great causes that we have supported here in the City of Palmdale over the past 20 plus years.

We both want to thank the City of Palmdale and it's officials for allowing us to be business owners here in the Antelope Valley Auto Center.

Sincerely,
Lou and Joyce Gonzales
Saturn of Antelope Valley

8/3/2010

# EXHIBIT 5

# STAFF REPORT
## City of Lancaster, California
## Lancaster Redevelopment Agency

| JNB 1 |
|---|
| 08/10/10 |
| MVB |

Date:    August 10, 2010

To:      Mayor Parris and City Council Members
         Chairman Parris and Agency Directors

From:    Mark V. Bozigian, City Manager
         Vern Lawson, Jr., Economic Development/Redevelopment Director

Subject: **Proposed New Antelope Valley Chevrolet Dealership at Lancaster Auto Mall**

**Recommendation:**

A.    1.    Adopt Agency **Resolution No. 16-10,** authorizing the Executive Director to execute an agreement, and any related documents, with JCH Automotive Properties, LLC for the acquisition of property in the Lancaster Auto Mall (APN 3125-024-008 and 009) to provide a public parking lot, and making findings in connection therewith.

      2.    Adopt City Council **Resolution No. 10-62,** authorizing the City Manager to execute an agreement, and any related documents, with JCH Automotive Properties, LLC for the acquisition of property in the Lancaster Auto Mall (APN 3125-024-008 and 009) to provide a public parking lot, and making findings in connection therewith.

B.    Authorize the Executive Director or his designee to execute an agreement, and any related documents, with Hawse Automotive Properties, LLC; JCH Automotive Properties, LLC; 7Jays, LLC; and Antelope Valley Chevrolet, Inc to provide for the establishment and operation of a new Chevrolet Dealership in the Lancaster Auto Mall.

**Fiscal Impact:**

From available bond proceeds, the Agency would purchase property in the Lancaster Auto Mall (APN 3125-024-008 and 009) for $1.1 million from JCH Automotive Properties, LLC and assume the existing note on the property, for the purpose of providing a public parking lot.

In consideration of a covenant to provide for the establishment and operation of a new Chevrolet Dealership in the Lancaster Auto Mall for a minimum of 10 years, the Agency will provide monthly payments from available Agency funds to 7Jays, LLC in the amount of $20,000 per month, beginning November 1, 2010, for a period of 12 months and thereafter, for the following 16 months, a monthly payment in an amount equal to 50% of the monthly sales tax revenue generated by Antelope Valley Chevrolet. At any time during the 28 month payment period, the payments would cease upon lease or sale of specific real property held by 7Jays, LLC, or when payments reach a total of $604,000.

**Background:**

Staff has been in discussions with Antelope Valley Chevrolet, Inc. regarding the possibility of the entity being awarded a new franchise for an Antelope Valley Chevrolet dealership in light of the fact that the previous franchise for this brand was to be terminated. The City and the new Dealer expressed interest in locating this new dealership in Lancaster and immediately began to craft a plan to secure a site in the Lancaster Auto Mall. In a relatively compressed period of time, an agreement is now proposed for Council consideration to accomplish this task. The transaction involves an agreement between JCH Automotive Properties and Antelope Valley Chevrolet, Inc., the owner of the newly created Antelope Valley Chevrolet.

The new dealership will be located in an existing building, adjacent to the Antelope Valley Freeway, which was previously occupied by Sierra Toyota and now is surplus because of the newly constructed Toyota facility to the north of the site. This structure is ideally located and configured to accommodate the new Chevrolet franchise. With its freeway visibility and location next to Toyota, it will be a great location both for the new Chevrolet dealership and to generate additional consumer traffic for the entire Lancaster Auto Mall. This will in turn provide additional sales tax revenues for the City to continue to provide quality City services, including law enforcement services.

This site was the subject of a previous agreement with Adventurecorp. Unfortunately, securing capital commitments for the transaction took longer than expected and all parties have agreed that it was prudent to proceed with the GM deal and search for an alternative site for Adventurecorp.

In addition to the obligations of the New Chevrolet Dealer, Hawse Automotive has agreed to make the payments pursuant to the terms of the promissory note and deed of trust on the property being leased to the New Chevrolet Dealer and to secure the obligation with a deed of trust on certain real property. The Agreement also requires Hawse Automotive to sign a covenant to continue to operate the Sierra Toyota dealership for a period of at least two (2) years in Lancaster.

The City has a demonstrated record of working in partnership with the dealers in the Lancaster Auto Mall to protect our tax base and the jobs provided by these dealers. We now have the best group of auto dealer entrepreneurs we have had in many years. The addition of Antelope Valley Chevrolet to that mix will continue to build the Lancaster Auto Mall and the addition of GM products sets up the Auto Mall as a regional auto mall able to offer car shoppers in the Antelope Valley and surrounding regions access to a mix of some of the best vehicles in the country.

Time is of the essence in this deal and the City is prepared to expedite all required approvals so that the dealership can open and begin to produce jobs and new sales tax revenues.

**Attachments:**

Agency Resolution No. 16-10
Council Resolution No. 10-62
Lancaster Auto Mall Aerial Map

RESOLUTION NO. 16-10

A RESOLUTION OF THE LANCASTER REDEVELOPMENT AGENCY
APPROVING THE ACQUISITION AGREEMENT AND MAKING CERTAIN
FINDINGS IN CONNECTION THEREWITH

WHEREAS, the Lancaster Redevelopment Agency (the "Agency") is a duly constituted redevelopment agency and is undertaking certain activities necessary for redevelopment under the provisions of the California Community Redevelopment Law (Health and Safety Code Section 33000 et seq.) and pursuant to the Redevelopment Plan (the "Plan") for the Amargosa Project (the "Project"); and

WHEREAS, it is a policy of the Agency to provide public improvements which are of benefit to the Project and the project area thereof (the "Project Area"); and

WHEREAS, pursuant to Health and Safety Code Section 33445, the Agency is authorized, as provided in its redevelopment plan, to assist in the acquisition of land within the Project Area; and

WHEREAS, Section 33445 provides, in part, that notwithstanding Section 33440, an agency may, with the consent of the legislative body, pay all or part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement which is publicly owned either within or without the project area, if the legislative body determines:

"(1)    That the buildings, facilities, structures, or other improvements are of benefit to the project area (or the immediate neighborhood in which the project is located, regardless of whether the improvement is within another project area, or in the case of a project area in which substantially all of the land is publicly owned that the improvement is of benefit to an adjacent project area of the agency.

(2)    That no other reasonable means of financing the buildings, facilities, structures, or other improvements, are available to the community.

(3)    That the payment of funds for the acquisition of land or the cost of buildings, facilities, structures, or other improvements will assist in the elimination of one or more blighting conditions inside the project area or provide housing for low- or moderate-income persons, and is consistent with the implementation plan adopted pursuant to Section 33490."; and

WHEREAS, the Agency desires to acquire certain real property for the provision of public parking for the benefit of Lancaster City Park (the "Improvements"); and

Resolution No. 16-10
Page 2

WHEREAS, the provision of the Improvements was contemplated and provided for in the redevelopment plan for the Project, as well as the Implementation Plan for the Project and the Project Area, and would benefit the Project Area, areas within the vicinity of the Project Area, and the residents of the Project Area; and

WHEREAS, the Agency and the City of Lancaster (the "City") have explored all possible funding sources for the Improvements, including federal, state, and local sources; and

WHEREAS, there are no other reasonable means available to the Agency and the City to finance the Improvements other than Agency funds; and

WHEREAS, the City Council has reviewed evidence, including both oral testimony and writings, in connection with this matter, and has determined that the foregoing recitals, and each of them, are true and correct, and further has determined that the provision of the Improvements is in the best interests of the Agency and the City and the health, safety, and welfare of its residents, and in accord with the public purposes and provisions of applicable State and local law requirements.

