Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026-reg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9           f/k/a General Motors Corporation, et al.,

10

11             Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15             United States Bankruptcy Court

16             One Bowling Green

17             New York, New York

18

19             September 7, 2010

20             10:11 AM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

Page 2

1   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

2   U.S.C. Section 363 and Authorizing the Debtors to Amend the

3   Terms of their Engagement Letter with AP Services LLC.

4

5   HEARING re Application by AP Services LLC as Crisis Manager to

6   the Debtors for Approval of the Success Fee.

7

8   HEARING re Motion of Debtors for Entry of Order Pursuant to

9   Sections 105, 363, and 365 of the Bankruptcy Code for an Order

10  Authorizing (I) the Debtors to Enter into the Stock Purchase

11  Agreement with General Motors Holdings, S.L., and (II) the

12  Assumption of the BMW Contract in Connection with the Debtors

13  Entry into the Stock Purchase Agreement.

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Dena Page

Page 3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  STEPHEN KAROTKIN, ESQ.

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  ROBERT SCHMIDT, ESQ.

17

18

19   AlixPartners

20        40 West 57th Street

21        New York, New York 10019

22   BY:  EDWARD J. STENGER, ESQ.

23        LAURA J. EISELE, ESQ. (TELEPHONICALLY)

24

25

Page 4

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3          U.S. Attorney's Office

4          86 Chambers Street

5          3rd Floor

6          New York, NY 10007

7

8    BY:  JOSEPH N. CORDARO, DEPUTY CHIEF, AUSA

9          DAVID S. JONES, DEPUTY CHIEF, AUSA

10

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13         U.S. Attorney's Office

14         33 Whitehall Street

15         21st Floor

16         New York, NY 10004

17

18   BY:  BRIAN S. MASUMOTO, ESQ.

19

20   MAYER BROWN, LLC

21         Attorneys for BMW AG

22         1675 Broadway

23         New York, New York 10019

24   BY:  FREDERICK D. HYMAN, ESQ.

25         JEAN-MARIE ATAMIAN, ESQ.

Page 5

1

2    HODGSON RUSS LLP

3         Attorney for Punch

4         One Grand Central Place

5         60 East 42nd Street

6         3rd Floor

7         New York, New York 10165

8      BY: S. ROBERT SCHRAGER, ESQ.

9

10

11    GODFREY & KAHN, S.C.

12         Motors Liquidation Company

13         333 Main Street

14         Suite 600

15         Green Bay, Wisconsin

16    BY:  CARLA O. ANDRES, ESQ. (TELEPHONICALLY)

17

18    GODFREY & KAHN, S.C.

19         Motors Liquidation Company

20         One East Main Street

21         Suite 500

22         Madison, Wisconsin

23    BY:  KATHERINE STADLER, ESQ.  (TELEPHONICALLY)

24         BRADY C. WILLIAMSON, ESQ. (TELEPHONICALLY)

25

Page 6

1

2

3    GENERAL MOTORS LLC

4          General Motors Legal Staff

5    BY:   LAWRENCE BUONOMO, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2            THE COURT:  Okay, let's start with GM next then,

3    please.

4            Mr. Masumoto, could you come up to a microphone or

5    ask the person next to you to do that please.  There may be a

6    disconnect between what's on my calendar and what people may be

7    here on.

8            (Off the record.)

9            THE COURT:  Okay.  Is there anybody else who is here

10   on a matter other than either GM or Pali?  Okay.  Fair enough.

11           Now, Mr. Karotkin, we have a few different matters.

12   On the matters that are carried from last time, the AP Services

13   matter, I have I think four supplemental affidavits and I think

14   and Mr. Masumoto, I assume you're going to be taking the lead

15   on this although some of the earlier papers might have been

16   signed by Mr. Velez Rivera or somebody else.  I guess the

17   question I have is now that those affidavits have been

18   satisfied, seemingly making the prima facie case that I thought

19   was in need of bolstering last time, does the US Trustee's

20   Office still object?  And if it does, do you want to cross-

21   examine the witnesses, especially Mr. Case or can I now rule on

22   the matter?

23           MR. MASUMOTO:  Your Honor, we have no desire to

24   cross-examine.  We did have several conversations with AP

25   Services and debtors' counsel, and as a result we don't have

Page 8

1    any need for any further evidentiary questions.

2            THE COURT:  Okay.  Do you want legal argument on the

3    existing record?

4            MR. MASUMOTO:  Your Honor, with respect to the

5    success the -- I believe our position currently is that we're

6    satisfied with the documentation with the exception of the

7    objections we specifically raised regarding expenses.  With

8    respect to the revised retention, we were satisfied by the

9    additional information in the declaration, as well as our

10   discussions.

11           THE COURT:  Okay.  So we're down to expenses then?

12   Forgive me, Mr. Masumoto.

13           MR. MASUMOTO:  Yes, Your Honor, with respect to AP

14   Services and the expenses related to that initial period in

15   June of 2009.

16           THE COURT:  Now historically Mr. Masumoto, we've been

17   able to deal with documentation of expenses-style issues by

18   authorizing payment of the undisputed portion and inviting the

19   applicant to have a dialogue with your guys to give them

20   further -- give you guys further support and then either once

21   you guys were satisfied allowing them or alternatively if you

22   kind of agree to disagree, teeing up the disputed portion.

23   What's your thinking vis-a-vie that now?

24           MR. MASUMOTO:  Your Honor, we're fine with that.  We

25   did receive on Friday some of the supplemental documentation.

