**Hearing Date:  September 24, 2010 at 9:45 a.m. (Eastern Time)**
**Objection Deadline:  September 17, 2010**

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
David L. Neale (DN 1948)

Attorneys for Dealer, First United Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                            :
**In re**                                                   :          **Chapter 11 Case No.**
                                                            :
**MOTORS LIQUIDATION COMPANY,** *et al* ,                   :          **09-50026 (REG)**
         **f/k/a General Motors Corp.,** *et al.*           :
                           **Debtors.**                     :          **(Jointly Administered)**
                                                            :
                                                            :
---------------------------------------------------------------x

**REPLY OF FIRST UNITED INC. TO DEBTORS' THIRTY-SECOND OMNIBUS**
**OBJECTION TO CLAIMS AND NOTICE OF FILING OF AMENDED PROOF OF**
**<u>CLAIM</u>**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

1.      First United Inc. (**"Dealer"**) hereby files this: (a) reply to the Thirty-Second Omnibus Objection To Claims (the **"Objection"**) filed by Motors Liquidation Company (f/k/a General Motors Corporation) (**"MLC"**) and its affiliated debtors, as debtors in possession (the **"Debtors"**), and (b) notice of filing of amended proof of claim.

2.      On November 27, 2010, First United filed a proof of claim against the Debtors (the **"Original Claim"**). The Original Claim, without exhibits, is attached hereto as Exhibit "1".

3.      On or about July 2, 2010, the Debtors filed the Objection, asserting that First United's Original Claim is incorrectly classified as a secured claim.  Further, the Debtors erroneously assert that the Original Claim "arises from the rejection of an executory contract. It is not secured by property of the Debtor' estate nor is it entitled to priority status.  Pursuant to Section 502(g) [of] the Bankruptcy Code this claim is only entitled to a non-priority, general unsecured claim.  Accordingly, this claim should be reclassified as a non-priority, general unsecured claim." (See Objection, Exhibit A, page 1.)

4.      The Debtors' characterization of the Original Claim as a "claim that arises from the rejection of an executory contract" is not accurate in as much as the Debtors are asserting that the "Debtors' Motion Pursuant To 11 U.S.C. § 365 Authorizing (A) The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain Related Relief" (the "Rejection Motion") was granted by the Court as the Rejection Motion relates to First United.  The Rejection Motion was not granted as to First United.  The Debtors' attorneys have advised counsel for First United that the Debtors will clarify this point

2

by way of a supplemental filing with the Court.  To date, no such supplemental filing has been made.

5.      To address the Debtors' assertion that the Original Claim is incorrectly classified as a secured claim, on September 17, 2010, First United amended its proof of claim (the **"Amended Claim"**).  The Amended Claim is attached hereto as Exhibit "2".  The Amended Claim addresses, and renders moot, the Debtor's objection.

6.      First United requests that the Debtors withdraw their Objection, as to the Original Claim, or, alternatively, respectfully requests that the Court deny the Objection as to the Original Claim as moot.  First United hereby reserves all of its rights and remedies in respect of the Amended Claim.

DATED: September 17, 2010            LEVENE, NEALE, BENDER, YOO
                                    & BRILL L.L.P.

                                    By:      _____/s/ David L. Neale_____
                                         DAVID L. NEALE (DN 1948)
                                         10250 Constellation Blvd., Suite 1700
                                         Los Angeles, CA 90067
                                         Telephone: (310) 229-1234
                                         Facsimile:  (310) 229-1244
                                         dln@lnbyb.com

                                         Attorneys for Dealer, First United Inc.

**EXHIBIT 1**

7008684

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | **PROOF OF CLAIM**
---|---

Name of Debtor  (Check Only One):
☒ Motors Liquidation Company (f/k/a General Motors Corporation)
☐ MLCS, LLC (f/k/a Saturn, LLC)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.)

Case No.
09-50026 (REG)
09-50027 (REG)
09-50028 (REG)
09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):  FIRST UNITED INC.

Name and address where notices should be sent:

FIRST UNITED INC.
Attn:  David Wick
5440 MOOREHOUSE DRIVE
SUITE 4000
SAN DIEGO CA 92121

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Telephone number:  (858) 623-9000, Ext 700
Email Address:  dwick@natent.com

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

1. Amount of Claim as of Date Case Filed, June 1, 2009:   $ 4,337,777

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. Basis for Claim:   See attached Supplement
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☒ Other
Describe:   Setoff rights pursuant to 11 U.S.C. Section 553

Value of Property: $ _____  Annual Interest Rate ____ %

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $ _____

Basis for perfection:   Secured claim subject to determination

Amount of Secured Claim: $ _____    Amount Unsecured: $ _____

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

Amount entitled to priority:

$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

Date: 11/25/09   Signature: The person filing this claim must sign it.  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.



David Wick, Authorized Agent

FOR COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

9795579132

5

**In re General Motors Corp.,** *et al.*
**Chapter 11 Case No. 09-50026 (REG)**
**(Jointly Administered)**

SUPPLEMENT TO PROOF OF CLAIM FILED BY FIRST UNITED, INC.

## A.    Background Facts

1.    On or about June 1, 2009, General Motors Corporation ("**GM**") commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York. No trustee has been appointed, and GM continues to manage its affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    On or about June 2, 2009, First United, Inc. ("**Dealer**") received from GM a letter dated June 1, 2009 (the "**Termination Letter**") advising Dealer, without any explanation whatsoever, that the "Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long term basis." A true and correct copy of the Termination Letter is attached as Exhibit "A" hereto. The Termination Letter also included a "Wind-Down Agreement," which provided, *inter alia*, that GM "has considered moving ... to reject the Dealer Agreement" unless Dealer executed the Wind-Down Agreement. The Wind-Down Agreement contained terms which were extremely economically harmful to Dealer and which Dealer believed to be highly unfair and improper: GM offered Dealer only $150,000 to compensate for the loss of the goodwill associated with a business that has existed for almost thirty years.    Thus, Dealer was presented not with an opportunity for what GM has characterized as a "soft landing" but rather with a "Hobson's Choice" – either accept unfavorable wind down terms that provided little, if any, value to Dealer, or face termination of the Agreement which will destroy Dealer's business entirely.

3.    On June 8, 2009, and again on June 12, 2009 and June 21, 2009, Dealer responded to the Termination Letter and made a Request for Review.    Copies of this correspondence are attached as Exhibit "B" hereto.

4.    During that time, Dealer continued to market Cadillac vehicles and requested that GM deliver additional vehicles for sale. Since the Agreement had not been terminated, Dealer repeatedly requested clarification from GM as to whether warranty and service obligations would be honored by GM.

5.    GM failed to respond to Dealer's inquiries for several weeks, while Dealer continued to operate its dealership in reliance upon and conformity with the Agreement. Dealer was subsequently advised by GM that, because Dealer had elected not to sign the Wind-Down Agreement, Dealer would no longer be supplied new vehicles, and warranty and service obligations would not be honored.

6.    In the meantime, GM sold substantially all of its assets to Vehicle Acquisition Holdings LLC ("**Purchaser**"). In connection with the sale of its assets to Purchaser, GM

1

assumed and assigned certain dealership agreements but did not initially assume and assign Dealer's Agreement.

7.      GM assumed and assigned to Purchaser certain agreements with other dealers located in the same general geographic area as Dealer, despite Dealer's superior performance and long history of sales.

## B.      Franchise Agreement Offered To Dealer By GM

8.      On or about July 6, 2009, GM filed the "Omnibus Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. § § 105 and 365 Authorizing (A) The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain Related Relief" (the **"Rejection Motion"**). The Rejection Motion sought to reject that certain 2005 GM Dealer Sales and Service Agreement, as amended or modified (the **"Pre-petition Agreement"**) by and between Dealer and GM. Attached hereto as Exhibit "C" is a true and complete copy of the Pre-petition Agreement.

9.      On or about July 27, 2009, Dealer filed an opposition to the Rejection Motion (the **"Opposition"**). On or about July 31, 2009, counsel for GM contacted counsel for Dealer and informed counsel for Dealer that GM intended to offer Dealer a franchise agreement.

10.      On or about August 10, 2009, Dealer entered into a franchise agreement (the **"Franchise Agreement"**) with GM. Attached hereto as Exhibit "D" is a true and correct copy of the Franchise Agreement.

## C.      Dealer's Claims Pursuant To The Pre-petition Agreement

11.      While GM has offered Dealer, and Dealer has entered into, a Franchise Agreement, GM's attempt to reject the Pre-petition Agreement has caused Dealer significant damage. Specifically, GM shut down Dealer's website, provided Dealer's customer lists to Dealer's competitors and advertised the closure of Dealer's business. As a result of GM's attempt to reject the Pre-petition Agreement and GM's actions in respect of GM's attempt to reject the Pre-petition Agreement, Dealer has been forced to incur expenses and has lost significant business and, as a result, profits.

12.      From the period from June 1, 2009 through September 30, 2009, which is the period during which GM failed and refused to honor its obligations under the Pre-Petition Agreement and sought to reject the Pre-petition Agreement, Dealer experienced actual losses from operations of approximately $645,777 (the **"Current Loss"**). Attached hereto as Exhibit "E" is a true and complete copy of Dealer's "Statement Of Operations" which quantifies Dealer's Actual Loss during the relevant period.

13.      As a result of GM's failure and refusal to honor the terms of the Pre-petition Agreement, Dealer has also suffered damages in the form of lost future gross sales. Dealer projects that it has lost approximately $18,893,750 in gross sales through 2014 as a result of GM's attempt to reject the Pre-petition Agreement. Attached hereto as Exhibit "F" is a true

2

and complete copy of "Dealer's Projected Reduction In Number Of Cadillacs Sold By De La Fuente Cadillac Due To GM Closing & Re-Opening The Franchise" which quantifies the Projected Gross Sale Loss. Based upon an average profit margin of $2,000 per vehicle sold plus future service and warranty business of $4,000 per vehicle sold, Dealer anticipates a loss of approximately $2,268,000 through 2014 as a result of, among other improper action, GM's failure and refusal to honor the terms of the Pre-petition Agreement (the "**Additional Profit Loss**").

14.     Also as a result of GM's failure and refusal to honor the terms of the Pre-petition Agreement, Dealer projects that it will incur marketing expenses that Dealer otherwise would not have incurred had GM not impaired Dealer's operations. Dealer projects that Dealer will expend approximately $424,000 in such marketing and advertisement expenses through 2014 as a result of GM's violation of the terms of the Pre-petition Agreement (the "**Additional Marketing Loss**"). Attached hereto as Exhibit "G" is a true and complete copy of the "Projected Additional Marketing Expenses Due To GM Closing & Re-Opening The Franchise" which quantifies the Projected Additional Marketing Loss.

15.     GM is also liable to Dealer for: (1) any claims and causes of action brought against Dealer as a result of GM's fault for safety design, defective parts, product liability claims, and any other claims based upon pre-petition conduct which Dealer may be required to defend as a result of GM's actions; and (2) damages and losses sustained by Dealer as a result of GM's business practices which have undermined Dealer's enterprise, which business practices include, without limitation, requiring Dealer to accept unwanted or obsolete parts and tools as a condition of securing desired models, and a concerted effort by GM to allocate more desirable models to Dealer's competitors while failing to reasonably deliver the same models to Dealer (collectively the "**GM Liability Claim**"). Dealer's GM Liability Claim is in an amount not yet determined, but which Dealer anticipates exceeds $1,000,000. Dealer hereby reserves its right to amend its Proof of Claim to reflect actual and additional GM Liability Claim amounts discovered to be owed by GM to Dealer.

16     In summary, Dealer's claims against GM are comprised of at least the following (collectively the "**Claim**"):

| **Claim Description** | **Claim Amount** |
|---|---|
| Current Loss | $645,777 |
| Additional Profit Loss | $2,268,000 |
| Additional Marketing Loss | $424,000 |
| GM Liability Claim | $1,000,000 |
| **TOTAL CLAIM:** | **$4,337,777** |

## D.     Reservation Of Rights

17.     Dealer reserves the right to amend, modify or supplement its Claim. Each and every document attached hereto is incorporated by and is a part of Dealer's Claim. By filing this Claim, Dealer intends to provide notice to GM: (a) of any and all claims set forth in the exhibits attached hereto and the documents incorporated herein; (b) that Dealer asserts any and

3

**EXHIBIT 2**



7015770



| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor** (Check Only One):
☒ Motors Liquidation Company (f/k/a General Motors Corporation)
☐ MLCS, LLC (f/k/a Saturn, LLC)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.)

**Case No.**
09-50026 (REG)
09-50027 (REG)
09-50028 (REG)
09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property): FIRST UNITED INC.

**Name and address where notices should be sent:**
FIRST UNITED INC.

ATTN: DAVID WICK
5440 MOOREHOUSE DRIVE
SUITE 4000
SAN DIEGO CA 92121

Telephone number: (858) 623-9000  Ext. 700
Email Address: dwick@natent.com

☒ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** 58889
*(If known)*

Filed on: November 27, 2009

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**Name and address where payment should be sent (if different from above):**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $ 4,337,777

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** See attached Supplement.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe:

**Value of Property:** $_____  **Annual Interest Rate** ___%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

**5.**  **Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).
☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

**Date:** 09/17/10

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

David Wick, Authorized Agent

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

3856874989

10

**In re General Motors Corp.,** *et al*.
**Chapter 11 Case No. 09-50026 (REG)**
**(Jointly Administered)**

SUPPLEMENT TO AMENDED PROOF OF CLAIM FILED BY FIRST UNITED, INC.

**A.      Background Facts**

1.      On or about June 1, 2009, General Motors Corporation ("**GM**") commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.  No trustee has been appointed, and GM continues to manage its affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      On or about June 2, 2009, First United, Inc. ("**Dealer**") received from GM a letter dated June 1, 2009 (the "**Termination Letter**") advising Dealer, without any explanation whatsoever, that the "Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long term basis."  A true and correct copy of the Termination Letter is attached as Exhibit "A" hereto.  The Termination Letter also included a "Wind-Down Agreement," which provided, *inter alia*, that GM "has considered moving … to reject the Dealer Agreement" unless Dealer executed the Wind-Down Agreement.  The Wind-Down Agreement contained terms which were extremely economically harmful to Dealer and which Dealer believed to be highly unfair and improper: GM offered Dealer only $150,000 to compensate for expenses incurred and the loss of the goodwill associated with closing a business that has existed for almost thirty years.  Thus, Dealer was presented not with an opportunity for what GM has characterized as a "soft landing", but rather with a "Hobson's Choice" – either accept unfavorable wind down terms that provided little, if any, value to Dealer, or face termination of the Agreement which will destroy Dealer's business entirely.

3.      On June 8, 2009, and again on June 12, 2009 and June 21, 2009, Dealer responded to the Termination Letter and made a Request for Review.  Copies of these communications are attached as Exhibit "B" hereto.

4.      During that time, Dealer continued to market Cadillac vehicles and requested that GM deliver additional vehicles for sale.  Since the Agreement had not been terminated, Dealer repeatedly requested clarification from GM as to whether warranty and service obligations would be honored by GM.

5.      GM failed to respond to Dealer's inquiries for several weeks, while Dealer continued to operate its dealership in reliance upon and conformity with the Agreement.  Dealer was subsequently advised by GM that, because Dealer had elected not to sign the Wind-Down Agreement, Dealer would no longer be supplied new vehicles, and warranty and service obligations would not be honored.

6.      In the meantime, GM sold substantially all of its assets to Vehicle Acquisition Holdings LLC (**"Purchaser"**).  In connection with the sale of its assets to Purchaser, GM

1

assumed and assigned certain dealership agreements, but did not initially assume and assign Dealer's Agreement.

7.       GM assumed and assigned to Purchaser certain agreements with other dealers located in the same general geographic area as Dealer, despite Dealer's superior performance and long history of sales.

**B.      Franchise Agreement Offered To Dealer By GM**

8.       On or about July 6, 2009, GM filed the "Omnibus Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. § § 105 and 365 Authorizing (A) The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting  Certain Related Relief" (the "**Rejection Motion**").  The Rejection Motion sought to reject that certain 2005 GM Dealer Sales and Service Agreement, as amended or modified (the "**Pre-petition Agreement**") by and between Dealer and GM.  Attached hereto as Exhibit "C" is a true and complete copy of the Pre-petition Agreement.

9.       On or about July 27, 2009, Dealer filed an opposition to the Rejection Motion (the "**Opposition**").  On or about July 31, 2009, counsel for GM contacted counsel for Dealer and informed counsel for Dealer that GM intended to offer Dealer a franchise agreement.

10.      On or about August 10, 2009, Dealer entered into a franchise agreement (the "**Franchise Agreement**") with GM.  Attached hereto as Exhibit "D" is a true and correct copy of the Franchise Agreement.

**C.      Dealer's Claims Pursuant To The Pre-petition Agreement**

11.      While GM has offered Dealer, and Dealer has entered into, a Franchise Agreement, GM's attempt to reject the Pre-petition Agreement has caused Dealer significant damage.  Specifically, GM shut down Dealer's website, provided Dealer's customer lists to Dealer's competitors and advertised the closure of Dealer's business.  As a result of GM's attempt to reject the Pre-petition Agreement and GM's actions in respect of GM's attempt to reject the Pre-petition Agreement, Dealer has been forced to incur expenses and has lost significant business and, as a result, profits.

12.      From the period from June 1, 2009 through September 30, 2009, which is the period during which GM failed and refused to honor its obligations under the Pre-Petition Agreement and sought to reject the Pre-petition Agreement, Dealer experienced actual losses from operations of approximately $645,777 (the "**Current Loss**").  Attached hereto as Exhibit "E" is a true and complete copy of Dealer's "Statement Of Operations" which quantifies Dealer's Actual Loss during the relevant period.

13.      As a result of GM's failure and refusal to honor the terms of the Pre-petition Agreement, Dealer has also suffered damages in the form of lost future gross sales.  Dealer projects that it has lost approximately $18,893,750 in gross sales through 2014 as a result of GM's attempt to reject the Pre-petition Agreement.  Attached hereto as Exhibit "F" is a true

2

and complete copy of "Dealer's Projected Reduction In Number Of Cadillacs Sold By De La Fuente Cadillac Due To GM Closing & Re-Opening The Franchise" which quantifies the Projected Gross Sale Loss. Based upon an average profit margin of $2,000 per vehicle sold plus future service and warranty business of $4,000 per vehicle sold, Dealer anticipates a loss of approximately $2,268,000 through 2014 as a result of, among other improper action, GM's failure and refusal to honor the terms of the Pre-petition Agreement (the "**Additional Profit Loss**").

14.     Also as a result of GM's failure and refusal to honor the terms of the Pre-petition Agreement, Dealer projects that it will incur marketing expenses that Dealer otherwise would not have incurred had GM not impaired Dealer's operations. Dealer projects that Dealer will expend approximately $424,000 in such marketing and advertisement expenses through 2014 as a result of GM's violation of the terms of the Pre-petition Agreement (the "**Additional Marketing Loss**"). Attached hereto as Exhibit "G" is a true and complete copy of the "Projected Additional Marketing Expenses Due To GM Closing & Re-Opening The Franchise" which quantifies the Projected Additional Marketing Loss.

