

Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
202-862-5000  202-429-3301 Fax
www.caplindrysdale.com

202-862-5081 Direct
tws@capdale.com

September 17, 2010

**By ECF and Hand Delivery**

The Honorable Robert E. Gerber
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

    Re:    In re Motors Liquidation Co., No. 09-50026 (REG) (Bankr. S.D.N.Y.)

Dear Judge Gerber:

    On behalf of the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**ACC**"), I write regarding the protocol by which the individual claims information sought by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") from several asbestos personal injury trusts (the "**Trusts**") may be made available on an anonymous basis.

    As the Court recognized at our August 9, 2010 hearing, an anonymity protocol is desirable here. The UCC and its expert Bates White are being provided discovery well beyond the scope of what defendants are ordinarily entitled to in the tort system. They seek information about more than 7500 individual mesothelioma claimants reflecting those individuals' claims against defendants other than General Motors and settlements made among those third parties. This information encompasses many claimants whose asbestos personal injury claims are currently pending in the tort system against non-settling solvent defendants.

    At the hearing, counsel for the UCC admitted that its discovery of the trust claim and settlement information is part of a litigation strategy calculated to affect individual claims against solvent defendants unrelated to the Motors Liquidation bankruptcy:

> This is an issue that's being fought out in courtrooms, state courtrooms, across the country. And it's very heated. It's one of the cutting edge[] issues in this

Caplin & Drysdale
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 2

> tort litigation across the country, the asbestos litigation. And if it were to get
> out, if Your Honor were to rule in your estimation ruling that the spike and
> values that occurred over the last decade was a short term thing and that the
> trusts are now paying as much, we believe in the aggregate, as those companies
> were paying in the tort system before they went bankrupt and that those values
> should be and probably will be reflected in the tort system going forward. That
> is a damaging ruling to the plaintiffs in state courts across the country.

Hr'g Tr. 19, Aug. 9, 2010.

The UCC's expert, Charles Bates, and his company, Bates White, are part of a concerted effort to alter the rules of evidence and substantive law so as to favor corporate defendants in asbestos personal injury cases. Far from being a dispassionate expert, Bates White has become an active participant in individual asbestos cases in its own right—outside of its work as an expert. For example, Bates White filed an amicus brief several weeks ago in a California case, *O'Neil v. Crane Co*, in support of the corporate defendant's position and in which it certified that "[n]o party or counsel for any party to this appeal authored the proposed amicus curiae brief in whole or in part or made a monetary contribution to fund the preparation or submission of the brief." Application and Amicus Curiae Brief of Bates White LLC Supporting Respondents, *O'Neil v. Crane Co*, No. S177401, 2010 WL 2984322, at *7 (Cal. July 28, 2010). Unfunded by any litigant, Bates White made broad assertions hostile to asbestos plaintiffs, alleging without evidence that they file their claims in secret, lie to courts and trusts, and collect duplicative damages. *Id.* at *5-7.

Bates White also holds itself out as an expert in individual asbestos cases against solvent defendants, offering testimony about what individual claimants are likely to be paid by third-party settlement trusts based on information that it has obtained through bankruptcy cases. For example, in another recent California case, *Lindenmeyer v. Allied Packing and Supply, Inc.*, purported expert Marc Scarcella, an employee of Bates White, disclosed that he would testify about

> the likelihood of, basis for, and dollar amounts of recovery available to Mr.
> Lindenmayer and his estate from various asbestos bankruptcy trusts. Mr.
> Scarcella's testimony will be based on the discovery conducted in this case, the
> publicly available documentation produced by various trusts established pursuant
> to section 11 U.S.C. 524(g), and his experience and expertise evaluating the
> processes used by various trusts in paying claims for asbestos-related diseases.

Declaration of Counsel in Support of Defendant Warren Pump LLC's Amended Designation of Expert Witnesses at 29-30, *Lindenmeyer v. Allied Packing and Supply, Inc.*, No. RG-09-

Caplin & Drysdale
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 3

483370 (Cal. July 2, 2010) (attached as Ex. A). Thus, Bates White markets itself as expert in the claim processing and payment practices of asbestos trusts and has a vested interest in using the claims estimation dispute in this case to accumulate information and knowledge that it can market to asbestos defendants, bankrupt or solvent, for use in tort suits and in other bankruptcies.

For its part, the UCC has indicated that its interest in this data is on an aggregate basis. Hr'g Tr. 70, Aug. 9, 2010. The UCC has claimed it has no interest in the identities of claimants. *Id.* Given this claim, the extraordinary scope of the UCC's proposed subpoenas, its announced strategy of seeking rulings in this case that will disadvantage claimants elsewhere, and Bates White's unusual role in individual asbestos cases, an anonymity protocol is a prudent and appropriate check on the misuse, inadvertent or otherwise, of sensitive settlement information from thousands of mesothelioma victims.

