# AMERICAN ARBITRATION ASSOCIATION
# AUTOMOBILE INDUSTRY SPECIAL BINDING ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Re: 30 532 00083 10
    Serra Chevrolet, Inc.
    and
    General Motors, LLC

## Written Determination of Arbitrator

I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act"), enacted December 16, 2009, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby make my Written Determination pursuant to the Act.

### Background

The Act affords a "covered dealership" (as defined in Section 747(a)(2)) the right to challenge by binding arbitration the decision of a "covered manufacturer" (as defined in Section 747(a)(1)(A) and (B)) to terminate, or not to assign, renew or continue, the covered dealership's franchise agreement. This case was filed in accordance with the Act's provisions and I held hearings and heard testimony on June 16, 17 and 18, 2010. Set forth below is my "written determination" (as provided for in 747(d) of the Act) of the issue to be decided under the Act, namely "whether or not the covered dealership should be added to the dealer network of the covered manufacturer."

### I. THE COVERED DEALERSHIP

This proceeding concerns "a covered dealership" known as Serra Chevrolet, Inc. Issue was joined as to whether it should be continued or added as a franchisee to the dealer network as described below. The location is within the geographical area where the covered dealership was located when its franchise agreement was terminated.

The covered dealership is Serra Chevrolet, Inc. It is to be located at 1503 Gadsden Highway, Trussville, Alabama 35235. The dealer operator identified in Paragraph Third shall be Kevin A. Serra. The dealership to be added shall be a single point stand alone Chevrolet dealership conforming to the image requirements and other terms and conditions of the dealer agreement.

## II. DETERMINATION

The covered dealership described above in Section I **shall be added** and therefore **shall be assumed** by the covered manufacturer, in the manner provided for by the Act and in accordance with the terms and conditions of the Act.

## III. KEY FACTS RELIED UPON BY THE ARBITRATOR IN MAKING THE DETERMINATION

Key facts considered by the Arbitrator include study and analysis of seven large ring binders of exhibits ranging from congressional testimony and acts to pictures of properly imaged dealerships to economic and operating reports and internal GM statistical documents. Expert reports and deposition testimony have been considered. In addition, the parties presented three days of detailed sworn testimony from live witnesses. Some of the specific facts considered are referred to in the body of this determination.

In accordance with Section 747, I considered the following factors:

### 1. The Covered Dealership's Profitability.

The applicable period covers an unprecedented downturn in the automobile market generally. General Motors claims, and attempted to prove, that the dealership lost millions of dollars each year. The dealership contests that fact and has proven that it made money even during the period of the downturn. The Arbitrator finds the dealership was profitable even though its accounting methods differ from the General Motors methods.

### 2. The Covered Manufacturer's Overall Business Plan.

The Arbitrator has no intent to review, re-write or criticize in any respect GM's overall business plan. In fact, GM has begun some recovery. The applicable aspect of that plan, however, is the reduction in the number of dealers. While in the abstract a strong dealer network is important to the success of GM, it must be noted that its original plan to reduce dealerships by approximately two thousand has been questioned and is drastically reduced to a planned reduction of six hundred or fewer dealers. The important aspects of the plan are in other areas.

### 3. The Covered Dealership's Current Economic Viability.

The Serra Family and Kevin Serra are likely the largest automobile dealers in North Alabama. They are leading distributors of Honda, Volkswagen, Toyota, Kia and other brands. In the approximately thirty years as Chevrolet Dealer, the Serra's have accumulated a net worth of over One Hundred Million Dollars. The dealership corporations are Sub-Chapter S and it is found the dealership is at least as economically viable as GM.

### 4. The Covered Dealership's Satisfaction of the Performance Objectives Established Pursuant to the Applicable Franchise Agreement.

GM established and defined its performance objectives. By those standards the covered dealership is defective and, according to the GM definitions and applications of its objectives, is very poor. It must be pointed out that forty one of the seventy one Alabama dealerships are also defective, but applying GM's analysis to GM's self created and defined objectives Serra is at or near the bottom.

### 5. The Demographic and Geographic Characteristics of the Covered Dealership's Market Territory.

Although GM objected to analysis of the market territory and although Serra agreed in 2007 the market territory issue had been resolved the Arbitrator is required to consider this factor. In that respect, it is noted that a major portion of the dealership's territory requires potential customers to drive past a competing dealership and go an additional thirteen miles to reach its dealership. The demographic and geographic characteristics of the territory make it difficult for the dealership to satisfy performance objectives established by GM.

### 6. The Covered Dealership's Performance in Relation to the Criteria Used by the Covered Manufacturer to Terminate, Not Renew, Not Assume or Not Assign the Covered Dealership's Franchise Agreement.

There was some allusion in the evidence to previous legal difficulties between GM and Serra. Despite that fact, the Arbitrator finds GM reviewed its criteria in a sterile and antiseptic way and made its election to terminate Serra's franchise agreement based on its objective factors. It must be pointed out, however, that the criteria and approach by GM were calculated and applied making no allowance or specific consideration for local dealership's local markets or other factors except as the national statistical model may apply.

### 7. The Length of Experience of the Covered Dealership.

Serra Chevrolet has approximately thirty years experience as a Chevrolet franchisee and is vastly experienced in all aspects of the automobile sales business. It is one of the largest and most profitable automobile dealers in Alabama, and has been for over thirty years.

