Theodore B. Stolman (*Pro Hac Vice* Admission Pending)
Margreta M. Morgulas (MM 7441)
Anthony Arnold (*Pro Hac Vice* Admission Pending)
STUTMAN, TREISTER & GLATT PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

*Attorneys for West Covina Motors, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, f/k/a General Motors Corp., *et al.* | **09-50026 (REG)** |
| Debtors. | **(Jointly Administered)** |

---------------------------------------------------------------x

**RESPONSE OF WEST COVINA MOTORS, INC. TO DEBTORS' THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS**

West Covina Motors, Inc. ("**West Covina**"), by its attorneys, Stutman, Treister & Glatt PC, hereby submits its response (the "**Response**") to the Thirty-Ninth Omnibus Objection to Claims (Dealership Claims) [Docket No. 6646] (the "**Objection**")[1] filed by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), seeking entry of an order disallowing and expunging from the claims register certain claims filed by West Covina.

In support of its Response, West Covina respectfully represents as follows:

**FACTS RELEVANT TO RESPONSE**

1. Prepetition, West Covina was a party to that certain "General Motors Dealer Sales and Service Agreement," dated as of March 1, 2002 (as amended and supplemented

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed thereto in the Objection.

543880v1

from time to time, the "**Dealer Agreement**") with General Motors Corporation (n/k/a Motors Liquidation Company) ("**GM**"), pursuant to which West Covina owns and operates a HUMMER car dealership in West Covina, California.

2. In the prepetition period, West Covina was contacted by GM and informed that GM intended to phase out its HUMMER line of vehicles. As an owner/operator of one of the largest and most lucrative HUMMER dealerships in the United States, West Covina desired to work with GM to effect an orderly liquidation of its vehicles, a dismantling and destruction of the costly custom building and signage that West Covina had been required to purchase in connection with its operation of the HUMMER dealership, and an efficient and systematic wind-down of its operations. To that end, the President of West Covina, Mr. Ziad Alhassen, spent a number of months negotiating a termination and release agreement with GM.

3. Mr. Alhassen's negotiations with GM culminated in the execution of the "Termination and Release Agreement," dated March 26, 2009, by and between GM and West Covina ("**Original Termination Agreement**"). A true and correct copy of the Original Termination Agreement is annexed hereto as Exhibit "A."

4. In paragraph 3 of the Original Termination Agreement, it provides, in pertinent part, as follows:

> (a) Dealer hereby **terminates and cancels** the Dealer Agreement by written agreement in accordance with Article 14.2 thereof, such termination and cancellation to be effective on October 31, 2010. Notwithstanding the foregoing, (i) Dealer may terminate the Dealer Agreement prior to October 31, 2010, upon thirty (30) days written notice to GM, in which event Dealer shall not be entitled to payment of the Final Amount, and GM shall have no obligation to pay the Final Amount to Dealer, and, (ii) GM may terminate the Dealer Agreement prior to October 31, 2010, upon thirty (30) days written notice to Dealer, in which event Dealer shall be entitled (subject to satisfaction of the conditions elsewhere set forth herein) to payment of the Final Amount. In the event that Dealer enters into a new dealer agreement on or before November 1, 2010, for its HUMMER dealership operations with GM or any successor to GM, then Dealer shall not be entitled to payment of the Final Amount, and GM shall have no obligation to pay the Final Amount to Dealer. Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer. As a condition to the payment of the Final Amount and/or payment for the

543880v1

> Eligible Items (as hereinafter defined), Dealer shall execute a Supplemental Termination and Release Agreement in the form attached hereto as <u>Exhibit A</u>.

*Original Termination Agreement*, ¶ 3 (emphasis added.). Accordingly, West Covina and GM agreed that the Dealer Agreement was terminated upon execution of the Original Termination Agreement with an effective date of such termination to be no later than October 31, 2010.

5.  As consideration for West Covina's "execution and delivery to GM of the [Original Termination Agreement], and [West Covina's] termination and cancellation of the Dealer Agreement by written agreement in accordance with Article 14.2 [of the Dealer Agreement]…" GM agreed to pay West Covina $2.5 million (as defined in the Original Termination Agreement, the "**Settlement Amount**"), subject to the terms and conditions set forth in the Original Termination Agreement. *Original Termination Agreement*, ¶ 1. Paragraph 1 of the Original Termination Agreement expressly provides as follow with respect to the payment of the Settlement Amount:

> This payment is consideration solely for the releases and waivers set forth herein, Dealer's termination and cancellation of the Dealer Agreement, and Dealer's transfer to GM of its right, title and interest in and to its customer lists and service records for its HUMMER dealership operations.

