Hearing Date and Time: September 24, 2010 at 9:45 a.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
MOTORS LIQUIDATION COMPANY, *et al.*,                   :   Case No. 09-50026
     f/k/a General Motors Corp., *et al.*,              :   (Jointly Administered)
                                                        :
                    Debtors.                            :   Honorable Robert E. Gerber
                                                        :
------------------------------------------------------- x

**FEE EXAMINER'S SUMMARY AND RECOMMENDATIONS -
INTERIM FEE APPLICATIONS SCHEDULED FOR HEARING ON
<u>SEPTEMBER 24, 2010</u>**

The Court has before it applications from 20 professionals to approve compensation and expenses totaling more than $14 million (excluding the application of the Evercore Group). For some professionals, this is the first application; for others, the second or third—most covering services for periods from February 1 through May 31, 2010. Of the 20 pending applications, the Court will hear eight on September 24, 2010, and the balance on October 26, 2010.[1] The Fee Examiner has reached agreement with most of the applicants scheduled for the hearing this Friday, avoiding the need for a judicial determination on all but the overall applications

---

[1] The accompanying exhibit summarizes the applications and recommendations for the September 24 hearing in chart form.

themselves. However, at least two applications present significant issues, involving hourly rate increases and compensation for the fee review process, which require a judicial resolution.

## SUMMARY STATEMENT

The instances of vague and lumped entries, imprecise incremental time-keeping, transient billers and block billing have decreased on the whole and, for repeat applicants, the percentage deduction recommended has increased where the problems persist. For at least one applicant, there remains a significant disparity between the terms of the unamended 2009 initial retention order—specifically, the anticipated fees if not the scope of work—and the subsequent applications, which have asked for $1 million more than the cost anticipated in the retention letter.

Important contested legal issues remain involving two applications—specifically, the applications of Weil, Gotshal & Manges for the Debtors and Kramer Levin Naftalis & Frankel for the Creditors' Committee. These applications (and, to a much more limited extent, others) raise several points of legal principle that merit this Court's resolution for their short- and long-term consequences in the fee application, review and approval process:

- Does a professional have discretion to increase its hourly rates without, at a minimum, specific notice and an affidavit demonstrating reasonableness?

- To what extent should a professional be compensated for time spent in the fee review process itself?

On other issues, the Court's April 29 and July 6, 2010 bench decisions have provided guidance and specificity, and the Fee Examiner excerpted the most relevant portions of the transcripts in a July 28 summary memorandum distributed to all of the professionals. However, the response to the Court's directive on time spent reviewing bills, one of the components of its July 6, 2010 bench decision, has not been uniform. That directive and the complementary 50 percent Court-ordered reduction aside, several firms continued to spend an uncommon

2

amount of time on bill review (distinct from compensable fee application time). Several applicants have been more rigorous in reviewing their own time entries, exercising billing judgment to voluntarily reduce the amounts submitted to the Court, but time-keeping and allocation issues do remain.

## PROCESS/STANDARDS

This review followed the process established for the first two sets of applications. Most of the third interim applications were filed in early August, only two were submitted to Stuart Maue for a quantitative audit and, with or without that audit, a series of correspondence and conversations between the Fee Examiner and the applicants followed the applications' filing. Around September 10, 2010, each applicant received a draft report, which encouraged additional discussion, and the Fee Examiner filed on September 17, 2010 the eight individual reports to be heard this Friday.

The Fee Examiner's discussions with the applicants no doubt will continue until the hearing, and the remaining group of third interim fee applications is scheduled for hearing later in October. Several of the pending fee applications actually cover time periods other than February through May, reflecting new professional retentions (related, for example, to asbestos claims) not in place in the early stages of this case.

## OPEN ISSUES

### *Hourly Rate Increases*

Whether an application is the second or third for a professional, the number and magnitude of hourly rate increases have become both more evident and more pronounced. One firm, for example, raised an eighth-year associate's rate from $500 to $595, a 20 percent increase. The average blended rate for Weil Gotshal has increased by 17 percent—from $487.12 to $570.31—from the first to the third application. In the aggregate, the total amount attributable

3

*solely* to hourly rate increases for the Debtors' counsel and for the Committee's counsel during the third interim fee period represents more than $640,000 out of the aggregate fee request of $5.96 million from those two firms combined.

