Theodore B. Stolman (*Pro Hac Vice* Admission Pending)
Margreta M. Morgulas (MM 7441)
Anthony Arnold (*Pro Hac Vice* Admission Pending)
STUTMAN, TREISTER & GLATT PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

*Attorneys for West Covina Motors, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                              :
**In re**                                     :   **Chapter 11 Case No.**
                                              :
**MOTORS LIQUIDATION COMPANY,** *et al.,*     :   **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.* :
                                              :
                        **Debtors.**          :   **(Jointly Administered)**
                                              :
-----------------------------------------------------------------x

<u>**SUBMISSION OF EXHIBITS A AND B TO RESPONSE OF WEST COVINA MOTORS,**
**INC. TO DEBTORS' THIRTY-NINTH OMNIBUS OBJECTION TO CLAIMS**</u>

West Covina Motors, Inc. ("**West Covina**"), by its attorneys, Stutman, Treister & Glatt

PC, hereby submits its Exhibits "A" and "B" to response (the "**Response**") to the Thirty-Ninth

Omnibus Objection to Claims (Dealership Claims) [Docket No. 6646] (the "**Objection**")[1] filed

by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), seeking

entry of an order disallowing and expunging from the claims register certain claims filed by

West Covina.

Exhibit "A" : "Termination and Release Agreement," dated March 26, 2009, by and

between GM and West Covina ("**Original Termination Agreement**").  A true and correct copy

of the Original Termination Agreement is annexed hereto as Exhibit "A."

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed thereto
    in the Objection.

544091v1

Exhibit "B" Postpetition Termination Agreement to the Debtors.  A true and correct copy of the executed Postpetition Termination Agreement is annexed hereto as Exhibit "B."

Dated: September 20, 2010

    /s/ Margreta M. Morgulas

Theodore B. Stolman,
Margreta M. Morgulas, and
Anthony Arnold,
STUTMAN, TREISTER & GLATT PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

*Attorneys for West Covina Motors, Inc.*

# EXHIBIT A

## TERMINATION AND RELEASE AGREEMENT

THIS TERMINATION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the 26 day of March , 2009, by and between WEST COVINA MOTORS, INC., a California corporation ("Dealer"), and GENERAL MOTORS CORPORATION, a Delaware corporation ("GM").

### RECITALS

A.      Dealer and GM are the parties to a Dealer Sales and Service Agreement dated November 1, 2005, pursuant to which Dealer was granted the right to purchase from GM certain HUMMER motor vehicles (the "Dealer Agreement").  Dealer's HUMMER dealership operations are currently located at 1900 East Garvey Avenue South in West Covina, California (the "Hummer Site").

B.      Dealer has agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

C.      In addition to the foregoing, GM has agreed that Dealer may relocate its HUMMER Dealership Operations (as hereinafter defined) from the Hummer Site to Dealer's Chevrolet dealership operations located at 1932 East Garvey Avenue South in West Covina, California (the "Chevrolet Site"), upon the terms and conditions set forth herein.  The Hummer Site, the Chevrolet Site and any other property to which Dealer's GM dealership operations are relocated with GM's approval are collectively referred to herein as the "Dealership Premises."

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree as follows:

1.    Payment to Dealer.

(a)  In consideration of Dealer's execution and delivery to GM of this Agreement, and Dealer's termination and cancellation of the Dealer Agreement by written agreement in accordance with Article 14.2 thereof (as set forth in Section 2 of this Agreement), GM shall pay, or cause to be paid, to Dealer the sum of Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Settlement Amount"), subject to the terms herein set forth.  This payment is consideration solely for the releases and waivers set forth herein, Dealer's termination and cancellation of the Dealer Agreement, and Dealer's transfer to GM of its right, title and interest in and to its customer lists and service records for its HUMMER dealership operations.  One Million Two Hundred Fifty Thousand Dollars ($1,250,000) of the Settlement Amount shall be paid to Dealer by crediting Dealer's open account maintained on the General Motors Corporation Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) days following GM's receipt of this fully executed Agreement.  The balance of the Settlement Amount (the "Final Amount") shall be paid to Dealer, subject to Section 3(a) below, by crediting Dealer's Open Account in accordance with GM's standard practices, after the completion of all of the following items: (i) Dealer's compliance with all applicable bulk transfer,

sales tax transfer or similar laws and the expiration of all time periods provided therein, (ii) the effective date of the termination and cancellation of the Dealer Agreement, and (iii) GM's receipt of the fully executed Supplemental Termination and Release Agreement pursuant to Section 3(a) below, whichever is later.

