KRAMER LEVIN NAFTALIS & FRANKEL LLP

PHILIP BENTLEY
PARTNER
PHONE 212-715-9505
FAX 212-715-8000
PBENTLEY@KRAMERLEVIN.COM

September 20, 2010

<u>VIA ECF AND HAND DELIVERY</u>

The Honorable Robert E. Gerber
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

    Re:   *Motors Liquidation Company, et al.*, Case No.: 09-50026

Dear Judge Gerber:

    On behalf of the Official Committee of Unsecured Creditors (the "Creditors' Committee"), I write in response to the September 17, 2010 letter (the "ACC letter") of Trevor W. Swett, counsel for the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "ACC"), concerning a proposed "anonymity protocol" to govern the confidential claimant data to be produced pursuant to the Court's two August 24, 2010 Orders – namely, the Order Pursuant to Bankruptcy Rule 2004 (the "Rule 2004 Order") and the accompanying Confidentiality Agreement and Protective Order (the "Agreed Protective Order").

    Over the six weeks that have elapsed since the Court's August 9 hearing on the Creditors' Committee's Rule 2004 motion, we have worked intensively with counsel for the ACC, the Trusts and the other parties to determine whether it may be possible, without undue harm to the estimation process, to devise a protocol that would accommodate the ACC's stated desire to render anonymous the claimant data to be produced by the Trusts. We have provided detailed substantive responses to each proposal advanced by the ACC, and have granted multiple extensions of the time frame set by the Court for the negotiation of the protocol. However, each proposal advanced by the ACC has proven unworkable. Most important, each proposal would significantly impair the ability of the Creditors' Committee's experts to conduct a rigorous analysis of the claimant data to be produced by the Trusts. By constraining the access of the Creditors' Committee's experts to the data needed for their analysis, the proposed protocol – in either of its proposes versions – could substantially bias the results of the estimation in an upward direction. In addition, either version of the proposed protocol would significantly increase the cost of these estimation proceedings and could cause significant delay.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 2

Because an anonymity protocol, however devised, would involve very substantial cost, in terms of money, time and (most important) impairment of the effectiveness of the estimation process, we have repeatedly urged the ACC and the other parties to explain why an approach of this sort is needed – that is, why the Agreed Protective Order already entered by the Court, after having been heavily negotiated by the parties for almost two weeks, would not provide sufficient protection. Their responses have been entirely unpersuasive, as we explain in Point I below.

We have concluded, as a result, that an anonymity protocol would not serve any substantial purpose. Moreover, as we show in Point II, the protocol proposed by the ACC – in either its "strong" version or its "compromise" version – would cause substantial harm to these proceedings. The principal effect of such a protocol would be to impair Bates White's access to information that it considers vital to its estimation analysis, thereby skewing the results of the estimation in an upward direction. The imposition of a protocol would also significantly increase the cost and the length of these proceedings.

For all of these reasons, we respectfully request that the Court adhere to the customary and long-established practice, which courts have followed even in cases involving the highest degree of sensitivity, of presuming that the parties will honor their express obligations under a confidentiality order – in this case, the Agreed Protective Order over which the ACC and the Trusts labored for weeks, and which the Court entered last month. As the Court observed at the August 9 hearing, experience demonstrates that confidentiality agreements and orders "do just fine, assuming that they're appropriately drafted." (Tr. of Aug. 9, 2010 hearing at 102; *see also id.* at 103: "I'm not going to presume or assume noncompliance with a confidentiality order. In ten years on the bench, I've never had any such noncompliance.") Nothing in the present case requires a departure from this settled practice.

