## RELOCATION TERMINATION AND RELEASE AGREEMENT

THIS RELOCATION, TERMINATION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the 11th day of July, 2008, by Gardner Chevrolet-Cadillac, Inc., a New Jersey Corporation ("Dealer"), and John F. Gardner ("Gardner" and, together with Dealer, the "Dealer Parties") and GENERAL MOTORS CORPORATION, a Delaware corporation ("GM").

### RECITALS

A. Dealer operates a Chevrolet-Cadillac dealership pursuant to Dealer Sales and Service Agreements (as the same are amended, modified, extended, renewed or replaced, the "Chevrolet Dealer Agreement" and the "Cadillac Dealer Agreement," respectively) between Dealer and the Chevrolet and Cadillac Divisions of GM (the "Existing Divisions"). Dealer's existing dealership operations are currently located 435 Route 72 West, Manahawkin, New Jersey (the "Dealership Site").

B. Dealer has agreed to terminate and cancel the Cadillac Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM from any and all liability arising out of or connected with the Cadillac Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Cadillac Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

C. GM has agreed to allow Dealer to relocated Dealer's existing Chevrolet dealership operations from the Dealership Site to the proposed site located at 272 Route 72 East situated at the intersection of Route 72 and Jennings Road, Manahawkin, New Jersey (the "Proposed Dealership Site").

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer, Gardner and Dealer Parties (collectively, the "Releasing Parties") hereby agree as follows:

1. Payment to Dealer.



(a) In consideration of the execution by Dealer, Dealer Principals and Dealer Parties and delivery to GM of this Agreement, and Dealer's termination and cancellation of the Cadillac Dealer Agreement by written agreement in accordance with Article 14.2 thereof (as set forth in Section 2 of this Agreement), GM shall pay, or cause to be paid, to Dealer the sum of Seven Hundred Thousand Dollars ($700,000.00) (the "Settlement Amount") to be paid in two installments: Three Hundred Fifty Thousand Dollars ($350,000) upon termination and cancellation of the Cadillac Dealer Agreement and Three Hundred Fifty Thousand Dollars ($350,000) upon completion of the Image construction as more fully described in paragraph 3(b),

{#00806593.2 77777-0191 6/26/2008 04:48 PM}

herein. These payments represent the consideration solely for the releases and waivers set forth herein and Dealer's termination and cancellation of the Cadillac Dealer Agreement. The Settlement Amount shall be paid to Dealer by crediting Dealer's open account maintained on the General Motors Corporation Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, after the completion of all of the following items: (i) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, and (ii) GM's receipt of this fully executed Agreement, whichever is later.

(b) If Dealer has not received payment of the net Settlement Amount (which net amount reflects the deduction of all sums owing to GM and its Affiliates) within sixty (60) days after the date Dealer terminates and cancels the Cadillac Dealer Agreement as set forth herein, and if Dealer has fulfilled its termination obligations under this Agreement, Dealer may request that GM estimate such net Settlement Amount (the "Estimated Settlement Amount") using the form request attached hereto as Exhibit A and incorporated herein by this reference. Upon such a request, GM will promptly calculate the Estimated Settlement Amount and pay seventy-five percent (75%) of the Estimated Settlement Amount owed Dealer. The remaining balance of the net Settlement Amount, if any, will be paid to Dealer as soon as practicable thereafter.

(c) GM shall purchase, at the option of Dealer, Eligible Items in accordance with Article 15.2 of the Cadillac Dealer Agreement and the GM Parts & Accessories Terms of Sale Bulletin No. 2002-1 U.S., as may be amended by GM from time to time. Transfer and payment for the foregoing Eligible Items shall be made on or after the effective date of termination of the Dealer Agreement, and in accordance with GM's standard practices. The consideration recited in paragraph 1(a) of this Agreement is separate and distinct from any consideration that GM may hereafter offer for such Eligible Items. GM shall be entitled to recover, and Dealer shall pay to GM, any unused portions of any interest credit and any other allowances or credits which had theretofore been paid to Dealer with respect to any such Eligible Items. Dealer hereby represents to GM that Dealer has certain demonstrator, service loaner, or other types of vehicles, or vehicles used for display, demonstration, or other marketing purposes, and that such vehicles (the "Excluded Vehicles") are not included within the Eligible Items that Dealer may require GM to purchase. Dealer further represents and warrants to GM that Dealer shall dispose of all Excluded Vehicles on its own and will not require or attempt to require GM to purchase any Excluded Vehicles.

(d) Notwithstanding the foregoing, payment of all or any part of the Settlement Amount or amounts for Eligible Items may, in GM's sole discretion, be (i) reduced by any amount owed by Dealer to GM or its Affiliates (as defined below), and/or (ii) delayed until GM has received evidence in form and substance acceptable to GM in its sole discretion that no other party has or claims any interest in the assets or properties of Dealer relating to its General Motors dealership operations which are the subject of this Agreement.

