**HEARING DATE: OCTOBER 4, 2010**
**HEARING TIME: 11:30 A.M.**

WILK AUSLANDER LLP
675 Third Avenue
New York, New York 10017
(212) 421-2233
Eric J. Snyder (ES-8032)

BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road
Suite 400
Mineola, NY 11501
(516) 873-3000
Steven Blatt (SB-6792)

Counsel for Rally Auto Group, Inc.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

In re:

MOTORS LIQUIDATION COMPANY, *et al.*,
f/k/a General Motors Corp., *et al.*, Chapter 11

Chapter 11
Case No. 09-50026 (reg)

Jointly Administered

                    Debtors.
-----------------------------------------------------------------------X

## OBJECTION OF RALLY AUTO GROUP, INC. TO MOTION
## OF GENERAL MOTORS LLC TO ENFORCE 363 SALE
## ORDER AND APPROVED DEFERRED TERMINATION AGREEMENT

**TO: HONORABLE ROBERT E. GERBER,**
     **UNITED STATES BANKRUPTCY JUDGE:**

Rally Auto Group, Inc. ("Rally"), by its attorneys Bellavia Gentile & Associates,

LLP and Wilk Auslander LLP, hereby submits its objection (the "Objection") to the

motion (the "New GM Motion") of General Motors, LLC ("New GM") for an order,

pursuant to sections 105 and 363 of Title 11, United States Code (the "Bankruptcy

Code") and Bankruptcy Rule 7001: (a) enforcing the order (the "Sale Order") of the

Bankruptcy Court, dated July 5, 2009 and the provisions of the Wind-Down Agreement

1

(as defined below) approved by this Court at that time, including but not limited to

sections 2(a) (termination of the dealer by October 31, 2010), 5(d) (covenant not to sue

New GM), 7(a) (no protest by Rally regarding relocation or establishment of new dealer)

and 13 (exclusive jurisdiction of the Bankruptcy Court), and ordering Rally to

specifically perform its obligations there under pursuant to, inter alia, sections 5(e)

(indemnity owed to New GM) and 5(d) and 17 (specific performance allowed) of the

Wind-Down Agreement; (b) directing Rally and all persons acting in concert with it to

cease and desist from further prosecuting, or otherwise pursuing the claims asserted in,

that certain action pending in the United States District Court (the "California District

Court") for the Central District of California, Southern Division, Case No. SACV 10-

1236 DOC (the "District Court Action") against New GM or from attempting to prevent,

delay or interfere with New GM's establishment of the new dealership, and (c) directing

Rally to dismiss the California Action with prejudice ("New GM's Motion").

In support of the Objection, Rally states as follows:

## BASES FOR THE OBJECTION

1.      When section 747 of the Consolidated Appropriations Act of 2010  (the

"Dealer Arbitration Act") became law, the rights of dealers under the Wind-Down

Agreements, previously approved under the Sale Order, were fundamentally changed.

Under the Wind-Down Agreements approved by the Bankruptcy Court during July, 2009,

the dealers were compelled to bargain away their rights, including all rights against the

Debtor and New GM, in exchange for a sum of money.

2.      When the Dealer Arbitration Act became law five (5) months later, the

statute revived the right of dealers such as Rally to commence arbitrations to recover the

2

436513v1

dealerships they were forced to surrender under their respective Wind-Down Agreements.

3.    During May, 2010, an arbitration (the "Arbitration") was conducted between Rally and New GM by an arbitrator chosen by the AAA and governed by the AAA Commercial Rules.  During June, 2010, the arbitrator issued an award.

4.    Under the AAA Commercial Rules, specifically rule 48(c):  "[p]arties to an arbitration … shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof."

5.    Rally, believing that the arbitrator had violated the Dealer Arbitration Act in its determination, invoked Rule 48(c) and filed a petition (the "Petition") commencing the California Action seeking to modify the Arbitration award.

6.    As we show below, the court of competent jurisdiction is the California District Court since: i) the Arbitration involves an interpretation of the Dealer Arbitration Act, a federal statute; and ii) diversity exists.

7.    GM interposed an answer to the California petition and, three days later, filed the New GM Motion. In the New GM Motion, New GM attempts to ignore the Dealer Arbitration Act, the Arbitration, and the rights of review included in the AAA Rules.   Instead, it claims that this Court maintains "sole" and "exclusive" jurisdiction regarding interpretations of the Wind-Down Agreement and seeks to compel Rally to withdraw the District Court Action.

8.    Based on the aforementioned, Rally interposes this objection based on four independent grounds. First, as made clear in the brief history above, and as conclusively set forth below, Rally is not seeking to interpret the Wind-Down

3

Agreement, but to exercise its rights under the Dealer Arbitration Act. Since the California District Court possesses jurisdiction over interpretations of the Dealer Arbitration Act, this court does not possess "sole or "exclusive" jurisdiction over either the Petition or the Arbitration.

9.      Second, as we also show below,  New GM specifically relied upon the jurisdiction of the District Court in California when it sought to enforce its rights under the Dealer Arbitration Act in a different arbitration; relying upon that statute, diversity, and the AAA to support its jurisdictional bases. For New GM, a non-debtor, to use the District Court to enforce its rights under the Dealer Arbitration Act during June, 2010 and to then run to this court in September claiming that only it has "sole" and "exclusive" jurisdiction over matters arising from the Dealer Arbitration Act, constitutes both forum shopping and judicial estoppel in its simplest form.

10.     Third, it is respectfully submitted that the Bankruptcy Court does not possess either core or related to jurisdiction over the New GM Motion. Regardless as to how the court determines the New GM Motion, it will have no effect, conceivable or otherwise, on the bankruptcy proceeding of Motors Liquidations Company, *et al.*, the debtor herein (the "Debtor") . As a result, the court should refuse to exercise jurisdiction over the New GM Motion.

11.     Finally, if this court should determine that it does maintain subject matter jurisdiction over Rally's attempt to modify its arbitration award, it is respectfully submitted that the court should defer to the arbitration process since there is no compelling bankruptcy purpose for interfering with the arbitration of two non-debtor

436513v1

entities. For all of the aforementioned reasons, the court should either refuse to exercise

jurisdiction over the New GM Motion or deny the New GM Motion in its entirety.

