# EXHIBIT A

GMMS 1012
USA 11/2004-

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective <u>November 1, 2005,</u> General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☒ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☒ Pontiac Motor Vehicles, ☒ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks, ☒ Buick Motor Vehicles, ☒ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, ("General Motors") and <u>RALLY AUTO GROUP, INC.,</u> ☐ a proprietorship, ☐ a partnership, or ☒ a <u>CALIFORNIA</u> corporation, ☐ a limited liability company, or ☐ other business entity, doing business as <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC</u> and located at <u>39012 CARRIAGE WAY,</u> <u>PALMDALE, CALIFORNIA, 93551,</u> ("Dealer"), hereby enter into separate Agreement(s) for each Motor Vehicle Line-Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line-Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line-Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

**FIRST: TERM OF AGREEMENT(S)**

This Agreement(s) shall expire on <u>October 31, 2010</u> unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

**SECOND: STANDARD PROVISIONS AND RELATED ADDENDA**

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

**THIRD: DEALER OPERATOR AND DEALER OWNER**

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:
<u>LARRY A. MAYLE</u>
—
—

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
<u>FRANCIS C. MAYLE</u>
—
—

**FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)**

This Agreement(s) and related agreement(s) are valid only if signed:
  (a)  on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and
  (b)  this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

**FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS**
The following agreement(s) are hereby incorporated by reference into this Agreement(s):

<u>RALLY AUTO GROUP, INC.</u>
dba <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC</u>
<u>GMC</u>
Dealer Firm Name

By: _____ 10-3-05
    Dealer Operator and Date

GENERAL MOTORS CORPORATION

By: _____
    Regional General Manager

By: _____ 10/3/05
    Authorized Representative and Date

GMMS 1006
USA 03/2005

# SUCCESSOR ADDENDUM
## TO
## GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement(s)

This Successor Addendum is effective November 1, 2005, and is executed pursuant to the provisions of the current Dealer Agreement(s) in effect between the undersigned Dealer and General Motors.

In reliance on the accuracy of the information provided by Dealer, in connection with the Request for Execution of Successor Addendum, General Motors and Dealer agree that:

1. Subject to paragraph 2 below, the proposed dealer operator(s) for purposes of designating and establishing a proposed successor dealer as provided in the Dealer Agreement(s) shall be:

   WILLIAM W. PENN

2. This addendum shall become null and void upon the execution of a new Dealer Agreement(s) by Dealer and General Motors.

3. This Successor Addendum cancels and supersedes any previous Successor Addendum between the parties.

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

By: _____ 10-3-05    GENERAL MOTORS CORPORATION

Dealer Operator    Date    By: _____ 10/3/05

Authorized Representative    Date

GMMS 1014A–1
USA* 11/2000

# DEALER STATEMENT OF OWNERSHIP

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

☐ a proprietorship,  ☐ a partnership or  ☒ a corporation incorporated on __AUGUST 18, 1969__ in the

State of __CALIFORNIA__, or  ☐ a limited liability company, or  ☐ other business entity _____

The undersigned Dealer hereby certifies that the following information is true, accurate and complete, as of

__NOVEMBER 01, 2005__.

| Names and Titles of all individuals, beneficiaries of trusts or other entities owning 5% or more of Dealer and entitled to receive dividends or profits from Dealer as a result of ownership.  (Identify Holding Company Owners on GMMS 1014–2) | Active in Dealer–ship (Yes or No) | If a Corporation, Show Number Of Shares and Class | | | Value of the Owner–ship Interest of Each Person Listed Based on Dealership's Current Net Worth | Percentage of Ownership of Record in Dealer |
|---|---|---|---|---|---|---|
| | | Number Shares | Type* Or Class | Voting (Yes or No) | | |
| LARRY A. MAYLE PRESIDENT | YES | 1,681.00 | COMM A | YES | $ 1,837,512 | 58.03% |
| FRANCIS C. MAYLE VICE–PRESIDENT | YES | 1,216.00 | COMM A | YES | $ 1,329,217 | 41.97% |
| | | | | | $ | % |
| | | | | | $ | % |
| | | | | | $ | % |
| | | | | | $ | % |
| | | | | | $ | % |
| Total | XXX | 2,897.00 | COMM A | XXX | $ 3,166,729 | 100.00% |

\* Indicate various classes of common or preferred stock issued. State Par Value of each share of preferred stock
Memo: If stock class "Common M" appears, the equity percentage under "Common M" refers to the percent of the number of shares of
issued and outstanding Preferred Stock of the total number of issued and outstanding Common Stock and Preferred Stock in Motors Holding
Investments. Contact Motors Holding to determine the value of equity interests at a given time.

Remarks:

RALLY AUTO GROUP, INC.
Dealer Firm Name

By ___[signature]___  10-3-05
Dealer Operator        Date

GENERAL MOTORS CORPORATION

By ___[signature]___  10/3/05
Authorized Representative   Date

GMMS 1016-1
USA 11/2004

# LOCATION AND PREMISES ADDENDUM
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement(s)

The undersigned Dealer and General Motors Corporation hereby agree that effective, November 1, 2005:

1.  "Description of Premises," identifies the Location and describes the Premises at which Dealer is authorized to conduct Dealership Operations under the Dealer Agreement(s).  Dealer also represents that "Description of Premises" accurately reflects the terms under which it occupies the premises and the manner in which each is used for GM Dealership Operations.

2.  "Premises Space Analysis," sets forth the actual space Dealer represents it uses in GM Dealership Operations, and the actual space at the same locations used by Dealer for a purpose other than GM Dealership Operations.

All changes in the Location or use of Premises must be approved by General Motors pursuant to provisions the Dealer Agreement(s) requirements shall be reflected in a new Location and Premises Addendum executed by Dealer and General Motors.

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____ 10-3-05          By _____ 10/4/05
Dealer Operator          Date                  Authorized Representative          Date

GMMS 1016-2
USA 11/2004

# PART I
## DESCRIPTION OF PREMISES

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State
June, 1991
Date Main Facility Constructed (Mo., Yr.)

November 1, 2005
Date of this GMMS (Mo., Day, Yr.)

Date Main Facility Remodeled or Added to (Mo., Yr.)

### LOCATION, USE AND OWNERSHIP OF PREMISES

| Identify by street address each separate dealership location and describe how each is used for GM Dealership Operations. Specify: NEW VEHICLE SALES, USED VEHICLE SALES, SERVICE, PARTS, OFFICE, NEW VEHICLE STORAGE, BODY SHOP, etc. Also indicate distance of each separate location from main location. | Dealer Asset | Leased | IF LEASED, INDICATE: Name of Lessor: Beginning and Expiration Date of Lease Annual Rental: $ Renewal Option: Term and Annual Rent |
|---|---|---|---|
| MAIN 39012 CARRIAGE WAY PALMDALE, CA INT - NEW, EXT - NEW, USED DISP, MECHANICAL, BODY, SERV RECP, PAR K-CUST, NEW STORAG, EMP PK/MSC, GEN OFFICE, PARTS, OTHER | ☐ | ☒ | RALLY AUTO GROUP, INC. 12-01-2002 THROUGH 11-30-2007 $348,000 FOUR 5-YEAR RENEWALS |
| 2 438 AUTO VISTA DRIVE PALMDALE, CA INT - NEW, EXT - NEW, USED DISP, BODY, PARK-CUST, NEW STORAG, EMP PK/MSC, GEN OFFICE  0.1 MILES FROM MAIN | ☐ | ☒ | RALLY AUTO GROUP, INC. 12-01-2002 THROUGH 11-30-2007 $372,000 FOUR 5-YEAR OPTIONS |

| TOTAL DEALERSHIP IN SQUARE FEET | | | |
|---|---|---|---|
| | GM Use | Other Use | Total Area |
| Total Building | 87,042 | 3,000 | 90,042 |
| Total Lot | 449,195 | 30,000 | 479,195 |
| Grand Total | 536,237 | 33,000 | 569,237 |

GMMS 1016-3
USA 11/2004

(Location and Premises Addendum continued)
PART II
PREMISES SPACE ANALYSIS

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

November 1, 2005
Date of this GMMS (Mo., Day, Yr.)

| DEPARTMENT ALLOCATION | Actual Space in Number of Stalls | | | | TOTAL |
| | Building | | Lot (Do not include Bldg.) | | |
| | GM Use (A) | Other Use (B) | GM Use (C) | Other Use (D) | (A+B+C+D) (E) |
|---|---|---|---|---|---|
| (1) New Vehicle Display | 6 | | 6 | | 12 |
| (2) Used Vehicle Display | | | 148 | | 148 |
| (3) Productive Service - Mechanical | 48 | | | | 48 |
| (4) Productive Service - Body | 14 | | | | 14 |
| (5) Service - Reception | | | 15 | | 15 |
| (6) Parking - Customer | | | 215 | | 215 |
| (7) New Vehicle Storage | | | 487 | | 487 |
| (8) Employee Parking and Miscellaneous | | | 42 | | 42 |
| (9) Total of Lines (1) through (8) | 68 | | 913 | | 981 |

| | Actual Space in Square Feet | | | TOTAL |
| | GM Use | Other Use | | |
|---|---|---|---|---|
| (10) General Office | 3,440 | | | 3,440 |
| (11) Parts | 10,650 | | | 10,650 |
| (12) Total of Lines (10) and (11) | 14,090 | | | 14,090 |

## VEHICLE LINES HANDLED

| General Motors Line-Makes | Non-GM Lines Handled |
|---|---|
| CHEVROLET | |
| PONTIAC | |
| BUICK | |
| CADILLAC | |
| GMC | |

