# EXHIBIT H

# AMERICAN ARBITRATION ASSOCIATION
## AUTOMOBILE INDUSTRY SPECIAL BINDING ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Re: 72 532 01370 09
    Rally Auto Group, Inc.
    VS
    General Motors, LLC

## Written Determination of Arbitrator

    I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act"), enacted December 16, 2009, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby make my Written Determination pursuant to the Act.

### Background

    The Act affords a "covered dealership" (as defined in Section 747(a)(2)) the right to challenge by binding arbitration the decision of a "covered manufacturer" (as defined in Section 747(a)(1)(A) and (B)) to terminate, or not to assign, renew or continue, the covered dealership's franchise agreement. This case was filed in accordance with the Act's provisions and I held hearings and heard testimony on May 13, 14 and 17, 2010. The parties submitted closing briefs on May 28, 2010, and the arbitrator determined that the case had been fully submitted as of May 28, 2010. Set forth below is my "written determination" (as provided for in 747(d) of the Act) of the issue to be decided under the Act, namely "whether or not the covered dealership should be added to the dealer network of the covered manufacturer." This Determination is being issued within seven (7) business days after the case was fully submitted.

## I.   The Parties

    This proceeding concerns the automobile dealership known as Rally Auto Group located at 39012 Carriage Way Palmdale, California 93551 ("Rally"). Rally is a "covered dealership" as defined in Section 747(a)(2).

    The "covered manufacturer" for purposes of this arbitration is General Motors, LLC, which is the current owner of the General Motors automobile manufacturing business. For convenience, the terms "General Motors" and "GM" is refers to both General Motors, LLC and General Motors Corporation.

## II.   Determination

Rally, the covered dealership described above in Section I, shall be added to the dealer network of General Motors, LLC, as to the Cadillac, Buick and GMC brands, in the manner provided for by the Act and in accordance with the terms and conditions of the Act.

Rally, the covered dealership described above in Section I, shall not be added to the dealer network of General Motors, LLC, with respect to the Chevrolet brand.

## III.   Key Facts Relied on by the Arbitrator in Making the Determination

In accordance with Section 747, I considered the following factors:

1.  The covered dealership's profitability in 2006, 2007, 2008 and 2009;

2.  The covered manufacturer's overall business plan;

3.  The covered dealership's current economic viability;

4.  The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

5.  The demographic and geographic characteristics of the covered dealership's market territory;

6.  The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and

7.  The length of experience of the covered dealership.

In making the determination, I relied upon the following key facts:

General Motors' overall business plan includes reducing the total number of GM dealers nationwide, for the purpose of increasing the sales volumes ("throughput"), and thus the profitability, of the remaining GM dealers. The plan anticipates that this increase in dealer profitability will enable dealers to invest in better facilities, provide better customer service and, in general, compete more effectively with non-GM brands. General Motors' plan for the Palmdale area is to replace Rally as the Chevrolet dealer with a dealership owned and operated by Lou Gonzalez, operator of a successful Saturn dealership in Palmdale, which is being wound down with the elimination by GM of the

Saturn brand. GM plans to remove the Cadillac, Buick and GMC brands from the Palmdale GM dealership.

Rally has many years of experience as a General Motors dealer in Palmdale, California, and has been operated by its current owner/operator, Larry Mayle, for around 20 years. It currently sells the Cadillac, Buick, GMC and Chevrolet brands, from two facilities. Rally's facilities are adequate, and it is currently economically viable. It has sufficient working capital, availability of inventory financing and adequate staffing. During the years 2006 through 2009 Rally's operations were profitable. (See below for further discussion of 2008 profitability).

The Dealer Sales and Service Agreement between Rally and General Motors, which is the applicable franchise agreement, establishes a variety of performance objectives. (Ex. 1) In Article 5.1(f) of the agreement Rally agreed "to comply with the retail sales standards established by General Motors, as amended from time to time." Ex. 1, p. 6. Article 9 of the agreement ("Review of Dealer's Sales Performance") provides that "Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100." Ex. 1, p. 17. The Retail Sales Index ("RSI") is the ratio of a dealer's reported retail sales to the sales necessary to equal the state average expected market share for the brand in question in the dealer's Area of Primary Responsibility ("APR"), adjusting for the popularity of various types and sizes of vehicles in the APR.

Rally did not achieve an RSI of 100 for any of its Chevrolet, Cadillac, Buick and GMC brands for the years 2006 through 2008, except for an RSI of 102.82 for Cadillac in 2008. These RSI scores ranked Rally low in sales performance as compared with other General Motors dealers. Rally's RSI has been particularly low for the Chevrolet brand. For Chevrolet its RSI in 2006 was 53.60, in 2007 was 50.36, and in 2008 was 53.07.

During 2006-2008, and in prior years, General Motors regularly communicated to Rally that General Motors considered Rally's levels of sales, particularly Chevrolet, to be inadequate and in need of substantial improvement. (Exs. 88, 201-203). After Rally received a "wind down" letter from General Motors in May 2009,[1] its sales performance improved, but that performance, under threat of termination, may not be as indicative of future performance as is Rally's historical sales record.

The demographic factors in Rally's area of principal responsibility ("APR") include high levels of unemployment, a working population that largely commutes "down the hill" to the greater Los Angeles area, with long commuting times. Rally contends that

---

[1]    In its "wind down" letter to Rally dated May 14, 2009, GM advised Rally that it did not expect its contractual relationship with Rally to continue past October 2010. The wind down letter was followed by a Wind Down Agreement, allowing Rally to operate its GM dealership through October 31, 2010, but imposing certain restrictions, including inability of Rally to purchase new GM vehicles from GM.

these factors make the state-wide RSI scores misleading as applied to Rally. However, the comparatively high sales levels and RSI scores of the General Motors dealership in Victorville, California, a community comparable in many respects to Palmdale, tends to show that the RSI scores, based on General Motors' state-wide market share for various vehicle categories, provide a realistic measure for dealer sales performance in the Palmdale market. The Palmdale Saturn dealership, operated by Lou Gonzalez, also has consistently achieved high RSI scores, again confirming that General Motors' RSI measure is applicable in Rally's market.

One of the criteria used by GM in deciding to terminate or not assign a dealer's franchise agreement is the Dealer Performance Score ("DPS"). This score measures the dealer's performance in four categories, which are weighted as follows:

| | |
|---|---|
| Sales | 50% |
| Customer Satisfaction Index | 30% |
| Capitalization | 10% |
| Profitability | 10% |

GM treats a score of 100 as average, and a score below 70 as poor performance. GM publicly stated that "Dealers with a score less than 70 received a wind-down agreement." (Ex. 26).

For 2008, GM calculated a DPS score for Rally of 55.27. (Ex. 31). The evidence showed, however, that this score depended on using an estimated LIFO adjustment to Rally's profits for 2008, rather than pre-LIFO profits or the actual, not estimated, LIFO profits. Using the latter two profit figures, Rally's DPS score was approximately 85.

## IV.  Balance of Economic Interests

The balance of economic interests of the covered dealership, of the covered manufacturer and of the public supports this determination for the reasons set forth below.

General Motors' decision to replace Rally as a Chevrolet dealer with a dealership operated by GM's former Saturn dealer in the Palmdale market is consistent with General Motors' plan to develop a stronger dealer network. Although there is no assurance of the new dealers' success, there is a reasonable basis, based on prior performance, for concluding that General Motors will obtain significantly stronger representation in the Palmdale area through that dealer than through Rally. The public will benefit by having a more active and aggressive Chevrolet sales effort in that market. In addition, there is some basis in Rally's customer satisfaction scores to conclude that customer service from the new Chevrolet dealer will be improved.

In the arbitrator's view, the balance of economic interests supports a determination that Rally should be able to retain its dealership for the Cadillac, Buick and GMC brands. Rally has a long history as a GM dealer, with millions of dollars invested in its business and facilities. Its sales performance has been somewhat better for these

brands than for the Chevrolet brand. The public will benefit by continuing to be able to purchase these brands in Palmdale, without having to drive at least 37 miles to the nearest dealer selling these brands. Because General Motors has decided to retain one GM dealer in the Palmdale area, it will likely not achieve the cost savings in that area that it expects to achieve by large-scale reductions in the number of its dealers. The evidence did not show a benefit to either GM or the public by eliminating these brands from the Palmdale market. Also, the evidence showed that there is some uncertainty about the physical capacity of the new Chevrolet dealer to provide parts and service for the full range of GM brands, and the public will benefit by the continued availability of parts and service from Rally.

## VI. Costs

In accordance with the statute, the administrative fees and expenses, and the arbitrator's fees and expenses, shall be borne equally.

This Award is in full settlement of all claims submitted to this arbitration.

Date: June 8, 2010.

Richard Mainland, Arbitrator

# EXHIBIT I

1    **FERRUZZO & FERRUZZO, LLP**
     GREGORY J. FERRUZZO, SBN 165782
2        A Limited Liability Partnership,
         including Professional Corporations
3          3737 Birch Street, Suite 400
          Newport Beach, California 92660
4           Telephone (949) 608-6900

5    **MORGANSTERN, MAC ADAMS & DE VITO CO., L.P.A.**
     CHRISTOPHER M. DE VITO, OH BAR 47118
6    623 West Stain Clair Avenue
     Cleveland, Ohio 44113
7    Telephone 9216) 687-1212
     **Attorneys for Petitioner, Rally Auto Group, Inc.**

8                 IN THE UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   RALLY AUTO GROUP, INC.                )   Case No.
                                           )
12          Petitioner-Covered Dealership, )   **PETITION TO MODIFY OR,**
                                           )   **ALTERNATIVELY, VACATE AN**
13   v.                                    )   **ARBITRATION AWARD**
                                           )
14   GENERAL MOTORS, LLC                   )   **(Hearing and Oral Argument**
                                           )   **Requested)**
15          Respondent-Covered Manufacturer.)
                                           )
16   ────────────────────────────────────

17        The Petitioner-Covered Dealership Rally Auto Group, Inc. hereby submits this Petition

18   to modify or, alternatively, to vacate a June 8, 2010 American Arbitration Association Award

19   ("Award") involving Respondent-Covered Manufacturer, General Motors, LLC.

20

21

22

23

24

25

26

27

28

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 608-6900

# TABLE OF CONTENTS

Page

1. PARTIES ............................................................... -1-

2. JURISDICTION .......................................................... -1-

3. VENUE ................................................................ -1-

4. BACKGROUND ........................................................... -1-

   A.  Section 747 of the Consolidated Appropriations Act of 2010 ............. -1-

   B.  Procedural and Factual History .................................... -4-
      Award in Favor of Rally ......................................... -4-
      Award Exceeds Powers and Scope of Authority ...................... -5-
      Award on Matters Not Submitted .................................. -5-
      Award's Remedy Beyond Authority Because Involves Non-Party ........ -6-
      GM Agreed to Allow Original Dealer to Represent Needed Market ....... -6-
      Judicial Estoppel ............................................... -7-

5. STATEMENT OF LAW ..................................................... -8-

   A.  Modifying or Correcting Arbitration Awards ......................... -8-

   B.  Vacating Arbitration Awards ...................................... -10-
      Misconduct and Misbehavior, Section 10(a)(3) ..................... -10-
      Exceeded and Imperfectly Executed Powers, Section 10(a)(4) .......... -11-
      Corruption, Fraud, and Undue Means by GM, Section 10(a)(1) .......... -11-
      GM Promised to Allow the Original Dealer to Continue in a Needed
      Market ........................................................ -12-
      GM Represented an "Objective" DPS Standard to Bankrupty Court and
      Congress ...................................................... -12-

6. ARGUMENT OF LAW AND FACT ............................................. -13-

7. CONCLUSION ........................................................... -16-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Greer-Burger v. Temesi,*
   116 Ohio St. 3de 324, 879 N.E. 2d 174, 2007-Ohio-6442 .................. 7, 12

*Hall Street Associates, LLC v. Mattel, Inc.,*
   552 U.S. 576, 585, 128 S.Ct. 1396, 1404 (2008) ...................... 1, 10

*International Brotherhood of Electrical Workers, Local No. 265 v.*
   *O.K. Electric Co.,* 793 F.2d 214 (8th Cir. 1986) ...................... 11

*Kyocera Corporation v. Prudential-Bache Trade Services*
   (2003) 34 F.3d 987 at 997-998. ...................................... 13

*Madison Hotel v. Hotel and Restaurant Employees, Local 25,*
   *AFL-CIO,* 128 F.3d 743, 749 (C.A. D.C. 1997) ...................... 8

*Matteson v. Rider Sys., Inc.,* 99 F3d 108, 113 (C.A. 3 1996) ........... 8

*Metromedia Energy, Inc. v. Ensearch Energy Services,*
   409 F.3d 574, 579 (C.A. 3 205) ...................................... 8

*Michigan Family Resources, Inc. v. Service Employees*
   *International Union Local 517M,* 475 F.3d 746, 760 (C.A. 6 2007) ............. 8

*NCR Corporation v. SAC-CO., Inc.,* 43 F.3d 1076, 1080 (6th Cir. 1995) .......... 11, 14

*Off Shore Marine Towing v. MR23,* 412 F.3d 1254 (2005) ...................... 9, 15

*Orion Shipping and Trading Company v. Eastern States*
   *Petroleum Corp. of Panama,* 312 F.2d 299 (2d Cir.), *cert. denied,*
   373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed. 2d 705 (1963) .................. 11

*Santa Fe Pacific Corporation v. Centra States, Southwest*
   *Areas Pension Fund,* 22 F.3d 725 (C.A. 7 1994) .................... 8

*Schoendwe Corporation v. Lucent Technologies, Inc.,*
   442 F. 3d 737, 731 (3rd Cir. 2006) ................................ 8, 14

*Stark v. Sandberg, Phoenix & von Gontard, P.C.,*
   381 F. 3d 793, 799 (8th Cir. 2004) ................................ 8

*Totem Marine Tug and Barge, Inc. v.*
   *North American Towing, Inc.,* 607 F.2d 649 (1979) .................. 9

**Statutes**                                                              **Page(s)**

9 U.S.C. § 1 ..................................................... 1, 8-10, 13

9 U.S.C. § 9 ..................................................... 8

9 U.S.C. § 10 ..................................................... 1, 8, 10, 11, 13

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1  9 U.S.C. § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9

2  27 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

4  **Other Authorities**                                                              **Page(s)**

5  Congressional Record-House, H14477 (December 10, 2009) . . . . . . . . . . . . . . . . . . . . . 3, 6

6  Consolidated Appropriations Act of 2010 (Public Law 111-117) . . . . . . . 1-4, 6, 9-11, 14-15

7  House of Representatives, Subcommittee on Commercial and Administrative
   Law, Committee of the Judiciary, *"Ramifications of Auto Industry*
8  *Bankruptcies (Part III),"* Serial No. 111-55, p. 1 (July 22, 2009) . . . . . . . . . . . . . . . . . . . 2

9  July 19, 2009, the Office of the Special Inspector General for TARP confirmed
   Congress' concerns in a report entitled, *"Factors Effecting the Decisions of*
10  *General Motors and Chrysler to Reduce Their Dealership Networks* . . . . . . . . . . . . . . 2, 3

11  June 10, 2009, Senate Banking Committee-Full Committee: *The*
    *State of the Domestic Automobile Industry: Impact of Federal Assistance* . . . . . . . . . . 2
12

13  June 12, 2009, House Energy and Commerce Committee-Subcommittee
    on Oversight, Investigations: *GM and Chrysler Dealership Closures and*
14  *Restructuring* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7, 12

15  June 3, 2009, State Senate Commerce Committee-Full Committee:
    *GM And Chrysler Dealership Closures: Protecting Dealers and Consumers* . . . . . . . . . 2

16  September 16, 2009, House Small Business Committee-Subcommittee on
    Rural Development, Entrepreneurship and Trade: *The Role of Automobile*
17  *Dealerships in Rural Economies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18

19

20

21

22

23

24

25

26

27

28

Ferruzzo & Ferruzzo, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1.   **PARTIES**

Petitioner Rally Auto Group, Inc. ("Rally") is an automobile dealership located at 39012 Carriage Way, Palmdale, California 93551. Rally is a "covered dealership," as defined in Section 747(a)(2) of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act" or "Section 747"), enacted December 16, 2009. (A true and correct copy of the Act is attached as Exhibit "1" to Petitioner's Appendix of Authorities in Support of Petition to Modify / Vacate Arbitration Award and Request for Judicial Notice filed concurrently herewith [hereinafter "Appendix"].)

Respondent General Motors, LLC ("GM") is the current owner of the General Motors automobile manufacturing business and has its principal place of business in Detroit, Michigan. GM is a "covered manufacturer" as defined by Section 747(a)(1) of the Act.

2.   **JURISDICTION**

While the Federal Arbitration Act's ("FAA") standards apply to this dispute, the FAA "bestow[s] no federal jurisdiction but rather require[s] an independent jurisdictional basis." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 1402, 170 L.Ed.2d 254 (2008), citing *Moses H. Cone*, 460 U.S. at 25 n. 32, 103 S.Ct. 927. The District Court, however, has federal question jurisdiction in this case under 27 U.S.C. § 1331 because it involves Section 747 of the Act, a law enacted by Congress (Public Law 111-117). (Appendix Exhibit "1.")

3.   **VENUE**

Venue is proper in this Court, pursuant to 9 U.S.C.A. § 10 and § 11, because the Arbitration was conducted in the City of Orange and the Award at issue was made within the Court's geographical district.

4.   **BACKGROUND**

A.   **Section 747 of the Consolidated Appropriations Act of 2010**

The underlying arbitration proceeding was timely initiated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117, 123 Stat. 3034 (2009)) ("Section 747" or "Act" [Appendix Exhibit "1"]. The genesis of Section 747 was the voluntary

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 608-6900

1  petitions for bankruptcy filed by GM and Chrysler Corporation in the summer of 2009. Both

2  GM and Chrysler previously applied for and received loans from the U.S. Government through

3  the Troubled Asset Relief Program ("TARP") emergency funding program.

4      In the bankruptcy proceedings, both GM and Chrysler used a provision in the Bankruptcy

5  Code to circumvent state franchise laws and summarily terminate or "wind down" (under the

6  threat of termination) the franchises of over 2,000 independent auto dealers throughout the

7  United States.

8      The House of Representatives, Committee on the Judiciary, held three (3) days of hearings

9  on the "*Ramifications of Auto Industry Bankruptcies*." The stated <u>purpose</u> of the hearings was

10  to review "the ramifications of auto bankruptcies <u>and their effect on dealers and other issues</u>"

11  (emphasis added).[1]  Other Congressional committees also conducted investigations, hearings,

12  and gathered evidence regarding the manufacturer's "expedited bankruptcy proceedings."[2]

13  Congress passed Section 747 of the Act because of the "bipartisanship concern in Congress of

14  the <u>mass closure of GM and Chrysler dealerships</u>." (Emphasis added.)  (*Id.*)

15      Recently, on July 19, 2009, the Office of the Special Inspector General for TARP

16  ("SIGTARP") confirmed Congress' concerns in a report entitled, "*Factors Effecting the*

17  *Decisions of General Motors and Chrysler to Reduce Their Dealership Networks.*" SIGTARP

18

19      [1]    House of Representatives, Subcommittee on Commercial and Administrative

20  Law, Committee of the Judiciary, "*Ramifications of Auto Industry Bankruptcies (Part III)*," Serial No. 111-55, p. 1 (July 22, 2009) [Appendix Exhibit "7"; this subcommittee also

21  held hearings on May 21, 2009, and July 21, 2009].

22      [2]    June 3, 2009, State Senate Commerce Committee-Full Committee [Appendix

23  Exhibit "6"]:
        *GM And Chrysler Dealership Closures: Protecting Dealers and Consumers;*

24  June 10, 2009, Senate Banking Committee-Full Committee:

25          *The State of the Domestic Automobile Industry: Impact of Federal Assistance;*

26  June 12, 2009, House Energy and Commerce Committee-Subcommittee on Oversight, Investigations [Appendix Exhibit "5"]:

27          *GM and Chrysler Dealership Closures and Restructuring;*
September 16, 2009, House Small Business Committee-Subcommittee on

28  Rural Development, Entrepreneurship and Trade:
        *The Role of Automobile Dealerships in Rural Economies.*

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 608-6900

1  concluded that its review "demonstrates that GM did not consistently follow its stated criteria"

2  regarding the wind-down and termination of dealerships. (Appendix Exhibit "4," p. 30.)

3  SIGTARP also found, just as troubling, the fact that GM had "little or no documentation of the

4  decision-making process to terminate or retain dealerships... ." (*Id.*) The SIGTARP report also

5  held that GM's acceleration of dealership closings "was not done with any explicit cost savings

6  to the manufacturer in mind." (Appendix Exhibit "4," p. 29.)

