**HEARING DATE AND TIME: October 4, 2010 at 3:00 p.m. (Eastern Time)**
**OBJECTION DEADLINE: September 23, 2010 at 4:00 p.m. (Eastern Time)**
**REPLY DEADLINE: September 29, 2010 at 4:00 p.m. (Eastern Time)**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

ISAACS CLOUSE CROSE & OXFORD LLP
21515 Hawthorne Boulevard, Suite 950
Torrance, California 90503
Telephone: (310) 316-1990
Facsimile: (310) 316-1330
Gregory R. Oxford

Attorneys for General Motors LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY, *et al.*,** | : | **Case No.: 09-50026 (REG)** |
| **f/k/a General Motors Corp., *et al.*** | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------x

## REPLY TO OBJECTION TO MOTION OF
## GENERAL MOTORS LLC TO ENFORCE 363 SALE ORDER
## <u>AND APPROVED DEFERRED TERMINATION AGREEMENT</u>

# **TABLE OF CONTENTS**

ANALYTIC FRAMEWORK ...........................................................................................................1

ARGUMENT ...............................................................................................................................4

A.  Congress Did Not Authorize and this Court Should Not Imply Any Right to Judicial Review
    of the Arbitration Award.......................................................................................................4

    1.  The Statute and Legislative History..................................................................................4

    2.  The Federal Arbitration Act and AAA Commercial Arbitration Rules.............................5

    3.  Constitutional Issues .......................................................................................................7

B.  This Court Has Exclusive Jurisdiction of Rally's Claims and Should Enforce the 363 Sale
    Order and Wind-Down Agreement.......................................................................................12

    1.  The Sale Approval Order Gives This Court Exclusive Jurisdiction ...................................12

    2.  The Judicial Estoppel Doctrine Does Not Apply Here .....................................................12

    3.  The Motion Invokes this Court's Core Jurisdiction.........................................................14

C.  Rally Has No Colorable Basis for Asking the Court  To Vacate or Modify the Arbitration
    Award...................................................................................................................................17

## TABLE OF AUTHORITIES

### CASES

*Back v. AM Gen. Corp. (In re Chateaugay Corp.)*,
    213 B.R. 633 (S.D.N.Y. 1997)........................................................................17

*Beneficial Trust Deeds v. Franklin (In re Franklin)*,
    802 F.2d 324 (9th Cir. 1986) ......................................................................15

*Bryson v. Gere*,
    268 F. Supp. 2d 46 (D.D.C. 2003) ..........................................................7, 21

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)....................................................................................9, 11

*Crowell v. Benson*,
    285 U.S. 22 (1932)............................................................................................8

*Francis v. Landstar Systems Holdings, Inc.*,
    No. 3:09-cv-238-J-32JRK, 2009 WL 4350250......................................................21

*General Motors LLC v. Santa Monica Group, Inc.*,
    No. CV 10-04787 DMG, 2010 WL 2740166 (C.D. Cal. July 9, 2010)............................ 12-14

*Hall Street Associates, L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)......................................................................................21

*Hohl v. Bastian*,
    279 B.R. 165 (W.D. Pa. 2002) ..............................................................17

*In re Chief Executive Officers Clubs, Inc.*,
    359 B.R. 527 (Bankr. S.D.N.Y. 2007) ..................................................17

*In re Crowder*,
    314 B.R. 445 (10th Cir. BAP 2004)........................................................16

*In re Hall's Motor Transit Co.*,
    889 F.2d 520 (3d Cir. 1989)....................................................................16

*In re Kalpana Elecs., Inc.*,
    58 B.R. 326 (Bankr. E.D.N.Y. 1986)......................................................17

*In re Marcus Hook Development Park, Inc.*,
    943 F.2d 261 (3d Cir. 1991)....................................................................15

*In re Eveleth Mines, LLC*,
    312 B.R. 634 (Bankr. D. Minn. 2004) ............................................ 14-16

*Luan Investment S.E. v. Franklin 145 Corp. (In re Petric Retail, Inc.)*,
    304 F.3d 223 (2d Cir. 2002).........................................................................15

*New England Power & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power
    Equipment & Marine, Inc.)*,
    292 F.3d 61 (1st Cir. 2002)........................................................................15

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...................................................................................13

*R.J. O'Brien & Assoc. Inc. v. Pipkin*,
    64 F.3d 257 (7th Cir. 1995) .......................................................................11

*Stolt-Nielsen S.A. v. Animalfeeds International Corp.*,
    130 S.Ct. 1758 (2010)...........................................................................21-22

*Switchmen's Union of North America v. National Mediation Board*,
    320 U.S. 297 (1943)................................................................................9-10

*T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
    592 F.3d 329 (2d Cir. 2010).......................................................................22

*Tenet Health System Philadelphia, Inc. v. National Union of Hospital and Health Care
    Employees*, 265 B.R. 88 (Bankr. W.D. Pa. 2001), *rev'd in part on other grounds*, 383
    F.3d 169 (3d Cir. 2004).........................................................................14-15

*Thomas v. Union Carbide Agr. Prod. Co.*,
    473 U.S. 568 (1985)............................................................................Passim

*Travelers Indem. Co. v. Bailey*,
    129 S. Ct. 2195 (2009)..........................................................................16-17


STATUTES

7 U. S. C. § 136 *et seq*.................................................................................8

11 U.S.C. § 363(b).......................................................................................15

11 U.S.C. § 363(f).......................................................................................14

11 U.S.C. § 363(m)......................................................................................16

28 U.S.C. § 157(b)(2) .................................................................................14

28 U.S.C. § 1331.........................................................................................12

CAL. VEH. CODE § 3060................................................................................20

## OTHER AUTHORITIES

Dealer Arbitration Act ...........................................................................................Passim

Rule 48(c) of Commercial Arbitration Rules.................................................................6

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC ("**New GM**") respectfully submits this reply

("**Reply**") (i) to  the Objection ("**Objection**") filed by Rally Auto Group, Inc. ("**Rally**") to New

GM's Motion To Enforce 363 Sale Order and Approved Deferred Termination Agreement

("**Motion**"), and (ii) in further support of the Motion.  In support of this Reply, New GM

respectfully represents as follows:

## <u>ANALYTIC FRAMEWORK</u>

1.      The starting point for analysis in this case is not the Dealer Arbitration Act

but the Deferred Termination ("**Wind-Down**") Agreements which Rally and other GM dealers

executed and which this Court approved and found to be "valid and binding contracts,

enforceable in accordance with their terms."  363 Sale Order, ¶ 31; Motion, Exh. A.

