**Hearing Date and Time: October 21, 2010 at 9:45 a.m. (Eastern Time)**
**Objection Deadline: October 14, 2010 at 4:00 p.m. (Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Timothy P. Harkness

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- X
                                                         :
In re:                                                   :        Chapter 11 Case No.:
                                                         :
MOTORS LIQUIDATION COMPANY., et al.,                     :        09-50026 (REG)
f/k/a General Motors Corp., et al.                       :
                                                         :
                        Debtors.                         :        (Jointly Administered)
                                                         :
-------------------------------------------------------- X
```

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY TO ENFORCE (A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER, AND (C) THE AMENDED DIP FACILITY

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

FACTS .................................................................................................................................3

    A.    "The Deal" – Negotiations Prior to the Bankruptcy Case .......................................3

    B.    The Term Loan Litigation......................................................................................4

JURISDICTION ...................................................................................................................12

RELIEF REQUESTED..........................................................................................................12

BASIS FOR RELIEF REQUESTED........................................................................................12

    A.    This Court Has the Authority to Enforce Its Orders ..............................................12

    B.    The Amended DIP Facility and the Orders Should be Enforced According
        to Their Plain Terms ............................................................................................13

    C.    The Course of Dealings and Surrounding Facts Show that Treasury Has No
        Interest in the Term Loan Litigation....................................................................14

    D.    Treasury Should Be Judicially Estopped From Arguing that the Term Loan
        Litigation Belongs to Any Entity Other Than the Committee.................................15

NOTICE..............................................................................................................................16

KL2 2666780.14

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Back v. AM Gen. Corp. (In re Chateaugay Corp.),*
    213 B.R. 633 (S.D.N.Y. 1997) ......................................................................12

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.,*
    No. 03 Civ. 8259 (CSH), 2007 WL. 1988150 (S.D.N.Y. July 10, 2007).......................13 n.7

*Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son),*
    815 F.2d 1314 (9th Cir. 1987) ....................................................................16

*Dickerson v. Colgrove,*
    100 U.S. (10 Otto) 578, 25 L. Ed. 618 (1880)....................................................16

*GMAC Bus. Credit, L.L.C., v. Ford Motor Co., No. Civ. 02-70297,*
    2002 WL. 32819769 (E.D. Mich. Sept. 30, 2002)................................................13

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In Re Dairy Mart
    Convenience Stores, Inc.),*
    272 B.R. 66 (S.D.N.Y. 2002) .....................................................................13

*United States of America v. Bartlett (In re Bartlett),*
    353 B.R. 398 (Bankr. D. Vt. 2006)................................................................13

*United States of America v. Owens,*
    54 F.3d 271 (6th Cir. 1995) ......................................................................16

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McLean Indus., Inc.),*
    68 B.R. 690 (Bankr. S.D.N.Y. 1986)..............................................................12

### STATE CASES

*Goldman v. White Plains Ctr. for Nursing Care, LLC,*
    11 N.Y.3d 173 (2008).........................................................................13 n.7

### STATUTES & RULES

11 U.S.C. § 105(a) ...........................................................................1,2,12, 16

11 U.S.C. § 361...............................................................................1,2

11 U.S.C. § 362...............................................................................1,2

ii

11 U.S.C. § 363 ...................................................................................................1, 2

11 U.S.C. § 364 ...................................................................................................1, 2

11 U.S.C. § 507 ...................................................................................................1, 2

28 U.S.C. § 157 .....................................................................................................12

28 U.S.C. § 157(b)(2) ...........................................................................................12

28 U.S.C. § 1334 ...................................................................................................12

28 U.S.C. § 1408 ...................................................................................................12

28 U.S.C. § 1409 ...................................................................................................12

Fed. R. Bankr. P. 1015(c) .....................................................................................16

