KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Timothy P. Harkness


*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ----------------------------------------------------------- | X | |
| | : | |
| In re: | : | Chapter 11 Case No.: |
| | : | |
| MOTORS LIQUIDATION COMPANY., et al., | : | 09-50026 (REG) |
| f/k/a General Motors Corp., et al. | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ----------------------------------------------------------- | X | |

**DECLARATION OF THOMAS MOERS MAYER IN SUPPORT OF
THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF MOTORS LIQUIDATION COMPANY TO ENFORCE
(A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER,
AND (C) THE AMENDED DIP FACILITY**

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK   )

THOMAS MOERS MAYER, under the penalty of perjury, deposes and says that:

1.      I am a member of Kramer Levin Naftalis & Frankel LLP ("**Kramer
Levin**"), with responsibility for the Official Committee of Unsecured Creditors (the
"**Committee**") of the Debtors' bankruptcy cases of Motors Liquidation Company, (f/k/a General
Motors Corp.) et al. as debtors and debtors-in-possession in the Debtors bankruptcy cases
(collectively, the "**Debtors**"), and I submit this declaration (the "**Declaration**") in support of the

Motion of the Official Committee of Unsecured Creditors of Motors Liquidation Company to Enforce (A) The Final DIP Order, (B) The Wind-Down Order, and (C) The Amended DIP Facility (the "**Motion**").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts hereinafter set forth.

2.    This paragraph is stated upon information and belief.  Paul Weiss Rifkind Wharton & Garrison LLP ("**Paul Weiss**") and Houlihan, Lokey Financial Advisors, Inc. were retained before the commencement of these cases by major holders of the Debtors' publicly traded bonds.  These firms negotiated the basic deal with Treasury[1] that underpins these chapter 11 cases, as follows.  Their major bondholder clients agreed not to object to the Debtors' sale under Section 363 of substantially all of the Debtors' assets to a new company controlled by Treasury ("**New GM**").  Treasury in return agreed to have New GM issue 10% of its common stock, and warrants with a value approximating an additional 10% of New GM equity, to the Debtors for distribution to the Debtors' unsecured creditors.

3.    This paragraph is stated upon information and belief.  The deal was based on an estimate of the Debtors' unsecured claims at $35 billion.  Treasury agreed that if unsecured claims increased, then, in a range from $35 billion to $42 billion, New GM would issue up to an additional 2% of New GM common stock.  Thus, within the $35 to $42 billion range, the 10% of New GM common stock was protected from dilution.  However, no additional warrants would be issued by New GM.  Thus the New GM warrants, which comprise approximately half of unsecured creditors' value, would not be protected from dilution if claims ranged from $35 billion to $42 billion.  If unsecured claims exceed $42 billion, there would be no dilution protection at all.  Current estimates of unsecured claims are not public with one exception:  New

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

KL3 2796567.2

GM's report for the second calendar quarter of 2010 states that it estimates unsecured claims against the Debtors will exceed $37 billion.

4.        Upon information and belief, the deal was also based on Treasury's commitment to pay, at the closing of the sale, all claims of the Debtors' secured bank lenders – including claims under a $1.5 billion (principal amount) term loan which was, at the time, believed to be fully secured by a non-voidable security interest and various mortgages (as more fully described below, the "**Prepetition Term Loan**").

5.        On June 1, 2009, (the "**Petition Date**"), all Debtors with material assets filed voluntary petitions for relief under chapter 11 of title 11, United States Code, as amended.

6.        On June 3, 2009, the Committee was formed and retained professionals.

7.        In the weeks following the Petition Date, the Committee negotiated the Amended DIP Facility and the Orders.  Each of these documents was drafted by Treasury's counsel, which took or rejected comments from the Committee and other parties in the course of the negotiations.

8.        A key all-hands meeting of counsel to the Debtors, the Committee and Treasury, plus Paul Weiss, and their respective financial advisors took place on June 19, 2009.

