# <u>Exhibit 1</u>

# General Motors Co

300 RENAISSANCE CENTER
DETROIT, MI, 48265−3000
313−.55−6.5000

# 10−Q

Quarterly report pursuant to sections 13 or 15(d)
Filed on 8/16/2010
Filed Period 6/30/2010





## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549−1004

### Form 10−Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the quarterly period ended June 30, 2010**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from      to**

**Commission file number 000−53930**

# GENERAL MOTORS COMPANY
*(Exact Name of Registrant as Specified in its Charter)*

| | |
|---|---|
| **STATE OF DELAWARE** | **27−0756180** |
| *(State or other jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **300 Renaissance Center, Detroit, Michigan** | **48265−3000** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**(313) 556−5000**
**Registrant's telephone number, including area code**

**Not applicable**
*(former name, former address and former fiscal year, if changed since last report)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark whether the registrant has submitted electronically and posted on its company Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S−T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b−2 of the Exchange Act. (Check one):

    Large accelerated filer ☐  Accelerated filer  ☐  Non−accelerated filer ☑  Smaller reporting company ☐
                Do not check if a smaller reporting company

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act). Yes ☐ No ☑

As of August 1, 2010, the number of shares outstanding of $0.01 par value common stock was 500,000,000 shares.

**Website Access to Company's Reports**

General Motors Company's internet website address is www.gm.com. Our annual report on Form 10−K, quarterly reports on Form 10−Q, current reports on Form 8−K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission.

**Table of Contents**

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

### INDEX

|  |  | Page No. |
|---|---|---|
| | **Part I − Financial Information** | |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 1 |
| | Condensed Consolidated Statements of Operations | 1 |
| | Condensed Consolidated Balance Sheets | 2 |
| | Condensed Consolidated Statements of Equity (Deficit) | 3 |
| | Condensed Consolidated Statements of Cash Flows | 4 |
| | Notes to Condensed Consolidated Financial Statements | 5 |
| | Note 1.    Nature of Operations | 5 |
| | Note 2.    Chapter 11 Proceedings and the 363 Sale | 5 |
| | Note 3.    Basis of Presentation and Recent Accounting Standards | 7 |
| | Note 4.    Acquisition and Disposals of Businesses | 10 |
| | Note 5.    Marketable Securities | 11 |
| | Note 6.    Inventories | 13 |
| | Note 7.    Equity in Net Assets of Nonconsolidated Affiliates | 13 |
| | Note 8.    Goodwill | 17 |
| | Note 9.    Intangible Assets, net | 18 |
| | Note 10.    Variable Interest Entities | 19 |
| | Note 11.    Depreciation and Amortization | 22 |
| | Note 12.    Restricted Cash and Marketable Securities | 23 |
| | Note 13.    Short−Term and Long−Term Debt | 24 |
| | Note 14.    Product Warranty Liability | 27 |
| | Note 15.    Pensions and Other Postretirement Benefits | 27 |
| | Note 16.    Derivative Financial Instruments and Risk Management | 32 |
| | Note 17.    Commitments and Contingencies | 38 |
| | Note 18.    Income Taxes | 43 |
| | Note 19.    Fair Value Measurements | 44 |
| | Note 20.    Restructuring and Other Initiatives | 50 |
| | Note 21.    Impairments | 54 |
| | Note 22.    Earnings (Loss) Per Share | 57 |
| | Note 23.    Transactions with Ally Financial | 58 |
| | Note 24.    Transactions with MLC | 60 |
| | Note 25.    Segment Reporting | 61 |
| | Note 26.    Subsequent Events | 64 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 65 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 112 |
| Item 4. | Controls and Procedures | 116 |
| | **Part II − Other Information** | |
| Item 1. | Legal Proceedings | 118 |
| Item 1A. | Risk Factors | 119 |
| Item 5. | Other Information | 129 |
| Item 6. | Exhibits | 131 |
| | Signature | 132 |

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**PART I**

Item 1. Condensed Consolidated Financial Statements (Unaudited)

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share amounts)**
**(Unaudited)**

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Net sales and revenue** | $ 33,174 | $ 64,650 | $ 23,047 | $ 45,478 |
| **Costs and expenses** |  |  |  |  |
| Cost of sales | 28,759 | 56,350 | 29,384 | 53,995 |
| Selling, general and administrative expense | 2,623 | 5,307 | 2,936 | 5,433 |
| Other expenses, net | 39 | 85 | 169 | 1,154 |
| Total costs and expenses | 31,421 | 61,742 | 32,489 | 60,582 |
| Operating income (loss) | 1,753 | 2,908 | (9,442) | (15,104) |
| Equity in income of and disposition of interest in Ally Financial | — | — | 1,880 | 1,380 |
| Interest expense | (250) | (587) | (3,375) | (4,605) |
| Interest income and other non−operating income, net | 59 | 544 | 408 | 833 |
| Loss on extinguishment of debt | — | (1) | (1,994) | (1,088) |
| Reorganization expenses, net (Note 2) | — | — | (1,157) | (1,157) |
| Income (loss) before income taxes and equity income | 1,562 | 2,864 | (13,680) | (19,741) |
| Income tax expense (benefit) | 361 | 870 | (445) | (559) |
| Equity income (loss), net of tax | 411 | 814 | (2) | 46 |
| **Net income (loss)** | 1,612 | 2,808 | (13,237) | (19,136) |
| Less: Net income (loss) attributable to noncontrolling interests | 76 | 204 | (332) | (256) |
| **Net income (loss) attributable to stockholders** | 1,536 | 2,604 | (12,905) | (18,880) |
| Less: Cumulative dividends on preferred stock | 202 | 405 | — | — |
| **Net income (loss) attributable to common stockholders** | $ 1,334 | $ 2,199 | $ (12,905) | $ (18,880) |
| **Earnings (loss) per share (Note 22)** |  |  |  |  |
| **Basic** |  |  |  |  |
| Net income (loss) attributable to common stockholders | $ 2.67 | $ 4.40 | $ (21.12) | $ (30.91) |
| Weighted−average common shares outstanding | 500 | 500 | 611 | 611 |
| **Diluted** |  |  |  |  |
| Net income (loss) attributable to common stockholders | $ 2.55 | $ 4.21 | $ (21.12) | $ (30.91) |
| Weighted−average common shares outstanding | 522 | 522 | 611 | 611 |

Reference should be made to the notes to the condensed consolidated financial statements.

1

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

### CONDENSED CONSOLIDATED BALANCE SHEETS
**(In millions, except share amounts)**
**(Unaudited)**

| | Successor | |
|---|---|---|
| | June 30, 2010 | December 31, 2009 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 26,773 | $ 22,679 |
| Marketable securities | 4,761 | 134 |
| | | |
| Total cash, cash equivalents and marketable securities | 31,534 | 22,813 |
| Restricted cash and marketable securities | 1,393 | 13,917 |
| Accounts and notes receivable (net of allowance of $272 and $250) | 8,662 | 7,518 |
| Inventories | 11,533 | 10,107 |
| Assets held for sale | — | 388 |
| Equipment on operating leases, net | 3,008 | 2,727 |
| Other current assets and deferred income taxes | 1,677 | 1,777 |
| | | |
| Total current assets | 57,807 | 59,247 |
| **Non−Current Assets** | | |
| Equity in net assets of nonconsolidated affiliates | 8,296 | 7,936 |
| Assets held for sale | — | 530 |
| Property, net | 18,106 | 18,687 |
| Goodwill | 30,186 | 30,672 |
| Intangible assets, net | 12,820 | 14,547 |
| Other assets | 4,684 | 4,676 |
| | | |
| Total non−current assets | 74,092 | 77,048 |
| | | |
| **Total Assets** | $131,899 | $ 136,295 |
| **LIABILITIES AND EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable (principally trade) | $ 20,755 | $ 18,725 |
| Short−term debt and current portion of long−term debt (including debt at GM Daewoo of $1,021 at June 30, 2010; Note 10) | 5,524 | 10,221 |
| Liabilities held for sale | — | 355 |
| Accrued expenses (including derivative liabilities at GM Daewoo of $352 at June 30, 2010; Note 10) | 24,068 | 23,134 |
| | | |
| Total current liabilities | 50,347 | 52,435 |
| **Non−Current Liabilities** | | |
| Long−term debt (including debt at GM Daewoo of $722 at June 30, 2010; Note 10) | 2,637 | 5,562 |
| Liabilities held for sale | — | 270 |
| Postretirement benefits other than pensions | 8,649 | 8,708 |
| Pensions | 25,990 | 27,086 |
| Other liabilities and deferred income taxes | 13,377 | 13,279 |
| | | |
| Total non−current liabilities | 50,653 | 54,905 |
| | | |
| **Total Liabilities** | 101,000 | 107,340 |
| Commitments and contingencies (Note 17) | | |
| Preferred stock, $0.01 par value (1,000,000,000 shares authorized, 360,000,000 shares issued and outstanding (each with a $25.00 liquidation preference) at June 30, 2010 and December 31, 2009) | 6,998 | 6,998 |
| **Equity** | | |
| Common stock, $0.01 par value (2,500,000,000 shares authorized, 500,000,000 shares issued and outstanding at June 30, 2010 and December 31, 2009) | 5 | 5 |
| Capital surplus (principally additional paid−in capital) | 24,052 | 24,050 |
| Accumulated deficit | (2,195) | (4,394) |
| Accumulated other comprehensive income | 1,153 | 1,588 |
| | | |
| Total stockholders' equity | 23,015 | 21,249 |
| Noncontrolling interests | 886 | 708 |
| | | |
| Total equity | 23,901 | 21,957 |
| | | |
| **Total Liabilities and Equity** | $131,899 | $ 136,295 |

Reference should be made to the notes to the condensed consolidated financial statements.

2

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)**
**(In millions)**
**(Unaudited)**

| | Common Stock | Capital Surplus | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Comprehensive Income (Loss) | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| **Balance December 31, 2008, Predecessor** | $ 1,017 | $16,489 | $ (70,727) | $ (32,339) | $ 484 | | $ (85,076) |
| Net income (loss) | — | — | (18,880) | — | (256) | $ (19,136) | (19,136) |
| **Other comprehensive income (loss)** | | | | | | | |
| Foreign currency translation adjustments | — | — | — | 115 | 1 | 116 | |
| Cash flow hedging gain, net | — | — | — | 81 | 193 | 274 | |
| Unrealized gain on securities | — | — | — | 48 | | 48 | |
| Defined benefit plans | | | | | | | |
| Net prior service benefit | — | — | — | 2,869 | — | 2,869 | |
| Net actuarial loss | — | — | — | (6,317) | — | (6,317) | |
| Net transition asset / obligation | — | — | — | 1 | — | 1 | |
| Other comprehensive income (loss) | — | — | — | (3,203) | 194 | (3,009) | (3,009) |
| Comprehensive income (loss) | | | | | | $ (22,145) | |
| Dividends declared or paid to noncontrolling interests | — | — | — | — | (17) | | (17) |
| Other | 1 | 6 | (1) | — | (39) | | (33) |
| **Balance June 30, 2009, Predecessor** | $ 1,018 | $16,495 | $ (89,608) | $ (35,542) | $ 366 | | $(107,271) |
| **Balance December 31, 2009, Successor** | $ 5 | $24,050 | $ (4,394) | $ 1,588 | $ 708 | | $ 21,957 |
| Net income (loss) | — | — | 2,604 | — | 204 | $ 2,808 | 2,808 |
| **Other comprehensive income (loss)** | | | | | | | |
| Foreign currency translation adjustments | — | — | — | (189) | (27) | (216) | |
| Cash flow hedging loss, net | — | — | — | (15) | — | (15) | |
| Unrealized loss on securities | — | — | — | (1) | — | (1) | |
| Defined benefit plans | | | | | | | |
| Net prior service cost | — | — | — | (5) | — | (5) | |
| Net actuarial loss | — | — | — | (225) | — | (225) | |
| Other comprehensive income (loss) | — | — | — | (435) | (27) | (462) | (462) |
| Comprehensive income (loss) | | | | | | $ 2,346 | |
| Effects of adoption of amendments to ASC 810−10 regarding variable interest entities (Note 3) | — | — | — | | 76 | | 76 |
| Cash dividends paid to GM preferred stockholders | — | — | (405) | — | — | | (405) |
| Dividends declared or paid to noncontrolling interests | — | — | — | — | (59) | | (59) |
| Repurchase of noncontrolling interest shares | — | 2 | — | — | (9) | | (7) |
| Other | — | — | — | — | (7) | | (7) |
| **Balance June 30, 2010, Successor** | $ 5 | $24,052 | $ (2,195) | $ 1,153 | $ 886 | | $ 23,901 |

Reference should be made to the notes to the condensed consolidated financial statements.

3

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In millions)
(Unaudited)

| | Successor | Predecessor |
|---|---|---|
| | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 |
| Net cash provided by (used in) operating activities | $ 5,695 | $ (15,086) |
| **Cash flows from investing activities** | | |
| Expenditures for property | (1,851) | (3,134) |
| Investments in available−for−sale marketable securities, acquisitions | (4,621) | (202) |
| Investments in trading marketable securities, acquisitions | (178) | — |
| Investments in available−for−sale marketable securities, liquidations | — | 185 |
| Investments in trading marketable securities, liquidations | 163 | — |
| Investment in Ally Financial | — | (884) |
| Investment in companies, net of cash acquired | (50) | — |
| Operating leases, liquidations | 298 | 1,122 |
| Change in restricted cash and marketable securities | 12,616 | (643) |
| Other | 33 | 27 |
| **Net cash provided by (used in) investing activities** | 6,410 | (3,529) |
| **Cash flows from financing activities** | | |
| Net decrease in short−term debt | (223) | (1,033) |
| Proceeds from debt owed to UST, EDC and German government | — | 29,937 |
| Proceeds from other debt | 434 | 335 |
| Payments on debt owed to UST and EDC | (7,153) | — |
| Payments on other debt | (438) | (7,446) |
| Payments to acquire noncontrolling interest | (6) | (5) |
| Fees paid for debt modification | — | (63) |
| Dividends paid to GM preferred stockholders | (405) | — |
| **Net cash provided by (used in) financing activities** | (7,791) | 21,725 |
| Effect of exchange rate changes on cash and cash equivalents | (611) | 207 |
| Net increase (decrease) in cash and cash equivalents | 3,703 | 3,317 |
| Cash and cash equivalents reclassified (to) from assets held for sale | 391 | |
| Cash and cash equivalents at beginning of the period | 22,679 | 14,053 |
| **Cash and cash equivalents at end of the period** | $ 26,773 | $ 17,370 |

Reference should be made to the notes to the condensed consolidated financial statements.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Operations**

General Motors Company was formed by the United States Department of the Treasury (UST) in 2009 originally as a Delaware limited liability company, Vehicle Acquisition Holdings LLC, and subsequently converted to a Delaware corporation, NGMCO, Inc. This company, which on July 10, 2009 acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation (363 Sale) and changed its name to General Motors Company, is sometimes referred to in this Quarterly Report on Form 10−Q for the periods on or subsequent to July 10, 2009 as "we," "our," "us," "ourselves," the "Company," "General Motors," or "GM," and is the successor entity solely for accounting and financial reporting purposes (Successor). General Motors Corporation is sometimes referred to in this Quarterly Report on Form 10−Q, for the periods on or before July 9, 2009, as "Old GM." Prior to July 10, 2009 Old GM operated the business of the Company, and pursuant to the agreement with the Securities and Exchange Commission (SEC) Staff, the accompanying condensed consolidated financial statements include the financial statements and related information of Old GM as it is our predecessor entity solely for accounting and financial reporting purposes (Predecessor). In connection with the 363 Sale, General Motors Corporation changed its name to Motors Liquidation Company, which is sometimes referred to in this Quarterly Report on Form 10−Q, for the periods on or after July 10, 2009, as "MLC." MLC continues to exist as a distinct legal entity for the sole purpose of liquidating its remaining assets and liabilities.

We develop, produce and market cars, trucks and parts worldwide. We analyze the results of our business through our three segments: General Motors North America (GMNA), General Motors International Operations (GMIO) and General Motors Europe (GME). Nonsegment operations are classified as Corporate. Corporate includes investments in Ally Financial Inc., formerly GMAC Inc. (Ally Financial), certain centrally recorded income and costs, such as interest, income taxes and corporate expenditures, certain nonsegment specific revenues and expenses, including costs related to the Delphi Benefit Guarantee Agreements (as subsequently defined in Note 17) and a portfolio of automotive retail leases.

**Note 2. Chapter 11 Proceedings and the 363 Sale**

**Background**

As a result of historical unfavorable economic conditions and a rapid decline in sales in the three months ended December 31, 2008 Old GM determined that, despite the previous actions it had then taken to restructure its U.S. business, it would be unable to pay its obligations in the normal course of business in 2009 or service its debt in a timely fashion, which required the development of a new plan that depended on financial assistance from the U.S. government.

In December 2008 Old GM requested and received financial assistance from the U.S. government and entered into a loan and security agreement with the UST, which was subsequently amended (UST Loan Agreement). In early 2009 Old GM's business results and liquidity continued to deteriorate, and, as a result, Old GM obtained additional funding from the UST under the UST Loan Agreement. Old GM, through its wholly owned subsidiary GMCL, also received funding from Export Development Canada (EDC), a corporation wholly−owned by the Government of Canada, under a loan and security agreement entered into in April 2009 (EDC Loan Facility).

As a condition to obtaining the loans under the UST Loan Agreement, Old GM was required to submit a plan in February 2009 that included specific actions intended to demonstrate that it was a viable entity and to use its best efforts to achieve certain debt reduction, labor modification and VEBA modification targets.

On March 30, 2009 the Presidential Task Force on the Auto Industry (Auto Task Force) determined that the plan was not viable and required substantial revisions. In conjunction with the March 30, 2009 announcement, the administration announced that it would offer Old GM adequate working capital financing for a period of 60 days while it worked with Old GM to develop and implement a more accelerated and aggressive restructuring that would provide a sound long−term foundation.

Old GM made further modifications to its plan in an attempt to satisfy the Auto Task Force requirement that Old GM undertake a substantially more accelerated and aggressive restructuring plan. The additional significant cost reduction and restructuring actions included reducing Old GM's indebtedness and VEBA obligations in addition to other cost reduction and restructuring actions.

5

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Our Annual Report on Form 10−K for the year ended December 31, 2009 (2009 Form 10−K) provides additional detail on Old GM's liquidity constraints, the terms and conditions of its various funding arrangements with U.S. and Canadian governmental entities, and its various cost reduction and restructuring activities.

**Chapter 11 Proceedings**

Old GM was not able to complete the cost reduction and restructuring actions, including the debt reductions and VEBA modifications, which resulted in extreme liquidity constraints. As a result, on June 1, 2009 Old GM and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 (Chapter 11 Proceedings) of the U.S. Bankruptcy Code (Bankruptcy Code) in the U.S. Bankruptcy Court for the Southern District of New York (Bankruptcy Court).

In connection with the Chapter 11 Proceedings, Old GM entered into a secured superpriority debtor−in−possession credit agreement with the UST and EDC (DIP Facility) and received additional funding commitments from EDC to support Old GM's Canadian operations.

**363 Sale**

On July 10, 2009 we completed the acquisition of substantially all of the assets and assumed certain liabilities of Old GM and certain of its direct and indirect subsidiaries (collectively, the Sellers). The 363 Sale was consummated in accordance with the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, as amended, (Purchase Agreement) between us and the Sellers, and pursuant to the Bankruptcy Court's sale order dated July 5, 2009.

**Accounting for the Effects of the Chapter 11 Proceedings and the 363 Sale**

*Chapter 11 Proceedings*

Accounting Standards Codification (ASC) 852, "Reorganizations," (ASC 852) is applicable to entities operating under Chapter 11 of the Bankruptcy Code. ASC 852 generally does not affect the application of U.S. GAAP that we and Old GM followed to prepare the consolidated financial statements, but it does require specific disclosures for transactions and events that were directly related to the Chapter 11 Proceedings and transactions and events that resulted from ongoing operations.

Old GM prepared its consolidated financial statements in accordance with the guidance in ASC 852 in the period June 1, 2009 through June 30, 2009. Revenues, expenses, realized gains and losses, and provisions for losses directly related to the Chapter 11 Proceedings were recorded in Reorganization expenses, net. Reorganization expenses, net do not constitute an element of operating loss due to their nature and due to the requirement of ASC 852 that they be reported separately. Old GM's balance sheet prior to the 363 Sale distinguished prepetition liabilities subject to compromise from prepetition liabilities not subject to compromise and from postpetition liabilities.

*Application of Fresh−Start Reporting*

The Bankruptcy Court did not determine a reorganization value in connection with the 363 Sale. Reorganization value is defined as the value of our assets without liabilities. In order to apply fresh−start reporting, ASC 852 requires that total postpetition liabilities and allowed claims be in excess of reorganization value and prepetition stockholders receive less than 50.0% of our common stock. Based on our estimated reorganization value, we determined that on July 10, 2009 both the criteria of ASC 852 were met and, as a result, we applied fresh−start reporting. In applying fresh−start reporting at July 10, 2009, which generally follows the provisions of ASC 805, "Business Combinations," (ASC 805) we recorded the assets acquired and the liabilities assumed from Old GM at fair value except for deferred income taxes and certain liabilities associated with employee benefits. Our consolidated balance sheet at July 10, 2009, which includes the adjustments to Old GM's consolidated balance sheet as a result of the 363 Sale and the application of fresh−start reporting, and related disclosures are discussed in Note 2 to our consolidated financial statements in our 2009 Form 10−K. These adjustments are final and no determinations of fair value are considered provisional.

6

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Reorganization Expenses, net**

The following table summarizes Old GM's Reorganization expenses, net in the six months ended June 30, 2009 prior to the 363 Sale (dollars in millions):

|  | Predecessor |
|---|---|
|  | Six Months Ended June 30, 2009 |
| Loss from the extinguishment of debt resulting from Old GM's repayment of credit facilities and U.S. term loan | $ (958) |
| Loss on contract rejections, settlements of claims and other lease terminations | (408) |
| Professional fees | (38) |
| Gain related to release of accumulated other comprehensive income (loss) associated with derivatives | 247 |
| Total reorganization expenses, net | $ (1,157) |

**Note 3. Basis of Presentation and Recent Accounting Standards**

We filed a Registration Statement on Form 10 on April 7, 2010, as amended on May 17, 2010, pursuant to an agreement with the SEC Staff, as described in a no−action letter issued to Old GM by the SEC Staff on July 9, 2009 regarding our filing requirements and those of MLC. On June 7, 2010 our Registration Statement on Form 10 became effective and we became subject to the filing requirements of Section 13 and 15(d) of the Securities Exchange Act of 1934. In accordance with the agreement with the SEC Staff, the accompanying unaudited condensed consolidated financial statements include the financial statements and related information of Old GM, for the period prior to July 10, 2009, our predecessor entity solely for accounting and financial purposes and the entity from whom we purchased substantially all of its assets and assumed certain of its liabilities.

The 363 Sale resulted in a new entity, General Motors Company, which is the successor entity solely for accounting and financial reporting purposes. Because we are a new reporting entity, our financial statements are not comparable to the financial statements of Old GM.

The accompanying condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the SEC for interim financial information. Accordingly, they do not include all of the information and footnotes required by U.S. GAAP for complete financial statements. The accompanying condensed consolidated financial statements include all adjustments, comprised of normal recurring adjustments, considered necessary by management to fairly state our results of operations, financial position and cash flows. The operating results for interim periods are not necessarily indicative of results that may be expected for any other interim period or for the full year. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in our 2009 Form 10−K.

In the three months ended June 30, 2010 we changed our managerial reporting structure so that certain entities geographically located within Russia and Uzbekistan were transferred from our GME segment to our GMIO segment. We have revised the segment presentation for all periods presented.

**Use of Estimates in the Preparation of the Financial Statements**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires the use of estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenue and expenses in the periods presented. We believe that the accounting estimates employed are appropriate and the resulting balances are reasonable; however, due to the inherent uncertainties in making estimates actual results could differ from the original estimates, requiring adjustments to these balances in future periods.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Principles of Consolidation**

Our condensed consolidated financial statements include our accounts and those of our subsidiaries that we control due to ownership of a majority voting interest. In addition, we consolidate variable interest entities (VIEs) when we are the VIE's primary beneficiary. Our share of earnings or losses of nonconsolidated affiliates are included in our consolidated operating results using the equity method of accounting when we are able to exercise significant influence over their operating and financial decisions. When we are not able to exercise significant influence over such affiliates, we use the cost method of accounting. All intercompany balances and transactions have been eliminated in consolidation. Old GM utilized the same principles of consolidation in its condensed consolidated financial statements.

**Correction of Presentation in Condensed Consolidated Statement of Cash Flows**

In the three months ended June 30, 2010 we identified several items which had not been properly classified in our condensed consolidated statement of cash flows for the three months ended March 31, 2010. We determined that we had not properly classified the effects of the devaluation of Venezuelan Bolivar Fuerte (BsF), which reduced our cash balance by $199 million. This reduction should have been presented as part of the Effect of exchange rate changes on cash and cash equivalents rather than a reduction of Net cash provided by operating activities. Additionally, the change in the cash component of the Saab Automobile AB (Saab) assets classified as held for sale of $330 million should have been presented as part of Cash and cash equivalents reclassified (to) from assets held for sale rather than an increase in Net cash flows from operating activities. The net effects of the remaining corrections are included in the table below. For the six months ended June 30, 2010, we have correctly presented these items in our condensed consolidated statement of cash flows. Although we do not consider the effects of these errors to be material, we intend to correct our condensed consolidated statement of cash flows for the three months ended March 31, 2010 in our Quarterly Report on Form 10−Q for the three months ending March 31, 2011 when filed. The originally reported and corrected amounts are summarized in the following table (dollars in millions):

|  | As Originally Reported | Adjustments | As Corrected |
|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 1,746 | $ 104 | $ 1,850 |
| Net cash provided by (used in) investing activities | 646 | (195) | 451 |
| Net cash provided by (used in) financing activities | (1,688) | (50) | (1,738) |
| Effect of exchange rate changes on cash and cash equivalents | (53) | (250) | (303) |
| Cash and cash equivalents reclassified (to) from assets held for sale | (20) | 391 | 371 |
| Cash and cash equivalents at beginning of the period | 22,679 | — | 22,679 |
| Cash and cash equivalents at end of the period | $ 23,310 | $ — | $ 23,310 |

**Venezuelan Exchange Regulations**

Our Venezuelan subsidiaries changed their functional currency from the BsF, the local currency, to the U.S. Dollar, our reporting currency, on January 1, 2010 because of the hyperinflationary status of the Venezuelan economy. Further, pursuant to the official devaluation of the Venezuelan currency and establishment of the dual fixed exchange rates in January 2010, we remeasured the BsF denominated monetary assets and liabilities held by our Venezuelan subsidiaries at the nonessential rate of 4.30 BsF to $1.00. The remeasurement resulted in a charge of $25 million recorded in Cost of sales in the three months ended March 31, 2010. During the six months ended June 30, 2010 all BsF denominated transactions have been remeasured at the nonessential rate of 4.30 BsF to $1.00.

In June 2010, the Venezuelan government introduced additional foreign currency exchange control regulations, which imposed restrictions on the use of the parallel foreign currency exchange market, thereby making it more difficult to convert BsF to U.S. Dollars. We periodically accessed the parallel exchange market, which historically enabled entities to obtain foreign currency for transactions that could not be processed by the Commission for the Administration of Currency Exchange (CADIVI). The restrictions on the foreign currency exchange market could affect our Venezuelan subsidiaries' ability to pay its non−BsF denominated obligations that do not qualify to be processed by CADIVI at the official exchange rates as well as our ability to benefit from those operations.

8

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table provides condensed financial information for our Venezuelan subsidiaries at and for the six months ended June 30, 2010, which includes amounts receivable from and payable to, and transactions with, affiliated entities (dollars in millions):

| | |
|---|---:|
| Total assets (a) | $1,347 |
| Total liabilities (b) | $1,116 |
| Revenue for six months ended June 30, 2010 | $  443 |
| Net income attributable to stockholders for six months ended June 30, 2010 (c) | $  215 |

(a)    Includes BsF denominated and non−BsF denominated monetary assets of $273 million and $720 million.

(b)    Includes BsF denominated and non−BsF denominated monetary liabilities of $553 million and $518 million.

(c)    Includes a gain of $119 million related to the devaluation of the Bolivar in January 2010 and a gain of $125 million due to favorable foreign currency exchanges that were processed by CADIVI in the three months ended June 30, 2010. The $119 million gain on the devaluation was offset by a $144 million loss recorded in the U.S. on BsF denominated assets, which is not included in the net income reported above.

In addition, the total amount pending government approval for settlement is BsF 1.2 billion (equivalent to $428 million), for which the requests have been pending starting from 2007. The amount includes payables to affiliated entities of $287 million, which includes dividends payable of $144 million.

**Recently Adopted Accounting Principles**

*Transfers of Financial Assets*

In January 2010 we adopted certain amendments to ASC 860−10, "Transfers and Servicing" (ASC 860−10). ASC 860−10 eliminates the concept of a qualifying special−purpose entity (SPE), establishes a new definition of participating interest that must be met for transfers of portions of financial assets to be eligible for sale accounting, clarifies and amends the derecognition criteria for a transfer of financial assets to be accounted for as a sale, and changes the amount that can be recorded as a gain or loss on a transfer accounted for as a sale when beneficial interests are received by the transferor. The adoption of these amendments did not have a material effect on the condensed consolidated financial statements.

*Variable Interest Entities*

In January 2010 we adopted amendments to ASC 810−10, "Consolidation" (ASC 810−10). These amendments require an enterprise to qualitatively assess the determination of the primary beneficiary of a VIE based on whether the enterprise: (1) has the power to direct the activities of a VIE that most significantly affect the entity's economic performance; and (2) has the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE. These amendments also require, among other considerations, an ongoing reconsideration of the primary beneficiary. In February 2010 the Financial Accounting Standards Board (FASB) issued guidance that permitted an indefinite deferral of these amendments for entities that have all the attributes of an investment company or that apply measurement principles consistent with those followed by investment companies. An entity that qualifies for the deferral will continue to be assessed under the overall guidance on the consolidation of VIEs in effect prior to the adoption of these amendments. This deferral was applicable to certain investment funds associated with our employee benefit plans and investment funds managing investments on behalf of unrelated third parties.

The amendments were adopted prospectively. Upon adoption, we consolidated General Motors Egypt (GM Egypt) which resulted in an increase in Total assets of $254 million, an increase in Total liabilities of $178 million, and an increase in Noncontrolling interests of $76 million. Due to our application of fresh−start reporting on July 10, 2009 and because our investment in GM Egypt was accounted for using the equity method of accounting, there was no difference between the net assets added to the condensed consolidated balance sheet upon consolidation and the amount of previously recorded interest in GM Egypt. As a result, there was no cumulative effect of a change in accounting principle to Accumulated deficit. The effect of these amendments was measured based on

9

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

the amount at which the asset, liability and noncontrolling interest would have been carried or recorded in the condensed consolidated financial statements if these amendments had been effective since inception of our relationship with GM Egypt. Refer to Note 10 for additional information regarding the effect of the adoption of these amendments.

**Accounting Standards Not Yet Adopted**

In September 2009 the FASB issued Accounting Standards Update (ASU) 2009−13, "Multiple−Deliverable Revenue Arrangements" (ASU 2009−13). ASU 2009−13 addresses the unit of accounting for multiple−element arrangements. In addition, ASU 2009−13 revises the method by which consideration is allocated among the units of accounting. The overall consideration is allocated to each deliverable by establishing a selling price for individual deliverables based on a hierarchy of evidence, including vendor−specific objective evidence, other third party evidence of the selling price, or the reporting entity's best estimate of the selling price of individual deliverables in the arrangement. ASU 2009−13 will be effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. We are currently evaluating the effects, if any, that ASU 2009−13 will have on the condensed consolidated financial statements.

**Note 4. Acquisition and Disposals of Businesses**

**Acquisition of Delphi Businesses**

In July 2009 we entered into the Delphi Master Disposition Agreement (DMDA) with Delphi Corporation (Delphi) and other parties, which was consummated in October 2009. Under the DMDA, we agreed to acquire Delphi's global steering business (Nexteer) and four domestic component manufacturing facilities as well as make an investment in a new entity, New Delphi, which acquired substantially all of Delphi's remaining assets. At October 6, 2009 the fair value of Nexteer and the four domestic facilities was $287 million and the assets acquired and liabilities assumed were consolidated and included in the results of our GMNA segment. Total assets of $1.2 billion were comprised primarily of accounts and notes receivables, inventories and property, plant and equipment. Total liabilities of $0.9 billion were comprised primarily of accounts payable, accrued expenses, short−term debt and other liabilities.

We funded the acquisitions, transaction−related costs and settlements of certain pre−existing arrangements through net cash payments of $2.7 billion. We also assumed liabilities and wind−down obligations of $120 million, waived our claims associated with the Delphi liquidity support agreements of $850 million and waived our rights to claims associated with previously transferred pension costs for hourly employees. Of these amounts, we contributed $1.7 billion to New Delphi and paid the Pension Benefit Guarantee Corporation (PBGC) $70 million in October 2009. Our investment in New Delphi is accounted for using the equity method.

In January 2010 we announced that we intended to pursue a sale of Nexteer. In July 2010 we entered into a definitive agreement for the sale of Nexteer as discussed in Note 26 to our condensed consolidated financial statements.

**Sale of India Operations**

In December 2009 we and SAIC Motor Hong Kong Investment Limited (SAIC−HK) entered into a joint venture, SAIC GM Investment Limited (HKJV) to invest in automotive projects outside of markets in China, initially focusing on markets in India. On February 1, 2010 we sold certain of our operations in India (India Operations), part of our GMIO segment, in exchange for a promissory note due in 2013. The amount due under the promissory note may be partially reduced, or increased, based on the India Operation's cumulative earnings before interest and taxes for the three year period ending December 31, 2012. In connection with the sale we recorded net consideration of $190 million and an insignificant gain. The sale transaction resulted in a loss of control and the deconsolidation of the India Operations on February 1, 2010. Accordingly, we removed the assets and liabilities of the India Operations from our consolidated financial statements and recorded an equity interest in HKJV to reflect cash of $50 million we contributed to HKJV and a $123 million commitment to provide additional capital that we are required to make in accordance with the terms of the joint venture agreement. We have recorded a corresponding liability to reflect our obligation to provide additional capital.

10

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Saab Bankruptcy and Sale**

In February 2009 Saab, part of the GME segment, filed for protection under the reorganization laws of Sweden in order to reorganize itself into a stand−alone entity. Old GM determined that the reorganization proceeding resulted in a loss of the elements of control necessary for consolidation and therefore Old GM deconsolidated Saab in February 2009. Old GM recorded a loss of $824 million in Other expenses, net related to the deconsolidation. The loss reflects the remeasurement of Old GM's net investment in Saab to its estimated fair value of $0, costs associated with commitments and obligations to suppliers and others, and a commitment to provide up to $150 million of DIP financing. We acquired Old GM's investment in Saab in connection with the 363 Sale. In August 2009 Saab exited its reorganization proceeding, and we regained the elements of control and consolidated Saab at an insignificant fair value.

In February 2010 we completed the sale of Saab and in May 2010 we completed the sale of Saab Automobile GB (Saab GB) to Spyker Cars NV. Of the negotiated cash purchase price of $74 million, we received $50 million at closing and received the remaining $24 million in July 2010. We also received preference shares in Saab with a face value of $326 million and an estimated fair value that is insignificant and received $114 million as repayment of the DIP financing that we provided to Saab during 2009. In the three months ended March 31, 2010 we recorded a gain of $123 million in Interest income and other non−operating income, net reflecting cash received of $166 million less net assets with a book value of $43 million.

**Sale of 1% Interest in Shanghai General Motors Co., Ltd.**

In February 2010 we sold a 1% ownership interest in Shanghai General Motors Co., Ltd. (SGM) to SAIC−HK, reducing our ownership interest to 49%. The sale of the 1% ownership interest to SAIC was predicated on our ability to work with SAIC to obtain a $400 million line of credit from a commercial bank to us. We also received a call option to repurchase the 1% which is contingently exercisable based on events which we do not unilaterally control. As part of the loan arrangement SAIC provided a commitment whereby, in the event of default, SAIC will purchase the ownership interest in SGM that we pledged as collateral for the loan. We recorded an insignificant gain on this transaction in the six months ended June 30, 2010.

**Acquisition of AmeriCredit Corp.**

Refer to Note 26 for information concerning the pending acquisition of AmeriCredit Corp.

**Note 5. Marketable Securities**

The following tables summarize information regarding investments in Marketable securities (dollars in millions):

| | Successor | | | | |
| --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 Unrealized | | Six Months Ended June 30, 2010 Unrealized | | June 30, 2010 Fair Value |
| | Gains | Losses | Gains | Losses | |
| Trading securities: | | | | | |
| Equity | $ — | $ 5 | $ — | $ 5 | $ 30 |
| United States government and agencies | — | — | — | — | 12 |
| Mortgage — and asset−backed | — | — | 1 | — | 29 |
| Foreign government | 1 | 1 | 1 | 1 | 30 |
| Corporate debt | 1 | 1 | 1 | 1 | 29 |
| Total trading securities | $ 2 | $ 7 | $ 3 | $ 7 | $ 130 |

11

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Successor | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2010 | | | | December 31, 2009 | | | |
| | | Unrealized | | Fair | | Unrealized | | Fair |
| | Cost | Gains | Losses | Value | Cost | Gains | Losses | Value |
| Available−for−sale securities: | | | | | | | | |
| United States government and agencies | $ 939 | $ — | $ — | $ 939 | $ 2 | $ — | $ — | $ 2 |
| Certificates of deposit | 1,326 | — | — | 1,326 | 8 | — | — | 8 |
| Corporate debt | 2,366 | — | — | 2,366 | — | — | — | — |
| Total available−for−sale securities | $4,631 | $ — | $ — | $4,631 | $10 | $ — | $ — | $ 10 |

We maintained $79 million of the available−for−sale securities as compensating balances to support letters of credit of $66 million at June 30, 2010 and December 31, 2009. We have access to these securities in the normal course of business; however, the letters of credit may be withdrawn if the minimum collateral balance is not maintained.

In addition to the securities previously discussed, securities of $16.2 billion and $11.2 billion with original maturities of 90 days or less classified as cash equivalents and marketable securities of $1.5 billion and $13.6 billion were classified as Restricted cash and marketable securities at June 30, 2010 and December 31, 2009.

The following table summarizes proceeds from and realized gains and losses on disposals of investments in marketable securities classified as available−for−sale (dollars in millions):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Sales proceeds | $ 1 | $ 1 | $ 95 | $ 185 |
| Realized gains | $ — | $ — | $ 2 | $ 3 |
| Realized losses | $ — | $ — | $ 4 | $ 10 |

The following table summarizes the fair value of investments classified as available−for−sale securities by contractual maturity at June 30, 2010 (dollars in millions):

| | Successor | |
|---|---|---|
| | Amortized Cost | Fair Value |
| Due in one year or less | $ 4,630 | $4,630 |
| Due after one year through five years | 1 | 1 |
| Due after five years through ten years | — | — |
| Due after ten years | — | — |
| Total contractual maturities of available−for−sale securities | $ 4,631 | $4,631 |

Refer to Note 21 for the amounts recorded as a result of other than temporary impairments on debt and equity securities.

12

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 6. Inventories**

The following table summarizes the components of our Inventories (dollars in millions):

|  | Successor | |
|---|---|---|
|  | June 30, 2010 | December 31, 2009 |
| Productive material, work in process, and supplies | $ 5,199 | $ 4,201 |
| Finished product, including service parts | 6,334 | 5,906 |
| Total inventories | $11,533 | $ 10,107 |

**Note 7. Equity in Net Assets of Nonconsolidated Affiliates**

Nonconsolidated affiliates are entities in which an equity ownership interest is maintained and for which the equity method of accounting is used, due to the ability to exert significant influence over decisions relating to their operating and financial affairs.

The following table summarizes information regarding equity in income (loss) of and disposition of interest in nonconsolidated affiliates (dollars in millions):

|  | Successor | | Predecessor | |
|---|---|---|---|---|
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| SGM and SGMW (a) | $ 378 | $ 734 | $ 183 | $ 289 |
| Ally Financial (b) | — | — | (597) | (1,097) |
| Gain on Conversion of UST Ally Financial Loan (c) | — | — | 2,477 | 2,477 |
| Total equity in income of and disposition of interest in Ally Financial (b) | — | — | 1,880 | 1,380 |
| New United Motor Manufacturing, Inc. (d) | — | — | (226) | (243) |
| Others | 33 | 80 | 41 | — |
| Total equity in income of nonconsolidated affiliates | $ 411 | $ 814 | $ 1,878 | $ 1,426 |

---

(a)    Includes SGM (49%) in the three and six months ended June 30, 2010 and (50%) in the three and six months ended June 30, 2009 and SAIC−GM−Wuling Automobile Co., Ltd. (SGMW) (34%).

(b)    Ally Financial converted its status to a C corporation effective June 30, 2009. At that date, Old GM began to account for its investment in Ally Financial using the cost method rather than the equity method as Old GM no longer exercised significant influence over Ally Financial. In connection with Ally Financial's conversion into a C corporation, each unit of each class of Ally Financial Membership Interests was converted into shares of capital stock of Ally Financial with substantially the same rights and preferences as such Membership Interests.

(c)    In May 2009 the UST exercised its option to convert the outstanding amounts owed on the UST Ally Financial Loan (as subsequently defined) into shares of Ally Financial's Class B common Membership Interests.

(d)    New United Motor Manufacturing (NUMMI) (50%) was retained by MLC as part of the 363 Sale.

13

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Investment in Ally Financial**

As part of the approval process for Ally Financial to obtain Bank Holding Company status in December 2008, Old GM agreed to reduce its ownership in Ally Financial to less than 10% of the voting and total equity of Ally Financial by December 24, 2011. At June 30, 2010 our equity ownership in Ally Financial was 16.6% as subsequently discussed.

In December 2008 Old GM and FIM Holdings, an assignee of Cerberus ResCap Financing LLC, entered into a subscription agreement with Ally Financial under which each agreed to purchase additional Common Membership Interests in Ally Financial, and the UST committed to provide Old GM with additional funding in order to purchase the additional interests. In January 2009 Old GM entered into the UST Ally Financial Loan Agreement pursuant to which Old GM borrowed $884 million (UST Ally Financial Loan) and utilized those funds to purchase 190,921 Class B Common Membership Interests in Ally Financial. The UST Ally Financial Loan was scheduled to mature in January 2012 and bore interest, payable quarterly, at the same rate of interest as the UST Loans. The UST Ally Financial Loan Agreement was secured by Old GM's Common and Preferred Membership Interests in Ally Financial. As part of this loan agreement, the UST had the option to convert outstanding amounts into a maximum of 190,921 shares of Ally Financial's Class B Common Membership Interests on a pro rata basis.

In May 2009 the UST exercised this option, the outstanding principal and interest under the UST Ally Financial Loan was extinguished, and Old GM recorded a net gain of $483 million. The net gain was comprised of a gain on the disposition of Ally Financial Common Membership Interests of $2.5 billion recorded in Equity in income of and disposition of interest in Ally Financial and, a loss on extinguishment of the UST Ally Financial Loan of $2.0 billion recorded in Loss on extinguishment of debt. After the exchange, Old GM's ownership was reduced to 24.5% of Ally Financial's Common Membership Interests.

Ally Financial converted its status to a C corporation effective June 30, 2009. At that date, Old GM began to account for its investment in Ally Financial using the cost method rather than the equity method as Old GM no longer exercised significant influence over Ally Financial. In connection with Ally Financial's conversion into a C corporation, each unit of each class of Ally Financial Membership Interests was converted into shares of capital stock of Ally Financial with substantially the same rights and preferences as such Membership Interests. On July 10, 2009 we acquired the investment in Ally Financial's common and preferred stocks in connection with the 363 Sale.

In December 2009 the UST made a capital contribution to Ally Financial of $3.8 billion consisting of the purchase of trust preferred securities of $2.5 billion and mandatory convertible preferred securities of $1.3 billion. The UST also exchanged all of its existing Ally Financial non−convertible preferred stock for newly issued mandatory convertible preferred securities valued at $5.3 billion. In addition the UST converted mandatory convertible preferred securities valued at $3.0 billion into Ally Financial common stock. These actions resulted in the dilution of our investment in Ally Financial common stock from 24.5% to 16.6%, of which 6.7% is held directly and 9.9% is held in an independent trust. Pursuant to previous commitments to reduce influence over and ownership in Ally Financial, the trustee, who is independent of us, has the sole authority to vote and is required to dispose of our 9.9% ownership in Ally Financial common stock held in the trust by December 24, 2011.

14

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following tables summarize financial information of Ally Financial for the period Ally Financial was accounted for as a nonconsolidated affiliate (dollars in millions):

| | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
|---|---|---|
| **Consolidated Statements of Loss** | | |
| Total financing revenue and other interest income | $ 3,389 | $ 6,916 |
| Total interest expense | $ 1,940 | $ 3,936 |
| Depreciation expense on operating lease assets | $ 1,056 | $ 2,113 |
| Gain on extinguishment of debt | $ 13 | $ 657 |
| Total other revenue | $ 867 | $ 2,117 |
| Total noninterest expense | $ 1,726 | $ 3,381 |
| Loss from continuing operations before income tax expense | $(1,583) | $ (2,260) |
| Income tax expense from continuing operations | $ 1,096 | $ 972 |
| Net loss from continuing operations | $(2,679) | $ (3,232) |
| Loss from discontinued operations, net of tax | $(1,224) | $ (1,346) |
| Net loss | $(3,903) | $ (4,578) |

| | June 30, 2009 |
|---|---|
| **Condensed Consolidated Balance Sheet** | |
| Loans held for sale | $ 11,440 |
| Total finance receivables and loans, net | $ 87,520 |
| Investment in operating leases, net | $ 21,597 |
| Other assets | $ 22,932 |
| Total assets | $ 181,248 |
| Total debt | $ 105,175 |
| Accrued expenses and other liabilities | $ 41,363 |
| Total liabilities | $ 155,202 |
| Preferred stock held by UST | $ 12,500 |
| Preferred stock | $ 1,287 |
| Total equity | $ 26,046 |

15

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Ally Financial – Preferred and Common Membership Interests*

The following tables summarize the activity with respect to the investment in Ally Financial Common and Preferred Membership Interests for the period Ally Financial was accounted for as a nonconsolidated affiliate (dollars in millions):

|  | Predecessor | |
|---|---|---|
|  | Ally Financial Common Membership Interests | Ally Financial Preferred Membership Interests |
| Balance at January 1, 2009 | $   491 | $   43 |
| Old GM's proportionate share of Ally Financial's losses | (500) | — |
| Investment in Ally Financial Common Membership Interests | 884 | — |
| Other, primarily accumulated other comprehensive loss | (121) | — |
| Balance at March 31, 2009 | 754 | 43 |
| Old GM's proportionate share of Ally Financial's losses (a) | (630) | (7) |
| Gain on disposition of Ally Financial Common Membership Interests (b) | 2,477 | — |
| Conversion of Ally Financial Common Membership Interests (b) | (2,885) | — |
| Other, primarily accumulated other comprehensive loss | 284 | — |
| Balance at June 30, 2009 | $   — | $   36 |

---

(a) Due to impairment charges and Old GM's proportionate share of Ally Financial's losses, the carrying amount of Old GM's investments in Ally Financial Common Membership Interests was reduced to $0. Old GM recorded its proportionate share of Ally Financial's remaining losses to its investment in Ally Financial Preferred Membership Interests.

(b) Due to the exercise of the UST's option to convert the UST Ally Financial Loan into Ally Financial Common Membership Interests, in connection with the UST Ally Financial Loan conversion, Old GM recorded a gain of $2.5 billion on disposition of Ally Financial Common Membership Interests and a $2.0 billion loss on extinguishment based on the carrying amount of the UST Ally Financial Loan and accrued interest of $0.9 billion.

**Transactions with Nonconsolidated Affiliates**

Nonconsolidated affiliates are involved in various aspects of the development, production and marketing of cars, trucks and parts. The following tables summarize the effects of transactions with nonconsolidated affiliates which are not eliminated in consolidation (dollars in millions):

|  | Successor | | Predecessor | |
|---|---|---|---|---|
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Results of Operations** | | | | |
| Net sales and revenue | $   479 | $   909 | $   297 | $   549 |
| Cost of sales | $   816 | $   1,570 | $   36 | $   233 |
| Selling, general and administrative expense | $   — | $   (3) | $   (3) | $   (5) |
| Interest income and other non-operating income, net | $   — | $   — | $   — | $   1 |

16

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Successor | | |
|---|---|---|---|
| | June 30, 2010 | | December 31, 2009 |
| **Financial Position** | | | |
| Accounts and notes receivable, net | $ 271 | $ | 594 |
| Accounts payable (principally trade) | $ 341 | $ | 396 |

| | Successor | | Predecessor |
|---|---|---|---|
| | Six Months Ended June 30, 2010 | | Six Months Ended June 30, 2009 |
| **Cash Flows** | | | |
| Operating | $ 701 | $ | 258 |
| Investing | $ 654 | $ | 278 |
| Financing | $ — | $ | — |

**Note 8. Goodwill**

The following table summarizes the changes in the carrying amount of Goodwill (dollars in millions):

| | Successor | | | |
|---|---|---|---|---|
| | GMNA | GMIO | GME | Total |
| Balance at January 1, 2010 | $26,409 | $ 928 | $3,335 | $30,672 |
| Effect of foreign currency translation | — | (29) | (457) | (486) |
| Balance at June 30, 2010 | $26,409 | $ 899 | $2,878 | $30,186 |

We recorded Goodwill of $30.5 billion upon application of fresh−start reporting. If all identifiable assets and liabilities had been recorded at fair value upon application of fresh−start reporting, no goodwill would have resulted. However, when applying fresh−start reporting, certain accounts, primarily employee benefit plan and income tax related, were recorded at amounts determined under specific U.S. GAAP rather than fair value and the difference between the U.S. GAAP and fair value amounts gave rise to goodwill, which is a residual. Our employee benefit related accounts were recorded in accordance with ASC 712, "Compensation — Nonretirement Postemployment Benefits" and ASC 715, "Compensation — Retirement Benefits" and deferred income taxes were recorded in accordance with ASC 740, "Income Taxes." Further, we recorded valuation allowances against certain of our deferred tax assets, which under ASC 852 also resulted in Goodwill. These valuation allowances were due in part to Old GM's history of recurring operating losses, and our projections at the 363 Sale date of continued near−term operating losses in certain jurisdictions. While the 363 Sale constituted a significant restructuring that eliminated many operating and financing costs, Old GM had undertaken significant restructurings in the past that failed to return certain jurisdictions to profitability. At the 363 Sale date, we concluded that there was significant uncertainty as to whether the recent restructuring actions would return these jurisdictions to sustained profitability, thereby necessitating the establishment of a valuation allowance against certain deferred tax assets. None of the goodwill from this transaction is deductible for tax purposes.

In the three months ended June 30, 2010 there were event driven changes in circumstances within our GME reporting unit that warranted the testing of goodwill for impairment. Anticipated competitive pressure on our margins in the near− and medium−term led us to believe that the goodwill associated with our GME reporting unit may be impaired. Utilizing the best available information as of June 30, 2010 we performed a step one goodwill impairment test for our GME reporting unit, and concluded that goodwill was not impaired. The fair value of our GME reporting unit was estimated to be approximately $325 million over its carrying amount. If we had not passed step one, we believe the amount of any goodwill impairment would approximate $140 million based on the estimated differences at June 30, 2010 between the fair value to U.S. GAAP adjustments that gave rise to goodwill, primarily related to employee benefit plans and income taxes.

17

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

We utilized a discounted cash flow methodology to estimate the fair value of our GME reporting unit. The valuation methodologies utilized were consistent with those used in our application of fresh−start reporting on July 10, 2009, as discussed in Note 2 to our 2009 Form 10−K, and in our 2009 annual and event driven GME impairment tests and result in Level 3 measures within the valuation hierarchy. Assumptions used in our discounted cash flow analysis that had the most significant effect on the estimated fair value of our GME reporting unit include:

•     Our estimated weighted−average cost of capital (WACC);

•     Our estimated long−term growth rates; and

•     Our estimate of industry sales and our market share.

We used a WACC of 22.0% that considered various factors including bond yields, risk premiums, and tax rates; a terminal value that was determined using a growth model that applied a long−term growth rate of 0.5% to our projected cash flows beyond 2015; and industry sales of 18.4 million vehicles and a market share for Opel/Vauxhall of 6.45% in 2010 increasing to industry sales of 22.0 million vehicles and a 7.4% market share in 2015.

Our fair value estimate assumes the achievement of the future financial results contemplated in our forecasted cash flows, and there can be no assurance that we will realize that value. The estimates and assumptions used are subject to significant uncertainties, many of which are beyond our control, and there is no assurance that anticipated financial results will be achieved.

**Note 9. Intangible Assets, net**

The following table summarizes the components of Intangible assets, net (dollars in millions):

| | Successor | | | | | |
| | June 30, 2010 | | | December 31, 2009 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|---|---|
| **Amortizing Intangibles** | | | | | | |
| Technology and intellectual property | $ 7,729 | $ 2,670 | $ 5,059 | $ 7,741 | $ 1,460 | $ 6,281 |
| Brands | 5,348 | 143 | 5,205 | 5,508 | 72 | 5,436 |
| Dealer network and customer relationships | 2,067 | 129 | 1,938 | 2,205 | 67 | 2,138 |
| Favorable contracts | 509 | 79 | 430 | 542 | 39 | 503 |
| Other | 19 | 6 | 13 | 17 | 3 | 14 |
| Total amortizing intangible assets | 15,672 | 3,027 | 12,645 | 16,013 | 1,641 | 14,372 |
| Non amortizing in−process research and development | 175 | — | 175 | 175 | — | 175 |
| Total intangible assets | $15,847 | $ 3,027 | $12,820 | $16,188 | $ 1,641 | $14,547 |

The following table summarizes amortization expense related to Intangible assets, net (dollars in millions):

| | Successor | | Predecessor | |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
|---|---|---|---|---|
| Amortization expense related to intangible assets, net | $ 667 | $ 1,403 | $ 21 | $ 43 |

18

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table summarizes estimated amortization expense related to Intangible assets, net in each of the next five fiscal years (dollars in millions):

| | Estimated Amortization Expense |
|---|---|
| 2011 | $ 1,785 |
| 2012 | $ 1,560 |
| 2013 | $ 1,227 |
| 2014 | $ 611 |
| 2015 | $ 314 |

**Note 10. Variable Interest Entities**

**Consolidated VIEs**

VIEs that we do not control through a majority voting interest that are consolidated because we are or Old GM was the primary beneficiary primarily include: (1) previously divested suppliers for which we provide or Old GM provided guarantees or financial support; (2) a program announced by the UST in March 2009 to provide financial assistance to automotive suppliers (Receivables Program); (3) vehicle sales and marketing joint ventures that manufacture, market and sell vehicles in certain markets; (4) leasing SPEs which held real estate assets and related liabilities for which Old GM provided residual guarantees; and (5) an entity which manages certain private equity investments held by our and Old GM's defined benefit plans, along with six associated general partner entities.

Certain creditors and beneficial interest holders of these VIEs have or had limited, insignificant recourse to our general credit or Old GM's general credit. In the event that creditors or beneficial interest holders were to have such recourse to our or Old GM's general credit, we or Old GM could be held liable for certain of the VIEs' obligations. GM Daewoo Auto & Technology Co. (GM Daewoo), a non−wholly owned consolidated subsidiary that we control through a majority voting interest, is also a VIE because in the future it may require additional subordinated financial support. The creditors of GM Daewoo's short−term debt of $1.0 billion, long−term debt of $722 million and current derivative liabilities of $352 million at June 30, 2010 do not have recourse to our general credit.

The following table summarizes the carrying amount of assets and liabilities of consolidated VIEs that we do not also control through a majority voting interest (dollars in millions):

| | Successor | |
|---|---|---|
| | June 30, 2010 (a)(b) | December 31, 2009 (a) |
| Assets: | | |
| Cash and cash equivalents | $ 81 | $ 15 |
| Restricted cash | 3 | 191 |
| Accounts and notes receivable, net | 121 | 14 |
| Inventories | 77 | 15 |
| Other current assets | 29 | — |
| Property, net | 52 | 5 |
| Other assets | 37 | 33 |
| Total assets | $ 400 | $ 273 |
| Liabilities: | | |
| Accounts payable (principally trade) | $ 196 | $ 17 |
| Short−term debt and current portion of long−term debt | 1 | 205 |
| Accrued expenses | 22 | 10 |
| Other liabilities and deferred income taxes | 47 | 23 |
| Total liabilities | $ 266 | $ 255 |

_____

(a)   Amounts exclude GM Daewoo.

(b)   Amounts at June 30, 2010 reflect the effect of our adoption of amendments to ASC 810−10 in January 2010, which resulted in the consolidation of GM Egypt. At June 30, 2010 GM Egypt had Total assets of $344 million and Total liabilities of $238 million.

19

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table summarizes the amounts recorded in earnings related to consolidated VIEs that we do not also control through a majority voting interest (dollars in millions):

|  | Successor | | Predecessor | |
|---|---|---|---|---|
|  | Three Months Ended June 30, 2010 (a)(b) | Six Months Ended June 30, 2010 (a)(b) | Three Months Ended June 30, 2009 (a) | Six Months Ended June 30, 2009 (a) |
| Net sales and revenue | $ 197 | $ 370 | $ 15 | $ 30 |
| Cost of sales | 152 | 287 | (1) | 6 |
| Selling, general and administrative expense | 7 | 17 | 24 | 28 |
| Other expenses, net | 1 | 2 | 1 | 2 |
| Interest expense | 1 | 4 | 1 | 1 |
| Interest (income) and other non−operating (income), net | (2) | (3) | — | — |
| Income tax expense | 5 | 8 | — | — |
| Net income (loss) | $ 33 | $ 55 | $ (10) | $ (7) |

_____

(a)    Amounts exclude GM Daewoo.

(b)    Amounts recorded in the three and six months ended June 30, 2010 reflect our adoption of amendments to ASC 810−10 in January 2010, which resulted in the consolidation of GM Egypt. In the three and six months ended June 30, 2010 GM Egypt recorded Net sales and revenue of $187 million and $349 million.

*GM Egypt*

GM Egypt is a 31% owned automotive manufacturing organization that was previously accounted for using the equity method. GM Egypt was founded in March 1983 to assemble and manufacture vehicles in Egypt. Certain voting and other rights permit us to direct those activities of GM Egypt that most significantly affect its economic performance. In connection with our adoption of amendments to ASC 810−10, we consolidated GM Egypt in January 2010.

*Receivables Program*

We determined that the Receivables Program was a VIE and that we and Old GM were the primary beneficiary. At December 31, 2009 our equity contributions were $55 million and the UST had outstanding loans of $150 million to the Receivables Program. In the three months ended March 31, 2010 we repaid these loans in full. The Receivables Program was terminated in accordance with its terms in April 2010. Upon termination, we shared residual capital of $25 million in the program equally with the UST and paid a termination fee of $44 million.

**Nonconsolidated VIEs**

VIEs that are not consolidated because we are not or Old GM was not the primary beneficiary primarily include: (1) troubled suppliers for which we provide or Old GM provided guarantees or financial support; (2) vehicle sales and marketing joint ventures that manufacture, market and sell vehicles and related services; (3) leasing entities for which residual value guarantees were made; (4) certain research entities for which annual ongoing funding requirements exist; and (5) Ally Financial.

Guarantees and financial support are provided to certain current or previously divested suppliers in order to ensure that supply needs for production are not disrupted due to a supplier's liquidity concerns or possible shutdowns. Types of financial support that we provide and Old GM provided include, but are not limited to: (1) funding in the form of a loan; (2) guarantees of the supplier's debt or credit facilities; (3) one−time payments to fund prior losses of the supplier; (4) indemnification agreements to fund the suppliers' future losses or obligations; (5) agreements to provide additional funding or liquidity to the supplier in the form of price increases or changes in payment terms; and (6) assisting the supplier in finding additional investors. The maximum exposure to loss related to these VIEs is not expected to be in excess of the amount of net accounts and notes receivable recorded with the suppliers and any related guarantees and loan commitments.

20

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

We have and Old GM had investments in joint ventures that manufacture, market and sell vehicles in certain markets. The majority of these joint ventures are typically self−funded and financed with no contractual terms that require us to provide future financial support. However, future funding is required for HKJV, as subsequently discussed. The maximum exposure to loss is not expected to be in excess of the carrying amount of the investments recorded in Equity in net assets of nonconsolidated affiliates, and any related capital funding requirements.

The following table summarizes the amounts recorded for nonconsolidated VIEs and the related off−balance sheet guarantees and maximum contractual exposure to loss, excluding Ally Financial, which is disclosed in Note 23 (dollars in millions):

| | Successor | | | |
|---|---|---|---|---|
| | June 30, 2010 | | December 31, 2009 | |
| | Carrying Amount | Maximum Exposure to Loss (a) | Carrying Amount | Maximum Exposure to Loss (b) |
| Assets: | | | | |
| Accounts and notes receivable, net | $   60 | $   60 | $   8 | $   8 |
| Equity in net assets of nonconsolidated affiliates | 285 | 285 | 96 | 50 |
| Other assets | 73 | 73 | 26 | 26 |
| Total assets | $   418 | $   418 | $   130 | $   84 |
| Liabilities: | | | | |
| Accounts payable | $   48 | $   (48) | $   — | $   — |
| Accrued expenses | 12 | 15 | — | — |
| Other liabilities | 225 | — | — | — |
| Total liabilities | $   285 | $   (33) | $   — | $   — |
| Off−Balance Sheet: | | | | |
| Residual value guarantees | | $   — | | $   32 |
| Loan commitments (c) | | 102 | | 115 |
| Other guarantees | | 3 | | 4 |
| Other liquidity arrangements (d) | | 230 | | — |
| Total guarantees and liquidity arrangements | | $   335 | | $   151 |

(a)    Amounts at June 30, 2010 included $128 million related to troubled suppliers.

(b)    Amounts at December 31, 2009 included $139 million related to troubled suppliers.

(c)    Amount at June 30, 2010 included a second lien term facility provided to American Axle and Manufacturing Holdings, Inc. (American Axle) of $100 million and other undrawn loan commitments of $2 million. Amount at December 31, 2009 included a second lien term facility provided to American Axle of $100 million and undrawn loan commitments of $15 million.

(d)    Amounts at June 30, 2010 included capital funding requirements, primarily an additional contingent future funding requirement of up to $223 million related to HKJV.

Stated contractual voting or similar rights for certain of our joint venture arrangements provide various parties with shared power over the activities that most significantly affect the economic performance of certain nonconsolidated VIEs. Such nonconsolidated VIEs are operating joint ventures located in developing international markets.

*American Axle*

In September 2009 we paid $110 million to American Axle, a former subsidiary and current supplier, to settle and modify existing commercial arrangements and acquire warrants to purchase 4 million shares of American Axle's common stock. This payment was made in response to the liquidity needs of American Axle and our desire to modify the terms of our ongoing commercial arrangement. Under the new agreement, we also provided American Axle with a second lien term loan facility of up to $100 million. Additional warrants will be granted if amounts are drawn on the second lien term loan facility.

21

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As a result of these transactions, we concluded that American Axle was a VIE for which we were not the primary beneficiary. This conclusion did not change upon our adoption of amendments to ASC 810−10 in January 2010 because we lack the power through voting or similar rights to direct those activities of American Axle that most significantly affect its economic performance. Our variable interests in American Axle include the warrants we received and the second lien term loan facility, which expose us to possible future losses depending on the financial performance of American Axle. At June 30, 2010 no amounts were outstanding under the second lien term loan. At June 30, 2010 our maximum contractual exposure to loss related to American Axle was $125 million, which represented the fair value of the warrants of $25 million recorded in Non−current assets and the potential exposure of $100 million related to the second lien term loan facility.

### Ally Financial

We own 16.6% of Ally Financial's common stock and preferred stock with a liquidation preference of $1.0 billion. We have previously determined that Ally Financial is a VIE as it does not have sufficient equity at risk; however, we are not the primary beneficiary. This conclusion did not change upon our adoption of amendments to ASC 810−10 in January 2010 because we lack the power through voting or similar rights to direct those activities of Ally Financial that most significantly affect its economic performance. Refer to Notes 7 and 23 for additional information on our investment in Ally Financial, our significant agreements with Ally Financial and our maximum exposure under those agreements.

### Saab

In February 2010 we completed the sale of Saab and in May 2010 we completed the sale of Saab GB to Spyker Cars NV. Our primary variable interest in Saab is the preference shares that we received in connection with the sale, which have a face value of $326 million and were recorded at an estimated fair value that is insignificant. We concluded that Saab is a VIE as it does not have sufficient equity at risk. We also determined that we are not the primary beneficiary because we lack the power to direct those activities that most significantly affect its economic performance. We continue to be obligated to fund certain Saab related liabilities, primarily warranty obligations related to vehicles sold prior to the disposition of Saab. At June 30, 2010 our maximum exposure to loss related to Saab was $60 million. Refer to Note 4 for additional information on the sale of Saab.

### HKJV

In December 2009 we established the HKJV operating joint venture to invest in automotive projects outside of China, initially focusing on markets in India. HKJV purchased our India Operations in February 2010. We determined that HKJV is a VIE because it will require additional subordinated financial support, and we determined that we are not the primary beneficiary because we share the power with SAIC−HK to direct the activities that most significantly affect HKJV's economic performance. We recorded a liability of $123 million for our future capital funding commitment to HKJV and we have an additional contingent future funding requirement of up to $223 million should certain conditions be met. Refer to Note 4 for additional information regarding HKJV.

**Note 11. Depreciation and Amortization**

The following table summarizes depreciation and amortization, including asset impairment charges, included in Cost of sales and Selling, general and administrative expense (dollars in millions):

| | Successor | | | Predecessor | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 |
| Depreciation and impairment of plants and equipment | $ | 481 | $ 1,010 | $ 2,621 | $ | 3,870 |
| Amortization and impairment of special tools | | 393 | 787 | 1,036 | | 2,072 |
| Depreciation and impairment of equipment on operating leases | | 135 | 253 | 86 | | 319 |
| Amortization of intangible assets | | 667 | 1,403 | 21 | | 43 |
| Total depreciation, amortization and asset impairment charges | $ | 1,676 | $ 3,453 | $ 3,764 | $ | 6,304 |

22

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Old GM initiated restructuring plans prior to the 363 Sale to reduce the total number of powertrain, stamping and assembly plants and to eliminate certain brands and nameplates. As a result, Old GM recorded incremental depreciation and amortization on certain of these assets as they were expected to be utilized over a shorter period of time than their previously estimated useful lives. We record incremental depreciation and amortization for changes in useful lives subsequent to the initial determination. In the three and six months ended June 30, 2009 Old GM recorded incremental depreciation and amortization of approximately $1.8 billion and $2.3 billion.

**Note 12. Restricted Cash and Marketable Securities**

Cash and marketable securities subject to contractual restrictions and not readily available are classified as Restricted cash and marketable securities. Restricted cash and marketable securities are invested in accordance with the terms of the underlying agreements. Funds previously held in the UST Credit Agreement (as subsequently defined in Note 13) and currently held in the Canadian Health Care Trust (HCT) escrow and other accounts have been invested in government securities and money market funds in accordance with the terms of the escrow agreements. At June 30, 2010 and December 31, 2009 we held $1.5 billion and $13.6 billion of the Restricted cash and marketable securities balance in marketable securities. Refer to Note 19 for additional information. The following table summarizes the components of Restricted cash and marketable securities (dollars in millions):

| | Successor | |
| --- | --- | --- |
| | June 30, 2010 | December 31, 2009 |
| **Current** | | |
| UST Credit Agreement (a) | $    — | $    12,475 |
| Canadian Health Care Trust (b) | 956 | 955 |
| Receivables Program (c) | — | 187 |
| Securitization trusts | 37 | 191 |
| Pre–funding disbursements | 235 | 94 |
| Other (d) | 165 | 15 |
| Total current restricted cash and marketable securities | 1,393 | 13,917 |
| **Non–current (e)** | | |
| Collateral for insurance related activities | 638 | 658 |
| Other non–current (d) | 623 | 831 |
| Total restricted cash and marketable securities | $    2,654 | $    15,406 |

(a)   In April 2010 the UST Loans and Canadian Loan (as subsequently defined in Note 13) were paid in full and funds remaining in escrow were no longer subject to restrictions.

(b)   Under the terms of an escrow agreement between General Motors of Canada Limited (GMCL), the EDC and an escrow agent, GMCL established a CAD $1.0 billion (equivalent to $893 million when entered into) escrow to fund certain of its healthcare obligations.

(c)   The Receivables Program provided financial assistance to automotive suppliers by guaranteeing or purchasing certain receivables payable by us. In April 2010 the Receivable Program was terminated in accordance with its terms.

(d)   Includes amounts related to various letters of credit, deposits, escrows and other cash collateral requirements.

(e)   Non–current restricted cash and marketable securities is recorded in Other assets.

23

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 13. Short−Term and Long−Term Debt**

The following table summarizes the components of short−term and long−term debt (dollars in millions):

|  | Successor | |
|---|---|---|
|  | June 30, 2010 | December 31, 2009 |
| **Short−Term** | | |
| UST Loans (a) | $      — | $      5,712 |
| Canadian Loan (a) | — | 1,233 |
| VEBA Notes | 2,908 | — |
| Short−term debt — third parties | 1,051 | 1,475 |
| Short−term debt — related parties (b) | 893 | 1,077 |
| Current portion of long−term debt | 672 | 724 |
| Total short−term debt and current portion of long−term debt | 5,524 | 10,221 |
| **Long−Term** | | |
| VEBA Notes | — | 2,825 |
| Other long−term debt | 2,637 | 2,737 |
| Total debt | $      8,161 | $      15,783 |
| Available under line of credit agreements (c) | $      1,115 | $      618 |

(a)    In April 2010 the UST Loans and Canadian Loan were paid in full.

(b)    Dealer financing from Ally Financial for dealerships we own.

(c)    Commitment fees are paid on credit facilities at rates negotiated in each agreement. Amounts paid and expensed for these commitment fees are insignificant.

**UST Loans and VEBA Notes**

As previously disclosed in our 2009 Form 10−K, Old GM received total proceeds of $19.4 billion from the UST under the UST Loan Agreement entered into on December 31, 2008. In connection with the Chapter 11 Proceedings, Old GM obtained additional funding of $33.3 billion from the UST and EDC under its DIP Facility. From these proceeds, there was no deposit remaining in escrow at June 30, 2010.

On July 10, 2009 we entered into the UST Credit Agreement and assumed debt of $7.1 billion (UST Loans) maturing on July 10, 2015 which Old GM incurred under its DIP Facility. Immediately after entering into the UST Credit Agreement, we made a partial repayment due to the termination of the U.S. government sponsored warranty program, reducing the UST Loans principal balance to $6.7 billion. In March 2010 and December 2009 we made quarterly payments of $1.0 billion on the UST Loans. In April 2010 we repaid the full outstanding amount of $4.7 billion using funds from our escrow account.

While we have repaid the UST Loans in full, certain of the covenants in the UST Credit Agreement and the executive compensation and corporate governance provisions of Section 111 of the Emergency Stabilization Act of 2008, as amended (the EESA), including the Interim Final Rule implementing Section 111 (the Interim Final Rule), remain in effect until the earlier to occur of the UST ceasing to own direct or indirect equity interests in us or our ceasing to be a recipient of Exceptional Financial Assistance, as determined pursuant to the Interim Final Rule, and impose obligations on us with respect to, among other things, certain expense policies, executive privileges and compensation requirements.

24

Table of Contents

GENERAL MOTORS COMPANY AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In connection with the 363 Sale, we entered into the VEBA Note Agreement and issued VEBA Notes of $2.5 billion to the UAW Retiree Medical Benefits Trust (New VEBA). The VEBA Notes have an implied interest rate of 9.0% per annum. The VEBA Notes and accrued interest are scheduled to be repaid in three equal installments of $1.4 billion on July 15 of 2013, 2015 and 2017; however, we may prepay the VEBA Notes at any time prior to maturity.

We have entered into negotiations with financial institutions regarding a credit facility. If we successfully execute a credit facility, we expect to prepay the VEBA Notes with available cash. Accordingly, at June 30, 2010 we reclassified the VEBA Notes from long−term debt to short−term debt in the amount of $2.9 billion (including unamortized premium of $209 million).

The obligations under the VEBA Note Agreement are secured by substantially all of our U.S. assets, subject to certain exceptions, including our equity interests in certain of our foreign subsidiaries, limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries due to tax considerations.

The following table summarizes interest expense and interest paid on the UST Loans and the loans under the UST Loan Agreement (UST Loan Facility) in the three and six months ended June 30, 2009 (dollars in millions):

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 |
| Interest expense | $ | 18 | $   117 | $ 2,859 | $ | 3,336 |
| Interest paid | $ | 91 | $   206 | $   — | $ | 144 |

The following table summarizes interest expense on the VEBA Notes (dollars in millions):

| | Successor | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | Six Months Ended June 30, 2010 | |
| Interest expense | $ | 51 | $ | 99 |

### Canadian Loan Agreement and EDC Loan Facility

As previously disclosed in our 2009 Form 10−K, on July 10, 2009 we entered into the Canadian Loan Agreement and assumed a CAD $1.5 billion (equivalent to $1.3 billion when entered into) term loan (Canadian Loan) maturing on July 10, 2015. In March 2010 and December 2009 we made quarterly payments of $194 million and $192 million on the Canadian Loan. In April 2010 GMCL repaid in full the outstanding amount of the Canadian Loan of $1.1 billion.

The following table summarizes interest expense and interest paid on the Canadian Loan in the three and six months ended June 30, 2010 and the EDC Loan Facility in the three and six months ended June 30, 2009 (dollars in millions):

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 |
| Interest expense | $ | 4 | $   26 | $   62 | $ | 62 |
| Interest paid | $ | 4 | $   26 | $   6 | $ | 6 |

### GM Daewoo Revolving Credit Facility

In April 2010 GM Daewoo repaid KRW 250 billion (equivalent to $225 million at the time of payment) of its KRW 1.4 trillion (equivalent to $1.2 billion at the time of payment) revolving credit facility.

25

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**German Revolving Bridge Facility**

In May 2009 Old GM entered into a revolving bridge facility with the German federal government and certain German states (German Facility) with a total commitment of up to Euro 1.5 billion (equivalent to $2.1 billion when entered into). In November 2009 the debt was paid in full and extinguished.

The following table summarizes interest expense and interest paid by Old GM on the German Facility during the three and six months ended June 30, 2009 including amortization of related discounts (dollars in millions):

|  | Predecessor | | | |
| --- | --- | --- | --- | --- |
|  | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 | |
| Interest expense | $ | 3 | $ | 3 |
| Interest paid | $ | — | $ | — |

**Other Debt**

In March 2009 Old GM entered into an agreement to amend its $1.5 billion U.S. term loan. Because the terms of the amended U.S. term loan were substantially different than the original terms, primarily due to the revised borrowing rate, Old GM accounted for the amendment as a debt extinguishment. As a result, Old GM recorded the amended U.S. term loan at fair value and recorded a gain on the extinguishment of the original loan facility of $906 million in the six months ended June 30, 2009.

In connection with the Chapter 11 Proceedings, Old GM's $4.5 billion secured revolving credit facility, $1.5 billion U.S. term loan and $125 million secured credit facility were paid in full on June 30, 2009. Old GM recorded a loss of $958 million in Reorganization expenses, net related to the extinguishments of the debt primarily due to the face value of the U.S. term loan exceeding the carrying amount.

**Technical Defaults and Covenant Violations**

Several of our loan facilities include clauses that may be breached by a change in control, a bankruptcy or failure to maintain certain financial metric limits. The Chapter 11 Proceedings and the change in control as a result of the 363 Sale triggered technical defaults in certain loans for which we have assumed the obligations. The total amount of the two loan facilities in technical default for these reasons at June 30, 2010 was $203 million. We have classified these loans as short−term debt at June 30, 2010. In July 2010 we executed an agreement with the lenders of the $150 million loan facility, which resulted in early repayment of the loan on July 26, 2010. On July 27, 2010 we executed an amendment with the lender of the second loan facility of $53 million which cured the defaults.

Two of our loan facilities had financial covenant violations at December 31, 2009 related to exceeding financial ratios limiting the amount of debt held by the subsidiaries. One of these violations was cured within the 30 day cure period through the combination of an equity injection and the capitalization of intercompany loans. In May 2010 we obtained a waiver and cured the remaining financial covenant violation on a loan facility of $70 million related to our 50% owned powertrain subsidiary in Italy.

26

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 14. Product Warranty Liability**

The following table summarizes activity for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities (dollars in millions):

|  | Successor Six Months Ended June 30, 2010 | Predecessor Six Months Ended June 30, 2009 |
|---|---|---|
| Beginning balance | $ 7,030 | $ 8,491 |
| Warranties issued and assumed in period | 1,534 | 1,077 |
| Payments | (1,711) | (1,833) |
| Adjustments to pre-existing warranties | 67 | (138) |
| Effect of foreign currency translation | (160) | 89 |
| Liability adjustment, net due to the deconsolidation of Saab | — | (77) |
| Ending balance | $ 6,760 | $ 7,609 |

**Note 15. Pensions and Other Postretirement Benefits**

The following tables summarize the components of pension and other postemployment benefits (OPEB) (income) expense (dollars in millions):

| | U.S. Plans Pension Benefits | | | |
|---|---|---|---|---|
| | Successor | | Predecessor | |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Components of (income) expense** | | | | |
| Service cost | $ 130 | $ 259 | $ 115 | $ 233 |
| Interest cost | 1,338 | 2,676 | 1,467 | 2,934 |
| Expected return on plan assets | (1,637) | (3,275) | (1,817) | (3,641) |
| Amortization of prior service cost (credit) | (1) | (1) | 205 | 411 |
| Amortization of transition obligation | — | — | — | — |
| Recognized net actuarial loss | — | — | 338 | 676 |
| Curtailments, settlements and other | — | — | 1,718 | 1,718 |
| Net periodic pension (income) expense | $ (170) | $ (341) | $ 2,026 | $ 2,331 |

27

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Non−U.S. Plans Pension Benefits | | | |
| --- | --- | --- | --- | --- |
| | Successor | | Predecessor | |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Components of (income) expense** | | | | |
| Service cost | $ 93 | $ 189 | $ 75 | $ 151 |
| Interest cost | 295 | 596 | 289 | 566 |
| Expected return on plan assets | (246) | (491) | (182) | (342) |
| Amortization of prior service credit | (1) | (1) | (14) | (7) |
| Amortization of transition obligation | — | — | 1 | 1 |
| Recognized net actuarial loss | 3 | 5 | 99 | 182 |
| Curtailments, settlements and other | 53 | 39 | 66 | 92 |
| Net periodic pension expense | $ 197 | $ 337 | $ 334 | $ 643 |

| | U.S. Plans Other Benefits | | | |
| --- | --- | --- | --- | --- |
| | Successor | | Predecessor | |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Components of (income) expense** | | | | |
| Service cost | $ 5 | $ 10 | $ 33 | $ 66 |
| Interest cost | 72 | 144 | 766 | 1,541 |
| Expected return on plan assets | — | — | (211) | (423) |
| Amortization of prior service credit | — | — | (498) | (992) |
| Amortization of transition obligation | — | — | — | — |
| Recognized net actuarial loss | — | — | 16 | 29 |
| Curtailments, settlements and other | — | — | 49 | 19 |
| Net periodic OPEB expense | $ 77 | $ 154 | $ 155 | $ 240 |

| | Non−U.S. Plans Other Benefits | | | |
| --- | --- | --- | --- | --- |
| | Successor | | Predecessor | |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Components of (income) expense** | | | | |
| Service cost | $ 8 | $ 16 | $ 5 | $ 11 |
| Interest cost | 49 | 98 | 50 | 98 |
| Expected return on plan assets | — | — | — | — |
| Amortization of prior service credit | (2) | (4) | (33) | (59) |
| Amortization of transition obligation | — | — | — | — |
| Recognized net actuarial loss | — | — | 12 | 21 |
| Curtailments, settlements and other | 3 | 3 | (123) | (123) |
| Net periodic OPEB (income) expense | $ 58 | $ 113 | $ (89) | $ (52) |

28

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Significant Plan Amendments, Benefit Modifications and Related Events**

### Three and Six Months Ended June 30, 2010

*Remeasurement*

In the three months ended June 30, 2010 certain pension plans in GME were remeasured as part of our Goodwill impairment analysis, resulting in an increase of $388 million to Pensions and Other comprehensive loss.

*Patient Protection and Affordable Care Act*

The Patient Protection and Affordable Care Act was signed into law in March 2010 and contains provisions that require all future reimbursement receipts under the Medicare Part D retiree drug subsidy program to be included in taxable income. This taxable income inclusion will not significantly affect us because effective January 1, 2010 we no longer provide prescription drug coverage to post–age 65 Medicare–eligible participants and we have a full valuation allowance against our net deferred tax assets in the U.S. We have assessed the other provisions of this new law, based on information known at this time, and we believe that the new law will not have a significant effect on our consolidated financial statements.

### Three and Six Months Ended June 30, 2009

The following table summarizes the significant defined benefit plan interim remeasurements, the related changes in accumulated postretirement benefit obligations (APBO), projected benefit obligations (PBO) and the associated curtailments, settlements and termination benefits recorded in the earnings of Old GM in the three and six months ended June 30, 2009 (dollars in millions):

| | | Change in Discount Rate | | Increase (Decrease) Since the Most Recent Remeasurement Date | | Gain (Loss) | | Termination Benefits and Other |
|---|---|---|---|---|---|---|---|---|
| Event and Remeasurement Date When Applicable | Affected Plans | From | To | PBO/APBO | Curtailments | Settlements | | |
| 2009 Special Attrition Programs — June 30 | U.S. hourly defined benefit pension plan | 6.15% | 6.25% | $ 7 | $ (1,390) | $ — | $ | (12) |
| Global salaried workforce reductions — June 1 | U.S. salaried defined benefit pension plan | — | — | 24 | (327) | — | | — |
| U.S. salaried benefits changes — February 1 | U.S. salaried retiree life insurance plan | 7.25% | 7.15% | (420) | — | — | | — |
| U.S. salaried benefits changes — June 1 | U.S. salaried retiree health care program | — | — | (265) | — | — | | — |
| 2009 CAW Agreement — June 1 | Canadian hourly defined benefit pension plan | 6.75% | 5.65% | 340 | — | — | | (26) |
| 2009 CAW Agreement — June 1 | CAW hourly retiree healthcare plan and CAW retiree life plan | 7.00% | 5.80% | (143) | 93 | — | | — |
| Total | | | | $ (457) | $ (1,624) | $ — | $ | (38) |

29

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*2009 Special Attrition Programs*

In February and June 2009 Old GM announced the 2009 Special Attrition Programs for eligible International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) represented employees, offering cash and other incentives for individuals who elected to retire or voluntarily terminate employment. In the six months ended June 2009 Old GM recorded postemployment benefit charges for 13,000 employees. Refer to Note 20 for additional information on the postemployment benefit charges.

Old GM remeasured the U.S. hourly defined benefit pension plan in June 2009 based on the 7,800 irrevocable acceptances through that date as these acceptances of the special attrition programs yielded a significant reduction in the expected future years of service of active participants.

*Global Salaried Workforce Reductions*

In February and June 2009 Old GM announced its intention to reduce global salaried headcount. In June 2009 Old GM remeasured the U.S. salaried defined benefit pension plan based upon an estimated significant reduction in the expected future years of service of active participants.

The U.S. salaried employee reductions related to this initiative were to be accomplished primarily through a salaried separation window program or through a severance program funded from operating cash flows. These programs were involuntary programs subject to management approval where employees were permitted to express interest in retirement or separation, for which the charges for the salaried separation window program were recorded as special termination benefits funded from the U.S. salaried defined benefit pension plan and other applicable retirement benefit plans. The costs associated with the total targeted headcount reductions expected to terminate under the programs was determined to be probable and estimable and severance charges of $250 million were recorded in the six months ended June 30, 2009. Refer to Note 20 for additional information on the involuntary severance program.

*U.S. Salaried Benefits Changes*

In February 2009 Old GM reduced salaried retiree life insurance benefits for U.S. salaried employees and remeasured its U.S. salaried retiree life insurance plan. In June 2009 Old GM approved and communicated negative plan amendments associated with the U.S. salaried retiree health care program, including reduced coverage and increased cost sharing. The plan was remeasured in June 2009.

In June 2009 Old GM communicated additional changes in benefits for retired salaried employees including an acceleration and further reduction in retiree life insurance, elimination of the supplemental executive life insurance benefit, and reduction in the supplemental executive retirement plan. These plan changes were contingent on completion of the 363 Sale and the effects of these amendments were included in the fresh−start remeasurements in July 2009.

*2009 Revised UAW Settlement Agreement*

In May 2009 Old GM and the UAW agreed to a revised settlement agreement that was related to the UAW hourly retiree medical plan and a 2008 settlement agreement that permanently shifted responsibility for providing retiree health care from Old GM to a new healthcare plan funded by the New VEBA. We and the UAW executed the revised settlement agreement on July 10, 2009 in connection with the 363 Sale. The most significant changes to the agreement, which were not yet in effect at June 30, 2009, included:

- The implementation date changed from January 1, 2010 to the later of December 31, 2009 or the closing date of the 363 Sale, which occurred on July 10, 2009;

- The timing of payments to the new VEBA changed as subsequently discussed;

- The form of consideration changed as subsequently discussed;

30

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

- The contribution of employer securities changed such that they were to be contributed directly to the New VEBA in connection with the successful completion of the 363 Sale;

- Certain coverages will be eliminated and certain cost sharing provisions will increase; and

- The flat monthly special lifetime pension benefit that was scheduled to commence on January 1, 2010 was eliminated.

There was no change to the timing of our existing internal VEBA asset transfer to the New VEBA in that the internal VEBA asset transfer was to occur within 10 business days after December 31, 2009 under both the 2008 settlement agreement and the 2009 revised settlement agreements with the UAW.

The new payment terms to the New VEBA under the 2009 revised settlement agreement, which were subject to the successful completion of the 363 Sale that had not yet occurred at June 30, 2009, were:

- VEBA Notes of $2.5 billion plus accrued interest, at an implied interest rate of 9.0% per annum, scheduled to be repaid in three equal installments of $1.4 billion in July of 2013, 2015 and 2017;

- 260 million shares of our Series A Fixed Rate Cumulative Perpetual Preferred Stock (Series A Preferred Stock) that accrue cumulative dividends at 9.0% per annum;

- 88 million shares (17.5%) of our common stock;

- A warrant to acquire 15 million shares (2.5%) of our common stock at $126.92 per share at any time prior to December 31, 2015;

- Two years funding of claims costs for individuals that elected the special attrition programs announced in 2009; and

- The existing internal VEBA assets.

Under the terms of the 2009 revised settlement agreement, we are released from UAW retiree health care claims incurred after December 31, 2009. All obligations of ours and any other entity or benefit plan of ours for retiree medical benefits for the class and the covered group arising from any agreement between us and the UAW were terminated at December 31, 2009. Our obligations to the new healthcare plan and the New VEBA are limited to the terms of the 2009 revised settlement agreement.

*2009 CAW Agreement*

In March 2009 Old GM announced that the members of the CAW had ratified an agreement intended to reduce manufacturing costs in Canada by closing the competitive gap with transplant automakers in the United States on active employee labor costs and reducing legacy costs through introducing co-payments for healthcare benefits, increasing employee healthcare cost sharing, freezing pension benefits, and eliminating cost of living adjustments to pensions for retired hourly workers. This agreement was conditioned on Old GM receiving longer term financial support from the Canadian and Ontario governments.

GMCL subsequently entered into additional negotiations with the CAW which resulted in a further addendum to the 2008 collective agreement which was ratified by the CAW members in May 2009. In June 2009 the governments of Ontario and Canada agreed to the terms of a loan agreement, approved the GMCL viability plan and provided funding to GMCL. The Canadian hourly defined benefit pension plan, the CAW hourly retiree healthcare plan and the CAW retiree life plan were remeasured in June 2009.

As a result of the termination of the employees from the former Oshawa, Ontario truck facility (Oshawa Facility), the CAW hourly retiree healthcare plan and the CAW retiree life plan were remeasured in June 2009 and a curtailment gain associated with the CAW hourly retiree healthcare plan was also recorded in the three months ended June 30, 2009.

In June 2009 GMCL and the CAW agreed to the terms of the HCT to provide retiree health care benefits to certain active and retired employees. The HCT will be implemented when certain preconditions are achieved, including certain changes to the Canadian Income Tax Act and the favorable completion of a class action process to bind existing retirees to the Trust. The latter is subject to the

31

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

agreement of the representative retirees and the courts. The preconditions have not been achieved and the HCT is not yet implemented at June 30, 2010. Under the terms of the HCT agreement, GMCL is obligated to make a payment of CAD $1.0 billion on the HCT implementation date which it will fund out of its CAD $1.0 billion escrow funds, and the HCT is obligated to reimburse GMCL for the cost of benefits paid for claims incurred by plan participants during the period January 1, 2010 through the implementation date. GMCL will provide a CAD $800 million note payable to the HCT on the HCT implementation date which will accrue interest at an annual rate of 7.0% with five equal annual installments of CAD $256 million due December 2014 through 2018. Concurrent with the implementation of the HCT, GMCL will be legally released from all obligations associated with the cost of providing retiree health care benefits to current employees and retired plan participants, and we will account for the termination of our CAW hourly retiree healthcare plan as a settlement, based upon the difference between the fair value of the notes and cash contributed and the health care plan obligation at the settlement date. As a result of the conditions precedent to this agreement not having yet been achieved, there was no accounting recognition for the health care trust at June 30, 2010.

**Note 16. Derivative Financial Instruments and Risk Management**

**Risk Management**

We enter and Old GM entered into a variety of foreign currency exchange, interest rate and commodity forward contracts and options to manage exposures arising from market risks resulting from changes in foreign currency exchange rates, interest rates and certain commodity prices. We do not enter into derivative transactions for speculative purposes.

Our overall financial risk management program is under the responsibility of the Risk Management Committee, which reviews and, where appropriate, approves strategies to be pursued to mitigate these risks. A risk management control framework is utilized to monitor the strategies, risks and related hedge positions, in accordance with the policies and procedures approved by the Risk Management Committee. At June 30, 2010 and June 30, 2009 we and Old GM did not have any derivatives designated in a hedge accounting relationship.

In August 2010 we changed our risk management policy. Under our prior policy we intended to reduce volatility of forecasted cash flows primarily through the use of forward contracts and swaps. The intent of the new policy is primarily to protect against risk arising from extreme adverse market movements on our key exposures and involves a shift to greater use of purchased options.

Subsequent to the 363 Sale, our ability to manage risks using derivative financial instruments was limited as most derivative counterparties were unwilling to enter into forward or swap transactions with us. In December 2009 we began purchasing commodity and foreign currency exchange options to manage these exposures. These nondesignated derivatives have original expiration terms of up to 12 months. In August 2010 we executed new agreements with counterparties that enable us to enter into forward contracts and swaps.

**Counterparty Credit Risk**

Derivative financial instruments contain an element of credit risk attributable to the counterparties' ability to meet the terms of the agreements. The maximum amount of loss due to credit risk that we would incur if the counterparties to the derivative instruments failed completely to perform according to the terms of the contract was $103 million at June 30, 2010. Agreements are entered into with counterparties that allow the set−off of certain exposures in order to manage the risk. The total net derivative asset position for all counterparties with which we were in a net asset position at June 30, 2010 was $74 million.

Counterparty credit risk is managed and monitored by our Risk Management Committee, which establishes exposure limits by counterparty. At June 30, 2010 a majority of all counterparty exposures were with counterparties that were rated A or higher.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Credit Risk Related Contingent Features**

At June 30, 2010 no collateral was posted related to derivative instruments and we did not have any agreements with counterparties to derivative instruments containing covenants requiring the maintenance of certain credit rating levels or credit risk ratios that would require the posting of collateral in the event that certain standards are violated or when a derivative instrument is in a liability position. In August 2010 we executed new agreements with counterparties that will require us to provide cash collateral for net liability positions or receive cash collateral for net asset positions that we would have with these counterparties.

**Derivatives and Hedge Accounting**

Our derivative instruments consist of nondesignated derivative contracts or economic hedges, including forward contracts and options that we acquired from Old GM or purchased directly from counterparties. At June 30, 2010 no outstanding derivative contracts were designated in hedging relationships. In the three and six months ended June 30, 2010 and 2009, we and Old GM accounted for changes in the fair value of all outstanding contracts by recording the gains and losses in earnings. Refer to Note 19 for additional information on the fair value measurements of our derivative instruments.

*Cash Flow Hedges*

We are and Old GM was exposed to certain foreign currency exchange risks associated with buying and selling automotive parts and vehicles and foreign currency exposure to long−term debt. We partially manage these risks through the use of nondesignated derivative instruments. At June 30, 2010 we did not have any financial instruments designated as cash flow hedges for accounting purposes.

Old GM previously designated certain financial instruments as cash flow hedges to manage its exposure to certain foreign currency exchange risks. For foreign currency transactions, Old GM typically hedged forecasted exposures for up to three years in the future. For foreign currency exposure on long−term debt, Old GM typically hedged exposures for the life of the debt.

For derivatives that were previously designated as qualifying cash flow hedges, the effective portion of the unrealized and realized gains and losses resulting from changes in fair value were recorded as a component of Accumulated other comprehensive income (loss). Subsequently, those cumulative gains and losses were reclassified to earnings contemporaneously with and to the same line item as the earnings effects of the hedged item. However, if it became probable that the forecasted transaction would not occur, the cumulative change in the fair value of the derivative recorded in Accumulated other comprehensive income (loss) was reclassified into earnings immediately.

The following table summarizes total activity in Accumulated other comprehensive income (loss) associated with cash flow hedges, primarily related to the release of previously deferred cash flow hedge gains and losses from Accumulated other comprehensive income (loss) into earnings (dollars in millions):

| | Predecessor | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 | |
| **Foreign Currency Exchange Contracts** | | | | |
| Sales | $ | (88) | $ | (326) |
| Cost of sales | | — | | 20 |
| Reorganization expenses, net | | 247 | | 247 |
| Total gains (losses) reclassified from accumulated other comprehensive income (loss) | $ | 159 | $ | (59) |

33

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In connection with the Chapter 11 Proceedings, at June 1, 2009 Accumulated other comprehensive income (loss) balances of $247 million associated with previously designated financial instruments were reclassified into Reorganization expenses, net because the underlying forecasted debt and interest payments were probable not to occur. At June 30, 2009 Old GM had deferred cash flow hedge gains and losses of $409 million in Accumulated other comprehensive income (loss).

The following table summarizes gains and (losses) that were reclassified from Accumulated other comprehensive income (loss) for cash flow hedges associated with previously forecasted transactions that subsequently became probable not to occur (dollars in millions):

|  | Predecessor | |
| --- | --- | --- |
|  | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Sales | $ (29) | $ (180) |
| Reorganization expenses, net | 247 | 247 |
| Total gains (losses) reclassified from accumulated other comprehensive income (loss) | $ 218 | $ 67 |

In connection with our investment in New Delphi, which we account for using the equity method, we record our share of New Delphi's Other comprehensive income (loss) in Accumulated other comprehensive income (loss). In the three and six months ended June 30, 2010 we recorded cash flow hedge losses of $30 million and $15 million related to our share of New Delphi's hedging losses.

*Fair Value Hedges*

We are and Old GM was subject to market risk from exposures to changes in interest rates that affect the fair value of long−term, fixed rate debt. At June 30, 2010 we did not have any financial instruments designated as fair value hedges to manage this risk.

Old GM previously used interest rate swaps designated as fair value hedges to manage certain of its exposures associated with this debt. Old GM hedged its exposures to the maturity date of the underlying interest rate exposure.

Gains and losses on derivatives designated and qualifying as fair value hedges, as well as the offsetting gains and losses on the debt attributable to the hedged interest rate risk, were recorded in Interest expense to the extent the hedge was effective. The gains and losses related to the hedged interest rate risk were recorded as an adjustment to the carrying amount of the debt. Previously recorded adjustments to the carrying amount of the debt were amortized to Interest expense over the remaining debt term. In the three and six months ended June 30, 2009 Old GM amortized previously deferred fair value hedge gains and losses of $1 million and $3 million to Interest expense.

In connection with the Chapter 11 Proceedings, at June 1, 2009 Old GM recorded basis adjustments of $18 million to the carrying amount of debt that ceased to be amortized to Interest expense. At June 1, 2009 the debt related to these basis adjustments was classified as Liabilities subject to compromise and no longer subject to interest accruals or amortization. We did not assume this debt from Old GM in connection with the 363 Sale.

*Net Investment Hedges*

We are and Old GM was subject to foreign currency exposure related to net investments in certain foreign operations. At June 30, 2010 we did not have any hedges of a net investment in a foreign operation.

Old GM previously used foreign currency denominated debt to hedge this foreign currency exposure. For nonderivative instruments that were designated as, and qualified as, a hedge of a net investment in a foreign operation, the effective portion of the unrealized and realized gains and losses were recorded as a Foreign currency translation adjustment in Accumulated other comprehensive income (loss). At June 30, 2009 Old GM had outstanding Euro denominated debt of $2.1 billion that qualified as a hedge of a net investment in a foreign operation.

34

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table summarizes the gains and (losses) related to hedges of net investments in foreign operations that were recorded as a Foreign currency translation adjustment in Accumulated other comprehensive income (loss) (dollars in millions):

| | Predecessor | |
| --- | --- | --- |
| | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Effective portion of net investment hedge gains (losses) | $ (133) | $ (8) |

**Derivatives Not Designated for Hedge Accounting**

Derivatives not designated in a hedging relationship, such as forward contracts, swaps, and options, are used to economically hedge certain risk exposures. Unrealized and realized gains and losses related to all of our nondesignated derivative hedges, regardless of type of exposure, are recorded in Interest income and other non-operating income, net. Derivative purchases and settlements are presented in Net cash provided by (used in) operating activities.

Old GM previously entered into a variety of foreign currency exchange, interest rate and commodity forward contracts and options to maintain a desired level of exposure arising from market risks resulting from changes in foreign currency exchange rates, interest rates and certain commodity prices. Unrealized and realized gains and losses related to Old GM's nondesignated derivative hedges were recorded in earnings based on the type of exposure, as subsequently discussed.

In May 2009 Old GM reached agreements with certain of the counterparties to its derivative contracts to terminate the derivative contracts prior to stated maturity. Commodity, foreign currency exchange, and interest rate forward contracts were settled for cash of $631 million, resulting in a loss of $537 million. The loss was recorded in Sales, Cost of sales and Interest expense in the amounts of $22 million, $457 million and $58 million.

When an exposure economically hedged with a derivative contract is no longer forecasted to occur, in some cases a new derivative instrument is entered into to offset the exposure related to the existing derivative instrument. In some cases, counterparties are unwilling to enter into offsetting derivative instruments and, as such, there is exposure to future changes in the fair value of these derivatives with no underlying exposure to offset this risk.

The following table summarizes gains and (losses) recorded for nondesignated derivatives originally entered into to hedge exposures that subsequently became probable not to occur (dollars in millions):

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Interest income and other non-operating income, net | $ — | $ — | $ 4 | $ 90 |

*Commodity Derivatives*

Certain raw materials, parts with significant commodity content, and energy are purchased for use in production. Exposure to commodity price risk may be managed by entering into commodity derivative instruments such as forward and option contracts. We currently manage this exposure using commodity options. At June 30, 2010, we had not entered into any commodity forward contracts.

Old GM hedged commodity price risk by entering into commodity forward and option contracts. Old GM recorded all commodity derivative gains and losses in Cost of sales.

35

**Table of Contents**

GENERAL MOTORS COMPANY AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table summarizes the notional amounts of nondesignated commodity derivative contracts (units in thousands):

| Commodity | Units | Successor Contract Notional | |
|---|---|---|---|
| | | June 30, 2010 | December 31, 2009 |
| Aluminum and aluminum alloy | Metric tons | 205 | 39 |
| Copper | Metric tons | 21 | 4 |
| Lead | Metric tons | 36 | 7 |
| Heating oil | Gallons | 83,296 | 10,797 |
| Natural gas | MMBTU | 9,226 | 1,355 |
| Natural gas | Gigajoules | 1,185 | 150 |

*Interest Rate Swap Derivatives*

At June 30, 2010, we did not have any nondesignated interest rate swap derivatives.

Old GM previously used interest rate swap derivatives to economically hedge exposure to changes in the fair value of fixed rate debt. Gains and losses related to the changes in the fair value of these nondesignated derivatives were recorded in Interest expense.

*Foreign Currency Exchange Derivatives*

Foreign currency exchange derivatives are used to economically hedge exposure to foreign currency exchange risks associated with: (1) forecasted foreign currency denominated purchases and sales of vehicles and parts; and (2) variability in cash flows related to interest and principal payments on foreign currency denominated debt. At June 30, 2010 we managed foreign currency exchange risk through the use of foreign currency options and forward contracts.

The following table summarizes the total notional amounts of nondesignated foreign currency exchange derivatives (dollars in millions):

| | Successor | |
|---|---|---|
| | June 30, 2010 | December 31, 2009 |
| Nondesignated foreign currency exchange derivatives | $    4,135 | $    6,333 |

Old GM recorded gains and losses related to these foreign currency exchange derivatives in: (1) Sales for derivatives that economically hedged sales of parts and vehicles; (2) Cost of sales for derivatives that economically hedged purchases of parts and vehicles; and (3) Cost of sales for derivatives that economically hedged foreign currency risk related to foreign currency denominated debt.

*Other Derivatives*

In September 2009 in connection with an agreement with American Axle, we received warrants to purchase 4 million shares of American Axle common stock exercisable at $2.76 per share. The fair value of the warrants on the date of receipt was recorded as a Non−current asset. Gains and losses related to these warrants were recorded in Interest income and other non−operating income, net. At June 30, 2010 the fair value of these warrants was $25 million.

On July 10, 2009 in connection with the 363 Sale, we issued warrants to MLC and the New VEBA to acquire shares of our common stock. These warrants are classified in equity and indexed to our common stock.

36

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In connection with the UST Loan Agreement, Old GM granted warrants to the UST for 122 million shares of its common stock exercisable at $3.57 per share. Old GM recorded the warrants as a liability and recorded gains and losses related to this derivative in Interest income and other non−operating income, net. At June 30, 2009 Old GM determined that the fair value of the warrants issued to the UST was $0 as a result of the Chapter 11 Proceedings. In connection with the 363 Sale, the UST returned the warrants and they were cancelled.

*Fair Value of Nondesignated Derivatives*

The following table summarizes the fair value of our nondesignated derivative instruments (dollars in millions):

| | Successor | | | | | | | |
| | June 30, 2010 | | | | December 31, 2009 | | | |
| | Asset Derivatives (a)(b) | | Liability Derivatives (c)(d) | | Asset Derivatives (a)(b) | | Liability Derivatives (c)(d) | |
|---|---|---|---|---|---|---|---|---|
| **Current Portion** | | | | | | | | |
| Foreign currency exchange derivatives | $ | 53 | $ | 355 | $ | 104 | $ | 568 |
| Commodity derivatives | | 24 | | — | | 11 | | — |
| Total current portion | $ | 77 | $ | 355 | $ | 115 | $ | 568 |
| **Non−Current Portion** | | | | | | | | |
| Foreign currency exchange derivatives | $ | 1 | $ | 15 | $ | 19 | $ | 146 |
| Other derivatives | | 25 | | — | | 25 | | — |
| Total non−current portion | $ | 26 | $ | 15 | $ | 44 | $ | 146 |

(a)    Recorded in Other current assets and deferred income taxes.

(b)    Recorded in Other assets.

(c)    Recorded in Accrued expenses.

(d)    Recorded in Other liabilities and deferred income taxes.

*Gains and (Losses) on Nondesignated Derivatives*

The following schedule summarizes gains and (losses) recorded in earnings on nondesignated derivatives (dollars in millions):

| | Successor | | | | Predecessor | | | |
| | Three Months Ended June 30, 2010 | | Six Months Ended June 30, 2010 | | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 | |
|---|---|---|---|---|---|---|---|---|
| **Foreign Currency Exchange Derivatives** | | | | | | | | |
| Sales | $ | — | $ | — | $ | (786) | $ | (726) |
| Cost of sales | | — | | — | | (81) | | (218) |
| Interest income and other non−operating income, net | | (98) | | 30 | | 4 | | 90 |
| **Interest Rate Swap Derivatives** | | | | | | | | |
| Interest expense | | — | | — | | (52) | | (38) |
| **Commodity Derivative Contracts** | | | | | | | | |
| Cost of sales | | — | | — | | (200) | | (334) |
| Interest income and other non−operating income, net | | (51) | | (53) | | — | | — |
| **Other Derivatives** | | | | | | | | |
| Interest income and other non−operating income, net | | (8) | | — | | 66 | | 164 |
| Total gains (losses) recorded in earnings | $ | (157) | $ | (23) | $ | (1,049) | $ | (1,062) |

37

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Net Change in Accumulated Other Comprehensive Income (Loss)**

The following table summarizes the net change in Accumulated other comprehensive income (loss) related to cash flow hedging activities (dollars in millions):

| | Predecessor | |
|---|---|---|
| | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Beginning net unrealized gain (loss) on derivatives | $ (241) | $ (490) |
| Change in fair value | — | — |
| Reclassification to earnings | (168) | 81 |
| Ending net unrealized gain (loss) on derivatives | $ (409) | $ (409) |

**Note 17. Commitments and Contingencies**

The following tables summarize information related to Commitments and contingencies (dollars in millions):

| | Successor | | December 31, 2009 | |
|---|---|---|---|---|
| | June 30, 2010 | | | |
| | Liability Recorded | Maximum Liability (a) | Liability Recorded | Maximum Liability (a) |
| **Guarantees** | | | | |
| Operating lease residual values (b) | $ — | $ 71 | $ — | $ 79 |
| Supplier commitments and other related obligations | $ 2 | $ 190 | $ 3 | $ 43 |
| Ally Financial commercial loans (c) | $ — | $ 29 | $ 2 | $ 167 |
| Other product−related claims | $ 54 | $ 553 | $ 54 | $ 553 |

(a)    Calculated as future undiscounted payments.

(b)    Excludes residual support and risk sharing programs related to Ally Financial.

(c)    At December 31, 2009 includes $127 million related to a guarantee provided to Ally Financial in Brazil in connection with dealer floor plan financing. At December 31, 2009 this guarantee was collateralized by certificates of deposit of $127 million purchased from Ally Financial to which we have title and which are recorded in Restricted cash and marketable securities. The purchase of the certificates of deposit was funded in part by contributions from dealers for which we have recorded a corresponding deposit liability of $104 million, which was recorded in Other liabilities at December 31, 2009. In the three months ended June 30, 2010 this guarantee was terminated.

| | Successor | |
|---|---|---|
| | June 30, 2010 Liability Recorded | December 31, 2009 Liability Recorded |
| Environmental liability (a) | $ 196 | $ 190 |
| Product liability | $ 280 | $ 319 |
| Liability related to contingently issuable shares | $ 162 | $ 162 |
| Other litigation−related liabilities (b) | $ 1,277 | $ 1,192 |

(a)    Of the amounts we recorded, $29 million and $28 million were recorded in Accrued expenses at June 30, 2010 and December 31, 2009, and the remainder was recorded in Other liabilities.

(b)    Consists primarily of tax related litigation not recorded pursuant to ASC 740−10, "Income Taxes," (ASC 740−10) as well as various non−U.S. labor related items.

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Guarantees**

We have provided guarantees related to the residual value of certain operating leases. These guarantees terminate in years ranging from 2011 to 2035. Certain leases contain renewal options.

We have agreements with third parties that guarantee the fulfilment of certain suppliers' commitments and other related obligations. These guarantees expire in years ranging from 2010 to 2013, or are ongoing or upon the occurrence of specific events.

In some instances, certain assets of the party whose debt or performance we have guaranteed may offset, to some degree, the cost of the guarantee. The offset of certain of our payables to guaranteed parties may also offset certain guarantees, if triggered.

We also provide payment guarantees on commercial loans made by Ally Financial and outstanding with certain third parties, such as dealers or rental car companies. These guarantees either expire in years ranging from 2010 to 2029 or are ongoing. We determined the value ascribed to the guarantees to be insignificant based on the credit worthiness of the third parties. Refer to Note 23 for additional information on guarantees that we provide to Ally Financial.

In connection with certain divestitures, we have provided guarantees with respect to benefits to be paid to former employees relating to pensions, postretirement health care and life insurance. Aside from indemnifications and guarantees related to Delphi, as subsequently discussed, it is not possible to estimate our maximum exposure under these indemnifications or guarantees due to the conditional nature of these obligations. No amounts have been recorded for such obligations as they are not probable or estimable at this time.

In addition to the guarantees and indemnifying agreements mentioned previously, we periodically enter into agreements that incorporate indemnification provisions in the normal course of business. Due to the nature of these agreements, the maximum potential amount of future undiscounted payments to which we may be exposed cannot be estimated. No amounts have been recorded for such indemnities as our obligations under them are not probable or estimable at this time.

In addition to the guarantees and indemnifying agreements previously discussed, we indemnify dealers for certain product liability related claims as subsequently discussed.

With respect to other product–related claims involving products manufactured by certain joint ventures, we believe that costs incurred are adequately covered by recorded accruals. These guarantees expire in 2022.

**Environmental**

Automotive operations, like operations of other companies engaged in similar businesses, are subject to a wide range of environmental protection laws, including laws regulating air emissions, water discharges, waste management and environmental remediation. We are in various stages of investigation or remediation for sites where contamination has been alleged. We are involved in a number of actions to remediate hazardous wastes as required by federal and state laws. Such statutes require that responsible parties fund remediation actions regardless of fault, legality of original disposal or ownership of a disposal site.

The future effect of environmental matters, including potential liabilities, is often difficult to estimate. An environmental reserve is recorded when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. This practice is followed whether the claims are asserted or unasserted. Liabilities have been recorded for the expected costs to be paid over the periods of remediation for the applicable sites, which typically range from five to 30 years.

For many sites, the remediation costs and other damages for which we ultimately may be responsible may vary because of uncertainties with respect to factors such as the connection to the site or to materials there, the involvement of other potentially responsible parties, the application of laws and other standards or regulations, site conditions, and the nature and scope of investigations, studies and remediation to be undertaken (including the technologies to be required and the extent, duration and success of remediation).

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The final outcome of environmental matters cannot be predicted with certainty at this time. Accordingly, it is possible that the resolution of one or more environmental matters could exceed the amounts accrued in an amount that could be material to our financial condition and results of operations. At June 30, 2010 we estimate that remediation losses could range from $140 million to $375 million.

**Product Liability**

With respect to product liability claims involving our and Old GM's products, it is believed that any judgment against us for actual damages will be adequately covered by our recorded accruals and, where applicable, excess insurance coverage. Although punitive damages are claimed in some of these lawsuits, and such claims are inherently unpredictable, accruals incorporate historic experience with these types of claims. Liabilities have been recorded for the expected cost of all known product liability claims plus an estimate of the expected cost for all product liability claims that have already been incurred and are expected to be filed in the future for which we are self-insured. These amounts were recorded within Accrued expenses and Other liabilities and deferred income taxes and exclude Old GM's asbestos claims, which are discussed separately.

In accordance with our assumption of dealer sales and service agreements, we indemnify dealers for certain product liability related claims. Our experience related to dealer indemnification obligations where we are not a party arising from incidents prior to July 10, 2009 is limited. We monitor actual claims experience for consistency with this estimate and make periodic adjustments as appropriate. Since July 10, 2009, the volume of product liability claims against us has been less than projected. In addition, as of this time due to the relatively short period for which we have been directly responsible for such claims, we have fewer pending matters than Old GM had in the past and than we expect in the future. Based on both management judgments concerning the projected number and value of both dealer indemnification obligations and product liability claims against us, we have estimated the associated liability. We have lowered our overall product liability estimate for dealer indemnifications and our exposure in the three months ended June 30, 2010 resulting in a $132 million favorable adjustment driven primarily by a lower than expected volume of claims. We expect our product liability reserve to rise in future periods as new claims arise from incidents subsequent to July 9, 2009.

**Liability Related to Contingently Issuable Shares**

We are obligated to issue additional shares of our common stock to MLC (Adjustment Shares) in the event that allowed general unsecured claims against MLC, as estimated by the Bankruptcy Court, exceed $35.0 billion. The maximum Adjustment Shares equate to 2% (or 10 million shares) of our common stock. The number of Adjustment Shares to be issued is calculated based on the extent to which estimated general unsecured claims exceed $35.0 billion with the maximum number of Adjustment Shares issued if estimated general unsecured claims total $42.0 billion or more. We determined that it is probable that general unsecured claims allowed against MLC will ultimately exceed $35.0 billion by at least $2.0 billion. In the circumstance where estimated general unsecured claims equal $37.0 billion, under the terms of the Purchase Agreement, we would be required to issue 2.9 million Adjustment Shares to MLC.

**Other Litigation−Related Liability**

Various legal actions, governmental investigations, claims and proceedings are pending against us or MLC including a number of shareholder class actions, bondholder class actions and class actions under the Employee Retirement Income Security Act of 1974, as amended, and other matters arising out of alleged product defects, including asbestos−related claims; employment−related matters; governmental regulations relating to safety, emissions, and fuel economy; product warranties; financial services matters; dealer, supplier and other contractual relationships; tax−related matters not recorded pursuant to ASC 740−10 and environmental matters.

With regard to the litigation matters discussed in the previous paragraph, reserves have been established for matters in which it is believed that losses are probable and can be reasonably estimated, the majority of which are associated with tax−related matters not recorded pursuant to ASC 740−10 as well as various non−U.S. labor−related matters. Tax related matters not recorded pursuant to ASC 740−10 are items being litigated globally pertaining to value added taxes, customs, duties, sales, property taxes and other non−income tax related tax exposures. The various non−U.S. labor−related matters include claims from current and former employees related to

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

alleged unpaid wage, benefit, severance, and other compensation matters. Certain South American administrative and legal proceedings are tax−related and may require that we deposit funds in escrow, such escrow deposits may range from $725 million to $900 million. Some of the matters may involve compensatory, punitive, or other treble damage claims, environmental remediation programs, or sanctions, that if granted, could require us to pay damages or make other expenditures in amounts that could not be reasonably estimated at June 30, 2010. We believe that appropriate accruals have been established for such matters based on information currently available. Reserves for litigation losses are recorded in Accrued expenses and Other liabilities and deferred income taxes. These accrued reserves represent the best estimate of amounts believed to be our and Old GM's liability in a range of expected losses. Litigation is inherently unpredictable, however, and unfavorable resolutions could occur. Accordingly, it is possible that an adverse outcome from such proceedings could exceed the amounts accrued in an amount that could be material to our or Old GM's financial condition, results of operations and cash flows in any particular reporting period.

**Asbestos−Related Liability**

In connection with the 363 Sale, MLC retained substantially all of the asbestos−related claims outstanding. At June 30, 2009 Old GM's liability recorded for asbestos−related matters was $636 million.

Like most automobile manufacturers, Old GM had been subject to asbestos−related claims in recent years. These claims primarily arose from three circumstances:

- A majority of these claims sought damages for illnesses alleged to have resulted from asbestos used in brake components;

- Limited numbers of claims have arisen from asbestos contained in the insulation and brakes used in the manufacturing of locomotives; and

- Claims brought by contractors who allege exposure to asbestos−containing products while working on premises Old GM owned.

Old GM had resolved many of the asbestos−related cases over the years for strategic litigation reasons such as avoiding defense costs and possible exposure to excessive verdicts. The amount expended on asbestos−related matters in any period depended on the number of claims filed, the amount of pre−trial proceedings and the number of trials and settlements in the period.

Old GM recorded the estimated liability associated with asbestos personal injury claims where the expected loss was both probable and could reasonably be estimated. Old GM retained a firm specializing in estimating asbestos claims to assist Old GM in determining the potential liability for pending and unasserted future asbestos personal injury claims. The analyses relied on and included the following information and factors:

- A third party forecast of the projected incidence of malignant asbestos−related disease likely to occur in the general population of individuals occupationally exposed to asbestos;

- Old GM's Asbestos Claims Experience, based on data concerning claims filed against Old GM and resolved, amounts paid, and the nature of the asbestos−related disease or condition asserted during approximately the four years prior;

- The estimated rate of asbestos−related claims likely to be asserted against MLC in the future based on Old GM's Asbestos Claims Experience and the projected incidence of asbestos−related disease in the general population of individuals occupationally exposed to asbestos;

- The estimated rate of dismissal of claims by disease type based on Old GM's Asbestos Claims Experience; and

- The estimated indemnity value of the projected claims based on Old GM's Asbestos Claims Experience, adjusted for inflation.

Old GM reviewed a number of factors, including the analyses provided by the firm specializing in estimating asbestos claims in order to determine a reasonable estimate of the probable liability for pending and future asbestos−related claims projected to be asserted over the next 10 years, including legal defense costs. Old GM monitored actual claims experience for consistency with this estimate and made periodic adjustments as appropriate.

41

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Old GM believed that the analyses were based on the most relevant information available combined with reasonable assumptions, and that Old GM may prudently rely on their conclusions to determine the estimated liability for asbestos−related claims. Old GM noted, however, that the analyses were inherently subject to significant uncertainties. The data sources and assumptions used in connection with the analyses may not prove to be reliable predictors with respect to claims asserted against Old GM. Old GM's experience in the past included substantial variation in relevant factors, and a change in any of these assumptions — which include the source of the claiming population, the filing rate and the value of claims — could significantly increase or decrease the estimate. In addition, other external factors such as legislation affecting the format or timing of litigation, the actions of other entities sued in asbestos personal injury actions, the distribution of assets from various trusts established to pay asbestos claims and the outcome of cases litigated to a final verdict could affect the estimate.

**GME Planned Spending Guarantee**

As part of our Opel/Vauxhall restructuring plan, agreed to with European labor representatives, we have committed in principle to achieve specified milestones associated with planned spending from 2011 to 2014 on certain product programs. If we fail to accomplish the requirements set out under the expected final agreement, we will be required to pay certain amounts up to Euro 265 million for each of those years, and/or interest on those amounts, to our employees. Management has the intent and believes it has the ability to meet the requirements under the agreement, which we expect to be finalized during the three months ended September 30, 2010.

**Delphi Corporation**

*Benefit Guarantee*

In 1999 Old GM spun−off Delphi Automotive Systems Corporation, which became Delphi. At the time of the spin−off, employees of Delphi Automotive Systems Corporation became employees of Delphi. As part of the separation agreements, Delphi assumed the pension and other postretirement benefit obligations for the transferred U.S. hourly employees who retired after October 1, 2000. Additionally at the time of the spin−off, Old GM entered into the Delphi Benefit Guarantee Agreements with the UAW, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers — Communication Workers of America (IUE−CWA) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW). The Delphi Benefit Guarantee Agreements provided that in the event that Delphi or its successor companies ceased doing business, terminated its pension plan or ceased to provide credited service or OPEB benefits at certain levels due to financial distress, Old GM could be liable to provide the corresponding benefits for certain covered employees at the required level and to the extent the pension benefits Delphi and the PBGC provided fall short of the guaranteed amount.

In October 2005 Old GM received notice from Delphi it would become obligated to provide benefits pursuant to the Delphi Benefit Guarantee Agreements in connection with Delphi's commencement in October 2005 of Chapter 11 proceedings under the Bankruptcy Code. In June 2007 Old GM entered into a memorandum of understanding with Delphi and the UAW (Delphi UAW MOU) that included terms relating to the consensual triggering, under certain circumstances, of the Delphi Benefit Guarantee Agreements as well as additional terms relating to Delphi's restructuring. Under the Delphi UAW MOU, Old GM also agreed to pay for certain health care costs of covered Delphi retirees and their beneficiaries in order to provide a level of benefits consistent with those provided to Old GM's retirees and their beneficiaries, if Old GM terminated OPEB benefits. In August 2007 Old GM also entered into memoranda of understanding with Delphi and the IUE−CWA and with Delphi and the USW containing terms consistent with the comprehensive Delphi UAW MOU.

*Delphi−GM Settlement Agreements*

In September 2007 and as amended at various times through September 2008, Old GM entered into agreements with Delphi. In September 2008 Old GM also entered into agreements with Delphi and the UAW, IUE−CWA and the USW. All of these agreements were intended to resolve, among other items, outstanding issues between Delphi and Old GM, govern certain aspects of Old GM's ongoing commercial relationship with Delphi, address a limited transfer of pension assets and liabilities, and address the triggering of the Delphi Benefit Guarantee Agreements. In September 2008 these agreements became effective.

42

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Upon consummation of the DMDA, these agreements were terminated with limited exceptions.

*Delphi Liquidity Support Agreements*

Beginning in 2008 Old GM entered into various agreements and amendments to such agreements to advance a maximum of $950 million to Delphi, subject to Delphi's continued satisfaction of certain conditions and milestones. Old GM also agreed to accelerate payment of North American payables to Delphi at various amounts up to a maximum of $300 million. As of June 30, 2009 we had advanced $700 million under these agreements. Upon consummation of the DMDA, we waived our rights to advanced amounts and accelerated payments of $850 million that became consideration to Delphi and other parties under the DMDA.

*Delphi Master Disposition Agreement*

In October 2009 we consummated the transaction contemplated by the DMDA with Delphi, New Delphi, Old GM, and other parties to the DMDA, as described in Note 4. Upon consummation of the DMDA, the Delphi−GM Settlement Agreements and Delphi liquidity support agreements discussed previously were terminated with limited exceptions, and we and Delphi waived all claims against each other. We maintain certain obligations relating to Delphi hourly employees to provide the difference between pension benefits paid by the PBGC according to regulation and those originally guaranteed by Old GM under the Delphi Benefit Guarantee Agreements.

The DMDA established our ongoing commercial relationship with New Delphi. This included the continuation of all existing Delphi supply agreements and purchase orders for GMNA to the end of the related product program and New Delphi agreed to provide us with access rights designed to allow us to operate specific sites on defined triggering events to provide us with protection of supply. In addition, we and a class of New Delphi investors agreed to establish a secured delayed draw term loan facility for New Delphi, with each committing to provide loans of up to $500 million.

*Delphi Charges*

In the three and six months ended June 30, 2009 Old GM recorded charges of $9 million and $284 million. These charges, which were recorded in Cost of sales and Other expenses, net, reflected the best estimate of obligations associated with the various Delphi agreements.

**Note 18. Income Taxes**

For interim income tax reporting we estimate our annual effective tax rate and apply it to year−to−date ordinary income/loss. The tax effect of unusual or infrequently occurring items, including changes in judgment about valuation allowances and effects of changes in tax laws or rates, are reported in the interim period in which they occur. Tax jurisdictions with a projected or year−to−date loss for which a tax benefit cannot be realized are excluded. The effective tax rate fluctuated in the six months ended June 30, 2010 primarily as a result of changes in the mix of earnings in valuation allowance and non−valuation allowance jurisdictions.

In the three months ended June 30, 2010 income tax expense of $361 million primarily resulted from income tax provisions for profitable entities. In the six months ended June 30, 2010 income tax expense of $870 million primarily resulted from income tax provisions for profitable entities and a taxable foreign currency gain in Venezuela. As a result of the official devaluation of the Venezuelan currency in the six months ended June 30, 2010, we recorded income tax expense related to the foreign currency exchange gain on the net monetary position of our foreign currency denominated assets.

In the three and six months ended June 30, 2009 income tax benefit of $445 million and $559 million primarily resulted from resolution of a U.S. and Canada transfer pricing matter and other discrete items offset by income tax provisions for profitable entities.

Most of the tax attributes generated by Old GM and its domestic and foreign subsidiaries (net operating loss carryforwards and various income tax credits) survived the Chapter 11 Proceedings and we expect to use these tax attributes to reduce future tax liabilities. The ability to utilize certain of the U.S. tax attributes in future tax periods could be limited by Section 382(a) of the Internal

43

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Revenue Code. In Germany, we have net operating loss carryforwards for corporate income tax and trade tax purposes. We have received a ruling from the German tax authorities confirming the availability of those losses under the prerequisite that an agreement with the unions as to employment costs will be achieved. This ruling is subject to the outcome of infringement proceedings initiated by the European Union with respect to the German law on which the ruling is based. If the European Union proceedings have a positive outcome we will be able to utilize those losses despite the reorganizations that have taken place in Germany in 2008 and 2009. In Australia, we have net operating loss carryforwards which are now subject to meeting an annual "Same Business Test" requirement. We will assess our ability to utilize these carryforward losses annually.

We file and Old GM filed income tax returns in multiple jurisdictions, which are subject to examination by taxing authorities throughout the world. We have open tax years from 1999 to 2009 with various significant tax jurisdictions. These open years contain matters that could be subject to differing interpretations of applicable tax laws and regulations as they relate to the amount, timing or inclusion of revenue and expenses or the sustainability of income tax credits for a given audit cycle. Given the global nature of our operations, there is a risk that transfer pricing disputes may arise. We have continuing responsibility for Old GM's open tax years. We record, and Old GM previously recorded, a tax benefit only for those positions that meet the more likely than not standard.

In May 2009 the U.S. and Canadian governments resolved a transfer pricing matter with Old GM, which covered the tax years 2001 through 2007. In the three months ended June 30, 2009 this resolution resulted in a tax benefit of $692 million and interest income of $229 million. Final administrative processing of the Canadian case closing occurred in late 2009, and final administrative processing of the U.S. case closing occurred in February 2010.

In June 2010, a Mexican income tax audit covering the 2002 and 2003 years was concluded and an assessment of $159 million, including tax, interest and penalties was issued. We do not agree with the assessment and intend to appeal. We believe we have adequate reserves established and collection of the assessment will be suspended during the appeal period and any subsequent proceedings through U.S. and Mexican competent authorities.

At June 30, 2010, it is not possible to reasonably estimate the expected change to the total amount of unrecognized tax benefits over the next 12 months.

**Note 19. Fair Value Measurements**

**Fair Value Measurements**

A three−level valuation hierarchy is used for fair value measurements. The three−level valuation hierarchy is based upon observable and unobservable inputs. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect market assumptions based on the best evidence available. These two types of inputs create the following fair value hierarchy:

• Level 1 — Quoted prices for *identical* instruments in active markets;

• Level 2 — Quoted prices for *similar* instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model−derived valuations whose significant inputs are observable; and

• Level 3 — Instruments whose significant inputs are *unobservable*.

Financial instruments are transferred in and/or out of Level 3 in the valuation hierarchy based upon the significance of the unobservable inputs to the overall fair value measurement. Level 3 financial instruments typically include, in addition to the unobservable inputs, observable components that are validated to external sources.

Securities are classified in Level 1 of the valuation hierarchy when quoted prices in an active market for identical securities are available. If quoted market prices are not available, fair values of securities are determined using prices from a pricing vendor, pricing models, quoted prices of securities with similar characteristics or discounted cash flow models and are generally classified in Level 2 of the valuation hierarchy. Our pricing vendor utilizes industry−standard pricing models that consider various inputs, including

44

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

benchmark yields, reported trades, broker/dealer quotes, issuer spreads and benchmark securities as well as other relevant economic measures. Securities are classified in Level 3 of the valuation hierarchy in certain cases where there are unobservable inputs to the valuation in the marketplace.

Annually, we conduct a review of our pricing vendor. This review includes discussion and analysis of the inputs used by the pricing vendor to provide prices for the types of securities we hold. These inputs included interest rate yields, bid/ask quotes, prepayment speeds and prices for comparable securities. Based on our review we believe the prices received from our pricing vendor are a reliable representation of exit prices.

All derivatives are recorded at fair value. Internal models are used to value a majority of derivatives. The models use, as their basis, readily observable market inputs, such as time value, forward interest rates, volatility factors, and current and forward market prices for commodities and foreign currency exchange rates. Level 2 of the valuation hierarchy includes certain foreign currency derivatives, commodity derivatives and warrants. Derivative contracts that are valued based upon models with significant unobservable market inputs, primarily estimated forward and prepayment rates, are classified in Level 3 of the valuation hierarchy. Level 3 of the valuation hierarchy includes warrants issued prior to July 10, 2009 to the UST, certain foreign currency derivatives, certain long–dated commodity derivatives and interest rate swaps with notional amounts that fluctuated over time.

The valuation of derivative liabilities takes into account our and Old GM's nonperformance risk. For the periods presented after June 1, 2009, our and Old GM's nonperformance risk was not observable through the credit default swap market as a result of the Chapter 11 Proceedings for Old GM and the lack of traded instruments for us. As a result, an analysis of comparable industrial companies was used to determine the appropriate credit spread which would be applied to us by market participants. In these periods, all derivatives whose fair values contained a significant credit adjustment based on our nonperformance risk were classified in Level 3 of the valuation hierarchy.

45

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Fair Value Measurements on a Recurring Basis**

The following tables summarize the financial instruments measured at fair value on a recurring basis (dollars in millions):

| | Successor | | | |
|---|---|---|---|---|
| | Fair Value Measurements on a Recurring Basis at June 30, 2010 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Cash equivalents | | | | |
| United States government and agency | $ — | $ 2,456 | $ — | $ 2,456 |
| Certificates of deposit | — | 3,719 | — | 3,719 |
| Money market funds | 2,699 | — | — | 2,699 |
| Commercial paper | — | 7,293 | — | 7,293 |
| Marketable securities | | | | |
| Trading securities | | | | |
| Equity | 16 | 14 | — | 30 |
| United States government and agency | — | 12 | — | 12 |
| Mortgage and asset−backed | — | 29 | — | 29 |
| Foreign government | — | 30 | — | 30 |
| Corporate debt | — | 29 | — | 29 |
| Available−for−sale securities | | | | |
| United States government and agency | — | 939 | — | 939 |
| Certificates of deposit | — | 1,326 | — | 1,326 |
| Corporate debt | — | 2,366 | — | 2,366 |
| Restricted cash and marketable securities | | | | |
| United States government and Agency | — | 160 | — | 160 |
| Government of Canada bonds | — | 956 | — | 956 |
| Money market funds | 389 | — | — | 389 |
| Other assets | | | | |
| Equity | 8 | — | — | 8 |
| Derivatives | | | | |
| Commodity | — | 24 | — | 24 |
| Foreign currency | — | 25 | 29 | 54 |
| Other | — | 25 | — | 25 |
| | | | | |
| Total assets | $ 3,112 | $ 19,403 | $ 29 | $22,544 |
| | | | | |
| **Liabilities** | | | | |
| Other liabilities | | | | |
| Options | $ — | $ — | $ 24 | $ 24 |
| Derivatives | | | | |
| Foreign currency | — | 3 | 367 | 370 |
| | | | | |
| Total liabilities | $ — | $ 3 | $ 391 | $ 394 |

46

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Successor | | | |
|---|---|---|---|---|
| | Fair Value Measurements on a Recurring Basis at December 31, 2009 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Cash equivalents | | | | |
|   United States government and agency | $ — | $ 580 | $ — | $ 580 |
|   Certificates of deposit | — | 2,140 | — | 2,140 |
|   Money market funds | 7,487 | — | — | 7,487 |
|   Commercial paper | — | 969 | — | 969 |
| Marketable securities | | | | |
|   Trading securities | | | | |
|     Equity | 15 | 17 | — | 32 |
|     United States government and agency | — | 17 | — | 17 |
|     Mortgage and asset−backed | — | 22 | — | 22 |
|     Foreign government | — | 24 | — | 24 |
|     Corporate debt | — | 29 | — | 29 |
|   Available−for−sale securities | | | | |
|     United States government and agency | — | 2 | — | 2 |
|     Certificates of deposit | — | 8 | — | 8 |
| Restricted cash | | | | |
|   Money market funds | 12,662 | — | — | 12,662 |
|   Government of Canada bonds | — | 955 | — | 955 |
| Other assets | | | | |
|   Equity | 13 | — | — | 13 |
| Derivatives | | | | |
|   Commodity | — | 11 | — | 11 |
|   Foreign currency | — | 90 | 33 | 123 |
|   Other | — | 25 | — | 25 |
| Total assets | $ 20,177 | $ 4,889 | $ 33 | $25,099 |
| **Liabilities** | | | | |
| Derivatives | | | | |
|   Foreign currency | $ — | $ 9 | $ 705 | $ 714 |
| Total liabilities | $ — | $ 9 | $ 705 | $ 714 |

*Fair Value Measurements on a Recurring Basis using Level 3 Inputs*

In the three months ended June 30, 2009 Old GM's mortgage and asset−backed securities were transferred from Level 3 to Level 2 as the significant inputs used to measure fair value and quoted prices for similar instruments were determined to be observable in an active market.

For periods presented after June 1, 2009 our and Old GM's nonperformance risk was not observable through the credit default swap market as a result of the Chapter 11 Proceedings for Old GM and the lack of traded instruments for us. As a result, foreign currency derivatives with a fair market value of $1.6 billion were transferred from Level 2 to Level 3 in the three months ended June 30, 2009.

In the six months ended June 30, 2009 Old GM determined the credit profile of certain foreign subsidiaries was equivalent to Old GM's nonperformance risk which was observable through the credit default swap market and bond market based on prices for recent trades. Accordingly, foreign currency derivatives with a fair value of $2.1 billion were transferred from Level 3 into Level 2 in the six months ended June 30, 2009.

47

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | Level 3 Financial Assets and Liabilities | | | | | |
| | Mortgage–backed Securities (a) | Commodity Derivatives, Net (b) | Foreign Currency Derivatives (c) | Options (d) | Other Securities (a) | Total Net Liabilities |
| Balance at April 1, 2010 | $ — | $ — | $ (355) | $ (21) | $ — | $ (376) |
| Total realized/unrealized gains (losses) | | | | | | |
| Included in earnings | — | — | (82) | (3) | — | (85) |
| Included in Accumulated other comprehensive income (loss) | — | — | 20 | — | — | 20 |
| Purchases, issuances, and settlements | — | — | 79 | — | — | 79 |
| Transfer in and/or out of Level 3 | — | — | — | — | — | — |
| Balance at June 30, 2010 | $ — | $ — | $ (338) | $ (24) | $ — | $ (362) |
| Amount of total gains and (losses) in the period included in earnings attributable to the change in unrealized gains or (losses) relating to assets still held at the reporting date | $ — | $ — | $ (82) | $ (3) | $ — | $ (85) |

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | Level 3 Financial Assets and Liabilities | | | | | |
| | Mortgage–backed Securities (a) | Commodity Derivatives, Net (b) | Foreign Currency Derivatives (c) | Options (d) | Other Securities (a) | Total Net Liabilities |
| Balance at January 1, 2010 | $ — | $ — | $ (672) | $ — | $ — | $ (672) |
| Total realized/unrealized gains (losses) | | | | | | |
| Included in earnings | — | — | 73 | (3) | — | 70 |
| Included in Accumulated other comprehensive income (loss) | — | — | 3 | — | — | 3 |
| Purchases, issuances, and settlements | — | — | 258 | (21) | — | 237 |
| Transfer in and/or out of Level 3 | — | — | — | — | — | — |
| Balance at June 30, 2010 | $ — | $ — | $ (338) | $ (24) | $ — | $ (362) |
| Amount of total gains and (losses) in the period included in earnings attributable to the change in unrealized gains or (losses) relating to assets still held at the reporting date | $ — | $ — | $ 59 | $ (3) | $ — | $ 56 |

| | Predecessor | | | | | |
|---|---|---|---|---|---|---|
| | Level 3 Financial Assets and Liabilities | | | | | |
| | Mortgage–backed Securities (a) | Commodity Derivatives, Net (b) | Foreign Currency Derivatives (c) | UST Warrant (a) | Other Securities (a) | Total Net Liabilities |
| Balance at April 1, 2009 | $ 44 | $ (13) | $ — | $ (66) | $ 14 | $ (21) |
| Total realized/unrealized gains (losses) | | | | | | |
| Included in earnings | (1) | 11 | — | 66 | (3) | 73 |
| Included in Accumulated other comprehensive income (loss) | — | — | — | — | — | — |
| Purchases, issuances, and settlements | (10) | 2 | — | — | (6) | (14) |
| Transfer in and/or out of Level 3 | (33) | — | (1,559) | — | (5) | (1,597) |
| Balance at June 30, 2009 | $ — | $ — | $ (1,559) | $ — | $ — | $ (1,559) |
| Amount of total gains and (losses) in the period included in earnings attributable to the change in unrealized gains or (losses) relating to assets still held at the reporting date | $ — | $ — | $ — | $ — | $ — | $ — |

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Predecessor | | | | | |
|---|---|---|---|---|---|---|
| | Level 3 Financial Assets and Liabilities | | | | | |
| | Mortgage–backed Securities (a) | Commodity Derivatives, Net (b) | Foreign Currency Derivatives (c) | UST Warrant (a) | Other Securities (a) | Total Net Liabilities |
| Balance at January 1, 2009 | $ 49 | $ (17) | $ (2,144) | $ (164) | $ 17 | $ (2,259) |
| Total realized/unrealized gains (losses) | | | | | | |
| Included in earnings | (2) | 13 | — | 164 | (5) | 170 |
| Included in Accumulated other comprehensive income (loss) | — | — | — | — | — | — |
| Purchases, issuances, and settlements | (14) | 4 | — | — | (7) | (17) |
| Transfer in and/or out of Level 3 | (33) | — | 585 | — | (5) | 547 |
| Balance at June 30, 2009 | $ — | $ — | $ (1,559) | $ — | $ — | $ (1,559) |
| Amount of total gains and (losses) in the period included in earnings attributable to the change in unrealized gains or (losses) relating to assets still held at the reporting date | $ | $ | $ | $ | $ | $ |

(a)   Realized gains (losses) and other than temporary impairments on marketable securities (including the UST warrants outstanding until the closing of the 363 Sale) are recorded in Interest income and other non−operating income, net.

(b)   Prior to July 10, 2009 realized and unrealized gains (losses) on commodity derivatives were recorded in Cost of sales. Changes in fair value are attributable to changes in base metal and precious metal prices. Beginning July 10, 2009 realized and unrealized gains (losses) on commodity derivatives are recorded in Interest income and other non−operating income, net.

(c)   Prior to July 10, 2009 realized and unrealized gains (losses) on foreign currency derivatives were recorded in the line item associated with the economically hedged item. Beginning July 10, 2009 realized and unrealized gains (losses) on foreign currency derivatives are recorded in Interest income and other non−operating income, net and foreign currency translation gains (losses) are recorded in Accumulated other comprehensive income (loss).

(d)   Realized and unrealized gains (losses) on options are recorded in Interest income and other non−operating income, net.

**Short−Term and Long−Term Debt**

We determined the fair value of debt based on a discounted cash flow model which used benchmark yield curves plus a spread that represented the yields on traded bonds of companies with comparable credit ratings.

The following table summarizes the carrying amount and estimated fair value of short−term and long−term debt, including capital leases, for which it is practicable to estimate fair value (dollars in millions):

| | Successor | |
|---|---|---|
| | June 30, 2010 | December 31, 2009 |
| Carrying amount (a) | $ 8,161 | $ 15,783 |
| Fair value (a) | $ 7,751 | $ 16,024 |

(a)   Accounts and notes receivable, net and Accounts payable (principally trade) are not included because the carrying amount approximates fair value due to their short−term nature.

**Ally Financial Common and Preferred Stock**

At December 31, 2009 we estimated the fair value of our investment in Ally Financial common stock using a market approach based on the average price to tangible book value multiples of comparable companies to each of Ally Financial's Auto Finance, Commercial Finance, Mortgage, and Insurance operations to determine the fair value of the individual operations. These values were aggregated to estimate the fair value of Ally Financial common stock. At June 30, 2010 we estimated the fair value of Ally Financial

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

common stock using a market approach that applies the average price to tangible book value multiples of comparable companies to the consolidated Ally Financial tangible book value. This approach provides our best estimate of the fair value of our investment in Ally Financial common stock at June 30, 2010 due to Ally Financial's transition to a bank holding company and less readily available information with which to value Ally Financial's business operations individually.

We calculated the fair value of our investment in Ally Financial preferred stock using a discounted cash flow approach. The present value of the cash flows was determined using assumptions regarding the expected receipt of dividends on Ally Financial preferred stock and the expected call date.

The following table summarizes the carrying amount and estimated fair value of Ally Financial common and preferred stock (dollars in millions):

|  | Successor | |
| --- | --- | --- |
|  | June 30, 2010 | December 31, 2009 |
| **Common stock** | | |
| Carrying amount | $ 966 | $ 970 |
| Fair value | $ 1,138 | $ 970 |
| **Preferred stock** | | |
| Carrying amount | $ 665 | $ 665 |
| Fair value | $ 1,035 | $ 989 |

**Note 20. Restructuring and Other Initiatives**

We have and Old GM had previously executed various restructuring and other initiatives, and we plan to execute additional initiatives in the future, if necessary, in order to preserve adequate liquidity, to align manufacturing capacity and other costs with prevailing global automotive sales and to improve the utilization of remaining facilities. Related charges are primarily recorded in Cost of sales and Selling, general and administrative expense.

Estimates of restructuring and other initiative charges are based on information available at the time such charges are recorded. Due to the inherent uncertainty involved, actual amounts paid for such activities may differ from amounts initially recorded. Accordingly, we may record revisions to previous estimates by adjusting previously established reserves.

Refer to Note 21 for asset impairment charges related to our restructuring initiatives.

50

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**GM**

The following table summarizes restructuring reserves (excluding restructuring reserves related to dealer wind−down agreements) and charges by segment, including postemployment benefit reserves and charges in the three and six months ended June 30, 2010 (dollars in millions):

| | Successor | | | |
| --- | --- | --- | --- | --- |
| | GMNA | GMIO | GME | Total |
| Balance at January 1, 2010 | $2,088 | $ 7 | $ 451 | $2,546 |
| Additions | 7 | — | 273 | 280 |
| Interest accretion and other | 10 | — | 32 | 42 |
| Payments | (243) | (3) | (37) | (283) |
| Revisions to estimates | (104) | — | — | (104) |
| Effect of foreign currency translation | 24 | — | (33) | (9) |
| Balance at March 31, 2010 | 1,782 | 4 | 686 | 2,472 |
| Additions | 21 | — | 207 | 228 |
| Interest accretion and other | 10 | — | 28 | 38 |
| Payments | (178) | (2) | (257) | (437) |
| Revisions to estimates | (1) | 1 | (8) | (8) |
| Effect of foreign currency translation | (25) | — | (63) | (88) |
| Balance at June 30, 2010 (a) | $1,609 | $ 3 | $ 593 | $2,205 |

_____

(a)    The remaining cash payments related to these restructuring reserves primarily relate to postemployment benefits to be paid.

*GMNA*

GMNA recorded charges, interest accretion and other and revisions to estimates that increased the restructuring reserves by $30 million in the three months ended June 30, 2010 and decreased the restructuring reserves by $57 million in the six months ended June 30, 2010. The increase was primarily related to a Canadian hourly separation program at the Oshawa Facility in the three months ended June 30, 2010 offset by increased production capacity utilization, which resulted in the recall of idled employees to fill added shifts at multiple production sites in the six months ended June 30, 2010.

*GME*

GME recorded charges, and interest accretion and other and revisions to estimates of $227 million and $532 million in the three and six months ended June 30, 2010 for separation programs primarily related to the following initiatives:

- Separation charges of $169 million and $353 million in the three and six months ended June 30, 2010 for a separation plan related to the closure of the Antwerp, Belgium facility which affected 1,300 employees in the three months ended June 30, 2010 and will affect 1,300 additional employees.

- Separation charges of $72 million in the six months ended June 30, 2010 and revisions to estimates of $8 million to decrease the reserve in the three months ended June 30, 2010 related to separation/layoff plans and an early retirement plan in Spain which will affect 1,200 employees.

- Separation charges of $25 million in the three months ended June 30, 2010 related to a voluntary separation program in the United Kingdom.

- Separation charges of $11 million and $27 million and interest accretion and other of $26 million and $56 million in the three and six months ended June 30, 2010 related to previously announced programs in Germany.

51

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Dealer Wind−downs*

We market vehicles worldwide through a network of independent retail dealers and distributors. As part of achieving and sustaining long−term viability and the viability of our dealer network, we determined that a reduction in the number of GMNA dealerships was necessary. At June 30, 2010 there were approximately 5,900 dealers in GMNA compared to approximately 6,500 at December 31, 2009. Certain dealers in the U.S. that had signed wind−down agreements with us elected to file for reinstatement through a binding arbitration process. In response to the arbitration filings we offered certain dealers reinstatement contingent upon compliance with our core business criteria for operation of a dealership. At June 30, 2010 the arbitration process had been fundamentally resolved.

The following table summarizes GMNA's restructuring reserves related to dealer wind−down agreements in the three and six months ended June 30, 2010 (dollars in millions):

| | Successor | | |
|---|---|---|---|
| | U.S. | Canada and Mexico | Total |
| Balance at January 1, 2010 | $ 460 | $ 41 | $ 501 |
| Additions | 9 | 9 | 18 |
| Payments | (44) | (28) | (72) |
| Effect of foreign currency translation | — | 2 | 2 |
| Balance at March 31, 2010 | 425 | 24 | 449 |
| Revisions to estimates | (6) | — | (6) |
| Payments | (140) | (4) | (144) |
| Effect of foreign currency translation | — | — | — |
| Balance at June 30, 2010 | $ 279 | $ 20 | $ 299 |

## Old GM

The following table summarizes Old GM's restructuring reserves (excluding restructuring reserves related to dealer wind−down agreements) and charges by segment, including postemployment benefit reserves and charges in the three and six months ended June 30, 2009 (dollars in millions):

| | Predecessor | | | |
|---|---|---|---|---|
| | GMNA | GMIO | GME | Total |
| Balance at January 1, 2009 | $2,456 | $ 58 | $468 | $2,982 |
| Additions | 411 | 32 | 10 | 453 |
| Interest accretion and other | 10 | — | (3) | 7 |
| Payments | (398) | (32) | (33) | (463) |
| Revisions to estimates | (297) | 9 | — | (288) |
| Effect of foreign currency translation | (28) | (2) | (28) | (58) |
| Balance at March 31, 2009 | 2,154 | 65 | 414 | 2,633 |
| Additions | 1,424 | 29 | 9 | 1,462 |
| Interest accretion and other | 5 | — | 13 | 18 |
| Payments | (571) | (55) | (30) | (656) |
| Revisions to estimates | (98) | — | — | (98) |
| Effect of foreign currency translation | 79 | 10 | 29 | 118 |
| Balance at June 30, 2009 | $2,993 | $ 49 | $435 | $3,477 |

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

GMNA recorded charges, interest accretion and other and revisions to estimates that increased the restructuring reserves by $1.3 billion and $1.5 billion for the three and six months ended June 30, 2009 for separation programs related to the following initiatives:

- Supplemental Unemployment Benefit (SUB) and Transitional Support Program (TSP) related charges in the U.S. of $707 million for the three months ended June 30, 2009 recorded as an additional liability determined by an actuarial analysis at the implementation of the SUB and TSP and related suspension of the JOBS Program, Old GM's job security provision in the collective bargaining agreement with the UAW to continue paying idled employees certain wages and benefits.

- Postemployment benefit charges in the U.S. of $529 million and $825 million for the three and six months ended June 30, 2009 related to 13,000 hourly employees who participated in the 2009 Special Attrition Programs.

- Separation charges of $135 million and $250 million for the three and six months ended June 30, 2009 for a U.S. salaried severance program to allow terminated employees to receive ongoing wages and benefits for up to 12 months.

- Revisions to estimates to decrease the reserve by $98 million and $395 million for the three and six months ended June 30, 2009 primarily related to $335 million for the six months ended June 30, 2009 for the suspension of the JOBS Program and $79 million and $136 million for the three and six months ended June 30, 2009 for estimated future wages and benefits due to employees who participated in the 2009 Special Attrition Programs; offset by a net increase of $86 million for the six months ended June 30, 2009 related to Canadian salaried workforce reductions and other restructuring initiatives in Canada.

- Postemployment benefit charges in Canada of $38 million for the three months ended June 30, 2009 related to 380 hourly employees who participated in a special attrition program at the Oshawa Facility.

GMIO recorded charges and revisions to estimates of $29 million and $70 million in the three and six months ended June 30, 2009 primarily related to separation programs in South America and Australia.

GME recorded charges, interest accretion and other and revisions to estimates of $22 million and $29 million in the three and six months ended June 30, 2009 for separation programs primarily related to early retirement programs in Germany and previously announced programs in Germany and Belgium.

*Dealer Wind−downs*

The following table summarizes Old GM's restructuring reserves related to dealer wind−down agreements in the three months ended June 30, 2009 (dollars in millions):

|  | Canada |
|---|---|
| Balance at April 1, 2009 | $ — |
| Additions | 120 |
| Payments | — |
| Effect of foreign currency translation | — |
| Balance at June 30, 2009 | $ 120 |

53

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 21. Impairments**

The following table summarizes impairment charges (dollars in millions):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **GMNA** | | | | |
| Product−specific tooling assets | $   — | $   — | $   — | $   278 |
| Cancelled powertrain programs | — | — | — | 42 |
| Equity and cost method investments (other than Ally Financial) | — | — | — | 28 |
| Vehicles leased to rental car companies | — | — | — | 11 |
| Total GMNA impairment charges | — | — | — | 359 |
| **GMIO** | | | | |
| Product−specific tooling assets | — | — | — | 7 |
| Other long−lived assets | — | — | 2 | 2 |
| Total GMIO impairment charges | — | — | 2 | 9 |
| **GME** | | | | |
| Product−specific tooling assets | — | — | 237 | 237 |
| Vehicles leased to rental car companies | 6 | 15 | 17 | 34 |
| Total GME impairment charges | 6 | 15 | 254 | 271 |
| **Corporate** | | | | |
| Other than temporary impairment charges on debt and equity securities (a) | — | — | 3 | 11 |
| Automotive retail leases | — | — | — | 16 |
| Total Corporate impairment charges | — | — | 3 | 27 |
| Total impairment charges | $   6 | $   15 | $   259 | $   666 |

(a) Refer to Note 5 and Note 19 for additional information on marketable securities and financial instruments measured at fair value on a recurring basis. Other than temporary impairment charges on debt and equity securities were recorded in Interest income and other non−operating income, net.

The following tables summarize assets measured at fair value (all of which utilized Level 3 inputs) on a nonrecurring basis subsequent to initial recognition (dollars in millions):

**GM**

*GME*

| | Successor | | | | |
|---|---|---|---|---|---|
| | | Fair Value Measurements Using | | | |
| | Three Months Ended June 30, 2010 (a) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Three Months Ended June 30, 2010 Total Losses |
| Vehicles leased to rental car companies | $   563 | — | — | $   563 | $   (6) |

(a) Amounts represent the fair value measure during the period.

54

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Successor | | | | |
|---|---|---|---|---|---|
| | | Fair Value Measurements Using | | | |
| | Six Months Ended June 30, 2010 (a) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Six Months Ended June 30, 2010 Total Losses |
| Vehicles leased to rental car companies | $ 537−563 | — | — | $  537−563 | $      (15) |

(a)    Amounts represent the fair value range of measures during the period.

Vehicles leased to rental car companies were adjusted to their fair value at the time of impairment, resulting in impairment charges of $6 million and $15 million in the three and six months ended June 30, 2010. Fair value measurements utilized projected cash flows which primarily consist of vehicle sales at auction.

**Old GM**

| | Predecessor | | | | |
|---|---|---|---|---|---|
| | | Fair Value Measurements Using | | | |
| | Three Months Ended June 30, 2009 (a) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Three Months Ended June 30, 2009 Total Losses |
| Product−specific tooling assets | $       — | — | — | $       — | $      (237) |
| Other long−lived assets | $       — | — | — | $       — | (2) |
| Vehicles leased to rental car companies | $      543 | — | — | $      543 | (17) |
| Total | | | | | $      (256) |

(a)    Amounts represent the fair value measure during the period.

| | Predecessor | | | | |
|---|---|---|---|---|---|
| | | Fair Value Measurements Using | | | |
| | Six Months Ended June 30, 2009 (a) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Six Months Ended June 30, 2009 Total Losses |
| Product−specific tooling assets | $      0−85 | — | — | $      0−85 | $      (522) |
| Cancelled powertrain programs | $       — | — | — | $       — | (42) |
| Other long−lived assets | $       — | — | — | $       — | (2) |
| Equity and cost method investments (other than Ally Financial) | $       — | — | — | $       — | (28) |
| Vehicles leased to rental car companies | $ 543−2,057 | — | — | $543−2,057 | (45) |
| Automotive retail leases | $     1,519 | — | — | $     1,519 | (16) |
| Total | | | | | $      (655) |

(a)    Amounts represent the fair value measure (or range of measures) during the period.

**GMNA**

Product−specific tooling assets were adjusted to their fair value at the time of impairment, resulting in impairment charges of $278 million in the six months ended June 30, 2009. Fair value measurements utilized projected cash flows, discounted at a rate commensurate with the perceived business risks related to the assets involved.

55

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Cancelled powertrain programs were adjusted to their fair value at the time of impairment, resulting in impairment charges of $42 million in the six months ended June 30, 2009. Fair value measurements utilized projected cash flows, discounted at a rate commensurate with the perceived business risks related to the assets involved.

CAMI Automotive, Inc. (CAMI), at the time an equity method investee, was adjusted to its fair value, resulting in an impairment charge of $28 million in the six months ended June 30, 2009. The fair value measurement utilized projected cash flows discounted at a rate commensurate with the perceived business risks related to the investment. In March 2009 Old GM determined that due to changes in contractual arrangements, CAMI became a VIE and Old GM was the primary beneficiary, and therefore CAMI was consolidated. In December 2009 we acquired the remaining noncontrolling interest of CAMI from Suzuki for $100 million increasing our ownership interest from 50% to 100%. As a result of this acquisition, CAMI became a wholly−owned subsidiary.

Vehicles leased to rental car companies were adjusted to their fair value at the time of impairment, resulting in impairment charges of $11 million in the six months ended June 30, 2009. Fair value measurements utilized projected cash flows which primarily consist of vehicle sales at auction.

### *GMIO*

Product−specific tooling assets were adjusted to their fair value at the time of impairment, resulting in impairment charges of $7 million in the six months ended June 30, 2009. Fair value measurements utilized projected cash flows, discounted at a rate commensurate with the perceived business risks related to the assets involved.

Other long−lived assets were adjusted to their fair value at the time of impairment, resulting in impairment charges of $2 million in the three months ended June 30, 2009. Fair value measurements utilized projected cash flows, discounted at a rate commensurate with the perceived business risks related to the assets involved.

### *GME*

Product−specific tooling assets were adjusted to their fair value at the time of impairment, resulting in impairment charges of $237 million in the three months ended June 30, 2009. Fair value measurements utilized projected cash flows, discounted at a rate commensurate with the perceived business risks related to the assets involved.

Vehicles leased to rental car companies were adjusted to their fair value at the time of impairment, resulting in impairment charges of $17 million and $34 million in the three and six months ended June 30, 2009. Fair value measurements utilized projected cash flows which primarily consist of vehicle sales at auction.

### *Corporate*

Automotive retail leases were adjusted to their fair value at the time of impairment, resulting in impairment charges of $16 million in the six months ended June 30, 2009. Fair value measurements utilized discounted projected cash flows from lease payments and anticipated future auction proceeds.

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Contract Cancellations**

The following table summarizes contract cancellation charges primarily related to the cancellation of product programs (dollars in millions):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| GMNA | $ 5 | $ 36 | $ 29 | $ 157 |
| GMIO | — | — | — | 8 |
| GME | — | — | 4 | 12 |
| Total contract cancellation charges | $ 5 | $ 36 | $ 33 | $ 177 |

**Note 22. Earnings (Loss) Per Share**

Basic and diluted earnings (loss) per share have been computed by dividing Net income (loss) attributable to common stockholders by the weighted average number of shares outstanding in the period.

The following table summarizes basic and diluted earnings (loss) per share (in millions, except per share amounts):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Basic** | | | | |
| Net income (loss) attributable to common stockholders (a) | $ 2.67 | $ 4.40 | $ (21.12) | $ (30.91) |
| Weighted−average common shares outstanding | 500 | 500 | 611 | 611 |
| **Diluted** | | | | |
| Net income (loss) attributable to common stockholders (a) | $ 2.55 | $ 4.21 | $ (21.12) | $ (30.91) |
| Weighted−average common shares outstanding | 522 | 522 | 611 | 611 |

(a)    The three and six months ended June 30, 2010 includes accumulated but undeclared dividends of $34 million on our Series A Preferred Stock, which decreases Net income attributable to common stockholders.

**GM**

In the three and six months ended June 30, 2010 diluted earnings per share included the potential effect of the assumed exercise of certain warrants to acquire shares of our common stock. The number of shares of common stock, assuming the exercise of the warrants, that were excluded in the computation of diluted earnings per share under the treasury stock method was 68 million in the three and six months ended June 30, 2010. The number of shares of common stock, assuming the exercise of the warrants, that were included in the computation of diluted earnings per share under the treasury stock method was 22 million in the three and six months ended June 30, 2010. The number of shares of common stock that were excluded in the computation of diluted earnings per share because the effect was antidilutive was 15 million in the three and six months ended June 30, 2010.

At June 30, 2010 the Adjustment Shares were excluded from the computation of basic and diluted earnings per share as the condition that would result in the issuance of the Adjustment Shares was not satisfied. At June 30, 2010 we believe it is probable that these claims will exceed $35.0 billion, but it is still possible they will not. The Adjustment Shares may, however, be dilutive in the future. Refer to Note 17 for additional information on the Adjustment Shares.

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

We have granted restricted stock units and salary stock to certain global executives. As these awards will be payable in cash if settled prior to six months after a completion of a successful initial public offering, the restricted stock and salary stock awards are excluded from the computation of diluted earnings per share. At June 30, 2010 6 million restricted stock units were outstanding.

**Old GM**

Due to Old GM's net losses in the three and six months ended June 30, 2009, the assumed exercise of stock options and warrants had an antidilutive effect and therefore was excluded from the computation of diluted loss per share. The number of such options and warrants not included in the computation of diluted loss per share was 208 million in the three and six months ended June 30, 2009.

No shares potentially issuable to satisfy the in−the−money amount of Old GM's convertible debentures have been included in the computation of diluted income (loss) per share in the three and six months ended June 30, 2009 as the conversion options in various series of convertible debentures were not in−the−money.

**Note 23. Transactions with Ally Financial**

Old GM entered into various operating and financing arrangements with Ally Financial. In connection with the 363 Sale, we assumed the terms and conditions of these agreements as more fully discussed in our 2009 Form 10−K. The following tables describe the financial statement effects of and maximum obligations under these agreements (dollars in millions):

|  | Successor | |
|---|---|---|
|  | June 30, 2010 | December 31, 2009 |
| Operating lease residuals | | |
| Residual support (a) | | |
|     Liabilities (receivables) recorded | $ (18) | $ 369 |
|     Maximum obligation | $ 881 | $ 1,159 |
| Risk sharing (a) | | |
|     Liabilities recorded | $ 401 | $ 366 |
|     Maximum obligation | $ 1,080 | $ 1,392 |
| Note payable to Ally Financial (b) | $ 35 | $ 35 |
| Vehicle repurchase obligations (c) | | |
|     Maximum obligations | $15,881 | $ 14,058 |
|     Fair value of guarantee | $ 34 | $ 46 |

(a)   Represents liabilities (receivables) recorded and maximum obligations for agreements entered into prior to December 31, 2008. Agreements entered into in 2010 and 2009 do not include residual support or risk sharing programs. During the six months ended June 30, 2010 favorable adjustments of $0.4 billion were recorded in the U.S. due to increases in estimated residual values.

(b)   Ally Financial retained an investment in a note, which is secured by certain automotive retail leases.

(c)   In May 2009 Old GM and Ally Financial agreed to expand Old GM's repurchase obligations for Ally Financial financed inventory at certain dealers in Europe, Asia, Brazil and Mexico. In November 2008 Old GM and Ally Financial agreed to expand Old GM's repurchase obligations for Ally Financial financed inventory at certain dealers in the United States and Canada. The maximum potential amount of future payments required to be made under this guarantee would be based on the repurchase value of total eligible vehicles financed by Ally Financial in dealer stock. The total exposure of repurchased vehicles would be reduced to the extent vehicles are able to be resold to another dealer. The fair value of the guarantee considers the likelihood of dealers terminating and the estimated loss exposure for the ultimate disposition of vehicles.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Marketing incentives and operating lease residual payments (a) | $ 204 | $ 511 | $ 435 | $ 601 |
| Exclusivity fee revenue | $ 25 | $ 50 | $ 25 | $ 50 |
| Royalty income | $ 3 | $ 7 | $ 6 | $ 8 |

_____

(a)    Payments to Ally Financial related to U.S. marketing incentive and operating lease residual programs. Excludes payments to Ally Financial related to the contractual exposure limit.

**Balance Sheet**

The following table summarizes the balance sheet effects of transactions with Ally Financial (dollars in millions):

|  | Successor | |
| --- | --- | --- |
|  | June 30, 2010 | December 31, 2009 |
| **Assets** | | |
| Accounts and notes receivable, net (a) | $ 698 | $ 404 |
| Restricted cash and marketable securities (b) | $ — | $ 127 |
| Other assets (c) | $ 27 | $ 27 |
| **Liabilities** | | |
| Accounts payable (d) | $ 100 | $ 131 |
| Short−term debt and current portion of long−term debt (e) | $ 893 | $ 1,077 |
| Accrued expenses and other liabilities (f) | $ 712 | $ 817 |
| Long−term debt (g) | $ 50 | $ 59 |
| Other non−current liabilities (h) | $ 154 | $ 383 |

_____

(a)    Represents wholesale settlements due from Ally Financial, amounts owed by Ally Financial with respect to automotive retail leases and receivables for exclusivity fees and royalties.

(b)    Represents certificates of deposit purchased from Ally Financial that are pledged as collateral for certain guarantees provided to Ally Financial in Brazil in connection with dealer floor plan financing.

(c)    Primarily represents distributions due from Ally Financial on our investments in Ally Financial preferred stock.

(d)    Primarily represents amounts billed to us and payable related to incentive programs.

(e)    Represents wholesale financing, sales of receivable transactions and the short−term portion of term loans provided to certain dealerships which we own or in which we have an equity interest. In addition, it includes borrowing arrangements with various foreign locations and arrangements related to Ally Financial's funding of company−owned vehicles, rental car vehicles awaiting sale at auction and funding of the sale of vehicles to which title is retained while the vehicles are consigned to Ally Financial or dealers, primarily in the United Kingdom. Financing remains outstanding until the title is transferred to the dealers. This amount also includes the short−term portion of a note payable related to automotive retail leases.

(f)    Primarily represents accruals for marketing incentives on vehicles which are sold, or anticipated to be sold, to customers or dealers and financed by Ally Financial in North America. This includes the estimated amount of residual support accrued under the residual support and risk sharing programs, rate support under the interest rate support programs, operating lease and finance receivable capitalized cost reduction incentives paid to Ally Financial to reduce the capitalized cost in automotive lease contracts and retail automotive contracts, and amounts owed under lease pull−ahead programs. In addition it includes interest accrued on the transactions in (e) above.

(g)    Primarily represents the long−term portion of term loans from Ally Financial to certain consolidated dealerships.

(h)    Primarily represents long−term portion of liabilities for marketing incentives on vehicles financed by Ally Financial.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Statement of Operations**

The following table summarizes the income statement effects of transactions with Ally Financial (dollars in millions):

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Net sales and revenue (reduction) (a) | $ (68) | $ (211) | $ (5) | $ 177 |
| Cost of sales and other expenses (b) | $ 5 | $ 29 | $ 103 | $ 179 |
| Interest income and other non-operating income, net (c) | $ 58 | $ 116 | $ 85 | $ 159 |
| Interest expense (d) | $ 58 | $ 118 | $ 50 | $ 95 |
| Servicing expense (e) | $ 1 | $ 2 | $ 7 | $ 16 |
| Derivative gains (losses) (f) | $ — | $ — | $ (1) | $ (2) |

(a)    Primarily represents the increase (reduction) in net sales and revenues for marketing incentives on vehicles which are sold, or anticipated to be sold, to customers or dealers and financed by Ally Financial. This includes the estimated amount of residual support accrued under residual support and risk sharing programs, rate support under the interest rate support programs, operating lease and finance receivable capitalized cost reduction incentives paid to Ally Financial to reduce the capitalized cost in automotive lease contracts and retail automotive contracts, and costs under lease pull-ahead programs. This amount is offset by net sales for vehicles sold to Ally Financial for employee and governmental lease programs and third party resale purposes.

(b)    Primarily represents cost of sales on the sale of vehicles to Ally Financial for employee and governmental lease programs and third party resale purposes. Also includes miscellaneous expenses on services performed by Ally Financial.

(c)    Represents income on investments in Ally Financial preferred stock and Preferred Membership Interests, exclusivity and royalty fee income and reimbursements by Ally Financial for certain services provided to Ally Financial. Included in this amount is rental income related to Ally Financial's primary executive and administrative offices located in the Renaissance Center in Detroit, Michigan. The lease agreement expires in November 2016.

(d)    Represents interest incurred on term loans, notes payable and wholesale settlements.

(e)    Represents servicing fees paid to Ally Financial on certain automotive retail leases.

(f)    Represents amounts recorded in connection with a derivative transaction entered into with Ally Financial as the counterparty.

**Note 24. Transactions with MLC**

We and MLC entered into a Transition Services Agreement (TSA), as more fully discussed in our 2009 Form 10-K. The following tables describe the financial statement effects of the transactions with MLC.

**Statement of Operations**

The following table summarizes the income statement effects of transactions with MLC (dollars in millions):

| | Successor | |
| --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 |
| Cost of sales (a) | $ 8 | $ 14 |

(a)    Primarily related to royalty income from MLC.

60

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Balance Sheet**

The following table summarizes the balance sheet effects of transactions with MLC (dollars in millions):

|  | Successor | | |
|---|---|---|---|
|  | June 30, 2010 | | December 31, 2009 |
| Accounts and notes receivable, net (a) | $ | 11 | $ | 16 |
| Other assets | $ | 1 | $ | 1 |
| Accounts payable (b) | $ | 24 | $ | 59 |
| Accrued expenses and other liabilities | $ | — | $ | (1) |

(a)    Primarily related to royalty income from MLC and services provided under the TSA.

(b)    Primarily related to the purchase of component parts.

**Cash Flow**

The following table summarizes the cash flow effects of transactions with MLC (dollars in millions):

|  | Successor |
|---|---|
|  | Six Months Ended June 30, 2010 |
| Operating (a) | $ (112) |
| Financing (b) | $ 4 |

(a)    Primarily includes payments to and from MLC related to the purchase and sale of component parts.

(b)    Payments received from (funding provided to) a facility in Strasbourg, France, that MLC retained. The terms do not permit additional funding after July 31, 2010. At June 30, 2010 we reserved $12 million against the advanced amounts.

**Note 25. Segment Reporting**

We develop, produce and market cars, trucks and parts worldwide. We do so through our three segments: GMNA, GMIO and GME.

In the three months ended June 30, 2010 we changed our managerial reporting structure so that certain entities geographically located within Russia and Uzbekistan were transferred from our GME segment to our GMIO segment. We have revised the segment presentation for all periods presented.

Substantially all of the cars, trucks and parts produced are marketed through retail dealers in North America, and through distributors and dealers outside of North America, the substantial majority of which are independently owned.

In addition to the products sold to dealers for consumer retail sales, cars and trucks are also sold to fleet customers, including daily rental car companies, commercial fleet customers, leasing companies and governments. Sales to fleet customers are completed through the network of dealers and in some cases sold directly to fleet customers. Retail and fleet customers can obtain a wide range of after sale vehicle services and products through the dealer network, such as maintenance, light repairs, collision repairs, vehicle accessories and extended service warranties.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

GMNA primarily meets the demands of customers in North America with vehicles developed, manufactured and/or marketed under the following brands:

|   |   |   |   |
|---|---|---|---|
| • Buick | • Cadillac | • Chevrolet | • GMC |

The demands of customers outside of North America are primarily met with vehicles developed, manufactured and/or marketed under the following brands:

|   |   |   |   |
|---|---|---|---|
| • Buick | • Daewoo | • Holden | • Opel |
| • Cadillac | • GMC | • Isuzu | • Vauxhall |
| • Chevrolet |   |   |   |

At June 30, 2010 we also had equity ownership stakes directly or indirectly through various regional subsidiaries, including GM Daewoo, SGM, SGMW, FAW−GM Light Duty Commercial Vehicle Co., Ltd. (FAW−GM) and HKJV. These companies design, manufacture and market vehicles under the following brands:

|   |   |   |   |
|---|---|---|---|
| • Buick | • Daewoo | • GMC | • Jiefang |
| • Cadillac | • FAW | • Holden | • Wuling |
| • Chevrolet |   |   |   |

Nonsegment operations are classified as Corporate. Corporate includes investments in Ally Financial, certain centrally recorded income and costs, such as interest, income taxes and corporate expenditures, certain nonsegment specific revenues and expenses, including costs related to the Delphi Benefit Guarantee Agreements and a portfolio of automotive retail leases.

All intersegment balances and transactions have been eliminated in consolidation.

|  | GMNA | GMIO | GME | Successor Eliminations | Corporate | Total |
|---|---|---|---|---|---|---|
| **At and For the Three Months Ended June 30, 2010** |  |  |  |  |  |  |
| Sales |  |  |  |  |  |  |
| External customers | $19,457 | $ 7,891 | $ 5,783 | $      — | $      — | $ 33,131 |
| Intersegment | 809 | 721 | 261 | (1,791) | — | — |
| Other revenue | — | — | — | — | 43 | 43 |
| Total net sales and revenue | $20,266 | $ 8,612 | $ 6,044 | $ (1,791) | $ 43 | $ 33,174 |
| Earnings (loss) attributable to stockholders before interest and income taxes | $ 1,592 | $ 672 | $ (160) | $ (42) | $ (29) | $ 2,033 |
| Interest income |  |  |  |  | 114 | 114 |
| Interest expense |  |  |  |  | 250 | 250 |
| Income tax expense (benefit) |  |  |  |  | 361 | 361 |
| Net income (loss) attributable to stockholders |  |  |  |  | $ (526) | $ 1,536 |
| Equity in net assets of nonconsolidated affiliates | $ 1,991 | $ 6,270 | $ 7 | $      — | $ 28 | $ 8,296 |
| Total assets | $79,258 | $27,549 | $17,640 | $ (32,427) | $ 39,879 | $131,899 |
| Depreciation, amortization and impairment | $ 1,082 | $ 220 | $ 359 | $      — | $ 15 | $ 1,676 |
| Equity income, net of tax | $ 41 | $ 365 | $ 4 | $      — | $ 1 | $ 411 |

62

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

|  | | | Successor | | | |
|---|---|---|---|---|---|---|
|  | GMNA | GMIO | GME | Eliminations | Corporate | Total |
| **For the Six Months Ended June 30, 2010** | | | | | | |
| Sales | | | | | | |
|    External customers | $37,965 | $15,431 | $11,157 | $ — | $ — | $64,553 |
|    Intersegment | 1,587 | 1,233 | 348 | (3,168) | — | — |
|    Other revenue | — | — | — | — | 97 | 97 |
| Total net sales and revenue | $39,552 | $16,664 | $11,505 | $ (3,168) | 97 | $64,650 |
| Earnings (loss) attributable to stockholders before interest and income taxes | $ 2,810 | $ 1,838 | $ (637) | $ (30) | $ (124) | $ 3,857 |
| Interest income | | | | | 204 | 204 |
| Interest expense | | | | | 587 | 587 |
| Income tax expense (benefit) | | | | | 870 | 870 |
| Net income (loss) attributable to stockholders | | | | | $ (1,377) | $ 2,604 |
| Depreciation, amortization and impairment | $ 2,223 | $ 420 | $ 744 | $ — | $ 66 | $ 3,453 |
| Equity income, net of tax | $ 75 | $ 727 | $ 11 | $ — | $ 1 | $ 814 |

|  | | | Predecessor | | | |
|---|---|---|---|---|---|---|
|  | GMNA | GMIO | GME | Eliminations | Corporate | Total |
| **For the Three Months Ended June 30, 2009** | | | | | | |
| Sales | | | | | | |
|    External customers | $11,177 | $5,166 | $6,582 | $ — | $ — | $ 22,925 |
|    Intersegment | 268 | 238 | 63 | (569) | — | — |
|    Other revenue | — | — | — | — | 122 | 122 |
| Total net sales and revenue | $11,445 | $5,404 | $6,645 | $ (569) | 122 | $ 23,047 |
| Earnings (loss) attributable to stockholders before interest and income taxes | $ (7,026) | $ (660) | $ (757) | $ 38 | $ (1,657) | $(10,062) |
| Interest income | | | | | 87 | 87 |
| Interest expense | | | | | 3,375 | 3,375 |
| Income tax expense (benefit) | | | | | (445) | (445) |
| Net income (loss) attributable to stockholders | | | | | $ (4,500) | $(12,905) |
| Depreciation, amortization and impairment | $ 2,620 | $ 295 | $ 834 | $ — | $ 15 | $ 3,764 |
| Equity income (loss), net of tax | $ (225) | $ 218 | $ 4 | $ 1 | $ — | $ (2) |
| Equity in income of and disposition of interest in Ally Financial | $ — | $ — | $ — | $ — | $ 1,880 | $ 1,880 |
| Significant noncash charges (gains) | | | | | | |
|    Gain on conversion of UST Ally Financial Loan | $ — | $ — | $ — | $ — | $ (2,477) | $ (2,477) |
|    Loss on extinguishment of UST Ally Financial Loan | — | — | — | — | 1,994 | 1,994 |
|    Impairment charges related to long−lived assets | — | 2 | 237 | — | | 239 |
| Total significant noncash charges | $ — | $ 2 | $ 237 | $ — | $ (483) | $ (244) |

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | | Predecessor | | | | |
|---|---|---|---|---|---|---|
| **For the Six Months Ended June 30, 2009** | **GMNA** | **GMIO** | **GME** | **Eliminations** | **Corporate** | **Total** |
| Sales | | | | | | |
| External customers | $ 22,989 | $10,359 | $11,809 | $        — | $        — | $ 45,157 |
| Intersegment | 775 | 796 | 137 | (1,708) | — | — |
| Other revenue | — | — | — | | 321 | 321 |
| Total net sales and revenue | $ 23,764 | $11,155 | $11,946 | $   (1,708) | $    321 | $ 45,478 |
| Earnings (loss) attributable to stockholders before interest and income taxes | $(10,452) | $   (699) | $(2,711) | $        64 | $ (1,209) | $(15,007) |
| Interest income | | | | | 173 | 173 |
| Interest expense | | | | | 4,605 | 4,605 |
| Income tax expense (benefit) | | | | | (559) | (559) |
| Net income (loss) attributable to stockholders | | | | | $ (5,082) | $(18,880) |
| Depreciation, amortization and impairment | $  4,322 | $   469 | $ 1,377 | $        — | $    136 | $  6,304 |
| Equity income (loss), net of tax | $   (284) | $   326 | $     4 | $        — | $      — | $      46 |
| Equity in income of and disposition of interest in Ally Financial | $      — | $     — | $     — | $        — | $  1,380 | $  1,380 |
| Significant noncash charges (gains) | | | | | | |
| Gain on conversion of UST Ally Financial Loan | $      — | $     — | $     — | $        — | $ (2,477) | $ (2,477) |
| Loss on extinguishment of UST Ally Financial Loan | — | — | — | | 1,994 | 1,994 |
| Gain on extinguishment of debt | — | — | — | | (906) | (906) |
| Impairment charges related to equipment on operating leases | 11 | — | 34 | | 16 | 61 |
| Impairment charges related to long-lived assets | 320 | 9 | 237 | | — | 566 |
| Impairment charges related to investment in CAMI | 28 | — | — | | — | 28 |
| Total significant noncash charges | $    359 | $     9 | $   271 | $        — | $ (1,373) | $   (734) |

## Note 26. Subsequent Events

**Sale of Nexteer**

On July 7, 2010 we entered into a definitive agreement to sell Nexteer to an unaffiliated party. The transaction is subject to customary closing conditions, regulatory approvals and review by government agencies in the U.S. and China. At June 30, 2010 Nexteer had total assets of $906 million, total liabilities of $458 million, and recorded revenue of $1.0 billion in the six months ended June 30, 2010, of which $543 million were sales to us and our affiliates. Nexteer did not qualify for held for sale classification at June 30, 2010. Once consummated, we do not expect the sale of Nexteer to have a material effect on the condensed consolidated financial statements.

**Acquisition of AmeriCredit Corp.**

On July 21, 2010 we entered into a definitive agreement to acquire AmeriCredit Corp. (AmeriCredit), an independent automobile finance company, for cash of approximately $3.5 billion. This acquisition will allow us to provide a more complete range of financing options to our customers including additional capabilities in leasing and non–prime financing options. At June 30, 2010 AmeriCredit had total assets of $9.9 billion, total liabilities of $7.5 billion, and recorded revenue of $1.5 billion in the year ended June 30, 2010. The transaction is expected to close in the fourth quarter of 2010.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

This Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) should be read in conjunction with the accompanying condensed consolidated financial statements and our Annual Report on Form 10−K for the year ended December 31, 2009 (2009 Form 10−K), as filed with the Securities and Exchange Commission (SEC).

**Presentation and Estimates**

*Basis of Presentation*

We analyze the results of our business through our three segments, namely General Motors North America (GMNA), General Motors International Operations (GMIO), and General Motors Europe (GME).

In the three months ended June 30, 2010 we changed our managerial reporting structure so that certain entities geographically located within Russia and Uzbekistan were transferred from our GME segment to our GMIO segment. We have revised the segment presentation for all periods presented.

Consistent with industry practice, market share information includes estimates of industry sales in certain countries where public reporting is not legally required or otherwise available on a consistent basis.

**Use of Estimates in the Preparation of the Financial Statements**

Our condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires the use of estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities at the date of the unaudited condensed consolidated financial statements and the reported amounts of revenue and expenses in the periods presented. We believe that the accounting estimates employed are appropriate and the resulting balances are reasonable; however, due to the inherent uncertainties in making estimates actual results could differ from the original estimates, requiring adjustments to these balances in future periods.

**OVERVIEW**

**Our Company**

General Motors Company was formed by The United States Department of the Treasury (UST) in 2009 originally as a Delaware limited liability company, Vehicle Acquisition Holdings LLC, and subsequently converted to a Delaware corporation, NGMCO, Inc. This company acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation (363 Sale) on July 10, 2009 and changed its name to General Motors Company, is sometimes referred to in this Quarterly Report on Form 10−Q for the periods on or subsequent to July 10, 2009 as "we," "our," "us," "ourselves," the "Company," "General Motors," or "GM," and is the successor entity solely for accounting and financial reporting purposes (Successor). General Motors Corporation is sometimes referred to in this Quarterly Report on Form 10−Q, for the periods on or before July 9, 2009, as "Old GM." Prior to July 10, 2009 Old GM operated the business of the Company, and pursuant to the agreement with the SEC Staff, the accompanying unaudited condensed consolidated interim financial statements include the financial statements and related information of Old GM as it is our predecessor entity solely for accounting and financial reporting purposes (Predecessor). On July 10, 2009 in connection with the 363 Sale, General Motors Corporation changed its name to Motors Liquidation Corporation (MLC). MLC continues to exist as a distinct legal entity for the sole purpose of liquidating its remaining assets and liabilities.

We are a leading global automotive company. Our vision is to design, build and sell the world's best vehicles. Our business is diversified across products and geographic markets, with operations and sales in over 120 countries. We assemble our passenger cars, crossover vehicles, light trucks, sport utility vehicles, vans and other vehicles in 71 assembly facilities worldwide and have 87 additional global manufacturing facilities. With a global network of over 21,700 independent dealers we meet the local sales and service needs of our retail and fleet customers. In 2009, we and Old GM sold 7.5 million vehicles, representing 11.6% of total vehicle

65

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

sales worldwide. Approximately 72% of our and Old GM's vehicle sales volume was generated outside the United States, including 38.7% from emerging markets, such as Brazil, Russia, India and China (collectively BRIC), which have recently experienced the industry's highest volume growth.

Our business is organized into three geographically−based segments:

- GMNA, with manufacturing and distribution operations in the U.S., Canada and Mexico and distribution operations in Central America and the Caribbean, represented 33.2% of our and Old GM's total 2009 vehicle sales volume. In North America, we sell our vehicles through four brands — Chevrolet, GMC, Buick and Cadillac — which are manufactured at plants across the U.S., Canada and Mexico and imported from other GM regions. In 2009, GMNA had the largest market share of any competitor in this market at 19.0%.

- GMIO, with manufacturing and distribution operations in Asia−Pacific, South America, Russia, the Commonwealth of Independent States, Eastern Europe, Africa and the Middle East, is our largest segment by vehicle sales volume, and represented 44.5% of our and Old GM's total 2009 vehicle sales volume including sales through our joint ventures. In these regions, we sell our vehicles under the Buick, Cadillac, Chevrolet, Daewoo, FAW, GMC, Holden, Isuzu, Jiefang, Opel and Wuling brands, and we plan to commence sales under the Baojun brand in 2011. In 2009, GMIO had the second largest market share for this market at 10.2% and the number one market share across the BRIC markets. Approximately 54.9% of GMIO's volume is from China, where, primarily through our joint ventures, we had the number one market share at 13.3% in 2009. Our Chinese operations are primarily comprised of three joint ventures: Shanghai General Motors Co., Ltd. (SGM; of which we own 49%), SAIC−GM−Wuling Automobile Co., Ltd. (SGMW; of which we own 34%) and FAW−GM Light Duty Commercial Vehicle Co., Ltd. (FAW−GM; of which we own 50%).

- GME, with manufacturing and distribution operations across Western and Central Europe, represented 22.3% of our and Old GM's total 2009 vehicle sales volume. In Western and Central Europe, we sell our vehicles under the Opel and Vauxhall (U.K. only) brands, which are manufactured in Europe, and under the Chevrolet brand, which is imported from South Korea where it is manufactured by GM Daewoo Auto & Technology, Inc. (GM Daewoo) of which we own 70.1%. In 2009, GME had the number five market share in this market, at 8.9%.

We offer a global vehicle portfolio of cars, crossovers and trucks. We are committed to leadership in vehicle design, quality, reliability, telematics (wireless voice and data) and infotainment and safety, as well as to developing key energy efficiency, energy diversity and advanced propulsion technologies, including electric vehicles with range extending capabilities such as the new Chevrolet Volt.

Our company commenced operations on July 10, 2009 when we completed the acquisition of substantially all of the assets and assumption of certain liabilities of Old GM through a 363 Sale under the U.S. Bankruptcy Code (Bankruptcy Code). As a result of the 363 Sale and other recent restructuring and cost savings initiatives, we have improved our financial position and level of operational flexibility as compared to Old GM when it operated the business. We commenced operations upon completion of the 363 Sale with a total amount of debt and other liabilities at July 10, 2009 that was $92.7 billion less than Old GM's total amount of debt and other liabilities at July 9, 2009. We reached a competitive labor agreement with our unions, began restructuring our dealer network and reduced and refocused our brand strategy in the U.S. to our four brands. Although our U.S. and non−U.S. pension plans were underfunded by $17.1 billion and $10.3 billion at December 31, 2009, we have a strong balance sheet, with available liquidity (cash, cash equivalents and marketable securities) of $31.5 billion and an outstanding debt balance of $8.2 billion at June 30, 2010.

In recent quarters, we achieved profitability. Our results for the three months ended March 31 and June 30, 2010 included net income of $1.2 billion and $1.6 billion. We had a net loss of $3.8 billion, which included a settlement loss of $2.6 billion related to the 2009 revised UAW settlement agreement, for the period from July 10, 2009 to December 31, 2009. We reported revenue of $31.5 billion and $33.2 billion in the three months ended March 31 and June 30, 2010, representing 40.3% and 43.9% year−over−year increases as compared to Old GM's revenue for the corresponding periods. For the period from July 10, 2009 to December 31, 2009, our revenue was $57.5 billion.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Our Competitive Strengths*

We believe the following strengths provide us with a foundation for profitability, growth and execution on our strategic vision to design, build and sell the world's best vehicles:

- *Global presence, scale and dealer network.* We are currently the world's second largest automaker based on vehicle sales volume and, as a result of our relative market positions in GMNA and GMIO, are positioned to benefit from future growth resulting from economic recovery in developed markets and continued secular growth in emerging markets. In 2009, we and Old GM sold 7.5 million vehicles in over 120 countries and generated $104.6 billion in revenue. We operate a global distribution network with over 21,700 independent dealers, and we maintain 10 design centers, 30 engineering centers, and eight science labs around the world. Our presence and scale enable us to deploy our purchasing, research and development, design, engineering, marketing and distribution resources and capabilities globally across our vehicle production base. For example, we have budgeted approximately $13.0 billion for engineering and capital expenditures in 2010, which will fund the development and production of our products globally.

- *Market share in emerging markets, such as China and Brazil.* Across the BRIC markets, we and Old GM had the industry−leading market share of 12.7% in 2009 based on vehicle sales volume, which has grown from a 9.8% share in 2004. In China, the fastest growing global market by volume of vehicles sold, through our joint ventures we had the number one market position with a share of 13.3% based on vehicle sales volume in 2009. We also held the third largest market share in Brazil at 19.0% in 2009. We established a presence in Brazil in 1925 and in China in 1997 and have substantial operating experience in these markets.

- *Portfolio of high−quality vehicles.* Our global portfolio includes vehicles in most key segments, with 31 nameplates in the U.S. and another 179 nameplates internationally. Our and Old GM's long−term investment over the last decade in our product portfolio has resulted in successful recent vehicle launches such as the Chevrolet Equinox, GMC Terrain, Buick LaCrosse and Cadillac SRX. Sales of these vehicles have had higher transaction prices than the products they replaced and have increased vehicle segment market shares. These vehicles also have had higher residual values. The design, quality, reliability and safety of our vehicles has been recognized worldwide by a number of third parties, including the following:

  - In the U.S., we have three of the top five most dependable models in the industry according to the 2010 J.D. Power Vehicle Dependability Study as well as leading the industry with the most segment leading models in both the 2010 J.D. Power Initial Quality Survey and the 2010 J.D. Power Vehicle Dependability Study;

  - All of our recently introduced U.S. models are Consumers Digest Best Buys;

  - In Europe, the Car of the Year Organizing Committee named the Opel Insignia the 2009 European Car of the Year;

  - In China, the Chinese Automotive Media Association named the new Buick LaCrosse the 2009 Car of the Year; and

  - In Brazil, AutoEsporte Magazine named the Chevrolet Agile the 2010 Car of the Year.

- *Commitment to new technologies.* We have invested in a diverse set of new technologies designed to meet customer needs around the world. Our research and product development efforts in the areas of energy efficiency and energy diversity have been focused on advanced and alternative propulsion and fuel efficiency. For example, the Chevrolet Volt will use lithium−ion battery technology to achieve a 40 mile range on plug−in battery power only, and when the Volt's battery runs low, an onboard gasoline−powered engine/generator will extend its driving range another 300 miles on a full tank of gas. Our investment in telematics and infotainment technology enables us to provide through OnStar a service offering that creates a connection to the customer and a platform for future infotainment initiatives.

- *Competitive cost structure in GMNA.* We have substantially completed the restructuring of our North American operations, which has reduced our cost base and improved our capacity utilization and product line profitability. We accomplished this through brand rationalization, ongoing dealer network optimization, salaried and hourly headcount reductions, labor agreement restructuring, transfer of hourly retiree healthcare obligations to the UAW Retiree Medical Benefits Trust (New VEBA) and manufacturing footprint reduction from 71 North American manufacturing facilities for Old GM at December 31, 2008 to 59 at June 30, 2010, and an expected 53 at December 31, 2010. The reduced costs resulting from these actions, along with our

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

improved price realization and lower incentives, have reduced our profitability breakeven point in North America. For the six months ended June 30, 2010 and based on GMNA's current market share, GMNA's earnings before interest and income taxes (EBIT) (EBIT is not an operating measure under U.S. GAAP — refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations — Reconciliation of Segment Results" for additional discussion) would have achieved breakeven with annual U.S. industry sales of approximately 10.5 to 11.0 million vehicles.

- *Competitive global cost structure.* Global architectures (that is, vehicle characteristics and dimensions supporting common sets of major vehicle underbody components and subsystems) allow us to streamline our product development and manufacturing processes, which has resulted in reduced material and engineering costs. We have consolidated our product development activities under one global development leadership team with a centralized budget. This allows us to design and engineer our vehicles globally while balancing cost efficient production locations and proximity to the end customer. Approximately 43% of our vehicles are manufactured in regions we believe to be low−cost manufacturing locations, such as China, Mexico, Eastern Europe, India and Russia, with all−in active labor costs of less than $15 per hour and approximately 17% are manufactured in medium−cost countries, such as South Korea and Brazil, with all−in labor costs between $15 and $30 per hour.

- *Strong balance sheet and liquidity.* As of June 30, 2010, we had available liquidity (cash, cash equivalents and marketable securities) of $31.5 billion and outstanding debt of $8.2 billion. In addition, we have no significant contractual debt maturities until 2015. Although our U.S. and non−U.S. pension plans were underfunded by $17.1 billion and $10.3 billion on a U.S. GAAP basis at December 31, 2009, we have no material mandatory pension contributions until 2014. We believe that our combination of cash and cash equivalents plus cash flow from operations should provide sufficient cash to fund our new product and technology development efforts, European restructuring program, growth initiatives and further cost−reduction initiatives in the medium term.

- *Strong leadership team with focused direction.* Our new executive management team combines years of experience at GM and new perspectives on growth, innovation and strategy deployment. Our management team operates in a streamlined organizational structure that allows for:

  - More direct lines of communication;

  - Quicker decision−making; and

  - Direct responsibility for individuals in various areas of our business.

As an example, we have eliminated multiple internal strategy boards and committees and instituted a single, smaller executive committee to focus our management functions and shorten our decision−making processes. The members of our Board of Directors, a majority of whom were not directors of Old GM, are directly involved in strategy formation and review.

**Our Strategy**

Our vision is to design, build and sell the world's best vehicles. The primary elements of our strategy to achieve this vision are to:

- Deliver a product portfolio of the world's best vehicles, allowing us to maximize sales under any market conditions;

- Sell our vehicles globally by targeting developed markets, which are projected to have increases in vehicle demand as the global economy recovers, and further strengthening our position in high growth emerging markets;

- Improve revenue realization and maintain a competitive cost structure to allow us to remain profitable at lower industry volumes and across the lifecycle of our product portfolio; and

- Maintain a strong balance sheet by reducing financial leverage given the high operating leverage of our business model.

Our management team is focused on hiring new and promoting current talented employees in order to execute on our strategy as follows:

***Deliver quality products.*** We intend to maintain a broad portfolio of vehicles so that we are positioned to meet global consumer preferences. We plan to do this in several ways, including:

- *Concentrate our design, engineering and marketing resources on fewer brands and architectures.* We plan to increase the volume of vehicles produced from common global architectures to more than 50% in 2014 from less than 17% today. We

68

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

expect that this initiative will result in greater investment per architecture and brand and will increase our product development and manufacturing flexibility, allowing us to maintain a steady schedule of important new product launches in the future. We believe our four−brand strategy in the U.S. will continue to enable higher marketing expenditures per brand.

- *Develop products across vehicle segments in our global markets.* We plan to develop vehicles in each of the key segments of the global markets in which we compete. For example, in September 2010 we plan to introduce the Chevrolet Cruze in the U.S. small car segment, an important and growing segment where we have historically been under−represented.

- *Continued investment in a portfolio of technologies.* We will continue to invest in technologies that support energy diversity and energy efficiency as well as in safety, telematics and infotainment technology. We are committed to advanced propulsion technologies and intend to offer a portfolio of fuel efficient alternatives that use energy sources such as petroleum, bio−fuels, hydrogen and electricity, including the new Chevrolet Volt. We are committed to increasing the fuel efficiency of our vehicles with internal combustion engines through features such as cylinder deactivation, direct injection, variable valve timing, turbo−charging with engine downsizing and six speed transmissions. For example, we expect the Chevrolet Cruze Eco to be capable of achieving an estimated 40 miles per gallon on the highway with a traditional internal combustion engine. Additionally, we are expanding our telematics and infotainment offerings and, as a result of our OnStar service and our partnerships with companies such as Google, are in a position to deliver safety, security, navigation and connectivity systems and features.

***Sell our vehicles globally.*** We will continue to compete in the largest and fastest growing markets globally.

- *Broaden GMNA product portfolio.* We plan to launch 19 new vehicles in GMNA across our four brands between 2010 and 2012, primarily in the growing car and crossover segments, where, in some cases, we are under−represented, and an additional 27 new vehicles between 2013 and 2014. These near−term launches include the new Chevrolet Volt, Cruze, Spark, Aveo and Malibu and Buick entries in the compact and mid−size segments. We believe that we have achieved a more balanced portfolio in the U.S. market, where we and Old GM maintained a sales volume mix of 42% from cars, 37% from trucks and 21% from crossovers in 2009 compared to 51% from trucks in 2006.

- *Increase sales in GMIO, particularly China and Brazil.* We plan to continue to execute our growth strategies in countries where we already hold strong positions, such as China and Brazil, and to improve share in other important markets, including South Korea, South Africa, Russia, India and the ASEAN region. We aim to launch 77 new vehicles throughout GMIO through 2012. We plan to enhance and strengthen our GMIO product portfolio through three strategies: leveraging our global architectures, pursuing local and regional solutions to meet specific market requirements and expanding our joint venture partner collaboration opportunities.

- *Refresh GME's vehicle portfolio.* To improve our product quality and product perception in Europe, by the start of 2012, we plan to have 80% of our Opel/Vauxhall carlines volume refreshed such that the model stylings are less than three years old. We have three product launches scheduled in 2010 and another four product launches scheduled in 2011. As part of our planned rejuvenation of Chevrolet's portfolio, which increasingly supplements our Opel/Vauxhall brands throughout Europe, we are moving the entire Chevrolet lineup to the new GM global architectures.

- *Ensure competitive financing is available to our dealers and customers.* We currently maintain multiple financing programs and arrangements with third parties for our wholesale and retail customers to utilize when purchasing or leasing our vehicles. Through our long−standing arrangements with Ally Financial Inc., formerly GMAC, Inc. (Ally Financial), and a variety of other worldwide, regional and local lenders, we provide our customers and dealers with access to financing alternatives. We plan to further expand the range of financing options available to our customers and dealers to help grow our vehicle sales. In particular, we have agreed to acquire AmeriCredit Corp. (AmeriCredit), which we expect will, when the acquisition is completed, enable us to offer increased availability of leasing and non−prime financing for our customers throughout economic cycles. We also plan to use AmeriCredit to initiate targeted customer marketing initiatives to expand our vehicle sales.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

***Reduce breakeven levels through improved revenue realization and a competitive cost structure.*** In developed markets, we are improving our cost structure to become profitable at lower industry volumes.

- *Capitalize on cost structure improvement and maintain reduced incentive levels in GMNA.* We plan to sustain the cost reduction and operating flexibility progress we have made as a result of our North American restructuring. In addition to becoming more cost competitive, our current U.S. and Canadian hourly labor agreements provide the flexibility to utilize a lower tiered wage and benefit structure for new hires, part−time employees and temporary employees. We aim to increase our vehicle profitability by maintaining competitive incentive levels with our strengthened product portfolio and by actively managing our production levels through monitoring of our dealer inventory levels.

- *Execute on our Opel/Vauxhall restructuring plan.* We expect our Opel/Vauxhall restructuring plan to lower our vehicle manufacturing costs. The plan includes manufacturing rationalization, headcount reduction, labor cost concessions from the remaining workforce and selling, general and administrative efficiency initiatives. Specifically, we have reached an agreement to reduce our European manufacturing capacity by 20% through, among other things, the closing of our Antwerp facility in Belgium and the rationalization of our powertrain operations in our Bochum and Kaiserslautern facilities in Germany. Additionally, we have reached an agreement with the labor unions in Europe to reduce labor costs by $323 million per year. The objective of our restructuring, along with the refreshed product portfolio pipeline, is to restore the profitability of the GME business.

- *Enhance manufacturing flexibility.* We primarily produce vehicles in locations where we sell them and we have significant manufacturing capacity in medium− and low−cost countries. We intend to maximize capacity utilization across our production footprint to meet demand without requiring significant additional capital investment. For example, we were able to leverage the benefit of a global architecture and start initial production for the U.S. of the Buick Regal 11 months ahead of schedule by temporarily shifting production from North America to Rüsselsheim, Germany.

***Maintain a strong balance sheet.*** Given our business's high operating leverage and the cyclical nature of our industry, we intend to minimize our financial leverage. We plan to use excess cash to repay debt and to make discretionary contributions to our U.S. pension plan. Based on this planned reduction in financial leverage and the anticipated benefits resulting from our operating strategy described above, we will aim to attain an investment grade credit rating over the long term.

## Old GM Bankruptcy and 363 Sale

### Background

As a result of historical unfavorable economic conditions and a rapid decline in sales in the three months ended December 31, 2008 Old GM determined that, despite the previous actions it had then taken to restructure its U.S. business, it would be unable to pay its obligations in the normal course of business in 2009 or service its debt in a timely fashion, which required the development of a new plan that depended on financial assistance from the U.S. government.

In December 2008 Old GM requested and received financial assistance from the U.S. government and entered into a loan and security agreement with the UST, which was subsequently amended (UST Loan Agreement). In early 2009 Old GM's business results and liquidity continued to deteriorate, and, as a result, Old GM obtained additional funding from the UST under the UST Loan Agreement. Old GM, through its wholly owned subsidiary General Motors of Canada Limited (GMCL), also received funding from Export Development Canada (EDC), a corporation wholly−owned by the Government of Canada, under a loan and security agreement entered into in April 2009 (EDC Loan Facility).

As a condition to obtaining the loans (UST Loan Facility) under the UST Loan Agreement, Old GM was required to submit a plan in February 2009 that included specific actions intended to demonstrate that it was a viable entity and to use its best efforts to achieve certain debt reduction, labor modification and VEBA modification targets.

On March 30, 2009 the Auto Task Force (as defined in Note 2) determined that the plan was not viable and required substantial revisions. In conjunction with the March 30, 2009 announcement, the administration announced that it would offer Old GM adequate working capital financing for a period of 60 days while it worked with Old GM to develop and implement a more accelerated and aggressive restructuring that would provide a sound long−term foundation.

70

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

Old GM made further modifications to its plan in an attempt to satisfy the Auto Task Force requirement that it undertake a substantially more accelerated and aggressive restructuring plan. The additional significant cost reduction and restructuring actions included reducing Old GM's indebtedness and VEBA obligations, in addition to other cost reduction and restructuring actions.

Our 2009 Form 10−K provides additional detail on Old GM's liquidity constraints, the terms and conditions of its various funding arrangements with U.S. and Canadian governmental entities, and its various cost reduction and restructuring activities.

#### Chapter 11 Proceedings

Old GM was not able to complete the cost reduction and restructuring actions, including the debt reductions and VEBA modifications, which resulted in extreme liquidity constraints. As a result, on June 1, 2009 Old GM and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 (Chapter 11 Proceedings) of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York (Bankruptcy Court).

In connection with the Chapter 11 Proceedings, Old GM entered into a secured superpriority debtor−in−possession credit agreement with the UST and EDC (DIP Facility) and received additional funding commitments from EDC to support Old GM's Canadian operations.

#### 363 Sale

On July 10, 2009 we completed the acquisition of substantially all of the assets and assumed certain liabilities of Old GM and certain of its direct and indirect subsidiaries (collectively, the Sellers). The 363 Sale was consummated in accordance with the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, as amended (Purchase Agreement), between us and the Sellers, and pursuant to the Bankruptcy Court's sale order dated July 5, 2009.

#### Accounting for the Effects of the Chapter 11 Proceedings and the 363 Sale

##### Chapter 11 Proceedings

Accounting Standards Codification (ASC) 852, "Reorganizations," (ASC 852) is applicable to entities operating under Chapter 11 of the Bankruptcy Code. ASC 852 generally does not affect the application of U.S. GAAP that we and Old GM followed to prepare the consolidated financial statements, but it does require specific disclosures for transactions and events that were directly related to the Chapter 11 Proceedings and transactions and events that resulted from ongoing operations.

Old GM prepared its consolidated financial statements in accordance with the guidance in ASC 852 in the period June 1, 2009 through June 30, 2009. Revenues, expenses, realized gains and losses, and provisions for losses directly related to the Chapter 11 Proceedings were recorded in Reorganization expenses, net. Reorganization expenses, net do not constitute an element of operating loss due to their nature and due to the requirement of ASC 852 that they be reported separately. Old GM's balance sheet prior to the 363 Sale distinguished prepetition liabilities subject to compromise from prepetition liabilities not subject to compromise and from postpetition liabilities.

##### Application of Fresh−Start Reporting

The Bankruptcy Court did not determine a reorganization value in connection with the 363 Sale. Reorganization value is defined as the value of our assets without liabilities. In order to apply fresh−start reporting, ASC 852 requires that total postpetition liabilities and allowed claims be in excess of reorganization value and prepetition stockholders receive less than 50.0% of our common stock. Based on our estimated reorganization value, we determined that on July 10, 2009 both the criteria of ASC 852 were met and, as a result, we applied fresh−start reporting. In applying fresh−start reporting at July 10, 2009, which generally follows the provisions of ASC 805, "Business Combinations," (ASC 805) we recorded the assets acquired and the liabilities assumed from Old GM at fair value except for deferred income taxes and certain liabilities associated with employee benefits. Our consolidated balance sheet at July 10, 2009,

71

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

which includes the adjustments to Old GM's consolidated balance sheet as a result of the 363 Sale and the application of fresh−start reporting, and related disclosures are discussed in Note 2 to our consolidated financial statements in our 2009 Form 10−K. These adjustments are final and no determinations of fair value are considered provisional.

**Specific Management Initiatives**

The execution of certain management initiatives is critical in achieving our goal of sustained future profitability. The following provides a summary of these management initiatives and significant results and events.

### *Streamline U.S. Operations*

#### *Increased Production Volume*

We continue to consolidate our U.S. manufacturing operations while maintaining the flexibility to meet increasing 2010 production levels. At December 31, 2009 we had reduced the number of U.S. manufacturing plants to 41 from 47 in 2008, excluding Nexteer and four domestic facilities recently acquired from Delphi.

The moderate improvement in the U.S. economy, resulting increase in U.S. industry vehicle sales and increase in demand for our products has resulted in increased production volumes for GMNA. In the three and six months ended June 30, 2010 GMNA produced 731,000 vehicles and 1.4 million vehicles. This represents an increase of 85.1% and 82.4% compared to 395,000 vehicles and 767,000 vehicles in the three and six months ended June 30, 2009. Production levels increased 63,000 (or 9.4%) in the three months ended June 30, 2010 as compared to the three months ended March 31, 2010.

#### *Improve Vehicle Sales*

In the six months ended June 30, 2010 U.S. industry vehicle sales were 5.7 million vehicles, of which our market share was 18.9%. This represents an increase in U.S. industry vehicle sales from 4.9 million vehicles (or 16.6%), of which Old GM's market share was 19.5% in the six months ended June 30, 2009. This increase is consistent with the gradual U.S. vehicle sales recovery from the negative economic effects of the U.S. recession first experienced in the second half of 2008.

GMNA dealers in the U.S. sold 603,000 vehicles and 1.1 million vehicles in the three and six months ended June 30, 2010. This represents an increase from Old GM's U.S. vehicle sales of 541,000 vehicles and 1.0 million vehicles (or 11.4% and 13.2%) in the three and six months ended June 30, 2009. This increase reflects our brand rationalization strategy to focus our product engineering and design and marketing on four brands: Buick, Cadillac, Chevrolet and GMC. This strategy has resulted in increased consumer demand for certain products such as the Chevrolet Equinox, GMC Terrain, Buick LaCrosse and Cadillac SRX. These four brands accounted for 600,000 vehicles and 1.1 million vehicles (or 99.5% and 99.0%) of our U.S. vehicle sales in the three and six months ended June 30, 2010. In addition, the moderate improvement in the U.S. economy has contributed to a slow but steady improvement in U.S. industry vehicle sales and increased consumer confidence.

The continued increase in U.S. industry vehicle sales and the vehicle sales of our four brands is critical for us to achieve our worldwide profitability.

#### *U.S. Dealer Reduction*

We market vehicles worldwide through a network of independent retail dealers and distributors. As part of achieving and sustaining long−term viability and the viability of our dealer network, we determined that a reduction in the number of U.S. dealerships was necessary. Certain dealers that had signed wind−down agreements with us elected to file for reinstatement through a binding arbitration process. In response to the arbitration filings we offered certain dealers reinstatement contingent upon compliance with our core business criteria for operation of a dealership. At June 30, 2010 the arbitration process had been fundamentally resolved. At June 30, 2010 there were approximately 5,200 vehicle dealers in the U.S. compared to approximately 5,600 at December 31, 2009.

72

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Repayment of Debt*

Proceeds from the DIP Facility were necessary in order to provide sufficient capital for Old GM to operate pending the closing of the 363 Sale. On July 10, 2009 we entered into the UST Credit Agreement and assumed debt of $7.1 billion (UST Loans), which Old GM incurred under the DIP Facility. On July 10, 2009 we also entered into the Canadian Loan Agreement and assumed a CAD $1.5 billion (equivalent to $1.3 billion when entered into) term loan (Canadian Loan). One of our key priorities was to repay the outstanding balances from these loans prior to maturity.

In April 2010 we used funds from our escrow account to repay in full the outstanding amount of the UST Loans of $4.7 billion. In addition, GMCL repaid in full the outstanding amount of the Canadian Loan of $1.1 billion. Both loans were repaid prior to maturity.

Following the repayment of the UST Loans and the Canadian Loan, the remaining funds in an amount of $6.6 billion that were held in escrow became unrestricted. The availability of those funds is no longer subject to the conditions set forth in the UST Credit Agreement.

*Brand Rationalization*

We completed the sale of Saab Automobile AB (Saab) in February 2010 and the sale of Saab Automobile GB (Saab GB) in May 2010 and have ceased production of our Pontiac, Saturn and HUMMER brands and continue the wind−down process of the related dealers.

*Opel/Vauxhall Restructuring Activities*

In February 2010 we presented our plan for the long−term viability of our Opel/Vauxhall operations to the German federal government. Our plan included funding requirement estimates of Euro 3.7 billion (equivalent to $5.1 billion) of which we planned to fund Euro 1.9 billion (equivalent to $2.6 billion) with the remaining funding from European governments.

In June 2010 the German federal government notified us of its decision not to provide loan guarantees to Opel/Vauxhall. As a result we have decided to fund the requirements of Opel/Vauxhall internally. Opel/Vauxhall has subsequently withdrawn all applications for government loan guarantees from European governments.

We plan to continue to invest in capital, engineering and innovative fuel efficient powertrain technologies including an extended−range electric vehicle and battery electric vehicles. Our plan also includes aggressive capacity reductions including headcount reductions and the closing of our Antwerp, Belgium facility.

The following provides an update of our restructuring activities related to our Opel/Vauxhall operations.

In the three months ended June 30, 2010 GME recorded charges of $25 million related to a voluntary separation program in the United Kingdom. In the six months ended June 30, 2010 GME recorded charges of $64 million related to separation/layoff plans and an early retirement plan in Spain which will affect 1,200 employees.

In the three and six months ended June 30, 2010 GME recorded charges of $169 million and $353 million related to a separation plan associated with the closure of the Antwerp, Belgium facility. Negotiations for the final termination benefits were concluded in April 2010, and the total separation costs are estimated to be Euro 0.4 billion (equivalent to $0.5 billion). There were 2,600 employees affected, of which 1,300 separated in June 2010. In addition, GME and employee representatives entered into a Memorandum of Understanding whereby both parties will cooperate in a working group, led by the Flemish government, in order to find an outside investor to acquire the facility. The search will conclude at the end of September 2010. If an investor is found, the investor will determine the number of employees that it will hire. If an investor is not found, termination benefits will be offered to the remaining employees and the facility will close by December 31, 2010.

73

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

### Pursue Section 136 Loans

Section 136 of the Energy Independence and Security Act of 2007 establishes an incentive program consisting of both grants and direct loans to support the development of advanced technology vehicles and associated components in the U.S. The U.S. Congress provided the U.S. Department of Energy (DOE) with $25.0 billion in funding to make direct loans to eligible applicants for the costs of re−equipping, expanding, and establishing manufacturing facilities in the United States to produce advanced technology vehicles and components for these vehicles. In October 2009 we submitted a consolidated application with respect to an aggregate amount of $14.4 billion of Section 136 Loans. Ongoing product portfolio updates and project modifications requested from the DOE have the potential to reduce the maximum loan amount. To date, the DOE has announced that it would provide approximately $8.4 billion in Section 136 Loans to Ford Motor Company, Nissan Motor Company, Tesla Motors, Inc., Fisker Automotive, Inc., and Tenneco Inc. There can be no assurance that we will qualify for any remaining loans or receive any such loans even if we qualify.

### Development of Multiple Financing Sources and Acquisition of AmeriCredit Corp.

A significant percentage of our customers and dealers require financing to purchase our vehicles. Historically, Ally Financial has provided most of the financing for our dealers and a significant amount of financing for our customers in the U.S., Canada and various other markets around the world. Additionally, we maintain other financing relationships, such as with U.S. Bank for U.S. leasing, AmeriCredit for non−prime lending and a variety of local and regional financing sources around the world.

In July 2010 we entered into a definitive agreement to acquire AmeriCredit, an independent automobile finance company for cash of approximately $3.5 billion. AmeriCredit, which we expect will, when the acquisition is completed, will allow us to complement our existing relationship with Ally Financial in order to provide a more complete range of financing options to our customers, including additional capabilities in leasing and non−prime financing options. We also plan to use AmeriCredit for targeted customer marketing initiatives to expand our vehicle sales. The transaction is expected to close during the fourth quarter of 2010, pending certain closing conditions, including the approval of AmeriCredit shareholders.

### Focus on Chinese Market

Our Chinese operations, which we established beginning in 1997, are primarily composed of three joint ventures: SGM, SGMW and FAW−GM. We view the Chinese market, the fastest growing global market by volume of vehicles sold, as important to our global growth strategy and are employing a multi−brand strategy, led by our Buick division, which we believe is a strong brand in China. In the coming years, we plan to increasingly leverage our global architectures to increase the number of nameplates under the Chevrolet brand in China.

SGM, of which we own 49% and the Shanghai Automotive Industry Corporation (SAIC) owns 51%, produces passenger cars utilizing GM global architectures under the Buick, Chevrolet and Cadillac brands. SGMW, of which we own 34%, SAIC owns 50% and Liuzhou Wuling Motors Co., Ltd. (Wuling) owns 16%, produces mini−commercial vehicles and passenger cars utilizing local architectures under the Wuling and Chevrolet brands. FAW−GM, of which we own 50% and China FAW Group Corporation (FAW) owns 50%, produces light commercial vehicles under the Jiefang brand and medium vans under the FAW brand. Our joint venture agreements allow for significant rights as a member as well as the contractual right to report SGMW and FAW−GM production volume in China. SAIC, one of our joint venture partners, currently produces vehicles under its own name for sale in the Chinese market. At present, vehicles that SAIC produces primarily serve markets that are different from markets served by our joint ventures.

During the three and six months ended June 30, 2010, SGM, SGMW and FAW−GM sold 586,000 and 1.2 million vehicles in China. In the three and six months ended June 30, 2010, SGM and SGMW, the largest of these three joint ventures, combined to provide equity income, net of tax, to us of $378 million and $734 million.

### GM South America

In June 2010 we announced that, beginning in the fourth quarter of 2010, we are creating a new regional organization in South America. The new organization, GM South America, will be headquartered in Sao Paulo, Brazil, and its president will report to our chairman and chief executive officer. GM South America will include existing sales and manufacturing operations in Brazil,

74

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

Argentina, Colombia, Ecuador and Venezuela, as well as sales activities in those countries and Bolivia, Chile, Paraguay, Peru and Uruguay. As part of our global product operations organization, GM South America will have product design and engineering capabilities, which will allow it to continue creating local cars and trucks that complement our global product architectures. GM South America will initially have approximately 29,000 employees.

### *Sale of Nexteer*

On July 7, 2010 we entered into a definitive agreement to sell Nexteer to an unaffiliated party. The transaction is subject to customary closing conditions, regulatory approvals and review by government agencies in the U.S. and China. At June 30, 2010 Nexteer had total assets of $906 million, total liabilities of $458 million, and recorded revenue of $1.0 billion in the six months ended June 30, 2010, of which $543 million were sales to us and our affiliates. Nexteer did not qualify for held for sale classification at June 30, 2010. Once consummated, we do not expect the sale of Nexteer to have a material effect on the unaudited condensed consolidated financial statements.

## Benefit Plan Changes

### *Patient Protection and Affordable Care Act*

The Patient Protection and Affordable Care Act was signed into law in March 2010 and contains provisions that require all future reimbursement receipts under the Medicare Part D retiree drug subsidy program to be included in taxable income. This taxable income inclusion will not significantly affect us because effective January 1, 2010 we no longer provide prescription drug coverage to post−age 65 Medicare−eligible participants and we have a full valuation allowance against our net deferred tax assets in the U.S. We have assessed the other provisions of this new law, based on information known at this time, and we believe that the new law will not have a significant effect on our consolidated financial statements.

## Venezuelan Exchange Regulations

Our Venezuelan subsidiaries changed their functional currency from Bolivar Fuerte (BsF), the local currency, to the U.S. dollar, our reporting currency, on January 1, 2010 because of the hyperinflationary status of the Venezuelan economy. Further, pursuant to the official devaluation of the Venezuelan currency and establishment of the dual fixed exchange rates in January 2010, we remeasured the BsF denominated monetary assets and liabilities held by our Venezuelan subsidiaries at the nonessential rate of 4.30 BsF to $1.00. The remeasurement resulted in a charge of $25 million recorded in Cost of sales in the three months ended March 31, 2010. During the six months ended June 30, 2010 all BsF denominated transactions have been remeasured at the nonessential rate of 4.30 BsF to $1.00.

In June 2010, the Venezuelan government introduced additional foreign currency exchange control regulations, which imposed restrictions on the use of the parallel foreign currency exchange market, thereby making it more difficult to convert BsF to U.S. Dollars. We, like most Venezuelan importers, periodically accessed the parallel exchange market, which historically enabled entities to obtain foreign currency for transactions that could not be processed by the Commission for the Administration of Currency Exchange (CADIVI). The restrictions on the foreign currency exchange market could affect our Venezuelan subsidiaries' ability to pay its non−BsF denominated obligations that do not qualify to be processed by CADIVI at the official exchange rates as well as our ability to benefit from those operations.

## Effect of Fresh−Start Reporting

The application of fresh−start reporting significantly affected certain assets, liabilities, and expenses. As a result, certain financial information at and in the three and six months ended June 30, 2010 is not comparable to Old GM's financial information. Total net sales and revenue was not significantly affected by fresh−start reporting and facilitates a comparison to combined vehicle sales data. Refer to Note 2 to the unaudited condensed consolidated financial statements for additional information on fresh−start reporting.

Because our and Old GM's financial information is not comparable, we are providing additional financial metrics for the periods presented in addition to disclosures concerning significant transactions and trends at June 30, 2010 and in the periods presented.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

Total net sales and revenue is primarily comprised of revenue generated from the sales of vehicles, in addition to revenue from OnStar, our customer subscription service, vehicle sales accounted for as operating leases and sales of parts and accessories.

Cost of sales is primarily comprised of material, labor, manufacturing overhead, freight, foreign currency transaction and translation gains and losses, product engineering, design and development expenses, depreciation and amortization, policy and warranty costs, postemployment benefit gains and losses, and separation and impairment charges. Prior to our application of fresh–start reporting on July 10, 2009, Cost of sales also included gains and losses on derivative instruments. Effective July 10, 2009 gains and losses related to all nondesignated derivatives are recorded in Interest income and other non–operating income, net.

Selling, general and administrative expense is primarily comprised of costs related to the advertising, selling and promotion of products, support services, including central office expenses, labor and benefit expenses for employees not considered part of the manufacturing process, consulting costs, rental expense for offices, bad debt expense and state and local taxes.

**Consolidated Results of Operations**
**(Dollars in millions)**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Net sales and revenue | $    33,174 | $    64,650 | $    23,047 | $    45,478 |
| **Costs and expenses** | | | | |
| Cost of sales | 28,759 | 56,350 | 29,384 | 53,995 |
| Selling, general and administrative expense | 2,623 | 5,307 | 2,936 | 5,433 |
| Other expenses, net | 39 | 85 | 169 | 1,154 |
| Total costs and expenses | 31,421 | 61,742 | 32,489 | 60,582 |
| Operating income (loss) | 1,753 | 2,908 | (9,442) | (15,104) |
| Equity in income of and disposition of interest in Ally Financial | — | — | 1,880 | 1,380 |
| Interest expense | (250) | (587) | (3,375) | (4,605) |
| Interest income and other non–operating income, net | 59 | 544 | 408 | 833 |
| Loss on extinguishment of debt | — | (1) | (1,994) | (1,088) |
| Reorganization expenses, net | — | — | (1,157) | (1,157) |
| Income (loss) before income taxes and equity income | 1,562 | 2,864 | (13,680) | (19,741) |
| Income tax expense (benefit) | 361 | 870 | (445) | (559) |
| Equity income (loss), net of tax | 411 | 814 | (2) | 46 |
| Net income (loss) | 1,612 | 2,808 | (13,237) | (19,136) |
| Less: Net income (loss) attributable to noncontrolling interests | 76 | 204 | (332) | (256) |
| Net income (loss) attributable to stockholders | 1,536 | 2,604 | (12,905) | (18,880) |
| Less: Cumulative dividends on preferred stock | 202 | 405 | — | — |
| Net income (loss) attributable to common stockholders | $     1,334 | $     2,199 | $     (12,905) | $     (18,880) |

76

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Vehicle Sales and Production Volume*

The following tables summarize total production volume and industry sales of new motor vehicles and competitive position (in thousands):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Production Volume (a)(b)(c) | | | | |
| GMNA | 731 | 1,399 | 395 | 767 |
| GMIO | 1,195 | 2,307 | 828 | 1,523 |
| GME | 331 | 636 | 315 | 579 |
| Worldwide | 2,257 | 4,342 | 1,538 | 2,869 |

(a)  Production volume represents the number of vehicles manufactured by our and Old GM's assembly facilities and also includes vehicles produced by certain joint ventures.

(b)  Includes SGM, SGMW, FAW−GM joint venture production in China and SAIC GM Investment Ltd. (HKJV) joint venture production in India.

(c)  The joint venture agreements with SGMW (34%) and FAW−GM (50%) allows for significant rights as a member as well as the contractual right to report SGMW and FAW−GM production volume in China.

| | Successor | | | | | | Predecessor | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | | Six Months Ended June 30, 2010 | | | Three Months Ended June 30, 2009 | | | Six Months Ended June 30, 2009 | | |
| | Industry | GM | GM as a % of Industry | Industry | GM | GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry |
| Vehicle Sales (a)(b)(c)(d) | | | | | | | | | | | | |
| GMNA (d) | 3,825 | 716 | 18.7% | 6,998 | 1,280 | 18.3% | 3,303 | 657 | 19.9% | 6,091 | 1,157 | 19.0% |
| GMIO (e)(f)(g) | 9,647 | 995 | 10.3% | 19,742 | 2,026 | 10.3% | 7,786 | 807 | 10.4% | 14,934 | 1,517 | 10.2% |
| GME (e) | 5,013 | 442 | 8.8% | 9,782 | 846 | 8.6% | 5,131 | 474 | 9.2% | 9,647 | 881 | 9.1% |
| Worldwide (e) | 18,485 | 2,153 | 11.6% | 36,522 | 4,152 | 11.4% | 16,220 | 1,938 | 11.9% | 30,672 | 3,555 | 11.6% |

(a)  Includes HUMMER, Saturn and Pontiac vehicle sales data.

(b)  Includes Saab vehicle sales data through February 2010.

(c)  Vehicle sales data may include rounding differences.

(d)  Vehicle sales represent sales to the ultimate customer.

(e)  Vehicle sales primarily represent estimated sales to the ultimate customer.

(f)  Includes SGM, SGMW and FAW−GM joint venture sales in China and HKJV joint venture sales in India.

(g)  The joint venture agreements with SGMW (34%) and FAW−GM (50%) allows for significant rights as a member as well as the contractual right to report SGMW and FAW−GM vehicle sales in China as a part of global market share.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Reconciliation of Segment Results*

Management believes EBIT provides meaningful supplemental information regarding our operating results because it excludes amounts that management does not consider part of operating results when assessing and measuring the operational and financial performance of the organization. Management believes these measures allow it to readily view operating trends, perform analytical comparisons, benchmark performance among geographic regions and assess whether our plan to return to profitability is on target. Accordingly, we believe EBIT is useful in allowing for greater transparency of our core operations and it is therefore used by management in its financial and operational decision−making.

While management believes that EBIT provides useful information, it is not an operating measure under U.S. GAAP and there are limitations associated with its use. Our calculation of EBIT may not be completely comparable to similarly titled measures of other companies due to potential differences between companies in the method of calculation. As a result, the use of EBIT has limitations and should not be considered in isolation from, or as a substitute for, other measures such as Net income (loss) or Net income (loss) attributable to common stockholders. Due to these limitations, EBIT is used as a supplement to U.S. GAAP measures.

The following table summarizes the reconciliation of EBIT to Net income (loss) attributable to stockholders for each of our operating segments (dollars in millions):

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Operating segments** | | | | |
| GMNA (a) | $ 1,592 | $ 2,810 | $ (7,026) | $ (10,452) |
| GMIO (a) | 672 | 1,838 | (660) | (699) |
| GME (a) | (160) | (637) | (757) | (2,711) |
| Total operating segments | 2,104 | 4,011 | (8,443) | (13,862) |
| Corporate and eliminations | (71) | (154) | (1,619) | (1,145) |
| **Earnings (loss) before interest and taxes** | 2,033 | 3,857 | (10,062) | (15,007) |
| Interest income | 114 | 204 | 87 | 173 |
| Interest expense | 250 | 587 | 3,375 | 4,605 |
| Income tax expense (benefit) | 361 | 870 | (445) | (559) |
| **Net income (loss) attributable to stockholders** | $ 1,536 | $ 2,604 | $ (12,905) | $ (18,880) |

(a)    Interest and income taxes are recorded centrally in Corporate; therefore, there are no reconciling items for our operating segments between Earnings (loss) attributable to stockholders before interest and taxes and Net income (loss) attributable to stockholders.

*Three and Six Months Ended June 30, 2010 and 2009*
*(Dollars in millions)*

*Total Net Sales and Revenue*

| | Successor | | Predecessor | | Three Months Ended 2010 vs. 2009 Change | | Six Months Ended 2010 vs. 2009 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 | Amount | % | Amount | % |
| Total net sales and revenue | $ 33,174 | $ 64,650 | $ 23,047 | $ 45,478 | $10,127 | 43.9% | $19,172 | 42.2% |

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

In the three months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $10.1 billion (or 43.9%), primarily due to: (1) higher wholesale volumes of $6.9 billion, which primarily resulted from increased volumes in GMNA of $6.6 billion; (2) favorable mix of $1.7 billion, which primarily resulted from GMNA of $1.5 billion; (3) favorable price effects of $0.8 billion; (4) derivative losses of $0.8 billion, which primarily resulted from derivative losses of $0.7 billion that GMIO recorded in the three months ended June 30, 2009; and (5) net favorable foreign currency translation and transaction gains of $0.2 billion.

In the six months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $19.2 billion (or 42.2%), primarily due to: (1) higher wholesale volumes of $13.3 billion, which primarily resulted from increased volumes in GMNA of $12.1 billion; (2) favorable pricing of $2.8 billion partially offset by less favorable adjustments to the accrual for U.S. residual support programs for leased vehicles in GMNA of $0.6 billion; (3) favorable mix of $1.7 billion; (4) Net foreign currency translation and transaction gains of $1.4 billion; and (5) derivative losses of $1.0 billion that GMIO recorded in the six months ended June 30, 2009.

*Cost of Sales*

| | Successor | | | | Predecessor | | | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| Cost of sales | $ 28,759 | 86.7% | $ 56,350 | 87.2% | $ 29,384 | 127.5% | $ 53,995 | 118.7% |
| Gross margin | $ 4,415 | 13.3% | $ 8,300 | 12.8% | $ (6,337) | (27.5)% | $ (8,517) | (18.7)% |

*GM*

In the three months ended June 30, 2010 Cost of sales included: (1) restructuring charges of $0.2 billion; (2) charges of $0.2 billion for a recall campaign on windshield fluid heaters; partially offset by (3) foreign currency translation and transaction gains of $0.3 billion.

In the six months ended June 30, 2010 Cost of sales included: (1) net restructuring charges of $0.4 billion; (2) charges of $0.2 billion for a recall campaign on windshield fluid heaters; partially offset by (3) net foreign currency translation and transaction gains of $0.2 billion.

*Old GM*

In the three months ended June 30, 2009 Cost of sales included: (1) a curtailment loss of $1.4 billion upon the interim remeasurement of the U.S. Hourly and U.S. Salaried Defined Benefit Pension Plans and a charge of $1.1 billion related to the Supplemental Unemployment Benefit (SUB) and Transitional Support Program (TSP), partially offset by a favorable adjustment of $0.4 billion primarily related to the suspension of the JOBS Program (as defined in Note 20 to the condensed consolidated financial statements); (2) incremental depreciation charges of $1.8 billion; (3) foreign currency translation losses of $1.0 billion; (4) separation program charges and Canadian restructuring activities of $0.7 billion; and (5) impairment charges of $0.3 billion.

In the six months ended June 30, 2009 Cost of sales included: (1) incremental depreciation charges of $2.3 billion; (2) a curtailment loss of $1.4 billion upon the interim remeasurement of the U.S. Hourly and U.S. Salaried Defined Benefit Pension Plans and a charge of $1.1 billion related to the SUB and TSP, partially offset by a favorable adjustment of $0.7 billion primarily related to the suspension of the JOBS Program; (3) separation program charges and Canadian restructuring activities of $1.1 billion; (4) foreign currency translation losses of $1.0 billion; (5) impairment charges of $0.7 billion; and (6) charges of $0.3 billion related to obligations associated with various Delphi agreements.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Selling, General and Administrative Expense*

| | Successor | | | | Predecessor | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| Selling, general and administrative expense | $    2,623 | 7.9% | $    5,307 | 8.2% | $    2,936 | 12.7% | $    5,433 | 11.9% |

*GM*

In the three months ended June 30, 2010 Selling, general and administrative expense included advertising expenses of $0.9 billion primarily in GMNA of $0.6 billion for promotional campaigns and GME of $0.2 billion for promotional campaigns to support the launch of new vehicles.

In the six months ended June 30, 2010 Selling, general and administrative expense included advertising expenses of $1.9 billion primarily in GMNA of $1.3 billion and GME of $0.3 billion for promotional campaigns to support the launch of new vehicles.

*Old GM*

In the three and six months ended June 30, 2009 Selling, general and administrative expense included curtailment loss of $0.3 billion upon the interim remeasurement of the U.S. Salary Defined Benefit Pension Plan as a result of global salaried workforce reductions and reserves related to the wind−down of dealerships of $0.1 billion.

*Other Expenses, net*

| | Successor | | | | Predecessor | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| Other expenses, net | $    39 | 0.1% | $    85 | 0.1% | $    169 | 0.7% | $    1,154 | 2.5% |

*GM*

In the three and six months ended June 30, 2010 Other expenses, net included ongoing expenses related to our portfolio of automotive retail leases.

*Old GM*

In the three months ended June 30, 2009 Other expenses, net included charges of $0.1 billion for Old GM's obligations related to Delphi and charges related to adjustments to contingencies associated with the deconsolidation of Saab of $0.1 billion.

In the six months ended June 30, 2009 Other expenses, net included: (1) charges of $0.8 billion related to the deconsolidation of Saab. Saab filed for reorganization protection under the laws of Sweden in February 2009; (2) charges of $0.1 billion for Old GM's obligations related to Delphi; and (3) expenses of $0.1 billion primarily related to ongoing expenses related to Old GM's portfolio of automotive retail leases, including depreciation and realized losses.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Interest Expense*

| | Successor | | | | Predecessor | | | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| Interest expense | $    (250) | (0.8)% | $    (587) | (0.9)% | $   (3,375) | (14.6)% | $   (4,605) | (10.1)% |

*GM*

In the three months ended June 30, 2010 Interest expense included interest expense on GMIO debt of $0.1 billion and VEBA Note interest expense and premium amortization of $0.1 billion.

In the six months ended June 30, 2010 Interest expense included interest expense on GMIO debt of $0.2 billion, VEBA Note interest expense and premium amortization of $0.1 billion and interest expense on the UST Loan of $0.1 billion.

*Old GM*

In the three months ended June 30, 2009 Interest expense included amortization of discounts related to the UST Loan Facility of $2.6 billion and interest expense on the UST Loan Facility of $0.3 billion.

In the six months ended June 30, 2009 Interest expense included: (1) amortization of discounts related to the UST Loan Facility of $2.9 billion; (2) interest expense on unsecured debt of $0.9 billion; and (3) interest expense on the UST Loan Facility of $0.4 billion.

*Interest Income and Other Non−Operating Income, net*

| | Successor | | | | Predecessor | | | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| Interest income and other non−operating income, net | $    59 | 0.2% | $    544 | 0.8% | $    408 | 1.8% | $    833 | 1.8% |

*GM*

In the three months ended June 30, 2010 Interest income and other non−operating income, net included: (1) interest income of $0.1 billion on cash deposits and marketable securities and (2) rental and royalty income of $0.1 billion; offset by (3) foreign currency and other derivative losses of $0.2 billion.

In the six months ended June 30, 2010 Interest income and other non−operating income, net included interest income of $0.2 billion on cash deposits and marketable securities and gain on the sale of Saab of $0.1 billion.

*Old GM*

In the three months ended June 30, 2009 Interest income and other non−operating income, net included interest income of $0.1 billion and foreign currency and other derivative gains of $0.1 billion.

In the six months ended June 30, 2009 Interest income and other non−operating income, net included foreign currency and other derivative gains of $0.3 billion, interest income of $0.2 billion and a gain of $0.1 billion on a warrant that Old GM issued to the UST in connection with the UST Loan Agreement.

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Loss on Extinguishment of Debt*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Loss on extinguishment of debt | $ — | $ (1) | $(1,994) | $ (1,088) |

*Old GM*

In the three months ended June 30, 2009 Loss on the extinguishment of debt included a loss of $2.0 billion related to the UST exercising its option to convert outstanding amounts of the UST Ally Financial Loan (as defined in Note 7 to the condensed consolidated financial statements) into shares of Ally Financial's Class B Common Membership Interests.

In the six months ended June 30, 2009 Loss on the extinguishment of debt included a loss of $2.0 billion related to the UST exercising its option to convert outstanding amounts of the UST Ally Financial Loan into shares of Ally Financial's Class B Common Membership Interests. This loss was partially offset by a gain on extinguishment of debt of $0.9 billion related to an amendment to Old GM's U.S. term loan.

*Reorganization Expenses, net*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Reorganization expenses, net | $ — | $ — | $(1,157) | $ (1,157) |

*Old GM*

In the three and six months ended June 30, 2009 Reorganization expenses, net included: (1) Old GM's loss on the extinguishment of debt resulting from repayment of its secured revolving credit facility, U.S. term loan, and secured credit facility due to the fair value of the U.S. term loan exceeding its carrying amount by $1.0 billion; (2) a loss on contract rejections, settlements of claims and other lease terminations of $0.4 billion; partially offset by (3) gains related to release of Accumulated other comprehensive income (loss) associated with derivatives of $0.2 billion.

*Income Tax Expense (Benefit)*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Income tax expense (benefit) | $ 361 | $ 870 | $ (445) | $ (559) |

*GM*

In the three months ended June 30, 2010 Income tax expense primarily related to income tax provisions for profitable entities.

In the six months ended June 30, 2010 Income tax expense primarily related to income tax provisions for profitable entities and a taxable foreign exchange gain in Venezuela.

The effective tax rate fluctuated in the six months ended June 30, 2010 primarily as a result of changes in the mix of earnings in valuation allowance and non−valuation allowance jurisdictions.

*Old GM*

In the three and six months ended June 30, 2009 Income tax benefit primarily related to a resolution of a U.S. and Canada transfer pricing matter and other discrete items offset by income tax provisions for profitable entities.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Equity Income, net of tax*

| | Successor | | | | Predecessor | | | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2010 | Percentage of Total net sales and revenue | Three Months Ended June 30, 2009 | Percentage of Total net sales and revenue | Six Months Ended June 30, 2009 | Percentage of Total net sales and revenue |
| SGM and SGMW | $ 378 | 1.1% | $ 734 | 1.1% | $ 183 | 0.8% | $ 289 | 0.6% |
| Other equity interests | 33 | 0.1% | 80 | 0.1% | (185) | (0.8)% | (243) | (0.5)% |
| Total equity income, net of tax | $ 411 | 1.2% | $ 814 | 1.3% | $ (2) | —% | $ 46 | 0.1% |

*GM*

In the three months ended June 30, 2010 Equity income, net of tax included equity income of $0.4 billion related to our China joint ventures primarily SGM and SGMW.

In the six months ended June 30, 2010 Equity income, net of tax included equity income of $0.7 billion related to our China joint ventures primarily SGM and SGMW and $0.1 billion of equity income related to New Delphi (as defined in Note 4 to the condensed consolidated financial statements).

*Old GM*

In the three months ended June 30, 2009 Equity income, net of tax included equity income of $0.2 billion related to our China joint ventures, SGM and SGMW, offset by a loss related to our investment in New United Motor Manufacturing, Inc. (NUMMI) of $0.2 billion.

In the six months ended June 30, 2009 Equity income, net of tax included equity income of $0.3 billion related to our China joint ventures, SGM and SGMW, offset by losses related to our investments in NUMMI and CAMI Automotive, Inc. (CAMI) of $0.3 billion.

83

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Changes in Consolidated Financial Condition**
**(Dollars in millions, except share amounts)**

| | Successor | |
|---|---|---|
| | June 30, 2010 | December 31, 2009 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $  26,773 | $  22,679 |
| Marketable securities | 4,761 | 134 |
| Total cash, cash equivalents and marketable securities | 31,534 | 22,813 |
| Restricted cash and marketable securities | 1,393 | 13,917 |
| Accounts and notes receivable (net of allowance of $272 and $250) | 8,662 | 7,518 |
| Inventories | 11,533 | 10,107 |
| Assets held for sale | — | 388 |
| Equipment on operating leases, net | 3,008 | 2,727 |
| Other current assets and deferred income taxes | 1,677 | 1,777 |
| Total current assets | 57,807 | 59,247 |
| **Non−Current Assets** | | |
| Equity in net assets of nonconsolidated affiliates | 8,296 | 7,936 |
| Assets held for sale | — | 530 |
| Property, net | 18,106 | 18,687 |
| Goodwill | 30,186 | 30,672 |
| Intangible assets, net | 12,820 | 14,547 |
| Other assets | 4,684 | 4,676 |
| Total non−current assets | 74,092 | 77,048 |
| **Total Assets** | $  131,899 | $  136,295 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| **Current Liabilities** | | |
| Accounts payable (principally trade) | $  20,755 | $  18,725 |
| Short−term debt and current portion of long−term debt (including debt at GM Daewoo of $1,021 at June 30, 2010) | 5,524 | 10,221 |
| Liabilities held for sale | — | 355 |
| Accrued expenses (including derivative liabilities at GM Daewoo of $352 at June 30, 2010) | 24,068 | 23,134 |
| Total current liabilities | 50,347 | 52,435 |
| **Non−Current Liabilities** | | |
| Long−term debt (including debt at GM Daewoo of $722 at June 30, 2010) | 2,637 | 5,562 |
| Liabilities held for sale | — | 270 |
| Postretirement benefits other than pensions | 8,649 | 8,708 |
| Pensions | 25,990 | 27,086 |
| Other liabilities and deferred income taxes | 13,377 | 13,279 |
| Total non−current liabilities | 50,653 | 54,905 |
| **Total Liabilities** | 101,000 | 107,340 |
| Commitments and contingencies | | |
| Preferred stock, $0.01 par value, (1,000,000,000 shares authorized, 360,000,000 shares issued and outstanding (each with a $25.00 liquidation preference) at June 30, 2010 and December 31, 2009) | 6,998 | 6,998 |
| **Equity** | | |
| Common stock, $0.01 par value, (2,500,000,000 shares authorized, 500,000,000 shares issued and outstanding at June 30, 2010 and December 31, 2009) | 5 | 5 |
| Capital surplus (principally additional paid−in capital) | 24,052 | 24,050 |
| Accumulated deficit | (2,195) | (4,394) |
| Accumulated other comprehensive income | 1,153 | 1,588 |
| Total stockholders' equity | 23,015 | 21,249 |
| Noncontrolling interests | 886 | 708 |
| Total equity | 23,901 | 21,957 |
| **Total Liabilities and Equity** | $  131,899 | $  136,295 |

84

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Current Assets*

At June 30, 2010 Marketable securities of $4.8 billion increased by $4.6 billion reflecting investments in securities with maturities exceeding 90 days.

At June 30, 2010 Restricted cash and marketable securities of $1.4 billion decreased by $12.5 billion (or 90.0%), primarily due to: (1) our payments of $1.2 billion on the UST Loans and Canadian Loan in March 2010; and (2) our repayment of the full outstanding amount of $4.7 billion on the UST Loans in April 2010. Following the repayment of the UST Loans and our repayment of the Canadian Loan of $1.1 billion in April 2010, the remaining UST escrow funds of $6.6 billion became unrestricted.

At June 30, 2010 Accounts and notes receivable of $8.7 billion increased by $1.1 billion (or 15.2%), primarily due to higher sales in GMNA.

At June 30, 2010 Inventories of $11.5 billion increased by $1.4 billion (or 14.1%), primarily due to: (1) increased production resulting from higher demand for our products and new product launches; (2) higher finished goods inventory of $6.3 billion compared to low levels at December 31, 2009 of $5.9 billion, resulting from the year−end shut−down in some locations; primarily offset by (3) a decrease of $0.5 billion due to the effect of foreign currency translation.

At June 30, 2010 Assets held for sale were reduced to $0 from $0.4 billion at December 31, 2009 due to the sale of Saab in February 2010 and the sale of Saab GB in May 2010 to Spyker Cars NV.

At June 30, 2010 Equipment on operating leases, net of $3.0 billion increased by $0.3 billion (or 10.3%) due to: (1) an increase of $0.6 billion in GMNA, primarily related to vehicles leased to daily rental car companies (vehicles leased to U.S. daily rental car companies increased from 97,000 vehicles at December 31, 2009 to 129,000 vehicles at June 30, 2010); partially offset by (2) a decrease of $0.3 billion due to the continued liquidation of our portfolio of automotive retail leases.

*Non−Current Assets*

At June 30, 2010 Equity in net assets of nonconsolidated affiliates of $8.3 billion increased by $0.4 billion (or 4.5%) due to: (1) equity income of $0.8 billion in the six months ended June 30, 2010, primarily related to our China joint ventures; and (2) an investment of $0.2 billion in the HKJV joint venture; partially offset by (3) a decrease of $0.3 billion for dividends received; (4) a decrease of $0.2 billion related to the sale of our 50% interest in a joint venture; and (5) a decrease of $0.1 billion related to the sale of a 1% ownership interest in SGM to SAIC.

At June 30, 2010 Assets held for sale were reduced to $0 from $0.5 billion at December 31, 2009 due to the sale of certain of our India operations (India Operations) in February 2010. We classified these Assets held for sale as long−term at December 31, 2009 because we received a promissory note in exchange for the India Operations that does not convert to cash within one year.

At June 30, 2010 Property, net of $18.1 billion decreased by $0.6 billion (or 3.1%), primarily due to depreciation of $1.8 billion and foreign currency translation, partially offset by capital expenditures of $1.9 billion.

At June 30, 2010 Intangible assets, net of $12.8 billion decreased by $1.7 billion (or 11.9%), primarily due to amortization of $1.4 billion and foreign currency translation of $0.3 billion.

*Current Liabilities*

At June 30, 2010 Accounts payable of $20.8 billion increased by $2.0 billion (or 10.8%), primarily due to: (1) higher payables for materials due to increased production volumes; and (2) increased payables of $0.2 billion related to the consolidation of GM Egypt upon our adoption of amendments to ASC 810−10, "Consolidation" (ASC 810−10) in January 2010.

Table of Contents

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

At June 30, 2010 Short−term debt and current portion of long−term debt of $5.5 billion decreased by $4.7 billion (or 46.0%), primarily due to our full repayments of the UST Loans and Canadian Loan of $5.7 billion and $1.3 billion and paydowns on other obligations of $0.6 billion. This was partially offset by an increase of $2.9 billion due to the reclassification of our VEBA Notes from long−term to short−term.

At June 30, 2010 Liabilities held for sale were reduced to $0 from $0.4 billion at December 31, 2009 due to the sale of Saab and Saab GB.

At June 30, 2010 Accrued expenses of $24.1 billion increased by $0.9 billion (or 4.0%). The change in Accrued expenses was primarily driven by GMNA due to higher customer deposits related to the increased number of vehicles leased to daily rental car companies of $1.2 billion and timing of other miscellaneous accruals of $0.4 billion. This was partially offset by the favorable effect of foreign currency translation of $0.7 billion.

#### Non−Current Liabilities

At June 30, 2010 Long−term debt of $2.6 billion decreased by $2.9 billion (or 52.6%) primarily due to the reclassification of our VEBA Notes from long−term to short−term.

At June 30, 2010 Liabilities held for sale were reduced to $0 from $0.3 billion at December 31, 2009 due to the sale of our India Operations in February 2010. We classified these Liabilities held for sale as long−term at December 31, 2009 because we received a promissory note in exchange for the India Operations that does not convert to cash within one year.

At June 30, 2010 our Pensions obligation of $26.0 billion decreased by $1.1 billion (or 4.0%) due to the favorable effect of foreign currency translation of $1.1 billion and an increase in net contributions of $0.4 billion partially offset by the effects of interim pension remeasurements of $0.4 billion.

Further information on each of our businesses and geographic segments is subsequently discussed.

### Segment Results of Operations

#### GM North America
#### (Dollars in millions)

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Total net sales and revenue | $20,266 | $ 39,552 | $11,445 | $ 23,764 |
| Earnings (loss) before interest and income taxes | $ 1,592 | $ 2,810 | $(7,026) | $ (10,452) |

#### Vehicle Sales and Production Volume

The following tables summarize total production volume and industry sales of new motor vehicles and competitive position (in thousands):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Production Volume (a) | | | | |
| Cars | 279 | 523 | 170 | 287 |
| Trucks | 452 | 876 | 225 | 480 |
| | | | | |
| Total | 731 | 1,399 | 395 | 767 |

(a)  Production volume represents the number of vehicles manufactured by our and Old GM's assembly facilities and also includes vehicles produced by certain joint ventures.

86

**Table of Contents**

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

| | Successor | | | | | | Predecessor | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | | Six Months Ended June 30, 2010 | | | Three Months Ended June 30, 2009 | | | Six Months Ended June 30, 2009 | | |
| | Industry | GM | GM as a % of Industry | Industry | GM | GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry |
| Vehicle Sales (a)(b)(c)(d) | | | | | | | | | | | | |
| Total GMNA | 3,825 | 716 | 18.7% | 6,998 | 1,280 | 18.3% | 3,303 | 657 | 19.9% | 6,091 | 1,157 | 19.0% |
| Total U.S. | 3,117 | 603 | 19.4% | 5,708 | 1,081 | 18.9% | 2,647 | 541 | 20.5% | 4,893 | 954 | 19.5% |
| U.S. — Cars | 1,527 | 234 | 15.4% | 2,811 | 425 | 15.1% | 1,349 | 236 | 17.5% | 2,440 | 403 | 16.5% |
| U.S. Trucks | 1,590 | 369 | 23.2% | 2,896 | 656 | 22.6% | 1,298 | 306 | 23.5% | 2,453 | 552 | 22.5% |
| Canada | 466 | 75 | 16.2% | 798 | 123 | 15.5% | 442 | 84 | 19.0% | 732 | 135 | 18.4% |
| Mexico | 189 | 36 | 19.2% | 382 | 72 | 19.0% | 165 | 29 | 17.8% | 365 | 65 | 17.7% |

(a)    Vehicle sales represent sales to the ultimate customer.

(b)    Includes HUMMER, Saturn and Pontiac vehicle sales data.

(c)    Includes Saab vehicle sales data through February 2010.

(d)    Vehicle sales data may include rounding differences.

***Three and Six Months Ended June 30, 2010 and 2009
(Dollars in millions)***

*Total Net Sales and Revenue*

| | Successor | | Predecessor | | Three Months Ended 2010 vs. 2009 Change | | Six Months Ended 2010 vs. 2009 Change | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 | Amount | % | Amount | % |
| Total net sales and revenue | $ 20,266 | $ 39,552 | $ 11,445 | $ 23,764 | $ 8,821 | 77.1% | $ 15,788 | 66.4% |

In the three months ended June 30, 2010 our vehicle sales in the United States increased compared to the corresponding period in 2009 by 62,000 vehicles (or 11.4%), our United States market share was 19.4%, our vehicle sales in Canada decreased by 9,000 vehicles (or 10.3%) and our vehicle sales in Mexico increased by 7,000 vehicles (or 23.4%).

In the three months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $8.8 billion (or 77.1%), primarily due to: (1) higher volumes of $5.8 billion due to an improving economy and successful recent vehicle launches such as the Chevrolet Equinox, GMC Terrain, Buick LaCrosse and Cadillac SRX and increased U.S. daily rental auction volume of $0.8 billion; (2) favorable mix of $1.5 billion due to increased crossover and truck sales; and (3) favorable price of $0.5 billion due to lower sales allowances.

In the six months ended June 30, 2010 our vehicle sales in the United States increased compared to the corresponding period in 2009 by 126,000 vehicles (or 13.2%), our United States market share was 18.9%, our vehicle sales in Canada decreased by 11,000 vehicles (or 8.3%) and our vehicle sales in Mexico increased by 8,000 vehicles (or 12.3%).

In the six months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $15.8 billion (or 66.4%), primarily due to: (1) higher volumes of $11.3 billion due to an improving economy and successful recent vehicle launches such as the Chevrolet Equinox, GMC Terrain, Buick LaCrosse and Cadillac SRX and increased U.S. daily rental auction volume of $0.8 billion; (2) favorable pricing of $2.3 billion due to lower sales allowances partially offset by less favorable adjustments in the U.S. (favorable of $1.0 billion in 2009 compared to favorable of $0.4 billion in 2010) to the accrual for U.S. residual support programs for leased vehicles of $0.6 billion; and (3) favorable mix of $1.7 billion due to increased crossover and truck sales.

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Earnings (Loss) Before Interest and Income Taxes*

In the three and six months ended June 30, 2010 EBIT was income of $1.6 billion and $2.8 billion driven by higher revenues. In the three and six months ended June 30, 2009 EBIT was a loss of $7.0 billion and $10.5 billion.

Cost and expenses includes both fixed costs as well as costs which generally vary with production levels. In the three and six months ended June 30, 2010 certain fixed costs, primarily labor related, have continued to decrease in relation to historical levels primarily due to various separation and other programs implemented in 2009 in order to reduce labor costs as subsequently discussed. In the three and six months ended June 30, 2009, Old GM's sales volumes were at historically low levels and Cost of sales exceeded Total net sales and revenue by $5.4 billion and $7.4 billion.

In the three months ended June 30, 2010 results included foreign currency translation gains of $0.2 billion driven by the weakening of the Canadian Dollar versus the U.S. Dollar which were offset by charges of $0.2 billion for a recall campaign on windshield fluid heaters.

In the six months ended June 30, 2010 results included: (1) charges of $0.2 billion for a recall campaign on windshield fluid heaters; (2) foreign currency translation losses of $0.2 billion driven by the strengthening of the Canadian Dollar versus the U.S. Dollar; partially offset by (3) favorable adjustments of $0.1 billion to restructuring reserves due to increased production capacity utilization, which resulted in the recall of idled employees to fill added shifts at multiple U.S. production sites.

In the three months ended June 30, 2009 results included: (1) a curtailment loss of $1.7 billion upon the interim remeasurement of the U.S. Hourly and U.S. Salaried Defined Benefit Pension Plan as a result of the 2009 Special Attrition Programs and salaried workforce reductions; (2) incremental depreciation charges of $1.5 billion recorded by Old GM prior to the 363 Sale for facilities included in GMNA's restructuring activities and for certain facilities that MLC retained; (3) a charge of $1.1 billion related to the SUB and TSP, partially offset by a favorable adjustment of $0.4 billion primarily related to the suspension of the JOBS Program; (4) foreign currency translation losses of $0.8 billion driven by the strengthening of the Canadian Dollar versus the U.S. Dollar; (5) U.S. Hourly and Salary separation program charges and Canadian restructuring activities of $0.7 billion; and (6) equity losses of $0.2 billion related to impairment charges at NUMMI, which was retained by MLC.

In the six months ended June 30, 2009 results included: (1) incremental depreciation charges of $1.8 billion recorded by Old GM prior to the 363 Sale for facilities included in GMNA's restructuring activities and for certain facilities that MLC retained; (2) curtailment loss of $1.7 billion upon the interim remeasurement of the U.S. Hourly and U.S. Salaried Defined Benefit Pension Plan as a result of the 2009 Special Attrition Programs and salaried workforce reductions; (3) a charge of $1.1 billion related to the SUB and TSP, partially offset by a favorable adjustment of $0.7 billion primarily related to the suspension of the JOBS Program; (4) U.S. Hourly and Salary separation program charges and Canadian restructuring activities of $1.1 billion; (5) foreign currency translation losses of $0.6 billion driven by the strengthening of the Canadian Dollar versus the U.S. Dollar; (6) charges of $0.4 billion primarily for impairments for special tooling and product related machinery and equipment; (7) charges of $0.3 billion related to obligations associated with various Delphi agreements; and (8) equity losses of $0.3 billion related to impairment charges at NUMMI and our proportionate share of losses at CAMI. MLC retained the investment in NUMMI and CAMI has been consolidated since March 1, 2009.

*GM International Operations*
*(Dollars in millions)*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| **Total net sales and revenue** | $ 8,612 | $   16,664 | $ 5,404 | $   11,155 |
| **Earnings (loss) before interest and income taxes** | $   672 | $    1,838 | $  (660) | $     (699) |

88

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Vehicle Sales and Production Volume*

The following tables summarize total production volume and industry sales of new motor vehicles and competitive position (in thousands):

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Production Volume (a)(b)(c) | 1,195 | 2,307 | 828 | 1,523 |

(a)  Production volume represents the number of vehicles manufactured by our and Old GM's assembly facilities and also includes vehicles produced by certain joint ventures.

(b)  Includes SGM, SGMW, FAW−GM joint venture production in China and HKJV joint venture production in India.

(c)  The joint venture agreements with SGMW (34%) and FAW−GM (50%) allows for significant rights as a member as well as the contractual right to report SGMW and FAW−GM production volume in China.

| | Successor | | | | | | Predecessor | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Three Months Ended June 30, 2010 | | | Six Months Ended June 30, 2010 | | | Three Months Ended June 30, 2009 | | | Six Months Ended June 30, 2009 | | |
| | Industry | GM | GM as a % of Industry | Industry | GM | GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry |
| Vehicle Sales (a)(b)(c) | | | | | | | | | | | | |
| Total GMIO | 9,647 | 995 | 10.3% | 19,742 | 2,026 | 10.3% | 7,786 | 807 | 10.4% | 14,934 | 1,517 | 10.2% |
| China (d)(e) | 4,466 | 586 | 13.1% | 9,143 | 1,209 | 13.2% | 3,421 | 451 | 13.2% | 6,110 | 814 | 13.3% |
| Brazil | 792 | 146 | 18.4% | 1,580 | 302 | 19.1% | 782 | 147 | 18.8% | 1,450 | 271 | 18.7% |
| Australia | 279 | 35 | 12.6% | 531 | 69 | 12.9% | 242 | 29 | 12.2% | 455 | 57 | 12.5% |
| India (f) | 703 | 28 | 4.0% | 1,461 | 60 | 4.1% | 513 | 14 | 2.8% | 1,056 | 28 | 2.7% |
| Argentina | 157 | 25 | 15.8% | 338 | 56 | 16.5% | 125 | 19 | 15.3% | 280 | 42 | 15.1% |
| South Korea (g) | 383 | 31 | 8.2% | 752 | 58 | 7.7% | 379 | 27 | 7.0% | 649 | 45 | 7.0% |
| Middle−East Operations | 289 | 30 | 10.2% | 565 | 55 | 9.8% | 269 | 30 | 11.3% | 522 | 57 | 10.8% |
| Colombia | 57 | 19 | 33.2% | 107 | 36 | 33.6% | 41 | 15 | 37.6% | 86 | 33 | 38.9% |
| Egypt | 65 | 17 | 26.0% | 122 | 32 | 26.3% | 51 | 11 | 22.4% | 90 | 23 | 25.3% |
| Venezuela | 31 | 12 | 37.7% | 59 | 24 | 41.4% | 32 | 12 | 38.7% | 81 | 35 | 43.4% |

(a)  Vehicle sales primarily represent estimated sales to the ultimate customer.

(b)  Vehicle sales data may include rounding differences.

(c)  Includes Saab vehicle sales data through February 2010.

(d)  Includes SGM, SGMW and FAW−GM joint venture sales in China.

(e)  The joint venture agreements with SGMW (34%) and FAW−GM (50%) allows for significant rights as a member as well as the contractual right to report SGMW and FAW−GM vehicle sales in China as part of global market share. SGMW and FAW−GM sales in China included in our vehicle sales and market share data was 324,000 vehicles and 686,000 vehicles in the three and six months ended June 30, 2010 and 262,000 vehicles and 493,000 vehicles in the three and six months ended June 30, 2009.

(f)  Includes HKJV joint venture sales in India.

(g)  Vehicle sales and market share data from sales of GM Daewoo produced Chevrolet brand products in Europe are reported as part of GME. Sales of GM Daewoo produced Chevrolet brand products in Europe was 91,000 vehicles and 166,000 vehicles in the three and six months ended June 30, 2010 and 102,000 vehicles and 185,000 vehicles in the three and six months ended June 30, 2009.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Three and Six Months Ended June 30, 2010 and 2009*
*(Dollars in millions)*

*Total Net Sales and Revenue*

| | Successor | | Predecessor | | Three Months Ended 2010 vs. 2009 Change | | Six Months Ended 2010 vs. 2009 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 | Amount | % | Amount | % |
| Total net sales and revenue | $ 8,612 | $ 16,664 | $ 5,404 | $ 11,155 | $ 3,208 | 59.4% | $ 5,509 | 49.4% |

In the three months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $3.2 billion (or 59.4%) primarily due to: (1) higher wholesale volumes of $1.9 billion (or 139,000 vehicles) resulting primarily from the market recovery in three key businesses, GM Daewoo (57,000 vehicles), Brazil (14,000 vehicles) and Australia (10,000 vehicles). The primary driver was the global economic recovery as well as the continuing effect of government incentive programs, lower interest rates and availability of consumer credit to customers; (2) derivative losses of $0.7 billion that Old GM recorded in the three months ended June 30, 2009, primarily driven by the depreciation of the Korean Won against the U.S. Dollar in that period. Subsequent to July 10, 2009, all gains and losses on non−designated derivatives were recorded in Interest income and other non−operating income, net; (3) net foreign currency translation and transaction gains of $0.3 billion, primarily driven by the strengthening of major currencies against the U.S. Dollar such as the Korean Won, Australian Dollar and Brazilian Real, partially offset by devaluation of the Venezuelan Bolivar; (4) favorable vehicle mix of $0.1 billion driven by launches of new vehicles; and (5) favorable pricing effect of $0.2 billion primarily in Venezuela of $0.1 billion driven by the hyperinflationary economy.

In the six months ended June 30, 2010 Total net sales and revenue increased compared to the corresponding period in 2009 by $5.5 billion (or 49.4%) primarily due to: (1) higher wholesale volumes of $3.4 billion (or 225,000 vehicles) resulting primarily from the market recovery in three key businesses, GM Daewoo (77,000 vehicles), Brazil (60,000 vehicles) and Australia (24,000 vehicles); (2) derivative losses of $1.0 billion that Old GM recorded in the six months ended June 30, 2009, primarily driven by the depreciation of the Korean Won against the U.S. Dollar in that period. Subsequent to July 10, 2009, all gains and losses on non−designated derivatives were recorded in Interest income and other non−operating income, net; (3) net foreign currency translation and transaction gains of $0.8 billion, primarily driven by the strengthening of major currencies against the U.S. Dollar such as the Korean Won, Australian Dollar and Brazilian Real, partially offset by devaluation of the Venezuelan Bolivar; and (4) the favorable pricing effect of $0.3 billion primarily in Venezuela of $0.2 billion driven by the hyperinflationary economy.

The increase in vehicle sales related to our joint venture operations in China and India is not reflected in Total net sales and revenue as their revenue is not consolidated in our financial results.

*Earnings (Loss) Before Interest and Income Taxes*

In the three and six months ended June 30, 2010 EBIT was income of $0.7 billion and $1.8 billion. In the three and six months ended June 30, 2009 EBIT was a loss of $0.7 billion in each period presented.

In the three months ended June 30, 2010 results included: (1) Equity income, net of tax of $0.4 billion from the operating results of our China joint ventures; (2) net income of $0.1 billion attributable to non−controlling interests of GM Daewoo; partially offset by (3) an unfavorable fair value adjustment of $0.1 billion on derivative instruments primarily resulting from the depreciation of the Korean Won against the U.S. Dollar.

In the six months ended June 30, 2010 results included Equity income, net of tax, of $0.7 billion from the operating results of our China joint ventures and net income of $0.2 billion attributable to non−controlling interests of GM Daewoo.

90

Table of Contents

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

In the three months ended June 30, 2009 results included: (1) an unfavorable fair value adjustment of $0.7 billion on derivative instruments primarily resulting from the depreciation of the Korean Won against the U.S. Dollar and release of Accumulated other comprehensive loss; (2) foreign currency translation loss of $0.4 billion primarily resulting from the purchase of U.S dollars on the parallel market in Venezuela; (3) Net loss of $0.3 billion attributable to non−controlling interests in GM Daewoo; partially offset by (4) Equity income, net of tax, of $0.2 billion from the operating results of our China joint ventures.

In the six months ended June 30, 2009 results included: (1) an unfavorable fair value adjustment of $1.0 billion on derivative instruments primarily resulting from the depreciation of Korean Won against the U.S. Dollar and release of Accumulated other comprehensive loss; (2) foreign currency translation loss of $0.5 billion primarily resulting from the purchase of U.S Dollars on the parallel market in Venezuela; (3) a Net loss of $0.3 billion attributable to non−controlling interests in GM Daewoo; partially offset by (4) Equity income, net of tax, of $0.3 billion from the operating results of our China joint ventures, which benefited from China's increasing vehicle industry during the global financial crises.

*GM Europe*
*(Dollars in millions)*

|  | Successor | | Predecessor | |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
|---|---|---|---|---|
| **Total net sales and revenue** | $ 6,044 | $ 11,505 | $ 6,645 | $ 11,946 |
| **Loss before interest and income taxes** | $ (160) | $ (637) | $ (757) | $ (2,711) |

*Vehicle Sales and Production Volume*

The following tables summarize total production volume and industry sales of new motor vehicles and competitive position (in thousands):

|  | Successor | | Predecessor | |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
|---|---|---|---|---|
| Production Volume (a) | 331 | 636 | 315 | 579 |

(a)    Production volume represents the number of vehicles manufactured by our and Old GM's assembly facilities and also includes vehicles produced by certain joint ventures.

|  | Successor | | | | | | Predecessor | | | | | |
|  | Three Months Ended June 30, 2010 | | | Six Months Ended June 30, 2010 | | | Three Months Ended June 30, 2009 | | | Six Months Ended June 30, 2009 | | |
|  | Industry | GM | GM as a % of Industry | Industry | GM | GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry | Industry | Old GM | Old GM as a % of Industry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vehicle Sales (a)(b)(c)(d) | | | | | | | | | | | | |
| Total GME | 5,013 | 442 | 8.8% | 9,782 | 846 | 8.6% | 5,131 | 474 | 9.2% | 9,647 | 881 | 9.1% |
| United Kingdom | 559 | 77 | 13.7% | 1,235 | 158 | 12.8% | 499 | 70 | 14.1% | 1,039 | 150 | 14.4% |
| Germany | 869 | 69 | 8.0% | 1,598 | 129 | 8.1% | 1,253 | 131 | 10.4% | 2,180 | 211 | 9.7% |
| Italy | 534 | 45 | 8.5% | 1,265 | 96 | 7.6% | 643 | 54 | 8.4% | 1,235 | 102 | 8.3% |
| Spain | 357 | 33 | 9.2% | 677 | 63 | 9.3% | 265 | 23 | 8.6% | 493 | 42 | 8.4% |
| Russia | 508 | 40 | 7.9% | 810 | 67 | 8.3% | 387 | 41 | 10.5% | 785 | 84 | 10.7% |
| France | 736 | 36 | 4.9% | 1,441 | 63 | 4.4% | 735 | 33 | 4.4% | 1,348 | 56 | 4.1% |

(a)    Vehicle sales primarily represent estimated sales to the ultimate customer.

91

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

(b)    The financial results from sales of GM Daewoo produced Chevrolet brand products are reported as part of GMIO. Sales of GM Daewoo produced Chevrolet brand products included in vehicle sales and market share data was 91,000 vehicles and 166,000 vehicles in the three and six months ended June 30, 2010 and 102,000 vehicles and 185,000 vehicles in the three and six months ended June 30, 2009.

(c)    Includes Saab vehicle sales data through February 2010.

(d)    Vehicle sales data may include rounding differences.

***Three and Six Months Ended June 30, 2010 and 2009***
***(Dollars in millions)***

*Total Net Sales and Revenue*

| | Successor | | Predecessor | | Three Months Ended 2010 vs. 2009 Change | | Six Months Ended 2010 vs. 2009 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 | Amount | % | Amount | % |
| Total net sales and revenue | $    6,044 | $    11,505 | $    6,645 | $    11,946 | $    (601) | (9.0)% | $    (441) | (3.7)% |

In the three months ended June 30, 2010 Total net sales and revenue decreased compared to the corresponding period in 2009 by $0.6 billion (or 9.0%) primarily due to: (1) lower wholesale volumes of $0.4 billion; (2) unfavorable net foreign currency translation of $0.3 billion, driven primarily by the weakening of the Euro and British Pound versus the U.S. Dollar; (3) lower powertrain revenue of $0.1 billion primarily due to the Strasbourg facility which was retained by MLC in connection with the 363 Sale; partially offset by (4) favorable vehicle pricing of $0.1 billion due to higher pricing on new vehicle launches; and (5) favorable vehicle mix of $0.1 billion due to higher proportion of lower content cars in the three months ended June 30, 2009 resulting from government scrappage programs.

Revenue decreased compared to the corresponding period in 2009 due to wholesale volume decreases of 24,000 vehicles (or 6.8%). Wholesale volumes decreased in Germany by 55,000 vehicles (or 46.5%), this was partially offset by wholesale increases in Spain of 7,000 vehicles (or 43.2%), wholesale increases in the United Kingdom of 5,000 vehicles (or 7.8%), and wholesale increases to the United States of 9,000 vehicles primarily related to the Buick Regal and smaller increases in various other European countries in the three months ended June 30, 2010.

In the six months ended June 30, 2010 Total net sales and revenue decreased compared to the corresponding period in 2009 by $0.4 billion (or 3.7%) primarily due to: (1) lower wholesale volumes of $0.7 billion; (2) lower powertrain revenue of $0.1 billion primarily due to the Strasbourg facility which was retained by MLC in connection with the 363 Sale; partially offset by (3) favorable vehicle pricing of $0.2 billion due to higher pricing on new vehicle launches.

Revenue decreased compared to the corresponding period in 2009 due to wholesale volume decreases of 18,000 vehicles (or 2.8%). Wholesale volumes decreased in Germany by 85,000 vehicles (or 43.8%), partially offset by wholesale increases in Spain of 20,000 vehicles (or 76.7%), wholesale increases in the United Kingdom of 7,000 vehicles (or 5.2%), and wholesale increases to the United States of 8,000 vehicles primarily related to the Buick Regal and smaller increases in various other European countries in the six months ended June 30, 2010.

*Loss Before Interest and Income Taxes*

In the three and six months ended June 30, 2010 EBIT was a loss of $0.2 billion and $0.6 billion. In the three and six months ended June 30, 2009 EBIT was a loss of $0.8 billion and $2.7 billion.

In the three months ended June 30, 2010 results included restructuring charges of $0.2 billion to restructure our European operations, primarily for separation programs announced in Belgium, Spain and the United Kingdom.

In the six months ended June 30, 2010 results included restructuring charges of $0.5 billion to restructure our European operations, primarily for separation programs announced in Belgium, Spain and the United Kingdom.

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

In the three months ended June 30, 2009 results included incremental depreciation charges of $0.3 billion related to restructuring activities and charges recorded in Other expenses, net of $0.1 billion related to adjustments to contingencies associated with the deconsolidation of Saab, which filed for reorganization protection under the laws of Sweden in February 2009.

In the six months ended June 30, 2009 results included: (1) charges recorded in Other expenses, net of $0.8 billion related to the deconsolidation of Saab; (2) incremental depreciation charges of $0.5 billion related to restructuring activities; and (3) operating losses related to Saab of $0.2 billion.

*Corporate Results of Operations*
*(Dollars in millions)*

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| Total net sales and revenue | $ 43 | $ 97 | $ 122 | $ 321 |
| Net income (loss) attributable to stockholders | $ (526) | $ (1,377) | $(4,500) | $ (5,082) |

*Three and six months ended June 30, 2010 and 2009*
*(Dollars in millions)*

*Total Net Sales and Revenue*

|  | Successor | | Predecessor | | Three Months Ended 2010 vs. 2009 Change | | Six Months Ended 2010 vs. 2009 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 | Amount | % | Amount | % |
| Total net sales and revenue | $ 43 | $ 97 | $ 122 | $ 321 | $ (79) | (64.8)% | $ (224) | (69.8)% |

In the three months ended June 30, 2010 Total net sales and revenue decreased compared to the corresponding period in 2009 by $0.1 billion (or 64.8%) primarily due to decreased lease financing revenue related to the liquidation of the portfolio of automotive retail leases. Average outstanding automotive retail leases on−hand for GM and Old GM were 7,000 and 86,000 for the three months ended June 30, 2010 and 2009.

In the six months ended June 30, 2010 Total net sales and revenue decreased compared to the corresponding period in 2009 by $0.2 billion (or 69.8%) primarily due to decreased lease financing revenues related to the liquidation of the portfolio of automotive leases. Average outstanding automotive retail leases on−hand for GM and Old GM were 13,000 and 104,000 for the six months ended June 30, 2010 and 2009.

*Net Loss Attributable to Stockholders*

In the three and six months ended June 30, 2010 Net loss attributable to stockholders was $0.5 billion and $1.4 billion. In the three and six months ended June 30, 2009 Net loss attributable to stockholders was $4.5 billion and $5.1 billion.

In the three months ended June 30, 2010 results included Income tax expense of $0.4 billion primarily related to income tax provisions for profitable entities and Interest expense of $0.3 billion primarily related to interest expense on GMIO debt of $0.1 billion and VEBA Note interest expense and premium amortization of $0.1 billion.

In the six months ended June 30, 2010 results included Income tax expense of $0.9 billion primarily related to income tax provisions for profitable entities and a taxable foreign exchange gain in Venezuela; and Interest expense of $0.6 billion related to interest expense on GMIO debt of $0.2 billion, VEBA Note interest expense and premium amortization of $0.1 billion and interest expense on the UST Loans of $0.1 billion.

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

The effective tax rate fluctuated in the six months ended June 30, 2010 primarily as a result of changes in the mix of earnings in valuation allowance and non−valuation allowance jurisdictions.

In the three months ended June 30, 2009 results included: (1) interest expense of $3.4 billion primarily related to amortization of discounts related to the UST Loan Facility of $2.6 billion and interest on the UST Loan Facility of $0.3 billion; (2) loss on the extinguishment of the UST Ally Financial Loan of $2.0 billion when the UST exercised its option to convert outstanding amounts into shares of Ally Financial's Class B Common Membership Interests; (3) centrally recorded Reorganization expenses, net of $1.2 billion which primarily related to Old GM's loss on the extinguishment of debt resulting from repayment of its secured revolving credit facility, U.S. term loan, and secured credit facility due to the fair value of the U.S. term loan exceeding its carrying amount by $1.0 billion, loss on contract rejections, settlements of claims and other lease terminations of $0.4 billion partially offset by gains related to release of Accumulated other comprehensive income (loss) associated with derivatives of $0.2 billion; partially offset by (4) a gain recorded on the UST Ally Financial Loan of $2.5 billion upon the UST's conversion of the UST Ally Financial Loan for Class B Common Membership Interests in Ally Financial. The gain resulted from the difference between the fair value and the carrying amount of the Ally Financial equity interests given to the UST in exchange for the UST Ally Financial Loan. The gain was partially offset by Old GM's proportionate share of Ally Financial's losses of $0.6 billion; and (5) income tax benefit of $0.4 billion primarily related to a resolution of a U.S. and Canada transfer pricing matter and other discrete items offset by income tax provisions for profitable entities.

In the six months ended June 30, 2009 results included: (1) interest expense of $4.6 billion primarily related to amortization of discounts related to the UST Loan Facility of $2.9 billion and interest expense on unsecured debt of $0.9 billion and on the UST Loan Facility of $0.4 billion; (2) centrally recorded Reorganization expenses, net of $1.2 billion which primarily related to Old GM's loss on the extinguishment of debt resulting from repayment of its secured revolving credit facility, U.S. term loan, and secured credit facility due to the fair value of the U.S. term loan exceeding its carrying amount by $1.0 billion, loss on contract rejections, settlements of claims and other lease terminations of $0.4 billion partially offset by gains related to release of Accumulated other comprehensive income (loss) associated with derivatives of $0.2 billion; (3) a loss on the extinguishment of the UST Ally Financial Loan of $2.0 billion when the UST exercised its option to convert outstanding amounts into shares of Ally Financial's Class B Common Membership Interests. This loss was partially offset by a gain on extinguishment of debt of $0.9 billion related to an amendment to Old GM's U.S. term loan; partially offset by (4) a gain recorded on the UST Ally Financial Loan of $2.5 billion upon the UST's conversion of the UST Ally Financial Loan for Class B Common Membership Interests in Ally Financial. The gain resulted from the difference between the fair value and the carrying amount of the Ally Financial equity interests given to the UST in exchange for the UST Ally Financial Loan. The gain was partially offset by Old GM's proportionate share of Ally Financial's losses of $1.1 billion; and (5) Income tax benefit of $0.6 billion primarily related to a resolution of a U.S. and Canada transfer pricing matter and other discrete items offset by income tax provisions for profitable entities.

### Liquidity and Capital Resources

We believe that our current level of cash and marketable securities will be sufficient to meet our liquidity needs. However, we expect to have substantial cash requirements going forward. Our known material future uses of cash include, among other possible demands: (1) Pension and OPEB payments; (2) continuing capital expenditures; (3) spending to implement long−term cost savings and restructuring plans such as restructuring our Opel/Vauxhall operations and potential capacity reduction programs; (4) reducing our overall debt levels which may include repayment of the VEBA Notes that we issued under the VEBA Note Agreement with the New VEBA, GM Daewoo's revolving credit facility and other debt payments; (5) acquisition of AmeriCredit, an independent automobile finance company, for cash of approximately $3.5 billion; and (6) certain South American tax−related administrative and legal proceedings may require that we deposit funds in escrow, such escrow deposits may range from $725 million to $900 million.

Our liquidity plans are subject to a number of risks and uncertainties, including those described in the "Risk Factors" sections of our 2009 Form 10−K and this report, some of which are outside our control. Macro−economic conditions could limit our ability to successfully execute our business plans and, therefore, adversely affect our liquidity plans.

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

*Recent Initiatives*

We continue to monitor and evaluate opportunities to optimize the structure of our liquidity position.

In the three months ended June 30, 2010 we made investments of $4.6 billion in highly liquid marketable securities instruments with maturities between 90 days and 365 days. Previously, these funds would have been invested in short−term instruments less than 90 days and classified as a component of Cash and cash equivalents. Investments in these longer−term securities will increase the interest we earn on these investments. We continue to monitor our investment mix and may reallocate investments based on business requirements.

In June 2010 the German federal government notified us of its decision not to provide loan guarantees to Opel/Vauxhall. As a result we have decided to fund the requirements of Opel/Vauxhall internally. Opel/Vauxhall has subsequently withdrawn all applications for government loan guarantees from European governments. In July 2010 we committed an additional Euro 1.1 billion (equivalent to $1.3 billion) to fund Opel/Vauxhall's restructuring and ongoing cash requirements.

In July 2010 we entered into a definitive agreement to acquire AmeriCredit, an independent automobile finance company, for cash of approximately $3.5 billion. This acquisition will allow us to provide a more complete range of financing options to our customers including additional capabilities in leasing and non−prime financing options. The transaction is expected to close in the fourth quarter of 2010 and we expect to fund the transaction using cash on hand.

The repayment of debt remains a key strategic initiative. We continue to evaluate potential debt repayments prior to maturity. Any such repayments may negatively affect our liquidity in the short−term. In July 2010 our Russian subsidiary repaid a loan facility of $150 million to cure a technical default. In the six months ended June 30, 2010 we repaid the remaining amounts owed under the UST Loans of $5.7 billion and Canadian Loan of $1.3 billion. Additionally, GM Daewoo repaid a portion of its revolving credit facility in the amount of $225 million.

We have entered into negotiations with financial institutions regarding a credit facility. While we do not believe we would require these proceeds to fund operating activities, the agreement would provide additional liquidity and financing flexibility. There is no assurance that we will reach a final agreement on this facility.

If we successfully execute a credit facility, we expect to prepay the VEBA Notes with available cash. Accordingly, at June 30, 2010 we reclassified the VEBA Notes from long−term debt to short−term debt in an amount of $2.9 billion (including unamortized premium of $209 million).

We continue to pursue our application for loans available under Section 136 of the Energy Independence and Security Act of 2007. While no assurance exists that we may qualify for the loans, any funds that we may receive would be used for costs associated with re−equipping, expanding and establishing manufacturing facilities in the United States to produce advanced technology vehicles and components for these vehicles.

*Available Liquidity*

Available liquidity includes cash balances and marketable securities. At June 30, 2010 available liquidity was $31.5 billion, not including funds available under credit facilities of $1.1 billion or in the Canadian Health Care Trust (HCT) escrow account of $1.0 billion. The amount of available liquidity is subject to intra−month and seasonal fluctuations and includes balances held by various business units and subsidiaries worldwide that are needed to fund their operations.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

We manage our global liquidity using cash investments in the U.S., cash held at our international treasury centers and available liquidity at consolidated overseas subsidiaries. The following table summarizes global liquidity (dollars in millions):

| | Successor | |
|---|---|---|
| | June 30, 2010 | December 31, 2009 |
| Cash and cash equivalents | $ 26,773 | $ 22,679 |
| Marketable securities | 4,761 | 134 |
| Available liquidity | 31,534 | 22,813 |
| Available under credit facilities | 1,115 | 618 |
| Total available liquidity | 32,649 | 23,431 |
| UST and HCT escrow accounts (a) | 956 | 13,430 |
| Total liquidity including UST and HCT escrow accounts | $ 33,605 | $ 36,861 |

_____

(a)    Classified as Restricted cash and marketable securities. Refer to Note 12 to the condensed consolidated financial statements. The remaining funds held in the UST Escrow account were released in April 2010 following the repayment of the UST Loans and Canadian Loan.

Total available liquidity increased by $9.2 billion in the six months ended June 30, 2010 primarily due to positive cash flows from operating activities of $5.7 billion, investing activities less net marketable securities acquisitions of $11.1 billion, which were partially offset by negative cash flows from financing activities of $7.8 billion.

*Credit Facilities*

At June 30, 2010 we had committed credit facilities of $2.0 billion, under which we had borrowed $1.6 billion leaving $440 million available. Of these committed credit facilities GM Daewoo held $1.1 billion and other entities held $0.9 billion. In addition, at June 30, 2010 we had uncommitted credit facilities of $0.9 billion, under which we had borrowed $228 million leaving $675 million available. Uncommitted credit facilities include lines of credit which are available to us, but under which the lenders have no legal obligation to provide funding upon our request. We and our subsidiaries use credit facilities to fund working capital needs, product programs, facilities development and other general corporate purposes.

Our largest credit facility is GM Daewoo's $1.1 billion revolving credit facility, which was established in October 2002 with a syndicate of banks. All outstanding amounts at October 2010 will convert into a term loan and are required to be paid in four equal annual installments by October 2014. Borrowings under this facility bear interest based on Korean Won denominated certificates of deposit. The average interest rate on outstanding amounts under this facility at June 30, 2010 was 5.6%. The borrowings are secured by certain GM Daewoo property, plant and equipment and are used by GM Daewoo for general corporate purposes, including working capital needs. In the three months ended June 30, 2010 GM Daewoo repaid $225 million of the $1.1 billion revolving credit facility. At June 30, 2010 the credit facility had an outstanding balance of $931 million leaving $207 million available.

The balance of our credit facilities are held by geographically dispersed subsidiaries, with available capacity on the facilities primarily concentrated at a few of our subsidiaries. At June 30, 2010 GM Hong Kong had $170 million of capacity on a $200 million term facility secured by a portion of our equity interest in SGM, with an additional $200 million revolving facility secured by the same collateral set to become available in late 2010. In addition, we have $355 million of capacity on a $370 million secured term facility available to certain of our subsidiaries in Thailand over 2010 and 2011. The facilities were entered into to fund growth opportunities within GMIO and meet potential cyclical cash needs.

*Restricted Cash and Marketable Securities*

In April 2010 we used funds from the UST Credit Agreement escrow account of $4.7 billion to repay in full the outstanding amount of the UST Loans. In addition, GMCL repaid in full the outstanding amount of the Canadian Loan of $1.1 billion. Both loans were repaid prior to maturity.

96

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

Following the repayment of the UST Loans and the Canadian Loan, the remaining UST escrow funds in an amount of $6.6 billion became unrestricted. The availability of those funds is no longer subject to the conditions set forth in the UST Credit Agreement.

Pursuant to an agreement between GMCL, EDC and an escrow agent we had $1.0 billion remaining in an escrow account at June 30, 2010 to fund certain of GMCL's health care obligations pending the satisfaction of certain preconditions which have not yet been met.

***Cash Flow***

*Operating Activities*

In the six months ended June 30, 2010 we had positive cash flows from operating activities of $5.7 billion primarily due to: (1) net income of $2.8 billion, which included non−cash charges of $3.5 billion resulting from depreciation, impairment and amortization expense; (2) change in income tax related balances of $0.6 billion; partially offset by (3) pension contributions and OPEB cash payments of $0.9 billion; and (4) unfavorable changes in working capital of $0.8 billion. The unfavorable changes in working capital were related to increases in accounts receivables and inventories, partially offset by an increase in accounts payable as a result of increased production.

In the six months ended June 30, 2009 Old GM had negative cash flows from operating activities of $15.1 billion primarily due to: (1) net loss of $19.1 billion, which included non−cash charges of $6.3 billion resulting from depreciation, impairment and amortization expense; and (2) unfavorable working capital of $2.1 billion due to decreases in accounts payable partially offset by a decrease in accounts receivable and inventories.

*Investing Activities*

In the six months ended June 30, 2010 we had positive cash flows from investing activities of $6.4 billion primarily due to: (1) a reduction in Restricted cash and marketable securities of $12.6 billion primarily related to withdrawals from the UST Credit Agreement escrow account; (2) liquidations of operating leases of $0.3 billion; partially offset by (3) net investments in marketable securities of $4.6 billion due to investments in securities with maturities greater than 90 days; and (4) capital expenditures of $1.9 billion.

In the six months ended June 30, 2009 Old GM had negative cash flows from investing activities of $3.5 billion primarily due to: (1) capital expenditures of $3.1 billion; and (2) investment in Ally Financial of $0.9 billion; and (3) increase in Restricted cash and marketable securities of $0.6 billion; partially offset by (4) liquidations of automotive retail leases of $1.1 billion.

*Financing Activities*

In the six months ended June 30, 2010 we had negative cash flows from financing activities of $7.8 billion primarily due to: (1) repayments on the UST Loans of $5.7 billion, Canadian Loan of $1.3 billion and the program announced by the UST in March 2009 to provide financial assistance to automotive suppliers (Receivables Program) of $0.2 billion; (2) preferred dividend payments of $0.4 billion; and (3) a net decrease in short−term debt of $0.2 billion.

In the six months ended June 30, 2009 Old GM had positive cash flows from financing activities of $21.7 billion primarily due to: (1) proceeds from the UST Loan Facility and UST Ally Financial Loan of $16.6 billion; (2) proceeds from the DIP Facility of $10.7 billion; (3) proceeds from the EDC Loan Facility of $1.9 billion (4) proceeds from the German Facility of $0.4 billion; (5) proceeds from the Receivables Program of $0.3 billion; partially offset by (6) net payments on other debt of $7.1 billion; and (7) a net decrease in short−term debt of $1.0 billion.

97

Table of Contents

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

### *Net Liquid Assets (Debt)*

Management believes the use of net liquid assets (debt) provides meaningful supplemental information regarding our liquidity. Accordingly, we believe net liquid assets (debt) is useful in allowing for greater transparency of supplemental information used by management in its financial and operational decision making to assist in identifying resources available to meet cash requirements. Our calculation of net liquid assets (debt) may not be completely comparable to similarly titled measures of other companies due to potential differences between companies in the method of calculation. As a result, the use of net liquid assets (debt) has limitations and should not be considered in isolation from, or as a substitute for, other measures such as Cash and cash equivalents and Debt. Due to these limitations, net liquid assets (debt) is used as a supplement to U.S. GAAP measures.

The following table summarizes net liquid assets (debt) (dollars in millions):

|  | Successor | |
|---|---|---|
|  | June 30, 2010 | December 31, 2009 |
| Cash and cash equivalents | $ 26,773 | $ 22,679 |
| Marketable securities | 4,761 | 134 |
| UST Credit Agreement and Canadian HCT escrow accounts | 956 | 13,430 |
| Total liquid assets | 32,490 | 36,243 |
| Short−term debt and current portion of long−term debt | (5,524) | (10,221) |
| Long−term debt | (2,637) | (5,562) |
| Net liquid assets | $ 24,329 | $ 20,460 |

Our net liquid assets increased by $3.9 billion in the six months ended June 30, 2010. This change was due to an increase of $4.1 billion in Cash and cash equivalents (as previously discussed); an increase of $4.6 billion in Marketable securities; and a decrease of $7.6 billion in Short−term and Long−term debt; partially offset by a reduction of $12.5 billion in the UST Credit Agreement escrow balance. The decrease in Short−term and Long−term debt primarily related to: (1) repayment in full of the UST Loans of $5.7 billion; (2) repayment in full of the Canadian Loan of $1.3 billion; and (3) repayment in full of the loans related to the Receivables Program of $0.2 billion.

### *Other Liquidity Issues*

In connection with the 363 Sale, we assumed the obligation of the Receivables Program. At December 31, 2009 our equity contributions were $55 million and the UST had outstanding loans of $150 million to the Receivables Program. In the three months ended March 31, 2010 we repaid these loans in full and the Receivables Program was terminated in accordance with its terms in April 2010. Upon termination, we shared residual capital of $25 million in the program equally with the UST and paid a termination fee of $44 million.

Ally Financial currently finances our vehicles while they are in−transit to dealers in a number of markets including the U.S. In the event Ally Financial significantly limits or ceases to finance in−transit vehicles, our liquidity will be adversely affected.

We have extended loan commitments to certain affiliated companies and critical business partners. These commitments can be triggered under certain conditions and expire in the years 2010, 2011 and 2014. At June 30, 2010 we had a total commitment of $782 million outstanding with $25 million loaned.

We have covenants in our VEBA Note Agreement that could limit the amount and type of additional financing that we could raise to bolster our liquidity if needed.

98

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Non−Cash Charges (Gains)*

The following table summarizes significant non−cash charges (gains) (dollars in millions):

| | Predecessor | | |
|---|---|---|---|
| | Three Months Ended June 30, 2009 | | Six Months Ended June 30, 2009 |
| Impairment charges related to equipment on operating leases | $ | 17 | $ | 61 |
| Long−lived asset impairment charges | | 239 | | 566 |
| Impairment charges related to equity and cost method investments | | — | | 28 |
| Gain on extinguishment of debt | | — | | (906) |
| Gain on conversion of UST Ally Financial Loan | | (2,477) | | (2,477) |
| Loss on extinguishment of UST Ally Financial Loan | | 1,994 | | 1,994 |
| Total significant non−cash charges (gains) | $ | (227) | $ | (734) |

**Defined Benefit Pension Plan Contributions**

We are considering making a discretionary contribution to the U.S. hourly defined benefit pension plan. This discretionary contribution is being considered to offset the effect of the increase to the projected benefit obligation of the U.S. hourly defined benefit pension plan incurred as a result of the Delphi Benefit Guarantee Agreements being triggered as well as to possibly reduce the projected future cash funding requirements. We are currently evaluating the amount, timing and form of assets that may be contributed.

**Guarantees Provided to Third Parties**

We have provided guarantees related to the residual value of operating leases, certain suppliers' commitments, certain product−related claims and commercial loans made by Ally Financial and outstanding with certain third parties excluding residual support and risk sharing related to Ally Financial. The maximum potential obligation under these commitments is $843 million at June 30, 2010.

Our current agreement with Ally Financial requires the repurchase of Ally Financial financed inventory invoiced to dealers after September 1, 2008, with limited exclusions, in the event of a qualifying voluntary or involuntary termination of the dealer's sales and service agreement. Repurchase obligations exclude vehicles which are damaged, have excessive mileage or have been altered. The repurchase obligation ends in August 2010 for vehicles invoiced through August 2009 and ends in August 2011 for vehicles invoiced through August 2010.

The maximum potential amount of future payments required to be made to Ally Financial under this guarantee would be based on the repurchase value of total eligible vehicles financed by Ally Financial in dealer stock and is estimated to be $15.9 billion at June 30, 2010. If vehicles are required to be repurchased under this arrangement, the total exposure would be reduced to the extent vehicles are able to be resold to another dealer or at auction. The fair value of the guarantee was $34 million at June 30, 2010, which considers the likelihood of dealers terminating and estimated loss exposure for the ultimate disposition of vehicles.

Refer to Notes 17 and 23 to the condensed consolidated financial statements for additional information on guarantees we have provided.

**Contractual Obligations and Other Long−Term Liabilities**

We have the following minimum commitments under contractual obligations, including purchase obligations. A purchase obligation is defined as an agreement to purchase goods or services that is enforceable and legally binding on us and that specifies all significant terms, including: fixed or minimum quantities to be purchased; fixed, minimum, or variable price provisions; and the

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

approximate timing of the transaction. Other long−term liabilities are defined as long−term liabilities that are recorded on our consolidated balance sheet. Based on this definition, the following table includes only those contracts which include fixed or minimum obligations. The majority of our purchases are not included in the table as they are made under purchase orders which are requirements based and accordingly do not specify minimum quantities.

The following table summarizes aggregated information about our outstanding contractual obligations and other long−term liabilities at June 30, 2010 (dollars in millions):

| | Payments Due by Period | | | | |
| | July 1, 2010 Through December 31, 2010 | 2011−2012 | 2013−2014 | 2015 and after | Total |
|---|---|---|---|---|---|
| Debt (a)(b) | $ 4,623 | $ 960 | $ 229 | $ 3,094 | $ 8,906 |
| Capital lease obligations | 76 | 141 | 86 | 317 | 620 |
| Interest payments (c) | 379 | 391 | 265 | 812 | 1,847 |
| Operating lease obligations | 240 | 668 | 403 | 583 | 1,894 |
| Contractual commitments for capital expenditures | 1,267 | 147 | — | — | 1,414 |
| Postretirement benefits (d) | 251 | 611 | — | — | 862 |
| Other contractual commitments: | | | | | |
| Material | 585 | 1,317 | 258 | 74 | 2,234 |
| Information technology | 990 | 132 | 48 | — | 1,170 |
| Marketing | 396 | 256 | 169 | 60 | 881 |
| Facilities | 89 | 192 | 83 | 33 | 397 |
| Rental car repurchases | 2,135 | 2,521 | — | — | 4,656 |
| Policy, product warranty and recall campaigns liability | 1,610 | 4,065 | 1,200 | 275 | 7,150 |
| Other | 44 | 25 | 5 | — | 74 |
| Total contractual commitments (e)(f)(g) | $ 12,685 | $ 11,426 | $ 2,746 | $ 5,248 | $32,105 |
| Non−contractual postretirement benefits (h) | $ 122 | $ 645 | $ 1,209 | $ 18,507 | $20,483 |

(a)    Debt obligations in the period July 1, 2010 through December 31, 2010 include VEBA Notes of $2.5 billion that have been classified as short−term debt due to our expectation to prepay in the event that we are able to successfully execute a credit facility, and a $150 million loan facility that was classified as short−term at June 30, 2010 and repaid early in July 2010. Refer to Note 13 to the condensed consolidated financial statements for additional information on the VEBA Notes and the $150 million loan facility. Interest payments related to the VEBA Notes and the $150 million loan facility are included in the period July 1, 2010 through December 31, 2010 to correspond to the expected timing of the payments.

(b)    Projected future payments on lines of credit were based on outstanding amounts drawn at June 30, 2010.

(c)    Amounts include interest payments based on contractual terms and current interest rates on our debt and capital lease obligations. Interest payments based on variable interest rates were determined using the current interest rate in effect at June 30, 2010.

(d)    Amounts include other postretirement benefit payments under the current U.S. contractual labor agreements for the remainder of 2010 and 2011 and Canada labor agreements for the remainder of 2010 through 2012. Post−2009, the UAW hourly medical plan cash payments are capped at the contribution to the New VEBA.

(e)    Future payments in local currency amounts were translated into U.S. Dollars using the balance sheet spot rate at June 30, 2010.

(f)    Amounts do not include future cash payments for long−term purchase obligations which were recorded in Accounts payable or Accrued expenses at June 30, 2010.

(g)    Amounts exclude the cash commitment of approximately $3.5 billion in the period July 1, 2010 through December 31, 2010 to acquire AmeriCredit as well as future annual contingent obligations of Euro 265 million in the years 2011 to 2014 related to our Opel/Vauxhall restructuring plan.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

(h)    Amount includes all expected future payments for both current and expected future service at June 30, 2010 for other postretirement benefit obligations for salaried employees and hourly postretirement benefit obligations extending beyond the current North American union contract agreements.

The table above does not reflect unrecognized tax benefits of $4.6 billion due to the high degree of uncertainty regarding the future cash outflows associated with these amounts.

The table above also does not reflect certain contingent loan and funding commitments that we have made with suppliers, other third parties and certain joint ventures. At June 30, 2010 we had commitments of $1.0 billion under these arrangements that were undrawn.

We do not have any contributions due to our U.S. qualified plans in 2010. The next pension funding valuation date based on the requirements of the Pension Protection Act (PPA) of 2006 will be October 1, 2010. At that time, based on the PPA, we have the option to select a funding interest rate for the valuation based on either the Full Yield Curve method or the 3−Segment method, both of which are considered to be acceptable methods. PPA also provides the flexibility of selecting a 3−Segment rate up to the preceding five months from the valuation date of October 1, 2010, i.e., the 3−Segment rate at May 31, 2010. Therefore, for a hypothetical valuation at June 30, 2010, we have assumed the 3−Segment rate at May 31, 2010 as the potential floor for funding interest rate that we could use for the actual funding valuation. Since this hypothetical election does not limit us to only using the 3−Segment rate beyond 2010, we have assumed that we retain the flexibility of selecting a funding interest rate based on either the Full Yield Curve method or the 3−Segment method. A hypothetical funding valuation at June 30, 2010, using the 3−Segment rate at May 31, 2010 and assuming the June 30, 2010 Full Yield Curve funding interest rate for all future valuations projects contributions of $4.3 billion and $5.7 billion in 2014 and 2015 and additional contributions may be required thereafter. Contributions of $0.2 billion and $0.1 billion may be required in 2012 and 2013 in order to preserve our flexibility to use credit balances to reduce cash contributions.

Alternatively, a hypothetical funding valuation at June 30, 2010 using the 3−Segment rate at May 31, 2010 and assuming that same funding interest rate for all future valuations projects contributions of $2.4 billion in 2015 and additional contributions may be required thereafter.

In both cases, we have assumed that the pension plans earn the expected return of 8.5% in the future. The hypothetical valuations do not comprehend the potential election of relief provisions that are available to us under the Pension Relief Act of 2010 (PRA) for the 2010 and 2011 plan year valuations. Electing the relief provisions for either the 2010, 2011 or both these valuations is projected to provide additional funding flexibility and allow additional deferral of significant contributions. However, the final regulations under the PRA have not yet been released, and as such we are not currently able to determine whether we would qualify or whether we would elect to avail ourselves of these relief provisions. In addition to the funding interest rate and rate of return on assets, the pension contributions could be affected by various other factors including the effect of any legislative changes.

**Fair Value Measurements**

In January 2009 Old GM adopted ASC 820−10, "Fair Value Measurements and Disclosures," for nonfinancial assets and nonfinancial liabilities. Refer to Note 21 to the condensed consolidated financial statements for additional information regarding fair value measurements of nonfinancial assets and nonfinancial liabilities. Refer to Note 19 to the condensed consolidated financial statements for additional information regarding fair value measurements of financial assets and financial liabilities.

101

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

Significant assets and liabilities classified as Level 3, with the related Level 3 inputs, are as follows:

- Foreign currency derivatives — Level 3 inputs used to determine the fair value of foreign currency derivative liabilities include the appropriate credit spread to measure our nonperformance risk. Given our nonperformance risk is not observable through the credit default swap market we based this measurement on an analysis of comparable industrial companies to determine the appropriate credit spread which would be applied to us and Old GM by market participants in each period.

### Level 3 Assets and Liabilities

At June 30, 2010 we used Level 3 inputs to measure net liabilities of $362 million (or 0.4%) of our total liabilities. These net liabilities included $29 million (or 0.1%) of the total assets, and $391 million (or 99.2%) of the total liabilities (of which $370 million were derivative liabilities) that we measured at fair value.

At June 30, 2010 net liabilities of $362 million measured using Level 3 inputs were primarily comprised of foreign currency derivatives. Foreign currency derivatives were classified as Level 3 due to an unobservable input which relates to our nonperformance risk. Given our nonperformance risk is not observable through the credit default swap market we based this measurement on an analysis of comparable industrial companies to determine the appropriate credit spread which would be applied to us by market participants. At June 30, 2010 we included a non−performance risk adjustment of $15 million in the fair value measurement of these derivatives which reflects a discount of 4.2% to the fair value before considering our credit risk. We anticipate settling these derivatives at maturity at fair value unadjusted for our nonperformance risk. Credit risk adjustments made to a derivative liability reverse as the derivative contract approaches maturity. This effect is accelerated if a contract is settled prior to maturity.

In the three months ended June 30, 2010 assets and liabilities measured using Level 3 inputs decreased $14 million from a net liability of $376 million to a net liability of $362 million primarily due to unrealized and realized gains on and the settlement of derivatives. In the six months ended June 30, 2010 assets and liabilities measured using Level 3 inputs decreased by $310 million from a net liability of $672 million to a net liability of $362 million primarily due to unrealized and realized gains on the settlement of derivatives.

At December 31, 2009 we used Level 3 inputs to measure net liabilities of $672 million (or 0.6%) of our total liabilities. These net liabilities included $33 million (or 0.1%) of the total assets, and $705 million (or 98.7%) of the total liabilities (all of which were derivative liabilities) that we measured at fair value. At December 31, 2009 we also included a non−performance risk adjustment of $47 million in the fair value measurement of these derivatives which reflects a discount of 6.5% to the fair value before considering our credit risk.

At June 30, 2009 Old GM's mortgage− and asset−backed securities were transferred from Level 3 to Level 2 as the significant inputs used to measure fair value and quoted prices for similar instruments were determined to be observable in an active market.

For periods presented after June 1, 2009 nonperformance risk for us and Old GM was not observable through the credit default swap market as a result of the Chapter 11 Proceedings for Old GM and the lack of traded instruments for us. As a result, foreign currency derivatives with a fair market value of $1.6 billion were transferred from Level 2 to Level 3 in the three months ended June 30, 2009.

In the three months ended March 31, 2009 Old GM determined the credit profile of certain foreign subsidiaries was equivalent to Old GM's nonperformance risk which was observable through the credit default swap market and bond market based on prices for recent trades. Accordingly, foreign currency derivatives with a fair value of $2.1 billion were transferred from Level 3 into Level 2 in the six months ended June 30, 2009.

Realized gains and losses related to assets and liabilities measured using Level 3 inputs did not have a material effect on operations, liquidity or capital resources in the three and six months ended June 30, 2010 and 2009.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Dividends**

Since our formation, we have not paid any dividends on our common stock. We have no current plans to pay any dividends on our common stock. So long as any share of our Series A Fixed Rate Cumulative Perpetual Preferred Stock (Series A Preferred Stock) remains outstanding, no dividend or distribution may be declared or paid on our common stock unless all accrued and unpaid dividends have been paid on our Series A Preferred Stock subject to exceptions such as dividends on our common stock payable solely in shares of our common stock. In addition, the VEBA Note Agreement contains certain restrictions on our ability to pay dividends, other than dividends payable solely in our shares of common stock.

In particular, the VEBA Note Agreement provides that we may not pay any such dividends on our common stock unless no default or event of default has occurred under such agreement and is continuing at the time of such payment and, immediately prior to and after giving effect to such dividend, our consolidated leverage ratio is less than 3.00 to 1.00.

Our payment of dividends in the future, if any, will be determined by our Board of Directors and will be paid out of funds legally available for that purpose.

We paid dividends of $203 million on March 15, 2010 and $202 million on June 15, 2010 on our Series A Preferred Stock for the periods December 15, 2009 to March 14, 2010 and March 15, 2010 to June 14, 2010 following approval by our Board of Directors.

**Employees**

At June 30, 2010 we employed 208,000 employees. The following table summarizes employment by region (in thousands):

|  | Successor | |
| --- | --- | --- |
|  | **June 30, 2010** | **December 31, 2009** |
| GMNA | 105 | 103 |
| GMIO (a) | 61 | 62 |
| GME (b) | 42 | 50 |
| Total Worldwide | 208 | 215 |
| United States — Salaried | 26 | 26 |
| United States — Hourly | 53 | 51 |

---

(a)    Decrease in GMIO reflects a reduction of 2,400 employees due to the sale of our India Operations.

(b)    Decrease in GME primarily relates to the sale of Saab, employees located within Russia and Uzbekistan transferred from our GME segment to our GMIO segment and restructuring initiatives in Germany, Spain, and the United Kingdom.

**Critical Accounting Estimates**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which require the use of estimates, judgments and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses in the periods presented. The critical accounting estimates that affect the condensed consolidated financial statements and the judgments and assumptions used are consistent with those described in the MD&A section in our 2009 Form 10–K.

We believe that the accounting estimates employed are appropriate and resulting balances are reasonable; however, due to inherent uncertainties in making estimates actual results could differ from the original estimates, requiring adjustments to these balances in future periods. We have discussed the development, selection and disclosures of our critical accounting estimates with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the disclosures relating to these estimates. Updates to our critical accounting estimates related to events occurring subsequent to the filing of our 2009 Form 10–K are discussed below.

103

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

*Pensions*

The defined benefit pension plans are accounted for on an actuarial basis, which requires the selection of various assumptions, including an expected rate of return on plan assets and a discount rate. Due to significant events including those discussed in Note 19 to our 2009 Form 10−K, certain of the pension plans were remeasured at various dates in the periods January 1, 2010 through June 30, 2010, July 10, 2009 through December 31, 2009, January 1, 2009 through July 9, 2009 and in the years ended 2008 and 2007.

Net pension expense is calculated based on the expected return on plan assets and not the actual return on plan assets. The expected return on U.S. plan assets that is included in pension expense is determined from periodic studies, which include a review of asset allocation strategies, anticipated future long−term performance of individual asset classes, risks using standard deviations, and correlations of returns among the asset classes that comprise the plans' asset mix. While the studies give appropriate consideration to recent plan performance and historical returns, the assumptions are primarily long−term, prospective rates of return. Differences between the expected return on plan assets and the actual return on plan assets are recorded in Accumulated other comprehensive income (loss) as an actuarial gain or loss, and subject to possible amortization into net pension expense over future periods. A market−related value of plan assets, which averages gains and losses over a period of years, is utilized in the determination of future pension expense. For substantially all pension plans, market−related value is defined as an amount that initially recognizes 60.0% of the difference between the actual fair value of assets and the expected calculated value, and 10.0% of that difference over each of the next four years. The market−related value of assets at December 31, 2009 used to determine net periodic pension income for the year ending December 31, 2010 was $2.8 billion lower than the actual fair value of plan assets at December 31, 2009.

Another key assumption in determining net pension expense is the assumed discount rate to be used to discount plan obligations. We estimate this rate for U.S. plans, using a cash flow matching approach, also called a spot rate yield curve approach, which uses projected cash flows matched to spot rates along a high quality corporate yield curve to determine the present value of cash flows to calculate a single equivalent discount rate. Old GM used an iterative process based on a hypothetical investment in a portfolio of high−quality bonds rated AA or higher by a recognized rating agency and a hypothetical reinvestment of the proceeds of such bonds upon maturity using forward rates derived from a yield curve until the U.S. pension obligation was defeased. This reinvestment component was incorporated into the methodology because it was not feasible, in light of the magnitude and time horizon over which U.S. pension obligations extend, to accomplish full defeasance through direct cash flows from an actual set of bonds selected at any given measurement date.

The benefit obligation for pension plans in Canada, the United Kingdom and Germany comprise 92% of the non−U.S. pension projected benefit obligation at December 31, 2009. The discount rates for Canadian plans are determined using a cash flow matching approach, similar to the U.S. The discount rates for plans in the United Kingdom and Germany use a curve derived from high quality corporate bonds with maturities consistent with the plans' underlying duration of expected benefit payments.

In the U.S., from December 31, 2009 to June 30, 2010, interest rates on high quality corporate bonds have decreased. We believe that a discount rate calculated as of June 30, 2010 using the methods described previously for U.S. pensions would be approximately 65 to 75 basis points lower than the rates used to measure the pension plans at December 31, 2009, the date of the last remeasurement for the U.S. Plans. As a result, funded status would decrease if the plans were remeasured at June 30, 2010, holding all other factors (e.g., actuarial assumptions and asset returns) constant. Refer to the following table, which presents the 25 basis point sensitivity for U.S. Pension Plans. It is not possible for us to predict what the economic environment will be at our next scheduled remeasurement as of December 31, 2010. Accordingly, discount rates and plan assets may be considerably different than those at June 30, 2010. Under U.S. GAAP, we are not obligated to remeasure the pension plans as of June 30, 2010.

| | 25 basis point increase | | 25 basis point decrease | |
|---|---|---|---|---|
| **U. S. Plans (a)** | | | | |
| Effect on Annual Pension Expense (in millions) | $ | 90 | $ | (95) |
| Effect on December 31, 2009 PBO (in billions) | $ | (2.3) | $ | 2.4 |

(a)    Based on December 31, 2009 remeasurements

104

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

There were multiple remeasurements of certain non−U.S. plans during the six months ended June 30, 2010. If all non−U.S. plans were remeasured as of June 30, 2010, we believe that the weighted average discount rate would not change significantly from the discount rates used to measure the obligations included in our balance sheet at June 30, 2010. Refer to the following table, which presents the 25 basis point sensitivity for non−U.S. plans.

| | 25 basis point increase | 25 basis point decrease |
|---|---|---|
| **Non−U. S. Plans (a)** | | |
| Effect on Annual Pension Expense (in millions) | $ (6) | $ 11 |
| Effect on December 31, 2009 PBO (in billions) | $ (0.6) | $ 0.7 |

(a)  Our largest plans are in Canada, Germany and the U.K. The largest plans in Germany and the U.K. were remeasured at June 30, 2010 and our plans in Canada at December 31, 2009.

The following table summarizes rates used to determine net pension expense:

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | January 1, 2010 Through June 30, 2010 (1) | July 10, 2009 Through December 31, 2009 | January 1, 2009 Through July 9, 2009 | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
| Weighted−average expected long−term rate of return on U.S. plan assets | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% |
| Weighted−average expected long−term rate of return on non−U.S. plan assets | 7.34% | 7.97% | 7.74% | 7.78% | 7.85% |
| Weighted−average discount rate for U.S. plan obligations | 5.52% | 5.63% | 6.27% | 6.56% | 5.97% |
| Weighted−average discount rate for non−U.S. plan obligations | 5.31% | 5.82% | 6.23% | 5.77% | 4.97% |

(1)  No remeasurement except for pension plans in the United Kingdom, Belgium, and Germany.

Significant differences in actual experience or significant changes in assumptions may materially affect the pension obligations. The effect of actual results differing from assumptions and the changing of assumptions are included in unamortized net actuarial gains and losses that are subject to amortization to expense over future periods.

The following table summarizes the unamortized actuarial (gain) loss (before tax) on U.S. and non−U.S. pension plans (dollars in billions):

| | Successor | | Predecessor |
|---|---|---|---|
| | June 30, 2010 | December 31, 2009 | December 31, 2008 |
| Unamortized actuarial (gain) loss | $ (2.7) | $ (3.0) | $ 41.1 |

The unamortized actuarial gain of $2.7 million as of June 30, 2010, reflects the December 31, 2009 amount updated for accounting activity during the six months ended June 30, 2010, arising primarily from the remeasurements in the United Kingdom, Belgium and Germany and foreign currency translation.

Table of Contents

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

The following table summarizes the actual and expected return on pension plan assets (dollars in billions):

| | Successor July 10, 2009 Through December 31, 2009 | Predecessor | | |
| --- | --- | --- | --- | --- |
| | | January 1, 2009 Through July 9, 2009 | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
| U.S. actual return (a) | $ 9.9 | $ (0.2) | $ (11.4) | $ 10.1 |
| U.S. expected return | $ 3.0 | $ 3.8 | $ 8.0 | $ 8.0 |
| Non−U.S. actual return (a) | $ 1.2 | $ 0.2 | $ (2.9) | $ 0.5 |
| Non−U.S. expected return | $ 0.4 | $ 0.4 | $ 1.0 | $ 1.0 |

(a)    Actual return not available for the six months ended June 30, 2010 as all of the plans were not remeasured.

Based on the last full set of pension plan remeasurements that was completed as of December 31, 2009, a change in the expected return on assets (EROA) assumption has the following effects: For the U.S. plans, an increase in the EROA of 25 basis points will decrease annual pension expense by $193 million; a decrease to the EROA will increase pension expense by $193 million. For the non−U.S. plans, an increase in the EROA of 25 basis points will decrease annual pension expense by $32 million, a decrease to the EROA of 25 basis points will increase pension expense by $32 million.

The U.S. pension plans generally provide covered U.S. hourly employees hired prior to October 15, 2007 with pension benefits of negotiated, flat dollar amounts for each year of credited service earned by an individual employee. Early retirement supplements are also provided to those who retire prior to age 62. Hourly employees hired after October 15, 2007 participate in a cash balance pension plan. Formulas providing for such stated amounts are contained in the applicable labor contract. Pension expense in the six months ended June 30, 2010, the periods July 10, 2009 through December 31, 2009, January 1, 2009 through July 9, 2009, and in the years ended 2008 and 2007 and the pension obligations at June 30, 2010, December 31, 2009 and 2008 do not comprehend any future benefit increases or decreases that may occur beyond current labor contracts. The usual cycle for negotiating new labor contracts is every four years. There is not a past practice of maintaining a consistent level of benefit increases or decreases from one contract to the next.

The following data illustrates the sensitivity of changes in pension expense and pension obligation based on the last remeasurement of the U.S hourly pension plan at December 31, 2009, as a result of changes in future benefit units for U.S. hourly employees, effective after the expiration of the current contract:

| Change in future benefit units | Effect on 2010 Pension Expense | Effect on December 31, 2009 PBO |
| --- | --- | --- |
| One percentage point increase in benefit units | +$82 million | +$  239 million |
| One percentage point decrease in benefit units | −$79 million | −$  232 million |

#### Other Postretirement Benefits

OPEB plans are accounted for on an actuarial basis, which requires the selection of various assumptions, including a discount rate and healthcare cost trend rates. Old GM used an iterative process based on a hypothetical investment in a portfolio of high−quality bonds rated AA or higher by a recognized rating agency and a hypothetical reinvestment of the proceeds of such bonds upon maturity using forward rates derived from a yield curve until the U.S. OPEB obligation was defeased. This reinvestment component was incorporated into the methodology because it was not feasible, in light of the magnitude and time horizon over which the U.S. OPEB obligations extend, to accomplish full defeasance through direct cash flows from an actual set of bonds selected at any given measurement date.

Beginning in September 2008, the discount rate used for the benefits to be paid from the UAW retiree medical plan during the period September 2008 through December 2009 is based on a yield curve which uses projected cash flows of representative high−quality AA rated bonds matched to spot rates along a yield curve to determine the present value of cash flows to calculate a single equivalent discount rate. All other U.S. OPEB plans started using a discount rate based on a yield curve on July 10, 2009. The UAW retiree medical plan was settled on December 31, 2009 and the plan assets were contributed to the New VEBA as part of the payment terms under the 2009 Revised UAW Settlement Agreement. We are released from UAW retiree health care claims incurred after December 31, 2009.

106

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

An estimate is developed of the healthcare cost trend rates used to value benefit obligations through review of historical retiree cost data and near−term healthcare outlook which includes appropriate cost control measures that have been implemented. Changes in the assumed discount rate or healthcare cost trend rate can have significant effect on the actuarially determined obligation and related U.S. OPEB expense. As a result of modifications made as part of the 363 Sale, there are no significant uncapped U.S. healthcare plans remaining at December 31, 2009 and, therefore, the healthcare cost trend rate no longer has a significant effect in the U.S.

The significant non−U.S. OPEB plans cover Canadian employees. The discount rates for the Canadian plans are determined using a cash flow matching approach, similar to the U.S. OPEB obligations plans.

Due to the significant events discussed in Note 19 to our 2009 Form 10−K, the U.S. and non−U.S. OPEB plans were remeasured at various dates in the periods July 10, 2009 through December 31, 2009, January 1, 2009 through July 9, 2009 and in the years ended 2008 and 2007.

Significant differences in actual experience or significant changes in assumptions may materially affect the OPEB obligations. The effects of actual results differing from assumptions and the effects of changing assumptions are included in net actuarial gains and losses in Accumulated other comprehensive income (loss) that are subject to amortization over future periods.

In the U.S., from December 31, 2009 to June 30, 2010, interest rates on high quality corporate bonds have decreased. We believe that a discount rate calculated as of June 30, 2010 using the methods described previously for U.S. OPEB plans would be approximately 65 to 75 basis points lower than the rates used to measure the plans at December 31, 2009, the date of the last remeasurement for U.S. OPEB Plans. As a result, funded status would decrease if the plans were remeasured at June 30, 2010, holding all other factors constant (e.g., actuarial assumptions). Our significant non−U.S. OPEB plans are in Canada. We do not believe that there has been a significant change in interest rates on high quality corporate bonds in Canada from December 31, 2009 to June 30, 2010. Accordingly, we believe that the weighted average discount rate would not change significantly from December 31, 2009. It is not possible for us to predict what the economic environment will be at our next scheduled remeasurement as of December 31, 2010. Accordingly, discount rates may be considerably different than those at June 30, 2010. Under U.S. GAAP, we are not obligated to remeasure the plans as of June 30, 2010.

The estimated effect of a 25 basis point change in discount rate is summarized in the sensitivity table which follows.

| | Change in Assumption | | | |
| | 25 basis point increase | | 25 basis point decrease | |
|---|---|---|---|---|
| **U. S. Plans** | | | | |
| Effect on Annual OPEB Expense (in millions) | $ | 5 | $ | (3) |
| Effect on December 31, 2009 APBO (in billions) | $ | (0.1) | $ | 0.1 |
| | | | | |
| **Non−U. S. Plans** | | | | |
| Effect on Annual OPEB Expense (in millions) | $ | 1 | $ | (1) |
| Effect on December 31, 2009 APBO (in billions) | $ | (0.1) | $ | 0.1 |

The following table summarizes the weighted−average discount rate used to determine net OPEB expense for the significant plans:

| | Successor | | Predecessor | | |
| | January 1, 2010 Through June 30, 2010 | July 10, 2009 Through December 31, 2009 | January 1, 2009 Through July 9, 2009 | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|---|---|---|
| Weighted−average discount rate for U.S. plans | 5.57% | 6.81% | 8.11% | 7.02% | 5.90% |
| Weighted−average discount rate for non−U.S. plans | 5.22% | 5.47% | 6.77% | 5.90% | 5.00% |

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

The following table summarizes the health care cost trend rates used in the last remeasurement of the accumulated postretirement benefit obligations (APBO) at December 31:

| Assumed Healthcare Trend Rates | Successor | | Predecessor | |
|---|---|---|---|---|
| | December 31, 2009 | | December 31, 2008 | |
| | U.S. Plans(a) | Non U.S. Plans(b) | U.S. Plans | Non U.S. Plans |
| Initial healthcare cost trend rate | —% | 5.4% | 8.0% | 5.5% |
| Ultimate healthcare cost trend rate | —% | 3.3% | 5.0% | 3.3% |
| Number of years to ultimate trend rate | — | 8 | 6 | 8 |

(a)    As a result of modifications made to health care plans in connection with the 363 Sale, there are no significant uncapped U.S. healthcare plans remaining at December 31, 2009 and, therefore, the healthcare cost trend rate does not have a significant effect on the U.S. plans.

(b)    The implementation of the HCT in Canada is anticipated in the near future, which will significantly reduce our exposure to changes in the healthcare cost trend rate.

The following table summarizes the effect of a one−percentage point change in the assumed healthcare trend rates based on the last remeasurement of the benefit plans at December 31, 2009:

| Change in Assumption | U.S. Plans(a) | | Non−U.S. Plans | |
|---|---|---|---|---|
| | Effect on 2010 Aggregate Service and Interest Cost | Effect on December 31, 2009 APBO | Effect on 2010 Aggregate Service and Interest Cost | Effect on December 31, 2009 APBO |
| One percentage point increase | $  — | $  — | +$  14 million | +$  413 million |
| One percentage point decrease | $  — | $  — | −$  11 million | −$  331 million |

(a)    As a result of modifications made to health care plans in connection with the 363 Sale, there are no significant uncapped U.S. healthcare plans remaining at December 31, 2009 and, therefore, the healthcare cost trend rate does not have a significant effect in the U.S.

*Impairment of Goodwill*

Goodwill is tested for impairment in the fourth quarter of each year for all reporting units, or more frequently if events occur or circumstances change that would warrant such a review. Our reporting units are GMNA, GME, and various components within the GMIO segment. The fair values of the reporting units are determined based on valuation techniques using the best available information, primarily discounted cash flow projections. We make significant assumptions and estimates about the extent and timing of future cash flows, growth rates and discount rates. The cash flows are estimated over a significant future period of time, which makes those estimates and assumptions subject to a high degree of uncertainty. While we believe that the assumptions and estimates used to determine the estimated fair values of each of our reporting units are reasonable, a change in assumptions underlying these estimates could result in a material effect on the financial statements.

At June 30, 2010 and December 31, 2009 we had goodwill of $30.2 billion and $30.7 billion, which predominately arose upon the application of fresh−start reporting. When applying fresh−start reporting, certain accounts, primarily employee benefit and income tax related, were recorded at amounts determined under specific U.S. GAAP rather than fair value, and the difference between the U.S. GAAP and fair value amounts gives rise to goodwill, which is a residual. Our employee benefit related accounts were recorded in accordance with ASC 712 and ASC 715 and deferred income taxes were recorded in accordance with ASC 740. Further, we recorded valuation allowances against certain of our deferred tax assets, which under ASC 852 also resulted in goodwill. If all identifiable assets and liabilities had been recorded at fair value upon application of fresh−start reporting, no goodwill would have resulted.

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

In the future, we have an increased likelihood of measuring goodwill for possible impairment during our annual or event−triggered goodwill impairment testing. An event driven impairment test is required if it is more likely than not that the fair value of a reporting unit is less than its net book value. Because our reporting units were recorded at their fair values upon application of fresh−start reporting, it is more likely that a decrease in the fair value of our reporting units from their fresh−start reporting values could occur, and such a decrease would trigger the need to measure for possible goodwill impairments.

Future goodwill impairments would occur should the fair value−to−U.S. GAAP adjustments differences decrease. Goodwill resulted from our recorded liabilities for certain employee benefit obligations being higher than the fair value of these obligations because lower discount rates were utilized in determining the U.S. GAAP values compared to those utilized to determine fair values. The discount rates utilized to determine the fair value of these obligations were based on our incremental borrowing rates, which included our nonperformance risk. Our incremental borrowing rates are also impacted by changes in market interest rates. Further, the recorded amounts of our assets were lower than their fair values because of the recording of valuation allowances on certain of our deferred tax assets. The difference between these fair value to U.S. GAAP amounts would decrease upon an improvement in our credit rating, thus resulting in a decrease in the spread between our employee benefit related obligations under U.S. GAAP and their fair values. A decrease will also occur upon reversal of our deferred tax asset valuation allowances. Should the fair value to U.S. GAAP adjustments differences decrease for these reasons, the implied goodwill balance will decline. Accordingly, at the next annual or event−driven goodwill impairment test, to the extent the carrying value of a reporting unit exceeds its fair value, a goodwill impairment could occur.

In the three months ended June 30, 2010 there were event driven changes in circumstances within our GME reporting unit that warranted the testing of goodwill for impairment. Anticipated competitive pressure on our margins in the near− and medium−term led us to believe that the goodwill associated with our GME reporting unit may be impaired. Utilizing the best available information as of June 30, 2010 we performed a step one goodwill impairment test for our GME reporting unit, and concluded that goodwill was not impaired. The fair value of our GME reporting unit was estimated to be approximately $325 million over its carrying amount. If we had not passed step one, we believe the amount of any goodwill impairment would approximate $140 million based on the estimated differences between the fair value to U.S. GAAP adjustments at June 30, 2010 primarily for employee benefit plans and income taxes that gave rise to goodwill.

We utilized a discounted cash flow methodology to estimate the fair value of our GME reporting unit. The valuation methodologies utilized were consistent with those used in our application of fresh−start reporting on July 10, 2009, as discussed in Note 2 to our 2009 Form 10−K, and in our 2009 annual and event driven GME impairment tests and result in Level 3 measures within the valuation hierarchy. Assumptions used in our discounted cash flow analysis that had the most significant effect on the estimated fair value of our GME reporting unit include:

• Our estimated weighted−average cost of capital (WACC);

• Our estimated long−term growth rates; and

• Our estimate of industry sales and our market share.

We used a WACC of 22.0% that considered various factors including bond yields, risk premiums, and tax rates; a terminal value that was determined using a growth model that applied a long−term growth rate of 0.5% to our projected cash flows beyond 2015; and industry sales of 18.4 million vehicles and a market share for Opel/Vauxhall of 6.45% in 2010 increasing to industry sales of 22.0 million vehicles and a 7.4% market share in 2015.

Our fair value estimate assumes the achievement of the future financial results contemplated in our forecasted cash flows, and there can be no assurance that we will realize that value. The estimates and assumptions used are subject to significant uncertainties, many of which are beyond our control, and there is no assurance that anticipated financial results will be achieved.

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

The following table summarizes the approximate effects that a change in the WACC and long−term growth rate assumptions would have had on our determination of the fair value of our GME reporting unit at June 30, 2010 keeping all other assumptions constant (dollars in millions):

| Change in Assumption | Effect on Fair Value of GME Reporting Unit at June 30, 2010 |
|---|---|
| One percentage point decrease in WACC | +$ 272 |
| One percentage point increase in WACC | −$ 247 |
| One−half percentage point increase in long−term growth rate | +$ 38 |
| One−half percentage point decrease in long−term growth rate | −$ 36 |

Refer to Note 8 to the unaudited condensed consolidated financial statements for additional information on goodwill impairments.

During the three months ended December 31, 2009 we performed our annual goodwill impairment testing for all of our reporting units and event driven impairment testing for our GME and certain other reporting units in GMIO. Based on this testing, we determined that goodwill was not impaired. Refer to Notes 12 and 25 to the 2009 Form 10−K for additional information on goodwill impairments.

### *Deferred Taxes*

We establish and Old GM established valuation allowances for deferred tax assets based on a more likely than not threshold. The ability to realize deferred tax assets depends on the ability to generate sufficient taxable income within the carryback or carryforward periods provided for in the tax law for each applicable tax jurisdiction. We consider and Old GM considered the following possible sources of taxable income when assessing the realization of deferred tax assets:

- Future reversals of existing taxable temporary differences;

- Future taxable income exclusive of reversing temporary differences and carryforwards;

- Taxable income in prior carryback years; and

- Tax−planning strategies.

The assessment regarding whether a valuation allowance is required or should be adjusted also considers, among other matters, the nature, frequency and severity of recent losses, forecasts of future profitability, the duration of statutory carryforward periods, our and Old GM's experience with tax attributes expiring unused and tax planning alternatives. In making such judgments, significant weight is given to evidence that can be objectively verified.

Concluding that a valuation allowance is not required is difficult when there is significant negative evidence that is objective and verifiable, such as cumulative losses in recent years. Although we are a new company, and our ability to achieve future profitability was enhanced by the cost and liability reductions that occurred as a result of the Chapter 11 Proceedings and 363 Sale, Old GM's historic operating results remain relevant as they are reflective of the industry and the effect of economic conditions. The fundamental businesses and inherent risks in which we globally operate did not change from those in which Old GM operated. We utilize and Old GM utilized a rolling three years of actual and current year anticipated results as the primary measure of cumulative losses in recent years. However, because a substantial portion of those cumulative losses relate to various non−recurring matters, those three−year cumulative results are adjusted for the effect of these items. In addition the near− and medium−term financial outlook is considered when assessing the need for a valuation allowance.

If, in the future, we generate taxable income in jurisdictions where we have recorded full valuation allowances, on a sustained basis, our conclusion regarding the need for full valuation allowances in these tax jurisdictions could change, resulting in the reversal of

110

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

some or all of the valuation allowances. If our operations generate taxable income prior to reaching profitability on a sustained basis, we would reverse a portion of the valuation allowance related to the corresponding realized tax benefit for that period, without changing our conclusions on the need for a full valuation allowance against the remaining net deferred tax assets.

The valuation of deferred tax assets requires judgment and accounting for deferred tax consequences of events that have been recorded in the financial statements or in the tax returns and our future profitability represents our best estimate of those future events. Changes in our current estimates, due to unanticipated events or otherwise, could have a material effect on our financial condition and results of operations. In 2008 because Old GM concluded there was substantial doubt related to its ability to continue as a going concern, it was determined that it was more likely than not that it would not realize its net deferred tax assets in most jurisdictions even though certain of these entities were not in three−year adjusted cumulative loss positions. In July 2009 with U.S. parent company liquidity concerns resolved in connection with the Chapter 11 Proceedings and the 363 Sale, to the extent there was no other significant negative evidence, we concluded that it is more likely than not that we would realize the deferred tax assets in jurisdictions not in three−year adjusted cumulative loss positions.

**Accounting Standards Not Yet Adopted**

Refer to Note 3 to the condensed consolidated financial statements.

**Forward−Looking Statements**

In this report and in reports we subsequently file with the SEC on Forms 10−K and 10−Q and file or furnish on Form 8−K, and in related comments by our management, we use words like "anticipate," "believe," "continue," "could," "designed," "effect," "estimate," "evaluate," "expect," "forecast," "goal," "initiative," "intend," "may," "objective," "outlook," "plan," "potential," "priorities," "project," "pursue," "seek," "should," "target," "when," "would," or the negative of any of those words or similar expressions to identify forward−looking statements that represent our current judgment about possible future events. In making these statements we rely on assumptions and analyses based on our experience and perception of historical trends, current conditions and expected future developments as well as other factors we consider appropriate under the circumstances. We believe these judgments are reasonable, but these statements are not guarantees of any events or financial results, and our actual results may differ materially due to a variety of important factors, both positive and negative. These factors, which may be revised or supplemented in subsequent reports on SEC Forms 10−K, 10−Q and 8−K, include among others the following:

•    Our ability to realize production efficiencies and to achieve reductions in costs as a result of our restructuring initiatives and labor modifications;

•    Our ability to maintain quality control over our vehicles and avoid material vehicle recalls;

•    Our ability to maintain adequate liquidity and financing sources and an appropriate level of debt, including as required to fund our planned significant investment in new technology, and, even if funded, our ability to realize successful vehicle applications of new technology;

•    The effect of business or liquidity difficulties for us or one or more subsidiaries on other entities in our corporate group as a result of our highly integrated and complex corporate structure and operation;

•    Our ability to continue to attract customers, particularly for our new products, including cars and crossover vehicles;

•    Availability of adequate financing on acceptable terms to our customers, dealers, distributors and suppliers to enable them to continue their business relationships with us;

•    The financial viability and ability to borrow of our key suppliers and their ability to provide systems, components and parts without disruption;

•    Our ability to take actions we believe are important to our long−term strategy, including our ability to enter into certain material transactions outside of the ordinary course of business, which may be limited due to significant covenants in the VEBA Note Agreement;

111

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

- Our ability to manage the distribution channels for our products, including our ability to consolidate our dealer network;

- Our ability to qualify for federal funding of our advanced technology vehicle programs under Section 136 of the Energy Independence and Security Act of 2007;

- The ability to successfully restructure our European operations;

- The continued availability of both wholesale and retail financing from Ally Financial and its affiliates in the United States, Canada and the other markets in which we operate to support our ability to sell vehicles in those markets, which is dependent on Ally Financial's ability to obtain funding and which may be suspended by Ally Financial if Ally Financial's credit exposure to us exceeds certain limitations provided in our operating arrangements with Ally Financial;

- Our ability to develop captive financing capability, including by closing the acquisition of AmeriCredit, which is contingent upon certain closing conditions such as the approval of AmeriCredit shareholders;

- Overall strength and stability of general economic conditions and of the automotive industry, both in the United States and in global markets;

- Continued economic instability or poor economic conditions in the United States and global markets, including the credit markets, or changes in economic conditions, commodity prices, housing prices, foreign currency exchange rates or political stability in the markets in which we operate;

- Shortages of and increases or volatility in the price of oil;

- Significant changes in the competitive environment, including the effect of competition and excess manufacturing capacity in our markets, on our pricing policies or use of incentives and the introduction of new and improved vehicle models by our competitors;

- Significant changes in economic and market conditions in China, including the effect of competition from new market entrants, on our vehicle sales and market position in China;

- Changes in the existing, or the adoption of new, laws, regulations, policies or other activities of governments, agencies and similar organizations, including where such actions may affect the production, licensing, distribution or sale of our products, the cost thereof or applicable tax rates;

- Costs and risks associated with litigation;

- Significant increases in our pension expense or projected pension contributions resulting from changes in the value of plan assets, the discount rate applied to value the pension liabilities or other assumption changes;

- Changes in accounting principles, or their application or interpretation, and our ability to make estimates and the assumptions underlying the estimates, which could have an effect on earnings; and

- Other risks described from time to time in periodic and current reports that we file with the SEC.

We caution readers not to place undue reliance on forward−looking statements. We undertake no obligation to update publicly or otherwise revise any forward−looking statements, whether as a result of new information, future events or other factors that affect the subject of these statements, except where we are expressly required to do so by law.

* * * * * * *

**Item 3.** *Quantitative and Qualitative Disclosures About Market Risk*

We and Old GM entered into a variety of foreign currency exchange, interest rate and commodity forward contracts and options to manage exposures arising from market risks resulting from changes in foreign currency exchange rates, interest rates and certain commodity prices. We do not enter into derivative transactions for speculative purposes.

**Table of Contents**

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

The overall financial risk management program is under the responsibility of the Risk Management Committee, which reviews and, where appropriate, approves strategies to be pursued to mitigate these risks. A risk management control framework is utilized to monitor the strategies, risks and related hedge positions, in accordance with the policies and procedures approved by the Risk Management Committee.

In August 2010 we changed our risk management policy. Our prior policy was intended to reduce volatility of forecasted cash flows primarily through the use of forward contracts and swaps. The intent of the new policy is primarily to protect against risk arising from extreme adverse market movements on our key exposures and involves a shift to greater use of purchased options.

A discussion of our and Old GM's accounting policies for derivative financial instruments is included in Note 4 to the consolidated financial statements in our 2009 10−K. Further information on our exposure to market risk is included in Note 20 to the consolidated financial statements in our 2009 10−K.

In 2008 credit market volatility increased significantly, creating broad credit concerns. In addition, Old GM's credit standing and liquidity position in the first half of 2009 and the Chapter 11 Proceedings severely limited its ability to manage risks using derivative financial instruments as most derivative counterparties were unwilling to enter into transactions with Old GM. Subsequent to the 363 Sale and through December 31, 2009, we were largely unable to enter forward contracts pending the completion of negotiations with potential derivative counterparties. In August 2010 we executed new agreements with counterparties that enable us to enter into options, forward contracts and swaps.

In accordance with the provisions of ASC 820−10, "Fair Value Measurements and Disclosures," which requires companies to consider nonperformance risk as part of the measurement of fair value of derivative liabilities, we record changes in the fair value of our derivative liabilities based on our current credit standing. At June 30, 2010 the fair value of derivatives in a net liability position was $340 million.

The following analyses provide quantitative information regarding exposure to foreign currency exchange rate risk, interest rate risk, commodity price risk and equity price risk. Sensitivity analysis is used to measure the potential loss in the fair value of financial instruments with exposure to market risk. The models used assume instantaneous, parallel shifts in exchange rates, interest rate yield curves and commodity prices. For options and other instruments with nonlinear returns, models appropriate to these types of instruments are utilized to determine the effect of market shifts. There are certain shortcomings inherent in the sensitivity analyses presented, primarily due to the assumption that interest rates and commodity prices change in a parallel fashion and that spot exchange rates change instantaneously. In addition, the analyses are unable to reflect the complex market reactions that normally would arise from the market shifts modeled and do not contemplate the effects of correlations between foreign currency pairs, or offsetting long−short positions in currency pairs which may significantly reduce the potential loss in value.

### Foreign Currency Exchange Rate Risk

We have and Old GM had foreign currency exposures related to buying, selling, and financing in currencies other than the functional currencies of our and Old GM's operations. Derivative instruments, such as foreign currency forwards, swaps and options are used primarily to hedge exposures with respect to forecasted revenues, costs and commitments denominated in foreign currencies. At June 30, 2010 such contracts have remaining maturities of up to 14 months. At June 30, 2010 our three most significant foreign currency exposures are the U.S. Dollar/Korean Won, Euro/British Pound and Euro/Korean Won.

At June 30, 2010, December 31, 2009 and 2008 the net fair value liability of financial instruments with exposure to foreign currency risk was $3.6 billion, $5.9 billion and $6.3 billion. This presentation utilizes a population of foreign currency exchange derivatives and foreign currency denominated debt and excludes the offsetting effect of foreign currency cash, cash equivalents and other assets. The potential loss in fair value for such financial instruments from a 10% parallel shift in all quoted foreign currency exchange rates would be $589 million, $941 million and $2.3 billion at June 30, 2010, December 31, 2009 and 2008.

We are and Old GM was also exposed to foreign currency risk due to the translation of the results of certain international operations into U.S. Dollars as part of the consolidation process. Fluctuations in foreign currency exchange rates can therefore create volatility in

Table of Contents

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

the results of operations and may adversely affect our and Old GM's financial position. The effect of foreign currency exchange rate translation on our consolidated financial position was a net translation loss of $189 million in the six months ended June 30, 2010 and a gain of $157 million in the period July 10, 2009 through December 31, 2009. The effect of foreign currency exchange rate translation on Old GM's consolidated financial position was a net translation gain of $232 million in the period January 1, 2009 through July 9, 2009 and a net translation loss of $1.2 billion in the year ended December 31, 2008. These gains and losses were recorded as an adjustment to Total stockholders' deficit through Accumulated other comprehensive income (loss). The effects of foreign currency exchange rate transactions were a loss of $33 million in the six months ended June 30, 2010 a loss of $755 million in the period July 10, 2009 through December 31, 2009, a loss of $1.1 billion in the period January 1, 2009 through July 9, 2009 and a gain of $1.7 billion in the year ended December 31, 2008.

**Interest Rate Risk**

We are and Old GM was subject to market risk from exposure to changes in interest rates due to financing activities. Interest rate risk in Old GM was managed primarily with interest rate swaps. The interest rate swaps Old GM entered into usually involved the exchange of fixed for variable rate interest payments to effectively convert fixed rate debt into variable rate debt in order to achieve a target range of variable rate debt. At June 30, 2010 we did not have any interest rate swap derivative positions to manage interest rate exposures.

At June 30, 2010 we had fixed rate short−term debt of $4.4 billion and variable rate short−term debt of $1.1 billion. Of this fixed rate short−term debt, $3.2 billion was denominated in U.S. Dollars and $1.2 billion was denominated in foreign currencies. Of the variable rate short−term debt, $339 million was denominated in U.S. Dollars and $796 million was denominated in foreign currencies.

At December 31, 2009 we had fixed rate short−term debt of $592 million and variable rate short−term debt of $9.6 billion. Of this fixed rate short−term debt, $232 million was denominated in U.S. Dollars and $360 million was denominated in foreign currencies. Of the variable rate short−term debt, $6.2 billion was denominated in U.S. Dollars and $3.4 billion was denominated in foreign currencies.

At June 30, 2010 we had fixed rate long−term debt of $2.1 billion and variable rate long−term debt of $588 million. Of this fixed rate long−term debt, $576 million was denominated in U.S. Dollars and $1.5 billion was denominated in foreign currencies. Of the variable rate long−term debt, $358 million was denominated in U.S. Dollars and $230 million was denominated in foreign currencies.

At December 31, 2009 we had fixed rate long−term debt of $4.7 billion and variable rate long−term debt of $873 million. Of this fixed rate long−term debt, $3.4 billion was denominated in U.S. Dollars and $1.3 billion was denominated in foreign currencies. Of the variable rate long−term debt, $551 million was denominated in U.S. Dollars and $322 million was denominated in foreign currencies.

At June 30, 2010, December 31, 2009 and 2008 the net fair value liability of financial instruments with exposure to interest rate risk was $7.8 billion, $16.0 billion and $17.0 billion. The potential increase in fair value at June 30, 2010 resulting from a 10% decrease in quoted interest rates would be $226 million. The potential increase in fair value at December 31, 2009 resulting from a 10% decrease in quoted interest rates would be $402 million. The potential increase in fair value at December 31, 2008 resulting from a 10 percentage point increase in quoted interest rates would be $3.6 billion.

**Commodity Price Risk**

We are and Old GM was exposed to changes in prices of commodities used in the automotive business, primarily associated with various non−ferrous and precious metals for automotive components and energy used in the overall manufacturing process. Certain commodity purchase contracts meet the definition of a derivative. Old GM entered into various derivatives, such as commodity swaps and options, to offset its commodity price exposures. We resumed a derivative commodity hedging program using options in December 2009.

At June 30, 2010, December 31, 2009 and 2008 the net fair value asset (liability) of commodity derivatives was $24 million, $11 million and ($553) million. The potential loss in fair value resulting from a 10% adverse change in the underlying commodity prices

114

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

would be $13 million, $6 million and $109 million at June 30, 2010, December 31, 2009 and 2008. This amount excludes the offsetting effect of the commodity price risk inherent in the physical purchase of the underlying commodities.

**Equity Price Risk**

We are and Old GM was exposed to changes in prices of equity securities held. We typically do not attempt to reduce our market exposure to these equity instruments. Our exposure includes certain investments we hold in warrants of other companies. At June 30, 2010 and December 31, 2009 the fair value of these warrants was $25 million. At June 30, 2010 and December 31, 2009 our exposure also includes investments of $30 million and $32 million in equity securities classified as trading. At December 31, 2008 Old GM had investments of $24 million in equity securities classified as available−for−sale. These amounts represent the maximum exposure to loss from these investments.

At June 30, 2010, the carrying amount of cost method investments was $1.7 billion, of which the carrying amounts of our investments in Ally Financial common stock and Ally Financial preferred stock were $966 million and $665 million. At December 31, 2009 the carrying amount of cost method investments was $1.7 billion, of which the carrying amounts of our investments in Ally Financial common stock and preferred stock were $970 million and $665 million. At December 31, 2008 the carrying amount of cost method investments was $98 million, of which the carrying amount of the investment in Ally Financial Preferred Membership Interests was $43 million. These amounts represent the maximum exposure to loss from these investments. On June 30, 2009 Ally Financial converted from a tax partnership to a C corporation and, as a result, our equity ownership in Ally Financial was converted from membership interests to shares of capital stock. Also, on June 30, 2009 Old GM began to account for its investment in Ally Financial common stock as a cost method investment. On July 10, 2009 as a result of our application of fresh−start reporting, we recorded an increase of $1.3 billion and $629 million to the carrying amounts of our investments in Ally Financial common stock and preferred stock to reflect their estimated fair value of $1.3 billion and $665 million. In the period July 10, 2009 through December 31, 2009 we recorded impairment charges of $270 million related to our investment in Ally Financial common stock and $4 million related to other cost method investments. In the year ended 2008 Old GM recorded impairment charges of $1.0 billion related to its investment in Ally Financial Preferred Membership Interests.

**Counterparty Risk**

We are exposed to counterparty risk on derivative contracts, which is the loss we could incur if a counterparty to a derivative contract defaulted. We enter into agreements with counterparties that allow the set−off of certain exposures in order to manage this risk.

Our counterparty risk is managed by our Risk Management Committee, which establishes exposure limits by counterparty. We monitor and report our exposures to the Risk Management Committee and our Treasurer on a periodic basis. At June 30, 2010 a majority of all of our counterparty exposures are with counterparties that are rated A or higher.

**Concentration of Credit Risk**

We are exposed to concentration of credit risk primarily through holding cash and cash equivalents (which include money market funds), short− and long−term investments and derivatives. As part of our risk management process, we monitor and evaluate the credit standing of the financial institutions with which we do business. The financial institutions with which we do business are generally highly rated and geographically dispersed.

We are exposed to credit risk related to the potential inability to access liquidity in money market funds we invested in if the funds were to deny redemption requests. As part of our risk management process, we invest in large funds that are managed by reputable financial institutions. We also follow investment guidelines to limit our exposure to individual funds and financial institutions.

\*  \*  \*  \*  \*  \*

115

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Item 4.** *Controls and Procedures*

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended (Exchange Act), is recorded, processed, summarized, and reported within the specified time periods and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chairman and CEO and Vice Chairman and CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a−15(e) or 15d−15(e) promulgated under the Exchange Act) at June 30, 2010. Based on this evaluation, our CEO and CFO concluded that, at that date, the disclosure controls and procedures required by paragraph (b) of Rules 13a−15 or 15d−15 were not effective at a reasonable assurance level because of a material weakness in internal control over financial reporting at GM as reported in our 2009 Form 10−K at December 31, 2009 that continues to exist.

**Material Weakness, Remediation, and Changes in Internal Controls**

The material weakness relates to controls that were not effective over the period−end financial reporting process. This ineffective process resulted in a significant number and magnitude of out−of−period adjustments to the consolidated financial statements. Specifically, controls have not been effective to ensure that accounting estimates and other adjustments were appropriately reviewed, analyzed and monitored by competent accounting staff on a timely basis. Additionally, some of the adjustments that were recorded related to account reconciliations not being performed effectively. Such a material weakness in the period−end financial reporting process has a pervasive effect on the reliability of financial reporting and could result in a company not being able to meet its regulatory filing deadlines. If not remediated, it is reasonably possible that our condensed consolidated financial statements could contain a material misstatement or that we could miss a filing deadline in the future.

We believe that the remediation activities completed at December 31, 2009 and discussed in our 2009 Form 10−K would have been sufficient to allow us to conclude that the previously identified material weakness no longer existed at December 31, 2009. However, due to the complexity of fresh−start adjustments resulting from the Chapter 11 Proceedings and the related 363 Sale in 2009 and the number of accounting periods open at one time, management did not have clear visibility into the operational effectiveness of newly remediated controls within the period−end financial reporting process. In some cases, management was not able to sufficiently test the operating effectiveness of certain remediated controls in 2009 and to conclude that the controls related to the period−end financial reporting process were operating effectively. During the six months ended June 30, 2010, management led various initiatives, including training, to help ensure the controls related to the period−end financial close process would operate as they had been designed and deployed during the 2009 material weakness remediation efforts. Testing is underway to assess operational effectiveness during 2010. Also, management identified additional opportunities to improve the effectiveness and efficiency of the Company's internal controls related to the period−end financial reporting process, including procedures and controls related to the preparation of the statement of cash flows.

Corporate Accounting and other key departments had their resources augmented by utilizing external resources and performing additional closing procedures in 2010. As a result, we believe that there are no material inaccuracies or omissions of material fact and, to the best of our knowledge, believe that the condensed consolidated financial statements of the Company at and for the three and six months ended June 30, 2010, fairly present in all material respects, the financial condition and results of operations in conformity with U.S. GAAP.

There have not been any other changes in internal control over financial reporting in the six months ended June 30, 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

116

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Limitations on the Effectiveness of Controls**

Our management, including our CEO and CFO, does not expect that our disclosure controls and procedures or internal control over financial reporting will prevent or detect all errors and all fraud. A control system cannot provide absolute assurance due to its inherent limitations; it is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. A control system also can be circumvented by collusion or improper management override. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of such limitations, disclosure controls and procedures and internal control over financial reporting cannot prevent or detect all misstatements, whether unintentional errors or fraud. However, these inherent limitations are known features of the financial reporting process, therefore, it is possible to design into the process safeguards to reduce, though not eliminate, this risk.

\* \* \* \* \* \*

117

**Table of Contents**

## GENERAL MOTORS COMPANY AND SUBSIDIARIES

### PART II

**Item 1.** *Legal Proceedings*

The discussion in the following paragraphs is limited to an update of developments that have occurred in various material pending legal proceedings to which we are a party, other than in the ordinary routine litigation incidental to our business. These proceedings are fully described in our 2009 Form 10−K as updated in our Form 10−Q for the three months ended March 31, 2010. We and other defendants affiliated with us intend to defend all of the following actions vigorously.

### OnStar Analog Equipment Litigation

As previously reported, our wholly−owned subsidiary OnStar Corporation is a party to more than 20 putative class actions filed in various states, including Michigan, Ohio, New Jersey, Pennsylvania and California. All of these cases have been consolidated for pretrial purposes in a multi−district proceeding under the caption *In re OnStar Contract Litigation* in the U.S. District Court for the Eastern District of Michigan. On August 2, 2010 plaintiffs filed a motion seeking to add General Motors LLC as an additional defendant. We will oppose that motion, which we believe is barred by the Sale Approval Order entered by the United States Bankruptcy Court for the Southern District of New York on July 5, 2009.

### Unintended Acceleration Class Actions

As previously reported, we have been named as a co−defendant in two of the many class action lawsuits brought against Toyota arising from Toyota's recall of certain vehicles related to reports of unintended acceleration. The two cases are *Nimishabahen Patel v. Toyota Motors North America, Inc. et al.* (filed in the United States District Court for the District of Connecticut on February 9, 2010) *and Darshak Shah v. Toyota Motors North America, Inc. et al.* (filed in the United States District court for the District of Massachusetts on or about February 16, 2010). The cases were consolidated in the multi−district proceeding pending in the Central District of California created to administer all cases in the Federal court system addressing Toyota unintended acceleration issues. On August 2, 2010, a consolidated Complaint was filed in the multi−district proceeding and we were omitted from the list of named defendants. Accordingly, it is possible that the claims asserted will not be further pursued against us.

### AmeriCredit Transaction Claims

On July 27, 2010 *Robert Hatfield, Derivatively on behalf of AmeriCredit Corp v. Clifton Morris, Jr. et al* , was filed in the district court for Tarrant County, Texas. General Motors Holdings, LLC and General Motors Company ("the GM entities") are two of the named defendants. Among other allegations, the complaint alleges that the individual defendants breached their fiduciary duty with regard to the proposed transaction between AmeriCredit and General Motors. The GM Entities are accused of aiding and abetting the alleged breach of fiduciary duty by the individual defendants (officers and directors of AmeriCredit). Among other relief, the complaint seeks to enjoin the transaction from closing. It is not possible to determine the likelihood of success or reasonably ascertain the amount of any attorneys' fees or costs that may be awarded.

On July 28, 2010 *Labourers Pension Fund of Eastern and Central Canada, on behalf of itself and all others similarly situated v. AmeriCredit Corp, et al.* was filed in the district court for Tarrant County, Texas. General Motors Company is one of the named defendants. The plaintiff seeks class action status and alleges that AmeriCredit and the individual defendants (officers and directors of AmeriCredit) breached their fiduciary duties in negotiating and approving the proposed transaction between AmeriCredit and General Motors. General Motors is accused of aiding and abetting the alleged breach of fiduciary duty. Among other relief, the complaint seeks to enjoin both the transaction from closing as well as a shareholder vote on the proposed transaction. No determination has been made that the case may be maintained as a class action, and it is not possible to determine the likelihood of liability or reasonably ascertain the amount of any damages.

On or about August 6, 2010, *Clara Butler, Derivatively on behalf of AmeriCredit Corp v. Clifton Morris, Jr. et al*, was filed in the district court for Tarrant County, Texas. General Motors Holdings, LLC and General Motors Company are among the named

118

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

defendants. Like previously filed litigation related to the proposed AmeriCredit acquisition, the complaint initiating this case alleges that individual officers and directors of AmeriCredit breached their fiduciary duties to AmeriCredit shareholders. The GM Entities are accused of breaching a fiduciary duty and aiding and abetting the individual defendants in usurping a corporate opportunity. Among other relief, the complaint seeks to rescind the AmeriCredit transaction and enjoin its consummation, and also to award plaintiff costs and disbursements including attorneys' and expert fees. It is not possible to determine the likelihood of success or reasonably ascertain the amount of any attorneys' fees or costs that may be awarded.

\* \* \* \* \* \*

**Item 1A.** *Risk Factors*

We face a number of significant risks and uncertainties in connection with our operations. Our business, results of operations and financial condition could be materially adversely affected by these risk factors.

While we described each risk separately, some of these risks are interrelated and certain risks could trigger the applicability of other risks.

***Our business is highly dependent on sales volume. Global vehicle sales have declined significantly from their peak levels, and there is no assurance that the global automobile market will recover in the near future or that it will not suffer a significant further downturn.***

Our business and financial results are highly sensitive to sales volume, as demonstrated by the effect of sharp declines in vehicle sales on our business in the U.S. since 2007 and globally since 2008. Vehicle sales in the U.S. have fallen significantly on an annualized basis since their peak in 2007, and sales globally have shown steep declines on an annualized basis since their peak in January 2008. Many of the economic and market conditions that drove the drop in vehicle sales, including declines in real estate and equity values, increases in unemployment, tightened credit markets, depressed consumer confidence and weak housing markets, continue to impact sales. In addition, recent concerns over levels of sovereign indebtedness have contributed to a renewed tightening of credit markets in some of the markets in which we do business. Although vehicle sales began to recover in certain of our markets in the three months ended December 31, 2009 there is no assurance that this recovery in vehicle sales will continue or spread across all our markets. Further, sales volumes may again decline severely or take longer to recover than we expect, and if they do, our results of operations and financial condition will be materially adversely affected.

***Our ability to attract a sufficient number of consumers to consider our vehicles, particularly our new products, is essential to our ability to achieve long-term profitability.***

Our ability to achieve long-term profitability depends on our ability to entice consumers to consider our products when purchasing a new vehicle. The automotive industry, particularly in the U.S., is very competitive, and our competitors have been very successful in persuading customers that previously purchased our products to purchase their vehicles instead as is reflected by our loss of market share over the past three years. We believe that this is due, in part, to a negative public perception of our products in relation to those of some of our competitors. Changing this perception, including with respect to the fuel efficiency of our products, will be critical to our long-term profitability. If we are unable to change public perception of our company and products, especially our new products, including cars and crossovers, our results of operations and financial condition could be materially adversely affected.

***The pace of introduction and market acceptance of new vehicles is important to our success, and the frequency of new vehicle introductions may be materially adversely affected by reductions in capital expenditures.***

Our competitors have introduced new and improved vehicle models designed to meet consumer expectations and will continue to do so. Our profit margins, sales volumes, and market shares may decrease if we are unable to produce models that compare favorably to these competing models. If we are unable to produce new and improved vehicle models on a basis competitive with the models introduced by our competitors, including models of smaller vehicles, demand for our vehicles may be materially adversely affected. Further, the pace of our development and introduction of new and improved vehicles depends on our ability to implement successfully improved technological innovations in design, engineering, and manufacturing, which requires extensive capital investment. Any

119

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

capital expenditure cuts in these areas that we may determine to implement in the future to reduce costs and conserve cash could reduce our ability to develop and implement improved technological innovations, which may materially reduce demand for our vehicles.

*Our continued ability to achieve cost reductions and to realize production efficiencies for our automotive operations is critical to our ability to achieve long−term profitability.*

We are continuing to implement a number of cost reduction and productivity improvement initiatives in our automotive operations, including labor modifications and substantial restructuring initiatives for our European operations. Our future competitiveness depends upon our continued success in implementing these restructuring initiatives throughout our automotive operations, especially in North America and Europe. In addition, while some of the elements of cost reduction are within our control, others such as interest rates or return on investments, which influence our expense for pensions, depend more on external factors, and there can be no assurance that such external factors will not materially adversely affect our ability to reduce our structural costs. Reducing costs may prove difficult due to our focus on increasing advertising and our belief that engineering expenses necessary to improve the performance, safety, and customer satisfaction of our vehicles are likely to increase.

*Failure of our suppliers, due to difficult economic conditions affecting our industry, to provide us with the systems, components, and parts that we need to manufacture our automotive products and operate our business could result in a disruption in our operations and have a material adverse effect on our business.*

We rely on many suppliers to provide us with the systems, components, and parts that we need to manufacture our automotive products and operate our business. In recent years, a number of these suppliers have experienced severe financial difficulties and solvency problems, and some have sought relief under the Bankruptcy Code or similar reorganization laws. This trend intensified in 2009 due to the combination of general economic weakness, sharply declining vehicle sales, and tightened credit availability that has affected the automotive industry generally. Suppliers may encounter difficulties in obtaining credit or may receive an opinion from their independent public accountants regarding their financial statements that includes a statement expressing substantial doubt about their ability to continue as a going concern, which could trigger defaults under their financings or other agreements or impede their ability to raise new funds.

When comparable situations have occurred in the past, suppliers have attempted to increase their prices, pass through increased costs, alter payment terms, or seek other relief. In instances where suppliers have not been able to generate sufficient additional revenues or obtain the additional financing they need to continue their operations, either through private sources or government funding, which may not be available, some have been forced to reduce their output, shut down their operations, or file for bankruptcy protection. Such actions would likely increase our costs, create challenges to meeting our quality objectives, and in some cases make it difficult for us to continue production of certain vehicles. To the extent we take steps in such cases to help key suppliers remain in business, our liquidity could be adversely affected. It may also be difficult to find a replacement for certain suppliers without significant delay.

*Increase in cost, disruption of supply, or shortage of raw materials could materially harm our business.*

We use various raw materials in our business including steel, non−ferrous metals such as aluminum and copper, and precious metals such as platinum and palladium. The prices for these raw materials fluctuate depending on market conditions. In recent years, freight charges and raw material costs increased significantly. Substantial increases in the prices for our raw materials increase our operating costs and could reduce our profitability if we cannot recoup the increased costs through increased vehicle prices. In addition, some of these raw materials, such as corrosion−resistant steel, are only available from a limited number of suppliers. We cannot guarantee that we will be able to maintain favorable arrangements and relationships with these suppliers. An increase in the cost or a sustained interruption in the supply or shortage of some of these raw materials, which may be caused by a deterioration of our relationships with suppliers or by events such as labor strikes, could negatively affect our net revenues and profitability to a material extent.

*We operate in a highly competitive industry that has excess manufacturing capacity and attempts by our competitors to sell more vehicles could have a significant negative impact on our vehicle pricing, market share, and operating results.*

The global automotive industry is highly competitive, and overall manufacturing capacity in the industry exceeds demand. Many manufacturers have relatively high fixed labor costs as well as significant limitations on their ability to close facilities and reduce fixed

120

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

costs. Our competitors may respond to these relatively high fixed costs by attempting to sell more vehicles by adding vehicle enhancements, providing subsidized financing or leasing programs, offering option package discounts or other marketing incentives, or reducing vehicle prices in certain markets. In addition, manufacturers in lower cost countries such as China and India have emerged as competitors in key emerging markets and announced their intention of exporting their products to established markets as a bargain alternative to entry−level automobiles. These actions have had, and are expected to continue to have, a significant negative impact on our vehicle pricing, market share, and operating results, and present a significant risk to our ability to enhance our revenue per vehicle.

*Inadequate cash flow could materially adversely affect our business operations in the future.*

We will require substantial liquidity to implement long−term cost savings and restructuring plans, continue capital spending to support product programs and development of advanced technologies, and meet scheduled term debt and lease maturities and pension contributions, in each case as contemplated by our business plan. If our cash levels approach the minimum cash levels necessary to support our normal business operations, we may be forced to borrow additional funds at rates that may not be favorable, curtail capital spending, and reduce research and development and other programs that are important to the future success of our business. If this were to happen, our need for cash would be intensified.

Although we believe that the funding we received in connection with our formation and our purchase of substantially all of MLC's assets provides us with sufficient liquidity to operate our business, our ability to maintain adequate liquidity over the long−term will depend significantly on the volume, mix and quality of our vehicle sales and our ability to minimize operating expenses. Our liquidity needs are sensitive to changes in each of these and other factors.

*As part of our business plan, we have reduced compensation for our most highly paid executives and have reduced the number of our management and non−management salaried employees, and these actions may materially adversely affect our ability to hire and retain salaried employees.*

As part of the cost reduction initiatives in our business plan, and pursuant to the direction of the Special Master for TARP Executive Compensation (the Special Master), the form and timing of the compensation for our most highly paid executives is not competitive with that offered by other major corporations. Furthermore, while we have repaid in full our indebtedness under the UST Credit Agreement, the executive compensation and corporate governance provisions of Section 111 of the Emergency Economic Stabilization Act of 2008, as amended (the EESA), including the Interim Final Rule implementing Section 111 (the Interim Final Rule), will continue to apply to us for the period specified in the EESA and the Interim Final Rule. In addition, certain of the covenants in the UST Credit Agreement will continue to apply to us until the earlier to occur of (i) us ceasing to be a recipient of Exceptional Financial Assistance, as determined pursuant to the Interim Final Rule or any successor or final rule, or (ii) UST ceasing to own any direct or indirect equity interests in us. The effect of Section 111 of EESA, the Interim Final Rule and the covenants is to restrict the compensation that we can provide to our top executives and prohibit certain types of compensation or benefits for any employees. At the same time, we have substantially decreased the number of salaried employees so that the workload is shared among fewer employees and in general the demands on each salaried employee are increased. Companies in similar situations have experienced significant difficulties in hiring and retaining highly skilled employees, particularly in competitive specialties. Given our compensation structure and increasing job demands, there is no assurance that we will be able to hire and retain the employees whose expertise is required to execute our business plan while at the same time developing and producing vehicles that will stimulate demand for our products.

*Our plan to reduce the number of our retail channels and brands and to consolidate our dealer network is likely to reduce our total sales volume, may not create the cost savings we anticipate, and is likely to result in restructuring costs that may materially adversely affect our results of operations.*

As part of our business plan, we will focus our resources in the U.S. on four brands: Chevrolet, Cadillac, Buick, and GMC. We completed the sale of Saab Automobile AB (Saab) in February 2010, and have ceased production of our Pontiac, Saturn and HUMMER brands. We also intend to consolidate our dealer network by reducing the total number of our U.S. dealers from approximately 5,200 as of June 30, 2010 to approximately 4,500 by the end of 2010. We anticipate that this reduction in retail outlets, brands, and dealers will result in cost savings over time, but there is no assurance that we would realize the savings expected. Based

121

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

on our experience and the experiences of other companies that have eliminated brands, models, and/or dealers, we believe that our market share could decline because of these reductions. In addition, executing the phase−out of retail channels and brands and the reduction in the number of our dealers will require us to terminate established business relationships. There is no assurance that we will be able to terminate all of these relationships, and if we are not able to terminate substantially all of these relationships, we would not be able to achieve all of the benefits we have targeted. In addition, the cost of negotiating terminations of any remaining dealers on an individual basis may adversely affect our results of operations.

> *Our business plan contemplates that we restructure our operations in various European countries, but we may not succeed in doing so, and that could have a material adverse effect on our business.*

Our business plan contemplates that we restructure our operations in various European countries, and we are actively working to accomplish this. We continue to work towards a restructuring of our German and certain other European operations. We cannot be certain that we will be able to successfully complete any of these restructurings. In addition, restructurings, whether or not ultimately successful, can involve significant expense and disruption to the business as well as labor disruptions, which can adversely affect the business. Moreover, in June 2010 the German federal government notified us of its decision not to provide loan guarantees to Opel/Vauxhall. As a result, we decided to fund the requirements of Opel/Vauxhall internally and withdrew all applications for government loan guarantees from European governments. Our decision to restructure our European operations will require us to invest significant additional funds and require significant management attention. We cannot assure you that any of our contemplated restructurings will be completed or achieve the desired results, and if we cannot successfully complete such restructurings, we may choose to, or the directors of the relevant entity may be compelled to, or creditors may force us to, seek relief for our various European operations under applicable local bankruptcy, reorganization, insolvency, or similar laws, where we may lose control over the outcome of the restructuring process due to the appointment of a local receiver, trustee, or administrator (or similar official) or otherwise and which could result in a liquidation and us losing all or a substantial part of our interest in the business.

> *Our U.S. defined benefit pension plans are currently underfunded, and our pension funding obligations may increase significantly due to weak performance of financial markets and its effect on plan assets.*

Our future funding obligations for our U.S. defined benefit pension plans qualified with the IRS depends upon the future performance of assets placed in trusts for these plans, the level of interest rates used to determine funding levels, the level of benefits provided for by the plans and any changes in government laws and regulations. Our employee benefit plans currently hold a significant amount of equity and fixed income securities. Due to Old GM's contributions to the plans and to the strong performance of these assets during prior periods, the U.S. hourly and salaried pension plans were consistently overfunded from 2005 through 2007, which allowed Old GM to maintain a surplus without making additional contributions to the plans. However, due to a number of factors, including significant declines in financial markets and a deterioration in the value of our plan assets, as well as the coverage of additional retirees, including certain Delphi hourly employees, our U.S. defined benefit pension plans were underfunded on a U.S. GAAP basis by $17.1 billion at December 31, 2009. In addition, at December 31, 2009, our non−U.S. defined benefit pension plans were underfunded on a U.S. GAAP basis by approximately $10.3 billion. The defined benefit pension plans are accounted for on an actuarial basis, which requires the selection of various assumptions, including an expected rate of return on plan assets and a discount rate. In the U.S., from December 31, 2009 to June 30, 2010, interest rates on high quality corporate bonds have decreased. We believe that a discount rate calculated as of June 30, 2010 would be approximately 65 to 75 basis points lower than the rates used to measure the pension plans at December 31, 2009, the date of the last remeasurement for the U.S. pension plans. As a result, funded status would decrease if the plans were remeasured at June 30, 2010, holding all other factors (e.g., actuarial assumptions and asset returns) constant (see the Critical Accounting Estimates for an indication of the sensitivity associated with movements in discount rate). It is not possible for us to predict what the economic environment will be at our next scheduled remeasurement as of December 31, 2010. Accordingly, discount rates and plan assets may be considerably different than those at June 30, 2010. Under U.S. GAAP, we are not required to remeasure our plans as of June 30, 2010.

The next U.S. pension funding valuation date based on the requirements of the Pension Protection Act (PPA) of 2006 will be October 1, 2010. However, based on a hypothetical funding valuation at June 30, 2010, we may need to make significant contributions to our U.S. pension plans in 2014 and beyond (see Contractual Obligations and Other Long−Term Liabilities section of Management's Discussion and Analysis of Financial Condition and Results of Operations for more details).

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

If the total values of the assets held by our pension plans decline and/or the returns on such assets underperform the Company's return assumptions, our pension expenses would generally increase and, as a result, could materially adversely affect our financial position. Changes in interest rates that are not offset by contributions, asset returns and/or hedging activities could also increase our obligations under such plans. If local legal authorities increase the minimum funding requirements for our pension plans outside the U.S., we could be required to contribute more funds, which would negatively affect our cash flow.

***If adequate financing on acceptable terms is not available through Ally Financial or other sources to our customers and dealers, distributors, and suppliers to enable them to continue their business relationships with us, our business could be materially adversely affected.***

Our customers and dealers require financing to purchase a significant percentage of our global vehicle sales. Historically, Ally Financial has provided most of the financing for our dealers and a significant amount of financing for our customers. Due to recent conditions in credit markets, particularly later in 2008, retail customers and dealers experienced severe difficulty in accessing the credit markets. As a result, the number of vehicles sold or leased declined rapidly in the second half of 2008, with lease contract volume dropping significantly by the end of 2008. This had a significant adverse effect on Old GM vehicle sales overall because many of its competitors have captive financing subsidiaries that were better capitalized than Ally Financial during 2008 and 2009 and thus were able to offer consumers subsidized financing and leasing offers.

Similarly, the reduced availability of Ally Financial wholesale dealer financing (in the second half of 2008 and 2009), the increased cost of such financing, and the limited availability of other sources of dealer financing due to the general weakness of the credit market has caused and may continue to cause dealers to modify their plans to purchase vehicles from us.

Because of recent modifications to our commercial agreements with Ally Financial, Ally Financial no longer is subject to contractual wholesale funding commitments or retail underwriting targets. In addition, Ally Financial's credit rating has declined in recent years. This may negatively affect its access to funding and therefore its ability to provide adequate financing at competitive rates to our customers and dealers. Further, if any of our competitors with captive financing subsidiaries are able to continue to offer consumers and dealers financing and leasing on better terms than our customers and dealers are able to obtain, consumers may be more inclined to purchase our competitors' vehicles and our competitors' dealers may be better able to stock our competitors' products.

As part of a strategy to develop our own captive financing unit, we have entered into a definitive agreement to acquire AmeriCredit, which we expect will enable us to offer increased availability of leasing and non–prime financing for our customers. We cannot assure you that we will be able to close the acquisition of AmeriCredit, which is subject to certain closing conditions, many of which are beyond our control, including the approval of AmeriCredit shareholders. Our failure to successfully develop our own captive financing unit, including through the AmeriCredit acquisition, could materially adversely affect our business.

***The UST (or its designee) owns a controlling in us, and its interests may differ from those of our other stockholders.***

The UST beneficially owns a majority of our common stock on a fully diluted basis. As a result of this stock ownership interest, the UST is able to exercise significant influence over our business if it elects to do so. This includes the ability to have significant influence over matters brought for a stockholder vote. To the extent the UST elects to exercise such influence over us, its interests (as a government entity) may differ from those of our other stockholders and it may influence, through its ability to vote for the election of our directors, matters including:

- The selection, tenure and compensation of our management;

- Our business strategy and product offerings;

123

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

•    Our relationship with our employees, unions and other constituencies; and

•    Our financing activities, including the issuance of debt and equity securities.

In the future we may also become subject to new and additional laws and government regulations regarding various aspects of our business as a result of participation in the TARP program and the U.S. government's ownership in our business. These regulations could make it more difficult for us to compete with other companies that are not subject to similar regulations.

***The VEBA Note Agreement and the UST Credit Agreement contain significant covenants that may restrict our ability and the ability of our subsidiaries to take actions management believes are important to our long−term strategy.***

The VEBA Note Agreement contains affirmative covenants requiring us to take certain actions and negative covenants restricting our ability to take certain actions. The affirmative covenants impose obligations on us with respect to, among other things, financial reporting to the New VEBA, use of proceeds of asset sales, maintenance of facility collateral and other property and payment of obligations. The negative covenants in the VEBA Note Agreement generally apply to us and our U.S. subsidiaries that provided guarantees of our obligations under that agreement and restrict us with respect to, among other things, granting liens, distributions on capital stock, amendments or waivers of certain documents and entering into new indebtedness.

In addition, while we have repaid in full our indebtedness under the UST Credit Agreement, the executive compensation and corporate governance provisions of Section 111 of the EESA, including the Interim Final Rule, will continue to apply to us for the period specified in the EESA and the Interim Final Rule. In addition, certain of the covenants in the UST Credit Agreement will continue to apply to us until the earlier to occur of (i) us ceasing to be a recipient of Exceptional Financial Assistance, as determined pursuant to the Interim Final Rule or any successor or final rule, or (ii) UST ceasing to own any direct or indirect equity interests in us. The effect of Section 111 of EESA, the Interim Final Rule and the covenants is to restrict the compensation that we can provide to our top executives and prohibit certain types of compensation or benefits for any employees. Compliance with the covenants contained in the VEBA Note Agreement and the UST Credit Agreement could restrict our ability to take actions that management believes are important to our long−term strategy. If strategic transactions we wish to undertake are prohibited or inconsistent with, or detrimental to, our long−term viability, our ability to execute our long−term strategy could be materially adversely affected. In addition, monitoring and certifying our compliance with the VEBA Note Agreement and the UST Credit Agreement requires a high level of expense and management attention on a continuing basis.

***Even though we have made significant modifications to our obligations to the New VEBA, we are still obligated to contribute a significant amount of cash to fund the New VEBA in the future.***

Even though we have made significant modifications to our obligations to the New VEBA, we are still required to contribute a significant amount of cash to the New VEBA over a period of years. The amounts payable to the New VEBA include: (1) dividends payable on the 260 million shares of Series A Preferred Stock issued to the New VEBA in connection with the closing of the 363 Sale, which have a liquidation preference of $25.00 per share and accrue cumulative dividends at a rate equal to 9.0% per annum (payable quarterly on March 15, June 15, September 15 and December 15) if, as and when declared by our Board of Directors (the UST and Canada GEN Investment Corporation (Canada Holdings) hold an additional 100 million shares of Series A Preferred Stock); and (2) payments on the VEBA Notes in three equal installments of $1.4 billion on July 15, 2013, 2015 and 2017. On or after December 31, 2014, we may redeem, in whole or in part, the shares of Series A Preferred Stock at the time outstanding, at a redemption price per share equal to the sum of: (1) $25.00 per share; and (2) subject to limited exceptions, any accrued and unpaid dividends. There is no assurance that we will be able to obtain all of the necessary funding to fund our existing VEBA payment obligations on terms that will be acceptable to us. If we are unable to obtain funding from internal or external sources or some combination thereof on terms that are consistent with our business plan, we would have to delay, reduce, or cancel other planned expenditures.

***Our planned investment in new technology in the future is significant and may not be funded at anticipated levels and, even if funded at anticipated levels, may not result in successful vehicle applications.***

We intend to invest significant capital resources to support our products and to develop new technology. In addition, we plan to invest heavily in alternative fuel and advanced propulsion technologies between 2010 and 2012, largely to support our planned

124

**Table of Contents**

### GENERAL MOTORS COMPANY AND SUBSIDIARIES

expansion of hybrid and electric vehicles, consistent with our announced objective of being recognized as the industry leader in fuel efficiency. Moreover, if our future operations do not provide us with the liquidity we anticipate, we may be forced to reduce, delay, or cancel our planned investments in new technology.

In some cases, the technologies that we plan to employ, such as hydrogen fuel cells and advanced battery technology, are not yet commercially viable and depend on significant future technological advances by us and by suppliers. For example, we have announced that we intend to produce by November 2010 the Chevrolet Volt, an electric car, which requires battery technology that has not yet proven to be commercially viable. There can be no assurance that these advances will occur in a timely or feasible way, that the funds that we have budgeted for these purposes will be adequate, or that we will be able to establish our right to these technologies. However, our competitors and others are pursuing similar technologies and other competing technologies, in some cases with more money available, and there can be no assurance that they will not acquire similar or superior technologies sooner than we do or on an exclusive basis or at a significant price advantage.

***New laws, regulations, or policies of governmental organizations regarding increased fuel economy requirements and reduced greenhouse gas emissions, or changes in existing ones, may have a significant effect on how we do business.***

We are affected significantly by governmental regulations that can increase costs related to the production of our vehicles and affect our product portfolio. We anticipate that the number and extent of these regulations, and the related costs and changes to our product lineup, will increase significantly in the future. In the U.S. and Europe, for example, governmental regulation is primarily driven by concerns about the environment (including greenhouse gas emissions), vehicle safety, fuel economy, and energy security. These government regulatory requirements could significantly affect our plans for global product development and may result in substantial costs, including civil penalties. They may also result in limits on the types of vehicles we sell and where we sell them, which can affect revenue.

Corporate Average Fuel Economy provisions in the Energy Independence and Security Act of 2007 (the EISA) mandate fuel economy standards beginning in the 2011 model year that would increase to at least 35 mpg by 2020 on a combined car and truck fleet basis, a 40% increase over current levels. In addition, California is implementing a program to regulate vehicle greenhouse gas emissions (AB 1493 Rules) and therefore will require increased fuel economy. This California program has standards currently established for the 2009 model year through the 2016 model year. Thirteen additional states and the Province of Quebec have also adopted the California greenhouse gas standards.

On May 19, 2009, President Obama announced his intention for the federal government to implement a harmonized federal program to regulate fuel economy and greenhouse gases. He directed the Environmental Protection Agency (EPA) and the United States Department of Transportation (DOT) to work together to create standards through a joint rulemaking for control of emissions of greenhouse gases and for fuel economy. In the first phase, these standards would apply to passenger cars, light−duty trucks, and medium−duty passenger vehicles built in model years 2012 through 2016. The California Air Resources Board (CARB) has agreed that compliance with EPA's greenhouse gas standards will be deemed compliance with the California greenhouse gas standards for the 2012 through 2016 model years. EPA and the National Highway Traffic Safety Administration (NHTSA), on behalf of DOT, issued their final rule to implement this new federal program on April 1, 2010. We have committed to work with EPA, the NHTSA, the states, and other stakeholders in support of a strong national program to reduce oil consumption and address global climate change.

We are committed to meeting or exceeding these regulatory requirements, and our product plan of record projects compliance with the anticipated federal program through the 2016 model year. We expect that to comply with these standards we will be required to sell a significant volume of hybrid or electrically powered vehicles throughout the U.S., as well as implement new technologies for conventional internal combustion engines, all at increased cost levels. There is no assurance that we will be able to produce and sell vehicles that use such technologies on a profitable basis, or that our customers will purchase such vehicles in the quantities necessary for us to comply with these regulatory programs.

125

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

In addition, the European Union (EU) passed legislation, effective April 23, 2009, to begin regulating vehicle carbon dioxide emissions beginning in 2012. The legislation sets a target of a fleet average of 95 grams per kilometer for 2020, with the requirements for each manufacturer based on the weight of the vehicles it sells. Additional measures have been proposed or adopted in Europe to regulate features such as tire rolling resistance, vehicle air conditioners, tire pressure monitors, gear shift indicators, and others. At the national level, 17 EU Member States have adopted some form of fuel consumption or carbon dioxide−based vehicle taxation system, which could result in specific market requirements for us to introduce technology earlier than is required for compliance with the EU emissions standards.

Other governments around the world, such as Canada, South Korea, and China are also creating new policies to address these same issues. As in the U.S., these government policies could significantly affect our plans for product development. Due to these regulations, we could be subject to sizable civil penalties or have to restrict product offerings drastically to remain in compliance. Additionally, the regulations will result in substantial costs, which could be difficult to pass through to our customers, and could result in limits on the types of vehicles we sell and where we sell them, which could affect our operations, including facility closings, reduced employment, increased costs, and loss of revenue.

***We may be unable to qualify for federal funding for our advanced technology vehicle programs under Section 136 of the EISA or may not be selected to participate in the program.***

The U.S. Congress provided the DOE with $25.0 billion in funding to make direct loans to eligible applicants for the costs of re−equipping, expanding, and establishing manufacturing facilities in the U.S. to produce advanced technology vehicles and components for these vehicles. Old GM submitted three applications for Section 136 Loans aggregating $10.3 billion to support its advanced technology vehicle programs prior to July 2009. Based on the findings of the Auto Task Force under Old GM's UST Loan Agreement in March 2009, the DOE determined that Old GM did not meet the viability requirements for Section 136 Loans.

On July 10, 2009 we purchased certain assets of Old GM pursuant to Section 363 of the Bankruptcy Code, including the rights to the loan applications submitted to the Advanced Technology Vehicle Manufacturing Incentive Program (the ATVMIP). Further, we submitted a fourth application in August 2009. Subsequently, the DOE advised us to resubmit a consolidated application including all the four applications submitted earlier and also the Electric Power Steering project acquired from Delphi in October 2009. We submitted the consolidated application in October 2009, which requested an aggregate amount of $14.4 billion of Section 136 Loans. Ongoing product portfolio updates and project modifications requested from the DOE have the potential to reduce the maximum loan amount. To date, the DOE has announced that it would provide approximately $8.4 billion in Section 136 Loans to Ford Motor Company, Nissan Motor Company, Tesla Motors, Inc., Fisker Automotive, Inc., and Tenneco Inc. There can be no assurance that we will qualify for any remaining loans or receive any such loans even if we qualify.

***A significant amount of our operations are conducted by joint ventures that we cannot operate solely for our benefit.***

Many of our operations, particularly in emerging markets, are carried on by joint ventures such as SGM. In joint ventures, we share ownership and management of a company with one or more parties who may not have the same goals, strategies, priorities, or resources as we do. In general, joint ventures are intended to be operated for the equal benefit of all co−owners, rather than for our exclusive benefit. Operating a business as a joint venture often requires additional organizational formalities as well as time−consuming procedures for sharing information and making decisions. In joint ventures, we are required to pay more attention to our relationship with our co−owners as well as with the joint venture, and if a co−owner changes, our relationship may be materially adversely affected. In addition, the benefits from a successful joint venture are shared among the co−owners, so that we do not receive all the benefits from our successful joint ventures.

***Our business in China is subject to aggressive competition and is sensitive to economic and market conditions.***

Maintaining a strong position in the Chinese market is a key component of our global growth strategy. The automotive market in China is highly competitive, with competition from many of the largest global manufacturers and numerous smaller domestic manufacturers. As the size of the Chinese market continues to increase, we anticipate that additional competitors, both international and domestic, will seek to enter the Chinese market and that existing market participants will act aggressively to increase their market

126

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

share. Increased competition may result in price reductions, reduced margins and our inability to gain or hold market share. In addition, our business in China is sensitive to economic and market conditions that drive sales volume in China. If we are unable to maintain our position in the Chinese market or if vehicle sales in China decrease or do not continue to increase, our business and financial results could be materially adversely affected.

***Shortages of and volatility in the price of oil have caused and may have a material adverse effect on our business due to shifts in consumer vehicle demand.***

Volatile oil prices in 2008 and 2009 contributed to weaker demand for some of Old GM's and our higher margin vehicles, especially our fullsize sport utility vehicles, as consumer demand shifted to smaller, more fuel−efficient vehicles, which provide lower profit margins and in recent years represented a smaller proportion of Old GM's and our sales volume in North America. Fullsize pick−up trucks, which are generally less fuel efficient than smaller vehicles, represented a higher percentage of Old GM's and our North American sales during 2008 and 2009 compared to the total industry average percentage of fullsize pick−up truck sales in those periods. Demand for traditional sport utility vehicles and vans also declined during the same periods. Any future increases in the price of oil in the U.S. or in our other markets or any sustained shortage of oil could further weaken the demand for such vehicles, which could reduce our market share in affected markets, decrease profitability, and have a material adverse effect on our business.

***Restrictions in our labor agreements could limit our ability to pursue or achieve cost savings through restructuring initiatives, and labor strikes, work stoppages, or similar difficulties could significantly disrupt our operations.***

Substantially all of the hourly employees in our U.S., Canadian, and European automotive operations are represented by labor unions and are covered by collective bargaining agreements, which usually have a multi−year duration. Many of these agreements include provisions that limit our ability to realize cost savings from restructuring initiatives such as plant closings and reductions in workforce. Our current collective bargaining agreement with the UAW will expire in September 2011, and while the UAW has agreed to a commitment not to strike prior to 2015, any UAW strikes, threats of strikes, or other resistance in the future could materially adversely affect our business as well as impair our ability to implement further measures to reduce costs and improve production efficiencies in furtherance of our North American initiatives. A lengthy strike by the UAW that involves all or a significant portion of our manufacturing facilities in the United States would have a material adverse effect on our operations and financial condition, particularly our liquidity.

***Despite the formation of our new company, we continue to have indebtedness and other obligations. Our obligations together with our cash needs may require us to seek additional financing, minimize capital expenditures, or seek to refinance some or all of our debt.***

Despite the formation of our new company, we continue to have indebtedness and other obligations, including significant liabilities to our underfunded defined benefit pension plans. Our current and future indebtedness and other obligations could have several important consequences. For example, they could:

- Require us to dedicate a larger portion of our cash flow from operations than we currently do to the payment of principal and interest on our indebtedness and other obligations, which will reduce the funds available for other purposes such as product development;

- Make it more difficult for us to satisfy our obligations;

- Make us more vulnerable to adverse economic and industry conditions and adverse developments in our business;

- Limit our ability to withstand competitive pressures;

- Limit our ability to fund working capital, capital expenditures, and other general corporate purposes; and

- Reduce our flexibility in responding to changing business and economic conditions.

Future liquidity needs may require us to seek additional financing or minimize capital expenditures. There is no assurance that either of these alternatives would be available to us on satisfactory terms or on terms that would not require us to renegotiate the terms and conditions of our existing debt agreements.

127

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

***Our failure to comply with the covenants in the agreements governing our present and future indebtedness could materially adversely affect our financial condition and liquidity.***

Several of the agreements governing our indebtedness, including the VEBA Note Agreement and other loan facility agreements, contain covenants requiring us to take certain actions and negative covenants restricting our ability to take certain actions. In the past, we have failed to meet certain of these covenants, including by failing to provide financial statements in a timely manner and failing certain financial tests. In addition, the Chapter 11 Proceedings and the change in control as a result of the 363 Sale triggered technical defaults in certain loans for which we had assumed the obligations. A breach of any of the covenants in the agreements governing our indebtedness, if uncured, could lead to an event of default under any such agreements, which in some circumstances could give the lender the right to demand that we accelerate repayment of amounts due under the agreement. Therefore, in the event of any such breach, we may need to seek covenant waivers or amendments from the lenders or to seek alternative or additional sources of financing, and we cannot assure you that we would be able to obtain any such waivers or amendments or alternative or additional financing on acceptable terms, if at all. Refer to Note 13 to the condensed consolidated financial statements for additional information on technical defaults and covenant violations that have occurred recently. In addition, any covenant breach or event of default could harm our credit rating and our ability to obtain additional financing on acceptable terms. The occurrence of any of these events could have a material adverse effect on our financial condition and liquidity.

***The ability of our new executive management team to quickly learn the automotive industry and lead our company will be critical to our ability to succeed.***

Within the past year we have substantially changed our executive management team. We have elected a new Chief Executive Officer who will start on September 1, 2010 and a new Chief Financial Officer who started on January 1, 2010, both of whom have no outside automotive industry experience. We have also promoted from within GM many new senior officers. It is important to our success that the new members of the executive management team quickly understand the automotive industry and that our senior officers quickly adapt and excel in their new senior management roles. If they are unable to do so, and as a result are unable to provide effective guidance and leadership, our business and financial results could be materially adversely affected.

***We could be materially adversely affected by changes or imbalances in foreign currency exchange and other rates.***

Given the nature and global spread of our business, we have significant exposures to risks related to changes in foreign currency exchange rates, commodity prices, and interest rates, which can have material adverse effects on our business. For example, at times certain of our competitors have derived competitive advantage from relative weakness of the Japanese Yen, which has provided pricing advantages for vehicles and parts imported from Japan to markets with more robust currencies like the U.S. and Western Europe. Similarly, a significant strengthening of the Korean Won relative to the U.S. dollar or the Euro would affect the competitiveness of our Korean operations as well as that of certain Korean competitors. As yet another example, a relative weakness of the British Pound compared to the Euro has had an adverse effect on our results of operations in Europe. In addition, in preparing the condensed consolidated financial statements, we translate our revenues and expenses outside the U.S. into U.S. Dollars using the average foreign currency exchange rate for the period and the assets and liabilities using the foreign currency exchange rate at the balance sheet date. As a result, foreign currency fluctuations and the associated translations could have a material adverse effect on our results of operations.

***Our businesses outside the U.S. expose us to additional risks that may materially adversely affect our business.***

The majority of our vehicle sales are generated outside the U.S. We are pursuing growth opportunities for our business in a variety of business environments outside the U.S. Operating in a large number of different regions and countries exposes us to political, economic, and other risks as well as multiple foreign regulatory requirements that are subject to change, including:

•  Economic downturns in foreign countries or geographic regions where we have significant operations, such as China;

•  Economic tensions between governments and changes in international trade and investment policies, including imposing restrictions on the repatriation of dividends, especially between the United States and China;

128

Table of Contents

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

•    Foreign regulations restricting our ability to sell our products in those countries;

•    Differing local product preferences and product requirements, including fuel economy, vehicle emissions, and safety;

•    Differing labor regulations and union relationships;

•    Consequences from changes in tax laws;

•    Difficulties in obtaining financing in foreign countries for local operations; and

•    Political and economic instability, natural calamities, war, and terrorism.

The effects of these risks may, individually or in the aggregate, materially adversely affect our business.

***New laws, regulations, or policies of governmental organizations regarding safety standards, or changes in existing ones, may have a significant negative effect on how we do business.***

Our products must satisfy legal safety requirements. Meeting or exceeding government−mandated safety standards is difficult and costly because crashworthiness standards tend to conflict with the need to reduce vehicle weight in order to meet emissions and fuel economy standards. While we are managing our product development and production operations on a global basis to reduce costs and lead times, unique national or regional standards or vehicle rating programs can result in additional costs for product development, testing, and manufacturing. Governments often require the implementation of new requirements during the middle of a product cycle, which can be substantially more expensive than accommodating these requirements during the design of a new product.

***The costs and effect on our reputation of product recalls could materially adversely affect our business.***

From time to time, we recall our products to address performance, compliance, or safety−related issues. The costs we incur in connection with these recalls typically include the cost of the part being replaced and labor to remove and replace the defective part. In addition, product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products. Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business. Conversely, not issuing a recall or not issuing a recall on a timely basis can harm our reputation and cause us to lose customers for the same reasons as expressed above.

***We have determined that our disclosure controls and procedures and our internal controls over financial reporting are currently not effective. The lack of effective internal controls could materially adversely affect our financial condition and ability to carry out our business plan.***

Our management team for financial reporting, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our internal controls. At December 31, 2009, because of the inability to sufficiently test the effectiveness of remediated internal controls, we concluded that our internal control over financial reporting was not effective. At June 30, 2010 we concluded that our disclosure controls and procedures were not effective at a reasonable assurance level because of the material weakness in our internal control over financial reporting that continued to exist. Until we have been able to test the operating effectiveness of remediated internal controls and ensure the effectiveness of our disclosure controls and procedures, any material weaknesses may materially adversely affect our ability to report accurately our financial condition and results of operations in the future in a timely and reliable manner. In addition, although we continually review and evaluate internal control systems to allow management to report on the sufficiency of our internal controls, we cannot assure you that we will not discover additional weaknesses in our internal control over financial reporting. Any such additional weakness or failure to remediate the existing weakness could materially adversely affect our financial condition or ability to comply with applicable financial reporting requirements and the requirements of the Company's various financing agreements.

## Item 5. Part II Other Information

On August 11, 2010 our Board of Directors elected Daniel F. Akerson, age 61, Chief Executive Officer. Mr. Akerson's election will be effective September 1, 2010, when Edward E. Whitacre, Jr. will retire from his current position as Chief Executive Officer.

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

Mr. Akerson will continue to serve on our Board of Directors, which he joined in July 2009. Mr. Whitacre will continue as Chairman and after he retires from the Board, which he intends to do by the end of 2010, Mr. Akerson will become Chairman.

Mr. Akerson has been Managing Director and Head of Global Buyout of The Carlyle Group since July 2009. He served as Managing Director and Co−Head of the U.S Buyout Fund from 2003 to 2009. Prior to joining Carlyle, Mr. Akerson served as Chairman and Chief Executive Officer of XO Communications, Inc. from 1999 to January 2003. XO Communications, Inc. filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in June 2002 and emerged from bankruptcy proceedings in January 2003. Mr. Akerson also served as Chairman of Nextel Communications from 1996 to 2001 and Chairman and Chief Executive Officer from 1996 to 1999. He held the offices of Chairman and Chief Executive Officer of General Instrument Corporation from 1993 to 1995. He is currently a director of American Express Company.

Mr. Akerson has no other reportable relationships with us or our affiliates.

Mr. Akerson's compensation has not been finalized; we will report that information in a Current Report on Form 8−K when it is available.

\* \* \* \* \* \*

130

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**Item 6. Exhibits**

| Exhibit Number | Exhibit Name | |
|---|---|---|
| 31.1 | Section 302 Certification of the Chief Executive Officer | Filed Herewith |
| 31.2 | Section 302 Certification of the Chief Financial Officer | Filed Herewith |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002 | Filed Herewith |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002 | Filed Herewith |

\* \* \* \* \* \*

131

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GENERAL MOTORS COMPANY
(Registrant)

By:  /s/   NICK S. CYPRUS
(Nick S. Cyprus, Vice President, Controller and Chief Accounting Officer)

Date: August 16, 2010

132

**Table of Contents**

**GENERAL MOTORS COMPANY AND SUBSIDIARIES**

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Name | |
|---|---|---|
| 31.1 | Section 302 Certification of the Chief Executive Officer | Filed Herewith |
| 31.2 | Section 302 Certification of the Chief Financial Officer | Filed Herewith |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002 | Filed Herewith |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002 | Filed Herewith |

133

**Exhibit 31.1**

## CERTIFICATION

I, Edward E. Whitacre, Jr., certify that:

1. I have reviewed this quarterly report for the period ended June 30, 2010 on Form 10−Q of General Motors Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/    EDWARD E. WHITACRE, JR.
Edward E. Whitacre, Jr.
Chairman and Chief Executive Officer

Date: August 16, 2010

**Exhibit 31.2**

**CERTIFICATION**

I, Christopher P. Liddell, certify that:

1. I have reviewed this quarterly report for the period ended June 30, 2010 on Form 10−Q of General Motors Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   CHRISTOPHER P. LIDDELL
Christopher P. Liddell
Vice Chairman and Chief Financial Officer

Date: August 16, 2010

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES−OXLEY ACT OF 2002**

In connection with the Quarterly Report of General Motors Company (the "Company") on Form 10−Q for the period ended June 30, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Edward E. Whitacre, Jr., Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes−Oxley Act of 2002, that to the best of my knowledge:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/    EDWARD E. WHITACRE, Jr.
Edward E. Whitacre, Jr.
Chairman and Chief Executive Officer

Date: August 16, 2010

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES−OXLEY ACT OF 2002**

In connection with the Quarterly Report of General Motors Company (the "Company") on Form 10−Q for the period ended June 30, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Christopher P. Liddell, Vice Chairman and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes−Oxley Act of 2002, that to the best of my knowledge:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/    CHRISTOPHER P. LIDDELL
Christopher P. Liddell
Vice Chairman and Chief Financial Officer

Date: August 16, 2010

# **Exhibit 2**

| From: | Novod, Gordon <gnovod@KRAMERLEVIN.com> |
|---|---|
| Sent: | Tuesday, June 23, 2009 9:57 AM |
| To: | 'Matthew.Feldman@do.treas.gov'; 'john.rapisardi@cwt.com'; 'Karotkin, Stephen' <stephen.karotkin@weil.com>; 'Smolinsky, Joseph' <Joseph.Smolinsky@weil.com> |
| Cc: | 'Gietz, Raymond' <raymond.gietz@weil.com>; michele.meises@weil.com; 'Pais, Harsh' <harsh.pais@weil.com>; Mayer, Thomas Moers <TMayer@KRAMERLEVIN.com>; Caton, Amy <ACaton@KRAMERLEVIN.com>; 'Andrew N Rosenberg' <arosenberg@paulweiss.com>; 'Berkovich, Ronit' <Ronit.Berkovich@weil.com>; 'Gromacki, Joseph P' <JGromacki@jenner.com>; 'Wolf, Michael T.' <MWolf@jenner.com>; 'lawrence.s.buonomo@gm.com'; 'Smith, Zachary' <Zachary.Smith@cwt.com>; 'ron.hopkinson@cwt.com'; 'greg.patti@cwt.com' |
| Subject: | RE: Call 10 a.m. ET Tuesday |
| Attach: | KL2-#2610015-v8-Summary_of_June_19th_Meeting_by_Issue_List.DOC |

All,

In anticipation of our 10 am call, please find a summary of our meeting on Friday, June 19, 2009. It also reflects subsequent discussions with the parties which occurred over the weekend and yesterday.

Gordon

---

**From:** Berkovich, Ronit [mailto:Ronit.Berkovich@weil.com]
**Sent:** Monday, June 22, 2009 11:38 PM
**To:** Gromacki, Joseph P; Wolf, Michael T.; Mayer, Thomas Moers; Caton, Amy; Novod, Gordon; Andrew N Rosenberg; lawrence.s.buonomo@gm.com; john.rapisardi@cwt.com; Smith, Zachary; Matthew.Feldman@do.treas.gov; greg.patti@cwt.com; ron.hopkinson@cwt.com
**Cc:** Karotkin, Stephen; Smolinsky, Joseph; Gietz, Raymond; michele.meises@weil.com; Pais, Harsh
**Subject:** Call 10 a.m. ET Tuesday

As discussed at Friday's meeting, we are having a call tomorrow (Tuesday) at 10 a.m. ET.
800-782-1473
4932755
Please forward to anyone else who should be on the call.

Ronit J. Berkovich
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8534
ronit.berkovich@weil.com

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

**K R A M E R   L E V I N   N A F T A L I S   &   F R A N K E L** LLP

6/23/2009

Please find below the list of issues that were discussed at the June 19th meeting by and among representatives of General Motors Corp., the Creditors' Committee of General Motors and the United States Treasury.

**Part I.**

| Issue | Initial Committee Position | Report from June 19th Meeting |
|---|---|---|
| 1. Employee Issues. | There should be a resolution of the IUE and USW OPEB issues that does not create administrative or unsecured claims against Old GM.  MPSA should be changed to clarify that New GM, not Old GM, will make changes in salaried retiree benefits. | UST: Talks are ongoing with respect to the IUE and are expected to do so as appropriate until the sale hearing. When asked whether there was a tax credit available, Matt Feldman [US Treasury] replied that the tax credit is available for retirees aged 55-65 and most IUE retirees are over 65 and thus eligible for Medicare. Feldman quantified the decrease in benefits for salaried retirees as a reduction of 67% in the total actuarial [balance sheet] value of their OPEB.  <br><br>Compare IUE & USW Objection:  <br><br>*IUE*:  28% of IUE OPEB relates to IUE retirees under 65, total actuarial [balance sheet] value of IUE OPEB cut by 85%.  <br><br>*USW*: 1,000 out of 6,200 retirees are aged 60-64 and will lose all benefits.  Total actuarial [balance sheet] value of USW OPEB cut by 87%. |
| 2. Tort Claims. | New GM should assume liability with respect to future products liability and asbestos claims; need resolution of current product liability and asbestos claims. | Products Liability – pre-petition claims: US Treasury: New GM will not assume these liabilities.  <br><br>Products Liability – post-petition claims: US Treasury: New GM will assume liability with respect to future products liability claims arising post-sale.  The sale documents will be amended to reflect this.  <br><br>Asbestos – pre-petition claims: US Treasury: New GM will not assume these claims.  <br><br>Asbestos – future claims: US Treasury: New GM will not assume these liabilities, but acknowledged that once a sale order is entered and people assert claims, then we'll see if they are able to successfully pursue such claims. |
| a. Pool of 2%. | Subject to agreement of bondholders, "additional 2%" of stock of New GM should be available to fund global settlement with existing tort claimants. | Kramer Levin:  suggested the possibility of offering the additional 2% of equity to satisfy tort claims, if the IUE/USW issues are resolved and the bondholders didn't object.  US Treasury indicated that it would think about it.  Feldman for US Treasury asked what New GM would get for the 2%; we suggested that if 2% New GM Equity, valued by Houlihan at $600mm, was left behind for tort claims, the Bankruptcy Court could issue a "channeling injunction" requiring current and future tort claimants to seek recovery from the 2% before trying to collect from New GM. Feldman suggested that he was "open to creative" settlements for tort claimants, but wanted concrete proposals.  Paul Weiss and Houlihan seemed receptive to solving tort issues with the incremental 2% of New GM equity. |
| 3. Administrative Solvency/Ability to Confirm Chapter 11 Plan. | The Sale Order should contain a finding that the estate can pay its administrative and priority claims in full from the $950mm wind-down monies and other asset sales (i.e., other than from the stock and warrants being left for Old GM).  Alix Partners should be prepared | Debtors: Steve Karotkin of Weil Gotshal said AlixPartners would testify the wind-down DIP Loan of $950mm would provide enough cash to cover both administrative and priority claims, leaving the New GM shares and warrants for distribution to unsecured creditors.  Paul Weiss and Houlihan were concerned that the shares and warrants would be invaded to pay for administrative and |

| | | |
|---|---|---|
| | to testify and make a record on this issue. In addition, the sale order should commit that the $950mm in cash being left behind will not be used to repay the Treasury DIP (or Wind-Down DIP) unless and until monies are clearly left over after a chapter 11 distribution plan is confirmed. Section 506(c) waiver should be conditioned on this. | priority claims.<br><br>US Treasury: $950mm will be available for the "wind-down" to satisfy all administrative expense and priority claims. The $950mm would be payable out of all assets of Old GM other than New GM shares and warrants. Note: the current wind-down budget by Alix uses $92mm of estimated asset sale proceeds to pay wind-down expenses, so the wind-down budget will need to be recalculated. US Treasury reluctant to allow any of $950mm to be distributed to Old GM unsecured creditors.<br><br>The wind-down budget will be refined over the next week as the UST, the Debtors and the Committee professionals get their arms around the claims.<br><br>* The UST will provide a wind-down DIP term sheet this weekend.<br><br>* The budget will allow for flexibility between categories. Certain taxes are going to New GM, while certain claims for income taxes and others are left behind and will be funded out of the wind-down budget.<br><br>New GM will fund the costs related to its properties and to pay the carrying costs of running the plants. |
| 4. Wind-Down Budget | Need resolution on what expenses are being paid from the $950mm. | See Part I, #3 above. |
| 5. Avoidance Actions and Banks' Liens. | The Committee should be granted a 60 day investigation period to review the prepetition lenders' liens. The cash collateral orders should be amended to provide that the prepetition lenders are not receiving indefeasible payment, and by accepting distributions from GM, are submitting to bankruptcy court jurisdiction. In addition, avoidance actions under Sections 547, 548, 550 and 553 should be carved out from Treasury's liens. | Debtors: Indicated that if the pre-petition term and revolver lenders are not paid within 45 days (i.e., by July 15th), they will ask for default rate interest for the postpetition period.<br><br>US Treasury: Will retain liens on avoidance actions other than actions against banks; agrees that Committee is reasonable when asking for 60 days (July 30) to review Banks' liens. |
| 6. Delphi Claims. | Any deal with Delphi must not result in claims against Old GM. | US Treasury: Agrees that Delphi deal will result in no claims against Old GM's estate; all costs will be borne by New GM. |
| 7. Supplier Issues. | New GM has reserved 30-days post-closing to determine which contracts to assume or reject. That period should be eliminated; New GM should have a definitive list as of the closing date. | Debtors: Agreed that once contracts are assumed, they are assumed. When asked about tooling and shipping on contracts that may not be assumed, Weil encouraged suppliers to call the Debtors call center, who can address these questions. The Debtors indicated that 99.9% of direct suppliers are assumed. Of the 497 cure objections filed, 307 have been resolved and the remainder are being contacted via telephone.<br><br>US Treasury: Agreed to consider whether there is a group of contracts which will be listed as definitively assumed on a rolling basis prior to closing. The UST commented that they are not trying to acquire tooling free and clear of claims and encumbrances and agreed that the order will be amended accordingly. |
| 8. Dealer Issues. | Need to scale back "preemption" language of states' dealer laws in any order. | Weil: indicated that like the suppliers, once dealers sign their dealer agreement, they are assumed.<br><br>Kramer Levin: argued that the order should not contain a decretal |

| | | paragraph regarding waiver of state law rights. Kramer Levin to provide comments on the order. |
|---|---|---|
| 9. Corporate Governance for Old GM. | Corporate governance structure for Old GM should be proposed, with Creditors' Committee playing role in corporate governance going forward. | <u>Weil</u>: AlixPartners is looking for someone with industry experience to serve on Old GM's board. <br><br> <u>US Treasury</u>: Remains interested in how Old GM is managed. <br><br> <u>Kramer Levin</u>: Will provide a post-sale corporate governance proposal for board membership. <br><br> <u>Paul Weiss</u>: Will provide input. |
| 10. Listing of the Consideration Shares and Warrants. <br><br> (Moved up from below) | New GM should report under the '34 Act following closing and New GM common stock and Warrants should be listed on the NYSE at the time of any 1145 distribution. | <u>US Treasury</u>: Old GM and New GM are negotiating with SEC over continued financial reporting. Old GM wants to stop '34 Act reports; New GM intends to voluntarily report under '34 Act but does not believe it can report in full compliance with '34 Act for any period prior to Q4 2009. Weil and US Treasury expect to have something to report on this next week. <br><br> Regarding listing the common/warrants, US Treasury is considering a date as of which New GM could undertake to have its securities listed on NYSE or NASDAQ if distributed under §1145. Paul Weiss asked for 1/1/10. |
| 11, Warrant Issues | | <u>US Treasury</u>: Warrants to be like non-TARP, commercial warrants. |
| 11A. Exercise Price Adjustments. | New GM warrants should include exercise price adjustments for (i) issuances of capital stock below fair market value, (ii) repurchases of capital stock, and (iii) adjustments to, repurchases of or distributions on the VEBA warrant or VEBA preferred. | These proposed exercise price adjustments are under consideration by the US Treasury. |
| 11B. Black-Scholes Protection. | The current version of the New GM warrant only provides Black-Scholes protection for cash-out mergers below the then-current exercise price of the warrants. | US Treasury is considering a proposal that Black-Scholes protection would apply to any transaction to the extent the common stock in any change of control transaction would receive consideration that does not consist of registered/listed common stock. |
| 11C. Black-Scholes Value. | We have proposed that the calculation of Black-Scholes value include either a floor amount (50%) or fixed value for assumed volatility. | The US Treasury resisted this proposal and proposes instead to implement a balanced process for determination of Black-Scholes value (e.g., Warrant Agent participation in banker selection process, etc). |

**Part II. Issues concerning the Master Sale and Purchase Agreement and associated documents**. In addition, we have assembled a primary issues list for discussion concerning the Master Sale and Purchase Agreement ("MSPA"), and the form of Registration Rights Agreement, Warrants, Transition Services Agreement and the Master Lease Agreement (the "MLA") attached to the MSPA. Following these is a list of drafting points and points for confirmation.

| **Issue** | **Initial Committee Position** | **Report from June 19th Meeting** |
|---|---|---|
| 1. Taxes. | Old GM retains pre-closing tax liabilities; therefore Old GM should retain the right to refunds for those periods. Old GM also needs greater rights with respect to tax matters (including tax returns and audits or other proceedings) that could materially affect taxes payable by Old GM. | Weil/Jenner & Block: New GM takes the obligations existing at the time of closing for franchise, real and personal |

|  |  | property taxes, but not income taxes. (Documents need to be amended to reflect Weil/Jenner & Block position.) |
|---|---|---|
| 2. Product Liability. | We are aware that there are on-going discussions regarding the extent to which Old GM will retain asbestos liabilities and product liabilities. To the extent that Old GM retains such liabilities, Old GM should retain insurance policies providing coverage with respect to such liabilities. |  |
| 3. Survival of Representations. | No representations or warranties should survive the closing under the MSPA. | <u>US Treasury</u>: Reps/Warranties will not survive post closing. |
| **Registration Rights** |  |  |
| 1. Listing of the Consideration Shares and Warrants. | New GM should report under the '34 Act following closing and New GM common stock and Warrants should be listed on the NYSE at the time of any 1145 distribution. | See Part I, #10 above. |
| 2. Most Favored Nations Clause. | Old GM should have the benefit of the MFN provision in the Registration Rights Agreement provided to the other parties. | <u>US Treasury</u>: OK. Will circle back. |
| 3. Indemnification. | Old GM should be exempted from the indemnification obligation on the same basis as the other holders of Registrable Securities. | <u>US Treasury</u>: Will consider our request. |
| **Transition Services Agreement** |  | Kramer Levin to provide a mark-up. |
| 1. Remedies. | Old GM should be entitled to require specific performance of the services under the TSA. |  |
| 2. Cap. | There should not be a $15mm cap on damages under the TSA. Gross negligence and intentional breach should not be subject to any cap. |  |
| 3. Term. | New GM should not be allowed to terminate service due to a non-monetary breach by Old GM. |  |
| 4. Scope of Service. | Old GM should be able to obtain additional services reasonably required for its wind-down. Services should include legal of the type previously provided in-house. |  |
| **Master Lease Agreement; Use of Properties under TSA** |  | Kramer Levin to provide a mark-up. |
| 1. Creditworthiness. | The tenant under the MLA is a shell entity. New GM should guaranty these obligations. |  |
| 2. Taxes and Repairs. | New GM should be responsible under the MLA (or the MLA guaranty) for taxes imposed on the real estate, fixtures and personal property and for repairs (other than major structural repairs) on a customary triple net lease basis. |  |
| 3. Abandonment of Tenancy By New GM. | New GM should be required to give Old GM notice of at least 6 months before it (or any of its affiliates) vacates any property covered by the MLA or Schedule C-3 of the TSA. |  |
| 4. Holdover Rent. | If New GM (or any of its affiliates) holds over at a property under the MLA, then holdover rent, at a customary premium to market rent, should accrue during the holdover and such party should remain responsible for the costs of operating such property. |  |
| 5. Landlord | New GM should be responsible for all liability incurred by Old GM by reason of the failure to obtain landlord consents in connection with the use |  |

KL2 2610015.6

| | | |
|---|---|---|
| Consents. | and occupancy rights granted under the TSA. | |
| 6. Environmental Liabilities. | Each New GM Party should be responsible for the cost of remediating, in accordance with applicable law, any contamination caused by it at or in connection with any property that is covered by the MLA or the TSA. This should not be limited to circumstances where the liability is subject to a non-appealable decision that it was caused by tenant's gross negligence or willful misconduct. In addition, New GM should be responsible for providing all environmental services on Schedule A-2. | |

## Part III. DRAFTING POINTS/POINTS TO BE CONFIRMED

Kramer Levin participated in a conference call with Jenner & Block on June 19th, during which Kramer Levin raised each of the issues found below.

| Issue | Initial Committee Position | Report from June 19th Meeting |
|---|---|---|
| MSPA | | |
| 1. Adjustment Shares. | The Adjustment Shares should be excluded from the assets of Old GM which secure the Wind Down Facility. | US Treasury: agreed to fix. |
| 2. UST Credit Facilities. | The definition of "UST Credit Facilities" should capture any amendments thereto. | Debtors' counsel agreed to fix. |
| 3. Assumed Plans. | Section 2.2(a)(xvi) provides for the acquisition by New GM of all Assumed Plans to the extent described in Section 6.17(e). Section 2.3(a)(xiii), however, provides only for the assumption of Liabilities under the Assumed Plans to the extent that such Liabilities relate to an Employee covered by the UAW Collective Bargaining Agreement. The assumption of liabilities under Assumed Plans should be consistent with the acquisition of the Assumed Plans and with Section 6.17(e). | Debtors' counsel agreed to look at the language together with Employee Benefits counsel and get back to us. |
| 4. Employee Related Obligations. | Section 2.3(a)(xiii) limits New GM's assumption of Employee Related Obligations to those relating to Employees who are covered by the UAW Collective Bargaining Agreement. We would like to understand the basis for this provision since the MSPA specifically contemplates taking on Employees who are not covered by the UAW Collective Bargaining Agreement (e.g. salaried Employees of Old GM). We would also like to understand the proposed treatment of Employee Related Obligations for other Employees who accept employment offers even though they are not required to receive such offers under the terms of the MSPA. | Debtors' counsel indicated that it is the intention that New GM will pick up more Employee Related Obligations for UAW employees, as compared to non-UAW employees. This is not intended to change. |
| 5. Purchased Assets. | It should be clarified that the definition of "Personal Property" does not include fixtures located at the Excluded Real Property. | Debtors' counsel indicated that the Purchased Assets include fixtures to the extent set forth in the MPA schedules. |
| 6. Intercompany Obligations. | The provisions in the MSPA relating to the assumption and retention of Intercompany Obligations (see Sections 2.3(a)(iii) and 2.3(b)(ii)) do not appear to work in parallel. In particular, the provision relating to the assumption of Intercompany Obligations by Purchaser references "Excluded Entities" while the provision relating to the retention of Intercompany Obligations references "Excluded Subsidiaries". We would like to understand the basis for this disjunction. | Debtors' counsel clarified that it was intentional that amounts owed from Retained Entities to Sellers are Purchased Assets, while amounts owed by Sellers to Retained Entities are not Assumed Liabilities. This will not change. |
| 7. Contingent Liabilities. | We understand that FTI has asked GM to provide estimates of Old GM's liability with respect to contingent liabilities including product liability claims, retained benefit plans, taxes, litigation, employees who are not | This process is ongoing. |

| | hired by New GM (e.g., employees of Saturn of Harlem) and other contingent liabilities to be retained by Old GM. What is the status of these estimates? | |
|---|---|---|
| 8. Existing VEBA Assets. | What are the assets of the Existing Internal VEBA and any existing external VEBA? Specifically, are any of the assets of the Existing Internal VEBA or any existing external VEBA or notes or other indebtedness of Old GM or the other Sellers? | Debtors' counsel confirmed to FTI that the Existing Internal VEBA does not include any obligations of Old GM (e.g., notes from Old GM) to the VEBA. We are awaiting confirmation of this. We also are awaiting information regarding the assets and liabilities relating to the Existing External VEBA. |
| 9. Treatment of OPEB/Other Liabilities. | The relevant documents should clearly state that Old GM is being affirmatively released from OPEB liabilities with respect to (i) UAW current, former and retired employees, (ii) salaried current, former and retired employees and (iii) current, former and retired employees who are or were members of other unions. The relevant documents should also clearly state that New GM is (i) assuming accrued but unpaid liabilities outstanding at the time of closing with respect to assumed OPEB liabilities and (ii) assuming liability for all incurred but unpaid health claims for all current, former and retired GM employees and their dependants, whether incurred before or after closing. | Debtors' counsel confirmed to FTI as follows: The UAW Settlement Agreement contains a release of Old GM from these liabilities. The agreements with 4 of the 5 other unions with whom an agreement was reached also include this release. The arrangements relating to the non-union employees will not include such a release. Debtors' counsel also confirmed to FTI that accrued and unpaid liabilities as of the closing with respect to Assumed Plans will be assumed by New GM. We are requesting copies of the agreements to confirm these points. |
| 10. Liabilities of Selling Subsidiaries. | Will there be any remaining liabilities at the subsidiaries which are Sellers under the MSPA -- Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc.? | Debtors' counsel indicated that the remaining liabilities in these entities are de minimis. |
| 11. Third Party Consents. | Please confirm that the Debtors do not believe that any consents will be required for Closing. | Debtors' counsel indicated that no third party consents are anticipated to hold up a closing. We will continue to monitor this issue. |
| 12. Employees. | Please confirm that the only employees of GM and its subsidiaries not assured of offers at New GM are those at Chevrolet-Saturn of Harlem, Inc. | Debtors' counsel indicated that substantially all the employees of Old GM will be offered employment with New GM. |
| 13. Saab. | Please confirm whether the intellectual property relating to the Saab brand will be transferred to New GM and, if so, we would like to understand why such intellectual property is being transferred without the Saab-related subsidiaries. | Debtors' counsel indicated that much of the IP is used throughout various divisions of Old GM. This applies to Saab-related IP and such IP would be transferred to New GM. To the extent that Saab is eventually sold, the purchaser would need to enter into license agreements with New GM |

|  |  | with respect to the IP. |
|---|---|---|
| Registration Rights |  |  |
| Indemnification. | The reference to "underwriters" in Section 2.9.2 should be removed. |  |
| Transition Services |  |  |
| 1. Standard of Care. | New GM should provide all services using reasonable care, skill and diligence, in a manner consistent with past practice, including with respect to nature, quality and timeliness. |  |
| 2. Third Party Service Providers. | New GM should be primarily liable for breach of TSA by third party providers. Also, if a consent from a third party provider cannot be obtained, New GM should provide a substantially equivalent service. |  |
| 3. Service Managers. | Each party should appoint a point person/liaison under the TSA. |  |
| 4. Extension of Term. | Old GM should have the right to reasonably extend the term of any service provided by New GM for up to 1 year. |  |
| 5. Personnel. | New GM should afford Old GM the benefit of the background, skill, expertise, information and institutional knowledge of employees of New GM. |  |

**Part IV.  Master Lease Agreement; Use of Properties under TSA**

| **Issue** | **Initial Committee Position** | **Report from June 19th Meeting** |
|---|---|---|
| 1. Governing Law. | The MLA should, as to each property, be governed by the laws of the state in which such property is located. |  |
| 2. Remedies. | The TSA should provide Old GM with traditional real estate remedies such as the right to recover possession of any property following a New GM default under the TSA relating to such property. |  |

**Part V. DIP Credit Agreement and Order**

See discussion above.

| **Issue** | **Initial Committee Position** | **Report from June 19th Meeting** |
|---|---|---|
| 1. Consent / Review Rights. | The Committee should be granted consultation rights over the Final Budget and any wind-down Budget (as referenced in Section 2.14 of the DIP loan agreement), with at least a 5 day notice period and opportunity to object.  In addition, the Committee should receive the same reports from the Company that the Company is providing to the DIP lender under Section 5.2 of the DIP loan agreement or Final DIP Order. |  |
| 2. Excluded Collateral. | Definition of "Excluded Collateral" should specifically include stock and warrants being left for Old GM and avoidance actions. | US Treasury is retaining lien on avoidance actions other than actions against prepetition lenders. |
| 3. Wind-Down Budget and Costs. | Before any Section 506(c) waiver is granted, Final DIP order should provide that the DIP Lender is committing to fund the Wind-Down Budget and the expenses contained therein by no more than $950 million. The $950 million shall not be used to prepay the DIP loan after an Event of Default without an order of the Bankruptcy Court. |  |
| 4. Investigation | The Committee should be granted a 60 day investigation period to review | Current proposal from Weil is 45 days.  Feldman for US Treasury |

KL2 2610015.6

| Period. | the prepetition lenders' liens. | thought 60 days was reasonable. |

KL2 2610015.6

# **Exhibit 3**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                June 25, 2009

                9:03 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Motion of Debtors for Entry of an Order Pursuant to

3    11 U.S.C. §§ 361, 362, 363, and 364 (i) Authorizing the Debtors

4    to Obtain Post-petition Financing, Including on an Immediate,

5    Interim Basis; (ii) Granting Superpriority Claims and Liens;

6    (iii) Authorizing the Debtors to Use Cash Collateral; (iv)

7    Granting Adequate Protection to Certain Prepetition Secured

8    Parties; (v) Authorizing the Debtors to Prepay Certain Secured

9    Obligations in Full Within Forty-Five Days; and (vi) Scheduling

10   a Final Hearing Pursuant to Bankruptcy Rule 4001

11

12   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13   U.S.C. Sections 105, 363, and 364 Authorizing Debtors to (i) Pay

14   Pre-petition Claims of Certain Essential Suppliers, Vendors and

15   Services Providers; (ii) Continue Troubled Supplier Assistance

16   Program; and (iii) Continue Participation in the United States

17   Treasury Auto Supplier Support Program

18

19   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

20   U.S.C. §§ 105(a) and 366 (i) Approving Debtors Proposed Form of

21   Adequate Assurance of Payment; (ii) Establishing Procedures for

22   Resolving Objections By Utility Companies; and (iii) Prohibiting

23   Utilities from Altering, Refusing, or Discontinuing Service

24

25

3

1

2    HEARING re Motion of Debtors for Entry of Orders Pursuant to 11

3    U.S.C. §§ 105, 361, 362, 363, and 507 (i)Authorizing Use of

4    Cash Collateral; (ii)Granting Adequate Protection to the

5    Revolver Secured Parties; (iii)Granting Adequate Protection to

6    the Term Loan Secured Parties, and (iv) Scheduling a Final

7    Hearing Pursuant to Bankruptcy Rule 4001

8

9    HEARING re Application For An Order Pursuant To Sections 327(a)

10    And 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a)

11    Authorizing the Employment and Retention of Evercore Group

12    L.L.C. as Investment Banker and Financial Advisor for the

13    Debtors Nunc Pro Tunc to the Petition Date

14

15    HEARING re Motion of the Debtors Pursuant to 11 U.S.C. § 363

16    for an Order Authorizing the Debtors to Employ and Retain AP

17    Services, LLC As Crisis Managers and to Designate Albert A.

18    Koch as Chief Restructuring Officer, Nunc Pro Tunc to the

19    Petition Date

20

21    HEARING re Motion to Appoint Committee Motion of Ad Hoc

22    Committee of Consumer Victims of General Motors for Appointment

23    of Official Committee of Tort Claimants Pursuant to 11 U.S.C.

24    §1102(a)(2)

25

4

1

2   HEARING re Motion to Appoint Committee Motion for an Order

3   (i)Appointing a Legal Representative for Future Asbestos

4   Personal Injury Claimants; and (ii)Directing the United States

5   Trustee to Appoint an Official Committee of Asbestos Personal

6   Injury Claimants

7

8   HEARING re Application of the General Motors Retirees

9   Association for Order to Appoint a Retiree Committee Pursuant

10   to 11 U.S.C. Section 1114(d)

11

12   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13   U.S.C. Sections 105(a) and 363(b) (i)Authorizing Debtors to Pay

14   Prepetition Obligations to Foreign Creditors; and

15   (ii)Authorizing and Directing Financial Institutions to Honor

16   and Process Related Checks and Transfers

17

18   HEARING re Motion of the Debtors Pursuant to 11 U.S.C. Sections

19   105(a) and 362 for Entry of (i)Interim and Final Orders

20   Establishing Notification Procedures Regarding Restrictions on

21   Certain Transfers of Interests in the Debtors; and (ii)Orders

22   Scheduling a Final Hearing

23

24

25

5

1

2   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3   U.S.C. Sections 105(a), 345(b), 363(b) and 363(c) and 364(a),

4   and Fed. R. Bankr. P. 6003 and 6004 (A)Authorizing Debtors to

5   (i)Continue Using Existing Cash Management System; (ii)Honor

6   Certain Pre-petition Obligations Related to Use of Cash

7   Management System; and (iii)Maintain Existing Bank Accounts and

8   Business Forms; (B)Extending Time to Comply with 11 U.S.C.

9   Section 345(b); and (C)Scheduling a Final Hearing

10

11   HEARING re Debtors' Motion Pursuant to Section 363 of the

12   Bankruptcy Code for Authority to Exercise Put Rights

13

14   HEARING re of Debtors for Entry of Order Granting Additional

15   Time to File Reports of Financial Information or to Seek

16   Modification of Reporting Requirements Pursuant to Bankruptcy

17   Rule 2015.3

18

19   HEARING re Application of the Debtors Pursuant to 11 U.S.C. §§

20   327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) for Authority

21   to Employ Weil, Gotshal & Manges LLP as Attorneys for the

22   Debtors, Nunc Pro Tunc to the Commencement Date

23

24

25

6

1

2    HEARING re Application of the Debtors Pursuant to Section

3    327(e) of the Bankruptcy Code and Rules 2014(a) and 2016(b) of

4    the Federal Rules of Bankruptcy Procedure for Authorization to

5    Employ and Retain Jenner & Block LLP as Attorneys for the

6    Debtors, Nunc Pro Tunc to the Commencement Date

7

8    HEARING re Application Under 11 U.S.C. §§327(e) And 328(a)

9    Authorizing Debtors to Employ and Retain Honigman Miller

10   Schwartz And Cohn LLP as Special Counsel for the Debtors, Nunc

11   Pro Tunc to the Petition Date

12

13   HEARING re Application Of Debtors for Entry of Order Pursuant

14   to 28 U.S.C. § 156(c) Authorizing Retention and Employment of

15   The Garden City Group, Inc. as Notice and Claims Agent Nunc Pro

16   Tunc to the Commencement Date

17

18

19

20

21

22

23

24

25   Transcribed by: Lisa Bar-Leib

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 159 of 317

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtor General Motors Corporation

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:  HARVEY R. MILLER, ESQ.

9        STEPHEN KAROTKIN, ESQ.

10       JOSEPH H. SMOLINSKY, ESQ.

11

12   JENNER & BLOCK LLP

13       Proposed Special Counsel for GM

14       919 Third Avenue

15       37th Floor

16       New York, NY 10022

17

18   BY:  PATRICK J. TROSTLE, ESQ.

19

20

21

22

23

24

25

8

1

2      JENNER & BLOCK LLP

3            Proposed Special Counsel for GM

4            330 North Wabash Avenue

5            Chicago, IL 60611

6

7      BY:  DANIEL MURRAY, ESQ.

8            (TELEPHONICALLY)

9

10     KRAMER LEVIN NAFTALIS & FRANKEL LLP

11           Attorneys for Official Committee of Unsecured Creditors

12           1177 Avenue of the Americas

13           New York, NY 10036

14

15     BY:  LAUREN M. MACKSOUD, ESQ.

16           THOMAS MOERS MATER, ESQ.

17           AMY CATON, ESQ.

18

19

20

21

22

23

24

25

9

1

2      UNITED STATES DEPARTMENT OF JUSTICE

3            Office of the United States Trustee

4            33 Whitehall Street

5            21st Floor

6            New York, NY 10004

7

8      BY:   BRIAN S. MASUMOTO, ESQ.

9

10     UNITED STATES DEPARTMENT OF JUSTICE

11           U.S. Attorney's Office

12           86 Chambers Street

13           New York, NY 10007

14

15     BY:   DAVID S. JONES, AUSA

16           MATTHEW L. SCHWARTZ, AUSA

17

18     BINGHAM MCCUTCHEN LLP

19           Attorneys for Deutsche Bank AG

20           399 Park Avenue

21           New York, NY 10022

22

23     BY:   ERIN H. MAUTNER, ESQ.

24           JEFFREY S. SABIN, ESQ.

25

10

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for U.S. Treasury Auto Task Force

4        One World Financial Center

5        New York, NY 10281

6

7    BY:  LESLIE W. CHERVOKAS, ESQ.

8

9    CADWALADER, WICKERSHAM & TAFT LLP

10        Attorneys for U.S. Treasury Auto Task Force

11        1201 F Street, N.W.

12        Washington, DC 20004

13

14    BY:  DOULAS S. MINTZ, ESQ.

15

16    FARELLA BRAUN & MARTEL LLP

17        Attorneys for

18        Russ Building

19        235 Montgomery Street

20        San Francisco, CA 94104

21

22    BY:  NEIL A. GOTEINER, ESQ.

23

24

25

11

1

2    HONIGMAN MILLER SCHWARTZ AND COHN LLP

3        Attorneys for Debtor/Defendant General Motors Corporation

4        2290 First National Building

5        660 Woodward Avenue

6        Detroit, MI 48226

7

8    BY:  ROBERT B. WEISS, ESQ.

9

10    KELLEY DRYE & WARREN LLP

11        Attorneys for Law Debenture; LBA Realty

12        101 Park Avenue

13        New York, NY 10178

14

15    BY:  JENNIFER A. CHRISTIAN, ESQ.

16

17    MCGUIREWOODS LLP

18        Attorneys for Dominion Retail, Inc.

19        1345 Avenue of the Americas

20        Seventh Floor

21        New York, NY 10105

22

23    BY:  SHAWN R. FOX, ESQ.

24

25

12

1

2    MORGAN, LEWIS & BOCKIUS LLP

3        Attorneys for JPMorgan Chase Bank

4        101 Park Avenue

5        New York, NY 10178

6

7    BY:  RICHARD S. TODER, ESQ.

8        ANDREW GOTTFRIED, ESQ.

9

10   ORRICK, HERRINGTON & SUTCLIFFE LLP

11       Attorneys for Ad Hoc Dealer Committee

12       666 Fifth Avenue

13       New York, NY 10103

14

15   BY:  ALYSSA D. ENGLUND, ESQ.

16

17   SIMMONSCOOPER LLC

18       Attorneys for

19       707 Berkshire Blvd.

20       East Alton, IL 62024

21

22   BY:  ROBERT W. PHILLIPS, ESQ.

23

24

25

13

1

2    SIMPSON THACHER & BARTLETT LLP

3         Attorneys for Citicorp USA, Inc., as Agent

4         425 Lexington Avenue

5         New York, NY 10017

6

7    BY:  PETER V. PANTALEO, ESQ.

8         ANNE L. KNIGHT, ESQ.

9

10   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

11        Attorneys for Ad Hoc Committee of Unsecured Creditors

12        2323 Bryan Street

13        Suite 2200

14        Dallas, TX 75201

15

16   BY:  SANDER L. ESSERMAN, ESQ.)

17

18   VEDDER PRICE P.C.

19        Attorneys for Export Development Canada

20        1633 Broadway

21        47th Floor

22        New York, NY 10019

23

24   BY:  MICHAEL L. SCHEIN, ESQ.

25

14

1

2    VINSON & ELKINS LLP

3         Attorneys for Mason Capital

4         666 Fifth Avenue

5         26th Floor

6         New York, NY 10103

7

8    BY:  DENIS F. CRONIN, ESQ.

9         CRAIG KORNREICH, ESQ.

10

11   WHITE AND WILLIAMS LLP

12        Attorneys for Nicor Gas

13        One Penn Plaza

14        250 West 34th Street

15        Suite 4110

16

17   BY:  KAREL S. KARPE, ESQ.

18

19

20

21

22

23

24

25

15

1

2      ALLARD & FISH, P.C.

3           Attorneys for Creditor Severstal North America, Inc.

4           535 Griswold

5           Suite 2600

6           Detroit, MI 48226

7

8      BY:  DEBORAH L. FISH, ESQ.

9           (TELEPHONICALLY)

10

11     ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

12          Attorneys for LBA Realty Fund III; PruSKS Brannan

13          Associates

14          Three Embarcadero Center

15          12th Floor

16          San Francisco, CA 94111

17

18     BY:  IVAN M. GOLD, ESQ.

19          (TELEPHONICALLY)

20

21

22

23

24

25

16

1

2    DAVIS POLK & WARDWELL

3        Attorneys for Interested Party Ford Motor Company

4        450 Lexington Avenue

5        New York, NY 10017

6

7    BY:  BRIAN M. RESNICK, ESQ.

8        (TELEPHONICALLY)

9

10   DLA PIPER LLP U.S.

11       Attorneys for Creditor Hewlett Packard

12       550 South Hope Street

13       Suite 2300

14       Los Angeles, CA 90071

15

16   BY:  KAROL K. DENNISTON, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

17

1

2   FROST BROWN TODD LLC

3        Lexington Financial Center

4        250 West Main

5        Suite 2800

6        Lexington, KY 40507

7

8   BY:  ROBERT V. SARTIN, ESQ.

9        (TELEPHONICALLY)

10

11   HANGLEY ARONCHICK SEGAL & PUDLIN

12        Attorneys for NCR Corporation

13        One Logan Square

14        18th & Cherry Streets

15        27th Floor

16        Philadelphia, PA 19103

17

18   BY:  MATTHEW A. HAMERMESH, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

18

1

2    MOTLEY RICE, LLC

3        28 Bridgeside Blvd.

4        Mt. Pleasant, SC 29464

5

6    BY:  JEANETTE M. GILBERT, ESQ.

7        (TELEPHONICALLY)

8

9    SCHIFF HARDIN LLP

10        Attorneys for Columbia Gas of Ohio; Columbia Gas of

11        Virginia

12        233 South Wacker Drive

13        Suite 6600

14        Chicago, IL 60606

15

16    BY:  JASON TORF, ESQ.

17        (TELEPHONICALLY)

18

19    SIDLEY AUSTIN LLP

20        Attorneys for Multiple Lenders

21        One South Dearborn

22        Chicago, IL 60603

23

24    BY:  KENNETH P. KANSA, ESQ.

25        (TELEPHONICALLY)

19

1

2    STAHL COWDEN CROWLEY ADDIS LLC

3        Attorneys for GM National Retiree Association

4        55 West Monroe Street

5        Suite 1200

6        Chicago, IL 60603

7

8    BY:   JON D. COHEN, ESQ.

9        (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.

3          ALL:  Good morning, Your Honor.

4          THE COURT:  GM.  Mr. Miller, good morning.  You want

5  to come on up and give me your recommendation as to how you

6  believe we should proceed both with the DIP which we have on

7  for 9:00 and also for the 9:45 calendar matters?

8          MR. MILLER:  Yes, Your Honor.  Harvey Miller, Weil

9  Gotshal & Manges for the debtors.  Your Honor, there is one

10  matter on the 9:00 calendar, as you pointed out, which is the

11  motion for a final approval of the DIP financing.  I believe,

12  Your Honor, all issues with respect to that have been resolved.

13  And Mr. Karotkin will explain that as we go on.

14          As to the 9:45 calendar, Your Honor, there are listed

15  nine uncontested matters and eight contested matters.  As to

16  those contested matters, Your Honor, essentially, most of them

17  have been resolved with the exception, Your Honor, of the

18  motion for the appointment of an ad hoc committee of asbestos

19  claimants and the motion for the appointment of a retiree

20  committee.  Those two matters are still open, Your Honor, and

21  would be heard at Your Honor's convenience after the 9:45

22  calendar call.

23          The motion, Your Honor, with respect to the retention

24  of Evercore Group LLC, we are requesting, Your Honor, that that

25  matter be adjourned until the hearing scheduled for July 2,

21

1   2009.  We're hopeful to resolve that matter, Your Honor.  We

2   have scheduled tentative meetings with the U.S. trustee's

3   office in an effort to resolve that application.

4           So, Your Honor, basically, there are two matters

5   which will be submitted today for Your Honor's determination

6   with respect to the additional creditors' committees, the

7   request for the appointment of a future representative for

8   future asbestos claimants and the motion for the appointment of

9   a retirees' committee under Section 1114(b) of the Bankruptcy

10  Code.

11          THE COURT:  Okay.  Fair enough.  Do we want to go

12  straight then into DIP financing?

13          MR. MILLER:  Yes.

14          THE COURT:  You're going to hand off to your partner,

15  Mr. Karotkin, on that?

16          MR. MILLER:  I certainly want to, Your Honor.

17          THE COURT:  All right.  Mr. Karotkin, come on up,

18  please?  Good morning.

19          MR. KAROTKIN:  Good morning, Your Honor.  Stephen

20  Karotkin, Weil Gotshal & Manges for the debtors.  As Mr. Miller

21  indicated, Your Honor, we're pleased to report that in

22  connection with the motion to approve the debtor-in-possession

23  financing on a final basis, we have reached a consensus with

24  all of the objecting parties as well as with the creditors'

25  committee and the secured lenders. And that is embodied in a

22

1    revised order which I have a blackline copy of which I'm please

2    to hand up to the Court.

3              THE COURT:  That would be very helpful.  Thank you.

4              MR. KAROTKIN:  May I approach, sir?

5              THE COURT:  Yes, sir.

6              MR. KAROTKIN:  Your Honor, the proposed order

7    resolves the four objections that were raised which are,

8    basically, categorized in four categories.  One was by various

9    governmental entities with respect to liens they have as to

10   personal property and real property.  One is with respect to

11   NCR as to their assertion of a constructive trust.  There was

12   another objection by Deutsche Bank with respect to the payment

13   of hedging obligations under the outstanding revolving credit

14   facility.  And the final objection related to a landlord which

15   wanted its lease hold interests -- the debtors' lease hold

16   interests with respect to its property carved out of the

17   collateral grant.  And all of those issues have been addressed

18   in the order.

19             THE COURT:  All right.  Do you want to pause and give

20   any counterparties to those objections a chance to confirm that

21   they're satisfied with the way by which you resolved them?

22             MR. KAROTKIN:  Sure.

23             THE COURT:  Mr. Sabin, you coming up?

24             MR. KAROTKIN:  Before Mr. Sabin speaks, in

25   anticipation of what he's going to say, hopefully to truncate

23

1  the hearing, Your Honor, we have agreed -- and I actually think

2  the DIP order is clear that in connection with the payment of

3  the pre-petition secured obligations to the JPMorgan group, the

4  Citigroup group and with respect to the hedging obligations,

5  the order provides they will be paid three business days after

6  the approval of the DIP loan on a final basis.  And we will

7  confirm on the record that when we pay the Citibank group and

8  the JPMorgan group, we will also pay the hedging obligations at

9  the same time.

10         THE COURT:  Okay.  Mr. Sabin, good morning.

11         MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

12  from Bingham McCutchen on behalf of Deutsche Bank AG.

13  Paragraph 19 of the revised proposed order that's in front of

14  you reflects the agreement, resolves in full the obligations.

15  My thank you to Mr. Karotkin and everyone else for bearing with

16  us as we work through the resolution.  And I think that if this

17  Court were to enter it with those words in it, it resolves in

18  full the objections.

19         THE COURT:  Okay.  Fair enough.  Anyone else?  All

20  right.  Given that the objections have been resolved and given

21  the showings that were made at the outset of the case, I'm not

22  going to make extensive findings on the record now, Mr.

23  Karotkin.  I think they're set forth in your proposed order.

24         MR. KAROTKIN:  They are, Your Honor.  And I would

25  like to point out one of the proposed findings which is in

24

1   paragraph (f) on page 12 which has been requested by the United

2   States Treasury.  And they are here to address that if you have

3   any questions with that.

4        THE COURT:  Okay.  Also, I realize -- and I see Ms.

5   Caton, you came up perhaps to speak.  I gather there was a

6   dialogue going on with the creditors' committee.  And if

7   there's anything that is desirable for the creditors' committee

8   to put on the record, I certainly want to give it that

9   opportunity.  Ms. Caton, good morning.

10       MS. CATON:  Thank you, Your Honor.  Amy Caton from

11  Kramer Levin Naftalis & Frankel on behalf of the creditors'

12  committee.  As you noted, there were a number of modifications

13  that were made with the order at the request of the creditors'

14  committee.  And I just want to highlight a couple of those.

15       THE COURT:  Of course.

16       MS. CATON:  The first one is that one of the

17  creditors' committee's main concern here is what happens to be

18  the state after the sale closes.  And I think the parties'

19  intent from the beginning is then that 950 millions or an

20  amount up to -- well, potentially greater than but, likely, 950

21  million dollars, will be left behind to fund the wind down of

22  these estates and pay administrative and priority claims.

23  However, when we started the negotiation of the DIP order, I

24  don't believe that these provisions were really made clear.

25  And that's one of the things that we have done in the DIP

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 177 of 317

25

1    order.  And that's highlighted in paragraph 21.

2         I think that the new provisions in here will allow us

3    to hopefully confirm a Chapter 11 plan of distribution and make

4    sure that the new GM stock and warrants are distributed to

5    unsecured creditors.

6         The second point that I would like to make clear is

7    that in paragraphs 5 and 6 of the DIP order that administrative

8    and priority claims are now senior in right of payment of

9    repayment to the DIP and that the DIP is non-recourse to the

10   new GM stock and warrants because this is, as we believe,

11   intended for distribution to unsecured creditors.

12        We still think that we have a ways to go before we

13   get to a final wind down to make this -- I guess, the budgets

14   clear.  We're still negotiating the wind down budget.  We need

15   to negotiate an amendment to the DIP credit facility to make it

16   appropriate for a wind down.  Right now, there are a number of

17   covenants and events of default that are a little stricter than

18   what we would like to see on a going forward basis.  And it's

19   our understanding that the parties intend to do this prior to

20   closing of the sale.  And paragraph 21 sets out specifically

21   that the committee is to be included in the negotiations in

22   this process.

23        Lastly, we did make a few changes to the order vis-a-

24   vis the committee's rights with respect to the pre-petition

25   lenders.  The highlight of these are that the committee's

26

1   investigation period of certain claims against the pre-petition

2   lenders has been extended till July 31st.  And secondly, any

3   claims by the agent on a going forward basis after it's paid

4   next week for reimbursement of the fees is now nonrecourse to

5   the new GM stock and warrants..

6          And with those changes, Your Honor, the committee

7   supports the entry of the DIP order.

8          THE COURT:  Okay.  Fair enough.  Thank you.  Good

9   morning, Mr. Schein.

10          MR. SCHEIN:  Good morning, Your Honor.  Michael

11   Schein, Vedder Price, on behalf of Export Development Canada.

12   Just one clarification made by committee counsel, the carve-out

13   in paragraph five with respect to the admin claims of the case

14   and the DIP to priority claim come into effect after a closing

15   of the 363 sales transaction, not prior to it.

16          THE COURT:  Okay.  And you're merely helping me

17   better understand what's in this document?

18          MR. SCHEIN:  Correct.

19          THE COURT:  Okay.  Anybody else?  All right.  Forgive

20   me.  Mr. Schwartz, United States Attorney's Office.

21          MR. SCHWARTZ:  Good morning, Your Honor.  Matthew

22   Schwartz for the United States of America.  As the debtors'

23   papers amply demonstrate, the credit that's being extended by

24   the government and other lenders in this case was the only

25   credit that was available to the debtors and the deal was

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 179 of 317

27

1    negotiated at arm's length between experienced professionals.

2    Nonetheless, the source of the DIP funds in this case is

3    somewhat unusual and so we've asked for the finding that's in

4    paragraph F of the redline order before you that speaks to the

5    authority of the United States to expend TARP funds to make the

6    DIP loan.  I think that the language in the paragraph speaks

7    for itself and the basis for the finding was set forth at

8    length in the government's opening statement that was filed on

9    the first day in these cases --

10            THE COURT:  Yes.  I remember that.

11            MR. SCHWARTZ:  -- as well as the documents that were

12   attached to it and the other document that we asked that the

13   Court take judicial notice of yesterday.

14            THE COURT:  Okay.  Fair enough.  I see no reason not

15   to include that.  It'll be included.

16            MR. SCHWARTZ:  Thank you, Your Honor.

17            THE COURT:  Anything else?  Anyone?  All right.  Mr.

18   Karotkin, for the reasons set forth in the opening papers, as

19   supplemented by the submission of the United States and

20   revisions made to deal with other parties' needs and concerns,

21   the final DIP financing is approved on the form of the order in

22   which it's been presented to me and subject to the need to get

23   other stuff done today, it will be entered sometime today.

24            MR. KAROTKIN:  Thank you, sir.

25            THE COURT:  Thank you.  Have a good day.  Now --

28

1      MR. KAROTKIN:  Could I make a suggestion, Your Honor?

2      THE COURT:  Yes.

3      MR. KAROTKIN:  I'm sorry to interrupt.  The matter

4  number 1 on the agenda on page 4, which is -- it relates to two

5  proposed orders for use of cash collateral and adequate

6  protection, those are related to the DIP and those also have

7  been resolved among the parties.  The same issues were raised

8  by the landlords, the state taxing authorities, with respect to

9  those proposed orders. Again, they have been resolved on the

10  same basis.  The committee raised the same issues that Ms.

11  Caton addressed as to their time to challenge the liens and

12  claims of those parties in the same language -- virtually the

13  same language including -- included in the final DIP order has

14  been included in those proposed final cash collateral orders as

15  well.  And I do have marked copies from the interim orders

16  which I can hand up to you, sir.

17      THE COURT:  You are reading my mind, Mr. Karotkin.

18  So long as nobody is prejudiced by their not being here yet,

19  I'd like to go right into those matters and the one you

20  suggested is most logically connected.  So far as you're aware,

21  anybody who was going to be here at 9:45 is either here or told

22  you they wouldn't be here?

23      MR. KAROTKIN:  That's my understanding, sir.  We

24  circulated copies to the taxing authority's lawyers, to the

25  landlord last night and they were -- they were comfortable with

29

1   the language.  In fact, they agreed to the language, so they

2   are on board, sir.

3            THE COURT:  Okay.  Fair enough.

4            MR. KAROTKIN:  May I approach?

5            THE COURT:  In a half a second, you may.  I just want

6   to be sure that the creditors' committee doesn't want to be

7   heard in any way on this.  Ms. Caton?

8            MS. CATON:  No, Your Honor.

9            THE COURT:  Okay.  Yes, Mr. Karotkin -- well

10  actually, I'm going to ask for a variant of that.  I'm going to

11  ask that you or one of your folks provide all the orders to my

12  courtroom deputy at a convenient break.  You can hand up the

13  cash collateral to me now but the mechanics of entry will be

14  separately handled.  Am I right that this -- aside from the

15  fact that of course it's a final -- principally papers the

16  understandings with the folks who entered those limited

17  objections?

18           MR. KAROTKIN:  Yes, sir.

19           THE COURT:  Okay.  All right.  It's approved and

20  we're going to deal with this the same way we dealt with the

21  final DIP.

22           MR. KAROTKIN:  Thank you, sir.

23           THE COURT:  Thank you.  Mr. Miller?

24           MR. MILLER:  Your Honor, may I make a suggestion at

25  this time?

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 182 of 317

30

1          THE COURT:  Yes, please.

2          MR. MILLER:  That we could take the uncontested

3     matters that's on the 9:45 calendar.

4          THE COURT:  Yes.  Certainly.  And if you know that

5     your counterparties or folks who want to be heard on further

6     matters are already here, we can move into that as well.  Do

7     you want to handle the uncontested ones or put them on one of

8     your folks?

9          MR. MILLER:  I'll handle them, Your Honor.

10          THE COURT:  Okay.

11          MR. MILLER:  They start at number 9 on the agenda for

12     9:45.  The first motion, Your Honor, is the motion to get a

13     final order authorizing the debtors to pay for pre-petition

14     obligations to foreign creditors and authorizing and directing

15     financial institutions to honor and process related checks and

16     transfers.  This was heard, Your Honor, on June 1 and Your

17     Honor entered an interim order.  There are no objections to the

18     entry of the final order.

19          THE COURT:  Okay.  Given that and the provisions of

20     my case management order, motion granted.

21          MR. MILLER:  Thank you, Your Honor.  Number 10, Your

22     Honor, is the motion for final orders establishing notification

23     procedures regarding restrictions on certain transfers of

24     interest in the debtor.  This is the NOL motion, Your Honor.

25          THE COURT:  I remembered my dialogue with Mr.

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 183 of 317

31

1    Karotkin on this.

2            MR. MILLER:  Yeah.  He refused to take the lectern

3    this at this point, Your Honor.

4            THE COURT:  Understandably.  Granted.

5            MR. MILLER:  Thank you, Your Honor.  Number 11 is the

6    order to -- a final order.  You entered an interim order, Your

7    Honor, on cash management.  There are no objections to the

8    final proposed order.

9            THE COURT:  Granted.

10            MR. MILLER:  Number 12, Your Honor, is the motion of

11    the debtors to -- for authority to exercise a put.  This

12    relates, Your Honor, to the claims which Your Honor approved

13    the rejection some time ago at a hearing.  One the claims we

14    have a twenty-five percent interest in and a right to put our

15    interest to the other party.  As a result of this put, Your

16    Honor, the estate will recover approximately 350,000 dollars.

17            THE COURT:  Granted.

18            MR. MILLER:  Thank you.  Number 13, Your Honor, is

19    the motion to grant additional time to file reports of

20    financial information or to seek modification of reporting

21    requirements pursuant to Bankruptcy Rule 2015.3.  There are no

22    objections to that Your Honor.

23            THE COURT:  Granted.

24            MR. MILLER:  Number 14, Your Honor, is the

25    application of the debtors to engage Weil Gotshal & Manges

32

1    under a general retainer as attorneys for the debtor nunc pro

2    tunc to the commencement date.  This order, that will be

3    proposed, Your Honor, was negotiated with the Office of the

4    United States Trustee.  There are no objections to this matter.

5            THE COURT:  Granted.

6            MR. MILLER:  Number 15, Your Honor, is the

7    application of the debtors to engage the law firm of Jenner &

8    Block LLP as attorneys for the debtors, pursuant to Section

9    327(e).  Jenner & Block, Your Honor, will be serving, Your

10   Honor, as conflicts counsel and special corporate counsel.

11   There is a supplemental declaration of Mr. Murray in connection

12   with the application and there are no objections to this

13   application, Your Honor.

14           THE COURT:  Granted.

15           MR. MILLER:  Number 16, Your Honor, is the

16   application to engage under Section 327(e) the law firm of

17   Honigman, Miller, Schwartz & Cohn, LLP as special counsel.  Mr.

18   Weiss appeared before you, Your Honor, in connection with a

19   suppliant matter two weeks ago.  There are no objections to

20   this application, Your Honor.

21           THE COURT:  Granted.

22           MR. MILLER:  The last uncontested matter in this part

23   of the calendar, Your Honor, is the application authorizing the

24   retention and employment of the Garden City Group, Inc. as

25   notice and claims agent nunc pro tunc to the commencement date.

33

1    There are no objections to that, Your Honor.

2              THE COURT:  Granted.

3              MR. MILLER:  I would also note, Your Honor, that item

4    on the contested calendar motion, item number -- let me get to

5    it.  I think it's item number 6, Your Honor, which was the

6    motion of the consumer -- ad hoc consumer victims committee for

7    the appointment of an additional committee of unsecured

8    creditors to represent consumer victims was withdrawn without

9    prejudice.

10             THE COURT:  Okay.

11             MR. MILLER:  We could do some other motions, Your

12   Honor.  I don't know if --

13             THE COURT:  It's all right.

14             MR. MILLER:  Subject to Your Honor's ruling that if

15   somebody shows up at 9:45, we can always go back.

16             THE COURT:  Okay.  Do you know whether anybody has

17   indicated to you that they're going to wish to show up on the

18   motion to pay essential suppliers and all that?

19             MR. MILLER:  Mr. Smolinsky, Your Honor.

20             THE COURT:  If you're in doubt, I think I need to

21   wait till 9:45 but I would prefer to deal with the easier ones

22   most quickly.

23             MR. SMOLINSKY:  Your Honor, everything is resolved.

24   I did represent that I would put one thing on the record and as

25   long as I do that, I think we're fine to go forward.

34

1          THE COURT:  Sure.  Go ahead, Mr. Smolinsky.

2          MR. SMOLINSKY:  Your Honor, we're here today seeking

3     entry of a final order with respect to the debtors' essential

4     supplier programs.  There were two objections filed.  One was

5     filed by Panasonic Electric Works Corporation.  The other by

6     Clements (ph.) Inc.  Both objections have been voluntarily

7     withdrawn but I did agree to clarify on the record -- Your

8     Honor, you may recall that we attached to our motion a trade

9     agreement and it was the debtors' intent to require critical

10    vendors to sign a trade agreement and return it.  These two

11    objections were related to that agreement.  They had some

12    issues with it.  I think they understand --

13         THE COURT:  They didn't want to give you everything

14    you were looking for, for the benefit of the estate?

15         MR. SMOLINSKY:  That's right, Your Honor.  But the

16    answer was easy.  You don't have to sign it and you're not a

17    critical vendor.

18         THE COURT:  You anticipated the first question I

19    would be asking in the argument, if there had been one.

20         MR. SMOLINSKY:  But Your Honor, I think they wanted

21    me to clarify that because they did not sign the trade

22    agreement, they're not bound by any of the terms contained in

23    that trade agreement.

24         THE COURT:  If they don't sign an agreement, they're

25    not bound by it?

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 187 of 317

35

1      MR. SMOLINSKY:  That's right, Your Honor.  And with

2    that, Your Honor, the objections are resolved.  The creditors'

3    committee did engage us in some dialogue about the form of the

4    final order.  We did add some clarifying language to make

5    certain that we would provide the creditors' committee with the

6    information that they need to be up to speed on how we

7    implemented that order and I'm happy to report that I don't

8    think there are any issues with respect to that.

9        THE COURT:  All right.  Fair enough.  I do want to

10   give the creditors' committee a chance to comment if it wants

11   to.  Mr. Mater, good morning.

12       MR. MATER:  Good morning, Your Honor.  Thomas Moers

13   Mater for Kramer, Levin, Naftalis & Frankel representing the

14   committee.  We have no issues.  We have certain supplier

15   matters that are referenced in our limited objection to the

16   general transaction but we're working those through and with

17   respect to what Mr. Smolinsky put on the record, we have

18   nothing further to add.

19       THE COURT:  Fair enough.  Then with the

20   clarifications and anything that you arranged for, Mr.

21   Smolinsky, the motion's granted.

22       MR. MILLER:  Your Honor, I think we could proceed

23   with the utilities motion which is item 2.

24       THE COURT:  Fair enough.

25       MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 188 of 317

36

1    entered a final order with respect to the utility motion on

2    June 1st.  The procedures provided that objections could be

3    filed to the form of adequate assurances by the 15th of June.

4    We received -- of the 261 utilities that were noticed in

5    connection with the order, we received objections from 35

6    utilities.  We have finally resolved all of the objections

7    except for a very few, I believe two objections, and we believe

8    that we have agreements in principle with respect to those two.

9    What I'd like, Your Honor, and I could share it with chambers

10   so that the docket accurately reflects the resolution of these

11   matters is that two of the objections, it's docket number 764

12   and 915, will be adjourned until the 30th of June so that we

13   can presumably deliver final resolutions of those matters.

14           THE COURT:  Pause, please, Mr. Smolinsky.  On those

15   adjournments, you have comfort that they're not going to turn

16   off the lights on you between now and then?

17           MR. SMOLINSKY:  Yes, Your Honor, we're still within

18   the thirty days so I don't think that that would be an issue.

19           THE COURT:  Okay.

20           MR. SMOLINSKY:  With respect to the remaining

21   motions, they are resolved and I believe they can be marked off

22   calendar and we could provide Your Honor with the docket

23   numbers.

24           THE COURT:  Okay.  Are there folks who are waiting to

25   be heard on this?  Would you come up please?  And,

37

1    unfortunately, I don't know everybody.  If you could identify

2    yourself on the record.

3            MS. KARPE:  Apologize, Your Honor.  Karel Karpe,

4    White & Williams for Nicor Gas.  Your Honor, I have spoken to

5    Mr. Smolinsky and we do have an agreement in principle.  But I

6    noticed that there was a first supplemental list filed sometime

7    very early this morning.  And it looks like there's the Nicor

8    Gas accounts have been transferred to that notice.  But it does

9    look like there may be an additional one.

10           So just to preserve my client's rights, Your Honor,

11   we filed an objection at docket number 1099 which I didn't hear

12   referenced this morning.  And all I want to do is just get some

13   assurance on the record that the objection that we previously

14   filed and any other accounts that Nicor and the debtor may have

15   are all rolled over to that next one.  We believe that we will

16   have an agreement in the next day and so I don't think that

17   this is going to prejudice either the debtor and we do not plan

18   on turning off any utility.

19           THE COURT:  Okay.  Mr. Smolinsky?

20           MR. SMOLINSKY:  Your Honor, just to clarify, an

21   additional list was filed this morning, as we're entitled to do

22   under the order.  The purpose of the list was not to add any

23   contracts or any utilities.  The purpose was to actually

24   eliminate certain utilities that had claims that their

25   contracts were forward contracts and not utilities.  And that

38

1    was the agreement by which certain of the objections were

2    resolved.  So I'll work with Nicor to make sure that they're

3    comfortable, but we did not have any utility companies to that

4    list.

5         THE COURT:  Okay.  You okay with that, Ms. Karpe?

6         MS. KARPE:  Yeah, Your Honor.  The only difference

7    that I noted this morning is that there was a difference in the

8    account numbers.  I'm sure that Mr. Smolinsky and I can work

9    our issues at and we should have a resolution, we hope, by

10   tomorrow.

11        THE COURT:  Very good.  Thank you.  Mr. Fox?

12        MR. FOX:  Good morning, Your Honor.  Shawn Fox from

13   McGuireWoods on behalf of the Dominion Retail, Inc.  With the

14   debtors' representation that they're not seeking to treat

15   Dominion Retail as a utility, our objection is resolved.

16        THE COURT:  Very good.  Thank you.  All right.

17   Anybody else on 366 issues, utility issues?  There being no

18   response, your mechanism is fine, Mr. Smolinsky.  So we'll be

19   locked in for all of those that have been resolved and it'll be

20   continued for the couple that haven't been?

21        MR. SMOLINSKY:  That's right, Your Honor.

22        THE COURT:  Very good.  Okay.  Thank you.

23        MR. MILLER:  If Your Honor please, item number 3 has

24   been resolved.  Mr. Karotkin -- that's the use of cash

25   collateral and the explanation that Mr. Karotkin gave.

39

1          Item 4, which is the Evercore Group LLC, as stated,

2     Your Honor, we request that be adjourned to July 2nd.

3          In connection with item number 5, Your Honor, which

4     is the motion of the debtors to employ and retain AP Services

5     LLC as crisis managers and to designate Albert A. Koch as chief

6     restructuring officer nunc pro tunc to the commencement date,

7     we have reached an agreement, Your Honor, with the Office of

8     the United States Trustee and we have a statement to put on the

9     record.

10         (Pause)

11         MR. MILLER:  Your Honor, I am just informed by Mr.

12    Karotkin that we have to meet with the Office of the U.S.

13    Trustee during break.

14         THE COURT:  Okay.

15         MR. MILLER:  So we'll put that off.

16         THE COURT:  We'll defer that one, then.

17         MR. MILLER:  Item 6 is a report, Your Honor, has been

18    withdrawn without prejudice.  And that leaves, Your Honor,

19    items 7 and 8, 7 being the motion of the ad hoc committee of

20    asbestos personal injury claimants for an order appointing a

21    legal representative, a future asbestos personal injury

22    claimant and directing the  United States trustee to appoint an

23    official committee of asbestos personal injury claimants.

24         THE COURT:  Okay.  Mr. Esserman here?

25         MR. ESSERMAN:  Yes, Your Honor.

40

1          THE COURT:  You want to come on up, please.  Somebody

2     give Mr. Esserman a place to sit at the counsel table?

3     Although, Mr. Esserman, after my preliminary remarks I'm going

4     to want you to speak first.  And when you do, you'll be at the

5     main counsel lectern.

6          Give me a moment, please.

7     (Pause)

8          THE COURT:  All right.  Folks, make your

9     presentations as you see fit but, Mr. Esserman, when it's your

10    turn, I'm going to need you to address not just the matters

11    that were set forth in the papers but the terrain as it now

12    exists as a consequence of my ruling on Tuesday.

13         We have, as I understand it, in your motion, the

14    regular tort litigants motion having been withdrawn, double

15    barreled issues and of course the future claims rep is a little

16    different then me forming another official committee.  But on

17    the matter of the official committee, in addition to the things

18    that you've briefed, I would appreciate it if by the time that

19    you're done you help me understand how it would be, if it is in

20    fact the case, that your request is different than the one for

21    the bondholders that I addressed on Tuesday.

22         On the future claims rep portion, the debtors told us

23    that it's not looking for a channeling injunction and that

24    we're going to have a liquidation here and that the debtor

25    isn't going to be looking for a discharge.  And I need your

41

1    help in understanding why those aren't some pretty important

2    facts.

3            I also want you to address, before you're done, what

4    seemingly is the case, I forgot which of the briefs I saw said

5    that, which focus on the fact that this, unlike the other case

6    in which you've been before me, is hardly an asbestos driven

7    case and that asbestos claims, compared to the totality of the

8    claims of all the other creditors in this case, are very, very

9    small percentage.

10           So, Mr. Esserman, come on up, please.  Good to see

11   you again.  Came in from Texas?

12           MR. ESSERMAN:  I did, Your Honor.  Nice to see you.

13   Sandy Esserman of Stutzman Bromberg Esserman & Plifka in

14   Dallas, movant today, and I will address all the questions that

15   Your Honor asked.  First I'd like to say that on behalf of the

16   ad hoc committee, and we have filed a 9019 --

17           THE COURT:  You said a 9019.  Did you mean that or a

18   2019?

19           MR. ESSERMAN:  A 2019; sorry.

20           THE COURT:  I would have been delighted to hear it

21   was a 9019 but I didn't think we were quite there yet.

22           MR. ESSERMAN:  No.  I guess I was anticipating the

23   future, hopefully.  Anyway, Your Honor has raised the

24   significant issues, I think, that I will address, each one of

25   those issues.  I'd like to address them in this context, in

42

1   light of the paper filed by the creditors' committee yesterday,

2   which was, I thought, a very significant paper in which the

3   creditors' committee filed what they called a limited objection

4   to the sale but in fact was a statement by the creditors'

5   committee and a full objection that provided that any sale that

6   does occur in this case cannot bond future claimants and should

7   not bond future claimants.

8         In light of the position taken by that committee and

9   in light of where we are, I no longer wish to proceed and would

10  adjourn a portion of our motion with regard to seeking a

11  separate committee at this time.  We will continue to be active

12  in the case; the ad hoc committee is not going away.  We are

13  not seeking official status.  This case and the context it was

14  filed, the motion was filed, coming off the Chrysler situation,

15  gave us great pause, gave the ad hoc committee great pause.

16  Just to give Your Honor a context of what I'm referring to, in

17  the Chrysler case the committee was -- had a lot of creditors

18  on it which wound up being assumed and paid in full after the

19  sale was approved, which caused wholesale resignations from the

20  creditors' committee.  In fact, I think a majority of the

21  creditors' committee in Chrysler had resigned after the sale

22  was approved because they were paid in full.  And that was a

23  difficult situation for those creditors that were "left behind"

24  in Chrysler.  Hopefully that is not going to be the case in the

25  GM case or the GM committee, which would, in great part,

43

1    alleviate the necessity for a separate committee.

2         I would like to distinguish or answer --

3    nevertheless, I'd like to answer some of your questions very

4    briefly.  For instance, how is this any different from, say, a

5    Dana which has been referenced in many of the papers, in which

6    asbestos claims were a relatively small percentage of the

7    population of claims versus the situation -- similar situation

8    in Chrysler.

9         In Dana, the asbestos claims -- and I moved for -- it

10   was pointed out that I moved for a separate committee and I did

11   and we were very active in that case.  But in Dana, they passed

12   the asbestos claims through.  They passed them through as

13   unimpaired and there was testimony in Dana that asbestos claims

14   were not only passed through to the entity but any successor

15   liability claims that anyone wanted to bring against New Dana

16   could be brought.  There was no concession that, in fact, they

17   were good claims or that they should succeed.  But that they

18   could survive the reorganization.

19        There was also extensive testimony that there was

20   adequate assets and insurance to pay asbestos claims in full,

21   in full.  So there was a lot of testimony there that, one,

22   asbestos claims were a very small piece of that puzzle; and

23   two, they were passed through.  Three, there was adequate

24   provision made for their compensation.  And to the extent

25   people look to Dana as a model case of how to deal with this

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 196 of 317

44

1    and how to dispose of not having a futures rep and a

2    committee -- I'm not necessarily endorsing that.  We still

3    disagree with those decisions, but that example does stand.

4    And as far as I know, post confirmation, has worked.

5            In this case, if, in fact, those situations --

6    situation is going to hold true and future claims, as the

7    creditors' committee has pointed out in their paper filed

8    yesterday, and I would urge Your Honor to read it at his

9    convenience, are going to be able to be asserted against what

10   will be called the New GM.  And GM does not seek to channel or

11   restrict in any way those claims.  Perhaps a futures

12   representative may not be needed.  Perhaps a, what I'll call a

13   future tort czar, future claims tort czar, not just for

14   asbestos claims but in thinking about this last night you've

15   got future damage claims, future rollover claims, future design

16   defect claims, future gas tank explosion claims for GM cars out

17   there in the public that have not yet occurred.  And as long as

18   those claims are not impaired in any sense and can be brought

19   against the surviving entity, then I think we need to rethink

20   this whole -- the direction that I was trying to push the pile,

21   so to speak.

22           On the other hand, if GM's position is no, Mr.

23   Esserman, we are absolutely taking this issue on dead square

24   and we are going to eliminate those claims and leave them

25   behind with no compensation or no special pot or no trust or no

45

1   whatever, I think that's a different situation.  And I think we

2   need to then think about how we can protect the public and how

3   we can protect the future claimants and the people that are

4   going to be damaged in the future, be it asbestos, be it

5   consumers, be it rollover victims, be it gas tank explosions,

6   etcetera.  So perhaps this is yet to play out.

7           The way I read GM's papers, and hopefully I'm wrong,

8   is they intend to constrict those claims.  They intend not to

9   pass those claims through.  They intend to, through a 363

10  device, eliminate those claims for the "New GM" whether they

11  gave good or bad publicity on that in the future.

12          So, I think, to a certain extent, we sort of need to

13  see where GM's going to take us on this ride.  And see if, in

14  fact, they're willing to accede to the issues raised by the

15  creditors' committee and frankly raised first by me in our

16  papers in the objection to the sale.  And in fact, if you will,

17  pass those claims through the estate.

18          I would note that one comment on appointing of an FCR

19  that the debtor made was the ad hoc committee -- ad hoc

20  asbestos claimants request to appoint an FCR at this early

21  stage of these cases should be denied.  Well, I know that if it

22  had been made later it would have been too late.  And I think,

23  in fact, you need to address this issue up front in a case and

24  early.  And if Your Honor decides to or GM is going to decide

25  to severely restrict future consumer claims, future tort

46

1    claims, future asbestos claims, it needs to decide which

2    direction to go.  And if that's the case I think it'd be only

3    prudent and a protection of the public to appoint somebody to

4    protect those interests and make sure those interests are

5    protected.

6            If not, I think the Supreme Court, as recently as

7    last week, in the Travelers vs. Bailey decision, which I was

8    involved in from the trial court all the way to the Supreme

9    Court; and lost, I might add, ultimately.  But I think that

10    it's sort of in the eye of the beholder whether the case is a

11    loss or a win because you have to look at what the Court said.

12    And the Court, sort of, said it wasn't -- it said you can't

13    collaterally attack orders.  You can't collaterally attack,

14    say, a 1986 order in 2004.

15            But on the other hand, it left open the question as

16    to who's bound by those orders.  Were my clients, in that case,

17    Pearly Bailey -- Pearly Lee Bailey, a widow of a Mizo (ph.)

18    victim, was she bound by that order?  And the Court remanded it

19    to the Second Circuit to decide whether or not, in fact, she

20    was bound because she was not present before the Court, didn't

21    have notice, etcetera.  Those issues all remained open, which

22    is why I say there's a lot of legs left in that case and a lot

23    of legs left after that decision for me in the Second Circuit

24    and in the bankruptcy court.

25            But what we can learn from that case is, and what the

47

1   Supreme Court I think was telling the public and telling the

2   Court was, you need to protect your rights at the time.  You

3   need to have your rights protected at the time.  And Congress,

4   through 524(g) has in fact; set forth a mechanism to protect

5   future unknown claims in an asbestos situation.  And is

6   specifically referenced that protection and it said -- the

7   Court said we do not decide whether any particular respondent

8   is bound by the 1986 orders.  They assumed that everyone was

9   bound and that relates very much to this case.  I think it's

10   almost dead-on this case.

11        If GM is trying to bind everybody and all the

12   futures, I think Congress has set forth in the asbestos context

13   and the Supreme Court affirmed last week, how that's done.  And

14   that's done through a 524(g) situation.  Or I could analogize

15   to that and say that a future tort czar, to protect the

16   futures.  And if not, then due process provides that those

17   people are not bound.  And I'm willing to, frankly, live with

18   either result.  I'm willing, if GM says it wants to go the Dana

19   route, I think that's a mistake but they can go the Dana route.

20   If GM wants to proceed a different route, I'm fine with that.

21        So in many respects, I punt this to GM.  If GM is in

22   fact going to try and cut everyone off at the knees for future

23   claims, I think they need to take this podium and say that.

24   And then I think they need to either live with the consequences

25   of not having a future claims tort czar or future claims rep or

48

1    not.  And also risk whether or not the order that they want

2    gets entered by this Court.  Thank you.

3              THE COURT:  All right.  Thank you.  Mr. Miller?

4         (Pause)

5              MR. MILLER:  Harvey Miller for the debtors.  Your

6    Honor, I wish Mr. Esserman had called last evening, I might

7    have gotten another hour of sleep.  As I understand his

8    presentation, the motion for the appointment of additional

9    committee of asbestos claimants is withdrawn without prejudice.

10             THE COURT:  That's my understanding as well.  Mr.

11   Esserman?

12             MR. ESSERMAN:  We would prefer to adjourn it.

13             MR. MILLER:  We would prefer to have it withdrawn

14   without prejudice.  We don't need it on the calendar, Your

15   Honor.

16             THE COURT:  All right.  Gentlemen, one of the things

17   I would like to do is to get more money into the pockets of

18   creditors.  I don't want to make people file more pieces of

19   paper then have already been filed in this case.  I'm sure you

20   got less sleep than I did, Mr. Miller, but the goal is the

21   same.

22             That portion can be continued but, frankly, I'm going

23   to set it for a date pretty far out, Mr. Esserman, without

24   prejudice for you to advance it on the calendar.  We keep them

25   on calendar so they don't fall between the outfielders but this

49

1    is really a distinction without a difference, gentlemen.

2    Continue, Mr. Miller.

3         MR. MILLER:  So that leaves, Your Honor, the question

4    of the future representative.  As Your Honor pointed out in

5    your opening remarks, 524(g) is a section of the Bankruptcy

6    Code which relates to a debtor proposing a plan of

7    reorganization that incorporates a channeling order where

8    asbestos claims are going to be channeled to a particular fund

9    for satisfaction, which is derivative out of the Johns Mandel

10   (ph.) case.

11        As we have said in our papers, Your Honor, there is

12   no intention on the part of GM to propose a channeling order.

13   And since we are proposing to do a plan of liquidation there

14   will be no discharge.  In that context, Your Honor, there is no

15   justification for the appointment of a future claimant

16   representative.  And I would direct Your Honor's attention to

17   the case of Locks vs. U.S. Trustee at 157 B.R. 89, a decision

18   of the United States District Court for the Western District of

19   Pennsylvania which held that in a case of a liquidation, rather

20   than a reorganization, there is no mandatory requirement for a

21   future claimant representative.

22        We are not proposing, in any way Your Honor, a

23   channeling order.  And as Mr. Esserman has pointed out, there

24   are negotiations going on with the official creditors'

25   committee as to the scope of the order which will be requested

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 202 of 317

50

1    in connection with the 363 transaction.  Where those

2    negotiations come out at this point, Your Honor, we're not

3    prepared to say.  There is active negotiation on all of the

4    issues that Mr. Esserman referred to.  They will be before Your

5    Honor on the hearing on June 30th.

6            In the context of where we are today, 524(g) is

7    simply not applicable and there is no basis here, today, for

8    the appointment of a future representative for future asbestos

9    victims.  Which, and also, as the Court pointed out in Locks

10   vs. U.S. Trustee, there is an inherent conflict between the

11   current asbestos claimants and the future claimants that may

12   have to be considered at a future date.  But in the

13   circumstances where we find ourselves today, Your Honor, there

14   is no basis for the appointment of a future representative.

15   And I say that, Your Honor, without prejudice to a future

16   application if that becomes appropriate.

17           THE COURT:  Okay.  Thank you.  Mr. Esserman, any

18   reply?  Oh, forgive me.  Mr. Mayer, come on up, please.

19           MR. MAYER:  Thank you, Your Honor.  Tom Mayer, again,

20   for the official committee.  And our limited objection is

21   exactly what it states to be.  But Mr. Esserman is correct that

22   certain of the issues that he raised we decided to raise

23   ourselves.  And it was no mean fete getting a fifteen-member

24   committee to agree to take that position.  We have on that

25   committee; I think I can do this from memory, two indentured

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 203 of 317

51

1    trustees representing approximately twenty-seven billion

2    dollars of debt.  We have the PBGC whose contingent liability

3    dwarfs that of the bonds.  We have three unions who are

4    receiving quite disparate treatment.  We have three dealers who

5    are receiving quite disparate treatment.  Two suppliers, one

6    advertising agency, two product liability claimants and an

7    asbestos representative.  I think I got to fifteen.

8          And the issues that Mr. Esserman raised were debated

9    at considerable length by what is not even so much a model

10   United Nations and we took the position we took in our papers

11   with respect to future claims.

12         We agree with Mr. Miller that there is no call for a

13   futures representative at this time.  If it becomes necessary,

14   we can deal with it at a future time.  But it is our position,

15   as set forth in the papers as Mr. Esserman noted, that we don't

16   believe that an order entered by this Court can bond future

17   claimants.  We don't believe 524 is applicable here.  We don't

18   think 524 is mandatory and there was no conceivable stretch

19   under which a 524(g) plan could possibly be confirmed in this

20   case.  It will never be a case where the asbestos claimants are

21   getting a majority of an operating company and no discharge is

22   being sought for it.

23         So if at some point in the future it becomes

24   necessary to deal with a futures claim issue, we can deal with

25   it at this time.  And at this point we see no basis for either

52

1   the appointment of a committee or the appointment of futures

2   representatives.  If you have questions, I'm happy to answer.

3          THE COURT:  No, I really don't.  Thank you.

4          MR. MAYER:  Thank you, Your Honor.

5          THE COURT:  Okay.  Mr. Esserman, I'll take any reply.

6          MR. ESSERMAN:  Future claims are being passed through

7   the estate unimpaired.  I see no reason for an appointment

8   either at this time, Your Honor.  Thank you.

9          THE COURT:  All right.  Everybody sit in place for a

10  second.

11     (Pause)

12         THE COURT:  Folks, the motion is denied without

13  prejudice to renewal if either the debtor proposes a channeling

14  injunction in the future or decides to propose a standalone

15  plan.

16         Mr. Esserman, if you want to take this up on appeal,

17  I'll give you full findings of fact and conclusions of law at

18  the end of the day today, but I don't want so many people in

19  the courtroom to have to await a recess for me to deliver those

20  findings which would likely be as long as they were on Tuesday.

21         MR. ESSERMAN:  Unnecessary, Your Honor.

22         THE COURT:  All right.  Thank you.  Is our next

23  matter the retirees committee?

24         MR. MILLER:  Yes, Your Honor.

25         THE COURT:  Do you folks want to go straight into it

53

1   or do you think anybody would want or need a five or ten minute

2   break?

3            MR. MILLER:  I would ask Your Honor for a five minute

4   break.  I would like to have that opportunity to meet with the

5   U.S. trustee.

6            THE COURT:  Certainly.  Okay.  We're in recess for --

7   until -- would an extra five minutes be prudent, Mr. Miller?

8            MR. MILLER:  Absolutely, Your Honor.

9            THE COURT:  Let's resume at 10:15.  We're in recess.

10       (Recess from 9:56 a.m. until 10:15 a.m.)

11            THE COURT:  Mr. Miller?

12            MR. MILLER:  Harvey Miller for the debtors.  Your

13   Honor, may we go back to the motion to engage AP Services?

14            THE COURT:  Certainly.

15            MR. MILLER:  Mr. Karotkin, please?

16            THE COURT:  Mr. Karotkin.

17            MR. KAROTKIN:  Thank you, Your Honor.  Stephen

18   Karotkin, Weil Gotshal & Manges, for the debtors.  In

19   connection with the application of the debtors to retain AP

20   Services, Your Honor, there was only one substantive objection

21   filed by the Office of the United States Trustee.  I believe

22   that the unsecured creditors' committee either filed a pleading

23   or requested certain clarification in any proposed order, which

24   were are more than willing to address.

25            With respect to the objection raised by the Office of

54

1    the United States Trustee, we have reached a resolution of that

2    dispute which we propose to embody in a revised proposed order,

3    which we will circulate with Ms. Adams as well as with the

4    unsecured creditors' committee.  But I would like to state on

5    the record the resolution that's been agreed to, if I might?

6         THE COURT:  Yes.  Go right ahead.

7         MR. KAROTKIN:  Thank you, sir.  I'm just going to go

8    to the substantive points.  With respect to the success fee

9    described and contained in their retention agreement, there

10   would be no objection to payment of fifty percent of the

11   success fee as provided in the retention agreement, on the

12   closing of the sale transaction, subject to AP Services filing,

13   prior to such payment, a supplemental affidavit with the Court

14   summarizing the services rendered by AP Services with respect

15   to the sale transaction.

16        Second, both the payment of the balance of the

17   success fee, which is proposed to be paid one year following

18   the closing of the sale transaction, and any discretionary fee,

19   as that term is defined in the application, both of those

20   payments shall be subject to review under the reasonableness

21   standards set forth in Sections 330 and 331 of the Bankruptcy

22   Code, including the filing of an appropriate fee application by

23   AP Services, including time records.

24        And finally, Your Honor, no person from AP Services

25   involved in the engagement, can bill at a rate higher than the

55

1    rate billed by Mr. Koch, as that rate may be adjusted from time

2    to time, on notice to the Office of the United States Trustee.

3    And I believe that, I hope, accurately sets forth the

4    understanding.  And if I have stated something --

5            THE COURT:  Mr. Matsumoto, forgive me.  Could you

6    pull a nearby microphone over unless you want to come to the

7    main lectern?

8            MR. MATSUMOTO:  That's correct, Your Honor.

9            THE COURT:  Okay.

10           MR. MATSUMOTO:  He's accurately said it.

11           THE COURT:  Mr. Mater.

12           MR. MOERS MATER:  That is correct, Your Honor.  That

13   reflects the agreement with the committee.

14           THE COURT:  All right.  Did everybody who weighed in

15   on this or wanted to, have a chance to be heard?  Okay.  As

16   modified by the understandings with the U.S. trustee and the

17   creditors' committee, that retention is approved.  And at your

18   convenience, you or one of your colleagues can get me the

19   revised order papering that understanding.

20           MR. KAROTKIN:  Thank you, sir.

21           THE COURT:  Thank you.

22           MR. MILLER:  If Your Honor pleases, Harvey Miller

23   again.  Your Honor, one housekeeping detail.

24           THE COURT:  Yes.

25           MR. MILLER:  The filing of a memorandum of law in

56

1    support of the proposed Section 363 transaction is due tonight.

2    There are objections, Your Honor, that are still coming in.

3    They've come in every day.  They're still streaming in.  What

4    we would propose, Your Honor, is to file our memorandum of law.

5    But we would like the extension, Your Honor, to amend that

6    memorandum before the commencement of the hearing on June 30th,

7    to take into account the additional objections that are coming

8    in.

9            THE COURT:  I need a little help from you here, Mr.

10   Miller, in a couple of ways.  First, I thought the time for

11   objections to what you're doing had come and gone.  You're

12   dealing with the practical problem that people, either because

13   they disregarded the deadline or didn't get notice of the

14   deadline, are still giving you stuff?

15           MR. MILLER:  I think one day, Your Honor, ECF was

16   down and that delayed a lot of things.  Some people claim they

17   did not get notice.  And they're just continually streaming in,

18   Your Honor.

19           THE COURT:  I hear you.  When were you thinking of --

20   you did file one brief already.  And this, I take it, would be

21   like a reply brief to the objections?

22           MR. MILLER:  Yes, Your Honor.

23           THE COURT:  And what was your thought as to when I

24   would get something I could work with?

25           MR. MILLER:  The hearing is on Tuesday, Your Honor.

57

1    Monday, 5:00, 6:00.

2              THE COURT:  Umm --

3              MR. MILLER:  I'll make a concession, Your Honor.

4    Noon.

5              THE COURT:  I feel like I'm playing Let's Make a

6    Deal.  I'm not going to default you if you can't make noon, but

7    I'd like you to try very hard to do that.

8              MR. MILLER:  Very good, Your Honor.  Thank you.

9              THE COURT:  Thank you.  Mr. Schwartz?

10             MR. SCHWARTZ:  On that point.  Mr. Miller said that

11   the deadline was this evening.  We were under the impression

12   that it was tomorrow.  And we were intending to put in papers

13   as well, if that's acceptable.

14             THE COURT:  Sure, you can do that.

15             MR. SCHWARTZ:  Thank you.

16             THE COURT:  Okay.  Are we now up to retirees, Mr.

17   Miller?

18             MR. MILLER:  Yes, sir.

19             THE COURT:  All right.  I would like counsel for the

20   retirees to come on up, but then, only to get a place at

21   counsel table.  Make room for him, folks.  Somehow, make room

22   for him, because I have some preliminary observations.  Mr.

23   Mater, you get a place at the -- okay, that's fine.

24             Folks, make your presentations as you see fit, but by

25   the time you're done, I want you to address the following

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 210 of 317

58

1    questions and concerns.  It seems to me, subject to your rights

2    to be heard, that 1114(d) has two prongs, one of which is

3    mandatory, if it applies; the other which is discretionary.

4    The mandatory part being "shall order, if the debtor seeks to

5    modify or not pay the retiree benefits"; and the discretionary

6    part being "or if the Court otherwise determines that it is

7    appropriate."  Now a "shall" proceeds the second also, but when

8    you give me the ability to determine whether it's appropriate,

9    it seems to me, that changes it into a discretionary

10    determination.  But it also seems to me, subject to your rights

11    to be heard, that neither of those requirements applies unless

12    1114 applies at all.

13            Now, on that, it appears to me that there are two

14    principal legal issues which I'll get to in half a second.  But

15    I also have a factual question for which I'd like your help,

16    Mr. Miller, or from whoever on your team is going to be arguing

17    it; which is, are the debtors' plans the same with respect to

18    both its retiree pension plans and also its welfare plans,

19    which I understand to be its health and life insurance plans?

20    Or is there some distinction between them?  That's more in the

21    nature of a factual predicate, just so I know what we're

22    talking about, either changing or leaving subject to the

23    possibility of a change.

24            But then, when we get to the legal prongs, it seems

25    to me that one of the issues I have to deal with is whether

59

1    1114 applies at all.  And on that -- and forgive me, on behalf

2    of the retirees, I'm not sure if I got your name?

3              MR. GOTEINER:  I'm sorry, Your Honor.  Neil Goteiner.

4              THE COURT:  Goteiner?

5              MR. GOTEINER:  Yes.

6              THE COURT:  Thank you.  Mr. Goteiner, it appeared to

7    me that in arguing the issue as to whether 1114 applied, you

8    took kind of a national perspective.  And I'm wondering, and I

9    would find your help valuable, in telling me whether I should

10   take a national perspective on the one hand, or whether I, as a

11   judge sitting in the Second Circuit in the Southern District of

12   New York, can appropriately consider a national perspective, or

13   whether I have to give greater attention to a decision of the

14   Second Circuit and of the case law in the Southern District of

15   New York.

16            Now, I think many people might believe that a

17   bankruptcy judge in the Second Circuit is bound by a decision

18   of the Second Circuit, and I've got the Chateaugay decision.

19   It's also the case that I'm on record in four or five or six

20   published decisions as saying that even though I'm not bound by

21   the decisions of other bankruptcy judges in this district, that

22   I believe that the interests of consistency for the financial

23   community, for the bankruptcy community in this district, are

24   very important, and therefore that I follow the decisions of

25   other bankruptcy judges in the Southern District of New York,

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 212 of 317

60

1    in the absence of clear error.

2            Now, I was a little surprised, Mr. Goteiner, that at

3    least in your opening brief, unless I missed it, there was no

4    attention to Judge Drain's decision in Delphi.  Now, obviously,

5    there was greater discussion of it by the debtors and the

6    creditors' committee when they filed their next round of

7    briefs.  And while you mentioned it in your reply, you didn't

8    really address, unless again I missed it, the substantive

9    holdings that Judge Drain had with respect to whether 1114

10   applies or whether I should follow his decision or whether his

11   decision was incorrect in any way.  Some might regard his

12   decision, albeit originally dictated, as one of the most

13   comprehensive and extensive discussions of this area that

14   anybody has ever written at any level in the federal system.

15   So I want both sides to address Judge Drain's decision

16   extensively, either up or down, whether it's right or wrong,

17   and address whether I should follow it or not.

18           Then we get to Sprague.  As I read Sprague, and it's

19   long and it's complicated, and I'm not claiming to be the only

20   person who can read it or understand it, it appeared to me to

21   be an 8-1-1-3 en banc decision.  And it looked to me that when

22   you looked at the plans, insofar as they affected the general

23   retirees, as contrasted to the early retirees, it was a 10 to 3

24   decision, putting aside the class action issue, which isn't

25   material to our concerns.  And it also appears to me that for

61

1   either most or all of the GM community, their situation is more

2   analogous to the general retiree situation rather than the

3   early retiree situation, because the principal difference was

4   the early retirees had separate deals that may have been

5   explained to them when they were asked to take early

6   retirement.

7           Now, one thing that was a matter of some difficulty

8   for me, from both sides, is that the contentions that Sprague

9   was wrong came up only in the reply brief filed on behalf of

10  the retiree committee, your folks, Mr. Goteiner.  And that

11  forced the debtor to deal with a whole new issue in a surreply,

12  which the debtor did, but then you didn't have a chance to

13  reply to that.  Now, debtor has stated in its surreply that res

14  judicata applies, binding on the retirees here, and also even

15  that collateral estoppel applies.  I'm wondering whether the

16  more appropriate course is to analyze this, principally, on

17  bases of stare decisis where you have the classic blue Buick.

18          I don't want to foreclose you folks from other points

19  that you want to make, but by the time you're done, please be

20  sure to have covered at least those.  Okay.  Your motion, Mr.

21  Goteiner.

22          MR. GOTEINER:  Neil Goteiner, General Motors

23  Retirees' Association.  Your Honor, I think the questions you

24  asked obviously go to the core of issues, and so I'll address

25  them up front.  And basically I'll constrain my general

62

1    comments to dealing with your questions.

2         THE COURT:  You don't have to constrain them, just be

3    sure you've covered them by the time you're done.

4         MR. GOTEINER:  Well, I'm constraining -- I'm saying

5    I'm constraining them, because they're core.

6         THE COURT:  Okay.

7         MR. GOTEINER:  And I haven't thought about every

8    point, but I think I can deal with them.  Let me begin by

9    saying this.  If you look at the statute, 1114, and you look at

10   the way it's structured, you don't have that much legislative

11   history on tap.  We have some, but very little.  But if you

12   look at it, what is it doing?  It uses the word "any benefit".

13   And it's a very, very modest proposal.  And this addresses part

14   of what Judge Drain did as well.

15        What Judge Drain did and what the debtors are doing -

16   - what some courts are doing, I respectfully submit

17   incorrectly, is that they're treating this exercise as a

18   summary judgment motion.  Judge Drain asked about abrogation of

19   rights and that 1114 is not supposed to abrogate rights, and

20   he's not familiar with other sections with the Bankruptcy Code

21   that create rights.  We're not creating rights here.  All that

22   1114 did was to create a forum, a platform for discussion so

23   that people, like the 122,000 members of this retiree group who

24   are not represented, has a chance to deal with and talk with

25   management about critical -- and this is not overly florid or

63

1    dramatic -- life-threatening decisions.

2            And Congress understood that.  So what happens is,

3    there's a discussion, a conversation that occurs.  And by the

4    way, Your Honor, it can occur very, very quickly.  This is not

5    going to delay any decisions.  There are lawyers on both sides

6    who can handle these issues, and management can handle them.

7    So you have the discussion.  And usually these things work out

8    fine, because this particular group, my clients, understands

9    that there has to be cuts, that there has to be serious cuts.

10   But the point is, to have those people whose lives are being

11   affected making the decisions, and not having them be made by

12   executives; not having them been made by other people who don't

13   understand and really live these issues.

14           So that needs to be stated.  And I didn't really see

15   that discussion in the cases.  This is not a summary judgment

16   motion.  What happens is, if there's going to be a

17   disagreement, and in the unlikely event that the committee --

18   if it was selected and formed -- in the unlikely event that the

19   committee disagreed with the debtor, then what happens?  Then

20   it comes -- then and only then does it come to Your Honor.  And

21   then you deal with some of the Sprague questions versus what we

22   think should control, which is the Devlin case in the Second

23   Circuit, which also addresses one of Your Honor's questions.

24           The debtor suggests that it's Sprague all the way.

25   That's not true.  Your Honor, I have not read all Your Honor's

64

1   decisions on this, but the Second Circuit has pointed out in

2   the Caesar case, I believe, as well as in other cases when they

3   were dealing the factors versus the Pro Arcs (ph.) cases, that

4   was around 1980.  I can get the cites to you on that.  That

5   when you're dealing with federal questions, Your Honor should

6   be looking at courts in the Second Circuit.  It's national, it

7   is national, but still, when you're looking at federal

8   questions, it's perfectly appropriate, and some courts say you

9   should look to the Second Circuit.

10          Now, I know that -- and so that means the Court

11   should also consider the Devlin -- and I'm saying we shouldn't

12   even be getting into that now, but if you look at the Devlin

13   burden analysis, in the Devlin burden analysis, you determined

14   whether there's an ambiguity.  Under the Sprague analysis, the

15   burden is on the retirees there to show it was clear and

16   unambiguous.  That is not the law of the Second Circuit.

17          THE COURT:  Pause, please, Mr. Goteiner, because if I

18   heard you right as you were getting into that, you mentioned

19   Pro Arts.  And sadly, I'm well aware of that case because in

20   the Adelphia case, I had issued a decision where I expressed

21   the view that the Third Circuit couldn't understand a matter of

22   Pennsylvania law correctly, or at least a two-judge majority in

23   a Third Circuit decision, and that they ignored a decision of

24   the Pennsylvania Supreme Court.  And while I wasn't reversed on

25   the issue because there were satisfactory alternative grounds,

65

1    it was pointed out to me that I, as a bankruptcy judge, don't

2    have the ability to tell a circuit court that it was wrong when

3    it's construing a matter of state law within its home state

4    district.  And I think that's what Pro Arts stands for among --

5            MR. GOTEINER:  State law.

6            THE COURT:  State law.

7            MR. GOTEINER:  Correct.

8            THE COURT:  Now, it appeared to me that even -- when

9    I was reading Sprague, that even though there isn't much

10   discussion of Michigan law, when they're talking about contract

11   formation as contrasted to what ERISA provides, that's got to

12   be state law.

13           MR. GOTEINER:  They didn't -- Your Honor, they didn't

14   discuss it.  And my -- I have the same question.  All right?

15   And it seemed at that level and at the level that Your Honor is

16   grappling with, it seems that the state issues are subsumed in

17   federal issues.  And look, there are a lot of blanks in

18   Sprague.  And there were a lot of disconnects and

19   discontinuities between the majority decision and the dissent.

20   The majority says most of the plans had the termination

21   language.  The dissents, in a robust and animated dissent, says

22   that some of them did.  But in any event, it was clear that it

23   was all over the lot, and most could be fifty-one percent.  So

24   I'm aware of the point.  I'm also aware of Factors, in fact, it

25   was one of my first cases.  I was representing the estate of

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 218 of 317

66

1    Elvis Presley and flew down to Graceland.  I remember that case

2    very well.

3              THE COURT:  That is Pro Arts, isn't it?

4              MR. GOTEINER:  Yes, Factors, Pro Arts.  So I'm aware

5    of that case, as well.  So in dealing with these issues, I

6    think 1114 trumps the analysis for today.  And all I'm saying,

7    1114 is a very modest proposal.  And where Judge Drain was

8    wrong was he started talking about creation of rights and

9    abrogation of rights.  That's not what would happen today if

10   Your Honor appointed an 1114 committee.  And by the way, Judge

11   Drain did appoint an 1114 committee after this long analysis.

12             THE COURT:  Albeit for a fairly limited purpose.

13             MR. GOTEINER:  Albeit for a fairly limited purpose,

14   but there was -- he left wedges in his decision.  And it

15   depends on what was going to come up in that analysis.  And

16   things do come up.

17             But the point is, the fair and equitable calculus

18   that Congress imposes on the debtor, on the retirees who are

19   not represented like the UAW -- I just want to make that clear;

20   it's an obvious statement -- what Congress imposes is a very

21   reasonable and quick approach.  And that was my major problem

22   with Judge Drain's decision.  He -- and by the way, I'll tell

23   you -- I'll take responsibility for part of that because we

24   were involved in that, as Your Honor may or may not know.  And

25   we were involved in the briefing, and we were co-counsel on

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 219 of 317

67

1   that point.  But I got more involved in this matter, and as I

2   started to look at the literature and I started to look at all

3   the cases, it became clear to me that, with all due respect to

4   these -- to very distinguished lawyers and judges, the

5   fundamental aspect and driving purpose of 1114 has been missed

6   in all this.  And what's happening is -- and so what I'm

7   looking for is an Occam's razor that gets down to the

8   fundamentals and explains what 1114 is.  And 1114 is as I

9   stated, I won't repeat it, and I doubt many people would

10   disagree with me on my right, but that's what it is.

11        And then Judge Drain did more than that.  Then Judge

12   Drain talked about his analysis of 1114(l).  What does that

13   mean?  Although I don't think you have to characterize this as

14   a vested right, as I was just saying, because that's not what

15   we're doing here.  We're not aggregating rights.  But what

16   Congress did do in 1114 is to create at least a vested

17   procedure outside of bankruptcy, for the 180 days preceding

18   bankruptcy.  To me, it's a dizzying non-sequitur -- and this is

19   also why I disagree with Judge Drain -- for to say that exists

20   in a pre-bankruptcy context that doesn't exist during

21   bankruptcy.

22        1114(l) has meaning.  And it only has meaning if you

23   apply it logically and consistently, and I think Judge Drain

24   missed that.  And frankly, everyone did.  But that's what

25   1114(l) means.  And --

68

1          THE COURT:  Well, pause, please, Mr. Goteiner.

2     Because -- and maybe the creditors' committee picked this point

3     up in its opposition to you or in -- I don't remember where I

4     got this from, to tell you the truth -- but there are different

5     scenarios under which, prepetition, a debtor can adversely

6     affect its retiree rights.  It can do it by exercising the

7     right that the debtor thinks it has to amend or terminate

8     unilaterally because it contends that its plan documents

9     provide it with that entitlement or that right.  Or it can do

10    it because it says we simply can't afford it.  And we're

11    changing it and maybe those guys can sue us.  I think it's

12    agreed that in the second -- or at least not very

13    controversial -- that in the second category, adversely

14    affected retirees can have had it and go after the debtor under

15    1114(l).  But I think somebody said, again, I think it was the

16    creditors' committee, that the jury may still be out -- or the

17    legal equivalent to that -- as to whether 1114 applies when the

18    debtor uses a right of amendment or termination that it

19    otherwise has in its plan documents.  Is that your

20    understanding, as well?

21          MR. GOTEINER:  Well, that's what they're saying, but

22    the --

23          THE COURT:  That's what the creditors' committee is

24    saying, you're saying?

25          MR. GOTEINER:  Right, well, I think the debtor --

VERITEXT REPORTING COMPANY

69

1          THE COURT:  Well, I guess what I'm interested in is

2     your view on that.

3          MR. GOTEINER:  Well, I'm interested in their view, as

4     well.  But my point is that the wording of 1114 is so broad, so

5     all-encompassing with any benefit, Congress was aware that

6     there are amendable benefits, and with that kind of language.

7     But when you combine that with the modest procedural rights

8     that 1114 provides, again, that's the simplest explanation of

9     what's happening here.  It's premature to decide this now.  And

10    we do know, because of announcements that they've been

11    transparent about this to a degree, that they're going to be

12    cutting two-thirds of benefits.  You know, these are critical

13    benefits.  So it's happening now.  This process is happening

14    now.  And it also happened in the six months prior to June 1,

15    which is an 1114(l) situation.

16          So I just disagree with the -- there's a lot, as I

17    say, of Talmudic analysis in all these decisions.  And

18    particularly, Judge Drain's was excellent, it's true.  I mean,

19    he covered the ground.  But the fact that he had the excellent

20    legal analysis doesn't say to me that he covered the

21    fundamental point of what 1114(a) says.  And on top -- and

22    1114(l), as well, where I think he's dead wrong.

23          But on top of that, if we even want to get into this

24    analysis, he says that bankruptcy law does not create rights.

25    Well, that's not true.  Preference rights, 1113 rights, 363

70

1   puts limits on a debtor's use of a third party lender's cash

2   collateral during a Chapter 11 case providing substantive

3   protections that don't exist outside bankruptcy.  Section 363

4   gives assets buyers the right to buy assets free and clear of

5   liens.  Section 364 gives third party post-petition lenders the

6   right, under limited circumstances, to get priming liens,

7   granting them a lien on collateral ahead of existing lenders

8   which cannot be done outside bankruptcy, so he's wrong on that

9   as well.  And, again, these points were not fully briefed.  But

10   as I read the decision, I started asking these questions, and

11   they didn't make sense.

12        So I could deal more with Judge Drain's decision, but

13   I think with respect to those fundamental points, though, and I

14   know it's the most comprehensive decision out there, today.

15   Painfully so.  But, it doesn't mean he's right.  And so I

16   respectfully suggest this is for Your Honor to wrestle with to

17   determine whether he is correct or not correct on the

18   fundamentals and also on this overarching point of whether we

19   should decide this now.  Is that what Congress had in mind?

20   And I respectfully submit they didn't.

21        So I think I have answered Your Honor's questions.

22   Let me just look at my notes for one second, Your Honor.  Ah,

23   let's address Sprague just for a minute longer because Your

24   Honor raised the res judicata possibility.  Your Honor also

25   said well, that was a class action; we don't need to involve

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 223 of 317

71

1    ourselves with that.  But we do.  We have --

2         THE COURT:  Your point being that they expressly

3    denied class action status for both of the two major classes?

4         MR. GOTEINER:  Precisely.  No -- class actions have

5    significant meaning, obviously, and they have significant

6    meeting, and as defendants, we sometimes stipulate to class

7    certification because of what it means for final peace, global

8    peace.  But there is no class representative there.  There is

9    nothing close to the privity type issues in these virtual

10   representation cases.

11        THE COURT:  Well, pause, please, Mr. Goteiner,

12   because you're absolutely right on the significance of class

13   action.  But is it the case that if there had been certified a

14   class action, the decision would be a no-brainer on res

15   judicata.  And the question really is, in the absence of a

16   class action, what's left?

17        MR. GOTEINER:  Well, you said stare decisis, but

18   again, Your Honor, that really has to do with, you know, there

19   are all sorts of things that occur in a class action.  Okay, I

20   do that kind of work, as well.  And there are all sorts of

21   decisions that are made.  You have to take a look at whether

22   the subclasses were defined correctly.  I don't know, I can't

23   answer your question because I also -- there are lacunae in

24   Sprague that don't make sense to me.  And it just wasn't

25   because you had an impassioned chief -- I think it was the

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 224 of 317

72

1    chief judge saying it was wrong.

2            THE COURT:  It was Martin, if I recall.

3            MR. GOTEINER:  I'm sorry?  Judge Martin was chief

4    judge --

5            THE COURT:  Yes.

6            MR. GOTEINER:  -- at that point.

7            THE COURT:  Yes.

8            MR. GOTEINER:  And it's not only the lacunae that

9    exist there, but theoretically, to me, it doesn't make sense

10   given the ambiguities that did exist.  But the Sixth Circuit

11   said, all right, this is our view, we see no ambiguity.  But

12   the Sixth Circuit went off on the Wise decision.  And that was,

13   as I recall it, that page, that was the first primary decision

14   they cited was Wise from the Fifth Circuit.  However, in

15   Devlin, the Second Circuit said we can see how the district

16   court could have been led by Wise into making the decision it

17   did, but we don't go that direction in the Second Circuit.  So

18   the core theoretical groundwork for Sprague finds itself

19   rejected in Devlin.  Now, I don't think Devlin cited -- I think

20   Devlin maybe came down a month or two after, I'm not sure.  But

21   there was no cross-referencing of the two.  And I also note

22   that in the debtors' brief, although I read it quickly, I

23   didn't see a reference to Devlin.

24            So, as I say, it's Sprague.  So I don't see

25   Sprague -- it's certainly not anything close to virtual

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 225 of 317

73

1   representation.  There's not the privity, there's not the same

2   motivation, it is not a one-on-one linkage that you found in

3   Chase.  It just isn't.  It's an aborted class action.  You

4   cannot cherry-pick from Sprague and take one point, and then

5   say it binds everyone, all the retirees.  You just can't.  It

6   is limited and it is not what the Second Circuit would buy into

7   as I read Devlin.

8          And I must say, with all due respect, Judge Drain was

9   wrong there, as well.  Now, I do recall that there was briefing

10  on this choice-of-law issue in the Delphi matter, and I'm not

11  quite sure because this came in late last night so I haven't

12  had time to check, I'm not sure because I think the judge in

13  the -- Judge Drain, in the decision that he announced from the

14  bench, said the parties hadn't briefed on him on the choice-of-

15  law issue.  Then there was briefing after that pursuant to his

16  comment.  But I don't know what happened between -- and maybe

17  counsel here does know -- I don't know what happened between

18  that briefing and Judge Drain's decision.  But clearly, he did

19  not take into account Second Circuit law, and he should have

20  because the Second Circuit controls Judge Drain in this issue.

21  Or at least, that's what the Second Circuit in Caesar (ph.)

22  said, and that's what is drawn from the analysis in Factors v.

23  Pro Arts.

24          So, let me just see if I -- I think -- Your Honor,

25  does that cover your main points?  I think it does.

74

1          THE COURT:  I think it does, too.

2          MR. GOTEINER:  So why don't I stop there and reserve

3     any additional time after I hear the opposition.

4          THE COURT:  Sure.

5          MR. GOTEINER:  Thank you very much.

6          THE COURT:  Mr. Miller?

7          MR. MATER:  Your Honor, please, Harvey Miller on

8     behalf of the debtors again.  Your Honor the law is perfectly

9     clear that Section 1111 -- I'm sorry, 1114 of the bankruptcy

10    code, does not apply with respect to a retiree plan that is

11    terminable or amendable or modifiable unilaterally by the plan

12    sponsor.  And while counsel may refer to Sprague as an aborted

13    class action case, it's certainly beside that GM had an

14    unqualified right to modify these retirement plans, and that

15    was heavily litigated, and that's what the Sixth Circuit

16    decided in the decision that you referred to.  So if GM has the

17    right to modify or terminate these retirement plans, then

18    Section 1114 does not apply and there should be no retiree

19    committee.

20          Counsel claims that Sprague decision should not be

21    binding on this Court.  And he says that the -- there's no

22    finding that the issues are exactly the same or there was an

23    alignment.  Well, what was Sprague about, Your Honor?  It was a

24    claim violation of ERISA that GM unilaterally modified and

25    terminated rights that the retirees claim in violation of

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 227 of 317

75

1    ERISA, because if it was a plan subject to ERISA, GM could not

2    do that unilaterally.  So this welfare plan, the Sixth Circuit

3    held, is modifiable by GM and it went through the different

4    plans and came to the conclusion that all of the plans reserved

5    to GM the right to modify or terminate and that right

6    continues, Your Honor.  And those are GM plans.

7         Now, counsel says, and the moving parties say, "Well,

8    now we're in the Second Circuit and Sprague doesn't apply."  We

9    argue, as we have in our brief, Your Honor, that there is

10   virtual representation.  And notwithstanding that the class

11   action certification was vacated, the claim's rights

12   asserted -- the same rights that are being asserted in

13   connection with this motion, Your Honor.  So now we move, Your

14   Honor, to the Delphi case.  And what happened in Delphi?

15   Exactly the same thing.

16        The argument was being made, by the plan

17   beneficiaries, that Delphi did not have the right to modify or

18   terminate these benefits unilaterally.  That was the issue that

19   was presented.  And the important factor in that, Your Honor,

20   is that Delphi plans were GM plans because Delphi was a spinoff

21   from GM, I think, in 1999, and those plans were all GM plans.

22   And as Your Honor pointed out, Judge Drain, in a very

23   comprehensive bench decision, came to the conclusion that

24   Delphi had the unilateral right to terminate and modify the

25   plans and therefore 1114 was not applicable, but he did appoint

76

1   a committee.  And he appointed a committee for a very limited

2   purpose.

3           There was a contention made that certain of the

4   beneficiaries had vested rights and if their rights were vested

5   then Delphi could not unilaterally modify or terminate those

6   rights.  So he appointed a committee for a specifically limited

7   purpose to explore and file a report as to whether any of the

8   rights were vested.

9           THE COURT:  Can you help me, if you know, as to why,

10  especially if these were former GM people, they might have had

11  vested rights?  Like, could they have retired before the first

12  of the plan descriptions were issued that reserved the right to

13  modify or was it some different basis?

14          MR. MILLER:  No, Your Honor.  It wasn't because of a

15  date or a time.  Within Delphi, there were other acquisitions

16  that form part of Delphi; American Axle Company and some other

17  companies.  It may have been that those companies had plans

18  that were in existence when they were merged.  And there may

19  have been the employees that came from those companies that

20  have vested benefits.

21          THE COURT:  In other words, they became Delphi

22  retirees but their retirement rights had been created back when

23  they were employees for different companies?

24          MR. MILLER:  That's correct, Your Honor, as I

25  understand it.

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 229 of 317

77

1          THE COURT:  I'm with you now, okay.

2          MR. MILLER:  Now, subsequently to the bench opinion,

3    Your Honor, which was issued on -- in the early part of 2009,

4    Judge Drain again revisited the issues that were presented and

5    in a transcript, which I was only able to get last night, Your

6    Honor.

7          THE COURT:  I think it's now on Westlaw also, maybe

8    Lexis also.

9          MR. MILLER:  It's March 11, 2009.  He considered the

10   report that came back from this committee.  And if I may, Your

11   Honor, I would hand up a copy of the transcript.

12         THE COURT:  I read it last night.

13         MR. MILLER:  And I would refer Your Honor to page --

14         THE COURT:  Finding it is a different question.  For

15   that, maybe you do have to hand it up.

16         MR. MILLER:  I have one if Your Honor would like it?

17         THE COURT:  Yes.  Why don't you do that.  Give me a

18   second, please, Mr. Miller.

19      (Pause)

20         THE COURT:  Go ahead, please.

21         MR. MILLER:  I would refer Your Honor to page 61.

22   And if I may, I would read.  This is in consideration of the

23   report that the committee that he had appointed rendered.

24         THE COURT:  Wait.  Did you say 61?

25         MR. MILLER:  61, Your Honor.

78

1          THE COURT:  Oh, I see.  The pagination on what I read

2     yesterday is different than what you just gave me.  Go ahead,

3     please.

4          MR. MILLER:  Starting with the first full sentence,

5     "With respect to the first point, as I noted, probably too much

6     I lent during oral argument, I continue to believe that the

7     Sixth Circuit Sprague decision is one in which the Sixth

8     Circuit at length determined, en banc, that there was no

9     ambiguity in the respect of GM's reservation of rights to

10    modify, at will, it's welfare plans.  Including for the

11    period" --

12         THE COURT:  Forgive me, Mr. Miller.  I'm having

13    trouble finding it in the one you gave me as well.  You said --

14    this is with respect to Sprague, right?

15         MR. MILLER:  Yes, Your Honor.

16         THE COURT:  Go on, please.  I'm not sure if I can

17    find it here, but I'll just listen to what you've given to me.

18         MR. MILLER:  All right.  "That there was no ambiguity

19    in respect of GM's reservation of rights to modify, at will,

20    it's welfare plans including for the period in question and

21    that -- or I could conclude otherwise, I would not be doing so

22    by applying a different standard than that which is applied in

23    the Second Circuit under Bouboulis v. Transport Workers Union

24    of American 442 F.3d 55 (2006), namely that the plan documents

25    contain specific written language that is reasonably

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 231 of 317

79

1    susceptible to interpretation as a promise to vest benefits.

2    Language quoted from Devlin v. Empire Blue Cross and Blue

3    Shield 274 F.3d 7684 (2001).  Instead, what I would be doing

4    would be, in essence, reversing the majority's conclusion in

5    the en banc Sprague opinion that there was no ambiguity in the

6    relevant documents.  And that, in fact, it was clearly

7    understood that GM had reserved the right to modify.

8         Based on the analysis of the record, which I believe

9    is one that is clearly pointed out as such by the descent of

10   Chief Judge Martin in that case, I don't believe there's any

11   difference as far as how the Sprague Court and the Second

12   Circuit would review the underlying documents.

13        In any event, I believe that that portion of the

14   report that went beyond my charge or my assignment to the

15   committee, since it, in essence, sought to reargue my earlier

16   ruling, and in addition sought to suggest that the assumption

17   by Delphi pursuant to the master separation agreement, which

18   appears at Exhibit 90 in the U.S. Employee Matter's Agreement,

19   which was referred to there and appears in here most readily at

20   supplemental Exhibit 4, provided for the transfer to Delphi and

21   the assumption by Delphi of GM's legal responsibilities for

22   OPEB claims.

23        My conclusion was in February and is now that in

24   assuming such legal responsibilities at the time, Delphi and GM

25   were both fully aware of the Sprague decision, which predated

80

1    these agreements which found that GM has no legal

2    responsibilities in respect to these claims.  And in light of

3    the clear evidence that all of Delphi's plans and all of GM's

4    plans, at least since 1985, contained a clear unambiguous

5    reservation of the right to terminate or plan documents contain

6    such reservation that I cannot ignore the context of the

7    Sprague decision as underlying the parameters of what Delphi

8    adequately assumed and what GM transferred to it."

9         I will submit to Your Honor, that on reconsideration,

10   Judge Drain went even further then the bench opinion.  And I

11   submit to Your Honor that it's incontestable that GM had the

12   right and has the right to modify, terminate, any of these

13   welfare plans.  And in that context, Your Honor, then GM is not

14   subject to 1114 and there is no need for a retiree's committee.

15        As to the -- Your Honor's question with respect to

16   the salaried OPEB plan and the pension plans, the pension plans

17   will be assumed by New GM and the salaried retiree plans, as

18   modified, will be assumed by New GM.  There are cuts being

19   made, Your Honor.  These are cuts, and as we pointed out in our

20   papers, since 2002 we outlined the various changes that have

21   been made by GM in these particular plans which increase the

22   cost to the employees from something like twenty-four percent

23   to forty-one percent over that decade.  And these changes were

24   made unilaterally, Your Honor, by GM and there's never been in

25   that period in time an action by any salaried retiree

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 233 of 317

81

1    contesting that that was a violation of vested benefits in any

2    way, shape or form.

3            THE COURT:  Pause, please, Mr. Miller.  Let me get it

4    straight.  I take it, for the retirees that we're talking about

5    here, they have rights of essentially three times.  They have

6    pensions, which if I heard you right, are being taken over if

7    the 363 is approved by New GM and would remain unchanged.  Then

8    they have a number two, health, and number three, insurance,

9    which would be taken over by the New GM by the modified form in

10   which they were modified before the filing date?

11           MR. MILLER:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. MILLER:  Now, the pension plan --

14           THE COURT:  And pause, please; a follow-up.  Are

15   there any changes contemplated beyond those that were

16   announced --

17           MR. MILLER:  Not currently.

18           THE COURT:  -- prior to the filing date?

19           MR. MILLER:  Not currently.  But I point out, Your

20   Honor, the pension plan is a defined benefits plan.  The --

21   which is a qualified plan.  The welfare plans are not

22   qualified.  These are discretionary plans with GM.

23           THE COURT:  Okay.  Continue, please.

24           MR. MILLER:  Also, Your Honor, in the March 11th oral

25   decision, subsequent oral decision by Judge Drain, he likewise

82

1   deals with 1114(l).  And he says very specifically in there,

2   Your Honor, that there is no indication whatsoever that

3   Congress intended to change the applicability of 1114 when it

4   adopted 1114(l).  In fact, there was nothing in the

5   congressional record.  There is no indication whatsoever that

6   Congress was changing the laws that existed prior to the

7   adoption of 1114(l), and I think it was in 2005.

8          So the law is, Your Honor, that if a welfare plan is

9   subject to unilateral termination or modification, then 1114

10  doesn't apply.

11         Now, in connection, Your Honor, with discussions with

12  the company, there's nothing holding back counsel and his group

13  from contacting GM.  You don't need a retiree committee to do

14  that.  There can be discussions and there is actually, a, as I

15  understand it, Your Honor, a salaried retirees' committee of

16  some type that does periodically discuss these issues with GM.

17         So we come back to the bottom line issue, Your Honor.

18  Is 1114 applicable to these particular welfare plans?  Judge

19  Drain, in his very comprehensive bench opinion said, no.

20  Subsequently, in his consideration of the report of that

21  committee which was appointed for a specific purpose, he

22  reiterated that.  He also went further, Your Honor, and said

23  that the Second Circuit, at least in his opinion, would not

24  vary at all from the Sprague decision.  And we would submit to

25  Your Honor the Sprague decision should be binding.  Yes, it's

83

1    binding on the 114 plaintiffs in that action, but when you look

2    at the issues that were litigated in that case, they are

3    precisely the issues that would come up here:  did GM have the

4    right to unilaterally terminate or modify?

5         The Second Circuit en banc, as Your Honor pointed

6    out, nature as majority, on certain issues, and 1011, on other

7    issues, found that GM had that right.  And all of the plans,

8    Your Honor, had the reservation of that right.  And it's been

9    consistent.  And in that context, Your Honor, there should be

10   no retiree committee in this case which would just simply add

11   more cost.  And as Your Honor pointed out in your decision last

12   Tuesday, all that means is you're transferring more costs to

13   the general creditors.  And in that context, Your Honor, we

14   submit there should be no committee.

15        THE COURT:  All right.  Thank you.  Mr. Mayer,

16   creditors' committee?

17        MR. MAYER:  Thank you, Your Honor.  Tom Mayer for the

18   official committee of unsecured creditors.  We echo the

19   debtors' view that because the contract provides for

20   modification at GM's will, I don't mean to minimize the

21   hardship that a termination or modification at the debtors'

22   option may impose on individuals but that's the agreement they

23   have; that's the effect of the agreement.  And with respect to

24   the Sixth Circuit versus Second Circuit, if I may pick up on a

25   comment Your Honor made, one of the unfortunate results of

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 236 of 317

84

1    going a different way here is to take a decision on these

2    precise documents and say the Sixth Circuit got wrong looking

3    at the documents before it.  I think perhaps Your Honor was

4    referring to a resonance to your earlier decision on the Third

5    Circuit.  Sixth Circuit, it's not just that it's interpreting

6    ERISA, it's interpreting these documents.  And to seek a

7    different decision in this Court when the Sixth Circuit has

8    looked at these documents, I think would be very unfortunate.

9    But that being said, there's one other major point that is sort

10   of the elephant in the room that is being overlooked and was

11   critical in the Chrysler case where we were involved, who are

12   the negotiations with, Your Honor?

13        A statement has been made that "GM" is cutting its

14   benefits by two-thirds.  Who's going to pay the one-third

15   that's left?  It's New GM.  The elephant in the room is the

16   government.  The government is the owner of New GM and any

17   relief that this committee is seeking is going to have to be

18   paid by New GM.  That's the only entity that's going to have

19   any plans going forward.  That's the only entity that's going

20   to be set up to pay retiree medical benefits going forward.

21   Any discussion has to be with New GM.

22        And if I may go back to an issue, Your Honor, at the

23   very beginning of this hearing as a shout point at 1114 and

24   there is a nay point at 1113.  We are not in the shout section,

25   no one has moved to terminate or modify retiree medical

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 237 of 317

85

1    benefits.  Largely because no -- the debtor has nothing, the

2    committee does not think that's necessary.

3           If you're in the nay part of 1114, and this is where

4    we start diverging from Delphi with respect to the need for any

5    committee in the first play, the fact of the matter is these

6    negotiations aren't with Old GM.  They're with New GM.  And I

7    think the Court should take that into account just as Judge

8    Gonzalez did in conjunction with the Chrysler decision where we

9    had a very similar set of arguments, and Judge Gonzalez

10   basically said, "Look, your discussion with new co."  And 1114

11   is not set up to facilitate a third party's discussions with an

12   acquirer.  It is the acquirer who is going to make the

13   decisions here.  That's the reality and I think that Your Honor

14   can take account of that in determining in whether you should

15   exercise discretion to appoint a committee here.  Because I

16   think that's the elephant in the room.

17          We cited to the Chrysler transcript.  We did not

18   include a copy of it in our pleading because we called chambers

19   and was told that because that transcript had not been made an

20   official record yet, it was not appropriate for us to provide

21   copies to the world by attaching it to our pleadings.  I have

22   copies here if you want --

23   TZIPPY2 14900

24          THE COURT:  This is what?  For the protection of

25   court reporters?  Because it's a public document.

86

1      MR. MILLER:  Well, yes, Your Honor.  I think that's

2  exactly what it is.  I have copies here.  I'm happy to hand

3  them out.

4      THE COURT:  Well, I must say, the most important

5  thing is to get one to Mr. Goteiner because I thought I was

6  allowed to read that transcript and I read the Gonzalez

7  transcript.

8      MR. MILLER:  I'm happy to provide it and I apologize

9  for not having done so but we were given instructions.

10     THE COURT:  Well, I think we've got to get a copy to

11  Mr. Goteiner.  I mean, you cited that transcript in your brief,

12  if I recall, at the end as your last point.  Didn't you, Mr.

13  Miller.

14     MR. MILLER:  Yes, Your Honor.  I did so and as I said

15  I apologize for not having attached it but we were told by

16  chambers, because of the court reporter's rules, that we

17  couldn't make copies available to everybody.

18     THE COURT:  Well, I'm sorry.  I didn't know that

19  chambers told you that.  Mr. Goteiner should have been given it

20  before now and I'm going to take a recess to allow him to

21  comment on it, if he wants to, before we're all done.

22     MR. MILLER:  Certain.

23     THE COURT:  I'm sorry.  Sometimes my chambers tells

24  people things that I never know about and they don't have the

25  same sensitivities that I do.  There are rules to protect

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 239 of 317

87

1    court reporters and sometimes those rules just have to be

2    trumped.  Okay.

3              MR. MILLER:  I have nothing further.

4              THE COURT:  All right.  Does anybody want to be heard

5    before I give Mr. Goteiner a chance to reply?  No.  Mr.

6    Goteiner, your option.  Would you like me to take a recess now

7    to give you a chance to read it?  The Gonzalez decision?

8              MR. GOTEINER:  Well --

9              THE COURT:  On the one hand it was referred to in Mr.

10   Miller's brief or in his firm's brief, I forgot whether he was

11   a signer, but on the other hand, the underlying transcript

12   wasn't there.

13             MR. GOTEINER:  Your Honor, if I may, might I respond

14   for a few minutes to arguments --

15             THE COURT:  Certainly.

16             MR. GOTEINER:  -- and then take a recess?

17             THE COURT:  Yes.

18             MR. GOTEINER:  Okay.  Well, the one overarching

19   argument that has not been dealt with is the 1114 process and

20   that what's gone on in some of the decisions and what debtors

21   and creditor committee wants to do is to turn this into a

22   summary judgment determination.  It's too premature for that.

23   And you know it's premature when they get back to Sprague.  I

24   also just read Drain's -- Judge Drain's decision or transcript

25   and he even points out that he's clear with respect to all the

88

1    plans, at least since 1985.  So what happens to the plans

2    before 1985?  So, there's a large number of retirees who come

3    within that time period.  Judge Drain starts talking about no

4    ambiguity but it's not a factual issue only, Your Honor.  And

5    this is -- unfortunately, we have to go back and take a look at

6    the decisions but Devlin -- it's a legal issue.  The question

7    is, what would the Devlin court decide as to whether it was

8    ambiguous.  We respectfully submit that Devlin, again, not

9    cited to except in Judge Drain's decision but with no analysis,

10   makes it real clear that under Second Circuit analysis, Judge

11   Martin was right; it was ambiguous.

12           And the notion of making a decision at this point and

13   totally sidestepping Congress' provision of an 1114 proceeding

14   because debtor suggests it's going to be more money, I think

15   absolutely flies in the face of what Congress intended

16   particularly when you're talking about billions of dollars of

17   benefits to people who truly -- this really is the archetypical

18   situation where you have widows and orphans.  And it's just --

19   it's grossly unfair.  But putting aside fairness and equity, it

20   flies in the face of 1114.  That's precisely what Congress

21   wanted to avoid; a quickly determined summary judgment

22   determination without giving the retirees a chance to sit down

23   and at least be the assistant captain of their fate.  That is

24   not what Congress had in mind and the notion of having an

25   informal ad hoc committee without portfolio as opposed to an

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 241 of 317

89

1    1114 committee, I suggest is absurd.  And again, flies in the

2    face of what 1114 does.

3           THE COURT:  Pause please, Mr. Goteiner.  I didn't

4    want to interrupt you when you made the point.  You pointed out

5    that Judge Drain's decision said, in substance, I don't

6    remember the exact words, at least since 1985 retirees had been

7    told that the company reserved the right to change the welfare

8    plans.  Do you know how many retirees there are who retired

9    before 1985 and, if I'm allowed to ask a compound question, how

10   many of them aren't sixty-five where they would get Medicare

11   rights and therefore their medical needs would be greater than

12   they would be if you got an entitlement to Medicare?

13          MR. GOTEINER:  I do not know that number.  I do not

14   know that number.  And as --

15          THE COURT:  That's almost twenty-five years ago.

16          MR. GOTEINER:  Oh, I understand.  I understand.  I

17   don't know that number but there are other rights as well.

18   There's life insurance, health bene -- you know, health

19   benefits might -- that would be an issue, I understand that but

20   if there's life insurance issues.  So, all I'm saying is that

21   there's ambiguity there as well.  And when you look at Judge

22   Martin's decision, I'm not trying to hold close to my bosom the

23   descending opinion for all purposes.  But the point is, for

24   purposes of Second Circuit analysis, it bears close reading.

25   Judge Martin pointed out how some of the materials were

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 242 of 317

90

1    deceptive.  So, yes, the majority opinion decided it was

2    unambiguous under the Wise standard.  That is not, I

3    respectfully submit, what the Second Circuit would do, not

4    withstanding Judge Drain's view of it in this transcript.

5           But again, that issue is so premature to what 1114 is

6    all about but what is does underlie is how this would be

7    singularly inappropriate, where you have that kind of

8    ambiguity, that kind of dissension about what these plan

9    documents mean and decide the issue now and say no 1114

10   committee because it's going to cost the debtor a few bucks

11   compared to the billions that are at issue for these people. It

12   doesn't make sense.  And I respectfully submit is not

13   consistent with what the Second Circuit does.

14          And there may be vested benefits.  I know the

15   debtor's counsel's saying there's no vested benefits.  That's

16   another issue.  It could well be, depending upon how the Second

17   Circuit would rule on whether there was sufficient ambiguity,

18   that they would find vested benefits.  If the Second Circuit

19   found or agreed with Judge Martin that there was, for instance,

20   deception or at least unclarity, I think the Second Circuit

21   would come out differently.  And that's what, respectfully

22   submitted, Your Honor has to grapple with.  But again, that's

23   for a different day.  There's been enough of a showing today

24   and in the papers and in everything that even Judge Drain said

25   in hi supplement, to make it clear this is singularly

91

1    unappropriate for the kind of judgment that defendants want

2    entered today, given what's at risk.

3         So it all -- this is more than just mother and apple

4    pie.  It really has to do with the practicalities of how these

5    decisions should be made and they can be made very quickly.

6    Your Honor could put a time period on it.  And within a couple

7    of days, the trustee can select a committee and the parties,

8    within a few more days after that, can sit down and start to

9    talk.  The down side is so miniscule compared to what's at

10   stake that I submit that cost benefit analysis mitigates very

11   heavily in terms of appointing the committee.

12        And I think that covers all issues except this

13   1411(l).  The 1411(l) statute is real clear.  There's no doubt

14   about it.  And I see a lot of evasion --

15        THE COURT:  Well, isn't it just as ambiguous as

16   1114(d) is?

17        MR. GOTEINER:  Well, Your Honor, okay --

18        THE COURT:  I mean, neither one -- each of them could

19   have said not withstanding any provision of contract that gives

20   the company greater rights and then proceed into what it says.

21        MR. GOTEINER:  Your Honor --

22        THE COURT:  Conversely, I suppose, it could've taken

23   the opposite view.  But one of the practical problems that guys

24   in my position have is we're sworn to follow instructions from

25   Congress and Congress sometimes doesn't do its job as well as

92

1    it might.

2          MR. GOTEINER:  Your Honor, I agree with that

3    obviously but then we have things to help judges and we have a

4    series of cases from the early 80s from the U.S. Supreme Court.

5    I think one of them was called Cannon in dealing -- at Touche

6    Ross -- in dealing with how you interpret congressional statute

7    when there is preexisting law.  And the Congress is presumed to

8    understand what the law was and yet they didn't put in that

9    little fillip at the end of the statute, why?  Because it was

10    good enough.  It said any benefit.  Congress is presumed to

11    know there is such a thing as amendable benefits.  And yes, I

12    read Judge Drain's point that there was even a proposal to deal

13    with Doxell (ph.); I saw that.  But that Congress rejects that

14    when Congress has language like any benefit, when the costs are

15    so minimal, I think speaks volumes.  And that is -- that

16    stubborn and irreducible fact and logic is something that the

17    defendant -- that the debtors have not dealt with.

18          THE COURT:  When Congress wanted to overrule Lilly

19    Ledbetter, it did so pretty clearly, didn't it?

20          MR. GOTEINER:  Sometimes they do.  Sometimes they do.

21    But when they don't, all you can do is go back to Sutherland, I

22    think that's the treatise, and go back to the Supreme Court

23    cases that talk about how you interpret statutory language when

24    there is existing law and when there is law that may be

25    inconsistent.  And again, that discussion has not taken place

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 245 of 317

93

1    enough here.  So, I think with -- that all the practicalities,

2    all the legislative interpretations that we've been discussing,

3    point to the appointment of an 1114 committee.  And again, the

4    cost benefit analysis says this very clearly.  And I'll stop

5    there, I'll take a --

6         THE COURT:  I don't want you quite to stop, Mr.

7    Goteiner --

8         MR. GOTEINER:  Okay.

9         THE COURT:  -- because on the wholly discretionary

10   point, I guess if 1114 doesn't apply at all, people can debate

11   about whether I'm even supposed to take a discretionary

12   analysis, but assume I do.  Toward the end of its brief, the

13   creditors committee pointed out that negotiation is with the

14   wrong entity and that the negotiation would have to be with

15   Treasury or new GM or somebody other than the debtor in

16   possession.  And that brings up Judge Gonzalez's holding and

17   I'm at a mind that I should give you a chance to comment on

18   that if you want it.  And since I'm going to have to take at

19   least a recess to do this anyway, just to go through what we

20   have, I wonder if you would like to reserve the right to say

21   something before I finally rule during a recess to take a look

22   at Gonzalez's decision and tell me if you thought Arthur

23   Gonzalez got it wrong.

24        MR. GOTEINER:  I'll do that, Your Honor, and you

25   know, again, I will do that.  I just want to make one more

94

1   point.  That -- which is subsumed in my prior points, it's

2   really not necessary for this Court to say the Sixth Circuit

3   got it wrong.  Again, not today.  It's just not.  But the only

4   thing I ask Your Honor to consider in making this decision, you

5   know debtors speak with certainty that hasn't been seen since

6   the twelfth century about what amendable benefits are and

7   whether they exist here and that is just not true.  And no

8   matter how many times you say it, that it's clear, even if

9   Judge Drain says he doesn't think there's ambiguity, that

10  doesn't make it true.  It is not certain here.  And that is

11  another point that's subsumed in Congress's wisdom about 1114

12  and I'll take a look at the transcript.

13          THE COURT:  Okay.  Thank you.

14          MR. GOTEINER:  Thank you.

15          THE COURT:  Folks, I'd like you to take an early

16  lunch and be back by 12:30.  I can't guarantee you that I'll be

17  ready by then but hopefully you can get something to eat

18  between now and then.  Give you enough time to both get a

19  sandwich down and also read Judge Gonzalez's transcript, Mr.

20  Goteiner.  And then I'll try to give you a decision after that

21  lunch break but not before giving Mr. Goteiner another chance

22  to be heard if he wants to.  Okay, we're in recess.

23      (Recess from 11:30 a.m. until 1:37 p.m.)

24          THE COURT:  I apologize for keeping you all waiting.

25  Before I come to a final decision, I want to give you, Mr.

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 247 of 317

95

1    Goteiner, an opportunity to comment on Judge Gonzalez's

2    decision since it was noted by the creditors' committee and is

3    at least arguably fairly relevant to this determination.

4          MR. GOTEINER:  Thank you, Your Honor.  Neil Goteiner,

5    Farella Braun + Martel, for the General Motors Retirees

6    Association.  I had a chance to take a look at the transcript.

7    I would just note a couple of distinctions and then get back to

8    a basic point.  Of course, here we do know that GM has

9    announced that there's going to be cuts in the order of

10   magnitude of two-thirds.  And we also know that there have been

11   prepetition cuts as well in the six-month period.

12          So were we to abandon at this point the 1114 process,

13   you would be -- what would be happening is that the committee

14   would be giving up whatever rights it has under 1114.  It would

15   lose leverage because, of course, New GM would not be a debtor.

16          And -- but I did go beyond that, obviously.  I took a

17   look at the practicalities that Judge Gonzalez was addressing,

18   and of course there are practicalities, but here it's not the

19   same sequence and it's not the same -- or different

20   personalities, completely different personalities, as in

21   Chrysler.

22          You will have committee speaking with people who are

23   going to be involved to some degree in New GM.  And lots of

24   things can happen in these negotiations.  Yes, it's possible

25   that the representatives of GM who will be in the New GM will

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 248 of 317

96

1   simply say okay, hats have changed, we reject what we agreed to

2   with you.  But it's quite possible that that won't happen and

3   that there will be some agreements that are reached with the

4   1114 committee participating that, in the negotiation process

5   and the relationships that develop during negotiations, will be

6   passed on to some of the same people in the New GM and they

7   will abide by what they agreed as they negotiated as part of

8   the 1114 process.

9        At least there's no reason to assume that will not

10  happen.  And, indeed, I think the way even the creditors'

11  committee phrased it is that this committee may not be the

12  appropriate person -- the appropriate party to negotiate now.

13  And anything is possible, but the atmospherics and the elements

14  are quite different here than in Chrysler.  And there's a

15  stronger argument/brief of appointing an 1114 committee.

16       And that's what 1114 says should happen in any event.

17  So that's my submission.

18       THE COURT:  Just one question before I give anyone

19  else a chance to comment, if they wish, because I like your

20  idea of being realistic.  Earlier in your remarks just a moment

21  ago you said you were concerned about giving up leverage.

22  Unrealistic to know that leverage tends to be something that

23  people think about all the time in large bankruptcy cases,

24  maybe smaller ones too.  But to what extent, in your view,

25  should I, as a judge who's supposed to call balls and strikes

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 249 of 317

97

1  the way he sees them, be guided by giving one party or another

2  leverage against the party with the different perspective?

3           MR. GOTEINER:  Well, leverage is whatever is

4  provided, and I use leverage -- I'm not backing away from the

5  word "leverage", it's a reasonable word to use, but the whole

6  panoply of dynamics that are embraced by 1114, because it has

7  to be equitable and fair, that's the leverage I'm talking

8  about.

9           So, and that, by the way -- leverages goes both ways,

10 Your Honor, because my clients, at the end of the day, have far

11 less leverage than the debtor has.  So it's far worse, from my

12 clients' point of view, than a two-way street.

13          THE COURT:  Okay.

14          MR. GOTEINER:  So that is why, I respectfully submit,

15 Your Honor should have not a moment's pause that there's any

16 untoward leverage given to the 1114 committee.  This is

17 precisely what 1114 contemplated; no more.

18          THE COURT:  Okay.  Thank you.  I know we've been at

19 this for a long time, but if either the debtors or the

20 creditors' committee who brought up Judge Gonzalez's decision

21 want to be heard before I take another brief recess, I'll

22 permit that.  Mr. Mayer?

23          MR. MAYER:  Yes, Your Honor, thank you.  Unless you

24 have questions, I don't think I have anything to add.

25          THE COURT:  Okay.  Mr. Miller?

98

1      MR. MILLER:  And if Your Honor please, I would just

2  point out, in order for --

3      THE COURT:  You're very tall, Mr. Miller.  Can you

4  either lift that microphone up or come to the main lectern?

5      MR. MILLER:  Thank you, Your Honor.  I would just

6  point out, in order for this committee to have any effect and

7  to provide the leverage which counsel says they need, you would

8  have to determine that GM does not have the right to modify or

9  terminate any of these claims.  And the record is, I think,

10  crystal clear that GM has the right to terminate or modify any

11  of these claims.

12      And what we're talking about, Your Honor, is a

13  situation which hopefully, in my view, is a few days.  The sale

14  hearing is scheduled for Tuesday.  Hopefully we will finish it

15  next week.  It's important that this company emerges -- these

16  assets emerge as part of a New GM that's going to have any

17  chance of success.

18      Counsel's talking about give the U.S. Trustee three

19  or four days to appoint a committee, the committee's got to

20  organize, it's going to have to hire professionals, probably a

21  financial advisor, a statistician, and so on.  By the time all

22  of that happens, Your Honor, hopefully, if we're right, and

23  Your Honor approves it, the transaction will have been

24  consummated.

25      So the leverage that is so important, and which is

99

1   the only purpose for which this motion has been brought, will

2   be of no avail because New GM will be off as a new OEM

3   manufacturing cars and trucks without the stigma, if I can use

4   that word, of bankruptcy, which is the objective for this

5   transaction.

6          So the negotiations, Your Honor, are going to be with

7   the debtor which is going forward with the plan of liquidation.

8   And in the context of the liquidation, even if 1114 applied,

9   it's going to have to be rejected under 1114 because there's

10  not going to be any ongoing company.

11         So what we're down to, Your Honor, and Your Honor put

12  your finger on it, is leverage, that if Your Honor would grant

13  this motion and appoint a retirees' committee, the next thing

14  that will happen is a request to defer the 363 transaction,

15  which affects a lot of parties-in-interest and affects all of

16  the creditors and affects the ability of this company to

17  survive going forward.

18         So there's a real downside, Your Honor, to this

19  motion, notwithstanding what counsel says.

20         THE COURT:  All right.  Thank you.  All right, folks,

21  I've made you wait a long time.  I'm going to ask you now to

22  sit in place and wait with me here in the courtroom for a

23  minute.

24         (Pause)

25         THE COURT:  Okay, folks once more I apologize for

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 252 of 317

100

1    keeping you all waiting.  In this contested matter in a case

2    under Chapter 11 of the Code, the General Motors Retiree

3    Association, which I'll refer to as the "Retirees Association",

4    moves for an order pursuant to Section 1114 of the Code,

5    appointing an official 1114 committee.  Its motion is opposed

6    by the debtors and the creditors' committee.

7           The motion is denied, though without prejudice to

8    reconsideration at a later time under appropriate

9    circumstances, largely in accordance with the ruling by my

10   colleague Judge Drain in Delphi on March 10 of this year.  The

11   following are my findings of fact, conclusions of law and bases

12   for the exercise of my discretion in connection with this

13   determination.

14          Turning first to my findings of fact, as facts I find

15   that GM offers retiree benefits to salaried retirees who

16   started work before 1993 under two plans:  the GM Salaried

17   Health Care Program, which I'll refer to as the "Health Care

18   Program", which includes medical, prescription drug, dental and

19   vision care; and the GM Life and Disability Benefits Program,

20   which I'll call the "Life Insurance Program", which provides

21   life insurance benefits.  I refer to the two programs together

22   as the "Welfare Plans".

23          The inference is compelling, and I so find, that the

24   benefits offered under the Welfare Plans are quite important to

25   many retirees, particularly those who are still under sixty-

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 253 of 317

101

1    five and who are ineligible for Medicare.

2         The salaried retirees are separate and apart from

3    hourly retirees whose interests have been represented by the

4    UAW or other unions.  At this point, they have no officially

5    designated representative, though, from everything I've seen so

6    far, the Retirees Association has been a forceful and effective

7    advocate on their behalf.  And to the extent any retirees might

8    have unsecured claims, their interests in that regard would be

9    well-protected by the official creditors' committee.

10        Retirees are required to reenroll in these plans at

11   the beginning of each calendar year, prior to which GM provides

12   enrollment forms accompanied by an enrollment brochure

13   explaining changes in benefits for the upcoming year.  The

14   debtors assert that these brochures have contained an

15   unequivocal statement of GM's right to amend, modify or

16   terminate the plans.  But that was not always so.  The Retirees

17   Association asserts that, at least between 1974 and 1987,

18   salaried retirees were performing under unilateral contracts

19   that guaranteed lifetime benefits upon retirement without

20   having also received statements reserving the right to amend or

21   terminate.  And the Retirees Association points to specific

22   language in benefit handbooks that it asserts could reasonably

23   be interpreted as a promise to provide such benefits.  However,

24   these matters were a subject of litigation, extensive

25   litigation, going all the way up to an en banc decision of the

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 254 of 317

102

1    Sixth Circuit Court of Appeals, which I'll describe more fully

2    in my conclusions of law.

3         GM effected changes in its retiree Welfare Plans from

4    time to time.  Prior to these Chapter 11 cases, three changes

5    were made that are at least arguably significant.  On July

6    2008, effective January 1, 2009, GM eliminated medical, dental,

7    vision and extended care coverage for salaried retirees, their

8    surviving spouses and their dependents age sixty-five or older.

9    In September 2008, GM changed the plans to comply with a cap on

10   salaried retiree health care; it was approved by the GM board

11   of directors in 2007.  And in February of this year, GM

12   accelerated a planned reduction in salaried retiree life

13   insurance, which had previously been announced in 2006 and was

14   going to be effective in 2017, in respect to whose details are

15   not material here, effective May 1, 2009.  All but the third

16   change, the one announced in February and effective May 1, were

17   communicated to salaried retirees more than six months prior to

18   the filing date, a time which is arguably significant to

19   parties' rights.

20        GM has not proposed any further changes in either of

21   the plans, at least insofar as it would implement them.  And

22   under the proposed sale agreement, assuming, of course, that it

23   is approved, and without prejudging that issue in any way, the

24   purchaser knew GM will assume responsibility for them going

25   forward but as modified prepetition in the manner I just

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 255 of 317

103

1    described to provide them in lesser amounts.

2          Turning now to my conclusions of law and bases for

3    the exercise of my discretion, as usual I start with the words

4    of the statute.  Section 1114 of the Code provides, in relevant

5    part, in its subsection (d), "The Court, upon motion by any

6    party-in-interest, and after notice and a hearing, shall order

7    the appointment of a committee of retired employees if the

8    debtor seeks to modify or not pay the retiree benefits or if

9    the Court otherwise determines that it is appropriate to serve

10   as the authorized representative, under this section, of those

11   persons receiving any retiree benefits not covered by a

12   collective bargaining agreement.  The United States Trustee

13   shall appoint any such committee."

14         Thus, under the statute, the Court must order the

15   appointment of the committee if the debtor seeks to modify or

16   not pay the retiree benefits.  Alternatively, it may order the

17   appointment if the Court otherwise determines that it's

18   appropriate to serve as a bargaining representative for

19   retirees not covered by a collective bargaining agreement.

20         The Retirees Association contends that Section 1114

21   of the Code applies to what the debtors did prepetition and

22   would do post-petition here and that I thus should appoint a

23   retirees' committee under each of the two separate regimes

24   under which a retirees' committee should be appointed.  I

25   disagree with the Retirees Association with respect to the

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 256 of 317

104

1   first, and for the most part with respect to the second,

2   although I think I should reserve room to have the ability

3   going forward to make a discretionary limited appointment if

4   circumstances not present now but in the future later warrant.

5          Turning to the matter of mandatory appointment, the

6   backdrop as to the mandatory appointment issue is the fact

7   that, as discussed in my findings of fact above, at some point

8   in time GM started to tell its employees, who were of course

9   its prospective retirees, that their welfare plans could be

10  amended, modified or terminated.  GM and the creditors'

11  committee contend that Section 1114 doesn't apply when a debtor

12  simply exercises the rights to modify or terminate that it has

13  outside of bankruptcy.  But the Retirees Association, in

14  contrast, contends that 1114 applies to any modification or

15  termination of retiree rights under a welfare plan, whether

16  such termination or modification is authorized under non-

17  bankruptcy law or not.  And thus, in substance, it argues that

18  Section 1114 improves upon non-bankruptcy law rights.

19         Though Sections 1114(d), (e) and (l) are, in my view,

20  ambiguous, and the cases are somewhat split in this area, I

21  must agree with GM and the creditors' committee.  The Retirees

22  Association says at page 9 of its motion that, quote, "A few

23  courts have held, on a divided issue of law where other courts

24  disagree, that this Section 1114 does not protect in bankruptcy

25  benefits the Debtor retained the unfettered right to amend

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 257 of 317

105

1    outside of bankruptcy", quote.  But I can't regard that as a

2    fully accurate description of the state of the law, especially

3    in this circuit and district.  In fact, I think it's exactly

4    the opposite.

5           The Retirees Association cites the Second Circuit's

6    decision in LTV Steel Company v. United Mine Workers, In re

7    Chateaugay Corporation, 945 F.2d 1205 (2nd Cir. 1991), as being

8    one of the cases that holds against the retirement committee on

9    this issue.  And, of course, Chateaugay does.  Chateaugay says,

10   in fact, "The Bankruptcy Protection Act", which was the statute

11   by which 1114's predecessor came into being, and from which

12   1114 evolved, "requires that during reorganization the parties

13   continue to provide benefits according to the plan in effect at

14   the time of the declaration of bankruptcy.  The Bankruptcy

15   Protection Act does not alter the terms of that plan."  945

16   F.2d at 1209.  And that's exactly why Judge Restani dissented

17   in that case.

18          But while acknowledging Chateaugay, the Retirees

19   Association doesn't give enough recognition, in my view, to the

20   fact that Chateaugay is a controlling decision of the Second

21   Circuit, binding on me and the other judges in this circuit.

22   Likewise, the Retirees Association cites decisions of a former

23   visiting judge who sat in this district, and a district who

24   affirmed him, in the case of Ames Department Stores,

25   insufficient attention to the fact that those decisions were,

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 258 of 317

106

1    with respect, strikingly lacking in consideration of the

2    applicable case law.  They can only be read as having been

3    roundly criticized by this circuit in a subsequent decision in

4    Ames (see 76 F.3d 66 at page 71), though not on direct appeal,

5    and while the thoughts were expressed in dictum.

6        The district court decision, which is available

7    electronically but isn't published, expressed its conclusions

8    in what some might say was an ipse dixit fashion, without

9    parsing the words of the statute or relying upon any case law,

10   which at that point in time included about nine cases, as

11   observed by Judge Lifland in Ionosphere Clubs, 134 B.R. 515 at

12   page 517 (1991).  Unfortunately, the decision of the bankruptcy

13   court was equally thin.

14       In that later Ames decision, the circuit held, "We

15   think that there's a substantial room for disagreement with the

16   categorical holding in the district court's orders that the

17   debtor was required to follow the requirements of Section

18   1114;" reading from page 71, 76 F.3d at 71.  And while the

19   circuit in that Ames decision merely held that it couldn't be

20   said that the argument for the debtor's interpretation was

21   frivolous, that being an appeal of a sanctions determination or

22   a denial of fees for pursuing a frivolous argument, and while

23   the circuit expressly stated that it wasn't examining the,

24   quote, "present status of the pertinent law", quote, id at 71,

25   it was hardly an endorsement of the lower court's views.  In

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 259 of 317

107

1    fact, the circuit made a point to cite Chateaugay and Doskocil,

2    Federated Department Stores, New Value, and Collier as examples

3    of authorities that had gone the other way.  And it went on to

4    observe that Collier -- Collier on Bankruptcy, of course --

5    provides that Section 1114 does not, however, protect retiree

6    benefits beyond the contractual obligations of the debtor.

7          And the circuit observed, with respect to the

8    bankruptcy court and district court Ames decisions upon which

9    the Retirees Association relies, not one of the foregoing

10   authorities was discussed or even mentioned by either the

11   bankruptcy court or the district court.  More importantly,

12   neither court cited any interpretative authority that

13   conflicted with that above cited.

14         Now, make no mistake, I don't read that decision as

15   having ruled in favor of the principle for which the debtors

16   and the creditors' committee argue here.  In fact, it expressly

17   stated that it was not then ruling on the existing law.  But

18   what I think it very effectively does, if not conclusively so,

19   is say that I shouldn't be relying on those lower court Ames

20   decisions.

21         But perhaps most importantly, in its briefing on this

22   motion the Retirees Association failed even to mention Judge

23   Drain's decision in March of this year in Delphi, 2009 WL

24   637315 (Bankr. S.D.N.Y. Mar. 10, 2009), until the Retirees

25   Association filed its reply.  And even then the Retirees

108

1   Association failed sufficiently, in my view, in that reply to

2   acknowledge all of the things Judge Drain said and to discuss

3   his substantive analysis before the retirees' committee

4   properly commented on the relatively limited relief that Judge

5   Drain had ultimately granted in Delphi.  Of course, the

6   Retirees Association made up for that in oral argument, but I

7   think Judge Drain's decision in Delphi is of great importance.

8          I've previously noted many times in writing my view

9   as to the importance of consistency in the decisions in the

10   bankruptcy court in this district and that I follow the

11   decisions of the other bankruptcy judges in this district, in

12   the absence of clear error.  But when we're talking about the

13   Delphi decision, I think that's feigned praise since, in my

14   view, Judge Drain's analysis was plainly correct and, by far,

15   the most comprehensive and well-reasoned of any of the

16   decisions in the 1114 area.

17          I note, by the way, that when I talk of Judge Drain's

18   decision, although I'm principally speaking of his decision of

19   March 10, there was a supplemental argument on or about March

20   11, as evidenced in a separate transcript to which I'll be

21   referring in a moment or two, and that getting one's arms

22   around Judge Drain's Delphi rulings is best achieved by

23   consideration of both of the two decisions.

24          Judge Drain also dealt with the argument that I also

25   heard here, that Chateaugay was overruled by statute by the

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 261 of 317

109

1    inclusion of new Section 1114(l) in BAPCPA.  Judge Drain

2    disagreed, and so do I.  As Judge Drain observed, Section

3    1114(l), however, does not specifically deal with the issue of

4    plans modifiable as of right and could conceivably apply to

5    pre-bankruptcy breaches by debtors in financial distress of

6    vested rights.

7         More importantly, even if it does apply to modifiable

8    plans, I do not view Section 1114(l), which applies to a

9    specific type of prepetition action, as overruling Doskocil and

10   the line of cases that follow it which apply to post-petition

11   actions.  Nor does there appear to me to be any legislative

12   history or other policy statements accompanying the 2005

13   amendment that would clearly set forth Congress's intention

14   generally in Section 1114(l) to override, beyond its specific

15   terms, the fundamental principle that bankruptcy does not give

16   new rights to individual parties-in-interest or to cut back on

17   the tenet set forth by the Supreme Court in Butner.

18        Now, I have not discussed the underlying principles

19   as thoroughly as Judge Drain did there.  In this oral dictated

20   decision, I don't know if that's necessary or appropriate.  But

21   I've carefully read Judge Drain's analysis and I concur in it

22   in full, even putting aside the deference in respect to which I

23   give the decisions of my colleague judges.  And since

24   Chateaugay and Delphi are in alignment, I'm ruling in

25   accordance with each of them that Section 1114 doesn't apply to

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 262 of 317

110

1   employee benefit plans that are terminable or amendable

2   unilaterally by the plan sponsor.  Putting it another way,

3   Section 1114 does not trump any agreement between a company and

4   its employee that gives the company the right to amend or

5   terminate a welfare plan.

6          Thus, in terms of arguably persuasive authority,

7   we're left only with the decision in Farmland Dairies.  If one

8   were to look solely at the words of the statute, which, as I've

9   noted, is ambiguous, the Farmland Dairies view is not

10  necessarily an unreasonable one.  But Farmland can't be

11  reasonable with the weight of authority in this area, only part

12  of which I've noted above, and Farmland Dairies is inconsistent

13  with the law in this circuit and district.  Of course, when I

14  speak of the weight of the authority I'm not counting noses;

15  I'm looking at it qualitatively and at what level it was

16  decided.  That consideration is particularly relevant to

17  Chateaugay and Delphi.  And, as I've noted, I regard Delphi as

18  by far the most thoughtful and comprehensive decision in this

19  area.  So for any retirees as to whom the debtor reserved the

20  right to modify before they retired, they don't have rights

21  under 1114.

22          So then we get to Sprague.  GM and the creditors'

23  committee each cite the Sixth Circuit's en banc decision in

24  Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998),

25  as having ruled that the health care programs explicitly permit

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 263 of 317

111

1    GM to unilaterally amend or terminate benefits under those

2    programs.  Sprague does hold that, although the Retirees

3    Association is correct in noting that Sprague was a split

4    decision and that it also isn't binding on me.  And I agree

5    with the Retirees Association, and perhaps the debtors agree

6    with it as well -- I don't think they addressed it one way or

7    the other -- that, on a question of federal law, Second Circuit

8    law, and not Sixth Circuit law, controls in any area where the

9    law of the two circuits is inconsistent.

10           But Judge Drain ruled, and I concur, that, and I'm

11   quoting Judge Drain, "I continue to believe that the Sixth

12   Circuit Sprague decision is one in which the Sixth Circuit at

13   length determined en banc that there was no ambiguity in

14   respect of GM's reservation of rights to modify at will its

15   welfare plans, and that, were I to conclude otherwise, I would

16   not be doing so by applying a different standard than that

17   which is applied in the Second Circuit under Bouboulis v.

18   Transport Workers Union of America, 442 F.3d 55 (2nd Cir.

19   2006), namely, that the plan documents contained, quote,

20   'specific written language that is reasonably susceptible to

21   interpretation as a promise to vest benefits', end quote."  I'm

22   quoting from the transcript of the Delphi hearing of March 11,

23   2009, which probably should be read as a supplemental and

24   second Delphi decision.  See also the comments Judge Drain made

25   in the course of argument at page 11.

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 264 of 317

112

1    And I recognize that sometimes judges say things in

2    oral argument that they don't mean or that they're throwing up

3    just to be devil's advocates, but from the context I believe

4    that Judge Drain meant it here.  If you read the opinions, they

5    really are applying the same standard.  They're basically

6    saying there was nothing ambiguous.

7    Now, when I use the words above, quote, "specific

8    written language that is reasonably susceptible to

9    interpretation as a promise", quote, those words being the

10   words that Judge Drain used, they in turn were a quotation from

11   Bouboulis, 442 F.3d at page 61.  And the Bouboulis words, in

12   turn, were a quotation from the Second Circuit's decision in

13   Devlin v. Blue Cross and Blue Shield, 274 F.3d at 84.

14   So when I rely on Judge Drain's analysis in this area

15   and I concur with it, it's very clear to me that he gave

16   careful consideration to both Bouboulis and Devlin and made a

17   knowing and accurate determination that there was no material

18   difference between Second Circuit law and Sixth Circuit law in

19   this regard.

20   Thus, at the risk of a slight repetition, stating a

21   similar thing a different way, I find insufficient basis to

22   conclude that the standard that the Sixth Circuit applied in

23   Sprague would be materially different than the standard that

24   the Second Circuit would apply.

25   Now, is the Sprague conclusion debatable under those

09-50026-mg   Doc 7226-3   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 1-5 to Mayer Declaration   Pg 265 of 317

113

1   standards?  I think it plainly is.  And if I were writing on a

2   clean slate, I think I might well have agreed with the Boyce

3   Martin dissent.  But as to the issues upon which GM relies upon

4   it, Sprague was an eight-to-five decision as to the early

5   retirees, and a ten-to-three decision as to the general

6   retirees.  And the general retirees' analysis is the one that's

7   more closely on point here.

8           A ten-to-three split isn't close, but once more I'd

9   agree that this isn't a counting game.  Rather, I look at it

10  qualitatively and see things as Judge Drain commented on in

11  argument.  Judge Drain observed, "You may agree with Judge

12  Martin, and maybe if one were writing on a clean slate one

13  might agree with Judge Martin, but the Sixth Circuit ruled, and

14  I find it very hard for me, when there's no difference in the

15  standard, to say oh, the Sixth Circuit was wrong;" reading from

16  the March 11 transcript at page 11.

17          Where the circuit court, with ten judges no less,

18  having ruled as it did with respect to general retirees,

19  addressing the same issues we have here, I think that as a

20  matter of stare decisis I should respect its ruling and follow

21  it.

22          Folks, as is implied by what I just said, I note that

23  I'm doing so as a matter of stare decisis.  I am not so ruling

24  on the applicability of res judicata one way or the other, and

25  I'm not relying on the doctrine of res judicata.  I have some

114

1    reservations as to whether res judicata applies is not very

2    similar to those Judge Drain had.  But I don't need to reach

3    that issue.  In my view, Sprague and Delphi are so dramatically

4    on point that they counsel the result I reach here on

5    traditional bases of stare decisis.  We have what we refer to

6    in law school as the "blue Buick".

7           So now we get to the application of Section 1114(d).

8    Turning first to its mandatory portion, GM hasn't moved for

9    permission to change any retiree welfare plan benefits, which

10   is hardly surprising in light of its position that it doesn't

11   need court approval to do so and the case law that I described

12   above, and I'm going to follow that it has the right to

13   unilaterally amend or terminate such benefits.  As at least the

14   first portion of 1114 doesn't apply at all, if not the entirety

15   of 1114(d), or 1114 at all for that matter, there's no occasion

16   to apply the mandatory portion of Section 1114.  So I'm going

17   to deny appointment insofar as it's premised on the contention

18   that appointment is mandatory.

19          Turning now to discretionary appointment, though

20   appointment of a retiree committee isn't mandatory, I need also

21   to consider discretionary appointment.  As I noted, Section

22   1114(d) provides that the Court shall order the appointment of

23   a committee of retired employees if the Court otherwise

24   determines that it is appropriate.  One can make an argument

25   that if 1114 doesn't apply at all, there's no occasion to apply

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 267 of 317

115

1    the provision in 1114 providing discretionary authority either.

2    But I think the better view might be consistent with what Judge

3    Drain concluded in Delphi:  that bankruptcy judges should have

4    the discretion to appoint a retirees' committee, especially if

5    its budget can be kept under control, in any instances where it

6    would really accomplish something.

7            I don't reach that issue today because I here do not

8    consider the appointment of a committee now to be necessary or

9    appropriate for retirees for whom GM has the right to amend or

10   terminate benefits, for, while I well understand the importance

11   of these kinds of benefits to any retiree, believe me I do, I

12   can't change retirees' non-bankruptcy rights.  And there is no

13   need to form a committee to argue or negotiate with respect to

14   entitlements under Section 1114(l) as that can be done by the

15   Retirees Association as an ad hoc committee with rights under

16   Section 1109.  See In re Anchor Glass Container Corp., 342 B.R.

17   878 at page 882, Middle District of Florida 2005 decision by

18   Judge Alex Paskay.

19           As Judge Paskay noted in that case, "Unlike Section

20   1114(e), which contemplates motions brought by, and the debtor

21   negotiating with, an authorized representative, Section

22   1114(l), similar to Section 1114(d), depends upon a motion

23   brought by a party-in-interest.  Section 1114(l) does not

24   require, nor does it contemplate, the appointment of a

25   committee."

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 268 of 317

116

1          I also made a similar point when I considered the

2     application of the Ad Hoc Committee of Family and Dissident

3     Bondholders a couple of days ago.  In most, if not all, cases

4     under the Code, an ad hoc committee can be heard perfectly

5     satisfactorily under 1109 without being designated as a formal

6     official committee.

7          Similarly, I share concerns articulated by the

8     creditors' committee as to unnecessary costs in this case.  And

9     I also agree with another creditors' committee point, which, in

10    my view, is quite significant.  Even assuming that New GM were

11    to be making further modifications in the future, assuming, of

12    course, that I approve the 363 sale, all salaried retiree

13    benefits would be entirely New GM's responsibilities.  Thus,

14    any modifications to such benefits would have to be negotiated

15    with New GM and/or the U.S. Treasury.

16          As Judge Gonzalez noted in Chrysler, "A retiree

17    committee should be appointed only if it's necessary to

18    negotiate with the debtors, not with a purchaser of the

19    debtors' assets."  See the transcript of Judge Gonzalez's May

20    14 hearing in Chrysler at page 35.

21          With all of that said, I can't rule out the

22    possibility that appointing a retirees' committee might be

23    desirable and thus appropriate to facilitate some kind of

24    negotiations in the future or any kind of a settlement,

25    including with respect to any appeal of the determination I'm

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 269 of 317

117

1    making today, or in connection with some other matters where it

2    would bring something to the table beyond appearing and being

3    heard in a fashion for which it could already do that under

4    1109.  That might be helpful, by way of example, to bind absent

5    parties or dissenters.

6         That appears to be the rationale upon which Judge

7    Drain allowed the formation of a committee, or one of them --

8    the other isn't applicable here -- though with a limited

9    200,000 dollar budget.  And if it turned out to be necessary or

10   desirable to do that here, I might be of a mind to do the same

11   thing if asked.  But that isn't now necessary, if it ever will

12   be.  For instance, I don't need a supplemental report of the

13   type that Judge Drain did, and which was an element of the

14   limited appointment authority that he granted.  I'll simply

15   note now that this ruling is without prejudice to any such

16   eventuality.

17        Accordingly, the motion is denied without prejudice

18   to reconsideration in the event of an eventuality of the type I

19   just described.

20        Mr. Miller, you or your folks are to settle an order

21   in accordance with this ruling at your earliest reasonable

22   convenience.

23        MR. MILLER:  Yes, sir.

24        THE COURT:  All right, folks.  Do we have any further

25   business for today?

118

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  All right, I want to thank you for

3    waiting as long as you did on the matter that I had taken under

4    advisement.  We're adjourned for the day.  Have a good day.

5          ALL:  Thank you, Your Honor.

6      (Whereupon these proceedings were concluded at 2:25 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

1

2                          I N D E X

3

4                         R U L I N G S

5     DESCRIPTION                                    PAGE      LINE

6     Debtors' motion for final order authorizing     30        20

7     debtors to pay pre-petition obligations to

8     foreign creditors and authorizing and directing

9     financial institutions to honor and process

10    related checks and transfers granted

11    Debtors' motion for final orders establishing    31         4

12    notification procedures regarding restrictions

13    on certain transfers of interest in the debtor

14    granted

15    Debtors' motion for final order on cash          31         9

16    management granted

17    Debtors' motion for authority to exercise a put  31        17

18    Debtors' motion to grant additional time to      31        23

19    file reports of financial information or to

20    seek modification of reporting requirements granted

21    Debtors' application to retain Weil Gotshal      32         5

22    & Manges as attorneys nunc pro tunc to

23    commencement date granted

24

25

120

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' application to retain Jenner & Block LLP pursuant to Section 327(e) as conflicts counsel and special corporate counsel granted | 32 | 14 |
| Debtors' application to retain under Section 327(e) Honigman, Miller, Schwartz & Cohn, LLP as special counsel granted | 32 | 21 |
| Debtors' application authorizing retention and employment of The Garden City Group, Inc. as notice and claims agent nunc pro tunc to commencement date granted | 33 | 2 |
| Debtors' motion seeking entry of final order with respect to the debtors' essential supplier programs granted | 35 | 21 |
| Motion of ad hoc committee of asbestos personal injury claimants for order appointing a future asbestos personal injury claimant denied without prejudice | 52 | 12 |

121

1

2                              I N D E X, cont'd

3

4                               R U L I N G S

5    DESCRIPTION                                        PAGE     LINE

6    Debtors' motion to retain AP Services LLC as        55       17

7    crisis managers and to designate Albert A. Koch

8    as chief restructuring officer nunc pro tunc to

9    commencement date

10   Application of the General Motors Retirees          117       17

11   Association for order to appoint retiree

12   committee pursuant to 11 U.S.C. Section 1114(d)

13   denied without prejudice to reconsideration

14

15

16

17

18

19

20

21

22

23

24

25

122

1

2                        C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Also transcribed by:  Tzippy Geralnik

12                           Pnina Eilberg

13                           Penina Wolicki

14                           Dena Page

15                           Ellen Kolman

16                           Clara Rubin

17

18     Veritext LLC

19     200 Old Country Road

20     Suite 580

21     Mineola, NY 11501

22

23     Date:  June 26, 2009

24

25

# **Exhibit 4**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

|  |  |  |
|---|---|---|
|  | :: |  |
| In re: | :: | Chapter 11 |
|  | :: | Case No. 09-50026 (REG) |
| General Motors Corporation, *et al.*, | :: |  |
|  | :: | (Jointly Administered) |
| Debtors. | :: |  |

------------------------------------------------------------------------ x

**FINAL ORDER PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105(a), 361, 362, 363, 364 AND 507 AND BANKRUPTCY**
**RULES 2002, 4001 AND 6004 (A) APPROVING A DIP CREDIT FACILITY**
**AND AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING**
**PURSUANT THERETO, (B) GRANTING RELATED LIENS AND SUPER-PRIORITY**
**STATUS, (C) AUTHORIZING THE USE OF CASH COLLATERAL AND (D)**
**GRANTING ADEQUATE PROTECTION TO CERTAIN**
**PRE-PETITION SECURED PARTIES**

THIS MATTER having come before this Court by the motion dated June 1, 2009

(the "**Motion**") of General Motors Corporation ("**GM**") and its affiliated debtors in the above-

captioned cases, as debtors and debtors-in-possession (collectively with GM, the "**Debtors**"),[1]

seeking, among other things, entry of a final order (the "**Final Order**"):

(i)    Authorizing the Debtors, pursuant to sections 105, 362, 363 and 364 of

title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 6004

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001

of the Local Bankruptcy Rules for the Southern District of New York (the "**Local**

**Bankruptcy Rules**"), to enter into the Secured Superpriority Debtor-in-Possession

Credit Agreement, by and among GM, as borrower, and The United States Department of

the Treasury ("**U.S. Treasury**") and Export Development Canada ("**EDC**"), as lenders

---

[1]    The Debtors in these cases include: GM, Saturn, LLC, Saturn Distribution Corporation, and
Chevrolet-Saturn of Harlem, Inc.

(together, the "**DIP Lenders**"), in substantially the form annexed hereto as <u>Exhibit 1</u> (as the same may be amended, supplemented, restated or otherwise modified from time to time, and together with all related agreements and documents, the "**DIP Credit Facility**"), and to obtain post-petition financing on a secured and super-priority basis pursuant to the terms and conditions thereof, up to a maximum aggregate amount of $33.3 billion (the "**Commitment**");

(ii)    Authorizing the Debtors to execute and deliver the DIP Credit Facility and to perform such other acts as may be reasonably necessary or desirable in order to give effect to the provisions of the DIP Credit Facility, including the unconditional, joint and several guaranty of the obligations of GM under the DIP Credit Facility by each other Debtor (each, a "**Guarantor**", and collectively, the "**Guarantors**");

(iii)    Providing, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, that all obligations owing to the DIP Lenders under the DIP Credit Facility shall be accorded administrative expense status in each of these cases, and shall, subject only to the Carve-Out (as defined below), have priority over any and all other administrative expenses arising in these cases; <u>provided</u>, <u>however,</u> that subsequent to the closing of the Related Section 363 Transactions (as defined in the DIP Credit Facility), claims against the Debtors' estates that have priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions (the "**Old GM Administrative and Priority Claims**") shall have priority over such obligations (up to the aggregate amount of $950,000,000; <u>provided</u>, <u>however</u>, that any greater amount shall

be subject to approval by the DIP Lenders) owing to the DIP Lenders under the DIP

Credit Facility; and

(iv)     Granting the DIP Lenders security interests in and liens on (the "**DIP**

**Liens**") all property and assets of each of the Debtors, of every kind or type whatsoever,

including tangible, intangible, real, personal or mixed, whether now owned or hereafter

acquired or arising, wherever located, all property of the estates of each of the Debtors

within the meaning of section 541 of the Bankruptcy Code and all proceeds, rents and

products of the foregoing, (including all avoidance actions arising under chapter 5 of the

Bankruptcy Code and applicable state law except avoidance actions against the

Prepetition Senior Facilities Secured Parties (as defined below)) with the exception of (a)

any stocks, warrants, options or other equity interests issued to or held by any Debtor

pursuant to the Related Section 363 Transactions (the "**New GM Equity Interests**"), (b)

any leasehold interest of the Debtors in (i) the real property located at and commonly

known as 301 Freedom Drive, City of Roanoke, Denton County, Texas or (ii) the real

property located at and commonly known as 475 Brannan Street, City and County of San

Francisco, California; and (c) certain Excluded Collateral (as defined in the DIP Credit

Facility) (collectively, "**Property**") as follows:

(A)     pursuant to section 364(c)(2) of the Bankruptcy Code, valid, perfected,

first-priority security interests in and liens on all Property that is not

subject to non-avoidable, valid and perfected liens in existence as of the

Petition Date (as defined herein) (or to non-avoidable valid liens in

existence as of the Petition Date that are subsequently perfected as

permitted by section 546(b) of the Bankruptcy Code), in each case subject

only to (1) the Permitted Liens (as defined in the DIP Credit Facility), (2) the Carve-Out, (3) the adequate protection liens granted in connection with the Prepetition Revolving Credit Agreement pursuant to paragraph 6(b)(1)(x) of the Interim Order (the "**Prepetition Revolving Credit Agreement Order**") Under 11 U.S.C. §§ 105, 361, 362, 363 and FED. R. BANKR. P. 2002, 4001 And 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Revolver Secured Parties and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B) (the "**Prepetition Revolving Credit Agreement Adequate Protection Liens**"), and (4) the adequate protection liens granted in connection with the Prepetition Term Loan Agreement pursuant to paragraph 5(b)(i) of the Interim Order (the "**Prepetition Term Loan Facility Order**", and together with the Prepetition Revolving Credit Agreement Order, the "**Prepetition Revolving And Term Loan Orders**") Under 11 U.S.C. §§ 105, 361, 362, 363 and FED. R. BANKR. P. 2002, 4001 and 9014 (I) Granting Adequate Protection to Term Loan Secured Parties and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B) (the "**Prepetition Term Loan Adequate Protection Liens**", and together with the Prepetition Revolving Credit Agreement Adequate Protection Liens, the "**Prepetition Revolving And Term Adequate Protection Liens**");

(B)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, perfected junior security interests in and liens on all Property that is subject to non-

avoidable, valid and perfected liens in existence as of the Petition Date, or

to non-avoidable valid liens in existence as of the Petition Date that are

subsequently perfected as permitted by section 546(b) of the Bankruptcy

Code, subject only to the Carve-Out; and

(C)       nothing in this Final Order, the Interim Order or the DIP Credit Facility

shall in any way be construed to authorize or permit the DIP Lenders to

seek recourse against the New GM Equity Interests at any time.

(v)       Authorizing the application of a portion of the proceeds of the DIP Credit

Facility toward payment in full of all principal, interest, letter of credit reimbursement

obligations (including obligations to cash collateralize undrawn letters of credit) and

other amounts due or outstanding under (A) that certain Term Loan Agreement, dated as

of November 29, 2006, among GM, Saturn Corporation and JPMorgan Chase Bank,

N.A., as administrative agent, and the lenders party thereto from time to time (as may be

amended, restated, supplemented or otherwise revised from time to time, and together

with all related agreements and documents, the "**Prepetition Term Loan Agreement**")

secured by a first-priority lien on certain Property (the "**Prepetition Term Loan

Collateral**"), (B) that certain Amended and Restated Credit Agreement, dated as of July

20, 2006, among GM, General Motors of Canada, Limited ("**GMCL**"), Saturn

Corporation, Citicorp USA, Inc., as administrative agent, and the lenders party thereto

from time to time (as may be amended, restated, supplemented or otherwise revised from

time to time, and together with all related agreements and documents, the "**Prepetition

Revolving Credit Agreement**") secured by a first-priority lien on certain Property (the

"**Prepetition Revolving Credit Agreement Collateral**"), and (C) that certain Loan and

Security Agreement, dated as of October 2, 2006, among GM and Gelco Corporation (d/b/a GE Fleet Services) (as may be amended, restated, supplemented or otherwise revised from time to time, and together with all related agreements and documents, the "**Prepetition Gelco Loan Agreement**", and together with the Prepetition Term Loan Agreement and the Prepetition Revolving Credit Agreement, the "**Prepetition Senior Facilities**") secured by a first-priority lien on certain Property (the "**Prepetition Gelco Loan Agreement Collateral**", and together with the Prepetition Term Loan Collateral and the Prepetition Revolving Credit Agreement Collateral, the "**Prepetition Senior Facilities Collateral**");

(vi)    Authorizing the Debtors to use cash collateral of the Existing UST Secured Parties (as defined below) (the "**Cash Collateral**");

(vii)    Granting to the Existing UST Secured Parties (as defined below), as adequate protection for the potential diminution in value of their respective liens on and security interests in Property, (A) a claim as contemplated by section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claim**"), which Adequate Protection Claim shall have a priority immediately junior to the Super-priority Claim (as defined below) and pari passu with the super-priority claims granted under the Prepetition Revolving And Term Loan Orders, (B) liens on and security interests in the Property (the "**Adequate Protection Liens**"), only to the extent of and on account of any diminution in the value of the Existing UST Secured Parties' interests in the Debtors' interests in the Property on and after the Petition Date, which Adequate Protection Liens shall have a priority immediately junior to the DIP Liens on the Property, and (C) reimbursement by the Debtors of all reasonable expenses incurred in the course of these

chapter 11 cases by the Existing UST Secured Parties and their respective professional advisors and counsel. "**Existing UST Secured Parties**" shall mean the secured parties under (1) that certain Loan and Security Agreement, dated as of December 31, 2008, by and between GM and the U.S. Treasury (as may be amended, restated, supplemented or otherwise revised from time to time, and together with all related agreements and documents, the "**TARP Loan Agreement**") and (2) that certain Credit Agreement, dated as of April 2, 2009, by and between GM Supplier Receivables LLC and the U.S. Treasury (as may be amended, restated, supplemented or otherwise revised from time to time, and together with all related agreements and documents, the "**Supplier Receivables Facility**", and together with the TARP Loan Agreement, the "**Existing UST Loan Agreements**").  For the avoidance of doubt, the Adequate Protection Liens shall be pari passu with any adequate protection liens granted under the Prepetition Revolving And Term Loan Orders except the Prepetition Revolving And Term Adequate Protection Liens as detailed in paragraph (iv)(A) above;

(viii)    Authorizing and directing the Debtors to pay, without further order of this Court, the principal, interest, reasonable fees, expenses and other amounts (including the Additional Notes (as defined in the DIP Credit Facility)) payable to the DIP Lenders and their professional advisors and counsel under the DIP Credit Facility, as the same become due, including all reasonable expenses incurred in the course of these chapter 11 cases by the DIP Lenders and their professional advisors and counsel, all as and to the extent provided in the DIP Credit Facility; provided, that copies of the invoices for reimbursement by the Debtors of such expenses and fees (if any) are to be provided to

the Committee, any other statutory committee appointed in the Debtors' chapter 11 cases, and the United States Trustee on a confidential basis; and

(ix)    Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Facility and this Final Order.

This Court having considered the Motion, the DIP Credit Facility, the pleadings in support thereof and the pleadings in response thereto; and due and proper notice of the Motion having been provided in accordance with Bankruptcy Rules 2002, 4001, and 6004, and Local Bankruptcy Rule 4001 as reflected in the Affidavit of Service (Docket No. 134) filed with the Court on June 1, 2009; and a hearing pursuant to Bankruptcy Rule 4001(c)(2) having been held and concluded on June 1, 2009 (the "**Interim Hearing**") to consider the interim relief requested in the Motion; and the Court having entered an order granting the interim relief requested in the Motion (the "**Interim Order**"); and the Court having held a final hearing with respect to the Motion on June 25, 2009 (the "**Final Hearing**"); and it appearing that granting the relief requested in the Motion is appropriate, fair and reasonable and in the best interests of the Debtors, their estates, creditors and other parties in interest, and is essential for the Debtors' continued operations; and all objections to the relief requested in the Motion having been withdrawn, resolved or overruled on the merits by this Court; and upon consideration of the evidence presented, proffered or adduced at the Interim Hearing, the Final Hearing and in the Affidavit of Frederick A. Henderson, which was filed pursuant to Local Bankruptcy Rule 1007-2 on the Petition Date, the Declaration of William C. Repko in Support of Debtors' Proposed Debtor in Possession Financing Facility, the Statement of the United States of America Upon The Commencement Of General Motors Corporation's Chapter 11 Case [Docket No. 37] and

any other evidence presented at the Interim Hearing and the Final Hearing; and upon the record

of the Interim Hearing and the Final Hearing; and upon the arguments of counsel; and after due

deliberation and consideration and good and sufficient cause appearing therefor:

> **BASED UPON THE RECORD ESTABLISHED AT THE INTERIM
> HEARING AND THE FINAL HEARING, THIS COURT HEREBY
> MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS
> OF LAW:**

A.      On June 1, 2009 (the "**Petition Date**"), the Debtors each filed a voluntary

petition under chapter 11 of the Bankruptcy Code in this Court, commencing these cases.  The

Debtors continue to manage and operate their businesses and properties as debtors in possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in these cases; the United States Trustee appointed the Official Committee of

Unsecured Creditors (the "**Committee**") on June 3, 2009.

B.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these

proceedings, and over the property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.

Consideration of the Motion constitutes a core proceeding as defined in and pursuant to

28 U.S.C. § 157(b)(2).  Venue for these cases and for the proceedings on the Motion is proper in

this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Need for Post-petition Financing</u>.  The Debtors have demonstrated a need

for immediate and continuing access to post-petition financing pursuant to sections 363 and 364

of the Bankruptcy Code and Bankruptcy Rule 4001(c)(2).  In the absence of this access, the

Debtors will be unable to continue operating their business, causing immediate and irreparable

loss or damage the Debtors' estates, to the detriment of the Debtors, their estates, their creditors

and other parties in interest in these cases.  The Debtors do not have sufficient unrestricted cash

and other financing available to operate their businesses, maintain the estates' properties, and administer these cases absent the relief provided in this Final Order.

        D.    <u>No Credit Available on More Favorable Terms</u>.  Given the Debtors' current financial condition, available assets and current and projected liabilities, as well as current conditions in the automotive and credit markets, the Debtors are unable to obtain financing from any other lender on terms more favorable than those provided by the DIP Lenders in the DIP Credit Facility.  Other than pursuant to the DIP Credit Facility, the Debtors have been unable to obtain credit that either (i) was allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (ii) would have priority over all other administrative expenses specified in sections 503(b) and 507(b) of the Bankruptcy Code, (iii) would be secured solely by a lien on property of the Debtors' estates that is not otherwise subject to a lien, or (iv) would be secured only by a junior lien on property of the Debtors' estates that is subject to a lien.

        E.    <u>Good Faith of DIP Lenders</u>.  The Debtors chose the DIP Lenders as post-petition lenders in good faith and after obtaining the advice of experienced counsel and other professionals.  The Debtors and the DIP Lenders proposed and negotiated the terms and provisions of the DIP Credit Facility, the Interim Order and this Final Order in good faith, at arm's length, without collusion and with the intention that all obligations owed under the DIP Credit Facility would be valid claims accorded the priority and secured by the liens set forth herein.  The loans and extensions of credit authorized in the Interim Order and this Final Order are supported by reasonably equivalent value and fair consideration and the terms and provisions of the DIP Credit Facility, the Interim Order and this Final Order are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

Any credit extended, loans made, or funds advanced to the Debtors pursuant to this Final Order, the Interim Order or the DIP Credit Facility is deemed to be so extended, made or permitted to be used in good faith by the DIP Lenders as required by and within the meaning of section 364(e) of the Bankruptcy Code.  As good faith lenders, the DIP Lenders' claims, super-priority status, security interests and liens and other protections arising from or granted pursuant to this Final Order and the DIP Credit Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

F.    <u>Authority for the DIP Credit Facility</u>.  The U.S. Treasury has extended credit to, and acquired a security interest in, the Debtors as set forth in the DIP Credit Facility and as authorized by the Interim Order and this Final Order.  Before entering into the DIP Credit Facility, the Secretary of the Treasury, in consultation with the Chairman of the Board of Governors of the Federal Reserve System and as communicated to the appropriate committees of Congress, found that the extension of credit to the Debtors is "necessary to promote financial market stability," and is a valid use of funds pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 et. seq. ("**EESA**").  The U.S. Treasury's extension of credit to, and resulting security interest in, the Debtors as set forth in the DIP Credit Facility and as authorized in the Interim Order and this Final Order is a valid use of funds pursuant to EESA.

G.    <u>Waiver</u>.  Upon entry of this Final Order, each of the Debtors hereby forever releases, waives and discharges the Existing UST Secured Parties and DIP Lenders, together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors (collectively, the "**Released Parties**") from any

and all claims and causes of action arising out of, based upon or related to, in whole or in part, (i) the Existing UST Loan Agreements, (ii) any aspect of the prepetition relationship, or any prepetition transaction, between any Debtor, on the one hand, and any Released Party, on the other hand, or (iii) any acts or omissions by any or all of the Released Parties in connection with any prepetition relationship or transaction with any Debtor or any affiliate thereof including, without limitation, any claims or defenses as to the extent, validity, characterization, priority or perfection of the liens and security interests granted to any Existing UST Secured Parties pursuant to the Existing UST Loan Agreements, "lender liability" and similar claims and causes of action, any actions, claims or defenses arising under chapter 5 of the Bankruptcy Code or any other claims or causes of action.  The waivers described in this paragraph were binding on the Debtors immediately upon entry of the Interim Order, and shall be binding upon the Committee or any other statutory committee and all other parties in interest sixty (60) days after entry of this Final Order if, prior to the expiration of such sixty (60) day period, the Committee or other party in interest has not commenced, or filed a motion with this Court for authority to commence, a proceeding asserting a claim or cause of action waived under this paragraph.

       H.     <u>Notice</u>.  Due and proper notice of the Motion, the DIP Credit Facility, and the time and location of the Final Hearing has been provided in accordance with the Interim Order.  Such notice was adequate and sufficient, and no other or further notice need be provided.

       **BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, AND UPON THE MOTION AND THE RECORD MADE BEFORE THIS COURT AT THE INTERIM HEARING AND THE FINAL HEARING, AND GOOD AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

       1.     The Motion is granted to the extent provided in this Final Order.  All objections to the Motion heretofore not withdrawn or resolved by the Final Order are overruled

on the merits in all respects. The Debtors are authorized, pursuant to section 364(c) of the Bankruptcy Code, to obtain post-petition financing on a final basis up to the maximum aggregate amount of the Commitment, on a super-priority and secured basis, pursuant and subject to the terms and conditions of the DIP Credit Facility and this Final Order including, without limitation, the Initial Budget (as defined in the DIP Credit Facility) and the DIP Credit Facility is approved in all respects.

2.      The Debtors are hereby authorized to (A) enter into the DIP Credit Facility and are authorized and directed to perform all obligations under the DIP Credit Facility and this Final Order, including paying the principal, interest, fees, expenses, and other amounts (including the Additional Notes) due to the DIP Lenders and their professional advisors and counsel pursuant to the DIP Credit Facility or this Final Order as the same become due, which payments shall not otherwise be subject to the approval of this Court, and (B) unconditionally guaranty such payments on a joint and several basis as provided in the DIP Credit Facility.

3.      Upon execution and delivery of the DIP Credit Facility and entry of this Final Order, the Debtors' obligations under the DIP Credit Facility (including the Additional Notes) shall constitute final, valid and binding obligations of the Debtors, enforceable against each Debtor and its estate in accordance with the terms thereof. No obligation, payment, transfer or grant of security under the DIP Credit Facility or this Final Order shall be stayed, restrained, voided or recovered under any provision of the Bankruptcy Code (including section 502(d) of the Bankruptcy Code) or other applicable law, or shall be subject to any defense, reduction, setoff, recoupment or counterclaim.

4.      Except for the Carve-Out, and upon entry of this Final Order, no costs or expenses of administration of these cases or any future proceeding that may result therefrom,

including liquidation in bankruptcy or other proceedings under any chapter of the Bankruptcy

Code, shall be imposed or charged against, or recovered from, the DIP Lenders or any of the

Property under section 506(c) of the Bankruptcy Code or any similar principle of law, and each

of the Debtors hereby waives for itself and on behalf of its estate any and all rights under section

506(c) of the Bankruptcy Code or otherwise to assert or impose, or seek to assert or impose, any

such costs or expenses of administration against the DIP Lenders or the Property.

     5.     The DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the

Bankruptcy Code, an allowed super-priority administrative expense claim in each of these cases

(the "**Super-priority Claim**") for all loans, reimbursement obligations and any other

indebtedness or obligations, contingent or absolute, which may now or from time to time be

owing by any of the Debtors to the DIP Lenders under the DIP Credit Facility or hereunder,

including, without limitation, all principal, accrued interest, costs, fees, expenses and all other

amounts (including the Additional Notes) due under the DIP Credit Facility, which Super-

priority Claim (A) shall have priority over any and all administrative expense claims and

unsecured claims (including without limitation, the Adequate Protection Claim) against each

Debtor or its estate in these cases, now existing or hereafter arising, of any kind or nature

whatsoever including, without limitation, administrative expenses and claims of the kind

specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 503(a),

503(b), 506(c) 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and any other provision of

the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code, and (B) shall

at all times be senior to the rights of each Debtor or its estate, and any successor trustee or other

representative of any Debtor's estate in these cases or in any subsequent proceeding or case

under the Bankruptcy Code, to the extent permitted by law; <u>provided</u>, <u>however</u>, that subsequent

to the closing of the Related Section 363 Transactions, claims against the Debtors' estates that have priority under sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions, shall have priority over the remaining obligations owing to the DIP Lenders under the DIP Credit Facility (up to the aggregate amount of $950,000,000; provided, however, that any greater amount shall be subject to approval by the DIP Lenders). The Super-priority Claim shall be subject and subordinate only to the Carve-Out and the claims set forth in the preceding proviso.

6.    The DIP Lenders are hereby granted, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, continuing, valid, binding, enforceable, and automatically perfected DIP Liens in and on any and all of the Property, with the priorities set forth in paragraph (iv) above, to secure all repayment and other obligations of the Debtors under the DIP Credit Facility and this Final Order, including the Additional Notes. Except as expressly provided in the DIP Credit Facility or this Final Order, the DIP Liens shall not be made subject to or pari passu with any lien on, or security interest in, the Property, and shall be valid and enforceable against any trustee appointed in these cases, in any successor case, or upon the dismissal of any of these cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code. Except as provided in the DIP Credit Facility, this Final Order, or as otherwise agreed to by the DIP Lenders, the Debtors shall not grant any liens on the Property junior to the DIP Liens. In addition, except as permitted in the DIP Credit Facility, this Final Order, or as otherwise agreed to by the DIP Lenders, the Debtors shall not incur any debt with priority equal to or greater than the DIP Credit Facility. For the avoidance of doubt,

notwithstanding anything to the contrary in this Final Order, the Interim Order or the DIP Credit Facility, the Permitted Liens shall include any valid, perfected, non-avoidable prepetition senior liens in any Property of the Debtors' estates (or non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected only as permitted by section 546(b) of the Bankruptcy Code), including, but not limited to, valid, perfected, non-avoidable prepetition senior statutory and possessory liens, and recoupment and setoff rights.  Further, nothing in this Final Order, the Interim Order or the DIP Credit Facility shall in any way impair the right of any claimant with respect to any alleged reclamation right or impair the ability of a claimant to seek adequate protection with respect to any alleged reclamation right; provided, however, that nothing in this Final Order, the Interim Order or the DIP Credit Facility shall prejudice any rights, defenses, objections or counterclaims that the Debtors, the DIP Lenders, any agent under the Prepetition Senior Facilities, the lender under the TARP Loan Agreement, the Committee or any other party in interest may have with respect to the validity or priority of such asserted liens or rights, or with respect to any claim for adequate protection; provided, further, that nothing in this Final Order, the Interim Order or the DIP Credit Facility shall in any way be construed to permit or authorize the DIP Lenders to seek recourse against the New GM Equity Interests at any time.  Notwithstanding the foregoing, the DIP Liens shall be subject and subordinate to valid and enforceable liens of governmental units for personal property taxes, real property taxes, special taxes, special assessments, and infrastructure improvement taxes arising after the Petition Date to the extent that such liens of governmental units take priority over previously granted and perfected consensual liens or security interests in property of the Debtors under applicable non-bankruptcy law.

7.      Except as expressly agreed by the DIP Lenders, the obligations of the
Debtors, including, without limitation, all obligations under the Notes (as defined in the DIP
Credit Facility), shall be unconditionally guaranteed on a joint and several basis by each of the
entities listed on <u>Schedule 1.1B to the DIP Credit Facility</u>.  Except as otherwise expressly agreed
to by each DIP Lender, the obligations of the Debtors shall further be unconditionally guaranteed
on a joint and several basis by each and every subsequently acquired or organized direct or
indirect domestic subsidiary of any Debtor (other than GMCL and direct and indirect
subsidiaries of GMCL), each of which shall be made a guarantor under the DIP Credit Facility
immediately upon its acquisition and/or organization as provided in the DIP Credit Facility.

8.      The Existing UST Secured Parties are hereby granted, pursuant to
sections 361, 362, 363, 364 and 507 of the Bankruptcy Code, the Adequate Protection Claim and
the Adequate Protection Liens with the priorities set forth in paragraph (vii) hereof, in each case
to the extent of any diminution in the value of the relevant Existing UST Secured Party's
interests in the Debtors' interests in the Property (including Cash Collateral) occurring on or after
the Petition Date.

9.      The Debtors are hereby authorized to use the Cash Collateral in
accordance with the Initial Budget, until the DIP Lenders have exercised remedies as a result of
an Event of Default under, and as defined in, the DIP Credit Facility.

10.     The DIP Liens, the Super-priority Claim, the Adequate Protection Liens
and the Adequate Protection Claim shall continue in any superseding case or cases for any or all
of the Debtors under any chapter of the Bankruptcy Code, and such liens, security interests and
claims shall maintain their priorities as provided in this Final Order.  If an order dismissing any
of these cases, pursuant to section 1112 of the Bankruptcy Code or otherwise, is at any time

entered, such order shall provide that (A) the DIP Liens, the Super-priority Claim, the Adequate

Protection Liens and the Adequate Protection Claim shall continue in full force and effect, shall

remain binding on all parties in interest in these cases, and shall maintain their priorities as

provided in this Final Order, until all obligations of the Debtors under the DIP Credit Facility

(with respect to the DIP Liens and the Super-priority Claim) and the Existing UST Loan

Agreements (with respect to the Adequate Protection Liens and the Adequate Protection Claim)

have been paid and satisfied in full.  Notwithstanding the dismissal of any or all of these cases,

this Court shall retain jurisdiction with respect to enforcing the DIP Liens and the Super-priority

Claim and the DIP Lenders' rights with respect thereto, and the Adequate Protection Liens and

the Adequate Protection Claim and the Existing UST Secured Parties' rights with respect thereto.

11.    Except as provided in this Final Order or in the DIP Credit Facility, the

DIP Liens, the Super-priority Claim, the Adequate Protection Liens and the Adequate Protection

Claim, and all rights and remedies of the DIP Lenders, shall not be modified, impaired or

discharged by the entry of an order or orders confirming a plan or plans of reorganization in any

or all of these cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, each Debtor

waives any discharge as to any remaining obligations under the DIP Credit Facility and this Final

Order including, without limitation, the Additional Notes.

12.    This Final Order shall be sufficient and conclusive evidence of the

validity, perfection and priority of the DIP Liens and the Adequate Protection Liens, without the

necessity of filing or recording any financing statement or other instrument or document, or the

taking of any other act that otherwise may be required under state or federal law, rule, or

regulation of any jurisdiction to validate or perfect the DIP Liens or the Adequate Protection

Liens or to entitle the DIP Lenders and the Existing UST Secured Parties to the priorities set

forth herein.  The DIP Liens and the Super-priority Claim granted to the DIP Lenders pursuant to

this Final Order and the DIP Credit Facility with respect to the property of the Debtors' estates

were perfected by operation of law upon entry of the Interim Order by the Court.  The Debtors

may execute, and the DIP Lenders or the Existing UST Secured Parties, as applicable, are hereby

authorized to file or record financing statements or other instruments to evidence the DIP Liens

and the Adequate Protection Liens, and the Debtors are hereby authorized and directed, promptly

upon demand by any DIP Lender or Existing UST Secured Party, to execute, file and record any

such statements or instruments as the DIP Lenders or such Existing UST Secured Party may

request; provided, however, that no such execution, filing, or recordation shall be necessary or

required in order to create or perfect the DIP Liens or any Adequate Protection Lien, and further,

if the DIP Lenders or any Existing UST Secured Party, each in its sole discretion, shall choose to

file such financing statements, mortgages, notices of lien or similar instruments or otherwise

confirm perfection of such liens, all such documents shall be deemed to have been filed or

recorded as of the Petition Date.  A certified copy of this Final Order may, in the discretion of

the DIP Lenders or any Existing UST Secured Party, as applicable, be filed with or recorded in

any filing or recording office in addition to or in lieu of such financing statements, notices of lien

or similar instruments, and all filing offices are hereby authorized to accept a certified copy of

this Final Order for filing and recording, and to deem this Final Order to be in proper form for

filing and recording.

        13.    Each and every federal, state, and local governmental agency, department

or office is hereby authorized and directed to accept this Final Order and any and all documents

and instruments necessary or appropriate to consummate the transactions contemplated by this

Final Order or the DIP Credit Facility.

14.    The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (A) the Debtors to grant the DIP Liens, the Super-priority Claim, the guaranties and other security provided for in the DIP Credit Facility, and to perform such acts as the DIP Lenders may request to assure the perfection and priority of the DIP Liens, (B) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claim, and to perform such acts as any Existing UST Secured Party may request to assure the perfection and priority of the Adequate Protection Liens, (C) the implementation of the terms of this Final Order and the DIP Credit Facility, (D) the repayment of the Prepetition Senior Facilities as detailed in paragraph 19 hereof, and (E) immediately upon the occurrence of an Event of Default under the DIP Credit Facility or the maturity of the credit extensions provided thereunder, the exercise by the DIP Lenders of all rights and remedies under such agreement or applicable law without further application to or order of this Court; provided, however, that prior to exercising any setoff of amounts held in any accounts maintained by any Debtor or enforcing any liens or other remedies with respect to the Property, the DIP Lenders shall provide to the Debtors (with copies to the Committee, any other statutory committee and the United States Trustee) five business days' prior written notice; provided further, however, that upon receipt of any such notice, the Debtors may only make disbursements in the ordinary course of business and with respect to the Carve-Out, but may not make any other disbursements.  Upon the occurrence and during the continuance of an Event of Default under the DIP Credit Facility, the DIP Lenders and their respective representatives shall be granted access to all locations in support of the enforcement and exercise of their remedies.

15.    Upon the occurrence and during the continuance of any Event of Default under the DIP Credit Facility, and subject to the five business day notice provision set forth in

paragraph 14 above, the DIP Lenders may compel any Debtor to exercise such Debtor's rights (if any) to sell any or all of the Property in its possession pursuant to section 363(b) of the Bankruptcy Code or any other applicable law, the DIP Lenders shall be entitled to exercise their right (if any) to credit bid the DIP Liens in any such sale pursuant to section 363(k) or other applicable provision of the Bankruptcy Code, or other applicable law, and the Debtors shall use best efforts (subject to applicable law) to exercise their rights (if any) to sell such Property if requested by the DIP Lenders (pursuant to section 363 of the Bankruptcy Code or otherwise).

16.    As used in this Final Order, "**Carve-Out**" means, following the occurrence and during the continuance of an Event of Default under the DIP Credit Facility, an amount sufficient for payment of (A) allowed professional fees and disbursements incurred by professionals retained by the Debtors, the Committee and any other statutory committee (after application of all outstanding retainers held by those professionals) and allowed expenses of members of the Committee and any other statutory committee in an aggregate amount not to exceed $20,000,000 (plus all such professional fees and disbursements, and expenses of members of the Committee and any other statutory committee that are unpaid after application of all outstanding retainers, and that were accrued or incurred prior to the occurrence of the Event of Default, to the extent allowed by this Court at any time), (B) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of this Court, (C) fees and disbursements incurred by a chapter 7 trustee (if any) not to exceed $2,000,000, and (D) fees and expenses incurred by a privacy ombudsman retained by Appointment of Ombudsman dated June 10, 2009 [Docket No. 565]; provided, however, that, so long as an Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable under 11 U.S.C. §§ 330 and 331, as the same may become due and payable, and the same shall not reduce the Carve-Out;

provided further, however, that the Carve-Out shall not include any fees or disbursements related

to the investigation of, preparation for, or commencement or prosecution of, any claims or

proceedings against the DIP Lenders, the Existing UST Secured Parties or EDC, in its capacity

as lender under the Canadian Facility (as defined in the DIP Credit Facility) and on behalf of the

Governments of Ontario and Canada, or other Canadian Lender Consortium Member (as defined

in the DIP Credit Facility), or the claims or security interests in or liens on the property granted

under the Canadian Facility, or their claims or security interests in or liens on the Property

granted under the DIP Credit Facility or this Final Order.

17.    The DIP Lenders have acted in good faith in connection with the DIP

Credit Facility, the Interim Order and this Final Order and their reliance on the provisions of this

Final Order when extending credit under the DIP Credit Facility will be in good faith.

Accordingly, if any provision of this Final Order is hereafter modified, vacated, or stayed by

subsequent order of this Court or any other court for any reason, the DIP Lenders are entitled to

the protections provided in section 364(e) of the Bankruptcy Code.  The DIP Credit Facility may

not be recharacterized as an equity investment or otherwise.

18.    The DIP Lenders may exercise their right (if any) to credit bid the loans

and the Additional Notes under the DIP Credit Facility (pursuant to section 363(k) or other

applicable provision of the Bankruptcy Code, or other applicable law), in whole or in part, in

connection with any sale or other disposition of some or all of the Property in these cases.

19.    (a) Upon entry of this Final Order, the Debtors shall be authorized to apply

and shall apply the proceeds of the DIP Credit Facility to repay amounts outstanding under the

Prepetition Senior Facilities and all second lien Hedging Obligations (as defined in the

Prepetition Revolving Credit Agreement), including principal, accrued and unpaid interest, fees,

letter of credit reimbursement obligations (including obligations to cash collateralize undrawn letters of credit) and any other amounts due or owed by the Debtors thereunder within three business days of entry of this Final Order.

(b)     Upon payment ("**Payment**") of all obligations under the Prepetition Senior Facilities, all commitments under each of the Prepetition Senior Facilities shall be deemed irrevocably terminated.  Further, upon Payment, except as set forth in subsection (c) below, the holders of such obligations (the "**Prepetition Senior Facilities Secured Parties**") shall have no further rights with respect to the Debtors, the DIP Lenders, the Property or any claims or liens relating thereto (all of which liens and claims shall be deemed automatically satisfied and released without further action), whether such claims or liens arise under the Prepetition Term Loan Agreement, Prepetition Revolving Credit Agreement, the Prepetition Gelco Loan Agreement or related documentation, and the Debtors and their estates shall have no further obligations to the Prepetition Senior Facilities Secured Parties in connection with the Prepetition Senior Facilities.  Nothing in this Order shall be deemed to alter, amend, release or waive any liens against, or obligations of, any non-Debtor affiliate under the Prepetition Revolving Credit Agreement and documents related thereto.

(c)     The Prepetition Senior Facilities Secured Parties' liens, claims and interests in the Property and any adequate protection claims or adequate protection liens, shall expire upon the Payment.  In the event that the Committee investigates any liens of any of the Prepetition Senior Facilities Secured Parties or any third party brings an action against a Prepetition Senior Facilities Secured Party that is entitled to indemnification by the Debtors under the applicable Prepetition Senior Facility, then, notwithstanding any other provision of this Final Order, (i) the Debtors shall pay (in accordance with Paragraph 6(d) of the Prepetition

Revolving Credit Agreement Order and Paragraph 5(d) of the Prepetition Term Loan Facility Order), the reasonable fees, costs and charges incurred by the agents for the Prepetition Senior Facilities (and, in the case of Gelco, reasonable fees, costs and charges incurred by Gelco, so long as Gelco complies with the expense reimbursement procedures applicable to the agents under the other Prepetition Senior Facilities) in responding to such investigation or in defending any challenge to such liens or to their ability to retain any Payment, and (ii) the super-priority adequate protection claims granted pursuant to the Prepetition Revolving and Term Adequate Protection Orders shall remain in effect with respect to such expense reimbursement obligations, provided that such claims shall not have recourse to the New GM Equity Interests and Gelco is hereby granted superpriority adequate protection claims equivalent to those provided to the agents under the other Prepetition Senior Facilities.  Nothing in this order shall affect the rights and remedies, if any, of the Prepetition Senior Facility Secured Lenders (other than Gelco and the agents under the other Prepetition Senior Facilities, whose rights and remedies shall be as described herein) to seek reimbursement of their reasonable fees, costs, and charges incurred in responding to any such investigation or in defending any challenge to such liens or Payment. Without limiting the generality of the foregoing, upon Payment, the Prepetition Senior Facilities Secured Parties (i) authorize the Debtors to file Uniform Commercial Code termination statements, mortgage releases and all other documents necessary to evidence the release of the liens against the Debtors securing the obligations under the Prepetition Senior Facilities and (ii) will take all such action and deliver all such other instruments and documents as may be reasonably requested by the Debtors or the agents under the Prepetition Senior Facilities to effectuate or evidence the termination of all such claims of the Prepetition Senior Facilities Secured Parties, in each case, at the sole cost and expense of the Debtors.

(d)      Effective upon entry of this Final Order, the Debtors (on behalf of their estates) and any successor thereto release the Prepetition Senior Facilities Secured Parties and each of their directors, officers, appointees, counsel, advisors and employees serving in any capacity or function, including as a fiduciary, agents, advisors, shareholders, subsidiaries, affiliates, heirs, executors, administrators, attorneys, advisors, successors and assigns from, against and with respect to any and all actual or potential demands, claims, actions, causes of action (including derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity, whether asserted or unasserted, known or unknown, foreseen or unforeseen, arising under the Bankruptcy Code, state law or otherwise now existing or hereafter arising, directly or indirectly related to the Prepetition Senior Facilities and any and all dealings between the Prepetition Senior Facilities Secured Parties in connection with the Prepetition Senior Facilities, provided**,** however, that such release shall not apply to the Committee with respect only to the perfection of first priority liens of the Prepetition Senior Facilities Secured Parties (it being agreed that if the Prepetition Senior Facilities Secured Parties, after Payment, assert or seek to enforce any right or interest in respect of any junior liens, the Committee shall have the right to contest such right or interest in such junior lien on any grounds, including (without limitation) validity, enforceability, priority, perfection or value) (the "**Reserved Claims**").  The Committee shall have automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Prepetition Senior Facilities Secured Parties not later than July 31, 2009 (the "**Challenge Period**"), provided, that upon the filing of any adversary proceeding prosecuting any Reserved Claim, the Challenge Period shall be extended with respect to such adversary proceeding through and until a court of competent jurisdiction

dismisses such adversary proceeding. The grant of automatic standing shall be without any further order of this Court or any requirement that the Committee file a motion seeking standing or authority to file a motion seeking standing or authority before prosecuting any such challenge. Any Prepetition Senior Facilities Secured Party accepting Payment shall submit to the jurisdiction of the Bankruptcy Court, it being understood that the respective administrative and collateral agents for the Prepetition Senior Facilities shall have no responsibility or liability for amounts paid to any Prepetition Senior Facilities Secured Parties and such agents shall be exculpated for any and all such liabilities, excluding only such funds as are retained by each such agent solely in its respective role as a lender.

(e)    Immediately upon Payment, the DIP Lenders shall be deemed to have obtained a secured, non-avoidable, perfected security interest in and lien on the Prepetition Senior Facilities Collateral.

20.    Notwithstanding anything herein to the contrary, none of the proceeds of any extension of credit under the DIP Credit Facility shall be used in connection with (a) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders or the Existing UST Secured Parties or EDC, in its capacity as lender under the Canadian Facility and on behalf of the Governments of Ontario and Canada, (b) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders or the Existing UST Secured Parties or EDC, in its capacity as lender under the Canadian Facility and on behalf of the Governments of Ontario and Canada, or any of their respective affiliates with respect to any loans, extensions of credit or other financial accommodations made to any Debtor prior to, on or after the Petition Date, or (c) any loans, advances, extensions of credit, dividends or other

investments to any person not a Borrower or Guarantor other than for certain permitted exceptions set forth in the DIP Credit Facility.

21.    On or substantially contemporaneous with the closing of the Related Section 363 Transactions, the Tranche C Term Loan (as such term is defined in the DIP Credit Facility) in an amount not less than $950,000,000 shall be provided to the Borrower in accordance with section 2.14 of the DIP Credit Facility to fund the wind-down of the Debtors (the "**Wind-Down Facility**").  The funding of the Wind-Down Facility shall be subject to an appropriate amendment to the DIP Credit Facility, acceptable to the Debtors and the DIP Lenders, which amendment shall be subject to approval by this Court on three days notice after the filing of a motion seeking approval of the Wind-Down Facility.  The Committee shall be copied on all drafts of the credit agreement related to the Wind-Down Facility and the Wind-Down Budget (as defined in the DIP Credit Facility) that are circulated between the Debtors and the DIP Lenders and shall be included in all substantive negotiations of the Wind-Down Facility and the Wind-Down Budget between the Debtors and the DIP Lenders.

22.    In the event of any inconsistency between the terms and conditions of the DIP Credit Facility or the Interim Order and this Final Order, the terms and conditions of this Final Order shall control.

23.    The parties to the DIP Credit Facility may, from time to time, enter into waivers or consents with respect thereto without further order of this Court.  In addition, the parties to the DIP Credit Facility may, from time to time, enter into amendments with respect thereto without further order of this Court; provided, that, (A) the DIP Credit Facility, as amended, is not materially different from the form approved by this Final Order, (B) notice of all amendments is filed with this Court, and (C) notice of all amendments (other than those that are

ministerial or technical and do not adversely affect the Debtors) are provided in advance to counsel for the Committee and any other statutory committee, all parties requesting notice in these cases and the United States Trustee.  For purposes hereof, a "material" difference from the form approved by this Final Order shall mean any difference resulting from a modification that operates to (1) shorten the maturity of the extensions of credit under the DIP Credit Facility or otherwise require more rapid principal amortization than is currently required under the DIP Credit Facility, (2) increase the aggregate amount of any of the commitments thereunder, (3) increase the rate of interest or any other fees or charges payable thereunder (other than to the extent contemplated in the DIP Credit Facility as in effect on the date of this Final Order), (4) add specific new Events of Default (as defined in the DIP Credit Facility) or shorten the notice or grace period in respect to any Default (as defined in the DIP Credit Facility) or Event of Default currently in the DIP Credit Facility, (5) enlarge the nature and extent of default remedies available to the DIP Lenders or agents under the DIP Credit Facility following the occurrence and during the continuance of an Event of Default, (6) add additional financial covenants or make any financial covenant or other negative or affirmative covenant or representation and warranty more restrictive on the Debtors, or (7) otherwise modify the DIP Credit Facility in a manner materially less favorable to the Debtors and their estates.

24.    This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014, and shall be deemed effective and enforceable immediately upon its entry and nunc pro tunc to the Petition Date.

25.    The rights, benefits, and privileges granted pursuant to this Final Order (including, without limitation, the DIP Liens, the Super-priority Claim, the Adequate Protection

Liens and the Adequate Protection Claim granted herein) shall attach and be enforceable against

the bankruptcy estate of any direct or indirect subsidiary of the Debtors that is a party to the DIP

Credit Facility and which hereafter becomes a debtor in these procedurally consolidated cases

automatically and without further court order on a final basis. Except as may be provided in this

Final Order, such subsidiary shall be deemed a "Debtor" hereunder effective as of the date such

subsidiary files a petition and becomes a debtor in these cases.

26.    Except as otherwise provided in this Final Order, the provisions of the DIP

Credit Facility and the provisions of this Final Order, including all findings of fact and

conclusions of law set forth herein, shall, immediately upon entry of this Final Order in these

cases, become valid and binding upon the Debtors, the DIP Lenders, the Existing UST Secured

Parties, all other creditors of the Debtors, the Committee, any other statutory committee and all

other parties in interest in these cases and their respective successors and assigns, including any

trustee or other fiduciary hereafter appointed as a legal representative of any Debtor's estate in

these cases or in any subsequent chapter 7 case. In no event shall the DIP Lenders, whether in

connection with the exercise of any rights or remedies under the DIP Credit Facility, hereunder

or otherwise, be deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the

Debtors, so long as the actions of the DIP Lenders do not constitute, within the meaning of 42

U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or

facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state

government or the status of responsible person or managing agent to exist under applicable law

(as such terms, or any similar terms, are used in the Comprehensive Environmental Response,

Compensation and Liability Act, sections 9601 et seq. of title 42, United States Code, as amended, or any similar federal or state statute).

27.    The Committee shall receive the same reports provided by the Debtors to the DIP Lenders under section 5.2 of the DIP Credit Facility.

28.    The Debtors have provided adequate and sufficient notice of the Final Hearing and this Final Order as required under section 364 of the Bankruptcy Code, Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Bankruptcy Rules.

29.    The Final Hearing was held pursuant to Rule 4001 of the Bankruptcy Rules.

30.    This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the DIP Credit Facility, the Interim Order and this Final Order in all respects; provided, however, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

Dated: **_June 25, 2009_**
New York, New York

**_/s/ Robert E. Gerber_**
HON. ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

# **<u>Exhibit 5</u>**

09-50026-mg    Doc 7226-3    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 1-5 to Mayer Declaration    Pg 307 of 317

Hearing Date and Time: July 2, 2009 at 2:00 p.m. (Eastern Time)
Objection Date and Time: July 2, 2009 at 9:00 a.m.. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                          :

**In re**                      :        **Chapter 11 Case No.**
                          :

**GENERAL MOTORS CORP.,** *et al.*,     :        **09-50026 (REG)**
                          :

            **Debtors.**        :        **(Jointly Administered)**
                          :
-------------------------------------------------------------x

**NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105(a), 361, 362, 363, 364 AND 507 AND BANKRUPTCY**
**RULES 2002, 4001 AND 6004 TO AMEND DIP CREDIT FACILITY**

        PLEASE TAKE NOTICE that upon the annexed Motion, dated June 29, 2009

(the "**Motion**"), of General Motors Corporation and its affiliated debtors, as debtors and debtors

in possession (the "**Debtors**"), pursuant to sections 105(a), 361, 362, 363, 364 and 507, of title

11, United States Code to amend their existing DIP Facility (as defined in the Motion), as more

fully set forth in the Motion, a hearing will be held before the Honorable Robert E. Gerber,

United States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, New York, New York 10004, on **July 2,**

**2009 at 2:00 p.m. (Eastern Time),** or as soon thereafter as counsel may be heard.

        PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan

48265 (Attn: Lawrence S. Buonomo, Esq.); (iii) Cadwalader, Wickersham & Taft LLP, attorneys

for the United States Department of the Treasury, One World Financial Center, New York, New

York 10281 (Attn: John J. Rapisardi, Esq.); (iv) the United States Department of the Treasury,

1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman,

Esq.); (v) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th

Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein,

Esq.); (vi) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of

unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Kenneth

H. Eckstein, Esq., Thomas Moers Mayer, Esq., Adam C. Rogoff, Esq., and Gordon Z. Novod,

Esq.); (vii) the International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America ("**UAW**"), 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:

Daniel W. Sherrick, Esq.); (viii) Cleary Gottlieb Steen & Hamilton LLP, attorneys for the UAW,

One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (xi) Cohen,

Weiss and Simon LLP, attorneys for the UAW, 330 W. 42nd Street, New York, New York

10036 (Attn: Babette Ceccotti, Esq.); (xii) the Office of the United States Trustee for the

Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor,

New York, New York 10004; (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street,

Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz,

Esq.); and (xiv) the affected Ordinary Course Professional(s) (as defined in the Motion) listed in

Exhibit C annexed to the Motion, so as to be received no later than **July 2, 2009, at 9:00 a.m.**

**(Eastern Time)** (the "**Objection Deadline**").

        If no objections are timely filed and served with respect to the Motion, the

Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order, which

order may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
      June 29, 2009

                    /s/ Stephen Karotkin
                    Harvey R. Miller
                    Stephen Karotkin
                    Joseph H. Smolinsky

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
In re                                     :          **Chapter 11 Case No.**
                                          :
**GENERAL MOTORS CORP.,** *et al.*,       :          **09-50026 (REG)**
                                          :
                      **Debtors.**        :          **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 361, 362, 363, 364 AND 507 AND BANKRUPTCY <u>RULES 2002, 4001 AND 6004 TO AMEND DIP CREDIT FACILITY</u>

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

       1.     This Motion seeks approval of an amendment to the Debtors' DIP Credit Facility (as defined below) to finalize the terms of the financing for the wind-down of the Debtors' estates following the closing under the 363 Transaction (as defined below).

<u>**Background**</u>

       2.     On June 1, 2009, General Motors Corporation ("**GM**") and certain of its subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**"), filed a motion for authority to obtain debtor in possession financing (the "**DIP Facility**") from the United States

Department of Treasury and Export Development of Canada, and for related relief [Docket No. 81] (the "**DIP Motion**").[1]

        3.      On June 2, 2009, the Court entered an interim order [Docket No. 292] granting the relief set forth in the DIP Motion on an interim basis.

        4.      On June 25, 2009, the Court entered a final order [Docket No. 2529] granting the relief set forth in the DIP Motion on a final basis (the "**Final DIP Order**").  The Final Order approved a $33.3 billion credit facility to fund the Debtors' operations and the administration of the chapter 11 cases through the consummation of the 363 Transaction.

<u>**The 363 Transaction and the Wind-Down Facility**</u>

        5.      On June 1, 2009, the Debtors filed a motion to approve the sale of substantially all of the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement, among the Debtors and Vehicle Acquisition Holdings LLC, a purchaser (the "**Purchaser**") sponsored by the United States Department of the Treasury (the "**363 Transaction**").  Subsequent to closing under the 363 Transaction, the Debtors intend to liquidate their remaining assets, resolve claims, and seek to confirm a chapter 11 plan of liquidation.  The DIP Lenders have agreed to provide a facility up to $950 million in the form of an Amended and Restated DIP Credit Facility (the "**Amended DIP Facility**") to fund the wind-down of the Debtors and these chapter 11 cases (the "**Wind-Down**").

        6.      The DIP Motion and DIP Facility contemplate the Amended DIP Facility. The DIP Motion provides at page 4:

> <u>Wind-Down Loan</u>. The Lenders agree to provide a wind-down loan upon agreement of the wind down budget (expected to be

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion.

approximately $950 million), in an amount satisfactory to a
majority, by aggregate exposure, of the lenders.

7.     Section 2.14 of the DIP Facility similarly provides that the Tranche C

Term Loan would be converted into a Wind-Down Facility.

8.     In addition, the Final DIP Order provides at ¶ 21:

On or substantially contemporaneous with the closing of the
Related Section 363 Transactions, the Tranche C Term Loan (as
such term is defined in the DIP Credit Facility) in an amount not
less than $950,000,000 shall be provided to the Borrower in
accordance with section 2.14 of the DIP Credit Facility to fund the
wind-down of the Debtors (the "**Wind-Down Facility**"). The
funding of the Wind-Down Facility shall be subject to an
appropriate amendment to the DIP Credit Facility, acceptable to
the Debtors and the DIP Lenders, which amendment shall be
subject to approval by this Court on three days notice after the
filing of a motion seeking approval of the Wind-Down Facility.

9.     The hearing on the 363 Transaction is scheduled for June 30, 2009. The

Debtors and the Purchaser desire to close the 363 Transaction as promptly as possible following

the entry of an order approving the 363 Transaction, assuming that the Court decides to enter

such an order. As such, the Debtors are currently finalizing the terms of the Amended DIP

Facility with the DIP Lenders.

10.     The Debtors are thus seeking approval of the Amended DIP Facility which

reflects the Wind-Down Facility. The Debtors will file a draft of the Amended DIP Facility prior

to the hearing on this Motion. The primary terms of the Amended DIP Facility as contemplated

as of the date of this Motion are set forth below:

(a)     Borrower. General Motors Corporation, the Debtor.[2]  Wind Down Facility
preamble.

(b)     Lenders. The U.S. Treasury and EDC. Wind Down Facility preamble.

---

[2] General Motors Corporation will be changing its name at the time of the closing of the 363
Transaction.

(c)     <u>Guarantors</u>.  Certain domestic subsidiaries listed on Schedule 1.1B of the Wind Down Facility.  Wind Down Facility Schedule 1.1B.

(d)     <u>Collateral</u>.  The obligations under the Wind-Down Facility are to be secured by substantially all property and assets of the Borrower and the Guarantors other than (i) any stocks, warrants, options or other equity interests issued to or held by any Debtor pursuant to the Related Section 363 Transactions (as defined in the Wind-Down Facility) and (ii) avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law against the Prepetition Senior Facilities Secured Parties (as defined in the DIP Facility).  For the avoidance of doubt, the proceeds of the Wind-Down constitute Collateral .  Wind-Down Facility, § 1.1.

(e)     <u>Joint Liability</u>.  Subject to the limitation on recourse in paragraph (f), the Guarantors will guarantee the obligations under the Wind Down Facility on a joint and several basis pursuant to an Amended and Restated Guaranty and Security Agreement.  Wind Down Facility Exhibit A.

(f)     <u>Limitation on Recourse</u>.  The obligations under the Wind-Down Facility will be non-recourse to the Borrower or the Guarantors, and recourse would be only to the Collateral. Wind-Down Facility, §2.1.

(g)     <u>Borrowing Limits</u>. Outstanding amounts of Tranche C Term Loans, in an amount not less than $950 million.  Wind Down Facility preamble, Schedule 1.1A.

(h)     <u>Interest Rate</u>.  The <u>non-default rate</u> for Eurodollar loans is the sum of (a) the greater of (i) the LIBOR rate for the period of the applicable loan, adjusted for certain reserve requirements and (ii) 2.00%, <u>plus</u> (b) 3.00% and for ABR loans is the sum of (a) the greater of (i) the prime rate, (ii) the fed funds rate <u>plus</u> 0.5%, and (iii) the three month Eurodollar rate <u>plus</u> 1%, <u>plus</u> (b) 2.00%.  Wind Down Facility § 2.6(a)-(b).  The <u>default interest rate</u> for outstanding loans is the otherwise applicable non-default rate (which, at the sole discretion of the U.S. Treasury may be the rate applicable to ABR loans) <u>plus</u> 5.00%.  The <u>default interest rate</u> for all other outstanding obligations is the applicable non-default rate for ABR loans <u>plus</u> 5.00%.  Wind Down Facility § 2.6(d). Interest accruing under the Wind-Down facility will be paid by adding such interest to the principal amount outstanding thereunder. Wind-Down Facility § 2.6(f).

(i)     <u>Purpose</u>.  The Wind Down Facility proceeds will be used to finance working capital needs and other general corporate purposes incurred in connection with the Wind-Down, including the payment of expenses associated with the administration of the Debtors' cases. Wind Down Facility § 3.20.

(j)     <u>Wind-Down Budget</u>.  The Borrower and the Lenders are discussing an agreed upon wind-down budget (the "**Wind-Down Budget**").  On a quarterly basis, the Borrower will amend the Wind-Down Budget by providing the Lenders reports of projected receipts and disbursements on a rolling 12-month basis that are certified by an officer of the Borrower.  Wind Down Facility § 1.1 and Annex I.

(k)     <u>Maturity</u>.  Maturity Date will be the date on which all claims against the Debtors have been resolved such that there are no remaining disputed claims, all assets of the Debtors (other than remaining cash) have been liquidated, all distributions on account of allowed claims

have been made, and all other actions that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been completed. On the Maturity Date, the plan administrator or other individual or entity charged with administering the liquidation plan shall be entitled to retain a de minimis amount of funds to complete the dissolution of the last remaining Debtor. Wind Down Facility § 1.1.

(l)    <u>Voluntary Prepayments</u>. The Wind Down Facility may be prepaid, in whole or in part, without premium or penalty, subject to minimum prepayment amounts in the case of partial prepayments. Wind Down Facility § 2.4.

(m)    <u>Mandatory Prepayment</u>. The Borrower is required to prepay the loans in an amount equal to the net cash proceeds of certain asset sales, extraordinary receipts, casualty and condemnation events and from the incurrence of indebtedness not permitted to be incurred under the Wind Down Facility, in each case subject to certain exceptions. Wind Down Facility § 2.5.

(n)    <u>Events of Default</u>. The Events of Default include the following (among others): (i) any failure to pay the obligations under the Wind-Down Facility on the Maturity Date; (ii) breach of non-payment obligations or covenants not covered by another Event of Default clause, and such default has not been remedied within the applicable grace period provided therein, or if no grace period, within ten (10) business days; (iii) the appointment of a trustee, dismissal of the cases, and similar bankruptcy-related provisions; (iv) an order granting relief from the automatic stay to certain secured parties; (v) a judgment for the payment of money in excess of $25 million shall be entered and not stayed for ten calendar days; (v) entry of any order modifying in any material respect the DIP Orders, or the failure of the Debtors or certain non-debtor affiliates to comply with the DIP Orders; (vi) certain ERISA-related events; and (vii) any change of control; (viii) certain insolvency triggers in respect of certain of the Debtors' affiliates. Wind Down Facility § 7.1.

(o)    <u>Remedies</u>. The DIP Lenders are required to provide five (5) business days' written notice prior to exercising any setoff rights or enforcing any liens or certain other remedies. Lenders' recourse is solely to the Collateral and there shall be no other recourse to the Borrower or the Guarantors.[3] Wind Down Facility § 7.2.

(p)    <u>Initial Conditions</u>. Funding of the DIP Facility is contingent upon a number of conditions precedent, including, among others, (i) Lender satisfaction with the terms of the 363 sale transaction; (ii) the Final Order not having been reversed, modified, amended, stayed or vacated without Lender consent; and (iii) delivery of the Wind-Down Budget. Wind Down Facility § 4.1.

(q)    <u>Indemnification</u>. The Borrower indemnifies the Lenders for any loss resulting from early termination of LIBOR contracts due to payment of the applicable loan on a date other than the last day of the applicable interest period and other circumstances. Wind Down Facility § 2.10. The Borrower also provides certain tax indemnities to the Lenders. Wind Down Facility

---

[3] See ¶ 10(f).

§ 2.12.  The Borrower also provides an indemnity in respect of certain expenses, liabilities and legal fees and breaches of environmental law.  Wind Down Facility § 8.5.

## The Amended DIP Facility Should be Approved

11.    The relief requested herein was contemplated by the DIP Motion and the Final DIP Order.  The terms of the Amended DIP Facility are fair and reasonable and provide financing with the flexibility necessary to fund the liquidation of the Debtors' estates in an orderly fashion to maximize value.  Absent approval of the Amended DIP Facility, the Debtors would not have sufficient liquidity to continue to administer their cases in chapter 11 and seek to pursue a plan.  Under such circumstances, the Debtors would likely have no choice but to convert the cases to cases under chapter 7 of the Bankruptcy Code.

12.    Significantly, the DIP Lenders have agreed (i) not to take a security interest in the stock of the Purchaser that the Debtors are receiving as consideration for the 363 Transaction and (ii) not to seek recourse against the Debtors for any unpaid portion of the DIP Facility if the proceeds of the collateral security therefor are insufficient.  The Debtors believe there are no other lenders willing to provide funding on these or better terms.

13.    Simply stated, the Amended DIP Facility is the only source of immediate liquidity for the wind-down of these estates.  The terms and provisions of the Amended DIP Facility are fair and reasonable, both economically and from the perspective of how the funds may be used.  Under these circumstances, the Debtors believe that the Amended DIP Facility is in the best interests of the Debtors and their estates and should be approved.

## Jurisdiction

14.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Notice**

15.     The Final DIP Order authorized that a hearing on this Motion could be held on 3 days' notice.  Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, (xi) the attorneys for the ad hoc bondholders committee, (xii) the U.S. Attorney's Office, S.D.N.Y., and (xiii) all entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

16.     Other than the DIP Motion, no previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
June 29, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession