# <u>Exhibit 6</u>

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 09-50026
- - - - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

GENERAL MOTORS CORPORATION, et al.,

        Debtors.

- - - - - - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court
                One Bowling Green
                New York, New York

                July 2, 2009
                9:02 AM


B E F O R E:
HON. ROBERT E. GERBER
U.S. BANKRUPTCY JUDGE

**Page 2**

```
 1
 2    HEARING re Motion of the Debtors for Entry of Order Pursuant to
 3    11 U.S.C. § 363(b) Authorizing and Approving Settlement
 4    Agreements with Certain Unions
 5
 6    HEARING re Debtors' Motion Pursuant to Bankruptcy Code §§
 7    105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002,
 8    4001 and 6004 to Amend DIP Credit Facility
 9
10    HEARING re Continuation of GM 363 Sale Hearing
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Transcribed by:  Lisa Bar-Leib
```

**Page 3**

```
 1
 2    A P P E A R A N C E S :
 3    WEIL, GOTSHAL & MANGES LLP
 4        Attorneys for Debtor General Motors Corporation
 5        767 Fifth Avenue
 6        New York, NY 10153
 7
 8    BY:  HARVEY R. MILLER, ESQ.
 9        STEPHEN KAROTKIN, ESQ.
10        JOSEPH H. SMOLINSKY, ESQ.
11        JOHN A. NEUWIRTH, ESQ.
12        IRWIN WARREN, ESQ.
13
14    HONIGMAN MILLER SCHWARTZ & COHN
15        Special Counsel for General Motors Corporation
16        2290 First National Building
17        660 Woodward Avenue
18        Detroit, MI 48226
19
20    BY:  ROBERT B. WEISS, ESQ.
21        SETH A. DRUCKER, ESQ. (TELEPHONICALLY)
22
23
24
25
```

**Page 4**

```
 1
 2    JENNER & BLOCK LLP
 3        Special Counsel for Debtors and Debtors-in-Possession
 4        919 Third Avenue
 5        37th Floor
 6        New York, NY 10022
 7
 8    BY:  PATRICK J. TROSTLE, ESQ.
 9
10    JENNER & BLOCK LLP
11        Special Counsel for Debtors and Debtors-in-Possession
12        330 North Wabash Avenue
13        Chicago, IL 60611
14
15    BY:  DANIEL R. MURRAY, ESQ.
16
17    KRAMER LEVIN NAFTALIS & FRANKEL LLP
18        Attorneys for Official Committee of Unsecured Creditors
19        1177 Avenue of the Americas
20        New York, NY 10036
21
22    BY:  KENNETH ECKSTEIN, ESQ.
23        ADAM ROSOFF, ESQ.
24        THOMAS MOERS MAYER, ESQ.
25        ROBERT T. SCHMIDT, ESQ.
```

**Page 5**

```
 1
 2    UNITED STATES DEPARTMENT OF JUSTICE
 3        Office of the United States Trustee
 4        33 Whitehall Street
 5        21st Floor
 6        New York, NY 10004
 7
 8    BY:  TRACY HOPE DAVIS, ESQ.
 9        BRIAN MASUMOTO, ESQ.
10
11    U.S. DEPARTMENT OF JUSTICE
12        United States Attorney's Office
13        Southern District of New York
14        86 Chambers Street
15        New York, NY 10007
16
17    BY:  MATTHEW L. SCHWARTZ, AUSA
18        DAVID S. JONES, AUSA
19
20
21
22
23
24
25
```

ARENT FOX LLP
   Attorneys for The Timken Company, Superior Industries
   International, Inc., Discovery Communications, LLC,
   Harman Becker Automotive Systems and its affiliated
   companies, Toyota Boshoku America, Inc., and JJF
   Management Services, Inc.
   1675 Broadway
   New York, NY 10019

BY:  JAMES M. SULLIVAN, ESQ.

ATTORNEY GENERAL OF TEXAS
   Counsel to State of Texas On Behalf of Texas Department of
   Transportation
   P.O. Box 12548
   Austin, TX 78711

BY: J. CASEY ROY, ASSISTANT ATTORNEY GENERAL

6

CAPLIN & DRYSDALE, CHARTERED
   Attorneys for Mark Buttita
   375 Park Avenue
   35th Floor
   New York, NY 10152

BY:  RITA C. TOBIN, ESQ.

CAPLIN & DRYSDALE, CHARTERED
   Attorneys for Mark Buttita
   One Thomas Circle N.W.
   Suite 1100
   Washington, DC 20005

BY:  RONALD E. REINSEL, ESQ.

8

BINGHAM MCCUTCHEN LLP
   Attorneys for Wells Fargo Bank, as Indenture Trustee
   399 Park Avenue
   New York, NY 10022

BY:  ERIN H. MAUTNER, ESQ.

CADWALADER, WICKERSHAM & TAFT LLP
   Attorneys for U.S. Treasury Auto Task Force
   One World Financial Center
   New York, NY 10281

BY:  JOHN RAPISARDI, ESQ.

CADWALADER, WICKERSHAM & TAFT LLP
   Attorneys for U.S. Treasury Auto Task Force
   1201 F Street, N.W.
   Washington, DC 20004

BY:  PETER M. FRIEDMAN, ESQ.
   JILL KAYLOR, ESQ. (TELEPHONICALLY)

7

CLEARY GOTTLIEB STEEN & HAMILTON LLP
   Attorneys for The International Union, United Automobile
   Aerospace and Agricultural Implement Workers of America,
   AFL-CIO
   One Liberty Plaza
   New York, NY 10006

BY: AVRAM E. LUFT, ESQ.
   JAMES BROMLEY, ESQ.

CLIFFORD CHANCE US LLP
   Attorneys for ABN AMRO BANK N.V., RBS Citizens N.A., Royal
   Bank of Scotland plc
   31 West 52nd Street
   New York, NY 10019

BY: ANDREW BROZMAN, ESQ.

COHEN, WEISS AND SIMON LLP
   Attorneys for United Auto Workers
   330 West 42nd Street
   New York, NY 10036

BY: BABETTE CECCOTTI, ESQ.

1

2  THE COLEMAN LAW FIRM

3   Attorneys for Product Liability Claimants:  Callan

4    Campbell, Kevin Junso, et al.; Edwin Agosto, Kevin

5    Chadwick, et al., and Joseph Berlingieri

6    77 West Wacker Drive

7    Suite 4800

8    Chicago, IL 60601

9

10  BY:  STEVE JAKUBOWSKI, ESQ.

11

12  CONNOLLY BOVE LODGE & HUTZ LLP

13   Attorneys for Connecticut General

14   The Nemours Building

15   1007 North Orange Street

16   Wilmington, DE 19899

17

18  BY:  JEFFREY C. WISLER, ESQ.

19

20

21

22

23

24

25

10

---

1

2  DICKINSON WRIGHT PLLC

3   Attorneys for Multimatic Inc.

4   301 East Liberty

5   Suite 500

6   Ann Arbor, MI 48104

7

8  BY:  TRENT B. COLLIER, ESQ.

9

10  DRINKER BIDDLE & REATH LLP

11   Attorneys for Cross-Complainant/Defendant, Manufacturers

12    and Trust Company and Wells Fargo Bank Northwest

13   1500 K Street, N.W.

14   Washington, DC 20005

15

16  BY:  STEPHANIE WICKOUSKI, ESQ.

17

18  FORMAN HOLT ELIADES & RAVIN LLC

19   Attorneys for Rose Cole, Guardian of Timothy L. Montis, a

20    Disabled Adult

21   80 Route 4 East

22   Paramus, NJ 07652

23

24  BY:  KIMBERLY J. SALOMON, ESQ.

25

12

---

1

2  COVINGTON & BURLING LLP

3   Attorneys for Union Pacific Railroad Company

4   The New York Times Building

5   620 Eighth Avenue

6   New York, NY 10018

7

8  BY:  MARTIN E. BEELER, ESQ.

9

10  DLA PIPER US LLP

11   Attorneys for Hewlett-Packard Company and all of its

12    Affiliates, Domestic and International, Including but not

13    Limited to Electronic Data Systems Corporation, and HP

14    Company and Hewlett-Packard Financial Services Company

15   550 South Hope Street

16   Suite 2300

17   Los Angeles, CA 90071

18

19  BY:  KAROL K. DENNISTON, ESQ.

20

21

22

23

24

25

11

---

1

2  GIBSON, DUNN & CRUTCHER LLP

3   Attorneys for Wilmington Trust Co., as Indenture Trustee

4   200 Park Avenue

5   New York, NY 10166

6

7  BY:  MATTHEW J. WILLIAMS, ESQ.

8    DAVID M. FELDMAN, ESQ.

9

10  GORLICK, KRAVITZ & LISTHAUS, P.C.

11   Attorneys for International Union of Operating Engineers

12    Local 18S, 101S and 832S, United Steelworkers, IUE- CWA

13   17 State Street

14   4th Floor

15   New York, NY 10004

16

17  BY:  BARBARA S. MEHLSACK, ESQ.

18

19  HISCOCK & BARCLAYS

20   Attorneys for The Schaeffer Group

21   One Park Place

22   300 South State Street

23   Syracuse, NY 13202

24

25  BY:  SUSAN R. KATZOFF, ESQ.

13

---

1
2    KELLEY DRYE & WARREN LLP
3        Attorneys for Law Debenture Trust Company of New York, as
4        Successor Indenture Trustee
5        101 Park Avenue
6        New York, NY 10178
7
8    BY:  JENNIFER A. CHRISTIAN, ESQ.
9        ROBERT L. LEHANE, ESQ.
10
11   KENNEDY JENNIK AND MURRAY, PC
12       Attorneys for IUE-CWA
13       113 University Place
14       Floor 7
15       New York, NY 10003
16
17   BY:  THOMAS M. KENNEDY, ESQ.
18       JOHN HOFFMAN, ESQ.
19
20   KIRKLAND & ELLIS LLP
21       Citigroup Center
22       153 East 53rd Street
23       New York, NY 10022
24
25   BY:  MARC A. LEWINSTEIN, ESQ.
                                                                14

1
2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
3        Attorneys for Henry Case Class Plaintiffs
4        1350 Broadway
5        Suite 501
6        New York, NY 10018
7
8    BY:  EDWARD J. LOBELLO, ESQ.
9        HANAN KOLKO, ESQ.
10
11   N.W. BERNSTEIN & ASSOCIATES, LLC
12       Attorneys for Environmental Conservation and Chemical
13       Corporation Site Trust Fund
14       800 Westchester Avenue
15       Suite N319
16       Rye Brook, NY 10573
17
18   BY:  NORMAN W. BERNSTEIN, ESQ.
19
20   NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
21       2030 M Street, NW
22       8th Floor
23       Washington, DC 20036
24
25   BY:  KAREN CORDRY, ESQ.
                                                                16

1
2    KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
3        Attorneys for Manufactures Traders & Trust
4        260 South Broad Street
5        Philadelphia, PA 19102
6
7    BY:  BRIAN CROWLEY, ESQ.
8
9    LATHAM & WATKINS LLP
10       Attorneys for GE Capital Corp.
11       Sears Tower
12       Suite 5800
13       233 South Wacker Drive
14       Chicago, IL 60606
15
16   BY:  DOUGLAS BACON, ESQ.
17
18   LAW OFFICES OF OLIVER ADDISON PARKER
19       Attorney Pro Se
20       4900 North Ocean Blvd.
21       Suite 421
22       Lauderdale By the Sea, FL 33308
23
24   BY:  OLIVER A. PARKER, ESQ.
25
                                                                15

1
2    PUBLIC CITIZEN LITIGATION GROUP
3        Attorneys for Product Liability Claimants:  Center for
4        Auto Safety, Consumer Action, Consumers for Auto
5        Reliability and Safety, National Association of Consumer
6        Advocates, and Public Citizen
7        1600 20th Street NW
8        Washington, DC 20009
9
10   BY:  ADINA H. ROSENBAUM, ESQ.
11       ALLISON M. ZIEVE, ESQ.
12
13   ORRICK, HERRINGTON & SUTCLIFFE LLP
14       Attorneys for GM Unofficial Dealer Committee
15       Columbia Center
16       1152 15th Street, NW
17       Washington, DC 20005
18
19   BY:  RICHARD H. WYRON, ESQ.
20       ROGER FRANKEL, ESQ.
21
22
23
24
25
                                                                17

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Finmeccenica S.p.A. and Ansaldo Ricercke
 S.p.A.; Ad Hoc Dealer Committee
666 Fifth Avenue
New York, NY 10103

BY: ROBERT M. ISACKSON, ESQ.
 ALYSSA D. ENGLUND, ESQ.

PATTON BOGGS LLP
Attorneys for Unofficial Committee of Family Bondholders
1185 Avenue of the Americas
30th Floor
New York, NY 10036

BY: MICHAEL P. RICHMAN, ESQ.

PATTON BOGGS LLP
Attorneys for Unofficial Committee of Family Bondholders
2550 M Street, NW
Washington, DC 20037

BY: MARK A. SALZBERG, ESQ.

18

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.
Attorneys for Greater New York Automobile Dealers
 Association
1345 Avenue of the Americas
New York, NY 10105

BY: RUSSELL P. MCRORY, ESQ.

ROBINSON WATERS & O'DORISIO, PC
Attorneys for Environmental Testing Corporation
1099 18th Street
Suite 2600
Denver, CO 80202

BY: ANTHONY L. LEFFERT, ESQ.

SCHNADER HARRISON SEGAL & LEWIS LLP
Attorneys for Ad Hoc Committee Consumer Victims
1600 Market Street
Suite 3600
Philadelphia, PA 19103

BY: BARRY E. BRESSLER, ESQ.

20

PATTON BOGGS LLP
Attorneys for Unofficial Committee of Family Bondholders
2001 Ross Avenue
Suite 3000
Dallas, TX 75201

BY: JAMES CHADWICK, ESQ.
 (TELEPHONICALLY)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Ad Hoc Bondholders Group
1285 Avenue of the Americas
New York, NY 10019

BY: ANDREW N. ROSENBERG, ESQ.
 JONATHAN KOEVARY, ESQ. (TELEPHONICALLY)

PENSION BENEFIT GUARANTY CORPORATION
United States Government Agency
1200 K Street NW
Washington, DC 20005

BY: MICHAEL A. MARICCO, ESQ.
 ANDREA WONG, Assistant Chief Counsel

19

SCHNADER HARRISON SEGAL & LEWIS LLP
Attorneys for Ad Hoc Committee Consumer Victims
824 North Market Street
Suite 1001
Wilmington, DE 19801

BY: RICHARD A. BARKASY, ESQ.

STATE OF MICHIGAN
Office of the State Attorney General
G. Mennen Williams Building
525 West Ottawa Street
6th Floor
Lansing, MI 48909

BY: CELESTE R. GILL, Assistant Attorney General

STATE OF NEW YORK
Office of the Attorney General
The Capitol
Albany, NY 12224

BY: MAUREEN F. LEARY, Assistant Attorney General

21

```
 1
 2   STATE OF NEW YORK
 3      Office of the Attorney General
 4      120 Broadway
 5      New York, NY 10271
 6
 7   BY:  KATHERINE KENNEDY, Special Deputy Attorney General
 8
 9   STEMBERG FEINSTEIN DOYLE & PAYNE, LLC
10      Attorneys for Class Representatives in Henry Case
11      1007 Mt. Royal Blvd.
12      Pittsburgh, PA 15223
13
14   BY:  WILLIAM T. PAYNE, ESQ.
15
16   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
17      Attorneys for Ad Hoc Committee of Unsecured Creditors
18      2323 Bryan Street
19      Suite 2200
20      Dallas, TX 75201
21
22   BY:  SANDER L. ESSERMAN, ESQ.)
23
24
25
                                                          22
```

```
 1
 2   TELEPHONIC APPEARANCES:
 3   ALLARD & FISH, P.C.
 4      Attorneys for Creditor Severstal North America, Inc.
 5      535 Griswold
 6      Suite 2600
 7      Detroit, MI 48226
 8
 9   BY:  DEBORAH L. FISH, ESQ.
10      (TELEPHONICALLY)
11
12   ARNALL GOLDEN & GREGORY LLP
13      Attorneys for Verizon Communications
14      171 17TH Street NW
15      Suite 1200
16      Atlanta, GA 30363
17
18   BY:  DARRYL S. LADDIN, ESQ.
19      FRANK N. WHITE, ESQ.
20      (TELEPHONICALLY)
21
22
23
24
25
                                                          24
```

```
 1
 2   VEDDER PRICE P.C.
 3      Attorneys for Export Development Canada
 4      1633 Broadway
 5      47th Floor
 6      New York, NY 10019
 7
 8   BY:  MICHAEL L. SCHEIN, ESQ.
 9
10   WILMER CURLER PICKERING HALE AND DORR LLP
11      Attorneys for Pension Benefit Guaranty Corporation
12      399 Park Avenue
13      New York, NY 10022
14
15   BY:  PHILIP D. ANKER, ESQ.
16
17   WINDELS MARK LANE & MITTENDORF, LLP
18      Attorneys for Lloyd Good; Plastic Omanna et al.;
19       Progressive Stamping Company; Morgan Adhesives Co. d/b/a
20       MACTAC; Western Flyer Express
21      156 West 56th Street
22      New York, NY 10019
23
24   BY:  LESLIE S. BARR, ESQ.
25
                                                          23
```

```
 1
 2   ATTORNEY GENERAL'S OFFICE, STATE OF CALIFORNIA
 3      Attorneys for State of California
 4      California Dept. of Justice
 5      P.O. Box 744255
 6      Sacramento, CA 94244
 7
 8   BY:  MARGARITA PACFILLA, ESQ.
 9      (TELEPHONICALLY)
10
11   ATTORNEY GENERAL'S OFFICE, STATE OF ILLINOIS
12      Attorneys for State of Illinois
13      100 West Randolph Street
14      Chicago, IL 60601
15
16   BY:  JAMES NEWBOLD, ESQ.
17      (TELEPHONICALLY)
18
19
20
21
22
23
24
25
                                                          25
```

```
 1                                              1
 2   ATTORNEY GENERAL'S OFFICE, STATE OF MICHIGAN   2   DAVIS POLK & WARDWELL
 3     State of Michigan Department of Treasury     3     Attorneys for Interested Party Ford Motor Company
 4     G. Mennen Williams Building                  4     450 Lexington Avenue
 5     7th Floor                                    5     New York, NY 10017
 6     525 West Ottawa Street                       6
 7     Lansing, MI 48909                            7   BY: BRIAN M. RESNICK, ESQ.
 8                                              8     (TELEPHONICALLY)
 9   BY: JULIUS O. CURTING, ESQ.                    9
10     (TELEPHONICALLY)                            10   DLA PIPER LLP U.S.
11                                             11     Attorneys for Creditor Hewlett Packard
12   ATTORNEY GENERAL'S OFFICE, STATE OF NEW JERSEY  12     550 South Hope Street
13     Attorneys for State of New Jersey Department of  13     Suite 2300
14      Environmental Protection Agency           14     Los Angeles, CA 90071
15     Richard J. Hughes Justice Complex          15
16     8th Floor, West Wing                       16   BY: KAROL K. DENNISTON, ESQ.
17     25 Market Street                           17     (TELEPHONICALLY)
18     Trenton, NJ 08625                          18
19                                             19
20   BY: RACHEL LEHR, ESQ.                        20
21     (TELEPHONICALLY)                           21
22                                             22
23                                             23
24                                             24
25                                      26    25                                      28
```

```
 1                                              1
 2   ATTORNEY GENERAL'S OFFICE, STATE OF TENNESSEE  2   FOLEY & LARDNER LLP
 3     Attorneys for Tennessee Department of Revenue  3     Attorneys for Toyota Motor Corp.
 4     Office of the Attorney General              4     One Detroit Center
 5     P.O. Box 20207                              5     500 Woodward Avenue
 6     Nashville, TN 37202                         6     Suite 2700
 7                                              7     Detroit, MI 48226
 8   BY: MARVIN CLEMENTS, ESQ.                     8
 9     (TELEPHONICALLY)                            9   BY: KATHERINE R. CALANESE, ESQ.
10                                             10     JOHN A. SIMON, ESQ.
11   ATTORNEY GENERAL'S OFFICE, STATE OF TEXAS    11     (TELEPHONICALLY)
12     Attorneys for Texas Department of Transportation Motor  12
13      Vehicle Division                          13   FOLEY & LARDNER LLP
14     300 West 15th Street                       14     Attorneys for Toyota Motor Corp.
15     Austin, TX 78701                           15     407 West Broadway
16                                             16     Suite 2100
17   BY: HAL F. MORRIS, ESQ.                       17     San Diego, CA 92101
18     RON DEL VENTO, ESQ.                         18
19     (TELEPHONICALLY)                           19   BY: MATTHEW J. RIOPELLE, ESQ.
20                                             20     (TELEPHONICALLY)
21                                             21
22                                             22
23                                             23
24                                             24
25                                      27    25                                      29
```

```
 1                                               1
 2   FREEBORN & PETERS LLP                       2   HANGLEY ARONCHICK SEGAL & PUDLIN
 3      Attorneys for Trico Products & PGW LLC    3      Attorneys for NCR Corporation
 4      311 South Wacker Drive                    4      One Logan Square
 5      Suite 3000                                5      18th & Cherry Streets
 6      Chicago, IL 620606                        6      27th Floor
 7                                               7      Philadelphia, PA 19103
 8   BY:  THOMAS R. FAWKES, ESQ.                  8
 9      (TELEPHONICALLY)                          9   BY:  MATTHEW A. HAMERMESH, ESQ.
10                                              10      (TELEPHONICALLY)
11   FROST BROWN TODD LLC                       11
12      Lexington Financial Center              12   KEMP KLEIN LAW FIRM
13      250 West Main                           13      Attorneys for Custom Automotive Services, Inc.
14      Suite 2800                              14      201 West Big Beaver Road
15      Lexington, KY 40507                     15      Suite 600
16                                              16      Troy, MI 48084
17   BY:  ROBERT V. SARTIN, ESQ.                17
18      (TELEPHONICALLY)                        18   BY:  GLORIA M. CHON, ESQ.
19                                              19      (TELEPHONICALLY)
20                                              20
21                                              21
22                                              22
23                                              23
24                                              24
25                                              25
                                      30                                              32
```

```
 1                                               1
 2   FULBRIGHT & JAWORSKI L.L.P                   2   MASTROMARCO FIRM
 3      Attorneys for Bell Atlantic               3      Attorneys for Gerald Haynor, Interested Party
 4      2200 Ross Avenue                          4      1024 North Michigan Avenue
 5      Suite 2800                                5      Saginaw, MI 48602
 6      Dallas, TX 75201                          6
 7                                               7   BY:  VICTOR MASTROMARCO, ESQ.
 8   BY:  ELIZABETH N. BOYDSTON, ESQ.             8      (TELEPHONICALLY)
 9      (TELEPHONICALLY)                          9
10                                              10   MCDONALD HOPKINS CO., LPA
11                                              11      Attorneys for Swegalok Company
12   GOULSTON & STORRS P.C.                     12      39533 Woodward Avenue
13      Attorneys for Creditor 767 Fifth Partners, LLC  13      Bloomfield Hills, MI 48304
14      400 Atlantic Avenue                     14
15      Boston, MA 02110                        15   BY:  JAYSON B. RUFF, ESQ.
16                                              16      (TELEPHONICALLY)
17   BY:  DOUGLAS B. ROSNER, ESQ.               17
18      (TELEPHONICALLY)                        18   MCNAMEE, LOCHNER, TITUS & WILLIAMS, PC
19                                              19      Attorneys for The Saint Regis Mohawk Tribe
20                                              20      677 Broadway
21                                              21      Albany, NY 12201
22                                              22
23                                              23   BY:  JACOB F. LAMME, ESQ.
24                                              24      (TELEPHONICALLY)
25                                              25
                                      31                                              33
```

```
 1
 2   MILLER, CANFIELD, PADOCK AND STONE, P.L.C.
 3      Attorneys for Creditor Ford Motor Company
 4      150 West Jefferson
 5      Suite 2500
 6      Detroit, MI 48226
 7
 8   BY: MARC N. SWANSON, ESQ.
 9      (TELEPHONICALLY)
10
11   MORRIS JAMES LLP
12      Attorneys for Monster Worldwide
13      500 Delaware Avenue
14      Suite 1500
15      Wilmington, DE 19801
16
17   BY: CARL N. KUNZ, III, ESQ.
18      (TELEPHONICALLY)
19
20
21
22
23
24
25
                                         34
```

```
 1
 2   PEPPER HAMILTON LLP
 3      Attorneys for Creditor SKF USA Inc.
 4      400 Berwyn Park
 5      899 Cassatt Road
 6      Berwyn, PA 19312
 7
 8   BY: HENRY J. JAFFE, ESQ.
 9      (TELEPHONICALLY)
10
11   PERDUE, BRANDON, FIELDER, COLLINS & MOTT LLP
12      Attorneys for Arlington ISD et al.
13      4025 South Woodland Park Boulevard
14      Suite 300
15      Arlington, TX 76013
16
17   BY: ELIZABETH BANDA, ESQ.
18      (TELEPHONICALLY)
19
20
21
22
23
24
25
                                         36
```

```
 1
 2   OFFICE OF SANTA CLARA COUNTY COUNSEL
 3      Attorneys for County of Santa Clara Tax Collector
 4      70 West Hedding Street
 5      9th Floor, East Wing
 6      San Jose, CA 95110
 7
 8   BY: NEYSA A. FIGOR, ESQ.
 9      (TELEPHONICALLY)
10
11   OHIO ATTORNEY GENERAL'S OFFICE
12      Attorneys for State of Ohio
13      State Office Tower
14      30 East Broad Street
15      17th Floor
16      Columbus, OH 43215
17
18   BY: LUCAS C. WARD, ESQ.
19      (TELEPHONICALLY)
20
21
22
23
24
25
                                         35
```

```
 1
 2   ROTH & DEMPSEY P.C.
 3      Attorneys for Burton Taft
 4      436 Jefferson Avenue
 5      Scranton, PA 18510
 6
 7   BY: MICHAEL G. GALLACHER, ESQ.
 8      (TELEPHONICALLY)
 9
10   SCHIFF HARDIN LLP
11      Attorneys for Columbia Gas of Ohio; Columbia Gas of
12      Virginia
13      233 South Wacker Drive
14      Suite 6600
15      Chicago, IL 60606
16
17   BY: JASON TORF, ESQ.
18      (TELEPHONICALLY)
19
20
21
22
23
24
25
                                         37
```

1
2    SINGER & LEVICK, P.C.
3    Attorneys for ACS Affiliated Computers Services, Inc
4    16200 Addison Road
5    Suite 140
6    Addison, TX 75001
7
8    BY:  LARRY A. LEVICK, ESQ.
9       (TELEPHONICALLY)
10
11   WOLFSON BOLTON PLLC
12   Attorneys for Guardian Industries
13   3150 Livernois
14   Suite 275
15   Troy, MI 48084
16
17   BY:  SCOTT A. WOLFSON, ESQ.
18      (TELEPHONICALLY)
19
20
21
22
23
24
25
                                              38

            P R O C E E D I N G S
1
2         THE COURT:  Good morning, folks.
3         MR. MILLER:  Good morning.
4         THE COURT:  Have seats, everybody.  Come on up,
5    please.
6         MR. WEISS:  Good morning, Your Honor.  Robert Weiss
7    of Honigman Miller Schwartz & Cohen, special counsel for
8    General Motors Corporation.
9         THE COURT:  Right, Mr. Weiss.
10        MR. WEISS:  When we ended last evening, I indicated
11   that we had arrived upon a stipulation order resolving
12   objection to sale motion with regard to GECC and some equipment
13   leases that are critical to the sale of the company should it
14   proceed based upon this Court's order.
15        I'm pleased to advise the Court that we have come to
16   a final resolution in the form of a stipulation and order
17   resolving objection to sale motion.  We have consulted with
18   counsel for the creditors' committee whose input is
19   incorporated within the final terms of the stipulation.
20        Your Honor, just very briefly, if I may, the subject
21   of the leases are very substantial equipment for both
22   manufacturing and assembly that's included in a number of
23   different General Motors facilities.  The stipulation is only
24   effective if the Court approves the sale and the sale closes.
25   In that period of time, the debtor has not yet elected whether
                                              39

1    it will assume or reject these leases.  This stipulation
2    permits the use of this equipment post closing in the period
3    before a decision is made as to whether to assume and assign or
4    reject these leases.  All rights and interests of the parties
5    are protected and we believe that this is a stipulation that is
6    very much in the interest of both constituents.  I would ask
7    that the Court approve it.
8         THE COURT:  Okay, Mr. Weiss.  Anybody else want to
9    comment?  Mr. Schmidt, creditors' committee?
10        MR. SCHMIDT:  Good morning, Your Honor.  Robert
11   Schmidt, Kramer Levin, on behalf of the committee.  Your Honor
12   Mr. Weiss presented the stip to me a little while ago.  He's
13   represented that one of my colleagues has signed off on it.  I
14   have no reason to not believe that but I just want to take a
15   quick look at it and we'll advise the Court at a break.
16        THE COURT:  I'm going to be tied up for the next hour
17   or two --
18        MR. SCHMIDT:  I suspect we'll have plenty of time to
19   read it.
20        THE COURT:  Fair enough.  Mr. Weiss, would it be
21   helpful more than just that?  Would it be necessary -- would
22   you like an order entered on that today assuming the creditors'
23   committee is so (indiscernible)?
24        MR. WEISS:  Yes, we would, Your Honor.  And I can
25   represent to the Court that, as Mr. Bacon can attest to, we had
                                              40

1    a number of different conversations with Adam Rogoff.  And he
2    has, in fact, signed off on the stipulation in the form in
3    which we're going to present it.
4         MR. BACON:  And by email as well.
5         THE COURT:  Sure.  The practical problem that a lot
6    of parties are having in this case is that this is a
7    complicated case.  You can't do it with one lawyer.  And people
8    have to kind of have enough time to talk to each other when
9    they're so busy on other things.
10        MR. WEISS:  Sure.
11        THE COURT:  So that's fine.  Mr. Schmidt, could I
12   simply ask you if either you or Mr. Rogoff or somebody
13   communicate with my chambers perhaps by lunchtime just to give
14   me comfort that you guys are okay with it?
15        MR. SCHMIDT:  Absolutely, Your Honor.
16        THE COURT:  Thank you.  Thank you.
17        MR. WEISS:  Your Honor, shall I --
18        THE COURT:  Yes, Mr. Weiss?
19        MR. WEISS:  Would you like me to present to the Court
20   a copy of the stip and order at this time?
21        THE COURT:  Well, actually, giving it to me is not
22   going to be that helpful right now.  So, yeah, you can give it
23   to me but I won't really be able to look at it until next
24   recess at the earliest or maybe after we're done today.
25        MR. WEISS:  May I approach the bench?
                                              41

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

1    THE COURT: Oh, sure. Sure. Thank you.
2    MR. WEISS: So just so I understand, assuming that
3    the creditors' committee confirms that the form of the order is
4    satisfactory to them, we need to appear before the Court again
5    on this matter?
6    THE COURT: I wouldn't think you need to.
7    MR. WEISS: Okay. Thank you, Your Honor.
8    MR. SCHMIDT: Thank you, Your Honor.
9    THE COURT: Thank you. Do we have other housekeeping
10    matters before -- yes?
11    MR. WARREN: Good morning, Your Honor. Irwin Warren,
12    Weil Gotshal & Manges, for the debtors. Two housekeeping
13    matters. On the record yesterday, I believe it was, there was
14    discussion about provisions of the loan security agreement
15    between the Treasury and the debtors, in particular with
16    respect to the question of what collateral did or did not have
17    liens. Going to Mr. Parker's question, we advised the Court we
18    would provide a letter with the relevant sections. And if I
19    may hand that up to Your Honor, we have done that. We've
20    provided it to Mr. Parker and to all other counsel for the
21    objectors. The particularly important provision is the
22    exclusion of collateral which is in here and the definition of
23    excluded collateral basically says it's any property to the
24    extent that the grant of a lien on it would give rise to a lien
25    under any other document. So it's sort of elegant in its

42

1    simplicity of addressing the question of whether a lien has
2    been granted. If it would grant a lien and it would have done
3    what Mr. Parker says, the government doesn't have it.
4    If I may hand up that letter?
5    THE COURT: Yes, Mr. Warren. Thank you.
6    MR. WARREN: The second housekeeping matter, Your
7    Honor, is Mr. Bressler had indicated that rather than putting a
8    witness on for certain of the questioning, he would designate
9    certain testimony from the depositions and Your Honor had said
10    we should counter designate by this morning. The IUE also
11    chose to designate not just with respect to Mr. Henderson but
12    with respect to Mr. Raleigh. We have put together our counter
13    designations. Those will be filed but Your Honor had asked
14    that marked copies of the transcripts be provided color-coded
15    to indicate who are the objectors.
16    THE COURT: I say color coded. I simply meant so
17    that I could tell whose is what.
18    MR. WARREN: We figured the easiest --
19    THE COURT: Black and white, that's equally
20    satisfactory.
21    MR. WARREN: We thought color might work. We have
22    taken the liberty of taking all of the objectors designations
23    and put them in yellow. Ours are in pink. And if I may hand
24    those up to Your Honor, these are the Henderson and Raleigh
25    transcripts. Hopefully, this will be of assistance.

43

1    THE COURT: Okay. And I assume all of your opponents
2    also have.
3    MR. WARREN: Yes. They all have been provided copies
4    and they'll have the designations which are filed. Thank you,
5    Your Honor.
6    THE COURT: Thank you, Mr. Warren.
7    MR. JONES: Sorry, Your Honor. Very quickly. David
8    Jones.
9    THE COURT: Mr. Jones?
10    MR. JONES: Let me note that on the Wilson
11    designations, we're in the process of doing the same thing. We
12    don't have it in hand yet. The designations are filed and
13    we'll provide it as soon as possible.
14    THE COURT: Okay.
15    MR. LEHANE: Good morning, Your Honor. Robert
16    LeHane, Kelly Drye & Warren, on behalf of the debtors' landlord
17    and its Roanoke, Texas distribution facility.
18    THE COURT: Good morning, Mr. LeHane.
19    MR. LEHANE: Your Honor, we filed a limited objection
20    that raised three issues: cure, adequate assurance and the
21    debtors' ability to remain in the premises prior to a
22    designation of the lease. The parties have, we believe,
23    arrived at a business decision, a business settlement. There's
24    a lease amendment that has yet to be executed. But the
25    settlement involves the debtor confirming for the record, one

44

1    of the issues raised in the adequate assurance objection. Your
2    Honor, the debtors agreed to assume the lease and assume the
3    lease at closing and that in connection with the assumption of
4    the lease, the debtor agrees that it will assume all of the
5    obligations to indemnify the landlord whether or not those
6    relate to incidents that may have occurred pre-closing or pre-
7    petition. The debtors also agreed to pay all tax obligations
8    under the lease. Specifically, in Texas, the real estate taxes
9    are billed at the end of the year and they may relate to
10    periods pre-petition and pre-closing and the debtors agreed
11    that it would confirm for the record that it has agreed to
12    assume all of those obligations. If debtors' counsel would
13    simply confirm that for the record, we can --
14    THE COURT: Okay. Anybody have any problems with
15    what Mr. LeHane said. Mr. Smolinsky?
16    MR. SMOLINSKY: Good morning, Your Honor. Joe
17    Smolinsky, Weil Gotshal & Manges for the debtors. Your Honor,
18    we have a number of contract resolutions, of cure disputes,
19    that are on the calendar today. We were hoping to do it in a
20    streamline fashion, so as not to cause a stampede, one at a
21    time. We are in the process of working out with LBA the terms
22    of a modified lease amendment. I think the statements that
23    were made are accurate to the extent that there's an unknown
24    indemnity event that occurs prior to closing that that -- to
25    the extent it's covered any indemnity agreement under the

45

1    lease, the purchaser is assuming that liability.
2        I didn't want to upset the flow of this hearing
3    today. And to the extent that we want to deal with these
4    issues now or deal with them later, we can.
5        THE COURT: You know, you're reading my mind, Mr.
6    Smolinsky. And, frankly, I didn't know what Mr. LeHane was
7    coming up to say. That's fine, Mr. LeHane. I think you've got
8    it done, though. But, folks, what we have here now, which is
9    what appears to be a line of people who want to get up on
10    relatively minor matters, important to you all, of course, but
11    smaller in the scheme of things, it raises the risk of really
12    spiraling out of control and undercutting, if not undoing,
13    everything I've been trying to accomplish in the last couple of
14    days in terms of triaging these matters and dealing with the
15    most important issues first.
16        Unless there are any other things of major
17    importance, such as modifying any of the arguments that I've
18    already heard, I'm going to ask all of the people who are on
19    line to speak to sit down until I can hear from Mr. Richman and
20    Mr. Parker and reply by the movants. And then rest assured
21    that before I leave today, we will have dealt with everybody.
22    Okay, folks.
23        MR. SMOLINSKY: And, Your Honor, I think I could
24    later present a streamlined approach to the cure objections so
25    that we can make sure we cover everybody's concerns in the

46

1    fastest possible way.
2        THE COURT: Sure. Thank you, Mr. Smolinsky.
3        MR. SMOLINSKY: Thank you.
4        THE COURT: All right. Mr. Richman, I think you're
5    up.
6        MR. RICHMAN: Good morning, Your Honor. Your Honor,
7    Michael Richman, Patton Boggs, for the unofficial committee of
8    family and dissident GM bondholders. Your Honor, my principal
9    argument, which I'm going to focus on this morning, is that the
10    debtors have not satisfied their burdens to demonstrate the
11    right to use Section 363 to effectuate a sale of substantially
12    all their assets in the first month of the case.
13        After the briefing and the evidence, a related and
14    central question that seems to be unique to this case is where
15    the government seeks to rescue a failing company through a
16    corporate restructuring under Chapter 11 of the Bankruptcy Code
17    may have circumvent the Code's various creditors' rights and
18    protections by labeling its restructuring a sale and then
19    conditioning its rescue on a quick sale to itself.
20        We understand the argument that but for the
21    government's rescue effort, we and many other stakeholders
22    would have nothing. And so, we should be grateful for
23    receiving anything. But that is not the way that bondholders
24    and other creditors and stakeholders look at what is being
25    proposed. Instead they ask why is a financial rescue under

47

1    Chapter 11 not according equal and ratable treatment to
2    different groups of claimants whose claims are legally similar.
3    They do not understand how our legal system can permit the
4    government to resort to Chapter 11 and yet choose to favor some
5    constituencies over others.
6        The government's answer is that it is purchasing the
7    best assets under Section 363. So it has the right to take
8    what it wants, leave what it doesn't want and make special
9    deals by allocating its equity in order to take care of the
10    constituencies that it needs to operate the new company. The
11    new company doesn't need the old company's bondholders. It
12    doesn't need or want a lot of other things. Provisions of
13    Chapter 11 that might require a restructuring to recognize that
14    the value of New GM belongs to all of Old GM and its estates to
15    be allocated in a more equal and ratable way are simply
16    inconvenient.
17        The debtors argue that this Court has the power to
18    authorize this transaction if it finds that there is an
19    articulated business justification. The business judgment must
20    be reasonable and the purchaser must have good faith. This
21    derives from Lionel and its progeny.
22        But, Your Honor, I submit that assumes a genuine
23    sale. That assumes independence between a purchaser and a
24    seller. That assumes that a debtor has a real choice other
25    than to bend to the will of its lender and its purchaser

48

1    whereas here, the record shows an utter dominance of the
2    debtors including the fact that the principal negotiators for
3    the debtors are also to be the principal managers of the new GM
4    negotiating with the owner of New GM, the protestations of
5    arm's length negotiations and good faith are simply irrelevant.
6    The absence of real choice and the dominance of the government
7    creates an environment unique in this case in which those
8    factors that are required for a 363 sale cannot credibly exist.
9        Indeed, the testimony was that the sale price was not
10    so much negotiated as derived on the basis of asset values, but
11    was rather derived on the basis of the minimum amounts needed
12    to settle the claims of the favored constituencies. That this
13    later turned out to be supported by a fairness opinion is
14    irrelevant to the fact that it wasn't negotiated as any real
15    sale of assets would be. Your Honor asked yesterday why there
16    was a fairness opinion at all if there were no other bidders.
17    It's clear from the response that the fairness opinion and the
18    liquidation analysis was window dressing for the board, and
19    maybe for the Court.
20        In this case, no one came to the company offering to
21    buy any assets. The government came to GM with financial
22    rescue, not to buy assets. The government then came up with a
23    restructuring plan with union and bondholder settlements. But
24    it concluded that implementing it through a Chapter 11 plan
25    would give rise to potential rights and uncertainties and the

49

1  possibility of longer time than if it could be implemented as a
2  sale.  So they made a conscious strategic decision to label
3  their restructuring a sale and a conscious strategic decision
4  to bypass and circumvent the Chapter 11 plan process.
5        The evidence shows that Treasury's lawyers presented
6  to Treasury alternative means of restructuring the company
7  including through a Chapter 11 plan and that 363 was chosen for
8  strategic purposes.
9        THE COURT:  Pause, please, Mr. Richman.  You've been
10 around the block a few times.  To what extent either in this
11 court or Delaware or anywhere else in the country have you ever
12 seen a Chapter 11 case?  Put aside a large one like this, even
13 medium size one, even cases in the fifty million dollar,
14 hundred million dollar range -- that has ever gone from filing
15 to confirmation within a period of ninety days.
16       MR. RICHMAN:  Well, Your Honor, what we mention in
17 the briefs is pre-packs and pre-negotiated plans certainly have
18 been confirmed very rapidly.  And this restructuring plan was
19 fundamentally a pre-negotiated plan.  There were agreements in
20 place with the union, important agreements in place with some
21 of the senior bondholders.  This could have been filed as a
22 pre-negotiated plan and put on an accelerated time frame.
23       Not only that, Your Honor, if the business objective
24 here, both on the --
25       THE COURT:  Pause.  Forgive me.  Can you give me any

50

1  more specificity than that?  Ninety days is a very short time.
2  A pre-negotiated plan, by definition, is, aside from the fact
3  that you haven't solicited your votes from the disclosure yet,
4  I get so-called pre-negotiated plans all the time where there
5  have been pre-negotiated secured debt or with major elements of
6  the unsecured creditor community.  But when they've been filed
7  that way, I can't count the number of times, even in my pre-
8  packs, where one issue or another comes up and -- I'm trying to
9  think of any specific example to any you know which have been
10 able to meet that time frame.  We have testimony, as I
11 understand it, from Mr. Wilson that he had gone to -- and I'll
12 have to look at the record for the number -- any number of
13 people experienced in Chapter 11.  And the view was unanimous,
14 subject to me checking the record, that it would have been
15 suicidal to expect it to be completed in that period of time.
16       MR. RICHMAN:  There were two alternatives.  Well,
17 first, let me respond to that, Your Honor.  I have complete
18 confidence that, with the resources available here, that (a)a
19 pre-negotiated plan with the agreements that are in place and
20 sought to be approved with the sale could have been filed on
21 June 1st; and that Your Honor, upon cause shown, would have
22 accelerated the timetable and all of the objections and issues
23 and creditors' rights issues and many of the things that we're
24 hearing today in a truncated way could still be determined by
25 Your Honor, could still be determined on a fast track.  Just

51

1  consider the extraordinary manner in which these hearings have
2  been held in the last couple of days, discovery over the
3  weekend, shortened times for everything.  The same thing could
4  be done in an accelerated plan if the same arguments were being
5  made but creditors' rights would be accorded to that.
6        I can't tell you standing here right now of a
7  specific case where I know that that was done.  Honestly, I
8  haven't had time to look for that.  We did cite cases where the
9  record showed confirmation within so many days of filing all of
10 which were within thirty, sixty, ninety days, some of which
11 were a couple of days.  Most of those were pre-packs; some were
12 pre-nego -- I believe some were pre-negotiated plans.  I'd have
13 to check and we could submit something afterwards, if Your
14 Honor wishes.
15       But the other thing that I think is a useful response
16 to Your Honor, if the goal here that everybody says they want
17 is to create spinoff New GM, and it has to be done quickly
18 because that'll get it out of the bankruptcy environment and
19 allow public to understand that there's a new GM in place, that
20 could have been done without allocating the equity.  The
21 company could have spun off the assets into a New GM.  It could
22 do so today.  It could do so under 363.  But it could retain
23 the equity so that all the equity -- all the interest holders
24 in this case would still have a stake in it and that equity
25 allocation could then be done later pursuant to a plan so that

52

1  full creditors' rights are protected.  And that would achieve
2  all of the objectives that the government and the debtors claim
3  that they have to achieve.  It would be outside the bankruptcy
4  environment but instead of the government holding the equity
5  and determining how it gets allocated, the debtors would hold
6  the equity until a plan could determine how it should be
7  allocated.
8        Your Honor, the evidence shows that Treasury's
9  lawyers presented various alternative means of effectuating the
10 restructuring including through a plan and that 363 was a
11 deliberate strategic choice.  It was only at that time, after
12 they decided to effectuate the restructuring through 363, that
13 the format of a sale was devised with a shell company and the
14 sale format was plugged in to fit the strategy.  Once Treasury
15 mandated a restructuring using a 363 sale strategy, the script
16 was written in order to make that work.  The company and its
17 advisors analyzed only two options:  the sale or a liquidation.
18 They conspicuously failed to analyze or to present to the board
19 the possibility of spinning off GM's best assets to a new GM,
20 as I just indicated, or in an accelerated plan process.
21       The evidence shows that the government decided to use
22 363 not for any goal that a real purchaser would have but as a
23 restructuring tool.  The government doesn't want to buy, own or
24 operate a car company.  That's been said many, many times on
25 the public record.  But if the Court allows this restructuring

53

1  under 363 then the government can take control more easily,
2  quickly and without providing value or distributions of a type
3  or amount that conceivably otherwise would be required in a
4  Chapter 11 plan.
5      It's a good strategy. We understand why they did it.
6  They have nothing to lose. They told the public, as did the
7  White House, that they hope to emerge from Chapter 11 in sixty
8  to ninety days. So if this Court decides that in the unusual
9  circumstances of this case including very distinguishing factor
10 from Chrysler, the absence of any independent third party
11 purchaser whose commercial needs are driving the deadlines, if
12 this Court decides that there is insufficient support under
13 Lionel and Chrysler to restructure under 363, the government
14 and the debtors can easily spin this as a temporary setback but
15 still well within their initial time frames. This case tests
16 the very meaning of Lionel and its limits.
17     These were the very concerns that the Second Circuit
18 had in articulating the Lionel guidelines, a balancing of
19 tensions between the need to preserve a business and the need
20 to protect creditors' rights. Lionel gave us six nonexclusive
21 factors for evaluating the propriety of 363 sales to dispose of
22 substantially all of the debtors' assets. But just before
23 reciting those factors, the Second Circuit cited to the Supreme
24 Court opinion in Committee for Independent Stockholders of TMT
25 Trailer against Anderson for the proposition that, and I quote,

54

1  asserted need to effectuate a new GM very quickly or at least
2  by July 10, is not supported by evidence of declining value.
3  Indeed, it's clear from the testimony of both Mr. Henderson and
4  Mr. Wilson that the debtors' and the government's first day
5  fears about the negative effects that Chapter 11 would have on
6  GM were greatly exaggerated and unsupported at least over the
7  first thirty days. And we presume over the first sixty to
8  ninety days that they predicted that the case would last and
9  inform the public that the case would last. What we see in the
10 evidence is that because the parties attempted at all cost to
11 justify the need for a fast track sale, there were a number of
12 conclusory statements and predictions of dire consequences that
13 turned out not to be true.
14     Mr. Henderson's first day affidavit in evidence as
15 Debtors' Exhibit 15 states at paragraph 82 that "The value of
16 and consumer confidence in the GM brand and its products and
17 support systems are fragile and will be subject to significant
18 value erosion unless they are expeditiously transferred to New
19 GM and its operations start free from the stigma of bankruptcy.
20 Any delay will result in irretrievable revenue perishability
21 and loss of market share to the detriment of all economic
22 interest. It will exacerbate and entrench consumer resistance
23 to General Motors products." Mr. Wilson said that his concerns
24 about timing were informed by articles from commentators who
25 predicted GM could not survive Chapter 11.

56

1  "The need for expedition is not a justification for abandoning
2  proper standards." The president of the United States made a
3  similar statement in his inaugural address which we quoted in
4  our brief. In essence, we should not compromise our principles
5  for the sake of expediency.
6      Then the Second Circuit had to say, in words that
7  apply fully to the situation we face today, and I quote, "A
8  bankruptcy judge must not blindly follow the hue and cry of the
9  most vocal special interest groups; rather, he should consider
10 all salient factors pertaining to the proceeding and,
11 accordingly, act to further the diverse interests of the
12 debtor, creditors and equity holders alike."
13     As the case law has subsequently developed and as
14 reflected in these hearings and the arguments, the criteria
15 considered most important are a sound business judgment and the
16 question whether the assets in question are declining in value.
17 The need to preserve value, particularly where there is
18 evidence of deterioration, is often argued and cited to support
19 unusual speed, particularly when the sale is sought so early in
20 the case as it is here.
21     The only evidence before the Court demonstrates that
22 since filing Chapter 11, GM's assets are not wasting. They are
23 not deteriorating; they are not melting. Chapter 11 has
24 apparently, so far, stabilized the company and sales have
25 increased over the pre-bankruptcy period. Therefore, the

55

1      But as we have seen from the evidence, these first
2  day predictions turned out not to be true. It is evidence and
3  not prophecy on which this Court should rely.
4      Though GM's overall financial performance was in
5  decline over a long period of time and clearly it is today on a
6  year-over-year basis below what it was a year ago, it enjoyed
7  improved performance in the first month of bankruptcy over the
8  month of May. Some of this may be attributable, as Mr.
9  Henderson testified, to the government backstopping of
10 warranties which occurred earlier and independently of any
11 bankruptcy filing. Some of it may also be attributable to
12 business strategies that Mr. Henderson and his team pursued
13 more recently. So the assets are not wasting or spoiling or
14 deteriorating.
15     Now, echoing his first day fears when he testified,
16 Mr. Henderson said that he thought one reason why the business
17 was doing better than expected in June was customer expectation
18 that the bankruptcy process would go quickly but he later
19 conceded that that was pure conjecture. Indeed, it became
20 clear from Mr. Henderson's testimony, as well as Mr. Wilson's,
21 that the fears of business decline that they said motivated
22 their desire for a fast track 363 as distinct from any
23 alternative were based on worries over a prolonged case --
24 "prolonged" was a word in the testimony -- one where the
25 company "languished" in Chapter 11. Mr. Wilson said Treasury

57

1    was concerned about a "traditional" Chapter 11 process.
2         Mr. Miller spent argument time warning of dire
3    consequences as well, not in the record of evidence but in Mr.
4    Miller's opinion, and concluded with the point that a Delphi-
5    like case would be bad for the business. That's not really
6    debatable but it's not the point.
7         The debtors argue that this transaction is the only
8    alternative to a liquidation but is it fair to say that there
9    is no viable alternative to a sale where you deliberately limit
10   your alternatives? I understand an aversion to a traditional
11   plan process. But here, where there was already the equivalent
12   of a pre-negotiated plan, an accelerated plan process could
13   have been and could yet be attempted. But no advisors were
14   asked to consider that or value it or present it as an option
15   to the board. Mr. Repko agreed that the value of a new GM
16   under a plan could be comparable to the value under the 363
17   transaction.
18        Now, Mr. Miller said that our suggestion of a Chapter
19   11 process that could be concluded within ninety days was
20   magical. Yet, as I indicated before, and I'd be prepared to
21   supplement the record with some further research, we know that
22   many cases with pre-packs and pre-negotiated plans have been
23   completed in that time frame without magic. And there is no
24   doubt that the debtors and the government have the resources to
25   do that here, to at least try that here. Perhaps the magic

58

1    that he was referring was making creditor objections disappear.
2    And if that's what he meant, then I agree that you couldn't do
3    that in a plan process. But this Court could have easily dealt
4    with as easily such issues in an accelerated plan time frame as
5    the Court demonstrated it could do with these hearings
6    especially in an extraordinary case like this. If there was
7    any magic here, it was the debtors and the government taking a
8    magic wand to a restructuring and saying poof, now you're a
9    sale. And with that, creditors' rights and plan protections
10   disappeared.
11        Since the evidence does not establish that the
12   business is deteriorating, the debtors' business judgment, if
13   it actually has any judgment of that sort in a case like this,
14   is narrowed to its asserted belief that the business
15   opportunity, if what the government is offering could even be
16   characterized as a business opportunity, is limited and
17   perishable. The government's offer of financing will expire on
18   July 10. If the debtors do not comply with the government's
19   dictates, liquidation will inevitably follow. The important
20   question is whether this Court has any power to disbelieve
21   that. From the debtors' perspective, we completely understand
22   the argument that they have to try this. They have to advocate
23   it and believe it. It's not business judgment, though, because
24   there's no real choice involved. It's inconceivable that any
25   company would choose to liquidate in the face of such a

59

1    government offer. Simply inconceivable. And we're not
2    criticizing the fact that the debtors have chosen this course.
3    And we're not criticizing the fact that they sensibly decided
4    not to liquidate. We're objecting to the form of the
5    transaction.
6         Even though the debtor had no choice, this Court
7    does. This Court can look through the form to the substance,
8    through the evidence to the truth and through the magic in
9    order to stand for the Chapter 11 process.
10        Now yesterday, Your Honor commented about our
11   familiar experiences with overbearing lenders. I believe the
12   comment was that lenders frequently overreach. In many such
13   situations the debtor, in dire need of financing, is in no
14   position to negotiate effectively. As here, the debtor is
15   given no real choice. Where the debtors' will is overborne,
16   the Court can and does step in. We see that all the time with
17   DIP financing and purchase -- 363 purchase provisions.
18   Desperate debtors agree to things demanded of them because they
19   have to. But the Courts will not hesitate to push back and
20   tell the lenders, sorry, I'm not approving those provisions.
21        THE COURT: I've done this a few times, Mr. Richman.
22   When you say we don't hesitate, I think that understates it a
23   little. Every time a judge rules on a DIP, he's rolling the
24   dice that he's going to crater the whole case if he messes
25   around with economic terms. If you give them extra time to do

60

1    investigations so they can bring their avoidance actions, we
2    make individualized adjustments as to whether 506(c) labors are
3    appropriate or handing over the proceeds of avoidance actions
4    are appropriate. But I cannot think of a single time in the
5    nine years I've been on the bench or the nearly four years I've
6    been doing this where I've ever told -- seen a judge tell a
7    lender that he has to agree to different deal terms.
8         MR. RICHMAN: I wasn't suggesting that, Your -- I
9    actually agree with Your Honor up to that point in the sense I
10   wasn't suggesting that you tell what the deal should be. But
11   Courts do and Your Honor has pushed back on provisions that
12   Your Honor was being told we're absolutely required by the
13   purchaser with the DIP lender. And Your Honor has said and
14   other judges have said, I want to prove those even though there
15   was the threat, difficult threat to deal with that the party
16   would walk away because the Court stands for the law and the
17   parties understand that they have to follow those dictates if
18   they want to do a transaction under Chapter 11. My only point,
19   which I think Your Honor was agreeing with, is that it's not
20   uncommon. When the debtor doesn't have the ability or leverage
21   or the independence of will to be able to fight back over
22   onerous provisions or even a mandated sale, the Court still has
23   the power and authority to do so.
24        Bankruptcy courts call the bluffs of billing lenders
25   and purchasers all the time. And that brings me to footnote 15

61

1  of Judge Gonzales' opinion in Chrysler  In Chrysler, as here,
2  the main argument was that the debtor had no viable options but
3  a sale or a liquidation.  Now, in that footnote, the Court
4  commented on a third option raised by dissenting creditors.
5  And I quote:  "Based upon the U.S. government's substantial
6  interest in preserving the automobile industry, jobs and
7  retiree benefits, the intimation is that the government was
8  bluffing when it indicated that it would walk away from
9  exploring other options if the Fiat did not close quickly."
10  The proposed third option is that the debtors could have
11  refused to accede to the government's terms in the hope that
12  the government would capitulate and agree to consider other
13  alternatives.  The Court concludes that gambling on the
14  possibility that the government was bluffing and listing the
15  potential for a lesser recovery in a resulting liquidation
16  would have been a breach of the debtor's fiduciary duty.
17       Judge Gonzales did not, however, say that he or any
18  other judge would be without power to call such a bluff.  We
19  are not challenging the debtors' choice which was a non-choice
20  to proceed with the strategy.  But we do say that in the
21  circumstances of this case, the Court has the power and
22  authority to push back.  Many people say that Chrysler is the
23  blueprint for GM and that the cases are the same.  They are
24  not.  And they are completely distinguishable in the most
25  fundamental of ways.  The deadline pressures in Chrysler were

62

1  in the main driven by the commercial needs of an independent
2  purchaser.  The business opportunity was legitimate, commercial
3  and limited.  By contrast, there is no real purchaser in this
4  case.  The government is not setting any deadlines with
5  reference to commercial exigencies of the automotive
6  marketplace; it has no experience running a car company.  The
7  deadlines were set to support the strategy of a 363
8  restructuring.
9       If you go to a Broadway musical, you expect an
10  orchestra.  For a 363 fast track sale, you need a drop dead
11  date.  It's part of the scenery; part of the show.
12       As distinct from the dissenters in Chrysler, we are
13  not suggesting that the debtor should have refused to attempt
14  the 363 transaction.  We don't see how they could have.  They
15  had no choice.  As the evidence has showed, and as other
16  parties have argued, the principal decision makers and senior
17  management were not acting with any independence.  They were
18  across the table from their new employer.  They were arguing
19  with their new owner.
20       But this Court can push back.  This Court can call
21  the bluff in the overriding interest of upholding the Chapter
22  11 process.  Consider:  the government has repeatedly said it
23  will not allow GM to fail.  It has said it is committed to
24  creating New GM.  It has already invested 19.4 billion dollars
25  pre-petition and perhaps as much as thirty three billion

63

1  dollars including DIP lending.  It told the public it was on a
2  sixty to ninety day track.  Like any powerful lender or
3  purchaser, it says, my way or the highway.
4       Mr. Wilson said that if the sale order was not
5  approved, Treasury would cut its losses.  Now, I submit that
6  Mr. Wilson's credibility was open to question on some points.
7  His demeanor was markedly different from the other witnesses.
8  He's smart enough to know what findings the Court needs to make
9  to approve the transaction and I believe and I submit that he
10  answered some questions in ways designed to serve the end.  For
11  example, he said that his understanding of the term
12  "languishing" meant anything more than thirty to forty days.
13  Most of his testimony was carefully couched in terms of present
14  intentions and beliefs.
15       But while the drop dead threat is out there, there is
16  nothing that binds the government to abandoning GM and the
17  government can and will react to a decision here, a decision of
18  law by this court, in a manner that is both politically and
19  economically sensible.  Their agreement on funding
20  administrative expenses was limited to 950 million dollars.
21  But we heard Mr. Koch testify that he had a feeling or a belief
22  that they would step up and do something more.  It wasn't in
23  writing but there may be a number of unwritten understandings
24  here as part of the strategy of how the parties are going
25  forward.  And the clear impression from the sixty to ninety day

64

1  pronouncements from both GM and the White House is that while
2  Treasury may not be obligated to fund beyond July 10, they will
3  step up and do so if they have to.  They have to threaten to
4  cut off financing.
5       THE COURT:  Pause, please.  Can you repeat that?  And
6  say a little slower.  And if you had a particular reference to
7  something, I ask you to repeat that as well.
8       MR. RICHMAN:  Yes, Your Honor.  I said the clear
9  impression from the sixty to ninety day pronouncements, which
10  we quoted in our brief from the outset of the case, is that
11  while Treasury may not be obligated to fund beyond July 10,
12  they will step up if they have to.  And to expand on that, it's
13  inconceivable to me that the White House press secretary or
14  GM's CEO would be telling the public sixty to ninety days if
15  they didn't have some assurance of financing beyond July 10th.
16       THE COURT:  Okay.  You preceded the words about clear
17  impression.  It's an inference you want me to draw --
18       MR. RICHMAN:  Yes.
19       THE COURT:  -- or, in fact, is it something somebody
20  said?
21       MR. RICHMAN:  That's correct, Your Honor.
22       THE COURT:  Okay.  Continue.
23       MR. RICHMAN:  The government has to threaten to cut
24  off the financing in order to limit the debtors' options and
25  perhaps those of this Court as well.  But I don't think and I

65

1    don't believe this Court should believe that the government is
2    now going to abandon GM if this Court merely says that the use
3    of 363 is not legally supportable in this case. Do it another
4    way. It's not credible to think that the White House will say
5    tomorrow, we've now decided to let GM fail because we don't
6    want to follow the law. We don't get our way in court on an
7    attempted fast track sale so we're going to give up --
8    sacrifice three-quarters of our investment and flush GM away
9    and the thousands of jobs with it and the dealer network and
10   the dependent suppliers and so on and so on. All the same
11   considerations that the debtors have argued are important
12   reasons to approve the transaction are at least equally
13   important reasons why the government will obey the law if Your
14   Honor determines that the law is that 363 can't be used on a
15   fast track under these circumstances.
16        Now, there was a related power or leverage threat
17   that seemed to come through in the hearings, something like an
18   additional drop dead threat that might be added, pressure for
19   approval of the transaction. And that was the suggestion that
20   the UAW agreements to modify their collective bargaining
21   agreement were in some way conditioned upon and could be
22   rescinded or undone by a failure to approve the sale order by
23   July 10. And I thought that's what Mr. Curson said in his
24   testimony.
25        Your Honor, we checked the documents that were

66

1    submitted in evidence in the records and we could not find
2    anything in writing in the evidentiary record which conditions
3    the collective bargaining agreements in any way. And both Mr.
4    Henderson and Wilson testified that those amendments were
5    already in effect and that the amended bargaining agreement is
6    now governing.
7        In particular, we looked at the amendments that the
8    UAW filed. We just didn't see anything which provided that if
9    the sale order wasn't approved by July 10 that those amendments
10   would be rescinded.
11        Now, the agreement to fund the VEBA, which we ask
12   questions --
13        THE COURT: Pause, please. Can you slice and dice
14   that piece of information? If I heard you right just a second
15   ago, you said by July 10. Would you mean to include or exclude
16   by that whether you had a view as to whether the union would
17   continue to perform this day to day stuff if it didn't get its
18   VEBA funding, new VEBA funding, one way or another or if you're
19   back to square one?
20        MR. RICHMAN: I do have a view of that, Your Honor.
21   My view on that is that the collective bargaining agreement is
22   a binding contract. And it's in effect and it's operative now
23   regardless of what happens to the VEBA at least as I read the
24   record and the evidence. The VEBA deal, I think, is a separate
25   deal. And I understand if it is, at least again as I

67

1    understand the record, it makes sense to me because one could
2    argue that the overall settlement in terms of the amendments to
3    the collective bargaining agreement are an asset of the estate
4    and that the VEBA deal is part of a consideration that should
5    actually go to the estate. But if you keep them legally
6    separate such that the VEBA is not inextricably intertwined
7    then maybe you create a better argument that the VEBA is like
8    the equivalent of giving stock to somebody by the purchaser and
9    isn't really consideration for the modification and then the
10   assumption and assignment of the collective bargaining
11   agreement.
12        THE COURT: Help me on that a little more, because I
13   thought the duty to the UAW's VEBA was in the ballpark of
14   twenty billion bucks and it was a liability rather than an
15   asset.
16        MR. RICHMAN: Your Honor, all I can say is we didn't
17   find any linkage that would cause that to fail in any way. And
18   in any event --
19        THE COURT: Your basic point is that, if you read the
20   documents, you're questioning whether Mr. Curson's right in his
21   view that he's got a package deal here.
22        MR. RICHMAN: Exactly. It goes to the question of
23   whether there's some further dire consequence that Your Honor
24   should consider would result if Your Honor did not approve this
25   transaction by July 10. And I submit that it's not a dire

68

1    consequence because of the lack of linkage. And if there's a
2    separate agreement on the VEBA, that separate agreement, I
3    don't know that it's conditioned on a July 10 approval, but
4    presumably that would still be in play for a plan process.
5        THE COURT: Go on, please.
6        MR. RICHMAN: As we've seen from the hearings, there
7    are many other questions and issues that a plan process could
8    better address: Why is the government getting full credit for
9    prepetition loans that could be challenged as equity? Doesn't
10   that call for more cash to be put into any deal, whether under
11   363 or a plan? Other counsel have raised serious questions
12   about the bypassing of rights under Section 1114 of the Code
13   and of attempts to shed successor liability. And we've also
14   raised other arguments in our brief, which we continue to
15   adhere, including that the transaction should also be rejected
16   as a sub rosa plan.
17        THE COURT: Okay. Pause, please. On the
18   recharacterization point, are you contending that not only the
19   pre-petition secured debt ballpark or nineteen billion bucks --
20   I'd have to check, or maybe it's thirteen billion, I'd have to
21   check the exact figure on that -- should be recharacterized?
22   Are you also contending that the thirty-three billion bucks of
23   U.S. and Canadian DIP financing also has to be recharacterized?
24        MR. RICHMAN: Only the pre-petition debt, Your Honor.
25   I think that in a case that wasn't moving at quite this

69

1    lightning speed where parties had a real opportunity to

2    negotiate allocations and distributions, that there would be

3    greater focus on the priority of that pre-petition loan as

4    compared to other creditors. I partic --

5        THE COURT: But stick with me for a second. Suppose

6    the U.S. government had only bid thirty-three -- credit bid

7    thirty-three billion instead of fifty-nine billion. I'm not

8    aware of there being any bids in the wings that could have

9    trumped a credit bid if it was low as thirty-three billion --

10    as low as.

11        MR. RICHMAN: And we know, we know, as a fact that --

12        THE COURT: -- as thirty-three billion as well.

13        MR. RICHMAN: We know as a fact there weren't.

14    I think that the way I would answer that is if the debtors have

15    produced a fairness opinion that indicates that the fair value

16    for the company is 90 billion dollars or 70 billion dollars,

17    and then you back out 19.4 billion dollars, it suggests that

18    the consideration is short by 19.4 billion dollars and that

19    there either has to be a reallocation of the equity or the

20    infusion of additional funds in order to meet the fair price.

21        But I agree with Your Honor that had this gone

22    differently as a real transaction might have gone -- remember,

23    this wasn't negotiated as a sale of assets. This was a

24    determination of how much money it would take to reach

25    settlement agreements with the favored constituencies, and

70

1    of the professional advisors on that issue.

2        And we appreciate that GM would already be liquidated

3    if the government had not come in late last year to provide

4    financing that no one else could provide. We wouldn't be here

5    discussing this today if the government wasn't committed to

6    saving GM. But that does not earn the government an exemption

7    from the law. Our gratitude to the government rescue does not

8    include sacrificing our legal principles. Perhaps the

9    government could nationalize GM, and we would all be left with

10    nothing, but they chose Chapter 11. And once you choose

11    Chapter 11, you should comply with all of Chapter 11. The

12    government should not be permitted to cherry-pick which

13    provisions of Chapter 11 it will use and which it will not use.

14        Right now, the value of New GM rightfully belongs to

15    the estates and all of its creditors. New companies are spun

16    off through Chapter 11 reorganizations all the time. In that

17    normal process, all of the major constituencies participate in

18    negotiations concerning overall value and allocations of that

19    value. The final results are accompanied by full disclosure.

20    Parties-in-interest have protection against oppressive results

21    through Section 1129. These negotiations would determine how

22    much equity in New GM the Old GM should award to the government

23    or the union or to other parties. That's the essence of the

24    Congressionally-mandated corporate reorganization process of

25    Chapter 11.

72

1    everything else was backed into that. And then, so, a price

2    was derived on the back end.

3        We also argued, Your Honor, that the transaction

4    should be rejected as a sub rosa plan. I'm not going to spend

5    a lot of time on that. The debtors' answer to that is that it

6    doesn't predetermine a plan because, the way this transaction

7    is designed, the 10 percent of stock and the warrants to

8    acquire another 15 percent and, I guess, the 950 million

9    dollars for administrative expenses is being left behind to be

10    distributed in the normal course.

11        But, Your Honor, if you engage in a transaction which

12    removes from the plan matrix an important class of creditors

13    and give them favored treatment outside of the plan process,

14    that's as much predetermining the plan as leaving them in the

15    plan process. You are still predetermining and creating the

16    construct of a plan but you're doing it through extra plan

17    provisions. So I don't think -- just because this doesn't

18    dictate distributions to every class doesn't mean that somehow

19    it's not a sub rosa plan.

20        I want to be clear about an important point, and it's

21    another distinction from the Chrysler case, particularly in

22    respect of parties who stand in the position of bondholders, as

23    our clients do. We've never argued, and we don't contend, that

24    GM should liquidate. We support the creation of a New GM. We

25    think it's a fine idea and we defer to the collective judgment

71

1        By taking what would otherwise be a deliberative

2    reorganization involving all major parties on an accelerated

3    basis and calling it a sale that must be completed by June 10

4    to avoid dire consequences, the debtors and the other favored

5    parties in the allocation of values are engaged in a fiction,

6    in a pretext, in a subterfuge to avoid a plan process in which

7    the allocations of value might be determined differently.

8        We get their arguments. If you accept that this

9    transaction is a legitimate sale, then of course the purchaser

10    can choose to divide up the ownership any way it likes. And

11    therefore, of course, its arrangement with the UAW and the

12    Canadian and Ontario governments, parties who are providing

13    unique present and future value to the new business, is its

14    prerogative. But if it's not a legitimate sale, or if the

15    other tests of 363 are not met, then these important allocation

16    decisions would not be the purchaser's to make.

17        If this Court does not have the freedom to push back,

18    if any distressed company can be diverted into Section 363 in

19    order to avoid plan confirmation requirements by overbearing

20    lenders or purchasers setting arbitrary deadlines or, more

21    importantly for the facts of this case, by an overbearing

22    government, then the Court does not truly have discretion.

23        We have seen before in our history how in times of

24    stress and extraordinary circumstances government asserts

25    itself on more grand and powerful scales than before. In

73

1  substance, this appears to be an historic first attempt at a
2  Chapter 11 nationalization. GM has no ability to resist that
3  power. In our system of government, it is the judicial system
4  which is the primary check on that power. This Court can and
5  should draw the line and hold that this transaction goes too
6  far. Doing so is consistent with Lionel and with Chrysler.
7  Such a holding which recognizes the important distinctions
8  between this and every case that has gone before sends a
9  powerful message that even in the bankruptcy courts of the
10  nation's commercial capitol there are limits and that due
11  process and creditors' rights are important values not to be
12  sacrificed in the interest of expediency. Thank you, Your
13  Honor.
14        THE COURT: Thank you. Thank you, Mr. Richman.
15        All right, Mr. Parker, I'll hear from you. Mr.
16  Parker, on anything that Mr. Richman addressed, I'll ask you to
17  limit yourself to anything where you think Mr. Richman failed
18  to do an adequate job.
19        MR. PARKER: Okay, Your Honor. If I may, may I begin
20  by asking the Court to -- for time reasons, and because I think
21  certain things have been adequately argued already, I'm not
22  going to argue some points that I've raised in my objections,
23  but I'd like to preserve those points.
24        THE COURT: Of course. Anything anybody said in a
25  brief or in a pleading is deemed to have been asserted. I

74

1  mean, the purpose of oral argument, in my court, is not to
2  repeat or to have to say again what you said in your papers.
3  It's to give me orally anything which helps me better
4  understand the papers or answer things where you're plugging
5  the holes.
6        MR. PARKER: Okay. So I'm not waiving anything, any
7  points --
8        THE COURT: Right.
9        MR. PARKER: -- by not mentioning it.
10        THE COURT: That's what I said.
11        MR. PARKER: I know, I'm just clarifying for myself.
12  I'd also like to also incorporate by reference the arguments of
13  Mr. Kennedy and of --
14        THE COURT: To the extent you need to, it's done.
15        MR. PARKER: Okay, and also my immediate predecessor
16  up here.
17        THE COURT: Same.
18        UNIDENTIFIED SPEAKER: Mr. Richman.
19        MR. PARKER: Mr. Richman, right.
20        Thank you, Your Honor. Your Honor, basically I want
21  to address four points, if I may, four points that I don't
22  think have been addressed. One I wish to address very, very
23  briefly, and I'll begin it with apologizing to the Court for my
24  less-than-stellar performance on Tuesday. But I think that
25  less-than-stellar performance is at least partly the result

75

1  of -- I object to the process, and I've objected in my
2  objections, to the process chosen by the debtor. This is not a
3  criticism of the Court or of yourself; this is a criticism of
4  the process they chose.
5        I don't believe that there has been adequate time to
6  prepare a response to their motion. For example, and after
7  making the example I'll move onto another point, for example,
8  they criticize, or in their oral argument to the Court they
9  have emphasized, that they're the only ones who've provided any
10  valuation scenarios for General Motors. Well, of course, they
11  had several months to prepare those valuation scenarios. We've
12  had less than thirty days. The time frame -- I mean, I filed
13  my objection on June 19th, so I've basically had eleven days.
14  In eleven days you can't find an expert, have an expert get
15  access to the records and create a valuation report. I don't
16  think it can be done. So I'm objecting on those grounds.
17        But I'll move on. One of the things I'm objecting
18  to, and I believe I'm the only one who's objecting on this, is
19  the limitation-on-liens argument. The -- I rest upon two
20  documents -- well, three documents: first, the 1995 indenture,
21  which I believe is Debtors' Exhibit 10 in evidence, if my notes
22  are correct. Section 1408 provides that it's governed by New
23  York and is to be interpreted by New York law. Section 406
24  contains a limitation-on-liens provision, which I think the
25  Court can read; I don't think the Court needs me to repeat it.

76

1        In addition, there's Parker's Exhibit 1 in evidence,
2  which I believe is my only exhibit, which is a prospectus
3  supplement dated June 26, 2003 for six and a quarter Series C
4  convertible debentures due in 2033, with an attached prospectus
5  dated June 19th, 2003. If you look at page 23 of the June 19th
6  prospectus, the one that's attached to the supplement, you'll
7  find that the identical limitation-on-liens provision is found
8  in that prospectus and that it applies to my bonds. The
9  prospectus also states that my bonds are issued under the 1995
10  indenture.
11        Now, the third document that I'm relying upon is -- I
12  believe it's Debtors' Exhibit 6. Again, back there it's
13  difficult to keep track of which exhibit is which, but it's the
14  loan and security agreement dated December 31st, 2008. And if
15  you'll give me one second to get the agreement. Here we go.
16  If you go to page 35 of Exhibit 6, which -- and I'm using the
17  numbers on the top right-hand corner --
18        THE COURT: Go on.
19        MR. PARKER: Do yours have the same pagination?
20  Otherwise, I'll use the pagination from the original document.
21        THE COURT: Why don't you speak to it, because it'll
22  take me a little bit of time to find it. But --
23        MR. PARKER: Sure, if I may.
24        THE COURT: -- I'll assume, unless somebody
25  disagrees, that you're accurately reading to me. And I'm

77

## Page 78

1  familiar with the issue. What I want you to focus on is
2  excluded assets within the meaning of the December 31st, 2008
3  agreement.
4      MR. PARKER: Yes, sir, I know, I'm getting there.
5  Paragraph -- or I should say section 4.01(a) creates a lien on
6  all real and personal property wherever located, where
7  excluded. Okay, section -- subsection - sub-subsection (a)(6)
8  provides a lien on all personalty; it gives a nonexclusive
9  definition of personalty, including equipment and instruments.
10     Section 4.02 provides that General Motors is to
11 provide UCC filings in order to perfect the government's liens
12 on all equipment. And there's a schedule of all the properties
13 where equipment is located that UCC liens are to be filed for;
14 that's section .402 (sic) on page 36. And, again, I'm using
15 the pagination 36 of 111 in the top right-hand corner.
16     Section 6.09 has excluded collateral, and it refers
17 one to schedule 6.29. It states that section 6.29 is a
18 complete and accurate list -- by the way, that's 6.29, I'm
19 sorry, not 6.09. Section 6.29, which is on page 51 of 111,
20 states that, on excluded collateral, "See, set forth on
21 Schedule 6.29, is a complete and accurate list of all excluded
22 collateral of each property." When you go to schedule 6.29,
23 you get a blank page. It says "Schedule 6.29, Blank". So
24 apparently there is no excluded property.
25     It then goes on --

## Page 79

1      THE COURT: Mr. Parker, are you going to eventually
2  get to subsection v --
3      MR. PARKER: Yes, yes.
4      THE COURT: -- romanette v, one of the definitions of
5  excluded collateral?
6      MR. PARKER: Yes, sir, but -- okay. I am eventually.
7  My point about what I -- to summarize, I was going through the
8  documents to show you -- I realize that there is a subsection v
9  on -- bear with me a second -- section 4.01, subsection v,
10 defines excluded -- has a definition of excluded property but
11 says "any property, including any debt or equity interest, any
12 manufacturing plant or facility which is located within the
13 continental United States, to the extent that the grant of a
14 security interest therein to secure the obligations will result
15 in a lien or an obligation to grant a lien in such property to
16 secure other obligation". I understand that that's there.
17 What I'm trying to show the Court is that even though that's
18 there they still went and filed liens on property. And I don't
19 think you can file liens on property and get an excuse for it
20 by saying oh, well, I filed someplace else a statement that if
21 I did it I didn't mean it.
22     The documents show that -- I might add, if you go to
23 section 6.30, Mortgaged Real Estate, that's actually the only
24 section that I've been able to find where they have language
25 that says we do not have a lien on mortgaged real estate if the

## Page 80

1  lien would give rise to a lien in favor of a person as set
2  forth in schedule 30 hereto. By the way, schedule 30 hereto is
3  also blank.
4      It seems to me that they have, whether they were
5  allowed to or not, and whether they've excused themselves from
6  doing it or not, filed liens on two classes of property that I
7  would like to bring to the Court's attention. The first class
8  of property is listed in schedule 6.25, which is the UCC
9  filings. They have filed the UCC filing -- lien on the
10 following -- on the manufacturing and equipment of the
11 following localities: the Doraville Assembly Center, the
12 Janesville Assembly Center, the Moraine Assembly Center, the
13 Massena Castings, Pittsburg Metal Stamping, Grand Rapids Metal
14 Stamping, Spring Hill Manufacturing Campus, Wilson Run (ph.)
15 PDC, Latsina (ph.) PDC, Pontiac North Pitt 17, Pontiac North
16 PC, Yps -- I can't even pronounce it -- Ypsilanti Vehicle
17 Center, Beavertown PDC, Grand Blanc Metal Center, Former Cherry
18 Town Assembly, Former Validation Center, Former Lansing Plants
19 1, 2, 3, and 6.
20     Finally, Your Honor, under schedules 1.1 and 1.2,
21 they've made it clear that among the assets that have been
22 liened are Saturn. Saturn is -- at least according to the
23 testimony of Mr. Fritz Henderson, Saturn is the only
24 manufacturing -- American manufacturing subsidiary of General
25 Motors. They've liened that. And indeed, because they liened

## Page 81

1  that, I believe that Saturn is a -- has an accompanying
2  bankruptcy proceeding that's consolidated with this one.
3      Now, I realize they say they gave themselves an
4  escape clause and if we lien something and we shouldn't have it
5  as liened. But in point of fact, they did lien it. And the
6  escape clause shows that they knew that they had obligations
7  not to lien it. And when they liened it, when they liened
8  these facilities and when they liened Saturn, under the terms
9  of the bond indenture, the 1995 bond indenture, the bondholders
10 acquired liens equal and ratable to that of the government.
11     THE COURT: Mr. Parker, do you think that if Mr.
12 Schwartz had come in to me and said I got a lien on that stuff
13 and any other party-in-interest in the case showed me romanette
14 v he wouldn't have been left out of court?
15     MR. PARKER: I don't know, Your Honor. I do know
16 that they attempted to perfect a lien on these assets even
17 though they were prohibited from doing so. And, Your Honor, if
18 nothing else, I believe that that goes toward the issue of bad
19 faith. I believe -- which, by the way, gets us to the next
20 issue that I wish to discuss.
21     THE COURT: Good time to do it.
22     MR. PARKER: Pardon?
23     THE COURT: Go ahead, please.
24     MR. PARKER: Give me a second to get there.
25     In order to approve a 363 sale, the government must

1    allege and prove good faith.  In looking at good faith, the
2    Court, I believe, needs to take a look at the totality of the
3    circumstances concerning not only the sale but of the events
4    leading up to the sale under the arrangement between the lender
5    and the debtor.  Even if they did not succeed in acquiring
6    liens on the properties -- on that long list of manufacturing
7    equipment that I listed -- and on Saturn, the only -- to the
8    best of my knowledge, and according to Mr. Henderson's
9    testimony, the only manufacturing subsidiary of GM, they
10   attempted to acquire liens.  They made UCC filing statements.
11   Schedule 6.25 shows the places where they scheduled and what
12   they -- the places where they liened the equipment and what
13   they liened.  Doing so, attempting to do so, Your Honor, is an
14   attempt to violate the covenants of our indentures.
15        In addition, the further evidence of bad faith is
16   found in the fact that their 363 sale procedure is tantamount
17   to a distribution plan which discriminates in favor of certain
18   favored creditors against others, as has been previously argued
19   by others.  Also, their 363 plan, as argued by Mr. Kennedy, is
20   designed to avoid a Section 114 hearing and the effects of the
21   114 hearing.
22        THE COURT:  114?
23        MR. PARKER:  1114, I'm sorry.  1114.  Further, Your
24   Honor, as ably argued by --
25        UNIDENTIFIED SPEAKER:  Mr. Richman.

82

1    MR. PARKER:  Mr. Richman, sorry.  You can obviously
2    tell there's not been much coordination between us.  As ably
3    argued by Mr. Richman, there is no real purchaser.  There is no
4    real -- there's been -- there's no real purchaser, there's been
5    no real negotiation.  This is basically the government selling
6    GM to itself.
7         Furthermore, Your Honor, and I guess this gets me to
8    my next point, I've argued in my objection that the government
9    is not authorized to purchase General Motors under EESA, that
10   is, the Emergency Economic Stabilization Act, or under TARP,
11   the Trouble Assets Recovery Program.  The -- as Mr. Wilson
12   testified, the loans that were given to General Motors were
13   given from TARP funds.  I have argued -- and I'm not going to
14   repeat the arguments here, I'm going to rest upon the argument
15   in the objection -- I have argued that the government is not
16   authorized, was not authorized to make those loans under TARP.
17   Making loans that it is not authorized to make is also evidence
18   of bad faith.
19        I realize that there is some question of whether I
20   have standing to raise this issue, and I'd like to address that
21   very briefly.  I do not believe that I have standing to
22   challenge the use of TARP money for the DIP lending, for the
23   DIP loans.  I believe you entered an order authorizing DIP
24   financing back on June 25th.  I had no standing to object
25   because I was not harmed by that action.  Because I did not

83

1    have standing to object, I didn't object.  However, I am harmed
2    by the government's proposed sale procedure, and because I am
3    harmed -- if they are going to use a credit bid of roughly
4    forty-nine billion dollars of TARP money to purchase GM.  So
5    they are using TARP money to make a purchase.
6         If my argument, as set out in the objection, is
7    correct, they are not authorized to use TARP money.  They may
8    use TARP money to buy a bank; they may use it to buy all sorts
9    of financial institutions.  But whatever else General Motors
10   may be, it is not a financial institution.  The use of money to
11   do something that they are not authorized to do is evidence of
12   bad faith.
13        Finally, Your Honor -- further, Your Honor, on bad
14   faith, I have argued in my brief that there are Constitutional
15   probl -- that there are Fifth Amendment taking problems with
16   the proposed proceeding.  I'm not going to repeat those
17   arguments here.  But, again, those concerns are evidence of bad
18   faith.
19        Which gets me to my final point.  I'm trying to go as
20   quickly as possible; I'm trying not to use too much time.  My
21   final point, Your Honor, if I can find it -- oh, yes.  I need
22   to refer to one more exhibit, if I may.  Here we go.  My final
23   complaint, Your Honor -- and by the way, I -- my final
24   complaint refers to the scheme of distribution, the
25   distribution of the sale proceeds of this 363 proceeding.  Now,

84

1    I want to make clear, I'm not objecting to the sale price.  As
2    I understand it -- and I'm referring now to the declaration of
3    Stephen Worth, Debtors' Exhibit 3, Exhibit F, page 15.  I don't
4    know what exhibit number Stephen Worth -- I don't know what
5    exhibit number it is, but his declaration is in evidence -- he
6    testified -- Exhibit F, page 15.  It is an analysis of the
7    proposed transaction.  It shows that the United States Treasury
8    is paying 104.5 billion dollars.  By the way, I'm using the
9    lower numbers in these calculations.  There's a difference; he
10   gives a range of -- it's usually only two to three billion
11   dollars different; I'm using the lower number.  You can redo
12   the calculations with the larger number if you prefer.
13        He gives a bid of 104.5 billion dollars.  That's
14   what, according to him, the Treasury is paying for General
15   Motors.  I think that's a fair price for General Motors; I'm
16   not quibbling over that.  According to him, the way that the
17   government is paying it is they're making a credit bid of 48.7
18   billion dollars of secured lending.  Now, I don't think he
19   quite explained to you how that number comes about, so I'd like
20   to explain it to the Court, if I may.  The total secured
21   indebtedness, excluding my argument about bonds, the total
22   secured indebtedness is approximately fifty-six billion
23   dollars.  The way you get that number is you take the 19.4, you
24   take the 33.3 and you add on the 6 billions that are owed to
25   previously secured lenders.  You add all those numbers up; you

85

1   come into approximately fifty-six billion dollars.
2       The government is taking back a loan, a secured loan,
3   from General Motors, the New General Motors, of approximately
4   seven billion dollars. They're also taking back two billion
5   dollars in preferred stock. If you take those two numbers out,
6   you come up with the 48.7 billion dollars that is listed here
7   on page 15 of Exhibit F of Stephen Worth's declaration.
8       Now, I fully recognize that secured lenders should be
9   paid first. So out of the 104 billion dollars they should get
10  their 48 billion. The problem is that when you look at the
11  sheet you realize that he -- that the other way, the other
12  consideration given, is that -- and if you look at the second
13  column -- the government is assuming and paying in full, or
14  agreeing to pay in full, 48.4 million (sic) dollars of
15  unsecured debt, which, by the way, according to the testimony
16  of everybody who's been up here, does not include the debt of
17  the UAW VEBA.
18      Now, personally, I find that testimony to be -- I
19  question the testimony. It seems to me that if the UAW VEBA is
20  getting 20.5 million dollars and is releasing its claim of
21  20. -- did I say million? I meant billion -- 20.5 billion
22  dollars and releasing its claim of 20.5 billion dollars in the
23  estate, that seems to me to be a payment.
24      For the purpose of this argument at the moment
25  though, I'm not going there. I've argued that in my objection;

86

1   I will -- obviously have argued that here. I agree with that
2   argument. But I'm arguing something slightly different. If
3   you take -- since the 20.5 billion is gone, according to this
4   sheet the total indebtedness for General Motors, that is, I
5   guess, real indebtedness, not just pro forma indebtedness, is
6   roughly 104.5 billion dollars, excluding the -- no, that's not
7   right, it's 48 and 48 makes 96; 97 plus 35 makes -- roughly 132
8   billion; I may be off by a billion or two because I did a fast
9   calculation in my head. The real debt in General Motors is 132
10  billion, excluding the 20.5 billion that's owed to the VEBA.
11  The government's getting 48.7 billion to pay off secured
12  lenders. That leaves 83.4 billion dollars in unsecured debt
13  that needs to be taken care of. 48.4 billion is being paid 100
14  percent on the dollar; 35 billion, including the 28 billion in
15  bonds -- and by the way, they keep saying it's 27, but when you
16  do the math with interest to June 1st or May 31st, take your
17  pick, 2009, it actually comes to 28 billion. The 28 billion
18  dollar debt is getting 7.4 billion dollars; roughly 20 cents on
19  the dollar.
20      So under the sale procedure, some unsecured
21  creditors, favored unsecured creditors, and we're not talking
22  about the VEBA now, are getting a hundred cents on the dollar
23  while others are getting twenty cents on the dollar. My
24  objection is let's take the purchase price but let's treat all
25  the unsecured creditors equally and ratably. And if you do

87

1   that, they would all get sixty-six cents on the dollar.
2       Furthermore, Your Honor -- so, Your Honor, that, I
3   believe, is my final point. The government is not only showing
4   favoritism with regard to the VEBA; they're showing favoritism
5   with regard to other unsecured claims. In a Chapter 1129
6   proceeding, those unsecured claims would be treated like all
7   other unsecured claims. And this, by the way, gets back to
8   good faith. In order for the government to be showing good
9   faith, they must be treating all unsecured creditors fairly.
10      Now, allegedly they have a good business reason for
11  treating the VEBA differently. I don't buy it; you may. I'm
12  not arguing for that this second. I don't agree with it. I've
13  argued otherwise in my objection. But putting that to one
14  side, they still have an obligation to treat all the remaining
15  creditors fairly, and they're not doing so. They're picking
16  winners and losers. And they've given no business
17  justification for these other winners that they've picked.
18      And for these reasons, Your Honor, I would urge you
19  to reject the sale. And I will make clear, I want General
20  Motors to reorganize. It is not in my interest or any
21  bondholder's interest to see General Motors liquidated,
22  although we have not had time to make a liquidation analysis.
23  All we want is an opportunity to negotiate in good faith with
24  the government to come up with a plan that is fair, fair to all
25  unsecured creditors.

88

1       With that, thank you very much, Your Honor, and I
2   want to thank you for your indulgence over the past three days.
3       THE COURT: Very well. Thank you.
4       All right, Mr. Bernstein?
5       MR. BERNSTEIN: I'll try to be brief, Your Honor.
6       THE COURT: Yes, I understand the issues. The main
7   thing I want to hear from you on is whether there's recall
8   authority supporting the idea that the consent decree
9   obligation is something other than a monetary obligation.
10      MR. BERNSTEIN: Yes, Your Honor. First thing that
11  supports it is that -- may I approach the bench, Your Honor?
12      THE COURT: Yes, sir.
13      MR. BERNSTEIN: Nolan entered a joint stipulation,
14  modified the consent decree and then entered the pack of them
15  as a final judgment of the United States District Court for the
16  Southern District of Indiana.
17  PENINA 1:24:32
18      THE COURT: Is this new evidence, or is this --
19      MR. BERNSTEIN: I believe you can take judicial
20  notice of this. We found this last night in response to Your
21  Honor's question, and you'll see the second as the final
22  judgment, Your Honor. It was entered by Judge Nolan under
23  54(b).
24      THE COURT: All right. Pause, please, Mr. Bernstein.
25  Mr. Miller, do you object to me considering this?

89

1    MR. MILLER: No, Your Honor.

2    THE COURT: Okay.

3    UNIDENTIFIED ATTORNEY: I'm sorry, Your Honor, we

4    don't have a copy of the judgment --

5    MR. BERNSTEIN: I can give you -- I have extra copies

6    for you, I'd be glad to provide them. Here's the stipulation

7    and order, and let's see if I have copies -- here's an

8    extra copy of the final judgment.

9    The second point, Your Honor, the legal context is

10   set by the Supreme Court of the United States. One of the

11   leading cases is Rufo v. Inmates of Suffolk County Jail. The

12   citation is 502 U.S. 367. And the relevant citation is at page

13   378: "There's no suggestion in these cases that a consent

14   decree is not subject to Rule 60(b)." I have Rule 60(b) as a

15   rule for modifying judgments.

16   THE COURT: Right. And --

17   MR. BERNSTEIN: Right. "A consent decree, no doubt

18   embodies an agreement of the parties, and thus in some respects

19   is contractual in nature. But it is an agreement the parties

20   desire and expect will be reflected in and be enforceable as a

21   judicial decree that is subject to the rules generally

22   applicable to other judgments and decrees."

23   The case counsel cited was one of these cases

24   involving an interpretation of the language of a consent order

25   or a consent decree, and yes, to that narrow context, the

90

1    courts look to contractual reasons, because the judgment

2    reflects an agreement of the parties. But in terms of

3    enforcement, a leading case in the Second Circuit is Badgley v.

4    Santa Croce -- I'll spell out the name, because I'm making a

5    hash of pronouncing it, I think. It's B-A-D-G-L-E-Y v.

6    S-A-N-T-A C-R-O-C-E. And in that case, the Second Circuit

7    reversed a decision of the district court denying the

8    enforcement of contempt proceedings in a civil consent decree

9    context.

10   "The respect due to the federal judgment is not

11   lessened because the judgment was entered by consent. The

12   plaintiff's suit alleged denial of their Constitutional rights.

13   When the defendants chose to consent to a judgment rather than

14   have a district court adjudicate the merits of the plaintiff's

15   claims, the result was a fully enforceable, federal judgment,

16   that overrides any conflicting state laws or state order.

17   The --"

18   THE COURT: I hear you, Mr. Bernstein. But where I

19   need help from both sides --

20   MR. BERNSTEIN: Yes, sir.

21   THE COURT: -- is whether when a federal court

22   proceeding gives rise to a judgment, consent or otherwise, that

23   creates a monetary obligation --

24   MR. BERNSTEIN: Yes, sir.

25   THE COURT: -- where the monetary obligation is a

91

1    discharge of a debt?

2    MR. BERNSTEIN: I misunderstood the question that you

3    raised yesterday. I thought you were raising the question

4    whether this was a mere contract or whether it was --

5    THE COURT: That was, for better or for worse,

6    another way of saying the same thing. And if I didn't say it

7    as well as I should have, I owe everybody in the room an

8    apology. But as I understand the issue, a consent decree

9    issued by a federal court required the debtor to pay money.

10   MR. BERNSTEIN: That is correct, Your Honor.

11   THE COURT: And the question that I need help in is,

12   is this like a lot of the other -- the debtors' other

13   contractual debts which, at least, seemingly fall within the

14   unsecured creditor community, or whether there's something

15   special about a monetary obligation that's been created by a

16   federal court decree that makes me analyze it in a different

17   way?

18   MR. BERNSTEIN: I would answer it this way, Your

19   Honor. This is a judgment, and the deliberate refusal by

20   General Motors to honor that judgment was inequitable conduct,

21   indeed conduct potentially punishable by civil contempt. And

22   therefore the Court has good grounds to modify on an equitable

23   basis, the sale agreement to provide for the small adjustment

24   we requested. And of course, Mr. Wilson yesterday testified it

25   was unlikely that the transaction -- the financing would be

92

1    affected by that.

2    THE COURT: Okay.

3    MR. BERNSTEIN: Thank you.

4    THE COURT: Thank you very much. All right. Yes?

5    MS. WICKOUSKI: Your Honor, I'm Stephanie Wickouski

6    -

7    THE COURT: Well, I need you to come to a microphone,

8    please. I take it you're coming up because you wanted to argue

9    on any of the issues we have before us.

10   MS. WICKOUSKI: Um --

11   THE COURT: And that your predecessors haven't done

12   it adequately.

13   MS. WICKOUSKI: -- yes, Your Honor. And my name is

14   Stephanie Wickouski. I'm here on behalf of two of the

15   indenture trustees on certain leverage lease transactions,

16   manufactures and Traders' Trust Company and Wells Fargo Bank

17   Northwest. We filed objections to the sale, but through, I

18   think, innocent inadvertence on the part of debtors' counsel,

19   they were not addressed in the omnibus objection by oversight.

20   This came to our attention on the eve of the hearing,

21   and we've had subsequent discussions that I think have

22   partially resolved and expect to resolve over the next week,

23   our objections. So I wanted to indicate what has been

24   discussed. I'm also here with counsel --

25   THE COURT: Tell me, Ms. Wickouski, I'm wondering how

93

1   much this is consistent with what I said before.  If you have a
2   deal, and you're telling me that you're working it out, this
3   isn't the time that I wanted to deal with matters of that
4   character.  And I don't want to be a jerk or a martinet, but I
5   am trying very hard in a case with 850 objections, to deal with
6   them in a way so that I can triage the matters before m.
7        MS. WICKOUSKI:  I understand, Your Honor.  And I
8   apologize.  It was my misunderstanding that the indenture
9   trustees were not being heard at this time.
10       THE COURT:  Well, if you're saying you've got a lien
11  and that your lien has to be addressed, and you've either got
12  to get satisfaction of the lien or a carry-through on the lien,
13  or something like that, that doesn't strike me as rising to the
14  level of controversy as a lot of the other matters that I have.
15       Now, if I'm understating your legal concerns, and you
16  want to argue a legal point, I'm not going to but a sock in
17  your mouth.  But if you're telling me that you and the debtor
18  are having a dialogue that lenders and debtors have all the
19  time to address issues of this character, I applaud that, and I
20  simply say, if you want to confirm your understanding at the
21  end, when I deal with other similar confirmations, I'd be happy
22  to hear that.
23       MS. WICKOUSKI:  Yes, Your Honor.  And my apologies
24  I misunderstood in terms of the course for proceedings, and I -
25  -

94

1        THE COURT:  I understand that I don't always speak
2   with perfect clarity.  And no offense intended.  But certainly
3   I want to deal with it, Ms. Wickouski.
4        MS. WICKOUSKI:  Understood, Your Honor.  Thank you.
5        THE COURT:  Thank you.  Okay.  Do I have any other
6   substantive objections that are actually being argued that I
7   haven't heard yet?  Mr. Schulman?  Mr. Mayer?
8        MR. MAYER:  Yes, Your Honor.  If I may.  Well, this -
9   -
10       THE COURT:  Oh, another asbestos objection.
11       MR. REINSEL:  Your Honor, Ron Reinsel on behalf of
12  Mark Buttita.  I will try not to rehash anything Mr. Esserman
13  said or anything the very eloquent Mr. Jakubowski said.  I want
14  to make just a couple of points and a clarification.
15       We have objected on a number of grounds, including
16  sub rosa plan, and the extent to which the requested sale
17  extends pat the bounds of 363, specifically to claims, and most
18  importantly to future claims; that they are not interests in
19  property, and a certainly that future claim that has not come
20  into existence, has not arisen, goes so far beyond the pale of
21  an "interest in property" even if that is permitted.  But I
22  want to concentrate on just a couple of points that distinguish
23  this case both from Chrysler and TWA, and also the White Motor
24  case that the debtors have relied on.
25       Contrary to Chrysler, Judge, and contrary to TWA,

95

1   this isn't a sale of assets that will meld assets into an
2   existing business.  It is, instead, a standalone, complete
3   continuation of the exact same business enterprise.  It is the
4   same products; it is the same employees; it's the same
5   management; it's the same marketing; it's the same logos.  And
6   to accomplish what the debtor and Treasury has indicated they
7   want is "a seamless transition in the eyes of consumers."  In
8   other words, New GM is just the same Old GM.
9        Yet, they want to escape the strictures of potential
10  continuation of liability as a successor of existing GM.  They
11  look -- in the order that they're going to present to you,
12  while we haven't seen any final order yet, but we've seen what
13  they're looking for.  And that is complete, but not just an
14  approval of a sale, but protection from specific factual
15  findings that may lead subsequent state courts to find that
16  there is continuation of liability under relevant state law;
17  despite the fact that many of those findings fly specifically
18  in the face of the evidence that we heard here, that could well
19  lead a state court to find such continuing liability.
20       Secondly, Judge, as you noted yesterday also in that
21  order, they're looking for an injunction.  And you asked if
22  that injunction didn't kind of sound like a duck -- like the
23  injunction under 524(g).  Well, Your Honor, it not only sounds
24  like a duck, it quacks like a duck, it walks like a duck, it
25  flies like a duck, and leaves feathers behind it like a duck.

96

1   It is completely the injunction as to future asbestos liability
2   that was provided for in Section 524(g).
3        Now, aside from the discriminatory treatment that's
4   provided here, they're trying to get protections under the code
5   without complying with the code's requirements.  Now, Mr.
6   Miller pointed out that this is not an asbestos case.  This is
7   not an asbestos-driven case, and that they're not seeking
8   relief under -- they're not including Section 524 treatment
9   here.  All of that is absolutely true.  The point is, however,
10  they're trying to get equivalent relief without complying with
11  the statutory requirements.  And that goes both to the ability
12  to even give the relief, as well as the effective notice and
13  due process requirements that are required in order to get that
14  relief.
15       Let's distinguish some of those cases -- the other
16  cases.  White Motors, it acknowledges, found that 363 did not
17  provide a basis to sell assets free and clear of claims.  And
18  it went on to find that in order to do that, however -- this is
19  certainly beyond the express statutory language -- the statue
20  says "free and clear of interest in that property."
21       Now, whether or not claims become interest in
22  property, cited in other cases.  But it found that 363 didn't
23  provide that basis.  We had to look to Section 105 of the code,
24  the Court's general equitable powers to make things happen --
25       THE COURT:  Yes, I know.  We went through that with

97

1    Mr. Jakubowski.
2         MR. REINSEL:  All right.  But here's where I wanted
3    to get with that, Judge.  White Motors was decided in 1987.  In
4    1994 Congress enacted Section 524(g).  Section 524(g) provides
5    a comprehensive design by Congress for dealing with asbestos
6    claims specifically, both present, and more importantly, future
7    claims; looking at the unique situation that that kind of
8    injury entails, particularly that it's an insidious product, it
9    went into commerce, and it has a very long latency period, such
10    that from exposure to actually manifesting a disease, finding
11    out that you have a claim, is a matter of decades.  Ten,
12    twenty, thirty, forty years.  Such that those folks who will
13    develop disease, who will become claimants, are not presently
14    claimants.  In fact, the nature of their potential future
15    illness is specifically excluded from the definition of a claim
16    under the Bankruptcy Code.  And in fact, under 524(g) it's
17    referred to a demand.
18         The problem of recognizing of how to give adequate
19    due process to those future potential claimants, those demand
20    holders, and how to give adequate notice, because you can't
21    give them notice -- in fact, we asked Mr. Henderson -- one of
22    the few questions I asked here, was, you gave broad notice of
23    these proceedings in order to give everyone notice of their
24    rights were at issue and could be affected.  But he recognized
25    that GM has 650 million dollars-worth of projected asbestos

98

1    liability going out over a period of at least ten years, and
2    that many of those claimants, many of those potential
3    claimants, don't presently have a disease, don't know they have
4    a claim, and that whatever publication notice was given to
5    them, wouldn't have reached them and would have done them no
6    good whatsoever.
7         In Chrysler, they kind of gave that notice issue
8    fairly short shrift.  There's one -- they deal with it about
9    two sentences on page 111 of that decision, simply holding that
10    "With respect to potential future tort claimants, their
11    objections are overruled, as those issues have been discussed.
12    Notice of the proposed sale was published in newspapers in very
13    wide circulation, and the Supreme Court has held that
14    publication of notice in such newspapers provide sufficient
15    notice to claimants 'whose interests or whereabouts could not
16    be with due diligence, ascertained'", citing to the Supreme
17    Court's decision in Mullane v. Central Hanover Bank.
18         Mullane was a trust fund case.  You either held funds
19    in a trust or you didn't.  This --- we're not presented here
20    with a question of we can't ascertain the location of folks; we
21    can't, with reasonable due diligence send them a specific
22    notice, such that the publication even becomes sufficient.
23    We're dealing with individual whose claim doesn't yet exist,
24    who don't know that they have rights that may be affected, and
25    won't know that for years.  That's why Congress, in Section

99

1    524(g), provided mechanisms to provide due process to those
2    folks, by the creation of a specific representative in the
3    court.
4         Last week you were asked to appoint someone -- a
5    futures representative to look out after the interests of those
6    future folks.  You declined.  You said we may look at that
7    later.  But the point is, there is no one here looking out for
8    their interests today.  They didn't get notice of this
9    proceeding.  You can't give effective notice of this
10    proceeding.  And no one is representing them here.  I want to
11    be clear, I am representing a single current asbestos claimant.
12    Mr. Esserman was representing single current asbestos
13    claimants.  We're not advocating -- other than saying they're
14    not here, Judge, we're not here in a position where we can
15    reasonably represent their interests in this case.
16         But let me be clear about the impact of 524(g) here.
17    As we said, this is not an asbestos-driven case.  There is no
18    requirement that the debtor use 524(g) here.  However, the
19    point is, if they don't -- if they don't employ the processes
20    that Congress designed in that section of the code to provide
21    adequate notice, adequate due process to claimants, then you
22    don't get the protections that that section provides.  You
23    don't get the injunction that they're looking for, at least as
24    to asbestos claimants.  You don't get the removal of future
25    successor liability as to those asbestos claimants.  It's a

100

1    question -- it's up to the debtor, and in this case, and the
2    buyer, to decide if they want to include those sorts of
3    relevant protections.  If they don't -- protections for the
4    claimants and future claimants.  However, if they don't the
5    point is, they take their chances, and you, Judge, can't give
6    them the same protections as that specific statute would under
7    the Court's general 105 equitable powers.  That's all, Your
8    Honor.  Thank you very much.
9         THE COURT:  Thank you.  Mr. Mayer?
10         MR. MAYER:  Thank you, Your Honor.
11    (Pause)
12         MR. MAYER:  Excuse me, Your Honor.  I need thirty
13    seconds to decide -- to figure how much of what we talked about
14    last night can be put on the public record at this moment.  Is
15    it possible to take a five --
16         THE COURT:  How much time to you need?
17         MR. MAYER:  -- take a short recess, perhaps?
18         THE COURT:  Actually, since we've been going so long,
19    let's take a ten-minute recess.
20         MR. MAYER:  Okay.  Thank you, Your Honor.
21         THE COURT:  See you back in ten minutes, folks.
22    (Recess from 10:47 a.m. until 11:10 a.m.)
23         MR. MAYER:  Thank you, Your Honor.  And good morning.
24    Again, Thomas Moers Mayer for Kramer Levin Naftalis & Frankel,
25    counsel to the official committee of unsecured creditors.

101

1    First, a housekeeping item. I'm pleased to report
2  that we can't confirm that we are fine on the GE matter; I
3  think that may be a typo. My partner at Waldorf was actually
4  with his wife at a medical facility and was able to get to us
5  and tell us he had this --
6    THE COURT: That's fine.
7    MR. MAYER: The committee is prepared to withdraw its
8  limited objection to the sale motion subject to the following:
9    First, individual committee members have forcefully
10  advocated certain of the arguments advanced in the committee's
11  limited objection, and the committee's withdrawal of its
12  limited objection is without prejudice to any position taken by
13  those individual committee members on their own behalf.
14    Second, the committee's withdrawal of its limited
15  objection is subject to the completion of the wind-down budget
16  and the sale order to the committee's satisfaction. And in
17  that connection, Your Honor, I'm pleased to report that in
18  literally the last sixteen hours, in a meeting that went until
19  I think 2 in the morning and resumed at 7, and it was handled
20  primarily for the committee by FTI's Conner and Anna Phillips
21  and two partners from my firm who are not here today, Amy Caton
22  and Bob Schmidt. Actually, Bob is here, I apologize.
23    We were able to close the substantive gap on the
24  wind-down budget. My understanding, which I would ask the
25  government to confirm is that the total amount of the facility

102

1  being provided to cover wind-down expenses has been upsized
2  such that the government is going to make available financing
3  in the amount of 1.175 billion dollars, Your Honor.
4    In addition, there is an agreement that asset
5  proceeds which have previously been dedicated to the repayment
6  of the government's facility will be available to fund
7  additional expenses if needed.
8    The government has agreed that asset sale proceeds
9  that were previously dedicated to the repayment of the
10  government's wind-down facility will now be available for the
11  payment of wind down expenses if needed.
12    MR. JONES: Also correct, Your Honor. And I should
13  make clear that the funding facility is on a non-recourse
14  basis, as has been the case throughout these discussions.
15    MR. MAYER: The details are still being fine tuned,
16  but those are the highlights. We also had useful discussions
17  with AlixPartners on its administration of the wind-down,
18  again, details will be forthcoming. But we believe we have an
19  agreement in principal on certain elements on that that are
20  important to us and will be disclosed at a later time when Alix
21  is prepared to come forward with its application.
22    With respect to corporate governance, there are two
23  time periods. There's a period between now and confirmation
24  and -- strike that. Consummation. And there's a period
25  between consummation and final distribution. And to be precise

103

1  we talked in this proceeding, Your Honor, about a sale
2  consummation, that's not what I mean here. I mean, there's a
3  period between the sale and the consummation of a Chapter 11
4  plan. And then there's a period after consummation of a
5  Chapter 11 plan. And we have agreements in principle for the
6  most part on both periods. One is ready for publication.
7    During the period from the sale until consummation
8  of a plan of reorganization, it is our understanding that the
9  board of directors of this debtor will be composed of one
10  designee from Alix, one designee from the creditors' committee.
11  And there's a third individual who the parties have agreed on,
12  but I'm not entirely sure he has agreed on it, so perhaps I
13  should keep his name confidential for the moment. But we have
14  an agreement on a person that would be acceptable to both of
15  us. And actually is quite a good pick.
16    And, again, the permanent board -- the board for the
17  post-consummation, GM -- Old GM will be in a plan of
18  reorganization and disclosure statement, itself, but we have
19  the outlines of an agreement on that as well.
20    Based on those agreements and one or two other
21  things, there was an issue that came up yesterday, about
22  workers' compensation claims in connection with the State of
23  Michigan. Our understanding is that the order or relevant
24  documents will be changed so as to have New GM bear
25  responsibility for Michigan Workers' Comp claims. Old GM will

104

1  not bear responsibility for Michigan workers' comp claims.
2  Does that need to be amplified.
3    MR. JONES: No amplification needed, Your Honor.
4  That description is correct so far.
5    THE COURT: Am I right in assuming Michigan has the
6  most workers and potentially the most workers' comp?
7    MR. MAYER: Mr. Henderson is nodding yes.
8    Finally, the committee reserves its rights with
9  respect to the master sale and purchase agreement and related
10  documents. As indicated by the narrative as to how late we
11  went last night, these things are still being machine, as is
12  not uncommon. And we intend to continue to work with Treasury
13  and the debtors. They fully involved us last night, we
14  appreciate that. We look forward to working with them to reach
15  a consensual resolution on these documents and we expect that
16  we will reach some if for some unforeseen reason there's an
17  issue of such moment that compels us to come back to the Court
18  we will let Your Honor know. But this is in the nature of
19  negotiating documents that we expect to reach an agreement on
20  and one that does not affect what I have said previously.
21    And if the Court has any questions, I'm happy to
22  answer them.
23    THE COURT: Just a couple. If I heard you right the
24  creditors' committee is withdrawing it's limited objection and
25  it is no longer taking the position one way or the other on the

105

1   tort and asbestos issues that at one time the creditors'
2   committee as a whole were taking. As of now you're just
3   leaving that to the individual advocates on both sides.
4       MR. MAYER: That's correct, Your Honor.
5       THE COURT: I sense that you folks are working very
6   hard to further narrow issues. But this is an ongoing process.
7   Is it possible for you, in consultation with other parties, to
8   figure out a mechanism to keep me informed over the next
9   several days, even though it's a holiday weekend, so that I can
10   keep my arms around where you are in that. Obviously, I don't
11   want to be ex parte. You have to figure out a mechanic to
12   notify me. Not on what's going on but when issues are buttoned
13   up, just like you reported to me now.
14       MR. MAYER: Yes, Your Honor. I think together with
15   the debtors and Treasury we can definitely do that.
16       THE COURT: Okay. Anything else at this point, Mr.
17   Mayer?
18       MR. MAYER: Well, we are withdrawing our objection so
19   we are no longer opposed to this transaction going forward.
20       THE COURT: Okay.
21       MR. MAYER: Thank you.
22       THE COURT: Thank you very much.
23       MR. MAYER: I don't want to leave any confusions.
24   The committee's papers were originally not in opposition to the
25   transaction going forward. The committee remains in support of

106

1   the transaction going forward. The particular objections that
2   we had to features of the order, those are withdrawn, and so
3   you can view the papers that we have filed the withdrawal of
4   those objections as being in support of the transaction.
5       THE COURT: Okay.
6       MR. MAYER: Have I neglected to -- about members in
7   the audience, people we negotiated with, if I misstated or
8   omitted anything. Thank you, Your Honor.
9       THE COURT: Thank you. Forgive me, which indentured
10   trustee do you represent, Mr. Feldman.
11       MR. FELDMAN: I represent Wilmington Trust Company,
12   the indentured trustee under the 1995 indenture and 1990
13   indentures, with bondholdings in the aggregate of more than
14   twenty-three billion. So we are the principal indentured
15   trustee in the case, with it's clear to say the largest
16   unsecured creditor constituency that will remain with Old GM in
17   this case.
18       Wilmington Trust Company also serves as the chairman
19   of the creditors committee. I will note there's been much said
20   about the equities of this case and the various parties
21   involved in the case, and about the importance of employees,
22   the importance of customers, the importance of dealers, the
23   importance of tort victims.
24       GM is an interesting case. Typically, when I stand
25   up here on behalf of bondholders, I'm standing up on behalf of

107

1   major financial institutions. GM bondholding are widely
2   distributed among thousands of mainstream Americans as well as
3   those financial institutions. So it was with -- in
4   consideration of our entire constituency. Some subset of our
5   constituency is represented by separate counsel. Paul Weiss
6   represents as stated in their 2019, approximate twenty percent
7   of the bondholding class. Mr. Richman according to his 2019
8   represents three bondholders -- I think three bondholders
9   aggregating, about two million of the twenty-eight billion
10   bondholders. And Mr. Parker has indicated that he is in his
11   individual capacity a bondholder.
12       We stand up here and we filed our papers on behalf of
13   those without a voice in the case. Wilmington Trust as an
14   indentured trustee believes it's his job to preserve and
15   protect the claims of the bondholder community that it
16   represents. And it is with that fiduciary duty in mind that we
17   carefully considered the transaction that was presented.
18   Wilmington Trust was not part of the team negotiating the
19   transaction. We came to this party and we got a chair at the
20   table, frankly, after the deal had been cut. And we were
21   presented with a binary choice, which is to support the sale or
22   to seek to object to the sale. And effectively as has been
23   dictated earlier, to potentially role the dice and hope upon an
24   objection to the sale that a debtor recovery for bondholders
25   was forthcoming. We took that obligation and that concern very

108

1   seriously. We had extensive discussions with the debtors'
2   advisors, with the committee's advisors, with the committee
3   members themselves, and with the ad hoc bondholder advisors.
4   And when I say the ad hoc bondholders I'm talking about Paul
5   Weiss and Houlihan. We reviewed the papers of substantially
6   all the parties in this case, with particular attention to the
7   papers filed on behalf of bondholders which are within our
8   constituency. And based on all of that information available
9   to us, we were of the view, and as our joinder indicates, that
10   based on all the facts available we felt that under the current
11   facts and circumstances that the sale appeared to be in the
12   best interest of the bondholders.
13       We did, however, have some particular concerns with
14   the transaction, not seeking to, frankly, to derail the sale
15   from going forward. But to ensure as Mr. Miller indicated in
16   his comments, that the sale creates a pie and it creates a
17   universe of people who are going to fight over that pie. We
18   understood that was the game when this case filed. What's
19   going to happen post-closing was there was going to be a
20   numerator and that is stock and warrants that the bondholders
21   and the other unsecured creditors are going to have discussion
22   and potential litigations over, how big the denominator was.
23   What we were fundamentally concerned with at the outset, was
24   that the size of the pie was set. We have heard today that the
25   wind-down budget issue, we had heard on the eve of this

109

1  hearing, that the wind-down budget was insufficient.  And we
2  were concerned if the wind-down budget was insufficient that it
3  would eat into the stock and the warrants that had been set
4  aside as testified by various witnesses, was designed to be set
5  aside for unsecured creditors.  We were concerned that that
6  wind-down budget would gain access to that stock and warrants
7  And we've been told based on the representations today in Cour
8  that that wind-down budget has been increased by 225 million
9  dollars.  Plus the proceeds of any asset sales.  And we are
10  comforted by that fact.
11      We reserve our rights to review the definitive
12  documentation in connection with that issue, and we will work
13  alongside the committee, as we have throughout this process to
14  streamline the process.
15      But with that in mind, Your Honor, and in closing --
16  and I think that Mr. Richman on behalf of his three individual
17  creditors and Mr. Parker on behalf of himself, they have the
18  ability to make informed decisions by themselves as to whether
19  or not they would like to roll the dice and potentially create
20  alternative outcome.  Unfortunately, we as -- fortunately
21  unfortunately, as a fiduciary for all these bondholders, our
22  job is to preserve and protect the value that is available to
23  bondholders under the deal.  What we don't see and
24  notwithstanding Mr. Richman's very eloquent presentation, what
25  I haven't seen yet is a clear articulation of what happens if
110

1  this sale doesn't go forward, and, in fact, we got to planned
2  process.  I think on behalf of Wilmington Trust I would say
3  it's not at all clear to me that on behalf of all the
4  bondholders that we represent that a plan process and the delay
5  attended to that plan process, would be designed to enhance the
6  recovery.  Or would, in fact, enhance the recovery to
7  bondholders under this case.  Frankly, it made the delay.  And
8  the other issues that may be attended to a plan process could
9  very well diminish the recovery to bondholders.  It's a risk on
10  behalf of our twenty-three plus billion dollars worth of
11  constituents we're not willing to take.  And with that, Your
12  Honor, we withdraw our joinder subject to the reservations I've
13  indicated.
14      THE COURT:  Thank you.  Ms. Christian, you're the
15  other indentured trustee?
16      MS. CHRISTIAN:  Yes, Your Honor.
17      THE COURT:  Come on up, please.  Is Law Debenture
18  Trust your client?
19      MS. CHRISTIAN:  That's correct, Your Honor.  Jennifer
20  Christian of Kelley Drye & Warren for Law Debenture Trust
21  Company of New York as proposed successor indentured trustee
22  for the holders of eight series of GM's bonds.
23      Your Honor, Law Debenture fully confers with the
24  committee and with Wilmington Trust, and is prepared to
25  withdraw its joinder to the committee's limited objection
111

1  subject to the conditions that have been outlined and with eh
2  full reservation of our rights.  Thank you.
3      THE COURT:  Okay.  We up to --
4      MR. FRANKEL:  Good morning, Your Honor.  It's Roger
5  Frankel from Orrick Hamilton.  I represent the GM National
6  Dealer Counsel and the committee that is formed.  We also
7  represent Paddock Chevrolet that's a member of the official
8  committee.
9      I wanted just to state for the record we had filed a
10  limited objection, reservation of rights.  We had been working
11  with the debtors and have been satisfied since we filed that
12  and even before we filed that that certain concerns that we had
13  have now been resolved.
14      This committee is comprised of dealers that were
15  elected by the entire dealer body as well as three members of
16  the National Automobile Dealers Association.  The National
17  Automobile Dealers Association is also an ex officio member of
18  the committee.  And we think it's important for the dealer
19  voice to be heard here and we are supportive that his
20  transaction move forward and move forward as quickly as
21  possible.
22      The one thing that I would add, Your Honor, I just
23  heard yesterday for the first time, the recommendation of the
24  privacy ombudsman, briefly looked at the report this morning,
25  and I would hope that GM would incorporate and Treasury would
112

1  incorporate the recommendations of the privacy ombudsman in the
2  sale order.  Thank you, Your Honor.
3      THE COURT:  Okay, thank you.
4      MS. TAYLOR:  Good morning, Judge.  I'm Susan Taylor,
5  I'm an assistant attorney general for the State of New York and
6  I represent the interest of the Department of Environmental
7  Conservation here today.
8      We filed an objection separate and apart from that as
9  to which Ms. Cordry has been speaking.  And I am here to tell
10  the Court that we are not in the same category as many of the
11  objectors.  Mr. Miller very nicely articulated the difference
12  between the State of New York and many of the objectors here.
13  We are not here about money.  We are here because we are
14  concerned that there appears to be an attempt in the proposed
15  order to impair the police and regulatory powers of the State
16  of New York.  And we are here to ask you not to let that
17  happen.
18      The department has an interest in being able to
19  enforce the state's environmental laws in order to protect the
20  public health and safety.  That interest is not an interest in
21  property within the meaning of Section 363.  And it cannot be
22  extinguished or impaired through the means of a 363 sale.  The
23  whole statutory scheme and many cases make clear that
24  regulatory and police powers do not give way to the important
25  interest protected by bankruptcy law.  To the extent that there
113

1    are provisions in the order that are still overly broad, and
2    one of those is still, in for instance, paragraph T, although I
3    confess that I have not this morning seen what may be an order
4    that has changed.  But to the extent that there is still
5    language in there that appears to extinguish or impair the
6    right of the state, to enforce its regulatory and police order,
7    we ask the Court not to let that happen.
8        In the State of New York two sites are not being
9    transferred, are not going with New GM.  One of them is Messina
10   GM, which is a national priorities list superfund cite in the
11   northern part of the state.  It is adjacent to tribal land.  It
12   has serious contamination and has in place consent and
13   administrative orders of the Department of Environmental
14   Conservation.  It came to our attention only on Friday that
15   there appears to be another site that has contamination that
16   may also be excluded.  It's a little unclear from the schedule,
17   we've been unable to get clarification as to whether that site
18   is, in fact, not being transferred.  And we are very concerned
19   about the department's abilities to continue to protect the
20   health and safety of the people of New York through consent
21   orders, administrative orders, and the ability to impose
22   injunctive relief, with respect to those and other sites.
23       If you would like to argue that the state's interests
24   are not interest in them I would be happy to do that.  I think
25   that is clear.  But to the extent that the Court?

114

1    THE COURT:  You have a brief on file, don't you?
2    MS. TAYLOR:  We do have a brief on file and I would
3    refer to the cases cited in the brief on that.  If you
4    disagree, however, we would ask you to condition a sale
5    pursuant to 363(e) in order to protect the state's ability to
6    enforce its police and regulatory powers.  And we have language
7    that we have circulated to GM and its counsel over the past few
8    days that we would like to see added to the order.  I would be
9    happy to submit that to the Court anytime today if you would
10   like that.
11       Essentially, it would provide "that nothing in the
12   order would release, nullify, enjoin, or otherwise affect the
13   police and regulatory authority of any governmental unit or its
14   ability to enforce."  And, of course, being lawyers it goes on,
15   but that is its essence.
16       THE COURT:  If it's consensual by all means.  If I
17   have differing proposal on that, I need to get yours in writing
18   and the debtors' perspective and argument.  The debtors'
19   perspective as to the language they think makes the most sense
20   in writing if it's different than what I have now.  And if
21   you're not in consensus obviously you need to get argument on
22   both.
23       MS. TAYLOR:  Happy to do that, Judge.  At this point
24   I cannot represent that it is consensual.  If you don't have
25   any questions, I will rest on our papers.

115

1    THE COURT:  Thank you.
2    MS. TAYLOR:  Thank you.
3    THE COURT:  Okay.  Mr. Roy, you're coming up.
4    MR. ROY:  I'm coming up in thirty seconds, Your
5    Honor.
6    THE COURT:  Okay.
7    (Pause)
8    MR. ROY:  Your Honor, for the record, Casey Roy from
9    the Texas Attorney General's Office on behalf of the State of
10   Texas.
11       We filed a limited standalone objection.  We've
12   reached an agreement with the debtors, subject to entry of that
13   agreement on the record, we will be prepared to withdraw.
14       THE COURT:  Okay.
15       MR. ROY:  Thank you, Your Honor.
16       THE COURT:  Thank you.
17       MR. MOTIF:  I'm not an attorney.  I'm coming to
18   you --
19       THE COURT:  Just a minute.  Is there -- I announced
20   earlier in the hearing that I wasn't going to hear oral
21   argument on all the objections.  Come up, tell me your status
22   so I can make a judgment as to whether you should be resting on
23   your papers.
24       MR. MOTIF:  My name is Normaji, last name is Motif.
25       We bought GM's bonds, 400,000 paying the same amount

116

1    And I --
2    THE COURT:  Sir, you're a bondholder?
3    MR. MOTIF:  Yes, sir.  Unsecured.
4    THE COURT:  Unsecured bondholder.  Do you have any
5    points that weren't made by either Mr. Richman, Mr. Parker or
6    the two indentured trustee?
7    MR. MOTIF:  That's correct.
8    THE COURT:  And you filed a written objection.
9    MR. MOTIF:  I did, but I want to make this.
10       In the master purchase and sales agreement they never
11   really splintered the phrase going concern.  As a grave concern
12   this needs to be sorted fast enough so that the value doesn't
13   go down.  I'm not sure whether they're talking about the legal
14   term of grave concern or the accounting term of grave concern.
15   No matter whether we go on the legal term or the accounting
16   term, that phrase cannot be used.  GM operations like the
17   (indiscernible) cooperation which I read the (indiscernible)
18   very frequently they use of the word grave concern.  They took
19   operations and cooperated in Delaware.  And Delaware's
20   (indiscernible) law with regard to the cooperation applies.
21   Even if this case is filed in New York State I would like the
22   Court to take analyze that usage of the going concern as a
23   property of (indiscernible).  I can understand that it's an
24   operating concern, they will be borrowing money and running the
25   business.  But definitely it is not a grave concern whether it

117

```
 1   is a legal usage or accounting usage.
 2        The (indiscernible) cooperation -- I mean, the GM
 3   cooperation whether you want to use the title GAAP.  GAAP means
 4   the general acts of accounting principals, or you want to use
 5   the fair market values of some of the methodology that you use.
 6   The corporation became insolvent three year ago.  And since
 7   then especially with the loan agreement signed by the Treasury
 8   it seems that even though they have created documents stating
 9   that this is the loan agreement, actually money, if
10   especially, if the government is going to be approving
11   commercial businessman would never lend money.  So the
12   expectation was a situation created and not a reality.  And you
13   have seen what Mr. Henderson and Mr. Wilson and others saying
14   that if the loan never came through then GM could not have
15   functioned, like what happened in the case of Chrysler.
16        Now, there are rules in the corporation's law of
17   Delaware saying that at a particular stage if the money was
18   lent not as a businessman but for other reasons, and especially
19   if control of the corporation has been taken over indefinitely,
20   then that entity should be treated as insiders.  And so,
21   therefore, the loans must be subordinated to the equity and to
22   the unsecured bondholders.  Because it would not be treated as
23   a loan as a creditor, but would be treated as insider, and so
24   therefore it is a capital contribution.
25        The important reason for that is if that is the
                                                          118
```

```
 1   capital contribution and not a law then --
 2        THE COURT:  The recharacterization subordination
 3   points were made in many briefs, I understood them.
 4        MR. MOTIF:  I'm ready to come to the other important
 5   point.
 6        If the Court determines that it is a capital
 7   contribution and not a loan per se, then the participation
 8   fails because in the proposals out of 19.4 billion dollars that
 9   was the pre-petition advances made, two million dollars worth
10   of (indiscernible) being taken by the New GM with approximately
11   about eight billion dollars of (indiscernible) and so that
12   leaves about nine million dollars as the big money so there
13   will be a shortage in the bid amount, even if you include the
14   DIP money less the other things.  I believe that this money was
15   given here, that the total purchase price of the total value
16   was between fifty and sixty billion dollars.  If that is the
17   case then it is my submission that the Treasury bring down that
18   nine million dollars and give it to the Old GM as part of the
19   purchase price.  Plus also the eight billion dollars for eight
20   million dollars of the note, plus two billion dollars that also
21   must come for a total of 19.4 billion dollars, must come to the
22   Old GM.
23        Now, the other argument is that --
24        THE COURT:  Are you getting near the end, sir?
25        MR. MOTIF:  Yes, give me five minutes.
                                                          119
```

```
 1        THE COURT:  Five more minutes.
 2        MR. MOTIF:  Yes.  Because this is a very crucial case
 3   and I need to explain that clearly.  May I proceed?
 4        THE COURT:  Yes.
 5        MR. MOTIF:  Now, I raised an issue that as an
 6   unsecured bondholder there is a breach of contract by GM when
 7   they --
 8        THE COURT:  GM has breached its contract to everyone
 9   of its twenty-eight --
10        MR. MOTIF:  I know, I know.  But I'm coming to the
11   final points, Your Honor.  There were secured bondholders and
12   there were unsecured bondholders, you've got two categories
13   before September 31 of 2008.  I do not know that the secured
14   bondholders are fully secured or partially secured.  And I have
15   no idea as to what properties are fully secured, or partially
16   secured by the secured bondholders.  Now, when they borrowed
17   13.4 billion dollars from the Treasury they put a first lien on
18   the property, which is not covered by the secured bondholders.
19   And with regard to the secured bondholders property they put a
20   second lien.  The document indenture of 1995 is clear that the
21   moment a lien is put then the unsecured bondholders must be
22   repeated on par with the --
23        THE COURT:  Is that the exact point Mr. Parker made?
24        MR. MOTIF:  No, I'm going to go further, Your Honor.
25   He made one point, but he did not elaborate more.
                                                          120
```

```
 1        Accurately, he admitted in his brief that they
 2   realized this lien problem.  So if you read the brief he
 3   acknowledges my brief --
 4        THE COURT:  I did read his brief.
 5        MR. MOTIF:  Pardon?
 6        THE COURT:  I did read his brief.
 7        MR. MOTIF:  Yeah.  And he acknowledges that he got
 8   the idea from me.
 9        THE COURT:  Okay.
10        MR. MOTIF:  Here is the question.  I read the
11   Chrysler opinion by Judge Gonzalez.  He said with regard to the
12   unsecured creditors the takings clause -- and I think he said
13   might apply because they don't have a lien.  But if this Court
14   were to decide that the fact that a lien was put on that and
15   that automatically triggered the other problem which is that
16   the unsecured bondholders also has liens on par with the
17   treasury, both with regard to the first lien that decided with
18   regard to the other property, and the second lien that decided
19   on the secured bondholders' property.  Then we have a right to
20   argue that the takings clause under the Fifth Amendment do
21   apply.
22        So with that, Your Honor, thank you very much.
23        THE COURT:  Thank you.  Now, putting aside deals on
24   the record and so forth, which we can deal with later, is there
25   any other substantive argument of a non-duplicative nature to
                                                          121
```

1  be heard? Sir?
2      MR. CHEEMA:  Your Honor, good afternoon.  Bik Cheema,
3  Baker Hostetler on behalf of the Bureau of Ohio Workers'
4  Compensation.
5      THE COURT:  Ohio Workers' Comp.
6      MR. CHEEMA:  Yes.  It's OBWC.  We filed a limited
7  motion, we don't oppose the sale.  The limited motion was the
8  OBWC reads the sale motion as indicating that New GM intends to
9  assume all the debtors' Ohio workers' compensation obligations.
10     In the last few hours we've reached an agreement on
11  some clarifying language with the U.S. Treasury, and we wish to
12  just offer that clarifying language for the record.  It will
13  literally take thirty seconds.
14     THE COURT:  Thirty seconds, it will take longer for
15  me to tell you to sit down and comply with what I said before.
16  So go ahead.
17     MR. CHEEMA:  "Pursuant to the master sale and
18  purchase agreement, New GM is assuming all of Old GM's
19  liabilities and obligations, under the workers' compensation
20  laws, rules and regulations of the State of Ohio.  OBWC reads
21  the provision to include the assumption by New GM of Old GM's
22  obligation to provide and to continue to provide security for
23  the payment and performance of all obligations under the
24  workers' compensation laws, rules and regulations of the State
25  of Ohio owed by Old GM.  New GM will be required to apply for

                                                    122

1  status as a self-insuring employer in the State of Ohio.  If it
2  seeks such status and nothing in the Court's order approving a
3  sale shall exclude New GM from satisfying all requirements and
4  conditions, including any requirement to provide security of
5  the OBWC to grant self-insuring employer status under
6  applicable Ohio law, rules and regulations."
7      THE COURT:  Okay.
8      MR. CHEEMA:  Thank you, Your Honor.
9      THE COURT:  All right.  Mr. Miller, are you ready
10  for -- sir, is this an objection, further argument, non-
11  repetitive argument?
12     MR. KANSA:  This is a non-repetitive very brief
13  argument, Your Honor.
14     THE COURT:  All right, come on up.
15     MR. KANSA:  Good morning, Your Honor.  Kenneth Kansa,
16  Sidley Austin on behalf of the TPC Lender Group.
17     The TPC Lender Group is a consortium of nine
18  commercial lenders with first priority liens on two of the
19  debtors' facilities, one in White Marsh, Maryland and the
20  second in Memphis, Tennessee.
21     Your Honor, we filed a limited objection to the sale
22  transaction.  We are in the process of working on language that
23  we hope will resolve that objection, but we haven't dotted the
24  I's and crossed the T's yet.  The only point I would raise in
25  addition to our papers, Your Honor, is in rebuttal to some of

                                                    123

1  the points that the debtors have made in their reply about our
2  limited objection, which really seeks to characterize this as a
3  garden variety secured creditor 363(f)(3) issue; where on the
4  one hand you have is it the value of the collateral, on the
5  other hand, is it the face amount of the lien.  We think in
6  this context, Your Honor, that misses the point.  There is only
7  one value on the table here today.  That is the amount of the
8  lender's allowed secured proof of claim on file at 90.7 million
9  dollars.  The debtors have stated that they will settle for a
10  purchase price in excess of the value of all liens on the
11  property, that's their obligation under 363(f)(3), and that's
12  the subsection they rely on to sell the facilities.  Our point
13  is simply in response, no purchase price has been specified, no
14  value has been allocated.  The only value that is out there is
15  the value of the claim in our secured proof of claim.  And the
16  only value out there is --
17     THE COURT:  You're saying that if you say that your
18  collateral is worth a certain amount it's binding on the world?
19     MR. KANSA:  I'm not saying it's binding on the world,
20  Your Honor.  I'm saying if they are going to rely here today on
21  363(f)(3), saying that they are selling in excess -- for our
22  purchase price, in excess of the value of our liens, that is
23  what the value of the liens is.  Today there is no other
24  competing value out there.  There's nothing in the record.
25     THE COURT:  You'll agree that sometimes there is a

                                                    124

1  difference between the amount that people claim in their proofs
2  of claim as secured claims, and the value of their collateral.
3  And that the actual value of the secured claim is measured by
4  the value of the collateral and the remainder is unsecured, I
5  assume.
6      MR. KANSA:  No disagreement, Your Honor.
7      THE COURT:  Okay.  So basically the issue to the
8  extent there is an issue, is that you're claiming an amount
9  which the debtor and other parties in the case, probably every
10  single other party in the case, might have a difference in
11  perception from you and might say that your secured claim is
12  measured by the value of your collateral.  But the remainder of
13  your claim is unsecured.
14     MR. KANSA:  That's true, Your Honor.  But the point
15  is there is no -- no one has articulated their belief as to the
16  other value here today.
17     THE COURT:  I understand your argument.
18     MR. KANSA:  Thank you, Your Honor.
19     THE COURT:  All right.  Are we now ready for Mr.
20  Miller?  No, one more.
21     MR. WISLER:  Good morning, Your Honor.  Jeffrey
22  Wisler on behalf of Connecticut General Life Insurance Company.
23     Your Honor, I have a non-resolved, non-cure executory
24  contract objection.  Would you like to hear that now, Your
25  Honor.

                                                    125

1    THE COURT: If it's an objection I think I would.
2    MR. WISLER: Understood. Your Honor, Connecticut
3    General Life Insurance, also known as CIGNA provides a range of
4    healthcare administrative services to GM and administers GM's
5    self-insured employee healthcare benefits plan for thousands of
6    its employees.
7        CIGNA's objection isn't just critical to CIGNA, it's
8    critical to GM, New GM and it's employees because we want to
9    make sure that the debtors attempt to assume and assign the
10   arrangement it has with CIGNA gets the job done and assures
11   that the employees of New GM will have the benefits that they
12   currently have now with Old GM. So while we do have a cure
13   objection I understand that will be deferred.
14       Today's objection is more fundamental. And that is
15   that the debtor has not given CIGNA or this Court what is
16   necessary for this Court to approve the assumption and
17   assignment of agreement. And there's three fundamental
18   problems, Your Honor. First is, the debtor in its contract
19   notices identified what appeared to be eight separate contracts
20   relating to CIGNA, but with no detail that we can comprehend.
21   It simply has vendor numbers, contract numbers, row numbers, I
22   don't know what those are. CIGNA has looked at these, they're
23   sophisticated business people, they don't know what these are.
24   And we haven't received any clarification on what they are.
25   Except that GM intends to assume and assign all of the CIGNA

126

1    contracts. Well that's meaningless also because we need to
2    know what they are, we need to make sure what we think is all
3    and what they think is all, is the same thing. Because, in
4    fact, CIGNA's position is that there is one overriding
5    contract, it's an administrative services contract. And under
6    that are addendums, and riders, and amendments that encompass
7    all of what CIGNA does for GM and its employee benefit plan.
8        So to warrant this Court's approval of the assumption
9    and assignment of that agreement, the debtor needs to formally
10   and unequivocally identify that contract and say to the Court
11   and to CIGNA, this is the contract we intend to assume and
12   assign.
13       THE COURT: Pause please, Mr. Wisler. What extent
14   did you or any of your guys pick up the phone and have a
15   dialogue with the debtor to kind of exchange information and
16   get answers to each of those concerns?
17       MR. WISLER: Both sides have done that, Your Honor,
18   it is not yet resolved.
19       THE COURT: And help me understand the problem,
20   because this stuff is done all the time. I didn't hear you
21   accusing the debtor of cherry picking or trying to split apart
22   the master agreement, am I right that that's not your concern?
23       MR. WISLER: Given the debtors' statement that it
24   wasn't to assume all of our contracts, I will assume that is
25   not the case.

127

1    THE COURT: All right. Forgive me, but I know a
2    little bit about this area, and I still can't understand the
3    problem.
4        MR. WISLER: Well, Your Honor, if a debtor comes to
5    the Court and does not identify the contract it wishes to
6    assume and assign, I don't think the Court can permit that
7    assumption and assignment.
8        THE COURT: Assuming arguendo that you're right, I
9    mean after you had the dialogue with them you're saying they
10   didn't tell you what contracts they wanted to assume and
11   assign?
12       MR. WISLER: Not to any specificity that anyone could
13   use to identify these agreements.
14       The fundamental problem, being number one, that we
15   think there's one agreement and they think there's more than
16   one.
17       THE COURT: But if the agreement with all of them
18   what difference does that make?
19       MR. WISLER: If two parties don't agree what all
20   means or, more specifically, if one party believes there's one
21   and one party believes there's multiple agreements, I don't
22   think there's a meeting of the minds, Your Honor. And I'm
23   certainly not standing up here saying this is not a resolvable
24   problem. Today's the day for the sale hearing, today's the day
25   we have to present our objection. We've attempted to come to a

128

1    resolution, we may actually be close to a resolution. But
2    because we're not at a resolution I need to present this
3    objection to the Court.
4        THE COURT: Okay. Make your remaining points.
5        MR. WISLER: Understood, Your Honor.
6        THE COURT: And then I'll hear your adversary.
7        MR. WISLER: Secondly, Your Honor, there are two bank
8    accounts that make this plan work for GM and its employees.
9    And these bank accounts have authorization approvals between GM
10   and CIGNA. And there has been no confirmation and no reference
11   to it in the APA or the form of order and the motion that those
12   authorizations will continue. If they do not continue the
13   self-insured plan that CIGNA administers will not work because
14   there will be no money passing from one account to another to
15   pay employee benefit claims, employee healthcare claims.
16       So, again, until that is unequivocally and formally
17   confirmed we don't think any contracts, any of this particular
18   contract that CIGNA has with GM can be assumed and assigned.
19       And, third, Your Honor, and very importantly, nowhere
20   in the APA or the proposed form of order, or the motion, is
21   there confirmation that New GM will be responsible for
22   claims -- healthcare claims -- employee healthcare claims that
23   were incurred prior to closing but will not be processed and
24   paid until after closing. That's very important because as
25   claims come through a system they come through at different

129

1    times. If someone goes to the doctor last week, the doctor may
2    take some time to submit the claim to the insurance company,
3    the insurance company has to process it. If it's approve it's
4    then paid. That takes time. There is no way to draw a bright
5    line on a closing date and say hey, these claims are not going
6    to be paid, these claims aren't. It's not a cure issue, it's a
7    question of is New GM going to take responsibility for paying
8    those claims that were incurred prior to closing.
9        My understanding with the discussions with the debtor
10    is yes, they are. But, again, that ahs not been --
11        THE COURT: I've encountered this issue over the
12    years. Whether you have to slice and dice whether a claim is a
13    pre-petition claim or post-petition claim. But I've never
14    encountered it with the context of the assume and assign,
15    because it envisions a smooth transition. Has your dialogue
16    led you to believe that there's some difference in perception
17    on this one?
18        MR. WISLER: No, Your Honor, that's what I was just
19    saying. My dialogue with the debtor indicates that this --
20    that it is New GM's intent to just continue to pay claims in
21    the ordinary course of business regardless of when they were
22    incurred. But, again, that has not been formalized, it has not
23    been unequivocally stated. Today's the day I have to present
24    this objection. If it's not formalized or unequivocally
25    stated, we have a problem is we go into closing and we don't

130

1    know the answer to that question. So our simple request for
2    relief is, Your Honor, do not approve assumption and assignment
3    of the CIGNA agreement until the debtor formally and
4    unequivocally clarifies those three points.
5        THE COURT: Thank you, Mr. Wisler.
6        MR. WISLER: Thank you, Your Honor.
7        THE COURT: Mr. Smolinsky, you're rising. Is this
8    just to respond to what Mr. Wisler said?
9        MR. SMOLINSKY: Yes, it is.
10        THE COURT: Sure, come on up.
11        MR. SMOLINSKY: Your Honor, again, Joe Smolinsky from
12    Weil Gotshal.
13        I'm not sure if Mr. Wisler is in communication with
14    his client. We are aware of the CIGNA situation. Seth Drucker
15    of Honigman Miller has been working with Janice Heulig, who is
16    the head of HR at GM. I've received no fewer than a dozen e-
17    mails over the last forty-eight hours specifically with respect
18    to CIGNA. We are assuming the CIGNA contracts. We have
19    provided them with the -- with a lot of information. In fact,
20    Jay Manor, an employee of GM who is on vacation this week, came
21    back to the office to put together the documents that CIGNA has
22    requested. There are bank accounts that need to be moved, the
23    company is in the process of moving those bank accounts.
24        As I understand it, CIGNA has requested execution of
25    a variety of documents. Consent agreements and other documents

131

1    which other of our suppliers, such as Medco who provide a
2    similar service, has not requested. I haven't reviewed those
3    document yet to the extent that they are not problematic we
4    will provide them with the assurances they need. But to the
5    extent that CIGNA does stand in our way of closing and
6    transferring the employee benefits we will be back in front of
7    you, Your Honor.
8        THE COURT: All right, thank you. Okay. Can I now
9    get to debtor reply.
10        MR. MILLER: I hate to disappoint you, Your Honor,
11    but the U.S. Attorney has asked to go first.
12        THE COURT: Sure, Mr. Jones.
13        MR. JONES: Thank you, Your Honor. We thought it
14    appropriate to let GM have the last word, and so we'll have a
15    short summation first.
16        First, Mr. Schwartz is going to address,
17    particularly, Your Honor's consent decree question, and then
18    I'll have remarks on additional issues.
19        THE COURT: Sure. Mr. Schwartz.
20        MS. CORDRY: Your Honor?
21        THE COURT: Ms. Cordry?
22        MS. CORDRY: Yes, sir. Karen Cordry from National
23    Association of Attorneys Generals.
24        We've been working with the debtors late into the
25    night and this morning, and all this time. I think we're at

132

1    close to an agreement. But the discussion we've been having
2    with them when we had the terms in the order we would be able
3    to say we have a resolution that I am still in the process of
4    getting all the attorneys general to sign on to that. If it
5    didn't then we would be in position to weave our objections on
6    the record, if the order is not done. I didn't realize I was
7    momentarily distracted, we got it in of everybody else there.
8        I think we are very close to having that. I guess I
9    would just like to reserve my right to state where that whole
10    position is. I don't want to necessarily hold up all this.
11    And I don't think anything I would say with that would
12    necessarily require them to have any different rebuttal than
13    they would have.
14        THE COURT: What's your recommendation, Ms. Cordry
15    do I let Mr. Schwartz or Mr. Miller speak? Maybe you'll have
16    the answer again. Otherwise, I assume that on issues that
17    haven't been resolved to your satisfaction I have your papers.
18    But I also sense that you're so close to the go line that
19    you're saying it might help me to do my job if you have some
20    news to report to me.
21        MS. CORDRY: Yes. I think in the same way that you
22    were saying that other people were trying to work towards
23    reporting, I hope I'm going to be in that position as soon as I
24    hear back their last couple of words or two on that page.
25        THE COURT: Let's agree that as of this point the

133

1    train hasn't left the station. If you need to be heard after
2    everybody else is done, I'll give you that chance, subject to
3    anybody else's rights to express a different view if you need
4    to.
5        MS. CORDRY: Okay. And when I do that I would
6    certainly keep in mind Your Honor has heard a great deal on a
7    great many topics that we had in our papers.
8        THE COURT: Yes. I've also heard capable arguments.
9        MS. CORDRY: Exactly, every capable arguments, far
10   beyond what I was probably planning on doing. So anything that
11   I would say would be specifically on very short points and
12   other issues that people definitely have no raised to this
13   point. So thank you, Your Honor.
14       THE COURT: Okay.
15       MR. MILLER: Your Honor, there will be one other
16   speaker. I understand that the UAW would also like to speak.
17       THE COURT: Is this a good time, or would the UAW be
18   speaking after the U.S. and the debtor?
19       MR. MILLER: After the Treasury, Your Honor.
20       MR. SCHWARTZ: Why don't I make my remarks which will
21   take about a minute, and then Mr. Jones and Mr. Bromley can
22   discuss their order.
23       I just wanted to address -- Matthew Schwartz for the
24   United States, the questions Your Honor asked about
25   environmental consent decrees because, of course, we're here

                                                              134

1    representing the United States, including the Environmental
2    Protection Agency.
3        Your Honor asked two specific questions, I'd like to
4    quickly provide answers and then suggest why it is you don't
5    have to answer those questions yourself today on this motion.
6        First, I heard the Court ask yesterday whether an
7    environmental consent decrees is a contract -- an executory
8    contract that can be rejected by a debtor in bankruptcy. As
9    Mr. Bernstein said, a consent decree has features of contract
10   and features of order. But I think the law is relative clear
11   that they are not executory contracts that can be rejected. I
12   would point you to Judge Coudle's (ph.) opinion in New York v.
13   Mirant. That's at 300 B.R. 174 at page 181.
14       The further question that Your Honor asked today, I
15   think the important question, is whether a consent decrees is,
16   therefore, enforceable against the debtor. And as Your Honor
17   said that turns on whether the consent decree creates a
18   monetary or injunctive obligation. Whether it embodies a claim
19   within the meaning of the Bankruptcy Code that's Chateaugay in
20   the Second Circuit, Trouweko in the Third Circuit. That is a
21   remarkably fact-intensive inquiry. And the fact --
22       THE COURT: Depends on what the decree actually says.
23       MR. SCHWARTZ: That's right. And I've only skimmed
24   the consent decree that Mr. Bernstein was speaking to, but I'll
25   make the general comment that simply because the obligations of

                                                              135

1    the debtor under a consent decree are to pay money does not
2    necessarily mean that it is a claim within the meaning of the
3    Bankruptcy Code. I think that's enough for today's purposes.
4    Because ultimately the objection that Mr. Bernstein raised is
5    not an objection to the sale. His consent decree is either
6    enforceable against GM or it isn't. So that obligation will
7    either be treated as an unsecured claim, or it will be
8    enforceable and so they will have to pay in full. But either
9    way, the claim is against OldCo. The claim is not against
10   NewCo. There's no basis, as Mr. Bernstein suggests, to go into
11   the MSPA and rewrite excluded liabilities to add his consent
12   decree. That's the only issue on today's record. And so Mr.
13   Bernstein's objection should be denied and we can take up the
14   more substantive issues on a --
15       THE COURT: To be denied without prejudice to his
16   raising it in a different context against OldCo.
17       MR. SCHWARTZ: Against OldCo, correct.
18       THE COURT: Okay.
19       MR. SCHWARTZ: Against NewCo it's just essentially
20   the successor liability issue.
21       THE COURT: Okay. All right, Mr. Jones?
22       MR. JONES: Thank you, Your Honor.
23       Your Honor, the government simply is not sacrificing
24   principles for expediency as it has been accused of doing. Far
25   from it. We are using established law to purchase assets full

                                                              136

1    stop. Specifically, the government sponsored purchasing entity
2    is purchasing the pieces necessary to operate the strongest
3    possible New GM. This is a liquidating estate, there's no
4    dispute about that. There is no alternative and no scenario in
5    which this bankruptcy proceeding ends in anything other than
6    some form of liquidation. And as in any liquidation
7    proceeding, the goal is to maximize recoveries and
8    distributions to the estate and its creditors.
9        So what is before the Court today is simply an asset
10   sale. It's not a plan. What is before the Court does not
11   dictate anything about the treatment of any creditor going
12   forward in the bankruptcy proceedings which will remain in
13   place. The evidence is clear that this sale achieves far and
14   away the highest possible recovery for the assets being sold.
15   And as is salient for legal purposes, vastly in excess of their
16   liquidation value which is the only legally relevant or
17   possible alternative scenario.
18       The evidence also shows that the opportunity to
19   achieve value through the sale is fleeting. And that the
20   achievable value of this -- of any portion of General Motors is
21   fragile and soon will be lost if not seized now.
22       There will be a plan as this case progresses. Again,
23   the case will go forward and there are mechanisms to ensure the
24   estate will remain administratively solvent and funded through
25   an orderly wind-down process. And the Court's well established

                                                              137

1  procedures under the Bankruptcy Code will provide the framework
2  for determining the respect of recoveries for all parties-in-
3  interest
4       Your Honor, the evidence is unambiguous and
5  unrebutted that the government has no intention of funding this
6  deal if an order is not in place by July 10th. Mr. Richman
7  speculates that the government doesn't really mean it, and that
8  the government will fund beyond that date if Your Honor just
9  calls our supposed bluff. But, Your Honor, speculation does
10  not trump evidence. There is no evidence of bad faith and
11  there is no evidence undermining what the government has
12  plainly stated in Court during these proceedings.
13       To the contrary, Mr. Wilson was extraordinary
14  forthright and he explained compellingly and without hesitation
15  what steps the government has taken in regards to General
16  Motors so far. And the reasons for those actions. And its
17  plans for its future actions with regard to New GM.
18       Your Honor, the gamble that Mr. Richman asks the
19  Court to take would be extraordinarily risky and contrary to
20  the best interest of the estate. In fact, he concedes that the
21  risk he asks the Court to take today would, in fact, breach the
22  fiduciary duty if undertaken by GM itself. It is clear that the
23  Court cannot require a lender to lend. It is clear that the
24  Court cannot compel a buyer to buy.
25       This transaction is certain. It is here today. It

138

1  is extraordinarily favorable, and it is the only one insight.
2  The purchase fully complies with all applicable law, including
3  Section 363 of the Code. The Second Circuit just recently in
4  Chrysler heard these issues squarely, and intensively argued to
5  it in an appeal from Judge Gonzalez's decision which being
6  considered the very arguments here today. And of course Judge
7  Gonzalez explicitly adopted and followed TWA, the Third
8  Circuit's decision in TWA and has, in turn, being adopted by
9  the Second Circuit for the reasons Judge Gonzalez stated. That
10  TWA order, just as the Chrysler order, expressly affirmed a
11  sale free and clear of claims, both known and unknown, and it
12  further enjoined claims in the future being brought against the
13  purchaser of the assets.
14       Your Honor, the -- I know Your Honor's made reference
15  to reading the transcript of arguments before the Second
16  Circuit, and I will not undertake here a detailed exegesis of
17  the interlocking provisions of the Bankruptcy Code. But I will
18  note that Fiat's counsel did an extraordinarily abled job of
19  doing just that in arguing before the Second Circuit. So, for
20  my purposes today, Your Honor, I'll limit myself to saying the
21  case law is very clear and establishes that exactly what is
22  happening here today is permissible and entirely authorized by
23  Section 363.
24       So -- and, Your Honor, in addition to being law, case
25  law that, at a minimum under principles of stare decisis,

139

1  supports the relief sought today, the ruling was correct on its
2  own terms, as shown in ours and GM's papers, and that ruling
3  simply controls here.
4       Your Honor, I won't elaborate, although -- and go
5  into --
6       THE COURT: That ruling being Chrysler, you're
7  saying?
8       MR. JONES: I'm sorry?
9       THE COURT: That ruling being Chrysler?
10      MR. JONES: Correct, Your Honor. And through
11  Chrysler, because it expressly adopted TWA, TWA's analysis as
12  well.
13      THE COURT: Um-hum.
14      MR. JONES: Your Honor, I'm not going to go into
15  detail on objections. I expect that Weil will address those
16  very ably, more than ably. I want to take a moment to thank
17  the extraordinary assistance provided throughout these
18  proceedings by the Cadwalader who is not authorized to
19  represent the government in court but has done a fantastic job
20  of supporting us in our endeavors and in serving the government
21  as a whole. And, Your Honor, in closing, let me simply urge
22  the Court that for the reasons stated and supported by the
23  evidence presented to the Court over these three days, the
24  Court should grant the 363 sale motion. Thank you.
25      THE COURT: Thank you.

140

1       Sure, Mr. Schein, come on up.
2       MR. SCHEIN: Yes, Your Honor. So that Mr. Miller can
3  have his final comment, I'm not adding any further comments as
4  to Export Development Canada's position. First of all, for the
5  record, Michael Schein, Vedder Price, on behalf of Export
6  Development Canada for the governments of Ontario and Canada.
7       I just want to clarify one legal point that was
8  raised yesterday by Mr., I believe, Jakubowski with respect to
9  an argument that he said was that if the DIP lenders exercise
10  their rights under the loan agreement come the July 10th
11  milestone, not defer their fund, he made a statement that that
12  would be an implied breach of covenant of fair dealing and good
13  faith and that maybe that would give rise to a contract claim
14  by the committee.
15      I'd like to give the Court a cite that expressly
16  rejects that argument so the Court's aware that if that right
17  is exercised. Specifically, that is Mirax Chemical
18  Products Corp. v. First Interstate Commercial Corp., and Eighth
19  Circuit Court of Appeals Case, 950 F.2d 566. And just one
20  statement. The Court said that that duty, which was the duty
21  of good faith and fair dealing, however, cannot be breached by
22  actions that are specifically authorized in an agreement.
23  That's just the one clarification, Your Honor. Thank you.
24      THE COURT: Thank you.
25      Mr. Bromley?

141

1    MR. BROMLEY: Thank you, Your Honor. James Bromley
2    of Cleary Gottlieb on behalf of the UAW. Just want to make one
3    particular point before I ceded to Mr. Miller, which is, to
4    address Mr. Richman's issue as opposed -- as it relates to the
5    linkage between the collective bargaining agreement and the
6    VEBA. Mr. Richman made a fair amount of hay out of a lack of
7    linkage, as he said, in the documents and in the evidence. But
8    I think it's important to look at the evidence. What we have
9    here is testimony from Mr. Henderson that if there was no VEBA
10   there would be no collective bargaining agreement, and with no
11   collective bargaining agreement there would be no workforce.
12       We have testimony from Mr. Wilson, again, saying if
13   there was no VEBA there would be no collective bargaining
14   agreement and, again, without a 1collective bargaining
15   agreement, no workforce.
16       Mr. Curson's declaration said exactly the same thing.
17   The exhibits to Mr. Curson's declaration, the ratification
18   summary at Exhibit 1 -- Exhibit A, I'm sorry, at page 1 and
19   page 11 made it crystal clear that when the UAW membership was
20   voting, they were voting on both the VEBA and the collective
21   bargaining agreement. And as Mr. Curson said unequivocally, it
22   was a single vote, up or down, for both.
23       Exhibit B to Mr. Curson's declaration is the white
24   book, the white book which contains the amendments to the
25   collective bargaining agreement. It makes absolutely clear

142

1    that the VEBA and the modifications are part of the collective
2    bargaining agreement that appears at page i, which says that
3    the ratification is on the terms of the ratification, that
4    single vote up or down.
5        And the addendum relating to the changes to the VEBA
6    appears at page 169 of that white book, and it is indeed part
7    and parcel of the amendments to the collective bargaining
8    agreement.
9        And this shouldn't come as any surprise to the
10   objectors. It's not new. Indeed, of all the information
11   that's been provided to the Court, this is probably the least
12   new because there is a full paragraph in the Chrysler opinion
13   going directly to this point where Judge Gonzalez found that
14   there is unequivocal evidence presented in the Chrysler trial
15   by Mr. Curson as the witness that there was direct linkage,
16   there was clear and unequivocal value being presented to the
17   new company and that the value of the VEBA was receiving was
18   not being received by the old company but indeed by the new
19   company.
20       In addition, the UAW is an express third-party
21   beneficiary of the master sale and purchase agreement. That
22   agreement requires that the collective bargaining agreement be
23   assumed and assigned. It requires that the VEBA be entered
24   into by the new company. These are unwaivable conditions to
25   closing.

143

1        In addition, Section 7.4(h) of the DIP says that
2    unless by July 10 the agreement, the master service sale and
3    purchase agreement, is approved, that there'll be an event of
4    default under the DIP. That includes all of the related
5    documents, and the UAW retiree settlement agreement in Schedule
6    1.1(e) to the DIP is one of those agreements.
7        So, Your Honor, I think that the record is replete
8    with evidence of linkage between the UAW's collective
9    bargaining agreement and the VEBA. And there shouldn't be any
10   doubt or any concern that a showing's been made on that front.
11   And it's very important to keep in mind that that showing is
12   being made by the UAW on behalf of the 475,000 individuals who
13   have either worked or depended on those who've worked for
14   General Motors, as well as the 61,000 active employees. There
15   are over half a million individuals who are dependent on this
16   transaction closing, and closing quickly. And I think we need
17   to look through the shorthand that is being used as timing. If
18   a little more time is given, everything will be fine, nothing
19   will change. But that's shorthand for if there's a little more
20   time, I can get a little more, maybe a lot more. And it would
21   fundamentally change all of the carefully constructed
22   arrangements that have been put in place and, indeed, would go
23   directly to the problem that both Treasury and General Motors
24   have pointed out, which is the damage that would be done to
25   this business in connection with a long-term contested Chapter

144

1    11 proceeding.
2        So for those reasons, Your Honor, the UAW strongly
3    urges that the Court approve the sale transaction.
4        THE COURT: Okay.
5        MR. BROMLEY: Thank you.
6        THE COURT: Thank you.
7        Mr. Miller?
8        MR. MILLER: Good afternoon, Your Honor. Harvey
9    Miller on behalf of the debtors. First, Your Honor, one
10   overarching comment. I was brought up in the school that
11   closing arguments should be confined by the record that was
12   made before the Court. As I sat here and listened to the
13   closing arguments, Your Honor, many of the closing arguments
14   made no reference to evidence which is in the record in these
15   cases. Rather, we heard opinions as to what could have
16   happened and not references to evidence that's in the record.
17   So I just make that as an overarching comment.
18       I want to note that none of the objectors has
19   suggested to the Court that it wants to see a liquidation of
20   the assets of GM. Rather, each of the objectors reiterates
21   that it should not be affected by the 363 transaction and,
22   therefore, it will receive more consideration than what
23   otherwise will be recoverable from the Old GM pursuant to the
24   plan of liquidation which will follow the consummation of the
25   363 transaction.

145

1     Every objector recognizes that a liquidation will
2    result in no recovery to general unsecured creditors.  So what
3    has happened?  By objecting to the 363 transaction, the
4    objectors are exercising what they perceive to be their
5    leverage.  Certain of the objectors are asking the Court to
6    conditionally allow the 363 transaction by laying down terms
7    and conditions that the purchaser would have to comply with or
8    walk.
9         To paraphrase the words of Mr. Jakubowski, Your
10    Honor, they want you to enter the negotiations and bargain with
11    the purchaser.  Indeed, Mr. Jakubowski suggested that the
12    debtors and the purchasers should have come to you as soon as
13    they knew you were assigned to the case to negotiate the terms
14    and conditions of the sale before finalizing the master
15    purchase agreement.  I suggest that the role that Mr.
16    Jakubowski has tailored for you is inconsistent with your role
17    and your responsibilities as a judge.
18         The essence of what the objectors want, as pointed
19    out by my predecessors, is that you should gamble the
20    preservation of the value of the GM assets, the hundreds of
21    thousands of jobs involved, the welfare of the communities they
22    rely upon in an ongoing automotive industry as well as incur
23    the risk of the probability of systemic failure in the hope
24    that the undisputed testimony of the Treasury's representative
25    is a lie and that the Treasury will not exercise its rights to

                                                              146

1    cease financing the debtors.
2         This is an awesome gamble.  It ignores the interests
3    of all other economic stakeholders, including the over 60,000
4    UAW active employees as well as the approximate 500,000
5    retirees and dependents represented by the UAW, as well as the
6    bondholders who have supported the 363 transaction, the
7    suppliers and their industry and the states and communities who
8    will be severely prejudiced if the gamble is lost.
9    Essentially, the objectors ask Your Honor to play Russian
10    Roulette.
11         Now, Mr. Richman referred to footnote 15 in Judge
12    Gonzalez's decision, and he read to you a portion of it, but he
13    did not read the last sentence.  He read the sentence, "The
14    Court concludes that gambling on the possibility that the
15    government was bluffing and risking the potential for a lesser
16    recovery in a resulting liquidation would have been a breach of
17    the debtor's fiduciary duty."  The next sentence is the key
18    sentence, Your Honor:  "This was simply not a viable option."
19         So what Judge Gonzalez held and used as a material
20    point in his decision, he could not take that option of the
21    financing disappearing and risking and bluffed -- that the U.S.
22    Treasury was bluffing.
23         In effect, the objectors are saying if I can't get my
24    pound of flesh, then let GM go down in flames and everybody
25    lose and the devil take the hindmost.  It is not a rational

                                                              147

1    avenue for the Court to go down in the face of the record in
2    these proceedings.  Liquidation or the risk of liquidation is
3    too great a danger to imperil the many beneficiaries of the 363
4    transaction.  A transaction, Your Honor, that squarely complies
5    with the applicable principles of law, no objector questions
6    the business rationale articulated by GM in support of the
7    sale.  No evidence was presented to Your Honor, through
8    testimony or otherwise, that the business rationale to
9    reconstitute these assets and make them the foundation of a
10    viable automotive manufacturing company -- there is no contrary
11    evidence in the record.  Rather, the complaint is that the pie
12    is not big enough to satisfy the particular needs of each
13    objector and, therefore, the 363 transaction cannot be
14    approved.  That is not a legally sustainable objection.
15         Mr. Bressler, representing the tort victims, or some
16    tort victims who have actual claims has argued that this
17    clients are entitled to extra indulgence.  He cites no legal
18    proposition or authority for that proposition -- I'm sorry, no
19    legal authority for that proposition.  Of course everybody
20    empathizes with his clients, but as stated, bankruptcy is a
21    zero-sum game.  And if GM is liquidated, his clients will
22    receive no recovery.
23         He described the purchase as an extraordinary
24    transaction because the government is not the usual purchaser.
25    But as Mr. Jones has pointed out, Your Honor, the United States

                                                              148

1    Treasury, in the perspective of this case, is a creditor; it is
2    a secured creditor.  It can stand in the position of any
3    secured creditor that appears in the bankruptcy proceeding.
4         From that conclusion, he jumps to another and more
5    far-fetched contention that the purchase is a result of a
6    conspiracy among the Treasury, General Motors, and I guess the
7    UAW, to deprive his clients of their right to trace the assets
8    to New GM.  He argues that New GM must assume the potential
9    liabilities due to his clients because there was no independent
10    purchaser of the GM assets.  Yet, the record is devoid of any
11    evidence to establish the facts that would support a finding
12    and conclusion of the existence of a conspiracy directed at all
13    product liability claimants.  It's just not in the record, Your
14    Honor.
15         So Mr. Bressler argues that there are no similar
16    situations where a pre-petition lender has been the purchaser
17    and the DIP financer and pre-petition creditor.  I suggest that
18    Mr. Bressler is on weak ground.  The concept of loan-to-own has
19    permeated bankruptcy practice throughout this decade.  An
20    example is In re Radner Holdings Corporation, 353 B.R. 820, a
21    bankruptcy case in Delaware before Judge Walsh.  In that case,
22    Tennenbaum Capital Partners was a substantial investor.  It
23    continued to finance the debtor as its fortunes declined and
24    acquired more and more collateral security in substantially of
25    the debtor's property.  When the debtor's revolving lenders

                                                              149

1 threatened to cut off funding, the company commenced a Chapter
2 11 case.
3     TCP, Tennenbaum, agreed to purchase the assets under
4 Section 363 and credit bid its 128.8 million dollar pre-
5 petition date claims.  That was challenged, Your Honor, as not
6 an independent purchaser, was challenged in the context of
7 recharacterization and equitable subordination.
8     In another case, Your Honor, of that -- and I didn't
9 have a chance, Your Honor, to do a great deal of research, but
10 another case is In re Medical Software Solutions, 286 B.R. 431,
11 a bankruptcy case out of the district of Utah.
12     THE COURT:  Before you go on to the second one, the
13 Software Solutions, you told me the contention rendered.  Judge
14 Walsh rejected the contention and he said that the lender did
15 in fact have the ability to --
16     MR. MILLER:  Yes, Your Honor.
17     THE COURT:  -- take it over?
18     MR. MILLER:  And he approved the 363 sale, and in a
19 long opinion, Your Honor.
20     THE COURT:  With the same types of protection on 363?
21     MR. MILLER:  Yes, Your Honor.
22     THE COURT:  Um-hum.
23     MR. MILLER:  In the Medical Software case, Judge
24 Thurman held that there was a sound business reason that
25 existed for the sale of the Chapter 11 debtors outside the

150

1 ordinary course of business and outside of the plan based
2 chiefly upon the lack of funds for continued operations and the
3 narrowing window for the sale of assets before they
4 significantly declined in value.
5     THE COURT:  The Judge Thurman, is that Bill Thurman
6 out in Utah?
7     MR. MILLER:  Yes, sir.  A corporate insider that had
8 provided both pre- and post-petition financing for the
9 operation of the debtor's business had a valid security
10 interest in the assets being sold and could credit bid its
11 secured claim.  An insider qualified as a good-faith purchaser,
12 and the Court approved the sale as being for a fair and
13 reasonable price and supported by sound business reasons.
14     There are -- I'm sure, Your Honor, with additional
15 time, we can find many more cases that follow in the concept of
16 loan-to-own.
17     So, turning to the concept that this was not an
18 independent transaction, the record demonstrates, Your Honor,
19 that there were strenuous arms'-length negotiations.  There
20 were differences of opinion.  There were requests made by GM;
21 they were either rejected by Treasury or they were negotiated.
22 And one example, Your Honor, is that GM tried to in, respect of
23 the seven-plus billion dollars of retiree benefits, it tried to
24 keep the cut down to sixty-two percent, but the Treasury came
25 back and said no, it's got to be sixty-six and two-thirds.

151

1 There was a negotiation over that, and that's just one little
2 item, Your Honor, of what was negotiated during the course of
3 this somewhat complex proceeding.
4     In terms of independence, Your Honor, a great deal of
5 moment is given to the fact that Mr. Henderson will be the CEO
6 of New GM.  Other executives will be employees of New GM.  And
7 because of that, this is a tainted transaction.  But as Your
8 Honor knows, there are many cases in the bankruptcy court where
9 an acquirer of a business will take that business with its
10 employees.  And when you think of this behemoth that is Old GM,
11 a purchaser would not be in its right frame of mind if it did
12 not take the employees who know the business, at least
13 initially, to allow the stabilization of the business while
14 other events may unfold.  The testimony is clear, Your Honor,
15 Mr. Henderson doesn't have an employment contract, he has no
16 employment contract with the purchaser, and none of the other
17 executives have employments contracts.
18     And in terms of independence, Your Honor, what's
19 happened to the stockholders of Old GM?  They're being wiped
20 out, Your Honor, because of the financial condition of the
21 estate.  New GM will have new stockholders.  In addition, New
22 GM, Your Honor, will have an independent board of directors.
23 Five independent directors from Old GM, people of great repute
24 and great business experience, are moving over to New GM.
25 Mr. Henderson is moving over to New GM.  But there will be

152

1 seven other directors.  And Mr. Edward Whittaker, the former
2 CEO of AT&T, has already been designated to be the chairman of
3 the board of directors.
4     That board of directors, Your Honor, will decide the
5 role in the future -- I mean the future role that Mr. Henderson
6 and other executives and other employees of Old GM will occupy
7 in the operation of New GM.  There has been full disclosure,
8 Your Honor, in this record of what the relationships are
9 between the parties and which, I submit to Your Honor, clearly
10 established the independence of the parties.
11     Mr. Bressler also complains that the UAW VEBA is just
12 too good a deal to be approved.  He ignores the fact that it is
13 the purchaser who made the deal with the VEBA in its interest
14 of getting employees to operate the business and enhance the
15 recoveries and the general unsecured creditors who will receive
16 equity securities as part of this transaction.  One objective
17 of this transaction, Your Honor, is to enhance the value of the
18 equity securities.  And that enhancement obviously requires the
19 employment of the UAW and the other employees.  There would be
20 no business without that.  And as Mr. Curson testified, Your
21 Honor, and notwithstanding Mr. Richman's statements, the record
22 is clear there is only one witness -- and he testified, and
23 he's a union officer -- that the ratification of a modified
24 collective bargaining agreement and the VEBA was one
25 ratification.  And if the VEBA is not approved, all of the

153

1    modifications to the collective bargaining agreement are
2    rescinded and we're back to where we were before with work
3    conditions, wage rates, et cetera, which are not tenable in an
4    automotive industry that is in such severe crisis as this
5    automotive industry.
6        The argument, Your Honor, that another potential 900
7    million dollars of liabilities, irrespective of the asbestos
8    liabilities, assuming the asbestos liabilities, and another 300
9    million-plus dollars of liabilities in connection with retiree
10   benefits, is insignificant.  And, therefore, the purchaser
11   should be required to assume those liabilities.
12       The objective of the purchase, as I said, Your Honor,
13   is to acquire the assets and assume only those liabilities that
14   will contribute to the success of the purchaser.  You take 900
15   million, 300 million, another 600 million, and pretty soon
16   you're in the area where Senator Dirksen said you're talking
17   about real money.
18       The purchaser has drawn the line as to what it is
19   willing to pay for the assets in the context of its credit bid
20   and its assumption of liabilities and the voluntary contractual
21   obligations that it has made to the UAW VEBA.
22       Now, Your Honor, turning to Mr. Jakubowski,
23   Mr. Jakubowski made an impassioned argument.  Essentially he
24   told the Court that it should forget about being in the Second
25   Circuit and it should ignore the Court's stated principle of

154

1    consistency in the decisions of the bankruptcy court in this
2    district.  Mr. Jakubowski speaks of Judge Posner in the Seventh
3    Circuit as if he is immortal and infallible.  I have great
4    respect for Judge Posner and for his colleague Judge
5    Easterbrook, but neither is infallible and particularly
6    conversant with bankruptcy in Chapter 11.  I once debated Judge
7    Easterbrook at a University of Pennsylvania Business and Law
8    Forum.  He argued that persons in businesses should be allowed
9    to contractually waive the benefit of the right to seek
10   bankruptcy protection.  He posited the argument on the basis
11   that the contracting parties had equal bargaining leverage and
12   could freely negotiate that provision.  I asked Judge
13   Easterbrook if he had ever studied a credit card agreement and
14   tried to change the terms of that printed agreement or borrowed
15   money from a financial institution while in financial distress.
16   He replied in the negative and then said he would have to
17   rethink his position.
18       As for Judge Posner, Mr. Jakubowski never named a
19   particular case that he was talking about yesterday and stating
20   that it was in conflict with TWA.  Let us not forget, Your
21   Honor, that the Seventh Circuit is the circuit that is the
22   Chicago school of finance, and it is the circuit that is the
23   least receptive to business reorganizations.  A circuit, Your
24   Honor, that is so unreceptive that it does not endorse the
25   critical vendor situation that is so important in most

155

1    reorganizations.  But --
2        THE COURT:  Or NOL protection.
3        MR. MILLER:  Or NO -- exactly, Your Honor.  But be
4    that as it may, Mr. Jakubowski argued that the jurisdiction of
5    this Court is extremely limited and unless you are able to find
6    specific words in the Code you are acting beyond your power.
7    He invites you to teach a lesson to the Second Circuit and tell
8    the judges of that court that they don't really understand
9    statutory construction.  Yet, his idol Judge Posner, in a case
10   called FutureSources LLC v. Reuters Limited at 312 F.2d 281,
11   283, a 2002 case, Judge Posner criticized a district court for
12   relying on an unreported opinion from another circuit and for
13   one of the parties to rely upon it in his argument.  Judge
14   Posner said that while, and I'm quoting, "The reasoning of a
15   district judge is of course is entitled to respect, the
16   decision of a district judge cannot be controlling precedent.
17   The law's coherence could not be maintained if district courts
18   were deemed to make law for their circuit, let alone for the
19   nation, since district courts do not have circuitwide or
20   nationwide jurisdiction."  Notwithstanding those piercing words
21   of Judge Posner, Mr. Jakubowski wants you to take on the Second
22   Circuit judges and, in effect, suggests to them that they
23   really ought to act a lot more like Judge Posner.  I don't
24   believe that Your Honor has a death wish.
25       Last week in the argument on the effect of the

156

1    Sprague Sixth Circuit decision, Your Honor unequivocally stated
2    that Sprague was never binding on you -- was not binding on you
3    and that your obligation is to follow the directions of the
4    Second Circuit and to maintain consistency of bankruptcy court
5    decisions in this district in the absence of clear error.  And
6    as Your Honor stated yesterday, you don't view Judge Gonzalez's
7    decision as clear error.  And right now, Your Honor, the law of
8    this circuit is the decision of the Second Circuit affirming
9    the Chrysler decision on the basis of the reasoning that Judge
10   Gonzalez used in his opinion.  That's the law in this circuit
11   which I believe Your Honor is required to follow.
12       Mr. Jakubowski alluded to stare -- I'm sorry, Your
13   Honor, alluded to stare decisis and the peril of the Court to
14   fill in gaps in the statute.  Mr. Jakubowski argued that 363(f)
15   subject to the plain meaning rule and must be construed
16   narrowly based upon a whole host of Supreme Court decisions
17   that he cited generally involving Chapter 7 or Chapter 13
18   cases.  Bankruptcy courts deal with business reorganizations as
19   situations which require flexibility and the exercise of
20   reasonable judgment by a bankruptcy court.  Courts need to fit
21   the requirements of the case in achieving the objectives and
22   policies of the Code.  A perfect example of the kind of role
23   that must be played by bankruptcy courts is demonstrated with
24   the situation that arose as a result of the Supreme Court's
25   decision in Hartford Accident and Underwriters v. Union

157

1    Planter's Bank at 530 U.S. 1, a 2000 case.  As Your Honor
2    undoubtedly knows, the case involved the construction of
3    Section 506(c) of the Bankruptcy Code and whether the Hartford
4    Accident and Underwriters could present a case for
5    administrative expenses under 506(c) when the language of the
6    statute read that only a trustee could do that.
7        And the Supreme Court, in applying what essentially,
8    I think, was Judge Scalia, the plain meaning rule, said the
9    statute says the trustee can only do that, therefore Hartford
10   could not step into the shoes of the trustee, could not qualify
11   under 506(c), and that's what the statute says and that's what
12   courts have to pay attention to.  So -- and they cite the Ron
13   Pair case and some of the cases that were cited by
14   Mr. Jakubowski.
15       So what followed after Hartford?  In 2003, a case
16   came to the Third Circuit, Cybergenics case at 130 F.3d 545, a
17   2003 case.  This was an en banc --
18       THE COURT:  You're talking about Cybergenics before
19   or after the first en banc?
20       MR. MILLER:  I'm talking about the en banc decision,
21   Your Honor.  Cybergenics involved Section 544(b)
22   of the Bankruptcy Code and that's the section, part of the
23   avoidance powers where a trustee may prosecute actions based
24   upon nonbankruptcy law to recover preferences, fraudulent
25   transfers, et cetera.

158

1    action in the first instance, should be recognized.  But that
2    there was a missing link.  And where there was a missing link
3    the Court said we believe that the missing link is supplied by
4    bankruptcy court's equitable powers "to craft flexible remedies
5    in situations where the Code's causes of action failed to
6    receive their intended purpose."
7        The Third Circuit went on to say, Your Honor, "that
8    the Supreme Court has long recognized that bankruptcy courts
9    are equitable tribunals that apply equitable principals in the
10   administration of bankruptcy proceedings."  And it noted, Your
11   Honor, that the Court in the 105(a) has the power to issue any
12   orders, process or judgment that is necessary or appropriate to
13   carry out the provisions of this title.  No provisions of this
14   title providing for the raising of an issue by a party-in-
15   interest shall be construed to preclude the Court from sua
16   sponte taking any action or making any determination necessary
17   or appropriate to enforce or implement court orders or rules,
18   or to prevent an abuse of process.
19       So what that -- those decisions say, Your Honor, is
20   where there is a statutory provision that doesn't comport with
21   a holistic interpretation of the Bankruptcy Code, and the
22   objectors and policies of the Bankruptcy Code, the bankruptcy
23   courts have the equitable power to construe that statute to
24   accomplish those objectives and purposes of the Bankruptcy
25   Code.

160

1        The language of the statute is almost precisely the
2    same as Section 506(c) of the Bankruptcy Code.  And when the
3    case was heard before the Third Circuit on appeal from the
4    bankruptcy court and the district court, a three-judge court in
5    the Third Circuit reversed the lower courts on the basis of the
6    Hartford Accident case, a pure case of statutory construction
7    as far as the three-judge court was concerned.  That decision
8    was withdrawn as a result of the granting of a motion that the
9    case be heard en banc.
10       When it was heard en banc, the issue of the
11   creditors' committee prosecuting avoidance actions under
12   Section 544(b) was upheld by a majority of the en banc court.
13   The Third Circuit decision, the en banc decision, reflects a
14   court recognizing the needs of the case and the necessity of
15   making the statute work.  And, if I might find -- let me just
16   get that decision.
17       THE COURT:  You're talking the second Cybergenics
18   decision, the en banc one that --
19       MR. MILLER:  Yes, I am.  As Your Honor does with
20   great frequency, first you look at the statute.  And they
21   looked at the statue.  And -- can you hear me?  How's that.
22       First the Court noted that statutory construction is
23   a holistic endeavor, citing the Timbers case.  And then, Your
24   Honor, in reviewing what had occurred, the Third Circuit noted
25   that the fact that the language does not authorize derivative

159

1        And in connection with Section 363(f), Your Honor,
2    Mr. Jakubowski says you can't give it effect.  It cannot -- it
3    just doesn't cover claims.  Claims are not included in the
4    statutory language and, therefore, this Court is without power
5    to issue an order that provides free and clear of all liens,
6    claims and encumbrances.
7        Now, if you think about Mr. Jakubowski's argument,
8    Your Honor, what he is basically saying that every single
9    unsecured claim carries over, that 363(f) is totally
10   inapplicable, that it doesn't work.  That, Your Honor, is not a
11   principal statutory construction.  Courts are under the duty, I
12   believe, Your Honor, to give effect to the words of a statute,
13   and to harmonize a statue so that it is effective.  And for
14   many, many years, Your Honor, courts have issued 363(f)
15   protections in connection with the 363(b) transaction.  And the
16   law in this Circuit, based upon Judge Gonzalez' order, is that
17   this Court -- the bankruptcy court has the authority to issue a
18   free and clear order as requested by the debtors in this
19   action, which is almost identical to the order that was entered
20   in the Chrysler case.
21       The scope of the power of the bankruptcy court under
22   Section 363 Your Honor once referred to in the Magnesium
23   Corporation of America case.  And you said in that case on June
24   13, 2002 "I believe Judge Walsh got it exactly right in TWA.  I
25   am not going to burden this already very lengthy decision by

161

1    telling you all of the reasons I believe Judge Walsh is right.
2    But I have rarely seen on my time on the bench a decision that
3    was as closely relevant and directly on point" -- and this was
4    in connection with a 363(b) sale, "and as well thought out as
5    his decision.  At the risk of appearing less than thorough I am
6    going to adopt his analysis by reference."
7         THE COURT:  That is the same TWA but before it was
8    affirmed all the way up to the Third Circuit?
9         MR. MILLER:  That's correct, Your Honor.  Your Honor
10   also referred to the Leckie Smokeless Coal Company case at 99
11   F.3d 573.  Your Honor said that Leckie -- that you interpreted
12   the Fourth Circuit as saying "That Congress did not expressly
13   indicate that the language of 363(f) was intended to limit the
14   scope of its application to in rem interest."
15        If Mr. Jakubowski's argument was taken and adopted by
16   Your Honor it would mean, Your Honor, that 363(b) is out of the
17   statute, and there can never be any sales of assets if they're
18   always going to be subject to the claims, the unsecured claims,
19   of the debtor.  Even outside of selling substantially all of
20   the assets every single sale under Section 363(b) would be
21   impaired by the fact that the purchaser is assuming or is going
22   to be responsible for claims that may drift or migrate with the
23   assets that are being sold.  That, Your Honor, cannot be the
24   law.  Common sense says that you cannot effect that kind of a
25   ruling in the face of what has transpired in bankruptcy courts

162

1    through thirty years since the adoption of the 1978 code.  And,
2    again, Your Honor, as I said before, the law in this circuit is
3    clearly Chrysler.
4         Now, Mr. Jakubowski also, like a true plaintiff's
5    lawyer, immediately jumped up and said if the government
6    doesn't go through with this acquisition or finance this
7    acquisition it will be a clear breach of contract.  And he
8    turns to the creditors' committee and says I hope you're
9    drafting a complaint against the government.
10        Counsel referred to a case right on point and in
11   Willis on Contracts under the title Express Conditions "assume
12   liabilities and express conditions in a contract, where there
13   are express conditions in a contract, where there are milestone
14   that have to be accomplished, such as there are in this
15   financing, if there is no order of approval on September 10 and
16   there is no wavier on the part of the U.S. Treasury, the U.S.
17   Treasury has the absolute right to terminate.  And that does
18   not give rise to a breach of contract.  And it is not subject
19   to a commercially unreasonable actions."
20        In connection, Your Honor, to the arguments that Mr.
21   Jakubowski made that the treasury is not -- if it wants to act
22   like a commercial bank it should be treated like a commercial
23   bank.  I would submit to Your Honor that the commercial bank
24   analogy is inappropriate.  We are not just talking about a
25   JPMorgan or a Citibank, we are involved with a federal

163

1    department that is attempting to salvage an industry and all it
2    represents, as well as protect the taxpayers' money.  The
3    Treasury hired an extremely abled cadre of experienced persons
4    to discharge this function.  They have made -- the Treasury has
5    made a decision that a prompt approval of the 363 transaction
6    is a condition precedent.  If there is no sale order there's no
7    more financing.  And, Your Honor, there is no evidence to the
8    contrary in respect of that.
9         Mr. Richman raises for the first time the credibility
10   of Mr. Wilson.  Mr. Wilson testified yesterday candidly and at
11   length.  And there is nothing in his testimony which would
12   establish that he was lying, falsifying any respect whatsoever.
13   And counsel for the treasury has reiterated the position that
14   Mr. Wilson testified, and there's nothing else in the record,
15   Your Honor.
16        The Court must accept that undisputed evidence and
17   take it into account the consequences of non-approval.  So in
18   connection with Mr. Jakubowski's argument, both the statutory
19   construction, I would submit to Your Honor that this Court has
20   ample power under its equitable powers to construe a statute so
21   that it may implement and further the interests of bankruptcy
22   reorganization and bankruptcy law under the bankruptcy code.
23        And in the context of stare decisis, again, Your
24   Honor, the Chrysler case is the decisional authority in this
25   circuit.  And, certainly, the TWA case is very persuasive, both

164

1    on bankruptcy court level and on the Court of Appeals level.
2         So then, Your Honor, I turn to Mr. Esserman.  So in
3    connection with that I will also deal with all the asbestos
4    claimants.  The argument is made, Your Honor, that somehow
5    OldCo should comply with 524(g).  524(g), by it's very
6    language, refers to the confirmation of a plan of
7    reorganization that would discharge asbestos claimants.  There
8    is not going to be any discharge here, Your Honor.  OldCo is in
9    liquidation, there will be no discharge of liabilities.
10   524(g), by its very terms, could not be complied with because
11   fifty percent of the equity of the so-called surviving
12   corporation is not available.  So 524(g) is not a player in
13   this scenario, Your Honor.  And Judge Gonzalez, again, Your
14   Honor, specifically held that 524(g) did not apply to the
15   Chrysler 363 transaction.  There is no discharge and there is
16   no channeling order requested.  What we have said to Your Honor
17   in the course of these proceedings, this will be an issue that
18   Old GM, OldCo, will have to deal with.  That the creditors'
19   committee will have to deal with in structuring a plan of
20   liquidation for OldCo.  How existing asbestos claimants are
21   going to be treated to the extent they have allowed claims, and
22   potential future claimants may be treated is an appropriate
23   subject for OldCo.  And it would not be different from some
24   other cases where, in the situation of a liquidation, a
25   specific fund is created to deal with future claimants.  But

165

1  that's an issue to be determined, Your Honor, after the sale is
2  consummated.
3      THE COURT:  Mr. Miller, there's no channeling order,
4  but there is an injunction requested.  And the two lawyers who
5  were raising asbestos issues pointed out that if you did give
6  personal notice and applied it to every state in the United
7  States you wouldn't be able to do much with it because they
8  wouldn't know that they've contracted asbestos.
9      Now, I have an interesting twist here.  Both of those
10  folks represent existing asbestos claimants who analytically in
11  the Jakubowski situation.  But I also believe that this issue
12  was raised that hasn't been discussed in the Second Circuit
13  argument in the (indiscernible) appeal.  To what extent would
14  it be proper or improper in Your view if words were added to
15  any approval order that said to the fullest extent
16  constitutional principal?
17      MR. MILLER:  Just speaking for myself, Your Honor,
18  without consultation for client, I don't have problem with that
19  language.  But I would, again, note, Your Honor, that Judge
20  Gonzalez dealt with the issue of notice and I do not recall the
21  colloquy between Judge Sack and Mr. Esserman, and I'm not sure
22  that colloquy related to injunctions or the ability to sue.
23  All I'm saying, Your Honor, there is going to be an estate.
24  And estate which we believe will have significant value.
25      Part of the claimants who will have rights against

166

1  the property of that estate will be asbestos claimants, current
2  and future.  And that estate, as part of its plan of
3  liquidation can provide a mechanic to deal with future
4  claimants.  That's not unheard of, Your Honor, the creation of
5  a fund or putting aside assets, so when the disease manifests
6  itself and there is an actual claim there will be a source of
7  recovery.  That can be done within that context.  And there is
8  no discharge in connection with that, Your Honor.
9      And besides, Your Honor, I think it was Mr. Koch
10  testified it will be three or five years, the asbestos
11  situation has been going on now, Your Honor, for I think pretty
12  close to thirty-five years.  GM has not been using brake
13  linings with asbestos for a long time.  If and when these
14  claims manifest and whether they're allowable or not, Your
15  Honor, is another issue that has to be dealt with.  But as far
16  as 363(f) is concerned, as Judge Gonzalez held, and the
17  specific provision in the order is broad I would construe it as a
18  very broad provision.  And you have to assume, Your Honor, that
19  in the appeal in Chrysler it was considered as Your Honor may
20  have noted in the colloquy, there was a discussion of it.
21      THE COURT:  Oh, there was definitely a discussion of
22  it.
23      MR. MILLER:  And also, Your Honor, I think we have to
24  refer to the per curiam decision of the Supreme Court in
25  connection with the application for a stay.  While the Supreme

167

1  Court said that it wasn't ruling on the merits, it did say that
2  the applicant, the Indiana Pension Funds, had failed to
3  demonstrate:  1) a reasonable probability that four justices
4  would consider an issue sufficiently meritorious to grant
5  certiorari, or to no probable jurisdiction.  Now, in reaching
6  that conclusion they had to evaluate what was decided by Judge
7  Gonzalez.  2) a fair prospect that a majority of the Court will
8  conclude that the decision below was erroneous; and 3) a
9  likelihood that an irreparable harm would result from the
10  denial of the stay.  So while it's not a ruling on the merits,
11  Your Honor, it does say something about the Supreme Court's
12  view of Judge Gonzalez's decision.
13      So coming back, Your Honor, into the context of stare
14  decisis, again, this is the law in the Second Circuit, and this
15  is the law that should be followed in connection with this
16  transaction that is so important to so many people.
17      Now, Your Honor, turning to Mr. Kennedy who made,
18  likewise, a very impassioned and emotional argument, and
19  likewise, I and everybody here, Your Honor, empathizes with his
20  clients and wished that there was a way to assuage his emotion
21  as well as his client's.  But alas, I can't do it, Your Honor.
22  He took issue, Your Honor, with a statement I made in
23  connection with my initial closing argument referring to his
24  papers as construing that there was a conspiracy, a conspiracy
25  among GM and the Treasury to deprive the splinter union

168

1  retirees of their benefits.
2      There is nothing in this record, Your Honor, that
3  would support a determination of a conspiracy and all of the
4  elements that would constitute a conspiracy.  Indeed, the
5  record goes the other way, Your Honor.  Mr. Henderson testified
6  that up until the very end of May, there was the hope of GM
7  that the bond exchange offer would be successful.  And if the
8  bond exchange offer would have been successful, there would
9  have been no impact on the retirees.
10      And further, Your Honor, in Mr. Rory's deposition,
11  which has been designated to Your Honor, at page 44 -- I'm
12  sorry, page 43, Your Honor, he refers to an exhibit which is
13  really Exhibit 9, which is in the record.  And he was directed
14  his attention to the first page of that exhibit.  And there's a
15  line in this exhibit, and the title of this exhibit, Your
16  Honor, is History of OPEB Defeasement - IUE.  And in the middle
17  of the third bullet point, it says, "2006, IUE resisted
18  mitigation VEBA concept - reluctant to bargain retiree VEBA for
19  large population from legacy operations (e.g. Frigidaire) not
20  represented by active members - relatively small active
21  population to generate wage and COLA deferrals."
22      So what does that demonstrate, Your Honor?  That in
23  2006, GM was in actual negotiations with the IUE about creating
24  a VEBA, a VEBA that would have provided the health and medical
25  benefits, and yet the union resisted that.  That VEBA could

169

1  have been set up in 2006, Your Honor, and it would have been
2  active.
3      In addition, Your Honor, Mr. Kennedy is an excellent
4  lawyer, and he knew how to play the strings on numbers.  He
5  talked about the 26,000 retirees of the splinter unions who
6  will be deprived of retiree benefits.  And actually, as he
7  spoke, Your Honor, he went on to say that approximately 20,000
8  of those retirees are already post-sixty-five, so they're on
9  Medicare.  And under the proposed retiree benefits that had
10  been offered, all benefits cease from the VEBA or General
11  Motors at the point that you go on Medicare.  So basically,
12  Your Honor, we're talking about 6,000 retirees, who right now,
13  are getting their retiree benefits.
14      Unfortunately, as OldCo goes into liquidation,
15  there's no way that you can sustain paying 26 million dollars a
16  month for retiree and medical benefits.  The exhibit -- I
17  forget the number, Your Honor -- of the statement made by Mr.
18  Henderson, clearly demonstrates that there was an effort to try
19  and find a way, a means, to assist the splinter union retirees
20  and the maintenance of benefits for those retirees.  There's
21  nothing else in the record, Your Honor, except that what
22  happened at the end of May when a decision was made that there
23  had to be a transaction, there had to be something to
24  regenerate and maintain the going concern value of these
25  assets, and that the 363 transaction was the best way to do
170

1  that, that this sale was finalized.
2      That doesn't give rise, Your Honor, to a conspiracy
3  to deprive these retirees of their benefits.  As Mr. Wilson
4  testified, Your Honor, the guiding principle of the Treasury
5  was to acquire the assets and assume the liabilities which were
6  necessary and incidental to the creation of a commercial
7  success; a commercial success, Your Honor, which would inure to
8  the benefit of OldCo and the creditors of OldCo.
9      This morning Your Honor heard of a potential
10  compromise with the State of Michigan on Workman's
11  Compensation, where NewCo or New GM has agreed to pick up the
12  Workman's Compensation obligations.  Now, why was that done?
13  That was done because if GM -- New GM did not do that, the
14  State of Michigan was not going to allow New GM to be a self
15  insurer, which would have cost New GM an enormous amount of
16  money; and which would come out of its cash flow.  By assuming
17  that liability, it is now going to be allowed to be a self
18  insurer.
19      Essentially, Mr. Kennedy, in his impassioned plea, is
20  arguing something which is novel.  He is basically saying, Your
21  Honor, that Sections 1113 and 1114 are effectively in the same
22  status as liens on the land.  They run with the assets.  That
23  you cannot transfer assets of a unionized business without
24  dealing with obligations under 1113 and 1114.  There is no
25  legal authority that supports that proposition, Your Honor.
171

1  There is no requirement that before you transfer assets, you
2  must reject the collective bargaining agreement, if that's the
3  condition.  There is no requirement in connection with a 363
4  sale that you must comply with 1114.  OldCo --
5      THE COURT:  Can I assume that there will be
6  compliance by OldCo with 1114?
7      MR. MILLER:  Until such time as Your Honor may rule
8  on an 1114 motion.  Yes, sir.  Right now, today, all of the IUE
9  retirees are still receiving the full benefits under that
10  program.  That's what's costing -- and I'm including all the
11  splinter unions, Your Honor -- that's what's costing
12  approximately twenty-five- to twenty-six million dollars a
13  month.
14      Now, as OldCo goes into its liquidation phase,
15  obviously that is not a sustainable benefit in a liquidation
16  scenario, nor is it a sustainable benefit in the context of New
17  GM, Your Honor.  Are we going to inflict upon New GM some of
18  the problems that contributed mightily to the demise of Old GM.
19  The concept of having job banks of thousands of employees who
20  sit around and don't do anything except paychecks with no
21  benefit to the ongoing operations, work rules, et cetera, and
22  conditions under collective bargaining agreements.  What has
23  happened here, Your Honor, is the Treasury, a government
24  sponsored purchaser, who has had to make an agreement with the
25  UAW because otherwise there would be no employees.  And it's
172

1  unfortunate that the IUE has basically no active employees.
2  Not necessary to the operation of the plants that are being
3  acquired by the purchaser.  And there has to be a line of
4  commercial reasonableness in terms of what New GM is going to
5  assume in connection with a sale.
6      Mr. Kennedy also criticized me because I used the
7  word jealousy in respect of the discussions or descriptions
8  that have been made in connection of the UAW recoveries through
9  the purchaser.  I withdraw the word jealousy.  Nonetheless,
10  through half this case I have heard repeated over, and over
11  again, that the UAW is getting too much and that it's just
12  unfair.  Well, it's the economic circumstances, Your Honor,
13  that resulted in the UAW situation.  The proposal by Mr.
14  Jakubowski that Your Honor an order of conditional approval
15  just doesn't work, it's not acceptable to the purchaser.  It
16  doesn't benefit the New GM and it doesn't benefit the Old GM.
17  Because the conditional approval will have a terrible negative
18  effect on consumers.  Everything that this company has been
19  fighting for the last thirty days to make it clear to the
20  consumer that it's going to be entangled in a bankruptcy
21  case, that these assets which will form a foundation of a new
22  OEM will be there free of the entanglements of bankruptcy will
23  dissipate.
24      And Mr. Richman, again, raised the issue in his
25  closing argument well, GM is really doing well in Chapter 11,
173

1    look at the month of June. It was only thirty-three percent
2    below June of 2008. And as Mr. Henderson testified lead sales
3    were down by an even greater margin. And if Your Honor
4    happened to read this morning's New York Times it shows the
5    relative figures between Chrysler, Ford and GM. And what you
6    have to surmise out of that or infer out of those discussions,
7    Your Honor, that Ford's market share is rising. And where is
8    that market share coming from. As we sit here today -- stand
9    here today, GM's market share is our owee. And the longer it's
10   in this process the more that will happen.
11          And Mr. Henderson testified that GM will not make
12   money in 2009, which means that somebody has to finance these
13   operations going forward. And not one objector has brought
14   forth a financier. Not one objector has brought forth an
15   alterative -- a viable alternative other than, Your Honor, you
16   should deny this application, we'll play poker or Russian
17   roulette with the government. And if the government walks,
18   well, we'll just have a Chapter 11 case and see what happens.
19          Well, what does that mean, Your Honor? Without
20   financing it would be the obligation of Old GM to close every
21   factory, to terminate every employee except those that are
22   needed to preserve and protect the properties. The results
23   will be catastrophic, Your Honor, and irreversible. So we're
24   be brought back again, Your Honor, to the bluff game.
25          But there's nothing in the record that says that the

                                                                    174

1    Treasury is bluffing. And I take the representation of counsel
2    for the United States that that representation is made on
3    information furnished to him by his client, the U.S. Treasury.
4    But again we hear the argument, Your Honor, that this was all
5    a -- this is not a true sale, and part of that also relates
6    back to this infamous document, Bondholders' Exhibit 2 from the
7    Cadwalader firm, about the use of Section 363. I would venture
8    to say, Your Honor, if anybody goes to a CLE program on
9    bankruptcy, they will get this slide show without the names. I
10   don't want to demean Cadwalader, Your Honor, but I think that
11   this is in general circulation.
12          Now, looking at that exhibit, Your Honor, and looking
13   at the record as to what GM did, if the board of directors of
14   GM did not consider the various alternatives, that board of
15   directors might have been remiss in its duties. It had an
16   obligation to consider all alternatives and to rely upon the
17   advice of its professionals and advisors. That's what the
18   board of directors did, and that's what the exhibits establish.
19   Clearly, there were presentations to the board as to what
20   bankruptcy provides for, what happens in a bankruptcy.
21   Otherwise, the board of directors could not be discharging its
22   fiduciary obligations.
23          I just want to see where I am in this, Your Honor.
24          Now, if I might, Your Honor, I would turn to Mr.
25   Richman's comments. Last evening, Your Honor, Mr. Richman

                                                                    175

1    asked for more time to prepare his closing arguments so that he
2    could address the evidence in the record. I listened carefully
3    to Mr. Richman's argument. There were no references to the
4    record other than his claim that Mr. Wilson is not credible.
5    During the course of these proceedings, he put on no evidence,
6    no witnesses, no declaration of fact, no expert witness. In
7    fact, he didn't do very much other than work off what was in
8    the record.
9           All of the others' evidence shows good-faith
10   bargaining, good-faith business judgment. And he concedes that
11   it's in the best interest of all parties that the GM assets be
12   sold. His cross-examination of Mr. Wilson certainly did not
13   shake Mr. Wilson's credibility. What he's doing, Your Honor,
14   he's asking you to take his opinion and speculate on the future
15   and not refer to the evidence that has been sworn to in these
16   cases -- in these proceedings. And basically he says, Your
17   Honor, oh, Chapter 11 is an easy process, given a few days
18   parties can agree on various things and in ninety days we can
19   be out of Chapter 11. I would just say, Your Honor, just
20   taking these three days of hearings as an example of what
21   happens in a Chapter 11, the concept that you could file a
22   Chapter 11 plan, and he doesn't even describe the Chapter 11
23   plan that you would file on the first day, but any Chapter 11
24   plan that you file that had open ends to it would involve the
25   appointment of creditors' committees, disclosure statements,

                                                                    176

1    arguments over valuation. The concept that a case of the size
2    and complexity of GM would move through some accelerated basis
3    so that you can have a confirmation in ninety days, I think,
4    Your Honor, is not credible. It just doesn't happen.
5           I refer to the Delphi case. The Delphi case was
6    supposed to move on a fast track. That track seems to have
7    disappeared. And in July -- later this month, I should say,
8    Your Honor, Delphi will either have a resolicited plan of
9    reorganization or will have a 363 sale with substantially less
10   recoveries for the creditors and basically no recoveries for
11   the unsecured creditors.
12          The problem with long term bankruptcies -- and I
13   don't mean long term to be years, Your Honor -- is that things
14   happen in bankruptcy cases. People come into the court with
15   all kinds of motions, applications, and various moves to get
16   leverage. We spent three days on this proceeding. Think of
17   the days that would be spent in valuation discussions; the
18   possibility of the appointment of an examiner; fights between
19   ad hoc committees and independent committees. And all during
20   this process,  Mr. Richman never refers to who's going to
21   finance it. Where's the money going to come from while
22   everybody's having fun in the courtroom.
23          Mr. Jones says don't look at the Treasury. We've got
24   to protect the taxpayer's money and we're not going to put good
25   dollars after bad dollars. And while this is happening, Your

                                                                    177

Honor, the consumer is scratching his or her head and saying is
there going to be a GM that's going to produce good vehicles,
reliable vehicles that I know I can service?  What are the
dealers going to say, Your Honor, when this process goes on
with no plan other than "We're going to stiff the Treasury and
we're going to make the Treasury put in more money."  That is
an awful gamble to play in this case when you're dealing
with -- and I sympathize with Mr. Kennedy and his 26,000
retirees, but we're talking about the UAWs with almost 600,000
retirees and active employees, 235,000 GM employees worldwide.
     Yesterday, I think, Your Honor, Lear, a supplier to
GM, commenced bankruptcy, Chapter 11 cases.  In the past month
I think there have been three or four suppliers.  If this case
doesn't come out the way it has been programmed, with a 363
transaction, there will be chaos in the supplier industry.
Systemic danger is all over the horizon, Your Honor.
     So what do we get down to, Your Honor?  We get down
to a situation in which there is no palatable alternative.  No
financier has shown up, and I think it is very significant,
Your Honor, that notwithstanding all the notoriety about GM
pre-Chapter 11 and post-Chapter 11, nobody -- no hedge fund, no
private equity fund, no foreign investor has come along and
said gee, I really would like to take a look at GM and maybe I
would like to buy it or parts of it.  Not one party has been
interested.  Not one party has been willing to sign a

178

confidentiality agreement to get into the data room and look at
it for the purposes of considering a bid.  There hasn't been
one expression of interest.
     So we have a situation, Your Honor, where the only
offer at all for these assets is the government-sponsored
purchaser, the only entity that will be able to get financing
and make these assets into a valuable original equipment
manufacture.  The only other option is to commence the
liquidation process because this company cannot survive without
financing, and there is no financing.  And when that becomes
public knowledge, that's the end of its ability to really sell
cars.  Then you are in the liquidation and no consumer, unless
he gets a terrific discount and takes his chances or her
chances, will buy a GM vehicle.
     There has to be a cutoff and a creation of certainty
as to the future of these GM assets.  And the fact, Your Honor,
as I alluded to before, that GM management is moving over,
doesn't make it a nonsale.  It's a sale.  There's a real
purchase price that's being paid here.  There is an independent
company that is buying these assets and will be an independent
company going forward, and hopefully in a very short period of
time, a publicly owned company for the benefit not only of
shareholders of this company but the whole automotive industry.
     Mr. Richman said that the White House will not allow
GM to fail.  I haven't heard anything come out of the White

179

House recently about these cases, but I recall President
Obama's speech that either Chrysler finds itself a purchaser by
May 1 or April 30 or there will be no further financing.  And
if GM doesn't come up with a viable plan by June 1st, that's
the end.  And I believe the President meant it.  And clearly,
the Chrysler people believe that he meant it, even though it
must have given Fiat some bargaining leverage.  There is
nothing on the record -- I keep repeating this Your Honor --
that there will ever be additional financing.
     I believe all of the objectors agree that if Your
Honor found that this is a legitimate sale, then the
transaction should be approved.  Delaying the transaction so
that various parties can try to exercise leverage by being ad
hoc committees in a Chapter 11 or attempting to be additional
committees only means further delay in the conservation of a
plan, a delay that cannot be borne by this company.
     Mr. Richman's closing argument, Your Honor, as I
said, had nothing to do with the record that was made before
Your Honor in the past two days.  It was his ipse dixit as to
what he thinks could happen in a Chapter 11 case.  With no
expert testifying, there's no other person offering any support
for that position.  He offers nothing in the way of a
purchaser.  He offers nothing in the way of a financier.
     I believe, Your Honor, Mr. Richman's closing argument
was just his opinion and his advice to you that you should take

180

up the purported bluff of the U.S. Treasury and that's an
awesome responsibility that he wants to impose on your
shoulders.
     With respect to, Your Honor, to Mr. Parker, we have
submitted, Your Honor, and I'm not going to speak further on
it, the statements and the arguments made by Mr. Parker with
respect to the equal and ratable clauses in the indentures, are
just not accurate.  Mr. Parker has not established and he's not
produced any certifications or a record of any lien filings
with respect to the excluded assets, and the agreements are
quite clear that if there were no liens granted to the federal
government, the U.S. Treasure in connection with the security
agreement of 12/31/08 that was subject to those indentures.
     THE COURT:  Let me go back to the Secured Financing
101.  UCC-1 perfects the security interests but the security
interest has to -- it's separately granted, am I correct?
     MR. MILLER:  That's correct, Your Honor.
     THE COURT:  And romanette v says that (indiscernible)
will be granting the security interest?
     MR. MILLER:  I'm sorry, sir?
     THE COURT:  And romanette v says, in its excluded
assets -- or excluded liens provision, that there isn't a grant
of security?
     MR. MILLER:  That's correct, Your Honor.
     THE COURT:  Okay.

181

1    MR. MILLER:  And Mr. Henderson testified at length,
2    Your Honor, that there were no liens granted in violation of
3    the indentures.
4        Bad faith.  Mr. Parker says that the purchaser has
5    not acted in good faith.  Yet the record is to the contrary.
6    The record establishes the extent and nature of the
7    negotiations, how they were conducted, and that they were
8    consistent with the standards of good faith under the cases.
9        The TARP argument.  Again, Your Honor, that argument
10   was raised in Chrysler, and Judge Gonzalez ruled on that.  It
11   involved the DDSA and TARP, and that argument was not
12   successful and was continually raised by the Indiana pension
13   plans that you can't use TARP money for these purposes.  And in
14   this circuit, Your Honor, at least, that is not an argument
15   that can stand.
16       Mr. Parker also complains about the scheme of
17   distribution.  And again, the basis of his argument on the
18   scheme of distribution is the UAW is just getting too much,
19   while the record is replete with the rationalization and
20   reasons why the UAW ended up in that position.  There are
21   sometimes, Your Honor, when union membership is a good thing.
22   Sometimes not.  But these active employees are critical to this
23   transaction.  If we did not have these employees, there would
24   not be a 363 transaction.  And more importantly, Your Honor,
25   the consideration that is being given to the UAW VEBA is coming

182

1    from the purchaser and not from OldCo.
2        And if this deal is not approved and this transaction
3    doesn't go forward, and Mr. Curson's testimony demonstrates,
4    the UAW claims, the VEBA claims will be reasserted in the OldCo
5    case so that you will be adding on an additional twenty plus
6    billion dollars of liabilities which will substantially dilute
7    the position of the bondholders and other creditors.
8        I am not going to deal with Mr. Bernstein's argument,
9    Your Honor, as to the consent decree and the effect of that.
10   That's an issue that can be determined in the future.  My
11   colleague, Mr. Karotkin, said I should refer to the case of In
12   re Rochnunis (ph.) and say pay the 62,000 dollars.  I'm not
13   going to do that.
14       As I understand it, Your Honor, the indenture
15   trustees are no longer objecting.  Mr. Reinsel, I think his
16   name is, made the same arguments as Mr. Esserman in respect of
17   asbestos claimants, and I think I've dealt with that.
18       So Your Honor, we get down to the basic issue.  And
19   in connection with --
20       THE COURT:  Before you wrap up, do you want to
21   comment in any way on Ms. Taylor's point that I should have
22   language in the approved order that says, in substance -- I
23   don't know if she's saying just that nothing in this order
24   affects the government's ability to use its police power or if
25   she's looking for more than that.  And I don't know if what she

183

1    says has controversial implications that I'm not sensitive
2    enough to.
3        MR. MILLER:  I would just note, Your Honor, that the
4    proposed sale order in paragraph 55 states, "Nothing contained
5    in this order shall in any way:  1) diminish the obligation of
6    the purchasers to comply with environmental laws or 2) diminish
7    the obligations of the debtors to comply with environmental
8    laws consistent with their rights and obligations as debtors-
9    in-possession under the Bankruptcy Code."  I would submit to
10   Your Honor that is fairly broad language that imposes on the
11   purchaser and the debtors as debtors-in-possession.  And there
12   is no intent to circumvent or evade the environmental laws.  To
13   the extent that New GM is acquiring plants that may have
14   environmental problems, they will be responsible for that.  To
15   the extent --
16       THE COURT:  Kind of like in Magcorp.
17       MR. MILLER:  I'm sorry?
18       THE COURT:  Kind of like in Magnesium Corporation of
19   America.
20       MR. MILLER:  That's correct, Your Honor.  And to the
21   extent that OldCo retains plants that haven't -- I mean, the
22   whole controversy, Your Honor, about the wind-down budget only
23   related to environmental claims.  As the analysis of the
24   environmental claims and the potential exposure there went up,
25   the committee, justifiably, said we need more in the wind-down

184

1    budget to cover environmental claims.  So there is no intent --
2    and I would submit to Your Honor the language is sufficiently
3    broad, and if the New York State Attorney General has a problem
4    with it, we'd be happy to work that language out with her.
5        THE COURT:  Okay.  Continue.
6        MR. MILLER:  So Your Honor, we come down to the final
7    aspect, I hope, of this proceeding.  The record, Your Honor, I
8    believe is abundantly clear.  The business justification has
9    been articulated.  Mr. Richman referred to the Lionel case and
10   the various factors in the Lionel case.  And in the Lionel
11   case, as Your Honor may recall, the sale was disapproved.  It
12   was disapproved and reversed by the Second Circuit because it
13   was being done at the insistence of the creditors' committee
14   who wanted a cash distribution as part of a subsequent plan of
15   reorganization.  And the issue was their electronics, the
16   common stock of that partially owned subsidiary.  But in the
17   Lionel case, Your Honor, there was no danger of diminution in
18   value.  Dale Electronics was an independent company listed on
19   the New York Stock Exchange.  The value of that stock was not
20   diminishing.  And as it turns out, three years later or two
21   years later it was at the same value.
22       We have a different case, Your Honor.  And as pointed
23   out by the Second Circuit in Lionel, the most important factor
24   is the potential diminution in the value of the assets.  This
25   record establishes that if this transaction is not approved,

185

**186**

1  the value of the GM assets will deteriorate and may deteriorate
2  at a much more rapid pace than either you or I or Mr. Richman
3  understands.  The fact that GM did better than its downside
4  projections in the month of June doesn't establish anything
5  when the month of June was thirty-three percent below the same
6  period in 2008, and a decline of forty-three percent in fleet
7  sales.  And then we have Mr. Henderson's testimony, even going
8  forward GM will lose money in 2009.  If we don't start -- if
9  the purchaser doesn't start using these assets as part of a new
10  GM, a new, leaner, more competitive, more efficient GM, the
11  downward cycle will be irreversible.
12      So we fit right within Lionel and its progeny.  We
13  have -- I will have to call it, Your Honor -- I don't want to
14  call it a melting ice cube because I got criticized for that
15  once before -- a wasting asset.  These are assets that will
16  deteriorate in value.  And that deterioration will be felt by
17  all of the stakeholders, including the stakeholders that oppose
18  this transaction.
19      The bottom line, Your Honor, is that there is no
20  viable alternative.  And that's the kind of situation that
21  Section 363 was enacted for, to deal with a situation where
22  there had to be a relatively quick sale of assets.  And
23  fortunately, we've had thirty days to see if there's anybody
24  else in the market for these assets.  What we have done, Your
25  Honor, is establish the value of these assets.  We've also

**187**

1  established that nobody's interested in buying them other than
2  this purchaser.
3      And the fact that it's the government, Your Honor,
4  doesn't detract that it is a purchaser.  It's voluntarily doing
5  this, Your Honor.  One, to protect the taxpayer's monies in the
6  hope that it will recover a portion of the taxpayer's monies.
7  And two, to try and salvage an industry.  But there are limits
8  to that, Your Honor, and the government has clearly said what
9  the limits are.
10      So we are in a situation where we can do this
11  transaction, we can create a new GM.  Yes, we're going to use
12  the same name, but we're only going to have four brands, Your
13  Honor.  We're going to have Cadillac, Chevrolet, Buick, and
14  GMC.  A leaner, more competitive GM that will benefit the
15  domestic industry, that will provide more value to the economic
16  stakeholders than any other alternative that has been
17  proffered, and no alternative, unfortunately, Your Honor, has
18  been proffered to date.
19      So on behalf of the debtors, Your Honor, we submit
20  that this case fits squarely within the four corners of 363(b).
21  There has been an articulated business reason for this sale.
22  It is reasonable business judgment.  The board of directors of
23  GM discharged their fiduciary obligations in considering the
24  alternatives and going forward with this Section 363 sale.  And
25  the purchaser, the government-sponsored entity, has acted in

**188**

1  good faith in negotiating this transaction, as demonstrated by
2  the negotiations that have gone on to this very hour.  There
3  has been no bad faith as Mr. Parker alleges.
4      To allow these assets to go through a process of
5  liquidation would be horrific, Your Honor, a situation that
6  Your Honor should not allow.  And Your Honor should approve
7  this transaction.  Thank you.
8      THE COURT:  All right.  Thank you.  All right.
9  Ladies and gentlemen, this hearing is now closed.  We're going
10  to take a lunch break for an hour, and then if you have any
11  deals to announce to me or any housekeeping matters, I'll hear
12  them an hour from now.  However, there will be no further
13  argument on today.  If it turns out that there are no
14  additional deals to announce or understandings to confirm, it
15  will be very short an hour from now.  The purpose of this,
16  among other things, is to give you a chance to talk to folks to
17  ascertain whether or not you need or want to put anything on
18  the record.  And there may be other people similarly situated.
19  I also will need to talk to at least one person of medium or
20  higher level seniority from each constituency to discuss
21  getting the transcript and exhibits to make sure that I have a
22  full set and the like.  This matter is taken under submission
23  and at this point we're in recess.  Thank you.
24      (Recess from 1:42 p.m. until 2:54 p.m.)
25      THE COURT:  Okay, folks, I need to get to work.  And

**189**

1  we said that we would set aside some time for you folks to put
2  deals on the record and deal with housekeeping matters, and I
3  have one or two of my own.
4      Mr. Karotkin or Ms. Cordry, who would like to take
5  the lead on taking care of some of those things?
6      MR. KAROTKIN:  Your Honor, I believe we have reached
7  an understanding with Ms. Cordry as to the proposed terms and
8  provisions of a proposed order to address the concerns she has
9  raised.
10      THE COURT:  Okay.
11      MR. KAROTKIN:  Is that correct?
12      MS. CORDRY:  Yes.
13      MR. KAROTKIN:  Okay.  And the one -- so I think that
14  addresses those issues.  If I might, Your Honor, the Attorney
15  General from the State of Texas would like to leave to catch a
16  plane.
17      THE COURT:  Sure.
18      MR. KAROTKIN:  So I --
19      THE COURT:  Would you like to say something before
20  you have to go?
21      MR. KAROTKIN:  He had asked me if I would read into
22  the record --
23      THE COURT:  Oh, okay.
24      MR. KAROTKIN:  -- three paragraphs which would
25  address his concerns as well.

1      THE COURT: All right.

2      MR. KAROTKIN: These would be three paragraphs that

3  would be inserted into the proposed order:

4      "Entry by GM into the Participation Agreements with

5  Accepting Dealers is hereby approved, and that the offer by GM

6  and entry into the Participation Agreements was appropriate and

7  not the product of coercion. The Court makes no finding as to

8  whether any specific provision of any participation agreement

9  governing the obligations of Purchaser and its Dealers is

10  enforceable under applicable provisions of state law. Any

11  disputes that may arise under the Participation Agreements

12  shall be adjudicated on a case-by-case basis in an appropriate

13  forum other than this court."

14      THE COURT: Mr. Roy, did he get it right?

15      MR. ROY: He got the first paragraph right, Your

16  Honor.

17      THE COURT: Still didn't express your last

18  implication there?

19      MR. KAROTKIN: This is very stressful for me, Your

20  Honor.

21      THE COURT: Okay.

22      MR. KAROTKIN: The next paragraph would be, "Nothing

23  contained in the preceding two paragraphs shall impact the

24  authority of any state to regulate Purchaser subsequent to the

25  closing."

190

1      And the final paragraph is as follows: "This Court

2  retains exclusive jurisdiction to enforce and implement the

3  terms and provisions of this order, the MPA, all amendments

4  thereto, any waivers and consents thereunder, and each of the

5  agreements executed in connection therewith, including but

6  not limited to retaining jurisdiction to: (a) compel delivery

7  of the Purchased Assets to the Purchaser; (b) compel delivery

8  of the Purchase Price or performance of other obligations owed

9  by or to the Debtors; (c) resolve any disputes arising under or

10  related to the MPA, except as otherwise provided therein; (d)

11  interpret, implement and enforce the provisions of this order;

12  (e) protect the Purchaser against any of the retained

13  liabilities or the assertion of any lien, claim, encumbrance or

14  other interest of any kind or nature whatsoever against the

15  Purchased Assets; and (f) resolve any disputes with respect to

16  or concerning the Deferred Termination Agreements.

17      "The Court does not retain jurisdiction to hear

18  disputes arising in connection with the application of the

19  Participation Agreements, which disputes shall be adjudicated

20  as necessary under applicable state or federal law in any other

21  court or administrative agency of competent jurisdiction."

22      THE COURT: Okay, I'll try to -- again, Mr. Roy, did

23  he get it right this time?

24      MR. ROY: He got it all right this time, Your Honor.

25

191

1      THE COURT: Okay. Fair enough.

2      MR. KAROTKIN: I believe, with that, this gentleman

3  is prepared to withdraw the --

4      MR. ROY: Yeah, Your Honor, with the agreement that

5  that language is going to be in the order that the debtors

6  submit as a proposed sale order, and with the understanding

7  that there's no objection from any other party, including

8  Treasury, the State of Texas is prepared to withdraw its

9  objection.

10      THE COURT: Okay, Mr. Schwartz?

11      MR. SCHWARTZ: That's correct, there's no objection.

12  We had a small tweak to add the federal government's ability to

13  continue to regulate the purchaser. I'm not sure if these

14  folks have signed off on it.

15      THE COURT: In other words, you're proposing that

16  there be an even more regulatory environment than what Mr. Roy

17  was asking for?

18      MR. SCHWARTZ: Exactly right.

19      MR. ROY: So I'm getting more than I asked for.

20      THE COURT: It sounds to me like you wouldn't care if

21  they got that, Mr. Roy.

22      MR. ROY: No, not at all. This -- I believe that

23  this protects the state's ability to enforce its regulatory

24  scheme.

25      THE COURT: Okay. Well, fair enough. I assume that

192

1  takes care of your needs and concerns then, Mr. Roy?

2      MR. ROY: It does, Your Honor.

3      THE COURT: Have a good flight.

4      MR. ROY: Thank you so much.

5      THE COURT: Thank you.

6      MR. ROY: It's been a privilege.

7      THE COURT: Thank you.

8      Ms. Cordry?

9      MS. CORDY: Having come here and sat here through the

10  last couple of days, I did want to indicate for the record the

11  basis on which the states were finding a resolution of their

12  objection. And I will be very brief, but I do want to, sort

13  of, lay out what is in here and what the basis was for pulling

14  what we had filed.

15      Certainly this is an extraordinary case; I think

16  everyone agrees on that. On the other hand, in some ways it's

17  also like every other Chapter 11 case in that it has to follow

18  the Bankruptcy Code. The Supreme Court has told us that the

19  uniformity clause sets aside bankruptcy from every other

20  portion of Congress's powers. So it's for those reasons that

21  the states initially analyzed this case under their view of

22  what the Bankruptcy Code says without a special exception for

23  the mega auto bankruptcy problems.

24      We had a number of problems with the order with

25  respect to clarity in a number of respects, with taxes,

193

1  environmental law, other provisions. We had concerns with the
2  substance of the terms in terms of what was being assumed, what
3  was not being assumed. The treatment of these dealer
4  agreements was a major issue for the states, and I'll get to
5  that in just a moment, and then some of the terms of the order
6  in terms of the way it was phrased about successor liability,
7  which was some of the questions I asked yesterday.
8       We have worked very hard since the beginning of the
9  case with debtors' counsel initially, with Treasury counsel,
10 almost everybody in this room at some point or another, it
11 feels like. And I think a great number of improvements have
12 been made in this agreement over that time period. The first
13 was the assumption of the future product liability claims.
14 Obviously, we -- you know, in a perfect world, we would not be
15 distinguishing between those two categories, but certainly
16 that's better than none of them. And it certainly goes a ways
17 to addressing issues that were raised by the state Attorney
18 Generals. And by the way, I am speaking strictly on behalf of
19 the forty-five-Attorney-General-objection that's there.
20      With respect to the dealers, you heard yesterday, one
21 set of dealers talked to you about the process of being
22 required to sign on to those. And there was a statement that
23 while 99.6 percent of the people signed it, so it must have
24 been a great deal. I -- as a matter of reality, I think most
25 things that you get 99.6 percent of people signing on are

194

1  probably not the greatest deal in the world; they're just
2  better than something really awful. But we're leaving aside
3  that concern.
4       There was a second concern that the ongoing terms of
5  those agreements that we were being asked to sign had
6  provisions that could be substantively unlawful under state
7  law. And we do not understand that anything that is said with
8  respect to rejection can carry over to the notion of saying
9  that if you assume a contract you can thereby assume some terms
10 that violate state law on a going-forward basis, any more than
11 if someone could make you sign a contract that said I'll take
12 less than the minimum wage and then assume that contract and
13 make you take less than the minimum wage.
14      So that was a concern on the dealer agreements. And
15 what you just heard read into the record dealt with that by
16 leaving us free to -- and the jurisdictional piece as well,
17 taking the jurisdiction to enforce ongoing agreements between
18 nondebtor parties, post-closing, that could not affect the
19 estate in trying to leave them in this bankruptcy court's
20 jurisdiction.
21      THE COURT: Let me interrupt you --
22      MS. CORDY: Sure.
23      THE COURT: -- for a second, Ms. Cordy. When Mr.
24 Roy was standing up next to Mr. Karotkin, they were talking
25 about the things in the context of resolving Mr. Roy's

195

1  objections. That was -- he was standing there and you weren't,
2  but that was part of a dialogue to which you were also a part.
3       MS. CORDY: Right. Yes, and that is part of the
4  overall package that is here. He spoke to it simply because he
5  had the separate objection on it. But, yes, that is one of the
6  pieces that went into this overall deal here.
7       So we were very concerned about that treatment of
8  assumed contracts, and that agreement works on that part. We
9  also wanted to be sure that lemon laws were covered under the
10 notion of warranty claims, but they did not specifically refer
11 to state lemon laws, and that coverage is being picked up.
12      Privacy, we had no idea what they were going to do
13 with privacy. We've read the consumer privacy ombudsman's
14 report. We couldn't talk to them directly, but we did try to
15 give some input. And what I've seen from his report appears to
16 be constructive and useful. And there is some language in the
17 agreement right now that was drafted without seeing his report.
18 It's pretty much consistent with what the report recommends,
19 perhaps not completely consistent. That's, I think, up to Your
20 Honor to decide with the debtor what they'll require for that.
21 We had signed off on the other language before we saw what the
22 consumer privacy ombudsman said.
23      On taxes, we clarified that the taxes in the first-
24 day order are all being assumed by the purchaser. We clarified
25 a number of other pieces of language; some of them are in with

196

1  the environmental piece.
2       THE COURT: Time out, Ms. Cordry.
3       MS. CORDY: Yes.
4       THE COURT: I thought I authorized taxes to be paid
5  under the first-day order.
6       MS. CORDY: Yes.
7       THE COURT: Your point being that, to the extent they
8  haven't been paid, they'll be assumed?
9       MS. CORDY: Well, that the -- the assumption was
10 clarified, which was somewhat unclear in the order, that the
11 provision for assumption of taxes is congruent with the kind of
12 taxes that were covered by the first-day order so that if they
13 are the kind of taxes that were being picked up under the
14 first-day order, they will be the kind of taxes that will be
15 assumed, either that there -- there may be some that have just
16 not been paid yet or a dispute or an audit, an ongoing
17 assessment, any of those kind --
18      THE COURT: One way or another, they'll get paid --
19      MS. CORDY: Right.
20      THE COURT: -- at some point in time?
21      MS. CORDY: Right, and that so they're going to be
22 assumed. And similarly with the environmental liabilities, we
23 clarified that the New GM intends to be fully liable for
24 environmental liabilities of its transferred facility.
25      So all of these were matters that were very important

197

1    to us.

2        The other piece we talked about, obviously, was the

3    successor liability.  And the basic construct we dealt with was

4    this notion that I raised yesterday of what is -- assuming you

5    can sell free and clear of liability on a claim or on

6    something, what is the scope of that?  And we came to an

7    agreement that we would limit it to a bankruptcy claim, a 1015

8    claim.  So the language on that is all in the agreement.

9        On the TWA issue, I can only say our view remains as

10   to what it is of the proper construction of law.  But we also

11   recognize that there's been a little water under the dam and a

12   lot of people have structured deals based on what they believe

13   the law to be, and certainly this case is an example of that.

14       So for all those reasons, after exhaustive, literally

15   of course, negotiations, we have reached agreement with the

16   debtor, with Treasury on the terms of the order that I have

17   recom -- well, when we say "we", mostly me.  I've recommended

18   to the AGs; I have talked to the staff, counsel, contacts, the

19   ones I could gather last night at 10:00.  We have sent it

20   around.  We have made the request to all the Attorneys General

21   to sign off on this, where they started getting that request at

22   about 9:30 this morning.  As of now, I've been told there are

23   forty-five -- the final total, I believe, was forty-five

24   Attorney Generals on the brief.  At this point I've been told,

25   I think, that the last count of approvals so far is twenty-

198

1    seven.  I'm reasonably optimistic that we will continue to get

2    the rest of them signed on over the course of the day or so.

3        At this point, my view would be I believe that we

4    have an agreement.  I don't believe we're going to have dissent

5    that would overturn the agreement, but the last position, I

6    understood, with the debtors and Treasury, was simply that if

7    for any reason we -- if the other fifteen AGs come back and say

8    no, no, over our dead bodies, that we would just say the deal's

9    off, the order goes back to what you were doing before you had

10   the agreement without us, and we'd just stand on our

11   objections.  But as of now, we think this agreement is going to

12   hold and we think it is a preferable agreement for the Attorney

13   Generals.  We also think it's preferable for all the other

14   parties as well in not having the Attorney Generals seek to

15   overturn this transaction.

16       THE COURT:  All right, thank you.

17       Mr. Karotkin?

18       MR. KAROTKIN:  Thank you, Your Honor.  With respect

19   to Ms. Cordry's colloquy and commentary, I don't know if that

20   was meant to be interpreting what the order said or

21   embellishing what the order said.  As far as we are concerned,

22   the agreement we have reached is in the order.  And we are not

23   necessarily agreeing that how she described it or how she

24   interpreted it is accurate or inaccurate.  It is what it is.

25       THE COURT:  If I approved the motion and entered the

199

1    order in the form as modified, the order would say whatever it

2    says?

3        MR. KAROTKIN:  Correct.

4        THE COURT:  Okay.

5        MR. KAROTKIN:  For example, to the extent she was

6    referring to how environmental laws are being treated under the

7    order, they are being treated as they are being treated.

8        THE COURT:  You're saying the order has them in

9    support of sales.

10       MR. KAROTKIN:  Exactly, sir.

11       THE COURT:  And that what she's saying isn't like a

12   presidential signing statement or --

13       MS. CORDRY:  I would stipulate to that, Your Honor.

14   If I get to be president, then I'll determine what kind of

15   authority I have at this point.  But --

16       THE COURT:  Okay.

17       MS. CORDY:  -- I was simply attempting to deal with

18   the fact that we did deal with issues regarding environmental

19   laws and made some improvements in that area that I think

20   are --

21       THE COURT:  Okay.

22       MS. CORDY:  -- hopeful and satisfactory to my

23   clients.  Thank you.

24       THE COURT:  All right.  Fair enough.

25       MR. KAROTKIN:  Thank you, sir.

200

1        THE COURT:  To what extent do we have other things

2    that people want to note on the record or so.

3        Mr. Smolinsky, I see a few people coming up.  You

4    want to, kind of, help coordinate that, if you can?

5        MR. SMOLINSKY:  Sure, Your Honor.  Let me at least

6    try.  Your Honor, there are approximately 600 objections

7    related to what I would call contract issues, and they continue

8    to come in.  So I thought, to try to head off everyone coming

9    up and making reservation of rights, that I would describe to

10   Your Honor the process that we're undergoing and perhaps that

11   satisfies everyone's concerns, and we could make -- shorten the

12   time here.

13       Your Honor, in connection with the sale, the

14   purchaser has identified over 700,000 contracts for probable

15   assumption and assignment.  We've done everything in our power

16   to manage the process focused on three goals:  First, to have

17   the ability to update the reconciliation process as new

18   invoices come in from the pre-petition and post-petition

19   period; two, allow the purchaser to continue its due diligence

20   with respect to the contracts; and, finally, to try to not bog

21   down this Court's docket with multiple objections.

22       The company, together with AlixPartners, developed a

23   fully trackable system to allow counterparties to see online

24   their contracts which are scheduled for assumption, as well as

25   backup on how cure amounts are derived.

201

1    You've heard a little bit about the call center.  The
2    call centers set up in Warren, Michigan have been fielding
3    calls, have been proactively reaching out to all parties who
4    have filed objections, and have also handled over 6,600 calls
5    from other parties that are making inquiries as to their
6    supplier agreements.
7        Your Honor, when we filed our initial reply last
8    Friday, we attached to it a schedule of those parties that
9    filed objections with respect to contract disputes.  And on
10   Monday when we filed our supplemental brief, we attached a new
11   Schedule J, which had three schedules in it, creatively named
12   J-1, J-2 and J-3.
13       I just want to walk Your Honor through these
14   schedules.  And let me just update that, Monday night after we
15   had made further progress on the contracts, we filed a
16   supplemental schedule and I think we made some significant
17   progress.  And if Your Honor would allow, I'd like to hand up a
18   copy.
19       THE COURT:  Sure.
20       MR. SMOLINSKY:  I have taken the liberty of
21   highlighting for you the few changes that have been made since
22   then.  Your Honor, if you turn to Schedule J-1, which is about
23   six pages long, that is a schedule of withdrawn objections.
24   Now, just to make clear for the record, that doesn't mean that
25   each and every counterparty on the schedule has agreed that

                                                           202

1    there are no reconciliation issues.  Either they've been
2    withdrawn because the reconciliation issues have been resolved,
3    or they signed trade agreements which elected into the
4    alternative dispute resolution to the extent a reasonable
5    resolution can't be obtained simply by talking to the call
6    center and working out their differences.  And we've had
7    significant progress there.
8        The only changes I just want to note for the record,
9    on page 1, Cellco Partnership d/b/a Verizon Wireless is going
10   to be moved to J-2; the same for Fiat on page 2.  On page 3,
11   Hitachi Cable Indiana, Inc. and Hitachi, Limited will be moved
12   to J-2.  Isuzu Motors will be moved to J-2; LMC Phase II to
13   phase (sic) 2.  On page 4, Progressive Stamping Company, Inc.
14   moved to J-2.  On page 5, Interpublic Group of Companies Inc.
15   to page 2 -- to J-2, as well as Toyota Motor Sales U.S.A.  And
16   on the last page, the two Verizon contracts will be moved to
17   J-2.
18       Other than that, Your Honor, we believe that the
19   remaining objections can be marked off calendar.
20       We have provided, in consultation with the creditors'
21   committee, to include in the order that if a contract was
22   withdrawn and then there's still a basis for coming back to the
23   Court, that both parties can do so on no less than fifteen
24   days' notice in case there are any further mistakes or
25   omissions.  What we'll propose at the end is to file a final

                                                           203

1    schedule and then to provide Your Honor's chambers with a list
2    by docket number rather than alphabetically so that the matters
3    could be marked off calendar.
4        Your Honor, Schedule J-2 is a schedule of objections
5    that have been limited to cure disputes, and they are subject
6    to adjournment.  And we have included in the order a request
7    for a hearing date around the third week of July for Your Honor
8    to carry these objections while we continue to try to resolve
9    them and get them off the Court's docket.
10       We have been having open dialogues with each of these
11   parties; we have delivered documents to them.  We have worked
12   with them on finalizing a list of contracts and cure amounts.
13   And we've dealt with a number of them in stipulations, which
14   I'll get to in a moment.
15       So the only changes to Schedule 2 is on page 2.
16   Behr-Hella Thermocontrol has filed a withdrawal, and that could
17   be moved to J-1, along with, on page 3, the Hewlett Packard
18   three objections can be moved to J-1 as well.
19       Your Honor, Schedule J-3 is a schedule which has
20   gotten shorter and shorter, which deals with objections that we
21   have not been able to resolve, some of which we have been now
22   able to resolve, and I just want to walk through a few of them
23   and then we can give the other parties an opportunity to speak
24   today if they still have ongoing objections.  To the extent
25   that they don't, I would suggest that we move them to J-2 and

                                                           204

1    adjourn them along with the others as a holding date while we
2    continue to reach out for them.
3        So if you turn to --
4        THE COURT:  I sense the way you did it, Mr.
5    Smolinsky, that these deal with something different than cure
6    amounts?
7        MR. SMOLINSKY:  It's unclear, Your Honor.  We've
8    looked at all of these objections and we believe that most of
9    them, even though they may raise adequate protection --
10   adequate assurance issues, they -- I believe they're all
11   quintessentially cure objections, with the exceptions of the
12   ones that I'm going to walk through.
13       THE COURT:  Okay.
14       MR. SMOLINSKY:  The first one that I'd like to speak
15   about is Hertz Corporation.  Your Honor will recall that Mr.
16   Henderson testified that some of the fleet customers are not
17   purchasing vehicles from General Motors because they have
18   issues, internal issues.  Hertz is a prime example.  They have
19   securitizations.  And if their contracts are not assumed by a
20   certain date, then they have to provide additional collateral
21   into their securitizations, which is an anti-competitive issue
22   for them.
23       So we have entered into discussions with Hertz.  We
24   have agreed to assume their contract now with the understanding
25   that they have no objection to the assignment of that contract

                                                           205

1    to New GM upon the sale closing. They acknowledge in the
2    stipulation they're not aware of any cure amounts that are
3    outstanding, and we do not believe that there are any either.
4    We've discussed this with U.S. Treasury, we've discussed this
5    with the committee, and they have no objection.
6        THE COURT: Okay. Continue, please.
7        MR. SMOLINSKY: Okay. Your Honor, the next contract,
8    Kolbenschmidt Pierburg AG, that could now be moved to J-2. LBA
9    Realty Fund -- I think you heard from counsel to LBA this
10    morning.
11        THE COURT: Mr. LeHane?
12        MR. SMOLINSKY: That's correct, Your Honor. And,
13    again, I could put it on the record, but I think you heard the
14    agreement that we intend to assume at closing, to the extent
15    that we finish our amendment discussions, or modification
16    discussions, and the indemnities will follow through with
17    respect to any claims that arise or become known after the
18    closing.
19        Pratt & Miller Engineering & Fabrication can be moved
20    to J-1. They withdrew their objection.
21        Royal Bank of Scotland, these contracts -- there are
22    four contracts that relate to the Lordstown plant. Subject to
23    closing, GM has agreed to assume those contracts and we agreed
24    to work cooperatively with RBS to make sure that we deal with
25    any transfer documents that are necessary and any third-party

206

1    consents.
2        Last one, Trafasee (ph.) Marketplaces Inc., that
3    could be moved to J-2 as well.
4        So, Your Honor, we did our best in these schedules to
5    reflect the desire and intention of the parties. We're also
6    working with the committee to add language to the order to make
7    it clear as to what the cure resolution process is and to
8    preserve everyone's rights while we work it out.
9        We're not currently intending to bar any reasonable
10    late objections. We understand the process was quick.
11    We're -- ultimately our goal is to try to reconcile all the
12    claims to the satisfaction of all parties. Of course, if
13    there's an unreasonable delay, then we'll bring it to Your
14    Honor.
15        We intend to send notice; we propose in our order
16    within two business days of the entry of the order. We would
17    send out notice to each of the parties in here notifying them
18    of the adjourn date for their objection or, if their objection
19    has been withdrawn, notifying them as to why it was withdrawn
20    and giving them the opportunity to come back and explain if
21    there was an error.
22        Turning to stipulations -- and many of these
23    stipulations, I don't believe, require the signature of Your
24    Honor; we're simply going to file them -- we have received
25    the stipulation from approximately 115 suppliers who have

207

1    agreed to withdraw their objection and to appear on Schedule
2    J-1 and defer into the alternative dispute resolution process
3    so that we don't have to deal with them further in the
4    bankruptcy process.
5        We have some additional stipulations, one with
6    International Automotive Components Group, one with Dell and
7    one with Timken that likewise withdraw their objection, but
8    they have not agreed to the ADR process. They have agreed to
9    work with us to try to reconcile, and if they can't reconcile
10    then we would use the procedure that I explained before that on
11    fifteen days' notice we can come back to Your Honor and
12    litigate the objection.
13        Your Honor, like Hertz, Avis is another fleet
14    customer. They're having a similar issue, but they don't have
15    the same timing issues that Hertz has. So they've entered into
16    a stipulation, again, acknowledging that they're not aware of
17    any cure amounts under the agreements. But we have agreed to
18    assume and assign those contracts upon the closing. So, unlike
19    Hertz, which happens immediately, the Avis will happen upon the
20    sale. Again, we shared that stipulation with the committee and
21    the Treasury and they have no problem.
22        Cigna, Your Honor, I think, we talked about earlier.
23    We continue to work with Cigna to try to get their comfort
24    level up on the assignment of those employee benefit-related
25    contracts. And, again, we wouldn't expect to be back before

208

1    Your Honor unless there's a problem in assigning those
2    contracts.
3        Equipment lessors. I just want to put on the record
4    that Manufacturers and Traders Company, as well as Wells Fargo
5    Bank, have equipment leases with the company. They've filed
6    objections. There are additional indentured trustees related
7    to those that have objections. And we've agreed to put on the
8    record that all those contracts are still in the undetermined
9    bucket, meaning that they haven't been noticed out for
10    assumption and assignment. Everyone reserves their rights. We
11    reserve the right to assume and assign those contracts. They
12    reserve the right to object. And we're going to work with them
13    over the next week to enter into an adequate protection
14    stipulation with respect to the use of that equipment as we go
15    through the transition of closing the sale. So we'll be back
16    before Your Honor on that.
17        Your Honor, I think that's the end. Of course,
18    people may want to make statements, and I'm happy to come back
19    and explain any clarifications that are necessary.
20        THE COURT: Okay.
21        People can now come on up, and those who I sent back
22    can now come up again.
23        Go ahead.
24        MR. BACON: Good afternoon, Your Honor. Doug Bacon
25    with Latham & Watkins for GE Capital. We spoke at the end of

209

**210**

1 yesterday's hearing and this morning and tendered a proposed
2 stipulation and order that has been underway for about the last
3 five days, about twenty hours a day. And Mr. Weiss, who had to
4 depart but left his colleague here and his special counsel to
5 the debtor, we have been successful in getting the creditors'
6 committee's support, or lack of objection.
7 Mr. Mayer -- this is the stipulation that Mr. Mayer
8 confirmed that indeed they're fine with and Treasury's counsel
9 is not opposed to. And we -- this bears the signature of the
10 debtors' special counsel and me as counsel for GE. Mr. Weiss
11 explained it to some degree earlier. We can certainly go into
12 more detail. There's a great deal of money involved and
13 hundreds of millions of dollars' worth of equipment, which is
14 why both sides have put a lot of energy into this.
15 We tendered this earlier today, Your Honor. And
16 since then, the only change that has been made is to change the
17 name of the purchaser. And I'm hoping Your Honor, under the
18 circumstances, will just indulge us in interlineation.
19 THE COURT: I would if it weren't for the fact that
20 it has to be electronically entered. I guess it can be
21 approved. Otherwise, if I could ask somebody to -- do you have
22 a floppy disk with the underlying document?
23 MR. BACON: I can arrange to have that down here this
24 afternoon, Your Honor.
25 THE COURT: Can you have it e-mailed to my chambers?

**211**

1 MR. BACON: Easily, Your Honor.
2 THE COURT: Okay. My law clerk can help you as to
3 how to do that. And I'm glad -- it's just as well that a new
4 one's coming, Mr. Bacon, because I think you did hand me up
5 something, or did you?
6 UNIDENTIFIED SPEAKER: Yes.
7 MR. BACON: We did.
8 THE COURT: I don't know if you saw how much paper
9 was on this thing just --
10 MR. BACON: I understand, Judge.
11 THE COURT: So e-mail it when it's finalized to the
12 Gerber chambers. Charlie will give you the exact e-mail
13 address. And on the transmission for the e-mail, note that
14 this is the one that Gerber said that he would enter today.
15 And we'll take care of it today.
16 MR. BACON: Thank you, Judge. Thank you very much.
17 May I approach Charlie?
18 THE COURT: Yes.
19 MR. BACON: Thank you.
20 THE COURT: Who's on deck?
21 MR. DUETCHE: I think I am, Your Honor.
22 THE COURT: Sure. Come on up, please.
23 MR. DEUTSCHE: Good afternoon, Your Honor. Benjamin
24 Deutsche, Schnader Harrison Segal & Lewis on behalf of New
25 United Motor Manufacturing Corp., commonly referred to as

**212**

1 NUMMI. NUMMI is a joint venture between Toyota and GM. We
2 had -- we received a notice to assume and assign. Based on the
3 notice and based on the Web site, we simply can't tell what
4 contracts GM is talking about. We're trying to work it out. I
5 believe -- I thought -- I spoke to Mr. Smolinsky earlier. I
6 thought we were going to have a stipulation, basically push
7 this over, give the parties a chance to figure out which
8 contracts they're talking about and then mark this down for
9 something later in July.
10 THE COURT: I think Mr. Smolinsky's being pulled in
11 more than one direction at the same time.
12 MR. SMOLINSKY: Your Honor, I believe we've been
13 having communications with Foley & Lardner, who are
14 representing Toyota in this matter. And we've agreed that
15 we're going to work together to resolve all these contracts.
16 MR. DEUTSCHE: Yeah -- I represent NUMMI and,
17 obviously, my clients instructed us to get resolution. I don't
18 represent Toyota --
19 THE COURT: Who does Foley represent?
20 MR. DEUTSCHE: I believe the Toyota part of NUMMI.
21 THE COURT: And who are the agreements with?
22 MR. DEUTSCHE: I believe with NUMMI. But, yeah, I'm
23 sure they're contracts --
24 MR. SMOLINSKY: We'd be happy to involve them in the
25 discussions.

**213**

1 THE COURT: Yeah, why don't you just turn it into a
2 three-way conversation so nobody's toes get stepped on.
3 MR. SMOLINSKY: Certainly makes sense, Your Honor.
4 THE COURT: Okay.
5 MR. DEUTSCHE: Thank you, Your Honor.
6 THE COURT: All right.
7 MR. QUIGLEY: Good afternoon, Your Honor. Sean
8 Quigley from Lowenstein Sandler on behalf of Group 1 Automotive
9 Inc., a company owning approximately seven dealerships in
10 Texas. Your Honor, we filed a limited cure objection.
11 Subsequently, however, we recently learned from the debtors
12 that the Group 1 dealers were sent either participation
13 agreements or wind-down agreements. Certainly, we don't object
14 to the sale, Your Honor, but --
15 THE COURT: Some have one type and some got the
16 other?
17 MR. QUIGLEY: Correct, Judge. Certainly, we don't
18 object to the sale, but to the extent there are any cure
19 amounts or other payments due under these agreements, we simply
20 want to reserve our rights.
21 THE COURT: Okay.
22 Would it help, folks, if I said that, unless there's
23 some reason why I shouldn't, Mr. Smolinsky or Mr. Schwartz,
24 that everybody who wants a reservation of rights on this stuff
25 can have it? Or is it more complicated than that?

1    Got an affirmative nod from the government.

2    Mr. Smolinsky, that's okay with you too?

3    MR. SMOLINSKY: We have no problem, Your Honor.

4    THE COURT: Okay, good. So anybody who wants to just

5    take a reservation of rights doesn't have to, unless they want

6    to. You certainly have one, Mr. Quigley.

7    MR. QUIGLEY: Thank you, Judge.

8    THE COURT: Mr. Sullivan?

9    MR. SULLIVAN: Thank you, Your Honor. James Sullivan

10   of Arent Fox, counsel for the Timken Company and Superior

11   Industries International Inc. Two things, Your Honor. First,

12   I had some communications with counsel for the debtor. We were

13   able to get the debtor to agree to some language added to the

14   sale order, and that's the reason why I didn't come up and

15   actually argue anything. Assuming that the language of the

16   sale order remains as has been represented to us, we would not

17   be pursuing any objection. I just wanted to reserve our right

18   to perhaps send -- or comment on the form of order that is

19   finally submitted to Your Honor.

20   THE COURT: That's a big problem, Mr. Sullivan. You

21   better get your comments in on the form of the order before the

22   proposed form of order is sent to me, because I can't have

23   hundreds of parties waiting for somebody to comment on the form

24   of the order.

25   MR. SULLIVAN: Your Honor, as far as I know, I think

214

1    the changes have already been included, although I've not been

2    able -- counsel for the debtor has not been willing to

3    circulate the current form of order to all the parties.

4    THE COURT: I would agree upon the language, Mr.

5    Sullivan, but I think I made my position on that clear.

6    MR. SULLIVAN: Okay, I'll discuss it with counsel for

7    GM.

8    THE COURT: Okay.

9    MR. SULLIVAN: The second thing, I just wanted to

10   correct something. I think Mr. Smolinsky made a comment on the

11   record about the Timken Company, about the ADR procedure. I

12   don't believe that they've opted out of that procedure. I

13   believe that they are in fact -- agreed to that procedure. So

14   I don't think that needs any further comment.

15   MR. SMOLINSKY: Your Honor, I think I said that the 3

16   parties that have not agreed to the ADR are subject to separate

17   stipulations from the 120 that did.

18   THE COURT: Okay. All right. Thank you.

19   Next.

20   MR. BEELER: Good afternoon. Martin Beeler of

21   Covington & Burling, on behalf of Union Pacific.

22   THE COURT: Okay, Mr. Beeler.

23   MR. BEELER: Union Pacific provides rail

24   transportation services to the debtors under various executory

25   contracts. We filed a limited objection to the sale, noncure

215

1    or adequate assurance-related limited objection, for the

2    avoidance of doubt, simply seeking language in the sale order

3    clarifying the setoff and recoupment rights of nondebtor

4    executory contract parties for nonassumed and assigned

5    contracts, similar to language that was included in the

6    Chrysler order for the same purpose.

7    And our understanding of the MPA is that receivables

8    related to those nonassigned contracts would stay with the

9    debtors and, consequently, setoff and recoupment rights would

10   be unimpaired. In discussion with debtors' counsel and in

11   reviewing the MPA provisions with debtors' counsel, we are

12   confirmed in that understanding and prepared to withdraw the

13   objection.

14   THE COURT: Okay. Pause, please, Mr. Beeler.

15   Mr. Smolinsky?

16   MR. SMOLINSKY: Your Honor, I just wanted to be clear

17   on this. I reviewed the language in the Chrysler order.

18   Frankly, I really didn't understand it but -- on this point,

19   but what the MPA says, and I'm only paraphrasing, is that

20   receivables related to excluded assets, assets which aren't

21   going to NewCo, are excluded assets themselves. And so I asked

22   counsel to simply rely on that language. I didn't want to

23   paraphrase it in the order or change the subject matter of the

24   contract by adding language to the order.

25   But I think that he has reviewed the contract and is

216

1    now comfortable that the contract protects his client's rights.

2    THE COURT: All right.

3    Anything further, Mr. Beeler?

4    MR. BEELER: No, that's fair enough.

5    THE COURT: Okay, good.

6    MR. BEELER: Thank you.

7    THE COURT: Mr. Brozman?

8    MR. BROZMAN: Thank you, Your Honor, and good

9    afternoon. Andrew Brozman, Clifford Chance, for the Royal Bank

10   of Scotland, ABN AMRO and RBS Citizens. Your Honor, the

11   agreement that I think we've arrived at with the debtors

12   involves a structured lease transaction for the supply of

13   energy to the Lordstown, Ohio plant. The record should note

14   the exact contracts that the debtors have agreed to assume and

15   assign, since the Web sites did not correctly list them and I'd

16   like to be clear on that. There is a lease dated July 17, 2003

17   between ICX Corporation, which is an affiliate of RBS Citizens,

18   as assignee of Kensington Capital Corp. and General Motors.

19   There is a tripartite agreement of the same date among

20   Lordstown Energy LLC, ICX, again as assignee of Kensington, and

21   General Motors, together with the two sets of schedules

22   pertinent thereto.

23   We have agreed to the assumption and the assignment.

24   There is no dispute, to my knowledge, raised by the debtor with

25   respect to cure amounts, if any. And the debtors, since this

217

1    is a structured lease transaction, have agreed with us to grant
2    us further assurances in the filing of safe harbor documents in
3    connection with the transfer of the assets.
4        And I think that accurately states our agreement, and
5    I appreciate Your Honor's time.
6        THE COURT:  Okay.
7        Mr. Smolinsky, do you need to be heard on what Mr.
8    Brozman just said?
9        MR. SMOLINSKY:  I agree, Your Honor.
10       THE COURT:  Okay.  Fair enough.
11       Who's next?  Ms. Taylor?
12       MS. TAYLOR:  Yes.  Judge, I just wanted to report
13   back -- Susan Taylor from the Attorney General's Office -- that
14   we accept Your Honor's offer for a reservation of rights.  And
15   I want it to be clear that New York's objection had two parts:
16   the part we discussed this morning, and it appears that
17   acceptable language may be being inserted in the final order.
18   But I don't currently have authority from my client to withdraw
19   our objection to that portion.
20       And in addition, in our papers we submitted we have a
21   successor liability -- part of our argument turns on successor
22   liability.  That part we didn't argue because it has been very
23   competently argued.  And I just wanted to be clear that we are
24   not withdrawing the objection as to that portion either and it
25   is now before the Court.

218

1    THE COURT:  Okay.
2    MS. TAYLOR:  Thank you very much.
3    THE COURT:  Thank you.
4    Did I take care of everybody?
5    Mr. Bromley?
6    MR. BROMLEY:  Your Honor, James Bromley of Cleary
7    Gottlieb on behalf of the UAW.  This is not with respect to an
8    objection by any stretch; this is just a cleanup from earlier.
9    I had not realized that when we were submitting our
10   designations with respect to depositions that we also needed to
11   submit marked copies separately to the Court.  So I just have
12   them here.  We submitted them online before noon, but we have
13   the marked ones here, so I'd like to just hand them up.
14       THE COURT:  That's not a problem.  You can give them
15   to Charlie.
16       MR. BROMLEY:  Thank you very much.
17       THE COURT:  I appreciate that.
18       Okay, to what extent do we have anything else, folks?
19   All right, I think -- I thought we were done but I see some
20   folks have now come back into the courtroom.
21       MR. SMOLINSKY:  Your Honor, just -- I'm not sure I
22   said it, so I wanted to make clear on the record.  There have
23   been a number of objections that have been filed since we filed
24   our last reply.  We would propose to just carry those along
25   with all the others until the holding date, July --

219

1    THE COURT:  These are executory contract objections?
2    MR. SMOLINSKY:  Cure objections, sorry.
3    THE COURT:  Cure?  Okay.
4    MR. SMOLINSKY:  Thank you.
5    MR. KANZA:  Good afternoon, Your Honor.  Ken Kansa of
6    Sidley Austin on behalf of the TPC lender group.  We have
7    agreed language for the order with the debtors and the
8    purchaser that resolves the TPC lenders' objections.  And so on
9    reliance on that language, we withdraw the objection.
10       THE COURT:  Okay.
11       Anybody else?
12       Going once.  All right, I see no response.
13       MR. SMOLINSKY:  Your Honor, we've been working on a
14   term sheet for a resolution of the Michigan workers'
15   compensation issues.  I think everyone is agreed in principle.
16   We just revised the term sheet over at Kinko's.  And we would
17   just need everyone to sign off, but we think that everyone is
18   in agreement on the terms.
19       MS. PRZEKOP-SHAW:  Good afternoon, Your Honor.  My
20   name is Susan Przekop-Shaw.  I'm an assistant attorney general
21   for the state of Michigan.
22       THE COURT:  Forgive me again.  You're last name,
23   please?
24       MS. PRZEKOP-SHAW:  Przekop-Shaw.
25       THE COURT:  Okay.

220

1    MS. PRZEKOP-SHAW:  It's spelled P as in Peter, R-Z-E-
2    K-O-P, hyphen, S-H-A-W.  On behalf of -- I'm here on behalf of
3    the Attorney General of Michigan, Mike Cox, who represents the
4    Michigan Workers' Compensation Agency and the Funds
5    Administration.  And we were compelled to file an objection in
6    this matter to resolve the issue of New -- NGMCO's ongoing
7    workers' compensation obligations in Michigan.  And as promised
8    by NGMCO's counsel yesterday, negotiations were held between
9    the State of Michigan and, in fact, they were pursued by the
10   Treasury in regards to resolving this workers' compensation
11   issue.  And these discussions culminated in the terms that were
12   necessary for the Michigan Workers' Compensation Agency
13   director to grant NGMCO self-insured status as an employer in
14   Michigan when it begins its operations.
15       What's left is that there's -- as Mr. Smolinsky
16   indicated, that there's ongoing steps being taken to
17   incorporate those terms into a binding agreement that the
18   appropriate parties, after they are identified, can sign on
19   behalf of NGMCO.
20       The representation was made today that such an
21   agreement will be finalized and signed at the end of today.
22   And on that basis, we feel that that addresses a major concern
23   for Michigan, who really wants to have a seamless transition
24   for GMCO to come into there.
25       There were several other legal issues that were

221

1 presented based upon the proposed order that was filed.
2 Paragraph 52 on the new one that Ms. Cordry worked with on
3 behalf -- with counsel to culminate in has a paragraph that
4 discusses NGMCO's assumption of these workers' compensation
5 obligations. And we have been advised by Old GM's counsel that
6 they will appropriately amend the master sale and purchase
7 order to reflect that provision.
8          And we also observed that proposed order paragraph
9 41, which was dealing with preventing a state to essentially
10 implement its statutory and regulatory system, that this
11 provision will not apply if there's a stipulation on the record
12 that it will not apply to the circumstances. And here, the
13 Michigan Workers' Compensation Agency --
14          THE COURT: Time out. What do you mean by that, that
15 if there's an individual stip it'll trump the moot stip?
16          MS. PRZEKOP-SHAW: From my understanding of paragraph
17 41, as provided, that effective upon the closing and except as
18 may be otherwise provided by stipulation filed with or
19 announced to the Court with respect to a specific matter, that
20 that provision would -- and the following terms would not
21 apply. And in regards to that provision, Michigan Workers'
22 Compensation Agency and the Funds Administration, in order to
23 operate its regulatory scheme and enforce the self-insured
24 process in Michigan, will need to have that stipulation made on
25 the record, and I understand counsel are prepared to do so

                                                          222

1 today.
2          MR. SMOLINSKY: Your Honor, I think the agreement,
3 with respect to paragraph 41, and just to make sure that we're
4 all clear, is that the stipulation that we're entering into
5 allows the Workers' Compensation Board to do their business, to
6 actually take the permit, the application that's proposed to
7 them, to make sure they have all the documents available and to
8 grant their license and then to regulate New GM going forward.
9 And so the agreement that we reached is that that paragraph
10 will not interfere with the Workers' Compensation Board
11 exercising their regulatory duties.
12          Is that accurate?
13          MS. PRZEKOP-SHAW: In regard -- yes.
14          In that regards, to its ongoing regulatory
15 obligations to meet the Workers' Compensation Agency's -- the
16 acts requirements and the rules that apply to that.
17          THE COURT: Mr. Jones, you heading up?
18          MR. JONES: Yep. Yes, Your Honor. Thank you, Your
19 Honor. I just need to note, the Treasury fully agrees to the
20 agreement as -- with the agreement as described. I just do
21 need to note for everyone that the signatory we need for the
22 actual stipulation may not be available today, although we're
23 trying to get that person. Failing that, we expect the person
24 to sign tomorrow.
25          THE COURT: Okay.

                                                          223

1          MR. JONES: Thank you.
2          THE COURT: All right -- I'm sorry, go ahead.
3          MS. PRZEKOP-SHAW: No, thank you.
4          THE COURT: Thank you.
5          Mr. Schmidt?
6          MR. SCHMIDT: Yes, Your Honor. And I apologize, one
7 point harking back to the TPC matter that you heard a few
8 minutes ago. I just received a note from one of my colleagues
9 that we hadn't seen that language in the order yet, and we'd
10 just like to take a few minutes to look at it.
11          THE COURT: Okay. Can somebody get the creditors'
12 committee the language they need to satisfy themselves?
13          MR. SCHMIDT: Thank you, Your Honor.
14          THE COURT: Sure.
15          All right, what else do we have, folks?
16          Mr. Karotkin?
17          MR. KAROTKIN: Your Honor, I think, as to the sale
18 motion, there is nothing else, unless I'm mistaken.
19          THE COURT: I have one or two things. I'm not going
20 to prejudge the motion. But I gather you have been, and may
21 even now still be, doing a lot of work on the order that you
22 would want me to enter, if I approved it, which, among other
23 things, requires you to implement a lot of understandings that
24 you have been working on even up to this minute. Am I correct
25 in assuming that there is going to be a revised proposed order

                                                          224

1 that's going to be sent to my chambers sometime when you've
2 been able to embody all of your deals, Mr. --
3          MR. KAROTKIN: Yes, sir.
4          THE COURT: Do you have some sense as to how long
5 it's going to take you to -- believe me, you don't have to
6 worry about it not getting here in time if it's going to take
7 more than twenty-four hours, but -- or even more, but what's
8 your sense as to how long it's going to take you to embody all
9 of your stuff so that something comes to me?
10          MR. KAROTKIN: I think, actually, we've made a lot of
11 progress. It's our intention to go back tonight, revise it,
12 circulate it to the parties this evening and hopefully get
13 their comments tomorrow morning, and hopefully get it to you
14 either sometime tomorrow night or Saturday, if that's fine with
15 you.
16          THE COURT: Yeah, that'll be fine.
17          Now, to what extent do parties have transcripts --
18 paper transcripts of the last three days?
19          MR. KAROTKIN: Excuse me, sir.
20          (Pause)
21          MR. KAROTKIN: We only have June 30 in the afternoon.
22 There was the problem in the morning with the microphones. We
23 don't have the other two days, but we're arranging to get those
24 as soon as possible.
25          THE COURT: Those have been ordered?

                                                          225

1    MR. KAROTKIN: Yes.

2    Have they been ordered?

3    Yes.

4    THE COURT: On expedited --

5    MR. KAROTKIN: Yes, sir.

6    THE COURT: -- request? Okay. As soon as you or any

7    of your colleagues -- by that I mean the Treasury, creditors'

8    committee, other parties-in-interest, anybody gets them, I

9    would like to have them e-mailed to the chambers e-mail

10    address.

11    MR. KAROTKIN: Yes, sir.

12    THE COURT: All right. I think that takes care of

13    the housekeeping matters I had, Mr. Karotkin. Do you have

14    other stuff?

15    MR. KAROTKIN: There are two other items on the

16    calendar for this afternoon.

17    THE COURT: Go ahead.

18    MR. KAROTKIN: I believe the first item, Your Honor,

19    relates to a motion by the debtors seeking authority and

20    approval of certain settlement with four different unions.

21    This was noticed on shortened time pursuant to an order of your

22    court.

23    This motion, Your Honor, involves a settlement with

24    four of what, over the last few days, you've come to know as

25    the splinter unions. They --

226

1    THE COURT: These are both non-UAW and --

2    MR. KAROTKIN: Non-I --

3    THE COURT: -- nonobjecting unions, or at least for

4    not presently objecting unions, not the IUE steelworkers, and I

5    forgot the third.

6    MR. KAROTKIN: Correct. That's correct. They

7    encompass about 1,050 retirees and 150 active employees. There

8    are four different settlement agreements annexed to the motion,

9    each of which is substantially identical. And they basically

10    provide, Your Honor, that the unions, as the 1114

11    representative of the covered groups, as defined in the

12    settlement agreements, have agreed to the retiree -- the

13    modified retiree benefits that, again, you heard about over the

14    last few days, of the same nature that were offered to salaried

15    employees and the same that were offered to the objecting

16    parties as well.

17    But these four unions have agreed to that. Two of

18    the unions have -- that have the active employees have also --

19    the debtor has also agreed to modify collective bargaining

20    agreements with those two unions. And all of this is

21    conditioned on approval and consummation of the sale.

22    And, again, like the UAW, in connection with each of

23    these agreements, they've agreed to waive their claims for the

24    retiree health and life benefits as against the debtor company.

25    THE COURT: Okay.

227

1    Any desire from the creditors' committee to be heard

2    on this?

3    All right.

4    MR. KAROTKIN: Now, if I --

5    THE COURT: Normally -- I think the deadline for

6    objections has passed, but considering the short notice, is

7    there anybody who wants to be heard in the way of objection to

8    that settlement?

9    Record will reflect no response.

10    MR. KAROTKIN: If I could interrupt for one second?

11    THE COURT: Yes.

12    MR. KAROTKIN: I'm sorry. If Your Honor's inclined

13    to grant the relief in the motion, I would suggest that -- we

14    don't have a proposed form of order with us. It was -- the

15    form that we had was incorrect in a few respects, and we

16    haven't had time to change it. My suggestion is if we could

17    send it down to chambers over the next day or so.

18    THE COURT: I'm going to approve the motion, and your

19    mechanics are okay with me, Mr. Karotkin. When you do that, I

20    want your -- either your letter transmittal or your e-mail

21    message accompanying any attached proposed order to be able to

22    give me a representation of counsel for all of the objected

23    unions and the creditors' committee and the U.S. government are

24    satisfied with the form of the order as consistent with

25    reflecting the deal as everybody understands it to be.

228

1    MR. KAROTKIN: Very well, sir.

2    THE COURT: Okay. Thank you.

3    What else do we have?

4    MR. KAROTKIN: The other item on the calendar is the

5    approval of the wind-down facility. Now, I think that, based

6    on the current state of play and all the negotiations that,

7    again, you heard about earlier today with respect to that

8    facility, I think the current state we're in right now is that

9    the document is still in somewhat of a state of flux, although

10    there is an agreement in principle as to the terms and

11    provisions of the wind-down facility. Of course, the amount of

12    the wind-down facility, as Your Honor heard this morning, would

13    be 1.175 billion dollars.

14    I think all of the substantive terms have been agreed

15    to. The document has not yet been finalized. We do have a

16    proposed order that we will be in a position to submit later

17    today or early tomorrow, which, as I understand it -- the terms

18    of which have been substantially agreed to by both the debtors,

19    the U.S. Treasury, the creditors' committee and the Paul Weiss

20    firm representing the ad hoc committee of bondholders.

21    I don't -- there was some suggestion, Your Honor,

22    that if we could take a short recess, perhaps we might even

23    have a form of document down here. But --

24    THE COURT: That's not necessarily a problem, but

25    before we get that far, I want to give Treasury and especially

229

1  the creditors' committee a chance to be heard if either of them

2  wants to be.

3      Ms. Caton?

4      MS. CATON:  Good afternoon, Your Honor.  Amy Caton

5  from Kramer Levin Naftalis & Frankel, on behalf of the

6  creditors' committee.  The wind-down credit facility has been

7  a -- the product of a lot of negotiation by the creditors'

8  committee.  This is a very important document to us because

9  it's going to govern how these estates run after the sale

10  closes.

11      I believe we are satisfied largely with the

12  resolution on the credit facility and the loan that Treasury is

13  making.  And there are a few nits that we still had to the

14  credit agreement, but I think those will be worked out.

15      The one substantive comment that we have to the form

16  of order that we're still trying to work out is corporate

17  governance and how Old GM will be governed after the sale

18  closes and the board leaves.  I believe we have a proposal

19  right now on the table, which is that two -- there will be a

20  five-member board, two members of which will be proposed by the

21  creditors' committee, nominated by the creditors' committee,

22  and basically go through the same board approval.

23      THE COURT:  Time out, Ms. Caton.

24      MS. CATON:  Yes.

25      THE COURT:  Is this an evolution since what I heard

230

1  this morning on that?  I thought I heard of a three-person

2  board, and now it sounds like it's up to five.

3      MS. CATON:  Yes.  Yes, Your Honor, it is.

4      MR. ECKSTEIN:  There has been developments --

5      THE COURT:  Evolution.

6      MR. ECKSTEIN:  There has been evolution.  A lot of

7  parties have been put into this issue, and we have been trying

8  to deal with changes as they've been evolving.

9      THE COURT:  I understand.  Okay.

10      MS. CATON:  I apologize.  I forgot about the

11  representations that were made this morning.

12      THE COURT:  No, that's fine.  I am really trying to

13  pay attention to what people tell me.

14      MS. CATON:  That's good.  That proves -- that

15  definitely shows you're paying attention.

16      THE COURT:  Is this like the guy who gets credit for

17  having given another litigant an idea, or --

18      MS. CATON:  Your Honor, I believe that the proposal

19  on the table is acceptable to the creditors' committee and

20  Weil, but we still need -- and the debtors, but we still need

21  Treasury's acceptance of that, and that's what we're waiting

22  on.

23      With that, I believe that we'll be prepared to have

24  the order entered.  And if Your Honor has any questions about

25  the credit facility, we or Weil or anyone is happy to answer

231

1  them.

2      THE COURT:  Well, I understand it in general terms.

3  I'm sure I don't have the detailed understanding that the

4  parties do, but certainly the concepts are fine with me.

5      Okay, anything else from your perspective, Ms. Caton?

6      MS. CATON:  No, Your Honor.

7      THE COURT:  Okay, Mr. Schwartz or Mr. Jones, either

8  of you want to comment?

9      MR. SCHWARTZ:  Not particularly.  I think that was an

10  accurate description in that we were comfortable with what was

11  announced this morning.  There have since been some proposals

12  that we're working through, as well as the form of the order.

13      THE COURT:  All right.

14      Mr. Karotkin, I'm not going anywhere this afternoon,

15  but I'm not sure, from what I heard, whether you're going to

16  have an order that's ready for me anytime that quickly.

17      MR. KAROTKIN:  You read my mind.  It's kind of like

18  what you say.  I suggest, Your Honor, since everyone pretty

19  much has agreed on the substance, that rather than sticking

20  around, we'd just submit an order to Your Honor after we've

21  circulated it.

22      THE COURT:  That's agreeable.  And the drill is going

23  to be the same.  When I get it sent to me, I need a

24  representation from whoever's sending it to me that it's been

25  run past the people who are the principal ones who need to be

232

1  heard on it; I think that's Treasury and creditors' committee

2  and the estate and Canada.

3      UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4      THE COURT:  Right.

5      Okay.  Mr. Schein, are your folks putting money in

6  this deal too?

7      MR. SCHEIN:  Your Honor, Canada is not actually

8  funding this.  But since it does change the rights of the

9  existing DIP facility, it's conditioned upon certain provisions

10  allowing the closing to happen.  That's why we are concerned.

11      THE COURT:  Sure.

12      Okay.  Mr. Rosenberg?

13      MR. ROSENBERG:  Good afternoon, Your Honor.  Andrew

14  Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison, on behalf

15  of the ad hoc bondholders.  I did -- actually, I think I was

16  the second person or so to speak the first day.  I didn't

17  intend to be just the last person to speak on the last day, but

18  I guess that's the way -- I just wanted to mention that when

19  Your Honor was mentioning who needed to be served or passed by

20  in terms of the documents, the Paul Weiss firm obviously has

21  also been involved in looking at the sale order and the DIP

22  order and the credit agreement.  We just want to make sure also

23  that we're staying in the loop and are going to see all drafts

24  of those documents.

25      THE COURT:  By all means.

233

1          Okay, Mr. Karotkin, I'm going to look to you to focus
2     more than I focused on who needs to look at the paper you send
3     me.
4          MR. KAROTKIN:  Yes, sir.
5          THE COURT:  And if you can give me a representation
6     both that you've gotten the okays and that you've consulted
7     everybody who has expressed the interest or need to be
8     consulted, that'll be good enough for me.
9          MR. SMOLINSKY:  Thank you, sir.
10         THE COURT:  Okay.
11         And to what extent do we have anything else?
12         All right, I think we're done.
13         And you can get me your proposed orders by e-mail.
14    I'm going to ask Mr. Pollack, Charlie, to hang around in case
15    anybody needs details of e-mail addresses and things of that
16    sort.
17         We're adjourned.  Thank you.
18         MR. SMOLINSKY:  Thank you, sir.
19    (Proceedings concluded at 3:57 PM)
20
21
22
23
24
25
                                                        234

1
2                 C E R T I F I C A T I O N
3
4     I, Lisa Bar-Leib, certify that the foregoing transcript is a
5     true and accurate record of the proceedings.
6
7     _____
8     LISA BAR-LEIB
9     AAERT Certified Electronic Transcriber (CET**D-486)
10
11    Also transcribed by:    Clara Rubin (CET**D-491)
12                            Penina Wolicki
13                            Esther Accardi (CET**D-485)
14
15    Veritext LLC
16    200 Old Country Road
17    Suite 580
18    Mineola, NY 11501
19
20    Date:  July 6, 2009
21
22
23
24
25
                                                        236

1              I N D E X
2
3              R U L I N G S
4     DESCRIPTION                    PAGE    LINE
5     Motion to authorize/Motion of the debtors    162    15
6     for entry of order authorizing and
7     approving settlement agreements with
8     certain unions, approved
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        235

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 62 of 273

Page 237

## A

**AAERT** 236:9
**abandon** 66:2
**abandoning** 55:1 64:16
**abilities** 114:19
**ability** 44:21 61:20 74:2
97:11 110:18 114:21
115:5,14 150:15
166:22 179:11 183:24
192:12,23 201:17
**abled** 139:18 164:3
**ably** 82:24 83:2 140:16
140:16
**ABN** 9:13 217:10
**absence** 49:6 54:10
157:5
**absolute** 163:17
**absolutely** 41:15 61:12
97:9 142:25
**abundantly** 185:8
**abuse** 160:18
**Accardi** 236:13
**accede** 62:11
**accelerated** 50:22 51:22
52:4 53:20 58:12 59:4
73:2 177:2
**accept** 73:8 164:16
218:14
**acceptable** 104:14
173:15 218:17 231:19
**acceptance** 231:21
**Accepting** 190:5
**access** 76:15 110:6
**Accident** 157:25 158:4
159:6
**accompanied** 72:19
**accompanying** 81:1
228:21
**accomplish** 46:13 96:6
160:24
**accomplished** 163:14

**accorded** 52:5
**account** 129:14 164:17
**accounting** 117:14,15
118:1,4
**accounts** 129:8,9 131:22
131:23
**accurate** 45:23 78:18,21
181:8 199:24 223:12
232:10 236:5
**accurately** 77:25 121:1
218:4
**accused** 136:24
**accusing** 127:21
**achievable** 137:20
**achieve** 53:1,3 137:19
**achieves** 137:13
**achieving** 157:21
**acknowledge** 206:1
**acknowledges** 97:16
121:3,7
**acknowledging** 208:16
**acquire** 71:8 82:10
154:13 171:5
**acquired** 81:10 149:24
173:3
**acquirer** 152:9
**acquiring** 82:5 184:13
**acquisition** 163:6,7
**ACS** 38:3
**act** 55:11 83:10 156:23
163:21
**acted** 182:5 187:25
**acting** 63:17 156:6
**action** 17:4 83:25 160:1
160:5,16 161:19
**actions** 61:1,3 138:16,17
141:22 158:23 159:11
163:19
**active** 144:14 147:4
169:20,20 170:2 173:1
178:10 182:22 227:7
227:18
**acts** 118:4 223:16
**actual** 125:3 148:16
167:6 169:23 223:22
**ad** 18:4 19:12 20:19 21:3
22:17 109:3,4 177:19
180:13 229:20 233:15

**Adam** 4:23 41:1
**add** 79:22 85:24,25
112:22 136:11 192:12
207:6
**added** 66:18 115:8
166:14 214:13
**addendum** 143:5
**addendums** 127:6
**adding** 141:3 183:5
216:24
**Addison** 15:18 38:4,6
**addition** 77:1 82:15
103:4 123:25 139:24
143:20 144:1 152:21
170:3 218:20
**additional** 66:18 70:20
103:7 132:18 151:14
180:9,14 183:5 188:14
205:20 208:5 209:6
**address** 55:3 69:8 75:21
75:22 83:20 94:19
132:16 134:23 140:15
142:4 176:2 189:8,25
211:13 226:10
**addressed** 74:16 75:22
93:19 94:11
**addresses** 189:14 221:22
234:15
**addressing** 43:1 194:17
**adequate** 44:20 45:1
74:18 76:5 98:18,20
100:21,21 205:9,10
209:13 216:1
**adequately** 74:21 93:12
**adhere** 69:15
**Adhesives** 23:19
**ADINA** 17:10
**adjacent** 114:11
**adjourn** 205:1 207:18
**adjourned** 234:17
**adjournment** 204:6
**adjudicate** 91:14
**adjudicated** 190:12
191:20
**adjustment** 92:23
**adjustments** 61:2
**administers** 126:4
129:13

**administration** 103:17
160:10 221:5 222:22
**administrative** 64:20
71:9 114:13,21 126:4
127:5 158:5 191:22
**administratively** 137:24
**admitted** 121:1
**adopt** 162:6
**adopted** 139:7 140:11
162:15
**adoption** 163:1
**ADR** 208:8 215:11,16
**Adult** 12:20
**advanced** 102:10
**advances** 119:9
**adversary** 129:6
**advice** 175:17 180:25
**advise** 39:15 40:15
**advised** 42:17 222:5
**advisors** 53:17 58:13
72:1 109:2,2,3 175:17
**advocate** 59:22
**advocated** 102:10
**advocates** 17:6 106:3
**advocating** 100:13
**Aerospace** 9:4
**affect** 105:20 115:12
195:18
**affidavit** 56:14
**affiliate** 217:17
**affiliated** 6:5 38:3
**Affiliates** 11:12
**affirmative** 214:1
**affirmed** 139:8,10 162:8
**affirming** 157:8
**AFL-CIO** 9:5
**afternoon** 122:2 145:8
209:24 210:24 211:23
213:7 215:20 217:9
220:5,19 225:21
226:16 230:4 232:14
233:13
**AG** 206:8
**agency** 19:20 26:14
135:2 191:22 221:4,12
222:13,22
**Agency's** 223:15
**aggregate** 107:13

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 63 of 273

Page 238

**aggregating** 108:9
**ago** 40:12 57:6 67:15
  118:6 224:8
**Agosto** 10:4
**agree** 59:2 60:18 61:7,9
  62:12 70:21 87:1 88:12
  124:25 128:19 133:25
  176:18 180:10 214:13
  215:4 218:9
**agreeable** 232:22
**agreed** 45:2,7,10,11
  58:15 103:8 104:11,12
  150:3 171:11 202:25
  205:24 206:23,23
  208:1,8,8,17 209:7
  212:14 215:13,16
  217:14,23 218:1 220:7
  220:15 227:12,17,19,23
  229:14,18 232:19
**agreeing** 61:19 86:14
  199:23
**agreement** 42:14 45:25
  64:19 66:21 67:5,11,21
  68:3,11 69:2,2 77:14
  77:15 78:3 90:18,19
  91:2 92:23 103:4,19
  104:14,19 105:9,19
  116:12,13 117:10
  118:7,9 122:10,18
  126:17 127:9,22
  128:15,17 131:3 133:1
  141:10,22 142:5,10,11
  142:14,15,21,25 143:2
  143:8,21,22,22 144:2,3
  144:5,9 146:15 153:24
  154:1 155:13,14 172:2
  172:24 179:1 181:13
  190:8 192:4 194:12
  196:8,17 198:7,8,15
  199:4,5,10,11,12,22
  206:14 217:11,19
  218:4 220:18 221:17
  221:21 223:2,9,20,20
  229:10 230:14 233:22
**agreements** 2:4 50:19,20
  51:19 66:20 67:3 70:25
  104:5,20 128:13,21
  131:25 144:6 172:22

**181:10** 190:4,6,11
  191:5,6,17,20 194:4
  195:5,14,17 202:6
  203:3 208:17 212:21
  213:13,13,19 227:8,12
  227:20,23 235:7
**agrees** 45:4 193:16
  223:19
**Agricultural** 9:4
**AGs** 198:18 199:7
**ahead** 81:23 122:16
  209:23 224:2 226:17
**ahs** 130:10
**al** 1:8 10:4,5 23:18 36:12
**alas** 168:21
**Albany** 21:22 33:21
**alike** 55:12
**Alix** 103:20 104:10
**AlixPartners** 103:17
  201:22
**ALLARD** 24:3
**allege** 82:1
**alleged** 91:12
**allegedly** 88:10
**alleges** 188:3
**ALLISON** 17:11
**allocated** 48:15 53:5,7
  124:14
**allocating** 48:9 52:20
**allocation** 52:25 73:5,15
**allocations** 70:2 72:18
  73:7
**allow** 52:19 63:23 146:6
  152:13 171:14 179:24
  188:4,6 201:19,23
  202:17
**allowable** 167:14
**allowed** 80:5 124:8 155:8
  165:21 171:17
**allowing** 233:10
**allows** 53:25 223:5
**alluded** 157:12,13
  179:17
**alongside** 110:13
**alphabetically** 204:2
**alterative** 174:15
**alternative** 50:6 53:9
  57:23 58:8,9 110:20

**137:4,17** 174:15
  178:18 186:20 187:16
  187:17 203:4 208:2
**alternatives** 51:16 58:10
  62:13 175:14,16
  187:24
**ALYSSA** 18:9
**amend** 2:8 222:6
**amended** 67:5
**amendment** 44:24 45:22
  84:15 121:20 206:15
**amendments** 67:4,7,9
  68:2 127:6 142:24
  143:7 191:3
**America** 6:6 9:4 24:4
  161:23 184:19
**American** 80:24
**Americans** 108:2
**Americas** 4:19 18:13
  19:13 20:5
**amount** 54:3 102:25
  103:3 116:25 119:13
  124:5,7,18 125:1,8
  142:6 171:15 229:11
**amounts** 49:11 201:25
  204:12 205:6 206:2
  208:17 213:19 217:25
**ample** 164:20
**amplification** 105:3
**amplified** 105:2
**AMRO** 9:13 217:10
**Amy** 102:21 230:4
**analogy** 163:24
**analysis** 49:18 85:6
  88:22 140:11 162:6
  184:23
**analytically** 166:10
**analyze** 53:18 92:16
  117:22
**analyzed** 53:17 193:21
**Anderson** 54:25
**ANDREA** 19:25
**Andrew** 9:18 19:16
  217:9 233:13
**Angeles** 11:17 28:14
**ANKER** 23:15
**Ann** 12:6
**Anna** 102:20

**annexed** 227:8
**announce** 188:11,14
**announced** 116:19
  222:19 232:11
**Ansaldo** 18:3
**answer** 48:6 70:14 71:5
  75:4 92:18 105:22
  131:1 133:16 135:5
  231:25
**answered** 64:10
**answers** 127:16 135:4
**ANTHONY** 20:16
**anti-competitive** 205:21
**anybody** 40:8 45:14
  74:24 134:3 175:8
  186:23 214:4 220:11
  226:8 228:7 234:15
**anytime** 115:9 232:16
**APA** 129:11,20
**apart** 113:8 127:21
**apologies** 94:23
**apologize** 94:8 102:22
  224:6 231:10
**apologizing** 75:23
**apology** 92:8
**apparently** 55:24 78:24
**appeal** 139:5 159:3
  166:13 167:19
**Appeals** 141:19 165:1
**appear** 42:4 208:1
**APPEARANCES** 24:2
**appeared** 109:11 126:19
**appearing** 162:5
**appears** 46:9 74:1
  113:14 114:5,15 143:2
  143:6 149:3 196:15
  218:16
**applaud** 94:19
**applicable** 90:22 123:6
  139:2 148:5 190:10
  191:21
**applicant** 168:2
**application** 103:21
  162:14 167:25 174:16
  191:19 223:6
**applications** 177:15
**applied** 166:6
**applies** 77:8 117:20

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 64 of 273

Page 239

**apply** 55:7 121:13,21
  122:25 160:9 165:14
  222:11,12,21 223:16
**applying** 158:7
**appoint** 100:4
**appointment** 176:25
  177:18
**appreciate** 72:2 105:14
  218:5 219:17
**approach** 41:25 46:24
  89:11 211:17
**appropriate** 61:3,4
  132:14 160:12,17
  165:22 190:6,12
  221:18
**appropriately** 222:6
**approval** 66:19 69:3
  96:14 127:8 163:15
  164:5 166:15 173:14
  173:17 226:20 227:21
  229:5 230:22
**approvals** 129:9 198:25
**approve** 40:7 64:9 66:12
  66:22 68:24 81:25
  126:16 130:3 131:2
  145:3 188:6 228:18
**approved** 51:20 64:5
  67:9 144:3 148:14
  150:18 151:12 153:12
  153:25 180:12 183:2
  183:22 185:25 190:5
  199:25 224:22 235:8
**approves** 39:24
**approving** 2:3 60:20
  118:10 123:2 235:7
**approximate** 108:6
  147:4
**approximately** 85:22
  86:1,3 119:10 170:7
  172:12 201:6 207:25
  213:9
**April** 180:3
**arbitrary** 73:20
**Arbor** 12:6
**area** 128:2 154:16
  200:19
**Arent** 6:2 214:10
**argue** 48:17 58:7 68:2

74:22 93:8 94:16
  114:23 121:20 214:15
  218:22
**argued** 55:18 63:16
  66:11 71:3,23 74:21
  82:18,19,24 83:3,8,13
  83:15 84:14 86:25 87:1
  88:13 95:6 139:4
  148:16 155:8 156:4
  157:14 218:23
**arguendo** 128:8
**argues** 149:8,15
**arguing** 63:18 87:2
  88:12 139:19 171:20
**argument** 47:9,20 58:2
  59:22 62:2 68:7 75:1
  76:8,19 83:14 84:6
  85:21 86:24 87:2
  115:18,21 116:21
  119:23 121:25 123:10
  123:11,13 125:17
  141:9,16 154:6,23
  155:10 156:13,25
  161:7 162:15 164:18
  165:4 166:13 168:18
  168:23 173:25 175:4
  176:3 180:17,24 182:9
  182:9,11,14,17 183:8
  188:13 218:21
**arguments** 46:17 52:4
  55:14 69:14 73:8 75:12
  83:14 84:17 102:10
  134:8,9 139:6,15
  145:11,13,13 163:20
  176:1 177:1 181:6
  183:16
**arisen** 95:20
**arising** 191:10,19
**Arlington** 36:12,15
**arms** 106:10 151:19
**arm's** 49:5
**ARNALL** 24:12
**ARONCHICK** 32:2
**arose** 157:24
**arrange** 210:23
**arrangement** 73:11 82:4
  126:10
**arrangements** 144:22

**arranging** 225:23
**arrived** 39:11 44:23
  217:11
**articles** 56:24
**articulated** 48:19 113:11
  125:15 148:6 185:9
  187:21
**articulating** 54:18
**articulation** 110:25
**asbestos** 95:10 97:1,6
  98:5,25 100:11,12,24
  100:25 106:1 154:7,8
  165:3,7,20 166:5,8,10
  167:1,10,13 183:17
**asbestos-driven** 97:7
  100:17
**ascertain** 99:20 188:17
**ascertained** 99:16
**aside** 50:12 51:2 97:3
  110:4,5 121:23 167:5
  189:1 193:19 195:2
**asked** 43:13 49:15 58:14
  96:21 98:21,22 100:4
  132:11 134:24 135:3
  135:14 155:12 176:1
  189:21 192:19 194:7
  195:5 216:21
**asking** 74:20 146:5
  176:14 192:17
**asks** 138:18,21
**aspect** 185:7
**assembly** 39:22 80:11,12
  80:12,18
**asserted** 56:1 59:14
  74:25
**assertion** 191:14
**asserts** 73:24
**assessment** 197:17
**asset** 49:10 68:3,15 103:4
  103:8 110:9 137:9
  186:15
**assets** 47:12 48:7 49:15
  49:21,22 52:21 53:19
  54:22 55:16,22 57:13
  70:23 78:2 80:21 81:16
  83:11 96:1,1 97:17
  136:25 137:14 139:13
  145:20 146:20 148:9

149:7,10 150:3 151:3
  151:10 154:13,19
  162:17,20,23 167:5
  170:25 171:5,22,23
  172:1 173:21 176:11
  179:5,7,16,20 181:10
  181:22 185:24 186:1,9
  186:15,22,24,25 188:4
  191:8,16 216:20,20,21
  218:3
**assign** 40:3 126:9,25
  127:12 128:6,11
  130:14 208:18 209:11
  212:2 217:15
**assigned** 129:18 143:23
  146:13 216:4
**assignee** 217:18,20
**assigning** 209:1
**assignment** 68:10 126:17
  127:9 128:7 131:2
  201:15 205:25 208:24
  209:10 217:23
**assist** 170:19
**assistance** 43:25 140:17
**assistant** 6:19 19:25
  21:17,24 113:5 220:20
**ASSOCIATES** 16:11
**Association** 16:20 17:5
  20:4 112:16,17 132:23
**assuage** 168:20
**assume** 40:1,3 44:1 45:2
  45:2,4,12 77:24 122:9
  125:5 126:9,25 127:11
  127:24,24 128:6,10
  130:14 133:16 149:8
  154:11,13 163:11
  167:18 171:5 172:5
  173:5 192:25 195:9,9
  195:12 205:24 206:14
  206:23 208:18 209:11
  212:2 217:14
**assumed** 129:18 143:23
  194:2,3 196:8,24 197:8
  197:15,22 205:19
**assumes** 48:22,23,24
**assuming** 40:22 42:2
  46:1 86:13 105:5
  122:18 128:8 131:18

09-50026-mg  Doc 7226-4  Filed 10/04/10  Entered 10/04/10 17:28:37  Exhibit B --
Exhibits 6-9 to Mayer Declaration  Pg 65 of 273

Page 240

154:8 162:21 171:16
198:4 214:15 224:25
**assumption** 45:3 68:10
122:21 126:16 127:8
128:7 131:2 154:20
194:13 197:9,11
201:15,24 209:10
217:23 222:4
**assurance** 44:20 45:1
65:15 205:10
**assurances** 132:4 218:2
**assurance-related** 216:1
**assured** 46:20
**assures** 126:10
**Atlanta** 24:16
**Atlantic** 31:3,14
**attached** 77:4,6 202:8,10
228:21
**attempt** 63:13 74:1
82:14 113:14 126:9
**attempted** 56:10 58:13
66:7 81:16 82:10
128:25
**attempting** 82:13 164:1
180:14 200:17
**attempts** 69:13
**attended** 111:5,8
**attention** 80:7 93:20
109:6 114:14 158:12
169:14 231:13,15
**attest** 40:25
**attorney** 6:13,19 15:19
21:11,17,20,24 22:3,7
25:2,11 26:2,12 27:2,4
27:11 35:11 90:3 113:5
116:9,17 132:11 185:3
189:14 194:17 198:24
199:12,14 218:13
220:20 221:3
**attorneys** 3:4 4:18 6:3
7:3,10,17 8:3,11 9:3,13
9:21 10:3,13 11:3,11
12:3,11,19 13:3,11,20
14:3,12 15:3,10 16:3
16:12,20 17:3,14 18:3
18:12,20 19:3,12 20:3
20:11,19 21:3 22:10,17
23:3,11,18 24:4,13

25:3,12 26:13 27:3,12
28:3,11 29:3,14 30:3
31:3,13 32:3,13 33:3
33:11,19 34:3,12 35:3
35:12 36:3,12 37:3,11
38:3,12 132:23 133:4
198:20
**Attorney's** 5:12
**attributable** 57:8,11
**AT&T** 153:2
**audience** 107:7
**audit** 197:16
**AUSA** 5:17,18
**Austin** 6:17 27:15
123:16 220:6
**authority** 61:23 62:22
89:8 115:13 148:18,19
161:17 164:24 171:25
190:24 200:15 218:18
226:19
**authorization** 129:9
**authorizations** 129:12
**authorize** 48:18 159:25
**authorized** 83:9,16,16,17
84:7,11 139:22 140:18
141:22 197:4
**authorize/Motion** 235:5
**authorizing** 2:3 83:23
235:6
**auto** 7:10,17 9:21 17:4,4
193:23
**automatically** 121:15
**automobile** 9:3 20:3 62:6
112:16,17
**automotive** 6:5 32:13
63:5 146:22 148:10
154:4,5 179:23 208:6
213:8
**available** 51:18 103:2,6
103:10 109:8,10
110:22 165:12 223:7
223:22
**avenue** 3:5,17 4:4,12,19
7:4 8:4 11:5 13:4 14:5
16:14 18:5,13 19:4,13
20:5 23:12 28:4 29:5
31:4,14 33:4,12 34:13
37:4 148:1

**aversion** 58:10
**Avis** 208:13,19
**avoid** 73:4,6,19 82:20
**avoidance** 61:1,3 158:23
159:11 216:2
**AVRAM** 9:9
**award** 72:22
**aware** 70:8 131:14
141:16 206:2 208:16
**awesome** 147:2 181:2
**awful** 178:7 195:2
**a)a** 51:18
**a.m** 101:22,22

---

**B**

**b** 1:22 3:20 12:8 31:17
33:15 142:23 191:8
**BABETTE** 9:25
**back** 60:19 61:11,21
62:22 63:20 67:19
70:17 71:2 73:17 77:12
83:24 86:2,4 88:7
101:21 105:17 131:21
132:6 133:24 151:25
154:2 168:13 174:24
175:6 181:14 199:7,9
203:22 207:20 208:11
208:25 209:15,18,21
218:13 219:20 224:7
225:11
**backed** 71:1
**backstopping** 57:9
**backup** 201:25
**Bacon** 15:16 40:25 41:4
209:24,24 210:23
211:1,4,7,10,16,19
**bad** 58:5 81:18 82:15
83:18 84:12,13,17
138:10 177:25 182:4
188:3
**Badgley** 91:3
**Baker** 122:3
**balancing** 54:18
**ballpark** 68:13 69:19
**banc** 158:17,19,20 159:9
159:10,12,13,18
**BANDA** 36:17
**bank** 7:3 9:13,14 12:12

84:8 93:16 99:17 129:7
129:9 131:22,23 158:1
163:22,23,23 206:21
209:5 217:9
**bankruptcies** 177:12
**bankruptcy** 1:2,14,24
2:6,7 47:16 52:18 53:3
55:8 56:19 57:7,11,18
61:24 74:9 81:2 98:16
113:25 135:8,19 136:3
137:5,12 138:1 139:17
148:20 149:3,19,21
150:11 152:8 155:1,6
155:10 157:4,18,20,23
158:3,22 159:2,4 160:4
160:8,10,21,22,22,24
161:17,21 162:25
164:21,22,22 165:1
173:20,22 175:9,20,20
177:14 178:12 184:9
193:18,19,22,23 195:19
198:7 208:4
**banks** 172:19
**bar** 207:9
**BARBARA** 13:17
**BARCLAYS** 13:19
**bargain** 146:10 169:18
**bargaining** 66:20 67:3,5
67:21 68:3,10 142:5,10
142:11,13,14,21,25
143:2,7,22 144:9
153:24 154:1 155:11
172:2,22 176:10 180:7
227:19
**BARKASY** 21:8
**BARR** 23:24
**BARRY** 20:24
**Bar-Leib** 2:25 236:4,8
**based** 39:14 57:23 62:5
104:20 109:8,10 110:7
151:1 157:16 158:23
161:16 198:12 212:2,3
222:1 229:5
**basic** 68:19 183:18 198:3
**basically** 42:23 75:20
76:13 83:5 125:7 161:8
170:11 171:20 173:1
176:16 177:10 212:6

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 66 of 273

Page 241

227:9 230:22
**basis** 49:10,11 57:6 73:3
92:23 97:17,23 103:14
136:10 155:10 157:9
159:5 177:2 182:17
190:12 193:11,13
195:10 203:22 221:22
**bear** 79:9 104:24 105:1
**bears** 210:9
**Beaver** 32:14
**Beavertown** 80:17
**Becker** 6:5
**Beeler** 11:8 215:20,20,22
215:23 216:14 217:3,4
217:6
**beginning** 194:8
**begins** 221:14
**behalf** 6:14 40:11 44:16
93:14 95:11 102:13
107:25,25 108:12
109:7 110:16,17 111:2
111:3,10 116:9 122:3
123:16 125:22 141:5
142:2 144:12 145:9
187:19 194:18 211:24
213:8 215:21 219:7
220:6 221:2,2,19 222:3
230:5 233:14
**behemoth** 152:10
**Behr-Hella** 204:16
**belief** 59:14 64:21
125:15
**beliefs** 64:14
**believe** 40:5,14 42:13
44:22 52:12 59:23
60:11 64:9 66:1,1 76:5
76:18,21 77:2,12 81:1
81:18,19 82:2 83:21,23
88:3 89:19 103:18
119:14 130:16 141:8
156:24 157:11 160:3
161:12,24 162:1
166:11,24 180:5,6,10
180:24 185:8 189:6
192:2,22 198:12,23
199:3,4 203:18 205:8
205:10 206:3 207:23
212:5,12,20,22 215:12

215:13 225:5 226:18
230:11,18 231:18,23
**believes** 108:14 128:20
128:21
**Bell** 31:3
**belongs** 48:14 72:14
**bench** 41:25 61:5 89:11
162:2
**bend** 48:25
**beneficiaries** 148:3
**beneficiary** 143:21
**benefit** 19:19 23:11
127:7 129:15 155:9
171:8 172:15,16,21
173:16,16 179:22
187:14
**benefits** 62:7 126:5,11
132:6 151:23 154:10
169:1,25 170:6,9,10,13
170:16,20 171:3 172:9
227:13,24
**benefit-related** 208:24
**Benjamin** 211:23
**Berlingieri** 10:5
**Bernstein** 16:11,18 89:4
89:5,10,13,19,24 90:5
90:17 91:18,20,24 92:2
92:10,18 93:3 135:9,24
136:4,10
**Bernstein's** 136:13 183:8
**Berwyn** 36:4,6
**best** 48:7 53:19 82:8
109:12 138:20 170:25
176:11 207:4
**better** 57:17 68:7 69:8
75:3 92:5 186:3 194:16
195:2 214:21
**beyond** 65:2,11,15 95:20
97:19 134:10 138:8
156:6
**bid** 70:6,6,9 84:3 85:13
85:17 119:13 150:4
151:10 154:19 179:2
**bidders** 49:16
**BIDDLE** 12:10
**bids** 70:8
**big** 32:14 109:22 119:12
148:12 214:20

**Bik** 122:2
**Bill** 151:5
**billed** 45:9
**billing** 61:24
**billion** 63:24,25 68:14
69:19,20,22 70:7,7,9,12
70:16,16,17,18 84:4
85:8,10,13,18,22 86:1,4
86:4,6,9,10,21,21,22
87:3,6,8,8,10,10,11,12
87:13,14,14,17,17,18
103:3 107:14 108:9
111:10 119:8,11,16,19
119:20,21 120:17
151:23 183:6 229:13
**billions** 85:24
**binary** 108:21
**binding** 67:22 124:18,19
157:2,2 221:17
**binds** 64:16
**BINGHAM** 7:2
**bit** 77:22 128:2 202:1
**Black** 43:19
**Blanc** 80:17
**blank** 78:23,23 80:3
**blindly** 55:8
**block** 4:2,10 50:10
**Bloomfield** 33:13
**blueprint** 62:23
**bluff** 62:18 63:21 138:9
174:24 181:1
**bluffed** 147:21
**bluffing** 62:8,14 147:15
147:22 175:1
**bluffs** 61:24
**Blvd** 15:20 22:11
**board** 49:18 53:18 58:15
104:9,16,16 152:22
153:3,4 175:13,14,18
175:19,21 187:22
223:5,10 230:18,20,22
231:2
**Bob** 102:22,22
**bodies** 199:8
**body** 112:15
**bog** 201:20
**Boggs** 18:11,19 19:2 47:7
**BOLTON** 38:11

**bond** 81:9,9 169:7,8
**bondholder** 49:23
108:11,15 109:3 117:2
117:4 120:6
**bondholders** 18:12,20
19:3,12 47:8,23 48:11
50:21 71:22 81:9
107:25 108:8,8,10,24
109:4,7,12,20 110:21
110:23 111:4,7,9
118:22 120:11,12,14,16
120:18,19,21 121:16,19
147:6 175:6 183:7
229:20 233:15
**bondholder's** 88:21
**bondholding** 108:1,7
**bondholdings** 107:13
**bonds** 77:8,9 85:21 87:15
111:22 116:25
**book** 142:24,24 143:6
**borne** 180:16
**borrowed** 120:16 155:14
**borrowing** 117:24
**Boshoku** 6:6
**Boston** 31:15
**bottom** 186:19
**bought** 116:25
**Boulevard** 36:13
**bounds** 95:17
**BOVE** 10:12
**Bowling** 1:15
**Box** 6:16 25:5 27:5
**BOYDSTON** 31:8
**brake** 167:12
**brand** 56:16
**BRANDON** 36:11
**brands** 187:12
**BRANZBURG** 15:2
**breach** 62:16 120:6
138:21 141:12 147:16
163:7,18
**breached** 120:8 141:21
**break** 40:15 188:10
**Bressler** 20:24 43:7
148:15 149:15,18
153:11
**BRIAN** 5:9 15:7 28:7
**brief** 55:4 65:10 69:14

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 67 of 273

Page 242

74:25 84:14 89:5 115:1
115:2,3 121:1,2,3,4,6
123:12 193:12 198:24
202:10
**briefing** 47:13
**briefly** 39:20 75:23
83:21 112:24
**briefs** 50:17 119:3
**bright** 130:4
**bring** 61:1 80:7 119:17
207:13
**brings** 61:25
**broad** 15:4 35:14 98:22
114:1 167:18 184:10
185:3
**Broadway** 6:8 16:4 22:4
23:4 29:15 33:20 63:9
**BROG** 20:2
**BROMBERG** 22:16
**Bromley** 9:10 134:21
141:25 142:1,1 145:5
219:5,6,6,16
**Brook** 16:16
**brought** 139:12 145:10
174:13,14,24
**BROWN** 30:11
**Brozman** 9:18 217:7,8,9
218:8
**Bryan** 22:18
**bucket** 209:9
**bucks** 68:14 69:19,22
**budget** 102:15,24 109:25
110:1,2,6,8 184:22
185:1
**Buick** 187:13
**Building** 3:16 10:14 11:4
21:12 26:4
**bullet** 169:17
**burden** 161:25
**burdens** 47:10
**Bureau** 122:3
**Burling** 11:2 215:21
**Burton** 37:3
**business** 44:23,23 48:19
48:19 50:23 54:19
55:15 57:12,16,21 58:5
59:12,12,14,16,23 63:2
73:13 88:10,16 96:2,3

117:25 126:23 130:21
144:25 148:6,8 150:24
151:1,9,13 152:9,9,12
152:13,24 153:14,20
155:7,23 157:18
171:23 176:10 185:8
187:21,22 207:16
223:5
**businesses** 155:8
**businessman** 118:11,18
**busy** 41:9
**Buttita** 8:3,11 95:12
**buttoned** 106:12
**buy** 49:21,22 53:23 84:8
84:8 88:11 138:24
178:24 179:14
**buyer** 101:2 138:24
**buying** 179:20 187:1
**bypass** 50:4
**bypassing** 69:12
**B-A-D-G-L-E-Y** 91:5
**B.R** 135:13 149:20
150:10

**C**
**c** 3:2 8:8 10:18 35:18
39:1 77:3 191:10 236:2
236:2
**CA** 11:17 25:6 28:14
29:17 35:6
**Cable** 203:11
**Cadillac** 187:13
**cadre** 164:3
**Cadwalader** 7:9,16
140:18 175:7,10
**CALANESE** 29:9
**calculation** 87:9
**calculations** 85:9,12
**calendar** 45:19 203:19
204:3 226:16 229:4
**California** 25:2,3,4
**call** 61:24 62:18 63:20
69:10 186:13,14 201:7
202:1,2 203:5
**Callan** 10:3
**called** 156:10
**calling** 73:3
**calls** 138:9 202:3,4

**Campbell** 10:4
**Campus** 80:14
**Canada** 23:3 141:6,6
233:2,7
**Canada's** 141:4
**Canadian** 69:23 73:12
**candidly** 164:10
**CANFIELD** 34:2
**capable** 134:8,9
**capacity** 108:11
**capital** 15:10 118:24
119:1,6 149:22 209:25
217:18
**capitol** 21:21 74:10
**capitulate** 62:12
**CAPLIN** 8:2,10
**car** 53:24 63:6
**card** 155:13
**care** 48:9 87:13 189:5
192:20 193:1 211:15
219:4 226:12
**carefully** 64:13 108:17
144:21 176:2
**CARL** 34:17
**carries** 161:9
**carry** 160:13 195:8
204:8 219:24
**carry-through** 94:12
**cars** 179:12
**case** 1:4 16:3 22:10 41:6
41:7 47:12,14 49:7,20
50:12 52:7,24 54:9,15
55:13,20 56:8,9 57:23
58:5 59:6,13 60:24
62:21 63:4 65:10 66:3
69:25 71:21 73:21 74:8
81:13 90:23 91:3,6
94:5 95:23,24 97:6,7
99:18 100:15,17 101:1
103:14 107:15,17,20,21
107:24 108:13 109:6
109:18 111:7 117:21
118:15 119:17 120:2
125:9,10 127:25
137:22,23 139:21,24
141:19 146:13 149:1
149:21,21 150:2,8,10
150:11,23 155:19

156:9,11 157:21 158:1
158:2,4,13,15,16,17
159:3,6,6,9,14,23
161:20,23,23 162:10
163:10 164:24,25
173:10,21 174:18
177:1,5,5 178:7,13
180:20 183:5,11 185:9
185:10,11,17,22 187:20
193:15,17,21 194:9
198:13 203:24 234:14
**cases** 50:13 52:8 58:22
62:23 90:11,13,23
97:15,16,22 113:23
115:3 145:15 151:15
152:8 157:18 158:13
165:24 176:16 177:14
178:12 180:1 182:8
**Casey** 6:19 116:8
**case-by-case** 190:12
**cash** 69:10 171:16
185:14
**Cassatt** 36:5
**Castings** 80:13
**catastrophic** 174:23
**catch** 189:15
**categories** 120:12 194:15
**category** 113:10
**Caton** 102:21 230:3,4,4
230:23,24 231:3,10,14
231:18 232:5,6
**cause** 45:20 51:21 68:17
**causes** 160:5
**cease** 147:1 170:10
**CECCOTTI** 9:25
**ceded** 142:3
**CELESTE** 21:17
**Cellco** 203:9
**center** 7:11 14:21 17:3
17:15 29:4 30:12 80:11
80:12,12,17,18,18
202:1 203:6
**centers** 202:2
**central** 47:14 99:17
**cents** 87:18,22,23 88:1
**CEO** 65:14 152:5 153:2
**certain** 2:4 43:8,9 74:21
82:17 93:15 102:10

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 68 of 273

Page 243

103:19 112:12 124:18
138:25 146:5 205:20
226:20 233:9 235:8
**certainly** 50:17 95:2,19
97:19 128:23 134:6
164:25 176:12 193:15
194:15,16 198:13
210:11 213:3,13,17
214:6 232:4
**certainty** 179:15
**certifications** 181:9
**Certified** 236:9
**certify** 236:4
**certiorari** 168:5
**CET** 236:9,11,13
**cetera** 154:3 158:25
172:21
**Chadwick** 10:5 19:8
**chair** 108:19
**chairman** 107:18 153:2
**challenge** 83:22
**challenged** 69:9 150:5,6
**challenging** 62:19
**chambers** 5:14 41:13
204:1 210:25 211:12
225:1 226:9 228:17
**chance** 9:12 134:2 150:9
188:16 212:7 217:9
230:1
**chances** 101:5 179:13,14
**change** 144:19,21 155:14
210:16,16 216:23
228:16 233:8
**changed** 104:24 114:4
**changes** 143:5 202:21
203:8 204:15 215:1
231:8
**channeling** 165:16 166:3
**chaos** 178:15
**Chapter** 47:16 48:1,4,13
49:24 50:4,7,12 51:13
54:4,7 55:22,23 56:5
56:25 57:25 58:1,18
60:9 61:18 63:21 72:10
72:11,11,13,16,25 74:2
88:5 104:3,5 144:25
150:1,25 155:6 157:17
157:17 173:25 174:18

**character** 94:4,19
**characterize** 124:2
**characterized** 59:16
**Charlie** 211:12,17
219:15 234:14
**CHARTERED** 8:2,10
**Chateaugay** 135:19
**check** 52:13 69:20,21
74:4
**checked** 66:25
**checking** 51:14
**Cheema** 122:2,2,6,17
123:8
**Chemical** 16:12 141:17
**cherry** 32:5 80:17
127:21
**cherry-pick** 72:12
**Chevrolet** 112:7 187:13
**Chicago** 4:13 10:8 15:14
25:14 30:6 37:15
155:22
**Chief** 19:25
**chiefly** 151:2
**choice** 48:24 49:6 53:11
59:24 60:6,15 62:19
63:15 108:21
**CHON** 32:18
**choose** 48:4 59:25 72:10
73:10
**chose** 43:11 72:10 76:4
91:13
**chosen** 50:7 60:2 76:2
**Christian** 14:8 111:14,16
111:19,20
**Chrysler** 54:10,13 62:1,1
62:22,25 63:12 71:21
74:6 95:23,25 99:7
118:15 121:11 139:4
139:10 140:6,9,11
143:12,14 157:9
161:20 163:3 164:24
165:15 167:19 174:5
180:2,6 182:10 216:6
216:17
**Cigna** 126:3,7,10,15,20

126:22,25 127:7,11
129:10,13,18 131:3,14
131:18,18,21,24 132:5
208:22,23
**CIGNA's** 126:7 127:4
**Circle** 8:12
**circuit** 54:17,23 55:6
91:3,6 135:20,20 139:3
139:9,16,19 141:19
154:25 155:3,21,21,22
155:23 156:7,12,18,22
157:1,4,8,8,10 158:16
159:3,5,13,24 160:7
161:16 162:8,12 163:2
164:25 166:12 168:14
182:14 185:12,23
**circuitwide** 156:19
**Circuit's** 139:8
**circulate** 215:3 225:12
**circulated** 115:7 232:21
**circulation** 99:13 175:11
**circumstances** 54:9
62:21 66:15 73:24 82:3
109:11 173:12 210:18
222:12
**circumvent** 47:17 50:4
184:12
**citation** 90:12,12
**cite** 52:8 114:10 141:15
158:12
**cited** 54:23 55:18 90:23
97:22 115:3 157:17
158:13
**cites** 148:17
**Citibank** 163:25
**Citigroup** 14:21
**citing** 99:16 159:23
**Citizen** 17:2,6
**Citizens** 9:13 217:10,17
**civil** 91:8 92:21
**claim** 53:2 86:20,22
95:19 98:11,15 99:4,23
124:8,15,15 125:1,2,3
125:11,13 130:2,12,13
130:13 135:18 136:2,7
136:9,9 141:13 151:11
161:9 167:6 176:4
191:14 198:5,7,8

**claimant** 100:11
**claimants** 10:3 17:3 48:2
98:13,14,19 99:2,3,10
99:15 100:13,21,24,25
101:4,4 149:13 165:4,7
165:20,22,25 166:10,25
167:1,4 183:17
**claiming** 125:8
**claims** 48:2 49:12 88:5,6
88:7 91:15 95:17,18
97:17,21 98:6,7 104:22
104:25 105:1 108:15
125:2 129:15,15,22,22
129:22,25 130:5,6,8,20
139:11,12 148:16
150:5 161:3,3,6 162:18
162:18,22 165:21
167:14 183:4,4 184:23
184:24 185:1 194:13
196:10 206:17 207:12
227:23
**Clara** 35:2,3 236:11
**clarification** 95:14
114:17 126:24 141:23
**clarifications** 209:19
**clarified** 196:23,24
197:10,23
**clarifies** 131:4
**clarify** 141:7
**clarifying** 75:11 122:11
122:12 216:3
**clarity** 95:2 193:25
**class** 16:3 22:10 71:12,18
80:7 108:7
**classes** 80:6
**clause** 81:4,6 121:12,20
193:19
**clauses** 181:7
**CLE** 175:8
**cleanup** 219:8
**clear** 49:17 56:3 57:20
64:25 65:8,16 71:20
80:21 85:1 88:19 97:17
97:20 100:11,16
103:13 107:15 110:25
111:3 113:23 114:25
120:20 135:10 137:13
138:22,23 139:11,21

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 69 of 273

Page 244

142:19,25 143:16
152:14 153:22 157:5,7
161:5,18 163:7 173:19
181:11 185:8 198:5
202:24 207:7 215:5
216:16 217:16 218:15
218:23 219:22 223:4
**clearly** 57:5 120:3 153:9
163:3 170:18 175:19
180:5 187:8
**Cleary** 9:2 142:2 219:6
**CLEMENTS** 27:8
**clerk** 211:2
**client** 111:18 131:14
166:18 175:3 218:18
**clients** 71:23 148:17,20
148:21 149:7,9 168:20
200:23 212:17
**client's** 168:21 217:1
**Clifford** 9:12 217:9
**close** 62:9 102:23 129:1
133:1,8,18 167:12
174:20
**closed** 188:9
**closely** 162:3
**closes** 39:24 230:10,18
**closing** 40:2 45:3,24
110:15 129:23,24
130:5,8,25 132:5
140:21 143:25 144:16
144:16 145:11,13,13
168:23 173:25 176:1
180:17,24 190:25
206:1,14,18,23 208:18
209:15 222:17 233:10
**Coal** 162:10
**code** 2:6 47:16 69:12
97:4,23 98:16 100:20
135:19 136:3 138:1
139:3,17 156:6 157:22
158:3,22 159:2 160:21
160:22,25 163:1
164:22 184:9 193:18
193:22
**coded** 43:16
**code's** 47:17 97:5 160:5
**coercion** 190:7
**Cohen** 9:20 39:7

**coherence** 156:17
**COHN** 3:14
**COLA** 169:21
**Cole** 12:19
**COLEMAN** 10:2
**collateral** 42:16,22,23
78:16,20,22 79:5 124:4
124:18 125:2,4,12
149:24 205:20
**colleague** 155:4 183:11
210:4
**colleagues** 40:13 224:8
226:7
**collective** 66:20 67:3,21
68:3,10 71:25 142:5,10
142:11,13,20,25 143:1
143:7,22 144:8 153:24
154:1 172:2,22 227:19
**Collector** 35:3
**COLLIER** 12:8
**COLLINS** 36:11
**colloquy** 166:21,22
167:20 199:19
**color** 43:16,21
**color-coded** 43:14
**Columbia** 17:15 37:11
37:11
**Columbus** 35:16
**column** 86:13
**come** 39:4,15 66:17 72:3
81:12 86:1,6 88:24
93:7 95:19 103:21
105:17 111:17 116:21
119:4,21,21 123:14
128:25 129:25,25
131:10 141:1,10 143:9
146:12 171:16 177:14
177:21 178:14,22
179:25 180:4 185:6
193:9 199:7 201:8,18
207:20 208:11 209:18
209:21,22 211:22
214:14 219:20 221:24
226:24
**comes** 51:8 85:19 87:17
128:4 225:9
**comfort** 41:14 208:23
**comfortable** 217:1

232:10
**comforted** 110:10
**coming** 46:7 93:8 116:3
116:4,17 120:10
168:13 174:8 182:25
201:3,8 203:22 211:4
**commence** 179:8
**commenced** 150:1
178:12
**comment** 40:9 60:12
135:25 141:3 145:10
145:17 183:21 214:18
214:23 215:10,14
230:15 232:8
**commentary** 199:19
**commentators** 56:24
**commented** 60:10 62:4
**comments** 109:16 141:3
175:25 214:21 225:13
**commerce** 98:9
**commercial** 54:11 63:1,2
63:5 74:10 118:11
123:18 141:18 163:22
163:22,23 171:6,7
173:4
**commercially** 163:19
**committed** 63:23 72:5
**committee** 4:18 17:14
18:4,12,20 19:3 20:19
21:3 22:17 39:18 40:9
40:11,23 42:3 47:7
54:24 101:25 102:7,9
102:13,20 104:10
105:8,24 106:2,25
107:19 109:2 110:13
111:24 112:6,8,14,18
141:14 159:11 163:8
165:19 184:25 185:13
203:21 206:5 207:6
208:20 224:12 226:8
228:1,23 229:19,20
230:1,6,8,21,21 231:19
233:1
**committees** 176:25
177:19,19 180:14,15
**committee's** 102:10,11
102:14,16 106:24
109:2 111:25 210:6

**common** 162:24 185:16
**commonly** 211:25
**communicate** 41:13
**communication** 131:13
**communications** 6:4
24:13 212:13 214:12
**communities** 146:21
147:7
**community** 51:6 92:14
108:15
**comp** 104:25 105:1,6
122:5
**companies** 6:6 72:15
203:14
**company** 6:3 11:3,11,14
11:14 12:12 14:3 23:19
28:3 33:11 34:3 39:13
47:15 48:10,11 49:20
50:6 52:21 53:13,16,24
55:24 57:25 59:25 63:6
70:16 73:18 93:16
107:11,18 111:21
125:22 130:2,3 131:23
143:17,18,19,24 148:10
150:1 162:10 173:18
179:9,20,21,22,23
180:16 185:18 201:22
203:13 209:4,5 213:9
214:10 215:11 227:24
**company's** 48:11
**comparable** 58:16
**compared** 70:4
**compel** 138:24 191:7,8
**compelled** 221:5
**compellingly** 138:14
**compels** 105:17
**compensation** 104:22
122:4,9,19,24 171:11
171:12 220:15 221:4,7
221:10,12 222:4,13,22
223:5,10,15
**competent** 191:22
**competently** 218:23
**competing** 124:24
**competitive** 186:10
187:14
**complains** 153:11 182:16
**complaint** 84:23,24

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 70 of 273

Page 245

148:11 163:9
**complete** 51:17 78:18,21
    96:2,13
**completed** 51:15 58:23
    73:3
**completely** 59:21 62:24
    97:1 196:19
**completion** 102:15
**complex** 26:15 152:3
**complexity** 177:2
**compliance** 172:6
**complicated** 41:7 213:25
**complied** 165:10
**complies** 139:2 148:4
**comply** 59:18 72:11
    122:15 146:7 165:5
    172:4 184:6,7
**complying** 97:5,10
**Components** 208:6
**comport** 160:20
**composed** 104:9
**comprehend** 126:20
**comprehensive** 98:5
**comprised** 112:14
**compromise** 55:4 171:10
**Computers** 38:3
**conceded** 57:19
**concedes** 138:20 176:10
**conceivably** 54:3
**concentrate** 95:22
**concept** 149:18 151:15
    151:17 169:18 172:19
    176:21 177:1
**concepts** 232:4
**concern** 108:25 117:11
    117:11,14,14,18,22,24
    117:25 127:22 144:10
    170:24 195:3,4,14
    221:22
**concerned** 58:1 109:23
    110:2,5 113:14 114:18
    159:7 167:16 196:7
    199:21 233:10
**concerning** 72:18 82:3
    191:17
**concerns** 46:25 54:17
    56:23 84:17 94:15
    109:13 112:12 127:16

189:8,25 193:1 194:1
    201:11
**conclude** 168:8
**concluded** 49:24 58:4,19
    234:19
**concludes** 62:13 147:14
**conclusion** 149:4,12
    168:6
**conclusory** 56:12
**condition** 115:4 152:20
    164:6 172:3
**conditional** 173:14,17
**conditionally** 146:6
**conditioned** 66:21 69:3
    227:21 233:9
**conditioning** 47:19
**conditions** 67:2 112:1
    123:4 143:24 146:7,14
    154:3 163:11,12,13
    172:22
**conduct** 92:20,21
**conducted** 182:7
**confers** 111:23
**confess** 114:3
**confidence** 51:18 56:16
**confidential** 104:13
**confidentiality** 179:1
**confined** 145:11
**confirm** 45:11,13 94:20
    102:2,25 188:14
**confirmation** 50:15 52:9
    73:19 103:23 129:10
    129:21 165:6 177:3
**confirmations** 94:21
**confirmed** 50:18 129:17
    210:8 216:12
**confirming** 44:25
**confirms** 42:3
**conflict** 155:20
**conflicting** 91:16
**confusions** 106:23
**Congress** 98:4,5 99:25
    100:20 162:12
**Congressionally-man...**
    72:24
**Congress's** 193:20
**congruent** 197:11
**conjecture** 57:19

**Connecticut** 10:13
    125:22 126:2
**connection** 45:3 102:17
    104:22 110:12 144:25
    154:9 161:1,15 162:4
    163:20 164:18 165:3
    167:8,25 168:15,23
    172:3 173:5,8 181:12
    183:19 191:5,19
    201:13 218:3 227:22
**Conner** 102:20
**CONNOLLY** 10:12
**conscious** 50:2,3
**consensual** 105:15
    115:16,24
**consensus** 115:21
**consent** 89:8,14 90:13,17
    90:24,25 91:8,11,13,22
    92:8 114:12,20 131:25
    132:17 134:25 135:7,9
    135:15,17,24 136:1,5
    136:11 183:9
**consents** 191:4 207:1
**consequence** 68:23 69:1
**consequences** 56:12 58:3
    73:4 164:17
**consequently** 216:9
**conservation** 16:12
    113:7 114:14 180:15
**consider** 52:1 55:9 58:14
    62:12 63:22 68:24
    168:4 175:14,16
**consideration** 68:4,9
    70:18 86:12 108:4
    145:22 182:25
**considerations** 66:11
**considered** 55:15 108:17
    139:6 167:19
**considering** 89:25 179:2
    187:23 228:6
**consistency** 155:1 157:4
**consistent** 74:6 94:1
    182:8 184:8 196:18,19
    228:24
**consolidated** 81:2
**consortium** 123:17
**conspicuously** 53:18
**conspiracy** 149:6,12

168:24,24 169:3,4
    171:2
**constituencies** 48:5,10
    49:12 70:25 72:17
**constituency** 107:16
    108:4,5 109:8 188:20
**constituents** 40:6 111:11
**constitute** 169:4
**constitutional** 84:14
    91:12 166:16
**construct** 71:16 198:3
**constructed** 144:21
**construction** 156:9 158:2
    159:6,22 161:11
    164:19 198:10
**constructive** 196:16
**construe** 160:23 164:20
    167:17
**construed** 157:15 160:15
**construing** 168:24
**consultation** 106:7
    166:18 203:20
**consulted** 39:17 234:6,8
**consumer** 17:4,5 20:19
    21:3 56:16,22 173:20
    178:1 179:12 196:13
    196:22
**consumers** 17:4 96:7
    173:18
**consummated** 166:2
**consummation** 103:24
    103:25 104:2,3,4,7
    145:24 227:21
**contacts** 198:18
**contained** 184:4 190:23
**contains** 76:24 142:24
**contamination** 114:12
    114:15
**contempt** 91:8 92:21
**contend** 71:23
**contending** 69:18,22
**contention** 149:5 150:13
    150:14
**contested** 144:25
**context** 90:9,25 91:9
    124:6 130:14 136:16
    150:6 154:19 164:23
    167:7 168:13 172:16

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 71 of 273

Page 246

195:25
**continental** 79:13
**continually** 182:12
**continuation** 2:10 96:3
    96:10,16
**continue** 65:22 67:17
    69:14 105:12 114:19
    122:22 129:12,12
    130:20 185:5 192:13
    199:1 201:7,19 204:8
    205:2 206:6 208:23
**continued** 149:23 151:2
**continuing** 96:19
**contract** 45:18 67:22
    92:4 120:6,8 125:24
    126:18,21 127:5,5,10
    127:11 128:5 129:18
    135:7,8,9 141:13
    152:15,16 163:7,12,13
    163:18 195:9,11,12
    201:7 202:9 203:21
    205:24,25 206:7 216:4
    216:24,25 217:1 220:1
**contracted** 166:8
**contracting** 155:11
**contracts** 126:19 127:1
    127:24 128:10 129:17
    131:18 135:11 152:17
    163:11 196:8 201:14
    201:20,24 202:15
    203:16 204:12 205:19
    206:21,22,23 208:18,25
    209:2,8,11 212:4,8,15
    212:23 215:25 216:5,8
    217:14
**contractual** 90:19 91:1
    92:13 154:20
**contractually** 155:9
**contrary** 95:25,25
    138:13,19 148:10
    164:8 182:5
**contrast** 63:3
**contribute** 154:14
**contributed** 172:18
**contribution** 118:24
    119:1,7
**control** 46:12 54:1
    118:19

**controlling** 156:16
**controls** 140:3
**controversial** 184:1
**controversy** 94:14
    184:22
**conversant** 155:6
**conversation** 213:2
**conversations** 41:1
**convertible** 77:4
**cooperated** 117:19
**cooperation** 117:17,20
    118:2,3
**cooperatively** 206:24
**coordinate** 201:4
**coordination** 83:2
**copies** 43:14 44:3 90:5,7
    219:11
**copy** 41:20 90:4,8 202:18
**Cordry** 16:25 113:9
    132:20,21,22,22 133:14
    133:21 134:5,9 189:4,7
    193:8 195:23 197:2
    222:2
**Cordry's** 199:19
**CORDY** 189:12 193:9
    195:22 196:3 197:3,6,9
    197:19,21 200:13,17,22
**corner** 77:17 78:15
**corners** 187:20
**Corp** 15:10 29:3,14
    141:18,18 211:25
    217:18
**corporate** 47:16 72:24
    103:22 151:7 230:16
**corporation** 1:8 3:4,15
    11:13 16:13 19:19
    20:11 23:11 32:3 39:8
    118:6,19 149:20
    161:23 165:12 184:18
    205:15 217:17
**corporation's** 118:16
**correct** 65:21 76:22 84:7
    92:10 103:12 105:4
    106:4 111:19 117:7
    136:17 140:1,10 162:9
    181:16,17,24 184:20
    189:11 192:11 200:3
    206:12 213:17 215:10

224:24 227:6,6
**correctly** 217:15
**cost** 56:10 171:15
**costing** 172:10,11
**couched** 64:13
**Coudle's** 135:12
**counsel** 3:15 4:3,11 6:14
    19:25 35:2 39:7,18
    42:20 45:12 69:11
    90:23 93:18,24 101:25
    108:5 112:6 115:7
    139:18 163:10 164:13
    175:1 194:9,9 198:18
    206:9 210:4,8,10,10
    214:10,12 215:2,6
    216:10,11,22 221:8
    222:3,5,25 228:22
**count** 51:7 198:25
**counter** 43:10,12
**counterparties** 201:23
**counterparty** 202:25
**country** 50:11 236:16
**County** 35:2,3 90:11
**couple** 46:13 52:2,11
    95:14,22 105:23
    133:24 193:10
**course** 46:10 60:2 71:10
    73:9,11 74:24 76:10
    92:24 94:24 115:14
    130:21 134:25 139:6
    148:19 151:1 152:2
    156:15 165:17 176:5
    198:15 199:2 207:12
    209:17 229:11
**court** 1:2,14 39:2,4,9,15
    39:24 40:7,8,15,16,20
    40:25 41:5,11,16,18,19
    41:21 42:1,4,6,9,17
    43:5,16,19 44:1,6,9,14
    44:18 45:14 46:5 47:2
    47:4 48:17 49:19 50:9
    50:11,25 53:25 54:8,12
    54:24 55:21 57:3 59:3
    59:5,20 60:6,7,16,21
    61:16,22 62:3,13,21
    63:20,20 64:8,18 65:5
    65:16,19,22,25 66:1,2,6
    67:13 68:12,19 69:5,17

70:5,12 73:17,22 74:4
74:14,20,24 75:1,8,10
75:14,17,23 76:3,8,25
76:25 77:18,21,24 79:1
79:4,17 81:11,14,21,23
82:2,22 85:20 89:3,6
89:12,15,18,24 90:2,10
90:16 91:7,14,18,21,21
91:25 92:5,9,11,16,22
93:2,4,7,11,25 94:10
95:1,5,10 96:19 97:25
99:13 100:3 101:9,16
101:18,21 102:6 105:5
105:17,21,23 106:5,16
106:20,22 107:5,9
110:7 111:14,17 112:3
113:3,10 114:7,25
115:1,9,16 116:1,3,6,14
116:16,19 117:2,4,8,22
119:2,6,24 120:1,4,8,23
121:4,6,9,13,23 122:5
122:14 123:7,9,14
124:17,25 125:7,17,19
126:1,15,16 127:10,13
127:19 128:1,5,6,8,17
129:3,4,6 130:11 131:5
131:7,10 132:8,12,19
132:21 133:14,25
134:8,14,17 135:6,22
136:15,18,21 137:9,10
138:12,19,21,23,24
140:6,9,13,19,22,23,24
140:25 141:15,19,20,24
143:11 145:3,4,6,12,19
146:5 147:14 148:1
150:12,17,20,22 151:5
151:12 152:8 154:24
155:1 156:2,5,8,11
157:4,13,16,20 158:7
158:18 159:4,4,4,7,12
159:14,17,22 160:3,8
160:11,15,17 161:4,17
161:17,21 162:7
164:16,19 165:1,1
166:3 167:21,24 168:1
168:7 172:5 177:14
181:14,18,21,25 183:20
184:16,18 185:5 188:8

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 72 of 273

Page  247

188:25 189:10,17,19,23
190:1,7,13,14,17,21
191:1,18,22,23 192:1
192:10,15,20,25 193:3
193:5,7,18 195:21,23
197:2,4,7,18,20 199:16
199:25 200:4,8,11,16
200:21,24 201:1
202:19 203:23 205:4
205:13 206:6,11
209:20 210:19,25
211:2,8,11,18,20,22
212:10,19,21 213:1,4,6
213:15,21 214:4,8,20
215:4,8,18,22 216:14
217:2,5,7 218:6,10,25
219:1,3,11,14,17 220:1
220:3,10,22,25 222:14
222:19 223:17,25
224:2,4,11,14,19 225:4
225:16,25 226:4,6,12
226:17,22 227:1,3,25
228:5,11,18 229:2,24
230:23,25 231:5,9,12
231:16 232:2,7,13,22
233:4,11,25 234:5,10
**courtroom** 177:22
219:20
**courts** 60:19 61:11,24
74:9 91:1 96:15 156:17
156:19 157:18,20,23
158:12 159:5 160:8,23
161:11,14 162:25
**court's** 39:14 80:7 97:24
99:17 101:7 123:2
127:8 137:25 141:16
154:25 157:24 160:4
168:11 195:19 201:21
204:9
**covenant** 141:12
**covenants** 82:14
**cover** 46:25 103:1 161:3
185:1
**coverage** 196:11
**covered** 45:25 120:18
196:9 197:12 227:11
**Covington** 11:2 215:21
**Cox** 221:3

**craft** 160:4
**crater** 60:24
**create** 52:17 68:7 76:15
187:11
**created** 92:15 118:8,12
165:25
**creates** 49:7 78:5 91:23
109:16,16 135:17
**creating** 63:24 71:15
169:23
**creation** 71:24 100:2
167:4 171:6 179:15
**creatively** 202:11
**credibility** 64:6 164:9
176:13
**credible** 66:4 176:4
177:4
**credibly** 49:8
**credit** 2:8 69:8 70:6,9
84:3 85:17 150:4
151:10 154:19 155:13
230:6,12,14 231:16,25
233:22
**creditor** 24:4 28:11
31:13 34:3 36:3 51:6
59:1 92:14 107:16
118:23 124:3 137:11
149:1,2,3,17
**creditors** 4:18 22:17
39:18 40:9,22 42:3
47:17,24 51:23 52:5
53:1 54:20 55:12 59:9
62:4 70:4 71:12 72:15
74:11 82:18 87:21,21
87:25 88:9,15,25
101:25 104:10 105:24
106:1 107:19 109:21
110:5,17 121:12 137:8
146:2 153:15 159:11
163:8 165:18 171:8
176:25 177:10,11
183:7 185:13 203:20
210:5 224:11 226:7
228:1,23 229:19 230:1
230:6,7,21,21 231:19
233:1
**crisis** 154:4
**criteria** 55:14

**critical** 39:13 126:7,8
155:25 182:22
**criticism** 76:3,3
**criticize** 76:8
**criticized** 156:11 173:6
186:14
**criticizing** 60:2,3
**Croce** 91:4
**crossed** 123:24
**Cross-Complainant/D...**
12:11
**cross-examination**
176:12
**CROWLEY** 15:7
**crucial** 120:2
**CRUTCHER** 13:2
**cry** 55:8
**crystal** 142:19
**cube** 186:14
**culminate** 222:3
**culminated** 221:11
**cure** 44:20 45:18 46:24
126:12 130:6 201:25
204:5,12 205:5,11
206:2 207:7 208:17
213:10,18 217:25
220:2,3
**curiam** 167:24
**CURLER** 23:10
**current** 100:11,12
109:10 167:1 215:3
229:6,8
**currently** 126:12 207:9
218:18
**Curson** 66:23 142:21
143:15 153:20
**Curson's** 68:20 142:16
142:17,23 183:3
**CURTING** 26:9
**Custom** 32:13
**customer** 57:17 208:14
**customers** 107:22 205:16
**cut** 64:5 65:4,23 108:20
150:1 151:24
**cutoff** 179:15
**CWA** 13:12
**Cybergenics** 158:16,18
158:21 159:17

**cycle** 186:11
**C-R-O-C-E** 91:6

**D**

**d** 18:9 23:15 39:1 191:11
235:1
**Dale** 185:18
**Dallas** 19:6 22:20 31:6
**dam** 198:11
**damage** 144:24
**danger** 148:3 178:16
185:17
**DANIEL** 4:15
**DARRYL** 24:18
**data** 11:13 179:1
**date** 63:11 130:5 138:8
150:5 187:18 204:7
205:1,20 207:18
217:19 219:25 236:20
**dated** 77:3,5,14 217:16
**David** 5:18 13:8 44:7
**DAVIS** 5:8 28:2
**day** 56:4,14 57:2,15 64:2
64:25 65:9 67:17,17
128:24,24 130:23
176:23 196:24 199:2
210:3 228:17 233:16
233:17
**days** 46:14 50:15 51:1
52:2,9,10,11 54:8 56:7
56:8 58:19 64:12 65:14
76:12,13,14 89:2 106:9
115:8 140:23 173:19
176:17,18,20 177:3,16
177:17 180:19 186:23
193:10 203:24 207:16
208:11 210:3 225:18
225:23 226:24 227:14
**DC** 7:19 8:14 12:14
16:23 17:8,17 18:22
19:22
**DDSA** 182:11
**DE** 10:16 21:6 34:15
**dead** 63:10 64:15 66:18
199:8
**deadline** 62:25 228:5
**deadlines** 54:11 63:4,7
73:20

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 73 of 273

Page 248

**deal** 46:3,4 61:7,10,15
67:24,25 68:4,21 69:10
94:2,3,5,21 95:3 99:8
108:20 110:23 121:24
134:6 138:6 150:9
152:4 153:12,13
157:18 165:3,18,19,25
167:3 183:2,8 186:21
189:2 194:24 195:1
196:6 200:17,18 205:5
206:24 208:3 210:12
228:25 231:8 233:6
**dealer** 17:14 18:4 66:9
112:6,15,18 194:3
195:14
**dealers** 20:3 107:22
112:14,16,17 178:4
190:5,9 194:20,21
213:12
**dealerships** 213:9
**dealing** 46:14 98:5 99:23
141:12,21 171:24
178:7 222:9
**deals** 48:9 121:23 188:11
188:14 189:2 198:12
204:20 225:2
**dealt** 46:21 59:3 166:20
167:15 183:17 195:15
198:3 204:13
**deal's** 199:8
**death** 156:24
**debatable** 58:6
**debated** 155:6
**Debenture** 14:3 111:17
111:20,23
**debentures** 77:4
**DEBORAH** 24:9
**debt** 51:5 69:19,24 79:11
86:15,16 87:9,12,18
92:1
**debtor** 3:4 39:25 44:25
45:4 48:24 55:12 60:6
60:13,14 61:20 62:2
63:13 76:2 82:5 92:9
94:17 96:6 100:18
101:1 104:9 108:24
125:9 126:15,18 127:9
127:15,21 128:4 130:9

130:19 131:3 132:9
134:18 135:8,16 136:1
149:23 162:19 196:20
198:16 210:5 214:12
214:13 215:2 217:24
227:19,24
**debtors** 1:10 2:2,6 4:3,11
42:12,15 44:16,21 45:2
45:7,10,12,17 47:10
48:17 49:2,3 53:2,5
54:14,22 56:4,15 58:7
58:24 59:7,12,18,21
60:2,15,18 62:10,19
65:24 66:11 70:14 71:5
73:4 76:21 77:12 85:3
92:12 93:18 94:18
95:24 105:13 106:15
109:1 112:11 115:18
115:18 116:12 122:9
123:19 124:1,9 126:9
127:23 132:24 145:9
146:12 147:1 150:25
161:18 184:7,8,11
187:19 191:10 192:5
194:9 199:6 210:10
213:11 215:24 216:9
216:10,11 217:11,14,25
220:7 226:19 229:18
231:20 235:5
**debtors-in-possession**
4:3,11 184:11
**debtor's** 62:16 147:17
149:25,25 151:9
**debts** 92:13
**decade** 149:19
**decades** 98:11
**December** 77:14 78:2
**decide** 101:2,13 121:14
153:4 196:20
**decided** 53:12,21 60:3
66:5 98:3 121:17,18
168:6
**decides** 54:8,12
**decision** 40:3 44:23 50:2
50:3 63:16 64:17,17
91:7 99:9,17 139:5,8
147:12,20 156:16
157:1,7,8,9,25 158:20

159:7,13,13,16,18
161:25 162:2,5 164:5
167:24 168:8,12
170:22
**decisional** 164:24
**decisions** 73:16 110:18
155:1 157:5,16 160:19
**decisis** 139:25 157:13
164:23 168:14
**deck** 211:20
**declaration** 85:2,5 86:7
142:16,17,23 176:6
**decline** 57:5,21 186:6
**declined** 100:6 149:23
151:4
**declining** 55:16 56:2
**decree** 89:8,14 90:14,17
90:21,25 91:8 92:8,16
132:17 135:9,17,22,24
136:1,5,12 183:9
**decrees** 90:22 134:25
135:7,15
**dedicated** 103:5,9
**deemed** 74:25 156:18
**default** 144:4
**Defeasement** 169:16
**defendants** 91:13
**defer** 71:25 141:11 208:2
**deferrals** 169:21
**deferred** 126:13 191:6
191:17
**defined** 227:11
**defines** 79:10
**definitely** 106:15 117:25
134:12 167:21 231:15
**definition** 42:22 51:2
78:9 79:10 98:15
**definitions** 79:4
**definitive** 110:11
**degree** 210:11
**DEL** 27:18
**Delaware** 34:13 50:11
117:19 118:17 149:21
**Delaware's** 117:19
**delay** 56:20 111:4,7
180:15,16 207:13
**Delaying** 180:12
**deliberate** 53:11 92:19

**deliberately** 58:9
**deliberative** 73:1
**delivered** 204:11
**delivery** 191:7,8
**Dell** 208:6
**Delphi** 58:4 177:5,5,8
**demand** 98:17,19
**demanded** 60:18
**demean** 175:10
**demeanor** 64:7
**demise** 172:18
**demonstrate** 47:10 168:3
169:22
**demonstrated** 59:5
157:23 188:1
**demonstrates** 55:21
151:18 170:18 183:3
**DEMPSEY** 37:2
**denial** 91:12 168:10
**denied** 136:13,15
**DENNISTON** 11:19
28:16
**denominator** 109:22
**Denver** 20:14
**deny** 174:16
**denying** 91:7
**depart** 210:4
**department** 5:2,11 6:14
26:3,13 27:3,12 113:6
113:18 114:13 164:1
**department's** 114:19
**depended** 144:13
**dependent** 66:10 144:15
**dependents** 147:5
**Depends** 135:22
**deposition** 169:10
**depositions** 43:9 219:10
**deprive** 149:7 168:25
171:3
**deprived** 170:6
**Dept** 25:4
**Deputy** 22:7
**derail** 109:14
**derivative** 159:25
**derived** 49:10,11 71:2
201:25
**derives** 48:21
**describe** 176:22 201:9

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 74 of 273

Page 249

described 148:23 199:23
223:20
description 105:4 232:10
235:4
descriptions 173:7
design 98:5
designate 43:8,10,11
designated 153:2 169:11
designation 44:22
designations 43:13,22
44:4,11,12 219:10
designed 64:10 71:7
82:20 100:20 110:4
111:5
designee 104:10,10
desire 57:22 90:20 207:5
228:1
Desperate 60:18
despite 96:17
detail 126:20 140:15
210:12
detailed 139:16 232:3
details 103:15,18 234:15
deteriorate 186:1,1,16
deteriorating 55:23
57:14 59:12
deterioration 55:18
186:16
determination 70:24
160:16 169:3
determine 53:6 72:21
200:14
determined 51:24,25
73:7 166:1 183:10
determines 66:14 119:6
determining 53:5 138:2
detract 187:4
detriment 56:21
Detroit 3:18 24:7 29:4,7
34:6
Deutsche 211:23,24
212:16,20,22 213:5
develop 98:13
developed 55:13 201:22
Development 23:3 141:4
141:6
developments 231:4
devil 147:25

devised 53:13
devoid 149:10
dialogue 94:18 127:15
128:9 130:15,19 196:2
dialogues 204:10
dice 60:24 67:13 108:23
110:19 130:12
DICKINSON 12:2
dictate 71:18 137:11
dictated 108:23
dictates 59:19 61:17
Diego 29:17
difference 85:9 113:11
125:1,10 128:18
130:16
differences 151:20 203:6
different 39:23 41:1 48:2
61:7 64:7 85:11 87:2
92:16 115:20 129:25
133:12 134:3 136:16
165:23 185:22 205:5
226:20 227:8
differently 70:22 73:7
88:11
differing 115:17
difficult 61:15 77:13
diligence 99:16,21
201:19
dilute 183:6
diminish 111:9 184:5,6
diminishing 185:20
diminution 185:17,24
DIP 2:8 60:17,23 61:13
64:1 69:23 83:22,23,23
119:14 141:9 144:1,4,6
149:17 233:9,21
dire 56:12 58:2 60:13
68:23,25 73:4
direct 143:15
directed 149:12 169:13
direction 212:11
directions 157:3
directly 143:13 144:23
162:3 196:14
director 221:13
directors 104:9 152:22
152:23 153:1,3,4
175:13,15,18,21 187:22

Dirksen 154:16
Disabled 12:20
disagree 115:4
disagreement 125:6
disagrees 77:25
disappear 59:1
disappeared 59:10 177:7
disappearing 147:21
disappoint 132:10
disapproved 185:11,12
disbelieve 59:20
discharge 92:1 164:4
165:7,8,9,15 167:8
discharged 187:23
discharging 175:21
disclosed 103:20
disclosure 51:3 72:19
104:18 153:7 176:25
discount 179:13
discovery 64:4 52:2
discretion 73:22
discriminates 82:17
discriminatory 97:3
discuss 81:20 134:22
188:20 215:6
discussed 93:24 99:11
166:12 206:4,4 218:16
discusses 222:4
discussing 72:5
discussion 42:14 109:21
133:1 167:20,21
216:10
discussions 93:21 103:14
103:16 109:1 130:9
173:7 174:6 177:17
205:23 206:15,16
212:25 221:11
disease 98:10,13 99:3
167:5
disk 210:22
dispose 54:21
dispute 137:4 197:16
203:4 208:2 217:24
disputes 45:18 190:11
191:10,16,19,20 202:9
204:5
dissent 199:4
dissenters 63:12

dissenting 62:4
dissident 47:8
dissipate 173:23
distinct 57:22 63:12
distinction 71:21
distinctions 74:7
distinguish 95:22 97:15
distinguishable 62:24
distinguishing 54:9
194:15
distracted 133:7
distress 155:15
distressed 73:18
distributed 71:10 108:2
distribution 44:17 82:17
84:24,25 103:25
182:17,18 185:14
distributions 54:2 70:2
71:18 137:8
district 1:3 5:13 89:15
89:16 91:7,14 150:11
155:2 156:11,15,16,17
156:19 157:5 159:4
diverse 55:11
diverted 73:18
divide 73:10
Division 27:13
dixit 180:19
DLA 11:10 28:10
docket 201:21 204:2,9
doctor 130:1,1
document 42:25 77:11
77:20 120:20 132:3
175:6 210:22 229:9,15
229:23 230:8
documentation 110:12
documents 66:25 68:20
76:20,20 79:8,22
104:24 105:10,15,19
118:8 131:21,25,25
142:7 144:5 204:11
206:25 218:2 223:7
233:20,24
doing 44:11 57:17 61:6
71:16 74:6 80:6 81:17
82:13 88:15 134:10
136:24 139:19 173:25
176:13 187:4 199:9

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 75 of 273

Page 250

224:21
**dollar** 50:13,14 87:14,18
87:19,22,23 88:1 150:4
**dollars** 63:24 64:1,20
70:16,16,17,18 71:9
84:4 85:8,11,13,18,23
86:1,4,5,6,9,14,20,22
86:22 87:6,12,18 103:3
110:9 111:10 119:8,9
119:11,12,16,18,19,20
119:20,21 120:17
124:9 151:23 154:7,9
170:15 172:12 177:25
177:25 183:6,12
210:13 229:13
**dollars-worth** 98:25
**domestic** 11:12 187:15
**dominance** 49:1,6
**Doraville** 80:11
**DORR** 23:10
**dotted** 123:23
**doubt** 58:24 90:17
144:10 216:2
**Doug** 209:24
**DOUGLAS** 15:16 31:17
**downside** 186:3
**downward** 186:11
**DOYLE** 22:9
**dozen** 131:16
**drafted** 196:17
**drafting** 163:9
**drafts** 233:23
**draw** 65:17 74:5 130:4
**drawn** 154:18
**dressing** 49:18
**drift** 162:22
**drill** 232:22
**DRINKER** 12:10
**Drive** 10:6 15:13 30:4
37:13
**driven** 63:1
**driving** 54:11
**drop** 63:10 64:15 66:18
**Drucker** 3:21 131:14
**Drye** 14:2 44:16 111:20
**DRYSDALE** 8:2,10
**duck** 96:22,24,24,24,25
96:25

**due** 74:10 77:4 91:10
97:13 98:19 99:16,21
100:1,21 149:9 201:19
213:19
**DUETCHE** 211:21
**DUNN** 13:2
**duties** 175:15 223:11
**duty** 62:16 68:13 108:16
138:22 141:20,20
147:17 161:11
**D-485** 236:13
**D-486** 236:9
**D-491** 236:11
**d/b/a** 23:19 203:9

---

### E

**e** 1:22,22,23 3:2,2 8:16
9:9 11:8 20:24 39:1,1
131:16 191:13 235:1
236:2
**earlier** 57:10 108:23
116:20 208:22 210:11
210:15 212:5 219:8
229:7
**earliest** 41:24
**early** 55:19 229:17
**earn** 72:6
**easiest** 43:18
**easily** 54:1,14 59:3,4
211:1
**East** 12:4,21 14:22 35:5
35:14
**Easterbrook** 155:5,7,13
**easy** 176:17
**eat** 110:3
**echoing** 57:15
**ECKSTEIN** 4:22 231:4
231:6
**economic** 56:21 60:25
83:10 147:3 173:12
187:15
**economically** 64:19
**Edward** 16:8 153:1
**Edwin** 10:4
**EESA** 83:9
**effect** 67:5,22 147:23
156:22,25 161:2,12
162:24 173:18 183:9

**effective** 39:24 97:12
100:9 161:13 222:17
**effectively** 60:14 108:22
171:21
**effects** 56:5 82:20
**effectuate** 47:11 53:12
56:1
**effectuating** 53:9
**efficient** 186:10
**effort** 47:21 170:18
**eh** 112:1
**eight** 111:22 119:11,19
119:19 126:19
**Eighth** 11:5 141:18
**either** 41:12 50:10 70:19
94:11 99:18 117:5
136:5,7,8 144:13
151:21 177:8 180:2
186:2 197:15 203:1
206:3 213:12 218:24
225:14 228:20 230:1
232:7
**elaborate** 120:25 140:4
**elected** 39:25 112:15
203:3
**Electronic** 11:13 236:9
**electronically** 210:20
**electronics** 185:15,18
**elegant** 42:25
**elements** 51:5 103:19
169:4
**eleven** 76:13,14
**ELIADES** 12:18
**ELIZABETH** 31:8
36:17
**ELLERS** 15:2
**ELLIS** 14:20
**eloquent** 95:13 110:24
**else's** 134:3
**email** 41:4
**embellishing** 199:21
**embodies** 90:18 135:18
**embody** 225:2,8
**emerge** 54:7
**Emergency** 83:10
**emotion** 168:20
**emotional** 168:18
**empathizes** 148:20

168:19
**emphasized** 76:9
**employ** 100:19
**employee** 126:5 127:7
129:15,15,22 131:20
132:6 174:21 208:24
**employees** 96:4 107:21
126:6,8,11 129:8
144:14 147:4 152:6,10
152:12 153:6,14,19
172:19,25 173:1
178:10,10 182:22,23
227:7,15,18
**employer** 63:18 123:1,5
221:13
**employment** 152:15,16
153:19
**employments** 152:17
**en** 158:17,19,20 159:9,10
159:12,13,18
**enacted** 98:4 186:21
**encompass** 127:6 227:7
**encountered** 130:11,14
**encumbrance** 191:14
**encumbrances** 161:6
**endeavor** 159:23
**endeavors** 140:20
**ended** 39:10 182:20
**endorse** 155:24
**ends** 137:5 176:24
**energy** 210:14 217:13,20
**enforce** 113:19 114:6
115:6,14 160:17 191:2
191:12 192:23 195:17
222:23
**enforceable** 90:20 91:15
135:16 136:6,8 190:10
**enforcement** 91:3,8
**engage** 71:11
**engaged** 73:5
**Engineering** 206:19
**Engineers** 13:11
**ENGLISH** 16:2
**ENGLUND** 18:9
**enhance** 111:5,6 153:14
153:17
**enhancement** 153:18
**enjoin** 115:12

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 76 of 273

Page 251

enjoined 139:12
enjoyed 57:6
enormous 171:15
ensure 109:15 137:23
entails 98:8
entangled 173:20
entanglements 173:22
enter 146:10 209:13
211:14 224:22
entered 40:22 83:23
89:13,14,22 91:11
143:23 161:19 199:25
205:23 208:15 210:20
231:24
entering 223:4
enterprise 96:3
entire 108:4 112:15
entirely 104:12 139:22
entitled 148:17 156:15
entity 118:20 137:1
179:6 187:25
entrench 56:22
entry 2:2 116:12 190:4,6
207:16 235:6
environment 49:7 52:18
53:4 192:16
environmental 16:12
20:11 26:14 113:6,19
114:13 134:25 135:1,7
184:6,7,12,14,23,24
185:1 194:1 197:1,22
197:24 200:6,18
envisions 130:15
equal 48:1,15 81:10
155:11 181:7
equally 43:19 66:12
87:25
equipment 39:12,21 40:2
78:9,12,13 80:10 82:7
82:12 179:7 209:3,5,14
210:13
equitable 92:22 97:24
101:7 150:7 160:4,9,9
160:23 164:20
equities 107:20
equity 48:9 52:20,23,23
52:24 53:4,6 55:12
69:9 70:19 72:22 79:11

118:21 153:16,18
165:11 178:22
equivalent 58:11 68:8
97:10
ERIN 7:7
erosion 56:18
erroneous 168:8
error 157:5,7 207:21
escape 81:4,6 96:9
especially 59:6 118:7,10
118:18 229:25
ESQ 3:8,9,10,11,12,20
3:21 4:8,15,22,23,24,25
5:8,9 6:11 7:7,14,21,22
8:8,16 9:9,10,18,25
10:10,18 11:8,19 12:8
12:16,24 13:7,8,17,25
14:8,9,17,18,25 15:7,16
15:24 16:8,9,18,25
17:10,11,19,20 18:8,9
18:17,24 19:8,16,17,24
20:8,16,24 21:8 22:14
22:22 23:8,15,24 24:9
24:18,19 25:8,16 26:9
26:20 27:8,17,18 28:7
28:16 29:9,10,19 30:8
30:17 31:8,17 32:9,18
33:7,15,23 34:8,17
35:8,18 36:8,17 37:7
37:17 38:8,17
essence 55:4 72:23
115:15 146:18
essentially 115:11
136:19 147:9 154:23
158:7 171:19 222:9
Esserman 22:16,22
95:12 100:12 165:2
166:21 183:16
establish 59:11 149:11
164:12 175:18 186:4
186:25
established 136:25
137:25 153:10 181:8
187:1
establishes 139:21 182:6
185:25
estate 45:8 68:3,5 79:23
79:25 86:23 137:3,8,24

138:20 152:21 166:23
166:24 167:1,2 195:19
233:2
estates 48:14 72:15
230:9
Esther 236:13
et 1:8 10:4,5 23:18 36:12
154:3 158:25 172:21
evade 184:12
evaluate 168:6
evaluating 54:21
eve 93:20 109:25
evening 39:10 175:25
225:12
event 45:24 68:18 144:3
events 82:3 152:14
eventually 79:1,6
everybody 39:4 46:21
52:16 86:16 92:7 133:7
134:2 147:24 148:19
168:19 194:10 213:24
219:4 228:25 234:7
everybody's 46:25
177:22
everyone's 201:11 207:8
evidence 47:13 50:5 53:8
53:21 55:18,21 56:2,10
56:14 57:1,2 58:3
59:11 60:8 63:15 67:1
67:24 76:21 77:1 82:15
83:17 84:11,17 85:5
89:18 96:18 137:13,18
138:4,10,10,11 140:23
142:7,8 143:14 144:8
145:14,16 148:7,11
149:11 164:7,16 176:2
176:5,9,15
evidentiary 67:2
evolution 230:25 231:5,6
evolving 231:8
ex 106:11 112:17
exacerbate 56:22
exact 69:21 96:3 120:23
211:12 217:14
exactly 68:22 134:9
139:21 142:16 156:3
161:24 192:18 200:10
exaggerated 56:6

examiner 177:18
example 51:9 64:11 76:6
76:7,7 149:20 151:22
157:22 176:20 198:13
200:5 205:18
excellent 170:3
exception 193:22
exceptions 205:11
excess 124:10,21,22
137:15
exchange 127:15 169:7,8
185:19
exclude 67:15 123:3
excluded 42:23 78:2,7,16
78:20,21,24 79:5,10,10
98:15 114:16 136:11
181:10,21,22 216:20,21
excluding 85:21 87:6,10
exclusion 42:22
exclusive 191:2
excuse 79:19 101:12
225:19
excused 80:5
executed 44:24 191:5
execution 131:24
executives 152:6,17
153:6
executory 125:23 135:7
135:11 215:24 216:4
220:1
exegesis 139:16
exemption 72:6
exercise 141:9 146:25
157:19 180:13
exercised 141:17
exercising 146:4 223:11
exhaustive 198:14
exhibit 56:15 76:21 77:1
77:2,12,13,16 84:22
85:3,3,4,5,6 86:7
142:18,18,23 169:12,13
169:14,15,15 170:16
175:6,12
exhibits 142:17 175:18
188:21
exigencies 63:5
exist 49:8 99:23
existed 150:25

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 77 of 273

Page 252

existence 95:20 149:12
existing 96:2,10 165:20
166:10 233:9
expand 65:12
expect 51:15 63:9 90:20
93:22 105:15,19
140:15 208:25 223:23
expectation 57:17
118:12
expected 57:17
expediency 55:5 74:12
136:24
expedited 226:4
expedition 55:1
expeditiously 56:18
expenses 64:20 71:9
103:1,7,11 158:5
experience 63:6 152:24
experienced 51:13 164:3
experiences 60:11
expert 76:14,14 176:6
180:21
expire 59:17
explain 85:20 120:3
207:20 209:19
explained 85:19 138:14
208:10 210:11
explicitly 139:7
exploring 62:9
Export 23:3 141:4,5
exposure 98:10 184:24
express 23:20 97:19
134:3 143:20 163:11
163:12,13 190:17
expressed 234:7
expression 179:3
expressly 139:10 140:11
141:15 162:12
extends 95:17
extensive 109:1
extent 42:24 45:23,25
46:3 50:10 75:14 79:13
95:16 113:25 114:4,25
125:8 127:13 132:3,5
165:21 166:13,15
182:6 184:13,15,21
197:7 200:5 201:1
203:4 204:24 206:14

213:18 219:18 225:17
234:11
extinguish 114:5
extinguished 113:22
extra 60:25 71:16 90:5,8
148:17
extraordinarily 138:19
139:1,18
extraordinary 52:1 59:6
73:24 138:13 140:17
148:23 193:15
extremely 156:5 164:3
eyes 96:7
e-mail 211:11,12,13
226:9 228:20 234:13
234:15
e-mailed 210:25 226:9
e.g 169:19

F

f 1:22 7:18 21:24 27:17
33:23 85:3,6 86:7
191:16 236:2
Fabrication 206:19
face 55:7 59:25 96:18
124:5 148:1 162:25
facilities 39:23 81:8
123:19 124:12
facility 2:8 44:17 79:12
102:4,25 103:6,10,13
197:24 229:5,8,11,12
230:6,12 231:25 233:9
fact 41:2 49:2,14 51:2
60:2,3 65:19 70:11,13
81:5 82:16 96:17 98:14
98:16,21 110:10 111:1
111:6 114:18 121:14
127:4 131:19 135:21
138:20,21 150:15
152:5 153:12 159:25
162:21 176:6,7 179:16
186:3 187:3 200:18
210:19 215:13 221:9
factor 54:9 185:23
factors 49:8 54:21,23
55:10 185:10
factory 174:21
facts 73:21 109:10,11

149:11
factual 96:14
fact-intensive 135:21
fail 63:23 66:5 68:17
179:25
failed 53:18 74:17 160:5
168:2
failing 47:15 223:23
fails 119:8
failure 66:22 146:23
fair 40:20 58:8 70:15,20
85:15 88:24,24 118:5
141:12,21 142:6
151:12 168:7 192:1,25
200:24 217:4 218:10
fairly 88:9,15 99:8
184:10
fairness 49:13,16,17
70:15
faith 48:20 49:5 81:19
82:1,1,15 83:18 84:12
84:14,18 88:8,9,23
138:10 141:13,21
182:4,5,8 188:1,3
fall 92:13
falsifying 164:12
familiar 60:11 78:1
family 18:12,20 19:3
47:8
fantastic 140:19
far 55:24 74:6 95:20
105:4 134:9 136:24
137:13 138:16 159:7
167:15 198:25 199:21
214:25 229:25
Fargo 7:3 12:12 93:16
209:4
far-fetched 149:5
fashion 45:20
fast 51:25 56:11 57:22
63:10 66:7,15 87:8
117:12 177:6
fastest 47:1
favor 48:4 80:1 82:17
favorable 139:1
favored 49:12 70:25
71:13 73:4 82:18 87:21
favoritism 88:4,4

FAWKES 30:8
fears 56:5 57:15,21
feathers 96:25
features 107:2 135:9,10
federal 91:10,15,21 92:9
92:16 163:25 181:11
191:21 192:12
fee 56:19
feel 221:22
feeling 64:21
feels 194:11
FEINSTEIN 22:9
Feldman 13:8 107:10,11
felt 109:10 186:16
fewer 131:16
Fiat 62:9 180:7 203:10
Fiat's 139:18
fiction 73:5
fiduciary 62:16 108:16
110:21 138:22 147:17
175:22 187:23
FIELDER 36:11
fielding 202:2
fifteen 199:7 203:23
208:11
Fifth 3:5 18:5 31:13
84:15 121:20
fifty 50:13 119:16 165:11
fifty-nine 70:7
fifty-six 85:22 86:1
fight 61:21 109:17
fighting 173:19
fights 177:18
FIGOR 35:8
figure 69:21 101:13
106:8,11 212:7
figured 43:18
figures 174:5
file 79:19 115:1,2 124:8
176:21,23,24 203:25
207:24 221:5
filed 43:13 44:4,12,19
50:21 51:6,20 67:8
76:12 78:13 79:18,20
80:6,9 93:17 107:3
108:12 109:7,18 112:9
112:11,12 113:8
116:11 117:8,21 122:6

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 78 of 273

Page 253

123:21 193:14 202:4,7
202:9,10,15 204:16
209:5 213:10 215:25
219:23,23 222:1,18
**filing** 50:14 52:9 55:22
57:11 80:9 82:10 218:2
**filings** 78:11 80:9 181:9
**fill** 157:14
**final** 39:16,19 72:19
84:19,21,22,23 88:3
89:15,21 90:8 96:12
103:25 120:11 141:3
185:6 191:1 198:23
203:25 218:17
**finalized** 171:1 211:11
221:21 229:15
**finalizing** 146:14 204:12
**finally** 80:20 84:13 105:8
201:20 214:19
**finance** 149:23 155:22
163:6 174:12 177:21
**financer** 149:17
**financial** 7:11 11:14
30:12 47:25 49:21 57:4
84:9,10 108:1,3 152:20
155:15,15
**financier** 174:14 178:19
180:23
**financing** 59:17 60:13,17
65:4,15,24 69:23 72:4
83:24 92:25 103:2
147:1,21 151:8 163:15
164:7 174:20 179:6,10
179:10 180:3,9 181:14
**find** 67:1 68:17 76:14
77:7,22 79:24 84:21
86:18 96:15,19 97:18
151:15 156:5 159:15
170:19
**finding** 98:10 149:11
190:7 193:11
**findings** 64:8 96:15,17
**finds** 48:18 180:2
**fine** 41:11 46:7 71:25
102:2,6 103:15 144:18
210:8 225:14,16
231:12 232:4
**finish** 206:15

**Finmeccenica** 18:3
**firm** 10:2 32:12 33:2
102:21 175:7 229:20
233:20
**first** 3:16 46:15 47:12
51:17 56:4,7,7,14 57:1
57:7,15 74:1 76:20
80:7 86:9 89:10 102:1
102:9 112:23 120:17
121:17 123:18 126:18
132:11,15,16 135:6
141:4,18 145:9 158:19
159:20,22 160:1 164:9
169:14 176:23 190:15
194:12 196:23 201:16
205:14 214:11 226:18
233:16
**first-day** 197:5,12,14
**FISH** 24:3,9
**fit** 53:14 157:20 186:12
**fits** 187:20
**five** 101:15 119:25 120:1
152:23 167:10 210:3
231:2
**five-member** 230:20
**FL** 15:22
**flames** 147:24
**fleet** 186:6 205:16
208:13
**fleeting** 137:19
**flesh** 147:24
**flexibility** 157:19
**flexible** 160:4
**flies** 96:25
**flight** 193:3
**Floor** 4:5 5:5 8:5 13:14
14:14 16:22 18:14
21:14 23:5 26:5,16
32:6 35:5,15
**floppy** 210:22
**flow** 46:2 171:16
**flush** 66:8
**flux** 229:9
**fly** 96:17
**Flyer** 23:20
**focus** 47:9 70:3 78:1
234:1
**focused** 201:16 234:2

**Foley** 29:2,13 212:13,19
**folks** 39:2 46:8,22 98:12
99:20 100:2,6 101:21
106:5 166:10 188:16
188:25 189:1 192:14
213:22 219:18,20
224:15 233:5
**follow** 55:8 59:19 61:17
66:6 145:24 151:15
157:3,11 193:17
206:16
**followed** 139:7 158:15
168:15
**following** 80:10,11 102:8
222:20
**follows** 191:1
**footnote** 61:25 62:3
147:11
**Force** 7:10,17
**forcefully** 102:9
**Ford** 28:3 34:3 174:5
**Ford's** 174:7
**foregoing** 236:4
**foreign** 178:22
**forget** 154:24 155:20
170:17
**Forgive** 50:25 107:9
128:1 220:22
**forgot** 227:5 231:10
**form** 39:16 41:2 42:3
60:4,7 129:11,20 137:6
173:21 200:1 214:18
214:21,22,23 215:3
228:14,15,24 229:23
230:15 232:12
**forma** 87:5
**formalized** 130:22,24
**formally** 127:9 129:16
131:3
**FORMAN** 12:18
**format** 53:13,14
**formed** 112:6
**former** 80:17,18,18
153:1
**forth** 78:20 80:2 121:24
174:14,14
**forthcoming** 103:18
108:25

**forthright** 138:14
**fortunately** 110:20
186:23
**fortunes** 149:23
**forty** 64:12 98:12
**forty-eight** 131:17
**forty-five** 198:23,23
**forty-five-Attorney-G...**
194:19
**forty-nine** 84:4
**forty-three** 186:6
**forum** 155:8 190:13
**forward** 64:25 103:21
105:14 106:19,25
107:1 109:15 111:1
112:20,20 137:12,23
174:13 179:21 183:3
186:8 187:24 223:8
**found** 77:7 82:16 89:20
97:16,22 143:13
180:11
**foundation** 148:9 173:21
**four** 61:5 75:21,21 168:3
178:13 187:12,20
206:22 226:20,24
227:8,17
**Fourth** 162:12
**Fox** 6:2 214:10
**fragile** 56:17 137:21
**frame** 50:22 51:10 58:23
59:4 76:12 152:11
**frames** 54:15
**framework** 138:1
**FRANK** 24:19
**Frankel** 4:17 17:20
101:24 112:4,5 230:5
**frankly** 46:6 108:20
109:14 111:7 216:18
**fraudulent** 158:24
**free** 97:17,20 139:11
161:5,18 173:22
195:16 198:5
**FREEBORN** 30:2
**freedom** 73:17
**freely** 155:12
**frequency** 159:20
**frequently** 60:12 117:18
**Friday** 114:14 202:8

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 79 of 273

Page 254

FRIEDMAN 7:21
Frigidaire 169:19
Fritz 80:23
front 132:6 144:10
FROST 30:11
FTI's 102:20
FULBRIGHT 31:2
full 53:1 69:8 72:19
86:13,14 112:2 136:8
136:25 143:12 153:7
172:9 188:22
fullest 166:15
fully 55:7 86:8 91:15
105:13 111:23 120:14
120:15 139:2,5 197:23
201:23 223:19
fun 177:22
function 164:4
functioned 118:15
fund 16:13 65:2,11 67:11
99:18 103:6 138:8
141:11 165:25 167:5
178:21,22 206:9
fundamental 62:25
126:14,17 128:14
fundamentally 50:19
109:23 144:21
funded 137:24
funding 64:19 67:18,18
103:13 138:5 150:1
233:8
funds 70:20 83:13 99:18
151:2 168:2 221:4
222:22
furnished 175:3
further 55:11 58:21
68:23 82:15,23 84:13
106:6 120:24 123:10
135:14 139:12 141:3
164:21 169:10 180:3
180:15 181:5 188:12
202:15 203:24 208:3
215:14 217:3 218:2
Furthermore 83:7 88:2
future 73:13 95:18,19
97:1 98:6,14,19 99:10
100:6,24 101:4 138:17
139:12 153:5,5 165:22

165:25 167:2,3 176:14
179:16 183:10 194:13
futures 100:5
FutureSources 156:10
F.2d 141:19 156:10
F.3d 158:16 162:11

## G

G 21:12 26:4 37:7 39:1
235:3
GA 24:16
GAAP 118:3,3
gain 110:6
GALLACHER 37:7
gamble 138:18 146:19
147:2,8 178:7
gambling 62:13 147:14
game 109:18 148:21
174:24
gap 102:23
gaps 157:14
garden 124:3
Garrison 19:11 233:14
Gas 37:11,11
gather 198:19 224:20
GE 15:10 102:2 209:25
210:10
GECC 39:12
gee 178:23
general 1:8 3:4,15 6:13
6:19 10:13 16:20 21:11
21:17,20,24 22:3,7
27:4 39:8,23 56:23
76:10 78:10 80:24 83:9
83:12 84:9 85:14,15
86:3,3 87:4,9 88:19,21
92:20 97:24 101:7
113:5 118:4 125:22
126:3 133:4 135:25
137:20 138:15 144:14
144:23 146:2 149:6
153:15 170:10 175:11
185:3 189:15 198:20
205:17 217:18,21
220:20 221:3 232:2
generally 90:21 157:17
Generals 132:23 194:18
198:24 199:13,14

General's 25:2,11 26:2
26:12 27:2,11 35:11
116:9 218:13
generate 169:21
GENOVESE 20:2
gentleman 192:2
gentlemen 188:9
genuine 48:22
Gerald 33:3
Gerber 1:23 211:12,14
getting 69:8 78:4 86:20
87:11,18,22,23 119:24
133:4 153:14 170:13
173:11 182:18 188:21
192:19 198:21 210:5
225:6
GIBSON 13:2
GILL 21:17
give 41:13,22 42:24
49:25 50:25 60:25 66:7
71:13 75:3 77:15 80:1
81:24 90:5 97:12 98:18
98:20,21,23 100:9
101:5 113:24 119:18
119:25 134:2 141:13
141:15 161:2,12
163:18 166:5 171:2
188:16 196:15 204:23
211:12 212:7 219:14
228:22 229:25 234:5
given 60:15 83:12,13
86:12 88:16 99:4
119:15 126:15 127:23
144:18 152:5 176:17
180:7 182:25 231:17
gives 78:8 85:10,13
91:22
giving 41:21 68:8 207:20
glad 90:6 211:3
GLORIA 32:18
GLUCK 20:2
GM 2:10 17:14 47:8
48:14,14 49:3,4,21
52:17,19,21 53:19 56:1
56:6,16,19,25 58:15
62:23 63:23,24 64:16
65:1 66:2,5,8 71:24,24
72:2,6,9,14,22,22 74:2

82:9 83:6 84:4 96:8,8
96:10 98:25 104:17,17
104:24,25 107:16,24
108:1 112:5,25 114:9
114:10 115:7 117:16
118:2,14 119:10,18,22
120:6,8 122:8,18,21,25
122:25 123:3 126:4,8,8
126:11,12,25 127:7
129:8,9,18,21 130:7
131:16,20 132:14
136:6 137:3 138:17,22
145:20,23 146:20
147:24 148:6,21 149:8
149:8,10 151:20,22
152:6,6,10,19,21,22,23
152:24,25 153:6,7
165:18 167:12 168:25
169:6,23 171:11,13,13
171:14,15 172:17,17,18
173:4,16,16,25 174:5
174:11,20 175:13,14
176:11 177:2 178:2,10
178:12,20,23 179:14,16
179:17,25 180:4
184:13 186:1,3,8,10,10
187:11,14,23 190:4,5
197:23 206:1,23 212:1
212:4 215:7 223:8
230:17
GMC 187:14
GMCO 221:24
GM's 53:19 55:22 57:4
65:14 111:22 116:25
122:18,21 126:4
130:20 140:2 174:9
222:5
go 57:18 63:9 68:5 69:5
77:15,16,18 78:22
79:22 81:23 84:19,22
111:1 117:13,15
120:24 122:16 130:25
132:11 133:18 136:10
137:23 140:4,14
144:22 147:24 148:1
150:12 163:6 170:11
181:14 183:3 188:4
189:20 209:14,23

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 80 of 273

Page 255

210:11 224:2 225:11
226:17 230:22
**goal** 52:16 53:22 137:7
207:11
**goals** 201:16
**goes** 68:22 74:5 78:25
81:18 95:20 97:1
115:14 130:1 169:5
170:14 172:14 175:8
178:4 194:16 199:9
**going** 40:16 41:3,22
42:17 46:18 47:9 60:24
64:24 66:2,7 71:4
74:22 79:1,7 83:13,14
84:3,16 86:25 94:16
96:11 99:1 101:18
103:2 106:12,19,25
107:1 109:15,17,19,19
109:21 114:9 116:20
117:11,22 118:10
120:24 124:20 130:5,7
132:16 133:23 137:11
140:14 143:13 161:25
162:6,18,21 165:8,21
166:23 167:11 170:24
171:14,17 172:17
173:4,20 174:13
177:20,21,24 178:2,2,4
178:5,6 179:21 181:5
183:8,13 186:7 187:11
187:12,13,24 188:9
192:5 196:12 197:21
199:4,11 203:9 205:12
207:24 209:12 212:6
212:15 216:21 220:12
223:8 224:19,25 225:1
225:5,6,8 228:18 230:9
232:14,15,22 233:23
234:1,14
**going-forward** 195:10
**GOLDEN** 24:12
**Gonzales** 62:1,17
**Gonzalez** 121:11 139:7,9
143:13 147:19 157:10
161:16 165:13 166:20
167:16 168:7 182:10
**Gonzalez's** 139:5 147:12
157:6 168:12

**good** 23:18 39:2,3,6
40:10 42:11 44:15,18
45:16 47:6 48:20 49:5
54:5 81:21 82:1,1 88:8
88:8,10,23 92:22 99:6
101:23 104:15 112:4
113:4 122:2 123:15
125:21 134:17 141:12
141:21 145:8 153:12
177:24 178:2 182:5,8
182:21 188:1 193:3
209:24 211:23 213:7
214:4 215:20 217:5,8
220:5,19 230:4 231:14
233:13 234:8
**good-faith** 151:11 176:9
176:10
**GORLICK** 13:10
**Gotshal** 3:3 42:12 45:17
131:12
**gotten** 204:20 234:6
**Gottlieb** 9:2 142:2 219:7
**GOULSTON** 31:12
**govern** 230:9
**governance** 103:22
230:17
**governed** 76:22 230:17
**governing** 67:6 190:9
**government** 19:20 43:3
47:15 48:4 49:6,21,22
53:2,4,21,23 54:1,13
57:9 58:24 59:7,15
60:1 62:7,12,14 63:4
63:22 64:16,17 65:23
66:1,13 69:8 70:6 72:3
72:5,6,7,9,12,22 73:22
73:24 74:3 81:10,25
83:5,8,15 85:17 86:2
86:13 88:3,8,24 102:25
103:2,8 118:10 136:23
137:1 138:5,7,8,11,15
140:19,20 147:15
148:24 163:5,9 172:23
174:17,17 181:12
187:3,8 214:1 228:23
**governmental** 115:13
**governments** 73:12
141:6

**government's** 47:21 48:6
56:4 59:17,18 62:5,11
78:11 84:2 87:11 103:6
103:10 183:24 192:12
**government-sponsored**
179:5 187:25
**grand** 73:25 80:13,17
**grant** 42:24 43:2 79:13
79:15 123:5 140:24
168:4 181:22 218:1
221:13 223:8 228:13
**granted** 43:2 181:11,16
182:2
**granting** 159:8 181:19
**grateful** 47:22
**gratitude** 72:7
**grave** 117:11,14,14,18
117:25
**great** 134:6,7 148:3
150:9 152:4,23,24
155:3 159:20 194:11
194:24 210:12
**greater** 20:3 70:3 174:3
**greatest** 195:1
**greatly** 56:6
**Green** 1:15
**GREENE** 20:2
**GREGORY** 24:12
**Griswold** 24:5
**ground** 149:18
**grounds** 76:16 92:22
95:15
**group** 13:20 17:2 19:12
123:16,17 203:14
208:6 213:8,12 220:6
**groups** 48:2 55:9 227:11
**Guaranty** 19:19 23:11
**Guardian** 12:19 38:12
**guess** 71:8 83:7 87:5
133:8 149:6 210:20
233:18
**guidelines** 54:18
**guiding** 171:4
**guy** 231:16
**guys** 41:14 127:14

**H**

**H** 3:10 7:7 17:10,19

**HAL** 27:17
**HALE** 23:10
**half** 144:15 173:10
**HAMERMESH** 32:9
**Hamilton** 9:2 36:2 112:5
**HANAN** 16:9
**hand** 42:19 43:4,23
44:12 124:4,5 193:16
202:17 211:4 219:13
**handing** 61:3
**handled** 102:19 202:4
**hang** 234:14
**HANGLEY** 32:2
**Hanover** 99:17
**happen** 97:24 109:19
113:17 114:7 174:10
177:4,14 180:20
208:19 233:10
**happened** 118:15 145:16
146:3 152:19 170:22
172:23 174:4
**happening** 139:22
177:25
**happens** 67:23 110:25
174:18 175:20 176:21
208:19
**happy** 94:21 105:21
114:24 115:9,23 185:4
209:18 212:24 231:25
**harbor** 218:2
**hard** 94:5 106:6 194:8
**HARDIN** 37:10
**harking** 224:7
**harm** 168:9
**Harman** 6:5
**harmed** 83:25 84:1,3
**harmonize** 161:13
**Harrison** 15:2 20:18
21:2 211:24
**Hartford** 157:25 158:3,9
158:15 159:6
**Harvey** 3:8 15:2 145:8
**hash** 91:5
**hate** 132:10
**hay** 142:6
**Haynor** 33:3
**head** 87:9 131:16 178:1
201:8

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 81 of 273

Page 256

**heading** 223:17
**health** 113:20 114:20
169:24 227:24
**healthcare** 126:4,5
129:15,22,22
**hear** 46:19 74:15 89:7
91:18 94:22 116:20
125:24 127:20 129:6
133:24 159:21 175:4
188:11 191:18
**heard** 46:18 64:21 67:14
94:9 95:7 96:18 105:23
109:24,25 112:19,23
122:1 134:1,6,8 135:6
139:4 145:15 159:3,9
159:10 171:9 173:10
179:25 194:20 195:15
202:1 206:9,13 218:7
224:7 227:13 228:1,7
229:7,12 230:1,25
231:1 232:15 233:1
**hearing** 2:2,6,10,10 46:2
51:24 82:20,21 93:20
110:1 116:20 128:24
188:9 204:7 210:1
**hearings** 52:1 55:14 59:5
66:17 69:6 176:20
**Hedding** 35:4
**hedge** 178:21
**held** 52:2 99:13,18
147:19 150:24 165:14
167:16 221:8
**help** 68:12 91:19 92:11
127:19 133:19 201:4
211:2 213:22
**helpful** 40:21 41:22
**helps** 75:3
**Henderson** 43:11,24
56:3 57:9,12,16 67:4
80:23 98:21 105:7
118:13 142:9 152:5,15
152:25 153:5 169:5
170:18 174:2,11 182:1
205:16
**Henderson's** 56:14 57:20
82:8 186:7
**Henry** 16:3 22:10 36:8
**hereto** 80:2,2

**HERRINGTON** 17:13
18:2
**Hertz** 205:15,18,23
208:13,15,19
**hesitate** 60:19,22
**hesitation** 138:14
**Heulig** 131:15
**Hewlett** 28:11 204:17
**Hewlett-Packard** 11:11
11:14
**hey** 130:5
**higher** 188:20
**highest** 137:14
**highlighting** 202:21
**highlights** 103:16
**highway** 64:3
**Hill** 80:14
**Hills** 33:13
**hindmost** 147:25
**hired** 164:3
**HISCOCK** 13:19
**historic** 74:1
**history** 73:23 169:16
**Hitachi** 203:11,11
**hoc** 18:4 19:12 20:19
21:3 22:17 109:3,4
177:19 180:14 229:20
233:15
**HOFFMAN** 14:18
**hold** 53:5 74:5 133:10
199:12
**holders** 52:23 55:12
98:20 111:22
**holding** 53:4 74:7 99:9
205:1 219:25
**Holdings** 149:20
**holes** 75:5
**holiday** 106:9
**holistic** 159:23 160:21
**HOLT** 12:18
**HON** 1:23
**Honestly** 52:7
**Honigman** 3:14 39:7
131:15
**honor** 39:6,20 40:10,11
40:24 41:15,17 42:7,8
42:11,19 43:7,9,13,24
44:5,7,15,19 45:2,16,17

46:23 47:6,6,8 48:22
49:15 50:16,23 51:17
51:21,25 52:14,16 53:8
60:10 61:9,11,12,13,19
65:8,21 66:14,25 67:20
68:16,23,24 69:24
70:21 71:3,11 74:13,19
75:20,20 80:20 81:15
81:17 82:13,24 83:7
84:13,13,21,23 88:2,2
88:18 89:1,5,10,11,22
90:1,3,9 92:10,19,20
93:5,13 94:7,23 95:4,8
95:11 96:23 101:8,10
101:12,20,23 102:17
103:3,12 104:1 105:3
105:18 106:4,14 107:8
110:15 111:12,16,19,23
112:4,22 113:2 116:5,8
116:15 120:11,24
121:22 122:2 123:8,13
123:15,21,25 124:6,20
125:6,14,18,21,23,25
126:2,18 127:17 128:4
128:22 129:5,7,19
130:18 131:2,6,11
132:7,10,13,20 134:6
134:13,15,19,24 135:3
135:14,16 136:22,23
138:4,8,9,18 139:14,20
139:24 140:4,10,14,21
141:2,17,23 142:1
144:7 145:2,8,9,13
146:10 147:9,18 148:4
148:7,25 149:14 150:5
150:8,9,16,19,21
151:14,18,22 152:2,4,8
152:14,18,20,22 153:4
153:8,9,17,21 154:6,12
154:22 155:21,24
156:3,24 157:1,6,7,11
157:13 158:1,21
159:19,24 160:7,11,19
161:1,8,10,12,14,22
162:9,9,11,16,16,23
163:2,20,23 164:7,15
164:19,24 165:2,4,8,13
165:14,16 166:1,17,19

166:23 167:4,8,9,11,15
167:18,19,23 168:11,13
168:17,19,21,22 169:2
169:5,10,11,12,16,22
170:1,3,7,12,17,21
171:2,4,7,9,21,25 172:7
172:11,17,23 173:12,14
174:3,7,15,19,23,24
175:4,8,10,12,23,24,25
176:13,17,19 177:4,8
177:13 178:1,4,11,16
178:17,20 179:4,16
180:8,11,17,19,24
181:4,5,17,24 182:2,9
182:14,21,24 183:9,14
183:18 184:3,10,20,22
185:2,6,7,11,17,22
186:13,19,25 187:3,5,8
187:13,17,19 188:5,6,6
189:6,14 190:16,20
191:25 192:4 193:2
196:20 199:18 200:13
201:5,6,10,13 202:7,13
202:17,22 203:18
204:4,7,19 205:7,15
206:7,12 207:4,14,24
208:11,13,22 209:1,16
209:17,24 210:15,17,24
211:1,21,23 212:12
213:3,5,7,10,14 214:3,9
214:11,19,25 215:15
216:16 217:8,10 218:9
219:6,21 220:5,13,19
223:2,18,19 224:6,13
224:17 226:18,23
227:10 229:12,21
230:4 231:3,18,24
232:6,18,20 233:3,7,13
233:19
**Honor's** 89:21 132:17
139:14 204:1 218:5,14
228:12
**hope** 5:8 11:15 28:12
54:7 62:11 108:23
112:25 123:23 133:23
146:23 163:8 169:6
185:7 187:6
**hopeful** 200:22

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 82 of 273

Page 257

hopefully 43:25 179:21
  225:12,13
hoping 45:19 210:17
HOPKINS 33:10
horizon 178:16
horrific 188:5
host 157:16
Hostetler 122:3
Houlihan 109:5
hour 40:16 188:2,10,12
  188:15
hours 102:18 122:10
  131:17 210:3 225:7
House 54:7 65:1,13 66:4
  179:24 180:1
housekeeping 42:9,12
  43:6 102:1 188:11
  189:2 226:13
How's 159:21
HP 11:13
HR 131:16
hue 55:8
Hughes 26:15
hundred 50:14 87:22
hundreds 146:20 210:13
  214:23
HUTZ 10:12
hyphen 221:2

**I**

ice 186:14
ICX 217:17,20
idea 71:25 89:8 120:15
  121:8 196:12 231:17
identical 77:7 161:19
  227:9
identified 126:19 201:14
  221:18
identify 127:10 128:5,13
idol 156:9
ignore 154:25
ignores 147:2 153:12
II 203:12
III 34:17
IL 4:13 10:8 15:14 25:14
  30:6 37:15
Illinois 25:11,12
illness 98:15

immediate 75:15
immediately 163:5
  208:19
immortal 155:3
impact 100:16 169:9
  190:23
impair 113:15 114:5
impaired 113:22 162:21
impassioned 154:23
  168:18 171:19
imperil 148:3
implement 9:4 160:17
  164:21 191:2,12
  222:10 224:23
implemented 50:1
implementing 49:24
implication 190:18
implications 184:1
implied 141:12
importance 46:17
  107:21,22,22,23
important 42:21 46:10
  46:15 50:20 55:15
  59:19 66:11,13 71:12
  71:20 73:15 74:7,11
  103:20 112:18 113:24
  118:25 119:4 129:24
  135:15 142:8 144:11
  155:25 168:16 185:23
  197:25 230:8
importantly 73:21 95:18
  98:6 129:19 182:24
impose 114:21 181:2
imposes 184:10
impression 64:25 65:9
  65:17
improper 166:14
improved 57:7
improvements 194:11
  200:19
inaccurate 199:24
inadvertence 93:18
inapplicable 161:10
inappropriate 163:24
inaugural 55:3
incidental 171:6
incidents 45:6
inclined 228:12

include 67:15 72:8 86:16
  101:2 119:13 122:21
  203:21
included 39:22 161:3
  204:6 215:1 216:5
includes 144:4
including 11:12 49:2
  50:7 53:10 54:9 64:1
  69:15 78:9 79:11 87:14
  95:15 97:8 123:4 135:1
  139:2 147:3 172:10
  186:17 191:5,6 192:7
inconceivable 59:24 60:1
  65:13
inconsistent 146:16
inconvenient 48:16
incorporate 75:12
  112:25 113:1 221:17
incorporated 39:19
incorrect 228:15
increased 55:25 110:8
incur 146:22
incurred 129:23 130:8
  130:22
indebtedness 85:21,22
  87:4,5,5
indefinitely 118:19
indemnify 45:5
indemnities 206:16
indemnity 45:24,25
indenture 7:3 13:3 14:4
  76:20 77:10 81:9,9
  93:15 94:8 107:12
  120:20 183:14
indentured 107:9,12,14
  108:14 111:15,21
  117:6 209:6
indentures 82:14 107:13
  181:7,13 182:3
independence 48:23
  61:21 63:17 152:4,18
  153:10
independent 54:10,24
  63:1 149:9 150:6
  151:18 152:22,23
  177:19 179:19,20
  185:18
independently 57:10

Indiana 89:16 168:2
  182:12 203:11
indicate 43:15 93:23
  162:13 193:10
indicated 39:10 43:7
  53:20 58:20 62:8 96:6
  105:10 108:10 109:15
  111:13 221:16
indicates 70:15 109:9
  130:19
indicating 122:8
indiscernible 40:23
  117:17,17,20,23 118:2
  119:10,11 166:13
  181:18
individual 99:23 102:9
  102:13 104:11 106:3
  108:11 110:16 222:15
individualized 61:2
individuals 144:12,15
indulge 210:18
indulgence 89:2 148:17
Industries 6:3 38:12
  214:11
industry 62:6 146:22
  147:7 154:4,5 164:1
  178:15 179:23 187:7
  187:15
inequitable 92:20
inevitably 59:19
inextricably 68:6
infallible 155:3,5
infamous 175:6
infer 174:6
inference 65:17
inflict 172:17
inform 56:9
information 67:14 109:8
  127:15 131:19 143:10
  175:3
informed 56:24 106:8
  110:18
infusion 70:20
initial 54:15 168:23
  202:7
initially 152:13 193:21
  194:9
injunction 96:21,22,23

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 83 of 273

Page 258

97:1 100:23 166:4
**injunctions** 166:22
**injunctive** 114:22 135:18
**injury** 98:8
**Inmates** 90:11
**innocent** 93:18
**input** 39:18 196:15
**inquiries** 202:5
**inquiry** 135:21
**inserted** 190:3 218:17
**insider** 118:23 151:7,11
**insiders** 118:20
**insidious** 98:8
**insight** 139:1
**insignificant** 154:10
**insistence** 185:13
**insolvent** 118:6
**instance** 114:2 160:1
**institution** 84:10 155:15
**institutions** 84:9 108:1,3
**instructed** 212:17
**instruments** 78:9
**insufficient** 54:12 110:1
110:2
**insurance** 125:22 126:3
130:2,3
**insurer** 171:15,18
**intend** 105:12 127:11
206:14 207:15 233:17
**intended** 95:2 160:6
162:13
**intending** 207:9
**intends** 122:8 126:25
197:23
**intensively** 139:4
**intent** 130:20 184:12
185:1
**intention** 138:5 207:5
225:11
**intentions** 64:14
**interest** 40:6 52:23 55:9
56:22 62:6 63:21 74:12
79:11,14 87:16 88:20
88:21 95:21 97:20,21
109:12 113:6,18,20,20
113:25 114:24 138:3
138:20 151:10 153:13
160:15 162:14 176:11

**interested** 28:3 33:3
178:25 187:1
**interesting** 107:24 166:9
**interests** 40:4 55:11
95:18 99:15 100:5,8,15
114:23 147:2 164:21
181:15
**interfere** 223:10
**interlineation** 210:18
**interlocking** 139:17
**internal** 205:18
**International** 6:4 9:3
11:12 13:11 208:6
214:11
**interpret** 191:12
**interpretation** 90:24
160:21
**interpreted** 76:23 162:11
199:24
**interpreting** 199:20
**Interpublic** 203:14
**interrupt** 195:21 228:10
**Interstate** 141:18
**intertwined** 68:6
**intimation** 62:7
**inure** 171:7
**invested** 63:24
**investigations** 61:1
**investment** 66:8
**investor** 149:22 178:22
**invites** 156:7
**invoices** 201:18
**involve** 176:24 212:24
**involved** 59:24 105:13
107:21 146:21 158:2
158:21 163:25 182:11
210:12 233:21
**involves** 44:25 217:12
226:23
**involving** 73:2 90:24
157:17
**in-possession** 184:9
**ipse** 180:19
**irrelevant** 49:5,14
**irreparable** 168:9
**irrespective** 154:7

**irretrievable** 56:20
**irreversible** 174:23
186:11
**Irwin** 3:12 42:11
**ISACKSON** 18:8
**ISD** 36:12
**issue** 51:8 72:1 78:1
81:18,20 83:20 92:8
98:24 99:7 104:21
105:17 109:25 110:12
120:5 124:3 125:7,8
130:6,11 136:12,20
142:4 158:21 159:10
160:11,14 161:5,17
165:17 166:1,11,20
167:15 168:4,22
173:24 183:10,18
185:15 194:4 198:9
205:21 208:14 221:6
221:11 231:7
**issued** 77:9 92:9 161:14
**issues** 44:20 45:1 46:4,15
51:22,23 59:4 69:7
89:6 93:9 94:19 99:11
106:1,6,12 111:8
132:18 133:16 134:12
136:14 139:4 166:5
189:14 194:17 200:18
201:7 203:1,2 205:10
205:18,18 208:15
220:15 221:25
**Isuzu** 203:12
**item** 102:1 152:2 226:18
229:4
**items** 226:15
**it'll** 77:21 222:15
**IUE** 13:12 43:10 169:16
169:17,23 172:8 173:1
227:4
**IUE-CWA** 14:12
**I's** 123:24

--------

**J**
**J** 4:8 6:19 12:24 13:7
16:8 26:15 29:19 36:8
202:11
**JACOB** 33:23
**JAFFE** 36:8

**Jail** 90:11
**Jakubowski** 10:10 95:13
98:1 141:8 146:9,11,16
154:22,23 155:2,18
156:4,21 157:12,14
158:14 161:2 163:4,21
166:11 173:14
**Jakubowski's** 161:7
162:15 164:18
**James** 6:11 9:10 19:8
25:16 34:11 142:1
214:9 219:6
**Janesville** 80:12
**Janice** 131:15
**JASON** 37:17
**JAWORSKI** 31:2
**Jay** 131:20
**JAYSON** 33:15
**jealousy** 173:7,9
**Jefferson** 34:4 37:4
**Jeffrey** 10:18 125:21
**JENNER** 4:2,10
**Jennifer** 14:8 111:19
**JENNIK** 14:11
**jerk** 94:4
**Jersey** 26:12,13
**JILL** 7:22
**JJF** 6:6
**job** 74:18 108:14 110:22
126:10 133:19 139:18
140:19 172:19
**jobs** 62:6 66:9 146:21
**Joe** 45:16 131:11
**JOHN** 3:11 7:14 14:18
29:10
**joinder** 109:9 111:12,25
**joint** 89:13 212:1
**JONATHAN** 19:17
**Jones** 5:18 44:7,8,9,10
103:12 105:3 132:12
132:13 134:21 136:21
136:22 140:8,10,14
148:25 177:23 223:17
223:18 224:1 232:7
**Jose** 35:6
**Joseph** 3:10 10:5
**JPMorgan** 163:25
**judge** 1:24 55:8 60:23

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 84 of 273

Page 259

61:6 62:1,17,18 89:22
95:25 96:20 98:3
100:14 101:5 113:4
115:23 121:11 135:12
139:5,6,9 143:13
146:17 147:11,19
149:21 150:13,23
151:5 155:2,4,4,6,12,18
156:9,11,13,15,16,21
156:23 157:6,9 158:8
161:16,24 162:1
165:13 166:19,21
167:16 168:6,12
182:10 211:10,16
213:17 214:7 218:12
**judges** 61:14 156:8,22
**judgment** 48:19 55:15
59:12,13,23 71:25
89:15,22 90:4,8 91:1
91:10,11,13,15,22
92:19,20 116:22
157:20 160:12 176:10
187:22
**judgments** 90:15,22
**judicial** 74:3 89:19 90:21
**JULIUS** 26:9
**July** 1:18 56:2 59:18
65:2,11,15 66:23 67:9
67:15 68:25 69:3 138:6
141:10 144:2 177:7
204:7 212:9 217:16
219:25 236:20
**jumped** 163:5
**jumps** 149:4
**June** 51:21 57:17 73:3
76:13 77:3,5,5 83:24
87:16 161:23 174:1,2
180:4 186:4,5 225:21
**Junso** 10:4
**jurisdiction** 156:4,20
168:5 191:2,7,18,22
195:17,20
**jurisdictional** 195:16
**Justice** 5:2,11 25:4 26:15
**justices** 168:3
**justifiably** 184:25
**justification** 48:19 55:1
88:17 185:8

**justify** 56:11
**J-1** 202:12,22 204:17,18
206:20 208:2
**J-2** 202:12 203:10,12,12
203:14,15,17 204:4,25
206:8 207:3
**J-3** 202:12 204:19

## K

**K** 11:19 12:13 19:21
28:16
**Kansa** 123:12,15,15
124:19 125:6,14,18
220:5
**KANZA** 220:5
**Karen** 16:25 132:22
**KAROL** 11:19 28:16
**Karotkin** 3:9 183:11
189:4,6,11,13,18,21,24
190:2,19,22 192:2
195:24 199:17,18
200:3,5,10,25 224:16
224:17 225:3,10,19,21
226:1,5,11,13,15,18
227:2,6 228:4,10,12,19
229:1,4 232:14,17
234:1,4
**KATHERINE** 22:7 29:9
**KATZOFF** 13:25
**KAYLOR** 7:22
**keep** 68:5 77:13 87:15
104:13 106:8,10 134:6
144:11 151:24 180:8
**Kelley** 14:2 111:20
**Kelly** 44:16
**KEMP** 32:12
**Ken** 220:5
**Kennedy** 14:11,17 22:7
75:13 82:19 168:17
170:3 171:19 173:6
178:8
**Kenneth** 4:22 123:15
**Kensington** 217:18,20
**Kevin** 10:4,4
**key** 147:17
**KIMBERLY** 12:24
**kind** 41:8 96:22 98:7
99:7 127:15 157:22

162:24 184:16,18
186:20 191:15 197:11
197:13,14,17 200:14
201:4 232:17
**kinds** 177:15
**Kinko's** 220:16
**KIRKLAND** 14:20
**KLEHR** 15:2
**KLEIN** 16:2 32:12
**knew** 81:6 146:13 170:4
**know** 46:5,6 51:9 52:7
58:21 64:8 69:3 70:11
70:11,13 75:11 78:4
81:15,15 85:4,4 97:25
99:3,24,25 105:18
120:10,10,13 126:22,23
127:2 128:1 131:1
139:14 152:12 166:8
178:3 183:23,25
194:14 199:19 211:8
214:25 226:24
**knowledge** 82:8 179:11
217:24
**known** 126:3 139:11
206:17
**knows** 152:8 158:2
**Koch** 64:21 167:9
**KOEVARY** 19:17
**Kolbenschmidt** 206:8
**KOLKO** 16:9
**Kramer** 4:17 40:11
101:24 230:5
**KRAVITZ** 13:10
**KUNZ** 34:17
**KY** 30:15
**K-O-P** 221:2

## L

**L** 5:17 12:19 14:9 20:16
22:22 23:8 24:9 235:3
**label** 50:2
**labeling** 47:18
**labors** 61:2
**lack** 69:1 142:6 151:2
210:6
**LADDIN** 24:18
**Ladies** 188:9
**LAMME** 33:23

**land** 114:11 171:22
**landlord** 44:16 45:5
**LANE** 23:17
**language** 79:24 90:24
97:19 114:5 115:6,19
122:11,12 123:22
158:5 159:1,25 161:4
162:13 165:6 166:19
183:22 184:10 185:2,4
192:5 196:16,21,25
198:8 207:6 214:13,15
215:4 216:2,5,17,22,24
218:17 220:7,9 224:9
224:12
**languished** 57:25
**languishing** 64:12
**Lansing** 21:15 26:7
80:18
**Lardner** 29:2,13 212:13
**large** 50:12 169:19
**largely** 230:11
**larger** 85:12
**largest** 107:15
**LARRY** 38:8
**late** 72:3 105:10 132:24
207:10
**latency** 98:9
**Latham** 15:9 209:25
**Latsina** 80:15
**Lauderdale** 15:22
**law** 10:2 14:3 15:18
32:12 55:13 61:16
64:18 66:6,13,14 72:7
76:23 96:16 111:17,20
111:23 113:25 117:20
118:16 119:1 123:6
135:10 136:25 139:2
139:21,24,25 148:5
155:7 156:18 157:7,10
158:24 161:16 162:24
163:2 164:22 168:14
168:15 190:10 191:21
194:1 195:7,10 198:10
198:13 211:2
**laws** 91:16 113:19
122:20,24 184:6,8,12
196:9,11 200:6,19
**lawyer** 41:7 163:5 170:4

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 85 of 273

Page 260

lawyers 50:5 53:9 115:14
    166:4
law's 156:17
lay 193:13
laying 146:6
LBA 45:21 206:8,9
lead 96:15,19 174:2
    189:5
leading 82:4 90:11 91:3
leaner 186:10 187:14
Lear 178:11
learned 213:11
LEARY 21:24
lease 44:22,24 45:2,3,4,8
    45:22 46:1 93:15
    217:12,16 218:1
leases 39:13,21 40:1,4
    209:5
leave 46:21 48:8 106:23
    189:15 195:19
leaves 87:12 96:25
    119:12 230:18
leaving 71:14 106:3
    195:2,16
Leckie 162:10,11
led 130:16
LEFFERT 20:16
left 71:9 72:9 81:14
    134:1 210:4 221:15
legacy 169:19
legal 48:3 72:8 90:9
    94:15,16 117:13,15
    118:1 137:15 141:7
    148:17,19 171:25
    221:25
legally 48:2 66:3 68:5
    137:16 148:14
legitimate 63:2 73:9,14
    180:11
LeHane 14:9 44:15,16
    44:18,19 45:15 46:6,7
    206:11
LEHR 26:20
LEINWAND 20:2
lemon 196:9,11
lend 118:11 138:23
lender 48:25 61:7,13
    64:2 82:4 123:16,17

138:23 149:16 150:14
    220:6
lenders 60:11,12,20
    61:24 73:20 85:25 86:8
    87:12 94:18 123:18
    141:9 149:25 220:8
lender's 124:8
lending 64:1 83:22 85:18
length 49:5 151:19
    164:11 182:1
lengthy 161:25
lent 118:18
LESLIE 23:14
lessened 91:11
lesser 62:15 147:15
lesson 156:7
lessors 209:3
less-than-stellar 75:24
    75:25
letter 42:18 43:4 228:20
let's 87:24,24 90:7 97:15
    101:19 133:25
level 94:14 165:1,1
    188:20 208:24
leverage 61:20 66:16
    93:15 146:5 155:11
    177:16 180:7,13
LEVICK 38:2,8
Levin 4:17 40:11 101:24
    230:5
LEWINSTEIN 14:25
Lewis 20:18 21:2 211:24
Lexington 28:4 30:12,15
liabilities 122:19 136:11
    149:9 154:7,8,8,9,11,13
    154:20 163:12 165:9
    171:5 183:6 191:14
    197:22,24
liability 10:3 17:3 46:1
    68:14 69:13 96:10,16
    96:19 97:1 99:1 100:25
    136:20 149:13 171:17
    194:6,13 198:3,5
    218:21,22
liable 197:23
liberty 9:6 12:4 43:22
    202:20
license 223:8

lie 146:25
lien 42:24,24 43:1,2 78:5
    78:8 79:15,15,25 80:1
    80:1,9 81:4,5,7,12,16
    94:10,11,12,12 120:17
    120:20,21 121:2,13,14
    121:17,18 124:5 181:9
    191:14
liened 80:22,25,25 81:5,7
    81:7,8 82:12,13
liens 42:17 78:11,13
    79:18,19 80:6 81:10
    82:6,10 121:16 123:18
    124:10,22,23 161:5
    171:22 181:11,22
    182:2
life 125:22 126:3 227:24
lightning 70:1
likelihood 168:9
likes 73:10
likewise 168:18,19 208:7
limit 58:9 65:24 74:17
    139:20 162:13 198:7
limitation-on-liens 76:19
    76:24 77:7
limited 11:13 44:19
    59:16 63:3 64:20 102:8
    102:11,12,14 105:24
    111:25 112:10 116:11
    122:6,7 123:21 124:2
    156:5,10 191:7 203:11
    204:5 213:10 215:25
    216:1
limits 54:16 74:10 187:7
    187:9
line 46:9,19 74:5 130:5
    133:18 154:18 169:15
    173:3 186:19 235:4
linings 167:13
link 160:2,2,3
linkage 68:17 69:1 142:5
    142:7 143:15 144:8
Lionel 48:21 54:13,16,18
    54:20 74:6 185:9,10,10
    185:17,23 186:12
liquidate 59:25 60:4
    71:24
liquidated 72:2 88:21

148:21
liquidating 137:3
liquidation 49:18 53:17
    58:8 59:19 62:3,15
    88:22 137:6,6,16
    145:19,24 146:1
    147:16 148:2,2 165:9
    165:20,24 167:3
    170:14 172:14,15
    179:9,12 188:5
Lisa 2:25 236:4,8
list 78:18,21 82:6 114:10
    204:1,12 217:15
listed 80:8 82:7 86:6
    185:18
listened 145:12 176:2
LISTHAUS 13:10
listing 62:14
literally 102:18 122:13
    198:14
litigant 231:17
litigate 208:12
LITIGATION 17:2
litigations 109:22
little 40:12 60:23 65:6
    68:12 77:22 114:16
    128:2 144:18,19,20
    152:1 198:11 202:1
Livernois 38:13
LLC 6:4 12:18 16:11
    22:9 30:3,11 31:13
    156:10 217:20 236:15
Lloyd 23:18
LLP 3:3 4:2,10,17 6:2
    7:2,9,16 9:2,12,20
    10:12 11:2,10 12:10
    13:2 14:2,20 15:2,9
    17:13 18:2,11,19 19:2
    19:11 20:18 21:2 23:10
    23:17 24:12 28:10 29:2
    29:13 30:2 34:11 36:2
    36:11 37:10
LMC 203:12
loan 42:14 70:3 77:14
    86:2,2 118:7,9,14,23
    119:7 141:10 230:12
loans 69:9 83:12,16,17
    83:23 118:21

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 86 of 273

Page 261

loan-to-own 149:18
151:16
LOBELLO 16:8
Local 13:12
localities 80:11
located 78:6,13 79:12
location 99:20
LOCHNER 33:18
LODGE 10:12
Logan 32:4
logos 96:5
long 57:5 82:6 98:9
101:18 150:19 160:8
167:13 177:12,13
202:23 225:4,8
longer 50:1 105:25
106:19 122:14 174:9
183:15
long-term 144:25
look 40:15 41:23 47:24
51:12 52:8 60:7 77:5
82:2 86:10,12 91:1
96:11 97:23 100:5,6
105:14 142:8 144:17
159:20 174:1 177:23
178:23 179:1 224:10
234:1,2
looked 67:7 112:24
126:22 159:21 205:8
looking 82:1 96:13,21
98:7 100:7,23 175:12
175:12 183:25 233:21
loop 233:23
Lordstown 206:22
217:13,20
Los 11:17 28:14
lose 54:6 147:25 186:8
losers 88:16
loss 56:21
losses 64:5
lost 137:21 147:8
lot 41:5 48:12 71:5 92:12
94:14 131:19 144:20
156:23 198:12 210:14
224:21,23 225:10
230:7 231:6
low 70:9,10
Lowenstein 213:8

lower 85:9,11 159:5
LPA 33:10
LUCAS 35:18
LUFT 9:9
lunch 188:10
lunchtime 41:13
lying 164:12
L.L.P 31:2

## M

m 6:11 7:21 13:8 14:17
16:21 17:11 18:8,21
28:7 32:18 94:6
MA 31:15
machine 105:11
MACTAC 23:20
Magcorp 184:16
magic 58:23,25 59:7,8
60:8
magical 58:20
Magnesium 161:22
184:18
mails 131:17
main 30:13 62:2 63:1
89:6
mainstream 108:2
maintain 157:4 170:24
maintained 156:17
maintenance 170:20
major 46:16 51:5 72:17
73:2 108:1 194:4
221:22
majority 159:12 168:7
makers 63:16
making 59:1 76:7 83:17
85:17 91:4 159:15
160:16 201:9 202:5
230:13
manage 201:16
management 6:7 63:17
96:5 179:17
managers 49:3
mandated 53:15 61:22
Manges 3:3 42:12 45:17
manifest 167:14
manifesting 98:10
manifests 167:5
manner 52:1 64:18

Manor 131:20
manufacture 179:8
Manufacturers 12:11
209:4
manufactures 15:3
93:16
manufacturing 39:22
79:12 80:10,14,24,24
82:6,9 148:10 211:25
MARC 14:25 34:8
MARGARITA 25:8
margin 174:3
MARICCO 19:24
mark 8:3,11 18:24 23:17
95:12 212:8
marked 43:14 203:19
204:3 219:11,13
markedly 64:7
market 20:20 21:4 26:17
56:21 118:5 174:7,8,9
186:24
marketing 96:5
marketplace 63:6
Marketplaces 207:2
Marsh 123:19
Martin 11:8 215:20
martinet 94:4
MARVIN 27:8
Maryland 123:19
Massena 80:13
master 105:9 117:10
122:17 127:22 143:21
144:2 146:14 222:6
MASTROMARCO 33:2
33:7
MASUMOTO 5:9
material 147:19
math 87:16
matrix 71:12
matter 1:6 42:5 43:6
98:11 102:2 117:15
188:22 194:24 212:14
216:23 221:6 222:19
224:7
matters 42:10,13 46:10
46:14 94:3,6,14 188:11
189:2 197:25 204:2
226:13

Matthew 5:17 13:7
29:19 32:9 134:23
MAUREEN 21:24
MAUTNER 7:7
maximize 137:7
Mayer 4:24 95:7,8 101:9
101:10,12,17,20,23,24
102:7 103:15 105:7
106:4,14,17,18,21,23
107:6 210:7,7
MCCUTCHEN 7:2
MCDONALD 33:10
MCNAMEE 33:18
MCRORY 20:8
mean 67:15 71:18 75:1
76:12 79:21 104:2,2
118:2 128:9 136:2
138:7 153:5 162:16
174:19 177:13 184:21
202:24 222:14 226:7
meaning 54:16 78:2
113:21 135:19 136:2
157:15 158:8 209:9
meaningless 127:1
means 50:6 53:9 113:22
115:16 118:3 128:20
170:19 174:12 180:15
233:25
meant 43:16 59:2 64:12
86:21 180:5,6 199:20
measured 125:3,12
mechanic 106:11 167:3
mechanics 228:19
mechanism 106:8
mechanisms 100:1
137:23
Medco 132:1
medical 102:4 150:10,23
169:24 170:16
Medicare 170:9,11
medium 50:13 188:19
meet 51:10 70:20 223:15
meeting 102:18 128:22
mega 193:23
MEHLSACK 13:17
meld 96:1
melting 55:23 186:14
member 112:7,17

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 87 of 273

Page 262

members 102:9,13 107:6
  109:3 112:15 169:20
  230:20
membership 142:19
  182:21
Memphis 123:20
Mennen 21:12 26:4
mention 50:16 233:18
mentioning 75:9 233:19
mere 92:4
merely 66:2
meritorious 168:4
merits 91:14 168:1,10
message 74:9 228:21
messes 60:24
Messina 114:9
met 73:15
Metal 80:13,13,17
methodology 118:5
MEYER 16:2
MI 3:18 12:6 21:15 24:7
  26:7 29:7 32:16 33:5
  33:13 34:6 38:15
Michael 18:17 19:24
  23:8 37:7 47:7 141:5
Michigan 21:10 26:2,3
  33:4 104:23,25 105:1,5
  171:10,14 202:2
  220:14,21 221:3,4,7,9
  221:12,14,23 222:13,21
  222:24
microphone 93:7
microphones 225:22
middle 169:16
mightily 172:18
migrate 162:22
Mike 221:3
milestone 141:11 163:13
Miller 3:8,14 34:2 39:3,7
  58:2,18 89:25 90:1
  97:6 109:15 113:11
  123:9 125:20 131:15
  132:10 133:15 134:15
  134:19 141:2 142:3
  145:7,8,9 150:16,18,21
  150:23 151:7 156:3
  158:20 159:19 162:9
  166:3,17 167:23 172:7

181:17,20,24 182:1
  184:3,17,20 185:6
  206:19
Miller's 58:4
million 50:13,14 64:20
  71:8 86:14,20,21 98:25
  108:9 110:8 119:9,12
  119:18,20 124:8
  144:15 150:4 154:7,15
  154:15,15 170:15
  172:12
millions 210:13
million-plus 154:9
mind 46:5 108:16 110:15
  134:6 144:11 152:11
  232:17
minds 128:22
Mineola 236:18
minimum 49:11 139:25
  195:12,13
minor 46:10
minute 116:19 134:21
  224:24
minutes 101:21 119:25
  120:1 224:8,10
Mirant 135:13
Mirax 141:17
misses 124:6
missing 160:2,2,3
misstated 107:7
mistaken 224:18
mistakes 203:24
misunderstanding 94:8
misunderstood 92:2
  94:24
mitigation 169:18
MITTENDORF 23:17
modification 68:9
  206:15
modifications 143:1
  154:1
modified 45:22 89:14
  153:23 200:1 227:13
modify 66:20 92:22
  227:19
modifying 46:17 90:15
Moers 4:24 101:24
Mohawk 33:19

moment 86:24 101:14
  104:13 105:17 120:21
  140:16 152:5 194:5
  204:14
momentarily 133:7
Monday 202:10,14
monetary 89:9 91:23,25
  92:15 135:18
money 70:24 83:22 84:4
  84:5,7,8,10 92:9
  113:13 117:24 118:11
  118:17 119:12,14,14
  129:14 136:1 154:17
  155:15 164:2 171:16
  174:12 177:21,24
  178:6 182:13 186:8
  210:12 233:5
monies 187:5,6
Monster 34:12
month 47:12 57:7,8
  170:16 172:13 174:1
  177:7 178:12 186:4,5
months 76:11
Montis 12:19
moot 222:15
Moraine 80:12
Morgan 23:19
morning 39:2,3,6 40:10
  42:11 43:10 44:15,18
  45:16 47:6,9 101:23
  102:19 112:4,24 113:4
  114:3 123:15 125:21
  132:25 171:9 198:22
  206:10 210:1 218:16
  225:13,22 229:12
  231:1,11 232:11
morning's 174:4
MORRIS 27:17 34:11
mortgaged 79:23,25
Motif 116:17,24,24
  117:3,7,9 119:4,25
  120:2,5,10,24 121:5,7
  121:10
motion 2:2,6 39:12,17
  76:6 102:8 122:7,7,8
  129:11,20 135:5
  140:24 159:8 172:8
  199:25 224:18,20

226:19,23 227:8
  228:13,18 235:5
motions 177:15
motivated 57:21
Motor 27:12 28:3 29:3
  29:14 34:3 95:23
  203:15 211:25
Motors 1:8 3:4,15 39:8
  39:23 56:23 76:10
  78:10 80:25 83:9,12
  84:9 85:15,15 86:3,3
  87:4,9 88:20,21 92:20
  97:16 98:3 137:20
  138:16 144:14,23
  149:6 170:11 203:12
  205:17 217:18,21
MOTT 36:11
mouth 94:17
movants 46:20
move 76:7,17 112:20,20
  177:2,6 204:25
moved 131:22 203:10,11
  203:12,14,16 204:17,18
  206:8,19 207:3
moves 177:15
moving 69:25 131:23
  152:24,25 179:17
MPA 191:3,11 216:7,11
  216:19
MSPA 136:11
Mt 22:11
Mullane 99:17,18
Multimatic 12:3
multiple 128:21 201:21
MURRAY 4:15 14:11
musical 63:9

—————————————
N

N 3:2 19:16 24:19 31:8
  34:8,17 39:1 235:1,3
  236:2
Naftalis 4:17 101:24
  230:5
name 91:4 93:13 104:13
  116:24,24 183:16
  187:12 210:17 220:20
  220:22
named 155:18 202:11

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 88 of 273

Page 263

names 175:9
narrative 105:10
narrow 90:25 106:6
narrowed 59:14
narrowing 151:3
narrowly 157:16
Nashville 27:6
nation 156:19
national 3:16 16:20 17:5
    112:5,16,16 114:10
    132:22
nationalization 74:2
nationalize 72:9
nationwide 156:20
nation's 74:10
nature 90:19 98:14
    105:18 121:25 182:6
    191:15 227:14
NCR 32:3
near 119:24
nearly 61:5
necessarily 133:10,12
    136:2 199:23 229:24
necessary 40:21 126:16
    137:2 160:12,16 171:6
    173:2 191:21 206:25
    209:19 221:12
necessity 159:14
need 42:4,6 48:11,12
    54:19,19 55:1,17 56:1
    56:11 60:13 63:10
    75:14 84:21 91:19
    92:11 93:7 101:12,16
    105:2 115:17,21 120:3
    127:1,2 129:2 131:22
    132:4 134:1,3 144:16
    157:20 184:25 188:17
    188:19,25 218:7
    220:17 222:24 223:19
    223:21,21 224:12
    231:20,20 232:23,25
    234:7
needed 49:11 103:7,11
    105:3 174:22 219:10
    233:19
needs 48:10 54:11 63:1
    64:8 76:25 82:2 87:13
    117:12 127:9 148:12

159:14 193:1 215:14
    234:2,15
negative 56:5 155:16
    173:17
neglected 107:6
negotiate 60:14 70:2
    88:23 146:13 155:12
negotiated 49:10,14
    70:23 107:7 151:21
    152:2
negotiating 49:4 105:19
    108:18 188:1
negotiation 83:5 152:1
    230:7
negotiations 49:5 72:18
    72:21 146:10 151:19
    169:23 182:7 188:2
    198:15 221:8 229:6
negotiators 49:2
neither 155:5
Nemours 10:14
network 66:9
NEUWIRTH 3:11
never 71:23 117:10
    118:11,14 130:13
    155:18 157:2 162:17
    177:20
new 1:3,16,16 3:6 4:6,20
    5:6,13,15 6:9 7:5,12
    8:6 9:7,16,23 11:4,6
    13:5,15 14:3,6,15,23
    16:6 18:6,15 19:14
    20:3,6 21:19 22:2,5
    23:6,13,22 26:12,13
    28:5 48:10,11,14 49:3
    49:4 52:17,19,21 53:19
    56:1,18 58:15 63:18,19
    63:24 67:18 71:24
    72:14,15,22 73:13
    76:22,23 86:3 89:18
    96:8 104:24 111:21
    113:5,12,16 114:8,9,20
    117:21 119:10 122:8
    122:18,21,25 123:3
    126:8,11 129:21 130:7
    130:20 135:12 137:3
    138:17 143:10,12,17,18
    143:24 149:8,8 152:6,6

152:21,21,21,24,25
    153:7 171:11,13,14,15
    172:16,17 173:4,16,21
    174:4 184:13 185:3,19
    186:9,10 187:11
    197:23 201:17 202:10
    206:1 211:3,24 218:15
    221:6 222:2 223:8
NEWBOLD 25:16
NewCo 136:10,19
    171:11 216:21
news 133:20
newspapers 99:12,14
NEYSA 35:8
NGMCO 221:13,19
NGMCO's 221:6,8
    222:4
nicely 113:11
night 89:20 101:14
    105:11,13 132:25
    198:19 202:14 225:14
nine 61:5 119:12,18
    123:17
nineteen 69:19
ninety 50:15 51:1 52:10
    54:8 56:8 58:19 64:2
    64:25 65:9,14 176:18
    177:3
nits 230:13
NJ 12:22 26:18
nobody's 187:1 213:2
nod 214:1
nodding 105:7
NOL 156:2
Nolan 89:13,22
nominated 230:21
non 123:10
nonassigned 216:8
nonassumed 216:4
nonbankruptcy 158:24
noncure 215:25
nondebtor 195:18 216:3
nonexclusive 54:20 78:8
nonobjecting 227:3
nonsale 179:18
non-approval 164:17
non-choice 62:19
non-cure 125:23

non-duplicative 121:25
Non-I 227:2
non-recourse 103:13
non-repetitive 123:12
non-resolved 125:23
non-UAW 227:1
noon 219:12
Normaji 116:24
normal 71:10 72:17
Normally 228:5
NORMAN 16:18
North 4:12 10:15 15:20
    21:4 24:4 33:4 80:15
    80:15
northern 114:11
Northwest 12:12 93:17
note 44:10 107:19
    119:20 139:18 145:18
    166:19 184:3 201:2
    203:8 211:13 217:13
    223:19,21 224:8
noted 96:20 159:22,24
    160:10 167:20
notes 76:21
notice 89:20 97:12 98:20
    98:21,22,23 99:4,7,12
    99:14,15,22 100:8,9,21
    166:6,20 203:24
    207:15,17 208:11
    212:2,3 228:6
noticed 209:9 226:21
notices 126:19
notify 106:12
notifying 207:17,19
notion 195:8 196:10
    198:4
notoriety 178:20
notwithstanding 110:24
    153:21 156:20 178:20
novel 171:20
nullify 115:12
number 39:22 41:1
    45:18 51:7,12,12 56:11
    64:23 85:4,5,11,12,19
    85:23 95:15 128:14
    170:17 193:24,25
    194:11 196:25 204:2
    204:13 219:23

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 89 of 273

Page 264

**numbers** 77:17 85:9,25
86:5 126:21,21,21
170:4
**numerator** 109:20
**NUMMI** 212:1,1,16,20
212:22
**NW** 16:21 17:7,16 18:21
19:21 24:14
**NY** 3:6 4:6,20 5:6,15 6:9
7:5,12 8:6 9:7,16,23
11:6 13:5,15,23 14:6
14:15,23 16:6,16 18:6
18:15 19:14 20:6 21:22
22:5 23:6,13,22 28:5
33:21 236:18
**N.A** 9:13
**N.V** 9:13
**N.W** 7:18 8:12 12:13
16:11
**N319** 16:15

**O**

**O** 1:22 26:9 39:1 236:2
**Obama's** 180:2
**obey** 66:13
**object** 76:1 83:24 84:1,1
89:25 108:22 209:12
213:13,18
**objected** 76:1 95:15
228:22
**objecting** 60:4 76:16,17
76:18 85:1 146:3
183:15 227:4,15
**objection** 39:12,17 44:19
45:1 76:13 83:8,15
84:6 86:25 87:24 88:13
93:19 95:10 102:8,11
102:12,15 105:24
106:18 108:24 111:25
112:10 113:8 116:11
117:8 123:10,21,23
124:2 125:24 126:1,7
126:13,14 128:25
129:3 130:24 136:4,5
136:13 148:14 192:7,9
192:11 193:12 196:5
205:25 206:5,20
207:18,18 208:1,7,12

210:6 213:10 214:17
215:25 216:1,13
218:15,19,24 219:8
220:9 221:5 228:7
**objections** 46:24 51:22
59:1 74:22 76:2 93:17
93:23 94:5 95:6 99:11
107:1,4 116:21 133:5
140:15 196:1 199:11
201:6,21 202:4,9,23
203:19 204:4,8,18,20
204:24 205:8,11
207:10 209:6,7 219:23
220:1,2,8 228:6
**objective** 50:23 153:16
154:12
**objectives** 53:2 157:21
160:24
**objector** 146:1 148:5,13
174:13,14
**objectors** 42:21 43:15,22
113:11,12 143:10
145:18,20 146:4,5,18
147:9,23 160:22
180:10
**obligated** 65:2,11
**obligation** 79:15,16
88:14 89:9,9 91:23,25
92:15 108:25 122:22
124:11 135:18 136:6
157:3 174:20 175:16
184:5
**obligations** 45:5,7,12
79:14 81:6 122:9,19,23
135:25 154:21 171:12
171:24 175:22 184:7,8
187:23 190:9 191:9
221:7 222:5 223:15
**observed** 222:8
**obtained** 203:5
**obviously** 83:1 87:1
106:10 115:21 153:18
172:15 194:14 198:2
217:21 233:20
**OBWC** 122:6,8,20 123:5
**occupy** 153:6
**occurred** 45:6 57:10
159:24

**occurs** 45:24
**Ocean** 15:20
**OEM** 173:22
**offense** 95:2
**offer** 59:17 60:1 122:12
169:7,8 179:5 190:5
218:14
**offered** 170:10 227:14,15
**offering** 49:20 59:15
180:21
**offers** 180:22,23
**office** 5:3,12 21:11,20
22:3 25:2,11 26:2,12
27:2,4,11 35:2,11,13
116:9 131:21 218:13
**officer** 153:23
**OFFICES** 15:18
**official** 4:18 101:25
112:7
**officio** 112:17
**oh** 35:16 42:1 79:20
84:21 95:10 167:21
176:17 189:23
**Ohio** 35:11,12 37:11
122:3,5,9,20,25 123:1,6
217:13
**okay** 40:8 41:14 42:7
44:1,14 45:14 46:22
65:16,22 69:17 74:19
75:6,15 78:7 79:6 90:2
93:2 95:5 101:20
106:16,20 107:5 112:3
113:3 116:3,6,14 121:9
123:7 125:7 129:4
132:8 134:5,14 136:18
136:21 145:4 181:25
185:5 188:25 189:10
189:13,23 190:21
191:23 192:1,10,25
200:4,16,21 205:13
206:6,7 209:20 211:2
213:4,21 214:2,4 215:6
215:8,18,22 216:14
217:5 218:6,10 219:1
219:18 220:3,10,25
223:25 224:11 226:6
227:25 228:19 229:2
231:9 232:5,7 233:5,12

234:1,10
**okays** 234:6
**old** 48:11,14 72:22 96:8
104:17,25 107:16
119:18,22 122:18,21,25
126:12 143:18 145:23
152:10,19,23 153:6
165:18 172:18 173:16
174:20 222:5 230:17
236:16
**OldCo** 136:9,16,17 165:5
165:8,18,20,23 170:14
171:8,8 172:4,6,14
183:1,4 184:21
**OLIVER** 15:18,24
**Omanna** 23:18
**ombudsman** 112:24
113:1 196:22
**ombudsman's** 196:13
**omissions** 203:25
**omitted** 107:8
**omnibus** 93:19
**once** 53:14 72:10 155:6
161:22 186:15 220:12
**onerous** 61:22
**ones** 76:9 198:19 205:12
219:13 232:25
**one's** 211:4
**ongoing** 106:6 146:22
172:21 195:4,17
197:16 204:24 221:6
221:16 223:14
**online** 201:23 219:12
**Ontario** 73:12 141:6
**OPEB** 169:16
**open** 64:6 176:24 204:10
**operate** 48:10 53:24
137:2 153:14 222:23
**operating** 13:11 117:24
**operation** 151:9 153:7
173:2
**operations** 56:19 117:16
117:19 151:2 169:19
172:21 174:13 221:14
**operative** 67:22
**opinion** 49:13,16,17
54:24 58:4 62:1 70:15
121:11 135:12 143:12

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 90 of 273

Page 265

150:19 151:20 156:12
157:10 176:14 180:25
**opinions** 145:15
**opponents** 44:1
**opportunity** 59:15,16
63:2 70:1 88:23 137:18
204:23 207:20
**oppose** 122:7 186:17
**opposed** 106:19 142:4
210:9
**opposition** 106:24
**oppressive** 72:20
**opted** 215:12
**optimistic** 199:1
**option** 58:14 62:4,10
147:18,20 179:8
**options** 53:17 62:2,9
65:24
**oral** 75:1 76:8 116:20
**orally** 75:3
**Orange** 10:15
**orchestra** 63:10
**order** 2:2 39:11,14,16
40:22 41:20 42:3 48:9
53:16 60:9 64:4 65:24
66:22 67:9 70:20 73:19
78:11 81:25 83:23 88:8
90:7,24 91:16 96:11,12
96:21 97:13,18 98:23
102:16 104:23 107:2
113:2,15,19 114:1,3,6
115:5,8,12 123:2
129:11,20 133:2,6
134:22 135:10 138:6
139:10,10 161:5,16,18
161:19 163:15 164:6
165:16 166:3,15
167:17 173:14 183:22
183:23 184:4,5 189:8
190:3 191:3,12 192:5,6
193:24 194:5 196:24
197:5,10,12,14 198:16
199:9,20,21,22 200:1,1
200:7,8 203:21 204:6
207:6,15,16 210:2
214:14,16,18,21,22,24
215:3 216:2,6,17,23,24
218:17 220:7 222:1,7,8

222:22 224:9,21,25
226:21 228:14,21,24
229:16 230:16 231:24
232:12,16,20 233:21,22
235:6
**ordered** 225:25 226:2
**orderly** 137:25
**orders** 114:13,21,21
160:12,17 234:13
**ordinary** 130:21 151:1
**original** 77:20 179:7
**originally** 106:24
**Orrick** 17:13 18:2 112:5
**Ottawa** 21:13 26:6
**ought** 156:23
**outcome** 110:20
**outlined** 112:1
**outlines** 104:19
**outset** 65:10 109:23
**outside** 53:3 71:13
150:25 151:1 162:19
**outstanding** 206:3
**overall** 57:4 68:2 72:18
196:4,6
**overarching** 145:10,17
**overbearing** 60:11 73:19
73:21
**overborne** 60:15
**overly** 114:1
**overreach** 60:12
**overrides** 91:16
**overriding** 63:21 127:4
**overruled** 99:11
**oversight** 93:19
**overturn** 199:5,15
**owe** 92:17
**owed** 85:24 87:10 122:25
191:9
**owee** 174:9
**owned** 179:22 185:16
**owner** 49:4 63:19
**ownership** 73:10
**owning** 213:9
**O'DORISIO** 20:10

---

**P**

**P** 3:2,2 18:17 20:8 39:1
221:1

**PA** 15:5 20:22 22:12
32:7 36:6 37:5
**pace** 186:2
**PACFILLA** 25:8
**Pacific** 11:3 215:21,23
**pack** 89:14
**package** 68:21 196:4
**Packard** 28:11 204:17
**packs** 51:8
**Paddock** 112:7
**PADOCK** 34:2
**page** 77:5,16 78:14,19,23
85:3,6 86:7 90:12 99:9
133:24 135:13 142:18
142:19 143:2,6 169:11
169:12,14 203:9,10,10
203:13,14,15,16 204:15
204:17 235:4
**pages** 202:23
**pagination** 77:19,20
78:15
**paid** 86:9 87:13 129:24
130:4,6 179:19 197:4,8
197:16,18
**Pair** 158:13
**palatable** 178:18
**pale** 95:20
**paper** 211:8 225:18
234:2
**papers** 75:2,4 106:24
107:3 108:12 109:5,7
115:25 116:23 123:25
133:17 134:7 140:2
168:24 218:20
**par** 120:22 121:16
**paragraph** 56:15 78:5
114:2 143:12 184:4
190:15,22 191:1 222:2
222:3,8,16 223:3,9
**paragraphs** 189:24
190:2,23
**Paramus** 12:22
**paraphrase** 146:9
216:23
**paraphrasing** 216:19
**parcel** 143:7
**Pardon** 81:22 121:5
**Park** 7:4 8:4 13:4,21

14:5 23:12 36:4,13
**Parker** 15:18,24 42:20
43:3 46:20 74:15,16,19
75:6,9,11,15,19 77:19
77:23 78:4 79:1,3,6
81:11,15,22,24 82:23
83:1 108:10 110:17
117:5 120:23 181:4,6,8
182:4,16 188:3
**Parker's** 42:17 77:1
**part** 63:11,11 64:24 68:4
93:18 104:6 108:18
114:11 119:18 143:1,6
153:16 158:22 163:16
166:25 167:2 175:5
185:14 186:9 196:2,2,3
196:8 212:20 218:16
218:21,22
**parte** 106:11
**partially** 93:22 120:14
120:15 185:16
**partic** 70:4
**participate** 72:17
**participation** 119:7
190:4,6,8,11 191:20
213:12
**particular** 42:15 65:6
67:7 107:1 109:6,13
118:17 129:17 142:3
148:12 155:19
**particularly** 42:21 55:17
55:19 71:21 98:8
132:17 155:5 232:9
**parties** 40:4 41:6 44:22
56:10 61:17 63:16
64:24 70:1 71:22 72:23
73:2,5,12 90:18,19
91:2 104:11 106:7
107:20 109:6 125:9
128:19 153:9,10
155:11 156:13 176:11
176:18 180:13 195:18
199:14 202:3,5,8
203:23 204:11,23
207:5,12,17 212:7
214:23 215:3,16 216:4
221:18 225:12,17
227:16 231:7 232:4

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 91 of 273

Page 266

parties-in 138:2
parties-in-interest 72:20
  226:8
partly 75:25
partner 102:3
partners 31:13 102:21
  149:22
Partnership 203:9
parts 178:24 218:15
party 28:3 33:3 54:10
  61:15 108:19 125:10
  128:20,21 178:24,25
  192:7
party-in 160:14
party-in-interest 81:13
passed 228:6 233:19
passing 129:14
pat 95:17
PATRICK 4:8
Patton 18:11,19 19:2
  47:7
Paul 19:11 108:5 109:4
  229:19 233:14,20
Pause 50:9,25 65:5 67:13
  69:17 89:24 101:11
  116:7 127:13 216:14
  225:20
pay 45:7 86:14 87:11
  92:9 129:15 130:20
  136:1,8 154:19 158:12
  183:12 231:13
paychecks 172:20
paying 85:8,14,17 86:13
  116:25 130:7 170:15
  231:15
payment 86:23 103:11
  122:23
payments 213:19
PAYNE 22:9,14
PC 14:11 20:10 33:18
  80:16
PDC 80:15,15,17
Penina 89:17 236:12
Pennsylvania 155:7
pension 19:19 23:11
  168:2 182:12
people 41:7 46:9,18
  51:13 62:22 107:7

109:17 114:20 125:1
  126:23 133:22 134:12
  152:23 168:16 177:14
  180:6 188:18 194:23
  194:25 198:12 201:2,3
  209:18,21 231:13
  232:25
PEPPER 36:2
perceive 146:4
percent 71:7,8 87:14
  108:6 151:24 165:11
  174:1 186:5,6 194:23
  194:25
perception 125:11
  130:16
PERDUE 36:11
perfect 78:11 81:16 95:2
  157:22 194:14
perfects 181:15
perform 67:17
performance 57:4,7
  75:24,25 122:23 191:9
peril 157:13
period 39:25 40:2 50:15
  51:15 55:25 57:5 98:9
  99:1 103:23,24 104:3,4
  104:7 179:21 186:6
  194:12 201:19
periods 45:10 103:23
  104:6
perishability 56:20
perishable 59:17
permanent 104:16
permeated 149:19
permissible 139:22
permit 48:3 128:6 223:6
permits 40:2
permitted 72:12 95:21
person 80:1 104:14
  180:21 188:19 223:23
  223:23 233:16,17
personal 78:6 166:6
personally 86:18
personalty 78:8,9
persons 155:8 164:3
perspective 59:21 115:18
  115:19 149:1 232:5
persuasive 164:25

pertaining 55:10
pertinent 217:22
Peter 7:21 221:1
PETERS 30:2
petition 45:7 150:5
PGW 30:3
ph 80:14,15 135:12
  183:12 207:2
phase 172:14 203:12,13
Philadelphia 15:5 20:22
  32:7
PHILIP 23:15
Phillips 102:20
phone 127:14
phrase 117:11,16
phrased 194:6
pick 87:17 104:15
  127:14 171:11
picked 88:17 196:11
  197:13
PICKERING 23:10
picking 88:15 127:21
pie 109:16,17,24 148:11
piece 67:14 195:16 197:1
  198:2
pieces 137:2 196:6,25
Pierburg 206:8
piercing 156:20
pink 43:23
PIPER 11:10 28:10
Pitt 80:15
Pittsburg 80:13
Pittsburgh 22:12
place 13:21 14:13 50:20
  50:20 51:19 52:19
  114:12 137:13 138:6
  144:22
places 82:11,12
plain 157:15 158:8
plainly 138:12
Plaintiffs 16:3
plaintiff's 91:12,14
  163:4
plan 49:23,24 50:4,7,18
  50:19,22 51:2,19 52:4
  52:25 53:6,10,20 54:4
  58:11,12,12,16 59:3,4,9
  69:4,7,11,16 71:4,6,12

71:13,14,15,16,16,19
  73:6,19 82:17,19 88:24
  95:16 104:4,5,8,17
  111:4,5,8 126:5 127:7
  129:8,13 137:10,22
  145:24 151:1 165:6,19
  167:2 176:22,23,24
  177:8 178:5 180:4,16
  185:14
plane 189:16
planned 111:1
planning 134:10
plans 50:17 51:4 52:12
  58:22 138:17 182:13
plant 79:12 206:22
  217:13
Planter's 158:1
plants 80:18 173:2
  184:13,21
Plastic 23:18
play 69:4 147:9 170:4
  174:16 178:7 229:6
played 157:23
player 165:12
Plaza 9:6
plc 9:14
plea 171:19
pleading 74:25
please 39:5 50:9 65:5
  67:13 69:5,17 81:23
  89:24 93:8 111:17
  127:13 206:6 211:22
  216:14 220:23
pleased 39:15 102:1,17
plenty 40:18
PLIFKA 22:16
PLLC 12:2 38:11
plugged 53:14
plugging 75:4
plus 87:7 110:9 111:10
  119:19,20 183:5
PM 234:19
point 58:4,6 61:9,18
  68:19 69:18 71:20 76:7
  79:7 81:5 83:8 84:19
  84:21 88:3 90:9 94:16
  97:9 100:7,19 101:5
  106:16 115:23 119:5

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 92 of 273

Page 267

120:23,25 123:24
124:6,12 125:14
133:25 134:13 135:12
141:7 142:3 143:13
147:20 162:3 163:10
169:17 170:11 183:21
188:23 194:10 197:7
197:20 198:24 199:3
200:15 216:18 224:7
**pointed** 97:6 144:24
146:18 148:25 166:5
185:22
**points** 64:6 74:22,23
75:7,21,21 95:14,22
117:5 119:3 120:11
124:1 129:4 131:4
134:11
**poker** 174:16
**police** 113:15,24 114:6
115:6,13 183:24
**policies** 157:22 160:22
**politically** 64:18
**POLK** 28:2
**Pollack** 234:14
**Pontiac** 80:15,15
**poof** 59:8
**population** 169:19,21
**portion** 137:20 147:12
187:6 193:20 218:19
218:24
**posited** 155:10
**position** 60:14 71:22
100:14 102:12 105:25
127:4 133:5,10,23
141:4 149:2 155:17
164:13 180:22 182:20
183:7 199:5 215:5
229:16
**Posner** 155:2,4,18 156:9
156:11,14,21,23
**possibility** 50:1 53:19
62:14 147:14 177:18
**possible** 44:13 47:1
84:20 101:15 106:7
112:21 137:3,14,17
225:24
**post** 40:2
**post-Chapter** 178:21

**post-closing** 109:19
195:18
**post-consummation**
104:17
**post-petition** 130:13
151:8 201:18
**post-sixty-five** 170:8
**potential** 49:25 62:15
96:9 98:14,19 99:2,10
109:22 147:15 149:8
154:6 165:22 171:9
184:24 185:24
**potentially** 92:21 105:6
108:23 110:19
**pound** 147:24
**power** 48:17 59:20 61:23
62:18,21 66:16 74:3,4
156:6 160:11,23 161:4
161:21 164:20 183:24
201:15
**powerful** 64:2 73:25
74:9
**powers** 97:24 101:7
113:15,24 115:6
158:23 160:4 164:20
193:20
**practical** 41:5
**practice** 149:19
**Pratt** 206:19
**pre** 45:6 51:7 150:4
151:8
**preceded** 65:16
**precedent** 156:16 164:6
**preceding** 190:23
**precise** 103:25
**precisely** 159:1
**preclude** 160:15
**predecessor** 75:15
**predecessors** 93:11
146:19
**predetermine** 71:6
**predetermining** 71:14
71:15
**predicted** 56:8,25
**predictions** 56:12 57:2
**prefer** 85:12
**preferable** 199:12,13
**preferences** 158:24

**preferred** 86:5
**prejudge** 224:20
**prejudice** 102:12 136:15
**prejudiced** 147:8
**premises** 44:21
**prepare** 76:6,11 176:1
**prepared** 58:20 102:7
103:21 111:24 116:13
192:3,8 216:12 222:25
231:23
**prepetition** 69:9
**prerogative** 73:14
**present** 41:3,19 46:24
53:18 58:14 64:13
73:13 96:11 98:6
128:25 129:2 130:23
158:4
**presentation** 110:24
**presentations** 175:19
**presented** 40:12 50:5
53:9 99:19 108:17,21
140:23 143:14,16
148:7 222:1
**presently** 98:13 99:3
227:4
**preservation** 146:20
**preserve** 54:19 55:17
74:23 108:14 110:22
174:22 207:8
**preserving** 62:6
**president** 55:2 180:1,5
200:14
**presidential** 200:12
**press** 65:13
**pressure** 66:18
**pressures** 62:25
**presumably** 69:4
**presume** 56:7
**pretext** 73:6
**pretty** 154:15 167:11
196:18 232:18
**prevent** 160:18
**preventing** 222:9
**previously** 82:18 85:25
103:5,9 105:20
**pre-bankruptcy** 55:25
**pre-Chapter** 178:21
**pre-closing** 45:6,10

**pre-nego** 52:12
**pre-negotiated** 50:17,19
50:22 51:2,4,5,19
52:12 58:12,22
**pre-packs** 50:17 52:11
58:22
**pre-petition** 45:10 63:25
69:19,24 70:3 119:9
130:13 149:16,17
201:18
**price** 23:2 49:9 70:20
71:1 85:1,15 87:24
119:15,19 124:10,13,22
141:5 151:13 179:19
191:9
**primarily** 102:20
**primary** 74:4
**prime** 205:18
**principal** 47:8 49:2,3
63:16 103:19 107:14
161:11 166:16 232:25
**principals** 118:4 160:9
**principle** 104:5 154:25
171:4 220:15 229:10
**principles** 55:4 72:8
136:24 139:25 148:5
**printed** 155:14
**prior** 44:21 45:24 129:23
130:8
**priorities** 114:10
**priority** 70:3 123:18
**privacy** 112:24 113:1
196:12,13,13,22
**private** 178:22
**privilege** 193:6
**pro** 15:19 87:5
**proactively** 202:3
**probability** 146:23 168:3
**probable** 168:5 201:14
**probably** 125:9 134:10
143:11 195:1
**probl** 84:15
**problem** 41:5 86:10
98:18 121:2,15 127:19
128:3,14,24 130:25
144:23 166:18 177:12
185:3 208:21 209:1
214:3,20 219:14

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 93 of 273

Page 268

225:22 229:24
**problematic** 132:3
**problems** 45:14 84:15
126:18 172:18 184:14
193:23,24
**procedure** 82:16 84:2
87:20 208:10 215:11
215:12,13
**procedures** 138:1
**proceed** 39:14 62:20
120:3
**proceeding** 55:10 81:2
84:16,25 88:6 91:22
100:9,10 104:1 137:5,7
145:1 149:3 152:3
177:16 185:7
**proceedings** 91:8 94:24
98:23 137:12 138:12
140:18 148:2 160:10
165:17 176:5,16
234:19 236:5
**proceeds** 61:3 84:25
103:5,8 110:9
**process** 44:11 45:21 50:4
53:20 57:18 58:1,11,12
58:19 59:3 60:9 63:22
69:4,7 71:13,15 72:17
72:24 73:6 74:11 76:1
76:2,4 97:13 98:19
100:1,21 106:6 110:13
110:14 111:2,4,5,8
123:22 130:3 131:23
133:3 137:25 160:12
160:18 174:10 176:17
177:20 178:4 179:9
188:4 194:21 201:10
201:16,17 207:7,10
208:2,4,8 222:24
**processed** 129:23
**processes** 100:19
**produce** 178:2
**produced** 70:15 181:9
**product** 10:3 17:3 98:8
149:13 190:7 194:13
230:7
**products** 30:3 56:16,23
96:4 141:18
**professional** 72:1

**professionals** 175:17
**proffered** 187:17,18
**progeny** 48:21 186:12
**program** 83:11 172:10
175:8
**programmed** 178:14
**progress** 202:15,17
203:7 225:11
**progresses** 137:22
**Progressive** 23:19
203:13
**prohibited** 81:17
**projected** 98:25
**projections** 186:4
**prolonged** 57:23,24
**promised** 221:7
**prompt** 164:5
**pronounce** 80:16
**pronouncements** 65:1,9
**pronouncing** 91:5
**proof** 124:8,15
**proofs** 125:1
**proper** 55:2 166:14
198:10
**properties** 78:12 82:6
120:15 174:22
**property** 42:23 78:6,22
78:24 79:10,11,15,18
79:19 80:6,8 95:19,21
97:20,22 113:21
117:23 120:18,19
121:18,19 124:11
149:25 167:1
**prophecy** 57:3
**proposal** 115:17 173:13
230:18 231:18
**proposals** 119:8 232:11
**propose** 203:25 207:15
219:24
**proposed** 47:25 62:10
84:2,16 85:7 99:12
111:21 113:14 129:20
170:9 184:4 189:7,8
190:3 192:6 210:1
214:22 222:1,8 223:6
224:25 228:14,21
229:16 230:20 234:13
**proposing** 192:15

**proposition** 54:25
148:18,18,19 171:25
**propriety** 54:21
**prosecute** 158:23
**prosecuting** 159:11
**prospect** 168:7
**prospectus** 77:2,4,6,8,9
**protect** 54:20 108:15
110:22 113:19 114:19
115:5 164:2 174:22
177:24 187:5 191:13
**protected** 40:5 53:1
113:25
**protection** 26:14 72:20
96:14 135:2 150:20
155:10 156:2 205:9
209:13
**protections** 47:18 59:9
97:4 100:22 101:3,3,6
161:15
**protects** 192:23 217:1
**protestations** 49:4
**prove** 61:14 82:1
**proves** 231:14
**provide** 42:18 44:13 72:3
72:4 78:11 90:6 92:23
97:17,23 99:14 100:1
100:20 115:11 122:22
122:22 123:4 132:1,4
135:4 138:1 167:3
187:15 204:1 205:20
227:10
**provided** 42:20 43:14
44:3 67:8 76:9 97:2,4
100:1 103:1 131:19
140:17 143:11 151:8
169:24 191:11 203:20
222:17,18
**provides** 76:22 78:8,10
98:4 100:22 126:3
161:5 175:20 215:23
**providing** 54:2 73:12
160:14
**provision** 42:21 76:24
77:7 122:21 155:12
160:20 167:17,18
181:22 190:8 197:11
222:7,11,20,21

**provisions** 42:14 48:12
60:17,20 61:11,22
71:17 72:13 114:1
139:17 160:13,13
189:8 190:10 191:3,12
194:1 195:6 216:11
229:11 233:9
**Przekop-Shaw** 220:19
220:20,24,24 221:1
222:16 223:13 224:3
**public** 17:2,6 52:19
53:25 54:6 56:9 64:1
65:14 101:14 113:20
179:11
**publication** 99:4,14,22
104:6
**publicly** 179:22
**published** 99:12
**PUDLIN** 32:2
**pulled** 212:10
**pulling** 193:13
**punishable** 92:21
**purchase** 60:17,17 83:9
84:4,5 87:24 105:9
117:10 119:15,19
122:18 124:10,13,22
136:25 139:2 143:21
144:3 146:15 148:23
149:5 150:3 154:12
179:19 191:9 222:6
**Purchased** 191:8,16
**purchaser** 46:1 48:20,23
48:25 53:22 54:11
61:13 63:2,3 64:3 68:8
73:9 83:3,4 139:13
146:7,11 148:24
149:10,16 150:6
151:11 152:11,16
153:13 154:10,14,18
162:21 172:24 173:3,9
173:15 179:6 180:2,23
182:4 183:1 184:11
186:9 187:2,4,25 190:9
190:24 191:8,13
192:13 196:24 201:14
201:19 210:17 220:8
**purchasers** 61:25 73:20
146:12 184:6

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 94 of 273

Page 269

**purchaser's** 73:16
**purchasing** 48:6 137:1,2
205:17
**pure** 57:19 159:6
**purported** 181:1
**purpose** 75:1 86:24
160:6 188:15 216:6
**purposes** 50:8 136:3
137:15 139:20 160:24
179:2 182:13
**pursuant** 2:2,6 52:25
115:5 122:17 145:23
226:21
**pursued** 57:12 221:9
**pursuing** 214:17
**push** 60:19 62:22 63:20
73:17 212:6
**pushed** 61:11
**put** 43:12,23 50:12,22
69:10 101:14 120:17
120:19,21 121:14
131:21 144:22 176:5
177:24 178:6 188:17
189:1 206:13 209:3,7
210:14 231:7
**putting** 43:7 88:13
121:23 167:5 233:5
**P.C** 13:10 16:2 20:2
22:16 23:2 24:3 31:12
37:2 38:2
**P.L.C** 34:2
**p.m** 188:24,24
**P.O** 6:16 25:5 27:5

**Q**
**quacks** 96:24
**qualified** 151:11
**qualify** 158:10
**quarter** 77:3
**question** 42:16,17 43:1
47:14 55:16,16 59:20
64:6 68:22 83:19 86:19
89:21 92:2,3,11 99:20
101:1 121:10 130:7
131:1 132:17 135:14
135:15
**questioning** 43:8 68:20
**questions** 64:10 67:12

69:7,11 98:22 105:21
115:25 134:24 135:3,5
148:5 194:7 231:24
**quibbling** 85:16
**quick** 40:15 47:19
186:22 207:10
**quickly** 44:7 52:17 54:2
56:1 57:18 62:9 84:20
112:20 135:4 144:16
232:16
**Quigley** 213:7,8,17 214:6
214:7
**quintessentially** 205:11
**quite** 69:25 85:19 104:15
181:11
**quote** 54:25 55:7 62:5
**quoted** 55:3 65:10
**quoting** 156:14

**R**
**R** 1:22 3:2,8 4:15 13:25
21:17 29:9 30:8 39:1
235:3 236:2
**RACHEL** 26:20
**Radner** 149:20
**rail** 215:23
**Railroad** 11:3
**raise** 83:20 123:24 205:9
**raised** 44:20 45:1 62:4
69:11,14 74:22 92:3
120:5 134:12 136:4
141:8 166:12 173:24
182:10,12 189:9
194:17 198:4 217:24
**raises** 46:11 164:9
**raising** 92:3 136:16
160:14 166:5
**Raleigh** 43:12,24
**Randolph** 25:13
**range** 50:14 85:10 126:3
**rapid** 186:2
**rapidly** 50:18
**Rapids** 80:13
**RAPISARDI** 7:14
**rarely** 162:2
**ratable** 48:1,15 81:10
181:7
**ratably** 87:25

**rates** 154:3
**ratification** 142:17 143:3
143:3 153:23,25
**rational** 147:25
**rationale** 148:6,8
**rationalization** 182:19
**RAVIN** 12:18
**RBS** 9:13 206:24 217:10
217:17
**reach** 70:24 105:14,16
105:19 205:2
**reached** 99:5 116:12
122:10 189:6 198:15
199:22 223:9
**reaching** 168:5 202:3
**react** 64:17
**read** 40:19 67:23 68:19
76:25 117:17 121:2,4,6
121:10 147:12,13,13
158:6 174:4 189:21
195:15 196:13 232:17
**reading** 46:5 77:25
139:15
**reads** 122:8,20
**ready** 104:6 119:4 123:9
125:19 232:16
**real** 45:8 48:24 49:6,14
53:22 59:24 60:15 63:3
70:1,22 78:6 79:23,25
83:3,4,4,5 87:5,9
154:17 179:18
**reality** 118:12 194:24
**realize** 79:8 81:3 83:19
86:11 133:6
**realized** 121:2 219:9
**reallocation** 70:19
**really** 41:23 46:11 58:5
68:9 117:11 124:2
138:7 156:8,23 169:13
173:25 178:23 179:11
195:2 216:18 221:23
231:12
**Realty** 206:9
**reason** 40:14 57:16
88:10 105:16 118:25
150:24 187:21 199:7
213:23 214:14
**reasonable** 48:20 99:21

151:13 157:20 168:3
187:22 203:4 207:9
**reasonableness** 173:4
**reasonably** 100:15 199:1
**reasoning** 156:14 157:9
**reasons** 66:12,13 74:20
88:18 91:1 118:18
138:16 139:9 140:22
145:2 151:13 162:1
182:20 193:20 198:14
**reasserted** 183:4
**REATH** 12:10
**rebuttal** 123:25 133:12
**recall** 89:7 166:20 180:1
185:11 205:15
**receivables** 216:7,20
**receive** 145:22 148:22
153:15 160:6
**received** 126:24 131:16
143:18 207:24 212:2
224:8
**receiving** 47:23 143:17
172:9
**receptive** 155:23
**recess** 41:24 101:17,19
101:22 188:23,24
229:22
**recharacterization**
69:18 119:2 150:7
**recharacterized** 69:21
69:23
**reciting** 54:23
**recognize** 48:13 86:8
198:11
**recognized** 98:24 160:1
160:8
**recognizes** 74:7 146:1
**recognizing** 98:18
159:14
**recom** 198:17
**recommendation** 112:23
133:14
**recommendations** 113:1
**recommended** 198:17
**recommends** 196:18
**reconcile** 207:11 208:9,9
**reconciliation** 201:17
203:1,2

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 95 of 273

Page 270

reconstitute 148:9
record 42:13 44:25
    45:11,13 49:1 51:12,14
    52:9 53:25 58:3,21
    67:2,24 68:1 101:14
    112:9 116:8,13 121:24
    122:12 124:24 133:6
    136:12 141:5 144:7
    145:11,14,16 148:1,11
    149:10,13 151:18
    153:8,21 164:14 169:2
    169:5,13 170:21
    174:25 175:13 176:2,4
    176:8 180:8,18 181:9
    182:5,6,19 185:7,25
    188:18 189:2,22
    193:10 195:15 201:2
    202:24 203:8 206:13
    209:3,8 215:11 217:13
    219:22 222:11,25
    228:9 236:5
records 67:1 76:15
recoupment 216:3,9
recover 158:24 187:6
recoverable 145:23
recoveries 137:7 138:2
    153:15 173:8 177:10
    177:10
recovery 62:15 83:11
    108:24 111:6,6,9
    137:14 146:2 147:16
    148:22 167:7
redo 85:11
refer 84:22 115:3 167:24
    176:15 177:5 183:11
    196:10
reference 63:5 65:6
    75:12 129:10 139:14
    145:14 162:6
references 145:16 176:3
referred 98:17 147:11
    161:22 162:10 163:10
    185:9 211:25
referring 59:1 85:2
    168:23 200:6
refers 78:16 84:24 165:6
    169:12 177:20
reflect 207:5 222:7 228:9

reflected 55:14 90:20
reflecting 228:25
reflects 91:2 159:13
refusal 92:19
refused 62:11 63:13
regard 39:12 88:4,5
    117:20 120:19 121:11
    121:17,18 138:17
    223:13
regarding 200:18
regardless 67:23 130:21
regards 138:15 221:10
    222:21 223:14
regenerate 170:24
Regis 33:19
regulate 190:24 192:13
    223:8
regulations 122:20,24
    123:6
regulatory 113:15,24
    114:6 115:6,13 192:16
    192:23 222:10,23
    223:11,14
rehash 95:12
Reinsel 8:16 95:11,11
    98:2 183:15
reiterated 164:13
reiterates 145:20
reject 40:1,4 88:19 172:2
rejected 69:15 71:4
    135:8,11 150:14
    151:21
rejection 195:8
rejects 141:16
relate 45:6,9 206:22
related 47:13 66:16
    105:9 144:4 166:22
    184:23 191:11 201:7
    209:6 216:8,20
relates 142:4 175:5
    226:19
relating 126:20 143:5
relationships 153:8
relative 135:10 174:5
relatively 46:10 169:20
    186:22
release 115:12
releasing 86:20,22

relevant 42:18 90:12
    96:16 101:3 104:23
    137:16 162:3
Reliability 17:5
reliable 178:3
reliance 220:9
relied 95:24
relief 97:8,10,12,14
    114:22 131:2 140:1
    228:13
reluctant 169:18
rely 57:3 124:12,20
    146:2 156:13 175:16
    216:22
relying 77:11 156:12
rem 162:14
remain 44:21 107:16
    137:12,24
remainder 125:4,12
remaining 88:14 129:4
    203:19
remains 106:25 198:9
    214:16
remarkably 135:21
remarks 132:18 134:20
remedies 160:4
remember 70:22
remiss 175:15
removal 100:24
removes 71:12
rendered 150:13
reorganization 72:24
    73:2 104:8,18 164:22
    165:7 177:9 185:15
reorganizations 72:16
    155:23 156:1 157:18
reorganize 88:20
repayment 103:5,9
repeat 65:5,7 75:2 76:25
    83:14 84:16
repeated 120:22 173:10
repeatedly 63:22
repeating 180:8
repetitive 123:11
Repko 58:15
replete 144:7 182:19
replied 155:16
reply 46:20 124:1 132:9

202:7 219:24
report 76:15 102:1,17
    112:24 133:20 196:14
    196:15,17,18 218:12
reported 106:13
reporting 133:23
represent 40:25 100:15
    107:10,11 111:4 112:5
    112:7 113:6 115:24
    140:19 166:10 212:16
    212:18,19
representation 175:1,2
    221:20 228:22 232:24
    234:5
representations 110:7
    231:11
representative 100:2,5
    146:24 227:11
Representatives 22:10
represented 40:13 108:5
    147:5 169:20 214:16
representing 100:10,11
    100:12 135:1 148:15
    212:14 229:20
represents 108:6,8,16
    164:2 221:3
repute 152:23
request 131:1 198:20,21
    204:6 226:6
requested 92:24 95:16
    131:22,24 132:2
    161:18 165:16 166:4
requests 151:20
require 48:13 133:12
    138:23 157:19 196:20
    207:23
required 49:8 54:3 61:12
    92:9 97:13 122:25
    154:11 157:11 194:22
requirement 100:18
    123:4 172:1,3
requirements 73:19 97:5
    97:11,13 123:3 157:21
    223:16
requires 143:22,23
    153:18 224:23
rescinded 66:22 67:10
    154:2

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 96 of 273

Page 271

**rescue** 47:15,19,21,25
49:22 72:7
**research** 58:21 150:9
**reservation** 112:2,10
201:9 213:24 214:5
218:14
**reservations** 111:12
**reserve** 110:11 133:9
209:11,12 213:20
214:17
**reserves** 105:8 209:10
**resist** 74:2
**resistance** 56:22
**resisted** 169:17,25
**RESNICK** 28:7
**resolicited** 177:8
**resolution** 39:16 105:15
129:1,1,2 133:3 193:11
203:4,5 207:7 208:2
212:17 220:14 230:12
**resolutions** 45:18
**resolvable** 128:23
**resolve** 93:22 123:23
191:10,16 204:8,21,22
212:15 221:6
**resolved** 93:22 112:13
127:18 133:17 203:2
**resolves** 220:8
**resolving** 39:11,17
195:25 221:10
**resort** 48:4
**resources** 51:18 58:24
**respect** 42:16 43:11,12
71:22 91:10 99:10
103:22 105:9 114:22
131:17 138:2 141:8
151:22 155:4 156:15
164:8,12 173:7 181:4,7
181:10 183:16 191:16
193:25 194:20 195:8
199:18 201:20 202:9
206:17 209:14 217:25
219:7,10 222:19 223:3
229:7
**respects** 90:18 191:6
193:25 228:15
**respond** 51:17 131:8
**response** 49:17 52:15

76:6 89:20 124:13
220:12 228:9
**responsibilities** 146:17
**responsibility** 104:25
105:1 130:7 181:2
**responsible** 129:21
162:22 184:14
**rest** 46:20 76:19 83:14
115:25 199:2
**resting** 116:22
**restructure** 54:13
**restructuring** 47:16,18
48:13 49:23 50:3,6,18
53:10,12,15,23,25 59:8
63:8
**result** 56:20 68:24 75:25
79:14 91:15 146:2
149:5 157:24 159:8
168:9
**resulted** 173:13
**resulting** 62:15 147:16
**results** 72:19,20 174:22
**resumed** 102:19
**retain** 52:22 191:18
**retained** 191:13
**retaining** 191:7
**retains** 184:21 191:2
**rethink** 155:17
**retiree** 62:7 144:5
151:23 154:9 169:18
170:6,9,13,16 227:12
227:13,24
**retirees** 147:5 169:1,9
170:5,8,12,19,20 171:3
172:9 178:9,10 227:7
**Reuters** 156:10
**revenue** 27:3 56:20
**reversed** 91:7 159:5
185:12
**review** 110:11
**reviewed** 109:5 132:2
216:17,25
**reviewing** 159:24 216:11
**revise** 225:11
**revised** 220:16 224:25
**revolving** 149:25
**rewrite** 136:11
**Ricercke** 18:3

**Richard** 17:19 21:8
26:15
**Richman** 18:17 46:19
47:4,6,7 50:9,16 51:16
60:21 61:8 65:8,18,21
65:23 67:20 68:16,22
69:6,24 70:11,13 74:14
74:16,17 75:18,19
82:25 83:1,3 108:7
110:16 117:5 138:6,18
142:6 147:11 164:9
173:24 175:25 177:20
179:24 185:9 186:2
**Richman's** 110:24 142:4
153:21 175:25 176:3
180:17,24
**riders** 127:6
**Rifkind** 19:11 233:14
**right** 39:9 41:22 47:4,11
48:7 52:6 67:14 68:20
72:14 74:15 75:8,19
87:7 89:4,24 90:16,17
93:4 98:2 105:5,23
114:6 121:19 123:9,14
125:19 127:22 128:1,8
132:8 133:9 135:23
136:21 141:16 149:7
152:11 155:9 157:7
161:24 162:1 163:10
163:17 170:12 172:8
186:12 188:8,8 190:1
190:14,15 191:24,25
192:18 196:3,17
197:19,21 199:16
200:24 209:11,12
213:6 214:17 215:18
217:2 219:19 220:12
224:2,15 226:12 228:3
229:8 230:19 232:13
233:4 234:12
**rightfully** 72:14
**rights** 40:4 47:17 49:25
51:23 52:5 53:1 54:20
59:9 69:12 74:11 91:12
98:24 99:24 105:8
110:11 112:2,10 134:3
141:10 146:25 166:25
184:8 201:9 207:8

209:10 213:20,24
214:5 216:3,9 217:1
218:14 233:8
**right-hand** 77:17 78:15
**RIOPELLE** 29:19
**rise** 42:24 49:25 80:1
91:22 141:13 163:18
171:2
**rising** 94:13 131:7 174:7
**risk** 46:11 111:9 138:21
146:23 148:2 162:5
**risking** 147:15,21
**risky** 138:19
**RITA** 8:8
**Road** 32:14 36:5 38:4
236:16
**Roanoke** 44:17
**Robert** 1:23 3:20 4:25
14:9 18:8 30:17 39:6
40:10 44:15
**ROBINSON** 20:2,10
**Rochnunis** 183:12
**Roger** 17:20 112:4
**Rogoff** 41:1,12
**role** 108:23 146:15,16
153:5,5 157:22
**roll** 110:19
**rolling** 60:23
**romanette** 79:4 81:13
181:18,21
**Ron** 27:18 95:11 158:12
**RONALD** 8:16
**room** 92:7 179:1 194:10
**Rory's** 169:10
**rosa** 69:16 71:4,19 95:16
**Rose** 12:19
**ROSENBAUM** 17:10
**Rosenberg** 19:16 233:12
233:13,14
**ROSNER** 31:17
**ROSOFF** 4:23
**Ross** 19:4 31:4
**ROTH** 37:2
**roughly** 84:3 87:6,7,18
**roulette** 147:10 174:17
**Route** 12:21
**row** 126:21
**Roy** 6:19 116:3,4,8,8,15

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 97 of 273

Page 272

190:14,15 191:23,25
192:4,16,19,21,22
193:1,2,4,6 195:24
**Royal** 9:13 22:11 206:21
217:9
**Roy's** 195:25
**Rubin** 236:11
**RUFF** 33:15
**Rufo** 90:11
**rule** 90:14,14,15 157:15
158:8 172:7
**ruled** 182:10
**rules** 2:7 60:23 90:21
118:16 122:20,24
123:6 160:17 172:21
223:16
**ruling** 140:1,2,6,9
162:25 168:1,10
**run** 80:14 171:22 230:9
232:25
**running** 63:6 117:24
**RUSSELL** 20:8
**Russian** 147:9 174:16
**Rye** 16:16
**R-Z-E** 221:1

---

**S**

**S** 3:2 5:18 13:17 23:24
24:18 39:1 235:3
**Sack** 166:21
**Sacramento** 25:6
**sacrifice** 66:8
**sacrificed** 74:12
**sacrificing** 72:8 136:23
**safe** 218:2
**safety** 17:4,5 113:20
114:20
**Saginaw** 33:5
**Saint** 33:19
**sake** 55:5
**salaried** 227:14
**sale** 2:10 39:12,13,17,24
39:24 47:11,18,19
48:23 49:8,9,15 50:2,3
51:20 53:13,14,15,17
55:19 56:11 58:9 59:9
61:22 62:3 63:10 64:4
66:7,22 67:9 70:23

73:3,9,14 81:25 82:3,4
82:16 84:2,25 85:1
87:20 88:19 92:23
93:17 95:16 96:1,14
99:12 102:8,16 103:8
104:1,3,7 105:9 108:21
108:22,24 109:11,14,16
111:1 113:2,22 115:4
122:7,8,17 123:3,21
128:24 136:5 137:10
137:13,19 139:11
140:24 143:21 144:2
145:3 146:14 148:7
150:18,25 151:3,12
162:4,20 164:6 166:1
171:1 172:4 173:5
175:5 177:9 179:18
180:11 184:4 185:11
186:22 187:21,24
192:6 201:13 206:1
208:20 209:15 213:14
213:18 214:14,16
215:25 216:2 222:6
224:17 227:21 230:9
230:17 233:21
**sales** 54:21 55:24 110:9
117:10 162:17 174:2
186:7 200:9 203:15
**salient** 55:10 137:15
**SALOMON** 12:24
**salvage** 164:1 187:7
**SALZBERG** 18:24
**San** 29:17 35:6
**SANDER** 22:22
**Sandler** 213:8
**Santa** 35:2,3 91:4
**SARTIN** 30:17
**sat** 145:12 193:9
**satisfaction** 94:12
102:16 133:17 207:12
**satisfactory** 42:4 43:20
200:22
**satisfied** 47:10 112:11
228:24 230:11
**satisfies** 201:11
**satisfy** 148:12 224:12
**satisfying** 123:3
**Saturday** 225:14

**Saturn** 80:22,22,23 81:1
81:8 82:7
**saving** 72:6
**saw** 196:21 211:8
**saying** 59:8 79:20 87:15
92:6 94:10 100:13
118:13,17 124:17,19,20
124:21 128:9,23
130:19 133:19,22
139:20 140:7 142:12
147:23 161:8 162:12
166:23 171:20 178:1
183:23 195:8 200:8,11
**says** 42:23 43:3 52:16
64:3 66:2 78:23 79:11
79:25 97:20 135:22
143:2 144:1 158:9,11
161:2 162:24 163:8
169:17 174:25 176:16
177:23 181:18,21
182:4 183:22 184:1
193:22 200:2 216:19
**scales** 73:25
**Scalia** 158:8
**scanned** 210:21
**scenario** 137:4,17 165:13
172:16
**scenarios** 76:10,11
**scenery** 63:11
**Schaeffer** 13:20
**schedule** 78:12,17,21,22
78:23 80:2,2,8 82:11
114:16 144:5 202:8,11
202:16,22,23,25 204:1
204:4,4,15,19,19 208:1
**scheduled** 82:11 201:24
**schedules** 80:20 202:11
202:14 207:4 217:21
**Schein** 23:8 141:1,2,5
233:5,7
**scheme** 46:11 84:24
113:23 182:16,18
192:24 222:23
**SCHIFF** 37:10
**Schmidt** 4:25 40:9,10,11
40:18 41:11,15 42:8
102:22 224:5,6,13
**Schnader** 20:18 21:2

211:24
**school** 145:10 155:22
**Schulman** 95:7
**Schwartz** 3:14 5:17 39:7
81:12 132:16,19
133:15 134:20,23
135:23 136:17,19
192:10,11,18 213:23
232:7,9
**scope** 161:21 162:14
198:6
**Scotland** 9:14 206:21
217:10
**SCOTT** 38:17
**Scranton** 37:5
**scratching** 178:1
**script** 53:15
**se** 15:19 119:7
**Sea** 15:22
**seamless** 96:7 221:23
**Sean** 213:7
**Sears** 15:11
**seats** 39:4
**second** 43:6 54:17,23
55:6 67:14 70:5 77:15
79:9 81:24 86:12 88:12
89:21 90:9 91:3,6
102:14 120:20 121:18
123:20 135:20 139:3,9
139:15,19 150:12
154:24 156:7,21 157:4
157:8 159:17 166:12
168:14 185:12,23
195:4,23 215:9 228:10
233:16
**Secondly** 96:20 129:7
**seconds** 101:13 116:4
122:13,14
**secretary** 65:13
**section** 47:11 48:7 69:12
72:21 73:18 76:22,23
78:5,7,10,14,16,17,19
79:9,23,24 82:20 97:2
97:8,23 98:4,4 99:25
100:20,22 113:21
139:3,23 144:1 150:4
158:3,21,22 159:2,12
161:1,22 162:20 175:7

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 98 of 273

Page 273

186:21 187:24
**sections** 42:18 171:21
**secure** 79:14,16
**secured** 51:5 69:19 85:18
85:20,22,25 86:2,8
87:11 120:11,13,14,14
120:15,16,16,18,19
121:19 124:3,8,15
125:2,3,11 149:2,3
151:11 181:14
**securities** 153:16,18
**securitizations** 205:19
205:21
**security** 42:14 77:14
79:14 122:22 123:4
149:24 151:9 181:12
181:15,15,19,23
**see** 56:9 60:16 63:14 67:8
78:20 88:21 89:21 90:7
101:21 110:23 115:8
145:19 174:18 175:23
186:23 201:3,23
219:19 220:12 233:23
**seeing** 196:17
**seek** 108:22 110:19
155:9 199:14
**seeking** 97:7 109:14
216:2 226:19
**seeks** 47:15 123:2 124:2
**seemingly** 92:13
**seen** 50:12 57:1 61:6
69:6 73:23 96:12,12
110:25 114:3 118:13
162:2 196:15 224:9
**Segal** 20:18 21:2 32:2
211:24
**seized** 137:21
**self** 171:14,17
**self-insured** 126:5
129:13 221:13 222:23
**self-insuring** 123:1,5
**sell** 97:17 124:12 179:11
198:5
**seller** 48:24
**selling** 83:5 124:21
162:19
**Senator** 154:16
**send** 99:21 207:15,17

214:18 228:17 234:2
**sending** 232:24
**sends** 74:8
**senior** 50:21 63:16
**seniority** 188:20
**sense** 61:9 68:1 106:5
115:19 133:18 162:24
205:4 213:3 225:4,8
**sensible** 64:19
**sensibly** 60:3
**sensitive** 184:1
**sent** 198:19 209:21
213:12 214:22 225:1
232:23
**sentence** 147:13,13,17,18
**sentences** 99:9
**separate** 67:24 68:6 69:2
69:2 108:5 113:8
126:19 196:5 215:16
**separately** 181:16
219:11
**September** 120:13
163:15
**series** 77:3 111:22
**serious** 69:11 114:12
**seriously** 109:1
**serve** 64:10
**served** 233:19
**serves** 107:18
**service** 132:2 144:2
178:3
**services** 6:7 11:14 32:13
38:3 126:4 127:5
215:24
**serving** 140:20
**set** 63:7 78:20 80:1 84:6
90:10 109:24 110:3,4
170:1 188:22 189:1
194:21 202:2
**setback** 54:14
**Seth** 3:21 131:14
**setoff** 216:3,9
**sets** 193:19 217:21
**setting** 63:4 73:20
**settle** 49:12 124:9
**settlement** 2:3 44:23,25
68:2 70:25 144:5
226:20,23 227:8,12

228:8 235:7
**settlements** 49:23
**seven** 86:4 153:1 199:1
213:9
**Seventh** 155:2,21
**seven-plus** 151:23
**severe** 154:4
**severely** 147:8
**Severstal** 24:4
**shake** 176:13
**share** 56:21 174:7,8,9
**shared** 208:20
**shareholders** 179:23
**shed** 69:13
**sheet** 86:11 87:4 220:14
220:16
**shell** 53:13
**shoes** 158:10
**short** 51:1 70:18 99:8
101:17 132:15 134:11
179:21 188:15 228:6
229:22
**shortage** 119:13
**shorten** 201:11
**shortened** 52:3 226:21
**shorter** 204:20,20
**shorthand** 144:17,19
**shoulders** 181:3
**show** 63:11 79:8,17,22
175:9
**showed** 52:9 63:15 81:13
**showing** 88:3,4,8 144:11
**showing's** 144:10
**shown** 51:21 140:2
178:19
**shows** 49:1 50:5 53:8,21
81:6 82:11 85:7 137:18
174:4 176:9 231:15
**shrift** 99:8
**sic** 78:14 86:14 203:13
**side** 88:14
**sides** 91:19 106:3 127:17
210:14
**Sidley** 123:16 220:6
**sign** 133:4 178:25 194:22
195:5,11 198:21
220:17 221:18 223:24
**signatory** 223:21

**signature** 207:23 210:9
**signed** 40:13 41:2 118:7
192:14 194:23 196:21
199:2 203:3 221:21
**significant** 56:17 166:24
178:19 202:16 203:7
**significantly** 151:4
**signing** 194:25 200:12
**similar** 48:2 55:3 94:21
132:2 149:15 208:14
216:5
**similarly** 188:18 197:22
**SIMON** 9:20 29:10
**simple** 131:1
**simplicity** 43:1
**simply** 41:12 43:16
45:13 48:15 49:5 60:1
94:20 99:9 124:13
126:21 135:25 136:23
137:9 140:3,21 147:18
196:4 199:6 200:17
203:5 207:24 212:3
213:19 216:2,22
**SINGER** 38:2
**single** 61:4 100:11,12
125:10 142:22 143:4
161:8 162:20
**sir** 78:4 79:6 89:12 91:20
91:24 117:2,3 119:24
122:1 123:10 132:22
151:7 172:8 181:20
200:10,25 225:3,19
226:5,11 229:1 234:4,9
234:18
**sit** 46:19 122:15 172:20
174:8
**site** 16:13 114:15,17
212:3
**sites** 114:8,22 217:15
**situated** 188:18
**situation** 55:7 98:7
118:12 131:14 155:25
157:24 165:24 166:11
167:11 173:13 178:18
179:4 186:20,21
187:10 188:5
**situations** 60:13 149:16
157:19 160:5

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 99 of 273

Page 274

**six** 54:20 77:3 202:23
**sixteen** 102:18
**Sixth** 157:1
**sixty** 52:10 54:7 56:7
    64:2,25 65:9,14 119:16
**sixty-six** 88:1 151:25
**sixty-two** 151:24
**size** 50:13 109:24 177:1
**SKF** 36:3
**skimmed** 135:23
**slice** 67:13 130:12
**slide** 175:9
**slightly** 87:2
**slower** 65:6
**small** 92:23 169:20
    192:12
**smaller** 46:11
**smart** 64:8
**Smokeless** 162:10
**Smolinsky** 3:10 45:15,16
    45:17 46:6,23 47:2,3
    131:7,9,11,11 201:3,5
    202:20 205:5,7,14
    206:7,12 212:5,12,24
    213:3,23 214:2,3
    215:10,15 216:15,16
    218:7,9 219:21 220:2,4
    220:13 221:15 223:2
    234:9,18
**Smolinsky's** 212:10
**smooth** 130:15
**sock** 94:16
**Software** 150:10,13,23
**sold** 137:14 151:10
    162:23 176:12
**solicited** 51:3
**Solutions** 150:10,13
**solvent** 137:24
**somebody** 41:12 65:19
    68:8 77:24 174:12
    210:21 214:23 224:11
**someplace** 79:20
**somewhat** 152:3 197:10
    229:9
**soon** 44:13 133:23
    137:21 146:12 154:15
    225:24 226:6
**sophisticated** 126:23

**sorry** 44:7 60:20 78:19
    82:23 83:1 90:3 140:8
    142:18 148:18 157:12
    169:12 181:20 184:17
    220:2 224:2 228:12
**sort** 42:25 59:13 193:12
    234:16
**sorted** 117:12
**sorts** 84:8 101:2
**sought** 51:20 55:19
    140:1
**sound** 55:15 96:22
    150:24 151:13
**sounds** 96:23 192:20
    231:2
**source** 167:6
**South** 11:15 13:22 15:4
    15:13 28:12 30:4 36:13
    37:13
**Southern** 1:3 5:13 89:16
**so-called** 51:4 165:11
**speak** 46:19 77:21 95:1
    133:15 134:16 181:5
    204:23 205:14 233:16
    233:17
**speaker** 75:18 82:25
    134:16 211:6 233:3
**speaking** 113:9 134:18
    135:24 166:17 194:18
**speaks** 155:2
**special** 3:15 4:3,11 22:7
    39:7 48:8 55:9 92:15
    193:22 210:4,10
**specific** 51:9 52:7 96:14
    99:21 100:2 101:6
    135:3 156:6 165:25
    167:17 190:8 222:19
**specifically** 45:8 95:17
    96:17 98:6,15 128:20
    131:17 134:11 137:1
    141:17,22 165:14
    196:10
**specificity** 51:1 128:12
**specified** 124:13
**speculate** 176:14
**speculates** 138:7
**speculation** 138:9
**speech** 180:2

**speed** 55:19 70:1
**spell** 91:4
**spelled** 221:1
**spend** 71:4
**spent** 58:2 177:16,17
**spin** 54:14
**spinning** 53:19
**spinoff** 52:17
**spiraling** 46:12
**splinter** 168:25 170:5,19
    172:11 226:25
**splintered** 117:11
**split** 127:21
**spoiling** 57:13
**spoke** 170:7 196:4
    209:25 212:5
**sponsored** 137:1 172:24
**sponte** 160:16
**Sprague** 157:1,2
**Spring** 71:4
**spun** 52:21 72:15
**square** 32:4 67:19
**squarely** 139:4 148:4
    187:20
**stabilization** 83:10
    152:13
**stabilized** 55:24
**staff** 198:18
**stage** 118:17
**stake** 52:24
**stakeholders** 47:21,24
    147:3 186:17,17
    187:16
**stampede** 45:20
**Stamping** 23:19 80:13
    80:14 203:13
**stand** 60:9 71:22 107:24
    108:12 132:5 149:2
    174:8 182:15 199:10
**standalone** 96:2 116:11
**standards** 55:2 182:8
**standing** 52:6 83:20,21
    83:24 84:1 107:25
    128:23 195:24 196:1
**stands** 61:16
**stare** 139:25 157:12,13
    164:23 168:13
**start** 56:19 186:8,9

**started** 198:21
**state** 6:14 13:13,22 21:10
    21:11,19 22:2 25:2,3
    25:11,12 26:2,3,12,13
    27:2,11 35:12,13 91:16
    91:16 96:15,16,19
    104:22 112:9 113:5,12
    113:15 114:6,8,11
    116:9 117:21 122:20
    122:24 123:1 133:9
    166:6 171:10,14 185:3
    189:15 190:10,24
    191:21 192:8 194:17
    195:6,10 196:11
    220:21 221:9 222:9
    229:6,8,9
**stated** 108:6 124:9
    130:23,25 138:12
    139:9 140:22 148:20
    154:25 157:1,6
**statement** 55:3 79:20
    104:18 127:23 141:11
    141:20 168:22 170:17
    194:22 200:12
**statements** 45:22 56:12
    82:10 153:21 176:25
    181:6 209:18
**states** 1:2,14 5:2,3,12
    19:20 55:2 56:15 77:9
    78:17,20 79:13 85:7
    89:15 90:10 134:24
    135:1 147:7 148:25
    166:7 175:2 184:4
    193:11,21 194:4 218:4
**state's** 113:19 114:23
    115:5 192:23
**stating** 118:8 155:19
**station** 134:1
**statue** 97:19 159:21
    161:13
**status** 116:21 123:1,2,5
    171:22 221:13
**statute** 101:6 157:14
    158:6,9,11 159:1,15,20
    160:23 161:12 162:17
    164:20
**statutory** 97:11,19
    113:23 156:9 159:6,22

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 100 of 273

Page 275

160:20 161:4,11
  164:18 222:10
**stay** 167:25 168:10 216:8
**staying** 233:23
**steelworkers** 13:12
  227:4
**STEEN** 9:2
**STEMBERG** 22:9
**step** 60:16 64:22 65:3,12
  158:10
**Stephanie** 12:16 93:5,14
**Stephen** 3:9 85:3,4 86:7
**stepped** 213:2
**steps** 138:15 221:16
**STEVE** 10:10
**stick** 70:5
**sticking** 232:19
**stiff** 178:5
**stigma** 56:19
**stip** 40:12 41:20 222:15
  222:15
**stipulate** 200:13
**stipulation** 39:11,16,19
  39:23 40:1,5 41:2
  89:13 90:6 206:2
  207:25 208:16,20
  209:14 210:2,7 212:6
  222:11,18,24 223:4,22
**stipulations** 204:13
  207:22,23 208:5
  215:17
**stock** 68:8 71:7 86:5
  109:20 110:3,6 185:16
  185:19,19
**stockholders** 54:24
  152:19,21
**STONE** 34:2
**stop** 137:1
**STORRS** 31:12
**strategic** 50:2,3,8 53:11
**strategies** 57:12
**strategy** 53:14,15 54:5
  62:20 63:7 64:24
**streamline** 45:20 110:14
**streamlined** 46:24
**Street** 5:4,14 7:18 9:15
  9:22 10:15 11:15 12:13
  13:13,22 14:22 15:4

16:21 17:7,16 18:21
  19:21 20:12,20 21:4,13
  22:18 23:21 24:14
  25:13 26:6,17 27:14
  28:12 35:4,14
**Streets** 32:5
**strenuous** 151:19
**stress** 73:24
**stressful** 190:19
**stretch** 219:8
**strictly** 194:18
**strictures** 96:9
**strike** 94:13 103:24
**strings** 170:4
**strongest** 137:2
**strongly** 145:2
**structured** 198:12
  217:12 218:1
**structuring** 165:19
**studied** 155:13
**stuff** 67:17 81:12 127:20
  213:24 225:9 226:14
**STUTZMAN** 22:16
**sua** 160:15
**sub** 69:16 71:4,19 95:16
**subject** 39:20 51:14
  56:17 90:14,21 102:8
  102:15 111:12 112:1
  116:12 134:2 157:15
  162:18 163:18 165:23
  181:13 204:5 206:22
  215:16 216:23
**submission** 119:17
  188:22
**submit** 48:22 52:13 64:5
  64:9 68:25 115:9 130:2
  153:9 163:23 164:19
  184:9 185:2 187:19
  192:6 219:11 229:16
  232:20
**submitted** 67:1 181:5
  214:19 218:20 219:12
**submitting** 219:9
**subordinated** 118:21
**subordination** 119:2
  150:7
**subsection** 78:7 79:2,8,9
  124:12

**subsequent** 93:21 96:15
  185:14 190:24
**subsequently** 55:13
  213:11
**subset** 108:4
**subsidiary** 80:24 82:9
  185:16
**substance** 60:7 74:1
  183:22 194:2 232:19
**substantial** 39:21 62:5
  149:22
**substantially** 47:11
  54:22 109:5 149:24
  162:19 177:9 183:6
  227:9 229:18
**substantive** 95:6 102:23
  121:25 136:14 229:14
  230:15
**substantively** 195:6
**subterfuge** 73:6
**sub-subsection** 78:7
**succeed** 82:5
**success** 154:14 171:7,7
**successful** 169:7,8
  182:12 210:5
**successor** 14:4 69:13
  96:10 100:25 111:21
  136:20 194:6 198:3
  218:21,21
**sue** 166:22
**sufficient** 99:14,22
**sufficiently** 168:4 185:2
**Suffolk** 90:11
**suggest** 135:4 146:15
  149:17 204:25 228:13
  232:18
**suggested** 145:19 146:11
**suggesting** 61:8,10 63:13
**suggestion** 58:18 66:19
  90:13 228:16 229:21
**suggests** 70:17 136:10
  156:22
**suicidal** 51:14
**suit** 91:12
**Suite** 8:13 10:7 11:16
  12:5 15:12,21 16:5,15
  19:5 20:13,21 21:5
  22:19 24:6,15 28:13

29:6,16 30:5,14 31:5
  32:15 34:5,14 36:14
  37:14 38:5,14 236:17
**Sullivan** 6:11 214:8,9,9
  214:20,25 215:5,6,9
**summarize** 79:7
**summary** 142:18
**summation** 132:15
**SUOZZI** 16:2
**superfund** 114:10
**Superior** 6:3 214:10
**supplement** 58:21 77:3,6
**supplemental** 202:10,16
**supplied** 160:3
**supplier** 178:11,15 202:6
**suppliers** 66:10 132:1
  147:7 178:13 207:25
**supply** 217:12
**support** 54:12 55:18
  56:17 63:7 71:24
  106:25 107:4 108:21
  148:6 149:11 169:3
  180:21 200:9 210:6
**supportable** 66:3
**supported** 49:13 56:2
  140:22 147:6 151:13
**supporting** 89:8 140:20
**supportive** 112:19
**supports** 89:11 140:1
  171:25
**Suppose** 70:5
**supposed** 138:9 177:6
**Supreme** 54:23 90:10
  99:13,16 157:16,24
  158:7 160:8 167:24,25
  168:11 193:18
**sure** 41:5,10 42:1,1
  46:25 47:2 77:23
  104:12 117:13 126:9
  127:2 131:10,13
  132:12,19 141:1
  151:14 166:21 188:21
  189:17 192:13 195:22
  196:9 201:5 202:19
  206:24 211:22 212:23
  219:21 223:3,7 224:14
  232:3,15 233:11,22
**surmise** 174:6

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 101 of 273

Page 276

**surprise** 143:9
**survive** 56:25 179:9
**surviving** 165:11
**Susan** 13:25 113:4
 218:13 220:20
**suspect** 40:18
**sustain** 170:15
**sustainable** 148:14
 172:15,16
**SUTCLIFFE** 17:13 18:2
**SWANSON** 34:8
**Swegalok** 33:11
**sworn** 176:15
**sympathize** 178:8
**Syracuse** 13:23
**system** 48:3 74:3,3
 129:25 201:23 222:10
**systemic** 146:23 178:16
**systems** 6:5 11:13 56:17
**S-A-N-T-A** 91:6
**S-H-A-W** 221:2
**S.p.A** 18:3,4

_____ **T** _____

**T** 4:25 22:14 114:2 236:2
 236:2
**table** 63:18 108:20 124:7
 230:19 231:19
**Taft** 7:9,16 37:3
**tailored** 146:16
**tainted** 152:7
**take** 40:14 48:7,9 54:1
 70:24 77:22 82:2 85:23
 85:24 86:5 87:3,16,24
 89:19 93:8 101:5,15,17
 101:19 111:11 117:22
 122:13,14 130:2,7
 134:21 136:13 138:19
 138:21 140:16 147:20
 147:25 150:17 152:9
 152:12 154:14 156:21
 164:17 175:1 176:14
 178:23 180:25 188:10
 189:4 195:11,13
 211:15 214:5 219:4
 223:6 224:10 225:5,6,8
 229:22
**taken** 43:22 87:13

102:12 118:19 119:10
 138:15 162:15 188:22
 202:20 221:16
**takes** 130:4 179:13 193:1
 226:12
**takings** 121:12,20
**talk** 41:8 188:16,19
 196:14
**talked** 101:13 104:1
 170:5 194:21 198:2,18
 208:22
**talking** 87:21 109:4
 117:13 154:16 155:19
 158:18,20 159:17
 163:24 170:12 178:9
 195:24 203:5 212:4,8
**tantamount** 82:16
**TARP** 83:10,13,16,22
 84:4,5,7,8 182:9,11,13
**Task** 7:10,17
**tax** 35:3 45:7
**taxes** 45:8 193:25 196:23
 196:23 197:4,11,12,13
 197:14
**taxpayers** 164:2
**taxpayer's** 177:24 187:5
 187:6
**Taylor** 113:4,4 115:2,23
 116:2 218:11,12,13
 219:2
**Taylor's** 183:21
**TCP** 150:3
**teach** 156:7
**team** 57:12 108:18
**TELEPHONIC** 24:2
**TELEPHONICALLY**
 3:21 7:22 19:9,17
 24:10,20 25:9,17 26:10
 26:21 27:9,19 28:8,17
 29:11,20 30:9,18 31:9
 31:18 32:10,19 33:8,16
 33:24 34:9,18 35:9,19
 36:9,18 37:8,18 38:9
 38:18
**tell** 43:17 52:6 60:20
 61:6,10 83:2 93:25
 102:5 113:9 116:21
 122:15 128:10 156:7

212:3 231:13
**telling** 65:14 94:2,17
 162:1
**temporary** 54:14
**ten** 98:11 99:1 101:21
**tenable** 154:3
**tendered** 210:1,15
**Tennenbaum** 149:22
 150:3
**Tennessee** 27:2,3 123:20
**tensions** 54:19
**ten-minute** 101:19
**term** 64:11 117:14,14,15
 117:16 177:12,13
 220:14,16
**terminate** 163:17 174:21
**Termination** 191:6,17
**terms** 39:19 45:21 46:14
 60:25 61:7 62:11 64:13
 68:2 81:8 91:2 94:24
 133:2 140:2 143:3
 146:6,13 152:4,18
 155:14 165:10 173:4
 189:7 191:3 194:2,2,5
 194:6 195:4,9 198:16
 220:18 221:11,17
 222:20 229:10,14,17
 232:2 233:20
**terrible** 173:17
**terrific** 179:13
**testified** 57:9,15 67:4
 83:12 85:6 92:24 110:4
 153:20,22 164:10,14
 167:10 169:5 171:4
 174:2,11 182:1 205:16
**testify** 64:21
**testifying** 180:21
**testimony** 43:9 49:9
 51:10 56:3 57:20,24
 64:13 66:24 80:23 82:9
 86:15,18,19 142:9,12
 146:24 148:8 152:14
 164:11 183:3 186:7
**Testing** 20:11
**tests** 54:15 73:15
**Texas** 6:13,14,14 27:11
 27:12 44:17 45:8 116:9
 116:10 189:15 192:8

213:10
**thank** 41:16,16 42:1,7,8
 42:9 43:5 44:4,6 47:2,3
 74:12,14,14 75:20 89:1
 89:2,3 93:3,4 95:4,5
 101:8,9,10,20,23
 106:21,22 107:8,9
 111:14 112:2 113:2,3
 116:1,2,15,16 121:22
 121:23 123:8 125:18
 131:5,6 132:8,13
 134:13 136:22 140:16
 140:24,25 141:23,24
 142:1 145:5,6 188:7,8
 188:23 193:4,5,7
 199:16,18 200:23,25
 211:16,16,19 213:5
 214:7,9 215:18 217:6,8
 219:2,3,16 220:4
 223:18 224:1,3,4,13
 229:2 234:9,17,18
**thereto** 191:4 217:22
**thereunder** 191:4
**therewith** 191:5
**Thermocontrol** 204:16
**thing** 44:11 52:3,15 89:7
 89:10 92:6 112:22
 127:3 142:16 182:21
 211:9 215:9
**things** 41:9 46:11,16
 48:12 51:23 60:18
 74:21 75:4 76:17 97:24
 104:21 105:11 119:14
 176:18 177:13 188:16
 189:5 194:25 195:25
 201:1 214:11 224:19
 224:23 234:15
**think** 42:6 45:22 46:7,23
 47:4 51:9 52:15 60:22
 61:4,19 65:25 66:4
 67:24 69:25 70:14
 71:17,25 74:17,20
 75:22,24 76:16,24,25
 79:19 81:11 85:15,18
 91:5 93:18,21 102:3,19
 106:14 108:8 110:16
 111:2 112:18 114:24
 115:19 121:12 124:5

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 102 of 273

Page 277

126:1 127:2,3 128:6,15
128:15,22 129:17
132:25 133:8,11,21
135:10,15 136:3 142:8
144:7,16 152:10 158:8
161:7 167:9,11,23
175:10 177:3,16
178:11,13,19 183:15,17
189:13 193:15 194:11
194:24 196:19 198:25
199:11,12,13 200:19
202:16 206:9,13
208:22 209:17 211:4
211:21 212:10 214:25
215:5,10,14,15 216:25
217:11 218:4 219:19
220:15,17 223:2
224:17 225:10 226:12
228:5 229:5,8,14
230:14 232:9 233:1,15
234:12
**thinks** 180:20
**third** 4:4 54:10 62:4,10
77:11 104:11 129:19
135:20 139:7 158:16
159:3,5,13,24 160:7
162:8 169:17 204:7
227:5
**third-party** 143:20
206:25
**thirteen** 69:20
**thirty** 52:10 56:7 63:25
64:12 76:12 98:12
101:12 116:4 122:13
122:14 163:1 173:19
186:23
**thirty-five** 167:12
**thirty-three** 69:22 70:6,7
70:9,12 174:1 186:5
**Thomas** 4:24 8:12 14:17
30:8 101:24
**thorough** 162:5
**thought** 43:21 57:16
66:23 68:13 92:3
132:13 162:4 197:4
201:8 212:5,6 219:19
231:1
**thousands** 66:9 108:2

126:5 146:21 172:19
**threat** 61:15,15 64:15
66:16,18
**threaten** 65:3,23
**threatened** 150:1
**three** 44:20 63:25 76:20
85:10 89:2 108:8,8
110:16 112:15 118:6
126:17 131:4 140:23
167:10 176:20 177:16
178:13 185:20 189:24
190:2 201:16 202:11
204:18 225:18
**three-judge** 159:4,7
**three-person** 231:1
**three-quarters** 66:8
**three-way** 213:2
**Thurman** 150:24 151:5
151:5
**tied** 40:16
**Timbers** 159:23
**time** 39:25 40:18 41:8,20
45:21 50:1,22 51:1,4
51:10,15 52:8 53:11
54:15 57:5 58:2,23
59:4 60:16,23,25 61:4
61:25 71:5 72:16 74:20
76:5,12 77:22 81:21
84:20 88:22 94:3,9,19
101:16 103:20,23
106:1 112:23 127:20
130:2,4 132:25 134:17
144:18,20 151:15
162:2 164:9 167:13
172:7 176:1 179:22
189:1 191:24,25
194:12 197:2,20
201:12 212:11 218:5
222:14 225:6 226:21
228:16 230:23
**times** 11:4 50:10 51:7
52:3 53:24 60:21 73:23
130:1 174:4
**timetable** 51:22
**timing** 56:24 144:17
208:15
**Timken** 6:3 208:7
214:10 215:11

**Timothy** 12:19
**title** 118:3 160:13,14
163:11 169:15
**TITUS** 33:18
**TMT** 54:24
**TN** 27:6
**TOBIN** 8:8
**today** 40:22 41:24 45:19
46:3,21 51:24 52:22
55:7 57:5 72:5 100:8
102:21 109:24 110:7
113:7 115:9 124:7,20
124:23 125:16 135:5
135:14 137:9 138:21
138:25 139:6,20,22
140:1 172:8 174:8,9
188:13 204:24 210:15
211:14,15 221:20,21
223:1,22 229:7,17
**today's** 126:14 128:24,24
130:23 136:3,12
**TODD** 30:11
**toes** 213:2
**told** 54:6 61:6,12 64:1
110:7 150:13 154:24
193:18 198:22,24
**tomorrow** 66:5 223:24
225:13,14 229:17
**tonight** 225:11
**tool** 53:23
**top** 77:17 78:15
**topics** 134:7
**TORF** 37:17
**tort** 99:10 106:1 107:23
148:15,16
**total** 85:20,21 87:4
102:25 119:15,15,21
198:23
**totality** 82:2
**totally** 161:9
**Tower** 15:11 35:13
**Town** 80:18
**Toyota** 6:6 29:3,14
203:15 212:1,14,18,20
**TPC** 123:16,17 220:6,8
224:7
**trace** 149:7
**track** 51:25 56:11 57:22

63:10 64:2 66:7,15
77:13 177:6,6
**trackable** 201:23
**TRACY** 5:8
**trade** 203:3
**Traders** 15:3 93:16
209:4
**traditional** 58:1,10
**Trafasee** 207:2
**Trailer** 54:25
**train** 134:1
**transaction** 48:18 58:7
58:17 60:5 61:18 63:14
64:9 66:12,19 68:25
69:15 70:22 71:3,6,11
73:9 74:5 85:7 92:25
106:19,25 107:1,4
108:17,19 109:14
112:20 123:22 138:25
144:16 145:3,21,25
146:3,6 147:6 148:4,4
148:13,24 151:18
152:7 153:16,17
161:15 164:5 165:15
168:16 170:23,25
178:15 180:12,12
182:23,24 183:2
185:25 186:18 187:11
188:1,7 199:15 217:12
218:1
**transactions** 93:15
**transcribed** 2:25 236:11
**Transcriber** 236:9
**transcript** 139:15 188:21
236:4
**transcripts** 43:14,25
225:17,18
**transfer** 171:23 172:1
206:25 218:3
**transferred** 56:18 114:9
114:18 197:24
**transferring** 132:6
**transfers** 158:25
**transition** 96:7 130:15
209:15 221:23
**transmission** 211:13
**transmittal** 228:20
**transpired** 162:25

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 103 of 273

Page 278

**transportation** 6:15
27:12 215:24
**Treasure** 181:12
**treasury** 7:10,17 26:3
42:15 50:6 53:14 57:25
64:5 65:2,11 85:7,14
96:6 105:12 106:15
112:25 118:7 119:17
120:17 121:17 122:11
134:19 144:23 146:25
147:22 149:1,6 151:21
151:24 163:16,17,21
164:3,4,13 168:25
171:4 172:23 175:1,3
177:23 178:5,6 181:1
192:8 194:9 198:16
199:6 206:4 208:21
221:10 223:19 226:7
229:19,25 230:12
233:1
**Treasury's** 50:5 53:8
146:24 210:8 231:21
**treat** 87:24 88:14
**treated** 88:6 118:20,22
118:23 136:7 163:22
165:21,22 200:6,7,7
**treating** 88:9,11
**treatment** 48:1 71:13
97:3,8 137:11 194:3
196:7
**TRENT** 12:8
**Trenton** 26:18
**triage** 94:6
**triaging** 46:14
**trial** 143:14
**tribal** 114:11
**Tribe** 33:19
**tribunals** 160:9
**Trico** 30:3
**tried** 151:22,23 155:14
**triggered** 121:15
**tripartite** 217:19
**TROSTLE** 4:8
**Trouble** 83:11
**Trouweko** 135:20
**Troy** 32:16 38:15
**true** 56:13 57:2 97:9
125:14 163:4 175:5

236:5
**truly** 73:22
**trump** 138:10 222:15
**trumped** 70:9
**truncated** 51:24
**trust** 12:12 13:3 14:3
15:3 16:13 93:16 99:18
99:19 107:11,18
108:13,18 111:2,18,20
111:24
**trustee** 5:3 7:3 13:3 14:4
107:10,12,15 108:14
111:15,21 117:6 158:6
158:9,10,23
**trustees** 93:15 94:9
185:15 209:6
**truth** 60:8
**try** 58:25 59:22 89:5
95:12 170:18 180:13
187:7 191:23 196:14
201:6,8,20 204:8
207:11 208:9,23
**trying** 46:13 51:8 79:17
84:19,20 94:5 97:4,10
127:21 133:22 195:19
212:4 223:23 230:16
231:7,12
**Tuesday** 75:24
**tuned** 103:15
**turn** 139:8 165:2 175:24
202:22 205:3 213:1
**turned** 49:13 56:13 57:2
**turning** 151:17 154:22
168:17 207:22
**turns** 135:17 163:8
185:20 188:13 218:21
**TWA** 95:23,25 139:7,8
139:10 140:11 155:20
161:24 162:7 164:25
198:9
**TWA's** 140:11
**tweak** 192:12
**twenty** 68:14 87:23
98:12 108:6 183:5
198:25 210:3
**twenty-eight** 108:9 120:9
**twenty-five** 172:12
**twenty-four** 225:7

**twenty-six** 172:12
**twenty-three** 107:14
111:10
**twist** 166:9
**two** 40:17 42:12 51:16
53:17 76:19 80:6 85:10
86:4,5 87:8 93:14 99:9
102:21 103:22 104:20
108:9 114:8 117:6
119:9,20 120:12
123:18 128:19 129:7
133:24 135:3 166:4
180:19 185:20 187:7
189:3 190:23 194:15
201:19 203:16 207:16
214:11 217:21 218:15
224:19 225:23 226:15
227:17,20 230:19,20
**two-thirds** 151:25
**TX** 6:17 19:6 22:20
27:15 31:6 36:15 38:6
**type** 54:2 213:15
**types** 150:20
**Typically** 107:24
**typo** 102:3
**T's** 123:24

---

**U**

**U** 235:3
**UAW** 66:20 67:8 73:11
86:17,19 134:16,17
142:2,19 143:20 144:5
144:12 145:2 147:4,5
149:7 153:11,19
154:21 172:25 173:8
173:11,13 182:18,20,25
183:4 219:7 227:22
**UAWs** 178:9
**UAW's** 68:13 144:8
**UCC** 78:11,13 80:8,9
82:10
**UCC-1** 181:15
**ultimately** 136:4 207:11
**Um** 93:10
**Um-hum** 140:13 150:22
**unable** 114:17
**unambiguous** 138:4
**unanimous** 51:13

**uncertainties** 49:25
**unclear** 114:16 197:10
205:7
**uncommon** 61:20 105:12
**undercutting** 46:12
**undergoing** 201:10
**underlying** 210:22
**undermining** 138:11
**understand** 42:2 47:20
48:3 51:11 52:19 54:5
58:10 59:21 61:17
67:25 68:1 75:4 79:16
85:2 89:6 92:8 94:7
95:1 117:23 125:17
126:13 127:19 128:2
131:24 134:16 156:8
183:14 195:7 207:10
211:10 216:18 222:25
229:17 231:9 232:2
**understanding** 64:11
94:20 102:24 104:8,23
130:9 189:7 192:6
205:24 216:7,12
222:16 232:3
**understandings** 64:23
188:14 224:23
**understands** 186:3
228:25
**understates** 60:22
**understating** 94:15
**understood** 95:4 109:18
119:3 126:2 129:5
199:6
**undertake** 139:16
**undertaken** 138:22
**underway** 210:2
**Underwriters** 157:25
158:4
**undetermined** 209:8
**undisputed** 146:24
164:16
**undoing** 46:12
**undone** 66:22
**undoubtedly** 158:2
**unequivocal** 143:14,16
**unequivocally** 127:10
129:16 130:23,24
131:4 142:21 157:1

09-50026-mg   Doc 7226-4   Filed 10/04/10   Entered 10/04/10 17:28:37   Exhibit B --
Exhibits 6-9 to Mayer Declaration   Pg 104 of 273

Page 279

unfair 173:12
unfold 152:14
unforeseen 105:16
unfortunate 173:1
unfortunately 110:20,21
 170:14 187:17
unheard 167:4
UNIDENTIFIED 75:18
 82:25 90:3 211:6 233:3
uniformity 193:19
unimpaired 216:10
union 9:3 11:3 13:11
 49:23 50:20 67:16
 72:23 153:23 157:25
 168:25 169:25 170:19
 182:21 215:21,23
unionized 171:23
unions 2:4 170:5 172:11
 226:20,25 227:3,4,10
 227:17,18,20 228:23
 235:8
unique 47:14 49:7 73:13
 98:7
unit 115:13
United 1:2,14 5:2,3,12
 9:3,21 13:12 19:20
 55:2 79:13 85:7 89:15
 90:10 134:24 135:1
 148:25 166:6 175:2
 211:25
universe 109:17
University 14:13 155:7
unknown 45:23 139:11
unlawful 195:6
unofficial 17:14 18:12,20
 19:3 47:7
unreasonable 163:19
 207:13
unrebutted 138:5
unreceptive 155:24
unreported 156:12
unsecured 4:18 22:17
 51:6 86:15 87:12,20,21
 87:25 88:5,6,7,9,25
 92:14 101:25 107:16
 109:21 110:5 117:3,4
 118:22 120:6,12,21
 121:12,16 125:4,13

136:7 146:2 153:15
 161:9 162:18 177:11
unsupported 56:6
unusual 54:8 55:19
unwaivable 143:24
unwritten 64:23
update 201:17 202:14
upheld 159:12
upholding 63:21
upset 46:2
upsized 103:1
urge 88:18 140:21
urges 145:3
USA 36:3
usage 117:22 118:1,1
use 40:2 47:11 53:21
 66:2 72:13,13 77:20
 83:22 84:3,7,8,8,10,20
 100:18 117:18 118:3,4
 118:5 128:13 175:7
 182:13 183:24 187:11
 208:10 209:14
useful 52:15 103:16
 196:16
usual 148:24
usually 85:10
Utah 150:11 151:6
utter 49:1
U.S 1:24 5:11 7:10,17
 28:10 62:5 69:23 70:6
 90:12 122:11 132:11
 134:18 147:21 158:1
 163:16,16 175:3 181:1
 181:12 206:4 228:23
 229:19
U.S.A 203:15
U.S.C 2:3

_____

V

v 30:17 79:2,4,8,9 81:14
 90:11 91:3,5 99:17
 135:12 141:18 156:10
 157:25 181:18,21
vacation 131:20
valid 151:9
Validation 80:18
valuable 179:7
valuation 76:10,11,15

177:1,17
value 48:14 54:2 55:16
 55:17 56:2,15,18 58:14
 58:15,16 70:15 72:14
 72:18,19 73:7,13
 110:22 117:12 119:15
 124:4,7,10,14,14,15,16
 124:22,23,24 125:2,3,4
 125:12,16 137:16,19,20
 143:16,17 146:20
 151:4 153:17 166:24
 170:24 185:18,19,21,24
 186:1,16,25 187:15
values 49:10 73:5 74:11
 118:5
variety 124:3 131:25
various 47:17 53:9
 107:20 110:4 175:14
 176:18 177:15 180:13
 185:10 215:24
vastly 137:15
VEBA 67:11,18,18,23,24
 68:4,6,7,13 69:2 86:17
 86:19 87:10,22 88:4,11
 142:6,9,13,20 143:1,5
 143:17,23 144:9
 153:11,13,24,25 154:21
 169:18,18,24,24,25
 170:10 182:25 183:4
Vedder 23:2 141:5
vehicle 27:13 80:16
 179:14
vehicles 178:2,3 205:17
vendor 126:21 155:25
VENTO 27:18
venture 175:7 212:1
Veritext 236:15
Verizon 24:13 203:9,16
viable 58:9 62:2 147:18
 148:10 174:15 180:4
 186:20
victims 20:19 21:3
 107:23 148:15,16
VICTOR 33:7
view 51:13 67:16,20,21
 68:21 107:3 109:9
 134:3 157:6 166:14
 168:12 193:21 198:9

199:3
violate 82:14 195:10
violation 182:2
Virginia 37:12
vocal 55:9
voice 108:13 112:19
voluntarily 187:4
voluntary 154:20
vote 142:22 143:4
votes 51:3
voting 142:20,20

_____

W

W 16:18
Wabash 4:12
Wacker 10:6 15:13 30:4
 37:13
wage 154:3 169:21
 195:12,13
waiting 214:23 231:21
waive 155:9 227:23
waivers 191:4
waiving 75:6
Waldorf 102:3
walk 61:16 62:8 146:8
 202:13 204:22 205:12
walks 96:24 174:17
Walsh 149:21 150:14
 161:24 162:1
wand 59:8
want 40:8,14 46:2,3,9
 48:8,12 52:16 53:23
 61:14,18 65:17 66:6
 71:20 75:20 78:1 85:1
 88:19,23 89:2,7 94:4
 94:16,20 95:3,13,22
 96:7,9 100:10 101:2
 106:11,23 117:9 118:3
 118:4 126:8 133:10
 140:16 141:7 142:2
 145:18 146:10,18
 175:10,23 183:20
 186:13 188:17 193:10
 193:12 201:2,4 202:13
 203:8 204:22 209:3,18
 213:20 214:5 216:22
 218:15 224:22 228:20
 229:25 232:8 233:22

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 105 of 273

Page 280

**wanted** 93:8,23 94:3
98:2 112:9 128:10
134:23 185:14 196:9
214:17 215:9 216:16
218:12,23 219:22
233:18
**wants** 48:8 145:19
156:21 163:21 181:2
213:24 214:4 221:23
228:7 230:2
**WARD** 35:18
**WARDWELL** 28:2
**warning** 58:2
**warrant** 127:8
**warranties** 57:10
**warrants** 71:7 109:20
110:3,6
**warranty** 196:10
**Warren** 3:12 14:2 42:11
42:11 43:5,6,18,21
44:3,6,16 111:20 202:2
**Washington** 7:19 8:14
12:14 16:23 17:8,17
18:22 19:22
**wasn't** 49:14 61:8,10
64:22 67:9 69:25 70:23
72:5 116:20 127:24
168:1
**wasting** 55:22 57:13
186:15
**water** 198:11
**WATERS** 20:10
**Watkins** 15:9 209:25
**wavier** 163:16
**way** 47:1,23 48:15 51:7
51:24 64:3 66:4,6,21
67:3,18 68:17 70:14
71:6 73:10 78:18 80:2
81:19 84:23 85:8,16,23
86:11,15 87:15 88:7
92:6,17,18 94:6 105:25
113:24 130:4 132:5
133:21 136:9 162:8
168:20 169:5 170:15
170:19,25 178:14
180:22,23 183:21
184:5 194:6,18 197:18
205:4 228:7 233:18

**ways** 62:25 64:10 193:16
194:16
**weak** 149:18
**weave** 133:5
**Web** 212:3 217:15
**week** 93:22 100:4 130:1
131:20 156:25 204:7
209:13
**weekend** 52:3 106:9
**Weil** 3:3 42:12 45:17
131:12 140:15 231:20
231:25
**Weiss** 3:20 9:20 19:11
39:6,6,9,10 40:8,12,20
40:24 41:10,17,18,19
41:25 42:2,7 108:5
109:5 210:3,10 229:19
233:14,20
**welfare** 146:21
**Wells** 7:3 12:12 93:16
209:4
**went** 79:18 97:18,25 98:9
102:18 105:11 160:7
170:7 184:24 196:6
**weren't** 70:13 117:5
196:1 210:19
**West** 9:15,22 10:6 21:13
23:21 25:13 26:6,16
27:14 29:15 30:13
32:14 34:4 35:4
**Westchester** 16:14
**Western** 23:20
**we'll** 40:15,18 44:13
132:14 174:16,18
203:25 207:13 209:15
211:15 231:23
**we're** 41:3,24 44:11
51:23 60:1,3,4 61:12
66:7 87:21 99:19,23
100:13,14 111:11
129:2 132:25 134:25
154:2 170:12 174:23
177:24 178:5,6,9
187:11,12,13 188:9,23
195:2 199:4 201:10
207:5,9,11,24 209:12
212:4,15 223:3,4,22
225:23 229:8 230:16

231:21 232:12 233:23
234:12,17
**we've** 42:19 66:5 69:6,13
71:23 76:11 93:21
96:12 101:18 110:7
114:17 116:11 122:10
128:25 132:24 133:1
177:23 186:23,25
196:13 201:15 203:6
204:13 205:7 206:4,4
209:7 212:12,14
217:11 220:13 225:10
232:20
**Wharton** 19:11 233:14
**whatsoever** 99:6 164:12
191:15
**whereabouts** 99:15
**white** 24:19 43:19 54:7
65:1,13 66:4 95:23
97:16 98:3 123:19
142:23,24 143:6
179:24,25
**Whitehall** 5:4
**Whittaker** 153:1
**whoever's** 232:24
**who've** 76:9 144:13
**WICKERSHAM** 7:9,16
**Wickouski** 12:16 93:5,5
93:10,13,14,25 94:7,23
95:3,4
**wide** 99:13
**widely** 108:1
**wife** 102:4
**WILLIAM** 22:14
**Williams** 13:7 21:12
26:4 33:18
**willing** 111:11 154:19
178:25 215:2
**Willis** 163:11
**WILMER** 23:10
**Wilmington** 10:16 13:3
21:6 34:15 107:11,18
108:13,18 111:2,24
**Wilson** 44:10 51:11 56:4
56:23 57:25 64:4 67:4
80:14 83:11 92:24
118:13 138:13 142:12
164:10,10,14 171:3

176:4,12
**Wilson's** 57:20 64:6
176:13
**wind** 103:11
**WINDELS** 23:17
**window** 49:18 151:3
**wind-down** 102:15,24
103:1,10,17 109:25
110:1,2,6,8 137:25
184:22,25 213:13
229:5,11,12 230:6
**Wing** 26:16 35:5
**wings** 70:8
**winners** 88:16,17
**wiped** 152:19
**Wireless** 203:9
**wish** 75:22 81:20 122:11
156:24
**wished** 168:20
**wishes** 52:14 128:5
**Wisler** 10:18 125:21,22
126:2 127:13,17,23
128:4,12,19 129:5,7
130:18 131:5,6,8,13
**withdraw** 102:7 111:12
111:25 116:13 173:9
192:3,8 208:1,7 216:12
218:18 220:9
**withdrawal** 102:11,14
107:3 204:16
**withdrawing** 105:24
106:18 218:24
**withdrawn** 107:2 159:8
202:23 203:2,22
207:19,19
**withdrew** 206:20
**witness** 43:8 143:15
153:22 176:6
**witnesses** 64:7 110:4
176:6
**WOLFSON** 38:11,17
**Wolicki** 236:12
**wondering** 93:25
**WONG** 19:25
**Woodland** 36:13
**Woodward** 3:17 29:5
33:12
**word** 57:24 117:18

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 106 of 273

Page 281

132:14 173:7,9
**words** 55:6 65:16 96:8
133:24 146:9 156:6,20
161:12 166:14 192:15
**work** 43:21 53:16 105:12
110:12 129:8,13
133:22 154:2 159:15
161:10 172:21 173:15
176:7 185:4 188:25
206:24 207:8 208:9,23
209:12 212:4,15
224:21 230:16
**worked** 144:13,13 194:8
204:11 222:2 230:14
**workers** 9:4,21 104:22
104:25 105:1,6,6 122:3
122:5,9,19,24 220:14
221:4,7,10,12 222:4,13
222:21 223:5,10,15
**workforce** 142:11,15
**working** 45:21 94:2
105:14 106:5 112:10
123:22 131:15 132:24
203:6 207:6 220:13
224:24 232:12
**Workman's** 171:10,12
**works** 196:8
**world** 7:11 124:18,19
194:14 195:1
**worldwide** 34:12 178:10
**worries** 57:23
**worry** 225:6
**worse** 92:5
**worth** 85:3,4 111:10
119:9 124:18 210:13
**Worth's** 86:7
**wouldn't** 42:6 72:4 81:14
99:5 166:7,8 192:20
208:25
**wrap** 183:20
**WRIGHT** 12:2
**writing** 64:23 67:2
115:17,20
**written** 53:16 117:8
**WYRON** 17:19

**X**

**x** 1:5,12 235:1

**Y**

**yeah** 41:22 121:7 192:4
212:16,22 213:1
225:16
**year** 45:9 57:6 72:3
118:6
**years** 61:5,5 98:12 99:1
99:25 130:12 161:14
163:1 167:10,12
177:13 185:20,21
**year-over-year** 57:6
**yellow** 43:23
**Yep** 223:18
**yesterday** 42:13 49:15
60:10 92:3,24 96:20
104:21 112:23 135:6
141:8 155:19 157:6
164:10 178:11 194:7
194:20 198:4 221:8
**yesterday's** 210:1
**York** 1:3,16,16 3:6 4:6
4:20 5:6,13,15 6:9 7:5
7:12 8:6 9:7,16,23 11:4
11:6 13:5,15 14:3,6,15
14:23 16:6 18:6,15
19:14 20:3,6 21:19
22:2,5 23:6,13,22 28:5
76:23,23 111:21 113:5
113:12,16 114:8,20
117:21 135:12 174:4
185:3,19
**York's** 218:15
**Yps** 80:16
**Ypsilanti** 80:16

**Z**

**zero-sum** 148:21
**ZIEVE** 17:11

**0**

**02110** 31:15
**07652** 12:22
**08625** 26:18
**09-50026** 1:4

**1**

**1** 77:1 80:19 142:18,18
158:1 168:3 180:3

184:5 203:9 213:8,12
**1collective** 142:14
**1st** 51:21 87:16 180:4
**1,050** 227:7
**1.1** 80:20
**1.1(e)** 144:6
**1.175** 103:3 229:13
**1.2** 80:20
**1:24:32** 89:17
**1:42** 188:24
**10** 56:2 59:18 65:2,11
66:23 67:9,15 68:25
69:3 71:7 73:3 76:21
144:2 163:15
**10th** 65:15 138:6 141:10
**10:00** 198:19
**10:47** 101:22
**100** 25:13 87:13
**10003** 14:15
**10004** 5:6 13:15
**10006** 9:7
**10007** 5:15
**1001** 21:5
**10017** 28:5
**10018** 11:6 16:6
**10019** 6:9 9:16 19:14
23:6,22
**10022** 4:6 7:5 14:23
23:13
**10036** 4:20 9:23 18:15
**1007** 10:15 22:11
**101** 14:5 181:15
**101S** 13:12
**10103** 18:6
**10105** 20:6
**1015** 198:7
**10152** 8:6
**10153** 3:6
**10166** 13:5
**10178** 14:6
**1024** 33:4
**10271** 22:5
**10281** 7:12
**104** 86:9
**104.5** 85:8,13 87:6
**105** 97:23 101:7
**105(a)** 2:7 160:11
**10573** 16:16

**1099** 20:12
**11** 2:3 47:16 48:1,4,13
49:24 50:4,7,12 51:13
54:4,7 55:22,23 56:5
56:25 57:25 58:1,19
60:9 61:18 63:22 72:10
72:11,11,13,16,25 74:2
104:3,5 142:19 145:1
150:2,25 155:6 173:25
174:18 176:17,19,21,22
176:22,23 178:12,21,21
180:14,20 193:17
**11:10** 101:22
**1100** 8:13
**111** 78:15,19 99:9
**1113** 171:21,24
**1114** 69:12 82:23,23
171:21,24 172:4,6,8
227:10
**1129** 72:21 88:5
**113** 14:13
**114** 82:20,21,22
**115** 207:25
**11501** 236:18
**1152** 17:16
**1177** 4:19
**1185** 18:13
**12/31/08** 181:13
**120** 22:4 215:17
**1200** 19:21 24:15
**1201** 7:18
**12201** 33:21
**12224** 21:22
**12548** 6:16
**128.8** 150:4
**1285** 19:13
**13** 157:17 161:24
**13.4** 120:17
**130** 158:16
**132** 87:7,9
**13202** 13:23
**1345** 20:5
**1350** 16:4
**140** 38:5
**1408** 76:22
**15** 56:15 61:25 71:8 85:3
85:6 86:7 147:11 235:5
**15th** 17:16 27:14

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 107 of 273

Page 282

**150** 34:4 227:7
**1500** 12:13 34:14
**15223** 22:12
**153** 14:22
**156** 23:21
**1600** 17:7 20:20
**162** 235:5
**16200** 38:4
**1633** 23:4
**1675** 6:8
**169** 143:6
**17** 13:13 80:15 217:16
**17th** 24:14 35:15
**171** 24:14
**174** 135:13
**18S** 13:12
**18th** 20:12 32:5
**181** 135:13
**18510** 37:5
**19th** 76:13 77:5,5
**19.4** 63:24 70:17,18
  85:23 119:8,21
**19102** 15:5
**19103** 20:22 32:7
**19312** 36:6
**1978** 163:1
**19801** 21:6 34:15
**1987** 98:3
**19899** 10:16
**1990** 107:12
**1994** 98:4
**1995** 76:20 77:9 81:9
  107:12 120:20

---

**2**

**2** 1:18 80:19 102:19
  168:7 175:6 184:6
  203:10,13,15 204:15,15
**2:54** 188:24
**20** 86:21 87:18
**20th** 17:7
**20,000** 170:7
**20.5** 86:20,21,22 87:3,10
**200** 13:4 236:16
**2000** 158:1
**20004** 7:19
**20005** 8:14 12:14 17:17
  19:22

**20009** 17:8
**2001** 19:4
**2002** 2:7 156:11 161:24
**2003** 77:3,5 158:15,17
  217:16
**20036** 16:23
**20037** 18:22
**2006** 169:17,23 170:1
**2008** 77:14 78:2 120:13
  174:2 186:6
**2009** 1:18 87:17 174:12
  186:8 236:20
**201** 32:14
**2019** 108:6,7
**20207** 27:5
**2030** 16:21
**2033** 77:4
**21st** 5:5
**2100** 29:16
**2200** 22:19 31:4
**225** 110:8
**2290** 3:16
**23** 77:5
**2300** 11:16 28:13
**2323** 22:18
**233** 15:13 37:13
**235,000** 178:10
**25** 26:17
**25th** 83:24
**250** 30:13
**2500** 34:5
**2550** 18:21
**26** 77:3 170:15
**26,000** 170:5 178:8
**260** 15:4
**2600** 20:13 24:6
**27** 87:15
**27th** 32:6
**2700** 29:6
**275** 38:14
**28** 87:14,17,17
**2800** 30:14 31:5
**281** 156:10
**283** 156:11
**286** 150:10

---

**3**

**3** 80:19 85:3 168:8

203:10 204:17 215:15
**3:57** 234:19
**30** 35:14 80:2,2 180:3
  225:21
**30th** 18:14
**300** 13:22 27:14 36:14
  135:13 154:8,15
**3000** 19:5 30:5
**301** 12:4
**30363** 24:16
**31** 9:15 120:13
**31st** 77:14 78:2 87:16
**311** 30:4
**312** 156:10
**3150** 38:13
**33** 5:4
**33.3** 85:24
**330** 4:12 9:22
**33308** 15:22
**35** 77:16 87:7,14
**35th** 8:5
**353** 149:20
**36** 78:14,15
**3600** 20:21
**361** 2:7
**362** 2:7
**363** 2:7,10 47:11 48:7
  49:8 50:7 52:22 53:10
  53:12,15,22 54:1,13,21
  57:22 58:16 60:17 63:7
  63:10,14 66:3,14 69:11
  73:15,18 81:25 82:16
  82:19 84:25 95:17
  97:16,22 113:21,22
  139:3,23 140:24
  145:21,25 146:3,6
  147:6 148:3,13 150:4
  150:18,20 161:22
  164:5 165:15 170:25
  172:3 175:7 177:9
  178:14 182:24 186:21
  187:24
**363(b)** 2:3 161:15 162:4
  162:16,20 187:20
**363(e)** 115:5
**363(f)** 157:14 161:1,9,14
  162:13 167:16
**363(f)(3)** 124:3,11,21

**364** 2:7
**367** 90:12
**37th** 4:5
**37202** 27:6
**375** 8:4
**378** 90:13
**39533** 33:12
**399** 7:4 23:12

---

**4**

**4** 12:21 203:13
**4th** 13:14
**4.01** 79:9
**4.01(a)** 78:5
**4.02** 78:10
**400** 31:14 36:4
**400,000** 116:25
**4001** 2:8
**402** 78:14
**4025** 36:13
**40507** 30:15
**406** 76:23
**407** 29:15
**41** 222:9,17 223:3
**42nd** 9:22
**421** 15:21
**43** 169:12
**431** 150:10
**43215** 35:16
**436** 37:4
**44** 169:11
**450** 28:4
**47th** 23:5
**475,000** 144:12
**48** 86:10 87:7,7
**48.4** 86:14 87:13
**48.7** 85:17 86:6 87:11
**4800** 10:7
**48084** 32:16 38:15
**48104** 12:6
**48226** 3:18 24:7 29:7
  34:6
**48304** 33:13
**48602** 33:5
**48909** 21:15 26:7
**4900** 15:20

---

**5**

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 108 of 273

Page 283

**5** 203:14
**500** 12:5 29:5 34:13
**500,000** 147:4
**501** 16:5
**502** 90:12
**506(c)** 61:2 158:3,5,11
  159:2
**507** 2:7
**51** 78:19
**52** 222:2
**52nd** 9:15
**524** 97:8
**524(g)** 96:23 97:2 98:4,4
  98:16 100:1,16,18
  165:5,5,10,12,14
**525** 21:13 26:6
**53rd** 14:22
**530** 158:1
**535** 24:5
**54(b)** 89:23
**544(b)** 158:21 159:12
**545** 158:16
**55** 184:4
**550** 11:15 28:12
**56th** 23:21
**566** 141:19
**573** 162:11
**580** 236:17
**5800** 15:12

---
### 6
**6** 77:12,16 78:7 80:19
  85:24 236:20
**6th** 21:14
**6,000** 170:12
**6,600** 202:4
**6.09** 78:16,19
**6.25** 80:8 82:11
**6.29** 78:17,17,18,19,21
  78:22,23
**6.30** 79:23
**60(b)** 90:14,14
**60,000** 147:3
**600** 32:15 154:15 201:6
**600,000** 178:9
**6004** 2:8
**60601** 10:8 25:14
**60606** 15:14 37:15

**60611** 4:13
**61,000** 144:14
**62,000** 183:12
**620** 11:5
**620606** 30:6
**650** 98:25
**660** 3:17
**6600** 37:14
**666** 18:5
**677** 33:20

---
### 7
**7** 14:14 102:19 157:17
**7th** 26:5
**7.4** 87:18
**7.4(h)** 144:1
**70** 35:4 70:16
**700,000** 201:14
**744255** 25:5
**75001** 38:6
**75201** 19:6 22:20 31:6
**76013** 36:15
**767** 3:5 31:13
**77** 10:6
**78701** 27:15
**78711** 6:17

---
### 8
**8th** 16:22 26:16
**80** 12:21
**800** 16:14
**80202** 20:14
**82** 56:15
**820** 149:20
**824** 21:4
**83.4** 87:12
**832S** 13:12
**850** 94:5
**86** 5:14
**899** 36:5

---
### 9
**9** 169:13
**9th** 35:5
**9:02** 1:19
**9:30** 198:22
**90** 70:16
**90.7** 124:8

**900** 154:6,14
**90071** 11:17 28:14
**919** 4:4
**92101** 29:17
**94244** 25:6
**950** 64:20 71:8 141:19
**95110** 35:6
**96** 87:7
**97** 87:7
**99** 162:10
**99.6** 194:23,25

# **Exhibit 7**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

|  |  |  |
|---|---|---|
|  | :: |  |
| IN RE: | :: | CHAPTER 11 |
|  | :: | CASE NO. 09-50026 (REG) |
| GENERAL MOTORS CORPORATION, *ET AL.*, | :: |  |
|  | :: | (JOINTLY |
| DEBTORS. | :: | ADMINISTERED) |

------------------------------------------------------------------------ x

**ORDER PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105(a), 361, 362, 363, 364 AND 507 AND BANKRUPTCY RULES 2002, 4001**
**AND 6004 (A) APPROVING AMENDMENT TO DIP CREDIT FACILITY**
**TO PROVIDE FOR DEBTORS' POST-PETITION WIND-DOWN FINANCING**

THIS MATTER having come before this Court by the motion dated June 29,

2009 (the "**Motion**") of General Motors Corporation ("**GM**") and its affiliated debtors in the

above-captioned cases, as debtors and debtors-in-possession (collectively with GM,

the "**Debtors**"),[1] seeking, among other things, entry of an order (the "**Order**") authorizing the

Debtors,[2] pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code, as

amended (the "**Bankruptcy Code**"), Rules 2002, 4001 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001 of the Local Bankruptcy Rules

for the Southern District of New York (the "**Local Bankruptcy Rules**"), on or substantially

contemporaneously with the closing of the Related Section 363 Transactions, to enter into that

certain Amended and Restated Superpriority Debtor-in-Possession Credit Facility providing for

---

[1]    The Debtors in these cases include: GM, Saturn, LLC, Saturn Distribution Corporation, and
Chevrolet-Saturn of Harlem, Inc.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the
Final DIP Order (as defined below).

the amendment and restatement of the terms applicable to the Tranche C Term Loan (as such

term is defined in the DIP Credit Facility (as defined below)) funding the wind-down of the

Debtors in an amount of $1,175,000,000 pursuant to and in accordance with section 2.14 of the

DIP Credit Facility (as so amended and restated, the "**Amended DIP Facility**")[3]; and this Court

previously having entered an order (the "**Final DIP Order**"), dated June 25, 2009 (Docket No.

2529), authorizing the Debtors, pursuant to sections 105, 362, 363 and 364 of the Bankruptcy

Code and Rules 2002, 4001 and 6004 of the Bankruptcy Rules, and Rule 4001 of the Local

Bankruptcy Rules, to enter into the Secured Superpriority Debtor-in-Possession Credit

Agreement, by and among GM, as borrower, and The United States Department of the Treasury

("**U.S. Treasury**") and Export Development Canada ("**EDC**"), as lenders (together, and

including any successors-in-interest, assigns or transferees thereof, the "**DIP Lenders**"), in

substantially the form annexed as Exhibit 1 to the Final DIP Order (as the same may be

amended, supplemented, restated or otherwise modified from time to time, including, without

limitation, by the Amended DIP Facility, and together with all related agreements and

documents, the "**DIP Credit Facility**"), and to obtain post-petition financing on a secured and

super-priority basis pursuant to the terms and conditions thereof, up to a maximum aggregate

amount of $33.3 billion (the "**Commitment**"); and the Final DIP Order having provided that the

Amended DIP Facility, acceptable to the Debtors and the DIP Lenders, shall be subject to

approval by this Court on three days notice after the filing of a motion seeking approval of the

Amended DIP Facility; and this Court having considered the Motion, the Amended DIP Facility,

and any pleadings in support thereof or in response thereto; and due and proper notice of the

Motion having been provided in accordance with the Final DIP Order; and a hearing having been

---

[3]    A copy of the Amended DIP Facility is annexed hereto as Exhibit 1.

held and concluded on July 2, 2009 (the "**Hearing**") to consider the relief requested in the

Motion; and it appearing that granting the relief requested in the Motion is appropriate, fair and

reasonable and in the best interests of the Debtors, their estates, creditors and other parties in

interest, and is essential for the Debtors' continued operations; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and the Official Committee of Unsecured Creditors (the "**Committee**") having been

actively engaged in substantive negotiations of the Amended DIP Facility and the Wind-Down

Budget (as defined in the DIP Credit Facility); and all objections, if any, to the relief requested in

the Motion having been withdrawn, resolved or overruled on the merits by this Court; and after

due deliberation and consideration and good and sufficient cause appearing therefor; it is hereby

**ORDERED** that the Findings of Fact and Conclusions of Law set forth in the

Final DIP Order are herein incorporated by reference and shall have the same force and

effect as though fully set forth in this Order; and it is further

**ORDERED** that the Motion is granted, and all objections, if any, to the Motion

heretofore not withdrawn or resolved are overruled on the merits in all respects; and it is

further

**ORDERED** that the Amended DIP Facility, substantially in the form annexed

hereto as Exhibit 1, is approved in all respects such that the Debtors are authorized to

obtain post-petition financing in accordance with the Amended DIP Facility of

$1,175,000,000, on a super-priority and secured basis, pursuant and subject to the terms and conditions of the Amended DIP Facility, the Final DIP Order and this Order; and it is further

**ORDERED** that upon the execution of the Amended DIP Facility, the defined term "DIP Credit Facility" as used in the Final DIP Order and this Order is deemed to mean and refer to such credit facility, as amended by the Amended DIP Facility; and it is further

**ORDERED** that, except as modified by the Amended DIP Facility or this Order, the Final DIP Order shall remain in full force and effect; and it is further

**ORDERED** that the claims and liens granted to the DIP Lenders under the Final DIP Order shall apply as set forth therein to the Amended DIP Facility except as explicitly modified by the following upon the Effective Date (as defined in the Amended DIP Facility):

> (a)    the claims of the DIP Lenders arising from the Amended DIP Facility, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, and all other obligations owing to the DIP Lenders under the DIP Credit Facility shall be and are accorded a super-priority administrative expense status in each of these cases, and, subject only to the Carve-Out, shall have priority over any and all other administrative expenses and unsecured claims arising in these cases; provided, however, that subsequent to the closing of the Related Section 363 Transactions, claims against the Debtors' estates that have priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions shall have priority over such obligations (up to the aggregate amount of $1,175,000,000; provided, however, that any greater amount shall be subject to approval by the DIP Lenders) owing to the DIP Lenders under the Amended DIP Facility; and

(b)    the DIP Liens granted under the Final DIP Order (i) shall continue under the Amended DIP Facility on the Property in the same force, effect and priority as set forth in the Final DIP Order to the extent any such Property remains Property of the Debtors (but, for the avoidance of doubt, shall not extend to any Property that has been transferred to a non-Debtor pursuant to the Related Section 363 Transaction), (ii) shall continue to be subject to the Carve-Out, and (iii) shall include the proceeds of the Amended DIP Facility; provided, however, notwithstanding anything to the contrary in this Order, the Final DIP Order, DIP Credit Facility or the Amended DIP Facility, the DIP Liens shall not include security interests in or liens on avoidance actions arising under chapter 5 of the Bankruptcy Code against the Prepetition Senior Facilities Secured Parties (as defined in the DIP Credit Facility) or any stock, warrants, options or other equity interests in New CarCo (as defined in the Amended DIP Facility) issued to or held by any Debtor (or any of its subsidiaries) pursuant to the Related Section 363 Transactions including any dividends, payments or other distributions thereon and any proceeds or securities received or receivable upon any disposition or exercise thereof (the "**New GM Equity Interests**").

ORDERED that substantially contemporaneously with the execution of the Amended DIP Facility, the amount of $1,175,000,000 in immediately available federal funds shall be deposited into a segregated bank account at a nationally recognized financial institution acceptable to the DIP Lenders; and it is further

ORDERED that, except as expressly permitted by this Order or the Amended DIP Facility or as otherwise permitted by the Wind-Down Budget, the proceeds of the Amended DIP Facility shall be used solely to finance the working capital needs and other general corporate purposes of the Debtors incurred in connection with the Wind-Down (as defined in the Amended DIP Facility), including the payment of expenses associated with the post-petition administration of the Debtors' cases; provided, however, that any allowed secured claims against the Debtors' estates may be paid or otherwise satisfied (including pursuant to a plan of liquidation) from the proceeds of the Amended DIP

Facility (other than the "TPC Excess Secured Claim" as defined in the Section 363 Sale Order (as defined in the Amended DIP Facility)); and provided, further, however, that any unused proceeds of the Amended DIP Facility shall be repaid to the Lender on the Maturity Date (as defined in the Amended DIP Facility); and it is further

**ORDERED** that, except as otherwise provided in the immediately preceding decretal paragraph of this Order, the proceeds of the Amended DIP Facility shall be unavailable to pay or otherwise satisfy any prepetition, general unsecured claims against the Debtors' estates; and it is further

**ORDERED** that the Loans (as defined in the Amended DIP Facility) shall be non-recourse to the Borrower and the Guarantors, such that the DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral (as defined in the Amended DIP Facility) securing the DIP Loans, and nothing in this Order, the Final DIP Order, the DIP Credit Facility or the Amended DIP Facility shall, or shall be construed in any way, to authorize or permit the DIP Lenders to seek recourse against the New GM Equity Interests at any time; and it is further

**ORDERED** that the Debtors are authorized to take such other and further action as is necessary to implement the decretal provisions of this Order with respect to the Amended DIP Facility, subject only to the consent of the DIP Lenders as provided under the Amended DIP Facility or this Order; and it is further

**ORDERED** that Section 5.26 of the Amended DIP Facility shall not be amended without the prior written consent of the Required Lenders, the Creditors' Committee and New CarCo; and it is further

**ORDERED** that prior to the making of any optional prepayments by the Debtors under the Amended DIP Facility, the Committee shall have received prior written notice of such prepayment at least fourteen (14) days prior to the date such prepayment is to be made; and it is further

**ORDERED** that the Committee shall receive the same reports and financial statements provided by the Debtors to the DIP Lenders under sections 5.1 and 5.2 of the Amended DIP Facility in the same manner and at the same time provided to the DIP Lenders; and it is further

**ORDERED** that the Debtors have provided adequate and sufficient notice of the this Order as required under the Final DIP Order; and it is further

**ORDERED** that this Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the Amended DIP Facility, the DIP Credit Facility, the Final DIP Order and this Order in all respects; <u>provided</u>, <u>however</u>, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

Dated: New York, New York
      July <u>5</u>, 2009

                                        *s/ Robert E. Gerber*
                                        HON. ROBERT E. GERBER
                                        UNITED STATES BANKRUPTCY JUDGE

<u>Exhibit 1</u>

[Amended DIP Facility]

**PRIVILEGED AND CONFIDENTIAL**
**CWT DRAFT 7/4/09**

---

$1,175,000,000
AMENDED AND RESTATED SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

MOTORS LIQUIDATION COMPANY
(f/k/a GENERAL MOTORS CORPORATION)
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

THE GUARANTORS

and

THE LENDERS PARTIES HERETO FROM TIME TO TIME

Dated as of July __, 2009

---

TABLE OF CONTENTS

Page

SECTION 1

DEFINITIONS

1.1    Defined Terms ........................................................................................................2
1.2    Other Definitional Provisions ...............................................................................23
1.3    Conversion of Foreign Currencies ........................................................................23

SECTION 2

AMOUNT AND TERMS OF THE LOANS

2.1    Loans......................................................................................................................24
2.2    [Intentionally Omitted] .........................................................................................24
2.3    Repayment of Loans; Evidence of Debt ...............................................................24
2.4    Optional Prepayments ...........................................................................................24
2.5    [Intentionally Omitted] .........................................................................................25
2.6    Interest Rates and Payment Dates/Fee Payment Dates/Fees .................................25
2.7    Computation of Interest and Fees ..........................................................................25
2.8    Inability to Determine Interest Rate; Illegality ....................................................26
2.9    Treatment of Borrowings and Payments; Evidence of Debt .................................26
2.10   Indemnity ...............................................................................................................27
2.11   Superpriority Nature of Obligations and Lenders' Liens ......................................27
2.12   Taxes......................................................................................................................27

SECTION 3

REPRESENTATIONS AND WARRANTIES

3.1    Existence ................................................................................................................30
3.2    [Intentionally Omitted] .........................................................................................30
3.3    [Intentionally Omitted] .........................................................................................30
3.4    [Intentionally Omitted] .........................................................................................30
3.5    Action, Binding Obligations ................................................................................30
3.6    Approvals...............................................................................................................30
3.7    [Intentionally Omitted] .........................................................................................31
3.8    Investment Company Act ......................................................................................31
3.9    [Intentionally Omitted] .........................................................................................31
3.10   Chief Executive Office; Chief Operating Office .................................................31
3.11   Location of Books and Records.............................................................................31
3.12   [Intentionally Omitted] .........................................................................................31

Page

3.13  [Intentionally Omitted] ................................................................................................31
3.14  Expense Policy ...........................................................................................................31
3.15  Subsidiaries ...............................................................................................................31
3.16  Capitalization .............................................................................................................31
3.17  Fraudulent Conveyance ..............................................................................................31
3.18  USA PATRIOT Act ....................................................................................................31
3.19  Embargoed Person ......................................................................................................32
3.20  Use of Proceeds ..........................................................................................................33
3.21  Representations Concerning the Collateral ...................................................................33
3.22  [Intentionally Omitted] ................................................................................................34
3.23  [Intentionally Omitted] ................................................................................................34
3.24  Lien Priority ...............................................................................................................34
3.25  [Intentionally Omitted] ................................................................................................35
3.26  [Intentionally Omitted] ................................................................................................35
3.27  [Intentionally Omitted] ................................................................................................35
3.28  Excluded Collateral .....................................................................................................35
3.29  Mortgaged Real Property .............................................................................................35
3.30  [Intentionally Omitted] ................................................................................................35
3.31  The Final Order ..........................................................................................................35
3.32  Wind-Down Budget .....................................................................................................35

## SECTION 4

## CONDITIONS PRECEDENT

4.1   Conditions to Effectiveness .........................................................................................36

## SECTION 5

## AFFIRMATIVE COVENANTS

5.1   Financial Statements ...................................................................................................38
5.2   Notices; Reporting Requirements .................................................................................39
5.3   Existence ....................................................................................................................41
5.4   Payments of Taxes ......................................................................................................42
5.5   Use of Proceeds ..........................................................................................................42
5.6   Maintenance of Existence; Payment of Obligations; Compliance with Law ...................42
5.7   Further Identification of Collateral ...............................................................................43
5.8   Defense of Title...........................................................................................................43
5.9   Preservation of Collateral ............................................................................................43
5.10  Maintenance of Papers, Records and Files ....................................................................43
5.11  Maintenance of Licenses..............................................................................................44
5.12  Payment of Obligations................................................................................................44
5.13  OFAC .........................................................................................................................44
5.14  Investment Company ...................................................................................................44
5.15  Further Assurances.......................................................................................................44

Page

5.16    Executive Privileges and Compensation....................................................................45
5.17    Aircraft........................................................................................................................46
5.18    Restrictions on Expenses .............................................................................................46
5.19    Employ American Workers Act....................................................................................47
5.20    Internal Controls; Recordkeeping; Additional Reporting............................................47
5.21    Waivers ........................................................................................................................47
5.22    [Intentionally Omitted] ...............................................................................................48
5.23    Additional Guarantors .................................................................................................48
5.24    Provide Additional Information ...................................................................................48
5.25    Inspection of Property; Books and Records; Discussions ............................................48
5.26    [Governance of Borrower]...........................................................................................49

SECTION 6

NEGATIVE COVENANTS

6.1     Prohibition on Fundamental Changes............................................................................49
6.2     Lines of Business .........................................................................................................49
6.3     Transactions with Affiliates.........................................................................................49
6.4     Limitation on Liens......................................................................................................50
6.5     Restricted Payments.....................................................................................................50
6.6     Amendments to Transaction Documents ......................................................................51
6.7     Changes in Fiscal Periods ............................................................................................51
6.8     Negative Pledge ...........................................................................................................51
6.9     Indebtedness.................................................................................................................51
6.10    Investments ..................................................................................................................51
6.11    Action Adverse to the Collateral..................................................................................51
6.12    Limitation on Sale of Assets........................................................................................51
6.13    [Intentionally Omitted] ...............................................................................................52
6.14    JV Agreements.............................................................................................................52
6.15    Swap Agreements ........................................................................................................52
6.16    Clauses Restricting Subsidiary Distributions...............................................................52
6.17    Sale/Leaseback Transactions .......................................................................................52
6.18    [Intentionally Omitted] ...............................................................................................53
6.19    Modification of Organizational Documents .................................................................53

SECTION 7

EVENTS OF DEFAULT

7.1     Events of Default .........................................................................................................53
7.2     Remedies upon Event of Default ..................................................................................55

<u>Page</u>

## SECTION 8

## MISCELLANEOUS

| | | |
|---|---|---|
| 8.1 | Amendments and Waivers | 57 |
| 8.2 | Notices | 58 |
| 8.3 | No Waiver; Cumulative Remedies | 60 |
| 8.4 | Survival of Representations and Warranties | 60 |
| 8.5 | Payment of Expenses | 60 |
| 8.6 | Successors and Assigns; Participations and Assignments | 61 |
| 8.7 | Adjustments; Set-off | 62 |
| 8.8 | Counterparts | 63 |
| 8.9 | Severability | 63 |
| 8.10 | Integration | 63 |
| 8.11 | Governing Law | 63 |
| 8.12 | Submission to Jurisdiction; Waivers | 63 |
| 8.13 | Acknowledgments | 64 |
| 8.14 | Release of Guaranties | 64 |
| 8.15 | Confidentiality | 64 |
| 8.16 | Waivers of Jury Trial | 65 |
| 8.17 | USA PATRIOT Act | 65 |
| 8.18 | Orders | 65 |
| 8.19 | Effect of Amendment and Restatement of the Existing Credit Agreement | 65 |
| 8.20 | New GM Equity Interests | 66 |

Page

ANNEXES:

I                Form of Wind-Down Budget

SCHEDULES:

1.1A            Outstanding Amounts of Tranche C Term Loans
1.1B            Guarantors
1.1C            Mortgaged Property
1.1D            Pledgors
1.1E            [Intentionally Omitted]
1.1F            [Intentionally Omitted]
1.1G            Certain Excluded Subsidiaries
3.3             [Intentionally Omitted]
3.10            Chief Executive Office and Chief Operating Office
3.11            Location of Books and Records
3.15            Subsidiaries
3.16            Ownership of North American Group Members
3.21            Jurisdictions and Recording Offices
3.25            [Intentionally Omitted]
3.26            [Intentionally Omitted]
3.28            Excluded Collateral

EXHIBITS:

A               Form of Amended and Restated Guaranty and Security Agreement
B-1             Form of Secretary's Certificate
B-2             Form of Officer's Certificate
C               Form of Assignment and Assumption
D-1             Form of Waiver for the Loan Parties
D-2             Form of Waiver of SEO to Treasury
D-3             Form of Consent and Waiver of SEO to Borrower
D-4             Form of Waiver of Senior Employee to Treasury
D-5             Form of Consent and Waiver of Senior Employee to Borrower
E               Form of Legal Opinion of Weil, Gotshal & Manges LLP
F               Form of Compliance Certificate
G               Form of Amended and Restated Note
H               [Intentionally Omitted]
I               Form of Amended and Restated Environmental Indemnity Agreement
J               Form of Amended and Restated Mortgage
K               [Intentionally Omitted]
L               Form of Amended and Restated Equity Pledge Agreement

AMENDED AND RESTATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "<u>Agreement</u>"), dated as of July __, 2009, by and among MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation), a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below) (the "<u>Borrower</u>"), the Guarantors (as defined below), and the several lenders from time to time parties to this Agreement (the "<u>Lenders</u>").

<center>W I T N E S S E T H:</center>

WHEREAS, on June 1, 2009 (the "<u>Petition Date</u>"), the Borrower, Saturn, LLC, a Delaware limited liability company, Saturn Distribution Corporation, a Delaware corporation, and Chevrolet-Saturn of Harlem, Inc., a Delaware corporation (each an "<u>Initial Debtor</u>" and collectively, the "<u>Initial Debtors</u>") filed voluntary petitions in the Bankruptcy Court (as defined below) for relief, and commenced cases (each an "<u>Initial Case</u>" and collectively, the "<u>Initial Cases</u>") under the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 3, 2009, the Borrower entered into the Secured Superpriority Debtor-In-Possession Credit Agreement, among the Borrower, the guarantors party thereto and the Lenders (the "<u>Existing Credit Agreement</u>");

WHEREAS, pursuant to the Existing Credit Agreement, the Lenders provided the Borrower with (i) term loans in an aggregate amount equal to $_____ (the "<u>Tranche B Term Loans</u>") and (ii) term loans in an aggregate amount equal to $1,175,000,000 (the "<u>Tranche C Term Loans</u>");

WHEREAS, on June 25, 2009, the Bankruptcy Court entered the Final Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "<u>Final Order</u>") approving the terms and conditions of the Existing Credit Agreement and the Loan Documents (as defined in the Existing Credit Agreement);

WHEREAS, on July __, 2009, the Bankruptcy Court entered the Wind-Down Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "<u>Wind-Down Order</u>") approving the amendment to the Existing Credit Agreement to provide for Debtors' with post-petition, wind-down financing;

WHEREAS, pursuant to the Master Transaction Agreement (as defined below), on [July __, 2009] [the date hereof] the Treasury (as defined below) exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with its Additional Notes (as defined in the Existing Credit Agreement) and its rights under the Existing UST Term Loan Agreement including the Warrant Note (as defined in the Existing UST Loan Agreement as defined below) and the Additional Notes (as defined in the Existing UST Loan Agreement) to

New CarCo (as defined below) in exchange for common and preferred Capital Stock (as defined below) of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement, on [July __, 2009] [the date hereof] the Canadian Lender exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with its Additional Notes to New CarCo in exchange for common and preferred Capital Stock of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement and in accordance with the Section 363 Sale Order (as defined below), the Borrower sold to New CarCo certain of its assets and property, and New CarCo assumed certain liabilities of the Borrower and its Subsidiaries (as defined below), including a portion of the Treasury's Tranche B Term Loans in an aggregate amount equal to $7,072,488,605 pursuant to the Assignment and Assumption Agreement, dated as of the date hereof (the "New CarCo Assignment and Assumption"), between the Borrower and New CarCo (collectively, and together with the other transactions contemplated by the Transaction Documents, the "Related Section 363 Transactions");

WHEREAS, after giving effect to the Related Section 363 Transactions, the remaining obligations of the Borrower to the Lenders are comprised solely of the Tranche C Term Loans; and

WHEREAS, the Borrower has requested, and the Lenders have agreed, to amend and restate the portion of the Existing Credit Agreement relating to the Tranche C Term Loans on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the parties hereto agree that on the Effective Date, as provided in Section 8.19, the Existing Credit Agreement shall be amended and restated in its entirety as follows:

## SECTION 1

## DEFINITIONS

1.1.  Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the three month Eurodollar Rate (for the avoidance of doubt after giving effect to the provisos in the definition thereof) plus 1.00%; provided that, in the event the Required Lenders shall have determined that adequate and reasonable means do not exist for ascertaining the calculation of clause (c), such calculation shall be replaced with the last available calculation of the three month Eurodollar Rate plus 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate shall be effective as of the opening of business on the effective

day of such change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate, respectively.

"<u>ABR Loans</u>":  Loans the rate of interest applicable to which is based upon the ABR.

"<u>Additional Guarantor</u>": as defined in Section 5.23.

"<u>Administrative/Priority Claim Payment Amount</u>":  any positive amount equal to the difference between $200,000,000 and the aggregate amount paid or payable (or specifically reserved for payment as such) to satisfy all of the administrative and priority claims comprising the Administrative/ Priority Claim Tranche.

"<u>Administrative/ Priority Claim Payment Date</u>":  the first Business Day after which the administrative and priority claims that comprise the Administrative/ Priority Claim Tranche are satisfied in full or otherwise finalized so that no such claims remain outstanding and unsatisfied, but in no case later than the date on which a liquidation plan with respect to the Debtors is approved by the Bankruptcy Court and declared effective.

"<u>Administrative/Priority Claim Tranche</u>":  an amount under the Wind-Down Budget up to $200,000,000 that was allocated as of the Effective Date to cover anticipated (i) administrative claims related to contract rejections by the Debtors and (ii) priority claims against the Debtors, each as further described in the Wind-Down Budget.  The description of the administrative and priority claims that are to be set forth in the Wind-Down Budget shall reflect such categories, provisions and assumptions such that a good faith estimate, as of the Effective Date, of the sum of the obligations arising from the claims referenced in clauses (i) and (ii) above shall be at least equal to $200,000,000.

"<u>Affiliate</u>":  with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this Agreement, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.  For the avoidance of doubt, pension plans of a Person and entities holdings the assets of such plans, shall not be deemed to be Affiliates of such Person.

"<u>Aggregate Exposure Percentage</u>":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's aggregate but unpaid principal amount of such Lender's Loans at such time to the sum of the aggregate but unpaid principal amount of all Lenders' Loans at such time.

"<u>Agreement</u>":  as defined in the preamble hereto.

"<u>Anti-Money Laundering Laws</u>":  as defined in Section 3.18(d).

"<u>Applicable Law</u>":  as to any Person, all laws (including common law), statutes, regulations, ordinances, treaties, judgments, decrees, injunctions, writs and orders of any court,

governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations.

"<u>Applicable Margin</u>":   (A) 2.0% per annum in the case of ABR Loans and (B) 3.0% per annum in the case of Eurodollar Loans.

"<u>Assignee</u>":  as defined in Section 8.6(b).

"<u>Assignment and Assumption</u>":  an Assignment and Assumption, substantially in the form of Exhibit C.

"<u>Bankruptcy Code</u>":   the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*

"<u>Bankruptcy Court</u>":   the United States Bankruptcy Court for the Southern District of New York (together with the District Court for the Southern District of New York, where applicable).

"<u>Bankruptcy Exceptions</u>":  limitations on, or exceptions to, the enforceability of an agreement against a Person due to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or the application of general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

"<u>Bankruptcy Rules</u>":   the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"<u>Benefitted Lender</u>":  as defined in Section 8.7(a).

"<u>Board</u>":   the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>":  as defined in the recitals.

"<u>Business Day</u>":   any day other than a Saturday, Sunday or other day on which banks in New York City or Ottawa, Ontario, Canada are permitted to close; <u>provided</u>, <u>however</u>, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London Interbank market.

"<u>Canadian Lender</u>":   Export Development Canada, a corporation established pursuant to the laws of Canada, and its successors and assigns.

"<u>Canadian Lender Consortium Members</u>":   each of the Export Development Canada, the Government of Canada and the Government of Ontario.

"Canadian Post-Sale Facility":  the Amended and Restated Loan Agreement, dated as of the [Effective Date], by and among General Motors of Canada Limited, as borrower, the other loan parties thereto, and the Canadian Lender.

"Canadian PV Loan Agreement":  the Loan Agreement, dated as of the [Effective Date], by and among New CarCo, as borrower, the other loan parties thereto, and the Canadian Lender.

"Capital Lease Obligations":  for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Capital Stock":  any and all equity interests, including any shares of stock, membership or partnership interests, participations or other equivalents whether certificated or uncertificated (however designated) of a corporation, limited liability company, partnership or any other entity, and any and all similar ownership interests in a Person and any and all warrants or options to purchase any of the foregoing.

"Carve-Out":  as defined in the Orders.

"Cases":  the Initial Cases and each other case of a Debtor filed with the Bankruptcy Court and joined with the Initial Cases.

"Cash Equivalents":   shall mean (a) Dollars, or money in other currencies received in the ordinary course of business, (b) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed or insured by the United States or Canadian government or any agency thereof, (c) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, province, commonwealth or territory of the United States or Canada, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's or equivalent rating, (d) demand deposit, certificates of deposit and time deposits with maturities of one (1) year or less from the date of acquisition and overnight bank deposits of any commercial bank, supranational bank or trust company having capital and surplus in excess of $500,000,000, (e) repurchase obligations with respect to securities of the types (but not necessarily maturity) described in clauses (b) and (c) above, having a term of not more than 90 days, of banks (or bank holding companies) or subsidiaries of such banks (or bank holding companies) and non-bank broker-dealers listed on the Federal Reserve Bank of New York's list of primary and other reporting dealers ("Repo Counterparties"), which Repo Counterparties have capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign equivalent thereof) and which Repo Counterparties or their parents (if the Repo Counterparties are not rated) will at the time of the transaction be rated "A-1" by S&P (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization, (f) commercial paper rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either

case maturing within one (1) year after the day of acquisition, (g) short-term marketable securities of comparable credit quality, (h) shares of money market mutual or similar funds which invest at least 95% in assets satisfying the requirements of clauses (a) through (g) of this definition, and (i) in the case of a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Change of Control":  with respect to the Borrower, the acquisition, after the Closing Date, by any other Person, or two or more other Persons acting in concert other than the Permitted Holders, the Lenders or any Affiliate of the Lenders, of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of outstanding shares of voting stock of the Borrower at any time if after giving effect to such acquisition such Person or Persons owns twenty percent (20%) or more of such outstanding voting stock.

"Closing Date":  June 3, 2009.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property and assets of the Loan Parties of every kind or type whatsoever, including tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located, all property of the estates of each Debtor within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law except avoidance actions against the Prepetition Senior Facilities Secured Parties (as defined in the Final Order)), all property pledged to secure the Obligations under each Collateral Document (other than the Orders) and all proceeds, rents and products of the foregoing other than Excluded Collateral.  For the avoidance of doubt, the proceeds of the Tranche C Term Loans constitute Collateral.

"Collateral Documents":  means, collectively, the Orders, the Guaranty, the Equity Pledge Agreement, each Mortgage, collateral assignment, security agreement, pledge agreement or similar agreements delivered to the Lenders to secure the Obligations.  The Collateral Documents (other than the Orders) shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"Committee":  any statutory committee appointed in the Cases.

"Compensation Regulations":  as defined in Section 5.16(a)(i).

"Compliance Certificate":  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit F, for the immediately prior calendar month and on a cumulative basis from the Petition Date.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control":  as defined in the definition of "Affiliate".

"Controlled Affiliate":  as defined in Section 3.18(a).

"Convention":  as defined in Section 2.12(d).

"Debtor":  each of the Initial Debtors and, subject to the written consent of the Required Lenders, each other Subsidiary of the Initial Debtors to the extent that (i) such Subsidiary files with the Bankruptcy Court, (ii) such case is joined with the Cases and (iii) such Subsidiary is subject, by order of the Bankruptcy Court, to the previously issued orders relating to the Cases (including the Orders).

"Debtor Successor":  with respect to any Debtor, (i) a "liquidating trust," within the meaning of Treas. Reg. § 301.7701-4, to which such Debtor's assets are distributed, or (ii) any other entity established for the sole purpose of liquidating the assets of such Debtor.

"Default":  any event, that with the giving of notice, the lapse of time, or both, would become an Event of Default.

"Disposition":  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollar Equivalent":  on any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to an amount denominated in any other currency, the equivalent in Dollars of such amount as determined by the Treasury in accordance with normal banking industry practice using the Exchange Rate on the date of determination of such equivalent.  In making any determination of the Dollar Equivalent, the Treasury shall use the relevant Exchange Rate in effect on the date on which a Dollar Equivalent is required to be determined pursuant to the provisions of this Agreement.  As appropriate, amounts specified herein as amounts in Dollars shall include any relevant Dollar Equivalent amount.

"Dollars" and "$":  the lawful money of the United States.

"Domestic 956 Subsidiary":  any U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Domestic Subsidiary":  any Subsidiary that is organized or existing under the laws of the United States or Canada or any state, province, commonwealth or territory of the United States or Canada.

"EAWA":  the Employ American Workers Act (Section 1611 of Division A, Title XVI of the American Recovery and Reinvestment Act of 2009), Public Law No. 111-5, effective as of February 17, 2009, as may be amended and in effect from time to time.

"EESA":  the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7000 *et al.* of Division A,

Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time.

"Effective Date":  the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall not be later than the date on which the Related Section 363 Transactions are consummated.

"EISA":  the Energy Independence and Security Act of 2007, Public Law No. 110-140, effective as of January 1, 2009, as may be amended and in effect from time to time.

"Embargoed Person":  as defined in Section 3.19.

"Environmental Agreement":  the Environmental Agreement dated as of the date hereof, executed by the Loan Parties for the benefit of the Lenders, substantially in the form of Exhibit I.

"Environmental Laws":  any and all foreign, Federal, state, provincial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or natural resources, as now or may at any time hereafter be in effect.

"Environmental Permits":  any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"Environmental Tranche" an amount under the Wind-Down Budget up to $500,000,000 that was allocated as of the Effective Date to cover anticipated environmental related expenses and claims.

"Equity Pledge Agreement":  the Amended and Restated Equity Pledge Agreement dated as of the date hereof, made by each Pledgor in favor of the Lenders, substantially in the form of Exhibit L.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System; provided that the Eurocurrency Reserve Requirements shall be $0 with respect to the Canadian Lender.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such

Interest Period appearing on page LIBOR01 of the Reuters screen as of 11:00 a.m. (London time) two Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on such page of the Reuters screen (or otherwise on such screen), the Eurodollar Base Rate shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Treasury or, in the absence of such availability, by reference to the rate at which a reference institution selected by the Treasury is offered Dollar deposits at or about 11:00 a.m. (New York City time) two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided that, in no event shall the Eurodollar Rate be less than 2.00%.

"Event of Default":  as defined in Section 7.

"Exchange Act":  the Securities and Exchange Act of 1934, as amended.

"Exchange Rate":  for any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into Dollars, as set forth at 11:00 a.m. (New York time) on such day on the applicable Bloomberg currency page with respect to such currency.  In the event that such rate does not appear on the applicable Bloomberg currency page, the Exchange Rate with respect to such currency shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Treasury and the Borrower or, in the absence of such agreement, such Exchange Rate shall instead be the spot rate of exchange of a reference institution selected by the Treasury in the London Interbank market or other market where such reference institution's foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. (New York time) on such day for the purchase of Dollars with such currency, for delivery two Business Days later; provided, however, that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Treasury may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Collateral":  as defined in Schedule 3.28.  For the avoidance of doubt, Excluded Collateral shall at all times include the New GM Equity Interests and tax refunds due to Canadian subsidiaries.

"Excluded Subsidiary":  (i) any JV Subsidiary in which any Loan Party owns less than 80% of the voting or economic interest, (ii) any U.S. Subsidiary of the Borrower listed as one of the "Domestic Entities" on Annex 1 to Schedule 3.28 other than the Loan Parties listed therein, (iii) any Subsidiary of the Borrower existing on the Closing Date that the Borrower does not Control as of the Closing Date (including, without limitation, dealerships wholly owned by the Borrower that are operated by a third party pursuant to an agreement in effect on the Petition Date), (iv) [intentionally omitted] and (v) any Subsidiary set forth on Schedule 1.1G as such Schedule 1.1G may be amended from time to time with the consent of the Required Lenders.

"Executive Order":  as defined in Section 3.19.

"Existing Agreements":  the agreements of the Loan Parties and their Subsidiaries in effect on the Closing Date and any extensions, renewals and replacements thereof so long as any such extension, renewal and replacement could not reasonably be expected to have a material adverse effect on the rights and remedies of the Lenders under any of the Loan Documents.

"Existing Credit Agreement":  as defined in the recitals.

"Existing UST Term Loan Agreement":  the Loan and Security Agreement, dated as of December 31, 2008, between the Borrower and the Treasury.

"Expense Policy":  the Borrower's comprehensive written policy on corporate expenses maintained and implemented in accordance with the Treasury regulations contained in 31 C.F.R. Part 30.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it.

"Final Order":  as defined in the recitals.

"Foreign Assets Control Regulations":  as defined in Section 3.19.

"Foreign 956 Subsidiary":  any Non-U.S. Subsidiary of the Borrower that is a "controlled foreign corporation" as defined in Code Section 957.

"Foreign Subsidiary":  any Subsidiary that is not a Domestic Subsidiary.

"Funding Office":  the office of each Lender specified in Schedule 1.1A or such other office as may be specified from time to time by such Lender as its funding office by written notice to the Borrower.

"GAAP":  generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Authority":  any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, or any federal, state or municipal court, in each case whether of the United States or a foreign jurisdiction.

"Group Members":  the collective reference to the Borrower and its Subsidiaries.

"Guarantee Obligation":  as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee Obligation" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, to the extent required by the Lenders.  The amount of any Guarantee Obligation of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"Guarantor":  each Person listed on Schedule 1.1B and each other Person that becomes an Additional Guarantor.

"Guaranty":  the Amended and Restated Guaranty and Security Agreement dated as of the date hereof, executed and delivered by the Borrower and each Guarantor, substantially in the form of Exhibit A.

"Indebtedness":  for any Person:  (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services; (c) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (g) and (i) of this definition secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (h) and (i) of this definition guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner unless the terms of such indebtedness expressly provide that such Person is not liable therefor; (j) the liquidation value of all redeemable preferred Capital Stock of such Person; and (k) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Liabilities":  as defined in Section 8.5.

"Indemnitee":  as defined in Section 8.5.

"Initial Case":  as defined in the recitals.

"Initial Debtors":  as defined in the recitals.

"Interest Payment Date":  (a) as to any ABR Loan, the first day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan, the last day of such Interest Period, and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period":  as to any Eurodollar Loan, (i) initially, the period commencing on the Borrowing Date (as defined in the Existing Credit Agreement) with respect to such Loan and ending three months thereafter; and (ii) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending three months thereafter; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(A)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(B)    any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date; and

(C)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interim Order":  the Interim Order entered June 2, 2009 by the Bankruptcy Court pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) approving this Agreement and authorizing the Loan Parties to obtain Postpetition financing pursuant thereto, (b) granting related Liens and Superpriority Claims, (c) granting adequate protection to certain Prepetition secured parties, and (d) scheduling a final hearing.

"Investments":  as defined in Section 6.10.

"JV Agreement":  each partnership or limited liability company agreement (or similar agreement) between a North American Group Member or one of its Subsidiaries and the relevant JV Partner as the same may be amended, restated, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"JV Partner":  each Person party to a JV Agreement that is not a Loan Party or one of its Subsidiaries.

"<u>JV Subsidiary</u>":  any Subsidiary of a Group Member which is not a Wholly Owned Subsidiary and as to which the business and management thereof is jointly controlled by the holders of the Capital Stock therein pursuant to customary joint venture arrangements.

"<u>Lenders</u>":  as defined in the preamble hereto.

"<u>Lien</u>":   any mortgage, pledge, security interest, lien or other charge or encumbrance (in the nature of a security interest), including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"<u>Loan Documents</u>":  this Agreement, the Notes, the Environmental Indemnity Agreement, the Collateral Documents and each post-closing letter or agreement now and hereafter entered into among the parties hereto.

"<u>Loan Parties</u>":  the Borrower, each Guarantor and the Pledgors.

"<u>Loans</u>":  as defined in Section 2.1.

"<u>Master Transaction Agreement</u>":  that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, among New CarCo and the sellers party thereto.

"<u>Material Adverse Effect</u>":   a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries (taken as a whole), (b) the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any of the Loan Documents to which they are a party, (c) the validity or enforceability in any material respect of any of the Loan Documents to which the Loan Parties are a party, (d) the rights and remedies of the Lenders under any of the Loan Documents, or (e) the Collateral (taken as a whole); <u>provided</u> that, (w) the taking of any action by the Borrower and its Subsidiaries, including the cessation of production, pursuant to and in accordance with the Wind-Down Budget, (x) the filing of the Cases, and (y) any sale pursuant to any Related Section 363 Transaction or any other action taken pursuant to the Orders, shall not be taken into consideration.

"<u>Material Environmental Amount</u>":  $50,000,000.

"<u>Maturity Date</u>":   the first date on which each of the following shall have occurred (which date may be extended by the Lenders in their sole discretion in accordance with Section 8.1):   (i) all claims against the Debtors have been resolved such that there are no remaining disputed claims, (ii) all assets of the Debtors (other than remaining cash) have been liquidated and (iii) all distributions on account of allowed claims have been made, and all other actions that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been completed.  On the Maturity Date, the plan administrator or other individual or entity charged with administering the liquidation plan shall be entitled to retain a de minimis amount of funds to complete the dissolution of the last remaining Debtor.  As used in this definition, references to a Debtor includes its Debtor Successor.

"<u>Moody's</u>":  Moody's Investors Service, Inc. and its successors.

"Mortgage":  each of the mortgages and deeds of trust made by the Borrower or any Guarantor in favor of, or for the benefit of, the Lenders, substantially in the form of Exhibit J, taking into consideration the law and jurisdiction in which such mortgage or deed of trust is to be recorded or filed, to the extent applicable.

"Mortgaged Property":  each property listed on Schedule 1.1C, as to which the Lenders shall be granted a Lien pursuant to the Orders or the Mortgages.

"New CarCo":  General Motors Company (formerly known as NGMCO, Inc.), a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings, LLC.

"New CarCo Assignment and Assumption":  as defined in the recitals.

"New GM Equity Interests":  any stock, warrants, options or other equity interests of New CarCo or any of its Subsidiaries issued to or held by any Debtor (or any of its Subsidiaries) pursuant to the Related Section 363 Transactions, including any (i) subsequent dividends, payment or other distribution thereon, and (ii) proceeds received or receivable upon any disposition thereof.

"Non-Debtor":  each Subsidiary of the Borrower that is not a Debtor.

"Non-Excluded Taxes":  as defined in Section 2.12(a).

"Non-U.S. Lender":  as defined in Section 2.12(d).

"Non-U.S. Subsidiary":  any Subsidiary of any Loan Party that is not a U.S. Subsidiary.

"North American Group Members":  collectively, the Loan Parties and each Domestic Subsidiary that is not an Excluded Subsidiary.

"Notes":  as defined in Section 4.1(a)(vi) and any promissory notes issued in connection with an assignment contemplated by Section 2.3(b).

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Loan Party to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to any Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise.

"OFAC":  the Office of Foreign Assets Control of the Treasury.

"Orders":  the Interim Order, the Final Order and the Wind-Down Order.

"Other Foreign 956 Subsidiary":  any Non-U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Other Taxes":  any and all present or future stamp or documentary taxes and any other excise or property taxes, intangible or mortgage recording taxes, charges or similar levies imposed by the United States or any taxing authority thereof or therein arising from any payment made, or from the execution, delivery or enforcement of, or otherwise with respect to this Agreement or any other Loan Document.

"Participant":  as defined in Section 8.6(c).

"Permitted Holders":  any holder of any Capital Stock of the Borrower as of the Closing Date.

"Permitted Indebtedness":

(a)    Indebtedness created under any Loan Document;

(b)    [intentionally omitted];

(c)    trade payables, if any, in the ordinary course of its business;

(d)    Indebtedness existing on the Petition Date and any refinancings, refundings, renewals or extensions thereof (without any increase, or any shortening of the maturity, of any principal amount thereof);

(e)    intercompany Indebtedness of a North American Group Member in the ordinary course of business; provided that, the right to receive any repayment of such Indebtedness (other than Indebtedness meeting the criteria of clause (d) above, or any extensions, renewals, exchanges or replacements thereof) shall be subordinated to the Lenders' rights to receive repayment of the Obligations;

(f)    [intentionally omitted];

(g)    [intentionally omitted];

(h)    Swap Agreements permitted pursuant to Section 6.15 that are not entered into for speculative purposes;

(i)    Indebtedness with respect to (x) letters of credit, bankers' acceptances and similar instruments issued in the ordinary course of business, including letters of credit, bankers' acceptances and similar instruments in respect of the financing of insurance premiums, customs, stay, performance, bid, surety or appeal bonds and similar obligations, completion guaranties, "take or pay" obligations in supply agreements, reimbursement obligations regarding workers' compensation claims, indemnification,

adjustment of purchase price and similar obligations incurred in connection with the acquisition or Disposition of any business or assets, and sales contracts, coverage of long-term counterparty risk in respect of insurance companies, purchasing and supply agreements, rental deposits, judicial appeals and service contracts and (y) appeal, bid, performance, surety, customs or similar bonds issued for the account of any Loan Party in the ordinary course of business;

(j)    Indebtedness incurred in the ordinary course of business in connection with cash management and deposit accounts and operations, netting services, employee credit card programs and similar arrangements and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

(k)    any guarantee by any Loan Party of Permitted Indebtedness; and

(l)    Indebtedness entered into under Section 136 of EISA.

"Permitted Investments":

(a)    any Investment in Cash Equivalents;

(b)    any Investment by a Loan Party in the Borrower, another Loan Party, or a Pledged Entity that is a Domestic Subsidiary;

(c)    [intentionally omitted];

(d)    any Investment (i) existing on the Effective Date, or (ii) consisting of any extension, modification or renewal of any Investment existing on the Closing Date; provided that the amount of any such Investment is not increased through such extension, modification or renewal;

(e)    [intentionally omitted];

(f)    [intentionally omitted];

(g)    [intentionally omitted];

(h)    any Investment otherwise permitted under this Agreement;

(i)    Investments in Indebtedness of, or Investments guaranteed by, Governmental Authorities, in connection with industrial revenue, municipal, pollution control, development or other bonds or similar financing arrangements;

(j)    [intentionally omitted];

(k)    Trade Credit;

(l)    [intentionally omitted];

(m)    Investments (i) received in satisfaction or partial satisfaction of delinquent accounts and disputes with customers or suppliers in the ordinary course of business, or (ii) acquired as a result of foreclosure of a Lien securing an Investment or the transfer of the assets subject to such Lien in lieu of foreclosure;

(n)    commercial transactions in the ordinary course of business with the Borrower or any of its Subsidiaries to the extent such transactions would constitute an Investment;

(o)    conveyance of Collateral in an arm's-length transaction to a Subsidiary that is not a Loan Party or an Affiliate of the Borrower for non-cash consideration consisting of Trade Credit or other Property to become Collateral having a fair market value equal to or greater than the fair market value of the conveyed Collateral; and

(p)    Investments after the Effective Date in (i) dealerships of the Borrower and its Subsidiaries in the United States in an aggregate amount not exceeding $2,500,000 and (ii) General Motors Strasbourg, S.A. in an aggregate amount not exceeding $7,500,000.

"Permitted Liens":  with respect to any Property of any North American Group Member:

(a)    Liens created under the Loan Documents;

(b)    Liens on Property of a North American Group Member existing on the date hereof (including Liens on Property of a North American Group Member pursuant to Existing Agreements; provided that such Liens shall secure only those obligations and any permitted refinancing that they secure on the date hereof);

(c)    [intentionally omitted];

(d)    Liens for taxes and utility charges not yet due or that are being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided;

(e)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or that are being contested in compliance with Section 5.8;

(f)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the proceeds thereof;

(g)    Liens securing Swap Agreements permitted pursuant to Section 6.15;

(h)    Liens created in the ordinary course of business in favor of banks and other financial institutions over balances of any accounts held at such banks or financial institutions or over investment property held in a securities account, as the case may be,

to facilitate the operation of cash pooling, cash management or interest set-off arrangements;

(i)      customary Liens in favor of trustees and escrow agents, and netting and set-off rights, banker's liens and the like in favor of counterparties to financial obligations and instruments, including, without limitation, Swap Agreements permitted pursuant to Section 6.15;

(j)      Liens securing Indebtedness incurred under Section 136 of EISA;

(k)      pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment or other insurance and other social security laws or regulations;

(l)      deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety, customs and appeal bonds, performance bonds and other obligations of a like nature, or to secure the payment of import or customs duties, in each case incurred in the ordinary course of business;

(m)      zoning and environmental restrictions, easements, licenses, encroachments, covenants and servitudes, rights-of-way, restrictions on use of real property or groundwater, institutional controls and other similar encumbrances or deed restrictions incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any North American Group Member;

(n)      [intentionally omitted];

(o)      judgment Liens securing judgments;

(p)      any Lien consisting of rights reserved to or vested in any Governmental Authority by statutory provision;

(q)      Liens securing Indebtedness described in clauses (d) and (e) of the definition of Permitted Indebtedness;

(r)      pledges or deposits made to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (k) or (l) of this definition;

(s)      [intentionally omitted];

(t)      [intentionally omitted]; and

(u)      other Liens created or assumed in the ordinary course of business of the North American Group Member; provided that the obligations secured by all such Liens shall not exceed the principal amount of $10,000,000.

"Person":      any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Petition Date":  as defined in the recitals hereto.

"Pledged Entity":  a Subsidiary of a Loan Party whose Capital Stock is subject to a security interest in favor of the Lenders pursuant to the Orders or the Collateral Documents.

"Pledgors":  the parties set forth on Schedule 1.1D and each other Person that makes a pledge in favor of the Lenders under the Equity Pledge Agreement.

"Postpetition":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"Prepetition":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that arose or was instituted, or another matter that occurred, prior to the Petition Date.

"Prepetition Payment":  a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or trade payables or other Prepetition claims against any Debtor.

"Prime Rate":  the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to borrowers).

"Prohibited Jurisdiction":  any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person":  any Person:

(a)      subject to the provisions of the Executive Order;

(b)      that is owned or controlled by, or acting for or on behalf of, any person or entity that is subject to the provisions of the Executive Order;

(c)    with whom a Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.goofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate or affiliated with a Person listed above.

"Property":  any right or interest in or to property (other than tax refunds due to Canadian subsidiaries) of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Quarterly Report":  as defined in Section 5.1(f).

"Records":  all books, instruments, agreements, customer lists, credit files, computer files, storage media, tapes, disks, cards, software, data, computer programs, printouts and other computer materials and records generated by other media for the storage of information maintained by any Person with respect to the business and operations of the Loan Parties and the Collateral.

"Register":  as defined in Section 8.6(b).

"Regulation D":  Regulation D of the Board as in effect from time to time.

"Related Section 363 Transactions":  as defined in the recitals.

"Required Lenders":  at any time, Lenders with Loans constituting a majority of the Loans of all Lenders.

"Requirements of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court of competent jurisdiction or other Governmental Authority, in each case applicable to and binding upon such Person and any of its property, and to which such Person and any of its property is subject.

"Responsible Officer":  as to any Person, the chief executive officer or, with respect to financial matters (including without limitation those matters set forth in Sections 5.1(f) and 5.2(h)), the chief financial officer, treasurer or assistant treasurer of such Person, an individual so designated from time to time by such Person's board of directors or, for the purposes of Section 5.2 only (other than Sections 5.1(f) and 5.2(h)), to include the secretary or an assistant secretary of the Borrower, or, in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer shall mean any officer

authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution (or equivalent); <u>provided</u> that the Lenders are notified in writing of the identity of such Responsible Officer.

"<u>Restricted Payments</u>":  as defined in Section 6.5.

"<u>S&P</u>":  Standard & Poor's Ratings Services and its successors.

"<u>Sale/Leaseback Transaction</u>":  as defined in Section 6.17.

"<u>SEC</u>":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"<u>Section 363 Sale Order</u>":  an order of the Bankruptcy Court approving the Related Section 363 Transactions in form and substance substantially in the form attached to the Transaction Documents or otherwise satisfactory to the Required Lenders.

"<u>Senior Employee</u>":  any of the 25 most highly compensated employees (including the SEOs) of the Loan Parties, as determined pursuant to the rules set forth in 31 C.F.R. Part 30.

"<u>SEO</u>":  a Senior Executive Officer as defined in the EESA and any interpretation of such term by the Treasury thereunder, including the rules set forth in 31 C.F.R. Part 30.

"<u>Special Inspector General of the Troubled Asset Relief Program</u>":  The Special Inspector General of the Troubled Asset Relief Program, as contemplated by Section 121 of the EESA.

"<u>Specified Benefit Plan</u>":  any employee benefit plan within the meaning of section 3(3) of ERISA and any other plan, arrangement or agreement which provides for compensation, benefits, fringe benefits or other remuneration to any employee, former employee, individual independent contractor or director, including any bonus, incentive, supplemental retirement plan, golden parachute, employment, individual consulting, change of control, bonus or retention agreement, whether provided directly or indirectly by any Group Member or otherwise.

"<u>Subsidiary</u>":  with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or shall have the right to have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.  Unless otherwise qualified, all references to a "Subsidiary" or "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"<u>Superpriority Claim</u>":  a claim against the Borrower or any other Debtor in any of the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses including administrative expenses specified in sections 503 and 507 of the Bankruptcy Code, whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"<u>Swap Agreement</u>":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "<u>Swap Agreement</u>."

"<u>Taxes</u>":  as defined in Section 2.12(a).

"<u>Trade Credit</u>":  accounts receivable, trade credit or other advances extended to, or investment made in, customers, suppliers, including intercompany, in the ordinary course of business.

"<u>Trading With the Enemy Act</u>":  as defined in Section 3.19.

"<u>Tranche B Term Loan</u>":  as defined in the recitals.

"<u>Tranche C Term Loan</u>":  as defined in the recitals.

"<u>Transaction Documents</u>":  each of, and collectively, (i) the Master Transaction Agreement, (ii) the Section 363 Sale Order, (iii) the Transition Services Agreement and (iv) the related manufacturing agreements, asset purchase agreements, organizational documents, finance support agreements and all other related documentation, each as amended, supplemented or modified from time to time in accordance with Section 6.6.

"<u>Transferee</u>":  any Assignee or Participant.

"<u>Transition Services Agreement</u>":  the Transition Services Agreement, dated as of the date hereof, among the Borrower, the other Initial Debtors, and New CarCo, substantially in the form of Exhibit T to the Master Transaction Agreement.

"<u>Treasury</u>":  The United States Department of the Treasury.

"<u>Uniform Commercial Code</u>":  the Uniform Commercial Code as in effect from time to time in the State of New York.

"<u>United States</u>":  the United States of America.

"<u>USA PATRIOT Act</u>":  as defined in Section 3.18(d).

"U.S. Subsidiary":  any Subsidiary of any Loan Party that is organized or existing under the laws of the United States or any state thereof or the District of Columbia.

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wind-Down":  the sale or shutdown of certain businesses and properties of the Debtors and the Subsidiaries thereof.

"Wind-Down Budget":  the budget, attached as Annex I hereto, setting forth in reasonable detail all anticipated receipts and disbursements of the Borrower and certain of its U.S. Subsidiaries on a calendar year basis from the Effective Date through and including December 30, 2011, as amended by each Quarterly Report delivered pursuant to Section 5.1(f).

"Wind-Down Order":  as defined in the recitals.

1.2.    Other Definitional Provisions.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to Group Members not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time and (vi) references to any Person shall include its successors and assigns.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole (including the Schedules and Exhibits hereto) and not to any particular provision of this Agreement (or the Schedules and Exhibits hereto), and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3.    Conversion of Foreign Currencies.  (a) For purposes of this Agreement and the other Loan Documents, with respect to any monetary amounts in a currency other than

Dollars, the Dollar Equivalent thereof shall be determined based on the Exchange Rate in effect at the time of such determination (unless otherwise explicitly provided herein).

(b)    The Treasury may set up appropriate rounding off mechanisms or otherwise round-off amounts hereunder to the nearest higher or lower amount in whole Dollar or cent to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in whole cents, as may be necessary or appropriate.

## SECTION 2

## AMOUNT AND TERMS OF THE LOANS

2.1.    Loans.  On the Effective Date, the Lenders made the Tranche C Term Loans in Dollars to the Borrower in the aggregate principal amount of $1,175,000,000 (the "Loans").  The Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral.  The Loans may from time to time be Eurodollar Loans or, solely in the circumstances specified in Section 2.8, ABR Loans.  Loans repaid or prepaid may not be reborrowed.

2.2.    [Intentionally Omitted].

2.3.    Repayment of Loans; Evidence of Debt.  (a) The Loans shall be payable on the Maturity Date; provided that, upon the Administrative/ Priority Claim Payment Date, the portion of the Loans equal to the Administrative/ Priority Claim Payment Amount as of such date shall be due.  Except as otherwise expressly provided herein, the repayment of the Loans shall, subsequent to the closing of the Related Section 363 Transactions, be subject to claims against the Debtors' estates that have priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions, in an aggregate amount up to $1,175,000,000, or such larger amount as approved by the Lenders.

(b)    Pursuant to Section 4.1(a), the Borrower shall execute and deliver the Notes on the Effective Date.  Following any assignment of the Loans pursuant to Section 8.6, the Borrower agrees that, upon the request of any Lender, the Borrower shall promptly execute and deliver to such Lender Notes reflecting the Loans assigned and the Loans retained by such Lender, if any.

2.4.    Optional Prepayments.  (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to each Lender no later than 12:00 noon (New York City time) three Business Days prior to the date such prepayment is requested to be made, which notice shall specify the date of such prepayment, the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such payment; provided that, if a Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.10.  If any such notice is given, the amount specified in

such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid and shall be applied as provided in Section (b). Partial prepayments of Loans shall be in an aggregate principal amount of $20,000,000 or a whole multiple thereof or, if less, the entire principal amount thereof then outstanding.

(b)    Unless the Required Lenders shall otherwise agree, amounts to be applied in connection with prepayments made pursuant to Section 2.4 shall be applied, (i) first, to pay accrued and unpaid interest on, and expenses in respect of, the Loans, and (ii) second, to repay the Loans. Any such prepayment shall be accompanied by a notice to each Lender specifying the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such prepayment.

2.5.    [Intentionally Omitted].

2.6.    Interest Rates and Payment Dates/Fee Payment Dates/Fees.    (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    [Intentionally Omitted].

(d)    (i) At any time any Event of Default shall have occurred and be continuing, (i) all outstanding Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.6 plus 5% per annum, which, in the sole discretion of the Treasury, may be the rate of interest then applicable to ABR Loans, and (ii) all other outstanding Obligations shall bear interest at 5% above the rate per annum equal to the rate of interest then applicable to ABR Loans.

(e)    [Intentionally Omitted].

(f)    Interest shall be payable in arrears on each Interest Payment Date, provided that, interest on the Loans shall not be payable in cash on each Interest Payment Date but shall instead be added to the principal of the Loans on each Interest Payment Date and shall be payable in cash on the Maturity Date.

2.7.    Computation of Interest and Fees.    (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-) day year for the actual days elapsed. The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Treasury shall, as soon as practicable, and promptly, notify the

Borrower and the other Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Treasury pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Treasury shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Treasury in determining any interest rate pursuant to Section 2.7(a).

2.8.    Inability to Determine Interest Rate; Illegality.  (a)  If prior to the first day of any Interest Period:

(i)     any Lender shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(ii)    any Lender shall have determined that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lender (as conclusively certified by such Lender) of making or maintaining their affected Loans during such Interest Period;

such Lender shall give telecopy or telephonic notice thereof to the Borrower and the other Lenders as soon as practicable thereafter.  If such notice is given pursuant to clause (i) or (ii) of this Section 2.8(a) in respect of Eurodollar Loans, then (1) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made by the affected Lenders as ABR Loans, and (2) any outstanding Eurodollar Loans of the affected Lender, shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such relevant notice has been withdrawn by such Lender, no further Eurodollar Loans by the affected Lenders shall be made or continued as such, nor shall the Borrower have the right to convert ABR Loans to Eurodollar Loans.

(b)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, such Lender shall give notice thereof to the Borrower describing the relevant provisions of such Requirement of Law, following which, (i) in the case of Eurodollar Loans, (A) the commitment of such Lender hereunder to make Eurodollar Loans and continue such Eurodollar Loans as such and (B) such Lender's outstanding Eurodollar Loans shall be converted automatically on the last day of the then current Interest Periods with respect to such Loans (or within such earlier period as shall be required by law) to ABR Loans.  If any such conversion or prepayment of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.10.

2.9.    Treatment of Borrowings and Payments;  Evidence of Debt.
(a)  [Intentionally Omitted].

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.  Amounts paid on account of the Loans may not be reborrowed.

(c)    [Intentionally Omitted].

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 3:00 p.m. (New York City time) on the due date thereof to the Lenders at their respective Funding Offices, in Dollars and in immediately available funds.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

2.10.    <u>Indemnity</u>.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the last day of such Interest Period (or, in the case of a failure to borrow the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) <u>over</u> (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market.  A certificate as to any amounts payable pursuant to this Section 2.10 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error and shall be payable within 30 days of receipt of any such notice.  The agreements in this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.11.    <u>Superpriority Nature of Obligations and Lenders' Liens.</u>  The priority of Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Final Order entered with respect to the Cases.

-27-

2.12.   <u>Taxes</u>.  (a)  All payments made by the Borrower under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereinafter imposed, levied, collected, withheld or assessed by any Governmental Authority (collectively, "<u>Taxes</u>"), except for any deduction or withholding required by law.  If the Borrower is required to withhold any Non-Excluded Taxes from any amounts payable to any Lender (i) the Borrower shall make such deductions and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable laws and (ii) the amounts so payable to such Lender shall be increased to the extent necessary to pay to such Lender such additional amounts as may be necessary so that the Lender receives, free and clear of all such Non-Excluded Taxes, a net amount equal to the amount it would have received from the Borrower under this Agreement or any other Loan Document if no such deduction or withholding had been made.  For purposes of this Agreement or any other Loan Document, "<u>Non-Excluded Taxes</u>" are withholding Taxes imposed by the United States or any taxing authority thereof or therein on payments made by the Borrower under this Agreement or any other Loan Document other than (a) withholding Taxes imposed on any Lender as a result of a present or former connection between such Lender and the jurisdiction of the United States or any taxing authority thereof or therein imposing such Tax (other than any such connection arising solely from such Lender having executed, delivered, or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States, (c) any withholding Taxes that exist on the date the Lender becomes a Lender or that arise as a result of a change in status of the Lender as a Governmental Authority which is an agency of the Canadian federal government that is exempt from withholding under the Convention as in effect on the date the Lender becomes a Lender, and (d) withholding Taxes that could be eliminated or reduced by the Lender providing tax forms, certifications, or other documentation.

(b)    In addition, the Borrower shall pay any Other Taxes over to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof (or if an official receipt is not available, such other evidence of payment as shall be reasonably satisfactory to such Lender).  If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes required to be paid by the Borrower when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, in each case after receiving at least five days' advance written notice from the Lender, the Borrower shall indemnify the Lender, as the case may be, for any incremental taxes, Non-Excluded Taxes or Other Taxes, interest, additions to tax, expenses or penalties that may become payable by any Lender, as the case may be, as a result of such failure.  The indemnification payments under this Section 2.12(c) shall be made within 30 days after the date such Lender, as the case may be, makes a written demand therefor (together with a reasonably detailed calculation of such amounts).

(d)    Each Lender (or any Transferee) (other than the United States government (including the Treasury)) that either (i) is not incorporated under the laws of the United States,

any state thereof, or the District of Columbia or (ii) whose name does not include "Incorporated," "Inc.," "Corporation," "Corp.," "P.C.," "insurance company," or "assurance company" (a "Non-U.S. Lender") shall deliver to the Borrower, so long as such Lender is legally entitled to do so, two originals of either U.S. Internal Revenue Service Form W-9, Form W-8BEN, Form W-8EXP, Form W-8ECI, or in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payment of "portfolio interest", a Form W-8BEN (along with a statement as to certain requirements in order to claim an exemption for "portfolio interest" reasonably acceptable to the Borrower), or Form W-8IMY (with applicable attachments), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming a complete exemption from (or reduced rate of) United States federal withholding tax on all payments by the Borrower under this Agreement or any other Loan Document.  In addition, each Lender shall provide any other U.S. tax forms (with applicable attachments) as will reduce or eliminate United States federal withholding tax on payments by the Borrower under this Agreement or any other Loan Document.  For the avoidance of doubt, the Canadian Lender shall provide a Form W-8BEN claiming exemption from withholding under the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital (the "Convention") on the Closing Date.  Each Lender (other than the United States government (including the Treasury)) shall provide the appropriate documentation under this clause (d) at the following times (i) prior to the first payment date after becoming a party to this Agreement, (ii) upon a change in circumstances or upon a change in law, in each case, requiring or making appropriate a new or additional form, certificate or documentation, (iii) upon or before the expiration, obsolescence or invalidity of any documentation previously provided to the Borrower and (iv) upon reasonable request by the Borrower.  If a Lender is entitled to an exemption from or a reduction of any non-U.S. withholding Tax under the laws of any jurisdiction imposing such Tax on any payments made by the Borrower under this Agreement, then the Lender shall deliver to the Borrower, at the time or times prescribed by Applicable Law and as reasonably requested by the Borrower, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate, provided that the Lender is legally entitled to complete, execute and deliver such documentation and without material adverse consequences to the Lender.

(e)    If any Lender determines, in its sole good faith discretion, that it has received a refund, credit or other tax benefit in respect of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower (but only to the extent of Non-Excluded Taxes or Other Taxes paid by the Borrower plus any interest thereon paid by the relevant Governmental Authority with respect to such refund), net of all out of pocket third-party expenses of the Lender related to claiming such refund or credit, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund) within 30 days of the date of such receipt.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, upon the request of the Lender, as the case may be, the Borrower agrees to repay any amount paid over to the Borrower by such Lender pursuant to the immediately preceding sentence if such Lender, as the case may be, is required to repay such amount to such Governmental Authority.  This paragraph shall not be construed to (i) interfere with the rights of any Lender to arrange its tax affairs in whatever manner it sees fit, (ii) obligate any Lender to

claim any tax refund, (iii) require any Lender to make available its tax returns (or any other information relating to its taxes or any computation with respect thereof which it deems in its sole discretion to be confidential) to the Borrower or any other Person, or (iv) require any Lender to do anything that would in its sole discretion prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(f)    Each Lender that is an Assignee shall be bound by this Section 2.12.

(g)    The agreements contained in this Section 2.12 shall survive the termination of this Agreement or any other Loan Document and the payments contemplated hereunder or thereunder.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to enter into this Agreement, each Loan Party represents to the Lenders, with respect to itself and each of its Subsidiaries that is a North American Group Member, in each case subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases, that as of the Effective Date:

3.1.    <u>Existence</u>.  Each North American Group Member (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law.

3.2.    [Intentionally Omitted].

3.3.    [Intentionally Omitted].

3.4.    [Intentionally Omitted].

3.5.    <u>Action, Binding Obligations</u>.  (i) Each North American Group Member has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; (ii) the execution, delivery and performance by each North American Group Member of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and (iii) each Loan Document has been duly and validly executed and delivered by each North American Group Member party thereto and constitutes a legal, valid and

binding obligation of all of the North American Group Members party thereto, enforceable against such North American Group Members in accordance with its terms, subject to the Bankruptcy Exceptions.

3.6.   <u>Approvals</u>.   Except as required under applicable state and federal bankruptcy rules, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by each North American Group Member of the Loan Documents to which it is a party for the legality, validity or enforceability thereof, except with respect to North American Group Members other than the Debtors for filings and recordings or other actions in respect of the Liens pursuant to the Collateral Documents, unless the same has already been obtained and provided to the Lenders.

3.7.   [Intentionally Omitted].

3.8.   <u>Investment Company Act</u>.   None of the Loan Parties is required to register as an "investment company", or is a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to any Federal or state statute or regulation which limits its ability to incur Indebtedness.

3.9.   [Intentionally Omitted].

3.10.   <u>Chief Executive Office; Chief Operating Office</u>.   The chief executive office and the chief operating office on the Closing Date for each North American Group Member is located at the location set forth on <u>Schedule 3.10</u> hereto.

3.11.   <u>Location of Books and Records</u>.   The location where the North American Group Members keep their books and records including all Records relating to their business and operations and the Collateral are located in the locations set forth in <u>Schedule 3.11</u>.

3.12.   [Intentionally Omitted].

3.13.   [Intentionally Omitted].

3.14.   <u>Expense Policy</u>.   The Borrower has taken steps necessary to ensure that (a) the Expense Policy conforms to the requirements set forth herein and (b) the Borrower and its Subsidiaries are in compliance with the Expense Policy.

3.15.   <u>Subsidiaries</u>.   All of the Subsidiaries of each Loan Party at the date hereof are listed on <u>Schedule 3.15</u>, which schedule sets forth the name and jurisdiction of formation of each of their Subsidiaries and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party or any of their Subsidiaries except as set forth on <u>Schedule 3.15</u>.

3.16.   <u>Capitalization</u>.   One hundred percent (100%) of the issued and outstanding Capital Stock of each North American Group Member (other than Borrower) is owned by the Persons listed on <u>Schedule 3.16</u> and, to the knowledge of each Loan Party, such Capital Stock

are owned by such Persons, free and clear of all Liens other than Permitted Liens.  No Loan Party has issued or granted any options or rights with respect to the issuance of its respective Capital Stock which is presently outstanding except as set forth on Schedule 3.16 hereto.

3.17.  Fraudulent Conveyance.    Each North American Group Member acknowledges that it will benefit from the Loans contemplated by this Agreement.  No North American Group Member is incurring Indebtedness or transferring any Collateral with any intent to hinder, delay or defraud any of its creditors.

3.18.  USA PATRIOT Act.    (a) Each North American Group Member represents and warrants that neither it nor any of its respective Affiliates over which it exercises management control (a "Controlled Affiliate") is a Prohibited Person, and such Controlled Affiliates are in compliance with all applicable orders, rules, regulations and recommendations of OFAC.

(b)    Each North American Group Member represents and warrants that neither it nor any of its members, directors, officers, employees, parents, Subsidiaries or Affiliates: (1) are subject to U.S. or multilateral economic or trade sanctions currently in force; (2) are owned or controlled by, or act on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. persons may not conduct business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State.

(c)    None of the Collateral are traded or used, directly or indirectly by a Prohibited Person or organized in a Prohibited Jurisdiction.

(d)    Each North American Group Member has established an anti-money laundering compliance program as required by all applicable anti-money laundering laws and regulations, including without limitation the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA PATRIOT Act") (collectively, the "Anti-Money Laundering Laws").

3.19.  Embargoed Person.  As of the date hereof and at all times throughout the term of any Loan, (a) none of any North American Group Member's funds or other assets constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.* (the "Trading With the Enemy Act"), any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or regulations promulgated thereunder or executive order relating thereto (which for the avoidance of doubt shall include but shall not be limited to (i) Executive Order No. 13224, effective as of September 24, 2001 and relating to Blocking Property and Prohibiting

Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (ii) the USA PATRIOT Act), with the result that the investment in the Borrower (whether directly or indirectly), is prohibited by law or any Loan made by the Lenders is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in it with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loan is in violation of law; (c) none of its funds have been derived from any unlawful activity with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loans is in violation of law; and (d) neither it nor any of its Affiliates (i) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (ii) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person". For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section 3.19, no North American Group Member shall be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

       3.20.  <u>Use of Proceeds</u>.  (a) The proceeds of the Loans shall be used (i) as permitted in the Wind-Down Order or (ii) to finance working capital needs and other general corporate purposes incurred in connection with the Wind-Down, including the payment of expenses associated with the administration of the Cases; <u>provided</u> that, the North American Group Members may not prepay Indebtedness without the prior written consent of the Required Lenders.

       (b)    Notwithstanding anything to the contrary herein, none of the proceeds of the Loans shall be used in connection with (i) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, (ii) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, any of their respective affiliates or other Canadian Lender Consortium Member with respect to any loans or other financial accommodations made to any North American Group Member prior to the Petition Date, or (iii) any loans, advances, extensions of credit, dividends or other investments to any person not a North American Group Member; <u>provided</u>, <u>however</u>, that the limitations set forth in this Section 3.20(b) shall not preclude the use of the proceeds of the Loans in connection with any claims, causes of action, adversary proceedings or other litigations against any Governmental Authority (excluding the Canadian Lender Consortium Members) with respect to the imposition or administration of any Tax laws or Environmental Laws. For the avoidance of doubt, the limitations set forth in Section 3.20(b)(i) and (ii) above, shall not limit the use of proceeds with respect to any of the actions and claims described in such clauses against any Governmental Authority that is not (x) a Lender or (y) a Canadian Lender Consortium Member.

       (c)    The North American Group Members are the ultimate beneficiaries of this Agreement and the proceeds of Loans to be received hereunder. The use of the Loans will comply with all Applicable Laws, including Anti-Money Laundering Laws. No portion of any Loan is to be used, for the "purpose of purchasing or carrying" any "margin stock" as such terms

are used in Regulations U and X of the Board, as amended, and the Borrower is not engaged in the business of extending credit to others for such purpose.

       3.21.  <u>Representations Concerning the Collateral</u>.  Each Loan Party represents and warrants to the Lenders:

       (a)    No Loan Party has assigned, pledged, conveyed, or encumbered any Collateral to any other Person (other than Permitted Liens) and immediately prior to the pledge of any such Collateral, a Loan Party was the sole owner of such Collateral and had good and marketable title thereto, free and clear of all Liens (other than Permitted Liens), and no Person, other than the Lenders has any Lien (other than Permitted Liens) on any Collateral.  No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral which has been signed by any Loan Party or which any Loan Party has authorized any other Person to sign or file or record, is on file or of record with any public office, except such as may have been filed by or on behalf of a Loan Party in favor of the Lenders pursuant to the Loan Documents or in respect of applicable Permitted Liens.

       (b)    The provisions of the Loan Documents are effective to create in favor of the Lenders a valid security interest in all right, title, and interest of each Loan Party in, to and under the Collateral, subject only to applicable Permitted Liens.

       (c)    Upon the entry and effectiveness of the Orders and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto, the security interests granted in the Collateral pursuant to the Collateral Documents will constitute perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of the applicable Loan Party in, to and under such Collateral, which can be perfected by filing under the Uniform Commercial Code, in each case, subject to applicable Permitted Liens and as provided in Section 3.24.

       (d)    Each Loan Party has and will continue to have the full right, power and authority, to pledge the Collateral, subject to Permitted Liens, and the pledge of the Collateral may be further assigned without any requirement.

       3.22.  [Intentionally Omitted].

       3.23.  [Intentionally Omitted].

       3.24.  <u>Lien Priority</u>.  (a) On and after the Closing Date, and the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto subject to the Permitted Liens, the provisions of the Loan Documents are effective to create in favor of the Lenders, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Loan Party that owns an interest in such Collateral and any other Person.

(b)      On and after the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on Schedule 3.21 attached hereto, all Obligations owing by the Loan Parties will be secured by:

(i)      valid, perfected, first-priority security interests in and liens (i) with respect to the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is not subject to non avoidable, valid and perfected liens in existence as of the Petition Date (or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to Permitted Liens (other than Liens permitted under clause (a) thereof) and the Carve-Out; and

(ii)      valid, perfected, security, junior interests in and liens pursuant to (i) with respect to the Debtors, section 364(c)(3) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is subject to non avoidable, valid and perfected liens in existence as of the Petition Date, or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out.

(c)      On and after the entry of the Orders and after giving effect thereto, all Obligations owing by the Debtors will be an allowed administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases having priority over all administrative expenses of the kind specified in sections 503 and 507 of the Bankruptcy Code and any and all expenses and claims of the Borrower and the other Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out.

3.25.    [Intentionally Omitted].

3.26.    [Intentionally Omitted].

3.27.    [Intentionally Omitted].

3.28.    Excluded Collateral.  Set forth on Annex I to Schedule 3.28 is a complete and accurate list as of the Effective Date of all Excluded Collateral that is Capital Stock of domestic joint ventures, Domestic Subsidiaries, "first-tier" foreign joint ventures, and Foreign 956 Subsidiaries.

3.29.    Mortgaged Real Property.  After giving effect to the recording of the Mortgages, real property identified on Schedule 1.1C shall be subject to a recorded first lien mortgage, deed of trust or similar security instrument (subject to Permitted Liens).

3.30.    [Intentionally Omitted].

3.31.  <u>The Final Order</u>.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Section 7 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.32.  <u>Wind-Down Budget.</u>  All material facts in the Wind-Down Budget are accurate and the Borrower has disclosed to each Lender all assumptions in the Wind-Down Budget, it being understood that in the case of projections, such projections are based on reasonable estimates, on the date as of which such information is stated or certified.

# SECTION 4

## CONDITIONS PRECEDENT

4.1.  <u>Conditions to Effectiveness</u>.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent, satisfaction of such conditions precedent to be determined by the Required Lenders in their reasonable discretion, except as otherwise set forth below:

(a)  <u>Loan Documents</u>.  The Lenders shall have received the following documents, which shall be in form satisfactory to each Lender:

(i)  this Agreement executed and delivered by the Borrower;

(ii)  the Guaranty, executed and delivered by each Guarantor;

(iii)  the Equity Pledge Agreement, executed and delivered by each Pledgor;

(iv)  [intentionally omitted];

(v)  the Environmental Indemnity Agreement, executed and delivered by each Loan Party party thereto; and

(vi)  a promissory note of the Borrower evidencing the Loans of such Lender, substantially in the form of Exhibit G (the "<u>Note</u>"), with appropriate insertions as to date and principal amount.

(b)  <u>Related Section 363 Transactions</u>.  The Required Lenders and their counsel shall be reasonably satisfied that the terms of the Related Section 363 Transactions and of the Transaction Documents are consistent in all material respects with the information provided to the Lenders in advance of the date hereof or are otherwise reasonably satisfactory to the Required Lenders (the Required Lenders acknowledge that the form of Transaction Documents provided to them on or prior to the date hereof are satisfactory).  The Transaction Documents shall have been duly executed and delivered by the parties thereto, all conditions precedent to the Related Section 363 Transactions set forth in the Transaction Documents shall have been satisfied, and the Related Section 363 Transactions shall have been consummated

pursuant to such Transaction Documents substantially contemporaneously with the conditions precedent set forth in this Section 4.1, and no provision thereof shall have been waived, amended, supplemented or otherwise modified, in each case in a manner adverse to the Lenders, without the Required Lender's consent.

(c)     Final Order.    (i) The Final Order shall have been entered by the Bankruptcy Court and shall have been in full force and effect.

(ii)     The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Lenders.

(iii)     The Debtors and their respective Subsidiaries shall be in compliance in all respects with the Final Order.

(iv)     [Intentionally Omitted].

(v)     [Intentionally Omitted].

(d)     New CarCo Assignment and Assumption.    The Borrower and New CarCo shall have executed and delivered the New CarCo Assignment and Assumption, and all conditions precedent to New CarCo's $7,072,488,605 First Lien Credit Agreement between New CarCo and Treasury shall have been satisfied or waived by the Treasury in accordance with the terms therewith substantially contemporaneously with the conditions precedent set forth in this Section 4.1.

(e)     Canadian Post-Sale Facility.    The Canadian Post-Sale Facility, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian Post-Sale Facility.

(f)     Canadian PV Loan Agreement.    The Canadian PV Loan Agreement, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian PV Loan Agreement.

(g)     [Intentionally Omitted].

(h)     [Intentionally Omitted].

(i)     Wind-Down Budget.    The Borrower shall have delivered to the Lenders the Wind-Down Budget in form and substance satisfactory to the Required Lenders.

(j)     [Intentionally Omitted].

(k)     Litigation.    There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Cases) or threatened in any court or before any arbitrator or Governmental Authority that, in the sole discretion of the Required Lenders, materially or

adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(l)    [Intentionally Omitted].

(m)    Consents.  The Lenders shall have received all necessary third party and governmental waivers and consents, and each Loan Party shall have complied with all applicable laws, decrees and material agreements.

(n)    No Default.  No Default or Event of Default shall exist on the Effective Date or after giving effect to the transactions contemplated to be consummated on the Effective Date pursuant to the Transaction Documents and the Loan Documents.

(o)    Accuracy of Representations and Warranties.  All representations and warranties made by the North American Group Members in or pursuant to the Loan Documents shall be true and correct in all material respects.

(p)    Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Lenders shall have received (i) a certificate of the secretary or assistant secretary of each Loan Party, dated the Effective Date, substantially in the form of Exhibit B-1, with appropriate insertions and attachments, including the certificate of incorporation (or equivalent organizational document) of each Loan Party, certified by the relevant authority of the jurisdiction of organization of such Loan Party (provided that, to the extent applicable, in lieu of delivering the certificate of incorporation and other organizational documents, such certificate may include a certification that such documents not have been amended, supplemented or otherwise modified since the Closing Date), (ii) bring down good standing certifications for each Loan Party from its jurisdiction of organization and (iii) a certificate of the Borrower and each Guarantor, dated the Effective Date, to the effect that the conditions set forth in this Section 4.1 have been satisfied, substantially in the form of Exhibit B-2.

(q)    Legal Opinions.  The Lenders shall have received the executed legal opinion of Weil, Gotshal and Manges LLP, New York counsel to the Loan Parties, substantially in the form of Exhibit E, as to New York law, United States federal law and the Delaware General Corporation Law.

## SECTION 5

## AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees to, and to cause each of its Subsidiaries that is a North American Group Member to, so long as any Loan is outstanding and until payment in full of all Obligations, in each case except as shall be required in connection with the Wind-Down, and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

5.1.    <u>Financial Statements</u>.  The Borrower shall deliver to the Lenders:

(a)    as soon as reasonably possible after receipt by the subject North American Group Member, a copy of any material report that may be prepared and submitted by such North American Group Member's independent certified public accountants at any time or any other material report with respect to the North American Group Members provided to the Borrower and its Subsidiaries pursuant to the Transition Services Agreement;

(b)    from time to time such other information regarding the financial condition, operations, or business of any North American Group Member as any Lender may reasonably request;

(c)    promptly upon their becoming available, copies of such other financial statements and reports, if any, as any North American Group Member may be required to publicly file with the SEC or any similar or corresponding governmental commission, department or agency substituted therefor, or any similar or corresponding governmental commission, department, board, bureau, or agency, federal or state;

(d)    [intentionally omitted];

(e)    notice of and copies of each Debtors' pleadings filed in the Cases in connection with any material contested matter or adversary proceeding in the Cases (but the foregoing may be satisfied by including each of the Lenders and their counsel in a "core service group," to receive copies of all pleadings under any order establishing notice and service requirements in the Cases), and such additional information with respect to such matters as either of the Lenders may reasonably request, and which notice shall also include sending copies of any pleadings or other documents that the Borrower or other Debtors seek to file under seal to each of the lenders and their counsel, <u>provided</u>, <u>however</u>, that if (in addition to the confidentiality provisions of this Agreement) additional confidentiality provisions are needed (i.e. if required by third parties), the Lenders and the Borrower shall endeavor to work out reasonable additional confidentiality terms;

(f)    no later than the twentieth Business Day following the last day of each fiscal quarter, a report (a "<u>Quarterly Report</u>") setting forth in reasonable detail the anticipated receipts and disbursements of the North American Group Members for the immediately succeeding twelve-month period (on a calendar month basis) and the aggregate amount of cash and Cash Equivalents of the North American Group Members as of the last day of the immediately preceding fiscal quarter, in form and substance reasonably satisfactory to the

Required Lenders. Each Quarterly Report shall be accompanied by a certificate of a Responsible Officer certifying that such Quarterly Report was prepared in good faith and are based on reasonable estimates on the date as of which such information is certified; and

(g)     on the first Business Day of February to occur each year from the Effective Date until the Maturity Date, a report setting forth in reasonable detail the three-year business plan of the Borrower.

5.2.    <u>Notices; Reporting Requirements</u>.  The relevant Loan Party shall deliver written notice to the Lenders of the following:

(a)     <u>Defaults</u>.  Promptly after a Responsible Officer or any officer of a North American Group Member with a title of at least executive vice president becomes aware of the occurrence of any Default or Event of Default, or any event of default under any publicly filed material Contractual Obligation of any Group Member;

(b)     <u>Litigation</u>.  Promptly after a Responsible Officer or an attorney in the general counsel's office of a North American Group Member obtains knowledge of any action, suit or proceeding instituted by or against such North American Group Member or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority (i) in which the amount in controversy, in each case, is an amount equal to $25,000,000 or more, (ii) in which injunctive or similar relief is sought, or (iii) which relates to any Loan Document, the relevant Loan Party shall furnish to the Lenders notice of such action, suit or proceeding;

(c)     <u>Material Adverse Effect on Collateral</u>.  Promptly upon any North American Group Member becoming aware of any default or any event or change in circumstances related to any Collateral which, in each case, could reasonably be expected to have a Material Adverse Effect;

(d)     <u>Judgments</u>.  Promptly upon the entry of a judgment or decree against any Loan Party or any of its Subsidiaries in an amount in excess of $15,000,000;

(e)     <u>Environmental Events</u>.  As soon as possible and in any event within seven Business Days of obtaining knowledge thereof:  (i) any development, event, or condition occurring after the date hereof that, individually or in the aggregate with other developments, events or conditions occurring after the date hereof, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, any Group Member; to the extent such Environmental Permit is material to the continued operations or business of the Group Members or of any manufacturing related facility;

(f)     <u>Material Adverse Effect</u>.  Any development or event that has had or could reasonably be expected to have a Material Adverse Effect;

(g)    Insurance.  Promptly upon any material change in the insurance coverage required of any Loan Party or any other Person pursuant to any Loan Document, with copy of evidence of same attached;

(h)    Compliance Certificate.    On the tenth Business Day of each calendar month, beginning with the first month to occur after the Effective Date, a Compliance Certificate, executed by a Responsible Officer of the Borrower, stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(i)    Investment Reports.  With respect to any Investment made pursuant to clause (p)(i) or (ii) of the definition of Permitted Investments, on the tenth Business Day of each calendar month, beginning with the month immediately following the calendar month in which the first such Investment is made, a report executed by a Responsible Officer of the Borrower, setting forth (x) the amount of each Investment made pursuant to each of clause (p)(i) and/or (p)(ii), if any, in the immediately proceeding calendar month, (y) a description of each such Investment, if any, and (z) the aggregate amount of Investments made pursuant to each of clause (p)(i) and (p)(ii) since the Effective Date, if any, as of the end of the immediately preceding calendar month;

(j)    [Intentionally Omitted];

(k)    [Intentionally Omitted];

(l)    Expense Policy.   Within 15 days after the conclusion of each calendar month, beginning with the month in which the Effective Date occurs, the Borrower shall deliver to the Lenders a certification signed by a Responsible Officer of the Borrower and its Subsidiaries that (i) the Expense Policy conforms to the requirements set forth herein; (ii) the Borrower and its Subsidiaries are in compliance with the Expense Policy; and (iii) there have been no material amendments to the Expense Policy or deviations from the Expense Policy other than those that have been disclosed to and approved by the Lenders; provided that the requirement to deliver the certification referenced in this Section 5.2(l) may be qualified as to the best of such Responsible Officer's knowledge after due inquiry and investigation;

(m)    Executive Privileges and Compensation.   The Borrower shall submit a certification on the [last] day of each month beginning July 2009, certifying that the Borrower has complied with and is in compliance with the provisions set forth in Section 5.16.   Such certification shall be made to the Lenders by an SEO of the Borrower, subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001; and

(n)    Organizational Documents.  Subject to Section 6.6, each North American Group Member shall furnish prompt written notice to the Lenders of any material amendment to such entity's organizational documents and copies of such amendments.

Each notice required to be provided pursuant to this Section 5.2(a)-(f) above shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

5.3.    <u>Existence</u>.    (a) Preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)    pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all their Postpetition obligations of whatever nature, except (i) where such payment, discharge or satisfaction is prohibited by the Orders, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court or by this Agreement or the Wind-Down Budget, or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be;

(c)    comply with the requirements of all Applicable Laws, rules, regulations and orders of Governmental Authorities if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect on any Loan Party or the Collateral;

(d)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, and maintain adequate accounts and reserves for all taxes (including income taxes), all depreciation, depletion, obsolescence and amortization of its properties, all contingencies, and all other reserves;

(e)    (i) change the location of its chief executive office/chief place of business from that specified in Section 3.10, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains records with respect to the Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction, it shall give the Lenders written notice thereof not later than ten (10) days after such event occurs, and shall deliver to the Lenders all Uniform Commercial Code financing statements and amendments as the Lenders shall request and take all other actions deemed reasonably necessary by the Lenders to continue its perfected status in the Collateral with the same or better priority;

(f)    keep in full force and effect the provisions of its charter documents, certificate of incorporation, by-laws, operating agreements or similar organizational documents; and

(g)    comply (i) in the case of each North American Group Member that is not a Debtor, with all Contractual Obligations in a manner such that a Material Adverse Effect could not reasonably be expected to result and (ii) in the case of each Debtor, with all material Postpetition Contractual Obligations (including the Transition Services Agreement).

5.4.    <u>Payments of Taxes</u>.    Except as prohibited by the Bankruptcy Code, the Borrower will and will cause each Group Member (i) to timely file or cause to be filed all federal and material state and other Tax returns that are required to be filed and all such Tax returns shall be true and correct and (ii) to timely pay and discharge or cause to be paid and discharged promptly all Taxes, assessments and governmental charges or levies arising Postpetition and imposed upon the Borrower or any of the other Group Members or upon any of their respective incomes or receipts or upon any of their respective properties before the same shall become in

09-50026-mg    Doc 7226-4    Filed 10/04/10    Entered 10/04/10 17:28:37    Exhibit B --
Exhibits 6-9 to Mayer Declaration    Pg 166 of 273

default or past due, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might result in the imposition of a Lien or charge upon such properties or any part thereof; provided that it shall not constitute a violation of the provisions of this Section 5.4 if the Borrower or any of the other Group Members shall fail to pay any such Tax, assessment, government charge or levy or claim for labor, materials or supplies which is being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided.

5.5.    Use of Proceeds.    The Loan Parties and their Subsidiaries shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner generally consistent with the Wind-Down Budget, except as otherwise permitted in Section 3.20(a)(i)).

5.6.    Maintenance of Existence; Payment of Obligations; Compliance with Law.    Subject to the Orders, the Related Section 363 Transactions and the Cases, each Loan Party shall:

(a)    keep all property useful and necessary in its business in good working order and condition; and

(b)    maintain errors and omissions insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing except in the event of self-insurance) and shall not reduce such coverage without the written consent of the Lenders, and shall also maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities. Notwithstanding anything to the contrary in this Section 5.6, to the extent that any North American Group Member is engaged in self-insurance with respect to any of its property as of the Closing Date, such Loan Party may, if consistent with past practices, continue to engage in such self-insurance throughout the term of this Agreement; provided, that the North American Group Members shall promptly obtain third party insurance that conforms to the criteria in this Section 5.6 at the request of the Lenders.

5.7.    Further Identification of Collateral.    Each Loan Party will furnish to the Lenders from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as any Lender may reasonably request, all in reasonable detail.

5.8.    Defense of Title.    Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party warrants and will defend the right, title and interest of the Lenders in and to all Collateral against all adverse claims and demands of all Persons whomsoever, subject to (x) the restrictions imposed by the Existing Agreements to the extent that such restrictions are valid and enforceable under the applicable Uniform Commercial Code and other Requirements of Law and (y) the rights of holders of any Permitted Lien.

5.9.    <u>Preservation of Collateral</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party shall do all things necessary to preserve the Collateral so that the Collateral remains subject to a perfected security interest with the priority provided for such security interest under the Loan Documents.  Without limiting the foregoing, each Loan Party will comply with all Applicable Laws, rules and regulations of any Governmental Authority applicable to such Loan Party or relating to the Collateral and will cause the Collateral to comply, with all Applicable Laws, rules and regulations of any such Governmental Authority, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.  No Loan Party will allow any default to occur for which any Loan Party is responsible under any Loan Documents and each Loan Party shall fully perform or cause to be performed when due all of its obligations under the Loan Documents.

5.10.    <u>Maintenance of Papers, Records and Files</u>.  (a) each North American Group Member will maintain all Records in good and complete condition and preserve them against loss or destruction, all in accordance with industry and customary practices;

(b)    each North American Group Member shall collect and maintain or cause to be collected and maintained all Records relating to its business and operations and the Collateral in accordance with industry custom and practice, including those maintained pursuant to the preceding subsection, and all such Records shall be in the possession of the North American Group Members or reasonably obtainable upon the request of any Lender unless the Lenders otherwise approve; and

(c)    for so long as any Lender has an interest in or Lien on any Collateral, each North American Group Member will hold or cause to be held all related Records in trust for such Lender.  Each North American Group Member shall notify, or cause to be notified, every other party holding any such Records of the interests and Liens granted hereby.

5.11.    <u>Maintenance of Licenses</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, except where the failure to do so could not reasonably be likely to have a Material Adverse Effect, each Loan Party shall (i) maintain all licenses, permits, authorizations or other approvals necessary for such Loan Party to conduct its business and to perform its obligations under the Loan Documents, (ii) remain in good standing under the laws of the jurisdiction of its organization, and in each other jurisdiction where such qualification and good standing are necessary for the successful operation of such Loan Party's business, and (iii) shall conduct its business in accordance with Applicable Law in all material respects.

5.12.    <u>Payment of Obligations</u>.  The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans and each North American Group Member will duly and punctually pay or cause to be paid all fees and other amounts from time to time owing by it hereunder or under the other Loan Documents, all in accordance with the terms of this Agreement and the other Loan Documents.  Each North American Group Member will, and will cause each of its Subsidiaries to, pay (i) with respect to each Debtor its Postpetition obligations; and (ii) with respect to each other Group Member its obligations, in each case including tax liabilities, assessments and governmental charges or levies imposed upon such

Person or upon its income and profits or upon any of its property, real, personal or mixed (including without limitation, the Collateral) or upon any part thereof, as well as any other lawful claims which, if unpaid, could reasonably be expected to become a Lien upon such properties or any part thereof, that, if not paid, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the relevant Loan Party, or such Subsidiary, has set aside on its books adequate reserves with respect thereto and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

5.13.  OFAC.  At all times throughout the term of this Agreement, each Loan Party and its Controlled Affiliates (a) shall be in full compliance with all applicable orders, rules, regulations and recommendations of OFAC and (b) shall not permit any Collateral to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person, and no lessee or sublessee shall be a Prohibited Person or a Person organized in a Prohibited Jurisdiction.

5.14.  Investment Company.  Each North American Group Member will conduct its operations in a manner which will not subject it to registration as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended from time to time.

5.15.  Further Assurances.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each North American Group Member to, from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that such Lender may be required to obtain from the Borrower or any Group Member such governmental consent, approval, recording, qualification or authorization.

5.16.  Executive Privileges and Compensation.  (a) Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall comply with the following restrictions on executive privileges and compensation:

(i)  the Borrower shall take all necessary action to ensure that its Specified Benefit Plans comply in all respects with the EESA, including, without limitation, the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or any other guidance or regulations

promulgated under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and shall not adopt any new Specified Benefit Plan (x) that does not comply therewith or (y) that does not expressly state and require that such Specified Benefit Plan and any compensation thereunder shall be subject to all relevant Compensation Regulations adopted, issued or released on or after the date any such Specified Benefit Plan is adopted. To the extent that the Compensation Regulations change, or are implemented in a manner that requires changes to then-existing Specified Benefit Plans, the Borrower shall effect such changes to its Specified Benefit Plans as promptly as practicable after it has actual knowledge of such changes in order to be in compliance with this Section 5.16(a)(i) (and shall be deemed to be in compliance for a reasonable period within which to effect such changes);

(ii)     the Borrower shall be subject to the limits on the deductibility of executive compensation imposed by section 162(m)(5) of the Code, as applicable;

(iii)     the Borrower shall not pay or accrue any bonus or incentive compensation to the Senior Employees, except as may be permitted under the EESA or the Compensation Regulations;

(iv)     the Borrower shall not adopt or maintain any compensation plan that would encourage manipulation of its reported earnings to enhance the compensation of any of its employees;

(v)     the Borrower shall maintain all suspensions and other restrictions of contributions to Specified Benefit Plans that are in place or initiated as of the Closing Date; and

(vi)     the Borrower shall otherwise comply with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, including without limitation the prohibition on golden parachute and tax "gross up" payments, the requirement with respect to the establishment of a compensation committee of the board of directors, and the requirement that the Borrower provide certain disclosures to Treasury and the Borrower's primary regulator.

At all times throughout the term of this Agreement, the Required Lenders shall have the right to require any Group Member to claw back any bonuses or other compensation, including golden parachutes, paid to any Senior Employees in violation of any of the foregoing.

(b)     On or prior to September 15, 2009, the Borrower shall cause (i) its principal executive officer and principal financial officer (or, in each case, a person acting in a similar capacity) and (ii) its compensation committee, as applicable, to provide the certifications to the Treasury and the Borrower's primary regulator required by the rules set forth in 31 C.F.R. Part 30. The Borrower shall preserve appropriate documentation and records to substantiate such certification in an easily accessible place for a period not less than three years following the Maturity Date.

From the Closing Date until the repayment of all Obligations, the Borrower shall comply with the provisions of this Section 5.16.

5.17.    Aircraft.  With respect to any private passenger aircraft or interest in such aircraft that is owned or held by the Borrower or any of its respective Subsidiaries immediately prior to the Closing Date, such party shall demonstrate to the satisfaction of the Treasury that it is taking all reasonable steps to divest itself of such aircraft or interest.  In addition, the Borrower shall not acquire or lease any private passenger aircraft or interest in private passenger aircraft after the Closing Date.

5.18.    Restrictions on Expenses.    (a) The Borrower shall maintain and implement an Expense Policy, provide the Expense Policy to Treasury and the Borrower's primary regulatory agency, and post the text of the Expense Policy on its Internet website, if the Borrower maintains a company website, and distribute the Expense Policy to all employees covered under the Expense Policy.  Any material amendments to the Expense Policy shall require the prior written consent of the Treasury, and any material deviations from the Expense Policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the Treasury.

(b)    The Expense Policy shall, at a minimum:  (i) require compliance with all Requirements of Law, (ii) apply to the Borrower and all of its Subsidiaries, (iii) govern (A) the hosting, sponsorship or other payment for conferences and events, (B) travel accommodations and expenditures, (C) consulting arrangements with outside service providers, (D) any new lease or acquisition of real estate, (E) expenses relating to office or facility renovations or relocations, and (F) expenses relating to entertainment or holiday parties, (iv) provide for (A) internal reporting and oversight, and (B) mechanisms for addressing non-compliance with the Expense Policy and (v) comply in all respects with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30.

5.19.    Employ American Workers Act.  The Borrower shall comply, and the Borrower shall take all necessary action to ensure that its Subsidiaries comply, in all respects with the provisions of the EAWA in all respects.

5.20.    Internal Controls; Recordkeeping; Additional Reporting.    (a) The Borrower shall promptly establish internal controls to provide reasonable assurance of compliance in all material respects with each of the Borrower's covenants and agreements set forth in Sections 5.16, 5.17, 5.18, 5.19 and 5.20(b) hereof and shall collect, maintain and preserve reasonable records evidencing such internal controls and compliance therewith, a copy of which records shall be provided to the Lenders promptly upon request.  On the 15th day after the last day of each calendar quarter (or, if such day is not a Business Day, on the first Business Day after such day) commencing with September 30, 2009, the Borrower shall deliver to the Treasury (at its address set forth in Section 8.2) a report setting forth in reasonable detail (x) the status of implementing such internal controls and (y) the Borrower's compliance (including any instances of material non-compliance) with such covenants and agreements.  Such report shall be accompanied by a certification duly executed by an SEO of the Borrower stating that such quarterly report is accurate in all material respects to the best of such SEO's knowledge, which

-47-

certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001.

(b)     The Borrower shall use its reasonable best efforts to account for the use and expected use of the proceeds from the Loans.  On the 30th day after the last day of each month (or, if such day is not a Business Day, on the first Business Day after such day) commencing with July 31, 2009, the Borrower shall deliver to the Lenders (at their respective addresses set forth in Section 8.2) a report setting forth in reasonable detail the actual results of the operations of the Borrower and its Subsidiaries for such month, which shall include (without limitation) a budget-to-actual variance analysis.   Such report shall be accompanied by a certification duly executed by an SEO of the Borrower that such monthly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, section 1001.

(c)     The Borrower shall collect, maintain and preserve reasonable records relating to the implementation of all Federal support programs provided to the Borrower or any of its Subsidiaries pursuant to the EESA, the use of the proceeds thereunder and the compliance with the terms and provisions of such programs; provided that the Borrower shall have no obligation to comply with the foregoing in connection with any such program to the extent that such program independently requires, by its express terms, the Borrower to collect, maintain and preserve any records in connection therewith. The Borrower shall provide the Treasury with copy of all such reasonable records promptly upon request.

5.21.   Waivers.  (a) For any Person who is a Loan Party as of the Closing Date and any Person that becomes a Loan Party after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-1, to be duly executed by such North American Group Member and promptly delivered to the Treasury.

(b)     For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-2, to be duly executed by such SEO, and promptly delivered to the Treasury.

(c)     For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-3, to be duly executed by such SEO, and promptly delivered to the Borrower (with a copy to the Treasury).

(d)     For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-4, to be duly executed by such Senior Employee, and promptly delivered to the Treasury.

(e)     For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-5, to be duly executed by such Senior Employee, and promptly delivered to the Borrower (with a copy to the Treasury).

(f)    For the avoidance of doubt, this requirement will be deemed satisfied for the United States with respect to Loan Parties that are party to the Existing UST Term Loan Agreement and any SEO or Senior Employee, to the extent such Loan Party, SEO or Senior Employee has previously provided such a waiver to the Treasury.

5.22.    [Intentionally Omitted].

5.23.    <u>Additional Guarantors</u>.    Except as otherwise agreed to by the Required Lenders, the Borrower shall cause each Domestic Subsidiary of a North American Group Member who becomes a Debtor after the Closing Date to become a Guarantor (each, an "<u>Additional Guarantor</u>") in accordance with Section 4.24 of the Guaranty, other than (i) [intentionally omitted], (ii) any Foreign 956 Subsidiary, (iii) any Other Foreign 956 Subsidiary and (iv) any Non-U.S. Subsidiary owned in whole or in part by a Foreign 956 Subsidiary, except in the case of clauses (i) through (iv), any Subsidiaries that were guarantors under the Existing UST Term Loan Agreement.

5.24.    <u>Provide Additional Information</u>.    Each North American Group Member shall, promptly, from time to time and upon request of any Lender, furnish to such Lender such information, documents, records or reports with respect to the Collateral, the Indebtedness of the North American Group Members or any Subsidiary thereof or the corporate affairs, conditions or operations, financial or otherwise, of such North American Group Member as any Lender may reasonably request, including without limitation, providing to such Lender reasonably detailed information with respect to each inquiry of such Lender raised with the North American Group Members prior to the Closing Date.

5.25.    <u>Inspection of Property; Books and Records; Discussions</u>.    Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each Group Member to, (a) keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of any Lender, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents at any reasonable time and as often as may reasonably desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with its independent certified public accountants.

5.26.    [<u>Governance of Borrower</u>].    [The Borrower shall, at all times (subject to turnover thereof), maintain a Board of Directors comprised of five (5) members, three (3) of which shall be chosen by New CarCo and two (2) of which shall be chosen by the Official Committee of Unsecured Creditors in the Borrower's Case (the "<u>Creditors' Committee</u>").    All members of the Board of Directors shall be subject to the prior review by and shall be found to be reasonably acceptable to the Required Lenders, New CarCo, and such Creditors' Committee.]

# SECTION 6

# NEGATIVE COVENANTS

Each Loan Party hereby covenants and agrees to, and to cause itself and each of its Subsidiaries that is a North American Group Member to, so long as any Loan or any interest or fee payable hereunder is owing to any Lender, each North American Group Member will abide by the following negative covenants, in each case except as shall be required in connection with the Wind-Down and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

6.1.    Prohibition on Fundamental Changes.    No North American Group Member shall, at any time, directly or indirectly, (i) enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or Dispose of all or substantially all of its Property without the Lender's prior consent, provided, any Guarantor may merge, consolidate, amalgamate into, or Dispose of all or substantially all of its Property to another North American Group Member; or (ii) form or enter into any partnership, syndicate or other combination (other than joint ventures permitted by Section 6.14) that could reasonably be expected to have a Material Adverse Effect.

6.2.    Lines of Business.    No North American Group Member will engage to any substantial extent in any line or lines of business activity other than the businesses generally carried on by the North American Group Members as of the Closing Date or businesses reasonably related thereto.

6.3.    Transactions with Affiliates.    No North American Group Member will (a) enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including Collateral) or the rendering of any service, with any Affiliate unless such transaction is (i) in the ordinary course of such North American Group Member's business, and (ii) generally upon fair and reasonable terms and, with respect to any transaction with an Affiliate that is not a Group Member, no less favorable to such North American Group Member than it would obtain in an arm's length transaction with a Person which is not an Affiliate (other than any transaction that occurs pursuant to an agreement in effect as of the Petition Date), and in either case, is otherwise permitted under this Agreement, or (b) make a payment that is not otherwise permitted by this Section 6.3 to any Affiliate.    Irrespective of whether such transactions comply with the provisions of this Section 6.3, but subject to the other restrictions set forth elsewhere in this Agreement, the Loan Parties shall be permitted to (x) transact business in the ordinary course with (i) the joint ventures in which the Loan Parties or their Subsidiaries participate and (ii) [intentionally omitted], and (y) make Restricted Payments permitted under Section 6.5.

6.4.    Limitation on Liens.    No North American Group Member will, create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except Permitted Liens.

6.5.    Restricted Payments.    Without the Lenders' consent, no North American Group Member shall, (i) declare or pay any dividend (other than dividends payable solely in

common Capital Stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any Capital Stock of any North American Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any North American Group Member and (ii) optionally prepay, repurchase, redeem or otherwise optionally satisfy or defease with cash or Cash Equivalents any Indebtedness (any such payment referred to in clauses (i) and (ii), a "Restricted Payment"), other than:

(a)     redemptions, acquisitions or the retirement for value or repurchases (or loans, distributions or advances to effect the same) of shares of Capital Stock from current or former officers, directors, consultants and employees, including upon the exercise of stock options or warrants for such Capital Stock, or any executive or employee savings or compensation plans, or, in each case to the extent applicable, their respective estates, spouses, former spouses or family members or other permitted transferees;

(b)     any Subsidiary (including an Excluded Subsidiary) may make Restricted Payments to its direct parent or to the Borrower or any Guarantor that is a Wholly Owned Subsidiary;

(c)     any JV Subsidiary may make Restricted Payments required or permitted to be made pursuant to the terms of the joint venture arrangements in effect on the Closing Date (or otherwise as approved by the Required Lenders) of holders of its Capital Stock, provided that, the Borrower and its Subsidiaries have received their *pro rata* portion of such Restricted Payments; and

(d)     any Subsidiary that is not a North American Group Member may make Restricted Payments to any other Subsidiary or Subsidiaries that are not North American Group Members.

For the avoidance of doubt this Section 6.5 shall not restrict in any manner any North American Group Member from Disposing of any New GM Equity Interests.

6.6.    Amendments to Transaction Documents.  (a) No North American Group Member will amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the indemnities and licenses furnished to New CarCo and its successors or any of its Subsidiaries pursuant to the Transaction Documents such that after giving effect thereto such indemnities or licenses, taken as a whole, shall be materially less favorable to the interests of the Lenders with respect thereto or (b) otherwise amend, supplement or otherwise modify the terms and conditions of the Transaction Documents.

6.7.    Changes in Fiscal Periods.  No North American Group Member will permit its fiscal year to end on a day other than December 31 or change its method of determining fiscal quarters, in each case, unless otherwise agreed by the Required Lenders.

6.8.    Negative Pledge.  No North American Group Member will, enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any North American Group Member to create, incur, assume or permit to exist any Lien upon any of the

Collateral, whether now owned or hereafter acquired, other than this Agreement, the other Loan Documents, the Existing Agreements, and Permitted Liens; provided that the agreements excepted from the restrictions of this Section shall include customary negative pledge clauses in agreements providing refinancing Indebtedness or permitted unsecured Indebtedness.

6.9.    Indebtedness.  No North American Group Member will, create, incur, assume or suffer to exist any Indebtedness except Permitted Indebtedness.

6.10.    Investments.  No North American Group Member will make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments"), except Permitted Investments.

6.11.    Action Adverse to the Collateral.  Except as permitted under any provision of this Agreement, no Loan Party shall or shall permit any Pledged Entity that is a Subsidiary to take any action that would directly or indirectly materially impair or materially adversely affect such North American Group Member's title to, or the value of, the Collateral, or materially increase the duties, responsibilities or obligation of any North American Group Member.

6.12.    Limitation on Sale of Assets.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases and any other applicable provision of any Loan Document, each North American Group Member shall have the right to Dispose freely of any of its Property (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired.

6.13.    [Intentionally Omitted].

6.14.    JV Agreements.  No North American Group Member or Pledged Entity shall allow any modification or amendment to any JV Agreement, except that any such party that is not a Debtor may modify or amend any JV Agreement; provided that such amendment or modification could not reasonably be expected to have a Material Adverse Effect.

6.15.    Swap Agreements.  The North American Group Members will not itself, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual or anticipated exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

6.16.    Clauses Restricting Subsidiary Distributions.  The Borrower will not, and will not permit any Guarantor to, enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Guarantor to (a) make Restricted Payments in respect of any Capital Stock of such Guarantor held by, or pay any Indebtedness owed to, the Borrower or any other Guarantor, (b) make loans or advances to, or other Investments in, the Borrower or any other Guarantor or (c) transfer any of its assets to the Borrower or any other Guarantor, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Guarantor

imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Guarantor, (iii) any agreement or instrument governing Indebtedness assumed in connection with the acquisition of assets by the Borrower or any Guarantor permitted hereunder or secured by a Lien encumbering assets acquired in connection therewith, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (iv) restrictions on the transfer of assets subject to any Lien permitted by Section 6.4 imposed by the holder of such Lien or on the transfer of assets subject to a Disposition permitted by Section 6.12 imposed by the acquirer of such assets, (v) provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock therein) entered into in the ordinary course of business, (vi) restrictions contained in the terms of any agreements governing purchase money obligations, Capital Lease Obligations or attributable obligations not incurred in violation of this Agreement; provided that, such restrictions relate only to the property financed with such Indebtedness, (vii) restrictions on cash or other deposits imposed by customers under contracts or other arrangements entered into or agreed to in the ordinary course of business, or (viii) customary non-assignment provisions in leases, contracts, licenses and other agreements entered into in the ordinary course of business and consistent with past practices.

   6.17.  <u>Sale/Leaseback Transactions</u>.  No North American Group Member will enter into any arrangement with any Person providing for the leasing by any such North American Group Member of real or personal property that has been or is to be sold or transferred by any such North American Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of any such North American Group Member (a "<u>Sale/Leaseback Transaction</u>") other than any Sale/Leaseback Transaction in effect on the Closing Date.

   6.18.  [<u>Intentionally Omitted</u>].

   6.19.  <u>Modification of Organizational Documents</u>.  No North American Group Member will modify any organizational documents, except (i) as required by the Bankruptcy Code or (ii) in connection with a Disposition permitted by Section 6.12.

## SECTION 7

## EVENTS OF DEFAULT

   7.1.  <u>Events of Default</u>.  Notwithstanding the provisions of section 362(c) of the Bankruptcy Code, and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, or any notice to any of the North American Group Members, and subject to the provisions of this Section 7, each of the following events shall constitute an "<u>Event of Default</u>", provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied:

     (a)  the Borrower shall default in the payment of any principal of or interest on any Loan when due (whether at stated maturity or upon acceleration), including the failure to pay

the Administrative Priority Claim Payment Amount on or before the Administrative/Priority Claim Payment Date; or

      (b)     any Guarantor shall default in its payment obligations under the Guaranty; or

      (c)     any Loan Party shall default in the payment of any other amount payable by it hereunder or under any other Loan Document after notification by the Lenders of such default, and such default shall have continued unremedied for three (3) Business Days; or

      (d)     any North American Group Member shall breach any covenant contained in Section 5.16 (Executive Privileges and Compensation), Section 5.17 (Aircraft), Section 5.18 (Restrictions on Expenses), Section 5.19 (Employ American Workers Act), Section 5.20 (Internal Controls; Recordkeeping; Additional Reporting), Section 5.21 (Waivers) or Section 6 hereof; or

      (e)     any North American Group Member shall default in performance of or otherwise breach non-payment obligations or covenants under any of the Loan Documents not covered by another clause in this Section 7, and such default has not been remedied within the applicable grace period provided therein, or if no grace period, within ten (10) Business Days; or

      (f)     any representation, warranty or certification made or deemed made herein or in any other Loan Document by any North American Group Member or any certificate furnished to the Lenders pursuant to the provisions hereof or thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

      (g)     [intentionally omitted]; or

      (h)     [intentionally omitted]; or

      (i)     [intentionally omitted]; or

      (j)     [intentionally omitted]; or

      (k)     any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee or interim trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver and manager, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or an application shall be filed by the Borrower or any of its Subsidiaries for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Lenders against any Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

      (l)     except as expressly agreed in writing by the Required Lenders, any Debtor shall make any Prepetition Payment to any general unsecured creditor other than any such

Prepetition Payments that are (i) payable pursuant to an order by the Bankruptcy Court or (ii) permitted by the Wind-Down Budget; or

(m)     [intentionally omitted]; or

(n)     [intentionally omitted]; or

(o)     [intentionally omitted]; or

(p)     any Loan Document shall for whatever reason be terminated, any default or event of default shall have occurred under any Loan Document, the Loan Documents shall for any reason cease to create a valid, security interest in any of the Collateral purported to be covered hereby or thereby, or any North American Group Member's material obligations (including the Borrower's Obligations hereunder) shall cease to be in full force and effect, or the enforceability thereof shall be contested by any North American Group Member; or

(q)     the filing of a motion, pleading or proceeding by any of the other Loan Parties which could reasonably be expected to result in a material impairment of the rights or interests of any Lender under any Loan Document, or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of any Lender under any Loan Document; or

(r)     (i) any order shall be entered reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying in any material respect the Final Order without the prior written consent of the Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien or to be otherwise in full force and effect or (iii) any Debtor shall fail to, or fail to cause any North American Group Member to, comply with the Orders; or

(s)     the North American Group Members or any other material Subsidiaries of the Borrower shall take any action in support of any of the events set forth in clauses (k), (l), (m), (q) or (s) or any person other than the North American Group Members or any other material Subsidiaries of the Borrower shall do so, and such application is not contested in good faith by the North American Group Members or any other material Subsidiaries of the Borrower and the relief requested is granted in an order that is not stayed pending appeal; or

(t)     [intentionally omitted]; or

(u)     any Change of Control shall have occurred without the prior consent of the Lenders other than pursuant to the Related Section 363 Transaction; or

(v)     any North American Group Member shall grant, or suffer to exist, any Lien on any Collateral other than Permitted Liens; or the Liens contemplated under the Loan Documents shall cease to be perfected Liens on the Collateral in favor of the Lenders of the requisite priority hereunder with respect to such Collateral (subject to the Permitted Liens); or

(w)     [intentionally omitted]; or

(x)     [intentionally omitted]; or

(y)      [intentionally omitted]; or

(z)      [intentionally omitted]; or

(aa)      [intentionally omitted]; or

(bb)      any North American Group Member (other than a Debtor) shall admit its inability to, or intention not to, perform any of such party's material Obligations hereunder; or

(cc)      a plan shall be confirmed in any of the Cases that does not, or any order shall be entered which dismisses any of the Cases and which order does not comply with the repayment provisions of this Agreement; or any of the Debtors shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

7.2.      <u>Remedies upon Event of Default</u>. (a) If any Event of Default occurs and is continuing under Section 7.1(l), the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(b)      After the Maturity Date, if any Obligations remain outstanding, the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(c)      Upon (but only upon) the occurrence of an event set forth in Section 7.2(a) and (b), the Required Lenders may take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (<u>provided</u> that (x) with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Lenders shall provide the Borrower (with a copy to counsel for each Committee and to the United States Trustee for the Southern District of New York) with five Business Days' written notice prior to taking the action contemplated thereby, (y) upon receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts, and (z) in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, the specific Event of Default giving rise to the enforcement has occurred and is continuing):

(i)      declare the principal of and accrued interest on the outstanding Loans to be immediately due and payable;

(ii)      [intentionally omitted]

(iii)      set-off any amounts (other than Excluded Collateral) held in any accounts maintained by any Loan Party with respect to which any Lender is a party to a control agreement;

(iv)      compel any Debtor to or to cause any North American Group Member to sell any or all of its assets (other than the Excluded Collateral) that comprise collateral consistent with Section 363(b) of the Bankruptcy Code or any other applicable law, and

credit bid the Loans in any such sale pursuant to Section 363(k) of the Bankruptcy Code
or other Applicable Law; or

(v)    take any other action or exercise any other right or remedy (including,
without limitation, with respect to the Liens in favor of the Lenders) permitted under and
consistent with the Loan Documents or by applicable law.

(d)    Notwithstanding any other provision in this Agreement or the other Loan
Documents, the Lenders' rights and remedies set forth in Section 7.2(a), (b) and (c) shall for all
purposes be the sole and exclusive remedy of the Lenders and their respective Affiliates under
this Agreement and the other Loan Documents, at law or in equity, for all purposes against the
Borrower, any of its direct or indirect Subsidiaries (including, the Guarantors), the Pledgors, and
any of their respective former, current and future direct or indirect equity holders, controlling
persons, stockholders, directors, officers, employees, agents, members, managers, general or
limited partners or assignees upon any Event of Default or for any loss or damage suffered as a
result of the breach of any representation, warranty, covenant or agreement contained in this
Agreement, the other Loan Documents or otherwise by the Borrower or any of its direct or
indirect Subsidiaries, any Pledgor or any Guarantor.

# SECTION 8

## MISCELLANEOUS

8.1.    <u>Amendments and Waivers</u>.    Neither this Agreement, any other Loan
Document, nor any terms hereof or thereof may be amended, supplemented or modified except
in accordance with the provisions of this Section 8.1 or as otherwise expressly provided herein.
The Required Lenders and the Borrower (on its own behalf and as agent on behalf of any other
Loan Party party to the relevant Loan Document) may, from time to time, (a) enter into written
amendments, supplements or modifications hereto and to the other Loan Documents for the
purpose of adding any provisions to this Agreement or the other Loan Documents or changing in
any manner the rights or obligations of the Lenders or of the Loan Parties hereunder or
thereunder or (b) waive, on such terms and conditions as the Lenders may specify in such
instrument, any of the requirements of this Agreement or the other Loan Documents or any
Default or Event of Default and its consequences; except that (x) the consent of each Lender
directly affected thereby shall be required with respect to (i) reductions in the amount or
extensions of the Maturity Date of any Loan or any change to the definition of "Maturity Date",
(ii) reductions in the rate of interest or any fee or extensions of any due date thereof,
(iii) [intentionally omitted], (iv) imposition of any additional restrictions on assignments and
participations, (v) [intentionally omitted] and (vi) modifications to the *pro rata* treatment and
sharing provisions of the Loan Documents, and (y) the consent of 100% of the Lenders shall be
required with respect to (i) modifications to this Section of any of the voting percentages, the
definition of "Required Lenders", or the minimum requirement necessary for all Lenders or
Required Lenders to take action hereunder, (ii) prior to the consummation of the Related
Section 363 Transactions, the release or subordination of any of the Guarantors or a material
portion of the Collateral other than in connection with the Related Section 363 Transactions,
(iii) after the consummation of the Related Section 363 Transactions, the release or subordination
of all or substantially all of the Guarantors or all or substantially all of the Collateral, (iv) the

assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under this Agreement and (v) amendments, supplements, modifications or waivers of Sections 2.12 (or the rights and obligations contained therein), 4.1(a), 4.1(c)(ii), 4.1(e), 4.1(f), 4.1(m) or 7.1(r), the definition of "ABR" or the minimum notice requirements contained in Section 2.4.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders and all future holders of the Loans.  In the case of any waiver, the Loan Parties and the Lenders shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 8.1; provided that, delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

8.2.    Notices.  (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or electronic transmission or overnight or hand delivery, when received, addressed as follows in the case of the Borrower and the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:

GM Global Headquarters
Att.  Mail Code 482-C37-A99
300 Renaissance Center
Detroit, MI  48265-3000
Telecopy:  248-262-8491

with a copy to:

Motors Liquidation Company
767 Fifth Avenue, 14th Floor
New York, NY  10153
Attention:  Treasurer
Telecopy:  212-418-3630

and

      Motors Liquidation Company
      300 Renaissance Center
      Detroit, MI  48265-3000
      Attention:  General Counsel
      Telecopy:  248-267-4584

and:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY  10153-0119
      Attention:  Stephen Karotkin
              Richard Ginsburg
              Soo-Jin Shim
      Telecopy:  212-310-8007

Treasury:

      The United States Department of the Treasury
      1500 Pennsylvania Avenue, NW
      Washington, D.C.  20220
      Attention:  Chief Counsel Office of Financial Stability
      Telecopy:  202-927-9225
      Email:  OFSChiefCounselNotices@do.treas.gov

with a copy to:

      Cadwalader, Wickersham & Taft LLP
      One World Financial Center
      New York, NY  10281
      Attention:  John J. Rapisardi
      Telecopy:  212-504-6666
      Telephone:  212-504-6000

Canadian Lender:

      Export Development Canada
      151 O'Connor Street
      Ottawa, Ontario
      Canada  K1A 1K3
      Attention:  Loans Services
      Telecopy:  613-598-2514

with a copy to:

> Export Development Canada
> 151 O'Connor Street
> Ottawa, Ontario
> Canada  K1A 1K3
> Attention:  Asset Management/Covenants Officer
> Telecopy: 613-598-3186

provided that any notice, request or demand to or upon the Lenders shall not be effective until received.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by each Lender in its sole discretion.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

8.3.    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.4.    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

8.5.    Payment of Expenses.  The Borrower agrees (a) to pay or reimburse the Lenders and any other Canadian Lender Consortium Member for all their (i) reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby (including the reasonable out-of-pocket costs and expenses of the advisors and counsel to each Lender and each other Canadian Lender Consortium Member, but excluding the professional fees of such advisors and counsel to each Lender and each other Canadian Lender Consortium Member), and (ii) costs and expenses incurred in connection with the enforcement or preservation of any rights or exercise of remedies under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith in respect of any Event of Default or otherwise, including the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and each other Canadian Lender Consortium Member, (b) to pay, indemnify, or reimburse each

Lender and each other Canadian Lender Consortium Member for, and hold each Lender and each other Canadian Lender Consortium Member harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying such fees, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (c) to pay, indemnify or reimburse each Lender and each other Canadian Lender Consortium Member, their respective affiliates, and their respective officers, directors, partners, employees, advisors, agents, controlling persons and trustees (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by an Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of, the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, including any of the foregoing relating to the use or proposed use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations or assets of any Group Member, including any of the Mortgaged Properties, and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by any third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee (x) for Taxes (it being understood that the Borrower's obligations with respect to Taxes are set forth in Section 2.12) or (y) with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from the gross negligence or willful misconduct of, in each case as determined by a final and nonappealable decision of a court of competent jurisdiction, such Indemnitee, any of its affiliates or its or their respective officers, directors, partners, employees, agents or controlling persons.  No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans.  Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.  All amounts due under this Section 8.5 shall be payable not later than 30 days after written demand therefor.  Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the Treasurer of the Borrower as set forth in Section 8.2, or to such other Person or address as may be hereafter

designated by the Borrower in a written notice to the Lenders.   The agreements in this
Section 8.5 shall survive repayment of the Loans and all other amounts payable hereunder.

       8.6.    <u>Successors and Assigns; Participations and Assignments</u>.    (a) The
provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto,
all future holders of the Loans and their respective successors and assigns permitted hereby,
except that the Borrower may not assign or otherwise transfer any of its rights or obligations
hereunder (except to its Debtor Successor) without the prior written consent of each Lender (and
any attempted assignment or transfer by the Borrower without such consent shall be null and
void) and no Lender may assign or otherwise transfer its rights or obligations hereunder except
in accordance with this Section 8.6.

       (b)    Any Lender may, without the consent of the Borrower, assign to one or
more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this
Agreement (including all or a portion of its Loans at the time owing to it) pursuant to an
Assignment and Assumption, executed by such Assignee and such Lender and delivered to the
Borrower for its records, to any other branch, division or agency of the United States or
Canadian governments or any government of any state, province, commonwealth or territory of
the United States or Canada or to New CarCo, together with any related rights and obligations
thereunder, without the consent of the Borrower.   The Borrower or its agent will maintain a
register ("<u>Register</u>") of each Lender and Assignee.   The Register shall contain the names and
addresses of the Lenders and Assignees and the principal amount of the loans (and stated interest
thereon) held by each such Lender and Assignee from time to time.   The entries in the Register
shall be conclusive and binding, absent manifest error.

       (c)    Any Lender may, without the consent of the Borrower, sell participations
to any other branch, division or agency of the United States or Canadian governments or any
government of any state, province, commonwealth or territory of the United States or Canada (a
"<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement
(including all or a portion of its Loans owing to it); <u>provided</u> that (A) such Lender's obligations
under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible
to the other parties hereto for the performance of such obligations, (C) the Borrower and the
other Lenders shall continue to deal solely and directly with such Lender in connection with such
Lender's rights and obligations under this Agreement.   Any agreement pursuant to which a
Lender sells such a participation shall provide that such Lender shall retain the sole right to
enforce this Agreement and to approve any amendment, modification or waiver of any provision
of this Agreement; <u>provided</u> that such agreement may provide that such Lender will not, without
the consent of the Participant, agree to any amendment, modification or waiver that (1) requires
the consent of each Lender directly affected thereby pursuant to the proviso to the second
sentence of Section 8.1 and (2) directly affects such Participant.   Subject to paragraph (c) of this
Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10
to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to
paragraph (b) of this Section 8.6.   To the extent permitted by law, and subject to paragraph (c) of
this Section, each Participant also shall be entitled to the benefits of Section 8.7 as though it were
a Lender.   Notwithstanding anything to the contrary in this Section 8.6, each Lender shall have
the right to sell one or more participations in all or any part of its Loans or other Obligations to
one or more lenders or other Persons that provide financing to such Lender in the form of sales

and repurchases of participations without having to satisfy the foregoing requirements. In the event that a Lender sells a participation in such Lender's rights and obligations under this Agreement, the Lender, on behalf of Borrower, shall maintain a register on which it enters the name, address and interest in this Agreement of all Participants.

8.7.    Adjustments; Set-off.    (a) Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders, if any Lender (a "Benefitted Lender") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 7, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash in Dollars from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral or the proceeds thereof, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, subject to any notice or other requirement contained in the Orders, each Lender shall have the right, without (i) further order of or application to the Bankruptcy Court, or (ii) prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon all amounts owing hereunder becoming due and payable (whether at the stated maturity, by acceleration or otherwise) to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the other Lenders after any such set-off and application made by such Lender; provided that, the failure to give such notice shall not affect the validity of such set off and application.

8.8.    Counterparts.    This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

8.9.    Severability.    Any provision of this Agreement that is held to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.10.  <u>Integration</u>.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.  Subject to Section 8.18, in the event of any conflict between this Agreement or any other Loan Document and the Orders, the Orders shall control.

8.11.  <u>Governing Law</u>.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

8.12.  <u>Submission to Jurisdiction; Waivers</u>.  All judicial proceedings brought against any Loan Party hereto arising out of or relating to this Agreement or any other Loan Document, or any Obligations hereunder and thereunder, may be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof.  Each Loan Party hereto hereby irrevocably and unconditionally:

(a)  submits for itself and its property in any such legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)  consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)  agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in Section 8.2 or at such other address of which the Lenders shall have been notified pursuant thereto; and

(d)  waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.13.  <u>Acknowledgments</u>.  The Loan Party hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)  no Lender has any fiduciary relationship with or duty to any Group Member arising out of or in connection with this Agreement or any of the other Loan

Documents, and the relationship between the Lenders, on one hand, and any Group Member, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower or any Subsidiary and the Lenders.

8.14.    <u>Release of Guaranties</u>.    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Lenders hereby agree to take promptly, any action requested by the Borrower having the effect of releasing, or evidencing the release of, any guarantee by any Loan Party of the Obligations to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 8.1.

8.15.    <u>Confidentiality</u>.    Each of the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party or any other Lender pursuant to this Agreement that is designated by such Loan Party as confidential; <u>provided</u> that nothing herein shall prevent any Lender from disclosing any such information (a) to any other Lender or any affiliate of any thereof, (b) subject to an agreement to comply with the provisions of this Section 8.15 (or other provisions at least as restrictive as this Section), to any actual or prospective Transferee or any pledgee of Loans or any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction relating to the Loan Party and its obligations, (c) to its affiliates, employees, directors, trustees, agents, attorneys, accountants and other professional advisors, or those of any of its affiliates for performing the purposes of a Loan Document, subject to such Lender, as the case may be, advising such Person of the confidentiality provisions contained herein, (d) upon the request or demand of any Governmental Authority or regulatory agency (including self-regulated agencies) having jurisdiction (or purporting to have jurisdiction) over it upon notice (other than in connection with routine examinations or inspections by regulators) to the Borrower thereof unless such notice is prohibited or the Governmental Authority or regulatory agency shall require otherwise, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, after notice to the Borrower if reasonably feasible, and, if applicable, after exhaustion of the Group Members' rights and remedies under Section 1.6 of the Department of the Treasury Regulations, 31 C.F.R. Part 1, Subpart A; Sections 27-29 inclusive and 44 of the Access to Information Act, R.S.C., ch A-1 (1985) and Section 28 and Part IV (Sections 50-56 inclusive) of the Freedom of Information and Protection of Privacy Act, R.S.O., ch. F.31 (1990), after notice to the Borrower if reasonably feasible, (f) if requested or required to do so in connection with any litigation or similar proceeding, after notice to the Borrower if reasonably feasible, (g) that has been publicly disclosed, other than in breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

8.16.    <u>Waivers of Jury Trial</u>.    **THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN**

**ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.17.  <u>USA PATRIOT Act</u>.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the USA PATRIOT Act.

8.18.  <u>Orders</u>.  The terms and conditions hereunder shall be subject to the terms and conditions of the Final Order.  In the event of any inconsistency between the terms or conditions of this Agreement and the terms and conditions of the Orders, the terms and conditions of the Orders shall control.  Notwithstanding the foregoing, in the event of any inconsistency between the terms or conditions of Section 8.1 and the terms and conditions of the Orders, the terms and conditions of Section 8.1 shall control.

8.19.  <u>Effect of Amendment and Restatement of the Existing Credit Agreement</u>. On the Effective Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety.  The parties hereto acknowledge and agree that (a) this Agreement and the other Loan Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment and reborrowing, or termination of the "Obligations" (as defined in the Existing Credit Agreement) under the Existing Credit Agreement as in effect prior to the Effective Date and (b) such "Obligations" are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement.

8.20.  <u>New GM Equity Interests.</u>  Each Lender hereby acknowledges and agrees that it, and each Affiliate of any Lender, (a) shall have no right, in any manner whatsoever, to the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans and (b) will not initiate or prosecute any claims, causes of action, adversary proceedings or other litigation seeking recourse against the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans or otherwise.

USActive 16691990.13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MOTORS LIQUIDATION COMPANY

By:_____
        Name:
        Title:

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]

[GUARANTOR]


By:_____
    Name:
    Title:

UNITED STATES DEPARTMENT OF THE
TREASURY, as a Lender


By:_____
     Title:  Interim Assistant Secretary of the
     Treasury for Financial Stability

EXPORT DEVELOPMENT CANADA, as a
Lender


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

# **Exhibit 8**

**EXECUTION VERSION**

$1,175,000,000
AMENDED AND RESTATED SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

MOTORS LIQUIDATION COMPANY
(f/k/a GENERAL MOTORS CORPORATION)
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

THE GUARANTORS

and

THE LENDERS PARTIES HERETO FROM TIME TO TIME

Dated as of July 10, 2009

# TABLE OF CONTENTS

Page

### SECTION 1

### DEFINITIONS

1.1    Defined Terms ........................................................................................................2
1.2    Other Definitional Provisions ...............................................................................23
1.3    Conversion of Foreign Currencies ........................................................................24

### SECTION 2

### AMOUNT AND TERMS OF THE LOANS

2.1    Loans......................................................................................................................24
2.2    [Intentionally Omitted] .........................................................................................24
2.3    Repayment of Loans; Evidence of Debt ...............................................................24
2.4    Optional Prepayments ...........................................................................................25
2.5    [Intentionally Omitted] .........................................................................................25
2.6    Interest Rates and Payment Dates/Fee Payment Dates/Fees .................................25
2.7    Computation of Interest and Fees ..........................................................................25
2.8    Inability to Determine Interest Rate; Illegality .....................................................26
2.9    Treatment of Borrowings and Payments; Evidence of Debt .................................27
2.10   Indemnity ...............................................................................................................27
2.11   Superpriority Nature of Obligations and Lenders' Liens ......................................28
2.12   Taxes......................................................................................................................28

### SECTION 3

### REPRESENTATIONS AND WARRANTIES

3.1    Existence ................................................................................................................30
3.2    [Intentionally Omitted] .........................................................................................30
3.3    [Intentionally Omitted] .........................................................................................30
3.4    [Intentionally Omitted] .........................................................................................30
3.5    Action, Binding Obligations ..................................................................................31
3.6    Approvals ...............................................................................................................31
3.7    [Intentionally Omitted] .........................................................................................31
3.8    Investment Company Act .......................................................................................31
3.9    [Intentionally Omitted] .........................................................................................31
3.10   Chief Executive Office; Chief Operating Office ..................................................31
3.11   Location of Books and Records..............................................................................31
3.12   [Intentionally Omitted] .........................................................................................31

Page

3.13   [Intentionally Omitted] ................................................................................31
3.14   Expense Policy .........................................................................................31
3.15   Subsidiaries ..............................................................................................31
3.16   Capitalization ...........................................................................................32
3.17   Fraudulent Conveyance .............................................................................32
3.18   USA PATRIOT Act ..................................................................................32
3.19   Embargoed Person ....................................................................................32
3.20   Use of Proceeds ........................................................................................33
3.21   Representations Concerning the Collateral ..................................................34
3.22   [Intentionally Omitted] ..............................................................................34
3.23   [Intentionally Omitted] ..............................................................................34
3.24   Lien Priority .............................................................................................34
3.25   [Intentionally Omitted] ..............................................................................35
3.26   [Intentionally Omitted] ..............................................................................35
3.27   [Intentionally Omitted] ..............................................................................35
3.28   Excluded Collateral ...................................................................................35
3.29   Mortgaged Real Property ...........................................................................36
3.30   [Intentionally Omitted] ..............................................................................36
3.31   The Final Order .........................................................................................36
3.32   Wind-Down Budget ...................................................................................36

## SECTION 4

## CONDITIONS PRECEDENT

4.1    Conditions to Effectiveness ........................................................................36

## SECTION 5

## AFFIRMATIVE COVENANTS

5.1    Financial Statements ..................................................................................39
5.2    Notices; Reporting Requirements ................................................................40
5.3    Existence ..................................................................................................41
5.4    Payments of Taxes .....................................................................................42
5.5    Use of Proceeds .........................................................................................43
5.6    Maintenance of Existence; Payment of Obligations; Compliance with Law ....43
5.7    Further Identification of Collateral .............................................................43
5.8    Defense of Title .........................................................................................43
5.9    Preservation of Collateral ...........................................................................43
5.10   Maintenance of Papers, Records and Files ...................................................44
5.11   Maintenance of Licenses ............................................................................44
5.12   Payment of Obligations ..............................................................................44
5.13   OFAC .......................................................................................................45
5.14   Investment Company .................................................................................45
5.15   Further Assurances ....................................................................................45

Page

5.16    Executive Privileges and Compensation ................................................................... 45
5.17    Aircraft ....................................................................................................................... 46
5.18    Restrictions on Expenses ........................................................................................... 47
5.19    Employ American Workers Act .................................................................................. 47
5.20    Internal Controls; Recordkeeping; Additional Reporting .......................................... 47
5.21    Waivers ...................................................................................................................... 48
5.22    [Intentionally Omitted] ............................................................................................. 48
5.23    Additional Guarantors ............................................................................................... 49
5.24    Provide Additional Information ................................................................................. 49
5.25    Inspection of Property; Books and Records; Discussions .......................................... 49
5.26    Governance of Borrower ............................................................................................ 49

## SECTION 6

## NEGATIVE COVENANTS

6.1    Prohibition on Fundamental Changes .......................................................................... 51
6.2    Lines of Business ......................................................................................................... 51
6.3    Transactions with Affiliates ........................................................................................ 51
6.4    Limitation on Liens ..................................................................................................... 51
6.5    Restricted Payments .................................................................................................... 51
6.6    Amendments to Transaction Documents ...................................................................... 52
6.7    Changes in Fiscal Periods ........................................................................................... 52
6.8    Negative Pledge .......................................................................................................... 52
6.9    Indebtedness ................................................................................................................ 53
6.10   Investments ................................................................................................................. 53
6.11   Action Adverse to the Collateral ................................................................................. 53
6.12   Limitation on Sale of Assets ....................................................................................... 53
6.13   [Intentionally Omitted] ............................................................................................... 53
6.14   JV Agreements ............................................................................................................ 53
6.15   Swap Agreements ........................................................................................................ 53
6.16   Clauses Restricting Subsidiary Distributions .............................................................. 53
6.17   Sale/Leaseback Transactions ....................................................................................... 54
6.18   [Intentionally Omitted] ............................................................................................... 54
6.19   Modification of Organizational Documents ................................................................ 54

## SECTION 7

## EVENTS OF DEFAULT

7.1    Events of Default ......................................................................................................... 54
7.2    Remedies upon Event of Default ................................................................................. 57

Page

SECTION 8

MISCELLANEOUS

8.1    Amendments and Waivers ................................................................................................58
8.2    Notices ............................................................................................................................59
8.3    No Waiver; Cumulative Remedies ...................................................................................61
8.4    Survival of Representations and Warranties ....................................................................61
8.5    Payment of Expenses ......................................................................................................61
8.6    Successors and Assigns; Participations and Assignments ................................................62
8.7    Adjustments; Set-off .......................................................................................................63
8.8    Counterparts ...................................................................................................................64
8.9    Severability ....................................................................................................................64
8.10    Integration ......................................................................................................................64
8.11    Governing Law ...............................................................................................................64
8.12    Submission to Jurisdiction; Waivers ...............................................................................64
8.13    Acknowledgments ..........................................................................................................65
8.14    Release of Guaranties .....................................................................................................65
8.15    Confidentiality ...............................................................................................................65
8.16    Waivers of Jury Trial ......................................................................................................66
8.17    USA PATRIOT Act ........................................................................................................66
8.18    Orders .............................................................................................................................66
8.19    Effect of Amendment and Restatement of the Existing Credit Agreement ......................66
8.20    New GM Equity Interests ...............................................................................................67

Page

SCHEDULES:

| 1.1A | Outstanding Amounts of Tranche C Term Loans |
| 1.1B | Guarantors |
| 1.1C | Mortgaged Property |
| 1.1D | Pledgors |
| 1.1E | [Intentionally Omitted] |
| 1.1F | [Intentionally Omitted] |
| 1.1G | Certain Excluded Subsidiaries |
| 3.3 | [Intentionally Omitted] |
| 3.10 | Chief Executive Office and Chief Operating Office |
| 3.11 | Location of Books and Records |
| 3.15 | Subsidiaries |
| 3.16 | Ownership of North American Group Members |
| 3.21 | Jurisdictions and Recording Offices |
| 3.25 | [Intentionally Omitted] |
| 3.26 | [Intentionally Omitted] |
| 3.28 | Excluded Collateral |

EXHIBITS:

| A | Form of Amended and Restated Guaranty and Security Agreement |
| B-1 | Form of Secretary's Certificate |
| B-2 | Form of Officer's Certificate |
| C | Form of Assignment and Assumption |
| D-1 | Form of Waiver for the Loan Parties |
| D-2 | Form of Waiver of SEO to Treasury |
| D-3 | Form of Consent and Waiver of SEO to Borrower |
| D-4 | Form of Waiver of Senior Employee to Treasury |
| D-5 | Form of Consent and Waiver of Senior Employee to Borrower |
| E | Form of Legal Opinion of Weil, Gotshal & Manges LLP |
| F | Form of Compliance Certificate |
| G | Form of Amended and Restated Note |
| H | [Intentionally Omitted] |
| I | Form of Environmental Agreement |
| J | Form of Amended and Restated Mortgage |
| K | [Intentionally Omitted] |
| L | Form of Amended and Restated Equity Pledge Agreement |

AMENDED AND RESTATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "<u>Agreement</u>"), dated as of July 10, 2009, by and among MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation), a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below) (the "<u>Borrower</u>"), the Guarantors (as defined below), and the several lenders from time to time parties to this Agreement (the "<u>Lenders</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, on June 1, 2009 (the "<u>Petition Date</u>"), the Borrower, Saturn, LLC, a Delaware limited liability company, Saturn Distribution Corporation, a Delaware corporation, and Chevrolet-Saturn of Harlem, Inc., a Delaware corporation (each an "<u>Initial Debtor</u>" and collectively, the "<u>Initial Debtors</u>") filed voluntary petitions in the Bankruptcy Court (as defined below) for relief, and commenced cases (each an "<u>Initial Case</u>" and collectively, the "<u>Initial Cases</u>") under the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 3, 2009, the Borrower entered into the Secured Superpriority Debtor-In-Possession Credit Agreement, among the Borrower, the guarantors party thereto and the Lenders (the "<u>Existing Credit Agreement</u>");

WHEREAS, pursuant to the Existing Credit Agreement, the Lenders provided the Borrower with (i) term loans in an aggregate amount equal to $32,125,000,000 (the "<u>Tranche B Term Loans</u>") and (ii) term loans in an aggregate amount equal to $1,175,000,000 (the "<u>Tranche C Term Loans</u>");

WHEREAS, on June 25, 2009, the Bankruptcy Court entered the Final Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "<u>Final Order</u>") approving the terms and conditions of the Existing Credit Agreement and the Loan Documents (as defined in the Existing Credit Agreement);

WHEREAS, on July 5, 2009, the Bankruptcy Court entered the Wind-Down Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "<u>Wind-Down Order</u>") approving the amendment to the Existing Credit Agreement to provide the Debtors with post-petition, wind-down financing;

WHEREAS, pursuant to the Master Transaction Agreement (as defined below), on July 10, 2009 the Treasury (as defined below) exchanged a portion of its Tranche B Term Loans in an amount equal to $25,052,511,395 together with its Additional Notes (as defined in the Existing Credit Agreement) and its rights under the Existing UST Term Loan Agreement including the Warrant Note (as defined in the Existing UST Loan Agreement as defined below) and the Additional Notes (as defined in the Existing UST Loan Agreement) to New CarCo (as

defined below) in exchange for common and preferred Capital Stock (as defined below) of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement, on July 10, 2009 the Canadian Lender exchanged a portion of its Tranche B Term Loans in an amount equal to $3,010,805,085 together with its Additional Notes to New CarCo in exchange for common and preferred Capital Stock of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement and in accordance with the Section 363 Sale Order (as defined below), the Borrower sold to New CarCo certain of its assets and property, and New CarCo assumed certain liabilities of the Borrower and its Subsidiaries (as defined below), including a portion of the Treasury's Tranche B Term Loans in an aggregate amount equal to $7,072,488,605 pursuant to the Assignment and Assumption Agreement, dated as of the date hereof (the "New CarCo Assignment and Assumption"), between the Borrower and New CarCo (collectively, and together with the other transactions contemplated by the Transaction Documents, the "Related Section 363 Transactions");

WHEREAS, after giving effect to the Related Section 363 Transactions, the remaining obligations of the Borrower to the Lenders are comprised solely of the Tranche C Term Loans; and

WHEREAS, the Borrower has requested, and the Lenders have agreed, to amend and restate the portion of the Existing Credit Agreement relating to the Tranche C Term Loans on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the parties hereto agree that on the Effective Date, as provided in Section 8.19, the Existing Credit Agreement shall be amended and restated in its entirety as follows:

## SECTION 1

## DEFINITIONS

1.1.    Defined Terms.    As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the three month Eurodollar Rate (for the avoidance of doubt after giving effect to the provisos in the definition thereof) plus 1.00%; provided that, in the event the Required Lenders shall have determined that adequate and reasonable means do not exist for ascertaining the calculation of clause (c), such calculation shall be replaced with the last available calculation of the three month Eurodollar Rate plus 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate shall be effective as of the opening of business on the effective

day of such change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Additional Guarantor":  as defined in Section 5.23.

"Administrative/Priority Claim Payment Amount":  any positive amount equal to the difference between $200,000,000 and the aggregate amount paid or payable (or specifically reserved for payment as such) to satisfy all of the administrative and priority claims comprising the Administrative/Priority Claim Tranche.

"Administrative/Priority Claim Payment Date":  the first Business Day after which the administrative and priority claims that comprise the Administrative/Priority Claim Tranche are satisfied in full or otherwise finalized so that no such claims remain outstanding and unsatisfied, but in no case later than the date on which a liquidation plan with respect to the Debtors is approved by the Bankruptcy Court and declared effective.

"Administrative/Priority Claim Tranche":  an amount under the Wind-Down Budget up to $200,000,000 that was allocated as of the Effective Date to cover anticipated (i) administrative claims related to contract rejections by the Debtors and (ii) priority claims against the Debtors, each as further described in the Wind-Down Budget.  The description of the administrative and priority claims that are to be set forth in the Wind-Down Budget shall reflect such categories, provisions and assumptions such that a good faith estimate, as of the Effective Date, of the sum of the obligations arising from the claims referenced in clauses (i) and (ii) above shall be at least equal to $200,000,000.

"Affiliate":  with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this Agreement, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.  For the avoidance of doubt, pension plans of a Person and entities holdings the assets of such plans, shall not be deemed to be Affiliates of such Person.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's aggregate but unpaid principal amount of such Lender's Loans at such time to the sum of the aggregate but unpaid principal amount of all Lenders' Loans at such time.

"Agreement":  as defined in the preamble hereto.

"Anti-Money Laundering Laws":  as defined in Section 3.18(d).

"Applicable Law":  as to any Person, all laws (including common law), statutes, regulations, ordinances, treaties, judgments, decrees, injunctions, writs and orders of any court,

governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations.

"Applicable Margin":  (A) 2.0% per annum in the case of ABR Loans and (B) 3.0% per annum in the case of Eurodollar Loans.

"Assignee":  as defined in Section 8.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit C.

"Bankruptcy Code":  the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*

"Bankruptcy Court":  the United States Bankruptcy Court for the Southern District of New York (together with the District Court for the Southern District of New York, where applicable).

"Bankruptcy Exceptions":  limitations on, or exceptions to, the enforceability of an agreement against a Person due to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or the application of general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

"Bankruptcy Rules":  the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Benefitted Lender":  as defined in Section 8.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the recitals.

"Business Day":  any day other than a Saturday, Sunday or other day on which banks in New York City or Ottawa, Ontario, Canada are permitted to close; provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London Interbank market.

"Canadian Lender":  Export Development Canada, a corporation established pursuant to the laws of Canada, and its successors and assigns.

"Canadian Lender Consortium Members":  each of the Export Development Canada, the Government of Canada and the Government of Ontario.

"<u>Canadian Post-Sale Facility</u>":  the Amended and Restated Loan Agreement, dated as of the Effective Date, by and among General Motors of Canada Limited, as borrower, the other loan parties thereto, and the Canadian Lender.

"<u>Canadian PV Loan Agreement</u>":  the Loan Agreement, dated as of the Effective Date, by and among New CarCo, as borrower, the other loan parties thereto, and the Canadian Lender.

"<u>Capital Lease Obligations</u>":  for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"<u>Capital Stock</u>":  any and all equity interests, including any shares of stock, membership or partnership interests, participations or other equivalents whether certificated or uncertificated (however designated) of a corporation, limited liability company, partnership or any other entity, and any and all similar ownership interests in a Person and any and all warrants or options to purchase any of the foregoing.

"<u>Carve-Out</u>":  as defined in the Orders.

"<u>Cases</u>":  the Initial Cases and each other case of a Debtor filed with the Bankruptcy Court and joined with the Initial Cases.

"<u>Cash Equivalents</u>":  (a) Dollars, or money in other currencies received in the ordinary course of business, (b) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed or insured by the United States or Canadian government or any agency thereof, (c) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, province, commonwealth or territory of the United States or Canada, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's or equivalent rating, (d) demand deposit, certificates of deposit and time deposits with maturities of one (1) year or less from the date of acquisition and overnight bank deposits of any commercial bank, supranational bank or trust company having capital and surplus in excess of $500,000,000, (e) repurchase obligations with respect to securities of the types (but not necessarily maturity) described in clauses (b) and (c) above, having a term of not more than 90 days, of banks (or bank holding companies) or subsidiaries of such banks (or bank holding companies) and non-bank broker-dealers listed on the Federal Reserve Bank of New York's list of primary and other reporting dealers ("<u>Repo Counterparties</u>"), which Repo Counterparties have capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign equivalent thereof) and which Repo Counterparties or their parents (if the Repo Counterparties are not rated) will at the time of the transaction be rated "A-1" by S&P (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization, (f) commercial paper rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either case

maturing within one (1) year after the day of acquisition, (g) short-term marketable securities of comparable credit quality, (h) shares of money market mutual or similar funds which invest at least 95% in assets satisfying the requirements of clauses (a) through (g) of this definition (except that such assets may have maturities of 13 months or less), and (i) in the case of a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Change of Control":  with respect to the Borrower, the acquisition, after the Closing Date, by any other Person, or two or more other Persons acting in concert other than the Permitted Holders, the Lenders or any Affiliate of the Lenders, of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of outstanding shares of voting stock of the Borrower at any time if after giving effect to such acquisition such Person or Persons owns twenty percent (20%) or more of such outstanding voting stock.

"Closing Date":  June 3, 2009.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property and assets of the Loan Parties of every kind or type whatsoever, including tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located, all property of the estates of each Debtor within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law except avoidance actions against the Prepetition Senior Facilities Secured Parties (as defined in the Final Order)), all property pledged to secure the Obligations under each Collateral Document (other than the Orders) and all proceeds, rents and products of the foregoing other than Excluded Collateral.  For the avoidance of doubt, the proceeds of the Tranche C Term Loans constitute Collateral.

"Collateral Documents":  means, collectively, the Orders, the Guaranty, the Equity Pledge Agreement, each Mortgage, collateral assignment, security agreement, pledge agreement or similar agreements delivered to the Lenders to secure the Obligations.  The Collateral Documents (other than the Orders) shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"Committee":  any statutory committee appointed in the Cases.

"Compensation Regulations":  as defined in Section 5.16(a)(i).

"Compliance Certificate":  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit F, for the immediately prior calendar month and on a cumulative basis from the Petition Date.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control":  as defined in the definition of "Affiliate".

"Controlled Affiliate":  as defined in Section 3.18(a).

"Convention":  as defined in Section 2.12(d).

"Debtor":  each of the Initial Debtors and, subject to the written consent of the Required Lenders, each other Subsidiary of the Initial Debtors to the extent that (i) such Subsidiary files with the Bankruptcy Court, (ii) such case is joined with the Cases and (iii) such Subsidiary is subject, by order of the Bankruptcy Court, to the previously issued orders relating to the Cases (including the Orders).

"Debtor Successor":  with respect to any Debtor, (i) a "liquidating trust," within the meaning of Treas. Reg. § 301.7701-4, to which such Debtor's assets are distributed, or (ii) any other entity established for the sole purpose of liquidating the assets of such Debtor.

"Default":  any event, that with the giving of notice, the lapse of time, or both, would become an Event of Default.

"Disposition":  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollar Equivalent":  on any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to an amount denominated in any other currency, the equivalent in Dollars of such amount as determined by the Treasury in accordance with normal banking industry practice using the Exchange Rate on the date of determination of such equivalent.  In making any determination of the Dollar Equivalent, the Treasury shall use the relevant Exchange Rate in effect on the date on which a Dollar Equivalent is required to be determined pursuant to the provisions of this Agreement.  As appropriate, amounts specified herein as amounts in Dollars shall include any relevant Dollar Equivalent amount.

"Dollars" and "$":  the lawful money of the United States.

"Domestic 956 Subsidiary":  any U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Domestic Subsidiary":  any Subsidiary that is organized or existing under the laws of the United States or Canada or any state, province, commonwealth or territory of the United States or Canada.

"EAWA":  the Employ American Workers Act (Section 1611 of Division A, Title XVI of the American Recovery and Reinvestment Act of 2009), Public Law No. 111-5, effective as of February 17, 2009, as may be amended and in effect from time to time.

"EESA":  the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7000 *et al.*  of Division A,

Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time.

"Effective Date":  the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall not be later than the date on which the Related Section 363 Transactions are consummated.

"EISA":  the Energy Independence and Security Act of 2007, Public Law No. 110-140, effective as of January 1, 2009, as may be amended and in effect from time to time.

"Embargoed Person":  as defined in Section 3.19.

"Environmental Agreement":  the Environmental Agreement dated as of the date hereof, executed by the Loan Parties for the benefit of the Lenders, substantially in the form of Exhibit I.

"Environmental Laws":  any and all foreign, Federal, state, provincial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or natural resources, as now or may at any time hereafter be in effect.

"Environmental Permits":  any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"Environmental Tranche" an amount under the Wind-Down Budget up to $500,000,000 that was allocated as of the Effective Date to cover anticipated environmental related expenses and claims.

"Equity Pledge Agreement":  the Amended and Restated Equity Pledge Agreement dated as of the date hereof, made by each Pledgor in favor of the Lenders, substantially in the form of Exhibit L.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System; provided that the Eurocurrency Reserve Requirements shall be $0 with respect to the Canadian Lender.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such

Interest Period appearing on page LIBOR01 of the Reuters screen as of 11:00 a.m. (London time) two Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on such page of the Reuters screen (or otherwise on such screen), the Eurodollar Base Rate shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Treasury or, in the absence of such availability, by reference to the rate at which a reference institution selected by the Treasury is offered Dollar deposits at or about 11:00 a.m. (New York City time) two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided that, in no event shall the Eurodollar Rate be less than 2.00%.

"Event of Default":  as defined in Section 7.1  .

"Exchange Act":  the Securities and Exchange Act of 1934, as amended.

"Exchange Rate":  for any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into Dollars, as set forth at 11:00 a.m. (New York time) on such day on the applicable Bloomberg currency page with respect to such currency.  In the event that such rate does not appear on the applicable Bloomberg currency page, the Exchange Rate with respect to such currency shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Treasury and the Borrower or, in the absence of such agreement, such Exchange Rate shall instead be the spot rate of exchange of a reference institution selected by the Treasury in the London Interbank market or other market where such reference institution's foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. (New York time) on such day for the purchase of Dollars with such currency, for delivery two Business Days later; provided, however, that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Treasury may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Collateral":  as defined in Schedule 3.28.  For the avoidance of doubt, Excluded Collateral shall at all times include the New GM Equity Interests and tax refunds due to Canadian subsidiaries.

"Excluded Subsidiary": (i) any JV Subsidiary in which any Loan Party owns less than 80% of the voting or economic interest, (ii) any U.S. Subsidiary of the Borrower listed as one of the "Domestic Entities" on Annex 1 to Schedule 3.28 other than the Loan Parties listed therein, (iii) any Subsidiary of the Borrower existing on the Closing Date that the Borrower does not Control as of the Closing Date (including, without limitation, dealerships wholly owned by the Borrower that are operated by a third party pursuant to an agreement in effect on the Petition Date), (iv) [intentionally omitted] and (v) any Subsidiary set forth on Schedule 1.1G as such Schedule 1.1G may be amended from time to time with the consent of the Required Lenders.

"Executive Order": as defined in Section 3.19.

"Existing Agreements": the agreements of the Loan Parties and their Subsidiaries in effect on the Closing Date and any extensions, renewals and replacements thereof so long as any such extension, renewal and replacement could not reasonably be expected to have a material adverse effect on the rights and remedies of the Lenders under any of the Loan Documents.

"Existing Credit Agreement": as defined in the recitals.

"Existing UST Term Loan Agreement": the Loan and Security Agreement, dated as of December 31, 2008, between the Borrower and the Treasury.

"Expense Policy": the Borrower's comprehensive written policy on excessive or luxury expenditures maintained and implemented in accordance with the Treasury regulations contained in 31 C.F.R. Part 30.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it (or, if JPMorgan Chase Bank, N.A. is no longer receiving such quotations for any reason, the average of such quotations received by a reference institution selected by the Lender).

"Final Order": as defined in the recitals.

"Foreign Assets Control Regulations": as defined in Section 3.19.

"Foreign 956 Subsidiary": any Non-U.S. Subsidiary of the Borrower that is a "controlled foreign corporation" as defined in Code Section 957.

"Foreign Subsidiary": any Subsidiary that is not a Domestic Subsidiary.

"Funding Office": the office of each Lender specified in Schedule 1.1A or such other office as may be specified from time to time by such Lender as its funding office by written notice to the Borrower.

"GAAP":  generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Authority":  any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, or any federal, state or municipal court, in each case whether of the United States or a foreign jurisdiction.

"Group Members":  the collective reference to the Borrower and its Subsidiaries.

"Guarantee Obligation":  as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee Obligation" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, to the extent required by the Lenders.  The amount of any Guarantee Obligation of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"Guarantor":  each Person listed on Schedule 1.1B and each other Person that becomes an Additional Guarantor.

"Guaranty":  the Amended and Restated Guaranty and Security Agreement dated as of the date hereof, executed and delivered by the Borrower and each Guarantor, substantially in the form of Exhibit A.

"Indebtedness":  for any Person:  (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services; (c) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (g) and (i) of this definition secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (h) and (i) of this definition guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner unless the terms of such indebtedness expressly provide that such Person is not liable therefor; (j) the liquidation value of all redeemable preferred Capital Stock of such Person;

and (k) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Liabilities": as defined in Section 8.5.

"Indemnitee": as defined in Section 8.5.

"Initial Case": as defined in the recitals.

"Initial Debtors": as defined in the recitals.

"Interest Payment Date": (a) as to any ABR Loan, the first day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan, the last day of such Interest Period, and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurodollar Loan, (i) initially, the period commencing on the Borrowing Date (as defined in the Existing Credit Agreement) with respect to such Loan and ending three months thereafter; and (ii) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending three months thereafter; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(A)   if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(B)   any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date; and

(C)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interim Order": the Interim Order entered June 2, 2009 by the Bankruptcy Court pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) approving this Agreement and authorizing the Loan Parties to obtain Postpetition financing pursuant thereto, (b) granting related Liens and Superpriority Claims, (c) granting adequate protection to certain Prepetition secured parties, and (d) scheduling a final hearing.

"Investments": as defined in Section 6.10.

"JV Agreement": each partnership or limited liability company agreement (or similar agreement) between a North American Group Member or one of its Subsidiaries and the

relevant JV Partner as the same may be amended, restated, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"JV Partner":  each Person party to a JV Agreement that is not a Loan Party or one of its Subsidiaries.

"JV Subsidiary":  any Subsidiary of a Group Member which is not a Wholly Owned Subsidiary and as to which the business and management thereof is jointly controlled by the holders of the Capital Stock therein pursuant to customary joint venture arrangements.

"Lenders":  as defined in the preamble hereto.

"Lien":  any mortgage, pledge, security interest, lien or other charge or encumbrance (in the nature of a security interest), including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"Loan Documents":  this Agreement, the Notes, the Environmental Agreement, the Collateral Documents and each post-closing letter or agreement now and hereafter entered into among the parties hereto.

"Loan Parties":  the Borrower, each Guarantor and the Pledgors.

"Loans":  as defined in Section 2.1.

"Master Transaction Agreement":  that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, among New CarCo and the sellers party thereto.

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries (taken as a whole), (b) the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any of the Loan Documents to which they are a party, (c) the validity or enforceability in any material respect of any of the Loan Documents to which the Loan Parties are a party, (d) the rights and remedies of the Lenders under any of the Loan Documents, or (e) the Collateral (taken as a whole); provided that, (w) the taking of any action by the Borrower and its Subsidiaries, including the cessation of production, pursuant to and in accordance with the Wind-Down Budget, (x) the filing of the Cases, and (y) any sale pursuant to any Related Section 363 Transaction or any other action taken pursuant to the Orders, shall not be taken into consideration.

"Material Environmental Amount":  $50,000,000.

"Maturity Date":  the first date on which the earlier of the following shall have occurred (which date may be extended by the Lenders in their sole discretion in accordance with Section 8.1):  (a) the effective date of a plan of liquidation confirmed by the Bankruptcy Court with respect to the Cases that is not reasonably satisfactory to the Treasury; provided that any objection from the Treasury that such plan is not reasonably satisfactory to the Treasury will not be based on the Disposition of Excluded Collateral under such plan and (b) the first date on

which each of the following shall have occurred (i) all claims against the Debtors have been resolved such that there are no remaining disputed claims, (ii) all assets of the Debtors (other than remaining cash) have been liquidated and (iii) all distributions on account of allowed claims have been made, and all other actions that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been completed.  On the Maturity Date arising under clause (b) above, the plan administrator or other individual or entity charged with administering the liquidation plan shall be entitled to retain a de minimis amount of funds to complete the dissolution of the last remaining Debtor.  As used in this definition, references to a Debtor includes its Debtor Successor.

"Moody's":  Moody's Investors Service, Inc. and its successors.

"Mortgage":  each of the mortgages and deeds of trust made by the Borrower or any Guarantor in favor of, or for the benefit of, the Lenders, substantially in the form of Exhibit J, taking into consideration the law and jurisdiction in which such mortgage or deed of trust is to be recorded or filed, to the extent applicable.

"Mortgaged Property":  each property listed on Schedule 1.1C, as to which the Lenders shall be granted a Lien pursuant to the Orders or the Mortgages.

"New CarCo":  General Motors Company (formerly known as NGMCO, Inc.), a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings, LLC.

"New CarCo Assignment and Assumption":  as defined in the recitals.

"New GM Equity Interests":  any stock, warrants, options or other equity interests of New CarCo or any of its Subsidiaries issued to or held by any Debtor (or any of its Subsidiaries) pursuant to the Related Section 363 Transactions, including any (i) subsequent dividends, payment or other distribution thereon, and (ii) proceeds received or receivable upon any Disposition thereof.

"Non-Debtor":  each Subsidiary of the Borrower that is not a Debtor.

"Non-Excluded Taxes":  as defined in Section 2.12(a).

"Non-U.S. Lender":  as defined in Section 2.12(d).

"Non-U.S. Subsidiary":  any Subsidiary of any Loan Party that is not a U.S. Subsidiary.

"North American Group Members":  collectively, the Loan Parties and each Domestic Subsidiary of a Loan Party that is not an Excluded Subsidiary.

"Notes":  as defined in Section 4.1(a)(vi) and any promissory notes issued in connection with an assignment contemplated by Section 2.3(b).

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing

of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Loan Party to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to any Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise.

"OFAC":  the Office of Foreign Assets Control of the Treasury.

"Orders":  the Interim Order, the Final Order and the Wind-Down Order.

"Other Foreign 956 Subsidiary":  any Non-U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Other Taxes":  any and all present or future stamp or documentary taxes and any other excise or property taxes, intangible or mortgage recording taxes, charges or similar levies imposed by the United States or any taxing authority thereof or therein arising from any payment made, or from the execution, delivery or enforcement of, or otherwise with respect to this Agreement or any other Loan Document.

"Participant":  as defined in Section 8.6(c).

"Permitted Holders":  any holder of any Capital Stock of the Borrower as of the Closing Date.

"Permitted Indebtedness":

(a)     Indebtedness created under any Loan Document;

(b)     [intentionally omitted];

(c)     trade payables, if any, in the ordinary course of its business;

(d)     Indebtedness existing on the Petition Date and any refinancings, refundings, renewals or extensions thereof (without any increase, or any shortening of the maturity, of any principal amount thereof);

(e)     intercompany Indebtedness of a North American Group Member in the ordinary course of business; provided that, the right to receive any repayment of such Indebtedness (other than Indebtedness meeting the criteria of clause (d) above, or any extensions, renewals, exchanges or replacements thereof) shall be subordinated to the Lenders' rights to receive repayment of the Obligations;

(f)      [intentionally omitted];

(g)      [intentionally omitted];

(h)      Swap Agreements permitted pursuant to Section 6.15 that are not entered into for speculative purposes;

(i)      Indebtedness with respect to (x) letters of credit, bankers' acceptances and similar instruments issued in the ordinary course of business, including letters of credit, bankers' acceptances and similar instruments in respect of the financing of insurance premiums, customs, stay, performance, bid, surety or appeal bonds and similar obligations, completion guaranties, "take or pay" obligations in supply agreements, reimbursement obligations regarding workers' compensation claims, indemnification, adjustment of purchase price and similar obligations incurred in connection with the acquisition or Disposition of any business or assets, and sales contracts, coverage of long-term counterparty risk in respect of insurance companies, purchasing and supply agreements, rental deposits, judicial appeals and service contracts and (y) appeal, bid, performance, surety, customs or similar bonds issued for the account of any Loan Party in the ordinary course of business;

(j)      Indebtedness incurred in the ordinary course of business in connection with cash management and deposit accounts and operations, netting services, employee credit card programs and similar arrangements and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

(k)      any guarantee by any Loan Party of Permitted Indebtedness; and

(l)      Indebtedness entered into under Section 136 of EISA.

"Permitted Investments":

(a)      any Investment in Cash Equivalents;

(b)      any Investment by a Loan Party in the Borrower, another Loan Party, or a Pledged Entity that is a Domestic Subsidiary;

(c)      [intentionally omitted];

(d)      any Investment (i) existing on the Effective Date, or (ii) consisting of any extension, modification or renewal of any Investment existing on the Closing Date; provided that the amount of any such Investment is not increased through such extension, modification or renewal;

(e)      [intentionally omitted];

(f)      [intentionally omitted];

(g)    [intentionally omitted];

(h)    any Investment otherwise permitted under this Agreement;

(i)    Investments in Indebtedness of, or Investments guaranteed by, Governmental Authorities, in connection with industrial revenue, municipal, pollution control, development or other bonds or similar financing arrangements;

(j)    [intentionally omitted];

(k)    Trade Credit;

(l)    [intentionally omitted];

(m)    Investments (i) received in satisfaction or partial satisfaction of delinquent accounts and disputes with customers or suppliers in the ordinary course of business, or (ii) acquired as a result of foreclosure of a Lien securing an Investment or the transfer of the assets subject to such Lien in lieu of foreclosure;

(n)    commercial transactions in the ordinary course of business with the Borrower or any of its Subsidiaries to the extent such transactions would constitute an Investment;

(o)    conveyance of Collateral in an arm's-length transaction to a Subsidiary that is not a Loan Party or an Affiliate of the Borrower for non-cash consideration consisting of Trade Credit or other Property to become Collateral having a fair market value equal to or greater than the fair market value of the conveyed Collateral; and

(p)    Investments after the Effective Date in (i) dealerships of the Borrower and its Subsidiaries in the United States in an aggregate amount not exceeding $2,500,000 and (ii) General Motors Strasbourg, S.A. in an aggregate amount not exceeding $7,500,000.

"Permitted Liens":  with respect to any Property of any North American Group Member:

(a)    Liens created under the Loan Documents;

(b)    Liens on Property of a North American Group Member existing on the date hereof (including Liens on Property of a North American Group Member pursuant to Existing Agreements; provided that such Liens shall secure only those obligations and any permitted refinancing that they secure on the date hereof);

(c)    [intentionally omitted];

(d)    Liens for taxes and utility charges not yet due or that are being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided;

(e)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or that are being contested in compliance with Section 5.8;

(f)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the proceeds thereof;

(g)    Liens securing Swap Agreements permitted pursuant to Section 6.15;

(h)    Liens created in the ordinary course of business in favor of banks and other financial institutions over balances of any accounts held at such banks or financial institutions or over investment property held in a securities account, as the case may be, to facilitate the operation of cash pooling, cash management or interest set-off arrangements;

(i)    customary Liens in favor of trustees and escrow agents, and netting and set-off rights, banker's liens and the like in favor of counterparties to financial obligations and instruments, including, without limitation, Swap Agreements permitted pursuant to Section 6.15;

(j)    Liens securing Indebtedness incurred under Section 136 of EISA;

(k)    pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment or other insurance and other social security laws or regulations;

(l)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety, customs and appeal bonds, performance bonds and other obligations of a like nature, or to secure the payment of import or customs duties, in each case incurred in the ordinary course of business;

(m)    zoning and environmental restrictions, easements, licenses, encroachments, covenants and servitudes, rights-of-way, restrictions on use of real property or groundwater, institutional controls and other similar encumbrances or deed restrictions incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any North American Group Member;

(n)    [intentionally omitted];

(o)    judgment Liens securing judgments;

(p)    any Lien consisting of rights reserved to or vested in any Governmental Authority by statutory provision;

(q)     Liens securing Indebtedness described in clauses (d) and (e) of the definition of Permitted Indebtedness;

(r)     pledges or deposits made to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (k) or (l) of this definition;

(s)     [intentionally omitted];

(t)     [intentionally omitted]; and

(u)     other Liens created or assumed in the ordinary course of business of the North American Group Member; <u>provided</u> that the obligations secured by all such Liens shall not exceed the principal amount of $10,000,000.

"<u>Person</u>":     any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"<u>Petition Date</u>":  as defined in the recitals hereto.

"<u>Pledged Entity</u>":  a Subsidiary of a Loan Party whose Capital Stock is subject to a security interest in favor of the Lenders pursuant to the Orders or the Collateral Documents.

"<u>Pledgors</u>":  the parties set forth on <u>Schedule 1.1D</u> and each other Person that makes a pledge in favor of the Lenders under the Equity Pledge Agreement.

"<u>Postpetition</u>":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"<u>Prepetition</u>":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that arose or was instituted, or another matter that occurred, prior to the Petition Date.

"<u>Prepetition Payment</u>":  a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or trade payables or other Prepetition claims against any Debtor.

"<u>Prime Rate</u>":  the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. (or if JPMorgan Chase Bank, N.A. is no longer announcing such a rate for any reason, another reference institution selected by the Lender) as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to borrowers).

"Prohibited Jurisdiction":  any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person":  any Person:

(a)    subject to the provisions of the Executive Order;

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is subject to the provisions of the Executive Order;

(c)    with whom a Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate or affiliated with a Person listed above.

"Property":  any right or interest in or to property (other than tax refunds due to Canadian subsidiaries) of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Quarterly Report":  as defined in Section 5.1(f).

"Records":  all books, instruments, agreements, customer lists, credit files, computer files, storage media, tapes, disks, cards, software, data, computer programs, printouts and other computer materials and records generated by other media for the storage of information maintained by any Person with respect to the business and operations of the Loan Parties and the Collateral.

"Register":  as defined in Section 8.6(b).

"Regulation D":  Regulation D of the Board as in effect from time to time.

"Related Section 363 Transactions":  as defined in the recitals.

"Required Lenders":  at any time, Lenders with Loans constituting a majority of the Loans of all Lenders.

"Requirements of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty,

rule or regulation or determination of an arbitrator or a court of competent jurisdiction or other Governmental Authority, in each case applicable to and binding upon such Person and any of its property, and to which such Person and any of its property is subject.

"Responsible Officer":  as to any Person, the chief executive officer or, with respect to financial matters (including without limitation those matters set forth in Sections 5.1(f) and 5.2(h)), the chief financial officer, treasurer or assistant treasurer of such Person, an individual so designated from time to time by such Person's board of directors or, for the purposes of Section 5.2 only (other than Sections 5.1(f) and 5.2(h)), to include the secretary or an assistant secretary of the Borrower, or, in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer shall mean any officer authorized to act on such officer's behalf as demonstrated by a certificate or corporate resolution (or equivalent); provided that the Lenders are notified in writing of the identity of such Responsible Officer.

"Restricted Payments":  as defined in Section 6.5.

"S&P":  Standard & Poor's Ratings Services and its successors.

"Sale/Leaseback Transaction":  as defined in Section 6.17.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Section 363 Sale Order":  an order of the Bankruptcy Court approving the Related Section 363 Transactions in form and substance substantially in the form attached to the Transaction Documents or otherwise satisfactory to the Required Lenders.

"Senior Employee":  any of the 25 most highly compensated employees (including the SEOs) of the Loan Parties, as determined pursuant to the rules set forth in 31 C.F.R. Part 30.

"SEO":  a Senior Executive Officer as defined in the EESA and any interpretation of such term by the Treasury thereunder, including the rules set forth in 31 C.F.R. Part 30.

"Special Inspector General of the Troubled Asset Relief Program":  The Special Inspector General of the Troubled Asset Relief Program, as contemplated by Section 121 of the EESA.

"Specified Benefit Plan":  any employee benefit plan within the meaning of section 3(3) of ERISA and any other plan, arrangement or agreement which provides for compensation, benefits, fringe benefits or other remuneration to any employee, former employee, individual independent contractor or director, including any bonus, incentive, supplemental retirement plan, golden parachute, employment, individual consulting, change of control, bonus or retention agreement, whether provided directly or indirectly by any Group Member or otherwise.

"Subsidiary":  with respect to any Person, any corporation, partnership, limited liability company or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or shall have the right to have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.  Unless otherwise qualified, all references to a "Subsidiary" or "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim":  a claim against the Borrower or any other Debtor in any of the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses including administrative expenses specified in sections 503 and 507 of the Bankruptcy Code, whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement."

"Taxes":  as defined in Section 2.12(a).

"Trade Credit":  accounts receivable, trade credit or other advances extended to, or investment made in, customers, suppliers, including intercompany, in the ordinary course of business.

"Trading With the Enemy Act":  as defined in Section 3.19.

"Tranche B Term Loan":  as defined in the recitals.

"Tranche C Term Loan":  as defined in the recitals.

"Transaction Documents":  each of, and collectively, (i) the Master Transaction Agreement, (ii) the Section 363 Sale Order, (iii) the Transition Services Agreement and (iv) the related manufacturing agreements, asset purchase agreements, organizational documents, finance support agreements and all other related documentation, each as amended, supplemented or modified from time to time in accordance with Section 6.6.

"Transferee":  any Assignee or Participant.

"Transition Services Agreement":  the Transition Services Agreement, dated as of the date hereof, among the Borrower, the other Initial Debtors, and New CarCo, substantially in the form of Exhibit T to the Master Transaction Agreement.

"Treasury":  The United States Department of the Treasury.

"Uniform Commercial Code":  the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States":  the United States of America.

"USA PATRIOT Act":  as defined in Section 3.18(d).

"U.S. Subsidiary":  any Subsidiary of any Loan Party that is organized or existing under the laws of the United States or any state thereof or the District of Columbia.

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wind-Down":  the sale or shutdown of certain businesses and properties of the Debtors and the Subsidiaries thereof.

"Wind-Down Budget":  the budget, in form and substance consistent with the budget provided by the Company prior to the Effective Date and satisfactory to the Required Lenders, setting forth in reasonable detail all anticipated receipts and disbursements of the Borrower and certain of its U.S. Subsidiaries on a calendar year basis, as amended by each Quarterly Report delivered pursuant to Section 5.1(f).

"Wind-Down Order":  as defined in the recitals.

1.2.    Other Definitional Provisions.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to Group Members not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as

amended, supplemented, restated or otherwise modified from time to time and (vi) references to any Person shall include its successors and assigns.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole (including the Schedules and Exhibits hereto) and not to any particular provision of this Agreement (or the Schedules and Exhibits hereto), and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3.    Conversion of Foreign Currencies.  (a) For purposes of this Agreement and the other Loan Documents, with respect to any monetary amounts in a currency other than Dollars, the Dollar Equivalent thereof shall be determined based on the Exchange Rate in effect at the time of such determination (unless otherwise explicitly provided herein).

(b)     The Treasury may set up appropriate rounding off mechanisms or otherwise round-off amounts hereunder to the nearest higher or lower amount in whole Dollar or cent to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in whole cents, as may be necessary or appropriate.

## SECTION 2

## AMOUNT AND TERMS OF THE LOANS

2.1.    Loans.  On the Effective Date, the Lenders made the Tranche C Term Loans in Dollars to the Borrower in the aggregate principal amount of $1,175,000,000 (the "Loans").  The Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral.  The Loans may from time to time be Eurodollar Loans or, solely in the circumstances specified in Section 2.8, ABR Loans.  Loans repaid or prepaid may not be reborrowed.

2.2.    [Intentionally Omitted].

2.3.    Repayment of Loans; Evidence of Debt.  (a) The Loans shall be payable on the Maturity Date; provided that, upon the Administrative/Priority Claim Payment Date, the portion of the Loans equal to the Administrative/Priority Claim Payment Amount as of such date shall be due.  Except as otherwise expressly provided herein, the repayment of the Loans shall, subsequent to the closing of the Related Section 363 Transactions, be subject to claims against the Debtors' estates that have priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions, in an aggregate amount up to $1,175,000,000, or such larger amount as approved by the Lenders.

(b)    Pursuant to Section 4.1(a), the Borrower shall execute and deliver the Notes on the Effective Date.  Following any assignment of the Loans pursuant to Section 8.6, the Borrower agrees that, upon the request of any Lender, the Borrower shall promptly execute and deliver to such Lender Notes reflecting the Loans assigned and the Loans retained by such Lender, if any.

2.4.    Optional Prepayments.  (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to each Lender no later than 12:00 noon (New York City time) three Business Days prior to the date such prepayment is requested to be made, which notice shall specify the date of such prepayment, the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such payment; provided that, if a Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.10.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid and shall be applied as provided in Section (b).  Partial prepayments of Loans shall be in an aggregate principal amount of $20,000,000 or a whole multiple thereof or, if less, the entire principal amount thereof then outstanding.

(b)    Unless the Required Lenders shall otherwise agree, amounts to be applied in connection with prepayments made pursuant to Section 2.4 shall be applied, (i) first, to pay accrued and unpaid interest on, and expenses in respect of, the Loans, and (ii) second, to repay the Loans.  Any such prepayment shall be accompanied by a notice to each Lender specifying the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such prepayment.

2.5.    [Intentionally Omitted].

2.6.    Interest Rates and Payment Dates/Fee Payment Dates/Fees.  (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    [Intentionally Omitted].

(d)    At any time any Event of Default shall have occurred and be continuing, (i) all outstanding Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.6 plus 5% per annum, which, in the sole discretion of the Treasury, may be the rate of interest then applicable to ABR Loans, and (ii) all other outstanding Obligations shall bear interest at 5% above the rate per annum equal to the rate of interest then applicable to ABR Loans.

(e)    [Intentionally Omitted].

(f)     Interest shall be payable in arrears on each Interest Payment Date, provided that, interest on the Loans shall not be payable in cash on each Interest Payment Date but shall instead be added to the principal of the Loans on each Interest Payment Date and shall be payable in cash on the Maturity Date.

2.7.    Computation of Interest and Fees.  (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-) day year for the actual days elapsed.  The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Treasury pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Treasury shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Treasury in determining any interest rate pursuant to Section 2.7(a).

2.8.    Inability to Determine Interest Rate; Illegality.  (a) If prior to the first day of any Interest Period:

(i)     any Lender shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(ii)     any Lender shall have determined that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lender (as conclusively certified by such Lender) of making or maintaining their affected Loans during such Interest Period;

such Lender shall give telecopy or telephonic notice thereof to the Borrower and the other Lenders as soon as practicable thereafter.  If such notice is given pursuant to clause (i) or (ii) of this Section 2.8(a) in respect of Eurodollar Loans, then (1) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made by the affected Lenders as ABR Loans, and (2) any outstanding Eurodollar Loans of the affected Lender, shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such relevant notice has been withdrawn by such Lender, no further Eurodollar Loans by the affected Lenders shall be made or continued as such, nor shall the Borrower have the right to convert ABR Loans to Eurodollar Loans.

(b)      If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, such Lender shall give notice thereof to the Borrower describing the relevant provisions of such Requirement of Law, following which, (i) in the case of Eurodollar Loans, (A) the commitment of such Lender hereunder to make Eurodollar Loans and continue such Eurodollar Loans as such and (B) such Lender's outstanding Eurodollar Loans shall be converted automatically on the last day of the then current Interest Periods with respect to such Loans (or within such earlier period as shall be required by law) to ABR Loans.  If any such conversion or prepayment of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.10.

2.9.   Treatment of Borrowings and Payments; Evidence of Debt. (a)  [Intentionally Omitted].

(b)      Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.  Amounts paid on account of the Loans may not be reborrowed.

(c)      [Intentionally Omitted].

(d)      All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 3:00 p.m. (New York City time) on the due date thereof to the Lenders at their respective Funding Offices, in Dollars and in immediately available funds.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

2.10.   Indemnity.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the last day of such Interest Period (or, in the case of a failure to borrow the Interest Period that would have

commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) <u>over</u> (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market.  A certificate as to any amounts payable pursuant to this Section 2.10 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error and shall be payable within 30 days of receipt of any such notice.  The agreements in this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.11.    <u>Superpriority Nature of Obligations and Lenders' Liens.</u>    The priority of Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Final Order entered with respect to the Cases.

2.12.    <u>Taxes.</u>  (a) All payments made by the Borrower under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereinafter imposed, levied, collected, withheld or assessed by any Governmental Authority (collectively, "<u>Taxes</u>"), except for any deduction or withholding required by law.  If the Borrower is required to withhold any Non-Excluded Taxes from any amounts payable to any Lender (i) the Borrower shall make such deductions and shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Laws and (ii) the amounts so payable to such Lender shall be increased to the extent necessary to pay to such Lender such additional amounts as may be necessary so that the Lender receives, free and clear of all such Non-Excluded Taxes, a net amount equal to the amount it would have received from the Borrower under this Agreement or any other Loan Document if no such deduction or withholding had been made.  For purposes of this Agreement or any other Loan Document, "<u>Non-Excluded Taxes</u>" are withholding Taxes imposed by the United States or any taxing authority thereof or therein on payments made by the Borrower under this Agreement or any other Loan Document other than (a) withholding Taxes imposed on any Lender as a result of a present or former connection between such Lender and the jurisdiction of the United States or any taxing authority thereof or therein imposing such Tax (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States, (c) any withholding Taxes that exist on the date the Lender becomes a Lender or that arise as a result of a change in status of the Lender as a Governmental Authority which is an agency of the Canadian federal government that is exempt from withholding under the Convention as in effect on the date the Lender becomes a Lender, and (d) withholding Taxes that could be eliminated or reduced by the Lender providing tax forms, certifications, or other documentation.

(b)     In addition, the Borrower shall pay any Other Taxes over to the relevant Governmental Authority in accordance with Applicable Law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing

payment thereof (or if an official receipt is not available, such other evidence of payment as shall be reasonably satisfactory to such Lender).  If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes required to be paid by the Borrower when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, in each case after receiving at least five days' advance written notice from the Lender, the Borrower shall indemnify the Lender, as the case may be, for any incremental taxes, Non-Excluded Taxes or Other Taxes, interest, additions to tax, expenses or penalties that may become payable by any Lender, as the case may be, as a result of such failure.  The indemnification payments under this Section 2.12(c) shall be made within 30 days after the date such Lender, as the case may be, makes a written demand therefor (together with a reasonably detailed calculation of such amounts).

(d)    Each Lender (or any Transferee) (other than the United States government (including the Treasury)) that either (i) is not incorporated under the laws of the United States, any state thereof, or the District of Columbia or (ii) whose name does not include "Incorporated," "Inc.," "Corporation," "Corp.," "P.C.," "insurance company," or "assurance company" (a "Non-U.S. Lender") shall deliver to the Borrower, so long as such Lender is legally entitled to do so, two originals of either U.S. Internal Revenue Service Form W-9, Form W-8BEN, Form W-8EXP, Form W-8ECI, or in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payment of "portfolio interest", a Form W-8BEN (along with a statement as to certain requirements in order to claim an exemption for "portfolio interest" reasonably acceptable to the Borrower), or Form W-8IMY (with applicable attachments), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming a complete exemption from (or reduced rate of) United States federal withholding tax on all payments by the Borrower under this Agreement or any other Loan Document.  In addition, each Lender shall provide any other U.S. tax forms (with applicable attachments) as will reduce or eliminate United States federal withholding tax on payments by the Borrower under this Agreement or any other Loan Document.  For the avoidance of doubt, the Canadian Lender shall provide a Form W-8BEN claiming exemption from withholding under the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital (the "Convention") on the Closing Date.  Each Lender (other than the United States government (including the Treasury)) shall provide the appropriate documentation under this clause (d) at the following times (i) prior to the first payment date after becoming a party to this Agreement, (ii) upon a change in circumstances or upon a change in law, in each case, requiring or making appropriate a new or additional form, certificate or documentation, (iii) upon or before the expiration, obsolescence or invalidity of any documentation previously provided to the Borrower and (iv) upon reasonable request by the Borrower.  If a Lender is entitled to an exemption from or a reduction of any non-U.S. withholding Tax under the laws of any jurisdiction imposing such Tax on any payments made by the Borrower under this Agreement, then the Lender shall deliver to the Borrower, at the time or times prescribed by Applicable Law and as reasonably requested by the Borrower, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate, provided that the Lender is legally entitled to complete, execute and deliver such documentation and without material adverse consequences to the Lender.

(e)     If any Lender determines, in its sole good faith discretion, that it has received a refund, credit or other tax benefit in respect of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower (but only to the extent of Non-Excluded Taxes or Other Taxes paid by the Borrower plus any interest thereon paid by the relevant Governmental Authority with respect to such refund), net of all out of pocket third-party expenses of the Lender related to claiming such refund or credit, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund) within 30 days of the date of such receipt.   Notwithstanding anything to the contrary in this Agreement or any other Loan Document, upon the request of the Lender, as the case may be, the Borrower agrees to repay any amount paid over to the Borrower by such Lender pursuant to the immediately preceding sentence if such Lender, as the case may be, is required to repay such amount to such Governmental Authority.   This paragraph shall not be construed to (i) interfere with the rights of any Lender to arrange its tax affairs in whatever manner it sees fit, (ii) obligate any Lender to claim any tax refund, (iii) require any Lender to make available its tax returns (or any other information relating to its taxes or any computation with respect thereof which it deems in its sole discretion to be confidential) to the Borrower or any other Person, or (iv) require any Lender to do anything that would in its sole discretion prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(f)     Each Lender that is an Assignee shall be bound by this Section 2.12.

(g)     The agreements contained in this Section 2.12 shall survive the termination of this Agreement or any other Loan Document and the payments contemplated hereunder or thereunder.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to enter into this Agreement, each Loan Party represents to the Lenders, with respect to itself and each of its Subsidiaries that is a North American Group Member, in each case subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases, that as of the Effective Date:

3.1.   Existence.  Each North American Group Member (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably

likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law.

      3.2.    [Intentionally Omitted].

      3.3.    [Intentionally Omitted].

      3.4.    [Intentionally Omitted].

      3.5.    <u>Action, Binding Obligations</u>.  (i) Each North American Group Member has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; (ii) the execution, delivery and performance by each North American Group Member of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and (iii) each Loan Document has been duly and validly executed and delivered by each North American Group Member party thereto and constitutes a legal, valid and binding obligation of all of the North American Group Members party thereto, enforceable against such North American Group Members in accordance with its terms, subject to the Bankruptcy Exceptions.

      3.6.    <u>Approvals</u>.  Except as required under applicable state and federal bankruptcy rules, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by each North American Group Member of the Loan Documents to which it is a party for the legality, validity or enforceability thereof, except with respect to North American Group Members other than the Debtors for filings and recordings or other actions in respect of the Liens pursuant to the Collateral Documents, unless the same has already been obtained and provided to the Lenders.

      3.7.    [Intentionally Omitted].

      3.8.    <u>Investment Company Act</u>.  None of the Loan Parties is required to register as an "investment company", or is a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to any Federal or state statute or regulation which limits its ability to incur Indebtedness.

      3.9.    [Intentionally Omitted].

      3.10.    <u>Chief Executive Office; Chief Operating Office</u>.  The chief executive office and the chief operating office on the Closing Date for each North American Group Member is located at the location set forth on <u>Schedule 3.10</u> hereto.

      3.11.    <u>Location of Books and Records</u>.  The location where the North American Group Members keep their books and records including all Records relating to their business and operations and the Collateral are located in the locations set forth in <u>Schedule 3.11</u>.

      3.12.    [Intentionally Omitted].

3.13.    [Intentionally Omitted].

3.14.    Expense Policy.  The Borrower has taken steps necessary to ensure that (a) the Expense Policy conforms to the requirements set forth herein and (b) the Borrower and its Subsidiaries are in compliance with the Expense Policy.

3.15.    Subsidiaries.  All of the Subsidiaries of each Loan Party at the date hereof are listed on Schedule 3.15, which schedule sets forth the name and jurisdiction of formation of each of their Subsidiaries and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party or any of their Subsidiaries except as set forth on Schedule 3.15.

3.16.    Capitalization.  One hundred percent (100%) of the issued and outstanding Capital Stock of each North American Group Member (other than Borrower) is owned by the Persons listed on Schedule 3.16 and, to the knowledge of each Loan Party, such Capital Stock are owned by such Persons, free and clear of all Liens other than Permitted Liens.  No Loan Party has issued or granted any options or rights with respect to the issuance of its respective Capital Stock which is presently outstanding except as set forth on Schedule 3.16 hereto.

3.17.    Fraudulent Conveyance.    Each North American Group Member acknowledges that it will benefit from the Loans contemplated by this Agreement.  No North American Group Member is incurring Indebtedness or transferring any Collateral with any intent to hinder, delay or defraud any of its creditors.

3.18.    USA PATRIOT Act.  (a) No North American Group Member nor any of its respective Affiliates over which it exercises management control (a "Controlled Affiliate") is a Prohibited Person, and such Controlled Affiliates are in compliance with all applicable orders, rules, regulations and recommendations of OFAC.

(b)    No North American Group Member nor any of its members, directors, officers, employees, parents, Subsidiaries or Affiliates:  (1) is subject to U.S. or multilateral economic or trade sanctions currently in force; (2) is owned or controlled by, or act on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; or (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. persons may not conduct business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State.

(c)    None of the Collateral is traded or used, directly or indirectly by a Prohibited Person or is located or organized (in the case of a Pledged Entity) in a Prohibited Jurisdiction.

(d)    Each North American Group Member has established an anti-money laundering compliance program as required by all applicable anti-money laundering laws and regulations, including without limitation the Uniting and Strengthening America by Providing

-32-

Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA PATRIOT Act") (collectively, the "Anti-Money Laundering Laws").

3.19.    Embargoed Person.  As of the date hereof and at all times throughout the term of any Loan, (a) none of any North American Group Member's funds or other assets constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq. (the "Trading With the Enemy Act"), any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or regulations promulgated thereunder or executive order relating thereto (which for the avoidance of doubt shall include but shall not be limited to (i) Executive Order No. 13224, effective as of September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (ii) the USA PATRIOT Act), with the result that the investment in the Borrower (whether directly or indirectly), is prohibited by law or any Loan made by the Lenders is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in it with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loan is in violation of law; (c) none of its funds have been derived from any unlawful activity with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loans is in violation of law; and (d) neither it nor any of its Affiliates (i) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (ii) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".  For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section 3.19, no North American Group Member shall be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

3.20.    Use of Proceeds.  (a) The proceeds of the Loans shall be used (i) as permitted in the Wind-Down Order or (ii) to finance working capital needs and other general corporate purposes incurred in connection with the Wind-Down, including the payment of expenses associated with the administration of the Cases; provided that, the North American Group Members may not prepay Indebtedness without the prior written consent of the Required Lenders.

(b)    Notwithstanding anything to the contrary herein, none of the proceeds of the Loans shall be used in connection with (i) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, (ii) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, any of their respective affiliates or other Canadian Lender Consortium Member with respect to any loans or other financial accommodations made to any North American Group Member prior to the Petition Date, or (iii) any loans, advances, extensions of credit, dividends or other investments to any

person not a North American Group Member; provided, however, that the limitations set forth in this Section 3.20(b) shall not preclude the use of the proceeds of the Loans in connection with any claims, causes of action, adversary proceedings or other litigations against any Governmental Authority (excluding the Canadian Lender Consortium Members) with respect to the imposition or administration of any Tax laws or Environmental Laws.  For the avoidance of doubt, the limitations set forth in Section 3.20(b)(i) and (ii) above, shall not limit the use of proceeds with respect to any of the actions and claims described in such clauses against any Governmental Authority that is not (x) a Lender or (y) a Canadian Lender Consortium Member.

(c)    The North American Group Members are the ultimate beneficiaries of this Agreement and the proceeds of Loans to be received hereunder.  The use of the Loans will comply with all Applicable Laws, including Anti-Money Laundering Laws.  No portion of any Loan is to be used, for the "purpose of purchasing or carrying" any "margin stock" as such terms are used in Regulations U and X of the Board, as amended, and the Borrower is not engaged in the business of extending credit to others for such purpose.

3.21.  Representations Concerning the Collateral.  Each Loan Party represents and warrants to the Lenders:

(a)    No Loan Party has assigned, pledged, conveyed, or encumbered any Collateral to any other Person (other than Permitted Liens) and immediately prior to the pledge of any such Collateral, a Loan Party was the sole owner of such Collateral and had good and marketable title thereto, free and clear of all Liens (other than Permitted Liens), and no Person, other than the Lenders has any Lien (other than Permitted Liens) on any Collateral.  No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral which has been signed by any Loan Party or which any Loan Party has authorized any other Person to sign or file or record, is on file or of record with any public office, except such as may have been filed by or on behalf of a Loan Party in favor of the Lenders pursuant to the Loan Documents or in respect of applicable Permitted Liens.

(b)    The provisions of the Loan Documents are effective to create in favor of the Lenders a valid security interest in all right, title, and interest of each Loan Party in, to and under the Collateral, subject only to applicable Permitted Liens.

(c)    Upon the entry and effectiveness of the Orders and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on Schedule 3.21 attached hereto, the security interests granted in the Collateral pursuant to the Collateral Documents will constitute perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of the applicable Loan Party in, to and under such Collateral, which can be perfected by filing under the Uniform Commercial Code, in each case, subject to applicable Permitted Liens and as provided in Section 3.24.

(d)    Each Loan Party has and will continue to have the full right, power and authority, to pledge the Collateral, subject to Permitted Liens, and the pledge of the Collateral may be further assigned without any requirement.

3.22.   [Intentionally Omitted].

3.23.   [Intentionally Omitted].

3.24.   <u>Lien Priority</u>.   (a) On and after the Closing Date, and the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto subject to the Permitted Liens, the provisions of the Loan Documents are effective to create in favor of the Lenders, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Loan Party that owns an interest in such Collateral and any other Person.

(b)     On and after the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto, all Obligations owing by the Loan Parties will be secured by:

(i)     valid, perfected, first-priority security interests in and liens (i) with respect to the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is not subject to non avoidable, valid and perfected liens in existence as of the Petition Date (or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to Permitted Liens (other than Liens permitted under clause (a) thereof) and the Carve-Out; and

(ii)     valid, perfected, security, junior interests in and liens pursuant to (i) with respect to the Debtors, section 364(c)(3) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is subject to non avoidable, valid and perfected liens in existence as of the Petition Date, or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out.

(c)     On and after the entry of the Orders and after giving effect thereto, all Obligations owing by the Debtors will be an allowed administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases having priority over all administrative expenses of the kind specified in sections 503 and 507 of the Bankruptcy Code and any and all expenses and claims of the Borrower and the other Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out.

3.25.   [Intentionally Omitted].

3.26.   [Intentionally Omitted].

3.27.    [Intentionally Omitted].

3.28.    Excluded Collateral.  Set forth on Annex I to Schedule 3.28 is a complete and accurate list as of the Effective Date of all Excluded Collateral that is Capital Stock of domestic joint ventures, Domestic Subsidiaries, "first-tier" foreign joint ventures, and Foreign 956 Subsidiaries.

3.29.    Mortgaged Real Property.    After giving effect to the recording of the Mortgages, real property identified on Schedule 1.1C shall be subject to a recorded first lien mortgage, deed of trust or similar security instrument (subject to Permitted Liens).

3.30.    [Intentionally Omitted].

3.31.    The Final Order.    Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Section 7 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.32.    Wind-Down Budget.    All material facts in the Wind-Down Budget are accurate and the Borrower has disclosed to each Lender all assumptions in the Wind-Down Budget, it being understood that in the case of projections, such projections are based on reasonable estimates, on the date as of which such information is stated or certified.

# SECTION 4

## CONDITIONS PRECEDENT

4.1.    Conditions to Effectiveness.    The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent, satisfaction of such conditions precedent to be determined by the Required Lenders in their reasonable discretion, except as otherwise set forth below:

(a)    Loan Documents.    The Lenders shall have received the following documents, which shall be in form satisfactory to each Lender:

(i)    this Agreement executed and delivered by the Borrower;

(ii)    the Guaranty, executed and delivered by each Guarantor;

(iii)    the Equity Pledge Agreement, executed and delivered by each Pledgor;

(iv)    [intentionally omitted];

(v)    the Environmental Agreement, executed and delivered by each Loan Party party thereto; and

(vi)    a promissory note of the Borrower evidencing the Loans of such Lender, substantially in the form of Exhibit G (the "Note"), with appropriate insertions as to date and principal amount.

(b)    Related Section 363 Transactions.    The Required Lenders and their counsel shall be reasonably satisfied that the terms of the Related Section 363 Transactions and of the Transaction Documents are consistent in all material respects with the information provided to the Lenders in advance of the date hereof or are otherwise reasonably satisfactory to the Required Lenders (the Required Lenders acknowledge that the form of Transaction Documents provided to them on or prior to the date hereof are satisfactory).    The Transaction Documents shall have been duly executed and delivered by the parties thereto, all conditions precedent to the Related Section 363 Transactions set forth in the Transaction Documents shall have been satisfied, and the Related Section 363 Transactions shall have been consummated pursuant to such Transaction Documents substantially contemporaneously with the conditions precedent set forth in this Section 4.1, and no provision thereof shall have been waived, amended, supplemented or otherwise modified, in each case in a manner adverse to the Lenders, without the Required Lender's consent.

(c)    Final Order.    (i) The Final Order shall have been entered by the Bankruptcy Court and shall have been in full force and effect.

(ii)    The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Lenders.

(iii)    The Debtors and their respective Subsidiaries shall be in compliance in all respects with the Final Order.

(iv)    [Intentionally Omitted].

(v)    [Intentionally Omitted].

(d)    New CarCo Assignment and Assumption.    The Borrower and New CarCo shall have executed and delivered the New CarCo Assignment and Assumption, and all conditions precedent to New CarCo's $7,072,488,605 First Lien Credit Agreement between New CarCo and Treasury shall have been satisfied or waived by the Treasury in accordance with the terms therewith substantially contemporaneously with the conditions precedent set forth in this Section 4.1.

(e)    Canadian Post-Sale Facility.    The Canadian Post-Sale Facility, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian Post-Sale Facility.

(f)    Canadian PV Loan Agreement.    The Canadian PV Loan Agreement, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian PV Loan Agreement.

(g)    [Intentionally Omitted].

(h)    [Intentionally Omitted].

(i)    Wind-Down Budget.  The Borrower shall have delivered to the Lenders the Wind-Down Budget in form and substance satisfactory to the Required Lenders.

(j)    [Intentionally Omitted].

(k)    Litigation.  There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Cases) or threatened in any court or before any arbitrator or Governmental Authority that, in the sole discretion of the Required Lenders, materially or adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(l)    [Intentionally Omitted].

(m)    Consents.  The Lenders shall have received all necessary third party and governmental waivers and consents, and each Loan Party shall have complied with all Applicable Laws, decrees and material agreements.

(n)    No Default.  No Default or Event of Default shall exist on the Effective Date or after giving effect to the transactions contemplated to be consummated on the Effective Date pursuant to the Transaction Documents and the Loan Documents.

(o)    Accuracy of Representations and Warranties.  All representations and warranties made by the North American Group Members in or pursuant to the Loan Documents shall be true and correct in all material respects.

(p)    Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Lenders shall have received (i) a certificate of the secretary or assistant secretary of each Loan Party, dated the Effective Date, substantially in the form of Exhibit B-1, with appropriate insertions and attachments, including the certificate of incorporation (or equivalent organizational document) of each Loan Party, certified by the relevant authority of the jurisdiction of organization of such Loan Party (provided that, to the extent applicable, in lieu of delivering the certificate of incorporation and other organizational documents, such certificate may include a certification that such documents not have been amended, supplemented or otherwise modified since the Closing Date), (ii) bring down good standing certifications for each Loan Party from its jurisdiction of organization and (iii) a certificate of the Borrower and each Guarantor, dated the Effective Date, to the effect that the conditions set forth in this Section 4.1 have been satisfied, substantially in the form of Exhibit B-2.

(q)    Legal Opinion.  The Lenders shall have received the executed legal opinion of Weil, Gotshal and Manges LLP, New York counsel to the Loan Parties, substantially in the form of Exhibit E, as to New York law, United States federal law and the Delaware General Corporation Law.

# SECTION 5

# AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees to, and to cause each of its Subsidiaries that is a North American Group Member to, so long as any Loan is outstanding and until payment in full of all Obligations, in each case except as shall be required in connection with the Wind-Down, and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

5.1.    <u>Financial Statements</u>.  The Borrower shall deliver to the Lenders:

(a)    as soon as reasonably possible after receipt by the subject North American Group Member, a copy of any material report that may be prepared and submitted by such North American Group Member's independent certified public accountants at any time or any other material report with respect to the North American Group Members provided to the Borrower and its Subsidiaries pursuant to the Transition Services Agreement;

(b)    from time to time such other information regarding the financial condition, operations, or business of any North American Group Member as any Lender may reasonably request;

(c)    promptly upon their becoming available, copies of such other financial statements and reports, if any, as any North American Group Member may be required to publicly file with the SEC or any similar or corresponding governmental commission, department or agency substituted therefor, or any similar or corresponding governmental commission, department, board, bureau, or agency, federal or state;

(d)    [intentionally omitted];

(e)    notice of and copies of each Debtors' pleadings filed in the Cases in connection with any material contested matter or adversary proceeding in the Cases (but the foregoing may be satisfied by including each of the Lenders and their counsel in a "core service group," to receive copies of all pleadings under any order establishing notice and service requirements in the Cases), and such additional information with respect to such matters as either of the Lenders may reasonably request, and which notice shall also include sending copies of any pleadings or other documents that the Borrower or other Debtors seek to file under seal to each of the lenders and their counsel, <u>provided</u>, <u>however</u>, that if (in addition to the confidentiality provisions of this Agreement) additional confidentiality provisions are needed (i.e. if required by third parties), the Lenders and the Borrower shall endeavor to work out reasonable additional confidentiality terms;

(f)    no later than the twentieth Business Day following the last day of each fiscal quarter, a report (a "<u>Quarterly Report</u>") setting forth in reasonable detail the anticipated receipts and disbursements of the North American Group Members for the immediately succeeding twelve-month period (on a calendar month basis) and the aggregate amount of cash and Cash Equivalents of the North American Group Members as of the last day of the immediately preceding fiscal quarter, in form and substance reasonably satisfactory to the

Required Lenders.  Each Quarterly Report shall be accompanied by a certificate of a Responsible Officer certifying that such Quarterly Report was prepared in good faith and are based on reasonable estimates on the date as of which such information is certified; and

(g)    on the first Business Day of February to occur each year from the Effective Date until the Maturity Date, a report setting forth in reasonable detail the three-year business plan of the Borrower.

5.2.    <u>Notices; Reporting Requirements</u>.  The relevant Loan Party shall deliver written notice to the Lenders of the following:

(a)    <u>Defaults</u>.  Promptly after a Responsible Officer or any officer of a North American Group Member with a title of at least executive vice president becomes aware of the occurrence of any Default or Event of Default, or any event of default under any publicly filed material Contractual Obligation of any Group Member;

(b)    <u>Litigation</u>.  Promptly after a Responsible Officer or an attorney in the general counsel's office of a North American Group Member obtains knowledge of any action, suit or proceeding instituted by or against such North American Group Member or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority (i) in which the amount in controversy, in each case, is an amount equal to $25,000,000 or more, (ii) in which injunctive or similar relief is sought, or (iii) which relates to any Loan Document, the relevant Loan Party shall furnish to the Lenders notice of such action, suit or proceeding;

(c)    <u>Material Adverse Effect on Collateral</u>.  Promptly upon any North American Group Member becoming aware of any default or any event or change in circumstances related to any Collateral which, in each case, could reasonably be expected to have a Material Adverse Effect;

(d)    <u>Judgments</u>.  Promptly upon the entry of a judgment or decree against any Loan Party or any of its Subsidiaries in an amount in excess of $15,000,000;

(e)    <u>Environmental Events</u>.  As soon as possible and in any event within seven Business Days of obtaining knowledge thereof:  (i) any development, event, or condition occurring after the date hereof that, individually or in the aggregate with other developments, events or conditions occurring after the date hereof, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, any Group Member; to the extent such Environmental Permit is material to the continued operations or business of the Group Members or of any manufacturing related facility;

(f)    <u>Material Adverse Effect</u>.  Any development or event that has had or could reasonably be expected to have a Material Adverse Effect;

(g)      Insurance.  Promptly upon any material change in the insurance coverage required of any Loan Party or any other Person pursuant to any Loan Document, with copy of evidence of same attached;

(h)      Compliance Certificate.   On the tenth Business Day of each calendar month, beginning with the first month to occur after the Effective Date, a Compliance Certificate, executed by a Responsible Officer of the Borrower, stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(i)      Investment Reports.  With respect to any Investment made pursuant to clause (p)(i) or (ii) of the definition of Permitted Investments, on the tenth Business Day of each calendar month, beginning with the month immediately following the calendar month in which the first such Investment is made, a report executed by a Responsible Officer of the Borrower, setting forth (x) the amount of each Investment made pursuant to each of clause (p)(i) and/or (p)(ii), if any, in the immediately proceeding calendar month, (y) a description of each such Investment, if any, and (z) the aggregate amount of Investments made pursuant to each of clause (p)(i) and (p)(ii) since the Effective Date, if any, as of the end of the immediately preceding calendar month;

(j)      [Intentionally Omitted];

(k)      [Intentionally Omitted];

(l)      Expense Policy.   Within 15 days after the conclusion of each calendar month, beginning with the month in which the Effective Date occurs, the Borrower shall deliver to the Lenders a certification signed by a Responsible Officer of the Borrower that (i) the Expense Policy conforms to the requirements set forth herein; (ii) the Borrower and its Subsidiaries are in compliance with the Expense Policy; and (iii) there have been no material amendments to the Expense Policy or deviations from the Expense Policy other than those that have been disclosed to and approved by the Lenders; provided that the requirement to deliver the certification referenced in this Section 5.2(l) may be qualified as to the best of such Responsible Officer's knowledge after due inquiry and investigation;

(m)      Executive Privileges and Compensation.  The Borrower shall submit a certification on the last day of each fiscal quarter beginning with the fiscal quarter ended September 30, 2009, certifying that the Borrower has complied with and is in compliance with the provisions set forth in Section 5.16.  Such certification shall be made to the Lenders by an SEO of the Borrower, subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001; and

(n)      Organizational Documents.  Subject to Section 6.6, each North American Group Member shall furnish prompt written notice to the Lenders of any material amendment to such entity's organizational documents and copies of such amendments.

Each notice required to be provided pursuant to this Section 5.2(a)-(f) above shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

5.3.    <u>Existence</u>.    (a) Preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)    pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all their Postpetition obligations of whatever nature, except (i) where such payment, discharge or satisfaction is prohibited by the Orders, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court or by this Agreement or the Wind-Down Budget, or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be;

(c)    comply with the requirements of all Applicable Laws, rules, regulations and orders of Governmental Authorities if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect on any Loan Party or the Collateral;

(d)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, and maintain adequate accounts and reserves for all taxes (including income taxes), all depreciation, depletion, obsolescence and amortization of its properties, all contingencies, and all other reserves;

(e)    (i) change the location of its chief executive office/chief place of business from that specified in Section 3.10, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains records with respect to the Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction, it shall give the Lenders written notice thereof not later than ten (10) days after such event occurs, and shall deliver to the Lenders all Uniform Commercial Code financing statements and amendments as the Lenders shall request and take all other actions deemed reasonably necessary by the Lenders to continue its perfected status in the Collateral with the same or better priority;

(f)    keep in full force and effect the provisions of its charter documents, certificate of incorporation, by-laws, operating agreements or similar organizational documents; and

(g)    comply (i) in the case of each North American Group Member that is not a Debtor, with all Contractual Obligations in a manner such that a Material Adverse Effect could not reasonably be expected to result and (ii) in the case of each Debtor, with all material Postpetition Contractual Obligations (including the Transition Services Agreement).

5.4.    <u>Payments of Taxes</u>.    Except as prohibited by the Bankruptcy Code, the Borrower will and will cause each Group Member (i) to timely file or cause to be filed all federal and material state and other Tax returns that are required to be filed and all such Tax returns shall be true and correct and (ii) to timely pay and discharge or cause to be paid and discharged promptly all Taxes, assessments and governmental charges or levies arising Postpetition and imposed upon the Borrower or any of the other Group Members or upon any of their respective incomes or receipts or upon any of their respective properties before the same shall become in

default or past due, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might result in the imposition of a Lien or charge upon such properties or any part thereof; provided that it shall not constitute a violation of the provisions of this Section 5.4 if the Borrower or any of the other Group Members shall fail to pay any such Tax, assessment, government charge or levy or claim for labor, materials or supplies which is being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided.

5.5.    Use of Proceeds.  The Loan Parties and their Subsidiaries shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner generally consistent with the Wind-Down Budget, except as otherwise permitted in Section 3.20(a)(i).

5.6.    Maintenance of Existence; Payment of Obligations; Compliance with Law.  Subject to the Orders, the Related Section 363 Transactions and the Cases, each Loan Party shall:

(a)    keep all property useful and necessary in its business in good working order and condition; and

(b)    maintain errors and omissions insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing except in the event of self-insurance) and shall not reduce such coverage without the written consent of the Lenders, and shall also maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities. Notwithstanding anything to the contrary in this Section 5.6, to the extent that any North American Group Member is engaged in self-insurance with respect to any of its property as of the Closing Date, such Loan Party may, if consistent with past practices, continue to engage in such self-insurance throughout the term of this Agreement; provided, that the North American Group Members shall promptly obtain third party insurance that conforms to the criteria in this Section 5.6 at the request of the Lenders.

5.7.    Further Identification of Collateral.  Each Loan Party will furnish to the Lenders from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as any Lender may reasonably request, all in reasonable detail.

5.8.    Defense of Title.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party warrants and will defend the right, title and interest of the Lenders in and to all Collateral against all adverse claims and demands of all Persons whomsoever, subject to (x) the restrictions imposed by the Existing Agreements to the extent that such restrictions are valid and enforceable under the applicable Uniform Commercial Code and other Requirements of Law and (y) the rights of holders of any Permitted Lien.

5.9.    <u>Preservation of Collateral</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party shall do all things necessary to preserve the Collateral so that the Collateral remains subject to a perfected security interest with the priority provided for such security interest under the Loan Documents.  Without limiting the foregoing, each Loan Party will comply with all Applicable Laws, rules and regulations of any Governmental Authority applicable to such Loan Party or relating to the Collateral and will cause the Collateral to comply, with all Applicable Laws, rules and regulations of any such Governmental Authority, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.  No Loan Party will allow any default to occur for which any Loan Party is responsible under any Loan Documents and each Loan Party shall fully perform or cause to be performed when due all of its obligations under the Loan Documents.

5.10.    <u>Maintenance of Papers, Records and Files</u>.  (a) each North American Group Member will maintain all Records in good and complete condition and preserve them against loss or destruction, all in accordance with industry and customary practices;

(b)    each North American Group Member shall collect and maintain or cause to be collected and maintained all Records relating to its business and operations and the Collateral in accordance with industry custom and practice, including those maintained pursuant to the preceding subsection, and all such Records shall be in the possession of the North American Group Members or reasonably obtainable upon the request of any Lender unless the Lenders otherwise approve; and

(c)    for so long as any Lender has an interest in or Lien on any Collateral, each North American Group Member will hold or cause to be held all related Records in trust for such Lender.  Each North American Group Member shall notify, or cause to be notified, every other party holding any such Records of the interests and Liens granted hereby.

5.11.    <u>Maintenance of Licenses</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, except where the failure to do so could not reasonably be likely to have a Material Adverse Effect, each Loan Party shall (i) maintain all licenses, permits, authorizations or other approvals necessary for such Loan Party to conduct its business and to perform its obligations under the Loan Documents, (ii) remain in good standing under the laws of the jurisdiction of its organization, and in each other jurisdiction where such qualification and good standing are necessary for the successful operation of such Loan Party's business, and (iii) shall conduct its business in accordance with Applicable Law in all material respects.

5.12.    <u>Payment of Obligations</u>.  The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans and each North American Group Member will duly and punctually pay or cause to be paid all fees and other amounts from time to time owing by it hereunder or under the other Loan Documents, all in accordance with the terms of this Agreement and the other Loan Documents.  Each North American Group Member will, and will cause each of its Subsidiaries to, pay (i) with respect to each Debtor its Postpetition obligations; and (ii) with respect to each other Group Member its obligations, in each case including tax liabilities, assessments and governmental charges or levies imposed upon such

Person or upon its income and profits or upon any of its property, real, personal or mixed (including without limitation, the Collateral) or upon any part thereof, as well as any other lawful claims which, if unpaid, could reasonably be expected to become a Lien upon such properties or any part thereof, that, if not paid, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the relevant Loan Party, or such Subsidiary, has set aside on its books adequate reserves with respect thereto and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

5.13.    OFAC.  At all times throughout the term of this Agreement, each Loan Party and its Controlled Affiliates (a) shall be in full compliance with all applicable orders, rules, regulations and recommendations of OFAC and (b) shall not permit any Collateral to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person, and no lessee or sublessee shall be a Prohibited Person or a Person organized in a Prohibited Jurisdiction.

5.14.    Investment Company.  Each North American Group Member will conduct its operations in a manner which will not subject it to registration as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended from time to time.

5.15.    Further Assurances.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each North American Group Member to, from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that such Lender may be required to obtain from the Borrower or any Group Member such governmental consent, approval, recording, qualification or authorization.

5.16.    Executive Privileges and Compensation.  (a) Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall comply with the following restrictions on executive privileges and compensation:

(i)    the Borrower shall take all necessary action to ensure that its Specified Benefit Plans comply in all respects with the EESA, including, without limitation, the provisions of the Capital Purchase Program (as defined in the EESA) and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or

any other guidance or regulations promulgated under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and shall not adopt any new Specified Benefit Plan (x) that does not comply therewith or (y) that does not expressly state and require that such Specified Benefit Plan and any compensation thereunder shall be subject to all relevant Compensation Regulations adopted, issued or released on or after the date any such Specified Benefit Plan is adopted.  To the extent that the Compensation Regulations change, or are implemented in a manner that requires changes to then-existing Specified Benefit Plans, the Borrower shall effect such changes to its Specified Benefit Plans as promptly as practicable after it has actual knowledge of such changes in order to be in compliance with this Section 5.16(a)(i) (and shall be deemed to be in compliance for a reasonable period within which to effect such changes);

(ii)    the Borrower shall be subject to the limits on the deductibility of executive compensation imposed by section 162(m)(5) of the Code, as applicable;

(iii)    the Borrower shall not pay or accrue any bonus or incentive compensation to the Senior Employees, except as may be permitted under the EESA or the Compensation Regulations;

(iv)    the Borrower shall not adopt or maintain any compensation plan that would encourage manipulation of its reported earnings to enhance the compensation of any of its employees;

(v)    the Borrower shall maintain all suspensions and other restrictions of contributions to Specified Benefit Plans that are in place or initiated as of the Closing Date; and

(vi)    the Borrower shall otherwise comply with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, including without limitation the prohibition on golden parachute and tax "gross up" payments, the requirement with respect to the establishment of a compensation committee of the board of directors, and the requirement that the Borrower provide certain disclosures to the Treasury and the Borrower's primary regulator.

At all times throughout the term of this Agreement, the Required Lenders shall have the right to require any Group Member to claw back any bonuses or other compensation, including golden parachutes, paid to any Senior Employees in violation of any of the foregoing.

(b)    On or prior to September 15, 2009, the Borrower shall cause (i) its principal executive officer and principal financial officer (or, in each case, a person acting in a similar capacity) and (ii) its compensation committee, as applicable, to provide the certifications to the Treasury and the Borrower's primary regulator required by the rules set forth in 31 C.F.R. Part 30.  The Borrower shall preserve appropriate documentation and records to substantiate such

certification in an easily accessible place for a period not less than three years following the Maturity Date.

From the Closing Date until the repayment of all Obligations, the Borrower shall comply with the provisions of this Section 5.16.

5.17.   <u>Aircraft</u>.  With respect to any private passenger aircraft or interest in such aircraft that is owned or held by the Borrower or any of its respective Subsidiaries immediately prior to the Closing Date, such party shall demonstrate to the satisfaction of the Treasury that it is taking all reasonable steps to divest itself of such aircraft or interest.  In addition, the Borrower shall not acquire or lease any private passenger aircraft or interest in private passenger aircraft after the Closing Date.

5.18.   <u>Restrictions on Expenses</u>.   (a) The Borrower shall maintain and implement an Expense Policy, provide the Expense Policy to the Treasury and the Borrower's primary regulatory agency, and post the text of the Expense Policy on its Internet website, if the Borrower maintains a company website, and distribute the Expense Policy to all employees covered under the Expense Policy.  Any material amendments to the Expense Policy shall require the prior written consent of the Treasury, and any material deviations from the Expense Policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the Treasury.

(b)    The Expense Policy shall, at a minimum:  (i) require compliance with all Requirements of Law, (ii) apply to the Borrower and all of its Subsidiaries, (iii) govern (A) the hosting, sponsorship or other payment for conferences and events, (B) travel accommodations and expenditures, (C) consulting arrangements with outside service providers, (D) any new lease or acquisition of real estate, (E) expenses relating to office or facility renovations or relocations, and (F) expenses relating to entertainment or holiday parties, (iv) provide for (A) internal reporting and oversight, and (B) mechanisms for addressing non-compliance with the Expense Policy and (v) comply in all respects with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30.

5.19.   <u>Employ American Workers Act</u>.   The Borrower shall comply, and the Borrower shall take all necessary action to ensure that its Subsidiaries comply, in all respects with the provisions of the EAWA in all respects.

5.20.   <u>Internal Controls; Recordkeeping; Additional Reporting</u>.   (a) The Borrower shall promptly establish internal controls to provide reasonable assurance of compliance in all material respects with each of the Borrower's covenants and agreements set forth in Sections 5.16, 5.17, 5.18, 5.19 and 5.20(b) hereof and shall collect, maintain and preserve reasonable records evidencing such internal controls and compliance therewith, a copy of which records shall be provided to the Lenders promptly upon request.  On the 15th day after the last day of each calendar quarter (or, if such day is not a Business Day, on the first Business Day after such day) commencing with the calendar quarter ending September 30, 2009, the Borrower shall deliver to the Treasury (at its address set forth in Section 8.2) a report setting forth in reasonable detail (x) the status of implementing such internal controls and (y) the

Borrower's compliance (including any instances of material non-compliance) with such covenants and agreements.  Such report shall be accompanied by a certification duly executed by an SEO of the Borrower stating that such quarterly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001.

(b)    The Borrower shall use its reasonable best efforts to account for the use and expected use of the proceeds from the Loans.  On the 30th day after the last day of each month (or, if such day is not a Business Day, on the first Business Day after such day) commencing with July 31, 2009, the Borrower shall deliver to the Lenders (at their respective addresses set forth in Section 8.2) a report setting forth in reasonable detail the actual results of the operations of the Borrower and its Subsidiaries for such month, which shall include (without limitation) a budget-to-actual variance analysis.   Such report shall be accompanied by a certification duly executed by an SEO of the Borrower that such monthly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, section 1001.

(c)    The Borrower shall collect, maintain and preserve reasonable records relating to the implementation of all Federal support programs provided to the Borrower or any of its Subsidiaries pursuant to the EESA, the use of the proceeds thereunder and the compliance with the terms and provisions of such programs; provided that the Borrower shall have no obligation to comply with the foregoing in connection with any such program to the extent that such program independently requires, by its express terms, the Borrower to collect, maintain and preserve any records in connection therewith. The Borrower shall provide the Treasury with copy of all such reasonable records promptly upon request.

5.21.    Waivers.  (a) For any Person who is a Loan Party as of the Closing Date and any Person that becomes a Loan Party after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-1, to be duly executed by such North American Group Member and promptly delivered to the Treasury.

(b)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-2, to be duly executed by such SEO, and promptly delivered to the Treasury.

(c)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-3, to be duly executed by such SEO, and promptly delivered to the Borrower (with a copy to the Treasury).

(d)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-4, to be duly executed by such Senior Employee, and promptly delivered to the Treasury.

(e)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-5, to be duly executed by such Senior Employee, and promptly delivered to the Borrower (with a copy to the Treasury).

(f)    For the avoidance of doubt, this requirement will be deemed satisfied for the United States with respect to Loan Parties that are party to the Existing UST Term Loan Agreement and any SEO or Senior Employee, to the extent such Loan Party, SEO or Senior Employee has previously provided such a waiver to the Treasury.

5.22.    [Intentionally Omitted].

5.23.    Additional Guarantors.    Except as otherwise agreed to by the Required Lenders, the Borrower shall cause each Domestic Subsidiary of a North American Group Member who becomes a Debtor after the Closing Date to become a Guarantor (each, an "Additional Guarantor") in accordance with Section 4.24 of the Guaranty, other than (i) [intentionally omitted], (ii) any Foreign 956 Subsidiary, (iii) any Other Foreign 956 Subsidiary and (iv) any Non-U.S. Subsidiary owned in whole or in part by a Foreign 956 Subsidiary, except in the case of clauses (i) through (iv), any Subsidiaries that were guarantors under the Existing UST Term Loan Agreement.

5.24.    Provide Additional Information.    Each North American Group Member shall, promptly, from time to time and upon request of any Lender, furnish to such Lender such information, documents, records or reports with respect to the Collateral, the Indebtedness of the North American Group Members or any Subsidiary thereof or the corporate affairs, conditions or operations, financial or otherwise, of such North American Group Member as any Lender may reasonably request, including without limitation, providing to such Lender reasonably detailed information with respect to each inquiry of such Lender raised with the North American Group Members prior to the Closing Date.

5.25.    Inspection of Property; Books and Records; Discussions.    Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each Group Member to, (a) keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of any Lender, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with its independent certified public accountants.

5.26.    Governance of Borrower.    Promptly after the Effective Date, the Borrower shall cause its by-laws to be amended and maintained to provide as follows:

(a)    From the date of such amendment until a plan of liquidation confirmed by the Bankruptcy Court is effective for each of the Cases (such date, the "Liquidation Plan Effective Date"):

(i)    the Borrower's Board of Directors shall be comprised of five (5) members (it being understood that so long as the Borrower is diligently and in good faith pursuing the nomination and appointment of members to the Borrower's Board of Directors, no Default shall arise under the Wind-Down Facility Agreement from the fact that from time to time, the Borrower's Board of Directors might consist of fewer than five (5) members);

(ii)    subject to clauses (iii) and (iv) below, (A) the Required Lenders, as a group, shall have the right to nominate three (3) individuals as members to the Board of Directors and (B) the Creditors' Committee, as a group, shall have the right to nominate two (2) individuals as members to the Borrower's Board of Directors, and each of the Required Lenders, the Creditors' Committee, and the Borrower shall use its commercially reasonable efforts to cause the election to the Board of Directors of such individuals as directors of Borrower (unless the Board of Directors reasonably concludes that any such individual is not eligible to serve as a director, in which event the Required Lenders or Creditors' Committee, as the case may be, shall nominate a substitute individual);

(iii)    prior to the appointment of any individual as director of the Borrower by the Board of Directors, such individual shall be subject to a review by and shall be reasonably acceptable to the Required Lenders and the Creditors' Committee (it being understood that so long as the Borrower is diligently and in good faith pursuing the nomination and appointment of members to its Board of Directors that satisfy the requirements of the undertaking set forth in this Annex, no Default shall arise under the Wind-Down Facility Agreement from the fact that the foregoing parties have not agreed on acceptable nominees);

(iv)    upon the vacancy of a director's position on the Borrower's Board of Directors (whether by resignation of a director or otherwise), the party with the right to nominate such director hereby shall be entitled to nominate such director's replacement; provided that, at no time shall the majority of the members serving on the Borrower's Board of Directors be members nominated by the Creditors' Committee; and

(v)    at least one director nominated by each of the Required Lenders and the Creditors' Committee shall be appointed to any committee of the Borrower's Board of Directors.

(b)    The provisions of the Borrower's by-laws relating to the matters set forth in clause (a) above, as amended in accordance with the terms thereof shall remain in effect and may not be amended or repealed in whole or in any part, nor may any provision inconsistent with any of the preceding provisions (in whole or in part) be adopted other than (i) with respect to any period, by a unanimous approval of the Borrower's Board of Directors or (ii) with respect to the period on or after the Liquidation Plan Effective Date, by a unanimous approval of the

Borrower's Board of Directors, or if such unanimous approval of the Borrower's Board of Directors is not obtained, as determined by the Bankruptcy Court.

(c)    Notwithstanding anything in this Agreement to the contrary, the Creditors' Committee (or the Unsecured Creditors Representative, as applicable) is intended to and shall be a third-party beneficiary of this Section 5.26, and shall be legally entitled to enforce the provisions hereof, but only to the extent that the Creditors' Committee (or the Unsecured Creditors Representative, as applicable) shall have take the action contemplated by this Section 5.26 to have been taken by such Person.

## SECTION 6

## NEGATIVE COVENANTS

Each Loan Party hereby covenants and agrees to, and to cause itself and each of its Subsidiaries that is a North American Group Member to, so long as any Loan or any interest or fee payable hereunder is owing to any Lender, each North American Group Member will abide by the following negative covenants, in each case except as shall be required in connection with the Wind-Down and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

6.1.    <u>Prohibition on Fundamental Changes</u>.    No North American Group Member shall, at any time, directly or indirectly, (i) enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or Dispose of all or substantially all of its Property without the Lender's prior consent, <u>provided</u>, any Guarantor may merge, consolidate, amalgamate into, or Dispose of all or substantially all of its Property to another North American Group Member; or (ii) form or enter into any partnership, syndicate or other combination (other than joint ventures permitted by Section 6.14) that could reasonably be expected to have a Material Adverse Effect.

6.2.    <u>Lines of Business</u>.    No North American Group Member will engage to any substantial extent in any line or lines of business activity other than the businesses generally carried on by the North American Group Members as of the Closing Date or businesses reasonably related thereto.

6.3.    <u>Transactions with Affiliates</u>.    No North American Group Member will (a) enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including Collateral) or the rendering of any service, with any Affiliate unless such transaction is (i) in the ordinary course of such North American Group Member's business, and (ii) generally upon fair and reasonable terms and, with respect to any transaction with an Affiliate that is not a Group Member, no less favorable to such North American Group Member than it would obtain in an arm's length transaction with a Person which is not an Affiliate (other than any transaction that occurs pursuant to an agreement in effect as of the Petition Date), and in either case, is otherwise permitted under this Agreement, or (b) make a payment that is not otherwise permitted by this Section 6.3 to any Affiliate.    Irrespective of whether such transactions comply with the provisions of this Section 6.3, but subject to the other restrictions set forth elsewhere in this Agreement, the Loan Parties shall be permitted to (x) transact business

-51-

in the ordinary course with (i) the joint ventures in which the Loan Parties or their Subsidiaries participate and (ii) [intentionally omitted], and (y) make Restricted Payments permitted under Section 6.5.

6.4.    <u>Limitation on Liens</u>.  No North American Group Member will, create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except Permitted Liens.

6.5.    <u>Restricted Payments</u>.  Without the Lenders' consent, no North American Group Member shall, (i) declare or pay any dividend (other than dividends payable solely in common Capital Stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any Capital Stock of any North American Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any North American Group Member and (ii) optionally prepay, repurchase, redeem or otherwise optionally satisfy or defease with cash or Cash Equivalents any Indebtedness (any such payment referred to in clauses (i) and (ii), a "<u>Restricted Payment</u>"), other than:

(a)    redemptions, acquisitions or the retirement for value or repurchases (or loans, distributions or advances to effect the same) of shares of Capital Stock from current or former officers, directors, consultants and employees, including upon the exercise of stock options or warrants for such Capital Stock, or any executive or employee savings or compensation plans, or, in each case to the extent applicable, their respective estates, spouses, former spouses or family members or other permitted transferees;

(b)    any Subsidiary (including an Excluded Subsidiary) may make Restricted Payments to its direct parent or to the Borrower or any Guarantor that is a Wholly Owned Subsidiary;

(c)    any JV Subsidiary may make Restricted Payments required or permitted to be made pursuant to the terms of the joint venture arrangements in effect on the Closing Date (or otherwise as approved by the Required Lenders) of holders of its Capital Stock, <u>provided</u> that, the Borrower and its Subsidiaries have received their *pro rata* portion of such Restricted Payments; and

(d)    any Subsidiary that is not a North American Group Member may make Restricted Payments to any other Subsidiary or Subsidiaries that are not North American Group Members.

For the avoidance of doubt this Section 6.5 shall not restrict in any manner any North American Group Member from Disposing of any New GM Equity Interests.

6.6.    <u>Amendments to Transaction Documents</u>.  (a) No North American Group Member will amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the indemnities and licenses furnished to New CarCo and its successors or any of its Subsidiaries pursuant to the Transaction Documents such that after giving effect thereto such indemnities or licenses, taken as a whole, shall be materially less favorable to the

interests of the Lenders with respect thereto or (b) otherwise amend, supplement or otherwise modify the terms and conditions of the Transaction Documents.

6.7.    Changes in Fiscal Periods.    No North American Group Member will permit its fiscal year to end on a day other than December 31 or change its method of determining fiscal quarters, in each case, unless otherwise agreed by the Required Lenders.

6.8.    Negative Pledge.    No North American Group Member will, enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any North American Group Member to create, incur, assume or permit to exist any Lien upon any of the Collateral, whether now owned or hereafter acquired, other than this Agreement, the other Loan Documents, the Existing Agreements, and Permitted Liens; provided that the agreements excepted from the restrictions of this Section shall include customary negative pledge clauses in agreements providing refinancing Indebtedness or permitted unsecured Indebtedness.

6.9.    Indebtedness.    No North American Group Member will, create, incur, assume or suffer to exist any Indebtedness except Permitted Indebtedness.

6.10.    Investments.    No North American Group Member will make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments"), except Permitted Investments.

6.11.    Action Adverse to the Collateral.    Except as permitted under any provision of this Agreement, no Loan Party shall or shall permit any Pledged Entity that is a Subsidiary to take any action that would directly or indirectly materially impair or materially adversely affect such North American Group Member's title to, or the value of, the Collateral, or materially increase the duties, responsibilities or obligation of any North American Group Member.

6.12.    Limitation on Sale of Assets.    Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases and any other applicable provision of any Loan Document, each North American Group Member shall have the right to Dispose freely of any of its Property (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired.

6.13.    [Intentionally Omitted].

6.14.    JV Agreements.    No North American Group Member or Pledged Entity shall allow any modification or amendment to any JV Agreement, except that any such party that is not a Debtor may modify or amend any JV Agreement; provided that such amendment or modification could not reasonably be expected to have a Material Adverse Effect.

6.15.    Swap Agreements.    The North American Group Members will not itself, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual or anticipated exposure (other than those in respect of Capital Stock) and

(b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

6.16.    <u>Clauses Restricting Subsidiary Distributions</u>.    The Borrower will not, and will not permit any Guarantor to, enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Guarantor to (a) make Restricted Payments in respect of any Capital Stock of such Guarantor held by, or pay any Indebtedness owed to, the Borrower or any other Guarantor, (b) make loans or advances to, or other Investments in, the Borrower or any other Guarantor or (c) transfer any of its assets to the Borrower or any other Guarantor, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Guarantor imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Guarantor, (iii) any agreement or instrument governing Indebtedness assumed in connection with the acquisition of assets by the Borrower or any Guarantor permitted hereunder or secured by a Lien encumbering assets acquired in connection therewith, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (iv) restrictions on the transfer of assets subject to any Lien permitted by Section 6.4 imposed by the holder of such Lien or on the transfer of assets subject to a Disposition permitted by Section 6.12 imposed by the acquirer of such assets, (v) provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock therein) entered into in the ordinary course of business, (vi) restrictions contained in the terms of any agreements governing purchase money obligations, Capital Lease Obligations or attributable obligations not incurred in violation of this Agreement; <u>provided</u> that, such restrictions relate only to the property financed with such Indebtedness, (vii) restrictions on cash or other deposits imposed by customers under contracts or other arrangements entered into or agreed to in the ordinary course of business, or (viii) customary non-assignment provisions in leases, contracts, licenses and other agreements entered into in the ordinary course of business and consistent with past practices.

6.17.    <u>Sale/Leaseback Transactions</u>.    No North American Group Member will enter into any arrangement with any Person providing for the leasing by any such North American Group Member of real or personal property that has been or is to be sold or transferred by any such North American Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of any such North American Group Member (a "<u>Sale/Leaseback Transaction</u>") other than any Sale/Leaseback Transaction in effect on the Closing Date.

6.18.    [<u>Intentionally Omitted</u>].

6.19.    <u>Modification of Organizational Documents</u>.    No North American Group Member will modify any organizational documents, except (i) as required by the Bankruptcy Code or (ii) in connection with a Disposition permitted by Section 6.12.

## SECTION 7

## EVENTS OF DEFAULT

7.1.    <u>Events of Default</u>.  Notwithstanding the provisions of section 362(c) of the Bankruptcy Code, and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, or any notice to any of the North American Group Members, and subject to the provisions of this Section 7, each of the following events shall constitute an "<u>Event of Default</u>", <u>provided</u> that any requirement for the giving of notice, the lapse of time, or both, has been satisfied:

(a)    the Borrower shall default in the payment of any principal of or interest on any Loan when due (whether at stated maturity or upon acceleration), including the failure to pay the Administrative Priority Claim Payment Amount on or before the Administrative/Priority Claim Payment Date; or

(b)    any Guarantor shall default in its payment obligations under the Guaranty; or

(c)    any Loan Party shall default in the payment of any other amount payable by it hereunder or under any other Loan Document after notification by the Lenders of such default, and such default shall have continued unremedied for three (3) Business Days; or

(d)    any North American Group Member shall breach any covenant contained in Section 5.16 (Executive Privileges and Compensation), Section 5.17 (Aircraft), Section 5.18 (Restrictions on Expenses), Section 5.19 (Employ American Workers Act), Section 5.20 (Internal Controls; Recordkeeping; Additional Reporting), Section 5.21 (Waivers) or Section 6 hereof; or

(e)    any North American Group Member shall default in performance of or otherwise breach non-payment obligations or covenants under any of the Loan Documents not covered by another clause in this Section 7, and such default has not been remedied within the applicable grace period provided therein, or if no grace period, within ten (10) Business Days; or

(f)    any representation, warranty or certification made or deemed made herein or in any other Loan Document by any North American Group Member or any certificate furnished to the Lenders pursuant to the provisions hereof or thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(g)    [intentionally omitted]; or

(h)    [intentionally omitted]; or

(i)    [intentionally omitted]; or

(j)    [intentionally omitted]; or

(k)    any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee or interim trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver and manager, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or an application shall be filed by the Borrower or any of its Subsidiaries for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Lenders against any Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

(l)    except as expressly agreed to in writing by the Required Lenders, any Debtor shall make any Prepetition Payment to any general unsecured creditor other than any such Prepetition Payments that are (i) payable pursuant to an order by the Bankruptcy Court or (ii) consistent with the Wind-Down Budget; or

(m)    [intentionally omitted]; or

(n)    [intentionally omitted]; or

(o)    [intentionally omitted]; or

(p)    any Loan Document shall for whatever reason be terminated, any default or event of default shall have occurred under any Loan Document, the Loan Documents shall for any reason cease to create a valid, security interest in any of the Collateral purported to be covered hereby or thereby, or any North American Group Member's material obligations (including the Borrower's Obligations hereunder) shall cease to be in full force and effect, or the enforceability thereof shall be contested by any North American Group Member; or

(q)    the filing of a motion, pleading or proceeding by any of the other Loan Parties which could reasonably be expected to result in a material impairment of the rights or interests of any Lender under any Loan Document, or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of any Lender under any Loan Document; or

(r)    (i) any order shall be entered reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying in any material respect the Final Order without the prior written consent of the Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien or to be otherwise in full force and effect or (iii) any Debtor shall fail to, or fail to cause any North American Group Member to, comply with the Orders; or

(s)    the North American Group Members or any other material Subsidiaries of the Borrower shall take any action in support of any of the events set forth in clauses (k), (l), (m), (q) or (s) or any person other than the North American Group Members or any other material Subsidiaries of the Borrower shall do so, and such application is not contested in good faith by the North American Group Members or any other material Subsidiaries of the Borrower and the relief requested is granted in an order that is not stayed pending appeal; or

(t)      [intentionally omitted]; or

(u)      any Change of Control shall have occurred without the prior consent of the Lenders other than pursuant to the Related Section 363 Transaction; or

(v)      any North American Group Member shall grant, or suffer to exist, any Lien on any Collateral other than Permitted Liens; or the Liens contemplated under the Loan Documents shall cease to be perfected Liens on the Collateral in favor of the Lenders of the requisite priority hereunder with respect to such Collateral (subject to the Permitted Liens); or

(w)      [intentionally omitted]; or

(x)      [intentionally omitted]; or

(y)      [intentionally omitted]; or

(z)      [intentionally omitted]; or

(aa)      [intentionally omitted]; or

(bb)      any North American Group Member (other than a Debtor) shall admit its inability to, or intention not to, perform any of such party's material Obligations hereunder; or

(cc)      a plan shall be confirmed in any of the Cases that does not, or any order shall be entered which dismisses any of the Cases and which order does not comply with the repayment provisions of this Agreement; or any of the Debtors shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

7.2.    Remedies upon Event of Default.  (a) If any Event of Default occurs and is continuing under Section 7.1(l), the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(b)      After the Maturity Date, if any Obligations remain outstanding, the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(c)      Upon (but only upon) the occurrence of an event set forth in Section 7.2(a) and (b), the Required Lenders may take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided that (x) with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Lenders shall provide the Borrower (with a copy to counsel for each Committee and to the United States Trustee for the Southern District of New York) with five Business Days' written notice prior to taking the action contemplated thereby, (y) upon receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts, and (z) in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, the specific Event of Default giving rise to the enforcement has occurred and is continuing):

-57-

(i)      declare the principal of and accrued interest on the outstanding Loans to be immediately due and payable;

(ii)      [intentionally omitted]

(iii)      set-off any amounts (other than Excluded Collateral) held in any accounts maintained by any Loan Party with respect to which any Lender is a party to a control agreement;

(iv)      compel any Debtor to or to cause any North American Group Member to sell any or all of its assets (other than the Excluded Collateral) that comprise collateral consistent with Section 363(b) of the Bankruptcy Code or any other Applicable Law, and credit bid the Loans in any such sale pursuant to Section 363(k) of the Bankruptcy Code or other Applicable Law; or

(v)      take any other action or exercise any other right or remedy (including, without limitation, with respect to the Liens in favor of the Lenders) permitted under and consistent with the Loan Documents or by Applicable Law.

(d)      Notwithstanding any other provision in this Agreement or the other Loan Documents, the Lenders' rights and remedies set forth in Section 7.2(a), (b) and (c) shall for all purposes be the sole and exclusive remedy of the Lenders and their respective Affiliates under this Agreement and the other Loan Documents, at law or in equity, for all purposes against the Borrower, any of its direct or indirect Subsidiaries (including, the Guarantors), the Pledgors, and any of their respective former, current and future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, members, managers, general or limited partners or assignees upon any Event of Default or for any loss or damage suffered as a result of the breach of any representation, warranty, covenant or agreement contained in this Agreement, the other Loan Documents or otherwise by the Borrower or any of its direct or indirect Subsidiaries, any Pledgor or any Guarantor.

# SECTION 8

## MISCELLANEOUS

8.1.    <u>Amendments and Waivers</u>.    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 8.1 or as otherwise expressly provided herein. The Required Lenders and the Borrower (on its own behalf and as agent on behalf of any other Loan Party party to the relevant Loan Document) may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Lenders may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; except that (x) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or

extensions of the Maturity Date of any Loan or any change to the definition of "Maturity Date", (ii) reductions in the rate of interest or any fee or extensions of any due date thereof, (iii) [intentionally omitted], (iv) imposition of any additional restrictions on assignments and participations, (v) [intentionally omitted] and (vi) modifications to the *pro rata* treatment and sharing provisions of the Loan Documents, and (y) the consent of 100% of the Lenders shall be required with respect to (i) modifications to this Section of any of the voting percentages, the definition of "Required Lenders", or the minimum requirement necessary for all Lenders or Required Lenders to take action hereunder, (ii) prior to the consummation of the Related Section 363 Transactions, the release or subordination of any of the Guarantors or a material portion of the Collateral other than in connection with the Related Section 363 Transactions, (iii) after the consummation of the Related Section 363 Transactions, the release or subordination of all or substantially all of the Guarantors or all or substantially all of the Collateral, (iv) the assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under this Agreement and (v) amendments, supplements, modifications or waivers of Sections 2.12 (or the rights and obligations contained therein), 4.1(a), 4.1(c)(ii), 4.1(e), 4.1(f), 4.1(m) or 7.1(r), the definition of "ABR" or the minimum notice requirements contained in Section 2.4.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders and all future holders of the Loans.  In the case of any waiver, the Loan Parties and the Lenders shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 8.1; provided that, delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

8.2.    Notices.  (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or electronic transmission or overnight or hand delivery, when received, addressed as follows in the case of the Borrower and the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:

Motors Liquidation Company
GM Global Headquarters
Att.  Mail Code 482-C37-A99
300 Renaissance Center
Detroit, MI  48265
Attn:  Treasurer, James Selzer
Telecopy:  248-262-8491

with a copy to:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY  10153-0119
      Attention:  Stephen Karotkin
              Richard Ginsburg
              Soo-Jin Shim
      Telecopy:  212-310-8007

Treasury:

      The United States Department of the Treasury
      1500 Pennsylvania Avenue, NW
      Washington, D.C.  20220
      Attention:  Chief Counsel Office of Financial Stability
      Telecopy:  202-927-9225
      Email:  OFSChiefCounselNotices@do.treas.gov

with a copy to:

      Cadwalader, Wickersham & Taft LLP
      One World Financial Center
      New York, NY  10281
      Attention:  John J. Rapisardi
      Telecopy:  212-504-6666
      Telephone:  212-504-6000

Canadian Lender:

      Export Development Canada
      151 O'Connor Street
      Ottawa, Ontario
      Canada  K1A 1K3
      Attention:  Loans Services
      Telecopy:  613-598-2514

with a copy to:

      Export Development Canada
      151 O'Connor Street
      Ottawa, Ontario
      Canada  K1A 1K3
      Attention:  Asset Management/Covenants Officer
      Telecopy:  613-598-3186

<u>provided</u> that any notice, request or demand to or upon the Lenders shall not be effective until received.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by each Lender in its sole discretion.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

8.3.    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.4.    <u>Survival of Representations and Warranties</u>.    All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

8.5.    <u>Payment of Expenses</u>.  The Borrower agrees (a) to pay or reimburse the Lenders and any other Canadian Lender Consortium Member for all their (i) reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby (including the reasonable out-of-pocket costs and expenses of the advisors and counsel to each Lender and each other Canadian Lender Consortium Member, but excluding the professional fees of such advisors and counsel to each Lender and each other Canadian Lender Consortium Member), and (ii) costs and expenses incurred in connection with the enforcement or preservation of any rights or exercise of remedies under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith in respect of any Event of Default or otherwise, including the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and each other Canadian Lender Consortium Member, (b) to pay, indemnify, or reimburse each Lender and each other Canadian Lender Consortium Member for, and hold each Lender and each other Canadian Lender Consortium Member harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying such fees, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (c) to pay, indemnify or reimburse each Lender and each other Canadian Lender Consortium Member, their respective affiliates, and their respective officers, directors, partners, employees, advisors, agents,

controlling persons and trustees (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by an Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of, the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, including any of the foregoing relating to the use or proposed use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations or assets of any Group Member, including any of the Mortgaged Properties, and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by any third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee (x) for Taxes (it being understood that the Borrower's obligations with respect to Taxes are set forth in Section 2.12) or (y) with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from the gross negligence or willful misconduct of, in each case as determined by a final and nonappealable decision of a court of competent jurisdiction, such Indemnitee, any of its affiliates or its or their respective officers, directors, partners, employees, agents or controlling persons.  No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans.  Without limiting the foregoing, and to the extent permitted by Applicable Law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.  All amounts due under this Section 8.5 shall be payable not later than 30 days after written demand therefor.  Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the Treasurer of the Borrower as set forth in Section 8.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lenders.  The agreements in this Section 8.5 shall survive repayment of the Loans and all other amounts payable hereunder.

8.6.    Successors and Assigns; Participations and Assignments.    (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, all future holders of the Loans and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (except to its Debtor Successor) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 8.6.

(b)     Any Lender may, without the consent of the Borrower, assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it) pursuant to an Assignment and Assumption, executed by such Assignee and such Lender and delivered to the Borrower for its records, to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada or to New CarCo, together with any related rights and obligations thereunder, without the consent of the Borrower.   The Borrower or its agent will maintain a register ("Register") of each Lender and Assignee.   The Register shall contain the names and addresses of the Lenders and Assignees and the principal amount of the loans (and stated interest thereon) held by each such Lender and Assignee from time to time.   The entries in the Register shall be conclusive and binding, absent manifest error.

(c)     Any Lender may, without the consent of the Borrower, sell participations to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 8.1 and (2) directly affects such Participant.   Subject to paragraph (c) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 8.6.   To the extent permitted by law, and subject to paragraph (c) of this Section, each Participant also shall be entitled to the benefits of Section 8.7 as though it were a Lender.   Notwithstanding anything to the contrary in this Section 8.6, each Lender shall have the right to sell one or more participations in all or any part of its Loans or other Obligations to one or more lenders or other Persons that provide financing to such Lender in the form of sales and repurchases of participations without having to satisfy the foregoing requirements.   In the event that a Lender sells a participation in such Lender's rights and obligations under this Agreement, the Lender, on behalf of Borrower, shall maintain a register on which it enters the name, address and interest in this Agreement of all Participants.

8.7.     Adjustments; Set-off.   (a) Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders, if any Lender (a "Benefitted Lender") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 7, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing

to such other Lender, such Benefitted Lender shall purchase for cash in Dollars from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral or the proceeds thereof, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, subject to any notice or other requirement contained in the Orders, each Lender shall have the right, without (i) further order of or application to the Bankruptcy Court, or (ii) prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by Applicable Law, upon all amounts owing hereunder becoming due and payable (whether at the stated maturity, by acceleration or otherwise) to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the other Lenders after any such set-off and application made by such Lender; provided that, the failure to give such notice shall not affect the validity of such set off and application.

8.8.    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

8.9.    Severability.  Any provision of this Agreement that is held to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.10.    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.  Subject to Section 8.18, in the event of any conflict between this Agreement or any other Loan Document and the Orders, the Orders shall control.

8.11.    Governing Law.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH,**

**THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

8.12.   <u>Submission to Jurisdiction; Waivers</u>.   All judicial proceedings brought against any Loan Party hereto arising out of or relating to this Agreement or any other Loan Document, or any Obligations hereunder and thereunder, may be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof.   Each Loan Party hereto hereby irrevocably and unconditionally:

(a)   submits for itself and its property in any such legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in Section 8.2 or at such other address of which the Lenders shall have been notified pursuant thereto; and

(d)   waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.13.   <u>Acknowledgments</u>.   The Loan Party hereby acknowledges that:

(a)   it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)   no Lender has any fiduciary relationship with or duty to any Group Member arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lenders, on one hand, and any Group Member, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)   no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower or any Subsidiary and the Lenders.

8.14.   <u>Release of Guaranties</u>.   Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Lenders hereby agree to take promptly, any action requested by the Borrower having the effect of releasing, or evidencing the release of, any

guarantee by any Loan Party of the Obligations to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 8.1.

8.15.    <u>Confidentiality</u>.    Each of the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party or any other Lender pursuant to this Agreement that is designated by such Loan Party as confidential; <u>provided</u> that nothing herein shall prevent any Lender from disclosing any such information (a) to any other Lender or any affiliate of any thereof, (b) subject to an agreement to comply with the provisions of this Section 8.15 (or other provisions at least as restrictive as this Section), to any actual or prospective Transferee or any pledgee of Loans or any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction relating to the Loan Party and its obligations, (c) to its affiliates, employees, directors, trustees, agents, attorneys, accountants and other professional advisors, or those of any of its affiliates for performing the purposes of a Loan Document, subject to such Lender, as the case may be, advising such Person of the confidentiality provisions contained herein, (d) upon the request or demand of any Governmental Authority or regulatory agency (including self-regulated agencies) having jurisdiction (or purporting to have jurisdiction) over it upon notice (other than in connection with routine examinations or inspections by regulators) to the Borrower thereof unless such notice is prohibited or the Governmental Authority or regulatory agency shall require otherwise, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, after notice to the Borrower if reasonably feasible, and, if applicable, after exhaustion of the Group Members' rights and remedies under Section 1.6 of the Department of the Treasury Regulations, 31 C.F.R. Part 1, Subpart A; Sections 27-29 inclusive and 44 of the Access to Information Act, R.S.C., ch A-1 (1985) and Section 28 and Part IV (Sections 50-56 inclusive) of the Freedom of Information and Protection of Privacy Act, R.S.O., ch. F.31 (1990), after notice to the Borrower if reasonably feasible, (f) if requested or required to do so in connection with any litigation or similar proceeding, after notice to the Borrower if reasonably feasible, (g) that has been publicly disclosed, other than in breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

8.16.    <u>Waivers of Jury Trial</u>.    **THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.17.    <u>USA PATRIOT Act</u>.    Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the USA PATRIOT Act.

8.18.    <u>Orders</u>.    The terms and conditions hereunder shall be subject to the terms and conditions of the Final Order.  In the event of any inconsistency between the terms or

conditions of this Agreement and the terms and conditions of the Orders, the terms and conditions of the Orders shall control.   Notwithstanding the foregoing, in the event of any inconsistency between the terms or conditions of Section 8.1 and the terms and conditions of the Orders, the terms and conditions of Section 8.1 shall control.

8.19.   <u>Effect of Amendment and Restatement of the Existing Credit Agreement</u>. On the Effective Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety.   The parties hereto acknowledge and agree that (a) this Agreement and the other Loan Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment and reborrowing, or termination of the "Obligations" (as defined in the Existing Credit Agreement) under the Existing Credit Agreement as in effect prior to the Effective Date and (b) such "Obligations" are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement.

8.20.   <u>New GM Equity Interests.</u>   Each Lender hereby acknowledges and agrees that it, and each Affiliate of any Lender, (a) shall have no right, in any manner whatsoever, to the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans and (b) will not initiate or prosecute any claims, causes of action, adversary proceedings or other litigation seeking recourse against the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans or otherwise.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MOTORS LIQUIDATION COMPANY


By:_____
    Name:
    Title:

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]

[GUARANTOR]

By:_____
    Name:
    Title:

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]

UNITED STATES DEPARTMENT OF THE
TREASURY, as a Lender


By:_____
    Title:  Interim Assistant Secretary of the
    Treasury for Financial Stability

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]

EXPORT DEVELOPMENT CANADA, as a
  Lender


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]

# **<u>Exhibit 9</u>**

## Mayer, Thomas Moers

**From:** Caton, Amy
**Sent:** Tuesday, June 23, 2009 9:58 AM
**To:** Mayer, Thomas Moers; 'Mintz, Douglas'; john.rapisardi@cwt.com
**Cc:** Novod, Gordon; Sharret, Jennifer; Campana, Kristen; Eckstein, Kenneth H.
**Subject:** RE: GUM -- DIP Order Draft

Doug and John -- below are the global comments we gave to the Debtors regarding the DIP and cash collateral orders. These are based on our meeting on Friday with the Debtors and Treasury. Could you please forward to your team as appropriate. We can discuss these on this morning's call, or on a follow-up call if that makes more sense.

We talked briefly with Weil last night about the issues we have with transforming the DIP facility into a wind-down facility, which will require stripping a lot of the DIP facility provisions. What we suggested was the following solution and changes to the DIP order: (1) a finding or so-ordered paragraph in the order that, upon the closing of the sale process, Treasury will fund $950mm to Old GM, to be used for wind-down expenses, (2) a finding in the order that, based on testimony from Alix Partners, that the $950mm being left behind is sufficient to fund wind-down expenses and pay administrative and priority claims, (3) a timeline for when the wind-down budget and amendments will be proposed, with the Committee being consulted on the drafting of the amendments and wind-down budget and an opportunity to object.

We can circulate more detailed comments to the Final Order as well. Of note, we have not yet seen the Final Budget, which is referenced in the Final Order.


1. **Consent / Review Rights.** The Committee should be granted consultation rights over the Final Budget and any wind-down Budget (as referenced in Section 2.14 of the DIP loan agreement), with at least a 5 day notice period and opportunity to object. In addition, the Committee should receive the same reports from the Company that the Company is providing to the DIP lender under Section 5.2 of the DIP loan agreement or Final DIP Order.


2. **Excluded Collateral.** Definition of "Excluded Collateral" should specifically include stock and warrants being left for Old GM and chapter 5 actions against the prepetition lenders. The DIP Loan should be non-recourse to these assets.


3. **Wind-Down Budget and Costs.** Before any Section 506(c) waiver is granted, Final DIP order should provide that the DIP Lender is committing to fund the Wind-Down Budget and the expenses contained therein by no more than $950 million. We need to have testimony from Alix Partners that the $950 million is enough to cover wind-down expenses, and confirm that the wind-down budget and requirements of the DIP credit agreement match. For example, the June 12 draft wind-down budget provides that an estimated $92.5mm in asset sale proceeds will be used to fund wind-down costs, whereas under the DIP credit agreement, those amounts are to be used to mandatorily prepay and reduce the DIP. Administrative and priority claims should be senior in right of payment out of the $950 million to any repayment of the DIP/wind-down loan.

We do not yet understand how the wind-down loan is going to fit in through the current DIP facility documents. Won't the wind-down facility have stripped-down covenants, events of default, mandatory prepayment provisions, etc, to avoid defaults and potential early repayment of the $950mm. In addition, if the Treasury leaves its claim for the $950mm outstanding, is it going to create a veto over the plan, or even a potential administrative insolvency.


4. **Investigation Period.** The Committee should be granted a 60 day investigation period to review the prepetition lenders' liens and claims against the prepetition lenders.

8/17/2010