# **<u>Exhibit 10</u>**

| | |
|---|---|
| **From:** | Caton, Amy <ACaton@KRAMERLEVIN.com> |
| **Sent:** | Tuesday, June 30, 2009 6:37 PM |
| **To:** | ram.burshtine@weil.com; Perry.Hicks@cwt.com; Julian.Chung@cwt.com; Jeff.Morneau@weil.com; soo-jin.shim@weil.com; richard.ginsburg@weil.com; steven.karotkin@weil.com |
| **Cc:** | Katz, Alyssa R. <akatz95503590@exchange.com>; campana@KRAMERLEVIN.com; arosenberg@paulweiss.com; mphillips@paulweiss.com; jhamill@paulweiss.com; Mayer, Thomas Moers <tmayer@exchange.com>; Eckstein, Kenneth H. <keckstein@exchange.com> |
| **Subject:** | GM Wind-Down Facility: KL Comments |
| **Attach:** | KL Markup Wind-Down CA 6-30-09.doc |

---

All,

We continue to be concerned that the wind-down credit agreement as drafted does not reflect the business deal that we understood would be implemented here.  Our understanding of the business deal is as follows:

First, the wind-down loan is to be repaid only to the extent that the wind-down is complete and there is cash left over.  The repayment provisions must reflect that, and the provisions of the DIP order that require payment of amounts contemplated under the wind-down budget must be included in this agreement.

Second, the wind-down is supposed to continue until we have a plan of distribution, without Treasury having the right to pull the plug on the wind-down, unless funds are not being used in accordance with the business of a wind-down and the wind-down budget.  This is why we have removed some of the covenants and events of default.  If there is a default under any of the sale documents, New GM has its remedies against Old GM under those documents.

Third, the only amounts that are going to prepay the loan are proceeds from asset sales.  [See Section __, which has added back in the concept of Extraordinary Receipts].

Finally, we have not yet seen a revised wind-down budget.  From recent conversations between FTI and Alix, we understand that the $950mm is not enough to pay administrative and priority expense claims, as well as pay for certain claims (including environmental liabilities, claims secured by real property that is being sold to New GM, and others) that New GM intends to leave behind with the estate.

These issues are of utmost importance to the Creditors' Committee.  We have attached a mark-up of the draft credit agreement that implement our requested changes and understanding of the business deal on the wind-down.

Please let us know at your earliest convenience how you would like to proceed.

**PRIVILEGED AND CONFIDENTIAL**
**~~CWT DRAFT~~KLNF COMMENTS 6/~~29~~30/09**

$[950,000,000]
AMENDED AND RESTATED SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

GENERAL MOTORS CORPORATION,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

THE GUARANTORS

and

THE LENDERS PARTIES HERETO FROM TIME TO TIME

Dated as of July __, 2009

# TABLE OF CONTENTS

Page

## SECTION 1

## DEFINITIONS

1.1 Defined Terms ........................................................................................................ 2
1.2 Other Definitional Provisions ............................................................................... 23
1.3 Conversion of Foreign Currencies ........................................................................ 24

## SECTION 2

## AMOUNT AND TERMS OF THE LOANS

2.1 Loans .................................................................................................................... 24
2.2 [Intentionally Omitted] ........................................................................................ 24
2.3 Repayment of Loans; Evidence of Debt ................................................................ 25
2.4 Optional Prepayments ........................................................................................... 25
2.5 Mandatory Prepayments ........................................................................................ 25
2.6 Interest Rates and Payment Dates/Fee Payment Dates/Fees ................................. 26
2.7 Computation of Interest and Fees .......................................................................... 27
2.8 Inability to Determine Interest Rate; Illegality ..................................................... 27
2.9 Treatment of Borrowings and Payments; Evidence of Debt .................................. 28
2.10 Indemnity ............................................................................................................. 28
2.11 Superpriority Nature of Obligations and Lenders' Liens ...................................... 29
2.12 Taxes .................................................................................................................... 29

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

3.1 Existence .............................................................................................................. 31
3.2 [Intentionally Omitted.] ........................................................................................ 31
3.3 [Intentionally Omitted.] ........................................................................................ 31
3.4 [Intentionally Omitted.] ........................................................................................ 31
3.5 Action, Binding Obligations .................................................................................. 32
3.6 Approvals .............................................................................................................. 32
3.7 [Intentionally Omitted.] ........................................................................................ 32
3.8 Investment Company Act ....................................................................................... 32
3.9 [Intentionally Omitted.] ........................................................................................ 32
3.10 Chief Executive Office; Chief Operating Office ................................................... 32
3.11 Location of Books and Records ............................................................................. 32
3.12 [Intentionally Omitted.] ........................................................................................ 32

Page

3.13    [Intentionally Omitted.] ........................................................................32
3.14    Expense Policy ......................................................................................32
3.15    Subsidiaries ...........................................................................................32
3.16    Capitalization ........................................................................................33
3.17    Fraudulent Conveyance .........................................................................33
3.18    USA PATRIOT Act. .............................................................................33
3.19    Embargoed Person .................................................................................33
3.20    Use of Proceeds .....................................................................................34
3.21    Representations Concerning the Collateral ...........................................35
3.22    [Intentionally Omitted] ..........................................................................35
3.23    [Intentionally Omitted] ..........................................................................35
3.24    Lien Priority ...........................................................................................35
3.25    [Intentionally Omitted] ..........................................................................36
3.26    [Intentionally Omitted.] .........................................................................36
3.27    [Intentionally Omitted] ..........................................................................36
3.28    Excluded Collateral ...............................................................................36
3.29    [Intentionally Omitted] ..........................................................................37
3.30    [Intentionally Omitted] ..........................................................................37
3.31    The Final Order ......................................................................................37
3.32    Wind-Down Budget ...............................................................................37

## SECTION 4

## CONDITIONS PRECEDENT

4.1     Conditions to Effectiveness ...................................................................37

## SECTION 5

## AFFIRMATIVE COVENANTS

5.1     Financial Statements ..............................................................................40
5.2     Notices; Reporting Requirements ..........................................................41
5.3     Existence ................................................................................................42
5.4     Payments of Taxes ..................................................................................43
5.5     Use of Proceeds .....................................................................................43
5.6     Maintenance of Existence; Payment of Obligations; Compliance with Law ..................44
5.7     Further Identification of Collateral ........................................................44
5.8     Defense of Title ......................................................................................44
5.9     Preservation of Collateral ......................................................................44
5.10    Maintenance of Papers, Records and Files ............................................45
5.11    Maintenance of Licenses ........................................................................45
5.12    Payment of Obligations ..........................................................................45
5.13    OFAC ......................................................................................................46
5.14    Investment Company ..............................................................................46
5.15    Further Assurances .................................................................................46

Page

5.16    Executive Privileges and Compensation...................................................................46
5.17    Aircraft................................................................................................................47
5.18    Restrictions on Expenses ......................................................................................47
5.19    Employ American Workers Act ...............................................................................48
5.20    Internal Controls; Recordkeeping; Additional Reporting...........................................48
5.21    Waivers................................................................................................................49
5.22    [Intentionally Omitted] ..........................................................................................49
5.23    Additional Guarantors ...........................................................................................49
5.24    Provide Additional Information ...............................................................................49
5.25    Inspection of Property; Books and Records; Discussions ..........................................50

## SECTION 6

### NEGATIVE COVENANTS

6.1    Prohibition on Fundamental Changes........................................................................50
6.2    Lines of Business..................................................................................................50
6.3    Transactions with Affiliates...................................................................................50
6.4    Limitation on Liens................................................................................................51
6.5    Restricted Payments .............................................................................................51
6.6    Amendments to Transaction Documents..................................................................51
6.7    Changes in Fiscal Periods ......................................................................................52
6.8    Negative Pledge...................................................................................................52
6.9    Indebtedness........................................................................................................52
6.10    Investments.........................................................................................................52
6.11    Action Adverse to the Collateral ...........................................................................52
6.12    Limitation on Sale of Assets .................................................................................52
6.13    [Intentionally Omitted] ..........................................................................................52
6.14    JV Agreements.....................................................................................................52
6.15    Swap Agreements.................................................................................................53
6.16    Clauses Restricting Subsidiary Distributions...........................................................53
6.17    Sale/Leaseback Transactions ................................................................................53
6.18    [Intentionally Omitted] ..........................................................................................53
6.19    Modification of Organizational Documents ..............................................................53

## SECTION 7

### EVENTS OF DEFAULT

7.1    Events of Default..................................................................................................54
7.2    Remedies upon Event of Default.............................................................................57

# SECTION 8

## MISCELLANEOUS

| | | |
|---|---|---|
| 8.1 | Amendments and Waivers | 57 |
| 8.2 | Notices | 58 |
| 8.3 | No Waiver; Cumulative Remedies | 60 |
| 8.4 | Survival of Representations and Warranties | 60 |
| 8.5 | Payment of Expenses | 60 |
| 8.6 | Successors and Assigns; Participations and Assignments | 62 |
| 8.7 | Adjustments; Set-off | 63 |
| 8.8 | Counterparts | 63 |
| 8.9 | Severability | 64 |
| 8.10 | Integration | 64 |
| 8.11 | Governing Law | 64 |
| 8.12 | Submission to Jurisdiction; Waivers | 64 |
| 8.13 | Acknowledgments | 65 |
| 8.14 | Release of Guaranties | 65 |
| 8.15 | Confidentiality | 65 |
| 8.16 | Waivers of Jury Trial | 66 |
| 8.17 | USA PATRIOT Act | 66 |
| 8.18 | Orders | 66 |
| 8.19 | Effect of Amendment and Restatement of the Existing Credit Agreement | 66 |

<u>Page</u>

ANNEXES:

I               Wind-Down Budget

SCHEDULES:

1.1A            Outstanding Amounts of Tranche C Term Loans
1.1B            Guarantors
1.1C            Mortgaged Property
1.1D            Pledgors
1.1E            [Intentionally Omitted]
1.1F            [Intentionally Omitted]
1.1G            Certain Excluded Subsidiaries
3.3             Material Litigation
3.10            Chief Executive Office and Chief Operating Office
3.11            Location of Books and Records
3.15            Subsidiaries
3.16            Ownership of North American Group Members
3.21            Jurisdictions and Recording Offices
3.25            Intellectual Property
3.26            JV Agreements
3.28            Excluded Collateral

EXHIBITS:

A               Form of Amended and Restated Guaranty and Security Agreement
B-1             Form of Secretary's Certificate
B-2             Form of Officer's Certificate
C               Form of Assignment and Assumption
D-1             Form of Waiver for the Loan Parties
D-2             Form of Waiver of SEO to Treasury
D-3             Form of Consent and Waiver of SEO to Borrower
D-4             Form of Waiver of Senior Employee to Treasury
D-5             Form of Consent and Waiver of Senior Employee to Borrower
E-1             Form of Legal Opinion of Weil, Gotshal & Manges LLP
E-2             Form of Legal Opinion of In-House Counsel
F               Form of Compliance Certificate
G               Form of Amended and Restated Note
H               [Intentionally Omitted]
I               Form of Amended and Restated Environmental Indemnity Agreement
J               Form of Amended and Restated Mortgage
K               [Intentionally Omitted]
L               Form of Amended and Restated Equity Pledge Agreement

AMENDED AND RESTATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of July __, 2009, by and among GENERAL MOTORS CORPORATION, a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"), the Guarantors (as defined below), and the several lenders from time to time parties to this Agreement (the "Lenders").

W I T N E S S E T H:

WHEREAS, on June 1, 2009 (the "Petition Date"), the Borrower, Saturn, LLC, a Delaware limited liability company, Saturn Distribution Corporation, a Delaware corporation, and Chevrolet-Saturn of Harlem, Inc., a Delaware corporation (each an "Initial Debtor" and collectively, the "Initial Debtors") filed voluntary petitions in the Bankruptcy Court (as defined below) for relief, and commenced cases (each an "Initial Case" and collectively, the "Initial Cases") under the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 3, 2009, the Borrower entered into the Secured Superpriority Debtor-In-Possession Credit Agreement, among the Borrower and the Lenders (the "Existing Credit Agreement");

WHEREAS, pursuant to the Existing Credit Agreement, the Lenders provided the Borrower with a multiple-draw term loan facility in an aggregate principal amount not to exceed $33,300,000,000, comprised of (i) term loans in an aggregate amount equal to $_____ (the "Tranche B Term Loans") and (ii) term loans in an aggregate amount equal to no less than $[950,000,000] (provided that any greater amount shall be subject to approval by the Lenders) (the "Tranche C Term Loans");

WHEREAS, on June 25, 2009, the Bankruptcy Court entered the Final Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "Final Order") approving the Existing Credit Agreement, and providing *inter alia*, that (i) obligations owing to the Lenders under the Existing Credit Agreement shall be accorded administrative expense status withand subject only to the Carve-Out (as defined below), have priority over any and all other administrative expenses arising in these Cases; provided, however, that subsequent to the closing of the Related Section 363 Sale Transactions (as defined below), claims against the Debtors' estates that have priority under Sections 503(b) and 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, as well as other expenses incurred under the Wind-Down Budget, whether incurred prior or subsequent to the consummation of the Related Section 363 Sale Transactions shall have priority over such obligations (up to the amount of the Tranche C Term Loans) owing to the Lenders under this Agreement and (ii) the obligations owing under the Existing Credit Agreement shall be secured by fully perfected security interests and Liens upon all Collateral;

WHEREAS, pursuant to the Master Transaction Agreement (as defined below), on [July __, 2009] [the date hereof] the Treasury (as defined below) exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with, its Additional Note (as defined in the Existing Credit Agreement) and its rights under the Existing UST Term Loan Agreement (as defined below) to New CarCo (as defined below) in exchange for common and preferred Capital Stock (as defined below) of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement, on [July __, 2009] [the date hereof] the Canadian Lender exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with its Additional Note to New CarCo in exchange for common and preferred Capital Stock of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement (as defined below) and in accordance with the Section 363 Sale Order (as defined below), the Borrower sold to New CarCo all or substantially all of the Borrower's assets and property, and New CarCo assumed certain liabilities of the Borrower and its subsidiaries, including a portion of the Treasury's Tranche B Term Loans in an aggregate amount equal to $7,072,488,605 pursuant to the Assignment and Assumption Agreement, dated as of the date hereof (the "New CarCo Assignment and Assumption"), between the Borrower and New CarCo (collectively, and together with the other transactions contemplated by the Transaction Documents, the "Related Section 363 Sale Transactions");

WHEREAS, after giving effect to the Related Section 363 Sale Transactions, the remaining obligations of the Borrower to the Lenders is comprised solely of the Tranche C Term Loans; and

WHEREAS, the Borrower has requested, and the Lenders have agreed, to amend and restate the portion of the Existing Credit Agreement relating to the Tranche C Term Loans on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the parties hereto agree that on the Effective Date, as provided in Section 8.19, the Existing Credit Agreement shall be amended and restated in its entirety as follows:

## SECTION 1

## DEFINITIONS

1.1.    <u>Defined Terms</u>.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"<u>ABR</u>":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1% and (c) the three month Eurodollar Rate (for the avoidance of doubt after giving effect to the provisos in the definition thereof) <u>plus</u>

1.00%; provided that, in the event the Required Lenders shall have determined that adequate and reasonable means do not exist for ascertaining the calculation of clause (c), such calculation shall be replaced with the last available calculation of the three month Eurodollar Rate plus 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate, respectively.

"ABR Loans": Loans the rate of interest applicable to which is based upon the ABR.

"Additional Guarantor": as defined in Section 5.23.

"Affiliate": with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this Agreement, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise. For the avoidance of doubt, pension plans of a Person and entities holdings the assets of such plans, shall not be deemed to be Affiliates of such Person.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's aggregate then unpaid principal amount of such Lender's Loans at such time to the sum of the aggregate then unpaid principal amount of all Lenders at such time.

"Agreement": as defined in the preamble hereto.

"Anti-Money Laundering Laws": as defined in Section 3.18(d).

"Applicable Law": as to any Person, all laws (including common law), statutes, regulations, ordinances, treaties, judgments, decrees, injunctions, writs and orders of any court, governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations.

"Applicable Margin": (A) 2.0% per annum in the case of ABR Loans and (B) 3.0% per annum in the case of Eurodollar Loans.

"Asset Sale": any Disposition of property or series of related Dispositions of property occurring contemporaneously. The term "Asset Sale" shall not include any issuance of Capital Stock or any event that constitutes a Recovery Event.

"Assignee": as defined in Section 8.6(b).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit C.

"Bankruptcy Code":  the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*

"Bankruptcy Court":  the United States Bankruptcy Court for the Southern District of New York (together with the District Court for the Southern District of New York, where applicable).

"Bankruptcy Exceptions":  limitations on, or exceptions to, the enforceability of an agreement against a Person due to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or the application of general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

"Bankruptcy Rules":  the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

~~"Benefit Plan":  any employee benefit plan within the meaning of section 3(3) of ERISA and any other plan, arrangement or agreement which provides for compensation, benefits, fringe benefits or other remuneration to any employee, former employee, individual independent contractor or director, including without limitation, any bonus, incentive, supplemental retirement plan, golden parachute, employment, individual consulting, change of control, bonus or retention agreement, whether provided directly or indirectly by any Loan Party or otherwise.~~

"Benefitted Lender":  as defined in Section 8.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the preamble hereto.

"Business Day":  any day other than a Saturday, Sunday or other day on which banks in New York City or Ottawa, Ontario, Canada are permitted to close; provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London Interbank market.

"Canadian Lender":  Export Development Canada, a corporation established pursuant to the laws of Canada, and its successors and assigns.

"Canadian Lender Consortium Members":  each of the Export Development Canada, the Government of Canada and the Government of Ontario.

"Canadian Post-Sale Facility":  the Amended and Restated Loan Agreement, dated as of the [Effective Date], by and among General Motors of Canada Limited, as borrower, the other loan parties thereto, and the Canadian Lender, as amended, supplemented or respected from time to time.

"Canadian PV Note": the [Note], dated as of the [Effective Date], by and among Vehicle Acquisition Holdings LLC, as borrower, the other loan parties thereto, and the Canadian Lender, as amended, supplemented or replaced from time to time.

"Capital Lease Obligations": for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Capital Stock": any and all equity interests, including any shares of stock, membership or partnership interests, participations or other equivalents whether certificated or uncertificated (however designated) of a corporation, limited liability company, partnership or any other entity, and any and all similar ownership interests in a Person and any and all warrants or options to purchase any of the foregoing.

"Carve-Out": as defined in the Orders.

"Cases": the Initial Cases and each other case of a Debtor filed with the Bankruptcy Court and joined with the Initial Cases.

"Cash Equivalents": shall mean (a) U.S. dollars, or money in other currencies received in the ordinary course of business, (b) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed or insured by the United States or Canadian government or any agency thereof, (c) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, province, commonwealth or territory of the United States or Canada, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's or equivalent rating, (d) demand deposit, certificates of deposit and time deposits with maturities of one (1) year or less from the date of acquisition and overnight bank deposits of any commercial bank, supranational bank or trust company having capital and surplus in excess of $500,000,000, (e) repurchase obligations with respect to securities of the types (but not necessarily maturity) described in clauses (b) and (c) above, having a term of not more than 90 days, of banks (or bank holding companies) or subsidiaries of such banks (or bank holding companies) and non-bank broker-dealers listed on the Federal Reserve Bank of New York's list of primary and other reporting dealers ("Repo Counterparties"), which Repo Counterparties have capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign equivalent thereof) and which Repo Counterparties or their parents (if the Repo Counterparties are not rated) will at the time of the transaction be rated "A-1" by S&P (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization, (f) commercial paper rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either case maturing within one (1) year after the day of acquisition, (g) short-term marketable securities of comparable credit quality, (h) shares of money market mutual or similar funds which invest at least 95% in assets satisfying the requirements of clauses (a) through (g) of this definition, and

(i) in the case of a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Change of Control":  with respect to the Borrower, the acquisition, after the Closing Date, by any other Person, or two or more other Persons acting in concert other than the Permitted Holders, the Lenders or any Affiliate of the Lenders, of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act of outstanding shares of voting stock of the Borrower at any time if after giving effect to such acquisition such Person or Persons owns twenty percent (20%) or more of such outstanding voting stock.

"Closing Date":  June 3, 2009.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property and assets of the Loan Parties of every kind or type whatsoever, including tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located, all property of the estates of each Debtor within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law except avoidance actions against the Prepetition Senior Facilities Secured Parties (as defined in the Final Order)), all property pledged to secure the Obligations under each Collateral Document (other than the Orders) and all proceeds, rents and products of the foregoing other than Excluded Collateral.  For the avoidance of doubt, the proceeds of the Tranche C Term Loans constitute Collateral.

"Collateral Documents":  means, collectively, the Orders, the Guaranty, the Equity Pledge Agreement, each Mortgage, collateral assignment, security agreement, pledge agreement or similar agreements delivered to the Lenders to secure the Obligations.  The Collateral Documents (other than the Orders) shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"Committee":  any statutory committee appointed in the Cases.

"Compensation Regulations":  as defined in Section 5.16(i).

"Compliance Certificate":  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit F, for the immediately prior calendar month and on a cumulative basis from the Petition Date.

"Consolidated":  the consolidation of accounts in accordance with GAAP.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control":  as defined in the definition of "Affiliate".

"Controlled Affiliate":  as defined in Section 3.18(a).

"Convention": as defined in Section 2.12(d).

"Debtor": each of the Initial Debtors and, subject to the written consent of the Required Lenders, each other Subsidiary of the Initial Debtors to the extent that (i) such Subsidiary files with the Bankruptcy Court, (ii) such case is joined with the Cases and (iii) such Subsidiary is subject, by order of the Bankruptcy Court, to the previously issued orders relating to the Cases (including the Orders).

"Default": any event, that with the giving of notice, the lapse of time, or both, would become an Event of Default.

"DIP Liens": the Liens described in Sections 3.24(b) and 3.24(c).

"Disposition": with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollar Equivalent": on any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to an amount denominated in any other currency, the equivalent in Dollars of such amount as determined by the Treasury in accordance with normal banking industry practice using the Exchange Rate on the date of determination of such equivalent. In making any determination of the Dollar Equivalent, the Treasury shall use the relevant Exchange Rate in effect on the date on which a Dollar Equivalent is required to be determined pursuant to the provisions of this Agreement. As appropriate, amounts specified herein as amounts in Dollars shall include any relevant Dollar Equivalent amount.

"Dollars" and "$": the lawful money of the United States.

"Domestic Subsidiary": any Subsidiary that is organized or existing under the laws of the United States or Canada or any state, province, commonwealth or territory of the United States or Canada.

"EAWA": the Employ American Workers Act (Section 1611 of Division A, Title XVI of the American Recovery and Reinvestment Act of 2009), Public Law No. 111-5, effective as of February 17, 2009, as may be amended and in effect from time to time.

"EESA": the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7000 *et al.* of Division A, Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time.

"Effective Date": the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied which date shall not be later than the date on which the Related Section 363 Sale Transactions are consummated.

"EISA": the Energy Independence and Security Act of 2007, Public Law No. 110-140, effective as of January 1, 2009, as may be amended and in effect from time to time.

"Embargoed Person": as defined in Section 3.19.

"Environmental Indemnity Agreement": the Amended and Restated Environmental Indemnity Agreement dated as of the date hereof, executed by the Loan Parties for the benefit of the Lenders, substantially in the form of Exhibit I.

"Environmental Laws": any and all foreign, Federal, state, provincial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health, the environment or natural resources, as now or may at any time hereafter be in effect.

"Environmental Permits": any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"Equity Pledge Agreement": the Amended and Restated Equity Pledge Agreement dated as of the date hereof, made by each Pledgor in favor of the Lenders, substantially in the form of Exhibit L.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System; provided that the Eurocurrency Reserve Requirements shall be $0 with respect to the Canadian Lender.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on page LIBOR01 of the Reuters screen as of 11:00 a.m. (London time) two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on such page of the Reuters screen (or otherwise on such screen), the Eurodollar Base Rate shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Treasury or, in the absence of such availability, by reference to the rate at which a reference institution selected by the Treasury is offered Dollar deposits at or about 11:00 a.m. (New York City time) two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided that, in no event shall the Eurodollar Rate be less than 2.00%.

"Eurodollar Tranche": the collective reference to Eurodollar Loans the then-current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": as defined in Section 7.

"Exchange Act": the Securities and Exchange Act of 1934, as amended.

"Exchange Rate": for any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into Dollars, as set forth at 11:00 a.m. (New York time) on such day on the applicable Bloomberg currency page with respect to such currency. In the event that such rate does not appear on the applicable Bloomberg currency page, the Exchange Rate with respect to such currency shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Treasury and the Borrower or, in the absence of such agreement, such Exchange Rate shall instead be the spot rate of exchange of a reference institution selected by the Treasury in the London Interbank market or other market where such reference institution's foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. (New York time) on such day for the purchase of Dollars with such currency, for delivery two Business Days later; provided, however, that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Treasury may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Collateral": as defined in Section 3.28.

"Excluded Subsidiary": (i) any JV Subsidiary in which any Loan Party owns less than 80% of the voting or economic interest, (ii) any U.S. Subsidiary of the Borrower listed as one of the "Domestic Entities" on Annex 1 to Schedule 3.28 other than the Loan Parties listed therein, (iii) any Subsidiary of the Borrower existing on the Closing Date that the Borrower does not Control as of the Closing Date (including, without limitation, dealerships wholly owned by the Borrower that are operated by a third party pursuant to an agreement in effect on the Petition Date), (iv) [intentionally omitted] and (v) any Subsidiary set forth on Schedule 1.1G as such Schedule 1.1G may be amended from time to time with the consent of the Required Lenders.

"Executive Order": as defined in Section 3.19.

"Existing Agreements": the agreements of the Loan Parties and their Subsidiaries in effect on the Closing Date and any extensions, renewals and replacements thereof so long as

any such extension, renewal and replacement could not reasonably be expected to have a material adverse effect on the rights and remedies of the Lenders under any of the Loan Documents.

"Existing Credit Agreement": as defined in the recitals.

"Existing UST Term Loan Agreement": the Loan and Security Agreement, dated as of December 31, 2008, between the Borrower and the Treasury.

"Expense Policy": the Borrower's comprehensive written policy on corporate expenses maintained and implemented in accordance with Section 3.14.

~~"Extraordinary Receipts": any (i) insurance proceeds (other than the proceeds of self-insurance) that are not the proceeds of a Recovery Event, (ii) downward purchase price adjustments, (iii) tax refunds (other than tax refunds received by Canadian Subsidiaries), judgments and litigation settlements, pension plan reversions and indemnity payments, and (iv) similar receipts outside of the ordinary course of business.~~

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it.

"Final Order": one or more orders of the Bankruptcy Court approving the terms and conditions of the Loan Documents substantially in the form of the Interim Order, unless provided in this Agreement or as otherwise agreed to by the Required Lenders.

"Foreign Assets Control Regulations": as defined in Section 3.19.

"Foreign Geographic Region": any of (i) the Asia Pacific region, (ii) the Latin America, Africa and Middle East region, and (iii) the European region.

"Foreign 956 Subsidiary": any Non-U.S. Subsidiary of the Borrower that is a "controlled foreign corporation" as defined in Code Section 957.

"Foreign Subsidiary": any Subsidiary that is not a Domestic Subsidiary.

"Funding Office": the office of each Lender specified in Schedule 1.1A or such other office as may be specified from time to time by such Lender as its funding office by written notice to the Borrower.

"GAAP": generally accepted accounting principles as in effect from time to time in the United States.

"<u>Governmental Authority</u>":  any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, or any federal, state or municipal court, in each case whether of the United States or a foreign jurisdiction.

"<u>Group Members</u>":  the collective reference to the Borrower and its Subsidiaries.

"<u>Guarantee Obligation</u>":  as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), <u>provided</u> that the term "Guarantee Obligation" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, to the extent required by the Lenders.  The amount of any Guarantee Obligation of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.  The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"<u>Guarantor</u>":  each Person listed on <u>Schedule 1.1B</u> and each other Person that becomes an Additional Guarantor.

"<u>Guaranty</u>":  the Amended and Restated Guaranty and Security Agreement dated as of the date hereof, executed and delivered by the Borrower and each Guarantor, substantially in the form of Exhibit A.

"<u>Indebtedness</u>":  for any Person:  (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services; (c) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (g) and (i) of this definition secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (h) and (i) of this definition guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner unless the terms of such indebtedness expressly provide that such Person is not liable therefor; (j) the liquidation value of all redeemable preferred Capital Stock of such Person; and (k) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"<u>Indemnified Liabilities</u>":  as defined in Section 8.5.

"Indemnitee":  as defined in Section 8.5.

"Initial Case":  as defined in the recitals.

"Initial Debtors":  as defined in the recitals.

"Interest Payment Date":  (a) as to any ABR Loan, the first day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan, the last day of such Interest Period, and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period":  as to any Eurodollar Loan, (i) initially, the period commencing on the Borrowing Date (as defined in the Existing Credit Agreement) with respect to such Loan and ending three months thereafter; and (ii) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending three months thereafter; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

   (A)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

   (B)    any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date; and

   (C)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interim Order":  the Interim Order entered June 2, 2009 by the Bankruptcy Court pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) approving this Agreement and authorizing the Loan Parties to obtain Postpetition financing pursuant thereto, (b) granting related Liens and Superpriority Claims, (c) granting adequate protection to certain Prepetition secured parties, and (d) scheduling a final hearing.

"Investments":  as defined in Section 6.10.

"JV Agreement":  each partnership or limited liability company agreement (or similar agreement) between a North American Group Member or one of its Subsidiaries and the relevant JV Partner as the same may be amended, restated, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"JV Partner":  each Person party to a JV Agreement that is not a Loan Party or one of its Subsidiaries.

"JV Subsidiary":  any Subsidiary of a Group Member which is not a Wholly Owned Subsidiary and as to which the business and management thereof is jointly controlled by the holders of the Capital Stock therein pursuant to customary joint venture arrangements.

"Lenders":  as defined in the preamble hereto.

"Lien":  any mortgage, pledge, security interest, lien or other charge or encumbrance (in the nature of a security interest), including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"Loans":  as defined in Section 2.1.

"Loan Documents":  this Agreement, the Notes, the Environmental Indemnity Agreement, the Collateral Documents and each post-closing letter or agreement now and hereafter entered into among the parties hereto.

"Loan Parties":  the Borrower, each Guarantor and the Pledgors.

"Master Transaction Agreement":  that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, among New CarCo and the sellers party thereto.

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries (taken as a whole), (b) the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any of the Loan Documents to which they are a party, (c) the validity or enforceability in any material respect of any of the Loan Documents to which the Loan Parties are a party, (d) the rights and remedies of the Lenders under any of the Loan Documents, or (e) the Collateral (taken as a whole); provided that, (w) the taking of any action by the Borrower and its Subsidiaries, including the cessation of production, pursuant to and in accordance with the Wind-Down Budget, (x) the filing of the Cases, and (y) any sale pursuant to any Related Section 363 Sale Transactions or any other action taken pursuant to the Orders, shall be taken into consideration.

"Material Environmental Amount":  $50,000,000.

"Maturity Date":  the date on which the earliest to occur of (such earliest date, which may be extended by the Lenders in their sole discretion in accordance with Section 8.1): (a) the date on which all Claims against the Debtors have been resolved such that there are no remaining disputed Claims, all assets of the Debtors (other than remaining cash) have been liquidated, all distributions on account of allowed Claims have been made, and all other actions that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been completed; (b) the acceleration of any Loans in accordance with the terms of this Agreement; (c) the date of the dissolution of the Borrower; and (d) December 30, 2011.  On the Maturity Date occurring pursuant to clause (a), the plan administrator or other individual or entity charged with administering the liquidation plan shall be entitled to retain a de minimis amount of funds to complete the dissolution of the last remaining Debtor.

"Moody's":  Moody's Investors Service, Inc. and its successors.

"Mortgage":  each of the mortgages and deeds of trust made by the Borrower or any Guarantor in favor of, or for the benefit of, the Lenders, substantially in the form of Exhibit J, taking into consideration the law and jurisdiction in which such mortgage or deed of trust is to be recorded or filed, to the extent applicable.

"Mortgaged Property":  each property listed on Schedule 1.1C, as to which the Lenders shall be granted a Lien pursuant to the Orders or the Mortgages.

"Net Cash Proceeds":  with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid or contractually committed to be paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than the Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable, including under any tax sharing arrangements) and, with respect to amounts that will be expatriated as a result of any event attributable to a Non-U.S. Subsidiary, the amount of any taxes that will be payable by any Group Member as a result of the expatriation, and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (as determined reasonably and in good faith by a Responsible Officer); provided that Net Cash Proceeds for any Recovery Event shall exclude any amounts required to be paid to New CarCo pursuant to the terms of the Transaction Documents, to the extent such proceeds are actually paid to New CarCo within the time period set forth for such prepayments in Section 2.5(b).

"New CarCo":  NGMCO, Inc.

"New CarCo Assignment and Assumption":  as defined in the recitals.

"New GM Entities":  New CarCo and its subsidiaries.

"New GM Equity Interests":  any stock, warrants, options or other equity interests issued to or held by any Debtor pursuant to the Related Section 363 Sale Transactions.

"Non-Debtor":  each Subsidiary of the Borrower that is not a Debtor.

"Non-Excluded Taxes":  as defined in Section 2.12(a).

