UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **MOTORS LIQUIDATION COMPANY, *et al*., f/k/a General Motors Corp., *et al*.** | : | **09-50026 (REG)** |
| **Debtors.** | : | **(Jointly Administered)** |
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.** | : | **09-50029 (REG)** |
| **Debtor.** | : | |
| **In re** | : | |
| | : | **Chapter 11 Case No** |
| **ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.,** | : | **09-50030 (REG)** |
| **Debtor.** | : | |

**AFFIDAVIT OF PUBLICATION**

STATE OF NEW YORK )
) ss
COUNTY OF SUFFOLK )

I, Barbara Kelley Keane, being duly sworn, depose and state:

1. I am an Assistant Director with The Garden City Group, Inc., the claims and noticing agent for the debtors and debtors-in-possession (the "Debtors") in the above-captioned proceeding. Our business address is 105 Maxess Road, Melville, New York 11747.

2. On September 14, 2010, at the direction of Weil, Gotshal & Manges LLP, counsel for the Debtors, I caused publication of the **Notice of Hearing to Consider Approval of Debtors' Proposed Disclosure Statement with Respect to Debtors' Joint Chapter 11 Plan** in the following publications:

Publication Name

*The Wall Street Journal – Global Edition*

*The New York Times*

*The National Post*

*The Globe and Mail*

*USA Today, National Edition*

3. I state under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

/s/ Barbara Kelley Keane

Sworn to before me this
21st day of September, 2010

/s/ Jodi Pujols
Notary Public – State of New York
No 01PU6175916
My Commission Expires October 22, 2011

# Mindray Eyes U.S. as West Looks East

## Suzlon Plans China Export Hub

By Shai Oster

TIANJIN, China—**Suzlon Energy** Ltd. plans to open a research-and-development center in China and to make the first large export of turbines from its Chinese factory, its chairman said.

Suzlon Chairman Tulsi Tanti also said in an interview Monday that Suzlon is considering listing its China-based assets on Hong Kong's stock exchange. He wasn't specific about the timing except to say the listing is a medium-term plan. Suzlon currently is listed on the Bombay Stock Exchange.

Mr. Tanti, speaking on the sidelines of the World Economic Forum's annual summer meeting of business leaders, politicians and others, said the planned export of 120 megawatts of wind turbines to Brazil marks the first time Suzlon is using its low-cost manufacturing and supply base in China for sales overseas and is part of broader plan to increase exports from China.

The Brazil deal could be valued at as much as $200 million, based on an industry average for deals of that size. Mr. Tanti declined to specify the value or the name of the buyer.

Each turbine will have a capacity of 2.1 megawatts. They are scheduled for delivery next year, he said.

Mr. Tanti said Suzlon will have to protect against currency fluctuations in its exports to Brazil, hedging the Brazilian real against possible fluctuations of the yuan.

Details on the size of investment, location and number of engineers for Suzlon's planned R&D center in China are being discussed, he said.

Suzlon, which Mr. Tanti founded in Pune, India, in 1995, is now one of the biggest wind-power companies in the world. But Suzlon and other wind-power turbine makers have suffered declining sales in the wake of the global financial crisis.

China is a bright spot, responsible for a 30% increase in the installation of wind-power capacity in Asia. Chinese companies have pushed out foreigners, mostly by selling at a lower cost.

But Mr. Tanti said that edge is disappearing. Suzlon brought prices down 10% on its turbines made in China by using domestic suppliers and content, bringing its prices close to those of the company's Chinese competitors. Further contributing to the lower costs are two new models Suzlon has designed for the China market that will be introduced next year.

"There is no more space for the price to come down—steel and copper won't get cheaper," he said. That will allow Suzlon to compete on technology and reliability, he added. Mr. Tanti said REpower Systems AG of Germany, 91% of which is owned by Suzlon, is considering setting up a venture with a Chinese company to pursue offshore wind farms. Suzlon would provide the wind turbines but is looking for a partner with expertise in offshore structure. The partner could be an oil company or someone similar who has built offshore platforms.

## Big Oil Find Is Confirmed

By Leia Parker

LONDON—**Tullow Oil** PLC said Monday that new drilling results and other tests confirm its Owo prospect offshore of Ghana is a "major new oil field."

Owo, the second big oil discovery the U.K. company has made off Ghana, is near the Tweneboa oil-and-gas discovery.

Tullow said in July it had found the Owo oil field in the deep-water Tano block, potentially adding a billion barrels of oil equivalent to the resource estimate for the area. It said in a statement Monday that the Owo-1 exploration sidetrack well had significantly extended the column of high-quality light oil discovered by the Owo-1 well.

"The discovery of very material volumes of light oil in Owo and the fact that the oil is concentrated in high-quality channel sands greatly enhances our outlook for the efficient future development of both the Owo and Tweneboa fields," said Angus McCoss, Tullow's exploration director.

The Owo field is estimated to contain some 200 million barrels of proven and probable oil resources, and up to 550 million barrels of possible reserves, said Royal Bank of Scotland, a broker for Tullow, which runs Tano and holds a 49.95% stake. Its partners are **Kosmos Energy Ghana**, with 18%; **Anadarko Petroleum** Corp., with 18%; **Sabre Oil & Gas**, with 4.1% and the **Ghana National Petroleum** Corp., with a 10% carried interest.

At $129.95 You Can Afford Gold!

image shown not actual size

1/10 oz. American Gold Eagle

The Best Way to Own Gold

Gold is the ultimate hedge against inflation and the American Gold Eagle is the best way to acquire gold – weight and purity guaranteed by the U.S. Mint. Now you can own the 1/10 oz $5 American Gold Eagle in mint quality for only **$129.95** ea. The smart money is investing in gold today, before inflation sends prices higher. Call now and **LOCK IN YOUR GOLD** or go on line to uscoins.com for real time gold and silver pricing.

**30 DAY UNCONDITIONAL GUARANTEE**

*Maximum order 10 coins. All major credit cards accepted.*

1 coin + $7 P&H ...... $136.95   3 coins + $9 P&H ... $398.85
5 coins + $10 P&H .... $659.75   10 coins + $12 P&H $1311.50

** Prices are subject to change. Please call to confirm all orders prior to sending funds. Orders above $1000 are not subject to NY State sales tax.*

USCOINS.com

a subsidiary of Eastern Numismatics
Coin & Bullion Dealers Since 1974
1-800-835-0008

LEGAL NOTICES

GLOBAL, NATIONAL, REGIONAL
TO ADVERTISE CALL 1.800.366.3975
FAX: 214.640.7900
WSJMEDIAKIT.COM

**BANKRUPTCIES**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re
MOTORS LIQUIDATION COMPANY, *et al.*,
f/k/a General Motors Corp., *et al.*
Debtors.

Chapter 11 Case No.
09-50026 (REG)

(Jointly Administered)

**NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a **General Motors Corporation**) | 09-50026 | 38-0572515 | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC (f/k/a **Saturn, LLC**) | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a **Saturn Distribution Corporation**) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a **Chevrolet-Saturn of Harlem, Inc.**) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2529430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650789 | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**"), filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**")

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing, (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party, (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response, (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (v) be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (vi) served in accordance with General Order M-399 so as to be actually received **on or before 4:00 p.m. (Eastern Time) on October 14, 2010** on the following parties (a) the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; (b) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (d) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (e) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (f) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (g) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (h) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (j) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (k) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (l) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in Bankruptcy Court of such adjournment on the date scheduled for the Hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |
|---|---|

Get Noticed.

Legal Notices
Advertise Today
Call 1-800-845-9720
or email
sales.legalnotices@wsj.com

THE WALL STREET JOURNAL

# LEGAL NOTICES

## BANKRUPTCIES

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re
MOTORS LIQUIDATION COMPANY, et al.,
f/k/a General Motors Corp., et al.
Debtors.

Chapter 11 Case No.
09-50026 (REG)
(Jointly Administered)

NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN

TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 | 38-0572515 | General Motors Corporation; GMC Truck Division; NAO Fleet Operations; GM Corporation; GM Corporation-GM Auction Department; National Car Rental; National Car Sales; Automotive Market Research |
| MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 | 38-2577506 | Saturn, LLC; Saturn Corporation; Saturn Motor Car Corporation; GM Saturn Corporation; Saturn Corporation of Tennessee |
| MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 | 20-1426090 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2923430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650264 | GM National Realty, Inc.; MCO Realty, Inc. |

PLEASE TAKE NOTICE that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "Debtors") filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "Plan") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "Disclosure Statement") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

PLEASE TAKE FURTHER NOTICE that:

1. A hearing (the "Hearing") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, on October 21, 2010 at 9:45 a.m. (Eastern Time) in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "Clerk") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.nysb.uscourts.gov and www.motorsliquidationdocket.com (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| If by overnight or hand delivery: | If by standard mailing: |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing; (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response; (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court; (v) be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable; and (vi) served in accordance with General Order M-399 on [illegible] so as to be received on or before 4:00 p.m. (Eastern Time) on October 14, 2010 [illegible]

4. IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by an announcement in the Bankruptcy Court of such adjournment on the date scheduled for the Hearing or any adjourned date thereof or in a notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |
|---|---|

## CORPORATE NEWS

# Designers don't pale hues

*White, nude tones brighten spring collections from Chakra, Gurung*

BY RACHEL DODES AND ELVA RAMIREZ

Following four seasons of cautious buying, luxury retailers have begun to see a light at the end of the tunnel. So it was only fitting that designers showing their spring 2011 collections in New York this week decided to fade to...white.

Pale tones "are always chic," said designer Georges Chakra, who showed a collection dominated by white and nude dresses and gowns featuring clouds of light chiffon. "The new black is the nude now," he said.

At Alexander Wang's show Saturday, all the models' tresses were covered in white paint, which matched Mr. Wang's unusual clothes— smock-like dresses in shades of white and cream, billowing tops and carpenter pants, some with metallic paint-splatter patterns. The loose-fitting looks featured big pockets and cross-back straps, ostensibly for the urban woman who is so self-sufficient that she doesn't call contractors to renovate her East Village loft.

Mr. Wang's style isn't for everybody, but maybe that's the point. The designer, who threw a raucous party Saturday night in the middle of a parking lot, has a cult following among downtown women who are already so cool that they look good in spite of, not because of, his often unflattering silhouettes.

