KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio 43215
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198
Jeffrey J. Jones (*pro hac pending*)

JONES, WALKER, WAECHTER,
  POITEVENT, CARRERE & DENEGRE, LLP
201 St. Charles Avenue, Suite 500
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 582-8011
David G. Radlauer (*pro hac pending*)
Thomas A. Casey, Jr. (*pro hac pending*)

Attorneys for General Motors LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                          :
In re                                     :
                                          :      Chapter 11
                                          :
MOTORS LIQUIDATION COMPANY, et al.,       :      Case No. 09-50026 (REG)
     f/k/a General Motors Corp., et al.   :
                                          :
              Debtors.                    :      (Jointly Administered)
-----------------------------------------------------------x
```

## MOTION OF GENERAL MOTORS LLC TO ENFORCE
## 363 SALE ORDER AND APPROVED DEFERRED TERMINATION AGREEMENTS
## AGAINST ROSE CHEVROLET, INC., HALLEEN CHEVROLET, INC., ANDY
## <u>CHEVROLET COMPANY, AND LESON CHEVROLET COMPANY, INC.</u>

# TABLE OF CONTENTS

**Page**

Requested Relief ................................................................................................ 1

Overview ............................................................................................................. 2

Background ......................................................................................................... 7

    A.    The 363 Sale Order And Wind-Down Agreements .............................. 7

    B.    The Wind-Down Of The Dealers And Their Attack On This Court's
        Exclusive Jurisdiction ....................................................................... 8

        1.    The Ohio Dealers ................................................................. 8

        2.    Leson ................................................................................... 11

Jurisdiction ........................................................................................................ 15

Argument ........................................................................................................... 16

    A.    To The Extent They Even Have Claims, The Dealers Are Pursuing Them
        In The Wrong Forum .......................................................................... 16

        1.    This Court Has Exclusive Jurisdiction Of The Dealers' Claims and
            Should Enforce The 363 Sale Order and Wind-Down Agreements ........ 16

        2.    The Requested Relief Should Be Approved By The Court .................... 17

    B.    Even If The Ohio Dealers Brought Their Appeals In This Court, They
        Have No Right To Appeal ................................................................... 19

        1.    Congress Did Not Authorize And This Court Should Not Imply
            Any Right To Judicial Review Of The Arbitration Awards ................... 19

            a.    The Statute And Legislative History ........................................... 19

            b.    The Federal Arbitration Act And AAA Commercial
                Arbitration Rules ............................................................... 19

        2.    Rose, Halleen and Sims Have No Colorable Basis For Asking The
            Court To Vacate Or Modify The Arbitration Awards ............................ 21

    C.    Even If Leson Had Filed Its Action In This Court, It Has No Colorable
        Basis For Asking The Court To Modify The LOI ............................... 25

Notice ................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page**

CASES

*Back v. AM Gen. Corp. (In re Chateaugay Corp.)*,
    213 B.R. 633 (S.D.N.Y. 1997)................................................................................18

*Bryson v. Gere*,
    268 F. Supp. 2d 46 (D.D.C. 2003) .........................................................................24

*Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*,
    773 F.2d 1193 (11th Cir. 1985) .............................................................................27

*Francis v. Landstar Systems Holdings, Inc.*,
    2009 U.S. Dist. LEXIS 118897 (M.D. Fla. Nov. 25, 2009) ..................................24

*Globe Motors, Inc. v. Studebaker-Packard Corp.*,
    328 F.2d 645 (3d Cir. 1964)...................................................................................27

*Greater Lowell Automall, Inc. v. Toyota Motor Distrib., Inc.*,
    618 N.E.2d 1369 (Mass. App. 1993) .....................................................................28

*Hall Street Associates L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)...............................................................................................24

*In re Cont'l Airlines, Inc.*,
    236 B.R. 318 (Bankr. D. Del. 1999) ......................................................................18

*In re Eveleth Mines, LLC*,
    312 B.R. 634 (Bankr. D. Minn. 2004) ...................................................................16

*In re Millennium Seacarriers, Inc.*,
    419 F.3d 83 (2d Cir. 2005)...............................................................................16, 18

*In re Petrie Retail, Inc.*,
    304 F.3d 223 (2d Cir. 2002)............................................................................16, 18

*In re Pioneer Ford Sales, Inc.*,
    729 F.2d 27 (1st Cir. 1984)....................................................................................28

*In re Van Ness Auto Plaza*,
    120 B.R. 545 (Bankr. N.D. Cal. 1990) .................................................................28

*Scott v. Prudential Securities, Inc.*,
    141 F.3d 1007 (11th Cir. 1998) .............................................................................24

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*,
    130 S. Ct. 1758 (2009) ...................................................................................25

*Travelers Indemn. Co. v. Bailey*,
    129 S. Ct. 2195 (2009) ...................................................................................18

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.)*,
    68 B.R. 690 (Bankr. S.D.N.Y. 1986) .............................................................18

*World-Wide Volkswagen Corp. v. Autobahn Motors Co.*,
    1980 U.S. Dist. LEXIS 14523 (S.D.N.Y. Oct. 24, 1980) ..............................27

*Zeno Buick-GMC v. GMC Truck & Coach*,
    844 F. Supp. 1340 (E.D. Ark. 1992) .............................................................27

## STATUTES

9 U.S.C. § 2 ..............................................................................................................19

11 U.S.C. § 363 .........................................................................................................2

11 U.S.C. § 105 .............................................................................................2, 18, 28

11 U.S.C. § 365 .......................................................................................................28

28 U.S.C. § 157 .......................................................................................................16

28 U.S.C. § 1334 .....................................................................................................15

28 U.S.C. § 1408 .....................................................................................................16

28 U.S.C. § 1409 .....................................................................................................16

Consolidated Appropriations Act 2010, Pub. Law 111-117,
    123 Stat. 3034 (2009) .............................................3-6, 9-14, 16, 19, 21-23, 25, 26

## OTHER AUTHORITIES

Cong. Rec. H14477 ..................................................................................................19

Fed. R. Bankr. P. 1015 ............................................................................................28

Fed. R. Bankr. P. 9007 ............................................................................................28

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC f/k/a General Motors Company (**"New GM"**) respectfully

represents:

## **Requested Relief**

1.        By this Motion, as described more particularly below, New GM seeks to enforce

the respective Deferred Termination Agreements (the "**Wind-Down Agreements**") against Rose

Chevrolet, Inc. ("**Rose**"), Halleen Chevrolet, Inc. ("**Halleen**"), Andy Chevrolet Company d/b/a

Sims Chevrolet, Inc. ("**Sims**"), and Leson Chevrolet Company, Inc. ("**Leson**" and, collectively

with Rose, Halleen and Sims, the "**Dealers**").  Rose, Halleen and Sims (collectively, the "**Ohio**

**Dealers**") have filed in the United States District Court for the Northern District of Ohio (the

"**Ohio District Court**"), and Leson has filed with the Louisiana Motor Vehicle Commission (the

"**Commission**"), separate actions (collectively, the "**Actions**") in which they assert that they are

not required to comply with their obligations under sections 2(a) and 13 of their respective

Wind-Down Agreements to terminate their Chevrolet Dealer Agreements by October 31, 2010

and to bring any disputes relating to the Wind-Down Agreements in this Court.  The Actions are

a direct violation of the Court's July 5, 2009 Order (i) Authorizing Sale of Assets Pursuant to

Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S.

Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain

Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting

Related Relief [Docket No. 2968] (the "**363 Sale Order**") and the Wind-Down Agreements that

the 363 Sale Order expressly approved.

