# EXHIBIT D

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026-reg

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.

9          f/k/a General Motors Corporation, et al.,

10

11          Debtors.

12

13    - - - - - - - - - - - - - - - - - - -x

14

15          United States Bankruptcy Court

16          One Bowling Green

17          New York, New York

18

19          October 4, 2010

20          3:06 PM

21

22

23    B E F O R E:

24    HON. ROBERT E. GERBER

25    U.S. BANKRUPTCY JUDGE

1

2      HEARING re Motion of General Motors LLC Pursuant to 11 U.S.C.

3      §§ 105 and 363 to Enforce 363 Sale Order and Approved Deferred

4      Termination (Wind-Down) Agreement

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Lisa Bar-Leib

Page 3

```
 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtors and Debtors-in-Possession

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  EVAN S. LEDERMAN, ESQ.

 9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for the Official Committee of Unsecured

12          Creditors

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16    BY:  JENNIFER SHARRET, ESQ.

17         (TELEPHONICALLY)

18

19    KING & SPALDING LLP

20         Attorneys for General Motors LLC a/k/a New GM

21         1185 Avenue of the Americas

22         New York, NY 10036

23

24    BY:  ARTHUR J. STEINBERG, ESQ.

25         SCOTT DAVIDSON, ESQ.
```

Page 4

1

2    ISAACS CLOUSE CROSE & OXFORD LLP

3        Attorneys for General Motors LLC a/k/a New GM

4        21515 Hawthorne Boulevard

5        Suite 950

6        Torrance, CA 90503

7

8    BY:  GREGORY R. OXFORD, ESQ.

9        (TELEPHONICALLY)

10

11   WILK AUSLANDER LLP

12       Attorneys for Rally Auto Group Inc.

13       675 Third Avenue

14       New York, NY 10017

15

16   BY:  ERIC J. SNYDER, ESQ.

17

18   BELLAVIA GENTILE & ASSOCIATES, LLP

19       Attorneys for Rally Auto Group Inc.

20       200 Old Country Road

21       Mineola, NY 11501

22

23   BY:  STEVEN H. BLATT, ESQ.

24

25

Page 5

1

2    MORGANSTERN, MACADAMS & DEVITO CO., L.P.A.

3         Attorneys for Rally Auto Group Inc.

4         636 West St. Clair Avenue

5         Cleveland, OH 44113

6

7    BY:   CHRISTOPHER M. DEVITO, ESQ.

8         (TELEPHONICALLY)

9

10   U.S. DEPARTMENT OF JUSTICE

11        U.S. Attorney's Office

12        Southern District of New York

13        86 Chambers Street

14        New York, NY 10007

15

16   BY:   DAVID S. JONES, DEPUTY CHIEF, CIVIL DIVISION

17

18

19

20

21

22

23

24

25

MOTORS LIQUIDATION COMPANY, et al.

Page 6

1               P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Good morning -- or afternoon.  Have

4    seats, please.  All right.  GM.  Motors Liquidation Company.

5    Rally Motors.  Mr. Lederman, do we have some preliminary

6    matters that I had become unaware of?

7          MR. LEDERMAN:  No, Your Honor, we don't.  The only

8    matter before you is a matter that you just introduced.  So I

9    was just going to introduce the parties and turn over the

10   lectern to them.

11         THE COURT:  All right.  Well, I know Mr. Steinberg

12   and Mr. Snyder.  Why don't the remainder of you folks introduce

13   yourselves.

14         MR. DAVIDSON:  Scott Davidson from King & Spalding --

15         THE COURT:  All right.

16         MR. DAVIDSON:  -- for New GM.

17         MR. OXFORD (TELEPHONICALLY):  Greg Oxford, Isaac

18   Clouse --

19         MR. BLATT:  Steven Blatt from Bellavia --

20         THE COURT:  Just a minute, please.  First, I need the

21   folks in the courtroom to introduce themselves.

22         MR. OXFORD:  Okay, Your Honor.

23         THE COURT:  And then if people are on the phone, I'm

24   going to have to ask that they defer to people in the courtroom

25   unless people in the courtroom hand off to them.

MOTORS LIQUIDATION COMPANY, et al.

1      MR. BLATT:  Steve --

2      THE COURT:  All right.  Just a minute, please,

3   gentlemen.

4      MR. BLATT:  Yes, Your Honor.

5      THE COURT:  All right.  With Mr. Snyder?

6      MR. BLATT:  Yes.

7      MR. SNYDER:  Yes, Your Honor.  I'm sorry.  Go ahead.

8      MR. BLATT:  Steven Blatt, Bellavia Gentile, 200 Old

9   Country Road, Mineola, New York, on behalf of Rally Auto Group.

10      THE COURT:  Right, Mr. Blatt.  Okay.

11      THE COURT:  Now, is there a gentleman on the phone

12   who wanted to introduce himself?

13      MR. OXFORD:  Yes, Your Honor.  It's Greg Oxford,

14   Isaac Clouse Crose & Oxford also appearing with Mr. Steinberg

15   on behalf of General Motors LLC.

16      THE COURT:  All right, Mr. Oxford.  Okay.  Gentlemen,

17   make your presentations as you see fit.  But I'm going to need

18   you to address the following needs and concerns.  But first,

19   let me lay on my frustration with you guys, both sides.  I

20   cannot, for the life of me, understand, Mr. Snyder and Mr.

21   Blatt, why you can't follow the requirements of my case

22   management orders and give me a table of cases and table of

23   authorities as those rules require in baby talk.  When I'm

24   trying to compare the two submissions and see what you guys

25   said about a particular case or, for that matter, how you

MOTORS LIQUIDATION COMPANY, et al.

Page 8

1    organized your arguments, that is a source of incredible

2    difficulty and frustration for me.  And, Mr. Steinberg and Mr.

3    Oxford -- Mr. Oxford, I think you at least have been in this

4    case before.  How many times have I said that I don't want to

5    use -- see the word "passum" especially when it refers to the

6    most important case in your whole brief on a lot of these

7    issues?  I'm not expecting a response now.  You can address it

8    when it's your turn.

9         Gentlemen -- Mr. Snyder and Mr. Blatt, if you want to

10   make your subject matter jurisdictions, you can, but it doesn't

11   seem to me that this is about subject matter jurisdiction in

12   any way, shape or form.  Frankly, I think you missed the boat

13   when you were talking about related-to jurisdiction.  It seems

14   to me that this is a poster child for arising-in jurisdiction

15   and the principle that bankruptcy judges have the authority to

16   enforce their own orders.  And when an agreement says that the

17   bankruptcy court will have exclusive jurisdiction to deal with

18   a particular matter and then the order implements that, I have

19   some trouble seeing how it can be to the contrary.  If you

20   nevertheless want to continue to the contrary, you got to help

21   me with Petrie Retail and Millenium Seacarriers on those

22   points.

23        Now, I sense that both sides agree that there is no

24   right of judicial review under the Dealer Arbitration Act and

25   that the Federal Arbitration Act applies only to contractual

MOTORS LIQUIDATION COMPANY, et al.

Page 9

1    agreements to arbitrate.  So therefore, we're on a little bit

2    of -- or totally implied remedies if and to the extent they

3    exist.  Now, Mr. Steinberg, I want to see whether your argument

4    proves too much.  And you can help me with that if I posit to

5    you a situation where the arbitrator is taking bribes or he's

6    taking an ex parte communication because my belly would tell me

7    that even if there weren't an expressed right of judicial

8    review in that situation that Rally Motors, if it were on the

9    losing end of that type of situation and, of course, if it came

10   to me, could come and say, Judge, I need relief from that kind

11   of thing.  But, of course, Mr. Snyder and Mr. Blatt, that isn't

12   what you're alleging here.  In essence, you're alleging that

13   the arbitrator made an error of law.  And you haven't shown me

14   any case in which the arbitrator was told that he had to deal

15   with these franchise agreements double or nothing.  And it

16   strikes me as a garden variety claim of legal error.  So help

17   me if I'm wrong on that.

