# EXHIBIT I

**AMERICAN ARBITRATION ASSOCIATION**

**AUTOMOBILE INDUSTRY ARBITRATION PROGRAM**

In the Matter of the Arbitration between:

| | | |
|---|---|---|
| Halleen Chevrolet, Inc., | : | |
| | : | |
| Claimant, | : | Case No. 53-532-000023-10 |
| | : | |
| v. | : | |
| | : | Arbitrator:  Dale A. Crawford |
| General Motors, LLC, | : | |
| | : | |
| Respondent. | : | |

WRITTEN DETERMINATION

I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the

Consolidated Appropriations Act of 2010 (the "Act"), has been duly sworn.  The Arbitrator

conducted the hearing in the above-captioned matter in Cleveland, Ohio on June 8 – 11,

2010.  The hearing and testimony was consolidated by agreement with three other

arbitrations so that duplicate witnesses would testify only once for all cases.  The parties

were present during the testimony of the witnesses whose testimony applied to their

arbitration.  Binders of numerous exhibits were submitted to the Arbitrator prior to the

hearing.  All exhibits previously submitted and introduced at the arbitration were stipulated

1

into evidence. By agreement of the parties, a view by the Arbitrator of the dealer's exterior premises and the geographical area in which the dealership is located was conducted prior to the hearing. At the close of the hearing and at the request of the parties, the Arbitrator extended for good cause the time for the completion of the arbitration for 30 days as provided in the Act.

The Arbitrator hereby makes his written Determination pursuant to the Act.

## I.    The Covered Dealership

The Halleen family has been in the automotive retail business since 1964 as a Ford dealer in Seville, Ohio. In 1969 the family built a new facility at 27932 Lorain Road in North Olmsted, just west of Cleveland, Ohio. In 1980 the Halleens gave up their Ford franchise and were awarded the Chevrolet franchise. The real estate upon which the dealership is located is owned by a family trust. Charley Halleen is the owner and, since 1990, Mark Halleen, Charley's nephew, has been the general manager. The dealership employs 37 people. (There were 51 people employed prior to the winddown.)

## II.    Determination

The Arbitrator has considered all of the evidence and the arguments of counsel and has weighed all of the factors set forth in the Act and has determined that the economic interests of the manufacturer and the economic interests of the public at large outweigh the economic interest of the dealership and has determined that the dealership shall not be added to the dealer network of New General Motors.

## III.    Acronyms

The following are a list of acronyms that will be used in the course of this Determination.

| | |
|---|---|
| AGSSA | Area of Geographic Sales and Service Advantage. A dealer's AGSSA is comprised of those census tracts the centroids of which are closer to that dealer than other dealers. For a dealer in an MDA, it is the area used to calculate the dealer's Sales Expectation. |
| APR | Area of Primary Responsibility. The APR is an area defined in the DSSA into which the dealer is responsible for selling and servicing. For a dealer in an SDA, it is the area used to calculate the dealer's Sales Expectation. |
| CSI | Customer Service Index. The CSI is the measure of a dealer's overall customer service performance. CSI is calculated by comparing a dealer's PDS and SSS scores separately to the regional average PDS and SSS scores for each line-make the dealer sells. |
| DPS | Dealer Performance Summary. The DPS is a measure of a dealer's performance. It is a weighted calculation utilizing the dealer's (1) RSI (50%), (2) CSI (30%), (3) percent of required net working capital (10%), and (4) profitability (10%). |
| NPBBT | Net Profit Before Business Bonuses and Taxes |
| RRI | Retail Registration Index. RRI is a measure of the brand's sales performance in an AGSSA/APR. It is calculated by dividing the total GM registrations in a dealer's AGSSA/APR by the dealer's Sales Expectation. |
| RSI | Retail Sales Index. RSI is a measure of the dealer's sales performance. It is calculated by dividing the dealer's reported sales by the dealer's Sales Expectation. |
| Sales Expectation | – State average GM brand market share by segment multiplied by all industry registrations by segment in the dealer's AGSSA/APR. |
| SSS | Sales and Service Satisfaction |
| Throughput | New Cars Sold Per Dealer |

IV.    **Background**

General Motors ("Old GM") was started over 100 years ago and has been among the top ten Fortune 500 companies since the listing was started. Old GM has had 463 direct and indirect wholly-owned subsidiaries; has had thousands of suppliers; employed 235,000

3

workers worldwide (in 2009); had worldwide revenues of $181 billion in 2007; and has hundreds of thousands of retirees dependent upon the company for their retirement benefits, including healthcare.

