# EXHIBIT T

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Claimant, | ) |
| | ) |
| | ) Case Nos.: Arbitrations filed against |
| v. | ) General Motors LLC under § 747 of the |
| | ) Consolidated Appropriations Act of 2010, |
| | ) Public Law No. 111-117 |
| | ) |
| Respondent General Motors LLC. | ) |

### RESPONDENT GENERAL MOTORS LLC'S ANSWERING STATEMENT TO CLAIMANT'S ARBITRATION CLAIM

Subject to and without waiving any objections, respondent General Motors LLC ("GM") submits its Answering Statement in response to Claimant's demand for arbitration:

### BACKGROUND

General Motors Corporation n/k/a Motors Liquidation Company ("Old GM") filed a voluntary petition for bankruptcy on June 1, 2009. As part of the bankruptcy proceedings, the United States Bankruptcy Court for the Southern District of New York approved the sale of certain Old GM assets to a new company (n/k/a General Motors LLC) under Section 363 of the U.S. Bankruptcy Code (the "Section 363 Sale").[1] A key component of the future viability of General Motors LLC was the Bankruptcy Court's approval of the assignment and assumption of Wind-Down Agreements that provided for the gradual phase-out of one or more GM linemakes then operated at various dealerships throughout the country. Subsequent to those rulings, Congress passed § 747 of the Consolidated Appropriations Act, 2010, Public Law Number 111-117, 123 Stat. 3034 (the "Arbitration Act"). The Arbitration Act gives certain dealers as defined

---

[1] The initial debtors were Motors Liquidation Company (f/k/a General Motors Corporation), MLCS, LLC (f/k/a Saturn, LLC), MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation), and MLC of Harlem, Inc. (Chevrolet-Saturn of Harlem, Inc.). Certain bankruptcy proceedings are the subject of appeals in the United States District Court for the Southern District of New York. See, e.g., Case Nos. 1:09-cv-06818, 1:09-cv-07794, 1:09-cv-07792, 1:09-cv-07011 (S.D.N.Y.).

COI-1434187v8

in the Arbitration Act the right to file an arbitration claim and seek relief regarding the narrow issue of the decision to send the dealer a Wind-Down Agreement. If the dealer is successful in prevailing on its claim in this proceeding, the arbitrator may compel GM to send a letter of intent to the dealer. If such dealer thereafter meets the requirements of the letter of intent and the other obligations under the Arbitration Act, it would be added or reinstated to GM's dealer network.

### The Dealer Network

A significant component of the Section 363 Sale included Court-approved efforts to help GM create a viable dealer network to compete in the marketplace with other leading manufacturers. Old GM's dealer network was outdated and poorly configured in numerous markets and had become a tremendous competitive disadvantage. The dealer network had developed over many decades, starting before the U.S. interstate highway system was even developed. The dealer network grew substantially during the 1950's and 1960's, a period in which Old GM held a dominant market share and there was little or no meaningful foreign competition. Subsequently, the market for new motor vehicles began to change dramatically as new foreign competition entered the market in a significant way. Import brands such as Toyota, Honda, Nissan, Hyundai and other manufacturers with lower cost structures and legacy benefit obligations began entering the market in increasing numbers.

These new manufacturers captured an increasing share of the automotive market over time and built dealer networks with larger, up-to-date facilities in some of the best locations in the country. As a result, Old GM faced increasing financial pressures as its market share declined in the face of this increasing foreign competition. Old GM's U.S. market share, for example, fell from approximately 45% in 1980 to 22% in 2008. The company had been focused on improving its dealer network for many years and had spent considerable resources on dealer network issues. Old GM, however, was unable to restructure its dealer network to keep pace

