# EXHIBIT U



Ken. W. Cole
Vice President, Public Policy and
  Government Relations
General Motors Company
Public Policy Center
25 Massachusetts Avenue, N.W.
Washington, D.C. 20001

September 11, 2009

The Honorable Richard J. Durbin         The Honorable Steny H. Hoyer
Assistant Majority Leader               Majority Leader
United States Senate                    United States House of Representatives
S-321 The Capitol                       H-107 The Capitol
Washington, DC  20510                   Washington, DC  20510

Dear Senator Durbin and Leader Hoyer:

GM appreciates the invitation to participate in efforts to reach an amicable, non-legislative solution to concerns raised by dealers.  Thank you for your leadership of this effort.  GM values our dealers and recognizes the contributions they are making to the future viability of the company and their importance to communities across the country.

Regarding the concerns raised by dealers, it is important to acknowledge that GM has already made very significant concessions to address them.  We urge you to consider these concessions when determining whether GM has met the legitimate issues that can be attributed to its dealer restructuring.  Moreover, GM dealer restructuring efforts, because of GM's unique wind down agreements, are different than Chrysler's.  Many, if not most, of the concerns raised now by dealers are relevant only to the Chrysler dealer restructuring and not applicable to GM.  The dealer groups that have continued to insist that additional measures be taken by GM fail to understand that these concerns either have been addressed or would be flatly inconsistent with the bankruptcy court's decisions.  Over 99% of GM dealers offered wind down agreements signed them.  To date, 208 have requested to complete their wind down of the dealer agreement early, with approximately one third of those -- or about 70 -- having completed the wind down.  Many more wind down dealers will continue operating as GM or other brand dealers.

While GM has not seen the latest list of dealer demands, we understand that they fall into five categories.  Below is a description of what GM has already done to address legitimate concerns in each category:

I.      **Reinstatement for terminated dealers**

Reinstatement is an issue only for terminated Chrysler dealers.  GM has not terminated any dealerships as a part of the dealer restructuring.

GM instead designed a unique wind down approach that allows dealers to remain in business until October 2010 when their existing five-year sales and service agreement is



set to expire. GM used objective criteria to identify wind down dealers (described below) and importantly created -- and then extended -- an appeals process to reconsider wind down decisions.

GM initially allowed dealers until mid-June to appeal the wind down decision. In response to dealer concerns and to conduct a robust appeal review, GM extended the appeal process to allow dealers through August 7 to appeal the decision. GM invited dealers to provide us with any information they believed relevant to the decision. GM utilized objective criteria and dealer performance data to assess and make wind down decisions, and the appeal process allowed the dealers to present any information they felt was relevant to the decision.

GM conducted a painstaking, extensive review of literally hundreds and hundreds of review requests and ultimately reversed the wind down decision in over 70 situations. All dealers had an opportunity to submit a review request.

II.     **Ability to reenter the same market area post-termination**

When dealers first raised the question of whether and if so, how, they would be allowed to reenter a market they previously served, GM worked to develop a process to provide for this. GM has agreed to the following:

> *If GM determines in the future that it needs to re-establish a new dealership in an area formerly served by a dealership that was wound down, GM will provide that dealer (and any other wound-down dealership in the area or other interested candidates) with the opportunity to submit a proposal to GM to establish that new dealership. GM would review all such proposals in line with its normal business procedures and select the proposal that it determined was the best one for that particular market.*

It is important for GM dealers to be located in key areas of the country to satisfy customer needs for sales and service. GM has carefully considered our dealer network coverage in rural areas and small towns versus urban/suburban markets. We know that our strong presence in rural areas, small towns and "hub" towns gives us a strong competitive advantage on average of more than 10 points in market share, and we are going to maintain that advantage. When our rural and small town dealers perform to our standards, they are a tremendous asset; therefore, we intend to retain an extensive rural network of 1,500 dealers nationally, far more than any other automotive manufacturer.

With this comprehensive network in place, we are confident we will continue to provide all of our customers with reasonable access to dealers and service. However, we periodically conduct market analyses to ensure that there is sufficient representation of GM dealers so that we meet the needs of customers, especially in rural areas.

