KRAMER LEVIN NAFTALIS & FRANKEL LLP

October 8, 2010

<u>VIA ECF AND HAND DELIVERY</u>

The Honorable Robert E. Gerber
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

      Re:   *Motors Liquidation Company, et al.*, Case No. 09-50026

Dear Judge Gerber:

      On behalf of the Creditors' Committee, we respectfully request leave to file this response to the October 1, 2010 letter submitted by Trevor Swett in further support of the ACC's proposed anonymity protocol.[1]

      The ACC's prior submission to the Court, dated September 17, advanced two alternate anonymity proposals – a "strong" version and a "compromise" version. In its latest submission, the ACC abandons the first of these two proposals in favor of the latter. Remarkably, however, the ACC makes only the barest attempt to respond to the arguments advanced in our September 20 letter concerning the glaring deficiencies of that proposal. For the most part, the ACC simply ignores our detailed showing that (a) the August 24, 2010 Protective Order negotiated by the parties and entered by the Court is sufficient, by itself, to protect claimants' legitimate confidentiality concerns; and (b) the ACC's "compromise" proposal would deprive the Creditors' Committee of data vital to its estimation analysis (thereby skewing the estimation outcome upward), while at the same time providing no additional confidentiality protections whatsoever.

---

[1] The Court's September 15, 2010 Order [docket no. 6934], which established a briefing schedule concerning the ACC's proposed anonymity protocol, did not contemplate that any party would file more than a single submission on this subject. Rather, that Order permitted the ACC to file a single written submission (by September 17) and required any responses to that submission to be filed by September 20. The ACC has nevertheless seen fit to file a further submission. If the Court accepts that unauthorized submission, we ask the Court to accept this reply as well.

1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036-2714   PHONE 212.715.9100   FAX 212.715.8000   WWW.KRAMERLEVIN.COM
ALSO AT 47 AVENUE HOCHE   75008 PARIS FRANCE

KL2 2669475.2

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Hon. Robert E. Gerber
October 8, 2010
Page 2

### A. The Heavily-Negotiated Protective Order is Sufficient to Protect Claimants' Legitimate Confidentiality Concerns

Most fundamentally, the ACC provides no good reason why the Protective Order is not fully adequate to preserve the confidentiality of the data that the Trusts will be producing. The ACC makes no attempt to rebut our showing that (i) the Bates White firm is routinely entrusted with highly sensitive data (including tax returns, credit card statements and other data more sensitive than that involved here); (ii) Bates White has always adhered strictly to the terms of governing confidentiality agreements; and (iii) no interest of either Bates White or the Creditors' Committee would even arguably be furthered by the improper disclosure of the names or social security numbers of individual claimants (as distinct from aggregate claimant data, the protection of which is not at issue here). *See* Sept. 20 letter at 2-3.

The ACC appears to think it is self-evident that the data involved here is uniquely "sensitive" and in need of an extraordinary level of protection. In fact, however, the claimant data that the Trusts will be producing is no more sensitive than information that is routinely produced in both state and federal court litigation. As the Court will recall, the Rule 2004 Order entered on August 24, 2010 permits the Trusts to redact all medical information, all personal financial information, and all information concerning claimants' family members. *See* Rule 2004 Order at ¶ 5. All that will be produced are the claims filed against the trusts, the payments made by the trusts, and claimants' social security numbers. While a tiny subset of this data (the social security numbers) is undeniably sensitive, it is far from clear that the remaining data – the claims filed against the trusts and the trusts' payments to claimants – is entitled to *any* confidentiality protection, let alone the enhanced protection demanded by the ACC.[2]

---

[2] The ACC asserts that, in the state courts, trust payments "typically are disclosed, if at all, only *after* the non-settling defendant has suffered an adverse verdict . . . ." (Oct. 1, 2010 letter at 4 & n. 2; emphasis in original.) This is simply untrue. The ACC cites only a single authority (*N.Y. Jurisprudence 2d*) in support of this proposition, and it simply ignores the multiple contrary authorities cited in our September 20, 2010 letter (at page 4). Equally important, even those courts that do not permit disclosure of trust payments prior to trial do *not* do so on the ground that this data is particularly sensitive, but rather on relevance grounds.

Just last month, Judge Bernstein denied the motion of a group of asbestos claimants' law firms for a sealing order to protect the confidentiality of documents showing the settlement amounts received by each settling law firm's clients. *In re Quigley Co.*, 2010 WL 3528818 (Bankr. S.D.N.Y. Sept. 8, 2010), at *36-38. Although Judge Bernstein permitted personal identifying information about individual claimants to be redacted from publicly filed documents (though not withheld from production), he declined to seal the settlement amount data. Following recent rulings by other courts in this District, Judge Bernstein held that settlement amounts do not constitute "commercial information" entitled to protection under Bankruptcy Code § 107(b)(1) and Bankruptcy Rule 9018. *Id.* (collecting authority).

