# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

IN RE,

GENERAL MOTORS CORP., ET AL.,

DEBTORS.



### CASE# 09-50026

## RESPONSE TO THE NINTY-EIGHTH OMNIBUS

## OBJECTION OF DEBTOR

COMES NOW, PLAINTIFF SHERIF RAFIK KODSY, AS PRO'SE, ACCORDING TO Rule 9014, STATES THAT THE CLAIM BEING OBJECTED TO, BY DEBTORS IN THE NINTY-EIGHTH OMNIBUS OBJECTION, IS IMPROPER AND ONLY GOES TO PROVE THE CLAIM HEREIN IS VALD AND PAST DUE, AS IT DEMONSTRATES, FRAUD, CONSPIRACY, CARELESS DISREGARDS TO THE CLAIMANT'S CLAIMS, FINANCIAL HARDSHIPS AND SUFFERING HEALTH AS A RESULT OF A PRODUCT DEFECT THAT THE GENERAL MOTORS REFUSES TO HONOR, AS THEY WERE INVOLVED WITH FRAUD, CONSPIRACY, GROSS NEGLIGENCE, STRICT LIABILITY, PERSONAL INJURY, DISCRIMINATION, BAD FAITH , PERJURY AND BRIBERYAS THEY ARE FURTHER LIABLE

FOR PUNITIVE DAMAGES AS THEY CONTINOUSLY SELL THEIR
PRODUCT WITH A DEFECT OF ELEVATED VIBRATIONS TO THE
CONSUMING PUBLIC, WITHOUT WARNINGS, OR AN
ALTERNATIVE.

THE GENERAL MOTORS AND ITS SUCCESSORS ARE WITHOUT
PROPER DIAGNOSIS EQUIPMENT TO DETERMINE AND MEASURE
THE EXPECTED APPTITUDE OF BIO-MECHANICAL EXPOSURES,
AS THEY ARE NOT TESTING TO DETERMINE THE ELEVATED
VIBRATION FREQUENCY OR RATING, ONLY CARELESS IMPUTED
DISREGARD TO HEALTH AND SAFETY STANDARDS WHICH THE
PUBLISHED SPECS BY GENERAL MOTORS, CANNOT BE TESTED
AT AN AUTHORIZED DEALER DUE TO GROSS NEGLIGENCE,
CONSPIRED FRAUD WITHIN ITS ORGANIZATION AND CARELESS
DISREGARD TO HUMAN EXPOSURE SAFETY MEASURES.

THE GENERAL MOTORS DID NOT HONOR THEIR WARRANTY
FOR SUCH A DEFECT OF RETARDED ENGINE TIMING IN THE
SUBJECT HUMMER H2, WHICH PRODUCES A HIGHER EMMISSION
RATIO THAN EXPECTED, WHICH IS NOT A COMMON DEFECT
RECOGNIZED UPON FIRST INSPECTION, WHICH CAUSED
PERMANENT MUSCULOSKELETAL INJURIES, DEVELOPED
PRIMARY DESEASES IN THE VASCULAR AND SENSORINEURAL

HUMAN BODY WHICH CAUSES PREMATURE AND UNEXPLAIND
DEATHS.

THE INSTANT PRODUCT SOLD TO PLAINTIFF HEREIN WAS
CONTRARY TO ADVERTISED EXPECTATIONS AND SPECS.
PUPLISHED, WHICH IT RECEIVED DISCRIMINATIVE CONSPIRED
UPON INSPECTIONS BY THE AUTHORIZED DEALERS, TO AVOID
A LIABILITY AND OBLIGATION TO THE CONCERNED AND
INJURED VICTIM OF CONSUMING THEIR PRODUCT.

FURTHER THE GENERAL MOTORS CORPORATION, FAILED TO
PROVIDE ITS DEALERS AND AUTHORIZED AGENTS, THE
NECESSARY EDUCATION AND TRAINING TO ADJUST OR
PROPERLY MEASURE ITS ENGINE ELEVATED PERFORMANCE
AND ENGINE TIMING FOR COMMON EXPECTED STANDARDS OF
A FUEL INJECTED VEHICLE WITH AN AIR/FUEL RATIO OF 14.7:1.

THE SUBJECT VEHICLE HAD A HIGHER MIXTURE OF FUEL,
WHICH AGITATES AND ELEVATES ITS PERFORMANCE AND
POLUTES THE ENVIRONMENT, WHILE CAUSING INJURIES TO ITS
CONSUMER FROM THE ELEVATED VIBRATION ENGINE SURGES,
WHICH EXCEEDED THE 4.3 HZ EMMISSION STANDARD FOR THE
SUBJECT VEHICLE, ACCORDING TO ADVERTISED SPECS., LISTED
IN THE "LYNCH HUMMER", "HUMMER H2 CHASSIS". ATTACHED.

3

HENCE NOT ALL ENGINES ARE DECLARED DEFECTIVE,

HOWEVER THE SUBJECT VEHICLE WAS A WHOLESALED

VEHICLE AT A GEORGIA AUCTION, A "SHOW TRUCK" PARKED

BY GENERAL MOTORS, NOT USED TO SHOW TO POTENTIAL

BUYERS, WITH 230 MILES ON THE ODOMETER, SOLD WITHOUT A

DISCLOSURE OF ORIGIN BY AN AUTHORIZED DEALER THAT DID

NOT ALERT OR DISCLOSE THE SUSPECTED INHERENT DEFECTS

WHEN SOLD TO THE CONSUMER, AND CONSPIRED SO AS NOT

TO REPAIR, ONLY NEGLIGENT, UNEDUCATED, CARELESS AND

FAILED ATTEMPTS TO REPAIR THE RECOGNIZED DEFECT

WERE CONDUCTED FOR THE INTERNAL ENGINE DEFECT FLAW,

CAUSING AN ELEVATED VIBRATION, NOT WARNED.

THE ELEVATED VIBRATION IN THE SUBJECT VEHICLE

CAUSED IRREPAIRABLE INJURIES TO THE HEART , HANDS AND

BRAIN OF PLAINTIFF, WHICH CAUSED HIGH BLOOD PRESSURE

DEFORMATIES SUCH AS FAINTING AND COLLAPSE THAT

REQUIRED EMERGENCY ROOM CARE, WHICH ALMOST CAUSED

DEATH TO PLAINTIFF,

THE CLAIMANT'S CLAIM HEREIN WAS PREVIOUSLY NOT

OBJECTED TO, BY MOTORS LIQUIDATION COMPANY OR THE

GENERAL MOTORS COMPANY, AS IT WAS A RECOGNIZED

4

SECURED CLAIM, "CLAIM #69683", UNTIL NOW, AND THE
DEBTOR'S DO NOT NOW ALLEGE A REASON WHY IT SHOULD
NOT PAY ITS CLAIMANT AS IT IS THEIR OBLIGATION TO DO SO
FOR ITS PRODUCT DEFECT AND FOR THE INJURIES IT CAUSED.

THIS CLAIM WAS PREVIOUSLY SECURED CORRECTLY
WITHOUT AN OBJECTION.

THE DEFENDANTS' ARE WITHOUT A VIABLE OBJECTION AS
THEY DO NOT OUTLINE CAUSES OF ACTION OR A BASIS FOR AN
OBJECTION, BESIDES THEIR BAD FAITH MOTION OF AN
OMNIBUS OBJECTION AND IT SHOULD NOT BE GRANTED IN THE
INSTANT CLAIM.

ALL MATERIAL DATA TO PROVE THE CLAIM HEREIN WAS
PREVIOUSLY APPROVED AND WAS SECURED BY DEBTORS.

A DEPOSITION OF AN EXPERT AUTO MECHANIC WITH
APPROX 25 YEARS EXPERIENCE IS ATTACHED, AIR FUEL RATIO
STANDARDS ARE ALSO ATTACHED, PHYSICAL INJURIES
REPORTS WERE PRODUCED, SEVERAL OTHER INSPECTIONS
WERE PREVIOUSLY SUBMITED OUTLING A NON-CONFORMITY
IN THE SUBJECT VEHICLE, AND THE PROCEEDINGS OF "THE
FIRST AMERICAN CONFERENCE ON HUMAN VIBRATION", THE
NIOCH DOCUMENTS WERE ALSO PREVIOUSLY SUBMITTED,

5

WHICH WERE PUBLISHED BY **THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR DISEASE CONTROL AND PREVENTION, AND THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH,** IN JUNE OF 2006.

PLAINTIFF REQUESTS FROM THIS HONORABLE COURT A JUDGMENT IN ITS FAVOR GRANTING THE SECURED CLAIM, AS FURTHER PLAINTIF DID OFFER TO SETTLE IN GOOD FAITH WITH THE DEFENDANTS' TWICE, FOR WHICH THE DEFENDANTS' DID NOT RESPOND AND DID NOT COUNTER A DIRECTED OR EXPRESS OFFER FOR ITS LIABILITY(IES) FROM THE DEFECTS OF ELEVATED VIBRATION AND OVERLY FIRM RIDE, WHICH GOES TO PROVE BAD FAITH AND CARELESS DISREGARD TO ITS PERMANENTLY INJURED CONSUMER OF THE SUBJECT VEHICLE.

PLAINTIFF/CLAIMENT UP TO THIS DAY AND FOR APPROX 24 MONTHS HAD BEEN DRIVING A RENTAL CAR BELOW EXPECTED STANDARDS OF A LARGE TRUCK, WHICH CAUSES MANY DISCOMFORTS AND INCREASES THE RISKS, OF FURTHER INJURY.

THERE WAS A FINANCIAL BURDEN OF PAYING FOR THE SUBJECT VEHICLE, NOT BEING USED AND PAYING FOR A RENTAL AT THE SAME TIME WITH FULL COVERAGE.

6

## CERTIFICATE OF SERVICE

ALL ASSERTIONS MADE IN THE FOREGOING REQUEST, ARE

TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND

BELIEF AND THAT A COPY WAS FILED AND  SENT TO THE

DEFENDANTS ATTORNEY OF RECORD, BY EMAIL AND U.S. MAIL

ON SEPTEMBER 27TH , 2010 .

**SHERIF RAFIK KODSY**
Individual/pro'se
**15968 LAUREL OAK CIRCLE**
**DELRAY BEACH FLORIDA 33484**
**561-737-8998 / 800-379-8648**

**COPY(S) TO:**

**WEIL, GOTSHAL & MANGES LLP.**
**767 FIFTH AVENUE**
**NEW YORK, NEW YORK 10153**

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

IN RE,

GENERAL MOTORS CORP., ET AL.,

DEBTORS.

CASE# 09-50026

## ORDER GRANTING PLAINTIFF'S SUMMARY JUDGMENT ON CLAIM

The Bankruptcy Court upon review of provided exhibits, inspections, medical records and allegations of a product defect which caused permanent injury(ies) and express financial hardships to claimant Sherif Rafik Kodsy , is **ENTITLED** to summary judgment , since the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. **FED.R.CIV.P. 56(C); FED.R.BANKR.P. 7056; ANDERSON V. LIBERTY LOBBY, INC., 477 U.S. 242, 247, 106 S.CT. 2505, 2509-2510 (1986).**

**ORDERED** that the claim shall remain secured in the Bankruptcy proceeding and payable to claimant upon request; and it is further

**ORDERED** that the relief requested in the Ninty-Eighth Omnibus Objection for the instant claim is denied to the extent provided herein; and it

1

is further

**ORDERED** that the subject "Claim Amount and Priority" listed on

exhibit "A" (The Debtors "Order Exhibit) annexed hereto remains Classified

as Secured and in its current Priority Status; and it is further

**ORDERED** that a separate hearing be held in the Bankruptcy court to

determine Punitive Damages.

**ORDERED** that this court shall retain jurisdiction to hear and

determine all matters arising from or related to this order.

Dated : New York, New York

_____, 2010


_____

United States Bankruptcy Judge

2

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO.: 2009 CA 11174 AH

SHERIF RAFIK KODSY,
    Plaintiff,

vs.

GENERAL MOTORS CORPORATION,
    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUBSTITUTION OF PARTY AND MOTION FOR EXTENSION OF TIME TO RESPOND TO AMENDED TRIAL DE NOVO PLEADING, AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

    This action came before the Court on various motions: Defendant's motion to substitute a defendant party and motion to extend time to respond to an amended trial de novo pleading, and Plaintiff's motion for partial summary judgment.

    It is necessary to substitute parties so that General Motors Company is substituted as the party for breach of warranty allegations in Count II and Motors Liquidation Company is the party for all other claims asserted. If Plaintiff wishes to amend to replead his Lemon Law arbitration decision appeal then the correct party would be General Motors Company. Defendants are allotted twenty days in which to respond to the amended complaint.

    Plaintiff's motion for partial summary judgment is denied.

    ORDERED at West Palm Beach, Florida, this ___ day of December, 2009.

EDWARD FINE
Circuit Judge

Copies furnished:
Sherif Rafik Kodsy
15968 Laurel Oak Circle
Delray Beach, FL  33484

Reviewed By Calendar Can
Nothing Calendared
advise if c/c
necessary
RECEIVED

DEC 2 2 2009

Orlando Law Offices of
Rumberger, Kirk & Caldwell, P.A.

Charles P. Mitchell, Esq.
Steven I. Klein, Esq.
Post Office Box 1873
Orlando, FL 32802-1873

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

SHERIF RAFIK KODSY,

       Plaintiff,

vs.                              CASE NO.: 09-CA-011174

GENERAL MOTORS, LLC,

       Defendant.

_____/

### ORDER CLARIFYING DECEMBER 17, 2009 ORDER
### ON DEFENDANT'S MOTION FOR SUBSTITUTION
### OF PARTY AND MOTION FOR EXTENSION OF TIME
### TO RESPOND TO AMENDED TRIAL DE NOVO PLEADING

THIS MATTER having come before the Court on February 26, 2010 on Defendant's

request for clarification of the Court's December 17, 2009 Order Granting Defendant's Motion

for Substitution of Party and Motion for Extension of Time to Respond to Amended Trial De

Novo Pleading and the Court having considered the matter, heard arguments of counsel and

Plaintiff and being otherwise apprised of the circumstances, it is hereby

**ORDERED AND ADJUDGED:** General Motors, LLC f/k/a General Motors Company

is the proper party for allegations of Count II pertaining to breach of General Motors' written

warranty only. Motors Liquidation Company is the proper party for all other claims asserted.

**DONE and ORDERED** in Chambers, West Palm Beach, Palm Beach County, Florida

this _____ day of _____, 2010.

SIGNED & DATED

_____
HONORABLE EDWARD H. FINE   FEB 2 6 2010
Circuit Judge

JUDGE EDWARD FINE

Copies furnished to:
Sherif R. Kodsy, Pro se
Steven Klein, Esquire

# IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

**SHERIF RAFIK KODSY**

**PLAINTIFF**

VS.

**CASE NO: 09-CA-011174**

**GENERAL MOTORS CORPORATION**
AND MOTORS LIQUIDATION COMPANY

DEFENDANT(S)

## RESPONSE TO THE GENERAL MOTORS DEFENSES TO COUNT II

HEREBY PLAINTIFF COMPELS THE EVIDENCE AND REFUTES

THE ERRONEOUS ALLEGATIONS STATED BY THE GENERAL

MOTORS COMPANY AND ITS SUCCESSORS.

1- THE SUBJECT VEHICLE WAS SOLD TO THE

AUTHORIZED INDEPENDENT DEALER AT A WHOLESALE

AUCTION, TO CONCEAL ITS DEFECTS, IN ADDITION TO AN

ENGINE FLAW, WHICH CANNOT BE REPAIRED, WITHOUT

REPLACEMENTS OF THE ENGINE. THE AUTHORIZED DEALER

SOLD THE SUBJECT VEHICLE TO THE PUBLIC, WITHOUT

WARNINGS OR ENGINE REPLACEMENTS .

NO PRIOR DISCLOSURES OF PRIOR INTENDED USE OR

1

INHERENT DEFECTS IN THE SUBJECT VEHICLE WERE NOT

DISCLOSED, WHICH WERE PRESENT AT THE TIME OF SALE TO

THE CONSUMER, WHICH WERE NOT PREVIOUSLY DISCLOSED

OR ALERTED. SEE **RULE 1.120, NON DISCLOSURES**

**CONSTITUTES, MALICE, FRAUD AND INTENTIONAL**

**MISCONDUCT.**

2- THE SUBJECT VEHICLE WAS NEVER REPAIRED FOR A

VIBRATION DEFECT FROM THE ENGINE.

3- THE AUTHORIZED DEALER, DID NOT PERFORM,

NECESSARY UPDATES AND REPAIRS ACCORDING TO THE

MANUFACTURER PUBLISHED RECALLS AND TECHNICAL

SERVICE BULLETINS.

4- THE AUTHORIZED INDEPENDENT DEALER, CONSPIRED

WITH THE DEFENDANTS' TO CONCEAL THE ELEVATED

VIBRATION DEFECTS WHICH WERE FROM THE ENGINE FLAW,

HESITANT MISS, AND ROUGH IDLE.

5- THE MANUFACTURER, PRODUCT ALLEGATION

RESOLUTION, INSPECTION REPORT, DATED JANUARY 21ST

2009, WAS CONCEALED FROM THE LEMON LAW BOARD.

6- THE LEMON LAW BOARD WERE NOT EXPERTS IN MOTOR

VEHICLES SUCH AS THE HUMMER H2, WHICH THEY ONLY

DROVE FOR ONE MILE, AND ADMITTED, THERE WAS A

SLIGHT VIBRATION PRESENCE.

7- THE INDEPENDENT AUTHORIZED DEALERS, ADMITTED

THE VEHICLE HAD AN ELEVATED VIBRATION PRESENCE,

BUT CONSPIRED WITH GM, TO PASS ON THE DEFECTS AS A

TRAIT FOR SUCH VEHICLE.{MR. JOE BARDILL CONSPIRED

WITH BOB MARTIN FROM H2, LEMON LAW TRANSCRIPT

PAGES [83- 84], THEN PROCEEDED TO SAY "IT IS THE SAME

EXACT IDLE QUALITY AS AN ESCALADE"}, FOR AN EXPERT

DEALERSHIP FOR CADILLAC ESCALADES, THEY

DISCONNECTED THE TRANSMISSION AND THE FLYWHEEL,

FROM THE ENGINE TO SEE IF THE THERE STILL WAS A

VIBRATION, WHICH THEY DID, IT IS OBVIOUS IF THERE WAS

NO ISSUE TO BE DETERMINED, THEN THERE WOULD BE NO

DISMANTLING OF THE SUBJECT VEHICLE COMPONANTS,

WHICH A DOCUMENTED INSPECTION WAS PROOF OF A NON-

CONFORMITY(IES) PRESENCE, WHICH WAS IGNORED, AND

THEN CONCEALED BY FURTHER FRAUDULANT NON

DISCLOSURES, TO AVOID HAVING TO REPLACE A DEFECTIVE

3

ENGINE, BY ELUDING THE CONSUMER ABOUT A REMEDY.

INTENTIONAL MISCONDUCT. 768.72 (2)(a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

8- THE SUBJECT VEHICLE WAS DECLARED AND USED AS A

SHOW TRUCK ONLY, BY GENERAL MOTORS, WHICH WAS NOT

INTENDED FOR PUBLIC USE, AND WHICH WAS NOT PLACED

IN THE STREAM OF SALES, INSTEAD THE SUBJECT VEHICLE

WAS SOLD AT A PUBLIC AUCTION, DUE TO ITS INHERENT

DEFECTS, AND ITS ELEVATED ENGINE PERFORMANCE

FLAWS. (NOT DISCLOSED OR WARNED).

9- THERE WAS NO EVIDENCE OF A LATENT DISCOVERED

DEFECT, AS ALLEGED BY THE DEFENDANTS', SINCE THE

AUTHORIZED DEALER HAD DOCUMENTED THE NON-

CONFORMITIES, TO EXIST, DURING THE INSPECTION, DURING

THE LIMITED WARRANTY 90 DAY(S) PERIOD, THAN THEY

LATER DISMISSED THE EXISTANCE OF THE NON-

CONFORMITY(IES), AFTER CONSPIRING WITH THE

DEFENDANTS' AGENTS, TO PASS ON THE VEHICLE AS

SIMILAR TO ANOTHER.

4

10-    THE AUTHORIZED DEALER SOLD THE SUBJECT

VEHICLE WITH NO DISCLOSURES, TO DEFRAUD THE

PLAINTIFF FROM HIS DESIGNATED EQUITY, WITHOUT AN

OPTION TO RESCIND, AS SOLD, USED, WITH 230 MILES ON THE

ODOMETER.

11-    THERE ARE NO DOCUMENTATIONS FROM A

SUCCESSFUL REPAIR, WHICH INDICATE FIXING THE SUBJECT

VEHICLE, FROM ITS ELEVATED ENGINE VIBRATIONS,

CAUSED FROM AN ENGINE FUEL INJECTOR SURGE, THE

VEHICLE WAS NEVER REPAIRED, ONLY A GROSSLY

NEGLIGENT INSPECTION WAS PERFORMED, BY CORAL

CADILLAC, INC. THE DEFENDANTS' AGENTS.

12-    THE DEFENDANTS', PROVIDED GROSSLY

NEGLIGENT ATTEMPTS TO DIAGNOSE, INSTEAD OF

REPLACING THE ENGINE, OR RECALLING THE SUBJECT

VEHICLE.

13-    THE SUBJECT MOTOR VEHICLE WAS NEVER

MISUSED, ABUSED, OR NEGLECTED, BY ANY OTHER PERSON

EXCEPT FROM THE AUTHORIZED DEALERS, FOR THE

DEFENDANTS', THE CORAL CADILLAC DEALERSHIP, AND THE

5

SCHUMMACKER HUMMER DEALER, WHICH REPLACED 3
TIRES, AND THE MAROONE CHEVROLET INSPECTION, WHICH
THEY STATED THE ENGINE VIBRATION WAS VISIBLE AND
THAT IT <u>INCREASED UPON EXCELLERATIONS.</u>

14-    THE GENERAL MOTORS ARE RESPONSIBLE FOR
WARRANTY(IES) TO THE SUBJECT VEHICLE, UP TO 50,000
MILES, WHICH INCLUDES ENGINE REPLACEMENTS IF
NEEDED, WHICH WAS NEEDED IN THE INSTANT CASE.

15-    PLAINTIFF HAD TAKEN MANY PRECAUTIONS SO AS
TO LIMIT HIS USE FROM THE SUBJECT VEHICLE, BY USING
RENTAL VEHICLES AS A REPLACEMENT, AND ONLY NEEDED
ERRANDS, WAS ALLOWED, PLUS MANY ATTEMPTS WERE
MADE TO ALLOW THE MANUFACTURER TO RE-INSPECT AND
REPAIR. WHICH WAS REWARDED WITH DISCRIMINATION
AND BAD FAITH, INSTEAD OF AN ENGINE ELEVATED
VIBRATION, REMEDIATION.

16-    THE GENERAL MOTORS COMPANY , SHOULD BE
HELD LIABLE FOR ITS BREACH OF WARRANTY, FOR THE
ENGINE FLAW WHICH IS STILL PRESENT, AND WHICH
WORSENED WITH CONSTANT USE AND EXCELLERATIONS.

6

**MCPHERSON V. BUICK MOTOR CO., 111 N.E. 1050 (N.Y. 1916),**
**If the nature of a thing is such that it is reasonably certain to place life and limb in**
**peril when negligently made, it is then a thing of danger. Its nature gives warning of**
**the consequence to be expected. If to the element of danger there is added**
**knowledge that the thing will be used by persons other than the purchaser, and used**
**without new tests, then, irrespective of contract, the manufacturer of this thing of**
**danger is under a duty to make it carefully. That is as far as we need to go for the**
**decision of this case . . . . If he is negligent, where danger is to be foreseen, a liability**
**will follow.**
See Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660,
666 (N.J. 1985)

17-    THE NON-USE OF THE SUBJECT VEHICLE HAD

CREATED A HARDSHIP, AND THE LIMITED USE HAD

DEVELOPED PERMENANT NEUROLOGICAL INJURIES AND

DISORDERS, TO THE PLAINTIFF, WHICH WAS WITHOUT PRIOR

WARNINGS, OF A BIO-MECHANICAL PROBLEM, UNTIL AFTER

THE NEW KNEE INJURY(IES)., WHICH OCCURED AFTER THE

FILING OF THE INSTANT CASE, THE BRAIN DAMAGE WAS

CONSISTANT WITH THE PROFOUND HEADACHS, A MONTH

LATER, FROM THE ELEVATED VIBRATION OVER-EXPOSURES,

WHICH CAUSES CALCIFICATIONS AND DEFORMITIES TO

HEALTHY TISSUE CELLS, AND AFFECTS THE INTRACRANIAL

OPTICAL NERVES, PLAINTIFF MAY STILL GO BLIND OR MAY

NEED EYEGLASSES SOON, DUE THE OPTICAL NERVES

DAMAGE PRESSURES AT THE FRONTAL VORTEX.

18-    THE ENGINE FLAW, WAS NOT NOTICABLE FROM A

ONE MILE TEST DRIVE, AS THE ELEVATED VIBRATIONS

INCREASED UPON CONSTANT USE, WITH REPEATED

EXCELLERATIONS, WHICH BECOMES EVIDENTLY

OVERWHELMING, TIRING, EXHAUSTING FEELING, WHICH

WAS NOT IMMEDIATELY CORROLATED TO THE SUBJECT

VEHICLE FLAWS. MONTHS LATER IT BECAME MORE

OBVIOUS, AND LESS TOLERABLE.

