GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
Nancy A. Mitchell, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: zirinskyb@gtlaw.com
  mitchelln@gtlaw.com
  baej@gtlaw.com
  ticollg@gtlaw.com

*Counsel for Certain Noteholders of General Motors Nova
Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., et al., | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------- x

## OBJECTION OF CERTAIN NOTEHOLDERS TO
## DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

RELEVANT BACKGROUND FACTS .................................................................................. 1

ARGUMENT .......................................................................................................................... 4

    I.   The Disclosure Statement Does Not Contain Adequate Information  and Fails to
       Satisfy the Requirements of Section 1125 of the Bankruptcy Code ................................. 4

       A.   The Disclosure Statement Fails to Provide Adequate  Information Regarding
           the Wind-up Claim and Guarantee Claims ................................................................. 7

       B.   The Disclosure Statement Fails to Provide Adequate Information Regarding
           the Amount of New GM Securities and Cash to be Withheld from
           Distribution to Holders of General Unsecured Claims on Account of
           Disputed Claims ......................................................................................................... 9

       C.   The Disclosure Statement Fails to Provide Adequate Information
           Concerning Mechanics of the GUC Trust and its Ability to Sell Assets ................. 11

       D.   The Disclosure Statement Fails to Provide  Adequate Information Regarding
           the Estimation Process .............................................................................................. 14

       E.   The Disclosure Statement Fails to Provide  Adequate Information Regarding
           the Mechanics of Distribution .................................................................................. 16

RESERVATION OF RIGHTS ............................................................................................. 18

NOTICE ................................................................................................................................ 19

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

**Federal Cases**

*In re Crowthers McCall Patterns, Inc.*,
  120 B.R. 279 (Bankr. S.D.N.Y. 1990) ......................................................... 5

*In re Ferretti*,
  128 B.R. 16 (Bankr. D.N.H. 1991) .............................................................. 5

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ............................................................. 5

*Kunica v. St. Jean Financial, Inc.*,
  233 B.R. 46 (S.D.N.Y. 1999) ........................................................... 5, 12, 15

**Federal Statutes**

11 U.S.C. § 1125(a)(1) .................................................................................. 5

1978 U.S.C.C.A.N. 6963 ............................................................................... 5

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Appaloosa Management L.P. ("Appaloosa"), Aurelius Capital Management, LP ("Aurelius"), Elliott Management Corporation ("Elliott"), and Fortress Investment Group LLC ("Fortress") (collectively, the "Objecting Parties"), each on behalf of their managed fund entities which hold certain of the £350,000,000 8.375% Guaranteed Notes due December 7, 2015 (the "2015 Notes") and the £250,000,000 8.875% Guaranteed Notes due July 10, 2023 (the "2023 Notes" and, collectively with the 2015 Notes, the "Notes") issued by General Motors Nova Scotia Finance Company ("GM Nova Scotia") and fully and unconditionally guaranteed by Motors Liquidation Company f/k/a General Motors Corporation ("MLC"), submit this objection (the "Objection") to the *Disclosure Statement* [Docket No. 6830] (the "Disclosure Statement") for the *Debtors' Joint Chapter 11 Plan* [Docket No. 6829] (the "Plan"), filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") on September 3, 2010, and respectfully represent as follows:

RELEVANT BACKGROUND FACTS

1.      On June 1, 2009 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      On June 3, 2009, the Office of the United States Trustee appointed a committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

1

3.      GM Nova Scotia is a Nova Scotia unlimited company and a wholly-owned direct subsidiary of MLC.  In connection with the issuance of Notes, GM Nova Scotia entered into two currency swap transactions with MLC, which resulted in a liability owed by GM Nova Scotia to MLC in the amount of $564,493,957 (the "Swap Liability").

