# EXHIBIT A

Proposed Revisions to Disclosure Statement

[*Objection 1*: *The Plan and Disclosure Statement do not reference the Wind Up Claim or MLC's obligations under the Lock Up Agreement.*]

Plan Section I (definitions)

**Companies Act** means *Companies Act* (**Nova Scotia**), being Chapter 81 of the Revised Statutes of Nova Scotia, 1989, as amended.

**GM Nova Scotia** means General Motors Nova Scotia Finance Company, a non-debtor, which was declared bankrupt under the Bankruptcy and Insolvency Act (Canada) on October 9, 2009.

**Global Proof of Claim** means the global proof of claim (No. 69551) related to the Guarantee Claim which was filed in the aggregate amount of $1,072,557,531.72 (converted to U.S. dollars using the exchange rate 1.6443) less the amount of certain Individual Proofs of Claim identified therein pursuant to the *Order Granting in Part and Denying in Part the Motion of Certain Noteholders for an Order Modifying the Bar Date Order* (Docket No. 4704).

**Guarantee Claim** means the guarantee Claim against MLC arising as a result of MLC's guarantee of the Nova Scotia Notes under the Nova Scotia Fiscal and Paying Agency Agreement. The Guarantee Claim has been asserted in the amount of $1,072,557,531.72, plus any additional amounts owed under the Nova Scotia Fiscal and Paying Agency Agreement.

**Individual Proofs of Claim** means the individual proofs of claim filed by Nova Scotia Noteholders on account of their Guarantee Claim.

**Lock Up Agreement** means that certain agreement, dated as of June 1, 2009, among GM Nova Scotia, GM Canada, GM Nova Scotia Investments Ltd., GM and certain Nova Scotia Noteholders, as amended or modified, which was assumed and assigned to New GM pursuant to the 363 Transaction.

**Nova Scotia Fiscal and Paying Agency Agreement** means that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among GM Nova Scotia, MLC, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Générale du Luxembourg S.A., as paying agent, as amended or modified.

**Nova Scotia Notes** means the £350,000,000 8.375% Guaranteed Notes due December 7, 2015 and the £250,000,000 8.875% Guaranteed Notes due July 10, 2023, in each case issued under the Nova Scotia Fiscal and Paying Agency Agreement.

**Nova Scotia Noteholders** means the beneficial holders of the Nova Scotia Notes.

**Wind Up Claim** means the Claim by the trustee of GM Nova Scotia against MLC, arising under Section 135 of the Companies Act, in the amount of $1,607,647,592.49, plus any additional amounts allowed under Canada's Bankruptcy and Insolvency Act or Section 135 of the Companies Act.

Disclosure Statement Section II.D

Nova Scotia Fiscal and Paying Agency Agreement. As of the Commencement Date, GM was party to a **the Nova Scotia** Fiscal and Payment Agency Agreement, dated as of July 10, 2003, by and between non-Debtor General Motors Nova Scotia Finance Company, as issuer, GM, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Bank Général du Luxembourg S.A., as paying agent. Under the Nova Scotia Fiscal and Paying Agency Agreement, **under which** GM guaranteed the payment by GM Nova Scotia of principal and interest on the £350,000,000 of 8.375% unsecured notes due 2015 and £250,000,000 of 8.875% unsecured notes due 2023 issued by GM Nova Scotia **Notes**. As of the Commencement Date, the total principal amount outstanding under the Nova Scotia Fiscal and Paying Agency Agreement was, in U.S. dollars, approximately $853 million. **Individual Proofs of Claim and a Global Proof of Claim have been filed asserting claims on account of the Guarantee Claim in an amount not less than $1,072,557,531.72.**

[New] Disclosure Statement New Section II.E

**E. Obligations to GM Nova Scotia**

**Non-debtor GM Nova Scotia, an unlimited company under the Companies Act, is a direct, wholly owned subsidiary of MLC. On October 9, 2009, GM Nova Scotia was declared bankrupt and the Supreme Court of Nova Scotia appointed Green Hunt Wedlake Inc. (the "Nova Scotia Trustee") as the legal representative of GM Nova Scotia. As discussed in detail below, the Nova Scotia Trustee believes that under Section 135 of the Companies Act, upon the winding-up of GM Nova Scotia, MLC, as its parent, is liable to the Nova Scotia Trustee for the amount of the unpaid debts and liabilities of GM Nova Scotia (the "Wind Up Claim").**

