**Hearing Date/Time: October 21, 2010, 9:45 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

In re:                                                                Chapter 11 Case

MOTORS LIQUIDATION COMPANY, *et al*.,                Case No. 09-50026 (REG)
f/k/a General Motors Corp., *et al.*,

(Jointly Administered)

                                    Debtors,


------------------------------------------------------------------------X


# UNITED STATES OF AMERICA'S OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY TO ENFORCE (A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER, AND (C) THE AMENDED DIP FACILITY


PREET BHARARA
United States Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile:  (212) 637-2730

*Attorney for the United States of America*

Of Counsel:

DAVID S. JONES
NATALIE N. KUEHLER
JOSEPH N. CORDARO
Assistant United States Attorneys

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

THE COURT SHOULD DENY THE MOTION FOR LACK OF STANDING
AND RIPENESS, AND AS CONTRARY TO THE BANKRUPTCY CODE
AND PREMATURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The Motion Identifies No Injury in Fact Sufficient to
Confer Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    The Motion Is Not Ripe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    The Motion Seeks Relief Beyond the Scope of Section 105(a). . . 11

    D.    Jurisdictional Issues Aside, the Court Should Defer Adjudicating
the Motion in the Interest of Judicial Economy and Sound Case
Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

WERE THE COURT TO REACH THE MERITS, IT SHOULD DENY THE
MOTION OR, IN THE ALTERNATIVE, DEFER DECIDING IT AND PERMIT
DISCOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    The Avoidance Action and Its Proceeds Belong to the Debtors'
Estates and the Committee Only Has Derivative Standing to Bring
the Avoidance Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    The Committee's Derivative Jurisdiction. . . . . . . . . . . . . 14

        2.    The Avoidance Action Proceeds Belong to the Estate
and Must Be Distributed Pursuant to a Plan That Meets
Bankruptcy Code Requirements . . . . . . . . . . . . . . . . . . . 16

B.    The Committee Has Not Overcome the Fundamental Bankruptcy
Precept That DIP Lenders Are Entitled to Cash Payment in Full
of Their Administrative Expense Claim . . . . . . . . . . . . . . . . . . . . 18

C.    If the Court Requires Extrinsic Evidence, It Should Grant the
Parties Sufficient Time to Gather and Analyze Such Evidence . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*680 Fifth Avenue Associates v. Mutual Benefit Life Insurance Co. in Rehabilitation (In re 680 Fifth Avenue Associates),*
156 B.R. 726 (Bankr. S.D.N.Y. 1993), aff'd 169 B.R. 22 (S.D.N.Y. 1993) and 29 F.3d 95 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Abbott Laboratories v. Gardner,*
387 U.S. 136 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Adelphia Communications Corp.,*
364 B.R. 518 (Bankr. S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Babbitt v. United Farm Workers National Union,*
442 U.S. 289 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bank of New York v. Adelphia Communications Corp. (In re Adelphia Communications Corp.),*
307 B.R. 432 (Bankr. S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Binder & Binder, P.C. v. Finnie (In re Finnie),*
No. 05-3652 (AJG), 2007 WL 1574294 (Bankr. S.D.N.Y. May 29, 2007). . . . . . . . . . . . . . . . . 11

*In re Blanks,*
64 B.R. 467 (Bankr. E.D.N.C. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Blockbuster, Inc. v. Galeno,*
472 F.3d 53 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boston Post Road Ltd. P'Ship v. FDIC (In re Boston Post Road Ltd. Partnership),*
21 F.3d 477 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Brooklyn Legal Services Corp. v. Legal Services Corp.,*
462 F.3d 219 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.),*
10 F.3d 944 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Clearing House Association, L.L.C. v. Cuomo,*
510 F.3d 105 (2d Cir. 2007), aff'd in part,
rev'd in part on other grounds, 129 S. Ct. 2710 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Commodore International Ltd. v. Gould (In re Commodore International Ltd.),*
262 F.3d 96 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Matter of DeLancey,*
94 B.R. 311 (Bankr. S.D.N.Y. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dougherty v. Town of N. Hempstead Board of Zoning Appeals,*
282 F.3d 83 (2d Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Drexel Burnham Lambert Group Inc.,*
995 F.2d 1138 (2d Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Former Employees of Builders Square Retail Stores v. Hechinger Investment Co. of Del. (In re
Hechinger Investment Co. of Del.),*
298 F.3d 219 (3d Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fortune v. Medical Associates of Woodhull, P.C.,*
803 F. Supp. 636 (E.D.N.Y. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re General Motors Corp.,*
407 B.R. 463 (Bankr. S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Genuity Solutions, Inc. v. Metropolitan Transport Authority (In re Genuity, Inc.),*
2007 WL 1792252 (Bankr. S.D.N.Y. June 20, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Global Crossing Estate Representative v. Alta Partners Holdings LDC, (In re Global Crossing,
Ltd.),*
385 B.R. 52 (Bankr. S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,*
530 U.S. 1 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lee v. Board of Governors of the Federal  Reserve System*,
118 F.3d 905 (2d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iv

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Marchi v. Board of Cooperative  Education Services,*
173 F.3d 469 (2d Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Morris v. St. John National Bank (In re Haberman),*
516 F.3d 1207 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NWL Holdings, Inc. v. Eden Ctr., Inc. (In re Ames Department Stores, Inc.),*
317 B.R. 260 (Bankr. S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
Convenience Stores, Inc.),*
351 F.3d 86 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Official Committee of Equity Sec. Holders of Adelphia Communications Corp. v. Official
Committee of Unsecured Creditors of Adelphia Communications Corp. (In re Adelphia
Communications Corp.),*
544 F.3d 420 (2d Cir 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Official Committee of Equity Sec. Holders v. nVidia Corp. (In re 3dfx Interactive, Inc.),*
2009 WL 223266 (Bankr. N.D. Cal. Jan. 6, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Official Committee of Unsecured Creditors of TOUSA, Inc. v. Technical Olympic, S.A. (In re
TOUSA, Inc.),*
2010 WL 3835829 (Bankr. S.D. Fla. Oct. 4, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
330 F.3d 548 (3d Cir. 2003) (en banc).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pereira v. National Union Fire Insurance Co. of Pittsburgh, Pa.,*
525 F. Supp. 2d 370 (S.D.N.Y. 2007), aff'd 330 Fed. App. 5 (2d Cir. 2009). . . . . . . . . . . . . . 24

