**Hearing Date and Time: October 21, 2010 at 9:45 a.m. (Eastern Time)**
**Objection Deadline: October 18, 2010 at 4:00 p.m. (Eastern Time) (By Agreement with the Debtors)**

**GIBSON DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-5232
Matthew J. Williams
Keith Martorana

*Counsel for Wilmington Trust Company as*
*Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
                                                         :

In re:                                      :        **Chapter 11 Case No.:**

                                          :

**MOTORS LIQUIDATION COMPANY, et al.,** :      **09-50026 (REG)**
**f/k/a General Motors Corp., et al.**      :

                                          :

                        **Debtors.**       :        **(Jointly Administered)**

                                          :
-------------------------------------------------------------- X

**OBJECTION OF WILMINGTON TRUST COMPANY AS INDENTURE TRUSTEE TO**
**DEBTORS' MOTION TO APPROVE DISCLOSURE STATEMENT**

**TABLE OF CONTENTS**

Page

I.   PRELIMINARY STATEMENT ............................................................. 2

II.   FACTS ............................................................................................... 3

   A.   Negotiations Concerning the Sale Motion and Wind-Down Facility. ................... 3

   B.   The Plan and Disclosure Statement. ................................................. 7

III.   OBJECTION ...................................................................................... 8

   A.   The Disclosure Statement Does Not Contain Adequate Information
        Concerning the Budget. ............................................................... 9

   B.   The Disclosure Statement Fails to Set Forth any Business Justification
        to Prepay the Wind-Down Facility. .................................................. 10

   C.   The Disclosure Statement Should Clarify That Treasury Has No Right
        to the Term Loan Litigation or the Proceeds Thereof. ........................... 11

IV.   RESERVATION OF RIGHTS ............................................................ 14

V.   CONCLUSION ................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Crowthers McCall Pattern, Inc.*,
  120 B.R. 279 (Bankr. S.D.N.Y. 1990) ................................................................................... 9

*In re Drexel Burnham Lambert Group Inc.*,
  113 B.R. 830 (Bankr. S.D.N.Y. 1990) ................................................................................. 13

*In re Metrocraft Pub. Servs., Inc.*,
  39 B.R. 567 (Bankr. N.D. Ga. 1984) ..................................................................................... 9

*In re Phoenix Petroleum Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................................... 9

*In re Radco Props., Inc.*,
  402 B.R. 666 (Bankr. E.D.N.C. 2009) .................................................................................. 9

*In re Scott Cable Communications, Inc.*,
  227 B.R. 596 (Bankr. D.Conn. 1998) .................................................................................. 14

## Statutes

11 U.S.C. § 1125(a)(1) .................................................................................................................... 9

11 U.S.C. § 1125(b) ........................................................................................................................ 8

11 U.S.C. 1129(a)(9)(A) ............................................................................................................... 13

**GIBSON DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-5232
Matthew J. Williams
Keith Martorana


*Counsel for Wilmington Trust Company as*
*Indenture Trustee*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
                                                              :
**In re:**                                                    :     **Chapter 11 Case No.:**
                                                              :
**MOTORS LIQUIDATION COMPANY, et al.,**   :     **09-50026 (REG)**
**f/k/a General Motors Corp., et al.**                        :
                                                              :
                                             **Debtors.**     :     **(Jointly Administered)**
                                                              :
-------------------------------------------------------------- X

### OBJECTION OF WILMINGTON TRUST COMPANY AS INDENTURE TRUSTEE TO DEBTORS' MOTION TO APPROVE DISCLOSURE STATEMENT

TO:   THE HONORABLE ROBERT E. GERBER, UNITED STATES BANKRUPTCY
      JUDGE:

Wilmington Trust Company, as Indenture Trustee ("**WTC**"),[1] by and through its

undersigned counsel, submits this objection (the "**Objection**") to the motion (the "**Motion**") of

the above-captioned debtors and debtors-in-possession in these chapter 11 cases (the "**Debtors**")

---

[1]     WTC is the successor indenture trustee to Citibank, N.A. ("**Citibank**"), under two indenture agreements with GM pursuant to which GM issued senior unsecured debt securities: (i) a Senior Indenture, dated as of December 7, 1995, as amended (the "**1995 Indenture**"); and (ii) a Senior Indenture, dated as of November 15, 1990 (the "**1990 Indenture**"). The outstanding series of notes issued pursuant to the 1995 Indenture are represented by CUSIP numbers: 370442AT2; 370442AU9; 370442AV7; 370442AZ8; 370442BB0; 370442816; 370442774; 370442766; 370442758; 370442741; 370442733; 370442725; 370442BQ7; 370442BT1; 370442717; 370442BW4; 370442BS3; 370442121; and 370442691.  The outstanding series of notes issued pursuant to the 1990 Indenture are represented by CUSIP numbers: 370442AN5; 370442AJ4; 370442AR6; 37045EAG3; and 37045EAS7.

