**Hearing Date and Time: October 21, 2010 at 9:45 a.m. (Eastern Time)**
**Objection Deadline (extended by agreement): October 18, 2010**

KRAMER LEVIN NAFTALIS & FRANKEL LLP

1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Robert T. Schmidt

*Counsel for the Official Committee*
*of Unsecured Creditors of Motors*
*Liquidation Company, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                                                      :

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case No.: |
| | : | |
| MOTORS LIQUIDATION COMPANY., et al., | : | 09-50026 (REG) |
| f/k/a General Motors Corp., et al. | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

--------------------------------------------------------- X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS OF MOTORS LIQUIDATION COMPANY TO THE DISCLOSURE**
**STATEMENT FOR THE PLAN OF LIQUIDATION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................2

BACKGROUND FACTS.........................................................................................4

OBJECTION.........................................................................................................4

A.    The Disclosure Statement Should Include the GUC Trust Agreement and the
      Retention Terms of Certain GUC Trust Professionals  ..........................................5

B.    The Disclosure Statement Should Include the Wind-Down Budget ......................6

      i.  Post-Effective Date Budget Under the Proposed Plan........................................6

      ii.  Wind-Down Budget Under the DIP Credit Agreement....................................9

C.    The Disclosure Statement Should Provide Additional Disclosure on
      the Impact to Unsecured Creditors Pending Determination of the
      Motion to Enforce the DIP..................................................................................11

D.    The Disclosure Statement Should Provide Detail on the Size of the
      Claims Pool......................................................................................................13

RESERVATION OF RIGHTS .................................................................................15

KL2 2669623.7

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re 680 Fifth Avenue Associates and 54th and Fifth Land Partners*,
    209 B.R. 314 (Bankr. S.D.N.Y. 1997)....................................................................5

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ....................................................................5

*In re Crowthers McCall Pattern, Inc.*,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...................................................................5

*In re Ferretti*,
    128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................................7, 15

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
    337 F.3d 314 (3rd Cir. 2003)..................................................................................5

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) ..................................................................................5

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988) ....................................................................7

## STATUTES & RULES

11 U.S.C. § 105(a) ..............................................................................................................9

11 U.S.C. § 361 ...................................................................................................................9

11 U.S.C. § 362 ...................................................................................................................9

11 U.S.C. § 363 ...................................................................................................................9

11 U.S.C. § 364 ...................................................................................................................9

11 U.S.C. § 507 ...................................................................................................................9

11 U.S.C. § 1125(a) .........................................................................................................4, 5

11 U.S.C. § 1125(b) ............................................................................................................4

Fed. R. Bankr. P. 2002........................................................................................................9

Fed. R. Bankr. P. 4001........................................................................................................9

Fed. R. Bankr. P. 6004........................................................................................................9

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Robert T. Schmidt

*Counsel for the Official Committee
of Unsecured Creditors of Motors
Liquidation Company, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                                                          :
In re:                                                    :        Chapter 11 Case No.:
                                                          :
MOTORS LIQUIDATION COMPANY., et al.,    :        09-50026 (REG)
f/k/a General Motors Corp., et al.                   :
                                                          :
                              Debtors.                    :        (Jointly Administered)
                                                          :
--------------------------------------------------------- X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOTORS LIQUIDATION COMPANY TO DISCLOSURE
<u>STATEMENT FOR THE PLAN OF LIQUIDATION</u>**

TO:    THE HONORABLE ROBERT E. GERBER,
         UNITED STATES BANKRUPTCY JUDGE:

         The Official Committee of Unsecured Creditors (the "**<u>Committee</u>**") of the above

captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the

"**<u>Debtors</u>**"), by and through its undersigned counsel, hereby submits this objection (the

"**<u>Objection</u>**") to the Debtors' Proposed Disclosure Statement (the "**<u>Disclosure Statement</u>**") With

Respect to Debtors' Joint Chapter 11 Plan of Liquidation (the "**Proposed Plan**") [1] and respectfully represents as follows:

## PRELIMINARY STATEMENT

During the first 40 days of the bankruptcy case, the Committee actively negotiated the terms of the 363 Sale Transaction and a Wind-Down Budget (defined below) with the Debtors and Treasury. As part of the closing of the 363 Sale Transaction, the Debtors received 10% stock in New GM and warrants for an additional 15% of New GM stock (the "**New GM Equity Interests**"). In addition, on July 31, 2009, the Committee initiated an action to recover $1.5 billion paid to the Prepetition Term Lenders (the "**Term Loan Litigation**"). Up until very recently, it was widely understood that these two assets, the New GM Equity Interests and the proceeds of the Term Loan Litigation, would be available for distribution to the Debtors' general unsecured creditors.

Throughout the case, the Committee has been focused on preserving and maximizing these assets for unsecured creditors, including by (i) drafting the terms of the trust to govern claims reconciliation and distributions to unsecured creditors post-Effective Date (the "**GUC Trust Agreement**"), (ii) ensuring that the estate has sufficient cash to pay all priority claims and expenses so that the New GM Equity Interests would be available exclusively for unsecured creditors, (iii) diligently prosecuting the Term Loan Litigation, and (iv) working with the Debtors to minimize claims in order to maximize recoveries.

