KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Timothy P. Harkness

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                           :
In re:                                                     :    Chapter 11 Case No.:
                                                           :
MOTORS LIQUIDATION COMPANY., et al.,                       :    09-50026 (REG)
f/k/a General Motors Corp., et al.                         :
                                                           :
                                Debtors.                   :    (Jointly Administered)
                                                           :
---------------------------------------------------------- X


**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOTORS LIQUIDATION COMPANY IN
FURTHER SUPPORT OF ITS MOTION TO ENFORCE
(A) THE FINAL DIP ORDER, (B) THE WIND-DOWN ORDER,
<u>AND (C) THE AMENDED DIP FACILITY</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT...................................................................................................................................2

    A.  The Motion is Ripe and the Identity of the Beneficiary of the Term Loan
        Litigation Should be Determined by the Court Now ...........................................2

    B.  Term Loan Litigation was Specifically Excluded from the Collateral Securing
        Treasury's Loan and Any Administrative Claim Held By Treasury Cannot Get
        Paid from the Term Loan Litigation ....................................................................4

    C.  There is No Need to Gather Extrinsic Evidence ..................................................9

KL2 2670799.9

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Communications*,
   544 F.3d 420 (2d Cir. 2008) ..................................................................................................8

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
   No. 03 Civ. 8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 10, 2007) .................................9

## STATUTES

11 U.S.C. § 1111(b) ....................................................................................................................n.6

11 U.S.C. § 1129(a)(7)(A) ............................................................................................................10

11 U.S.C. § 1129(a)(9) ..........................................................................................................2, 4, 7

11 U.S.C. § 1129(a)(9)(A) .......................................................................................................4, 10

## MISCELLANEOUS

Guidelines for Financing Requests,
   Southern District of New York General Order No. M-274 .......................................................7

KL2 2670799.9

TO:   THE HONORABLE ROBERT E. GERBER,
      UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the **"Committee"**) of the above captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**"), by and through its undersigned counsel, hereby submits this reply (the "**Reply**"), to the objection (the "**Objection**") filed by the United States Department of the Treasury ("**Treasury**") to the Committees' motion (the "**Motion**") [Docket No. 7226] to enforce: (i) the Final Order; (ii) Wind-Down Order; and (iii) Amended DIP Facility.[1]

## PRELIMINARY STATEMENT

Treasury's Objection establishes that this Court can, and should, act now to resolve once and for all which entity is entitled to the proceeds of the Term Loan Litigation. Treasury does not dispute that it negotiated the Orders at issue here with the Debtors and the Committee. Nor does Treasury contest that it has no lien over the Term Loan Litigation or that the Wind-Down Facility is non-recourse to those proceeds. And, Treasury does not dispute that it has sat silently by while the Committee prosecuted the Term Loan Litigation with the clear understanding that the proceeds of this case would inure to the benefit of creditors other than Treasury. This Court has a hearing on summary judgment on the Term Loan Litigation on November 1, by which time the Committee needs to know whether it is litigating for creditors (in which case the Committee will proceed) or for Treasury (in which case the Committee will seek to drop the lawsuit.)[2]

Treasury now asks the Court to do nothing.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

[2] Treasury's Objection incorrectly states that the Committees filed its Motion on ten days notice when in fact, the Committee filed its Motion on seventeen days notice with copies of the Motion either hand delivered or sent by overnight mail to Treasury and its counsel.

KL2 2670799.9

With regard to the merits of the Motion, Treasury's Objection fails to provide a basis for having this Court re-write the deal that was negotiated between the parties about who would get the benefit of the Term Loan Litigation. Treasury's sole argument is that it has a priority claim and it must be paid at confirmation. This argument ignores the plain language of Section 1129(a)(9), which provides that a priority claim must be paid "except to the extent that a holder of a particular claim has agreed to a different treatment of such claim." Treasury has so agreed. The Committee asks the Court to enforce that agreement.

## ARGUMENT

### A.   The Motion is Ripe and the Identity of the Beneficiary of the Term Loan Litigation Should be Determined by the Court Now

1.   As explained in our Motion, should the Committee succeed in recovering $1.5 billion from the Term Loan Litigation, unsecured claims against the estate would increase by that amount – diluting distributions on each unsecured claim. As further explained in our Motion, unsecured creditors are entitled to receive additional New GM ***shares*** if unsecured claims increase from $35 billion to $42 billion, but unsecured creditors are ***not*** entitled to receive additional New GM ***warrants*** if claims increase. Over $42 billion (or under $35 billion), unsecured creditors have no protection at all against dilution from increased claims; between $35 billion and $42 billion, unsecured creditors are protected against dilution only with respect to their New GM shares, not with respect to the New GM warrants. Therefore unsecured creditors are not fully protected from dilution   Increasing claims against the estate without also making the proceeds of the litigation available to unsecured creditors would reduce the general

unsecured creditors' recovery. In other words, if the general unsecured creditors do not get the proceeds of the Term Loan Litigation, they are better off discontinuing the litigation.[3]

    2.  Cross motions for summary judgment are scheduled to be heard by the Court in the Term Loan Litigation on November 1, 2010. Therefore, it is imperative for the Committee to know whether general unsecured creditors will receive the benefit of the Term Loan Litigation in advance of any ruling on the motions for summary judgment because if it is decided, ultimately, that the Committee does not receive such benefit, the Committee immediately would discontinue prosecution of the Term Loan Litigation to prevent the dilution of its overall recovery.

