Hearing Date and Time:  October 26, 2010 at 9:45 a.m. (Prevailing Eastern Time)
Objection Date and Time:  October 19, 2010 at 4:00 p.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                                :

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.,* | Case No. 09-50026 |
|     f/k/a General Motors Corp., *et al.,* | (Jointly Administered) |
| Debtors. | Honorable Robert E. Gerber |

------------------------------------------------------------ x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED
OBJECTION TO THE FIRST INTERIM FEE APPLICATION OF
<u>TOGUT, SEGAL & SEGAL LLP</u>**

**TO:    THE HONORABLE ROBERT E. GERBER
         UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company), appointed on December 23, 2009, submits this *Report and Statement of Limited Objection* pursuant to the *Stipulation and Order With Respect to Appointment of a Fee Examiner* [Docket No. 4708] (the "**Fee Examiner Order**") in connection with the *First Application of Togut, Segal & Segal LLP as Conflicts Counsel for the Debtors for Allowance of Interim Compensation for Services Rendered for the Period December 21, 2009 Through May 31, 2010 and for Reimbursement of Expenses* [Docket No. 6543] (the "**Fee Application**").  The Court appointed the Fee Examiner to monitor the fees and expenses incurred by professionals in these chapter 11

cases and to provide periodic reports to the Court, separately or in conjunction with applications submitted for approval by the professionals, with or without a filed objection.

With this *Report and Statement of Limited Objection*, the Fee Examiner identifies $1,989.00 in fees, from a total of $532,471.43 requested in the Fee Application, that are objectionable. The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

The applicant and the Fee Examiner have reached agreement and resolved all concerns about the Fee Application. As adjusted, the amount sought can be approved by the Court.

In general, the Fee Application appears substantively sound, prepared with apparent care. It requests a total of $532,471.43. Nonetheless, after reviewing the Fee Application, counsel for the Fee Examiner raised some preliminary concerns with Togut, Segal & Segal LLP ("**Togut Segal**") by letter dated October 5, 2010. On October 5, by telephone conference in response to counsel's letter, Togut Segal voluntarily agreed to some of the Fee Examiner's proposed reductions. By letter dated October 7, 2010 ("**Response Letter**"), Togut Segal provided additional information, and the parties have reached a consensual resolution.

This *Report and Statement of Limited Objection* summarizes the Fee Examiner's analysis in support of a total suggested disallowance of $1,989.00 in fees from a total request of $532,471.43 in compensation and expenses.

## BACKGROUND

1. Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors

2

are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan and Disclosure Statement [Docket Nos. 6829 and 6830]. Plan confirmation is anticipated before—or soon after—year-end.

3. On January 14, 2010, the Debtors' counsel filed the *Application of Debtors for Entry of Order Pursuant to 11 U.S.C. § 327(a) Authorizing the Employment and Retention of Togut, Segal & Segal LLP as Conflicts Counsel for the Debtors Nunc Pro Tunc to December 21, 2009* (the "**Retention Application**") [Docket No. 4815]. On January 29, 2010, the Court approved the retention [Docket No. 4898]. Since its retention, Togut Segal has worked primarily on three matters; its work on the $24 million Deutsche Bank set-off motion represents its most significant expenditure of time.

4. According to the Debtors' monthly operating reports, Togut Segal has received payments from the Debtors of $113,000 for services rendered and reimbursement of expenses incurred between December 21, 2009 and May 31, 2010. This includes payment of 80 percent of $4,003.50 in fees and 100 percent of $1,343.21 in expenses billed erroneously. *See* Fee Application at 4 n.1. The Fee Application reflects Togut Segal's unilateral adjustment for the error. *Id.*

5. The Fee Examiner has evaluated the Fee Application, the Retention Application, the retention order, the *Declaration of Albert Togut in Support of Application of Debtors for Entry of Order Pursuant to 11 U.S.C. § 327(a) Authorizing the Employment and Retention of Togut, Segal & Segal LLP as Conflicts Counsel for the Debtors Nunc Pro Tunc to December 21, 2009* [Docket No. 4815, Ex. B] (the "**Togut Declaration**"), and the *Supplement to First Fee*

3

*Application of Togut, Segal & Segal LLP as Conflicts Counsel for the Debtors for Allowance of Interim Compensation for Services Rendered for the Period December 21, 2009 Through May 31, 2010, and for Reimbursement of Expenses* [Docket No. 6544].

6. By correspondence dated October 5, 2010, counsel to the Fee Examiner requested supplemental information from Togut Segal as part of the review of specific matters in the Fee Application. The supplemental information involved:

    A. Project categories;

    B. Monthly budget;

    C. Billing rates/work allocation;

    D. Vague communications and tasks;

    E. Block billing;

    F. Internal and external communications;

    G. Duplicative services;

    H. Pre-retention services/voluntary reductions; and

    I. Fee application services.

Togut Segal provided information in response to these inquiries by telephone conference on October 5 and by letter dated October 7, 2010, and the parties have resolved all outstanding concerns.

