CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
Jeffrey A. Cooper, Esq.
Marc D. Miceli, Esq.

ADAMS AND REESE LLP
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
(504) 581-3234
Mark R. Beebe (*pro hac pending*)
Johnny L. Domiano (*pro hac pending*)
David C. Coons (*pro hac pending*)

*Attorneys for Leson Chevrolet Company, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                              Chapter 11

**MOTORS LIQUIDATION COMPANY,** *et al.*            Case No.: 09-50026 (REG)
            **f/k/a General Motors Corp.,** *et al.*

                        **Debtors.**
------------------------------------------------------------x

**Leson Chevrolet Company, Inc.'s Memorandum in Opposition to**
**Motion of General Motors LLC to Enforce 363 Sale Order and Approved Deferred**
**Termination Agreements against Rose Chevrolet, Inc., Halleen Chevrolet, Inc., Andy**
**Chevrolet Company, and Leson Chevrolet Company, Inc.**

# TABLE OF CONTENTS

I.  **RELIEF REQUESTED**..................................................................................................1

   A.  The Facts and Law Applicable to Leson's Position before this Court are different from those of the Other Delaers and Leson Should be Severed from this Motion. ............1

   B.  This Court's Jurisdiction over Dealers that Won in Arbitration is Non-Exclusive............3

   C.  This Court Should Exercise Permissive Abstention and Defer Questions of State Law to a Louisiana Agency or Court....................................................................3

   D.  Unique Questions of Law and Fact Necessitate a Stay of this Proceeding Pending Discovery...............................................................................................................4

II.  **BACKGROUND** ....................................................................................................5

   A.  GM's 2009 "Wind-Down" of Leson's Dealership .........................................................5

   B.  GM's Bankruptcy and 363 Sale.....................................................................................5

   C.  Passage of Section 747: "The Dealer Arbitration Act" .....................................................6

   D.  Leson's Arbitration Award against GM .........................................................................6

   E.  GM's Failure to Comply with Section 747 .....................................................................7

   F.  Leson's Complaint to Enforce its Rights, Followed by GM's Instant Motion ..................8

III.  **ANALYSIS** ........................................................................................................10

   A.  This Court Does Not have Exclusive Jurisdiction over Leson's Claim. ...........................10

     1.  Congress Purposefully Altered this Court's Jurisdiction by Enacting Section 747 .....10

     2.  Louisiana Law Governs Leson's Relationship with GM. .......................................12

       a.  Leson's Reinstatement through Section 747 Arbitration Voids GM's 2009 "Wind-Down" Agreement.......................................................................12

       b.  The "Wind-Down" Agreement is now Void for Lack of Cause under Louisiana Civil Law ......................................................................................13

       c.  GM's Proposed Letter of Intent Violates Section 747 and is a Void as Leson Signed it under Duress........................................................................15

       d.  Louisiana has a Strong Public Interest in Regulating the Relationship Between Leson and GM. ..........................................................................17

     3.  Leson Properly sought to enforce its reinstatement rights before the LMVC..............19

   B.  Alternatively, if this Court Maintains that it Enjoys Exclusive Jurisdiction over Leson's Claim, this Court Should Enforce Leson's Reinstatement.................................................22

     1.  Leson Requests Discovery Concerning its Dispute with GM ....................................22

     2.  Leson Won its Arbitration. ..................................................................................23

     3.  Because Leson won Reinstatement through Arbitration, *Rally* is Inapplicable. ...........24

(continued)

4.  GM's Letter of Intent is Neither "Customary" nor "Usual," as Required by
Section 747. ...................................................................................................................25

   a.   GM Must Offer Leson a Dealer Sales and Service Agreement, not an
        Amended "Wind-Down" Agreement .......................................................25

   b.   GM's Capital Requirement is Commercially Unreasonable. ...................27

   c.   GM Admits that its Letter of Intent is only for Dealers Reinstated through
        Arbitration. ............................................................................................30

**IV.  CONCLUSION** ....................................................................................................**30**

## TABLE OF AUTHORITIES

**Cases**

*Bains v. Young Men's Christian Ass'n of Greater New Orleans*,
  969 So.2d 646, 649 (La. App. 4 Cir. 2007) .............................................................................13

*Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission*,
  403 So.2d 13, 16 (La. 1981) ........................................................................................18, 19

*Forest Homes Dodge, Inc. v. Karns*, 138 N.W. 2d 214, 218 (Wis. 1965) ....................................18

*In re Lyondell Chemical Co., et al*, 2010 WL 1544411, p. 2 (Bkrtcy. S.D. N.Y.) .....................3, 4

*Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d 556, 580 (E.D. N.Y. 1999) ...........................2

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir.),
  *cert. denied*, 488 U.S. 848, (1988) ............................................................................................2

**Statutes**

28 U.S.C. 1334 ........................................................................................................................3

28 USC 1441 .........................................................................................................................21

La. Civil Code art. 1 ...............................................................................................................13

La. Civil Code art. 1953 ..........................................................................................................16

La. Civil Code art. 1962 ..........................................................................................................16

La. Civil Code art. 1966 ..........................................................................................................13

La. Civil Code art. 1967 ..........................................................................................................13

La. R.S. 32:1251 ..........................................................................................................17, 18, 20

La. R.S. 32:1253 ..............................................................................................................17, 20

La. R.S. 32:1261 .....................................................................................................12, 18, 19, 20

Consolidated Appropriations Act, 2010,
  Public Law 111-117, 123 Stat. 3219, §747 (2009) ...........................1, 3, 6, 7, 11, 17, 25, 26, 30

**Other Authorities**

Litvinoff, Saúl, "Still Another Look at Cause," 48 La. L. Rev. 3, 8-9 (1987) ..............................13

# EXHIBIT LIST

Exhibit "A".......... Consolidated Appropriations Act, 2010, Public Law 111-117, 123 Stat. 3219, §747 (2009), ("**Section 747**").

Exhibit "B".......... Transcript of this Court's October 4, 2010, hearing ("***Rally* Transcript**").

Exhibit "C".......... Written Determination of Arbitrator.

Exhibit "D".......... Neil Roland, *U.S. opens investigation of possible illegal activity in dealer cuts*, Automotive News, Oct. 14, 2010.

Exhibit "E".......... June 28, 2010, correspondence of Leson to GM.

Exhibit "F"........... July 1, 2010, correspondence of Leson to GM.

Exhibit "G".......... June 21, 2010, correspondence of GM to Leson.

Exhibit "H".......... Congressional Record concerning Section 747, 155 Cong. Rec. H14477 (2009).

Exhibit "I" ........... September 13, 2010, correspondence of Leson's counsel to the Louisiana Motor Vehicle Commission ("**LMVC**").

Exhibit "J" ........... LMVC's September 15, 2010, Interlocutory Cease and Desist Order against GM.

Exhibit "K".......... GM's Notice of Removal in the U.S. District Court for the Eastern District of Louisiana.

Exhibit "L" .......... Wind-Down Agreement.

Exhibit "M" ......... July 2, 2010, correspondence of GM to Leson.

Exhibit "N".......... October 18, 2010, remand Order & Reasons of the U.S. District Court for the Eastern District of Louisiana.

Exhibit "O".......... GM's Capital Standard Addendum to Leson's November 1, 2005, Dealer Sales and Service Agreement.

Exhibit "P"........... Net Working Capital Standard Computations Balance Sheet, by GM during Leson's arbitration.

Exhibit "Q".......... §1746 Declaration of Lisa Rebowe.

Exhibit "R" .......... Robert Schoenbergert, *GM sues Hallen Chevrolet and Sims Chevrolet as they fight to keep their franchises*, Cleveland Plain Dealer, Oct. 11, 2010.

Exhibit "S"........... September 28, 2010, remand Order of U.S. District Court for the Middle District of Florida in re: *BGR v. Chrysler Group LLC*.

Exhibit "T" .......... October 18, 2010, Order of the U.S. District Court for the Eastern District of Louisiana, staying its remand Order.

