**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:

MOTORS LIQUIDATION COMPANY, *et al.*,          Chapter 11
f/k/a General Motors Corp., *et al.*, Chapter 11          Case No. 09-50026 (reg)

                                                         Jointly Administered

                     Debtors.
----------------------------------------------------------------X

## OBJECTION OF ROSE CHEVROLET, INC., HALLEEN CHEVROLET, INC. AND ANDY CHEVROLET COMPANY TO MOTION OF GENERAL MOTORS LLC TO ENFORCE 363 SALE ORDER AND APPROVED DEFERRED TERMINATION AGREEMENTS

**BELLAVIA GENTILE & ASSOCIATES, LLP**
*Attorneys for Objectors*
200 Old Country Road – Suite 400
Mineola, New York 11501
(P) 516-873-3000
(F) 516-873-9032

# TABLE OF CONTENTS

TABLE OF AUTHORITES ..................................................................

BASES FOR THE OBJECTION.................................................................2

SECTION 747 OF THE ACT...............................................................10

ARGUMENT.................................................................................18

    I.    **THIS ARTICLE I BANKRUPTCY COURT IS PROHIBITED FROM CONSTITUTIONAL DUE PROCESS REVIEW AND TRADITIONAL JUDICIAL REVIEW FUNCTIONS RESERVED EXCLUSIVELY FOR ARTICLE III DISTRICT COURTS..........19**

    II.    **THE NEW GM MOTION IS NOT A CORE PROCEEDING.........24**

    III.    **THE NEW GM MOTION IS NOT A RELATED PROCEEDING...27**

    IV.    **IF THE NEW GM MOTION IS DETERMINED TO BE A "RELATED" PROCEEDING, THEN THE BANKRUPTCY COURT SHOULD HAVE NONETHELESS DENIED THE MOTION IN THE INTEREST OF JUDICIAL ECONOMY.........29**

    V.    **THE BANKRUPTCY COURT SHOULD NOT EXERCISE JURISDICTION OVER THE ASSETS, POST-SALE, UNLESS INDEPENDENT JURISDICTION UNDER THE BANKRUPTCY CODE WAS ESTABLISHED...............................................30**

    VI.    **THE BANKRUPTCY COURT SHOULD DEFER TO THE STATUTORILY CREATED ARBITRATION PROCESS....32**

    VII.    **THE COMMERCIAL RULES OF THE AAA, WHICH APPLIED IN EACH OF THE OHIO DEALERS' DEALER REINSTATEMENT ARBITRATIONS SPECIFICALLY STATE THAT JUDGMENT UPON THE ARBITRATION AWARDS MAY BE ENTERED IN ANY FEDERAL OR STATE COURT HAVING JURISDICTION THEREOF...................................................................33**

    VIII.    **THE OHIO DISTRICT COURT IS CLEARLY CONFERRED WITH THE SUBJECT MATTER JURISDICTION NEEDED TO REVIEW PETITIONS TO VACATE.................................................37**

IX.    NEW GM SHOULD HAVE BEEN JUDICIALLY ESTOPPED
FROM ARGUING THAT JUDICIAL REVIEW OF THE
ARBITRATION AWARDS MUST BE DONE BY THE
BANKRUPTCY COURT...................................................41

CONCUSION........................................................................45

## TABLE OF AUTHORITIES

### CASES:

Ashcroft v. Iqbal, - - - U.S. - - - -, 129 S.Ct. 1937, 1945, 173 L.Ed. 2d 868 (2009)......10

Ausa Life Ins. Co. v. Citigroup, Inc.,
B.R. 471, 476 (N.D. Iowa 2003).................................................................28

Austin Chevrolet, Inc. v. Texas Motor Vehicle Board (2006), 212 S.W.3d 425.............6

Balt & Phila. Steamboat Co. v. Norton,
284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed 366 (1932)..........................................5

Beal Bank, S.S.B. v. U.S. Bank Nat. Ass'n
2010 WL 2541165 at *2 (S.D.N.Y., June 8, 2010).............................................25

Binder v. Price Waterhouse & Co.,
LLP, 372 F.3d 154, 161 (3d Cir. 2004).........................................................31

Bryson, III v. Gere, 268 F.Supp.2d 46 (D.D.C.2003).........................................34

Buckley v. Valeo, 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976)
(per curiam)....................................................................................20

Celotex Corp. v. Edwards,
514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)..................................28

*EMO Energy Solutions, LLC v. Acre Consultants, LLC*, No. 08-4365, 2008 WL
5110585,at *1 (E.D. La. Nov.25, 2008) (citation omitted)....................................33

Franchise Tax Board of the State of Cal. v. Constr. Laborers Vacation Trust for So.
California,
463 U.S. 1, 9-11 (1983)........................................................................37

Francis v. Landstar Systems Holding, Inc., 2009 WL 4350250 (M.D. Fla. 2009)........38

General Motors Corporation v. Illinois Motor Vehicle Review Board
(2007), 224 Ill.2d 1, 862 N.E.2d 209, 224......................................................6

General Motors Corporation v. Samuel Kinlaw dba Knox Olds-Pontiac,
78 N.C. at 521, 338 S.E.2d 014 (1995)..........................................................6

Gimbel v. UBS Financial, 2009 WL 1904554 (N.D. Ill. 2009)...................37, 38

Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.,
545 U.S. 308, 312 (2005)...............................................................................37

General Motors LLC v. Santa Monica Group, Inc. (10-CV-4787).........................39

Gimbel v. UBS Financial, 2009 WL 1904554 (N.D. Ill. 2009) ...........................39

Hatzel & Buehler, Inc. v. Orange * Rockland Utilities, Inc.,
107 B.R. 34 (D.Del. 1989)...........................................................................21

Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.), 190 B.R. 157, 160
190 B.R. 157, 160 (S.D.N.Y.1995)..............................................................28

Idea Nuova, Inc. v. GM Licensing Group, Inc.,
2010 WL 3079917 (2d Cir., Aug. 9, 2010)("*Idea Nuovo*")................................36

In re Cablevision, 315 B.R. 818 (S.D.N.Y. 2004)............................................21

In re Cary Metal Products, Inc., 158 B.R. 459, 462 (N.D.Ill. 1993)......................31

In re Crowder, 314 B.R. 445, 448 (10th Cir. 2004)..........................................30

In re Fairfield Communities, Inc., 142 F.3d 1093, 1095 (8th Cir. 1998)..................30

In re G-1 Holdings, Inc., 295 B.R. 222 (D.N.J. 2003).......................................21
Futures Trading Comm'n v. NRG Energy, Inc.,
457 F.3d 776,780 (8th Cir. 2006)..................................................................30

In re Hall's Motor Transit Co., 889 F.2d 520, 522 (3rd Cir.1989)..........................30

In re IPDN Corp., 352 B.R. 870, 877-78 (Bankr. E.D. Mo. 2006) (citing *Credit Mgmt.
Corp. v. McAlpin,* 263 B.R. 881, 884 (8th Cir. 2001)........................................29

In re Johns-Manville Corporation, 63 B.R. 600 (S.D.N.Y. 1986) ..........................21

In re Leco Enterprises, .144 B.R. 244, 248 (Bankr. S.D.N.Y. 1992).......................27

In re Orion Pictures, 4 F.3d 1095, 1101 (2d Cir.1993)......................................29

In re Pettibone, 935 F.2d 120, 122 (7th Cir. 1991)...........................................31

In re Resorts Intern., Inc.,
372 F.2d 154, 161 (3rd Cir. 2004).................................................................28

In re S.G. Phillips Constructors, 45 F.3d 702, 707 (2d Cir.1995)..........................25

In re United States Lines. Inc., 197 F.3d 631, 637 (2d Cir.1999).............................25

In re Wood, 825 F.2d at 97..............................................................................28

Med-Tel International v. Loulakis, 403 F.Supp.2d 496 (E.D. Va. 2005)....................38

Minor v. Prudential Sec. Inc., 94 F.3d 1103, 1006 (7th Cir. 1996).........................40

Montefiore Medical Center v. Crest Plaza LLC,
24 Misc.3d 1201(A), 889 N.Y.S.2d 506 (S.Ct. Westchester Co. 2009)....................44

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983)...............38

New Motor Vehicle Board v. Orrin W. Fox Co.
(1978), 439 U.S. 96, 100 fn. 4, 99 S.Ct. 403, 58 L.Ed.2d 361...........................15, 17

Northport Health Services of Arkansas, LLC v. Rutherford,
605 F.3d 483 (8th Cir. 2010)...........................................................8, 37

Northern Pipeline Construction Co. v. Marathon Pipeline Company,
458 U.S. 50, 102 S.Ct. 2858 (1982).....................................19, 20, 21, 22, 23, 24

Norwest Equip. Fin., Inc. v. Nath (In re D & P Partnership),
91 F.3d 1072, 1074 (8th Cir.1996)......................................................30

Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984)....................................28

Publicker Ind. Inc. v. U.S. (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d
980 F. 2d 110, 114 (2d Cir.1992) (citations omitted)......................................27

Rainwater v. Nat'l Home Ins. Co.,
944 F.2d 190, 193 (4th Cir. 1991) (citing cases)..........................................34

Shearson/American Express, Inc., v. McMahon,
482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)("McMahon").............32

Specialty Mills, Inc. v. Citizens State Bank,
51 F.3d 770, 774 (8th Cir.1995)........................................................28

State of New Hampshire v. State of Maine,
532 U.S. 742,121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)...................................44

Stoe v. Flaherty, 436 F.3d 209, 218 (3rd Cir. 2006).......................................28

Syngenta Crop Protection, Inc. v. Drexel Chemical Company,
655 F.Supp.2d 54 (U.S.D.C. District of Columbia 2009)......................................40

Thomas v. Union Carbide Argicultural Products Co.,
473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)...............19, 22, 23, 24, 38, 40

Troll Company v. Uneeda Doll Company, 483 F.3d 150 (2d Cir. 2007)...................44

United States v. Denedo, 129 S.Ct. 2213, 2219, 173 L.Ed. 2d 1235........................10

Vaden v. Discover Bank, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009).....................8, 38

Woodard v. General Motors Corp.
(5th Cir. 1962), 298 F.2d 121, *cert. denied* (1962), 369 U.S. 887...........................15

## **STATUTES:**

9 U.S.C. § 1 ................................................................. 38

15 U.S.C. § 1221-1225 ............................................................13, 23

15 U.S.C. § 1226......................................................................16, 22, 24

28 U.S.C. § 157 . . . . ...............................................................27

28 U.S.C.1331...............................................................36, 40, 43

28 U.S.C. 1332.......................................................................43

28 U.S.C § 1334...............................................................18, 24

Federal Arbitration Act, 9 U.S.C. § 2......................................................32

Federal Arbitration Act, 9 U.S.C. Section 1, et seq...........................................37

Sections 105 of Title 11, United States Code ...................................1, 30

