EXHIBIT A

H. R. 3288—186

(i) EXECUTIVE AGENCY DEFINED.—In this section, the term "executive agency" has the meaning given the term in section 4 of the Office of Federal Procurement Policy Act (41 U.S.C. 403).

SEC. 744. (a) The adjustment in rates of basic pay for employees under the statutory pay systems that takes effect in fiscal year 2010 under section 5303 of title 5, United States Code, shall be an increase of 1.5 percent, and the overall average percentage of the adjustments taking effect in such fiscal year under sections 5304–5304a of such title 5 shall be an increase of 0.5 percent (with comparability payments to be determined and allocated among pay localities by the President). Adjustments under the preceding sentence shall also apply to civilian employees in the Department of Homeland Security and in the Department of Defense. All adjustments under this subsection shall be effective as of the first day of the first applicable pay period beginning on or after January 1, 2010.

(b) Notwithstanding section 710, the adjustment in rates of basic pay for the statutory pay systems that take place in fiscal year 2010 under sections 5344 and 5348 of title 5, United States Code, shall be no less than the percentages in subsection (a) as employees in the same location whose rates of basic pay are adjusted pursuant to the statutory pay systems under section 5303 and 5304–5304a of title 5, United States Code. Prevailing rate employees at locations where there are no employees whose pay is increased pursuant to sections 5303 and 5304–5304a of such title 5 and prevailing rate employees described in section 5343(a)(5) of such title 5 shall be considered to be located in the pay locality designated as "Rest of U.S." pursuant to section 5304 of such title 5 for purposes of this subsection.

(c) Funds used to carry out this section shall be paid from appropriations, which are made to each applicable department or agency for salaries and expenses for fiscal year 2010.

SEC. 745. (a) Section 5538 of title 5, United States Code, is amended by striking subsection (b) and inserting the following:

"(b) Amounts under this section shall be payable with respect to each pay period (which would otherwise apply if the employee's civilian employment had not been interrupted)—

"(1) during which such employee is entitled to re-employment rights under chapter 43 of title 38 with respect to the position from which such employee is absent (as referred to in subsection (a)); and

"(2) for which such employee does not otherwise receive basic pay (including by taking any annual, military, or other paid leave) to which such employee is entitled by virtue of such employee's civilian employment with the Government.".

(b) The amendments made by this section shall take effect on the first day of the first applicable pay period beginning on or after the date of the enactment of this Act.

SEC. 746. Except as expressly provided otherwise, any reference to "this Act" contained in any title other than title IV or VIII shall not apply to such title IV or VIII.

SEC. 747. (a) DEFINITIONS.—For purposes of this section the following definitions apply:

(1) The term "covered manufacturer" means—

(A) an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under

H.R. 3288—187

title I of the Emergency Economic Stabilization Act of 2008; or

(B) an automobile manufacturer which acquired more than half of the assets of an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008.

(2) The term "covered dealership" means an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008, and such agreement was terminated, not assigned in the form existing on October 3, 2008 to another covered manufacturer in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010.

(b) A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Such continuation, reinstatement, or addition shall be limited to each brand owned and manufactured by the covered manufacturer at the time the arbitration commences, to the extent that the covered dealership had been a dealer for such brand at the time such dealer's franchise agreement was terminated, not assigned, not renewed, or not continued.

(c) Before the end of the 30-day period beginning on the date of the enactment of this Act, a covered manufacturer shall provide to each covered dealership related to such covered manufacturer a summary of the terms and the rights accorded under this section to a covered dealership and the specific criteria pursuant to which such dealer was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer.

(d) A covered dealership may elect to pursue the right to binding arbitration with the appropriate covered manufacturer. Such election must occur within 40 days of the date of enactment. The arbitration process must commence as soon as practicable thereafter with the selection of the arbitrator and conclude with the case being submitted to the arbitrator for deliberation within 180 days of the date of enactment of this Act. The arbitrator may extend the time periods in this subsection for up to 30 days for good cause. The covered manufacturer and the covered dealership may present any relevant information during the arbitration. The arbitrator shall balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based on that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer. The factors considered by the arbitrator shall include (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009, (2) the

H. R. 3288—188

covered manufacturer's overall business plan, (3) the covered dealership's current economic viability, (4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement, (5) the demographic and geographic characteristics of the covered dealership's market territory, (6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and (7) the length of experience of the covered dealership. The arbitrator shall issue a written determination no later than 7 business days after the arbitrator determines that case has been fully submitted. At a minimum, the written determination shall include (1) a description of the covered dealership, (2) a clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer, (3) the key facts relied upon by the arbitrator in making the determination, and (4) an explanation of how the balance of economic interests supports the arbitrator's determination.

