EXHIBIT C

# AMERICAN ARBITRATION ASSOCIATION
# AUTOMOBILE INDUSTRY SPECIAL BINDING ARBITRATION PROGRAM

In the Matter of the Arbitration between:

Layton Dodge Inc./Cutrubus Chrysler Jeep Dodge
and
Chrysler Group, LLC

Re: 77 532 00064 10

## Written Determination of Arbitrator

I, the undersigned Arbitrator, having been designated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act"), enacted December 16, 2009, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby make my Written Determination pursuant to the Act.

### Background

The Act affords a "covered dealership" (as defined in Section 747(a)(2)) the right to challenge by binding arbitration the decision of a "covered manufacturer" (as defined in Section 747(a)(1)(A) and (B)) to terminate, or not to assign, renew or continue, the covered dealership's franchise agreement. This case was filed in accordance with the Act's provisions and I held hearings and heard testimony on May 12, 13 and 14, 2010. Set forth below is my "written determination" (as provided for in 747(d) of the Act) of the issue to be decided under the Act, namely "whether or not the covered dealership should be added to the dealer network of the covered manufacturer."

### I. The Covered Dealership

This proceeding concerns the automobile dealership known as Layton Dodge Inc. dba Cutrubus Motors Chrysler Jeep Dodge and located at 1234 North Main Street, Layton, Utah, hereinafter referred to as ("LDI").

### II. Determination

The covered dealership described above in Section I shall be renewed and therefore shall be added back into the network of the covered manufacturer in the manner provided for by the Act and in accordance with the terms and conditions of the Act.

### III. Key Facts Relied Upon by the Arbitrator in Making the Determination

In accordance with Section 747, I considered the following factors:

    1.    The covered dealership's profitability in 2006, 2007, 2008 and 2009,

1

    2.    The covered manufacturer's overall business plan,
    3.    The covered dealership's current economic viability,
    4.    The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement,
    5.    The demographic and geographic characteristics of the covered dealership's market territory,
    6.    The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and
    7.    The length of experience of the covered dealership.

In making the determination, I relied upon the following key facts:

### The covered dealership's profitability in 2006, 2007, 2008 and 2009:

    1.    LDI was profitable for the applicable period when accounting conventions are taken into consideration, as suggested by the legislative history of the statute, and including incentives from the manufacturer, adjustments for rents, management fees and reserves for facility improvements.
    2.    The financial information LDI provided to the Old Chrysler was supplied on the manufacturer's form. There was no space on the form for the additional information with respect to accounting conventions.
    3.    New Chrysler's conclusion that LDI was not profitable for the applicable years was based only on the form provided and New Chrysler's position that no additional information was or should be considered.
    4.    LDI showed it was, and continues to be, financially capable of investing in renovations to the facility as previously requested and consistent with the New Chrysler business plan and the "Millennium" look.
    5.    LDI previously agreed to invest in renovation of the facility to be consistent with the Millennium look, but was unwilling to do so in early 2009 because of uncertainties regarding the manufacturer's economic condition and viability at that time.

### The covered manufacturer's overall business plan:

    6.    The covered manufacturer's business plan limits the number of dealers in the network. Following rejection, there were no dealers in the Layton Trade Zone.
    7.    There is presently one dealer in the Layton Trade Zone, the Riverdale Miller dealership, who testified that its business may be negatively impacted by adding LDI back into the network at this time as a result of the competition and possible reduced sales volume. That dealer was awarded a dealership in December, 2009, opened a temporary facility in January, 2010 and has not yet finalized the purchase of land for the proposed new facility.
    8.    Both New Chrysler and the new dealer were or should have been aware of the Act and the possibility of arbitration that might result in LDI being added back into the network.

### The covered dealership's current economic viability:

9. LDI continues to be economically viable. It could resume operations of the dealership for Chrysler, Jeep and Dodge brands quickly and has the financial capacity to do so.

### The covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement:

10. LDI did not meet the Chrysler metrics during 2006 through 2008. LDI exceeded the MSR in 2009. Chrysler considered only the underperformance prior to 2009 in its decision to reject. LDI was certified as a "Five Star Dealership" in April 2010, only 2 months prior to rejection and less than 2 weeks prior to being placed on the rejection list. LDI was a Genesis dealership at the time of rejection.

11. LDI's MSR performance increased when it received an allocation of more desirable vehicles in 2009.

12. The importance of meeting the Chrysler metrics was not communicated to LDI. LDI was well-respected in the community, and there was and continues to be community support for LDI.

### The demographic and geographic characteristics of the covered dealership's market territory:

13. Little evidence was submitted by either party concerning demographic and geographic characteristics.

### The covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement:

14. The two criterion emphasized by Chrysler as the basis for the rejection were LDI's alleged lack of profitability and failure to meet the Chrysler metrics. The facts relied on by the arbitrator and related to those factors are set forth above.

15. The covered manufacturer did not consider location in recommending rejection of LDI because LDI was considered to be an unsatisfactory dealer for other reasons.

### The length of experience of the covered dealership:

16. The experience of the covered dealership can be measured only by the experience of its principals and key employees. LDI's general manager has been employed and worked with the Chrysler and Dodge brands since 1979. Homer and Phidia Cutrubus have owned Chrysler dealerships since 1969, became Dodge dealers in 1979, and a Jeep dealer in 1988.

In addition, I considered the following:

1. LDI's burden of proof in this arbitration.

3

2. The purpose of the Section 363 sale in bankruptcy and New Chrysler's intention to take the assets purchased free of Old Chrysler's liabilities.

3. Auto sales were down dramatically in 2008 for all automakers.

4. That the Act was passed to give rejected dealers a fair and reasonable chance to get back into business at no material cost to the manufacturer.

5. That New Chrysler's business plan includes only the Riverdale Miller dealership in the Layton Trade Zone and New Chrysler strenuously opposes adding LDI back into the dealership network.

6. That Old Chrysler did not provide LDI with clearly identified details as to why it was rejected until the exchange of documentation in the arbitration.