NOW, THEREFORE, THE LANCASTER REDEVELOPMENT AGENCY DOES RESOLVE AS FOLLOWS:

Section 1. The Agency hereby approves the Acquisition Agreement in the form presented at this meeting with such additions, deletions or modifications as are approved by the Executive Director. The Executive Director is hereby authorized and directed to execute the Acquisition Agreement on behalf of the Agency and to take all other actions necessary to implement the Acquisition Agreement.

Section 2. The Agency finds and determines that: (i) the provision of the Improvements is of benefit to the Project Area and the neighborhood in which such Improvements are to be situated; (ii) no other reasonable means of financing the Improvements are available to the community; and (iii) the payment of funds for the Improvements will assist in the elimination of one or more blighting conditions within the Project Area and is consistent with the adopted implementation plan.

Resolution No. 16-10
Page 3

PASSED, APPROVED and ADOPTED this _____ day of _____, 2010, by
the following vote:

AYES:

NOES:

ABSTAIN:

ABSENT:

ATTEST:                                      APPROVED:


_____            _____
GERI K. BRYAN, CMC                         R. REX PARRIS
City Clerk                                 Mayor
City of Lancaster                          City of Lancaster


STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES        )       ss
CITY OF LANCASTER            )

CERTIFICATION OF RESOLUTION
CITY COUNCIL

I, _____, _____ City
of Lancaster, California, do hereby certify that this is a true and correct copy of the original
Resolution No. 16-10, for which the original is on file in my office.

WITNESS MY HAND AND THE SEAL OF THE CITY OF LANCASTER, on this
_____ day of _____, _____.

(seal)


_____

RESOLUTION NO. 10-62

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF LANCASTER
APPROVING THE ACQUISITION AGREEMENT AND MAKING CERTAIN
FINDINGS IN CONNECTION THEREWITH

WHEREAS, the Lancaster Redevelopment Agency (the "Agency") is a duly constituted redevelopment agency and is undertaking certain activities necessary for redevelopment under the provisions of the California Community Redevelopment Law (Health and Safety Code Section 33000 et seq.) and pursuant to the Redevelopment Plan (the "Plan") for the Amargosa Project (the "Project"); and

WHEREAS, it is a policy of the Agency to provide public improvements which are of benefit to the Project and the project area thereof (the "Project Area"); and

WHEREAS, pursuant to Health and Safety Code Section 33445, the Agency is authorized, as provided in its redevelopment plan, to assist in the acquisition of land within the Project Area; and

WHEREAS, Section 33445 provides, in part, that notwithstanding Section 33440, an agency may, with the consent of the legislative body, pay all or part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement which is publicly owned either within or without the project area, if the legislative body determines:

"(1)    That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, regardless of whether the improvement is within another project area, or in the case of a project area in which substantially all of the land is publicly owned that the improvement is of benefit to an adjacent project area of the agency.

(2)    That no other reasonable means of financing the buildings, facilities, structures, or other improvements, are available to the community.

(3)    That the payment of funds for the acquisition of land or the cost of buildings, facilities, structures, or other improvements will assist in the elimination of one or more blighting conditions inside the project area or provide housing for low- or moderate-income persons, and is consistent with the implementation plan adopted pursuant to Section 33490."; and

WHEREAS, the Agency desires to acquire certain real property for the provisions of public parking for the benefit of Lancaster City Park (the "Improvements"); and

WHEREAS, the provision of the Improvements was contemplated and provided for in the redevelopment plan for the Project, as well as the Implementation Plan for the Project and the Project Area, and would benefit the Project Area, areas within the vicinity of the Project Area, and the residents of the Project Area; and

WHEREAS, the Agency and the City of Lancaster (the "City") have explored all possible funding sources for the Improvements, including federal, state, and local sources; and

Resolution No. 10- 62
Page 2

WHEREAS, there are no other reasonable means available to the Agency and the City to finance the Improvements other than Agency funds; and

WHEREAS, the City Council has reviewed evidence, including both oral testimony and writings, in connection with this matter, and has determined that the foregoing recitals, and each of them, are true and correct, and further has determined that the provision of the Improvements is in the best interests of the Agency and the City and the health, safety, and welfare of its residents, and in accord with the public purposes and provisions of applicable State and local law requirements.

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF LANCASTER DOES RESOLVE AS FOLLOWS:

Section 1. The City hereby approves the Acquisition Agreement in the form presented at this meeting with such additions, deletions or modifications as are approved by the City Manager. The City Manager is hereby authorized and directed to execute the Acquisition Agreement on behalf of the City and to take all other actions necessary to implement the Acquisition Agreement.

Section 2. The City Council finds and determines that: (i) the provision of the Improvements is of benefit to the Project Area and the neighborhood in which such Improvements are to be situated; (ii) no other reasonable means of financing the Improvements are available to the community; and (iii) the payment of funds for the Improvements will assist in the elimination of one or more blighting conditions within the Project Area and is consistent with the adopted implementation plan.

PASSED, APPROVED and ADOPTED this _____ day of _____, 2010, by the following vote:

AYES:

NOES:

ABSTAIN:

ABSENT:

ATTEST:                                          APPROVED:


_____                _____
GERI K. BRYAN, CMC                          R. REX PARRIS
City Clerk                                  Mayor
City of Lancaster                           City of Lancaster

Resolution No. 10- 62
Page 3


STATE OF CALIFORNIA            )
COUNTY OF LOS ANGELES          )       ss
CITY OF LANCASTER              )

## CERTIFICATION OF RESOLUTION
## CITY COUNCIL

I, _____, _____ City
of Lancaster, California, do hereby certify that this is a true and correct copy of the original
Resolution No. 10-62, for which the original is on file in my office.

WITNESS MY HAND AND THE SEAL OF THE CITY OF LANCASTER, on this
_____ day of _____, _____.

(seal)



_____



# EXHIBIT 6

**KBB**  KANE, BALLMER & BERKMAN

A LAW CORPORATION

WWW.KBBLAW.COM

515 S. FIGUEROA STREET
SUITE 1850
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 617-0480
FAX (213) 625-0931

BRUCE D. BALLMER
(RETIRED)
—————
ROBERT P. BERKMAN
(1919-2001)

402 WEST BROADWAY
4TH FLOOR
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 567-3450
FAX (619) 567-3448

August 10, 2010

**VIA PERSONAL DELIVERY AT CITY
COUNCIL MEETING OF AUGUST 10, 2010**

Hon. Mayor/Chairman R. Rex Parris
Hon. Vice Mayor/Vice Chairman Ronald D. Smith
Hon. Council Member/Agency Director Marvin Crist
Hon. Council Member/Agency Director Ken Mann
Hon. Council Member/Agency Director Sherry Marquez
City of Lancaster
Lancaster Redevelopment Agency
44933 N. Fern Avenue
Lancaster, California 93534

Re:  Brown Act Violations – Demand for Cure and Compliance

Dear Hon. Mayor/Chairman and Council Members/Directors:

We represent the City of Palmdale and the Community Redevelopment Agency of the City of Palmdale. On behalf of our clients demand is hereby made of you in your respective capacities as members of the City Council and as the governing board of the Lancaster Redevelopment Agency (jointly the "Public Agencies") to cure violations of the Brown Act described below. This demand is made pursuant to the provisions of the Brown Act (California Government Code Section 54950 *et seq*).

At their meeting of July 27, 2010 the Public Agencies entertained discussion in closed session of real property negotiations where the negotiating parties are identified as Hawse Automotive Properties, LLC and JCH Automotive Properties, LLC. (Closed Session Agenda item #3). The Public Agencies failed to comply with the provisions of the Brown Act in their failure to identify the property that was the subject of the real property negotiations (as contrasted with Agenda Closed Session item #2 where the property was identified). The violation of the Brown Act in these circumstances appears to be nothing short of intentional.