09-50026-mg   Doc 6904   Filed 09/07/10   Entered 09/13/10 15:31:03   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 9 of 39

Page 9

1   There were still some outstanding issues that the applicant was

2   still researching.  But with respect to undisputed amounts, I

3   have no objection to, you know, that being paid.

4        THE COURT:  Okay.  Well, folks my tentative, subject

5   to your rights to be heard would be now to approve the things

6   to which the US Trustee's Office no longer objects and to grant

7   that kind of arrangement that I just described with Mr.

8   Masumoto which is to approve the undisputed portion and to give

9   the process a little more time to play out on the disputed

10  portion with the thought that if the US Trustee's Office is

11  satisfied, then by an order -- by kind of so-ordering the

12  record, I will permit those to be paid if and when the US

13  Trustee's Office is satisfied.  And if issues remain, to leave

14  the disputed portion for a follow-up hearing.

15       Is there an AP applicant or anybody else who would

16  want to be heard on that type of an approach?   Mr. Karotkin?

17       MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

18  Manges for the debtors.  That approach sounds fine, Your Honor,

19  and I think that reflects the status of the record with respect

20  to the position taken by the United States Trustee.  I am quite

21  confident that AP Services and the US Trustee can work out

22  whatever differences remain as to the expenses.

23       And as I understand what you are saying, sir, that

24  that issue would be reserved.  The payment of the success fee

25  would be approved, as well as the amendment of the AP Services

MOTORS LIQUIDATION COMPANY, et al.

Page 10

1    retention agreement.

2         THE COURT:  Yes, if I heard Mr. Masumoto right, with

3    the supplemental declarations that I received, I mentioned Mr.

4    Case, I didn't want to ignore the Katan and Mayer declarations

5    and I know I also have another Choch (sic) or Choate (sic),

6    forgive me if I am mispronouncing those.

7         MR. KAROTKIN:  No, it's Choch.

8         THE COURT:  It is Choch?

9         MR. KAROTKIN:  Yes, sir.

10        THE COURT:  And when I read them, I was satisfied

11   subject to any cross-examination rights that might be

12   requested.  So what I would ask you or your designee to do, Mr.

13   Karotkin, is on the success fee, on the modification of the

14   terms and the undisputed portion of the expenses, to give me

15   one or more orders to paper the fact that they are now

16   approved.

17        And if the dialogue with the US Trustee's Office can

18   be completed in a way that doesn't materially delay the other

19   three things that I just mentioned, you can roll it into a

20   single order or you can do it by a supplemental one, whichever

21   you think skins the cat best.  I am not ruling today on the

22   matters for which the dialogue is to continue but I am

23   approving everything else.

24        MR. KAROTKIN:  Thank you, sir.  And that would

25   include, Your Honor, as I understand it, the payments of the

Page 11

1    amounts provided for in the amended retention.

2          THE COURT:  Yes, because I don't understand those to

3    involve the expenses --

4          MR. KAROTKIN:  That is correct.

5          THE COURT:  -- that are still the subject of the

6    dialogue.

7          MR. KAROTKIN:  That is correct, sir.

8          THE COURT:  All right.  Standby.  Mr. Masumoto?

9          MR. MASUMOTO:  Your Honor, I just wanted to mention

10   that in my conversations with AP Services this morning, there

11   was an issue that I thought they were here to address the Court

12   on. I don't know if you want -- Your Honor wants to hear all

13   sort of disputes at the same time or since they are here today.

14   Specifically, it had to do with the application of meal expense

15   limitations.  Our office wanted to be consistent with the

16   application to all professionals.  The AP Services wanted to

17   argue with Your Honor -- I'm sorry, Your Honor, just to be -- I

18   don't want to characterize it.

19         THE COURT:  Wanted to be heard before me?

20         MR. MASUMOTO:  Yes.  Your Honor, my understanding is

21   that other professionals in this case have been imposed with

22   the twenty dollars per meal limitation and so we're trying to

23   be consistent with everyone.  I believe AP Services wanted to

24   be able to present their case for a variation.  I don't know if

25   Your Honor wants to hear that today or defer that to any other

Page 12

1    disputes that we may have.

2          THE COURT:  I hate to bring people back.  Can we deal

3    with it without a material delay in the French sub-matter and

4    other things that we need to deal with today?

5          MR. MASUMOTO:  That's fine with me, Your Honor.   I

6    will defer to AP Services.

7          THE COURT:  And you're willing to waive any further

8    briefing and so forth?  You'll just have it out right now?

9          MR. MASUMOTO:  Yes, Your Honor.

10          THE COURT:  Okay.  Let me hear from AP on why I

11    should have an exception on that one.  Oh, hang on just a

12    minute.  I've got to -- I am told that there are some attorneys

13    who are expecting to be heard by phone on this or at least to

14    listen in on phone.  Let's pause the proceedings.  Let's do it

15    now.

16          (Pause)

17          THE COURT:  We can continue.  Okay.

18          MR. STENGER:  Good morning, Your Honor.  Ted Stenger

19    of AlixPartners.

20          Your Honor, the issue is actually very narrow.

21    AlixPartners, most of our work and our staff's work is done at

22    the client location which is generally not in the city that the

23    individual lives in.  So for example, on the Motors Liquidation

24    case, in the period of June and the first ten days of July of

25    2009, AlixPartners professionals were working on the case in

Page 13

1    downtown Detroit, Michigan, in Warren, Michigan, in Saginaw,

2    Michigan, in various locations throughout Europe, in Shanghai,

3    in New York and probably a couple of other locations.