15.     GM is also liable to Dealer for: (1) any claims and causes of action brought against Dealer as a result of GM's fault for safety design, defective parts, product liability claims, and any other claims based upon pre-petition conduct which Dealer may be required to defend as a result of GM's actions; and (2) damages and losses sustained by Dealer as a result of GM's business practices which have undermined Dealer's enterprise, which business practices include, without limitation, requiring Dealer to accept unwanted or obsolete parts and tools as a condition of securing desired models, and a concerted effort by GM to allocate more desirable models to Dealer's competitors while failing to reasonably deliver the same models to Dealer (collectively the "**GM Liability Claim**"). Dealer's GM Liability Claim is in an amount not yet determined, but which Dealer anticipates exceeds $1,000,000. Dealer hereby reserves its right to amend its Proof of Claim to reflect actual and additional GM Liability Claim amounts discovered to be owed by GM to Dealer.

16     In summary, Dealer's claims against GM are comprised of at least the following (collectively the "**Claim**"):

| Claim Description | Claim Amount |
|---|---|
| Current Loss | $645,777 |
| Additional Profit Loss | $2,268,000 |
| Additional Marketing Loss | $424,000 |
| GM Liability Claim | $1,000,000 |
| **TOTAL CLAIM:** | **$4,337,777** |

## D.     Reservation Of Rights

17.     Dealer reserves the right to amend, modify or supplement its Claim. Each and every document attached hereto is incorporated by and is a part of Dealer's Claim. By filing this Claim, Dealer intends to provide notice to GM: (a) of any and all claims set forth in the exhibits attached hereto and the documents incorporated herein; (b) that Dealer asserts any and

3

all of its rights and remedies at law or under the operative documents, including any and all cross and counter-claims.  To the extent it is determined that any claim herein properly lies against any jointly administered entity, Dealer hereby gives notice of its intent that Dealer's Claim be deemed filed in any such case against any such entity.  Dealer also reserves the right to assert any portion of the Claim as a secured claim based upon any right to setoff pursuant to 11 U.S.C. § 553.  Nothing in Dealer's Claim is intended to limit Dealer's rights against any third party or any rights it has at law or in equity.  Dealer reserves all rights to further assert and pursue any post-petition administrative claims against GM and GM's estate.  Dealer believes that some or all of the Claim may be an administrative claim and reserves its rights to bring such Claim as a claim entitled to priority under 11 U.S.C. §§ 507(a)(2) and 503(b).

18.     Specifically, Dealer hereby reserves all of its rights and remedies to bring additional claims against GM and Purchaser as a result of GM's violation of the Pre-Petition Agreement and any and all post-petition actions by GM.  Although GM ultimately offered Dealer a Franchise Agreement, prior to Dealer filing the Opposition, it was GM's and Purchaser's intent to reject Dealer's Agreement.  In violation of the Pre-Petition Agreement, and by way of example and not limitation, GM shut down Dealer's website, provided Dealer's customer lists to competitors of Dealer, and undertook other activity that has resulted in a loss of sales to Dealer.  By attempting to terminate the Agreement, GM and potentially Purchaser have caused significant damages to Dealer's business, which damages Dealer will seek to recover.  Dealer hereby reserves its rights to bring any and all such claims for GM's and Purchaser's post-petition conduct which has damaged Dealer.

19.     The foregoing is an estimate based on information available to Dealer at the time of the preparation of Dealer's Claim.  To the extent that Dealer discovers additional information regarding Dealer's Claim, Dealer hereby expressly reserves any and all rights to amend or supplement its Claim as necessary.

# EXHIBIT A



## General Motors Corporation

June 1, 2009

VIA Federal Express

First United Inc.
1385 E Main St
El Cajon, CA  92021

Attention:  Roque De La Fuente II

7

        This letter is to advise you that the Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Cadillac dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before **June 12, 2009**.

        In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

* For the termination of the Dealer Agreement no earlier than January 1, 2010 and no later than October 31, 2010
* For the assignment and assumption of the Dealer Agreement, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "363 Acquirer")
* For the payment of financial assistance in installments in connection with the orderly winding down of your Cadillac operations
* For the waiver of any other termination assistance of any kind
* For a release of claims against GM, the 363 Acquirer and their related parties
* For dealership operations to continue pursuant to the Dealer Agreement, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreement, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

        Given that the enclosed agreement provides your dealership with the ability to wind-down the Cadillac dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before **June 12, 2009**. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreement (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before **June 12, 2009**, GM will apply to the bankruptcy court to reject your Dealer Agreement. If we reject the Dealer Agreement, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreement.

        While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Cadillac dealership business and to sell your Cadillac new Motor Vehicle inventory in an orderly fashion.

        If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

                                Sincerely,

                                GENERAL MOTORS CORPORATION

16

## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between First United Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer Agreement") for Cadillac motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").    No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all of Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.    As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer.    If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2. <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3. <u>Payment to Dealer.</u>

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of  $150,632 (the "<u>Wind-Down Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "<u>Open Account</u>"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "<u>Final Payment Amount</u>") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time

periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)  In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.  Complete Waiver of All Termination Assistance Rights.  In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)  Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to the either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

19

6. <u>Subject Dealership Operations</u>.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7. <u>No Protest.</u>

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

20

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5.   Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination and cancellation, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby

expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(f) The terms of this Section 5 shall survive the termination of this Agreement.

(b) Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein..

(d)     Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(e)     Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8.   Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. Binding Effect. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. Effectiveness. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13. Continuing Jurisdiction.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. Other Agreements.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the

terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c)  All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach.  In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties.  This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows[*

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

First United Inc.

By: _____

Name:_____

Title:_____


**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative


**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

## EXHIBIT A

## SAMPLE SUPPLEMENTAL WIND-DOWN AGREEMENT

THIS SUPPLEMENTAL WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Wind-Down Agreement dated June __, 2009 (the "Original Wind-Down Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Wind-Down Agreement.

C.    [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Wind-Down Agreement to the 363 Acquirer.]

D.    Pursuant to the Original Wind-Down Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between [GM or the 363 Acquirer] and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Wind-Down Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.  Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Wind-Down Agreement.

2. Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any Manufacturer warranty claims approved and paid by GM prior to the effective date of termination and cancellation, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or Original Wind-Down Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. Binding Effect. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding

upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. Continuing Jurisdiction. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. No Reliance. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

# EXHIBIT B

 *De La Fuente Cadillac*

June 8, 2009                                                <u>VIA EMAIL ONLY</u>

General Motors
515 Marin Street
Thousand Oaks, CA 91360

Reference: <u>BAC No: 119153</u>
           <u>De La Fuente Cadillac</u>
           <u>El Cajon, California</u>

Gentlemen:

We have received a copy of the notice for the non renewal of our Franchise Agreement.
We have no intention of executing the *Wind-Down Agreement* and returning it to your office by
the imposed deadline. We believe that the path chosen by GM in severing ties with such a large
number of its dealers is both unprecedented, improper, and hardly in the best interest of General
Motors, itself. This letter is tendered to appeal your arbitrary decision to sever ties with our
company and shall serve as a Request for Review.

The potential damage to the image of GM caused by the cancellation of its dealership network is
irreversible, as long-standing retailers are forced out of business. Franchisees are not creditors,
whose claims bring about insolvency. On the contrary, they are assets of GM, whose future
viability depends on a dynamic dealer network to serve as its representatives and promoters in
the market place.

De La Fuente Cadillac has been serving San Diego's East County for almost 30 years, and a
member of the Better Business Bureau, where it has attained an "A+" rating, for almost 25 years.
For calendar year 2008, it merited a Retail Sales Index rating of 151.59. While it was not ranked
in the top 15% of Cadillac dealers in 2008, over the years, it has always been a consistent
performer. Last year it finished 30th out of the Western Region's 75 dealerships, selling in excess
of 50 percent more vehicles than the state average. In these twelve months, De La Fuente
Cadillac sold nearly twice as many mid size luxury sedans than the state average. In fact, our

Page 2
June 8, 2009
General Motors

operation exceeded the state average in every classification with the exception of Escalade ESV.
For the years 2003 through 2007 our RSI rating has been 131.20, 105.57, 101.23, 108.61, and
112.22, respectively. By your own criteria, our performance has never been evaluated as
anything less than satisfactory.

While total sales at our dealership declined in 2008 from that of the previous year, our ranking in
the Western Division surged from 47th position to 30th. De La Fuente Cadillac has retained a
satisfactory Retail Sales Index rating, year after year, always out performing the state's average
number of sales. We need not dwell on the financial health of the American automotive industry,
where in the first four months of 2009, 22 of the 25 Cadillac dealers in Southern California
experienced a decrease in sales over the same period from the previous year. What is sometimes
lost in an analysis of all the numbers is that De La Fuente has been a steady consistent performer
for GM. In a robust economy, certain dealerships prevail, but they are but a *flash in the pan* in a
tough market. In the first four months of 2009, De La Fuente experienced the smallest decline in
sales of the four San Diego Cadillac franchises, over the same period compared with 2008.
While the numbers are certainly not great, our drop in sales has been less than the average 50%
reported by like dealers in the Western Region. This is indicative of the fact that our operation
has been a dependable and steadfast vendor for Cadillac, year in and year out. Consistency is one
of the most valuable, but often overlooked, qualities in automotive dealerships.

But these are not just a mere agglomeration of figures. Let us share with you some additional
facts, of which you may not be aware. De La Fuente Cadillac has been recognized as a Platinum
Dealer in six of the last twelve years. In 2007, we were one of only two Cadillac dealerships in
the State to receive this special award and last year one of only three. Proclaimed a General
Motors Master Dealer in 2000, 2002, and 2003, we were the recipient of the President's Award
Trophy, a special honor bestowed only to an elite group of GM dealers who exemplify retail
sales and customer satisfaction excellence. In every year since, we have been in the top 10% tier
of Western Region dealers and in 2008 finished fifth out of 144 dealers. Our accomplishments
were acknowledged by then district general manager, Michael Jackson, and zone manager, Ron
McCants, reinforcing the fact that such accolades are a byproduct of hard work, commitment,
dedication, and teamwork.

Sales figures tell only a part of the story. Since January 1, 2007 to date, we have purchased over
$20 million in new vehicle inventory. In the last three years, De La Fuente Cadillac has
purchased over $1 million in parts from the factory and last year, alone, nearly three-quarters of a
million dollars from GM's Smart Auction. It is sometimes overlooked that dealerships, such as
De La Fuente Cadillac, serve as the face of Cadillac in the community, where service after a sale
is one of the most critical factors taken into account by automotive consumers. We are proud that
we have had no complaints filed against our company with the California Department of Motor
Vehicles. Our American flag, which flies high above the tree line in El Cajon, is a site noted by
thousands of commuters and travelers who daily drive through East County. Seldom does a day
pass where we don't find ourselves conversing with customers whose parents or grandparents
were proud owners of Cadillacs purchased at our dealership.

Page 3
June 8, 2009
General Motors

As a stand alone franchise, De La Fuente Cadillac is a great benefit to GM because, by not offering any competing automaker inventories, it does not siphon off any potential sales for the factory. We are the only Cadillac exclusive dealer in San Diego County. Multiple-brand dealerships may be a model of success for the dealers themselves, but offer little in return to the car manufacturers. Our market area is not just the City of El Cajon, but includes La Mesa, Lemon Grove, Alpine, Santee, Lakeside, and a large portion of South Bay - a demographic area in excess of million people. In addition, with the closure of the Cadillac franchise in Imperial County, the potential service area of De La Fuente would extend to Calexico, Brawley, and El Centro. The situation is compounded with the potential closure of Bob Baker Chevrolet in El Cajon. The car buying population in this region will simply stop buying your product line. GM is, in essence, abandoning a large geographic market for a short term gain.

The role of De La Fuente Cadillac extends beyond the dollars it returns to GM. Since receiving our franchise, we have generated almost $1 million in sales tax for the City of El Cajon – money that is used by local government to pay for services utilized by our customer base. Since 2001, alone, our operation has generated nearly $1 million in payroll taxes and over half a million dollars in employer paid Social Security taxes. Again, these are not just meaningless numbers, but represent employees and customers, past, present, and future. No business can succeed if the community it serves is not well positioned for future growth and success, and, at De la Fuente Cadillac, we take seriously our responsibility to support the community we serve.

Eliminating dealerships will not solve GM's problems. The severing of our long term relationship benefits no one – neither Cadillac nor the taxpayers who have provided TARP funds, and certainly not the community and our loyal customers. Even if the official position of GM is that there are too many Cadillac dealers in San Diego County, it makes no difference to GM's bottom line. Dealerships are not a cost burden. Granted, some stores will not survive the current economic environment, but that has no effect either. We take exception to the claim that excess dealerships are somehow to blame for failing to deliver a retail experience that could help woo customers back to Detroit's domestic cars and trucks.

In conclusion, this calamitous decision to consolidate dealerships is sending the wrong message to potential purchasers of the GM line of vehicles. That's all your need to remember is that when Marvin K Brown purchased the Guy Hill dealership, there was not an incremental sales increase of vehicles. We believe that by closing our operation will drive business to both Lexus and BMW - East County representative of luxury cars. Accordingly, we respectfully request your office reconsider its decision to terminate its franchise agreement with De la Fuente Cadillac.

Sincerely

Roque De La Fuente II
President

*De La Fuente Cadillac*

June 12, 2009

Mr. Mark LaNeve
General Motors
100 Renaissance Center
Detroit, MI 48243

Dear Mark,

The automotive industry is experiencing the most difficult economic times in its entire history. So far, I have stayed on the sidelines, viewing the turmoil which has unfolded before me, eying it with a third party perspective. Now, however, as present events unfold, I realize I must become actively involved in the controversy.

## By the numbers –

## "29" years as a Cadillac dealer.
Only exclusive Cadillac dealer in San Diego County.

## Master Dealer Award

## 1987,   2000,  2002,  2003,

We are all aware that the Master Dealer Award formulas are meant to reward the dealers which sell a **1000 ++** vehicles. And I must compete for three awards in a huge field, getting four Master Dealer Awards and coming in fifth in 2008 is quite an accomplishment.

## In 1987 our planning potential was 300 Cadillacs
## We sold 518 new Cadillacs, exceeding our PP by 173%

1

We sold new Cadillacs.

| Year - | Sales | RSI |
|---|---|---|
| 2002 – | 326 | |
| 2003 - | 340 | 131.20 |
| 2004 - | 372 | 105.57 |
| 2005 - | 331 | 101.23 |
| 2006 - | 298 | 108.61 |
| 2007 - | 268 | 112.22 |
| 2008 - | 191 | 151.59 |

Customer  Satisfaction  Award

1995,

SFE  Platinum  Performer  Award

1997,    1998,  1999,  2000,  2007,  2008,

Better Business Bureau
29 Years with an A+ Rating,

2

# Personal
# Roque De La Fuente II

## Sales
My team and I have sold over of 30,000 vehicles in the San Diego market since 1968.

**First Mega-Dealer in the USA.**
28 different automobile manufacturers by 1982.

Today only **one** **- Cadillac –**

**In 1982,** I was chosen by my fellow dealers as

## Chairman of the National Dealer Council
for the then 3rd largest auto manufacturer in the world. Youngest person ever elected to this office.

## In 1988, Chairman of the Mexican-American Foundation.

## Then President Reagan Proclaimed I
**was a role model for all Californians to follow.**

## In 1992, I was elected to the Democratic National Convention as a Delegate-At-Large.
One of 5 in the State. (Super - Super - Delegate.) To lead the California delegation.

## Hispanic Business Magazine
One of the 100 most influential Hispanics in the country.

3

# Our Market

RSI (Retail Sales Index)

For the years 2003 thru 2008 RSI Rating has been
131.20, 105.57, 101.23, 108.61, 112.22, & 151.59 respectively

We are currently one of 4 Cadillac dealers in San Diego County,
only dealer which is exclusively Cadillac.
Our current market is :

| We currently serve : | As of | Population |
|---|---|---|
| County of San Diego/ including Tijuana | 2008 | 5,009,170 |
| County of San Diego | 2008 | 3,001,072 |
| City of San Diego | 2009 | 1,353,993 |
| Our immediate market is : | | |
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

We also serve all the eastern communities of San Diego County,
including :
Casa De Oro
San Diego Country Estates
Jamul
Crest

4

Granite Hills, and many more.
And with the closing of the Cadillac dealer in El Centro,
California,
We will now service :

| City of El Centro | 2000 | 40,563 |
| City of Brawley | 2000 | 22,052 |
| City of Calexico, and | 2000 | 36,005 |
| Their sister city of | | |
| Mexicali, BC, Mexico | 2008 | 1,001,010 |

and with the closing of the Cadillac dealer in Yuma, Arizona, we
are the closest dealer from the Arizona border to the County of San
Diego – over 200 miles.

Our current market San Diego County is serviced by :

# 5  BMW dealerships

### Cunningham BMW – City of El Cajon

# 4 Lexus dealerships

### Bob Baker Lexus – City of El Cajon

# 3  Mercedes Benz dealerships

5

**In 1979, Cadillac registered over 3,500 sales in San Diego County.**

**This can be achieved with :**
**1 -  Product**
**2 – Service**
**3 – Loyal Customers (Over 30,000 sales in San Diego County)**
**4 -  Loyal Exclusive Dealers (29 years)**

Mark, I have been your Cadillac dealer for over 29 years. I have another 29 years left in me. I am only 54 years old, plus 29 more years would only put me at 83.

I respectfully request you review the above information and expect to see you at the next Master Dealers Conference.

Very truly yours,

Roque De La Fuente II
President

Cell.    (858) 353 - 5252

6

Shopping in 92020
Sunday, June 21, 2009
12:30 PM

# De La Fuente Cadillac

(858) 353-5252

June, 21, 2009

## Mr. Mark LaNeve
## General Motors
## 100 Renaissance Center
## Detroit, MI 48243

# Dear Mark,

By the numbers –

"29" years as a Cadillac dealer.
Only exclusive Cadillac dealer in San Diego County.