An anonymity protocol is preferable to relying on the confidentiality order alone for several reasons. First, it restricts the sheer number of parties and entities who hold sensitive information, significantly limiting the chances that error or carelessness would result in the data being compromised. Second, it reduces the difficulties of policing the confidentiality agreement. Finally, without affecting whatever utility this information might have in the aggregate estimation that will take place in this case, it curtails the potential misuse of the information outside this case.

### A strong anonymity protocol

The protocol that would offer the strongest anonymity protection and that is most in line with the observations the Court made at the hearing would be one in which the Trusts submit their data to a neutral third-party and the UCC's expert Bates White also submits to the neutral any data it contemplates merging with the Trust data. The neutral would then merge the Trusts' and Bates White's databases. The combined database would reside exclusively on the neutral's computers, and the neutral would respond to queries for aggregate and statistical information by the experts without revealing to them the identity of any individual claimant in those responses.

Caplin & Drysdale
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 4



The advantages of such an approach are several. First, the individual claimant information would be provided only to one party, rather than to multiple parties, increasing security and decreasing the likelihood of misuse. In addition, the work of merging the databases would be done only once, by the neutral, rather than multiple times by different experts, saving time and associated expert costs.

The ACC has contacted the firm Alvarez & Marsal, who is willing and able to serve as the neutral to administer the anonymity protocol. The Alvarez & Marsal professionals would be jointly retained by the parties and would charge hourly rates. While the total cost would depend on the nature of the data provided and the number and types of expert inquiries made, a preliminary estimate of the fees is $150,000 to $225,000. Both preparation of a merged database and the associated analysis are steps that would likely be undertaken by one or more of the parties' experts without a protocol, so there would be little additional time required. Overall, the protocol would have a relatively small impact on the overall expenditure or schedule of any estimation proceedings.

The UCC rejected this proposal for two principal reasons. First, it claimed that the neutral would not be able to merge the databases from the Trusts and from Bates White to their satisfaction. However, each of the component databases will have sufficient identifying information—such as name, social security number, or birthdate—to make merging them a relatively simply task. In the unlikely event that some additional work in merging the component databases is required, Alvarez & Marsal has experts in the field of claims data processing capable of that function.

Second, the UCC claimed that receiving only statistical and aggregate information from the neutral would interfere with its analysis of the data. While submitting requests to the neutral to run on the merged database might cause some modest inconvenience to the parties' experts, who would prefer to have the data on their own computers, nothing would prevent the

**Caplin & Drysdale**
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 5

experts from extracting any aggregate or statistical information from the database that they required. In seeking a fair balance, the inconvenience for the experts is outweighed by the interests of the non-party claimants in the security of this information. If the UCC complains that it needs access to detailed individual claimant information as output, moreover, that contention would be at odds with its representation that its interest in the data is on an aggregate basis only.

### A compromise anonymity protocol

An alternative protocol with similar features, but that offers somewhat less anonymity, could be structured to eliminate the objection that having experts work through the neutral would be cumbersome. It would work as follows: The Trusts and experts, here likely only Bates White, would submit their respective data to the neutral third-party, the neutral would merge the Trusts' and Bates White's data and create a single, merged database, and the neutral would then anonymize the database and provide it to the parties.



The fields from the merged database that would have to be redacted or limited would ultimately depend on what material the UCC wanted to add to the merged database, information that the UCC has not yet provided in any detail. Preliminarily, at least the following categories of fields in the Trusts' databases would need to be redacted or limited:

    Claimant name, SSN, address, phone, fax, email (except state)
    Claimant date of birth (except year)
    Claimant date of death (except year)
    Claimant death certificate date (except year)
    Personal Representative name, SSN, address, phone, fax, email
    Contact name, address, phone, fax, email
    Occupationally exposed person name, SSN, address, phone, fax, email (except state)
    Other exposed person name, SSN, address, phone, fax, email (except state)

**Caplin & Drysdale**
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 6

 Exposure affiant name
 Dependant name
 Dependant date of birth (except year)
 Exposure site (except state)
 Dates of diagnosis (except year)
 Dates of exposure (except year)
 Date of lawsuit (except year)
 Lawsuit case numbers
 Attorney name/firm/address

 With respect to the material the UCC indicated that it wanted to add, these would generally be treated as described above. For example, dates would be rounded to years. The UCC did suggest that it would add detailed work history for each claimant. Including such information would not be compatible with anonymity, however. Nor is the detailed job history of individual claimants something this Court is likely to consider in an aggregate estimation. The ACC would be willing to include industry and occupation codes.

 Alvarez & Marsal has confirmed that it is available to serve as the neutral under this proposal and has the necessary resources to do so efficiently. Once the list of fields to be removed or redacted from the merged database is finalized, the process of generating the anonymized database would be relatively quick. The cost would be roughly commensurate with the first proposal discussed above.