## IV. BALANCE OF ECONOMIC INTERESTS

Overlaying the determination herein and the balance of economic interest required, note should be made in the difference in approach to this matter between GM and Serra. Serra has provided specific proof of its profitability, its plan for fitting into the new GM dealership network and its experience in the automobile business. It has further provided specific proof of its financial ability and intention to pursue that plan. On the other hand, the GM approach and proof is purely

statistical. It is derived from a combination of theory, statistics derived from a model created solely by GM and applied solely by GM and opinions from consultants which have little true evidentiary underpinning. The GM approach in some respects could be said to be disingenuous. For instance, GM declared "GM has had to provide financial support to prop up claimant over the last four years. (See Resp. Trial Ex. 84.)" The fact is respondent's Exhibit 84 shows standards for excellence payments of $17,000.00 in 2006 and no payments for 2007, 2008 or 2009. GM has declared the statistical geographical distance between the subject dealership and the downtown Chevrolet dealership is one mile. The real distance is thirteen miles. GM says it cannot identify or prove any specific amount of savings to itself by eliminating Serra. GM says that it has wound down and terminated some pretty good dealers who were well performing and has retained others who were not. Despite the fact that natural attrition at the rate of eighty dealerships per month will produce the desired reduction of dealer network in approximately one year, GM declares its statistics are better than the marketplace in determining who is a successful dealer. GM says Serra is not economically viable and is under-capitalized based upon its theoretical statistical models. In the real world, Serra has proven that while GM has worked its way into bankruptcy, the Serra Family Auto Dealerships have accumulated a net worth of over one hundred million dollars selling automobiles. It has shown repeated willingness to spend it on the dealership. By way of observation, it is also noted that GM acknowledges that having capital, whether in individual or corporate names, does not determine how it is spent. GM says that Serra cannot sell cars. On the other hand, Serra has proven that it can sell BMW's, Toyotas, Kia's, Honda's, Mitsubishi's, Volkswagen's, Nissan's, Lincoln-Mercury, Chrysler-Dodges and Jeeps, and can sell them successfully, at profit to itself and its maufacturers. There is no reason to disbelieve Serra's assertion it can also sell Chevrolets. GM, in fact, has invited Serra to take over other dealerships. GM says its statistics show that Serra does not satisfy its customers. In the real world, however, Serra has an excellent record for repeat business in all its dealerships. The seven statutory factors have been considered by the Arbitrator. A balancing test, however, is not merely a scoring of factors, nor does a single factor determine the outcome. Of greater importance is that none of the factors involve or take into account the interest of the public, and it is that factor which determines the outcome herein.

The economic interest of Serra favors the addition of the covered dealership. Serra has successfully and profitably sold Chevrolet automobiles for nearly thirty years. It has proven that it has the ability and the resources to do so under the umbrella of the new GM. GM has pointed out in this context however, that the principals of Serra have other profitable dealerships and would not be substantially affected by losing the Chevrolet dealership. The economic interest of Serra favors retention.

The economic interest of GM has not been shown to be affected by the determination herein. While GM has undertaken to rebut Serra's proof as to the effectiveness of its dealership, it by its own admission cannot specifically offer proof as to potential loss from addition of the Serra dealership. Moreover, if the dealership fails there is little evidence of any measurable bad effect on the GM plan, while if the dealership thrives there is potential economic gain to GM. Further, the only specific evidence is that it will cost GM approximately Five Hundred Thousand Dollars ($500,000.00) to wind down the Serra dealership. In either event the effect of this determination on the economic interest on GM is minimal at most.

It is the economic interest of the public which determines the outcome herein. GM argues the public of the country at large has an interest in the continued survival of GM. While this is certainly true, there is no evidence of any meaningful impact on that interest by adding the dealership herein. The public most seriously affected is the public in the general area of the covered dealership. GM acknowledges it needs and wants a dealership in the exact location of

4

the covered dealership described in Paragraph I. It hopes to close Serra and it hopes one of its other dealerships will close its doors and then purchase or lease property in order to construct a new dealership. This is a speculative proposition at best. Even if it succeeded, it would cost millions of dollars and result in delay in the public being served in the area of the new dealership. There would be a negative economic impact on the area and economy of the public surrounding the closed dealership. Inferentially, the closed dealership was profitable and effective but then would be lost. It would disrupt the employees, it would affect their travel time and their routine. It would likely require GM to spend money in assisting the dealership to purchase and build a new franchise. On the other hand the continuation of Serra would result in no disruption at all. The addition of Serra would have a very positive impact on economic interest of the public in the area of the dealership. Approximately fifty new jobs would be created in an area in desperate need of jobs. Remarkably, GM complains that Serra "sells its cars too cheaply". It says this is bad for GM and for other dealers. At no point in its proofs or testimony did GM present analysis or even observation that the public also had an interest in these proceedings and in the operation and sales of its cars. The Arbitrator finds that substantial benefit to the public ensues from price competition and the existence of Serra Chevrolet.

Balancing the economic interest of Serra and GM alone slightly favors the addition of the Serra dealership. It is not necessary to determine whether that slight preference meets the requisite burden of proof because when the interest of the public is weighed in the balance the overwhelming result is that the Serra dealership should be added.

## V. COSTS

In accordance with the statute, the administrative fees and expenses, and the arbitrator's fees and expenses shall be borne equally.

This Written Determination is in full settlement of all claims submitted to this arbitration.

_July 1, 2010_
Date

_Arthur J. Hanes, Jr._
Arthur J. Hanes, Jr.
Arbitrator

CC:   Sandra Barrett, Case Manager
      Jeffrey J. Jones, Esq.
      John Martin Galese, Esq.
      Jeffrey L. Ingram, Esq.

5