6.  Upon the signing of the Agreement, West Covina received $1.25 million. As provided in the Original Termination Agreement, the remaining $1.25 million was to be paid by GM to West Covina upon completion of (i) West Covina's compliance with all applicable bulk transfer, sales tax transfer or similar laws, (ii) the effective date[2] of the termination and cancellation of the Dealer Agreement, and (iii) GM's receipt of the fully executed "Supplemental Termination and Release Agreement" pursuant to Section 3(a) below…." *Original Termination Agreement*, ¶ 1. Before West Covina could comply with the conditions precedent to the

---

[2] Relevant to an earlier point, because the Dealer Agreement actually terminated upon the execution of the Original Termination Agreement, GM had to distinguish between the termination of the Dealer Agreement and the effective date of the termination of the Dealer Agreement.

543880v1

payment of the remaining $1.25 million portion of the Settlement Amount, GM filed for chapter 11 protection.[3]

7.  Shortly after the Debtors' Petition Dates, the Debtors sent West Covina and the other Hummer dealers a single page letter dated June 1, 2010 ("**June 1 Letter**"), enclosing a form "Deferred Termination Agreement" ("**Postpetition Termination Agreement**"). Pursuant to the June 1 Letter, the Debtors reaffirmed that they had no intention of continuing the Hummer line. In addition, they informed West Covina that they had recently executed a memorandum of understand that could result in a third party buyer ("**Prospective Buyer**") purchasing certain of the Debtors' assets and, important to West Covina and other Hummer dealers, "offering a replacement dealer agreement to Hummer dealers." The June 1 Letter threatened, however, that any dealer that refused to execute the Postpetition Termination Agreement would (i) not be "eligible to receive a replacement dealer agreement from the" Prospective Buyer, and (ii) would have its dealer agreement rejected by the Debtors. West Covina and the other dealers were only given until June 12 to review and return the Postpetition Termination Agreement to the Debtors. Accordingly, by the time that West Covina received the June 1 Letter, it had less than 10 days to review and consider the Postpetition Termination Agreement prior to the deadline to return the same.

8.  Shockingly, <u>neither the June 1 Letter nor the Postpetition Termination Agreement makes any mention of the Original Termination Agreement</u> or of the fact that the Dealer Agreement had already been terminated and cancelled pursuant to the Original Termination Agreement. In this way, the June 1 Letter and the Postpetition Termination Agreement were, at best, confusing with respect to their impact on the Original Termination Agreement. The only thing that was clear in the June 1 Letter was the threat that if West Covina refused to execute and return the Postpetition Termination Agreement on or before June 12,

---

[3] Accordingly, as of the Petition Date, the Original Termination Agreement was an executory contract. Despite this fact, the Debtors do not appear to have listed the same in their Schedules.

2009, it would be ineligible to receive a replacement dealer agreement from the Prospective Buyer.

9.  Accordingly, before June 12, 2009, West Covina executed and returned the Postpetition Termination Agreement to the Debtors. A true and correct copy of the executed Postpetition Termination Agreement is annexed hereto as Exhibit "B."

10. As this Court is well aware, the possible sale referenced in the June 1 Letter did not occur and no replacement dealer agreements were otherwise ever offered to Hummer dealers.

11. On or about November 27, 2009, West Covina filed a general unsecured claim in the total amount of $3.75 million in the chapter 11 case of GM, which claim has been assigned claim no. 59084 on the official claims docket in these cases (the "**Proof of Claim**"). The amounts claims in the Proof of Claim arise from amounts owed under the Original Termination Agreement and the Dealer Agreement.

## RESPONSE

12. The Objection is based exclusively on the fact that West Covina entered into the Postpetition Termination Agreement and thereby allegedly released the Debtors from any and all claims, including those claims asserted in the Proof of Claim. However, for the reasons set forth herein below, the Postpetition Termination Agreement and the releases contained therein are invalid and unenforceable as to West Covina due to a lack of mutual assent and a lack of sufficient and valid consideration. Accordingly, the Objection must be overruled as the Objection pertains to West Covina.