There is little case law on the specific question of hourly rate increases, and the Bankruptcy Code surely does not prohibit rate increases during the pendency of a proceeding. Especially in light of the significant length of some chapter 11 proceedings, though perhaps not this one, rate increases are hardly uncommon. Professionals in bankruptcy cases should be compensated consistently with compensation in non-bankruptcy cases, and rate increases are often market-driven—whether directly (annual firm-wide increases, for example) or indirectly (increases related to an individual attorney's experience, often based on an employment anniversary). That begs the question, however, of rate increases that do not appear to be in the ordinary course and, even if ordinary course, the need for specific notice and judicial approval with at least a minimal evidentiary basis.

The retention applications for Weil Gotshal and Kramer Levin refer only indirectly to rate increases. Kramer Levin's application notes the potential for "periodic adjustment to reflect economic and other conditions" [Docket No. 1744] and the Weil Gotshal application uses generic language as well ("normal hourly rates subject to change from time to time"). [Docket No. 949.] In neither instance did the Court's retention orders impose an explicit notice and justification or judicial approval requirement. By contrast, in *In re Basilicata Realty Corp.*, this Court has required notice—and, implicitly, the right to be heard—for any rate increases. *See* Order Authorizing the Retention and Employment of the Law Office of Cesar A. Fernandez, P.C. as Counsel to Debtor *Nunc Pro Tunc* to the Petition Date, at ¶ 4, No. 10-11887 (Bankr. S.D.N.Y. Sept. 9, 2010) [Basilicata Realty Docket No. 13].

4

It is noteworthy, in addition, that in this proceeding the application to change the retention terms for a consulting firm specifically incorporated a rate increase that, in turn, triggered an inquiry and a responsive affidavit to provide factual support. *See Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 327(a) and 330 Authorizing the Debtors to Amend the Terms of their Engagement with Brownfield Partners, LLC* [Docket No. 5207]; *Declaration of Ted Stenger on Behalf of Motors Liquidation Company in Support of the Revised Hourly Rates of Brownfield Partners, LLC* [Docket No. 5934]. The Court's recent approval of AP Services' compensation application also included a retroactive and prospective hourly rate increase [Docket No. 6362], preceded by a form of notice and, in turn, an objection by both the U.S. Trustee [Docket No. 6517] and the Fee Examiner [Docket No. 6497].

The question of hourly rate increases has arisen in the *Lehman Brothers* proceeding, where it has engendered controversy and chambers conferences but, to date, not an explicit judicial resolution. This is an excerpt from the most recent Fee Committee report:

> Increases to 2009 billing rates [for 2010] will be reviewed for reasonableness in accordance with the standards set forth under Bankruptcy Code 11 U.S.C. §330(a)(3). If the fees requested are not found to be reasonable they will be opposed effective on January 1, 2010 and increases will be deducted and reflected in the Fifth Interim Fee Application and all subsequent fee applications.

*In re Lehman Brothers Holdings Inc. et al.*, Fee Committee Report Pertaining to the Fourth Interim Fee Applications of All Retained Professionals, at 3, No. 08-13555 (Bankr. S.D.N.Y. Aug. 20, 2010) [Lehman Brothers Docket No. 10947].

Here, the Fee Examiner's report on the Kramer Levin and Weil Gotshal applications has called attention to the rate increases, but it does not specifically object to them. That position is conditioned on the submission of an appropriate affidavit and certification that permits the Court

5

to conclude that the rate increases (both as a whole and for individual timekeepers) meet the "market-rate" and reasonableness standards and have a factual foundation.

Prospectively, the Fee Examiner requests that the Court require formal notice, providing an opportunity to be heard for the U.S. Trustee, the Fee Examiner and any party in interest, for any hourly rate increases. While the notice requirement for hourly rate increases is not explicit in the Code, it is inherent in the requirement that professional fees be reasonable and subject to review. The alternative, in the absence of an order, is the *status quo* here: a professional can raise its hourly rates unilaterally and without either specific notice or at least affidavit-based support.

A modest annual rate increase, across-the-firm and for all clients, would not be objectionable, but it should still warrant notice and the right to be heard. It would be fair neither to the applicant nor to the estate to defer any review of rates (including interim rate increases) to the conclusion of a case and the final fee hearing. They are either reasonable and justified when they take effect, warranting compensation, or they are not.