2.  Relocation of HUMMER Dealership Operations.  At any time prior to the effective date of the termination of the Dealer Agreement, Dealer may, upon submission of a written change request to GM in a form acceptable to GM, relocate its Dealership Operations (as defined in the Dealer Agreement) for HUMMER from the Hummer Site to the Chevrolet Site, subject to Dealer's compliance with any requirements from GM for such relocation.

3.  Termination of Dealer Agreement.

(a)  Dealer hereby terminates and cancels the Dealer Agreement by written agreement in accordance with Article 14.2 thereof, such termination and cancellation to be effective on October 31, 2010.    Notwithstanding the foregoing, (i) Dealer may terminate the Dealer Agreement prior to October 31, 2010, upon thirty (30) days written notice to GM, in which event Dealer shall not be entitled to payment of the Final Amount, and GM shall have no obligation to pay the Final Amount to Dealer, and, (ii) GM may terminate the Dealer Agreement prior to October 31, 2010, upon thirty (30) days written notice to Dealer, in which event Dealer shall be entitled (subject to satisfaction of the conditions elsewhere set forth herein) to payment of the Final Amount.   In the event that Dealer enters into a new dealer agreement on or before November 1, 2010, for its HUMMER dealership operations with GM or any successor to GM, then Dealer shall not be entitled to payment of the Final Amount, and GM shall have no obligation to pay the Final Amount to Dealer. Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.  As a condition to the payment of the Final Amount and/or payment for the Eligible Items (as hereinafter defined), Dealer shall execute a Supplemental Termination and Release Agreement in the form attached hereto as Exhibit A.

(b)  Concurrently with its termination and cancellation of the Dealer Agreement, Dealer hereby conveys to GM all of Dealer's right, title and interest in and to its customer lists and service records for its HUMMER dealership operations, and within ten (10) days following GM's written request, Dealer shall deliver to GM digital computer files containing copies of such lists and records.

(c)  Payment of all or any part of the Settlement Amount or amounts for any Eligible Items in Section 4 below may, in GM's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or its Affiliates (as defined below), and/or (ii) delayed in the event GM has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to its GM dealership operations which are the subject of this Agreement including, but not limited to, all or any part of the Settlement Amount or amounts for any Eligible Items (each, a "Competing Claim"), in which event GM may delay payment of all or any part of the Settlement Amount or amounts for any Eligible Items until GM has received evidence in form and substance reasonably acceptable to GM that all Competing Claims have been fully and finally resolved.

4.  Termination Assistance.  Upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of HUMMER dealership operations, GM shall offer the following termination assistance:

(a)    GM shall purchase new and unused Motor Vehicles (as defined in the Dealer Agreement) that are not damaged or altered and that have less than 300 recorded miles, of the current model year purchased by Dealer from GM and of the previous model year if purchased by Dealer from GM within one hundred twenty (120) days before the effective date of termination, at a price equal to the net prices and charges that were paid by Dealer to GM. GM is not obligated to buy back new and unused Motor Vehicles acquired by Dealer from other GM dealers. Dealer must provide its GM Zone Manager with a list of eligible vehicles within fifteen (15) days following the effective date of termination under this Agreement. GM's Zone Manager will confirm the eligibility of each vehicle and will notify Dealer of the proper disposition of all applicable vehicles.

(b) GM shall purchase, at the option of Dealer, Eligible Parts and Accessories (as defined below) in accordance with Article 15.2.1 and the GM Parts & Accessories Terms of Sale Bulletin No 2002 1 U.S., as may be amended by GM from time to time.

GM will authorize Dealer to submit an application for termination parts return. Dealer must submit a single listing of Eligible Parts and Accessories electronically to its GM Parts Distribution Center within sixty (60) days after authorization. "Eligible Parts and Accessories" means new or remanufactured, unused and undamaged parts and accessories that:

(i)    have been purchased by Dealer directly from GM or indirectly from GM via an outgoing authorized dealer as part of Dealer's initial Parts and Accessories inventory where the authorized outgoing dealer purchased the parts directly from GM;

(ii)    meet packaging standards and merchandising pack quantities set by GM; and

(iii)    are not classified as factory source or identified as non-returnable by GM.