I.  **There is No Reason to Believe that Bates White or the Other Parties' Estimation Experts Will Not Comply Fully With the Agreed Protective Order**

The Creditors' Committee's expert, Bates White, LLC ("Bates White"), is a leading consulting firm with a stellar reputation, which is entrusted routinely with highly sensitive data. Within the context of asbestos litigation, Bates White regularly receives confidential data from active tort defendants, debtors, unsecured creditors, insurers, and prospective buyers of companies with asbestos-related litigation. Outside of the asbestos context, Bates White has worked with highly sensitive data of a variety of sorts, including tax returns, individual-level transactions on credit cards, individual-level purchases of prescription drugs, and diacetyl claims. In each of these situations, Bates White has strictly adhered to the terms of the governing confidentiality agreement and data security protocols. Neither the ACC nor any of the other parties has suggested otherwise.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 3

      Nor have the parties advanced any reason why Bates White might have the slightest interest in disclosing the data that the ACC seeks to render anonymous – namely, the names and social security numbers of *individual* asbestos claimants. As the Court is aware (and the ACC itself observes), Bates White's focus, like that of the other estimation experts, is on aggregate, not individual, matters – that is, on what conclusions can be drawn from the claimant data as to GM's aggregate asbestos liability. No possible scenario has been suggested in which Bates White would even have an interest that would be furthered by the improper disclosure of individual claimant information in violation of the Agreed Protective Order.

      The ACC contends that Bates White is not a "dispassionate expert" (ACC letter at 2) but, instead, is a passionate advocate in asbestos estimation matters with a professional stake in being known as such – and, to that end, recently filed an amicus brief in a California asbestos-related appeal.[1] In this respect, however, Bates White is hardly different from other professionals in this case. The ACC's professionals, for example, are widely known (and highly regarded) as staunch plaintiff-side estimation advocates and have repeatedly taken public positions concerning asbestos matters. The ACC's estimation expert, Mark Peterson of Legal Analysis Systems, Inc., has testified at least three times before the Judiciary Committee of the United States Senate on asbestos matters. This does not mean, of course, that either the ACC's professionals or the Creditors' Committee's professionals cannot be trusted to honor the terms of the Agreed Protective Order.

      The ACC also notes that a Bates White employee, Marc Scarcella, sometimes offers testimony concerning the amounts that individual claimants are likely to be paid by Trusts, "based on information that it has obtained through bankruptcy cases." (ACC letter at 2.) The suggestion appears to be that information that Bates White obtains in the present case might

---

[1] In a similar vein, the ACC attempts to portray the Creditors' Committee and its counsel as engaged in a zealous campaign to alter the existing tort environment. *See* ACC letter at 1, contending that the discovery the Creditors' Committee seeks from the Trusts is "part of a litigation strategy calculated to affect individual claims against solvent defendants unrelated to [this] bankruptcy." Regrettably, the quotation from the August 9 hearing that the ACC offers in support of this proposition is taken out of context. A review of the transcript makes clear that Committee counsel was not describing his client's litigation strategy, but instead was explaining the apparent motivation behind the vigorous opposition by the Trusts and the ACC to the Committee's Rule 2004 motion: "[S]ome of the concerns you may hear expressed about burden really are masking the fact" that the plaintiffs' bar does not want its practice of "double-dipping, triple, quadruple-dipping" to be publicly examined by this Court or other courts. (Aug. 9, 2010 Tr. at 18-19; *see also id.* at 19: "that may stand behind the position they're taking[,] why they're making such a big deal about the burden.")

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 4

conceivably be used by Mr. Scarcella. What the ACC fails to mention is that Mr. Scarcella only uses public data and case-specific data, never data supplied to Bates White confidentially for other purposes. In this respect, he is no different from the experts hired by the ACC and the FCR, who regularly have access to trust data as part of their work (and who presumably adhere to the confidentiality conditions under which they received those data). Information obtained by Bates White in connection with the present case would not in any circumstances be part of any of Mr. Scarcella's analyses. In any event, if the Court wishes, Bates White is prepared to implement an "ethical wall" that would ensure that Mr. Scarcella (and any other employee who might subsequently undertake similar work)[2] has no access to any information obtained in connection with this case.