2. Termination of Dealer Agreement.

(a) Dealer hereby terminates and cancels the Cadillac Dealer Agreement by written agreement in accordance with Article 14.2 thereof, such termination and cancellation to be effective on July 14, 2008. Dealer covenants and agrees that Dealer will timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Cadillac Dealership operations.

(b) Dealer acknowledges that the provisions of Article 15.3 of the Dealer Agreement do not, by their terms, apply to such termination and cancellation. Dealer hereby reaffirms the inapplicability of Article 15.3. Dealer expressly agrees that the terms of such Article 15.3 shall not apply to Dealer's termination and cancellation of the Cadillac Dealer Agreement by written agreement and that GM shall have no obligations there under.

(c) Dealer acknowledges that all termination rights of Dealer are expressly set forth herein and that any termination assistance otherwise available to Dealer as set forth in any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement described herein.

(d) If, for any reason, GM is obligated to purchase any property of Dealer other than Eligible Items, or is obligated to pay for parts and accessories in an amount exceeding the Maximum Parts Amount, then the Settlement Amount shall be reduced by the amount which GM pays for Dealer's property which is not Eligible Items and by the amount which the parts purchased by GM exceeds the Maximum Parts Amount. If the Settlement Amount has already been paid to Dealer, Dealer shall immediately refund to GM such excess. GM, at its option, shall be entitled to charge Dealer's Open Account for such excess.

3. Relocation of Chevrolet Dealership Operations.

(a) Dealer will be permitted to relocate Chevrolet dealership operations from the Dealership Site to the Proposed Dealership Site on July 14, 2008, the relocation to occur on the same date that the termination described in Section 2(a) above occurs.

(b) In exchange for GM's consent to the proposed relocation as set forth in paragraph 3(a) above, Dealer agrees to participate in the Chevrolet Image Program, the terms and conditions of which are incorporated by reference herein. The construction which Dealer agrees to undertake as part of the Chevrolet Image Program is to be completed so as to be "stipend eligible."



(c) Estimated cost to complete the Chevrolet Image Program at the Proposed Dealership Site is Four Hundred Eighty Five Thousand Dollars ($485,000) but actual costs will be based on contractor bids to be obtained by Dealer. In the event the actual costs exceed $485,000, Dealer and GM will jointly decide on which components of the Chevrolet Image Program will be implemented which may result in Dealer not being eligible for the Image Stipend. However, the ineligibility for the Image Stipend will not affect the Dealer's eligibility for the second $350,000 payment referenced in paragraph 1(a) above.

4. <u>Eligibility for Potential Incentive Payments</u>.

(a) GM would like the Dealer to improve its performance as measured by the "Retail Sales Index" (RSI), an index commonly used by GM to measure the performance of its dealers. As an incentive to Dealer, GM will provide to Dealer the following amounts if Dealer meets the specified thresholds for performance in 2009, 2010 and 2011. Each of these years will be assess independently such that the accomplishment of these thresholds does not depend on reaching the threshold in any prior year:

(i) for calendar year 2009, the threshold is 75 RSI and GM will pay Dealer $100,000 if Dealer obtains that threshold;

(ii) for calendar year 2010, the threshold is 85 RSI an GM will pay Dealer $100,000 if Dealer obtains that threshold; and,

(iii) for calendar year 2011, the threshold is 100 RSI and GM will pay Dealer $100,000 if Dealer obtains that threshold.

(b) Within thirty (30) days from the execution of this Agreement, GM will have an analysis completed by the Dealer's Area of Primary Responsibility ("APR") to verify the accuracy of Dealer's current APR and will provide Dealer with a copy of the analysis promptly after its completion. If that analysis results in an APR that is different from Dealer's current APR, the new APR will apply when calculating the Dealer's RSI for eligibility for the potential incentive payments enumerated in paragraph 4(a) above.

5. <u>Eligibility for Dealer Support Programs</u>.

GM agrees to make two resources available to the Dealer that may be beneficial to Dealer. These resources are the Profit Optimization Program and the Service Development Manager Program. These resources will be made available at no cost to Dealer but Dealer must undertake the appropriate steps to enroll in the programs.

6. <u>Release, Covenant, Not to Sue; Indemnity</u>.

(a) Releasing Parties, for themselves, their Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns, hereby release, settle, cancel, discharge, and acknowledge to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Releasing Parties or anyone claiming through or under them may now or hereafter have against GM, its Affiliates or any of their members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns, arising out of or relating to the Cadillac Dealer Agreement or any predecessor agreement(s) thereto, provided, however, that the foregoing release shall not extend to (i) reimbursement to Dealer of unpaid warranty claims, (ii) the payment to Dealer of any incentives currently owing to Dealer, any amounts currently owing to Dealer in its Open Account, or any

amounts due or to become due to Dealer in connection with its return of Eligible Items pursuant to Article 15.2 of the Cadillac Dealer Agreement, or (iii) any Claims of Dealer pursuant to Article 17.4 of the Cadillac Dealer Agreement, all of which amounts described in (i) - (iii) above of this section shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any GM warranty claims approved and paid by GM prior to the effective date of termination and cancellation, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)    Dealer and the other Releasing Parties hereby agree not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any Claim that is covered by the release provision in subparagraph (a) above. Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Releasing Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to GM, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Releasing Party.