## RELEVANT FACTS

A.    **The Debtor's Bankruptcy Proceeding and The Wind-Down Agreement**

12.    On June 1, 2009, (the "Petition Date") the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code.  Thereafter, as part of numerous

transactions approved by this Court, the Debtor entered into and assigned to New GM

certain Wind-Down and other Deferred Termination Agreements (collectively, the

"Wind-Down Agreements") between the Debtor and hundreds of its authorized new

motor vehicle dealers.

13.    Dealers that entered into these Wind-Down Agreements, would, as of

October 31, 2010, lose their General Motors' franchises and, thereafter, be precluded

from buying and selling New GM motor vehicles and performing any warranty service

for New GM's customers.

B.    **Rally and the Wind-Down Agreement**

14.    Rally has been selling and servicing General Motors products in Lancaster

and Palmdale California for forty one (41) years. Rally began its business as a Chevrolet

dealership in Lancaster, California in 1969. Over the years, Rally became a General

Motors dealer for the Pontiac, Buick, GMC Truck, and Cadillac brands.

15.    As of November 5 2005, Rally possessed a singular General Motors Sales

and Service Agreement for five (5) General Motors brand of vehicles: Chevrolet

passenger vehicles and light duty trucks; Pontiac (which has been eliminated as a General

436513v1

Motors brand); GMC light duty trucks, Buick, and Cadillac. (A copy of Rally's

Dealership Sales and Service Agreement is annexed hereto as Exhibit A.)

16.     The franchise agreement for all of such General Motors vehicle brands

were contained in a **single** dealer Sales and Service Agreement. In the same vein, the

Debtor treated the five vehicles brands sold and serviced by Rally as one dealership. In

fact, the Debtors identified its dealers by Business Associate Codes ("BAC code") and

had assigned a <u>singular</u> BAC Code to the five (5) vehicle brands manufactured by the

Debtor and sold and serviced by Rally.

17.     On or about the Petition Date, the Debtor forwarded to Rally a Wind-

Down Agreement. If Rally executed the Wind-Down Agreement, then it would receive

"assistance" in the form of a "wind-down payment." In the alternative, the Debtor

indicated to Rally that it would simply apply to this Court for an order rejecting Rally's

dealership sales and service agreement. As a result, Rally, and numerous other General

Motors dealers, feeling that they had no economic alternative, signed the Wind-Down

Agreement. (A copy of the Wind-Down Agreement executed by Rally is annexed hereto

as Exhibit B).

C.     **The Dealer Arbitration Act.**

18.     During December, 2009, President Obama signed into law the Dealer

Arbitration Act. (A copy of the Dealer Arbitration Act is annexed hereto as Exhibit C.)

19.     Through the promulgation and enactment of the Dealer Arbitration Act,

President Obama and Congress recognized that automobile manufacturers, such as New

GM, will be unable to get back on their feet without a strong dealer network and

Congress was committed to ensuring that such a network exists.

6

436513v1

20.     Indeed, in passing the Dealer Arbitration Act, Congressman Van Hollen represented to Congress that:

> Automobile manufacturers won't be able to get back on their feet without a strong dealer network, and Congress is committed to ensuring that such a network exists. I salute the tenacity and determination of these small business owners, many of whom have been selling cars and supporting the American auto industry for decades. **Under the provision we are approving today, these terminated dealers will have an opportunity, once again, to do what they do best—sell and service cars. And that is good for our economy, for job creation and for the American car industry.**

(Congressional Record — House, December 10, 2009 (Ex. J) (Emphasis added.)

21.     The Dealer Arbitration Act specifically afforded each of the Debtor's dealerships that executed a Wind-Down Agreement the right to challenge by binding arbitration the termination of its franchises. According to the Dealer Arbitration Act, the arbitrator was required to be chosen from the AAA.  (See Exhibit C, Section 747(a)(2)(e).)

D.     **Rally Files a Demand For a Dealer Reinstatement Arbitration**

22.     Firmly believing that its General Motors' dealership was wrongfully selected for termination, pursuant to the Dealership Arbitration Act, Rally commenced the Arbitration by filing a demand (the "Demand") against New GM with the AAA.  (A copy of the Demand is annexed hereto as Exhibit D).

23.     An arbitrator was selected (Richard Mainland)(the "Arbitrator") with respect to the Arbitration from the AAA, pursuant to the Dealer Arbitration Act.

24.     New GM filed an Answering Statement with respect to Rally's Demand for Arbitration.  (A copy of the Answering Statement is annexed hereto as Exhibit E.)

436513v1

25.    Shortly thereafter (March 25, 2010), New GM participated, through its counsel, in a telephonic preliminary hearing with Rally's counsel and the Arbitrator. As a result thereof, a Scheduling Order was issued by the Arbitrator with respect to the Arbitration. (A copy of the Scheduling Order is annexed hereto as Exhibit F). As indicated in such Scheduling Order, the Arbitration was to be conducted pursuant to the Dealer Arbitration Act and the AAA Commercial Arbitration Rules (the "AAA Commercial Rules").

26.    In this respect, AAA Commercial Rule R-1 (a) (a copy of which is annexed hereto as Exhibit G) provides, in relevant part that:

> **these [AAA Commercial Arbitration Rules] rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA.** The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.  (emphasis added).

27.    Significantly, New GM did not file or make any objection to the Scheduling Order[1] and further participated in the Arbitration including, but not limited to, paying AAA filing and hearing fees, attending the proceedings, presenting evidence at hearings held on May 13, 14, and 17, 2010, and filing a post-hearing brief.

28.    Furthermore, there was no written agreement by the parties to vary the applicability of the AAA Commercial Rules nor did the Arbitrator consent to any modifications thereof.  As such, there can be no dispute that the AAA Commercial Rules fully applied to the parties' underlying dealer reinstatement.

---

[1] New GM asserted various defenses in its Answering Statement, but never pursued any of these defenses with the Arbitrator.

436513v1

29.    In this respect, and importantly, for the purposes of this objection, the AAA Commercial Rules clearly and unambiguously addressed the scope of judicial review with respect to the Arbitrator's determination in the parties' dealer reinstatement arbitration.  Specifically, Rule-48(c) of the AAA Commercial Rules provides:

> Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof."  (Emphasis Added).

30.    In sum, New GM did not object to judicial review of the Arbitration (be it confirmation, vacatur or modification of the arbitration award) when it: a) paid AAA required fees; b) participated in the arbitration process; and c) did not interpose an objection in writing to the use by the parties of Rule 48(c).