GMMS 958
USA 03/2005

# MANUFACTURER'S CERTIFICATION OF DEALER

Date: <u>November 1, 2005</u>

**To the Department or
Bureau of Motor Vehicles**

**This is to certify that:**

<u>RALLY AUTO GROUP, INC.</u>
Dealer Firm Name

☐ an individual
☐ a partnership
☒ a corporation
☐ a limited liability company
☐ other - specify  _____

<u>39012 CARRIAGE WAY</u>
Dealership Street and Number
<u>PALMDALE, CALIFORNIA</u>
City, State

is a party to a written Dealer Sales and Service Agreement effective <u>November 1, 2005</u> with: ☒ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☒ Pontiac Motor Vehicles, ☒ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks ☒ Buick Motor Vehicles, ☒ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, GENERAL MOTORS CORPORATION, Detroit, MI , authorizing such party as a Dealer to sell and service new motor vehicles commonly known and designated as:

☒ Chevrolet:  Dealer Firm Name d/b/a <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC.</u>
☒ Pontiac:  Dealer Firm Name d/b/a <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC.</u>
☒ GMC: Dealer Firm Name d/b/a <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC.</u>
☒ Buick: Dealer Firm Name d/b/a <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC.</u>
☒ Cadillac:  Dealer Firm Name d/b/a <u>RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC.</u>
☐ HUMMER: Dealer Firm Name d/b/a.

The above stated Dealer Sales and Service Agreement(s) is a personal service contract dependent upon the personal

services of  <u>LARRY A. MAYLE</u>
  —
  —

All Persons Named in Paragraph Third

with the above stated Dealer's business and the Dealer Sales and Service Agreement(s) expires on <u>October 31, 2010</u> unless sooner terminated pursuant to the provisions thereof.

GENERAL MOTORS CORPORATION

By  _____
Authorized Representative Signature and Title

<u>100 RENAISSANCE CENTER</u>
Office Address

<u>DETROIT, MICHIGAN</u>
City, State

GMMS 1015
USA 09/2004

# CAPITAL STANDARD ADDENDUM
## TO
## GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement(s)

This Capital Standard Addendum, effective November 1, 2005, is pursuant to the Dealer Sales and Service Agreement(s) in effect between General Motors and Dealer.

General Motors has determined that the minimum net working capital (standard) necessary for the Dealer to adequately conduct Dealership Operations consistent with the Dealer's responsibilities is $4,885,000.

Dealer has established, or will, within a reasonable time, establish and maintain actual dealer net working capital in an amount not less than the minimum amount specified above.

## GENERAL MOTORS DEALER CAPITAL STANDARD PROGRAM

General Motors Corporation has endeavored, through the General Motors Capital Standard Program, to help dealers develop sound financial positions. Over the years, this Program has contributed substantially to the effectiveness and relative permanency of General Motors dealers as a whole.

The purpose of the General Motors Capital Standard Program is to establish the minimum amount of regularly needed net working capital that should be provided by the owners through capital stock, other investment and earnings.

A minimum net working capital standard is established for each dealer based on the dealership operations it is expected to conduct under its Dealer Sales and Service Agreement(s). Dealer having actual net working capital equal to the standard established for the dealership operations contemplated at its dealership location should have net working capital to be compared to the standard which shall be determined by arriving at the sum of Total Current Assets plus Driver Training Vehicles, Lease and Rental Units and Total Accumulated LIFO Writedown minus the sum of Total Liabilities excluding those listed below.

Those liabilities that are not subtracted are:

1. Long term notes payable which are qualified long term debt. Qualified long term debt is defined by the following criteria:
   a. The note must be payable to an owner of Dealer;
   b. Principle payments must be restricted to be paid only from profits; and
   c. The amount of qualified long-term debt to be excluded is limited to 50% of the Net Working Capital standard.
   This exception is made because an owner would be less inclined to collect on a note payable at maturity than an outside creditor when payment of such a note would place the dealership in financial jeopardy.

2. Long term notes payable secured by real property.
   This exception is made because dealers are not required to own land and buildings that are used for dealership operations. Many dealers, however, elect to acquire and hold title to all or a portion of such real property, thereby investing a portion of the total equity capital in land and buildings that would otherwise be available for working capital purposes.

3. Deferred Taxes.
   This exception is made because deferred taxes are typically long term reserves for a liability and not due and payable unless the bulk of the business assets are sold. As a result, there is not a working capital requirement under normal ongoing operating conditions.

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____    10/3/05
Authorized Representative                Date

GMMS 1035
USA 11/2004

# BUICK MOTOR DIVISION
# MOTOR VEHICLE ADDENDUM
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

### RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
**Dealer Firm Name**

### PALMDALE, CALIFORNIA
**City, State**

Effective November 1, 2005, Dealer, as an authorized General Motors dealer, has non-exclusive right to buy the following new Motor Vehicles marketed by BUICK MOTOR DIVISION of General Motors Corporation, subject to the terms and conditions of the Standard Provisions.

## PASSENGER CARS
### CENTURY, LESABRE, PARK AVENUE, REGAL, LACROSSE, LUCERNE

## LIGHT DUTY TRUCKS
### RENDEZVOUS, RAINIER, TERRAZA

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Corporation. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors.

### GENERAL MOTORS CORPORATION

By: _____

**Division Marketing General Manager**
**BUICK MOTOR DIVISION**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

Effective <u>NOVEMBER 01, 2005</u>, the area described below and known as <u>PALMDALE, CALIFORNIA</u> shall be the Dealer's Area of Primary Responsibility for the Buick Motor Division of General Motors.

The following U.S. Census Tract(s) contained in KERN county, CALIFORNIA:

| | | |
|---|---|---|
| 55.06 | 57.00 | 58.00 |

And the following U.S. Census Tract(s) contained in LOS ANGELES county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 9001.01 | 9001.02 | 9002.00 | 9003.00 | 9005.01 | 9005.02 | 9005.03 |
| 9005.04 | 9006.02 | 9006.04 | 9006.05 | 9006.06 | 9006.07 | 9007.01 |
| 9007.03 | 9007.04 | 9007.05 | 9008.03 | 9008.04 | 9008.05 | 9008.06 |
| 9009.00 | 9010.03 | 9010.04 | 9010.05 | 9010.06 | 9010.07 | 9011.01 |
| 9011.02 | 9012.04 | 9012.05 | 9012.06 | 9012.07 | 9100.00 | 9101.00 |
| 9102.01 | 9102.02 | 9102.03 | 9102.04 | 9102.05 | 9102.06 | 9103.01 |
| 9103.02 | 9104.01 | 9104.02 | 9104.03 | 9104.04 | 9105.01 | 9105.02 |
| 9105.03 | 9106.01 | 9106.02 | 9106.03 | 9106.04 | 9107.03 | 9107.04 |
| 9107.05 | 9107.06 | 9107.07 | 9107.08 | 9107.09 | 9107.10 | 9108.03 |
| 9108.04 | 9108.05 | 9108.06 | 9109.01 | 9109.02 | 9110.00 | |

{CONTINUED ON FOLLOWING PAGE(S)}

**Page 01 of 02**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

{CONTINUED FROM PRECEDING PAGE(S)}

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above:

| | | | |
|---|---|---|---|
| ACTON | EDWARDS AFB | LAKE LOS ANGELES | LANCASTER |
| LITTLEROCK | NEWHALL | NORTH ANTELOPE VAL | PALMDALE |
| QUARTZ HILL | ROSAMOND | SOUTH ANTELOPE VAL | |

The Area of Primary Responsibility will be employed by General Motors to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____  10/4/05

Authorized Representative       Date

Page 02 of 02

GMMS 1035
USA 11/2004

# PONTIAC-GMC DIVISION (Pontiac Motor Vehicles)
## MOTOR VEHICLE ADDENDUM
## TO
## GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

### RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
**Dealer Firm Name**

### PALMDALE, CALIFORNIA
**City, State**

Effective November 1, 2005, Dealer, as an authorized General Motors dealer, has non-exclusive right to buy the following new Motor Vehicles marketed by PONTIAC-GMC DIVISION (Pontiac Motor Vehicles) of General Motors Corporation, subject to the terms and conditions of the Standard Provisions.

### PASSENGER CARS
BONNEVILLE, FIREBIRD, GRAND AM, GRAND PRIX, SUNFIRE, VIBE, GTO, G6, SOLSTICE, TORRENT

### LIGHT DUTY TRUCKS

MONTANA, AZTEK, MONTANA SV6

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Corporation. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors.