7      It is precisely because of the arbitrary and capricious actions of GM and Chrysler in the

8  Bankruptcy Court, after acceptance of Federal TARP loans, that Section 747 mandated that any

9  manufacturer who accepted money from the Federal government had to provide the "specific

10  criteria" for their rejection or wind-down of dealerships. The Act further required these

11  American Arbitration Association ("AAA") proceedings, if a dealer made demand on the

12  manufacturer, for a hearing before a neutral arbitrator to protect the parties' due process rights.

13      Section 747(b) states "[A] covered dealership that was not lawfully terminated under

14  applicable state law on or before April 29, 2009, shall have the right to seek, through binding

15  arbitration, continuation or reinstatement of a franchise agreement... ." The Petitioner herein

16  was not lawfully terminated and sought arbitration. That legal prerequisite to these proceedings

17  has been met.

18      Section 747(c) provides a legal and factual prerequisite upon the covered manufacturer

19  (*i.e.* GM): provide the covered dealer, within thirty (30) days of the enactment of the Act,

20  "specific criteria" as to why the dealer was terminated. The Congressional Record explained:

21          "We intend this process to provide transparency and avoid the
           excessive costs and delays of litigation and discovery disputes. **The**
22          **manufacturer should provide the respective covered dealers with**
           **each and every detail and criteria related to the evaluations of the**
23          **dealership** and the decisions to terminate, not assign, not renew or
           discontinue. It is anticipated that the manufacturers will be
24          cooperative and forthcoming and that all relevant information will be
           provided promptly."

25

26  Congressional Record-House, H14477 (December 10, 2009) [Appendix Exhibit "2"].

27  (Emphasis added.) There must be compliance with the legal and factual prerequisites in order

28  to frame the issues at the arbitration hearing.

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 558-6800

1    The Federal legislation is clear that there is a <u>tri-partite</u> balancing test, which must be

2    performed by the arbitrator, regarding "the economic interest of the covered dealership, the

3    economic interest of the covered manufacturer, and the economic interest of the public at

4    large." Section 747 (d). The Act sets forth seven (7) <u>required</u> factors[3] that the arbitrator must

5    consider **AND** "that the covered dealership may present any relevant information during the

6    arbitration." Section 747(d). The law provides the remedy of "continuation," as well as

7    "reinstatement," of the covered dealership's franchise agreement. Section 747(b) and (d).

8    Petitioner sought the remedy of "continuation" as well as "reinstatement" or "addition"

9    of the covered dealership's franchise agreement pursuant to Section 747(b) and (e) of the Act.

10    **B.    Procedural and Factual History**

11    On January 13, 2010, GM provided its required notice regarding the specific criteria

12    which it used to issue the covered dealership (*i.e.* Rally) a wind-down agreement for its

13    Chevrolet, Buick, Pontiac, GMC, and Cadillac brands. The only two (2) criteria listed were as

14    follows: "2008 overall DPS total dealership score under 70" and "2008 overall RSI total

15    dealership score under 70."

16    Rally timely commenced an arbitration with AAA. The matter was assigned AAA Case

17    No. 72-532-01370-09 and Arbitrator Richard Mainland. Testimony was heard at the hearings

18    held on May 13, 14, and 17, 2010. The parties submitted closing briefs on May 28, 2010.

19    **Award in Favor of Rally**

20    In this matter, the Arbitrator determined that Rally <u>exceeded</u> GM's publicly stated and

21    sworn criteria (*i.e.* DPS) for terminating the covered dealership, based upon the Dealer

22

23            [3]    "The factors considered by the arbitrator shall include:
(1) the covered dealership's profitability in 2006, 2007, 2008, and 2009,

24    (2) the covered manufacturer's overall business plan,
(3) the covered dealership's current economic viability,

25    (4) the covered dealership's satisfaction of the performance objectives established
pursuant to the applicable franchise agreement,

26    (5) the demographic and geographic characteristics of the covered dealership's market
territory,

27    (6) the covered dealership's performance in relation to the criteria used by the covered
manufacturer to terminate, not renew, not assume or not assign the covered dealership's

28    franchise agreement, and
(7) the length of experience of the covered dealership." (Section 747(d).)

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

*Rally Auto Group, Inc. v. General Motors, LLC*    -4-    PETITION TO MODIFY OR, ALTERNATIVELY,
VACATE AN ARBITRATION AWARD

1   Performance Score ("DPS") being <u>below</u> the 70 DPS index average. (Appendix Exhibit "8,"
2   p. 4.) <u>The Award held that "Rally's DPS score was approximately 85."</u> (Appendix Exhibit
3   "8," p. 4.) Rally should <u>not</u> have been given a wind-down agreement based on GM's stated
4   specific criteria. The Award's calculation of Rally's DPS score <u>included all five (5) brands</u> of
5   the covered dealership: Chevrolet, Buick, Pontiac, GMC, and Cadillac. The Rally dealership
6   has <u>one (1)</u> GM Business Activity Code for all five (5) GM brands. The Rally dealership has
7   one GM Dealer Sales and Service Agreement which allows it to sell and service all five (5)
8   brands. The Rally dealership submits <u>one (1)</u> Operating Statement to GM every month. The
9   Rally dealership is evaluated by GM (*i.e.* profitability, working capital, sales and service
10  satisfaction, etc.) as <u>one (1)</u> dealership. The Award should be modified and/or vacated
11  regarding the *dicta* attempting to <u>take</u> the Chevrolet brand from the covered dealership's
12  franchise and <u>give</u> it to a former Saturn dealer. (Appendix Exhibit "8," p. 4.)

### Award Exceeds Powers and Scope of Authority

14     On June 8, 2010, AAA disseminated Arbitrator Richard Mainland's Award to the parties.
15  (Appendix Exhibit "8".) The Award held that the covered dealership (*i.e.* Rally) "shall be
16  added to the dealer networks of General Motors, LLC, as to the Cadillac, Buick and GMC
17  brands, in the manner provided for by the Act and in accordance with the terms and conditions
18  of the Act." (Appendix Exhibit "8," p. 2.) The Award also determined that the Chevrolet brand
19  should be continued in Rally's market. However, the Arbitrator exceeded the scope of his
20  authority by attempting to **remove** the Chevrolet brand from the "covered dealership" and <u>give</u>
21  it to a <u>non</u>-party, a former Saturn dealer.[4]

### Award on Matters <u>Not</u> Submitted

23     The Act does <u>not</u> allow for the splitting of brands within the "covered dealership" and
24  only grants the Arbitrator the authority to "decide, based on that balancing, whether or not the
25  *covered dealership* should be added to the dealer network of the covered manufacturer."
26  (Emphasis added.) (Section 747(d).) The Act defined "covered dealership" as "an automobile

27

28     [4]     Specifically, the Award stated that, with respect to the Chevrolet brand Rally
"shall not be added to the dealer network of General Motors, LLC." (*Id.*)

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 608-6900

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 608-6900

1  dealership that had <u>a franchise agreement for the sale and service of vehicles of **a brand or**
2  **brands** with a covered manufacturer." (Emphasis added.) (Section 747(a)(2).) Congress
3  intended that the "covered dealership," with or without all brands desired by the manufacturer,
4  should be added back to the dealer network.[5] The Award held that Chevrolet should be added
5  back to GM's dealer network. Thus, Rally should keep its Chevrolet brand.

### Award's Remedy Beyond Authority Because Involves <u>Non</u>-Party

7  The Arbitrator exceeded the scope of the authority granted by Section 747(d) of the Act
8  and it must be modified and/or vacated in part to conform with the Federal law. The Award
9  impermissibly provides the remedy of <u>taking</u> Rally's Chevrolet brand and <u>giving</u> it to "GM's
10  former Saturn dealer in the Palmdale market." (Appendix Exhibit "8," p. 4.) The Arbitrator
11  did <u>not</u> have the authority to <u>take</u> a brand away from a covered dealership and <u>give</u> it to another
12  dealer within the same marketplace. (Section 747(b) and (d).) To the contrary, since GM's
13  overall business plan is to maintain representation and the Award determined that Rally and the
14  Chevrolet brand should be continued in this market[6], the Arbitrator could not "cherry pick" one
15  brand to <u>take</u> from Rally and <u>give</u> it to a former Saturn dealer. (*Id.*)

### GM <u>Agreed</u> to Allow Original Dealer to Represent Needed Market

17  GM's CEO, Fritz Henderson, testified to Congress that "in the event we need to put a
18  place—put a location back, one of the things that we committed to the Senate and I'll commit
19  to you today, is that if we need to relocate a spot there, *we will provide the existing operator*
20  *the opportunity to actually look at that first.*"[7] (Emphasis added.) [Appendix Exhibit "5," p.

21  _____

22        [5]        Congressional Record, H14478 (Appendix Exhibit "2").

23        [6]        The Award found in favor of Rally to maintain its Buick, GMC, and Cadillac
brands. (Appendix Exhibit "8," p. 2.) The Award also held that the Chevrolet brand should
24  be maintained in this market. (Appendix Exhibit "8," p. 4.) The Award admitted that the
"evidence showed that there is some uncertainty about the physical capacity of the new
25  Chevrolet dealer to provide parts and service for the full range of GM brands, and <u>the public
will benefit by the continued availability of the parts and service from Rally.</u>" (Emphasis
26  added.) (Appendix Exhibit "8," p. 5.) Thus, Rally's "covered dealership" facility is
necessary to sell and service the Chevrolet brand in this market, in addition to the Buick,
27  GMC, and Cadillac brands.

28        [7]        June 12, 2009, House Committee on Energy and Commerce, Subcommittee on
Oversight and Investigations, *Hearing on GM and Chrysler Dealership Closures and*

1  66]

2      GM's CEO, Fritz Henderson, testified a <u>second</u> time and reiterated that "if we've made

3  mistakes in the future, we've concluded we cannot take care of customers in the location and

4  a point needs to be put back. *We would go to whoever the individual was effected and give*

5  *them the first chance to do that.*"[8]  (Emphasis added.) [Appendix Exhibit "5," p. 66] The

6  Award has determined that GM needs Chevrolet representation and Rally is entitled to continue

7  representation as the "covered dealership" in the Palmdale market.

8  **Judicial Estoppel**

9      GM is judicially estopped from arguing a contrary position since it was successful during

10  the bankruptcy proceeding and consummated its 363 sale. *Greer-Burger v. Temesi,* 116 Ohio

11  St. 3de 324, 879 N.E. 2d 174, 2007-Ohio-6442, ¶ 25 ["Courts apply judicial estoppel in order

12  to 'preserve the integrity of the courts by preserving a party from abusing the judicial process

13  through cynical gamesmanship, achieving success on one position, then arguing the opposing

14  to suit an exigency of the moment," quoting *Telendyne Industries, Inc. v. NLRB* (C.A. 6, 1990),

15  911 F. 2d 1214, 1218.]

16      GM achieved its 363 sale by promising to "*provide the existing operator the opportunity*"

17  and "*give them the first chance*" to be added back to represent GM in the market.  GM took

18  a contrary position in this arbitration and through "undue means" obtained an arbitration award

19  seeking to <u>take</u> the Chevrolet brand from Rally and <u>give</u> it to the former Saturn dealer in the

20  same market.  Similarly, GM achieved its 363 sale by representing to the bankruptcy court that

21  it used an "objective" DPS index standard of below 70.  GM took a contrary position during the

22  arbitration and "cherry-picked" the Retail Sales Index ("RSI") from the DPS index <u>and</u> errantly

23  calculated Rally's DPS score.  GM is legally bound to follow its "objective" and "stated

24  criteria" (i.e. DPS) regarding Rally, which requires continuation and/or reinstatement of the

25  Chevrolet brand.

26

27  _____

*Restructuring* (Appendix Exhibit "5").

28      [8]   (*Id.*)

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 954-6900

1   5.   **STATEMENT OF LAW**

2        This matter involves the FAA (Federal Arbitration Act), which was Congressionally

3   enacted and codified at 9 U.S.C.A. § 1, *et seq.*, as it applies to Petitioner Rally and Respondent

4   GM's Federally mandated automobile industry special binding arbitration, pursuant to Section

5   747 of the Act.  This matter seeks modification or, alternatively, partial vacation of a June 8,

6   2010 Award based upon 9 U.S.C.A. §§ 10 and 11.

7        Congress has limited the ability of Federal courts to review arbitration awards in order to

8   promote the policy of favoring arbitration as an expeditious and relatively inexpensive means

9   of resolving disputes.   See 9 U.S.C. § 9; see also, *Schoenduve Corporation v. Lucent*

10  *Technologies, Inc.,* 442 F. 3d 737, 731 (3rd Cir. 2006).  However, the Circuit Courts[9] have

11  cautioned that the district court is **neither "entitled nor encouraged simply to 'rubber stamp'**

12  **the interpretations and decisions of arbitrators."**

13       Recently, the Eight District explained that the deference owed to arbitration awards "is

14  **not** the equivalent of a grant of limitless power." *Stark v. Sandberg, Phoenix & von Gontard,*

15  *P.C.,* 381 F. 3d 793, 799 (8th Cir. 2004) (citation omitted) (emphasis added).  Congress has

16  enacted protections to (1) modify or correct and/or (2) vacate an arbitration award pursuant to

17  certain enumerated circumstances. (9 U.S.C. §§ 10-11.)  In this matter, valid grounds exist on

18  the face of the arbitration Award to modify or, alternatively, partially vacate the June 8, 2010

19  Award.

20       A.   **Modifying or Correcting Arbitration Awards**

21       The FAA delineates in 9 U.S.C. § 11 the District Court's power to modify or correct an

22  arbitration award as follows:

23           **§11.  Same; modification or correction; grounds; order**
             In either of the following cases the United States court in and

24

25        [9]     *Matteson v. Rider Sys., Inc.,* 99 F3d 108, 113 (C.A. 3 1996) (citations omitted);
26  *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M,* 475
    F.3d 746, 760 (C.A. 6 2007); *Metromedia Energy, Inc. v. Ensearch Energy Services,* 409
27  F.3d 574, 579 (C.A. 3 205); *Stark v. Sandberg, Phoenix & von Gontard, P.C.,* 381 F.3d 793,
    799 (C.A. 8 2004); *Madison Hotel v. Hotel and Restaurant Employees, Local 25, AFL-CIO,*
28  128 F.3d 743, 749 (C.A. D.C. 1997); *Santa Fe Pacific Corporation v. Centra States,*
    *Southwest Areas Pension Fund,* 22 F.3d 725 (C.A. 7 1994).

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1   for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party

2   to the arbitration -

       (a)    Where there was an evident material miscalculation of

3   figures or an **evident material mistake in the description** of any person, thing, or property referred to in the award.

4        (b)    Where the arbitrators have **awarded upon a matter not submitted** to them, unless it is a matter not affecting the merits

5   of the decision upon the matter submitted.

       (c)    Where the award is imperfect in matter of form not

6   affecting the merits of the controversy.

     **The order may modify and correct the award, so as to**

7   **effect the intent thereof and promote justice between the parties."** (Emphasis added.)

8

9       In this matter, Rally seeks modification and correction, pursuant to Section 11(a), based

10   upon the material mistake in the description in the Award (*i.e.* "covered dealership" versus

11   Chevrolet brand) and Section 11(b) based upon the fact that there was a determination upon a

12   matter <u>not</u> submitted — or could have been submitted — regarding (1) the severing of a brand

13   from the "covered dealership" franchise and (2) the remedy to <u>take</u> away the Chevrolet brand

14   from Rally's Buick, Pontiac, GMC, and Cadillac covered dealership business and <u>give</u> it to a

15   former Saturn dealer in the same marketplace. Both separate modification grounds,

16   independently or together, justify - as a matter of law - correcting the Award to promote justice

17   between the parties and promote the remedial purpose of Section 747.

18       Circuit Courts have held that a district court may modify an award and strike the portion

19   of the award on a matter <u>not</u> submitted to the arbitrator for determination. *Off Shore Marine*

20   *Towing v. MR23*, 412 F.3d 1254 (2005); *Totem Marine Tug and Barge, Inc. v. North American*

21   *Towing, Inc.,* 607 F.2d 649 (1979). Similarly, an award which evidently mistakes the

22   description of the matter being considered, also allows modification by a district court.

23   Congress specifically explained through the plain language of the FAA, that any modification

24   by a district court should "promote justice between the parties." (9 U.S.C. § 11.)

25       In this matter, justice requires modification to remove the Award's *dicta*, which

26   inappropriately attempts to <u>take</u> the Chevrolet brand from the "covered dealership" and <u>give</u> it

27   to a former Saturn dealers in the same marketplace. Since the Award determined that

28   Chevrolet, Buick, GMC, and Cadillac should be maintained in the Palmdale market, the

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone (949) 558-0300

1   "covered dealership" (i.e. Rally) has the right to continue with all four (4) brands.  There exists

2   an (1) evident material mistake in the description of the "covered dealership," which errantly

3   excluded the Chevrolet brand, and (2) an award upon a matter not submitted or authorized for

4   consideration, which gave the Chevrolet brand to a non-party and fashioned a remedy beyond

5   the authority established in Section 747 of the Act.  Once the Award determined that the

6   Chevrolet brand should be continued in the local market and that Rally should be maintained,

7   the arbitrator's responsibility was completed.

8      **B.    Vacating Arbitration Awards**

9       The FAA also delineates the following four (4) bases for a District Court to vacate or

10  partially vacate an arbitration award in 9 U.S.C. § 10, as follows:

11      **§10. Same; vacation; grounds; rehearing**
             (a)    In any of the following cases, the United States court
12      in an for the district wherein the award was made may make an order
        vacating the award upon the application of any party to the
13      arbitration-
             (1)    Where the award was procured by **corruption, fraud,**
14      **or undue means;**
             (2)    Where there was evident partiality or corruption in the
15      arbitrators, or either of them;
             (3)    Where the **arbitrators were guilty of misconduct** in
16      refusing to postpone the hearing, upon sufficient cause shown, or in
        refusing to hear evidence pertinent and material to the controversy;
17      **or of any other misbehavior by which the rights of any party
        have been prejudiced; or**
18           (4)    Where the **arbitrators exceeded their powers, or so
        imperfectly executed them** that a mutual, final, and definite award
19      upon the subject matter submitted was not made."

20      In this matter, Rally seeks partial vacation pursuant to Subsections (a)(1), (3), and (4).

21  The subsections authorizing vacating an award, when an arbitrator is "guilty of misconduct" or

22  "misbehavior" (i.e. 10(a)(3)) and/or "exceeded their powers" or "so imperfectly executed them"

23  (i.e. 10(a)(4)), have collectively been described as the "manifest disregard" of the law by the

24  United States Supreme Court.  *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 585,

25  128 S.Ct. 1396, 1404 (2008).

26      **Misconduct and Misbehavior, Section 10(a)(3)**

27      The Arbitrator in this matter was guilty of misconduct, misbehavior, and exceeded his

28  power (i.e. "manifest disregard") by (1) ruling on a matter not submitted for determination and

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1   (2) attempting to fashion a remedy not authorized by Section 747 of the Act. Specifically, the

2   Award attempts to carve out and take one GM brand (i.e. Chevrolet) from the "covered

3   dealership" and give it to a former Saturn dealer (i.e. non-party) within the same market

4   territory. Section 747 of the Act clearly limits the Arbitrator's authority to only determine

5   whether the "covered dealership" (i.e. not GM brands) should be continued, reinstated, or added

6   "as a franchisee to the dealer network of the covered manufacturer in the geographical area

7   where the covered dealership was located ... ." (Section 747(b).)

### Exceeded and Imperfectly Executed Powers, Section 10(a)(4)

9       Furthermore, even if the Arbitrator could sever a brand from within the "covered

10  dealership," which is not specifically authorized by the Act, the remedy fashioned in the Award

11  exceeds the Arbitrator's power. Circuit Courts have held that arbitrators exceed or imperfectly

12  execute their powers when they determine rights and obligations of individuals who are not

13  parties to the arbitration proceedings. *NCR Corporation v. SAC-CO., Inc.*, 43 F.3d 1076, 1080

14  (6th Cir. 1995); *International Brotherhood of Electrical Workers, Local No. 265 v. O.K.*

15  *Electric Co.*, 793 F.2d 214 (8th Cir. 1986); *Orion Shipping and Trading Company v. Eastern*

16  *States Petroleum Corp. of Panama*, 312 F.2d 299 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct.

17  1679, 10 L.Ed. 2d 705 (1963). In this matter, the former Saturn dealer was awarded the

18  franchise, even though it was not a party to the arbitration proceedings. The Award, as a matter

19  of law, cannot determine the "rights and obligations" of a non-party regarding Rally's Chevrolet

20  brand and its "covered dealership" facility in Palmdale.