2.      Under the Wind-Down Agreement, Rally's Chevrolet Dealer Agreement

must terminate no later than October 31, 2010.  Motion, Exh. A, § 2(a).  The Wind-Down

Agreement also specifically precludes Rally from filing suit against New GM (*id.*, § 5(d)) or

taking any action to interfere with New GM's establishment of additional dealerships (*Id.*,

§ 7(a)).  Further, Rally has agreed that this Court retains "full, complete and exclusive

jurisdiction to . . . enforce, and adjudicate disputes concerning the terms of [the Wind-Down]

Agreement and any other matter related thereto."  *Id.*, § 13.  This provision dovetails with

paragraph 71(f) of the 363 Sale Order in which this Court retained exclusive jurisdiction to

"resolve any disputes with respect to or concerning the Deferred Termination Agreements."

3.      The Dealer Arbitration Act (the "**Act**") did not void the Wind-Down

Agreement or the 363 Sale Order, or relieve Rally of any of its wind-down obligations.  To the

contrary, the specific provisions of the Wind-Down Agreement (the lack of any right of wind-

1

down dealers to purchase new GM vehicles, the fact that the Dealer Agreements expire by their terms no later than October 31, 2010, *etc.*) *remained in full force and effect* after Congress enacted the Act, *continued in effect* during the arbitration proceedings which Rally initiated, and (as to Chevrolet) *remain in effect today* following issuance of the Arbitrator's award denying Rally's request for reinstatement. The only change that the Act worked to the Wind-Down Agreement and 363 Sale Order was the creation of a new statutory right allowing dealers to *seek* "reinstatement" through binding arbitration. During the arbitration process, therefore, dealers like Rally continued to operate under the very limited "wind-down" status defined by their Wind-Down Agreements.

4.       The Dealer Arbitration Act provided that Rally could gain reinstatement, and thereby escape wind-down status, only if it (1) filed a request for arbitration no later than 40 days after enactment of the Act; (2) obtained a reinstatement award in arbitration proceedings that had to be completed no later than July 14, 2010[1]; and (3) complied with the terms of a customary letter of intent regarding such matters as having an adequate dealership facility, sufficient capitalization, etc. The truncated timetable for arbitration, the Act's explicit limits on discovery and the legislative history all reflected the "time sensitive nature of this situation" and clear Congressional intent not to let the proceedings get bogged with "the excessive costs and delays of litigation and discovery disputes" so that "added dealers [could] return to full-fledged operations quickly." Remarks of Rep. Van Hollen, Cong. Rec., H14477 (December 10, 2009) [Objection, Exh. J]; Remarks of Rep. Conyers, Cong. Rec., H14478 [*id.*].

---

[1] The Act provided that arbitration had to be completed not later than 180 day after its enactment, but individual arbitrators could extend this period for up to 30 days. *See* Motion, Exh. B, § 747(d).

5.     Importantly, the Dealer Arbitration Act did not supplant or deprive wind-down dealers of any pre-existing common law or statutory right.  Instead, the Act created a brand new statutory right with specified characteristics and limitations, including the lack of judicial review.  Given the importance that Congressional proponents attached to swift proceedings, it is no accident that the Act did not provide for judicial review, which would have created the prospect for delays far greater than those which might stem from the "discovery disputes" that proponents took such pains to avoid in drafting the Act.  After all, a right to judicial review would have to have been reciprocal and, if included in the Act, would not only have permitted dealers like Rally to re-litigate adverse arbitration awards, but also would have permitted New GM to do so, contrary to the straightforward text and intent of the Act envisioning a stream-lined and expeditious arbitration process.  In addition, Congress obviously was well aware of both the Wind-Down Agreements signed by GM dealers and this Court's 363 Sale Order approving those agreements.  If, in addition to granting limited arbitration rights to wind-down dealers, Congress also had intended to provide dealers with the additional right to challenge adverse arbitration awards in a court, then Congress certainly would have said so expressly.

6.     Rally chose to exercise its limited arbitration rights under the Act but was not successful in obtaining an award reinstating it as a Chevrolet dealer.  Yet now, contrary to its covenant not to sue New GM, and ignoring its consent to this Court's retention of exclusive jurisdiction in section 13 of the Wind-Down Agreement, Rally claims in a suit filed in another Court that it should not be required to honor its obligations under the Wind-Down Agreement due to alleged legal errors by the Arbitrator.  In short, it is attempting to use a self-proclaimed right to judicial review of the adverse arbitration award as a defense to enforcement of the Wind-

Down Agreement which requires termination of the Chevrolet Dealer Agreement by October 31, 2010.

7.      As we show below, there is no statutory or other basis for Rally's self-created "right" to judicial review of the Arbitrator's award and, in any event, Rally's claims relate centrally to the Wind-Down Agreement and therefore fall squarely within this Court's retention of full, complete and exclusive jurisdiction in paragraph 71 of the Sale Approval Order. And even if the Court could somehow imply a right to judicial review that Congress never enacted, general principles governing the exceedingly limited scope of judicial review of arbitration awards would defeat Rally's arguments for modification or vacation of the Arbitrator's award.