Fed. R. Bankr. P. 2002 .......................................................................................1, 2

Fed. R. Bankr. P. 4001 .......................................................................................1, 2

Fed. R. Bankr. P. 6004 .......................................................................................1, 2

Fed. R. Bankr. P. 9007 ..........................................................................................16

## MISCELLANEOUS

*Black's Law Dictionary*, 1020-21 (9th ed. 2009) ..........................................................14

7 Collier on Bankruptcy § 1111(b)(1)(A)(i) (Alan N. Resnick & Henry J. Sommer eds.,
    16th Ed. rev. 2009) ............................................................................................14

11 Samuel Williston, *Williston on Contracts* § 31:4, at 277-78 (4th ed. 1999)......................13 n.5

KL2 2666780.14

**Hearing Date and Time: October 21, 2010 at 9:45 a.m. (Eastern Time)**
**Objection Deadline: October 14, 2010 at 4:00 p.m. (Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Timothy P. Harkness

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
In re:                                                   :          Chapter 11 Case No.:
                                                         :
MOTORS LIQUIDATION COMPANY., et al.,                     :          09-50026 (REG)
f/k/a General Motors Corp., et al.                       :
                                                         :
                              Debtors.                   :          (Jointly Administered)
                                                         :
-------------------------------------------------------- X

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY TO ENFORCE (A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER, AND (C) THE AMENDED DIP FACILITY

TO:    THE HONORABLE ROBERT E. GERBER,
       UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above

captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the

"**Debtors**" or "**Old GM**"), by and through its undersigned counsel, hereby moves for entry of an

order, substantially in the form annexed as **Exhibit A** hereto, enforcing: (i) the Final Order

Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules

2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain

Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties dated June 25, 2009 (the "**Final DIP Order**") [Docket No. 2529]; (ii) the Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing dated July 5, 2009 (the "**Wind-Down Order**" and together with the Final DIP Order, the "**Orders**") [Docket No. 2969]; and (iii) the $1,175,000,000 Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement (the "**Amended DIP Facility**"), dated as of July 10, 2010, by and among the Debtors, the United States Department of the Treasury ("**Treasury**"), and Export Development Canada ("**EDC**").

## PRELIMINARY STATEMENT

On August 26, 2010 – more than a year after the Committee sued for the return of $1.5 billion paid on account of an apparently voidable security interest (as defined more precisely below, the "**Term Loan Litigation**") – Treasury for the first time asserted that Treasury, not unsecured creditors, owned the Term Loan Litigation.  On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan (the "**Proposed Plan**") [Docket No 6829], which, at Treasury's request, provided that ownership of the Term Loan Litigation would be determined by the Court or by negotiation between Treasury and the Committee.

Treasury's position with respect to the Term Loan Litigation contradicts the Final DIP Order, approving Treasury's original $33.3 billion debtor-in-possession facility, the Wind-Down Order, approving the Amended DIP Facility and the Amended DIP Facility itself, each of

2

which Treasury agreed to before they were entered by the Court.  The Orders and the Amended

DIP Facility provide as follows:

- The Committee, and only the Committee, has the ability to bring the Term Loan Litigation.

- The Term Loan Litigation is specifically excluded from Treasury's collateral.

- Treasury's recourse is limited solely to its collateral.  Thus Treasury has no interest in the Term Loan Litigation.

Treasury must live up to its agreements.  The Committee asks this Court to

enforce them.

## FACTS

### A.    "The Deal" – Negotiations Prior to the Bankruptcy Case

1.      Paul Weiss Rifkind Wharton & Garrison LLP ("**Paul Weiss**") and

Houlihan, Lokey Financial Advisors, Inc. were retained before the commencement of these cases

by major holders of the Debtors' publicly traded bonds.  These firms negotiated the basic deal

with Treasury that underpins these chapter 11 cases, as follows:  Their major bondholder clients

agreed not to object to the Debtors' sale under Section 363 of substantially all of the Debtors'

assets to a new company controlled by Treasury ("**New GM**").  Treasury in return agreed to have

New GM issue 10% of its common stock, and warrants with a value approximating an additional

10% of New GM equity, to the Debtors for distribution to the Debtors' unsecured creditors.  *See*

Mayer Decl. ¶ 2.[1]

2.      The deal was based on an estimate of the Debtors' unsecured claims at

$35 billion.  Treasury agreed that if unsecured claims increased, then, in a range from $35 billion

---

[1] All references to "Mayer Decl. ¶ __" are to the accompanying Declaration of Thomas Moers Mayer, dated October 4, 2010, attached hereto as **Exhibit B**.  All references to "Mayer Decl. Ex. __" are to the exhibits annexed to the Mayer Declaration.