9.        Prior to the June 19 Negotiating Session, the Committee had commenced its investigation of liens and security interests securing a pre-petition $1.5 billion term loan dated as of November 29, 2006 and amended March 4, 2009 (the "**Prepetition Term Loan**") from a bank syndicate (the "**Prepetition Term Lenders**")[2] agented by JPMorgan Chase Bank, N.A. ("**JPMorgan**").  The day before the June 19 Negotiating Session, JPMorgan's counsel called to inform Committee counsel that, prior to the Petition Date, a paralegal for counsel to the Debtors

---

[2] The Final DIP Order and the Wind-Down Order refer to the Prepetition Term Lenders as the Prepetition Senior Facilities Secured Parties.

KL3 2796567.2

filed a UCC-3 termination statement with respect to the Prepetition Term Loan's security interests without authority. Subsequent discovery has uncovered facts supporting the Committee's contention that JPMorgan did in fact authorize the paralegal to file the UCC-3 termination statement. This matter is currently *sub judice* with this Court.

10. The Committee was therefore particularly focused on a possible challenge to the Prepetition Term Lenders' security interest and recovery of the $1.5 billion in cash slated to be paid, at the closing of the sale, to the lenders (the "**Term Loan Litigation**"). The Committee's agenda for the June 19 Negotiating Session, and discussions thereafter, included preserving the benefit of the Term Loan Litigation for unsecured creditors.

11. By the end of the June 19 Negotiating Session, all parties in interest – including Treasury – agreed that Treasury's ***collateral*** would not include proceeds from the Term Loan Litigation.

12. Shortly after the June 19 Negotiating Session, Committee counsel further specifically requested that Treasury's ***recourse*** under the Amended DIP Facility be limited to its collateral – specifically ***excluding*** from such recourse the New GM stock, the New GM warrants ***and*** the Term Loan Litigation. Treasury's counsel inserted this proposed language into the Amended DIP Facility and the language remained in each subsequent draft of the Amended DIP Facility through and including the execution version.

13. By June 25, 2009, the Debtors, Treasury, the Prepetition Term Lenders and the Committee had agreed on the terms of the Final DIP Order and the Debtors submitted the order to the Court. At the June 25, 2009 hearing, Treasury asked the Court to enter the order, which the Court did.

KL3 2796567.2

14.     On June 29, 2009, the Debtors filed a Motion Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 to Amend DIP Credit Facility [Docket No. 2755].

15.     By July 2, 2009, after exchanging multiple drafts and comments thereon, the parties agreed on the Amended DIP Facility and the Wind-Down Order.  The parties, including Treasury, asked the Court to enter the Wind-Down Order approving the Amended DIP Facility.

16.     At the July 2, 2009 hearing on the Debtors' motion to approve the Amended DIP Facility, counsel to the Committee provided the Court with a brief overview of the Committee's discussions with the Debtors and Treasury regarding the Amended DIP Facility and the Wind-Down Order.  Treasury did not object to this narrative or the terms of the Amended DIP Facility or the Wind-Down Order.

17.     Hearing no objection, this Court signed and entered the Wind-Down Order on July 5, 2009, approving the Amended DIP Facility in substantially the form attached as an exhibit thereto.  Treasury subsequently insisted on further amendments, not approved by the Court, but such amendments are not relevant to this Motion.  Treasury signed and consummated the Amended DIP Facility, with the provisions excluding the Term Loan Litigation from both collateral and recourse included in the executed final document, on July 10, 2009.

18.     On July 31, 2009, pursuant to standing granted to the Committee under Final DIP Order ¶ 19(d), the Committee filed a complaint against the Prepetition Term Lenders seeking to: (i) avoid the security interest that was subject to the UCC-3 termination statement; (ii) avoid and recover funds from the Prepetition Term Lenders paid on account of such security

5

interest; and (iii) disallow claims held by the Prepetition Term Lenders.  Cross motions for

summary judgment are scheduled to be heard by the Court on November 1, 2010.

19.    For almost a year, Treasury made no attempt to intervene in the lawsuit or

assert any interest therein.  Moreover, Treasury has not once objected to any of the Committee's

fee applications seeking reimbursement for its work on the litigation.