"Non-U.S. Lender":  as defined in Section 2.12(d).

"Non-U.S. Subsidiary":  any Subsidiary of any Loan Party that is not a U.S. Subsidiary.

"North American Group Members":  collectively, the Loan Parties and each Domestic Subsidiary that is not an Excluded Subsidiary.

"Notes":  as defined in Section 4.1(a)(vi) and any promissory notes issued in connection with an assignment contemplated by Section 2.3(b).

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Loan Party to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to any Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise.

"OFAC":  the Office of Foreign Assets Control of the Treasury.

"Orders":  the Interim Order and the Final Order.

"Other Foreign 956 Subsidiary":  any Non-U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Other Taxes":  any and all present or future stamp or documentary taxes and any other excise or property taxes, intangible or mortgage recording taxes, charges or similar levies imposed by the United States or any taxing authority thereof or therein arising from any payment made, or from the execution, delivery or enforcement of, or otherwise with respect to this Agreement or any other Loan Document.

"Outstanding Amount":  as of any date of determination (a) with respect to Indebtedness, the aggregate outstanding principal amount thereof, (b) with respect to banker's acceptances, letters of credit or letters of guarantee, the aggregate undrawn, unexpired face amount thereof plus the aggregate unreimbursed drawn amount thereof, (c) with respect to hedging obligations, the aggregate amount recorded by the Borrower or any Subsidiary as its net termination liability thereunder calculated in accordance with the Borrower's customary accounting procedures, (d) with respect to cash management obligations or guarantees, the aggregate maximum amount thereof (i) that the relevant cash management provider is entitled to assert as such as agreed from time to time by the Borrower or any Subsidiary and such provider or (ii) the principal amount of the Indebtedness being guaranteed or, if less, the maximum amount of such guarantee set forth in the relevant guarantee and (e) with respect to any other obligations, the aggregate outstanding amount thereof.

"Participant": as defined in Section 8.6(c).

"Permitted Holders":  any holder of any Capital Stock of the Borrower as of the Closing Date.

"Permitted Indebtedness":

(a)    Indebtedness created under any Loan Document;

(b)    [intentionally omitted];

(c)    trade payables, if any, in the ordinary course of its business;

(d)    Indebtedness existing on the Petition Date and any refinancings, refundings, renewals or extensions thereof (without any increase, or any shortening of the maturity, of any principal amount thereof);

(e)    intercompany Indebtedness of a North American Group Member in the ordinary course of business; provided that, the right to receive any repayment of such Indebtedness (other than Indebtedness meeting the criteria of clause (d) above, or any extensions, renewals, exchanges or replacements thereof) shall be subordinated to the Lenders' rights to receive repayment of the Obligations;

(f)    [intentionally omitted];

(g)    [intentionally omitted];

(h)    Swap Agreements permitted pursuant to Section 6.15 that are not entered into for speculative purposes;

(i)    Indebtedness with respect to (x) letters of credit, bankers' acceptances and similar instruments issued in the ordinary course of business, including letters of credit, bankers' acceptances and similar instruments in respect of the financing of insurance premiums, customs, stay, performance, bid, surety or appeal bonds and similar obligations, completion guaranties, "take or pay" obligations in supply agreements, reimbursement obligations regarding workers' compensation claims, indemnification, adjustment of purchase price and similar obligations incurred in connection with the acquisition or disposition of any business or assets, and sales contracts, coverage of long-term counterparty risk in respect of insurance companies, purchasing and supply agreements, rental deposits, judicial appeals and service contracts and (y) appeal, bid, performance, surety, customs or similar bonds issued for the account of any Loan Party in the ordinary course of business;

(j)    Indebtedness incurred in the ordinary course of business in connection with cash management and deposit accounts and operations, netting services, employee credit card programs and similar arrangements and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument

drawn against insufficient funds in the ordinary course of business, <u>provided</u> that such Indebtedness is extinguished within five Business Days of its incurrence;

(k)    any guarantee by any Loan Party of Permitted Indebtedness; and

(l)    Indebtedness entered into under Section 136 of EISA.

"<u>Permitted Investments</u>":

(a)    any Investment in Cash Equivalents;

(b)    any Investment by a Loan Party in the Borrower, another Loan Party, or a Pledged Entity that is a Domestic Subsidiary;

(c)    [intentionally omitted];

(d)    any Investment (i) existing on the Closing Date, or (ii) consisting of any extension, modification or renewal of any Investment existing on the Closing Date; <u>provided</u> that the amount of any such Investment is not increased through such extension, modification or renewal;

(e)    [intentionally omitted];

(f)    [intentionally omitted];

(g)    [intentionally omitted];

(h)    any Investment otherwise permitted under this Agreement;

(i)    ~~Investments in Indebtedness of, or Investments guaranteed by, Governmental Authorities, in connection with industrial revenue, municipal, pollution control, development or other bonds or similar financing arrangements;~~<u>[intentionally omitted]</u>;

(j)    ~~any capped call, ratio capped call or other similar derivative transaction entered into by a Loan Party on or before the Closing Date;~~<u>[intentionally omitted]</u>;

(k)    Trade Credit;

(l)    [intentionally omitted];

(m)    Investments (i) received in satisfaction or partial satisfaction of delinquent accounts and disputes with customers or suppliers in the ordinary course of business, or (ii) acquired as a result of foreclosure of a Lien securing an Investment or the transfer of the assets subject to such Lien in lieu of foreclosure;

(n)    commercial transactions in the ordinary course of business with the Borrower or any of its Subsidiaries to the extent such transactions would constitute an Investment; and

(o)    conveyance of Collateral in an arm's-length transaction to a Subsidiary that is not a Loan Party or an Affiliate of the Borrower for non-cash consideration consisting of Trade Credit or other Property to become Collateral having a fair market value equal to or greater than the fair market value of the conveyed Collateral.

"Permitted Liens":  with respect to any Property of any North American Group Member:

(a)    Liens created under the Loan Documents;

(b)    Liens on Property of a North American Group Member existing on the date hereof (including Liens on Property of a North American Group Member pursuant to Existing Agreements; provided that such Liens shall secure only those obligations and any permitted refinancing that they secure on the date hereof);

(c)    [intentionally omitted];

(d)    Liens for taxes and utility charges not yet due or that are being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided;

(e)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or that are being contested in compliance with Section 5.8;

(f)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the proceeds thereof;

(g)    Liens securing Swap Agreements permitted pursuant to Section 6.15;

(h)    Liens created in the ordinary course of business in favor of banks and other financial institutions over balances of any accounts held at such banks or financial institutions or over investment property held in a securities account, as the case may be, to facilitate the operation of cash pooling, cash management or interest set-off arrangements;

(i)    customary Liens in favor of trustees and escrow agents, and netting and set-off rights, banker's liens and the like in favor of counterparties to financial obligations and instruments, including, without limitation, Swap Agreements permitted pursuant to Section 6.15;

(j)    Liens securing Indebtedness incurred under Section 136 of EISA;

(k)    pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment or other insurance and other social security laws or regulations;

(l)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety, customs and appeal bonds, performance bonds and other obligations of a like nature, or to secure the payment of import or customs duties, in each case incurred in the ordinary course of business;

(m)    zoning and environmental restrictions, easements, rights-of-way, restrictions on use of real property or groundwater, institutional controls and other similar encumbrances or deed restrictions incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any North American Group Member;

(n)    [intentionally omitted];

(o)    judgment Liens securing judgments;

(p)    any Lien consisting of rights reserved to or vested in any Governmental Authority by statutory provision, not securing Indebtedness;

(q)    Liens securing Indebtedness described in clauses (d) and (e) of the definition of Permitted Indebtedness;

(r)    pledges or deposits made to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (k) or (l) of this definition;

(s)    [intentionally omitted];

(t)    [intentionally omitted]; and

(u)    other Liens created or assumed in the ordinary course of business of the North American Group Member; provided that the obligations secured by all such Liens shall not exceed the principal amount of $10,000,000.

"Person":    any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Petition Date":  as defined in the recitals hereto.

"Pledged Entity":  a Subsidiary of a Loan Party whose Capital Stock is subject to a security interest in favor of the Lenders pursuant to the Orders or the Collateral Documents.

"Pledgors":  the parties set forth on Schedule 1.1D and each other Person that makes a pledge in favor of the Lenders under the Equity Pledge Agreement.

"Postpetition": when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"Prepetition": when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that arose or was instituted, or another matter that occurred, prior to the Petition Date.

"Prepetition Payment": a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or trade payables or other Prepetition claims against any Debtor.

"Prime Rate": the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to borrowers).

"Prohibited Jurisdiction": any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person": any Person:

(a)    subject to the provisions of the Executive Order;

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is subject to the provisions of the Executive Order;

(c)    with whom a Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.goofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate or affiliated with a Person listed above.

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Quarterly Report": as defined in Section 5.1(f).

"Records":  all books, instruments, agreements, customer lists, credit files, computer files, storage media, tapes, disks, cards, software, data, computer programs, printouts and other computer materials and records generated by other media for the storage of information maintained by any Person with respect to the business and operations of the Loan Parties and the Collateral.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim (other than the proceeds of any self-insurance) or any condemnation proceeding relating to any asset of any Group Member.

"Register":  as defined in Section 8.6(b).

"Regulation D":  Regulation D of the Board as in effect from time to time.

"Related Section 363 Sale Transactions":  as defined in the recitals.

"Reorganization Plan":  a plan of reorganization in any of the Cases of the Debtors.

"Required Lenders":  at any time, Lenders with Loans constituting a majority of the Loans of all Lenders.

"Requirements of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court of competent jurisdiction or other Governmental Authority, in each case applicable to and binding upon such Person and any of its property, and to which such Person and any of its property is subject.

"Responsible Officer":  as to any Person, the chief executive officer or, with respect to financial matters (including without limitation those matters set forth in Sections 5.1(f) and 5.2(h)), the chief financial officer, treasurer or assistant treasurer of such Person, an individual so designated from time to time by such Person's board of directors or, for the purposes of Section 5.2 only (other than Sections 5.1(f) and 5.2(h)), to include the secretary or an assistant secretary of the Borrower, or, in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer shall mean any officer authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution (or equivalent); provided that the Lenders are notified in writing of the identity of such Responsible Officer.

"Restricted Payments":  as defined in Section 6.5.

"S&P":  Standard & Poor's Ratings Services and its successors.

"Sale/Leaseback Transaction":  as defined in Section 6.17.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"<u>Section 363 Sale Order</u>":  an order of the Bankruptcy Court approving the Related Section 363 Sale Transactions in form and substance substantially in the form attached to the Transaction Documents or otherwise satisfactory to the Required Lenders.

"<u>Senior Employee</u>":  with respect to the Loan Parties collectively, any of the 25 most highly compensated employees (including the SEOs).

"<u>SEO</u>":  a Senior Executive Officer as defined in the EESA and any interpretation of such term by the Treasury thereunder, including the rules set forth in 31 C.F.R. Part 30.

"<u>Special Inspector General of the Troubled Asset Relief Program</u>":  The Special Inspector General of the Troubled Asset Relief Program, as contemplated by Section 121 of the EESA.

"<u>Specified Benefit Plan</u>":  any employee benefit plan within the meaning of section 3(3) of ERISA and any other plan, arrangement or agreement which provides for compensation, benefits, fringe benefits or other remuneration to any employee, former employee, individual independent contractor or director, including any bonus, incentive, supplemental retirement plan, golden parachute, employment, individual consulting, change of control, bonus or retention agreement, whether provided directly or indirectly by any Group Member or otherwise.

"<u>Subsidiary</u>":  with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or shall have the right to have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.  Unless otherwise qualified, all references to a "Subsidiary" or "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"<u>Superpriority Claim</u>":  a claim against the Borrower or any other Debtor in any of the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses including administrative expenses specified in sections 503 and 507 of the Bankruptcy Code, whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"<u>Swap Agreement</u>":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former

directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement."

"Taxes": as defined in Section 2.12(a).

"Trade Credit": accounts receivable, trade credit or other advances extended to, or investment made in, customers, suppliers, including intercompany, in the ordinary course of business.

"Trading With the Enemy Act": as defined in Section 3.19.

"Tranche B Term Loan": as defined in the recitals.

"Tranche C Term Loan": as defined in the recitals.

"Transaction Documents": each of, and collectively, (i) the Master Transaction Agreement, (ii) the Section 363 Sale Order, (iii) the Transition Services Agreement and (iv) the related manufacturing agreements, asset purchase agreements, organizational documents, finance support agreements and all other related documentation, each as amended, supplemented or modified from time to time in accordance with Section 6.6.

"Transferee": any Assignee or Participant.

"Transition Services Agreement": the Transition Services Agreement, dated as of the date hereof, among the Borrower, the other Initial Debtors, and New CarCo, substantially in the form of Exhibit T to the Master Transaction Agreement.

"Treasury": The United States Department of the Treasury.

"Uniform Commercial Code": the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States": the United States of America.

"USA PATRIOT Act": as defined in Section 3.18(d).

"U.S. Subsidiary": any Subsidiary of any Loan Party that is organized or existing under the laws of the United States or any state thereof or the District of Columbia.

"Warrant": the Warrant to Purchase Common Stock, dated as of December 31, 2008, issued by the Borrower in favor of the Treasury pursuant to the Warrant Agreement.

"Warrant Agreement": the Warrant Agreement, dated as December 31, 2008, by and between the Borrower and the Treasury.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wind-Down": the sale or shutdown of certain businesses and properties of the Debtors and the Subsidiaries thereof.

"Wind-Down Budget": the budget, attached as Annex I hereto, setting forth in reasonable detail all anticipated receipts and disbursements of the Borrower and certain of its U.S. Subsidiaries on a calendar [year] basis from the Effective Date through and including [December 30, 2011];2011, as amended by each Quarterly Report delivered pursuant to Section 5.1(f).

1.2.    Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to Group Members not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time and (vi) references to any Person shall include its successors and assigns.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole (including the Schedules and Exhibits hereto) and not to any particular provision of this Agreement (or the Schedules and Exhibits hereto), and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3.    Conversion of Foreign Currencies. (a) For purposes of this Agreement and the other Loan Documents, with respect to any monetary amounts in a currency other than Dollars, the Dollar Equivalent thereof shall be determined based on the Exchange Rate in effect at the time of such determination (unless otherwise explicitly provided herein).

(b)    The Treasury may set up appropriate rounding off mechanisms or otherwise round-off amounts hereunder to the nearest higher or lower amount in whole Dollar or cent to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in whole cents, as may be necessary or appropriate.

## SECTION 2

## AMOUNT AND TERMS OF THE LOANS

2.1.    <u>Loans</u>.  On the Effective Date, the Lenders made the Tranche C Term Loans in Dollars to the Borrower in the aggregate amount of $[950,000,000] (the "<u>Loans</u>").  The Loans shall be non-recourse to the Borrower and recourse only to the Collateral.  <u>Nothing in this Agreement shall in any way be construed to authorize or permit the Lenders to seek recourse against any of the New GM Equity Interests at any time.</u>  The Loans may from time to time be Eurodollar Loans or, solely in the circumstances specified in Section 2.8, ABR Loans.  Loans repaid or prepaid may not be reborrowed.

2.2.    [Intentionally Omitted].

2.3.    <u>Repayment of Loans; Evidence of Debt</u>.  (a)  ~~The Loans~~<u>To the extent that any cash and Cash Equivalents remain after the consummation of the Wind-Down, such excess amount</u> shall be repayable on the Maturity Date~~.~~<u> in accordance with Section 2.5(c).</u>

(b)    Pursuant to Section 4.1(a), the Borrower shall execute and deliver the Notes on the Effective Date.  Following any assignment of the Loans pursuant to Section 8.6, the Borrower agrees that, upon the request of any Lender, the Borrower shall promptly execute and deliver to such Lender Notes reflecting the Loans assigned and the Loans retained by such Lender, if any.

2.4.    <u>Optional Prepayments</u>.  The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to each Lender and the Committee no later than 12:00 noon (New York City time) three Business Days prior to the date such prepayment is requested to be made, which notice shall specify the date of such prepayment, the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such payment; <u>provided</u> that, if a Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.10.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid and shall be applied as provided in Section 2.5(c).  Partial prepayments of Loans shall be in an aggregate principal amount of $20,000,000 or a whole multiple thereof or, if less, the entire principal amount thereof then outstanding.

2.5.    <u>Mandatory Prepayments</u>.    (a)    Unless the Required Lenders shall otherwise agree, if any Indebtedness is incurred or issued, except for Indebtedness permitted by Section 6.9, as the same may be amended, restated, supplemented or modified from time to time hereafter in accordance with the terms and conditions of this Agreement and the other Loan Documents, by any Group Member, then promptly upon such incurrence or issuance, as the case may be (and in any case not more than three (3) Business Days thereafter), the Loans shall be prepaid by an amount equal to the amount of the Net Cash Proceeds of such incurrence or issuance, as set forth in Section 2.5(c); <u>provided</u> that no prepayment shall be required under this Section 2.5(a) if the Indebtedness was incurred or issued by a Foreign Subsidiary for the purpose of funding operations in the jurisdiction where such Foreign Subsidiary is organized or within

the same Foreign Geographic Region as the jurisdiction of organization of such Foreign Subsidiary. With respect to any Indebtedness incurred or issued by a Non-U.S. Subsidiary, the aggregate amount of the Net Cash Proceeds thereof required to be applied pursuant to Section 2.5(c) to the prepayment of the Loans shall be subject to reduction to the extent that expatriation of such Net Cash Proceeds (1) would result in material adverse tax or legal consequences (including, without limitation, violation of contractual liabilities), (2) would be reasonably likely to result in adverse personal liability of any director of any Group Member, or (3) would result in the insolvency of the applicable Foreign Subsidiary. The provisions of this Section do not constitute a consent to the incurrence of any Indebtedness by any Group Member.

(b)    Unless the Required Lenders shall otherwise agree, if on any date any Group Member shall receive Net Cash Proceeds from any Asset Sale~~; or~~ Recovery Event ~~or Extraordinary Receipt~~, promptly upon receipt by such Group Member of such Net Cash Proceeds (and in any case not more than three (3) Business Days thereafter), the Loans shall be prepaid by an amount equal to the amount of such Net Cash Proceeds, as set forth in Section 2.5(c). With respect to any Net Cash Proceeds realized or received by a Non-U.S. Subsidiary in connection with any Asset Sale~~; or~~ Recovery Event ~~or Extraordinary Receipt~~, the aggregate amount of such Net Cash Proceeds required to be applied pursuant to Section 2.5(c) to the prepayment of the Loans shall be subject to reduction to the extent that expatriation of such Net Cash Proceeds (1) would result in material adverse tax or legal consequences (including, without limitation, violation of contractual liabilities), (2) would be reasonably likely to result in adverse personal liability of any director of any Group Member, or (3) would result in the insolvency of the applicable Foreign Subsidiary. The provisions of this Section 2.5 do not constitute a consent to the consummation of any Disposition not permitted by Section 6.12.

(c)    Unless the Required Lenders shall otherwise agree, amounts to be applied in connection with prepayments made pursuant to Section 2.4 and this Section 2.5 shall be applied, (i) first, to pay accrued and unpaid interest on, and expenses in respect of, the Loans, and (ii) second, to repay the Loans. Any such prepayment shall be accompanied by a notice to each Lender specifying the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such prepayment.

(d)    ~~The Borrower shall apply any cash and Cash Equivalents remaining after the consummation of the Wind-Down to the prepayment of the Loans in accordance with Section 2.5(c).~~

2.6.    Interest Rates and Payment Dates/Fee Payment Dates/Fees. (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    When any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such continuations, no Eurodollar Loan may be continued as such.

(d)    (i) At any time any Event of Default shall have occurred and be continuing, (i) all outstanding Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.6 plus 5% per annum, which, in the sole discretion of the Treasury, may be the rate of interest then applicable to ABR Loans, and (ii) all other outstanding Obligations shall bear interest at 5% above the rate per annum equal to the rate of interest then applicable to ABR Loans.

(e)    [Intentionally Omitted].

(f)    Interest shall be payable in arrears on each Interest Payment Date, provided that, (i) interest on the Loans shall not be payable on each Interest Payment Date but shall instead be added to the principal of the Loans on each Interest Payment Date and shall be payable in cash on the Maturity Date, and (ii) interest accruing pursuant to paragraph (d) of this Section 2.6 shall be payable from time to time on demand.

2.7.    Computation of Interest and Fees.  (a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-) day year for the actual days elapsed.  The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Treasury pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Treasury shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Treasury in determining any interest rate pursuant to Section 2.7(a).

2.8.    Inability to Determine Interest Rate; Illegality.  (a)  If prior to the first day of any Interest Period:

(i)    any Lender shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(ii)    any Lender shall have determined that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lender (as conclusively certified by such Lender) of making or maintaining their affected Loans during such Interest Period;

such Lender shall give telecopy or telephonic notice thereof to the Borrower and the other Lenders as soon as practicable thereafter.  If such notice is given pursuant to clause (i) or (ii) of

this Section 2.8(a) in respect of Eurodollar Loans, then (1) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made by the affected Lenders as ABR Loans, and (2) any outstanding Eurodollar Loans of the affected Lender, shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such relevant notice has been withdrawn by such Lender, no further Eurodollar Loans by the affected Lenders shall be made or continued as such, nor shall the Borrower have the right to convert ABR Loans to Eurodollar Loans.

(b)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, such Lender shall give notice thereof to the Borrower describing the relevant provisions of such Requirement of Law, following which, (i) in the case of Eurodollar Loans, (A) the commitment of such Lender hereunder to make Eurodollar Loans and continue such Eurodollar Loans as such and (B) such Lender's outstanding Eurodollar Loans shall be converted automatically on the last day of the then current Interest Periods with respect to such Loans (or within such earlier period as shall be required by law) to ABR Loans.  If any such conversion or prepayment of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.10.

2.9.    Treatment of Borrowings and Payments; Evidence of Debt.
(a)  [Intentionally Omitted].

(b)     Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.  Amounts paid on account of the Loans may not be reborrowed.

(c)     [Intentionally Omitted].

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 3:00 p.m. (New York City time) on the due date thereof to the Lenders at their respective Funding Offices, in Dollars and in immediately available funds.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

2.10.    Indemnity.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of Eurodollar Loans after the

Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the last day of such Interest Period (or, in the case of a failure to borrow the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market. A certificate as to any amounts payable pursuant to this Section 2.10 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error and shall be payable within 30 days of receipt of any such notice. The agreements in this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.11.   Superpriority Nature of Obligations and Lenders' Liens. The priority of Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Final Order entered with respect to the Cases.

2.12.   Taxes. (a) All payments made by the Borrower under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereinafter imposed, levied, collected, withheld or assessed by any Governmental Authority (collectively, "Taxes"), except for any deduction or withholding required by law. If the Borrower is required to withhold any Non-Excluded Taxes from any amounts payable to any Lender (i) the Borrower shall make such deductions and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable laws and (ii) the amounts so payable to such Lender shall be increased to the extent necessary to pay to such Lender such additional amounts as may be necessary so that the Lender receives, free and clear of all such Non-Excluded Taxes, a net amount equal to the amount it would have received from the Borrower under this Agreement or any other Loan Document if no such deduction or withholding had been made. For purposes of this Agreement or any other Loan Document, "Non-Excluded Taxes" are withholding Taxes imposed by the United States or any taxing authority thereof or therein on payments made by the Borrower under this Agreement or any other Loan Document other than (a) withholding Taxes imposed on any Lender as a result of a present or former connection between such Lender and the jurisdiction of the United States or any taxing authority thereof or therein imposing such Tax (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States, (c) any withholding Taxes that exist on the date the Lender becomes a Lender or that arise as a result of a change in status of the Lender as a Governmental Authority which is an agency of the Canadian federal government that is exempt from withholding under the Convention as in effect on the date the

Lender becomes a Lender, and (d) withholding Taxes that could be eliminated or reduced by the Lender providing tax forms, certifications, or other documentation.

(b)    In addition, the Borrower shall pay any Other Taxes over to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof (or if an official receipt is not available, such other evidence of payment as shall be reasonably satisfactory to such Lender). If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes required to be paid by the Borrower when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, in each case after receiving at least five days' advance written notice from the Lender, the Borrower shall indemnify the Lender, as the case may be, for any incremental taxes, Non-Excluded Taxes or Other Taxes, interest, additions to tax, expenses or penalties that may become payable by any Lender, as the case may be, as a result of such failure. The indemnification payments under this Section 2.12(c) shall be made within 30 days after the date such Lender, as the case may be, makes a written demand therefor (together with a reasonably detailed calculation of such amounts).

(d)    Each Lender (or any Transferee) (other than the United States government (including the Treasury)) that either (i) is not incorporated under the laws of the United States, any state thereof, or the District of Columbia or (ii) whose name does not include "Incorporated," "Inc.," "Corporation," "Corp.," "P.C.," "insurance company," or "assurance company" (a "Non-U.S. Lender") shall deliver to the Borrower, so long as such Lender is legally entitled to do so, two originals of either U.S. Internal Revenue Service Form W-9, Form W-8BEN, Form W-8EXP, Form W-8ECI, or in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payment of "portfolio interest", a Form W-8BEN (along with a statement as to certain requirements in order to claim an exemption for "portfolio interest" reasonably acceptable to the Borrower), or Form W-8IMY (with applicable attachments), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming a complete exemption from (or reduced rate of) United States federal withholding tax on all payments by the Borrower under this Agreement or any other Loan Document. In addition, each Lender shall provide any other U.S. tax forms (with applicable attachments) as will reduce or eliminate United States federal withholding tax on payments by the Borrower under this Agreement or any other Loan Document. For the avoidance of doubt, the Canadian Lender shall provide a Form W-8BEN claiming exemption from withholding under the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital (the "Convention") on the Closing Date. Each Lender (other than the United States government (including the Treasury)) shall provide the appropriate documentation under this clause (d) at the following times (i) prior to the first payment date after becoming a party to this Agreement, (ii) upon a change in circumstances or upon a change in law, in each case, requiring or making appropriate a new or additional form, certificate or documentation, (iii) upon or before the expiration, obsolescence or invalidity of any documentation previously provided to the Borrower and (iv) upon reasonable request by the Borrower. If a Lender is entitled to an exemption from

or a reduction of any non-U.S. withholding Tax under the laws of any jurisdiction imposing such Tax on any payments made by the Borrower under this Agreement, then the Lender shall deliver to the Borrower, at the time or times prescribed by Applicable Law and as reasonably requested by the Borrower, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate, provided that the Lender is legally entitled to complete, execute and deliver such documentation and without material adverse consequences to the Lender.

(e)    If any Lender determines, in its sole good faith discretion, that it has received a refund, credit or other tax benefit in respect of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower (but only to the extent of Non-Excluded Taxes or Other Taxes paid by the Borrower plus any interest thereon paid by the relevant Governmental Authority with respect to such refund), net of all out of pocket third-party expenses of the Lender related to claiming such refund or credit, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund) within 30 days of the date of such receipt.    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, upon the request of the Lender, as the case may be, the Borrower agrees to repay any amount paid over to the Borrower by such Lender pursuant to the immediately preceding sentence if such Lender, as the case may be, is required to repay such amount to such Governmental Authority.    This paragraph shall not be construed to (i) interfere with the rights of any Lender to arrange its tax affairs in whatever manner it sees fit, (ii) obligate any Lender to claim any tax refund, (iii) require any Lender to make available its tax returns (or any other information relating to its taxes or any computation with respect thereof which it deems in its sole discretion to be confidential) to the Borrower or any other Person, or (iv) require any Lender to do anything that would in its sole discretion prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(f)    Each Lender that is an Assignee shall be bound by this Section 2.12.

(g)    The agreements contained in this Section 2.12 shall survive the termination of this Agreement or any other Loan Document and the payments contemplated hereunder or thereunder.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to enter into this Agreement, each Loan Party represents to the Lenders, with respect to itself and each of its Subsidiaries that is a North American Group Member, in each case subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases, that as of the Effective Date:

3.1.    Existence.    Each North American Group Member (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good

standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law.

3.2.    [Intentionally Omitted.]

3.3.    [Intentionally Omitted.]

3.4.    [Intentionally Omitted.]

3.5.    Action, Binding Obligations.  (i) Each North American Group Member has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; (ii) the execution, delivery and performance by each North American Group Member of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and (iii) each Loan Document has been duly and validly executed and delivered by each North American Group Member party thereto and constitutes a legal, valid and binding obligation of all of the North American Group Members party thereto, enforceable against such North American Group Members in accordance with its terms, subject to the Bankruptcy Exceptions.

3.6.    Approvals.    Except as required under applicable state and federal bankruptcy rules, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by each North American Group Member of the Loan Documents to which it is a party for the legality, validity or enforceability thereof, except with respect to North American Group Members other than the Debtors for filings and recordings or other actions in respect of the Liens pursuant to the Collateral Documents, unless the same has already been obtained and provided to the Lenders.

3.7.    [Intentionally Omitted.]

3.8.    Investment Company Act.  None of the Loan Parties is required to register as an "investment company", or is a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to any Federal or state statute or regulation which limits its ability to incur Indebtedness.

3.9.    [Intentionally Omitted.]

3.10.   <u>Chief Executive Office; Chief Operating Office</u>.   The chief executive office and the chief operating office on the Closing Date for each North American Group Member is located at the location set forth on <u>Schedule 3.10</u> hereto.

3.11.   <u>Location of Books and Records</u>.   The location where the North American Group Members keep their books and records including all Records relating to their business and operations and the Collateral are located in the locations set forth in <u>Schedule 3.11</u>.

3.12.   [Intentionally Omitted.]

3.13.   [Intentionally Omitted.]

3.14.   <u>Expense Policy</u>.   The Borrower has taken steps necessary to ensure that (a) the Expense Policy conforms to the requirements set forth herein and (b) the Borrower and its Subsidiaries are in compliance with the Expense Policy.

3.15.   <u>Subsidiaries</u>.   All of the Subsidiaries of each Loan Party at the date hereof are listed on <u>Schedule 3.15</u>, which schedule sets forth the name and jurisdiction of formation of each of their Subsidiaries and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party or any of their Subsidiaries except as set forth on <u>Schedule 3.15</u>.

3.16.   <u>Capitalization</u>.   One hundred percent (100%) of the issued and outstanding Capital Stock of each North American Group Member (other than Borrower) is owned by the Persons listed on <u>Schedule 3.16</u> and, to the knowledge of each Loan Party, such Capital Stock are owned by such Persons, free and clear of all Liens other than Permitted Liens.   No Loan Party has issued or granted any options or rights with respect to the issuance of its respective Capital Stock which is presently outstanding except as set forth on <u>Schedule 3.16</u> hereto.

3.17.   <u>Fraudulent Conveyance</u>.   Each North American Group Member acknowledges that it will benefit from the Loans contemplated by this Agreement.   No North American Group Member is incurring Indebtedness or transferring any Collateral with any intent to hinder, delay or defraud any of its creditors.

3.18.   <u>USA PATRIOT Act</u>.   (a)   Each North American Group Member represents and warrants that neither it nor any of its respective Affiliates over which it exercises management control (a "<u>Controlled Affiliate</u>") is a Prohibited Person, and such Controlled Affiliates are in compliance with all applicable orders, rules, regulations and recommendations of OFAC.

(b)   Each North American Group Member represents and warrants that neither it nor any of its members, directors, officers, employees, parents, Subsidiaries or Affiliates:  (1) are subject to U.S. or multilateral economic or trade sanctions currently in force; (2) are owned or controlled by, or act on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. persons may not conduct

business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State.

(c)    None of the Collateral are traded or used, directly or indirectly by a Prohibited Person or organized in a Prohibited Jurisdiction.

(d)    Each North American Group Member has established an anti-money laundering compliance program as required by all applicable anti-money laundering laws and regulations, including without limitation the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA PATRIOT Act") (collectively, the "Anti-Money Laundering Laws").

3.19.    Embargoed Person. As of the date hereof and at all times throughout the term of any Loan, (a) none of any North American Group Member's funds or other assets constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq. (the "Trading With the Enemy Act"), any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or regulations promulgated thereunder or executive order relating thereto (which for the avoidance of doubt shall include but shall not be limited to (i) Executive Order No. 13224, effective as of September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (ii) the USA PATRIOT Act, with the result that the investment in the Borrower (whether directly or indirectly), is prohibited by law or any Loan made by the Lenders is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in it with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loan is in violation of law; (c) none of its funds have been derived from any unlawful activity with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loans is in violation of law; and (d) neither it nor any of its Affiliates (i) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (ii) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person". For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section 3.19, no North American Group Member shall be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

3.20.    Use of Proceeds. (a) The proceeds of the Loans shall be used to finance working capital needs and other general corporate purposes incurred in connection with the Wind-Down, including the payment of expenses associated with the administration of the Cases; provided that, the North American Group Members may not prepay Indebtedness without the prior written consent of the Required Lenders.

(b)    Notwithstanding anything to the contrary herein, none of the proceeds of the Loans shall be used in connection with (i) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, (ii) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, any of their respective affiliates or other Canadian Lender Consortium Member with respect to any loans or other financial accommodations made to any North American Group Member prior to the Petition Date, or (iii) any loans, advances, extensions of credit, dividends or other investments to any person not a North American Group Member except to the extent permitted pursuant to clause (c) of the Permitted Investments definition; provided, however, that the limitations set forth in this Section 3.20(b) shall not preclude the use of the proceeds of the Loans in connection with any claims, causes of action, adversary proceedings or other litigations against any Governmental Authority (excluding the Canadian Lender Consortium Members) with respect to the imposition or administration of any Tax laws.