Edun is a brand that has struggled to convince shoppers that its clothes are as cool as its celebrity founders: U2 front man Bono and the effortlessly chic Ali Hewson. On Saturday in between two buildings in Chelsea, the brand's new designer, Sharon Wauchob, unveiled a new vision for the five-year-old label. Ms. Wauchob, a former Louis Vuitton designer who also has an eponymous brand, showed layered blouses in flowing white silk, cream-colored macramé tops and dresses with clever knitting details.

> At Alexander Wang's show, all the models' tresses were covered in white paint, which matched the clothes.

Sitting in the front row was Toni Belloni, group managing director at **LVMH Moët Hennessy Louis Vuitton**, which bought 49% of the money-losing label last year. Mr. Belloni said Ms. Wauchob's vision will likely increase the brand's audience beyond the limited group of consumers who like that the brand has a social conscience. (It was founded with a mission to help increase trade with Africa.)

Photo: [illegible]/Getty Images

A model showed [illegible]-colored Gurung gown in New York on Saturday.

"[illegible] very fresh, very light," Mr. Belloni said. "There is an inspiration that is more cosmopolitan, with a touch of Africa, which is right because you need to have a much broader scope than that."

Nepalese designer Prabal Gurung hit it big this year when Michelle Obama wore a red dress he designed to the White House Correspondents' Dinner. For spring, Mr. Gurung's elegant white dresses featuring folds of fabric and interesting embellishments were punctuated with a shocking display of color. Turquoise was juxtaposed with poppy in bold patterns on knits, and there were dresses and skirts in bright saffron.

Bloomingdale's fashion director Stephanie Solomon was bowled over by Mr. Gurung's daring use of color, in a season when it seems that many other designers are playing it safe. "That's not easy, you know," she said. With his spring 2011 show, "he just catapulted himself into the realm of world-class designer," Ms. Solomon said.

Retailers also were impressed with the elegant collection presented by Jill Stuart, known for her feminine dresses that start at around $250. The line was chock full of vanilla-colored cocktail dresses, gossamer tops and skirts of varying lengths, making them adaptable for different occasions. Ms. Stuart, who was inspired by "the colors of sunsets," said that versatility and longevity was the point.

"A lot of the dresses are day-to-night, and mixing them with a little jacket or a little pea coat keeps them fresh," said Ms. Stuart. As for the creamy color palette, she said, "It's classic. And it's minimal. And it's something that you can have forever."

After watching Diane von Furstenberg's show Sunday, Neiman Marcus's fashion director, Ken Downing, said: "I love a good sophisticated neutral, but I need some color for success." Ms. von Furstenberg and her creative director Yvan Mispelaere, whipped up an upbeat, colorful parade of patterned dresses, jumpsuits and hooded jackets.

# Rio Tinto boosts Ivanhoe Mines stake

BY EDWARD WELSCH

Anglo-Australian miner **Rio Tinto PLC** said Monday it has increased its stake in **Ivanhoe Mines Ltd.**, a Vancouver-based miner developing one of the world's largest new gold-copper mines in Mongolia.

Rio Tinto said it bought 40.1 million Ivanhoe shares at US$10 each by exercising a $350 million convertible credit facility issued to Ivanhoe in 2007, increasing its stake by 5.3 percentage points to 34.9%.

Rio Tinto's increased stake in Ivanhoe follows news last week that Ivanhoe Mines' flagship Oyu Tolgoi copper-gold mine is on track to begin production at the end of 2012. The mine is expected to have average annual production during its first 10 years of more than 540,000 metric tons of copper and 650,000 ounces of gold. That compares with Rio Tinto's annual production at the end of 2008 of 699,000 metric tons of copper and 501,000 ounces of gold.

Rio Tinto also holds additional warrants on Ivanhoe shares; if it exercised all of them, it could increase its stake in Ivanhoe by nine percentage points, to about 44%.

## OPINION: REVIEW & OUTLOOK

# The Other China Sea Flashpoint

Rival claims to islands in the South China Sea have garnered plenty of attention in the last year, as Beijing raised its territorial ambition to the level of a "core interest." But an equally dangerous flashpoint lurks in the East China Sea. The collision of a Chinese fishing boat and two Japanese coast guard vessels near the Senkaku Islands last week brought a long-simmering quarrel between the two nations back on the boil.

The islands, known as the Diaoyutais in Chinese, are uninhabited, and when sleeping dogs are allowed to lie, the dispute is manageable. A 1997 fisheries agreement allows both sides' fishermen to operate free of regulation around the islands. So it's not clear why the Japanese coast guard needed to stop the Chinese boat.

Tensions are still rising because the Japanese authorities have detained the Chinese captain, Zhan Qixiong, on suspicion of deliberately ramming the coast guard vessels. But Japanese ships have a history of aggressive maneuvers in this area, for instance sinking a Hong Kong [illegible] vessel in June 1998 and a Taiwanese sport-fishing boat in 2008.

The other big issue at stake is natural gas below the sea floor. It took lengthy negotiations to reach preliminary agreement on the midline between the two countries' exclusive economic zones two years ago. Tokyo had accused Beijing of developing a field that might tap gas on the Japanese side of the line. In the end, China not only largely conceded on the placement of the line, but also cut Japan in on the disputed field.

> Japan risks unleashing the genie of Chinese nationalism.

In the last few months, China's navy has been increasingly assertive in the waters near Japan, and so the Japanese defense forces may be using the Senkakus as a way to push back. In April, a Chinese helicopter flew dangerously close to a Japanese destroyer that was monitoring a Chinese exercise. And Chinese warships have begun passing through the Miyako Strait and exercising near Okinawa.

While Japan needs to show that it won't be intimidated, using the Senkakus to do so would be dangerous. The genie of pan-Chinese nationalism re-emerged in the 1970s, for the first time since the 1949 civil war, after the U.S. returned the Senkakus to Japanese control along with Okinawa. This enraged Chinese in Taiwan and Hong Kong, who noted that the islands were first seized by Japan when Taiwan was taken as a colony in 1895. By rights, they reasoned, the islands should have been returned to China like other former colonial possessions.

Regardless of the niceties of territorial law, this is a highly emotive issue due to the death and destruction wreaked on China during the Japanese invasion. The return of the islands to Japan spurred Chinese around the world to rally to Beijing's side. In Hong Kong, the generation of both pro-democracy and pro-China politicians now in their prime cut their teeth on the Diaoyutai movement.

Beijing is wary of being made to look soft on the Japanese by Taiwanese and Hong Kong activists, who periodically charter boats to the islands. So it's no surprise that bursts of bellicose rhetoric occasionally emanate from the Foreign Ministry. However, China's record of trying to smooth the waters is also creditable, starting with Deng Xiaoping's visit to Japan in 1978 when he agreed to put the problem off for future generations to solve. Protesters from the mainland have been prevented from making their own pilgrimages. Precisely because it is so explosive, Beijing has reason to be fearful of blowback if it tries to exploit the issue.

The U.S. and Japan are planning exercises later this year to practice retaking islands from an unnamed power. That is a plenty powerful signal to the Chinese navy, and to Beijing to keep its more adventurous junior officers in check. But Tokyo needs to do likewise with its coast guard. Otherwise crossed signals could end up igniting nationalism on both sides. Once started, the cycle of escalation would be much harder to extinguish.

# Sebelius Has a List

'As a consequence of us getting 30 million additional people health care, at the margins that's going to increase our costs—we knew that," President Obama said at his press conference Friday in response to a question about rising health spending.

That wasn't how he sold the plan, but, anyway, that's a truism. Here's another: The White House was always going to blame insurance companies for any cost increases, even when its own policies cause them.

Witness Kathleen Sebelius's Thursday letter to America's Health Insurance Plans, the industry trade group—a thuggish message even by her standards. The Health and Human Services secretary wrote that some insurers have been attributing part of their 2011 premium increases to ObamaCare and warned that "there will be zero tolerance for this type of misinformation and unjustified rate increases."

Zero tolerance for expressing an opinion, or offering an explanation to policyholders? They're more subtle than this in Caracas.

What Ms. Sebelius really means is that the government will prohibit insurers from doing business if reality is not politically convenient for Democrats. ObamaCare includes a slew of mandated benefits for next year, such as allowing children to remain on their parents' plans until age 26 and "free" preventative care (i.e., no direct out-of-pocket cost sharing for consumers). The tone of Ms. Sebelius's letter suggests that she doesn't understand that money is exchanged for goods and services, and that if Congress mandates new benefits, premiums will rise.

The Administration estimates that these regulations should increase all premiums by 1% to 2% on average. Even if that turns out to be right—on average—that isn't what insurers are finding in practice in the local, price-sensitive individual and small business insurance markets, where coverage is typically less comprehensive to hold down costs. For some current policies in some states, the one-year increase jumps as much as 9%.

ObamaCare gives Ms. Sebelius's regulators the power to define "unreasonable" premium hikes, which will mean whatever they decide it will mean later this fall. She promised to keep a list of insurers "with a record of unjustified rate increases" and then to bar them from ObamaCare's subsidized "exchanges" when they come on line in 2014. In other words, insurers must accept price controls now or face the retribution of a de facto ban on selling their products to consumers four years from now.

This is nasty stuff and an obvious attempt to shift political blame for rising insurance costs before the election. It's also an early sign of life under ObamaCare, when all health-care decisions are political and the bureaucrats decide who can charge how much for a service or product.

Democrats built this system and they now own it politically. The least they could do is take credit for its consequences.

# Darth Boehner

In 2006, a parade of Republicans trooped through our offices explaining their strategy to retain control of Congress: Make San Francisco Democrat Nancy Pelosi the issue. By scaring voters about the then-House Minority Leader and her retinue of ancient Big Government barons, Republicans hoped to change the subject from Iraq and GOP corruption. We said at the time it wouldn't work, and you know what happened.

Four years later, Democrats seem to have concluded that the GOP was nonetheless on to something. They've decided that their strategic ace in the hole is to scare Americans about . . . John Boehner. If they can make the election about the terrifying threat posed by the heretofore unknown House Minority Leader, maybe voters will forget about ObamaCare, the failed stimulus, cap and tax and 9.6% unemployment.

This strategy appears to come straight from the top because President Obama himself is leading the charge against Darth Boehner. In his speech last Wednesday laying out the Democratic campaign themes, Mr. Obama mentioned the Ohio Republican by name or title no fewer than nine times.

"There were no new policies from Mr. Boehner," the President said in reference to a recent speech by the Republican. "There were no new ideas. There was just the same philosophy that we had already tried during the decade that they were in power—the same philosophy that led to this mess in the first place: Cut more taxes for millionaires and cut more rules for corporations."