2.        Because the Dealers are refusing to abide by the 363 Sale Order and their

respective Court-approved Wind-Down Agreements, New GM requests the entry of an order

pursuant to sections 105 and 363 of the Bankruptcy Code: (a) enforcing the 363 Sale Order and the terms of the Wind-Down Agreements, including, but not limited to, sections 2(a) (termination of the Chevrolet Dealer Agreements by October 31, 2010), 5(d) (covenant not to sue New GM), and 13 (exclusive jurisdiction of the Bankruptcy Court), and directing Rose, Halleen, Sims and Leson to specifically perform their respective obligations pursuant to, *inter alia*, sections 5(d) and 17 thereof; (b) directing Rose, Halleen, Sims, Leson and all persons acting in concert with them to cease and desist from further prosecuting, or otherwise pursuing the claims asserted in, the Actions against New GM; (c) directing Rose, Halleen, Sims and Leson to dismiss the Actions forthwith; and (d) granting such other and further relief as may be warranted by, among other things, the Dealers' breach of section 5(e) of the Wind-Down Agreements (the indemnification provision) and the Dealers' violations of this Court's orders.

### Overview

3.      Based on this Court's ruling in *Rally*, decided on October 4, 2010, the proceedings initiated by the Dealers in Ohio and in Louisiana are contrary to the terms of the Wind-Down Agreements and this Court's 363 Sale Order. Indeed, the three Ohio Actions seek relief virtually identical to the relief sought in *Rally*. Notably, Chris DeVito, the attorney that filed the *Rally* action in California as co-counsel also filed the Ohio Actions at issue here. The applications filed by the Ohio Dealers mirror the California petition filed by Rally, with many of the same arguments and even the same rhetoric, adapted and modified for the specific dealers. Mr. DeVito, counsel for the Ohio Dealers, also participated in the *Rally* hearing on Monday, October 4, 2010 by telephone. For all practical purposes, the Dealers seek to end-run this Court's orders in precisely the same manner that Rally sought to end-run this Court's orders. This Court's decision in *Rally* has already disposed of every argument raised by the Dealers and the same analysis should compel the same result here.

4.      Prior to filing this Motion and after this Court's ruling in *Rally*, New GM requested in writing that the Ohio Dealers comply with this Court's 363 Sale Order and dismiss the Rose, Halleen and Sims Actions.  A true and correct copy of New GM's counsel's letter making this request is attached as Exhibit A.  The Ohio Dealers have refused to do so.  Accordingly, as provided in section 5(e) of the Wind-Down Agreements, New GM is entitled to indemnification from the Ohio Dealers for New GM's costs and reasonable attorney fees based on the Ohio Dealers' knowing violations of the 363 Sale Order and the Court-approved Wind-Down Agreements, including the full amount of any costs and fees incurred in connection with the filing of this Motion and continued defense of the Rose, Halleen and Sims Actions.  New GM is also entitled to sanctions for the Ohio Dealers' knowing refusal to abide by this Court's Orders.  Prior to filing this Motion, New GM also made a similar request on counsel for Leson, asking Leson to dismiss the Leson action.  A true and correct copy of New GM's counsel's letter making this request is attached as Exhibit B.  To date, Leson has likewise refused to do so.  Accordingly, the same relief is warranted against Leson.

5.      As in *Rally*, the Dealers here purport to rely on § 747 of the Consolidated Appropriations Act 2010, Pub. Law 111-117, 123 Stat. 3034 (2009) (the "**Dealer Arbitration Act**," attached as Exhibit C) to justify their attempted end-run around this Court's exclusive jurisdiction.  As in *Rally*, the starting point for analysis is not the Dealer Arbitration Act but rather the Wind-Down Agreements that these Dealers and other GM dealers executed and which this Court approved providing for the wind down of the dealers, which the Court found to be "valid and binding contracts, enforceable in accordance with their terms."  363 Sale Order, ¶ 31.  Under the 363 Sale Order, this Court should determine the parties' respective rights under the

Wind-Down Agreements in light of any defenses that dealers may raise against their

enforcement, whether it be the Dealer Arbitration Act or other claimed defenses.

6.      Under the Wind-Down Agreements, the Dealers' respective Chevrolet Dealer

Agreements must terminate no later than October 31, 2010.  Wind-Down Agreements, § 2(a).

The Wind-Down Agreements also specifically preclude the Dealers from filing suit against New

GM for certain claims.  *Id.*, § 5(d).  Further, the Dealers have agreed that this Court retains "full,

complete and exclusive jurisdiction to . . . enforce, and adjudicate disputes concerning the terms

of [the Wind-Down] Agreement and any other matter related thereto."  *Id.*, § 13.  This provision

dovetails with paragraph 71(f) of the 363 Sale Order in which this Court retained exclusive

jurisdiction to "resolve any disputes with respect to or concerning the Deferred Termination

Agreements."

7.      Based upon these provisions, this Court already determined in *Rally* that it has

exclusive jurisdiction over any efforts to defeat the Wind-Down Agreements through challenges

to arbitration decisions made under the Dealer Arbitration Act:

> I assume without deciding that Congress could, if it wished, to
> have taken my exclusive jurisdiction away just as Congress can
> take away jurisdiction from the lower federal courts on other
> matters.  But Congress didn't do that.  If we temporarily put aside
> issues as to the right to judicial review and decisions as to the
> merits, I assume, without deciding, that a California district court
> could under its diversity jurisdiction have subject matter
> jurisdiction over a controversy like this one.  But if it did, it would
> be foreclosed from exercising its subject matter jurisdiction by
> reason of the final exclusive jurisdiction order that I entered back
> in July of 2009.

October 4, 2010 Hearing Transcript (the "**Rally Transcript**") at 56:4-15, a true and correct copy

of which is attached as Exhibit D.  Indeed, there are strong policy reasons for vesting exclusive

jurisdiction of post-sale disputes over a sale order in the bankruptcy court that approved it,

including ensuring that the purchasers of assets get what they bargained for as part of the sale. *Id*. at 49:2-13.

8.      The Dealer Arbitration Act did not void the Wind-Down Agreement or the 363 Sale Order or relieve the Dealers of any of their wind-down obligations.  As this Court noted in *Rally*, "there was nothing in the Dealer Arbitration Act . . . to modify any of my earlier orders other than to provide what amounted to a defense to enforcement of the deferred termination agreements if and to the extent that a dealer prevailed in the arbitration process for which Congress provided." *Id.* at 45:7-13.  The specific provisions of the Wind-Down Agreement remained in full force and effect after Congress enacted the Dealer Arbitration Act, continued in effect during the arbitration proceedings, which the Dealers initiated, and remain in full force and effect today.  The only change that the Dealer Arbitration Act made to the Wind-Down Agreement and 363 Sale Order was the creation of a limited statutory right allowing dealers to seek "reinstatement" through binding arbitration.  During the arbitration process, the Dealers continued to operate under the limited "wind-down" status defined by their Wind-Down Agreements.

9.      Nor did the Dealer Arbitration Act supplant or deprive wind-down dealers of any pre-existing common law or statutory entitlement.  Instead, the Dealer Arbitration Act created a narrowly tailored statutory right to file an arbitration proceeding with specified characteristics and limitations and without further judicial review.  *See* Ex. D, Rally Transcript at 50:19-20 ("[T]he Dealer Arbitration Act doesn't provide for judicial review of arbitration awards."), 54:4-5 ("[T]he statute doesn't provide for such review.").  Given the importance that Congressional proponents attached to swift proceedings, it is no accident that the Act did not provide for

judicial review, which would have created the prospect of lengthy delays far greater than the strict statutory timetables set forth in the Act.