18        Now, I don't know how many times I and the other

19   bankruptcy judges in this district have had 363 orders and

20   confirmation orders provide for continuing jurisdiction

21   typically to follow up on the implementation of things that

22   were in the sale order and in the plan or agreements that were

23   provided under either.  Counterparties come into the court all

24   the time putting their money on the line to get benefits by

25   dealing with the bankruptcy court.  And that's an important

MOTORS LIQUIDATION COMPANY, et al.

Page 10

1    reason, as at least one of the cases that was quoted to me

2    says, why we have provisions of this character.  And I need

3    your help in understanding why I should say "Never mind" to

4    provisions of that type.  But if there is authority for some

5    kind of implied judicial review that I, in contrast to a

6    district judge exercising diversity jurisdiction, could issue,

7    or even if it were deemed to be 1331 federal question

8    jurisdiction -- though I don't see the provision of the U.S.C.

9    under which the federal right arises.  I mean, I see why you

10   could compel GM to arbitrate but New GM didn't quarrel with

11   your right to arbitrate that I need help on that.

12           So, Mr. Snyder, will it be you or Mr. Blatt?

13           MR. SNYDER:  It'll be me, Your Honor.

14           THE COURT:  Okay.

15       (Pause)

16           MR. SNYDER:  Your Honor, as I think the analogy for

17   our purposes or the point where we start is the AAA commercial

18   rules.  And I focus on those, Your Honor, only because, as the

19   Court pointed out, I don't think anyone disputes that when both

20   parties sat down to the arbitration that the commercial rules

21   apply.  Now, GM states that it objected to the use of the

22   commercial rules.  But be that as it may, the scheduling order,

23   in particular, paragraph 1, which is annexed to our objection

24   as Exhibit F, specifically states that the commercial rules

25   apply.  And one of those rules, Your Honor, is 48(c) which we

MOTORS LIQUIDATION COMPANY, et al.

Page 11

1   relied on extensively in our papers but it states, and I

2   quote -- it's short: "Parties to an arbitration under this

3   rule shall be deemed to have consented.  A judgment upon the

4   arbitration award may be entered into any federal, state or

5   court of competent jurisdiction."  Now it doesn't say they have

6   to agree.  It says that they've deemed to have consented.  And

7   so our argument is, Your Honor, that if the AAA commercial

8   rules apply and GM is deemed to have consented then, naturally,

9   there is a -- the arbitration award is final and binding and

10  there has to be a right of judicial review under the terms of

11  48(c).  Now we cited to the Idea Nuova case for the proposition

12  that although that was a contract case, where the contract is

13  silent as to whether the rights of judicial review apply, the

14  Courts will impute 48(c) not because the parties agreed to

15  arbitrate, Your Honor, but because by going forward with the

16  arbitration, because the commercial rules themselves apply,

17  they're deemed to have consented to both the arbitration and

18  the entry of a final judgment.  And, Your Honor, that's based

19  solely on facts that are not in dispute.

20          THE COURT:  Mr. Oxford, do you want to mute your

21  phone, please?

22          MR. OXFORD:  I'm not sure I know how to do that.  We

23  could --

24          THE COURT:  All right.  CourtCall, mute them.  Go

25  ahead, Mr. Snyder.

MOTORS LIQUIDATION COMPANY, et al.

Page 12

1          MR. OXFORD:  I didn't hear you, Your Honor.  I'm

2    sorry.

3          THE COURT:  I'm telling CourtCall to mute you, Mr.

4    Oxford.  Go ahead, Mr. Snyder.

5          MR. SNYDER:  Thank you, Your Honor.  Now we agree,

6    Your Honor, as GM has pointed out that the Dealer Arbitration

7    Act is silent as to judicial review.  But we contend in

8    addition to the AAA commercial rules giving the federal court

9    subject matter jurisdiction that, as Your Honor pointed out,

10   that if a federal question presents itself under 28 U.S.C. 1331

11   then the California district court can rely on that federal

12   question to possess subject matter jurisdiction.  And that

13   federal question is presented here, to wit.  Is the removal of

14   a Chevrolet brand the granting of a "covered dealership" as

15   that term is defined under 747(a) and (d)?  It's stated

16   specifically, Your Honor, in Rally's statement.  Does the

17   removal of a Chevrolet brand constitute a "covered dealership"?

18   So we have a federal statute that Rally is asking a federal

19   court to interpret and we have the Vaden case which I cite to

20   at -- and -- 129 S. Ct. 1262.  In that case, the Supreme Court

21   held that a federal court could look through the arbitration,

22   Your Honor, to determine whether the controversy in question

23   arises under the federal law so that the court has federal

24   question jurisdiction.  That's all we're asking the federal

25   court to do.  Interpret a federal statute on a federal

MOTORS LIQUIDATION COMPANY, et al.

Page 13

1    question.

2            And in addition, Your Honor, we believe the federal

3    court has jurisdiction for the issue that Your Honor has raised

4    and is the most troubling, at least to me, that there is no

5    right to judicial review.  GM doesn't cite to any federal

6    statute, while may be silent or limited, that did not allow for

7    judicial review.  Which goes right to the due process argument

8    and the constitutionality of the statute itself.

9            Your Honor, the arbitrator didn't have to take

10   bribes.  Let's just say we end this hearing and regardless of

11   what happens GM says, I'm not reinstating you.  I don't care

12   what Judge Gerber says or anyone else says.

13           THE COURT:  Well, isn't that the easier case because

14   wouldn't you, Mr. Snyder, be able to come back to me in about

15   ten minutes and say that New GM isn't complying with the

16   arbitration award?  And to the extent that I understood your

17   48(c) argument, the language is "deemed to have consented to

18   enforcement".  And if you say -- let's take what I understand

19   to be the case.  You won three-quarters of -- or your client

20   won three-quarters of the arbitration before the arbitrator.

21   And suppose GM stiffs you on those three-quarters where you

22   prevailed -- your client prevailed.  I would have thought --

23   and maybe Mr. Steinberg should be heard on this because if he

24   contends to the contrary, I guess I should know it.  But I

25   would have thought that you could come back to me and say make

MOTORS LIQUIDATION COMPANY, et al.

Page 14

1    GM -- New GM comply with the arbitrator's award.  But you're

2    not trying to enforce the arbitrator's award.  You're trying to

3    attack it.  You're trying to attack the one-quarter of it you

4    don't like.

5             MR. SNYDER:  Your Honor, we're trying to say that if

6    there is judicial review of a statute that does not allow for

7    judicial review that the constitutionality of the statute, the

8    due process argument is the district court possesses

9    jurisdiction to that.  There's a crucial difference, Your Honor

10   -- and to me, this is the crux of our argument.  Putting the

11   core related and Petrie aside for the moment, whether this

12   Court has jurisdiction or not is to me not the issue.  The

13   issue is whether the California court has jurisdiction.  What

14   GM is saying is this Court has sole and exclusive jurisdiction.

15   That means of the 600 dealers that had their claims arbitrated

16   with GM, if they are unhappy with a portion of the award then

17   all 600 nondebtors with New GM, a nondebtor, that this Court

18   has sole and exclusive jurisdiction to determine under the

19   Federal Arbitration Act what a covered dealership is.  And I'm

20   suggesting that the California district court, whether as a

21   federal question or for constitutionality purposes, might also

22   have that jurisdiction because it can't be that as a result of

23   the wind-down agreements, when the Dealer Arbitration Act was

24   passed that the Court was willing to say we're going to pass

25   the Dealer Arbitration Act to give you dealers another bite at

MOTORS LIQUIDATION COMPANY, et al.

Page 15

1    the apple.  But you have to go back to the bankruptcy court if

2    you want it enforced.  Now maybe this Court does have related-

3    to jurisdiction but it couldn't be, Your Honor, that there is

4    no right of judicial review and Congress' intent was that

5    everybody has to come back here.  And that's --

6            THE COURT:  I don't want to interpret you, Mr.

7    Snyder, but it wasn't related-to jurisdiction that I think is

8    in play here.  I think it's arising-in jurisdiction, the second

9    of the three prongs under 1334.

10           MR. SNYDER:  Understood, Your Honor.  And again, even

11   if this Court has arising-to jurisdiction, that is not what

12   we're arguing.  They are arguing -- and remember, Your Honor,

13   the motion seeks to compel us to withdraw a lawsuit in federal

14   court because the district court does not have jurisdiction.