Up until the 1960's, U.S. automakers had little competition from foreign automobile manufacturers. The Old GM dealer network grew up and through the 1960's. Dealerships could be found in most rural areas and proliferated in the urban networks. Prior to the creation of the intrastate and interstate highway systems, new car purchasers bought almost exclusively from their hometown dealership because it was too difficult to travel outside of their hometowns for the service. With the advent of the interstate and intrastate highway systems in the 1960's and beyond, came the foreign automobile manufacturers. Foreign competition grew from the 1960's to the present with foreign dealerships located in prime urban areas at or near major highway systems. Old GM dealerships were still located in most rural areas in addition to their multiple urban locations. While maintaining its dealership level, Old GM's market share dropped from 45% in 1980 to 22% in 2008 and 20% in 2009. In 2008, many of the competing foreign dealerships had between 1/5 to 1/3 fewer dealerships with throughput being almost four (4) times that of Old GM dealers. Ford Motor Company had close to half of the dealerships Old GM had. (Toyota had 1589 new vehicles sold per dealership to 459 for Chevrolet. Lexus had 1158 new vehicles sold per dealership to 112 for Cadillac.)

2008 was a difficult year for all automotive manufacturers, including Old GM. Gas prices were high and the financial markets collapsed. Credit markets were completely closed. Old GM had few liquid assets to pay its long and short-term obligations. Finding no other alternative, in November 2008, Old GM sought financial assistance from the United

4

States Government.  A proposed First Viability Plan was submitted to the President and

Congress outlining the efforts Old GM would undertake if the loan(s) was granted.  On

December 31, 2008 an agreement was reached with the Treasury Department for a loan

through the first quarter of 2009.

In February 2009, a Second Viability Plan was submitted to the Treasury Department

in an effort to get more financial assistance from the government.  The Second Plan proposed

phasing out all Old GM brands except Chevrolet, Cadillac, Buick and GMC.  (Hummer, Saab

and Saturn were to be phased out.)  Pontiac was to remain in a smaller capacity.  The second

plan proposed phasing out its dealership network, by attrition, through 2014.  The

Automotive Task Force was created by President Obama to review the Plan and report to the

President, Congress and the Treasury Department.  On March 30, 2009 the Second Plan was

rejected by the President, the Task Force and the Treasury Department.  The Plan was

rejected for several reasons, including a belief that the restructuring of the dealer network

was not aggressive enough.  The Task Force recognized that unprofitable, underperforming

dealers were putting "a drag on the overall brand equity of GM and hurt the prospects of the

many stronger dealers who could help GM drive incremental sales."

Additional credit was extended to Old GM and it was given a deadline of June 1,

2009 to come up with a new acceptable viability plan.  A new plan was not created and,

lacking an acceptable viability plan, bankruptcy was declared by Old GM on June 1, 2009.

Even though claimant disagrees, it was universally agreed by the Task Force, the

Treasury Department and the Bankruptcy Court, that the Old GM's 6000 plus dealer network

could not compete with the foreign and domestic manufacturers whose fewer dealers had

higher throughput. With this in mind, Old GM, on May 14, 2009 sent letters to 1100 dealers advising them that their dealership agreements would not be renewed as of October 31, 2010. During the bankruptcy proceedings, Old GM advised the Bankruptcy judge that it sought the termination of 1100 of the dealership executor agreements.

Because most state laws are protective of dealer's agreements with the manufacturers, (Courts only permitting the termination for "just cause," which is liberally construed in favor of the dealer) Old GM needed the Bankruptcy Court to approve the terminations. The Bankruptcy Court approved the request to terminate the agreements.