- 2 -

COI-1434187v8

with these changes. This resulted in an excess of dealerships in many markets, often in poor locations with outdated facilities and often with little or no significant investment capital. Many Old GM dealers had sales per store, also known as "throughput," well below expected or competitive levels and had marginal, if any, returns on investment, making it impossible or impractical for them to invest in their facilities or provide additional amenities to their customers. Historically, many foreign manufacturers achieved substantially more throughput than Chevrolet, Buick, Cadillac, and GMC Truck dealers. For example, for calendar year 2008, reported sales included:

| U.S. Car and Light-Truck Sales per Franchise, Total 2008 (totals for selected brands) | |
|---|---|
| Toyota division (includes Scion) | 1,589 |
| Honda division | 1,253 |
| Lexus | 1,158 |
| Nissan division | 785 |
| BMW division | 737 |
| Mercedes-Benz | 651 |
| Hyundai division | 509 |
| Chevrolet | 459 |
| GMC | 167 |
| Cadillac | 112 |
| Pontiac | 101 |
| Buick | 52 |

(Supplement to Automotive News, May 25, 2009, p. 2.)

Old GM's inefficient dealer network also adversely impacted the company's viability. Because of the dealers' insufficient throughput and only marginal network-wide profitability in many instances, Old GM was forced to expend substantial funding on dealer-related subsidies for,

- 3 -

among other things, wholesale floor plan support, margin support, and other programs or funds paid directly to dealers. In addition to the staggering costs associated with those dealer support programs, Old GM was forced to spend hundreds of millions of dollars in additional structural costs related to maintaining the large dealer network, including channel network alignment payments, sales and service consultant funds, dealer website funding, dealer IT systems and support costs, dealer employee training programs, and other programs. On top of those costs, Old GM also lost substantial sales from poorly performing dealers who did not meet customer expectations, provided poor customer service, provided poor overall customer satisfaction (thereby alienating these owners as future customers), or had other deficiencies such as substandard facilities. In addition to these historic challenges, several major economic events during 2008 and 2009, including an increase in gasoline prices, a worldwide recession, and other competitive forces, led to unprecedented financial distress for Old GM, resulting in Old GM's Chapter 11 filing.

### Economic Downturn And Liquidity Crisis

As a result of the economic crisis, in November 2008 Old GM was compelled to seek financial assistance from the U.S. government. In response to communications with Congressional leaders, on December 2, 2008, Old GM submitted a proposed viability plan (the "First Viability Plan") to Congress that addressed the efforts it intended to take to help the company rebound. Key elements of the First Viability Plan included a proposed reduction in brands, nameplates, and retail outlets to focus available resources and growth strategies on Old GM's more profitable operations. Economic conditions continued to worsen globally, however, further reducing the company's sales volume, revenue, and cash flow.

After December 2, 2008, the U.S. Treasury Department and Old GM entered into negotiations for federal loans, reaching agreement on December 31, 2008. The agreement

- 4 -

provided Old GM with loans to sustain operations through the First Quarter of 2009, providing necessary liquidity support while Old GM finalized its viability plans. In consideration for this temporary loan facility, Old GM was required to submit to the U.S. Treasury a detailed restructuring plan for the period 2009-2014 that demonstrated long-term viability, specifically including a plan to rationalize its outdated dealer network.

On February 17, 2009, Old GM submitted another viability plan to the U.S. Treasury Department (the "Second Viability Plan"), which sought to transform the company's business in the U.S. by concentrating the company's resources on Chevrolet, Cadillac, Buick, and GMC, phasing out other brands (e.g., HUMMER, Saab, and Saturn), and transforming Pontiac into a niche brand. The dealer network planning was one of many steps that Old GM proposed taking to transform the business in an effort to save other jobs, grow revenues, and preserve retirement benefits, among other things. The Second Viability Plan proposed streamlining the company's retail distribution channel to achieve a stronger, more effective dealer network by gradual reductions in the dealer network through 2014. In developing this plan, Old GM spent considerable time analyzing the market and the dealers in its network to determine the best way to achieve these goals. This focus on the dealer network was not new.