Page 2

ARBITRATION CONFIDENTIAL

GMARBE-000000390



### III. Arbitration for terminated dealers

As stated above, GM has not terminated any dealerships as part of its restructuring efforts. Rather, GM created a unique wind down process that allows dealers to remain in business until October 2010, when their current vehicle sales and service agreement expires. Over 99% of dealers GM has identified to be wound down have signed the wind down agreements.

While the selection process GM used to identify dealers to be wound down was objective and data-driven, we recognized the importance of making the best decision possible. To ensure the decisions were based on the best available data and all circumstances, we put a process in place that invited dealers to submit any information they felt relevant for review. Over 1300 requests for review were submitted and investigated by a vehicle sales, service and marketing team. In the vast majority of cases no new information was provided and the dealer was notified that there was no change in the decision. However, in a number of cases, information that impacted the performance data or other unique circumstances were submitted and subsequently reviewed in depth with the dealer. Thanks to careful review of the submitted dealer review requests, we have reversed 70 wind-down decisions to date. The appeals process took place over more than a two-month period.

The concept of a third party arbitration -- involving state law – runs directly contrary to settled law and the bankruptcy court's decisions. The bankruptcy court has already reviewed and approved the wind down agreements and process, and the decision of that court is now final. No dealer or group representing dealers appealed this decision. GM and the dealers have acted on this final decision, including GM paying approximately $100 million to winding down dealers pursuant to the wind down agreements. Moreover, it would be impossible from a practical standpoint to conduct hundreds upon hundreds of individual arbitrations reviewing each wind down decision. Arbitration is something to which GM cannot agree.

### IV. Processes and rules applicable to dealers who are winding down (i.e., purchasing vehicles, trading vehicles, winding down prior to October 2010)

As compared to a bankruptcy court's standard rejection of contracts or a liquidation scenario, GM's wind down process is far superior to what dealers, whose contracts would otherwise have been completely rejected -- with no financial compensation -- in bankruptcy court would normal expect. GM provided each wind down dealership until October 2010 to wind down their businesses. GM did not, and has not, publicly announced the list of wind down dealers. GM believes it is extremely important to allow dealers to communicate this information to their employees and customers at the time and in the manner the dealer feels appropriate.

Page 3



GM also provided each of these dealerships with substantial financial assistance – generally 8 months of "rent support" based on the dealer's operating report plus $1,000 per new vehicle in the dealer's stock at the end of May. The total amount of GM financial assistance is about $600 million (the exact amount depends on the outcome of the potential sale of Hummer, Saab and Saturn). In mid July, GM paid more than $100 million of this amount to the wind down dealers as called for in their agreements. The remaining funds will be paid as the dealers wind down their operations.

a. **Wind down dealer activities:** Winding down dealerships may continue to sell their new vehicle inventories and service vehicles, and can do so, if they choose, through October 2010 when the dealer agreement expires. Dealers can still obtain "stock" new vehicles by dealer trading with other dealers. GM is also satisfying each bona fide sold customer order placed by dealers before the wind down agreement became effective.

b. **Acceleration of wind down payments:** GM is working with individual dealers to satisfy their requests to accelerate receipt of the rest of the financial assistance GM agreed to provide the dealers when they completed their wind down. To date, 208 wind down dealers have asked GM to accelerate the wind down process for the dealer agreement, choosing to cease those dealership operations now instead of waiting until October 2010 when their dealer agreements expire. About 70 of these dealerships have already actually completed the wind down of the dealer agreement. GM has agreed to pay these dealers, pursuant to the wind down agreement, the remaining 75% of their wind down financial assistance now as well. More of these early termination requests are coming in every day. GM is processing these requests and is prepared to promptly pay the amounts owed to those dealers under the terms of their wind down agreements with GM. The proposed congressional legislation could upset these plans and potentially have these GM dealers closing up without the financial assistance the dealers are counting on and which GM would otherwise provide.

c. **Placement assistance for dealer technicians:** GM has also agreed to provide assistance to technicians working at dealerships to be wound down. GM is proud of the dealer technicians who service GM vehicles. Many of these technicians are highly trained and possess multiple technical certifications. Factory trained individuals with these skills and credentials are highly sought after in the industry. GM shares concerns that these technicians may lose their current positions. GM has already committed to taking actions, such as by making training records and certifications available, with technician consent, to employment services and resume sites. In addition, GM has already begun a review with our National Dealer Council to develop ideas on how GM can help the dealers' technicians transition to other dealerships.