KL2 2669475.2

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Hon. Robert E. Gerber
October 8, 2010
Page 3

       The ACC asserts (at page 3) that "the policing of compliance" with the Protective Order will somehow be more difficult here than in most cases. In fact, the opposite is true. Compliance with a confidentiality order is generally "policed," if at all, only by the parties to the action, who are usually few in number and seldom wealthy. Here, in contrast, a virtual Scotland Yard of investigators, funded by the ample resources of the asbestos plaintiffs' bar, will in all likelihood be poised to pounce upon and bring before this Court any suspected violation of the Protective Order.

       As the Court is aware, the courts have long relied upon protective orders to preserve the confidentiality of information far more sensitive than that involved here – even data as sensitive as Coca-Cola's secret formulas. The seminal case is *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288 (D. Del. 1985). There, the court acknowledged the extreme sensitivity of Coca-Cola's formulas, which were kept in a bank vault and were known to only two living persons, who themselves were forbidden even to travel on a plane together. *See id.* at 284. Nevertheless, the court ordered Coca-Cola to produce its formulas, subject to entry of "an appropriate protective order" (107 F.R.D. at 293):

> I am . . . aware that an order compelling disclosure of the Company's secret formulae could be a bludgeon in the hands of plaintiffs to force a favorable settlement. . . . [However], except for a few privileged matters, *nothing is sacred in civil litigation*; even the legendary barriers erected by the Coca-Cola Company to keep its formulae from the world must fall if the formulae are needed to allow plaintiffs and the Court to determine the truth in these disputes.

107 F.R.D. at 290 (emphasis added); *see also id.* at 293 ("The balance between the need for information and the need for protection against the injury caused by disclosure is tilted in favor of disclosure once relevance and necessity have been shown. As the Supreme Court has recognized, 'orders forbidding any disclosure of trade secrets or confidential commercial information are rare.'") (citing *Federal Open Market Comm. v. Merrill*, 443 U.S. 340, 362 n. 4 (1979)).

       The *Coca-Cola* decision has been followed by many courts, including courts in this District. *See, e.g., Rywkin v. New York Blood Center*, 1998 U.S. Dist. LEXIS 13490 (S.D.N.Y. Aug. 31, 1998) (ordering production of blood center's confidential research materials under a protective order); *Heublein Inc. v. E&J Gallo Winery, Inc.*, 1995 U.S. Dist. LEXIS 4521 (S.D.N.Y. Apr. 7, 1995) (ordering disclosure of Gallo's secret formula under a protective order). Each of these cases involved information more sensitive than the trust claim materials at issue

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Hon. Robert E. Gerber
October 8, 2010
Page 4

here, yet in each case, the court concluded that a standard protective order was sufficient to preserve confidentiality.

For all of these reasons, the Court should adhere to its observation, at the August 9, 2010 hearing, that it will not "presume or assume noncompliance with" the Protective Order negotiated by the parties and entered by the Court. (Tr. of Aug. 9, 2010 hearing at 103; *see also id.*: "In ten years on the bench, [the Court has] never had any such noncompliance.") There is no reason to believe that the experienced and highly-regarded professionals retained in this case will be any less than fully compliant with their obligations under the Protective Order.

### B. The Proposed Anonymity Protocol Would Deprive the Creditors' Committee of Data Vital to its Estimation Analysis, Thereby Skewing the Outcome in the ACC's Favor, While Providing No Additional Confidentiality Protections

In addition to being unnecessary, the anonymity protocol proposed by the ACC would do precisely what the Supreme Court and courts in this District have ruled should not be done: It would bar disclosure of data highly relevant this proceeding on the unfounded ground that a protective order would not provide sufficient confidentiality protection. Specifically, the proposed protocol would require the third-party neutral to redact and not produce to the parties' experts a long list of data fields, including, among others, the identity of each claimant's law firm, the dates on which each claimant filed his or her lawsuit and his or her claim against each trust, and each claimant's job site history.

Our September 20 letter explained in some detail (at page 7) the relevance of each of the key data fields just noted. In response, the ACC's October 1 letter simply ignores our showing of the importance of (i) the identity of each claimant's law firm and (ii) the dates on which each claimant filed his or her claims against GM and against the Trusts (a showing that the ACC calls "far-fetched" but does not attempt to rebut). As for the importance of job site information, the ACC points out that the parties' experts do not need to know the identity of the particular auto repair shop or shops at which any given claimant worked. This is true, but it misses the real point: The experts need to know all of the job sites (not just auto repair shops) at which each claimant worked, in order to determine the claimant's eligibility for payment from the various trusts that have not yet processed his claim – since eligibility for payment often turns on whether the claimant worked at specified job sites at which the defendant's product was present.

The ACC's October 1 letter also completely ignores our showing that its proposal would deprive the parties' experts of the ability to audit the third-party neutral's work. *See* Sept. 20 letter at 6, 8. As we explained, much of the work that the neutral would do, including its merging and "de-duplicating" of the data, is not merely ministerial or mechanical; to the

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Hon. Robert E. Gerber
October 8, 2010
Page 5

contrary, this work involves the application of sophisticated procedures about which estimation experts often disagree.