19-    PLAINTIFF WAS INDUCED TO PURCHASE THE

SUBJECT VEHICLE WITH FULL WARRANTIES AS SOLD, WHICH

INCLUDES AN ENGINE DEFECT REPLACEMENT, WHICH WAS

NECESSARY IN THE INSTANT CASE, AND THE SUBJECT

VEHICLE WAS SOLD WITHOUT A RESCIND OPTION AS SOLD,

WHICH WAS AN OVERLY FIRM RIDE, WITH A SLIGHT

HESITANT MISS, WHICH WAS DISREGARDED, AS IT WAS NOT

KNOWN TO THE CUSTOMER THAT SUCH A HESITANT FLAW

WOULD WORSEN AND CAUSE DISABLING AND PERMENANT

INJURY(IES),

IT WAS FURTHER NOT KNOWN OR FORESEEN THAT THE

MANUFACTURER AND ITS AUTHORIZED DEALERS WOULD

8

IGNORE A DEFECT AND THEN NOT REPAIR IT, AFTER THE
SALE, ONCE THE DEFECT BECAME MORE OBVIOUS, TO
REQUIRE A SERVICE, WHICH WAS AFTER THE ENGINE MASS
AIRFLOW SENSOR WAS REPLACED, BY CORAL
CADILLAC.INC., ON 10/20/2008 , HENCE A VIBRATION BECAME
CONSTANT AND DISTURBINGLY ANOYING, AT (5223 MILES).

20-      THE SLIPPING TRANSMISSION, AND THE SQUEELING
BRAKES, ARE ALSO REMAINING AND SHOULD HAVE BEEN
FURTHER DIAGNOSED, AND PROPERLY REPAIRED
ACCORDING TO THE PUBLISHED MANUFACTURER,
TECHNICAL SERVICE BULLETINS, AND RECALLS, WHICH WAS
NOT PERFORMED.

ONLY GROSS NEGLIGENCE WAS EXTENDED, FROM ALL
REPS. AND AGENTS, OF GENERAL MOTORS COMPANY, WITH
WILLFULL AND INTENTIONAL MISCONDUCTS, TO CONCEAL
THE DEFECTS, WITHOUT A CARE FOR THE HEALTH AND
SAFETY OF ITS CONSUMERS.

21-      THE FUEL INJECTORS IN THE SUBJECT VEHICLE AND
IN ALL VEHICLES SO DESIGNED TO HAVE A FUEL INJECTION
SYSTEM, ARE DESIGNED SIMILARLY IN THE CONCEPT OF

9

OPERATION REGARDLESS OF SIZE, WHICH IS A COMBINATION

OF AIR AND FUEL RATIO FOR ITS FUNCTION. 14.7:1

22-     THE PLAINTIFF REQUESTS A JUDGMENT IN ITS

FAVOR, WITH FULL BENEFITS FOR LEGAL FEES AND COSTS,

EXPENSES, AND PAIN AND SUFFERING, FOR BRINGING FORTH

THIS PROCEEDING ACCORDING TO CHAPTER 681., AS A TRIAL

DENOVO, FOR COUNT II, AND ALL OTHER COUNTS, OR AS

THIS HONORABLE COURT SEES PROPER, FOR ALL COUNTS,

WHICH DERIVED FROM THE BREACH OF WARRANTY(IES).

23-    PLAINTIFF WAS RUSHED TO THE HOSPITAL BY EMS

TRANSPORT, AT LEAST ONCE, DUE TO HIGH BLOOD PRESSURE

AND SHORTNESS OF BREATH, WHICH WAS DIAGNOSED AS AN

ACUTE BRONCHITES, IN CRITICAL CONDITION, UNABLE TO

GASP ENOUGH AIR, TO GASP THE ELEVATED VIBRATION

EXPOSURES CONCEPTS TO A DOCTOR OF UNDERSTANDING.

FURTHER ELABORATIONS ON THE WHOLE BODY ELEVATED

VIBRATION EXPOSURE RISKS AND HAZZARDS WAS

REFERENCED IN THE PROCEEDINGS OF THE FIRST AMERICAN

CONFERENCE ON HUMAN VIBRATION, NIOSH DOCUMENTS AND

EXHIBITS WERE PREVIOUSLY SUBMITTED;

1- THE VIBRATIONAL INJURY(IES) ARE WIDELY ASSOCIATED
WITH INDUCED DISORDERS IN THE VASCULAR,
SENSORINEURAL, AND MUSCULOSKELETAL STRUCTURES OF
THE HUMAN BODY, WHICH AS ERGONOMICALY SEATED,
DETERMINES SEVERITY(IES), THROUGH A TRANSMITTED
SURGE.

2- THE PLAINTIFF CLARIFIES, THAT NOT ALL THE INJURY(IES)
PRESENT, WERE FROM THE OVER-EXPOSURES, FOR A LONG
PERIOD OF TIME, WHICH CAUSES INJURY(IES) AND INDUCED
NEUROLOGICAL DISODRERS FROM THE VIBRATION SURGES,
AND BOUNCING, IN THE SUBJECT VEHICLE, TRANSMITTED
FROM ITS ENGINE FLAW AND OVERLY ROUGH FIRMNESS.

3- THE NEW SCIENTIFIC DATA CONFIRM, AND DICTATE THAT
INJURY(IES), DO DEVELOP IN A SHORT PERIOD OF TIME FROM
PROLONGED ELEVATED VIBRATIONAL EXPOSURES, IN AS
LITTLE AS ONE HOUR, INJURY(IES) CAN DEVELOP IN HEALTHY
INDIVIDUALS.

4- CORRELATIONS, AND AVALABLE NEW STUDIES OF THE
ELEVATED VIBRATIONAL EXPOSURES ARE SUPPORTED BY
REFERENCES OF PRIOR STUDIES, AND EXPERIMENTS

PERFORMED BY **INDUSTRIAL HYGIENISTS, ENGINEERS,
PHYSICIANS, EPIDERMOLOGISTS, SCIENTISTS,
PSYCHOLOGISTS, PHYSIOLOGISTS, HEALTH AND SAFETY
SPECIALISTS, CONSULTANTS, STUDENTS, AND OTHER
INDIVIDUALS FROM GOVERNMENT, INDUSTRY, AND
ACADEMIC INSTITUTIONS** FROM THE U.S., CANADA, AND
MORE THAN SEVEN OTHER COUNTRIES.

5- THE PLAINTIFF, DID NOT UNDERGO A COMPLETE PHYSICAL
ANALYSIS FOR VIBRATIONAL EXPOSURES, WHICH ARE NOT
COMMONLY DETECTED AS A VIBRATIONAL INJURY(IES), BY A
LOCAL PHYSICIAN WITH LIMITED VIBRATIONAL
UNDERSTANDINGS OF EFFECTS AND TRAUMA, WHICH ARE
EASILY MIS-DIAGNOSED, WITHOUT PROPER FORE-KNOWLEDGE.

6- PLAINTIFF PROVIDED LIMITED AVAILABLE DIAGNOSTICS
WHICH HE WAS PRIMARILY EXAMINED FOR A CAR ACCIDENT,
WHICH WAS IMMEDIATELY AFFECTED BY ELEVATED
VIBRATIONS, FROM THE SUBJECT VEHICLE ENGINE FLAWS,
WITH ITS ELEVATED VIBRATIONAL DEFECTS, WHICH CAUSES
INJURY(IES), AND ELEVATED SENSITIVITY(IES) FROM **BIO-
MECHANICAL** APPLICATIONS AND EXPOSURES WHICH CAUSES

12

DEFORMITIES, INJURY(IES), COMA AND DEATH.

7- THERE ARE NO SPECIAL TREATMENTS FOR VIBRATIONAL

INJURY(IES), WHICH THEY ARE INSTANTLY AND

PERMENANTLY DISABLING, WITHOUT WARNINGS, WHICH ARE

COMMONLY ASSOCIATED TO <u>VASCULAR</u>, <u>SENSORINEURAL</u>,

AND <u>MUSCULOSKELETAL DISORDERS, WHICH DEVELOPES</u>

<u>PERMANENT AND FATAL DISEASES, AND DISORDERS.</u>

8- ALL AVAILABLE NEW DATA PROVIDED BY THE NIOSH

DOCUMENT, <u>THE 177 PAGE</u>, OF **THE FIRST AMERICAN**

**CONFERENCE ON HUMAN VIBRATION**, AND RELEVANT

ABSTRACTS ARE GOVERNING IN THE INSTANT CASE.

9- THE DEFENDANTS, BAD FAITH, WAS EVIDENT BY THEIR

DENIALS TO ADMIT THAT THE SUBJECT VEHICLE WAS FLAWED

WHICH HAD AN ELEVATED VIBRATION PROBLEM FROM THE

ENGINE THAT COULD NOT BE REPAIRED, THEY CONCEALED,

AND IGNORED, THE ENGINE FLAW, WITHOUT CONSIDERATIONS

FOR SAFETY AND HEALTH. WHICH WAS A SCHEME TO FURTHER

PREJIDICE UPON PLAINTIFF, AND TO AVOID LIABILITY(IES).

10- THE DEFENDANTS' INSPECTED THE SUBJECT VEHICLE AND

<u>DOCUMENTED THE ELEVATED VIBRATIONS, EXISTANCE,</u>

13

FIRST INTRODUCED IN 1989, TO ELIMINATE OR REDUCE
RISKS TO HEALTH AND SAFETY, AND TO WARN THE USER OF
ANY RESIDUAL RISKS. THE STANDARDS INCLUDE TEST CODES
FOR VIBRATION EMISSION.

15- THE DEFENDANTS' NEVER PERFORMED ANY SUCH TESTING
FOR VIBRATION EMISSIONS, WHICH CAUSES PERMANENT
INJURY(IES), DEVELOPS DISEASES, COMA AND DEATH.

16- PLAINTIFF RELIES AND COMPILES ITS PREPONDERANCE ON
THE DOCUMENTED, INCOMPLETE AND LIMITED INDEPENDENT
DIAGNOSTICS AND PHYSICAL M.R.I. OF THE BRAIN AND LEFT
KNEE AND SCANS FOR NEW INJURY(IES), AND DISCOMFORTS OF
NEUROLOGICAL INDUCED DISORDERS, WHICH COMENCED
APPROX. ONE MONTH AFTER THE PURCHASE OF THE SUBJECT
VEHICLE.

17- THE SUBJECT VEHICLE HAD AN ELEVATED VIBRATION AND
WAS PLAINTIFF'S SOLE AND PRIMARY VEHICLE, USED DAILY,
FOR PROLONGED HOURS OF USE, WHICH CAUSES VASCULAR,
SENSORINEURAL, AND MUSCULOSKELETAL DISORDERS TO
HEALTHY SUBJECTS, IN AS LITTLE AS 1 HOUR, FROM A 60 HZ.
VIBRATION EXPOSURE WITH A 4 HR CONTINOUS EXPOSURE

15

STUDY, WAS ALSO DOCUMENTED, AT FREQUENCIES OF 30, 60,

120 OR 800 HZ.. SEE  THE NIOSH REFERENCES PAGES 61-62,.

**1. VIBRATION EXPOSURE DURATION AS SHORT AS I HOUR  AT
60 HZ. CAN CAUSE MYELIN DISRUPTION**

**2. DAMAGE IS NOT LIMITED TO A SINGLE FREQUENCY.**

**3. FREQUENT REST PERIODS DO NOT REDUCE, BUT
EXACERBATE, DAMAGE AS EVIDENCED BY INCREASED
MYELIN DISRUPTION AND TRANSIENT HYPERSENSITIVITY.**

**"THE SUBJECTS TOLERATED CONTINOUS VIBRATION
VERY WELL AND EXHIBITED NO BEHAVIORAL SIGNS OF
STRESS. HOWEVER WHEN EXPOSED TO INTERMITTENT
VIBRATION, THERE WAS INCREASED VOCALIZATION, A
STARTLE REFLEX AT THE BEGINNING OF EACH BOUT OF
VIBRATION, DEPOSITION OF PROPHYRIN AROUND THE EYES
AND TRANSIENT HYPERSENSITIVITY TO TOUCH".**

REPEATED EXPOSURES OF 4 HR INTERVALS IN A 7 DAY SPAN

WAS ALSO A DOCUMENTED STUDY AT **43.5 HZ,** SEE THE NIOSH

REFERENCES, PAGES 55-56. THE RESULTS IN  THAT STUDY,OF  24

HEALTHY RATS AS TEST SUBJECTS WERE RANDOMNLY

DIVIDED, WHICH IT WAS DISCOVERED THAT THE VIBRATED

NERVES SHOW DEFINITE PATHOLOGIC CHANGES IN THE FORM

OF AXONAL DAMAGE AND MYELIN FRAGMENTATION.

**"WHILE LIGHT MICROSCOPY SHOWED MINIMAL
HISTOLOGICAL DIFFERENCES BETWEEN VIBRATED (N=12)
AND CONTROL NERVES (N=12), THE CHANGES REVEALED BY
ELECTRON MICROSCOPY WERE DRAMATIC. THESE
INCLUDED THICKENING OF THE EPINEURIUM, AS WELL AS**

16

THICKENING OF THE MYELIN SHEATH AS COMPARED WITH
NORMAL NERVE. ALSO THE AXON PLASMA WAS DETACHED
FROM THE MYELIN SHEATHS, AND MANY VACUOLES WERE
SEEN BETWEEN THE MYELIN LAMINAE, THESE CHANGES
WERE FOUND IN ALL VIBRATED ANIMALS, AND IN THE
WHOLE SEGMENT OF EACH VIBRATED NERVE. MYELIN
BALLS, CONSISTING OF DESTROYED MYELIN ROLLED INTO
WOOL-LIKE THREADS, WERE LOCATED INSIDE THE MYELIN
LAYERS. AXONAL DAMAGE WAS SEEN IN BOTH MYELINATED
AND NONMYELINATED AXONS. IN ADDITTION
NONMYLENITED AXONS WERE EDEMATOUS. AN
INTERESTING FINDING WAS THE CIRUMFERENTIAL
DISRUPTION OF SEVERAL MYELIN LAYERS, LEAVING A
LARGE CIRCULAR SPACE AROUND THE IMPACTED MYELIN
WITH CENTRAL AXONAL CONSTRICTION, THIS
CHARACTERISTIC FINDING, GIVING THE APPEARANCE OF A
FINGER RING, WAS FOUND IN EVERY VIBRATED NERVE.
MANY MICROTUBES AND MICROFILAMENTS WERE
RUPTURED OR HAD DISAPPEARED".

18- THE DEFORMITIES IN THE SUBJECT VEHICLE WAS NOT

KNOWN OR FORE-WARNED TO CAUSE INJURY(IES), WHICH WAS

NOT PROVIDED ANY TREATMENT, OR IMMEDIATE CONCERNS

FOR VIBRATIONAL RISKS AND HAZZARDS.

19- POTENTIAL INJURY(IES) FROM AN UNDISCLOSED VIBRATION

NON-CONFORMITY(IES), CANNOT BE DETERMINED BY ONE

MEDICAL ENTITY, OR FACILITY, WITHOUT SPECIFIC AND CO-

ORDINATED BEFORE AND AFTER, TESTS, DIAGNOSTICS, AND

BIO-MECHANICAL MEASUREMENTS, AND ANALYSIS.

20- THE PLAINTIFF SUSTAINED DISORDERS AND INJURIES

WHICH WERE NOT PRESENT BEFORE THE PURCHASE OF THE
SUBJECT VEHICLE, AND NEW INJURIES AND DEFORMITIES WAS
ALSO DEVELOPING, AS A RESULT, PLAINTIFF WAS
COMPOUNDED WITH SUFFERING AND PERMENANT
DEFORMITIES RELATED TO VASCULAR, SENSORINEURAL, AND
MUSCULOSKELETAL DISORDERS, WHICH CORRELATE WITH
THE ELEVATED VIBRATION INDUCED DISORDERS, AND
INJURY(IES).

21- THE DEFENDANTS' SHOULD HAVE BEEN ABREAST OF
SCIENTIFIC ADVANCES, AND SHOULD BE HELD ACCOUNTABLE
FOR THE PERMENANT INJURY(IES), AND FUTURE DISORDERS
WHICH THE PLAINTIFF WOULD FURTHER SUSTAIN FROM THE
NON-CURE-ABLE EXPOSURES AND SYMPTOMS INDUCED FROM
THE ELEVATED WHOLE BODY VIBRATION. SEE NIOSH
DOCUMENT PAGE 72-73, WHICH IN THAT STUDY 14 WOMEN
WERE SELECTED TO DOCUMENT, REGIONAL CEREBRAL
OXYGENATION AND BLOOD VOLUME RESPONSES IN HEALTHY
WOMEN, DURING SEATED WHOLE BODY VIBRATION IN A 30
MINUTE SESSION, AT A FREQUENCY NOT EXCEED 6 HZ WITH
HEAD REST SUPPORT, "DURING VIBRATION, WEINSTEIN ET AL.

18

(1988) SUGGESTED AN INCREASE IN AXONAL TRANSPORT DUE

TO THE DIRECT STIMULATION OF THE BRAIN, SIMILAR TO THE

MECHANISM OCCURRING DURING PERIPHERAL NERVE INJURY,

AND THE CURRENT EVIDENCE FROM EXPOSURE TO WHOLE

BODY VIBRATION IN DIFFERENT EXPERIMENTAL CONDITIONS

SUGGEST THAT, INCREASED NEURONAL ACTIVITY

SUBSEQUENTLY RESULTS IN INCREASED PERFUSION TO THE

PRE-FRONTAL CORTEX".

SEE NIOSH DOCUMENT PAGES 127-128, THE RESULTS OF THAT

STUDY DOCUMENTED THE PREVELANCE OF

MUSCULOSKELETAL SYMPTOMS. THREE BODY REGIONS THAT

RECEIVED THE HIGHEST TOTAL PERCENT OF SYMPTOMS

CATEGORIZED AS SOMEWHAT SEVERE OR HIGHER, INCLUDED

THE KNEE, SHOULDER/UPPER ARM, AND THE LOW BACK. THE

RESULTS INDICATE THE RISK FOR DEVELOPING

MUSCULOSKELETAL DISORDERS.

22- THE ELEVATED HAND TRANSMITTED SURGES, DAMAGING

THE PERIPHERAL NERVES, WHICH WAS FROM THE SUBJECT

VEHICLE VIBRATIONS TRANSMITED THROUGH THE STEERING

WHEEL, WHICH WAS TRANSMITTED THROUGH THE FINGERS,

DURING THE MECHANICAL FLAW PRODUCING ELEVATED
VIBRATION SURGES. SEE THE NIOSH DOCUMENT PAGE 101-102,
WHICH IN THAT STUDY IT WAS A PILOT STUDY OF
TRANSMISSIBILITY OF THE RAT TAIL COMPARED TO THAT OF
THE HUMAN FINGER. THE FINGER NAILS TEND TO SHOW
SIMILAR FREQUENCY RESPONSES WITH COMPARABLE FIRST
RESONANCES AROUND 125-160 HZ AND A SECOND PEAK AT
500 HZ, ALBEIT WITH VARYING LEVELS OF AMPLIFICATION. THE
FINGERS ARE LARGER WITH MORE MASS AND DAMPING, WHILE
THE TAIL IS ALSO STIFFER. SEE NIOSH DOCUMENT PAGES 7-8,
WHICH ELABORATES ON VIBRATION AND ARTERIAL DAMAGE. "
RECENT MORPHOLOGICAL EVIDENCE FROM RATS
EXPERIMENTS SHOWS THAT VIBRATION ACCELERATION
STRESS (INCLUDING SHEAR STRESS) AND SMOOTH MUSCLE
CONTRACTION CONTRIBUTE TO ARTERIAL DAMAGE OF
SMOOTH MUSCLE AND ENDOTHELIAL CELLS. THE VIBRATION
INDUCED ARTERIAL DAMAGE IS FREQUENCY-APLITUDE-
DEPENDENT. REPEATED VIBRATION EXPOSURE MAY DAMAGE
SMOOTH MUSCLE CELLS TO MEDIAL HYPERTROPHY LEADING
TO LUMEN NARROWING AND INJURE ENDOTHELIAL CELLS TO

IMPAIRED VASODILATION, RESULTING IN VASOSPASTIC
RESPONSE TO COLD. THE ENHANCED VASOSPASTIC RESPONSE
MIGHT IN TURN EXAGGERATE VASCONSTRICTION IN RESPONSE
TO COLD".

23- PLAINTIFF'S SUFFERING FROM THE NEUROLOGICAL
INDUCED DISORDERS, WHICH CORRELATE WITH THE
VIBRATIONAL EXPOSURES, ALMOST KILLED PLAINTIFF, WHICH
REQUIRED REPEATED AND PROLONGED DAYS OF REST, AFTER
PROLONGED VIBRATIONAL EXPOSURES, TO OUTLAST THE
VIBRATIONAL PROFOUND, POUNDING HEADACHS AND
NEUROLOGICAL INDUCED DISORDERS, HEART ACHES, OPTICAL
NERVES DISCOMFORTS, SHORTNESS OF BREATH, HEADACHES,
LOSS OF CONCIOUSNESS AND MUSCLE ACHES WHICH WAS A
VERY PAINFULL EXPERIENCE, TO ENDURE, AS IT REQUIRED
LAYNIG DOWN FOR SEVERAL DAYS AT A TIME, WITH VERY
LIMITED ACTIVITIES.

24- PLAINTIFF WAS IN A HUMMER H2, AUTO ACCIDENT ON
07/01/2008, AND COMENCED EXPOSURES TO THE VIBRATION
RESIDUAL SURGES FROM THE SUBJECT VEHICLE ON 08/19/2008.

25- THE LIKELY DEVELOPMENT OF PLAQUE IN THE DELICATE

21

SKELETAL ARTERIES OF THE HEART, AND CALCIFICATION OF

OTHER SKELETAL MUSCLES IN THE PLAINTIFF'S BODY, BRAIN,

HANDS, NECK AND LEGS, HOURS AND MONTHS, <u>AFTER THE</u>

<u>PROLONGED VIBRATIONAL EXPOSURE SURGES FROM THE</u>

<u>SUBJECT VEHICLE,</u> ARE EXPECTED, AND MOST LIKELY TO

OCCUR, CAUSING PERMENANT PHYSICAL DAMAGE, WHICH

CORROLETES WITH THE SCIENTIFIC DATA AND ABSTRACTS

PREVIOUSLY SUBMITED ABOUT RISKS AND HAZZARDS, FROM

**ELEVATED VIBRATIONAL EXPOSURES,** <u>IN HEALTHY</u>

<u>INDIVIDUALS AND SUBJECTS.</u>

26- THE DEFNDANTS' SHOULD BE HELD LIABLE FOR ANY AND

ALL  INJURY(IES), INCLUDING BUT NOT LIMITED TO THE

PRESENT, AND FUTURE PHYSICAL COMPLAINTS, INDUCED

UPON THE PLAINTIFF WHICH WAS FROM THE MAGNIFICATION

OF ELEVATED VIBRATIONAL EXPOSURE SURGES ASSOCIATED

TO <u>VASCULAR,</u> <u>SENSORINEURAL,</u> AND <u>MUSCULOSKELETAL</u>

INJURY(IES), WHICH CORRELATE WITH THE EFFECTS OF

VIBRATIONAL EXPOSURE DEFORMATIES, AND COMPLAINTS.

27- THE NEW SCIENTIFIC DATA AVAILABLE FOR A REFERENCE,

IN THE INSTANT CASE, DICTATES, THE RELEVENCE OF

INDUCED DISORDERS FROM ELEVATED VIBRATIONAL

EXPOSURES WHICH DEVELOP DESEASES AND WORSENS

WITH REPEATED ELEVATED EXPOSURES, WHICH CAUSES

INJURY(IES), LONG TERM DEFORMITIES, COMA AND DEATH, TO

HEALTHY INDIVIDUALS, AND SUBJECTS.

28- THE DEFENDANTS' SHOULD HAVE BEEN ABREAST OF

SCIENTIFIC ADVANCES, TO WARN ITS USER.

"WHEN YOU BOARD AN AIRPLANE IT IS ASSUMED AND RELIED

UPON THAT THE PILOT KNOWS A LITTLE MORE THAN YOU DO".

SEE THE NIOSH DOCUMENTS IN THE 177 PAGE BINDED BOOK,

PAGES # iii, 1, 3-10, 31-36, 46-49, 53-61, 64-69, 70-73, 79-80, 99-101,

119-120, 127-128, 130-133, 152-157, 160-161, 168-169.

29- THE DEFENDANTS SOLD THE PLAINTIFF, A LAME 2008

HUMMER H2, WHICH WAS SOLD UNDER FALSE PRETENSES WITH

CARELESS DISREGARD TO HUMAN SAFETY AND HEALTH.

30- IT WAS EVIDENCED BY ALL PARTIES, WHICH INSPECTED THE

VEHICLE THAT AN ELEVATED VIBRATION EMISSION SURGE

EXISTED, IN THE SUBJECT VEHICLE, WHICH WAS NOT NORMAL

AND ABOVE AVERAGE, REQUIRING FURTHER DIAGNOSTICS FOR

REPAIRS, AND CONFORMITY(IES).

31- PLAINTIFF WAS EXPOSED TO **607.7 HOURS,** OF ELEVATED

VIBRATIONAL SURGES, AT APPROX. **30 HZ,** WHICH

INCREASED UPON ACCELERATIONS, FROM THE SUBJECT

VEHICLE WITH **ELEVATED VIBRATIONS TRANSMITED**

**SURGES, THROUGH ITS BODY.** DOCUMENTED BY THE SUBJECT

VEHICLE HOUR METER DISPLAY ODOMETER AND WITH A HAND

HELD ECONOMICAL VIBRATION METER.