4.      On October 9, 2009, the Supreme Court of Nova Scotia adjudged GM Nova Scotia bankrupt and issued an order on that date pursuant to the *Bankruptcy and Insolvency Act* (Canada) appointing Green Hunt Wedlake Inc. as trustee of the estate of GM Nova Scotia ("Nova Scotia Trustee").  Under Section 135 of the Companies Act (Nova Scotia), MLC, as the direct parent of GM Nova Scotia, is liable for the debts and liabilities of GM Nova Scotia in the event of the winding-up of GM Nova Scotia (the "Wind-up Obligations").  Pursuant to section 77 of the *Bankruptcy and Insolvency Act* (Canada), the amount which MLC is required to contribute to GM Nova Scotia is deemed an asset of GM Nova Scotia and a debt payable to the Nova Scotia Trustee upon the winding-up of GM Nova Scotia.

5.      The Wind-up Obligations are comprised of the amounts due under the Notes, the Swap Liability, and certain other obligations.[1]

6.      On November 30, 2009, the Nova Scotia Trustee filed its Claim No. 66319 in the amount of $1,607,647,592.49 based upon the Wind-up Obligations of MLC (the "Wind-up Claim").  The Wind-Up Claim is separate and apart from the Guarantee Claims (as defined herein) as it arises statutorily from MLC's Wind-Up Obligations.

7.      Various proofs of claim also have been filed against MLC on behalf of the Objecting Parties and other beneficial holders of the Notes (collectively, the "Noteholders")

---

[1] The components of the Wind-up Claim include: deficiencies of CDN$589,292,176 related to the Swap Liability; CDN$1,088,542,512.01 related to the Notes; and CDN$436,222.14 in other obligations, aggregating CDN$1,678,270,910.68 which, when converted to US Dollars at the date of the bankruptcy of GM Nova Scotia at the exchange rate of 0.957919, equals US$1,607,647,592.49.

based upon MLC's unconditional guarantee (the "Guarantee") of the obligations under that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among GM Nova Scotia, MLC, Deutsche Bank Luxembourg S.A., and Banque Général du Luxembourg S.A. (the "Fiscal and Paying Agency Agreement") pursuant to which the Notes were issued.  In addition, on December 10, 2009, pursuant to an order of this Court made at the hearing on November 20, 2009 and subsequently entered on December 23, 2009, a global proof of claim (the "Global Proof of Claim") was filed with the Court bearing the Claim No. 69551 on the behalf of the Noteholders other than as identified therein.  The Global Proof of Claim and the proofs of claim by various Noteholders assert claims against MLC based on the Guarantee (the "Guarantee Claims" and, together with the Wind-up Claim, the "Claims").  The Guarantee Claims in the aggregate represent a liability in the amount of approximately $1,072,557,531.72.

8.       Pursuant to the Lock Up Agreement, dated June 1, 2009, entered into between and among the Objecting Parties and MLC, GM Nova Scotia, General Motors of Canada Ltd. and GM Investments Ltd. (the "Lock-Up Agreement"), MLC confirmed, acknowledged and agreed that the Guarantee Claims would be treated as allowed general unsecured claims in MLC's chapter 11 cases for the full amount due under the Guarantee.  *See* Lock-Up Agreement, ¶ 6(b)(ii).   In addition, under the Lock-Up Agreement, MLC confirmed the validity and enforceability of the Wind-up Claim and agreed that the Nova Scotia Trustee would be entitled to an allowed general unsecured claim in MLC's chapter 11 cases on account of its Wind-up Obligations under Nova Scotia Law.  *See* Lock-Up Agreement, ¶¶ 19(b), 6(b)(iii), (iv).  The Lock-up Agreement was assumed by MLC and assigned to the purchaser of MLC's assets on July 24, 2009.

9.       On July 2, 2010, the Committee filed the *Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief* [Docket No. 6248] (the "Committee Objection").  In the Committee Objection, the Committee purports to challenge the validity of the Claims.  The hearing on the Committee Objection is currently set for November 18, 2010.

10.      On September 3, 2010, the Debtors filed the *Debtors' Motion for an Order (I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement; (III) Establishing a Record Date; (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan; (V) Approving Solicitation Packages; and Procedures for Distribution Thereof; (VI) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (VII) Approving the Form of Notices to Non-Voting Classes Under the Plan* [Docket No. 6854] (the "Motion").

## ARGUMENT

I.       The Disclosure Statement Does Not Contain Adequate Information
         and Fails to Satisfy the Requirements of Section 1125 of the Bankruptcy Code

11.      The Disclosure Statement does not contain "adequate information" within the meaning of section 1125 of the Bankruptcy Code and cannot be approved unless it is modified to provide additional and clarifying information.