**GM Nova Scotia was formed to issue debt and allow the General Motors corporate group to benefit from favorable tax treatment on such debt. GM Nova Scotia, as the issuer of the Nova Scotia Notes, is the primary obligor under the Nova Scotia Fiscal and Paying Agency Agreement. GM Nova Scotia is also party to a currency swap arrangement (the "Swap Arrangement") with New GM (which was assigned the swap arrangement from MLC).**

**On July 10, 2003, GM Nova Scotia loaned certain of the proceeds from the Nova Scotia Notes to GM Canada, resulting in intercompany loans payable by GM Canada to GM Nova Scotia in the aggregate principal amount of approximately CAN$1.3 billion (the "GM Canada Loans"). In May 2008, GM and GM Canada entered into two transactions involving returns of capital to GM and amended the credit agreement to which GM and GM Canada were parties. On March 2, 2009, certain of the Nova Scotia Noteholders filed**

2

an action in the Supreme Court of Nova Scotia (the "Nova Scotia Proceeding") against, among others, GM, GM Canada, and GM Nova Scotia for certain Canadian law causes of action alleging that the aforementioned transactions violated Sections 238 and 241 of the Canadian Business Corporations Act. The plaintiffs sought a declaration that each of these transactions was "oppressive, unfairly prejudicial and unfairly disregarded the interests of creditors." They further sought orders to set aside the two May 2008 transactions, compel GM to disgorge the sums received, and enjoin GM Canada from guaranteeing or securing the debt of any other entity. Finally, the Plaintiffs requested the award of damages and compensation jointly and severally against GM, GM Canada, GM Nova Scotia, a GM Nova Scotia affiliate and certain individual directors of GM Canada or of GM Nova Scotia and its affiliate. *See Aurelius Capital Partners, LP, et al. v. General Motors Corp., et al.*, Court File No. HFX No. 308066.

Following prepetition negotiations, on June 1, 2009, GM Nova Scotia, GM Canada, GM Nova Scotia Investments Ltd., GM and certain of the Nova Scotia Noteholders signed the Lock Up Agreement. The Lock Up Agreement contains the following material provisions:

- **GM Nova Scotia, GM Canada and GM agreed that (i) the Wind Up Claim is enforceable against GM as a general unsecured claim, (ii) the Nova Scotia Notes are enforceable against GM Nova Scotia in their full amount, and (iii) the Guarantee Claim is enforceable against GM as a general unsecured claim.** *See* **Lock-Up Agreement, ¶6(a).**
- **The Wind Up Claim includes the amount outstanding under the Nova Scotia Fiscal and Paying Agency Agreement, the Swap Arrangement and any other liabilities of GM Nova Scotia.** *See* **Lock Up Agreement, ¶6(b)(iii).**
- **GM Nova Scotia agreed to consent to entry of an order (a "Bankruptcy Order") under Canada's Bankruptcy and Insolvency Act (the "BIA").** *See* **Lock-Up Agreement, ¶ 6(b)(i).**
- **GM Canada funded a consent fee (the "Consent Fee") into an escrow account, which would be payable to the Nova Scotia Noteholders upon the Nova Scotia Noteholders' approval of an extraordinary resolution.** *See* **Lock-Up Agreement, ¶2.**
- **GM Canada was relieved of its liability under the GM Canada Loans, provided, however, that if the Consent Fee is ever successfully challenged, the full amount owing under the GM Canada Loans will be immediately due and payable by GM Canada to the Nova Scotia Noteholders.** *See* **Lock Up Agreement, ¶5(b).**
- **The Nova Scotia Noteholders agreed to discontinue prosecution of the Nova Scotia Proceeding, provided, however, that the action may be reinstituted if the Consent Fee is required to be disgorged.** *See* **Lock Up Agreement, ¶5(a).**
- **GM agreed that if, for any reason, any portion of the Wind Up Claim is disallowed, GM Nova Scotia's liability to GM on the Swap Liability (as defined below) would be subordinated to full repayment of the GM Nova Scotia Notes. GM further agreed not to assert any setoff rights with respect to the Wind Up Claim.** *See* **Lock Up Agreement, ¶6(b)(v), (vi).**