*Port Washington Teachers' Association v. Board of Education,*
478 F.3d 494 (2d Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*In re Racing Services, Inc.,*
540 F.3d 892 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re River Ctr. Holdings, LLC,*
394 B.R. 704 (Bankr.  S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schlaifer Nance & Co. v. Estate of Warhol,*
119 F.3d 91 (2d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Shain v. Ellison,*
356 F.3d 211 (2d Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,*
211 F.3d 21 (2d Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*TIG Insurance Co. v. Combustion Engineering, Inc. (In re Combustion Engineering, Inc.),*
366 F. Supp. 2d 224 (D. Del. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Texas v. United States,*
523 U.S. 296 (1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Williams v. Hernandez,*
2006 WL 156411 (S.D.N.Y. Jan. 18, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

11 U.S.C. § 105(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11 U.S.C. §§ 364(c)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11 U.S.C. § 507(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11 U.S.C. § 507(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11 U.S.C. § 541(a)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11 U.S.C. § 551. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 U.S.C. § 551. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11 U.S.C. § 1109(a)(9)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 13

11 U.S.C. § 1111 (b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

11 U.S.C. § 1129(a)(9)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const., Art. III, § 2, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
In re:                                                                                    Chapter 11

MOTORS LIQUIDATION COMPANY, *et al.*,                    Case No. 09-50026 (REG)
f/k/a General Motors Corp., *et al.*,
                                                                                          (Jointly Administered)

                        Debtors,


------------------------------------------------------------------------X


## UNITED STATES OF AMERICA'S OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY TO ENFORCE (A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER, AND (C) THE AMENDED DIP FACILITY

The United States of America, by its attorney Preet Bharara, United States Attorney for

the Southern District of New York, on behalf of the United States of America, including but not

limited to the United States Department of the Treasury ("**Treasury**") as debtor-in-possession

("**DIP**") lender, respectfully submits this opposition to the October 4, 2010 motion (the

"**Motion**" [Dkt. No. 7226]) of the Official Committee of Unsecured Creditors (the

"**Committee**"), which purportedly seeks to enforce prior orders of this Court as well as the terms

of the amended debtor-in-possession loan facility that Treasury and Export Development Canada

("**EDC**") have provided to Debtors**.**

## PRELIMINARY STATEMENT

1.      The Motion should be denied because it is jurisdictionally and procedurally

improper, because it seeks relief that is contrary to the Bankruptcy Code, and because, at bottom,

it rests on the asserted existence of a "deal" that is not borne out by the governing documents,

and that did not exist in fact.

2.      The Motion fails to acknowledge that the very orders that the Committee invokes

grant Treasury, as DIP lender, an allowed super-priority administrative expense claim for "all

principal, accrued interest, costs, fees, expenses and all other amounts . . . due under the DIP Credit Facility." And, of course, the Bankruptcy Code requires Debtors to pay all allowed administrative claims in cash in full as a condition of confirmation. *See* 11 U.S.C. § 1109(a)(9)(A). The Motion nevertheless asks the Court to decide, based on other provisions of orders and agreements that nowhere expunge or waive Treasury's administrative claim, that only the Debtors' unsecured creditors are entitled to benefit from future potential proceeds of an action to avoid $1.5 billion in liens and transfers (the "**Avoidance Action**," Adv. P. No. 09-00504 (REG)). The Committee requests this finding regardless of whether the Debtors' proposed plan pays administrative and other priority claimants in full. As discussed in Point II, this request lacks merit and for that reason should be denied.

3. Moreover, as detailed in Point I, the Motion should be denied because it purportedly seeks to enforce orders that Treasury neither has violated nor is in imminent danger of violating and, therefore, presents no ripe case or controversy. As the Committee acknowledges, all the United States has done is (a) file a short pleading in the Avoidance Action noting that, as the Committee itself states in its complaint, any recovery should be for the benefit of the estate pursuant to Bankruptcy Code section 551; and (b) request that the Debtors modify their proposed plan of liquidation to leave open the ultimate allocation of any proceeds of the Avoidance Action. This change merely permits further analysis and consideration by the parties and, if necessary, allows this Court to determine through the plan confirmation process or later proceedings the proper entitlements to any recovery in the Avoidance Action. Nowhere does the Committee explain how the United States' actions violate any prior order, or necessitate or justify intervention by this Court to "enforce" those orders or the DIP facility itself. Thus, there is no ripe case or controversy.

4.     Jurisdictional issues aside, the Motion also should be denied in the exercise of the Court's case management discretion as premature.  It is presently unclear whether or to what extent the Avoidance Action will succeed.  Accordingly, the question the Motion asks the Court to resolve is purely hypothetical and may never need to be decided.  There is no reason for the Court to devote judicial resources, nor for the parties to litigate (with costs potentially borne by Treasury), when the potential dispute may ultimately prove to be about how to allocate a zero recovery.  Moreover, the Motion is superfluous to – and an improper attempt to circumvent – the disclosure statement and plan confirmation process.  Debtors' proposed Disclosure Statement and Plan already identify the Avoidance Action as a possible source of payment for unsecured creditors depending on two contingencies – the outcome of the action and the ultimate distribution of assets under the plan or subsequent order.  No more is required.

5.     Indeed, the relief sought by the Motion is contrary to the Bankruptcy Code, which provides simply that the assets recovered through avoidance actions are for the benefit of the estate; thus, it is for the plan, and not for a motion purportedly to aid a prior order, to determine how the assets should be allocated.  Even if the Court were otherwise to adopt all of the Committee's arguments and determine that Treasury relinquished its rights to recover from the Avoidance Action proceeds, this would not resolve the question of whether the proceeds should properly be distributed to other creditors of the estate with higher priority claims.  Indeed, as the bar date for the filing of administrative expense claims has not yet passed, the total amount of such administrative expenses is yet unknown.  Other parties' entitlement to those proceeds must be resolved either by a plan, or according to procedures approved in a plan.