1

seeking approval of the disclosure statement (the "**Disclosure Statement**") [Docket No. 6830]

filed in connection with the Debtors' Joint Chapter 11 Plan (the "**Plan**") [Docket No. 6829].

## I.
## PRELIMINARY STATEMENT

Since the beginning of this case, WTC has sought to ensure that the estate's budgeted

cash position was sufficient to fund an orderly wind-down, claims reconciliation and distribution

process.  This is because absent adequate cash, the administrator of the Debtors' liquidating joint

plan could be forced to sell New GM Securities (as defined below) to fund the wind-down,

thereby compromising recoveries to unsecured creditors.

Indeed, this precise issue—the concern that the Debtors' estates would not have sufficient

cash to fund the wind-down of their estates without liquidating securities that were always

intended to be distributable to unsecured creditors—was already raised by WTC in connection

with its objection to the Debtors' motion to sell substantially all of their assets.  WTC's concern

was resolved pursuant to an agreement among the United States Department of Treasury

("**Treasury**"), the Debtors and the official committee of unsecured creditors (the "**Creditors'**

**Committee**") pursuant to which Treasury agreed to (a) better ensure the sufficiency of its

proposed wind-down financing (the "**Wind-Down Facility**") by increasing the funds available

for the wind-down from $950 million to $1.175 billion and (b) provide for a Wind-Down Facility

that would mature only at the conclusion of the claims reconciliation and distribution process and

after the liquidation of the Debtors' assets.  If approved in its current form, the Disclosure

Statement would eviscerate this deal insofar as the Plan proposes to prepay the Wind-Down

Facility on the effective date of the Debtors' Plan (the "**Effective Date**"), yet the Disclosure

Statement provides no information to creditors regarding the amount of monies that will be left

behind to fund the wind-down of these complex cases and no clear mechanism for funding the

cost of the wind-down in the event the undisclosed budget proves insufficient.  Absent access to,

and review of, the budget provided for in the Plan that will govern the post-effective-date

funding of Plan implementation (the "**Budget**"), it is wholly impossible for WTC (or any of the

bondholders it represents) to understand the risk that New GM Securities will be sold to fund the

wind-down of the Debtors' chapter 11 cases.  Until this information is provided, approval of the

Disclosure Statement should be withheld.

Similar disclosure deficiencies exist with respect to the $1.5 billion avoidance action

commenced by the Creditors' Committee against certain prepetition lenders (the "**Term Loan**

**Litigation**," Adv. P. No. 09-00504).  The Disclosure Statement provides that the Creditors'

Committee (or its successor under the Plan) will continue to prosecute the Term Loan Litigation

to conclusion, but fails to disclose who is entitled to the proceeds thereof, instead reserving

Treasury's right to participate in the upside of the litigation even though Treasury explicitly

waived its right to do so at the beginning of these cases.

## II.
## FACTS

A.    **Negotiations Concerning the Sale Motion and Wind-Down Facility.**

1.    On June 1, 2009, the Debtors filed a motion (the "**Sale Motion**") [Docket No. 92]

to sell substantially all of their assets to Vehicle Acquisition Holdings LLC ("**New GM**"), a

purchaser sponsored by Treasury.  On the same date, the Debtors filed a motion for authority to

enter into a debtor-in-possession credit facility (the "**DIP Facility**") [Docket No. 64] by and

among the Debtors, Treasury, and Export Development Canada ("**EDC**"), the proceeds of which

would be used to fund the Debtors through a sale of substantially all of their assets.  The

proposed sale was supported by over 50% of the Debtors' bondholders, who understood that in

an ensuing plan of liquidation, unsecured creditors would receive the stock and warrants of New

3

GM (the "**New GM Securities**") that were being paid to the Debtors pursuant to the sale

agreement.  *See* June 1, 2009 Hearing Tr., p. 87; General Motors Corporation, Notification of an

Unscheduled Material Event (Form 8-k) (May 28, 2009), p. 2.