Despite repeated requests for the Debtors to publicly disclose additional information and provide greater transparency to creditors, a significant amount of important

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Proposed Plan or Disclosure Statement.

information is notably absent from the Disclosure Statement.   In particular, the Disclosure

Statement fails to provide adequate information in certain key respects:

- The Disclosure Statement does not include the form of the GUC Trust Agreement, which will govern the claims reconciliation process and distributions and reporting to creditors post-Effective Date.  This agreement was principally drafted by the Committee, is substantially finalized, and should be attached to the Disclosure Statement.  Unsecured creditors, who will receive beneficial units in the GUC Trust, have a right to understand (and comment) on the terms of the GUC Trust before they are required to vote on the Proposed Plan.

- The Disclosure Statement does not disclose who will by retained by the GUC Trust to administer the day-to-day operations of the GUC Trust and on what terms.

- The Disclosure Statement does not include a budget for wind-down expenses post-Effective Date.  In the course of plan negotiations, the Committee began negotiating a post-Effective Date budget with the Debtors and Treasury to ensure that there would be sufficient funding available to administer the claims reconciliation and prosecute the Term Loan Litigation.  The amount of the budget is critical to evaluating whether there are sufficient funds to properly administer the wind-down of the Debtors' estates without the need to sell the New GM Equity Interests.  The Committee submits that Treasury previously agreed to fund reasonable wind-down expenses and cannot use the requirement of a **reasonable** budget as a means to avoid paying necessary expenses.  If the parties cannot agree on a budget, the Committee submits that this Court has the jurisdiction and the power to determine what budget is reasonable.

- Less than two weeks prior to the filing of the Proposed Plan and Disclosure Statement, counsel to the Committee learned that, per Treasury's request, the Proposed Plan would leave open whether Treasury or unsecured creditors are the proper beneficiaries of the Term Loan Litigation.  While the Committee has now initiated an action to resolve this dispute, the Disclosure Statement does not adequately address the impact on unsecured creditors if the Court determines that Treasury is the ultimate beneficiary of the Term Loan Litigation.

- The Disclosure Statement does not provide detail on the size of the claims pool, which is critical for creditors (as hypothetical investors) to understand the amount of their distribution and the required reserves.

Accordingly, the Committee asks that the Disclosure Statement be modified to (i) include the current form of the GUC Trust Agreement, (ii) disclose who will be employed by the GUC Trust to manage the claims reconciliation process and the terms of the engagement, (iii) include the proposed Budget and (iv) provide additional disclosure on the size of the claims pool and the impact to unsecured creditor recoveries pending determination of who is the ultimate beneficiary of the Term Loan Litigation.

## BACKGROUND FACTS

1.      On August 31, 2010, the Debtors filed the Proposed Plan [Docket No. 6829] and Disclosure Statement [Docket No. 6830].  On September 3, 2010, the Debtors filed a motion to approve the Disclosure Statement (the "**Disclosure Statement Motion**") [Docket No. 6854].

2.      The additional facts relevant to each particularized Disclosure Statement issue referenced in the Preliminary Statement are separate and distinct.  In order to avoid repetition of the relevant facts, such facts are discussed in each specific Disclosure Statement issue below.

## OBJECTION

3.      Section 1125(b) of the Bankruptcy Code provides that acceptance or rejection of a plan may not be solicited unless a disclosure statement containing "adequate information" is transmitted to each creditor and equity holder at or before solicitation.  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of

4

the case, the benefit of additional information to creditors and other parties
in interest, and the cost of providing additional information."

11 U.S.C. § 1125(a)(1).

4.      Debtors have an "affirmative duty" to provide creditors with a disclosure

statement containing adequate information. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.*

*v. General Motors Corp.*, 337 F.3d 314, 321 (3rd Cir. 2003). This Disclosure Statement must

"contain simple and clear language delineating the consequences of the proposed plan on their

claims, and the possible Code alternatives." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973,

981 (Bankr. N.D.N.Y. 1988).

5.      A disclosure statement must set forth enough information to permit

creditors to make an informed decision on whether to vote to accept or reject a proposed plan.

*See, e.g., Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,

25 F.3d 1132, 1136 (2d Cir. 1994); *In re 680 Fifth Avenue Associates and 54th and Fifth Land*

*Partners*, 209 B.R. 314, 322 (Bankr. S.D.N.Y. 1997) ("A disclosure statement is a critical step in

the reorganization process, and the importance of full disclosure is underlaid by the reliance

placed upon it by the creditors and the court."); *In re Crowthers McCall Pattern, Inc.*, 120 B.R.

279, 300 (Bankr. S.D.N.Y. 1990) (proper disclosure is "[a]t the 'heart' of the chapter 11

process").

**A.      The Disclosure Statement Should Include the GUC Trust Agreement
and the Retention Terms of Certain GUC Trust Professionals**

6.      Although the GUC Trust Agreement is the critical document governing

the rights of unsecured creditors following the Effective Date, the Debtors only seek to make this

document available *after* the voting deadline on the Proposed Plan. The Proposed Plan provides

that the Plan Supplement, containing, among other items, the GUC Trust Agreement, will be

filed no later than *ten days prior* to the Confirmation Hearing (*See* Proposed Plan §§ 1.80 and

KL2 2669623.7

1.99), while the motion to approve the Disclosure Statement sets the voting deadline as *seventeen days prior* to the Confirmation Hearing. Disclosure Statement Motion at ¶ 38.