    3.  Moreover, as the Court is aware, the hearing to approve the Disclosure Statement is scheduled for the same date as the hearing on this Motion. Both the proposed Disclosure Statement and the Proposed Plan provide, at the insistence of Treasury, that the beneficiary of the Term Loan Litigation will be determined either by mutual agreement between Treasury and the Committee or by order of this Court. Since the parties have been unable to reach an agreement to date, the Committee filed the Motion so that the Court can determine the identity of the litigation's beneficiary. As is outlined more fully in the Committees' Disclosure Statement objection, unsecured creditors have a right to know whether they will receive the benefit of the litigation that they have pursued for over a year and the impact of the instant

---

[3] Treasury's Objection postulates that the $1.5 billion Term Loan Litigation exceeds Treasury's $1.175 billion DIP loan, so that unsecured creditors would receive $325 million if the Committee prevailed. First, this assumption ignores the dilution that unsecured creditor recoveries would suffer by the addition of $1.5 billion in claims against the estate. Second, the calculation ignores the interest that has accrued and will continue to accrue on the DIP loan over the life of the litigation. For instance, the DIP loan has already accrued approximately $75 million in interest to date so should the Committee prevail on the Term Loan Litigation, as of today, under Treasury's argument, the Committee would only recover approximately $250 million, not $325 million. It is highly probable that any judgment on the Term Loan Litigation will be appealed to the U.S. Court of Appeals for the Second Circuit. During that time, interest will continue to accrue on the loan further reducing the amount the Committee would recover. Lastly, final victory will require collecting from over 40 institutions, including numerous hedge funds, who have received shares of the $1.5 billion; the ultimate solvency of these recipients is not known.

3

Motion on unsecured creditor recovery. [Docket No. 7383]. The Committee submits that now is the appropriate time to adjudicate this issue so that an individual creditor can understand the expected source of recovery prior to voting on the Proposed Plan.

4.  Lastly, contrary to Treasury's assertions, this Court has the power and jurisdiction to decide this Motion. The Orders provide that the Court retains jurisdiction to enforce the terms of such orders. *See* Final DIP Order ¶ 30; Wind-Down Order at p. 7. Accordingly, the Committee requests that the Court enforce the plain language of its Orders.

B.  **The Term Loan Litigation was Specifically Excluded from the Collateral Securing Treasury's Loan and Any Administrative Claim Held By Treasury Cannot Get Paid from the Term Loan Litigation**

5.  As explained in our Motion, and as conceded by Treasury, the Orders and the Amended DIP Facility unequivocally provide that the Term Loan Litigation is not Collateral over which Treasury has a lien and the Amended DIP Facility was non-recourse to the Term Loan Litigation and its proceeds. *See* Motion at ¶¶ 12 – 16. Treasury responds that, although this is all true, it nevertheless has a superpriority administrative claim which under Section 1129(a)(9)(A) must be paid on the effective date.

6.  Treasury has no right to be paid on the effective date.

7.  Section 1129(a)(9) provides as follows:

> (9) ***Except to the extent that the holder of a particular class has agreed to a different treatment of such claim***, the plan provides that –
>
> (A) with respect to a claim of a kind specified in section 507(a)(2) or (3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

(Emphasis added.)

8.  Treasury has "agreed to a different treatment" of its claim – not merely by agreeing to forego a lien on or recourse to the Term Loan Litigation (and the New GM Equity

4

Interests) but also by agreeing to be paid only after all claims against the estate are allowed or disallowed. Treasury's wind-down loan matures on the Maturity Date, which is defined in relevant part as follows:

> (a) the effective date of a plan of liquidation that is not **_reasonably satisfactory_** to Treasury (provided that any objection that such plan is not reasonably satisfactory to Treasury **_will not be based on disposition of Excluded Collateral_**); or
>
> (b) all claims against the Debtors had been allowed or disallowed and all expenses of the final administration of the cases had been paid in full.

(Emphasis added.)

9. The Term Loan Litigation is specifically excluded from the definition of Collateral in the Amended DIP Facility and Orders. Because Treasury has waived both lien and recourse against the Term Loan Litigation, the Committee submits that the Treasury cannot reasonably object to the Proposed Plan because it fails to pay Treasury out of the proceeds of the Term Loan Litigation.