## APPLICABLE STANDARDS

7. The Fee Application has been evaluated for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST**

4

**Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order and Quarterly Reporting Order—including the extent, if any, that variation has been expressly permitted by order. In addition, the Fee Examiner has provided Togut Segal with a draft memorandum summarizing the Court's April 29 and July 6, 2010 rulings on fees and expenses.

## COMMENTS

8.  **Task Allocation and Billing Rates**. Services have been provided by three position titles for attorneys—partner, of counsel and associate—and one position title for non-attorneys. The blended rate for Togut Segal's professional services was not disclosed in the application but appears to have been a total blended rate, not including paraprofessionals, of $574.83 an hour. This rate corresponds to an associate-level billing rate. *See* Retention Application at 5.

9.  The Fee Application includes charges associated with rate increases in the five to six percent range for all partners, and one of two of counsel, and a 16.9 percent increase for a single 2008 associate. *See* Fee Application, Ex. 1. Togut Segal adjusts its billing rates on an annual basis, and the increases apparently reflected in the Fee Application seem to have occurred between the *nunc pro tunc* retention date and the Retention Application. Togut Segal has represented that it will not raise its rates without express notice to the Court. Retention Application, ¶ 11.

10. Togut Segal relies, generally, on law clerk assistance. Fee Application, ¶ 56; Response Letter at 4. The Fee Application does not disclose services by any law clerks, however, and the Fee Examiner has not inquired into the use of summer associates. *See In re Motors Liquidation Company, et al.,* First Interim Fee Hr'g Tr. at 19-20, No. 09-50026 (Bankr.

5

S.D.N.Y. Apr. 29, 2010, 5:24 P.M.) [Docket No. 5699] (services provided by summer associates not compensable).

11. In response to the Fee Examiner's inquiry regarding an apparent billing rate discrepancy among three 2008 associates, Togut Segal explained that the billing rate for the 2008 associate whose rate increased by 16.9 percent during the fee period had a different and higher rate based on his greater bankruptcy experience in comparison with his colleagues. Togut Segal explained that the associate had approximately one year of bankruptcy law experience before his formal admission to the bar in 2008. His colleagues had less experience.

*Suggested disallowance for rate issues: none.*

12. **Project Categories**. Togut Segal did not provide a summary identifying the number of hours worked and fees requested for each individual who provided services in each project category. *See* 28 U.S.C. Part 58, Appendix A at (b)(4)(iii)(B) and (C) ("UST Guidelines"). The mandatory fee review process is less efficient when a party in interest must search hundreds of pages in an attempt to track the billing descriptions for professionals who worked limited hours. Togut Segal has stated that it will provide the summary with future monthly fee statements and fee applications.

13. Togut Segal also did not provide a narrative description of each of its project categories. Under the UST Guidelines, a fee applicant is to provide:

> a description of the project, its necessity and benefit to the estate, and the status of the project including all pending litigation for which compensation and reimbursements are requested;

UST Guidelines, § (4)(iii)(A). Togut Segal provided a summary of the substantive work it did but not which project code was used to segregate time from each of the various tasks. Moreover, Togut Segal professionals did not uniformly segregate their time based on the project categories identified in the Fee Application. The failure to segregate time by project category—and to

6

describe each project category in detail—does not meet the UST Guidelines' requirement and increases the amount of time required to review an application for necessity and reasonableness.

14. Togut Segal explained that it strives to ensure that all timekeepers who work on the same matter enter their time under the same project code category. It attributed the misallocation of time in the Fee Application to human error.

*Suggested disallowance for project category deficiencies: none.*

15. **Monthly Budget**. Each professional whose application is subject to review by the Fee Examiner is obligated to "provide to the Fee Examiner a budget for the particular month…setting forth an estimate of the projected fees and expenses for such month[.]" *Stipulation and Order with Respect to Appointment of a Fee Examiner*, ¶ 5 [Docket 4708]. Togut Segal has not served any monthly budgets. This requirement, though separate from the formal fee application requirements and review, provides context about each professional's services. In response to the Fee Examiner's inquiry, Togut Segal explained it had been unaware of the requirement but would provide the budget beginning with October 2010 and it has done so.

16. **Vague Communications and Tasks**. Togut Segal timekeepers generally documented their tasks and communications well. There are some instances, however, of timekeepers listing only some of their activities or some of the participants to a communication and identifying the remainder as "etc." Such practices do not comply with the UST Guidelines that each task be described "in detail." UST Guidelines at (b)(4)(v).