## I.    RELIEF REQUESTED

1.    Leson Chevrolet Company, Inc., ("**Leson**") submits this Memorandum in Opposition to the Motion of General Motors LLC ("**New GM**") to Enforce 363 Sale Order and Approved Deferred Termination Agreements against Rose Chevrolet, Inc., Halleen Chevrolet, Inc., Andy Chevrolet Company, and Leson ("**GM's Motion**" or "**this Motion**")

2.    Simply put, this Court's 363 Sale Order and Old GM's "Wind-Down" Agreements do not govern Leson's relationship with New GM.  Leson **won reinstatement** to the Chevrolet dealer network through Congressionally-mandated arbitration.  Unlike Rose, Halleen, Andy, or Rally, Leson seeks <u>enforcement</u>—not judicial review—of its arbitration order.  This Court does not maintain exclusive jurisdiction over Leson's claim for enforcement of its reinstatement order.  **New GM's Motion should be DENIED as to Leson.**

### A.    The Facts and Law Applicable to Leson's Position before this Court are different from those of the Other Delaers and Leson Should be Severed from this Motion.

3.    In light of the Court's October 4th ruling in *Rally*, GM argues that the claims of Rose, Halleen, Andy, and Leson are <u>all</u> barred by the "Wind-Down" Agreements and this Court's 363 Sale Order.  *See* GM's Motion, Doc. #7269, at ¶ 3.  Leson is situated differently than the other dealers, however, and *Rally* is inapplicable to Leson's claim.  Unlike Rally Auto Group or any of the other dealers in this Motion, Leson <u>won</u> reinstatement of its dealership through Congressionally-mandated arbitration.  *See* Consolidated Appropriations Act, 2010, Public Law 111-117, 123 Stat. 3219, §747 (2009), ("**Section 747**"), attached as Exhibit "A."  Leson now seeks enforcement of the §747 arbitrator's reinstatement ruling.  Much of GM's Motion focuses on Congress' purported reluctance to grant judicial review of arbitration awards.  *See* GM's

Motion, Doc. #7269, at ¶¶ 31-40.  Leson does not seek judicial review, and certainly did not seek this court to enforce its winning arbitration award.

4.      Because Leson's position differs from Rally's and the other dealers', **this court should sever Leson from this Motion**.  All the factors that this court should consider favor severance:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d 556, 580 (E.D. N.Y. 1999) (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir.), *cert. denied*, 488 U.S. 848, (1988)).

5.      GM brings this Motion against four dealers.  The dealers are not part of the same transaction or occurrence.  Leson's factual situation is particularly unique as it is the only dealership that won its arbitration and is still being denied reinstatement.[1]  Leson challenges the "wind-down" agreement's applicability under Louisiana law and Section 747 now that Leson won its arbitration.  Lumping Leson into this hearing with dealerships that lost their arbitrations prejudices Leson.  In order to properly consider Leson's factual and legal questions, such as what constitutes a "customary and usual" letter of intent under Section 747 (which is not an issue germane to the other dealerships), Leson must present different witnesses and documentary proof than the other dealers.  Leson should be afforded its own hearing so that this Court may fully consider Leson's jurisdictional and substantive arguments separate from the unsuccessful dealerships' claims.

---

[1] Leson is presumably the only dealer anywhere to win arbitration and still be denied reinstatement by GM.  If there were other such dealers, GM would have named them here or otherwise sought to bring them before this Court.

**B.    This Court's Jurisdiction over Dealers that Won in Arbitration is Non-Exclusive**

6.    This Court does not have exclusive jurisdiction over Leson's claim brought before the Louisiana Motor Vehicle Commission ("**LMVC**").  Congress intentionally altered this Court's jurisdiction over GM's "wind-down" agreements by enacting Section 747.  After winning its arbitration for reinstatement, Leson now urges that GM has failed to comply with Section 747.  Leson's claim does not impact the Court's 363 Sale Order or Deferred Termination Agreements.  Furthermore, and significantly, Congress provided that all arbitrations would take place in the dealer's home state.  *See* §747(e).  It is inconsistent with Section 747 to suggest that now all dealers that won reinstatement through arbitration in their home state <u>must</u> then come to this Court to seek enforcement of its award.[2]

**C.    This Court Should Exercise Permissive Abstention and Defer Questions of State Law to a Louisiana Agency or Court**

7.    Leson's dispute with GM directly implicates Louisiana law, including an express public policy to regulate automobile retail sales and Civilian principles of cause and duress.  Leson's purported contracts with GM, including the 2009 "wind-down" agreement and 2010 Letter of Intent, are invalidated by these Louisiana doctrines.  For this reason, this Court should exercise its permissible abstention under 28 U.S.C. 1334 and defer these questions of state law to a Louisiana agency or court.

8.    In a separate case earlier this year concerning a debtor's possible tax liability under Texas law, your Honor explained that, "[…] six factors are appropriate to determine whether discretionary abstention under §1334(c)(1) is appropriate."  *In re Lyondell Chemical Co., et al*, 2010 WL 1544411, p. 2 (Bkrtcy. S.D. N.Y.).  One such factor is, "the complexity of

---

[2] Out of over 1,200 dealers that filed for arbitration with GM, only thirty-nine dealers were successfully reinstated. *See* Robert Schoenbergert, *GM sues Hallen Chevrolet and Sims Chevrolet as they fight to keep their franchises*, Cleveland Plain Dealer, Oct. 11, 2010,  attached as Exhibit "R."

the issues to be decided." *Id*. In *Lyondell*, your Honor found in favor of abstention because, although this Court is familiar with valuing businesses and real estate, the case involved complex issues of Texas law where your Honor would, "be starting from scratch." *Id*. Similarly, Leson presents questions of Louisiana law unique to the state's Civilian tradition that are appropriate for a Louisiana forum. In *Lyondell*, this Court found that abstention might prejudice the parties if the debtor was, "without a forum where it could seek and obtain judicial review of its assessment." *Id*. at p. 4. Here, however, New GM would not be prejudiced by this Court's abstention, because the LMVC provides a forum for adjudicating Leson's claim for reinstatement.

> **D.    Unique Questions of Law and Fact Necessitate a Stay of this Proceeding Pending Discovery.**

9.    Should this court find that it has exclusive jurisdiction over Leson's claim— which Leson respectfully denies —**Leson requests a stay to conduct discovery** as to whether GM's Letter of Intent issued to Leson is "customary and usual," what capital amounts GM requires of other dealers, the appropriate amount of capital in Leson's case, and related topics.[3] Simply put: Leson's rights as a reinstated dealer differ from those of dealers that lost in arbitration. This court recognized as much in its October 4th hearing: "to the extent Rally was successful in the arbitration, of course that would be a defense to win any effort to make it terminate its agreement." *See* transcript of this Court's October 4, 2010, hearing ("***Rally Transcript***"), Exhibit "B," at p. 47:12-14.

10.    GM's requested relief—to terminate Leson—is contrary to what Congress provided in Section 747. To properly hear Leson's defense to termination and fully consider how a reinstated dealer can enforce its favorable arbitration ruling, this Court should sever Leson

---

[3] Such discovery could not be conducted prior to this hearing since Leson was only given one week to respond to GM's Motion. Leson's request to GM to continue the hearing was refused.

from this Motion, consider Leson's case separately from every other dealer that lost its arbitration with GM, and allow adequate discovery to adjudicate these questions of law and fact.

## II.    BACKGROUND

### A.    GM's 2009 "Wind-Down" of Leson's Dealership

11.    Leson is a Chevrolet dealer in metropolitan New Orleans, Louisiana.  For nearly eighty years, Leson, has prospered and sold Chevrolet vehicles on the Westbank of the Mississippi River.  Despite increased competition, devastating hurricanes, economic upheaval in the auto industry, and record high fuel prices, Leson remained a high-volume Chevrolet dealer and was considered a top 300 dealer in the national Chevrolet dealer network.  *See* Written Determination of Arbitrator, attached as Exhibit "C," at p. 2.