Sections 363 of Title 11, United States Code .. ...................................1, 30

Bankruptcy Rule 7001 ...........................................................1

Section 747 of the Consolidated Appropriations Act of 2010
(Public Law 111-117)............3, 4, 5, 10, 11, 12, 13, 14, 16, 17, 18, 22, 23, 25, 28, 29, 40

**HEARING DATE: TO BE DETERMINED**
**HEARING TIME:  TO BE DETERMINED**

BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road
Suite 400
Mineola, NY 11501
(516) 873-3000
Steven Blatt (SB-6792)

Counsel for Rose Chevrolet, Inc., Halleen Chevrolet, Inc. and
Andy Chevrolet Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:

MOTORS LIQUIDATION COMPANY, *et al.,*          Chapter 11
f/k/a General Motors Corp., *et al.,* Chapter 11        Case No. 09-50026 (reg)

                                                                             Jointly Administered

                        Debtors.
-----------------------------------------------------------------X

**OBJECTION OF ROSE CHEVROLET, INC., HALLEEN**
**CHEVROLET, INC. AND ANDY CHEVROLET COMPANY**
**TO MOTION OF GENERAL MOTORS LLC TO ENFORCE**
**363 SALE ORDER AND APPROVED DEFERRED**
**TERMINATION AGREEMENTS**

**TO:  HONORABLE ROBERT E. GERBER,**
          **UNITED STATES BANKRUPTCY JUDGE:**

        Rose Chevrolet, Inc., Halleen Chevrolet, Inc. and Andy Chevrolet Company

(collectively, the "Ohio Dealers"), by their attorneys Bellavia Gentile & Associates,

LLP, hereby submit their objection (the "Objection") to the motion (the "New GM

Motion") of General Motors, LLC ("New GM") for an order, pursuant to sections 105

and 363 of Title 11, United States Code (the "Bankruptcy Code") and Bankruptcy Rule

7001: (a) enforcing the order (the "Sale Order") of the Bankruptcy Court, dated July 5,

2009 and the provisions of the Wind-Down Agreement (as defined below) approved by this Court at that time, including but not limited to sections 2(a) (termination of the Chevrolet Dealer Agreements by October 31, 2010), 5(d) (covenant not to sue New GM), and 13 (exclusive jurisdiction of the Bankruptcy Court), and directing Rose Chevrolet, Inc. ("Rose"), Halleen Chevrolet, Inc. ("Halleen"), and Andy Chevrolet Company d/b/a Sims Chevrolet, Inc. ("Sims") to specifically perform theirs obligations pursuant to, inter alia, sections 5(e) (indemnity owed to New GM) and 5(d) and 17 (specific performance allowed) of the Wind-Down Agreement; (b) directing the Dealers and all persons acting in concert with them to cease and desist from further prosecuting, or otherwise pursuing the claims asserted in, the Actions (as defined in New GM's motion) against New GM, (c) directing the Dealers to dismiss the Actions with prejudice ("New GM's Motion"), and (d) granting such other and further relief as may be warranted by, among other things, the Dealers' breach of section 5(e) of the Wind-Down Agreements (the indemnification provision) and the Dealers' violation of this Court's orders.

## BASES FOR THE OBJECTION

1. As shown more fully herein, on or about the Debtor's Petition Date, the Debtor forwarded to each of the Ohio Dealers a Wind-Down Agreement through which would it receive "assistance" in the form of a "wind-down payment." The Ohio Dealers, and numerous other General Motors dealers, otherwise facing the termination of their franchise agreements in the Debtor's bankruptcy proceeding and feeling that they had no economic alternative, signed the Wind-Down Agreement.

2.  During December, 2009, President Obama signed into law Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117). This newly enacted federal legislation specifically afforded each of the Debtor's dealerships that executed a Wind-Down Agreement the right to challenge by binding arbitration the termination of its dealership. **In this respect, the new federal legislation (a copy of which is attached as Exhibit A) superseded the Sale Order**.

3.  Firmly believing that their General Motors' dealerships were wrongfully selected for termination, pursuant to the Dealership Arbitration Act, each of the Ohio Dealers commenced the Arbitration by filing a demand against New GM with the American Arbitration Association ("AAA"). Testimony was heard at "consolidated" hearings with respect to each of the Ohio Dealers reinstatement arbitrations on June 8-11, 2010.

4.  While the Arbitrator's awards held that the "covered dealership" (i.e., for each of the Ohio Dealers) shall not be added to the dealer network, as shown more fully herein, the arbitrator's awards (copies of which are attached as Exhibit B) clearly and unambiguously demonstrated the arbitrator's multiple errors and bias requiring that such awards to be <u>vacated</u>.

5.  As just one glaring example, the arbitrator <u>failed</u> to follow his Congressional mandate to review and balance the seven factors set out in the federal legislation for consideration. Instead, the arbitrator merely "accepted" New GM's overall business plan and only checked the Debtor's "math" regarding performance objectives.

3

6. Indeed, the arbitrator acknowledged that the Act required him to "consider the manufacturer's overall business plan," but then explained that he was merely going to "accept" the plan, without any review or analysis. The arbitrator stated that he interpreted the Congressional mandate of "consideration" as his duty to "identify the stated plan, accept the plan, and then determine where this dealer fits in the stated plan." (Exhibit B, Award).

7. Nowhere in Section 747 does the federal legislation provide that the manufacturer must "accept the plan." To the contrary, the accuracy and/or viability of the manufacturer's plan should have been "considered", as intended by the Congressional legislation, and as litigated by the arbitrating parties during the hearing through expert witnesses and documents.

8. Other AAA arbitration decisions have noted that New GM's argument (and this arbitrator's conclusion) to give greater weight to the manufacturer's overall business plan would "**eviscerate**" the purpose of the act and make the AAA proceeding meaningless.[1]. The arbitrator in this matter did "tilt the balance" and undermine the arbitration process. His methodology was **predestined** to be against the dealership, because he gave complete deference—without any consideration or review—to the manufacturer's overall business plan. The arbitrator failed to consider the voluminous evidence and New GM's admissions that its plan is not reasonable or reliable.

---

[1] *Layton Dodge, Inc./Cutrubus Chrysler Jeep Dodge and Chrysler Group, LLC*, AAA Case No. 77-532-64-10 (May 25, 2010) ["**To automatically weight the New Chrysler business plan to tilt the balance as suggested would eviscerate the Act and the attendant arbitration process.**"] (See Exhibit C).

4

9. Similarly, the awards contained a legal section entitled "Disputing the Specific Criteria" and concluded he was <u>not</u> going to review the reasonableness of the manufacturer's performance standard and only determine whether or not the dealership fell below the "specific criteria" established by the manufacturer. The arbitrator explained: **"Put another way, did the manufacturer use the proper math in determining this dealership's 'specific criteria?'"** (Exhibit B). This arbitrator necessarily made a *fait accompli* by <u>not</u> performing a "consideration" and review of this factor, but rotely checking the manufacturer's "math" calculation.

10. Obviously, the end result was already known and predetermined by his improper methodology. The arbitrator made a sham and mockery of the arbitration process. He did not perform his duties. The arbitrator's undue means, misbehavior, and misconduct occurred because of his failure to "consider" each of the factors set forth in the federal legislation which provided for the dealer reinstatement arbitration, instead of blindly accepting the manufacturer's calculation and only double-checking New GM's math.

11. Yet a further bias disclosed in the Awards were the arbitrator's <u>refusal</u> to consider the application of "state law" to those proceedings. The arbitrator determined that "the act is a law in and of itself and will be strictly followed." (Exhibit B). However, it cannot be disputed that Section 747 is remedial and must be broadly and liberally construed to promote its purpose.[2]

---

[2] *Balt. & Phila. Steamboat Co v. Norton*, 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932).

12. Indeed, the arbitrator's holding also directly conflicted with the plain meaning of the Act and the Congressional intent as explained as follows:

> "**In considering this factor and related factors, it is important for arbitrators to recognize that state law is part and parcel of and modifies automobile dealer franchise agreements. To look only at a franchise agreement, in other words, this is an important contextual element. Accordingly, <u>it is anticipated that the arbitrators will consider state law elements of good faith and fair dealing in this process and that, for example, the franchise agreement's performance standards and a dealer's performance under the original agreement will be evaluated in accordance with state law</u>.**"[3]

13. This arbitrator <u>refused</u> to consider state law "good faith and fair dealing" when reviewing the manufacturer's performance objectives. (Exhibit B). Many courts have held that a manufacturer's state average is illusory because it would result in HALF of the manufacturer's dealerships being in contractual default.[4]

14. Due to the arbitrator's multiple errors and bias, requiring that such awards to be vacated, the Ohio dealers each filed, in the United States District Court for the Northern District of Ohio, Eastern District, an "application to vacate arbitration

---

[3] Congressional Record, House H14477–H14478. (App. Ex. 3).

[4] *General Motors Corporation v. Samuel Kinlaw dba Knox Olds-Pontiac*, 78 N.C. at 521, 338 S.E.2d 014 (1995); *Austin Chevrolet, Inc. v. Texas Motor Vehicle Board* (2006), 212 S.W.3d 425 [**GM's state average, product segment adjusted, was NOT "a useful tool for accurately gauging Chevrolet's performance in the Houston MDA" because it "unfairly raise[d] the expected average for the Houston MDA by including in its calculation the routinely higher expected averages enjoyed by SDA markets."**]. See also, *General Motors Corporation v. Illinois Motor Vehicle Review Board* (2007), 224 Ill.2d 1, 862 N.E.2d 209, 224 [**"In light of Dr. Matthews' testimony and the other evidence, it was reasonable for the Board to conclude that Anderson's approach was not as valid a method as Dr. Matthews' for measuring dealership performance in a multidealer area in a large metropolitan area."**]

6

award" (collectively, the "Petitions to Vacate." ).  A copy of each Petition to

Vacate is attached as Exhibits E, F and G hereto.

15.  Furthermore, anticipating that New GM would seek to both forum shop and

circumvent the Ohio District Court's subject matter jurisdiction over the Petitions

to Vacate, the Ohio Dealers filed, with the Ohio District Court, an emergency

motion seeking to prevent New GM from collaterally attacking the subject matter

jurisdiction of the Ohio District Court over the Petitions to Vacate.

16.  Despite the filing of such emergency application with the Ohio District Court,

New GM filed the within motion with the United States Bankruptcy Court for the

Southern District of New York seeking, among other things, an order (a)

enforcing the terms of the Sale Order and the terms of the Wind-Down

Agreement;, (b) directing the Ohio Dealers to cease and desist from prosecuting

the Petitions to Vacate and (c) directing the Ohio Dealers to dismiss with

prejudice the Petitions to Vacate.

17.  On October 18, 2010, the Ohio District Court denied the Ohio Dealers'

emergency application.  A copy of that decision is attached as Exhibit H.