(e) The arbitrator shall be selected from the list of qualified arbitrators maintained by the Regional Office of the American Arbitration Association (AAA), in the Region where the dealership is located, by mutual agreement of the covered dealership and covered manufacturer. If agreement cannot be reached on a suitable arbitrator, the parties shall request AAA to select the arbitrator. There will be no depositions in the proceedings, and discovery shall be limited to requests for documents specific to the covered dealership. The parties shall be responsible for their own expenses, fees, and costs, and shall share equally all other costs associated with the arbitration, such as arbitrator fees, meeting room charges, and administrative costs. The arbitration shall be conducted in the State where the covered dealership is located. Parties will have the option of conducting arbitration electronically and telephonically, by mutual agreement of both parties. The arbitrator shall not award compensatory, punitive, or exemplary damages to any party. If the arbitrator finds in favor of a covered dealership, the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement.

(f) Any legally binding agreement resulting from a voluntary negotiation between a covered manufacturer and covered dealership(s) shall not be considered inconsistent with this provision and any covered dealership that is a party to such agreement shall forfeit the right to arbitration established by this provision.

(g) Notwithstanding the requirements of this provision, nothing herein shall prevent a covered manufacturer from lawfully terminating a covered dealership in accordance with applicable State law.

# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION

AUTOMOBILE INDUSTRY ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Rose Chevrolet,                                  :

                                                 :

                Claimant,               :        Case No. 52-532-000049-10

                                                 :

        v.                                       :

                                                 :        Arbitrator:  Dale A. Crawford

General Motors, LLC,                    :

                                                 :

                Respondent.             :

WRITTEN DETERMINATION

      I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the

Consolidated Appropriations Act of 2010 (the "Act"), has been duly sworn.  The Arbitrator

conducted the hearing in the above-captioned matter in Cleveland, Ohio on June 8 – 11,

2010.  The hearing and testimony was consolidated by agreement with three other

arbitrations so that duplicate witnesses would testify only once for all cases.  The parties

were present during the testimony of the witnesses whose testimony applied to their

arbitration.  Binders of numerous exhibits were submitted to the Arbitrator prior to the

hearing.  All exhibits previously submitted and introduced at the arbitration were stipulated

1

into evidence. By agreement of the parties, a view by the Arbitrator of the dealer's exterior premises and the geographical area in which the dealership is located was conducted prior to the hearing. At the close of the hearing and at the request of the parties, the Arbitrator extended for good cause the time for the completion of the arbitration for 30 days as provided in the Act.

The Arbitrator hereby makes his written Determination pursuant to the Act.

I.    **Description of Dealership**

Ross Chevrolet has been in business since June 20, 1984. Edward E. Larkin, Jr. is the owner of the franchise and his son, Edward D. Larkin, is the current President and has been the general manager since 2000. Edward E. Larkin is the third generation Larkin to be in the automobile industry. The Larkin Family has been in the automobile business in Hamilton, Ohio since the late 1940's.

The dealership sits on 3.633 acres and consists of a Fixed Operations Center that houses the service center, parts department, and clean-up building. The service area has 16 bays and 26 employees in that area. Square footage is 12,892 in the service area, 3,020 square feet in the parts department, and 2,188 square feet in the clean-up department. There are two lots with new cars on them. One lot is gravel and sits across a busy four-lane road from the dealership showroom.

The new car showroom and office has square footage of 6,600. It can display up to seven vehicles. It also has a storage facility that is 1,480 square feet. It provides expected amenities of beverages, loaner/rental cars, extended hours, car washes, et cetera.

2

The dealership is located at the intersection of State Route 4 and High Street (Route 129). It is located ten miles from Interstate 75 and is two miles from a new retail development (Best Buy, Target, Wal-Mart, Kohl's, Dick's, Applebee's, Max and Erma's, Chili's).

Edward E. Larkin, Jr. is the registered owner of the corporation and owns the real estate. His son, Edward D. Larkin, stated he is a minority owner, general manager, and runs the day-to-day operations. He is also listed on the Successor Addendum and approved by Old GM.

## II.   Determination

The Arbitrator has considered all of the evidence and the arguments of counsel and has weighed all of the factors set forth in the Act and has determined that the economic interests of the manufacturer and the economic interests of the public at large outweigh the economic interest of the dealership and has determined that the dealership shall not be added to the dealer network of New General Motors.