7. That the performance metrics relied on by Old Chrysler were complex and had never been clearly explained to LDI, and that although LDI's performance on the metrics had been below average for over five years, the covered manufacturer had never terminated LDI on account of underperformance.

8. LDI did not receive the same allocation of desirable vehicles as other dealerships in the Sales Locality, yet was still held to its share of sales pursuant to the performance metrics. LDI was also allocated undesirable vehicles that were difficult to sell.

9. Testimony from LDI and Respondent's exhibits verifying LDI's previous commitment to make Millennium improvements and reserve of funds for that purpose.

10. LDI had recently expended over $2,000,000 to move the body shop to accommodate manufacturer's programs in the old body shop facility, and had historically made whatever renovations were requested by the manufacturer.

11. Testimony that when the manufacturer required LDI to separate the Volkswagen and Audi brands from the Chrysler and Jeep brands, the manufacturer was offered the first opportunity to house the Chrysler and Jeep brands in the new facility facing the interstate. Old Chrysler had declined the opportunity, instead choosing to remain in the facility facing Main Street. Subsequently, a new state of the art facility was constructed for Volkswagen and Audi at considerable expense, thus indicating both willingness to comply with the manufacturer's directive to separate the brands as well as expend funds as necessary to meet the Volkswagen and Audi manufacturers' standards.

12. Consolidation of Layton Hills Dodge into Cutrubus Chrysler Jeep Dodge was contentious.

## IV. Balance of Economic Interests

The balance of economic interests of the covered dealership, of the covered manufacturer and of the public supports this determination. The economic interests of the covered dealership are served only by adding the dealership back into the network. The economic interests of the public are served by adding back into the network a viable and competitive dealer who has historically served the public interests in the Layton Trade Zone. Assuming cooperation by New Chrysler in allocating sufficient desirable vehicles to LDI and otherwise providing fair opportunities for success to LDI, and also assuring investment by LDI in the Millennium improvements, the economic interests of the covered manufacturer can be served by adding LDI back into the network.

### V. The Purpose of the Act

The Act was passed to give covered dealers a fair and objective opportunity to present evidence in support of being added back into the dealer network, while at the same time affording the covered manufacturer an opportunity to present information against such addition. The manufacturer argued that the need to respect the New Chrysler business plan tilts the balance of economic interests to favor keeping LDI out of the dealer network. Although the viability of New Chrysler and its ability to repay TARP funding is critical to the economic interests of the public, the weight of that factor should not preclude adding otherwise deserving dealers back into the dealer network and giving them a fair opportunity to become profitable members of that dealer network. To automatically weight the New Chrysler business plan to tilt the balance as suggested would eviscerate the Act and the attendant arbitration process.

### VI. Costs

In accordance with the statute, the administrative fees and expenses, and the arbitrator's fees and expenses shall be borne equally.

This Award is in full settlement of all claims submitted to this arbitration.

5-25-10
Date

_____
Arbitrator

ND: 4846-9424-9734, v. 1

5

EXHIBIT D



# Congressional Record

United States of America

PROCEEDINGS AND DEBATES OF THE 111th CONGRESS, FIRST SESSION

Vol. 155     WASHINGTON, THURSDAY, DECEMBER 10, 2009     No. 185

## House of Representatives

The House met at 10 a.m. and was called to order by the Speaker pro tempore (Mr. BLUMENAUER).

### DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

WASHINGTON, DC,
*December 10, 2009.*
I hereby appoint the Honorable EARL BLUMENAUER to act as Speaker pro tempore on this day.

NANCY PELOSI,
*Speaker of the House of Representatives.*

### PRAYER

The Chaplain, the Reverend Daniel P. Coughlin, offered the following prayer:

Lord God, for people who live in the light of faith and who are attuned to Your greatest commandment, peace is always more than the absence of war. It remains a matter of the human heart.

Peace cannot be reduced to a human concept as only the balance of power for opposing forces. We know, Lord, peace cannot be imposed by human authority or by simple majority. Peace, Lord, is often illusive for us because it remains beyond our imagining or achievement. Peace is a gift.

Peace, Lord, is born out of the right ordering of things which You, the Creator, have invested in human society. Peace is realized by us, when our thirsting for an ever more perfect realm of justice and union reaches a certain plateau that invites us to go even further.

Lord, grant us peace of heart so we may bring this gift to our family life, work for justice, and so gift our world, both now and forever.

Amen.

---

### NOTICE

If the 111th Congress, 1st Session, adjourns sine die on or before December 23, 2009, a final issue of the *Congressional Record* for the 111th Congress, 1st Session, will be published on Thursday, December 31, 2009, to permit Members to insert statements.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT-59 or S-123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through Wednesday, December 30. The final issue will be dated Thursday, December 31, 2009, and will be delivered on Monday, January 4, 2010.

None of the material printed in the final issue of the *Congressional Record* may contain subject matter, or relate to any event, that occurred after the sine die date.

Senators' statements should also be formatted according to the instructions at http://webster/secretary/cong_record.pdf, and submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at "Record@Sec.Senate.gov".

Members of the House of Representatives' statements may also be submitted electronically by e-mail, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerk.house.gov/forms. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, and signed manuscript. Deliver statements to the Official Reporters in Room HT-59.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the *Congressional Record* may do so by contacting the Office of Congressional Publishing Services, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

CHARLES E. SCHUMER, *Chairman.*

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.

H14447


Printed on recycled paper.


App. EXHIBIT 3

seem to think that three convictions by military tribunals in the entire period of their existence is an impressive record. One of those was by a guilty plea. This isn't an impressive record; it's a dismal record. By contrast, recent analysis of the 119 terrorism cases involving 289 defendants tried over the last 20 years in U.S. courts shows a 91 percent conviction rate for the cases that had been resolved as of June 2.

I can't tell you whether one option or the other is better for any given case, but that's not the call we have to make in an appropriations bill. With current law, we can leave that decision to the experts in the administration who can best decide on a case-by-case basis who should be prosecuted in the U.S. and what mitigation plans are necessary to address any risks that may result from these trials.