Hon. Mayor/Chairman Rex Parris
Hon. Vice Mayor/Vice Chairman Ronald D. Smith
Hon. Council Member/Agency Director Marvin Crist
Hon. Council Member/Agency Director Ken Mann
Hon. Council Member/Agency Director Sherry Marquez
August 10, 2010
Page 2 of 2

      Should the Public Agencies ignore their obligations to cure this violation, please take note that our client intends to seek judicial relief to declare the action taken on Agenda Item #3 and any subsequent action (such as the August 10, 2010 items presumably based on the direction provided by the Public Agencies at the closed session of July 27, 2010) null and void.

      Very truly yours,

      KANE, BALLMER & BERKMAN

      *Murray O. Kane*

      Murray O. Kane



**KBB**  KANE, BALLMER & BERKMAN
A LAW CORPORATION
WWW.KBBLAW.COM

515 S. FIGUEROA STREET
SUITE 1850
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 617-0480
FAX (213) 625-0931

BRUCE D. BALLMER
(RETIRED)

ROBERT P. BERKMAN
(1919-2001)

402 WEST BROADWAY
4TH FLOOR
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 567-3450
FAX (619) 567-3448

August 10, 2010

**VIA PERSONAL DELIVERY AT CITY
COUNCIL MEETING OF AUGUST 10, 2010**

Hon. Mayor/Chairman R. Rex Parris
Hon. Vice Mayor/Vice Chairman Ronald D. Smith
Hon. Council Member/Agency Director Marvin Crist
Hon. Council Member/Agency Director Ken Mann
Hon. Council Member/Agency Director Sherry Marquez
City of Lancaster
Lancaster Redevelopment Agency
44933 N. Fern Avenue
Lancaster, California 93534

Re:  Brown Act Violations – Demand for Cure and Compliance

Dear Hon. Mayor/Chairman and Council Members/Directors:

We represent the City of Palmdale and the Community Redevelopment Agency of the City of Palmdale.  On behalf of our clients demand is hereby made of you in your respective capacities as members of the City Council and as the governing board of the Lancaster Redevelopment Agency (jointly the "Public Agencies") to cure violations of the Brown Act described below.  This demand is made pursuant to the provisions of the Brown Act (California Government Code Section 54950 *et seq*).

Tonight's meeting includes two discussion items under the heading of "JOINT NEW BUSINESS" wherein the Public Agencies have failed to meet the notice and agenda requirements of the Brown Act.  The posting of agenda items A.1 and A.2 concerning Resolutions Nos. 16-10 and 10-62 fails to meet the requirements under the Brown Act in that APN 3125-024-008 and 3125-024-009 are not recognized APNs in the Los Angeles County Assessor's records.  Attached to this letter are the results of my efforts to obtain information from the Los Angeles County Assessor's website for the two APNs identified in your agenda.  As you can see, efforts to identify the two properties by a search of the website elicit the following response to the inquiries: "Sorry … we were unable to find a match for…" for each of the two parcels in question.

Hon. Mayor/Chairman Rex Parris
Hon. Vice Mayor/Vice Chairman Ronald D. Smith
Hon. Council Member/Agency Director Marvin Crist
Hon. Council Member/Agency Director Ken Mann
Hon. Council Member/Agency Director Sherry Marquez
August 10, 2010
Page 2 of 2

     Given this remarkable failure, demand is hereby made that the Public Agencies abandon all discussion of these two agenda items and repost the items for a future meeting at which the true and accurate description of the parcels in question is provided in the agenda. In the absence of such corrective action one can only assume that it is not your intent to provide the effective notice required under the provisions of the Brown Act and judicial precedent interpreting the pertinent provisions of the Brown Act.

     In addition to the above violation, the provisions of Section 1 of Resolution 16-10 and Section 1 of Resolution 16-62 constitute an unlawful grant of authority to the Agency Executive Director and the City Manager, respectively. The delegation of authority in each resolution permits the effective rewriting of the Acquisition Agreement by allowing for "such additions, deletions and modifications as are approved by the [Executive Director][City Manager]" without further consideration by the governing bodies of the revised agreement. Since the Brown Act specifically provides for the public's right to testify at meetings on matters to be considered by a public body[1], the public cannot be denied its right to participate and testify on an agreement that is to, ultimately, be negotiated by the Agency Executive Director and the City Manager out of public scrutiny should the current grant of authority stand.

     This further constitutes our notice that any attempt to proceed with the discussion of these two items shall serve as the basis of legal proceedings we shall institute on behalf of our client to declare null and void any action taken on Resolution Nos. 16-10 and 16-62.

Very truly yours,

KANE, BALLMER & BERKMAN

*Murray O. Kane*

Murray O. Kane

---

[1] Section 59954.3(a): "Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body....."



*Sorry ...*

We were unable to find a match for

"3125-024-008"

between Assessor ID No.s

3125-023-009 and 3125-024-013.

This may be due to recent or ongoing parcel change activity.

Please email any questions or concerns you may have to
gismaps@assessor.lacounty.gov referencing within your
inquiry the **Assessor ID No.** (AIN) you were searching.

Otherwise, click on either of the Assessor ID No.s above, or

Return to Search Form

*Sorry ...*

We were unable to find a match for

"3125-024-009"

between Assessor ID No.s

3125-023-009 and 3125-024-013.


This may be due to recent or ongoing parcel change activity.


Please email any questions or concerns you may have to
gismaps@assessor.lacounty.gov referencing within your
inquiry the **Assessor ID No.** (AIN) you were searching.

Otherwise, click on either of the Assessor ID No.s above, or

Return to Search Form



**KBB**    KANE, BALLMER & BERKMAN
A LAW CORPORATION
WWW.KBBLAW.COM

515 S. FIGUEROA STREET
SUITE 1850
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 617-0480
FAX (213) 625-0931

BRUCE D. BALLMER
(RETIRED)

ROBERT P. BERKMAN
(1919-2001)

402 WEST BROADWAY
4TH FLOOR
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 567-3450
FAX (619) 567-3448

August 10, 2010

Via Hand Delivery

Hon. Mayor/Chairman R. Rex Parris
Hon. Vice Mayor/Vice Chairman Ronald D. Smith
Hon. Council Member/Agency Director Marvin Crist
Hon. Council Member/Agency Director Ken Mann
Hon. Council Member/Agency Director Sherry Marquez
City of Lancaster
Lancaster Redevelopment Agency
44933 N. Fern Avenue
Lancaster, California 93534

Re:    Proposed Direct and Indirect Financial Assistance to Lou Gonzales

Dear Hon. Mayor/Chairman and Council Members/Directors:

We represent the City of Palmdale and the Community Redevelopment Agency of the City of Palmdale. These comments relate to Joint New Business Item No. JNB 1 on the agenda for the Joint Meeting of the Lancaster City Council and the Lancaster Redevelopment Agency on August 10, 2010. These written comments serve to supplement the oral comments that we will make at the public hearing on August 10, 2010.

According to the Staff Report relating to Agenda Item No. JNB 1, City Staff recommends that the City of Lancaster and the Lancaster Redevelopment Agency provide about $1,700,000 in direct and indirect financial assistance, and additional undisclosed assistance, to Lou Gonzales and/or business entities in which he holds an ownership interest. On behalf of our clients, we object to the proposed direct and indirect financial assistance that is proposed to be provided by the City of Lancaster and the Lancaster Redevelopment Agency.

As you know, Mr. Gonzales is a long-time Vehicle Dealer in the City of Palmdale. He is closing his Palmdale location no later than October 31, 2010. The financial assistance that the City of Lancaster and the Lancaster Redevelopment Agency are proposing to make to Mr. Gonzales and/or business entities in which he holds an ownership interest is intended to entice Mr. Gonzales to open a new location in Lancaster after November 1, 2010.