4           While it is typical -- it's not typical on our

5    assignments to be that far a flung, it is very typical for our

6    professionals to be providing services outside of their

7    location of their home.  So as a result, our expense policy is

8    generally that dinners will be limited to fifty-five dollars

9    per person.  The local rule in New York is I believe twenty

10   dollars for an individual dinner.  I think that that is

11   intended generally to allow persons to charge dinners if they

12   have worked very late on a matter and at that point in time,

13   it's unreasonable to expect them to go home and either have

14   their spouse or significant other or themselves make dinner.

15          In our case, our employees are out of town for these

16   meal charges.  Our firm has historically used that policy as

17   opposed to local court policy with the exception of cases where

18   we are, in fact, staffing them out of a local office.  So for

19   example, we had a number of people who lived in the Detroit

20   Metropolitan area who were actually on that assignment.  They

21   would not be charging dinners to General Motors typically

22   because -- whether they worked ten or twelve or fifteen hours

23   because that's actually not covered by our policy.

24          So what we would like is to be able to use our

25   internal policy of fifty-five dollars per individual per

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 14 of 39

Page 14

1    dinner, as opposed to the local rule of twenty dollars.

2                THE COURT:  Okay.  Mr. Stenger.  Mr. Masumoto?

3                MR. MASUMOTO:  Your Honor, if I may?  Again, the

4    Office of the United States Trustee just wanted to be

5    consistent with the other professionals.  I believe other

6    professionals in this case have also had travels of -- many

7    travels to other locations and we have applied or at least this

8    court has applied that twenty dollar per cap on the amount of

9    the meal.  The concern of fifty-five dollars, even if it were a

10   travel expense allowed is much higher than I think the courts

11   in this area have applied.  I do recognize that some courts

12   will allow travel meals perhaps to be in excess of the twenty

13   dollars but fifty-five is certainly far in excess of the

14   permitted amount.

15               THE COURT:  Okay.  Mr. Stenger, any reply?

16               MR. STENGER:  Yes, Your Honor.  The fifty-five is an

17   absolute limit.  Most individuals, it's your actual expenses

18   limited to fifty-five.  So in a number of instances, I know

19   myself personally, I am not big on spending a lot of time

20   eating dinner after a long day.  So I usually buy carryout and

21   it's ten bucks, five bucks, fifteen bucks.

22               I would be happy to provide and Mr. Masumoto and I

23   have spoken, I have not had a chance to finish the analysis of

24   the meal charges.  I will do that and I will identify for him

25   an average across all of the meals, as well as identify all of

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 15 of 39

Page 15

1    those meals that were up to the fifty-five limit and compare

2    that to the twenty dollar limit, so we know what we're talking

3    about here in terms of dollars.

4            THE COURT:  I am not going to require that but I am

5    about to rule, unless you have anything else.

6            MR. STENGER:  No, thank you, Your Honor.

7            THE COURT:  All right.  Folks, I am going to sustain

8    the US Trustee's Office objection and the following are the

9    basis for the exercise of my discretion in this regard.  The

10   issue is not of course the extent to which the employees should

11   be allowed to be reimbursed for whatever needs to be expended.

12   The issue is the extent to which one kind of professional

13   should be subject to a different standard than the other

14   professionals in the case.  I think based on other matters that

15   have been put before me, I can take judicial notice of the fact

16   that other professionals in this case have likewise had to

17   travel, especially for instance debtors' counsel had to spend a

18   lot of time at their client's offices in Michigan and

19   elsewhere.

20           And the issue is essentially a policy one as to

21   whether we should be making special rules for one kind of

22   professional.  I assume subject to hearing something different,

23   that ever professional makes its own type of contribution to

24   the case and if they were invaluable I wouldn't be authorizing

25   the fees on them but the issue is whether there should be

Page 16

1    different rules.

2         And I think under the circumstances that the same

3    rules that apply to Weil, to Kramer Levin and any number of

4    other professionals will also apply to AP Partners.  And to the

5    extent they exceed the traditional cap, I assume that the

6    employees will still be reimbursed but they'll be absorbed as

7    overhead.  And the other compensation for which the

8    professional receives is sufficient in my view to permit the

9    absorption of overhead.

10        For those reasons, Mr. Masumoto, your limited

11   objection is sustained and when you adjust the exact amount due

12   to AP Partners, the expense reimbursement will be capped no

13   more, no less than it is for other professionals in the case.

14        MR. MASUMOTO:  Thank you, Your Honor.

15        THE COURT:  Okay.  Are we ready to move on to

16   Strasbourg?

17        MR. KAROTKIN:  Yes, Your Honor.

18        THE COURT:  Okay.  And Mr. Karotkin, when you get to

19   the main lectern, pause for a minute because I have a

20   preliminary comment or two.  Folks, you all should make your

21   presentations as you see fit but when you do I want you to help

22   me in a couple of respects.

23        First it seems to me that the Punch objection is a

24   classic example of business judgment and I need help as to why

25   the debtors exercise of their business judgment shouldn't be

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 17 of 39

Page 17

1   given the normal respect that we do, especially if the failure

2   to assume and assign -- or to sell the stock here and to assume

3   and assign any contracts that I otherwise authorize to be

4   assumed and assigned, have the effect of saving both jobs and

5   expenses that the estate's unsecured creditors community would

6   otherwise have to eat.