Master Dealer Award

1987,   2000,  2002,  2003,

SFE  Platinum  Performer  Award

1997,   1998,  1999,  2000,  2007,  2008,

## ☆ Mark.......

# You want to buy

# a car or truck   ?????

? You live in 92020

## City of  El Cajon

**☆ Or  you live in one of this community's**

**What are your options.    ???????**

# Our Market

We currently serve :        As of                    Population

Our immediate market is :

| | As of | Population |
|---|---|---|
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

Our immediate market is :

| | | |
|---|---|---|
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

We also serve all the eastern communities of San Diego County, including :

Casa De Oro

San Diego Country Estates

Jamul

Crest

☆  **You can buy and service you car or truck within 3 miles of your home or business......**
**shop on one or more of the following options from fine automobile dealerships.**

# Lexus

Dealer in the vicinity of 92020







**Bob Baker Lexus  El Cajon**

1000 Arnele Avenue          Mon-Fri 9am - 8pm          **Distance:**     0.96 Miles
El Cajon, CA 92020          Sat 9am - 7pm
Phone: (619) 440-5398      Sun 10am - 6pm

Posted from <http://www.lexus.com/lexus/LexusSearchSubmitWEbMap.do?dealerLocator_pm/DealerOnly=false&application=LexusAndVersus=50km&markId=2
&street=null&city=null&state=null&zip_code=92020&searchType=zipcode&distance&_num=yes>

# BMW

9:45 AM
## Dealer Locator
June 21, 2009



## Search Results
BMW centers found. Click on the links below to see location details for each dealer's vehicle

BMW South County
Dealer Website
720 El Cajon Blvd
El Cajon, CA 92020-4906
Phone: 619-873-4386
Fax  619-401-0918

                                      Distance from ZIP code,      <1 mile

BMW Service
BMW South County
Dealer Website
875 El Cajon Blvd
El Cajon, CA 92020-5714
Phone: 619-442-8888
Fax: 619-440-3876

                                      Distance from ZIP code,      <1 mile

Hours of operation:
Mon,Tue,Wed,Thu,Fri
8:00 AM - 8:00 PM
Sat 9:00 AM - 7:00 PM

Shopping in 92020  final..june 21, 2009 Page 4

# Ford

**Dealer**

1. El Cajon Ford
   
   Distance: 0.86 miles

   1595 E Main
   El Cajon, CA 92021

   Tel: (619) 588-7647
   Fax: (619) 441-8521

2. Drew Ford
   
   Distance: 2.53 miles

   8970 La Mesa Blvd
   La Mesa, CA 91941

   Tel: (619) 464-7777
   Fax: (619) 668-7717

# Honda

The following dealers were found near 92020
Show Map
1

**Tipton Honda**
889 Arnele Ave
El Cajon, CA 92020
(888)902-1155

0.4 miles away

2
**DCH Honda of Lemon Grove**
3615 Lemon Grove Ave
Lemon Grove, CA 91945
(619)461-2600

4.8 miles away

3
**Honda Mission Valley**
5812 Mission Gorge Rd
San Diego, CA 92120
(619)563-1095

7.3 miles away

# Toyota

## Dealers near "92020"

| | DEALER | MAP & DISTANCE |
|---|---|---|
| 1 | Toyota Of El Cajon<br>300 El Cajon Blvd.<br>El Cajon, CA 92020<br>(619) 270-3000 | 0.39 Miles Away |
| 2 | Toyota Of El Cajon Toyota Certified Service Center<br>9135 Mission Gorge Road<br>Santee, CA 92071<br>(619) 596-7700 | 3.74 Miles Away |
| 3 | Bob Baker Toyota Lemon Grove | 6.41 Miles Away |

8.04 Miles Away
6800 Federal Boulevard
Lemon Grove, CA 91945
(619) 287-2400

4   Toyota San Diego                   8.04 Miles Away
5910 Mission Gorge Road
San Diego, CA 92120
(619) 280-4100

Pasted from <http://www.toyota.com/dealers/?tp=9200&x=17&y=17>

# ===City of El Cajon ===

El Cajon Car Dealers

Bob Baker Chevrolet           Soon to be close by GM
900 Arnele Ave
El Cajon, CA , 92020

El Cajon Kia
720 El Cajon Blvd
El Cajon, CA , 92020

Saturn Of El Cajon
541 N Johnson Ave
El Cajon, CA , 92020

Cunningham BMW
875 El Cajon Blvd
El Cajon, CA , 92020

Mossy Nissan El Cajon
1170 W Main St
El Cajon, CA , 92020

Toyota Of El Cajon
500 El Cajon Blvd
El Cajon, CA , 92020

De La Fuente Cadillac          Soon to be close by GM
1385 E Main St
El Cajon, CA , 92021

El Cajon Ford
1595 E Main St
El Cajon, CA , 92021

Suzuki Of El Cajon
792 El Cajon Blvd
El Cajon, CA , 92020

Tipton Honda
889 Arnele Ave
El Cajon, CA , 92020

El Cajon Mitsubishi
247 El Cajon Blvd
El Cajon, CA , 92020

Bob Baker Lexus El Cajon
1000 Arnele Ave
El Cajon, CA , 92020

Bob Baker Subaru
900 Arnele Ave
El Cajon, CA 92020

# ===City of la Mesa ===

La Mesa Car Dealers
Drew Isuzu                              Distance: 2.65 miles
8850 Grossmont Blvd
La Mesa, CA , 91941

Bob Stall Chevrolet                     Distance: 4 miles
7601 Alvarado Rd
La Mesa, CA , 91941

Drew Ford
8970 La Mesa Bl                         Distance: 2.53 miles
vd
La Mesa, CA , 91941

Carl Burgers Dodge World                Distance: 3.15 miles
Highway 8 at Jackson Dr
La Mesa, CA , 91942

Carl Burgers Chrysler Jeep World        Distance: 3.14 miles
8333 Hercules St
La Mesa, CA , 91942

Drew Volkswagon                         Distance: 2.65 miles
8850 Grossmont Blvd
La Mesa, CA 91941

Drew Hyundai                            Distance: 2.65 miles
8850 Grossmont Blvd
La Mesa, CA , 91941

# ==City of Lemon Grove ==

Lemon Grove     Car Dealers

Bob Baker Toyota Lemon Grove            6.41 Miles Away
6800 Federal Blvd
Lemon Grove, CA , 91945
PH: (619) 287-2600 | FX: (619) 265-3199

DCH Honda of Lemon Grove                4.8 miles away

3615 Lemon Grove Ave
Lemon Grove, CA 91945

San Diego    East County

Toyota San Diego                        8.04 Miles Away
5910 Mission Gorge Rd
San Diego, CA , 92120
PH: (619) 280-4100 | FX: (619) 280-5468

HONDA Mission Valley
5812 Mission Gorge Rd
San Diego, CA 92120
(619)563-1095
                                        7.8 miles away

Posted from <http://by129w.bay129.mail.live.com/mail/InboxLight.aspx?FolderID=00000000-0000-0000-0000-000000000000, n1&InboxSortAscending=False&InboxSortBy=Date&n=1331259?>

# 3 Regional Shoping Center

## Serve the
## San Diego East County Market

### Westfield Parkway Plaza    CITY OF EL CAJON

Yet another Westfield mall, Parkway Plaza is the regional mall serving East County. This indoor, single level mall is in El Cajon. Malls tend to reflect their clientele, and Parkway serves the unpretentious, middle America of East County. Young adult shops, a Regal Cinema and a food court make this the area's teen hangout. A two-story Wal-Mart is the newest tenant. Tidbit: A Family Lounge is located in the Food

Pasted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>

### . Grossmont  Center     CITY OF LA MESA

This quaint mall in La Mesa is the shopping center that time forgot. It's a cozy, well-maintained outdoor mall in La Mesa that is lacking in pizazz and choices - in fact, it's a bit dull. But in the world of mega-malls, sometimes dull is OK. Anchored by a two-story Target, a smallish Macy's, Grossmont also has a nice Pacific Cinema, and a two-level Wal-Mart. **Tidbit: There's a surprisingly good choice of sitdown restaurants, including the new Casa de Pico and Shakey's Pizza for families.**

Pasted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>

### Otay Ranch Town Center      CITY OF CHULA VISTA

OK, Otay Ranch Town Center just opened in fall 2006. So what makes it so special? Well, it's the first regional mall to open in 20 years. And it's not your traditional mall, but a "lifestyle" mall. Think: a neighborhood business district, only with upscale shops and department stores. Tidbit: The "main street" allows parking in front of many stores. It's pedestrian friendly, with a dog park, too. For entertainment, an AMC theatre (soon) and lots of dining.

Pasted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>

 **or** drive two or more cities away to buy

or service your auto or truck...
Consumers are not dumb...... to the contrary,
There are very smart, I will bet on them......
Today within 5 miles from De La Fuente Cadillac
6 dealers sell over 3000 cars & trucks with 3 Brands
(2 Ford, 2 Toyota, 2 Honda)

every Month over  36,000 a year.....
and not one of them is a GM product from
the new or old GM.
The new GM can not afford to make this kind of

mistake.....

A 29 year Dealer.

Very truly yours,

Roque De La Fuente II
President

Cell.    (858) 353 - 5252

Master Dealer (4)
   1987, 2000, 2002,  2003
SFE Platinum Performer (6)
   1997, 1998, 1999, 2000, 2007. 2008


P.S.

This Market (San Diego East County) has the highest
truck/auto sales ratio in any Metro Market in the Country
Yet it does not have a Buick or GMC Dealer.
 Or maybe No New GM Representation
(Cadillac, Chevrolet, Buick, GMC)

This is a Mature & Growing market yet Land is very
difficult to come by.....and quickly absorb by aggressive
Manufactures.



This Market used to be home to:
Cunnigham BMW/Pontiac/GMC......"rip" now BMW
Tipton Oldmobile/Honda..................."rip" now Honda
McClelan Buick/Pontiac/GMC..........."rip" now Toyota

Bob Baker Chevrolet……………..…."rip" Lexus Expansion

The New GM (Cadillac, Chevrolet, Buick, GMC, ) needs
to be in this Market…….25% of all San Diego County
Auto/Truck Sales come from this market……
The New GM can not afford not to be in this Market.

With a good Faithfull Dealer

CC.  Bill G. Beasley……bill.g.beasley@gm.com

# EXHIBIT C

GMMS 1013
11-05 USA

# Dealer Sales and
# Service Agreement

## Standard Provisions

## GENERAL MOTORS CORPORATION

# Table of Contents

PURPOSE OF AGREEMENT ........................................................ 1

ARTICLE 1. APPOINTMENT AS AUTHORIZED DEALER ................ 1

ARTICLE 2. DEALER OPERATOR ................................................ 2

ARTICLE 3. DEALER OWNER ...................................................... 2

ARTICLE 4. AUTHORIZED LOCATIONS ...................................... 2
4.1    Dealer Network Planning ................................................ 2
4.2    Area of Primary Responsibility ....................................... 3
4.3    Establishment of Additional Dealers ............................... 3
4.4    Facilities    ...................................................................... 4
       4.4.1    Location ........................................................... 4
       4.4.2    Change in Location or Use of Premises ............. 4
       4.4.3    Size .................................................................. 4
       4.4.4    Dealership Image and Design ............................ 4
       4.4.5    Dealership Equipment ....................................... 5

ARTICLE 5. DEALER'S RESPONSIBILITY TO PROMOTE,
SELL, AND SERVICE PRODUCTS ................................................ 5
5.1    Responsibility to Promote and Sell ................................. 5
5.2    Responsibility to Service ................................................ 6
5.3    Customer Satisfaction .................................................... 7
5.4    Business Planning .......................................................... 7
5.5    Dealer Council ............................................................... 8
5.6    Electronic Communications, Data Interchange and
       Electronic Transactions ................................................. 8
5.7    Exchange of Information and the Handling of
       Customer Information ..................................................... 8

ARTICLE 6. SALE OF PRODUCTS TO DEALERS .......................... 9
6.1    Sale of Motor Vehicles to Dealer .................................... 9
6.2    Sale of Parts and Accessories to Dealer .......................... 9
6.3    Prices and Other Terms of Sale ....................................... 9
       6.3.1    Motor Vehicles ................................................. 9
       6.3.2    Parts and Accessories ...................................... 10
6.4    Inventory ...................................................................... 10
       6.4.1    Motor Vehicle Inventory ................................. 10
       6.4.2    Parts and Accessories ...................................... 10
6.5    Warranties on Products ................................................. 10

ARTICLE 7. SERVICE OF PRODUCTS ........................................ 11
7.1    Service for Which General Motors Pays ......................... 11
       7.1.1    New Motor Vehicle Pre-Delivery Inspections
                and Adjustments .............................................. 11
       7.1.2    Warranty and Special Policy Repairs ................ 11
       7.1.3    Field Actions and Corrections .......................... 11
       7.1.4    Payment for Pre-Delivery Adjustments, Warranty,
                Field Action and Transportation Damage Work .. 11
7.2    Parts, Accessories, and Body Repairs ............................ 12
       7.2.1    Warranty and Policy Repairs ............................ 12
       7.2.2    Representations and Disclosures as to
                Parts and Accessories ...................................... 12
       7.2.3    Body Repairs ................................................... 12
       7.2.4    Tools and Equipment ....................................... 12

ARTICLE 8. TRAINING .............................................................. 12

ARTICLE 9  REVIEW OF DEALER'S SALES PERFORMANCE ....... 13

ARTICLE 10. CAPITALIZATION .................................................. 13
10.1    Net Working Capital ..................................................... 13
10.2    Wholesale Floorplan ..................................................... 13

ARTICLE 11. ACCOUNTS AND RECORDS ................................... 14
11.1    Uniform Accounting System .......................................... 14
11.2    Submission of Accurate Applications and Information ..... 14
11.3    Examination of Accounts and Records ........................... 14
11.4    Confidentiality of Dealer Data ...................................... 14

ARTICLE 12. CHANGES IN MANAGEMENT AND OWNERSHIP ..... 14
12.1    Succession Rights Upon Death or Incapacity .................. 14
       12.1.1    Successor Addendum ....................................... 14
       12.1.2    Absence of Successor Addendum ...................... 15
       12.1.3    Successor Dealer Requirements ........................ 15
       12.1.4    Term of New Dealer Agreement ........................ 15
       12.1.5    Limitation on Offers ........................................ 15
       12.1.6    Cancellation of Addendum ............................... 15
12.2    Other Changes in Ownership or Management .................. 16
12.3    Right of First Refusal to Purchase ................................. 16
       12.3.1    Creation and Coverage .................................... 16
       12.3.2    Purchase Price and Other Terms of Sale ........... 17
       12.3.3    Consummation ................................................. 17
       12.3.4    Assignment ..................................................... 17
       12.3.5    Transfer Involving Family Members and
                 Dealer Management .......................................... 17
       12.3.6    Expenses ......................................................... 18

ARTICLE 13. BREACHES AND OPPORTUNITY TO REMEDY ........ 18
13.1    Certain Acts or Events ................................................. 18
13.2    Failure of Performance by Dealer .................................. 19

ARTICLE 14. TERMINATION OF AGREEMENT ............................ 20
14.1    By Dealer ..................................................................... 20
14.2    By Agreement ............................................................... 20
14.3    Failure to be Licensed .................................................. 20
14.4    Death or Incapacity of Dealer Operator ......................... 20
14.5    Acts or Events .............................................................. 20
14.6    Reliance on Any Applicable Termination Provision ......... 21
14.7    Transactions After Termination ..................................... 21
       14.7.1    Effect on Orders .............................................. 21
       14.7.2    Termination Deliveries .................................... 21
       14.7.3    Effect of Transactions After Termination .......... 21

ARTICLE 15. TERMINATION ASSISTANCE ................................. 22
15.1    Deferral of Effective Date ............................................. 22
15.2    Purchase of Personal Property ...................................... 22
       15.2.1    General Motors Obligations .............................. 22
       15.2.2    Dealer's Responsibilities .................................. 22
       15.2.3    Payment ......................................................... 23
       15.2.4    Replacement Dealer ......................................... 23
15.3    Assistance on Premises ................................................. 23
       15.3.1    General Motors Obligation ............................... 23
       15.3.2    Owned Premises ............................................... 24
       15.3.3    Leased Premises ............................................... 24
       15.3.4    Rent and Price ................................................ 24
       15.3.5    Limitations on Obligation to Provide Assistance .. 25

ARTICLE 16. DISPUTE RESOLUTION PROCESS ......................... 25

ARTICLE 17. GENERAL PROVISIONS ........................................ 26
17.1    No Agent or Legal Representative Status ......................... 26
17.2    Responsibility for Operations ........................................ 26
17.3    Taxes ........................................................................... 26
17.4    Indemnification by General Motors ................................ 26
17.5    Trademarks and Service Marks ...................................... 27
17.6    Notices ......................................................................... 27
17.7    No Implied Waivers ....................................................... 28
17.8    Assignment of Rights or Delegation of Duties ................. 28
17.9    No Third Party Benefit Intended .................................... 28
17.10   Accounts Payable .......................................................... 28
17.11   Sole Agreement of Parties .............................................. 28
17.12   Applicable Law ............................................................. 29
17.13   Superseding Dealer Agreements ..................................... 29

GLOSSARY ............................................................................. 30

# Standard Provisions

The following Standard Provisions are part of the General Motors Dealer Sales and Service Agreement(s) (Form GMMS 1012).

## PURPOSE OF AGREEMENT

The purpose of this Agreement is to promote a relationship between General Motors and its Dealers which encourages and facilitates cooperation and mutual effort to satisfy customers, and permits General Motors and its dealers to fully realize their opportunities for business success. General Motors has established a network of authorized dealers operating at approved locations to effectively sell and service its Products and to build and maintain consumer confidence and satisfaction in Dealer and General Motors. Consequently, General Motors relies upon each Dealer to provide appropriate skill, capital, equipment, staff and facilities to properly sell, service, protect the reputation, and satisfy the customers of General Motors Products in a manner that demonstrates a caring attitude toward those customers. At the same time, Dealer relies upon General Motors to provide sales and service support and to continually strive to enhance the quality and competitiveness of its Products. This mutual dependence requires a spirit of cooperation, trust and confidence between General Motors and its dealers. To facilitate attainment of cooperation, trust and confidence, and to provide General Motors with the benefit of dealer advice regarding many decisions which affect dealer business operations, General Motors has established dealer councils, dealer advisory boards, and other mechanisms to obtain dealer input in the decision making process.

This Agreement (i) authorizes Dealer to sell and service General Motors Products and represent itself as a General Motors Dealer; (ii) states the terms under which Dealer and General Motors agree to do business together; (iii) states the responsibilities of Dealer and General Motors to each other and to customers; and (iv) reflects the mutual dependence of the parties in achieving their business objectives.

## ARTICLE 1. APPOINTMENT AS AUTHORIZED DEALER

General Motors appoints Dealer as a non-exclusive dealer of General Motors Products. Dealer has the right to buy Products and the obligation to market and service those Products in accordance with this Agreement and related documents.

1

## ARTICLE 2.  DEALER OPERATOR

This is a Personal Services Agreement, entered into in reliance on the qualifications, integrity and reputation of Dealer Operator identified in Paragraph Third, and on Dealer's assurance that Dealer Operator will provide personal services by exercising full managerial authority over Dealership Operations. Dealer Operator is responsible for developing and implementing policies, practices and procedures necessary for the Dealer to meet its obligations under this Agreement with respect to sales, service, customer satisfaction, facilities, and capitalization. Dealer Operator will have an unencumbered ownership interest in Dealer of at least 15 percent at all times. A Dealer Operator must be a competent business person, an effective manager, must have demonstrated a caring attitude toward customers, and should have a successful record as a merchandiser of automotive products and services or otherwise have demonstrated the ability to manage a dealership. The experience necessary may vary with the potential represented by each dealer location. Although this Agreement is entered into in reliance on the personal services of the Dealer Operator, the Dealer entity specified in this Agreement is the only party to this Agreement with General Motors.

## ARTICLE 3.  DEALER OWNER

General Motors enters into this Agreement in reliance on the qualifications, integrity and reputation of dealer owner(s) identified in the Dealer Statement of Ownership. General Motors and Dealer agree each dealer owner will continue to own, both of record and beneficially, the percentage stated in the Dealer Statement of Ownership, unless a change is made in accordance with Article 12.

## ARTICLE 4.  AUTHORIZED LOCATIONS

### 4.1    Dealer Network Planning

Because General Motors distributes it's Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement. Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and General Motors all benefit.

To maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive, to the extent

2

practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above. Such marketing conditions include General Motors sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the ability of General Motors existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

### 4.2    Area of Primary Responsibility

Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the Area designated in a Notice of Area of Primary Responsibility. The Area of Primary Responsibility is used by General Motors in assessing performance of dealers and the dealer network. General Motors retains the right to revise Dealer's Area of Primary Responsibility at General Motors sole discretion consistent with dealer network planning objectives. If General Motors determines that marketing conditions warrant a change in Dealer's Area of Primary Responsibility, it will advise Dealer in writing of the proposed change, the reasons for it, and will consider any information the Dealer submits. Dealer must submit such information in writing within thirty 30 days of receipt of notice of the proposed change. If requested by Dealer within the thirty days, General Motors will extend the time for an additional 30 days for Dealer to obtain and submit relevant information. If General Motors thereafter decides the change is warranted, it will issue a revised Notice of Area of Primary Responsibility.