 The UCC had objections to this alternative protocol as well. First, it claimed that various details, such as a work history, were necessary to their analysis. But, as noted above, claim-by-claim analysis of individual work histories and other details is inconsistent with the aggregate approach to estimation. As explained fully in the ACC's submission on the Rule 2004 requests, this Court cannot make case-by-case determinations of the validity of individual asbestos claims in an estimation context. Indeed, any attempt to do so would violate due process and the jury trial rights of claimants, which are protected both by the Seventh Amendment and by statute. *See* 28 U.S.C. § 1411(a) (providing, with irrelevant exceptions, that "this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable non bankruptcy law with regard to a personal injury or wrongful death tort claim"). Second, the UCC claimed that, even with certain fields removed or limited, it would be possible to circumvent the anonymity protocol by matching the anonymized database back to those source databases it held in unredacted form. While it is true that such circumvention might be theoretically possible (at least to some degree), it would depend on inferences that fall short of positive identification of claimants. Moreover, the UCC's argument is not compatible with good faith, in that it suggests that Bates White would in fact attempt to avoid the protocol

Caplin & Drysdale
CHARTERED

The Honorable Robert E. Gerber
September 17, 2010
Page 7

even if this Court adopted it. When asked directly whether they would agree not to attempt to circumvent the anonymity protocol in this fashion, the UCC and Bates White remained silent.

\* \* \*

The data on thousands of individual claimants that the Trusts may produce is highly sensitive information to which co-defendants in the tort system—and their experts like Bates White—would not ordinarily have unfettered access. The ACC has suggested two viable methods by which the individual claims data produced by the Trusts could be rendered anonymous, providing protection to those individual claimants against misuse of the information in this case or in other settings. None of them would meaningfully add to the cost of these proceedings. The ACC therefore requests that the Court require one of the two anonymity protocols outlined here.

Respectfully submitted,

*[signature]*

Trevor W. Swett

Attachment

cc: Stephen Karotkin, *Counsel to Debtors*
Robert Weiss, Joseph Sgroi, *Counsel to New GM*
Philip Bentley, *Counsel to the Unsecured Creditors Committee*
Sander Esserman, Robert Brousseau, *Counsel to the Future Claims Representative*
Stephen M. Juris, *Counsel to Certain Trusts*
Emily Stubbs, *Counsel to Manville Trust*

# EXHIBIT A

07/02/2010 10:33 FAX  4159890932          CARROLL BURDICK                    ☒ 006/009

James P. Cunningham, No. 121406
Susanne G. Arani, No. 238891
**CARROLL, BURDICK & McDONOUGH** LLP
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:  415.989.5900
Facsimile:  415.989.0932
Email:  jcunningham@cbmlaw.com
sarani@cbmlaw.com

Attorneys for Defendant
WARREN PUMPS, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

| ROBERT LINDENMAYER AND BEVERLY LINDENMAYER,<br><br>Plaintiffs,<br><br>v.<br><br>ALLIED PACKING & SUPPLY, INC., et al.,<br><br>Defendants. | **ASBESTOS**<br><br>No. RG-09-483370<br><br>**DECLARATION OF COUNSEL IN SUPPORT OF WARREN PUMPS, LLC'S AMENDED DESIGNATION OF EXPERT WITNESSES**<br><br>Complaint Filed: November 5, 2009<br>Trial Date:  August 2, 2010 |
|---|---|

I, Susanne G. Arani, declare:

1. I am an attorney at law licensed in all the courts of the State of California and am employed with the law firm of Carroll Burdick & McDonough, attorneys of record for Defendant Warren Pumps, LLC (hereinafter "Defendant") in the above captioned matter. As such, I am familiar with the facts of this case. If called and sworn as a witness, I would testify to the following:

2. The expert witnesses described herein have been contacted by or on behalf of Warren Pumps, LLC and have agreed to act as expert witnesses in this. Each of these expert witnesses will be prepared to give timely and meaningful deposition testimony. Each of these experts will have accomplished a review of pertinent materials regarding this action. The materials reviewed will potentially include some or all of the