543880v1

A. **Under Michigan Law, The Postpetition Termination Agreement Is Invalid And Unenforceable Due To A Lack of Mutual Assent and A Lack of Sufficient and Valid Consideration.**

13. Under Michigan law,[4] there are five essential elements of a contract: competent parties, proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *Detroit Trust Co. v Struggles*, 289 Mich 595, 286 NW 844 (1939); *Hess v Cannon Township*, 265 Mich App 582, 592, 696 NW2d 742 (2005); *Thomas v Leja*, 187 Mich App 418, 468 NW2d 58 (1991). The Postpetition Termination Agreement lacks at least two[5] of these essential elements – legal consideration and mutuality of agreement – and is therefore invalid unenforceable at to West Covina.

  (1) **The Postpetition Termination Agreement Is Invalid And Unenforceable As To West Covina Due To A Lack of Mutual Assent.**

14. While it is axiomatic that parties to a contract may modify the original contract by a later agreement, there must be mutual assent for the modification, which must be

---

[4] The Dealer Agreement, Original Termination Agreement, and Postpetition Termination Agreement all expressly provide that the laws of the state of Michigan shall govern their interpretation. Accordingly, solely for purposes of this Response, West Covina assumes, but does not concede, that Michigan law is the appropriate law to govern the resolution of any contract interpretation issues.

[5] Although West Covina believes that this matter can be resolved on a purely legal basis, to the extent that the Court determines a factual analysis is appropriate, West Covina reserves all rights to supplement this response to address facts that could aide in further establishing the invalidity and unenforceability of the Postpetition Termination Agreement. While it does not have sufficient information to so allege at this time, West Covina might, for example, attempt to show that the Postpetition Termination Agreement is invalid and unenforceable by reason of false and fraudulent representations made to it by GM during the procurement of the Postpetition Termination Agreement. *Rood v Midwest Matrix Mart, Inc.*, 350 Mich 559, 87 NW2d 186 (1957). Fraud and fraudulent misrepresentation are similar and require a showing that (1) GM made a material representation, (2) the representation was false, (3) GM knew the representation was false when made or made it recklessly without knowledge of its truth and as a positive assertion, (4) the representation was made with the intention to induce West Covina's reliance, (5) West Covina acted in reliance upon the representation, and (6) West Covina suffered injury as a result of its reliance. *In re Swantek Estate*, 172 Mich App 509, 432 NW2d 307 (1988); *Temborious v Slatkin*, 157 Mich App 587, 403 NW2d 821 (1986); *Arim v General Motors Corp.*, 206 Mich. App. 178, 195; 520 N.W.2d 695 (1994).

543880v1

established through clear and convincing evidence of a written agreement establishing a mutual agreement to waive the terms of the original contract. *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 372-73, 666 N.W.2d 251 (2003) ("Where mutual assent does not exist, a contract does not exist. Accordingly, where there is no mutual agreement to enter into a new contract modifying a previous contract, there is no new contract and, thus, no modification"). *See also City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188 (2005) ("[W]here a party alleges waiver or modification, that party is alleging that both contracting parties mutually assented to alter or amend the existing contract. Therefore, a clear and convincing standard in this context makes sense"); *Richardson v. State Emples. Ret. Sys.*, 2010 Mich. App. LEXIS 621 (Mich. Ct. App. Apr. 13, 2010); *Loloee v. Ali*, 2010 Mich. App. LEXIS 590 (Mich. Ct. App. Apr. 6, 2010). The party advancing the claim that a modification occurred has the burden of showing by clear and convincing evidence that "the parties mutually intended to modify the particular original contract." *Quality Products*, 469 Mich. at 373. "A meeting of the minds is judged by an objective standard, looking to the express words of the parties…." *Kamalnath v Mercy Mem Hosp Corp,* 194 Mich App 543, 548; 487 NW2d 499 (1992) ("'Meeting of the minds' is a figure of speech for mutual assent" *Id.*). No such mutual assent to the modification of the Original Termination Agreement in the form of the Postpetition Termination Agreement is present in this case.

        15.    As stated previously herein above, neither the June 1 Letter nor the Postpetition Termination Agreement make mention of the Original Termination Agreement. To date, the Debtors have failed to offer any reason why the Postpetition Termination Agreement makes no mention of the Original Termination Agreement or why, if the Debtors sought to modify or supersede the Original Termination Agreement pursuant to the Postpetition Termination Agreement, they did not expressly provide for the same in the Postpetition Termination Agreement.[6] The lack of any reference to the Original Termination Agreement in

---

[6]    Paragraph 17 of the Postpetition Termination Agreement contains a typical merger clause, which provides in, relevant part:

> This Agreement, the Dealer Agreement, and the schedules, exhibits and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement….