***Compensation for the Fee Review Process***

Virtually all of the professionals have requested compensation for time spent responding to inquiries and objections from the U.S. Trustee and the Fee Examiner. In some instances, that category accounts for an appreciable amount of time. Kramer Levin, for example, reported that it spent a total of 285 hours preparing fee applications (compensable) and responding to inquiries and objections (questionable). Accordingly, it has requested the Court to approve payment of 100 percent of all of its fees in this category—totaling $124,773.00 in compensation. That is nearly 20 percent of Kramer's total fee request for this period.

With or without a Fee Examiner, the fee review process is burdensome. The Bankruptcy Code and the U.S. Trustee Guidelines have made it so, and there is no need to recount the

6

independent obligation of the Court and the U.S. Trustee's office to review and approve requests for compensation. The involvement of a Fee Examiner—or, in the case of *Lehman Brothers* and other proceedings, a Fee Committee—adds to the burden and, at times, adds to it appreciably. The question though, as this Court has often noted in different contexts, is not the burden but who bears it.

Disagreements over "fees for fees" have been addressed by the courts. The problem, of course, is that there is a split in authority. *See* 3 Collier on Bankruptcy ¶ 330.03[16][a][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010); *see also In re CCT Communications, Inc.*, No. 07-10210, 2010 WL 3386947, at *9 (Bankr. S.D.N.Y. Aug. 24, 2010) (Bernstein, J., noting split of authority and permitting compensation where fee applicant has "substantially prevailed").

Courts that have denied compensation have often reasoned that defending a fee application is a different activity—practically and within the meaning of Code—than preparing the application itself. *E.g.*, *In re Riverside-Linden Inv. Co.*, 945 F.2d 320 (9th Cir. 1991); *In re St. Rita's Assocs. Private Placement, L.P.*, 260 B.R. 650, 652 (Bankr. W.D.N.Y. 2001); *In re Brous*, 370 B.R. 563, 572 (Bankr. S.D.N.Y. 2007). Some of those courts have also noted that absent explicit statutory or other authority, the American Rule—with each party paying its own litigation costs—generally applies to deny compensation for time spent on fee disagreements. *E.g.*, *St. Rita's*, 260 B.R. at 652.

Those courts embracing this position, however, have acknowledged the possibility that, under the right facts, compensation may be nonetheless appropriate. *E.g.*, *Riverside-Linden*, 945 F.2d at 323 (leaving open whether fee litigation might be "necessary"—and compensable— within the meaning of the Code); *St. Rita's*, 260 B.R. at 652 (leaving open whether compensation

7

could be had where the objection was not meritorious); *In re Teraforce Tech. Corp.*, 347 B.R. 838, 867 (Bankr. N.D. Tex. 2006) (noting that "counsel should not *normally* be able to recover") (emphasis added).

Judge Bernstein, writing in *Brous* three years ago, analyzed the relatively few cases on the issue and denied the compensation requested by a chapter 7 trustee for responding to a "good faith" fee objection. He noted both the force of the American Rule and the fact that the objecting party had "substantially prevailed." 370 B.R. at 572. In *Teraforce Tech. Corp.*, cited in *Brous*, Judge Houser noted the division of authority, cited *St. Rita's* with approval, and emphasized the American Rule, concluding that the objections "were filed in good faith and ultimately resulted in a partial disallowance of the requested fees." 347 B.R. at 866. The Code's silence on the issue led Judge Houser to conclude that "counsel should not normally be able to recover fees for defending a fee application...." *Id*. at 867.

Other courts have reached precisely the opposite conclusion. "[R]equiring counsel who has *successfully* defended a fee claim to bear the costs of that defense is no different than cutting counsel's rate or denying compensability on an earlier fee application." *In re Worldwide Direct, Inc.*, 334 B.R. 108, 112 (D. Del. 2005) (emphasis added); *see also In re Ahead Commc'ns Sys., Inc.*, No. 02-30574, 2006 WL 2711752, at *5 (Bankr. D. Conn. 2006); *In re Smith*, 317 F.3d 918, 928 (9th Cir. 2002). Again, however, those courts permitting compensation have often noted that a *per se* rule is nonetheless inappropriate because it could encourage meritless fee requests by permitting applicants to be paid for pursuing questionable time and expense compensation. *See Worldwide Direct*, 334 B.R. at 112; *Smith*, 317 F.3d at 928-29 (distinguishing *Riverside-Linden* on the basis of the merits of the defense and granting fees based, in part, on concern of fee dilution).