GM will subsequently provide Dealer with a listing and tags with instructions for the return of Eligible Parts and Accessories.

(c) GM will purchase any essential tools recommended by GM and designated specifically for service of Motor Vehicles that GM offered for sale during the three (3) years preceding the effective date of termination (the "Essential Tools") at prices established in accordance with the applicable pricing formula in the Services Policies and Procedures Manual. On or before the effective date of termination, GM will provide Dealer with a preliminary list of eligible tools and instructions regarding tool inventory verification. GM will advise Dealer in writing of the disposition of the eligible Essential Tools and Dealer will have thirty (30) days from the date of GM's letter to return the Essential Tools to the location designated by GM.

(d) Transfer and payment for the foregoing items in subsections (a) – (c) in this Section 3 (collectively, the "Eligible Items") shall be made on or after the effective date of termination of the Dealer Agreement by a credit to Dealer's Open Account, in accordance with GM's standard practices. The consideration recited in Section 1 of this Agreement is separate and distinct from any consideration that GM may offer under this Section 4. GM shall be entitled to recover, and Dealer shall pay to GM, any unused portion of any interest credit and any other allowances or credits that had theretofore been paid to Dealer with respect to the Eligible Items in this Section 4.

(e) Dealer understands and agrees that any signs used or useful in connection with Dealer's HUMMER dealership operations are not included within the definition of Eligible Items

and that GM will not purchase any such signs. Dealer hereby waives any rights it may have to require GM to purchase any signs used or useful in connection with its HUMMER dealership operations. Dealer understands and agrees that the Settlement Amount was determined in part by GM based on Dealer's agreement that it will retain all of such signs and will not require or attempt to require GM to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(f)    Dealer expressly agrees that the provisions of Article 15.3 of the Dealer Agreement do not, by their terms, apply to this termination. Dealer hereby reaffirms the inapplicability of Article 15.3.

(g)    Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

5.    Release; Covenant Not to Sue; Indemnity.

(a)    Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, its Affiliates or any of their members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns, arising out of or relating to (i) the Dealer Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, HUMMER Standards for Excellence related payments or bonuses, and any representations regarding HUMMER motor vehicle sales or profits associated with a HUMMER dealership, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the execution of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims, (y) the payment to Dealer of any incentives currently owing to Dealer, any amounts currently owing to Dealer in its Open Account, or any amounts due or to become due to Dealer in connection with its return of Eligible Items pursuant to Section 4 above, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any GM warranty claims approved and paid by GM prior to the effective date of termination and cancellation, as described in Section 3 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)    Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any Claim that is covered by the release provision in subparagraph (a) above. Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to GM, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(d) Dealer shall indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

6. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

7. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

8. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress.

9. <u>Binding Effect</u>. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns.

10. <u>Effectiveness</u>. This Agreement, and any offers made by GM to Dealer with respect to the implementation of GM's marketing channel strategy in Dealer's metropolitan area, shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is returned to GM on or before April 15, 2009. This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

11. <u>Disputes - Arbitration</u>.

(a) Subject to the following provisions of this section, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "<u>Disputes</u>"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("<u>AAA</u>") at an AAA regional office nearest the Dealership Premises. The intent of this paragraph is that the parties hereto agree to mandatory, binding arbitration of Disputes in a private proceeding involving only the parties. Under no circumstances shall any Dispute be combined with, joined with, or adjudicated in, a common proceeding with Disputes involving persons in addition to the parties.

(b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Disputes. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, *et seq.*). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a prehearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Dealer and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the arbitration process. Dealer and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

(f) No arbitration may be commenced after the expiration of the applicable statute of limitations. The arbitrator may award only compensatory damages and may not award any punitive or exemplary damages. The arbitrator may award interest at the prevailing judgment rate.