The ACC asserts, finally, that that the information sought in the Creditors' Committee's subpoenas goes "well beyond the scope of what defendants are ordinarily entitled to in the tort system." (ACC letter at 1.) This is simply untrue. State courts regularly require asbestos plaintiffs to disclose the amounts they have recovered from settled co-defendants, including trusts. *See generally* Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 Rev. of Litig. 501, 550-553 (Spring 2009) (describing tort system trend toward permitting discovery of plaintiffs' trust claims); William P. Shelley, Jacob C. Cohn, and Joseph A. Arnold, *The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 J. Bankr. L. & Prac. 2, Art. 3, at 272-276 (April 2008) (same); *see also, e.g., In re Asbestos Personal Injury Litigation*, Civil Action No. 03-C-9600 (W. Va. Cir. Ct. Mar. 3, 2010) (case management order requiring claimants to disclose, among other things, all claims filed against asbestos trusts, including proofs of claim and supporting materials). Even in the absence of case management orders mandating such disclosure, tort defendants are free to inquire about such subjects at deposition or through document discovery, in keeping with the bedrock principle permitting discovery on all relevant issues.

## II. In Addition to Being Unnecessary, the ACC's Proposed Protocol Would Impair the Accuracy of the Estimation Process, Increase Costs and Delay These Proceedings

### A. The ACC's "strong anonymity protocol" is deeply flawed

Under the ACC's "strong" proposal, the Trusts and the Creditors' Committee's estimation expert would each provide their data sets to a third-party neutral. The neutral would then combine the data sets and maintain a master database on its own servers to which the Creditors' Committee's estimation expert could submit one-off queries. Rather than the

---

[2] Mr. Scarcella is the only Bates White amployee engaged in the sort of work described by the ACC.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 5

Creditors' Committee's expert having direct access to the database, each time that the expert wanted to query the data, it would have to send its requests to the neutral.

This approach – under which the third-party neutral would have sole access to the master database, and each expert's only access would be via "queries" made to the neutral – would be unworkable. The approach would fundamentally alter the usual process by which the parties' experts analyze asbestos claims data, replacing it with a process that would be much more expensive (increasing expense several-fold) and much slower (adding weeks or months to the data analysis process), that would result in substantially lower quality analysis by the experts, and that would raise significant issues concerning preservation of the confidentiality of each expert's analyses of the GM claims data *and* each expert's proprietary data analysis procedures.

When experts possess the data themselves, they can explore the relationships in that data quickly and cost effectively. Bates White typically performs hundred of queries on the data every day during the early stages of its analysis. The specification of each set of queries is informed by the previous set of queries in a naturally iterative process. Under the ACC's "strong" proposal, Bates White and other experts would submit queries to the third party neutral and wait for them to run the queries and return the results. Instead of getting back results virtually instantaneously, experts would have to wait to get back results for each query, which would dramatically slow down the data analysis process and increase its cost.

Even more important, depriving experts of the ability to explore claimant-level data would severely hamper the types of analysis that could be performed. Bates White's normal methodology is to perform an in-depth analysis of micro-level data in order to determine macro-level trends. The ACC's "strong" proposal would foreclose Bates White's ability to perform this sort of analysis, which would bias the resultant estimate in an upward direction, *i.e.*, in favor of the ACC. For example:

- Bates White typically begins analysis by plotting various cuts of the raw data. These plots can be extremely helpful at identifying patterns in the data that merit additional research. The new proposal would not allow for this type of analysis.

- Many forms of analysis require the removal of outliers. By definition, outliers are individual claims and must be identified at that level, which would not be possible under this proposal.

- Case studies of individual claimants -- particularly those with high-value claims -- are extremely useful to improve understanding of the data, formulate and test hypotheses, and arrive at macro-level trends. Experts' ability to perform these sorts of analyses would be substantially impaired under the proposed approach.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 6

- All of these problems would be compounded if the third party neutral were not well-versed in all of the necessary programming languages (SAS, Stata, C++, MatLab, SQL, Python, and Excel), or if it did not have the ability to port data at low cost between platforms and to run code that called upon multiple languages at once.

Yet another complication raised by the ACC's "strong" proposal is that experts would need to have an ability to audit the work being performed by the third party. Initially, Bates White would want to ensure that the data had been properly merged and de-duplicated. In many previous asbestos litigations, Bates White and other experts have disagreed on the proper methodology both for merging and de-duplicating the data. Bates White believes that its procedures in this regard are more rigorous than those employed by most other estimation experts. Subsequently, Bates White would want to be able to audit the implementation of the code that was executed by the third party. Quality control is a critical component of expert work; it entails critiquing both the methodology being employed and the execution of that methodology. In the absence of audit provisions, Bates White and other experts might lack proper foundation for their testimony.