(c)    Dealer and the other Releasing Parties hereby agree to indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by the breach of this Agreement by any of the Released Parties, or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

7.    Due Authority. Releasing Parties hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8.    Confidentiality. Releasing Parties hereby agree that, without the prior written consent of GM, they shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9. *Informed and Voluntary Acts.* Releasing Parties have reviewed this Agreement with their legal, tax, or other advisors, and are fully aware of all of their rights and alternatives. In executing this Agreement, Releasing Parties acknowledge that their decisions and actions are entirely voluntary and free from any mental, physical, or economic duress.

10. *Binding Effect.* This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns.

11. *Effectiveness.* This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

12. *Disputes - Arbitration.*

(a) Subject to the following provisions of this section, GM and Releasing Parties agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Claims"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") at an AAA regional office nearest the Dealership Site. The intent of this paragraph is that the parties hereto agree to mandatory, binding arbitration of Claims in a private proceeding involving only the parties. Under no circumstances shall any Claim be combined with, joined with, or adjudicated in, a common proceeding with Claims involving persons in addition to the parties.

(b) GM and Releasing Parties agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Claims. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, *et seq.*). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a pre-hearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Releasing Parties and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any

other reasonable expenses relating to the arbitration process. Releasing Parties and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

(f) No arbitration may be commenced after the expiration of the applicable statute of limitations. The arbitrator may award only compensatory damages and may not award any punitive or exemplary damages. The arbitrator may award interest at the prevailing judgment rate.

13. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

14. <u>Complete Agreement of the Parties</u>. This Agreement and the attached Exhibits A and B (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

15. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts and by facsimile or electronic transmission which shall be deemed an original.

[Signature Page Follows]

IN WITNESS WHEREOF, Releasing Parties have executed this Termination and Release Agreement through its duly authorized officer as of the day and year first above written.

Gardner Chevrolet-Cadillac, Inc., a New Jersey Corporation

By:_____
Name:_____
Title:_____

_____
John F. Gardner

The undersigned hereby executes this Agreement solely in connection with Section 1(a) above.

GENERAL MOTORS CORPORATION, a Delaware Corporation

By: *[signature]*
M.L. Heisel, Finance Director, or
S.M. Sprague, Finance Manager

By: *[signature]*
_____, Regional Director, or
Steven E Murdock, Regional Manager

{#00806593.2 77777-0191 6/26/2008 04:48 PM}8

IN WITNESS WHEREOF, Releasing Parties have executed this Termination and Release Agreement through its duly authorized officer as of the day and year first above written.

                Gardner Chevrolet-Cadillac, Inc., a New Jersey Corporation

By: _____
Name: JOHN GARDNER
Title: Pres

_____
John F. Gardner

The undersigned hereby executes this Agreement solely in connection with Section 1(a) above.

                GENERAL MOTORS CORPORATION, a Delaware Corporation

By: _____
M.L. Heisel, Finance Director, or
S.M. Sprague, Finance Manager

By: _____
_____, Regional Director, or
_____, Regional Manager

# EXHIBIT A

## PAYMENT REQUEST LETTER

_____7/14_____, 2008

General Motors Corporation
100 Renaissance Center
MC: 481-C24-C66
Detroit, Michigan 48265-1000

    Re:   Payment Request

Ladies and Gentlemen:

    In connection with Dealer's termination and cancellation of its Cadillac Dealer Sales and Service Agreement (the "Dealer Agreement"), Dealer executed and delivered to GM a Termination and Release Agreement dated 7/14, 2008 (the "Agreement"). Dealer executes this letter to request that GM estimate the net Settlement Amount (which net amount reflects a deduction of all sums owing to GM and its Affiliates). Dealer understands that, provided Dealer has fulfilled its termination obligations under the Agreement and subject to the terms of Section 1(b) of the Agreement, GM will promptly calculate the Estimated Settlement Amount (as defined in the Agreement) and pay seventy-five percent (75%) of the Estimated Settlement Amount owed Dealer. The remaining balance of the net Settlement Amount will be paid to Dealer, if any, as soon as practicable thereafter.

    Dealer represents that, pursuant to Section 1(b) of the Agreement, Dealer delivers this payment request on or after the date sixty (60) days after the actual date of termination and cancellation of its Dealer Agreement.

Very truly yours,

Gardner Chevrolet-Cadillac, Inc., a New Jersey Corporation

By: _____
Name: _____John Gardner_____
Title: _____Pres_____

113969

{#00806593.2 77777-0191 6/26/2008 04:48 PM} A-1