E.    **The Dealer Reinstatement Arbitration and The Arbitrator's Determination**

31.    Debtor used an internal method of scoring its dealers known as Dealer Performance Summary ("DPS"). Generally, the Debtor determined to provide Wind-Down Agreements to its dealerships that maintained an overall DPS score under 70. Prior to the Arbitration, and pursuant to the express terms of Dealer Arbitration Act, New GM provided Rally with a notice indicating that Rally was issued a Wind-Down Agreement due to, among other things, a "2008 overall DPS total dealership score under 70."

32.    At the Arbitration, Rally presented evidence that, for the years 2003 through 2007, Rally had an overall DPS Score of **OVER 70**. Rally further presented evidence that Debtor has used an accounting convention (estimated LIFO adjustment to Rally's 2008 profit) to calculate Rally's 2008 DPS which resulted in an artificially low DPS score. As such, at the Arbitration, Rally demonstrated, and the arbitrator later

9

determined that, by using Rally's actual 2008 profits, Rally's properly computed DPS score was actually 85, well above the wind-down cut off of 70.

33.    As such, after having heard the proofs and allegations of Rally on the one hand, and New GM, on the other hand, the Arbitrator determined that Rally should be **reinstated** as a General Motors dealership in Palmdale, California. (A copy of the Arbitrator's decision (the "Award") is attached hereto as Exhibit H).

F.    <u>**The Petition to Modify/Vacate the Award**</u>

34.    The clear intent of the Dealer Arbitration Act was to restore previously rejected dealers to the same position as they were prior to both Debtor's bankruptcy filing. As stated above, prior to the Petition Date,  Rally possessed only one General Motors Sales and Service Agreement for all five (5) General Motors brand of vehicles: Chevrolet passenger vehicles and light duty trucks; Pontiac (which has been eliminated as a General Motors brand); GMC light duty trucks, Buick, and Cadillac. Furthermore, Rally regularly submitted to the Debtor one (1) Operating Statement each month and Debtor evaluated Rally as a singular dealership (i.e., on the basis of  profitability, working capital, sales and service satisfaction, etc.).

35.    Despite the above facts, and the clear and unambiguous language contained in the Dealer Arbitration Act, the Arbitrator's award held that the covered dealership *(i.e.* Rally) "shall be added to the dealer networks of General Motors, LLC, [solely] as to the Cadillac, Buick and GMC brands, in the manner provided for by the Act and in accordance with the terms and conditions of the Act." (Exhibit H at p. 2).

36.    The Award also determined that the Chevrolet brand should be continued in Rally's Palmdale market. However, the Arbitrator held that Chevrolet should be

10

removed from the "covered dealership" (and thereby permit New GM to award such Chevrolet dealership to a third party, whom New GM has identified as a former Saturn dealer).

37.    Firmly believing that the arbitrator exceeded the scope of his authority granted to him by the Dealer Arbitration Act, Rally filed, with the California District Court the Petition. (A copy of the Petition is annexed hereto as Exhibit I).

38.    As more fully set forth in the Petition, Rally has taken the position that the Dealer Arbitration Act does <u>not</u> allow for the splitting of brands within the "covered dealership" and only grants the Arbitrator the authority to "decide, based on that balancing, whether or not the ***covered dealership*** should be added to the dealer network of the covered manufacturer." (emphasis added.)  (See Section 747(d) of the Dealer Arbitration Act; Exhibit C).

39.    Indeed, the Dealer Arbitration Acts defined "covered dealership" as "an automobile dealership that had <u>a franchise agreement for the sale and service of vehicles of ***a brand or brands*** with a covered manufacturer</u>." (Emphasis added.) (*See* Section 747(a)(2); Exhibit C).

40.    Based upon the above clear and unambiguous language of the Dealer Arbitration Act, it is Rally's contention that Congress intended that the "covered dealership," with all the vehicle ***brands*** that it possessed prior to its rejection in Debtor's bankruptcy case, should be added back (reinstated) to the dealer network.[2]  Since the Award held that the Chevrolet vehicle brand held by Rally prior to its rejection in the Debtor's bankruptcy proceeding should be added back to New GM's dealer network,

---

[2]    Congressional Record, H14478.  (Exhibit J).

11

pursuant to Dealer Arbitration Act, Rally should have been awarded the reinstatement of
its Chevrolet brand.

41.    As such, the Petition seeks to modify and/or vacate the Arbitrator's Award
to the extent that it reinstates Rally without the Chevrolet brand of vehicles.

42.    On September 7, 2010, New GM interposed an answer in the District
Court Action.

G.    **The New GM Motion.**

43.    On September 10, 2010, New GM filed the New GM Motion. In the New
GM Motion, New GM  takes the position that, as a result of the Award: (a) this Court
should "direct Rally to dismiss the California [District Court Action] against New GM,
with prejudice (New GM's Motion, ¶. 32) and (b) "the Wind-Down Agreement remains
in effect as to Rally's Chevrolet Dealer agreement and, pursuant to section 2(a) of the
Wind-Down Agreement, Rally's Chevrolet Dealer Agreement must terminate no later
than October 31, 2010." (New GM's Motion, ¶ 15).

44.    To support these conclusions, New GM submits a number of arguments
that, as shown more fully herein below, are not persuasive and must be rejected.
Specifically, New GM contends that (a) Rally's California Federal Court Petition must be
dismissed because "[t]here is no statutory authority in the Dealer Arbitration Act or
elsewhere in federal law for judicial review of awards issued under the Dealer Arbitration
Act" (New GM's Motion at ¶. 16), (b) this Court has 'retained exclusive jurisdiction' to
enforce and implement the terms of the 363 Sale Order and Wind-Down Agreement, and
resolve any disputes concerning these court-approved documents" (New GM's Motion at
¶19), and (c) "even if judicial review of the arbitration award is somehow available, Rally

436513v1

must not 'end run' around this Court [by seeking judicial review of the Award in the

California District Court]; such judicial review must be done by this Court." (New GM's

Motion, ¶ 19).