### GENERAL MOTORS CORPORATION

By: _John P. L_____

**Division Marketing General Manager**
Pontiac-GMC Division
(Pontiac Motor Vehicles)

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

Effective <u>NOVEMBER 01, 2005</u>, the area described below and known as <u>PALMDALE, CALIFORNIA</u>    shall be the Dealer's Area of Primary Responsibility for the Pontiac–GMC Motor Division (Pontiac Motor Vehicles) of General Motors.

```
The following U.S. Census Tract(s) contained in KERN
county, CALIFORNIA:

55.06    57.00    58.00


And the following U.S. Census Tract(s) contained in LOS ANGELES
county, CALIFORNIA:

9001.01   9001.02   9002.00   9003.00   9005.01   9005.02   9005.03
9005.04   9006.02   9006.04   9006.05   9006.06   9006.07   9007.01
9007.03   9007.04   9007.05   9008.03   9008.04   9008.05   9008.06
9009.00   9010.03   9010.04   9010.05   9010.06   9010.07   9011.01
9011.02   9012.04   9012.05   9012.06   9012.07   9100.00   9101.00
9102.01   9102.02   9102.03   9102.04   9102.05   9102.06   9103.01
9103.02   9104.01   9104.02   9104.03   9104.04   9105.01   9105.02
9105.03   9106.01   9106.02   9106.03   9106.04   9107.03   9107.04
9107.05   9107.06   9107.07   9107.08   9107.09   9107.10   9108.03
9108.04   9108.05   9108.06   9109.01   9109.02   9110.00
```

{CONTINUED ON FOLLOWING PAGE(S)}

**Page 01 of 02**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

{CONTINUED FROM PRECEDING PAGE(S)}

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above:

| | | | |
|---|---|---|---|
| ACTON | EDWARDS AFB | LAKE LOS ANGELES | LANCASTER |
| LITTLEROCK | NEWHALL | NORTH ANTELOPE VAL | PALMDALE |
| QUARTZ HILL | ROSAMOND | SOUTH ANTELOPE VAL | |

The Area of Primary Responsibility will be employed by General Motors to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____  10/3/05
Authorized Representative    Date

Page 02 of 02

GMMS 1035
USA 11/2004

# CHEVROLET MOTOR DIVISION
# MOTOR VEHICLE ADDENDUM
# TO
# GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

### RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
**Dealer Firm Name**

### PALMDALE, CALIFORNIA
**City, State**

Effective November 1, 2005, Dealer, as an authorized General Motors dealer, has non-exclusive right to buy the following new Motor Vehicles marketed by CHEVROLET MOTOR DIVISION of General Motors Corporation, subject to the terms and conditions of the Standard Provisions.

### PASSENGER CARS
CAMARO, CAVALIER, LUMINA, MONTE CARLO, MALIBU, METRO, PRIZM, IMPALA, CORVETTE, AVEO, MALIBU MAXX, CLASSIC, COBALT

### LIGHT DUTY TRUCKS

ASTRO, C3500HD, S-10, BLAZER, TAHOE, SUBURBAN, EXPRESS, VENTURE, TRACKER, SILVERADO, AVALANCHE, TRAILBLAZER, C4500, SSR, COLORADO, EQUINOX, UPLANDER, HHR

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Corporation. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors.

### GENERAL MOTORS CORPORATION

By   *Ed Peper*

**Division Marketing General Manager**
**Chevrolet Motor Division**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

Effective <u>NOVEMBER 01, 2005</u>, the area described below and known as <u>PALMDALE, CALIFORNIA</u>    shall be the Dealer's Area of Primary Responsibility for the Chevrolet Motor Division of General Motors.

**\*\* PASSENGER CAR – LIGHT DUTY TRUCK \*\***

The following U.S. Census Tract(s) contained in KERN county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 55.03 | 55.04 | 55.05 | 55.06 | 56.00 | 57.00 | 58.00 |
| 59.00 | | | | | | |

And the following U.S. Census Tract(s) contained in LOS ANGELES county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 9001.01 | 9001.02 | 9002.00 | 9003.00 | 9005.01 | 9005.02 | 9005.03 |
| 9005.04 | 9006.02 | 9006.04 | 9006.05 | 9006.06 | 9006.07 | 9007.01 |
| 9007.03 | 9007.04 | 9007.05 | 9008.03 | 9008.04 | 9008.05 | 9008.06 |
| 9009.00 | 9010.03 | 9010.04 | 9010.05 | 9010.06 | 9010.07 | 9011.01 |
| 9011.02 | 9012.04 | 9012.05 | 9012.06 | 9012.07 | 9100.00 | 9101.00 |
| 9102.01 | 9102.02 | 9102.03 | 9102.04 | 9102.05 | 9102.06 | 9103.01 |
| 9103.02 | 9104.01 | 9104.02 | 9104.03 | 9104.04 | 9105.01 | 9105.02 |
| 9105.03 | 9106.01 | 9106.02 | 9106.03 | 9106.04 | 9107.03 | 9107.04 |
| 9107.05 | 9107.06 | 9107.07 | 9107.08 | 9107.09 | 9107.10 | 9108.03 |
| 9108.04 | 9108.05 | 9108.06 | 9109.01 | 9109.02 | 9110.00 | |

{CONTINUED ON FOLLOWING PAGE(S)}

**Page 01 of 02**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

{CONTINUED FROM PRECEDING PAGE(S)}

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above:

| | | | |
|---|---|---|---|
| ACTON | BORON | CALIFORNIA CITY | EDWARDS AFB |
| LAKE LOS ANGELES | LANCASTER | LITTLEROCK | MOJAVE |
| NEWHALL | NORTH ANTELOPE VAL | PALMDALE | QUARTZ HILL |
| ROSAMOND | SOUTH ANTELOPE VAL | | |

The Area of Primary Responsibility will be employed by General Motors to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____  10/3/05
Authorized Representative    Date

Page 02 of 02

GMMS 1035
USA 11/2004

# CADILLAC MOTOR DIVISION
# MOTOR VEHICLE ADDENDUM
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

### RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
**Dealer Firm Name**

### PALMDALE, CALIFORNIA
**City, State**

Effective <u>November 1, 2005,</u> Dealer, as an authorized General Motors dealer, has non-exclusive right to buy the following new Motor Vehicles marketed by CADILLAC MOTOR DIVISION of General Motors Corporation, subject to the terms and conditions of the Standard Provisions.

## PASSENGER CARS
DEVILLE, ELDORADO, SEVILLE, CATERA, CTS, XLR*, (*MUST SATISFY ENROLLMENT REQUIREMENTS), STS, DTS

## LIGHT DUTY TRUCKS

ESCALADE, ESCALADE EXT, ESCALADE ESV, SRX

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Corporation. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors.

### GENERAL MOTORS CORPORATION

By: _Jim Taylor_

**Division Marketing General Manager**
**Cadillac Motor Division**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

Effective <u>NOVEMBER 01, 2005,</u> the area described below and known as <u>LANCASTER, CALIFORNIA</u>    shall be the Dealer's Area of Primary Responsibility for the Cadillac Motor Division of General Motors.

The following U.S. Census Tract(s) contained in KERN county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 53.00 | 54.01 | 54.02 | 54.03 | 54.04 | 55.01 | 55.03 |
| 55.04 | 55.05 | 55.06 | 56.00 | 57.00 | 58.00 | 59.00 |

And the following U.S. Census Tract(s) contained in LOS ANGELES county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 9001.01 | 9001.02 | 9002.00 | 9003.00 | 9005.01 | 9005.02 | 9005.03 |
| 9005.04 | 9006.02 | 9006.04 | 9006.05 | 9006.06 | 9006.07 | 9007.01 |
| 9007.03 | 9007.04 | 9007.05 | 9008.03 | 9008.04 | 9008.05 | 9008.06 |
| 9009.00 | 9010.03 | 9010.04 | 9010.05 | 9010.06 | 9010.07 | 9011.01 |
| 9011.02 | 9012.04 | 9012.05 | 9012.06 | 9012.07 | 9100.00 | 9101.00 |
| 9102.01 | 9102.02 | 9102.03 | 9102.04 | 9102.05 | 9102.06 | 9103.01 |
| 9103.02 | 9104.01 | 9104.02 | 9104.03 | 9104.04 | 9105.01 | 9105.02 |
| 9105.03 | 9106.01 | 9106.02 | 9106.03 | 9106.04 | 9107.03 | 9107.04 |
| 9107.05 | 9107.06 | 9107.07 | 9107.08 | 9107.09 | 9107.10 | 9108.03 |
| 9108.04 | 9108.05 | 9108.06 | 9109.01 | 9109.02 | 9110.00 | 9302.00 |

{CONTINUED ON FOLLOWING PAGE(S)}

**Page 01 of 02**

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

{CONTINUED FROM PRECEDING PAGE(S)}

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above:

| | | | |
|---|---|---|---|
| ACTON | BORON | CALIFORNIA CITY | EDWARDS AFB |
| INYOKERN | LAKE LOS ANGELES | LANCASTER | LITTLEROCK |
| MOJAVE | NEWHALL | NORTH ANTELOPE VAL | PALMDALE |
| QUARTZ HILL | RIDGECREST | ROSAMOND | SANTA CLARITA |
| SOUTH ANTELOPE VAL | | | |

The Area of Primary Responsibility will be employed by General Motors to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

**GENERAL MOTORS CORPORATION**

By _____  10/3/05

Authorized Representative    Date

Page 02 of 02

GMMS 1035
USA 11/2004

# PONTIAC-GMC DIVISION (GMC Motor Vehicles)
# MOTOR VEHICLE ADDENDUM
## TO
# GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
**Dealer Firm Name**

PALMDALE, CALIFORNIA
**City, State**

Effective November 1, 2005, Dealer, as an authorized General Motors dealer, has non-exclusive right to buy the following new Motor Vehicles marketed by PONTIAC-GMC DIVISION (GMC Motor Vehicles) of General Motors Corporation, subject to the terms and conditions of the Standard Provisions.

## LIGHT DUTY TRUCKS

JIMMY, DENALI, DENALI XL, ENVOY, SAFARI, SAVANA, SIERRA, SIERRA 3500HD, SONOMA, YUKON, YUKON XL, C4500, CANYON

This Motor Vehicle Addendum shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum furnished Dealer by General Motors Corporation. This Motor Vehicle Addendum cancels and supersedes any previous Motor Vehicle Addendum furnished Dealer by General Motors.