### Corruption, Fraud, and Undue Means by GM, Section 10(a)(1)

22      Subsection 10(a)(1) allows for the vacation of an arbitration award if it was procured by

23  "corruption, fraud, or undue means." Respondent GM procured the Award in this matter

24  through its "corruption, fraud and undue means." (1) GM publicly stated to Congress that if its

25  dealer network plans determined a brand needed representation in a market, then the original

26  dealership would have the opportunity to continue in the local market. (2) GM also publicly

27  stated to Congress and represented to the bankruptcy court that it used an "objective" DPS

28  standard to evaluate and determine which dealerships were terminated. **BOTH** of these

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1    statements were <u>contradicted</u> by GM in this AAA matter and require partial vacation of the

2    Award as a matter of law and equity as to the Chevrolet brand.

3        **GM <u>Promised</u> to Allow the Original Dealer to Continue in a Needed Market**

4        GM's CEO, Fritz Henderson, testified to Congress that "in the event we need to put a

5    place—put a location back, one of the things that we committed to the Senate and I'll commit

6    to you today, is that if we need to relocate a spot there, *we will provide the existing operator*

7    *the opportunity to actually look at that first."*[10] (Emphasis added.) [Appendix Exhibit "5,"

8    p. 66.] GM's CEO, Fritz Henderson, testified a <u>second</u> time and reiterated that "if we've made

9    mistakes in the future, we've concluded we cannot take care of customers in the location and

10    a point needs to be put back. *We would go to whoever the individual was effected and give*

11    *them first chance to do that."*[11] (Emphasis added.) [Appendix Exhibit "5," p. 66.]

12        The Award established that GM <u>needs</u> and <u>plans</u> on having Chevrolet representation in

13    this market (Award, p. 4). However, the Award <u>failed</u> to apply this undisputed fact to this

14    matter. GM <u>needs</u> Chevrolet representation in Palmdale and Rally is legally entitled to continue

15    representation, as the operator and the "covered dealership," to follow GM's business plan and

16    sworn statements to other tribunals (*i.e.* Bankruptcy Court, Congress).

17      **GM Represented an "Objective" DPS Standard to Bankrupty Court and Congress**

18        GM is judicially estopped from arguing a contrary position since it was successful during

19    the bankruptcy proceeding and consummated its 363 sales of assets. *Greer-Burger v. Temesi*,

20    116 Ohio St. 3d 324, 8789 N.E. 3d 174, 2007-Ohio-6442. ¶ 25, quoting *Teledyne Industries,*

21    *Inc. v. NLRB* (C.A. 6, 1990), 911 F.2d 1214, 1218. GM achieved its 363 sale by representing

22    to the bankruptcy court and Congress that it used an "objective" DPS index standard of below

23    70 to terminate a covered dealership."[12] GM took a contrary position during the AAA

24

25         [10]     June 12, 2009, House Committee on Energey and Commerce, Subcommittee
26    on Oversight and Investigations, *Hearing on GM and Chrysler Dealership Closures and*
     *Restructuring* (Appendix Exhibit "5").

27         [11]     (*Id.*)

28         [12]     GM Dealer Network analysis presented to House Committee on Energy and
     Commerce, Subcommittee on Oversight and Investigations on June 12, 2009.

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1  Arbitration and "cherry-picked" the RSI of the Chevrolet brand from the DPS as justification

2  to take the Chevrolet brand from Rally and give it to a former Saturn dealer in the same market.

3  GM also errantly calculated Rally's DPS score. The Award determined that properly taking into

4  consideration legitimate LIFO accounting adjustments, Rally's DPS score was approximately

5  85 and that Rally should be maintained in the market. (Appendix Exhibit "8," p. 4.)

6    GM took a contrary position in this arbitration and through "undue means" obtained an

7  arbitration award taking the Chevrolet brand because Rally allegedly had a low RSI Score. As

8  a matter of law and equity, the Chevrolet brand must be continued with the "covered

9  dealership" because (1) Rally exceeded GM's "objective" DPS standard and (2) GM plans on

10  maintaining Chevrolet representation in this local market.

11  **6.**  <u>**ARGUMENT OF LAW AND FACT**</u>

12    That portion of the Arbitration Award which allows GM to "replace" Rally as a Chevrolet

13  dealership with another dealership in the Palmdale market exceeds the authority of the

14  Arbitrator.

15    The Federal Arbitration Act allows the District Court to strike a portion of an Arbitrator's

16  Award pertaining to an issue not subject to arbitration.

17      "In sum, the Federal Arbitration Act allows a federal court to
18      correct a technical error, to strike all or a portion of an award
       pertaining to an issue not at all subject to *998 arbitration, and to
       vacate an award that evidences affirmative misconduct in the arbitral
19      process or the final result or that is completely irrational or exhibits
       a manifest disregard for the law."

20

21      *Kyocera Corporation v. Prudential-Bache Trade Services* (2003) 34
       F.3d 987 at 997-998.

22    Specifically, 9 USC §10(a)(4) permits the United States Court in the District wherein the

23  award was made to vacate that part of an award where the Arbitrator exceeds their powers.

24      "Section 10(a)(4) provides that an award may be vacated
       where the arbitrators exceeded their powers. Some circuits have
25      specifically held that arbitrators exceed their powers when they
       determine rights and obligations of individuals who are not parties to
26      the arbitration proceedings."

27

28  (http://energycommerce.house.gov/Press_111/20090612/gmnetworkanalysis.pdf) [Appendix
   Exhibit "3"]

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

*Rally Auto Group, Inc. v. General Motors, LLC*   -13-   PETITION TO MODIFY OR, ALTERNATIVELY, VACATE AN ARBITRATION AWARD

R403.7054920v1

1      *NCR Corporation v. SAC-CO., Inc.* (1995) 43 F.3d 1076 at 1080

2      The case of NCR Corporation (*supra*) arises out of a contract dispute between a

3 manufacturer of electronic cash registers and one of its dealers. The arbitrator in that case

4 awarded punitive damages against the manufacturer which were ordered to be paid to dealers

5 who were not parties to the arbitration. In that case the District Court Magistrate vacated the

6 punitive damages part of the arbitrator's award on the grounds that the arbitrator exceeded the

7 scope of his authority by awarding the recovery of punitive damages payable to non-parties.

8 In its decision, the Court of Appeals, Sixty Circuit, affirmed the judgment vacating part of the

9 arbitrator's award which exceeded his authority. The present case is analogous in that the

10 Arbitrator exceeded his authority by allowing GM "to replace Rally as a Chevrolet dealer with

11 a dealership operated by GM's former Saturn dealer in the Palmdale market".

12      The case of *Schoenduve Corporation v. Lucent Technologies, Inc.* (2006) 442 F.3d 727

13 examined the scope of the arbitrator's authority to award relief. In its decision the Court

14 considered the contract requiring arbitration and the parties' demand for arbitration to determine

15 the scope of the arbitrator's authority. In the present case the scope of the Arbitrator's authority

16 is very narrow and specific. The federal law, Section 747(d), which authorizes this arbitration

17 proceeding states that "the arbitrator shall balance the economic interest of the covered

18 dealership, the economic interest of the covered manufacturer, and the economic interest of the

19 public at large **and shall decide, based on that balancing, whether or not the covered**

20 **dealership should be added to the dealer network of the covered manufacturer**" (Emphasis

21 added). This is the only determination which the arbitrator is authorized to make. This

22 arbitration proceeding does <u>not</u> authorize the arbitrator to decide if Rally should be replaced as

23 the Chevrolet dealer by another dealer in Palmdale.

24      As part of the chain of events which led to the enactment of Section 747, GM has asserted

25 that it was critical to the reorganization of the company to <u>reduce</u> the size of its dealer network.

26 The Business Plans which GM submitted to the government set forth a need to reduce the

27 number of dealerships in its dealer network. The bankruptcy of GM allowed the company the

28 ability to threaten the rejection of dealer franchise agreements and enabled GM to obtain the

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1   "Wind-down Agreements" by which GM sought to reduce the size of its dealer body.  The

2   Answering Statement submitted by GM in the arbitration hearings, which were conducted under

3   Section 747, details GM's plan to reduce the total number of dealers by eliminating those

4   dealers who had inadequate facilities or undesirable locations. The issue to be determined by

5   the arbitrator was whether Rally should be eliminated.  The premise behind Section 747 and the

6   scope of the arbitrator's authority was not whether underperforming dealers should be replaced

7   with other dealers who GM believes might perform better.  To include this determination in the

8   arbitrator's decision improperly expands the scope of the arbitrator's authority and required

9   modification.

10          Where an arbitrator includes in their award a form of relief or remedy not submitted to

11   the arbitrator, the District Court may properly modify the award to exclude any such provision.

12   In the case of *Offshore Marine Towing v. MR23* (2005) 412 F.3d 1254, the plaintiff, Offshore

13   Marine Towing, Inc., sought to enforce a maritime salvage lien against a vessel.  The District

14   Court ordered the parties to arbitration.  The arbitrator awarded plaintiff its claim under the lien

15   and also awarded plaintiff the recovery of attorneys fees and costs.  The owner of the vessel

16   moved to modify or vacate the award of attorneys fees.  The District Court modified the

17   arbitration award to exclude the attorneys fees because attorneys fees may not be awarded in

18   an *in rem* action for a salvage lien.

19          The Court of Appeals, Eleventh Circuit, affirmed the finding that

20                  "Because attorney's fees may not be awarded in an *in rem*
                    action for a salvage lien and the issue of attorney's fees was not
21                  submitted to the arbitrator, the district court correctly modified the
                    arbitration award in favor of OMT to exclude attorney's fees and
22                  costs".

23          *Offshore Marine Towing Inc. (supra)* at page 1258.

24          In the present case, Petitioner Rally respectfully submits that the determination of whether

25   or not the Chevrolet franchise at issue here might do better if the dealer (Rally) was replaced

26   with another dealer (the former Saturn dealer) was not an issue properly before the Arbitrator

27   and this determination exceeds the authority of the Arbitrator.  (Section 747(d).)

28          In his Decision, the Arbitrator found that Rally had been a GM dealer for many years, that

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1   its dealership facilities were adequate and that the business was economically viable. The

2   Arbitrator determined that after taking into account the LIFO accounting conversion employed

3   in the dealership's operating statements that the dealership's total DPS score was approximately

4   87, not 55 which GM used as justification for terminating the dealership. As a result, the

5   Arbitrator concluded that the dealership should be reinstated. The arbitrator also determined

6   that the public needed Chevrolet representation in the Palmdale market. The Arbitrator's

7   inquiry should have ended there. Rally, as the covered dealership, should have been reinstated

8   for all GM brands including Chevrolet.

9   **7.  CONCLUSION**

10       Petitioner Rally seeks the remedy of modifying and partially vacating the AAA Award's

11   *dicta* attempting to take the Chevrolet brand from the covered dealership and give it to a non-

12   party, a former Saturn dealer, in the same local Palmdale market. Rally also requests any and

13   all other equitable relief the Court deems appropriate and necessary, in order to effectuate its

14   decision, including, but not limited to, maintaining the *status quo* until a final determination

15   requiring GM to continue/add back the Chevrolet brand with Rally's existing and reinstated

16   Buick, GMC, and Cadillac GM lines of new motor vehicles.

17

18   Dated: August 13, 2010       **FERRUZZO & FERRUZZO, LLP**

19

20                 By: _____

21                     Gregory J. Ferruzzo

22                 **MORGANSTERN, MAC ADAMS & DE VITO**

23                 **CO., LPA**

24                 By: _s/ Christopher M. DeVito_____

25                     Christopher M. DeVito

26

27

28

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

R403.20254920v1

1  **FERRUZZO & FERRUZZO, LLP**
GREGORY J. FERRUZZO, SBN 165782
2  A Limited Liability Partnership,
    including Professional Corporations
3      3737 Birch Street, Suite 400
      Newport Beach, California 92660
4      Telephone (949) 608-6900

5  **MORGANSTERN, MAC ADAMS & DE VITO CO., L.P.A.**
CHRISTOPHER M. DE VITO, OH BAR 47118
6  623 West Saint Clair Avenue
Cleveland, Ohio 44113
7  Telephone (216) 687-1212
Attorneys for Petitioner, **Rally Auto Group, Inc.**
8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  RALLY AUTO GROUP, INC.          )   Case No.
                                    )
12              Petitioner,         )   **DECLARATION OF LARRY MAYLE**
                                    )   **IN SUPPORT OF APPLICATION TO**
13  v.                              )   **MODIFY OR ALTERNATIVELY TO**
                                    )   **VACATE ARBITRATION AWARD**
14  GENERAL MOTORS, LLC             )
                                    )
15              Respondent.         )
                                    )
16

17      I, Larry Mayle, declare as follows:

18      1.    I am the president of Rally Auto Group, Inc., a California corporation, which

19  conducts business as a new automobile dealership located at a 39012 Carriage Way,

20  Palmdale California 93551. I have owned Rally Auto Group for the last twenty years. I have

21  personal knowledge of the facts which are stated herein and I am competent to testify to the

22  truth of the matters which are stated herein.

23      2.    Rally Auto Group, Inc. is the petitioner in the action. The underlying arbitration

24  proceeding was filed by Rally Auto Group, Inc. on December 21, 2009, pursuant to Section

25  747 of the Consolidated Appropriations Act of 2010. A true correct copy of the arbitration

26  claim filed December 21, 2009, is attached hereto as **Exhibit"1"**.

27      3.    The Arbitrator assigned to this matter was Mr. Richard Mainland. The

28  arbitration hearing was held at Chapman University in the city of Orange. The arbitration

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1  hearing was conducted on May 13, 14, and 17, 2010.

2      4.    The arbitrator issued his written decision on June 8, 2010. A true and correct

3  copy of the written decision of Arbitration is attached hereto as **Exhibit "2"**.

4      5.    Rally Auto Group, Inc. has been selling & servicing General Motors products in

5  Lancaster and Palmdale California for 41 years. Rally Auto Group began its business as a

6  Chevrolet dealership in Lancaster, California in 1969. Over the years Rally Auto Group, Inc.

7  also became a dealer for the Pontiac, Buick, GMC Truck and Cadillac Brands.

8      6.    As of November 2005 Rally Auto Group, Inc. had a General Motors Dealer

9  Sales & Service Agreement (Franchise Agreement) for five (5) brands:  (1) Chevrolet

10  passenger vehicles and light duty trucks, (2) Pontiac Motor Vehicles, (3) GMC light duty

11  trucks, (4 Buick Motor Vehicles, and (5) Cadillac Motor Vehicles. The franchise agreement

12  for all of these GM brands were contained in a single Dealer Sales and Service Agreement.

13  The Pontiac brand is being eliminated by GM.  Because Pontiac is not relevant to the

14  discussion of this case my Declaration will address the four remaining GM brands.

15      7.    Rally Auto Group represents the four (4) General Motors brands (Chevrolet,

16  Cadillac, Buick, and GMC) and operates two dealership facilities in the Palmdale, California

17  Auto Mall.  The Palmdale Auto Mall is located off the 14 Freeway in the City of Palmdale.

18  These dealership facilities were built in 1991 when the Auto Mall was developed.  Rally

19  Auto Group sells and services the Chevrolet and Cadillac brands from the six acre facility

20  located at 39012 Carriage Way, Palmdale, California.  Rally Auto Group sells and services

21  the Buick and GMC brands from the six acre facility located at 438 Auto Vista Drive,

22  Palmdale, California.  A copy of the map of the Palmdale Auto Mall is attached hereto for

23  the Court's reference as **Exhibit 3**.

24      The Chevrolet/Cadillac facility is a large modern facility with a well-equipped service

25  and parts operation.  The dealership's service department has 38 service bays.

26      As the owner of Rally Auto Group I have millions of dollars invested in these GM

27  dealerships and their facilities.

28  \\

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

1       8.      GM has treated the four GM brands, which Rally Auto Group represents, as one

2  dealership.  General Motors identifies its dealers by "Business Associate Code" (BAC

3  #114624). General Motors had one BAC code assigned to all four GM Brands which Rally

4  Auto Group sells.

5       9.      The terms of the General Motors Dealer Sales and Service Agreement required

6  Rally Auto Group, Inc. to maintain a minimum net working capital of $4,377,000.00 for the

7  entire Dealership operation (i.e. all GM brands).

8       10.     General Motors requires that Dealers submit monthly operating reports. Rally

9  Auto Group submitted one (1) operating report each month for the entire dealership operation

10  which included all four GM Brands which Rally Auto Group sold.

11       11.     Rally Auto Group leases the facility located at 39012 Carriage Way in Palmdale

12  California where the dealership operations are conducted.

13       12.     General Motors uses an internal method of scoring its dealers known as the

14  Dealer Performance Summary (DPS). The Dealer Performance Summary is made up of 4

15  components which are each weighted to produce an overall score. The overall score if made

16  up of the following categories:

17       (1)     Retail Sales Index (RSI)
                 weighted 50%
18

19       (2)     Customers Service Index (CSI)
                 weighted 30%

20       (3)     Working Capital
                 weighted 10%
21

22       (4)     Profitability
                 weighted 10%

23       13.     For the years 2003 through 2007 Rally Auto Group had an overall DPS Score of

24  over 70 (2003 overall DPS score 87.381; 2004 overall DPS score 91.93; 2005 overall DPS

25  score 85.60; 2006 overall DPS score 82.69; 2007 overall DPS score 73.19). General Motors

26  uses the financial information on the dealer operating reports, which are electronically

27  submitted monthly to General Motors together with Sales and Customer Service information

28  to calculate the Dealership's DPS score.

DECLARATION OF LARRY MAYLE

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

R403.2\254533v1

1    14.    For 2008 General Motors calculated a DPS score for Rally Auto Group, Inc. of

2  55.27. However, the 2008 financial information reflected in the operating reports included an

3  estimated LIFO adjustment to the Dealers 2008 profits. This accounting convention resulted

4  in an artificially low score in 2008. At Arbitration Rally Auto Group asserted, and the

5  Arbitrator found, that by using the actual profits for 2008 that the re-computed overall DPS

6  score for the Dealership was actually 85. (see written determination of Arbitrator attached as

7  **Exhibit "2"** at page 4, 4th paragraph) As a result, the Arbitrator determined that Rally Auto

8  Group should be reinstated as a GM dealer in Palmdale.

9    15.    In the summer of 2009, General Motors filed a voluntary petition for

10  bankruptcy. In the bankruptcy proceedings General Motors used a provision of the

11  Bankruptcy Code to circumvent the California State Automobile Dealer Franchise laws and

12  threatened to terminate a large number of Dealers. On or about June 1, 2009, General Motors

13  sent "wind down" letters to numerous dealers including Rally Auto Group. A true and correct

14  copy of the June 1, 2009, wind down letter is attached hereto as **Exhibit "4"**. By this letter

15  General Motors notified Rally Auto Group, Inc. that the Chevrolet, Pontiac, Buick, Cadillac,

16  and GMC Truck dealer Agreements with Rally Auto Group, Inc. would "not continue on a

17  long term basis" and would not continue past October 31, 2010. The letter asked the dealer to

18  sign a "Wind-Down Agreement to be executed and delivered to GM before June 12, 2009.

19  As the letter states if the dealer agrees to the wind down agreement then the dealer would

20  receive "assistance" in the form of a specified "wind down payment". If not then General

21  Motors stated that it would apply to the Bankruptcy Court to reject the Dealer Agreement.

22    16.    I felt that I had no alternative but to sign the Wind-Down Agreement on behalf

23  of Rally Auto Group, Inc.

24    17.    As a result of the actions of General Motors (and Chrysler) to "wind down" the

25  franchises of over 2,000 independently owned auto dealers throughout the United States

26  Congress passed and President Obama signed into law Section 747 of the Consolidated

27  Appropriations Act of 2010.

28  \ \

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

4

R403.20254533v1

1       18.    The passage of Section 747 provided Dealerships such as Rally Auto Group

2  with a right to file an arbitration claim before the American Arbitration Association and seek

3  reinstatement of their franchise agreement and to be added to the Dealer Network. Rally Auto

4  Group, Inc. is a "covered dealership" which timely filed its arbitration claim (**Exhibit 1**). The

5  written Determination of the Arbitrator (**Exhibit 2**) concluded that Rally Auto Group, Inc.

6  should be added to the dealer network of General Motors as to the Cadillac, Buick, and GMC

7  truck Brands. However, the arbitrator improperly decided that the Chevrolet Brand would

8  not be reinstated with Rally.

9       19.    GM filed an Answering Statement with the American Arbitration Association in

10  response to Rally Auto Group's arbitration claim. Attached hereto as **Exhibit 5** is a true and

11  correct copy of the Answering Statement filed by GM.