## ARGUMENT

A.    **Congress Did Not Authorize and this Court Should Not Imply**
       **Any Right to Judicial Review of the Arbitration Award**

1.    **The Statute and Legislative History**

8.      To begin with the obvious, the Dealer Arbitration Act does not authorize, or even hint at, any right to judicial review.  Equally obviously, the Congressional proponents of the Act sought a stream-lined and expeditious binding arbitration procedure culminating in swift reinstatement of dealers who obtained a favorable award.  If, as Rep. Van Hollen stated, it was important to avoid the excessive costs and delays of "litigation" and "discovery disputes" [Objection, Exh. J], it certainly is not "inconceivable" (as Rally asserts in footnote 6 of its Objection) that Congress would chose deliberately to omit any provision for judicial review in order to avoid the "excessive costs and delays of litigation."  Remarks of Rep. Van Hollen, Cong. Rec. H14477 (December 10, 2009) [Objection, Exh. J].  Indeed, given the Act's ringing silence on the issue of judicial review, the expressed emphasis of its proponents on expedition

4

and Congressional knowledge of this Court's approval of the Wind-Down Agreements, the

burden plainly falls on Rally to point to something concrete which would create a right to

judicial review *sub silentio*. This it has failed to do.

### 2.      The Federal Arbitration Act and AAA Commercial Arbitration Rules

9.      Rally argues in its petition in the California Action that limited judicial

review is available under the Federal Arbitration Act ("**FAA**"). But the FAA is triggered only if

there is an arbitration agreement and here, indisputably, there isn't. *See* Motion, ¶ 16 (pp. 7-8).

New GM did not agree to arbitrate. Congress required it to do so. So, while Rally in its

Objection continues to cite cases decided under the FAA, it now admits that the FAA does not

apply here: "[T]he arbitration remedy is a creation of a federal statute. Rally and New GM did

not arbitrate pursuant to a contract, they arbitrated because Congress mandated it…." Objection,

¶ 67 (p. 19).

10.      Having conceded this point, Rally attempts to find an implied consent to

judicial review in New GM's supposed acceptance of the American Arbitration Association

Commercial Arbitration Rules. But the premise of this argument crumbles under the weight of

indisputable evidence that New GM *did not* accept the blanket applicability of the AAA Rules.

Instead, its statement answering Rally's arbitration demand, attached to Rally's Objection,

clearly states New GM's position that the AAA Rules do not override contrary provisions of the

Act:

> By filing this Answering Statement and participating in this
> proceeding, GM does not waive any objections it may have to this
> proceeding. *The sole and exclusive authority for this proceeding is
> the [Dealer] Arbitration Act*, and GM reserves the right to object
> to any requests, allegations or claims outside the Arbitration Act.
> Depending on the Claimant's claims at the hearing, GM reserves
> the right to raise any and all affirmative defenses under applicable
> law and reserves the right to contest the jurisdiction of the
> arbitrator, the arbitrability of any claim, *or the applicability of the*

> *AAA's rules to this proceeding.  GM also reserves the right to*
> *object to the application of any of the AAA's Commercial*
> *Arbitration Rules where appropriate **or where such rules are***
> ***otherwise inconsistent with the provisions or purposes of the***
> ***[Dealer] Arbitration Act**.  GM will address these issues in*
> *accordance with any schedule for this case.*

Objection, Exh. E, p. 10 (emphasis added).  Moreover, the American Arbitration Association

recognized *and approved* New GM's position, as shown in the following statement posted on its

website (www.adr.org):

> American Arbitration Association (AAA) Automobile Industry
> Special Binding Arbitration Program
> . . .
>
> Arbitrations will be administered pursuant to the AAA's
> Commercial Arbitration Rules, *however all provisions of the*
> *legislation that are inconsistent with the Commercial Rules shall*
> *trump the Commercial Rules* . . . .

(Emphasis added.)  A copy of this AAA posting is attached hereto as Exhibit A.  A rule that

purported to provide for judicial review of an arbitration award issued under the Dealer

Arbitration Act which does not authorize judicial review plainly would be "inconsistent" with

the Act and therefore "trumped," not only in New GM's but also in the AAA's opinion.

11.     Moreover, the rule in question, Rule 48(c), does not authorize full-scale

judicial review, contrary to Rally's statement (Objection, ¶ 58) that "the Commercial Rules

specifically permit judicial review of the Arbitration (be it confirmation, vacatur or modification

of the arbitration award) . . . ."  In fact, Rule 48(c) does not even mention vacatur or modification

but merely implies consent "that judgment upon the arbitration award may be entered in any

federal or state court having jurisdiction thereof," *i.e.*, consent that the award can be *enforced* if

the loser balks at compliance.  Rally here is not seeking to enforce the arbitrator's award but to

*escape* enforcement.

6

12.     Finally, *all* of the cases that Rally cites which imply consent to a binding award and entry of judgment enforcing the award [*see* Objection, ¶¶ 45, 50, 55-56] were cases in which judicial review was available under the FAA *because there was an arbitration agreement*.[2]  Here, once again, New GM did not agree to arbitrate, it was forced to do so, so the FAA simply does not apply, let alone authorize judicial review.  The cited cases therefore are entirely inapposite.

13.     To be sure, Rally makes a half-hearted waiver argument based on the fact that New GM did not object to the Arbitrator's scheduling order stating that AAA rules would apply, but New GM already had preserved, and AAA already had accepted, its position that rules inconsistent with the Dealer Arbitration Act were "trumped."  At that stage of the pre-trial proceedings it certainly was not incumbent upon New GM – or even permissible – to argue about the lack of any right to judicial review of an arbitration award that had not yet been issued.  Instead, as a matter of common sense, there was no reason or basis for New GM to anticipate, let alone raise the lack of authorization for judicial review until Rally sought it, which it did not do until it filed its petition in the California Action.  Accordingly, New GM's assertion that the Act does not provide for judicial review is certainly timely.  In short, there is simply no legal and factual basis for Rally's argument that New GM gave its "implied consent" to judicial review that Congress did not authorize merely by agreeing to abide by *some* AAA rules.

### 3.    Constitutional Issues

14.     In a last ditch effort to construct a right to judicial review which Congress did not enact, Rally suggests in footnote 6 of its Objection (p. 20) that the lack of such a right may "implicate the constitutionality of this federal statute," citing *Thomas v. Union Carbide Agr.*

---

[2]  *See*, *e.g.*, *Bryson v. Gere*, 268 F. Supp. 2d 46, 50 (D.D.C. 2003) ("The parties concede, and this Court has previously determined that this dispute is governed by the Federal Arbitration Act . . . .").