to $42 billion, New GM would issue up to an additional 2% of New GM common stock. Thus, within the $35 to $42 billion range, the 10% of New GM common stock was protected from dilution. However, no additional warrants would be issued by New GM. Thus the New GM warrants, which could comprise approximately half of unsecured creditors' value, would not be protected from dilution if claims ranged from $35 billion to $42 billion. If unsecured claims exceed $42 billion, there would be no dilution protection at all. Current estimates of unsecured claims are not public with one exception: New GM's report for the second calendar quarter of 2010 states that it estimates unsecured claims against the Debtors will exceed $37 billion. *See* Mayer Decl. ¶ 3; Mayer Dec. Ex. 1, General Motors Co. 10-Q filed August 16, 2010 at p. 40.

3.      The deal was also based on Treasury's commitment to pay, at the closing of the sale, all claims of the Debtors' secured bank lenders – including claims under a $1.5 billion (principal amount) term loan which was, at the time, believed to be fully secured by a non-voidable security interest and various mortgages (as more fully defined below, the "**Prepetition Term Loan**"). *See* Mayer Decl. ¶ 4.

4.      The foregoing paragraphs are set forth on information and belief, based on Committee counsel's interviews of Paul Weiss and Houlihan Lokey Financial Advisors LLP and statements contained in the Debtors' Disclosure Statement filed on August 31, 2010 (the "**Disclosure Statement**") [Docket No. 6830]. The Committee does not believe the foregoing paragraphs are disputed.

B.      **The Term Loan Litigation**

5.      On June 1, 2009, (the "**Petition Date**"), all Debtors with material assets filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"). *See* Mayer Decl. ¶ 5. On June 3, 2009, the Committee was formed and retained professionals. *See* Mayer Decl. ¶ 6.

4

6.      In the weeks following the Petition Date, the Committee negotiated the Amended DIP Facility and the Orders.  Each of these documents was drafted by Treasury's counsel, which took or rejected comments from the Committee and other parties in the course of the negotiations.  *See* Mayer Decl. ¶ 7.

7.      A key all-hands meeting of counsel to the Debtors, the Committee and Treasury, plus Paul Weiss, and their respective financial advisors took place on June 19, 2009 (the "**June 19 Negotiating Session**").  *See* Mayer Decl. ¶ 8.

8.      Prior to the June 19 Negotiating Session, the Committee had commenced its investigation of liens and security interests securing a prepetition $1.5 billion term loan dated as of November 29, 2006 and amended March 4, 2009 (the "**Prepetition Term Loan**") from a bank syndicate (the "**Prepetition Term Lenders**")[2] agented by JPMorgan Chase Bank, N.A. ("**JPMorgan**").  The day before the June 19 Negotiating Session, JPMorgan's counsel called to inform Committee counsel that, prior to the Petition Date, a paralegal for counsel to the Debtors filed a UCC-3 termination statement with respect to the Prepetition Term Loan's security interests without authority.  *See* Mayer Decl. ¶ 9.  Subsequent discovery has uncovered facts supporting the Committee's contention that JPMorgan did in fact authorize the paralegal to file the UCC-3 termination statement.  *See* Mayer Decl. ¶ 9.  This matter is currently *sub judice* with this Court.  *See* Mayer Decl. ¶ 9, *see also* Adversary Complaint dated July 31, 2009 [Case No. 09-00504].

9.      The Committee was therefore particularly focused on a possible challenge to the Prepetition Term Lenders' security interest and recovery of the $1.5 billion in cash slated to be paid, at the closing of the sale, to the lenders (the "**Term Loan Litigation**").  The

---

[2] The Final DIP Order and the Wind-Down Order refer to the Prepetition Term Lenders as the Prepetition Senior Facilities Secured Parties.

KL2 2666780.14

Committee's agenda for the June 19 Negotiating Session, and discussions thereafter, included preserving the benefit of the Term Loan Litigation for unsecured creditors.  *See* Mayer Decl. ¶10; Mayer Decl. Ex. 2, E-mail to Treasury.