20.    The initial draft of the Debtors' Proposed Plan, which was circulated to

the Committee on July 23, 2010, provided that the Term Loan Litigation would be prosecuted for

the sole benefit of unsecured creditors.[3]  Specifically, the initial draft of the Proposed Plan

provided that the distribution to unsecured creditors included the proceeds of the Term Loan

Litigation.

21.    On July 22, 2010, Treasury's counsel called Committee counsel and for

the first time asserted that Treasury had an interest in the Term Loan Litigation.  On July 26,

2010, August 16, 2010 and August 18, 2010, Committee counsel participated in conference calls

with Treasury's counsel regarding, among other things, the status of the Term Loan Litigation.

By no later than August 19, 2010, counsel to the Debtors informed counsel to the Committee that

per Treasury's request, the Proposed Plan would provide that the beneficiary of the Term Loan

Litigation would be determined at a later date.

22.    On August 26, 2010, Treasury filed the Statement of the United States of

America with Respect to Cross-Motions for Summary Judgment [Docket No. 6805] requesting

for the first time that any resolution of the cross motions for summary judgment not determine

any person or entity's entitlements with respect to the ultimate distribution of any funds

recovered from the Term Loan Litigation.

---

[3] The Proposed Plan provides that the Term Loan Litigation may continue to be prosecuted post-confirmation.

KL3 2796567.2

23.     On August 31, 2010, the Debtors filed the Proposed Plan, which provides that the Term Loan Litigation will be included in the Avoidance Action Trust as an Avoidance Action Trust Asset. The Proposed Plan further provides that interests in the Avoidance Action Trust will be distributed to Treasury or to unsecured creditors as the Court may decide or as the Committee and Treasury may agree.

24.     Attached as Exhibit 1 is a true and correct copy of the 10-Q for General Motors Co. filed on August 16, 2010.

25.     Attached as Exhibit 2 is a true and correct copy of an e-mail from Gordon Novod to Treasury's Counsel, Debtors' Counsel, and Bondholders' Counsel, dated June 23, 2009, attaching Summary of June 19th Meeting by Issue List.

26.     Attached as Exhibit 3 is a true and correct copy of the transcript of the June 25, 2009 hearing before this Court.

27.      Attached as Exhibit 4 is a true and correct copy of the Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties [Docket No. 2529], dated June 25, 2009.

28.     Attached as Exhibit 5 is a true and correct copy of the Debtors Motion Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 to Amend DIP Credit Facility [Docket No. 2755], dated June 29, 2009.

29.     Attached as Exhibit 6 is a true and correct copy of the transcript of the July 2, 2009 hearing before this Court.

30.    Attached as Exhibit 7 is a true and correct copy of the Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing [Docket No. 2969], dated July 5, 2009.

31.    Attached as Exhibit 8 is a true and correct copy of the $1,175,000,000 Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated July 10, 2010.

32.    Attached as Exhibit 9 is a true and correct copy of an e-mail from Amy Caton to Treasury's Counsel regarding GUM-DIP Order Draft, dated June 23, 2009.

33.    Attached as Exhibit 10 is a true and correct copy of an e-mail from Amy Caton to Debtors' Counsel and Treasury's Counsel regarding KL Comments to the GM Wind-Down Facility, dated June 30, 2009, attaching KL Markup Wind-Down CA 6-30-09.

34.    Attached as Exhibit 11 is a true and correct copy of the Statement of the United States of America with Respect to Cross-Motions for Summary Judgment [Docket No. 6805], dated August 26, 2010.

35.    Attached as Exhibit 12 is a true and correct copy of the Debtors' Joint Chapter 11 Plan [Docket No. 6829], dated August 31, 2010.

KL3 2796567.2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed:    October 4, 2010
             New York, New York


                              */s/ Thomas Moers Mayer*
                              Thomas Moers Mayer

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP
                              Thomas Moers Mayer
                              Timothy P. Harkness
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Telephone:  (212) 715-9100
                              Facsimile:  (212) 715-8000

                              *Counsel for the Official Committee of Unsecured
                              Creditors of Motors Liquidation Co., (f/k/a General
                              Motors Corp.) et al.*

9