(c)    The North American Group Members are the ultimate beneficiaries of this Agreement and the proceeds of Loans to be received hereunder.  The use of the Loans will comply with all Applicable Laws, including Anti-Money Laundering Laws.  No portion of any Loan is to be used, for the "purpose of purchasing or carrying" any "margin stock" as such terms are used in Regulations U and X of the Board, as amended, and the Borrower is not engaged in the business of extending credit to others for such purpose.

3.21.    <u>Representations Concerning the Collateral</u>.  Each Loan Party represents and warrants to the Lenders that as of each day that a Loan is outstanding pursuant to this Agreement:

(a)    No Loan Party has assigned, pledged, conveyed, or encumbered any Collateral to any other Person (other than Permitted Liens) and immediately prior to the pledge of any such Collateral, a Loan Party was the sole owner of such Collateral and had good and marketable title thereto, free and clear of all Liens (other than Permitted Liens), and no Person, other than the Lenders has any Lien (other than Permitted Liens) on any Collateral.  No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral which has been signed by any Loan Party or which any Loan Party has authorized any other Person to sign or file or record, is on file or of record with any public office, except such as may have been filed by or on behalf of a Loan Party in favor of the Lenders pursuant to the Loan Documents or in respect of applicable Permitted Liens.

(b)    The provisions of the Loan Documents are effective to create in favor of the Lenders a valid security interest in all right, title, and interest of each Loan Party in, to and under the Collateral, subject only to applicable Permitted Liens.

(c)    Upon the entry and effectiveness of the Orders and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto, the security interests granted in the Collateral pursuant to the Collateral Documents will constitute perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of the applicable Loan Party in, to and under such

Collateral, which can be perfected by filing under the Uniform Commercial Code, in each case, subject to applicable Permitted Liens and as provided in Section 3.24.

(d)    Each Loan Party has and will continue to have the full right, power and authority, to pledge the Collateral, subject to Permitted Liens, and the pledge of the Collateral may be further assigned without any requirement.

3.22.    [Intentionally Omitted].

3.23.    [Intentionally Omitted].

3.24.    Lien Priority.    (a)    On and after the Closing Date, and the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on Schedule 3.21 attached hereto subject to the Permitted Liens, the provisions of the Loan Documents are effective to create in favor of the Lenders, legal, valid and perfected liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Loan Party that owns an interest in such Collateral and any other Person.

(b)    On and after the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on Schedule 3.21 attached hereto, all Obligations owing by the Loan Parties will be secured by:

(i)    valid, perfected, first-priority security interests in and liens (i) with respect to the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is not subject to non avoidable, valid and perfected liens in existence as of the Petition Date (or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to Permitted Liens (other than Liens permitted under clause (a) thereof) and the Carve-Out; and

(ii)    valid, perfected, security, junior interests in and liens pursuant to (i) with respect to the Debtors, section 364(c)(3) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is subject to non avoidable, valid and perfected liens in existence as of the Petition Date, or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out.

(c)    On and after the entry of the Orders and after giving effect thereto, all Obligations owing by the Debtors will be an allowed administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases having priority over all administrative expenses of the kind specified in sections 503 and 507 of the Bankruptcy Code

and any and all expenses and claims of the Borrower and the other Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out.

3.25.    [Intentionally Omitted].

3.26.    [Intentionally Omitted.].

3.27.    [Intentionally Omitted].

3.28.    Excluded Collateral.    Set forth on Schedule 3.28 is a complete and accurate list of all (i) domestic joint ventures and Domestic Subsidiaries that comprise Excluded Collateral and, (ii) all "first tier" foreign joint ventures and Controlled Foreign Subsidiaries that are owned by the Borrower or any of its Domestic Subsidiaries that comprise Excluded Collateral, and (iii) the New GM Equity Interests that comprise Excluded Collateral, and in each case, are described in Schedule 3.28.    All such Property together with the other Property described in Schedule 3.28 shall be excluded from the Collateral (collectively, "Excluded Collateral").

3.29.    [Intentionally Omitted].

3.30.    [Intentionally Omitted].

3.31.    The Final Order.    Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Section 7 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.32.    Wind-Down Budget.    All material facts in the Wind-Down Budget are accurate and the Borrower has disclosed to each Lender all assumptions in the Wind-Down Budget, it being understood that in the case of projections, such projections are based on reasonable estimates, on the date as of which such information is stated or certified.

# SECTION 4

# CONDITIONS PRECEDENT

4.1.    Conditions to Effectiveness.    The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent, satisfaction of such conditions precedent to be determined by the Required Lenders in their reasonable discretion, except as otherwise set forth below:

(a)    Loan Documents.    The Lenders shall have received the following documents, which shall be in form satisfactory to each Lender:

(i)    this Agreement executed and delivered by the Borrower;

(ii)    the Guaranty, executed and delivered by each Guarantor;

(iii)    the Equity Pledge Agreement, executed and delivered by each Pledgor;

(iv)    [intentionally omitted];

(v)    the Environmental Indemnity Agreement, executed and delivered by each Loan Party party thereto; and

(vi)    a promissory note of the Borrower evidencing the Loans of such Lender, substantially in the form of Exhibit G (the "Note"), with appropriate insertions as to date and principal amount.

(b)    Related Section 363 Sale Transactions.  The Lender and its counsel shall be reasonably satisfied that the terms of the Related Section 363 Sale Transactions and of the Transaction Documents are consistent in all material respects with the information provided to the Lender in advance of the date hereof or  are otherwise reasonably satisfactory to the Lender (the Lender acknowledges that the form of Transaction Documents provided to it on or prior to the date hereof are satisfactory).  The Transaction Documents shall have been duly executed and delivered by the parties thereto, all conditions precedent to the Related Section 363 Sale Transactions set forth in the Transaction Documents shall have been satisfied, and the Related Section 363 Sale Transactions shall have been consummated pursuant to such Transaction Documents substantially contemporaneously with the conditions precedent set forth in this Section 4.1, and no provision thereof shall have been waived, amended, supplemented or otherwise modified, in each case in a manner adverse to the Lender, without the Lender's consent.

(c)    Final Order.    (i)    The Final Order shall have been entered by the Bankruptcy Court and shall have been in full force and effect.

(ii)    The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Lenders.

(iii)    The Debtors and their respective Subsidiaries shall be in compliance in all respects with the Final Order.

(iv)    [Intentionally Omitted].

(v)    [Intentionally Omitted].

(d)    New CarCo Assignment and Assumption.  The Borrower and New CarCo shall have executed and delivered the New CarCo Assignment and Assumption, and all conditions precedent to New CarCo's $[7,072,488,605] First Lien Credit Agreement between New CarCo and the Lender shall have been satisfied or waived by the Treasury in accordance with the terms therewith substantially contemporaneously with the conditions precedent set forth in this Section 4.1.

(e)    Canadian Post-Sale Facility.  The Canadian Post-Sale Facility, in form and substance satisfactory to the Canadian Lender, shall have become effective and the Canadian Lender shall have received all documents, instruments and related agreements in connection with the Canadian Post-Sale Facility.

(f)    Canadian PV Note.  The Canadian PV Note, in form and substance satisfactory to the Canadian Lender, shall have become effective and the Canadian Lender shall have received all documents, instruments and related agreements in connection with the Canadian PV Note.

(g)    [Intentionally Omitted].

(h)    [Intentionally Omitted].

(i)    Wind-Down Budget.  The Borrower shall have delivered to the Lenders the Wind-Down Budget in form and substance satisfactory to the Required Lenders.

(j)    [Intentionally Omitted].

(k)    Litigation.  There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Cases) or threatened in any court or before any arbitrator or Governmental Authority that, in the sole discretion of the Required Lenders, materially or adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(l)    [Intentionally Omitted].

(m)    Consents.  The Lenders shall have received all necessary third party and governmental waivers and consents, and each Loan Party shall have complied with all applicable laws, decrees and material agreements.

(n)    No Default.  No Default or Event of Default shall exist on the Effective Date or after giving effect to the transactions contemplated to be consummated on the Effective Date pursuant to the Transaction Documents and the Loan Documents.

(o)    Accuracy of Representations and Warranties.  All representations and warranties made by the North American Group Members in or pursuant to the Loan Documents shall be true and correct in all material respects.

(p)    Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Lenders shall have received (i) a certificate of the secretary or assistant secretary of each Loan Party, dated the Effective Date, substantially in the form of Exhibit B-1, with appropriate insertions and attachments, including the certificate of incorporation (or equivalent organizational document) of each Loan Party, certified by the relevant authority of the jurisdiction of organization of such Loan Party (provided that, to the extent applicable, in lieu of delivering the certificate of incorporation and other organizational documents, such certificate may include a certification that such documents not have been amended, supplemented or otherwise modified since the Closing Date), (ii) bring down good standing certifications for each

Loan Party from its jurisdiction of organization and (iii) a certificate of the Borrower and each Guarantor, dated the Effective Date, to the effect that the conditions set forth in this Section 4.1 have been satisfied, substantially in the form of <u>Exhibit B-2</u>.

(q)    <u>Legal Opinions</u>.    The Lenders shall have received the executed legal opinion of (i) Weil, Gotshal and Manges LLP, New York counsel to the Loan Parties, substantially in the form of Exhibit E-1, as to New York law, United States federal law and the Delaware General Corporation Law, and (ii) in-house counsel to the Loan Parties, substantially in the form of Exhibit E-2.

## SECTION 5

## AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees to, and to cause each of its Subsidiaries that is a North American Group Member to, so long as any Loan is outstanding and until payment in full of all Obligations, in each case subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

5.1.    <u>Financial Statements</u>.    The Borrower shall deliver to the Lenders:

(a)    as soon as reasonably possible after receipt by the subject North American Group Member, a copy of any material report that may be prepared and submitted by such North American Group Member's independent certified public accountants at any time or any other material report with respect to the North American Group Members provided to the Borrower and its Subsidiaries pursuant to the Transition Services Agreement;

(b)    from time to time such other information regarding the financial condition, operations, or business of any North American Group Member as any Lender may reasonably request;

(c)    promptly upon their becoming available, copies of such other financial statements and reports, if any, as any North American Group Member may be required to publicly file with the SEC or any similar or corresponding governmental commission, department or agency substituted therefor, or any similar or corresponding governmental commission, department, board, bureau, or agency, federal or state;

(d)    [intentionally omitted];

(e)    notice of and copies of each Debtors' pleadings filed in the Cases in connection with any material contested matter or adversary proceeding in the Cases (but the foregoing may be satisfied by including each of the Lenders and their counsel in a "core service group," to receive copies of all pleadings under any order establishing notice and service requirements in the Cases), and such additional information with respect to such matters as either of the Lenders may reasonably request, and which notice shall also include sending copies of any pleadings or other documents that the Borrower or other Debtors seek to file under seal to each

of the lenders and their counsel, provided, however, that if (in addition to the confidentiality provisions of this Agreement) additional confidentiality provisions are needed (i.e. if required by third parties), the Lenders and the Borrower shall endeavor to work out reasonable additional confidentiality terms; and

(f)    no later than the twentieth Business Day following the last day of each fiscal quarter, a report (a "Quarterly Report") setting forth in reasonable detail the anticipated receipts and disbursements for the immediately succeeding twelve~~moth~~month period and the aggregate amount of cash and Cash Equivalents as of the last day of the immediately preceding fiscal quarter, in form and substance reasonably satisfactory to the Required Lenders.  Each Quarterly Report shall be accompanied by a certificate of a Responsible Officer certifying that such Quarterly Report was prepared in good faith and are based on reasonable estimates on the date as of which such information is certified.

5.2.    Notices; Reporting Requirements.  The relevant Loan Party shall deliver written notice to the Lenders of the following:

(a)    Defaults.  Promptly after a Responsible Officer or any officer of a North American Group Member with a title of at least executive vice president becomes aware of the occurrence of any Default or Event of Default, or any event of default under any publicly filed material Contractual Obligation of any Group Member;

(b)    Litigation.  Promptly after a Responsible Officer or an attorney in the general counsel's office of a North American Group Member obtains knowledge of any action, suit or proceeding instituted by or against such North American Group Member or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority (i) in which the amount in controversy, in each case, is an amount equal to $25,000,000 or more, (ii) in which injunctive or similar relief is sought, or (iii) which relates to any Loan Document, the relevant Loan Party shall furnish to the Lenders notice of such action, suit or proceeding;

(c)    Material Adverse Effect on Collateral.  Promptly upon any North American Group Member becoming aware of any default or any event or change in circumstances related to any Collateral which, in each case, could reasonably be expected to have a Material Adverse Effect;

(d)    Judgments.  Promptly upon the entry of a judgment or decree against any Loan Party or any of its Subsidiaries in an amount in excess of $15,000,000;

(e)    Environmental Events.  As soon as possible and in any event within seven (7) Business Days of obtaining knowledge thereof:  (i) any development, event, or condition occurring after the date hereof that, individually or in the aggregate with other developments, events or conditions occurring after the date hereof, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, any Group Member;

(f)    <u>Material Adverse Effect</u>.  Any development or event that has had or could reasonably be expected to have a Material Adverse Effect;

(g)    <u>Insurance</u>.  Promptly upon any material change in the insurance coverage required of any Loan Party or any other Person pursuant to any Loan Document, with copy of evidence of same attached;

(h)    <u>Compliance Certificate</u>.   On the tenth Business Day of each calendar month, beginning with the first month to occur after the Effective Date, a Compliance Certificate, executed by a Responsible Officer of the Borrower, stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(i)    [Intentionally Omitted];

(j)    [Intentionally Omitted];

(k)    [Intentionally Omitted];

(l)    <u>Expense Policy</u>.  Within 15 days after the conclusion of each calendar month, beginning with the month in which the Closing Date occurs, the Borrower shall deliver to the Lenders a certification signed by a Responsible Officer of the Borrower and its Subsidiaries that (i) the Expense Policy conforms to the requirements set forth herein; (ii) the Borrower and its Subsidiaries are in compliance with the Expense Policy; and (iii) there have been no material amendments to the Expense Policy or deviations from the Expense Policy other than those that have been disclosed to and approved by the Lenders; <u>provided</u> that the requirement to deliver the certification referenced in this Section 5.2(l) may be qualified as to the best of such Responsible Officer's knowledge after due inquiry and investigation;

(m)    <u>Executive Privileges and Compensation</u>.   The Borrower shall submit a certification on the last day of each month beginning July 2009, certifying that the Borrower has complied with and is in compliance with the provisions set forth in Section 5.16.   Such certification shall be made to the Lenders by an SEO of the Borrower, subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001;

(n)    <u>Organizational Documents</u>.  Subject to Section 6.6, each North American Group Member shall furnish prompt written notice to the Lenders of any material amendment to such entity's organizational documents and copies of such amendments; and

(o)    [Intentionally Omitted].

Each notice required to be provided pursuant to this Section 5.2(a)-(f) shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

5.3.    Existence.  (a)  Preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)    pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all their Postpetition obligations of whatever nature, except (i) where such payment, discharge or satisfaction is prohibited by the Orders, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court or by this Agreement or the Wind-Down Budget, or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be;

(c)    comply with the requirements of all Applicable Laws, rules, regulations and orders of Governmental Authorities if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect on any Loan Party or the Collateral;

(d)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, and maintain adequate accounts and reserves for all taxes (including income taxes), all depreciation, depletion, obsolescence and amortization of its properties, all contingencies, and all other reserves;

(e)    (i) change the location of its chief executive office/chief place of business from that specified in Section 3.10, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains records with respect to the Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction, it shall give the Lenders written notice thereof not later than ten (10) days after such event occurs, and shall deliver to the Lenders all Uniform Commercial Code financing statements and amendments as the Lenders shall request and take all other actions deemed reasonably necessary by the Lenders to continue its perfected status in the Collateral with the same or better priority;

(f)    keep in full force and effect the provisions of its charter documents, certificate of incorporation, by-laws, operating agreements or similar organizational documents; and

(g)    comply (i) in the case of each North American Group Member that is not a Debtor, with all Contractual Obligations in a manner such that a Material Adverse Effect could not reasonably be expected to result and (ii) in the case of each Debtor, with all material Postpetition Contractual Obligations (including the Transition Services Agreement).

5.4.    Payments of Taxes.  Except as prohibited by the Bankruptcy Code, the Borrower will and will cause each Group Member (i) to timely file or cause to be filed all federal and material state and other Tax returns that are required to be filed and all such Tax returns shall be true and correct and (ii) to timely pay and discharge or cause to be paid and discharged promptly all Taxes, assessments and governmental charges or levies arising Postpetition and imposed upon the Borrower or any of the other Group Members or upon any of their respective incomes or receipts or upon any of their respective properties before the same shall become in

default or past due, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might result in the imposition of a Lien or charge upon such properties or any part thereof; provided that it shall not constitute a violation of the provisions of this Section 5.4 if the Borrower or any of the other Group Members shall fail to pay any such Tax, assessment, government charge or levy or claim for labor, materials or supplies which is being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided.

5.5.    Use of Proceeds.    The Loan Parties and their Subsidiaries shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner generally consistent with the Wind-Down Budget.

5.6.    Maintenance of Existence; Payment of Obligations; Compliance with Law.    Subject to the Orders, the Related Section 363 Sale Transactions and the Cases, each Loan Party shall:

(a)    keep all property useful and necessary in its business in good working order and condition; and

(b)    maintain errors and omissions insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing except in the event of self-insurance) and shall not reduce such coverage without the written consent of the Lenders, and shall also maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities. Notwithstanding anything to the contrary in this Section 5.6, to the extent that any North American Group Member is engaged in self-insurance with respect to any of its property as of the Closing Date, such Loan Party may, if consistent with past practices, continue to engage in such self-insurance throughout the term of this Agreement; provided, that the North American Group Members shall promptly obtain third party insurance that conforms to the criteria in this Section 5.6 at the request of the Lenders.

5.7.    Further Identification of Collateral.    Each Loan Party will furnish to the Lenders from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as any Lender may reasonably request, all in reasonable detail.

5.8.    Defense of Title.    Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party warrants and will defend the right, title and interest of the Lenders in and to all Collateral against all adverse claims and demands of all Persons whomsoever, subject to (x) the restrictions imposed by the Existing Agreements to the extent that such restrictions are valid and enforceable under the applicable Uniform Commercial Code and other Requirements of Law and (y) the rights of holders of any Permitted Lien.

5.9.    <u>Preservation of Collateral</u>.    Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party shall do all things necessary to preserve the Collateral so that the Collateral remains subject to a perfected security interest with the priority provided for such security interest under the Loan Documents.    Without limiting the foregoing, each Loan Party will comply with all Applicable Laws, rules and regulations of any Governmental Authority applicable to such Loan Party or relating to the Collateral and will cause the Collateral to comply, with all Applicable Laws, rules and regulations of any such Governmental Authority, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.    No Loan Party will allow any default to occur for which any Loan Party is responsible under any Loan Documents and each Loan Party shall fully perform or cause to be performed when due all of its obligations under the Loan Documents.

5.10.    <u>Maintenance of Papers, Records and Files</u>.

(a)    each North American Group Member will maintain all Records in good and complete condition and preserve them against loss or destruction, all in accordance with industry and customary practices;

(b)    each North American Group Member shall collect and maintain or cause to be collected and maintained all Records relating to its business and operations and the Collateral in accordance with industry custom and practice, including those maintained pursuant to the preceding subsection, and all such Records shall be in the possession of the North American Group Members or reasonably obtainable upon the request of any Lender unless the Lenders otherwise approve; and

(c)    for so long as any Lender has an interest in or Lien on any Collateral, each North American Group Member will hold or cause to be held all related Records in trust for such Lender.    Each North American Group Member shall notify, or cause to be notified, every other party holding any such Records of the interests and Liens granted hereby.

5.11.    <u>Maintenance of Licenses</u>.    Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions and the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, except where the failure to do so could not reasonably be likely to have a Material Adverse Effect, each Loan Party shall (i) maintain all licenses, permits, authorizations or other approvals necessary for such Loan Party to conduct its business and to perform its obligations under the Loan Documents, (ii) remain in good standing under the laws of the jurisdiction of its organization, and in each other jurisdiction where such qualification and good standing are necessary for the successful operation of such Loan Party's business, and (iii) shall conduct its business in accordance with Applicable Law in all material respects.

5.12.    <u>Payment of Obligations</u>.    The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans and each North American Group Member will duly and punctually pay or cause to be paid all fees and other amounts from time to time owing by it hereunder or under the other Loan Documents, all in accordance with the terms of this Agreement and the other Loan Documents. Each North American Group Member will, and will cause each of its Subsidiaries to, pay (i) with respect to each Debtor its Postpetition

obligations; and (ii) with respect to each other Group Member its obligations, in each case including tax liabilities, assessments and governmental charges or levies imposed upon such Person or upon its income and profits or upon any of its property, real, personal or mixed (including without limitation, the Collateral) or upon any part thereof, as well as any other lawful claims which, if unpaid, could reasonably be expected to become a Lien upon such properties or any part thereof, that, if not paid, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the relevant Loan Party, or such Subsidiary, has set aside on its books adequate reserves with respect thereto and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

5.13.   <u>OFAC</u>.  At all times throughout the term of this Agreement, each Loan Party and its Controlled Affiliates (a) shall be in full compliance with all applicable rules, regulations and recommendations of OFAC and (b) shall not permit any Collateral to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person, and no lessee or sublessee shall be a Prohibited Person or a Person organized in a Prohibited Jurisdiction.

5.14.   <u>Investment Company</u>.  Each North American Group Member will conduct its operations in a manner which will not subject it to registration as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended from time to time.

5.15.   <u>Further Assurances</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions and the Cases, the Borrower shall, and shall cause each North American Group Member to, from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that such Lender may be required to obtain from the Borrower or any Group Member such governmental consent, approval, recording, qualification or authorization.

5.16.   <u>Executive Privileges and Compensation.</u>  (a)  Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions and the Cases, the Borrower shall comply with the following restrictions on executive privileges and compensation:

(i)   the Borrower shall take all necessary action to ensure that its Specified Benefit Plans comply in all respects with the EESA, including, without limitation, the provisions for the Capital Purchase Program, as implemented by any guidance or

regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or any other guidance or regulations under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and shall not adopt any new Specified Benefit Plan (x) that does not comply therewith or (y) that does not expressly state and require that such Specified Benefit Plan and any compensation thereunder shall be subject to all relevant Compensation Regulations adopted, issued or released on or after the date any such Specified Benefit Plan is adopted. To the extent that the Compensation Regulations change during the period when any Obligations remain outstanding in a manner that requires changes to then-existing Specified Benefit Plans, the Borrower shall effect such changes to its Specified Benefit Plans as promptly as practicable after it has actual knowledge of such changes in order to be in compliance with this Section 5.16(i) (and shall be deemed to be in compliance for a reasonable period within which to effect such changes);

(ii)    the Borrower shall be subject to the limits on annual executive compensation deductibles imposed by section 162(m)(5) of the Code, as applicable;

(iii)    the Borrower shall not pay or accrue any bonus or incentive compensation to the Senior Employees, except as may be permitted under the EESA or the Compensation Regulations;

(iv)    the Borrower shall not adopt or maintain any compensation plan that would encourage manipulation of its reported earnings to enhance the compensation of any of its employees; and

(v)    the Borrower shall maintain all suspensions and other restrictions of contributions to Specified Benefit Plans that are in place or initiated as of the Closing Date.

At all times throughout the term of this Agreement, the Required Lenders shall have the right to require any Group Member to claw back any bonuses or other compensation, including golden parachutes, paid to any Senior Employees in violation of any of the foregoing.

(b)    On or prior to June 30,July ___, 2009, the Borrower shall cause the principal executive officer (or person acting in a similar capacity) to certify in writing to the Treasury's Chief Compliance Officer that its compensation committee has reviewed the compensation arrangements of the SEOs with its senior risk officers and determined that the compensation arrangements do not encourage the SEOs to take unnecessary and excessive risks that threaten the value of the Borrower. The Borrower shall preserve appropriate documentation and records to substantiate such certification in an easily accessible place for a period not less than three years following the Maturity Date.

From the Closing Date until the repayment of all ObligationsMaturity Date, the Borrower shall comply with the provisions of this Section 5.16.

5.17.    Aircraft. With respect to any private passenger aircraft or interest in such aircraft that is owned or held by the Borrower or any of its respective Subsidiaries immediately

prior to the Closing Date, such party shall demonstrate to the satisfaction of the Treasury that it is taking all reasonable steps to divest itself of such aircraft or interest.  In addition, the Borrower shall not acquire or lease any private passenger aircraft or interest in private passenger aircraft after the Closing Date.

     5.18.  <u>Restrictions on Expenses</u>.  (a)  At all times throughout the term of this Agreement, the Borrower shall maintain and implement an Expense Policy and distribute the Expense Policy to all employees covered under the Expense Policy.  Any material amendments to the Expense Policy shall require the prior written consent of the Treasury, and any material deviations from the Expense Policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the Treasury.

     (b)    The Expense Policy shall, at a minimum:  (i) require compliance with all Requirements of Law, (ii) apply to the Borrower and all of its Subsidiaries, (iii) govern (A) the hosting, sponsorship or other payment for conferences and events, (B) travel accommodations and expenditures, (C) consulting arrangements with outside service providers, (D) any new lease or acquisition of real estate, (E) expenses relating to office or facility renovations or relocations, and (F) expenses relating to entertainment or holiday parties, and (iv) provide for (A) internal reporting and oversight, and (B) mechanisms for addressing non-compliance with the Expense Policy.

     5.19.  <u>Employ American Workers Act</u>.  The Borrower shall comply, and the Borrower shall take all necessary action to ensure that its Subsidiaries comply, in all respects with the provisions of the EAWA in all respects.

     5.20.  <u>Internal Controls; Recordkeeping; Additional Reporting</u>.  (a)  The Borrower shall promptly establish internal controls to provide reasonable assurance of compliance in all material respects with each of the Borrower's covenants and agreements set forth in Sections 5.16, 5.17, 5.18, 5.19 and 5.20(b) hereof and shall collect, maintain and preserve reasonable records evidencing such internal controls and compliance therewith, a copy of which records shall be provided to the Lenders promptly upon request.  On the 15th day after the last day of each calendar quarter (or, if such day is not a Business Day, on the first Business Day after such day) commencing with September 30, 2009, the Borrower shall deliver to the Treasury (at its address set forth in Section 8.2) a report setting forth in reasonable detail (x) the status of implementing such internal controls and (y) the Borrower's compliance (including any instances of material non-compliance) with such covenants and agreements.  Such report shall be accompanied by a certification duly executed by an SEO of the Borrower stating that such quarterly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001.

     (b)    The Borrower shall use its reasonable best efforts to account for the use and expected use of the proceeds from the Loans.  On the 15th day after the last day of each calendar quarter (or, if such day is not a Business Day, on the first Business Day after such day) commencing with September 30, 2009, the Borrower shall deliver to the Lenders (at their respective addresses set forth in Section 8.2) a report setting forth in reasonable detail the actual use of the proceeds from the Loans.  Such report shall be accompanied by a certification duly

executed by an SEO of the Borrower that such quarterly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, section 1001.

(c)    The Borrower shall collect, maintain and preserve reasonable records relating to the implementation of all Federal support programs provided to the Borrower or any of its Subsidiaries pursuant to the EESA, the use of the proceeds thereunder and the compliance with the terms and provisions of such programs; provided that the Borrower shall have no obligation to comply with the foregoing in connection with any such program to the extent that such program independently requires, by its express terms, the Borrower to collect, maintain and preserve any records in connection therewith. The Borrower shall provide the Treasury with copy of all such reasonable records promptly upon request.

5.21.    Waivers.  (a)  For any Person who is a Loan Party as of the Closing Date and any Person that becomes a Loan Party after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-1, to be duly executed by such North American Group Member and promptly delivered to the Treasury.

(b)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-2, to be duly executed by such SEO, and promptly delivered to the Treasury.

(c)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-3, to be duly executed by such SEO, and promptly delivered to the Borrower (with a copy to the Treasury).

(d)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-4, to be duly executed by such Senior Employee, and promptly delivered to the Treasury.

(e)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-5, to be duly executed by such Senior Employee, and promptly delivered to the Borrower (with a copy to the Treasury).

(f)    For the avoidance of doubt, this requirement will be deemed satisfied for the United States with respect to Loan Parties that are party to the Existing UST Term Loan Agreement and any SEO or Senior Employee, to the extent such Loan Party, SEO or Senior Employee has previously provided such a waiver to the Treasury.

5.22.    [Intentionally Omitted].

5.23.    Additional Guarantors.  Except as otherwise agreed to by the Required Lenders, the Borrower shall cause each Domestic Subsidiary of a North American Group Member who becomes a Debtor after the Closing Date to become a Guarantor (each, an

"Additional Guarantor") in accordance with Section 4.24 of the Guaranty, other than (i) [intentionally omitted], (ii) any Foreign 956 Subsidiary, (iii) any Other Foreign 956 Subsidiary and (iv) any Non-U.S. Subsidiary owned in whole or in part by a Foreign 956 Subsidiary, except in the case of clauses (i) through (iv), any Subsidiaries that were guarantors under the Existing UST Term Loan Agreement.

5.24.  <u>Provide Additional Information</u>.  Each North American Group Member shall, promptly, from time to time and upon request of any Lender, furnish to such Lender such information, documents, records or reports with respect to the Collateral, the Indebtedness of the North American Group Members or any Subsidiary thereof or the corporate affairs, conditions or operations, financial or otherwise, of such North American Group Member as any Lender may reasonably request, including without limitation, providing to such Lender reasonably detailed information with respect to each inquiry of such Lender raised with the North American Group Members prior to the Closing Date.

5.25.  <u>Inspection of Property; Books and Records; Discussions</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions and the Cases, the Borrower shall, and shall cause each Group Member to, (a) keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of any Lender, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with its independent certified public accountants.

# SECTION 6

# NEGATIVE COVENANTS

Each Loan Party hereby covenants and agrees to, and to cause itself and each of its Subsidiaries that is a North American Group Member to, so long as any Loan or any interest or fee payable hereunder is owing to any Lender, each North American Group Member will abide by the following negative covenants, in each case subject to the Wind-Down, the Orders, the Related Section 363 Sale Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

6.1.  <u>Prohibition on Fundamental Changes</u>.  No North American Group Member shall, at any time, directly or indirectly, (i) enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or Dispose of all or substantially all of its Property without the Lender's prior consent, provided, any Guarantor may merge, consolidate, amalgamate into, or Dispose of all or substantially all of its Property to another North American Group Member; or (ii) form or enter into any partnership, syndicate or other combination (other than joint ventures permitted by Section 6.14) that could reasonably be expected to have a Material Adverse Effect.

6.2.    <u>Lines of Business</u>.  No North American Group Member will engage to any substantial extent in any line or lines of business activity other than the businesses generally carried on by the North American Group Members as of the Closing Date or businesses reasonably related thereto.

6.3.    <u>Transactions with Affiliates.</u>  No North American Group Member will (a) enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including Collateral) or the rendering of any service, with any Affiliate unless such transaction is (i) in the ordinary course of such North American Group Member's business, and (ii) generally upon fair and reasonable terms and, with respect to any transaction with an Affiliate that is not a Group Member, no less favorable to such North American Group Member than it would obtain in an arm's length transaction with a Person which is not an Affiliate (other than any transaction that occurs pursuant to an agreement in effect as of the Petition Date), and in either case, is otherwise permitted under this Agreement, or (b) make a payment that is not otherwise permitted by this Section 6.3 to any Affiliate.  Irrespective of whether such transactions comply with the provisions of this Section 6.3, but subject to the other restrictions set forth elsewhere in this Agreement, the Loan Parties shall be permitted to (x) transact business in the ordinary course with (i) the joint ventures in which the Loan Parties or their Subsidiaries participate and (ii) [intentionally omitted], and (y) make Restricted Payments permitted under Section 6.5.

6.4.    <u>Limitation on Liens</u>.  No North American Group Member will, create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except Permitted Liens.

6.5.    <u>Restricted Payments</u>.  Without the Lenders' consent, no North American Group Member shall, (i) declare or pay any dividend (other than dividends payable solely in common Capital Stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any Capital Stock of any North American Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any North American Group Member and (ii) optionally prepay, repurchase, redeem or otherwise optionally satisfy or defease with cash or Cash Equivalents any Indebtedness (any such payment referred to in clauses (i) and (ii), a "<u>Restricted Payment</u>"), other than:

(a)    redemptions, acquisitions or the retirement for value or repurchases (or loans, distributions or advances to effect the same) of shares of Capital Stock from current or former officers, directors, consultants and employees, including upon the exercise of stock options or warrants for such Capital Stock, or any executive or employee savings or compensation plans, or, in each case to the extent applicable, their respective estates, spouses, former spouses or family members or other permitted transferees;

(b)    any Subsidiary (including an Excluded Subsidiary) may make Restricted Payments to its direct parent or to the Borrower or any Wholly Owned Guarantor;

(c)    any JV Subsidiary may make Restricted Payments required or permitted to be made pursuant to the terms of the joint venture arrangements in effect on the Closing Date (or otherwise as approved by the Required Lenders) of holders of its Capital Stock, <u>provided</u> that, the Borrower and its Subsidiaries have received their *pro rata* portion of such Restricted Payments; and

(d)    any Subsidiary that is not a North American Group Member may make Restricted Payments to any other Subsidiary or Subsidiaries that are not North American Group Members.