He followed with another personal attack in an interview with ABC. White House spokesman Robert Gibbs ridicules Mr. Boehner almost on a daily basis, and Democratic Party chief Tim Kaine makes him a regular foil. The media are picking up the theme, with the New York Times reporting at enormous length over the weekend that the Republican leader smokes, likes to play golf and—brace yourself—is tight with several business lobbyists. A trifecta of liberal anathemas.

*John Boehner*

The White House seems to think, or at least hope, that raising Mr. Boehner's profile in this way will arouse a dispirited Democratic base to vote in November. As our James Taranto points out, the strategy is consistent with Rule No. 13 in Saul Alinsky's "Rules for Radicals," a favorite White House playbook: "Pick the target, freeze it, personalize it, and polarize it." Perhaps liberal voters will see Mr. Boehner's tan visage on TV, recoil in horror, and emerge from their academic and union halls to block the bourgeois barbarian from taking power.

On the other hand, this has the same flavor of desperation it did for the GOP in 2006. Independent voters—whom Democrats carried in 2006 and 2008 but are losing now—want someone who will put the brakes on runaway liberal government. Voters know that Republicans can't govern by themselves as long as Mr. Obama is in the White House.

In any case, Mr. Boehner's main campaign theme has been to call for a freeze on new spending, new regulation and new taxes. The more Mr. Obama personalizes and polarizes Mr. Boehner, the more popular he might become to independents—and the less Presidential Mr. Obama looks.

Mr. Boehner will have his challenges if the GOP does win a majority, not least showing voters that Republicans have learned their lesson on spending and corruption. But compared to, say, ObamaCare (see above), he's hardly scary at all.

Pg 5 of 9

26 THE WALL STREET JOURNAL. Tuesday, September 14, 2010

# LEGAL NOTICES

## BANKRUPTCIES

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al.<br>Debtors. | Chapter 11 Case No.<br>09-50026 (REG)<br><br>(Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company f/k/a **General Motors Corporation** | [illegible] | [illegible] | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC f/k/a **Saturn, LLC** | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation f/k/a **Saturn Distribution Corporation** | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. f/k/a **Chevrolet-Saturn of Harlem, Inc.** | [illegible] | [illegible] | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-3528130 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | [illegible] | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**") filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") (Docket No. 6829) and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") (Docket No. 6830), pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**").

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| If by overnight or hand delivery: | If by standard mailing: |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 7358<br>Dublin, OH 43017-4266<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement must (i) be in writing; (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest [illegible] (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to [illegible] Disclosure Statement to resolve any such objection or response; [illegible] Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy [illegible] with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) [illegible] users of the Bankruptcy Court's filing system, and [illegible] CD-ROM or [illegible] portable document format (PDF) [illegible] delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and [illegible] in accordance with General Order M-399 so as to be actually received [illegible] **(Eastern Time) on October 14, 2010** on the following parties: [illegible] of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; [illegible] attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (iv) General Motors LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (v) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (vi) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (vii) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (viii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (ix) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (x) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (xi) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (xii) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in the Bankruptcy Court of such adjournment on the date scheduled for the Hearing or in a notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| | |
|---|---|
| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |

## BUSINESS & FINANCE

# Ex-IBM executive sentenced to prison

By Chad Bray

NEW YORK—A former senior vice president at **International Business Machines** Corp. was sentenced to six months in prison after he pleaded guilty in an insider-trading case that has ensnared several hedge-fund executives, including **Galleon Group** founder Raj Rajaratnam.

Robert Moffat Jr., who joined IBM out of college in 1978, admitted in March to providing tips to Danielle Chiesi, a former consultant for New Castle Funds LLC, involving insider information about **Advanced Micro Devices Inc.** and **Lenovo Group** Ltd. between August 2008 and October 2008. Mr. Moffat was serving on Lenovo's board of directors at the time.

**THE GALLEON CASE**

Robert Moffat Jr., formerly of IBM, entered court in Manhattan on Monday.

At the time of his plea, Mr. Moffat said Ms. Chiesi was a friend, but his lawyers later said in court papers that the relationship became "an intimate one."

"I made terrible mistakes in judgment, which will haunt me for the rest of my life," Mr. Moffat said in court on Monday. "I am alone responsible for my conduct."

Mr. Moffat is one of 12 people to plead guilty in the case and is the highest-profile company executive to admit to providing inside tips in the case. In total, [illegible] people have been charged criminally.

Mr. Moffat pleaded guilty to conspiracy and securities fraud in March. He faced as much as six months in prison under a plea agreement with prosecutors.

"He's learned a terrible lesson here," said Kenneth Schacter, Mr. Moffat's lawyer, in seeking leniency. Mr. Moffat's lawyers had sought a sentence of probation.

On Monday, U.S. District Judge Deborah Batts in Manhattan also ordered Mr. Moffat to pay a $50,000 fine. The judge said he could begin serving his sentence in June 2011 in order to see his daughter's graduation next May.

After the hearing, Mr. Moffat briefly scuffled with a tabloid reporter who attempted to board an elevator at the courthouse with Mr. Moffat's family. [illegible] blocked the elevator doors and yelled, "Stay away from my family" to the reporter. He was [illegible] into the elevator by another family member.

Mr. Moffat was arrested last October, along with Mr. Rajaratnam, Ms. Chiesi and three others.

Mr. Rajaratnam and Ms. Chiesi are expected to go to trial next year on charges of conspiracy and securities fraud. They have denied wrongdoing.

Prosecutors have alleged Mr. Rajaratnam was at the center of an insider-trading ring that generated millions of dollars in improper trades.

# Former Moody's manager sues company, CEO over comments

By Serena Ng

A former managing director at Moody's Investors Service sued the credit-ratings company; its parent, **Moody's** Corp.; and Chief Executive Raymond McDaniel, alleging they made false and misleading statements about him after he left the firm last year.

Eric Kolchinsky, a former Moody's managing director who previously oversaw credit ratings of debt pools backed by mortgage securities and other assets, left Moody's in mid-September 2009 after complaining to his superiors about what he felt were questionable rating practices for complex securities. Last autumn, Mr. Kolchinsky testified before the House Committee on Oversight and Government Reform about his experience at Moody's and his views about how the firm managed potential conflicts of interest.

Eric Kolchinsky

In a civil suit filed in federal court in New York on Monday, Mr. Kolchinsky alleged that in statements made by Moody's before and after his testimony last year, the firm sought to discredit him "and impugn his integrity, honesty, work and abilities." Mr. Kolchinsky also said in the complaint that after Moody's made various statements about him, he has, "in effect, been black-listed by the private sector financial industry."

"Mr. Kolchinsky has not served his complaint on Moody's," a spokesman for the ratings firm said on Monday afternoon. "However, we are confident Mr. Kolchinsky has no basis for any suit against Moody's."

Since leaving Moody's, Mr. Kolchinsky, 39 years old, has done project work as a consultant for state insurance regulators.

At Moody's, Mr. Kolchinsky ran a group in New York that assigned credit ratings to mortgage debt pools known as collateralized-debt obligations, or CDOs, prior to the onset of the financial crisis. In September 2007, he raised concerns to his superiors about high ratings Moody's was planning to give to new mortgage CDOs while it was reviewing many securities backing the CDOs for downgrades, he has previously said. After he flagged those issues, Moody's adjusted its ratings approach, the complaint said. The instruments have since suffered large-scale downgrades and caused hundreds of billions of dollars in losses.

A few weeks after Mr. Kolchinsky raised red flags about Moody's CDO ratings, the firm transferred him to a nonratings division of Moody's, according to a memo he wrote that Congress made public last year. In 2008, Mr. Kolchinsky filed a complaint within Moody's about what he considered to be retaliation by the firm, the memo also said.

In 2009, Mr. Kolchinsky submitted another complaint within Moody's about ratings it assigned to complex securities tied to corporate loans. He wasn't involved in rating those particular securities but alleged in a letter to the chief compliance officer at Moody's that the firm knowingly assigned inflated ratings to them. In September 2009, he was suspended by Moody's, and he resigned shortly afterward.

After Mr. Kolchinsky left Moody's and went public with the allegations, the company said in a statement to The Wall Street Journal and other media outlets that he had made an "evolving series of claims of misconduct." Moody's said its reviews of those claims found they were "unsupported."

Moody's Corp. CEO Mr. McDaniel also said in a conference call with analysts in late 2009 that Mr. Kolchinsky's allegations "were not supported by the facts and were without merit."

Mr. Kolchinsky is challenging those assertions. He is seeking damages of at least $15 million.

Tuesday, September 14, 2010 THE WALL STREET JOURNAL. 11

## WORLD NEWS

# Kashmir protesters killed in rally

By Vibhuti Agarwal

SRINAGAR, India—At least 14 people were killed in the restive Indian state of Jammu and Kashmir on Monday as New Delhi scrambled to find a way to stem the violence and persuade stone-throwing youths to retreat to their homes.

The deaths are the latest in a series of clashes since June as the valley—an area of disputed territory between India and Pakistan—has erupted in a new bout of separatist sentiment that security forces have been unable to quell despite a curfew. In response, a committee of the Indian cabinet was meeting Monday to consider proposed amendments to curb the power of the country's armed forces in certain parts of Jammu and Kashmir state.

[illegible] before the Committee on Security, headed by Prime Minister Manmohan Singh, was the Armed Forces Special Powers Act. The law, deeply unpopular in the region, gives security forces broad powers to carry out operations against insurgents and shields the army from liability. Currently, 14 of the state's 22 districts are covered by the act and the committee was considering a recommendation to remove it from four districts in the Kashmir valley in an effort to show the government's willingness to compromise to stem the rioting.

No decision was made on the withdrawal of the special-powers act at the end of the cabinet meeting.

A Kashmiri boy shouts slogans during a protest on the outskirts of Srinagar, Jammu and Kashmir state, India, Monday.

According to a statement released by India's home ministry, the government reiterated its "intention to restart the process of dialogue with different sections of the people of Jammu and Kashmir" and called for a meeting of all political parties in New Delhi on Wednesday to "elicit their views on the way forward."

Earlier Monday, Mr. Singh expressed concern about the violence in Kashmir over the past few weeks.

"The youth of Kashmir are our citizens and their grievances have to be addressed," Mr. Singh said at a conference of combined commanders Monday. "We are willing to talk to every person or group which abjures violence."