10.    The Ohio Dealers chose to exercise their limited arbitration rights under the Act but were *not* successful in obtaining an award reinstating them as Chevrolet dealers.  They lost.  Their Wind-Down Agreements therefore clearly govern their rights and responsibilities.  Leson was successful in its arbitration bid,  so New GM provided Leson with a letter of intent as required by the Dealer Arbitration Act.  *See* Ex. C, § 747(d).  Leson then executed the letter of intent ("**LOI**").  However, by Leson's own admission, Leson has not satisfied the terms of the LOI.  In other words, Leson continues to operate under the Wind-Down Agreement.

11.    Ignoring their consent to this Court's retention of exclusive jurisdiction in the 363 Sale Order and section 13 of their respective Wind-Down Agreements, and contrary to their covenant not to sue New GM under the conditions contained in the Wind-Down Agreements, the Dealers filed suits in other tribunals seeking to avoid their obligations under the Wind-Down Agreement due to alleged legal errors by the arbitrators or on other grounds.  In short, the Dealers seek to use their claimed right to judicial review in other forums as a defense to enforcement of the Wind-Down Agreements, which otherwise require termination of their Chevrolet Dealer Agreements by October 31, 2010.

12.    As we show below, there is no statutory or other basis for the Dealers' claims that they are entitled to judicial review of the arbitrators' awards or otherwise.  In any event, their claims relate centrally to their respective Wind-Down Agreements and therefore fall squarely within this Court's retention of full, complete and exclusive jurisdiction in paragraph 71 of the Sale Approval Order.  *See* Ex. D, Rally Transcript at 56:4-57:1.  And even if the Court found an implied right to judicial review for arbitration awards that Congress never enacted, general

principles governing the exceedingly limited scope of judicial review of arbitration awards would defeat the Dealers' arguments for modification or vacation of the arbitrators' awards or further review.

## Background

**A.** **The 363 Sale Order And Wind-Down Agreements**

13. After notice and a comprehensive three-day evidentiary hearing, on July 5, 2009, this Court entered the 363 Sale Order. The 363 Sale Order, *inter alia*, authorized and approved the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "**MSPA**"), by and among General Motors Corporation, n/k/a Motors Liquidation Company, and certain of its affiliates (collectively, the "**Debtor**") and New GM. Pursuant to the MSPA and the 363 Sale Order, New GM, on July 10, 2009, purchased substantially all of the assets of the Debtor free and clear of the Debtor's liabilities, except as expressly assumed by New GM under the MSPA.

14. As part of the transactions approved by the 363 Sale Order, the Debtor entered into and assigned to New GM certain Wind-Down Agreements between the Debtor and certain of its authorized new motor vehicle dealers. The Debtor offered these agreements to dealers as an alternative to outright rejection of their General Motors Dealer Sales and Service Agreements ("**Dealer Agreements**") under section 365 of the Bankruptcy Code. The Wind-Down Agreements provided, among other things, that in exchange for certain payments and other consideration, the Dealer Agreements would terminate no later than October 31, 2010.

15. This Court, over objection by the Greater New York Automobile Dealers Association, approved the Wind-Down Agreements and specifically found in Paragraph 31 of the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable

-7-

in accordance with their terms." This Court further retained exclusive jurisdiction to enforce and

implement these agreements. As stated in paragraph 71 of the 363 Sale Order:

> This Court retains exclusive jurisdiction to enforce and implement
> the terms and provisions of this Order, the MPA [MSPA], … and
> each of the agreements executed in connection therewith, including
> the Deferred Termination Agreements, in all respects, including,
> but not limited to, retaining jurisdiction to … (f) resolve any
> disputes with respect to or concerning the Deferred Termination
> Agreements.

In Recital JJ of the 363 Sale Order, the term "Deferred Termination Agreements" is defined to

include "Wind-Down Agreements." Consistent with these provisions, the form of Wind-Down

Agreement approved by the Court provides as follows in section 13:

> <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer
> hereby consents and agrees that the Bankruptcy Court shall retain,
> full, complete and exclusive jurisdiction to interpret, enforce, and
> adjudicate disputes concerning the terms of this Agreement and
> any other matter related thereto. The terms of this Section 13 shall
> survive the termination of this Agreement.

Thus, to the extent that a dealer challenges the Wind-Down Agreement, or asserts any claim,

defense, or allegation that it is not required to comply with its obligations under the Wind-Down

Agreement (including its obligations under sections 2(a) and 5(d)), it must assert that claim in

this Court, and not elsewhere. This Court already reached that straightforward conclusion in

*Rally* and it applies equally here.

**B.      The Wind-Down Of The Dealers And Their Attack On This Court's Exclusive
         Jurisdiction**

     **1.      The Ohio Dealers**

     16.      Before the Debtor filed for bankruptcy, Rose operated an authorized Chevrolet

Dealership in Hamilton, Ohio, as part of the Cincinnati Multiple Dealer Area ("**MDA**"), pursuant

to a General Motors Dealer Sales and Service Agreement (the "**Rose Dealer Agreement**").

Halleen operated an authorized Chevrolet Dealership in North Olmsted, Ohio, as part of the

Cleveland MDA, pursuant to a General Motors Dealer Sales and Service Agreement (the

"**Halleen Dealer Agreement**").  And, Sims operated an authorized Chevrolet Dealership in

Lyndhurst, Ohio, as part of the Cleveland MDA, pursuant to a General Motors Dealer Sales and

Service Agreement (the "**Sims Dealer Agreement**").  The Ohio Dealers' respective new vehicle

sales performance had been exceedingly poor for several years, and the Debtor, for this and other

reasons, determined not to retain the Ohio Dealers as authorized Chevrolet dealerships.  As an

alternative to outright rejection of the Rose, Halleen and Sims Dealer Agreements, the Debtor

offered each of them a Wind-Down Agreement, which the Ohio Dealers each accepted, executed

and returned to the Debtor in June 2009.  Under these agreements, true and correct copies of

which are attached as Exhibits E, F and G, the Ohio Dealers agreed, among other things, to

terminate their respective Chevrolet Dealer Agreements no later than October 31, 2010.  The

Rose, Halleen and Sims Wind-Down Agreements were assigned to New GM as part of the 363

Sale.

       17.     In December 2009, Congress passed the Dealer Arbitration Act, which gave

"wind-down" dealers the opportunity to seek reinstatement to the GM dealer network through

binding arbitration that was to be conducted and completed by no later than June 14, 2010 under

the original statutory schedule or by July 14, 2010 under the maximum allowable statutory

extension.  *See* Ex. C, § 747.  The Ohio Dealers each filed timely demands for arbitration in

accordance with the Dealer Arbitration Act.  Dale A. Crawford, an experienced and highly

respected former state court judge who served on the bench full-time for 27 years, presiding over

800 jury trials, and who still serves as a visiting judge from time-to-time at the designation of the

Ohio Supreme Court, was appointed with the consent of the parties to serve as arbitrator for the

Ohio Dealers' arbitrations.  A copy of Judge Crawford's AAA biography is attached as

Exhibit Y.  An omnibus hearing for Rose, Halleen, Sims and another dealer, Dunn Chevrolet-Olds, Inc. ("**Dunn**"), was held on June 8-11, 2010.  On June 29, 2010, the arbitrator issued separate awards finding that Rose, Halleen and Sims should "not be added to the dealer network of New General Motors."  True and correct copies of the arbitrator's awards are attached as Exhibits H, I and J.  The arbitrator also issued an award directing New GM to reinstate Dunn's Buick Dealer Agreement.  As a result of the awards in Rose, Halleen and Sims, their respective Wind-Down Agreements with New GM remain in effect and, pursuant to section 2(a) of the Wind-Down Agreements, the Ohio Dealers' respective Dealer Agreements must terminate no later than October 31, 2010.