15   And I think for the three reasons I've stated, the plain

16   language of 48(c), the introduction of a federal question and

17   the constitutionality of a law that does not allow for judicial

18   review, gives the California district court jurisdiction.  It's

19   not to say that this Court doesn't have jurisdiction but we

20   didn't start in this court.  We started in the federal court in

21   California.  They filed an answer.  They didn't move to

22   dismiss.  And then three days later, they filed the motion

23   here.  Not by order to show cause because they were so

24   concerned about the California's court jurisdiction but by

25   regular motion.  The -- we, in deference to this Court, didn't

MOTORS LIQUIDATION COMPANY, et al.

Page 16

1    go into the California court to seek a stay.  We told them that

2    we would come here and explain to this Court why the Court, the

3    California court, has federal court jurisdiction.  They don't

4    reply to our arguments about Vaden and the ability of a federal

5    court to go through -- look through an arbitration.  The

6    decision is powerful, Your Honor, to the extent it allows you

7    to look through the arbitration and see if a federal question

8    is presented.  That's our issue, that federal questions are

9    presented, constitutionality presented.  Normally not an issue

10   but in a case where a statute is silent as to the right of

11   judicial review, the implication or the logical extension of

12   their argument is that everybody has to come back here.  And it

13   is submitted, Your Honor, that that's not what Congress

14   intended by leaving the statute silent.  We believe what they

15   intended is that the arbitration rules will allow the dealer,

16   the aggrieved dealer, to go into a court of competent

17   jurisdiction to get the relief they seek.

18        And although the judicial estoppel argument has gone

19   up and back, Your Honor, in their complaint, in paragraph 3 in

20   the Santa Monica case, they don't just rely on diversity when

21   they seek to compel Santa Monica to execute the settlement

22   agreement.  They rely on 28 U.S.C. 1331 to get the district

23   court's attention.  They rely on the Dealer Arbitration Act to

24   get the Court to execute -- to restrain Santa Monica.  Then

25   they come here and say this Court has sole and exclusive

MOTORS LIQUIDATION COMPANY, et al.

1   jurisdiction with respect to matters in the Dealer Arbitration

2   Act.  They didn't come here, Your Honor, when Santa Monica

3   sought to exercise jurisdiction and refused to sign that

4   settlement agreement.  They went to the California district

5   court.  And so, to argue that sole and exclusive jurisdiction

6   sits here but to rely on federal jurisdiction not just

7   diversity, 28 U.S.C. 1331 jurisdiction in California, to me,

8   rises to the level of judicial estop.

9           The last argument, Your Honor, which was the first

10  one you raised, is the applicability of Petrie and the ability

11  of the Court to enforce its orders.  And there's no doubt that

12  buyers have expectations and they want this Court to enforce

13  them and they have a right to come in here and seek that.  But

14  they have -- every provision of the wind-down agreement that

15  they have pointed to, other than the covenant to sue, is not

16  being implicated.  We were able to sue, commence an

17  arbitration, because the Dealer Arbitration Act allowed us to.

18  They actually state in their papers that us going into

19  California district court violated the covenant to sue.  Well,

20  how can that be?  How can that be that the statute allows us to

21  go to Califor -- and commence an arbitration but doesn't allow

22  it to enforce it anywhere?

23          The wind-down agreement is still the wind-down

24  agreement.  The dealer, Rally, and the other 600 dealers still

25  have certain obligations that they need to fulfill by October

MOTORS LIQUIDATION COMPANY, et al.

Page 18

1    31st.  But the covenant not to sue is not one of them because

2    the statute that was codified in December 2009 gave the dealer

3    certain rights.  And they are limited rights.  They're not

4    happy with the outcome.  Rally believes that the definition of

5    covered dealer was inappropriately misinterpreted by the

6    arbitrator.  There is nothing in the wind-down agreement or the

7    363 order, Your Honor, that suggests they would have to come

8    back here for that.

9             Now, it's unfortunate that the statute is silent.

10   But issues of due process and federal question as well as the

11   AAA rules allow Rally to go into court in California to redress

12   those arguments.  That's our position.  Again, we're not

13   suggesting or it's minimally relevant that this Court has

14   jurisdiction.  Our question is does the California court have

15   jurisdiction.  GM thought it did under 28 U.S.C. 1331.  So do

16   we.  And that's the reason we object to them saying this Court

17   has sole and exclusive jurisdiction under the wind-down

18   agreements as if the Dealer Arbitration Act didn't exist.

19            THE COURT:  Well, you hit on something that I'm glad

20   you did, Mr. Snyder, because I want both you and Mr. Steinberg

21   to address it when it's your respective turns.  And, of course,

22   it's your turn now.  I would have thought that the Dealer

23   Arbitration Act trumps my order and the wind-down agreements to

24   the extent they're inconsistent.  But that the duty of any

25   Court is to try to construe them together to achieve harmony

MOTORS LIQUIDATION COMPANY, et al.

Page 19

1    between them so there is the minimal clashing between the two

2    and that where, of course, the later Dealer Arbitration Act

3    speaks to something, it controls over my order but only to that

4    extent.  Do you think I'm off base from that?

5            MR. SNYDER:  I do not, Your Honor.

6            THE COURT:  All right.  Keep going.

7            MR. SNYDER:  And, Your Honor, I or Rally do not see

8    the ability to confirm a judgment, as that term is defined in

9    48(c), or if the district court should allow, modify or vacate

10   the judgment under the commercial arbitration rules as being

11   anything other than an extension of the arbitration which was

12   codified in the Dealer Arbitration Act.  It isn't a violation

13   of the covenant not to sue under the wind-down agreements

14   because under the wind-down agreements in July 2009, this was

15   not a sparkle in anybody's eye.  No one knew what Congress

16   would end up doing six months later.  They're looking to

17   prohibit us from doing something that wasn't even contemplated

18   at the time Your Honor entered that order.  This came six

19   months later.  And so the rules changed partially.  I'm not

20   suggesting the wind-down agreements are -- they say aggregated

21   -- none of that.  But the covenant to sue was.  And they were

22   allowed to commence arbitrations against New GM in order to get

23   rights back, thumbs up or thumbs down.

24           THE COURT:  Do you think it covers all covenants or

25   all suits or can you harmonize them by saying that if you win

MOTORS LIQUIDATION COMPANY, et al.

1    in the arbitrations that Congress has now given you, of course

2    you have the right to enforce that if your opponent, which in

3    this case is New GM, is so dumb as to try to welsh on the

4    arbitrator's ruling.  But that's really how they -- separate

5    provisions are best read together.

6              MR. SNYDER:  Your Honor, there's a reason why -- you

7    call it dumb, but there's a reason why the fifty states and

8    every federal statute except this one that I've seen has the

9    right of judicial review.  It's because if there is no

10   enforcement of a final or binding arbitration then the other

11   side could say, ha, forget it, I'm not doing anything 'cause

12   you have no place to go.

13             THE COURT:  Again, I remain troubled by the

14   distinction between enforcing the award which my tentative,

15   California style subject to your opponent's right to be heard,

16   is that if New GM hadn't complied with the arbitrator's award,

17   I would make it, and to attack the arbitrator's award which

18   invokes separate policy considerations.

19             MR. SNYDER:  Well, Your Honor, I would say that it

20   seems as if the rules which required findings of fact were set

21   up for judicial review.  If the arbitrator had simply said,

22   Your Honor, we're ruling against Rally because I know Larry

23   Mayle, the president, and I don't like him, where could we go?

24   If the Court is suggesting if that was the ruling that we could

25   go into this court to overturn or vacate an arbitration for

MOTORS LIQUIDATION COMPANY, et al.

Page 21

1    manifest disregard of fact and law out of an arbitration coming

2    out of the Dealer Arbitration Act, I don't see it.  I see it as

3    being a federal question that allows judicial review for

4    manifest disregard of facts and law through a federal court.

5    That's what the Supreme Court said in Vaden, that you can look

6    through the arbitration to see if a federal question exists.