The terminated dealers and various state and national dealers' organizations sought relief from their terminations from the United States Congress. After negotiations with various Congressmen and Senators, a bill to restore all terminated dealers was introduced and ultimately defeated. A compromise bill was then introduced and passed. The bill is entitled Section 747 of the Consolidated Appropriations Act of 2010. (The "Act " )

The Act, which brings the parties before this Arbitrator, provides that Old GM and Chrysler dealers who were improperly terminated under state law may, through binding arbitration, seek reinstatement or be added as a franchisee to the dealer network. The arbitrator is to be selected from a list of qualified arbitrators maintained by the American Arbitration Association ("AAA") and shall render a written determination following the substantive law set forth in the Act and the procedural rules of AAA. Under the Act, the arbitrator is required to balance the "economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based upon that balancing, whether or not the covered dealership

6

should be added to the dealer network of the covered manufacturer." The Act further provides that the arbitrator shall consider the following seven factors in balancing the economic interests of the manufacturer, the dealer and the public at large:

(1) The covered dealership's profitability in 2006, 2007, 2008, and 2009;

(2) The covered manufacturer's overall business plan;

(3) The covered dealership's current economic viability;

(4) The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

(5) The demographic and geographic characteristics of the covered dealership's market territory;

(6) The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement; and

(7) The length of experience of the covered dealership.

V.    **Legal Issues Not Yet Decided**

On a previous occasion the Arbitrator determined that the Claimant had the burden of proof (by a preponderance of the evidence) and the burden of going forward. The Arbitrator notes that the burden of proof will only be an issue if the relevant scales (economic interests of the manufacturer, dealer and public at large) are balanced equally.

The legal issues yet to be determined are as follows:

(1) Can the dealership dispute the validity of the manufacturer's stated "overall business plan"?

(2) In considering the profitability of the covered dealership, are new car sales the only component of profitability?

(3) Does the economic viability of the dealership include all sources of income?

(4) Can the dealership dispute, as unreliable, the specific criteria (i.e. CSI) used by the manufacturer to terminate the dealer?

(5) In considering length of experience, is a longer time period for the dealer to hold the franchise a positive or a negative?

(6) In balancing the economic interest of the "public at large" should the Arbitrator consider the "public" to be local, national, or a combination thereof?

(7) Can the Arbitrator consider state law in rendering the determination?

## VI.    Resolution of Pending Legal Issues

1. Manufacturer's Overall Business Plan

Included in the evidence were the live testimony of Jim Bunnell and Sharif Farhat and the extensive documentary testimony, statements, affidavits of Fritz Henderson, Robert Secrest, Rob Toussaint and Harry Foster, reports to the Task Force, and reports to the Bankruptcy Court regarding Old GM's overall business plan as it relates to its dealerships. The Arbitrator heard Claimant's live testimony from Alan Spitzer and Professor John P. Matthews regarding Old GM's overall business plan. Old GM believed it needed to produce a competitive product and significantly reduce its dealerships (proposed from 6,000 to 4,000+) so that the new dealership network will have higher throughput. Old GM believed that with a good product and higher throughput for the dealer this would lead to more profitable dealers which in turn would lead to more modern competitive facilities, better

8

advertising, better skilled employees, higher consumer satisfaction, more community

involvement, and, most importantly, lower cost to the manufacturer by the reduction of

dealer incentives. Old GM believed that fewer modern, profitable dealers are necessary to

compete in today's market. New GM believes it now has a better product and it can compete

with all other manufacturers. With a better product, New GM must now concentrate on

modernizing its dealer network.

Alan Spitzer, a multiple auto franchise owner, (35 franchises at the highpoint) was

and is a spokesperson for the dealers nationwide before the United States Congress.

Mr. Spitzer testified before Congress and during the bankruptcy proceeding of Chrysler. He

is the founder of the Committee to Restore Dealer's Rights. Mr. Spitzer believes the New

GM's overall business plan is flawed. Mr. Spitzer does not believe that higher throughput

per dealer will occur by closing dealerships nor does he believe that higher throughput will

reduce any costs to New GM. He believes that dealer subsidies are variable costs and will

not be reduced or eliminated with more profitable dealers.