On March 30, 2009, President Obama announced that the Second Viability Plan was not satisfactory and did not justify a substantial new investment of taxpayer dollars. The Administration's designee announced that GM's plans did not go far enough in a number of business plans, including addressing Old GM's dealer network. The Administration's designee determined, for example, that Old GM "is currently burdened with underperforming brands, nameplates and an excess of dealers. The plan does not act aggressively enough to curb these

problems." (Auto Task Force, Determination of Viability Summary, General Motors Corporation, March 30, 2009, p. 1.) The Administration's designee further stated:

> In short, while the Company has made meaningful progress in its turnaround plan over the last few years, the progress has been far too slow, allowing the Company to continue to lag the best-in-class competitors. As a result, the President's Designee has found that General Motors' plan is not viable as it is currently structured. However, because of GM's scale, franchise, and progress to date, we believe that there could be a viable business within GM if the Company and its stakeholders engaged in a substantially more aggressive restructuring plan.

(Id.) The same report stated:

> GM has been successfully pruning unprofitable or underperforming dealers for several years. However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur. These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales.

(Id., p. 4.)

On March 30, 2009, the U.S. government set a deadline of June 1, 2009, for Old GM to demonstrate that its viability plan would fundamentally transform the company's operations into a profitable and competitive American car company. The President indicated that the U.S. Treasury would extend additional working capital for another 60 days to enable Old GM to continue operations and, as Old GM's largest secured creditor, would negotiate with Old GM to develop and implement a more aggressive and comprehensive viability plan that would answer the question as to whether the company had a "credible model for how not only to survive, but to succeed" in the competitive global market. (President Obama, Remarks on the American Automotive Industry, March 30, 2009.)

### GM's Process For Making Dealer Decisions And Bankruptcy Proceedings

As a result of an ongoing deterioration in the market and other factors, Old GM ultimately filed for bankruptcy on June 1, 2009. In the bankruptcy proceedings, Old GM sought approval to undertake and complete the Section 363 Sale to sell certain assets to a new company under terms and conditions approved by the Bankruptcy Court. The long-term viability and success of the purchasing company in the Section 363 Sale was dependent on, among other key parts of the business, modernizing the dealer network to allow the new company to compete more effectively with its competitors in the automotive industry.

In reviewing each of the dealers in its network, Old GM used an objective process to determine which dealers would be selected for complete Wind-Down Agreements. As set forth in disclosures made available to the dealers, very small dealers with new GM vehicle sales under 50 sales per year and very poorly performing dealers in terms of dealership operations or other criteria were selected. Factors considered as part of this process included: (1) sales effectiveness; (2) customer satisfaction; (3) dealer capitalization; and (4) dealer profitability. In this process, GM used an objective, metric-based approach based on measures contained in the Dealer Sales and Service Agreement, which the dealers are familiar with and which utilize data relied upon throughout the motor vehicle industry. In addition, Old GM reviewed other aspects of the dealer's operations, location, and facilities. In certain circumstances, including situations involving "partial" wind-downs, dealer network factors such as dealer throughput and network viability also came into play. The company spent considerable time analyzing and reviewing the operations of each dealer in its network as part of this process.

A significant reduction in the number of dealer rooftops was key to allowing GM to compete more effectively in the market. The parties also determined that these reductions would allow the new company to begin to systematically reduce dealer support programs and other

- 7 -

structural costs. In addition to the substantial cost savings that would be realized from the reduction in dealerships, the contemplated reductions in the number of dealerships would bring the purchaser's dealership footprint closer in line with major competitors in markets throughout the country. The remaining dealers could enjoy improved throughput, enabling them to re-invest capital in their dealerships, attract new investments and personnel, and compete more effectively in facilities, locations, staff, amenities, and other criteria that consumers have come to expect in today's marketplace.