Page 4

ARBITRATION CONFIDENTIAL

GMARBE-000000392



V. **Transparency**

GM has been and agrees to continue to be transparent in its decisions and actions regarding its dealer restructuring. In determining which dealers would be wound down GM used specific objective measurements to identify the performance criteria by which the dealerships to be wound down were selected.

- GM sent wind down agreements to:
    - Dealers with an overall dealer performance score (DPS) of less than 70 (on a scale where 100 is average, thus less than 70 is very poor performing)
    - Dealers selling less than 50 new vehicles a year
    - Dealers with Non-GM Brands under the same roof, and other dealer performance issues
    - Dealers selling phased out brands, such as Pontiac, or dealer networking situations impacted by the Pontiac phase-out (Over 600 dealers selling Saab, HUMMER, and Saturn brands were sent deferred termination agreements but these dealers are expected to continue to operate under new ownership if GM completes the sale of those brands)
    - Dealers in an unprofitable position 3 years in a row with inadequate working capital

- DPS score is comprised of four Category Scores added together to total an *Overall Score* for the portfolio:
    - Sales – Weighted at 50% measured against appropriate average for size of market (i.e. measuring relative performance against dealers in similar size markets in the state)
    - Customer Satisfaction Index – Weighted at 30% measured against regional average (GM has 5 regions in U.S.)
    - Capitalization – Weighted at 10% measured against dealer's needed working capital standard
    - Profitability – Net profits before taxes weighted at 10%
    - Overall – A score of 100 is average; below 100 indicates a performance issue with 70 or below indicating extremely poor performance

Other dealerships identified with serious performance issues were dealerships with a DPS score under 80 and dealers with very poor sales performance (these dealers had retail sales index (RSI) of less than 70 on a scale where 100 is just average performance). These dealers were also sent wind down agreements.

Page 5

ARBITRATION CONFIDENTIAL                                                                                                 GMARBE-000000393



**Participating dealers:**

Dealers and dealer groups separately raised issues concerning the agreement that dealers signed to continue to participate in the GM dealer network after October 2010. As background, here is a list of additional steps that GM already has taken voluntarily on the dealer issues related to dealers who are continuing in GM's dealer network:

1. Sales and inventory issues would be mutually agreed upon in individual dealer business meetings.

2. Exclusivity (non-GM brand prohibition) would only apply to the showroom rather than entire dealership facility.

3. Need for new facilities or changes would be mutually agreed upon, including the timeframe for issue resolution.

4. GM's remedies for breach of Participation Agreement would be addressed under the Dealer Agreement mediation process allowing Dealers significant rights.

5. Agreed that "No Protest" waiver only applies to relocations and re-establishment of previously existing dealerships and only for two years.

6. Normal choice of law rules apply so that state franchise laws not impacted with respect to the participation agreements.

7. Agreed State Franchise Laws would apply to participation agreements and GM after New GM emerged from bankruptcy and this is set forth in bankruptcy court order.

8. Agreed that any disputes involving the participation agreements would be resolved under applicable law in local courts or commissions.

9. Bankruptcy court did not retain jurisdiction over this Participation Agreements.

10. Bankruptcy court retains jurisdiction of Wind Down Agreements to ensure uniform enforcement.

GM appreciates the opportunity to participate in the effort to resolve dealer concerns in a non-legislative way. Dealers are critical to the success of the new GM and we do not underestimate the impact that dealer restructuring has on them, their families and their

Page 6

ARBITRATION CONFIDENTIAL

GMARBE-000000394



communities. We appreciate the support of all the stakeholders who have made substantial sacrifices to enable GM to position itself for the future.

We look forward to a constructive and positive resolution of this important issue.

Sincerely,

Ken W. Cole
Vice President, Public Policy and Government Relations

Page 7

ARBITRATION CONFIDENTIAL                                                                                              GMARBE-000000395