In addition, the ACC's October 1 proposal actually compounds the deficiencies of its prior "compromise" proposal. The proposed order that accompanies the ACC's October 1 letter fleshes out that earlier proposal in a few respects – and this added detail does not alleviate any of its problems but, to the contrary, compounds them. To mention only one example, the proposed order (at ¶ 3) forbids the third-party neutral to merge data provided by Bates White with data supplied by the Trusts unless the data supplied by Bates White contains at least two of three specified data fields (social security number, first and last name, and date of birth). This rigid and onerous requirement will skew the experts' resulting estimates in an upward direction.

Finally, the ACC provides no serious response to our showing that its "compromise" proposal provides no additional confidentiality benefits whatsoever – that is, it provides no protections against either an intentional violation or an inadvertent violation of the Protective Order. *See* Sept. 20 letter at 8-9.

The ACC's sole response to this crucial point is to denigrate the alternative (and vastly simpler) protocol proposed in our September 20 letter as "mere window-dressing," because it would not prevent deliberate violations of the Protective Order by the parties' experts. (Oct. 1 letter at 6.) In so arguing, the ACC overlooks the all-important distinction between deliberate and inadvertent violations of the Protective Order. As we explained – and as the ACC does not dispute – the ACC's proposal will not prevent any expert, if so inclined, from recovering personal identifying information for the vast majority of claimants in a matter of hours. This would be a simple task, which could be accomplished with minimal effort. Consequently, if the objective of this protocol is to prevent *deliberate* violations of the Protective Order, it fails utterly.[3] If, on the other hand, the purpose of the ACC's protocol is to prevent *inadvertent* violations of the Protective Order, that goal could be accomplished through the much simpler mechanism proposed in our September 20 letter (at 8-9) – an approach that would involve none of the very substantial complications and adverse consequences of the ACC's proposal.

---

[3] Regrettably, the ACC persists in its unfounded suggestion that the Creditors' Committee has been less than clear in disclaiming any intention to "circumvent[] the protocol." (Oct. 1 letter at 3-4 n. 1.) It goes without saying, of course, that none of the Committee's professionals would ever circumvent any protocol adopted by this Court – and we have certainly never suggested otherwise. The ACC's confusion on this point appears to stem from its failure to grasp the point just noted – namely, that if the goal of its protocol is to prevent deliberate violations of the Protective Order (a goal that is unnecessary because none of the professionals retained in this case would ever engage in such misconduct), the protocol fails to accomplish that objective.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Hon. Robert E. Gerber
October 8, 2010
Page 6

\*     \*     \*

   We close with a few words concerning timing. As the Court will recall, the Rule 2004 Order entered on August 24, 2010 contains a detailed and rather lengthy schedule designed to accommodate the confidentiality concerns of the ACC and the Trusts, as well as Due Process considerations. To that end, the Order gives individual mesothelioma claimants the opportunity to object to the subpoenas that the Creditors' Committee will be serving on the Trusts. Due to the length of time that this individual-claimant objection process will take, the Trusts will not be required to produce the subpoenaed data until more than a month after the Court rules on the pending anonymity protocol dispute.[4] The production of the trust data is a "gating point" in the estimation process, given that expert reports cannot be prepared until after the experts have had the opportunity to review and analyze the trust data.

   As noted in our September 20 letter (at 9), we are prepared to present the testimony of Dr. Charles Mullin of Bates White at the upcoming hearing on the anonymity protocol dispute if the Court believes that testimony would be helpful. Given the parties' desire for a prompt ruling on this dispute, so as not to delay the overall estimation proceeding, we respectfully request that, if the Court wishes to hear testimony in connection with this dispute, it hear such testimony at the scheduled October 21, 2010 hearing, rather than at a later hearing.

         Respectfully submitted,

         Philip Bentley

---

[4] The Rule 2004 order provides that the Creditors' Committee may not serve its subpoenas on the Claims Processing Facilities and the Trusts until this Court has entered an order resolving the anonymity protocol dispute; that the Claims Processing Facilities must then give notice as soon as reasonably practicable thereafter (but in any event within eight business days) to the mesothelioma claimants; that those claimants then have two weeks to file objections, if any; that the Creditors' Committee and other parties then have five business days to respond to any such objections; and that the Trusts then have up to five days from the date of the Court's order resolving those objections to produce the subpoenaed data.

KL2 2669475.2

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Hon. Robert E. Gerber
October 8, 2010
Page 7


cc (by email):

Stephen Karotkin, *Counsel to Debtors*
Joseph Sgroi, *Counsel to New GM*
Trevor Swett, *Counsel to Asbestos Claimants' Committee*
Sander Esserman, *Counsel to Future Claims Representative*
Stephen M. Juris, *Counsel to Certain Trusts*
Emily Stubbs, *Counsel to Manville Trust*

09-50026-mg    Doc 7286    Filed 10/08/10    Entered 10/08/10 19:13:46    Main Document
Pg 7 of 7

KRAMER LEVIN NAFTALIS & FRANKEL LLP