32- THE DEFENDANT'S BAD FAITH IS CLEARLY OBVIOUS AS

THEY NEVER ATTEMPTED TO CHECK THE

TRASMISSABILITY(IES) OF THE SURGES, IN THE SUBJECT

VEHICLE, AND ACTED IN BAD FAITH TO CORRECT, WITHOUT

PROVIDING HONEST AND PROMPT RELIEF.

33- HUMAN COMFORTABLE TOLERANCE LEVELS OF EXPOSURES

TO ELEVATED VIBRATIONS, SHOULD NOT EXCEED **4-8 HZ.** SEE

THE VIBRATION- MEASUREMENT, CONTROL AND STANDARDS,

THE NIOSH DOCUMENT PREVIOUSLY SUBMITED.

34- THE PLAINTIFF PREVIOUSLY LEASED A NEW 2008 HUMMER

H2, SUV, WHICH WAS A CONFORMED AND A COMFORTABLE

MOTOR VEHICLE WITH LOW EMISSIONS, WHICH WAS A

COMPLETE OPPOSITE, COMPARED TO THE SUBJECT VEHICLE,

24

WHICH HAD MECHANICAL DISTURBANCES OF ELEVATED
VIBRATION EMISSIONS, WITH A HESITANT MISS AT IDLE,
SLIPPING TRANSMISSION, SQUEELING BRAKES AND OVERLY
ROUGH FIRMNESS, WHICH WAS NOT IMMEDIATELY WARNED,
OR REPAIRED.

35- PLAINTIFF WAS EXPOSED TO UNLIMITED VIBRATIONAL
EXPOSURES EXCEEDING THE COMFORT BOUNDRY LEVELS,
WHICH DEVELOPED NEUROLOGICAL INDUCED DISORDERS
WHICH WAS COMPOUNDED BY NEW INJURIES AND MANY
DISCOMFORTS AFTER THE PURCHASE, INCLUDING, VASCULAR,
SENSORINEURAL, AND MUSCULOSKELETAL INJUR(IES),

A- POUNDING HEADACHS, INDUCED DISORDERS,

B- DIZZINESS, FAINTING, SENSITIVITY TO COLD,

C- SHORTNESS OF BREATH, SLEEPING DISORDERS,

D- NUMBNESS OF HANDS, (CARPEL TUNNEL SYNDROME),

E- COLLAPSE, NEW KNEE INJURY(IES), CALCIFICATION

F- BLURRY VISION, REQUIRING, EXIT AND ABANDONMENT
FROM THE SUBJECT VEHICLE, HIGH BLOOD PRESSURE,

G- REDUCED TOLLERANCE LEVEL TO VIBRATION, AND
ELEVATED SENSIVITY FROM BIO-MECHANICAL EXPOSURES,

H- EXCESSIVE FATIGUE, LAZZINESS, AND LOTS OF PAIN.

I- DIFFUSE AXONAL INJURY, TRAUMATIC BRAIN INJURY CAUSED BY INTRACRANIEL PRESSURES. WHICH WAS REFERENCED BY THE MRI OF THE BRAIN, WHICH DETECTED EVIDENCE OF MUCOSAL THICKENING AND FLUID LEVELS OF THE PARANASAL SINUSES WHICH THE LAB CONCLDED: "SINUSITIS", WHICH THE DAI, TYPE OF INJURY(IES) IS BEST DIAGNOSED FROM A CAT SCAN, WHICH THE DAI MAY BE MISSED IN THE MRI, BECAUSE IT IS MORE SENSITIVE WHICH IDENTIFIES THE INJURY(IES) USING SIGNS OF ADEMA, WHICH MAY NOT BE PRESENT, HOWEVER A NON-CONFORMITY WAS DETECTED, WHICH CORRELATES TO THE DAI, INJURY(IES).

36- THE DAI, INDUCES CALCIUM INFLUX MODULATED BY TETROTOXIN-SENSITIVE SODIUM CHANNELS, AND PROTESE INHIBITORS. WHICH IS MAINLY CAUSED BY INTRACRANIAL PRESSURE, OR INTRACRANIAL HYPERTENSION.

37- PLAINTIFF HAD NO PRIOR BRAIN INJURY(IES), OR HEADACHES, HISTORY FROM  INDUCED DISORDERS, REQUIRING TREATMENTS OR DIAGNOSTICS, PRIOR TO THE PURCHASE OF THE SUBJECT VEHICLE.

38- PLAINTIFF WAS A MALE, AND A LARGE PERSON
WEIGHING APPROX. 275 LBS., WHICH HAD ENDURED MANY
VASCULAR, SENSORINEURAL, AND MUSCULOSKELETAL
DISORDERS, WHICH ARE PERMANENTLY AFFECTING HIS
HEALTH, WHICH A SMALLER MORE FRAGILE PERSON COULD
NOT ENDURE, WITH SIMILAR INTENSIFIED AND REPEATED
VIBRATION EXPOSURES, AS IT WOULD HAVE CERTAINLY
CAUSED A FATAL TRAGEDY AS A RESULT, WITHOUT PRIOR
NOTICE.

39- PLAINTIFF WAS RUSHED TO THE HOSPITAL BY EMS
TRANSPORT, AT LEAST ONCE, DUE TO HIGH BLOOD PRESSURE
AND SHORTNESS OF BREATH, IN CRITICAL CONDITION , PLUS
MANY OTHER INSTANCES REQUIRING STILL RESTING.

40- THE DEFENDANTS' SOLD THE SUBJECT VEHICLE, CONTRARY
TO THE REVISED PROPOSED REGULATION OF THE DEPARTMENT
OF MOTOR VEHICLES, LCB FILE NO. R129-07, SECTION 3(B),
WHICH STATES, THE SELLER OF THE MOTOR VEHICLE SOLD IN
THE WHOLESALE TRANSACTION HAS:

{1} PHYSICALLY SEPARATED THE MOTOR VEHICLE FROM
OTHER MOTOR VEHICLES DISPLAYED FOR RETAIL USE;

27

{2} MARKED THE MOTOR VEHICLE IN A MANOR THAT
REASONABLE AND PRUDENT PERSONS WOULD KNOW THE
MOTOR VEHICLE IS NOT INTENDED FOR RETAIL USE;
{3} INDICATED ON ALL WRITTEN RECORDS RELATING TO THE
MOTOR VEHICLE IDENTIFYING THE MOTOR VEHICLE AS
SUITABLE ONLY FOR SALE IN A WHOLESALE TRANSACTION;
AND {4} PREPARED A WRITTEN DISCLOSURE NOTICE FOR
INCLUSION WITH THE DEALERSHIP'S PERMENENT RECORDS OF
THE MOTOR VEHICLE WHICH DETAILS THE REASONS WHY THE
MOTOR VEHICLE IS ONLY SUITABLE FOR SALE IN A
WHOLESALE TRANSACTION.

THE SUBJECT VEHICLE WAS SOLD IN A GEORGIA AUCTION, AS
WHOLESALE, WITHOUT AN ATTACHED DISCLOSURE
STATEMENT.

41- THE SUBJECT MOTOR VEHICLE WAS SOLD CONTRARY TO
FLORIDA STATUTES, 681.114{2}.

42- FURTHER ACCORDING TO THE REVISED PROPOSED
REGULATION OF THE DEPARTMENT OF MOTOR VEHICLES, LCB
FILE NO. R129-07, (9)(A)(B), WHICH RELATES TO THE "NON-
COMPLIANT MOTTER VEHICLE", MEANS ANY MOTOR VEHICLE

THAT HAS A DEVICE FOR THE CONTROL OF POLLUTION WHICH
IS NOT CORRECTLY INSTALLED OR IN OPPERATING CONDITION
IN ACCORDANCE WITH THE SPECIFICATIONS OF THE VEHICLE
MANFACTURER AND ANY APPLICABLE STATE OR FEDERAL
STATUTE OR REGULATION. WHICH IN THE INSTANT CASE
WOULD BE THE AIR MASS-FLOW SENSOR AND FUEL INJECTORS,
NON-CONFORMITIES, CAUSING AN ELEVATED VIBRATION.
43- THE MANUFACTURER PRODUCT ALLEGATION RESOLUSION ,
PRELIMINARY INSPECTION, ON JANUARY 21ST 2009, WHICH
STATED ON PAGE {1}" ENGINE IDLE APPEARED NORMAL WITH
ONLY A SLIGHT QUIVER IN THE TACHOMETER NEEDLE AS THE
FUEL INJECTION MADE MINOR ADJUSTMENT TO THE FUEL/AIR
MIXTURE". ON PAGE (2), IT STATED, " SUSPENSION NORMAL,
ROUGH AND OVERLY FIRM". AND IT ALSO STATED, " ENGINE
NORMAL, IDLES ROUGH AND TACH NEEDLE DROPS TO 0".
INDICATIVE OF AN ENGINE FLAW.
ON PAGE (7), IT IDENTIFIES THE TIRES BRAND AND TREAD
DEPTH, OF WHICH THERE WAS ONE NON CONFORMING TIRE
TREAD DEPTH OF 15, VERSES THREE OTHER TIRES OF 17., THIS
WAS DUE TO THE SCHUMMACKER DEALER'S NEGLIGENCE OF

ONLY REPLACING THREE TIRES.

44- THE PRODUCT ALLEGATION REPORT WAS CONCEALED

FROM THE LEMON LAW BOARD MEMBERS AND THE

CONSUMER, UNTIL IT WAS FIRST SUBMITTED IN THE

DEFENDANTS', GENERAL MOTORS CORPORATION'S EXHIBIT

LIST, EXECUTED ON THE 9TH DAY OF JUNE, 2009.

45- PLAINTIFF, SHERIF RAFIK KODSY, SHOULD BE ENTITLED TO

DAMAGES AND PUNITIVE DAMAGES AS APPLICABLE, IN THE

INSTANT CASE, ACCORDING TO FLORIDA LAW.

46- THE SUBJECT VEHICLE WAS A SHOW TRUCK NOT INTENDED

FOR PUBLIC USE, LEMON LAW TRANSCRIPT PAGES [17-18].

47- THE NOTORIZED, DIAMOND DUAL INSPECTION, DATED

05/04/09, STATES, " SCAN CC COMPUTER SYSTEM, NOTE: BLOCK

LEARN OUT OF SPEC, FUEL RATIO OUT OF SPEC., CAUSE OF THIS

PROBLEM COMES FROM TIMING CHAIN INSTALLED WRONG.,

FUEL AND TIMING PROBLEM/INTERNAL ENGINE PROBLEM.,

{NOTE:} ENGINE SHOULD BE REPLACED UNDER FACTORY

WARR. 100,000 MILES".

48- THE DEFENDENTS' EXCERCIZED GROSS NEGLIGENCE,

FRAUD, AND CONSPIRED IN BAD FAITH, TO AVOID REPAIRING

30

THE SUBJECT VEHICLE TO ITS CONFORMED SPECS AND

DESIGN.

49- INJURY(IES) FROM THE ELEVATED ENGINE VIBRATION

SURGES, ARE FROM THE DEFENDANTS' CARELESS DISREGARD

FOR HEALTH AND SAFETY, WHICH WAS EXCERCISED TO ITS

MAXIMUM LIMITS, IN WHICH INJURY(IES), TO THE CONSUMER,

WERE EXPECTED AND EVIDENT, WHICH COULD DEVELOP IN A

SHORT PERIOD OF TIME, WITHOUT FORE-KNOWLEDGE AND

WARNINGS.

THE SUBJECT MOTOR VEHICLE WAS A DANGEROUS

INSTRUMENT NOT INTENDED FOR PUBLIC SALE OR USE, AS IS.

BURCH v. SUN STATE FORD, INC 864 So. 2d 466 (5th DCA Jan. 2,
2004) DANGEROUS INSTRUMENTALITY DOCTRINE. Florida's
dangerous instrumentality doctrine originated in
the case of Southern Cotton Oil Co. v. Anderson, 80
Fla. 441,468, 86 So. 629, 638 (1920) one who
authorizes and permits an instrumentality that is
peculiarly dangerous in its operation to be used by
another on the public highway, is liable in damages
for injuries to third persons caused by the
negligent operation of such instrumentality on the
highway by one so authorized by the owner.

SEE, PERLMAN V. PRUDENTIAL INS. CO. OF AMERICA, 686 SO.
2D AT 1378, (FLA. 3RD DCA 1997).THE TRIAL COURT MADE A
LEGAL RULLING THAT A MERE ALLEGATION OF FRAUD,
ENTITLED THE PLAINTIFF TO AMEND THE COMPLAINT AS A
MATTER OF LAW. IN ADDITTION TO THE SUFFICIENCY OF
THE EVIDENCE. SEE, CRUISE V. GRAHAM, 622 SO. 2D 37 {FLA.

31

**4TH DCA 1993), STATING: THE RULE NOW SEEMS CLEAR IN FLORIDA THAT A CLAIM OF FRAUD IS SUFFICIENT TO JUSTIFY COMPENSATORY DAMAGES, IS ALSO SUFFICIENT TO SUPPORT AN AWARD OF PUNITIVE DAMAGES.**
**SEE, <u>RAPPAPORT V. JIMMY BRYAN TOYOTA OF FT. LAUDERDALE, INC., 522 SO. 2D 1005, 1006 (FLA. 4TH DCA 1988).</u>SEE ALSO, <u>LOU BACHRODT CHEVROLET, INC. V. SAVAGE, 570 SO. 2D 306, 308 (FLA. 4TH DCA 1990}.</u>**

In <u>Chrysler Corporation v. Pitsirelos, 721 So. 2d 710 (Fla. 1998)</u>, **this Court examined section 681.1095(4), Florida Statutes (1989), part of Florida's Motor Vehicle Warranty Enforcement Act, which requires parties in motor vehicle warranty disputes to submit to arbitration before filing an action in circuit court.**
**Section 681.1095(13), Florida Statutes (1989), provided for a trial de novo in the circuit court for a party who appealed the arbitration award. 721 So. 2d at 713.**
**We determined that the entitlement of either party to a trial de novo in the circuit court after completion of the mandatory arbitration respected the parties' access to courts. Id. We noted, however, that a statutory requirement that the arbitration board's decision be presumed correct in the trial de novo would raise serious concerns as to whether such a statute would violate access to courts because it would diminish the right to have the ultimate decision in a case made by a court. Id. at 714.**

In *Schropp v Crown Eurocars, Inc., 654 So.2d 1158 (Fla. 1995),* the supreme court reviewed the law concerning corporate liability for punitive damages, and established a clear distinction between vicarious and direct liability. In order to hold a corporation liable for vicarious liability for punitive damages, there must be a willful and malicious act on the part of an employee as well as a finding of independent negligent conduct by the corporation. *Id.* at 1159; *see also **Mercury Motors Express, Inc. v Smith, 393 So.2d 545 (Fla. 1981).*** In order to impose direct liability for punitive damages on a corporation, there must be a showing of willful and malicious action on the part of a managing agent of the corporation. *Id.; see also **Bankers Multiple Line Ins. Co. v Farish, 464 So.2d 530 (Fla. 1985**). Under the vicarious liability theory, there is no requirement that

the independent negligent conduct by the corporation be attributed to a managing agent. *Id.* at 1160-61.

 **APPLICABLE FLORIDA STATUTES;**

**CHAPTER 681.103, DUTY OF MANUFACTURER CONFORM A MOTOR VEHICLE TO WARRANTY**
**CHAPTER 681.104, NONCONFORMITY OF MOTOR VEHICLES**
**CHAPTER 681.106, BAD FAITH CLAIMS**
**CHAPTER 681.111, UNFAIR AND DECEPTIVE TRADE PRACTICE**
**CHAPTER 681.112 CONSUMER REMEDIES**
**CHAPTER 681.114 {2} FRAUDULANT PRACTICES**
**CHAPTER 681.115, CERTAIN AGREEMENTS VOID**
**CHAPTER 681.116, PREEMPTION, MOTOR VEHICLES SALES WARRANTIES**
**CHAPTER 607.0831(1)(B)(2)(5), (2)(A)(B), LIABILITY OF DIRECTORS**
**CHAPTER 817.413 SALE OF USED MOTOR VEHICLE AS NEW.**
**CHAPTER 319.14  (1)(C)(2)A, (2),(3)(1),(5),(8)**
**CHAPTER 768.72 NEGLIGENCE**
**CHAPTER 768.042 DAMAGES**
**CHAPTER 777.04(3) THE=2 0CRIME OF CONSPIRACY**
**FLORIDA RULES OF CIVIL PROCEEDINGS RULE 1.120(B)**
**320.60        DEFINITIONS SS 320.61-320.70.**

**COX V. CSX INTERMODEL, INC., 732 SO.2D 1092, 1096 (FLA. 1ST DCA) (QUOTING ; ANGELL V. DON JONES INS. AGENCY, 620 SO.2D 1012,1014 (FLA.  2ND DCA, 1993),** It is well settled that legislative intent is the polestar that guides a court's statutory construction analysis. See State v. Rife, 789 So. 2d 288, 292 (Fla. 2001); McLaughlin v. State, 721 So. 2d 1170, 1172 (Fla. 1998). In determining that intent, we have explained that "we look first to the statute's plain meaning." Moonlit Waters Apartments, Inc. v. Cauley, 666 So. 2d 898, 900 (Fla. 1996). Normally, "[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984) (quoting A.R.Douglass, Inc., v. McRainey, 137 So. 157, 159 (Fla. 1931)).

## CERTIFICATE OF SERVICE

ALL STATEMENTS, PLEADINGS AND EXHIBITS WERE

SUBMITED AND DISCLOSED TRUTHFULLY AND ACCURATELY

TO CONVEY THE CHAIN OF EVENTS WHICH TRANSPIRED

FROM THE PURCHASE OF A 2008 HUMMER H2,

VIN# 5GRGN23878H107653, FROM THE CORAL CADILLAC

DEALERHIP, IN POMPANO BEACH FLORIDA AND THAT A

TRUE AND CORRECT COPY OF THE FOREGOING HAS BEEN

FURNISHED VIA E-MAIL & U.S. MAIL, TO ALL COUNSEL OF

RECORD ON JANUARY 12TH 2010.

RESPECTFULLY SUBMITED,

SHERIF RAFIK KODSY
INDIVIDUAL, PRO'SE
15968 LAUREL OAK CIRCLE
DELRAY BEACH FLORIDA 33484
561-666-0237

34

Lynch HUMMER Home.
Lynch HUMMER in the News.
Visit Lynch HUMMER.
Contact Us.

Pre-Owned H1s.
New H2 Inventory.
New H3 Inventory.
Pre-Owned H2s and H3s.

New H3-T Inventory.
Stupid HUMMER Tricks.
HUMMER Accessories.
Shooting Sports.

Model Year Changes.
HUMMER Videos.
HUMMER History.
Who is Lynch HUMMER?





## H2 CHASSIS TUNED TO OPTIMAL BLEND OF ON-ROAD COMFORT AND OFF-ROAD PROWESS

The chassis of the HUMMER H2 was painstakingly designed and engineered to provide a solid foundation for best-in-class off-road performance, while maintaining a refined, comfortable ride on pavement. Not only was the chassis specially tuned for superior off-road performance, it was designed to optimize the off-road balance between rock crawling and desert racing. Special attention was paid in areas of obstacle clearance, suspension articulation, wheel control and underbody protection.



From the start of development of H2's frame design, all components were packaged flush with or above the frame rails. This provides better protection during underbody impacts. It also allows the vehicle to slide over obstacles more easily on the frame rail or rocker protection-H2 is not as likely as other vehicles to get hung up on any low-hanging components.

H2 was created with a long wheelbase, wide tread and short overhangs to provide superior control for the driver in varying types of road or terrain conditions. The short overhangs provide high approach and departure angles, allowing the H2 to drive right into a hole and out again, for example, without getting hung up in front or rear.

With its standard LT315/70R17 tires and air leveling suspension, the H2 has a 43.6-degree approach angle and 39.7-degree departure angle.

Special underbody protection, including large skid plates, helps define the H2's rugged character and enhance its performance characteristics. A thick (4mm) stamped aluminum front engine shield runs from right beneath the front bumper back to the transmission. It angles prominently up at the front, with the H2 logo pressed into the shield just below the bumper. A one-inch diameter tubular steel, ladder-type shield protects the transmission and the exhaust system's two catalytic

converters. It is strong enough, when necessary, to briefly support the load of the vehicle sitting on a rock that it is passing over. A third, high-tensile strength, galvanized steel shield protects the transfer case. It has a special cantilevered design, which allows it to flex or spring back after coming into contact with a rock. The shield is designed so that the weight of the truck can move it up when traveling over a rock. But, once the truck has passed over a rock and the shield has done its job of protecting the transfer case, it springs right back to its previous position.



Unique rocker protectors bolt through the frame. Large, standard, black-painted steel tubes, running along each side of the vehicle, protect its lower body and door panels against rocks and stumps. The high-strength structural pieces bolt right into the frame with heavy brackets and are designed to withstand off-road impacts from beneath or from side angles. The rocker protectors are so strong they can be used to pivot the entire vehicle on a rock. The fuel tank also has its own heavy plastic shield, designed to absorb abrasions and hits that would otherwise contact the tank.

Such protective features greatly enhance the H2's performance capabilities because they allow it go places competitors cannot go.

Also providing superior off-road control is H2's solid rear axle setup. It helps optimize suspension articulation and gross motion control, giving the driver a precise sense of vehicle control in the tightest of situations.

CHASSIS CONSTRUCTION: THREE-PIECE, FULLY WELDED FRAME

A fully welded ladder-type frame, with a modular, three-piece design that incorporates a number of hydroformed components, provides outstanding strength, stiffness and dimensional accuracy for H2's chassis. The hydroformed front section helps create the H2's high approach angle. To improve the frontal crush zone, GM engineers added reinforcements in key box sections of the frame, enhancing its ability to absorb energy, crush and collapse.



Uncommonly flat crossmembers are used around the transmission mounting area to preclude any possible hang-up points. The tolerances for powertrain mount positions have also been tightened to reduce potential noise, vibration and harshness (NVH).

Because of H2's full-time 4WD system, GM engineers also took great care to minimize the NVH transmitted by the front axle to the frame, devising a special three-point mounting system to isolate it. Two forward mounts vertically connect the axle to the frame, while the rear mount attaches it to a crossmember that fits between the two lower control arm brackets in the frame.

The front frame section incorporates a GM-first standard winch receiver. It is designed to handle an impressive 9,000-pound capacity winch for freeing a vehicle that's helplessly grounded. An extension for the receiver could also be used for adding such accessories as a bicycle rack. The receiver itself has the same diameter

as the standard integrated rear trailer hitch receiver. Therefore, the front receiver could also be fitted with a hitch that would allow pushing a boat into the water, for example. The winch platform, including the receiver and a bracket, is built right into a thick front crossmember as an integral part of the vehicle's design. Paired tow loops up front complement the distinctive HUMMER-style rear pivoting tow loops.

The mid-frame has a stamped-steel box section design, with common inner and outer sections and a clamshell-welded configuration. Its strength and stiffness help minimize ride and body vibrations, contributing to a smooth ride on-road and providing the strength and stiffness required to handle severe bumps and jolts. As in other GM SUVs, the composite fuel tank (with large, 33-gallon capacity) is mounted inside the left frame rail, ahead of the rear axle, for maximum protection.

The hydroformed, short rear-frame section helps create a high departure angle. It is heavily reinforced in key areas for H2's 8,600-pound GVWR capacity. The rear section incorporates a standard, integral trailer hitch receiver. Unlike with most SUVs (whose hitch receiver is added on), the H2's is built right into the last crossmember of the frame rail and developed into the bumper. A Class 3 trailer hitch is standard.

UNIQUE SUSPENSION INCLUDES NEW SELF-LEVELING REAR AIR SPRING SYSTEM

The H2's standard independent front torsion bar and five-link coil spring rear suspension provides excellent on-pavement ride comfort and control and a high degree of strength, control and rear-axle articulation off-road. An optional self-leveling air spring suspension for the rear takes comfort, control and off-road axle articulation to an even higher level.

FRONT SUSPENSION

The independent front torsion bar has 46mm monotube gas-charged shock absorbers, a large 35.9mm diameter tubular front stabilizer bar and unique tuning. The axle has a 4,000-pound capacity.

The front shocks contain unique features for off-road performance. They have a large, high-strength 40mm center tube and a secondary integral bump stop feature, which allows them to absorb jolts at two junctures. Full-size trucks typically have only one urethane front jounce bumper. When severe bumps push the suspension toward the frame, it acts like a final cushion to protect the suspension from hitting the frame. The H2 also has a secondary jounce bumper built into the shock. So, rather than taking all the load at the bump stop attached to the frame rail, it takes some of the load with the shock's built-in bump stop, slowing the suspension's travel before it hits its final cushion. The design is ideal for absorbing the extreme forces exerted on the jounce bumper during high-speed desert racing.

REAR SUSPENSIONS

There are two suspensions available for the rear: a standard five-link trailing arm coil spring suspension and optional self-leveling air spring suspension, available with the off-road package. The package also includes an air compressor and tire inflation accessory.

The standard five-link coil spring suspension's basic linkages include two forged-steel upper control arms and two stamped-steel lower control arms with bushings on each side for better isolation. These components control the solid rear axle's fore-aft and vertical position; a track bar controls the axle's lateral position. This suspension is inherently much smoother than a leaf-spring system. H2's suspension also features brand new variable-rate coil springs, longer shock absorbers and different linkage positioning-all designed to provide more articulation for the rear axle during off-road operation.