12.      Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains "adequate information."  The Bankruptcy Code defines adequate information as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's

> books and records, that would enable a hypothetical reasonable investor typical of
> claims or interests in the relevant class to make an informed judgment about the
> plan . . .

11 U.S.C. § 1125(a)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999)

(disclosure statement must contain information that is "reasonably practicable [to permit an]

informed judgment" by holders of claims or interests entitled to vote on the plan); *In re

Crowthers McCall Patterns, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of

the chapter 11 process is the requirement that holders of claims in impaired classes be furnished

a proper disclosure statement 'that would enable a hypothetical reasonable investor . . . to make

an informed judgment about the plan'" (*quoting* H.R. Rep. No. 95-595, at 408-09 (1977)),

*reprinted* in 1978 U.S.C.C.A.N. 6963, 6364-65; *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H.

1991) (disclosure statement "must clearly and succinctly inform the average unsecured creditor

what it is going to get, when it is going to get it, and what contingencies there are to getting its

distribution").

13.     The Disclosure Statement must provide enough information to enable the

Debtors' creditors and this Court to make an informed judgment about the Plan.  *See Kunica v.

St. Jean Financial, Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("The importance of full disclosure is

underlaid by the reliance placed upon the disclosure statement by the creditors and the court")

(*quoting Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988),

*cert. denied*, 488 U.S. 967 (1988)).  Accordingly, it is impossible to "overemphasize the debtor's

obligation to provide sufficient data to satisfy the Bankruptcy Code standard of 'adequate

information.'"  *Kunica*, 233 B.R. at 54 (quoting Oneida, 848 F.2d at 417).

14.     The Disclosure Statement fails to provide adequate information from which a

"hypothetical reasonable investor" could make an informed decision about the Plan. The

Disclosure Statement is defective because neither the Disclosure Statement nor the attached Plan

is clear as to whether the Guarantee Claims and the Wind-Claim are Allowed as required by the Lock-Up Agreement. In addition, the following non-exhaustive list of items require additional information or clarification before the Disclosure Statement can be deemed to provide adequate information: (i) the Allowed[2] amount of the Wind-up Claim and the Guarantee Claims, (ii) the definition of Disputed Claims, (iii) the estimated amount of New GM Securities being distributed and/or withheld; (iv) provisions purporting to govern the distribution of proceeds of the sale of New Warrants, (v) the scope of GUC Trust Administrator's ability to sell GUC Trust Assets, (vi) the effect of estimating claims, and (vii) the mechanism for distribution of recoveries on account of the Claims.

15.    In addition, the Disclosure Statement contains numerous blanks and defers disclosure of material information to the Plan Supplement, which is not to be filed under after hearing on the Motion and the Disclosure Statement. For instance, almost all of the estimated Allowed Claim amounts in the Disclosure Statement summary chart on pages 4-8 are blank, thus preventing creditors from understanding the amount and kind of treatment they are receiving under the Plan.

16.    Given the foregoing, the Court cannot approve the Disclosure Statement in its current form because it fails to adequately disclose certain material information, including that which is described more fully below. The Objecting Parties submit that additional information is required before they can make an informed judgment about the Plan. In an effort to address certain of the deficiencies in the Disclosure Statement, this Objection contains proposed

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and Plan, as applicable.

additional language which the Objecting Parties believe would resolve certain of the issues highlighted herein.[3]

    A.    <u>The Disclosure Statement Fails to Provide Adequate
Information Regarding the Wind-up Claim and Guarantee Claims</u>

    17.    As an initial matter, the Disclosure Statement and Plan are unclear as to whether MLC is acting in a manner consistent with its obligations under the Lock-up Agreement. As described above, the Lock-up Agreement clearly obligates MLC to Allow both the Wind-up and the Guarantee Claims. The Disclosure Statement also contains confusing and ambiguous language with regard to the allowance and treatment of the Wind-up Claim and the Guarantee Claims, which makes it impossible for the Objecting Parties (and other creditors) to make an informed decision regarding the treatment of these Claims under the Plan.