3

- GM agreed not to take any action or assert any position inconsistent with the provisions of paragraph 6 of the Lock Up Agreement. To the extent requested by the Nova Scotia Noteholders, GM is required to confirm its support of the Wind Up Claim and Guarantee Claim. *See* Lock Up Agreement, ¶6(b)(vii).
- Among other termination provisions, any party not in material breach of the Lock Up Agreement may terminate the agreement if another party takes an action that is materially inconsistent with the Lock Up Agreement. *See* Lock Up Agreement, ¶3.

On November 30, 2009, the Nova Scotia Trustee filed the Wind Up Claim (claim no. 66319, amending claim no. 65814) in the amount of $1,607,647,592.49, plus additional amounts owing under the Companies Act and the BIA. As of October 9, 2009 (the "GM Nova Scotia Petition Date"), the amount outstanding to the Nova Scotia Noteholders was CAN$1,088,542,512.01 (as converted from pounds sterling at a rate of 1.66852, the rate at market closing on the GM Nova Scotia Petition Date). In addition, New GM (as successor in interest to MLC under the Swap Arrangement) has also asserted a claim under the Swap Arrangement of CAN$589,292,176.53 (the "Swap Liability"). The Nova Scotia Trustee believes that as a result of the foregoing claims against GM Nova Scotia and the other expenses of GM Nova Scotia, the Nova Scotia Trustee has a statutory unsecured claim against MLC for CAN$1,678,270,910.68 (converted at the exchange rate of 0.957919, the claim amounts to US$1,607,647,592.49), plus all other amounts owed to GM Nova Scotia under the Companies Act and BIA.

In connection with the 363 Transaction (discussed in detail in section II.B of this Disclosure Statement), the Lock Up Agreement was assumed and assigned to New GM.

The Nova Scotia Trustee believes that Lock Up Agreement obligates MLC and, following assumption and assignment, New GM to support allowance of the Wind Up Claim and the Guarantee Claim in the Chapter 11 Cases. A failure to comply with the terms of the Lock Up Agreement may expose MLC and New GM to significant risks. First, to the extent that MLC and/or New GM fail to meet their obligations under the Lock Up Agreement, MLC and/or New GM may be subject to significant litigation and postpetition liability for, among other things, breach of contract. Second, upon a material breach of the Lock Up Agreement by MLC or New GM, the Noteholders may, among other things, terminate the Lock Up Agreement and reinstate the Nova Scotia Proceeding against GM, GM Nova Scotia and GM Canada. Third, to the extent the Consent Fee is required to be disgorged, GM (and ultimately, New GM) will be liable for the full amount of the GM Canada Loans (approximately CAN$1.3 billion), and such liability may impact the value of securities to be distributed to unsecured creditors of MLC under the Plan.

On July 2, 2010, the Creditors' Committee filed its *Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders and General Motors Nova Scotia Finance Company and Motion for Other Relief* (Docket No. 6248) (the "Claims Objection"). Through the Claims Objection, the Committee is seeking disallowance of or, in the alternative, equitable subordination of the Wind Up Claim and certain of the

4

**Noteholders' Claims.  Responses to the Claims Objection are due on November 15, 2010.  A hearing on the Claims Objection is currently scheduled for November 18, 2010.  Despite their obligations under the Lock Up Agreement, the Debtors have remained silent regarding the Claims Objection.  If the Guarantee Claim and the Wind Up Claim are Allowed, each Claim will be classified as a General Unsecured Claim and receive distributions** *pari passu* **with other Class 3 General Unsecured Claims.**


[*Objection 2*:  *The Plan and Disclosure Statement do not explain whether the Guarantee Claim and the Wind Up Claim are both to be treated as Eurobond Claims or General Unsecured Claims under the Plan.*]