6.     Finally, setting its many procedural failings aside, the Motion should be denied because it lacks merit.  As an initial matter, the governing documents do not reflect the "deal"

that the Committee claims the parties struck.  It is true that Treasury agreed to except any Avoidance Action proceeds from its DIP wind-down loan "collateral," and it is true that that facility is on a "non-recourse basis."  But it is also true that the very same negotiated orders and agreements granted Treasury "an allowed super-priority administrative expense claim" in the full amount outstanding on the DIP wind-down loan.  No order or agreement has deprived Treasury of such a claim, nor has any order authorized a plan that, contrary to statute, fails to pay Treasury's allowed administrative claim.  The Motion entirely fails to acknowledge these vital aspects of the governing orders and agreements.  Nor does it present any extrinsic evidence that Treasury agreed or intended that the governing orders would have the meaning the Committee asserts.  Instead, the Committee seeks -- on ten days' notice and based on a selective excerpting of documents -- a dispositive ruling that unsecured creditors are the only parties who may receive any portion of any future Avoidance Action proceeds, even if this result leaves Treasury with an unpaid administrative claim.  This extraordinary request lacks merit and should be denied as unsupported by fact or law.

## STATEMENT OF FACTS

7.    On June 25, 2009, the Bankruptcy Court entered the "Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties" (the "**Final DIP Order**") [Dkt. No. 2529].

8.    Under the Final DIP Order, Treasury and EDC, as lenders (together, the "**DIP Lenders**"), were granted "an allowed super-priority administrative expense claim . . . for all

4

loans, reimbursement obligations and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lenders under the DIP Credit Facility." Final DIP Order ¶ 5 at 14.

9.    On July 5, 2009, the Court entered the "Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing dated July 5, 2009" (the "**Wind-Down Order**") [Dkt. No. 2969], which authorized execution of the $1,175,000,000 Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement (the "**Amended DIP Facility**"), dated as of July 10, 2010, by and among the Debtors and the DIP Lenders.

10.    Nothing in the Wind-Down Order or Amended DIP Facility eliminated or modified the provision in the Final DIP Order allowing the DIP Lenders an "allowed super-priority administrative expense claim." Final DIP Order at 14 ¶ 5. To the contrary, the Wind-Down Order provides that "except as modified by the Amended DIP Facility or this Order, the Final DIP Order shall remain in full force and effect," and further provides that:

> [T]he claims of the DIP Lenders arising from the Amended DIP Facility . . . and all other obligations owing to the DIP Lenders under the DIP Credit Facility shall be and are accorded a super-priority administrative expense status in each of these cases, and, subject only to the Carve-Out, shall have priority over any and all other administrative expenses and unsecured claims arising in these cases. . . .

Wind-Down Order at 4.

11.    The Wind-Down Order also provides that:

> [T]he Loans (as defined in the Amended DIP Facility) shall be non-recourse to the Borrower and the Guarantors, such that the

5

> DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral (as defined in the Amended DIP Facility) securing the DIP Loans, and nothing in this Order, the Final DIP Order, the DIP Credit Facility or the Amended DIP Facility shall, or shall be construed in any way, to authorize or permit the DIP Lenders to seek recourse against the New GM Equity Interests at any time. . . .

Wind-Down Order at 6. The Amended DIP Facility similarly states that "the Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral." Amended DIP Facility at 24.

12.    On July 31, 2009, the Committee commenced the Avoidance Action, titled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (REG) (Bankr. S.D.N.Y.), which seeks to avoid as unperfected a lien asserted by the lenders under a "Prepetition Term Loan Agreement," and to recover more than $1.5 billion in payments made to the lenders under that agreement. The complaint in the Avoidance Action seeks the "recover[y] *for the Debtors' estates* [of] the proceeds or value of" the transfers at issue. Complaint, July 31, 2009, at ¶ 452 (emphasis added); *see generally id.* ¶¶ 438-464 (claims for relief seeking avoidance and/or return of funds to the estates); *see also id.* at 55-56 ("pray[ers] for judgment" seeking relief in form of avoidance and restoration of funds "for the benefit of the estates pursuant to 11 U.S.C. § 551"). Cross-motions for summary judgment in the Avoidance Action are scheduled to be heard on November 1, 2010.

13.    On August 31, 2010, the Debtors filed their Joint Chapter 11 Plan (the "**Plan**") [Dkt. No. 6829] and corresponding Disclosure Statement (the "**Disclosure Statement**") [Dkt. No. 6830]. The Plan proposes to pay Treasury's administrative expense claims through (a) distribution of beneficial interests in the Environmental Response Trust, (b) payment of all excess cash remaining after funding "all obligations and amounts to be funded under the Plan,"

and (c) distributions of Avoidance Action proceeds, to the extent it is determined Treasury is entitled to such proceeds. Disclosure Statement at 41-42. This proposed treatment does not guarantee that Treasury's administrative expense claims will be paid in full on the effective date of the Plan.

## ARGUMENT

### POINT I

THE COURT SHOULD DENY THE MOTION FOR LACK OF STANDING AND RIPENESS,
AND AS CONTRARY TO THE BANKRUPTCY CODE AND PREMATURE

**A.      The Motion Identifies No Injury in Fact Sufficient to Confer Standing**

14.      As the party asserting the court's jurisdiction, the Committee bears the burden of demonstrating that jurisdiction exists over the Motion. *See Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006). The Committee, however, has strikingly failed to demonstrate that the Court's orders and the agreement they seek to enforce have been violated, or that there is an actual or imminent danger of such a violation. Because the Committee cannot satisfy the "injury in fact" requirement of standing doctrine, the Court lacks jurisdiction over the Motion. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

15.      "The constitutional requirements for standing are grounded in Article III of the Constitution, which limits the jurisdiction of federal courts to cases or controversies." *Port Washington Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 501 (2d Cir. 2007) (citing U.S. Const., Art. III, § 2, cl. 1). One of the requirements of standing – the injury in fact requirement – places the burden on a plaintiff to demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61 (internal quotation marks, citations, and footnote omitted). As the Second Circuit has explained:

> In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that "he has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct."

*Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)) (citations and internal quotation marks omitted in original). "[T]he theoretical possibility that [injury] might occur in the future does not amount to injury in fact." *Port Washington Teachers' Ass'n*, 478 F.3d at 500. Rather, "with respect to future injury, the [Supreme] Court has held that the prospect of such harm must be 'certainly impending' and 'real and immediate.'" *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 912 (2d Cir. 1997) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), and *Lyons*, 461 U.S. at 102).

16.    The Committee's demand for an order to "enforce" prior orders does not arise from any such threat of "certainly impending" injury. As noted, the Motion alleges no past or imminent violation of any order, and merely states that the United States (a) filed a statement in the Avoidance Action proceedings noting that allocation of any proceeds should not be resolved there, because Bankruptcy Code section 551 requires that any recovery in avoidance actions be for the benefit of the estate; and (b) allegedly influenced Debtors to propose a plan of liquidation that stated that entitlement to any Avoidance Action proceeds would be resolved by Final Order or other agreement. The Committee does not, and cannot, establish that either of these acts violates any order, nor does the Committee identify any imminent violation of any order by the United States. Even if the Committee "subjectively fear[s]" adverse Governmental action, such a fear is insufficient to satisfy the constitutional standing requirement, *Port Washington Teachers' Ass'n*, 478 F.3d at 501, and because any suggestion that the United States would take

8

some (unspecified) future action against the Committee or in violation of an order is "entirely

conjectural," *Shain*, 356 F.3d at 215, the Motion should be dismissed for lack of jurisdiction.

**B**.     **The Motion Is Not Ripe**

17.     The Motion also is jurisdictionally deficient because it is unripe.  Another aspect

of the Constitution's case-or-controversy requirement, the ripeness doctrine serves "to ensure

that a dispute has generated injury sufficient to satisfy the case or controversy requirement of

Article III." *Clearing House Ass'n, L.L.C. v. Cuomo*, 510 F.3d 105, 123 (2d Cir. 2007), *aff'd in

part, rev'd in part on other grounds*, 129 S. Ct. 2710 (2009); *see also Dougherty v. Town of N.

Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 90 (2d Cir. 2002).  The ripeness doctrine takes

into account "'the fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration.'" *Texas v. United States,* 523 U.S. 296, 301 (1998) (quoting

*Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)).  Ripeness and standing doctrines have a

"shared requirement that the injury be imminent rather than conjectural or hypothetical."

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006); *see also

Clearing House Ass'n*, 510 F.3d at 123 (where a plaintiff challenged future enforcement action,

holding that ripeness doctrine's "hardship" analysis "coincides with the question of whether an

imminent injury in fact has been established for the purposes of standing" (internal quotation

marks omitted)).

18.     Just as the Committee's Motion is too speculative for standing purposes, it is also

too speculative for ripeness purposes.  The Committee does not allege or demonstrate that

Treasury has violated or intends to violate the prior orders that the Motion purportedly seeks to

"enforce."  *Cf. Clearing House Ass'n*, 510 F.3d at 124-25 (case not ripe where state attorney

general had not sent demand letter to plaintiff indicating likelihood of an enforcement action,

even though such a letter had been sent to other entities); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478-79 (2d Cir. 1999) (plaintiff could not show "a sufficiently real and immediate threat of prosecution exists" where school board had not shown any indication that it would apply a policy to the conduct in question).  Moreover, the Committee does not demonstrate how it will suffer hardship if the Court withholds consideration of the Motion.  *See Williams v. Hernandez*, No. 05 Civ. 2420 (PKC), 2006 WL 156411, at *5 (S.D.N.Y. Jan. 18, 2006) (finding that withholding judicial review would not create a present detriment where the plaintiff would not be evicted absent "an extensive set of procedures . . . none of which ha[d] yet occurred"); *Bank of New York v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 432, 439 (Bankr. S.D.N.Y. 2004) (finding that withholding judicial consideration would not constitute hardship because subordinated creditors would have an opportunity to raise any objections to the proposed plan of reorganization at confirmation).

19.    Finally, these standing and ripeness requirements apply to the Motion, and generally in bankruptcy proceedings.  Indeed, in strikingly similar circumstances where objectors protested that a settlement whose approval was sought would violate a prior settlement agreement, this Court applied case or controversy principles to reject the objection as unripe:

> Other contentions by the Objectors must be rejected, or are not yet ripe. One such contention is that the proposed Settlement represents a violation of provisions of the settlement agreement between the Debtors and the Rigases, entered into in April 2005. . . . I agree that this agreement must be honored by the Estate, but do not see a violation of that undertaking based on anything the Estate has done yet. And while measures by the Estate to secure payments under the Policies to which the Estate itself is entitled would at least seemingly not be violative of that undertaking either, it is sufficient to await any future action proposed by the Estate and then see whether or not it should be deemed to be violative of that obligation.

10

*In re Adelphia Communications Corp.,* 364 B.R. 518, 530 (Bankr. S.D.N.Y. 2007); *see also In re*

*Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1145-1146 (2d Cir. 1993) (doctrine of

ripeness prevented consideration of objections to the potential distribution of a SEC

Disgorgement Fund, when no plan of distribution had yet been presented, and the district court

had not approved the distribution of the fund for the Second Circuit to review); *In re Adelphia*

*Communications Corp.,* 307 B.R. at 441-42 (declining to decide "X-Clause" controversy

between senior and subordinated debt creditors at the time, because controversy was then not yet

ripe for review); *Binder & Binder, P.C. v. Finnie (In re Finnie)*, No. 05-3652 (AJG), 2007 WL

1574294, at *7 (Bankr. S.D.N.Y. May 29, 2007) (declining to issue declaratory judgment

because "it [was] contingent upon . . . uncertain future events").