2.    On June 24, 2009, the Creditors' Committee filed a limited objection to the Sale

Motion (the "**Committee Sale Objection**") [Docket No. 2362], which was joined by WTC

through a joinder (the "**WTC Joinder**" [Docket No. 2367] and, together with the Committee

Sale Objection, the "**Sale Objection**").  These creditor constituencies argued that prior to

approving the sale, it was imperative to ensure that the Debtors' post-closing cash position would

be adequate to fund an orderly wind-down of the Debtors' estates, thereby ensuring New GM

Securities would not be cannibalized to fund administrative costs.  *See* WTC Joinder at ¶¶ 6-7

(noting that while WTC supported the Sale Motion generally, certain provisions of the proposed

sale, including whether the post-sale assets left behind at GM would be "even remotely

sufficient" to pay the administrative and priority expenses of the estate, "placed bondholder

recoveries so at risk as to mandate the filing of [the WTC Joinder]").

3.    While the Sale Motion was pending, the Debtors filed a motion to amend the DIP

Facility and provide for the Wind-Down Facility in the amount of $950 million to fund the wind-

down of the Debtors and the chapter 11 cases to the extent the Sale Motion was ultimately

approved (the "**Wind-Down Motion**") [Docket No. 2755].  Because the complex wind-down

would likely take many years, the express terms of the Wind-Down Facility provided that it did

not mature until all claims against the Debtors were resolved and all distributions under a

liquidating plan had been made.  *See* Wind-Down Motion at ¶ 10(k); Wind-Down Facility Order

(defined below), Exhibit 1, Section 1, p. 13.[2]

4.        Moreover, as noted in the Wind-Down Motion, Treasury agreed that it would not

seek recourse against the Debtors on account of its administrative expense claim to the extent the

proceeds of the Collateral (which explicitly excluded the Term Loan Litigation) were insufficient

to pay its claim in full.  *See* Wind-Down Motion at ¶ 12.

5.        During negotiations with creditor constituencies surrounding the Wind-Down

Facility, Treasury addressed the concerns raised by the Sale Objection by agreeing to increase

the principal amount available under the facility from the originally proposed $950 million to

$1.175 billion.  The increase of the Wind-Down Facility, coupled with a maturity date that

ensured the Wind-Down Facility would be payable only after the costs of liquidating the estates

had been funded, provided WTC with comfort that there would be adequate cash funds to wind-

down the estate, reducing the risk that New GM Securities would need to be sold to fund

administrative costs.  In withdrawing its objection to the Sale Motion, counsel to WTC noted as

follows:

> And we were concerned if the wind-down budget was insufficient that it would
> eat into the stock and the warrants that had been set aside as testified by various
> witnesses, was designed to be set aside for unsecured creditors.  We were
> concerned that that wind-down budget would gain access to [the New GM
> Securities]. . .  And we've been told based on the representations today in Court
> that that wind-down budget has been increased by 225 million dollars. . .  And we
> are comforted by that fact.

---

[2]        Specifically, that certain Amended DIP Facility (the "**Wind-Down Credit Agreement**"), attached
as Exhibit 1 to the Wind-Down Facility Order (defined below), defines "**Maturity Date**" as the first date on which
each of the following shall have occurred (which date may be extended by the Lenders in their sole discretion in
accordance with Section 8.1 of the Wind-Down Credit Agreement): (i) all claims against the Debtors have been
resolved such that there are no remaining disputed claims; (ii) all assets of the Debtors (other than remaining cash)
have been liquidated; and (iii) all distributions on account of allowed claims have been made, and all other actions
that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been
completed.

*See* July 2, 2009 Hearing Tr., p. 110.

6.        On July 5, 2010, the Bankruptcy Court entered orders approving the (i) Sale

Motion [Docket No. 2968] and (ii) the Wind-Down Facility (the "**Wind-Down Facility Order**")

[Docket No. 2969].  As agreed, the Wind-Down Facility Order provided for a Wind-Down

Facility in the increased amount of $1.175 billion, and the stated maturity of the facility was the

completion of the wind-down.