7.      The Committee believes that a form of the GUC Trust Agreement should be included in the solicitation package and is at a complete loss as to why this cannot be accomplished. Counsel to the Committee first circulated an initial draft of the GUC Trust agreement on April 22, 2010. After further revisions to the document, counsel to the Debtors has failed to articulate why the GUC Trust Agreement (which is now in substantially final form) should not be attached to the Disclosure Statement in advance of the voting deadline. The GUC Trust Agreement contains detailed mechanics regarding public reporting, calculating distributions to creditors, and administration and oversight of the GUC Trust. The Committee believes that unsecured creditors should have the opportunity to review, comment and vote on the GUC Trust Agreement in connection with their vote on the Proposed Plan.

8.      In addition, the Proposed Plan contemplates the appointment of a GUC Trust Administrator who will oversee professionals to manage the day to day operation of the GUC Trust. The Disclosure Statement should disclose the identity of the firm that will perform such managerial services and the terms of its retention. The Committee expects that AP Services (the crisis managers for the Debtors), which is currently managing the claims reconciliation process, will be retained by the GUC Trust to continue these services, and believes that, should AP Services be retained (or any other firm), the terms of such engagement should be disclosed to creditors.

**B.      The Disclosure Statement Should Include the Budget**

**i.   Post-Effective Date Budget Under the Proposed Plan**

9.      The Proposed Plan contemplates that the Debtors will deposit a particular amount of cash into various trusts for purposes of administering such trusts. The Proposed Plan

defines "Budget" as the agreed budget for the post-Effective Date period detailing funding for, among other things, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, and any other post-Effective Date obligations detailed in the Proposed Plan or the various trust agreements.  *See* Proposed Plan § 1.32.  Neither the Proposed Plan nor the Disclosure Statement, however, specifies the cash amounts that will be deposited into each of the trusts.  Instead, these funding amounts are conspicuously blank.

10.     The amount of the Budget (particularly as applied to funding for the GUC Trust and the Avoidance Action Trust) is a critical disclosure issue.  In order to ensure that the New GM Equity Interests are devoted exclusively for unsecured creditors, there needs to be sufficient funding in the GUC Trust to pay administrative costs post-Effective Date for claims reconciliation.  In addition, as discussed further below, assuming the Court determines that unsecured creditors are the rightful "Avoidance Action Trust Beneficiaries," there needs to be sufficient funding in the Avoidance Action Trust to prosecute the Term Loan Litigation for the benefit of unsecured creditors.  Absent these assurances, which can only be accomplished through the disclosure of an appropriate budget, unsecured creditors will not know whether there is a substantial risk that the New GM Equity Interests, which have been earmarked for them since prior to the commencement of this case, will need to be invaded in order to pay administrative expenses.  As noted by several bankruptcy courts, one of the standard disclosure issues is "[i]nformation relevant to the risks being taken by the creditors and interest holders."  *In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988).  The potential need to liquidate the New GM Equity Interests in order to pay wind-down expenses is clearly a risk being taken by creditors.

KL2 2669623.7

11.     Treasury has the right to a "reasonable" budget, but not the right or the ability to dictate the terms of the Budget or the Proposed Plan at the price of confirmation. The Proposed Plan does not allow Treasury to dictate the terms of the Budget. The DIP Credit Agreement (dated July 10, 2009), in addressing the time frame for repayment of the wind-down loan, defines "Maturity Date" as the earlier of:

(a) the effective date of a plan of liquidation that is not **reasonably satisfactory** to Treasury (provided that any objection that such plan is not reasonably satisfactory to Treasury will not be based on disposition of Excluded Collateral); or

(b) all claims against the Debtors had been allowed or disallowed and all expenses of the final administration of the cases had been paid in full (emphasis added).

DIP Credit Agreement at p. 13.[2] A copy of the DIP Credit Agreement is attached as Exhibit 8 to Exhibit B to the Motion to Enforce the DIP (defined below) [Docket No. 7226].

12.     To date, the Committee, Treasury and the Debtors have been unable to agree on the Budget. Should the parties be unable to agree on a Budget by confirmation,

---

[2] The version of the DIP Credit Agreement submitted to the Court for approval on July 5, 2009, and attached to the July 5 Wind-Down Order as an exhibit did not include clause (a). *See* July 5 DIP Credit Agreement at p. 13 (definition of "Maturity Date") [Docket No. 2969]. This earlier definition of the Maturity Date had been specifically requested by both the Committee and Paul Weiss Rifkind Wharton & Garrison LLP (counsel to the ad hoc bondholders prior to the Petition Date) and had been incorporated by Treasury into the document prior to its submission to the Court on July 5. Sometime in the late evening of July 9 or the very early morning of July 10, 2009, Treasury for the first time insisted on changing the definition back to an earlier version which provided for an earlier maturity date – specifically, upon confirmation of a plan "not reasonably acceptable" to Treasury. With the sale closing scheduled to occur in a few hours, counsel to the Committee acceded to the change on the grounds that Treasury (a) had already agreed to a Wind-Down Budget which provided funding through 2014 and (b) must be "reasonable" in objecting to a plan that would trigger early maturity. Court approval was never sought with respect to the amendment providing Treasury with an earlier maturity date, notwithstanding an obligation to do so under the June 25, 2009 DIP Order [Docket No. 2529]. *See* June 25 DIP Order ¶ 23.