10. The Committee notes further that paragraph (a) of the definition of Maturity Date – the only provision that gives Treasury even an argument that its claim must be paid on the Effective Date – did not appear in the version of the Amended DIP Facility that was approved by the Bankruptcy Court by the Wind-Down Order.[4] The definition of "Maturity Date" in this version of the Amended DIP Facility contains only language similar to clause (b); there was no requirement that the plan be "reasonably acceptable" to Treasury. *See* Mayer Decl. Ex. 7, Wind-Down Order at p. 13 of Exhibit 1 thereto (definition of "Maturity Date") [Docket No. 2969].

---

[4] This version is dated July 4, 2009 and is attached to the Wind-Down Order as Exhibit 7.

5

KL2 2670799.9

11. This earlier definition of the Maturity Date had been specifically requested by both the Committee and Paul Weiss Rifkind Wharton & Garrison LLP (counsel to the ad hoc bondholders prior to the Petition Date) and had been incorporated by Treasury into the document prior to its submission to the Court on July 5, 2009. The Debtors' Motion to Amend DIP Facility specifically referred to the "Maturity Date" as occurring only after all claims had been allowed or disallowed. Sometime in the late evening of July 9 or the very early morning of July 10, 2009, literally hours before the closing of the sale of the Debtors' assets, Treasury for the first time insisted on changing the definition back to an earlier version which provided for an earlier maturity date – specifically, upon confirmation of a plan "not reasonably acceptable" to Treasury. With the sale closing scheduled to occur in a few hours, counsel to the Committee acceded to the change on the grounds that Treasury (a) had already agreed to a Wind-Down Budget which provided funding through 2014 and (b) must be "reasonable" in objecting to a plan that would trigger early maturity. Court approval was never sought with respect to the amendment providing Treasury with an earlier maturity date, notwithstanding an obligation to do so under the Final DIP Order. *See* Mayer Decl. Ex. 4, Final DIP Order ¶ 23 [Docket No. 2529].

12. The Committee submits there is no issue of interpretation that requires discovery. The Orders are plain on their face.[5] Treasury does not deny that it waived its lien and its recourse to the Term Loan Litigation. Treasury's argument that it is nonetheless entitled to be paid on the Effective Date of a Plan is belied by the definition of "Maturity Date" in the version of the Amended DIP Facility that was approved by the Court – a definition that could not be changed in any material respect without court approval pursuant to the Final DIP Order. If any

---

[5] Treasury cites to 11 U.S.C. § 1111(b) in an attempt to create some ambiguity about the nature of "recourse". Section 1111(b) does not apply to Treasury's DIP Loan, as Treasury itself concedes. Section 1111(b) applies only to claims "allowed under section 502", and claims under a debtor-in-possession loan are allowed under section 503.

6

guide to interpretation is required, the Committee asks the Court to apply both the general rule that a document is interpreted against the draftsman (here, Treasury) and the specific rule, described more fully below, that DIP Lenders must disclose any attempt to assert a lien or claim against an avoidance action.

13. The *Guidelines for Financing Requests* of the Bankruptcy Court of the Southern District of New York require disclosure of so-called "Extraordinary Provisions" that ordinarily will not be approved without substantial cause shown, compelling circumstances and reasonable notice. With respect to liens and superpriority claims on avoidance actions, the Guidelines provide:

> Extraordinary Provisions include the granting of liens on the debtors' claims and causes of action arising under sections 544, 545, 547, 548 and 549 (but not liens on recoveries under section 549 on account of collateral as to which the lender has a postpetition lien), and the proceeds thereof, or a superpriority administrative claim payable from the proceeds of such claims and causes of action.

*See* Southern District of New York General Order No. M-274 ¶¶ I(a)(4) and II(a)(6).

14. Treasury explicitly waived its interest in the Term Loan Litigation; if Treasury sought to preserve a "back door" right to the Term Loan Litigation through Section 1129(a)(9), it was Treasury's burden to inform the Court. The Motion to Amend DIP Facility offers no hint of Treasury's current position and in its Objection, Treasury essentially concedes that it did not disclose previously its view that its superpriority claim extended to the proceeds of the Term Loan Litigation. As importantly, Treasury answers the Committees' judicial estoppel argument with silence, offering no rebuttal at all. This Court may, therefore, base its decision to grant the Committees' Motion not only on the plain meaning of the Orders but also on Treasury's own behavior over the last 14 months.