17. Similarly, some timekeepers routinely listed, in a single entry, multiple conferences without identifying the number of conferences or the time involved in each conference. The routine use of such lumping, particularly in a fee application where so many of the services for which compensation is sought relate to conferences of some kind, renders it more

7

difficult to determine the necessity of the services.[1] Togut Segal responded that it tries to include enough detail in time entries so that interested parties can understand the service provided, stating that it would remind its timekeepers to be more specific in the future.

*Suggested disallowance for vague timekeeping: none.*

18. **Block Billing**. Togut Segal timekeepers generally avoided listing more than one activity in each time entry—thereby satisfying on a general level the UST Guidelines rule to avoid block billing. *See* UST Guidelines at § (b)(4)(v).

*Suggested disallowance for block billing: none.*

19. **Internal and External Communications**. A significant percentage of Togut Segal's services were for internal and external communications. At the beginning of a retention, internal communications may be more necessary and more frequent as the professionals gather and analyze background information and define their roles. As the retention progresses, however, the instance and frequency of interoffice conferences should decline.

20. In response to the Fee Examiner's inquiry, Togut Segal responded—not surprisingly—that it uses internal conferences to strategize and coordinate work across professionals. In light of Togut Segal's explanation that it staffed matters with "senior level attorneys," however, the level of conferencing remains a concern. *See* Response Letter at 4. Significant use of experienced attorneys to staff what appear to be largely unrelated matters should reduce the need for extensive internal conferencing. The Fee Examiner does not suggest a disallowance at this time but reserves the right to amend this recommendation in light of Togut Segal's subsequent fee applications.

*Suggested disallowance for excessive conferencing: none at this time.*

---

[1] The total amount spent did not generally exceed 0.5 hours, and this billing practice does not violate the block billing prohibition contained in the UST Guidelines.

8

21.     **Duplicative Services**.  Some services provided by junior associates appear to have been duplicative or unnecessary—for example, in the services provided on the KinderCare matters.  Each of two junior associates in that matter billed substantial time to keep up to date on communications, but their particular role in the matters was unclear from the time detail.  Togut Segal explained that the associates had had distinct roles:  one was responsible for conducting the factual due diligence and the other for conducting case law research.  Upon consideration of the explanation and review of the time detail, the explanation is reasonable.

22.     The Fee Examiner also questioned whether some services performed related to the Deutsche Bank set-off motion had been duplicative.  Most of the substantive work was performed by an of counsel attorney with more than 20 years of experience.  In addition, two partners provided strategy advice.  The Fee Examiner was unable to discern from the time detail or the narrative description the non-duplicative role the two partners played in the matter.

23.     In response, Togut Segal explained that one partner, a bankruptcy attorney who is not a litigator, had principal day-to-day responsibility for the matter, staffed primarily with a senior litigator (of counsel).  This partner has expended on average ten hours each month in his role.  The second partner, in contrast, was only involved in the initial stages of the matter while the overall strategy was developed.

*Suggested disallowance for duplicative services:  none.*

24.     **Pre-retention Services/Voluntary Reductions**.  Togut Segal's request for compensation includes a voluntary reduction of $5,346.71 for pre-retention fees ($4,003.50) and misidentified expenses ($1,343.21) erroneously invoiced to the Debtors.  *See* Fee Application at 4 n.1.  In response to the Fee Examiner's calculation of a total of $4,092.50 in pre-retention fees, Togut Segal agreed to an additional voluntary reduction of $89.00.  Togut Segal has not

9

written off any additional amount, in the exercise of its billing judgment, other than those identified above.

*Agreed reduction for pre-retention fees:  $89.00.*

25. **Fee Application Services**.  The Fee Examiner identified several hours billed at full rates for reviewing and revising Togut Segal's time detail.  Such services are compensable at 50 percent.  *In re Motors Liquidation Company, et al.,* Second Interim Fee Ruling Tr. at 8-15, No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010) [Docket No. 6369].  In response to the Fee Examiner's inquiry, Togut Segal voluntarily agreed to a reduction of $1,900, and agreed to segregate and discount fees for reviewing and revising their time detail by 50 percent in future fee applications.

*Agreed reduction for fee application services:  $1,900.*

*Total Fees Suggested for Disallowance:  $1,989.00.*

*Total Expenses Suggested for Disallowance:  $0.*

*Total Fees and Expenses Suggested for Disallowance:  $1,989.00.*

### CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on future interim fee applications or on final fee applications.  All professionals subject to the Fee Examiner review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.  The

conclusions and recommendations in this report are, therefore, subject to further refinement upon each professional's submission of its subsequent and final fee applications.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Fee Application.

Dated: Madison, Wisconsin
October 19, 2010.

                GODFREY & KAHN, S.C.

By:   */s/ Katherine Stadler*
      Katherine Stadler (KS 6831)
      Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: kstadler@gklaw.com
       tnixon@gklaw.com

*Attorneys for Fee Examiner*

5493032_3