12.    General Motors' struggles are all-too-familiar to this Court.  In May and June of 2009, GM executives told Congress that the manufacturer had to terminate dealers to survive.[4] GM then received $50 billion in government assistance.  On or about May 15, 2009, Leson received a letter from General Motors Corporation ("Old GM") advising that its Dealer Agreement would not be continued beyond October of 2010.  Old GM characterized Leson's termination as a "wind down" process.  Since issuing this "wind down" notice, GM has prevented Leson from buying new GM vehicles or participating in GM programs.

### B.    GM's Bankruptcy and 363 Sale

13.    On June 1, 2009, GM filed a Voluntary Petition with this Court under Chapter 11 of Title 11 of the United State Code (the "Bankruptcy Code").  *See* Doc. #1.  On July 5, 2009, the Court issued a 363 Sale Order authorizing the transfer of certain Old GM assets to a new

---

[4]  The Federal Government is now investigating whether GM mislead the public with this claim.  *See* Neil Roland, *U.S. opens investigation of possible illegal activity in dealer cuts*, Automotive News, Oct. 14, 2010, attached as Exhibit "D."

company ("New GM").   Under the 363 transaction, New GM assumed the Leson wind-down agreement, among others.

### C.    Passage of Section 747: "The Dealer Arbitration Act"

14.    In December, 2009, Congress passed and the President signed Section 747 of the Consolidated Appropriations Act, 2010 ("Section 747" or "The Dealer Arbitration Act").   *See* Section 747, attached as Exhibit "A."   Section 747 gave "covered dealerships" that were not lawfully terminated under applicable state law the "right to seek, through binding arbitration, the continuation, or reinstatement of a franchise agreement […]."   *Id*. at §747(b).   In deciding whether to reinstate a dealer, the arbitrator was charged with balancing the economic interests of the covered dealer, the covered manufacturer, and the public at large.   *Id*. at §747(d).   This required the arbitrator to consider numerous factor, including the dealer's profitability, the "manufacturer's overall business plan," the dealer's "economic viability," the "demographic and geographic characteristics" of the dealer's market territory, and "the length of experience of the covered dealership."   *Id*.

### D.    Leson's Arbitration Award against GM

15.    Firmly believing that its dealership was wrongfully terminated, Leson filed a demand for arbitration against GM pursuant to Section 747.   Leson qualified as a "covered dealership" under the Act because, but for GM's bankruptcy, Leson's Dealership Agreement could not have been terminated under Louisiana law.   Pursuant to Section 747, an evidentiary hearing between Leson and GM was held in New Orleans on June 3 and 4, 2010.

16.    AAA arbitrator A.J. Krouse ruled that Leson "shall be renewed and therefore shall be assumed by the covered manufacturer, in the manner provided for by the Act and in accordance with the terms and conditions of the Act, and shall be added to the dealer network of

General Motors, LLC." *See* Written Determination of Arbitrator, attached as Exhibit "C," at p.

2. The arbitrator found in favor of Leson on each §747 basis for evaluation, meaning that GM

should not have issued Leson a "wind-down" agreement in 2009.

### E.    GM's Failure to Comply with Section 747

17.    Pursuant to Section 747:

> If the arbitrator finds in favor of a covered dealership, the covered manufacturer
> (GM) shall as soon as practicable, but not later than 7 business days after receipt
> of the arbitrator's determination, provide the dealer a customary and usual letter
> of intent to enter into a sales and service agreement.

§747(e). GM has not complied with Section 747. GM demanded that Leson execute a

"Letter of Intent" ("LOI") that was neither customary nor usual. First, GM's proposed LOI is

not a pathway to a sales and service agreement, as mandated by Section 747. GM states that, "if

Leson should timely satisfy the terms and conditions of the LOI, it will operate under an

amended Wind-Down Agreement […]." *See* GM's Motion, Doc. #7269, at ¶ 22 (emphasis

added). To be clear, Section 747 requires GM to offer Leson a new sales and service agreement,

not an amended wind-down agreement. Section 747 allows reasonable operational conditions to

be imposed in the new sales and service agreement, once Leson is fully operating and allowed to

order inventory from GM. Operational prerequisites cannot be imposed in the Letter of Intent,

which is what GM has attempted to do. Further, Section 747 does not allow for an amended

"wind-down" agreement.

18.    Additionally, GM's Letter of Intent requires that Leson provide the same working

capital of $2,850,000 that it asked of Leson in 2003-2008. *See* Written Determination of

Arbitrator, attached as Exhibit "C," at p. 4. This imposition ignores that GM has prevented

Leson from selling new GM vehicles for the past eighteen months after improperly terminating

or "winding down" Leson's dealership. The §747 arbitrator held that, "**Leson has also met**

7

**GM's capital requirements** as these standards have not changed since 2003." *Id.* (emphasis

added).   As GM argued and this Court held in *Rally*, the Section 747 arbitrator's ruling is

immutable and cannot be revisited.   The arbitrator's ruling that Leson met GM's capital

requirements must be sufficient for GM to reinstate Leson now.

19.      Because GM is acting outside the scope of Section 747, Leson attempted to

negotiate with GM concerning the conditions of the LOI.   GM refused to respond to Leson's

calls, letters, or e-mails regarding the terms of the LOI.   *See* June 28, 2010, and July 1, 2010,

correspondences from Leson to GM, attached as Exhibits "E" and "F," respectively.   GM refused

to meaningfully change the terms, instead imposing arbitrary deadlines to comply despite that

Congress imposed no such deadlines in Section 747.   GM threatened that if Leson did not:

> execute and return an unaltered counterpart of [the LOI…] within the ten (10) day
> period, then this Letter of Intent shall be deemed rescinded and this Letter of
> Intent shall be null and void and GM shall have no further obligations.

*See* June 21, 2010, correspondence of GM to Leson, attached as Exhibit "G," at p. 3.   Ultimately,

Leson signed and returned GM's adhesionary LOI under duress and fear of instantly losing its

dealership.

### F.      Leson's Complaint to Enforce its Rights, Followed by GM's Instant Motion

20.      Leson was reinstated to the Chevrolet dealer network pursuant to Federal law.

Congress enacted Section 747 to restore improperly-terminated dealers to the same position as

they were prior to their "Wind-Downs."[5]   For Leson, this meant subjecting itself to state law

governing the sale of motor vehicles   After all, Leson and GM have long been regulated by the

LMVC.   On September 13, 2010, Leson filed a complaint with the LMVC to protect itself

---

[5] *See, e.g.*: Congressional Record concerning Section 747, 155 Cong. Rec. H14477 (2009), attached as Exhibit "H,"
at p. 3 ("Congress has included specific timeliness for this process and we expect both parties to the arbitration to act
in good faith and expeditiously so that added dealers can return to full-fledged operations quickly.") (emphasis
added).

against GM's threats to terminate Leson's dealership on October 31, 2010. *See* September 13, 2010, correspondence of Leson's counsel to the LMVC, attached as Exhibit "I."

21.    Leson explained that, "Under [Section 747] and Louisiana law, GM has an implied duty of good faith and fair dealing toward Leson in reinstating its GM franchise." *Id*. at p. 3. Leson's complaint highlights GM's bad faith acts:

> ➢ "Leson has been unable to order inventory or participate in GM programs since it was wrongfully terminated in June of 2009." *Id*. at pp. 2-3.

> ➢ "GM, however, refuses to take into account Leson's profits and losses during the GM imposed wind-down period for purposes of calculating Leson's working capital requirements." *Id*. at p. 3.

> ➢ "Although Leson and other dealers can borrow their working capital needs if it is secured by real property pursuant to GM's accounting guidelines, no bank or other lender can ignore Leson's financial performance during the wind-down." *Id*.

> ➢ "Wrongfully, GM seeks to ignore completely the financial hardship it imposed upon Leson in 2009 and 2010 through its unlawful termination and instead requires Leson to capitalize the dealership based on its 2008 performance." *Id*.

Leson prayed for, *inter alia*, an order prohibiting GM from terminating Leson's Dealer Sales and Service Agreement. *Id*. at p. 3. The LMVC issued an Interlocutory Cease and Desist Order against GM on September 15, 2010, which barred GM, "from terminating Leson Chevrolet Company, Inc.'s sales and service agreement […]." *See* Exhibit "J."