18.  As shown more fully herein, New GM's motion should, in all respects, be denied

because, respectfully (a) this non-Article III Bankruptcy Court lacks the subject

matter jurisdiction to review the Ohio Dealers' Petitions to Vacate which concern

the interpretation of a United States law of first impression, a function reserved

exclusively for Article III District Courts and (b) this non-Article III Bankruptcy

Court certainly lacks both the jurisdiction and authority to prevent an Article III

court (the Ohio District Court) from exercising its unquestioned jurisdiction to decide a matter that is related only indirectly to the bankruptcy proceeding.

19.  Second, as we show below, as a matter of law, the Ohio District Court is conferred with the federal question jurisdiction[5] needed to review each of the Petitions to Vacate. In fact, the Supreme Court, in *Vaden v. Discover Bank*, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009), only recently determined that a federal district court could properly "look through" a petition to compel arbitration to the parties' underlying substantive controversy in order to determine whether the petition is predicated on an action that arises under federal law, such that the federal district court has federal question jurisdiction over the petition.

20.  Here, each of the Petitions to Vacate clearly seeks relief that was necessarily created by federal law (i.e., the vacatur of an arbitrator's award in an arbitration derived solely through the Dealer Arbitration Act).  Stated otherwise, **any irregularity with the arbitration remedy, as alleged by each of the Ohio Dealers in their Petitions to Vacate filed with the Ohio District Court necessarily implicates the interpretation of the applicable federal statute.**

---

[5]    The Ohio District Court is also conferred with diversity jurisdiction to determine the Petitions to Vacate. Diversity jurisdiction turns on two issues, is there complete diversity of citizenship between the parties and does the amount in controversy exceed $75,000. *Northport Health Services of Arkansas, LLC v. Rutherford*, 605 F.3d 483 (8th Cir. 2010). Here, New GM is a limited liability company organized and existing under the laws of the State of Delaware while each of the Ohio Dealers is a corporation duly organized and existing under the laws of the State of Ohio. Furthermore, to resolve the next issue (i.e., issue of the amount in controversy), "courts uniformly appl[y] a limited 'look through' approach, determining whether the 'value at stake in the arbitration' being sought in the federal action could exceed $75,000 . . . " *Id.* At 486-487. Here, New GM cannot argue that the value of each Ohio Dealer in issue does not exceed $75,000. As such, given that the Petitions to Vacate concern a matter in which there is complete diversity of citizenship between the parties and the amount in controversy exceed $75,000, the Ohio District Court is conferred with subject matter jurisdiction (diversity jurisdiction) to review the Arbitrator's award and the underlying arbitration between the parties.

21. Indeed, resolution of the Petitions to Vacate will specifically require the Ohio

District Court to address whether Congress intended that, under the Federal

Arbitration Act, the arbitrator was (a) to consider the manufacturer's overall

business plan as a factor in his/her arbitration awards or blindly accept such

manufacturer's plan without any review or analysis, (b) review the reasonableness

of the manufacturer's performance standards or merely determine whether the

manufacturer "used the proper math" in determining whether the rejected dealer

met the manufacturer's criteria for termination , and (c) to consider application of

relevant state law as a factor in his/her arbitration awards.

22. Third, this Court should find that New GM is judicially estopped from arguing

that any review of the Arbitration Awards necessarily had to be done by the

Bankruptcy Court as New GM specifically relied upon the jurisdiction of a

District Court in California when it sought to enforce its rights under the Dealer

Arbitration Act in a different arbitration; relying upon that statute, diversity, and

the AAA to support its jurisdictional bases.

23. Likewise, prior to filing the within motion, New GM first sought to rely upon the

jurisidiction of the District Court in Louisiana when it removed that State court

proceeding (i.e., Leson Chevrolet Company, Inc.) related to the Dealer Arbitration

Act. For New GM, a non-debtor, to use the District Courts to enforce its rights

under the Dealer Arbitration Act in both June (California) and the end of

September (Louisiana) and to then run to the Bankruptcy Court in September

claiming that only it has "sole" and "exclusive" jurisdiction over matters arising

9

from the federal legislation, constituted both forum shopping[6] and judicial

estoppel in its simplest form.

## SECTION 747 OF THE ACT

24. On June 1, 2009, (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code. Thereafter, as part of numerous

transactions approved by the Bankruptcy Court, the Debtor entered into and

assigned to New GM certain Wind-Down Agreements between the Debtor and

hundreds of its authorized new motor vehicle dealers. Dealers that entered into

these Wind-Down Agreements, would, as of October 31, 2010, lose their General

Motors' franchises and, thereafter, be precluded from buying and selling New

GM motor vehicles and performing any warranty service for New GM's

customers.

25. Each of the Ohio Dealers had been selling and servicing General Motors products

in the State of Ohio. On or about the Petition Date, the Debtor forwarded to each

of the Ohio Dealers a Wind-Down Agreement. If the Ohio Dealers executed the

---

[6] There can be no doubt that New GM, through the within New GM Motion to Enforce, is seeking to improperly forum shop. Specifically, 12(b)(1) establishes that "every defense to a claim for relief in any pleading must be asserted in the responsive pleading" or by a motion if it involves the issue of "lack of subject-matter jurisdiction." Thus, the Federal Civil Rules of Procedure provide that the only proper method for New GM to assert that the Ohio District Court did not have jurisdiction over the Petitions to Vacate was to assert its argument of "lack of subject-matter jurisdiction" before the Ohio District Court. Nevertheless, New GM circumvented the Civil Rules and collaterally attacked the Ohio District Court's subject-matter jurisdiction and constitutional authority. The United States Supreme Court has explained that "before we address another court's subject jurisdiction we must first determine our own. See *Ashcroft v. Iqbal*, - - - U.S. - - - -, 129 S.Ct. 1937, 1945, 173 L.Ed. 2d 868 (2009) ('Subject matter jurisdiction ... should be considered when fairly in doubt.')." *United States v. Denedo*, 129 S.Ct. 2213, 2219, 173 L.Ed. 2d 1235. It is black letter law that courts should determine their own subject-matter jurisdiction, in the first instance, and not allow a collateral attack by parties in a foreign tribunal. Civil Rule 12(b)(1) provides the proper procedure for a party challenging subject-matter jurisdiction of a court. As shown herein more fully, New GM improperly sought this Court's Article I Bankruptcy Court's review and determination of an Article III Court's subject-matter jurisdiction. New GM's actions in forum shopping should not be condoned.

Wind-Down Agreements, then they would receive "assistance" in the form of a "wind-down payment." In the alternative, the Debtor indicated to the Ohio Dealers that it would simply apply to this Court for an order rejecting each of the Ohio Dealers' dealership sales and service agreement. As a result, each of the Ohio Dealers, and numerous other General Motors dealers, feeling that they had no economic alternative, signed the Wind-Down Agreement.

26. During December, 2009, President Obama signed into law Section 747 of the Consolidated Appropriations Act of 2010 (the "Dealer Arbitration Act"). The Dealer Arbitration Act specifically afforded each of the Debtor's dealerships that executed a Wind-Down Agreement the right to challenge by binding arbitration the termination of its franchises.

27. The genesis of Section 747 was the voluntary petitions for bankruptcy filed by the Debtor and Chrysler Corporation in the summer of 2009. Both GM and Chrysler applied for and received loans from the U.S. Government through the Troubled Asset Relief Program ("TARP") emergency funding program.

28. In the bankruptcy proceedings, both GM and Chrysler used a provision in the Bankruptcy Code to circumvent federal and state franchise laws and summarily terminate or "wind down" (under the threat of termination) the franchises of over 2,000 independent auto dealers throughout the United States.

29. The House of Representatives, Committee on the Judiciary, held three (3) days of hearings on the "*Ramifications of Auto Industry Bankruptcies*." The stated purpose of the hearings was to review "the ramifications of auto bankruptcies and

11

their effect on dealers and other issues." (Emphasis added).[7]  Other

Congressional committees also conducted investigations, hearings, and gathered

evidence regarding the manufacturer's "expedited bankruptcy proceedings."[8]

Congress passed Section 747 of the Act because of the "bipartisan concern in

Congress of the mass closure of GM and Chrysler dealerships."  (Emphasis

added) (Id.).

30.  On July 19, 2010, the Office of the Special Inspector General for the Troubled

Asset Relief Program ("SIGTARP") confirmed Congress' concerns in a report

entitled *Factors Effecting the Decisions of General Motors and Chrysler to

Reduce Their Dealership Networks*."  SIGTARP concluded that its investigation

"demonstrates that GM did not consistently follow its stated criteria" regarding

the wind-down and termination of dealerships.  (Exhibit I, SIGTARP, p. 30).

SIGTARP also found, just as troubling, the fact that GM had "little or no

documentation of the decision-making process to terminate or retain dealerships

... ."  (Id.).  The SIGTARP report also held that GM's acceleration of dealership

closings "was not done with any explicit cost savings to the manufacturer in

mind."  (Emphasis added) (Exhibit I, SIGTARP, p. 29).

---

[7]  House of Representatives, Subcommittee on Commercial and Administrative Law, Committee of the Judiciary, "**Ramifications of Auto Industry Bankruptcies (Part III)**," Serial No. 111-55, p. 1 (July 22, 2009) [This subcommittee also held hearings on May 21, 2009, and July 21, 2009].

[8]  June 3, 2009, State Senate Commerce Committee-Full Committee:
*GM And Chrysler Dealership Closures:  Protecting Dealers And Consumers;*
June 10, 2009, Senate Banking Committee-Full Committee:
*The State of the Domestic Automobile Industry:  Impact of Federal Assistance;*
June 12, 2009, House Energy and Commerce Committee-Subcommittee on Oversight/ Investigations:  *GM And Chrysler Dealership Closures And Restructuring;*
September 16, 2009, House Small Business Committee-Subcommittee on Rural Development, Entrepreneurship and Trade:  *The Role of Automobile Dealerships in Rural Economies*

31. It is precisely because of the arbitrary and capricious actions of Debtor and

Chrysler in the Bankruptcy Court, after acceptance of Federal TARP loans, that

Section 747 mandated that any manufacturer who accepted money from the

Federal government had to provide the "<u>specific</u> criteria" for their rejection or

wind-down of dealerships. The Act further required American Arbitration

Association ("AAA") proceedings, if a dealer made demand on the manufacturer,

for a hearing before a <u>neutral</u> arbitrator to protect the covered dealership's due

process rights.

32. Section 747(b) states "[A] covered dealership that was not lawfully terminated

under applicable state law on or before April 29, 2009, shall have the right to

seek, through binding arbitration, continuation or reinstatement of a franchise

agreement ... ." (Exhibit A).

33. Section 747(c) provides a legal and factual prerequisite upon the covered

manufacturer (i.e. GM): to provide the covered dealer, within thirty (30) days of

the enactment of the Act, "specific criteria" as to why the dealer was terminated.