## III.   Acronyms

The following are a list of acronyms that will be used in the course of this Determination.

| AGSSA | Area of Geographic Sales and Service Advantage. A dealer's AGSSA is comprised of those census tracts the centroids of which are closer to that dealer than other dealers. For a dealer in an MDA, it is the area used to calculate the dealer's Sales Expectation. |
| APR | Area of Primary Responsibility. The APR is an area defined in the DSSA into which the dealer is responsible for selling and servicing. For a dealer in an SDA, it is the area used to calculate the dealer's Sales Expectation. |

3

| | |
|---|---|
| CSI | Customer Service Index. The CSI is the measure of a dealer's overall customer service performance. CSI is calculated by comparing a dealer's PDS and SSS scores separately to the regional average PDS and SSS scores for each line-make the dealer sells. |
| DPS | Dealer Performance Summary. The DPS is a measure of a dealer's performance. It is a weighted calculation utilizing the dealer's (1) RSI (50%), (2) CSI (30%), (3) percent of required net working capital (10%), and (4) profitability (10%). |
| NPBBT | Net Profit Before Business Bonuses and Taxes |
| RRI | Retail Registration Index. RRI is a measure of the brand's sales performance in an AGGSSA/APR. It is calculated by dividing the total GM registrations in a dealer's AGGSSA/APR by the dealer's Sales Expectation. |
| RSI | Retail Sales Index. RSI is a measure of the dealer's sales performance. It is calculated by dividing the dealer's reported sales by the dealer's Sales Expectation. |
| Sales Expectation | – State average GM brand market share by segment multiplied by all industry registrations by segment in the dealer's AGSSA/APR. |
| SSS | Sales and Service Satisfaction |
| Throughput | New Cars Sold Per Dealer |

## IV.   **Background**

General Motors ("Old GM") was started over 100 years ago and has been among the top ten Fortune 500 companies since the listing was started. Old GM has had 463 direct and indirect wholly-owned subsidiaries; has had thousands of suppliers; employed 235,000 workers worldwide (in 2009); had worldwide revenues of $181 billion in 2007; and has hundreds of thousands of retirees dependent upon the company for their retirement benefits, including healthcare.

Up until the 1960's, U.S. automakers had little competition from foreign automobile manufacturers. The Old GM dealer network grew up and through the 1960's. Dealerships could be found in most rural areas and proliferated in the urban networks. Prior to the

4

creation of the intrastate and interstate highway systems, new car purchasers bought almost exclusively from their hometown dealership because it was too difficult to travel outside of their hometowns for the service. With the advent of the interstate and intrastate highway systems in the 1960's and beyond, came the foreign automobile manufacturers. Foreign competition grew from the 1960's to the present with foreign dealerships located in prime urban areas at or near major highway systems. Old GM dealerships were still located in most rural areas in addition to their multiple urban locations. While maintaining its dealership level, Old GM's market share dropped from 45% in 1980 to 22% in 2008 and 20% in 2009. In 2008, many of the competing foreign dealerships had between 1/5 to 1/3 fewer dealerships with throughput being almost four (4) times that of Old GM dealers. Ford Motor Company had close to half of the dealerships Old GM had. (Toyota had 1589 new vehicles sold per dealership to 459 for Chevrolet. Lexus had 1158 new vehicles sold per dealership to 112 for Cadillac.)

2008 was a difficult year for all automotive manufacturers, including Old GM. Gas prices were high and the financial markets collapsed. Credit markets were completely closed. Old GM had few liquid assets to pay its long and short-term obligations. Finding no other alternative, in November 2008, Old GM sought financial assistance from the United States Government. A proposed First Viability Plan was submitted to the President and Congress outlining the efforts Old GM would undertake if the loan(s) was granted. On December 31, 2008 an agreement was reached with the Treasury Department for a loan through the first quarter of 2009.

In February 2009, a Second Viability Plan was submitted to the Treasury Department in an effort to get more financial assistance from the government. The Second Plan proposed

phasing out all Old GM brands except Chevrolet, Cadillac, Buick and GMC. (Hummer, Saab and Saturn were to be phased out.) Pontiac was to remain in a smaller capacity. The second plan proposed phasing out its dealership network, by attrition, through 2014. The Automotive Task Force was created by President Obama to review the Plan and report to the President, Congress and the Treasury Department. On March 30, 2009 the Second Plan was rejected by the President, the Task Force and the Treasury Department. The Plan was rejected for several reasons, including a belief that the restructuring of the dealer network was not aggressive enough. The Task Force recognized that unprofitable, underperforming dealers were putting "a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales."

Additional credit was extended to Old GM and it was given a deadline of June 1, 2009 to come up with a new acceptable viability plan. A new plan was not created and, lacking an acceptable viability plan, bankruptcy was declared by Old GM on June 1, 2009.