The purpose of the Republican amendment, which was rightly rejected in the conference committee, was to shut off access to U.S. courts for terrorism prosecution. That is a proposition that is patently absurd and that, I dare say, our Republican colleagues would not be putting forward if there were a Republican President.

The SPEAKER pro tempore. The time of the gentleman has expired.

Mr. OLVER. I yield the gentleman 1 additional minute.

Mr. PRICE of North Carolina. Is criminal prosecution an option we simply summarily want to close off? Of course, the answer is "no."

□ 1315

We should be using these carefully selected prosecutions to send a message to the world that we will not be intimidated by the prospect of bringing terrorists to justice or allow terrorism to undermine the rule of law in our country.

Mr. LATHAM. At this time, it is my privilege to yield 3 minutes to the gentlewoman from Texas (Ms. GRANGER).

Ms. GRANGER. Mr. Speaker, I rise to speak briefly about the State/Foreign Operations division of this omnibus package.

As the ranking member of the subcommittee, I am pleased that I have been able to work closely with Chairwoman LOWEY this year. She and her staff have worked to address concerns by committee Republicans and by me, and I thank her for her commitment to bipartisanship.

I also thank our Senate colleagues and our staff for working together to achieve common ground in the conference agreement. In the end, many priorities were preserved: funding a new compact for the Millennium Challenge Corporation; fighting drug trafficking in Mexico, Central America, and Colombia; and continuing security assistance to key allies like Israel, Egypt, and Jordan.

Funds provided in this bill will allow State and USAID to hire more than 1,000 new staff, which will help balance the three D's of smart power, the approach to national security. The increase for development and diplomacy will, in turn, support our Nation's defense and allow our military men and women to refocus on their core mission.

As the Congress provides additional staff and increases foreign assistance funding, the level of commitment to reform must be equal to funding commitment made. Oversight must be a priority. For that reason, the bill provides $149 million for inspectors general, and many oversight provisions and reporting requirements are also included.

The conference agreement retains language that prevents U.S. tax dollars from going to organizations that support or participate in involuntary or coercive methods of family planning. There are legitimate plans about family planning funding that goes abroad, and legislative safeguards will remain in place the next fiscal year.

I regret that this package lumps six bills together in a package of close to half a trillion dollars and does not allow this body to address appropriations bills individually and fully vet them so that I could support them. I support the many programs in this bill. However, we must be aware of the tremendous debt held by this country and work competently, being aware of this issue.

Again, I thank Chairman LOWEY, our excellent committee staff, and our Senate colleagues for working together to address shared priorities.

Mr. OLVER. I yield 3 minutes to the gentleman from Wisconsin (Mr. OBEY).

Mr. OBEY. Mr. Speaker, I would like to comment very briefly on the comments of the gentleman from Tennessee, who a few moments ago criticized us because we were some 70 days late in passing the Military Construction-VA appropriation bill.

Let me simply point out that we may be 70 days late, but we are getting the job done. In addition to passing the basic bill, we are, for the first time in history, providing advance funding for VA activities. That is something that the veterans community has wanted for years and years, and it has been this Congress that delivered.

That stands in contrast to the performance of the minority party when they chaired this institution with respect to what they produced on the Military Construction-VA bill. They complain about the fact that we were 70 days late. They never passed that bill at all. They didn't pass it in October. They didn't pass it in November, which would have been 30 days late. They didn't pass it in December, which would have been 60 days late. They never passed it. When a new Congress took over, we had to pass all of those domestic appropriation bills and the Military Construction bill. I think it is quaint, indeed, when they attack us on the question of performance on, of all bills, the Military Construction bill. I think they need to go back and take a look at the record when they chaired this place.

With respect to the funding overall levels in this overall bill, let me simply repeat what I said earlier. When you take into account the necessary increases for veterans disability, for the census, for the war costs which are not being hidden in a supplemental as they were under the stewardship of our friends on the other side of the aisle, when you take into account the infrastructure change in funding and the $6 billion that we needed to prepare the health care system for the legislation which is about to pass, the rest of the increases in the bill before us amount to 1 percent. I hardly think that that's excessive, given the economic crisis that we face.

Mr. LATHAM. Mr. Speaker, just one comment. I think it's interesting to note the gentleman talked about that we are finally getting the Military Construction bill done, VA funding. The last two bills that we are funding are Defense, which will be 80 days out from the start of the new fiscal year, the Military Construction-VA bill.

But if you remember back with the schedule, the very first bill that was passed and signed into law was to fund Congress itself. We took care of ourselves here first and the military was the very, very last. I think that is very unfortunate.

I am now pleased to yield 2 minutes to the gentleman from Ohio (Mr. LATOURETTE).

Mr. LATOURETTE. I thank the gentleman for yielding. I am going to break the mold here and say something nice about five pages of the bill, this bill in front of me—I think those pages are right here—and say something nice about Mr. OBEY as well, and Mr. SERRANO is waving in the back.

By way of history, people know that the auto industry in this country got into trouble, and this administration made a decision to use leftover TARP funds to bail out Chrysler and General Motors. Both car companies submitted reorganization plans in February of this year and both were rejected by the auto task force.

The auto task force was kind of a strange collection of people that didn't have any experience in the auto industry at all. Most of them didn't own cars. Those that did own cars owned foreign cars, but they determined that the car companies had to be more aggressive when it came to dealerships. As a result, about 800 Chrysler dealers were closed and about 2,000 GM dealers. The problem with that is, with rampant unemployment, about 60 people work at each car dealership across this country. Car dealerships don't cost the car companies any money, and it was a strange way to do business and potentially take 200,000 people and put them on the street.

A couple of young, fresh-faced Democrats, Mr. MAFFEI of New York and Mr. KRATOVIL of Maryland, launched a legislative effort. But as a grizzled veteran, having been here for the last 15

years, I know that the one piece of legislation or pieces of legislation that have to leave town are the appropriations bills. We drafted some language and put it in Mr. SERRANO's bill, and Mr. OBEY took it. They didn't have to—they probably got in trouble for taking it—but that became the 800-pound gorilla that had to be dealt with as General Motors and Chrysler have moved forward on how to deal with this dealer situation.