Lancaster City Council
Lancaster Redevelopment Agency Board
August 10, 2010
Page 2

Under such undisputed circumstances, the proposed financial assistance is prohibited by law. Health and Safety Code section 33426.7 and Government Code section 53084 prohibit a redevelopment agency and a city, respectively, from providing any direct or indirect financial assistance to a Vehicle Dealer to relocate from one city to another city in the same market. "Relocating" is defined in the statutes, in relevant part, as follows,

> "Relocating" means the closing of a vehicle dealer . . . in one location and the opening of a vehicle dealer . . . in another location within a 365-day period when a person . . . has an ownership interest in both the vehicle dealer . . . that has closed or will close and the one that is opening.

It is beyond serious dispute that (1) Mr. Gonzales currently is a Vehicle Dealer in Palmdale; (2) his Palmdale location will close no later than October 31, 2010; and (3) if you approve the recommended financial assistance, Mr. Gonzales presumably will open a location in Lancaster on or after November 1, 2010. Therefore, under the subject statutes, Mr. Gonzales is a Vehicle Dealer who is closing one location and opening another location within a 365-day period in the same market, and "relocation" has occurred as a matter of law. Further, in an email dated July 30, 2010, shortly after your illegally noticed closed session conference on July 27, 2010, Mr. Gonzales informed the City of Palmdale that he would be relocating from Palmdale, despite having been approved and designated by General Motors as the Palmdale Chevrolet Vehicle Dealer.

The prohibited financial assistance that is being considered consists of both direct and indirect benefits. The direct financial assistance is being paid to 7 Jays, LLC, an entity in which Mr. Gonzales holds an ownership interest. The Staff Report reflects that the Lancaster Agency will pay 7 Jays the sum of $20,000 per month for twelve (12) months beginning November 1, 2010, and an additional amount for the following sixteen (16) months of fifty percent (50%) of the sales tax revenue generated by Antelope Valley Chevrolet, for a total payment over twenty-eight (28) months of $608,000. Therefore, the Lancaster Redevelopment Agency is paying Mr. Gonzales the sum of $608,000 in financial assistance to relocate to Lancaster. Antelope Valley Chevrolet, Inc., owned by Mr. Gonzales, is also a party to and beneficiary of that agreement.

There are additional payments that constitute indirect financial assistance to Mr. Gonzales. We do not believe that anyone seriously doubts or contests the fact that the financial assistance that is ostensibly being provided to Hawse Automotive Properties, LLC ("Hawse") and JCH Automotive Properties, LLC ("JCH") is for the sole benefit of Mr. Gonzales. The Lancaster Redevelopment Agency certainly is not interested in using Auto Mall property for the construction of a public parking lot, except for its impact on financing Mr. Gonzales' opening of a new location in Lancaster. The proposed public parking lot will eliminate the possibility of any future tax increment and sales taxes being generated by that property.

Moreover, the Staff Report discloses neither the address of the property nor the price that is being paid for the Hawes/JCH property. The Staff Report does disclose that Hawes/JCH will be paid $1,100,000 for the property, which is the approximate amount currently owed to the

Lancaster City Council
Lancaster Redevelopment Agency Board
August 10, 2010
Page 3

Lancaster Redevelopment Agency by JCH. The Staff Report fails to disclose if the purported purchase price is actually going to be paid to the Agency through the repayment of the JCH debt. Further, the proposed purchase price includes the assumption of debt secured by the property in an undisclosed amount, so the full purchase price has not been disclosed, as required by law.

Finally, regarding the proposed public parking lot for the City Park, we note that the proposed public parking lot is not safe for public use, because it will require families to walk across K-8, a very busy secondary arterial, to the City Park. The potential liability of the City and the Agency for creating such a dangerous condition is substantial. In any event, the construction of the proposed parking lot is a fiction being used to try to support a payment to Hawse/JCH that is otherwise legally unsupportable.

If you approve the recommendation made in the Staff Report, please be advised that our clients will pursue all their legal rights and remedies to terminate all direct and indirect benefits to Mr. Gonzales under the subject agreements or otherwise. Rest assured that this is not an issue in which our clients will accede to Lancaster's plans.

Very truly yours,

KANE, BALLMER & BERKMAN

Murray O. Kane

**KBB**  KANE, BALLMER & BERKMAN
A LAW CORPORATION
WWW.KBBLAW.COM

515 S. FIGUEROA STREET
SUITE 1850
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 617-0480
FAX (213) 625-0931

BRUCE D. BALLMER
(RETIRED)

ROBERT P. BERKMAN
(1919-2001)

402 WEST BROADWAY
4TH FLOOR
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 567-3450
FAX (619) 567-3448

# August 10, 2010

# DOCUMENTARY EVIDENCE
# IN SUPPORT OF
# OBJECTIONS OF
# CITY OF PALMDALE AND
# COMMUNITY REDEVELOPMENT AGENCY
# OF THE CITY OF PALMDALE
# TO LANCASTER FINANCIAL ASSISTANCE TO
# LOU GONZALES

# (8/10/10 Lancaster Joint Agenda Items A.1 and A.2)

Recording Requested by
And When Recorded Return to:

Agreement No. A-0373

City Clerk's Office
City of Palmdale
38300 North Sierra Highway
Palmdale, CA 93550

Attention: City Clerk/Secretary

SPACE ABOVE RESERVED FOR RECORDER'S USE

## SECOND IMPLEMENTATION AGREEMENT
## TO DISPOSITION AND DEVELOPMENT AGREEMENT

THIS SECOND IMPLEMENTATION AGREEMENT TO DISPOSITION AND DEVELOPMENT AGREEMENT (the "Implementation Agreement") dated for reference purposes as of the fifth day of September 2003, is entered into by and between the COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF PALMDALE, public body, corporate and politic (the "Agency") and HOLIDAY SATURN, INC., a Delaware corporation (the "Dealer").

### RECITALS

A.    Pursuant to that certain Disposition and Development Agreement dated as of December 3, 1993 (the "DDA"), Agency conveyed to Saturn of Antelope Valley, Inc. ("SAV") fee title to that certain real property within the Antelope Valley Auto Center in the City of Palmdale, California, as identified in the Legal Description attached hereto and incorporated herein as Exhibit A (the "Property"), in consideration for which SAV issued to Agency that certain Land Sale Note in the original principal amount of $685,530 (the "Note") and agreed to construct and operate upon the Property a motor vehicle sales and service business (the "Auto Dealership") according to the terms and conditions set forth in the DDA.

B.    The unpaid balance on the Note is secured by a Deed of Trust given to Agency by SAV, which was recorded against the Property on July 22, 1994, as Instrument No. 94-1367046 in Official Records in the office of the County Recorder of Los Angeles County, California (the "Deed of Trust"); SAV and Agency subsequently amended the terms of the said Note, Deed of Trust and DDA by entering into that certain First Implementation Agreement to Disposition and Development Agreement, Modification of Deed of Trust and First Loan Modification Agreement (the "Modification Agreement") dated as of July 1, 1998, which was recorded on February 25, 1999, as Instrument No. 99-0313037 in Official Records in the office of the County Recorder of Los Angeles County, California (hereinafter, all references to the Note, Deed of Trust and DDA shall be understood to mean and refer to such Note, Deed of Trust and DDA as amended by the Modification Agreement).

**IN WITNESS WHEREOF**, the Parties have executed this Implementation Agreement by their duly authorized representative on the dates shown below.