7          The more serious issue in my regard is how I should

8   be dealing with the BMW objection because it kind of seems to

9   raise a kind of first cousin of an Orion issue which is that I

10  have something here which is at least seemingly plainly in the

11  interest of the estate and it seems to me that some of the

12  issues that BMW raises are not the kinds of issues that would

13  be susceptible to determination in the absence of more

14  extensive proceedings which would be exactly inconsistent with

15  what we try to do on 363 motions.

16         Now I tried to do my homework in preparation for

17  today but I saw a debtor reply on Punch but I didn't see one on

18  BMW and I assume absent chamber's error that that was

19  intentional on your part, Mr. Karotkin.  So we've how I should

20  deal with BMW into the remainder of your remarks.  Go ahead.

21         MR. KAROTKIN:  Thank you, sir.  Stephen Karotkin,

22  Weil, Gotshal, & Manges for the debtors.

23         Your Honor, I think that I can help you out a lot

24  with respect to BMW fairly easily and I apologize for the late

25  notice on this but just this morning a resolution was achieved

Page 18

1    between the debtors, BMW and what I call new GM which is the

2    parent company of the purchaser of the stock, with respect to

3    the resolution of the objection raised by BMW as to the

4    assumption and assignment of the contract.

5            It's my understanding, Your Honor, and counsel for

6    BMW is here today, that subject to the terms of that agreement,

7    BMW will withdraw its objection to the sale and transfer and

8    assignment of his contract to the entity that is the purchaser

9    here, not to Punch but to this entity.

10           And what the debtors have agreed in connection with

11   that resolution is that as Your Honor may be aware, it's

12   reflected in our papers, an adversary proceeding was commenced

13   by MLC against BMW.  BMW has asserted various counterclaims, I

14   believe.  Both the complaint as well as the counterclaims would

15   be dismissed with prejudice in connection with the overall

16   resolution of this matter.  So I think, Your Honor, that -- and

17   again, I apologize, that resolution was reached overseas this

18   morning.  That's why we were unable to advise you over the

19   weekend.

20           But that, I believe, takes care of that issue

21   entirely.  There would be no need for an evidentiary hearing to

22   the extent Your Honor would be prepared to approve this sale to

23   the new GM entity.  Obviously, the Punch proposal by its own

24   terms is conditioned on an assumption and assignment of the

25   contract with BMW.  Again, I don't want to speak for BMW but I

Page 19

1    believe that the objection that they have filed would remain in

2    the event Punch were the prospective purchaser.

3                    THE COURT:  Mr. Karotkin, is this a good time for you

4    to just stand in place for a minute and for me to give BMW a

5    chance to comment on whether you got it right?

6                    MR. HYMAN:  Good morning, Your Honor.  Rick Hyman

7    from Mayer Brown on behalf of BMW AG.

8                    I stand behind what Mr. Karotkin represented to this

9    court.  There had been discussions over the long weekend while

10   we were at our vacation homes and the folks over in Germany

11   were working very hard to resolve these issues and it was

12   reported to both Mr. Karotkin and myself this morning that they

13   have reached a settlement agreement.  Mr. Karotkin is correct

14   that it resolves any issues as it relates to the transfer of

15   the contract to new GM.  It would not resolve any issues as it

16   relates to the transfer of the contract to Punch which BMW

17   would still resist.

18                   THE COURT:  I understand.  Now, Mr. Hyman, did I also

19   hear him right that the deal that the folks -- the business

20   folks put together will resolve not just the assumption and

21   assignment issue but the underlying adversary, as well?

22                   MR. HYMAN:  That's a critical component of it, Your

23   Honor.

24                   THE COURT:  Very good.

25                   MR. HYMAN:  The dismissal with prejudice of the

09-50026-mg   Doc 6904   Filed 09/07/10   Entered 09/13/10 15:31:03   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 20 of 39

Page 20

1    complaint is a condition to the agreement.

2            THE COURT:  Okay.

3            MR. KAROTKIN:  Your Honor, I have one correction if I

4    may?

5            THE COURT:  Yes.

6            MR. KAROTKIN:  I was not at my vacation home over the

7    weekend.

8            THE COURT:  Fair enough.  Okay.

9            MR. KAROTKIN:  In fact, I don't have a vacation home.

10           THE COURT:  In fact, people at your firm don't get

11   vacations.

12           MR. KAROTKIN:  I didn't want to say that.

13           THE COURT:  All right.  I think then it's premature

14   for me to bless any resolution of the type that you folks just

15   had if it is contingent upon a non-Punch assignment until I

16   hear from Punch.  So let's turn to that aspect of the motion

17   now, Mr. Karotkin and give Punch's counsel a chance to be

18   heard.

19           MR. KAROTKIN:  Sure.

20           THE COURT:  The BMW folks can remain at the counsel

21   table but I want to hear the Punch objection and then I will

22   hear the usual response and reply.

23           MR. SCHRAGER:  Your Honor, Robert Schrager, Hudgson

24   Russ for Punch Corporation.

25           BMW -- excuse me, I am sorry, I got confused because

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 21 of 39

Page 21

1    this is the first we've heard about the BMW resolution.  The

2    debtor states three things basically with respect to the Punch

3    claim -- Punch proposal; one is that it's non-binding.  That's

4    not correct.  It is binding.  Punch makes a clear, unequivocal

5    offer to purchase for three million dollars plus fifty percent

6    of the BMW claim, whatever that is.  We don't know obviously

7    what the terms of the BMW resolution are but to the extent

8    there is an economic benefit to it, fifty percent of whatever

9    that economic benefit is would be added to the Punch proposal.