### 4.3    Establishment of Additional Dealers

General Motors reserves the right to appoint additional dealers but General Motors will not exercise this right without first analyzing dealer network planning considerations with respect to the Line-Make under consideration. Prior to establishing an additional same Line-Make dealer within Dealer's Area of Primary Responsibility, General Motors will advise Dealer in writing and give Dealer thirty days to present relevant information before General Motors makes a final decision. If requested by Dealer within the thirty days, General Motors will extend the time for an additional thirty days for Dealer to obtain and submit relevant information. General Motors will advise Dealer of the final decision concerning the establishment of an additional dealer, which will be made solely by General Motors pursuant to its business judgment. Nothing in this Agreement is intended to require Dealer's consent to the establishment of an additional dealer, nor is this Agreement intended to give Dealer a right to object to the establishment of a different Line-Make.

The appointment of a dealer at or within three miles of a former dealership location as a replacement for the former dealer ("dealer replacement") or the relocation of an existing dealer point ("relocation") shall not be considered the establishment of an additional Dealer for purposes of this Article 4.3. General Motors shall not have any obligation to provide notice under Article 4 for a dealer replacement or relocation, and such events are within the sole discretion of General Motors pursuant to its business judgment.

3

### 4.4    Facilities

#### 4.4.1    Location

Dealer agrees to conduct Dealership Operations only from the approved location(s) within its Area of Primary Responsibility. The Location and Premises Addendum identifies Dealer's approved location(s) and facilities ("Premises"). If more than one location is approved, Dealer agrees to conduct from each location only those Dealership Operations authorized in the Addendum for such location.

#### 4.4.2    Change in Location or Use of Premises

If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment.

Before General Motors requires any changes in Premises, it will consult with Dealer, indicate the rationale for the change, and solicit Dealer's views on the proposal. If, after such review with Dealer, General Motors determines a change in Premises or location is appropriate, the Dealer will be allowed a reasonable time to implement the change. Any such changes will be reflected in a new Location and Premises Addendum or other written agreement executed by Dealer and General Motors.

Nothing herein is intended to require the consent or approval of any dealer to a proposed relocation of any other dealer.

#### 4.4.3    Size

Dealer agrees to provide Premises at its approved location(s) that will promote the effective performance and conduct of Dealership Operations, and General Motors image and goodwill. Consistent with General Motors dealer network planning objectives and General Motors interest in maintaining the stability and viability of its dealers, Dealer agrees that its facilities will be sized in accordance with General Motors requirements for that location.

General Motors agrees to establish and maintain a clearly stated policy for determining reasonable dealer facility space requirements and to periodically re-evaluate those requirements to ensure that they continue to be reasonable.

#### 4.4.4    Dealership Image and Design

The appearance of Dealer's Premises is important to the image of Dealer and General Motors, and can affect the way customers perceive General Motors Products and its dealers generally. Dealer therefore agrees that its Premises will be properly equipped and maintained, clean, and appealing to customers. The interior and exterior retail environment and signs also will comply with any reasonable requirements General Motors may establish to promote and preserve the image of General Motors and its dealers.

General Motors will monitor developments in automotive and other retail industries to ensure that

4

General Motors image and facility requirements are responsive to changes in the marketing environment.

General Motors will take into account existing economic and marketing conditions and consult with the appropriate dealer council in establishing such requirements.

### 4.4.5  Dealership Equipment

Effective performance of Dealer's responsibilities under this Agreement requires that the dealership be reasonably equipped to communicate with customers and General Motors and to properly diagnose and service Products. Accordingly, Dealer agrees to provide for use in the Dealership Operations any equipment reasonably designated by General Motors as necessary for Dealer to perform effectively under this Agreement. General Motors will make such designations only after having consulted with the appropriate dealer council.

# ARTICLE 5.  DEALER'S RESPONSIBILITY TO PROMOTE, SELL, AND SERVICE PRODUCTS

### 5.1    Responsibility to Promote and Sell

*5.1.1* Dealer agrees to effectively, ethically and lawfully sell and promote the purchase, lease and use of Products by consumers located in its Area of Primary Responsibility. To achieve this objective, Dealer agrees to:

(a) maintain an adequate staff of trained sales personnel;

(b) explain to Product purchasers the items which make up the purchase price and provide purchasers with itemized invoices;

(c) not charge customers for services for which Dealer is reimbursed by General Motors;

(d) include in customer orders only equipment or accessories requested by customer or required by law;

(e) ensure that the customer's purchase and delivery experience are satisfactory; and

(f) comply with the retail sales standards established by General Motors, as amended from time to time. General Motors will consult with the appropriate dealer council and the national dealer council before amending the retail sales standards.

If Dealer modifies or sells a modified new Motor Vehicle, or installs any equipment, accessory, recycled part or part not supplied by General Motors, or sells any non-General Motors service contract for a Motor Vehicle, Dealer will disclose this fact on the purchase order and bill of sale, indicating that the modification, equipment, accessory or part is not warranted by General Motors or, in the case of a service contract, the coverage is not provided by General Motors or an affiliate.

*5.1.2* Dealer located in the United States is authorized to sell new Motor Vehicles only to

5

customers located in the United States. Dealer agrees that it will not sell new Motor Vehicles for resale or principal use outside the United States. Dealer also agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in the United States. For this section, United States includes the fifty states and the District of Columbia.

**5.1.3** Dealer located in Puerto Rico or the US Virgin Islands is authorized to sell new Motor Vehicles only to customers located in Puerto Rico or the US Virgin Islands respectively. Dealer in Puerto Rico or the US Virgin Islands agrees that it will not sell new Motor Vehicles to customers located outside Puerto Rico or the US Virgin Islands respectively, or to customers for resale or principal use outside of Puerto Rico or the US Virgin Islands. Dealer agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in Puerto Rico or the US Virgin Islands respectively.

**5.1.4** It is General Motors policy not to sell or allocate new Motor Vehicles to dealers for resale to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling Motor Vehicles. The dealer distribution organizations that General Motors has established in the United States, Puerto Rico and US Virgin Islands are best suited for the distribution of Motor Vehicles in the United States, Puerto Rico and the US Virgin Islands respectively, and are in the best position to arrange for the proper performance of Motor Vehicle warranty repairs, field actions and inspections, pre-delivery inspections, and ongoing maintenance and compliance with government requirements. Therefore, unless otherwise authorized in writing by General Motors, Dealer agrees that this Agreement authorizes Dealer to purchase Motor Vehicles only for resale to customers for personal use or primary business use other than resale. Dealer is not authorized by this Agreement to directly or indirectly sell Motor Vehicles to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling of Motor Vehicles. Nothing in this Article 5.1.4 is intended to restrict Dealer from selling Motor Vehicles to other General Motors dealers of the same Line-Make in the same country or territory.

**5.1.5** General Motors will conduct general advertising programs to promote the sale of Products for the mutual benefit of General Motors and Dealers. General Motors will make available to Dealer advertising and sales promotion materials from time to time and advise Dealer of any requirements or applicable charges.

**5.1.6** Dealer agrees to advertise and conduct promotional activities that are lawful and enhance the reputation of Dealer, General Motors and its Products. Dealer will not advertise or conduct promotional activities in a misleading or unethical manner, or that is harmful to the reputation of Dealer, General Motors, or its Products.

## 5.2    Responsibility to Service

**5.2.1** Dealer agrees to maximize customer satisfaction by providing courteous, convenient, prompt, efficient and quality service to owners of Motor Vehicles, regardless of from whom the Vehicles were purchased. All service will be performed and administered in a professional manner

6

and in accordance with all applicable laws and regulations, this Agreement, and the Service Policies and Procedures Manual, as amended from time to time. Dealer also will comply with the retail service standards established by General Motors, as amended from time to time. General Motors will consult with the appropriate dealer council and the national dealer council before amending the retail service standards.

*5.2.2* Dealer agrees to maintain an adequate service and parts organization as recommended by General Motors, including a competent, trained service and parts manager(s), trained service and parts personnel and, where service volume or other conditions make it advisable, a consumer relations manager.

*5.2.3* Dealer and General Motors will each provide the other with such information and assistance as may reasonably be requested by the other to facilitate compliance with applicable laws, regulations, investigations and orders relating to Products.

*5.2.4* To build and maintain consumer confidence in, and satisfaction with, Dealer and General Motors, Dealer will comply with General Motors procedures for the investigation and resolution of Product-related complaints.

*5.2.5* General Motors will make available to Dealer current service and parts manuals, bulletins, and technical data publications relating to Motor Vehicles.

### 5.3    Customer Satisfaction

Dealer and General Motors recognize that appropriate care for the customer will promote customer satisfaction with General Motors Products and its dealers, which is critically important to our current and future business success. Dealer therefore agrees to conduct its operations in a manner which will promote customer satisfaction with the purchase and ownership experience. General Motors agrees to provide Dealer with reasonable support to assist Dealer's attainment of customer satisfaction, but Dealer remains responsible for promoting and maintaining customer satisfaction at the dealership.

General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's purchase and delivery customer satisfaction and Dealer's service customer satisfaction. The report will compare Dealer's performance to other same Line-Make dealers in the Region. General Motors will provide a written explanation of the customer satisfaction review process to Dealer.

General Motors may revise the customer satisfaction evaluation process from time to time. General Motors will consult with the appropriate dealer council before making any changes.

### 5.4    Business Planning

General Motors has established a business planning process to assist dealers, although Dealer remains responsible for satisfying its performance obligations under the Agreement. Dealer agrees to prepare and implement a reasonable business plan if requested by General Motors. General Motors agrees to provide Dealer with information specific to its dealership, and if requested, to assist Dealer in its

7

business planning as agreed upon by Dealer and General Motors.

## 5.5    Dealer Council

General Motors agrees to establish such dealer councils as appropriate to foster and maintain a positive business relationship between General Motors and its dealers, and to obtain dealer input in General Motors decision-making process. These councils may be established on a national, regional or local basis, and General Motors will consult with dealers in establishing or changing such dealer councils. These councils are intended to provide General Motors with the benefit of dealer advice regarding various decisions which affect dealership operations.

## 5.6    Electronic Communications, Data Interchange, and Electronic Transactions

To provide for effective and efficient communication, data interchange and electronic transactions between General Motors, its dealers, and its customers, General Motors may establish reasonable requirements for Dealer's acquisition and use of certain computer software, computer hardware, and systems in Dealership Operations, including but not limited to use involving or relating to the Internet. General Motors will take into consideration factors such as market conditions, competitive circumstances, and costs in establishing such reasonable requirements. Dealer agrees to comply with those requirements and all restrictions and limitations applicable to such computer software, computer hardware or systems. General Motors will consult with the appropriate dealer council in establishing such requirements, and such

requirements shall be listed in GM Dealer World under publications, or such other website(s) as General Motors may designate.

## 5.7    Exchange of Information, and the Handling of Customer Information

General Motors may provide Dealer from time to time certain customer information or other information or data. Dealer agrees to use such information or data only as designated by General Motors, and not to otherwise disclose such information or data without General Motors written permission, unless otherwise required by law. This restriction only applies to information and data provided by General Motors to its dealers, and does not apply to data or information Dealer obtains from its customers or other sources.

To protect the security and confidentiality of customer information Dealer shares with General Motors, General Motors implements and maintains technical, physical and administrative safeguards in accordance with the law.  General Motors shall provide privacy statements to its customers that explain how General Motors handles customer personal information, including that it shares customer personal information with General Motors affiliates and dealers as permitted by law.  General Motors privacy statement(s) for U.S. consumers shall be made available at www.gm.com, or such other website(s) as General Motors may designate.

To protect the security and confidentiality of customer information General Motors shares with Dealer, Dealer agrees to implement and maintain technical, physical and administrative safeguards in accordance with the law.  Further, Dealer agrees to familiarize dealership employees that handle or have

access to customer information received from General Motors with General Motors privacy requirements, and the GM privacy statements found at www.gm.com, or such other website(s) as GM may designate. Dealer shall provide privacy statements to its customers that explain how the dealership handles customer personal information, including that it shares customer personal information with non-affiliated third parties as permitted by law. Dealer's privacy statement shall be made available at the dealership and at any Dealer websites that collect customer personal information.

# ARTICLE 6.  SALE OF PRODUCTS TO DEALERS

### *6.1    Sale of Motor Vehicles to Dealer*

General Motors will periodically furnish Dealer one or more Motor Vehicle Addenda specifying the current model types or series of new Motor Vehicles which Dealer may purchase under this Agreement. General Motors may change a Motor Vehicle Addendum by furnishing a superseding one, or may cancel an Addendum at any time.

General Motors will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers, including component availability and available production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations, and other conditions beyond the control of General Motors. General Motors reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final. Upon written request, General Motors will advise Dealer of the total number of new Motor Vehicles, by allocation group, sold to dealers in Dealer's Market Area or Region during the preceding month.

### *6.2    Sale of Parts and Accessories to Dealer*

New, reconditioned or remanufactured automotive parts and accessories marketed by General Motors and listed in current Dealer Parts and Accessories Price Schedules or supplements furnished to Dealer are called Parts and Accessories. Orders for Parts and Accessories will be submitted and processed according to written or electronic procedures established by General Motors or other designated suppliers.

### *6.3    Prices and Other Terms of Sale*

#### *6.3.1    Motor Vehicles*

Prices, destination charges, and other terms of sale applicable to purchases of new Motor Vehicles will be those established according to Vehicle Terms of Sale Bulletins furnished periodically to Dealer.

Prices, destination charges, and other terms of sale applicable to any Motor Vehicle may be changed at any time. Except as otherwise provided in writing or electronically, changes apply to Motor Vehicles not shipped to Dealer at the time the changes are made effective. Dealer will receive written or electronic notice of any price increase before any Motor

9

Vehicle to which such increase applies is shipped, except for initial prices for a new model year or for any new model or body type. Dealer has the right to cancel or modify the affected orders by delivering written or electronic notice to General Motors within 10 days after its receipt of the price increase notice in accordance with procedures established by General Motors.

If General Motors offers any incentives to customers or dealers, and payment is conditioned upon the purchase or lease of a new Motor Vehicle, Dealer agrees to comply with the then current applicable policies and procedures in the General Motors Incentive Manual, as amended from time to time.

### 6.3.2   Parts and Accessories

Prices and other terms of sale applicable to Parts and Accessories are established by General Motors according to the Parts and Accessories Terms of Sale Bulletin furnished to Dealer. Prices and other terms of sale applicable to Parts and Accessories may be changed by General Motors at any time.

### 6.4   Inventory

#### 6.4.1   Motor Vehicle Inventory

Dealer recognizes that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory. Accordingly, Dealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility.

### 6.4.2   Parts and Accessories

Dealer agrees to stock sufficient Parts and Accessories made available by General Motors to perform warranty repairs and policy adjustments and meet customer demand.

### 6.5   Warranties on Products

General Motors warrants new Motor Vehicles and Parts and Accessories (Products) as explained in documents provided with the Products or in the Service Policies and Procedures Manual.

EXCEPT AS OTHERWISE PROVIDED BY LAW, THE WRITTEN GENERAL MOTORS WARRANTIES ARE THE ONLY WARRANTIES APPLICABLE TO PRODUCTS. WITH RESPECT TO DEALERS, SUCH WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES OR LIABILITIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY LIABILITY FOR COMMERCIAL LOSSES BASED UPON NEGLIGENCE OR MANUFACTURER'S STRICT LIABILITY EXCEPT AS MAY BE PROVIDED UNDER AN ESTABLISHED GENERAL MOTORS PROGRAM OR PROCEDURE, GENERAL MOTORS NEITHER ASSUMES NOR AUTHORIZES ANYONE TO ASSUME FOR IT ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH PRODUCTS, AND GENERAL MOTORS MAXIMUM LIABILITY IS TO REPAIR OR REPLACE THE PRODUCT.

10

# ARTICLE 7. SERVICE OF PRODUCTS

## 7.1 Service for Which General Motors Pays

### 7.1.1 New Motor Vehicle Pre-Delivery Inspections and Adjustments

Because new vehicle delivery condition is critical to customer satisfaction, Dealer agrees to perform specified pre-delivery inspections and adjustments on each new Motor Vehicle and verify completion according to procedures identified in the Service Policies and Procedures Manual.

### 7.1.2 Warranty and Special Policy Repairs

Dealer agrees to perform (i) required warranty repairs on each qualified Motor Vehicle at the time of pre-delivery service and when requested by owner, and (ii) special policy repairs approved by General Motors. When the vehicle is returned to the owner, Dealer will provide owner a copy and explanation of the repair document reflecting all services performed.

### 7.1.3 Field Actions and Corrections

General Motors will notify Dealer of suspected unsatisfactory conditions on Products, issue field action instructions, and make available a system that Dealer will use to check if a Product is subject to a field action. Dealer agrees to inspect and correct suspected unsatisfactory conditions on Products as instructed. For new and used Motor Vehicles in its inventory and for vehicles in its service facility, Dealer agrees to check the system for open field actions and to complete applicable field action inspections and corrections as instructed.

General Motors may ship, and Dealer agrees to accept, unordered parts and materials required for product field actions. Upon product field action completion, Dealer will receive credit for excess parts and materials so shipped if they are returned or disposed of in accordance with instructions from General Motors.

### 7.1.4 Payment for Pre-Delivery Adjustments, Warranty, Field Action and Transportation Damage Work

For Dealer's performance of services, pre-delivery inspections and adjustments, warranty repairs, special policy repairs, field action inspections and corrections, and transportation damage repairs, General Motors will provide or pay Dealer for the Parts and other materials required and will pay Dealer a reasonable amount for labor. Payment will be made according to policies in the Service Policies and Procedures Manual. Dealer will not impose any charge for such service on owners or users except where a deductible or pro-rata charge applies.

11

### 7.2    Parts, Accessories, and Body Repairs

#### 7.2.1    Warranty and Policy Repairs

Dealer agrees to use only genuine GM or General Motors approved Parts and Accessories in performing warranty repairs, special policy repairs, and any other repairs paid for by General Motors, in accordance with the applicable provisions of the Service Policies and Procedures Manual.

#### 7.2.2    Representations and Disclosures as to Parts and Accessories

In servicing vehicles marketed by General Motors, Dealer agrees to disclose the use of recycled and non-General Motors parts and accessories as set forth in Article 5.1.1.

#### 7.2.3    Body Repairs

Dealer agrees to provide quality body repair service for Motor Vehicles. Dealer can provide this service through its own body shop, or by arrangement with an alternate repair establishment approved by General Motors.

#### 7.2.4    Tools and Equipment

Dealer agrees to provide and maintain on Dealership Premises essential service tools as required by General Motors, and such other tools and equipment as reasonably necessary to fulfill its responsibilities to properly diagnose and service Products. Dealer also agrees to allow General Motors or its designated representative to survey or inspect Dealer's tools and equipment to ensure that they are in good repair and proper calibration to enable Dealer to meet its service responsibilities. In the event a dispute arises from such a survey or inspection, General Motors personnel agree to discuss the matter with the Dealer in order to resolve the dispute.