1  containing gaskets or packing, if any, associated with a Warren pump, were below the
2  current and all historical, permissible exposure limits, excursions, and short-term limits
3  and are therefore subject to the warning label exemption of OSHA.
4      f.   She will testify about the historical literature and other applicable
5  government regulations of asbestos and their importance to asbestos-containing products
6  that may have been used with various types of equipment including pumps.
7      g.   She will testify regard the historical literature and other applicable
8  government regulations of asbestos and their importance to Defendants' products.
9      h.   She will testify about current and past regulations concerning permissible
10 exposure. The current OSHA permissible exposure level, published in 1994, is 0.1 fibers
11 per cubic centimeter (f/cc), as an eight-hour time weighted average. The OSHA
12 permissible level from 1986 to 1994 was 0.2 f/cc, as an eight-hour time weighted average.
13 The OSHA permissible level from 1976 to 1986 was 2 f/cc, as an eight-hour time
14 weighted average. The OSHA permissible level from 1971 to 1976 was 5 f/cc, as an eight-
15 hour time weighted average.
16     Warren Pumps reserves the right to amend or supplement this designation
17 based on newly discovered documents, records, or other materials relating to the
18 Plaintiffs. A copy of Ms. Ringo's curriculum vitae will be made available upon request.
19     9.   Marc Scarcella, MA, Bates White, LLC, 1300 Eye Street NW, Suite 600
20 Washington, DC 20005. Mr. Scarcella has several years experience providing economic
21 analysis and consultative services in Chapter 11 bankruptcy proceedings involving the
22 establishment of section 11 U.S.C. 524(g) asbestos trusts. He is familiar with asbestos
23 claims processing, reporting, and quality control management, as well as the detailed
24 provisions of various asbestos Trust Distribution Procedures. He will be prepared to
25 testify concerning the likelihood of, basis for, and dollar amounts of recovery available to
26 Mr. Lindenmayer and his estate from various asbestos bankruptcy trusts. Mr. Scarcella's
27 testimony will be based on the discovery conducted in this case, the publicly available
28 documentation produced by various trusts established pursuant to section 11 U.S.C.

07/02/2010 10:43 FAX 4159890932          CARROLL BURDICK                    ☒ 035/055

524(g), and his experience and expertise evaluating the processes used by various trusts in paying claims for asbestos-related diseases. Mr. Scarcella's fees for deposition and trial testimony are $395 per hour.

10. David P. Sargent, Jr., SEI Associates, P.O. Box 1466, Great Falls, VA 22066-1466. David P. Sargent, Jr. is a retired Rear Admiral of the United States Navy. He began his Navy career in 1967, after receiving a Bachelor of Science degree in Mechanical Engineering from Cornell University. Upon commissioning in the Navy, Admiral Sargent attended the Pacific Fleet Chief Engineer School in a course focused on the maintenance of engineering plants of World War II era steam propulsion ships. Admiral Sargent also has a Master of Engineering degree from the Naval Postgraduate School, Monterey, California, in 1974. In addition, Admiral Sargent is a licensed Professional Engineer with extensive operational experience in ship engineering, ship maintenance, and at-sea operations.

Following twenty years of operational experience in warships, Admiral Sargent held a variety of program and technical management positions in the Naval Sea Systems Command program offices responsible for the design, construction, introduction, and support of new warships from 1988 until his retirement in 1999. Upon his selection to Rear Admiral in 1994, he was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations responsible for research and development of all technical aspects of U.S. Navy surface ships and submarines. His final tour before retirement was Program Executive Officer (PEO) for Aircraft Carriers, Expeditionary Warfare and Auxiliary ships. In this position, he had the overall responsibility of all matters relating to both the technical and programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare, and auxiliary ships of the Navy.

Admiral Sargent is now President of Sargent Enterprises, Inc. Sargent Enterprises, Inc. includes two companies serving the marine industry: SEI Associates, a consulting business that provides technical and management advice to marine industries;

CARROLL, BURDICK &
MCDONOUGH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CBM-SF\SF484893                              -30-

DEF. WARREN PUMPS, LLC'S DECLARATION OF COUNSEL IN SUPPORT OF AMENDED DESIGNATION OF EXPERT WITNESSES

1    Dr. Sawyer may also offer opinions regarding the fact and reasonableness of
2    industry's and specific companies' reliance upon the development of the scientific and
3    medical literature regarding asbestos and disease.

4    Dr. Sawyer may also testify about the Navy's response to information about
5    possible asbestos hazards based on his own training and experience in the Navy as a
6    physician and officer 1960 and 1970s. He may testify about how the medical community
7    actually responded to information in the published literature that related to possible health
8    hazards of asbestos as opposed to people who were not there testifying about how people
9    should have responded.

10   Dr. Sawyer may also offer testimony in response to any issue discussed by
11   plaintiff's experts in reports or testimony. His testimony may also include specific
12   opinions related to this defendant's state-of-the-art issues, including corporate documents.
13   His fees to be determined at the time of deposition.

14   Defendant hereby reserves the right to supplement this expert list, if necessary,
15   as a result of testimony or developments which expose the need for additional experts, as
16   well as in response to the designation of experts by Plaintiff's and other Defendants to this
17   action.

18   I declare under penalty of perjury that the foregoing is true and correct, and
19   that this declaration was executed on this 2nd day of July, 2010 at San Francisco,
20   California.

Susanne G. Arani