Debtors will undoubtedly attempt to rely on Paragraph 17 of the Postpetition Termination Agreement in arguing that the Original Termination Agreement has been superseded in its entirety by the Postpetition Termination Agreement. However, from a practical standpoint, merger clauses such as that contained in Paragraph 17 of the Postpetition Termination Agreement simply cannot be read to effect the supersession of a prior express, written agreement between the same parties on the same subject matter when there is no reference to the prior agreement in the agreement purporting to supersede it. See, e.g., *Gavigan v. Evans*, 45 Mich. 597, 8 N.W. 545 (1881) ("A contract is not affected by a subsequent agreement that does not refer to it and the provisions of which are not framed so as to furnish the means for connecting them.").

The weight of the case law is not consistent with the position that Paragraph 17 of the Postpetition Termination Agreement effects the supersession of the Original Termination Agreement. First, courts have held that merger clauses preclude consideration of extrinsic evidence only where the parties intend that the document containing the merger is exclusive. *ARB, Inc. v. E-Systems, Inc.*, 214 U.S. App. D.C. 12, 663 F.2d 189, 199 (D.C. Cir. 1980); *Darner Motor Sales v. Universal Underwriters*, 140 Ariz. 383, 682 P.2d 388, 398 (Ariz. 1984); *Anderson & Nafziger v. G.T. Newcomb, Inc.*, 100 Idaho 175, 595 P.2d 709, 714 (Idaho 1979); *Sutton v. Stacey's Fuel Mart, Inc.*, 431 A.2d 1319, 1323 n.3 (Me. 1981). Rather, merger and integration clauses are to be afforded varying weight depending on the circumstances of the case. *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986); *see also ARB*, 663 F.2d at 199 (court must consider "the circumstances surrounding the making of the contract" to ascertain whether an integration clause serves to "express the genuine intention of the parties to make the written contract the complete and exclusive statement of their agreement"); *Darner*, 682 P.2d at 398 ("Evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like, is taken to determine the parties' intent with regard to integration of the agreement. . . . This method obtains even though the parties have bargained for and written the actual words found in the instrument."); *Anderson*, 595 P.2d at 714 (courts "should consider not only the language of the agreement but all extrinsic evidence relevant to the issue of whether the parties intended the written agreement to be a complete integration"); RESTATEMENT (SECOND) OF CONTRACTS § 210 cmt. b (1979) (for purposes of proving a complete integration, "a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties"); *cf. Whitney v. Halibut, Inc.*, 235 Md. 517, 202 A.2d 629, 634 (Md. 1964) ("an integration clause is not necessarily conclusive"); *Sutton*, 431 A.2d at 1323 n.3 ("A merger clause does not control the question of whether a

543880v1

the Postpetition Agreement -- the Original Termination Agreement is not even mentioned in the "Recitals" section of the Postpetition Termination Agreement, where one would reasonably expect a reference to made if the Postpetition Termination Agreement was truly intended to modify the parties' mutual understanding pursuant to the Original Termination Agreement -- led to confusion on the part of West Covina about the impact of the Postpetition Termination Agreement on the Original Termination Agreement.

16.     In fact, it was unclear to West Covina that by signing the Postpetition Termination Agreement it would be waiving all of its rights to collect the remaining amounts due and owing to it under the Original Termination Agreement.  Clearly, there cannot be said to have been a "meeting of the minds" or "mutual assent" to any modification of the Original Termination Agreement pursuant to the Postpetition Termination Agreement as a result of the failure of the Debtors to clearly and plainly make their intentions known in either a written or oral communications with West Covina.  Representatives of West Covina and GM spent months

---

writing was intended to be a completely integrated agreement."); *Neville v. Scott*, 182 Pa. Super. 448, 127 A.2d 755, 757 (Pa. 1956) ("integration clause is not controlling"). As the United States Supreme Court describes, "even a written contractual provision declaring that the contract contains the complete agreement of the parties, and that no antecedent or extrinsic representations exist, does not conclusively bar subsequent proof that such additional agreements exist and should be given force." *Blackledge v. Allison*, 431 U.S. 63, 75 n.6, 52 L. Ed. 2d 136, 97 S. Ct. 1621 (1977).