The Code's silence on the propriety of estate compensation for defending a fee application has, unsurprisingly, been cited as support both for allowing and disallowing compensation. For example, Judge Cudahy (a senior 7th Circuit judge sitting in the 9th Circuit) in *In Re Smith* reached precisely the opposite conclusion several bankruptcy judges had reached in light of the same silence. Relying on section 330(a)(4)(A), Judge Cudahy held that the denial of compensation for time spent in contested fee awards would "reduce the effective compensation of bankruptcy attorneys to levels below the compensation available to attorneys generally." 317 F.3d at 928. The Court emphasized as well that the objections had been found "frivolous" and that the applicant had successfully defended its fee award. *Id*. at 929.

Quantitatively, this Court probably has three categorical alternatives: permit compensation for all of the time spent on the fee review process, for none of it, or for some portion of it under a formula. The first two are not attractive.

To permit compensation for all of the time spent would encourage a relaxed if not lax approach to time-keeping and to maintaining the integrity of fee applications. It would ignore the distinction between experienced professionals and others and, moreover, eliminate any incentive to adapt to a Court's rulings and the case's context as the proceeding evolved. Finally, permitting full compensation would ignore the American Rule for fee allocation where there is disagreement over those fees.

A rule flatly prohibiting compensation has its own drawbacks. It would, at least to some extent, penalize the professional for time spent participating in a process that, whether by stipulation or not, the Court has mandated to help execute its responsibility and to ensure accountability and transparency under the Code. It is not enough to say that attorneys in non-bankruptcy cases are not compensated for resolving fee disagreements with their clients.

9

They are not, but neither do they have to meet the detailed U.S. Bankruptcy Code and U.S. Trustee requirements in non-bankruptcy cases.

The third alternative, a formulaic approach—probably based on the relationship between objections sustained or stipulated and those not—has a theoretical benefit but would only increase the cost of fee review. Time would be spent, not productively, in applying the formula to the myriad objections, stipulations, amendments, and decisions about fees in many cases—certainly this one. The formula's application itself might well trigger disagreements. It would, moreover, ignore the prophylactic benefit of diligent fee review, even where objections were not sustained—a process reflected, one would hope, in the exercise of billing judgment before applications are filed and in less expense over the course of a proceeding.

The recommendation embodied in the Fee Examiner's individual reports suggests a pragmatic approach. For experienced firms, it proposes a 50 percent payment for time spent on responding to the Fee Examiner or to the U.S. Trustee or, for that matter, to the Court itself. For less experienced firms, the suggested reduction is less. This approach takes into account the case law, to the extent there is bright line authority in those cases, and tries to account both for sustained objections and stipulations as well as for objections that, though not sustained, are made in good faith—generally in concert, though not jointly, by the U.S. Trustee and the Fee Examiner.

## CONCLUSION

In the third fee application period, the number and corresponding dollar amounts of objections have decreased. The number and amount of stipulated applications have increased. The number and significance of issues brought to the Court have declined. Yet at least two questions, applicable to all of the professionals, remain for the Court: the procedure for hourly rate increases and the determination of compensation for the fee review process.

Dated: Madison, Wisconsin
September 20, 2010.

               GODFREY & KAHN, S.C.

            By:   /s/ *Katherine Stadler*
               Katherine Stadler (KS 6831)
               Timothy F. Nixon (TN 2644)

               GODFREY & KAHN, S.C.
               780 North Water Street
               Milwaukee, Wisconsin 53202
               E-mail: kstadler@gklaw.com
                   tnixon@gklaw.com

               *Attorneys for Fee Examiner*

5424380_1

**EXHIBIT**

**CHART OF INTERIM FEE APPLICATIONS NOTICED FOR HEARING ON
<u>SEPTEMBER 24, 2010 AT 9:45 A.M. (PREVAILING EASTERN TIME)</u>**

INTERIM FEE APPLICATIONS NOTICED FOR HEARING ON
SEPTEMBER 24, 2010 AT 9:45 A.M. (PREVAILING EASTERN TIME)