12. <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

13. <u>Complete Agreement of the Parties</u>.  This Agreement and the schedules, exhibits and attachments to such agreement (i) contains the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersedes all prior statements, representations and agreements relating to the subject matter of this Agreement.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

WEST COVINA MOTORS, INC., a California corporation

By: _____

Name: ZIAD ALHASSEN

Title: PRESIDENT


GENERAL MOTORS CORPORATION, a Delaware corporation

By: _____

P. V. Gonzales, Finance Director, or
S. M. Sprague, Finance Manager

By: _____

M.L. Flory, Dealer Business Planning Manager, or
Authorized Representative

## EXHIBIT A

## SUPPLEMENTAL TERMINATION AND RELEASE AGREEMENT

THIS SUPPLEMENTAL TERMINATION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by WEST COVINA MOTORS, INC., a California corporation ("Dealer"), for the use and benefit of GENERAL MOTORS CORPORATION, a Delaware corporation ("GM").

## RECITALS

A.      Dealer and GM are the parties to a Dealer Sales and Service Agreement dated November 1, 2005, pursuant to which Dealer was granted the right to purchase from GM certain HUMMER motor vehicles (the "Dealer Agreement").

B.      Dealer and GM are parties to that certain Termination and Release Agreement dated _____, 2009 (the "Original Termination"), pursuant to which Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

C.      Dealer executes this Agreement in accordance with Section 3(a) of the Original Termination. All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Termination.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.     Termination of Dealer Agreement.

(a) Dealer hereby terminates and cancels the Dealer Agreement by written agreement in accordance with Article 14.2 thereof.  The effective date of such termination and cancellation shall be _____.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to payment of the Final Amount and/or the Eligible Items in accordance with the terms of the Original Termination.

2.   Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and

nature whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may now or hereafter at any time have or acquire against GM, its Affiliates or any of their members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns, arising out of or relating to (i) the Dealer Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, HUMMER Standards for Excellence related payments or bonuses, and any representations regarding HUMMER motor vehicle sales or profits associated with a HUMMER dealership, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the execution of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims, (y) the payment to Dealer of any incentives currently owing to Dealer, any amounts currently owing to Dealer in its Open Account, or any amounts due or to become due to Dealer in connection with its return of Eligible Items pursuant to Section 1 above, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any GM warranty claims approved and paid by GM prior to the effective date of termination and cancellation, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected.  In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof.  Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any Claim that is covered by the release provision in subparagraph (a) above. Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to GM, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(d) Dealer shall indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress.

6. Binding Effect. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns.

7. Effectiveness. This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

8. Disputes - Arbitration.

(a) Subject to the following provisions of this section, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Disputes"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") at an AAA regional office nearest the Dealership Premises. The intent of this paragraph is that the parties hereto agree to mandatory, binding arbitration of Disputes in a private proceeding involving only the parties. Under no circumstances shall any Dispute be combined with, joined with, or adjudicated in, a common proceeding with Disputes involving persons in addition to the parties.

(b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Disputes. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, *et seq.*). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a prehearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Dealer and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the arbitration process. Dealer and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

(f) No arbitration may be commenced after the expiration of the applicable statute of limitations. The arbitrator may award only compensatory damages and may not award any punitive or exemplary damages. The arbitrator may award interest at the prevailing judgment rate.

9.    Notices. All notices, demands, requests, and other communications required or permitted under this Agreement shall be in writing and shall only be deemed properly given and received (a) when actually given and received, if delivered in person to a party; or (b) one (1) business day after deposit with a private courier or overnight delivery service for next-business-day delivery. All such notices shall be transmitted by one of the methods described above to the party to receive the notice at, in the case of notices to Dealer, West Covina Motors, Inc., 1932 East Garvey Avenue South, West Covina, California 91791; in the case of GM, General Motors Corporation, 100 Renaissance Center, P. O. Box 100, Mail Code 482-A06-C66, Detroit, Michigan 48265, Attention: DNPI Western Regional Director, with copies to General Motors Corporation, Legal Staff, Mail Code 482-C24-C66, 300 Renaissance Center, P. O. Box 300, Detroit, Michigan 48265-3000, Attention: Deborah Collins, Esq., or, in any case, at such other address(es) as Dealer or GM may notify the other of according to this Section.