The ACC's "strong" proposal also raises very serious confidentiality concerns of two distinct sorts. First, the third-party neutral would be aware of the analyses being performed by each expert. In no other litigation in which Bates White has participated has there been a party in possession of such knowledge. Ensuring that the analyses of each expert remain confidential until expert reports are filed would be of utmost concern. This might require the third party neutral to have a distinct walled-off individual assigned to each expert, with access only to that expert's analysis database.

A second confidentiality concern relates to the protection of the proprietary data analysis procedures of Bates White and the other experts. Bates White (and presumably each of the other experts) has invested heavily in the development of sophisticated claims data analysis procedures and considers these procedures to be part of its intellectual property. Under the new proposal, the third party neutral would run Bates White's code and would otherwise become privy to Bates White's analytical procedures. This would enable the third party to become a competitor, and would provide it with an unfair advantage if it were to be retained in a future case in which Bates White were involved. This is a significant concern that would need to be addressed.

**B.    The ACC's "compromise anonymity protocol" is unworkable and provides no conceivable confidentiality benefit**

Under the ACC's "compromise" proposal, the third party neutral would not itself maintain the database, but instead would merge the data sets of the Trusts and the Creditors' Committee's expert, would redact certain information fields, and would provide the merged and redacted database to the parties' experts.

This proposal, too, would be unworkable. As with the "strong" version of the protocol, this alternative version would limit the analysis Bates White could do in a way that

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 7

would bias the results in favor of the ACC. This version, too, would increase the cost and delay the proceedings. In addition, this alternative version – in contrast to the "strong" version – would not even arguably provide a confidentiality benefit: It would provide no confidentiality protection whatsoever beyond that already provided by the Agreed Protective Order.

The problem with this alternative proposal, from the standpoint of permitting a robust estimation analysis, is that a number of the fields that the ACC proposes to redact are essential to an accurate estimation analysis. In general, more detailed information allows the parties' experts to more fully characterize the attributes that result in a high-value claim. Once identified, those attributes can be identified on a macro level within the respective pools of settled claims, pending claims and projected future claims to produce a more accurate liability estimate. Failing to control for these characteristics yields a less accurate estimate – and one that, typically, is biased in an upward direction. Again, we provide a few examples:

- Identification of each claimant's law firm is critical on many levels. After disease, the identity of the law firm is typically the next most important variable in estimating settlement values and dismissal rates. As such, it is unacceptable to redact the law firm information field. For one thing, law firm serves as a proxy for unobservable claimants' characteristics. For example, some law firms only take on strong cases with substantial litigation risk. Without knowing plaintiff's legal representation, Bates White would not be able to accurately value these high-litigation-risk claims. Further, the most successful plaintiff attorneys tend to get their claims resolved faster, which results in the pending claims being of disproportionately lower value. Redacting law firm would prevent an assessment of this issue and likely bias the resultant estimate high.

- Date of filing is essential for Bates White's analysis and cannot be replaced with the year of filing. Imagine two scenarios: Plaintiff A filed a claim with the trusts in January of 2008; in December of the same year, this plaintiff settled his claim with GM, after disclosing the amounts he received from the trusts. Another claimant, Plaintiff B, settled his claim with GM in February of 2008 and only after that, in the fall of 2008, filed a claim with the trusts. One may expect that the settlement amounts of Plaintiff A and Plaintiff B would be different, holding all else constant. However, in the dataset that the ACC is proposing to turn over, these two claimants would be undistinguishable.

- Replacement of job sites with the state of exposure is also unacceptable. This introduces a substantial lack of granularity and prohibits detailed analysis of exposure profiles. For example, it is very possible that brake mechanics have been receiving substantially higher settlement amounts from GM than non-mechanics. This hypothesis can only be tested using claimants' occupation description. The knowledge of the occupation is therefore essential for the proper, macro-level valuation of the future and pending stock of claims.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 8

   As with the ACC's "strong" proposal, experts would need to have an ability to audit the work being performed by the third party. Each of the audit issues discussed above applies to this alternative proposal as well.