## ARGUMENT

## POINT I

**THE COMMERCIAL RULES OF THE AAA, WHICH APPLIED IN THE ARBITRATION, SPECIFICALLY STATE THAT JUDGMENT UPON THE ARBITRATION AWARD MAY BE ENTERED IN ANY FEDERAL OR STATE COURT HAVING JURISDICTION THEREOF**

45.     Courts have held that "when parties agree to submit to the rules of the

American Arbitration Association, they consent to a federal court's jurisdiction to enforce

the arbitration award." *Idea Nuova, Inc. v. GM Licensing Group, Inc.*, 2010 WL

3079917 (2d Cir., Aug. 9, 2010)("*Idea Nuova*"); *EMO Energy Solutions, LLC v. Acre*

*Consultants, LLC,* No. 08-4365, 2008 WL 5110585, at *1 (E.D. La. Nov.25, 2008)

(citation omitted); *see also Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190, 193 (4th

Cir.1991) (citing cases).

46.     Shortly after filing its Answering Statement with respect to the Demand

for Arbitration, New GM participated, through its counsel, in a telephonic preliminary

hearing with Rally's counsel and the Arbitrator. As a result thereof, a Scheduling Order

was issued by the Arbitrator with respect to the Arbitration. (A copy of which is attached

as Exhibit F).

13

47.    As indicated in such Scheduling Order, the **Arbitration was to be conducted pursuant to the Dealer Arbitration Act[3] and Commercial Arbitration Rules of the AAA.[4]**

48.    In this respect, AAA Commercial Rule R-1 (a) (a copy of which is attached as Exhibit G) provides, in relevant part that:

> these [AAA Commercial Arbitration Rules] rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

49.    Significantly, New GM did not file or interpose any objection to the Scheduling Order and further participated in the parties' underlying dealer reinstatement arbitration at issue including, but not limited to, attending and presenting evidence at hearings held on May 13, 14 and 17, 2010 and filing a post-hearing brief.

50.    Furthermore, there was no written agreement by the parties to vary the applicability of the AAA Commercial Arbitration Rules nor did the Arbitrator consent to any modifications thereof. As such, there can be no dispute that the AAA Commercial Rules fully applied to the Arbitration. *See Bryson, III v. Gere*, 268 F.Supp.2d 46 (D.D.C.2003) (reference to rules and regulations of AAA effectively incorporates those rules in their entirety and "under the AAA rules, all arbitrations are binding.").

---

[3] The Dealer Arbitration Act expressly refers to the AAA by stating that the arbitrator for the dealer reinstatement arbitration shall be selected from the AAA panel of arbitrators, and if the parties cannot agree, the AAA shall select the arbitrator.

[4] The fact that the Arbitrator utilized AAA Rules is not a surprise The Congressional Record relating to the Dealer Arbitration Act (at H14479) specifically provides that: "It is our understanding that the General Commercial Rules of the American Arbitration Association shall apply to the arbitration proceeding . . . ). See Congressional Record attached hereto as Exhibit J.

14

Consequently, reference to AAA rules and its regulations is sufficient to make the

arbitration "binding" and final.

51.    **AAA Commercial Arbitration Rules clearly and unambiguously**

**addressed the scope of judicial review with respect to the Arbitrator's**

**determination in the Arbitration.**  Specifically, Rule-48(c) of the AAA Commercial

Arbitration Rules provides:

> **Parties to an arbitration under these rules shall be deemed to have
> consented that judgment upon the arbitration award may be entered in any
> federal or state court having jurisdiction thereof. (emphasis Added).**

52.    As a result, a "federal or state court having jurisdiction thereof" may

entertain issues surrounding the Award. Any doubt that a court (having subject matter

jurisdiction) may review the Arbitrator's award (be it confirmation, vacatur of

modification of the award)  - was put to rest by the recent decision of the Second Circuit.

53.    In *Idea Nuova*,  the plaintiff argued that the district court did not have

jurisdiction to confirm an arbitration under the AAA, when the underlying arbitration

agreement was silent as to whether the arbitration award would be final and binding and

permitting the district court to reject the arbitration awards "outright and review the

parties dispute *de novo*." *See Idea Nuovo v. GM Licensing Group, Inc.,* 08 Civ

8595(PKC), 2009 WL 2568332 at *4-6 (S.D.N.Y. Aug. 19, 2009).   (A copy of the

District Court decision in *Idea Nuova* is annexed hereto as Exhibit K).

54.    The District Court, relying upon an unpublished decision of the Second

Circuit, held that the language providing for arbitration pursuant to the AAA rules is

sufficient to incorporate those rules into the agreement, notably including consent to

confirmation. The plaintiff thereafter appealed from the District Court's judgment

confirming the AAA arbitration award and dismissing its complaint seeking to vacate or

modify such award based upon the plaintiff's contention that it never agreed to binding

arbitration or a District Court's jurisdiction to confirm arbitral awards. *(Id)*.

55.    In the plaintiff's appeal, the Second Circuit affirmed, holding that, by

arbitrating pursuant to the AAA rules, the parties agreed to incorporate the AAA rules

into their agreement. *Idea Nuova,* 2010 WL 3079917 at *4.

56.    The Second Circuit further held that, after determining that the AAA rules

were incorporated into their agreement:

> permits us to easily resolve this appeal. AAA Rule 7
> and 48 repeatedly reference arbital awards as "final"….
> with these rules incorporated into the parties Agreement,
> see AAA Rule 1(a), we reject Idea Nuova's argument that
> it never agreed to binding arbitration *or to the court's jurisdiction*
> *to confirm arbital awards*. This conclusion finds support not only
> in our previously cited precedent but indecisions of our sister
> circuits. [citing cases]

*Idea Nuova, Id.*(emphasis added).

57.    Such is the case here. As set forth above, the AAA Commercial Rules

applied to the Arbitration. Since judicial review of the Petition (be it confirmation,

vacatur or modification of the arbitration award) is specifically provided for in the

Commercial Rules, then a court of competent jurisdiction was conferred with jurisdiction

under Rule 48(c). As a result, the Bankruptcy Court does **not** have exclusive jurisdiction

over the Arbitration (if it has jurisdiction at all).

## POINT II

### THE CALIFORNIA DISTRICT COURT IS CONFERRED WITH SUBJECT MATTER JURISIDCTION NEEDED TO REVIEW RALLY'S PETITION TO VACATE THE ARBITRATION AWARD

58.    As stated above, the AAA Commercial Rules specifically permit judicial review of the Arbitration (be it confirmation, vacatur or modification of the arbitration award) in any federal or state court having jurisdiction thereof.