### GENERAL MOTORS CORPORATION

By: *[signature]*

**Division Marketing General Manager**
Pontiac-GMC Division
(GMC Motor Vehicles)

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

Effective <u>NOVEMBER 01, 2005</u>, the area described below and known as <u>PALMDALE, CALIFORNIA</u>    shall be the Dealer's Area of Primary Responsibility for the Pontiac–GMC Motor Division (GMC Motor Vehicles) of General Motors.

**\*\* LIGHT DUTY TRUCK \*\***

The following U.S. Census Tract(s) contained in KERN county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 53.00 | 54.01 | 54.02 | 54.03 | 54.04 | 55.01 | 55.03 |
| 55.04 | 55.05 | 55.06 | 56.00 | 57.00 | 58.00 | 59.00 |

And the following U.S. Census Tract(s) contained in LOS ANGELES county, CALIFORNIA:

| | | | | | | |
|---|---|---|---|---|---|---|
| 9001.01 | 9001.02 | 9002.00 | 9003.00 | 9005.01 | 9005.02 | 9005.03 |
| 9005.04 | 9006.02 | 9006.04 | 9006.05 | 9006.06 | 9006.07 | 9007.01 |
| 9007.03 | 9007.04 | 9007.05 | 9008.03 | 9008.04 | 9008.05 | 9008.06 |
| 9009.00 | 9010.03 | 9010.04 | 9010.05 | 9010.06 | 9010.07 | 9011.01 |
| 9011.02 | 9012.04 | 9012.05 | 9012.06 | 9012.07 | 9100.00 | 9101.00 |
| 9102.01 | 9102.02 | 9102.03 | 9102.04 | 9102.05 | 9102.06 | 9103.01 |
| 9103.02 | 9104.01 | 9104.02 | 9104.03 | 9104.04 | 9105.01 | 9105.02 |
| 9105.03 | 9106.01 | 9106.02 | 9106.03 | 9106.04 | 9107.03 | 9107.04 |
| 9107.05 | 9107.06 | 9107.07 | 9107.08 | 9107.09 | 9107.10 | 9108.03 |
| 9108.04 | 9108.05 | 9108.06 | 9109.01 | 9109.02 | 9110.00 | |

{CONTINUED ON FOLLOWING PAGE(S)}

GMMS 1031
USA 10/2004

# NOTICE OF
# AREA OF PRIMARY RESPONSIBILITY
# TO
# GENERAL MOTORS CORPORATION
## Dealer Sales and Service Agreement

{CONTINUED FROM PRECEDING PAGE(S)}

The following whole or partial communities do not define the undersigned Dealer's Area of Primary Responsibility but are included as a reference list of commonly used community names in the Area of Primary Responsibility described above:

| | | | |
|---|---|---|---|
| ACTON | BORON | CALIFORNIA CITY | EDWARDS AFB |
| INYOKERN | LAKE LOS ANGELES | LANCASTER | LITTLEROCK |
| MOJAVE | NEWHALL | NORTH ANTELOPE VAL | PALMDALE |
| QUARTZ HILL | RIDGECREST | ROSAMOND | SOUTH ANTELOPE VAL |

The Area of Primary Responsibility will be employed by General Motors to review the effectiveness of Dealer's performance under the Dealer Agreement, and for other matters relating to Dealership Operations. The Area of Primary Responsibility described herein will continue in effect until changed by written notice to Dealer.

RALLY AUTO GROUP, INC.
Dealer Firm Name

PALMDALE, CALIFORNIA
City, State

GENERAL MOTORS CORPORATION

By _____  10/3/05
Authorized Representative      Date

Page 02 of 02



General Motors Company
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

<u>FEDERAL EXPRESS AIRBILL# 7978 5471 4422</u>
PERSONAL AND CONFIDENTIAL

August 18, 2009

Rally Auto Group, Inc. d/b/a
Rally Cadillac Chevrolet Buick Pontiac GMC
39012 Carriage Way
Palmdale, CA 93551

Attention: Mr. Larry A. Mayle, President

This letter is written by General Motors Company on behalf of Cadillac, Chevrolet, Buick Pontiac and GMC Divisions, and will confirm the information you have provided regarding the transfer of stock to the Mayle Family Trust for Rally Auto Group, Inc. d/b/a Rally Cadillac Chevrolet Buick Pontiac GMC.

The enclosed GMMS 1014, Dealer Statement of Ownership, has been completed in duplicate to reflect the change. If everything is correct, please sign **both** copies and return them to the address listed below. After obtaining a General Motors countersignature (which will execute the documents), one copy of the documents will be returned to you. It is important that both documents have original signatures – copies or faxes are not accepted.

*your copy attached Betty*

General Motors Company
100 Renaissance Center
MC: 100-A06-C66
Detroit, MI, 48265-1000
Attn: Betty Menifield
*(313) 665-1837*

Very truly yours,

Betty Menifield
Dealer Business Planning Analyst
*on behalf of*
General Motors Company

GMMS 1014-I
USA 11/2004

# DEALER STATEMENT OF OWNERSHIP

<u>RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC</u>
Dealer Firm Name
<u>PALMDALE, CALIFORNIA</u>
City, State

☐ a proprietorship, ☐ a partnership ☒ a corporation incorporated on <u>August 18, 1969</u> in the State of <u>CALIFORNIA</u>, or ☐ a limited liability company, or ☐ other business entity.

The undersigned Dealer hereby certifies that the following information is true, accurate and complete, as of <u>August 14, 2009.</u>

| Names and Titles of all individuals, beneficiaries of trusts or other entities owning 5% or more of Dealer and entitled to receive dividends or profits from Dealer as a result of ownership.<br><br>(Identify Holding Company Owners on GMMS 1014-2) | Active in Dealership (Yes or No) | If a Corporation, Show Number Of Shares and Class | | | Value of the Ownership Interest of Each Person Listed Based on Dealership's Current Net Worth | Percentage Of Ownership of Record in Dealer |
|---|---|---|---|---|---|---|
| | | Number Shares | Type* Or Class | Voting (Yes or No) | | |
| LARRY A. MAYLE<br>PRESIDENT | YES | 1,681.00 | COMM A | YES | $1,273,384 | 58.03% |
| MAYLE FAMILY TRUST | NO | 1,216.00 | COMM A | YES | $920,971 | 41.97% |
| Total | XXX | 2,897.00 | COMM A | XXX | $2,194,355 | 100% |

*Indicate various classes of common or preferred stock issued. State Par Value of each share of preferred stock

<u>RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC</u>
Dealer Firm Name

**GENERAL MOTORS COMPANY**

By: ✓ _[signature]_   8-20-09
    Dealer Operator        Date

By: _[signature] Michael L. [Daly]_   8-10-09
    Authorized Representative      Date

GMMS 1014-2
USA 11/2004

# DEALER STATEMENT OF OWNERSHIP

## HOLDING COMPANY OWNERSHIP

RALLY AUTO GROUP, INC. dba RALLY CADILLAC CHEVROLET BUICK PONTIAC GMC
Dealer Firm Name
PALMDALE, CALIFORNIA
City, State

| INVESTORS FOR | PERCENT OF OWNERSHIP |
|---|---|
| MAYLE FAMILY TRUST | |
| RUTH 0. MAYLE | 100.00% |

# EXHIBIT B

**GM**

**General Motors LLC**

<u>**Via Federal Express**</u>

<u>PERSONAL & CONFIDENTIAL</u>                    January 13, 2010

RALLY AUTO GROUP, INC.
39012 CARRIAGE WAY
PALMDALE, CA  93551

Attention:  Larry A Mayle

RE:  WIND-DOWN AGREEMENT RECEIVED BY YOUR DEALERSHIP

As you may know, the President recently signed into law the Consolidated Appropriations Act of 2010 (H.R. 3288) ('the Act"). This notice is being provided to your dealership as required by Section 747 of the Act.

First, we are providing you, as required, with the terms and rights contained in the Act. This information is in the attachment to this letter, which is a complete copy of Section 747 as enacted. Second, as also required, we are providing you with the specific criteria which GM used to issue your dealership a wind-down agreement for the Chevrolet, Buick, GMC, Cadillac Dealer Agreement(s).