12       20.    In the arbitration hearing, GM submitted its purported Dealer Network Plan for

13  the Rally Chevrolet dealership in Palmdale. A true and correct copy of GM's Dealer

14  Network Planning and Investment Executive Proposed Summary dated December 7, 2009, is

15  attached hereto as **Exhibit 6**. In this Plan GM states that GM wants to "re-establish"

16  Chevrolet "C" in Palmdale to replace wind-down dealer (Rally Auto Group) with candidate

17  Lou Gonzales.

18      Lou Gonzales is the dealer who operated the Saturn dealership in the Palmdale Auto

19  Mall located just down the street from Rally Auto Group's Chevrolet facility. Because GM

20  is eliminating the entire Saturn brand, the Antelope Valley Saturn dealership operated by Lou

21  Gonzales is being wound down.

22      The Arbitrator accepted General Motors "Plan" to replace Rally Auto Group as the

23  Chevrolet dealer with the dealership owned by Lou Gonzales, the operator of a Saturn

24  dealership in Palmdale which is being wound down with the total elimination by General

25  Motors of the entire Saturn Brand.

26       21.    At the arbitration hearing General Motors asserted that Rally Auto Group's

27  Chevrolet franchise should be terminated and that General Motors should be allowed to "re-

28  establish" that Chevrolet dealership with Mr. Lou Gonzales in a smaller facility located in the

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

5

R403.2\254533v1

1   same auto mall. The justification offered by General Motors was that as a Saturn dealer Mr.

2   Gonzales had a higher RSI score than Rally Auto Group did as a Chevrolet Dealer. This

3   assertion ignores the fact that, stated right on the DPS Score, GM says "Since there are

4   differences in calculations, direct comparisons between Saturn, Saab and the other GM line

5   makes <u>are not appropriate</u>. Sale Performance is evaluated using State average with the

6   exception of Hummer, Saturn, and Saab which use Region average". A true and correct coy

7   of this statement on the DPS Score (showing the corrected DPS score of 85.57) is attached

8   hereto as **Exhibit 7**.

9       22.    The Arbitrator's Decision is internally inconsistent because it determines that

10   Palmdale needs (1) Chevrolet representation, and (2) Rally's facilities to service Chevrolet

11   customers, but then <u>takes</u> the Chevrolet brand and <u>gives</u> it to a <u>non</u>-party.

12       I declare under penalty of perjury that the foregoing is true and correct.

13

14   DATED: August 13, 2010

                                  Larry Mayle

15                            Digitally signed by Larry Mayle
                           DN: cn=Larry Mayle, o=Rally Auto
                           Group, Inc., ou,
                           email=lamayle@pacbell.net, c=US
                           Date: 2010.08.13 12:12:01 -07'00'

16                         LARRY MAYLE, Declarant

17

18

19

20

21

22

23

24

25

26

27

28

FERRUZZO & FERRUZZO, LLP
3737 Birch Street, Suite 400
Newport Beach, California 92660
Telephone: (949) 608-6900

R409.20254533v1

# EXHIBIT J



# Congressional Record

**United States of America**

PROCEEDINGS AND DEBATES OF THE 111th CONGRESS, FIRST SESSION

| Vol. 155 | WASHINGTON, THURSDAY, DECEMBER 10, 2009 | No. 185 |
|---|---|---|

# House of Representatives

The House met at 10 a.m. and was called to order by the Speaker pro tempore (Mr. BLUMENAUER).

## DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

WASHINGTON, DC,
December 10, 2009.

I hereby appoint the Honorable EARL BLUMENAUER to act as Speaker pro tempore on this day.

NANCY PELOSI,
*Speaker of the House of Representatives.*

### PRAYER

The Chaplain, the Reverend Daniel P. Coughlin, offered the following prayer:

Lord God, for people who live in the light of faith and who are attuned to Your greatest commandment, peace is always more than the absence of war. It remains a matter of the human heart.

Peace cannot be reduced to a human concept as only the balance of power for opposing forces. We know, Lord, peace cannot be imposed by human authority or by simple majority. Peace, Lord, is often illusive for us because it remains beyond our imagining or achievement. Peace is a gift.

Peace, Lord, is born out of the right ordering of things which You, the Creator, have invested in human society. Peace is realized by us, when our thirsting for an ever more perfect realm of justice and union reaches a certain plateau that invites us to go even further.

Lord, grant us peace of heart so we may bring this gift to our family life, work for justice, and so gift our world, both now and forever.

Amen.

---

## NOTICE

If the 111th Congress, 1st Session, adjourns sine die on or before December 23, 2009, a final issue of the *Congressional Record* for the 111th Congress, 1st Session, will be published on Thursday, December 31, 2009, to permit Members to insert statements.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT–59 or S–123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through Wednesday, December 30. The final issue will be dated Thursday, December 31, 2009, and will be delivered on Monday, January 4, 2010.

None of the material printed in the final issue of the *Congressional Record* may contain subject matter, or relate to any event, that occurred after the sine die date.

Senators' statements should also be formatted according to the instructions at http://webster/secretary/cong__record.pdf, and submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at "Record@Sec.Senate.gov".

Members of the House of Representatives' statements may also be submitted electronically by e-mail, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerk.house.gov/forms. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, and signed manuscript. Deliver statements to the Official Reporters in Room HT–59.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the *Congressional Record* may do so by contacting the Office of Congressional Publishing Services, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

CHARLES E. SCHUMER, *Chairman.*

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.



Printed on recycled paper.



**App. EXHIBIT 3**

seem to think that three convictions by military tribunals in the entire period of their existence is an impressive record. One of those was by a guilty plea. This isn't an impressive record; it's a dismal record. By contrast, recent analysis of the 119 terrorism cases involving 289 defendants tried over the last 20 years in U.S. courts shows a 91 percent conviction rate for the cases that had been resolved as of June 2.

I can't tell you whether one option or the other is better for any given case, but that's not the call we have to make in an appropriations bill. With current law, we can leave that decision to the experts in the administration who can best decide on a case-by-case basis who should be prosecuted in the U.S. and what mitigation plans are necessary to address any risks that may result from these trials.

The purpose of the Republican amendment, which was rightly rejected in the conference committee, was to shut off access to U.S. courts for terrorism prosecution. That is a proposition that is patently absurd and that, I dare say, our Republican colleagues would not be putting forward if there were a Republican President.

The SPEAKER pro tempore. The time of the gentleman has expired.

Mr. OLVER. I yield the gentleman 1 additional minute.

Mr. PRICE of North Carolina. Is criminal prosecution an option we simply summarily want to close off? Of course, the answer is ''no.''

□ 1315

We should be using these carefully selected prosecutions to send a message to the world that we will not be intimidated by the prospect of bringing terrorists to justice or allow terrorism to undermine the rule of law in our country.

Mr. LATHAM. At this time, it is my privilege to yield 3 minutes to the gentlewoman from Texas (Ms. GRANGER).

Ms. GRANGER. Mr. Speaker, I rise to speak briefly about the State/Foreign Operations division of this omnibus package.

As the ranking member of the subcommittee, I am pleased that I have been able to work closely with Chairwoman LOWEY this year. She and her staff have worked to address concerns by committee Republicans and by me, and I thank her for her commitment to bipartisanship.

I also thank our Senate colleagues and our staff for working together to achieve common ground in the conference agreement. In the end, many priorities were preserved: funding a new compact for the Millennium Challenge Corporation; fighting drug trafficking in Mexico, Central America, and Colombia; and continuing security assistance to key allies like Israel, Egypt, and Jordan.

Funds provided in this bill will allow State and USAID to hire more than 1,000 new staff, which will help balance the three D's of smart power, the approach to national security. The increase for development and diplomacy will, in turn, support our Nation's defense and allow our military men and women to refocus on their core mission.

As the Congress provides additional staff and increases foreign assistance funding, the level of commitment to reform must be equal to funding commitment made. Oversight must be a priority. For that reason, the bill provides $139 million for inspectors general, and many oversight provisions and reporting requirements are also included.

The conference agreement retains language that prevents U.S. tax dollars from going to organizations that support or participate in involuntary or coercive methods of family planning. There are legitimate plans about family planning funding that goes abroad, and legislative safeguards will remain in place the next fiscal year.

I regret that this package lumps six bills together in a package of close to half a trillion dollars and does not allow this body to address appropriations bills individually and fully vet them so that I could support them. I support the many programs in this bill. However, we must be aware of the tremendous debt held by this country and work competently, being aware of this issue.

Again, I thank Chairman LOWEY, our excellent committee chair, and our Senate colleagues for working together to address shared priorities.

Mr. OLVER. I yield 3 minutes to the gentleman from Wisconsin (Mr. OBEY).

Mr. OBEY. Mr. Speaker, I would like to comment very briefly on the comments of the gentleman from Tennessee, who a few moments ago criticized us because we were some 70 days late in passing the Military Construction-VA appropriation bill.

Let me simply point out that we may be 70 days late, but we are getting the job done. In addition to passing the basic bill, we are, for the first time in history, providing advance funding for VA activities. That is something that the veterans community has wanted for years and years, and it has been this Congress that delivered.

That stands in contrast to the performance of the minority party when they chaired this institution with respect to what they produced on the Military Construction-VA bill. They complain about the fact that we were 70 days late. They never passed that bill at all. They didn't pass it in October. They didn't pass it in November, which would have been 30 days late. They didn't pass it in December, which would have been 60 days late. They never passed it. When a new Congress took over, we had to pass all of those domestic appropriation bills and the Military Construction bill. I think it is quaint, indeed, when they attack us on the question of performance on, of all bills, the Military Construction bill. I think they need to go back and take a look at the record when they chaired this place.

With respect to the funding overall levels in this overall bill, let me simply repeat what I said earlier. When you take into account the necessary increases for veterans disability, for the census, for the war costs which are not being hidden in a supplemental as they were under the stewardship of our friends on the other side of the aisle, when you take into account the infrastructure change in funding and the $6 billion that we needed to prepare the health care system for the legislation which is about to pass, the rest of the increases in the bill before us amount to 1 percent. I hardly think that that's excessive, given the economic crisis we face.

Mr. LATHAM. Mr. Speaker, just one comment. I think it's interesting to note the gentleman talked about that we are finally getting the Military Construction bill done, VA funding. The last two bills that we are funding are Defense, which will be 80 days out from the start of the new fiscal year, the Military Construction-VA bill.

But if you remember back with the schedule, the very first bill that was passed and signed into law was to fund Congress itself. We took care of ourselves here first and the military was the very, very last. I think that is very unfortunate.

I am now pleased to yield 2 minutes to the gentleman from Ohio (Mr. LATOURETTE).

Mr. LATOURETTE. I thank the gentleman for yielding. I am going to break the mold here and say something nice about five pages of the bill, this bill in front of me—I think those pages are right here—and say something nice about Mr. OBEY as well, and Mr. SERRANO is waving in the back.

By way of history, people know that the auto industry in this country got into trouble, and this administration made a decision to use leftover TARP funds to bail out Chrysler and General Motors. Both car companies submitted reorganization plans in February of this year and both were rejected by the auto task force.

The auto task force was kind of a strange collection of people that didn't have any experience in the auto industry at all. Most of them didn't own cars. Those that did own cars owned foreign cars, but they determined that the car companies had to be more aggressive when it came to dealerships. As a result, about 800 Chrysler dealers were closed and about 2,000 GM dealers. The problem with that is, with rampant unemployment, about 60 people work at each car dealership across this country. Car dealerships don't cost the car companies any money, and it was a strange way to do business and potentially take 200,000 people and put them on the street.

A couple of young, fresh-faced Democrats, Mr. MAFFEI of New York and Mr. KRATOVIL of Maryland, launched a legislative effort. But as a grizzled veteran, having been here for the last 15

years, I know that the one piece of legislation or pieces of legislation that have to leave town are the appropriations bills. We drafted some language and put it in Mr. SERRANO's bill, and Mr. OBEY took it. They didn't have to—they probably got in trouble for taking it—but that became the 800-pound gorilla that had to be dealt with as General Motors and Chrysler have moved forward on how to deal with this dealer situation.

I also want to say something nice about the majority leader, Mr. HOYER. He took up the mantle and said we are going to solve this problem. As a result, the five pages that are here in the bill indicate that those aggrieved dealers now have the opportunity for binding arbitration, and the facts need to be brought forward, and hopefully fairness will prevail. But that wouldn't happen without something good and bipartisan happening in the United States Congress.

Mr. LATHAM. Mr. Speaker, it is my honor to yield 1 minute to the minority leader of the House, the gentleman from Ohio (Mr. BOEHNER).

Mr. BOEHNER. We're broke. We're broke. America is broke. All year long our friends across the aisle have been on this massive spending spree that our Nation can't afford.

We had a trillion dollar stimulus bill that was supposed to create jobs immediately, and yet unemployment is now 10 percent in America. Three million people have lost their jobs since the bill was signed into law.

We passed a budget that's going to double the national debt in 5 years, triple it in 10 years. We have got a $12 trillion national debt.

We brought a national energy tax bill to the floor that's going to cost a trillion dollars, passed it. We had a health care bill here several weeks ago, another trillion dollars, passed it.

When are we going to say enough is enough? Here we are today. We are wrapping six appropriation bills together. We are going to spend a half a trillion dollars, and it has got over 5,000 earmarks in the bill, you know, things like $292,000 for the elimination of slum and blight in Scranton, Pennsylvania; $300,000 for music and education programs at New York City's Carnegie Hall, where they pay the employee who runs this program $580,000 a year in salary and benefits. There is plenty in here for Washington as well: $150,000 for the National Building Museum; $250,000 for the Wolf Trap Foundation for the Performing Arts, a concert venue.

Listen, I don't know how worthy any of these projects are, but I do have to ask the question, are they more important than our kids and our grandkids who have to pay the debt, because we don't have the money to spend on this. It's our kids and grandkids who are going to pay for it. Yet we can't find ways to cut spending.

Before the President took office, he said that he must go through the budg-

et and these bills line by line and page by page. Well, after Congress passed the $410 billion omnibus spending bill earlier this year, with 9,000 earmarks, the President signed it and he said, well, that was last year's business. Now the President says reducing the deficit is next year's business and that we need to spend our way out of this economic recession that we are in.

Well, I think the President ought to go through this bill line by line and page by page, all 2,500 pages of it, then maybe he will figure out that we don't need to be spending this money that we don't have and piling more and more debt on the backs of our kids and grandkids. Instead, our bond rating, our AAA bond rating is in jeopardy and our Democrat friends want to raise the debt limit next week by $1.8 trillion.

Let's stop the madness and vote "no."

□ 1330

Mr. OLVER. Mr. Speaker, how much time does each side now have?

The SPEAKER pro tempore. The gentleman from Massachusetts has 7 minutes remaining, and the gentleman from Iowa has 3 minutes remaining.

Mr. OLVER. Mr. Speaker, I yield 3 minutes to the gentleman from Wisconsin (Mr. OBEY).

Mr. OBEY. Mr. Speaker, I regret that this has become another typical "Who Shot John" debate, but since it has, let me respond to the distinguished minority leader. Let's compare what President Obama inherited with what President Bush inherited. When President Bush walked into the White House, he inherited $6 trillion in projected surpluses. He inherited 3 years in a row of budget surpluses under President Clinton. And he inherited an economy in which all income groups saw their income rise by roughly the same percentage.

In contrast, when Mr. Obama walked into the White House, he inherited a $1 trillion deficit, he inherited two wars that were paid for on the cuff, with borrowed money. He inherited $6 trillion in projected deficits. And he inherited an economy in which, for six straight years, 94 percent of the income growth went to the wealthiest 10 percent of people, and everybody else got table scraps. In addition, he inherited an economy that was projected to have a $2.5 trillion hole because of the biggest collapse of the economy in 75 years.

And so, indeed, Mr. Obama and the majority party in this Congress spent money to try to prime the pump, to keep the economy going, because we were losing 700,000 jobs a month the last 3 months of the Bush administration. We have now got that down to an 11,000 job loss last month. That's not good enough, but it's certainly a lot better than the situation was when we inherited it.

The gentleman squawks about the debt ceiling. The debt has already been rung up, and now the question is, when

the bill comes in the mail, is it going to be paid or not. The fact is, out of that $1.8 trillion debt increase, $1.4 trillion of that is directly traceable to policy actions that were taken by the previous administration and the previous Republican Congress. And $400 billion of it are directly traceable to the actions we've had to take to try to bail the economy out of the mess that you folks got us in.

So if you want to start comparing records, I'd be happy to. I'd much prefer to talk about the contents of this bill and the individual programs of this bill. But since some the gentlemen on that side of the aisle prefer to politicize everything, I guess we're going to have to have the debate at that level. That's too bad, but I've come to expect very little but that from the other side, I regret to say.

I do want to thank the gentleman from Ohio for trying insert a bit of bipartisanship into the debate.

Mr. LATHAM. Mr. Speaker, I yield myself as much times as I may consume.

I don't know if the gentleman has more speakers, but I'm planning on closing. I just want to thank the staff, on both sides. Our subcommittee does an outstanding job working together, and I'm just very, very proud of the work that they've done and the kind of commitment they've shown, and just want to say thank you for the professionalism that they have exhibited throughout this whole process.

Mr. Speaker, I'm going to oppose this for various reasons. Number one, the fact that this $450 billion bill is a 14 percent increase in spending over last year. At a time when people are hurting, we cannot afford this kind of additional debt that's being put on the taxpayers, on the families at home. Realizing that in the last 2 years, discretionary spending in this House of Representatives has increased now, 85 percent; 85 percent more money, discretionary money, being spent today than just 2 years ago. Does anybody at home have 85 percent more money today than what they had 2 years ago? Is it responsible in any way, shape or form to have that kind of an increase?

The gentleman from Massachusetts—and I appreciate his professionalism—made the case, basically, for me before. We held down spending previously. And this explosion that we've seen just throughout the budget is simply wrong. We cannot sustain it, and it is about the next generations. I've got four grandchildren. They're going to pay this bill, and their children are going to pay this bill, and it simply is not fair. It's generational theft. And we've got to finally hold the line as far as spending in this Congress and find some kind of sanity around here.

With that, again, I would hope that everyone would vote "no." We could get some reality. We could separate these bills, have them done correctly and in a responsible way. And just one other thing in closing. I want to, again,

thank Chairman OLVER for being a very good friend, his professionalism, and someone that I really admire.

Mr. Speaker, I yield myself the balance of my time.

Mr. OLVER. I yield myself the remainder of the time.

The SPEAKER pro tempore. The gentleman from Massachusetts is recognized for 4 minutes.

Mr. OLVER. Mr. Speaker, my counterpart, the ranking member from Iowa, has graciously thanked the people on both sides who have done all of the work that our subcommittee dealt with. Actually, since there's six different bills here, I would like to extend that thanks to the people on the staffs of each of the six subcommittees on each side of the aisle who put countless hours into the work that has brought this bill to the floor at this time.

But particularly, let me just personalize it one more step. On our side, my clerk, Kate Hallahan, and on the Republican side, their clerk, Dena Baron, and the people who work under them, for them and with them, and for us and for the people of the country. They have done an exemplary job in the THUD committee, as I think each of the other groups have done for their own particular subcommittee. We should all be very grateful for that.

With the passage of this bill—and I'm going to urge passage as I close—we will on our side have completed the work on 11 of the 12 bills, and thereby we will be a very large step closer to the finish of the budgetary process necessary to provide for the year 2010. And so I am very optimistic today, in fact, a great load rises from the shoulders of all the chairs and ranking members of the subcommittees.

With that, let me just urge a "yes" vote on this budget bill in order to be able to reach that point very close to the completion of our work.

Mr. VAN HOLLEN. Mr. Speaker, I rise in support of the Consolidated Appropriations Act of 2010 and urge its swift consideration by our colleagues in the Senate.

This legislation includes final conference reports for the FY 2010 Transportation-HUD, Commerce-Justice-Science, Financial Services, Labor-HHS-Education, Military Construction-VA and State-Foreign Operations bills. Its total funding of $446.8 billion makes priority investments in infrastructure, health care, and education, while supporting our veterans, funding the upcoming census and honestly accounting for war costs previously left to supplementals. Remaining items in the bill are limited to a 1% funding increase.

The $50 billion in infrastructure spending in this bill—including $150 million for the Washington Metropolitan Area Transit Authority—will enable us to modernize our aging infrastructure, ease congestion, facilitate commerce and create good-paying, homegrown American jobs. To further bolster our economic recovery, HR 3288 provides $824 million to the Small Business Administration for its work helping our job-generating small businesses succeed. This investment will help facilitate an additional $28 billion in new lending to small businesses. I am delighted that the

National Institutes of Health is funded at $31 billion so that it can continue driving scientific innovation and health system reform. Finally, I am especially pleased that the Financial Services division of this consolidated legislation sets up a fair and reasonable process by which profitable auto dealers can have an opportunity to get back into business so that they and their employees can play their part in supporting our ongoing economic recovery. In that regard, I ask that the full text of the attached statement be entered into the legislative RECORD.