*Prod. Co.*, 473 U.S. 568 (1985). New GM agrees that *Thomas* is instructive, but in fact its

holding supports the right of Congress to create a new statutory arbitration right *without*

providing for full or – as in this case – *any* judicial review.

15.     *Thomas* involved a "data sharing" provision of the Federal Insecticide,

Fungicide, and Rodenticide Act ("**FIFRA**"), 7 U. S. C. § 136 *et seq.*, that allowed the EPA to use

data already in its files to review applications for pesticide approval *provided* that the applicant

offered to compensate the party that originally submitted the data. In place of a prior provision

permitting the EPA Administrator to determine the amount of compensation, the applicant and

data submitter were required to agree on the amount or, failing agreement, submit the issue to

binding arbitration. *See* 473 U.S. at 573-74.

16.     This arbitration requirement was, like the compulsory arbitration at issue

in this case, entirely a creature of statute (as Rally agrees, *see* Objection, ¶ 67). Like the parties

in this case, the applicant and data submitter in *Thomas* had no pre-existing common law or

statutory rights concerning the issues which the statute directed them to arbitrate. *See* 473 U.S.

at 584 ("Any right to compensation . . . results from FIFRA and does not depend upon or replace

a right to such compensation under state law").

17.     Thus, in contrast to the issue in *Crowell v. Benson*, 285 U.S. 22 (1932),

FIFRA *did not* "displace[] a traditional cause of action" or "affect a pre-existing relationship

based on a common-law contract" which "clearly fell within the range of matters reserved to

Article III courts" under the holding of the *Northern Pipeline* case. *Thomas*, 473 U.S. at 587.

*Thomas* held under these and other relevant circumstances that the decision of Congress to

provide only very limited judicial review of FIFRA arbitration awards did not violate the separation of powers clause of the Constitution. [3]

18.    Congress could have dealt with the issue of compensating data submitters entirely legislatively, without involving an Article III court or an arbitrator.  *Thomas*, 473 U.S. at 590 ("Congress, without implicating Article III, could have authorized EPA to charge follow-on registrants fees [and thus] directly subsidized FIFRA data submitters for their contributions of needed data").  In such circumstances, "when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced."  *Id.* at 589.  Similarly, issues relating to dealer reinstatement could have been dealt with purely by legislation.  The fact that Congress crafted the Act to permit reinstatement by impartial arbitrators utilizing specified criteria with no additional layer of judicial review does not implicate any legitimate constitutional concerns.

19.    The conclusions in the two immediately preceding paragraphs follow not only from the Court's analysis in *Thomas* but, as the Court there recognized (473 U.S. at 588), from its decision in *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297 (1943), which upheld the denial of judicial review in conjunction with legislative creation of a new statutory right.  The *Switchmen's* case involved a provision of the Railway Labor Act "that established a [**new**] 'right' of a majority of any craft or class of employees to choose its

---

[3] *See also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854 (1986) ("The risk that Congress may improperly have encroached on the federal judiciary is obviously magnified when Congress '[withdraws] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty' and which therefore has traditionally been tried in Article III courts, and allocates the decision of those matters to a non-Article III forum of its own creation" (citation omitted)).  Here, in contast, arbitration under the Dealer Arbitration Act obviously does not "withdraw" any traditional common law or equitable right from "judicial cognizance."

bargaining representative  and vested the resolution of disputes concerning representation solely

in the National Mediation Board, *without judicial review*.”  473 U.S. at 588 (emphasis added).

The analysis in the *Switchmen's* case, quoted in *Thomas*, is highly relevant here:

> The Act . . . writes into law the 'right' of the 'majority of any craft
> or class of employees' to 'determine who shall be the representative
> of the craft or class for purposes of this Act.'  That 'right' is
> protected by [a provision] which gives the Mediation Board the
> power to resolve controversies concerning it.  . . .  *A review by the
> federal district courts of the Board's determination is not necessary
> to preserve or protect that 'right.'  Congress for reasons of its own
> decided upon the method for protection of the 'right' which it
> created.*

*Thomas*, 473 U.S. at 588 *quoting Switchmen*, 320 U.S. at 300-01 (emphasis added). The same is

true of Congress' decision *not* to provide for judicial review of arbitration awards granting or

denying dealer reinstatement.  Having created the potential new “right” to reinstatement, and

having done so without displacing any previously recognized common law or statutory rights,

Congress chose arbitration *without judicial review* as the method for determining the extent of

that right.  By electing arbitration, Rally was entitled to take advantage of its new right to

*possible* reinstatement, but it was not entitled to seek enlargement of that right – or to any other

remedy for escaping its obligations under the Wind-Down Agreement beyond the limited

procedural mechanism of binding arbitration that Congress chose to provide.

       20.    This conclusion gains additional support from another important similarity

between FIFRA and the Dealer Arbitration Act.  By electing to participate in the “data sharing”

program, said the Court in *Thomas*, follow-on applicants “explicitly consent[] to have [their]

rights determined by arbitration.”  473 U.S. at 592.  This analysis was followed in subsequent

appellate decisions involving commodities industry association rules which required consent to

arbitration.  These decisions upheld the validity of member consent to binding arbitration even

10

though association memberships were required for plaintiffs to remain in the commodities

business:

> As this court summarized in [*Geldermann v. Board of Trade of the City of Chicago*, 836 F.2d 310 (7th Cir. 1987)], "under FIFRA, an applicant has the option of participating in the arbitration scheme or going out of business. Yet despite this economic compulsion, the Supreme Court [in *Thomas*] held that 'the follow-on registrant . . . explicitly consents to have his rights determined by arbitration.'" *Id.*, 836 F.2d at 318 (quoting *Thomas*, 473 U.S. at 592).

*R.J. O'Brien & Assoc. Inc. v. Pipkin*, 64 F.3d 257, 261 (7th Cir. 1995).