10.    By June 25, 2009, the Debtors, Treasury, the Prepetition Term Lenders and the Committee had agreed on the terms of the Final DIP Order and the Debtors submitted the order to the Court.  *See* Mayer Decl. ¶ 13; Mayer Decl. Ex. 3, June 25, 2009 Hearing Tr. at pp. 20-22.  The Final DIP Order, among other things, provides that the Debtors release the Prepetition Term Lenders on behalf of the Debtors and all parties claiming through the Debtors (including, for example, Treasury) with one exception:  the Committee, and only the Committee, was given both the right and standing to challenge the Prepetition Term Lenders' liens.  *See* Mayer Decl. Ex. 4, Final DIP Order ¶ 19(d) at p. 25:

> . . . provided, however, that such release shall not apply to the Committee with respect only to the perfection of first priority liens of the Prepetition Senior Facilities Secured Parties (it being agreed that if the Prepetition Senior Facilities Secured Parties, after payment, assert or seek to enforce any right or interest in respect of any junior liens, the Committee shall have the right to contest such right or interest in such junior lien on any grounds, including (without limitation) validity, enforceability, priority, perfection or value) (the "**Reserved Claims**").[3]  The Committee shall have automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Prepetition Senior Facilities Secured Parties not later than July 31, 2009 (the "**Challenge Period**") . . . .

11.    As noted above, Treasury's counsel drafted the Final DIP Order.  At the June 25, 2009 hearing, Treasury asked the Court to enter the order.  *See* Mayer Decl. Ex. 3, June 25, 2009 Hearing Tr. at pp. 21-22.

---

[3] The term "Reserved Claims" shall have the meaning ascribed thereto in paragraph 19(d) of the Final DIP Order.

KL2 2666780.14

12.    On June 29, 2009, the Debtors filed their Motion Pursuant to Bankruptcy

Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 to

Amend DIP Credit Facility (the "**Motion to Amend DIP Facility**") [Docket No. 2755], which

seeks approval of the Amended DIP Facility.  *See* Mayer Decl. Ex. 5, Motion to Amend DIP

Facility.  This motion highlights for the Court the primary terms of the Amended DIP Facility

and specifically provides that the term "Collateral" excludes "avoidance actions arising under

chapter 5 of the Bankruptcy Code and applicable state law against the Prepetition Senior

Facilities Secured Parties (as defined in the DIP Facility)."  *See* Mayer Decl. Ex. 5, Motion to

Amend DIP Facility ¶ 10(d) at p. 4.  In addition, the Motion to Amend DIP Facility provides that

the "obligations under the Wind-Down Facility will be non-recourse to the Borrower or the

Guarantors, and recourse would only be to the Collateral."  *See* Mayer Decl. Ex. 5, Motion to

Amend DIP Facility ¶ 10(f) at p. 4.

13.    By July 2, 2009, after exchanging multiple drafts and comments thereon,

the parties agreed on the terms of the Amended DIP Facility and the Wind-Down Order.  The

parties, including Treasury, asked the Court to enter the Wind-Down Order approving the

Amended DIP Facility.  *See* Mayer Decl. ¶ 15; Mayer Decl. Ex. 6, July 2, 2009 Hearing Tr. at

pp. 101-07.  On July 5, 2009, the Court signed and entered the Wind-Down Order approving the

Amended DIP Facility in substantially the form attached as an exhibit thereto.  *See* Mayer Decl.

¶ 17; Mayer Decl. Ex. 7, Wind-Down Order.

14.    The Amended DIP Facility specifically excludes the Term Loan Litigation

from Treasury's collateral by defining "Collateral" as follows:

> [A]ll property and assets of the Loan Parties of every kind or type
> . . . (including avoidance actions arising under Chapter 5 of the
> Bankruptcy Code and applicable state law **except avoidance**

7

**actions against the Prepetition Senior Facilities Secured Parties**
(as defined in the Final Order)) . . . .

Mayer Decl. Ex. 8, Amended DIP Facility at p. 6 (emphasis added).  The Amended DIP Facility

defines the New GM stock and warrants as "New GM Equity Interests" and excludes those

assets from Treasury's lien as "Excluded Collateral."  Mayer Decl. Ex. 8, Amended DIP Facility

at p. 9; *see also* Mayer Decl. Ex. 8, Amended DIP Facility § 8.20 at p. 67.