~~6.6.    Amendments to Transaction Documents.  (a)  No North American Group Member will amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the indemnities and licenses furnished to New CarCo and its successors or any of its Subsidiaries pursuant to the Transaction Documents such that after giving effect thereto such indemnities or licenses, taken as a whole, shall be materially less favorable to the interests of New CarCo or the Lenders with respect thereto or (b) otherwise amend, supplement or otherwise modify the terms and conditions of the Transaction Documents.~~

6.6.    ~~6.7.~~ <u>Changes in Fiscal Periods</u>.  No North American Group Member will permit its fiscal year to end on a day other than December 31 or change its method of determining fiscal quarters, in each case, unless otherwise agreed by the Required Lenders.

6.7.    ~~6.8.~~ <u>Negative Pledge</u>.  No North American Group Member will, enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any North American Group Member to create, incur, assume or permit to exist any Lien upon any of the Collateral, whether now owned or hereafter acquired, other than this Agreement, the other Loan Documents, the Existing Agreements, and Permitted Liens; <u>provided</u> that the agreements excepted from the restrictions of this Section shall include customary negative pledge clauses in agreements providing refinancing Indebtedness or permitted unsecured Indebtedness.

6.8.    ~~6.9.~~ <u>Indebtedness</u>.  No North American Group Member will, create, incur, assume or suffer to exist any Indebtedness except Permitted Indebtedness.

6.9.    ~~6.10.~~ <u>Investments</u>.  No North American Group Member will make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "<u>Investments</u>"), except Permitted Investments.

6.10.    ~~6.11.~~ <u>Action Adverse to the Collateral</u>.  Except as permitted under any provision of this Agreement, no Loan Party shall or shall permit any Pledged Entity that is a Subsidiary to take any action that would directly or indirectly materially impair or materially adversely affect such North American Group Member's title to, or the value of, the Collateral, or materially increase the duties, responsibilities or obligation of any North American Group Member.

6.11.    ~~6.12.~~ <u>Limitation on Sale of Assets</u>.  Subject to the Wind-Down, the Orders, the Related Section 363 <u>Sale</u> Transactions and the Cases and any other applicable

provision of any Loan Document, each North American Group Member shall have the right to Dispose freely of any of its Property (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired; <u>provided</u> that, to the extent required, the Net Cash Proceeds thereof are applied in accordance with Section 2.5.

6.12.    ~~6.13.~~ [Intentionally Omitted].

6.13.    ~~6.14.~~ <u>JV Agreements</u>.  No North American Group Member or Pledged Entity shall allow any modification or amendment to any JV Agreement, except that any such party that is not a Debtor may modify or amend any JV Agreement; <u>provided</u> that such amendment or modification could not reasonably be expected to have a Material Adverse Effect.

6.14.    ~~6.15.~~ <u>Swap Agreements</u>.  The North American Group Members will not itself, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual or anticipated exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

6.15.    ~~6.16.~~ <u>Clauses Restricting Subsidiary Distributions</u>.  The Borrower will not, and will not permit any Guarantor to, enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Guarantor to (a) make Restricted Payments in respect of any Capital Stock of such Guarantor held by, or pay any Indebtedness owed to, the Borrower or any other Guarantor, (b) make loans or advances to, or other Investments in, the Borrower or any other Guarantor or (c) transfer any of its assets to the Borrower or any other Guarantor, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Guarantor imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Guarantor, (iii) any agreement or instrument governing Indebtedness assumed in connection with the acquisition of assets by the Borrower or any Guarantor permitted hereunder or secured by a Lien encumbering assets acquired in connection therewith, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (iv) restrictions on the transfer of assets subject to any Lien permitted by Section 6.4 imposed by the holder of such Lien or on the transfer of assets subject to a Disposition permitted by Section 6.12 imposed by the acquirer of such assets, (v) provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock therein) entered into in the ordinary course of business, (vi) restrictions contained in the terms of any agreements governing purchase money obligations, Capital Lease Obligations or attributable obligations not incurred in violation of this Agreement; <u>provided</u> that, such restrictions relate only to the property financed with such Indebtedness, (vii) restrictions on cash or other deposits imposed by customers under contracts or other arrangements entered into or agreed to in the ordinary course of business, or (viii) customary non-assignment provisions in leases, contracts, licenses and other agreements entered into in the ordinary course of business and consistent with past practices.

6.16.    6.17.  Sale/Leaseback Transactions.  No North American Group Member will enter into any arrangement with any Person providing for the leasing by any such North American Group Member of real or personal property that has been or is to be sold or transferred by any such North American Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of any such North American Group Member (a "Sale/Leaseback Transaction") other than any Sale/Leaseback Transaction in effect on the Closing Date.

6.17.    6.18.  [Intentionally Omitted].

6.18.    6.19.  Modification of Organizational Documents.  No North American Group Member will modify any organizational documents, except (i) as required by the Bankruptcy Code or (ii) in connection with a Disposition permitted by Section 6.12.

## SECTION 7

## EVENTS OF DEFAULT

7.1.    Events of Default.  Notwithstanding the provisions of section 362(c) of the Bankruptcy Code, and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, or any notice to any of the North American Group Members, and subject to the provisions of this Section 7, each of the following events shall constitute an "Event of Default", provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied:

(a)    the Borrower shall default in the payment of any principal of or interest on any Loan when due (whether at stated maturity, upon acceleration or upon any mandatory prepayment pursuant to Section 2.5), provided however, that the Borrower shall have two (2) Business Days' grace period for the payment of interest hereunder; or

(b)    any Guarantor shall default in its payment obligations under the Guaranty; or

(c)    any Loan Party shall default in the payment of any other amount payable by it hereunder or under any other Loan Document after notification by the Lenders of such default, and such default shall have continued unremedied for three (3) Business Days; or

(d)    any North American Group Member shall breach any covenant contained in Section 5.16 (Executive Privileges and Compensation), Section 5.17 (Aircraft), Section 5.18 (Restrictions on Expenses), Section 5.19 (Employ American Workers Act), Section 5.20 (Internal Controls; Recordkeeping; Additional Reporting), Section 5.21 (Waivers) or Section 6 hereof; or

(e)    any North American Group Member shall default in performance of or otherwise breach non-payment obligations or covenants under any of the Loan Documents not covered by another clause in this Section 7, and such default has not been remedied within the applicable grace period provided therein, or if no grace period, within ten (10) Business Days; or

(f)      any representation, warranty or certification made or deemed made herein or in any other Loan Document by any North American Group Member or any certificate furnished to the Lenders pursuant to the provisions hereof or thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(g)      [intentionally omitted]; or

(h)      [intentionally omitted]; or

(i)      [intentionally omitted]; or

(j)      [intentionally omitted]; or

(k)      any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee or interim trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver and manager, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or an application shall be filed by the Borrower or any of its Subsidiaries for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Lenders against any Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

(l)      except as agreed by the Required Lenders, any Debtor shall make any Prepetition Payment other than (i) Prepetition Payments authorized by the Bankruptcy Court in accordance with "first day" motions and related orders or other orders of the Bankruptcy Court, or (ii) Prepetition Payments required by the Bankruptcy Code; or

(m)      ~~the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $25,000,000 in the aggregate or (ii) permit other actions that would have a material adverse effect on the Loan Parties and in the case of the Debtors, their estates~~[intentionally omitted]; or

(n)      [intentionally omitted]; or

(o)      ~~any North American Group Member shall default under, or fail to perform as required under, or shall otherwise materially breach the terms of any instrument, agreement or contract for Indebtedness without the consent of the Lenders (which in the case of the Debtors only, arose Postpetition) between any North American Group Member, on the one hand, and a Lender or any Affiliate of a Lender on the other; or any North American Group Member shall default under, or fail to perform as requested under, the terms of any instrument, agreement or contract for Indebtedness (which in the case of the Debtors only, arose Postpetition) entered into by such North American Group Member and any third party; if, in either case, the effect of any such default or failure is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the~~

~~lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity;~~ ~~provided that, it shall not constitute an Event of Default pursuant to this paragraph (o) unless the~~ ~~aggregate amount of all such Indebtedness then outstanding exceeds $25,000,000~~[intentionally omitted]; or

(p)    any Loan Document shall for whatever reason be terminated, any default or event of default shall have occurred under any Loan Document, the Loan Documents shall for any reason cease to create a valid, security interest in any of the Collateral purported to be covered hereby or thereby, or any North American Group Member's material obligations (including the Borrower's Obligations hereunder) shall cease to be in full force and effect, or the enforceability thereof shall be contested by any North American Group Member; or

(q)    the filing of a motion, pleading or proceeding by any of the other Loan Parties which could reasonably be expected to result in a material impairment of the rights or interests of any Lender under any Loan Document, or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of any Lender under any Loan Document; or

(r)    (i) any order shall be entered reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying in any material respect the Final Order without the prior written consent of the Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien or to be otherwise in full force and effect or (iii) any Debtor shall fail to, or fail to cause any North American Group Member to, comply with the Orders; or

(s)    the North American Group Members or any other material Subsidiaries of the Borrower shall take any action in support of any of the events set forth in clauses (k), (l), (m), (q) or (s) or any person other than the North American Group Members or any other material Subsidiaries of the Borrower shall do so, and such application is not contested in good faith by the North American Group Members or any other material Subsidiaries of the Borrower and the relief requested is granted in an order that is not stayed pending appeal; or

(t)    [intentionally omitted]; or

(u)    any Change of Control shall have occurred without the prior consent of the Lenders other than pursuant to the Related Section 363 Transaction; or

(v)    any North American Group Member shall grant, or suffer to exist, any Lien on any Collateral other than Permitted Liens; or the Liens contemplated under the Loan Documents shall cease to be perfected Liens on the Collateral in favor of the Lenders of the requisite priority hereunder with respect to such Collateral (subject to the Permitted Liens); or

(w)    [intentionally omitted]; or

(x)    [intentionally omitted]; or

(y)    [intentionally omitted]; or

(z)    [intentionally omitted]; or

(aa)    [intentionally omitted]; or

(bb)    any North American Group Member (other than a Debtor) shall admit its inability to, or intention not to, perform any of such party's material Obligations hereunder; or

(cc)    a plan shall be confirmed in any of the Cases that does not, or any order shall be entered which dismisses any of the Cases and which order does not, comply with the repayment provisions of this Agreement; or any of the Debtors shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

7.2.    Remedies upon Event of Default.  If any Event of Default occurs and is continuing, without limiting the rights and remedies available to any Lender under applicable law, the Required Lenders shall, by written notice to the Borrower, take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided that (x) with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Lenders shall provide the Borrower (with a copy to counsel for each Committee and to the United States Trustee for the Southern District of New York) with five Business Days' written notice prior to taking the action contemplated thereby, (y) upon receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts, and (z) in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing:

(i)    declare the principal of and accrued interest on the outstanding Loans to be immediately due and payable;

(ii)    [intentionally omitted];

(iii)    set-off any amounts held in any accounts maintained by any Loan Party with respect to which any Lender is a party to a control agreement;

(iv)    compel any Debtor to or to cause any North American Group Member to sell any or all of its assets pursuant to Section 363(b) of the Bankruptcy Code or any other applicable law, and credit bid the Loans in any such sale pursuant to Section 363(k) of the Bankruptcy Code or other applicable law; or

(v)    take any other action or exercise any other right or remedy (including, without limitation, with respect to the Liens in favor of the Lenders) permitted under the Loan Documents or by applicable law.

# SECTION 8

# MISCELLANEOUS

8.1.    Amendments and Waivers.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except

in accordance with the provisions of this Section 8.1 or as otherwise expressly provided herein. The Required Lenders and the Borrower (on its own behalf and as agent on behalf of any other Loan Party party to the relevant Loan Document) may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Lenders may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; except that (x) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the Maturity Date of any Loan or any change to the definition of "Maturity Date", (ii) reductions in the rate of interest or any fee or extensions of any due date thereof, (iii) [intentionally omitted], (iv) imposition of any additional restrictions on assignments and participations, (v) [intentionally omitted] and (vi) modifications to the *pro rata* treatment and sharing provisions of the Loan Documents, and (y) the consent of 100% of the Lenders shall be required with respect to (i) modifications to this Section of any of the voting percentages, the definition of "Required Lenders", or the minimum requirement necessary for all Lenders or Required Lenders to take action hereunder, (ii) prior to the consummation of the Related Section 363 Sale Transactions, the release or subordination of any of the Guarantors or a material portion of the Collateral other than in connection with the Related Section 363 Sale Transactions, (iii) after the consummation of the Related Section 363 Sale Transactions, the release or subordination of all or substantially all of the Guarantors or all or substantially all of the Collateral, (iv) the assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under this Agreement and (v) amendments, supplements, modifications or waivers of Sections 2.12 (or the rights and obligations contained therein), 4.1(a), 4.1(c)(ii) or 7.1(r), the definition of "ABR", any proviso to the definition of "Net Cash Proceeds" or the minimum notice requirements contained in Section 2.4.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders and all future holders of the Loans. In the case of any waiver, the Loan Parties and the Lenders shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 8.1; provided that, delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

8.2.    Notices.    (a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or electronic transmission or overnight or hand delivery, when received, addressed as follows in the case of the Borrower and the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:

    General Motors Corporation
    300 Renaissance Center
    Detroit, MI 48265-3000
    Attention:  Chief Financial Officer
    Telecopy:  313-667-4605

with a copy to:

    General Motors Corporation
    767 Fifth Avenue, 14th Floor
    New York, NY 10153
    Attention:  Treasurer
    Telecopy:  212-418-3630

and

    General Motors Corporation
    300 Renaissance Center
    Detroit, MI 48265-3000
    Attention:  General Counsel
    Telecopy:  248-267-4584

and:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, NY 10153-0119
    Attention:  Stephen Karotkin
              Richard Ginsburg
              Soo-Jin Shim
    Telecopy:  212-310-8007

Treasury:

    The United States Department of the Treasury
    1500 Pennsylvania Avenue, NW
    Washington, D.C.  20220
    Attention:  Chief Counsel Office of Financial Stability
    Telecopy:  202-927-9225
    Email:  OFSChiefCounselNotices@do.treas.gov

with a copy to:

    Cadwalader, Wickersham & Taft LLP
    One World Financial Center
    New York, NY  10281
    Attention:  John J. Rapisardi
    Telecopy:  212-504-6666
    Telephone:  212-504-6000

Canadian Lender:

    Export Development Canada
    151 O'Connor Street
    Ottawa, Ontario
    Canada K1A 1K3
    Attention:  Loans Services
    Telecopy:  613-598-2514

with a copy to:

    Export Development Canada
    151 O'Connor Street
    Ottawa, Ontario
    Canada K1A 1K3
    Attention:  Asset Management/Covenants Officer
    Telecopy:  613-598-3186

provided that any notice, request or demand to or upon the Lenders shall not be effective until received.

    (b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by each Lender in its sole discretion.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

    8.3.    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

    8.4.    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or

statement delivered pursuant hereto or in connection herewith shall survive the execution and
delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

8.5.    Payment of Expenses.  The Borrower agrees (a) to pay or reimburse the
Lenders and any other Canadian Lender Consortium Member for all their (i) reasonable out-of-
pocket costs and expenses incurred in connection with the development, preparation and
execution of, and any amendment, supplement or modification to, this Agreement and the other
Loan Documents and any other documents prepared in connection herewith or therewith, and the
consummation and administration of the transactions contemplated hereby and thereby
(including the reasonable out-of-pocket costs and expenses of the advisors and counsel to each
Lender and each other Canadian Lender Consortium Member, but excluding the professional
fees of such advisors and counsel to each Lender and each other Canadian Lender Consortium
Member), and (ii) costs and expenses incurred in connection with the enforcement or
preservation of any rights or exercise of remedies under this Agreement, the other Loan
Documents and any other documents prepared in connection herewith or therewith in respect of
any Event of Default or otherwise, including the fees and disbursements of counsel (including
the allocated fees and disbursements and other charges of in-house counsel) to each Lender and
each other Canadian Lender Consortium Member, (b) to pay, indemnify, or reimburse each
Lender and each other Canadian Lender Consortium Member for, and hold each Lender and each
other Canadian Lender Consortium Member harmless from, any and all recording and filing fees
and any and all liabilities with respect to, or resulting from any delay in paying such fees, if any,
which may be payable or determined to be payable in connection with the execution and delivery
of, or consummation or administration of any of the transactions contemplated by, or any
amendment, supplement or modification of, or any waiver or consent under or in respect of, this
Agreement, the other Loan Documents and any such other documents, and (c) to pay, indemnify
or reimburse each Lender and each other Canadian Lender Consortium Member, their respective
affiliates, and their respective officers, directors, partners, employees, advisors, agents,
controlling persons and trustees (each, an "Indemnitee") for, and hold each Indemnitee harmless
from and against any and all other liabilities, obligations, losses, damages, penalties, actions,
judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by
an Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any
other Loan Party arising out of, in connection with, or as a result of, the execution or delivery of
this Agreement, any other Loan Document or any agreement or instrument contemplated hereby
or thereby, the performance by the parties hereto or thereto of their respective obligations
hereunder or thereunder or the consummation of the transactions contemplated hereby or
thereby, including any of the foregoing relating to the use or proposed use of proceeds of the
Loans or the violation of, noncompliance with or liability under, any Environmental Law
applicable to the operations or assets of any Group Member, including any of the Mortgaged
Properties, and the reasonable fees and expenses of legal counsel in connection with claims,
actions or proceedings by any Indemnitee against any Loan Party under any Loan Document or
any actual or prospective claim, litigation, investigation or proceeding relating to any of the
foregoing, whether based on contract, tort or any other theory, whether brought by any third
party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a
party thereto (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"),
provided that the Borrower shall have no obligation hereunder to any Indemnitee (x) for Taxes
(it being understood that the Borrower's obligations with respect to Taxes are set forth in Section
2.12) or (y) with respect to Indemnified Liabilities to the extent such Indemnified Liabilities

resulted from the gross negligence or willful misconduct of, in each case as determined by a final and nonappealable decision of a court of competent jurisdiction, such Indemnitee, any of its affiliates or its or their respective officers, directors, partners, employees, agents or controlling persons. No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 8.5 shall be payable not later than 30 days after written demand therefor. Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the Treasurer of the Borrower as set forth in Section 8.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lenders. The agreements in this Section 8.5 shall survive repayment of the Loans and all other amounts payable hereunder.

      8.6.   Successors and Assigns; Participations and Assignments. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, all future holders of the Loans and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 8.6.

      (b)   Any Lender may, without the consent of the Borrower, assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it) pursuant to an Assignment and Assumption, executed by such Assignee and such Lender and delivered to the Borrower for its records, to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada or to New CarCo, together with any related rights and obligations thereunder, without the consent of the Borrower. The Borrower or its agent will maintain a register ("Register") of each Lender and Assignee. The Register shall contain the names and addresses of the Lenders and Assignees and the principal amount of the loans (and stated interest thereon) held by each such Lender and Assignee from time to time. The entries in the Register shall be conclusive and binding, absent manifest error.

      (c)   Any Lender may, without the consent of the Borrower, sell participations to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible

to the other parties hereto for the performance of such obligations, (C) the Borrower and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 8.1 and (2) directly affects such Participant.  Subject to paragraph (c) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 8.6.  To the extent permitted by law, and subject to paragraph (c) of this Section, each Participant also shall be entitled to the benefits of Section 8.7 as though it were a Lender.  Notwithstanding anything to the contrary in this Section 8.6, each Lender shall have the right to sell one or more participations in all or any part of its Loans or other Obligations to one or more lenders or other Persons that provide financing to such Lender in the form of sales and repurchases of participations without having to satisfy the foregoing requirements.  In the event that a Lender sells a participation in such Lender's rights and obligations under this Agreement, the Lender, on behalf of Borrower, shall maintain a register on which it enters the name, address and interest in this Agreement of all Participants.

       8.7.    Adjustments; Set-off.    (a)    Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders, if any Lender (a "Benefitted Lender") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 7, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash in Dollars from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral or the proceeds thereof, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

       (b)    In addition to any rights and remedies of the Lenders provided by law, subject to any notice or other requirement contained in the Orders, each Lender shall have the right, without (i) further order of or application to the Bankruptcy Court, or (ii) prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon all amounts owing hereunder becoming due and payable (whether at the stated maturity, by acceleration or otherwise) to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.

Each Lender agrees promptly to notify the Borrower and the other Lenders after any such set-off and application made by such Lender; provided that, the failure to give such notice shall not affect the validity of such set off and application.

       8.8.   Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

       8.9.   Severability.  Any provision of this Agreement that is held to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

       8.10.   Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.  Subject to Section 8.18, in the event of any conflict between this Agreement or any other Loan Document and the Orders, the Orders shall control.

       8.11.   Governing Law.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

       8.12.   Submission to Jurisdiction; Waivers.  All judicial proceedings brought against any Loan Party hereto arising out of or relating to this Agreement or any other Loan Document, or any Obligations hereunder and thereunder, may be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof.  Each Loan Party hereto hereby irrevocably and unconditionally:

       (a)   submits for itself and its property in any such legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

       (b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or

proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in Section 8.2 or at such other address of which the Lenders shall have been notified pursuant thereto; and

(d)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.13.    <u>Acknowledgments</u>.  The Loan Party hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    no Lender has any fiduciary relationship with or duty to any Group Member arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lenders, on one hand, and any Group Member, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower or any Subsidiary and the Lenders.

8.14.    <u>Release of Guaranties</u>.    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Lenders hereby agree to take promptly, any action requested by the Borrower having the effect of releasing, or evidencing the release of, any guarantee by any Loan Party of the Obligations to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 8.1.

8.15.    <u>Confidentiality</u>.    Each of the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party or any other Lender pursuant to this Agreement that is designated by such Loan Party as confidential; <u>provided</u> that nothing herein shall prevent any Lender from disclosing any such information (a) to any other Lender or any affiliate of any thereof, (b) subject to an agreement to comply with the provisions of this Section 8.15 (or other provisions at least as restrictive as this Section), to any actual or prospective Transferee or any pledgee of Loans or any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction relating to the Loan Party and its obligations, (c) to its affiliates, employees, directors, trustees, agents, attorneys, accountants and other professional advisors, or those of any of its affiliates for performing the purposes of a Loan Document, subject to such Lender, as the case may be, advising such Person of the confidentiality provisions contained herein, (d) upon the request or demand of any Governmental Authority or regulatory agency (including self-regulated agencies) having jurisdiction (or purporting to have jurisdiction) over it upon notice (other than in connection with routine examinations or inspections by regulators) to the Borrower thereof unless such notice is

prohibited or the Governmental Authority or regulatory agency shall require otherwise, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, after notice to the Borrower if reasonably feasible, and, if applicable, after exhaustion of the Group Members' rights and remedies under Section 1.6 of the Department of the Treasury Regulations, 31 C.F.R. Part 1, Subpart A; Sections 27-29 inclusive and 44 of the Access to Information Act, R.S.C., ch A-1 (1985) and Section 28 and Part IV (Sections 50-56 inclusive) of the Freedom of Information and Protection of Privacy Act, R.S.O., ch. F.31 (1990), after notice to the Borrower if reasonably feasible, (f) if requested or required to do so in connection with any litigation or similar proceeding, after notice to the Borrower if reasonably feasible, (g) that has been publicly disclosed, other than in breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

8.16.    Waivers of Jury Trial.    **THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.17.    USA PATRIOT Act.    Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the USA PATRIOT Act.

8.18.    Orders.    The terms and conditions hereunder shall be subject to the terms and conditions of the Final Order.  In the event of any inconsistency between the terms or conditions of this Agreement and the terms and conditions of the Orders, the terms and conditions of the Orders shall control.  Notwithstanding the foregoing, in the event of any inconsistency between the terms or conditions of Section 8.1 and the terms and conditions of the Orders, the terms and conditions of Section 8.1 shall control.

8.19.    Effect of Amendment and Restatement of the Existing Credit Agreement. On the Effective Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety.  The parties hereto acknowledge and agree that (a) this Agreement and the other Loan Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment and reborrowing, or termination of the "Obligations" (as defined in the Existing Credit Agreement) under the Existing Credit Agreement as in effect prior to the Effective Date and (b) such "Obligations" are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement.

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

          GENERAL MOTORS CORPORATION

By:_____
    Name:
    Title:

[GUARANTOR]


By:_____
    Name:
    Title:

UNITED STATES DEPARTMENT OF THE
TREASURY, as a Lender


By:_____
    Title:  Interim Assistant Secretary of the
    Treasury for Financial Stability

EXPORT DEVELOPMENT CANADA, as a
Lender


By: _____
    Name:
    Title:

Document comparison by Workshare Professional on Tuesday, June 30, 2009 5:43:39 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://KL2/2611303/1 |
| Description | KL2-#2611303-v1-GM:_Wind-Down_Credit_Facility_Draft_6/29 |
| Document 2 ID | PowerDocs://KL2/2611303/2 |
| Description | KL2-#2611303-v2-GM:_Wind-Down_Credit_Facility_Draft_6/29 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 57 |
| Deletions | 44 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 105 |

# Exhibit 11

**Hearing Date/Time:  October 21, 2010, 9:45 a.m.**

PREET BHARARA
United States Attorney for the
Southern District of New York
By: DAVID S. JONES and
   NATALIE N. KUEHLER
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel:    (212) 637-2739.2741
Fax:    (212) 637-2730
E-mail:david.jones6@usdoj.gov
Natalie.kuehler@usdoj.gov

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No. 09-50026 (REG) |
| | : | |
| Debtors, | : | (Jointly Administered) |
| | : | |
| | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | Adversary Proceeding |
| CREDITORS OF MOTORS LIQUIDATION COMPANY | : | |
| f/k/a GENERAL MOTORS CORPORATION, | : | Case No. 09-00504 (REG) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| JPMORGAN CHASE BANK, N.A., *et al.,* | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------x

**STATEMENT OF THE UNITED STATES OF AMERICA WITH RESPECT TO
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

1.    The United States of America, by its attorney Preet Bharara, United States Attorney

for the Southern District of New York, respectfully submits this statement with respect to the

parties' cross-motions for summary judgment in the above-captioned adversary proceeding**.**

2.    This submission expresses no position with respect to the parties' contentions on the merits of this matter, in which plaintiff seeks relief in the form of avoidance of a lien and/or of certain transfers, as well as the "recover[y] for the Debtors' estates [of] the proceeds or value of" the transfers at issue. Complaint, July 31, 2009, at ¶ 452, see generally id. ¶¶ 438-464 (claims for relief seeking avoidance and/or return of funds to the estates); see also id. at 55-56 ("pray[ers] for judgment" seeking relief in form of avoidance and restoration of funds "for the benefit of the estates pursuant to 11 U.S.C. § 551").

3.    The United States nevertheless makes this brief submission to ensure that the resolution of these motions does not prematurely determine any person or entity's entitlements with respect to the ultimate distribution of any funds that are recovered in the event that plaintiff prevails. As the Complaint properly recognizes, section 551 of the Bankrutpcy Code provides, "Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551. Accordingly, the proper relief, should plaintiff prevail, must be entered "for the benefit of the estate," id., and not for any particular creditor(s) or class of creditors. The Court therefore need not, and should not, adjudicate any party's ultimate entitlement to any funds recovered through this adversary proceeding; rather, that question is properly reserved for determination through the plan confirmation process.

4.    Plaintiff's prayers for relief in both the Complaint and their motion papers do not appear to seek relief beyond that authorized in section 551, and appear not to constitute a request for an order directing the ultimate disposition of any proceeds of this action. The United States nevertheless, in an abundance of caution, makes this filing to ensure that the ultimate distribution of any proceeds recovered through this adversary proceeding will not be decided in this

adversary proceeding, but instead will remain reserved for determination by the Court through

the plan confirmation process.

New York, New York
August 26, 2010

PREET BHARARA
United States Attorney
Southern District of New York


By:  _____/s/ David S. Jones_____
DAVID S. JONES
NATALIE N. KUEHLER
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2739/2741
Facsimile:  (212) 637-2730