The U.S. Ambassador to India, Timothy Roemer, held a news conference to say the U.S. was dismayed to hear reports of an attack on a Kashmiri school.

The demand to lift the special-powers act was brought up by Jammu and Kashmir Chief Minister Omar Abdullah, who met Home Minister P. Chidambaram in New Delhi before Monday's cabinet meeting to discuss confidence-building measures to end the cycle of violence in the state.

The army is opposed to any lifting of the law, army officers have said, as is the main opposition Bharatiya Janata Party. There also are differences of opinion within the cabinet on withdrawing the law.

# Tycoon's fate grips Malaysia

By James Hookway

Malaysian police Monday expanded their investigation into the disappearance of cosmetics entrepreneur Sosilawati Lawiya and three of her colleagues, who investigators say were killed.

Police said two lawyers and six plantation workers were arrested last week as suspects in the case. They said some of the suspects, who haven't been charged or publicly identified, confessed to abducting Ms. Sosilawati, 17 years old, and her companions, and to bludgeoning them to death at a poultry farm before burning the bodies and tossing the remains into a river.

Investigators were conducting DNA analysis to determine the identity of remains found at the river.

Ms. Solisawati's family reported her missing on Aug. 30 after she traveled to Selangor with her driver, lawyer and financial adviser apparently to carry out a land purchase. Their vehicles were later found abandoned. Police have said one of the lawyers detained was involved in the land deal with Ms. Solisawati.

The disappearance of Ms. Sosilawati, the ex-wife of a rock star, has captivated Malaysia. She founded a line of cosmetics in 1994 called Nouvelle Visages, which she expanded to Thailand, Brunei and Singapore.

# U.N. nuclear chief sends Iran a rebuke

By David Crawford

VIENNA—The head of the United Nations' nuclear agency lashed out at Iran for its treatment of the organization's inspectors and set the stage for further confrontation with Tehran by promoting the agency's Iran section chief to a senior post.

"Iran's repeated objection to the designation of inspectors with experience in Iran's nuclear fuel cycle and facilities hampers the inspection process," International Atomic Energy Agency Director General Yukiya Amano said at a meeting of the Vienna-based agency's Board of Governors Monday.

Mr. Amano, a Japanese diplomat who took over the IAEA last year, said at a news conference that Iran was impeding inspections and preventing his agency from determining whether the country's nuclear program was designed to build a bomb.

He criticized Iran's decision to ban two inspectors earlier this year, saying the officials were "experienced and reliable." The two inspectors reported evidence that Iran was experimenting with a process used to create uranium metal, an ingredient of nuclear weapons. Iran later denied it was conducting such research.

The IAEA also announced that the man who oversaw much of the agency's recent work in Iran, Herman Nackaerts, had been promoted to oversee the IAEA's safeguards division, the unit responsible for all inspections. The job is viewed as a key position at the agency, and by appointing Mr. Nackaerts, a Belgian, Mr. Amano appeared to be signaling to Tehran that he wouldn't shy from further conflict.

U.S. Ambassador to the U.N. Glyn Davies criticized the Iranian decision to ban the two inspectors, saying on Monday it was the first time that IAEA officials working in Iran were banned after publishing a critical report. Iran's tactic is to "shoot the messenger," Mr. Davies said.

The U.N. Security Council in June approved a fourth round of sanctions against Iran in an effort to curb its program of uranium enrichment, which the U.S. and others say is aimed at weapons development, and force Tehran to cooperate with the IAEA. Further sanctions by the U.S., European Union and others followed.

IAEA inspectors routinely verify the peaceful nature of nuclear activity at facilities around the world. Iran formally agreed to cooperate with the agency when it signed and ratified the Nuclear Non-Proliferation Treaty about four decades ago. Iran says its nuclear program is peaceful in nature and intended to produce nuclear energy.

During their deliberations this week, the IAEA Board of Governors will also discuss Israel's nuclear program. A year ago, the IAEA General Conference, the agency's highest body, issued a resolution ordering the agency to issue an Israel report. The 81-page report contains statements from 43 nations and regional organizations.

Go ahead and make the
TOUGH DECISIONS.
D&O insurance that will be there for you.
The risks faced by directors, officers and companies are constantly changing. That's why we've enhanced our Directors and Officers liability insurance to safeguard individuals' personal assets and protect the organisations they serve in today's changing risk landscape.
It's market-leading coverage built on 40 years of D&O experience. Learn more and find out if your current insurance is doing enough.
Europe: www.chartisinsurance.com/BusinessGuard
UK: www.chartisinsurance.com/uk/d&o
CHARTIS
Your world, insured

## COMMERCIAL REAL ESTATE

Colliers International

INVESTMENT OPPORTUNITY
Vaughan, ON
- 71,302 square feet on 4.0 acres
- 9.75% cap rate
- **Asking: $4,200,000 ($59 PSF)**

John Stewart* 416.791.7213
Jim McIntosh* 416.791.7236

USER / REDEVELOPMENT OPPORTUNITY
Ottawa, ON
- 32,000 (+/-) SF building on 0.85 acres - excellent long term value potential in improving area
- Ample frontage and presence on Scott Street
- Very close proximity to downtown core and CBD; superior access to proposed light rail transit
- **Offers on or after October 5, 2010**

Nico Zentil* 613.683.2200

OFFICE BUILDING AVAILABLE
Toronto, ON
- Very attractive one-storey freestand office building of 10,200 SF
- Situated on one acre
- Located west of Don Mills Road; north of Eglinton Avenue
- $14.00 net per square foot
- Zoning allows many uses
- Central location; quiet street

Janet Leitch* 416.791.7211

COLLIERS INTERNATIONAL

*Sales Representative **Broker
© 2010. All rights reserved. Colliers Macaulay Nicolls (Ontario) Inc., Brokerage.
www.colliers.com
Our Knowledge is your Property®

FOR SALE WWW.PRIMECORP.CA
MULTI-FAMILY PORTFOLIO - TORONTO AREA

- Unique opportunity to acquire 7 properties consisting of 12 buildings in Toronto & Mississauga
- 551 Apartment Suites
- Solid Investment with long-term upside
- Potential for development of additional apartment suites
- Portfolio sale preferred, however individual asset sales will be considered

EXCLUSIVE ADVISORS FOR THIS OFFERING, PRINCIPALS ONLY CONTACT
PRIMECORP COMMERCIAL REALTY INC., BROKERAGE & MURRAY & COMPANY LIMITED
(888) 720-2020 X 250
SAM FIRESTONE, LL.B. PRINCIPAL/BROKER sfirestone@primecorp.ca
AIK ALIFERIS, B.B.A. PRINCIPAL/BROKER aaliferis@primecorp.ca

Bids for the Portfolio will be accepted until: 12 p.m., EST, October 15, 2010

Murray & Company

FOR SALE
INVESTMENT OPPORTUNITIES

WATERLOO, ONTARIO
- Four 2 storey townhouse buildings totalling 51 units
- 15 two bedroom & 36 three bedroom
- Well located

WINDSOR, ONTARIO
- 21 storey mixed use building
- 73,168 sq. ft. of office space & 152 apartment suites
- Convenient downtown location

PRINCIPALS ONLY CONTACT
PRIMECORP COMMERCIAL REALTY INC., BROKERAGE
AIK ALIFERIS, B.B.A. PRINCIPAL/BROKER aaliferis@primecorp.ca
SAM FIRESTONE, LL.B. PRINCIPAL/BROKER sfirestone@primecorp.ca
NICK PANTIERAS, MBA, CMA PRINCIPAL/BROKER OF RECORD npantieras@primecorp.ca
(888) 720-2020 EXT. 250
WWW.PRIMECORP.CA

INVITATIONS FOR OFFERS TO PURCHASE RESIDENTIAL DEVELOPMENT PROPERTY

BDO Canada Limited, in its capacity as the privately appointed receiver ("Receiver") of Baysong Developments Inc. ("Baysong") invites offers to purchase Baysong's interest in this high profile realty property (the "Property") located at the northeast corner of Regional Road 57 and Concession Road 3 in Bowmanville, in the municipality of Clarington, Ontario. Highlights include:

- Northglen Development - adjacent to other residential neighbourhoods in an affordably priced bedroom community within commuting distance of Toronto
- Approximately 116 acres of land rough graded and ready for underground service installation
- Draft Plan of Subdivision approved for 907 units on 737 building lots, including park, school site, mixed use commercial block
- Completed Sales Centre to accommodate up to 3 home builders

We are specifically canvassing for potential purchasers with an interest in the Property. All offers must be received by the Receiver at the address set out below, on or before 5:00 pm (Eastern Standard Time – Toronto), Thursday October 28, 2010.

For additional information please contact:

BDO Canada Limited
123 Front Street
Suite 1200
Toronto, Ontario M5J 2M2
Canada
Attention: Ken Pearl
Telephone: 416-865-0210
Direct: 416-369-3063
Fax: 416-865-0904
Email: kpearl@bdo.ca

BDO

MULTI-RESIDENTIAL SALE TRANSACTIONS

188 Units - Toronto
70 Units - Toronto

108 Units - Mississauga

211 Units - Hamilton

For further information, please contact:
Drew Koivu, MBA†, 416-359-6781
drew.koivu@bmo.com
† Sales Representative
* Includes BMO Capital Markets Real Estate Inc., Brokerage
BMO Capital Markets
BMO Capital Markets Real Estate Group

INDUSTRIAL FREESTANDS FOR SALE OR LEASE

2562 STANFIELD ROAD MISSISSAUGA, ON
- 25,700 SF - 361,800 SF - two buildings on 16.57 acres
- 19' - 36' Clear height
- Precast construction
- Potential for CN Rail
- New T5 and T8 lighting
- 26 Truck-level, 4 drive-in & 1 rail door

For further information, please call:
John LaFontaine*
john.lafontaine@cbre.com
416.798.6229
www.cbre.ca
*Sales Representative
CBRE CB RICHARD ELLIS
CB Richard Ellis Limited, Real Estate Brokerage

## LEGALS

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corp., *et al.* Debtors. | Chapter 11 Case No. 09-50026 (REG) (Jointly Administered) |
|---|---|

**NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

**TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:**

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a **General Motors Corporation**) | 09-50026 | 38-0572515 | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC (f/k/a **Saturn, LLC**) | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a **Saturn Distribution Corporation**) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a **Chevrolet-Saturn of Harlem, Inc.**) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2529430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650789 | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**"), filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**").