18.    Despite the lack of any provision in the Dealer Arbitration Act or other applicable federal law authorizing judicial review of arbitration awards issued under the Dealer Arbitration Act, and notwithstanding paragraph 71 of the 363 Sale Order and section 13 of the Wind-Down Agreement, Rose, Halleen and Sims each filed actions in the Ohio District Court seeking review of the arbitral decisions from their respective arbitrations.  The Ohio Actions were filed by the same attorney that filed *Rally* and the relief sought in the Ohio actions is virtually identical to the relief sought in *Rally*.

19.    On September 20, 2010, Halleen filed an "Application to Vacate an Arbitration Award" in the Ohio District Court, which is styled *Halleen Chevrolet, Inc. v. General Motors, LLC*, Case No. 1:10-cv-02097 (N.D. Ohio) (the "**Halleen Action**").  A true and correct copy of Halleen's "Application to Vacate an Arbitration Award" is attached as Exhibit K.  On September 23, 2010, Rose filed an "Application to Vacate an Arbitration Award" in the Ohio District Court, which is styled *Rose Chevrolet, Inc. v. General Motors, LLC*, Case No. 1:10-cv-02140 (N.D. Ohio) (the "**Rose Action**").  A true and correct copy of Rose's "Application to

Vacate an Arbitration Award" is attached as Exhibit L.  On September 24, 2010, Sims filed an

"Application to Vacate an Arbitration Award" in the Ohio District Court, which is styled *Andy*

*Chevrolet Co. v. General Motors, LLC*, Case No. 1:10-cv-02153 (N.D. Ohio) (the "**Sims**

**Action**").  A true and correct copy of Sims' "Application to Vacate an Arbitration Award" is

attached as Exhibit M.

20.     Because federal law does not authorize judicial review of arbitration awards

issued under the Dealer Arbitration Act, the Rose, Halleen and Sims Actions are, in reality,

nothing more than attempts to circumvent or nullify the 363 Sale Order and the Court-approved

Wind-Down Agreements and constitute improper collateral attacks on both.  Accordingly, Rose,

Halleen and Sims should be required to dismiss their respective Actions.  Even if judicial review

of the arbitration awards were somehow available, Rose, Halleen and Sims may not ignore this

Court's reservation of jurisdiction by filing such challenges in other forums.  Pursuant to the 363

Sale Order and the Wind-Down Agreement, this Court "retain[ed] exclusive jurisdiction" to

enforce and implement the terms of the 363 Sale Order and the Wind-Down Agreement and

resolve any disputes concerning these Court-approved documents.  363 Sale Order, ¶ 71; *see also*

Wind-Down Agreement, § 13.

### 2.    Leson

21.     Before the Debtor filed for bankruptcy, Leson operated an authorized Chevrolet

Dealership in Harvey, Louisiana, pursuant to a General Motors Dealer Sales and Service

Agreement (the "**Leson Dealer Agreement**").  In the Debtor's bankruptcy proceedings, the

Debtor determined not to retain Leson as an authorized Chevrolet dealership.  The Debtor, as an

alternative to outright rejection of the Leson Dealer Agreements, offered Leson a Wind-Down

Agreement, which Leson accepted, executed and returned to the Debtor in June 2009.  Under this

agreement, a true and correct copy of which is attached as Exhibit N, Leson agreed, among other

things, to terminate its Chevrolet Dealer Agreement no later than October 31, 2010.  The Leson

Wind-Down Agreement was assigned to New GM as part of the 363 Sale.

22.    Leson filed a timely demand for arbitration in accordance with the Dealer

Arbitration Act and an arbitration hearing was held on June 3 and 4 before arbitrator A.J.

Krouse.  On June 18, 2010, the arbitrator issued an award finding that Leson had satisfied the

factors set forth in the Dealer Arbitration Act.  A true and correct copy of the arbitrator's award

is attached as Exhibit O.  Accordingly, New GM sent Leson the LOI, New GM's standard

"customary and usual letter of intent" and the same form agreement that was offered to other

dealers nationwide that prevailed in arbitrations.  A true and correct copy of the LOI is attached

as Exhibit P.  Leson signed the LOI on July 1, 2010.  *See* Ex. P, LOI, p. 3.  The LOI provides

that Leson would be reinstated to the dealer network "[u]pon compliance with the terms and

conditions" in the LOI.  *Id.*, p. 1.  One of those terms is that the reinstatement would "be

accomplished by amending the *existing* Wind-Down Agreement *in place*."  *Id.* (emphasis added).

The LOI included as an exhibit a form amendment for the Wind-Down Agreement.  *Id.*, Ex. A.

Thus, the Wind-Down Agreement controls no matter what.  Until Leson satisfies the terms of the

LOI, Leson is continuing to operate under the original Wind-Down Agreement.  If Leson should

timely satisfy the terms and conditions of the LOI, it will operate under an amended Wind-Down

Agreement as a fully functioning Chevrolet dealer under essentially the same terms as dealers

retained in June, 2009.[1]

23.    The LOI also outlines New GM's standard business requirements to be a dealer,

which are substantially similar to the Debtor's requirements in place prior to the 363 sale.  These

requirements include, by way of example, a requirement that the dealer obtain a sufficient line of

---

[1] The primary surviving implication of the Wind-Down Agreement for reinstated dealers is a  release of
claims against the Debtor and New GM arising prior to its execution.  However, retained dealers executed a
"Participation Agreement" which contained an identical release.

-12-

credit (normally referred to as "floor plan" financing) to finance the purchase of new vehicles from GM. *Id.*, ¶¶ 6, 7.[2]  The LOI required Leson to satisfy the terms of the LOI within sixty (60) days of the date of signature (meaning that Leson would have needed to satisfy the requirements by September 1, 2010).  New GM agreed to extend this deadline several times, and the current deadline is October 31, 2010.  As of the present date, Leson has not satisfied the terms of the LOI that it signed.

24.     Despite the lack of any provision in the Dealer Arbitration Act allowing Leson to undo a letter of intent it signed and despite paragraph 71 of the 363 Sale Order and section 13 of the Wind-Down Agreement, Leson filed an action, which is styled *Leson Chevrolet Company, Inc. v. General Motors LLC*, Hearing No. 2010-040, (the "**Leson Action**"), with the Commission on September 14, 2010, objecting to the manner by which New GM seeks to amend the Wind-Down Agreement and claiming that the agreed LOI violates the Dealer Arbitration Act.  A true and correct copy of the complaint (the "**Leson Complaint**") filed by Leson in the Leson Action is attached as Exhibit Q.  New GM removed the Leson Action to the United States District Court for the Eastern District of Louisiana.  The Leson Complaint also seeks to override the Wind-Down Agreement in multiple respects, including the following examples:

1.     Leson seeks a "cease and desist order prohibiting . . . GM from terminating Leson's" relationship with New GM. Ex. Q, Leson Complaint, p. 5.

2.     Leson asks for an order that it "be immediately reinstated with the ability to order inventory and participate in all GM programs *in the same manner as any dealer who was not under a wind-down agreement*."  *Id.*, p. 5 (emphasis added).

---

[2] Despite having signed the LOI, Leson later complained that certain terms of the LOI were "unfair."  For example, Leson said that the provision in the LOI requiring it to maintain net working capital in the amount of $2.85 million was unreasonable.  Additionally, Leson complained that it was having difficulty obtaining a commitment for floor plan financing as required by the LOI.  It is noteworthy that both requirements mirror provisions of the Dealer Agreement of which Leson seeks reinstatement.  In other words, Leson claims the LOI is unfair because it requires Leson  to comply with the very terms of the relationship it seeks to reinstate.