7    GM doesn't even cite to Vaden in their reply brief.  But that

8    is uniquely a federal question.  Is Chevy a covered brand as

9    that term is defined under 747(a) and (d)?  What could be more

10   of a federal question than citing to the statute itself.  This

11   is not an abstract referral, Your Honor, where Rally was trying

12   to get around state jurisdiction.  This is questioning the

13   words of a federal statute.  And Rally would have never thought

14   to come to this court, Your Honor, as a result of an

15   arbitration to enforce or to ask this Court to make findings of

16   fact as to whether Chevy is a covered dealership as that term

17   is defined under 747(a) because although this Court might have

18   jurisdiction, the California court certainly has jurisdiction.

19         And, Your Honor, that's what we see as the

20   difference.  When I speak about losing or diminishing

21   jurisdiction in the sales process, I'm not suggesting that

22   buyers can't come back to get the benefit of their bargain.

23   But this was not the benefit of anybody's bargain because the

24   Dealer Arbitration Act wasn't even in existence at the time.

25   They couldn't have said we want this statute because we want no

MOTORS LIQUIDATION COMPANY, et al.

Page 22

1    judicial review from the dealers.  What are you talking about?

2    There's no right to review anyway.  There's a covenant to not

3    to sue.  The Dealer Arbitration Act hadn't even been introduced

4    yet.  So they can't say they didn't get their expectation

5    'cause there was no expectation.  This was six months later.

6    So I don't see this as an enforcement of an order 'cause there

7    was no expectation that they would have that right.

8         (Pause)

9         THE COURT:  Okay.  Mr. Snyder, I'm going to give you

10   a chance to reply but is this a good time to hear from Mr.

11   Steinberg?

12        MR. SNYDER:  Yes, Your Honor.  Thank you.

13        THE COURT:  Thank you.

14        (Pause)

15        MR. STEINBERG:  Good afternoon, Your Honor.  I think

16   Your Honor's questions were very incisive and I will try to

17   answer them as best as I can and to try to point out why I

18   think my colleague has not fully answered Your Honor's inquiry.

19   I think Your Honor is correct that the real issue here is there

20   was a wind-down agreement.  Your Honor approved the wind-down

21   agreement that was part of the sale process.  And then

22   subsequently, Congress acted under the Dealer Arbitration Act.

23   So how do you mesh what you had done versus the later

24   congressional statute?

25        And I think it's important to distinguish what does

MOTORS LIQUIDATION COMPANY, et al.

Page 23

1    the Dealer Arbitration Act do and what it specifically did not

2    do.  And the thing that it did, and I think my colleague has

3    agreed with this, is it provided dealers who either signed the

4    wind-down agreements or had their dealership agreements

5    rejected in either the Chrysler or General Motors cases a new

6    right created by a federal statute to be reinstated to the

7    dealer network of the debtor or the purchaser of the debtor's

8    assets.  And in order to avail themselves of that right, they

9    had to file timely notices in accordance with the Dealer

10   Arbitration Act for binding arbitration.  And I think my

11   colleague was correct.  It was either up or down.  Either

12   you're reinstated or you're not reinstated.  And the Dealer

13   Arbitration Act told arbitrators they had seven factors,

14   nonexclusive, to take a look at for purposes of making that

15   determination.  And there was specific and very, very tight

16   deadlines that were put in for the arbitration.  You had to act

17   to ask for arbitration within forty days.  You had six months

18   to complete the arbitration.  The arbitrator had seven days to

19   make its ruling and that everything had to be done by July 14th

20   because the legislative intent of the statute which was to try

21   to create what Congress thought was a better balance between

22   the rights of dealers and the rights of the manufacturers, the

23   legislative intent was we need to have a streamlined process

24   that would not otherwise get bogged down with discovery or

25   litigation.  We both quote -- at least our reply quotes from

MOTORS LIQUIDATION COMPANY, et al.

Page 24

1    the legislative history to the statute which is fairly sparse.

2    But the legislative history refers to the need to have

3    something streamlined and quick and the statute does not

4    provide for judicial review unlike the Federal Arbitration Act

5    in Section 9, 10, 11 and 12.  There are specific provisions

6    which talk about what a Court can do or not do in connection

7    with something that is governed by the FAA.  This clearly is

8    not governed by the FAA.  The FAA governs agreements where the

9    parties had agreed to arbitrate.  This was not one of those

10   situations.  This was a case where Congress had imposed the

11   obligation or the right for the dealer to seek arbitration

12   under specific circumstances but it wasn't a contractual

13   obligation that the parties had bargained for.  So the FAA,

14   which is leadered (sic), the cases relating to the FAA, the

15   judicial review relating to an FAA, which my adversary recites

16   in his papers, they really have no relevance here.  And I think

17   Your Honor was right.  There is no judicial review.  And that

18   was, I think, intentional.  And I think my adversary says where

19   is it that you can never get judicial review?  You know,

20   Congress passes a statute not -- imposing a new right and then

21   says that's -- we'll have a procedure to implement that statute

22   and that's it.  And there's no more judicial review.

23              THE COURT:  Well, pause, Mr. Steinberg, because I'm

24   wondering if that proves too much.  Suppose the arbitrator's

25   taking bribes.  And suppose the forum is this court and the

MOTORS LIQUIDATION COMPANY, et al.

Page 25

1    dealer's been victimized by the arbitrator taking bribes.

2    You're telling me that I can't look at that?

3            MR. STEINBERG:  I'm not sure if the right remedy

4    would have been to go to the AAA and say that there was an

5    invalid arbitration and seek the remedy there to invalidate the

6    results of the arbitration.  But --

7            THE COURT:  So you're going to take that and -- bring

8    it down and give it to the marshals and then you can return to

9    the courtroom.

10           MR. STEINBERG:  But I will say, Your Honor, that the

11   hypothetical that you posed which is that if there was a

12   violation of what Congress had enacted because they had bribed

13   the arbiter of the resolution, it would seem to me that there

14   needs to be some kind of review.  And maybe it would be Your

15   Honor who has the review.  I'm not sure whether it would be the

16   AAA that would review it.  But it would seem to me in a bribe

17   circumstance that that would be the case.

18           But I think critical for what my adversary has argued

19   which is that he's raised the potential for the

20   constitutionality of the Dealer Arbitration Act because there

21   is no judicial review, I don't know where that argument goes

22   for him because the Dealer Arbitration Act was a right given to

23   the dealers to potentially seek reinstatement.  If you declare

24   the statute unconstitutional then they don't have that right.

25   If he's asking you to put in to the statute that which doesn't

MOTORS LIQUIDATION COMPANY, et al.

Page 26

1   exist which is to, in effect, write the judicial review section

2   when Congress didn't write it, I don't think Your Honor has the

3   ability to do that.

4          And I don't think -- you know, they spend ten pages

5   of their brief saying how we didn't comply with provisions that

6   is the judicial standard under the Federal Arbitration Act.

7   And I would say to Your Honor that that's irrelevant because

8   that's not -- there is no standard of judicial review.  And you

9   can't pick something from another statute and say that's what

10  I'm going to use here in order to make it constitutional.

11         Now, there is situations where Congress has given a

12  right to a party and there is no judicial review.  We cited in

13  our papers the Switchmen case which was actually quoted in

14  Thomas.  And we specifically highlighted the language which

15  said that "A review by the federal district court of the

16  board's determination is not necessary to preserve or protect

17  that right."  Congress, for its reasons on its own, decided

18  upon the protection of the right which it created.  And if you

19  look at Thomas itself, they talked about the concept of where

20  Congress has written legislation where it asked an agency to

21  make a decision.  And the issue was if the agency did something

22  wrong, can it get judicial review.  And there are certain

23  statutes that provide that there is no judicial review.  So the

24  Thomas case when it was written referred to Medicare

25  reimbursement and said that an agency's review relating to

MOTORS LIQUIDATION COMPANY, et al.

Page 27

1    Medicare reimbursement is not subject to judicial review.

2    So --

3                THE COURT:  And Switchmen dealt with the Railway

4    Labor Act?

5                MR. STEINBERG:  Yes.

6                THE COURT:  And it was at least Thomas that was the

7    use of your "passum" if I recall.