Claimant's expert witness, Professor Jack Matthews, testified that he believes that

closing any dealer will have a negative impact on the manufacturer. He testified that the

manufacturer will have lost sales, a reduction of customer convenience and service, and

community loyalty will suffer.

The Arbitrator is respectful of the experts in the automotive field that believe that

reducing dealerships will be of no cost savings to the manufacturer. Some, including Spitzer

and Matthews, believe that all manufacturer subsidies and incentives are variable costs and

will exist regardless of the number of dealerships. All Claimants before the Arbitrator assert

that the reduction of dealerships will cost the manufacturer additional money, not save it money. The Arbitrator has considered the testimony of Jim Bunnell, Harry Foster and Fritz Henderson, Robert Secrest and Rob Toussaint, in addition to the findings of the Task Force and the Department of the Treasury and Bankruptcy Court and has determined that, more likely than not, the reduction of low profitable dated facility dealers will increase the remaining dealers throughput and increase New GM's future revenues.

However, whether or not this Arbitrator's conclusion is correct is not relevant. The Act provides that the Arbitrator is to consider the manufacturer's overall business plan – not the viability or accuracy of the plan. The Arbitrator is to identify the stated plan, accept the plan and then determine where this dealer fits in the stated plan.

2. Profitability.

The Arbitrator is to consider the profitability of the covered dealership in the years 2006,    2007, 2008, and 2009. There are statements made in the congressional hearings that suggest that profitability should be determined by considering new car sales only. Many dealerships, like Claimant, have losses in new car sales but their used car sales and service and body work make the dealership overall profitable. It is the Arbitrator's position that Congress intended to have the Arbitrator consider both, the overall profitability and the dealer's profitability on new car sales. Obviously, if a dealer was maintaining its dealership for the sole purpose of maintaining its used car department (with the ability to buy demo cars from Old or New GM) and its service department warranty work, this would and should be a concern for the manufacturer. Low performing dealers on their CSI scores often are not concerned with upgrading facilities because they are making a profit elsewhere, including

10

high rent going to the dealer owner who owns the property upon which the dealership

operates. The Arbitrator will consider both overall profitability and profitability on new car

sales.

3. Economic Viability

As with profitability, the Arbitrator believes that the economic viability of the

dealership includes all facets of the dealership operation. If the dealership can only function

in its geographical area largely on its used car sales and service departments, this is a

consideration. Economic viability will be defined as the "ability to compete and win in the

market in the long run" (Brian Gaspardo) and will include the market, geographical area,

competition, need to upgrade facilities, long and short-term debt, all sources of income,

future capital needs, highways, location, and most importantly, the economic viability of the

community served by the dealer.

4. Disputing the Specific Criteria.

Claimant was terminated because of a CSI score below 70. Some experts in the

market, including Professor Matthews, believe the CSI and DPS scores are not fair criteria

upon which to judge the success of a dealer. Professor Matthews believes there should be

"adjustments" to the score based upon factors beyond the control of the dealer. CSI and DPS

scores are universally used in the automotive industry. (Other manufacturers have some

variances in the scores but no manufacturer makes "adjustments".)

This Arbitrator has reviewed all of the testimony and literature submitted in this case

relevant to CSI and DPS scores and has determined they are an appropriate criteria for a

manufacturer to use on a year-to-year basis. Should one year's low CSI or DPS be the sole

criteria to use at a time where the bankruptcy of Old GM is not a consideration? Probably

not. State law requires "good cause" before a dealer can be terminated, and a one year of a

low CSI would not be "good cause" under Ohio law. However, that is not the issue in this

arbitration. "Good cause" is not the standard to be applied. The "specific criteria"

established by the manufacturer is what this Arbitrator must consider. Whether the "specific

criteria" used with this dealer is fair or unfair is not relevant with this factor but will be

considered by the Arbitrator with "other relevant considerations." The only relevant fact for

this Arbitrator to apply in this factor is whether this dealership in fact fell below the "specific

criteria" established by the manufacturer. Put another way, did the manufacturer use the

proper math in determining this dealership's "specific criteria"? The answer is yes.