It was recognized that the dealer reductions were part and parcel of a difficult and painful bankruptcy. Indeed, many of the parties adversely affected by the bankruptcy process were employees, retirees, stockholders, bondholders, and suppliers, among others. All sacrificed substantially in order to try to make GM viable for the long run. To temper these effects, the Section 363 Sale allowed an orderly wind-down rather than an abrupt cutoff of those dealerships that were not being retained as was permissible under the Bankruptcy Code. Old GM assumed and assigned Wind-Down Agreements with most of the dealers that would be exiting their markets under Court orders approved in the bankruptcy proceedings. In his Decision overruling certain objections, Judge Gerber specifically endorsed the Wind-Down Agreements:

> All concerned with GM's future knew that GM had to slim down and improve its dealer network, and that this required modifying dealer agreements before they were assumed and assigned—a process that led to the Participation Agreements. Similarly, as an alternative to simply leaving dealers who would otherwise be terminated in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other rights – a process that led to the Deferred Termination Agreements [Wind-Down Agreements]. Those offers secured widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.
>
> The alternative, in each case, was rejection. Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights. But here GM was not

- 8 -

> obligated, as a matter of law, to choose between leaving its dealer contracts unmodified or rejecting them. It could, it if wished, offer its contract counterparties deals that would more appropriately meet each side's needs and concerns, without fear that such deals would be subject to collateral attack by reason of assertions of coercion.

(Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement, p. 75-76, No. 09-50026, Bankr. S.D.N.Y., July 5, 2009, see also related Errata Order July 6, 2009.)

Under the Wind-Down Agreements, the nonretained dealers received financial assistance and were permitted to continue certain operations subject to various terms and conditions until October 2010 when their dealer agreements would otherwise expire at the end of their terms. Although the dealer agreements could simply have been rejected outright in the bankruptcy proceedings, as Judge Gerber noted, these Court-approved agreements allowed the individual dealers time and assistance in transitioning out of the business. Put simply, but for the wind down program and the consideration offered, the Claimants' applicable dealer agreements that were made part of the wind down program would have already ended.

### Congressional Action

After the Section 363 Sale was approved by Bankruptcy Court order and the closing on the sale was completed, the new company, now known as General Motors LLC, began operations under the terms and conditions approved by the Court. In response to requests by the outgoing dealers, however, Congress passed the Arbitration Act. The Arbitration Act does not change the Wind-Down Agreements in any way and they remain in full force and effect. The Arbitration Act gives eligible dealers a limited right to seek to have GM issue a letter of intent to add or reinstate them to GM's dealer network under the criteria provided for in the Act. The

- 9 -

COI-1434187v8

Claimant has demanded arbitration under that statute seeking the relief provided by the statute and therefore carries the burden of proof in this proceeding. GM contends that Claimant's claims and requests for relief lack merit and that Claimant's claims should be rejected. GM denies that the Claimant is entitled to any requested relief under applicable law and, subject to the presentation of evidence at any hearing held in this matter, otherwise denies Claimant's claims.

By filing this Answering Statement and participating in this proceeding, GM does not waive any objections it may have to this proceeding. The sole and exclusive authority for this proceeding is the Arbitration Act, and GM reserves the right to object to any requests, allegations, or claims outside the Arbitration Act. Depending on the Claimant's claims at the hearing, GM reserves the right to raise any and all affirmative defenses under applicable law and reserves the right to contest the jurisdiction of the arbitrator, the arbitrability of any claim, or the applicability of the AAA's rules to this proceeding. GM also reserves the right to object to the application of any of the AAA's Commercial Arbitration Rules where appropriate or where such rules are otherwise inconsistent with the provisions or purposes of the Arbitration Act. GM will address these issues in accordance with any schedule for this case.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims fail to state a claim upon which relief may be granted.

CO1-1434187v8

### SECOND AFFIRMATIVE DEFENSE

2.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to object to the jurisdiction of the arbitrator or the statutory authority to adjudicate claims in this proceeding or the arbitrability of any claims.

### THIRD AFFIRMATIVE DEFENSE

3.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by principles of preclusion, collateral estoppel, and/or res judicata.

### FOURTH AFFIRMATIVE DEFENSE

4.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by the principles of waiver and/or estoppel.

### FIFTH AFFIRMATIVE DEFENSE

5.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to contest Claimant's standing or status as the real party in interest, including but not limited to Claimant's standing to proceed or otherwise contest any allegation that Claimant meets the requirements of the Arbitration Act.