The new variable-rate coil springs have a dual stage design for on-/off-road comfort and increased suspension articulation under demanding off-road conditions. On-road (or under lightly loaded conditions), their low or soft spring rate optimizes comfort. Off-road, the springs adjust themselves to varying road conditions. If a driver starts running through undulating terrain or speeding over rocks, the spring rate will progressively stiffen to help prevent high input forces at the rear from being transmitted to body and to keep the suspension from bottoming out. The springs actually progress from a low rate to a transitional and then a high rate. Aside from their excellent ride characteristics, they also provide good handling because, due to

their progressive nature, they don't transfer weight to the same degree as conventional coil springs, thereby minimizing vehicle roll.

A specifically tuned, 30mm diameter rear stabilizer bar helps enhance off-road control. It has a tubular design, with a 5mm wall thickness, designed to provide high strength in a lightweight design. Like the stabilizer bar used with the air spring suspension, it is also specially contoured to help protect the more delicate drop links.

The optional, self-leveling air spring suspension system is brand new for GM. The system is available with the off-road suspension package. Targeted to dedicated off-road enthusiasts, it includes a high-capacity air compressor and inflation accessory. Rim protection, a reinforcement of the tire design that extends the durable rubber over the rim of the wheel, and triple sidewalls are standard as well. Rim protection adds extra protection to the tires and prevents them from slipping off the wheels when aired down.



The air spring suspension system's numerous benefits include:

· A smooth on-road ride. The air springs provide a 4.3-Hz rating (natural frequency), compared to the 4.5-Hz rating of the standard coil spring suspension.

· A longer suspension stroke for off-road operation. Longer, 719mm length shocks are used to provide an additional 20mm of rebound travel over that of the coil spring suspension. This improves traction by helping to maintain wheel contact with the ground over undulating terrain. The shock absorbers, although having the same 46mm diameter as those with the coil spring suspension, also feature a larger-diameter-size rod for increased durability.

· Automatic load leveling. If a customer loads up the rear of an H2, for example, the automatic load leveling suspension system will detect the drop in ride height and pump more air into the springs to restore a level condition. It has height sensors attached to the suspension links, which monitor and determine deviations from the standard height, and the system adjusts accordingly. The system includes an air dryer, which removes all the moisture from the air to prevent it from contaminating or degrading the springs. Because it's a closed system, once the springs are charged, they won't lose pressure.

· A driver-selectable rear suspension height elevation ("extended ride height") provides extra ground clearance at the rear and improves the vehicle's departure angle. Off-road, if the truck is in the "4 LO" transfer case mode, the driver can raise the rear suspension by 50mm (about two inches) using a ride height switch on the instrument panel. This increases the H2's rear departure angle from 35.9 degrees to 41 degrees. Once the vehicle's wheels are freed and driver leaves the rock, the system can be returned back to normal. Anytime the vehicle exceeds 20 mph, the system automatically restores the rear suspension to its standard height. Also, at freeway speeds (beginning around 50 mph), it will lower the rear end slightly to further improve the vehicle's stability.



1

# IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

## CASE NO.:  09-CA-011174

SHERIF RAFIK KODSY,

    Plaintiff,

vs.

GENERAL MOTORS COMPANY
and MOTORS LIQUIDATION COMPANY

    Defendants.

_____/

- - -

### DEPOSITION OF SCOTT MAY
### A WITNESS
### TAKEN BY THE DEFENDANTS

- - -

DATE: WEDNESDAY, AUGUST 11, 2010

TIME: 2:06 P.M. - 5:05 P.M.

PLEASANTON, GREENHILL, MEEK AND ASSOCIATES
561-833-7811

1                      I N D E X

2

3    WEDNESDAY, AUGUST 11, 2010

4    SCOTT MAY

5

6

7              DIRECT   CROSS   REDIRECT   RECROSS

8

9    By Mr. Klein      4                    113

10   By Mr. Kodsy              105                      114

11

12

13

14              E X H I B I T S

15

16   DEFENDANT'S          DESCRIPTION      MARKED FOR

17

18   No. 1        Notice of Taking Depo        7

19   No. 2         Inspection Report        9

20   No. 3         Specifications

21   No. 4         Deponent's File        15

22   No. 5        Printout from Internet        17

23

24   (Ex. 3 to be supplied by the witness to Mr. Klein.)

25

1      The deposition of SCOTT MAY, a Witness in the

2    above-entitled and numbered cause, was taken before

3    me, Beth L. Kelly, Notary Public for the State of

4    Florida at Large, at Flagler Square, 1840 Forest Hill

5    Boulevard, Suite 205, in the City of West Palm Beach ,

6    County of Palm Beach, State of Florida, on Wednesday,

7    the 11th day of August, 2010.

8

9      APPEARING PRO SE:

10        SHERIF R. KODSY
          15968 Laurel Oak Circle
11        Delray Beach, FL  33484

12

13

14      APPEARING ON BEHALF OF DEFENDANTS:

15        STEVEN I. KLEIN, ESQUIRE
          RUMBERGER, KIRK & CALDWELL, P.A.
16        Lincoln Plaza, Suite 1400
          300 South Orange Avenue
17        Orlando, FL 32802
          (407) 872-7300
18

19

20      ALSO PRESENT:

21        Charles Thornton, Corporate Representative

22

23

24

25

1    THEREUPON,

2                    SCOTT MAY,

3    having been first duly sworn by me, was examined and

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. KLEIN:

7        Q    Good afternoon, Mr. May.

8        A    How are you doing?

9        Q    Good.  My name's Steve Klein.  I'm an

10    attorney that represents General Motors with regard

11    to the lawsuit that Mr. Kodsy's filed against it.

12        A    Right.

13        Q    This deposition is part of that lawsuit

14    process.  It's to discover information, what you

15    know, what your experience and involvement in the

16    case has been.  So, I'm going to be asking you some

17    questions.

18            First, can you state your full name for

19    the record?

20        A    Scott Martin May.

21        Q    What is your birth date?

22        A    12/19/64.

23        Q    Have you ever given a deposition before?

24        A    Never.

25        Q    Never?  Okay.

1          Well, let me kind of explain a little bit

2     about how the process is going.  Obviously the court

3     reporter's taking down what I say and what you say,

4     so it's important you answer out loud.

5          A     Correct.

6          Q     If you're going to answer with a yes or a

7     no answer, you kind of have to say yes or no or some

8     word.

9          A     No nodding the head.

10         Q     Exactly.

11              Also, uh-huh and huh-unh pretty much look

12     about the same when they're typed up.

13         A     Right.

14         Q     It's also important that we speak one at a

15     time.  So, it may take me a bit to finish my

16     question.  Likewise, it may take you some time to

17     finish an answer.  I'd just ask you to speak one at

18     a time.  Will you do that?

19         A     Sure.

20         Q     Okay.  And if you don't understand a

21     question I'm asking, let me know and I'll rephrase

22     it.  Otherwise I'm going to assume that you

23     understood the question.  Is that fair?

24         A     It can't be that difficult.

25         Q     But that's fair, if you answer it --

1        A      That's fair.

2        Q      All right.  Also, this isn't an endurance

3    contest.

4        A      Right.

5        Q      So, if you need to take a break for any

6    reason, let me know and we can take a break.  The

7    only thing I ask is if there's a question pending,

8    you answer before we break.

9        A      Right.

10       Q      Will you let me know if you need to take a

11   break?

12       A      I'm good.

13       Q      In the future?

14       A      Yeah, I'll let you know whenever.

15       Q      Okay.  Are you under the influence of any

16   medicine or alcohol that would effect your ability

17   to give this statement, this deposition?

18       A      Not that would effect my questions, but I

19   take medication, yes.

20       Q      What medications do you take?

21       A      Requip for Parkinson's.

22       Q      Can you spell that?

23       A      Requip, R-e-q-u-i-p.

24       Q      For Parkinson's?

25       A      Yeah.

1      Q     How long have you had Parkinson's?

2      A     Probably seven years, somewhere in there.

3    I don't know.  Didn't keep track of it.

4      Q     Does that Parkinson's effect your memory

5    at all?

6      A     No.  It effects my muscles, that's it.

7      Q     And you understand you're under oath to

8    tell the truth today?

9      A     Sure.

10      Q     And if at any point you think of

11    additional information that you may want to add to

12    go back to another question, let me know and we can

13    add that.

14            Will you let me know if there's anything

15    additional?

16      A     Yeah.  Yes.

17      Q     I'm going to show you what we'll mark as

18    Exhibit 1.  This is the second amended notice of

19    taking deposition duces tecum for your deposition

20    today.

21            (Defendant's Exhibit No. 1 was marked for

22            identification.)

23    BY MR. KLEIN:

24      Q     Have you seen that document before?

25      A     Yes.

1      Q    Okay. I'm going to turn to page -- also

2    attached to Exhibit 1 is the subpoena for the

3    deposition. You were served with a subpoena today,

4    right?

5      A    Not today, last week or a couple weeks

6    ago.

7      Q    Right, for your appearance today?

8      A    Yes.

9      Q    On Schedule A of the Notice of Taking

10   Deposition we asked you to bring three categories of

11   documents. I want to go through them and find out

12   what you've brought with you, what you have.

13        So, the first one is any and all written

14   reports, notes, diagnostics, other documents

15   generated as a result of your inspection of the 2008

16   Hummer H2 vehicle identification number

17   5GRGN23878H107653 owned by Sherif Kodsy.

18     A    There's some invoices that were written

19   when he first came in -- brought the shop -- vehicle

20   into the shop.

21     Q    Can you show me those?

22        MR. KODSY: It's all attached, but you can

23        take it apart.

24   BY MR. KLEIN:

25     Q    Okay. The documents you've handed me in

1    this packet, is this your original file?

2        A    Yes it is.

3            MR. THORNTON:  May I take a look?

4            MR. KLEIN:  Yeah.  We'll end up making

5    copies.  Maybe we should do now.

6            MR. KODSY:  I did provide him that at one

7    time, but, you know...

8            (A recess was held.)

9    BY MR. KLEIN:

10        Q    Mr. May, I'm showing you one of the

11    documents from the packet that was just copied of

12    the materials you brought with you.  Is that the

13    document you discussed as the written report, notes

14    and diagnostics you generated as a result of your

15    inspection?

16        A    Correct.

17        Q    Is there anything else other than that one

18    document that we'll mark as Exhibit 2, anything else

19    from your inspection, diagnostic results, anything

20    else, other than that one invoice that you have?

21        A    Not that's on paper.  It's other than just

22    my knowledge the way the vehicle performs or doesn't

23    perform.

24            (Defendant's Exhibit No. 2 was marked for

25        identification.)

1    BY MR. KLEIN:

2        Q    The second request of Exhibit 1 asked for

3    any and all specifications, bulletins or other

4    documents you reviewed in connection with your

5    inspection of the 2008 Hummer H2 owned by Sherif

6    Kodsy and/or upon which you base your opinion

7    regarding this vehicle.

8            Have you brought any other specifications,

9    bulletins, documents that you relied on?

10           THE WITNESS:  In this one here, did we put

11       the specs of the scanner stuff?

12           MR. KODSY:  I think you wrote that down.

13           THE WITNESS:  No.  But I can provide you

14       with that later this afternoon if you need it.

15   BY MR. KLEIN:

16       Q    Why didn't you bring it with you today?

17       A    It's probably laying on my desk.  I

18   thought we grabbed everything.  There may have been

19   one package we left on the desk.

20       Q    And what would that package consist of?

21       A    Specifications on -- specs for the

22   readouts of the computer, normal values and abnormal

23   values.

24       Q    Where were those specifications generated

25   from?

1       A      The Snap-on -- the scan tools that I use.

2       Q      And whose specifications are they?  The

3    Snap-on's specifications?

4       A      The General Motors' specifications.  All

5    the software comes from General Motors.

6       Q      You obtain the software directly from

7    General Motors.

8       A      No.  They come in -- Snap-on gets it out

9    of their data base.  Snap-on sits on the board of

10   General Motors, Ford, Chrysler and all the rest of

11   them.  So, they have access to all the software when

12   they release it.

13      Q      So, the scan tool, the Snap-on scan tool

14   you use, is it a cartridge or what is it?

15      A      It's a cartridge.

16      Q      It's a GM cartridge?

17      A      Yeah.

18      Q      What model Snap-on scan tool did you use?

19      A      MT 2500.

20      Q      And what cartridge did you have for the GM

21   specs?

22      A      The most updated one they have, which

23   is -- the one that I have is probably -- I think

24   it's an '09 is what I got.

25      Q      When did you do your inspection of this

1    Hummer H2?

2        A    Back a while ago.  The invoice says it was

3    back in '09.

4        Q    Okay.  What day?

5        A    It looks like 5/4/09.

6        Q    And did you prepare the invoice on the

7    same day as you did the inspection?

8        A    Yes.

9        Q    Other than the specifications which you

10   left at home -- and we'll leave that blank for

11   Exhibit 3 and I'll ask that you submit them to me.

12       A    Okay.

13       Q    What specifications -- that's the Snap-on

14   specifications, is that what you said?

15       A    Well, General Motors' specifications.

16       Q    From the Snap-on tool?

17       A    From the Snap-on tool.

18       Q    In what format are those specifications

19   that you have on your desk?  Are they print?

20   Electronic?  How are they stored?

21       A    They're printed.

22       Q    And what do those specifications show?

23       A    They show you the values of the sensors,

24   the readings on the vehicle, the actual readings.

25       Q    Okay.  What other documents are in this

1   packet of materials you brought with you -- or I

2   guess Mr. Kodsy handed you at the beginning of this

3   deposition?  What are these other documents?

4       A    The documents are just other sources of

5   information of where he had the vehicle worked on or

6   had things inspected at Schumacher Buick and the

7   Cadillac dealership, Firestone and some other places

8   that the vehicle's been for inspection and had work

9   done or prepared to.

10      Q    And did you review those documents in

11  preparation for your inspection on May 4th, 2009?

12      A    Some of them I did, some of them I didn't.

13      Q    What documents did you review in

14  preparation for your inspection, if you'd show me

15  from these materials?

16      A    From what date?

17      Q    Whatever documents you reviewed in

18  preparation for your May 4th, 2009 inspection.

19      A    Oh, prior to that, no, I didn't look at no

20  invoices.  I don't need anybody's invoices to look

21  at somebody's ticket.  I look at my own vehicles.

22      Q    So, before you conducted an inspection you

23  didn't look at any other materials --

24      A    Oh, no, no.

25      Q    Again, you've got to wait for me to finish

1    my question.

2        A    Okay.  Go ahead.

3        Q    So, before you did your inspection you

4    didn't look at any materials regarding the Hummer H2

5    or anything else, correct?

6        A    Correct.  I didn't know any of it existed.

7    I was just told to find the problem with the

8    vehicle.

9        Q    When did you actually review these other

10   materials?

11       A    Several months later.

12       Q    Approximately when?

13       A    Oh, I wouldn't have a clue.  Maybe three,

14   four, five, six months later.

15       Q    Why was it so much later from your

16   inspection that you then looked at these materials?

17       A    Because he came back to me and asked me if

18   I would do a report because he was in a process with

19   General Motors, which I didn't know that prior to

20   that, in response to the vehicle, the problem with

21   it.

22       Q    And did you do a report?

23       A    Just what I had written him up before and

24   that was it.

25       Q    Okay.  I don't understand.  You wrote up

1    an invoice on May 4th, 2009, right?

2        A    Right.

3        Q    And that's the invoice that we've marked

4    as Exhibit 2?

5        A    Right.

6        Q    That's this right here?

7        MR. KODSY:  He wrote an estimate to start

8        with.

9    BY MR. KLEIN:

10       Q    I'm confused.  Why don't you go ahead and

11   explain -- well, I guess we can come back to that.

12            So, we'll mark the rest of your file, the

13   materials you just handed me, as Exhibit 4.

14            (Defendant's Exhibit No. 4 was marked for

15       identification.)

16   BY MR. KLEIN:

17       Q    Other than the materials in Exhibit 4, is

18   there anything else you've reviewed in connection

19   with your work on this case?

20       A    No.

21       Q    Nothing else?

22       A    No.

23       Q    What are the other documents sitting in

24   front of you Mr. Kodsy handed you about five minutes

25   ago?

1        A       From Hummer.

2        Q       Have you ever reviewed those documents

3    before?

4        A       Not this particular page.

5        Q       Well, any of what Mr. Kodsy just handed

6    you, have you ever seen that before?

7        A       No.

8        Q       Do those documents have anything to do

9    with any of the opinions you have in this case?

10       A       I couldn't tell you.  I haven't looked at

11    them.

12       Q       So, as we sit here today they have nothing

13    to do with the opinions you're here to testify about

14    today?

15       A       My opinions on the vehicle's performance

16    have nothing to do with anybody's other information.

17       Q       Okay.  And, again, Mr. Kodsy handed you

18    these documents today --

19       A       And this may show -- this information may

20    show bulletins or something in regards to the

21    situation that he has, but I haven't reviewed any of

22    that.

23       Q       Okay.  Why don't you take a moment to look

24    at the information Mr. Kodsy just handed you and see

25    if, in your opinion, it's relevant to your testimony

1    either today or that you intend to give at trial.

2         We'll go ahead and mark that document as

3    Exhibit 5.

4         (Defendant's Exhibit No. 5 was marked for

5    identification.)

6         THE WITNESS:  The one document is Hummer

7    stating in there that they've had to change

8    some of their suspension stuff because of the

9    vibrations in the ride conditions of the

10    vehicle they were trying to correct.

11    BY MR. KLEIN:

12        Q    This printout, where did that printout

13    come from?

14        A    The Internet.

15        Q    What Website?

16        MR. KODSY:  I pulled it.  So, it's -- do

17    you still want him to answer that?

18        THE WITNESS:  Hummer 2.  It says Hummer,

19    class two.

20    BY MR. KLEIN:

21        Q    It says Lynch Hummer at the top.  What is

22    Lynch Hummer?

23        A    It's a Website made by an aftermarket

24    company that does Hummer probably.

25        Q    So, that's not actually information from

1   General Motors then, to your knowledge?

2       MR. KLEIN:  Mr. Kodsy, I ask you not to

3   communicate with the deponent while he's being

4   deposed.

5       THE WITNESS:  They may be a subsidiary,

6   like a sister company of GM, but I couldn't

7   tell you to be truthful with you.  But they

8   have something to do with GM or they wouldn't

9   be able to use Hummer's name all the time.

10      Hummer's what you call a copyrighted

11  thing.  You can't use their logo and their

12  letterheads unless you're part of Hummer or GM.

13  BY MR. KLEIN:

14      Q    Is that your opinion or do you have actual

15  specific factual knowledge that that's correct?

16      A    That's worldwide known.  You can't

17  advertise in the Yellow Pages and put a Flowmaster

18  sign on there unless you get authorization from

19  Flowmaster.  Or anything that's registered, you

20  can't use their signature.

21      Q    But even if they have authorization that

22  doesn't make them a subsidiary of General Motors,

23  does it?

24      A    It makes them a sister company that they

25  approved.  General Motors won't just give anybody

1    their knowledge.

2        Q    Lynch Hummer may be a Hummer dealer, is

3    that right?

4        A    Lynch Hummer's the GM name for Hummer,

5    Lynch Hummer, the H2.

6        Q    They call it a Lynch Hummer?

7        A    Well, some companies do, but most people

8    just call it Hummer.

9        Q    What company's call it a Lynch Hummer?

10       A    The one on that paper right there.

11       Q    Okay.  You yourself didn't find that

12   printout, correct?

13       A    No.

14       Q    So, that's correct, you didn't find that

15   document on the Internet?

16       A    No.

17       Q    And that was not provided to you until

18   just as we began this deposition today?

19       A    We talked about it, but I never really

20   reviewed it.

21       Q    Who's we?

22       A    Me and --

23       Q    Mr. Kodsy?

24       A    Mr. Kodsy.

25       Q    Any other documentation that you reviewed

1    in this case other than the Lynch Hummer thing you

2    just looked at and what we've already marked as

3    exhibits two and four and then the specs that are

4    Exhibit 3 that you have not brought with you today?

5         A    Other documentation that I've looked at?

6         Q    Yeah, as part of your involvement in this

7    case.

8         A    No, I've just glanced at some invoices and

9    some stuff he's had done.  Other than that I haven't

10   reviewed any of it.

11        Q    And those invoices --

12        A    They don't pertain to what I have to say.

13   It doesn't have anything to do with me.  It has to

14   do with some other companies who voice their

15   opinion.

16        Q    So, you did not take that information into

17   account in forming any opinions you have?

18        A    I don't take any opinions into account.  I

19   do my own opinions.

20        Q    And I'm going to start asking you some

21   specific questions about this next area, but for now

22   number three of the Notice of Taking Deposition

23   asked you to bring any documentation regarding

24   automotive training or certifications you currently

25   hold or have held in the past.

1          Do you have any documentation with you

2   about your certifications?

3     A   No, I don't.

4     Q   Why don't you go ahead -- actually, I

5   guess I should get a little more background.

6          What's your current address?

7     A   3696 10th Avenue North, Palm Springs,

8   Florida, 33461.

9     Q   Is that a house or an apartment?

10    A   House.

11    Q   Do you own it or rent it?

12    A   Own it.

13    Q   How long have you lived there?

14    A   About three years.

15    Q   Where did you live before 3696 10th Avenue

16   North?

17    A   1820 18th Lane.

18    Q   Sorry, can you spell the name of the lane?

19    A   18th.

20    Q   Oh, 18th.

21    A   One eight T-H Lane, L-A-N-E, Greenacres,

22   Florida, 33463.

23    Q   And how long have you lived there or had

24   you lived there?

25    A   Two years probably.

1          Q       And where did you live before that?

2          A       3435 Rostan Lane.

3          Q       Can you spell --

4          A       R-O-S-T-A-N Lane, Palm Springs, Florida,

5     33461.

6          Q       And how long did you live at 3435 Rostan

7     Lane?

8          A       10 to 12 years.

9          Q       Are you currently employed?

10         A       Self employed.

11         Q       And what's the name of your business?

12         A       House of Diamond Dual Exhaust.

13         Q       And what is your position with House of

14    Diamond Dual Exhaust?

15         A       Owner.

16         Q       Does House of Diamond Dual Exhaust have

17    any other employees?

18         A       No.

19         Q       Does it have any independent contractors

20    that work for it?

21         A       Yes.

22         Q       What type of independent contractors?

23         A       I have a guy that does muffler and

24    mechanical work.

25         Q       And what's his name?

1        A    What's he got to do with this?

2        Q    I'm just trying to find out who works for

3    or with your business.

4        A    He's a muffler installer.  He doesn't have

5    anything to do with it.

6        Q    What's his name?

7        A    Walter.

8        Q    Walter what?

9        A    I can't think of his last name.  Walter

10    Rodriguez, I believe.

11        Q    And he is not an employee of House of

12    Diamond Dual Exhaust?

13        A    He's a subcontractor.

14        Q    Is there any other subcontractors?

15        A    No.

16        Q    So, what is House of Diamond Dual Exhaust?

17    What is that business?

18        A    It's a repair shop.

19        Q    Does it do business by any other name?

20        A    Muffler House of Delray.

21        Q    And how long have you owned that business?

22        A    Nine and a half years.

23        Q    Has it always gone by the name House of

24    Diamond Dual Exhaust or Muffler Shop -- Muffler

25    House of Delray?

1     A    Yes.

2     Q    And where is House of Diamond Dual Exhaust

3    located?

4     A    Delray Beach, Florida.

5     Q    And what's the address?

6     A    401 Northeast 6th Avenue.

7     Q    What's the zip?

8     A    33483.

9     Q    Other than yourself and Mr. Rodriguez,

10   does anybody else work at that location?

11    A    No.

12    Q    How long has Mr. Rodriguez been a

13   subcontractor?

14    A    Year and a half, two years.

15    Q    Before Mr. Rodriguez began working with

16   the company as a subcontractor, did House of Diamond

17   Dual Exhaust have any other employees or

18   subcontractors before that?

19    A    That has nothing to do with this at all,

20   so I'm gonna avoid answering that question.

21    Q    You're not going to answer that question?

22    A    I don't see what it pertains to my General

23   Motors statements on Mr. Kodsy's car here.

24    Q    I'm trying to get information about your

25   business and as it might relate to your experience

1    and the business.  So I'm going to ask you again,

2    has --

3        A    No.

4        Q    Let me finish the question, then you can

5    answer.

6            Has House of Diamond Dual Exhaust or

7    Muffler House of Delray as it's doing business ever

8    had any employees or subcontractors other than

9    yourself and Mr. Rodriguez?

10       A    Yes.

11       Q    How many employees or subcontractors has

12   it had since it was formed?

13       A    I have no idea.

14       Q    Other than Mr. Rodriguez, when was the

15   last time you had a subcontractor or another

16   employee working at House of Diamond Dual Exhaust?

17       A    Maybe three years maybe four.

18       Q    Otherwise currently, aside from you and

19   Mr. Rodriguez, there's nobody else there?

20       A    No.

21       Q    So, if somebody were to call the business,

22   who would answer the phone?

23       A    Walter.

24       Q    Is there ever any time someone else other

25   than you or Walter would answer the phone?

1        A    Maybe if my son or somebody's there.

2        Q    Any women working at the company?

3        A    There's some that stop in every now and

4    then to help out.