    18.    First, the definition of Eurobond Claims in the Plan and Disclosure Statement is unclear as to whether it is intended to include the Wind-up Claim as well as the Guarantee Claims. The definition of Eurobond Claims reads as follow:

> [A] Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among MLC, Deutsche Bank AG London, and Banque Generale du Luxembourg S.A., (ii) that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2001, among General Motors Nova Scotia Finance Company, MLC, Deutsche Bank Luxembourg S.A., and Banque Generale du Luxembourg S.A., and (iii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse. (emphasis added)

Plan, Art. 1.72.

    19.    The Guarantee Claims arise under Section 5 of Schedule 1 to the Fiscal and Paying Agency Agreement and therefore fall squarely within the definition of Eurobond Claims. However, the definition is less clear with regard to the Wind-up Claim. The Wind-up Claim,

---

[3] The proposed additional language is denoted in bold-style font throughout this Objection.

although it arises by statute, could be deemed to arise *in connection* with the issuance of the Notes pursuant to the Fiscal and Paying Agency Agreement. Therefore, the Guarantee Claims and the Wind-up Claim could each be fairly construed as Eurobond Claims under the definition set forth above.

20. An understanding of what is intended to be included in the definition of Eurobond Claims is particularly important as the Plan purports to fix the Allowed amount of the Eurobond Claims (which, as defined in the Plan, may include both the Wind-up Claim and the Guarantee Claims). Further the Allowed amount is intended to "override and supersede any individual Claims filed by record or by beneficial holders of debt securities arising out of or relating to the Eurobond Claims." *See* Disclosure Statement, § III.C; Plan, Art. 3.3(f). The Allowed amount is currently blank. Without clarification as to both what is included in the definition of Eurobond Claims and the proposed Allowed amount, it is impossible for the Objecting Parties to understand the treatment of the Wind-up Claim and the Guarantee Claims under the Plan.

21. To add to the confusion, pursuant to Article 1.53(b) of the Plan, a Claim is deemed Disputed if, with respect to any Claim and for which a proof of Claim has been filed by the applicable deadline, "a timely objection or request for estimation is interposed by the Debtors or other authorized Entity which has not been withdrawn or determined by a Final Order." Plan, Art. 1.53(b). In the Committee Objection, the Committee challenged certain of the Guarantee Claims and the Wind-up Claim and, as a result, at least certain of the Claims fit within the definition of Disputed Claims under the Plan.[4] However, as set forth above, the Claims also fit within the definition of Eurobond Claims which are to be Allowed in a fixed amount.

---

[4] The Objecting Parties challenge whether the Committee is an "authorized Entity" to assert objections to the Claims, however that issue ill be resolved in connection with the Committee Objection.

22.    The Objecting Parties request that the Disclosure Statement be clarified by the addition of the language in the Disclosure Statement (and corresponding changes to the Plan) which makes it clear that (a) the Wind-up Claim and the Guarantee Claims are treated as General Unsecured Claims under the Plan, (b) the proofs of Claim have been filed with regard to the Wind-up Claim and the Guarantee Claims, and (c) that the Objecting Parties and the Nova Scotia Trustee believe that the Lock-up Agreement obligates the Debtors to Allow the Wind-up Claim and the Guarantee Claims in the Plan.

23.    Absent clarification, the Objecting Parties are unable to assess the Plan because they cannot tell how the Wind-up Claim and the Guarantee Claims are intended to be treated. Until the Disclosure Statement is modified as proposed above, the Disclosure Statement does not contain adequate information and therefore cannot be approved.

24.    Moreover, the Objecting Parties assert that the Disclosure Statement contains inaccurate information with respect to the aggregate amount outstanding under the Fiscal Paying and Agency Agreement as of the Petition Date.   Section II.D of the Disclosure Statement provides that "[a]s of the Commencement Date, the total amount outstanding under the Nova Scotia Fiscal and Paying Agency Agreement was, in U.S. dollars, approximately $853 million." *See* Disclosure Statement, § II.D.   The Objecting Parties submit that this figure is incorrect and request that the Debtors revise this portion of the Disclosure Statement to provide that the principal amount outstanding as of the Petition Date was $986,580,000.