Disclosure Statement Section III.C/ Plan 4.3(f) and 1.72

General Unsecured Claims (Class 3).  (Estimated Amount of Allowed General Unsecured Claims is $_____.)  The aggregate amount of General Unsecured Claims filed against the Debtors on or before the Bar Dates, as well as the General Unsecured Claims listed in the Debtors' Schedules, is approximately $270 billion.  However, the Debtors estimate that the aggregate amount of Allowed Claims in Class 3 will be approximately $___ billion, after deducting duplicate Claims, amended and superseded Claims, previously paid Claims, Claims not supported by the Debtors' books and records, Claims that are covered by insurance, and Claims that are subject to other objections.  The Claims in Class 3 consist of the Claims of unions, suppliers and other vendors, landlords with prepetition rent claims and/or claims based on rejection of leases, employment, personal injury, and other litigation claimants to the extent not covered by insurance, Asbestos Property Damage Claims, environmental claims subject to discharge under Environmental Laws to pay money to private and governmental entities for cleanup or remediation of property not owned by the Debtors, including Superfund liabilities, parties to contracts with the Debtors that are being rejected, the principal and interest accrued and unpaid through the Commencement Date under the notes that are subject to the Indentures, **the Wind Up Claim (to the extent Allowed), the Guarantee Claim (to the extent Allowed)** and other general unsecured claims.  Class 3 does not include any Property Environmental Claims or Asbestos Personal Injury Claims.

The Eurobond Claims under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among MLC, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $_____ , **and (ii)** ~~that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, MLC, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $_____, and~~ ~~(iii)~~ that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse, shall be Allowed in the amount of $_____ (together, the "Fixed Allowed Eurobond Claims").  The Fixed Allowed Eurobond Claims shall override and supersede any individual Claims filed by record or by beneficial holders of debt securities arising out of or relating to the Eurobond Claims.

5

**1.72 Eurobond Claim** means a Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among MLC, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A., **and (ii)** ~~that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, MLC, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A., and (iii)~~ that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse.  For the avoidance of doubt, Eurobond Claim does not include the Wind Up Claim.

[*Objection 3*: *The Disclosure Statement and Plan contain inconsistencies between the definitions of Eurobond Claims and Disputed Claims*.]

Plan Section 1.4

1.4 **Allowed** means (i) with reference to any Claim (other than an Asbestos Personal Injury Claim), (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any (I) timely filed Claim that is no longer subject to the ADR Procedures in the case of Unliquidated Litigation Claims or (II) Claim listed on the Schedules or timely filed proof of Claim, as to which no objection to allowance has been interposed in accordance with Section 7.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or **(d) any Claim specifically allowed under the Plan, regardless of whether an objection to such Claim is pending,** and (ii) with reference to any Asbestos Personal Injury Claim, any Asbestos Personal Injury Claim to the extent that it is Allowed in accordance with the procedures established pursuant to the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, which shall establish the amount of legal liability against the Asbestos Trust in the amount of the liquidated value of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos Trust Distribution Procedures. The Asbestos Trust Claim shall be deemed "Allowed" when fixed by Final Order or settlement.

1.53 **Disputed** means, with respect to any Claim (other than an Asbestos Personal Injury Claim) that has not been Allowed pursuant to the Plan or a Final Order,

(a) if no proof of Claim has been filed by the applicable deadline: a Claim (other than an Asbestos Personal Injury Claim) that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

6

(b) if a proof of Claim or request for payment of an Administrative Expense has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (iv) a Claim for which a timely objection or request for estimation is interposed which has not been withdrawn or determined by a Final Order.  Any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures **or under the Plan**, shall be an Allowed Claim, not a Disputed Claim.

For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim (other than an Asbestos Personal Injury Claim) has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim shall not be valid and shall be disregarded.

[*Objection 4: The GUC Trust Administrator is given the authority to sell New Warrants that are set to expire and distribute the proceeds to holders of Allowed General Unsecured Claims; however, the Plan does not indicate whether the proceeds of sale of the New Warrants will be held for the benefit of holders of Disputed Claims.*]

Disclosure Statement III.F.6/Plan 5.2(e)

Sale of New Warrants About to Expire.  During the sixty (60) days preceding the expiration of the New Warrants, the GUC Trust Administrator shall have the authority to sell any New Warrants remaining in the GUC Trust, whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute **a pro rata amount of the** proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, **and hold a pro rata amount of the proceeds in a reserve for Disputed General Unsecured Claims,** as applicable, consistent with, and as provided in, the Plan.