## C.        The Motion Seeks Relief Beyond the Scope of Section 105(a)

20.       Even if the Motion were not jurisdictionally defective, the relief that the

Committee seeks is well outside the scope of this Court's equitable power under 11 U.S.C. §

105(a) -- cited without discussion in paragraph 29 of the Motion.  Section 105(a) provides that

bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."  11 U.S.C. § 105(a).  The Second Circuit "has long

recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and

can only be exercised within the confines of the Bankruptcy Code.  It does not authorize the

bankruptcy courts to create substantive rights that are otherwise unavailable under applicable

law, or constitute a roving commission to do equity."  *New England Dairies, Inc. v. Dairy Mart*

*Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir.

2003) (citations and internal quotation marks omitted).  This Court similarly has recognized the

limitations of section 105(a).  *See In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711-12 (Bankr.

S.D.N.Y. 2008) ("While section 105(a) may be used for, among other purposes, enforcing earlier orders of the Court and agreements approved by the Court . . . a bankruptcy court cannot utilize section 105(a) to contravene other provisions of the Code, or to create substantive rights that are otherwise unavailable under applicable law."); *NWL Holdings, Inc. v. Eden Ctr., Inc. (In re Ames Dep't Stores, Inc.),* 317 B.R. 260, 273 (Bankr. S.D.N.Y. 2004) ("This Court . . . invokes section 105(a) with restraint, and never inconsistently with, or to circumvent, other provisions of the Code."); *see also In re General Motors Corp.*, 407 B.R. 463, 517 n.136 (Bankr. S.D.N.Y. 2009) (section "105(a) does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity") (internal quotation marks omitted) (quoting *In re DairyMart Convenience Stores*, *Inc.* 351 F.3d at 92).

21.    Here, the Committee's Motion contravenes the Bankruptcy Code and the very DIP Orders that the Committee seeks to "enforce."  As such, the Motion should be denied as outside the scope of Bankruptcy Code section 105(a).

22.    The Committee seeks a determination that Treasury "has no interest in the Term Loan Litigation or any proceeds thereof," and that "[i]nterests in the Avoidance Action Trust shall be distributed exclusively to the general unsecured creditors," Proposed Order ¶¶ 2-3, even though (a) the DIP Order grants the DIP Lenders a super-priority administrative claim under 11 U.S.C. §§ 364(c)(1) and 507(b), (b) the Bankruptcy Code explicitly provides that the Court cannot confirm a Chapter 11 plan unless administrative expense claimants, such as the DIP Lenders, receive full payment on their claims (unless such claimants have agreed to different treatment), *see* 11 U.S.C. § 1129(a)(9)(A); *Boston Post Rd. Ltd. P'Ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 484 (2d Cir. 1994) ("[A]dministrative claims are defined as

priority claims under 11 U.S.C. § 507(a)(1) and must be paid in full in cash pursuant to 11 U.S.C. § 1129(a)(9)(A)."), and (c) any recovery in the Avoidance Action is for the benefit of the *estate*, not solely for the unsecured creditors, s*ee* 11 U.S.C. § 551 ("Any transfer avoided under section 522, 544, 545, 547, 548, 549 or 724(a) of this title . . . is preserved for the benefit of the estate . . . ."). Accordingly, the Court does not have authority under section 105(a) to order the relief requested in the Committee's motion.

**D.    Jurisdictional Issues Aside, the Court Should Defer Adjudicating the Motion in the Interest of Judicial Economy and Sound Case Management**

23.    Finally, even if the Motion were not barred by the related doctrines of standing and ripeness, the Court should defer adjudicating the Motion now, to avoid potentially needless expenditure of judicial and party resources. As noted, cross-motions for summary judgment are scheduled to be argued in the Avoidance Action on November 1, and at this point it is unclear how or when the Avoidance Action will be resolved. In these circumstances, it would waste judicial and party resources (particularly because Treasury is funding the Committee's counsel through the Wind-Down budget) to permit litigation of the Motion to go forward while there is such uncertainty as to whether there will be any Avoidance Action proceeds to allocate.

24.    Quite simply, there is no need for a decision on the Motion at this time. Debtors' Disclosure Statement identifies the Avoidance Action and the potential disposition of any proceeds, and Debtors' proposed Plan likewise identifies the Avoidance Action as a potential source of estate assets, and includes an adequate provision for allocation of any proceeds. If the Committee is dissatisfied with either the Disclosure Statement or the proposed Plan, it may object.[1] Meanwhile, the Motion cannot as a practical matter contribute greater certainty, because

---

[1]    Any such objection would lack merit, especially in light of the financial analysis prepared by the Committee, which analyzes potential recoveries of unsecured creditors in a variety of circumstances, and which identifies recoveries that vary by at most three percent depending on variables including the

13

any ruling on the Motion could be the subject of lengthy appeals.  Thus, the Motion simply adds

no value, and considerable burden, and the Court accordingly should decline to consider it.  *See*

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (courts have implied powers to "manage their

own affairs so as to achieve the orderly and expeditious disposition of cases").

<div align="center">POINT II</div>

<div align="center">WERE THE COURT TO REACH THE MERITS, IT SHOULD DENY THE MOTION OR, IN
THE ALTERNATIVE, DEFER DECIDING IT AND PERMIT DISCOVERY</div>

25.     Even if the Motion were not fatally flawed procedurally, it should be denied on

the merits because, at bottom, it rests on a selective and incorrect reading of the governing

documents, and on the asserted existence of a "deal" that does not, in fact, exist.

**A.      The Avoidance Action and Its Proceeds Belong to the Debtors' Estates and
the Committee Only Has Derivative Standing to Bring the Avoidance Action**

1.   The Committee's Derivative Jurisdiction

26.     The Avoidance Action and its proceeds are property of the Debtors' estates.

Section 541(a)(1) of the Bankruptcy Code states a debtor's estate includes:  "all legal or

equitable interests of the debtor in property as of the commencement of the case."  Property of

the estate also includes "any interest in property that the trustee recovers under section 329(b),

363(n), 543, 550, 553, 723 of this title."  11 U.S.C. § 541(a)(3).