7.        Sometime after the Court entered the Wind-Down Facility Order, Treasury

materially altered the Wind-Down Facility to provide for its maturity upon confirmation of a

plan of reorganization that was not reasonably acceptable to Treasury.  To WTC's knowledge,

neither Treasury nor the Debtors sought Court approval with respect to the amendment, and the

proposed change was not disclosed to WTC.[3]

8.        In addition, notwithstanding Treasury's previous agreement not to assert a claim

against the Debtors if the proceeds of their Collateral (which excluded the Term Loan Litigation)

were insufficient to pay its administrative expense claim in full (*see* Wind-Down Motion at

¶ 12), on August 26, 2010, more than a year after the entry of the Wind-Down Facility Order,

Treasury filed its Statement of the United States of America with Respect to Cross-Motions for

Summary Judgment ("**Treasury Avoidance Action Statement**") [Docket No. 6805] requesting

that any resolution of summary judgment motions not determine entitlement to funds recovered

from the Term Loan Litigation.

---

[3]        On July 27, 2009, the Debtors Filed a Notice of First Amendment to the Amended and Restated
DIP Facility ("**Notice of First Amendment**") [Docket No. 3423].  Therein, the Debtors noted that, "pursuant to
paragraph 23 of the DIP Order, notice of all amendments to the DIP Facility must be filed with the Court and
'provided in advance to counsel for the Committee and any other statutory committee, all parties requesting notice in
these cases and the United States Trustee.'"  Id. at 2.  A copy of the proposed amendment (which contained certain
ministerial and technical amendments but did not purport to alter any material term, including the Maturity Date)
was attached to the Notice of First Amendment.

**B.     The Plan and Disclosure Statement.**

9.     On August 31, 2010, the Debtors filed the Plan and related Disclosure Statement.

10.     Pursuant to the Plan, on the Effective Date, the Debtors will transfer (i) an amount of cash (the amount is not specified) and (ii) the New GM Securities to a trust established to resolve and manage distributions related to general unsecured claims (the "**GUC Trust**"). *See* Plan at § 5.2(a).  The GUC Trust will distribute the New GM Securities to holders of allowed claims, while the cash (the "**GUC Trust Administrative Cash**") will be used to fund the expenses incurred in connection with the claims reconciliation and wind-down process. *See* Plan at §§ 6.2(b) and 6.2(j).[4]

11.     The amount and administration of the GUC Trust Administrative Cash will be provided for in the Budget, which will be agreed to by Treasury and the Debtors. *See* Plan at § 1.32.  In addition to providing for funding of the GUC Trust, the Budget will also address funding for, among other things, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust (all as defined in the Plan), and any other post-chapter 11 obligations detailed in the Plan or in any related agreements governing the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust. *Id.*

12.     Notwithstanding the importance of the Budget to implementation of the Plan, the Disclosure Statement does not disclose the terms of the Budget, making it impossible for creditors to determine whether the administrative costs incurred by the GUC Trust in connection with the wind-down will require a sale of New GM Securities.  Moreover, although the Wind-

---

[4]     The Disclosure Statement does not clearly disclose the mechanism for funding costs and expenses of wind-down in the event that the GUC Trust Administrative Fund (as defined in the Plan) proves insufficient (i.e. it is not clear whether the administrator of the GUC Trust (the "**GUC Trust Administrator**") may sell New GM Securities to address any such short-fall).  WTC presumes that this funding mechanism will be addressed in the agreement governing the GUC Trust.

Down Facility does not, at least by its Court-approved terms, mature until the Debtors' assets

have been liquidated and the claims reconciliation and distribution process is complete, and

notwithstanding the fact that the Wind-Down Facility Order provides for payment of the Wind-

Down Facility on the Maturity Date (*see* Wind-Down Facility Order, Exhibit 1, § 2.3, p. 24), the

Plan requires the Debtors to pay the Wind-Down Facility on or immediately after the Effective

Date of the Plan to the extent set forth in the Budget.[5]

## III.
## OBJECTION

13.     Section 1125(b) of the United States Bankruptcy Code prohibits the

solicitation of votes to accept or reject a plan from creditors or equity holders "unless, at the time

of or before such solicitation, there is transmitted… a written disclosure statement approved…

by the court as containing adequate information."  11 U.S.C. § 1125(b).   Section 1125(a)(1) of

the Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records . . . that would enable a hypothetical investor of the relevant class to
> make an informed judgment about the plan . . . and in determining whether a
> disclosure statement provides adequate information, the court shall consider the
> complexities of the case, the benefit of additional information to creditors and
> other parties in interest, and the cost of providing additional information.