8

Treasury could assert that its wind-down loan must be repaid on the Effective Date. However, as provided for in the DIP Credit Agreement, the Budget (the funds for which are currently held by the Debtors) need only be "reasonably satisfactory" to Treasury. As discussed below, the Committee submits that Treasury has already committed funds for a Budget in connection with negotiations of the DIP Credit Agreement, the Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing dated July 5, 2009 (the "**Wind-Down Order**") [Docket No. 2969] and the Wind-Down Budget (as defined below) and cannot now attempt to influence the amounts to be provided for in the Budget to the detriment of unsecured creditors by claiming that its loan matures earlier than it otherwise would.

### ii. Wind-Down Budget Under the DIP Credit Agreement

13.    As the Court is aware, one of the Committees' principal goals in the early days of the case was to increase Treasury's funding for wind-down expenses. The Committee believed that the $950 million originally provided under the DIP Credit Agreement would prove insufficient to fund all necessary wind-down expenses and indeed objected to the sale transaction on the ground that it would leave the Debtors with insufficient cash and require the sale of some of the New GM Equity Interests in order to fund expenses. *See* Limited Objection of Official Committee of Unsecured Creditors to Debtors' Motion to Approve the Master Sale and Purchase Agreement [Docket No. 2362]. The Committee withdrew its objection when Treasury agreed to increase its wind-down loan by $225 million to $1.175 billion. *See* July 2, 2009 Hearing Tr. at p. 102 – 107 [Docket No. 3062]. A copy of the July 2, 2009 Hearing Transcript is attached as Exhibit 6 to Exhibit B to the Motion to Enforce the DIP.

14.    The DIP Credit Agreement provides for a "Wind-Down Budget" (the

"**Wind-Down Budget**") defined as follows:

> **Wind-Down Budget**:    the budget, in form and substance
> consistent with the budget provided by the Company prior to the
> Effective Date and satisfactory to the Required Lenders, setting
> forth in reasonable detail all anticipated receipts and disbursements
> and certain of its U.S. Subsidiaries on a calendar year basis, as
> amended by each Quarterly Report delivered pursuant to Section
> 5.1(f).

DIP Credit Agreement at p. 23.

15.    Section 3.20(a) of the DIP Credit Agreement allows the Debtors to use

proceeds of the wind-down loan "to finance . . . other general corporate purposes incurred in

connection with the Wind-Down Order, ***including the payment of expenses associated with the***

***administration of the Cases***." (Emphasis added).  DIP Credit Agreement § 3.20(a).  The Wind-

Down Order contains virtually identical language.  Wind-Down Order at p. 5.  *See also* July 2,

2009 Hearing Tr. at p. 102 – 103 (comments at the sale hearing by counsel to the Committee,

agreed to by counsel to Treasury, noting the upsize in the amount of the DIP Credit Agreement

and that asset sale proceeds previously dedicated to repayment of Treasury's wind-down facility

will now be available for payment of wind-down expenses if needed).

16.    The Debtors delivered a Wind-Down Budget to Treasury prior to July 10,

2009, which allocated the receipts and disbursements related to the $1.175 billion wind-down

loan into various categories.  *See* Phillips Declaration at ¶ 2, attached hereto as **Exhibit B**.  Other

than two specific categories totaling approximately $700 million (one for environmental

remediation costs and one to pay administrative and priority claims), the amounts in the other

categories were to be fungible, that is, the funding was generally available to be spent within and

between categories as needed, as long as the total funding requirement of the Wind-Down

Budget was not exceeded.    *See* Phillips Declaration at ¶ 3.

17.    Moreover, the Committee has been unable to find any language in either the DIP Credit Agreement or the Wind-Down Order which limits "expenses associated with administration of the Cases" to administrative expenses incurred prior to confirmation.  Indeed, the Wind-Down Budget the Debtors provided to Treasury in July 2009 provided funding through 2014.  *See* Phillips Declaration at ¶ 2.

18.    The funds advanced by Treasury and held by the Debtors are more than adequate to fund the wind-down of the Debtors' estates.  At issue is how much Treasury will seek to reclaim through imposition of a post-Effective Date Budget and whether such Budget is unreasonable in exposing the post-confirmation estate to the risk of inadequate funds.  Unsecured creditors should not be left in the dark as to the risks associated with an inadequate, undisclosed and unreasonable budget.  Accordingly it is crucial for the Budget to be finalized and disclosed to general unsecured creditors now.  If the parties cannot agree on what is reasonable, the Court should make its own determination.