7

15. The balance of Treasury's arguments are irrelevant. Treasury argues that the Court granted the Committee standing to pursue the Term Loan Litigation on behalf of the estate, not merely unsecured creditors. *See* Objection at ¶¶ 14-18. This is true but besides the point as (i) Treasury has agreed that all administrative expenses and priority claims will be paid out of the proceeds of the Amended DIP Facility, and (ii) the only unpaid creditors remaining are Treasury and unsecured creditors. Once Treasury is determined to have no interest in the Term Loan Litigation, unsecured creditors receive the benefits thereof. Treasury itself had acknowledged this by insisting on insertion in the Proposed Plan of a provision that allocates interests between only Treasury, on the one hand, and unsecured creditors, on the other, as the Court may determine or as Treasury and the Committee may agree. Accordingly, Treasury's citation of *In re Adelphia Communications* and like cases is completely beside the point. 544 F.3d 420 (2d Cir. 2008).

16. This Court should see Treasury's *post hoc* reading of its "understanding of the deal," (Objection at ¶¶ 47-50), for what it is: a desperate, after-the-fact attempt to rewrite a deal that bankruptcy professionals, acting in a complex deal under immense time pressure, agreed to in good faith. This attempted rewrite of history does not hold up.

17. *First*, Treasury does not state, or even suggest, that this "understanding" existed at the time the Orders were presented to the Court, or that this "understanding" was ever shared with any of the parties who negotiated the Orders.

18. *Second,* this "understanding", had it been shared with the Court and the Committee, would have undoubtedly resulted in the Term Loan Litigation being abandoned by the Committee. As we explained above and in the Motion, unsecured creditors face material dilution of their claims if the Committee is successful in the Term Loan Litigation but Treasury

8

receives up to the first $1.175 billion of the proceeds from that litigation. There would have been no reason for the Committee to actively litigate a $1.5 billion avoidance action if doing so would ultimately diminish unsecured creditor recoveries. Nothing Treasury says in its Objection changes this. Moreover, Treasury's assertion about "ensuring the Debtors would not settle the Avoidance Action for an unacceptably low amount" shows that Treasury fails to understand the complexities of the economic drivers of this bankruptcy.

19.     *Third,* this "understanding" still does not explain why Treasury felt compelled to explain to the Court in July of 2009 that the financing at issue is "on a non-recourse basis, as has been the case throughout the discussions" or how this "understanding" is consistent with the non-recourse nature of the wind-down loan. And, why didn't Treasury further explain its "understanding" about its superpriority claim as this Court's rules require? Treasury's Objection is remarkably silent on these questions. This Court should accept this silence for what it is: an admission that Treasury's entire position is an attempt to rewrite the deal struck by the parties and endorsed by this Court a year ago, which has been the underpinning of the Committees' prosecution of the Term Loan Litigation.

### C.      There is No Need to Gather Extrinsic Evidence

20.     The language of the Orders is clear that Treasury does not have an interest in the Term Loan Litigation. As noted in the Motion, where a contract is unambiguous on its face, "the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, *10 (S.D.N.Y. July 10, 2007) (citation omitted). In the face of unambiguous language that Treasury cannot look to the proceeds of the Term Loan Litigation (which is excluded from the definition of Collateral) for repayment of its loan, there is no need to defer consideration of the Motion for an evidentiary hearing.

9

21. No further discovery or fact-gathering should be considered necessary. Treasury has had over a year to address the fact that the Committee has instituted the Term Loan Litigation for the benefit of general unsecured creditors and instead, has remained silent. Moreover, Treasury has had three months, since discussions with the Committee regarding the draft Proposed Plan, to obtain an affidavit from its representatives who are familiar with the deal and has failed to do so. Lastly, Treasury's Objection presents no facts that put at issue the nature of the deal we allege. Treasury's response is nothing but a feeble attempt to say that an issue exists when one does not.

22. Contrary to Treasury's assertions, the Motion needs to be adjudicated now. The Committee will discontinue the lawsuit if the Court determines that Treasury must be paid the proceeds. This determination is critical to the Disclosure Statement and the Proposed Plan. Treasury's only argument (rebutted above) is that Section 1129(a)(9)(A) requires payment of its claim prior to confirmation of a plan. Section 1129(a)(9)(A) applies only in chapter 11. While the Committee would be exceedingly reluctant to advocate chapter 7 liquidation as opposed to orderly liquidation through chapter 11, if the cost of chapter 11 is foregoing a $1,500,000,000 asset, creditors need to know that, the Disclosure Statement needs to so state and the Section 1129(a)(7)(A) analysis should deal with this issue before asking creditors to vote.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Committee respectfully requests that this Court (i) overrule the Objection, (ii) grant the Motion, and (iii) grant such other and further relief as the Court may deem just and proper.

Dated:   October 18, 2010
         New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:   /s/ *Thomas Moers Mayer*
Thomas Moers Mayer
Timothy P. Harkness
1177 Avenue of the Americas
New York, New York 10036
Phone: (212) 715-9100
Fax: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors of Motors Liquidation
Company , et al.*

11

KL2 2670799.9