22.    On September 27, 2010, GM voluntarily filed a Notice removing Leson's action from the LMVC to the United States District Court for the Eastern District of Louisiana. *See* Notice of Removal, attached as Exhibit "K." This court then issued a ruling in the *Rally* case on October 4, 2010. In a blatant attempt at forum shopping, GM filed the instant Motion with this Court. **In the interim, on October 18, 2010, the U.S. District Court for the Eastern District of Louisiana remanded the action <u>initiated by GM</u>,** holding that, the District Court, "lacks subject matter jurisdiction over" a claim pending before a state agency. *See* October 18, 2010,

9

remand Order & Reasons of the U.S. District Court for the Eastern District of Louisiana, attached at Exhibit "N," at p. 3.

## III.    ANALYSIS

### A.    This Court Does Not have Exclusive Jurisdiction over Leson's Claim.

23.    Because Leson was reinstated to the Chevrolet dealer network through Congress' Section 747 Arbitration, Leson is no longer subject to GM's 2009 "wind-down" agreement. While dealers that did not win in arbitration are still governed by the "wind-down" agreement, dealers that were successful in arbitration and ordered reinstated are not governed by the "wind-down." Leson disputes the terms of its Letter of Intent with GM and now GM's arbitrary and wrongful attempt to terminate Leson through this bankruptcy proceeding. The parties are subject to claims under Louisiana and Federal law, but not the exclusive jurisdiction of this Court because Leson—after having successfully won reinstatement in arbitration—is no longer under the "wind-down" agreement approved by this Court.

### 1.    Congress Purposefully Altered this Court's Jurisdiction by Enacting Section 747

24.    GM points out that this Court retains exclusive jurisdiction to enforce and implement the 363 Sale Order and Deferred Termination Agreements. But GM refuses to recognize that Section 747 has a substantial and substantive effect on this Court's jurisdiction and authority to enforce winning arbitration decisions.

25.    Congress enacted Section 747 in December of 2009 as part of its Consolidated Appropriations Act. *See* Section 747, attached as Exhibit "A." This legislation came a full five months after this Court approved GM's 363 Sale. Although GM's Wind-Down agreements and pending bankruptcy kept dealers like Leson from appealing their terminations, Section 747 was enacted thereafter to specifically allow dealerships to seek reinstatement through binding

10

arbitration.  *See* §747(b).  The Act provided for administration of these proceedings by the American Arbitration Association ("AAA") <u>and for hearings in a dealer's home state</u>.  *See* §747(e) (emphasis added).

26.    Congress enacted Section 747 with full knowledge of GM's wind-down agreements and this Court's 363 Sale Order.  In doing so, Congress amended and abridged unequivocally this Court's jurisdiction to administer the transfer of the wind-down agreements from Old GM to New GM.  Section 747 offered a mechanism for terminated dealers to be reinstated into New GM's dealer network.  Section 747 specifically required that the arbitration, "[…] be conducted in the State where the covered dealership is located."  *Id*.  Leson seeks to enforce the arbitration order rendered in its favor.  It is incongruent to suggest that Congress intended every reinstated dealer to come to this Court to enforce a Section 747 Arbitration when Congress required each reinstatement arbitration to take place in the dealer's home state.  *See* §747(e).  Notably, there were only thirty-nine dealers that succeeded in arbitration out of more than 1,200 that filed for arbitration.  *See* Robert Schoenbergert, *GM sues Hallen Chevrolet and Sims Chevrolet as they fight to keep their franchises*, Cleveland Plain Dealer, Oct. 11, 2010, attached as Exhibit "R."  GM, itself, went to Louisiana to fight against Leson's reinstatement in arbitration.  Later, GM went to Louisiana to remove Leson's LMVC action to the District Court.[6] GM would not incur great inconvenience and expense by defending its Letter of Intent in Louisiana, especially since Leson seems to be the only dealer that won arbitration still not fully reinstated.

---

[6] Again, the U.S. District Court for the Eastern District of Louisiana remanded the case on October 18, 2010. *See* October 18, 2010, remand Order & Reasons of the U.S. District Court for the Eastern District of Louisiana, attached at Exhibit "N."

2.    **Louisiana Law Governs Leson's Relationship with GM.**

a.    **Leson's Reinstatement through Section 747 Arbitration Voids GM's 2009 "Wind-Down" Agreement.**

27.    GM's argument that, "the Wind-Down Agreement controls no matter what," is unconvincing. *See* GM's Motion, Doc. #7269, at ¶ 22. In May, 2009, Leson and GM executed a "wind-down" agreement to ultimately close Leson's dealership. *See* Wind-Down Agreement, Exhibit "L." This agreement specified that Leson would continue operating its Chevrolet dealership until termination, "which shall not occur earlier than January 1, 2010 or later than October 31, 2010 […]." *Id*. at §2(a). The "wind-down" agreement also contained a covenant not to sue GM or any of GM's affiliates. *Id*. at §5. In return, GM offered Leson, which has been in business for nearly eighty years, a "wind-down payment" of $1,000,000. *Id*. at §3(a). For context, the arbitrator found that Leson earned a profit <u>for GM</u> of $8.88-$10.62 million in 2007 and $6.17-$7.35 million in 2008. *See* Written Determination of Arbitrator, exhibit "C," at p. 3.

28.    Leson did not want to lose its profitable, high-volume dealership. But Leson executed GM's proposed "wind-down" agreement because Leson had no choice. Leson feared that GM could otherwise terminate the dealership immediately. GM clearly provided that the "wind-down" agreement, "shall be null and void if not executed by dealer and received by GM on or before June 12, 2009, or if dealer changes any term or provision herein." *Id*. at p. 9.

29.    The 2009 "wind-down" agreement was a product of Old GM's bankruptcy. GM could not have terminated Leson were it not for the bankruptcy. After all, Louisiana law prohibits the nonrenewal of a dealer's franchise agreement, "solely for failure to meet performance standards based on a survey of sales penetration […]." La. R.S. 32:1261(1)(d). The "wind-down" agreement, however, no longer governs GM's relationship with Leson (as opposed to GM's relationships with dealers that lost in arbitration). Congress offered dealers a

12

path out of their deferred terminations by enacting Section 747. As explained, *supra*, Leson exercised its right to arbitration with GM under Section 747, and the arbitrator ruled that Leson should be reinstated to GM's dealer network. *See* Written Determination of Arbitrator, Exhibit "C," at p. 8.

### b. The "Wind-Down" Agreement is now Void for Lack of Cause under Louisiana Civil Law

30. When the arbitrator awarded Leson's reinstatement on June 18, 2010, the wind-down agreement was rendered void for lack of cause. Under Louisiana law, "[c]ause is the reason why a party obligates himself." La. Civil Code art. 1967.[7] As the late Saúl Litvinoff explains, "[a]n obligation must not only have a cause, but that cause must be lawful, that is, neither illegal nor immoral, nor contrary to public policy. A cause is illegal when it is forbidden by law." *See* Litvinoff, Saúl, "Still Another Look at Cause," 48 La. L. Rev. 3, 8-9 (1987). Professor Litvinoff clarifies this unique aspect of Louisiana law:

> At common law, lack of consideration is a good reason to deny enforceability of a promise. In civilian systems derived from the French, such as the Louisiana system of private law, absence of cause, or unlawfulness or immorality of the cause, is a good reason to deprive an obligation of its legal effect.

*Id*. at 3. It is a basic tenant of Louisiana's civilian tradition that, "an obligation cannot exist without a lawful cause." La. Civil Code art. 1966.[8]

31. Leson's reason or "cause" for executing the "wind-down" agreement was to avoid immediate termination, remain in operation, "wind-down" its business towards closing it doors after eighty years of business, and to receive the $1 million transition payment as opposed to

---

[7] Louisiana's civilian tradition recognizes that, "the sources of law are legislation and custom." La. Civil Code art. 1.