The Congressional Record explained:

> "We intend this process to provide transparency and avoid
> the excessive costs and delays of litigation and discovery
> disputes. **The manufacturer should provide the
> respective covered dealers with each any every detail
> and criteria related to the evaluations of the dealership**
> and the decisions to terminate, not assign, not renew or
> discontinue. It is anticipated that the manufacturers will be
> cooperative and forthcoming and that all relevant
> information will be provided promptly."

(Emphasis added).    Congressional Record-House, H14477 (December 10, 2009).

(Exhibit D).  There must be compliance with the legal and factual prerequisites in order

to frame the issues at the arbitration hearing.

34. The Act created a <u>tri-partite</u> balancing test, which had to be performed by the <u>neutral</u> arbitrator, regarding "the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large." Section 747(d). (Exhibit A). The Act sets forth seven (7) <u>required</u> factors[9] that the arbitrator must consider **AND** "that the covered dealership may present any relevant information during the arbitration." Section 747(d). The law provides the remedy of "continuation," as well as "reinstatement" or "addition" of the covered dealership's franchise agreement. Section 747(b) and (d).

35. Section 747 of the Consolidated Appropriations Act of 2010 is the **THIRD** instance that Congress has intervened and statutorily modified the commercial contract between automobile manufacturers and automobile dealerships. A review of the prior <u>remedial</u> legislative enactments demonstrates the need to preserve automobile dealerships' constitutional, contract, and statutory rights and remedies from manufacturers' encroachments and abusive tactics.

36. The Automobile Dealers Franchise Act, *15 U.S.C. 1221-1225* (commonly known as the "Automobile Dealers' Day in Court Act" or "ADDCA"), was **FIRST**

---

[9] "The factors considered by the arbitrator shall include:
(1) the covered dealership's profitability in 2006, 2007, 2008, and 2009,
(2) the covered manufacturer's overall business plan,
(3) the covered dealership's current economic viability,
(4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement,
(5) the demographic and geographic characteristics of the covered dealership's market territory,
(6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and
(7) the length of experience of the covered dealership." (Section 747(d)). (App. Ex. 1).

14

enacted by Congress in 1956 to establish a balance of power between

manufacturers and dealers in the automobile and truck industry by curtailing the

economic advantages of the manufacturers, and increasing those of the dealers.

*Woodard v. General Motors Corp.* (5th Cir. 1962), 298 F.2d 121, *cert. denied*

(1962), 369 U.S. 887.

37.  The primary purpose of the ADDCA is to protect dealers from abusive trade

practices (i.e., wrongful terminations) employed by the manufacturer in an

extremely concentrated market.  In *New Motor Vehicle Board v. Orrin W. Fox*

*Co.* (1978), 439 U.S. 96, 100 fn. 4, 99 S.Ct. 403, 58 L.Ed.2d 361, the United

States Supreme Court relied upon the Congressional findings set forth in S. Rep.

No. 2073, 84th Cong., 2d Sess., 2 (1956) to explain:

> **Dealers are with few exceptions completely dependent on the manufacturer
> for their supply of cars.**  When the dealer has invested to the extent required to
> secure a franchise, he becomes in a real sense the economic captive of his
> manufacturer.  **The substantial investment of his own personal funds by the
> dealer in the business, the inability to convert easily the facility to other uses,
> the dependence upon a single manufacturer for supply of automobiles, and
> the difficulty of obtaining a franchise from another manufacturer all
> contribute toward making the dealer an easy prey for domination by the
> factory.**  On the other hand, from the standpoint of the automobile manufacturer,
> any single dealer is expendable.  The faults of the factory-dealer system are
> directly attributable to the superior market position of the manufacturer.
> (Emphasis added).

38.  As the legislative history makes clear, the balance of power is heavily weighted

in favor of automobile manufacturers because of their "superior economic

position which ... [they] retain[ed] by threat of franchise termination." H.R.Rep.

No. 2850, 84th Cong., 2nd Sess., *reprinted in* 1956 *U.S. Code Cong. &*

*Admin.News* 4596, 4598 (1956), citing *Bigness and Concentration of Economic*

*Power - - A Case Study of General Motors Corp.*, S.Rep. No. 1879, 84th Cong.,

2nd Sess. 79.

39. In 2002, Congress for a **SECOND** time altered the automobile manufacturers and

automobile dealerships commercial contracts with the Motor Vehicle Franchise

Contract Dispute Resolution Process legislation. (15 U.S.C. 1226). The 2002

Senate Report explained that the motor vehicle franchise contract arbitration

fairness act "is a targeted **amendment to the Federal Arbitration Act**" and "is

intended to insure that motor vehicle dealers are not required to forfeit important

rights and remedies afforded by state law as a condition of obtaining or renewing

a motor vehicle franchise contract." Thus, Congress' **second** remedial law

regulating manufacturers and dealerships' contracts demonstrate Petitioner's

"private right" and constitutional due process protections being maintained.

Additionally, Congress' "targeted amendment to the Federal Arbitration Act"

conclusively demonstrates that the FAA applies to all arbitrations between

manufacturers and dealerships. There was no need for Congress to specifically

enumerate in Section 747 that the FAA applies. It previously set forth in 2002

that the FAA does apply to arbitrations "to resolve a controversy arising out of or

relating to such contract." (15 U.S.C. 1226).

40. On September 10, 2002, the Senate Committee Report for the 107th Congress, 2d

Session Senate Report 107-166, explained the automobile dealership's precarious

position as a franchisee of large manufacturers. The Committee Report explained

as follows:

**Dealers of new motor vehicles are virtual economic captives of automobile
manufacturers.** Unlike some other franchisees, who may have a broad choice of

16

franchisors with which to contract, new motor vehicle dealers may only obtain the right to merchandise and sell their product from an extremely limited group of manufacturers. **As a result of the imbalance in bargaining power inherent in this relationship, manufacturers possess unparallel leverage over dealers and potential franchisees. Motor vehicle manufacturers have historically, and do currently, require dealers to execute standard contracts of adhesion defining the manufacturer-dealer contract on a "take it or leave it" basis.** Additionally, manufacturers have broad discretion to allocate vehicle inventory and to control the timing for delivery of dealer stock. Manufacturers also exercise considerable control over the flow of revenue to dealers, such as warranty payments.

**In recognition of the disparity and bargaining power between motor vehicle dealers and manufacturers, all States have enacted laws specifically designed to level the playing field between manufacturers and dealers and prevent unfair contract terms and practices.** In fact, State laws govern nearly every aspect of the franchise contract (except for the inclusion of arbitration clauses as discussed below). Motor vehicle franchise contracts and resulting disputes greatly affect the competitive distribution of vehicles which directly affects consumers as well as the individual States' economies generally. In fact, the U.S. Supreme Court has held that State legislators are constitutionally empowered to regulate the motor vehicle contractual relationship as a valid exercise of their police powers. *New Motor Vehicle Board v. Orrin W. Fox Co.*, 99 S.Ct. 403 (1978). **As a result, dealers have clear and enforceable rights under State franchise laws. Generally, these State rights and procedures are non-waivable, and contract terms that conflict with State law are routinely rendered unenforceable, irrespective of the contract terms.** (Emphasis added)

*Committee Reports, 107th Congress, 2d Session, Senate Report 107-266, September 10, 2002. .*

41. As indicated in the 2002 Senate Judiciary's report, the concepts therein have been approvingly adopted by the United States Supreme Court and all states have adopted laws designed to level the playing field between manufacturers and dealers. Section 747 is Congress' most recent (i.e., **third**) remedial intervention to protect dealerships' contract rights and establish additional remedies to combat manufacturers egregious and reprehensible conduct.

17

42.  The 2009 Congressional Record (Exhibit D) and Section 747 (Exhibit A) for a

**THIRD** time explains Congress and the Court's need to provide a procedure and

a remedy for automobile dealerships to maintain their contract rights through

"continuation" or "reinstatement" as a new motor vehicle dealership.

### ARGUMENT

43.  New GM relies heavily upon the recent October 12, 2010 determination of this

Court with respect to Rally Auto Group, Inc. ("Rally"). Based upon the Court's

determination in Rally (the "Rally Motion to Enforce")[10], New GM again asks

that this Court make the starting point for its analysis the Wind-Down Agreement

and the Sale Order and not the Ohio Dealers claims under Section 747 of the Act.

44.  Based upon this starting point, New GM asserts, and this Court determined in the

Rally Motion to Enforce, that it has (a) "exclusive jurisdiction over any efforts to

defeat the Wind-Down Agreements through challenges to arbitration decisions

made under the Dealer Arbitration Act." New GM Motion to Enforce at page 4,

paragraph 7, (b) there is no 'basis for the [Ohio] Dealers' claims that they are

entitled to judicial review of the arbitrators' awards or otherwise." New GM

Motion to Enforce at page 6, paragraph 12, (c) 'this Court has subject matter

jurisdiction to consider this matter pursuant to 28 U.S.C 1334" (New GM Motion

to Enforce, page 15, paragraph 26), and (d) "[t[his is a core proceeding pursuant

to 28 U.S.C 157(b)(2)(N) (New GM Motion to Enforce, page 16, paragraph 26).

45.  As shown herein below, respectfully, each of these contentions should be rejected

and the within motion should be denied in its entirety.

---

[10] Rally has appealed from this Order and now seeks a stay of the enforcement of Judge Gerber's Order
pending the determination of this appeal. That application is pending in the District Court before Judge
Patterson.

## POINT I

### THIS ARTICLE I BANKRUPTCY COURT IS PROHIBITED FROM CONSTITUTIONAL DUE PROCESS REVIEW AND TRADITIONAL JUDICIAL REVIEW FUNCTIONS RESERVED EXCLUSIVELY FOR ARTICLE III DISTRICT COURTS

46.  The following seminal U.S. Supreme Court case decisions provide analysis and support for the Ohio Dealers' position that, respectfully, this Article I Bankruptcy Court does not have subject-matter jurisdiction to review the Petitions to Vacate because it requires the application of traditional judiciary powers of constitutional due process review, federal question jurisdiction involving the interpretation of a United States law of first impression, and equitable powers exclusively reserved to Article III District Courts to insure litigants' rights through judicial review of legislative court proceedings.

47.  In *Northern Pipeline Construction Co. v. Marathon Pipeline Company*, 458 U.S. 50, 102 S.Ct. 2858 (1982) and *Thomas v. Union Carbide Agricultural Products*, 473 U.S. 568, 105 S.Ct. 3325 (1985), the Supreme Court thoroughly explained the limitation of powers that Congress can constitutionally delegate to an Article I Bankruptcy Court.  In contrast, Article III District Courts (like the Ohio District Court) have exclusive judiciary powers reserved to them, through the Constitution, in order to maintain the separation of powers between the three branches of government.