Even though claimant disagrees, it was universally agreed by the Task Force, the Treasury Department and the Bankruptcy Court, that the Old GM's 6000 plus dealer network could not compete with the foreign and domestic manufacturers whose fewer dealers had higher throughput. With this in mind, Old GM, on May 14, 2009 sent letters to 1100 dealers advising them that their dealership agreements would not be renewed as of October 31, 2010. During the bankruptcy proceedings, Old GM advised the Bankruptcy judge that it sought the termination of 1100 of the dealership executor agreements.

Because most state laws are protective of dealer's agreements with the manufacturers, (Courts only permitting the termination for "just cause," which is liberally construed in favor

6

of the dealer) Old GM needed the Bankruptcy Court to approve the terminations. The Bankruptcy Court approved the request to terminate the agreements.

The terminated dealers and various state and national dealers' organizations sought relief from their terminations from the United States Congress. After negotiations with various Congressmen and Senators, a bill to restore all terminated dealers was introduced and ultimately defeated. A compromise bill was then introduced and passed. The bill is entitled Section 747 of the Consolidated Appropriations Act of 2010. (The "Act " )

The Act, which brings the parties before this Arbitrator, provides that Old GM and Chrysler dealers who were improperly terminated under state law may, through binding arbitration, seek reinstatement or be added as a franchisee to the dealer network. The arbitrator is to be selected from a list of qualified arbitrators maintained by the American Arbitration Association ("AAA") and shall render a written determination following the substantive law set forth in the Act and the procedural rules of AAA. Under the Act, the arbitrator is required to balance the "economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based upon that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer." The Act further provides that the arbitrator shall consider the following seven factors in balancing the economic interests of the manufacturer, the dealer and the public at large:

(1)  The covered dealership's profitability in 2006, 2007, 2008, and 2009;

(2)  The covered manufacturer's overall business plan;

(3)  The covered dealership's current economic viability;

(4) The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement;

(5) The demographic and geographic characteristics of the covered dealership's market territory;

(6) The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement; and

(7) The length of experience of the covered dealership.

## V.    Legal Issues Not Yet Decided

On a previous occasion the Arbitrator determined that the Claimant had the burden of proof (by a preponderance of the evidence) and the burden of going forward. The Arbitrator notes that the burden of proof will only be an issue if the relevant scales (economic interests of the manufacturer, dealer and public at large) are balanced equally.

The legal issues yet to be determined are as follows:

(1) Can the dealership dispute the validity of the manufacturer's stated "overall business plan"?

(2) In considering the profitability of the covered dealership, are new car sales the only component of profitability?

(3) Does the economic viability of the dealership include all sources of income?

(4) Can the dealership dispute, as unreliable, the specific criteria (i.e. CSI) used by the manufacturer to terminate the dealer?

(5) In considering length of experience, is a longer time period for the dealer to hold
the franchise a positive or a negative?

(6) In balancing the economic interest of the "public at large" should the Arbitrator
consider the "public" to be local, national, or a combination thereof?

(7) Can the Arbitrator consider state law in rendering the determination?

## VI.  Resolution of Pending Legal Issues

1. Manufacturer's Overall Business Plan

Included in the evidence were the live testimony of Jim Bunnell and Sharif Farhat and
the extensive documentary testimony, statements, affidavits of Fritz Henderson, Robert
Secrest, Rob Toussaint and Harry Foster, reports to the Task Force, and reports to the
Bankruptcy Court regarding Old GM's overall business plan as it relates to its dealerships.
The Arbitrator heard Claimant's live testimony from Alan Spitzer and Professor John P.
Matthews regarding Old GM's overall business plan.  Old GM believed it needed to produce
a competitive product and significantly reduce its dealerships (proposed from 6,000 to
4,000+) so that the new dealership network will have higher throughput.  Old GM believed
that with a good product and higher throughput for the dealer this would lead to more
profitable dealers which in turn would lead to more modern competitive facilities, better
advertising, better skilled employees, higher consumer satisfaction, more community
involvement, and, most importantly, lower cost to the manufacturer by the reduction of
dealer incentives.  Old GM believed that fewer modern, profitable dealers are necessary to
compete in today's market.  New GM believes it now has a better product and it can compete

with all other manufacturers. With a better product, New GM must now concentrate on modernizing its dealer network.