I also want to say something nice about the majority leader, Mr. HOYER. He took up the mantle and said we are going to solve this problem. As a result, the five pages that are here in the bill indicate that those aggrieved dealers now have the opportunity for binding arbitration, and the facts need to be brought forward, and hopefully fairness will prevail. But that wouldn't happen without something good and bipartisan happening in the United States Congress.

Mr. LATHAM. Mr. Speaker, it is my honor to yield 1 minute to the minority leader of the House, the gentleman from Ohio (Mr. BOEHNER).

Mr. BOEHNER. We're broke. We're broke. America is broke. All year long our friends across the aisle have been on this massive spending spree that our Nation can't afford.

We had a trillion dollar stimulus bill that was supposed to create jobs immediately, and yet unemployment is now 10 percent in America. Three million people have lost their jobs since the bill was signed into law.

We passed a budget that's going to double the national debt in 5 years, triple it in 10 years. We have got a $12 trillion national debt.

We brought a national energy tax bill to the floor that's going to cost a trillion dollars, passed it. We had a health care bill here several weeks ago, another trillion dollars, passed it.

When are we going to say enough is enough? Here we are today. We are wrapping six appropriation bills together. We are going to spend a half a trillion dollars, and it has got over 5,000 earmarks in the bill, you know, things like $292,000 for the elimination of slum and blight in Scranton, Pennsylvania; $300,000 for music and education programs at New York City's Carnegie Hall, where they pay the employee who runs this program $530,000 a year in salary and benefits. There is plenty in here for Washington as well: $150,000 for the National Building Museum; $250,000 for the Wolf Trap Foundation for the Performing Arts, a concert venue.

Listen, I don't know how worthy any of these projects are, but I do have to ask the question, are they more important than our kids and our grandkids who have to pay the debt, because we don't have the money to spend on this. It's our kids and grandkids who are going to pay for it. Yet we can't find ways to cut spending.

Before the President took office, he said that he must go through the budget and these bills line by line and page by page. Well, after Congress passed the $410 billion omnibus spending bill earlier this year, with 9,000 earmarks, the President signed it and he said, well, that was last year's business. Now the President says reducing the deficit is next year's business and that we need to spend our way out of this economic recession that we are in.

Well, I think the President ought to go through this bill line by line and page by page, all 2,500 pages of it, then maybe he will figure out that we don't need to be spending this money that we don't have and piling more and more debt on the backs of our kids and grandkids. Instead, our bond rating, our AAA bond rating is in jeopardy and our Democrat friends want to raise the debt limit next week by $1.8 trillion.

Let's stop the madness and vote "no."

□ 1330

Mr. OLVER. Mr. Speaker, how much time does each side now have?

The SPEAKER pro tempore. The gentleman from Massachusetts has 7 minutes remaining, and the gentleman from Iowa has 3 minutes remaining.

Mr. OLVER. Mr. Speaker, I yield 3 minutes to the gentleman from Wisconsin (Mr. OBEY).

Mr. OBEY. Mr. Speaker, I regret that this has become another typical "Who Shot John" debate, but since it has, let me respond to the distinguished minority leader. Let's compare what President Obama inherited with what President Bush inherited. When President Bush walked into the White House, he inherited $6 trillion in projected surpluses. He inherited 3 years in a row of budget surpluses under President Clinton. And he inherited an economy in which all income groups saw their income rise by roughly the same percentage.

In contrast, when Mr. Obama walked into the White House, he inherited a $1 trillion deficit, he inherited two wars that were paid for on the cuff, with borrowed money. He inherited $6 trillion in projected deficits. And he inherited an economy in which, for six straight years, 94 percent of the income growth went to the wealthiest 10 percent of people, and everybody else got table scraps. In addition, he inherited an economy that was projected to have a $2.5 trillion hole because of the biggest collapse of the economy in 75 years.

And so, indeed, Mr. Obama and the majority party in this Congress spent money to try to prime the pump, to keep the economy going, because we were losing 700,000 jobs a month the last 3 months of the Bush administration. We have now got that down to an 11,000 job loss last month. That's not good enough, but it's certainly a lot better than the situation was when we inherited it.

The gentleman squawks about the debt ceiling. The debt has already been rung up, and now the question is, when the bill comes in the mail, is it going to be paid or not. The fact is, out of that $1.8 trillion debt increase, $1.4 trillion of that is directly traceable to policy actions that were taken by the previous administration and the previous Republican Congress. And $400 billion of it are directly traceable to the actions we've had to take to try to bail the economy out of the mess that you folks got us into.

So if you want to start comparing records, I'd be happy to. I'd much prefer to talk about the contents of this bill and the individual programs of this bill. But since some the gentlemen on that side of the aisle prefer to politicize everything, I guess we're going to have to have the debate at that level. That's too bad, but I've come to expect very little but that from the other side, I regret to say.

I do want to thank the gentleman from Ohio for trying insert a bit of bipartisanship into the debate.

Mr. LATHAM. Mr. Speaker, I yield myself as much times as I may consume.

I don't know if the gentleman has more speakers, but I'm planning on closing. I just want to thank the staff, on both sides. Our subcommittee does an outstanding job working together, and I'm just very, very proud of the work that they've done and the kind of commitment they've shown, and just want to say thank you for the professionalism that they have exhibited throughout this whole process.

Mr. Speaker, I'm going to oppose this for various reasons. Number one, the fact that this $450 billion bill is a 14 percent increase in spending over last year. At a time when people are hurting, we cannot afford this kind of additional debt that's being put on the taxpayers, on the families at home. Realizing that in the last 2 years, discretionary spending in this House of Representatives has increased now, 85 percent; 85 percent more money, discretionary money, being spent today than just 2 years ago. Does anybody at home have 85 percent more money today than what they had 2 years ago? Is it responsible in any way, shape or form to have that kind of an increase?