**"AGENCY"**
COMMUNITY REDEVELOPMENT AGENCY
OF THE CITY OF PALMDALE

Dated: 10 - 14 , 2003          By: _____
                                              James C. Ledford, Chair

ATTEST: By: _Victoria L. Hancock_
                    Victoria Hancock
                    Secretary

APPROVED AS TO FORM:

KANE, BALLMER & BERKMAN

APPROVED AS TO FORM:

By: _____
          Agency Counsel

Agency Attorney

**"DEALER"**

Dated: 9  10 , 2003          By: _____
                                              David Dow

Dated: 9 - 10 , 2003          By: _____
                                              Lou Gonzales

# ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_ } ss.

On _9-10-03_ before me, _GINA C. DAY_,
(DATE)                                    (NOTARY)

personally appeared _DAVID DOW & LOU GONZALES_
(SIGNER(S))

☑ personally known to me  - OR-  ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

GINA C. DAY
Comm. # 1269230
NOTARY PUBLIC-CALIFORNIA
Los Angeles County
My Comm. Expires July 9, 2004

_____
NOTARY'S SIGNATURE

═══════════ OPTIONAL INFORMATION ═══════════

The information below is not required by law. However, it could prevent fraudulent attachment of this acknowledgment to an unauthorized document.

## CAPACITY CLAIMED BY SIGNER (PRINCIPAL)

☑ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____
_____

### SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____
_____

## DESCRIPTION OF ATTACHED DOCUMENT

_Agreement_
TITLE OR TYPE OF DOCUMENT

_5_
NUMBER OF PAGES

_9-10-03_
DATE OF DOCUMENT

_____
OTHER

APA 1/94                    VALLEY-SIERRA, 800-362-3369

# AMERICAN ARBITRATION ASSOCIATION
# AUTOMOBILE INDUSTRY SPECIAL BINDING ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Re: 72 532 01370 09
    Rally Auto Group, Inc.
    VS
    General Motors, LLC

## Written Determination of Arbitrator

    I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act"), enacted December 16, 2009, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby make my Written Determination pursuant to the Act.

### Background

    The Act affords a "covered dealership" (as defined in Section 747(a)(2)) the right to challenge by binding arbitration the decision of a "covered manufacturer" (as defined in Section 747(a)(1)(A) and (B)) to terminate, or not to assign, renew or continue, the covered dealership's franchise agreement. This case was filed in accordance with the Act's provisions and I held hearings and heard testimony on May 13, 14 and 17, 2010. The parties submitted closing briefs on May 28, 2010, and the arbitrator determined that the case had been fully submitted as of May 28, 2010. Set forth below is my "written determination" (as provided for in 747(d) of the Act) of the issue to be decided under the Act, namely "whether or not the covered dealership should be added to the dealer network of the covered manufacturer." This Determination is being issued within seven (7) business days after the case was fully submitted.

## I.    <u>The Parties</u>

    This proceeding concerns the automobile dealership known as Rally Auto Group located at 39012 Carriage Way Palmdale, California 93551 ("Rally"). Rally is a "covered dealership" as defined in Section 747(a)(2).

    The "covered manufacturer" for purposes of this arbitration is General Motors, LLC, which is the current owner of the General Motors automobile manufacturing business. For convenience, the terms "General Motors" and "GM" is refers to both General Motors, LLC and General Motors Corporation.

## II.    Determination

Rally, the covered dealership described above in Section I, shall be added to the dealer network of General Motors, LLC, as to the Cadillac, Buick and GMC brands, in the manner provided for by the Act and in accordance with the terms and conditions of the Act.

Rally, the covered dealership described above in Section I, shall not be added to the dealer network of General Motors, LLC, with respect to the Chevrolet brand.

## III.    Key Facts Relied on by the Arbitrator in Making the Determination

In accordance with Section 747, I considered the following factors:

1.  The covered dealership's profitability in 2006, 2007, 2008 and 2009;

2.  The covered manufacturer's overall business plan;

3.  The covered dealership's current economic viability;

4.  The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

5.  The demographic and geographic characteristics of the covered dealership's market territory;

6.  The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and

7.  The length of experience of the covered dealership.

In making the determination, I relied upon the following key facts:

General Motors' overall business plan includes reducing the total number of GM dealers nationwide, for the purpose of increasing the sales volumes ("throughput"), and thus the profitability, of the remaining GM dealers. The plan anticipates that this increase in dealer profitability will enable dealers to invest in better facilities, provide better customer service and, in general, compete more effectively with non-GM brands. General Motors' plan for the Palmdale area is to replace Rally as the Chevrolet dealer with a dealership owned and operated by Lou Gonzalez, operator of a successful Saturn dealership in Palmdale, which is being wound down with the elimination by GM of the

Saturn brand.  GM plans to remove the Cadillac, Buick and GMC brands from the Palmdale GM dealership.

Rally has  many years of experience as a General Motors dealer in  Palmdale, California, and has been operated by its current owner/operator, Larry Mayle, for around 20 years.  It currently sells the Cadillac, Buick, GMC and Chevrolet brands, from two facilities.  Rally's facilities are adequate, and it is currently economically viable.  It has sufficient working capital, availability of inventory financing and adequate staffing.  During the years 2006 through 2009 Rally's operations were profitable. (See below for further discussion of 2008 profitability).

The Dealer Sales and Service Agreement between Rally and General Motors, which is the  applicable franchise agreement,  establishes a variety of performance objectives. (Ex. 1)  In Article 5.1(f) of the agreement Rally agreed "to comply with the retail sales standards established by General Motors, as amended from time to time." Ex. 1, p. 6.  Article 9 of the agreement ("Review of Dealer's Sales Performance") provides that "Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100." Ex. 1, p. 17.  The Retail Sales Index ("RSI") is the ratio of a dealer's reported retail sales to the sales necessary to equal the state average expected market share for the brand in question in the dealer's Area of Primary Responsibility ("APR"), adjusting for the popularity of various types and sizes of vehicles in the APR.

Rally did not achieve an RSI of 100 for any of its Chevrolet, Cadillac, Buick and GMC  brands for the years 2006 through 2008, except for an RSI of 102.82 for Cadillac in 2008.   These RSI scores ranked Rally low in sales performance as compared with other General Motors dealers.  Rally's RSI has been particularly low for the Chevrolet brand.  For Chevrolet its RSI in 2006 was 53.60, in 2007 was 50.36, and in 2008 was 53.07.

During 2006-2008, and in prior years, General Motors  regularly communicated to Rally that General Motors considered Rally's levels of sales, particularly Chevrolet, to be inadequate and in need of substantial improvement. (Exs. 88, 201-203).  After Rally received a "wind down" letter from General Motors in May 2009,[1] its sales performance improved, but that performance, under threat of termination, may not be as indicative of future performance as is Rally's historical sales record.

The demographic factors in Rally's area of principal responsibility ("APR") include high levels of unemployment, a working population that largely commutes "down the hill" to the greater Los Angeles area, with long commuting times.  Rally contends that

---

[1]      In its "wind down" letter to Rally dated May 14, 2009, GM advised Rally that it did not expect its contractual relationship with Rally to continue past October 2010.  The wind down letter was followed by a Wind Down Agreement, allowing Rally to operate its GM dealership through October 31, 2010, but imposing certain restrictions, including inability of Rally to purchase new GM vehicles from GM.

these factors make the state-wide RSI scores misleading as applied to Rally. However, the comparatively high sales levels and RSI scores of the General Motors dealership in Victorville, California, a community comparable in many respects to Palmdale, tends to show that the RSI scores, based on General Motors' state-wide market share for various vehicle categories, provide a realistic measure for dealer sales performance in the Palmdale market. The Palmdale Saturn dealership, operated by Lou Gonzalez, also has consistently achieved high RSI scores, again confirming that General Motors' RSI measure is applicable in Rally's market.

One of the criteria used by GM in deciding to terminate or not assign a dealer's franchise agreement is the Dealer Performance Score ("DPS"). This score measures the dealer's performance in four categories, which are weighted as follows:

| | |
|---|---|
| Sales | 50% |
| Customer Satisfaction Index | 30% |
| Capitalization | 10% |
| Profitability | 10% |

GM treats a score of 100 as average, and a score below 70 as poor performance. GM publicly stated that "Dealers with a score less than 70 received a wind-down agreement." (Ex. 26).