10   That's part of the Punch proposal.

11          The second aspect as Your Honor mentioned was

12   substantial risk.  That, Your Honor, is zero quite frankly.

13   Footnote 3 of the debtors reply papers states that the debtor

14   doesn't even believe that there's any liability.  So Punch does

15   not understand why the debtor believes that there's liability.

16   Punch is assuming all of that and there is no liability to the

17   debtor.  They themselves in footnote 3 agree that under French

18   law, they would not be responsible.  So we don't understand

19   that.

20          The third is that there is a only nominal difference

21   between the Punch offer and the GM offer, the new GM offer.

22   Your Honor, that's the difference between $1.28 which was

23   proposed by new GM as the purchase price, one euro and three

24   million dollars plus fifty percent of the BMW transaction,

25   whatever that might be.  Or if the BMW transaction doesn't take

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 22 of 39

Page 22

1   place, the BMW claim which is estimated to be somewhere between

2   thirty-five million to one billion dollars.

3          That's not nominal in my way of thinking.  I don't

4   understand how anybody thinks it's nominal.  Three million

5   dollars to me isn't a nominal amount and I don't care how many

6   debtors they have.  They claim that it's nominal because they

7   have so many debtors that nobody is going to see anything out

8   of that.  It's still a higher and better offer.

9          Taking it in detail; Punch gave a binding and non-

10  contingent offer which creates an obligation for Punch to go

11  through with the purchase.  It's clear.  It's set forth.  We

12  will purchase.  MLC overstates its exposure.  In their own

13  reply, they say that.  They say that there's a question as to

14  whether there's an employee issue.  There is no problem with

15  employees in Strasbourg.

16         Punch intends to operate this plant.  Punch has

17  already arranged for additional contracts to be coming into

18  this plant.  Nobody is going to be fired.  The plant is not

19  going to be closed.  We're not paying three million dollars to

20  close a plant.  The French Works Council has the right to give

21  an advisory opinion.  They do not have the right to say we

22  bless this.  We don't bless this.  You can't do it.  You can do

23  it.  They can give an advisory opinion.

24         Punch is prepared to sit down with them.  Punch has

25  said it will honor all contracts.  It will go forward with

Page 23

1    everything that's there.  Hence, they don't see that there's

2    any reason that the French Works Council will have a problem,

3    especially in light of the fact that there's additional work

4    coming in and additional people to be hired.

5           The debtor raises the issue, well this might be

6    subject to the French Court, whether the French Court will

7    approve it.  Your Honor, it's our understanding that if Your

8    Honor approves the sale to Punch, the French Court will approve

9    the sale.  There's no reason why they wouldn't.  Punch is a

10   substantial company, willing to support its offer with good

11   hard cash.  It's a substantial increase and everything else.

12          On the business judgment aspect, Your Honor, we have

13   real questions as to how fair this entire transaction has been

14   throughout the entire time or whether this is a sweetheart deal

15   that was arranged.  On May 25, Punch gave an offer based upon

16   certain information that it had.  That offer resulted -- was

17   one euro offer also.  And that was based upon the information

18   that we had been given.  That was then withdrawn.  On May 26,

19   we now learn having looked at these papers, the GM offer, the

20   new GM debtor offer was put into place, also for one euro,

21   however, without anything else.

22          Your Honor, we think that this is a sweetheart

23   transaction.  We are offering higher and better value to the

24   creditors and everyone else.  And the business judgment is

25   highly suspect in this whole transaction.

Page 24

1           THE COURT:  Mr. Schrager, if the debtor had been

2     exercise deficient business judgment, I got a pretty competent

3     creditors committee counsel; don't you think that they would

4     have raised some concerns to me?

5           MR. SCHRAGER:  Your Honor, I don't know if creditors

6     committee counsel has even looked at the Punch offer as of yet.

7     I haven't heard from creditors committee counsel at all on this

8     transaction.  This case up, quite frankly, after the people in

9     Europe saw the application for approval of this.  Until then,

10    they had no idea this whole thing was going on.  I don't know

11    how creditors committee counsel can say the three million

12    dollars plus fifty percent of a claim that could be a

13    substantial amount of money is a nominal amount.  I would be

14    interested in hearing creditors committee counsel stand up here

15    and say oh, yes, three million dollars is nominal.

16          THE COURT:  Okay.  Continue, please.

17          MR. SCHRAGER:  I think that's it, Your Honor.  I

18    think it's a higher and better offer.  It gives the debtor and

19    all interested parties protection.  The employees are

20    protected.  The creditors are more than protected.  And we

21    don't understand how there can be any question as to which

22    offer is a higher and better offer.

23          What is the advantage of taking less money than

24    taking more money if everyone who has, you know, any interest

25    in this entity is protected?

MOTORS LIQUIDATION COMPANY, et al.

1          THE COURT:  Okay.  Thanks.  I will hear next from the

2     debtor and then from anybody else who wants to be heard.

3          MR. KAROTKIN:  Thank you, Your Honor.  First of all,

4     it's not a higher and better offer.  I am not even sure it's

5     higher in terms of dollar amount.  I think we're talking about

6     certainly a real uncertainty as to whether Punch can even close

7     this deal and the risk associated with that.  As Your Honor

8     knows, there's a September 30 drop dead date with respect to

9     the existing contract.  Punch would have to engage with the

10    Workers council.  There is no time period  under French law as

11    to how long that could take.