## ARTICLE 8.  TRAINING

Properly trained personnel are essential to the success of Dealer and General Motors, and to providing customers with a satisfactory sales and service experience. General Motors agrees to make available or recommend to Dealer product, sales, service and parts, accounting, business management, finance and insurance, and systems training courses for Dealer personnel. General Motors will make such training available through training sites, interactive distance learning, or other appropriate medium as determined by General Motors. General Motors will assist Dealer in determining training requirements and periodically will require that Dealer have personnel attend or participate in specific courses

held as conveniently as practicable. Dealer agrees to comply with any such reasonable training requirements and pay any specified training charges. General Motors will consult with the appropriate dealer council prior to determining the training courses or programs from which an individual Dealer's requirements under this Article may be established. Specific minimum service training requirements will be described in General Motors Service Policies and Procedures Manual.

General Motors will make available personnel to advise and counsel Dealer personnel on sales, service, parts and accessories, and related subjects.

12

# ARTICLE 9.  REVIEW OF DEALER'S SALES PERFORMANCE

General Motors willingness to enter into this Agreement is based in part on Dealer's commitment to effectively sell and promote the purchase, lease and use of Products in Dealer's Area of Primary Responsibility. The success of General Motors and Dealer depends to a substantial degree on Dealer taking advantage of available sales opportunities.

Given this Dealer commitment, General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's sales performance. The report will compare Dealer's retail sales to retail sales opportunities by segment in Dealer's Area of Primary Responsibility or Area of Geographical Sales and Service Advantage, whichever is applicable. General Motors will provide a written explanation of the sales review process to Dealer. Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100. If Dealer's Retail Sales Index is less than 100, Dealer's sales performance will be rated as provided in the General Motors Sales

Evaluation process. General Motors expects Dealer to pursue available sales opportunities exceeding this standard. Additionally, General Motors expectations of its sales and registration performance for a Line-Make in a particular area may exceed this standard for individual dealer compliance.

In addition to the Retail Sales Index, General Motors will consider any other relevant factors in deciding whether to proceed under the provisions of Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities. General Motors will only pursue its rights under Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities if General Motors determines that Dealer has materially breached its sales performance obligations under this Dealer Agreement.

General Motors may modify the sales evaluation process from time to time and will consult with the appropriate dealer council before adopting such modifications.

# ARTICLE 10.  CAPITALIZATION

## 10.1  Net Working Capital

The Capital Standard Addendum reflects the minimum net working capital necessary for Dealer to effectively conduct Dealership Operations. Dealer agrees to maintain at least this level of net working capital. General Motors will issue a new Addendum if changes in operating conditions or General Motors guidelines indicate capital needs have changed materially.

## 10.2  Wholesale Floorplan

To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments, Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors. The amount of the line of credit will be sufficient for Dealer to meet its obligations under Article 6.4.

13

# ARTICLE 11.  ACCOUNTS AND RECORDS

### 11.1    Uniform Accounting System

A uniform accounting system facilitates an evaluation of Dealer business management practices and the impact of General Motors policies and practices. General Motors therefore agrees to maintain, and Dealer agrees to use and maintain records in accordance with a uniform accounting system set forth in an accounting manual furnished to Dealer. Dealer further agrees to submit to General Motors data in a manner specified by General Motors and on a timely basis.

### 11.2    Submission of Accurate Applications and Information

Dealer also agrees to timely submit true and accurate applications or claims for payments, discounts or allowances; true and correct orders for Products and reports of sale and delivery; and any other reports or statements required by General Motors, in the manner specified by General Motors, and to retain such records for at least two years.

### 11.3    Examination of Accounts and Records

Dealer agrees to permit any designated representative of General Motors to access, examine, audit, and take copies of any of the accounts and records Dealer is to maintain under the accounting manual and this Agreement. Dealer agrees to make such accounts and records readily available at its facilities during regular business hours. General Motors agrees to furnish Dealer with a list of any reproduced records.

### 11.4    Confidentiality of Dealer Data

General Motors agrees not to furnish any personal or financial data submitted to it by Dealer to any non-affiliated entity unless authorized by Dealer, required by law, or in connection with judicial or administrative proceedings, or to proceedings under the Dispute Resolution Process.

# ARTICLE 12.  CHANGES IN MANAGEMENT AND OWNERSHIP

The parties recognize that customers and authorized dealers, as well as shareholders and employees of General Motors, have a vital interest in the continued success and efficient operation of General Motors dealer network. Accordingly, General Motors has the responsibility of continuing to administer the network to ensure that dealers are owned and operated by qualified persons able to meet the requirements of this Agreement.

### 12.1    Succession Rights Upon Death or Incapacity

#### 12.1.1  Successor Addendum

Dealer can apply for a Successor Addendum designating a proposed dealer operator and/or owners of a successor dealer to be established if this Agreement is to expire or be terminated because of death or incapacity. General Motors will execute the Addendum provided Dealer is meeting its obligations

14

under this Agreement and under any Dealer Agreement which Dealer may have with General Motors for the conduct of Dealership Operations at the approved location; and the proposed dealer operator is, and will continue to be, employed full-time by Dealer or a comparable automotive dealership, and is already qualified or is being trained to qualify as a dealer operator; and provided all other proposed owners are acceptable.

Upon expiration of this Agreement, General Motors will, upon Dealer's request, execute a new successor addendum provided a new and superseding dealer agreement is executed with Dealer, and Dealer, the proposed dealer operator and dealer owners are then qualified as described above.

### 12.1.2 Absence of Successor Addendum

If this Agreement is to expire or be terminated because of death or incapacity of Dealer Operator, and Dealer and General Motors have not executed a Successor Addendum, any remaining Dealer Operator or, if there is not a remaining Dealer Operator, the remaining dealer owners may propose a successor dealer to continue the operations identified in this Agreement. If there are more than one dealer owners remaining, these persons may only propose a successor dealer if they can agree on such proposal.

### 12.1.3 Successor Dealer Requirements

General Motors will accept a proposal to establish a successor dealer submitted by a proposed dealer operator under this Article 12.1 provided:

(a) the proposed successor dealer and the proposed dealer operator are ready, willing and able to meet the requirements of a new dealer agreement at the approved location(s).

(b) General Motors approves the proposed dealer operator and all proposed owners not previously approved for the existing Dealership Operations.

(c) all outstanding monetary obligations of Dealer to General Motors have been satisfied.

### 12.1.4 Term of New Dealer Agreement

The dealer agreement offered a successor dealer will be for a three-year term. General Motors will notify the successor dealer in writing at least 90 days prior to the expiration date whether the successor dealer has performed satisfactorily and, if so, that General Motors will offer a new Dealer Agreement.

### 12.1.5 Limitation on Offers

Dealer will be notified in writing of the decision on a proposal to establish a successor dealer submitted under Article 12.1 within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors. General Motors may condition its offer of a dealer agreement on the relocation of dealership operations to an approved location by successor dealer within a reasonable time. General Motors offer of a new dealer agreement under this Article 12.1 will automatically expire if not accepted in writing by the proposed successor dealer within 60 days after it receives the offer.

### 12.1.6 Cancellation of Addendum

Dealer may cancel an executed Successor Addendum at any time prior to the death of a Dealer Operator or the incapacity of Dealer Operator. General Motors may cancel an executed Successor

Addendum only if the proposed dealer operator is no longer qualified under Article 12.1.1.

## 12.2    Other Changes in Ownership or Management

If Dealer proposes a change in Dealer Operator, a change in ownership, or a transfer of the dealership business or its principal assets to any person conditioned upon General Motors entering into a Dealer Agreement with that person, General Motors will consider Dealer's proposal and not unreasonably refuse to approve it, subject to the following:

*12.2.1* Dealer agrees to give General Motors prior written notice of any proposed change or transfer described above. Dealer understands that if any such change is made prior to General Motors approval of the proposal, termination of this Agreement will be warranted and General Motors will have no further obligation to consider Dealer's proposal.

*12.2.2* General Motors agrees to consider Dealer's proposal, taking into account factors such as (a) the personal, business, and financial qualifications of the proposed dealer operator and owners, and (b) whether the proposed change is likely to result in a successful dealership operation with acceptable management, capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction.

*12.2.3* General Motors will notify Dealer in writing of General Motors decision on Dealer's proposal within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors. If General

Motors disagrees with the proposal, it will specify its reasons. General Motors may request that Dealer submit such applications and information in writing or electronically.

*12.2.4* Any material change in Dealer's proposal, including change in price, facilities, capitalization, proposed owners, or dealer operator, will be considered a new proposal, and the time period for General Motors to respond shall recommence.

*12.2.5* General Motors prior written approval is not required where the transfer of equity ownership or beneficial interest to an individual is (a) less than ten percent in a calendar year, and (b) between existing dealer owners previously approved by General Motors where there is no change in majority ownership or voting control. Dealer agrees to notify General Motors within 30 days of the date of the change and to execute a new Dealer Statement of Ownership.

*12.2.6* General Motors is not obligated to approve any proposed changes in management or ownership under this Article unless Dealer makes arrangements acceptable to General Motors to satisfy any indebtedness of Dealer to General Motors and other commitments of Dealer to General Motors.

## 12.3    Right of First Refusal to Purchase
### 12.3.1 Creation and Coverage

If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer. If General Motors chooses

16

to exercise this right, it will do so in its written response to Dealer's proposal. General Motors will have a reasonable opportunity to inspect the assets, including real estate, and corporate records before making its decision.

### 12.3.2 Purchase Price and Other Terms of Sale
#### (a) Bona Fide Agreement

If Dealer has entered into a bona fide written buy/sell agreement, the purchase price and other terms of sale will be those set forth in such agreement and any related documents, unless Dealer and General Motors agree to other terms.

Upon General Motors request, Dealer agrees to provide all documents relating to the proposed transfer. If Dealer refuses to provide such documentation or state in writing that such documents do not exist, it will be presumed that the agreement is not bona fide.

#### (b) Absence of Bona Fide Agreement

In the absence of a bona fide written buy/sell agreement, the purchase price of the dealership assets or stock and such other rights as proposed to be transferred will be determined by good faith negotiations by Dealer and General Motors. If agreement cannot be reached within a reasonable time, the price and other terms of sale will be established by arbitration according to the rules of the American Arbitration Association.

### 12.3.3 Consummation

Dealer agrees to transfer the property by Warranty Deed, where possible, conveying marketable title free and clear of liens and encumbrances. The Warranty Deed will be in proper form for recording and Dealer will deliver complete possession of the property when the Deed is delivered. Dealer will also furnish copies of any easements, licenses or other documents affecting the property and assign any permits or licenses necessary for the conduct of Dealership Operations.

### 12.3.4 Assignment

General Motors rights under this section may be assigned to any third party ("Assignee"). If there is an assignment, General Motors will guarantee full payment of the purchase price by the Assignee. General Motors shall have the opportunity to discuss the terms of the buy/sell agreement with the potential Assignee(s).

General Motors rights under this Article are binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets or stock and such other rights as proposed to be transferred.

### 12.3.5 Transfer Involving Family Members and Dealer Management

When the proposed change of ownership involves a transfer by a dealer owner solely to a member or members of his or her immediate family, or to a qualifying member of Dealer's Management, and such member or members meet General Motors' qualification requirements under Article12.2, General Motors right of first refusal will not apply. An

17

"immediate family member" shall be the spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of the dealer owner. A "qualifying member of Dealer's Management" shall be an individual who has been employed by Dealer for at least two years and otherwise qualifies as a dealer operator.

### 12.3.6 Expenses

If General Motors exercises its right of first refusal, General Motors agrees to pay the proposed owner the reasonable expenses, including reasonable attorney fees, that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, and that are incurred by the proposed owner in negotiating and implementing the contract for the proposed change in Dealer ownership before General Motors gives notice of its exercise of its right of first refusal. The proposed owner must provide a reasonable accounting and documentation of such expenses to receive such reimbursement.

## ARTICLE 13. BREACHES AND OPPORTUNITY TO REMEDY

### 13.1   Certain Acts or Events

The following acts or events, which are within the control of Dealer or originate from action taken by Dealer or its management or owners, are material breaches of this Agreement. If General Motors learns that any of the acts or events has occurred, it may notify the Dealer in writing. If notified, Dealer will be given the opportunity to respond in writing within 30 days of receipt of the notice, explaining or correcting the situation to General Motors satisfaction.

**13.1.1** The removal, resignation, withdrawal, or elimination from Dealer for any reason of any Dealer Operator or dealer owner without General Motors prior written approval.

**13.1.2** Any attempted or actual sale, transfer, or assignment by Dealer of this Agreement or any of the rights granted Dealer hereunder, or any attempted or actual transfer, assignment or delegation by Dealer of

any of the responsibilities assumed by it under this Agreement contrary to the terms of this Agreement.

**13.1.3** Any change, whether voluntary or involuntary, in the record or beneficial ownership of Dealer as set forth in the Dealer Statement of Ownership furnished by Dealer, unless permitted by Article 12.2.5 or pursuant to General Motors written approval.

**13.1.4** Any undertaking by Dealer or any of its owners to conduct, either directly or indirectly, any of the Dealership Operations at any un-approved location.

**13.1.5** Any sale, transfer, relinquishment, discontinuance, or change of use by Dealer of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without General Motors prior written approval.

18

*13.1.6* Any dispute among the owners or management personnel of Dealer which, in General Motors judgment, may adversely affect the Dealership Operations or the interests of Dealer or General Motors.

*13.1.7* Refusal by Dealer to timely furnish sales, service or financial information and related supporting data, or to permit General Motors examination or audit of Dealer's accounts and records.

*13.1.8* A finding by a government agency or court of original jurisdiction or a settlement arising from charges that Dealer, Dealer Operator, or a predecessor of Dealer owned or controlled by the same person, had committed an unfair or deceptive business practice which, in General Motors judgment, may adversely affect the reputation or interests of Dealer or General Motors.

*13.1.9* Willful failure of Dealer to comply with the provisions of any laws or regulations relating to Dealership Operations.

*13.1.10* Submission by Dealer of false applications or reports, including false orders for Products or reports of delivery or transfer of Products.

*13.1.11* Failure of Dealer to maintain the line of credit required by Article 10.

*13.1.12* Failure of Dealer to timely pay its obligations to General Motors.

*13.1.13* Refusal by Dealer to permit General Motors or any designated representative of General Motors to access, examine, audit, or take copies of any of the accounts or records Dealer is to maintain under the accounting manual and this Agreement.

*13.1.14* Any other material breach of Dealer's obligations under this Agreement not otherwise identified in this Article 13 or in Article 14, or any other fraudulent conduct not specifically mentioned above.

If Dealer's response demonstrates that the breach has been corrected, or otherwise explains the circumstances to General Motors satisfaction, then General Motors shall confirm this fact in writing to Dealer. If, however, Dealer's response does not demonstrate that the breach has been corrected, or explain the circumstances to General Motors satisfaction, termination is warranted and General Motors may terminate this Agreement upon written notice to Dealer. Termination will be effective 60 days following Dealer's receipt of the notice.

### 13.2    Failure of Performance by Dealer

If General Motors determines that Dealer's Premises are not acceptable, or that Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, General Motors will review such failure with Dealer.

As soon as practical thereafter, General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during which Dealer will have the opportunity to correct the failure.

19

If Dealer does correct the failure by the expiration of the period, General Motors will so advise the Dealer in writing. If, however, Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice.

# ARTICLE 14. TERMINATION OF AGREEMENT

### 14.1   By Dealer

Dealer has the right to terminate this Agreement without cause at any time upon written notice to General Motors. Termination will be effective 30 days after General Motors receipt of the notice, unless otherwise mutually agreed in writing.

### 14.2   By Agreement

This Agreement may be terminated at any time by written agreement between General Motors and Dealer. Termination assistance will apply only as specified in the written termination agreement.

### 14.3   Failure to be Licensed

If General Motors or Dealer fails to secure or maintain any license required for the performance of obligations under this Agreement or such license is suspended or revoked, either party may terminate this Agreement by giving the other party fifteen days written notice. Dealer may only conduct Dealership Operations if permitted by law.

### 14.4   Death or Incapacity of Dealer Operator

Because this is a Personal Services Agreement, General Motors may terminate this Agreement by written notice to Dealer upon the death of the Dealer Operator or if Dealer Operator is so physically or mentally incapacitated that the Dealer Operator is unable to actively exercise full managerial authority. The effective date of termination will be stated in such written notice and will be not less than three months after receipt of such notice. Prior to issuing a written notice of termination under Article 14.4, General Motors will provide Dealer with sixty days to submit a proposal for a replacement dealer operator by submitting the application forms and such other information reasonably requested by General Motors. General Motors will evaluate the candidate's qualification requirements under Article 12.2.

### 14.5   Acts or Events

If General Motors learns that any of the following has occurred, it may terminate this Agreement by giving Dealer written notice of termination. Termination will be effective on the date specified in the notice.

14.5.1   Conviction in a court of original jurisdiction of Dealer, or a predecessor of Dealer owned or controlled by the same person, or any Dealer Operator or dealer owner of any felony.

14.5.2   Insolvency of Dealer; or filing by or against Dealer of a petition in bankruptcy; or filing of a proceeding for the appointment of a receiver or

20

74

trustee for Dealer, provided such filing or appointment is not dismissed or vacated within thirty days; or execution by Dealer of an assignment for the benefit of creditors or any foreclosure or other due process of law whereby a third party acquires rights to the operation, ownership or assets of Dealer.

**14.5.3** Failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days.

**14.5.4** Any misrepresentation to General Motors by Dealer or by any Dealer Operator or owner in applying for this Agreement, or in identifying the Dealer Operator, or record or beneficial ownership of Dealer.

**14.5.5** Submission by Dealer of false applications or claims for any payment, credit, discount, or allowance, including false applications in connection with incentive activities, where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment.

Termination for failure to correct other breaches will be according to the procedures outlined in Article 13.

## 14.6    Reliance on Any Applicable Termination Provision

The terminating party may select the provision under which it elects to terminate without reference in its notice to any other provision that may also be applicable. The terminating party subsequently also may assert other grounds for termination.

## 14.7    Transactions After Termination
### 14.7.1 Effect on Orders

If Dealer and General Motors do not enter into a new Dealer Agreement when this Agreement expires or is terminated, all of Dealer's outstanding orders for Products will be automatically canceled except as provided in this Article 14.7.

Termination of this Agreement will not release Dealer or General Motors from the obligation to pay any amounts owing the other, nor release Dealer from the obligation to pay for Special Vehicles if General Motors has begun processing such orders prior to the effective date of termination.

### 14.7.2 Termination Deliveries

If this Agreement is voluntarily terminated by Dealer or expires or is terminated because of the death or incapacity of a Dealer Operator, without a termination or expiration deferral, General Motors will use its best efforts consistent with its distribution procedures to furnish Dealer with Motor Vehicles to fill Dealer's bona fide retail sold orders with customers as of the effective date of termination or expiration, not to exceed, however, the total number of Motor Vehicles invoiced to Dealer for retail sale during the three months immediately preceding the effective date of termination.

### 14.7.3 Effect of Transactions After Termination

Neither the sale of Products to Dealer nor any other act by General Motors or Dealer after termination of this Agreement will be construed as a waiver of the termination.

# ARTICLE 15. TERMINATION ASSISTANCE

## 15.1   Deferral of Effective Date

If this Agreement is scheduled to expire or terminate because of the death or incapacity of a Dealer Operator and Dealer requests an extension of the effective date of expiration or termination thirty days prior to such date, General Motors will defer the effective date for up to a total of eighteen months after such death or incapacity occurs to assist Dealer in winding up its Dealership Operations.