<u>Moreover, the failure to make reference to a prior agreement in a subsequent agreement that purports to supersede that prior agreement rises dangerously close to the level of concealment that courts have cited as basis for voiding the entire subsequent agreement, including the merger clause.</u> *See, e.g., UAW-GM Human Resource Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 503 (Mich. Ct. App. 1998) ("To establish fraud, it is not sufficient merely to show that the writing states that there was no antecedent agreement when the fact is that there had been one. If by artifice or concealment, one party induces the other to suppose that the antecedent agreement is included in the writing, or to forget that agreement and to execute an incomplete writing, while describing it as complete, the written provision may be voidable on the ground of fraud.") (quoting 3 Arthur Linton Corbin, CORBIN ON CONTRACTS § 578, at 405-06, 406 n.43 (1960 & 1994 Supp.)).  A party "should not be allowed to hide behind an integration clause to avoid the consequences of a misrepresentation.'" *Keller v. A.O. Smith Harvestore Prods.*, 819 P.2d 69, 73 (Colo. 1991) (quoting *Formento v. Encanto Bus. Park*, 154 Ariz. 495, 744 P.2d 22, 26 (Ariz. Ct. App. 1987)).

543880v1

negotiating the Original Termination Agreement and by the time their agreement was reduced to paper, both sides clearly understood its terms and conditions. On June 1, 2009, the Debtors unilaterally issued their threatening 1-page letter and Postpetition Termination Agreement with no warning, no prior or subsequent communications, and no mention of the Original Termination Agreement. It is ludicrous for the Debtors to now contend that there was the requisite mutuality present to effectively modify the Original Termination Agreement as is required by *Quality Products* and similar cases. 469 Mich. at 372-73. This is especially true when the Debtors failed to even expressly state such intention in the Postpetition Termination Agreement.

17. Mr. Alhassen is a successful business person with a lot of experience in automotive sales but he is not a lawyer and with less than 10 days to review and consider the business aspects of the proposal he received from the Debtors the first week in June 2009, he felt he did not have the requisite time to involve legal counsel. *See also*, Ftnt 7, *infra*. Accordingly, he elected to sign the Postpetition Termination Agreement and, thereby (or so he thought as a result of the tone and language in the June 1 Letter), take the only course of action that would preserve the ability of West Covina to execute a new dealer agreement with the Prospective Buyer that he had read so much about in the trade journals and press. What Mr. Alhassen did not believe he was doing by signing the Postpetition Termination Agreement, however, <u>because it was not clear</u>, was modifying the Original Termination Agreement so as to waive all of West Covina's claims under the Original Termination Agreement.

18. For all of the foregoing reasons, there is no basis for the Debtors to contend that there was mutual assent to the modification of the Original Termination Agreement. Accordingly, for this reason alone the proposed modification or amendment of the Original Termination Agreement pursuant to the Postpetition Termination Agreement is invalid.

**(2) The Postpetition Termination Agreement Is Invalid And Unenforceable As To West Covina Due To A Lack of Sufficient and Valid Consideration.**

19. Under Michigan law, in order for a contract to be valid, there must be legal consideration. *Yerkovich v AAA*, 461 Mich. 732, 740; 610 N.W.2d 542 (2000); *Detroit*

543880v1

*Trust Co. v. Struggles*, 289 Mich. 595, 286 N.W. 844 (1939). Every agreement or promise, to be valid and binding, must be based on a sufficient and valid consideration. *Koenig v. City of South Haven*, 460 Mich. 667, 597 N.W.2d 99 (1999); *De Camp v. Scofield*, 75 Mich. 449, 42 N.W. 962 (1889). Consideration requires "'a benefit on one side, or a detriment suffered, or service done on the other.'" *Gen. Motors Corp v Dep't of Treasury*, 466 Mich. 231, 239; 644 N.W.2d 734 (2002), quoting *Plastray Corp v Cole*, 324 Mich. 433, 440; 37 N.W.2d 162 (1949).

20. Michigan follows the general rule of contract law that courts will not inquire into the adequacy of consideration in a contract, *Cochran v. Ernst & Young*, 758 F. Supp. 1548 (E.D. Mich. 1991), unless the consideration is "grossly inadequate." *Moffit v. Sederlund*, 145 Mich. App. 1, 11, 378 N.W.2d 491 (1985). The Michigan Court of Appeals has defined "grossly inadequate consideration," as "an inequality so strong, gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it." *Rose v. Lurvey*, 40 Mich. App. 230, 235-36, 198 N.W.2d 839 (1972) (citations omitted).