MOTORS LIQUIDATION COMPANY, *et al.*, DEBTORS
CHAPTER 11 CASE NO. 09-50026 (REG)

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS[1] 80% OF FEES AND 100% OF EXPENSES | | AMOUNTS ALLOWED BY THE COURT | | HOLDBACK ON FEES (10% RECOMMENDED) | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| 1. Brownfield Partners, LLC | 08/05/2010 [6541] | 02/01/2010-05/31/2010 | 416,398.80 | 14,930.47 | Adjourned by Stipulation at Docket No. 6951 | Adjourned by Stipulation at Docket No. 6951 | 291,294.80 | 14,730.89 | | | | | 09/17/2010 [6973] |
| 2. Caplin & Drysdale, Chartered | 08/05/2010 [6553] | 10/06/2009-05/31/2010 | 497,190.25 | 50,070.63 | 13,780.54 | 94.55 | 0.00 | 0.00 | | | | | 09/17/2010 [6980] Amended 09/20/2010 [7006] |
| 3. Kramer Levin Naftalis & Frankel LLP | 08/05/2010 [6538] | 02/01/2010-05/31/2010 | 644,939.25 | 7,592.26 | 52,386.50 | 15.00 | 529,559.80 | 9,024.06 | | | | | 09/17/2010 [6979] |
| 4. Plante & Moran, PLLC | 08/05/2010 [6527] | 02/01/2010-05/31/2010 | 332,405.34 | 5,870.07 | 1,848.50 | 72.33 | 262,746.95 | 5,807.07 | | | | | 09/17/2010 [6977] |
| 5. Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation | 07/15/2010 [6352] | 02/24/2010-05/31/2010 | 63,314.50 | 3,712.78 | 1,804.15 | 64.94 | 39,036.40 | 3,479.19 | | | | | 09/17/2010 [6976] |
| 6. The Claro Group, LLC | 08/04/2010 [6506] | 02/01/2010-05/31/2010 | 527,315.50 | 7,886.51 | 14,869.35 | 293.94 | 87,912.00 | 4,843.23 | | | | | 09/17/2010 [6974] |

---

[1] These figures include additional payments made by the Debtors subsequent to the submission of the first, second and third interim fee applications but *does not* include any of the payments reported in rounded numbers in the Debtors' Monthly Operating Reports.

| Name of Retained Professional | Date Fee application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested | | Amounts Recommended For Disallowance / Status | | Amounts Already paid to Retained Professionals[1] 80% of Fees and 100% of Expenses | | Amounts Allowed by the Court | | Holdback on Fees (10% recommended) | | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | |
| 7. Dean M. Trafelet in his Capacity as Legal Representative for Future Asbestos Personal Injury Claimants | 07/15/2010 [6350] | 11/13/2009-05/31/2010 | 38,936.00 | 2,050.61 | 757.52 | 80.92 | 5,400.80 | 4.05 | | | | | 09/17/2010 [6975] |
| 8. Weil, Gotshal & Manges, LLP | 08/05/2010 [6554] | 02/01/2010-05/31/2010 | 5,316,122.75 | 141,489.52 | 282,079.09 | 2,388.90 | 1,060,679.22 | 36,308.64 | | | | | 09/17/2010 [6984] |
| **TOTAL Interim Fee Applications Noticed for Hearing on September 24, 2010 :** | | | **$7,836,622.39** | **$233,602.85** | | | | | | | | | |

| QUARTERLY REPORTS | | Period covered by Quarterly Report | Fees | Expenses | | | |
|---|---|---|---|---|---|---|---|
| AP Services, LLC | 04/14/2010[2] [5505] | 12/1/2009 – 2/28/2010 | 9,347,167.12 | 673,813.62 | | | |
| | 07/15/2010 [6355] | 03/01/2010 – 05/31/2010 | 8,873,645.98 | 541,466.86 | | | |
| | | **TOTAL QUARTERLY REPORTS:** | **$18,220,813.10** | **$1,215,280.48** | | | |

---

[2] The scope of the April 14, 2010 Quarterly Report includes one month of the Third Interim Fee Period (February 1, 2010 through May 31, 2010). The fees incurred by AP Services during the Third Fee Period are $11,752,004.53 plus expenses of $808,104.73 (for a total of $12,560,109.26). AP Services has received payment of all fees and expenses reported in the Third Fee Period.

5424464_1

3