10.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

11.    Complete Agreement of the Parties. Except as set forth in Section 1(c) above, this Agreement (i) contains the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersedes all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally

waive, modify, amend or expand this Agreement.  The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

WEST COVINA MOTORS, INC., a California corporation

By:_____

Name:_____

Title:_____

*EXHIBIT ONLY*
*NO SIGNATURE REQUIRED*

# EXHIBIT B

## DEFERRED TERMINATION AGREEMENT

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between West Covina Motors, Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are parties to a Dealer Agreement (the "Dealer Agreement") for HUMMER Motor Vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of their assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    A memorandum of understanding, letter of intent, or other similar document (the "MOU"), has been executed with a party (the "Buyer") that proposes to purchase all or substantially all of the 363 Assets from GM or, if GM convey such 363 Assets to the 363 Acquirer, the 363 Acquirer.

E.    The MOU contemplates that the Buyer will enter into an acquisition agreement (the "Purchase Agreement") with GM or the 363 Acquirer, as applicable, pursuant to which the Buyer will purchase certain of the 363 Assets (the "Acquisition").

F.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, before the closing of the 363 Sale unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

G.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement (i) to allow GM to assume the Dealer Agreement, as supplemented by this Agreement, in the Bankruptcy Case, (ii) to allow GM, at its option, to assign the Dealer Agreement, as supplemented by this Agreement, to the 363 Acquirer in connection with the 363 Sale, (iii) release GM, the 363 Acquirer, and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein, and (iv) to provide for the deferred termination of the Dealer Agreement.

H.    If the 363 Sale closes, but the Acquisition fails thereafter to close for any reason, this Agreement shall continue in full force and effect and provide for (i) Dealer's voluntary termination of the Dealer Agreement, (ii) GM's payment of certain monetary consideration to Dealer to allow orderly wind-down of its Dealership Operations, and (iii) Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealer Operations").



## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals), as follows:

1. <u>Assignment-363 Sale</u>. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer. If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2. <u>Termination of Dealer Agreement and this Agreement Upon Acquisition by Third-Party Buyer</u>. If the Acquisition by the Buyer closes on or before September 30, 2009, or such later date selected by GM or the 363 Acquirer, as applicable, in its sole discretion (the "<u>Acquisition Closing Deadline</u>"), this Agreement and the Dealer Agreement shall be assigned to and assumed by the Buyer. Thereafter, the Dealer Agreement, as supplemented by this Agreement, shall terminate and be of no further force or effect (except for those terms thereof that specifically survive the termination of this Agreement or the Dealer Agreement, as applicable) on the earlier of (a) the date on which Buyer and Dealer have executed a replacement dealer sales and service agreement, however denominated (a "<u>Replacement Dealer Agreement</u>"), or (b) October 31, 2010, whether or not the Buyer and Dealer have executed a Replacement Dealer Agreement. Following such termination, the terms of Section 5 of this Agreement shall govern Dealer's right to receive termination assistance.

3. <u>Termination of Dealer Agreement – No Acquisition by Third Party Buyer</u>. Subject to the terms of Sections 1 and 2 above:

(a) Dealer hereby covenants and agrees to conduct the Subject Dealer Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010, or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided in Section 2 above) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009, and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its agreement to such termination request, subject to the terms of this Agreement..

(b) Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealer Operations for similar purposes as the data may have been used by Dealer or GM and, within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers

2

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

4.   Termination Payment to Dealer.

(a)  Unless the Dealer Agreement and this Agreement are terminated in accordance with Section 2 above, in consideration of (i) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (ii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 3 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $5,000 (the "Termination Payment Amount"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use its customer lists and service records.

(b)  GM or the 363 Acquirer, as applicable, shall pay twenty-five percent (25%) of the Termination Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM or the 363 Acquirer, as applicable (the "Open Account"), in accordance with its standard practices and on or before the date ten (10) business days following the Acquisition Closing Deadline (provided that the Acquisition has not closed).  GM or the 363 Acquirer, as applicable, shall pay the balance of the Termination Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with GM's or the 363 Acquirer's, as applicable, standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 3 above, (v) Dealer's compliance with the terms of Section 5(c) below, (vi) GM's or the 363 Acquirer's, as applicable, receipt of the fully executed Supplemental Termination Agreement in substantially the form attached hereto as Exhibit A and incorporated herein by this reference (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals.  GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)  In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Termination Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM, the 363 Acquirer or their Affiliates, and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealer Operations including, but not limited to, all or any part of the Termination Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to GM or the 363 Acquirer, as applicable, that all Competing Claims have been fully and finally resolved.