   Not only does the ACC proposal impair Bates White's ability to accurately estimate liability; it also fails in its objective to create anonymity. This is the case whether the objective is to prevent an intentional violation of the Agreed Protective Order or to prevent an inadvertent violation.

   If the ACC's goal is to prevent Bates White or other experts from *deliberately* violating the confidentiality order – something none of the experts retained in this case would ever do[3] – the proposal is no more effective than the Agreed Protective Order at accomplishing this goal. The information in the database produced by the third party neutral would be sufficient to uniquely identify the vast majority of claimants for any expert who desired to do so. In fact, *any expert could recover the personal identifying information within hours* of receiving the data from the third party.

   Alternatively, if the ACC's "compromise" proposal is intended to protect against the *inadvertent* disclosure of confidential claimant information, that objective can readily be accomplished through much simpler means, involving none of the complications or adverse consequences of this proposal. During the course of the recent protocol negotiations, Bates White proposed such a protocol (which was received with resounding indifference from the other parties).

   The terms of the alternative – and vastly simplified – protocol proposed by Bates White are straightforward. This protocol differs from both ACC proposals in that it calls for the Trusts to comply, without modification, with their obligations under the Rule 2004 Order, that is, to produce directly to the parties' experts the data subpoenaed by the Creditors' Committee. The one key modification this simple protocol would make is that Bates White and the other experts would agree to use claimants' names and social security numbers *for matching purposes only.* Specifically, once having matched the data from the Trusts with its own data, Bates White would create a separate database that replaced names and social security numbers with a unique identifier. Bates White would then conduct all of its analyses only in this new, redacted

---

[3] The ACC's suggestion (ACC letter at 6-7) that the Creditors' Committee and Bates White have been less than completely clear in stating their intention to comply with the Agreed Protective Order is regrettable and false. Throughout the course of the recent negotiations, the Committee's counsel stated repeatedly that all Creditors' Committee representatives, including Bates White, will of course comply in every respect with their obligations under the Agreed Protective Order.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

September 20, 2010
Page 9

database. The source datasets would be taken off the network, put on an external storage device, and kept in a secured location.[4]

Segregation of the unredacted trust and GM data in this fashion would ensure that no inadvertent disclosure of any personally identifiable information could possibly occur. Consequently, the ACC's "compromise" proposal – with its very substantial attendant costs – would serve no possible confidentiality objective that could not be achieved in this much simpler and less costly fashion.

\*        \*        \*

The Creditors' Committee appreciates that the issues raised by this letter are intensely factual. In the event the Court believes that testimony on these issues would assist its resolution of this procedural dispute, the Creditors' Committee is prepared to offer the testimony of Charles Mullin of Bates White – either at the scheduled September 24 hearing or, if the Court prefers, at a later hearing.

Respectfully submitted,

Philip Bentley

---

[4] In addition, the Creditors' Committee would be prepared to let each Trust redact a majority of the information fields to be produced by the Trusts. Specifically, the Creditors' Committee would have no objection to redaction of the following fields, which Bates White does not need for its estimation analysis:
- Claimant address, phone, fax, email (except state)
- Personal Representative name, SSN, address, phone, fax, email
- Contact name, address, phone, fax, email
- Occupationally exposed person address, phone, fax, email (except state)
- Dependant name (except number of dependents)
- Dependant date of birth (except year)
- Attorney address

No third party's involvement would be needed to implement these redactions, which would further narrow the issues as to which the ACC and the Trusts have expressed confidentiality concerns.

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

September 20, 2010
Page 10

cc (by email):

Stephen Karotkin, *Counsel to Debtors*
Joseph Sgroi, *Counsel to New GM*
Trevor Swett, *Counsel to Asbestos Claimants' Committee*
Sander Esserman, *Counsel to Future Claims Representative*
Stephen M. Juris, *Counsel to Certain Trusts*
Emily Stubbs, *Counsel to Manville Trust*