59.    While New GM is correct that the Federal Arbitration Act does not, standing alone, confer subject matter jurisdiction upon the California District Court to review the Petition, in any given case a federal court may be independently conferred with at least one of three (3) types of subject matter jurisdiction (i.e., jurisdiction under a specific statutory grant; federal question jurisdiction pursuant to 28 U.S.C.1331; or diversity jurisdiction pursuant to 28 U.S.C. 1331). Here, as shown below, as a matter of law, the California District Court is conferred with the federal question jurisdiction[5] needed to review the California District Court Petition.

60.    Federal Courts have subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. 1331. An action arises under federal law where, among other things, the plaintiff pleads a cause of

---

5    The California District Court is also conferred with diversity jurisdiction to determine the California District Court Petition. Diversity jurisdiction turns on two issues, is there complete diversity of citizenship between the parties and does the amount in controversy exceed $75,000. *Northport Health Services of Arkansas, LLC v. Rutherford,* 605 F.3d 483 (8th Cir. 2010). Here, New GM is a limited liability company organized and existing under the laws of the State of Delaware while Rally is a corporation duly organized and existing under the laws of the State of California. Furthermore, to resolve the next issue (i.e., issue of the amount in controversy), "courts uniformly appl[y] a limited 'look through' approach, determining whether the 'value at stake in the arbitration' being sought in the federal action could exceed $75,000 . . . " *Id.* At 486-487. Here, New GM cannot argue that the value of the Rally Chevrolet dealership in issue does not exceed $75,000. As such, given that the California District Court Petition concerns a matter in which there is complete diversity of citizenship between the parties and the amount in controversy exceed $75,000, the California District Court is conferred with subject matter jurisdiction (diversity jurisdiction) to review the Arbitrator's award and the underlying arbitration between the parties.

17

action "created by a federal law." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005); *Franchise Tax Board of the State of Cal. V. Constr. Laborers Vacation Trust for So. California*, 463 U.S. 1, 9-11 (1983).

61.     Furthermore, although the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.*, does not create any independent federal question jurisdiction, a federal court may obtain jurisdiction if there is an **independent** federal question. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). The inquiry for a federal court in determining whether it has federal question jurisdiction to consider vacating an arbitration award is whether the resolution of the request to vacate such award requires consideration of federal law. *Med-Tel International v. Loulakis*, 403 F.Supp.2d 496 (E.D. Va. 2005).

62.     In fact, the Supreme Court, in *Vaden v. Discover Bank*, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009), only recently determined that a federal district court could properly "look through' a petition to compel arbitration to the parties' underlying substantive controversy in order to determine whether the petition is predicated on an action that arises under federal law, such that the federal district court has federal question jurisdiction over the petition.

63.     **Following the Supreme Court's decision in *Vade*r, two recent District Courts cases have seemingly dealt squarely with the issue raised in the New GM's Motion – *i.e*, whether a federal district court could properly "look through" a petition to vacate an arbitration to the parties' underlying substantive controversy in order to determine whether the petition is predicated on an action that arises**

436513v1

under federal law, such that the federal district court has federal question

jurisdiction over the petition.  In both cases, the answer was in the **affirmative**.

64.    In *Francis v. Landstar Systems Holding, Inc.*, 2009 WL 4350250 (M.D.

Fla. 2009), a Florida district court found that it had federal question jurisdiction to

determine the plaintiff's motion to vacate an arbitrator's decision on the basis of the

plaintiff's argument that the arbitrator misapplied federal law interpreting Title VII.

Specifically, the District Court held that: "[w]hile federal claims may appropriately be

resolved through arbitration, the federal courts have a strong interest in ensuring that

arbitrators interpret and apply federal law properly, even if within a wide range of

tolerance."

65.    Likewise, in *Gimbel v. UBS Financial*, 2009 WL 1904554 (N.D. Ill.

2009), the petitioner argued that their request to vacate an arbitration award relied upon

an interpretation of Securities and Exchange rules and regulations. Since the District

Court found that "[i]nterpreting the Securities Exchange Act is the province of federal

courts," indicating the petitioner's claims would necessarily require interpreting

substantial questions of federal law and, therefore, the District Court had subject matter

jurisdiction over the petition to vacate.

66.    In Rally's case, the Petition clearly seeks relief that was necessarily

created by federal law (i.e., the vacatur of an arbitrator's award in an arbitration derived

solely through the Dealer Arbitration Act).

67.    Stated otherwise, the arbitration remedy is a creation of a federal statute.

Rally and New GM did not arbitrate pursuant to a contract, they arbitrated because

Congress mandated it as a condition to Rally's reinstatement.

436513v1

68.    Furthermore, and perhaps more importantly, like the *Francis* and *Gimbel*

cases, **any irregularity with the arbitration remedy, as alleged by Rally in the**

**Petition, necessarily implicates the interpretation of the federal statute (i.e., the**

**Dealer Arbitration Act).**    Indeed, resolution of the Petition will specifically require the

California District Court to address whether Congress intended that the Federal

Arbitration Act allow (or does not allow) for the splitting of brands within the "covered

dealership" and only grants the Arbitrator the authority to "decide, based on that

balancing, whether or not the ***covered dealership*** should be added to the dealer network

of the covered manufacturer."  (emphasis added.) (*See* Section 747(d).) *See Minor v.*

*Prudential Sec. Inc.*, 94 F.3d 1103, 1006 (7th Cir. 1996) ("[i]f Minor's motion to vacate

somehow involved the resolution of her federal claims or some question of federal law,

then . . . the district court would have subject matter jurisdiction.").[6]

69.    In sum, despite New GM's contentions to the contrary, the California

District Court has subject matter jurisdiction over the controversy raised in the Petition as

a result of the federal question raised in the Petition.  While New GM disingenuously

argues that, whether the arbitrator exceeded the scope of his authority is a question of

---

[6] In addition to the interpretation of the Dealer Arbitration Act, the Petition could implicate the
constitutionality of this federal statute.  If this Court were to somehow agree with New GM that Rally
has absolutely no recourse to the Courts for a review of a final and binding arbitrator's decision, the
question becomes whether such a statute violates the United States Constitution's guaranty to due
process under law.  *See Thomas v. Union Carbide Argicultural Products Co.*, 473 U.S. 568, 105 S.Ct.
3325, 87 L.Ed.2d 409 (1985) (Federal Insecticide, Fungicide, and Rodenticide Act did not preclude
review of the arbitration proceedings by an Article III Court as "review of constitutional error is
preserved" and therefore FIFRA does not obstruct whatever judicial review might be required by due
process.); *Syngenta Crop Protection, Inc. v. Drexel Chemical Company*, 655 F.Supp.2d 54 (U.S.D.C.
District of Columbia 2009) (While the express language of the Federal Insecticide, Fungicide, and
Rodenticide Act seemingly permits judicial review of the arbitrator's findings in only specified limited
instances, "review of constitutional error is preserved."). Even without considerations of due process, it
borders on inconceivable that Congress would provide Rally and GM the right to arbitration, before the
AAA, without the right to somehow obtain a judicial review of such arbitration in a court with
jurisdiction over both the subject matter (diversity jurisdiction and federal question jurisdiction) and
the parties.