The criteria used are as follows:

• 2008 overall DPS total dealership score under 70

• 2008 overall RSI total dealership score under 70

General Motors LLC

Attachment

SEC. 747. (a) DEFINITIONS.—For purposes of this section the following definitions apply: (1) The term "covered manufacturer" means—(A) an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008; or (B) an automobile manufacturer which acquired more than half of the assets of an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008. (2) The term "covered dealership" means an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008, and such agreement was terminated, not assigned in the form existing on October 3, 2008 to another covered manufacturer in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010. (b) A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Such continuation, reinstatement, or addition shall be limited to each brand owned and manufactured by the covered manufacturer at the time the arbitration commences, to the extent that the covered dealership had been a dealer for such brand at the time such dealer's franchise agreement was terminated, not assigned, not renewed, or not continued. (c) Before the end of the 30-day period beginning on the date of the enactment of this Act, a covered manufacturer shall provide to each covered dealership related to such covered manufacturer a summary of the terms and the rights accorded under this section to a covered dealership and the specific criteria pursuant to which such dealer was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer. (d) A covered dealership may elect to pursue the right to binding arbitration with the appropriate covered manufacturer. Such election must occur within 40 days of the date of enactment. The arbitration process must commence as soon as practicable thereafter with the selection of the arbitrator and conclude with the case being submitted to the arbitrator for deliberation within 180 days of the date of enactment of this Act. The arbitrator may extend the time periods in this subsection for up to 30 days for good cause. The covered manufacturer and the covered dealership may present any relevant information during the arbitration. The arbitrator shall balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based on that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer. The factors considered by the arbitrator shall include (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009, (2) the covered manufacturer's overall business plan, (3) the covered dealership's current economic viability, (4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement, (5) the demographic and geographic characteristics of the covered dealership's market territory, (6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and (7) the length of experience of the covered dealership. The arbitrator shall issue a written determination no later than 7 business days after the arbitrator determines that case has been fully submitted. At a minimum, the written determination shall include (1) a description of the covered dealership, (2) a clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer, (3) the key facts relied upon by the arbitrator in making the determination, and (4) an explanation of how the balance of economic interests supports the arbitrator's determination. (e) The arbitrator shall be selected from the list of qualified arbitrators maintained by the Regional Office of the American Arbitration Association (AAA), in the Region where the dealership is located, by mutual agreement of the covered dealership and covered manufacturer. If agreement cannot be reached on a suitable arbitrator, the parties shall request AAA to select the arbitrator. There will be no depositions in the proceedings, and discovery shall be limited to requests for documents specific to the covered dealership. The parties shall be responsible for their own expenses, fees, and costs, and shall share equally all other costs associated with the arbitration, such as arbitrator fees, meeting room charges, and administrative costs. The arbitration shall be conducted in the State where the covered dealership is located. Parties will have the option of conducting arbitration electronically and telephonically, by mutual agreement of both parties. The arbitrator shall not award compensatory, punitive, or exemplary damages to any party. If the arbitrator finds in favor of a covered dealership, the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the

arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement. (f) Any legally binding agreement resulting from a voluntary negotiation between a covered manufacturer and covered dealership(s) shall not be considered inconsistent with this provision and any covered dealership that is a party to such agreement shall forfeit the right to arbitration established by this provision. (g) Notwithstanding the requirements of this provision, nothing herein shall prevent a covered manufacturer from lawfully terminating a covered dealership in accordance with applicable State law.

Second, as also required, we are providing you with the specific criteria which GM used to issue your dealership a wind-down agreement for the Chevrolet, Buick, GMC, Cadillac Dealer Agreement(s).

The criteria used are as follows:

- 2008 overall DPS total dealership score under 70

This is the criteria that were testified to under oath to both houses of Congress and the Bankruptcy Court. Using these criteria and adjusting for the LIFO error our score is in excess of 85 and we should never have received a wind down letter.

- 2008 overall RSI total dealership score under 70

This criterion was never mentioned, let alone testified to under oath to both houses of Congress and the Bankruptcy Court. If in fact our overall DPS total dealership score was under 70 they wouldn't need this second criteria. They have added this second criterion to make sure that their pre-determined outcome has a better chance of success. I don't see the conditions under which they have the right to add criterion that is inconsistent with prior testimony.

Nonetheless, I understand that we need to be prepared to refute this measurement.

# EXHIBIT C

PUBLIC LAW 111–117—DEC. 16, 2009          123 STAT. 3219

(i) EXECUTIVE AGENCY DEFINED.—In this section, the term "executive agency" has the meaning given the term in section 4 of the Office of Federal Procurement Policy Act (41 U.S.C. 403).

SEC. 744. (a) The adjustment in rates of basic pay for employees under the statutory pay systems that takes effect in fiscal year 2010 under section 5303 of title 5, United States Code, shall be an increase of 1.5 percent, and the overall average percentage of the adjustments taking effect in such fiscal year under sections 5304–5304a of such title 5 shall be an increase of 0.5 percent (with comparability payments to be determined and allocated among pay localities by the President). Adjustments under the preceding sentence shall also apply to civilian employees in the Department of Homeland Security and in the Department of Defense. All adjustments under this subsection shall be effective as of the first day of the first applicable pay period beginning on or after January 1, 2010.

President.
Determination.
5 USC 5303 note.

Applicability.
Effective date.

(b) Notwithstanding section 710, the adjustment in rates of basic pay for the statutory pay systems that take place in fiscal year 2010 under sections 5344 and 5348 of title 5, United States Code, shall be no less than the percentages in subsection (a) as employees in the same location whose rates of basic pay are adjusted pursuant to the statutory pay systems under section 5303 and 5304–5304a of title 5, United States Code. Prevailing rate employees at locations where there are no employees whose pay is increased pursuant to sections 5303 and 5304–5304a of such title 5 and prevailing rate employees described in section 5343(a)(5) of such title 5 shall be considered to be located in the pay locality designated as "Rest of U.S." pursuant to section 5304 of such title 5 for purposes of this subsection.

(c) Funds used to carry out this section shall be paid from appropriations, which are made to each applicable department or agency for salaries and expenses for fiscal year 2010.

SEC. 745. (a) Section 5538 of title 5, United States Code, is amended by striking subsection (b) and inserting the following:

"(b) Amounts under this section shall be payable with respect to each pay period (which would otherwise apply if the employee's civilian employment had not been interrupted)—

"(1) during which such employee is entitled to re-employment rights under chapter 43 of title 38 with respect to the position from which such employee is absent (as referred to in subsection (a)); and

"(2) for which such employee does not otherwise receive basic pay (including by taking any annual, military, or other paid leave) to which such employee is entitled by virtue of such employee's civilian employment with the Government.".

(b) The amendments made by this section shall take effect on the first day of the first applicable pay period beginning on or after the date of the enactment of this Act.

Effective date.
5 USC 5538 note.

SEC. 746. Except as expressly provided otherwise, any reference to "this Act" contained in any title other than title IV or VIII shall not apply to such title IV or VIII.

SEC. 747. (a) DEFINITIONS.—For purposes of this section the following definitions apply:

(1) The term "covered manufacturer" means—

(A) an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under

123 STAT. 3220          PUBLIC LAW 111–117—DEC. 16, 2009

title I of the Emergency Economic Stabilization Act of 2008; or

(B) an automobile manufacturer which acquired more than half of the assets of an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008.

(2) The term "covered dealership" means an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008, and such agreement was terminated, not assigned in the form existing on October 3, 2008 to another covered manufacturer in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010.

(b) A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Such continuation, reinstatement, or addition shall be limited to each brand owned and manufactured by the covered manufacturer at the time the arbitration commences, to the extent that the covered dealership had been a dealer for such brand at the time such dealer's franchise agreement was terminated, not assigned, not renewed, or not continued.

Deadline.

(c) Before the end of the 30-day period beginning on the date of the enactment of this Act, a covered manufacturer shall provide to each covered dealership related to such covered manufacturer a summary of the terms and the rights accorded under this section to a covered dealership and the specific criteria pursuant to which such dealer was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer.

Deadlines.

(d) A covered dealership may elect to pursue the right to binding arbitration with the appropriate covered manufacturer. Such election must occur within 40 days of the date of enactment. The arbitration process must commence as soon as practicable thereafter with the selection of the arbitrator and conclude with the case being submitted to the arbitrator for deliberation within 180 days of the date of enactment of this Act. The arbitrator may extend the time periods in this subsection for up to 30 days for good cause. The covered manufacturer and the covered dealership may present any relevant information during the arbitration. The arbitrator shall balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based on that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer. The factors considered by the arbitrator shall include (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009, (2) the

PUBLIC LAW 111–117—DEC. 16, 2009        123 STAT. 3221

covered manufacturer's overall business plan, (3) the covered dealership's current economic viability, (4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement, (5) the demographic and geographic characteristics of the covered dealership's market territory, (6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and (7) the length of experience of the covered dealership. The arbitrator shall issue a written determination no later than 7 business days after the arbitrator determines that case has been fully submitted. At a minimum, the written determination shall include (1) a description of the covered dealership, (2) a clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer, (3) the key facts relied upon by the arbitrator in making the determination, and (4) an explanation of how the balance of economic interests supports the arbitrator's determination.

*Determination.*
*Deadline.*

(e) The arbitrator shall be selected from the list of qualified arbitrators maintained by the Regional Office of the American Arbitration Association (AAA), in the Region where the dealership is located, by mutual agreement of the covered dealership and covered manufacturer. If agreement cannot be reached on a suitable arbitrator, the parties shall request AAA to select the arbitrator. There will be no depositions in the proceedings, and discovery shall be limited to requests for documents specific to the covered dealership. The parties shall be responsible for their own expenses, fees, and costs, and shall share equally all other costs associated with the arbitration, such as arbitrator fees, meeting room charges, and administrative costs. The arbitration shall be conducted in the State where the covered dealership is located. Parties will have the option of conducting arbitration electronically and telephonically, by mutual agreement of both parties. The arbitrator shall not award compensatory, punitive, or exemplary damages to any party. If the arbitrator finds in favor of a covered dealership, the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement.

*Deadline.*
*Contracts.*

(f) Any legally binding agreement resulting from a voluntary negotiation between a covered manufacturer and covered dealership(s) shall not be considered inconsistent with this provision and any covered dealership that is a party to such agreement shall forfeit the right to arbitration established by this provision.

(g) Notwithstanding the requirements of this provision, nothing herein shall prevent a covered manufacturer from lawfully terminating a covered dealership in accordance with applicable State law.