Mr. Speaker, I rise today to express my appreciation that language has been included in the Financial Services Appropriations Conference Report that will give automobile dealers around the nation a fair and reasonable shot at getting back into business. For the past several months, I have been pleased to join with Majority Leader HOYER, Congressmen KRATOVIL and MAFFEI, and others to ensure that profitable car dealers have every opportunity to contribute to our economic recovery and put their employees back to work.

Profitable and viable dealers should have never been terminated in the first place, and I was proud to join the fight to have these short-sighted decisions reversed. Automobile manufacturers won't be able to get back on their feet without a strong dealer network, and Congress is committed to ensuring that such a network exists. I salute the tenacity and determination of these small business owners, many of whom have been exiting cars and supporting the American auto industry for decades. Under the provision we are approving today, these terminated dealers will have an opportunity, once again, to do what they do best—sell and service cars. And that is good for our economy, for job creation and for the American car industry.

It would have been my preference that we would not need to legislate on this matter. We convened talks with the auto dealer groups and the manufacturers and while both sides offered significant concessions, efforts to achieve a non-legislative solution failed when auto manufacturers offered plans that fell short of what was needed to add dealers to their dealer networks and put their employees back to work.

As 2009 comes to a close, the federal government still maintains a substantial financial stake in Chrysler and General Motors and therefore in the United States automobile industry. Clearly, it is in the national interest to have the domestic automobile industry regain profitability and maintain sufficient dealerships to meet consumer demand.

Section 747 of the Financial Services Appropriations division of this bill recognizes the valuable role that dealers play in the auto industry and our local economies. Automobile dealers are essential to the success of automobile manufacturers because at no material cost to the manufacturers, they facilitate distribution, sales, and servicing of hundreds of millions of vehicles annually. This legislation is premised on the notion that it is in the best interest of automobile manufacturers, the automotive industry, dealers and the public to have an extensive and competitive automobile distribution network throughout the country, including in urban, suburban and rural areas.

Section 747 mandates that manufacturers promptly provide covered auto dealers in writing the specific criteria and supporting data relied upon by a manufacturer in its decision to end or wind down the dealership relationship. In the spirit of cooperation and to ensure an efficient process as this legislation is implemented, we expect that the manufacturers will provide the information in a format that is user friendly, clearly identifies facts, readily accessible, and understandable by the dealer and that the data may be transmitted either by mail or electronically. We intend that this process provide transparency and avoid the excessive costs and delays of litigation and discovery disputes. The manufacturers should provide their respective covered dealers with each and every detail and criterion related to the evaluations of the dealership and the decisions to terminate, not assign, not renew or discontinue. It is anticipated that the manufacturers will be cooperative and forthcoming and that all relevant information will be provided promptly.

It further provides such dealers with the opportunity to participate in a neutral arbitration process designed for the dealer to make the case for being added to the manufacturer's dealer network. Congress has included specific timeliness for this process and we expect both parties to the arbitration to act in good faith and expeditiously so that added dealers can return to full-fledged operations quickly.

Section 747 expressly permits the manufacturer and dealer to present any kind of relevant information during the arbitration and provides that the arbitrator shall decide whether the dealer should be added to the manufacturer's dealer network based on a balancing of the interests of the dealer, the manufacturer, and the general public. The public interest includes reasonably convenient access for consumers to a dealer who can service their vehicles, which is of particular concern in rural areas where many dealers were terminated in 2009. It has been well-reported that more and more individuals have to drive substantial distances to obtain service from an authorized dealer of a specific brand because of a dealer termination.

Congress has provided seven enumerated factors for the arbitrator to consider, but this list is not exhaustive because the legislation provides that the parties can introduce "any relevant information." For example, we expect that arbitrators should consider relevant State laws, which provide a context for analyzing franchise agreements and the obligations of dealers and manufacturers.

A couple of these enumerated criteria merit additional explanation. For example, Congress has directed that the demographic and geographic characteristics of the market are taken into account. This reflects our intention that the arbitrator should pay special attention to the concerns expressed by some terminated dealers that there are factors in their market areas or States that affect their performance and render some measurements, such as State averages, less than accurate in portraying the true picture of a dealer's operations.

Another one of the factors involves the dealer's performance under the franchise agreement terminated in 2009. In considering this factor and related factors, it is important for arbitrators to recognize that state law is part and parcel of and modifies auto dealer franchise agreements. To look only at a franchise agreement, in other words, misses an important contextual element. Accordingly, it is anticipated that the arbitrators will consider State

law elements of good faith and fair dealing in this process and that, for example, the franchise agreement's performance standards and a dealer's performance under the original agreement may be evaluated in accordance with State law.

Another factor is the historic profitability of the dealership. During the legislative process, Congress learned that some dealers, for tax planning reasons or other reasons use a variety of legitimate, widely recognized accounting conventions, such as LIFO, that could, depending on the date a snapshot is taken, affect materially whether the dealership appears profitable. It is important that arbitrators recognize such accounting conventions when considering the profitability of a dealership so a fair and accurate picture is obtained.

With respect to being added back to a dealer network, it is the intent of Congress that notwithstanding the preference of a manufacturer to have several brands in the same dealership, in the case of a dealer seeking to be added to a dealer network but with fewer than all of the preferred brands, the dealer nonetheless will be eligible to be added.

It is worth noting that pursuant to subsection (f), manufacturers and dealers may, of their own volition, decide to enter into legally binding agreements with one another instead of going through the arbitration process. It is the intent of Congress that for this subsection to apply, the legally binding agreements shall be consensual, non-coercive resolutions of the issue between the dealer and the manufacturer entered into or ratified after the date of enactment. Coercive agreements should not be upheld.

In conclusion, I want to recognize the tireless efforts of dealers from around the Nation who worked to develop and implement a truly historic grassroots effort over the past seven months. Groups such as the Committee to Restore Dealer Rights, the Automobile Trade Association Executives, National Automobile Dealers Association and the National Association of Minority Auto Dealers, were instrumental in bringing about the legislation we are approving today.

Mrs. BACHMANN. Mr. Speaker, today, the House of Representatives once again sidestepped its constitutional obligation to fund our Nation's Federal priorities in a responsible manner and railroaded a massive spending bill through the House without allowing an open and honest debate that American taxpayers deserve. While I believe this legislation contains important funding for many programs administered by Federal agencies, spending bills and the projects they fund must be considered individually on their merits, and not obscured by being tucked into a giant "omnibus" spending package.

Right now, the national debt has already ballooned to a whopping $12.1 trillion and Democrats are ready to increase the debt limit by another $1.8 billion to accommodate their rabid spending habits. But at a time when American families are struggling to make ends meet and Federal deficits are skyrocketing at a record pace, it is absolutely necessary for Congress to fully commit to fiscal responsibility and scrutinize how every tax dollar is spent. While I understand the difficulty associated with such a large task, I, like so many of my colleagues, believed the Democrat majority when they pledged to "create the most honest, most open, and most ethical Congress in

history." I was hopeful that their stated commitment to open government would entail the individual consideration of each of the 12 annual appropriations bills, setting a path towards restoring the confidence and trust of the American people.

Unfortunately, the actions taken today indicate that our leadership is content with the status quo, and will avoid difficult decisions that should be made in order to prevent saddling future generations with debilitating debt. By combining half of the total appropriations bills into one measure, this majority has shown that it has no interest in real transparency and is more focused on growing government to accommodate their tax-and-spend agenda than being good stewards of the taxpayers' money.

Congress should show the American people that it is serious about making the same tough choices American families make every month. But this bill's 24 percent increase in government spending ignores the realities of our limited budget and assumes the taxpayers will just pick up the tab in future years. While the bill includes some of Minnesota's local priorities, it strays far from representing anything but a big government spending bill that lacks any consideration of our massive budget deficit.

Indeed, in the same manner as households across America set a budget, Washington needs to set a budget, and stick to it. However, the tax and spend approach to government being exhibited this year serves as a haunting indication that no amount of spending or government control is too much for the Democrats. That said, it is my sincere hope that as Congress moves forward with next year's budget and spending priorities, strict attention will be paid to protecting the American taxpayer and fostering an atmosphere of bipartisan cooperation and fiscal responsibility.

Mr. CONYERS. Mr. Speaker, I would like to thank the Conferees for including section 747, which regulates the relationship between automobile manufacturers and automobile dealerships. I, along with Majority Leader STENY HOYER, and Representatives CHRIS VAN HOLLEN, DANIEL MAFFEI, FRANK KRATOVIL, STEVEN LATOURETTE, JACKIE SPEIER, ROBERT BRADY, BETTY SUTTON, and BOB ETHERIDGE worked together to create legislation that will best serve the interests of the automobile industry, including manufacturers and dealerships, and the citizens who have a significant portion of their tax dollars invested in the success of this critical industry. The following is a description of the legislation.

Section 747 of the Conference Agreement includes language establishing an arbitration process to determine whether previously terminated, non-assigned, non-renewed, or non-continued auto dealerships should be added to dealership networks of automobile manufacturers that received federal assistance under the TARP program, or that are partially owned by the Federal Government. This provision replaces Section 745 of the House bill, which also addressed concerns regarding terminated auto dealerships.

It is in the national interest to protect the substantial federal investment in automobile manufacturers by assuring the viability of such companies through the maintenance of sufficiently sized dealership networks to meet consumer demand for sales and servicing nationally. In addition to facilitating the maintenance

and growth of industry market share among manufacturers that benefited from TARP funds, and in which the taxpayers have a significant financial investment, it is in the national interest to ensure that dealerships and manufacturers are each treated fairly in their business relationships based on their respective economic interests.

Evidence obtained over the course of numerous Congressional hearings in 2009 demonstrates that the automobile industry is integral to the health of the United States economy as a whole. Automobile manufacturers have been among the largest and most successful corporations in the United States, providing significant numbers of jobs and producing valuable goods for consumers. Automobile dealerships are also essential businesses in most communities nationally, providing many jobs to local residents and facilitating the distribution, sales, and servicing of millions of vehicles annually. Our investigations have made clear that it is in the best interest of the automobile industry, automobile manufacturers, dealerships and the public to have a competitive and economically viable domestic automobile distribution network throughout the country, including urban, suburban, and rural areas.

This provision was included because we also believe that by providing a process for working out the relationship between automobile manufacturers and dealerships that ensures transparency and review by a neutral arbitrator according to an equitable and balanced standard, taking into account the interests of all affected parties, the property and due process rights of manufacturers and dealerships will be safeguarded.

Section 747 establishes a procedure by which an automobile dealership that had a franchise agreement for a vehicle brand that was not assigned to a covered manufacturer, or that was terminated in a manner not consistent with applicable state law, on or before April 29, 2009, may seek continuation or reinstatement of the franchise agreement, or seek to be added as a franchisee to a dealership network of the covered manufacturer who manufactures the vehicle brand of the covered dealership, with such franchisee being located in the geographic area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Absent such election by the covered dealership, no such binding arbitration would occur.

In order to provide a covered automobile dealership with the information useful to determine whether to elect to enter into binding arbitration, the dealership will receive in writing notice from the covered manufacturer detailing the specific criteria pursuant to which such dealership's franchise agreement was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer. This notice must be provided within the 30-day period beginning on the date of the enactment of this Section. This transparency is a vital step in giving dealership the opportunity to understand why their franchise agreements were terminated, not renewed, or were not assumed and assigned to a covered manufacturer. It is our expectation that this transparency will obviate the need for unnecessary arbitration. It is also our expectation that this transparency will encourage informal agreements between covered dealerships and manufacturers without

*December 10, 2009*        CONGRESSIONAL RECORD—— HOUSE        **H14479**

recourse to the more formal procedures provided in this Section. We expect that the written transmittal letter will also provide appropriate contact information, including an e-mail address, to enable the dealership to contact the manufacturer should the dealership have specific questions about the dealership's information and individual criteria contained in such letter.

The Conference Agreement provides such dealerships with the opportunity to elect to participate in a neutral arbitration process designed to permit the dealership to present information in support of its addition to the manufacturer's dealership network, and for the manufacturer to present information against such addition based on its business plan and future economic viability. The arbitrator in each case shall balance the interests of the covered dealership, the covered manufacturer, and the public and will decide based on that balancing whether or not the covered dealership should be added to the dealership network of the covered manufacturer. These are the only remedies the arbitrator may provide. The Conference Agreement specifically prohibits the awarding of compensatory, punitive, or exemplary damages to any party.

The Conference Agreement sets out seven specific factors that the arbitrator should consider in ruling on each case. The list is not exclusive, and the arbitrator would have the discretion to consider all the relevant facts on a case-by-case basis. In considering whether adding the covered dealership to the covered manufacturer's dealership network is in the public interest, the arbitrator should consider, among other factors, the need for reasonable access for consumers to a dealership that can service their vehicles, which is of particular concern in rural areas. The arbitrator should also consider the impact on the viability of the manufacturer of adding the dealership to the manufacturer's network, the length of experience of the dealership, the dealership's historical profitability and current economic viability, and demographic and geographic characteristics of the market.

It is our understanding that the General Commercial Rules of the American Arbitration Association shall apply to the arbitration proceeding, except to the extent that a rule is inconsistent with any provision of this Section.

Subsection (f) addresses negotiations between a covered manufacturer and a covered dealership, whether acting individually, as a group, or through an organization acting on behalf of one or more covered dealerships. The provision is intended to ensure that any legally binding agreement, such as a memorandum of understanding, resulting from a voluntary negotiation between a covered manufacturer and a covered dealership, a group of covered dealerships, or an organization acting on behalf of one or more covered dealerships will not be disturbed by this section. It also makes clear that once a covered dealership is party to such an agreement, such covered dealership would not be eligible for the arbitration remedy in this section.

It is not the intent of Congress to bar a covered dealership from the provisions of this section if the covered dealership accepted a standard form contract prepared by the covered manufacturer and offered on a "take-it-or-leave-it" basis, even if the agreement was entered into voluntarily. As a consequence, a covered dealership that accepted a "wind-

down" agreement drafted by a covered manufacturer would be able to avail itself of the provisions of this section. An agreement between a covered manufacturer and a covered dealership, whether acting individually, as a group, or as part of a group of dealerships acting through an organization, will be considered voluntarily negotiated if the agreement between the parties reflects a compromise based on written or oral discussions, even if one party to the negotiation is the principal or primary drafter of the agreement.

We choose this approach because binding arbitration by a neutral arbitrator is the most appropriate means of resolving the differences between covered dealerships and manufacturers, and to protect the taxpayers, and the broader economy. For this reason, the Conference Agreement sets out a procedure for ensuring that a neutral arbitrator conducts the arbitration according to a clear standard with factors the arbitrator must weigh.

Due to the time sensitive nature of this situation, the Conference Agreement provides that a covered dealership must elect to pursue arbitration no later than 40 days of the date of enactment of this section, that such arbitration must commence as soon as practicable and must be submitted to the arbitrator for deliberation not later than 180 days of such date. The arbitrator is given the flexibility to extend that period for up to 30 days for good cause. The arbitrator then has seven business days after the arbitrator determines that the case has been fully submitted to issue a written opinion.

Section 747 expressly permits the manufacturer and dealership to present any kind of relevant information during the arbitration. As an additional means of ensuring efficiency and economy in the arbitration process, the provision prohibits depositions and limits discovery to documents specific to the covered dealership.

Section 747 also makes clear that a manufacturer may terminate a covered dealership in accordance with applicable state law.

I yield back the balance of my time.

The SPEAKER pro tempore. All time for debate has expired.

Under the rule, the previous question is ordered.

The question is on the conference report.

Pursuant to clause 10 of rule XX, the yeas and nays are ordered.

Pursuant to clause 8 of rule XX, this 15-minute vote on adoption of the conference report will be followed by a 5-minute vote on suspending the rules and passing H.R. 4017.

The vote was taken by electronic device, and there were—yeas 221, nays 202, answered "present" 1, not voting 10, as follows:

[Roll No. 949]

YEAS—221

| | | |
|---|---|---|
| Abercrombie | Bishop (GA) | Cardoza |
| Ackerman | Bishop (NY) | Carnahan |
| Altmire | Blumenauer | Carson (IN) |
| Andrews | Boccieri | Castor (FL) |
| Arcuri | Boswell | Chandler |
| Baca | Boucher | Chu |
| Barrow | Boyd | Clarke |
| Bean | Brady (PA) | Clay |
| Becerra | Braley (IA) | Cleaver |
| Berkley | Butterfield | Clyburn |
| Berman | Capps | Cohen |
| Berry | Capuano | Connolly (VA) |

| | | |
|---|---|---|
| Conyers | Kagen | Price (NC) |
| Costa | Kanjorski | Quigley |
| Courtney | Kaptur | Rahall |
| Crowley | Kennedy | Rangel |
| Cuellar | Kildee | Reyes |
| Cummings | Kilpatrick (MI) | Richardson |
| Davis (AL) | Kilroy | Rodriguez |
| Davis (CA) | Kirkpatrick (AZ) | Ross |
| Davis (IL) | Kissell | Rothman (NJ) |
| Davis (TN) | Klein (FL) | Roybal-Allard |
| DeFazio | Kosmas | Ruppersberger |
| DeGette | Langevin | Rush |
| Delahunt | Larsen (WA) | Ryan (OH) |
| DeLauro | Larson (CT) | Salazar |
| Dicks | Lee (CA) | Sánchez, Linda T. |
| Dingell | Levin | |
| Doggett | Lewis (GA) | Sanchez, Loretta |
| Doyle | Loebsack | Sarbanes |
| Edwards (MD) | Lofgren, Zoe | Schakowsky |
| Edwards (TX) | Lowey | Schauer |
| Ellison | Luján | Schiff |
| Engel | Lynch | Schrader |
| Eshoo | Maffei | Schwartz |
| Etheridge | Maloney | Scott (GA) |
| Farr | Markey (CO) | Scott (VA) |
| Fattah | Markey (MA) | Serrano |
| Filner | Massa | Sestak |
| Foster | Matsui | Shea-Porter |
| Fudge | McCarthy (NY) | Sherman |
| Garamendi | McCollum | Sires |
| Giffords | McDermott | Slaughter |
| Gonzalez | McGovern | Smith (WA) |
| Grayson | McIntyre | Snyder |
| Green, Al | McMahon | Space |
| Green, Gene | McNerney | Spratt |
| Griffith | Meek (FL) | Stark |
| Gutierrez | Meeks (NY) | Sutton |
| Hall (NY) | Michaud | Teague |
| Halvorson | Miller (NC) | Thompson (CA) |
| Hare | Miller, George | Thompson (MS) |
| Harman | Mollohan | Tierney |
| Hastings (FL) | Moore (KS) | Titus |
| Heinrich | Moore (WI) | Tonko |
| Herseth Sandlin | Murphy (CT) | Towns |
| Higgins | Murphy (NY) | Tsongas |
| Hill | Murphy, Patrick | Van Hollen |
| Himes | Nadler (NY) | Velázquez |
| Hinchey | Napolitano | Visclosky |
| Hinojosa | Neal (MA) | Walz |
| Hirono | Nye | Wasserman |
| Hodes | Oberstar | Schultz |
| Holden | Obey | Waters |
| Holt | Olver | Watson |
| Honda | Ortiz | Watt |
| Hoyer | Pallone | Waxman |
| Inslee | Pascrell | Weiner |
| Israel | Pastor (AZ) | Welch |
| Jackson (IL) | Payne | Wexler |
| Jackson-Lee (TX) | Perlmutter | Wilson (OH) |
| Johnson (GA) | Perriello | Woolsey |
| Johnson, E. B. | Peters | Wu |
| | Pingree (ME) | Yarmuth |
| | Pomeroy | |

NAYS—202

| | | |
|---|---|---|
| Aderholt | Cantor | Foxx |
| Adler (NJ) | Cao | Franks (AZ) |
| Akin | Capito | Frelinghuysen |
| Alexander | Carney | Gallegly |
| Austria | Carter | Garrett (NJ) |
| Bachmann | Cassidy | Gerlach |
| Bachus | Castle | Gingrey (GA) |
| Baird | Chaffetz | Gohmert |
| Bartlett | Childers | Goodlatte |
| Barton (TX) | Coble | Gordon (TN) |
| Biggert | Coffman (CO) | Granger |
| Bilbray | Cole | Graves |
| Bilirakis | Conaway | Guthrie |
| Bishop (UT) | Costello | Hall (TX) |
| Blackburn | Crenshaw | Harper |
| Blunt | Culberson | Hastings (WA) |
| Boehner | Dahlkemper | Heller |
| Bonner | Davis (KY) | Hensarling |
| Bono Mack | Deal (GA) | Herger |
| Boozman | Dent | Hoekstra |
| Boren | Diaz-Balart, L. | Hunter |
| Boustany | Diaz-Balart, M. | Inglis |
| Brady (TX) | Donnelly (IN) | Issa |
| Bright | Dreier | Jenkins |
| Broun (GA) | Driehaus | Johnson (IL) |
| Brown (SC) | Duncan | Johnson, Sam |
| Brown-Waite, Ginny | Ehlers | Jones |
| | Ellsworth | Jordan (OH) |
| Buchanan | Emerson | Kind |
| Burgess | Fallin | King (IA) |
| Burton (IN) | Flake | King (NY) |
| Calvert | Fleming | Kingston |
| Camp | Forbes | Kirk |
| Campbell | Fortenberry | Kline (MN) |

# EXHIBIT K

Not Reported in F.Supp.2d, 2009 WL 2568332 (S.D.N.Y.)