21.    Rally confronted precisely the same sort of choice here. It could trigger its

arbitration rights under the Act by filing a timely demand, thereby accepting the terms of the

Dealer Arbitration Act as they stood, *i.e.*, without judicial review, or it could have chosen to "go

out of business" pursuant to the terms of the valid and enforceable Wind-Down Agreement that

this Court approved. It chose the former and accordingly, without more, is bound by the award.

22.    Finally, even assuming the premise suggested (but not supported) by Rally

– that the Act's failure to authorize judicial review "could implicate [*i.e.*, throw into doubt] the

constitutionality of this federal statute," Objection, p. 20, n. 6, Rally cites no case which so much

as suggests that this Court is empowered to re-write the statute to supply such a right. To the

contrary, applicable case law explicitly precludes such action. *See*, *e.g.*, *Commodity Futures

Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (the canon of construction requiring a court

to interpret a statute when "fairly possible" in a manner that avoids the constitutional question

"must not and will not [be carried] to the point of perverting the purpose of the statute … or

judicially rewriting it" (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964)

(citations and internal quotation marks omitted)).

11

23.     Thus, if, as Rally suggests, the lack of judicial review makes the Dealer

Arbitration Act unconstitutional, this Court's inability to remedy the omission means Rally has

no enforceable rights under the Act at all, and its claims in the California Action therefore must

be dismissed in any event.

**B.      This Court Has Exclusive Jurisdiction of Rally's Claims and
         Should Enforce the 363 Sale Order and Wind-Down Agreement**

**1.      The Sale Approval Order Gives This Court Exclusive Jurisdiction**

24.     Even if Rally somehow could convince the Court that it has a right to

judicial review of the arbitration award, the governing documents could not be any clearer that

jurisdiction to conduct such a review would lie exclusively in this Court.  Sale Approval Order,

¶ 71; MSPA, § 9.13; Wind-Down Agreement, § 13.  Rally's extended argument that the federal

court in California otherwise would have subject matter jurisdiction under 28 U.S.C. § 1331

[Objection, pp. 17-21] is therefore entirely beside the point.  Rally is seeking to use its purported

appeal rights under the Dealer Arbitration Act as a "defense" to enforcement of the Wind-Down

Agreement which the 363 Sale Order approved and found to be a "valid and binding" agreement

that is "enforceable in accordance with [its] terms."  363 Sale Order, ¶ 31.  That defense

obviously implicates this Court's reservation of jurisdiction to "enforce" the Wind-Down

Agreement and resolve any disputes that relate to it.  At the very least, therefore, the California

Action is an improper collateral attack on paragraph 71 of the 363 Sale Order, which is a binding

and final order that has full res judicata effect.

**2.      The Judicial Estoppel Doctrine Does Not Apply Here**

25.     Citing Judge Gee's decision in *General Motors LLC v. Santa Monica

Group, Inc.*, No. CV 10-04787 DMG, 2010 WL 2740166 (C.D. Cal. July 9, 2010), Rally claims

that New GM should be "judicially estopped" from asserting that this Court has exclusive

12

jurisdiction because it invoked district court jurisdiction in that case, which also arose out of an

arbitration under the Act. What Rally ignores, however, is the complete factual dissimilarity

between the two cases. Unlike this case, New GM did not ask the district court in the *Santa

Monica* case to interpret or enforce the Wind-Down Agreement or, indeed, to interpret or enforce

the Dealer Arbitration Act. Instead, it asked the Court to enforce a private written settlement

agreement in which the defendant dealership had promised to dismiss its arbitration claim.

      26.     As a result of the obvious factual dissimilarities in the two cases, Rally

cannot establish the elements necessary for a finding of judicial estoppel. Those elements are

clearly stated in Rally's principal authority, *New Hampshire v. Maine*, 532 U.S. 742 (2001):

> First, a party's later position must be "clearly inconsistent" with its
> earlier position. Second, courts regularly inquire whether the party
> has succeeded in persuading a court to accept that party's earlier
> position, so that judicial acceptance of an inconsistent position in a
> later proceeding would create "the perception that either the first or
> the second court was misled," *Edwards, 690 F.2d at 599*. Absent
> success in a prior proceeding, a party's later inconsistent position
> introduces no "risk of inconsistent court determinations," and thus
> poses little threat to judicial integrity. A third consideration is
> whether the party seeking to assert an inconsistent position would
> derive an unfair advantage or impose an unfair detriment on the
> opposing party if not estopped.

*Id*. at 750-51. New GM's assertion that the California federal court had jurisdiction to enforce a

private settlement agreement under common law contract principles in no way clashes with the

assertion that, based on paragraph 71 or the 363 Sale Order, only this Court has jurisdiction to

pass on Rally's attempt to avoid its obligations under the Wind-Down Agreement. Judge Gee's

decision to enjoin further arbitration proceedings in the *Santa Monica* case as a means of

enforcing the settlement agreement, where both sides agreed, based on the specific dispute

resolution provisions of that agreement, that it was appropriate for her to determine whether

there was a breach thereof, does not support any "perception that either the first or second court

was misled," let alone entail any "risk of inconsistent court determinations" on issues in the two

cases that obviously are completely unrelated.  Finally, New GM's successful enforcement of the

*Santa Monica* settlement agreement obviously gave it no "unfair advantage" over Rally nor

imposed any "unfair detriment" on it given the provisions of the Wind-Down Agreement in

which Rally consented to this Court's exclusive jurisdiction in the event of any disputes about its

provision.  The *Santa Monica* case did not involve any dispute concerning the terms or

enforceability of the Wind-Down Agreement.

### 3. The Motion Invokes this Court's Core Jurisdiction

27.    It is beyond question that (a) a debtor's sale of assets pursuant to section

363(f) of the Bankruptcy Code, or (b) a debtor's post petition agreement to terminate an

executory contract, are "core" matters under 28 U.S.C. § 157(b)(2).  The 363 Sale Order and the

Court's approval of the Wind-Down Agreement reflect the outcome of these core proceedings.