15.     Not only does the Amended DIP Facility exclude the Term Loan

Litigation from Treasury's collateral but the Wind-Down Order does so as well:

> [T]he DIP Liens shall not include security interests in or liens on
> avoidance actions arising under chapter 5 of the Bankruptcy Code
> against the Prepetition Senior Facilities Secured Parties (as defined
> in the DIP Credit facility) or any stock, warrants, options or other
> equity interests in New CarCo (as defined in the Amended DIP
> Facility) issued to or held by any Debtor (or any of its subsidiaries)
> pursuant to the Related Section 363 Transactions including any
> dividends, payments or other distributions thereon and any
> proceeds or securities received or receivable upon any disposition
> or exercise thereof (the "**New GM Equity Interests**").

Mayer Decl. Ex. 7, Wind-Down Order at p. 5.

16.     Both the Amended DIP Facility and the Wind-Down Order explicitly

provide that Treasury's Wind-Doan Loan shall be ___*non-recourse*___:

> The Loans shall be non-recourse to the Borrower and the
> Guarantors and recourse only to the Collateral.

Mayer Decl. Ex. 8, Amended DIP Facility § 2.1 at p. 24 (second sentence).

> [T]he Loans (as defined in the Amended DIP Facility) shall be
> non-recourse to the Borrower and the Guarantors, such that the
> DIP Lenders' recourse under the Amended DIP Facility shall be
> only to the Collateral (as defined in the Amended DIP Facility)
> securing the DIP Loans. . . .

Mayer Decl. Ex. 7, Wind-Down Order at p. 6.   As noted above, the Amended DIP Facility's

definition of "Collateral," used in both the Amended DIP Facility and the Wind-Down Order,

specifically excludes the Term Loan Litigation from "Collateral."  *See* Mayer Decl. Ex. 8, Amended DIP Facility at p. 6; Mayer Decl. Ex. 7, Wind-Down Order at p. 6.

17.    The foregoing provisions were no accident.  By the end of the June 19 Negotiating Session, all parties in interest – including Treasury – agreed that Treasury's **_collateral_** would not include the Term Loan Litigation.  *See* Mayer Decl. ¶ 11.  Shortly after the June 19 Negotiating Session, Committee counsel further specifically requested that Treasury's **_recourse_** under the Amended DIP Facility be limited to its collateral – specifically **_excluding_** from such recourse the New GM stock, the New GM warrants **_and_** the Term Loan Litigation.  *See* Mayer Decl. ¶ 12; Mayer Decl. Ex. 9, E-mail to Treasury.  Committee counsel submitted comments amending the Amended DIP Facility § 2.1, limiting recourse to "Collateral", in an attachment to an e-mail dated June 30, 2009 and circulated to the Debtors, Treasury, and other parties in interest.  *See* Mayer Decl. Ex. 10, June 30, 2009 E-mail to Debtors and Treasury.  Treasury's counsel inserted this proposed language into the Amended DIP Facility and the language remained in each subsequent draft of the Amended DIP Facility through and including the execution version.  *See* Mayer Decl. ¶ 12.

18.    At the July 2, 2009 hearing on the Debtors' motion to approve the Amended DIP Facility, counsel to the Committee provided the Court with a brief overview of the Committee's discussions with the Debtors and Treasury regarding the Amended DIP Facility and the Wind-Down Order.  *See* Mayer Decl. Ex. 6, July 2, 2009 Hearing Tr. at pp. 101-03.  Treasury did not object to this narrative or the terms of the Amended DIP Facility or the Wind-Down Order.  *See* Mayer Decl. Ex. 6, July 2, 2009 Hearing Tr.

19.    Indeed, Treasury's counsel affirmed the Committee's representations and supplemented them by stating, "I should make clear that the funding facility is on a non-recourse

basis, as has been the case throughout these discussions." Mayer Decl. Ex. 6, July 2, 2009

Hearing Tr. at p. 103.

20.     Hearing no objection, this Court entered the Wind-Down Order, which

approved the Amended DIP Facility in substantially the form attached as an Exhibit thereto. *See*

Mayer Decl. ¶ 17. Treasury subsequently insisted on further amendments, not approved by the

Court, but such amendments are not relevant to this Motion. *See* Mayer Decl. ¶ 17. Treasury

signed and consummated the Amended DIP Facility, with the provisions excluding the Term

Loan Litigation from both collateral and recourse included in the executed final document, on

July 10, 2009. *See* Mayer Decl. Ex. 8, Amended DIP Facility.