# Exhibit 12

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
MOTORS LIQUIDATION COMPANY, et al.,       :        09-50026 (REG)
      f/k/a General Motors Corp., et al.  :
                                          :
                 Debtors.                 :        (Jointly Administered)
                                          :
------------------------------------------------------------x
```

## DEBTORS' JOINT CHAPTER 11 PLAN

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

# TABLE OF CONTENTS

**Page**

Article I.   Definitions and Interpretation ................................................................. 1

1.1   363 Transaction ............................................................................................. 1

1.2   Administrative Expenses ............................................................................... 1

1.3   ADR Procedures ........................................................................................... 2

1.4   Allowed ......................................................................................................... 2

1.5   Asbestos Claimants' Committee ................................................................... 2

1.6   Asbestos Claims ............................................................................................ 3

1.7   Asbestos Insurance Assets ............................................................................ 3

1.8   Asbestos Personal Injury Claim ................................................................... 3

1.9   Asbestos Property Damage Claim ................................................................ 3

1.10   Asbestos Trust .............................................................................................. 4

1.11   Asbestos Trust Administrator ....................................................................... 4

1.12   Asbestos Trust Agreement ............................................................................ 4

1.13   Asbestos Trust Assets ................................................................................... 4

1.14   Asbestos Trust Claim .................................................................................... 4

1.15   Asbestos Trust Distribution Procedures ....................................................... 5

1.16   Asbestos Trust Transfer Date ....................................................................... 5

1.17   Avoidance Action .......................................................................................... 5

1.18   Avoidance Action Trust ................................................................................ 5

1.19   Avoidance Action Trust Administrative Cash ............................................... 5

1.20   Avoidance Action Trust Administrator ......................................................... 5

1.21   Avoidance Action Trust Agreement .............................................................. 6

1.22   Avoidance Action Trust Assets ..................................................................... 6

1.23   Avoidance Action Trust Beneficiaries .......................................................... 6

1.24   Avoidance Action Trust Claims Reserve ...................................................... 6

1.25   Avoidance Action Trust Monitor .................................................................. 6

1.26   Avoidance Action Trust Transfer Date ......................................................... 6

1.27   Avoidance Assets .......................................................................................... 6

1.28   Ballot ............................................................................................................. 6

i

# TABLE OF CONTENTS
### (continued)

Page

| 1.29 | Bankruptcy Code | 7 |
|------|------|---|
| 1.30 | Bankruptcy Court | 7 |
| 1.31 | Bankruptcy Rules | 7 |
| 1.32 | Budget | 7 |
| 1.33 | Business Day | 7 |
| 1.34 | Cash | 7 |
| 1.35 | Causes of Action | 7 |
| 1.36 | Chapter 11 Cases | 7 |
| 1.37 | Claim | 7 |
| 1.38 | Claim Settlement Procedures | 8 |
| 1.39 | Class | 8 |
| 1.40 | Collateral | 8 |
| 1.41 | Commencement Date | 8 |
| 1.42 | Confirmation Date | 8 |
| 1.43 | Confirmation Hearing | 8 |
| 1.44 | Confirmation Order | 8 |
| 1.45 | Creditors' Committee | 8 |
| 1.46 | Debtors | 8 |
| 1.47 | Demand | 8 |
| 1.48 | DIP Credit Agreement | 8 |
| 1.49 | DIP Credit Agreement Claims | 9 |
| 1.50 | DIP Lenders' Avoidance Actions | 9 |
| 1.51 | DIP Lenders' Avoidance Assets | 9 |
| 1.52 | Disclosure Statement | 9 |
| 1.53 | Disputed | 9 |
| 1.54 | Distribution Record Date | 9 |
| 1.55 | District Court | 10 |
| 1.56 | EDC | 10 |
| 1.57 | Effective Date | 10 |

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 1.58 | ENCORE | 10 |
| 1.59 | Encumbrance | 10 |
| 1.60 | Entity | 10 |
| 1.61 | Environmental Action | 10 |
| 1.62 | Environmental Laws | 10 |
| 1.63 | Environmental Response Trust | 10 |
| 1.64 | Environmental Response Trust Administrative Funding Account | 11 |
| 1.65 | Environmental Response Trust Administrative Trustee | 11 |
| 1.66 | Environmental Response Trust Agreement | 11 |
| 1.67 | Environmental Response Trust Assets | 11 |
| 1.68 | Environmental Response Trust Consent Decree and Settlement Agreement | 11 |
| 1.69 | Environmental Response Trust Parties | 12 |
| 1.70 | Environmental Response Trust Transfer Date | 12 |
| 1.71 | Equity Interest | 12 |
| 1.72 | Eurobond Claim | 12 |
| 1.73 | Final Order | 12 |
| 1.74 | Future Claimants' Representative | 12 |
| 1.75 | General Unsecured Claim | 12 |
| 1.76 | Governmental Authorities | 13 |
| 1.77 | GUC Trust | 13 |
| 1.78 | GUC Trust Administrator | 13 |
| 1.79 | GUC Trust Administrative Fund | 13 |
| 1.80 | GUC Trust Agreement | 13 |
| 1.81 | GUC Trust Assets | 13 |
| 1.82 | GUC Trust Monitor | 13 |
| 1.83 | GUC Trust Transfer Date | 14 |
| 1.84 | GUC Trust Units | 14 |
| 1.85 | Indentures | 14 |
| 1.86 | Indenture Trustees | 15 |

# TABLE OF CONTENTS
### (continued)

Page

1.87    Indenture Trustee Reserve Cash ............................................................. 15

1.88    Indirect Asbestos Claim .......................................................................... 15

1.89    Initial Debtors ........................................................................................ 16

1.90    MLC ........................................................................................................ 16

1.91    MSPA ..................................................................................................... 16

1.92    New GM .................................................................................................. 16

1.93    New GM Securities ................................................................................. 17

1.94    New GM Stock ........................................................................................ 17

1.95    New Warrants .......................................................................................... 17

1.96    Note Claim .............................................................................................. 17

1.97    Person ..................................................................................................... 17

1.98    Plan ......................................................................................................... 17

1.99    Plan Supplement ..................................................................................... 17

1.100   Post-Effective Date MLC ....................................................................... 17

1.101   Priority Non-Tax Claim .......................................................................... 18

1.102   Priority Order Sites ................................................................................ 18

1.103   Priority Order Sites Consent Decrees and Settlement Agreements ......... 18

1.104   Priority Tax Claim .................................................................................. 18

1.105   Pro Rata Share ........................................................................................ 18

1.106   Property or Properties ............................................................................ 18

1.107   Property Environmental Claim ............................................................... 18

1.108   Protected Party ....................................................................................... 18

1.109   REALM ................................................................................................... 19

1.110   Registered Holder ................................................................................... 19

1.111   Residual Wind-Down Assets .................................................................. 19

1.112   Schedules ............................................................................................... 19

1.113   Secured Claim ........................................................................................ 19

1.114   Solicitation Procedures .......................................................................... 20

1.115   Tax Code ................................................................................................ 20

# TABLE OF CONTENTS
## (continued)

**Page**

1.116   Term Loan Avoidance Action ................................................................ 20

1.117   Unliquidated Litigation Claim .............................................................. 20

1.118   U.S. Treasury ........................................................................................ 20

1.119   U.S. Trustee .......................................................................................... 20

1.120   Voting Deadline .................................................................................... 20

Article II.    Administrative Expenses and Priority Tax Claims ............................... 20

2.1   Administrative Expenses ....................................................................... 20

2.2   Compensation and Reimbursement Claims ........................................... 21

2.3   Priority Tax Claims ............................................................................... 21

2.4   DIP Credit Agreement Claims ............................................................... 21

2.5   Special Provisions Regarding Indenture Trustees' Fees and
        Expenses ............................................................................................... 22

Article III.    Classification of Claims and Equity Interests ...................................... 22

Article IV.    Treatment of Claims and Equity Interests ............................................ 23

4.1   Class 1 – Secured Claims ....................................................................... 23

4.2   Class 2 - Priority Non-Tax Claims ........................................................ 23

4.3   Class 3 - General Unsecured Claims ...................................................... 23

4.4   Class 4 – Property Environmental Claims .............................................. 25

4.5   Class 5 – Asbestos Personal Injury Claims ............................................ 25

4.6   Class 6 - Equity Interests in MLC ......................................................... 26

Article V.    Provisions Governing Distributions ...................................................... 27

5.1   Distribution Record Date ....................................................................... 27

5.2   Method of Distributions Under the Plan ................................................ 27

      a.    Payments and Transfers on Effective Date ................................. 27

      b.    Repayment of Excess Cash to the U.S. Treasury and EDC ......... 28

      c.    Payment of Cash or Certain Assets to Charitable
            Organizations ............................................................................. 28

      d.    Distributions of Cash ................................................................. 29

      e.    Sale of New Warrants About to Expire ....................................... 29

5.3   Delivery of Distributions and Undeliverable Distributions .................... 29

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| 5.4 | | Withholding and Reporting Requirements | 30 |
| 5.5 | | Time Bar to Cash Payments | 31 |
| 5.6 | | Minimum Distributions and Fractional Shares or Units | 31 |
| 5.7 | | Setoffs | 31 |
| 5.8 | | Transactions on Business Days | 32 |
| 5.9 | | Allocation of Plan Distribution Between Principal and Interest | 32 |
| Article VI. | | Means for Implementation and Execution of the Plan | 32 |
| 6.1 | | Substantive Consolidation | 32 |
| 6.2 | | The GUC Trust | 33 |
| | a. | Execution of GUC Trust Agreement | 33 |
| | b. | Purpose of GUC Trust | 33 |
| | c. | GUC Trust Assets | 33 |
| | d. | Governance of GUC Trust | 33 |
| | e. | The GUC Trust Administrator and the GUC Trust Monitor | 33 |
| | f. | Role of the GUC Trust Administrator | 33 |
| | g. | Role of the GUC Trust Monitor | 34 |
| | h. | Transferability of GUC Trust Interests | 34 |
| | i. | Cash | 34 |
| | j. | Costs and Expenses of the GUC Trust Administrator | 35 |
| | k. | Compensation of the GUC Trust Administrator | 35 |
| | l. | Distribution of GUC Trust Assets | 35 |
| | m. | Retention of Professionals by the GUC Trust Administrator and the GUC Trust Monitor | 35 |
| | n. | U.S. Federal Income Tax Treatment of GUC Trust | 35 |
| | o. | Dissolution | 36 |
| | p. | Indemnification of the GUC Trust Administrator and the GUC Trust Monitor | 36 |
| | q. | Closing of Chapter 11 Cases | 37 |
| 6.3 | | The Asbestos Trust | 37 |
| | a. | Execution of Asbestos Trust Agreement | 37 |

## TABLE OF CONTENTS
### (continued)

| | | | |
|---|---|---|---|
| | b. | Purpose of Asbestos Trust | 37 |
| | c. | Assumption of Certain Liabilities by Asbestos Trust | 37 |
| | d. | Asbestos Trust Assets | 38 |
| | e. | Governance of Asbestos Trust | 38 |
| | f. | The Asbestos Trust Administrator(s) | 38 |
| | g. | Role of the Asbestos Trust Administrator(s) | 38 |
| | h. | Nontransferability of Asbestos Trust Interests | 38 |
| | i. | Cash | 38 |
| | j. | Costs and Expenses of the Asbestos Trust Administrator(s) | 39 |
| | k. | Allowance of Asbestos Personal Injury Claims | 39 |
| | l. | Distribution of Asbestos Trust Assets | 39 |
| | m. | Retention of Professionals by the Asbestos Trust Administrator(s) | 39 |
| | n. | U.S. Federal Income Tax Treatment of Asbestos Trust | 39 |
| | o. | Dissolution | 40 |
| | p. | Indemnification of the Asbestos Trust Administrator(s) | 40 |
| 6.4 | | The Environmental Response Trust | 40 |
| | a. | Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement | 40 |
| | b. | Purpose of Environmental Response Trust | 41 |
| | c. | Environmental Response Trust Assets | 41 |
| | d. | Governance of Environmental Response Trust | 42 |
| | e. | Role of Environmental Response Trust Administrator | 42 |
| | f. | Nontransferability of Environmental Response Trust Interests | 42 |
| | g. | Cash | 42 |
| | h. | Indemnification of the Environmental Response Trust Administrator(s) | 43 |
| | i. | U.S. Federal Income Tax Treatment of Environmental Response | 43 |

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| 6.5 | | The Avoidance Action Trust | 43 |
| | a. | Execution of Avoidance Action Trust Agreement | 43 |
| | b. | Purpose of Avoidance Action Trust | 44 |
| | c. | Avoidance Action Trust Assets | 44 |
| | d. | Governance of Avoidance Action Trust | 44 |
| | e. | The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor | 44 |
| | f. | Role of the Avoidance Action Trust Administrator | 45 |
| | g. | Role of the Avoidance Action Trust Monitor | 45 |
| | h. | Nontransferability of Avoidance Action Trust Interests | 46 |
| | i. | Cash | 46 |
| | j. | Distribution of Avoidance Action Trust Assets | 46 |
| | k. | Costs and Expenses of Avoidance Action Trust Administrator | 46 |
| | l. | Compensation of the Avoidance Action Trust Administrator | 46 |
| | m. | Retention of Professionals by the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor | 46 |
| | n. | U.S. Federal Income Tax Treatment of Avoidance Action Trust | 47 |
| | o. | Dissolution | 50 |
| | p. | Indemnification of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor | 51 |
| | q. | Cooperation Regarding Insurance Matters | 51 |
| 6.6 | | Securities Law Matters | 52 |
| 6.7 | | Cancellation of Existing Securities and Agreements | 52 |
| 6.8 | | Equity Interests in MLC Subsidiaries Held by the Debtors | 52 |
| 6.9 | | Administration of Taxes | 53 |
| 6.10 | | Dissolution of the Debtors | 53 |
| 6.11 | | Determination of Tax Filings and Taxes | 53 |
| 6.12 | | Books and Records | 54 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 6.13 | Corporate Action | 55 |
| 6.14 | Effectuating Documents and Further Transactions | 56 |
| Article VII. | Procedures for Disputed Claims | 56 |
| 7.1 | Objections to Claims and Resolution of Disputed Claims | 56 |
| 7.2 | No Distribution Pending Allowance | 57 |
| 7.3 | Estimation | 58 |
| 7.4 | Allowance of Disputed Claims | 58 |
| 7.5 | Dividends | 58 |
| Article VIII. | Executory Contracts and Unexpired Leases | 58 |
| 8.1 | Executory Contracts and Unexpired Leases | 58 |
| 8.2 | Approval of Rejection of Executory Contracts and Unexpired Leases | 59 |
| 8.3 | Rejection Claims | 59 |
| Article IX. | Effectiveness of the Plan | 59 |
| 9.1 | Condition Precedent to Confirmation of Plan | 59 |
| 9.2 | Conditions Precedent to Effective Date | 59 |
| 9.3 | Satisfaction and Waiver of Conditions | 60 |
| 9.4 | Effect of Nonoccurrence of Conditions to Consummation | 60 |
| Article X. | Effect of Confirmation | 61 |
| 10.1 | Vesting of Assets | 61 |
| 10.2 | Release of Assets | 61 |
| 10.3 | Binding Effect | 61 |
| 10.4 | Term of Injunctions or Stays | 61 |
| 10.5 | Term Loan Avoidance Action; Offsets | 62 |
| 10.6 | Injunction | 62 |
| 10.7 | Injunction Against Interference with Plan | 62 |
| 10.8 | Special Provisions for the United States | 62 |
| Article XI. | Retention of Jurisdiction | 63 |
| 11.1 | Jurisdiction of Bankruptcy Court | 63 |
| Article XII. | Miscellaneous Provisions | 65 |

# TABLE OF CONTENTS
## (continued)

Page

12.1  Dissolution of Committees ................................................................ 65

12.2  Substantial Consummation ............................................................... 65

12.3  Effectuating Documents and Further Transactions................................. 65

12.4  Exemption from Transfer Taxes ....................................................... 66

12.5  Release ........................................................................................ 66

12.6  Exculpation ................................................................................... 66

12.7  Post-Confirmation Date Fees and Expenses .......................................... 67

    a.    Fees and Expenses of Professionals............................................. 67

    b.    Fees and Expenses of GUC Trust Administrator, Asbestos
          Trust Administrator, Environmental Response Trust
          Administrative Trustee, and Avoidance Action Trust
          Administrator ....................................................................... 67

12.8  Payment of Statutory Fees .............................................................. 67

12.9  Modification of Plan ....................................................................... 67

12.10  Revocation or Withdrawal of Plan...................................................... 68

12.11  Courts of Competent Jurisdiction ..................................................... 68

12.12  Severability .................................................................................. 68

12.13  Governing Law .............................................................................. 68

12.14  Exhibits ....................................................................................... 69

12.15  Successors and Assigns................................................................... 69

12.16  Time ............................................................................................ 69

12.17  Notices ........................................................................................ 69

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
In re                                     :          **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,*  :          **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.* :
                                          :
                    **Debtors.**           :          **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

## DEBTORS' JOINT CHAPTER 11 PLAN

Motors Liquidation Company (f/k/a General Motors Corporation); MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., the above-captioned debtors, propose the following chapter 11 plan pursuant to section 1121(a) of title 11 of the United States Code:

### ARTICLE I.

### DEFINITIONS AND INTERPRETATION

**DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.1**    **363 Transaction** means the sale of substantially all the assets of General Motors Corporation and certain of its Debtor subsidiaries, and the assumption of certain executory contracts and unexpired leases of personal property and nonresidential real property, to a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code, as embodied in the MSPA.

**1.2**    **Administrative Expenses** means costs or expenses of administration of any of the Chapter 11 Cases allowed under sections 503(b), 507(a)(1), and 1114(e) of the Bankruptcy Code that have not already been paid by the Debtors, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the

estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States
Code; *provided, however*, that Administrative Expenses does not mean the Debtors'
obligations and liabilities that were assumed by New GM under the MSPA, as approved
by the order of the Bankruptcy Court entered July 5, 2009.

**1.3    ADR Procedures** means the alternative dispute resolution procedures,
including mandatory mediation, approved by orders of the Bankruptcy Court, pursuant to
section 105(a) of the Bankruptcy Code and General Order M-390 authorizing
implementation of alternative dispute procedures, including mandatory mediation,
entered February 23, 2010 and April 29, 2010 [Docket Nos. 5037, 5673], with respect to
the following types of unliquidated and/or litigation Claims:  (i) personal injury Claims,
(ii) wrongful death Claims, (iii) tort Claims, (iv) products liability Claims, (v) Claims for
damages arising from the rejection of executory contracts or unexpired leases of
nonresidential real property (excluding Claims for damages arising from the rejection of
executory contracts as they related primarily to environmental matters), (vi) indemnity
Claims (excluding tax indemnity Claims relating to leveraged fixed equipment lease
transactions and excluding indemnity Claims relating to asbestos liability), (vii) lemon
law Claims, to the extent applicable under section 6.15 of the MSPA, (viii) warranty
Claims, to the extent applicable under section 6.15 of the MSPA, and (ix) class action
Claims.

**1.4    Allowed** means, (i) with reference to any Claim (other than an Asbestos
Personal Injury Claim), (a) any Claim against any Debtor that has been listed by such
Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to
time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed
or contingent and for which no contrary proof of Claim has been filed, (b) any (I) timely
filed Claim that is no longer subject to the ADR Procedures in the case of Unliquidated
Litigation Claims or (II) Claim listed on the Schedules or timely filed proof of Claim, as
to which no objection to allowance has been interposed in accordance with Section 7.1
hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the
Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been
determined by a Final Order to the extent such objection is determined in favor of the
respective holder, or (c) any Claim expressly allowed by a Final Order, pursuant to the
Claim Settlement Procedures, or hereunder, and (ii) with reference to any Asbestos
Personal Injury Claim, any Asbestos Personal Injury Claim to the extent that it is
Allowed in accordance with the procedures established pursuant to the Asbestos Trust
Agreement and the Asbestos Trust Distribution Procedures, which shall establish the
amount of legal liability against the Asbestos Trust in the amount of the liquidated value
of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos
Trust Distribution Procedures.  The Asbestos Trust Claim shall be deemed "Allowed"
when fixed by Final Order or settlement.

**1.5    Asbestos Claimants' Committee** means the official committee of
unsecured creditors holding Asbestos Personal Injury Claims appointed by the U.S.
Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.6**    **Asbestos Claims** means Asbestos Personal Injury Claims and Asbestos Property Damage Claims.

**1.7**    **Asbestos Insurance Assets** means all rights arising under liability insurance policies issued to the Debtors with inception dates prior to 1986 with respect to liability for Asbestos Claims, including, but not limited to (i) rights (a) under insurance policies, (b) under settlement agreements made with respect to such insurance policies, (c) against the estates of insolvent insurers that issued such policies or entered into such settlements, and (d) against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers, and (ii) the right, on behalf of MLC and its subsidiaries as of the Effective Date, to give a full release of the insurance rights of MLC and its subsidiaries as of the Effective Date under any such policy or settlement agreement with the exception of rights to coverage with respect to workers' compensation policies. The Asbestos Insurance Assets that shall be transferred to the Avoidance Action Trust shall not include the transfer of any insurance policies themselves nor any rights or claims that the Debtors have or may have against any insurers with respect to amounts the Debtors have already paid on account of Asbestos Claims.

**1.8**    **Asbestos Personal Injury Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Personal Injury Claim), and any claim under any settlement entered into by or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Personal Injury Claim.

**1.9**    **Asbestos Property Damage Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Property Damage Claim), and any claim under any settlement entered into by or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Property Damage Claim. Asbestos Property Damage Claims do not include any Claims or Causes of Action of governmental units under Environmental Laws.

     **1.10**    **Asbestos Trust** means the trust established under the Plan in accordance with the Asbestos Trust Agreement.

     **1.11**    **Asbestos Trust Administrator(s)** means the Person or Persons confirmed by the Bankruptcy Court to serve as administrator(s) of the Asbestos Trust, pursuant to the terms of the Asbestos Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

     **1.12**    **Asbestos Trust Agreement** means that certain Asbestos Trust Agreement executed by the Debtors and the Asbestos Trust Administrator(s), substantially in the form included in the Plan Supplement.

     **1.13**    **Asbestos Trust Assets** means the Debtors' assets transferred to the Asbestos Trust in accordance with the Plan and the Asbestos Trust Agreement.  The Asbestos Trust Assets shall be comprised of (i) Cash in the amount of $[__] million and (ii) the Asbestos Trust Claim (or, if fixed by Final Order or settlement prior to the Effective Date, the distribution to which such Claim is entitled as an Allowed General Unsecured Claim).

     **1.14**    **Asbestos Trust Claim** means the amount of the Debtors' aggregate asbestos liability for Asbestos Personal Injury Claims that either will be in an amount (i) mutually agreed upon by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative or (ii) ordered by the Bankruptcy

Court, which, when fixed by Final Order or settlement, shall be treated as an Allowed General Unsecured Claim in Class 3 for purposes of distribution from the GUC Trust and the Avoidance Action Trust, as applicable.  For the avoidance of doubt, prior to the determination of the Allowed amount of the Asbestos Trust Claim, the Asbestos Trust Claim is not and shall not be treated as a Disputed General Unsecured Claim.

      **1.15**    **Asbestos Trust Distribution Procedures** means the distribution procedures to be implemented by the Asbestos Trust Administrator(s) pursuant to the Plan and the Asbestos Trust Agreement to process, liquidate, and pay Asbestos Personal Injury Claims, substantially in the form included in the Plan Supplement.

      **1.16**    **Asbestos Trust Transfer Date** means the date on which the Asbestos Trust Assets are transferred to the Asbestos Trust, which transfer shall occur on the Effective Date, or as soon thereafter as is reasonably practicable, but shall be no later than December 15, 2011.

      **1.17**    **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement.

      **1.18**    **Avoidance Action Trust** means the trust established under the Plan in accordance with the Avoidance Action Trust Agreement.

      **1.19**    **Avoidance Action Trust Administrative Cash** means the Cash held and maintained by the Avoidance Action Trust Administrator for the purpose of paying the expenses incurred by the Avoidance Action Trust Administrator (including fees and expenses for professionals retained by the Avoidance Action Trust) in connection with the Avoidance Action Trust and any obligations imposed on the Avoidance Action Trust Administrator or the Avoidance Action Trust, including expenses relating to the performance of the Avoidance Action Trust Administrator's obligations under the Avoidance Action Trust Agreement and Section 6.5 hereof.  The Debtors shall reserve $___ million for the Avoidance Action Trust Administrative Cash, which shall be transferred to the Avoidance Action Trust on the Avoidance Action Trust Transfer Date.

      **1.20**    **Avoidance Action Trust Administrator** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to serve as administrator of the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement; *provided, however*, that if it is determined that either the holders of the DIP Credit Agreement Claims or the holders of General Unsecured Claims are not entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then the Debtors shall neither seek nor obtain the consent of the U.S. Treasury or the Creditors' Committee, as

applicable. The identity of the Avoidance Action Trust Administrator shall be disclosed in the Plan Supplement.

**1.21    Avoidance Action Trust Agreement** means that certain Avoidance Action Trust Agreement executed by the Debtors and the Avoidance Action Trust Administrator, substantially in the form included in the Plan Supplement.

**1.22    Avoidance Action Trust Assets** means the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof, (ii) the Asbestos Insurance Assets transferred to the Avoidance Action Trust and any proceeds thereof, and (iii) the Avoidance Action Trust Administrative Cash transferred to the Avoidance Action Trust.

**1.23    Avoidance Action Trust Beneficiaries** means the holders of the DIP Credit Agreement Claims and/or the holders of Allowed General Unsecured Claims, as determined either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee prior to the Effective Date, (ii) mutual agreement between the U.S. Treasury and the GUC Trust Administrator on or after the Effective Date, or (iii) a Final Order.

**1.24    Avoidance Action Trust Claims Reserve** means the Avoidance Action Trust Assets allocable to, or retained on account of, Disputed General Unsecured Claims.

**1.25    Avoidance Action Trust Monitor** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to oversee the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement; *provided, however*, that if it is determined that either the holders of the DIP Credit Agreement Claims or the holders of General Unsecured Claims are not entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then the Debtors shall neither seek nor obtain the consent of the U.S. Treasury or the Creditors' Committee, as applicable. The identity of the Avoidance Action Trust Monitor shall be disclosed in the Plan Supplement.

**1.26    Avoidance Action Trust Transfer Date** means the date selected by the Debtors, with the consent of the U.S. Treasury and (a) the Creditors' Committee prior to the Effective Date or (b) the GUC Trust Administrator on or after the Effective Date, as applicable, on which the Avoidance Action Trust Assets are transferred to the Avoidance Action Trust, which transfer shall occur on or before December 15, 2011.

**1.27    Avoidance Assets** means the collections realized on the settlement or resolution of the Avoidance Actions.

**1.28    Ballot** means the form(s) distributed to holders of impaired Claims on which is to be indicated the acceptance or rejection of the Plan.

**1.29    Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.30    Bankruptcy Court** means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**1.31    Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.32    Budget** means that certain budget for the post-Effective Date period agreed to by the U.S. Treasury, as lender under the DIP Credit Agreement, and the Debtors detailing the funding of, among other things, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, and any other post-Effective Date obligations detailed in the Plan or in the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, or the Avoidance Action Trust Agreement.

**1.33    Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.34    Cash** means legal tender of the United States of America.

**1.35    Causes of Action** means the Avoidance Actions and any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date, except to the extent the prosecution of any Causes of Action are prohibited by the DIP Credit Agreement.

**1.36    Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re Motors Liquidation Company, et al. f/k/a General Motors Corp. et al,* Ch. 11 Case No. 09-50026 (REG) (Jointly Administered).

**1.37    Claim** has the meaning set forth in section 101 of the Bankruptcy Code.

**1.38    Claim Settlement Procedures** means the procedures for settling Claims approved by order of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) authorizing the Debtors to (i) file omnibus

Claims objections and (ii) establish procedures for settling certain Claims, entered
October 6, 2009 [Docket No. 4180].

**1.39     Class** means any group of Claims or Equity Interests classified by the Plan
pursuant to section 1122(a)(1) of the Bankruptcy Code.

**1.40     Collateral** means any property or interest in property of the estate of any
Debtor subject to a lien, charge, or other encumbrance to secure the payment or
performance of a Claim, which lien, charge, or other encumbrance is not subject to
avoidance under the Bankruptcy Code.

**1.41     Commencement Date** means (i) June 1, 2009 with respect to Motors
Liquidation Company; MLC of Harlem, Inc.; MLCS, LLC; and MLCS Distribution
Corporation and (ii) October 9, 2009 with respect to Remediation and Liability
Management Company, Inc. and Environmental Corporate Remediation Company, Inc.

**1.42     Confirmation Date** means the date on which the Clerk of the Bankruptcy
Court enters the Confirmation Order.

**1.43     Confirmation Hearing** means the hearing to be held by the Bankruptcy
Court regarding confirmation of the Plan, as such hearing may be adjourned or continued
from time to time.

**1.44     Confirmation Order** means the order of the Bankruptcy Court
confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.45     Creditors' Committee** means the statutory committee of unsecured
creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102
of the Bankruptcy Code.

**1.46     Debtors** means Motors Liquidation Company; MLC of Harlem, Inc.;
MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management
Company, Inc.; and Environmental Corporate Remediation Company, Inc., whether prior
to or on and after the Effective Date.

**1.47     Demand** means a demand for payment that (i) was not a Claim during the
Chapter 11 Cases, (ii) arises out of the same or similar conduct or events that gave rise to
Asbestos Personal Injury Claims addressed by the Asbestos Trust, and (iii) is to be paid
or otherwise addressed by the Asbestos Trust pursuant to the Plan.

**1.48     DIP Credit Agreement** means that certain Amended and Restated
Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, as
amended, among Motors Liquidation Company (f/k/a General Motors Corporation), as
borrower, the Guarantors (as defined therein), and the United States Department of the
Treasury and Export Development Canada, as lenders, and any of the documents and
instruments relating thereto or referred to therein.

**1.49**    **DIP Credit Agreement Claims** means all Claims arising under the DIP Credit Agreement.

**1.50**    **DIP Lenders' Avoidance Actions** means any actions commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except (i) to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement and (ii) for the Term Loan Avoidance Action.

**1.51**    **DIP Lenders' Avoidance Assets** means the collections, if any, realized on the settlement or resolution of any Avoidance Actions other than the Term Loan Avoidance Actions.

**1.52**    **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.53**    **Disputed** means, with respect to any Claim (other than an Asbestos Personal Injury Claim) that has not been Allowed pursuant to the Plan or a Final Order,

(a) if no proof of Claim has been filed by the applicable deadline:  a Claim (other than an Asbestos Personal Injury Claim) that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

(b) if a proof of Claim or request for payment of an Administrative Expense has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors or other authorized Entity which has not been withdrawn or determined by a Final Order.  Any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures or hereunder, shall be an Allowed Claim, not a Disputed Claim.

For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim (other than an Asbestos Personal Injury Claim) has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim shall not be valid and shall be disregarded.

**1.54**    **Distribution Record Date** means five (5) Business Days after the Effective Date.

**1.55** **District Court** means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

**1.56** **EDC** means the Government of Canada and the Government of Ontario, through Export Development Canada, Canada's export trading agency.

**1.57** **Effective Date** means a Business Day on or after the Confirmation Date specified by the Debtors on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively waived. The Debtors shall file a notice of the Effective Date with the Bankruptcy Court and with the Securities and Exchange Commission. The Debtors and/or the Creditors' Committee shall issue a press release regarding the Effective Date.

**1.58** **ENCORE** means Environmental Corporate Remediation Company, Inc., a Delaware corporation, as debtor or debtor in possession, as the context requires.

**1.59** **Encumbrance** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such asset (including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**1.60** **Entity** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof, or other Person or entity.

**1.61** **Environmental Action** means any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under law with respect to a Property.

**1.62** **Environmental Laws** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (i) pollution, (ii) the protection or regulation of human health, natural resources, or the environment, (iii) the management of hazardous materials, or (iv) the release of hazardous materials into the environment.

**1.63** **Environmental Response Trust** means the Environmental Response Trust established under the Plan in accordance with the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.64    Environmental Response Trust Administrative Funding Account**
means the funding held by the Environmental Response Trust for the administration of
the Environmental Response Trust, including property taxes, liability insurance, security,
demolition costs, other plant wind-down costs, and any obligations imposed on the
Environmental Response Trust or the Environmental Response Trust Administrative
Trustee pursuant to the Plan, including expenses relating to the performance of the
Environmental Response Trust Administrative Trustee's obligations under the
Environmental Response Trust Agreement and Section 6.4 hereof.  The funding of the
Environmental Response Trust Administrative Funding Account and the management of
such funding shall be as provided in the Environmental Response Trust Consent Decree
and Settlement Agreement.

**1.65    Environmental Response Trust Administrative Trustee** means the
trustee or trustees designated to serve in a fiduciary capacity consistent with, and in
furtherance of, the Environmental Response Trust, pursuant to the terms of the
Environmental Response Trust Agreement or as subsequently may be appointed pursuant
to the terms of the Environmental Response Trust Agreement.

**1.66    Environmental Response Trust Agreement** means that certain
Environmental Response Trust Agreement executed by MLC, the Governmental
Authorities, the United States, and the Environmental Response Trust Administrative
Trustee, substantially in the form included in the Plan Supplement.

**1.67    Environmental Response Trust Assets** means the Environmental
Response Trust Administrative Funding Account and the assets transferred to the
Environmental Response Trust in accordance with the Plan, the Environmental Response
Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement
Agreement, but shall not include any New GM Securities.  The Environmental Response
Trust Assets shall be comprised of (i) Cash in the amount of $____ million, (ii) the
Properties, (iii) personal property, including equipment, related to certain of the
Properties set forth on Attachment A to the Environmental Response Trust Consent
Decree and Settlement Agreement, (iv) all leases of manufacturing facilities with New
GM, and (v) all property management contracts and contracts related to the
Environmental Actions relating to the Properties that the Debtors and the Environmental
Response Trust Administrative Trustee agree should be assumed by the Environmental
Response Trust.

**1.68    Environmental Response Trust Consent Decree and Settlement
Agreement** means that certain Consent Decree and Settlement Agreement among the
Debtors, the Environmental Response Trust Administrative Trustee, the United States,
certain States, and the St. Regis Mohawk Tribe establishing an Environmental Response
Trust for certain Property in Delaware, Illinois, Indiana, Kansas, Louisiana,
Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania,
Virginia, and Wisconsin, executed by MLC and the Governmental Authorities, in the
form included in the Plan Supplement.

**1.69    Environmental Response Trust Parties** means the Environmental Response Trust, the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust's officers, directors, employees, consultants, agents, or other professionals or representatives employed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee.

**1.70    Environmental Response Trust Transfer Date** means the date on which the Environmental Response Trust Assets are transferred to the Environmental Response Trust, which transfer shall occur on the Effective Date.

**1.71    Equity Interest** means the interest of any holder of an equity security of any of the Debtors, or any direct or indirect subsidiaries of the Debtors, represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, or any direct or indirect subsidiaries of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.72    Eurobond Claim** means a Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among MLC, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A., (ii) that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, MLC, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A., and (iii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse.

**1.73    Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceeding for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired.  The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.74    Future Claimants' Representative** means Dean M. Trafalet, the Legal Representative for Future Claimants appointed pursuant to the order dated and entered by the Bankruptcy Court on April 8, 2010.

**1.75    General Unsecured Claim** means any Claim against any of the Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority

Non-Tax Claim, Asbestos Personal Injury Claim, or Property Environmental Claim or (ii)
otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.  Upon
settlement or determination by Final Order of the Asbestos Trust Claim, the Asbestos
Trust Claim shall be treated as an Allowed General Unsecured Claim in Class 3 for
purposes of distribution from the GUC Trust and the Avoidance Action Trust, as
applicable; *provided, however*, that any General Unsecured Claims reserved in the
Environmental Response Trust Consent Decree and Settlement Agreement are General
Unsecured Claims.

      **1.76**   **Governmental Authorities** means the United States of America, on
behalf of the Environmental Protection Agency; the States of Delaware, Illinois, Kansas,
Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio,
Pennsylvania, Virginia, Wisconsin; and the Saint Regis Mohawk Tribe, each as parties to
the Environmental Response Trust Consent Decree and Settlement Agreement.

      **1.77**   **GUC Trust** means the trust established under the Plan in accordance with
the GUC Trust Agreement.

      **1.78**   **GUC Trust Administrator** means the entity appointed by the Creditors'
Committee with the consent of the Debtors to serve as administrator of the GUC Trust,
pursuant to the terms of the GUC Trust Agreement, or as subsequently may be appointed
pursuant to the terms of the GUC Trust Agreement.  The identity of the GUC Trust
Administrator shall be disclosed in the Plan Supplement.

      **1.79**   **GUC Trust Administrative Fund** means the fund established, held, and
maintained by the GUC Trust Administrator for the purpose of paying the expenses
incurred by the GUC Trust Administrator (including fees and expenses for professionals
retained by the GUC Trust) in connection with the GUC Trust and any obligations
imposed on the GUC Trust Administrator or the GUC Trust, including expenses relating
to the performance of the GUC Trust Administrator's obligations under the GUC Trust
Agreement and Section 6.2 hereof.  The Debtors shall deposit $__ million into the GUC
Trust Administrative Fund on the GUC Trust Transfer Date.

      **1.80**   **GUC Trust Agreement** means that certain GUC Trust Agreement
executed by the Debtors and the GUC Trust Administrator, substantially in the form
included in the Plan Supplement.

      **1.81**   **GUC Trust Assets** means the (i) GUC Trust Administrative Fund
(comprised of Cash in the amount of $_____) and (ii) New GM Securities.

      **1.82**   **GUC Trust Monitor** means the entity appointed by the Creditors'
Committee with the consent of the Debtors to oversee the GUC Trust, pursuant to the
terms of the GUC Trust Agreement, or as subsequently may be appointed pursuant to the
terms of the GUC Trust Agreement.  The identity of the GUC Trust Monitor shall be
disclosed in the Plan Supplement.

**1.83    GUC Trust Transfer Date** means the date on which the GUC Trust Assets are transferred to the GUC Trust, which transfer shall occur on the Effective Date, or as soon thereafter as is reasonably practicable, but shall be no later than December 15, 2011.

**1.84    GUC Trust Units** means the units of beneficial interests in the GUC Trust.

**1.85    Indentures** means (i) the Indenture, dated as of November 15, 1990, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $299,795,000 of 9.40% Debentures due July 15, 2021 were issued on July 22, 1991, (b) $600,000,000 of 8.80% Notes due March 1, 2021 were issued on March 12, 1991, (c) $500,000,000 of 7.40% Debentures due September 1, 2025 were issued on September 11, 1995, (d) $15,000,000 of 9.40% Medium Term Notes due July 15, 2021 were issued on July 22, 1991, and (e) $48,175,000 of 9.45% Medium Term Notes due November 1, 2011 were issued on December 21, 1990, (ii) the Indenture, dated as of December 7, 1995, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $377,377,000 of 7.75% Discount Debentures due March 15, 2036 were issued on March 20, 1996, (b) $500,000,000 of 7.70% Debentures due April 15, 2016 were issued on April 15, 1996, (c) $400,000,000 of 8.10% Debentures due June 15, 2024 were issued on June 10, 1996, (d) $600,000,000 of 6.75% Debentures due May 1, 2028 were issued on April 29, 1998, (e) $1,500,000,000 of 7.20% Notes due January 15, 2011 were issued on January 11, 2001, (f) $575,000,000 of 7.25% Quarterly Interest Bonds due April 15, 2041 were issued on April 30, 2001, (g) $718,750,000 of 7.25% Senior Notes due July 15, 2041 were issued on July 9, 2001, (h) $690,000,000 of 7.375% Senior Notes due October 1, 2051 were issued on October 3, 2001, (i) $875,000,000 of 7.25% Senior Notes due February 15, 2052 were issued on February 14, 2002, (j) $1,150,000,000 of 4.50% Series A Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (k) $2,600,000,000 of 5.25% Series B Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (l) $1,115,000,000 of 7.375% Senior Notes due May 15, 2048 were issued on May 19, 2003, (m) $425,000,000 of 7.375% Senior Notes due May 23, 2048 were issued on May 23, 2003, (n) $3,000,000,000 of 8.375% Senior Debentures due July 15, 2033 were issued on July 3, 2003, (o) $4,300,000,000 of 6.25% Series C Convertible Senior Debentures due July 15, 2033 were issued on July 2, 2003, (p) $1,250,000,000 of 8.250% Senior Debentures due July 15, 2023 were issued on July 3, 2003, (q) $1,000,000,000 of 7.125% Senior Notes due July 15, 2013 were issued on July 3, 2003, (r) $ 720,000,000 of 7.50% Senior Notes due July 1, 2044 were issued on June 30, 2004, and (s) $1,500,000,000 of 1.50% Series D Convertible Senior Debentures due June 1, 2009 were issued on May 31, 2007, (iii) the Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Law Debenture, as successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified,

related to $58,800,000 Michigan Strategic Fund Multi-Modal Interchangeable Rate
Pollution Control Refunding Revenue Bonds Series 1995, (iv) the Indenture of Trust,
dated as of July 1, 1994, between City of Moraine, Ohio and Law Debenture, as
successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such
Indenture may have been amended, supplemented, or modified, related to $12,500,000
Solid Waste Disposal Revenue Bonds (General Motors Corporation Project) Series 1994,
(v) the Indenture, dated as of July 1, 1999, between City of Moraine, Ohio and Law
Debenture, as successor-in-interest Trustee to Dai Ichi Kangyo Trust Company of New
York, as such Indenture may have been amended, supplemented, or modified, related to
$10,000,000 Solid Waste Disposal Revenue Bonds (General Motors Project), Series
1999, (vi) the Trust Indenture, dated as of December 1, 2002, between City of Fort
Wayne, Indiana and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase
Bank, and Bank One Trust Company, N.A., as Co-Trustee, as such Indenture may have
been amended, supplemented, or modified, related to $31,000,000 City of Fort Wayne,
Indiana Pollution Control Revenue Bonds (General Motors Corporation Project), Series
2002, (vii) the Trust Indenture, dated as of March 1, 2002, between Ohio Water
Development Authority and Law Debenture, as successor-in-interest Trustee to
JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or
modified, related to $20,040,000 State of Ohio Pollution Control Refunding Revenue
Bonds (General Motors Corporation Project), Series 2002, (viii) the Indenture of Trust,
dated as of December 1, 2002, between Ohio Water Development Authority and Law
Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture
may have been amended, supplemented, or modified, related to $46,000,000 State of
Ohio Solid Waste Revenue Bonds, Series 2002 (General Motors Corporation Project),
and (ix) the Trust Indenture, dated as of April 1, 1984, among City of Indianapolis,
Indiana and Law Debenture, as successor-in-interest Trustee to Bankers Trust Company,
and the Indiana National Bank, as Co-Trustee, as such Indenture may have been
amended, supplemented, or modified, relating to $1,400,000 City of Indianapolis, Indiana
Pollution Control Revenue Bonds (General Motors Corporation Project), Series 1984.

**1.86** **Indenture Trustees** means the trustees, co-trustees, agents, paying agents,
distribution agents, authenticating agents, registrars, and bond registrars under the
respective Indentures, and any and all successors or predecessors thereto.

**1.87** **Indenture Trustee Reserve Cash** means sufficient Cash for the Indenture
Trustees to administer distributions to Registered Holders as contemplated by the Plan,
including all reasonable fees and expenses related thereto (including the reasonable fees
and expenses of the respective counsel, advisors, and/or agents of the Indenture
Trustees), and to compensate for any loss, liability, or reasonable expenses incurred
without negligence or bad faith on the part of the Indenture Trustees, arising out of or in
connection with the performance of their duties under the Indentures, including the
reasonable costs and expenses of defending themselves against any claim of liability,
from Registered Holders or otherwise, related thereto.

**1.88** **Indirect Asbestos Claim** means any Claim or remedy, liability, or
Demand against the Debtors now existing or hereafter arising, whether or not such Claim,

remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy, liability, or Demand are known or unknown, that is (i) (A) held by (I) any Entity (other than a director or officer entitled to indemnification pursuant to Section 12.5 hereof) who has been, is, or may be a defendant in an action seeking damages for (a) death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products or (b) property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property, to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which the Debtors are otherwise allegedly liable, or (II) any assignee or transferee of such Entity, and (B) on account of alleged liability of the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action, or (ii) held by any Entity that is seeking reimbursement indemnification, subrogation, or contribution from the Debtors with respect to any surety bond, letter of credit, or other financial assurance issued by any Entity on account of, or with respect to, Asbestos Claims.

**1.89    Initial Debtors** means MLC; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); and MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation).

**1.90    MLC** means Motors Liquidation Company (f/k/a General Motors Corporation), a Delaware corporation, the parent debtor or debtor in possession, as the context requires.

**1.91    MSPA** means that certain Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury, as Purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

**1.92    New GM** means General Motors Company (formerly known as General Motors Holding Company), a Delaware corporation formed as part of that certain holding company reorganization that occurred on October 19, 2009, pursuant to which all of the outstanding shares of common stock and preferred stock of the prior General Motors

Company (now known as "**General Motors, LLC**") were exchanged on a one-for-one basis for shares of common stock and preferred stock of the newly organized holding company that now bears the name General Motors Company.  General Motors Company has a 100% ownership interest in General Motors Holdings LLC, a Delaware limited liability company, and General Motors, LLC is a direct wholly-owned subsidiary of General Motors Holdings LLC.

     **1.93**    <u>**New GM Securities**</u> means the New GM Stock and the New Warrants, each of which was received as consideration pursuant to the 363 Transaction as embodied in the MSPA.

     **1.94**    <u>**New GM Stock**</u> means the stock of New GM, including any additional shares issued if the Bankruptcy Court determines that the estimated amount of (i) Allowed General Unsecured Claims against the Initial Debtors and (ii) the Allowed Asbestos Trust Claim against the Initial Debtors collectively exceeds $35 billion.

     **1.95**    <u>**New Warrants**</u> means (i) the warrants to acquire 45,454,545 newly issued shares of New GM Stock, with an exercise price set at $30.00 per share, and (ii) the warrants to acquire 45,454,545 newly issued shares of New GM Stock, with an exercise price set at $55.00 per share.

     **1.96**    <u>**Note Claim**</u> means a Claim against any of the Debtors arising under or in connection with any Indenture and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

     **1.97**    <u>**Person**</u> has the meaning set forth in section 101(41) of the Bankruptcy Code.

     **1.98**    <u>**Plan**</u> means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

     **1.99**    <u>**Plan Supplement**</u> means the forms of documents, in a form reasonably acceptable to the U.S .Treasury, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to the extent such document affects the respective party, effectuating the transactions contemplated by this Plan, which documents shall be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement upon written request to the undersigned counsel.  Copies of the Plan Supplement also are available on the Voting Agent's website, www.motorsliquidationdocket.com.

     **1.100**    <u>**Post-Effective Date MLC**</u> means MLC on and after the Effective Date.

**1.101    Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.102    Priority Order Sites** means the non-owned sites, as set forth on Exhibit "A" hereto, that are subject to an order requiring performance of an Environmental Action.

**1.103    Priority Order Sites Consent Decrees and Settlement Agreements** means the Consent Decrees and Settlement Agreements to be filed with the Bankruptcy Court in respect of the Priority Order Sites.

**1.104    Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code other than Priority Tax Claims that New GM is liable for under the MSPA.

**1.105    Pro Rata Share** means the ratio (expressed as a percentage) of (i) the amount of any Allowed Claim in a particular Class to (ii) the sum of (x) the aggregate amount of Allowed Claims in such Class and (y) the aggregate amount of Disputed Claims in such Class.

**1.106    Property or Properties** means (i) the properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement and (ii) the Priority Order Sites.

**1.107    Property Environmental Claim** means any civil Claim or Cause of Action by the Governmental Authorities against the Debtors under Environmental Laws with respect to the Properties except for any General Unsecured Claim reserved in the Environmental Response Trust Consent Decree and Settlement Agreement or the Priority Order Sites Consent Decrees and Settlement Agreements.

**1.108    Protected Party** means (i) the Debtors, (ii) any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors (including, without limitation, the GUC Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the GUC Trust Monitor, the Avoidance Action Trust Monitor, and their respective professionals) or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of its becoming such a transferee or successor), (iii) the holders of DIP Credit Agreement Claims, (iv) any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Post-Effective Date MLC, or the Asbestos Trust, or to a successor to, or transferee of, any assets of the Debtors or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired), or (v) any Entity to the

extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors or the Asbestos Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following:  (a) such Entity's ownership of a financial interest in the Debtors, a past or present affiliate of the Debtors, or a predecessor in interest of the Debtors, (b) such Entity's involvement in the management of the Debtors or any predecessor in interest of the Debtors, (c) such Entity's service as an officer, director, or employee of the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in the Debtors, any past or present affiliate of the Debtors, or any predecessor in interest of the Debtors, (d) such Entity's provision of insurance to the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in (I) the Debtors, (II) any past or present affiliate of the Debtors, or (III) any predecessor in interest of the Debtors, but only to the extent that the Debtors or the Asbestos Trust enters into a settlement with such Entity that is approved by the Bankruptcy Court and expressly provides that such Entity shall be a Protected Party under the Plan, or (e) such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in the Debtors, any past or present affiliate of the Debtors, or any predecessor in interest of the Debtors.

**1.109  REALM** means Remediation and Liability Management Company, Inc., a Michigan corporation, as debtor or debtor in possession, as the context requires.

**1.110  Registered Holder** means the registered holders (or bearers, if applicable) of the securities issued pursuant to the Indentures.

**1.111  Residual Wind-Down Assets** means the Cash necessary to fund the resolution of Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, and the Cash reserved to pay such Administrative Expenses and Claims.  If the Debtors have not resolved and paid all of the foregoing Claims and Administrative Expenses by the date of MLC's dissolution, then the Residual Wind-Down Assets (including the power to object, settle, and or satisfy such Claims and Administrative Expenses) shall be transferred to the GUC Trust.

**1.112  Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**1.113  Secured Claim** means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with

section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.114** **Solicitation Procedures** means the procedures relating to the solicitation and tabulation of votes with respect to the Plan.

**1.115** **Tax Code** means title 26 of the United States Code, as amended from time to time.

**1.116** **Term Loan Avoidance Action** means the Avoidance Action commenced by the Creditors' Committee against JPMorgan Chase Bank, N.A., individually and as Administrative Agent, and various lenders party to a term loan agreement, dated as of November 29, 2006, between General Motors Corporation, as borrower, JPMorgan Chase Bank, N.A., as agent, and various institutions as lenders and agents, styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.117** **Unliquidated Litigation Claim** means a General Unsecured Claim that qualifies for reconciliation pursuant to the ADR Procedures, regardless of whether the Claim is filed in an unliquidated amount, until it becomes an Allowed Claim.

**1.118** **U.S Treasury** means the United States Department of the Treasury.

**1.119** **U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.120** **Voting Deadline** means the date set by the Bankruptcy Court by which all completed Ballots must be received.

### INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

### ARTICLE II.

### ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**2.1** **Administrative Expenses.**  Except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment or as provided in the subsequent sentence of this Section, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed

Administrative Expense, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense. Notwithstanding the foregoing, any and all liabilities of the Debtors to the Governmental Authorities under Environmental Laws associated with the Properties that otherwise would constitute Administrative Expenses shall be treated and satisfied by and in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

      **2.2**    **Compensation and Reimbursement Claims.**  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Confirmation Date, and (ii) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Administrative Expense is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors.

      **2.3**    **Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.  Priority Tax Claims that New GM is liable for under the MSPA shall be the responsibility of New GM and shall receive no distribution under the Plan.

      **2.4**    **DIP Credit Agreement Claims.**  The lenders under the DIP Credit Agreement shall have an Allowed Administrative Expense for the total amount due under the DIP Credit Agreement as of the Effective Date, ratably in accordance with their respective interests in the DIP Credit Agreement Claims, subject to any applicable provisions of paragraph 5 of the Final Order approving the DIP Credit Agreement.  The Debtors shall pay on account of the amounts outstanding under the DIP Credit Agreement an amount equal to all Cash and Cash equivalents, if any, remaining after funding all obligations and amounts to be funded under the Plan (including the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Account, the Avoidance Action Trust Administrative Cash, and the Indenture Trustee Reserve Cash, and such amounts necessary to satisfy payment of and funding to reconcile Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims) and shall distribute beneficial interests in the Environmental Response Trust to the lenders under the DIP Credit Agreement.  To the extent it is determined that the lenders under the DIP Credit Agreement are entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee prior to the Effective Date, (ii) mutual agreement between the U.S. Treasury and the GUC Trust

Administrator on or after the Effective Date, or (iii) Final Order, the lenders under the DIP Credit Agreement shall receive the proceeds of the Term Loan Avoidance Action and/or the Asbestos Insurance Assets in accordance with Sections 4.3 and 6.5 hereof and the Avoidance Action Trust Agreement.  Notwithstanding anything to the contrary in the Plan, if any Collateral provided under the DIP Credit Agreement (including the DIP Lenders' Avoidance Assets) is not distributed pursuant to the Plan, such Collateral shall be distributed to lenders under the DIP Credit Agreement ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  Notwithstanding anything herein to the contrary, the lenders under the DIP Credit Agreement shall have the sole right to collect on, prosecute, designate another party to prosecute, assign, or waive the DIP Lenders' Avoidance Actions and the sole right to recover from or assign the DIP Lenders' Avoidance Assets.

      **2.5**    **Special Provisions Regarding Indenture Trustees' Fees and Expenses.** The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, upon submission of documented invoices to the Debtors and the Creditors' Committee, subject to a review for reasonableness by the Debtors and representatives of the members of the Creditors' Committee who are not Indenture Trustees, without the necessity of making application to the Bankruptcy Court. Subject to Section 6.7 hereof, each Indenture Trustee's charging lien will be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees and termination of the respective Indenture Trustee's duties.  Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustees' respective charging liens for any fees and expenses not paid by the Debtors.

**ARTICLE III.**

**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

      The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Property Environmental Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Asbestos Personal Injury Claims | Impaired | Yes |
| Class 6 | Equity Interests in MLC | Impaired | No (deemed to reject) |

For convenience of identification, the Plan classifies the Allowed Claims in Class 1 as a single Class. This Class is actually a group of subclasses, depending on the underlying property securing such Allowed Claims, and each subclass is treated hereunder as a distinct Class for voting and distribution purposes.

## ARTICLE IV.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1** **Class 1 – Secured Claims.** Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. In the event a Secured Claim is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released.

**4.2** **Class 2 - Priority Non-Tax Claims.** Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**4.3** **Class 3 - General Unsecured Claims.**

(a) As soon as is reasonably practicable after the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the GUC Trust its Pro Rata Share of (i) the New GM Securities and (ii) the GUC Trust Units, in accordance with the terms of the GUC Trust and the GUC Trust

23

Agreement. The GUC Trust shall make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed. The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units in accordance with the terms of the GUC Trust and the GUC Trust Agreement.

(b)    If any proceeds of the Term Loan Avoidance Action and/or the Asbestos Insurance Assets are received prior to the Avoidance Action Trust Transfer Date, then, to the extent it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets, either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee prior to the Effective Date, (ii) mutual agreement between the U.S. Treasury and the GUC Trust Administrator on or after the Effective Date, or (iii) Final Order, (A) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive its Pro Rata Share of such proceeds, net of any expenses incurred by the Debtors on or after the Effective Date, and (B) the Debtors shall make subsequent distributions of the net proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets to holders of Disputed General Unsecured Claims and Disputed Asbestos Personal Injury Claims as of the Distribution Record Date whose Claims are subsequently Allowed. Holders of Disputed General Unsecured Claims and Disputed Asbestos Personal Injury Claims on the Distribution Record Date whose Claims are subsequently Allowed prior to the initial distribution of proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets shall be deemed to be holders of Allowed General Unsecured Claims as of the Distribution Record Date for the purpose of this Section 4.3(b).

(c)    As soon as is reasonably practicable after the Avoidance Action Trust Transfer Date, to the extent it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets, either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee prior to the Effective Date, (ii) mutual agreement between the U.S. Treasury and the GUC Trust Administrator on or after the Effective Date, or (iii) Final Order, (A) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the Avoidance Action Trust, to the extent not already distributed, its Pro Rata Share of such proceeds in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement and (B) the Avoidance Action Trust shall make subsequent distributions of any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets to holders of Disputed General Unsecured Claims and Disputed Asbestos Personal Injury Claims as of the Distribution Record Date whose Claims are subsequently Allowed. The Avoidance Action Trust shall make additional distributions of any proceeds of the Term Loan Avoidance Action and of the Asbestos Insurance Assets to the Avoidance Action Trust Beneficiaries in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement. Holders of Disputed General Unsecured Claims and Disputed Asbestos Personal Injury Claims on the Distribution Record Date whose Claims

are subsequently Allowed prior to the Avoidance Action Trust Transfer Date shall be
deemed to be holders of Allowed General Unsecured Claims as of the Distribution
Record Date for the purpose of this Section 4.3(c).

(d)    Holders of Unliquidated Litigation Claims, at the option of the
Debtors or the GUC Trust Administrator, as applicable, shall be subject to the ADR
Procedures in order to determine the Allowed amount of their respective General
Unsecured Claims.

(e)    The Note Claims shall be Allowed in the respective amounts listed
next to each Indenture set forth in Exhibit "B" annexed hereto (the "**Fixed Allowed Note
Claims**").  The Fixed Allowed Note Claims shall override and supersede any individual
Claims filed by record or by beneficial holders of debt securities arising out of or relating
to the Note Claims.

(f)    The Eurobond Claims under (i) that certain Fiscal and Paying
Agency Agreement, dated as of July 3, 2003, among MLC, Deutsche Bank AG London,
and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $_____ ,
(ii) that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among
General Motors Nova Scotia Finance Company, MLC, Deutsche Bank Luxembourg S.A.,
and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $_____,
and (iii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986,
between General Motors Corporation and Credit Suisse, shall be Allowed in the amount
of $_____ (together, the "**Fixed Allowed Eurobond Claims**").  The Fixed Allowed
Eurobond Claims shall override and supersede any individual Claims filed by record or
by beneficial holders of debt securities arising out of or relating to the Eurobond Claims.

(g)    Notwithstanding anything to the contrary in this Section 4.3, all
proceeds of the Term Loan Avoidance Action and/or the Asbestos Insurance Assets shall
be applied first to pay the U.S. Treasury (i) all amounts expended on and after the
Effective Date to fund the costs and expenses associated with realizing such proceeds and
(ii) without duplication, the amount of the Avoidance Action Trust Administrative Cash.

**4.4    Class 4 – Property Environmental Claims.**  On the Effective Date, all
Property Environmental Claims shall be satisfied and treated in accordance with the
terms of the Environmental Response Trust Agreement, the Environmental Response
Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent
Decrees and Settlement Agreements.  All Property Environmental Claims are fully
satisfied in accordance with the terms of the Environmental Response Trust Consent
Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and
Settlement Agreements.

**4.5    Class 5 – Asbestos Personal Injury Claims.**  On the Effective Date, or as
soon thereafter as is reasonably practicable, all Asbestos Personal Injury Claims shall be
channeled to the Asbestos Trust and all Asbestos Personal Injury Claims shall be satisfied
in accordance with the terms of the Asbestos Trust, the Asbestos Trust Distribution

Procedures, and the Asbestos Trust Agreement.  The sole recourse of the holders of
Asbestos Personal Injury Claims shall be from the Asbestos Trust, and such holders shall
have no right whatsoever at any time to assert their respective Asbestos Personal Injury
Claims against any Protected Party, provided that, once Allowed, the Asbestos Trust
Claim shall be entitled to the same distributions from the GUC Trust and the Avoidance
Action Trust, as applicable, as an Allowed General Unsecured Claim in Class 3.  Without
limiting the foregoing, on the Effective Date, all Entities shall be permanently stayed,
restrained, and enjoined from taking any of the following actions for the purpose of,
directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect
to any Asbestos Personal Injury Claim (other than actions brought to enforce any right or
obligation under the Plan, any Exhibits to the Plan, the Plan Supplement, or any other
agreement or instrument between the Debtors and the Asbestos Trust, which actions shall
be in conformity and compliance with the provisions hereof and other than the right of
the Allowed Asbestos Trust Claim to receive distributions from the GUC Trust and the
Avoidance Action Trust, as applicable):  (i) commencing, conducting, or continuing in
any manner, directly or indirectly, any suit, action, or other proceeding (including,
without limitation, a judicial, arbitral, administrative, or other proceeding) in any forum
against any Protected Party or any property or interests in property of any Protected
Party, (ii) enforcing, levying, attaching (including without limitation, any prejudgment
attachment), collecting, or otherwise recovering by any means or in any manner, whether
directly or indirectly, any judgment, award, decree, or other order against any Protected
Party or any property or interests in property of any Protected Party, (iii) creating,
perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance
against any Protected Party or any property or interests in property of any Protected
Party, (iv) setting off, seeking reimbursement of, contribution from, or subrogation
against, or otherwise recouping in any manner, directly or indirectly, any amount against
any liability owed to any Protected Party or any property or interests in property of any
Protected Party, and (v) proceeding in any manner in any place with regard to any matter
that is subject to resolution pursuant to the Asbestos Trust Agreement, except in
conformity and compliance therewith.

     **4.6**    **Class 6 - Equity Interests in MLC.**  On the Effective Date, all Equity
Interests issued by MLC shall be cancelled and one new share of MLC's common stock
shall be issued to a custodian to be designated by MLC, who will hold such share for the
benefit of the holders of such former Equity Interests consistent with their former
economic entitlements.  All Equity Interests of the other Debtors shall be cancelled when
such Debtors are dissolved or merged out of existence in accordance with Section 6.10
hereof.  Each holder of an Equity Interest shall neither receive nor retain any property or
interest in property on account of such Equity Interest; *provided, however*, that in the
event all Allowed Claims have been satisfied in full, holders of Equity Interests may
receive a pro rata distribution of any remaining assets of the Debtors.  On or promptly
after the Effective Date, but in no event later than December 15, 2011, MLC shall file
with the Securities and Exchange Commission a Form 15 for the purpose of terminating
the registration of any of its publicly traded securities.  All Equity Interests in MLC
outstanding after the Effective Date shall be cancelled on the date MLC is dissolved in

accordance with Section 6.10 hereof.  The rights of a holder of an Equity Interest or former Equity Interest issued by MLC pursuant to this Section 4.6 shall be nontransferable.

### ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS

**5.1    Distribution Record Date.**  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests.  The Debtors shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date.  The Debtors shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.  Notwithstanding the foregoing, if the GUC Trust Units are transferable as set forth in Section 6.2(h) hereof, then the GUC Trust Administrator may set additional record dates for subsequent distributions to holders of GUC Trust Units, in accordance with the GUC Trust Agreement.

**5.2    Method of Distributions Under the Plan.**

(a)    **Payments and Transfers on Effective Date.**  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall (i) remit to holders of Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims an amount in Cash equal to the Allowed amount of such Claims, (ii) transfer the GUC Trust Assets to the GUC Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of General Unsecured Claims, (iii) transfer the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of Asbestos Personal Injury Claims, (iv) transfer the Environmental Response Trust Assets to the Environmental Response Trust free and clear of all liens, claims, and encumbrances (except for any statutory liens for property and ad valorem taxes not yet due and payable), but subject to any obligations imposed by the Plan, on behalf of holders of Property Environmental Claims, (v) reserve Cash for the Indenture Trustee Reserve Cash, which Cash shall be distributed to the Indenture Trustees upon submission of documented invoices to the Debtors or the GUC Trust Administrator in accordance with Section 6.2(f) hereof without the necessity of making application to the Bankruptcy Court, and (vi) remit and transfer to the holders of Allowed DIP Credit Agreement Claims the payments and distributions provided for in Section 2.4 hereof.

(b)    **Repayment of Excess Cash to the U.S. Treasury and EDC.**  If the Debtors have any Cash remaining after (i) transferring the GUC Trust Assets to the GUC Trust, including the funding of the GUC Trust Administrative Fund and the transfer

of the Indenture Trustee Reserve Cash in accordance with Section 6.2 hereof, (ii) transferring the Asbestos Trust Assets to the Asbestos Trust, (iii) transferring the Environmental Response Trust Assets to the Environmental Response Trust, including the funding of the Environmental Response Trust Administrative Funding Account, (iv) transferring the Avoidance Action Trust Assets to the Avoidance Action Trust, (v) the resolution (and the payment, to the extent Allowed) of all Disputed Administrative Expenses (including compensation and reimbursement of expenses under sections 330 or 503 of the Bankruptcy Code), Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims, (vi) the payment in full of all Allowed Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code), Allowed Priority Tax Claims, Allowed DIP Credit Agreement Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, and (vii) completing the acts described in Section 6.10 hereof, the Debtors shall pay such Cash to the U.S. Treasury and EDC by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  In the event any Cash remains in the GUC Trust Administrative Fund, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust Administrative Cash, or the Indenture Trustee Reserve Cash after all the obligations imposed on the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, or the Indenture Trustees, respectively, and the GUC Trust, the Environmental Response Trust, and the Avoidance Action Trust, respectively, pursuant to the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, respectively, have been satisfied, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, respectively, shall pay such Cash to the U.S. Treasury and EDC by wire transfer of immediately available funds to an account designated by the U.S Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  If the GUC Trust Administrator determines to close the Chapter 11 Cases in accordance with Section 6.2(q) hereof, the GUC Trust Administrator shall repay the Cash from the balance of the GUC Trust Administrative Fund after reserving any amounts necessary to close the Chapter 11 Cases to the U.S. Treasury and EDC by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.

(c)    **Payment of Cash or Certain Assets to Charitable Organizations.**  In the event any Cash or property remains in the Asbestos Trust after all the obligations imposed on the Asbestos Trust Administrator(s) and the Asbestos Trust pursuant to the Plan and the Asbestos Trust Agreement have been satisfied, the Asbestos Trust Administrator(s) shall pay such Cash amounts to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by,

and unrelated to, the Asbestos Trust Administrator(s). In the event any Asbestos Trust Assets remain in the Asbestos Trust after all Allowed Asbestos Personal Injury Claims have been satisfied pursuant to the Plan and the Asbestos Trust Agreement, the Asbestos Trust Administrator(s) shall transfer such Asbestos Trust Assets to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator(s).

(d)     **Distributions of Cash.** At the option of the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, any Cash payment to be made under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(e)     **Sale of New Warrants About to Expire.** During the sixty (60) days preceding the expiration of the New Warrants, the GUC Trust Administrator shall have the authority to sell any New Warrants remaining in the GUC Trust, whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute the proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable, consistent with, and as provided in, the Plan. For the avoidance of doubt, any holder of an Allowed General Unsecured Claim and/or GUC Trust Unit, as applicable, that is entitled to receive such New Warrants shall receive only the net cash proceeds, if any, of the sold New Warrants that the GUC Trust Administrator received upon such sale. To the extent holders of Allowed Claims and/or GUC Trust Units, as applicable, have received a portion of the New Warrants to which they are entitled pursuant to the Plan, the GUC Trust Administrator shall have the authority to sell the remaining portion of New Warrants pursuant to this Section 5.2(e).

**5.3     Delivery of Distributions and Undeliverable Distributions.**

(a)     Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder. Any distribution to be made to a holder of an Allowed General Unsecured Claim under any of the Indentures shall be made to the respective Indenture Trustee, subject to the Indenture Trustee's right to assert its charging lien against such distributions. The distribution from the Debtors, the GUC Trust, or the Avoidance Action Trust, as applicable, to any of the Indenture Trustees shall be deemed a distribution to the Registered Holders under the respective Indentures. In the event that any distribution to any holder is returned as undeliverable, no further distributions to such

holder shall be made unless and until the Debtors or the GUC Trust Administrator, the
Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as
applicable, are notified of such holder's then-current address, at which time all missed
distributions shall be made to such holder, without interest.  All demands for
undeliverable distributions shall be made on or before ninety (90) days after the date such
undeliverable distribution was initially made.  Thereafter, the amount represented by such
undeliverable distribution shall irrevocably revert to the Debtors or the GUC Trust, the
Asbestos Trust, or the Avoidance Action Trust, as applicable, and any Claim in respect of
such undeliverable distribution shall be discharged and forever barred from assertion
against the Debtors, the GUC Trust, the Asbestos Trust, the Avoidance Action Trust, and
their respective property.

(b)    Any distribution from the Debtors, the GUC Trust, or the
Avoidance Action Trust to any of the Indenture Trustees in accordance with the Plan
shall be deemed a distribution to the respective Registered Holders thereunder and shall
be subject to the applicable Indenture Trustee's right to assert its charging lien against
such distributions.  Distributions shall be made to the Registered Holders as follows:

(i)    Each Indenture Trustee shall distribute, as soon as is
reasonably practicable after receipt thereof and pursuant to the terms of the
applicable Indenture, the New GM Securities and the GUC Trust Units it receives
from the GUC Trust in accordance with Section 4.3(a) hereof to the Registered
Holders as of the Distribution Record Date.  The GUC Trust shall make additional
distributions of New GM Securities to holders of GUC Trust Units in accordance
with the GUC Trust Agreement and Section 4.3(a) hereof.

(ii)    To the extent that it is determined that the holders of
Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan
Avoidance Action and/or the Asbestos Insurance Assets either by (i) mutual
agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final
Order, then each Indenture Trustee shall distribute, as soon as is reasonably
practicable after receipt thereof and pursuant to the terms of the applicable
Indenture, the net proceeds of the Term Loan Avoidance Action and the Asbestos
Insurance Assets it receives from either (i) the Debtors in accordance with Section
4.3(b) hereof or (ii) the Avoidance Action Trust in accordance with Section 4.3(c)
hereof, to the Registered Holders as of the Distribution Record Date.

**5.4    Withholding and Reporting Requirements.**  In connection with the Plan
and all instruments issued in connection therewith and distributed thereon, any party
issuing any instrument or making any distribution under the Plan shall comply with all
applicable withholding and reporting requirements imposed by any federal, state, or local
taxing authority, and all distributions under the Plan and all related agreements shall be
subject to any such withholding or reporting requirements.  In the case of a non-Cash
distribution that is subject to withholding, the distributing party may withhold an
appropriate portion of such distributed property and sell such withheld property to
generate Cash necessary to pay over the withholding tax.  Notwithstanding the foregoing,

each holder of an Allowed Claim or Equity Interest (other than the Indenture Trustees) that receives a distribution under the Plan shall have responsibility for any taxes imposed by any governmental unit, including income, withholding, and other taxes, on account of such distribution.