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing, (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party, (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response, (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (v) be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (vi) served in accordance with General Order M-399 so as to be actually received **on or before 4:00 p.m. (Eastern Time) on October 14, 2010** on the following parties (a) the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; (b) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (d) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (e) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (f) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (g) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (h) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (j) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (k) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (l) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in Bankruptcy Court of such adjournment on the date scheduled for the Hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |
|---|---|

For Sale
54 Acres
Ancaster, Ontario

Residential Development Opportunity

Hwy 403
Hwy 6
Garner Rd E

- Highly sought after residential community
- Adjacent to Hwy 403 and Hwy 6 ramps
- Direct access to the 400 series highways
- Close to many amenities including shopping, offices, restaurants, schools, golf and more

Andrew Barnicke* andrew.barnicke@dtzbarnicke.com Tel: 416 863 1215
Reid Stephens* reid.stephens@dtzbarnicke.com Tel: 1 800 737 1215
*Sales Representative, DTZ Barnicke Limited, Real Estate Brokerage

FOR SALE
Centaria Urban Village
Kelowna, British Columbia

- Grocery and pharmacy anchored retail investment opportunity.
- Long term leases with strong tenant covenants.
- Exceptional contracted rental rate escalations.
- Sale Price: $10,975,000

Stirling Richmond
604 662 5140
stirling.richmond@cbre.com
CBRE CB RICHARD ELLIS
CB Richard Ellis Limited, Real Estate Brokerage

PRIME EXPOSURE
FOR SALE / LEASE

5507 DUNDAS STREET WEST TORONTO, ON
- ±11,000 SF
- 0.386 Acre corner lot
- Frontage on Dundas St. W.
- 6 Drive-in doors

For further information, please call:
Phillip Cheung*
phillip.cheung@cbre.com
416.798.6243
www.cbre.ca
*Sales Representative
CBRE CB RICHARD ELLIS
CB Richard Ellis Limited, Real Estate Brokerage

CREEMORE
6.7 ACRES • VILLAGE
- Subdivide or Strata
- Possible Future Lot(s)
- Possible Live/Work Studios(s)
- Active Retirement+Artisan Community

$245,000
Includes: • Topographical Survey • Environmental • Geotechnical • Hydrological
Offers will be accepted until 5:00pm (EST), October 15, 2010
Patrick Prime 705.466.2683
Royal LePage Patrick Prime Co. Brokerage

ARIZONA Commercial and Residential Foreclosure Properties As Low As $20,000!*
www.roipropertiesaz.com
602.319.1326
*Subject to availability.

FRANCHISES

The UPS Store
FREE Franchise Seminars Happening Across Canada
Coquitlam, BC; Calgary AB; Regina, SK; Winnipeg, MB; Markham, St. Catherines, Oakville, Kitchener, Ottawa, ON; Montreal & Quebec City, PQ; Antigonish, NS.
Tuesday September 21, 2010
Please contact 1.800.661.6232 or www.theupsstore.ca to register. Space is limited! Reserve your spot today!

THE GLOBE AND MAIL
CALL 1-866-36GLOBE TO SUBSCRIBE.

FOR SALE
Toronto, ON
- Attractive industrial building
- 21,000 SF
- Totally renovated
- Near Don Valley & Eglinton
- High quality office finish
- 75% of building is air conditioned

For further information, please call:
Ted Gurnik**
ted.gurnik@cbre.com
416 495 6260
www.cbre.ca
** Broker
CBRE CB RICHARD ELLIS
CB Richard Ellis Limited, Real Estate Brokerage

DEVELOPMENT OPPORTUNITY
DOWNTOWN OAKVILLE
- Approved 66,995 sf mixed use development project
- 0.58 acre corner site
- $3,850,000 - Power of Sale
- Offers due Oct. 5, 2010

Noah Rechtsman* 416.359.2753
Caitlin MacDonald* 416.359.2410
CUSHMAN & WAKEFIELD Global Real Estate Solutions
* Sales Rep. Cushman & Wakefield Ltd., Brokerage

## DIVIDENDS

**TECSYS INC.**

Notice is hereby given that the Board of Directors of TECSYS Inc. declared a dividend of CA$0.025 per common share payable on October 6, 2010 to shareholders of record at the close of business on September 22, 2010.

**FAIRFAX FINANCIAL HOLDINGS LIMITED**

**NOTICE OF DIVIDEND**

Notice is hereby given that a dividend of C$0.359375 per Series C Preferred Share, C$0.296875 per Series E Preferred Share and C$0.21918 per Series G Preferred Share has been declared payable on September 30, 2010 to shareholders of record at the close of business on September 22, 2010.

AAA Retail Properties For Sale in Southwestern Ontario
- National Tenants
- Long Term Leases

Charlie Miller
Canadian Commercial Realty Inc. Brokerage
519-672-7490 ext. 1
Charlie@canadiancommercial.ca

News. Insight. Perspective. Depth.
More of what you want every day.
CALL 1-866-36GLOBE TO SUBSCRIBE.
THE GLOBE AND MAIL It's not just news. It's a conversation.

# Microsoft to look into claim Russian anti-piracy investigators harassing

TECHNOLOGY

**Microsoft Corp., the world's biggest software maker,** will investigate a report that efforts to combat piracy of its programs in Russia resulted in the harassment of non-governmental agencies. "We unequivocally abhor any attempt to leverage intellectual property rights to stifle political advocacy or pursue improper personal gain," Microsoft general counsel Brad Smith, right, wrote yesterday in a blog post. Microsoft will take more steps to ensure that NGOs and other groups that act as public advocates aren't mistreated amid anti-piracy efforts, Mr. Smith said. On Sept. 11, *The New York Times* reported that Russian security services monitored "outspoken advocacy groups" and seized their computers, claiming the groups were using pirated Microsoft software. Microsoft plans a new licence for the organizations to make sure they have free, legal Microsoft software and will help them document that they have legitimate software, Mr. Smith said. *Bloomberg News*

breakingviews.com

# *Basel III rules a good start*

## Higher capital ratios alone won't prevent a crisis

PETER THAL LARSEN

Basel: Global bank supervisors are not a fast-moving bunch: the last set of capital rules took a decade to design and implement. So it is to the regulators' credit that new rules, known as Basel III, were agreed just two years after Lehman Brothers collapsed.

The Basel Committee has 27 members, so any agreement was bound to involve a compromise. The first bit of horse-trading was over the amount of equity capital that banks are required to hold. Though the ratio has more than doubled, from 2% of a bank's risk-adjusted assets to 4.5%, hard-liners would have liked even more.

Regulators have also introduced a 2.5% "capital conservation buffer." In theory, banks can draw on this buffer in hard times. In practice, none will want to. So the actual minimum equity capital ratio — formerly known as core Tier 1 — is now 7%. This is a big improvement: Royal Bank of Scotland went into the crisis with a ratio of just 4%.

The other compromise is over timing. Japan and Germany were worried that their banks would be at a disadvantage. So the rules will be phased in. The capital conservation buffer doesn't have to be in place until January 2019. Unlisted German banks have been given until 2023 to fully replace their "silent participations" — debt-like instruments that previously counted as core capital.

> "Large banks will probably have to hold an extra buffer"

But investors are unlikely to pay much attention to this timetable. Any large lender that depends on the support of the markets will be expected to show that it meets the new standards today.

And banks will want to hold an additional bit of capital in reserve. That is why most already have equity capital ratios above 8%. One of the few that doesn't — Deutsche Bank — unveiled a €9.8-billion rights issue just hours before the Basel agreement was announced.

Moreover, regulators are not finished. National authorities have the right to demand that banks hold up to 2.5% of additional capital, depending on the economic cycle. Large, systemic banks will probably have to hold an extra buffer.

Even if regulators can ensure the new rules are implemented around the globe, higher capital ratios alone will not prevent another crisis.

Regulators must also enforce recently agreed tougher liquidity standards, and introduce laws that allow even big banks to be wound down if they get into trouble. The new rules could also just shift risk to other parts of the financial system, like hedge funds or insurance companies. Even so, the Basel III agreement is a good start.

*Reuters Breakingviews*

RICK MAIMAN / BLOOMBERG NEWS

**Robert Moffat, a former senior vice-president with IBM Corp., leaves federal court in New York after being sentenced to six months in prison yesterday.**

LEGAL

# Former IBM exec gets six months for tipping

ROBERT MOFFAT

BY PATRICIA HURTADO

Robert Moffat, a former **International Business Machines Corp.** senior vice-president was sentenced to six months in prison for leaking information to Danielle Chiesi, a consultant for **New Castle Funds LLC**.

Moffat, 54, admitted in March to giving inside information to Ms. Chiesi about IBM, **Lenovo Group Ltd.** and **Advanced Micro Devices Inc.** from August to October in 2008. He is one of 12 people who have pleaded guilty in two overlapping insider-trading cases related to **Galleon Group LLC** and New Castle. Nine others still face charges.

U.S. District Judge Deborah Batts directed Moffat to surrender to federal prison on June 30, 2011. She said he must begin paying a US$50,000 fine after he is released from prison. Prosecutors had asked for the six-month sentence.

At his plea hearing, Moffat admitted to telling Ms. Chiesi about disappointing sales of IBM servers, a pending restructuring at chipmaker AMD and earnings at Lenovo, a maker of personal computers.

"Your honour, I made a terrible mistake in judgment which will haunt me for the rest of my life," Moffat said yesterday, his voice breaking with emotion as he wiped tears from his eyes. "What I did was wrong. I alone am responsible for my conduct."

Moffat claimed he had an "intimate relationship" with Ms. Chiesi, 44, a former executive at New York-based New Castle Funds who was arrested along with Galleon Group co-founder Raj Rajaratnam. Moffat's lawyers said Ms. Chiesi manipulated their client to obtain the information.

*Bloomberg News*

FINANCE

# Fidelity buying more Canadian corporate bonds

## Betting that profit will recover with economy

BY FREDERIC TOMESCO

Fidelity Investments, the largest U.S. mutual fund manager, is boosting its holdings of Canadian corporate bonds and dumping government debt on a bet company profits will climb as North America's economy avoids recession.

The extra yield investors demand to own the debt of Canadian corporate rather than federal securities was 1.48 percentage points on Sept. 10, near the high for the year of 1.54 percentage points reached in June, according to a Bank of America Merrill Lynch index. The spread tightened to as little as 1.14 percentage points in March.