3.      Leson also seeks an order mandating that New GM "reinstate Leson *to its status quo immediately prior to its wind-down letter*." *Id.*, p. 6 (emphasis added).

Leson sought this relief even though it has not met the requirements for reinstatement specified in the LOI as required by the Dealer Arbitration Act.  Also, despite the fact that New GM's counsel was having regular conversations with Leson's counsel in a good faith attempt to resolve their differences, Leson went to the Commission without notifying New GM and obtained an ex parte order from the Executive Director of the Commission on September 15, 2010, which "ORDERED that an interlocutory cease and desist order issue prohibiting General Motors, LLC from terminating Leson Chevrolet Company, Inc.'s sale and service agreement."  A true and correct copy of the Commission's September 15, 2010 Order is attached as Exhibit R.  Indeed, Leson never even served New GM with the order or the request for the order; New GM received a copy of the signed order from the Commission almost a week later on September 21, 2010.

25.     As Leson's requested relief makes apparent, the Leson Action is nothing more than an attempt to end-run the provisions of the Wind-Down Agreement and the LOI at issue, as if neither agreement had ever been executed, and to require New GM to execute a Dealer Sales and Service Agreement without regard to the terms of the Wind-Down Agreement and the LOI. Leson argues, in effect, "I do not need to comply with the terms of the Wind-Down Agreement or the LOI (even though I signed it), because the terms are not fair."  In that regard, the Leson Action constitutes an improper collateral attack on the 363 Sale Order and the Wind-Down Agreement, purportedly under the provisions of the Dealer Arbitration Act but not, in fact, consistent with its provisions.  The resolution of the parties' rights under the Wind-Down Agreement in light of such claimed defenses are for this Court to determine.  Leson should, therefore, be required to dismiss the Leson Action.  Even assuming judicial review of the letter of intent that New GM provided is available, Leson may not "end-run" this Court by seeking to

-14-

void the Wind-Down Agreement in other forums.  Pursuant to the 363 Sale Order and the Wind-Down Agreement, this Court has retained "exclusive jurisdiction" to enforce and implement the terms of the 363 Sale Order and the Wind-Down Agreement, and resolve any disputes concerning these Court-approved documents.  363 Sale Order, ¶ 71; *see also* Wind-Down Agreement, § 13.

### Jurisdiction

26.     As the Court already determined in *Rally*, this Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334, Paragraph 71 of the 363 Sale Order, and Article IX, Section 9.13 of the MSPA, as well as section 13 of the Wind-Down Agreement approved by the Court.  *See* Ex. D, Rally Transcript at 44:5-7 ("[I]t's plain that the district courts and bankruptcy courts in this district have subject matter jurisdiction over this controversy."), 45:25-46:1 ("I so rule that this Court does have subject matter jurisdiction over this controversy.").  Specifically, the 363 Sale Order states that:

> This Court retains *exclusive jurisdiction to enforce and implement the terms and provisions of this Order*, the M[S]PA, . . . and each of the agreements executed in connection therewith, including the Deferred Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to . . . (f) *resolve any disputes with respect to or concerning the Deferred Termination Agreements*.

363 Sale Order, ¶ 71 (emphasis added).  And the Wind-Down Agreements provide:

> Continuing Jurisdiction.  By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain, full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 13 shall survive the termination of this Agreement.

Wind-Down Agreement, § 13.  As this Court explained in *Rally*, "it's plain that the district courts and bankruptcy courts in this district have subject matter jurisdiction over this controversy."

-15-

Ex. D, Rally Transcript at 44:5-7.  This is also a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(N).  *See id.* at 46:2-47:3 ("I find that this is a core proceeding."); *In re Eveleth Mines,*

*LLC*, 312 B.R. 634, 644-45 (Bankr. D. Minn. 2004), *rev'd on other grounds*, 318 B.R. 682

(B.A.P. 8th Cir. 2004); *In re Millennium Seacarriers, Inc.*, 419 F.3d 83, 97 (2d Cir. 2005); *In re*

*Petrie Retail, Inc.*, 304 F.3d 223, 229-30 (2d Cir. 2002).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>Argument</u>

A.    <u>To The Extent They Even Have Claims, The Dealers Are Pursuing Them In The
Wrong Forum</u>

1.    <u>This Court Has Exclusive Jurisdiction Of The Dealers' Claims And Should
Enforce The 363 Sale Order And Wind-Down Agreements</u>

27.    As this Court found in *Rally*, even if the Dealers have a right to review of

proceedings under the Dealer Arbitration Act or otherwise challenge any amendments to the

Wind-Down Agreement, the governing documents could not be any clearer that jurisdiction to

conduct such a review would lie exclusively in this Court.  363 Sale Order,  ¶ 71; MSPA, § 9.13;

Wind-Down Agreement, § 13.  Just as in *Rally*, the Dealers here are seeking to use claimed (and

non-existent) rights under the Dealer Arbitration Act as a "defense" to enforcement of the Wind-

Down Agreements that the 363 Sale Order approved and that the Court found to be a "valid and

binding" agreement that is "enforceable in accordance with [its] terms."  363 Sale Order, ¶ 31.

Such claimed defenses obviously implicate this Court's reservation of jurisdiction to "enforce"

the Wind-Down Agreement and resolve any disputes that relate to it.  The Dealers also seek to

impose rights and obligations on New GM beyond those assumed in violation of this Court's

"free and clear" provisions under the 363 Sale Order.  At the very least, therefore, the Actions

are improper collateral attacks on paragraph 71 of the 363 Sale Order, which is a binding and

final order that has full res judicata effect.

### 2.    The Requested Relief Should Be Approved By the Court

28.    The Dealers' Actions directly violate and contravene the 363 Sale Order, as well

as sections 2(a), 5(d) and 13 of the Wind-Down Agreement.  Specifically, section 2(a) of the

Wind-Down Agreements provides in relevant part:

> Dealer hereby covenants and agrees to conduct the Subject
> Dealership Operations until the effective date of termination of the
> Dealer Agreements, which shall not occur earlier than January 1,
> 2010 or later than October 31, 2010, under and in accordance with
> the terms of the Dealer Agreements, as supplemented by the terms
> of this Agreement.  Accordingly, Dealer hereby terminates the
> Dealer Agreements by written agreement in accordance with
> Section 14.2 thereof, such termination to be effective on
> October 31, 2010.

Section 5(d) of the Wind-Down Agreement provides in relevant part:

> Dealer, for itself, and the other Dealer Parties, hereby agrees not
> to, at any time, sue, protest, institute or assist in instituting any
> proceeding in any court or administrative proceeding, or otherwise
> assert (i) any Claim that is covered by the release provision in
> subparagraph (a) above or (ii) any claim that is based upon, related
> to, arising from, or otherwise connected with the assignment of the
> Dealer Agreements or this Agreement by GM to the 363 Acquirer
> in the 363 Sale, if any, or an allegation that such assignment is
> void, voidable, otherwise unenforceable, violates any applicable
> law or contravenes any agreement.  As a result of the foregoing,
> any such breach shall absolutely entitle GM or the 363 Acquirer, as
> applicable, to an immediate and permanent injunction to be issued
> by any court of competent jurisdiction, precluding Dealer from
> contesting GM's or the 363 Acquirer's, as applicable, application
> for injunctive relief and prohibiting any further act by Dealer in
> violation of this Section 7.  In addition, GM or the 363 Acquirer, as
> applicable, shall have all other equitable rights in connection with
> a breach of this Section 7 by Dealer, including, without limitation,
> the right to specific performance.