8                MR. STEINBERG:  Yes.  And I apologize for that, Your

9    Honor.

10               So we have a situation here where there was a

11   legislative reason why things were done on a streamlined basis.

12   There is no language that talks about judicial review and there

13   is no issue I believe relating to constitutionality.  But if it

14   is, I don't think it gets them anywhere.  And it was nice that

15   they made this a central part of their oral argument when it

16   was relegated to a footnote in their brief which -- without any

17   real challenge other than just a throw-away that they question

18   whether it could be constitutional if there's no judicial

19   review.

20               Your Honor --

21               THE COURT:  At least it got your attention enough for

22   you to cover it from pages 8 through 10 of your reply.

23               MR. STEINBERG:  Yes, Your Honor, because I did think

24   it was an important issue and that Your Honor would want the

25   benefit of some briefing.  But I did not think that that was

MOTORS LIQUIDATION COMPANY, et al.

Page 28

1    the center of the argument.

2          Similarly, you'll notice how their argument is

3    morphed because their papers said Your Honor didn't have

4    jurisdiction, didn't have core jurisdiction, didn't have

5    related jurisdiction, asked you to defer to the public policy

6    of the Federal Arbitration Act, to defer to an arbitration when

7    they weren't prepared to necessarily defer to arbitration.  And

8    now they, today, said well, we really didn't say you didn't say

9    you didn't have jurisdiction.  You just don't have exclusive

10   jurisdiction.  We think it may be concurrent jurisdiction.  So

11   they did move as well on that.

12         But I think, Your Honor, that the reason why you do

13   have exclusive jurisdiction and the reason why the wind-down

14   agreement is implicating is because there is no judicial review

15   of what the arbitrator did.  If there is no judicial review --

16   I think everybody agrees that the statute doesn't provide for

17   it explicitly.  If there isn't then what's left?  Because the

18   other thing that was critical as to the interplay between the

19   Dealer Arbitration Act and the wind-down agreement, the other

20   thing that's critical is that the Dealer Arbitration Act didn't

21   abrogate totally the wind-down agreement.  I think my

22   colleague, my adversary, has agreed that it didn't totally

23   abrogate it.  There are specific provisions that survive.  And

24   so, that if you have an arbitration which has been completed

25   because all the arbitrations had to be completed by July 14th,

MOTORS LIQUIDATION COMPANY, et al.

Page 29

1    and that's it then what's left on the areas where there was no

2    reinstatement, the thumbs down for the Chevrolet dealership,

3    you're back to being governed by the wind-down agreement.  The

4    wind-down agreement provided that you couldn't sue New General

5    Motors.  That still applies.  There (sic) was abrogated solely

6    to the extent that the Dealer Arbitration Act allowed for this

7    binding arbitration remedy to be afforded to dealers who

8    availed themselves of the opportunity to seek arbitration

9    within forty days of the enactment of the Act.  Otherwise, the

10   wind-down agreement stayed in effect.  And the wind-down

11   agreement stayed in effect now for purposes for this entire

12   period of time that the Rally dealership was not entitled to

13   buy New General Motors vehicles because the wind-down provision

14   for that still stayed in effect.

15        THE COURT:  Mr. Steinberg, do you agree that if New

16   GM hadn't complied with the arbitrator's award on the three

17   brands for which the arbitrator ruled in Rally's favor that

18   Rally could have come back here to enforce it with or without

19   the no-sue clause?

20        MR. STEINBERG:  Yes.

21        THE COURT:  All right.

22        MR. STEINBERG:  Yes.  I agree with that because

23   there, the provision, I believe, is ancillary to the

24   arbitration decision.  They're looking to implement and enforce

25   the arbitration decision.  And I think that if it wasn't being

MOTORS LIQUIDATION COMPANY, et al.

Page 30

1    done since the arbitration is over, they do need to have some

2    kind of remedy.  And they should be able to come back to this

3    Court.  But I do think it's this Court because I do think that

4    part and parcel of the reason why there was exclusive

5    jurisdiction language in the sale order, exclusive jurisdiction

6    in the wind-down agreement that everybody who signed the wind-

7    down agreement signed was that New General Motors had bargained

8    for as part of the sale process -- had bargained for one forum,

9    this Court who had approved the transaction, to handle anything

10   relating to an enforcement or dispute relating to these

11   agreements.  And to take it more broadly, to handle anything

12   that related to, in effect, the assignment and the continuation

13   of the dealership network from Old GM to New GM.  And I think

14   that that was what New GM had bargained for here.  And I think

15   Rally understood that because they not only were passive on the

16   entry of the sale order but in the wind-down agreement they

17   specifically recognized the exclusive jurisdiction.  And that

18   didn't change.  That didn't change.  That's what New GM had

19   bargained for.

20        The issue, Your Honor, with regard to judicial

21   estoppel I think could be easily dealt with by the fact that in

22   the case where New General Motors went to a court, it was to

23   enforce a settlement agreement.  The Dealer Arbitration Act

24   specifically says that if you're going to settle then there is

25   no arbitration and that the arbitrator has nothing to do.  So

MOTORS LIQUIDATION COMPANY, et al.

Page 31

1   when parties settle, they take themselves out of the Dealer

2   Arbitration Act totally based on the expressed language of the

3   statute.  Then if someone --

4           THE COURT:  Why didn't New GM come to me to enforce

5   that order?

6           MR. STEINBERG:  We could have, for sure, Your Honor.

7           THE COURT:  I'm sorry?

8           MR. STEINBERG:  We could have, for sure, done that.

9           Your Honor, the issue with regard to Rule 48(c) of

10  the Commercial Arbitration Rules, we did indicate that we

11  weren't fully adopting the Commercial Arbitration Rules.  The

12  Commercial Arbitration Rule, Rule 48(c), is for purposes of

13  seeking enforcement of an arbitration award and they are not

14  seeking enforcement of an arbitration award.  And the AAA rules

15  itself say that the rules will be applied only to the extent

16  that it's not inconsistent with the Dealer Arbitration Act.

17  And we believe to try to, in effect, implicitly put in a

18  judicial review concept through a rule that says that you can

19  move for enforcement where we had protested it is inconsistent

20  with the Dealer Arbitration Act which didn't provide for

21  judicial review.

22          Now, the fact that -- I think my adversary pointed

23  out to the fact that October 31 is fast approaching.  And under

24  the wind-down agreement, the Chevrolet dealership will be

25  terminated.  And the new dealership that New GM had promised to

MOTORS LIQUIDATION COMPANY, et al.

Page 32

1    -- an entity that used to be a Saturn dealership that operated

2    in the area is going to be given.  And there are rights that

3    people have because of that unless something happens in this

4    court or another court.  But there is this ticking deadline

5    that is there.  And they never -- they filed a motion -- a

6    complaint in August.  They themselves have never moved for an

7    injunction or for a stay or to try to continue the October 31

8    deadline.  And I don't think that they can.  I think that they

9    had agreed that it would get terminated.  I think even the

10   Dealer Arbitration Act specifically wanted finality to these

11   issues and to have finality because it's not only New GM's

12   rights that are being implicated but we've had a dealer who's

13   effectively been on hold since December of 2009 waiting to go

14   in on November 1st.  And their rights will be implicated as

15   well.

16           I think that, Your Honor, that with regard to the

17   interplay between the wind-down agreement and the Dealer

18   Arbitration Act -- the two most critical things is that there

19   is no judicial review that's specified in the statute.  And

20   because there's no judicial review, you're left with a wind-

21   down agreement that had not been, in effect, modified at all

22   except for the overlay of allowing for binding arbitration on a

23   right given by Congress.  And therefore, the commencement of

24   the lawsuit after the award had been given by the arbitrator is

25   a violation of the wind-down agreement and the provisions that

MOTORS LIQUIDATION COMPANY, et al.

Page 33

1   say that you should not sue and you should not interfere.

2          I will note, because it hasn't been said, that the

3   arbitrator gave his award in June and New General Motors gave a

4   letter of intent for the other four dealerships that the

5   arbitrator said had to be reinstated.  And Rally has been

6   reinstated for those other four dealerships.  And this --

7          THE COURT:  Oh.  So when I said it won three-

8   quarters, actually it won four-fifths?  Or with respect to four

9   of the five franchises that it once owned?