5.  Length of Experience

The manufacturer believes that if a dealer has been in business for many years and is

unable to have appropriate new car sales, this should be a negative on the Arbitrator's scale.

The Arbitrator disagrees. Long-term successful dealerships which have served and

participated in their local communities for years should be a positive factor for the dealership

and for the manufacturer. It is the Arbitrator's belief that Congress wanted the long-term

goodwill of the dealership to be considered as one factor in favor of the dealership. This

factor can be counterbalanced by other factors, such as low profitability, low CSI, low

viability and poor location. Viable longevity of a dealership will be considered as a plus for

the dealership.

6.  Public at Large

Claimant would have the Arbitrator believe that the "public at large" means the local community in which the dealership resides and/or serves. Claimant wants the Arbitrator to consider the benefit this dealership provides to the local community by way of taxes, employment and support given to community organizations. This Arbitrator believes these things are important considerations, but they are not factors in the "public at large" factor. "Public at large" means the general public. It means the aggregate of citizens of our nation not limited to any particular place. If Congress intended it to mean local community, it would have so provided. If Congress had stated "public" only, it could have been interpreted to include local community.

The closing of any dealership will be a hardship for its local community. Jobs will be lost, taxes will be lost and other businesses will be affected. However, the business plan of increased throughput on the remaining dealers means more jobs with the remaining dealers and more taxes in the communities where the remaining dealers will sell cars. If the remaining dealers are more profitable they will be able to participate further in their local communities.

Public at large means the American taxpayer who owns more than 50% of New GM. The public at large includes the need for New GM to be profitable in the future so its debt to the government can be paid, the retirement debts and healthcare of its former employees continued, and the catastrophic effects of New GM's liquidation avoided.

7. State Law

The Claimant wants this Arbitrator to apply, at least in part, state law in determining whether this dealership should be restored. The Attorney General of the State of Ohio has

submitted a letter which in effect states that the dealers have been unlawfully terminated and should be restored. The dealers were terminated under federal bankruptcy law which permits the Bankruptcy Court to lawfully terminate executory contracts. The Act creates a new right for the dealers that does not exist under any state, federal or common law. The Act is a law in and of itself and will be strictly followed.

VII.    **The Factors**

<u>The covered dealership's profitability in 2006, 2007, 2008 and 2009.</u>

The Claimant's dealership had an overall profit (NPBBT) for each of 2006 ($442,732); 2007 ($692,025); 2008 ($674,083); and 2009 ($388,051). However, this profit came almost exclusively from used car sales, payments( SFE) and service .The operating losses on new car sales were 2006, loss of $341,616; 2007, loss of $204,999; 2008, loss of $246,196; and 2009, loss of $186,511. During the four years from 2006-2009 Claimant made $1,802,792 selling used cars and during the same time period had a loss of $979,322 selling new cars.

The Arbitrator has previously stated that it will consider both overall profitability and profitability in new car sales with this factor. Since there is such a discrepancy between the profitability figures, it would appear to the manufacturer that Claimant is in a good location and its efforts are not sufficiently directed to new car sales.

This factor weighs slightly against the Claimant.

14

<u>The covered manufacturer's overall business plan.</u>

As the Arbitrator has previously stated, he will not second guess the viability of New GM's overall business plan. The plan as described by Ron Rozanski, and the affidavits previously noted is to reduce the number of dealerships nationwide and in Ohio; have dealerships with better facilities in better locations with better staff and better amenities for their customers. This plan should result in more throughput for each dealership with better profits for its dealers which should result in the reduction of the subsidies given to the dealer. (Estimated at $1000 per new car sold.)

Claimant argues that returning this one dealership will have little or no impact on New GM's overall business plan. While this may be true, if all arbitrators took this view, as some have, all dealerships would be restored and there would have been no need to go through this arbitration process. Congress rejected this position. The business plan is what it is. The Arbitrator has accepted the plan and has applied it to this dealership.