### SIXTH AFFIRMATIVE DEFENSE

6.  Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by the applicable limitations period set forth in the statute.

### SEVENTH AFFIRMATIVE DEFENSE

7. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by prior written agreements.

### EIGHTH AFFIRMATIVE DEFENSE

8. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred in whole or in part by the parol evidence rule and/or the Statute of Frauds.

### NINTH AFFIRMATIVE DEFENSE

9. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by the doctrine of mootness.

### TENTH AFFIRMATIVE DEFENSE

10. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by payment and release.

### ELEVENTH AFFIRMATIVE DEFENSE

11. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims are barred by accord and satisfaction.

### TWELFTH AFFIRMATIVE DEFENSE

12. Depending on Claimant's claims in this proceeding and subject to further inquiry, GM reserves the right to argue that Claimant's claims fail for lack of consideration.

## THIRTEENTH AFFIRMATIVE DEFENSE

13. GM reserves the right to raise any additional affirmative defenses that may be available under applicable law depending on Claimant's claims and/or the evidence introduced at the arbitration hearing.

_____
On behalf of Assigned Counsel in Individual Arbitrations[2]

Jeffrey J. Jones
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215-2673
Telephone: (614) 469-3939
Facsimile: (614) 461-4198

---

[2] Assigned counsel from the law firms listed in this Answering Statement have already entered appearances or will be entering appearances in each of the arbitrations filed. This Answering Statement shall be deemed filed by assigned counsel in each of the matters in which they are appearing.

COI-1434187v8

## OTHER ASSIGNED COUNSEL

James C. McGrath
Bingham McCutchen LLP
One Federal Street
Boston, MA  02110-1726

Joseph E. O'Neil
Lavin O'Neil Ricci Cedrone & DiSipio
190 North Independence
Mall West, Suite 500
Philadelphia, PA 19106

A. Erin Dwyer
Figari & Davenport, LLP
3400 Bank of America Plaza
901 Main Street
Dallas, Texas  75202

David G. Radlauer
Jones Walker
201 St. Charles Avenue
New Orleans, LA 70170-5100

Mark S. Lillie
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Kenneth K. Skogg
Lowe, Fell & Skogg LLC
Republic Plaza
370 Seventeenth Street
Suite 4900
Denver, CO 80202

Gregory Oxford
Isaacs, Clouse, Crose & Oxford LLP
21515 Hawthorne Blvd.
Suite 950
Torrance, CA  90503

Lawrence J. Murphy
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226

Dwight J Davis
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA 30309

S. Thomas Wienner
Wienner & Gould, P.C.
950 W. University Dr., Ste. 350
Rochester, MI  48307

Lloyd E Ferguson
Strasburger
600 Congress Avenue Suite 1600
Austin , TX  78701.2974

Kyle H. Dreyer
Hartline, Dacus, Barger, Dreyer & Kern, LLP
6688 N. Central Expy.
Suite 1000
Dallas, TX 75206

Daniel J. LaCombe
Barris, Sott, Denn & Driker, P.L.L.C.
211 W Fort St.
15th Floor
Detroit, MI 48226-3202

Victor J. Torres
Williams Acosta PLLC
535 Griswold
Suite 1000
Detroit, MI 48226

Michael P. Cooney
Dykema
400 Renaissance Center
Detroit, Michigan 48243

Jeffrey A. Lipps
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio  43215

## CERTIFICATE OF SERVICE

Pursuant to an agreement with the American Arbitration Association, this Answering Statement is being submitted to the American Arbitration Association for filing in all of the pending arbitration cases filed against General Motors LLC under § 747 of the Consolidated Appropriations Act of 2010, Public Law No. 111-117. The American Arbitration Association has agreed to file the Answering Statement in all of the pending matters filed against GM and forward the Answering Statement to all Claimants or their representatives.

_____
On behalf of Assigned Counsel

COI-1434187v8