5        Q    And who are they?

6        A    Just friends.

7        Q    And are those friends paid for their help?

8        A    No, they're not.

9        Q    So, you have friends that just stop in and

10    volunteer?

11        A    Or ex-wives.

12        Q    Ex-wives come and volunteer?

13        A    Don't volunteer, but they come.  There's

14    always an ulterior motive for them to be there.

15        Q    What is that?

16        A    They want money.

17        Q    How many ex-wives do you have?

18        A    Two.

19        Q    Can you describe your educational

20    background?  You don't have to go to, like,

21    kindergarten.  Start at high school.

22        A    Come on, let's go all the way back.

23            I graduated from Lake Worth High School.

24    Then '83 I left and went to Tennessee to an

25    automotive repair school, Nashville Auto Diesel

1    College.

2        Q    Nashville Auto Diesel College?

3        A    Correct.  And that was -- they're still in

4    existence today.  It's a very big school.  They

5    teach you from front to rear, cars and trucks, body

6    work, automotive, everything.  And I stayed there

7    for a year and a half, two years, somewhere in

8    there.

9        Q    Did you receive a degree from Nashville

10   Auto Diesel College?

11       A    Yes.

12       Q    What type of degree?

13       A    Just a diploma.

14       Q    And what does the diploma say?

15       A    You're the best, don't bother with the

16   rest.

17            No, it said -- I don't know.  It just says

18   diploma, Nashville Auto Diesel College graduated

19   Scott May, da, da, da.

20       Q    Okay.  That was pretty fast and I know you

21   were -- for the court reporter's benefit, if you can

22   slow down some too it will help.

23            So, when did you receive the diploma from

24   Nashville Auto Diesel College?

25       A    I'm gonna say -- in '85 I'm gonna put it

1    at.  Maybe '86, but I'm gonna say '85.

2         Q    And after you left Nashville Auto Diesel

3    College, did you have any further education?

4         A    No.

5         Q    Did you have any other further

6    certifications with regard to vehicle mechanics or

7    technician's work?

8         A    I retained a job at Clark Oldsmobile in

9    West Palm Beach off of South Olive.  I worked there

10   for a little over 10 years until they closed for

11   General Motors.

12        Q    You worked at Clark Oldsmobile from

13   approximately when to when?

14        A    From '85 to '95, somewhere in there.

15        Q    And did you receive any certifications or

16   training while you worked at Clark Oldsmobile?

17        A    Yeah, they sent us to GM classes and stuff

18   all the time.  Down to Sherwood -- was it Sherwood?

19   I'm trying to think of the name of it down there.

20   Sherwood Vocational Center down off of -- down in

21   Fort Lauderdale somewhere we used to go to where GM

22   has all their classes, or some of their classes.

23   Maybe it's Sheraton vo-tech down there.

24        Q    And do you have documentation of your GM

25   classes and certification?

1        A     No.  I would have no idea where they're

2    at.

3              Then I worked for Art Moran Auto Plaza for

4    five to seven years.  That's GM, Pontiac.

5        Q     Why did you leave Clark Oldsmobile?

6        A     They sold to Schumacher Buick.

7        Q     And you didn't stay with Schumacher?

8        A     No, I didn't stay with the Schumacher

9    family.

10       Q     Why not?

11       A     I went and worked on my own for about

12   three years and then Art Moran kept calling me,

13   calling me to come work for them.  So, I finally

14   went and worked for him and stayed there about five

15   or six years.

16       Q     When you worked on your own for those

17   three years, where did you work?

18       A     At my house.

19       Q     Did you do mechanical work out of your

20   house?

21       A     Yeah.

22       Q     What type of work did you do out of your

23   house?

24       A     Just normal automotive repair, timing

25   belts, brakes, whatever need to be done, valve jobs.

1     Q    What house was that that you worked out

2  of?

3     A    Off of Kudza Road in West Palm.

4     Q    What's the address?

5     A    1942 Kudza, K-U-D-Z-A, Road.

6     Q    Did you have a lift?

7     A    No.  I had two cement driveways I had

8  poured right up to my garage.

9     Q    Did you have a business license to do that

10  automotive repair business out of your home?

11     A    If I had to venture to say way back then

12  I'd probably say no, but I couldn't tell you.

13     Q    How did people know of your business when

14  you were working out of your home?

15     A    Just referrals from friends and family and

16  neighbors.

17     Q    Why didn't you want to work for

18  Schumacher?

19     A    Didn't want to pay no money.

20     Q    They didn't want to pay money or you

21  didn't want to pay money?

22     A    They didn't want to pay money.  I'm good

23  at what I do.  I need to get paid for it.

24     Q    How much did you make working at Clark

25  Olds?

```
 1          A    I started out at 18 an hour.  I think I
 2    ended up at 28 an hour.
 3          Q    And how much did you charge as your hourly
 4    rate when you worked out of your house on Kudza
 5    Road?
 6          A    I didn't really have an hourly rate.  Just
 7    went by whatever the job was.
 8          Q    How many jobs did you average in a week
 9    when you were working out of your house?
10          A    Three to four cars a day.
11          Q    Did you have about three or four cars a
12    day pretty much every day five days a week?
13          A    Oh, yeah, and then some.
14          Q    Did your neighbors ever complain about
15    that?
16          A    No.
17          Q    And you said after working on your own for
18    three years you went to work for Art Moran Auto
19    Plaza?
20          A    That's correct.
21          Q    What year was that?
22          A    I don't have any idea.
23          Q    Best guess, what was it?
24          A    Probably '89 to '90, somewhere in there.
25          Q    I thought you said you worked at Clark
```

1   Olds from '85 to '95?

2       A    Right.  Oh, okay.  Well, then that

3   meant -- so, it would be '98 to '99 and up.

4       Q    '98 or '99 and up until when?

5       A    I'm trying to think.  No, it couldn't have

6   been that.

7           So, Clark's Oldsmobile, I would have been

8   there until about '83 to -- I mean '93 to '95,

9   somewhere in there, and then out of the house for a

10  couple three years.

11      Q    Clark Oldsmobile from '93 to '95?

12      A    No, '85 to -- I'm not good with dates.

13  I'd have to look at a calendar.

14          I graduated in '84 or '85, came back down,

15  put 10 years on at Clark's Oldsmobile.  From there

16  that would make it '95, '94, somewhere in there.

17  Then, say, two years out of the house.  Then Art

18  Moran, I was there for -- I'm gonna say three to

19  five years, but I don't remember.

20      Q    How much money did you make when you

21  worked at Art Moran?

22      A    I think it was at 22 an hour, 23 an hour.

23      Q    The whole time you were there?

24      A    Yeah.

25      Q    What was your title at Art Moran?

1       A     Just a technician.

2       Q     What was your title at Clark Oldsmobile?

3       A     Technician and diesel tech.  I did a lot

4   of the diesel cars that came through there.

5       Q     Do you have any ASE certifications?

6       A     No.

7       Q     You know what ASE is, right?

8       A     Yeah.

9       Q     You don't have any certifications?

10      A     No.

11      Q     Have you ever had any ASE certifications?

12      A     No.

13      Q     What does ASE stand for?

14      A     Automotive Service something, Education.

15  In Palm Beach County you don't have to be ASE

16  certified.  Broward County, you have to be ASE

17  certified.

18      Q     Broward County actually requires its

19  technicians to be certified?

20      A     Yes.

21      Q     Is there any reason for that, to your

22  knowledge?

23      A     They used to.  I don't know if that's

24  changed over the years, but back in the day they

25  did.

1      Q     Is there any reason, to your knowledge,

2   why they would require that?

3      A     No, none other than to generate more money

4   in their pockets for schooling and licensing and

5   stuff.

6      Q     What type of vehicles did Art Moran sell?

7      A     Mitsubishi, GMC, Pontiac.

8      Q     Did they have --

9      A     Volkswagen.

10     Q     Did they have separate service centers for

11  each make of vehicles?

12     A     Yeah, they had certain mechanics that

13  did -- or technicians that worked on certain cars.

14     Q     And what vehicles did you work on while

15  you were at Art Moran?

16     A     GMC and Pontiac mostly.

17     Q     And why did you leave Art Moran?

18     A     I became a Snap-on tool dealer.  Try

19  something different.

20     Q     And what did you have to do to become a

21  Snap-on tool dealer?

22     A     Just bought a route.  Put some money down

23  and take over an existing route.

24     Q     What route was yours?

25     A     Delray Beach.

1      Q     And what were your responsibilities as a

2   Snap-on tool dealer?

3      A     Service the area with tools and use as

4   much merchandise on the street as possible.

5      Q     And how would you do that?

6      A     I had a big 25 foot truck.  I drove around

7   to different dealerships and independent garages and

8   sold them stuff to make them -- to help them fix

9   cars better.

10            A lot of times the guys would ask me, what

11   do I have to do to this car to fix this, Scott.

12   Because they knew I used to do that for a living.

13   So, I used to show them how to fix their cars they

14   didn't know how to fix.

15      Q     How long were you a Snap-on tool dealer?

16      A     I believe nine to 10 years.

17      Q     Are you currently a Snap-on tool dealer?

18      A     No.

19      Q     And something may not be right in my

20   chronology, so I just want to make sure I

21   understand.

22      A     That's what I was trying to figure out,

23   but...

24      Q     You said you graduated approximately 1985

25   from Nashville?

1      A      Right.

2      Q      You went and worked 10 years at Clark.

3    So, that would take us to about '95, right?

4      A      If it was 10. I'm thinking it was 10, but

5    now when I do that math it don't seem right. So --

6      Q      So, it may have been less than 10 years?

7      A      It may be been less than 10 years, but I

8    don't think it was. I don't really know. I'd have

9    to ask my wife. I don't take care of my stuff. I

10   don't even know my own kids' birthdays.

11     Q      So, remembering numbers and stuff is kind

12   of difficult?

13     A      No, I don't remember numbers. I remember

14   my phone number and my date of birth, that's it.

15   That's all I need to remember. But when it comes to

16   a car, I can figure out specifications and stuff, I

17   know what they're supposed to be. If it's not

18   important to me, I don't retain it. And knowing

19   dates, birth dates don't mean nothing to me.

20     Q      You said you thought you worked at Art

21   Moran from '98 or '99 for about three to five years,

22   so that puts us around 2000-ish.

23     A      I know. That's why when you say 10 years,

24   it doesn't seem right.

25     Q      If you were a Snap-on dealer for another

1    10 years, it brings us to present day?

2        A    Right.

3        Q    So, what do you think realistically?

4        A    So, maybe five years at Clark Oldsmobile,

5    maybe five years at Art Moran.

6        Q    So, that would put you at about '95?

7        A    Right.

8        Q    And then 10 years makes it 2005?

9        A    Right.

10       Q    But you said you've had Muffler House of

11   Delray for nine and a half years?

12       A    I run the Snap-on tool truck for about a

13   year and a half, two years while I still had the

14   Muffler House.  And I owned Duro Transmission at the

15   same time.  I had Duro Transmission, Muffler House

16   and my Snap-on truck running.

17       Q    Duro Transmission is what?

18       A    A shop next door to the Muffler House.  I

19   was running all three of them.

20       Q    Did you have any other employees.

21       A    My Duro Tran, I did.

22       Q    Is that, yes, you did?

23       A    Yes.  That's the first time I did that.

24       Q    It is the first time.  Let's try and avoid

25   it.

```
 1              So, you had employees at Duro Tran?

 2      A     Yes, I did.

 3      Q     How many employees did you have at Duro

 4   Tran?

 5      A     Two or three depending on how busy we

 6   were.

 7      Q     Did you have any at Muffler House at that

 8   time?

 9      A     Yeah, we had a few.

10      Q     How many?

11      A     Probably four.

12      Q     Were they the same employees as at Duro

13   Tran?

14      A     No.

15      Q     And then you were running the Snap-on

16   route at the same time?

17      A     Yes.

18      Q     What happened at Duro Tran?

19      A     I sold it to one of my employees.

20      Q     When did you sell Duro Tran?

21      A     Probably seven, eight years ago.  Probably

22   eight years ago.

23      Q     And are you still running the Snap-on tool

24   route?

25      A     No.
```

1        Q      When did you stop running the Snap-on tool

2    route?

3        A      I don't have any idea.  I've been here

4    nine years.  So, probably six to seven years ago.

5        Q      And where is the Art Moran dealership

6    located?

7        A      Northlake Boulevard in North Palm Beach

8    right off of 95.

9        Q      That's now a Schumacher then too, right?

10       A      That's Schumacher now too.

11       Q      Where did you say Clark Olds was?

12       A      South Olive Avenue and Okeechobee

13   Boulevard.  They're bulldozed down now.

14       Q      Now, the only business you have is Delray

15   Muffler House, right?

16       A      Correct.

17       Q      What type of work do you do at Delray

18   Muffler House?

19       A      Whatever needs to be done from automotive

20   repair to book work to fix anything -- fixing

21   anything around the shop, whatever needs to be done.

22       Q      How much money do you make annually from

23   Delray Muffler House?

24              MR. KODSY:  Gross?

25              MR. KLEIN:  Yeah, gross.

1          THE WITNESS: 40,000.

2    BY MR. KLEIN:

3          Q    40,000 a year?

4          A    Yeah.

5          Q    Do you own the building that Delray

6    Muffler House is located at?

7          A    No, I don't.

8          Q    Who owns that building?

9          A    I have first right of refusal to it.

10         Q    Who owns the building?

11         A    A man named John Goodman.

12         Q    Do you pay rent to Mr. Goodman?

13         A    Yes, I do.

14         Q    What's your monthly rent?

15         A    Around 3,000.

16         Q    And that $40,000 figure, is that Delray

17   Muffler House's gross income or is that your

18   personal gross income?

19         A    That's my personal.

20         Q    How much money does Delray Muffler House

21   make annually gross?

22         A    I couldn't tell you.

23         Q    And how are you paid by the Muffler House?

24         A    Usually cash.

25         Q    Is there any type of a formula or basis?

1   Do you get a percentage?  That's what I'm asking

2   you.

3          How do you determine how much money to pay

4   yourself personally?

5      A    I don't.  I just take what I need when I

6   need it.

7      Q    Does Delray Muffler House have an

8   accountant?

9      A    Yes.

10     Q    Who is that?

11     A    I just retained him.  I don't know his

12   name right off the top of my head.

13     Q    Who did Delray Muffler House have as an

14   accountant before that?

15     A    Tom Mahoney.

16     Q    Where's Tom Mahoney located?

17     A    In Boynton Beach.

18     Q    Do you need to answer that?

19          (A recess was held.)

20   BY MR. KLEIN:

21     Q    Before we took our break, Mr. May, I was

22   asking you a little bit about Delray Muffler House

23   and your income from that.  Other than Delray

24   Muffler House, do you have any other sources of

25   income?

1    A    I used to have, but I don't have much

2    anymore.

3    Q    What did you used to have?

4    A    Rental houses.

5    Q    And what happened to the rental houses?

6    A    A lot of them are in -- are empty or

7    vacant right now.

8    Q    Do you still own them?

9    A    Yeah.

10    Q    How many rental houses do you own?

11    A    Maybe 10.

12    Q    Have any of them been foreclosed upon?

13    A    There's some of them in the -- in the

14    action of being foreclosed on.

15    Q    How many are in the process of being

16    foreclosed on?

17    A    Probably nine to 10.

18    Q    So, pretty much all of them?

19    A    Yeah.

20    Q    Are there any of them that are not in the

21    process of being foreclosed on?

22    A    I got a couple of them out of foreclosure

23    in limbo right now, so...

24    Q    What about the house you're currently

25    living in, do you own that?

1      A    Yeah. That's in foreclosure too.

2      Q    When was the last time you had rental

3  income from the rental houses?

4      A    A couple of them I get a month. There's,

5  like, two of them that are consistent. The rest of

6  them, you get it when you get it. And so two of

7  them, I would say last month.

8      Q    And how much do you get from those two

9  houses?

10     A    Around 2,000.

11     Q    Total?

12     A    Yeah. Before the economy went south, I

13  never used to have an empty house in my life. They

14  were always full, always.

15     Q    What were you asked to do with regard to

16  Mr. Kodsy's Hummer?

17     A    Let him know what the vibration and the

18  running problem was with the vehicle. And that took

19  about five minutes.

20     Q    I want you to take me through kind of step

21  by step how you became involved in the case. Let's

22  start there. How did you even come to look at this

23  Hummer?

24     A    He drove in my shop. I don't remember if

25  he said someone referred him over there or what. He

1    said, can you look at this, they say you're pretty

2    good.

3              I just got in the vehicle.  I didn't have

4    to hook anything up to it at first.  I knew just by

5    the way it felt wasn't right.

6        Q    Did he call you before he came in?  When I

7    say he, Mr. Kodsy.

8        A    Not that I'm aware of, no.

9        Q    So, he shows up at Delray Muffler House on

10   May 4th.  And what did he tell you?

11       A    Well, maybe --

12       THE WITNESS:  Were you in there the week

13   before and you were mentioning the Hummer to me

14   and I told you to bring it to me?  That's what

15   it was.  He was having something done there.

16

17       MR. KODSY:  Right.

18       THE WITNESS:  And probably a week or two

19   ahead of time, maybe a month ago before he came

20   in, he was having another car worked on and we

21   just were talking about something and he was

22   saying something about his Hummer.  I said,

23   well, bring it in, I'll take a look at it, see

24   what I can do with it.

25

1   BY MR. KLEIN:

2       Q    And what did he tell you about his Hummer

3   at that time?

4       A    Just that there was a problem with it, it

5   wasn't running right, it had this vibration in it

6   that no one seems to know what's wrong with it.

7           I said, I can fix that, whatever it is.

8   It will take no time to fix that.  On a brand new

9   Hummer, it would be nothing.  There can only be a

10  couple things that can make that problem.

11          He said, well, everybody else don't know

12  how to fix it.  So, he brought it to me.

13      Q    What vehicle was he having worked on

14  before the Hummer?

15      A    Lord, I wouldn't have any idea.  I

16  wouldn't have a clue.

17      Q    Do you have an invoice for that vehicle?

18      A    Yeah.  I'd have to go back and dig it out.

19      Q    Does Delray Muffler House have a computer

20  system to track its repair orders?

21      A    No.

22      Q    How are Delray Muffler House's files kept?

23      A    In a filing cabinet and then they get

24  moved to the -- the archive file in boxes for three

25  years or four years and then they get disposed of.

1        Q    Are they stored by owner, vehicle?  How

2    are they filed?

3        A    They're filed by month.

4        Q    So, Mr. Kodsy comes back to the dealership

5    on -- or to the Muffler House on May 4th.  What did

6    you do then?

7        A    Got in the vehicle, took it for a ride.

8        Q    Did Mr. Kodsy go with you?

9        A    No.

10        Q    Before you got in the vehicle, did he tell

11    you what the problems he was experiencing were?

12        A    Yes.  He said he was having a running

13    rough problem, no one could find the vibration.

14        Q    Anything else?

15        A    No.  I think it was just mostly vibration

16    and running rough.  I don't remember if there was a

17    check engine light on or not, if he was saying there

18    was a light -- possibly a light, but I don't

19    remember.  It just seemed like it didn't have no

20    power, he says.

21        Q    Was there anything else he complained

22    about?

23        A    Not to my recollection right off the top

24    of my head.

25        Q    Did you take any notes when Mr. Kodsy came

1    in?

2        A    No.  I just stored it in my memory bank

3    because it didn't have anything to do with dates.

4        Q    So, where did you take it for a ride?

5        A    Down Federal Highway.

6        Q    How far did you drive?

7        A    Probably five or six blocks.

8        Q    One way or total five or six blocks?

9        A    One way.

10       Q    And how did the vehicle drive?

11       A    It had no power and very sluggish.

12       Q    When you took it for a ride, did you plug

13   in any diagnostic equipment?

14       A    No.

15       Q    Before you took it for a ride, did you do

16   any type of a diagnostic check?

17       A    No.  I wanted to feel what he was talking

18   about because normally I can diagnose most things

19   without even hooking anything up to it.

20       Q    So, you didn't feel it was necessary to

21   check to see if there were any diagnostic trouble

22   codes before you drove it?

23       A    No.  I wanted to experience what it felt

24   like before I get a machine out, see how close I am

25   to being right.  I'm always in the money.

1       Q     Always?  You've never misdiagnosed a

2    vehicle?

3       A     I've misdiagnosed two or three, but that's

4    very rare.  That's really rare.

5       Q     So, after your ride in the Hummer H2 what

6    was your opinion?

7       A     The car -- the truck is in retarded

8    timing.  There's something internally wrong with the

9    motor, that the timing chain or camshaft is out of

10   position.

11      Q     And did you come to that conclusion before

12   hooking up any diagnostic tools?

13      A     Yes, I did.  You could feel it in the

14   vehicle soon as you put it in gear.

15      Q     What did you feel?

16      A     You can feel the truck lugs, lugs down,

17   and has this -- if you listen to the way a motor's

18   tuned -- you wouldn't have the ear for it, but if

19   you're in the business long enough you can hear the

20   way a motor tunes, the way it talks to you if you

21   listen to it.

22            It's in retarded timing.  It just lugs

23   down and just sounds -- sounds like it's gasping for

24   breath.  And if you put another H2 next to it,

25   you'll see the difference between one that can

1    breathe and one that can't breathe.

2        Q    Did you compare another H2 to this one?

3        A    I did just the other day. I had an H2 in

4    the other day and I took that thing for a ride and I

5    said, man, what a world of difference this one is

6    compared to that one. You can just -- you can just

7    feel the motor is so much spunkier and cheerful and

8    can breathe compared to the one that you sit next to

9    that's just choking.

10       Q    What year H2 did you have in the shop the

11   other day?

12       A    I think it was a 2000 or a '99. No, no.

13           MR. KODSY: 2007.

14           THE WITNESS: 2007.

15           MR. KLEIN: Mr. Kodsy, again, I'm going to

16       ask you not to communicate with the witness on

17       his testimony.

18   BY MR. KLEIN:

19       Q    If you don't know an answer, you can say

20   you don't know.

21       A    You know, it's going back to those numbers

22   again.

23       Q    So, it was a 2007 Hummer H2?

24       A    Yeah.

25       Q    Was Mr. Kodsy there when this other Hummer

1   H2 came in?

2       A    Not when it came in.

3       Q    But he was there while you were working on

4   it?

5       A    Well, he showed up later in the day.  I

6   had it there and was working on it and I kept it

7   overnight to do some stuff on it and he happened to

8   come in the next morning.

9       Q    What was the Hummer H2, the 2007, what was

10  it at the shop for?

11      A    Some exhaust work.

12      Q    Custom exhaust work?

13      A    Yeah.

14      Q    What ECM calibration was on that 2007 H2?

15      A    What do you mean, ECM calibration?

16      Q    There's an engine control module, correct,

17  in a vehicle?

18      A    Correct.

19      Q    And there's a calibration that governs the

20  way the engine performs, the shift points and those

21  things, correct?

22      A    Well, there's not -- there's a calibration

23  that the computer's set to.

24      Q    Correct.  What version calibration was in

25  that computer?

1      A    Oh, I don't have any idea.  I never looked

2  up the conversion.  I told the customer I was going

3  to use his truck as a guinea pig and compare values

4  to this other one.

5          So, I wrote down all the values on his

6  Hummer and was gonna have his Sherif bring his back

7  in and compare the readings to it.

8      Q    What engine's in the 2007 Hummer H2?

9      A    I believe it had a six liter in it.

10     Q    A six liter?

11     A    It's either a five, seven or a six liter,

12  one of the two.

13     Q    What engine is in Mr. Kodsy's Hummer H2?

14     A    I believe it's a six liter.

15     Q    The 2007 Hummer H2 that you looked at, did

16  it have any modifications?

17     A    No.  I actually called the customer and

18  asked him asked him if he -- because the thing was

19  so fast and it had big tires.  It had monster tires.

20  It had, like, 27s or something on it, 24s.  I said,

21  did you have anything done to this truck.  He goes,

22  nope, that's all stock.

23     Q    Was he the original owner?

24     A    Yes.

25     Q    You know that for a fact?

1       A    Yes.

2       Q    Where did he buy the vehicle?

3       A    Oh, I wouldn't have any idea.  He just

4    brought me a Jaguar the other day.

5       Q    Do you know if the dealership may have

6    made any modifications to the Hummer H2 '07?

7       A    Dealerships don't usually modify their

8    vehicles.

9       Q    But you don't know whether or not the

10   dealership may have made any qualifications?

11      A    No.  I didn't get that far into detail

12   with him.  I just had called him and asked him if I

13   could use his truck as a guinea pig and get some

14   specs off of it since it was in there just for

15   exhaust work.  He said, yeah, go ahead.

16      Q    And have you actually seen Mr. Kodsy's

17   Hummer H2 since May 4th, 2009?

18      A    Yeah.

19      Q    When did you see it?

20      A    Probably -- maybe two to three weeks ago.

21      Q    Let's go back to the May 4th, 2009

22   inspection.  Before that had you driven any other

23   Hummer H2s?

24      A    Yes.

25      Q    And how many Hummer H2s had you driven

1    before the May 4th, 2009 inspection?

2        A    Probably four or five.

3        Q    What years were they?

4        A    All different years.  Most of them were up

5    in the 2000 year or better.

6        Q    And what were they at the shop for?

7        A    One was -- a couple of them were exhaust

8    work and a couple of them were power steering.  Pump

9    pulley blew off of it.  And one, maybe it was just a

10   routine maintenance, oil changes and stuff.