B.    The Disclosure Statement Fails to Provide Adequate Information Regarding the Amount of New GM Securities and Cash to be Withheld from Distribution to Holders of General Unsecured Claims on Account of Disputed Claims

25.    The Disclosure Statement does not contain adequate information because it nowhere discloses an estimate as to the amount of Cash and New GM Securities that are to be

distributed to holders of General Unsecured Claims on the Effective Date and, correspondingly, the amount to be withheld on account of Disputed General Unsecured Claims.

26.     The failure to disclose any information concerning the distributions anticipated to be made to holders of General Unsecured Claims, or to be withheld on account of Disputed Claims, prevents a hypothetical reasonable investor from making an informed judgment on the Plan.  Based on a thorough review of the Disclosure Statement and Plan, it is not clear whether the Debtors intend to distribute a significant portion of the New GM Securities allocable to holders of Allowed General Unsecured Claims on or after the Effective Date or, alternatively, whether the Debtors intend to make a somewhat nominal distribution, thus forcing holders of General Unsecured Claims to wait even longer for any recovery on account of their Claims.  This information clearly impacts the Objecting Parties' evaluation of the Plan, and without such information, the Objecting Parties cannot make an informed judgment on the Plan.

27.     The Plan and Disclosure Statement defer to the GUC Trust Agreement for additional information.  However, the GUC Trust Agreement is to be filed as a part of the Plan Supplement and, as set forth above, the Plan Supplement will not be filed in advance of hearing on the Disclosure Statement.  The GUC Trust Agreement governs, among other things, the additional distributions of New GM Securities to holders of GUC Trust Units.  Accordingly, without reviewing the GUC Trust Agreement it is not possible for a creditor to know how the additional stock and warrants will be distributed to holders of General Unsecured Claims including Disputed Claims.  Therefore, creditors need to be able to review the GUC Trust Agreement as part of the Disclosure Statement.

28.     Additional information is also required in the Disclosure Statement as to the estimated amount of New GM Securities and Cash to be withheld on account of Disputed

Claims, because the Objecting Parties are unable to make an informed decision regarding the treatment of General Unsecured Claims.  The Objecting Parties propose the following additional language for Section III.C of the Disclosure Statement (and Section 4.3(a) of the Plan):

> As soon as is reasonably practicable after the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the GUC Trust is Pro Rata Share of (i) New GM Securities and (ii) GUC Trust Units, in accordance with the terms of the GUC Trust and the GUC Trust Agreement. **The Debtors estimate that approximately ___% of the aggregate amount of New GM Securities and Cash will be distributed on the Effective Date on account of non-Disputed General Unsecured Claims**. The balance will be held in the GUC Trust pending resolution of the Disputed Claims.  The GUC Trust shall make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently allowed. The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units in accordance with the terms of the GUC Trust and the GUC Trust Agreement.

29.    The Objecting Parties submit that inclusion of this language would provide holders of Allowed and Disputed General Unsecured Claims with adequate information from which to make an informed judgment.  To the extent similar language is not included, the Objecting Parties believe that the Disclosure Statement will remain fatally deficient.

C.    The Disclosure Statement Fails to Provide Adequate Information
Concerning Mechanics of the GUC Trust and its Ability to Sell Assets

30.    The Disclosure Statement does not adequately describe the mechanics of the GUC Trust with respect to Disputed Claims.  Although the purpose of the GUC Trust is to, among other things, resolve Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of New GM Securities under the Plan, the Disclosure Statement does not explain the interplay between the GUC Trust Administrator's authority to take certain actions with respect to the GUC Trust Assets and the

GUC Trust Administrator's obligation to ensure that the Disputed GUC reserve is sufficiently funded to satisfy Disputed Claims that are subsequently Allowed.  It is also unclear whether the GUC Trust Administrator is required to distribute the New GM Securities (including New Warrants) in kind or is allowed to monetize the New GM Securities and distribute cash or other property instead.  Without a basic understanding of any safeguards to prevent the GUC Trust Administrator from selling or otherwise distributing proceeds of the GUC Trust that are properly allocable to Disputed Claims or to General Unsecured Claims, the Objecting Parties and other creditors cannot make an informed judgment about the Plan.  Accordingly, the Disclosure Statement is inadequate in this regard.