[*Objection 5: The Plan authorizes the GUC Trust Administrator to sell the GUC Trust Assets; however, it is not clear whether the GUC Trust Administrator will be authorized to sell GUC Trust Assets being held on account of Disputed Claims.*]

Disclosure Statement III.G.2.f/Plan 6.2(f)

Role of the GUC Trust Administrator. In furtherance of and consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, **provided that the GUC Trust Administrator shall not sell or otherwise distribute GUC Trust Assets being held on account of Disputed General Unsecured Claims except as provided in Section 5.2(e)**, (ii) . . .

7

[*Objection 6*:  *The Plan and Disclosure Statement do not disclose an estimate of the amount of Cash and New GM Securities that will be distributed on the Effective Date to holders of non-Disputed General Unsecured Claims.*]

Disclosure Statement Section III.C/Plan 4.3(a):

As soon as is reasonably practicable after the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the GUC Trust is Pro Rata Share of (i) New GM Securities and (ii) GUC Trust Units, in accordance with the terms of the GUC Trust and the GUC Trust Agreement.  **The Debtors estimate that approximately ___% of the aggregate amount of New GM Securities and Cash will be distributed on the Effective Date on account of non-Disputed General Unsecured Claims. The balance will be held in the GUC Trust pending resolution of the Disputed Claims.**  The GUC Trust shall make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently allowed.  The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units in accordance with the terms of the GUC Trust and the GUC Trust Agreement.

[*Objection 7: The Plan and Disclosure Statement do not indicate whether the proposed estimation process is intended to fix the Allowed amount of Claims for distribution purposes.*]

Disclosure Statement III.H.3/Plan 7.3

Estimation. The Debtors or the GUC Trust Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code **for all purposes**, regardless of whether the Debtors or the GUC Trust Administrator previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim **for all purposes, including for purposes of making distributions under the Plan**, as determined by the Bankruptcy Court, **provided that the estimation provisions shall not apply to the Guarantee Claim and/or the Wind Up Claim.**

[*Objection 8*:  *The Plan provides for the payment of the reasonable fees and expenses of the Indenture Trustees, but it does not provide for the payment of reasonable fees and expenses of the Fiscal and Paying Agents.  The Plan and Disclosure Statement do not provide any information concerning the mechanics of distributions of the Claims of the Noteholders.*]

8

[New] Plan 1.74:

**Fiscal and Paying Agents** means, collectively, Deutsche Bank AG London, solely in its capacity as the fiscal agent, and Bank Général du Luxebourg S.A., solely in its capacity as the paying agent, under the Nova Scotia Fiscal and Paying Agency Agreement.

Plan 2.5:

Special Provisions Regarding Indenture Trustee **and Fiscal and Paying Agents** Fees and Expenses. The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees) **and the reasonable prepetition and postpetition fees and expenses of the Fiscal and Paying Agents (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Fiscal and Paying Agents**) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date . . .

[New] Disclosure Statement III.F.7/Plan 5.3(c):

**Distributions to the Nova Scotia Noteholders.** Any distribution from the Debtors, the GUC Trust, or the Avoidance Action Trust to the Fiscal Agent in accordance with the Plan shall be deemed a distribution to the respective beneficial owners under the applicable trust. Distributions shall be made to the beneficial owners as follows:

(i) The Fiscal Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the Fiscal and Paying Agency Agreement, the New GM Securities and the GUC Trust Units (or the proceeds of the foregoing, as applicable) it receives from the GUC Trust pursuant to Section 4.3 hereof to the beneficial owners as of the Distribution Record Date. The GUC Trust shall make additional distributions of New GM Securities (or the proceeds of the foregoing, as applicable) to holders of GUC Trust Units in accordance with the GUC Trust Agreement and Section 4.3 hereof.