27.     Debtors frequently litigate avoidance actions that constitute property of their

estates during the course of, or after, their bankruptcy.  *See Global Crossing Estate*

*Representative v. Alta Partners Holdings LDC, (In re Global Crossing, Ltd.)*, 385 B.R. 52, 59

(Bankr. S.D.N.Y. 2008) (noting that the estate representative had filed over 1,000 avoidance

actions post-confirmation).  It is common for the Court to also grant derivative standing to a

---

size of the unsecured creditor pool and the recovery in the Avoidance Action.

statutory committee of unsecured creditors, as an estate representative, to pursue claims on behalf of the estate where a debtor has waived the right to pursue those claims. *See Official Comm. of Equity Sec. Holders of Adelphia Communications Corp. v. Official Comm. of Unsecured Creditors of Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 544 F.3d 420, 424 (2d Cir 2008) (finding that bankruptcy courts have the power to "confer derivative standing upon a committee with the consent of either the debtor-in-possession or trustee" and withdraw standing where it no longer serves the best interests of the estate); *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (finding that "a creditors' committee may acquire standing to pursue the debtor's claims if (a) the committee has the consent of the debtor in possession or trustee, and (b) the court finds that the suit by the committee is (i) in the best interests of the bankruptcy estate, and (ii) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings."); *In re Racing Services, Inc.*, 540 F.3d 892, 904-05 (8th Cir. 2008) ("a creditor (or creditor's committee) may obtain derivative standing to pursue avoidance actions").

28.      This is true even where recoveries may benefit creditor constituencies other than unsecured creditors. *See Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Technical Olympic, S.A. (In re TOUSA, Inc.)*, No. 09-1616-JKO, 2010 WL 3835829, at *3 (Bankr. S.D. Fla. Oct. 4, 2010) (noting that a recovery obtained on behalf of a debtor subsidiary conferring derivative standing would go to the estate of such subsidiary and not to the committee); *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 569-70 (3d Cir. 2003) (en banc) (observing that derivative standing is conferred on a committee on the assumption that action is being pursued "*for the estate's direct benefit* rather than [the committee's] own" (emphasis in original)).

29.    Here, the Court granted the Committee both the authority and standing to pursue the Avoidance Action on behalf of the Debtors' estates.  *See* Final DIP Order ¶ 19(d) ("The Committee shall have automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Prepetition Senior Facilities Secured Parties.").   The Court did not, however, grant unsecured creditors ownership of the litigation.

2.    The Avoidance Action Proceeds Belong to the Estate and Must Be
Distributed Pursuant to a Plan That Meets Bankruptcy Code Requirements

30.    Regardless of who brings an avoidance action on behalf of an estate, if the estate successfully avoids a transfer and claws back a prior payment, it does so for the benefit of all creditors of the estate.   "Any transfer avoided under section 522, 544, 545, 547, 548, 549 or 724(a) of this title . . . is preserved for the benefit of the estate . . . ."  11 U.S.C. § 551.

31.    This Court has stated that:

> The rationale behind the automatic preservation rule [found in section 551 of the Bankruptcy Code] for transfers and liens avoided by a trustee in bankruptcy is that the estate should benefit from each avoidance rather than promoting the priority of unavoidable junior secured interests who would otherwise improve their positions at the expense of the estate.

*Matter of DeLancey*, 94 B.R. 311, 313 (Bankr. S.D.N.Y. 1988); *see also Morris v. St. John Nat'l Bank (In re Haberman)*, 516 F.3d 1207, 1210 (10th Cir. 2008) ("the trustee, on behalf of the entire estate, assumes the original lienholder's position in the line of secured creditors").

32.    The case of *In re Blanks*, 64 B.R. 467, 468-69 (Bankr. E.D.N.C. 1986), makes clear that, under section 551, avoidance action recoveries by the estate are available to fund estate payments to administrative and priority claimants.   In *Blanks*, the trustee brought adversary proceedings to avoid two deeds of trust against the same collateral.  *Id.* at 468.  The

court allowed the Debtors to avoid the senior lien, and held that "[p]reservation of an avoided lien is not conditioned on nonpriority unsecured creditors receiving the proceeds." *Id.* at 468-69. Rather, "[p]reservation is . . . 'for the benefit of the estate' . . . . Clearly, the estate benefits if the proceeds will be used to pay costs of administration and priority claimants." *Id.* Thus, the Debtors were allowed to use this recovery to benefit priority claimants before paying recoveries to unsecured claimants. *Id.*

33.     The mere fact that a party has derivative standing to bring an avoidance action on behalf of the estate does not grant that party ownership over the litigation. *See Adelphia*, 544 F.3d at 423 (rejecting the Equity Committee's argument that as a result of its derivative standing it acquired ownership over claims it brought on behalf of the estate); *Official Comm. of Equity Sec. Holders v. nVidia Corp. (In re 3dfx Interactive, Inc.)*, No. 06-5115, 2009 WL 223266, at *6 (Bankr. N.D. Cal. Jan. 6, 2009) ("[D]erivative standing, a salutary element of the chapter 11 process, does not confer ownership of the claims on the party proceeding in that capacity.")

34.     In this case, by routine operation of the Bankruptcy Code, any proceeds recovered on behalf of the Debtors' estates would be distributed to all priority unsecured claimants (including administrative expense claimants) before distribution to general unsecured claimants. The amounts, sources and timing of such payments are quintessential plan elements. Until the Court has confirmed a plan that determines and details how Debtors will pay those claims (including the DIP Lenders' allowed administrative priority claim), the Court cannot properly direct the Debtors to pay any future proceeds of the Avoidance Action to general unsecured creditors.

35.     Nevertheless, the Committee now requests an order finding that interests in the Avoidance Action "shall be distributed exclusively to the general unsecured creditors."

17

Committee Proposed Order at p. 4.  This request, if granted, would impermissibly supplant the proper role of the plan confirmation process.  Nothing in the prior orders permits the plan process to be circumvented in this manner, and this Court should not do so now by granting the Motion.