---

[5]        Plan Section 2.4 provides that obligations incurred under the Wind-Down Facility will be paid in
full, in cash, to the extent cash is available after funding all obligations and amounts to be funded under the Plan.
Plan Section 5.2(a), in turn, provides that "[o]*n the Effective Date, or as soon as is reasonably practicable
thereafter*, the Debtors shall . . . (vi) remit and transfer to the holders of Allowed DIP Credit Agreement Claims the
payments and distributions provided for in Section 2.4 [of the Plan]." (emphasis added); *see also* Disclosure
Statement, at 4 ("***On the Effective Date***, the Debtors shall pay holders of DIP Credit Claims Cash equal to all Cash
and Cash equivalents remaining after all obligations under the Plan to be paid on the Effective Date have been
paid. . . .") (emphasis added); *id.* at 20 ("It is expected that there will be approximately [$    ] million of Cash
remaining in MLC after funding the GUC Trust, Asbestos Trust, the Environmental Response Trust, and the
Avoidance Action Trust. ***Any recovery amounts after paying such expenses will be returned to the U.S. Treasury
and EDC in one or more distributions, either at or subsequent to the Effective Date of the Plan***.") (emphasis
added); *id.* at 53-54 (noting that "If the Debtors have any Cash remaining" after payments of delineated Effective
Date payments, then "the Debtors shall pay such Cash to the U.S. Treasury and EDC by wire transfer of
immediately available funds.").

11 U.S.C. § 1125(a)(1).

14.    Adequate information requires, among other things, "[i]nformation relevant to the risks posed to creditors under the plan." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001) (c*iting In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  This is because "[c]reditors not only rely on the disclosure statements to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face".  *In re Radco Props., Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009).   The inclusion of adequate information is critical to ensuring that a disclosure statement serves its purpose – to enable creditors to make an informed judgment about the Plan.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) (a disclosure statement that contains adequate information to allow holders of claims in impaired classes to make an informed judgment about the plan is "at the 'heart' of the chapter 11 process").

A.    **The Disclosure Statement Does Not Contain Adequate Information Concerning the Budget.**

15.    Because the Disclosure Statement does not include the Budget, it is impossible for creditors to test the assumptions set forth in the Budget or develop any meaningful conclusion as to whether all of the New GM Securities will be available for distribution or whether some of them will be sold to fund the wind-down.  The amount of cash in the Budget is much more than an academic exercise, it has important practical considerations as to the distributions unsecured creditors will receive and the timing of such distributions, and without this information, creditors cannot form any view regarding the "sort of distribution they will receive" or the "risks" inherent in that proposed distribution.  *In re Radco Props., Inc.*, 402 B.R. at 682.  The Disclosure Statement, therefore, lacks adequate information.

16.     The failure to include the Budget is frustrating given the fact that—since the beginning of this case—creditor constituencies have been keenly focused on the need to ensure that the cash left behind in the estates was adequate to fund the wind-down.  As noted above, this issue was already addressed once in the Sale Objection.  Recognizing the validity of creditor concerns, Treasury agreed to upsize the Wind-Down Facility by $225 million, a material inducement that led to the withdrawal of WTC's objection to the Sale Motion.  But the Plan now requires that the Debtors prepay any excess over the (undisclosed) Budget to Treasury.  Hence, any cushion that may have been built into the $225 million upsize will no longer be available to fund the wind-down, because such monies will have been paid to Treasury.  Given that the creditors, rather than Treasury (who will have been prepaid), bear the full risk that their distributions will be impaired if the remaining cash is inadequate, it is imperative that the creditors are provided with a full understanding as to exactly how much money will remain after payments to Treasury and how that remaining money will be allocated.

**B.      The Disclosure Statement Fails to Set Forth any Business Justification to Prepay the Wind-Down Facility.**

17.     As noted above, the Wind-Down Facility, at least by its Court-approved terms, does not mature until all claims are resolved and all distributions have been made.  This Maturity Date was disclosed to all creditors and the Court in the Wind-Down Motion.