**C.    The Disclosure Statement Should Provide Additional Disclosure on the Impact to Unsecured Creditors Pending Determination of the Motion to Enforce the DIP**

19.    For over a year, the Committee has been diligently prosecuting the Term Loan Litigation, seeking to recover $1.5 billion in payments made to the Prepetition Term Lenders for the benefit of unsecured creditors.  In July 2010, counsel to the Committee first learned that Treasury believed that Treasury (and not unsecured creditors) had a right to any proceeds from the Term Loan Litigation.  At Treasury's insistence, the Proposed Plan provides that interests in the Avoidance Action Trust (including the proceeds of the Term Loan Litigation) will be distributed to Treasury or to unsecured creditors as the Court may decide or as the Committee and Treasury may agree.  Proposed Plan §1.23.  On October 4, 2010, the Committee filed a Motion to Enforce (A) the Final DIP Order, (B) the Wind-Down Order and (C) the

KL2 2669623.7

Amended DIP Facility (the "**Motion to Enforce the DIP"**) [Docket No. 7226] seeking a determination that Treasury has no interest in the Term Loan Litigation and the interests in the Avoidance Action Trust should be distributed exclusively to general unsecured creditors.

20.    The Committee continues to be baffled at how Treasury can reasonably assert an interest in the Term Loan Litigation and is hopeful the Court will grant the Motion to Enforce the DIP in favor of unsecured creditors.  However, to the extent this issue is not resolved prior to solicitation of votes on the Proposed Plan, the Disclosure Statement should be modified to explain the impact on unsecured creditors if the Court ultimately decides that Treasury is the beneficiary of the Term Loan Litigation.  In addition, should the issue of the Term Loan Litigation's ownership remain open post-Effective Date, the Proposed Plan should be modified to provide that the Committee survives until the issue is resolved.[3]

21.    As explained more fully in the Motion to Enforce the DIP, the basic underpinnings of the bondholders' deal with Treasury (and codified by the Master Sale and Purchase Agreement) provided that, if unsecured claims range from $35 billion to $42 billion, New GM will issue up to an additional 2% of New GM common stock to protect against dilution.  *See* Section 3.2(c) of the Second Amendment to Amended and Restated Master Sale and Purchase Agreement dated July 5, 2009, attached hereto as **Exhibit A**.  However, in that instance, no additional warrants will be issued by New GM.  Thus the New GM warrants, which could comprise approximately half of unsecured creditors' value, will not be protected from dilution if claims range from $35 billion to $42 billion.  If unsecured claims exceed $42 billion, there will be no dilution protection at all.

---

[3] Should the Committee survive post-Effective Date, the Budget would need to include funding for the Committees' professionals to continue to prosecute this issue.

KL2 2669623.7

22.    If the Term Loan Litigation is successful, the $1.5 billion in cash recovered from the losing Prepetition Term Lenders will cause a $1.5 billion dilutive increase in unsecured claims.    As explained more fully in the Motion to Enforce the DIP, should the unsecured creditors receive the potential proceeds of the Term Loan Litigation, unsecured creditors stand to increase their overall percentage recovery by anywhere from 2.2% to 2.9% despite the dilution of their New GM Equity Interests.    Conversely, initiating the Term Loan Litigation without receiving the potential proceeds would result in as much as a 0.4% reduction to the general unsecured creditors' recovery.    *See* Motion to Enforce the DIP ¶ 37 and Exhibit C to the Motion to Enforce the DIP, Phillips Decl. ¶ 3.    Therefore, the Disclosure Statement should be modified to fully address the dilution issue and to note that the Committee would discontinue the lawsuit if Treasury is deemed to own it (as such a result would only decrease unsecured creditor recoveries).    Mere disclosure of the risk that unsecured creditors will not receive value from the Term Loan Litigation is not sufficient in light of the hearing on summary judgment motions in the Term Loan Litigation adversary proceeding scheduled for November 1, 2010.

**D.    The Disclosure Statement Should Provide Detail on the Size of the Claims Pool**

23.    The current draft of the Disclosure Statement does not list the estimated amount of allowed claims in each class.    Given that this is a "pot" plan, the size of the claims pool will materially affect the distribution any unsecured creditor will receive on its claim.

24.    While the Committee understands that the Debtors intend to revise the Disclosure Statement to include a range for the estimated amount of allowed claims, the Committee submits that the Disclosure Statement should provide a further break-down of this range for unsecured claims including (i) by category and (ii) the amount of disputed and undisputed claims.

13

25.     Since July 2009, the Debtors have been filing monthly operating reports which list out the following categories in the "Liabilities Subject to Compromise" section: (i) unsecured bond debt; (ii) accounts payable; (iii) environmental reserves; (iv) union obligations; (v) workers' compensation; (vi) litigation and product liability; and (vii) other accrued liabilities. *See, e.g.,* August 2010 Monthly Operating Report, at p. 14 [Docket No. 7220].   Unsecured creditors and other institutional investors have relied on this data to forecast the expected distribution of New GM Equity Interests to general unsecured creditors.  *See* Phillips Declaration at ¶ 4.  If the estimated range of unsecured claims differs from the total Liabilities Subject to Compromise stated in the monthly operating reports, unsecured creditors (as hypothetical investors) could be relying on incomplete information for purposes of voting on the Proposed Plan.[4]  *See* Phillips Declaration at ¶ 4.  Based on information from the Debtors and their own research, FTI, the Committees' financial advisor, has generated a chart (the "**Claims Chart**") showing the likely estimated range of allowed unsecured claims in each subcategory.  *See* Phillips Declaration at ¶ 5.  If this information is not disclosed by the Debtors in the Disclosure Statement, we request that the Court authorize public disclosure of this information by the Committee on its website, together with a passage in the Disclosure Statement directing readers to the website.[5]

26.     In addition, in order to provide greater transparency, the Disclosure Statement should specify the amount of disputed and undisputed claims in these categories.