[8] "[…] unlike the common law analysis of a contract using consideration which requires something in exchange, the civil law concept of 'cause' can obligate a person by his act of the will. The difference has been analogized to a civilian contract-consent approach compared to a common law contract-bargain approach. Consideration is an objective element required to form a contract, whereas cause is a more subjective element that goes to the intentions of the parties." *Bains v. Young Men's Christian Ass'n of Greater New Orleans*, 969 So.2d 646, 649 (La. App. 4 Cir. 2007) (emphasis added).

being immediately terminated.  This "cause" fails or is extinguished in light of Section 747 and the arbitrator's order reinstating Leson.  Because Leson won reinstatement through a Congressionally-ordered arbitration, GM can no longer terminate Leson.  Thus, Leson's cause to enter into the "wind-down" agreement is no longer valid.  Pursuant to the Section 747, GM is now obliged to issue Leson a "customary and usual" letter of intent for a new dealer sales and service agreement.  GM cannot terminate Leson on October 31, 2010, under the original wind-down agreement, which has now been extinguished  because the cause for which Leson entered into the "wind-down" agreement no longer exists, and the agreement is invalid under Louisiana law.[9]  Further, the termination would violate the Section 747 arbitrator's order and the Louisiana Motor Vehicle Commission's Interlocutory Cease and Desist Order.  *See* Exhibits "C" and "J," respectively.

32.    Section 747 and Leson's subsequent arbitration victory renders GM's "wind-down" agreement without cause and thus moot.  It is important to remember that, if a dealer loses in arbitration, it is still governed by its "wind-down" agreement.  But if a dealer wins, like Leson did, then Section 747 makes certain that the dealer cannot be wound-down.  Because this matter no longer involves Leson's "wind-down" agreement that Old GM transferred in its 363 Sale, this Court does not maintain sole and exclusive jurisdiction over Leson's ability to enforce its arbitration judgment.  Further, the above analysis highlights the unique questions of state law—such as cause, Louisiana public policy, and Louisiana's vehicle manufacturer franchise regulations—that a court or agency must tackle to enforce Leson's arbitration order.  It is unreasonable to conclude that Congress intended that a single Court, including this Court, would

---

[9] In addition to Section 747 prohibiting GM from terminating Leson, the parties are still under the Louisiana Motor Vehicle Commission's September 15, 2010, Interlocutory Cease and Desist Order, attached as Exhibit "J."

have the exclusive jurisdiction to decide unique and different state law principles to enforce each

and every dealer reinstatement.

### c.   GM's Proposed Letter of Intent Violates Section 747 and is a Void as Leson Signed it under Duress.

33.   Leson is not governed by the Letter of Intent that GM proposed on June 21, 2010.

Much like GM's 2009 "wind-down" agreement, GM offered its LOI in non-negotiable terms:

> [if] Dealer Company (Leson) does not execute and return an unaltered counterpart
> of this Letter of Intent to the undersigned (GM representative) within the ten (10)
> day period, then this Letter of Intent shall be deemed rescinded and this Letter of
> Intent shall be null and void and GM shall have no further obligations.

*See* June 21, 2010, correspondence of GM to Leson, attached a Exhibit "G," at p. 3.   Further, the

LOI required Leson to maintain net working capital in the amount of $2,850,000.   *Id*. at p. 2.

And inconsistent with 747, GM offered that Leson's execution of the LOI would entitle the

dealership to a "Wind-Down Amendment."   *Id*. at p. 1.

34.   Leson wrote GM and expressed its concerns that GM's proposed LOI was

inconsistent with it reinstatement rights.   *See* June 28, 2010, correspondence of Leson to GM,

attached as Exhibit "E."   Leson specifically took issue with GM's capital requirement (discussed

more fully, *infra*).   *Id*. at p. 2.   Leson also explained that Section 747 requires a reinstated dealer

to be granted a Letter of Intent to enter into a sales and service agreement, not an "Amended

Wind-Down Agreement," as GM offered.   *Id*. at p. 1.   After receiving no response to its June

28th correspondence, and cognizant of GM's arbitrary deadline for executing the LOI, Leson

again wrote GM three days later to reiterate its objections to the LOI.   *See* July 1, 2010,

correspondence of Leson to GM, attached as Exhibit "F."   In that July 1st follow-up

correspondence, Leson included an executed copy of GM's proposed Letter of Intent.   *Id*.   Leson

executed the LOI out of duress and fear for losing its dealership immediately.   But Leson

15

executed the LOI under protest, declaring that, "GM's letter of intent is adhesionary." *Id*. Only after Leson executed the LOI did GM generically reply that it, "believes that its Letter of Intent fully complies with the Arbitration Statute." *See* July 2, 2010, correspondence of GM to Leson, attached as Exhibit "M."

35.    La. Civil Code article 1959 states that, "Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." GM's unwillingness to negotiate the terms of its LOI made Leson fear for losing its dealership immediately, which would cause considerable injury to the nearly eighty year-old business. GM's behavior also qualifies as fraud in the inducement. La. Civil Code article 1953 provides that, "Fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

36.    It is simply not true that Leson had to sign GM's Letter of Intent or be terminated—Leson has an absolute defense to termination based on its Section 747 arbitration order. Much like the French equivalent of "*dol*," intentional fraud in Louisiana need not be a criminal act. *See* La. Civil Code art. 1953, cmt. (c). GM asserted that it could terminate Leson's dealership immediately if Leson did not execute the LOI. This representation was calculated to induce Leson to sign a Letter of it Intent that it would not have otherwise considered. This kind of fraud vitiates Leson's consent to the LOI. *Id*.

37.    La. Civil Code art. 1962 provides that, "[a] threat of doing a lawful act or a threat of exercising a right does not constitute duress." But GM could not exercise a right to impose unreasonable timelines or conditions on Leson to sign the LOI because no such timelines or

conditions were granted or allowed by Section 747.  GM and Leson are not governed by this contract.

>    **d.    Louisiana has a Strong Public Interest in Regulating the Relationship Between Leson and GM.**

38.    Another reason that Louisiana law governs the GM-Leson relationship is that the state must maintain its sovereign authority to regulate Louisiana businesses.  *See, e.g.*: La. R.S. 32:1253 (empowering the LMVC to enforce Louisiana statutes governing retail automotive franchising); *see also*: La. R.R. 32:1251 (in the exercise of its police powers, it is necessary to regulate "and avoid undue control of the independent motor vehicle dealer […] by their motor vehicle manufacturing and distributive organizations […].").  For years, the relationship between GM and Leson has been subject to Louisiana statutes governing new automobile sales and dealer franchising.  *See* La. R.S. 32:1251, et seq.  GM was allowed to circumvent these regulations and attempt to terminate Leson because of Old GM's bankruptcy.  But Leson ultimately won reinstatement to the Chevrolet dealer network through Federal law.  Section 747 granted an arbitration right to any dealer that was, "not lawfully terminated under applicable State law […]."  *See* §747(b).  Once the arbitrator ruled that GM impermissibly "wound down" Leson in 2009, GM's "Deferred Termination Agreement" stopped governing its relationship with Leson.  By default, the parties are now governed by Louisiana law, including Louisiana's well-established motor vehicle regulations.

39.    GM argues that, "there are strong policy reasons for vesting exclusive jurisdiction of post-sale disputes over a sale order in the bankruptcy court that approved it […]."  *See* GM's Motion, Doc. #7269, at ¶ 7.  But GM mistakes the argument.  Leson's disagreement with GM is not a post-sale dispute.  This matter is about Leson's reinstatement, which the arbitrator ordered. GM has not complied with Section 747 to reinstate Leson's dealership.  If GM succeeds in

characterizing this as a post-sale dispute, then all dealers will have to come to this Court to interpret each state's law any time that a reinstated dealer has a dispute with New GM. When would this Court's exclusive jurisdiction end under such a scenario?