48.  In *Northern Pipeline v. Marathon*, the U.S. Supreme Court set forth the historical context in order to explain why only Article III District Courts have certain traditional judiciary powers reserved to it, which cannot be delegated by Congress

to a legislative court (i.e., bankruptcy court or arbitration) through an Article I enactment by Congress. The *Northern Pipeline* court explained as follows:

"Basic to the constitutional structure established by the Framers was their recognition that '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.' The Federalist No. 47, p. 300 (H. Lodge ed. 1888) (J. Madison). To ensure against such tyranny, the Framers provided that the Federal Government would consist of three distinct Branches, each to exercise one of the governmental powers recognized by the Framers as inherently distinct. 'The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment of aggrandizement of one branch, at the *58 expense of the other.'" *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (*per curiam*).

The Federal Judiciary was therefore designed by the Framers to stand independent of the Executive and Legislature to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial.

*Northern Pipeline*, 458 U.S. at 57-58, 102 S.Ct. at 2864.

49. The *Northern Pipeline* matter was the Supreme Court's review of whether or not the Bankruptcy Reform Act of 1978 was unconstitutional because Congress' broad grant of jurisdiction to bankruptcy judges violates Article III of the Constitution. A plurality of the Supreme Court held in the affirmative and declared that the Bankruptcy Reform Act of 1978 unconstitutional because "judicial power of the United States must be vested in Article III courts." (Id. at 63). The Court further explained that private rights disputes (i.e., the liability of one individual to another), "lie at the core of the historically recognized judicial power." (Id. at 70). The Supreme Court further concluded that "in sum, Art. III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws ... nor can we discern

any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art. III." (*Northern Pipeline*, 458 U.S. at 76). The Court held that congressional enactments must retain "the essential attributes of the judicial power" in Article III tribunals. (Id. at 77). The *Northern Pipeline* court explained that even with respect to congressionally created rights, "some factual determinations may be made by a specialized fact finding tribunal designed by Congress, without constitutional bar." (Id. at 81). However, the congressional enactment must still have "the reservation of full authority" to an Article III court "to deal with matters of law." (Id. at 81).

50. In this matter, the Dealer Arbitration Act provides for the "continuation" of automobile dealerships' state law contract and statutory rights be preserved through a binding arbitration proceeding. It is a private right between the Ohio Dealers and New GM. Only Article III courts (like the Ohio District Court) have the subject-matter jurisdiction and constitutional power to review the dealer reinstatement arbitration proceedings between the Ohio Dealers and New GM to insure the rights of due process and perform the traditional judicial review of legislative courts' fact finding determinations are consistent with the law.[11]

---

[11] A similar analysis is made by District Courts in determining whether to withdraw a reference to a bankruptcy court, pursuant to 28 U.S.C. § 157(a). *See In re G-1 Holdings, Inc.*, 295 B.R. 222 (D.N.J. 2003) (Withdrawal of reference to bankruptcy court, **for district court to determine which provision of IRS Code applied to tax obligations of debtor was mandatory since determination of whether particular code section applied to facts in case was one of first impression and such determinations were reserved for Article III Courts**, substantial and material considerations of non-bankruptcy legal standards was required to be undertaken); *In re Cablevision*, 315 B.R. 818 (S.D.N.Y. 2004) **(matters must be withdrawn if they require the bankruptcy court to substantially interpret federal statutes which affect interstate commerce);** *In re Johns-Manville Corporation*, 63 B.R. 600 (S.D.N.Y. 1986) **(question of whether claims against debtor for cleanup of hazardous waste arose before or after debtor filed bankruptcy required interpretation of CERCLA thus mandatory withdrawal statute required that adversary proceeding be heard in district, rather than bankruptcy court);** Hatzel & Buehler, Inc. v. Orange * Rockland Utilities, Inc., 107 B.R. 34 (D.Del. 1989) **(mandatory withdrawal from bankruptcy court was required with respect to adversary proceedings bought by subcontractor-**

51. Thus, *Northern Pipeline* is controlling authority explaining that only a District Court has the exclusive power and subject-matter jurisdiction involving the California District Court Action because it involves a private right, federal question of interpreting a law of the United States, and requires traditional judicial review functions, only reserved to Article III courts in order to protect and promote the separation of powers and the three-pronged checks and balances of the United States government.

52. In *Thomas v. Union Carbide*, the Supreme Court reviewed whether or not "Article III bars Congress from requiring arbitration of disputes among registrants concerning compensation under FIFRA without also affording substantial review by tenured judges of the arbitrator's decision." *Thomas*, 473 U.S. at 582.

53. The *Thomas* Supreme Court reaffirmed its *Northern Pipeline* decision that "Congress may not vest in a non-Article III court the power to adjudicate, render a final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." (Id. at 584).

54. Similarly, in this matter, the mandatory and binding arbitration set forth in the Dealer Arbitration Act (Section 747) involved each of the Ohio Dealers' state

---

debtor alleging violations of OSHA and EPA regulations). Here, as only non-Code matters are at issue, the Bankruptcy Court, respectfully, does not have statutory authority to assert jurisdiction. Even if the case involved aspects of Title 11, the claim for judicial review of the arbitration and the necessary interpretation of the Dealer Arbitration Act order so dominates that no decision could issue without "substantial and material consideration" of Section 747, not to mention judicial economy and common sense, require that this matter of non-Code federal, state law contract, and state law statute be adjudicated in an Article III District Court.

contract claims, state statutory rights, and federal statutory rights enacted in the

ADDCA. (15 U.S.C. 1221 and 1226.).

55. The *Thomas* court went on to explain that matters subject to a suit at common

law or equity are at the "protective core of Article III judicial powers." (Id. at

587). Furthermore, state law contract actions are "the stuff of the traditional

actions at common law tried by the courts at Westminster in 1979." (Id. at 587).

56. This matter involves Section 747 and the franchise agreement between the

manufacturer and dealership. In *Thomas*, the court explained that FIFRA **"limits**

**but does not preclude review of the arbitration proceeding by an Article III**

**court."** (Id. at 592). FIFRA, at a minimum, allows private parties to secure

Article III review of the arbitrator's findings and determinations for fraud,

misconduct, or misrepresentation. (Id. at 592). The *Thomas* court explained that

the reservation of judicial review to the Article III court "protects against

arbitrators who abuse or exceed their powers or willfully misconstrue their

mandate under the governing law." (Id. at 592). The *Thomas* court concluded

that "we need not identify the extent to which due process may require review of

determinations by the arbitrator because the parties stipulated below to abandon

any due process claims. For purposes of our analysis, it is sufficient to note that

FIFRA does provide for limited Article III review, including whatever review is

independently required by due process considerations." (Id. at 592-593).[12]

---

[12]  The *Thomas* court concluded that its "holding is limited to the proposition that Congress, acting for a
valid legislative purpose pursuant to its constitutional*594 powers under Article I, may create a seemingly
'private' right that is so closely integrated**3340 into a public regulatory scheme as to be a matter
appropriate for agency resolution with limited involvement by the Article III judiciary. To hold otherwise
would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures
such as negotiation and arbitration with respect to rights created by a regulatory scheme." In this matter, no

57. In sum, the *Thomas v. Union Carbide* and *Northern Pipeline v. Marathon*
reasoning clearly explains that only an Article III District Court has the power to
provide for constitutional review of a law, **interpretation of United States law
as a federal question**, insure the constitutional right to due process, and provide
the traditional judiciary functions and equitable review of underlying legislative
court proceedings (i.e., arbitration) in order to maintain a separation of powers
and ensures litigants an impartial and fair proceeding.

## POINT II

## THE NEW GM MOTION IS NOT A CORE PROCEEDING

58. As stated above, in determining the Rally GM Motion to Enforce, this Court
found that the New GM Motion was a core proceeding. To reach this conclusion,
this Bankruptcy Court relied upon the Sale Order and the Wind-Down
Agreement, The Rally GM Motion, however, was a (not too) covert attempt to
circumvent the California District Court and the jurisdiction it was granted under
the AAA Commercial Rules and federal common law (*i.e.,* federal question).
Indeed, a review of the case law in this Circuit makes it abundantly clear that the
New GM Motion does not constitute a core proceeding.

59. Specifically, 28 U.S.C. §1334 provides, in pertinent part, that district courts have
original *but not exclusive* jurisdiction of "all civil proceedings arising under title
11 [ (the Bankruptcy Code) ], or arising in or related to cases under title 11." 28
U.S.C.A. § 1334(b) (West 2006)(emphasis added). Cases "arising under" title 11

---

regulatory scheme or agency has been created by Congress.  Furthermore, even if Congress had created a
"public regulatory scheme" (i.e., FIFRA), the Constitution still would require the basic due process right of
an Article III court review.

24

or "arising in" a title 11 case are "core" proceedings that may be heard and

determined by bankruptcy courts, subject to appellate review by the district

courts.

60. Whether a proceeding is core depends, *inter alia*, on the degree to which the

proceeding is independent of the reorganization. This inquiry hinges on "the

nature of the proceeding." *Beal Bank, S.S.B. v. U.S. Bank Nat. Ass'n,* 2010 WL

2541165 at *2 (S.D.N.Y., June 8, 2010)., *citing In re S.G. Phillips Constructors,*

*Inc.,* 45 F.3d 702, 707 (2d Cir.1995). "Proceedings can be core by virtue of their

nature if either: (1) the type of proceeding is unique to or uniquely affected by the

bankruptcy proceedings, ... or (2) the proceedings directly affect a core

bankruptcy function...." *In re United States Lines. Inc.,* 197 F.3d 631, 637 (2d

Cir.1999).

61. Here, the New GM Motion is not a core proceeding. It is neither unique to the

bankruptcy proceeding nor does it directly effect a core function. The

constitutional and statutory rights asserted here by the Ohio Dealers originate in

Section 747 and were effectuated by the arbitrator's order. The request for

constitutional due process, traditional judiciary review, and review pursuant to the

Dealer Arbitration Act does <u>not</u> "involve a cause of action created or determined

by a statutory provision of title 11."

62. Stated otherwise, in this matter, the Ohio Dealers' rights and remedies clearly

exist <u>outside</u> the context of the bankruptcy. The Ohio Dealers' contract rights and

Section 747 arbitration remedy was pursuant to the **subsequent, intervening, and**

**superceding** Dealer Arbitration Act  enacted six (6) months <u>after</u> the Bankruptcy

Court's 363 Sale Order. Furthermore, it is a claim and/or remedy which could not have been set forth in the bankruptcy proceeding and/or on a proof of claim, because it did not exist at the time the bankruptcy matter was pending and then concluded.

63. The Ohio Dealers claims and remedies are outside the bankruptcy estate and are new rights and remedies that will not affect the bankruptcy proceeding and could never be a core matter. In sum, there can be no "arising under" jurisdiction of the bankruptcy court in the instant case.

64. Respectfully, while this Court previously may have viewed New GM's actions in the Rally Motion to Enforce as seeking to "enforce" the Sale Order, the relief New GM is seeking here has nothing to do with the Sale Order or the Wind-Down Agreements. While the Wind-Down Agreement sets forth certain limitations as to what actions the Ohio Dealers could and could not undertake against the Debtor or New GM, the landscape was dramatically altered when President Obama signed the Dealer Arbitration Act into law, on December 16, 2009.