Alan Spitzer, a multiple auto franchise owner, (35 franchises at the highpoint) was and is a spokesperson for the dealers nationwide before the United States Congress. Mr. Spitzer testified before Congress and during the bankruptcy proceeding of Chrysler. He is the founder of the Committee to Restore Dealer's Rights. Mr. Spitzer believes the New GM's overall business plan is flawed. Mr. Spitzer does not believe that higher throughput per dealer will occur by closing dealerships nor does he believe that higher throughput will reduce any costs to New GM. He believes that dealer subsidies are variable costs and will not be reduced or eliminated with more profitable dealers.

Claimant's expert witness, Professor Jack Matthews, testified that he believes that closing any dealer will have a negative impact on the manufacturer. He testified that the manufacturer will have lost sales, a reduction of customer convenience and service, and community loyalty will suffer.

The Arbitrator is respectful of the experts in the automotive field that believe that reducing dealerships will be of no cost savings to the manufacturer. Some, including Spitzer and Matthews, believe that all manufacturer subsidies and incentives are variable costs and will exist regardless of the number of dealerships. All Claimants before the Arbitrator assert that the reduction of dealerships will cost the manufacturer additional money, not save it money. The Arbitrator has considered the testimony of Jim Bunnell, Harry Foster and Fritz Henderson, Robert Secrest and Rob Toussaint, in addition to the findings of the Task Force and the Department of the Treasury and Bankruptcy Court and has determined that, more

10

likely than not, the reduction of low profitable dated facility dealers will increase the remaining dealers throughput and increase New GM's future revenues.

However, whether or not this Arbitrator's conclusion is correct is not relevant. The Act provides that the Arbitrator is to consider the manufacturer's overall business plan – not the viability or accuracy of the plan. The Arbitrator is to identify the stated plan, accept the plan and then determine where this dealer fits in the stated plan.

2. Profitability.

The Arbitrator is to consider the profitability of the covered dealership in the years 2006, 2007, 2008, and 2009. There are statements made in the congressional hearings that suggest that profitability should be determined by considering new car sales only. Many dealerships, like Claimant, have losses in new car sales but their used car sales and service and body work make the dealership overall profitable. It is the Arbitrator's position that Congress intended to have the Arbitrator consider both, the overall profitability and the dealer's profitability on new car sales. Obviously, if a dealer was maintaining its dealership for the sole purpose of maintaining its used car department (with the ability to buy demo cars from Old or New GM) and its service department warranty work, this would and should be a concern for the manufacturer. Low performing dealers on their CSI scores often are not concerned with upgrading facilities because they are making a profit elsewhere, including high rent going to the dealer owner who owns the property upon which the dealership operates. The Arbitrator will consider both overall profitability and profitability on new car sales.

3. Economic Viability

11

As with profitability, the Arbitrator believes that the economic viability of the dealership includes all facets of the dealership operation. If the dealership can only function in its geographical area largely on its used car sales and service departments, this is a consideration. Economic viability will be defined as the "ability to compete and win in the market in the long run" (Brian Gaspardo) and will include the market, geographical area, competition, need to upgrade facilities, long and short-term debt, all sources of income, future capital needs, highways, location, and most importantly, the economic viability of the community served by the dealer.

4. Disputing the Specific Criteria.

Claimant was terminated because of a CSI score below 70. Some experts in the market, including Professor Matthews, believe the CSI and DPS scores are not fair criteria upon which to judge the success of a dealer. Professor Matthews believes there should be "adjustments" to the score based upon factors beyond the control of the dealer. CSI and DPS scores are universally used in the automotive industry. (Other manufacturers have some variances in the scores but no manufacturer makes "adjustments".)

This Arbitrator has reviewed all of the testimony and literature submitted in this case relevant to CSI and DPS scores and has determined they are an appropriate criteria for a manufacturer to use on a year-to-year basis. Should one year's low CSI or DPS be the sole criteria to use at a time where the bankruptcy of Old GM is not a consideration? Probably not. State law requires "good cause" before a dealer can be terminated, and a one year of a low CSI would not be "good cause" under Ohio law. However, that is not the issue in this arbitration. "Good cause" is not the standard to be applied. The "specific criteria"

12

established by the manufacturer is what this Arbitrator must consider. Whether the "specific criteria" used with this dealer is fair or unfair is not relevant with this factor but will be considered by the Arbitrator with "other relevant considerations." The only relevant fact for this Arbitrator to apply in this factor is whether this dealership in fact fell below the "specific criteria" established by the manufacturer. Put another way, did the manufacturer use the proper math in determining this dealership's "specific criteria"? The answer is yes.