The gentleman from Massachusetts—and I appreciate his professionalism—made the case, basically, for me before. We held down spending previously. And this explosion that we've seen just throughout the budget is simply wrong. We cannot sustain it, and it is about the next generations. I've got four grandchildren. They're going to pay this bill, and their children are going to pay this bill, and it simply is not fair. It's generational theft, and we've got to finally hold the line as far as spending in this Congress and find some kind of sanity around here.

With that, again, I would hope that everyone would vote "no." We could get some reality. We could separate these bills, have them done correctly and in a responsible way. And just one other thing in closing. I want to, again,

thank Chairman OLVER for being a very good friend, his professionalism, and someone that I really admire.

Mr. Speaker, I yield back the balance of my time.

Mr. OLVER. I yield myself the remainder of the time.

The SPEAKER pro tempore. The gentleman from Massachusetts is recognized for 4 minutes.

Mr. OLVER. Mr. Speaker, my counterpart, the ranking member from Iowa, has graciously thanked the people on both sides who have done all of the work that our subcommittee dealt with. Actually, since there's six different bills here, I would like to extend that thanks to the people on the staffs of each of the six subcommittees on each side of the aisle who put countless hours into the work that has brought this bill to the floor at this time.

But particularly, let me just personalize it one more step. On our side, my clerk, Kate Hallahan, and on the Republican side, their clerk, Dena Baron, and the people who work under them, for them and with them, and for us and for the people of the country. They have done an exemplary job in the THUD committee, as I think each of the other groups have done for their own particular subcommittee. We should all be very grateful for that.

With the passage of this bill—and I'm going to urge passage as I close—we will on our side have completed the work on 11 of the 12 bills, and thereby we will be a very large step closer to the finish of the budgetary process necessary to provide for the year 2010. And so I am very optimistic today, in fact, a great load rises from the shoulders of all the chairs and ranking members of the subcommittees.

With that, let me just urge a "yes" vote on this budget bill in order to be able to reach that point very close to the completion of our work.

Mr. VAN HOLLEN. Mr. Speaker, I rise in support of the Consolidated Appropriations Act of 2010 and urge its swift consideration by our colleagues in the Senate.

This legislation includes final conference reports for the FY 2010 Transportation-HUD, Commerce-Justice-Science, Financial Services, Labor-HHS-Education, Military Construction-VA and State-Foreign Operations bills. Its total funding of $446.8 billion makes priority investments in infrastructure, health care, and education, while supporting our veterans, funding the upcoming census and honestly accounting for war costs previously left to supplementals. Remaining items in the bill are limited to a 1% funding increase.

The $50 billion in infrastructure spending in this bill—including $150 million for the Washington Metropolitan Area Transit Authority—will enable us to modernize our aging infrastructure, ease congestion, facilitate commerce and create good-paying, homegrown American jobs. To further bolster our economic recovery, HR 3288 provides $824 million to the Small Business Administration for its work helping our job-generating small businesses succeed. This investment will help facilitate an additional $28 billion in new lending to small businesses. I am delighted that the National Institutes of Health is funded at $31 billion so that it can continue driving scientific innovation and health system reform. Finally, I am especially pleased that the Financial Services division of this consolidated legislation sets up a fair and reasonable process by which profitable auto dealers can have an opportunity to get back into business so that they and their employees can play their part in supporting our ongoing economic recovery. In that regard, I ask that the full text of the attached statement be entered into the legislative RECORD.

Mr. Speaker, I rise today to express my appreciation that language has been included in the Financial Services Appropriations Conference Report that will give automobile dealers around the nation a fair and reasonable shot at getting back into business. For the past several months, I have been pleased to join with Majority Leader HOYER, Congressmen KRATOVIL and MAFFEI, and others to ensure that profitable car dealers have every opportunity to contribute to our economic recovery and put their employees back to work.

Profitable and viable dealers should have never been terminated in the first place, and I was proud to join the fight to have these short-sighted decisions reversed. Automobile manufacturers won't be able to get back on their feet without a strong dealer network, and Congress is committed to ensuring that such a network exists. I salute the tenacity and determination of these small business owners, many of whom have been selling cars and supporting the American auto industry for decades. Under the provision we are approving today, these terminated dealers will have an opportunity, once again, to do what they do best—sell and service cars. And that is good for our economy, for job creation and for the American car industry.

It would have been my preference that we would not need to legislate on this matter. We convened talks with the auto dealer groups and the manufacturers and while both sides offered significant concessions, efforts to achieve a non-legislative solution failed when auto manufacturers offered plans that fell short of what was needed to add dealers to their dealer networks and put their employees back to work.

As 2009 comes to a close, the federal government still maintains a substantial financial stake in Chrysler and General Motors and therefore in the United States automobile industry. Clearly, it is in the national interest to have the domestic automobile industry regain profitability and maintain sufficient dealerships to meet consumer demand.

Section 747 of the Financial Services Appropriations division of this bill recognizes the valuable role that dealers play in the auto industry and our local economies. Automobile dealers are essential to the success of automobile manufacturers because at no material cost to the manufacturers, they facilitate distribution, sales, and servicing of hundreds of millions of vehicles annually. This legislation is premised on the notion that it is in the best interest of automobile manufacturers, the automotive industry, dealers and the public to have an extensive and competitive automobile distribution network throughout the country, including in urban, suburban and rural areas.

Section 747 mandates that manufacturers promptly provide covered auto dealers in writing the specific criteria and supporting data relied upon by a manufacturer in its decision to end or wind down the dealership relationship. In the spirit of cooperation and to ensure an efficient process as this legislation is implemented, we expect that the manufacturers will provide the information in a format that is user friendly, clearly identifies facts, readily accessible, and understandable by the dealer and that the data may be transmitted either by mail or electronically. We intend that this process provide transparency and avoid the excessive costs and delays of litigation and discovery disputes. The manufacturers should provide their respective covered dealers with each and every detail and criterion related to the evaluations of the dealership and the decisions to terminate, not assign, not renew or discontinue. It is anticipated that the manufacturers will be cooperative and forthcoming and that all relevant information will be provided promptly.