For 2008, GM calculated a DPS score for Rally of 55.27. (Ex. 31). The evidence showed, however, that this score depended on using an estimated LIFO adjustment to Rally's profits for 2008, rather than pre-LIFO profits or the actual, not estimated, LIFO profits. Using the latter two profit figures, Rally's DPS score was approximately 85.

## IV. Balance of Economic Interests

The balance of economic interests of the covered dealership, of the covered manufacturer and of the public supports this determination for the reasons set forth below.

General Motors' decision to replace Rally as a Chevrolet dealer with a dealership operated by GM's former Saturn dealer in the Palmdale market is consistent with General Motors' plan to develop a stronger dealer network. Although there is no assurance of the new dealers' success, there is a reasonable basis, based on prior performance, for concluding that General Motors will obtain significantly stronger representation in the Palmdale area through that dealer than through Rally. The public will benefit by having a more active and aggressive Chevrolet sales effort in that market. In addition, there is some basis in Rally's customer satisfaction scores to conclude that customer service from the new Chevrolet dealer will be improved.

In the arbitrator's view, the balance of economic interests supports a determination that Rally should be able to retain its dealership for the Cadillac, Buick and GMC brands. Rally has a long history as a GM dealer, with millions of dollars invested in its business and facilities. Its sales performance has been somewhat better for these

brands than for the Chevrolet brand. The public will benefit by continuing to be able to purchase these brands in Palmdale, without having to drive at least 37 miles to the nearest dealer selling these brands. Because General Motors has decided to retain one GM dealer in the Palmdale area, it will likely not achieve the cost savings in that area that it expects to achieve by large-scale reductions in the number of its dealers. The evidence did not show a benefit to either GM or the public by eliminating these brands from the Palmdale market. Also, the evidence showed that there is some uncertainty about the physical capacity of the new Chevrolet dealer to provide parts and service for the full range of GM brands, and the public will benefit by the continued availability of parts and service from Rally.

## VI. Costs

In accordance with the statute, the administrative fees and expenses, and the arbitrator's fees and expenses, shall be borne equally.

This Award is in full settlement of all claims submitted to this arbitration.


Date:  June 8, 2010.

Richard Mainland, Arbitrator

# INFORMATION PACKAGE

**Historical Registration Trend for** _Palmdale, CA_
**_Chevrolet*_**

| Palmdale, CA | 2006 | 2007 | 2008 |
|---|---|---|---|
| Chevrolet | 1,745 | 1,292 | 691 |
| Industry | 22,226 | 17,929 | 11,867 |
| Total % Industry | 7.85% | 7.21% | 5.82% |

*Table reflects the proposed Chevrolet geography

The below table provides information on the expected sales, calculated at both state and national averages, for the proposed dealership opportunity.

| Palmdale, CA | Approximate Expected At State | Approximate Expected At National |
|---|---|---|
| Chevrolet | 821 | 1,321 |
| Total Expected | 821 | 1,321 |

## Facility Expectations - Business Planning Estimates Only : Minimum

The proposed dealership point is expected to be in a new or completely renovated GM approved Image facility dedicated to the sales and service of Chevrolet vehicles only. Non-GM brands are not allowed.

The following is an estimated planning guide for an exclusive, stand-alone facility based on expected sales of 821 new units. GM facility planning guides are subject to continuing review and possible change; thus, GM retains the right to modify these guides. In that event, Dealer's proposal must satisfy GM's amended planning guides.

| Palmdale, CA | Site Sizes (Acres) or Sq. Ft | Approximate Building Specifications (sq. ft) | # of Stalls | # of Parking Spaces |
|---|---|---|---|---|
| Total land (Acres) | 3.7 | | | |
| **Interior** | | | | |
| Showroom | | 3,845 | 4 | |
| General office | | 2,530 | | |
| Customer Convenience | | 955 | | |
| **Total Variable Operation** | | 7,330 | | |
| Parts Department | | 4,852 | | |
| Service Department | | 10,075 | 18 | |
| Service Reception | | 1,647 | 3 | |
| **Total Fixed Operation** | | 16,574 | | |
| **Total Building** | 23,906 | | | |
| **Exterior** | | | | |
| New Unit Display | | 2,400 | 4 | |
| New Unit Storage | | 60,000 | 150 | |
| Used Unit Display | | 36,000 | 90 | |
| Customer parking | | 16,000 | 40 | |
| Employee Parking & Misc | | 19,320 | 46 | |
| **Total Land** | 136,920 | | | |
| Total number of Stalls | | | 355 | |
| Total Bldg. & Land (sq ft) | 160,826 | | | |

| Other: | Successful candidate will be required to enter into a 25 year Exclusive Use Agreement |
|---|---|

## Note:

Proposal should include specific details regarding facility and property being proposed.
The following information should be included:

- Address of facility
- Sq. Ft. of building(s), by department as outlined above
- Building age and condition
- Lease terms, or date acquired, or if purchase has not yet taken place, purchase terms

# INFORMATION PACKAGE

**City ST Marketing Area Description for GM Channel**    | Palmdale, CA |

Information concerning the proposed dealership opportunity:
  Geography Description: Re-establish Chevrolet in Palmdale, CA
  Market Type (SDA/MDA/Hubtown): Hubtown

| **Preferred Location** |
| In the vicinity of the Palmdale Auto Mall |



## DEALER NETWORK PLANNING & INVESTMENTS
### Executive Proposal Summary

### REVISED PHASE TWO PROPOSAL

| Project #: | 00110 | DNPI Network Manager | Alan Ray | Date: | December 7, 2009 |
|---|---|---|---|---|---|
| Initiative(s): | AA | | | | |

| Dlr # | BAC | Loc Pt | Dealership Name | City Name | State | M/H/R |
|---|---|---|---|---|---|---|
| A | 114624 | 4061 | Rally Cadillac Chevrolet Buick Pontiac GMC | Palmdale | CA | H |

### PURPOSE
Re-establish C in Palmdale, CA to replace Wind Down dealer with candidate Lou Gonzales as Dealer Operator.

### BACKGROUND
On November 10, 2009 "Request For Proposal" packages were sent to 6 candidates.

The following two candidates submitted proposals:

1. Larry Mayle, Rally Cadillac Chevrolet Buick Pontiac GMC, Palmdale, CA (W/D dealer, CBPGK still in operation)
2. Lou Gonzales, Saturn of Antelope Valley (W/D)

After thorough review, the Region has selected Lou Gonzales as the preferred candidate for this point. The reasons for this choice include:

- Wind Down dealer, at Saturn of Antelope Valley (Palmdale)
- Outstanding DPS
- Dealer for largest volume GM brand sales (Saturn) in market
- History of profitable dealership operations (3 yr. DPS)
- Solid business plan
- Has location/property available to support Chevrolet dealership
- "Turn key" transition, would keep entire Saturn staff
- Years of successful business in this market
- Strong growth strategy for Saturn business as Saturn Operator
- Minority dealer

Lou Gonzales has successfully operated the Saturn dealership in this market since June 2001. Saturn of Antelope Valley received a Wind Down agreement in June 2009, due to the Saturn brand winding down. The Saturn store is located in the Palmdale Auto Center, same as Chevrolet currently.

Gonzales proposes to begin operation as a Chevrolet dealer, and wind down Saturn concurrently, and is able to begin operations with-in 45 days of approval. Gonzales proposes the current Saturn facility – 2.2 acres as the temporary facility for Chevrolet, and will use a second facility, currently used for Nissan used cars by Gonzales investor partner, for used cars and additional service. He will use GM signage, and will make modifications as necessary for Chevrolet. The Nissan used facility will be used for storage and service bays as necessary, on a temporary basis.