12          And they suggest that their offer is unconditional.

13    Well the fact of the matter is, it's hardly unconditional.  It

14    is expressly conditioned on the ability of the debtors to

15    assume and assign the BMW contract and you've already heard

16    BMW's position as to that issue with respect to a proposed sale

17    to Punch.  That in and of itself would jeopardize this entire

18    prospective sale for an illusory -- and I do mean and illusory

19    -- three million dollars in the hope perhaps, perhaps, that at

20    some point in the future there would be some recovery on

21    litigation against BMW.

22          And I question, Your Honor, in addition whether

23    Punch's offer being contingent on the assumption and assignment

24    of the BMW contract, whether under those circumstances there

25    could be any claim against BMW with respect to that litigation

Page 26

1   in any event going forward post-assumption which again, their

2   deal is conditioned on.  They cavalierly suggest that well,

3   they'll take the employees and they'll take the new employment

4   contract, the new collective bargaining agreement.  And as

5   we've indicated in our papers, Your Honor, well that collective

6   bargaining agreement is not available to any purchaser.  That

7   new collective bargaining agreement is available to the entity

8   that new GM is proposing, purchase the stock of General Motor

9   -- of GM Strasbourg.  So that's not available to them and they

10  cavalierly assert that; well it is available to them, it's not

11  contingent.

12          In addition, Your Honor, as we have noted in our

13  reply pleadings, the purchaser has antitrust clearance and is

14  prepared to move forward expeditiously with a closing.  The

15  suggestion that this process was a sweetheart deal for new GM

16  is ridiculous and there's no evidence in the record to support

17  it.  He certainly has presented no evidence to support that.

18  In fact, as our pleadings indicate and Mr. Choch is here to

19  testify and I am prepared to submit an offer of proof on behalf

20  of Mr. Choch, the debtors negotiated with Punch for a long time

21  in the hope that they would come forward with a deal.  Punch

22  insisted that any deal it proposed be conditioned on a new

23  agreement with GM -- with new GM pursuant to which they would

24  get some assurances as to future commitments for the supply of

25  transmissions, pursuant to which they would have the ability to

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 27 of 39

                                                                    Page 27

1    use new GM technology.

2            They were unable to reach an agreement with new GM.

3    New GM was under no obligation to enter into an agreement with

4    Punch.  It could do whatever it felt was in its own economic

5    interest.  Punch walked away from that transaction.  And now

6    all of the sudden they come forward as a spoiler.  Basically

7    what you have here, Your Honor, is a three million dollar

8    option for -- I'm not suggesting that three million dollars is

9    not a significant amount of money even for me with no vacation

10   home, it's a significant amount of money, but it's an illusory

11   amount of money, Your Honor.  There's no assurance this will

12   close.  And from the perspective of the debtors' business

13   judgment, the conditional nature of the Punch proposal, three

14   million dollars is not an appropriate risk to take when if we

15   do proceed with the offer that is before Your Honor, we know it

16   will close.  We know the BMW issue has been resolved.  And we

17   know, most importantly, Your Honor from the perspective of

18   these debtors' estates that a major issue in the context of the

19   windup of these estates meaning the disposition of General

20   Motors Strasbourg will be addressed, will be finalized, will be

21   done with.

22            It has been a major issue that has consumed a fair

23   amount of resources of MLC.  As you know, they have been trying

24   to sell it for some period of time.  It assures the continued

25   operation of the facility and the preservation of twelve

09-50026-mg   Doc 6904   Filed 09/07/10   Entered 09/13/10 15:31:03   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 28 of 39

Page 28

1   hundred jobs.  Whether or not that liability would ever come

2   back to MLC in the United States, Your Honor, in the event

3   there were a shut down, we hope not, but of course there could

4   be no certainty as to that.

5           As I said, this transaction ties everything up in a

6   neat little bow.  We are done.  As Your Honor knows last week,

7   as I think you know, we filed a plan and disclosure statement.

8   We've scheduled a disclosure statement hearing with Your Honor

9   for October 21.  Again, this was a major item.  We are moving

10  towards consummating a plan in these cases and making

11  distributions to creditors.  And this element of this deal

12  brings more certainty to achieving that goal and most

13  importantly, shields the estate from liability from a rejection

14  of contracts, from any potential liability from new GM, from

15  any potential liability from BMW.  It resolves the BMW

16  litigation.

17          And based on that, based on the debtors' business

18  judgment, taking all of those factors into account, it is the

19  debtors' business judgment and the debtors' board's business

20  judgment which has nothing, the board is totally unrelated to

21  new GM, that this deal is higher and better.  And, Your Honor,

22  as I said, I am prepared to make an offer of proof from Mr.

23  Choch, if you would like an evidentiary basis and he's

24  available for cross-examination.

25          THE COURT:  Well if I needed an evidentiary hearing,

Page 29

1   we would have to go by the practices under the case management

2   order and the Court's local rules which would make an offer of

3   proof on the fly today inappropriate.  But I take it your point

4   is that they haven't put in any arguments that go to the

5   debtors' business judgment and that the debtors' business

6   judgment is self-evident.

7           MR. KAROTKIN:  Yes, sir, absolutely.

8           THE COURT:  Okay.  Before I give Mr. Schrager an

9   opportunity to reply, does anybody else want to be heard?  Mr.

10  Schmidt?  Creditors Committee?

11          MR. SCHMIDT:  Good morning, Your Honor.  For the

12  record, Robert Schmidt from Kramer Levin on behalf of the

13  committee.