## 15.2   Purchase of Personal Property

### 15.2.1   General Motors Obligations

If this Agreement: a) expires or is terminated by Dealer, and General Motors does not offer Dealer or a replacement dealer a new dealer agreement, or b) is terminated by General Motors for cause under the Dealer Agreement, General Motors will offer to purchase the following items of personal property (herein called Eligible Items) from Dealer at the prices indicated:

(a) New and unused Motor Vehicles of the current model year purchased by Dealer from General Motors, and of the previous model year if purchased by Dealer from General Motors within one hundred twenty days before the effective date of termination, at a price equal to the net prices and charges that were paid to General Motors;

(b) Any signs owned by Dealer of a type recommended in writing by General Motors and bearing any Marks at a price agreed upon by General Motors and Dealer. If General Motors and Dealer cannot agree on a price, they will select a third party who will set the price;

(c) Any essential tools recommended by General Motors and designed specifically for service of Motor Vehicles that General Motors offered for sale during the three years preceding termination at prices established in accordance with the applicable pricing formula in the Service Policies and Procedures Manual; and

(d) Unused and undamaged Parts and Accessories that (i) are still in the original, re-salable merchandising packages and in unbroken lots (in the case of sheet metal, a comparable substitute for the original package may be used); (ii) are listed for sale in the then current Dealer Parts and Accessories Price Schedules (except those items marked **NOT ELIGIBLE** Parts and Accessories); and (iii) were purchased by Dealer either directly from General Motors or from an outgoing dealer as a part of Dealer's initial Parts and Accessories inventory. Prices will be those dealer prices in effect at the time General Motors receives the Parts and Accessories, less any applicable allowances whether or not any such allowances were made to Dealer when Dealer purchased the Parts and Accessories. In addition, an allowance of five percent of dealer price for packing costs and reimbursement for transportation charges to the destination specified by General Motors will be credited to Dealer's account.

### 15.2.2   Dealer's Responsibilities

General Motors obligation to purchase Eligible Items is subject to Dealer fulfilling its responsibility under this subsection.

Within fifteen days following the effective date of termination or expiration of this Agreement, Dealer will furnish General Motors with a list of vehicle identification numbers and such other information as

22

General Motors may request pertaining to eligible Motor Vehicles. Dealer will deliver the eligible Motor Vehicles to a destination determined by General Motors that will be in a reasonable proximity to Dealer's Premises.

Within two months following the effective date of termination or expiration of this Agreement, Dealer will mail or deliver to General Motors a complete and separate list of each of the Eligible Items other than Motor Vehicles. Dealer will retain the Eligible Items until receipt of written shipping instructions from General Motors. Within thirty days after receipt of instructions, Dealer will ship the Eligible Items, transportation charges prepaid, to the destinations specified in the instructions.

Dealer will take action and execute and deliver such instruments as necessary to (a) convey to General Motors good and marketable title to all Eligible Items to be purchased, (b) comply with the requirements of any applicable state law relating to bulk sales or transfer, and (c) satisfy and discharge any liens or encumbrances on Eligible Items prior to their delivery to General Motors.

### 15.2.3 Payment

Subject to Article 17.10, General Motors will pay for the Eligible Items as soon as practicable following their delivery to the specified destinations. Payment may be made directly to anyone having a security or ownership interest in the Eligible Items.

If General Motors has not paid Dealer for the Eligible Items within two months after delivery, and if Dealer has fulfilled its termination obligations under this Agreement, General Motors will, at Dealer's written request, estimate the purchase price of the unpaid Eligible Items and all other amounts owed Dealer by General Motors. After deducting the amounts estimated to be owing General Motors and its subsidiaries by Dealer, General Motors will pay Dealer 75 percent of the net amount owed Dealer and will pay the balance, if any, as soon as practicable thereafter.

### 15.2.4 Replacement Dealer

If Dealer intends to terminate its Dealer Agreement and General Motors has approved a replacement dealer, the Dealer or replacement dealer may submit electronically to General Motors prior to the closing a listing of the Dealer's parts inventory, and General Motors will advise the Dealer or replacement dealer within thirty days what parts General Motors is willing to repurchase under General Motors policies and procedures then in effect upon Dealer's termination of its Dealer Agreement. General Motors will assist the replacement dealer in establishing an appropriate Motor Vehicle inventory as provided in Article 6.4.1.

### 15.3 Assistance on Premises

#### 15.3.1 General Motors Obligation

Subject to Article 17.10, General Motors agrees to give Dealer assistance in disposing of the Premises as provided below if (i) this Agreement expires for any reason or is terminated by General Motors under Articles 13.2 or 14.4 and (ii) Dealer is not offered a new Dealer Agreement. Such assistance shall be given only on Premises that are described in the Location and Premises Addendum and only if:

(a) they are used solely for Dealership Operations (or similar dealership operations under other agreements with General Motors which will be terminated simultaneously with this Agreement); and

(b) they are not substantially in excess of space requirements at the time of termination or, if they are substantially in excess, they became excessive because of a reduction in the requirements applicable to Dealer's facilities.

Any Dealer request for such assistance must be in writing and received by General Motors within thirty days of the expiration or termination of this Agreement.

Premises that consist of more than one parcel of property or more than one building, each of which is separately usable, distinct and apart from the whole or any other part with appropriate ingress or egress, shall be considered separately under this Article 15.3.

### 15.3.2 Owned Premises

General Motors will provide assistance on owned Premises by either (a) locating a purchaser who will offer to purchase the Premises at a reasonable price, or (b) locating a lessee who will offer to lease the Premises. If General Motors does not locate a purchaser or lessee within a reasonable time, General Motors will itself either purchase or, at its option, lease the Premises for a reasonable term at a reasonable rent. If the cause of termination or expiration is a death or the incapacity of the Dealer Operator, General Motors may instead pay Dealer a sum equal to a reasonable rent for a period of twelve months immediately following the effective date of termination or expiration of this Agreement.

### 15.3.3 Leased Premises

General Motors will provide assistance on leased Premises by either:

(a) locating a tenant(s), satisfactory to lessor, who will sublet for the balance of the lease or assume it; or

(b) arranging with the lessor for the cancellation of the lease without penalty to Dealer; or

(c) reimbursing Dealer for the lesser of the rent specified in the lease or settlement agreement or a reasonable rent for a period equal to the lesser of twelve months from the effective date or termination or expiration of the balance of the lease term.

Upon request, Dealer will use its best efforts to effect a settlement of the lease with the lessor subject to General Motors prior approval of the terms. General Motors is not obligated to reimburse Dealer for rent for any month during which the Premises are occupied by Dealer or anyone else, after the first month following the effective date of termination or expiration.

### 15.3.4 Rent and Price

General Motors and Dealer will fix the amount of a reasonable rent and a reasonable price for the Premises by agreement at the time Dealer requests assistance. The factors to be considered in fixing those amounts are:

(a) the adequacy and desirability of the Premises for a dealership operation; and

(b) the fair market value of the Premises. If General Motors and Dealer cannot agree, the fair market value will be determined by the median appraisal of three qualified real estate appraisers, of whom Dealer and General Motors will each select one and the two selected will select the third. The cost of appraisals will be shared equally by Dealer and General Motors.

24

### 15.3.5 *Limitations on Obligation*
### *to Provide Assistance*

General Motors will not be obligated to provide assistance on Premises if Dealer:

(a) fails to accept a bona fide offer from a prospective purchaser, sub-lessee or assignee;

(b) refuses to execute a settlement agreement with the lessor if the agreement would be without cost to Dealer;

(c) refuses to use its best efforts to effect a settlement when requested by General Motors; or

(d) refuses to permit General Motors to examine Dealer's books and records if necessary to verify claims of Dealer under this Article.

Any amount payable by General Motors as rental reimbursement or reasonable rent shall be proportionately reduced if the Premises are leased or sold to another party during the period for which such amount is payable. Payment of rental reimbursement or reasonable rent is waived by Dealer if it does not file its claim therefor within two months after the expiration of the period covered by the payment. Upon request, Dealer will support its claim with satisfactory evidence of its accuracy and reasonableness.

## ARTICLE 16.  DISPUTE RESOLUTION PROCESS

Dealer and General Motors recognize that it is desirable to resolve disputes in a fair, prompt, and cost efficient manner. Therefore, except for the matters specified below, and except as otherwise specifically agreed upon in writing between Dealer and General Motors, Dealer and General Motors agree to mediate any dispute arising under this Agreement or applicable law using the General Motors Dispute Resolution Process then in effect, a copy of which has been provided to Dealer, before using other remedies available under federal, state or local law. The matters ineligible for mediation include: (i) terminations due to insolvency, a dealer's failure to conduct customary sales and service operations during customary business hours for at least seven consecutive business days, license revocation, fraud or felony convictions, (ii) disputes requiring participation by a third party who does not agree to participate in the mediation, and (iii) disputes of General Motors Policies or Procedures as

applied to dealers generally. Dealer or General Motors may file simultaneously with a court or administrative agency if necessary to retain its rights under applicable law. Mediation under the General Motors Dispute Resolution Process is mandatory, but mediation is not binding on the parties unless the parties agree upon a solution. If a dispute is not resolved through mediation, Dealer and General Motors may agree to resolve this dispute through voluntary binding arbitration available under the General Motors Dispute Resolution Process.

The General Motors Dispute Resolution Process is set forth in a separate booklet, and this Process will be administered by a Joint Mediation/Arbitration Committee composed of dealers and General Motors representatives. General Motors may amend the Process from time to time, but will consult with the Joint Mediation/Arbitration Committee before making any changes.

# ARTICLE 17.  GENERAL PROVISIONS

## 17.1    No Agent or Legal Representative Status

This Agreement does not make either party the agent or legal representative of the other for any purpose, nor does it grant either party authority to assume or create any obligation on behalf of or in the name of the others. No fiduciary obligations are created by this Agreement.

## 17.2    Responsibility for Operations

Except as provided in this Agreement, Dealer is solely responsible for all expenditures, liabilities and obligations incurred or assumed by Dealer for the establishment and conduct of its operations.

## 17.3    Taxes

Dealer is responsible for all local, state, federal, or other applicable taxes and tax returns related to its dealership business and will hold General Motors harmless from any related claims or demands made by any taxing authority.

## 17.4    Indemnification by General Motors

General Motors will assume the defense of Dealer and indemnify Dealer against any judgment for monetary damages or rescission of contract, less any offset recovered by Dealer, in any lawsuit naming Dealer as a defendant relating to any Product that has not been altered when the lawsuit concerns:

*17.4.1* Breach of the General Motors warranty related to the Product, bodily injury or property damage claimed to have been caused solely by a defect in the design, manufacture, or assembly of a Product by General Motors (other than a defect

which should have been detected by Dealer in a reasonable inspection of the Product);

*17.4.2* Failure of the Product to conform to the description set forth in advertisements or product brochures distributed by General Motors because of changes in standard equipment or material component parts unless Dealer received notice of the changes prior to retail delivery of the affected Product by Dealer; or

*17.4.3* Any substantial damage to a Product purchased by Dealer from General Motors which has been repaired by General Motors unless Dealer has been notified of the repair prior to retail delivery of the affected Product.

If General Motors reasonably concludes that allegations other than those set forth in 17.4.1, 17.4.2, or 17.4.3 above are being pursued in the lawsuit, General Motors shall have the right to decline to accept the defense or indemnify dealer or, after accepting the defense, to transfer the defense back to Dealer and withdraw its agreement to indemnify Dealer.

Procedures for requesting indemnification, administrative details, and limitations are contained in the Service Policies and Procedures Manual under "Indemnification." The obligations assumed by General Motors are limited to those specifically described in this Article and in the Service Policies and Procedures Manual and are conditioned upon compliance by Dealer with the procedures described in the Manual. This Article shall not affect any right either party may have to seek indemnification or

26

contribution under any other contract or by law and such rights are hereby expressly preserved.

### 17.5    Trademarks and Service Marks

General Motors, its subsidiaries or other affiliated companies are the exclusive owners or licensees of the various trademarks, service marks, names and designs (Marks) used in connection with Products and services.

Dealer is granted the non-exclusive right to display Marks in the form and manner approved by General Motors in the conduct of its dealership business. Dealer agrees to permit any designated representative of General Motors upon the Premises during regular business hours to inspect Products or services in connection with Marks.

Dealer will not apply to register or maintain a registration for any Marks either alone or as part of another mark, and will not take any action which may adversely affect the validity of the Marks or the goodwill associated with them. Dealer will not apply to register or maintain a registration for any name which includes a Mark as an Internet domain name without General Motors prior written approval. Upon written notice by General Motors of any such applications or registrations by Dealer, Dealer will, at the election of General Motors, expressly abandon or assign the name to General Motors no later than 30 days from receipt of such notice.

Dealer agrees to purchase and sell goods bearing Marks only from parties authorized or licensed by General Motors.

Marks may be used as part of the Dealer's name with General Motors written approval. Dealer agrees

to change or discontinue the use of any Marks upon General Motors request.

Dealer agrees that no company owned by or affiliated with Dealer or any of its owners may use any Mark to identify a business without General Motors written permission.

Upon termination of this Agreement, Dealer agrees to immediately discontinue, at its expense, all use of Marks, including but not limited to removal of all Marks from any and all Dealer owned signs. Thereafter, Dealer will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that General Motors determines is likely to cause confusion or mistake or deceive the public.

Dealer will reimburse General Motors for all legal fees and other expenses incurred in connection with action to require Dealer to comply with this Article 17.5.

### 17.6    Notices

Any notice required to be given by either party to the other in connection with this Agreement will be in writing and delivered personally or by first class or express mail or by facsimile, or electronically as provided in this Agreement. Notices to Dealer will be directed to Dealer or its representatives at Dealer's principal place of business and, except for indemnification requests made pursuant to Article 17.4, notices by Dealer will be directed to the appropriate Regional General Manager of General Motors.

27

### 17.7    No Implied Waivers

The delay or failure of either party to require performance by the other party or the waiver by either party of a breach of any provision of this Agreement will not affect the right to subsequently require such performance.

## 17.8    Assignment of Rights or Delegation of Duties

Dealer has not paid any fee for this Agreement. Neither this Agreement nor any right granted by this Agreement is a property right.

Except as provided in Article 12, neither this Agreement nor the rights or obligations of Dealer may be sold, assigned, delegated, encumbered or otherwise transferred by Dealer.

General Motors may assign this Agreement and any rights, or delegate any obligations, under this Agreement to any affiliated or successor company, and will provide Dealer written notice of such assignment or delegation. Such assignment or delegation shall not relieve General Motors of liability for the performance of its obligations under this Agreement.

### 17.9    No Third Party Benefit Intended

This Agreement is not enforceable by any third parties and is not intended to convey any rights or benefits to anyone who is not a party to this Agreement.

### 17.10    Accounts Payable

All monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries. In addition, General Motors may deduct any amounts due or to become due from Dealer to General Motors or its subsidiaries, or any amounts held by General Motors, from any sums or accounts due or to become due from General Motors, or its subsidiaries.

### 17.11    Sole Agreement of Parties

Except as provided in this Agreement or in any other unexpired written agreements executed by both parties, General Motors has made no promises to Dealer, Dealer Operator, or dealer owner and there are no other agreements or understandings, either oral or written, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement.

Except as otherwise provided herein, this Agreement cancels and supersedes all previous agreements between the parties that relate to any matters covered herein, except as to any monies which may be owing between the parties and any other unexpired written agreements executed by both parties.

No agreement between General Motors and Dealer which relates to matters covered herein, including the grant or amendment of any Dealer Agreement and no change in, addition to (except the filling in of blank lines) or modification of this Agreement, will be binding unless approved in a written agreement executed by an authorized person. Approvals required or provided for under this Agreement must be in writing by an authorized person. No General Motors representative is authorized to orally grant, waive or revise any terms of this Agreement or any rights conferred under this Agreement. General Motors and Dealer expressly waive application of any local, state or federal law, statute, or judicial

28

decision allowing oral grant, modifications, amendments, or additions of a Dealer Agreement notwithstanding an express provision requiring a writing signed by the Parties.

## 17.12 *Applicable Law*

This agreement is governed by the laws of the State of Michigan. The provisions of this Agreement will be deemed severable, and if any provision of this Agreement is held illegal, void, or invalid under applicable law effective in the resident jurisdiction of Dealer as of the effective date of this agreement, such provision shall be interpreted as amended to the extent reasonably necessary to make the provision legal, valid, and binding. If any provision of this Agreement is held illegal, void, or invalid in its entirety, the remaining provisions of this Agreement will not be affected but will remain binding in accordance with their terms.

## 17.13 *Superseding Dealer Agreements*

If General Motors offers a superseding form of dealer agreement or an amendment to the dealer agreement to General Motors dealers generally at any time prior to expiration of this Agreement, General Motors may terminate this Agreement by ninety days prior written notice to Dealer, provided General Motors offers Dealer a dealer agreement in the superseding form for a term of not less than the un-expired term of this Agreement.

Unless otherwise agreed in writing, the rights and obligations of Dealer that may otherwise become applicable upon termination or expiration of the term of this Agreement shall not be applicable if General Motors and Dealer execute a superseding dealer agreement, and the matured rights and obligations of the parties hereunder shall continue under the new agreement.

Dealer's performance under any prior agreement may be considered in an evaluation of Dealer's performance under this or any succeeding agreement.

29

# GLOSSARY

**Area of Primary Responsibility** -- The geographic area designated by General Motors from time to time in a Notice of Area of Primary Responsibility.

**Dealer** -- The corporation, partnership, proprietorship, limited liability corporation, or limited liability partnership that signs the Dealer Agreement with General Motors.

**Dealer Agreement** -- The Dealer Sales and Service Agreement, including the Agreement proper that is executed, the Standard Provisions, and all of the related Addenda.

**Dealership Operations** -- All operations contemplated by the Dealer Agreement. These operations include the sale and service of Products and any other activities undertaken by Dealer related to Products, including rental and leasing operations, used vehicle sales and body shop operations, finance and insurance operations, any electronic commerce, and any service of other General Motors motor vehicles authorized by General Motors, whether conducted directly or indirectly by Dealer.

**General Motors** -- General Motors Corporation.

**Incentives Manual** -- The Manual issued periodically which details certain policies and procedures related to dealer or customer incentives or promotions.

**Line-Make** -- A brand of General Motors Motor Vehicles, or a brand used to badge motor vehicles for another manufacturer. For this Dealer Agreement, the General Motors brands are Chevrolet Passenger Vehicles and Light Duty Trucks, Chevrolet Medium Duty Trucks, Pontiac Motor Vehicles, Buick Motor Vehicles, Cadillac Motor Vehicles, GMC Light Duty Trucks, GMC Medium Duty Trucks, Hummer Motor Vehicles and Saab Motor Vehicles.

**Products** -- Motor Vehicles, Parts and Accessories.

**Motor Vehicles** -- All current model types or series of new motor vehicles specified in any Motor Vehicle Addendum incorporated into this Agreement and all past General Motors motor vehicles marketed through Motor Vehicle Dealers.

**Service Policies and Procedures Manual** -- The Manual issued periodically which details certain administrative and performance requirements for Dealer service under the Dealer Agreement.

**Special Vehicles** -- Motor Vehicles that have limited marketability because they differ from standard specifications or incorporate special equipment.