21. Furthermore, Michigan courts have held that "[t]he performance of a pre-existing duty or legal obligation is generally held not to be sufficient consideration for a return promise." *Green v Millman Brothers, Inc*, 7 Mich. App. 450, 455; 151 N.W.2d 860 (1967). Michigan courts have barred "the modification of an existing contractual relationship when the purported consideration for the modification consists of the performance or promise to perform that which one party was already required to do under the terms of the existing agreement." *Yerkovich*, 461 Mich. 732, 740.

22. Even assuming *arguendo* the Debtors could demonstrate that West Covina had assented to the modification of the Original Termination Agreement, which they could not, the Postpetition Termination Agreement is invalid and unenforceable due to the grossly inadequate lack of consideration. Pursuant to the Postpetition Termination Agreement, the Debtors demanded that West Covina agree to significant additional concessions. For instance, pursuant to the Postpetition Termination Agreement, the Debtors demanded that West Covina

543880v1

agree to a complete waiver of all termination assistance rights. *See, Original Termination Agreement*, ¶ 4; *Postpetition Termination Agreement*, ¶ 5. In addition, West Covina was required to grant a complete release and waiver of <u>all claims</u> to "GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns," which was significantly more comprehensive than the release provided for under the Original Termination Agreement. *Postpetition Termination Agreement*, ¶ 6; *cf*, *Original Termination Agreement*, ¶ 5. Finally, and perhaps most importantly, the Debtors required that West Covina forego the payment of the remaining $1.25 million due under the Original Termination Agreement.

    23. In exchange for the material modifications that the Debtors intended to effect pursuant to the Postpetition Termination Agreement, all that the Debtors offered to West Covina in the way of consideration was the following:

    (i) The Debtors agreed that they had "the right, but not, the obligation, to seek to assign the Dealer Agreement and [the Postpetition Termination Agreement] in the Bankruptcy Case…" to the Potential Acquirer. *Postpetition Termination Agreement*, ¶ 1; and

    (ii) The Debtors agreed that if there was no acquisition by the Prospective Buyer, they would pay West Covina $5,000 "in consideration solely for Dealer's covenants, releases and waivers set forth [in the Postpetition Termination Agreement], and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use its customer lists and service records." *Postpetition Termination Agreement*, ¶ 4.

As laid out in the following paragraphs there was no real value to any of the consideration allegedly offered by the Debtors in connection with the proposed modification.

    24. The Debtors did not actually commit themselves to take any course of action in connection with the potential sale to or for the benefit of West Covina. First and foremost, as stated herein above, upon the execution of the Original Termination Agreement, the

543880v1

Dealer Agreement had already been terminated. Accordingly, it was a legally impossible for the Debtors to assume or assume and assign the Dealer Agreement to any party. *See, e.g., Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1212 (7th Cir. 1984); *Kopelman v. Halvajian (In re Triangle Laboratories, Inc.)*, 663 F.2d 463, 467-68 (3rd Cir. 1981) ('"[F]or section 365 to apply, the contract ... must be in existence. If the contract ... has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the trustee to assume....'" (citations omitted)); *In re GSVC Restaurant Corp.*, 3 B.R. 491, 494 (Bankr. S.D.N.Y.), aff'd, 10 B.R. 300 (S.D.N.Y. 1980); *In re Coast Cities Truck Sales. Inc..* 147 B.R. 674, 677 (D. N.J. 1992) (holding "dealer agreement" terminated prepetition and may not be revived by the bankruptcy court); *Shell Oil Co. v. Anne Cara Oil Co. (In re Anne Cara Oil Co.)*, 32 B.R. 643, 647 (Bankr. D. Mass 1983) (holding that franchise agreement terminated prepetition and that "the bankruptcy court cannot create an interest for the debtor where none exists."). The fact that the Debtor could no longer legally assume or assume and assign the Dealer Agreement as of the time it sent the June 1 Letter makes it representation that the Postpetition Termination Agreement provides for "the potential assignment and assumption of the Dealer Agreement…by the purchaser of certain assets of GM in the bankruptcy…" more than a little disingenuous. *June 1 Letter*, at 1. It also casts into further light the hollowness of the veiled threat contained in the June 1 Letter that if West Covina did not "execute the [Postpetition Agreement], GM [would] move to reject the Dealer Agreement in the bankruptcy process." *Id.*

25. Second, even if the Dealer Agreement had not previously terminated, the "agreement" of the Debtors with respect to the assignment of the Dealer Agreement in the event of a sale to a third party was, at best, illusory. Indeed, all the Debtors agreed to do if the sale to the Prospective Purchaser occurred was to decide if they would, in their sole and absolute discretion, elect to assume and assign the Dealer Agreement to the Prospective Buyer. *Postpetition Termination Agreement*, ¶1.