3

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(d) GM or the 363 Acquirer, as applicable, shall have no obligation to disburse any portion of the Termination Payment Amount to Dealer if either the closing of the 363 Sale does not occur or the closing of the Acquisition does occur.

5. <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by GM and the 363 Acquirer, as applicable, hereunder, upon the termination of the Dealer Agreement, as provided in Section 2 or Section 3 of this Agreement, and cessation of the Subject Dealer Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c) Dealer shall eliminate or remove from the Dealer Premises all Dealer-owned signs (freestanding or not) for the Subject Dealer Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer. Dealer understands and agrees that the Termination Payment Amount was determined by GM in part based on Dealer's agreements that it will timely remove all signs for the Saturn Retail Facility Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement pursuant to this Agreement.

(f) The terms of this Section 5 shall survive the termination of this Agreement.

6. <u>Release; Covenant Not to Sue; Indemnity</u>.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) Dealer's Dealership Operations for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of Dealer's facilities, locations or

4

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer, as applicable, shall pay any SFE payments due to Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days of the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. Neither GM or the 363 Acquirer, as applicable, shall charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein. As set forth above, GM reaffirms the provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with either the assignment of the Dealer Agreement by GM to the 363 Acquirer in the 363 Sale or the assignment of the Dealer Agreement by GM or the 363 Acquirer, as applicable, to the Buyer in the Acquisition, or an allegation that either is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any

5

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

further act by Dealer in violation of this Section 6. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties , or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 6 shall survive the termination of this Agreement.

7. Subject Dealer Operations. From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Sections 2 and 3 above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives, from and after the earlier of (i) the closing of the Acquisition, (ii) if the Acquisition has not occurred, the date upon which the Acquisition Agreement terminates or (iii) if the Acquisition has not occurred, the Acquisition Closing Deadline.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

6

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply: Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles) after the Acquisition Closing Deadline; Article 8 (Training); Article 9 (Review of Dealer's Performance); Sections 12.2 and 12.3 (Changes in Management and Ownership); Article 15 (Termination Assistance); and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

8.   Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM and the 363 Acquirer that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9.   Confidentiality. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10.   Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11.   Binding Effect. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the Acquisition occurs, this Agreement shall benefit and bind the Buyer.

12.   Effectiveness. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13.   Continuing Jurisdiction.     By executing this Agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14.   Other Agreements.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM, or one or more of its Affiliates, and Dealer, provided that GM and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "Channel Agreements" shall mean agreements (other than the Dealer Agreement) between GM, or one or more of its Affiliates, and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other Dealers, to conduct exclusive

7

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement,"," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement (pursuant to either Section 2(b) or Section 3 hereof), except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, the Buyer, GM or the 363 Acquirer, as applicable, and Dealer shall enter into documents in recordable form reasonably satisfactory to the Buyer, GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Complete Agreement of the Parties. This Agreement, the Dealer Agreement, and the schedules, exhibits and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

West Covina Motors, Inc.

By: ~~~~~~~~~  6-4-09

Name: ZIAD ALHASSEN

Title: PRESIDENT

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

9

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

## EXHIBIT A

## SAMPLE SUPPLEMENTAL TERMINATION AGREEMENT

THIS SUPPLEMENTAL TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to a Dealer Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Termination Agreement.

C.    **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER] [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Termination Agreement, Dealer agreed to terminate the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM or the 363 Acquirer, as applicable, and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 4 of the Original Termination Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(b) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(c) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(d) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Termination Agreement.

---

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894



2.  Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the Dealer's Dealership Operations for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of retail facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer, as applicable, shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. Neither GM nor the 363 Acquirer, as applicable, shall charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that either GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

2

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

3968_19_166894

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER] [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 2. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 2 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

3

19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

6. <u>Binding Effect</u>. This Agreement shall be binding upon any replacement or successor Dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor Dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. <u>No Reliance</u>. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

4

**19 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

3968_19_166894