20

state arbitration law, Rally's right to relief necessarily depends on a resolution of

substantial question of federal law.

**POINT III**

**NEW GM SHOULD BE JUDICIALLY ESTOPPED
FROM ARGUING THAT JUDICIAL REVIEW OF THE
ARBITRATION AWARD MUST BE DONE BY THIS COURT**

70.     A final contention of New GM is that "even if judicial review of the

arbitration award is somehow available, Rally must not 'end run' around this Court [by

seeking judicial review of the Arbitration Award in a California District Court]; such

judicial review must be done by this Court." (New GM's Motion, ¶ 19).

71.     To say that New GM's contention is insincere, may be an understatement.

In fact, this contention by New GM demonstrates the disingenuous nature of New GM's

Motion before this Court.

72.     While New GM rails that Rally is making an "end run" around this Court

by seeking judicial review of the Award, New GM has, a mere three (3) months ago, filed

a complaint in the United States District Court for the Central District of California

(Western Division) seeking a declaratory judgment to resolve a dispute between New

GM and another dealer (like Rally,  a General Motors dealer that had signed the Wind-

Down Agreement) **arising from the purported settlement of an arbitration pursuant**

**to Dealer Arbitration Act**.

73.     Incredibly, in the case entitled *General Motors LLC v. Santa Monica*

*Group, Inc.* (10-CV-4787) (a copy of the complaint is annexed hereto as Exhibit L) (the

"Santa Monica Action"), New GM asserts that the California District Court is conferred

with the subject matter jurisdiction needed (both federal question and diversity

21

jurisdiction) to determine the parties' dispute that has arisen as a result of a dealer

reinstatement arbitration under the Dealer Arbitration Act.  (Santa Monica Complaint ¶¶

3 and 4.)

74.    In contrast, as this Court is well aware, New GM and its counsel in this

proceeding have taken the position that the Petition, which clearly derived from the same

federal statute, does not confer jurisdiction upon the California District Court![7]

75.    Indeed, in the Santa Monica Action, New GM has expressly alleged that:

- **The District Court has jurisdiction of this action under 28 U.S.C. 1331(a) because it arises under federal law, specifically the dealer arbitration provisions contained in the Dealer Arbitration Act.** (Santa Monica Complaint, ¶ 3) (emphasis added);

- Alternatively, **the District Court has jurisdiction under 28 U.S.C. 1332(a)(1) because plaintiff and defendant are citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interests and costs.** (*Id.*, ¶. 4) (emphasis added);

- Congress deliberately chose to limit the scope of arbitration under the Dealer Arbitration Act. Arbitrators are only empowered to decide whether or not the specific dealership should be added back to the GM dealer network. **All other issues that arise under the Act must be addressed by a court of competent jurisdiction.**  (*Id.*, ¶22) (emphasis added); and

---

[7] New GM was, in fact, successful in obtaining a preliminary injunction against Santa Monica Group, Inc., enjoining it from further prosecuting its dealer reinstatement arbitration pending a trial in that action.  (*See* decision annexed hereto as Exhibit M).

- The underlying dealer reinstatement arbitration was "pursuant to procedures contemplated by Congress and implemented by the American Arbitration Association." (*Id.*, ¶. 17)

76.    Judicial estoppel, or the doctrine of inconsistent positions, precludes a party who assumed a certain position in a prior legal proceeding from assuming a contrary position in another action simply because his or her interests have changed. *State of New Hampshire v. State of Maine*, 532 U.S. 742,121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

77.    The principle of judicial estoppel applies where two elements are shown: first, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the tribunal in some manner. *Montefiore Medical Center v. Crest Plaza LLC*, 24 Misc.3d 1201(A), 889 N.Y.S.2d 506 (S.Ct. Westchester Co. 2009). *See Troll Company v. Uneeda Doll Company*, 483 F.3d 150 (2d Cir. 2007) (a party invoking judicial estoppel, which prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that is successfully advanced in another proceeding, must show that (a) another party advanced an inconsistent position in another proceeding and (b) the first tribunal adopted that position in some manner).

78.    "The doctrine of estoppel against inconsistent positions precludes a party from 'framing his pleadings in a manner inconsistent with a position taken in a prior proceeding.' The doctrine rests upon the principle that a litigant 'should not be permitted . . . to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise.' The policies underlying preclusion of

23

inconsistent positions are general considerations of orderly administration of justice and regard for the dignity of judicial proceedings." *Montefiore Medical Center v. Crest Plaza LLC*, 24 Misc.3d 1201(A), 889 N.Y.S.2d 506 (S.Ct. Westchester Co. 2009).

79.    In this case, it is clear that New GM has framed its pleadings in the Santa Monica Action in a manner entirely inconsistent with the position that it has taken in the New GM's Motion pending here. Based upon New GM's conduct and the well stated principles of law set forth above, New GM should be judicially estopped from arguing that judicial review of the California District Court Petition is the sole and exclusive provenance of this court.

## POINT IV

## THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO DETERMINE NEW GM'S MOTION

80.    Not only does the District Court maintain subject matter jurisdiction to review the outcome of the Arbitration (See Arguments I-II , *supra*), the Bankruptcy Court does **not** possess any jurisdiction over the New GM Motion for five (5) independent reasons.