# EXHIBIT D

## ONLINE FILING DEMAND FOR ARBITRATION/MEDIATION FORM

**This concludes your filing.**

**Thank you for submitting your claim to the AAA.**

**Your claim confirmation number is: 002-OVX-Q9H**

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your dispute has been filed in accordance with: AAA Automobile Industry Special Binding Arbitration Program

This Claim has Been Filed For: Arbitration

Filing Fee: $1,625.00

### Additional Claim Information

Claim Amount: $0.00

Claim Description: Rescind the Wind-Down Agreement for Buick, Cadillac, Chevrolet, and GMC dated June 1, 2009, and continuation/reinstatement of the GM Dealer Sales and Service Agreement/Participation Agreement for Buick, Cadillac, Chevrolet, and GMC.

Arbitration Clause: By consent of all parties.

Hearing Locale Requested: Palmdale , CA

Contract Date: 06/01/2009

Number of Neutrals: 1

| Claimant | Representatives |
|---|---|
| **Larry Mayle-Rally Auto Group, Inc.** | |
| Type of Business: Seller | |

| | |
|---|---|
| Name: Larry Mayle | Name: Michael Sieving |
| Company Name: Rally Auto Group, Inc. | Company Name: The Law Offices of Michael Sieving |
| Address: 39012 Carriage Way | Address: 1801 Park Court Place, Suite F101 |
| Palmdale, CA 93551 | Santa Ana, CA 92701 |
| Tel#: 661-947-6000 | Tel#: 714-541-0034 |
| Fax#: 661-266-1497 | Fax#: 714-541-5988 |
| Email: lamayle@pacbell.net | Email: msieving@sievinglaw.com |
| Include in Caption: Both | |

| Respondent | Representatives |
|---|---|
| **General Motors Co.** | |
| Type of Business: Manufacturer | |

| |
|---|
| Name: Dale Sullivan |
| Company Name: General Motors Co. |
| Address: 100 Renaissance Center |
| Detroit, MI 48265 |
| Tel#: 805-373-9610 |
| Fax#: |
| Email: dale.sullivan@gm.com |
| Include in Caption: Company |

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your demand/submission for arbitration/mediation has been received on 12/21/2009 18:10 EST

# EXHIBIT E

# AMERICAN ARBITRATION ASSOCIATION

|  |  |  |
|---|---|---|
| Claimant, | ) | |
| | ) | Case Nos.: Arbitrations filed against |
| v. | ) | General Motors LLC under § 747 of the |
| | ) | Consolidated Appropriations Act of 2010, |
| | ) | Public Law No. 111-117 |
| Respondent General Motors LLC. | ) | |

## RESPONDENT GENERAL MOTORS LLC'S ANSWERING STATEMENT TO CLAIMANT'S ARBITRATION CLAIM

Subject to and without waiving any objections, respondent General Motors LLC ("GM") submits its Answering Statement in response to Claimant's demand for arbitration:

## BACKGROUND

General Motors Corporation n/k/a Motors Liquidation Company ("Old GM") filed a voluntary petition for bankruptcy on June 1, 2009. As part of the bankruptcy proceedings, the United States Bankruptcy Court for the Southern District of New York approved the sale of certain Old GM assets to a new company (n/k/a General Motors LLC) under Section 363 of the U.S. Bankruptcy Code (the "Section 363 Sale").[1] A key component of the future viability of General Motors LLC was the Bankruptcy Court's approval of the assignment and assumption of Wind-Down Agreements that provided for the gradual phase-out of one or more GM linemakes then operated at various dealerships throughout the country. Subsequent to those rulings, Congress passed § 747 of the Consolidated Appropriations Act, 2010, Public Law Number 111-117, 123 Stat. 3034 (the "Arbitration Act"). The Arbitration Act gives certain dealers as defined

---

[1] The initial debtors were Motors Liquidation Company (f/k/a General Motors Corporation), MLCS, LLC (f/k/a Saturn, LLC), MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation), and MLC of Harlem, Inc. (Chevrolet-Saturn of Harlem, Inc.). Certain bankruptcy proceedings are the subject of appeals in the United States District Court for the Southern District of New York. See, e.g., Case Nos. 1:09-cv-06818, 1:09-cv-07794, 1:09-cv-07792, 1:09-cv-07011 (S.D.N.Y.).

in the Arbitration Act the right to file an arbitration claim and seek relief regarding the narrow issue of the decision to send the dealer a Wind-Down Agreement. If the dealer is successful in prevailing on its claim in this proceeding, the arbitrator may compel GM to send a letter of intent to the dealer. If such dealer thereafter meets the requirements of the letter of intent and the other obligations under the Arbitration Act, it would be added or reinstated to GM's dealer network.

### The Dealer Network

A significant component of the Section 363 Sale included Court-approved efforts to help GM create a viable dealer network to compete in the marketplace with other leading manufacturers. Old GM's dealer network was outdated and poorly configured in numerous markets and had become a tremendous competitive disadvantage. The dealer network had developed over many decades, starting before the U.S. interstate highway system was even developed. The dealer network grew substantially during the 1950's and 1960's, a period in which Old GM held a dominant market share and there was little or no meaningful foreign competition. Subsequently, the market for new motor vehicles began to change dramatically as new foreign competition entered the market in a significant way. Import brands such as Toyota, Honda, Nissan, Hyundai and other manufacturers with lower cost structures and legacy benefit obligations began entering the market in increasing numbers.

These new manufacturers captured an increasing share of the automotive market over time and built dealer networks with larger, up-to-date facilities in some of the best locations in the country. As a result, Old GM faced increasing financial pressures as its market share declined in the face of this increasing foreign competition. Old GM's U.S. market share, for example, fell from approximately 45% in 1980 to 22% in 2008. The company had been focused on improving its dealer network for many years and had spent considerable resources on dealer network issues. Old GM, however, was unable to restructure its dealer network to keep pace

- 2 -

with these changes. This resulted in an excess of dealerships in many markets, often in poor locations with outdated facilities and often with little or no significant investment capital. Many Old GM dealers had sales per store, also known as "throughput," well below expected or competitive levels and had marginal, if any, returns on investment, making it impossible or impractical for them to invest in their facilities or provide additional amenities to their customers. Historically, many foreign manufacturers achieved substantially more throughput than Chevrolet, Buick, Cadillac, and GMC Truck dealers. For example, for calendar year 2008, reported sales included:

| U.S. Car and Light-Truck Sales per Franchise, Total 2008 (totals for selected brands) | |
| --- | --- |
| Toyota division (includes Scion) | 1,589 |
| Honda division | 1,253 |
| Lexus | 1,158 |
| Nissan division | 785 |
| BMW division | 737 |
| Mercedes-Benz | 651 |
| Hyundai division | 509 |
| Chevrolet | 459 |
| GMC | 167 |
| Cadillac | 112 |
| Pontiac | 101 |
| Buick | 52 |

(Supplement to Automotive News, May 25, 2009, p. 2.)

Old GM's inefficient dealer network also adversely impacted the company's viability. Because of the dealers' insufficient throughput and only marginal network-wide profitability in many instances, Old GM was forced to expend substantial funding on dealer-related subsidies for,

- 3 -

among other things, wholesale floor plan support, margin support, and other programs or funds

paid directly to dealers. In addition to the staggering costs associated with those dealer support

programs, Old GM was forced to spend hundreds of millions of dollars in additional structural

costs related to maintaining the large dealer network, including channel network alignment

payments, sales and service consultant funds, dealer website funding, dealer IT systems and

support costs, dealer employee training programs, and other programs. On top of those costs,

Old GM also lost substantial sales from poorly performing dealers who did not meet customer

expectations, provided poor customer service, provided poor overall customer satisfaction

(thereby alienating these owners as future customers), or had other deficiencies such as

substandard facilities. In addition to these historic challenges, several major economic events

during 2008 and 2009, including an increase in gasoline prices, a worldwide recession, and other

competitive forces, led to unprecedented financial distress for Old GM, resulting in Old GM's

Chapter 11 filing.

### Economic Downturn And Liquidity Crisis

As a result of the economic crisis, in November 2008 Old GM was compelled to seek

financial assistance from the U.S. government. In response to communications with

Congressional leaders, on December 2, 2008, Old GM submitted a proposed viability plan (the

"First Viability Plan") to Congress that addressed the efforts it intended to take to help the

company rebound. Key elements of the First Viability Plan included a proposed reduction in

brands, nameplates, and retail outlets to focus available resources and growth strategies on Old

GM's more profitable operations. Economic conditions continued to worsen globally, however,

further reducing the company's sales volume, revenue, and cash flow.

After December 2, 2008, the U.S. Treasury Department and Old GM entered into

negotiations for federal loans, reaching agreement on December 31, 2008. The agreement

- 4 -

provided Old GM with loans to sustain operations through the First Quarter of 2009, providing

necessary liquidity support while Old GM finalized its viability plans. In consideration for this

temporary loan facility, Old GM was required to submit to the U.S. Treasury a detailed

restructuring plan for the period 2009-2014 that demonstrated long-term viability, specifically

including a plan to rationalize its outdated dealer network.

On February 17, 2009, Old GM submitted another viability plan to the U.S. Treasury

Department (the "Second Viability Plan"), which sought to transform the company's business in

the U.S. by concentrating the company's resources on Chevrolet, Cadillac, Buick, and GMC,

phasing out other brands (e.g., HUMMER, Saab, and Saturn), and transforming Pontiac into a

niche brand. The dealer network planning was one of many steps that Old GM proposed taking

to transform the business in an effort to save other jobs, grow revenues, and preserve retirement

benefits, among other things. The Second Viability Plan proposed streamlining the company's

retail distribution channel to achieve a stronger, more effective dealer network by gradual

reductions in the dealer network through 2014. In developing this plan, Old GM spent

considerable time analyzing the market and the dealers in its network to determine the best way

to achieve these goals. This focus on the dealer network was not new.