<u>Motions, Pleadings and Filings</u>
<u>Judges and Attorneys</u>
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
IDEA NUOVA, INC., Plaintiff-Respondent,
v.
GM LICENSING GROUP, INC., Defendant-Petitioner.

No. 08 Civ. 8595(PKC).
Aug. 19, 2009.

West KeySummary

⟜25T Alternative Dispute Resolution
   ⟜25TII Arbitration
      ⟜25TII(G) Award
         ⟜25Tk327 Mistake or Error
            ⟜25Tk329 k. Error of Judgment or Mistake of Law. <u>Most Cited Cases</u>

   Novelty products company was not entitled to vacatur of an arbitration award granted to a consulting company for breach of contract. The arbiter's decision to enforce an oral contract renewal was not a manifest disregard for the law. The novelty products company failed to establish that the parties consented to apply New York law to their arbitral disputes or that the arbiter had knowledge of New York law in order to make a decision. 9 U.S.C.A. § 10(a).

*MEMORANDUM AND ORDER*

<u>P. KEVIN CASTEL</u>, District Judge.

   *1 Plaintiff-Respondent Idea Nuova, Inc. ("Idea Nuova") brings this action to vacate or modify a Final Arbitration Award (the "Award") issued in favor of Defendant-Petitioner GM Licensing Group, Inc. ("GM"). The question before the arbitrator was whether Idea Nuova had orally renewed its consulting agreement with GM and, if so, whether GM was entitled to monetary and injunctive relief as a result of that renewal. The arbitrator found that Idea Nuova had both renewed and breached its agreement with GM, and the Award granted compensatory damages, attorney's fees and injunctive relief to GM under the renewed agreement. Idea Nuova contends that the Award is unlawful and should be vacated pursuant to <u>section 10</u> of the Federal Arbitration Act ("FAA"), <u>9 U.S.C. § 1 et seq.</u> (2006), or modified pursuant to section 11 of the FAA. (Second Amended Complaint ("Compl."), at ¶ 45.) Idea Nuova also seeks a declaratory judgment that, contrary to the arbitrator's finding, it did not renew its agreement with GM in May 2006. ( *Id.* ¶ 61.)

   Two motions are presently before the Court: GM petitions for confirmation of the Award under section 9 of the FAA and an award, pursuant to the parties' agreement, of its costs, attorney's fees and other expenses in this action. Idea Nuova moves, in the alternative, for summary judgment on the claims in its Second Amended Complaint or for vacatur or modification of the Award. For the reasons explained below, GM's petition is granted and Idea Nuova's motions are denied.[FN1]

      <u>FN1.</u> Idea Nuova is a New York corporation with its principal place of business in New York, New York. (Compl. at ¶ 1.) GM is a California corporation with its principal place of business in the State of California. (Petition to Confirm Arbitration Awards ("Pet."), at 1.) The Court has subject matter jurisdiction over this action pursuant to <u>28 U.S.C. § 1332</u>.

I. *Background*

Idea Nuova is a New York-based company that markets novelty products for the home and specializes in novelty bedding. (Compl.¶ 12.) On December 16, 2002, Idea Nuova entered into a written consulting agreement (the "Agreement") with GM, under which GM would provide Idea Nuova with consulting services to "help ... acquire the licensing rights to comic and cartoon characters, live action, feature films, brands, logos, and other properties." (Agreement at 1, attached at Pet. Ex. A & Compl. Ex. A.) The term of the Agreement was one year, from January 1, 2002 through December 31, 2003, but could be "extended by a written agreement signed by both parties." *Id.* at 2. The parties subsequently renewed the Agreement through 2004 and 2005. (Compl. Ex. B & C.)

The Agreement included the following arbitration clause at section 8, under the heading "Attorneys' fees:"

In the event of a dispute arising hereunder, the parties must attempt to resolve same for a period of forty-five (45) days after which time the dispute shall be submitted to [American Arbitration Association] arbitration for resolution. In such arbitration, the discovery rules of the California Code of Civil Procedure shall apply. If either party succeeds in any legal or other proceeding in connection with the other party's violation of this agreement or other improper act or omission, the prevailing party will be entitled to receive from the losing party reimbursement for the prevailing party's reasonable attorneys' fees and costs and other expenses of such proceedings.

**\*2** (Agreement at 3.)

The Agreement did not include a choice of law provision other than its specification that arbitration-related discovery would be governed by the California Code of Civil Procedure.

Beginning in late 2005 and early 2006, GM and Idea Nuova exchanged several proposals regarding the renewal and possible modification of the Agreement. According to Idea Nuova, these efforts proved unsuccessful and the parties failed to renew the Agreement past December 31, 2005. GM maintains that the parties orally agreed to a three-year extension of the Agreement during their negotiations. On or about November 27, 2006, GM demanded arbitration pursuant to the Agreement's arbitration clause and sought a determination that: (i) the Agreement had been renewed for a three-year period, from January 1, 2006 through December 31, 2008, during oral negotiations that occurred in May 2006; and (ii) Idea Nuova owed GM certain commissions under the renewed Agreement. *See* Interim Arbitration Award ("Interim Award"), at 4.

Hearings were held before the arbitrator on November 19 and 20, 2007 ("Hearing One"), and the first of three interim awards was issued on December 20, 2007. In that award, the arbitrator found that "the parties did intend that renewals of the Agreement would be reflected in a signed, written agreement." ( *Id.* at 7.) But the arbitrator also concluded that both California contract law and principles of equitable estoppel supported enforcement of an oral agreement to renew, even without subsequent reduction of that agreement to writing, where both parties intended their oral agreement to be binding. ( *Id.* at 8.) Applying these standards to the evidence, the arbitrator found that "the parties renewed the Agreement for the period extending from January 1, 2006 through December 1, 2008 ...." ( *Id.* at 11.) [FN2]

> [FN2.] The arbitrator later corrected this initial finding to state that the renewed Agreement extended through December 31, 2008 and not December 1, 2008. See Interim Award No. 2 (As Modified), at 1 n. 1.

In March 2008, Idea Nuova moved to terminate the arbitration, arguing that, by reason of the Agreement's "cooling-off period" clause, the parties had resolved all of the issues then eligible for arbitration. (Interim Award No. 2 (As Modified), at 2.) According to Idea Nuova, the arbitration of additional issues, including which, if any, of its outstanding license agreements triggered post-demand

commissions to GM under the Agreement, would violate the Agreement's express requirement that the parties attempt to resolve their claims for forty-five days prior to seeking arbitral relief. ( *Id.* ) GM opposed Idea Nuova's motion to terminate and moved for leave to file an Amended Demand for Arbitration. ( *Id.* ) The arbitrator heard oral argument of both motions and granted GM leave to amend on March 17, 2008.( *Id.* ) Hearings continued in April, May and June of 2008, and the arbitrator issued his Second Interim Award on August 18, 2008. The Second Interim Award formally granted GM's motion to file a supplemental and amended Demand for Arbitration, denied Idea Nuova's March 2008 motion to terminate the arbitration, and identified specific license and special sales agreements under which GM was entitled to commissions. ( *Id.* 18-19.) The Second Interim Award expressly included "license agreements entered into by [Idea Nuova] after September 2006 with licensors to which GM had rendered consulting services in or before September 2006" in its definition of the "Covered Agreements" that entitled GM to related sales commissions. ( *Id.* at 16-17.)

**\*3** The arbitration hearings continued on September 16 and 17, 2008. The arbitrator issued his Third Interim Award on November 24, 2008, finding that Idea Nuova had conceded its breach of the Agreement and calculating specific dollar amounts due to GM as a result of that breach. (Interim Award No. 3, at 19-20.) The Third Interim Award granted compensatory damages to GM and also awarded injunctive relief and reimbursement of the costs incurred by GM in connection with the arbitration. ( *Id.* at 20-23.) <u>FN3</u>

> <u>FN3.</u> The Third Interim Award's injunction provision required Idea Nuova to: (i) timely deliver copies of all Covered Agreements to GM; (ii) render full and accurate accountings to GM, as required under paragraph three of the Agreement; (iii) timely deliver any supporting royalty reports relevant to such accountings; (iv) timely deliver copies of any supporting purchase orders and invoices pertaining to Special Sales; (v) timely pay all commissions due under its accountings; and (vi) pay additional interest payments of one and a half percent (1.5%) on all late commission payments to GM. (Interim Award No. 3, at 21-22.)

The arbitrator issued his Final Arbitration Award on January 21, 2009, reaffirming all three interim awards in their entirety and specifying a fee award of $323,175.53. (Award at 1-3.)

## II. *Subsequent procedural history*

Idea Nuova commenced this action on October 8, 2008 and filed an amended complaint on November 25, 2008. (Dkt.Nos.1, 6.) At an initial pre-trial conference on December 5, 2008, the Court granted Idea Nuova permission to further amend its complaint within 20 days of the arbitrator's final award. (Dkt. No. 8) Idea Nuova filed its Second Amended Complaint on January 23, 2009. (Dkt. No. 9.)

On February 24, 2009, GM petitioned for confirmation of the Award and an award of its reasonable costs and attorney's fees. (Dkt. No. 14.) Idea Nuova responded to GM's petition on March 24, 2009 by moving for summary judgment on, in the alternative, for vacatur or modification the Award under <u>sections 10</u> and <u>11</u> of the FAA. (Dkt. No. 23.)

## III. *Confirmation and vacatur under the FAA*

"Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court,' and the court 'must grant' the award 'unless the award is vacated, modified, or corrected.' ' *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir.2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984), and <u>9 U.S.C. § 9</u>). The FAA permits vacatur of an arbitral award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon

sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 90-91 (2d Cir.2008)*, cert. granted, --- U.S. ----, 129 S.Ct. 2793, 174 L.Ed.2d 289 (June 15, 2009) (No. 08-1198) (citing 9 U.S.C. § 10(a)).*FN4*

> FN4. Section 11 of the FAA lists various circumstances in which an award may be modified or corrected, including "where the arbitrators have awarded upon a matter not submitted to them." 9 U .S.C. § 11. Idea Nuova does not cite any specific provisions from this section to support its motion.

District courts may also vacate an arbitral award where the award exhibits "manifest disregard" for the law, but review under this doctrine is "severely limited" and permits vacatur "only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *Id.* at 91-92 (citations omitted). The "manifest disregard" standard requires that an arbitrator be "fully aware of the existence of a clearly defined governing legal principle, but refuse [ ] to apply it, in effect, ignoring it." *Id.* at 96 (alteration in original; citation omitted). Since the Supreme Court's decision in *Hall Street Assocs. ., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), the Second Circuit has emphasized that the "manifest disregard" doctrine survives primarily as "a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94.

**\*4** The party moving to vacate an arbitration award bears the burden of proof and "the showing required to avoid confirmation is very high." *D.H. Blair*, 462 F.3d at 110 (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997)). "[A]n arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is 'a barely colorable justification for the outcome reached.'" *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir.2008) (citations omitted).

IV. *Idea Nuova's cross-motion to vacate or modify*

Idea Nuova argues that the arbitrator exceeded his authority in three ways: by manifestly disregarding governing law, by reviewing claims that were ineligible for arbitration under the Agreement's "cooling-off period" clause, and by awarding excessive attorney's fees to GM. The Court addresses each of these arguments in turn.

A. *Manifest disregard of the law*

"A federal court cannot vacate an arbitral award merely because it is convinced that the [arbitrator] made the wrong call on the law ." *Stolt-Nielsen*, 548 F.3d at 92 (quoting *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir.2004)). The "manifest disregard" standard requires that courts vacate arbitration awards only in those "rare instances in which the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Id.* at 95 (quoting *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 217 (2d Cir.2002)) (alteration in original).

There are three components to a court's application of the "manifest disregard" standard. First, the court must "consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators." *Id.* at 93. Second, the court must find that this "clear and plainly applicable" law "was in fact improperly applied, leading to an erroneous outcome." *Id.* Once the first two inquiries are satisfied, the court looks to "a subjective element, that is, the knowledge actually possessed by the arbitrators. In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him. In determining an arbitrator's awareness of the law," the court imputes "only knowledge of governing law identified by the parties to the arbitration." *Id.* In other words, "[a]n arbitrator (even an arbitrator

who is a lawyer) ... is ordinarily assumed to be a blank slate unless educated in the law by the parties." *Goldman v. Architectural Iron Co.,* 306 F.3d 1214, 1216 (2d Cir.2002).

Idea Nuova cites four examples of manifest disregard for the law in its motion. *See* Mem. of Law in Support of Plaintiffs Motion for Summary Judgment, or in the Alternative to Vacate or Modify the Arbitration Awards ("Idea Nuova Br."), at 19-24. First, Idea Nuova argues that two of the arbitrator's findings-the recognition and enforcement of an oral renewal under California law, and the conclusion that principles of estoppel support enforcement of such a renewal-conflicted with the New York standards that "must apply" to the instant dispute. (Idea Nuova Br. at 13.) But Idea Nuova does not identify the relevant conflict between New York and California law, and it does not indicate that it raised a choice of law objection to the arbitrator.[FN5] Nor does Idea Nuova identify any provision in the Agreement that indicates consent by the parties to apply New York law in their arbitral disputes.[FN6] Without these showings, Idea Nuova cannot demonstrate that the arbitrator knew that New York law conflicted with California law and that New York law was applicable to GM's renewal claim rather than California law. *See Stolt-Nielsen,* 548 F.3d at 93. Idea Nuova has not, therefore, demonstrated that the arbitrator's analysis of renewal under California law "willfully flouted the governing law by refusing to apply it." *Id. at 95.*

> FN5. Preservation of the choice of law issue was raised with Idea Nuova's counsel during the December 5, 2008 initial pre-trial conference. Idea Nuova has not addressed the import of an apparent failure to raise the issue before the arbitrator.

> FN6. Idea Nuova concedes in its Second Amended Complaint that the Agreement is "silent" on the choice of law issue. (Compl.¶ 51.)

**\*5** Idea Nuova's third and fourth examples of "manifest disregard" are equally insufficient to demonstrate "egregious impropriety" in the arbitration. Idea Nuova asserts in conclusory fashion that "[t]he [a]rbitrator manifestly disregarded the law since he held that the Agreement was renewed but that GM was completely excused from all contractual obligations." According to Idea Nuova, this finding defied "the fundamental rule of 'mutuality of obligations' " and amounted to "the [a]rbitrator's 'own brand of justice.' " (Idea Nuova Br. at 22.) But Idea Nuova's argument mischaracterizes the arbitrator's finding. The arbitrator concluded only that, because Idea Nuova "terminated GM's consulting services in or around September 2006 and did not allow GM to render consulting services for [Idea Nuova] after that time," GM was "excused from any obligation to render consulting services for [Idea Nuova] from and after September 2006." (Interim Award No. 2 (As Modified), at 16.) This finding does not conflict with the arbitrator's simultaneous finding of renewal in May 2006, and it is not inconsistent with the Agreement's own terms, which contemplated continued commission payments even after termination of GM's consulting services. *See* Agreement at 1 ("Consulting Services").

Idea Nuova also argues that the arbitrator "manifestly disregarded the law because he awarded clearly excessive attorney fees for duplicative and/or clearly unnecessary legal work." (Idea Nuova Br. at 22.) Idea Nuova does not, however, appear to contend that the arbitrator ignored or deliberately rejected reasonableness requirements in reaching the fee award. Instead, Idea Nuova appears to challenge the application of those requirements by repeating its objections and then concluding that "the [a]rbitrator did not appear to even consider any of these issues." ( *Id.* at 24.) "Based on [the] improper uses of attorney resources," Idea Nuova argues, "GM's fee award should have been reduced to *some* extent ." ( *Id.* (emphasis in original).) Apart from this general criticism, Idea Nuova does not articulate a specific objection to the arbitrator's legal analysis and does not explain how that analysis amounted to a deliberate disregard for governing legal standards. The Court has no basis to conclude that the arbitrator's fee award exhibits manifest disregard for the law. The Court also notes that an arbitrator's calculation of a reasonable award necessarily involves findings of fact, "which federal courts may not review even for manifest disregard." *Stolt-Nielsen,* 548 F.3d at 98 (citation omitted).

B. *Arbitrability*

Idea Nuova's remaining arguments under section 10 assert that the arbitrator improperly reached issues outside the scope of the Agreement's arbitration clause. The Court's inquiry under this aspect of section 10(a)(4) focuses on "whether the arbitrator[ ] had the power, based on the parties' submissions or the arbitration agreement, to *reach* a certain issue, not whether the arbitrator correctly decided that issue." *Stolt-Nielsen*, 548 F.3d at 101 (citations omitted; emphasis added). Although Idea Nuova argues that the arbitrator exceeded his authority "by allowing GM to amend its Demand to include a host of additional issues that did not satisfy the required 45-day cooling-off clause" and by awarding attorney's fees for Hearing One (Idea Nuova Br. at 17), the Court concludes that Idea Nuova's arguments do not support vacatur in this case.

1. *The Amended Demand*
   ***6** According to Idea Nuova, GM improperly added three new issues to the arbitration through its Amended Demand: "(i) damages for non-payment of commissions that allegedly accrued after GM demanded arbitration (i.e.2006 going forward); (ii) injunctive relief to remedy [Idea Nuova]'s alleged failure to provide certain reports; and (iii) attorney fees regarding these additional issues." (Idea Nuova Br. at 17.) Idea Nuova objects to these changes because: "[i]t was of course not possible for [GM] to have satisfied the 45 day requirement for its new claims as defined in its Amended Demand since it alleges that the only good faith attempts took place in 2006 and there was less than 45 days left in 2006 following the November 27 Demand." (Idea Nuova Reply Br. at 5 n. 1.)

   As an initial matter, Idea Nuova has misrepresented the text of GM's Amended Demand, which stated that GM "made repeated good faith attempts *throughout 2006* to resolve the dispute(s) embodied in [its] Demand for Arbitration, and more than forty-five (45) days have passed since [GM] did so." (Amended Demand for Arbitration, at 5) (emphasis added).

   Idea Nuova also appears to have overstated the substance of GM's amendment. The arbitrator's August 2008 finding on damages for non-payment of commissions that accrued after November 2006, for example, fell within a general review of which license or sales agreements between Idea Nuova and its licensors qualified as "Covered Agreements" under the renewed Agreement. *See* Interim Award No. 2 (As Modified), at 16-17.<u>FN7</u> This finding may fairly be characterized as an interpretation and application of the Agreement's terms, and does not amount to an impermissible expansion of the original renewal review. In fact, the arbitrator appears to have highlighted this element of the parties' dispute in his first, December 2007 award. *See* Interim Award at 4 ("The parties stipulated that an initial hearing ("Hearing One") would be held, limited to the issues of the existence, nature and term of the agreement between the parties, after which an Interim Award would be rendered on those issues. Additional issues, such as which license agreements were covered by the Agreement and what monies, if any, were owed under the Agreement, were reserved for a later hearing.").

   FN7. The Second Interim Award states as follows:
       Based upon the evidence introduced at Hearings One and Two, the arbitrator finds and declares:

       (a) The term "Covered Agreement" in paragraph 1 of the Agreement means and includes all license agreements and special sales agreements (as that term is defined in paragraph 1 of the agreement) entered into between [Idea Nuova] and licensors during the term of the agreement or within 12 months after expiration of the term, as to which licensors GM rendered consulting services for [Idea Nuova].
       (b) ... The term Covered Agreement includes license agreements entered into by [Idea Nuova] after September 2006 with licensors as to which GM has rendered consulting services in or before September 2006. (Interim Award No. 2 (As Modified), at 16-17.)

The arbitrator's injunction required Idea Nuova to abide by the provisions of the Agreement, with its term extended through December 2008, by delivering certain commission payments and supporting documentation. This appears consistent with the scope of the parties' original dispute. Idea Nuova's post-November 2006 obligations-like its pre-November 2006 obligations-arose out of the

same Agreement,

Idea Nuova does not cite any material from the arbitral record, or from its own submission to the arbitrator in March 2008, to support or explain its contention that the 2008 amendments were improper. Without such support, this Court has no basis to conclude that the amendments cited expanded the scope of the parties' arbitration or circumvented the Agreement's 45-day "cooling-off" provision.