Both the 363 Sale Order and the Wind-Down Agreement contain provisions which expressly

invoke this Court's exclusive jurisdiction regarding the interpretation and enforcement of these

documents.  A proceeding, such as the Motion, which seeks relief predicated on a "retained

jurisdiction" clause in this Court's order resolving a "core" matter is by definition a core matter

as well.  *Tenet Health System Philadelphia, Inc. v. National Union of Hospital and Health Care

Employees,* 265 B.R. 88, 95-96 (Bankr. W.D. Pa. 2001), *rev'd in part on other grounds*, 383

F.3d 169 (3d Cir. 2004); *In re Eveleth Mines, LLC*, 312 B.R. 634, 644-45 and n.14 (Bankr. D.

Minn. 2004).

28.    *Eveleth Mines* is directly on point.  In that case, the Court noted:

> [T]he motion at bar directly and necessarily comes out of a core
> proceeding in this case, the Debtor's motion for authority to
> conduct a sale of assets of the estate free and clear of liens
> [pursuant to 11 U.S.C. § 363].  Core proceedings under 28 U.S.C.
> § 157(b) fall under the "arising under" or "arising in" jurisdiction

14

of 28 U.S.C. § 1334(b).  Then, [proceedings for] "the enforcement
of orders resulting from core proceedings are themselves
considered core proceedings."

*Id*. at 644-45 (citations omitted).  *Accord Tenet Health System*, 265 B.R. at 95-96. (Bankr. W.D.

Pa. 2001) ("a bankruptcy court has core subject matter jurisdiction to construe its own orders"

which involve "sales of assets within the bankruptcy court pursuant to 11 U.S.C. § 363"); *Luan*

*Investment S.E. v. Franklin 145 Corp. (In re Petric Retail, Inc.)*, 304 F.3d 223, 229-30 (2d Cir.

2002) (disputes concerning Bankruptcy Court's sale order fall within "core" jurisdiction); *In re*

*Marcus Hook Development Park, Inc.*, 943 F.2d 261 (3d Cir. 1991) (to the same effect); *New*

*England Power & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equipment &*

*Marine, Inc.)*, 292 F.3d 61, 68 (1st Cir. 2002) (the "underlying dispute here involves a

subsequent purchaser's interpretation of a sale order 'free and clear of liens' under 11 U.S.C. §

363(b), an order that can only be issued by a bankruptcy court, and so it is one that arises in a

case under title 11 or perhaps arises under title 11"); *Beneficial Trust Deeds v. Franklin (In re*

*Franklin)*, 802 F.2d 324, 326 (9th Cir. 1986) ("Requests for bankruptcy courts to construe their

own orders must be considered to arise under title 11 ["core" jurisdiction] if the policies

underlying the Code are to be effectively implemented").

      29.    The court in *Eveleth Mines* went on to explain as follows:

As applied to a sale free and clear of liens, there are also good
policy reasons for making a derivative core-proceeding
classification.  . . .  Active bidding on assets from bankruptcy
estates will be promoted if prospective purchasers have the
assurance that they may go back to the original forum that
authorized the sale, for a construction or clarification of the terms
of the sale that it approved.  Relegating post-sale disputes to a
different forum injects an uncertainty into the sale process, which
would dampen interest and hinder the maximization of value.  A
purchaser that relies on the terms of a bankruptcy court's order, and
whose title and rights are given life by that order, should have a
forum in the issuing court.

*Id*. at 645 n.14.

   30. These black-letter principles are especially applicable here since the Bankruptcy Court expressly reserved jurisdiction to interpret and address issues arising under the 363 Sale Order and the Wind-Down Agreement.  Specifically, pursuant to Paragraph 71 of the 363 Sale Order, this Court retained exclusive jurisdiction to, among other things, enforce and implement the terms and provisions of the 363 Sale Order and "each of the agreements executed in connection therewith," which clearly includes the Wind-Down Agreement.  See 363 Sale Order, ¶ 71; *see also Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009) ("when the Bankruptcy Court entered the [prior orders,] it explicitly retained jurisdiction to enforce its injunctions").  Similarly, Section 13 of the Wind-Down Agreement provides as follows:  "By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain, full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto."  Accordingly, as the Motion is predicated on the enforcement of the 363 Sale Order and the terms of the Wind-Down Agreement, the Motion is a core proceeding triable in this Court.[4]

---

[4]  *In re Crowder*, 314 B.R. 445 (10th Cir. BAP 2004) cited by Rally in paragraph 97 of the Objection does not warrant a different result.  The issue in *Crowder* was simply the good faith of the purchaser and whether Section 363(m) of the Bankruptcy Code rendered an appeal of a sale order moot; it had nothing to do with enforcing the terms of a sale order and a court approved agreement where both documents had a "retention of jurisdiction" provision.  *In re Hall's Motor Transit Co.,* 889 F.2d 520 (3d Cir. 1989), also cited by Rally in paragraph 97 of the Objection, is equally inapposite.  There, between bidding and closing on a debtor's property, the property was rezoned and neither the purchaser nor the debtor sought to challenge the action; the sale was thereafter approved by the bankruptcy court.  Two years later, the purchaser sought to enjoin the village from interfering with the purchaser's use of the property.  The court found that the property was no longer part of the debtor's estate and was the purchaser's property; thus, the court no longer had jurisdiction to address the dispute.  This is clearly distinguishable from the matter at hand where Rally is attempting to void the specific terms of the Wind-Down Agreement that were approved by the 363 Sale Order.