21.     On July 31, 2009, pursuant to standing granted to the Committee under

Final DIP Order ¶ 19(d), the Committee timely filed a complaint against the Prepetition Term

Lenders seeking to: (i) avoid the security interest that was subject to the UCC-3 termination

statement; (ii) avoid and recover funds from the Prepetition Term Lenders paid on account of

such security interest; and (iii) disallow claims held by the Prepetition Term Lenders. *See*

Adversary Complaint dated July 31, 2009 [Case No. 09-00504, Docket No. 1]. Cross motions

for summary judgment are scheduled to be heard by the Court on November 1, 2010. *See* Mayer

Decl. ¶ 18.

22.     For almost a year, Treasury made no attempt to intervene in the lawsuit or

assert any interest therein. *See* Mayer Decl. ¶ 19. Moreover, Treasury has not once objected to

any of the Committee's fee applications seeking reimbursement for its work on the litigation.

*See* Mayer Decl. ¶ 19.

23.     The initial draft of the Proposed Plan, which was circulated to the

Committee on July 23, 2010, provided that the Term Loan Litigation would be prosecuted for the

sole benefit of unsecured creditors.[4]  *See* Mayer Decl. ¶ 20.  Specifically, the initial draft of the

Proposed Plan provided that the distribution to unsecured creditors included the proceeds of the

Term Loan Litigation.  *See* Mayer Decl. ¶ 20.

24.     On July 22, 2010, Treasury's counsel called Committee counsel and for

the first time asserted that Treasury had an interest in the Term Loan Litigation.  *See* Mayer

Decl. ¶ 21.  On July 26, 2010, August 16, 2010 and August 18, 2010, Committee counsel

participated in conference calls with Treasury's counsel regarding, among other things, the status

of the Term Loan Litigation.  *See* Mayer Decl. ¶ 21.  By no later than August 19, 2010, counsel

to the Debtors informed counsel to the Committee that per Treasury's request, the Proposed Plan

would provide that the beneficiary of the Term Loan Litigation be determined at a later date.  *See*

Mayer Decl. ¶ 21.

25.     On August 26, 2010, more than a full year after the Committee initiated

the Term Loan Litigation, Treasury filed the Statement of the United States of America with

Respect to Cross-Motions for Summary Judgment ("**Statement**") [Docket No. 6805] requesting

that any resolution of the cross motions for summary judgment not determine any person or

entity's entitlements with respect to the ultimate distribution of any funds recovered from the

Term Loan Litigation.  *See* Mayer Decl. ¶ 22; Mayer Decl. Ex. 11, Statement.

26.     On August 31, 2010, the Debtors filed the Proposed Plan, which provides

that the Term Loan Litigation will be included in the Avoidance Action Trust as an Avoidance

Action Trust Asset.  *See* Mayer Decl. ¶ 23; Mayer Decl. Ex. 12, Debtors' Joint Chapter 11 Plan

at § 1.22.  The Proposed Plan further provides that interests in the Avoidance Action Trust will

be distributed to Treasury or to unsecured creditors as the Court may decide or as the Committee

---

[4] The Proposed Plan provides that the Term Loan Litigation may continue to be prosecuted post-confirmation.

KL2 2666780.14

and Treasury may agree.  *See* Mayer Decl. ¶ 23; Mayer Decl. Ex. 12, Debtors' Joint Chapter 11

Plan at § 1.23.

## JURISDICTION

27.    This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

28.    The Committee seeks the entry of an order, substantially in the form

attached hereto as **Exhibit A**, enforcing the Orders and the Amended DIP Facility and thereby

determining (as contemplated in the Proposed Plan at Treasury's insistence) that Treasury has no

interest in the Term Loan Litigation and interests in the Avoidance Action Trust shall be

distributed to unsecured creditors.

## BASIS FOR RELIEF REQUESTED

A.    **This Court Has the Authority to Enforce Its Orders**

29.    A Bankruptcy Court has the inherent authority to enforce its own orders:

"The duty of any court to hear and resolve legal disputes carries with it the power to enforce the

order."  *U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.),* 68 B.R. 690,

695 (Bankr. S.D.N.Y. 1986) (citations omitted).  This fundamental premise is codified in Section

105 of the Bankruptcy Code.  *See* 11 U.S.C. § 105(a).  *See also Back v. AM Gen. Corp. (In re*

*Chateaugay Corp.),* 213 B.R. 633, 640 (S.D.N.Y. 1997) (discussing 11 U.S.C. § 105 and noting

Bankruptcy Court's inherent power to enforce its own orders).