**5.5** **Time Bar to Cash Payments.** Checks issued by the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, by the holder of the Allowed Claim to whom such check originally was issued. Any Claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the one hundred eighty (180) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtors, the GUC Trust, the Asbestos Trust, or the Avoidance Action Trust, as applicable, and any Claim in respect of such voided check shall be discharged and forever barred.

**5.6** **Minimum Distributions and Fractional Shares or Units.** No payment of Cash less than $25 shall be made by the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, to any holder of an Allowed Claim. No fractional shares of New GM Securities shall be distributed. For purposes of distribution, fractional shares of New GM Securities shall be rounded down to the next whole number or zero, as applicable; *provided, however*, that if an Entity's fractional shares are rounded down to zero, such Entity shall receive one share of New GM Securities. If an Entity holds more than one Allowed Claim, such Entity's Allowed Claims shall be aggregated for purposes of rounding down pursuant to this Section 5.6. After all distributions under the Plan have been made, any New GM Securities that are undistributable as a result of the foregoing shall be sold by the GUC Trust Administrator, and the GUC Trust Administrator shall distribute the Cash proceeds to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable; *provided, however*, that if the Cash proceeds from the sale of the New GM Securities is less than $150,000, such Cash shall be distributed to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the GUC Trust Administrator.

**5.7** **Setoffs.** The Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator(s), and the Avoidance Action Trust Administrator, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, of any such claim the Debtors may have against the holder of such Claim. Nothing in the Plan

shall limit or affect any right of the United States to offset (subject to obtaining Bankruptcy Court approval to the extent required) any obligation owed by the United States to the Debtors against any obligation owed by the Debtors to the United States.

**5.8    Transactions on Business Days.**  If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.9    Allocation of Plan Distribution Between Principal and Interest.**  All distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, as determined for U.S. federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any.

**ARTICLE VI.**

**MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN**

**6.1    Substantive Consolidation.**

(a)    Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of MLC of Harlem, Inc.; MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., and their respective estates, into MLC for voting, confirmation, and distribution purposes under the Plan.  Solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into MLC, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, (v) all Claims between or among the Debtors shall be cancelled, and (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

(b)    The substantive consolidation and deemed merger effected pursuant to Section 6.1(a) hereof shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.1(a) hereof) (i) the legal and organizational structure of the Debtors, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.

6.2    **The GUC Trust.**

      (a)    **Execution of GUC Trust Agreement.**  On or before the Effective
Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors'
Committee, the U.S. Treasury, as lender under the DIP Credit Agreement, and the GUC
Trust Administrator, shall be executed, and all other necessary steps shall be taken to
establish the GUC Trust and the beneficial interests therein, which shall be for the benefit
of the holders of Allowed General Unsecured Claims.  This Section 6.2 sets forth certain
of the rights, duties, and obligations of the GUC Trust Administrator.  In the event of any
conflict between the terms of this Section 6.2 and the terms of the GUC Trust Agreement,
the terms of the GUC Trust Agreement shall govern.

      (b)    **Purpose of GUC Trust.**  The GUC Trust shall be established to
administer certain post-Effective Date responsibilities under the Plan, including, but not
limited to, distributing New GM Securities and resolving outstanding Disputed General
Unsecured Claims to determine the amount of Allowed General Unsecured Claims that
will be eligible for distribution of their Pro Rata Share of New GM Securities under the
Plan.  If the Residual Wind-Down Assets are transferred to the GUC Trust upon
dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed
Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax
Claims, and Disputed Secured Claims.  The GUC Trust has no objective to continue or
engage in the conduct of a trade or business.

      (c)    **GUC Trust Assets.**  The GUC Trust shall consist of the GUC
Trust Assets.  On the GUC Trust Transfer Date, the Debtors shall transfer all the GUC
Trust Assets to the GUC Trust free and clear of all liens, claims, and encumbrances,
except to the extent otherwise provided herein.

      (d)    **Governance of GUC Trust.**  The GUC Trust shall be governed by
the GUC Trust Administrator and the GUC Trust Monitor.

      (e)    **The GUC Trust Administrator and the GUC Trust Monitor.**
The GUC Trust Administrator and the GUC Trust Monitor shall be designated by the
Creditors' Committee with the consent of the Debtors and the U.S. Treasury, as lender
under the DIP Credit Agreement, and the identities of the GUC Trust Administrator and
the GUC Trust Monitor shall be disclosed in the Plan Supplement.

      (f)    **Role of the GUC Trust Administrator.**  In furtherance of and
consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Administrator
shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the
holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC
Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii)
have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust
Assets obtained through the exercise of its power and authority, (iv) have the power and
authority to prosecute and resolve objections to Disputed General Unsecured Claims, (v)
have the power and authority to perform such other functions as are provided in the Plan

and the GUC Trust Agreement, (vi) have the power and authority to administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, and (vii) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, then the GUC Trust Administrator shall have the authority to prosecute, resolve objections, and satisfy the Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. The GUC Trust Administrator shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets and shall file periodic public reports on the status of claims reconciliation and distributions. In all circumstances, the GUC Trust Administrator shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement. Upon the dissolution of MLC, the Indenture Trustee Reserve Cash shall be transferred to the GUC Trust and the GUC Trust Administrator shall distribute funds to the Indenture Trustees from the Indenture Trustee Reserve Cash as required.

(g)    **Role of the GUC Trust Monitor.**  In furtherance of and consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Monitor shall oversee the activities of the GUC Trust Administrator as set forth in the GUC Trust Agreement. The GUC Trust Administrator shall report material matters to, and seek approval for material decisions from, the GUC Trust Monitor, as and to the extent set forth in the GUC Trust Agreement. Without limiting the foregoing, the GUC Trust Administrator shall obtain the approval of the GUC Trust Monitor with respect to settlements of Disputed General Unsecured Claims above a certain threshold and present periodic reports to the GUC Trust Monitor on the GUC Trust distributions and budget. In all circumstances, the GUC Trust Monitor shall act in the best interests of all beneficiaries of the GUC Trust, in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement.

(h)    **Transferability of GUC Trust Interests.**  Beneficial interests in the GUC Trust shall be transferable to the extent that the transferability thereof would not require the GUC Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended, and otherwise shall not be transferable except as provided in the GUC Trust Agreement.

(i)    **Cash.**  The GUC Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by section 345 of the Bankruptcy Code were the GUC Trust a debtor under the Bankruptcy Code, or as otherwise permitted by an order of the Bankruptcy Code, which may include the Confirmation Order.

(j)    **Costs and Expenses of the GUC Trust Administrator.**  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trust Administrator and its retained professionals, shall be paid out of the GUC Trust Administrative Fund, subject to the provisions of the Budget and the terms of the GUC Trust Agreement.

(k)    **Compensation of the GUC Trust Administrator.**  The GUC
Trust Administrator shall be entitled to reasonable compensation, subject to the
provisions of the Budget and the terms of the GUC Trust Agreement, in an amount
consistent with that of similar functionaries in similar types of bankruptcy cases.  Such
compensation shall be payable solely from the GUC Trust Administrative Fund.

(l)    **Distribution of GUC Trust Assets.**  The GUC Trust
Administrator shall distribute at least quarterly and in accordance with the GUC Trust
Agreement, beginning on the first Business Day following the Distribution Record Date,
or as soon thereafter as is practicable, (i) the appropriate amount of New GM Securities
(and other distributions of Cash, if any) to holders of Allowed General Unsecured Claims
and/or GUC Trust Units, as applicable, and (ii) Cash from the GUC Trust Administrative
Fund (a) in amounts as reasonably necessary to meet contingent liabilities and otherwise
address the expenses of the GUC Trust, (b) to pay reasonable expenses (including, but
not limited to, any taxes imposed on the GUC Trust or in respect of the GUC Trust
Assets), and (c) to satisfy other liabilities incurred by the GUC Trust in accordance with
the Plan or the GUC Trust Agreement.

(m)    **Retention of Professionals by the GUC Trust Administrator
and the GUC Trust Monitor.**  The GUC Trust Administrator and the GUC Trust
Monitor may retain and reasonably compensate counsel and other professionals to assist
in their duties as GUC Trust Administrator and GUC Trust Monitor on such terms as the
GUC Trust Administrator and the GUC Trust Monitor deem appropriate without
Bankruptcy Court approval, but subject to the consent of the U.S. Treasury, as lender
under the DIP Credit Agreement, and to the provisions of the GUC Trust Agreement.
The GUC Trust Administrator and the GUC Trust Monitor may retain any professional
who represented parties in interest, including the Debtors or the Creditors' Committee, in
the Chapter 11 Cases.  All fees and expenses incurred in connection with the foregoing
shall be payable solely from the GUC Trust Administrative Fund and shall be subject to
the provisions of the Budget and the terms of the GUC Trust Agreement.

(n)    **U.S. Federal Income Tax Treatment of GUC Trust.**

(i)    **Tax Status of GUC Trust.**  For all U.S. federal and
applicable state and local income tax purposes, all parties (including, without limitation,
the Debtors, the GUC Trust Administrator, and the holders of General Unsecured Claims)
shall treat the GUC Trust as a "disputed ownership fund" within the meaning of Treasury
Regulation section 1.468B-9.

(ii)    **Delivery of Statement of Transfers.**  Following the
funding of the GUC Trust (and in no event later than February 15th of the calendar year
following the funding of the GUC Trust), MLC shall provide a "§ 1.468B-9 Statement"
to the GUC Trust Administrator in accordance with Treasury Regulation section 1.468B-
9(g).

(iii)    **Tax Reporting.**

35

(1)    The GUC Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the GUC Trust that are required by any governmental unit.

(2)    The GUC Trust Administrator shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or the GUC Trust Assets.

(3) The GUC Trust Administrator may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(o)    **Dissolution.**  The GUC Trust Administrator and the GUC Trust shall be discharged or dissolved, as applicable, at such time as (i) all Disputed General Unsecured Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, (iii) all distributions required to be made by the GUC Trust Administrator under the Plan and the GUC Trust Agreement have been made, and (iv) if the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims have been resolved, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims.

(p)    **Indemnification of the GUC Trust Administrator and the GUC Trust Monitor.**  The GUC Trust Administrator and the GUC Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor, or the GUC Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor,  or the GUC Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts.  Any indemnification claim of the GUC Trust Administrator, the GUC Trust Monitor, and the other parties entitled to indemnification under this subsection shall be satisfied first from the GUC Trust Administrative Fund and then from the GUC Trust Assets.  The GUC Trust Administrator and the GUC Trust Monitor shall be entitled to rely, in good faith, on the advice of its retained professionals.

(q)    **Closing of Chapter 11 Cases.**  When all Disputed Claims (other than Asbestos Personal Injury Claims) filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, and all of the GUC Trust Assets and all Avoidance Action Trust Assets, if applicable, have been distributed in accordance with the Plan, the GUC Trust Administrator shall seek authority from the Bankruptcy Court to

close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.  If at any time the GUC Trust Administrator determines that the expense of administering the GUC Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the GUC Trust Assets remaining in the GUC Trust, the GUC Trust Administrator shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Chapter 11 Cases, (ii) repay any Cash balance from the GUC Trust Administrative Fund to the U.S. Treasury and EDC in accordance with Section 5.2(b) of the Plan, and (iii) unless the Chapter 11 Cases have been closed, close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

### 6.3    **The Asbestos Trust.**

(a)    **Execution of Asbestos Trust Agreement.**  On the Effective Date, the Asbestos Trust Agreement, in a form reasonably acceptable to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the U.S. Treasury, as lender under the DIP Credit Agreement, shall be executed, and all other necessary steps shall be taken to establish the Asbestos Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed Asbestos Personal Injury Claims.  In the event of any conflict between the terms of this Section 6.3 and the terms of the Asbestos Trust Agreement, the terms of the Asbestos Trust Agreement shall govern.

(b)    **Purpose of Asbestos Trust.**  The Asbestos Trust shall be established to, among other things, (i) direct the processing, liquidation, and payment of all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos Trust Distribution Procedures, and the Confirmation Order and (ii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Personal Injury Claims.

(c)    **Assumption of Certain Liabilities by Asbestos Trust.**  In consideration of the Asbestos Trust Assets transferred to the Asbestos Trust under the Plan and in furtherance of the purposes of the Asbestos Trust and the Plan, the Asbestos Trust shall assume all liability and responsibility for all Asbestos Personal Injury Claims and the Debtors shall have no further financial or other responsibility or liability therefor. The Asbestos Trust also shall assume all liability for premiums, deductibles, retrospective premium adjustments, security or collateral arrangements, or any other charges, costs, fees, or expenses (if any) that become due to any insurer in connection with the Asbestos Insurance Assets with respect to Asbestos Personal Injury Claims, asbestos-related claims against Entities insured under policies included in the Asbestos Insurance Assets by reason of vendor's endorsements, or under the indemnity provisions of settlement agreements that the Debtors made with various insurers prior to the Commencement Date to the extent that those indemnity provisions relate to Asbestos Personal Injury Claims,

and the Debtors shall have no further financial or other responsibility for any of the
foregoing.

(d)    **Asbestos Trust Assets.**  The Asbestos Trust shall consist of the
Asbestos Trust Assets.  On the Asbestos Trust Transfer Date, the Debtors shall transfer
all the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and
encumbrances, except to the extent otherwise provided herein.

(e)    **Governance of Asbestos Trust.**  The Asbestos Trust shall be
governed by the Asbestos Trust Administrator(s).

(f)    **The Asbestos Trust Administrator(s).**  The Asbestos Trust
Administrator(s) shall be designated on or before the Effective Date by the Debtors, with
the consent of the Asbestos Claimants' Committee, the Future Claimants' Representative,
and the U.S. Treasury, as lender under the DIP Credit Agreement, and such designation
shall be confirmed by the Bankruptcy Court.

(g)    **Role of the Asbestos Trust Administrator(s).**  In furtherance of
and consistent with the purpose of the Asbestos Trust and the Plan, the Asbestos Trust
Administrator(s) shall (i) have the power and authority to hold, manage, sell, invest, and
distribute the Asbestos Trust Assets to the holders of Allowed Asbestos Personal Injury
Claims, (ii) hold the Asbestos Trust Assets for the benefit of the holders of Allowed
Asbestos Personal Injury Claims, (iii) have the power and authority to hold, manage, sell,
and distribute the Asbestos Trust Assets obtained through the exercise of its power and
authority, (iv) have the power and authority to prosecute and resolve objections to
Asbestos Personal Injury Claims, and (v) have the power and authority to perform such
other functions as are provided in the Plan and the Asbestos Trust Agreement.  The
Asbestos Trust Administrator(s) shall be responsible for all decisions and duties with
respect to the Asbestos Trust and the Asbestos Trust Assets.  In all circumstances, the
Asbestos Trust Administrator(s) shall act in the best interests of all beneficiaries of the
Asbestos Trust and in furtherance of the purpose of the Asbestos Trust.

(h)    **Nontransferability of Asbestos Trust Interests.**  The beneficial
interests in the Asbestos Trust shall not be certificated and are not transferable (except as
otherwise provided in the Asbestos Trust Agreement).

(i)    **Cash.**  The Asbestos Trust Administrator(s) may invest Cash
(including any earnings thereon or proceeds therefrom).

(j)    **Costs and Expenses of the Asbestos Trust Administrator(s).**
The costs and expenses of the Asbestos Trust, including the fees and expenses of the
Asbestos Trust Administrator(s) and its retained professionals, shall, subject to the
provisions of the Budget and the terms of the Asbestos Trust Agreement, be paid first out
of the $__ million in Cash in the Asbestos Trust Assets and then out of the other Asbestos
Trust Assets.

      **(k)**     **Allowance of Asbestos Personal Injury Claims.**  With respect to any Asbestos Personal Injury Claim that is Allowed by the Asbestos Trust in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, such allowance shall establish the amount of legal liability against the Asbestos Trust in the amount of the liquidated value of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos Trust Distribution Procedures.

      **(l)**     **Distribution of Asbestos Trust Assets.**  In accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner.

      **(m)**     **Retention of Professionals by the Asbestos Trust Administrator(s).**  The Asbestos Trust Administrator(s) may retain and reasonably compensate counsel and other professionals to assist in its or their duties as Asbestos Trust Administrator(s) on such terms as the Asbestos Trust Administrator(s) deem(s) appropriate without Bankruptcy Court approval, but subject to the provisions of the Budget and the terms of the Asbestos Trust Agreement.  The Asbestos Trust Administrator(s) may retain any professional who represented parties in interest in the Chapter 11 Cases.

      **(n)**     **U.S. Federal Income Tax Treatment of Asbestos Trust.**

      **(i)**     **Tax Status of Asbestos Trust.**  For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Asbestos Trust Administrator(s), and the holders of Asbestos Personal Injury Claims) shall treat the Asbestos Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

      **(ii)**     **Delivery of Statement of Transfers.**  Following the funding of the Asbestos Trust (and in no event later than February 15th of the calendar year following the funding of the Asbestos Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Asbestos Trust Administrator(s) in accordance with Treasury Regulation section 1.468B-3(e)

      **(iii)**     **Other Statements.**  The Asbestos Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Asbestos Trust that are required by any governmental unit.

      **(iv)**     **Tax Payments.**  The Asbestos Trust Administrator(s) shall be responsible for payment, out of the Asbestos Trust Assets, of any taxes imposed on the Asbestos Trust or the Asbestos Trust Assets.

(v)     **Expedited Determination.**  The Asbestos Trust Administrator(s) may request an expedited determination of taxes of the Asbestos Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Asbestos Trust for all taxable periods through the dissolution of the Asbestos Trust.

(o)     **Dissolution.**  The Asbestos Trust Administrator(s) and the Asbestos Trust shall be discharged or dissolved, as applicable, at such time as (i) all Asbestos Personal Injury Claims have been resolved, (ii) all Asbestos Trust Assets have been liquidated, and (iii) all distributions required to be made by the Asbestos Trust Administrator(s) under the Plan and the Asbestos Trust Agreement have been made.

(p)     **Indemnification of the Asbestos Trust Administrator(s).**  The Asbestos Trust Administrator(s) and its or their agents and professionals shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Asbestos Trust Administrator(s) or the Asbestos Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Asbestos Trust Administrator(s) or the Asbestos Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Asbestos Trust Administrator(s) (and the other parties entitled to indemnification under this subsection (p)) shall be satisfied first from the $____ million in Cash in the Asbestos Trust Assets and then from the Asbestos Trust Assets.  The Asbestos Trust Administrator(s) shall be entitled to rely, in good faith, on the advice of its retained professionals.

**6.4**     **The Environmental Response Trust.**

(a)     **Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement.**  On the Effective Date, the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall become effective and the Environmental Response Trust shall be established and funded.  Entry of the Confirmation Order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The establishment and funding of the Environmental Response Trust and the transfer of Environmental Response Trust Assets to the Environmental Response Trust shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the General Unsecured Claims reserved in the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements, with respect to any of the Properties listed on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, whether prepetition or postpetition, in accordance with this Section 6.4 and the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that

40

nothing in this sentence shall preclude additional payments to the Environmental
Response Trust in the event that any of the Priority Order Sites Consent Decrees and
Settlement Agreements are not approved as provided in the Priority Order Sites Consent
Decrees and Settlement Agreements.  In the event of any conflict between the terms of
the Plan and the terms of the Environmental Response Trust Consent Decree and
Settlement Agreement, the terms of the Environmental Response Trust Consent Decree
and Settlement Agreement shall govern.

   **(b)**  **Purpose of Environmental Response Trust.**  The purpose of the
Environmental Response Trust shall be to conduct, manage, and/or fund Environmental
Actions with respect to certain of the Properties, including the migration of hazardous
substances emanating from certain of the Properties, in accordance with the provisions of
the Environmental Response Trust Agreement and the Environmental Response Trust
Consent Decree and Settlement Agreement; to reimburse the lead agency for
Environmental Actions it conducts or has agreed to pay for with respect to the Properties;
to own certain of the Properties, carry out administrative and property management
functions related to the Properties, and pay associated administrative costs; and to try to
sell or transfer the Properties owned by the Environmental Response Trust with the
objective that the Properties be put to productive or beneficial use.  After the
establishment and funding of, and the conveyance of the Properties owned by the Debtors
to, the Environmental Response Trust as provided in the Environmental Response Trust
Consent Decree and Settlement Agreement, the Debtors shall have no further liability,
role, or residual interest with respect to the Environmental Response Trust or the
Properties.

   **(c)**  **Environmental Response Trust Assets.**  The Environmental
Response Trust shall consist of the Environmental Response Trust Assets, as described in
the Environmental Response Trust Consent Decree and Settlement Agreement.  On the
Effective Date, the Debtors shall transfer all the Environmental Response Trust Assets to
the Environmental Response Trust, as provided in and subject to the provisions of the
Environmental Response Trust Consent Decree and Settlement Agreement.  Such transfer
shall include the transfer of Environmental Response Trust Cash in the amount of $____
million, which represents the aggregate amounts approved by the Bankruptcy Court to
pay the costs that will be incurred by the Environmental Response Trust with respect to
Environmental Actions and the costs of administering the Environmental Response Trust.
In settlement and full satisfaction of the Property Environmental Claims, on or before the
Effective Date, the Environmental Response Trust Administrative Trustee shall create,
and the Debtors shall make payments to, accounts held by or within the Environmental
Response Trust as specified and in the amounts provided in the Environmental Response
Trust Consent Decree and Settlement Agreement, and the Debtors shall make the
payments required under the Priority Order Sites Consent Decrees and Settlement
Agreements.  The Environmental Response Trust Administrative Trustee shall deposit,
maintain, and use the funding in accordance with the terms of the Environmental
Response Trust Agreement and the Environmental Response Trust Consent Decree and
Settlement Agreement for the purposes described therein.  Any Property may be sold or

transferred by the Environmental Response Trust Administrative Trustee in the circumstances and in light of the considerations described in the Environmental Response Trust Consent Decree and Settlement Agreement.

(d)      **Governance of Environmental Response Trust.**  The Environmental Response Trust shall be governed by the Environmental Response Trust Administrative Trustee according to the terms set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(e)      **Role of Environmental Response Trust Administrative Trustee.**  The Environmental Response Trust Administrative Trustee shall be responsible for implementing the purpose of the Environmental Response Trust, including overseeing the development of budgets, retaining and overseeing professionals to conduct Environmental Actions, entering into and overseeing the implementation of all contracts binding the Environmental Response Trust, executing agreements, preparing and filing all required plans and reports with the applicable Governmental Authorities, handling accounting and legal matters for the Environmental Response Trust, establishing funding objectives, monitoring the performance of the staff, and other administrative tasks, and shall carry out and implement the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.  The Environmental Response Trust Administrative Trustee shall not be authorized to engage in any trade or business with respect to the Environmental Response Trust Assets.

(f)      **Nontransferability of Environmental Response Trust Interests.** The beneficial interests in and powers under the Environmental Response Trust shall not be certificated and are not transferable (except as otherwise provided in the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement).

(g)      **Cash.**  The Environmental Response Trust Administrative Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by (i) section 345 of the Bankruptcy Code were the Environmental Response Trust a debtor under the Bankruptcy Code and (ii) the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(h)      **Indemnification of Environmental Response Trust Administrative Trustee.**  The potential liability of each Environmental Response Trust Party shall be limited as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.  Each Environmental Response Trust Party shall be indemnified and protected from litigation-related expenses as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

     **(i)**      **U.S. Federal Income Tax Treatment of Environmental Response Trust.**

        (i)     **Tax Status of Environmental Response Trust.**  Except as provided in the following sentence, for all  U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Environmental Response Trust Administrative Trustee, the lenders under the DIP Credit Agreement, and the holders of Property Environmental Claims) shall treat the Environmental Response Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  This provision shall not be binding on the Internal Revenue Service as to the application of Treasury Regulation section 1.468B-1 or any other tax issue with respect to the Environmental Response Trust.

        (ii)     **Delivery of Statement of Transfers.**  Following the funding of the Environmental Response Trust (and in no event later than February 15th of the calendar year following the funding of the Environmental Response Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Environmental Response Trust Administrative Trustee in accordance with Treasury Regulation section 1.468B-3(e).

        (iii)     **Other Statements.**  The Environmental Response Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Environmental Response Trust that are required by any governmental unit.

        (iv)     **Tax Payments**.  The Environmental Response Trust Administrative Trustee shall be responsible for payment, out of the Environmental Response Trust Assets, of any taxes imposed on the Environmental Response Trust or the Environmental Response Trust Assets.

        (v)     **Expedited Determination.**  The Environmental Response Trust Administrative Trustee may request an expedited determination of taxes of the Environmental Response Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Environmental Response Trust for all taxable periods through the dissolution of the Environmental Response Trust.

    **6.5**    **The Avoidance Action Trust.**

        **(a)**     **Execution of Avoidance Action Trust Agreement.**  On or before the Effective Date, the Avoidance Action Trust Agreement, in a form acceptable to the Debtors, the U.S. Treasury, and the Creditors' Committee, and the Avoidance Action Trust Administrator, shall be executed, and all other necessary steps shall be taken to establish the Avoidance Action Trust and the beneficial interests therein, which shall be for the benefit of the Avoidance Action Trust Beneficiaries; *provided, however*, that the Avoidance Action Trust Assets shall not be transferred to the Avoidance Action Trust until the Avoidance Action Trust Transfer Date; and *further provided,* that if it is determined that the U.S. Treasury or the holders of General Unsecured Claims are not entitled to any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance

Assets either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then the Avoidance Action Trust Agreement need not be in a form acceptable to the U.S. Treasury or the Creditors' Committee, as applicable.  In the event of any conflict between the terms of this Section 6.5 and the terms of the Avoidance Action Trust Agreement, the terms of the Avoidance Action Trust Agreement shall govern.  The Avoidance Action Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not adversely affect the status of the Avoidance Action Trust (or any applicable portion thereof) as a liquidating trust for federal income tax purposes, subject only to the federal income tax treatment of amounts held by the Avoidance Action Trust in respect of Disputed Claims (which amounts may comprise all or part of the assets of the Avoidance Action Trust, depending on the nature of the dispute).

       **(b)**      **Purpose of Avoidance Action Trust.**  The Avoidance Action Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

       **(c)**      **Avoidance Action Trust Assets.**  The Avoidance Action Trust shall consist of the Avoidance Action Trust Assets.  On the Avoidance Action Trust Transfer Date, if the Term Loan Avoidance Action is still pending or if there is any remaining balance in the Asbestos Insurance Assets, the Debtors shall transfer all of the Avoidance Action Trust Assets to the Avoidance Action Trust.  Upon delivery of the Avoidance Action Trust Assets to the Avoidance Action Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets.  In connection with the administration of the Avoidance Action Trust, any and all proceeds realized from the Term Loan Avoidance Action shall at all times be segregated from any and all proceeds realized from the Asbestos Insurance Assets.

       **(d)**      **Governance of Avoidance Action Trust.**  The Avoidance Action Trust shall be governed by the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.

       **(e)**      **The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be designated by the Debtors with the consent of the U.S. Treasury and the Creditors' Committee, and the identities of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be disclosed in the Plan Supplement, *provided, however*, that if it is determined that the U.S. Treasury or the holders of General Unsecured Claims are not entitled to any proceeds of the Term Loan Avoidance Action and/or the Asbestos Insurance Assets either by (i) mutual agreement between the Creditors' Committee and the U.S. Treasury or (ii) Final Order, then the Debtors shall neither seek nor obtain the consent of the U.S. Treasury or the Creditors' Committee, as applicable.

(f)    **Role of the Avoidance Action Trust Administrator.**  In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Administrator shall (i) have the power and authority to hold and manage the Avoidance Action Trust Assets, (ii) hold the Avoidance Action Trust Assets for the benefit of the Avoidance Acton Trust Beneficiaries, (iii) have the power and authority to prosecute and resolve, in the name of the Debtors and/or the names of the Avoidance Action Trust Administrator, the Term Loan Avoidance Action, and the Asbestos Insurance Assets, (iv) have the power and authority to invest and distribute to the Avoidance Action Trust Beneficiaries any proceeds of the Term Loan Avoidance Action and the Asbestos Insurance Assets, and (v) have the power and authority to perform such other functions as are provided in the Plan and the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator shall be responsible for all decisions and duties with respect to the Avoidance Action Trust and the Avoidance Action Trust Assets.  In all circumstances, the Avoidance Action Trust Administrator shall act in the best interests of the Avoidance Action Trust Beneficiaries and in furtherance of the purpose of the Avoidance Action Trust.  Prior to the Avoidance Action Trust Transfer Date, the Term Loan Avoidance Action shall be prosecuted, resolved, and administered by the GUC Trust Administrator.  All expenses incurred in connection with the prosecution of the Term Loan Avoidance Action (whether prior to or after the Avoidance Action Trust Transfer Date) shall be funded by the Avoidance Action Trust Administrative Cash, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(g)    **Role of the Avoidance Action Trust Monitor.**  In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Monitor shall oversee the activities of the Avoidance Action Trust Administrator as set forth in the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator shall report material matters to, and seek approval for material decisions from, the Avoidance Action Trust Monitor, as and to the extent set forth in the Avoidance Action Trust Agreement.  Without limiting the foregoing, the Avoidance Action Trust Administrator shall obtain the approval of the Avoidance Action Trust Monitor with respect to settlements of the Avoidance Action Trust Assets and present periodic reports to the Avoidance Action Trust Monitor on the Avoidance Action Trust distributions and budget.  In all circumstances, the Avoidance Action Trust Monitor shall act in the best interests of the Avoidance Action Trust Beneficiaries, in furtherance of the purpose of the Avoidance Action Trust, and in accordance with the Avoidance Action Trust Agreement.

(h)    **Nontransferability of Avoidance Action Trust Interests.**  The beneficial interests in the Avoidance Action Trust shall not be certificated and shall not be transferable (except as otherwise provided in the Avoidance Action Trust Agreement).

(i)    **Cash.**  The Avoidance Action Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation

section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

**(j)**     **Distribution of Avoidance Action Trust Assets.**  The Avoidance Action Trust shall distribute at least annually and in accordance with the Avoidance Action Trust Agreement any amount of Cash proceeds from the Term Loan Avoidance Action to the Avoidance Action Trust Beneficiaries (treating as Cash for purposes of this Section 6.5(j) any permitted investments under Section 6.5(i) hereof) except such amounts, if any, as would be distributable to a holder of a Disputed General Unsecured Claim or Disputed Asbestos Personal Injury Claim if such Disputed General Unsecured Claim or Disputed Asbestos Personal Injury Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved).  The Avoidance Action Trust shall distribute in accordance with the Avoidance Action Trust Agreement funds (i) as are reasonably necessary to meet contingent liabilities and maintain the value of the Avoidance Action Trust Assets during liquidation, (ii) necessary to pay reasonable incurred and anticipated expenses (including, but not limited to, any taxes imposed on the Avoidance Action Trust or in respect of the Avoidance Action Trust Assets), and (iii) necessary to satisfy other liabilities incurred and anticipated by the Avoidance Action Trust in accordance with the Plan or the Avoidance Action Trust Agreement.

**(k)**     **Costs and Expenses of Avoidance Action Trust.**  The costs and expenses of the Avoidance Action Trust, including the fees and expenses of the Avoidance Action Trust Administrator and its retained professionals, shall be paid out of the Avoidance Action Trust Assets, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Action Trust, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

**(l)**     **Compensation of the Avoidance Action Trust Administrator.**  The Entities serving as or comprising the Avoidance Action Trust Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

**(m)**     **Retention of Professionals by the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain and compensate attorneys and other professionals to assist in their duties as Avoidance Action Trust Administrator and Avoidance Action Trust Monitor on such terms as the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor deem appropriate without Bankruptcy Court approval, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.  Without limiting the foregoing, the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain any professional that represented parties in interest in the Chapter 11 Cases.

(n)    **U.S. Federal Income Tax Treatment of Avoidance Action Trust.**

(i)    **Treatment of Avoidance Action Trust Assets.**  For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Avoidance Action Trust Assets to the Avoidance Action Trust in a manner consistent with the remainder of this Section 6.5(n)(i).

(1)    If the Avoidance Action Trust Beneficiaries have not been identified on or prior to the Avoidance Action Trust Transfer Date either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the Avoidance Action Trust as either (A) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (including, if required, timely so electing) or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "complex trust" for U.S. federal income tax purposes.

(2)    If the Avoidance Action Trust Beneficiaries have been identified on or prior to the Avoidance Action Trust Transfer Date, or upon identification of the Avoidance Action Trust Beneficiaries after the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets shall be treated as being transferred (A) directly to the Avoidance Action Trust Beneficiaries and, to the extent Avoidance Action Trust Assets are allocable to Disputed Claims, to the Avoidance Action Trust Claims Reserve, followed by (B) the transfer by such Avoidance Action Trust Beneficiaries of the Avoidance Action Trust Assets (other than the Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve) in exchange for beneficial interests in the Avoidance Action Trust.  Accordingly, the Avoidance Action Trust Beneficiaries receiving beneficial interests in the Avoidance Action Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Avoidance Action Trust Assets (other than any Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve).  Any determination made pursuant to this Section 6.5(n)(i) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes. Accordingly, to the extent permitted by applicable law, all parties shall report consistently with the federal treatment of the Avoidance Action Trust by the Avoidance Action Trust Administrator for state and local income tax purposes.  For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be

indemnified from all liability for any and all consequences resulting from its determination under this Section 6.5(n)(i).

    (ii)    **Tax Reporting.**

    (1)    If the Avoidance Action Trust Administrator elects to treat the Avoidance Action Trust in its entirety or, if otherwise applicable, the Avoidance Action Trust Claims Reserve as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9, then following the Avoidance Action Trust Transfer Date (but in no event later than February 15th of the calendar year following the funding of the Avoidance Action Trust), MLC shall provide a "§ 1.468B-9 Statement" to the Avoidance Action Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

    (2)    From and after the date at which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall file returns for the Avoidance Action Trust treating the Avoidance Action Trust (except the Avoidance Action Trust Claims Reserve) as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the applicable provisions of this Section 6.5(n). The Avoidance Action Trust Administrator also shall annually send to each Avoidance Action Trust Beneficiary a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such Avoidance Action Trust Beneficiaries to report such items on their respective U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns. The Avoidance Action Trust Administrator also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Avoidance Action Trust that are required by any governmental unit.

    (A)    Allocations of the Avoidance Action Trust's taxable income among the Avoidance Action Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Avoidance Action Trust had distributed all of its other assets (valued at their tax book value and other than assets attributable to the Avoidance Action Trust Claims Reserve) to the Avoidance Action Trust Beneficiaries, in each case up to the tax book value of the assets treated as contributed by such Avoidance Action Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Action Trust. Similarly, taxable loss of the Avoidance