Yields on Canadian corporate debt fell to the lowest in at least 18 years last month on concern that a faltering economic recovery in the United States, the nation's largest trading partner, would drag on growth.

The spread between company and government debt usually narrows as investors become more comfortable holding riskier assets. A government report on Sept. 10 showed that Canadian employers added more jobs than forecast in August.

"I am overweight Canadian corporates and have been increasing that overweight," said Brian Miron, who helps manage about $10.5-billion in Canadian fixed-income securities in several bond funds for Fidelity in Merrimack, N.H.

"I've been dialling it up recently in part due to the rise in spreads and my view that the North American economy isn't going to double dip."

Corporate bonds account for as much as 40% of Fidelity's Canadian fixed-income assets, Mr. Miron said in a telephone interview. That's about 13 percentage points more than the weighting in the Dex Universe Bond Index, which Fidelity uses as a benchmark, he said.

Canadian corporate bonds have returned 8.2% in the past year, besting the 5.8% return for government bonds, Merrill data show. Total returns for Canadian corporate bonds averaged 7% annually in the decade ended in 2009. This year, corporates are headed toward an 8.7% return, based on year-to-date performance, the data show.

> "I have been dialling it up ... due to the rise in spreads"

Elsewhere in credit markets, Bank of Canada governor Mark Carney said on Sept. 10 the central bank will be "careful" in considering the implications of slower U.S. growth when deciding whether to raise interest rates further.

His comments came two days after the Bank of Canada boosted its benchmark interest rate by a quarter-point to 1% and said domestic demand would probably remain buoyant.

Canadian employers added more jobs than forecast in August and the unemployment rate rose as more people entered the workforce, Statistics Canada said on Friday. Payrolls rose by 35,800 jobs, the seventh gain in the past eight months, following a drop of 9,300 in July.

Fidelity holds as much as 11% of its Canadian bond assets in securitized products such as commercial mortgage-backed securities, depending on the fund, Mr. Miron said. Government bonds make up about half of assets.

Mr. Miron, a 10-year veteran of the company who previously worked for RBC Dominion Securities, co-manages funds such as the Fidelity Canadian Asset Allocation Fund and the Fidelity Canadian Short Term Bond Fund.

The $1.4-billion Canadian Short Term Bond Fund, which gained 3.5% in the year ended Sept. 9, counts Bank of Nova Scotia and Canadian Imperial Bank of Commerce among its biggest holdings, as well as utilities.

"The Canadian banks remain in great shape," Mr. Miron said. "Profitability is continuing to improve. Banks are getting back to pre-crisis levels in net income. Balance sheets and liquidity are quite strong."

Last week, Canada's banking system was ranked the world's soundest for the third straight year by the World Economic Forum.

Lenders such as Royal Bank of Canada withstood the financial crisis without taking government bailouts, and recorded only a fraction of the US$1.8-trillion in writedowns taken by banks and brokers worldwide.

Fidelity forecasts Canada's gross domestic product to expand by 2% to 3% this year and next, Mr. Miron said. That compares with growth of less than 2% in the United States, he said.

"Canada has held up much better than the U.S.," he said. "Canada has just about recovered all the lost jobs of the recession. Real estate didn't collapse in Canada, and this helped support investor confidence and consumer spending."

*Bloomberg News*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br>**MOTORS LIQUIDATION COMPANY, *et al.*,**<br>**f/k/a General Motors Corp., *et al.***<br>**Debtors.** | **Chapter 11 Case No.**<br>**09-50026 (REG)**<br><br>**(Jointly Administered)** |

**NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

**TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:**

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a **General Motors Corporation**) | 09-50026 | 38-0572515 | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC (f/k/a **Saturn, LLC**) | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a **Saturn Distribution Corporation**) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a **Chevrolet-Saturn of Harlem, Inc.**) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2529430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650789 | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**"), filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**").

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing, (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party, (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response, (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (v) be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (vi) served in accordance with General Order M-399 so as to be actually received **on or before 4:00 p.m. (Eastern Time) on October 14, 2010** on the following parties (a) the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; (b) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (d) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (e) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (f) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (g) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (h) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (j) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (k) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (l) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in Bankruptcy Court of such adjournment on the date scheduled for the Hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| | |
|---|---|
| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |

**ADVERTISING**

# For Female-Aphrodisiac Makers, Effort at Parity

By ABBY ELLIN

A WOMAN in her early 40s pops up on the TV screen. "Women are starting to talk about something they have been feeling for a long time," she says, "wanting more sexual satisfaction."

Another woman, this one in her mid-50s says, "After I had my children, sex didn't make me feel the same way."

And a third, "I wish it were easier for me to feel aroused."

The two-minute ad for Zestra Essential Arousal Oils, a blend of botanical oils and extracts that promise to enhance sexual arousal for women, was created by ShadowBox Entertainment Pictures.

In an age of soul-bearing memoirs (adultery, addiction, incest) and frank discourse on male sexual concerns (impotence, size), the commercial is pretty tame: middle-age women discussing how they feel less than amorous. And when compared with a commercial for, say, Fire and Ice from Trojan, which features a couple racing into a 24-hour pharmacy to buy the product, it's downright PG.

•

Still, Zestra has had a difficult time getting its ad approved to run on the air, meeting resistance from TV networks, national cable stations, radio stations, and even Web sites like Facebook and WebMD.

Rachel Braun Scherl, the president of Semprae Laboratories, which manufactures Zestra, believes it is because of the culture's discomfort with women's sexuality.

"The Cialises of the world are a perfectly acceptable part of conversation in our culture today, but when it comes to talking about the realities of women's lives, like menstruation, you always have some woman running in the field in a dress," Ms. Braun Scherl said. "In our experience, we haven't seen women behaving that way. There's a double standard when it comes to society's comfort level with female sexual health and enjoyment."

From May to December 2009, Ms. Braun Scherl and Mary W. Jaensch, Semprae's chief executive, shopped the ad around to about 100 TV stations. With the exception of Soapnet Women's Entertainment and Discovery Health, many either refused or placed certain parameters on the ads.

BET, for example would only broadcast the ad from 11 p.m. to 4 a.m. and 8 to 9 a.m. Some of the other networks required additions — which the company made — to add disclaimers like: "Not for people under 18." But the bulk of the stations and networks indicated that there were no changes that could be made to render the ad appropriate.

Zestra did not fare any better with radio. In the spring, Ms. Braun Scherl and Ms. Jaensch hired Leibler-Bronfman Lubalin advertising, a Manhattan agency, to create a series of radio ads. Many stations told them to remove the words sex and arousal, which proved somewhat challenging for a product having to do with sexual arousal.

In the end, only KBAY in San Jose, Calif., and KMJQ in Houston ran the commercials; KBAB and KSCS, both in Texas, agreed to broadcast them from midnight to 6 a.m., "which is useless," said Albert Romano, LBL's media director. "It's called the graveyard shift for a reason. What's the point of running the spots if no one's going to hear them?"

Beth Bronfman, LBL's chief executive, agreed that a double-standard existed when marketing some products to women. "Have you ever listened to a Cialis commercial word for word?" Ms. Bronfman said. "'An erection lasting more than four hours.' Why is that O.K.?"

Zestra came close to being featured on the Web site WebMD's sex and relationship section, which regularly posts advertorials on Viagra and erectile dysfunction, but the company ultimately received an e-mail saying that Zestra "did not fall in line with WebMD's Best Practice Guidelines." When Ms. Braun Scherl and Ms. Jaensch asked for clarification on what those practices were, they did not receive a response. Neither Eric Lloyd, the Web site's director for strategic consumer partnerships, nor Kate Hahn, a spokeswoman for WebMD, returned phone calls or e-mails seeking comment.

GEORGE STILABOWER

Top, a commercial for Zestra, which is intended to enhance sexual arousal for women. Rachel Braun Scherl, left, and Mary W. Jaensch of Semprae Laboratories, which makes Zestra.

An ad on Facebook that read "Zestra Essential Arousal Oils — Try Zestra for Free" was pulled after several weeks. Ms. Braun Scherl and Ms. Jaensch received an e-mail stating that Facebook did not allow "advertisements that contain or promote adult content" including "sexual terms and/or images." The women said they were unsuccessful in reaching Facebook officials to discuss the ad. Representatives from Facebook did not return calls or e-mails.

"Double standards abound when it comes to advertising anything having to do with our private parts," said Robert J. Thompson, a professor of television and popular culture at Syracuse. "Commercials for erectile dysfunction products, which discuss not only sex but the hydraulic processes involved in having sex have played during major venues like the Super Bowl. They boldly tout male sexual pleasure as a commodity: an erection in a bottle."

•

The difference with Zestra is that it "places female pleasure first, and even seems to suggest that this pleasure can be had with or without the presence of a man," Mr. Thompson said. Indeed, in one online ad for Zestra, a woman says that, "It works so well, when I think about it, it even makes me want to go home and use it now." There are no men anywhere in the picture.

Mr. Thompson acknowledges that some of the reluctance to broadcast the ads may have to do with the vague sense of what products like Zestra actually do. "If this product works as well as it claims, Victorian prissiness and the collective American embarrassment about sex will probably be trumped by the marketplace," he said.

According to Ms. Braun Scherl and Ms. Jaensch, Zestra sales have increased month over month, and the business is growing. The product has also been featured on television shows like "Dr. Oz," "Rachael Ray" and the "Tyra Banks."

Still, "there is a huge unmet need, and we're limited in our ability to get the message to men and women who would benefit from the product," Ms. Braun Scherl said. "What I would say is, if there are standards for what is acceptable and what is not acceptable, they should be equally applied to products for male and female sexual enjoyment."

"Had it not been for Ally & Gargano, Federal Express would probably not exist today."

**Fred Smith**

*FedEx Founder, Chairman, President&CEO*

Advertising case study number 29 of 46 remarkable advertising successes.

The most important book on advertising in a generation.

**www.graphis.com/go/allygargano**

**Enter discount code AGNYC at checkout for a special offer.**

# Nokia Executive to Leave; Hints of Chairman's Exit

By KEVIN J. O'BRIEN

A shake-up at the top of Nokia continued on Monday after the company said the head of its smartphone business would be leaving.

Nokia, which is the largest maker of mobile phones in the world, also confirmed that its longtime board chairman, Jorma Ollila, might step down from the board after the company's general meeting in 2012.