29.    Section 13 contains the "exclusive jurisdiction" provisions, which the Dealers

clearly breached.  Under these circumstances, the Court should enforce the terms of the 363 Sale

Order by ordering the Dealers to specifically perform all of their obligations under the Wind-

Down Agreement (including, but not limited to sections 2(a), 5(d), and 13 thereof), and direct the

-17-

Dealers to promptly dismiss the Actions, cease and desist from all efforts to assert the claims

attempted to be asserted in the Rose, Halleen, Sims and Leson Actions, and cease and desist

from taking any action or attempting in any way to avoid the terms of their respective Wind-

Down Agreements in any forum other than this Court

30.    Bankruptcy Courts have the inherent authority to enforce their orders: "[a]ll

courts, whether created pursuant to Article I or Article III, have inherent contempt power to

enforce compliance with their lawful orders.  The duty of any court to hear and resolve legal

disputes carries with it the power to enforce the order."  *U.S. Lines, Inc. v. GAC Marine Fuels,*

*Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) (Buschman, J.).

Section 105 of the Bankruptcy Code also provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions, and

this section "codif[ies] the bankruptcy court's inherent power to enforce its own orders."  *Back v.*

*AM Gen. Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997) (Lifland, J.); 11

U.S.C. § 105(a).[3]

---

[3] This Court likewise retains subject matter jurisdiction to enforce the 363 Sale Order, as it "is axiomatic
that a court possesses the inherent authority to enforce its own orders" and agreements approved by the court.  *In re
Cont'l Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999) ("In the bankruptcy context, courts have specifically,
and consistently, held that the bankruptcy court retains jurisdiction, inter alia, to enforce its confirmation order."),
*aff'd*, No. 09-932, Adv. 99-47, Civ. A. 99-795-SLR, 2000 WL 1425751 (D. Del. Sep. 12, 2000), *aff'd*, 279 F.3d 226
(3d Cir. 2002), *cert. denied*, 537 U.S. 944 (2002); *Travelers Indemn. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009)
("as the Second Circuit recognized, . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its
own prior orders."), *on remand to*, __ F.3d __, 2010 WL 1007932 (2d Cir. March 22, 2010).  Indeed, the Second
Circuit has held repeatedly that bankruptcy courts have the authority to enforce their own sale orders.  *Seacarriers*,
419 F.3d at  97; *Petrie Retail*, 304 F.3d at 229-30.

**B.      Even If The Ohio Dealers Had Brought Their Appeals In This Court, They Have No Right To Appeal**

**1.      Congress Did Not Authorize And This Court Should Not Imply Any Right To Judicial Review Of The Arbitration Awards**

**a.      The Statute And Legislative History**

31.      As the Court determined in *Rally*, the Dealer Arbitration Act itself does not authorize any right to judicial review.  *See* Ex. D, Rally Transcript at 50:18-21.  The Congressional proponents of the Act sought a stream-lined and expedited binding arbitration procedure culminating in swift reinstatement of dealers who obtained a favorable award.  As Representative Van Hollen stated, it was important to avoid the excessive costs and delays of "litigation" and "discovery disputes."  Cong. Rec. H14477, a copy of which is attached hereto as Exhibit S.  Thus, it is apparent that Congress also deliberately chose to omit any provision for judicial review in order to avoid the "excessive costs and delays of litigation."  *See id.*  As explained below, to the extent there are any arguable exceptions for certain types of arbitrator misconduct, none of those exceptions would apply here.

**b.      The Federal Arbitration Act And AAA Commercial Arbitration Rules**

32.      Recognizing this deficiency, the Ohio Dealers argue in their applications to the Ohio District Court that limited judicial review is available under the Federal Arbitration Act ("**FAA**").  *See* Exs. K, L & M ¶¶ 3, 29-32.  This Court already addressed that very argument in *Rally*.  The FAA is triggered only if there is an arbitration agreement and here, indisputably, there is not.  The FAA, by its terms, has no application to this matter.  It governs only *contractual* arbitrations.  *See* 9 U.S.C. § 2.  New GM did not agree to arbitrate.  Congress required it to do so.  As this Court found in *Rally*:  "Both sides now seem to agree that the Federal Arbitration Act doesn't apply because it implements contractual agreements to arbitrate.

And here, the right to compel arbitration comes not from a contract but from the Dealer

Arbitration Act itself."  Ex. D, Rally Transcript at 50:14-18.

33.    The Ohio Dealers also attempt to find an implied consent to judicial review in

New GM's supposed acceptance of the American Arbitration Association Commercial

Arbitration Rules.  *See* Exs. K, L & M ¶¶ 3, 29.  Again, this Court has already disposed of that

argument.  *See* Ex. D, Rally Transcript at 51:3-16 ("Nor can I accept Rally's argument that New

GM conceded a right to judicial review by reason of its willingness to proceed under the AAA's

commercial arbitration rules.").  In the statement filed by New GM answering every dealers'

arbitration demand, New GM clearly states its objection to any AAA Rules contrary to the

provisions of the Act:

> By filing this Answering Statement and participating in this
> proceeding, GM does not waive any objections it may have to this
> proceeding.  *The sole and exclusive authority for this proceeding is
> the [Dealer] Arbitration Act*, and GM reserves the right to object
> to any requests, allegations or claims outside the Arbitration Act.
> Depending on the Claimant's claims at the hearing, GM reserves
> the right to raise any and all affirmative defenses under applicable
> law and reserves the right to contest the jurisdiction of the
> arbitrator, the arbitrability of any claim, *or the applicability of the
> AAA's rules to this proceeding.  GM also reserves the right to
> object to the application of any of the AAA's Commercial
> Arbitration Rules where appropriate **or where such rules are
> otherwise inconsistent with the provisions or purposes of the
> [Dealer] Arbitration Act***.  GM will address these issues in
> accordance with any schedule for this case.

New GM's Answering Statement, p. 10 (emphasis added), a true and correct copy of which is

attached as Exhibit T; *see also* Ex. D, Rally Transcript at 51:16-21 ("For that same reason, I

can't find a waiver on the part of New GM of its rights based on a failure to protest again after its

initial reservation of rights was put on the record.").  Moreover, as the Court explained, "even if

New GM had agreed to AAA arbitration rules, the arbitration rules called for a mechanism to

enforce an award not to attack it." Ex. D, Rally Transcript at 51:25-52:2. The Ohio Dealers are

not seeking to enforce the arbitrator's awards, but to escape enforcement.

> ### 2.    Rose, Halleen And Sims Have No Colorable Basis For Asking The Court To Vacate Or Modify The Arbitration Awards

34.    This Court suggested, without deciding, that there may be a limited right of

review under the Dealer Arbitration Act under certain limited circumstances: "So I don't believe

that judicial review is necessary except in those cases not presented here, and here only arguably,

where there are allegations of fraud, corruption or manifest disregard of an existing decision."

Ex. D, Rally Transcript at 55:21-24. While the applications in Rose, Halleen and Sims include

conclusory recitals of "fraud," "corruption," and "manifest disregard" – much like the *Rally*

application did – this Court made clear that "just invoking words making conclusory allegations

in a pleading isn't enough." *Compare* Exs. K, L & M, *with* Ex. D, Rally Transcript at 77:17-19.

A review of the applications in Rose, Halleen and Sims reveals that their respective claims do

not satisfy this standard. What is more, their conclusory claims of fraud, corruption and manifest

disregard ring hollow when the fourth dealer (Dunn) at the same omnibus hearing involving

Rose, Halleen and Sims prevailed in its arbitration in front of the same arbitrator.