10         MR. STEINBERG:  That's correct.  So they are

11  operating right now.  And they got their letter of intent which

12  was supposed to be given by New General Motors, I think, with

13  ten days of the arbitration award.  It was only after that they

14  were well down the road to getting the four in place that they

15  decided to sue for the fifth.  And, Your Honor, our brief tries

16  to strip away the layers.  And to some extent when you orally

17  argue, you try to figure out how much of all the arguments you

18  have to make.  But this was even governed by the Federal

19  Arbitration Act.  I'm not even sure whether -- what they're

20  arguing about would be subject to any kind of judicial review

21  anyway.  We do set forth in our brief the arguments that we

22  think show that there was -- that the arbitration award was

23  consistent with what should have been done because there was

24  not one franchise agreement but there were five franchises

25  agreement.  And it's been dealt with because they've taken four

MOTORS LIQUIDATION COMPANY, et al.

Page 34

1    of the five and we still have one that's outstanding.  And we

2    point to the language of the sales agreement which talk about

3    "General Motors separately on behalf of its division

4    identified" and talk about the "separate" nature of each of

5    these agreements.  The wind-down agreements uses the plural,

6    doesn't use the singular for purposes of talking about these

7    agreements.  And not to be overly cute about the argument, but

8    if they were right that this was one agreement and not five

9    agreements and the arbitrator found a taint with regard to one

10   portion of an integrated agreement then the result would be the

11   same as if it was an executory contract under the Bankruptcy

12   Code with five lease schedules as part of one integrated

13   agreement where the debtor couldn't perform all five.  It's an

14   all-up or nothing.  And if that's the case, there would not

15   have been a reinstatement for all five instead of one.  That's

16   the natural outflow of what their argument is which is that if

17   you've got a taint on an integrated agreement which is

18   nonsoluble then the whole agreement falls not that the whole

19   agreement becomes good.  And so, what you have here is someone

20   who got the benefits of four dealerships.  Then after they got

21   the four dealerships on the reinstatement decided to sue and is

22   now making an argument which is I want my cake, I want to eat

23   it, too, in the context of a statute that doesn't provide for

24   this type of relief.

25            Your Honor, if you'd just bear with me just one

MOTORS LIQUIDATION COMPANY, et al.

Page 35

1   second, I just want to check my notes to see if I --

2           THE COURT:  Sure.

3           MR. STEINBERG:  -- have answered your questions.

4       (Pause)

5           MR. STEINBERG:  I think, Your Honor, when you said --

6   you asked my adversary the question did the Dealer Arbitration

7   Act trump the wind-down agreement for all purposes and he

8   answered no that it was incumbent on you to try to make the two

9   consistent and coherent that he was essentially making the

10  argument that I'm asking Your Honor to, as well, which is that

11  the wind-down agreement had vitality and it was modified for

12  purposes of the covenant not to sue solely for the purposes of

13  doing the binding arbitration procedure consistent with the

14  statute that Congress had subsequently passed.  Thank you.

15          THE COURT:  Okay.  Thank you.  Mr. Snyder, reply?

16          MR. SNYDER:  Your Honor, to first argue what is a

17  covered dealership, what is a not covered dealership to use

18  executory contract analyses versus using franchise law

19  analyses, using California law versus Title 11 law, that's

20  another reason why the California court has jurisdiction

21  because, again, what Mr. Steinberg is doing is saying well,

22  look, Judge, you have jurisdiction.  You can apply bankruptcy

23  law between two nondebtor parties as to what means a covered

24  dealership under the Federal Arbitration Act.  And any of the

25  600 dealers who applied for arbitration under GM could do that

MOTORS LIQUIDATION COMPANY, et al.

Page 36

1   as well.  And it seems to me that if Congress meant to give

2   dealers and the AAA jurisdiction over these acts then by a

3   natural extension, he meant them to be final and binding.

4   Counsel for New GM sort of takes the car and then he hits a

5   brake.  He says the covenant not to sue was abrogated by the

6   Dealer Arbitration Act but it stops there, that there is no

7   right after the arbitration.  And that is not true and also

8   doesn't address the question of federal question jurisdiction

9   that the federal court can possess jurisdiction over.

10          And he raised the Thomas case, Your Honor, but the

11  statute involved in the Thomas case is the Federal Insecticide

12  Fungicide and Rodenticide Act.  In that statute, Your Honor,

13  and I cite to Section 136a(c)(1)(F)(iii) of Title 7:  "The

14  FIFRA arbitration scheme allows judicial review of 'the

15  findings and determinations of the arbitrator' only in the

16  instance of fraud, misrepresentation or other misconduct by one

17  of the parties to the arbitration or the arbitrator.  This

18  provision protects against arbitrators who abuse or exceed the

19  powers or willfully misconstrue their mandate under the

20  governing law."  So Title 7 allowed for judicial review or

21  allowed for a response to Your Honor's question as to what

22  happens when an arbitrator acts inappropriately.  Those last

23  quotes, by the way, Your Honor, were the Thompson v. Union

24  Carbide, 473 U.S. at 592.

25          Here there's nothing.  There's no ability for Rally

MOTORS LIQUIDATION COMPANY, et al.

Page 37

1    or any of the 600 dealers to get redress as a direct result of

2    the arbitrator's conduct no matter what it is.  And so what

3    they're saying is everybody, come back here.  And we just don't

4    believe that's appropriate under the case law.  It's not

5    appropriate under Union Carbide.  It's not appropriate under

6    Vaden.  And it's not appropriate, we would suggest, under the

7    Second Circuit law.

8            Your Honor, the statute is less than a year old.  Of

9    course, the cases we need to use are cases by analogy which are

10   the FAA statutes.  So under the FAA -- I'm sorry -- line of

11   cases, there are agreements.  Agreed.  But that doesn't mean

12   the arguments aren't consistent because the AAA rules assume

13   that if you're a party to the arbitration you've agreed to

14   consent to the outcome.  In the Second Circuit case, in the

15   Idea Nuova case, the statute is silent just like the statute --

16   I'm sorry -- the agreement is silent just like the statute here

17   is silent.  AAA rules apply and we're not saying anything else.

18   And the Second Circuit said if the AAA rules apply then

19   whatever the arbitrator says is final and binding and the

20   unhappy party can then go to the district court and try to

21   confirm that arbitration.  Makes sense.  That's all we're

22   seeking to do here.  The statute is silent.  To suggest that we

23   have no right of judicial review of an arbitration belies the

24   fact that every stage plus Title 9 allow for confirmation,

25   vacature, review of arbitrations.

MOTORS LIQUIDATION COMPANY, et al.

Page 38

1    Now, Mr. Steinberg is right. The statute 48(c) only

2  speaks to judgment. And maybe the California district court'll

3  say you can only seek to confirm the judgment. You can't seek

4  to vacate it. You can't seek to modify it. And interprets

5  Rule 48(c) that way as counsel did. But why can't Rally have

6  the chance to allow California law to do that?

7    Your Honor, this is important. I'd like to go

8  through the wind-down agreement and the jurisdiction sections

9  because they are not inconsistent with the relief we're seeking

10  here. This is from GM's own motion. "The Court retains

11  exclusive jurisdiction to enforce and implement the terms of

12  this order, the MSPA," which is the wind-down agreements, "and

13  each of the agreements executed in connection therewith,

14  including the deferred termination agreement in all respects

15  including, but not limited to, retaining jurisdiction to

16  resolve any disputes with respect to or concerning the deferred

17  termination agreements."

18    There's no dispute regarding the deferred termination

19  agreements at all. There's a dispute as to whether Chevy is a

20  covered dealership under the Dealer Arbitration Act. We take

21  no position as to whether this Court -- the sale order speaks

22  for itself. Section 13 of the wind-down agreement.

23  "Continuing jurisdiction. By executing this agreement, Dealer

24  hereby consents and agrees that the bankruptcy court shall

25  retain full complete and exclusive jurisdiction to interpret,

MOTORS LIQUIDATION COMPANY, et al.

Page 39

1    enforce and adjudicate disputes concerning the terms of this

2    agreement and any matters related therein and survives

3    termination."