With respect to the Cleveland area, the manufacturer has a plan to reduce the number of Chevrolet dealerships from 14 to 7. This is being done to compete with Toyota, which has 5 dealers in the APR ; Honda, which has 6 dealers; and Nissan, which has 5 dealers. Mr. Rozanski and Mr. Farhat testified that the Cleveland overall plan of maintaining the 7 best producing dealerships will result in higher throughput for all remaining dealers with better facilities, better customer experiences and ultimately more profit for New GM. Claimant was chosen as one of the seven dealerships to winddown because it had a low RSI score in 2008. The dealership probably came close to making the cut. However, with the business plan being to cut the dealerships to 7, Claimant was not retained.

15

This factor weighs against the Claimant.

### The covered dealership's current economic viability.

Claimant and Respondent agree that Claimant's location in North Olmsted on the Auto Mile is a good location for a car dealership. However, the Cleveland APR is on the decline as will be discussed in the demographics factor section. It appears there is no chance in the future for Claimant to increase its new car sales. There are three other Chevrolet dealers within 6 miles of Claimant. All have significantly higher RSI than Claimant. Another near dealer (Pat O'Brien) is selling more Chevrolets than Claimant in Claimant's own AGSSA. It appears that Claimant has operational problems that have and will continue to preclude it from being a successful new car dealer.

Claimant has the working capital, location and overall profitability to make it economically viable. However, for some reason it cannot compete in the new cars sales with Ganley, Jack Matia and Pat O'Brien.

Claimant's economic viability will weigh in favor of Claimant but negatively against the manufacturer and public at large.

### The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement.

It is unclear what Congress meant by "performance objectives". There are numerous obligations imposed on the dealership and the manufacturer in the franchise agreement. These include size of the dealership (Franchise Agreement para. 4.4.3); dealership image (4.4.4); dealership equipment (4.4.5); responsibility to promote and sell (5.1); responsibility

to service (5.2); customer satisfaction (5.3); net working capital (10.1); and comply with the retail sales standards established by the manufacturer. (5.1.1(f)).

Claimant has complied with most of its general obligations under the franchise agreement except that which deals with its responsibility to promote and sell retail sales. (RSI).

All dealerships are required under the franchise agreement to maintain an RSI of 100. As noted in the acronyms section, this is a sales expectation figure based upon the AGSSA/APR of the dealership. Claimant's RSI was 57.34 in 2006, 67.19 in 2007 and 62.37 in 2008. In 2008 Claimant would have had to sell an additional 298 cars to get to the contractual 100 RSI.

Claimant's expert witness, Professor Jack Matthews, testified that the RSI is not a fair test of a dealership's performance. He believes it discriminates against urban dealers and does not take into account factors beyond the control of the dealer. In the case of Claimant, Professor Matthews believes that the fact that there is a Ford facility located near Claimant should be factored into the RSI performance index. Mr. Matthews does not explain why the three other Chevrolet dealers near Claimant (Ganley, Jack Matia and Pat O'Brien) all have RSI's close to 100 or above and Claimant does not. Claimant believes that in 2000 Old GM added some census tracts to its AGSSA to reduce its RSI in retaliation for a claim Claimant filed against Old GM. The testimony clearly shows the additional census tracts resulted from the 2000 census, not retaliation. Professor Matthews has opined that "only where there is evidence that the dealer is not using reasonable efforts to promote and sell the manufacturer's vehicles should low RSI be grounds for the dealer's termination." There is evidence in this

17

case that Claimant has made little effort to increase its RSI. Its present location should be conducive to new car sales; other dealers nearby meet their sales objectives; until 2009 Claimant did not cooperate with other dealers to market their products; the new car advertising budget was relatively low; and there was a significant effort to sell used cars at the expense of new cars.

The evidence shows that it wasn't the Ford plant or the increased census tracts that caused the lost RSI. The problem was a dealership operational problem seemingly in the control of the general manager.

Respondent claims that Claimant violated its franchise agreement by sharing its service facilities with its next door Kia dealership. While this may be a minor infraction, the Arbitrator will not hold this against the Claimant.

The physical facilities are relatively small but adequate. Even though substantial improvements have not been made since 1993, they meet the criteria set forth in the franchise agreement.

Because the RSI is substantially below that which is required by the agreement, this factor weighs against the Claimant.