11       Q    So, back to Mr. Kodsy's 2008 Hummer H2,

12   after you took it for a ride, you came back to the

13   shop and you determined that it felt like the truck

14   lugged down, you could hear the motor and you felt

15   that it was in retarded timing?

16       A    Correct.  Oh, I know it is.  It's not a

17   matter of thought.

18       Q    You knew just from driving it it was in

19   retarded timing?

20       A    Sure.

21       Q    What is the timing on the truck?

22       A    It's set by the computer.  Depending how

23   it's set up, it's supposed to be around 20.

24   Advanced timing is, I think, 21 to 23.

25       Q    21 to 23 what?

1       A       Degrees advance.

2       Q       And what was the timing on Mr. Kodsy's

3    truck?

4       A       Like a negative something.

5       Q       How did you determine that?

6       A       With the scanner.

7       Q       And that's the Snap-on MT 2500?

8       A       Correct.

9       Q       Other than the truck lugging and the sound

10    being different, what other symptoms would there be

11    of retarded timing?

12       A       Retarded timing, the whole truck will

13    shimmy or a vibration that hums through the truck.

14       Q       Are there any other symptoms?

15       A       When you're driving, you just don't have

16    the power. It kind of gives you -- it kind of gives

17    you a vibration through the truck.

18       Q       And explain to me what timing is.  What

19    does that mean?  What is the timing?

20       A       General Motors or Ford or Chrysler,

21    whoever, you have to have a certain spec that they

22    have the motor timed by to make it perform the way

23    it's supposed to perform at its best.  And there's a

24    timing before top dead center, which meaning the

25    piston is at its -- the number one piston in most

1    cars is blown to the top.  You set your chains and

2    everything to a certain location that General Motors

3    has issued to be in the best performance.  You put

4    your marks here and the piston to be on top is set

5    at number one.

6         So, the vehicle performs at its best when

7    it's put together -- all the rest is put together

8    and everything matches together.  If the timing is

9    out, you get vibrations, low power, check engine

10   lights because it's not meeting its peak

11   performance.

12        Q    Does the timing have anything to do with

13   the actual rotations of the crank shaft and the

14   camshaft and the openings and closings of the

15   valves?

16        A    It doesn't have anything to do with the

17   openings and closing of the valves.  The opening and

18   closing of the timing is the load lift on the

19   camshaft that gives you how long a valve is open for

20   and how long -- when a valve closes is a load lift.

21   The pistons and the crank shaft just are up and down

22   creating compression when the valve closes the

23   cylinder.

24        Q    And if the timing is off in a vehicle,

25   could you have --

1      A    You could have valve lash. You could have

2   valves that are opening and closing too soon or too

3   late causing pinging, overheating of the motor,

4   burning the valves, different values reading wrong.

5      Q    Did you observe any pinging in Mr. Kodsy's

6   motor?

7      A    Yeah. Well, not pinging. It depends how

8   hard you accelerate it. If you accelerate it hard

9   enough it rattles a little bit.

10      Q    The engine rattles or something in the

11   truck rattles?

12      A    No. The engine rattles. It's called a

13   pinging noise from lack of being in the incorrect

14   timing or poor fuel. If you have a truck or a car

15   that has low grade fuel in it and the timing's off,

16   it will ping and rattle because it is not burning

17   the fuel properly.

18           I mean, it's detonating inside the

19   cylinder instead of exploding in the cylinder in a

20   mist and creating the combustion that it needs.

21   It's creating a fire ball in there because the

22   timing is not in the right spot.

23      Q    Okay. So, you mentioned hooking up the

24   Snap-on tool. What did the Snap-on tool tell you?

25      A    It doesn't tell you anything. You have to

1    read it.  And it's mostly values that you have to

2    read and know what the values mean.  Because if

3    you're looking at a scanner and it's just numbers

4    and opening and closings and figures, if you don't

5    know what they mean --

6        Q    Well, let's go through it.  What values

7    did you get from hooking up the Snap-on scan tools

8    to Mr. Kodsy's truck?

9        A    Well, it gives you values it's possible to

10   read.  It gives you tool and sensor value,

11   temperature sensor.  It gives you block learn.  It

12   gives you advanced timing.  It gives you O2 sensor

13   readings.  There's oil temperature sometimes and

14   some of them -- sometimes transmission temperature

15   sensor.  Let's you know if the brakes are -- brake

16   lights are on or off.  It has just all kinds of

17   different readings.

18       Q    What was the coolant sensor reading for

19   Mr. Kodsy's truck?

20       A    I don't have the specs.  I have that

21   written at the shop on the chart that is Exhibit 3,

22   I believe, that we don't have here.

23       Q    Those are the specs on what it should be,

24   correct?

25       A    Those are the specs that I wrote down,

1    what are and what they should be and what they

2    currently were.

3         Q    So, you wrote down the values on

4    Mr. Kodsy's truck?

5         A    Yes.

6         Q    And you did not bring that information

7    today?

8         A    No. I thought it was in that packet we

9    brought today.

10        Q    Why didn't you write it on the invoice?

11        A    Because there was so much other junk on

12   there.

13        Q    Could you have prepared an attachment to

14   the invoice?

15        A    I could.

16        Q    When did you write those values down?

17        A    That day. And I didn't know it was gonna

18   be in litigation and all that stuff. So, I really

19   don't put that stuff on there because it doesn't

20   mean a hill of beans to anybody.

21        Q    Does the Snap-on scan tool have the

22   ability to show any diagnostic trouble codes in a

23   vehicle?

24        A    Sure.

25        Q    Did you find any diagnostic trouble codes?

1      A      Does it say I found them?  If I did, I

2  would have wrote it down on here.

3           It doesn't look like I see a trouble code

4  in here.  I would have wrote it down.

5      Q      If a vehicle has retarded timing, would it

6  trigger a diagnostic trouble code?

7      A      Some vehicles will, some vehicles won't.

8  But depending on -- on how sensitive some of the

9  main computer is or the O2 sensors, if they pick up

10  a value that's out of range within a certain degree

11  or a certain temperature, then it will set a light.

12  If it's still within a value of itself, it may not

13  be right, but it won't set the light either.  There

14  are certain vehicles that are just hard to set

15  lights on.

16      Q      But if the timing was significantly off,

17  as your opinion has it, would you have expected

18  there to be a diagnostic trouble code?

19      A      No.  Because normally cars that are in

20  retarded timing don't usually set a check engine

21  light.  They show different values and the computer

22  tries to compensate for those to get them back to

23  normal values and it can never get there.  That's

24  why it's always so slow or pinging.

25      Q      So, the computer's actually designed to

1    adapt to whatever sensors it's reading to make it

2    perform better?

3         A    To make it perform where it needs to be.

4         Q    And if it doesn't perform at that level,

5    it would trigger a diagnostic trouble code?

6         A    It may, it may not.  Depends if it's out

7    of its values.  All sensors and relays and stuff

8    have a value range to be within a specification.

9         Q    And did you find that the values for all

10    the sensors in Mr. Kodsy's were in the range they

11    should have been?

12         A    No.

13         Q    So, then it would have set a trouble code,

14    correct?

15         A    It may and it may not.  Depends on if the

16    sensor's working properly.  Some of them don't pick

17    up trouble codes.  Like a map sensor on a Ford and

18    some map sensors on Chevrolets, when they go bad,

19    they make the truck run terrible first thing in the

20    morning.  When you first fire up them up, the map

21    sensor's not reading right, but it never triggers a

22    check engine light because it's not on long enough,

23    but it's a bad map sensor.

24         Q    Do you have anything from your inspection

25    that would indicate to you that the sensors in

1    Mr. Kodsy's vehicle are not performing properly?

2    A    No, just the internal parts. So, the

3    truck wasn't timing properly, so it was causing

4    sensor readings to be -- certain sensor readings to

5    be in the wrong spec.

6    Q    So, we don't have a situation in this

7    vehicle where the sensors are bad, that's your

8    opinion?

9    A    No, no. You have an internal problem with

10   the motor.

11   Q    So, my question to you before was, if the

12   internal sensors were within the values they should

13   be in won't set a trouble code, right?

14   A    Most of the time not.

15   Q    In your opinion, on this vehicle the

16   sensors are not within their proper values?

17   A    The timing is out of its value. And there

18   may be a couple other ones out of their values, but

19   they may not trigger a light.

20   Q    Would they trigger a misfire in the

21   engine?

22   A    No.

23   Q    There wouldn't be a misfire in the engine

24   based on the difference in what you say the

25   specified timing should be versus what you found?

1      A      No. But it's not misfiring. It's out of

2    time. It's in a different position. It's not a

3    misfire. A misfire is when it quits firing. It

4    starts and comes and goes and goes. This is at a

5    different location.

6            When it's supposed to fire at 10 degrees

7    before top dead center and now it's firing at

8    10 degrees after top dead center, it's firing in a

9    different location. It doesn't have anything to do

10   with it.

11     Q      Would it effect the omissions?

12     A      Sure. That's why the 02 sensors pick up a

13   reading. And then it tries to remix the fuel to get

14   it back to where normal would be, but it never can

15   get it there, but it always tries.

16     Q      I'm looking at Exhibit 2 and it says here,

17   scan cc. What is cc?

18     A      Computer command control, which is a

19   computer diagnostic system.

20     Q      And it says, note, block learn out of

21   spec, fuel ratio out of spec.

22     A      Block learned is normal -- normal values.

23   Any vehicle, block learn is 128. Fuel ratio is

24   14:7:1. Both of his are out. If I didn't write

25   them down it's 'cause it didn't need to be written

1    down, but I probably had them on a chart at the

2    shop.

3        Q    Other than the block learn and the fuel

4    ratio, did you have any other things that were out

5    of spec?

6        A    I believe the advanced timing, the timing,

7    some spec was out of spec.

8        Q    But you did not write that down on this

9    invoice, correct?

10        A    If it's not written down there, no.

11    Because these are the two important things that give

12    you the full mixture ratio telling you that it's not

13    firing and -- not firing properly. When the car is

14    running properly, it has a block read of 128,

15    guaranteed, every car. And your fuel ratio would be

16    14:7:1, guaranteed, every car.

17        Q    You said the cause of this problem is the

18    timing chain installed wrong?

19        A    Installed wrong or the camshaft is

20    incorrect or the camshaft marks, the lobes are worn

21    on it, the timing chain was installed incorrectly,

22    got it off a tooth.

23        Q    Did you inspect the timing chain?

24        A    No. I didn't inspect anything internally

25    in that motor. That's something up to General

1     Motors.  It's under warranty.  You shouldn't tamper

2     with something under warranty.

3          Q     And you have a note here.  It says, engine

4     should be replaced under factory warranty?

5          A     Correct.

6          Q     The timing couldn't be adjusted?

7          A     If General Motors sees fit to do that, if

8     that's what it takes, but it has to be tore down and

9     inspected to see what's internally wrong.

10          Most people can't feel that by putting it

11     in gear and noticing that it's out of timing.  They

12     just -- they ain't got enough common sense.  So, you

13     need to tear it down to inspect it to see what's

14     wrong.  There's no way to fix it unless you tear it

15     down.  So, it may be a chain to be reset.  It may be

16     a camshaft is wrong in the vehicle it.  Could be a

17     lot of things.

18          Q     So, when you're saying the engine should

19     be replaced, that's just speculation on your part?

20          A     That's not speculation.  That's what

21     General Motors normally would do.  When a

22     transmission fails within a certain period of time

23     under their factory specs, they don't want you to

24     overhaul it, they want you to replace it.

25          So, in most cases in those vehicles with

1    low mileage and under a factory warranty, they

2    replace the engines.  They don't tear them apart and

3    fix them because they usually take those vehicles

4    back for that transmission or that motor.  They take

5    it back and inspect it to see what is wrong with it

6    so they can correct their problems later on down the

7    road so they don't have this problem.

8         Q    But based on your conclusion that the

9    timing is retarded, that wouldn't in and of itself

10   require the engine to be replaced, right?

11        A    In most vehicles, no.  But under a

12   warranty vehicle, yes.  But if I was gonna -- if it

13   was out of warranty, no, you'd pull it apart and fix

14   it.

15        Q    If the timing is retarded, would it lead

16   to an engine miss?

17        A    No.  An engine miss would come when

18   something fails.  Like if a spark plug failed, it

19   doesn't work.  If a coil doesn't work or an injector

20   stopped working, that would create a miss.  Retarded

21   timing is not going to cause a miss.  It causes

22   sluggishness.

23        Q    Would doing a compression test to the

24   engine give you indications to whether or not the

25   timing was in fact wrong?

1    A    No.  A compression test is gonna give

2    you -- it's gonna give you more of a -- it's still

3    gonna build the compression in the cylinder.

4         Say the normal value on the compression

5    test is 160 pounds.  As long as the valves are

6    closing -- opening and closing in a certain period

7    of time, you're still going to get that 160 pounds

8    unless the timing's way off and then you're not

9    gonna have that.  I mean, it has to be way off.

10    Q    You had mentioned before that you prepared

11    this invoice that's Exhibit 2 and then prepared a

12    separate report, is that right?  Or Mr. Kodsky came

13    back and asked you to prepare a report?

14    A    Yeah.

15    Q    What does that mean?  What report did you

16    prepare?

17    A    To tell you the truth, I don't remember

18    what I wrote, what the report was.  It's been way

19    back when.  But I'd have to ask Sherif if I wrote up

20    something for him or not, but I couldn't tell you

21    off the top of my head.

22    Q    So, you don't know if you did a separate

23    report or not, separate from Exhibit 2?

24    A    I did a separate report.  We wrote up

25    something, but I don't remember what we put in that

1    without looking at it. It's been so long.

2        Q    And where is that report currently?

3        A    If it's -- is it in that pile?

4    It's in the first pile.

5            MR. KODSY: It's got to be in your shop

6        because I didn't get anything from you. That

7        was that and then I came back and you notarized

8        it, that's what happened.

9            THE WITNESS: Oh, is that what it was?

10           MR. KODSY: You had to write it so we

11       could go get it notarized.

12           THE WITNESS: Oh. So, that's what it was.

13   BY MR. KLEIN:

14       Q    So, this is the only thing you've written

15   up on the vehicle?

16       A    Yeah.

17       Q    And when did Mr. Kodsy come back to have

18   the invoice notarized?

19       A    Whenever the date is on there that they

20   notarized it. I think he did it within the same day

21   or within the week.

22       Q    How long did your inspection of the Hummer

23   H2 take?

24       A    A half an hour, 45 minutes.

25       Q    Is it your process not to write

1    specifications on the actual work orders when you

2    inspect the vehicle and perform a scan tool check on

3    it?

4        A    Yeah.  In certain cases if it's got a

5    code, I put the code down.  So if it does come back

6    for a check engine light, then I know that we fixed

7    the code so and so.

8            But I don't put specifications down.  It's

9    just not necessary.  The customer doesn't know what

10   it means.  Most customers don't know what it means.

11   All they want to know is, did you fix my car and how

12   much.

13       Q    But when you handed this invoice to

14   Mr. Kodsy with the note that the engine should be

15   replaced under factory warranty, did you expect he

16   would take it to General Motors and show this to

17   them?

18       A    No.  Well, I don't know.  I didn't discuss

19   that with him.  So, I didn't know.

20       Q    So, after you inspected the vehicle for 30

21   to 45 minutes Mr. Kodsy left, is that right?

22       A    Correct.

23       Q    And he came back, you say, a week or so

24   later to have this notarized?

25       A    Yeah, whenever it was.

1       Q       Did you add anything additional to the

2    invoice that's Exhibit 2 when the notary was there?

3       A       Not that I'm aware of.

4       Q       What did you do to rule out any other

5    possible -- I'm looking at Exhibit 2.  It says

6    inspect for vibration/miss.  So, Mr. Kodsy mentioned

7    there may be a miss, right?

8       A       Right, because it runs so slow.

9       Q       And you did not find any miss?

10      A       No.

11      Q       The scan tool, when you're plugging it in

12   to scan the vehicle, is the vehicle running at the

13   time?

14      A       No.  You shut it off.  It's off and you

15   load the information and the VIN number and then it

16   tells you to fire up the car or turn the key on.

17      Q       But the engine itself is not running?

18      A       No.

19      Q       Do you have equipment at Delray Muffler

20   House that would enable you to plug into the

21   diagnostic port and actually record or take

22   snapshots of how the engine is performing while it's

23   operating?

24      A       Sure.

25      Q       Did you do that in this case?

1        A      No.

2        Q      Why not?

3        A      Because it wasn't necessary.  I didn't

4   know it was going to go into litigation and all that

5   stuff.  He asked me to diagnose what was wrong with

6   the car and I diagnosed what was wrong with the car

7   and put it on paper.

8        Q      And after Mr. Kodsy left the Muffler House

9   on May 4th, 2009 or after he came back -- I guess

10  between when he left and when he came back with the

11  notary, did you have any conversations with

12  Mr. Kodsy?

13       A      Not that I'm aware of.

14       Q      After the notary notarized Exhibit 2, did

15  you have any further communications with Mr. Kodsy?

16       A      After what now?

17       Q      After this was notarized?

18       A      Yeah, he's been in and out of the shop

19  with a couple different things, but nothing to do

20  with this.

21       Q      When you say this, you mean with the

22  Hummer H2?

23       A      Right.

24       Q      When did you receive the other documents

25  that are marked as Exhibit 4?

1        A    I don't know.  He probably brought these

2    to me probably within the last -- some of them

3    probably within the last 45 days.

4            MR. KODSY:  Couple months.

5    BY MR. KLEIN:

6        Q    Why did he bring those documents to you?

7        A    He wanted my opinion on them.

8        Q    And what is your opinion on the documents

9    of Exhibit 4?

10        A    It just states some issues that Hummer has

11    with their vehicles on some -- some problems they

12    had with fixing things.  But none of it pertains to

13    anything that I would say has to do with the

14    internal part of that motor.  This is other stuff

15    that causes other conditions and may pertain to that

16    vehicle for other reasons, but the motor is the

17    problem for the vibration.  And the tires are the

18    wrong tires on the vehicle to start with that

19    General Motors put on it.

20        Q    How do you know General Motors put the

21    tires on the vehicle?

22        A    Because he bought it from General Motors.

23        Q    He bought it from where?

24        A    General Motors.

25        Q    Directly?

1       A       Well, they bought it from a GM dealer.

2   When you put a sign in front of your building that

3   says GM, you're pretty much GM.

4       Q       So, when you worked for Art Moran Auto

5   Mall --

6       A       Right.

7       Q       -- Art Moran is General Motors?

8       A       No.  It was his individual self, but he

9   has to abide by General Motors' rules.

10      Q       But it's an independently owned and

11  operated dealer?

12      A       Correct.

13      Q       Have you reviewed any of the purchase

14  documentation for Mr. Kodsy's Hummer?

15      A       No, I have not.

16      Q       Do you even know what dealer Mr. Kodsy

17  purchased the vehicle from?

18      A       I believe it was a Cadillac dealership

19  somewhere down south, but I don't know the name of

20  it, to tell you the truth.

21      Q       So, let's go through Exhibit 4.  I'm going

22  to mark -- the first two pages is a printout.  What

23  is that, All Data?

24      A       Right.

25      Q       Did you print this document?

1       A    No.

2       Q    Do you have access to All Data?

3       A    I have Mitchell.

4       Q    What is Mitchell?

5       A    Same thing as All Data, but Mitchell.

6       Q    Okay.  What is All Data?

7       A    It's a company that, again, sits on a

8    board of General Motors, Ford, Chrysler and the rest

9    of the car manufacturers that get their information,

10   software company that produces or makes software for

11   their vehicles out here so independent garages and

12   people like me can get in and look at the computers.

13      Q    So, this printout of the technical service

14   bulletin, that's not something you printed?

15      A    No, I didn't print that.

16      Q    Did you think it was necessary to see what

17   technical bulletins might be on Mr. Kodsy's vehicle

18   in reaching your opinions?

19      A    I told him to look up some bulletins

20   because there may be something else on there.

21      Q    But you did not?

22      A    No.  I told him to do it.  I don't mess

23   with computers.

24      Q    I'll mark these two pages 4A.

25           (Defendant's Exhibit No. 4A was marked for

1        identification.)

2    BY MR. KLEIN:

3        Q    Are there any technical bulletins on 4A

4    that relate to your findings on the vehicle?

5        A    Yeah, the interior seat cover wear.  No,

6    only joking.

7             Radial tires on here is force vibration

8    information is the bulletin 00-03-10-6C as in

9    Charlie dated January '08.

10       Q    And how would that relate to your opinions

11   on the vehicle?

12       A    'Cause it does have a tire vibration as

13   well with a tire chopping vibration and he says in

14   his report here he's complaining about a vibration.

15       Q    Where did you note a tire chopping

16   vibration?

17       A    Oh, I don't have a note on there.  I'm

18   just saying in the complaint that I --

19       Q    So, Mr. Kodsy asked you to inspect the

20   vehicle, and I'm looking at your invoice, for a

21   vibration?

22       A    Right.

23       Q    And you concluded about the retarded

24   timing.  You didn't make any mention of tire

25   vibration.  When did you realize there was a tire

1    vibration in the vehicle?

2        A    I realized the tire vibration about four

3    or three weeks ago when he brought me the vehicle

4    back and I wanted to read the specs on it. I was

5    looking at the vehicle while I sat there. I said,

6    those don't look like the right tires for this

7    vehicle.

8            So, General Motors has a sticker on the

9    side of the door -- inside of the driver's door. It

10   tells you the rating of the tires that should be on

11   this vehicle. It's an A rating, D rating, C rating

12   and the tire size.

13           So, I mentioned that to him that I looked

14   at the tires, something didn't look right about

15   them. He didn't mention it to me. I went over and

16   looked at the tires.

17           I said, do you know these are the wrong

18   tires for this truck. I called down the street to

19   the tire store. I said, what is the Z rating or D

20   rating mean. He said one is a truck rating and one

21   is for passenger truck.

22       Q    What tires are on Mr. Kodsy's truck?

23       A    Passenger -- what was it, light duty

24   passenger truck?

25           MR. KODSY:  Light duty.

1    BY MR. KLEIN:

2        Q    What size?

3        A    I don't know. I'd have to look.

4        Q    Did you write it down somewhere?

5        A    Yeah, probably on a note pad at the shop.

6        Q    Why didn't you bring that with you today?

7        A    Because I thought he had some information

8    on it. Because I told him to go to Firestone down

9    there. It would have printed off the Internet on

10   the tire stuff because I don't have access to the

11   Internet. I don't have time to mess with all that

12   stuff. I'm just not into that.

13           The rating on the tires in that truck are

14   a light duty truck and on the sticker on the truck

15   itself says it should be a heavy duty, I think a D

16   rating.

17           MR. KODSY: D rating.

18           THE WITNESS: That's what's supposed to be

19       on there. And what's on there, A rating?

20           MR. KODSY: Off road tires, light truck.

21           THE WITNESS: I just noticed that by the

22       truck just sitting there. He didn't mention

23       anything about it.

24   BY MR. KLEIN:

25       Q    Do you have any training or expertise

1    regarding the possible impact of the different rated

2    tire?

3        A    Experience on how they ride.

4        Q    And again, those were the tires that were

5    on the truck when you inspected it in May of '09,

6    right?

7        A    I believe so.  I don't know if he had them

8    changed before that or after that, but I believe so.

9    I couldn't tell you.

10       Q    And if Mr. Kodsy had the tires changed,

11   that would effect your opinion that they were on

12   there from the beginning, wouldn't it?

13       A    If he had them changed?

14       Q    Yeah.

15       A    No, it wouldn't change my opinion.

16   There's still a motor problem.

17       Q    No, you said earlier you thought those

18   tires were on there from the beginning.  If

19   Mr. Kodsy had them changed, that wouldn't be the

20   case now, would it?

21       A    No.  If he had them changed, they were

22   done by General Motors, a General Motors

23   representative.

24       Q    How do you know that?

25           MR. KODSY:  He doesn't.

1              THE WITNESS:  I'm just saying, that's

2          where he normally takes his truck.  He would

3          have taken it back to Cadillac.

4      BY MR. KLEIN:

5          Q    Let's look at the other documents that are

6      in Exhibit 4.

7              (Defendant's Exhibit No. 4B was marked for

8          identification.)

9      BY MR. KLEIN:

10         Q    Exhibit 4B, which I've marked --

11         A    I'm just assuming that's what he would

12     have done.

13         Q    I don't want you to assume.  I want you to

14     tell me what you know.

15         A    Oh, okay.

16         Q    We're here to determine your opinions and

17     your knowledge.

18         A    Correct.

19         Q    Now, what I marked as Exhibit 4B, did this

20     document have anything to do with your opinions --

21         A    No.

22         Q    -- leading to the vehicle?

23         A    No.

24         Q    So, in your opinion, it's not relevant?

25         A    What is this?  This is a diagnostic

1    signal. It doesn't have anything to do with me.

2        Q    Does it have anything to do with the

3    opinions you've got about the vehicle one way or the

4    other?

5        A    It's somebody else's opinion about that

6    particular vehicle, but it doesn't have any opinion

7    to do with me and my opinion about that vehicle.

8        Q    Did you look at this in forming your

9    opinion at all?

10       A    No.

11       Q    So, as far as you're concerned, it's not

12   relevant to this vehicle?

13       A    It's relevant to the vehicle in this guy's

14   case, but not to me because I don't go by somebody

15   else's judgment.

16       Q    And when you're looking at a vehicle as a

17   mechanic or technician, you don't think knowing the

18   previous repair history or visits may be relevant to

19   what was done and what may need to be done?