31.     Under the Plan, General Unsecured Creditors are to receive any distribution to which they are entitled from the GUC Trust in the form of New GM Securities and GUC Trust Units (*i.e.*, beneficial interests in the GUC Trust).  See Plan, Art. 4.3(a).  The Plan provides that the GUC Trust will make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims whose claims are subsequently allowed.  *See id.*

32.     The New GM Securities are comprised of New GM Stock and New Warrants.  Pursuant to Article 5.2(e) of the Plan, the GUC Trust Administrator has the authority to sell the New Warrants remaining in the GUC Trust during the sixty (60) day period preceding their expiration, regardless of "whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute the proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable . . ."  Plan, Art. 5.2.  The Plan is not clear whether the proceeds of the New Warrants which are sold are to be held first for the benefit of the Disputed Claims for which they are held.  If the GUC Trust Administrator is authorized to sell these New

Warrants that are being held on account of Disputed General Unsecured Claims and distribute

the proceeds of such sale to holders of General Unsecured Claims whose claims have been

Allowed, it is not clear how the GUC Trust will make up for the shortfall in the reserve

established for Disputed Claims.

33.     The Objecting Parties believe that this discrepancy can be resolved through the

inclusion of the following additional language in Section III F.6 of the Disclosure Statement (and

Section 5.3(e) of the Plan:

> During the sixty (60) days preceding the expiration of the
> New Warrants, the GUC Trust Administrator shall have the
> authority to sell any New Warrants remaining in the GUC Trust,
> whether held in a reserve for Disputed General Unsecured Claims
> or otherwise, and distribute **a pro rata amount** of the proceeds
> thereof to holders of Allowed General Unsecured Claims and/or
> GUC Trust Units, **and hold a pro rata amount of the proceeds in
> a reserve for Disputed General Unsecured Claims**, as
> applicable, consistent with, and as provided in, the Plan.

34.     Accordingly, the Objecting Parties request that the Debtors revise the Disclosure

Statement to incorporate the proposed language set forth above.

35.     Similarly, the Plan authorizes the GUC Trust Administrator to sell the GUC Trust

Assets, which are comprised of the GUC Trust Administrative Fund (the amount of which is

currently left blank) and the New GM Securities.  See Plan, Art. 1.81.  Pursuant to Article 6.2(f)

of the Plan, the GUC Trust Administrator has the authority to sell the GUC Trust Assets and

distribute to the holders of Allowed General Unsecured Claims.  It is not clear from reading the

Plan, and the Disclosure Statement does not clarify, whether the GUC Trust Administrator may

sell the GUC Trust Assets that are being held by the GUC Trust Administrator on account of

Disputed Claims or otherwise.  It is also unclear as to whether the GUC Trust Administrator is

required to distribute the New GM Securities (including New Warrants) in kind.  Without

clarification or explanation, the Objecting Parties cannot properly evaluate this provision.

Clearly the Disclosure Statement is deficient in its failure to explain how the GUC Trust will treat assets being held by the GUC Trust Administrator.

36.    The Objecting Parties propose the following additional language to Section III G.2.f of the Disclosure Statement (and Section 6.2(f) of the Plan) to clarify this issue:

> In furtherance of and consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets; **provided, that the GUC Trust Administrator shall not sell or otherwise distribute GUC Trust Assets being held on account of Disputed General Unsecured Claims except as provided in Section 5.2(e) and shall distribute any New GM Securities (including New Warrants) in kind to holders of Allowed Claims**, (ii) . . .

37.    The Objecting Parties request that the Debtors include the language set forth above, or language substantially similar, in order to clarify the GUC Trust Administrator's treatment of GUC Trust Assets being held by it.

38.    At this time, the Objecting Parties (and other creditors that may hold Disputed Claims) are unable to make an informed decision on the Plan.  Accordingly, the Disclosure Statement should be modified to include information explaining how the Disputed Claims will be segregated from other GUC Trust Assets being sold or distributed to holders of Allowed General Unsecured Claims.