**B.    The Committee Has Not Overcome the Fundamental Bankruptcy Precept That DIP Lenders Are Entitled to Cash Payment in Full of Their Administrative Expense Claim**

36.    Section 1129(a)(9)(A) of the Bankruptcy Code provides:  "with respect to a claim specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."  Section 507(a)(2), in turn, establishes the priority of administrative expenses. Pursuant to these Code provisions, courts have regularly found administrative claimants are entitled to payment in full in cash on their claim as a condition of confirmation of a plan.  *See, e.g.*, *Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 960 (2d Cir. 1993) (noting that section 1129(a)(9)(A) requires "full cash payment of all administrative claims"); *see also Former Employees of Builders Square Retail Stores v. Hechinger Inv. Co. of Del. (In re Hechinger Inv. Co. of Del.),* 298 F.3d 219, 224 (3d Cir. 2002) ("In a Chapter 11 case, a court cannot confirm a distribution plan unless the plan provides full cash payment of all § 503(b) administrative expense claims or the claim holder agrees to different treatment.").

37.    In this case, the Wind-Down Order grants the DIP Lenders a super-priority administrative expense claim pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code. See Wind-Down Order at 4 ("the claims of the DIP Lenders arising from the Amended DIP Facility pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, and all other obligations owing to the DIP Lenders under the DIP Credit Facility shall be and are accorded a

18

super-priority administrative expense status in each of these cases . . . .").  As super-priority administrative claimants, the DIP Lenders are entitled to payment in full under any plan.

38.    Moreover, quite apart from the allowance of Treasury's administrative claim, and contrary to the Committee's contentions, *see* Motion at ¶¶ 32-33, the DIP orders at issue nowhere explicitly preclude the DIP Lenders from being repaid from any proceeds of the Avoidance Action.  Rather, the DIP Orders do not discuss distribution of the proceeds of the Avoidance Action at all, nor do they purport to supplant the plan confirmation process.  Thus, the Committee's "plain" reading of the DIP Orders as reserving any proceeds of the Avoidance Action solely for unsecured creditors is unsupported by the actual language of those orders.

39.    Against the backdrop of Treasury's allowed administrative claim and the lack of any express provision governing allocation of Avoidance Action proceeds, the Committee relies on a provision stating that the Amended DIP Facility is "non-recourse to the Borrower and the Guarantors, such that the DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral . . . securing the DIP Loans . . . ."  Wind-Down Order at 6.  Treasury does not dispute that the Amended DIP Facility is non-recourse, but this fact does not justify the extraordinary conclusion that the Committee argues flows from it – especially when the orders allow Treasury's administrative claim and do not explicitly determine the ultimate distribution of any Avoidance Action proceeds.  Notably, the Committee cites no case holding that an administrative claim-holder loses its statutory entitlement to full payment under a plan merely by providing credit on a non-recourse basis.

40.    Outside bankruptcy, a non-recourse loan is "a secured loan that allows the lender to attach only the collateral, not the borrower's personal assets, if the loan is not repaid." BLACK'S LAW DICTIONARY 1020-21 (9th ed. 2009).  In a non-recourse loan transaction, the

borrower also grants a security interest in its property to secure the payment of a loan. However, in the event of default, the secured creditor has no right (or recourse) to assert a claim for amounts in excess of the value of the pledged collateral. Rather, the secured creditor's recourse "is limited to the collateral, i.e., the property of the [borrower] that secures the repayment of the loan." *Id.*

41.    The Bankruptcy Code directly addresses the nature and scope of recourse and non-recourse loans in only one place -- section 1111(b)(1)(A) (relied on by the Committee, *see* Motion at ¶ 33), which provides, subject to certain exceptions, that an undersecured prepetition non-recourse creditor is entitled to have its entire claim treated as though the loan transaction was recourse for the purposes of the chapter 11 proceeding. That is, section 1111(b)(1)(A) of the Bankruptcy Code allows an undersecured non-recourse prepetition creditor to receive a distribution on both its secured claim for the value of the collateral and its unsecured deficiency claim for the difference between the value of the collateral and the remainder of the obligation owed to the non-recourse creditor. Accordingly, if section 1111(b)(1)(A) of the Bankruptcy Code applies to a prepetition non-recourse creditor's claim, the non-recourse creditor is treated as a recourse creditor for purposes of the chapter 11 proceedings.

42.    As one court described the impact of section 1111(b)(1)(A) of the Bankruptcy Code: "[i]f a non-recourse lender advances $1 million secured by collateral worth $100,000 at confirmation, the non-recourse lender gets its secured claim for $100,000 and a bonus – an unsecured claim for $900,000." *680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. in Rehab. (In re 680 Fifth Ave. Assocs.)*, 156 B.R. 726, 732 (Bankr. S.D.N.Y.), aff'd, 169 B.R. 22 (S.D.N.Y. 1993), 29 F.3d 95 (2d Cir. 1994). Section 1111(b)(1)(A) of the Bankruptcy Code expands the rights of undersecured non-recourse creditors beyond the rights they possess outside bankruptcy

and is consistent with section 506(a) of the Bankruptcy Code, which gives secured creditors two claims in a bankruptcy case -- a secured claim for the value of any collateral and an unsecured deficiency claim for the remainder of the value of the claim.

43.    Section 1111(b)(1)(A) by its terms does not apply to post-petition administrative claims.  This inapplicability is logical because post-petition lenders get treated better than prepetition lenders under the Bankruptcy Code, receiving administrative claims fully payable in cash.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) ("administrative expenses . . . as a rule [are] entitled to priority over prepetition unsecured claims . . ."); *Genuity Solutions, Inc. v. Metro. Transp. Auth. (In re Genuity, Inc.)*, No. 03-93469, 2007 WL 1792252, at *4 (Bankr. S.D.N.Y. June 20, 2007) ("While pre-petition claims are usually paid through fractional dividends, or percentages on the dollar, post-petition administrative expenses are paid in 'full,' 100 cent dollars.").  By contrast, prepetition undersecured creditors receive a bifurcated claim, the unsecured portion of which is likely to receive minimal if any recovery.  Thus, there is no need for an unsecured deficiency claim for an administrative creditor and no reason for section 1111(b)(1)(A) to apply.  Therefore, the fact that the Wind-Down Facility is non-recourse is not determinative of how the Debtors should pay back the DIP Lenders' administrative claims under a plan.