18.     Without any legal or business explanation or justification, the Disclosure Statement provides that the Debtors will prepay the Wind-Down Facility on or immediately after the Effective Date of the Plan.  *See* Disclosure Statement, p. 4.  Yet the Plan is devoid of any mechanism that obligates Treasury to refund the prepayment to the extent that the Budget turns out to be inadequate, thereby leaving creditors, not Treasury, to bear the risk that the Debtors prepay too much, too early.  Absent some compelling (and, to date, undisclosed) business or

10

legal justification, the Debtors should not pay any monies back to Treasury until the Court-approved Maturity Date, which will not be until years after the Effective Date given the complexities inherent in the wind-down. Indeed, the proposed prepayment is contrary to previous orders of this Court, which provide that the Wind-Down Facility will be paid "on the Maturity Date." *See* Wind-Down Facility Order, Exhibit 1, Section 2.3, p. 24.

19.      WTC recently became aware that, after this Court entered a June 25, 2009 order approving the DIP Credit Facility (the "**Final DIP Order**") [Docket No. 2529] and the Wind-Down Facility Order, Treasury purported to amend the Wind-Down Credit Agreement to accelerate the Maturity Date. The Disclosure Statement should make clear that any such purported amendment is ineffective. Although the Final DIP Order authorizes the Debtors to enter into amendments if the amendment is not material and notice is provided to creditors and filed with the Bankruptcy Court (*see* Final DIP Order at ¶ 23), to the best of WTC's knowledge, the purported amendment to the Maturity Date was not filed with the Court nor was notice provided to creditors. Moreover, even if proper notice had been provided, the Final DIP Order expressly provides that amendments to the Maturity Date are "material" amendments which require separate Bankruptcy Court approval. *Id.* To WTC's knowledge, no Court approval was ever sought in connection with the proposed amendment to the Wind-Down Facility and WTC, the largest creditor in this case holding an allowed claim of approximately $23 billion on behalf of its constituent bondholders, never consented to such an amendment. Indeed, the idea that the Wind-Down Facility would mature prior to wind-down undermines the entire purpose of the facility, which is to ensure that adequate funds are available to complete the job of administering claims and making distributions to creditors.

**C.      The Disclosure Statement Should Clarify That Treasury Has No Right to the Term Loan Litigation or the Proceeds Thereof.**

11

20.     The Disclosure Statement does not state who will benefit from the successful prosecution of the Term Loan Litigation, deferring that issue until a later date.  *See*, *e.g.,* Disclosure Statement, p. 44.  This is apparently the end result of Treasury's recent filing of the Treasury Avoidance Action Statement, which purported to reserve Treasury's right to the proceeds of the Term Loan Litigation.

21.     Like the other issues raised above, this, too, is a crucial disclosure issue.  As noted in the Creditors' Committee's Motion to Enforce (A) The Final DIP Order, (B) the Wind-Down Facility Order, and (C) the Amended DIP Facility [Docket No. 7226] (the "**Motion to the Enforce DIP**"), the Creditors' Committee is the only party with the ability to bring the Term Loan Litigation.  If Treasury is entitled to the proceeds of the Term Loan Litigation, the Creditors' Committee's successful prosecution of the action will *reduce* unsecured creditor recovery under the Plan.  *See* Motion to Enforce the DIP at ¶ 38.  Hence, creditors should be informed now whether Treasury has a valid claim on the proceeds of the Term Loan Litigation, because if Treasury is correct, the Creditors' Committee, which has a fiduciary duty to unsecured creditors, should discontinue the suit immediately, thereby enhancing unsecured creditor recoveries.  Similarly, unsecured creditors should be able to assess whether it makes sense for the GUC Trust Administrator to expend resources prosecuting the Term Loan Litigation, as provided under certain circumstances under the Plan.  *See* Plan at § 6.5(f).  Absent information regarding the appropriate beneficiary of the proceeds of the Term Loan Litigation, unsecured creditors cannot make an informed judgment about the efficacy of continuing to prosecute this action.