---

[4] The Committee recognizes that the monthly operating report states that the "Liabilities Subject to Compromise" are likely to increase and should not be relied upon as a precise estimate of claims that will ultimately be allowed. This is a further reason why the Disclosure Statement should provide a further breakdown of estimated claims by category.

[5] The Committee is not attaching the Claims Chart to this Objection as it contains certain non-public information. However, the Committee will bring sealed copies of the Claims Chart to the hearing on the Disclosure Statement should the Court wish to review this information.

14

Bankruptcy courts require that the disclosure statement include the amount projected for

undisputed claims and total amount projected for disputed claims. *In re Ferreti*, 128 B.R. at 19.

This information will provide greater clarity on the likely initial distribution to holders of

allowed claims shortly after the Effective Date and the expected reserve for unsecured claims.


### **RESERVATION OF RIGHTS**

27.     The Committee understands that the Debtors intend to file a revised

Proposed Plan and Disclosure Statement prior to the hearing on the Disclosure Statement.[6] The

Committee reserves its right to supplement this Objection prior to or at the hearing.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]


---

[6] The Committee provided additional comments to the Proposed Plan and Disclosure Statement on a variety of items.
For example, discussions are ongoing between the Committee and the Debtors regarding the Proposed Plan's
treatment of certain claims asserted by, or for the benefit of, noteholders of General Motors Nova Scotia Finance
Company and the associated description thereof in the Disclosure Statement.

WHEREFORE, the Committee respectfully requests that (i) the Disclosure

Statement incorporate the disclosures requested herein, and (ii) grant such other and further relief

as the Court may deem just and proper.


Dated:    October 18, 2010
          New York, New York


                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                        By:   /s/    Thomas Moers Mayer
                                        Thomas Moers Mayer
                                        Robert T. Schmidt
                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        Phone: (212) 715-9100
                                        Fax: (212) 715-8000

                                        *Counsel for the Official Committee
                                        of Unsecured Creditors of Motors Liquidation
                                        Company , et al.*

KL2 2669623.7

## **EXHIBIT A**

## SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of July 5, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "Purchase Agreement");

WHEREAS, Sellers and Purchaser have entered into that certain First Amendment to Amended and Restated Master and Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.        *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.        *Amendments to Purchase Agreement.*

(a)      The following new definition of "Advanced Technology Credits" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Credits" has the meaning set forth in **Section 6.36**.

(b)      The following new definition of "Advanced Technology Projects" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Projects" means development, design, engineering and production of advanced technology vehicles and components, including the vehicles known as "the Volt", "the Cruze" and components, transmissions and systems for vehicles employing hybrid technologies.

(c)      The definition of "Ancillary Agreements" is hereby amended and restated in its entirety to read as follows:

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

(d)    The following new definition of "Excess Estimated Unsecured Claim Amount" is hereby included in **Section 1.1** of the Purchase Agreement:

"Excess Estimated Unsecured Claim Amount" has the meaning set forth in **Section 3.2(c)(i)**.

(e)    The definition of "Permitted Encumbrances" is hereby amended and restated in its entirety to read as follows:

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use

of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

(f)    The following new definition of "Purchaser Escrow Funds" is hereby included in **Section 1.1** of the Purchase Agreement:

"Purchaser Escrow Funds" has the meaning set forth in **Section 2.2(a)(xx)**.

(g)    **Section 2.2(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all credits, Advanced Technology Credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(h)    **Section 2.2(a)(xviii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xviii) any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period;

(i)    **Section 2.2(a)(xix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xix)    any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability; and

(j)    A new **Section 2.2(a)(xx)** is hereby added to the Purchase Agreement to read as follows:

(xx)    all cash and cash equivalents, including all marketable securities, held in (1) escrow pursuant to, or as contemplated by that certain letter agreement dated as of June 30, 2009, by and between Parent, Citicorp USA, Inc., as Bank Representative, and Citibank, N.A., as Escrow Agent or (2) any escrow established in contemplation or for the purpose of the Closing, that would otherwise constitute a Purchased Asset pursuant to **Section 2.2(a)(i)** (collectively, "Purchaser Escrow Funds");

(k)    **Section 2.2(b)(i)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(i)    cash or cash equivalents in an amount equal to $1,175,000,000 (the "Excluded Cash");

(l)    **Section 2.2(b)(ii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ii)    all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities, which for the avoidance of doubt, shall not be deemed to include Purchaser Escrow Funds;

(m)    **Section 2.3(a)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)    all Liabilities arising under any Environmental Law (A) relating to the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(n)    **Section 2.3(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** or (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(o)    **Section 2.3(b)(iv)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third party Claims related to Hazardous Materials that were or are located at or that were Released into the Environment from Transferred Real Property prior to the Closing, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property, except as provided under Section 18.2(e) of the Master Lease Agreement or as provided under the "Facility Idling Process" section of Schedule A of the Transition Services Agreement; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(p)    **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(q)    **Section 3.2(a)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to:  (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,247,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

For the avoidance of doubt, immediately following the Closing, the only indebtedness for borrowed money (or any guarantees thereof) of Sellers and their Subsidiaries to Sponsor, Canada and Export Development Canada is amounts under the Wind Down Facility.