40.     Importantly, in the *Rally* hearing, this Court astutely recognized that, "comity is a factor that I would take into account if there were, as contrasted to here, strong state law concerns." *See Rally* transcript, Exhibit "B," at 49:16-18. Louisiana has a vital interest in administering the relationship between manufactures and vehicle dealers in the state. The Louisiana legislature enacted its auto sales regulations to, "[…] avoid undue control of the independent motor vehicle dealer and recreational products by their motor vehicle manufacturing and distributive organizations and foster and keep alive vigorous and healthy competition […]." *See* La. R.S. 32:1251. Surveying the history of state laws protecting automobile dealers, the Louisiana Supreme Court explains that, "the purpose of the law [is] 'to furnish the dealer with some protection against unfair treatment by the manufacturer.'" *Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission*, 403 So.2d 13, 16 (La. 1981) (quoting *Forest Homes Dodge, Inc. v. Karns*, 138 N.W. 2d 214, 218 (Wis. 1965)). Louisiana's regulations balance the bargaining power between dealers and powerful multi-national manufactures like GM. GM's attempt to terminate Leson, even after Leson won reinstatement through arbitration, is the type of wrongful behavior that Louisiana has chosen to regulate. GM is not prohibited from non-renewals, but Louisiana law prohibits the nonrenewal of a franchise without just cause. La. R.S. 32:1261(1)(d)

41.     Louisiana's laws apply to Leson and GM now that Leson is no longer in "wind-down." Leson's dispute with GM is akin to one that GM might have with a new dealer.

18

Therefore, this Court should exercise discretion to defer to the LMVC or, alternatively, courts in Louisiana, to interpret and enforce Louisiana law.

### 3. Leson Properly sought to enforce its reinstatement rights before the LMVC.

42.    Louisiana regulates dealer/manufacturer relationships in the state:

the legislature created an eight member Motor Vehicle Commission, empowered to regulate the automobile industry in order to prevent frauds and abuses upon the citizens of Louisiana by automobile dealers and manufacturers, and to forestall undue control and unfair trade practices imposed upon dealers by manufacturers.

*Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission*, 403 So.2d at 17 (La. 1981).

43.    Because GM was violating state law and Section 747, Leson brought a claim against GM with the Louisiana Motor Vehicle Commission.  *See* September 13, 2010, correspondence of Leson's counsel to the LMVC, attached as Exhibit "I."  Leson went to the LMVC to enforce the arbitrator's order that GM reinstate Leson as a Chevrolet dealer.  La. R.S. 32:1261(B)(1) and (3).  Because GM refused to offer Leson a sales and service agreement as required by Section 747, Leson feared that GM would move to terminate the dealership.  Leson sought, and received, an Interlocutory Cease and Desist Order against GM from the LMVC on September 15, 2010.  *See* Exhibit "J."  The Order recognized that GM was acting, "in violation of the rights of Leson Chevrolet Company, Inc." and that, "substantial injury to the rights of [Leson] is threatened irrespective of any remedy at law."  *Id*. at p.1.  This order is currently in place and this Court must address how it can abrogate and over-rule this order without offending traditional notions of comity and states' rights.

44.    As the winner of its Section 747 arbitration, Leson had the right to chose its forum for enforcing the arbitrator's order.  Rule 48(c) of AAA's Commercial Arbitration Rules states

19

that, "parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof."   Although GM urged in *Rally* that it did not consent to Rule 48(c), this Court recognized that "to the extent Rally was successful in the arbitration, of course that would be a defense to win any effort to make it terminate its agreement."  *See Rally* transcript, Exhibit "B," at p. 47:12-14.  Unlike Rally, or any other dealers subject to GM's current Motion, Leson <u>was</u> successful in arbitration.  Leson's order of reinstatement is a defense to GM's attempted termination of Leson's dealership.  Leson was the first to seek enforcement of the arbitrator's order, and its choice of forum should be honored.

45.    Leson went to the LMVC to avail itself of administrative remedies to which it is rightfully entitled and to seek enforcement of its reinstatement rights.  The LMVC's role is to fully enforce Louisiana's laws governing the sale of motor vehicles.  La. R.S. 32:1253(E).  As the agency charged with preventing, "undue control of the independent motor vehicle dealer […] by [its] motor vehicle manufacturing and distributive organizations," the LMVC is specialized in resolving disputes between dealers and manufacturers.  La. R.S. 32:1251.  The LMVC is,

> […] <u>expressly empowered and authorized to order the renewal or reinstatement,</u> as the case may be, of any franchise of a licensee which, after following the procedures under this Chapter, is found by the commission to have been unfairly cancelled or not renewed due to lack of provocation or cause.

La. R.S. 32:1261(B)(1) (emphasis added).  In light of GM's arbitrary and unilateral deadline of October 31st to enter an "amended Wind-Down" agreement, Leson also knew it could rely on the LMVC's accelerated process of adjudication to stop GM's attempted termination and reinstate Leson.

46.    On September 27, 2010, <u>after</u> the LMVC issued its Interlocutory Cease and Desist Order preventing GM from taking further action to harm Leson, GM voluntarily filed a Notice

removing Leson's action from the LMVC to the United States District Court for the Eastern District of Louisiana. *See* Notice of Removal, attached as Exhibit "K." Then, without notice to the LMVC or the District Court, GM filed the instant Motion on October 8, 2010. Procedurally, GM never asked that the LMVC or Eastern District of Louisiana to transfer Leson's case to the Southern District of New York for referral to this Court, pursuant to 28 USC 1441.

47.    On October 18, 2010, the District Court remanded Leson's claim that GM had removed to U.S. District Court for the Eastern District of Louisiana. *See* October 18, 2010, remand Order & Reasons of the U.S. District Court for the Eastern District of Louisiana, attached at Exhibit "N." In so doing, the District Court held that, "since the Louisiana Motor Vehicle Commission does not sufficiently function as a court, the action is not removable." *Id*. at p. 2.[10]

48.    GM first sought to remove Leson's action to the District Court and only filed this Motion against Leson, a non-party, after and in immediate response to your Honor's October 4th ruling in *Rally*. Without notifying counsel for Leson, GM contacted the District Court for a stay of the remand Order, ostensibly to file a motion for reconsideration with the District Court. *See* October 18, 2010, stay Order of the U.S. District Court for the Eastern District of Louisiana, attached as Exhibit "T." Therefore, the District Court's remand Order is stayed until after this Court hears the instant Motion. GM's inappropriate forum-shopping should be rejected.

49.    **This Court should ask why GM seeks to consolidate losing dealers with Leson and why it is the first and only winning dealer which is being hauled from its chosen forum to enforce its reinstatement rights.** GM's attempt to haul Leson (a dealer that won its

---

[10] This ruling is consistent with those in other District Courts weighing the rights of dealerships after Section 747 arbitrations. *See*, *e.g.*: September 28, 2010, remand Order of U.S. District Court for the Middle District of Florida in re: *BGR v. Chrysler Group LLC*, attached as Exhibit "S," at p. 4 ("Nothing in Section 747 provides for the relief which DeLand Doge seeks because the statute does not provide for confirmation of the arbitration […].").

reinstatement through local arbitration) from a state agency to District Court, and then across the country, at great expense to Leson, should not be permitted by this Court.

    **B.**    **Alternatively, if this Court Maintains that it Enjoys Exclusive Jurisdiction over Leson's Claim, this Court Should Enforce Leson's Reinstatement.**

        **1.**    **Leson Requests Discovery Concerning its Dispute with GM**

50.    Should this Court find exclusive jurisdiction Leson respectfully requests discovery so as to ensure a fair hearing. GM's posture with Leson since it issued a "wind-down" letter has been to withhold all information regarding other GM dealers. Throughout arbitration, for example, GM repeatedly denied Leson's requests to discover the performance scores of other dealerships against which Leson was allegedly compared. Now, GM refuses to show how the terms it imposes on Leson compare to those of dealers not reinstated through arbitration. Leson contends that GM treats dealers reinstated through arbitration differently than those that it continued prior to filing bankruptcy.

51.    Discovery is necessary regarding whether GM's Letter of Intent for Leson is "customary and usual" under Section 747. Leson requests discovery concerning, *inter alia*:

> ➢ How many dealers reinstated through Section 747, if any, have been issued new dealer sales and service agreement by GM.
>
> ➢ Whether GM has negotiated the terms of its LOI with other dealers.
>
> ➢ Whether other dealers are required to meet out-dated and improper net working capital requirements.