65. The Dealer Arbitration Act specifically gave dealers like the Ohio Dealers the right to arbitrate determinations regarding their dealerships *despite their entry into the Wind-Down Agreements.* As one of the sponsors of the Dealer Arbitration Act noted:

> It is not the intent of Congress to bar a covered dealership from the provisions of this section if the covered dealership accepted a standard form contract prepared by the covered manufacturer and offered on a 'take-it-or-leave-it' basis, even if the agreement was entered into voluntarily. ***As a consequence, a covered dealership that accepted a 'wind-down' agreement drafted by a covered manufacturer would be able to avail itself of the provisions of [the Dealer Arbitration Act].***

26

(Rep. John Conyers, Congressional Record - House, H14478-79, Dec. 10, 2009; Exhibit D) (emphasis added).

66. Indeed, New GM had little problem seeking affirmative relief in a California District Court itself (referring to the District Court as a court of competent jurisdiction) to enforce the terms of its settlement and relying upon the jurisdiction of the Dealer Arbitration Act. In sum, the New GM Motion is an attempt to forum shop and the Bankruptcy Court should either denied the New GM Motion or refuse to exercise jurisdiction over it.

## POINT III

### THE NEW GM MOTION IS NOT A RELATED PROCEEDING

67. The New GM Motion is also not a "related" proceeding. The Bankruptcy Court has jurisdiction to hear and (unless the parties consent to determination of the matters by the bankruptcy court) make proposed findings of fact and conclusions of law to the district court with respect to matters that are merely "related to" title 11 bankruptcy cases. 28 U.S.C. § 157(c)(1). The determination as to whether a matter is "related to" a pending bankruptcy case turns on "whether its outcome might have any 'conceivable effect' on the bankrupt estate ... 'any significant connection' with the bankrupt estate ... would [also] establish § 1334(b) jurisdiction." *Publicker Ind. Inc. v. U.S. (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir.1992) (citations omitted).*

68. In order for a proceeding to relate to a bankruptcy case, it must have a significant connection with the case and have a potential effect on the bankruptcy estate. *In re Leco Enterprises*, .144 B.R. 244, 248 (Bankr. S.D.N.Y. 1992); *see also Celotex*

27

*Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995);

*Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.),* 190 B.R. 157, 160

(S.D.N.Y.1995) ("An action is related to the bankruptcy if the outcome could alter

the debtor's rights, liabilities, options, or freedom of action ... and which in any

way impacts upon the handling and administration of the bankruptcy estate." (

*citing Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984))).

69.   "'Related to' jurisdiction is not established when a third-party dispute affects

neither the distribution of estate assets nor the bankruptcy estate in general." *In re

IPDN Corp.,* 352 B.R. 870, 877-78 (Bankr. E.D. Mo. 2006) (citing *Credit Mgmt.

Corp. v. McAlpin,* 263 B.R. 881, 884 (8th Cir. 2001); *Specialty Mills, Inc. v.

Citizens State Bank,* 51 F.3d 770, 774 (8th Cir.1995)).

70.   Further, "speculative, theoretical claims are not sufficient to show 'related to'

bankruptcy jurisdiction." *Ausa Life Ins. Co. v. Citigroup, Inc.,* B.R. 471, 476

(N.D. Iowa 2003).

71.   Regardless as to how the Ohio District Court ultimately decides the Petitions to

Vacate, the bankruptcy estate of the Debtor will not --in any way-- be affected by

its determination.[13] It is simply immaterial to any parties, other than New GM and

the Ohio Dealers, all non-debtors, as to how the Ohio District Court addresses the

---

[13] The reality is that New GM is not the Debtor and the lack of any bankruptcy estate which could possibly be offended by this case destroys any alleged nexus to the bankruptcy case required to create jurisdiction. As if that were not enough, there is the matter that Congress, with full knowledge of the Debtor's bankruptcy, crafted Section 747 with the sole intent of having all applicable dealer termination and wind-down cases determined by a particular set of arbitrators.. Each arbitration was <u>required</u> to be conducted in the state where the dealership was located.  As the very branch of government that "vested 'limited authority' in bankruptcy courts," *In re Resorts Intern.,* Inc., 372 F.2d 154, 161 (3rd Cir. 2004), Congress sought to create a narrow and efficient procedure for addressing the rights of the respective parties which **excluded** the <u>Bankruptcy Court</u>. (Id.).

Petitions to Vacate. For this reason, the Bankruptcy Court should determine that it

has no jurisdiction to hear or determine the New GM Motion.[14]

## POINT IV

### IF THE NEW GM MOTION IS DETERMINED TO BE A "RELATED" PROCEEDING, THEN THE BANKRUPTCY COURT SHOULD HAVE NONETHELESS DENIED THE MOTION IN THE INTEREST OF JUDICIAL ECONOMY

72. Even if the New GM Motion is somehow determined to be a non-core, related

proceeding, judicial economy would been be served if this Court denied the New

GM Motion. A Bankruptcy Court, in non-core matters, may only "submit

proposed findings of fact and conclusion of law to the district court." Section

157(c)(1).

73. The district court would have to review, *de novo*, the bankruptcy courts findings

of fact and conclusions of law to which any party interposes an objection. *Id.*

Such secondary review duplicates judicial time and resources. *In re Orion*

*Pictures*, 4 F.3d 1095, 1101 (2d Cir.1993) ("the fact that a bankruptcy court's

determination on non-core matters is subject to *de novo* review by the district

---

[14] The Petitions to Vacate also do not "arise in" the context of bankruptcy and are not a "core proceedings" subject to the jurisdiction of the bankruptcy court. "'[A]rising in' proceedings are those that are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* at 1018 (quoting *In re Wood,* 825 F.2d at 97). These are "claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case" (*Id.* (quoting *Stoe v. Flaherty,* 436 F.3d 209, 218 (3rd Cir. 2006)), and are "principally ... administrative matters, such as for turn-over orders, determination of lien priority or validity, or preference avoidance or recovery." *In re IPDN Corp.,* 354 B.R. 870, 876-77 (Bankr. E.D.Mo. 2006) (internal citations omitted). Section 747 served to confer a new right upon General Motors dealers, whether terminated or wound down, and was passed by Congress with full knowledge of the Debtor's bankruptcy. The arbitrations were held subsequent to the Bankruptcy Court Order approving the 363 sale order and were conducted according to rules and procedures set out in Section 747 as well as the Commercial Rules of the AAA. The proceedings and resulting orders by the arbitrators were not bound in any manner by the bankruptcy and were not subject to review in any manner by the Bankruptcy Court. As the Petitions to Vacate are based wholly upon the ruling of the Section 747 arbitration award and state law contract issues, there can be no "arising in" jurisdiction of the Bankruptcy Court in the instant case.

court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in a district court").

74. As a result, since a district court would have to, in any event, review the facts and law *de novo*, it make sense on all levels, for the Bankruptcy Court to simply have allowed the Ohio District Court to exercise appropriate jurisdiction over the Petitions to Vacate.

## POINT V

**THE BANKRUPTCY COURT SHOULD NOT EXERCISE    JURISDICTION OVER THE ASSETS, POST-SALE, UNLESS INDEPENDENT JURISDICTION UNDER THE BANKRUPTCY CODE WAS ESTABLISHED**

75. At least one Circuit Court has stated that "[g]enerally, once a bankruptcy debtor's reorganization plan has been confirmed ... 'the estate of the debtor, and thus the bankruptcy court's jurisdiction, ceases to exist.'" *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998) (quoting *Norwest Equip. Fin., Inc. v. Nath (In re D & P Partnership)*, 91 F.3d 1072, 1074 (8th Cir.1996)).

76. This sentiment is echoed in cases involving transactions under Section 363 of the Bankruptcy Code. "[T]he [bankruptcy] court's jurisdiction typically lapses when the property leaves the estate, including property that has been removed by sale under § 363 of the Bankruptcy Code." *In re Crowder*, 314 B.R. 445, 448 (10th Cir. 2004); see also *In re Hall's Motor Transit Co.*, 889 F.2d 520, 522 (3rd Cir.1989) ("The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the debtor's estate.")

77. Additionally, just as the parties by agreement cannot confer subject matter jurisdiction upon a court, a bankruptcy court's order "by itself cannot confer

jurisdiction," it "must be independently established under the bankruptcy code."

*In re Cary Metal Products, Inc.*, 158 B.R. 459, 462 (N.D.Ill. 1993). Although this

Court clearly reserved exclusive jurisdiction to enforce and implements its Sale

Order and resolve disputes relating to the Wind-Down Agreements, "bankruptcy

courts are unable to expand their own jurisdiction by order." U.S> Commodity

Futures Trading Comm'n v. NRG Energy, Inc., 457 F.3d 776,780 (8th Cir. 2006).

See Binder v. Price Waterhouse & Co., LLP, 372 F.3d 154, 161 (3d Cir. 2004)

("[N]either the Bankruptcy Court nor the parties can write their own jurisdictional

ticket."). In other words, respectfully, the Bankruptcy Court's retention of

jurisdiction is meaningless unless the Bankruptcy Court could exercise

jurisdiction in the first place.

78. It is no coincidence that these principles of jurisdictional restraint were

highlighted by the Bankruptcy Court in discussing the unique utility of the 363

sale as a means to get the Debtor back on its feet and out from under the thumb of

the Bankruptcy Court as soon as possible:

> Under this game plan, [New GM] would acquire the
> purchased assets; create a New GM; and operate New GM
> free of the entanglement with the bankruptcy cases .... This
> plan was put in place for the specific purpose of
> "avoid[ing] the enormous costs of financing a lengthy
> chapter 11 case.

(Sale Order, pp. 13-14).

79. As presciently set forth by Judge Easterbrook in In re *Pettibone*, 935 F.2d 120,

122 (7th Cir. 1991), New GM "may not come running to the bankruptcy judge

every time something unpleasant happens." 936 F.2d at 122. For these reasons,

31

the Bankruptcy Court should have seen the New GM Motion for what it is: a

naked attempt to forum shop and deny the New GM Motion.

### POINT VI

### THE BANKRUPTCY COURT SHOULD DEFER TO
### THE STATUTORILY CREATED ARBITRATION PROCESS

80. Regardless as to whether the New GM Motion is a core or non-core proceeding,

it is respectfully submitted that the Bankruptcy Court should defer to the strong

national policy favoring arbitration and deny the New GM Motion. The United

States Supreme Court has recognized the strong national policy favoring

arbitrating and has held that arbitration will be compelled unless the party

opposing arbitration is able to demonstrate that "Congress intended to preclude a

waiver of judicial remedies for the statutory rights at issue." *Shearson/American*

*Express, Inc., v. McMahon*, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185

(1987)("*McMahon*").