5. Length of Experience

The manufacturer believes that if a dealer has been in business for many years and is unable to have appropriate new car sales, this should be a negative on the Arbitrator's scale. The Arbitrator disagrees. Long-term successful dealerships which have served and participated in their local communities for years should be a positive factor for the dealership and for the manufacturer. It is the Arbitrator's belief that Congress wanted the long-term goodwill of the dealership to be considered as one factor in favor of the dealership. This factor can be counterbalanced by other factors, such as low profitability, low CSI, low viability and poor location. Viable longevity of a dealership will be considered as a plus for the dealership.

6. Public at Large

Claimant would have the Arbitrator believe that the "public at large" means the local community in which the dealership resides and/or serves. Claimant wants the Arbitrator to consider the benefit this dealership provides to the local community by way of taxes, employment and support given to community organizations. This Arbitrator believes these things are important considerations, but they are not factors in the "public at large" factor.

13

"Public at large" means the general public. It means the aggregate of citizens of our nation not limited to any particular place. If Congress intended it to mean local community, it would have so provided. If Congress had stated "public" only, it could have been interpreted to include local community.

The closing of any dealership will be a hardship for its local community. Jobs will be lost, taxes will be lost and other businesses will be affected. However, the business plan of increased throughput on the remaining dealers means more jobs with the remaining dealers and more taxes in the communities where the remaining dealers will sell cars. If the remaining dealers are more profitable they will be able to participate further in their local communities.

Public at large means the American taxpayer who owns more than 50% of New GM. The public at large includes the need for New GM to be profitable in the future so its debt to the government can be paid, the retirement debts and healthcare of its former employees continued, and the catastrophic effects of New GM's liquidation avoided.

7.  State Law

The Claimant wants this Arbitrator to apply, at least in part, state law in determining whether this dealership should be restored. The Attorney General of the State of Ohio has submitted a letter which in effect states that the dealers have been unlawfully terminated and should be restored. The dealers were terminated under federal bankruptcy law which permits the Bankruptcy Court to lawfully terminate executory contracts. The Act creates a new right for the dealers that does not exist under any state, federal or common law. The Act is a law in and of itself and will be strictly followed.

14

VII.   **The Factors**

### The covered dealership's profitability in 2006, 2007, 2008 and 2009.

Claimant had a net profit in 2006 ($104,352), 2007 ($103,881), 2008 ($105,096), and

2009 ($201,333).  However, in all four years it had an operating loss:  2006 a loss of

$175,628; 2007 a loss of $194,062; 2008 a loss of $195,595; and 2009 a loss of $189,774.

With respect to new car sales, Claimant had significant losses in each of the four years:  2006

a loss of $448,967; 2007 a loss of $557,859; 2008 a loss of $656,448; and, 2009 a loss of

$740,465.  Claimant and Respondent have different views as to the profitability of the

Claimant.  Claimant believes standards for excellence support payments from Old GM and

DOC fees should be added to operating income with respect to this factor.  Respondent does

not agree.

The bottom line is that Claimant is existing on used car sales and service fees to stay

afloat.  New car sales are low and that part of the business is operating at a significant loss.

This factor balances somewhat against the dealership.

### The covered manufacturer's overall business plan.

The Arbitrator has previously stated it will not second guess the viability of New

GM's overall business plan.

Mr. Spitzer, Professor Matthews and Professor Krumholz all believe "it is difficult to

imagine how closing dealerships will increase the competitiveness of GM products."

(Krumholz Rose report)  He also believes "that sharp declines in the number of dealerships

will erode profitability and market share."  The professor also believes "there is little

15

evidence to support GM's contention that consolidated dealers will outperform nonconsolidated dealers." As previously stated, all of this opinion evidence is relevant to the issue of what the plan should be, not what it is.

Claimant also argues that returning this one dealership to New GM will have little impact on New GM's overall business plan and its future profitability. While this may be true, if all arbitrators took this view, as some have, all dealerships would be restored and there would be no need to go through this arbitration process. Congress rejected this position when it refused to return all dealers to the manufacturers' networks. The business plan is what it is. The Arbitrator has accepted the plan as stated by Messrs. Bunnell, Farhat, Rozanski, Foster and Henderson and has applied it to the Claimant.

Rose is an underperforming non-profitable new car dealer in an overdealered urban market with extremely outdated facilities, and as such, terminating the dealership is consistent with its overall business plan.

This factor balances in favor of the manufacturer.

<u>The covered dealership's current economic viability.</u>

Claimant's accountant, Kenneth Hayes, and Professor Krumholz and Professor Matthews testified Claimant is an economically viable dealership. Respondent's witnesses, Brian Gaspardo, Ron Rozanski opined differently. Mr. Gaspardo has defined economic viability as "the ability to compete and win in the long run."