It further provides such dealers with the opportunity to participate in a neutral arbitration process designed for the dealer to make the case for being added to the manufacturer's dealer network. Congress has included specific timeliness for this process and we expect both parties to the arbitration to act in good faith and expeditiously so that added dealers can return to full-fledged operations quickly.

Section 747 expressly permits the manufacturer and dealer to present any kind of relevant information during the arbitration and provides that the arbitrator shall decide whether the dealer should be added to the manufacturer's dealer network based on a balancing of the interests of the dealer, the manufacturer, and the general public. The public interest includes reasonably convenient access for consumers to a dealer who can service their vehicles, which is of particular concern in rural areas where many dealers were terminated in 2009. It has been well-reported that more and more individuals have to drive substantial distances to obtain service from an authorized dealer of a specific brand because of a dealer termination.

Congress has provided seven enumerated factors for the arbitrator to consider, but this list is not exhaustive because the legislation provides that the parties can introduce "any relevant information." For example, we expect that arbitrators should consider relevant State laws, which provide a context for analyzing franchise agreements and the obligations of dealers and manufacturers.

A couple of these enumerated criteria merit additional explanation. For example, Congress has directed that the demographic and geographic characteristics of the market are taken into account. This reflects our intention that the arbitrator should pay special attention to the concerns expressed by some terminated dealers that there are factors in their market areas or States that affect their performance and render some measurements, such as State averages, less than accurate in portraying the true picture of a dealer's operations.

Another one of the factors involves the dealer's performance under the franchise agreement terminated in 2009. In considering this factor and related factors, it is important for arbitrators to recognize that state law is part and parcel of and modifies auto dealer franchise agreements. To look only at a franchise agreement, in other words, misses an important contextual element. Accordingly, it is anticipated that the arbitrators will consider State

law elements of good faith and fair dealing in this process and that, for example, the franchise agreement's performance standards and a dealer's performance under the original agreement will be evaluated in accordance with State law.

Another factor is the historic profitability of the dealership. During the legislative process, Congress learned that some dealers, for tax planning reasons or other reasons use a variety of legitimate, widely recognized accounting conventions, such as LIFO, that could, depending on the date a snapshot is taken, affect materially whether the dealership appears profitable. It is important that arbitrators recognize such accounting conventions when considering the profitability of a dealership so a fair and accurate picture is obtained.

With respect to being added back to a dealer network, it is the intent of Congress that notwithstanding the preference of a manufacturer to have several brands in the same dealership, in the case of a dealer seeking to be added to a dealer network but with fewer than all of the preferred brands, the dealer nonetheless will be eligible to be added.

It is worth noting that pursuant to subsection (f), manufacturers and dealers may, of their own volition, decide to enter into legally binding agreements with one another instead of going through the arbitration process. It is the intent of Congress that for this subsection to apply, the legally binding agreements shall be consensual, non-coercive resolutions of the issue between the dealer and the manufacturer entered into or ratified after the date of enactment. Coercive agreements should not be upheld.

In conclusion, I want to recognize the tireless efforts of dealers from around the Nation who worked to develop and implement a truly historic grassroots effort over the past seven months. Groups such as the Committee to Restore Dealer Rights, the Automobile Trade Association Executives, National Automobile Dealers Association and the National Association of Minority Auto Dealers, were instrumental in bringing about the legislation we are approving today.

Mrs. BACHMANN. Mr. Speaker, today, the House of Representatives once again sidestepped its constitutional obligation to fund our Nation's Federal priorities in a responsible manner and railroaded a massive spending bill through the House without allowing an open and honest debate that American taxpayers deserve. While I believe this legislation contains important funding for many programs administered by Federal agencies, spending bills and the projects they fund must be considered individually on their merits, and not obscured by being tucked into a giant "omnibus" spending package.

Right now, the national debt has already ballooned to a whopping $12.1 trillion and Democrats are ready to increase the debt limit by another $1.8 billion to accommodate their rabid spending habits. But at a time when American families are struggling to make ends meet and Federal deficits are skyrocketing at a record pace, it is absolutely necessary for Congress to fully commit to fiscal responsibility and scrutinize how every tax dollar is spent. While I understand the difficulty associated with such a large task, I, like so many of my colleagues, believed the Democrat majority when they pledged to "create the most honest, most open, and most ethical Congress in history." I was hopeful that their stated commitment to open government would entail the individual consideration of each of the 12 annual appropriations bills, setting a path towards restoring the confidence and trust of the American people.

Unfortunately, the actions taken today indicate that our leadership is content with the status quo, and will avoid difficult decisions that should be made in order to prevent saddling future generations with debilitating debt. By combining half of the total appropriations bills into one measure, this majority has shown that it has no interest in real transparency and is more focused on growing government to accommodate their tax-and-spend agenda than being good stewards of the taxpayers' money.

Congress should show the American people that it is serious about making the same tough choices American families make every month. But this bill's 24 percent increase in government spending ignores the realities of our limited budget and assumes the taxpayers will just pick up the tab in future years. While the bill includes some of Minnesota's local priorities, it strays far from representing anything but a big government spending bill that lacks any consideration of our massive budget deficit.

Indeed, in the same manner as households across America set a budget, Washington needs to set a budget, and stick to it. However, the tax and spend approach to government being exhibited this year serves as a haunting indication that no amount of spending or government control is too much for the Democrats. That said, it is my sincere hope that as Congress moves forward with next year's budget and spending priorities, strict attention will be paid to protecting the American taxpayer and fostering an atmosphere of bipartisan cooperation and fiscal responsibility.

Mr. CONYERS. Mr. Speaker, I would like to thank the Conferees for including section 747, which regulates the relationship between automobile manufacturers and automobile dealerships. I, along with Majority Leader STENY HOYER, and Representatives CHRIS VAN HOLLEN, DANIEL MAFFEI, FRANK KRATOVIL, STEVEN LATOURETTE, JACKIE SPEIER, ROBERT BRADY, BETTY SUTTON, and BOB ETHERIDGE have worked together to create legislation that will best serve the interests of the automobile industry, including manufacturers and dealerships, and the citizens who have a significant portion of their tax dollars invested in the success of this critical industry. The following is a description of the legislation.