The permanent facility plan is to secure a 3.2 acre parcel across the street from Saturn that backs up to Highway 14, and build a new Chevrolet Image facility for new sales and service. The current Saturn facility would be modified per the Chevrolet Image to be a GM Certified Used Car department, additional service bays, and the dealership business office.

# ANTELOPE VALLEY NEWS

DOWNTOWN
A NEWS CORPORATION COMPANY

TUESDAY, JULY 6, 2010 · VOL.CCLI NO. 125

DJIA 1259413 ▲45.68 0.4%   NASDAQ 2486.70 ▲0.2%   NIKKEI 13709.44 ▼1.3%   DJ STOXX 50 3169.69 ▲0.7%   10-YR TREAS ▼23/32, yield 4.009%   OIL $131.03 ▲$2.18   GOLD $900.50 ▼$7.20   EURO $1.5645   YEN 104.73

★★★★ $1.

## Palmdale Saturn Dealer Awarded Chevrolet Franchise

### Lou Gonzales might just be the happiest person in the entire Antelope Valley.

**PALMDALE, California.**

After spending the past 10 years as the Dealer Principal of Saturn of Antelope Valley, General Motors informed Mr. Gonzales that when the Saturn brand is officially retired on October 31, 2010, he will become the proud new owner and operator of the All-New Antelope Valley Chevrolet.

Mr. Gonzales said that his number one goal in seeking a franchise to replace his Saturn brand was to "ensure he could continue to service" the 9000-plus loyal customers he has developed relationships with as the Antelope Valley's most successful Saturn dealer.

"Chevrolet is the natural next step for the majority of our customers who are seeking award winning service along with the finest selection of automobiles in the industry," he said.



With his Antelope Valley Chevrolet Grand Opening Event scheduled for November 1st, 2010 Gonzales' timing couldn't be better as it coincides with an impressive new lineup from Chevrolet.

Later this summer, Chevrolet will introduce the all-new 2011 Silverado HD. It's been called the heavier-duty heavy-duty. With an available Duramax 6.6L Turbo-Diesel V8, it promises to deliver more horsepower and torque than its predecessor.

Gonzales continued, "In spite of its amazing power, the new Silverado will actually be more fuel efficient than before. The technology is unprecedented.

But Chevrolet isn't stopping there. After four million rigorous global test miles, the 2011 Chevy Cruze is on its way to America and expected to arrive this Fall. Gonzales quotes GM in saying that, every mule led to the creation of a truly unique car, designed for efficiency without compromising performance. It's a driving experience unlike any other compact car.

And that's not the point.

Late 2010 will also see the long anticipated introduction of Chevrolet's technological wonder, the Chevy Volt. An electric vehicle that uses gas to create its own electricity. Plug it in, let it charge overnight, and it's ready to run on a pure electric charge.

AV Chevy Cont'd Page 2

---

## NFL Moving Downtown?

★    ★    ★

### Sports

The concept of building a football stadium in downtown Los Angeles next to Staples Center is just that: a concept. But it's one that's picking up steam with some influential people in NFL circles.

By way of review, Casey Wasserman and Tim Leiweke are exploring the possibility of a retractable-roof venue located where the West Hall of the convention center now sits. That 250,000-square-feet of convention space would be replaced nearby and the stadium also could serve as convention space (as well as potentially playing host to major indoor events such as Final Fours, concerts, title fights, etc.)

The downtown concept is in direct competition with

★    ★    ★

### Sports

one in the city of Industry, Los Angeles to Staples a proposal that has a head start of at least a year because its land is entitled and shovel-ready.

As preliminary as the downtown vision is, it got a noteworthy thumbs-up today from Dallas Cowboys owner Jerry Jones.

"They are so credible and so substantive....Leiweke has the utmost respect in the National Football League, and I have the respect for everybody involved," he said. "With all of that in mind, and with a real passion to have a team in Los Angeles, I like the way this thing is starting to sound."

Jones said that a multi-use stadium "makes sense" and that he can speak to that better

# Suzette, we can continue to take care of you.

We would like to inform you of some very exciting news/

General Motors has made a decision to change their dealer network here in the Antelope Valley. We are very pleased to announce that General Motors has selected us to become the new Chevrolet Dealer here in Antelope Valley no later than November 1st, 2010.

By becoming your new local Chevrolet Dealer, we will be able to continue to provide quality parts and service for your Saturn including warranty repairs.

We will continue to keep you informed as we get more definitive information. We want to truly thank you for your loyalty and look forward to satisfying all of your automotive needs when we become Antelope Valley Chevrolet.

Sincerely,

*Lou Gonzales*

Lou Gonzales
President
Saturn of Antelope Valley

SATURN
of Antelope Valley

*We asked all of my managers to sign off for you*

# GET READY FOR CHEVY!
# INVENTORY LIQUIDATION SALE
"Unprecedented Discounts until the last one is gone"

Get $2,000 Extra

Get $2,000 Extra

No Payments Until 2011

## APPRAISE YOUR OWN TRADE-IN
Go to WWW.KBB.COM
ADD $2,000 [LOYALTY BONUS]

Record Fair Market Value and Enter Below

KBB TRADE-IN VALUE:   $ _____
Add $2,000 LOYALTY BONUS + $2,000
"TOTAL TRADE-IN VALUE:   $ _____

X _Nina Garcia_

*KBB trade-in value is less mileage and reconditioning adjustments. Not valid with any other offer.
**Qualifying customers eligible to receive up to a maximum of 5 monthly payments not to exceed $150000. Coupon does not apply to prior purchases. Some restrictions may apply. Valid Only at Saturn of Antelope Valley. Void where prohibited. All coupons expire 7/31/10. Limit one coupon per transaction. Some customers may not qualify for all offers.

## $2,000
PURCHASE ASSISTANCE MONEY
DOWN PAYMENT HELP
PRICE REDUCTION FUNDS
Whatever You Call It,
IT'S $2,000 JUST FOR YOU

X _Justin Gonzales_

## Your First
# 5 PAYMENTS are on Us!

X _George Crosby_

## Steve Williams

**From:** Lou Gonzales [pma4lou@saturnav.com]
**Sent:** Friday, July 30, 2010 10:44 AM
**To:** Steve Williams; Laurie Lile; Danny Roberts; David Walter; Mike Dispenza; Jim Ledford
**Subject:** Business decision for Antelope Valley Chevrolet Inc.

Mr. Steve Williams
City Manager


Mr. Williams,

After taking some time to evaluate the City of Palmdale's position on our proposal, we have made a decision regarding our business future. Unfortunately
It will not be in the Antelope Valley Auto Center.

Both my wife and I were disappointed that the City of Palmdale rejected our proposal for our new business venture  Antelope Valley Chevrolet Inc.
As the President of Saturn of Antelope Valley I have prospered greatly here in the Antelope Valley Auto Center over the past 10 years. It will be a sad day
on October 31st 2010 when we have to close our Saturn store per our termination agreement with General Motors.

My wife and I are very proud of the business success we have enjoyed here in the City of Palmdale. We are also very proud of the many charities and other
great causes that we have supported here in the City of Palmdale over the past 20 plus years.

We both want to thank the City of Palmdale and it's officials for allowing us to be business owners here in the Antelope Valley Auto Center.


Sincerely,
Lou and Joyce Gonzales
Saturn of Antelope Valley

8/3/2010

# EXHIBIT 7

RESOLUTION NO. 10-62

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF LANCASTER
APPROVING THE ACQUISITION AGREEMENT AND MAKING CERTAIN
FINDINGS IN CONNECTION THEREWITH

WHEREAS, the Lancaster Redevelopment Agency (the "Agency") is a duly constituted redevelopment agency and is undertaking certain activities necessary for redevelopment under the provisions of the California Community Redevelopment Law (Health and Safety Code Section 33000 et seq.) and pursuant to the Redevelopment Plan (the "Plan") for the Amargosa Project (the "Project"); and

WHEREAS, it is a policy of the Agency to provide public improvements which are of benefit to the Project and the project area thereof (the "Project Area"); and

WHEREAS, pursuant to Health and Safety Code Section 33445, the Agency is authorized, as provided in its redevelopment plan, to assist in the acquisition of land within the Project Area; and

WHEREAS, Section 33445 provides, in part, that notwithstanding Section 33440, an agency may, with the consent of the legislative body, pay all or part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement which is publicly owned either within or without the project area, if the legislative body determines:

"(1)    That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, regardless of whether the improvement is within another project area, or in the case of a project area in which substantially all of the land is publicly owned that the improvement is of benefit to an adjacent project area of the agency.