14          Your Honor, the committee did with its advisors look

15  closely at these transactions and did an investigation and is

16  satisfied that the debtors has exercised an appropriate

17  exercise of the debtors' business judgment.  The committee is

18  very focused on the potential for increase in claims and that's

19  really the most important aspect of the wind down for the

20  committee.

21          While three million dollars is three million dollars,

22  firstly it's not particularly significant in the context of

23  this case.  More importantly from the committee's perspective,

24  it's not likely to enhance the committee's recoveries at all.

25  It does not go to the general unsecured -- it does not go to

Page 30

```
 1    satisfy the general unsecured claim pool.

 2              So we are much more focused on the avoidance of

 3    potential expenses down the road if this transaction doesn't

 4    consummate.  And we believe that the debtor has appropriately

 5    exercised its business judgment.  As Mr. Karotkin pointed out,

 6    there's a separate independent board that does include

 7    designees of the committee.  We have every reason to believe

 8    that they exercised with all due diligence their obligations

 9    and fulfilled their fiduciary duties.

10              So with that, Your Honor, the committee is supportive

11    of the debtors position in going forward with the transaction

12    as is.

13              THE COURT:  Okay.  Thank you.  Anybody else before I

14    give Mr. Schrager a chance to respond?  Mr. Schrager, reply?

15              MR. SCHRAGER:  Your Honor, just in conclusion I think

16    that Punch should be afforded the opportunity to have someone

17    look at the two transactions and say which is the higher and

18    better offer, as opposed to simply the board saying that in

19    their business judgment that makes sense.  We keep hearing

20    about these --

21              THE COURT:  Pause pleas, Mr. Schrager.  If you are

22    talking about me as that someone that would change the standard

23    by which we judges look at these from a business judgment

24    standard to a best interest of the estate standard which we use

25    in 9019s and some limited other matters but historically have
```

Page 31

1    not applied to 363 transactions, most significant of course

2    being the one earlier in this case after the three days of

3    trial leading up to my opinion which is now published around

4    the time of the fourth of July weekend of 2009.  Were you

5    talking about some independent fiduciary whom I might appoint

6    or were you talking about me?

7                  MR. SCHRAGER:  No, I was talking about an independent

8    fiduciary looking at it, Your Honor, to determine which is

9    fairer.  The whole claim that I -- the whole argument I've

10   heard as to why the new GM offer is better than the Punch offer

11   is very simple.  They're increased liabilities.  I don't know

12   what they're talking about.  They themselves in their own

13   papers say they don't believe that they're liable.  We're

14   talking about a speculation that there's some increased

15   liability that we don't think we're liable for but maybe we

16   are.  And for that reason, we're going to turn down three

17   million dollars as opposed to $1.28.

18                  Your Honor, it's that black and white.  We have an

19   illusionary claim that there is some liability and for that we

20   should balance against hard cash.  That's -- it's fairly black

21   and white, just on that point alone.  I don't see where Your

22   Honor can say that that is an exercise of good business

23   judgment.  I don't see where anyone can say that.

24                  THE COURT:  Okay.  Thank you.  All right.  We'll take

25   a recess.  I would like everybody back here at 11 o'clock and I

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 39

Page 32

1    will rule on that matter.

2              (The Court is in recess at 10:54 a.m.)

3              THE CLERK:  All rise.  Have seats, please.

4              ^THE COURT:  I apologize for keeping you all waiting.

5    Folks, I am approving the sale of the stock of the Strasbourg

6    transmission manufacturing subsidiary to the new GM affiliate

7    finding that the standards for approval of the sale under

8    Lionel and its progeny and my earlier extensive discussion of

9    the law underlying 363 sales in the earlier decision in this

10   case that I issued on the fourth of July weekend of 2009 have

11   been fully satisfied.  My findings of fact, conclusions of law

12   and basis for the exercise of my discretion in connection with

13   this determination follow.

14             Punch didn't request an evidentiary hearing here.

15   However, I likely wouldn't have granted one anyway as I see no

16   material disputed issues of fact.  The undisputed facts in this

17   case show both "good business reason for the sale," as required

18   under the Second Circuit's decision in Lionel and its progeny,

19   and also an appropriate exercise of business judgment which is

20   the standard for approval of transactions of this character

21   involving sales under 363.

22             The basis for the business judgment include the

23   extensive marketing effort that took place before today, the

24   review of a disinterested board, the certainty of closing the

25   transaction that the debtors asked me to approve, the increased

09-50026-mg    Doc 6904    Filed 09/07/10    Entered 09/13/10 15:31:03    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 33 of 39

Page 33

1    certainty for saving up to twelve hundred jobs, the ability to

2    more seamlessly proceed with the collective bargaining

3    agreement and decreased claims against the estate included but

4    not limited to the arguably separate issue of the ability to

5    resolve the BMW litigation which is complex and which has in

6    addition to the usual commercial issues, forum selection issues

7    that also impact upon the underlying controversy.

8            When the creditors committee observed that it

9    supported the sale, it didn't surprise me that the creditors

10   committee was satisfied with the exercise of business judgment

11   here or that the creditors committee supported the sale, for

12   among other reasons it's potential to reduce the claims against

13   the estate which are an important aspect of creditors

14   recoveries in this case.

15           As a conclusion of law, I must reject Punch's implied

16   suggestion that I should conduct my own review of which

17   purchaser is more in the interest of the estate and its express

18   suggestion that I should appoint some kind of independent

19   fiduciary to evaluate the two offers and choose the better one.