GMMS 958
USA 03/2005

# MANUFACTURER'S CERTIFICATION OF DEALER

Date: <u>November 1, 2005</u>

**To the Department or
Bureau of Motor Vehicles**

**This is to certify that:**

<u>FIRST UNITED INC.</u>
Dealer Firm Name

☐ an individual
☐ a partnership
☒ a corporation
☐ a limited liability company
☐ other - specify        _____

<u>1385 E MAIN ST</u>
Dealership Street and Number

<u>EL CAJON, CALIFORNIA</u>
City, State

is a party to a written Dealer Sales and Service Agreement effective <u>November 1, 2005</u> with: ☐ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks ☐ Buick Motor Vehicles, ☒ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, **GENERAL MOTORS CORPORATION**, Detroit, MI , authorizing such party as a Dealer to sell and service new motor vehicles commonly known and designated as:

☐ Chevrolet:  Dealer Firm Name d/b/a,
☐ Pontiac:  Dealer Firm Name d/b/a,
☐ GMC: Dealer Firm Name d/b/a,
☐ Buick: Dealer Firm Name d/b/a,
☒ Cadillac:  Dealer Firm Name d/b/a <u>DE LA FUENTE CADILLAC</u>,
☐ HUMMER: Dealer Firm Name d/b/a.

The above stated Dealer Sales and Service Agreement(s) is a personal service contract dependent upon the personal

services of        <u>ROQUE  DE LA FUENTE,  II,</u>

All Persons Named in Paragraph Third

with the above stated Dealer's business and the Dealer Sales and Service Agreement(s) expires on <u>October 31, 2010</u> unless sooner terminated pursuant to the provisions thereof.

**GENERAL MOTORS CORPORATION**

By _____
Authorized Representative Signature and Title

<u>100 RENAISSANCE CENTER</u>
Office Address

<u>DETROIT, MICHIGAN</u>
City, State

85

# EXHIBIT D

GMMS 958
USA 03/2005

# MANUFACTURER'S CERTIFICATION OF DEALER

Date: <u>August 10, 2009</u>

To the Department or
Bureau of Motor Vehicles

This is to certify that:

<u>FIRST UNITED INC.</u>
Dealer Firm Name

☐ an individual
☐ a partnership
☒ a corporation
☐ a limited liability company
☐ other - specify _____

<u>1385 E MAIN ST</u>
Dealership Street and Number
<u>EL CAJON, CALIFORNIA</u>
City, State

is a party to a written Dealer Sales and Service Agreement effective <u>August 10, 2009</u> for: ☐ Chevrolet Passenger Vehicles and Light
Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty
Trucks ☐ Buick Motor Vehicles, ☒ Cadillac Motor Vehicles, ☐ HUMMER Motor Vehicles, and GENERAL MOTORS COMPANY,
Detroit, MI , authorizing such party as a Dealer to sell and service new motor vehicles commonly known and designated as:

☐ Chevrolet: Dealer Firm Name d/b/a,
☐ Pontiac: Dealer Firm Name d/b/a,
☐ GMC: Dealer Firm Name d/b/a,
☐ Buick: Dealer Firm Name d/b/a,
☒ Cadillac: Dealer Firm Name d/b/a <u>DE LA FUENTE CADILLAC,</u>
☐ HUMMER: Dealer Firm Name d/b/a,
The above stated Dealer Sales and Service Agreement(s) is a personal service contract dependent upon the personal

services of     <u>ROQUE  DE LA FUENTE, II.</u>
                       ·
                       ·

All Persons Named in Paragraph Third

with the above stated Dealer's business and the Dealer Sales and Service Agreement(s) expires on
<u>October 31, 2010</u> unless sooner terminated pursuant to the provisions thereof.

GENERAL MOTORS COMPANY

By _____     0616 mbr.
Authorized Representative Signature and Title

<u>100 RENAISSANCE CENTER</u>
                              Office Address

<u>DETROIT, MICHIGAN</u>
                        City, State

GMMS 1012
USA 05/2008

# GENERAL MOTORS COMPANY
## Dealer Sales And Service Agreement(s)

Effective August 10, 2009, General Motors Company, a Delaware Corporation, is entering into a Dealer Sales and Service Agreement ("Agreement") for each of the boxes checked: ☐ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks, ☐ Buick Motor Vehicles, ☒ Cadillac Motor Vehicles, ☐ HUMMER Motor Vehicles, and with FIRST UNITED INC., ☐ a proprietorship, ☐ a partnership, ☒ a CALIFORNIA corporation, ☐ a limited liability company, or☐ other business entity, doing business as DE LA FUENTE CADILLAC and located at 1385 E MAIN ST. EL CAJON, CALIFORNIA, 92021-6540, ("Dealer"). The Motor Vehicles that Dealer is authorized to sell and service under this Agreement(s) are listed in the Motor Vehicle Addendum(s) as provided in Article 6.1 of this Agreement.

## FIRST: TERM OF AGREEMENT

This Agreement shall expire on October 31, 2010 unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement at the expiration date if General Motors Company determines that Dealer has fulfilled its obligations under this Agreement.

### SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

### THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:
ROQUE DE LA FUENTE, II.

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
N/A

### FOURTH: EXECUTION OF AGREEMENT AND RELATED DOCUMENT(S)

This Agreement and related agreement(s) are valid only if signed:
    (a) on behalf of Dealer by its duly authorized representative, and in the case of this Agreement, by its Dealer Operator; and
    (b) this Agreement as set forth below on behalf of General Motors Company by the Executive Director, Dealer Network Planning and Investments, and an authorized General Motors Company representative. All related agreements will be signed by an authorized General Motors Company representative.

### FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS
The following agreement(s) are hereby incorporated by reference into this Agreement:

FIRST UNITED INC.
dba DE LA FUENTE CADILLAC
Dealer Firm Name

By: _____  8/6/2009
Dealer Operator and Date

**GENERAL MOTORS COMPANY**

By: _____
Executive Director, Dealer Network Planning
and Investments

By: _____  8/6/09
Authorized Representative and Date

GMMS 1014-1
USA 11/2004

# DEALER STATEMENT OF OWNERSHIP

FIRST UNITED INC. dba DE LA FUENTE CADILLAC
Dealer Firm Name
EL CAJON, CALIFORNIA
City, State

☐ a proprietorship, ☐ a partnership ☒ a corporation incorporated on February 23, 1978 in the State of
CALIFORNIA, or ☐ a limited liability company, or ☐ other business entity.

The undersigned Dealer hereby certifies that the following information is true, accurate and complete, as of
August 10, 2009.

| Names and Titles of all individuals, beneficiaries of trusts or other entities owning 5% or more of Dealer and entitled to receive dividends or profits from Dealer as a result of ownership. (Identify Holding Company Owners on GMMS 1014-2) | Active in Dealer-ship (Yes or No) | If a Corporation, Show Number Of Shares and Class | | | Value of the Owner-ship Interest of Each Person Listed Based on Dealership's Current Net Worth | Percentage Of Ownership of Record in Dealer |
|---|---|---|---|---|---|---|
| | | Number Shares | Type* Or Class | Voting (Yes or No) | | |
| ROQUE DE LA FUENTE, II PRESIDENT | YES | 1,113.00 700.00 | COMM A COMM B | NO YES | $1,115,744 | 41.67% |
| NATIONAL ENTERPRISES, INC. | NO | 1,113.00 700.00 | COMM A COMM B | NO YES | $1,115,744 | 41.67% |
| KATAYOUN Y. DE LA FUENTE VICE-PRESIDENT | NO | 325.00 400.00 | COMM A COMM B | NO YES | $446,083 | 16.66% |
| Total | XXX | 2,551.00 1,800.00 | COMM A COMM B | XXX | $2,677,572 | 100% |

*Indicate various classes of common or preferred stock issued.  State Par Value of each share of preferred stock

FIRST UNITED INC. dba DE LA FUENTE CADILLAC
Dealer Firm Name

By: _____ II    Aug 6/2009
Dealer Operator    Date

GENERAL MOTORS COMPANY

By: _____   5/6/09
Authorized Representative    Date

89

GMMS 1014-2
USA 11/2004

# DEALER STATEMENT OF OWNERSHIP

## HOLDING COMPANY OWNERSHIP

FIRST UNITED INC. dba DE LA FUENTE CADILLAC
Dealer Firm Name
EL CAJON, CALIFORNIA
City, State

| INVESTORS FOR | PERCENT OF OWNERSHIP |
|---|---|
| NATIONAL ENTERPRISES, INC. | |
| K. DE LA FUENTE YAZDANI TRUST | 33.30% |
| R. DE LA FUENTE YAZDANI TRUST | 33.30% |
| ROQUE DE LA FUENTE, III TRUST | 33.30% |

GMMS 1015
USA 09/2004

## CAPITAL STANDARD ADDENDUM
## TO
## GENERAL MOTORS COMPANY
### Dealer Sales and Service Agreement(s)

This Capital Standard Addendum, effective <u>August 10, 2009</u>, is pursuant to the Dealer Sales and Service Agreement(s) in effect between General Motors Company and Dealer.

General Motors Company has determined that the minimum net working capital (standard) necessary for the Dealer to adequately conduct Dealership Operations consistent with the Dealer's responsibilities is <u>$556,000</u>.

Dealer has established, or will, within a reasonable time, establish and maintain actual dealer net working capital in an amount not less than the minimum amount specified above.

## GENERAL MOTORS COMPANY DEALER CAPITAL STANDARD PROGRAM

General Motors Company has endeavored, through the General Motors Company Capital Standard Program, to help dealers develop sound financial positions. Over the years, this Program has contributed substantially to the effectiveness and relative permanency of General Motors Company dealers as a whole.

The purpose of the General Motors Company Capital Standard Program is to establish the minimum amount of regularly needed net working capital that should be provided by the owners through capital stock, other investment and earnings.

A minimum net working capital standard is established for each dealer based on the dealership operations it is expected to conduct under its Dealer Sales and Service Agreement(s). Dealer having actual net working capital equal to the standard established for the dealership operations contemplated at its dealership location should have net working capital to be compared to the standard which shall be determined by arriving at the sum of Total Current Assets plus Driver Training Vehicles, Lease and Rental Units and Total Accumulated LIFO Writedown minus the sum of Total Liabilities excluding those listed below.

Those liabilities that are not subtracted are:

1.  Long term notes payable which are qualified long term debt. Qualified long term debt is defined by the following criteria:
    a. The note must be payable to an owner of Dealer;
    b. Principle payments must be restricted to be paid only from profits; and
    c. The amount of qualified long-term debt to be excluded is limited to 50% of the Net Working Capital standard.
    This exception is made because an owner would be less inclined to collect on a note payable at maturity than an outside creditor when payment of such a note would place the dealership in financial jeopardy.

2.  Long term notes payable secured by real property.
    This exception is made because dealers are not required to own land and buildings that are used for dealership operations. Many dealers, however, elect to acquire and hold title to all or a portion of such real property, thereby investing a portion of the total equity capital in land and buildings that would otherwise be available for working capital purposes.

3.  Deferred Taxes.
    This exception is made because deferred taxes are typically long term reserves for a liability and not due and payable unless the bulk of the business assets are sold. As a result, there is not a working capital requirement under normal ongoing operating conditions.

<u>FIRST UNITED INC. dba DE LA FUENTE CADILLAC</u>
Dealer Firm Name

<u>EL CAJON, CALIFORNIA</u>
City, State

**GENERAL MOTORS COMPANY**

By _____    8-6-09
Authorized Representative           Date

BAC. 258684                                                        LP: 9754

GMMS 1016-1
USA 11/2004

# LOCATION AND PREMISES ADDENDUM
## TO
## GENERAL MOTORS COMPANY
### Dealer Sales and Service Agreement(s)

The undersigned Dealer and General Motors Company hereby agree that effective, August 10, 2009:

1.  "Description of Premises," identifies the Location and describes the Premises at which Dealer is authorized to conduct Dealership Operations under the Dealer Agreement(s). Dealer also represents that "Description of Premises" accurately reflects the terms under which it occupies the premises and the manner in which each is used for GM Dealership Operations.

2.  "Premises Space Analysis," sets forth the actual space Dealer represents it uses in GM Dealership Operations, and the actual space at the same locations used by Dealer for a purpose other than GM Dealership Operations.

All changes in the Location or use of Premises must be approved by General Motors Company pursuant to provisions the Dealer Agreement(s) requirements shall be reflected in a new Location and Premises Addendum executed by Dealer and General Motors Company.

FIRST UNITED INC. dba DE LA FUENTE CADILLAC
Dealer Firm Name

EL CAJON, CALIFORNIA
City, State

By _____ II    AUG/06/2009    GENERAL MOTORS COMPANY
Dealer Operator            Date     By _____ 8-6-09
                                    Authorized Representative    Date

92

GMMS 1016-2
USA 11/2004

# PART I
## DESCRIPTION OF PREMISES

<u>FIRST UNITED INC. dba DE LA FUENTE CADILLAC</u>
Dealer Firm Name

<u>EL CAJON, CALIFORNIA</u>                    <u>November 1, 2005</u>
City, State                                  Date of this GMMS (Mo., Day, Yr.)

Date Main Facility Constructed (Mo., Yr.)        Date Main Facility Remodeled or Added to (Mo., Yr.)

## LOCATION, USE AND OWNERSHIP OF PREMISES

| Identify by street address each separate dealership location and describe how each is used for GM Dealership Operations. Specify: NEW VEHICLE SALES, USED VEHICLE SALES, SERVICE, PARTS, OFFICE, NEW VEHICLE STORAGE, BODY SHOP, etc. Also indicate distance of each separate location from main location. | Dealer Asset | Leased | IF LEASED, INDICATE: Name of Lessor: Beginning and Expiration Date of Lease Annual Rental: $ Renewal Option: Term and Annual Rent |
|---|---|---|---|
| MAIN    1385 EAST MAIN STREET EL CAJON, CA INT - NEW, EXT - NEW, USED DISP, MECHANICAL, BODY, SERV RECP, PARK-CUST, NEW STORAG, EMP PK/MSC, GEN OFFICE, PARTS | ☐ | ☒ | East Main Property LLC 5/1/1985-6/30/2009 $283,200 5 Year Option New rent to be negotiated |

| TOTAL DEALERSHIP IN SQUARE FEET | | | |
|---|---|---|---|
| | <u>GM Use</u> | <u>Other Use</u> | <u>Total Area</u> |
| Total Building | 20,445 | 0 | 20,445 |
| Total Lot | 71,844 | 0 | 71,844 |
| Grand Total | 92,289 | 0 | 92,289 |

GMMS 1016-3
USA 11/2004

## (Location and Premises Addendum continued)
## PART II
## PREMISES SPACE ANALYSIS

### FIRST UNITED INC. dba DE LA FUENTE CADILLAC
Dealer Firm Name

EL CAJON, CALIFORNIA
City, State

August 10, 2009
Date of this GMMS (Mo., Day, Yr.)

| DEPARTMENT ALLOCATION | Actual Space in Number of Stalls | | | | TOTAL (A+B+C+D) (E) |
|---|---|---|---|---|---|
| | Building | | Lot (Do not include Bldg.) | | |
| | GM Use (A) | Other Use (B) | GM Use (C) | Other Use (D) | |
| (1) New Vehicle Display | 3 | | 23 | | 26 |
| (2) Used Vehicle Display | | | 50 | | 50 |
| (3) Productive Service - Mechanical | 19 | | | | 19 |
| (4) Productive Service - Body | | | | | |
| (5) Service - Reception | 4 | | 4 | | 8 |
| (6) Parking - Customer | | | 70 | | 70 |
| (7) New Vehicle Storage | | | 106 | | 106 |
| (8) Employee Parking and Miscellaneous | | | 24 | | 24 |
| (9) Total of Lines (1) through (8) | 26 | | 277 | | 303 |

| | Actual Space in Square Feet | | | TOTAL |
|---|---|---|---|---|
| | GM Use | Other Use | | |
| (10) General Office | 4,000 | | | 4,000 |
| (11) Parts | 5,500 | | | 5,500 |
| (12) Total of Lines (10) and (11) | 9,500 | | | 9,500 |

### VEHICLE LINES HANDLED

| General Motors Company Line-Makes | Non-GM Lines Handled |
|---|---|
| CADILLAC | |

94

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS COMPANY
## Dealer Sales and Service Agreement

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above.

| | | | |
|---|---|---|---|
| ALPINE | BONITA | BONSALL | BOSTONIA |
| CAMP PENDLETON NOR | CARLSBAD | CASA DE ORO-MOUNT | CHULA VISTA |
| CORONADO | CREST | DEL MAR | EL CAJON |
| ENCINITAS | ESCONDIDO | FAIRBANKS RANCH | HARBISON CANYON |
| HIDDEN MEADOWS | IMPERIAL BEACH | JAMUL | JULIAN |
| LA MESA | LA PRESA | LAGUNA-PINE VALLEY | LAKE SAN MARCOS |
| LAKESIDE | LEMON GROVE | MOUNTAIN EMPIRE | NATIONAL CITY |
| OCEANSIDE | PALOMAR-JULIAN | PINE VALLEY | POWAY |
| RAMONA | RANCHO SAN DIEGO | RANCHO SANTA FE | SAN DIEGO |
| SAN DIEGO COUNTRY | SAN MARCOS | SANTEE | SOLANA BEACH |
| SPRING VALLEY | VALLEY CENTER | VISTA | WINTER GARDENS |

The Area of Primary Responsibility will be employed by General Motors Company to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

### FIRST UNITED INC. dba DE LA FUENTE CADILLAC
**Dealer Firm Name**

### EL CAJON, CALIFORNIA
**City, State**

### GENERAL MOTORS COMPANY

by _Michael J Daly_    8-6-09

Authorized Representative        Date

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS COMPANY
## Dealer Sales and Service Agreement

Effective August 10, 2009, the area described below and known as SAN DIEGO, CALIFORNIA shall be the Dealer's Area of Primary Responsibility for CADILLAC Motor Vehicles.

** PASSENGER CAR**

All of SAN DIEGO county, CALIFORNIA except the following U.S. Census Tract(s):

188.01    188.02    189.03    189.04    189.05    189.06

190.01    190.02    191.01    210.00

GMMS 1035
USA 11/2004

# MOTOR VEHICLE ADDENDUM
## TO
# GENERAL MOTORS COMPANY
## Dealer Sales and Service Agreement
## For CADILLAC Motor Vehicles

### FIRST UNITED INC. dba DE LA FUENTE CADILLAC
**Dealer Firm Name**

### EL CAJON, CALIFORNIA
**City, State**

Effective August 10, 2009, Dealer, as an authorized General Motors Company dealer, has non-exclusive right to buy the following new CADILLAC Motor Vehicles, subject to the terms and conditions of the Standard Provisions.

### PASSENGER CARS

(*MUST SATISFY ENROLLMENT REQUIREMENTS), CTS, CTS WAGON, DTS, STS, XLR*

### LIGHT DUTY TRUCKS

ESCALADE, ESCALADE ESV, ESCALADE EXT, SRX

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Company. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors Company.

### GENERAL MOTORS COMPANY

By: _____

**General Manager, Cadillac**

# GM PULSAT NETWORK
## EQUIPMENT INSTALLATION AGREEMENT

This Agreement is made between General Motors Company ("GM") and the party identified below as "Dealer." Reference is made to (1) Dealer's Dealer Sales and Service Agreement(s) for GM vehicles, (2) Dealer's DCS Service Agreement and any other service agreement(s) pertaining to transmittal of authorized data over the GM PULSAT Network. Where dealer is not the landowner, this Agreement is signed by Dealer's authorized representative in conjunction with a Consent and Agreement of Landowner providing the landowner's consent for installation and removal of the Equipment. This Agreement is effective upon signature by an authorized Dealer representative and a GM PULSAT Network authorized representative.