26. Finally, even assuming the Debtors did elect to assume and assign the Dealer Agreement to the Prospective Buyer, it is difficult to understand why this is of significant

543880v1

value to West Covina. Given that West Covina has been one of the top Hummer dealers in the United States for several years, it is hard to imagine that any Prospective Buyer would not have at least considered entering into a replacement dealer agreement with West Covina regardless of whether it executed the Postpetition Termination Agreement and regardless of whether the Debtors elected to assign the Dealer Agreement and Postpetition Termination Agreement to the Prospective Buyer. The June 1 Letter, of course, fails to mention the fact that a Prospective Buyer would certainly be free to contract with any party it wanted to once it owned the Hummer assets. Rather, it gave the clear impression to dealers that the only way a party would be eligible to execute a replacement dealer with the Prospective Buyer would be if it executed the Postpetition Termination Agreement.[7] Accordingly, there was no value to the Debtors' "agreement" to exercise their discretion in determining whether to assign the Dealer Agreement and the Postpetition Termination to the Prospective Buyer in connection with any sale transaction.

27.  With respect to the proposed $5,000 payment to be made in consideration for the covenants, releases and waivers in the Postpetition Termination Agreement, the amount was both *de minimus* and insignificant when compared to (i) the remaining $1.25 million of the Settlement Payment that West Covina would have had to forego under the Original Termination Agreement, and (ii) the value of the additional claims that were released and waived under the Postpetition Termination Agreement, including, but in no way limited to the termination assistance rights that West Covina would have had to give up.

---

[7]  The Debtors seek to make much of the fact that the Postpetition Termination Agreement contains a clause providing that "Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives." *Postpetition Termination Agreement*, ¶ 10. While the Dealer is a successful business person with a lot of experience in this industry, with only a few days to review the proposed Postpetition Termination Agreement, he felt he did not have the ability to discuss its implications or all of his options with bankruptcy counsel or, in fact, any legal counsel. Accordingly, he was unable to make a fully informed decision given the time and significant business pressures imposed by the situation and its presentation by the Debtors. *See also*, ¶ 17, *supra*.

543880v1

28.     For all of the foregoing reasons, under Michigan law, the Postpetition Termination Agreement is unenforceable due to the fact that there was no mutual assent to the modification and there was a lack of consideration for the material modifications proposed under and pursuant to the Postpetition Termination Agreement.

**B.     The Court's Approval Of The Deferred Termination Agreements In The Sale Approval Order Should Be Found Inapplicable To The Postpetition Termination Agreement.**

29.     In discussing the enforceability of the Postpetition Termination Agreement with West Covina, the Debtors suggest that there can be no merit to any of West Covina's arguments because the Court previously approved the Debtors' entry into the Postpetition Termination Agreement in connection with the approval of the "Court's Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief" [Docket No. 2968] (the "**Sale Approval Order**").  However, as set for herein below, the findings of fact and conclusions of law upon which the Court approved the Debtors' entry into various Deferred Termination Agreements are inapplicable to the Postpetition Termination Agreement.  Accordingly, West Covina respectfully submits that the Court should determine that the Sale Approval Order is inapplicable to the Postpetition Termination Agreement.  In the alternative, West Covina requests that the Court determine that its entry of the Sale Approval Order does not affect the ability of West Covina to now challenge the enforceability of the Postpetition Termination Agreement for the reasons set forth in this response or on any other basis that may later be developed in connection with the Objection.

543880v1

30. The findings and determinations in the Sale Approval Order provide, in pertinent part, as follows with respect to the Deferred Termination Agreements:

> The Deferred Termination Agreements were offered as an alternative to rejection of the *existing* Dealer Sales and Service Agreements of these dealers pursuant to section 365 of the Bankruptcy Code and *provide substantial additional benefits to dealers which enter into such agreements*. Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for *good and sufficient consideration*.

*Sale Approval Order*, Recital JJ at p. 19 (Emphasis added.).