### A.    The New GM Motion is not a Core Proceeding.

81.    In the New GM Motion, New GM avers that it is a core proceeding. (New GM Motion, ¶9). To reach this conclusion, New GM cites repeatedly to the Sale Order and the Wind-Down Agreement, ¶¶ 1-9, 24-34. No matter how hard New GM attempts to address the relief it seeks as the enforcement of the Sale Order and the Wind-Down Agreements under Sections 105 and 363 of the Bankruptcy Code, the New GM Motion is a (not too) covert attempt to circumvent the California District Court and the jurisdiction

24

it was granted under the AAA Commercial Rules and federal common law (*i.e.,* federal question).

82.    A review of the case law in this Circuit makes it abundantly clear that the New GM Motion does not constitute a core proceeding. 28 U.S.C. §1334 provides, in pertinent part, that district courts have original *but not exclusive* jurisdiction of "all civil proceedings arising under title 11 [ (the Bankruptcy Code) ], or arising in or related to cases under title 11." 28 U.S.C.A. § 1334(b) (West 2006)(emphasis added). Cases "arising under" title 11 or "arising in" a title 11 case are "core" proceedings that may be heard and determined by bankruptcy courts, subject to appellate review by the district courts.

83.    Whether a proceeding is core depends, *inter alia*, on the degree to which the proceeding is independent of the reorganization. This inquiry hinges on "the nature of the proceeding." *Beal Bank, S.S.B. v. U.S. Bank Nat. Ass'n,* 2010 WL 2541165 at *2 (S.D.N.Y., June 8, 2010)., *citing  In re S.G. Phillips Constructors, Inc.,* 45 F.3d 702, 707 (2d Cir.1995). "Proceedings can be core by virtue of their nature if either: (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, ... or (2) the proceedings directly affect a core bankruptcy function...." *In re United States Lines. Inc.,* 197 F.3d 631, 637 (2d Cir.1999).

84.    The New GM Motion is not a core proceeding. It is neither unique to the bankruptcy proceeding nor does it directly effect a core function. Despite New GM's attempt to fashion the new GM Motion as an attempt to "enforce" the Sale Order, the relief GM seeks has nothing to do with the Sale Order or the Wind-Down Agreements.

436513v1

85.    While the Wind-Down Agreement sets forth certain limitations as to what actions Rally could and could not undertake against the Debtor or New GM, the landscape was dramatically altered when President Obama signed the Dealer Arbitration Act into law, on December 16, 2009.

86.    The Dealer Arbitration Act specifically gave dealers like Rally the right to arbitrate determinations regarding their dealerships *despite their entry into the Wind-Down Agreements.*  As one of the sponsors of the Dealer Arbitration Act noted:

> It is not the intent of Congress to bar a covered dealership from the provisions of this section if the covered dealership accepted a standard form contract prepared by the covered manufacturer and offered on a 'take-it-or-leave-it' basis, even if the agreement was entered into voluntarily. *As a consequence, a covered dealership that accepted a 'wind-down' agreement drafted by a covered manufacturer would be able to avail itself of the provisions of [the Dealer Arbitration Act].*

(Rep. John Conyers, Congressional Record - House, H14478-79, Dec. 10, 2009; Exhibit J) (emphasis added).

87.    New GM had little problem seeking affirmative relief in the California District Court itself (referring to the District Court  as a court of competent jurisdiction) to enforce the terms of its settlement and relying upon the jurisdiction of the Dealer Arbitration Act.  Therefore, the New GM Motion is New GM's naked attempt to forum shop and the court should either deny the New GM Motion or refuse to exercise jurisdiction over it.

B.    **The New GM Motion is Not a Related Proceeding.**

88.    The New GM Motion is not a "related" proceeding. The Bankruptcy Court has jurisdiction to hear and (unless the parties consent to determination of the matters by the bankruptcy court) make proposed findings of fact and conclusions of law to the

district court with respect to matters that are merely "related to" title 11 bankruptcy cases.

28 U.S.C. § 157(c)(1).

89.     The determination as to whether a matter is "related to" a pending

bankruptcy case turns on "whether its outcome might have any 'conceivable effect' on

the bankrupt estate ... 'any significant connection' with the bankrupt estate ... would

[also] establish § 1334(b) jurisdiction." *Publicker Ind. Inc. v. U.S. (In re Cuyahoga*

*Equip. Corp.),* 980 F.2d 110, 114 (2d Cir.1992) (citations omitted).

90.     In order for a proceeding to relate to a bankruptcy case, it must have a

significant connection with the case and have a potential effect on the bankruptcy estate.

*In re Leco Enterprises,* .144 B.R. 244, 248 (Bankr. S.D.N.Y. 1992); *see also Celotex*

*Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995);

*Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.),* 190 B.R. 157, 160

(S.D.N.Y.1995) ("An action is related to the bankruptcy if the outcome could alter the

debtor's rights, liabilities, options, or freedom of action ... and which in any way impacts

upon the handling and administration of the bankruptcy estate." ( *citing Pacor, Inc. v.*

*Higgins,* 743 F.2d 984, 994 (3d Cir.1984))).

91.     "'Related to' jurisdiction is not established when a third-party dispute

affects neither the distribution of estate assets nor the bankruptcy estate in general." *In re*

*IPDN Corp.*, 352 B.R. 870, 877-78 (Bankr. E.D. Mo. 2006) (citing *Credit Mgmt. Corp. v.*

*McAlpin,* 263 B.R. 881, 884 (8th Cir. 2001); *Specialty Mills, Inc. v. Citizens State Bank,*

51 F.3d 770, 774 (8th Cir.1995)). Further, "speculative, theoretical claims are not

sufficient to show 'related to' bankruptcy jurisdiction." *Ausa Life Ins. Co. v. Citigroup,*

*Inc.*, B.R. 471, 476 (N.D. Iowa 2003).

27

436513v1

92.     Regardless as to how the District Court decides the Petition, the

bankruptcy estate of the Debtor will not --in any way-- be effected by its determination. It

is simply immaterial to any party, other than New GM and Rally, both non-debtors, as to

how the District Court addresses the Motion to Modify.

93.     For this reason, the Bankruptcy Court should determine that it has no

jurisdiction to hear or determine the New GM Motion.