On March 30, 2009, President Obama announced that the Second Viability Plan was not

satisfactory and did not justify a substantial new investment of taxpayer dollars. The

Administration's designee announced that GM's plans did not go far enough in a number of

business plans, including addressing Old GM's dealer network. The Administration's designee

determined, for example, that Old GM "is currently burdened with underperforming brands,

nameplates and an excess of dealers. The plan does not act aggressively enough to curb these

- 5 -

problems." (Auto Task Force, Determination of Viability Summary, General Motors

Corporation, March 30, 2009, p. 1.) The Administration's designee further stated:

> In short, while the Company has made meaningful progress in its
> turnaround plan over the last few years, the progress has been far
> too slow, allowing the Company to continue to lag the best-in-class
> competitors. As a result, the President's Designee has found that
> General Motors' plan is not viable as it is currently structured.
> However, because of GM's scale, franchise, and progress to date,
> we believe that there could be a viable business within GM if the
> Company and its stakeholders engaged in a substantially more
> aggressive restructuring plan.

(Id.) The same report stated:

> GM has been successfully pruning unprofitable or
> underperforming dealers for several years. However, its current
> pace will leave it with too many such dealers for a long period of
> time while requiring significant closure costs that its competitors
> will not incur. These underperforming dealers create a drag on the
> overall brand equity of GM and hurt the prospects of the many
> stronger dealers who could help GM drive incremental sales.

(Id., p. 4.)

On March 30, 2009, the U.S. government set a deadline of June 1, 2009, for Old GM to

demonstrate that its viability plan would fundamentally transform the company's operations into

a profitable and competitive American car company. The President indicated that the U.S.

Treasury would extend additional working capital for another 60 days to enable Old GM to

continue operations and, as Old GM's largest secured creditor, would negotiate with Old GM to

develop and implement a more aggressive and comprehensive viability plan that would answer

the question as to whether the company had a "credible model for how not only to survive, but to

succeed" in the competitive global market. (President Obama, Remarks on the American

Automotive Industry, March 30, 2009.)

**GM's Process For Making Dealer Decisions And Bankruptcy Proceedings**

As a result of an ongoing deterioration in the market and other factors, Old GM

ultimately filed for bankruptcy on June 1, 2009. In the bankruptcy proceedings, Old GM sought

approval to undertake and complete the Section 363 Sale to sell certain assets to a new company

under terms and conditions approved by the Bankruptcy Court. The long-term viability and

success of the purchasing company in the Section 363 Sale was dependent on, among other key

parts of the business, modernizing the dealer network to allow the new company to compete

more effectively with its competitors in the automotive industry.

In reviewing each of the dealers in its network, Old GM used an objective process to

determine which dealers would be selected for complete Wind-Down Agreements. As set forth

in disclosures made available to the dealers, very small dealers with new GM vehicle sales under

50 sales per year and very poorly performing dealers in terms of dealership operations or other

criteria were selected. Factors considered as part of this process included: (1) sales effectiveness;

(2) customer satisfaction; (3) dealer capitalization; and (4) dealer profitability. In this process,

GM used an objective, metric-based approach based on measures contained in the Dealer Sales

and Service Agreement, which the dealers are familiar with and which utilize data relied upon

throughout the motor vehicle industry. In addition, Old GM reviewed other aspects of the

dealer's operations, location, and facilities. In certain circumstances, including situations

involving "partial" wind-downs, dealer network factors such as dealer throughput and network

viability also came into play. The company spent considerable time analyzing and reviewing the

operations of each dealer in its network as part of this process.

A significant reduction in the number of dealer rooftops was key to allowing GM to

compete more effectively in the market. The parties also determined that these reductions would

allow the new company to begin to systematically reduce dealer support programs and other

- 7 -

structural costs. In addition to the substantial cost savings that would be realized from the reduction in dealerships, the contemplated reductions in the number of dealerships would bring the purchaser's dealership footprint closer in line with major competitors in markets throughout the country. The remaining dealers could enjoy improved throughput, enabling them to re-invest capital in their dealerships, attract new investments and personnel, and compete more effectively in facilities, locations, staff, amenities, and other criteria that consumers have come to expect in today's marketplace.

It was recognized that the dealer reductions were part and parcel of a difficult and painful bankruptcy. Indeed, many of the parties adversely affected by the bankruptcy process were employees, retirees, stockholders, bondholders, and suppliers, among others. All sacrificed substantially in order to try to make GM viable for the long run. To temper these effects, the Section 363 Sale allowed an orderly wind-down rather than an abrupt cutoff of those dealerships that were not being retained as was permissible under the Bankruptcy Code. Old GM assumed and assigned Wind-Down Agreements with most of the dealers that would be exiting their markets under Court orders approved in the bankruptcy proceedings. In his Decision overruling certain objections, Judge Gerber specifically endorsed the Wind-Down Agreements:

> All concerned with GM's future knew that GM had to slim down and improve its dealer network, and that this required modifying dealer agreements before they were assumed and assigned—a process that led to the Participation Agreements. Similarly, as an alternative to simply leaving dealers who would otherwise be terminated in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other rights – a process that led to the Deferred Termination Agreements [Wind-Down Agreements]. Those offers secured widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.
>
> The alternative, in each case, was rejection. Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights. But here GM was not

- 8 -

> obligated, as a matter of law, to choose between leaving its dealer
> contracts unmodified or rejecting them. It could, it if wished, offer
> its contract counterparties deals that would more appropriately
> meet each side's needs and concerns, without fear that such deals
> would be subject to collateral attack by reason of assertions of
> coercion.

(Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition

Holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry

into UAW Retiree Settlement Agreement, p. 75-76, No. 09-50026, Bankr. S.D.N.Y., July 5,

2009, see also related Errata Order July 6, 2009.)

Under the Wind-Down Agreements, the nonretained dealers received financial assistance

and were permitted to continue certain operations subject to various terms and conditions until

October 2010 when their dealer agreements would otherwise expire at the end of their terms.

Although the dealer agreements could simply have been rejected outright in the bankruptcy

proceedings, as Judge Gerber noted, these Court-approved agreements allowed the individual

dealers time and assistance in transitioning out of the business. Put simply, but for the wind

down program and the consideration offered, the Claimants' applicable dealer agreements that

were made part of the wind down program would have already ended.

### Congressional Action

After the Section 363 Sale was approved by Bankruptcy Court order and the closing on

the sale was completed, the new company, now known as General Motors LLC, began

operations under the terms and conditions approved by the Court. In response to requests by the

outgoing dealers, however, Congress passed the Arbitration Act. The Arbitration Act does not

change the Wind-Down Agreements in any way and they remain in full force and effect. The

Arbitration Act gives eligible dealers a limited right to seek to have GM issue a letter of intent to

add or reinstate them to GM's dealer network under the criteria provided for in the Act. The

COI-1434187v8

Claimant has demanded arbitration under that statute seeking the relief provided by the statute and therefore carries the burden of proof in this proceeding. GM contends that Claimant's claims and requests for relief lack merit and that Claimant's claims should be rejected. GM denies that the Claimant is entitled to any requested relief under applicable law and, subject to the presentation of evidence at any hearing held in this matter, otherwise denies Claimant's claims.

By filing this Answering Statement and participating in this proceeding, GM does not waive any objections it may have to this proceeding. The sole and exclusive authority for this proceeding is the Arbitration Act, and GM reserves the right to object to any requests, allegations, or claims outside the Arbitration Act. Depending on the Claimant's claims at the hearing, GM reserves the right to raise any and all affirmative defenses under applicable law and reserves the right to contest the jurisdiction of the arbitrator, the arbitrability of any claim, or the applicability of the AAA's rules to this proceeding. GM also reserves the right to object to the application of any of the AAA's Commercial Arbitration Rules where appropriate or where such rules are otherwise inconsistent with the provisions or purposes of the Arbitration Act. GM will address these issues in accordance with any schedule for this case.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims fail to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

2.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to object to the jurisdiction of the arbitrator or the statutory authority to adjudicate claims in this proceeding or the arbitrability of any claims.

## THIRD AFFIRMATIVE DEFENSE

3.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by principles of preclusion, collateral estoppel, and/or res judicata.

## FOURTH AFFIRMATIVE DEFENSE

4.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by the principles of waiver and/or estoppel.

## FIFTH AFFIRMATIVE DEFENSE

5.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to contest Claimant's standing or status as the real party in interest, including but not limited to Claimant's standing to proceed or otherwise contest any allegation that Claimant meets the requirements of the Arbitration Act.

## SIXTH AFFIRMATIVE DEFENSE

6.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by the applicable limitations period set forth in the statute.

COI-1434187v8

### SEVENTH AFFIRMATIVE DEFENSE

7.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by prior written agreements.

### EIGHTH AFFIRMATIVE DEFENSE

8.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by the parol evidence rule and/or the Statute of Frauds.

### NINTH AFFIRMATIVE DEFENSE

9.      Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by the doctrine of mootness.

### TENTH AFFIRMATIVE DEFENSE

10.     Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by payment and release.

### ELEVENTH AFFIRMATIVE DEFENSE

11.     Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by accord and satisfaction.

### TWELFTH AFFIRMATIVE DEFENSE

12.     Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims fail for lack of consideration.

COI-1434187v8

## THIRTEENTH AFFIRMATIVE DEFENSE

13.    GM reserves the right to raise any additional affirmative defenses that may be available under applicable law depending on Claimant's claims and/or the evidence introduced at the arbitration hearing.