2. *Attorney's fees*

*7 Idea Nuova also contends that the arbitrator "was not permitted to award attorney fees for Hearing One." (Idea Nuova Br. at 17.) According to Idea Nuova, "until the [a]rbitrator held that the parties renewed the Agreement by implication, there simply was no Agreement to violate. As such, it was entirely beyond the scope of the [a]rbitrator's power to award attorney fees pertaining to Hearing One, which was the only hearing that contained arbitrable issues." This argument seems to assume that the Agreement terminated prior to being revived by the arbitrator's finding and that, in the interim, Idea Nuova could not have violated the Agreement's fee award clause. But the arbitrator concluded, based upon the evidence before him, that the parties had renewed the Agreement orally in May 2006. Inherent in this finding is a conclusion that the Agreement's arbitration clause, including its fee provision, also continued in force, uninterrupted, through the renewal period. An award under the attorney's fee provision would not, therefore, be improper.

V. *De novo review*

Idea Nuova suggests in its Memorandum of Law that, as an alternative to vacatur or modification under the "restrictions contained in §§ 10 and 11 of the [FAA]," this Court may reject the Award outright and review the parties' dispute de novo. (Idea Nuova Br. at 11-12.) According to Idea Nuova, the absence of language in the Agreement stating that the parties' arbitration would be "final and binding" permits this Court to consider and resolve the underlying dispute independently. ( *Id.* at 11.) Idea Nuova adds that, because "there is no provision [in the Agreement] for the AAA Rules to govern ... the Awards-at most-are merely advisory, and are given whatever 'persuasive weight as the court concludes it deserves.' " ( *Id.* at 12.) Idea Nuova asks the Court to apply its review power to grant Idea Nuova "summary judgment on the merits." ( *Id.*)

The Second Circuit has explained that "a clause [in an arbitration agreement] providing for the settlement of controversies by arbitration pursuant to the rules of the American Arbitration Association [§ 'AAA') ]" is 'sufficient to incorporate th[ose] rules into the agreement.' " *St. Lawrence Explosives Corp. v. Worthy Bros. Pipeline Corp., 111 F.3d 124, 1997 WL 187332, at *1 (2d Cir.1997)* (unpublished opinion) (citing *Varley v. Tarrytown Assocs., Inc., 477 F.2d 208, 210 (2d Cir.1973)*) (alterations in original). "Therefore, by virtue of Rules 1 and 47(c) [of the AAA Rules], if parties to a contract agree to conduct arbitration in accordance with or pursuant to the AAA Rules, they have satisfied the 'consent-to-confirmation' requirement of section 9 of the FAA." *Id.* (citing *I/S Stavborg v. National Metal Converters. Inc., 500 F.2d 424, 426 (2d Cir.1974)*).

Idea Nuova has not identified any binding authority to support its contention that the parties' selection of AAA arbitration was insufficient to ensure limited judicial review under the FAA.[FN8] Idea Nuova quotes an Eighth Circuit case as holding that this Court may give the Award "whatever 'persuasive weight as the court concludes it deserves,' " but the same case also states that parties who intend binding arbitration may demonstrate their intent "either by providing that the arbitration award will be 'final and binding,' or words to that effect, or by incorporating by reference the rules of the American Arbitration Association or a similar arbitral body that expressly provide for binding arbitration." *Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, 745 (8th Cir.2003)*.

FN8. Idea Nuova cites one Second Circuit case as establishing that "[w]here the arbitration is not final and binding, Federal courts have subject matter jurisdiction to decide the underlying dispute." (Idea Nuova Br. at 11 (citing *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists and Aerospace Workers. AFL-CIO v. United Technologies Corp., 230 F.3d 569, 575 (2d Cir.2000)*.) The language cited, however, relates exclusively to the review of a presumption, under section 301 of the Labor

Management Relations Act, favoring access to a judicial forum to resolve disputes involving the application and interpretation of collective bargaining agreements. *See* 230 F.3d at 575. Specifically, the Second Circuit states that: "a district court has jurisdiction to review an arbitration award where the [collective bargaining agreement] does not expressly provide that the arbitration is 'final and binding' or the equivalent, but lacks jurisdiction where the [collective bargaining agreement] so states." *Id.* (citations omitted). This Court does not read Aeronautical Industrial as overruling or abrogating the Second Circuit's well-established deference to arbitral awards issued under the FAA. *See Stolt-Nielsen,* 548 F.3d at 95.

## VI. *Conclusion*

**\*8** For the reasons outlined above, GM's petition for confirmation of the Award is granted. Idea Nuova's motion for summary judgment or, in the alternative, for vacatur or modification of the Award, is denied. Because the Court concludes that Idea Nuova has failed to identify any ground for vacatur or modification under the FAA, Idea Nuova's claims for such relief in the Second Amended Complaint are also dismissed.

As the prevailing party in this dispute, GM is entitled to an award of the reasonable costs, attorney's fees and other expenses that it has incurred in connection with this action. (Agreement at 3.) The parties are directed to meet and confer regarding the amount of that award. Failing agreement with Idea Nuova, GM is directed to submit a specific award request, with supporting documentation, to the Court for review within 20 days of the date of this Order.

SO ORDERED.

S.D.N.Y.,2009.
Idea Nuova, Inc. v. GM Licensing Group, Inc.
Not Reported in F.Supp.2d, 2009 WL 2568332 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

- 2009 WL 4838820 (Trial Motion, Memorandum and Affidavit) Defendant-Petitioner's Memorandum of Points and Authorities in Response to the Court's October 23, 2009 Order to Show Cause (Oct. 26, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4838819 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum of Law (Apr. 14, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4838818 (Trial Motion, Memorandum and Affidavit) Petitioner's Memorandum of Points and Authorities in Opposition to Respondent's Cross-Motion to Vacate Arbitration Award (Mar. 31, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4838817 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, or in the Alternative to Vacate or Modify the Arbitration Awards (Mar. 24, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4834688 (Trial Pleading) Answer to Second Amended Complaint and Counterclaim (Feb. 24, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4838816 (Trial Motion, Memorandum and Affidavit) Petition to Confirm Arbitration Awards (Feb. 24, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4864651 (Arbitration Award) Final Arbitration Award (Feb. 24, 2009) 🖼 Original Image of this Document (PDF)
- 2009 WL 4834689 (Trial Pleading) Second Amended Complaint (Jan. 23, 2009) 🖼 Original Image of this Document (PDF)

    🖼 Exhibit(s) Available

- 2009 WL 5894874 (Exhibit) Consulting Agreement (Jan. 23, 2009) 🖼 Original Image of this Document (PDF)

2009 WL 2568332

- <u>1:08cv08595</u> (Docket) (Oct. 8, 2008)

---

Judges and Attorneys (<u>Back to top</u>)

Judges

Judges

- **Castel, Hon. P. Kevin**
  United States District Court, Southern New York
  New York
  <u>Litigation History Report</u> | <u>Judicial Motion Report</u> | <u>Judicial Reversal Report</u> | <u>Judicial Expert Challenge Report</u> | <u>Profiler</u>

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT L

1    GREGORY R. OXFORD (SGN 62333)            U FILED
     goxford@icclawfirm.com
2    ISAACS CLOUSE CROSE & OXFORD LLP
     21515 Hawthorne Boulevard, Suite 950
3    Torrance, California 90503                10 JUN 28 PM 3: 09
     Telephone: (310) 316-1990
4    Facsimile: (310) 316-1330               CLERK U.S. DISTRICT COURT
                                             CENTRAL DIST. OF CALIF.
5    Attorneys for Plaintiff                     LOS ANGELES
     General Motors LLC                     BY:_____
6

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                       WESTERN DIVISION

11

12   GENERAL MOTORS LLC, a          )   CASE NO. CV 10 4787-DMG
     Delaware limited liability company, )              -(RC)
13                                   )
            Plaintiff,               )
14                                   )   COMPLAINT FOR
        vs.                          )   (1) DECLARATORY
15                                   )   JUDGMENT THAT WRITTEN
     SANTA MONICA GROUP, INC., a     )   SETTLEMENT AGREEMENT
16   California corporation; KAYVAN  )   IS BINDING AND
     NAIMI, an individual; FARINAZ   )   ENFORCABLE ; (2) SPECIFIC
17   NAIMI, an individual; KAMRAN    )   PERFORMANCE OF WRITTEN
     NAIMI, an individual; and NILOFAR )  SETTLEMENT AGREEMENT;
18   NAIMI, an individual,           )   (3) INJUNCTIVE RELIEF
                                     )
19          Defendants.              )

20

21         Plaintiff General Motors LLC, for its complaint herein, alleges as follows:

22                   **The Parties and Jurisdiction**

23         1.     Plaintiff General Motors LLC (hereinafter "plaintiff" or "GM"), is a

24   limited liability company organized and existing under the laws of the State of

25   Delaware with its principal place of business in Detroit, Michigan.  GM is in the

26   business of manufacturing and distributing new motor vehicles and related products

27   through a network of independent retail dealers throughout the United States,

28   including California.

                                                            Complaint

1        2.    Defendant Santa Monica Group, Inc. (hereinafter "SMG") is a

2  corporation organized and existing under the laws of the State of California, with its

3  principal place of business in Santa Monica, California.  SMG operates as an

4  authorized Chevrolet and Buick dealer in Santa Monica, California pursuant to the

5  terms of a General Motors Dealer Sales and Service Agreement ("Dealer

6  Agreement").  Defendants Kayvan Naimi, Farinaz Naimi, Kamran Naimi and

7  Nilofar Naimi are citizens of the State of California and are the owners of SMG and

8  of the real property which is utilized in SMG's dealership operations.

9        3.    This Court has jurisdiction of this action under 28 U.S.C. § 1331(a)

10  because it arises under federal law, specifically the dealer arbitration provisions

11  contained in Section 747, Consolidated Appropriations Act, 2010, Pub. L. No. 111-

12  117, 123 Stat. 3034 (2009) ("Dealer Arbitration Act").

13        4.    Alternatively, this Court has jurisdiction under 28 U.S.C. §1332(a)(1)

14  because plaintiff and defendant are citizens of different states and the amount in

15  controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000)

16  exclusive of interest and costs.

17                                      **Venue**

18        5.    Venue is proper in this district under 28 U.S.C. §1391(a)(1) because

19  defendant has its place of business within this district and, alternatively, pursuant to

20  28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving

21  rise to GM's claims against defendants occurred within this district.

22                         **FACTUAL BACKGROUND**

23              Bankruptcy of General Motors Corporation

24        6.    General Motors Corporation n/k/a Motors Liquidation Company ("Old

25  GM") once was one of the world's largest corporations as a global manufacturer

26  and distributor of new motor vehicles and related products.

27        7.    Due to the rise of foreign competition, changing market conditions,

28  and other factors, Old GM gradually lost market share in the United States.

1         8.    When the financial markets collapsed in the fall of 2008, Old GM

2    faced a financial crisis. It did not have sufficient liquid assets to meet its short term

3    obligations and could not obtain sufficient credit to address its liquidity needs.

4         9.    Caught in a difficult situation, Old GM sought assistance from the

5    United States government. The government responded by authorizing a $ 13.4

6    billion loan to Old GM under the Troubled Asset Relief Program. In connection

7    with this loan, Old GM was required to present a restructuring plan to the

8    government no later than February 17, 2009.

9         10.    In its restructuring plan, Old GM proposed many significant business

10    changes, including a substantial reduction in the number of authorized GM

11    dealerships in the United States. Simply put, given Old GM's reduced market

12    share, it had too many dealerships; as a result, many dealerships had difficulty

13    maintaining the new vehicle sales volume necessary for them to be profitable and

14    reinvest in GM's retail automotive sales business.

15         11.    On March 30, 2009, the President's Automotive Task Force rejected

16    Old GM's restructuring plan, stating among other things that Old GM needed to

17    speed up and increase the proposed reductions in its dealer network.

18         12.    On June 1, 2009, Old GM was forced to file a voluntary petition for

19    bankruptcy in the United States Bankruptcy Court for the Southern District of New

20    York (the "Bankruptcy Court").

21         13.    The Bankruptcy Court subsequently approved the sale of certain assets

22    of Old GM to GM under section 363 of the Bankruptcy Code (11 U.S.C. § 363).

23    As part of this sale, the Bankruptcy Court approved further efforts to scale back Old

24    GM's dealer network.

25         14.    In most cases, Old GM executed and then assigned to GM "Wind-

26    Down Agreements" with virtually all GM dealers who were not going to be

27    retained by GM, including SMG. Under the Wind-Down Agreements, non-retained

28    dealers like SMG received compensation and were permitted to continue certain

1   dealership operations until October 31, 2010, when they were required to terminate

2   their Dealer Agreements. In a few cases in which non-retained dealers declined to

3   execute Wind-Down Agreements, Old GM successfully moved to reject the

4   dealers' executory Dealer Agreements under section 365 of the Bankruptcy Code

5   (11 U.S.C. § 365).

6      15.    After the section 363 sale closed on July 10, 2009, GM began doing

7   business outside bankruptcy under the terms and conditions approved by the

8   Bankruptcy Court.

9                          **The Arbitration Act**

10     16.    In December 2009, Congress passed and President Obama signed the

11  Dealer Arbitration Act which permitted "wind-down dealers" such as SMG to file

12  demands for arbitration and, if successful in arbitration, receive a "normal and

13  customary letter of intent" from GM that would permit them, assuming certain

14  conditions were satisfied, to be added back to the GM dealer network.

15     17.    SMG did file a demand for arbitration and, pursuant to procedures

16  contemplated by Congress and implemented by the American Arbitration

17  Association, an arbitration hearing was held before Arbitrator Lawrence J. Kaplan

18  on June 8 and 9, 2010 in Santa Ana, California. During the course of these

19  proceedings, GM and SMG entered into a confidential settlement and settlement

20  documentation was prepared which was executed on behalf of SMG on June 18,

21  2010 and delivered by counsel for SMG to counsel for GM on June 21, 2010. A

22  copy of the signed agreement ("Settlement Agreement") is submitted herewith with

23  an application permitting it to be filed under seal as Exhibit A to this complaint.

24     18.    On June 22, 2010, counsel for SMG, Michael M. Sieving, verbally

25  informed counsel for GM, Gregory R. Oxford, that, contrary to the Settlement

26  Agreement which requires SMG to request that AAA immediately dismiss the

27  arbitration proceedings, his clients had instructed him to attempt to schedule an

28

4

**sblatt**

From:      Eric Snyder [esnyder@wilkauslander.com]
Sent:      Thursday, September 16, 2010 11:57 AM
To:        John Gentile; Steve Blatt
Subject:   FW: Westlaw Results : 2010 WL 2740166

See attached case. When GM could not get a dealer to execute an agreed to settlement, what did it do: it went into district court in California to restrain the continuation of the arbitration.

The name of the firm has changed to Wilk Auslander LLP. My new email address is esnyder@wilkauslander.com

Eric J. Snyder
Wilk Auslander LLP
675 Third Avenue
New York, New York 10017
Phone: (212) 421-2233
Direct Dial: (212) 981-2328
Facsimile: (212) 752-6380

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed within.

NOTES: The contents of this electronic mail message and any attachments are confidential, possibly privileged, and intended for the addressee(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message and any attachments, and any Wilk Auslander LLP employee may do so only in accordance with Wilk Auslander's email and Internet use policies and procedures from time to time in effect. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone or retaining a copy. Wilk Auslander LLP reserves the right to monitor and review the content of all e-mail communications sent to and received by its employees. Internet communications cannot be guaranteed to be secure or error-free as information could arrive late or contain viruses or be intercepted, corrupted, or lost. The sender, therefore, does not accept liability for any errors or omissions in the content of this message which arise as a result of Internet transmission. If verification is required please request a hard-copy version.

From: westlaw@westlaw.com [mailto:westlaw@westlaw.com]
Sent: Thursday, September 16, 2010 11:33 AM
To: Eric Snyder
Subject: Westlaw Results : 2010 WL 2740166

**Westlaw Delivery Summary Report for SNYDER,ERIC**

| | |
|---|---|
| Your Search: | "Dealer Arbitration Act" |
| Date/Time of Request: | Thursday, September 16, 2010 10:33 Central |
| Client Identifier: | RALLY |
| Database: | ALLFEDS |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 213 |
| Documents: | 1 |
| Images: | 0 |
| Recipient(s): | esnyder@wilkauslander.com |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

1   additional hearing day with Arbitrator Kaplan in order to complete the arbitration

2   hearing.

3       19.   Under the Dealer Arbitration Act, arbitration hearings must be

4   completed no later than June 14, subject to the Arbitrator's power to extend this

5   deadline for up to 30 days. Arbitrator Kaplan has granted such an extension. As a

6   result, the arbitration between SMG and GM must be completed, if at all, no later

7   than July 14, 2010.

8       20.   SMG's failure to request immediate dismissal of the arbitration

9   proceedings and apparent attempt to repudiate the Settlement Agreement constitute

10   material breaches of the Settlement Agreement.

11       21.   GM has performed each and all of its obligations pursuant to the

12   Settlement Agreement except to the extent such performance has been prevented by

13   SMG's material breaches. The Settlement Agreement is a valid, binding and

14   enforceable contract that requires SMG to request dismissal of the arbitration

15   proceedings forthwith.

16       22.   Congress deliberately chose to limit the scope of arbitration under the

17   Dealer Arbitration Act. Arbitrators are only empowered to decide whether or not

18   the specific dealership should be added back to the GM dealer network. All other

19   issues that arise under the Act must be addressed by a court of competent

20   jurisdiction.

21       23.   Absent a prompt order from this Court (a) requiring SMG to

22   specifically perform its obligations under the Settlement Agreement, including its

23   obligation to request dismissal of the arbitration proceedings, or (b) enjoining SMG

24   from continuing to prosecute the arbitration proceedings, GM will be required to

25   complete the arbitration proceedings within a very short period of time at

26   significant expense and, more importantly, will be required to run the risk of

27   suffering an adverse determination – the precise risk that the parties mutually

28   agreed to avoid by entering into the Settlement Agreement.

1     24.    Beyond SMG's agreement to request immediate dismissal of the

2    AAA arbitration proceedings, Paragraphs 4.1 and 4.2 of the Settlement Agreement

3    include a broad form of release in which SMG releases and discharges (with

4    specified exceptions) all known and unknown claims against GM.  Paragraph 4.3

5    includes a "covenant not to sue" GM which includes SMG's commitment not to

6    "assert any claim that is covered by the release provision in paragraphs 4.1 and

7    4.2," which obviously includes SMG's claim under the Dealer Arbitration Act

8    which it is now attempting to revive.

9     25.    Paragraph 4.3 goes on to provide that, in the event that SMG attempts

10    to assert a claim that is barred by the broad form of release found in paragraphs 4.1

11    and 4.2, GM will suffer irreparable harm and therefore shall be entitled to

12    immediate equitable relief:

13         "Notwithstanding anything to the contrary, the Dealer Parties [*i.e.*,

14         SMG and the Naimis] acknowledge and agree that any breach of this

15         covenant not to sue will cause irreparable harm to GM and therefore

16         agree that GM shall be entitled to available equitable remedies,

17         including, without limitation, injunctive relief, upon the breach of

18         such covenant not to sue by any of the Dealer Parties."

19     26.    Finally, paragraph 4.4 of the Settlement Agreement provides that

20         "SMG ... shall indemnify, defend and hold GM, its Affiliates

21         and their respective members, partners, venturers, stockholders,

22         officers, directors, employees, agents, spouses, legal representatives,

23         successors and assigns (the "GM Indemnified Parties") harmless,

24         from and against any and all claims, demands, fines, penalties, suits,

25         causes of action, liabilities, losses, damages, costs of settlement, and

26         expenses (including, without limitation, reasonable attorneys' fees and

27         costs) which may be imposed upon or incurred by the GM

28         Indemnified Parties, or any of them, arising from, relating to, or

1    caused by [SMG's] breach of this Agreement or SMG's execution or

2    delivery of or performance under this Agreement."

3                            **FIRST CLAIM FOR RELIEF**

4                            <u>**(Declaratory Judgment)**</u>

5        27.    GM repeats and incorporates by reference its allegations contained in

6    paragraphs 1 through 26 *supra*.

7        28.    SMG by its repudiation and material breach of the Settlement

8    Agreement has created an actual controversy concerning the enforceability of that

9    agreement.  By virtue of the clear provisions of the Settlement Agreement, GM is

10   entitled pursuant to 28 U.S.C. § 2201 *et seq.* to a judicial declaration that the

11   Settlement Agreement is a valid, binding and enforceable contract and obligation of

12   SMG and that SMG accordingly is required to request immediate dismissal of the

13   AAA arbitration proceedings and perform its other obligations under the Settlement

14   Agreement, including the submission to the California New Motor Vehicle Board,

15   of a proposed Stipulated Decision in order that the terms of the settlement can be

16   fully implemented as soon as possible.

17                           **SECOND CLAIM FOR RELIEF**

18                   <u>**(Specific Performance of Settlement Agreement)**</u>

19       29.    GM repeats and incorporates by reference its allegations contained in

20   paragraphs 1 through 28 *supra*.