31.     Moreover, the Bankruptcy Court's retention of jurisdiction is consistent with the general rule that the "home" bankruptcy court is the proper forum for civil proceedings "arising under" or "arising in cases under" Title 11, so-called "core" bankruptcy matters.  *See Hohl v. Bastian*, 279 B.R. 165, 177 (W.D. Pa. 2002) ("[T]he home court presumption provides that the court in which the bankruptcy case itself is pending is the proper venue for adjudicating all the related litigation, including those suits which have been filed in other state or federal courts.").  The relief requested in the Motion is ancillary to the 363 Sale Order and the Wind-Down Agreement as New GM is seeking to prevent Rally from violating the provisions of these Court-approved documents.  The Bankruptcy Court -- as the "home" court -- is the proper venue for interpretation and enforcement of its own Orders. [5]

32.     Lastly, it is curious that Rally argues that this Court should defer to the arbitration process created by the Act.  *See* Objection, at 30-31.  By making this argument, Rally is, in effect, agreeing with New GM's argument that neither the California Court nor any other court should be interfering with the Arbitrator's award.

**C.      Rally Has No Colorable Basis for Asking the Court
         To Vacate or Modify the Arbitration Award**

33.     The gist of Rally's challenge to the arbitration award is its claim that the Dealer Arbitration Act did not authorize the Arbitrator to reach separate conclusions with respect

---

[5] Bankruptcy courts have the inherent authority to enforce their orders — "[t]he power to issue an order carries with it the power to enforce the order."  *In re Kalpana Elecs., Inc.*, 58 B.R. 326, 335 (Bankr. E.D.N.Y. 1986); *see also Travelers*, 129 S. Ct. at 2205 ("as the Second Circuit recognized, . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *Back v. AM Gen. Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 637 (S.D.N.Y. 1997) (quoting the lower bankruptcy court opinion that "it had jurisdiction pursuant to its 'inherent or ancillary jurisdiction to interpret and enforce [its] own orders'"); *In re Chief Executive Officers Clubs, Inc.*, 359 B.R. 527, 533 (Bankr. S.D.N.Y. 2007) ("Courts have the inherent power to enforce compliance with their lawful orders through civil contempt.").

to reinstatement of its Chevrolet franchise, on the one hand, and its Buick, Cadillac and GMC

franchises, on the other hand.  *See* Objection, ¶¶ 35-41.

34.    The central premise of this argument is simply wrong.  Rally claims it

"possessed only one General Motors Dealer Sales and Service Agreement for all five (5) brands

of vehicles . . . ."  Objection, ¶¶ 15, 34.  Yet the very document which Rally cites in support of

this assertion, Exhibit A to its Objection, proves exactly the opposite.  This document, entitled

"General Motors Corporation Dealer Sales and Service Agreement(s), states as follows in its

very first paragraph:

> General Motors Corporation, *separately* on behalf of its
> Division(s) identified in the specific Motor Vehicle Addendum(s)[6]
> for Chevrolet Passenger Vehicles and Light Duty Trucks, …
> Pontiac Motor Vehicles, GMC Light Duty Trucks, Buick Motor
> Vehicles [and] Cadillac Motor Vehicles . . ., . . . and Rally Auto
> Group Inc., . . . hereby enter into *separate* Agreement(s) for each
> Motor Vehicle Line-Make(s) included in the Motor Vehicle
> Addendums incorporated into this Agreement, and only for the
> Line-Make(s) included in the Motor Vehicle Addendum(s).  *The
> Agreement for each Line-Make is independent and separately
> enforceable by each party, and the use of the common form is
> intended solely to simply execution of the Agreement(s).*

Objection, Exhibit A, p. 1 (emphasis added).  Thus, when the Dealer Arbitration Act was

enacted, Rally indisputably had not one but five separate GM Dealer Sales and Service

Agreements, including one for the Pontiac brand which has been discontinued.  The fact that all

of these agreements were administered under one BAC, *i.e.*, "Business Associate Code," merely

reflects the fact that the same legal entity, Rally Auto Group, Inc., was the "Dealer" under all of

the Dealer Agreements.  *See* Exh. A, p. 1 (first paragraph).  Similarly, the fact that Rally

---

[6]  Rally's Motor Vehicle Addendums, included in Exhibit A to its objection, specify the line-
makes and models of GM vehicles that Rally is authorized to purchase from GM and sell or lease
to retail customers.  In Rally's case, at the time it executed the Wind-Down Agreement it had
Motor Vehicle Addendums authorizing it to sell GM's surviving Chevrolet, Buick, Cadillac and
GMC Line-Makes and its discontinued Pontiac Line-Make.

18

submitted a single consolidated operating report to GM each month merely reflects the fact that, administratively, it only had one BAC code.  Neither of these facts demonstrates, in the face of the directly contrary contractual language in Exhibit A, that Rally had "one singular Dealer Sales and Service Agreement" for all five GM brands as its Objection (¶ 15) erroneously states.

35.     Rally also is wrong in asserting that the Dealer Arbitration Act permitted the Arbitrator to determine only (1) that all four Dealer Agreements should be reinstated or (2) that none of them should be reinstated.  *See* Objection, ¶¶ 38-41.  This assertion depends, first of all, on the erroneous premise that Rally had only a single Dealer Agreement which, as demonstrated above, is simply incorrect.  *See* Objection, ¶ 34.  But, further, Rally also flatly misreads the definition of "covered dealership" which, read correctly, independently defeats its argument.

36.     Rally says that the Act "does not allow the splitting of brands within the 'covered dealership'" and therefore permits the Arbitrator only to determine whether the "singular" covered dealership, including all brands, should or should not be reinstated. Objection, ¶ 38.  This argument rests in turn on Rally's interpretation of the Act's definition of "covered dealership," which Rally quotes with the following emphasis (Objection, ¶ 39):   "an automobile dealership that had *a franchise agreement for the sale and service of vehicles of **a brand or brands** with a covered manufacturer*."   Section 747(a)(2) (emphasis supplied by Rally). But regardless of Rally's attempt to focus on the number of "brands," it did not have "a" franchise agreement when the Act was enacted, instead it had ***five*** franchise agreements.  Thus, it was a "covered" Chevrolet dealer by virtue of its Chevrolet Dealer Agreement, a "covered" Buick Dealer by virtue of its separate Buick Dealer Agreement, and so on.  And since the Act permitted covered dealers to seek reinstatement of their "franchise agreements," separate

19

reinstatement determinations for separate franchise agreements certainly were completely within

the boundaries of the Arbitrators' authority.