30.    Pursuant to Paragraph 30 of the Final DIP Order, this Court retained

exclusive jurisdiction "to interpret and enforce the provisions of the DIP Credit Facility, the

Interim Order and this Final Order in all respects."  *See* Mayer Decl. Ex. 4, Final DIP Order ¶ 30.

Similarly, pursuant to the final paragraph of the Wind-Down Order, this Court retained exclusive

jurisdiction "to interpret and enforce the provisions of the Amended DIP Facility, the DIP Credit

Facility, the Final DIP Order and this Order in all respects."  *See* Mayer Decl. Ex. 7, Wind-Down

Order at p. 7.

**B.    The Amended DIP Facility and the Orders
        Should be Enforced According to Their Plain Terms**

31.    The Committee asks the Court to enforce the Orders and the Amended

DIP Facility according to the plain meaning of their provisions.  *See New England Dairies, Inc.*

*v. Dairy Mart Convenience Stores, Inc. (In Re Dairy Mart Convenience Stores, Inc.)*, 272 B.R.

66 (S.D.N.Y. 2002) (Court cannot read beyond the four corners of the Order); *United States of*

*America v. Bartlett (In re Bartlett)*, 353 B.R. 398 (Bankr. D. Vt. 2006) ("after-the-fact exercise in

interpretation cannot substitute for the plain language of the District Court Order."); *GMAC Bus.*

*Credit, L.L.C., v. Ford Motor Co.*, No. Civ. 02-70297, 2002 WL 32819769, *4 (E.D. Mich. Sept.

30, 2002) ("Court orders must ordinarily be interpreted by examination of only the four corners

of the document." (Internal quotations omitted)).[5]

32.    The relevant provisions of the Orders, set forth above, are in no way

ambiguous.   The Orders and the Amended DIP Facility plainly demonstrate that: (i) the

Committee and only the Committee has standing to bring the Term Loan Litigation; (ii) the Term

Loan Litigation is explicitly excluded from "Collateral" as defined in the Amended DIP Facility;

---

[5] It is also well-settled law that when a contract is clear and unambiguous on its face, a court will not look beyond the four corners of the contract to interpret the parties' intentions.  *See* 11 Samuel Williston, *Williston on Contracts* § 31:4, at 277-78 (4th ed. 1999).  Under New York law, "agreements are construed in accordance with the intent of the parties and the best evidence of the parties' intent is what they express in their written contract."  *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 11 N.Y.3d 173, 176, (2008).  Where a contract is unambiguous on its face, "the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence."  *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, *10 (S.D.N.Y. July 10, 2007) (citation omitted).  Accordingly, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Id.* (*citing Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)).

KL2 2666780.14

and (iii) the Amended DIP Facility is recourse only to Collateral, and not to assets excluded therefrom.

33.    By definition, a non-recourse loan is a "secured loan that allows the lender to attach only the collateral, and not the borrower's [other] assets, if the loan is not repaid." BLACK'S LAW DICTIONARY, 1020-21 (9th ed. 2009).  "A lack of recourse means that a secured creditor may not pursue the debtor or its estate after realization of the collateral originally given."  7 COLLIER ON BANKRUPTCY § 1111(b)(1)(A)(i) (Alan N. Resnick & Henry J. Sommer eds., 16th Ed. rev. 2009).  Since Treasury provided its $1.175 billion loan on a non-recourse basis, Treasury cannot now look beyond its collateral for repayment of its loan.

**C.    The Course of Dealings and Surrounding Facts Show that Treasury Has No Interest in the Term Loan Litigation**

34.    Even if an ambiguity can be tortured from the straightforward provisions set forth above, the course of negotiations show beyond cavil that the Committee asked Treasury to exclude the Term Loan Litigation from its collateral and Treasury agreed.   When the Committee followed through by asking Treasury to make its loan non-recourse, Treasury agreed to that, too.