Action Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Avoidance Action Trust Assets. The tax book value of the Avoidance Action Trust Assets for this purpose shall equal their fair market value on the date at which Section 6.5(n)(i)(2) hereof applies, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

(B)    If the Avoidance Action Trust previously was treated as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9 or a complex trust for U.S. federal income tax purposes pursuant to Section 6.5(n)(i) hereof, the Avoidance Action Trust Administrator shall continue to treat the Avoidance Action Trust Claims Reserve in the same manner. If Section 6.5(n)(i)(2) hereof is applicable as of the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator shall (x) treat the Avoidance Action Trust Claims Reserve as either (i) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election or (ii) a "complex trust" for U.S. federal income tax purposes and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Any determination made pursuant to this Section 6.5(n)(ii)(2)(B) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes. For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be indemnified from all liability for any and all consequences resulting from its making such election.

(C)    As soon as practicable after the Avoidance Action Trust Transfer Date, and, if applicable, at any later date at which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall make a good-faith valuation of the Avoidance Action Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for all U.S. federal and applicable state and local income tax purposes.

(3)    The Avoidance Action Trust Administrator shall be responsible for payment, out of the Avoidance Action Trust Assets, of any taxes imposed on the Avoidance Action Trust or the Avoidance Action Trust Assets, including the Avoidance Action Trust Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Action Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable by the Avoidance Action Trust Administrator as a result of the resolution of such Disputed Claims.

(4)    The Avoidance Action Trust Administrator may request an expedited determination of taxes of the Avoidance Action Trust, including the Avoidance Action Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Avoidance Action Trust for all taxable periods through the dissolution of the Avoidance Action Trust.

(o)    **Dissolution.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust shall be discharged or dissolved, as applicable, at such time as (i) all of the Avoidance Action Trust Assets have been distributed pursuant to the Plan and the Avoidance Action Trust Agreement, (ii) the Avoidance Action Trust Administrator determines, in its sole discretion, that the administration of the Avoidance Action Trust Assets is not likely to yield sufficient additional Avoidance Action Trust Assets to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Action Trust Administrator under the Plan and the Avoidance Action Trust Agreement have been made, but in no event shall the Avoidance Action Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the third (3rd) anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Avoidance Action Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Action Trust Assets.  If at any time the Avoidance Action Trust Administrator determines, in reliance upon such professionals as the Avoidance Action Trust Administrator may retain, that the expense of administering the Avoidance Action Trust so as to make a final distribution to the Avoidance Action Trust Beneficiaries is likely to exceed the value of the Avoidance Action Trust Assets remaining in the Avoidance Action Trust, the Avoidance Action Trust Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Avoidance Action Trust, (ii) transfer the balance to the U.S. Treasury and EDC and/or

the GUC Trust as determined either by (A) mutual agreement between the U.S. Treasury and the Creditors' Committee prior to the Effective Date, (B) mutual agreement between the U.S. Treasury and the GUC Trust Administrator on or after the Effective Date, or (C) Final Order, or donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Avoidance Action Trust, and any insider of the Avoidance Action Trust Administrator, and (iii) dissolve the Avoidance Action Trust.

          **(p)**      **Indemnification of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts. Any indemnification claim of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and the other parties entitled to indemnification under this subsection) shall be satisfied first from the Avoidance Action Trust Administrative Cash and then from the Avoidance Action Trust Assets.  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be entitled to rely, in good faith, on the advice of their retained professionals.

          **(q)**      **Cooperation Regarding Insurance Matters.**  The Debtors shall cooperate with the Avoidance Action Trust and the Avoidance Action Trust Administrator and use commercially reasonable efforts to take or cause to be taken all appropriate actions and do or cause to be done all things necessary or appropriate to effectuate the transfer of the Asbestos Insurance Assets to the Avoidance Action Trust. By way of enumeration and not of limitation, the Debtors shall be obligated, to the extent practicable, to (i) provide the Avoidance Action Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Insurance Assets and (ii) execute further assignments or allow the Avoidance Action Trust to pursue claims relating to the Asbestos Insurance Assets in its name (subject to appropriate disclosure of the fact that the Avoidance Action Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings, or litigation, to the extent necessary or helpful to the efforts of the Avoidance Action Trust to obtain insurance coverage under the Asbestos Insurance Assets.

      **6.6**      **Securities Law Matters.**  In reliance upon section 1145(a) of the Bankruptcy Code, the offer and/or issuance of the New GM Securities by either MLC or the GUC Trust, as a successor of MLC under the Plan, is exempt from registration under

the Securities Act of 1933, as amended (the "**Securities Act**"), and any equivalent
securities law provisions under state law.  The exemption from Securities Act registration
provided by section 1145(a) of the Bankruptcy Code (as well as any equivalent securities
law provisions under state law) also is available for the offer and/or issuance by the GUC
Trust of (i) beneficial interests in the GUC Trust and (ii) New GM Securities in exchange
for such beneficial interests as outstanding Disputed General Unsecured Claims are
resolved in accordance with the Plan.  The offer and/or issuance of beneficial interests by
any of the following successors of the Debtors – the Asbestos Trust, the Environmental
Response Trust, and the Avoidance Action Trust – is  exempt from Securities Act
registration (along with equivalent securities law provisions under state law) in reliance
upon section 1145(a) of the Bankruptcy Code.

     **6.7**    **Cancellation of Existing Securities and Agreements.**  Except for
purposes of evidencing a right to distributions under the Plan or otherwise provided
hereunder, on the Effective Date all the agreements and other documents evidencing the
Claims or rights of any holder of a Claim against the Debtors, including all Indentures
and bonds, debentures, and notes issued thereunder evidencing such Claims, all Note
Claims, and any options or warrants to purchase Equity Interests, or obligating the
Debtors to issue, transfer, or sell Equity Interests or any other capital stock of the
Debtors, shall be cancelled and discharged; *provided, however*, that the Indentures shall
continue in effect solely for the purposes of (i) allowing the Indenture Trustees to make
any distributions on account of Allowed General Unsecured Claims in Class 3 pursuant
to the Plan and perform such other necessary administrative functions with respect
thereto, (ii) permitting the Indenture Trustees to receive payment from the Indenture
Trustee Reserve Cash, and (iii) permitting the Indenture Trustees to maintain any rights
or liens they may have for fees, costs, expenses, and indemnities under the Indentures,
against or recoverable from the Registered Holders.

     **6.8**    **Equity Interests in MLC Subsidiaries Held by the Debtors.**  On the
Effective Date, at the option of the Debtors, each respective Equity Interest in a direct or
indirect subsidiary of MLC shall be unaffected by the Plan, in which case the Debtor
holding such Equity Interests shall continue to hold such Equity Interests and shall cause
any such subsidiaries to be dissolved prior to December 15, 2011.  An amount equal to
any net proceeds realized from such dissolutions shall be distributed to the lenders under
the DIP Credit Agreement on account of amounts outstanding.

     **6.9**    **Administration of Taxes.**  Subject to the MSPA and the GUC Trust
Agreement, MLC shall be responsible for all tax matters of the Debtors until a certificate
of cancellation or dissolution for MLC shall have been filed in accordance with Section
6.10 hereof.

     **6.10**    **Dissolution of the Debtors.**  Within thirty (30) days after its completion
of the acts required by the Plan, or as soon thereafter as is practicable, but no later than
December 15, 2011, each Debtor shall be deemed dissolved for all purposes without the
necessity for any other or further actions to be taken by or on behalf of each Debtor;
*provided, however,* that each Debtor shall file with the office of the Secretary of State or

other appropriate office for the state of its organization a certificate of cancellation or dissolution.

### 6.11    Determination of Tax Filings and Taxes.

**(a)**    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA and the GUC Trust Agreement, the GUC Trust Administrator shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

**(b)**    Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes.  Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 6.11(a) hereof.

**(c)**    The Debtors and the GUC Trust Administrator shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the filing of a certificate of cancellation or dissolution for MLC.

**(d)**    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) and (d) of the MSPA, the GUC Trust Administrator shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and ad valorem taxes relating to the Environmental Response Trust Assets).

**(e)**    Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrative Fund shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and ad valorem tax refunds and credits relating to the Environmental Response Trust Assets).

(f)     The Environmental Response Trust shall be responsible for the payment of any property and ad valorem taxes relating to the Environmental Response Trust Assets that become due after the Environmental Response Trust Transfer Date.

(g)     Following the Environmental Response Trust Transfer Date, subject to Section 6.16(a) and (d) of the MSPA, the Environmental Response Trust Administrative Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for property and ad valorem taxes attributable to the Environmental Response Trust Assets and shall be authorized to respond to any such tax inquiries relating to the Environmental Response Trust Assets.

(h)     Following the Environmental Response Trust Transfer Date, subject to the MSPA, the Environmental Response Trust Administrative Trustee shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any property and ad valorem taxes attributable to the Environmental Response Trust Assets, including for any taxable period ending on, prior to, or after the Effective Date.

(i)     Each of the Debtors and the Environmental Response Trust Administrative Trustee shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to property and ad valorem taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the Environmental Response Trust Transfer Date a power of attorney authorizing the Environmental Response Trust Administrative Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxes described in Section 6.11(f) hereof.

**6.12    Books and Records.**  MLC shall comply with its obligations under the Environmental Response Trust Consent Decree and Settlement Agreement to provide documents, other records, and/or information to the Environmental Response Trust Administrative Trustee.  Upon the Effective Date, MLC shall transfer and assign to the GUC Trust full title to, and the GUC Trust shall be authorized to take possession of, all of the books and records of the Debtors, with the exception of those books and records that are necessary for the implementation of the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, which books and records MLC shall transfer and assign to the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, respectively.  Upon the Effective Date, the Creditors' Committee shall transfer and assign to the GUC Trust Monitor the books and records related to the administration of the GUC Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases.  Upon the Avoidance Action Trust Transfer Date, (i) MLC shall transfer and assign to the Avoidance Action Trust full

title to, and the Avoidance Action Trust shall be authorized to take possession of, all of the books and records of the Debtors relating to the Avoidance Action Trust Assets and (ii) the Creditors' Committee shall transfer and assign to the Avoidance Action Trust Monitor the books and records related to the administration of the Avoidance Action Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases.  Any such books and records transferred by either the Debtors or the Creditors' Committee shall be protected by the attorney client privilege.  The GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, shall have the responsibility of storing and maintaining the books and records transferred hereunder until one year after the date MLC is dissolved in accordance with Section 6.10 hereof, after which time such books and records may be abandoned or destroyed without further Bankruptcy Court order; *provided, however,* that any tax-related books and records transferred hereunder shall be stored and maintained until the expiration of the applicable statute of limitations.  The Debtors shall cooperate with the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, to facilitate the delivery and storage of their books and records in accordance herewith.  The Debtors (as well as their current and former officers and directors) shall be entitled to reasonable access to any books and records transferred in accordance with this Section 6.12 for all necessary corporate purposes, including, without limitation, defending or prosecuting litigation, determining insurance coverage, filing tax returns, and addressing personnel matters.  For purposes of this Section, books and records include computer-generated or computer-maintained books and records and computer data, as well as electronically-generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties and all the claims and rights of the Debtors in and to their books and records, wherever located.

    **6.13    Corporate Action.**  Upon the Effective Date, the Debtors shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefor, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors.  Each of the Debtors shall be authorized and directed, following the completion of all disbursements, other transfers, and other actions required of the Debtors by the Plan, to file its certificate of cancellation or dissolution as contemplated by Section 6.10 hereof.  The filing of such certificates of cancellation or dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, members, or directors (or other governing body) of the Debtors.

**6.14    Effectuating Documents and Further Transactions.**  Each of the officers of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VII.

### PROCEDURES FOR DISPUTED CLAIMS

**7.1    Objections to Claims and Resolution of Disputed Claims.**

(a)    Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, on and after the Effective Date and through the dissolution of MLC, the Debtors shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to object to Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(b)    On and after the Effective Date, the GUC Trust Administrator shall have the exclusive right to object, and/or continue prosecution of objections, to General Unsecured Claims (other than the Asbestos Trust Claim).  If the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, after such transfer, the GUC Trust Administrator shall have the exclusive right to object to any remaining Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(c)    The Debtors or the GUC Trust Administrator, as applicable, shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than one hundred eighty (180) days after (i) the Effective Date for all Claims (with the exception of Unliquidated Litigation Claims as set forth in this Section 7.1, and (ii) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the dates specified in clause (i) above. The Bankruptcy Court shall have the authority on request of the Debtors or the GUC Trust Administrator, as applicable, to extend the foregoing dates ex parte.  On and after the Effective Date, the Debtors shall continue to have the power and authority to prosecute and resolve objections to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.  All objections shall be litigated to a Final Order except to the extent the Debtors or the GUC Trust Administrator, as applicable, elects to withdraw any such objection or the Debtors or the GUC Trust Administrator, as applicable, and the holder of a Claim elect to compromise, settle, or otherwise resolve any such objection, in which event they may compromise, settle, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

(d)      Notwithstanding the foregoing, holders of Unliquidated Litigation Claims (other than the United States, including its agencies and instrumentalities) shall be subject to the ADR Procedures and Unliquidated Litigation Claims shall be channeled to the GUC Trust and resolved in accordance with the ADR Procedures.  If the Debtors or the GUC Trust Administrator, as applicable, terminate the ADR Procedures with respect to an Unliquidated Litigation Claim, the Debtors or the GUC Trust Administrator, as applicable, shall have one hundred eighty (180) days from the date of termination of the ADR Procedures to file and serve an objection to such Unliquidated Litigation Claim.  If the Debtors or the GUC Trust Administrator terminate the ADR Procedures with respect to an Unliquidated Litigation Claim and such Unliquidated Litigation Claim is litigated in a court other than the Bankruptcy Court, the Debtors or the GUC Trust Administrator, as applicable, shall have ninety (90) days from the date of entry of a Final Order adjudicating such Claim to file and serve an objection to such Claim for purposes of determining the treatment of such Claim under the Plan.

(e)      The resolution of Asbestos Personal Injury Claims shall be dealt with by the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures.

**7.2      No Distribution Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder to the holder thereof shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Until such time, with respect to General Unsecured Claims, the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, shall withhold from the property to be distributed to holders of beneficial interests in the GUC Trust or the Avoidance Action Trust, as applicable, the portion of such property allocable to Disputed General Unsecured Claims and Disputed Asbestos Claims and shall hold such property in the GUC Trust or the Avoidance Action Trust Claims Reserve, as applicable.  If any Disputed General Unsecured Claims are disallowed, the GUC Trust Assets held in the GUC Trust or the Avoidance Action Trust Assets held in the Avoidance Action Trust Claims Reserve, as applicable, shall be released as and to the extent the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, determines such property is no longer necessary to fund unresolved Disputed General Unsecured Claims, and such GUC Trust Assets or Avoidance Action Trust Assets, as applicable, shall be distributed in accordance with Sections 6.2 and 6.5 hereof, respectively.  All Unliquidated Litigation Claims shall be deemed Disputed Claims unless and until they are Allowed after resolution by settlement or Final Order.  This Section 7.2 shall not apply to Property Environmental Claims.

**7.3      Estimation.**  The Debtors or the GUC Trust Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the GUC Trust Administrator previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation,

during the pendency of any appeal relating to any such objection.  In the event that the
Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount
so estimated shall constitute either the Allowed amount of such Claim or a maximum
limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated
amount constitutes a maximum limitation on the amount of such Claim, the Debtors or
the GUC Trust Administrator, as applicable, may pursue supplementary proceedings to
object to the allowance of such Claim.  All the aforementioned objection, estimation, and
resolution procedures are intended to be cumulative and not exclusive of one another.  On
and after the Confirmation Date, Claims that have been estimated may be compromised,
settled, withdrawn, or otherwise resolved subsequently, without further order of the
Bankruptcy Court.  This Section 7.3 shall not apply to Property Environmental Claims.

**7.4**    **Allowance of Disputed Claims.**  If, on or after the Effective Date, any
Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtors, the GUC
Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, shall,
on the next applicable distribution date following when the Disputed Claim becomes an
Allowed Claim, distribute to the holder thereof the distributions, if any, that such holder
would have received had its Claim been Allowed on the Effective Date, except as
otherwise provided herein.

**7.5**    **Dividends.**  In the event that dividend distributions have been made with
respect to the New GM Securities that are in the GUC Trust, such dividends shall be
distributed to holders of Allowed Claims in the same manner and at the same time as the
New GM Securities to which such dividends relate are distributed.

## ARTICLE VIII.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1**    **Executory Contracts and Unexpired Leases.**  On the Effective Date, all
executory contracts and unexpired leases to which any of the Debtors are parties shall be
deemed rejected as of the Effective Date, except for an executory contract or unexpired
lease that (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy
Court entered prior to the Effective Date, (ii) is the subject of a separate motion to
assume or reject filed under section 365 of the Bankruptcy Code by the Debtors prior to
the Effective Date, or (iii) constitute Environmental Trust Assets.

**8.2**    **Approval of Rejection of Executory Contracts and Unexpired Leases.**
Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a)
of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases
rejected as of the Effective Date pursuant to the Plan.

**8.3**    **Rejection Claims.**  In the event that the rejection of an executory contract
or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the
other party or parties to such contract or lease, a Claim for such damages, if not
heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be

enforceable against the Debtors, the GUC Trust Administrator, the Asbestos Trust
Administrator(s), the Environmental Response Trust Administrative Trustee, and the
Avoidance Action Trust Administrator, or any property to be distributed under the Plan,
the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the
Avoidance Action Trust unless a proof of Claim is filed with the Bankruptcy Court and
served upon the Debtors, the GUC Trust Administrator, the Asbestos Trust
Administrator(s), the Environmental Response Trust Administrative Trustee, and the
Avoidance Action Trust Administrator on or before the date that is thirty (30) days after
the Confirmation Date.

**ARTICLE IX.**

**EFFECTIVENESS OF THE PLAN**

**9.1    Condition Precedent to Confirmation of Plan.**  The following is a
condition precedent to the confirmation of the Plan:

**(a)**    The Bankruptcy Court shall have entered the Confirmation Order
in form and substance satisfactory to the Debtors.

**9.2    Conditions Precedent to Effective Date.**  The following are conditions
precedent to the Effective Date of the Plan:

**(a)**    The Confirmation Order shall be in full force and effect, and no
stay thereof shall be in effect;

**(b)**    The GUC Trust Agreement, the Asbestos Trust Agreement, the
Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement
shall have been executed;

**(c)**    The GUC Trust Assets shall have been transferred to the GUC
Trust;

**(d)**    The Environmental Response Trust Consent Decree and
Settlement Agreement shall have been approved by order of the Bankruptcy Court, such
order shall be in full force and effect, and no stay thereof shall be in effect, and the
Environmental Response Trust Assets shall have been transferred to the Environmental
Response Trust; and

**(e)**    The Debtors shall have sufficient Cash to pay the sum of (i)
Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-
Tax Claims, and, if applicable, Allowed Secured Claims, and the professional fees of the
Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future
Claimants' Representative that have not been paid, (ii) an amount that would be required
to distribute to the holders of Disputed Administrative Expenses, Disputed Priority Tax
Claims, Disputed Priority Non-Tax Claims, and, if applicable, Disputed Secured Claims

if all such Claims are subsequently Allowed, as set forth more fully in Article VII hereof, and (iii) the amounts required to fund the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust, and the Indenture Trustee Reserve Cash.

**9.3**    **Satisfaction and Waiver of Conditions.**    Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that any of the conditions precedent set forth in Section 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court.  Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right, with the written consent of the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to waive the occurrence of any of the conditions precedent set forth in Section 9.2(b) or (c) hereof or to modify any of such conditions precedent.  Any such written waiver of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

**9.4**    **Effect of Nonoccurrence of Conditions to Consummation.**    If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the first Business Day that is one hundred eighty (180) days after the Confirmation Date, or such later date as shall be agreed by the Debtors and the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the U.S. Treasury, the Confirmation Order may be vacated by the Bankruptcy Court.  If the Confirmation Order is vacated pursuant to this Section, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims against any of the Debtors.

### ARTICLE X.

### EFFECT OF CONFIRMATION

**10.1**    **Vesting of Assets.**    As of the Effective Date, the property of the Debtors' estates shall vest in the Debtors and, in accordance with Article VI hereof and subject to the exceptions contained therein, (i) the GUC Trust Assets shall be transferred to the GUC Trust, (ii) the Asbestos Trust Assets shall be transferred to the Asbestos Trust, (iii) the Environmental Response Trust Assets shall be transferred to the Environmental Response Trust, and (iv) if the Term Loan Avoidance Action is still pending on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets shall be transferred to the Avoidance Action Trust.  From and after the Effective Date, (i) the GUC Trust Administrator may dispose of the GUC Trust Assts free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the GUC Trust Agreement, (ii) the Asbestos Trust Administrator(s) may dispose of the Asbestos Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the

provisions of the Plan and the Asbestos Trust Agreement, (iii) the Environmental Response Trust Administrative Trustee may dispose of the Environmental Response Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, and (iv) if the Term Loan Avoidance Action is still pending on the Asbestos Trust Transfer Date, the Avoidance Action Trust Administrator may dispose of the Avoidance Action Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Avoidance Action Trust Agreement. As of the Effective Date, all assets of the Debtors, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust shall be free and clear of all Claims and Encumbrances, except as provided in the Plan or the Confirmation Order.

**10.2    Release of Assets.** Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors and their assets and properties. Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article XI hereof.

**10.3    Binding Effect.** Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**10.4    Term of Injunctions or Stays.** Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**10.5    Term Loan Avoidance Action; Offsets.** If the Term Loan Avoidance Action is still pending on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator may pursue, abandon, settle, or release the Term Loan Avoidance Action transferred to the Avoidance Action Trust as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court. The Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, may, in their sole discretion, offset any claim held against a person against any payment due such person under the Plan; *provided, however*, that any claims of the Debtors arising before the Commencement Date shall first be offset against Claims against the Debtors arising before the Commencement Date.

**10.6    Injunction.** On and after the Confirmation Date, all persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which the Debtors

or the GUC Trust Administrator retains sole and exclusive authority to pursue in accordance with the Plan.

**10.7** **Injunction Against Interference with Plan.**  Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**10.8** **Special Provisions for the United States.**  Except as provided in the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements, as to the United States, the States of Delaware, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, Wisconsin, the Saint Regis Mohawk Tribe, Canada, and their respective agencies, departments, or agents (collectively for purposes of this Section 10.8, the "**United States**"), nothing in the Plan, including Sections 12.5 and 12.6 hereof, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, arising on or after the Confirmation Date, (ii) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (iii) any valid right of setoff or recoupment, (iv) any police or regulatory action, (v) any environmental liability that the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (vi) any liability to the United States on the part of any Persons or Entities other than the Debtors, their Estates, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, except with respect to the parties as specifically provided for in Sections 12.5 and 12.6 hereof.

ARTICLE XI.

**RETENTION OF JURISDICTION**

**11.1** **Jurisdiction of Bankruptcy Court.**  The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action (including the Term Loan Avoidance Action);

(c) To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e) To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f) To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i) To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, including to formulate and enforce alternative dispute resolution procedures with respect to the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement;

(j) To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k) To recover all assets of the Debtors, property of the Debtors' estates, the GUC Trust Assets, the Asbestos Trust Assets, and the Avoidance Action Trust Assets, wherever located;

(l)  To hear and determine all objections to the termination of the Asbestos Trust;

(m) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o) To resolve all matters related to the 363 Transaction;

(p) To enforce all orders previously entered by the Bankruptcy Court;

(q) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(r)  To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Notwithstanding anything in this Article XI to the contrary, (i) the allowance of Asbestos Personal Injury Claims and the forum in which such allowance will be determined shall be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement and (ii) the Bankruptcy Court and/or the District Court shall have concurrent, rather than exclusive, jurisdiction with respect to disputes relating to (a) rights under insurance policies issued to the Debtors that are included in the Asbestos Insurance Assets, and (b) the Debtors' rights to insurance with respect to workers' compensation claims.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**12.1    Dissolution of Committees.**  Except in connection with the Term Loan Avoidance Action prior to the Avoidance Action Trust Transfer Date, on the Effective Date, the Creditors' Committee shall dissolve; *provided, however*, that, following the Effective Date, the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution

pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the
Confirmation Order that remain pending as of the Effective Date to which the Creditors'
Committee is a party, (iii) responding to creditor inquiries for one hundred twenty (120)
days following the Effective Date, and (iv) the settlement or determination by Final Order
of the Asbestos Trust Claim (including through any appeals).  On the Effective Date, the
Asbestos Claimants' Committee shall dissolve.  Upon the dissolution of the Creditors'
Committee and the Asbestos Claimants' Committee, the current and former members of
the Creditors' Committee, the members of the Asbestos Claimants' Committee, and the
Future Claimants' Representative, and their respective officers, employees, counsel,
advisors, and agents, shall be released and discharged of and from all further authority,
duties, responsibilities, and obligations related to and arising from and in connection with
the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's,
the Asbestos Claimants' Committee's, and the Future Claimant's Representative's
respective attorneys, accountants, and other agents shall terminate, except that the
Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants'
Representative, and their respective professionals shall have the right to pursue, review,
and object to any applications for compensation and reimbursement of expenses filed in
accordance with Section 2.2 hereof.  The Creditors' Committee shall continue to serve
through the Avoidance Action Trust Transfer Date to prosecute the Term Loan
Avoidance Action.  The Future Claimants' Representative shall continue to serve through
the termination of the Asbestos Trust in order to perform the functions required under the
Asbestos Trust Agreement.  The fees and expenses of the Future Claimants'
Representative from and after the Effective Date relating to the role of the Future
Claimants' Representative in the Asbestos Trust, pursuant to the Asbestos Trust
Agreement and the Asbestos Trust Distribution Procedures (including, without limitation,
the fees and expenses of any professionals retained by the Future Claimants'
Representative), shall be the sole responsibility of the Asbestos Trust.

     **12.2**    **Substantial Consummation.**  On the Effective Date, the Plan shall be
deemed to be substantially consummated under sections 1101 and 1127(b) of the
Bankruptcy Code.

     **12.3**    **Effectuating Documents and Further Transactions.**  An officer of each
of the Debtors is authorized and directed to execute, deliver, file, or record such
contracts, instruments, releases, indentures, and other agreements or documents and take
such actions as may be reasonably necessary or appropriate to effectuate and further
evidence the terms and conditions of the Plan and any securities issued pursuant to the
Plan.

     **12.4**    **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the
Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of
any deed or other instrument of transfer under, in furtherance of, or in connection with
the Plan, including any deeds, bills of sale, or assignments executed in connection with
any disposition of assets contemplated by the Plan (including transfers of assets to and by
the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the

Avoidance Action Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

**12.5    Release.**  As of the Effective Date, the Debtors release (i) all present and former directors and officers of the Debtors who were directors and/or officers, respectively, on or after the Commencement Date, and any other Persons who serve or served as members of management of the Debtors on or after the Commencement Date, (ii) all post-Commencement Date advisors, consultants, or professionals of or to the Debtors, the lenders under the DIP Credit Agreement, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the Indenture Trustees, and (iii) all members (current and former) of the Creditors' Committee and of the Asbestos Claimants' Committee, in their capacity as members of such Committees, the Future Claimants' Representative, and the Indenture Trustees from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, and the ownership, management, and operation of the Debtors, except for willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Debtors' estates) or gross negligence; *provided, however,* that the foregoing shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors to such former director, officer, or employee.

**12.6    Exculpation.**  Neither the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the lenders under the DIP Credit Agreement, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the Indenture Trustees, nor any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and each of their respective members (current or former), officers, directors, employees, counsel, advisors, professionals, and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**12.7    Post-Confirmation Date Fees and Expenses.**

(a)    **Fees and Expenses of Professionals.**  The Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court (but subject to the review by and approval of the lenders under the DIP Credit Agreement), pay the reasonable fees and expenses, incurred after the Confirmation Date, of the professional persons employed by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Committee in connection with the implementation and consummation of the Plan, the claims reconciliation process, and any other matters as to which such professionals may be engaged.

(b)    **Fees and Expenses of GUC Trust Administrator, Asbestos Trust Administrator(s), Environmental Response Trust Administrative Trustee, and Avoidance Action Trust Administrator.**  The fees and expenses of the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator shall be paid in accordance with the terms of the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement, respectively, and shall be subject to the provisions of the Budget.

**12.8    Payment of Statutory Fees.**  On the Effective Date, and thereafter as may be required, the Debtors, and after the Effective Date, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator shall each (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) be responsible for the filing of postconfirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules.

**12.9    Modification of Plan.**  Upon reasonable notice to the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors (and as of the Effective Date, the GUC Trust Administrator) may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however,* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

**12.10    Revocation or Withdrawal of Plan.**  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Debtors

take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

**12.11    Courts of Competent Jurisdiction.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.12    Severability.**  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.13    Governing Law.**  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit to the Plan or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**12.14    Exhibits.**  The Exhibits to the Plan and the Plan Supplement are incorporated into and as part of the Plan as if set forth herein.

**12.15    Successors and Assigns.**  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

**12.16    Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.17    Notices.**  To be effective, all notices, requests, and demands to or upon the
Debtors, the Creditors' Committee, the U.S. Treasury, the GUC Trust Administrator, the
Asbestos Trust Administrator(s), the Environmental Response Trust Administrative
Trustee, or the Avoidance Action Trust Administrator shall be in writing (including by
facsimile or electronic transmission) and, unless otherwise expressly provided herein,
shall be deemed to have been duly given or made when actually delivered or, in the case
of notice by facsimile transmission, when received and telephonically confirmed,
addressed as follows:

If to the Debtors, to:

Motors Liquidation Company
500 Renaissance Center, Suite 1400
Detroit, Michigan 48243
Attn:  Ted Stenger
Telephone:  (313) 486-4044
Telecopier:  (313) 486-4259
E-mail:  tstenger@alixpartners.com

AlixPartners LLP
40 West 57th Street
New York, New York 10019
Attn:  Ted Stenger
Telephone:  (212) 490-2500
Telecopier:  (212) 490-1344
E-mail:  tstenger@alixpartners.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Stephen Karotkin, Esq.
          Joseph H. Smolinsky, Esq.
Telephone:  (212) 310-8000
Telecopier:  (212) 310-8007
E-mail:  stephen.karotkin@weil.com
          joseph.smolinsky@weil.com

If to the Creditors' Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:    Thomas Moers Mayer, Esq.
          Robert Schmidt, Esq.
Telephone:  (212) 715-9100
Telecopier:  (212) 715-8000
E-mail:  tmayer@kramerlevin.com
          rschmidt@kramerlevin.com

If to the Asbestos Claimants' Committee, to:

Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Attn:    Elihu Inselbuch, Esq.
          Rita C. Tobin, Esq.
Telephone:  (212) 319-7125
Telecopier:  (212) 644-6755
E-mail:  ei@capdale.com
          rct@capdale.com

-and-

Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005
Attn:    Trevor W. Swett III, Esq.
          Kevin C. Maclay, Esq.
Telephone:  (202) 862-5000
Telecopier:  (202) 429-3301
E-mail:  tws@capdale.com
          kcm@capdale.com

If to the Future Claimants' Representative, to:

Stutzman, Bromberg, Esserman & Plifka,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Attn:   Sander L. Esserman, Esq.
        Robert T. Brousseau, Esq.
Telephone:  (214) 969-4900
Telecopier:  (214) 969-4999
E-mail:  esserman@sbep-law.com
         brousseau@sbep-law.com

If to the U.S. Treasury, to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attn:   Chief Counsel, Office of Financial Stability
Telecopier:  (202) 927-9225
E-mail:  OFSChiefCounselNotices@do.treas.gov

If to the GUC Trust Administrator,
the Asbestos Trust Administrator(s),
the Environmental Response Trust Administrative Trustee, or
the Avoidance Action Trust Administrator,
to the address(es)
designated in the Confirmation Order

Dated:      New York, New York
            August 31, 2010


                    Respectfully submitted,


                    MOTORS LIQUIDATION COMPANY

                    By:    /s/ Ted Stenger_____
                            Name:  Ted Stenger
                            Title:  Executive Vice President

MLC OF HARLEM, INC.
MLCS, LLC
MLCS DISTRIBUTION CORPORATION
REMEDIATION AND LIABILITY MANAGEMENT COMPANY,
INC.
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY,
INC.

BY:  MOTORS LIQUIDATION COMPANY, as agent for each of
the foregoing entities

By:    /s/ Ted Stenger
           Name:  Ted Stenger
           Title:  Executive Vice President

**EXHIBIT A**

## PRIORITY ORDER SITES

Wheeler Pit, Intersection of County Highway O and County Highway J, LaPrairie Township, WI

Scatterfield Road/Columbus Avenue, 2900 South Scatterfield Road, 2401 Columbus Avenue, Anderson, IN

Harvey & Knott, Old County Road, Kirkwood, DE

Sioux City, 1805 Zenith Drive, Sioux City, IA

Delphi Dayton, 300 Taylor Street, Dayton, OH

Garland Road, Frederick Garland Road, West Milton, OH

# EXHIBIT B

## FIXED ALLOWED NOTE CLAIMS

## [TO BE PROVIDED]