The announcement of the departure of the head of the smartphone business, Anssi Vanjoki, a board member who has worked at Nokia for 19 years, came just days after Nokia named a new chief executive. It appointed Stephen Elop, a Canadian who headed Microsoft's business software division, to replace Olli-Pekka Kallasvuo.

One analyst pointed to the high-level staff changes as signs that Nokia was seeking a transformation after losing ground to Apple and its iPhone.

"It would have been a mixed signal to investors to replace the chief executive and have the board chairman stay on," said the analyst, Mats Nystrom of SEB Enskilda Bank in Stockholm.

Mr. Ollila oversaw the company's ascent to the top of the market during his tenure as chief executive from 1992 through 2006. He also oversaw the selection of Mr. Kallasvuo, who was then his chief financial officer, as his successor.

Mr. Ollila was quoted by Finnish news media over the weekend as saying that he intended to remain at the board's disposal as chairman until 2012, a deadline that investors interpreted as indicating his intention to leave the company. Nokia confirmed on Monday that he was considering stepping down in 2012.

Nokia has maintained its global market lead, currently 38 percent of the market, according to the British research firm Canalys. But it has struggled to match the iPhone's success and has stagnated in the United States, where it has less than 10 percent of the market. Its share price has lost more than half its value since 2007, when the iPhone was introduced.

"There was a feeling among some investors that the board at Nokia should have done something sooner to address the situation," Mr. Nystrom said.

VIJAY MATHUR/REUTERS

Anssi Vanjoki, with a cutout of the 5800 XpressMusic at its 2008 introduction, is leaving as head of smartphones.

Mr. Ollila said last week that the board had considered several internal and external candidates before deciding on Mr. Elop, 46, a native of Ancaster, Ontario, to become the first non-Finn to be chief executive of Nokia.

Mr. Vanjoki ran the smartphone business from 2004-8, and again from May of this year. He was most likely one of several internal candidates considered for chief executive. In a statement on Monday, Nokia said Mr. Vanjoki, who holds the title of executive vice president and general manager for mobile solutions, had decided to leave in six months, after his notice period expired.

"I felt the time has come to seek new opportunities in my life," said Mr. Vanjoki, 54, who oversaw development of Nokia's N-Series line of smartphones. "At the same time, I am 100 percent committed to doing my best for Nokia until my very last working day." Mr. Kallasvuo is remaining at the company as chairman of Nokia Siemens Networks.

# Lionsgate and Televisa Unite on Films Aimed at Latinos

*From First Business Page*

tried to till this ground, without success. In 1999, two Los Angeles companies announced plans to release as many as a dozen Spanish-language films in the United States a year. That effort fizzled after audiences ignored two early releases. In 2003, Universal Pictures scrapped a distribution agreement with Arenas Entertainment, a Latino film label.

Samuel Goldwyn Films got burned when it tried to tap the Hispanic market in 2001 with films like "Tortilla Soup." At the time, Meyer Gottlieb, Samuel Goldwyn's president, told The Los Angeles Times, "When it comes to filmed entertainment, they don't view themselves as Latinos. They want to see it because everybody else wants to see it."

But Mr. Azcárraga and Jon Feltheimer, chief executive of Lions Gate Entertainment, say they are confident they can succeed, citing figures showing that 37 million Hispanic moviegoers bought 300 million tickets in 2009, a per-moviegoer rate of more than eight tickets a year, the highest of any ethnic group.

Analysts say that, compared with other racial and ethnic groups, Latinos are the fastest-growing segment of the moviegoing audience and tend to buy more DVDs. At the same time, Latinos have started to drive results for broad releases; "Alvin and the Chipmunks," from 20th Century Fox, and "Fast & Furious" from Universal blossomed into hits in large part because of support from Latino moviegoers, the studios said. At the art house, "Pan's Labyrinth," directed by Mexico-born Guillermo del Toro, has shown the potential for a crossover audience. That film, made for about $19 million, generated more than $83 million at the global box office.

Lionsgate has also been quietly experimenting with Spanish-language releases, finding moderate success with tiny films like "La Mujer de Mi Hermano" ("My Brother's Wife"), which sold about $5 million in tickets in 2006.

"We have been interested in this market for a long time, but now we really think we can turn it into a business," Mr. Feltheimer said.

The difference this time, the executives involved say, is experience. Lionsgate has a successful track record in marketing movies to niche audiences. Televisa's strength is in production. And Pantelion has a potential ace up its sleeve: AMC Entertainment, North America's second-largest movie theater chain behind Regal Entertainment. AMC's chief executive, Geraldo Lopez, has agreed in advance to dedicate at least one screen in 50 of its theaters to Pantelion films. The theaters are in neighborhoods where more than a third of the population is Hispanic. Another chain, Cinemark, said it was in discussions with Pantelion to provide the fledgling production company with marketing support.

"Gee, if we can give them more culturally relevant product we may just get them to come to the movies a little bit more," said Mr. Lopez.

He said that was something he thought about not as a chief executive but as an average moviegoer. "It's difficult to go to the movies and find Latinos in roles that are normal," he said. "Instead, it's the bad guy in the neighborhood, the guy with the tattoos. Rarely do you see a Latino portrayed as a businessman, for crying out loud."

James M. McNamara, the former chief executive of Telemundo, will be Pantelion's chairman and Paul Presburger, a longtime Lionsgate international executive, will be chief executive. Mr. Presburger said part of Pantelion's strategy involved forging partnerships with consumer brands that were courting the same demographic. "We are deep in those conversations," he said.

Mr. McNamara says he is hopeful that Pantelion will get a robust welcome from screenwriters and actors. "I think there is a lot of pent-up demand for this on behalf of the industry's creative community," he said.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br>**MOTORS LIQUIDATION COMPANY, *et al.*,**<br>**f/k/a General Motors Corp., *et al.***<br>**Debtors.** | **Chapter 11 Case No.**<br>**09-50026 (REG)**<br><br>**(Jointly Administered)** |

**NOTICE OF HEARING TO CONSIDER APPROVAL OF DEBTORS' PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

**TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:**

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a **General Motors Corporation**) | 09-50026 | 38-0572515 | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC (f/k/a **Saturn, LLC**) | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a **Saturn Distribution Corporation**) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a **Chevrolet-Saturn of Harlem, Inc.**) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2529430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650789 | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**"), filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**").

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing, (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party, (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response, (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (v) be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (vi) served in accordance with General Order M-399 so as to be actually received **on or before 4:00 p.m. (Eastern Time) on October 14, 2010** on the following parties (a) the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; (b) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (d) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (e) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (f) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (g) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (h) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (j) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (k) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (l) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in Bankruptcy Court of such adjournment on the date scheduled for the Hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| | |
|---|---|
| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |

**Citation File No. 282-09**
**SURROGATE'S COURT, New York COUNTY**
THE PEOPLE OF THE STATE OF NEW YORK,
By the Grace of God Free and Independent

TO: **Marie Pasquinelli, Vincent Stanzione, Public Administrator County of New York, heirs at law, next of kin and distributees of Lucienne Bugel (a/k/a Lucienne Bugel Viviano) deceased, if living and if any of them be dead, to their heirs at law, next of kin, distributees, legatees, executors, administrators, assignees and successors in interest whose names are unknown and can not be ascertained after due diligence.**

A petition having been duly filed by Barry J. Albano who is/are domiciled at 32 Pickwick Drive, Syosset, New York 11791. YOU ARE HEREBY CITED TO SHOW CAUSE before the Surrogate's Court, New York County, at 31 Chambers Street, New York, room 509, New York, on September 21, 2010, at 9:30 o'clock in the fore noon of that day, why a decree should not be made in the estate of Lucienne Bugel, aka Lucienne Bugel Viviano lately domiciled at 333 East 79th Street, New York, New York 10075, United States admitting to probate a Will dated May 4, 2005 (and Codicil(s), if any, a copy of which is attached, as the Will of Lucienne Bugel, deceased, relating to real and personal property, and directing that: Letters Testamentary issue to Barry J. Albano

Dated, Attested and Sealed,
July 28, 2010

HON. Nora S. Anderson, Surrogate
Jane Passenant, Chief Clerk
**Ralph B. Kelley, Attorney**
**(212) 768-6908**

**Sonnenschein Nath & Rosenthal LLP**
**1221 Avenue of the Americas, New York, New York 10020**

NOTE: This citation is served upon you as required by law. You are not required to appear. If you fail to appear it will be assumed you do not object to the relief requested. You have a right to have an attorney appear for you.

The New York Times
**Knowledge Network**
nytimes.com/knowledge

**Toronto International Film Festival**

# For Briton Sally Hawkins, three's a charm

## The multi-stage actress has multiple movies showing, too

By Claudia Puig
USA TODAY

TORONTO — British actress Sally Hawkins loves movies — even the not-so-great ones. "There's always a piece of magic there, always a moment that engages or moves you," she says.

So it's appropriate that she's the big Toronto player — with three movies at the film festival. (She's also starring now on Broadway in *Mrs. Warren's Profession*, with Cherry Jones.) Hawkins, 34, stars in the much-buzzed-about *Never Let Me Go*, as well as *Made in Dagenham* and *Submarine*.

LIVE FROM TORONTO

For the latest festival news, visit movies.usatoday.com.

Don't ask her to choose her favorite when it comes to theater vs. film. "I love both," she says. "I'm interested in creating stories. Theater is how I got into acting and theater is how I learned."

Even as a child in southeast London, she was always playing characters. "In primary school, I was engaged with creating characters with friends," she says. "It was like an extension of play. There was something in there that I loved. It was magic. It made me happy. I was always creating these little playlets for friends. They were probably awful."

She laments that she won't have much time to actually watch movies at the festival: "I read the reviews and keep thinking, 'I have to see that.' "

When it comes to her own films, "it's always weird to watch yourself. It takes me a while to be objective. I'll be thinking 'What's with the mouth? I didn't know my mouth made that shape. It's so big, what am I doing? Oh, don't do that!'

"But you just have to kind of get over it," she says. "And the older I get, the less I worry."

American audiences first became aware of her in a big way with 2008's *Happy Go Lucky*, about an indefatigably optimistic schoolteacher. And though she's charming and quick to laugh, she bears little resemblance to that character.

In *Submarine*, she plays an odd and self-absorbed mother of a teenage boy with a vivid imagination. In *Made in Dagenham*, set in 1968, she's a machinist working long hours who engineers an important strike. In *Never Let Me Go*, she plays a teacher who wants her students to know the truth about their lives.