35.    At the outset, the Ohio Dealers contend that their arbitral awards should be

vacated due to "GM's Undue Means, Corruption, and Fraud." *See* Exs. K, L & M ¶¶ 33-38.

Such claims are directed to GM. The allegations are not directed to the arbitrator at all, which

would be the only arguable basis for review. As this Court noted in explaining possible bases for

judicial review, "we're not talking about corruption by GM. We're talking about corruption by

the arbitrator." Ex. D, Rally Transcript at 77:19-20. Here, there are no factual allegations of

bribery or conspiracy by the arbitrator or any other specific factual allegations of wrongdoing by

the arbitrator.

36.    Even if fraud or corruption directed to New GM were enough for vacatur, the

Ohio Dealers' factual allegations do not make a claim of fraud or corruption even plausible.  The

Ohio Dealers claim that it was "fraudulent" for New GM to rely on criteria other than a Dealer

Performance Summary ("**DPS**") score below 70 as a basis for offering dealers Wind-Down

Agreements because New GM and the Debtor had previously discussed the DPS criteria in Court

and before Congress.  *See* Exs. K, L & M ¶¶ 33, 34, 38.  But these arguments were made to the

arbitrator and were rejected by him.  Moreover, GM explained in a detailed letter to Congress

that it used *other* performance criteria, including its retail sales index, as well.  A true and correct

copy of GM's letter to Congress is attached hereto as Exhibit U.  And all of that is beside the

point.  The Dealer Arbitration Act allowed consideration of any criteria identified in the

"franchise agreement," and the retail sales index was indisputably outlined in the dealers'

"franchise agreement."  *See* Ex. H, Rose Arbitration Award, at p. 17-19; Ex. I, Halleen

Arbitration Award, at p. 16-18; Ex. J, Sims Arbitration Award, p. 18-19  Additionally, even as to

the criteria used for non-retained dealers, Congress did not limit GM in any way.  To the

contrary, Congress required New GM to identify "the specific criteria pursuant to which such

dealer was terminated" and then asked the arbitrator to consider "the covered dealership's

performance in relation to the criteria used by the covered manufacturer."  Ex. C, § 747(b) &

(d)(6).  If Congress wanted to limit GM to its DPS scores, it would not have asked New GM to

identify anew the criteria used by the Debtor to select dealers for a Wind-Down Agreement.

Thus, there was nothing improper, much less fraudulent, about identifying and relying on retail

sales index as a criterion for selecting the Ohio Dealers for Wind-Down Agreements.  *See* Exs.

K, L & M ¶ 34.

37.    The remaining allegations about New GM's supposed fraud or corruption are merely quarrels about the sufficiency and credibility of the evidence that New GM presented at the omnibus hearing. *See* Exs. K, L & M ¶¶ 35-38. For example, the Ohio Dealers claim it was "fraudulent" for New GM to present testimony that there were too many dealers in the Ohio Dealers' markets when New GM did not have a specific study to confirm this testimony. *See* Exs. K, L & M ¶ 35. Likewise, the Ohio Dealers argue that it was "fraudulent" for New GM to offer evidence that it would save $2 billion from reducing the size of its dealer network without a sufficiently robust study. *Id.* ¶ 36. At bottom, the Ohio Dealers merely argue that it was fraudulent or corrupt for New GM to present evidence that was harmful to the Ohio Dealers' cases unless New GM had irrefutable proof of that fact. But the Ohio Dealers cross-examined New GM's witnesses on those issues and offered competing documentary evidence and expert testimony. The arbitrator simply weighed the evidence and found in favor of New GM as to those issues.

38.    The Ohio Dealers' allegations of evident partiality by the arbitrator toward New GM are likewise based solely on their dissatisfaction with the results. For example, the Ohio Dealers claim it was a manifest error of law for the arbitrator to rule that the Dealer Arbitration Act required him to consider New GM's business plan without assessing the propriety of it. Exs. K, L & M ¶¶ 40, 41. The Ohio Dealers also assert that it was a manifest error for the arbitrator to rule that the Dealer Arbitration Act did not require him to assess the reasonableness of the manufacturer's criteria. *Id.* ¶ 42. And, the Ohio Dealers complain that it was manifest error for the arbitrator not to consider state law when making his determinations. *Id.* ¶¶ 43-44.

39.    Actually, the law on all of these issues, which New GM submitted to the arbitrator in pre-hearing briefs, fully supported the arbitrator's conclusions. Even giving the Ohio Dealers

every benefit of the doubt, however, all they are doing is arguing their differences with the arbitrator on disputed points of law.  They have not identified any language in the Dealer Arbitration Act or other controlling authority that would *require* the arbitrator to interpret the law as the Ohio Dealers would have liked.  As in *Rally*, "[t]here are no allegations of ex parte communication.  There are no allegations of any irregularities in the proceedings before the arbitrator other than the assertion that, as a matter of law, the arbitrator got it wrong. And even then, there's no allegation that the arbitrator disregarded any particular case that would suggest to the arbitrator that he got it wrong." Ex. D, Rally Transcript at 77:21-78:2.  It is simply irrelevant that another arbitrator in another case may have adopted the position that the Ohio Dealers pressed here.  *See, e.g.*, Exs. K, L & M ¶ 41.  Were it otherwise, New GM would be within its rights to challenge each and every one of those awards, leading to exactly the type of protracted litigation scheme rejected by Congress.

40.    Even under the FAA, which does not apply here, the scope of judicial review of an arbitration award is extremely limited.  "[B]ecause arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law." *Francis v. Landstar Systems Holdings, Inc.*, 2009 U.S. Dist. LEXIS 118897, at *18 (M.D. Fla. Nov. 25, 2009).  As a result, "it is settled law . . . that courts are generally prohibited from vacating an arbitration on the basis of errors of law or interpretation." *Id.* at *23, *quoting Scott v. Prudential Securities, Inc.*, 141 F.3d 1007, 1014 (11th Cir. 1998) (other citations and internal quotation marks omitted), *cert. denied*, 525 U.S. 1068 (1999), *reh'g denied*, 526 U.S. 1034 (1999); *see also Bryson v. Gere*, 268 F. Supp. 2d 46, 50 (D.D.C. 2003) (alleged error in contract interpretation would not support vacatur); *Hall Street Associates L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (rejecting parties' agreement to permit judicial review for "just any legal error" given

FAA's requirement of "extreme arbitral conduct" for vacatur), *on remand to*, 531 F.3d 1019 (9th

Cir. 2008); *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2009)

("Petitioners contend that the decision of the arbitration panel must be vacated, but in order to

obtain that relief, they must clear a high hurdle.  It is not enough for petitioners to show that the

panel committed an error – or even a serious error."), *on remand to*, __ F.3d __, 2010 WL

3896523 (2d Cir. 2010).  Here, the Ohio Dealers' factual allegations do not warrant the Court

even considering whether there is a limited implied right of appeal under the Dealer Arbitration

Act.  *See* Ex. D, Rally Transcript at 54:7-56:1.

**C.**    **Even If Leson Had Filed Its Action In This Court, It Has No Colorable Basis For Asking The Court To Modify The LOI**

41.    In the Leson Action, Leson claims it does not have to satisfy either the terms of

the LOI or its Wind-Down Agreement.  *See* Ex. Q, Leson Complaint, p. 3.  The only relief

available to Leson under the Dealer Arbitration Act is a "customary and usual letter of intent to

enter into a sales and service agreement" from New GM.  *See* Ex. C, § 747(e).  Accordingly,

when Leson prevailed in its arbitration, New GM provided, and Leson accepted, executed and

returned to New GM, the LOI.  *See* Ex. P.  The LOI required Leson to satisfy the terms of the

LOI within sixty (60) days of the date of signature (meaning that Leson would have needed to

satisfy the requirements by September 1, 2010).  New GM agreed to extend this deadline several

times, with the latest deadline being October 31, 2010.  As of the present date, Leson has not

satisfied the terms of the LOI that it signed, and Leson does not dispute this.  If Leson fails to

satisfy the terms of the LOI, the Wind-Down Agreement will not be amended, and the Leson

Dealer Agreement will be terminated in accordance with section 2(a) of its Wind-Down

Agreement.  If it does satisfy the terms of the LOI, the Wind-Down Agreement will be amended

to allow Leson to be reinstated into GM's dealer network.