4        Absolutely.  There's an October 31st deadline.  The

5    wind-down agreement sets that out.  We're bound to the extent

6    we're bound under the wind-down agreement.  We've asked GM to

7    extend the October 31st date because of the late hour.  They've

8    refused.  So now we have to deal with the October 31st deadline

9    or get an extension by a court of competent jurisdiction.

10        But we're not addressing any of those provisions.

11   Our -- we are seeking jurisdiction based on the Dealer

12   Arbitration Act and not on the sale order and not on the wind-

13   down agreements.  This Court still has jurisdiction over those.

14        Your Honor, the argument about timing -- no good deed

15   goes unpunished.  They answered on September 7th and came into

16   this court on September 10th.  And then when we tried to get a

17   hearing date as quickly as possible, we agreed we wouldn't go

18   to the court in California to seek a stay if we could get a

19   hearing date on October 4th.  And we've abided by our agreement

20   and we're anxiously awaiting whatever the Court's determination

21   is going to be.  But we deferred to this Court first because

22   that's where New GM went.  And nobody delayed here.  As soon as

23   the motion was filed, we sought a quick hearing and we got one

24   thanks to chambers and Your Honor's courtesy.  But -- I believe

25   I'm finished.

MOTORS LIQUIDATION COMPANY, et al.

Page 40

1      THE COURT: All right. Very well. All right. We're
2  going to take a recess. I don't know how long it's going to
3  take me. But you needn't be here before 4:30. And I'll come
4  out with a ruling as soon thereafter as I can. We're in
5  recess.

6      (Recess from 4:04 p.m. until 5:30 p.m.)

7      THE COURT: Have seats, please. I apologize for
8  keeping you all waiting. In these jointly administered cases
9  under Chapter 11 of the Code, General Motors LLC, which I'll
10  normally refer to as New GM, moves for an order enjoining Rally
11  Dealership from interfering with New GM's ability to, as it was
12  put, to reform its dealership platform pursuant to a previous
13  order I entered, from vacating or modifying an arbitration
14  decision and from pursuing that effort in California district
15  court.

16      Rally was a GM dealership that was being closed
17  pursuant to an agreement that was acquired by New GM from Old
18  GM. The Dealer Arbitration Act, which was subsequently signed
19  into law, provided an opportunity for dealers such as Rally to
20  become reinstated as New GM dealers, if they were successful in
21  a binding arbitration proceeding, with New GM.

22      Rally won its arbitration proceeding with respect to
23  three of its brands but not its Chevrolet brand. Rally is
24  attempting to have this arbitration award modified or vacated
25  in a federal district court in California. New GM argues that

MOTORS LIQUIDATION COMPANY, et al.

Page 41

1   there is no right to modify the arbitration award and,

2   additionally, that my Court is the only forum that can hear

3   this issue.  In addition, New GM argues that Rally has been

4   interfering with New GM's establishment of an alternate Chevy

5   dealership in violation of its agreement with New GM.

6          While I understand the difficulties faced by dealers

7   such as Rally as a consequence of the events of last year, the

8   motion must be granted.  The following are my findings of fact

9   and conclusions of law in connection with this determination.

10         As facts, I find that on July 5th, 2009, I entered

11  the 363 sale order.  That sale order authorized and approved a

12  master purchase agreement dated as June 26, 2009, often

13  referred by the parties as the MPA, between Old GM and an

14  entity that later became New GM.  Pursuant to the MPA and the

15  363 sale order, on July 10, 2009, New GM purchased

16  substantially all of Old GM's assets free and clear of Old GM's

17  liabilities except as expressly assumed by New GM under the

18  MPA.

19         As part of the transactions that were approved under

20  the 363 sale order, Old GM entered into and assigned to New GM

21  certain deferred termination agreements, which we refer to as

22  wind-down agreements, which had originally been entered into

23  between Old GM and certain of its authorized dealers.  These

24  agreements had been offered to dealers as an alternative to

25  outright rejection of their dealer sales and service

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1    agreements, which we sometimes refer to as dealer agreements

2    under the rights afforded to debtors to reject executory

3    contracts under 365 of the Code.  The wind-down agreements

4    provided, among other things, that in exchange for certain

5    payments and other consideration, the affected dealers' dealer

6    agreements would terminate no later than October 31, 2010.

7            In December 2009, Congress enacted into law a new

8    statute called the Dealer Arbitration Act which gave wind-down

9    dealers such as Rally the opportunity to seek reinstatement to

10   the GM dealer network through a binding arbitration process.

11   Rally timely filed a request for arbitration and an arbitration

12   was held in May before an arbitration -- arbitrator in

13   California.  On June 8, 2010, the arbitrator issued an award

14   directing New GM to reinstate Rally's Buick, Cadillac and GMC

15   dealer agreements but ruling that Rally's Chevrolet dealer

16   agreement should not be reinstated.  New GM is now currently

17   attempting to establish another Chevrolet dealership in the

18   Palmdale, California area where Rally is located.  During this

19   process, the owner of Rally has continued to lobby New GM to

20   reinstate his Chevy dealership.  After various proceedings, New

21   GM determined to relocate the Chevy dealership to Lancaster,

22   California which triggered an action by Palmdale against the

23   city of Lancaster in the Superior Court of California.

24   Palmdale claims that the terms of an agreement between

25   Lancaster and the new Chevy dealership violated a state law

MOTORS LIQUIDATION COMPANY, et al.

Page 43

1   that prevent cities from engaging in bidding wars to lure auto

2   dealers and other large sales techs generating businesses to

3   relocate them from one city to another.  The owner of Rally,

4   one Mr. Mayle, provided an affidavit on behalf of Palmdale in

5   that action.  New GM argues that Rally, through its agent, Mr.

6   Mayle, is providing assistance in litigation against New GM and

7   is interfering with the establishment of a new dealership in

8   violation of the wind-down agreement.

9          Rally argues that the arbitrator was bound by the

10  Dealer Arbitration Act to either reject or accept the entire

11  dealer contract and that the arbitrator exceeded his authority

12  by not reinstating the Chevy brand as well.  Thus, on August

13  13, 2010, Rally filed suit in California district court seeking

14  to vacate or modify the arbitration award and to prevent

15  termination of his Chevy dealer agreement though presumably

16  wishing to maintain intact the other aspects of the

17  arbitrator's award which maintained his dealerships for the

18  other three brands, Cadillac, Buick and GMC.

19         Rally alleges, in substance, that the arbitrator's

20  award in not giving him a complete victory was erroneous as a

21  matter of law in its failure to accept its position that all of

22  the separate brands had to be considered together in the

23  species of double or nothing.  He has not alleged that the

24  arbitration award was the result of bribery, fraud, corruption,

25  manifest disregard of settled law or any other ground that

MOTORS LIQUIDATION COMPANY, et al.

Page 44

1    would be a basis for vacating an arbitration award if the

2    Federal Arbitration Act applied.

3            I'll now turn to my conclusions of law.  Turning

4    first to jurisdiction and within the jurisdiction umbrella,

5    first, to subject matter jurisdiction.  First, it's plain that

6    the district courts and bankruptcy courts in this district have

7    subject matter jurisdiction over this controversy.  The

8    applicable subject matter jurisdiction statute is 28 U.S.C.,

9    Section 1334, the section of the judicial code that follows the

10   judicial code sections relating to federal question, diversity

11   and admiralty jurisdiction.  1334 deals with subject matter

12   jurisdiction with respect to bankruptcy cases and proceedings.

13   That section provides, in relevant part, subsection (b), with

14   exceptions not relevant here, "the district courts shall have

15   original but not exclusive jurisdiction of all civil

16   proceedings arising under title 11, or arising in or related to

17   cases under title 11".

18           Rally addresses the issue of "related-to"

19   jurisdiction under 1334 but that isn't the relevant subject

20   matter jurisdiction issue.  Rather it's the "arising in" prong

21   of 1334 where New GM relies on an order I entered last year in

22   this case under which this Court retained exclusive

23   jurisdiction in paragraph 71(f) to "resolve any disputes with

24   respect to or concerning the deferred termination agreements".