<u>The demographic and geographic characteristics of the covered dealership's market territory.</u>

The dealership's APR is the Cleveland region which consists of 5 counties. The area has a declining population of 2.1 million who can easily commute through the region on a well developed highway system. As stated by Claimant's expert, Professor Krumholz, "the Cleveland area has long been in decline due to de-industrialization and fundamental

economic restructuring resulting in the loss of manufacturing jobs .... The City of Cleveland

has lost most of its corporate headquarters .... The city's rate of population loss since 2000

has been exceeded only by post-Katrina New Orleans." The Cleveland APR cannot support

its 14 Chevrolet dealers as previously stated. Because of the excellent highway system in the

APR, closing the Claimant will have little, if any, impact on the ability of existing Sims

Chevrolet owners and potential buyers to travel to another dealership. There are 3 other

Chevrolet dealers in close proximity to Claimant. There is no need for this dealership in this

location and, assuming 7 dealerships in the area should be closed, Claimant should be one of

the 7.

     This factor weighs against the Claimant.

### The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement

     Claimant was chose for winddown because its RSI score was 62.37 in 2008. The RSI

score ranks Claimant 140 out of 190 dealers statewide. No retained Cleveland APR

dealership had a lower RSI score than Claimant. Claimant would have had to sell an

additional 298 cars in 2008 to bring its score up to 100. Claimant states that it sold 494 new

cars in 2008 which ranks it 139 out of 190 dealers and this alone should compensate for the

low RSI. Urban dealers are expected to have high sales. That factor is considered when the

RSI is computed. While Claimant believes he is being hurt because he is an urban dealer, the

bottom line is he has underperformed in relation to the criteria established to winddown the

dealership.

     This factor weighs against the Claimant.

### The length of experience of the covered dealership.

Claimant has been selling and servicing Chevrolets in North Olmsted for 30 years. The Halleen family is involved in the community and is well respected. The dealership presently employs 37 people and has paid taxes of over $9 million in the past 4 years. The dealership has good customer service ratings and good recommendations from its employees, customers and community leaders.

This factor weighs in favor of the Claimant.

### Other relevant considerations.

There were no other relevant considerations the Arbitrator took into consideration in rendering this Written Determination.

VIII. **Balancing the economic interests of the manufacturer, the dealer and the public at large.**

The American taxpayer currently owns a majority of New GM. Having New GM suffer from an uncompetitive and bloated dealership network is not in the public interest and may delay the repayment of the loans unless the business can be turned in the right direction. The public benefits when New GM has better operating dealers, with better facilities, highly trained and experienced employees that provide the auto-buying public with a better product and a better sales and service experience. The public benefits when New GM closes an underperforming, outdated, not profitable (new car sales) dealership like Claimant.

New GM benefits when its business plan is carried out. Even though its plan to do away with almost 2000 dealers will not come to fruition in 2010, its plan to reduce the size of

its dealerships, especially in urban areas, to create a higher throughput per dealer weighs on the manufacturer's scale. While looking at Claimant alone will not have a measurable impact on New GM's overall success, taking away as many poor performing dealers as possible will, in the long run, have a major impact on the economic success of the manufacturer. High producing profitable dealers will increase New GM's overall profitability and will increase the auto purchaser's buying experience and may significantly reduce New GM's payouts to and support of their dealers.

In addition to just reducing the number of dealerships and increasing the throughput of the remaining dealerships, New GM must make regional changes along with the reduction of its dealerships. Heavily on its scale is the need to significantly reduce the number of dealerships in the Cleveland APR and other urban areas. As Claimant is one of the lower CSI performing dealers in the area, Claimant was properly selected for winddown.

There is a lot on the dealership's scale. It is overall profitable, its facilities are outdated but not bad, it is in a good location to sell cars and it provides support to the community. The scales in this case are closely balanced; however, the inexplicable low car sales and the manufacturer's need to reduce dealerships in the Cleveland area tip the scales in favor of the manufacturer and the public at large.

IX.    **Costs**

In accordance with the Act, the administrative fees and expenses, and the Arbitrator's fees and expenses shall be borne equally.

This Written Determination is in full settlement of all claims submitted to this arbitration.

21

June 30, 2010

Dale A. Crawford, Arbitrator