20       A    No. Because I can vouch for probably on

21   the average -- in a good month there will probably

22   be 15 to 20 cars that come from the General Motors

23   dealership, the Ford dealership or a local

24   independent car shop that send me cars that say they

25   need converters on them and they don't need

1    converters.  So, I don't -- I ask the customer, what

2    is your complaint of the car.

3         I have a car right now that came from

4    Carmax.  They say it needs a converter.  The car is

5    running on four cylinders.  It needs to have a

6    tune-up done to it.  It's a six cylinder.

7         I listen to what they say, but then I ask

8    the customer, what is your complaint so we can fix

9    your problem.  Forget what they said, let me fix

10   your problem.  We fixed the lady's car without

11   putting a converter on it and tuned it like it

12   should have been and Carmax sent it down for a

13   converter.

14        So, that's why I say I don't base my

15   opinion on anybody else.  I listen to what they say,

16   but I inspect all my stuff myself so we fix the

17   customer's problem and we don't have them coming

18   back saying, you took my money and you didn't fix

19   anything.  That's not the way I operate.

20   Q    So, you didn't look at what we marked as

21   Exhibit 4B, correct, as far as forming your

22   opinions?

23   A    No.  I don't form any opinion by somebody

24   else's invoices.

25   Q    Okay.  And I'll mark the next --

1      A    Those are all somebody else's opinions on

2    what they suggest or think is wrong with the

3    vehicle.

4      Q    And you didn't take any of this into

5    account in forming your own opinions, correct?

6      A    No.

7      Q    Sorry, that's not correct or it is

8    correct?

9      A    I didn't take that into advisement on any

10   of my opinions.  My opinions are based solely on my

11   decision, not anybody else's decisions.

12     Q    And that's correct for every part of

13   Exhibit 4, none of that relates to your opinions?

14     A    If it doesn't have my name on it or my

15   signature on it, it doesn't relate to my opinion.

16   It relates to somebody else's opinion about that

17   vehicle.

18     Q    But you didn't take that into

19   consideration?

20     A    No, I didn't take that into consideration.

21     Q    Is the Snap-on tool a GM authorized

22   diagnostic tool?  Do they recognize it?

23     A    I believe they do.

24     Q    When you worked at Art Moran, did you ever

25   use a Snap-on tool for a GM diagnostic?

1      A    No. 'Cause GM uses what they call a Tech

2    1 and now then they went to a Tech 2. They probably

3    are up to a Tech 3 by now.

4      Q    So, GM actually has its own diagnostic

5    tool?

6      A    Correct.

7      Q    Why would GM have its own diagnostic tool

8    rather than use the one commonly available?

9      A    Because Tech 1, 2, and 3 has the

10    capability to get into air bags and ABS's which are

11    safety issues and those aren't to be released to the

12    public out there for somebody to be messing with the

13    air bag system and antilock brake systems.

14          So, General Motors has a different tool

15    that can get into that and the outside equipment

16    cannot get into it until a certain year passes by.

17      Q    When you inspected Mr. Kodsy's vehicle on

18    May 4th, was the check engine light on?

19      A    I don't believe it was, but I couldn't

20    tell you unless it was written on that invoice

21    that's Exhibit 2 or 3 over there.

22      Q    Well, if it was on, would you have written

23    it down on the invoice?

24      A    Yes. I would have wrote check engine

25    light on and would have wrote the code down.

1        Q    And if the check engine light comes on,

2    that's because actually a diagnostic code is stored?

3        A    Stored or a problem existing.

4            (A recess was held.)

5    BY MR. KLEIN:

6        Q    Mr. May, we're back on the record.  You

7    said that the vibration and the roughness of the

8    vehicle was noticeable to you just, you know, by

9    sound or whatever.  With the hood up, could you see

10    the engine vibrating differently?

11        A    You can watch the whole truck vibrate.

12    The mirrors bounce and --

13        Q    What about just the engine itself with the

14    hood up, if you're looking at the engine you'll see

15    it vibrate?

16        A    You can see it a little bit vibrating.

17    But the engine is mounted in rubber, so it absorbs a

18    lot of the small vibrations.  Only heavy vibrations

19    would really be noticeable.  Because when you mount

20    something in rubber, it's designed to absorb any

21    abnormal vibrations.

22        Q    What was the idle RPM?

23        A    I wouldn't have any idea without looking

24    at my spec sheet to see what I wrote down.

25        Q    But you did write down what the idle RPM

1     was?

2         A      Yeah, should be on there.

3         Q      What time of day was the inspection?

4         A      Probably around three o'clock.

5         Q      I just want to make sure I understand.

6     When you had the scan tool connected to Mr. Kodsy's

7     vehicle the engine was never running, right?

8         A      No.  When you first log it in to identify

9     it's that vehicle, you don't have it running.  You

10    log in all the information that it asks you, then it

11    asks you to start the vehicle.

12        Q      Okay.  I wasn't clear about that.

13             So, when you wrote down all your

14    specifications, the vehicle was running with the

15    Snap-on scan tool attached?

16        A      That would be the only way to get the

17    specifications out of the vehicle.

18        Q      Was it in park at that time?

19        A      Yes.

20        Q      Did you put it into neutral to check to

21    see how it effected any of the values?

22        A      In drive, not neutral.  But neutral would

23    be the same as park, no load.

24        Q      And you wrote down all the specifications

25    on this sheet of paper?

1      A    Correct.

2      Q    And where did you put that piece of paper

3  after you had written down all the specifications?

4      A    Probably up on the counter by the desk.

5      Q    Why didn't you include it in the file

6  along with the invoice?

7      A    Because I don't usually put that stuff.  I

8  usually throw the stuff out.  But this was written

9  not on this first one.  This was written on the

10  second time around when it came back like three to

11  four weeks ago.  That's when all those values were

12  written down.

13      Q    So, when you first looked at it May 4th,

14  2009 and came to all of the opinions you have about

15  the vehicle, you did not write down the

16  specifications, right?

17      A    I looked at them, but I didn't write them

18  down.

19      Q    So, when you said that the timing was off

20  and you looked at it and you gave me the number,

21  that was not the number from May 4th, 2009?

22      A    Yeah, the block learn I wrote down, that's

23  the main thing that tells you that the engine's not

24  running at its peak performance because the block

25  learn is off and the compression the fuel ratio is

1    off.  I tell you right there that the motor's not

2    running at its peak performance.

3         Q    But you would have specifically said that

4    the timing --

5         A    Because I can feel it.

6         Q    But you said it had a negative value.

7         A    Right.

8         Q    You gave me a spec about 23 degrees

9    advance?

10        A    Right.  That's what they should run, 22,

11   21.

12        Q    You said it was negative in this vehicle?

13        A    Right.

14        Q    Was that negative recorded on May 4th,

15   2009 or when you saw it again later?

16        A    I probably recorded it later.  I just took

17   it for notation in my mind at the time I inspected

18   it the first time.

19        Q    So, when you inspected it the first time

20   you didn't write down any of the specifications or

21   values for Mr. Kodsy's vehicle?

22        A    If I did, I didn't put it with the thing.

23   I may have, I don't know.  But I know I remember

24   looking at the block learn stuff and saying that

25   this stuff is way off.

1      Q    How much did you charge Mr. Kodsy for the

2   May 4th, 2009 inspection?

3      A    I don't know.  Whatever it says on here.

4   $180 or $100.

5      Q    Is it 100 or 180?

6         MR. KODSY:  180.

7         THE WITNESS:  180.  It's lightly printed

8      on there, so I can't tell.  It says 180.

9   BY MR. KLEIN:

10     Q    Do you have the original of this invoice

11   at your shop?

12     A    '08 is probably in a file somewhere.

13     Q    How many stalls does Delray Muffler House

14   have to work on vehicles?

15     A    Seven to eight.

16        Hold on.  Let me get this for a second.

17   Excuse me.

18        (A recess was held.)

19   BY MR. KLEIN:

20     Q    Before we took a break, Mr. May, you said

21   Delray Muffler House has seven to eight stalls?

22     A    Yeah.

23     Q    How many vehicles per day do you all

24   service?

25     A    On an average basis today, since I'm down

1    to one, just me and Walter, sometimes we can do five

2    to 10 cars.  Some days there may be three.

3         Q    And what type of services do you -- what

4    are the majority of the services you perform?

5         A    Everything bumper to bumper.

6         Q    Do you guys do engine rebuilds?

7         A    Yes.

8         Q    What's your hourly rate for work you

9    perform at Delray Muffler House?

10        A    Hourly rate usually is on the average of

11   $95.

12        Q    And how did you come up with a $180 figure

13   for Mr. Kodsy to inspect the H2?

14        A    I just based it on my time that I had into

15   it and based -- I didn't base it on anything.

16        Q    You said the inspection took 30 to 45

17   minutes.  If you charged $95 an hour, shouldn't this

18   have cost 47 and change?

19        A    Well, no, because we probably did some

20   other stuff.  I don't recall why it's 180.

21        Q    When did Mr. Kodsy come back with the H2?

22        A    Sometimes, like I mentioned to you, I

23   do -- I don't do an hourly thing.  Sometimes I do a

24   flat rate of -- like, when we install mufflers, I

25   charge a customer this price for the muffler.  I

1    don't charge them labor and install them.  I get

2    that and they get labor for free.

3         Every vehicle's different.  I don't base

4    my rate.  If I'm gonna do an inspection on

5    something, it may be a flat rate of something.  If

6    they're asking me to do something else, it may be a

7    flat rate.

8         Normally I would -- on, like, a tune up I

9    would do $95 an hour, something like that.  It just

10   depends.  Ain't nothing set in stone.

11       Q    When was the next time you saw Mr. Kodsy's

12   Hummer H2 after May 4th, 2009?

13       A    I don't think I seen it again until just a

14   few weeks back.

15       MR. KODSY:  About a month ago.

16   BY MR. KLEIN:

17       Q    Did you prepare an invoice for that second

18   time you saw the vehicle?

19       A    I don't believe we did.  I made up that --

20   that's when I did the sheets for the specifications.

21       Q    Did you charge Mr. Kodsy for that visit?

22       THE WITNESS:  Did we?

23       MR. KODSY:  No.

24   BY MR. KLEIN:

25       Q    Do you know?

1    A    No.

2    Q    I want to make sure I have all the

3    opinions that you might testify to down.  Can you

4    tell me what all your opinions are?

5    A    My opinion is the vehicle has a vibration

6    in it.  It has a -- so to speak, a bad motor,

7    internal problem in the motor and it has the

8    incorrect tires that are required or that are

9    recommended to be on that vehicle.

10    Q    Other than the vehicle having a vibration

11    in it, the, quote, unquote, bad motor, internal

12    problem in the motor, and the incorrect tires, do

13    you have any other opinions that you intend to

14    testify to in this case?

15        MR. KODSY:  I have some questions for him.

16        MR. KLEIN:  When I'm done.

17        THE WITNESS:  Not that I'm aware.  It

18        depends on the questions that's gonna be asked

19        of me what I'm gonna spit out, I guess, so to

20        speak.  So, I can testify to anything.  It's

21        just what the questions are that are going to

22        be asked me.

23    BY MR. KLEIN:

24    Q    Do you have any plans to do anything

25    further in this case with regard to the vehicle

1    itself?

2        A    No, I don't.

3        Q    If a vehicle sits for a period of time

4    without being operated, will that effect how it

5    performs?

6        A    It depends on how long you say it sits.

7        Q    What about a period of a few weeks?

8        A    No, never.

9        Q    Can it have any effect on the quality of

10    the fuel?

11        A    Quality of fuel, but not within a few

12    weeks.

13        Q    How long would it take for fuel to

14    separate?

15        A    Probably a couple months.

16        Q    You had mentioned contaminated fuel as a

17    possible cause to make a vehicle run rough, right?

18        A    Correct.

19        Q    Did you do anything in this vehicle to

20    check the fuel when you inspected it?

21        A    No.  We didn't have to.  I could tell the

22    motor was retarded instantly when I got in it.

23        Q    But you had mentioned also the computer in

24    the vehicle can adjust to the way the motor

25    performed on a few things, right?  The fuel --

1        A    Ratio.

2        Q    The fuel ratio, if fuel has more

3    contaminants or even say more ethanol, can that

4    effect the fuel ratio?

5        A    It still reads 14:7:1.

6        Q    But it might be a little more lean, right?

7        A    Not if the timing's right.  If all the

8    other things equal up, it can still fire at 14:7:1.

9        Q    But contaminated fuel could cause the

10    vehicle to run rough, right?

11        A    Oh, most definitely.

12        Q    And you didn't do anything to eliminate

13    that as a possible cause to what you found in the

14    vehicle?

15        A    Didn't see no need to.  'Cause

16    contaminated fuel has a different feeling.  You can

17    feel the way the motor runs in a vehicle that's out

18    of time.

19        Q    What did you do the second time Mr. Kodsy

20    brought the vehicle back?

21        A    Just hooked it up and compared the values

22    to the other vehicle, wrote them down.

23        Q    And you compared it to the '07 Hummer?

24        A    Correct.

25        Q    Did you drive Mr. Kodsy's vehicle on the

1    second time you saw it?

2        A    I think around the building, that was

3    about it.

4        Q    How did it perform compared to when you

5    saw it on the 4th of May, 2009?

6        A    Same way, slow.

7        Q    Did Mr. Kodsy ever tell you that he had a

8    lemon law hearing involving this vehicle?

9        A    Not until, you know, I believe several

10   months after the fact when he came back and said,

11   can you write this up so I can have it notarized.

12       Q    What part of Exhibit 2 did you have to

13   write up to be notarized?

14       A    We had to write it so it's legible.  My

15   writing's terrible.  If you look at some of my

16   invoices, you can't read none of them.

17       Q    So, Exhibit 2 is not the original invoice

18   from the May 4th, 2009 inspection?

19       A    That's the original invoice.  It -- it

20   just had to be rewritten so you can read it.

21       Q    So it's been changed, it's not the one

22   that you generated on May 4th, 2009?

23       A    Right.

24       Q    Where is that original invoice?

25       A    That's probably with that one in the file.

1     Q    And you did not bring it with you today?

2     A    No.

3     Q    I'm going to ask that you provide me with,

4     as we requested, any materials that you reviewed or

5     generated in connection with your inspection of

6     Mr. Kodsy's vehicle.  Will you do that?

7     A    Sure.

8     Q    That includes the specifications you wrote

9     down, that includes the original invoice and

10    anything else that you have on the vehicle.

11    A    Sure.

12    Q    Whose handwriting is this on Exhibit 2?

13    A    I believe that was my secretary at the

14    time.

15    Q    And what was her name, or his name?

16         MR. KODSY:  That was your wife actually.

17         THE WITNESS:  Was it my wife?  Which one?

18         MR. KODSY:  The first one.

19         THE WITNESS:  Ivy.

20    BY MR. KLEIN:

21    Q    Ivy what?

22    A    May.  See, I told you I have people to

23    stop in.

24    Q    What was the mileage on Mr. Kodsy's

25    vehicle at the time you inspected it on May 4th,

1    2009?

2        A    13,572.

3        Q    What was the mileage when you most

4    recently saw it?

5        A    Oh, I don't know.

6        Q    Did you record the mileage?

7        A    No.  Because I actually had him bring the

8    vehicle after hours, after five or six o'clock,

9    because I had the other Hummer there.  I just said,

10   bring it by, I want to compare the two.

11       Q    How many times have you seen Mr. Kodsy's

12   H2 total?

13       A    Two, maybe three times.  But I'm gonna say

14   two.

15       Q    Have you ever been arrested before?

16       A    Yes.

17       Q    How many times?

18       A    Once or twice.

19       Q    What were you arrested for?

20       A    Eluding a police officer supposedly.  No

21   foundation to that.

22       Q    What else have you been arrested for?

23       A    I don't know.  It was back in high school.

24   I don't know what it was for.

25       Q    Have you ever been charged with a crime in

```
 1    court?

 2        A    No.

 3        Q    Have you ever been convicted of a crime?

 4        A    No.

 5        Q    You were never convicted of a felony

 6   domestic violence?

 7        A    No.

 8        Q    Were you ever charged with felony domestic

 9   violence?

10        A    No.

11        Q    What happened with the eluding a police

12   officer case?

13        A    It was -- I think I pled down to -- or

14   reduced down to something.  They put me on probation

15   for three months or six months and I paid a couple

16   fines.

17        Q    Where was that charge, what county?

18        A    Palm Beach County.

19        Q    What year?

20        A    Maybe a year and a half ago.  And that's

21   about to be brought back up for false arrest.  I'm

22   filing a report on that.  So, that's gonna be

23   expunged from my record.  I'm not having that on

24   there because that never happened.

25        Q    But you're actually sentenced to probation
```

```
 1        Q     Does Delray Muffler House or Diamond Dual

 2    Exhaust, whatever the name of the company is

 3    currently, did they file their own corporate taxes?

 4        A     Uh-huh.

 5        Q     Have they always filed their corporate

 6    taxes?

 7        A     Yes.

 8        Q     Have you ever petitioned the court for an

 9    injunction against domestic violence?

10        A     Yes.

11        Q     When was that?

12        A     I don't know.  Sometime last year.

13        Q     Did that involve one of your two ex-wives?

14        A     Yes.

15        Q     What were the circumstances of that?

16        A     Her swinging at me, taking my phones and

17    breaking them.

18        Q     Were you married at the time to her?

19        A     Yes, we were.

20        Q     How long have you all been divorced?

21        A     I think in August.  I think we were

22    divorced August of last year.

23        Q     And was this Ivy or a different wife?

24        A     Beverly.

25        Q     Beverly.  And when did you get divorced
```

1    from Ivy?

2        A    There you go with those dates again.  I

3    don't know.  I really don't know.

4        Q    Were all those divorces here in Palm Beach

5    County?

6        A    Yes, they were.

7        Q    Do you have any opinion with regard to the

8    amount of damages Mr. Kodsy might be entitled to in

9    this case?

10       A    No.  I have no opinion on that ever.

11       Q    Is there anything with regard to your

12   involvement on the vehicle or opinions you're going

13   to testify to that we've not discussed today?

14       A    Not that I'm aware of.

15       Q    And you're aware that Mr. Kodsy did not

16   win in the lemon law case, is that right?

17       A    Oh, I don't have any idea.

18       Q    Did he tell you he filed a lemon law and

19   also lost?

20       A    No.  I don't know anything about this

21   other than what's wrong with the vehicle.

22       Q    How long have you known Mr. Kodsy?

23       A    A little over --

24            THE WITNESS:  What's it been, a year?

25            MR. KODSY:   Since May.

1        THE WITNESS:  Since then.

2    BY MR. KLEIN:

3        Q    This is May 4th, 2009.  You said he

4    brought another vehicle in to you weeks before you

5    did the inspection on the H2.  Was that the first

6    time he had ever been there?

7        A    Yeah.

8        Q    So, before that you had never seen him

9    before?

10       A    No.

11           MR. KLEIN:  At this time, Mr. May, I don't

12       have any further questions.  Depending -- oh, I

13       do.  I'm sorry.

14   BY MR. KLEIN:

15       Q    Have you ever testified in court before as

16   an expert?

17       A    Yeah.

18       Q    When did you testify as an expert in

19   court?

20       A    When I owned Duro Transmission.  I had a

21   customer not want to pay me for a job.  I testified

22   in court back then.  I'm gonna say that was, god,

23   seven, eight, nine years ago.

24       Q    That was on behalf of your company, that

25   wasn't as an expert witness, correct?

1          A    Oh, no, correct.

2          Q    Have you ever testified as an expert

3    witness before?

4          A    No.

5          Q    Have you ever tried to testify as an

6    expert witness in court before?

7          A    No.

8          Q    Have you ever given -- I asked you if

9    you've ever given a deposition before.  Never mind.

10               Other than the Snap-on specs from the GM

11   cartridge, did you ever look at documents from

12   General Motors?

13         A    No.

14         Q    Did you ever contact any General Motors

15   dealership about your findings on the H2?

16         A    No.

17         Q    Other than Mr. Kodsy, did you talk with

18   anybody about your findings on his H2 or your

19   opinions?

20         A    There was a mechanic that came in from

21   another shop that day that I was comparing it with

22   the other H2.  He was from the City of Boynton.

23               MR. KODSY:  Delray.

24               THE WITNESS:  Delray?  I asked him -- I

25   said -- he said he used to work here or he used

1       to be over here doing something or whatever.  I

2       said, let me see how good you are, get in

3       there, tell me what you think is wrong with

4       this vehicle.

5           He sat in the driver's seat.  He didn't

6       hook up no scan or nothing and he said the same

7       thing I said.  I said, I can't believe that

8       just came out of your mouth, you just said

9       that.

10   BY MR. KLEIN:

11       Q    What was that guy's name?

12       A    I don't know, to tell you the truth.

13           MR. KODSY:  He don't want to get involved

14       either.

15           THE WITNESS:  And he said -- he says, the

16       motor is internally out of balance, something's

17       wrong with it internally.

18   BY MR. KLEIN:

19       Q    And he works for the City of Delray?

20       A    Yeah.

21       Q    How was he at your shop that day?

22       A    He was picking up a vehicle.

23       Q    So you would have his name in your files?

24       A    No, 'cause he was picking up a city

25   vehicle.

1      Q    You would have an invoice for that city

2    vehicle in your file though, right?

3      A    Yeah.  And he got in the truck and said

4    the same thing.  I said, man, I can't believe that

5    just came out of your mouth.  I said, you're the

6    only one with any brains around here without hooking

7    up a scan tool.

8      Q    Are you aware that Mr. Kodsy's brought the

9    vehicle to various General Motors dealers and they

10   have not found problems with it?

11     A    No.

12     Q    You're not aware of that?

13     A    Huh-unh.

14     Q    Sorry, that was a no?

15     A    No.  Yes, yes, no.

16          But you got to remember, most General

17   Motors technicians -- I worked for General Motors

18   for many years.  Most General Motors technicians

19   don't -- aren't -- there's only like two top guys in

20   the shop.  You may have 10 guys in the dealership.

21   There's maybe two to three guys that can fix a car

22   in that shop.  The rest of them are all gofers and

23   parts changers that couldn't tell you a thing about

24   a car and couldn't diagnose or couldn't fix their

25   own plate at a buffet table if they had to.

1          They rely on, like, one or two guys in the

2    shop that are very good at what they do.  And when I

3    worked for Art Moran, me and two other guys were the

4    only guys in that shop that could fix anything.

5          So, it depends on what technician looks at

6    the vehicle.  They don't know what they're looking

7    at.  But if you have General Motors hook that

8    vehicle up and check the specs, it's right there.

9    It reads it off the computer.  You don't have to do

10   nothing.  You read it off the computer.

11       Q    Your opinion is the vehicle has a bad

12   motor that's based on the retarded timing?

13       A    Correct.

14       Q    Is there anything else that leads you to

15   the conclusion that the vehicle has a bad motor?

16       A    No.  It's in retarded timing.

17          MR. KLEIN:  At this point, Mr. May, I

18       don't have any further questions.  Mr. Kodsy

19       may have some for you and I may have some

20       follow-up after that.

21                CROSS-EXAMINATION

22   BY MR. KODSY:

23       Q    While it's fresh, Mr. May, he just

24   mentioned that the court -- rather that General

25   Motors inspected the vehicle and found no problems.

1    I just want you to look at some of these invoices

2    that I received and tell me if they're actually

3    saying there's a problem or not just based on your

4    knowledge and experience.

5         MR. KLEIN:  Object to the form of the

6    question.

7         MR. KODSY:  Can I let him see these and

8    base an opinion on some of these invoices?

9         MR. KLEIN:  Mr. Kodsy, because you're pro

10   se I'll explain for depositions that you can do

11   an objection to the form of the question, which

12   means if there's a problem with the form, I'm

13   letting you know so you have an opportunity to

14   correct it.

15        My form objection in this case is that

16   it's speculation.  So, he would be speculating.

17        MR. KODSY:  Based on documented evidence?

18        MR. KLEIN:  But he would be speculating on

19   that evidence.  That's my objection to the

20   form.  He can answer the question.  I'm just

21   making the objection for the record.

22   BY MR. KODSY:

23        Q    Just here, Mr. May, if you can take a look

24   at some of their notes here dated November 8 --

25   November 12, '08.  He's saying -- if you want to

1    just read what the complaint was and then go down

2    here and see what he actually wrote, what that

3    actually tells you.

4        A    This says -- this is the one invoice from

5    Coral Cadillac that says it has a vibration in the

6    exhaust.  They changed the exhaust and it still says

7    it has a vibration and needs some balancers or

8    something in it.

9        Q    Exhaust weight, is that something that's

10   common?

11       A    Yes.  It's -- Ford uses an exhaust weight

12   on Town Cars, Continentals.  They come with a big

13   lump of metal the size of 50 pounds that they change

14   on their exhaust to take the -- absorb the vibration

15   out of it.  That's on a Ford.  Sometimes General

16   Motors uses the same thing.

17       Q    Did you notice any suspension defects on

18   that truck when you drove it when you come across a

19   bump or if you're just riding it down the road?

20       A    It just doesn't ride right.  Other than

21   the vibration and the way it rides is uncomfortable.

22       Q    Okay.

23       A    Like a bouncing effect.

24       Q    What do you mean by uncomfortable?  Is it

25   just like --

1      A      The suspension or the tires are bad on it.

2    You can just feel it just doesn't ride like it

3    should.

4      Q      It's not smooth?

5      A      It's not smooth.

6      Q      Okay.

7      A      Like when you put good tires on a vehicle,

8    it totally rides different than when it did when you

9    just got your old tires off there.