   D.    The Disclosure Statement Fails to Provide
         Adequate Information Regarding the Estimation Process

39.    The Disclosure Statement does not provide adequate information concerning the claims estimation process described in Article 7.3 of the Plan and, particularly, whether this process is intended to fix the Allowed amount of claims for distribution purposes.  Under the Plan, the Debtors or the GUC Trust Administrator are empowered to request that the Bankruptcy Court estimate contingent, unliquidated or Disputed Claims under section 502(c) of the

Bankruptcy Code.  See Plan, Art. 7.3.  Moreover, the Plan provides that "[i]n the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court."  *Id.*  On its face, this appears to state that the Allowed amount of any claim will be fixed for all purposes.  It is unclear, and the Disclosure Statement does not explain, whether this estimated amount is to be the Allowed amount of the Claim for distribution purposes or whether it is intended to apply for voting purposes only.

40.    The distinction between an estimation procedure that fixes the Allowed amount of a claim for voting purposes only versus a procedure that fixes the Allowed amount of a claim for distribution purposes is critical to the Objecting Parties' ability to make an informed judgment about the Plan.  The Disclosure Statement is deficient in its failure to discuss this ambiguity, and therefore it does not provide the requisite amount of information from which a creditor can evaluate the Plan.  To the extent this language is intended to allow such an estimation, it is inconsistent with the process by which the Wind-up Claim and the Guarantee Claims are being resolved in these Cases.  Until this material ambiguity is clarified, the Objecting Parties submit that the Disclosure Statement cannot be approved.

41.    The Objecting Parties submit that this deficiency can be cured through the inclusion of the following proposed language in Section III.H.3 of the Disclosure Statement (and Section 7.3 of the Plan):

> The Debtors or the GUC Trust Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code **for all purposes**, regardless of whether the Debtors or the GUC Trust Administrator previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including,

without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim **for all purposes, including for purposes of making distributions under the Plan**, as determined by the Bankruptcy Court; **provided, that the estimation provisions shall not apply to the Guarantee Claim and/or the Wind Up Claim**.

42.     With this clarification, as to both the scope of the estimation process and the treatment of the Claims under the Plan, the concerns of the Objecting Parties regarding the estimation process will likely be resolved.  Accordingly, the Objecting Parties request that the Debtors include language substantially similar to that which is set forth above so as to provide adequate information regarding the estimation process.

E.      The Disclosure Statement Fails to Provide
        Adequate Information Regarding the Mechanics of Distribution

43.     The Plan contemplates distribution of the Objecting Parties' Claims through the GUC Trust.  However, the Disclosure Statement fails to provide any detail concerning the mechanics of this distribution.  The holders of various series of bonds issued pursuant to Indentures with MLC have Indenture Trustees to shepherd the distribution of claims to the individual noteholders.  These Indenture Trustees receive payment of their "reasonable prepetition and postpetition fees and expenses" under the Plan as an Allowed Administrative Expense to be paid in Cash on the Effective Date.  *See* Plan, Art. 2.5.

44.     The Noteholders do not have an Indenture Trustee.  Rather, the Notes were issued under the Fiscal and Paying Agency Agreement, with Deutsche Bank AG London designated as the fiscal agent and Bank Général du Luxembourg S.A. the paying agent (together, the "Fiscal and Paying Agents").  The Fiscal and Paying Agents perform services comparable to the Indenture Trustees under the various MLC-issued Indentures, however, the Plan does not provide

for the payment of their fees (and the fees of their retained professionals). Thus, the Noteholders experience a pro rata reduction in their overall recovery by the payment of the Indenture Trustees as Administrative Expenses, but the Noteholders do not receive the corresponding benefits. Putting aside these inequities, the Plan and Disclosure Statement nowhere provide that distributions on account of the Claims will be made through the Fiscal and Paying Agents as a conduit to the beneficial owners of the Notes. Given the absence of information concerning distribution of the Claims through the Fiscal and Paying Agents, it is not clear how recoveries are to be distributed. Without information concerning the mechanics of distribution, the Noteholders cannot make an informed judgment on the Plan.