44.    When faced with two potentially contradictory provisions of an order, a court should attempt to read those provisions in harmony.  *See Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 100 (2d Cir. 1997) (noting "well-established principles of contract interpretation, which require that all provisions of a contract be read together as a harmonious whole, if possible"); *see also SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 211 F.3d 21, 27-28 (2d Cir. 2000) (resolving apparent conflict between statutes by

21

"applying the familiar canon that, where two laws are in conflict, courts should adopt the interpretation that preserves the principal purposes each"); *TIG Ins. Co. v. Combustion Eng'g, Inc. (In re Combustion Eng'g, Inc.)*, 366 F. Supp. 2d 224, 229 (D. Del. 2005) (noting that courts frequently attempt to harmonize conflicting provisions in an agreement in order to determine the intent of the parties).  Here, if and when the issue is properly raised and no longer premature, the Court can and should do exactly that.  But the Motion fails even to acknowledge the DIP Lenders' allowed administrative claim, much less to explain why the "non-recourse" nature of the loan somehow nullifies the allowance of an administrative claim in the very same orders.

45.    Thus, at bottom, the Motion fails on the merits because it would entirely write out of the DIP Orders the provisions that provide the DIP Lenders with allowed administrative claims.  The Court should not grant a Motion that, while expressly premised on the DIP orders, completely disregards such a critical and negotiated provision of those very orders.

46.    Further, the Committee's arguments concerning the purported logic of the "deal" fail both because such arguments cannot overcome the plain language of agreements and orders, and because the Committee's asserted "logic" is faulty.  The Committee argues that it "makes sense for the Committee to have brought the litigation only if unsecured creditors get the cash," Motion at ¶ 38, and the Committee presents an affidavit that concludes that paying the entire potential Avoidance Action recovery to Treasury would dilute recoveries to unsecured creditors by 0.4 percent.  This analysis ignores the obvious fact that the Amended DIP Facility was for $1.175 billion, and thus unsecured creditors stand to benefit by whatever proceeds of their $1.5 billion action remain after the obligation to the DIP Lenders is satisfied, whether from Avoidance Action proceeds or any other source.  In addition, the Motion fails to mention the existing protection for dilution from additional allowed general unsecured claims that increase

22

the size of the claims pool above $35 billion.  In particular, New GM will issue up to an additional 2% of the outstanding common stock as of the closing of the 363 Transaction.  *See* Disclosure Statement at 15-16.  As a result, the increase to the size of the claims pool is felt less (if at all) by the holders of unsecured claims if claims fall between $35 billion and $42 billion and more by larger holders of equity of New GM such as the DIP Lenders.

47.    Even more fundamentally, though, the Committee's analysis ignores the fact that there is a compelling rationale supporting *Treasury's* understanding of the deal, which, unlike the Committee's, is entirely consistent with the agreement and orders at issue.

48.    As the Committee notes, the DIP Lenders agreed that they would not have a lien on the Avoidance Action and that the Committee would be charged with litigating the Avoidance Action.  By giving up their liens, the DIP Lenders agreed that even in the event of a default on the Amended DIP Facility, they would not seize control of the Avoidance Action.  When considered in company with the DIP Lenders' allowed administrative claim (as well as the ongoing administrative claims of others not party to this dispute), this agreement served to allow the Committee – rather than Debtors – to conduct the litigation, which was of value to the Committee because it ensured that Debtors would not settle the Avoidance Action for an unacceptably low amount that might fail to enhance the recovery of unsecured creditors.

49.    Thus, the parties' agreement ensured that, if the Committee succeeded in the Avoidance Action, any cash not needed to cover a shortfall in funds available to repay the DIP Lenders would flow to the unsecured creditors, boosting their recovery beyond the baseline estimate detailed in the Phillips Declaration attached to the Motion.  That possibility constituted value to the unsecured creditor community.

23

50.     Had the Committee actually obtained agreement that the DIP Lenders would waive any recovery from Avoidance Action proceeds even at the cost of not being repaid on their administrative claim, the documents would have said so plainly.  They do not.  Rather, the documents contain no language expressly waiving or qualifying the DIP Lenders' allowed super-priority administrative expense claim, and nothing authorizing a plan that fails to pay the DIP Lenders on account of such a claim.

## C.     If the Court Requires Extrinsic Evidence, It Should Grant the Parties Sufficient Time to Gather and Analyze Such Evidence

51.     Despite the Committee's numerous assertions that the Court should look to the plain language of the DIP Orders, the Motion nevertheless offers extrinsic documentation and sworn statements in support of the Committee's arguments.  Treasury has had only ten days to respond, and given the Motion's prematurity, has not developed a full evidentiary record in opposition.

52.     As the Committee itself recognizes, to the extent the Motion can be decided without reference to more than the plain language of the DIP orders, the Court should not consider extrinsic evidence.  Motion at ¶ 31; *Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 525 F. Supp. 2d. 370, 375 (S.D.N.Y. 2007), aff'd, 330 Fed. App. 5 (2d Cir. 2009) (where "a contract is not ambiguous, the court 'should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence'") (quoting *Alexander & Alexander Serv., Inc. v. Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)).  If, however, the Court (a) declines to deny the Motion on standing, ripeness, or other grounds of prematurity, and (b) concludes that it must consider extrinsic evidence of the meaning of the relevant agreement and orders, the Court should permit all parties to these cases, including Treasury, sufficient time to conduct discovery and to prepare and present an evidentiary case.

24

*See Fortune v. Med. Assocs. of Woodhull, P.C.,* 803 F. Supp. 636, 641 (E.D.N.Y. 1992) ("Where the terms of a contract are ambiguous, the court must give the parties an opportunity to adduce extrinsic evidence of their intent.").

## **CONCLUSION**

For the reasons stated above, the Motion should be denied.

New York, New York
October 14, 2010

<div style="margin-left:40%">

PREET BHARARA
United States Attorney
Southern District of New York


By:      /s/ David S. Jones
DAVID S. JONES
NATALIE N. KUEHLER
JOSEPH N. CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile:  (212) 637-2730
David.jones6@usdoj.gov
Natalie.kuehler@usdoj.gov
Joseph.cordaro@usdoj.gov

</div>