22.     Moreover, as ably argued by the Creditors' Committee in the Motion to Enforce the DIP, there is already a detailed factual record enabling this Court to put to rest any confusion

sowed by the Treasury Avoidance Action Statement.[6]   Treasury does not dispute that the Wind-

Down Facility is only recourse to its "collateral" under the Wind-Down Facility, nor does it

claim to have a lien on the Term Loan Litigation or proceeds thereof.  *See* United States of

America's Opposition to Motion of the Official Committee of Unsecured Creditors Of Motors

Liquidation Company to Enforce (A) The Final DIP Order, (B) The Wind-Down Facility Order,

and (C) The Amended DIP Facility [Docket No. 7338] at § 6 ("It is true that Treasury agreed to

except any Avoidance Action proceeds from its DIP wind-down loan 'collateral,' and it is true

that that facility is on a 'non-recourse basis.'").  Rather, Treasury argues that because Treasury

has an outstanding super-priority administrative expense claim, it is nonetheless—despite the

non-recourse nature of its claim—entitled to a portion of the Term Loan Litigation until its claim

is paid in full, because "the Bankruptcy Code explicitly provides that the Court cannot confirm a

Chapter 11 plan unless administrative expense claimants, such as the DIP Lenders, receive full

payment of their claims (unless such claimants have agreed to different treatment)."  *Id.* at ¶ 22

(citing 11 U.S.C. 1129(a)(9)(A)); *see also, id.* at § 37 ("As superpriority administrative

claimants, the DIP Lenders are entitled to payment in full under any plan.").

      23.     The Bankruptcy Code, however, does not require payment in full of

administrative claims if the administrative claimant has *agreed* to a different treatment.  *See* 11

U.S.C. 1129(a)(9)(A) ("*Except to the extent that a holder of a particular claim has agreed to a*

*different treatment*…[the plan must provide] with respect to a claim of a kind specified in section

507(a)(2) or 507(a)(3)…on the effective date of the plan, the holder of such claim will receive …

cash equal to the allowed amount of such claim.") (emphasis added).  *See also In re Drexel*

---

[6] WTC will not restate in detail the arguments made in the Motion to Enforce the DIP and instead incorporates those arguments by reference.

*Burnham Lambert Group Inc.*, 113 B.R. 830, 855 (Bankr. S.D.N.Y. 1990) (Allowed claims

receiving treatment under Sec. 507(a) will "be paid in full and in cash on confirmation of a plan

of reorganization unless the parties agree otherwise."); *In re Scott Cable Communications, Inc.*,

227 B.R. 596, 600 (Bankr. D.Conn. 1998) (A plan cannot be confirmed if administrative claims

are not paid in full "unless the holders agree to a different treatment").

24.     In this case, Treasury explicitly agreed, as part of the negotiations regarding the

Wind-Down Facility, that (a) it would not demand payment in full on the Effective Date, but

would wait until the wind-down was complete (see discussion above); and (b) it would not assert

a claim against the estate to the extent its collateral was insufficient to pay its administrative

claim (i.e. its claim is non-recourse and necessarily vulnerable to payment at less than 100%).

25.     This agreement could not be more clear in the documents themselves, and in fact

it was highlighted to the Court and creditors in the very motion that sought approval of the

Wind-Down Facility.  "***Significantly, the DIP Lenders have agreed,***" the Debtors said, "***not to

seek recourse against the Debtors for any unpaid portion of the DIP Facility if the proceeds of

the collateral security therefore are insufficient.***"  Wind-Down Motion at ¶ 12 (emphasis

added).  It would be the height of inequity to allow Treasury, which previously waived its right

to assert a claim against the Debtor over and above the value of its collateral, to simply change

its mind more than a year later, to the detriment of unsecured creditors.  The Disclosure

Statement should make clear whether Treasury will be held to its bargain.

**IV.**
**RESERVATION OF RIGHTS**

WTC understands that the Debtors intend to file a revised Disclosure Statement prior to

the hearing on the Disclosure Statement.  WTC reserves its right to supplement this Objection

prior to or at the hearing.

14

## V.
## CONCLUSION

WHEREFORE, WTC respectfully requests that this Court (i) deny the Disclosure

Statement Motion until the Debtors rectify the disclosure defects set forth herein and (ii) grant

such other and further relief as the Court may deem just and proper.

Dated:          October 18, 2010
                New York, New York

**GIBSON DUNN & CRUTCHER LLP**

By:  /s/  Matthew J. Williams
Matthew J. Williams
Keith Martorana
200 Park Avenue
New York, New York 10166
Phone: (212) 351-4000
Fax: (212) 351-5232

Counsel for Wilmington Trust Company as
Indenture Trustee

100952675_12.DOC