(r)    **Section 3.2(c)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the "Adjustment Shares") to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the "Excess Estimated Unsecured Claim Amount;" in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000).  The number of Adjustment Shares to be issued will be equal to the number of shares, rounded up to the next whole share, calculated by multiplying (i) 10,000,000 shares of Common Stock (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the

6

Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares) and (ii) a fraction, (A) the numerator of which is Excess Estimated Unsecured Claim Amount (capped at $7,000,000,000) and (B) the denominator of which is $7,000,000,000.

(ii)    At the Closing, Purchaser will have authorized and, thereafter, will reserve for issuance the maximum number of shares of Common Stock issuable as Adjustment Shares.

(s)    **Section 6.9(b)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $1,175,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at the Eurodollar Rate (as defined in the Wind-Down Facility) plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities or proceeds received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(t)    **Section 6.17(e)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies*. As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (collectively, the "Assumed Plans"), and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of

the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP.  Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(u)    A new **Section 6.17(n)** is hereby added to the Purchase Agreement to read as follows:

(n)    *Harlem Employees*.   With respect to non-UAW employees of Harlem, Purchaser or one of its Affiliates may make offers of employment to such individuals at its discretion.  With respect to UAW-represented employees of Harlem and such other non-UAW employees who accept offers of employment with Purchaser or one of its Affiliates, in addition to obligations under the UAW Collective Bargaining Agreement with respect to UAW-represented employees, Purchaser shall assume all Liabilities arising out of, relating to or in connection with the salaries and/or wages and vacation of all such individuals that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date. With respect to non-UAW employees of Harlem who accept such offers of employment, Purchaser or one of its Affiliates shall take all actions necessary such that such individuals shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual in any employee benefit plans (excluding equity compensation plans or programs) covering such individuals after the Closing; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such individual or the funding for any such benefit. Purchaser or one of its Affiliates, in its sole discretion, may assume certain employee benefit plans maintained by Harlem by delivering written notice (which such notice shall indentify such employee benefit plans of Harlem to be assumed) to Sellers of such assumption on or before the Closing, and upon delivery of such notice, such employee benefit plans shall automatically be deemed to be set forth on Section 6.17(e) of the Sellers' Disclosure Schedules. All such employee benefit plans that are assumed by Purchaser or one of its Affiliates pursuant to the preceding sentence shall be deemed to be Assumed Plans for purposes of this Agreement.

(v)    A new **Section 6.36** is hereby added to the Purchase Agreement to read as follows:

*Section 6.36    Advanced Technology Credits*.   The Parties agree that Purchaser shall, to the extent permissible by applicable Law (including all rules, regulations and policies pertaining to Advanced Technology Projects), be entitled to receive full credit for expenditures incurred by Sellers prior to the Closing towards Advanced Technology Projects for the purpose of any current or future program sponsored by a Governmental Authority providing financial assistance in

connection with any such project, including any program pursuant to Section 136 of the Energy Independence and Security Act of 2007 ("Advanced Technology Credits"), and acknowledge that the Purchase Price includes and represents consideration for the full value of such expenditures incurred by Sellers.

(w)     **Section 7.2(c)(vi)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (vi)    *[Reserved]*;

(x)     **Section 7.2(c)(vii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (vii)    *[Reserved]*;

(y)     **Section 7.3(c)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (viii)    *[Reserved]*;

(z)     **Section 7.3(c)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (ix)    *[Reserved]*;

(aa)     **Section 7.3(f)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (f)     Purchaser shall have (i) offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (ii) transferred to Sellers the UST Warrant and (iii) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(bb)     **Exhibit R** to the Purchase Agreement is hereby deleted in its entirety.

(cc)     **Exhibit S** to the Purchase Agreement is hereby deleted in its entirety.

(dd)     **Exhibit U** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit U** attached hereto.

(ee)     **Exhibit X** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit X** attached hereto.

(ff)     Section 2.2(b)(iv) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 2.2(b)(iv) of the Sellers' Disclosure Schedule attached hereto.

(gg)     Section 4.4 of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 4.4 of the Sellers' Disclosure Schedule attached hereto.

(hh)     Section 6.6(a)(i) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 6.6(a)(i) of the Sellers' Disclosure Schedule attached hereto.

Section 3.     *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.     *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.  This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.     *Counterparts.* This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

10

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer


SATURN LLC


By: _____

    Name:  Jill Lajdziak
    Title:   President


SATURN DISTRIBUTION CORPORATION


By: _____

    Name:  Jill Lajdziak
    Title:   President


CHEVROLET-SATURN OF HARLEM, INC.


By: _____

    Name:  Michael Garrick
    Title:   President


NGMCO, INC.


By: _____

    Name: Sadiq Malik
    Title:  Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be
executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title:  President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title:  President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title:  President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title:  President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:  Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION


By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
          Officer


SATURN LLC


By: _____
    Name:  Jill Lajdziak
    Title:   President


SATURN DISTRIBUTION CORPORATION


By: _____
    Name:  Jill Lajdziak
    Title:   President


CHEVROLET-SATURN OF HARLEM, INC.