Leson expects this discovery will prove that:

> ➢ GM has negotiated the terms of its LOIs and net working capital requirements with other dealers.
>
> ➢ GM reinstated dealers that did not met their net working capital requirements.

> ➢ Some dealers that did not meet their net working capital requirements were never "wound down" in 2009 and are currently in operation without 100% of GM's required net working capital.

> ➢ Leson's net working capital requirement is not $2.85 million, based on GM's accounting formula and Leson's operations over the past twelve months.

Leson also requests supplemental briefing at the conclusion of discovery, as this Court's decision regarding Leson may effectively make or break the eighty year-old family business that a Section 747 arbitrator has already reinstated and decided was an asset to GM

### 2.    Leson Won its Arbitration.

52.    The most important fact in this Motion is that Leson won in its Congressionally-mandated arbitration with GM.   After a thorough, two-day arbitration, arbitrator A.J. Krouse took the evidence and live testimony under advisement.   The arbitrator ultimately determined that:

> The covered dealership described above in Section I (Leson) shall be renewed and therefore shall be assumed by the covered manufacturer (GM), in the manner provided for by the Act and in accordance with the terms and conditions of this Act, and shall be added to the dealer network of General Motors, LLC.

*See* Written Determination of Arbitrator, Exhibit "C," at p. 2.   Pursuant to Section 747, the arbitrator's written order included an analysis of ten statutory factors guiding his determination. By way of example, the arbitrator concluded:

> ➢ "GM's profits generated by Leson from 2006-2008 were significant.  In 2006, Leson was ranked No. 5 in Louisiana in new car sales (1958 vehicles) with a profit to GM from $11.29-$13.51 million dollars." *Id*.

> ➢ "Leson's net worth was almost $5.6 million in 2008.  Leson's net worth is 2.5 times the average net worth of dealers in the region." *Id*. at 3.

> ➢ "Leson has also met GM's capital requirements as these standards have not changed since 2003." *Id*. at 4.

> ➢ "The arbitrator finds that Leson has met or exceeded the performance objectives established pursuant to the franchise agreement between the parties for the period at issue." *Id*. at 5.

> ➢ "On balance the Arbitrator finds that the economic interests weighs heavily in favor of reinstating Leson Chevrolet to the dealer network at its present location in Harvey, Louisiana." *Id*. at 7.

> ➢ "The arbitrator finds that Leson Chevrolet has met its burden of proof by establishing by a preponderance of the evidence that it should be reinstated to the dealer network of General Motors, L.L.C., in accordance to the provisions of the Act." *Id*. at 8.

53.    Simply put: GM got it wrong when it issued Leson a "wind-down" agreement in 2009.  The arbitrator's decision shows that this was not a close call.  Leson should have been continued as a fully-operating dealer with New GM.  Given how profitable Leson has been, and how adamant GM remains about terminating Leson, it's no wonder that <u>Automotive News</u> recently reported that federal inspectors have opened an investigation of possible illegal activity behind effort to terminate about 2,300 General Motors and Chrysler dealers.  *See* Neil Roland, *U.S. opens investigation of possible illegal activity in dealer cuts*, Automotive News, Oct. 14, 2010, attached as Exhibit "D."  This background helps to put Leson's current claim dispute with GM in proper context—GM refuses to honor its legal obligations to Leson.

### 3.    Because Leson won Reinstatement through Arbitration, *Rally* is Inapplicable.

54.    GM filed this Motion, "[b]ased on this Court's ruling in *Rally*, decided on October 4, 2010 […]."  *See* GM's Motion, Doc. #7269, at ¶ 3.  But the Court's October 4th determinations do not apply to Leson because Leson won reinstatement.  **In fact, Rally Auto (to the extent of its Motion) and the dealerships in this Motion (other than Leson) <u>all</u> lost their bids for reinstatement through Section 747**.  All of those dealerships sought judicial review of their arbitration decisions in District Courts.  Your Honor found that such right of review does

not exist, and GM's Motion focuses on that finding. *See* GM's Motion, Doc. #7269, at ¶¶ 31-40. But Leson seeks <u>enforcement</u>, not review, of its Congressionally-mandated arbitration determination.

55.    GM insists that its "wind-down" agreements, "remain in full force and effect today." *Id*. at ¶ 8.  As explained, *supra*, this is not a colorable argument as to Leson because Leson's "wind-down" agreement fails for cause in light of the dealership's reinstatement through arbitration.  Further, GM's Motion is misguided.  GM focuses on the "wind-down" agreement.  But the starting point for adjudicating a dealership's dispute with GM is Section 747.  If a dealer lost in arbitration, then admittedly, the "wind-down" agreement governs that dealer's relationship with GM.  If a dealer won in arbitration, like Leson did, the analysis moves to Section 747's requirement that GM provide a "customary and usual letter of intent" <u>and</u> a sales and service agreement.  *See* Section 747(e), attached as Exhibit "A.".

56.    Unlike Rally, which arbitrated and lost, Leson was not properly terminated by GM.  This was determined by the arbitrator and is not subject to challenge.  Leson should have naturally rolled into New GM without any interruption of its dealership.  This is not just Leson's position—it is the written determination of an arbitrator made after a full evidentiary hearing pursuant to Federal Law.

**4.    GM's Letter of Intent is Neither "Customary" nor "Usual," as Required by Section 747.**

**a.    GM Must Offer Leson a Dealer Sales and Service Agreement, not an Amended "Wind-Down" Agreement**

57.    Section 747 provides only one form of relief for a dealer that is reinstated through arbitration.  The Act requires that GM, "provide the dealer a customary and usual letter of intent to enter into a <u>sales and service agreement</u>." §747(e) (emphasis added).  Section 747 says

nothing about offering a reinstated dealer an amended "wind-down" agreement, which is what GM offers Leson in its LOI.

58.     Despite this clear rule, GM proposes that Leson's execution of its Letter of Intent would entitle the dealership to a "Wind-Down Amendment." *See* June 21, 2010, correspondence of GM to Leson, attached as Exhibit "G," at p. 1.   GM insists that, "its Letter of Intent fully complies with the Arbitration Statute." *See* July 2, 2010, correspondence of GM to Leson, attached as Exhibit "M."   In its Motion, GM threatens that, "[i]f Leson fails to satisfy the terms of the LOI, the Wind-Down Agreement will not be amended." *See* GM's Motion, Doc. #7269, ¶ 41.  By offering an amended "wind-down" agreement, GM directly violates Section 747.

59.     GM may argue that, regardless of whether it offers Leson an amended "wind-down" agreement or dealer sales and service agreement, Leson has refused to comply with its Letter of Intent.  First, as explained, *supra*, Leson signed GM's LOI only out of duress and fear of losing its dealership immediately.   Leson advised GM that the LOI was inappropriate and violated Section 747. *See* June 28, 2010, correspondence of Leson to GM, attached at Exhibit "E."  GM would not respond to Leson's repeated phone calls, e-mails, or letter concerning the LOI. *See* July 1, 2010, correspondence of Leson to GM, attached as Exhibit "F."  The defective LOI is simply void under Louisiana law as it was signed out of duress. *See* La. C.C. art 1959.

60.     Second, and significantly, Section 747 does not allow for prerequisites to be imposed in an LOI.  Section 747 grants reinstated dealers:

> a customary and usual letter of intent to enter into a sales and service agreement. <u>After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein</u>, a covered dealership shall return [any financial compensation provided for the deferred termination].

§747(e) (emphasis added).   While Section 747 contemplates that a dealer sales and service agreement will contain prerequisites, the Act does not allow for such impositions in the LOI.  It

is indisputable, however, that GM imposed operational prerequisites (that were neither usual nor customary) in its Letter of Intent. It is also indisputable that GM sought to "reinstate" Leson through an amended "wind-down" agreement, rather than a dealer sales and service agreement mandated by Section 747. Leson cannot be terminated for a second time because GM chooses not to abide by the plain language of Section 747.