81. In *McMahon*, the Supreme Court promulgated a three factor test to determine

Congress' intent: 1) the text of the statute; 2) the legislative history; and  3)

whether an inherent conflict between arbitration and the underlying purpose of the

statute exists. McMahon, 482 U.S. at 227.[15]

82. Applying the *McMahon* factors to the present case, there is no evidence within the

Bankruptcy Code or its legislative history intended to create an exception to the

Dealer Arbitration Act and the Bankruptcy Code. In fact, the evidence is the

opposite: the Dealer Arbitration Act was enacted by Congress intentionally to

---

[15] In *McMahon*, the statute that required arbitration was the Federal Arbitration Act, 9 U.S.C. § 2,
the analysis should be no different under the Dealer Arbitration Act.

afford the dealers relief form the "take it or leave it" nature of the Wind-Down

Agreements approved by the Bankruptcy Court.

83. Furthermore, there is no inherent conflict between the arbitration requirements

set forth in the Dealer Arbitration Act and the Bankruptcy Code. It cannot be

overstated that neither New GM nor the Ohio Dealers are debtors in this

bankruptcy case. In light of the stated policy favoring arbitration, there was no

compelling reason for the Bankruptcy Court to have disrupted the arbitration

between these non-debtor entities.

84. The Dealer Arbitration Act, consistent with the objectives of the Bankruptcy

Court to "disentangle" the Debtor from New GM, was meant to provide relief to

the Covered Dealers and has no effect, negative or otherwise, on the Debtor or its

estate. For this reason, the Bankruptcy Court should determine that the New GM

Motion is neither a core nor non-core, related proceeding, and should deny the

New GM Motion in deference to the statutorily codified arbitration process.

### POINT VII

**THE COMMERCIAL RULES OF THE AAA, WHICH APPLIED IN EACH
OF THE OHIO DEALERS' DEALER REINSTATEMENT ARBITRATIONS
SPECIFICALLY STATE THAT JUDGMENT UPON THE ARBITRATION
AWARDS MAY BE ENTERED IN ANY FEDERAL OR STATE COURT
HAVING JURISDICTION THEREOF**

85. Courts have held that "when parties agree to submit to the rules of the American

Arbitration Association, they consent to a federal court's jurisdiction to enforce

the arbitration award." *Idea Nuova, Inc. v. GM Licensing Group, Inc.*, 2010 WL

3079917 (2d Cir., Aug. 9, 2010)("*Idea Nuova*"); *EMO Energy Solutions, LLC v.

Acre Consultants, LLC*, No. 08-4365, 2008 WL 5110585, at *1 (E.D. La. Nov.25,

2008) (citation omitted); *see also Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190, 193 (4th Cir.1991) (citing cases).

86. Here, the Ohio Dealers' consolidated reinstatement arbitrations were **conducted pursuant to the Dealer Arbitration Act**[16] **and Commercial Arbitration Rules of the AAA.**[17] In this respect, AAA Commercial Rule R-1 (a) (a copy of which is attached as Exhibit J) provides, in relevant part that:

> these [AAA Commercial Arbitration Rules] rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

87. In each of the Ohio Dealers reinstatement arbitrations there was no written agreement by the parties to vary the applicability of the AAA Commercial Arbitration Rules nor did the Arbitrator consent to any modifications thereof. As such, there can be no dispute that the AAA Commercial Rules fully applied to these Arbitrations. *See Bryson, III v. Gere,* 268 F.Supp.2d 46 (D.D.C.2003) (reference to rules and regulations of AAA effectively incorporates those rules in their entirety and "under the AAA rules, all arbitrations are binding."). Consequently, reference to AAA rules and its regulations is sufficient to make the arbitration "binding" and final.

---

[16] The Dealer Arbitration Act expressly refers to the AAA by stating that the arbitrator for the dealer reinstatement arbitration shall be selected from the AAA panel of arbitrators, and if the parties cannot agree, the AAA shall select the arbitrator.

[17] The fact that the Arbitrator utilized AAA Rules is not a surprise The Congressional Record relating to the Dealer Arbitration Act (at H14479) specifically provides that: "It is our understanding that the General Commercial Rules of the American Arbitration Association shall apply to the arbitration proceeding . . . ). See Congressional Record attached hereto as Exhibit D.

88. AAA Commercial Arbitration Rules clearly and unambiguously addressed the scope of judicial review with respect to the Arbitrator's determination in the Arbitration. Specifically, Rule-48(c) of the AAA Commercial Arbitration Rules provides:

> **Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof. (emphasis Added).**

89. As a result, a "federal or state court having jurisdiction thereof" may entertain issues surrounding the Awards. Any doubt that a court (having subject matter jurisdiction) may review the Arbitrator's awards (be it confirmation, vacatur of modification of the awards) - was put to rest by the recent decision of the Second Circuit.

90. In *Idea Nuova*, the plaintiff argued that the district court did not have jurisdiction to confirm an arbitration under the AAA, when the underlying arbitration agreement was silent as to whether the arbitration awards would be final and binding and permitting the district court to reject the arbitration awards "outright and review the parties dispute *de novo*." See *Idea Nuovo v. GM Licensing Group, Inc.*, 08 Civ 8595(PKC), 2009 WL 2568332 at *4-6 (S.D.N.Y. Aug. 19, 2009). (A copy of the District Court decision in *Idea Nuova* is annexed hereto as Exhibit K).

91. The District Court, relying upon an unpublished decision of the Second Circuit, held that the language providing for arbitration pursuant to the AAA rules is sufficient to incorporate those rules into the agreement, notably including consent to confirmation. The plaintiff thereafter appealed from the District Court's

35

judgment confirming the AAA arbitration award and dismissing its complaint

seeking to vacate or modify such award based upon the plaintiff's contention that

it never agreed to binding arbitration or a District Court's jurisdiction to confirm

arbitral awards. *(Id)*

92.   In the plaintiff's appeal, the Second Circuit affirmed, holding that, by arbitrating

pursuant to the AAA rules, the parties agreed to incorporate the AAA rules into

their agreement. *Idea Nuova,* 2010 WL 3079917 at *4. The Second Circuit

further held that, after determining that the AAA rules were incorporated into

their agreement:

> permits us to easily resolve this appeal. AAA Rule 7
> and 48 repeatedly reference arbital awards as "final"....
> with these rules incorporated into the parties Agreement,
> see AAA Rule 1(a), we reject Idea Nuova's argument that
> it never agreed to binding arbitration *or to the court's jurisdiction
> to confirm arbital awards.* This conclusion finds support not only
> in our previously cited precedent but indecisions of our sister
> circuits. [citing cases]

93. *Idea Nuova, Id.*(emphasis added).

94.   Such is the case here. As set forth above, the AAA Commercial Rules applied to

the consolidated arbitrations. Since judicial review of the Petitions to Vacate (be it

confirmation, vacatur or modification of the arbitration award) is specifically

provided for in the Commercial Rules, then a court of competent jurisdiction was

conferred with jurisdiction under Rule 48(c). As a result, the Bankruptcy Court

does **not** have exclusive jurisdiction over the consolidated arbitrations (if it has

jurisdiction at all).

36

## POINT VIII

### THE OHIO DISTRICT COURT IS CLEARLY CONFERRED WITH THE SUBJECT MATTER JURISDICTION NEEDED TO REVIEW PETITIONS TO VACATE

95. In any given case a federal court may be independently conferred with at least one of three (3) types of subject matter jurisdiction (i.e., jurisdiction under a specific statutory grant; federal question jurisdiction pursuant to 28 U.S.C.1331; or diversity jurisdiction pursuant to 28 U.S.C. 1331). Here, as shown below, as a matter of law, the Ohio District Court is conferred with the federal question jurisdiction[18] needed to review the Petitions to Vacate.

96. Federal Courts have subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. 1331. An action arises under federal law where, among other things, the plaintiff pleads a cause of action "created by a federal law." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005); *Franchise Tax Board of the State of Cal. v. Constr. Laborers Vacation Trust for So. California*, 463 U.S. 1, 9-11 (1983).

---

[18]    As stated above, the Ohio District Court is also conferred with diversity jurisdiction to determine the Petitions to Vacate. Diversity jurisdiction turns on two issues, is there complete diversity of citizenship between the parties and does the amount in controversy exceed $75,000. *Northport Health Services of Arkansas, LLC v. Rutherford*, 605 F.3d 483 (8th Cir. 2010). Here, New GM is a limited liability company organized and existing under the laws of the State of Delaware while each of the Ohio Dealers is a corporation duly organized and existing under the laws of the State of Ohio. Furthermore, to resolve the next issue (i.e., issue of the amount in controversy), "courts uniformly appl[y] a limited 'look through' approach, determining whether the 'value at stake in the arbitration' being sought in the federal action could exceed $75,000 . . . " *Id.* At 486-487. Here, New GM cannot argue that the value of each Ohio Dealer in issue does not exceed $75,000. As such, given that the Ohio District Court Petition concerns a matter in which there is complete diversity of citizenship between the parties and the amount in controversy exceed $75,000, the Ohio District Court is conferred with subject matter jurisdiction (diversity jurisdiction) to review the Arbitrator's award and the underlying arbitration between the parties.

97. Furthermore, although the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.*, does not create any independent federal question jurisdiction, a federal court may obtain jurisdiction if there is an **independent** federal question. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). The inquiry for a federal court in determining whether it has federal question jurisdiction to consider vacating an arbitration award is whether the resolution of the request to vacate such award requires consideration of federal law. *Med-Tel International v. Loulakis*, 403 F.Supp.2d 496 (E.D. Va. 2005).

98. In fact, the Supreme Court, in *Vaden v. Discover Bank*, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009), only recently determined that a federal district court could properly "look through' a petition to compel arbitration to the parties' underlying substantive controversy in order to determine whether the petition is predicated on an action that arises under federal law, such that the federal district court has federal question jurisdiction over the petition.

99. Following the Supreme Court's decision in *Vaden*, two recent District Courts cases have seemingly dealt squarely with the issue raised in the New GM's Motion – *i.e,* whether a federal district court could properly "look through" a petition to vacate an arbitration to the parties' underlying substantive controversy in order to determine whether the petition is predicated on an action that arises under federal law, such that the federal district court has federal question jurisdiction over the petition.  In both cases, the answer was in the affirmative.

100.    In *Francis v. Landstar Systems Holding, Inc.*, 2009 WL 4350250 (M.D. Fla. 2009), a Florida district court found that it had federal question jurisdiction to

determine the plaintiff's motion to vacate an arbitrator's decision on the basis of

the plaintiff's argument that the arbitrator misapplied federal law interpreting

Title VII. Specifically, the District Court held that: "[w]hile federal claims may

appropriately be resolved through arbitration, the federal courts have a strong

interest in ensuring that arbitrators interpret and apply federal law properly, even

if within a wide range of tolerance."