Claimant has operating losses and significant new car sales losses. While it has some excess working capital, it will need to move and to purchase new land and build new

16

facilities which may exhaust much of its working capital. The Cincinnati market for new car sales is either stagnant or on the decline. While Claimant is well respected in its Hamilton community, the evidence does not support a realistic finding that new car sales will increase. Claimant has economic viability as a used car dealer and service facility. It does not have the ability to compete and win in the new car market in the future.

This factor weighs against the Claimant.

### The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement.

It is unclear what Congress meant by "performance objectives" as set forth in the Act. There are numerous obligations imposed on the dealership and the manufacturer in the franchise agreement. The dealership obligations include size of the dealership (Franchise Agreement para. 4.4.3); dealership image (4.4.4); dealership equipment (4.4.5); responsibility to promote and sell (5.1); responsibility to service (5.2); customer satisfaction (5.3); net working capital (10.1); and compliance with retail sales standards established by the manufacturer. (5.1.1(f)).

Claimant has complied with most of the general obligations except that which deals with the dealership image (physical facilities), responsibility to promote and sell and retail sales standards. (RSI)

All dealerships are required under the franchise agreement to maintain an RSI of 100. As noted in the acronyms section, this is a sales expectation figure based upon the

17

AGSSA/APR of the dealership. During the years of 2006-2009, Claimant has been significantly below that standard: 2006 RSI 54.4; 2007 RSI 67.3; and 2008 RSI 58.3.

Professor Matthews testified regarding the unfairness of RSI to urban dealerships like Rose (Cincinnati APR) and he testified that Rose's low RSI scores are a result of an unfair AGSSA. As previously noted, Professor Matthews believes that adjustments should be made to the RSI and AGSSA when there are factors beyond the control of the dealership that may lower the RSI. In 2006 and 2007, Rose was in an AGSSA that did not include the Oxford, Ohio area. In 2007, the Oxford, Ohio GM dealership closed and Rose was assigned the area in its AGSSA.

Professor Matthews did not adequately explain to this Arbitrator why Rose had an RSI of 54.4 in 2006 and 67.3 in 2007 when its AGSSA did not include the Oxford area. He also didn't explain why the RSI in 2008 would still be below 70 if the Oxford area is taken out of the AGSSA. Professor Matthews also stated in his Rose report that "only where there is evidence that the dealer is not using reasonable efforts to promote and sell the manufacturer's vehicles should low RSI be grounds for the dealer's termination." This Arbitrator finds that there is sufficient circumstantial evidence that Rose has not used reasonable efforts to promote and sell new cars. The dealership is happy selling used cars and doing service and shows no effort to increase new car sales.

Claimant has performed well in many of the performance objectives established in the franchise agreement. It has performed extremely well with respect to service and its DPS has been above 70 for the past three years. However, new car sales are what will drive New GM in the future. Claimant had an RSI that was 148 out of 189 Chevrolet dealers in the State of

Ohio in 2008. Claimant had been in Old GM's critical care program for several years because of its low new car sales. Claimant has done very little in the past several years to correct low RSI. The documents introduced in evidence appear to show Claimant has been somewhat defiant when the manufacturer makes suggestions for change.

This factor balances against the Claimant.

The demographic and geographic characteristics of the covered dealership's market territory.

The Cincinnati area is in a state of flux. As Claimant's witness, Professor Norman Krumholz, testified, "The Cincinnati area has long been in decline due to de-industrialization and fundamental economic restructuring resulting in the loss of manufacturing jobs that once were the centerpiece of the regional economy.... The region is one of the many older industrial communities that are still struggling to make a successful transition from an economy based on routine manufacturing to one based on more knowledge-oriented activities." Claimant is in the town of Hamilton which is a suburban community of Cincinnati. The community is mostly residential and the dealership is on a four-lane highway with three very old and dated buildings with lots on both sides of the street. The dealership does not have any access to a major highway nor is it near any substantial retail shopping center (shopping is two miles away). There are four other Chevrolet dealers within 15 miles of Claimant. The Cincinnati APR had 11 Chevrolet dealers serving the area before the winddown. The plan is to reduce that number to 6.

The Arbitrator has determined that the demographic and geographic characteristics of the APR cannot support more than six Chevrolet dealers.

This factor weighs against the Claimant.