Section 747 of the Conference Agreement includes language establishing an arbitration process to determine whether previously terminated, non-assigned, non-renewed, or non-continued auto dealerships should be added to dealership networks of automobile manufacturers that received federal assistance under the TARP program, or that are partially owned by the Federal Government. This provision replaces Section 745 of the House bill, which also addressed concerns regarding terminated auto dealerships.

It is in the national interest to protect the substantial federal investment in automobile manufacturers by assuring the viability of such companies through the maintenance of sufficiently sized dealership networks to meet consumer demand for sales and servicing nationally, in addition to facilitating the maintenance and growth of industry market share among manufacturers that benefitted from TARP funds, and in which the taxpayers have a significant financial investment, it is in the national interest to ensure that dealerships and manufacturers are each treated fairly in their business relationships based on their respective economic interests.

Evidence obtained over the course of numerous Congressional hearings in 2009 demonstrates that the automobile industry is integral to the health of the United States economy as a whole. Automobile manufacturers have been among the largest and most successful corporations in the United States, providing significant numbers of jobs and producing valuable goods for consumers. Automobile dealerships are also essential businesses in most communities nationally, providing many jobs to local residents and facilitating the distribution, sales, and servicing of millions of vehicles annually. Our investigations have made clear that it is in the best interest of the automobile industry, automobile manufacturers, dealerships and the public to have a competitive and economically viable domestic automobile distribution network throughout the country, including urban, suburban, and rural areas.

This provision was included because we also believe that by providing a process for working out the relationship between automobile manufacturers and dealerships that ensures transparency and review by a neutral arbitrator according to an equitable and balanced standard, taking into account the interests of all affected parties, the property and due process rights of manufacturers and dealerships will be safeguarded.

Section 747 establishes a procedure by which an automobile dealership that had a franchise agreement for a vehicle brand that was not assigned to a covered manufacturer, or that was terminated in a manner not consistent with applicable state law, on or before April 29, 2009, may seek continuation or reinstatement of the franchise agreement, or seek to be added as a franchisee to a dealership network of the covered manufacturer who manufactures the vehicle brand of the covered dealership, with such franchisee being located in the geographic area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Absent such election by the covered dealership, no such binding arbitration would occur.

In order to provide a covered automobile dealership with the information useful to determine whether to elect to enter into binding arbitration, the dealership will receive in writing notice from the covered manufacturer detailing the specific criteria pursuant to which such dealership's franchise agreement was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer. This notice must be provided within the 30-day period beginning on the date of the enactment of this Section. This transparency is a vital step in giving dealerships the opportunity to understand why their franchise agreements were terminated, not renewed, or were not assumed and assigned to a covered manufacturer. It is our expectation that this transparency will obviate the need for unnecessary arbitration. It is also our expectation that this transparency will encourage informal agreements between covered dealerships and manufacturers without

*December 10, 2009* CONGRESSIONAL RECORD — HOUSE H14479

recourse to the more formal procedures provided in this Section. We expect that the written transmittal letter will also provide appropriate contact information, including an e-mail address, to enable the dealership to contact the manufacturer should the dealership have specific questions about the dealership's information and individual criteria contained in such letter.

The Conference Agreement provides such dealerships with the opportunity to elect to participate in a neutral arbitration process designed to permit the dealership to present information in support of its addition to the manufacturer's dealership network, and for the manufacturer to present information against such addition based on its business plan and future economic viability. The arbitrator in each case shall balance the interests of the covered dealership, the covered manufacturer, and the public and will decide based on that balancing whether or not the covered dealership should be added to the dealership network of the covered manufacturer. These are the only remedies the arbitrator may provide. The Conference Agreement specifically prohibits the awarding of compensatory, punitive, or exemplary damages to any party.

The Conference Agreement sets out seven specific factors that the arbitrator should consider in ruling on each case. The list is not exclusive, and the arbitrator would have the discretion to consider all the relevant facts on a case-by-case basis. In considering whether adding the covered dealership to the covered manufacturer's dealership network is in the public interest, the arbitrator should consider, among other factors, the need for reasonable access for consumers to a dealership that can service their vehicles, which is of particular concern in rural areas. The arbitrator should also consider the impact on the viability of the manufacturer of adding the dealership to the manufacturer's network, the length of experience of the dealership, the dealership's historical profitability and current economic viability, and demographic and geographic characteristics of the market.

It is our understanding that the General Commercial Rules of the American Arbitration Association shall apply to the arbitration proceeding, except to the extent that a rule is inconsistent with any provision of this Section.

Subsection (f) addresses negotiations between a covered manufacturer and a covered dealership, whether acting individually, as a group, or through an organization acting on behalf of one or more covered dealerships. The provision is intended to ensure that any legally binding agreement, such as a memorandum of understanding, resulting from a voluntary negotiation between a covered manufacturer and a covered dealership, a group of covered dealerships, or an organization acting on behalf of one or more covered dealerships will not be disturbed by this section. It also makes clear that once a covered dealership is party to such an agreement, such covered dealership would not be eligible for the arbitration remedy in this section.

It is not the intent of Congress to bar a covered dealership from the provisions of this section if the covered dealership accepted a standard form contract prepared by the covered manufacturer and offered on a "take-it-or-leave-it" basis, even if the agreement was entered into voluntarily. As a consequence, a covered dealership that accepted a "wind-down" agreement drafted by a covered manufacturer would be able to avail itself of the provisions of this section. An agreement between a covered manufacturer and a covered dealership, whether acting individually, as a group, or as part of a group of dealerships acting through an organization, will be considered voluntarily negotiated if the agreement between the parties reflects a compromise based on written or oral discussions, even if one party to the negotiation is the principal or primary drafter of the agreement.

We chose this approach because binding arbitration by a neutral arbitrator is the most appropriate means of resolving the differences between covered dealerships and manufacturers, and to protect the taxpayers, and the broader economy. For this reason, the Conference Agreement sets out a procedure for ensuring that a neutral arbitrator conducts the arbitration according to a clear standard with factors the arbitrator must weigh.