(2)    That no other reasonable means of financing the buildings, facilities, structures, or other improvements, are available to the community.

(3)    That the payment of funds for the acquisition of land or the cost of buildings, facilities, structures, or other improvements will assist in the elimination of one or more blighting conditions inside the project area or provide housing for low- or moderate-income persons, and is consistent with the implementation plan adopted pursuant to Section 33490."; and

WHEREAS, the Agency desires to acquire certain real property for the provisions of public parking for the benefit of Lancaster City Park (the "Improvements"); and

WHEREAS, the provision of the Improvements was contemplated and provided for in the redevelopment plan for the Project, as well as the Implementation Plan for the Project and the Project Area, and would benefit the Project Area, areas within the vicinity of the Project Area, and the residents of the Project Area; and

WHEREAS, the Agency and the City of Lancaster (the "City") have explored all possible funding sources for the Improvements, including federal, state, and local sources; and



Resolution No. 10- 62
Page 2

WHEREAS, there are no other reasonable means available to the Agency and the City to finance the Improvements other than Agency funds; and

WHEREAS, the City Council has reviewed evidence, including both oral testimony and writings, in connection with this matter, and has determined that the foregoing recitals, and each of them, are true and correct, and further has determined that the provision of the Improvements is in the best interests of the Agency and the City and the health, safety, and welfare of its residents, and in accord with the public purposes and provisions of applicable State and local law requirements.

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF LANCASTER DOES RESOLVE AS FOLLOWS:

Section 1. The City hereby approves the Acquisition Agreement in the form presented at this meeting with such additions, deletions or modifications as are approved by the City Manager. The City Manager is hereby authorized and directed to execute the Acquisition Agreement on behalf of the City and to take all other actions necessary to implement the Acquisition Agreement.

Section 2. The City Council finds and determines that: (i) the provision of the Improvements is of benefit to the Project Area and the neighborhood in which such Improvements are to be situated; (ii) no other reasonable means of financing the Improvements are available to the community; and (iii) the payment of funds for the Improvements will assist in the elimination of one or more blighting conditions within the Project Area and is consistent with the adopted implementation plan.

PASSED, APPROVED and ADOPTED this _____ day of _____, 2010, by the following vote:

AYES:

NOES:

ABSTAIN:

ABSENT:

ATTEST:                                             APPROVED:

_____            _____
GERI K. BRYAN, CMC                          R. REX PARRIS
City Clerk                                  Mayor
City of Lancaster                           City of Lancaster

Resolution No. 10- 62
Page 3


STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES        )        ss
CITY OF LANCASTER            )

## CERTIFICATION OF RESOLUTION
## CITY COUNCIL

I, _____, _____ City
of Lancaster, California, do hereby certify that this is a true and correct copy of the original
Resolution No. 10-62, for which the original is on file in my office.

WITNESS MY HAND AND THE SEAL OF THE CITY OF LANCASTER, on this
_____ day of _____, _____.

(seal)


_____



# EXHIBIT 8

RESOLUTION NO. 16-10

A RESOLUTION OF THE LANCASTER REDEVELOPMENT AGENCY
APPROVING THE ACQUISITION AGREEMENT AND MAKING CERTAIN
FINDINGS IN CONNECTION THEREWITH

WHEREAS, the Lancaster Redevelopment Agency (the "Agency") is a duly constituted redevelopment agency and is undertaking certain activities necessary for redevelopment under the provisions of the California Community Redevelopment Law (Health and Safety Code Section 33000 et seq.) and pursuant to the Redevelopment Plan (the "Plan") for the Amargosa Project (the "Project"); and

WHEREAS, it is a policy of the Agency to provide public improvements which are of benefit to the Project and the project area thereof (the "Project Area"); and

WHEREAS, pursuant to Health and Safety Code Section 33445, the Agency is authorized, as provided in its redevelopment plan, to assist in the acquisition of land within the Project Area; and

WHEREAS, Section 33445 provides, in part, that notwithstanding Section 33440, an agency may, with the consent of the legislative body, pay all or part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement which is publicly owned either within or without the project area, if the legislative body determines:

"(1)    That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, regardless of whether the improvement is within another project area, or in the case of a project area in which substantially all of the land is publicly owned that the improvement is of benefit to an adjacent project area of the agency.

(2)    That no other reasonable means of financing the buildings, facilities, structures, or other improvements, are available to the community.

(3)    That the payment of funds for the acquisition of land or the cost of buildings, facilities, structures, or other improvements will assist in the elimination of one or more blighting conditions inside the project area or provide housing for low- or moderate-income persons, and is consistent with the implementation plan adopted pursuant to Section 33490."; and

WHEREAS, the Agency desires to acquire certain real property for the provision of public parking for the benefit of Lancaster City Park (the "Improvements"); and

Resolution No. 16-10
Page 2

WHEREAS, the provision of the Improvements was contemplated and provided for in the redevelopment plan for the Project, as well as the Implementation Plan for the Project and the Project Area, and would benefit the Project Area, areas within the vicinity of the Project Area, and the residents of the Project Area; and

WHEREAS, the Agency and the City of Lancaster (the "City") have explored all possible funding sources for the Improvements, including federal, state, and local sources; and

WHEREAS, there are no other reasonable means available to the Agency and the City to finance the Improvements other than Agency funds; and

WHEREAS, the City Council has reviewed evidence, including both oral testimony and writings, in connection with this matter, and has determined that the foregoing recitals, and each of them, are true and correct, and further has determined that the provision of the Improvements is in the best interests of the Agency and the City and the health, safety, and welfare of its residents, and in accord with the public purposes and provisions of applicable State and local law requirements.

NOW, THEREFORE, THE LANCASTER REDEVELOPMENT AGENCY DOES RESOLVE AS FOLLOWS:

Section 1.    The Agency hereby approves the Acquisition Agreement in the form presented at this meeting with such additions, deletions or modifications as are approved by the Executive Director. The Executive Director is hereby authorized and directed to execute the Acquisition Agreement on behalf of the Agency and to take all other actions necessary to implement the Acquisition Agreement.

Section 2.    The Agency finds and determines that: (i) the provision of the Improvements is of benefit to the Project Area and the neighborhood in which such Improvements are to be situated; (ii) no other reasonable means of financing the Improvements are available to the community; and (iii) the payment of funds for the Improvements will assist in the elimination of one or more blighting conditions within the Project Area and is consistent with the adopted implementation plan.

Resolution No. 16-10
Page 3

PASSED, APPROVED and ADOPTED this _____ day of _____, 2010, by the following vote:

AYES:

NOES:

ABSTAIN:

ABSENT:

ATTEST:                                        APPROVED:


_____              _____
GERI K. BRYAN, CMC                     R. REX PARRIS
City Clerk                             Mayor
City of Lancaster                      City of Lancaster


STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES        )       ss
CITY OF LANCASTER            )

CERTIFICATION OF RESOLUTION
CITY COUNCIL

I, _____, _____ City of Lancaster, California, do hereby certify that this is a true and correct copy of the original Resolution No. 16-10, for which the original is on file in my office.

WITNESS MY HAND AND THE SEAL OF THE CITY OF LANCASTER, on this _____ day of _____, _____.

(seal)


_____