20           My questioning in oral argument suggested my

21   difficulties with each approach.  The first, that anything

22   other than a business judgment test or as stated slightly

23   differently, a good business reason test, is inconsistent with

24   the law.  I discussed it at length last year, canvassing the

25   authority in this area albeit it in the context of a much more

MOTORS LIQUIDATION COMPANY, et al.

Page 34

1    extensive sale, a 363 motion is determined by a business

2    judgment test, not a best interest of the estate test such as

3    by way of example, a 9019 motion would be.

4         And the arguments I heard were couched in terms of

5    business judgment.  Ultimately, they were in a best interest

6    analysis asking me to determine that Punch's offer really was

7    the better one for the creditors in this case.  I or any other

8    judge should not appropriately be making a determination based

9    on those standards in a request for a 363 approval.

10        Similarly, there is no authority for the notion that

11   we judges should appoint one or more independent fiduciaries to

12   evaluate competing offers to determine which is better for the

13   estate, especially when a debtor is under the control of an

14   independent and disinterested board and where the transaction

15   has the support of the creditors committee which is, of course,

16   a fiduciary of a more statutorily recognized type which also

17   has at least in this context, needs and concerns that are very

18   similar to those that I or any other judge would have.

19        Accordingly, the debtor is to settle an order in

20   accordance with this ruling on no less than two business days

21   notice by hand, fax or email or seven calendar days notice if

22   it chooses to issue notice of settlement by snail mail, by US

23   mail.

24        The stay of effectiveness of this order, however,

25   will not be waived.  Therefore, permitting a request for a stay

1    of this ruling at the district court if one is desired.  I will

2    say, however, that considering the needs of the debtor in this

3    case and the best interest of the estate and what I perceive to

4    be the not particularly close issues in this case, and the

5    other standards for a stay -- seeking a stay pending appeal,

6    you can and should if you take it up the street, tell the

7    district court that I have considered whether I should issue a

8    stay.  I have determined that I should not; that is, no stay

9    beyond the period provided under the bankruptcy rules and that

10   any further application to the bankruptcy court for a stay

11   pending appeal is dispensed with and waived.  Any stay requests

12   should go to the district court, not  to me.  I don't think

13   it's close enough to warrant me issuing a more extensive stay

14   ruling or granting a stay myself.

15          Now, Mr. Karotkin, on the BMW understandings which

16   were reached so recently, is it your thought that there will be

17   a formal 9019 at least with respect to the adversary or how is

18   that going to proceed?

19          MR. KAROTKIN:  Well, Your Honor, I really haven't

20   thought about it that much but my initial thought was simply to

21   embody that in the sale order in connection with the assumption

22   and assignment of the contract.

23          THE COURT:  The parties whose ox would be gored by

24   that kind of a determination would be the unsecured creditor

25   community and the US government, which still has claims as a

MOTORS LIQUIDATION COMPANY, et al.

Page 36

1   secured creditor -- do I still have a US Attorney Office

2   representative here?  I guess I need to know from the two main

3   creditor constituencies whether they would be comfortable with

4   that approach or whether they need the debtor to do anything

5   more extensive.

6         MR. CORDARO:  Good morning, Your Honor.  Joseph

7   Cordaro from the United States Attorney Office from the

8   Southern District of New York.

9         And not in an attempt to circumvent Your Honor's

10  question but as Mr. Karotkin noted, this is the first we're

11  hearing about this also.  So we haven't had a chance to

12  evaluate it either.  So at this point, we would just like to

13  evaluate it and then get into contact with Mr. Karotkin with

14  the government's position on that.

15        THE COURT:  Mr. Schmidt?

16        MR. SCHMIDT:  Yes, Your Honor.  From the committee's

17  perspective, we'll certainly want to take a look at the details

18  and we will certainly move as quickly as possible to review the

19  settlement within the time frame contemplated by the notice of

20  settlement order and so forth.

21        THE COURT:  Okay.  Mr. Karotkin, I would waive a more

22  extensive 9019 presentation on the basis that the two parties

23  whose ox's have been gored know what this is about as such time

24  as they're comfortable with waiver.  But I think you need to

25  get their okay.  If you can give me a green light with some

MOTORS LIQUIDATION COMPANY, et al.

Page 37

1   kind of written consent after each has had the opportunity to

2   do its due diligence, I would do it.  Otherwise, you'll have to

3   tee up a simple 9019.

4           MR. KAROTKIN:  Very well, sir.  Thank you.

5           THE COURT:  Okay.  Do we have any further GM business

6   today?

7           MR. KAROTKIN:  No, I don't believe so.

8           THE COURT:  Okay.  Thank you.

9       (Whereupon these proceedings were concluded at 11:29 AM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 38

1

2                          I N D E X

3

4                          RULINGS

5                                              Page       Line

6   Application for Approval of the Success Fee -

7   granted                                     9          5

8   Application for Amendment of AP Services

9   retention agreement - granted               9          5

10  US Trustee objection to fees - sustained    15         9

11

12  Sale of the stock of the Strasbourg

13  transmission manufacturing subsidiary

14  to the new GM affiliate - approved          32         5

15

16

17

18

19

20

21

22

23

24

25

Page 39

1

2

3                    C E R T I F I C A T I O N

4

5      I, Dena Page, certify that the foregoing transcript is a true

6      and accurate record of the proceedings.

7

8      _____

9      DENA PAGE

10

11     Veritext

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date:  September 8, 2010

17

18

19

20

21

22

23

24

25