1. Dealer agrees to the installation, maintenance, removal and operation of the Equipment described herein ("PULSAT Equipment" or "Equipment"), which Equipment is bailed to Dealer in accord with this Agreement, including the General Provisions attached hereto.

2. Dealer agrees to pay $4500 installation and configuration charge for basic PULSAT Equipment.* This will be debited to Dealer's Open Account. There is no additional (separate) charge to Dealer for basic GM-provided maintenance. The basic Equipment configuration, installation and GM-provided maintenance are described below and in the General Provisions. If the Dealer requires Equipment or services other than or in addition to the basic levels, they are also described below and will be subject to a separate charge.

3. Dealer acknowledges the Equipment is the property of GM (including affiliated companies) held by Dealer in bailment. Upon termination of the Agreement GM may remove from the installation premises all of the Equipment installed hereunder, and GM's only obligations upon such removal will be those described in the General Provisions.

Dealer:    FIRST UNITED INC. dba DE LA FUENTE CADILLAC

Address:    1385 E MAIN ST, EL CAJON, CALIFORNIA 92021-6540

Business Management Division (BMD):    CADILLAC MOTOR CAR DIVISION

Premises of Installation (if different from above):    BMD Dealer Code:    36810

Selling Source:    CAD

Basic PULSAT Equipment Includes:
　　　Digital Interface Unit (DIU)
　　　Integrated Receiver Decoder (IRD)
　　　Very Small Aperture Terminal (VSAT)
　　　Network File Server with Switch

Optional Equipment/Services:
　　　Antenna De-icer
　　　Extended Maintenance
　　　Tall Pole

GM PULSAT Coordinator:

Name: _____    Phone: _____

Alternate: _____    Phone: _____

Dealer Firm Name:    FIRST UNITED INC. dba DE LA FUENTE CADILLAC

By _____    AUG/06/2009
Signature and Title    Date

*NOTE    $4500 fee waived if PULSAT Satellite equipment is currently installed and in working condition at this location. Modifications or changes will be subject to a separate charge.

After signing, Fax to: (586) 576-3355, Attention: Amber Cook

GENERAL MOTORS COMPANY

By _____
General Director, Dealer System

By _____    8-7-09
Authorized Representative    Date

98

# GENERAL PROVISIONS
# GM PULSAT NETWORK
# EQUIPMENT INSTALLATION AGREEMENT

1. Consents. As used herein, "landowner" means each fee titleholder and all other persons holding an interest in the Dealer's dealership premises where PULSAT Equipment is to be installed ("Premises"), including land and improvements, which interest affects Dealer's occupation and possession of the Premises, and their respective successors and assigns. Dealer will obtain from each landowner its consent to this Equipment Installation Agreement and to the installation, maintenance, removal and operation of the PULSAT Equipment pursuant to this Equipment Installation Agreement, and to any changes required to be made to the Premises as deemed necessary by GM in order to provide adequate support and any necessary power wiring or any electrical equipment. Such consent of landowners will acknowledge the clear and unencumbered title to said PULSAT Equipment in GM and the right to remove the PULSAT Equipment as provided herein. Dealer is responsible for any changes associated with such consent. In the event Dealer is unable to obtain the consent of any landowner in the form provided by or satisfactory to GM within ten days from the date of execution hereof, then this Agreement will become voidable at the option of GM, and upon GM's exercise of such option the parties will be released from all obligations hereunder.

2. Installation Restrictions. It is agreed with respect to each piece of Equipment subject to this Agreement that:
    (a) It will comply with all applicable state and local laws, ordinances and regulations, and all required installation permits therefore must be obtained from the appropriate governmental authorities.
    (b) In GM's judgment, it must be practicable from both an engineering and a financial standpoint to install the PULSAT Equipment at the Premises.

Dealers will cooperate with and assist GM in accomplishing installation of the PULSAT Equipment within the foregoing limitations. If no Equipment offered by GM will meet the foregoing limitations, this Agreement will become null and void and the parties will be released from all obligations hereunder.

3. Installations. PULSAT Equipment will be installed at such date and time as may be reasonably scheduled by GM; GM will not be liable for any delays in commencing or completing the installation thereof.

GM agrees to install the PULSAT Equipment upon the Premises in accordance with the specifications set forth herein. Dealer agrees to allow GM to remove or relocate any existing equipment which may interfere with or be duplicative of PULSAT Equipment. Upon termination of this Agreement GM will not be responsible for the replacement of any equipment so removed or relocated. Dealer will provide normal power and any telephone hookup required for use of the Equipment.

4. Equipment/Services. The basic Equipment configuration, basic installation and basic maintenance is provided by GM, and charges applicable thereto, are described further in written procedures provided by GM from time to time, and are subject to change if changes are made for dealers in general. Any agreement or services required by Dealer in addition to the basic levels provided herein are subject to a separate charge. GM offerings of additional equipment and services for use with the GM PULSAT Network and charges therefore, are also described in the written procedures. Any charges hereunder will be calculated in accord with GM's then published schedule of charges, which is subject to change from time to time, and will be debited to Dealer's Open Account.

Additional installation services may include such things as additional cable, special footings, and related work required for a non-standard installation resulting from inability to locate the satellite dish in close proximity to the other Equipment or to mount it in a standard fashion, removal of unrelated antennas, installation of an electrical outlet for operation of the Equipment, or installation of additional television hookups within the Premises for receiving the satellite video signal.

(2)

Installation of the PULSAT Equipment establishes Dealer's Premises as a node on the GM PULSAT Network.
To receive video applications, Dealer must provide the necessary television and video recording equipment.
To use the data communications applications, Dealer must obtain hardware and software from an authorized
dealer systems provider and have a service agreement with GM for access to GM's host computer.

5. GM's Property. All PULSAT Equipment installed pursuant to this Agreement will be appropriately
marked and identified as the property of GM (including its affiliates). Dealer will ensure that such stickers,
labels or plaques as become affixed to the Equipment so as to mark and identify it as property of GM are not
removed, damaged or obscured. Dealer agrees to take such measures and precautions as are necessary to
ensure that Equipment remains on Dealer's Premises as installed and is protected from damage, deterioration
and other abuse.

Upon GM's request Dealer will execute such documents as GM may require for filing in public records to give
notice that the PULSAT Equipment is the property of GM bailed to Dealer. Dealer will take such further
actions as GM may from time to time require so as to protect GM's interest in the Equipment. GM may inspect
the Equipment at the Premises at any time during Dealer's normal business hours.

6. Equipment Relocations. No Equipment subject to this Agreement will be relocated except as expressly
authorized by GM. Authorization by GM of any relocation will be evidenced in writing, which will be made
part of this Agreement effective as of the date noted thereon. The expense of any authorized relocation will be
borne by Dealer. In the event of any unauthorized relocation, GM will have the option of restoring the
Equipment to the location specified herein, or of inspecting the Equipment as relocated and taking such
measures as GM deems appropriate to bring such Equipment into compliance with GM's installation
specifications, and in either such event Dealer will bear the expense thereof.

7. Dealership Relocation. In the event Dealer relocates its dealership operations to new premises, GM will
have the option either of terminating this Agreement without any further obligation or liability to Dealer
hereunder, or amending this Agreement to cover the new location, in which case this Agreement will be
amended accordingly and the new landowner consents obtained as appropriate, and the expense of removing
the Equipment from the old location and of installing it at the new location will be borne by Dealer.

8. Termination. This Agreement will automatically terminate and be of no force and effect, without notice,
upon the termination by GM or Dealer of Dealer's Dealer Sales and Service Agreement(s) with GM, the
non-renewal of such Dealer Sales and Service Agreement(s) upon the expiration of its term, the termination of
Dealer's DCS Service Agreement with GM, or if for any reason Dealer vacates the Premises or ceases to
operate them in the regular course of business for the sale and service of GM vehicles as an authorized dealer.
Upon such termination Dealer will remain responsible for any damage to the Equipment until it is removed.

This Agreement will not operate or be construed to extend, or imply intention to extend, Dealer's Dealer Sales
and Service Agreement(s) with GM beyond its expiration or in any way whatsoever affect the rights and
obligations of either of the parties to such Dealer Sales and Service Agreement(s).

9. Taxes and Permits. GM will report and pay any personal property taxes applicable to its property bailed
to Dealer under this Agreement. Dealer will cooperate with and assist GM in identifying any applicable
personal property taxes.

Dealer will cooperate with and assist GM in obtaining any permits or licenses required for installation of the
Equipment. Thereafter, Dealer will be responsible for and obtain and maintain any permits or licenses
necessary for the Equipment. If Dealer fails for any reason to maintain such permits or licenses, GM may do
so and charge the cost of said permits or licenses, or any other such cost due to such failure, to Dealer.

10. Ordinance Changes. Dealer will notify GM of any changes in local ordinances or regulations which affect
the Equipment subject to this Agreement. GM will perform any alterations or relocations necessary to comply
with said changes at Dealer's expense.

(3)

11. Dealer's Use of Equipment. Dealer agrees to use the Equipment only in connection with authorized transmissions over the GM PULSAT Network and in accordance with written procedures provided by GM from time to time. Dealer further agrees to use the video programming only in connection with Dealer business under its GM Dealer Sales and Service Agreement. Dealer will take no action which may interfere with normal operation of the Equipment or increase the expense of operating or maintaining the Equipment. No banners, signs, lights, or other materials of any kind whatsoever will be attached or affixed to the Equipment or any part thereof, including the satellite dish and its supporting structure.

12. No Assignments by Dealers. This Agreement may not be assigned by Dealer except with the express prior written consent of GM. Any attempt by Dealer to assign this Agreement without consent will be deemed a void assignment and constitute default by Dealer of the terms and conditions hereof.

13. Operation and Maintenance. Dealer will use its best efforts to keep the Equipment in good working order and condition and operate the Equipment in accordance with written procedures provided by GM from time to time, which may include routine maintenance procedures. Dealer will notify GM promptly whenever the Equipment requires any repairs or services. GM will be responsible for providing and paying for all such repairs or services; however, Dealer will reimburse GM for any repairs or services which become necessary as a result of abuse, misuse, or negligent use of the Equipment or failure to comply with procedures prescribed by GM. Dealer will provide GM and its contractor with access to the Premises and Equipment as required for repairs or services.

14. Equipment Damage or Destruction. In the event of damage to or destruction of PULSAT Equipment by any cause whatsoever, GM may rebuild, replace or restore said Equipment.

Dealer will be solely responsible for damages to or destruction of Equipment caused by or resulting from any act, omission or negligence of Dealer, its agents, invitees, employees or guests. Dealer will promptly reimburse GM for the cost to GM to repair or replace PULSAT Equipment when damages result from Dealer's or its agents', invitees', employees' or guests' act, omission or negligence.

GM will carry at its expense Comprehensive General Liability Insurance on the Equipment in the amount of at least two million ($2,000,000) dollars, combined single limit. The maintenance of such insurance by GM will in no way limit or release Dealer from liability as more particularly set forth herein. GM will furnish a Certificate of Insurance upon request to any landowner.

IN NO EVENT WILL GM BE LIABLE TO DEALER OR THIRD PARTIES FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES SUCH AS BUT NOT LIMITED TO LOSS OF ANTICIPATED PROFITS, OTHER ECONOMIC LOSS, LOSS OF USE OF EQUIPMENT OR MATERIALS, COST OF SUBSTITUTE EQUIPMENT OR MATERIALS, OR DOWNTIME COST(S) IN CONNECTION WITH OR ARISING OUT OF THE FURNISHING, FUNCTIONING OR USE OF ANY ITEM OF EQUIPMENT OR SERVICE PROVIDED FOR IN THIS AGREEMENT.

15. Equipment Removal. It is agreed that the PULSAT Equipment is and at all times pertinent hereto will remain personal property, owned by GM (including its affiliates), and that even though attached or connected to real estate it will not become or be deemed to be real estate improvements, fixtures or appurtenances.

GM will have the right, at the expiration or termination of this Agreement, to remove all Equipment bailed to Dealer pursuant hereto. GM will not be required to remove any satellite dish foundations or footings in their entirety, but only to grade level. In the case of a roof-mounted satellite dish, removal will be deemed complete when any structure is removed to several inches above the roof level, even though columns or supports may extend below. GM will endeavor to complete the removal within ninety days following termination of this Agreement or following GM's receipt of a written request therefore from Dealer or a landowner in lawful possession of the Premises.

(4)

16. Defaults by Dealer. In the event Dealer is in default of any provision of this Agreement for a period of sixty days, then GM may, at its option, terminate this Agreement, remove the PULSAT Equipment from the Premises and be relieved of all obligations to Dealer under this Agreement. Any waiver or non-enforcement by GM of a breach of this Agreement on the part of Dealer will not constitute a waiver of any further or future breach by Dealer. In the event of termination of this Agreement pursuant to this section, Dealer will be responsible for any damage to the Equipment until it is removed.

17. Advance Notice By Dealer. Dealer agrees to notify GM in writing at least thirty days in advance of any impending sale, mortgage, or property lease expiration of the real estate and improvements used by Dealer as dealership facilities.

18. Equipment and Service Changes by GM. GM will have the right (but not the duty) to change the PULSAT Equipment installed pursuant to this Agreement, and related services, if similar changes are made for dealers in general. GM will have the further right (but not the duty) to change the size, style, design, specifications and type of Equipment or relocate any or all Equipment installed pursuant to this Agreement if in the opinion of GM such change or relocation is desirable to promote better performance. Any additional or replacement equipment will be deemed PULSAT Equipment under this Agreement.

19. Assignment or Delegation By GM. All obligations under this Agreement to be performed by GM may, at GM's option, be performed by parties with whom GM has contracted for such performance or such parties as may be designated by GM to perform the obligations. GM reserves the right to assign this Agreement.

20. Notices. All notices required by or permitted under this Agreement will be in writing and will be deemed received when sent by certified or registered mail properly addressed to the other party at the business address shown on the Equipment Installation Agreement, or when actually delivered to the other party. Either party may substitute for itself a new address by due notice to the other party.

21. General. This Agreement, including these General Provisions and GM's written procedures described herein, constitutes the full understanding of the parties, and a complete and exclusive statement of the terms and conditions of their agreement pertaining to the PULSAT Equipment. It cancels and supersedes all prior understandings and agreements between them, whether express or implied, pertaining to Dealer's acquisition and use of the Equipment. No understanding or agreement which purports to modify or supplement this Agreement will be binding unless hereafter made in writing and signed by the parties to be bound thereby. This Agreement is binding on the parties and their respective successors and permitted assigns. It is governed in all respects by the laws of the State of Michigan. If any term, condition or provision of this Agreement or the application thereof is judicially or otherwise determined to be invalid or unenforceable, or if the parties mutually agree in writing to any revision of this Agreement, the remainder of this Agreement and the application thereof will not be affected, and this Agreement will otherwise remain in full force and effect.

22. GM PULSAT Dealer Communications Requirements for Service. This document is located on the GM DealerWorld website (www.gmdealerworld.com, Gen. Office tab, GM ACCESS User Guide). This document replaces and supersedes all Divisional PULSAT DCS agreements. NOTE: This document does not modify or alter the terms and conditions of the GM PULSAT Network Equipment Installation Agreement, the Consent and Agreement of Landowner; nor the General Provisions documents.

23. GM ACCESS Equipment Installation Addendum. This addendum to the GM PULSAT Network Equipment Installation Agreement is located on the GM DealerWorld website (www.gmdealerworld.com, Gen. Office tab, GM ACCESS User Guide).

# EXHIBIT E

# FIRST UNITED, INC. dba DE LA FUENTE CADILLAC
## STATEMENT of OPERATIONS
### June 1, 2009 through September 30, 2009

|  | June | July | August | September | TOTAL |
|---|---|---|---|---|---|
| Revenue |  |  |  |  |  |
| New car sales | $ 254,015 | $ 200,115 | $ 334,570 | $ 670,518 | $ 1,459,218 |
| Used car sales | 391,647 | 676,209 | 548,295 | 313,699 | 1,929,850 |
| Other income | 135,463 | 125,712 | 111,148 | 119,068 | 491,391 |
| Total Revenue | 781,125 | 1,002,036 | 994,013 | 1,103,285 | 3,880,459 |
| Cost of Goods Sold | 729,707 | 973,385 | 914,393 | 1,027,312 | 3,644,797 |
| Gross Profit | $ 51,418 | $ 28,651 | $ 79,620 | $ 75,973 | $ 235,662 |
| General and Administrative Expenses: |  |  |  |  |  |
| Advertising | 44,011 | 26,417 | 32,835 | 18,378 | 121,641 |
| Delivery and freight | 4,037 | 5,072 | 1,904 | 7,494 | 18,507 |
| Insurance | 9,836 | 9,769 | 9,755 | 8,743 | 38,103 |
| Interest expense | 10,166 | 7,133 | 11,266 | 10,252 | 38,817 |
| Legal, professional and outside services | 16,256 | 5,314 | 4,293 | 4,909 | 30,772 |
| Office expense | 19,801 | 15,797 | 16,547 | 23,057 | 75,202 |
| Rent expense | 43,814 | 43,814 | 43,814 | 43,814 | 175,256 |
| Repairs and maintenance | 4,236 | 3,376 | 3,056 | 4,774 | 15,442 |
| Salaries and wages | 99,956 | 72,723 | 60,274 | 73,098 | 306,051 |
| Taxes and licenses | 6,916 | 6,045 | 5,226 | 7,890 | 26,077 |
| Telephone and utilities | 9,408 | 9,394 | 8,841 | 7,928 | 35,571 |
| Total General and Admin. Expenses | 268,437 | 204,854 | 197,811 | 210,337 | 881,439 |
| (Loss) from Operations | $ (217,019) | $ (176,203) | $ (118,191) | $ (134,364) | $ (645,777) |

# EXHIBIT F

**De La Fuente Cadillac**
**Today's Date: November 2, 2009**

**Projected Additional Marketing Expenses Due To GM Closing & Re-Opening The Franchise**

| Year | Projected Annual Additional Marketing Expenses Due To GM Closing & Re-Opening The Franchise |
|------|------|
| 2009 (a) | $60,000 |
| 2010 | $150,000 |
| 2011 | $90,000 |
| 2012 | $60,000 |
| 2013 | $40,000 |
| 2014 | $24,000 |
| Total: | $424,000 |

(a) Represents October, November and December 2009.

# EXHIBIT G

**De La Fuente Cadillac**
**Today's Date: November 2, 2009**

## Projected Reduction In Number Of Cadillacs Sold By De La Fuente Cadillac Due To GM Closing & Re-Opening The Franchise

| Year | Projected Number Of Cadillac's Sold In San Diego County | Projected Number Of Cadillacs Sold By De La Fuente Cadillac IF GM had Not Closed & Re-Opened The Franchise | Lost De La Fuente Cadillac Sales By Unit Due To GM Closing & Re-Opening The Franchise |
|---|---|---|---|
| 2009 (a) | 578 | 145 | 18 |
| 2010 | 701 | 175 | 79 |
| 2011 | 876 | 219 | 88 |
| 2012 | 1,095 | 274 | 82 |
| 2013 | 1,369 | 342 | 68 |
| 2014 | 1,711 | 428 | 43 |
| Total: | 6,330 | 1,583 | 378 |

Today's Average Price Of New Cadillac:    $50,000

Total Projected Potential Loss Of Gross Sales Due To GM Closings & Re-Opening De La Fuente Cadillac:    $18,893,750

(a) Represents October, November and December 2009.