31. These findings and determinations should not be found applicable to West Covina because they were predicated on incomplete information provided to the Court by the Debtors in the course of the Court's consideration of the Sale Approval Order. In particular, there is no indication that the Court was made aware – because the Debtors did not inform the Court – of the fact that West Covina has executed the Original Termination Agreement prior to the Petition Date and had, thereby, terminated its Dealer Agreement with GM. Among other things, the Debtors failed to inform the Court that the Postpetition Termination Agreement (i) did not make any mention of the Original Termination Agreement but was intended by the Debtors to modify the Original Termination Agreement, and (ii) required West Covina to waive millions of dollars of claims against the Debtors in exchange for only a single credit of $5,000.

32. Specifically, the underlying motion to which the Sale Approval Order relates contained none of the key information about the Original Termination Agreement or the waiver of claims. The United States Supreme Court has held that procedural due process requires that in order for a proceeding to be accorded finality, notice must be given that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). An inadequate notice results in a void order. *See Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.)*,

543880v1

759 F.2d 1440, 1448 (9th Cir. Cal. 1985). Obviously, the notice must be sufficient to inform the interested party that its rights could be adversely affected, thereby providing the party with a choice to appear or default. *See Mullane*, 339 U.S. at 314. *See also In re Takeout Taxi Holdings, Inc.*, 307 B.R. 525, 532 (Bankr. E.D. Va. 2004) ("Constitutional due process is not simply satisfied by properly placing a piece of paper in the hands of the respondent. The paper served must contain adequate information. The content must be reasonably calculated to put the respondent on notice. The person whose interests are sought to be affected should be identified."). Because the Sale Motion failed to make reference to the existence of dealers that had already entered into agreements terminating their dealer agreements and the fact that dealer agreements that had been terminated pursuant to pre-petition termination agreements, West Covina had no notice that its rights under the Original Termination Agreement could be adversely affected by the Sale Approval Order.

33.    The "Debtors' Motion Pursuant To 11 U.S.C. §§ 105, 363(B), (F), (K), And (M), And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006, To (I) Approve (A) The Sale Pursuant To The Master Sale And Purchase Agreement With Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (C) Other Relief; And (II) Schedule Sale Approval Hearing" [Docket No. 92] (the "**Sale Motion**") divides the universe of dealers it planned to enter Deferred Termination Agreements with into two groups: "(i) all dealers associated with Continuing Brands who were not offered the opportunity (or who were extended the opportunity and declined) to enter into a Participation Agreement and (ii) all dealers associated with Discontinued Brands." *Sale Motion,* ¶ 21.   The Sale Motion further provides, "[e]ach Deferred Termination Agreement will be an Assumable Executory Contract under the [363 sale agreement].  In the absence of a Deferred Termination Agreement with the applicable counterparty, the dealer agreements will constitute Rejectable Executory Contracts under the

543880v1

[363 sale agreement]." *Id.* The Sale Motion does not disclose: (1) the existence of dealers, such as West Covina, that had already entered into agreements terminating their dealer agreements; and, (2) the fact that dealer agreements that had been terminated pursuant to pre-petition termination agreements, such as the Original Termination Agreement, could not be legally assumed or rejected under the relevant provisions of the Bankruptcy Code. *See, Response,* ¶ 24, *supra*.

34. With the findings and determinations inapplicable to West Covina, it follows that the Sale Approval Order on which they rely should likewise be inapplicable to West Covina. Specifically, Paragraph 31 of the Sale Approval Order states:

> Entry by GM into the Deferred Termination Agreements with accepting dealers is hereby approved. Executed Deferred Termination Agreements represent valid and binding contracts, enforceable in accordance with their terms.

In other words, West Covina respectfully proposes that the Court finds and determines that because the Sale Approval Order, and specifically Paragraph 31 thereof, was founded upon facts and law that were not correct with respect to the Postpetition Termination Agreement that the same held to be inapplicable to West Covina and the Postpetition Termination Agreement. Regardless, West Covina respectfully requests that the Court not bar West Covina from challenging the enforceability of the Postpetition Termination Agreement simply on the basis that the Court previously approved the Debtors entry into numerous Deferred Termination Agreements, including the Postpetition Termination Agreement, pursuant to the Sale Approval Order.

543880v1

## CONCLUSION

WHEREFORE, for the reasons and based on the authorities cited herein, West Covina respectfully submits that the Objection should be overruled in its entirety as the same pertains to the Proof of Claim of West Covina.

Dated: September 20, 2010

    /s/ Margreta M. Morgulas
Theodore B. Stolman,
Margreta M. Morgulas, and
Anthony Arnold,
STUTMAN, TREISTER & GLATT PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

*Attorneys for West Covina Motors, Inc.*

543880v1