**C.      If the New GM Motion is Determined to be a "Related"
         Proceeding, then the Bankruptcy Court Should Nonetheless
         Deny the Motion in the Interest of Judicial Economy.**

94.     Even if the New GM Motion was determined to be a non-core, related

proceeding, judicial economy is best served if the Bankruptcy Court denies the New GM

Motion.  A Bankruptcy Court, in non-core matters, may only "submit proposed findings

of fact and conclusion of law to the district court." Section 157(c)(1). The district court

would have to review, *de novo*, the bankruptcy courts findings of fact and conclusions of

law to which any party interposes an objection. *Id.* Such secondary review duplicates

judicial time and resources. *In re Orion Pictures*, 4 F.3d 1095, 1101 (2d Cir.1993) ("the

fact that a bankruptcy court's determination on non-core matters is subject to *de novo*

review by the district court could lead the latter to conclude that in a given case

unnecessary costs could be avoided by a single proceeding in a district court").

95.     As a result, since a district court would have to, in any event, review the

facts and law *de novo*, it make sense on all levels, to simply allow the California District

Court to exercise appropriate jurisdiction over the District Court Action. Therefore, even

if this court determines the New GM Motion is a non-core proceeding, it should

nonetheless allow the district court to determine the District Court Action.

436513v1

D.    **The Bankruptcy Court Should Not Exercise Jurisdiction Over the Assets, Post-Sale, Unless Independent Jurisdiction Under the Bankruptcy Code is Established.**

96.    At least one Circuit Court has stated that "[g]enerally, once a bankruptcy debtor's reorganization plan has been confirmed ... 'the estate of the debtor, and thus the bankruptcy court's jurisdiction, ceases to exist.'" *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998) (quoting *Norwest Equip. Fin., Inc. v. Nath (In re D & P Partnership)*, 91 F.3d 1072, 1074 (8th Cir.1996)).

97.    This sentiment is echoed in cases involving transactions under Section 363 of the Bankruptcy Code. "[T]he [bankruptcy] court's jurisdiction typically lapses when the property leaves the estate, including property that has been removed by sale under § 363 of the Bankruptcy Code." *In re Crowder*, 314 B.R. 445, 448 (10th Cir. 2004); see also *In re Hall's Motor Transit Co.*, 889 F.2d 520, 522 (3rd Cir.1989) ("The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the debtor's estate.")

98.    Additionally, just as the parties by agreement cannot confer subject matter jurisdiction upon a court, a bankruptcy court's order "by itself cannot confer jurisdiction," it "must be independently established under the bankruptcy code." *In re Cary Metal Products, Inc.*, 158 B.R. 459, 462 (N.D.Ill. 1993).

99.    It is no coincidence that these principles of jurisdictional restraint were highlighted by the Bankruptcy Court in discussing the unique utility of the 363 sale as a means to get GM back on its feet and out from under the thumb of the Bankruptcy Court as soon as possible:

436513v1

> Under this game plan, [New GM] would acquire the
> purchased assets; create a New GM; and operate New GM
> free of the entanglement with the bankruptcy cases .... This
> plan was put in place for the specific purpose of
> "avoid[ing] the enormous costs of financing a lengthy
> chapter 11 case.

(Sale Order, pp. 13-14).

100.    As presciently set forth by Judge Easterbrook in In re *Pettibone*, 935 F.2d

120, 122 (7th Cir. 1991), New GM "may not come running to the bankruptcy judge every

time something unpleasant happens." 936 F.2d at 122.

101.    For these reasons, the Bankruptcy Court should see the New GM Motion

for what it is: a naked attempt to forum shop and deny the New GM Motion.

E.    **The Bankruptcy Court Should Defer to the Statutorily
      Created Arbitration Process.**

102.    Regardless as to whether the New GM Motion is a core or non-core

proceeding, the Bankruptcy Court should defer to the strong national policy favoring

arbitration and deny the New GM Motion.

103.    The United States Supreme Court has recognized the strong national

policy favoring arbitrating and has held that arbitration will be compelled unless the party

opposing arbitration is able to demonstrate that "Congress intended to preclude a waiver

of judicial remedies for the statutory rights at issue." *Shearson/American Express, Inc., v.*

*McMahon*, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)("*McMahon*").

104.    In *McMahon,* the Supreme Court promulgated a three factor test to

determine Congress' intent: 1) the text of the statute; 2) the legislative history; and

436513v1

3) whether an inherent conflict between arbitration and the underlying purpose of the statute exists. McMahon, 482 U.S. at 227.[8]

105.    Applying the *McMahon* factors to the present case, there is no evidence within the Bankruptcy Code or its legislative history intended to create an exception to the Dealer Arbitration Act and the Bankruptcy Code. In fact, the evidence is the opposite: the Dealer Arbitration Act was enacted by Congress intentionally to afford the dealers relief form the "take it or leave it" nature of the Wind-Down Agreements approved by the Bankruptcy Court. (*See* Rep. John Conyers, Congressional Record - House, H14478-79, Dec. 10, 2009) (Exhibit J).

106.    Furthermore, there is no inherent conflict between the arbitration requirements set forth in the Dealer Arbitration Act and the Bankruptcy Code. It cannot be overstated that neither New GM nor Rally are debtors in this bankruptcy case. In light of the stated policy favoring arbitration, there is no compelling reason for this court to disrupt the arbitration between these two non—debtor entities.

107.    The Dealer Arbitration Act, consistent with the objectives of the Bankruptcy Court to "disentangle" the Debtor from New GM, was meant to provide relief to the Covered Dealers and has no effect, negative or otherwise, on the Debtor or its estate. For this reason, should the court determine that the New GM Motion is either a core or non-core, related proceeding, it should nonetheless deny the New GM Motion in deference to the statutorily codified arbitration process.

---

[8] In *McMahon*, the statute that required arbitration was the Federal Arbitration Act, 9 U.S.C. § 2, the analysis should be no different under the Dealer Arbitration Act.

31

## CONCLUSION

For the foregoing reasons, Rally respectfully requests that this Court enter an

Order denying New GM's Motion in all respects.

Dated: Mineola, New York
        September 23, 2010

                              Respectfully,

                              BELLAVIA GENTILE & ASSOCIATES,
                              LLP


                              /s/Steven Blatt
                              By:  Steven Blatt, Esq. (SB 6792)
                              Attorneys for Rally Auto Group, Inc.
                              200 Old Country Road
                              Suite 400
                              Mineola, NY 11501
                              (516) 873-3000

                              WILK AUSLANDER LLP


                              /s/ Eric J. Snyder
                              By: Eric J. Snyder ( ES 8032)
                              Attorneys for Rally Auto Group, Inc.
                              675 Third Avenue
                              New York, New York 10017
                              (212) 421-2233

436513v1