On behalf of Assigned Counsel in Individual Arbitrations[2]

Jeffrey J. Jones
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215-2673
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198

---

[2] Assigned counsel from the law firms listed in this Answering Statement have already entered appearances or will be entering appearances in each of the arbitrations filed.  This Answering Statement shall be deemed filed by assigned counsel in each of the matters in which they are appearing.

COI-1434187v8

## OTHER ASSIGNED COUNSEL

James C. McGrath
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110-1726

Joseph E. O'Neil
Lavin O'Neil Ricci Cedrone & DiSipio
190 North Independence
Mall West, Suite 500
Philadelphia, PA 19106

A. Erin Dwyer
Figari & Davenport, LLP
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202

David G. Radlauer
Jones Walker
201 St. Charles Avenue
New Orleans, LA 70170-5100

Mark S. Lillie
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Kenneth K. Skogg
Lowe, Fell & Skogg LLC
Republic Plaza
370 Seventeenth Street
Suite 4900
Denver, CO 80202

Gregory Oxford
Isaacs, Clouse, Crose & Oxford LLP
21515 Hawthorne Blvd.
Suite 950
Torrance, CA 90503

Lawrence J. Murphy
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226

Dwight J Davis
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA 30309

S. Thomas Wienner
Wienner & Gould, P.C.
950 W. University Dr., Ste. 350
Rochester, MI 48307

Lloyd E Ferguson
Strasburger
600 Congress Avenue Suite 1600
Austin , TX 78701.2974

Kyle H. Dreyer
Hartline, Dacus, Barger, Dreyer & Kern, LLP
6688 N. Central Expy.
Suite 1000
Dallas, TX 75206

Daniel J. LaCombe
Barris, Sott, Denn & Driker, P.L.L.C.
211 W Fort St.
15th Floor
Detroit, MI 48226-3202

Victor J. Torres
Williams Acosta PLLC
535 Griswold
Suite 1000
Detroit, MI 48226

Michael P. Cooney
Dykema
400 Renaissance Center
Detroit, Michigan 48243

Jeffrey A. Lipps
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215

- 14 -

## CERTIFICATE OF SERVICE

Pursuant to an agreement with the American Arbitration Association, this Answering Statement is being submitted to the American Arbitration Association for filing in all of the pending arbitration cases filed against General Motors LLC under § 747 of the Consolidated Appropriations Act of 2010, Public Law No. 111-117. The American Arbitration Association has agreed to file the Answering Statement in all of the pending matters filed against GM and forward the Answering Statement to all Claimants or their representatives.

On behalf of Assigned Counsel

- 15 -

# EXHIBIT F

**AMERICAN ARBITRATION ASSOCIATION**
Automobile Industry Special Binding Arbitration Program

---

| | |
|---|---|
| In the Matter of the Arbitration of | ) |
| | ) |
| Rally Auto Group, Inc., | ) |
| | ) |
| Claimant, | )   Case No.: 72 532 01370 09 JMLE |
| | ) |
| vs. | ) |
| | ) |
| General Motors, LLC, | ) |
| | ) |
| Respondent. | ) |

---

## SCHEDULING ORDER NO. 1

A telephonic preliminary hearing among the undersigned arbitrator and counsel for the parties was held in this matter on March 25, 2010. Michael Sieving, Esq., appeared for Claimant Rally Auto Group, Inc., ("Claimant" or "Dealership") and Gregory Oxford, Esq., appeared for Respondent General Motors, LLC ("GM" or "Manufacturer"). Based upon the discussion at the preliminary hearing, the following order is made respecting the conduct of this arbitration:

1. **Applicable Statute and Rules.** This arbitration is being conducted pursuant to Section 747 of the Consolidated Appropriations Act of 2010 and the Commercial Arbitration Rules of the American Arbitration Association.

2. **Witness Disclosures:** The Dealership and the Manufacturer shall each serve and file a disclosure of all witnesses reasonably expected to be called on or before April 30, 2010. Disclosure of witnesses shall include:

    - The full name of each witness,

    - A short summary of anticipated testimony,

    - Copies of any expert reports,

    - A written C.V. of all experts

3. **Exhibits:** On or before April 30, 2010, the parties shall exchange copies of all exhibits to be offered, an all schedules, summaries, diagrams and charts to be considered by the arbitrator in making the award determination. Each proposed exhibit shall be pre-marked for identification.

The parties shall at the same time submit one complete set of their respective exhibits to the arbitrator through the AAA.

4. **Initial Briefs:** On or before April 30, 2010, each party will submit Initial Briefs setting forth, at a minimum, the party's position and the supporting arguments and evidence or authorities on the seven factors required in Section 747, along with these other specific issues:

- the covered dealership's profitability in 2006, 2007, 2008, and 2009;

- the covered manufacturer's overall business plan;

- the covered dealership's current economic viability;

- the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

- the demographic and geographic characteristics of the covered dealership's market territory;

- the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement;

- the length of experience of the covered dealership;

- how the economic interests of the dealership, the manufacturer and the public are supported by the above factors;

- any additional facts to be considered by the arbitrator in making the termination;

- specifically whether the covered dealership is to be renewed, continued, assigned or assumed by the covered manufacturer.

Where the parties have jointly stipulated to the same data or documents in the Initial Briefs, the section or data shall be so marked. For instance, if the parties agree on the profitability data, the demographic and geographic characteristics of the territory, the length of experience, etc., these sections and this information shall be marked as "Jointly Stipulated."

5. **Reply Briefs:** Pre-hearing reply briefs may be submitted to the arbitrator by each party, after receipt of the Initial Briefs, but not later than May 7, 2010. Any reply briefs will be limited to ten (10) pages.

6. **Arbitrator Questions:** On or before May 10, 2010, the arbitrator may submit written questions to the parties that the arbitrator wants to have answered as part of the final hearing.

7.    **Hearings:** The hearings will be held on May 13 and 14, 2010, at the courtroom facility of Chapman University. Claimant will proceed first with its case, followed by Respondent. The parties shall provide exhibits notebooks for use at the hearing including copies for the arbitrator, the witness and each counsel. Claimant shall have exhibits Nos. 1 through 199 and Respondent exhibits Nos. 200 through 399.

8.    **Hearing Briefs or Submissions:** The parties may submit post-hearing briefs and must submit any documents requested by the arbitrator not later than May 24, 2010. The receipt of either post-hearing briefs or post-hearing documents requested by the arbitrator will be considered the final submission of the case to the arbitrator.

9.    **Written Determination of the Arbitrator:** On or before May 31, 2010, the arbitrator will issue a determination, to include:

- A description of the covered dealership,

- A clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer,

- The key facts relied upon by the arbitrator in making the determination,

- An explanation of how the balance of economic interests supports the arbitrator's determination.

10.    **Delivery of the Written Determination** of the Arbitrator will be made by the American Arbitration Association by electronic transmission and by regular or overnight mail.

11.    **Discovery.** The parties are presently engaged in the exchange of documents pursuant to requests for production. The parties have agreed that April 15, 2010 is a target date for completion of document production. If the parties disagree on the scope or adequacy of production by the other party, they shall confer in an effort to resolve this disagreement. If the disagreement is not resolve after this conference, either party may submit a discovery dispute to the arbitrator for resolution. Application for discovery orders may be made by email, with the other party given a reasonable opportunity to respond. The arbitrator will then decide the issue on the written submissions, unless either party requests a telephonic hearing.

12.    **Direct Submissions to Arbitrator.** The parties may submit briefs and similar documents directly to the arbitrator by email, with a copies to opposing counsel and the AAA Case Manager. The relevant email addresses are: rmainland@fulbright.com; msleving@slevinglaw.com; goxford@icclawfirm.com.

No changes may be made to this Order without the express consent of the Arbitrator and the AAA. The parties have acknowledged that the arbitrator and the parties must work together in order to make the above schedule possible.

Dated: March 25, 2010

_Richard R. Mainland_
Richard R. Mainland, Arbitrator

# EXHIBIT G

Commercial Arbitration Rules and Mediation Procedures

# Commercial Arbitration Rules

### R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs.

Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes

20

Commercial Arbitration Rules and Mediation Procedures

R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

*Commercial Arbitration Rules and Mediation Procedures*

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

## R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

## R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

## R-11. Appointment from National Roster

(a) If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c) Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

edures

lirects that documents or
itrator after the hearing,
I be filed with the AAA for
ties shall be afforded an
to such documents or other


n inspection or investigation
ect the AAA to so advise the
d time and the AAA shall
may be present at such an
at one or all parties are not
.he arbitrator shall make an
ord them an opportunity to



rim measures he or she
elief and measures for
erty and disposition of


>rm of an interim award,
/ for the costs of such


sed by a party to a judicial
atible with the agreement
irbitrate.

## R-35. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

## R-36. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

## R-37. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

35

on Procedures

nay include:

om such date as the arbitrator(s)
d

if all parties have requested such
l by law or their arbitration

ring the course of the arbitration
oitrator may set forth the terms of
" A consent award must include
ncluding administrative fees and
and expenses.

es

elivery of the award the placing of
the mail addressed to the parties or
own addresses, personal or electron-
; of the award in any other manner

ıl of an award, any party, upon
quest the arbitrator, through the
raphical, or computational errors
empowered to redetermine the
d. The other parties shall be given
The arbitrator shall dispose of the
nittal by the AAA to the arbitrator of
eto.

### R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

### R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

### R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

39