21       30.    The Settlement Agreement is a valid, binding and enforceable contract

22   between SMG and GM.

23       31.    SMG has materially breached and repudiated the contract.

24       32.    SMG's breach threatens GM with irreparable harm inasmuch as

25   without judicial intervention enforcing the Settlement Agreement GM will be

26   forced to complete the arbitration proceedings which SMG has agreed to dismiss

27   and to run the risk of an adverse determination which it bargained to avoid.

28

                                          7

1      33.    GM has no adequate remedy at law, as damages will not adequately

2    compensate if for the risk of an adverse determination in the arbitration, which will

3    force GM to continue involuntarily and indefinitely its unsatisfactory contractual

4    relationship with SMG.  Absent the beneficial provisions of the Settlement

5    Agreement, SMG's continued status as a Buick and Chevrolet dealer will injure

6    GM in an amount not readily calculable but certainly in excess of $75,000

7    exclusive of interest and costs inasmuch as (a) SMG does not effectively sell Buick

8    and Chevrolet vehicles in its assigned market in Santa Monica and West Los

9    Angeles; in fact, its new vehicle sales performance for Chevrolet in 2008 was the

10    worst of any Chevrolet dealer in the State of California which remains in business;

11    and (b) SMG due to state franchise laws (which are preempted by the Dealer

12    Arbitration Act) would, absent the beneficial provisions of the Settlement

13    Agreement, be in a position to block the appointment of additional Buick and

14    Chevrolet dealers in or near its assigned market area by prosecuting "protest"

15    proceedings with the California New Motor Vehicle Board ("Board") under Veh.

16    Code § 3062, further damaging GM's efforts to improve the sales of new Chevrolet

17    and Buick vehicles in Santa Monica, West Los Angeles and Culver City and their

18    environs for an indefinite time.

19      34.    GM has performed, or stands ready to perform, its obligations under

20    the Settlement Agreement contingent upon a judgment and decree from this Court

21    ordering SMG to specifically perform its obligations under that agreement.

22      35.    GM based on the facts stated above is entitled to a judgment and

23    decree requiring SMG to perform each and all of its obligations under the

24    Settlement Agreement forthwith.

### THIRD CLAIM FOR RELIEF

#### (Preliminary and Permanent Injunction)

27      36.    GM repeats and incorporates by reference its allegations contained in

28    paragraphs 1 through 35 *supra*.

8

1    37.    By reason of the foregoing alleged facts, including the threatened

2    irreparable harm to GM which SMG has conceded in paragraph 4.3 of the

3    Settlement Agreement, GM is entitled to a preliminary and permanent injunction

4    prohibiting SMG from prosecuting its arbitration claim under the Dealer Arbitration

5    Act, including without limitation scheduling a third day of hearing before Arbitrator

6    Kaplan or otherwise continuing to prosecute its arbitration claim against GM.

7    WHEREFORE, GM prays judgment as follows:

8    (A)    For a declaratory judgment that the Settlement Agreement is a valid,

9    binding and enforceable contract and obligation of SMG which requires it to

10    request immediate dismissal of the AAA arbitration proceedings and take all other

11    steps which that agreement requires SMG to take in order to fully implement the

12    terms of the settlement;

13    (B)    For an order requiring SMG to perform all of its obligations under

14    the Settlement Agreement forthwith, including without limitation its obligation to

15    request that the American Arbitration Association dismiss the arbitration

16    proceedings before Arbitrator Kaplan and take all other steps which the agreement

17    requires SMG to take in order to fully implement the terms of the settlement;

18    (C)    For a preliminary and permanent injunction commanding SMG to

19    cease and desist forthwith from any further prosecution of the AAA arbitration

20    proceedings;

21    (D)    For an award of attorney's fees and costs of suit incurred herein

22    pursuant to paragraph 4.4 of the Settlement Agreement and applicable law; and

23    (E)    For such other or further relief as the Court may deem proper.

24    DATED:  June 28, 2010          GREGORY R. OXFORD
                                    ISAACS CLOUSE CROSE & OXFORD LLP
25

26

27    By: _____
                                    Gregory R. Oxford
28                                  Attorneys for Plaintiff
                                    General Motors LLC

9

## PROOF OF SERVICE

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 21515 Hawthorne Blvd., Suite 950, Torrance, California 90503.

  X  VIA U.S. MAIL on June 28, 2010, I served the foregoing documents described as **COMPLAINT; APPLICATION FOR ORDER PERMITTING FILING OF EXHIBIT A UNDER SEAL; EXHIBIT A; CERTIFICATION OF INTERESTED PARTIES** on the parties in this action by U.S. mail, by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

  X  VIA ELECTRONIC MAIL on June 28, 2010, I served the foregoing documents described as **COMPLAINT; APPLICATION FOR ORDER PERMITTING FILING OF EXHIBIT A UNDER SEAL; EXHIBIT A; CERTIFICATION OF INTERESTED PARTIES** on the parties in this action by U.S. mail, by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

  X  VIA FAXSIMILE on June 28, 2010, I served the foregoing documents described as **COMPLAINT; APPLICATION FOR ORDER PERMITTING FILING OF EXHIBIT A UNDER SEAL; EXHIBIT A; CERTIFICATION OF INTERESTED PARTIES** on the parties in this action by U.S. mail, by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

> Michael M. Sieving
> 1801 Parkcourt Place, Suite F-101
> Santa Ana, CA 92701

Executed on June 28, 2010 at Torrance, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

1

2

3
Gwendolyn Oxford

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dolly Gee and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV10- 4787 DMG (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

═══════════════════════════════════════════════════

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address: Gregory R. Ox    d SBN 62~~~
Isaacs Clouse Crose & Oxford LLP
21515 Hawthorne Boulevard, Suite 950
Torrance, California 90503
(310) 316-1990
(310) 316-1330 (facsimile)

**ORIGINAL**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENERAL MOTORS LLC,<br><br>*see attached*<br><br>              **PLAINTIFF(S)**<br><br>    v.<br><br>SANTA MONICA GROUP, INC.,<br><br>*See Attached*  **DEFENDANT(S).** | CASE NUMBER<br><br>**CV10 4787**-DMG (RQ)<br><br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): <u>Santa Monica Group, Inc., Kayvan Naimi, Farinaz Naimi, Kamran Naimi and</u>
<u>Nilofar Naimi</u>

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, <u>Gregory R. Oxford                </u>, whose address is
<u>21515 Hawthorne Boulevard, Suite 950, Torrance, California 90503                </u>. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: __**2 8 JUN 2010**.__

By: _____
        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

1    GREGORY R. OXFORD (SGN 62533)
     goxford@icclawfirm.com
2    ISAACS CLOUSE CROSE & OXFORD LLP
     21515 Hawthorne Boulevard, Suite 950
3    Torrance, California 90503
     Telephone: (310) 316-1990
4    Facsimile: (310) 316-1330

5    Attorneys for Plaintiff
     General Motors LLC

6

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                WESTERN DIVISION

11

12   GENERAL MOTORS LLC, a            )    CASE NO.
     Delaware limited liability company,  )
13                                    )
            Plaintiff,                 )    COMPLAINT FOR
14                                    )    (1) DECLARATORY
     vs.                              )    JUDGMENT THAT WRITTEN
15                                    )    SETTLEMENT AGREEMENT
     SANTA MONICA GROUP, INC., a      )    IN BINDING AND
16   California corporation; KAYVAN   )    ENFORCABLE ; (2) SPECIFIC
     NAIMI, an individual; FARINAZ    )    PERFORMANCE OF WRITTEN
17   NAIMI, an individual; KAMRAN     )    SETTLEMENT AGREEMENT;
     NAIMI, an individual; and NILOFAR )    (3) INJUNCTIVE RELIEF
18   NAIMI, an individual,            )
                                      )
19          Defendants.               )

20

21        Plaintiff General Motors LLC, for its complaint herein, alleges as follows:

22                **The Parties and Jurisdiction**

23        1.    Plaintiff General Motors LLC (hereinafter "plaintiff" or "GM"), is a

24   limited liability company organized and existing under the laws of the State of

25   Delaware with its principal place of business in Detroit, Michigan. GM is in the

26   business of manufacturing and distributing new motor vehicles and related products

27   through a network of independent retail dealers throughout the United States,

28   including California.

                                                              Complaint

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| GENERAL MOTORS LLC | SANTA MONICA GROUP, INC.; KAYVAN NAIMI; FARINAZ NAIMI; KAMRAN NAIMI; and NILOFAR NAIMI |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Gregory R. Oxford, Isaacs Clouse Crose & Oxford LLP 21515 Hawthorne Boulevard, Suite 950, Torrance CA 90503 (310) 316-1990 | Michael M. Sieving, Law Offices of Michael M. Sieving 1801 Park Court Place, Suite F-101, Santa Ana CA 92701 (714) 541-0034 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Consolidated Appropriations Act, sec. 747, 2010, P.L.111-117; declaratory relief; specific performance; injunction; enforcement of written settlement agreement

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark SOCIAL SECURITY |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | | | | |

## CV10 4787

**FOR OFFICE USE ONLY:    Case Number:** _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

Case 2:10-cv-04787-DMG-RC    Document 1    Filed 06/28/10    Page 16 of 16    Page ID #:16

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Incorporated in Delaware; principal place of business in Michigan |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles (all defendants) |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date June 28, 2010

    Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# EXHIBIT M

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 2740166 (C.D.Cal.)
**(Cite as: 2010 WL 2740166 (C.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
GENERAL MOTORS LLC, a Delaware limited li-
ability company, Plaintiff,
v.
SANTA MONICA GROUP, INC., et al., Defendants.
**No. CV 10-04787 DMG (RCx).**

July 9, 2010.

Gregory R. Oxford, Issacs Clouse Crose & Oxford
LLP, Torrance, CA, for Plaintiff.

**ORDER GRANTING PRELIMINARY
INJUNCTION**

DOLLY M. GEE, District Judge.

**\*1** This matter is before the Court on the Order to
Show Cause why a preliminary injunction should not
issue, which was set for hearing on July 9, 2010. For
the reasons set forth below, the preliminary injunc-
tion is GRANTED.

**I.**

**BACKGROUND**

On June 28, 2010, Plaintiff filed a complaint in this
Court seeking (1) declaratory judgment, (2) specific
performance, and (3) preliminary and permanent in-
junction. On June 29, 2010, Plaintiff filed an applica-
tion for temporary restraining order ("TRO") and
order to show cause why a preliminary injunction
should not issue seeking to restrain Defendants Santa
Monica Group, Inc. ("SMG"), Kayvan Naimi, Fari-
naz Naimi, Kamran Naimi and Nilofar Naimi from
continuing to prosecute **arbitration** proceedings
pending before the AAA and **Arbitrator** Kaplan,
Case No. 72-532-00050-10 pursuant to the **Dealer
Arbitration Act.**. Defendants filed an opposition on
July 1, 2010, and on the same day, Plaintiff filed its
reply. According to Defendants' opposition, the **arbi-
tration** is scheduled to resume on July 13, 2010. In
its reply, GM urged the Court to grant the TRO or,

alternatively, schedule a prompt preliminary injunc-
tion hearing in advance of the July 13 hearing date
set by the **Arbitrator.** On July 2, 2010, in light of the
resumption date for the **arbitration** and Plaintiff's
alternative request for a prompt hearing on its request
for preliminary injunction, this Court, rather than
ruling on the TRO application, ordered Defendants to
appear on July 9, 2010 to show cause why a prelimi-
nary injunction should not issue.

**II.**

**LEGAL STANDARD GOVERNING
PRELIMINARY INJUNCTIONS**

Federal Rule of Civil Procedure 65 governs the issu-
ance of preliminary injunctions. The purpose of such
injunctions is to preserve the rights and relative posi-
tions of the parties, *i.e.,* the *status quo,* until a final
judgment issues. *See U.S. Philips Corp. v. KBC Bank
N.V.,* 590 F.3d 1091, 1094 (9th Cir.2010) (citing
*Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101
S.Ct. 1830, 68 L.Ed.2d 175 (1981)). In light of this
purpose and because the factual record under consid-
eration at the preliminary injunction stage may differ
materially from the fully developed factual record,
preliminary injunctions frequently provide little guid-
ance as to the appropriate disposition on the merits.
*See Marlyn Nutraceuticals, Inc. v. Mucos Pharma
GmbH & Co.,* 571 F.3d 873, 876-77 (9th Cir.2009);
*see also Brown v. Chote,* 411 U.S. 452, 456, 93 S.Ct.
1732, 36 L.Ed.2d 420 (1973).

Plaintiffs seeking a preliminary injunction in a case
involving the public interest must show that (1) they
are likely to succeed on the merits; (2) they are likely
to suffer irreparable harm in the absence of prelimi-
nary relief; (3) the balance of equities tips in their
favor; and (4) an injunction is in the public interest.
*Dominguez v. Schwarzenegger,* 596 F.3d 1087, 1092
(9th Cir.2010), *petition for cert. filed,* 78 USLW
3581 (Mar. 24, 2010); *see also Winter v. Natural Res.
Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374,
172 L.Ed.2d 249 (2008).

**III.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2740166 (C.D.Cal.)
(Cite as: 2010 WL 2740166 (C.D.Cal.))

### DISCUSSION

**\*2** Plaintiff seeks a preliminary injunction restraining and enjoining Defendant SMG, based on a valid and binding written settlement agreement, from continuing to prosecute **arbitration** proceedings now pending before the American **Arbitration** Association ("AAA") as AAA Case No. 72-532-0050-10 ("AAA **Arbitration**") pursuant to section 747, Consolidated Appropriations Act, 2010, Pub. Law 11-117, 123 Stat. 3034 (2009) (the "**Dealer Arbitration** Act").

### A. *Plaintiff Has Demonstrated A Likelihood Of Success On The Merits*

All parties agree that pursuant to a request for **arbitration** by SMG, the parties herein were involved in **arbitration** proceedings before **Arbitrator** Kaplan on June 8 and 9, 2010. In **arbitration**, Defendants brought their claims for reinstatement of their franchise thereby challenging SMG's "Wind-Down Agreement," [FN1] under which non-retained **dealers** like SMG were permitted to continue certain dealership operations until October 31, 2010, at which time they were required to terminate their **Dealer** Agreement. During the course of these proceedings, the parties engaged in settlement negotiations. All parties executed the Settlement and Deferred Termination Agreement and Release, which states that "[t]his Settlement and Deferred Termination Agreement and Release ('Agreement') is entered into as of June 9, 2010 by and between General Motors LLC ('GM'), on the one hand, and Santa Monica Group, Inc. ('SMG') and SMG's owners Kayvan Naimi, Farinaz Naimi, Kamran Naimi and Nilofar Naimi ('Owners'), on the other hand, collectively the 'Parties.' Among its terms, the Agreement provides that "[u]pon execution and delivery of this Agreement (a) SMG shall immediately request that the American **Arbitration** Association dismiss the **Arbitration** ...."

> FN1. GM's predecessor, General Motors Corporation n/k/a Motors Liquidation Company ("Old GM"), as part of its bankruptcy proceedings, entered into these "Wind-Down Agreements" with dealerships Old GM chose not to retain. These dealerships were given the right to file **arbitration** claims under the **Dealer Arbitration** Act.

Although Defendants concede that they executed the

Agreement, their sole contention on the merits is that the settlement contemplated the execution and/or filing of other documents, which Defendants have not done. However, as explained by Plaintiff in its reply brief, "[w]hile it is true that the Settlement Agreement contemplates preparation and execution of additional documents, *the Settlement Agreement obligates the parties, including defendants, to prepare and execute those documents ....*" (GM Reply, ¶ 2 [Doc. # 1] )

As such, Plaintiff has established that it has a binding written settlement agreement under which SMG is obligated to request that the American **Arbitration** Association dismiss the Arbitration.[FN2] Evidence presented by defendants that they have not executed subsequent documents or performed subsequent acts does not negate the formation of a binding contract. Instead, it is evidence of defendants' breach thereof.

> FN2. In their opposition to the preliminary injunction, Defendants, referring to the Settlement and Deferred Termination Agreement and Release as the "initial settlement agreement," concede that they executed the agreement on June 18, 2010. It is unclear why they make a point of saying that they notified counsel for GM "(prior to the execution by GM of the initial settlement agreement) that, upon reviewing the terms of what the initial settlement agreement required, they could not execute or authorize the execution of the remainder of the documents necessary to complete the settlement terms." [Doc. # 15.] Defendants do not argue that this prior notification to GM's counsel was a revocation of their offer prior to GM's execution in acceptance thereof. Defendants do not controvert Plaintiff's evidence that prior to Defendants' execution of the "initial settlement agreement," Defendants were informed by GM's counsel that the draft which Defendants subsequently signed was acceptable to GM. As such, Defendants' execution and delivery of the "initial settlement agreement" constituted acceptance of GM's offer. "Parties may engage in preliminary negotiations, oral or written, in order to reach an agreement. These negotiations ordinarily result in a binding contract when all of the terms are definitely under-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2740166 (C.D.Cal.)
(Cite as: 2010 WL 2740166 (C.D.Cal.))

stood, even though the parties intended that a formal writing embodying these terms was to be executed later." 1 B.E. Witkin, *Summary of California Law* § 133 (10th ed. 2005) (Citations omitted).

## B. *Plaintiff Is Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief*

Issuance of a preliminary injunction will maintain the *status quo*. In the absence of a preliminary injunction, the arbitration proceedings will resume on July 13, 2010, which would completely deprive GM of an important benefit of its bargain. Moreover, absent a preliminary injunction, GM would face the risk of an adverse arbitration award which, during the pendency of this action, could prevent GM from establishing a planned Chevrolet dealership in Culver City-a harm for which legal compensation is not easily ascertainable.

*3 Consequently, Plaintiff has demonstrated a likelihood of irreparable harm unless a preliminary injunction is issued.

## C. *The Balance Of Equities Tips In Plaintiff's Favor*

In assessing whether a plaintiff has met its burden of establishing that the balance of equities tips in its favor, the district court has a duty to balance the interests of all parties and weigh the damage to each. *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138 (9th Cir.2009).

As stated above, a preliminary injunction will maintain the *status quo*, in the absence of which Plaintiff is likely to suffer irreparable harm. On the other hand, if a preliminary injunction issues, Defendants will lose its opportunity to reopen arbitration proceedings. This potential harm Defendants face is lessened because they do not controvert the fact that they voluntarily entered into the Agreement promising that "[u]pon execution and delivery of this Agreement (a) SMG shall immediately request that the American Arbitration Association dismiss the Arbitration ...." (Settlement Agreement, ¶ 2.1)

Accordingly, the Court finds that the balance of equities tips in favor of Plaintiff.

## D. *An Injunction Is In The Public Interest*

When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction. *Stormans,* 586 F.3d at 1138-39. If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction. *Id.* at 1139. In this case, the public interest is served by the enforcement of a valid and binding contract.

Plaintiff has demonstrated that (1) there is a likelihood of success on the merits; (2) there is a likelihood of irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Consequently, the Court grants Plaintiff's Motion for Preliminary Injunction.

## E. *Posting of A Bond*

Rule 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Notwithstanding the seemingly mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier,* 572 F.3d 1067, 1086 (9th Cir.2009) (internal quotation marks omitted). A district court may dispense with the filing of a bond if it concludes that there is no realistic likelihood of harm to the defendant from the injunction. *Id.* The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the defendant. *Philips Elecs. N. Am. Corp. v. Hope,* 631 F.Supp.2d 705, 724 n. 14 (M.D.N.C.2009) (citing *Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996).

*4 Here, Defendants identify no costs or damages that they would sustain as a result of an injunction, except for their attorneys' fees and costs, which Defendants estimate to be approximately $50,000. The Court therefore orders that Plaintiff post a security

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2740166 (C.D.Cal.)
**(Cite as: 2010 WL 2740166 (C.D.Cal.))**

bond in connection with the injunction in the amount of $50,000.

## IV.

### *CONCLUSION*

In light of the foregoing, the Court GRANTS a Preliminary Injunction as follows: Defendants Santa Monica Group, Inc., Kayvan Naimi, Farinaz Naimi, Kamran Naimi and Nilofar Naimi, their officers, agents, servants, employees, attorneys and all those in active concert or participation with Defendants are hereby restrained and enjoined, pending trial on the merits herein, from continuing to prosecute **arbitration** proceedings now pending before the AAA and **Arbitrator** Kaplan, Case No. 72-532-00050-10, pursuant to the **Dealer Arbitration Act**.

Defendant shall post a bond in the amount of $50,000.

IT IS SO ORDERED.

C.D.Cal.,2010.
General Motors LLC v. Santa Monica Group, Inc.
Not Reported in F.Supp.2d, 2010 WL 2740166 (C.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.