       37.    This conclusion flows directly and inescapably from Rally's possession of

multiple franchise agreements and the express language of the Act:

> A covered dealership that was not lawfully terminated under
> applicable State law on or before April 29, 2009,[7] shall have the
> right to seek, through binding arbitration, continuation, or
> reinstatement **of a franchise agreement**, or to be added as a
> franchisee to the dealer network of the covered manufacturer in the
> geographical area where the covered dealership was located **when
> its franchise agreement** was terminated, not renewed, not assigned
> or not continued.

Section 747(b) (emphasis supplied).  Thus, Rally as a "covered" Chevrolet dealer could seek

reinstatement of its Chevrolet franchise agreement, or not, could seek reinstatement of its Buick

franchise agreement, or not, and so on.  The fact that it sought reinstatement of its franchise

agreements for all four surviving GM Line-Makes does not mean that it could not have sought

reinstatement for only some of its franchise agreements or that the Arbitrator could not make

separate reinstatement determinations for each franchise agreement.  In fact, that is exactly what

the Act directed the Arbitrator to do:

> At a minimum, the [Arbitrator's] written determination shall
> include . . . (2) a clear statement indicating whether **the franchise
> agreement** at issue is to be renewed, continued, assigned or
> assumed by the covered manufacturer….

Section 747(d) (emphasis added).  Where, as here, a single dealership entity had more than one

franchise agreement, the Arbitrator was entitled to determine whether each of those agreements

should be reinstated, regardless of the dealer's other franchise agreements.

---

[7] Reflecting the fact that GM and other manufacturers have separate franchise agreements for
individual Line-Makes, the California New Motor Vehicle Board, which hears and determines
termination protests by new motor vehicle dealers under CAL. VEH. CODE § 3060, requires dual-
line dealers to file separate termination protests for each Line-Make.

38.      Beyond the illogic of Rally's argument, one other point deserves mention. Rally does not dispute, indeed its own authorities repeatedly state, that the scope of judicial review of an arbitration award is extremely limited.  For example, as stated in *Francis v. Landstar Systems Holdings, Inc.*, No. 3:09-cv-238-J-32JRK, 2009 WL 4350250, "[b]ecause arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law."  *Id.* at *5 (quoting *AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007)).  As a result, "it is settled law … that courts are generally prohibited from vacating an arbitration on the basis of errors of law or interpretation."  *Id.* at *6 (quoting *Scott v. Prudential Securities, Inc.*, 141 F.3d 1007, 1014 (11th Cir.1998) (other citations and internal quotation marks omitted)).  Here, even giving Rally every benefit of the doubt, what it is complaining about is at best a mere error by the Arbitrator on an unsettled point of law – an error which even under Rally's authorities would not warrant vacatur. *See Bryson v. Gere*, 268 F. Supp. 2d at 50 (alleged error in contract interpretation would not support vacatur); *see also Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (rejecting parties' agreement to permit judicial review for "just any legal error" given FAA's requirement of "extreme arbitral conduct" for vacatur); *Stolt-Nielsen S.A. v. Animalfeeds International Corp.*, 130 S.Ct. 1758, 1767 (2010) ("Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error -- or even a serious error.").[8]

---

[8] Despite the *Hall Street* holding that the grounds for vacatur under the FAA are limited to those set forth in FAA  § 10, it remains unsettled whether the concept of "manifest disregard for the law" retains any vitality in the vacatur analysis.  *See Stolt-Nielsen*, 130 S.Ct. at 1768 n.3.  Even assuming that this standard is not inconsistent with *Hall Street* (an issue not decided in *Stolt-Nielsen*), Rally certainly has not made the required showing here that the Arbitrator "knew of the

39.    Finally, even assuming *arguendo* that a valid ground for vacatur existed (which it plainly does not), it is not at all clear what the ultimate result of vacatur would be or whether it would benefit Rally. Rally suggests, without citing any pertinent legal authority, that only part of the award declining to reinstate its Chevrolet franchise should be vacated, leaving it with its victory in obtaining reinstatement of its Buick, Cadillac and GMC franchise agreements. But if "piecemeal" reinstatement decisions truly are not authorized, as Rally argues, its victory as to Buick, Cadillac and GMC certainly is equally vulnerable to its argument. No one knows what the Arbitrator would have done if he had believed in Rally's "all or nothing" approach. And given that Congressional authority for AAA to conduct dealer arbitrations expired at the latest on July 14, 2010, a "remand" to the Arbitrator for a revised award is not possible. The only other alternative would be for a Court to rule on the reinstatement issue *de novo*, which would be directly contrary to the intent of the Dealer Arbitration Act to commit that issue to prompt and binding arbitration. All of these circumstances counsel wise restraint in considering Rally's request that the Court disturb the award which Congress clearly empowered the Arbitrator to make.

---

relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Stolt-Nielsen*, 130 S.Ct. at 1768. Instead, it has demonstrated at the very most that the Arbitrator ruled on a legal issue on which there exists no directly applicable appellate authority. This is not the stuff out of which a finding of "manifest disregard of the law" can be made. *See T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) ("awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent").

22

WHEREFORE, New GM respectfully requests that this Court: (i) enter an order substantially in the form attached to the Motion as Exhibit H, granting the relief sought therein; (ii) overrule the Objection in its entirety; and (iii) grant New GM such other and further relief as the Court may deem just and proper.

Dated: September 29, 2010
       New York, New York

                                        Respectfully submitted,


                                        /s/ Arthur Steinberg
                                        Arthur Steinberg
                                        Scott Davidson
                                        KING & SPALDING LLP
                                        1185 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone:  (212) 556-2100
                                        Facsimile:  (212) 556-2222

                                        Gregory R. Oxford
                                        ISAACS CLOUSE CROSE & OXFORD LLP
                                        21515 Hawthorne Boulevard, Suite 950
                                        Torrance, California 90503
                                        Telephone: (310) 316-1990
                                        Facsimile: (310) 316-1330
                                        Attorneys for General Motors LLC
                                        f/k/a General Motors Company