35.    Finally, the background facts also show that Treasury does not have and cannot have any interest in the Term Loan Litigation.  The basic deal underpinning these cases, as reflected in the Proposed Plan, is that New GM common stock and warrants are distributed to unsecured creditors, who are partially protected against dilution by receiving more common stock – but not more warrants – if claims increase from $35 billion to $42 billion.  Unsecured creditors are completely unprotected against dilution by claims above $42 billion.  If the Term Loan Litigation is successful, the $1.5 billion in cash recovered from the losing Prepetition Term Lenders will be matched by a $1.5 billion dilutive increase in unsecured claims.

14

36.    FTI, the Committee's financial advisor, has analyzed the recoveries that the general unsecured creditors would receive if the proceeds of the Term Loan Litigation inured to the benefit of unsecured creditors versus if they did not.  Attached hereto as **Exhibit C** is the declaration of Anna Phillips ("**Phillips Decl.**"), which demonstrates the dilution that would occur should the Committee prevail in the Term Loan Litigation – thereby leaving the Prepetition Term Lenders with an unsecured claim of $1.5 billion – without the unsecured creditors receiving the benefit of the proceeds of the litigation.  Schedule 1 to the Phillips Decl. is a chart, prepared by FTI, which further demonstrates why it would have made no logical sense for the Committee to initiate the Term Loan Litigation unless its constituents were to receive the potential proceeds thereof.

37.    Put simply, should the unsecured creditors receive the potential proceeds of the Term Loan Litigation, unsecured creditors stand to increase their overall percentage recovery by anywhere from 2.2% to 2.9%.  Conversely, initiating the Term Loan Litigation without receiving the potential proceeds would result in as much as a 0.4% reduction to the general unsecured creditors' recovery.  Phillips Decl. ¶ 3.

38.    It thus makes sense for the Committee to have brought the litigation only if unsecured creditors get the cash.  If Treasury gets the cash, the litigation will ***decrease*** unsecured creditor recoveries.  The Committee would never have commenced the lawsuit and prosecuted it for over a year if Treasury owned it, and the Committee will discontinue the lawsuit if Treasury is determined to own it now – ***no one will own the lawsuit***.

**D.    Treasury Should Be Judicially Estopped From
Arguing that the Term Loan Litigation Belongs to
Any Entity Other Than the Committee**

39.    This Court rightly expects parties appearing before it to live by – and to be bound by – their words and actions.  "The notion that a party in bankruptcy can be permitted to

15

thwart a bankruptcy order which has been conceived and fostered through its participation has been vigorously rejected." *Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son)*, 815 F.2d 1314, 1318 (9th Cir. 1987) (internal quotations and citations omitted). "Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both." *Dickerson v. Colgrove*, 100 U.S. 578, 580 (1880).

40. This rule applies to Treasury, as it would any other litigant. *United States of America v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (Given its important role in protecting the judicial process, judicial estoppel may be asserted against the government when it conducts "what appears to be a knowing assault upon the integrity of the judicial system." (internal quotations omitted)).

41. Treasury's counsel drafted the Orders and the Amended DIP Facility, incorporating only such changes as its client deemed acceptable. Treasury supported the entry of each Order. Having agreed to the form of the Orders, having consented to their entry on the record, having represented to the Court that its DIP liens were "non-recourse," having sat idly by as the Committee vigorously pursued the Term Loan Litigation, Treasury should not be heard now to claim that it, and not the unsecured creditors represented by the Committee, should receive the benefit of the Committee's work.

## NOTICE

42. Notice of this motion has been provided to counsel to the Debtors, counsel to Treasury, and parties in interest in accordance with the Fourth Amended Order Pursuant to 11 U.S.C. Section 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 24, 2010 [Docket No. 6750]. The Committee submits that such notice is sufficient and no other or further notice need be provided.

16

KL2 2666780.14

No prior request for the relief sought in this motion has been made by the Committee to this or any other Court.

WHEREFORE, the Committee respectfully requests that this Court (i) enter an order substantially in the form attached hereto as **Exhibit A** granting the relief sought herein, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:    October 4, 2010
          New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:   /s/ *Thomas Moers Mayer*
Thomas Moers Mayer
Timothy P. Harkness
1177 Avenue of the Americas
New York, New York 10036
Phone: (212) 715-9100
Fax: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors of Motors Liquidation*
*Company , et al.*

17