"I've been quite lucky I haven't been typecast," she says. "And it's easy in this profession to be."

But theater has a special allure for someone who's all about creating characters.

"There's nothing like a live audience," she says. "The immediate gratification of it. It's great, so very different from film."

Even so, she adds, "it's terrifying to be on Broadway, and it's also very exciting."

By Carlo Allegri, AP

**"Always a piece of magic":** Hawkins stars in *Never Let Me Go*, *Made in Dagenham* and *Submarine* — all playing in Toronto. She's also known for 2008's *Happy Go Lucky*.

## 20 years later, Clint enters 'Hereafter'

Clint Eastwood was on hand this weekend for the premiere of his new film, *Hereafter*. The last time Eastwood showed a film at the festival was for 1990's *White Hunter, Black Heart*.

He recalled that he was first at the festival 46 years ago with *A Fistful of Dollars*.

WireImage

**Eastwood:** He first visited fest in 1964.

Receiving a long and appreciative standing ovation, Eastwood was characteristically down-to-earth and low-key. He wrapped things up quickly after introducing stars Matt Damon and Bryce Dallas Howard, saying, "Let's get on with the movie."

*Hereafter*, written by Peter Morgan (*The Queen*), has the rhythm of a foreign film. Damon plays a man with psychic abilities who feels cursed by his visions. ***— Claudia Puig***

### Aronofsky *seems* so normal . . .

Dressed in weekend casual and showing little wear-and-tear from visiting three film festivals in a row in the past two weeks, Darren Aronofsky exudes the sort of pleasant demeanor that one would welcome in a next-door neighbor.

That is, until you see his visually assaulting films with obsessive characters whose urges often lead to their own destruction. *Pi*, *Requiem for a Dream* and *The Wrestler* all exhibit degrees of these elements. But *Black Swan*, his psycho-sexual thriller set in the cutthroat world of competitive ballet, pushes such themes to the max.

So what's a nice 41-year-old family man with a lovely companion, actress Rachel Weisz, and a 4-year-old son doing with a résumé of get-under-your-skin cinema? "I think people who go to extremes make for interesting characters," he says.

***— Susan Wloszczyna***

# Strangers hear things you wouldn't tell friends

**Continued from 1D**

tice that is natural and often beneficial," says John Locke, a linguistics professor at the City University of New York.

"We teach people they should mind their own business," he says, but "that's extremely bad advice. It's dangerous because you won't see the terrorist next door making a bomb; you won't see the kids being abused, or the husband beating up a wife. If there wasn't any eavesdropping, if people minded their own business and ignored what they saw and heard, how would you prevent and how would you solve crimes?"

**Cover story**

Locke, author of a new book, *Eavesdropping: An Intimate History*, says apes keep an eye on each other to maintain order, and we humans have neighborhood watch programs.

But eavesdropping is more than just listening in. It's glancing over at someone else's laptop screen to see what they're doing. It's peering into an apartment window as you walk by. It's catching a glimpse through a door that's slightly ajar. It's trolling Facebook to see what your friends are saying to others.

And yes, it's a bit thrilling, he says. "There is something quite tantalizing about this behavior."

But is it really eavesdropping if they're broadcasting and we can't help overhearing?

"I don't regard it at all as me eavesdropping," says Etti Baranoff, who has overheard plenty of cellphone conversations in 15 years of traveling twice a week as an associate professor of insurance and finance at Virginia Commonwealth University in Richmond. "We think no matter where we are, we are in our own living room, but we are not. We are walking with our phones as if we are in our own homes."

**No keyholes needed**

"It's a generational and cultural change," says W. Keith Campbell, a professor of psychology at the University of Georgia in Athens.

"That old image of sticking your ear to a keyhole — we don't need to do it anymore," Campbell says. "Our personal lives are much more open."

What's changed is that more private behavior, such as personal phone calling, happens in public today, says social psychologist Robert Kraut of Carnegie Mellon University in Pittsburgh.

It may seem like eavesdropping, but the "victim" is no longer the person being eavesdropped on, he says — it's "the overhearers, who can't get away. What had once been private behavior is now being shoved in their face."

"We teach people they should mind their own business, but that's extremely bad advice."

— John Locke, City University of New York

Fischer, author of *Made in America: A Social History of American Culture and Character*, says it's ironic that "a cellphone call overheard while walking down the street is a throwback to (party lines) where everybody knew everybody's business."

Whether eavesdropping is by choice or forced makes a big difference, Locke says.

"If someone is speaking low, people will lean in the direction of the message. But if people are speaking loudly on a cellphone, they'll back the other way. We resent the fact they are broadcasting personal information. We want the option of tuning in."

This dichotomy is evident in new research on public cellphone use. One study, to be presented to the National Communication Association in November, included 15- to 20-minute observations of 19,741 people using cellphones on a college campus from 2005 to 2008. Researcher Yi-Fan Chen of Old Dominion University in Norfolk, Va., found that mobile devices "blurred boundaries between public and private spaces." Her 2009 survey found cellphones were most often used on the street, observers said, "in a loud or annoying manner."

Another study, in the journal *Behaviour & Information Technology* in 2004, found cellphone conversations "significantly more noticeable and annoying than face-to-face" at the same volume.

"There is an idea in social psychology that you can talk about intimate things to strangers because they are not part of your network and are not considered to be a risk," Campbell says. "If you're actually in public and clearly don't know people, it's almost seen as a private space."

Some say today's mix of easy information sharing and celebrity-driven media culture is making us more narcissistic. With Facebook and Twitter, we're more willing to showcase our lives for all who want to look or listen. We can tell our friends our innermost thoughts, but those who aren't so close also see.

"Go into an airport and you hear people talking in a particularly loud voice, so people think they're important or have status. There's a subset of people that ties in more with narcissism and attention-seeking that are using these channels to get attention," says Campbell, co-author of *The Narcissism Epidemic*.

**Gleaning new information**

But the fact that you can watch or listen on social networks without engaging "has some real advantages," says Keith Hampton, assistant professor of communication at the University of Pennsylvania in Philadelphia.

"It's exposure to little bits of information you would never otherwise have had access to," he says. "And little bits of information can be really important. You have access to new ideas, and not from very close social ties that know what you know."

Pop culture expert Richard Lachmann, a sociology professor at the University at Albany, State University of New York, says it's not just the idea of privacy that has changed. He believes the very nature of eavesdropping is up for debate, since people are willing to share more and more personal information.

"Everybody still has a notion of eavesdropping. It's somebody trying to hear something they haven't been invited to hear. What's changing is what goes in that category," he says.

"It used to be people had a real long list of things that were private and only heard by a few, and a short list of things that would be public. For many people, that's moved from one list to another."

MARKETPLACE TODAY

www.russelljohns.com/usatoday | To advertise call 1.800.397.0070 Toll-free in the U.S. only

NOTICES

LEGAL NOTICE

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br>**MOTORS LIQUIDATION COMPANY, *et al.*,**<br>**f/k/a General Motors Corp., *et al.***<br>**Debtors.** | **Chapter 11 Case No.**<br>**09-50026 (REG)**<br><br>**(Jointly Administered)** |

**NOTICE OF HEARING TO CONSIDER APPROVAL
OF DEBTORS' PROPOSED DISCLOSURE STATEMENT
WITH RESPECT TO DEBTORS' JOINT CHAPTER 11 PLAN**

**TO: ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SET FORTH BELOW:**

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a **General Motors Corporation**) | 09-50026 | 38-0572515 | General Motors Corporation<br>GMC Truck Division<br>NAO Fleet Operations<br>GM Corporation<br>GM Corporation-GM Auction Department<br>National Car Rental<br>National Car Sales<br>Automotive Market Research |
| MLCS, LLC (f/k/a **Saturn, LLC**) | 09-50027 | 38-2577506 | Saturn, LLC<br>Saturn Corporation<br>Saturn Motor Car Corporation<br>GM Saturn Corporation<br>Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a **Saturn Distribution Corporation**) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a **Chevrolet-Saturn of Harlem, Inc.**) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. |
| Remediation and Liability Management Company, Inc. | 09-50029 | 38-2529430 | Uptown Land Development Corporation |
| Environmental Corporate Remediation Company, Inc. | 09-50030 | 41-1650789 | GM National Hawaii, Inc.<br>NCRS Hawaii, Inc. |

**PLEASE TAKE NOTICE** that on August 31, 2010, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors set forth above (collectively, the "**Debtors**"), filed the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Plan**") [Docket No. 6829], and the proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan, dated August 31, 2010 (as it may be amended, the "**Disclosure Statement**") [Docket No. 6830], pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**").

**PLEASE TAKE FURTHER NOTICE** that:

1. A hearing (the "**Hearing**") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, **on October 21, 2010 at 9:45 a.m. (Eastern Time)** in Room 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, or as soon thereafter as counsel can be heard, to consider the entry of an order, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and approving the Disclosure Statement.

2. The Disclosure Statement and Plan are on file with the Clerk of the Bankruptcy Court (the "**Clerk**") and may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Disclosure Statement and Plan may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Disclosure Statement and Plan may also be obtained by written request to the Debtors' voting agent at the address set forth below:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
|---|---|
| The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>Attn: Motors Liquidation Company Balloting Center | The Garden City Group, Inc.<br>P.O. Box 9386<br>Dublin, OH 43017-4286<br>Attn: Motors Liquidation Company Balloting Center |

3. Responses and objections, if any, to the approval of the Disclosure Statement or any of the other relief sought by the Debtors in connection with approval of the Disclosure Statement, must (i) be in writing, (ii) state the name and address of the objecting or responding party and the amount and nature of the claim or interest of such party, (iii) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be incorporated into the Disclosure Statement to resolve any such objection or response, (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (v) be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (vi) served in accordance with General Order M-399 so as to be actually received **on or before 4:00 p.m. (Eastern Time) on October 14, 2010** on the following parties (a) the Clerk of the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408; (b) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (d) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (e) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (f) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn: Joseph Samarias, Esq.); (g) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (h) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.); (j) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (k) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (l) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.).

4. **IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND MAY NOT BE HEARD AT THE HEARING.**

5. Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtors who are entitled to vote on the Plan will receive a copy of the Disclosure Statement, the Plan, and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

6. The Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by an announcement in Bankruptcy Court of such adjournment on the date scheduled for the Hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Bankruptcy Court.

| | |
|---|---|
| Dated: New York, New York<br>September 3, 2010 | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Attorneys for Debtors and Debtors in Possession |