42.      But Leson cannot turn its failure to meet the agreed business terms in the LOI into

a basis to void the Wind-Down Agreement or rewrite the LOI, which it signed.  The Dealer

Arbitration Act does not afford as relief an unrestricted sales and service agreement with New

GM without regard to any provisions in the Wind-Down Agreement or the LOI at issue.  Ex. C,

§ 747(e).  It merely affords Leson with a "customary and usual letter of intent to enter into a

sales and service agreement," which New GM provided in accordance with the arbitrator's

award.  *See id.*  The Leson Action seeks to rewrite the Dealer Arbitration Act to revoke the

Wind-Down Agreements based solely on its dissatisfaction with the relief that Congress afforded

Leson under the Dealer Arbitration Act.  This, the Dealer Arbitration Act does not permit.  *See*

Ex. D, Rally Transcript at 52:17-54:5.

43.      Leson's attempt to avoid the terms of the LOI begins and ends with the fact that

Leson signed the LOI.  On July 1, 2010, Leson's president represented in the LOI that "the

decision to enter into this Letter of Intent is based upon an independent analysis" by Leson and

that Leson is not "relying on any representations . . . or information provided by GM."  Ex. P,

LOI, p.3.  Leson has failed to offer any analysis for why it should be relieved of an agreement

that it stipulated it had signed voluntarily.  Leson's admitted failure to comply with the terms of

its LOI means that the LOI expires on October 31, 2010, and Leson's Dealer Agreement expires

under the Wind-Down Agreement on October 31, 2010, as well. Put simply, Leson does not have

a "defense to enforcement" of the Wind-Down Agreement.  *See* Ex. D, Rally Transcript at 45:7-

13.[4]

44.      Moreover, the aspects of the LOI about which Leson complains are manifestly

reasonable.  The working capital requirements about which Leson complains essentially carry

---

[4] Leson is a sophisticated multi-million dollar dealership that has been in operation for many years.  The
company has been surrounded by lawyers at every turn.  Leson could have refused to sign the LOI and filed an
action in this Court to seek relief before signing the LOI on July 1, 2010.  It did not do that.

forward the very same requirements that were embedded in its Dealer Agreement prior to the

bankruptcy. *Compare* Ex. P, LOI, ¶ 7, *with* Leson Capital Standard Addendum, a true and

correct copy of which is attached hereto as Exhibit V. Courts have repeatedly recognized that

working capital is an appropriate and reasonable requirement in the context of the automotive

manufacturer-dealer relationship. *See, e.g.*, *World-Wide Volkswagen Corp. v. Autobahn Motors

Co.*, 1980 U.S. Dist. LEXIS 14523, *10 (S.D.N.Y. Oct. 24, 1980) ("We find World-Wide's

requirement that its dealers maintain minimum capital to be reasonable.") (holding distributors'

decision not to renew made in good faith); *Cabriolet Porsche Audi, Inc. v. American Honda

Motor Co.*, 773 F.2d 1193, 1212 (11th Cir. 1985) (holding Honda was not required to decrease

the dealer's working capital requirement when the number of new cars Honda delivered to dealer

decreased); *Globe Motors, Inc. v. Studebaker-Packard Corp.*, 328 F.2d 645, 648 (3d Cir. 1964)

(setting aside jury verdict finding an automobile manufacturer acted in bad faith by requiring its

dealer to meet a working capital requirement in the franchise agreement); *Zeno Buick-GMC v.

GMC Truck & Coach*, 844 F. Supp. 1340, 1351 (E.D. Ark. 1992), *aff'd*, 9 F.3d 115 (8th Cir.

1993) (holding the Arkansas Motor Vehicle law "does not prohibit the manufacturer from

requiring certain levels of working capital or investment under the franchise agreement").

Moreover, it is manifestly appropriate for GM to require inventory financing for a dealer seeking

to be added to its network, as Leson's Dealer Agreement has always required. *See* Dealer Sales

and Service Agreement-Standard Provisions, ¶ 10.2 (attached as Exhibit W) ("Dealer agrees to

have and maintain a separate line of credit from a creditworthy financial institution reasonably

acceptable to General Motors and available to finance the Dealer's purchase of new vehicles . .

.."). Ample precedent, including precedent in the bankruptcy context, supports a manufacturer's

right to enforce requirements so directly and obviously linked to the ability of a prospective

dealer to meet the terms of a dealer agreement. *See In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 30 (1st Cir. 1984) ("[F]ew positive features about Toyota Village that the record reveals can overcome the problem of a history of losses and failure to meet Ford's capital requirements. In these circumstances, Ford would seem perfectly reasonable in withholding its consent to the transfer."); *In re Van Ness Auto Plaza*, 120 B.R. 545, 551 (Bankr. N.D. Cal. 1990) (holding a car manufacture could reasonably withhold its consent to assignment under 11 U.S.C. § 365 based upon, among other things, "concerns regarding working capital and profitability"); *Greater Lowell Automall, Inc. v. Toyota Motor Distrib., Inc.*, 618 N.E.2d 1369, 1372 (Mass. App. 1993), *review denied by*, 622 N.E.2d 1364 (Mass. 1993) (holding that Toyota reasonably withheld its consent to transfer a dealership given the history of dualing facilities failing). In short, Leson's basic complaint about the LOI is that it requires that Leson comply with the terms of the very Dealer Agreement it seeks to reinstate. That is untenable.

### Notice

45.     Notice of this Motion has been provided (a) to counsel for Rose, Halleen, Sims and Leson and (b) parties in interest in accordance with the Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 24, 2010 [Docket No. 6750]. New GM submits that such notice is sufficient and no other or further notice need be provided. No prior request for the relief sought in this Motion as against the Dealers has been made to this or any other Court.

WHEREFORE, New GM respectfully requests that this Court: (i) enter an order substantially in the form attached as Exhibit X, granting the relief sought therein; and (ii) grant New GM such other and further relief as the Court may deem proper.

Dated: October 8, 2010
      New York, New York

              Respectfully submitted,

              /s/ Arthur Steinberg
              Arthur Steinberg
              Scott Davidson
              KING & SPALDING LLP
              1185 Avenue of the Americas
              New York, New York 10036
              Telephone: (212) 556-2100
              Facsimile: (212) 556-2222

              Jeffrey J. Jones (*pro hac pending*)
              JONES DAY
              325 John H. McConnell Blvd., Suite 600
              Columbus, Ohio 43215-2673
              Telephone: (614) 469-3939
              Facsimile: (614) 461-4198

              David G. Radlauer (*pro hac pending*)
              Thomas A. Casey, Jr. (*pro hac pending*)
              JONES, WALKER, WAECHTER,
                POITEVENT, CARRERE & DENEGRE, LLP
              201 St. Charles Avenue, Suite 5100
              New Orleans, Louisiana 70170-5100
              Telephone: (504) 582-8000
              Facsimile: (504) 582-8011

              Attorneys for General Motors LLC
              f/k/a General Motors Company