25   The deferred termination agreements, which as I noted are also

MOTORS LIQUIDATION COMPANY, et al.

Page 45

1    referred to as the wind-down agreements, included provisions by

2    which dealers and New GM contractually agreed that this Court

3    retained full and exclusive jurisdiction to enforce them as

4    well as to specifically preclude Rally and other wind-down

5    dealers from filing suit against New GM and taking any action

6    to interfere with New GM's establishment of additional

7    dealerships.  I'll note parenthetically that there was nothing

8    in the Dealer Arbitration Act to modify the subject matter

9    jurisdiction of the federal courts nor to modify any of my

10   earlier orders other than to provide what amounted to a defense

11   to enforcement of the deferred termination agreements if and to

12   the extent that a dealer prevailed in the arbitration process

13   for which Congress provided.

14        Rally did prevail in the arbitration process with

15   respect to three of its franchises and, presumably, would like

16   to avail itself and enforce that part of the arbitration award.

17   But it wishes to upset the arbitration result as to which it

18   didn't prevail and used the hoped-for alternative result, that

19   is, a reinstatement of its Chevy franchise, as a defense to its

20   duties under the deferred termination agreement which duties

21   otherwise obligated it to give up its Chevy dealership, that

22   being a classic "dispute with respect to or concerning the

23   deferred termination agreements".

24        Now, Rally may have come to an agreement by the end

25   of oral argument.  But in any event, I so rule that this Court

MOTORS LIQUIDATION COMPANY, et al.

Page 46

1    does have subject matter jurisdiction over this controversy.

2         Similarly, I find that this is a core matter.  Under

3    28 U.S.C., Section 157(a)(2)(N), core matters include, with

4    exceptions not relevant here, orders approving the sale of

5    property.  The 363 sale order and my approval of the wind-down

6    agreement documented the outcome of those core proceedings.

7    And a proceeding such as the motion now before me which seeks

8    relief predicated on a "retained jurisdiction" clause in my

9    order resolving a core matter is a core matter as well.  The

10   decision in Eveleth Mines, 312 B.R. at pages 644 to 645, is

11   directly on point.  In that case, the Court noted the motion

12   that barred directly and necessarily comes out of a core

13   proceeding in this case, the debtors' motion for authority to

14   conduct a sale of assets of the estate free and clear of liens.

15   Court proceedings under 28 U.S.C., Section 157(b) fall under

16   the "arising under" or "arising in" jurisdiction of 28 U.S.C.

17   Section 1334(b).  Then the enforcement of orders resulting from

18   core proceedings are themselves considered core proceedings.

19        The Second Circuit has held similarly.  It's held

20   that bankruptcy courts are empowered to enforce the sale orders

21   that they enter and to protect the rights which were

22   established by the sale order.  See Millenium Seacarriers, 419

23   F.3d at 97; and Petrie Retail, 304 F.3d at 229-230.  Petrie

24   Retail is particularly instructive because it also dealt with a

25   dispute between two nondebtors addressing rights that were

MOTORS LIQUIDATION COMPANY, et al.

Page 47

1    created by the sale order.  Though Petrie Retail was not

2    unanimous, it's no less binding on the lower courts for that

3    reason.

4         Now there can be no dispute what the sale order

5    actually said.  Nor can there be any dispute as to the wind-

6    down agreement said.  Section 13 of the wind-down agreement had

7    that continuing jurisdiction clause providing that the dealer

8    hereby consented to and agreed that the bankruptcy court would

9    retain full complete and exclusive jurisdiction to interpret,

10   enforce and adjudicate disputes concerning the terms of this

11   agreement and any other matter related thereto.

12        Here and to the extent Rally was successful in the

13   arbitration, of course that would be a defense to win any

14   effort to make it terminate its agreement.  And to the extent

15   that it wishes to either enforce the agreement as it has the

16   right to do with the three franchises for which it prevailed or

17   to defeat the agreement with respect to the one agreement where

18   it lost, in any event they concern the terms of the agreement

19   and, in particular, any other matter related thereto.  I don't

20   think that's subject to serious dispute.

21        Finally, I've considered and ultimately rejected

22   Rally's suggestion that I exercise discretionary abstention on

23   that.  Plainly, there is a right to invoke discretionary

24   invention under 1334(c)(1) of the judicial code.  That's 28

25   U.S.C. Section 1334(c)(1) which provides that nothing in this

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1    section prevents a district court in the interest of justice or

2    in the interest of comity with state courts or respect for

3    state law from abstaining or hearing a particular proceeding

4    arising under Title 11 or arising in or related to a case until

5    Title 11.  And while it speaks principally of state courts and

6    state law, I accept for the purposes of this analysis that we,

7    bankruptcy courts have the power to abstain in favor of other

8    federal courts when the circumstances so warrant.  But I don't

9    believe that the factors here so warrant.  Standards that have

10   been articulated for the exercise of discretionary abstention

11   include of the efficient administration of the bankruptcy

12   estate, comity, the degree of relatedness or remoteness of the

13   proceeding to the main bankruptcy case, the existence of the

14   right a trial and prejudice to the involuntarily removed party.

15   Some of these, obviously, come in removal cases.

16          Here, I think the factor that is most important is

17   the effect of the effect deficient administration of the

18   bankruptcy estate.  This was a procedure that needed to be

19   resolved quickly as evidenced by the very tight time frames

20   that Congress imposed.  As important or more so, the bidders of

21   the world that come in to bid for assets in the bankruptcy

22   court must have knowledge that bankruptcy courts will stand by

23   the documents as they were then drafted to give the parties to

24   those agreements the predictability in their relations for

25   which they are binding and upon which they justifiably rely.

MOTORS LIQUIDATION COMPANY, et al.

Page 49

1    The Court in Eveleth Mines explained "as applied to a sale free

2    and clear of liens, there are also good policy reasons for

3    making a derivative core proceeding classification.  Active

4    bidding on assets from bankruptcy estates will be promoted if

5    prospective purchasers have the assurance that they may go back

6    to the originally forum that authorized the sale for a

7    construction or clarification of the terms of the sale that it

8    approved.  Relegating post-sale disputes to a different forum

9    injects an uncertainty into the sale process which would dampen

10   interest and hinder the maximization of value.  A purchaser

11   that relies on the terms of a bankruptcy court's order and

12   whose title and rights are given life by that order should have

13   a forum in the issuing court."  That is very strong guidance

14   that suggests that a Court, like me, should not abstain in

15   favor of another jurisdiction.

16          Similarly, comity is a factor that I would take into

17   account if there were, as contrasted to here, strong state law

18   concerns.  But here, of course, there are not.  I, no less

19   than a district court, either in New York or California, can

20   determine that which is just in determining whether or not to

21   enforce or, as more relevant here, to undercut an arbitration

22   award.

23          The degree of relatedness or remoteness of the

24   proceeding to the main bankruptcy court is subject to a double

25   entendre.  On the one hand, this is not going to affect the

MOTORS LIQUIDATION COMPANY, et al.

Page 50

1    assets and order of its liquidation in court.  But the factors

2    articulated in Eveleth Mines likewise cause Courts here to be

3    slow to abstain because giving purchasers of assets the comfort

4    that their needs and concerns are going to be addressed is

5    pretty important.

6         I consider the existence of the right to a jury trial

7    inapplicable because I assume that this would be decided

8    without a jury trial in either events and I also consider

9    prejudice to the involuntary removed party under the facts of

10   this case.

11        So for all of these reasons, I decline to exercise

12   discretionary abstention.

13        Now turning to what I should do with this controversy

14   before me.  Both sides now seem to agree that the Federal

15   Arbitration Act doesn't apply because it implements contractual

16   agreements to arbitrate.  And here, the right to compel

17   arbitration comes not from a contract but from the Dealer

18   Arbitration Act itself.  And it also now appears to be

19   undisputed that the Dealer Arbitration Act doesn't provide for

20   judicial review of arbitration awards issued after the

21   mechanisms for which the Dealer Arbitration Act provides.

22        Nor do I think that I can or should find an applied

23   right to judicial review under that statute.  First, as you

24   know from reading many earlier decisions that I've issued, I

25   start with textural analysis where I note the significant