10      Q      So, when you inspected the vehicle and you

11    shifted the gears from park to drive, was that real

12    smooth or did you get a bump and a clunk and how was

13    that to you, if you remember?

14      A      I believe it had a slight rough

15    engagement. But I wasn't looking for that. So, I

16    was looking for the -- the way the engine runs. But

17    I think it had a slight engagement problem, but I

18    don't know. I wasn't looking for that.

19      Q      Okay. You're familiar with manufacturer

20    recalls?

21      A      Right.

22      Q      What does that actually mean to you, a

23    manufacturer recall?

24      A      A vehicle has been ordered by the federal

25    government to be recalled because there was over a

1    certain amount of complaints issued or called in to

2    a hotline saying that they have this problem with

3    this vehicle or that the government found something

4    wrong in one of their crash tests and so they put

5    the car or the part on a recall to be done -- to be

6    replaced free of charge no matter how many miles or

7    how many owners you've had to the vehicle.

8       Q    So, if there's a squealing in the brakes

9    and there's a recall for a wheel speed sensor

10   wiring, would that mean that that needs to be

11   replaced?

12          MR. KLEIN:  Object to the form.  You can

13          answer the question.  I'm just objecting for

14          the record.

15          THE WITNESS:  If it's a recall, it has to

16          be replaced.

17   BY MR. KODSY:

18       Q    Okay.

19       A    That's what a recall is.  A recall is to

20   be replaced or inspected.  Depending how the recall

21   is noted, some of them are inspected for a

22   certain -- say there may be a marking on an all

23   white -- a sensor that has a white mark on it needs

24   to be inspected.  If it doesn't have a white mark on

25   it, it's fine.

1          So, they may have changed designs in the

2     middle of making the part and they've noticed that

3     all the ones that have white dots on them have a

4     problem.  So that's the one they ask you to bring it

5     in.  We're going to inspect it.  If it's white,

6     we're going to replace it.  If it's black, we'll let

7     it go.  That's what a recall is.  It may not

8     necessarily mean it has to be replaced.

9          Q     How did the transmission feel to you when

10    you drove the vehicle?

11         Did it feel like it was smooth?  Was it

12    rough?  Did it hesitate?  How did that feel to you?

13         A     It wasn't driving it for that.  I didn't

14    really notice other than the -- the slight rough

15    engagement when put in gear.

16         Q     Okay.

17         A     And I really didn't notice anything about

18    the transmission.  I wasn't looking for that.

19         Q     Now, the engine vibration, would you say

20    that was a surge, a rev, an elevated rev type deal

21    that was in the vehicle that actually created that

22    vibration?

23         Would it be more like a rev that was felt

24    in there or how did that feel to you?

25         A     A rev is -- can be something that goes

1    from an idle down into a low gear or into gear.  You

2    could have a surge or an elevated rev, but, you

3    know, that may be the engine being in retarded

4    timing because a transmission problem because it's

5    not -- it's lugging.  So, the transmission drives

6    with the engine producing power, so they have to

7    work together.

8        Q    Okay.

9        A    So, you may have a transmission problem,

10    but once you fix the engine, the transmission

11    problem may go away.

12        Q    So, it is all one thing related to the

13    other?

14        A    Yes.

15        MR. KLEIN:  Object to the form.

16    BY MR. KODSY:

17        Q    And when you first seen the vehicle in May

18    of last year, it was basically just an estimate that

19    you were doing, not just an actual invoice?

20        MR. KLEIN:  Object to the form.

21        THE WITNESS:  An inspection.

22    BY MR. KODSY:

23        Q    Okay.  Did you notice any tire chopping on

24    that vehicle when you inspected it last?

25        A    I believe the tires were chopped on the

1    outside and the inside.  That's why I said there's

2    something wrong with those tires, they don't look

3    right.

4        Q    Now, are you familiar with an HZ in RPM's,

5    the conversion on that?  It's like 60 to one.  So,

6    if a manufacturer or authorized dealer advertises

7    that this vehicle's supposed to run at a certain RPM

8    or a certain HZ, that would be expected from a

9    vehicle, correct?

10        MR. KLEIN:  Object to the form; foundation

11        and speculation.

12        THE WITNESS:  They had parameters that

13        they suggested the idle ought to run between

14        such and such and such and such.  It's usually

15        printed on the label underneath the hood.  Or

16        if you look it up in a Snap-on scanner, it

17        gives you values to go by too that are -- or

18        your All Data or Mitchell On Demand.

19    BY MR. KODSY:

20        Q    So, on the Lynch Hummer, this one here,

21    this is an authorized dealer for Hummer and they're

22    advertising a certain spec.  Now, reasonably you

23    would believe that's what you'd expect, wouldn't

24    that be so?

25        MR. KLEIN:  Object to the form.

1    BY MR. KODSY:

2        Q    Where it says a smooth on road ride, the

3    air springs provide 4.83Z rating compared to the 4.5

4    rating of a standard coil suspension, what does that

5    actually tell you?

6        A    This is just to beef up the suspension.

7        Q    What does that mean?  It's supposed to be

8    better, a better ride?

9        A    Better quality ride.

10       Q    Better quality ride.  It doesn't actually

11   mean it's supposed to be vibrating or have a high

12   RPM?

13       A    Right.

14           MR. KLEIN:  Object to the form.

15           MR. KODSY:  I'm pretty much done with it.

16   I'm done.

17                   REDIRECT EXAMINATION

18   BY MR. KLEIN:

19       Q    Mr. May, I just have a few follow-up

20   questions.

21           You testified you didn't look at any of

22   the previous repair records or subsequent repair

23   records for Mr. Kodsy's vehicle, right?

24       A    No.

25       Q    So, you didn't rely on them in any way?

1     A   No shape or form.

2     Q   Did you look at any of the maintenance

3 records to see if the tires had been rotated?

4     A   No, I did not.

5     MR. KODSY: I have one more question.

6 BY MR. KLEIN:

7     Q   When I asked you about all your opinions

8 earlier, you didn't mention anything on suspension

9 defect and it's not written on Exhibit 2. What is

10 your opinion as to whether there's a suspension

11 defect in this vehicle?

12     A   I think he just needs to put the proper

13 tires on it and you'll be all right.

14     Q   Do you have any type of financial

15 arrangement with Mr. Kodsy to receive any additional

16 money for your testimony in this case?

17     A   No, I do not.

18     MR. KLEIN: I have no further questions.

19        RECROSS EXAMINATION

20 BY MR. KODSY:

21     Q   Mr. May, you're familiar with a mass air

22 flow sensor in the vehicle?

23     A   Right.

24     Q   How often is that replaced?

25     A   Whenever they fail.

1          Q    Would you say within the first 5,000

2    miles, does that sound like it's normal?

3               MR. KLEIN:  Object to the form.

4               THE WITNESS:  Nothing's normal when it

5          comes to electronic parts.  Electronic parts

6          can fail at any time.  But mass air flow

7          sensors, normally you get 30, 40,000 miles

8          before they have to be replaced.  But being an

9          electronic part, it can surge, have a problem

10         or blow a sensor inside and make it not work.

11    BY MR. KODSY:

12         Q    Okay.  Now, you're aware that -- he did

13    ask you if the vehicle sits for a couple months

14    about the fuel.  Now, if the vehicle sits for

15    several months, how would that effect the

16    electronics?

17              Let's say six months, if it sits out in

18    all kinds of different weather?

19         A    The only thing it may effect the most

20    would be the fuel pump because the fuel pump's in

21    the tank and it may not start or it may have the

22    fuel pump dragging, running slow because it's got

23    sludge in it or something may have built up in the

24    fuel and you would have a no start or fuel pump.

25              The rest of the electronic parts, it

1    wouldn't bother a thing.  Maybe an injector if it

2    had garbage in the fuel.

3        Q    And if it was an injector, it would cause

4    a slight surge or a miss?

5        A    Yes, it would.

6        Q    Let me see if there's one more thing here.

7            Okay.  Here's a notation that they have

8    here from this dealer.  This says, vehicle had same

9    vibration.  Then it goes on to say, remove fly wheel

10   bolts and restart engine to isolate vibration, still

11   has vibration with fly wheel removed.  What does

12   that tell you?

13           MR. KLEIN:  Object to the form.

14           THE WITNESS:  They were looking for a

15           vibration.  They disconnected the transmission

16           to see if it went away and it didn't go away.

17           So, it would tell you that the vibration's

18           coming out of the motor.

19   BY MR. KODSY:

20       Q    Okay.  If you don't mind, this other

21   invoice here, this is their notes, noise vibration

22   at IPC.  And then it says, after above repair still

23   had some vibration in steering wheel, compared with

24   like vehicle and had same vibration.

25           Does that sound like it is what it says or

1    is that something that's just overstated?

2              MR. KLEIN:  Object to the form;

3         speculation.

4              THE WITNESS:  It says it had some

5         vibration in the steering wheel.  They didn't

6         fix the vibration, couldn't fix it.

7    BY MR. KODSY:

8         Q    Okay.

9         A    They didn't recognize it.

10        Q    They didn't recognize it, okay.

11             Did it sound like -- well, you didn't

12   drive it far, but did you hear any other noises when

13   you were driving it?

14        A    Just the tire noise.

15        Q    Like a wind noise?

16        A    Right.

17        Q    Okay.

18        A    That was the tire noise, I believe.

19        Q    The vibration in a vehicle after driving

20   it like that for a while, would it cause other parts

21   in the vehicle to come loose?

22             MR. KLEIN:  Object to the form;

23        speculation.

24             THE WITNESS:  You'd have to have an

25        excessive vibration like a diesel, I would

1      think.

2      BY MR. KODSY:

3          Q    Correct.  So, here it says, left central

4      AC vent loose and won't hold position.  Then you

5      got, instrument panel cluster trim plate bezzle

6      replacement.  That would be from the vibration?

7              MR. KLEIN:  Object to the form;

8          speculation.

9      BY MR. KODSY:

10         Q    That means it needs to be replaced?

11             MR. KLEIN:  Same objection.

12             THE WITNESS:  Read it again.

13     BY MR. KODSY:

14         Q    Okay.  It says, left central AC vent loose

15     and won't hold position.  And then it goes on to

16     say, instrument panel cluster trim plate bezzle

17     replacement, which was -- there's another one here.

18     Let me see where it is.

19             It says -- I didn't find that one, but

20     here it says, customer states engine runs rough and

21     buzzes through IPC.  And then they got their note.

22     It says, exhaust vibration, exhaust system,

23     dampener?

24         A    That's the one they put the weights on to

25     see if they get rid of the vibration.

1          MR. KLEIN:  Wait for me to make my
2     objection.
3          THE WITNESS:  I'm sorry.
4          MR. KLEIN:  To the extent there was a
5     question, I object for speculation.
6    BY MR. KODSY:
7     Q    Basically at the end of this invoice it
8    says -- I'm just trying to skim through these.
9          Would you need to reposition an AC
10   compressor if you have a noise vibration at IPC?
11        MR. KLEIN:  Object to the form;
12   speculation.
13        THE WITNESS:  Depends on what was
14   vibrating.  Everything's on an individual
15   basis.
16   BY MR. KODSY:
17    Q    Okay.  So, that's not something that's
18   commonly done?
19    A    No.
20        MR. KLEIN:  Object to the form.
21        THE WITNESS:  Never heard of anybody
22   adjusting an AC compressor to get rid of a
23   vibration unless a belt was loose, that was
24   about it.
25

1    BY MR. KODSY:

2        Q    Okay.  Here it says, customer states noise

3    from dash area at highway speeds.  Then they're

4    going into cause.

5        What would your opinion be if a customer

6    comes to you and he says, I got noise in my dash

7    area at highway speeds?

8        MR. KLEIN:  Object to the form.  Calls for

9    speculation.  Lack of foundation.

10       THE WITNESS:  You had air coming into your

11       dashboard.

12   BY MR. KODSY:

13       Q    Would it require replacements of moldings,

14   side pillar?

15       MR. KLEIN:  Object to the form.  Calls for

16       speculation.

17       THE WITNESS:  On that there, I don't know.

18       It's on an individual basis.  It would have to

19       be inspected to see what was wrong, but...

20   BY MR. KODSY:

21       Q    My point is if there was an excessive

22   vibration in a vehicle, would all these things come

23   loose?

24       MR. KLEIN:  Object to the form;

25       speculation.

1          THE WITNESS:  They could, yes.

2          MR. KODSY:  That's what I want to hear.

3     All right.  Thank you.

4          MR. KLEIN:  I have nothing further.  We'll

5     go ahead and order it.

6          Mr. May, you have the right to read the

7     transcript for any errors in transcription or

8     things that might have been taken down

9     incorrectly that you can change on an errata

10    sheet.

11         THE WITNESS:  Okay.

12         MR. KLEIN:  You can waive that, but most

13    witnesses, especially when it's technical

14    testimony, want to read it and make sure they

15    were recorded accurately.  There may be a typo

16    you want to correct.

17         Do you want to read the transcript or do

18    you want to waive?

19         THE WITNESS:  I don't want to read it.

20         MR. KODSY:  You should.  Then you sign

21    afterwards just verifying that what you said is

22    what it is.  That's it.  Nothing more, nothing

23    less.

24         THE WITNESS:  When we doing that?

25         MR. KLEIN:  The court reporter will notify

1          you when the transcript's ready so you can come

2          in and look at it.

3               THE WITNESS:  All right.

4               MR. KODSY:  Let us know.  I'll try to make

5          it friendly for him.

6               MR. KLEIN:  All right.  You're reading and

7          signing the transcript?

8               MR. KODSY:  Yeah, he should.

9               (Witness excused.)

10              (The deposition was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF OATH

2

3

4     THE STATE OF FLORIDA)

5     COUNTY OF PALM BEACH)

6

7        I, the undersigned authority, certify that SCOTT

8     MAY personally appeared before me on the 11th day of

9     August, 2010, and was duly sworn.

10

11       WITNESS my hand and official seal this 22nd day

12    of August, 2010.

13

14

15       _____

16       Beth L. Kelly, Court Reporter

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3    THE STATE OF FLORIDA)
     COUNTY OF PALM BEACH)

4

5        I, Beth L. Kelly, Court Reporter, Florida
     Professional Reporter, certify that I was authorized
6    to and did stenographically report the deposition of
     SCOTT MAY; that a review of the transcript was
7    requested; and that the transcript, Pages 4 through
     122, is a true and complete record of my stenographic
8    notes.

9        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
10   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am
11   I financially interested in the action.

12       The certification does not apply to any
     reproduction of the same by any means unless under
13   direct control and/or direction of the reporter.

14       Dated this 22nd day of August, 2010.

15

16

17

18       _____
         Beth L. Kelly, Court Reporter
19

20

21

22

23

24

25

```
 1          Pleasanton, Greenhill, Meek & Associates
                   330 Clematis Street - Suite 208
 2           West Palm Beach, Fl  33401  561-833-7811

 3

 4                        August 22, 2010

 5     SCOTT MAY
       3696 10th Ave. North
 6     Palm Springs, FL  33461

 7

 8     RE: SHARIF KODSY vs. GENERAL MOTORS COMPANY

 9
       Dear Mr. May:
10
            At the conclusion of your deposition in the
11     above-styled matter you indicated that you wished to
       read your testimony.  This letter is to advise you
12     that you must contact our office between the hours of
            to 4:00 p.m., Monday through Friday, to schedule
13     a time convenient to both of us.

14          Thank you for your cooperation and prompt
       attention to this matter.
15

16                     Sincerely,

17                     PLEASANTON, GREENHILL MEEK &
                       ASSOCIATES
18

19                     Beth L. Kelly, Court Reporter

20
       cc:  Steven I. Klein, Esq.
21

22

23

24

25
```

# IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

SHERIF RAFIK KODSY

    PLAINTIFF

VS.

                          CASE NO: 09-CA-011174

GENERAL MOTORS CORPORATION
AND MOTORS LIQUIDATION COMPANY

    DEFENDANT(S)

## REFERENCED SPECIFICATIONS PRODUCED BY SCOTT MAY

Attached are the general motors diagnostic codes, provided to mr. Scott May, for referencing the specifications from the subject vehicle, documented from his observations and measurements previously conducted on the subject vehicle.

There were no other documents remaining or existing to be produced from his Inspection, as per his testimony, he did not rely on any specifications to determine that the subject vehicle timing was retarded, since he did recognize the excessive non-conformed vibration ,which was evident upon his inspection , based on approx. twenty five years of auto mechanical experience.

Mr. May had noted an air/fuel ratio of 12.4, upon his Initial inspection of

1

the subject vehicle which was contrary to a conforming engine performance

and expectations from a gas engine, which should be 14.7:1.

Exhibit attached.

## CERTIFICATE OF SERVICE

I CERTIFY THAT A TRUE AND CORRECT COPY OF THE

FOREGOING INSTRUMENT WAS MAILED BY U.S. MAIL TO THE

DEFENDANTS' COUNSEL ON RECORD, ON SEPTEMBER 20TH, 2010.

SHERIE R. KODSY
PRO'SE
**ENVIRONMENTAL CONSULTANT
MICROBIAL REMEDIATOR
HEALTH AND SAFETY TECHNICIAN
RADON GAS MITIGATION EXPERT
RESIDENTIAL WINDLOAD TECHNICIAN
SPECIALTY BUILDING CONTRACTOR
15968 LAUREL OAK CIRCLE
DELRAY BEACH FLORIDA 33484
561-666-0237**

2

**Search:** ⦿ The Web ⦾ Angelfire  ✖ Report Abuse  « Previous | Top 100 | Next »  Hosted by 

GENERAL MOTORS+1  GO GET IT!  share: del.icio.us | digg | reddit | furl | facebook

Ads by Google

| Ask a GM Mechanic Online | Check Engine Light Codes | Check engine light on? | Auto Parts Warehouse |
|---|---|---|---|
| 12 GM Mechanics Are Online! Ask a Question, Get an Answer ASAP. JustAnswer.com/GM | Save on Car Parts Compare Prices & Save www.Shopping.com | Trouble lights are no trouble at Thom's Chicago Auto Repair ThomsChicagoCarRepair.com | We Beat Competitors Prices. Free Shipping on orders over $50 www.autopartswarehouse.com |

## *General Motors Diagnostic Codes*

The are the General Motors Diagnostic Trouble codes.
They are for all General Motors Vehicles except Front Wheel Drive Cadillac Vehicles.
This list is for reference only and does not mean a specific part is defective, only that the system specified has
malfunctioned.
For information on reading codes click here.



| CODE | MEANING |
|---|---|
| 12 | No engine RPM reference pulses--System Normal |
| 13 | Oxygen Sensor (02S) circuit open--left side on 2 sensor system |
| 14 | Engine Coolant Temperature (ECT) sensor-- possible circuit high or shorted circuit |
| 15 | Engine Coolant Temperature (ECT) sensor-- possible circuit low or open circuit |
| 16 | Direct Ignition System (DIS), fault line circuit |
| | -or- Distributor ignition system (low resolution pulse) |
| | -or- Missing 2X reference circuit |
| | -or- OPTI-Spark ignition timing system (low resolution pulse) |
| | -or- System voltage out of range |
| 17 | Camshaft Position Sensor (CPS) or spark reference circuit error |
| 18 | Crank/Cam error |
| 19 | Camshaft Position Sensor (CPS) circuit |
| 21 | Throttle Position (TP) sensor circuit--signal out of range, probably high |
| 22 | Throttle Position (TP) sensor circuit--signal voltage low |
| 23 | Intake Air Temperature (IAT or MAT) sensor circuit--temperature out of range, low |
| | -or- Open or grounded M/C solenoid--Feedback carburetor system |
| 24 | Vehicle Speed Sensor (VSS) circuit |
| 25 | Intake Air Temperature (IAT or MAT) sensor circuit--temperature out of range, high |
| 26 | Quad-Driver Module (QDM) #1 circuit |
| | -or- Transaxle gear switch circuit |
| 27 | Quad-Driver Module (QDM) circuit |
| | -or- Transaxle gear switch, probably 2nd gear switch circuit |
| | Quad-Driver Module (QDM) #2 circuit |

| 28 | -or- Transaxle gear switch, probably 3rd gear switch circuit |
| 29 | Transaxle gear switch, probably 4th gear switch circuit |
| 31 | Camshaft sensor circuit fault |
|  | -or- Park/Neutral Position (PNP) switch circuit |
|  | -or- Wastegate circuit signal |
| 32 | Exhaust Gas recirculation (EGR) circuit fault |
|  | -or- Barometric Pressure Sensor circuit low--Feedback Carburetor system |
| 33 | Manifold Absolute Pressure (MAP) sensor--signal out of range, high |
|  | -or- Mass Air Flow (MAF) sensor--signal voltage out of range, probably high |
| 34 | Manifold Absolute Pressure (MAP) sensor--signal out of range, low |
|  | -or- Mass Air Flow (MAF) sensor circuit (gm/sec low) |
| 35 | Idle Air Control (IAC) or idle speed error |
|  | -or- Idle speed Control (ISC) circuit--throttle switch shorted--Feedback Carburetor system |
| 36 | Ignition system circuit error |
|  | -or- Transaxle shift problem--4T60E Transaxle |
| 38 | Brake input circuit fault--torque converter clutch signal |
| 39 | Clutch input circuit fault--Torque converter clutch signal |
| 41 | Cam sensor or cylinder select circuit fault--ignition control (IC) reference pulse system fault |
|  | -or- Electronic Spark Timing (EST) circuit open or shorted |
| 42 | Electronic Spark Timing (EST) circuit grounded |
|  | -or- Ignition Control circuit grounded or faulty bypass line |
| 43 | Knock Sensor (KS) or Electronic Spark Control (ESC) circuit fault |
| 44 | Oxygen Sensor (O2S), left side on 2 sensor system--lean exhaust indicated |
| 45 | Oxygen Sensor (O2S), left side on 2 sensor system--rich exhaust indicated |
| 46 | Personal Automotive Security System (PASS-KEY II) circuit |
|  | -or- Power Steering Pressure Switch (PSPS) circuit |
| 47 | PCM-BCM data circuit |
| 48 | Misfire diagnosis |
| 51 | Calibration error, faulty MEM-CAL, ECM or EEPROM failure |
| 52 | Engine oil temperature sensor circuit, low temperature indicated |
|  | -or- Fuel Calpac missing |
|  | -or- Over voltage condition |
|  | -or- EGR Circuit fault |
| 53 | Battery voltage error |
|  | -or- EGR problem |
|  | -or- Personal Automotive Security System (PASS-KEY II) circuit |



| | |
|---|---|
| 54 | EGR #2 problem |
| | -or- Fuel pump circuit (low voltage) |
| | -or- Shorted mixture control solenoid circuit--Feedback Carburetor system |
| 55 | A/D Converter error |
| | -or- PCM error or not grounded |
| | -or- EGR #3 problem |
| | -or- Fuel lean monitor |
| | -or- Grounded voltage reference, faulty oxygen sensor, full lean-- Feedback Carburetor system |
| 56 | Quad-Driver Module (QDM) #2 circuit |
| | -or- Secondary air inlet valve actuator vacuum sensor circuit signal high--(5.7L VIN J) |
| 57 | Boost control problem |
| 58 | Vehicle Anti-theft System fuel enable circuit |
| 61 | A/C system performance |
| | -or- Cruise vent solenoid circuit fault |
| | -or- Oxygen Sensor (O2S)--degraded signal |
| | -or- Secondary port throttle valve system fault--(5.7L VIN J) |
| | -or- Transaxle gear switch signal |
| 62 | Cruise vacuum solenoid circuit fault |
| | -or- Engine oil temperature sensor, high temperature indicated |
| | -or- Transaxle gear switch signal circuit fault |
| 63 | Oxygen Sensor (O2S), right side--circuit open |
| | -or- Cruise system problem (speed error) |
| | -or- Manifold Absolute Pressure (MAP sensor--circuit out of range |
| 64 | Oxygen Sensor (O2S), right side--lean exhaust indicated |
| 65 | Oxygen Sensor (O2S), right side--rich exhaust indicated |
| | -or- Cruise servo position circuit |
| | -or- Fuel injector circuit low current |
| 66 | A/C pressure sensor circuit fault, probably low pressure |
| | -or- Engine power switch, voltage high or low or PCM fault (5.7L VIN J) |
| 67 | A/C pressure sensor circuit, sensor or A/C clutch circuit failure |
| | -or- Cruise switch circuit fault |
| 68 | A/C compressor relay (shorted circuit) |
| | -or- Cruise system fault |
| 69 | A/C clutch circuit or head pressure high |
| 70 | A/C refrigerant pressure sensor circuit (high pressure) |
| 71 | A/C evaporator temperature sensor circuit (low temperature) |



| 72 | Gear selector switch circuit |
| 73 | A/C evaporator temperature sensor circuit (high temperature) |
| 75 | Digital EGR #1 solenoid error |
| 76 | Digital EGR #2 solenoid error |
| 77 | Digital EGR #3 solenoid error |
| 79 | Vehicle Speed Sensor (VSS) circuit signal high |
| 80 | Vehicle Speed Sensor (VSS) circuit signal low |
| 81 | Brake input circuit fault--Torque converter clutch signal |
| 82 | Ignition Control (IC) 3X signal error |
| 85 | PROM error |
| 86 | Analog/Digital ECM error |
| 87 | EEPROM error |
| 99 | Power management |

Site Sponsors

WHOWHERE?   Gamesville   Rhapsody   WIRED

Allstate sent out _____ in
Safe Driving Bonus Checks last year.
Get yours.

Allstate

QUOTE NOW

AiR fuel RAtio·12.4 — No Code

X

Scott Mz