45.    Accordingly, the Objecting Parties propose a process to facilitate distributions to the Noteholders that is similar to the process currently in place with respect to the holders of MLC-issued bonds, whereby the Indenture Trustees direct distributions to individual noteholders. As an initial matter, this requires the inclusion of an additional defined term in the Plan, as follows:

> **Fiscal and Paying Agents means, collectively, Deutsche Bank AG London, solely in its capacity as the fiscal agent, and Bank Général du Luxembourg S.A., solely in its capacity as the paying agent, under that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, Motors Liquidation Company, Deutsche Bank Luxembourg S.A., and Banque Général du Luxembourg S.A.**

46.    In addition, the Objecting Parties propose the following process to govern the distribution of recoveries to the Noteholders:

> **Any distribution from the Debtors, the GUC Trust, or the Avoidance Action Trust to the Fiscal Agent in accordance with the Plan shall be deemed a distribution to the respective beneficial owners under the applicable trust. Distributions shall be made to the beneficial owners as follows:**
>
>> **(i)    The Fiscal Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the Fiscal and Paying Agency Agreement, the New**

**GM Securities and the GUC Trust Units, (or the proceeds of the foregoing, as applicable) it receives from the GUC Trust pursuant to Section 4.3 hereof to the beneficial owners as of the Distribution Record Date. The GUC Trust shall make additional distributions of New GM Securities (or the proceeds of the foregoing, as applicable) to holders of GUC Trust Units in accordance with the GUC Trust Agreement and Section 4.3 hereof.**

47.     Under this framework, the Fiscal Agent will provide services substantially similar to those being provided by the Indenture Trustees. Accordingly, the Objecting Parties submit that the Fiscal Agent's reasonable fees and expenses should be paid as an Administrative Expense under the Plan. The Objecting Parties proposed to broaden the scope of the Plan paragraph that provides for the payment of the Indenture Trustees' fees, as follows and to make corresponding changes to the Disclosure Statement:

Special Provisions Regarding Indenture Trustee **and Fiscal and Paying Agents** Fees and Expenses.

The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees) **and the reasonable prepetition and postpetition fees and expenses of the Fiscal and Paying Agents (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Fiscal and Paying Agents)** shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date . . .

48.     With these changes, the Objecting Parties believe that the issues concerning the mechanism for distributions under the Plan will be largely resolved. Accordingly, the Objecting Parties request that the Debtors adopt this proposed process and in the Fiscal and Paying Agents as a part of the distribution scheme under the Plan.

<u>RESERVATION OF RIGHTS</u>

49.     The Objecting Parties continue to analyze the Disclosure Statement and Plan. As such, this Objection is submitted without prejudice to, and with a full reservation of, the

Objecting Parties' rights to supplement this Objection in advance of or in connection with the hearing to consider the Motion.  In addition, the Objecting Parties reserve the right to object to confirmation of the Plan or any other plan on any grounds whatsoever, regardless of whether those grounds are addressed herein.

NOTICE

50.    The Objecting Parties have provided notice of this Objection to: (i) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243 (Attn: Ted Stenger); (iii) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 68265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys to the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John Rapisardi, Esq.); (v) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding

asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152 (Attn: Elihu

Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington,

D.C. 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); and (xii) Stutzman,

Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his

capacity as the legal representative for future asbestos personal injury claimants 2323 Bryan

Street, Suite 2200, Dallas, Texas (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau,

Esq.).

<u>CONCLUSION</u>

WHEREFORE the Objecting Parties respectfully request that the Court (i) deny the

approval of the Motion unless the modifications to the Disclosure Statement set forth in this

Objection are adopted by the Debtors, and (ii) provide the Objecting Parties with such other and

further relief as is just and proper.

Dated: New York, New York
October 14, 2010

GREENBERG TRAURIG, LLP

By: */s/ John H. Bae*
    Bruce R. Zirinsky, Esq.
    Nancy A. Mitchell, Esq.
    John H. Bae, Esq.
    Gary D. Ticoll, Esq.
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400
    Email:    zirinskyb@gtlaw.com
            mitchelln@gtlaw.com
            baej@gtlaw.com
            ticollg@gtlaw.com

*Counsel for Certain Noteholders of General*
*Motors Nova Scotia Finance Company*

20