By: _____
    Name:  Michael Garrick
    Title:   President


NGMCO, INC.


By: _____
    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name:  Frederick A. Henderson
      Title:   President and Chief Executive
             Officer

SATURN LLC

By: _____
      Name:  Jill Lajdziak
      Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
      Name:  Jill Lajdziak
      Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name:  Michael Garrick
      Title:   President

NGMCO, INC.

By: _____
      Name:  Sadiq Malik
      Title:   Vice President and Treasurer

# EXHIBIT B

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Robert T. Schmidt

*Counsel for the Official Committee
of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                :

In re:                    :        Chapter 11 Case No.:

                :

MOTORS LIQUIDATION COMPANY., et al.,  :     09-50026 (REG)

f/k/a General Motors Corp., et al.    :

                :

          Debtors.       :     (Jointly Administered)

                :

--------------------------------------------------------- X

## DECLARATION OF ANNA PHILLIPS IN SUPPORT OF THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY TO THE DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION

STATE OF NEW YORK   )
                ) ss.:
COUNTY OF NEW YORK  )

      ANNA PHILLIPS, under the penalty of perjury, deposes and says that:

      1.    I am a Senior Managing Director with FTI Consulting, Inc. (together with its wholly owned subsidiaries, agents, independent contractors and employees "**FTI**"), a financial advisory services firm with numerous offices throughout the country.  I submit this Declaration on behalf of FTI (the "**Phillips Declaration**") in support of the objection (the "**Objection**") of the Official Committee of Unsecured Creditors (the "**Committee**") appointed in

KL2 2670135.4

the chapter 11 cases of Motors Liquidation Company, *et al*., (f/k/a General Motors Corp., *et al*.,) the debtors and debtors-in-possession herein (collectively, the "**Debtors**"), to the Disclosure Statement for the Plan of Liquidation, as such documents are defined in the Objection.[1]  Unless otherwise stated in this Declaration, I have personal knowledge of the facts hereinafter set forth.

2.    On the evening of July 1, 2009 and into the morning hours of July 2, 2009, I attended a meeting with Treasury and the Debtors at the offices of Cadwalader, Wickersham & Taft LLP to discuss, among other things, the terms of the DIP Credit Agreement and the amounts needed to wind-down the Debtors' estates.  In the course of the discussions, the parties reviewed a budget (the "**Wind-Down Budget**")[2] that had been prepared by the Debtors' advisors.  The Wind-Down Budget appeared to have been prepared on a cash basis and listed the annual totals, by category, of anticipated receipts and disbursements of the estate, through 2014.  The Wind-Down Budget ultimately agreed to by the parties provided that the total estimated cost, net of receipts, for the Debtors' wind-down would be $1.175 billion.

3.    Other than two specific categories totaling approximately $700 million (one for environmental remediation costs and one to pay administrative and priority claims), the parties agreed that the amounts in the other categories would be generally available to be spent within and between categories as needed, so long as the total funding requirements were not exceeded.  On this basis, and due to this accommodation, the Committee and its advisors agreed to the sufficiency of the Wind-Down Budget.  Had the parties providing funding to the Wind-Down Budget requested that all categories within the budget be quarantined, that is, unavailable

---

1 Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Objection.

2 A copy of the Wind-Down Budget was never filed with the Court.

KL2 2670135.4

to be spent for any purpose other than that specific category of the Wind-Down Budget, then the Committee would have required a significantly greater period to conduct due diligence in order to decide on the sufficiency of the amounts set forth in each category of the Wind-Down Budget, on an annual basis.  Consistent with the Committee's understanding, there is no such reference to quarantining by category in the DIP Credit Agreement.

4.     Since July 2009, the Debtors have been filing monthly operating reports which list out the following categories in the "Liabilities Subject to Compromise" section: (i) unsecured bond debt; (ii) accounts payable; (iii) environmental reserves; (iv) union obligations; (v) workers' compensation; (vi) litigation and product liability; and (vii) other accrued liabilities. Unsecured creditors and other institutional investors have relied on this data to forecast the expected distribution of New GM Equity Interests to general unsecured creditors.   If the estimated range of unsecured claims differs from the total Liabilities Subject to Compromise stated in the monthly operating reports, unsecured creditors (as hypothetical investors) could be relying on incomplete information for purposes of voting on the Proposed Plan.[3]  The Committee believes that unsecured creditors have the right to meaningful and adequate information, including the likely range of allowed claims, for purposes of voting.

5.     Based on information from the Debtors, and FTI's own research, FTI has generated a chart (the "**Claims Chart**") showing the likely estimated range of allowed unsecured claims in each subcategory.  If this information is not disclosed by the Debtors in the Disclosure Statement, the Committee will request that the Court authorize the public disclosure of this

---

[3] The Committee recognizes that the monthly operating report states that the "Liabilities Subject to Compromise" are likely to increase and should not be relied upon as a precise estimate of claims that will ultimately be allowed. This is a further reason why the Disclosure Statement should provide a further breakdown of estimated claims by category.

3

information by the Committee on its website, together with a passage in the Disclosure Statement directing readers to the website.

    6.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:  New York, New York
      October 18, 2010

            /s/ *Anna Phillips*
            Anna Phillips

4