### b.    GM's Capital Requirement is Commercially Unreasonable.

61.    First, the Section 747 arbitrator held that Leson has met GM's capital requirements since 2003. *See* Written Determination of Arbitrator, Exhibit "C," at p. 4. This Court has held that it, "now appears to be undisputed that the Dealer Arbitration Act doesn't provide for judicial review of arbitration awards issued after the mechanisms for which the Dealer Arbitration Act provides." *See Rally* transcript, attached as Exhibit "B," at p. 50:18-21. GM admits that, "the Dealer Arbitration Act itself does not authorize any right to judicial review." *See* GM's Motion, Doc. #7269, at ¶ 31.

62.    GM's LOI required that Leson maintain net working capital in the amount of $2,850,000. *See* June 21, 2010, correspondence of GM to Leson, attached a Exhibit "G," at p. 2. In its Motion, GM emphasizes the importance of working capital in the automotive retail business. *See, e.g.*: GM's Motion, Doc. #7269, ¶ 44. GM's generic and conclusory argument misses the mark. Leson does not dispute the importance of working capital to its operations— after all, Leson has been a successful Chevrolet dealer for nearly eighty years based, in part, on its financial acumen. But GM's demanded capital requirement is not appropriate nor does it comply with its dealer sales and service agreement and accounting regulations. GM's Capital Standard Addendum to Leson's November 1, 2005, Dealer Sales and Service Agreement also required $2,850,000 in working capital. *See* Exhibit "O." GM's capital requirement is based on

27

so many inputs and variables that it is impossible to be the same number each year. *See* Net Working Capital Standard Computations Balance Sheet, attached as Exhibit "O," and produced by GM during Leson's arbitration.

63.    The Section 747 arbitrator determined that, "Leson has also met GM's capital requirements as these standards have not changed since 2003." *See* Written Determination of Arbitrator, Exhibit "C," at p. 4. Because the $2,850,000, has remained constant for years, Leson asked GM to recalculate Leson's capital requirements based on its current profits and losses. *See* June 28, 2010, correspondence of Leson to GM, Exhibit "E," at p. 2. GM simply replied that, "the $2,850,000 figure contained in the LOI accurately reflects [the Net Working Capital Standard]." *See* July 2, 2010, correspondence of GM to Leson, Exhibit "M." Notably, Leson calculates its proper net working capital, "utilizing the formula set forth by GM to be less than $1.8 million utilizing the 12 month period from June 2009-May 2010 [...]." *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 13.[11]

64.    Because GM specifically prohibited Leson from purchasing any new cars and from participating in GM programs for the past eighteen months of its "wind-down," Leson's sales have been significantly reduced. For example:

> ➢ "At the time [Leson] received its Wind-Down Notice on or about May 15, 2009, it had 326 new vehicles in its inventory and $1.2 million in parts and accessories in inventory." *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 6.

> ➢ "Despite being reinstated on June 18, 2010, by Order of the Arbitrator assigned this case pursuant to the Dealer Arbitration Act, [Leson] currently has only 33 new vehicles in inventory and approximately $999,000 in parts and accessories in inventory." *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 7.

---

[11] *See also* Net Working Capital Standard Computations Balance Sheet, attached as Exhibit "Q," and produced by GM during Leson's arbitration ("This net working capital standard is part of the contractual agreement between the dealership and the manufacturer and is established annually based on the dealer's method of operation and data shown on the operating reports for a 12-month period.").

> ➢ "In the 12-month period prior to receiving its Wind-Down Notice, [Leson] sold 735 new vehicles." *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 8.

> ➢ "In the last 12 months [of being in 'wind-down,' Leson] sold only 337 new vehicles." *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 9.

65.    GM's high capital standard is not a proper requisite because it places Leson in a completely untenable position with its lenders.  Leson must obtain credit to finance a sufficient number of vehicles and to establish $2.85 million in working capital.  While GM wants to impose a 2008 capital requirement on Leson in 2010, banks, "want to evaluate [Leson's] profitability, cash flow and performance over the last 12 months to date in order to assess [Leson's] credit standing."  *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 12.  More specifically:

> ALLY, formerly known as GMAC, has to date refused to authorize [Leson's] floor line of credit for new vehicles until GM and [Leson] have agreed upon a net working capital requirement.  GM's use of the incorrect capital standard has impeded Leson's ability to obtain floor financing and order inventory.

*See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 14.

66.    Leson, "has been unable to purchase new vehicles from GM since May 15, 2009," pursuant to it's "wind-down" with GM.  *See* §1746 Declaration of Lisa Rebowe, attached as Exhibit "Q," at ¶ 10.   The arbitrator held that GM's "wind-down" was GM's mistake and essentially the wrong decision.  The damages will take many, many months to rehabilitate and it will start only when Leson can order new cars.  GM must give Leson an appropriate amount of time from the time it is able to order and receive inventory to meet an appropriate working capital requirement or set one that comports with GM's own manual and Leson's weakened performance that GM caused through its wrongful "wind-down."

       c.      **GM Admits that its Letter of Intent is only for Dealers Reinstated through Arbitration.**

67.    An additional reason that GM's LOI fails to comply with Section 747 is that it is a form letter directed only at dealers that won in arbitration.  GM states that, "New GM sent Leson the LOI, New GM's standard 'customary and usual letter of intent' and the same form agreement that was offered to other dealers nationwide that prevailed in arbitrations."  *See* GM's Motion, Doc. #7269, at ¶ 22.  By GM's own admission, therefore, it did not give Leson the same LOI or terms that it gives to <u>all</u> dealers, including those that continued with the manufacturer in 2009 without being wrongfully "wound down."  Treating dealers that won reinstatement through arbitration differently that those that settled or were continued without challenge is not envisioned by Section 747, which does not assign reinstated dealers into a class of franchisees inferior to others.  *See* §747(e) (requiring a letter of intent to enter into a sales a service agreement, <u>not</u> an amended "wind-down" agreement, as GM offers).  Further, GM speaks in conclusory terms about its LOI being "customary and usual," without explaining how this is true.  GM offers no evidence to suggest that the terms of its LOI comport to those imposed on dealers that continued with GM without arbitration.  In fact, the LOI is unique in that it offers an amended "wind-down" agreement instead of a dealer sales and service agreement, which is the GM contract by which all other dealerships operate.  GM's onerous Letter of Intent is drafted solely to defeat Leson's reinstatement and render its arbitration order moot.

## IV.    CONCLUSION

68.    GM got it wrong when it wound-down Leson's dealership in 2009, as the finder-of-fact concluded after a Congressionally-mandated Section 747 arbitration.  GM has it wrong, today, with its arguments for applying the 363 Sale Order and Approved Deferred Termination Agreement against Leson.  This Court's October 4th ruling in *Rally* is inapplicable to Leson.

Unlike Rally Auto, or the other dealers in this Motion, Leson won its arbitration.  Leson is no longer subject to the "wind-down" agreement, which now lacks a cause in light of the arbitrator's order to reinstate Leson.  Louisiana law governs Leson's relationship with GM.  Therefore, Leson's claim for <u>enforcement</u> of the arbitrator's decision is properly before the Louisiana Motor Vehicles Commission, not this Court.

69.    Alternatively, should this Court find that it maintains exclusive jurisdiction over Leson's claim—which Leson respectfully denies—it should also find that GM's Letter of Intent is not "customary or usual" and a violation of Section 747.  GM must offer Leson a dealer sales and service agreement, not an amended "wind-down" agreement.  GM seeks to use this Court to overturn the decision of a Section 747 arbitration which your Honor found to be immutable in *Rally*.

Dated: October 19, 2010
       Roseland, New Jersey

Respectfully Submitted,

/s/ Jeffrey A. Cooper
Jeffrey A. Cooper, Esq.
Marc D. Miceli, Esq.
**CARELLA, BYRNE, CECCHI, OLSTEIN,
   BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Mark R. Beebe, Esq. *(pro hac pending*)
Johnny L. Domiano, Esq. (*pro hac pending*)
David C. Coons, Esq. (*pro hac pending*)
**ADAMS AND REESE LLP**
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
(504) 581-3234

*Attorneys for Leson Chevrolet Company, Inc.*

CBBG #405147v1