101.    Likewise, in *Gimbel v. UBS Financial*, 2009 WL 1904554 (N.D. Ill.

2009), the petitioner argued that their request to vacate an arbitration award relied

upon an interpretation of Securities and Exchange rules and regulations. Since the

District Court found that "[i]nterpreting the Securities Exchange Act is the

province of federal courts," indicating the petitioner's claims would necessarily

require interpreting substantial questions of federal law and, therefore, the District

Court had subject matter jurisdiction over the petition to vacate.

102.    Here, the Petitions to Vacate clearly seek relief that was necessarily

created by federal law (i.e., the vacatur of an arbitrator's award in an arbitration

derived solely through the Dealer Arbitration Act). Stated otherwise, the

arbitration remedy is a creation of a federal statute. The Ohio Dealers and New

GM did not arbitrate pursuant to a contract, they arbitrated because Congress

mandated it as a condition to the Ohio Dealers' reinstatement.

103.    Furthermore, and perhaps more importantly, like the *Francis* and *Gimbel*

cases, any irregularity with the arbitration remedy, as alleged by the Ohio Dealers

in the Petitions to Vacate, necessarily implicate the interpretation of the federal

statute (i.e., the Dealer Arbitration Act). Indeed, resolution of the Petitions to

Vacate will specifically require the Ohio District Court to address whether

Congress intended that, under the Federal Arbitration Act, the arbitrator was (a) to

consider the manufacturer's overall business plan as a factor in his/her arbitration

awards or blindly accept such manufacturer's plan without any review or analysis,

(b) review the reasonableness of the manufacturer's performance standards or

merely determine whether the manufacturer "used the proper math" in

determining whether the rejected dealer met the manufacturer's criteria for

termination , and (c) to consider application of relevant state law as a factor in

his/her arbitration awards. *See Minor v. Prudential Sec. Inc.*, 94 F.3d 1103, 1006

(7th Cir. 1996) ("[i]f Minor's motion to vacate somehow involved the resolution

of her federal claims or some question of federal law, then . . . the district court

would have subject matter jurisdiction.").[19]

104.    In sum, the Ohio District Court has subject matter jurisdiction over the

controversy raised in the Petitions to Vacate as a result of the substantial federal

question raised in the Petition.

---

[19] In addition to the interpretation of the Dealer Arbitration Act, the Petitions to Vacate could
implicate the constitutionality of this federal statute. If this Court were to somehow agree with New
GM that the Ohio Dealers have absolutely no recourse to the Courts for a review of a final and binding
arbitrator's decision, the question becomes whether such a statute violates and/or requires the implied
right of the United States Constitution's guaranty to due process under law. *See Thomas v. Union
Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (Federal
Insecticide, Fungicide, and Rodenticide Act did not preclude review of the arbitration proceedings by
an Article III Court as "review of constitutional error is preserved" and therefore FIFRA does not
obstruct whatever judicial review might be required by due process.); *Syngenta Crop Protection, Inc.
v. Drexel Chemical Company*, 655 F.Supp.2d 54 (U.S.D.C. District of Columbia 2009) (While the
express language of the Federal Insecticide, Fungicide, and Rodenticide Act seemingly permits judicial
review of the arbitrator's findings in only specified limited instances, "review of constitutional error is
preserved."). Even without considerations of due process, it borders on inconceivable that Congress
would provide Rally and GM the right to arbitration, before the AAA, without the right to somehow
obtain a judicial review of such arbitration in a court with jurisdiction over both the subject matter
(diversity jurisdiction and federal question jurisdiction) and the parties. An article III Court has always
had the constitutional right to equitably review arbitration decisions whether or not the agreement
specifically allows for such review.

### POINT IX

### NEW GM SHOULD HAVE BEEN JUDICIALLY ESTOPPED FROM ARGUING THAT JUDICIAL REVIEW OF THE ARBITRATION AWARDS MUST BE DONE BY THE BANKRUPTCY COURT

105.    While New GM, in support of the New GM Motion, rails that the Ohio dealers are making an "end run" around this Court by seeking judicial review of the arbitration awards in the Ohio District Court, New GM had filed a complaint in the United States District Court for the Central District of California (Western Division) seeking a declaratory judgment to resolve a dispute between New GM and another dealer (like the Ohio Dealers, another General Motors dealer that had signed the Wind-Down Agreement) **arising from the purported settlement of an arbitration pursuant to Dealer Arbitration Act.**

106.    Incredibly, in the case entitled *General Motors LLC v. Santa Monica Group, Inc.* (10-CV-4787) (a copy of the complaint is annexed hereto as Exhibit L) (the "Santa Monica Action"), New GM asserted that the California District Court is conferred with the subject matter jurisdiction needed (both federal question and diversity jurisdiction) to determine the parties' dispute that has arisen as a result of a dealer reinstatement arbitration under the Dealer Arbitration Act.  (Santa Monica Complaint ¶¶ 3 and 4.)[20]

107.    Indeed, in the Santa Monica Action, New GM has expressly alleged that:

- **The District Court has jurisdiction of this action under 28 U.S.C. 1331(a) because it arises under federal law, specifically the dealer**

---

[20] New GM was, in fact, successful in obtaining a preliminary injunction against Santa Monica Group, Inc., enjoining it from further prosecuting its dealer reinstatement arbitration pending a trial in that action.  (*See* decision annexed hereto as Exhibit M).

arbitration provisions contained in the Dealer Arbitration Act. (Santa
Monica Complaint, ¶ 3) (emphasis added);

- Alternatively, **the District Court has jurisdiction under 28 U.S.C.
  1332(a)(1) because plaintiff and defendant are citizens of different
  states and the amount in controversy exceeds the sum of $75,000
  exclusive of interests and costs.** (*Id.*, ¶. 4) (emphasis added);

- Congress deliberately chose to limit the scope of arbitration under the
  Dealer Arbitration Act. Arbitrators are only empowered to decide whether
  or not the specific dealership should be added back to the GM dealer
  network. **All other issues that arise under the Act must be addressed
  by a court of competent jurisdiction.** (*Id.*, ¶22) (emphasis added); and

- The underlying dealer reinstatement arbitration was "pursuant to
  procedures contemplated by Congress and implemented by the American
  Arbitration Association." (*Id.*, ¶. 17).

108.    In the same fashion, prior to obtaining this Court's decision with respect
to the Rally GM Motion to Enforce, on September 27, 2010, New GM also
asserted that the United States District Court for the Eastern District of Louisiana
was conferred with the subject matter jurisdiction needed (both federal question
and diversity jurisdiction) to determine the parties' dispute that has arisen as a
result of a dealer reinstatement arbitration under the Dealer Arbitration Act.

109.    In a Notice of Removal in an action entitled Leson Chevrolet Company,
Inc. v. General Motors LLC (Exhibit N), New GM asserted that:

42

- **This Court has federal question jurisdiction under 28 U.S.C. 1331 in that this civil action arises under the laws of the United States. For** example, on the face of the Commission Complaint, Leon seeks an interpretation of 747, which is a federal statute. Interpretation of that provision is the threshold and controlling issue in this matter. **(Exhibit N at page 6, para. 21);**

- The Court also has diversity jurisdiction pursuant to 28 U.S.C. 1332. The parties are diverse and the amount in controversy exceeds $75,000. (Exhibit N at page 8, para. 29).

110.     **This position previously taken by New GM in the Louisiana federal action is the exact same contention made by the Ohio Dealers in this case** (which is contradicted by the position that was taken by New GM in support of the within motion). Specifically, New GM contended in the Louisiana federal action, and the Ohio Dealers contend here, that the District Court (the Ohio District Court) **has federal question jurisdiction in that the Petitions to Vacate arise under the laws of the United States and, on the face of the Petitions to Vacate, the Ohio Dealers seek an interpretation of the Dealer Arbitration Act, which is a federal statute. As New GM argued in the Louisiana federal action, the interpretation of the same federal statute (the Dealer Arbitration Act) is the threshold and controlling issue.**

111.     Judicial estoppel, or the doctrine of inconsistent positions, precludes a party who assumed a certain position in a prior legal proceeding from assuming a contrary position in another action simply because his or her interests have

changed. *State of New Hampshire v. State of Maine*, 532 U.S. 742,121 S.Ct.

1808, 149 L.Ed.2d 968 (2001). The principle of judicial estoppel applies where

two elements are shown: first, the party against whom the estoppel is asserted

must have argued an inconsistent position in a prior proceeding; and second, the

prior inconsistent position must have been adopted by the tribunal in some

manner. *Montefiore Medical Center v. Crest Plaza LLC*, 24 Misc.3d 1201(A),

889 N.Y.S.2d 506 (S.Ct. Westchester Co. 2009). *See Troll Company v. Uneeda*

*Doll Company*, 483 F.3d 150 (2d Cir. 2007) (a party invoking judicial estoppel,

which prevents a party from asserting a factual position in one legal proceeding

that is contrary to a position that is successfully advanced in another proceeding,

must show that (a) another party advanced an inconsistent position in another

proceeding and (b) the first tribunal adopted that position in some manner).

112.    "The doctrine of estoppel against inconsistent positions precludes a party

from 'framing his pleadings in a manner inconsistent with a position taken in a

prior proceeding.' The doctrine rests upon the principle that a litigant 'should not

be permitted . . . to lead a court to find a fact one way and then contend in

another judicial proceeding that the same fact should be found otherwise.' The

policies underlying preclusion of inconsistent positions are general considerations

of orderly administration of justice and regard for the dignity of judicial

proceedings." *Montefiore Medical Center v. Crest Plaza LLC*, 24 Misc.3d

1201(A), 889 N.Y.S.2d 506 (S.Ct. Westchester Co. 2009).

113.    In this case, it is clear that New GM has framed its pleadings in both the

Santa Monica Action and, initially, in the Leson Chevrolet Action in the

Louisiana District Court in a manner entirely inconsistent with the position that it

has taken in the New GM's Motion. Based upon New GM's conduct and the well

stated principles of law set forth above, this Court should determine that New GM

is judicially estopped from arguing that judicial review of the Petitions to Vacate

is the sole and exclusive provenance of the Bankruptcy Court.

114.    Although the Ohio Dealers are filing the within Objection, the Ohio

Dealers reserve their rights to seek to withdraw the standing the standing

reference to the Bankruptcy Court pursuant to 28 U.S.C. 157(d).

## CONCLUSION

For the foregoing reasons, the Ohio Dealers respectfully request that this Court

enter an Order denying New GM's Motion in all respects.

Dated: Mineola, New York
      October 19, 2010

                              Respectfully,

                              BELLAVIA GENTILE & ASSOCIATES,
                              LLP

                              /s/Steven Blatt
                              By:  Steven Blatt, Esq. (SB 6792)
                              Attorneys for
                              Rose Chevrolet, Inc., Halleen Chevrolet,
                              Inc. and Andy Chevrolet Company
                              200 Old Country Road
                              Suite 400
                              Mineola, NY 11501
                              (516) 873-3000