### The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement

The Claimant was chose for winddown because its RSI score for 2008 was 58.29. The RSI score ranked the Claimant 148 out of 189 Chevrolet dealers in the State of Ohio for 2008. The criteria for winddown was an RSI score below 70. While Claimant asserts that the low RSI score was a result of an addition to its AGSSA in 2008, it doesn't explain the fact that its RSI scores for 2006 was 54.4 and 2007 was 67.3. Claimant argues that its volume of new car sales is 34 out of 189 Ohio Chevrolet dealers and this factor should be a more appropriate consideration than RSI. High volume is important but it is expected that urban dealers will have high volume compared to rural dealers. While Claimant did have relatively high volume, its volume was not sufficient to have appropriate RSI scores. Claimant also argues that since its DPS score was above 70 it met the criteria for retaining the dealership. Even though DPS was a criteria mentioned before Congress, it was not the only criteria. Claimant did not meet the criteria used to terminate it.

This factor weighs against the Claimant.

### The length of experience of the covered dealership.

Claimant has been selling and servicing Chevrolets in Hamilton, Ohio since June 1984. Claimant presently employs 43 people and before the winddown, it employed 51

people. The Larkin family is very well respected in the community and the President and general manager, Ed Larkin, recently won a significant award from the local Chamber of Commerce. The Arbitrator has received numerous letters from civic leaders, state and federal elected officials, customers and fellow businessmen urging this Arbitrator to restore Rose to the New GM dealership network. From 1984 to the present the dealership has made no effort to upgrade its very outdated, unappealing facilities. Ever since 2006, the dealership has been in the critical care program with no progress being made.

While this factor weighs in favor of the dealership, with the dealer's length of experience it has had sufficient time to increase its RSI and upgrade its facilities.

<u>Other relevant considerations.</u>

Claimant and Old GM have been in discussions with each other for many years regarding Claimant's RSI and its outdated facilities. Claimant believes it sells enough new cars and it shouldn't be held to an RSI standard that is unfair and unrealistic. Claimant has even taken the position that if GM doesn't like my dealership then GM should buy him out.

Mr. Larkin testified that if restored he would move and build a new facility, if needed. This Arbitrator has no authority to order Claimant to do anything other than be restored. Claimant can make all the promises it wants during the Arbitration but once it prevails, the promises are not enforceable. If Claimant did move in the future and didn't do those things it previously failed to do to increase new car sales, the dealer owner would lose his substantial rental income and the dealership would have increased operating losses. Claimant argues in its post-hearing brief that Claimant should be a single point dealer rather than in the

21

Cincinnati APR. This is not a hypothesis this Arbitrator can consider. Claimant is in the
Cincinnati APR and this Determination is based upon that fact.

There are no other considerations that would weigh in favor of the Claimant.

VIII.    **Balancing the economic interests of the manufacturer, the dealer and the public at large.**

The American taxpayer currently owns a majority of New GM. Having New GM
suffer from an uncompetitive and bloated dealership network is not in the public interest and
may delay the repayment of the loans unless the business can be turned in the right direction.
The public benefits when New GM has better operating dealers, with better facilities, highly
trained and experienced employees that provide the auto-buying public with a better product
and a better sales and service experience. The public benefits when New GM closes an
underperforming, outdated, not profitable dealership like Claimant.

New GM benefits when its business plan is carried out. Even though its plan to do
away with almost 2000 dealers will not come to fruition in 2010, its plan to reduce the size of
its dealerships, to create higher throughput per dealer and to do away with poorly located
dealerships with outdated facilities weighs heavily on the manufacturer's scale. While
deleting Claimant alone will not have a measurable impact on New GM's overall success,
taking away as many poor performing dealers as possible will, in the long run, have a major
impact on the economic success of the manufacturer. High producing profitable dealers will
increase New GM's overall profitability and increase the auto purchaser's buying experience
and may significantly reduce New GM's payouts to and support of their dealers.

The exclusion of Claimant's dealership is exactly what New GM's business plan is all about. Claimant is an excellent example of the New GM plan. Claimant has underperformed for years. It is in an urban market that is severely overdealered. (Presently 11 Chevrolet dealers need to go to six.) The physical facilities are 25 years old and cannot be upgraded where they are presently located. The area in which the dealership is located is changing and cannot support more than 6 dealers.

While the scale of the dealer weighs in favor of the dealer, the weight is slight in comparison to the manufacturer's and public at large scale. The Larkin family can continue as a used car dealer with service and body shop facilities.

The economic interests of the public at large and the manufacturer significantly outweigh the interests of the dealer.

IX.    **Costs**

In accordance with the Act, the administrative fees and expenses, and the Arbitrator's fees and expenses shall be borne equally.

This Written Determination is in full settlement of all claims submitted to this arbitration.

June 29, 2010

_____
Dale A. Crawford, Arbitrator