Due to the time sensitive nature of this situation, the Conference Agreement provides that a covered dealership must elect to pursue arbitration no later than 40 days of the date of enactment of this section, that such arbitration must commence as soon as practicable and must be submitted to the arbitrator for deliberation not later than 180 days of such date. The arbitrator is given the flexibility to extend that period for up to 30 days for good cause. The arbitrator then has seven business days after the arbitrator determines that the case has been fully submitted to issue a written opinion.

Section 747 expressly permits the manufacturer and dealership to present any kind of relevant information during the arbitration. As an additional means of ensuring efficiency and economy in the arbitration process, the provision prohibits depositions and limits discovery to documents specific to the covered dealership.

Section 747 also makes clear that a manufacturer may terminate a covered dealership in accordance with applicable state law.

I yield back the balance of my time.

The SPEAKER pro tempore. All time for debate has expired.

Under the rule, the previous question is ordered.

The question is on the conference report.

Pursuant to clause 10 of rule XX, the yeas and nays are ordered.

Pursuant to clause 8 of rule XX, this 15-minute vote on adoption of the conference report will be followed by a 5-minute vote on suspending the rules and passing H.R. 4017.

The vote was taken by electronic device, and there were—yeas 221, nays 202, answered "present" 1, not voting 10, as follows:

[Roll No. 949]

YEAS—221

Abercrombie
Ackerman
Altmire
Andrews
Arcuri
Baca
Barrow
Bean
Becerra
Berkley
Berman
Berry
Bishop (GA)
Bishop (NY)
Blumenauer
Boccieri
Boswell
Boucher
Boyd
Brady (PA)
Braley (IA)
Butterfield
Capps
Capuano
Cardoza
Carnahan
Carson (IN)
Castor (FL)
Chandler
Chu
Clarke
Clay
Cleaver
Clyburn
Cohen
Connolly (VA)
Conyers
Costa
Courtney
Crowley
Cuellar
Cummings
Davis (AL)
Davis (CA)
Davis (IL)
Davis (TN)
DeFazio
DeGette
Delahunt
DeLauro
Dicks
Dingell
Doggett
Doyle
Edwards (MD)
Edwards (TX)
Ellison
Engel
Eshoo
Etheridge
Farr
Fattah
Filner
Foster
Fudge
Garamendi
Giffords
Gonzalez
Grayson
Green, Al
Green, Gene
Griffith
Grijalva
Gutierrez
Hall (NY)
Halvorson
Hare
Harman
Hastings (FL)
Heinrich
Herseth Sandlin
Higgins
Hill
Himes
Hinchey
Hinojosa
Hirono
Hodes
Holden
Holt
Honda
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee (TX)
Johnson (GA)
Johnson, E. B.
Kagen
Kanjorski
Kaptur
Kennedy
Kildee
Kilpatrick (MI)
Kilroy
Kirkpatrick (AZ)
Kissell
Klein (FL)
Kosmas
Langevin
Larsen (WA)
Larson (CT)
Lee (CA)
Levin
Lewis (GA)
Loebsack
Lofgren, Zoe
Lowey
Luján
Lynch
Maffei
Maloney
Markey (CO)
Markey (MA)
Massa
Matsui
McCarthy (NY)
McCollum
McDermott
McGovern
McIntyre
McMahon
McNerney
Meek (FL)
Meeks (NY)
Michaud
Miller (NC)
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Murphy (CT)
Murphy (NY)
Murphy, Patrick
Nadler (NY)
Napolitano
Neal (MA)
Nye
Oberstar
Obey
Olver
Ortiz
Pallone
Pascrell
Pastor (AZ)
Payne
Perlmutter
Perriello
Peters
Pingree (ME)
Pomeroy
Price (NC)
Quigley
Rahall
Rangel
Reyes
Richardson
Rodriguez
Ross
Rothman (NJ)
Roybal-Allard
Ruppersberger
Rush
Ryan (OH)
Salazar
Sánchez, Linda T.
Sanchez, Loretta
Barbanes
Schakowsky
Schauer
Schiff
Schrader
Schwartz
Scott (GA)
Scott (VA)
Serrano
Sestak
Shea-Porter
Sherman
Sires
Slaughter
Smith (WA)
Snyder
Space
Spratt
Stark
Sutton
Teague
Thompson (CA)
Thompson (MS)
Tierney
Titus
Tonko
Towns
Tsongas
Van Hollen
Velázquez
Visclosky
Walz
Wasserman Schultz
Waters
Watson
Watt
Waxman
Weiner
Welch
Wexler
Wilson (OH)
Woolsey
Wu
Yarmuth

NAYS—202

Aderholt
Adler (NJ)
Akin
Alexander
Austria
Bachmann
Bachus
Baird
Bartlett
Barton (TX)
Biggert
Bilbray
Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehner
Bonner
Bono Mack
Boozman
Boren
Boustany
Brady (TX)
Bright
Broun (GA)
Brown (SC)
Brown-Waite, Ginny
Buchanan
Burgess
Burton (IN)
Calvert
Camp
Campbell
Cantor
Cao
Capito
Carney
Carter
Cassidy
Castle
Chaffetz
Childers
Coble
Coffman (CO)
Cole
Conaway
Costello
Crenshaw
Culberson
Dahlkemper
Davis (KY)
Deal (GA)
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Donnelly (IN)
Dreier
Driehaus
Duncan
Ehlers
Ellsworth
Emerson
Fallin
Flake
Fleming
Forbes
Fortenberry
Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gingrey (GA)
Gohmert
Goodlatte
Gordon (TN)
Granger
Graves
Guthrie
Hall (TX)
Harper
Hastings (WA)
Heller
Hensarling
Herger
Hoekstra
Hunter
Inglis
Issa
Jenkins
Johnson (IL)
Johnson, Sam
Jones
Jordan (OH)
Kind
King (IA)
King (NY)
Kingston
Kirk
Kline (MN)