# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROSE CHEVROLET, INC.<br>110 N. Erie Highway<br>Hamilton, Ohio 45011<br><br>Petitioner-Covered Dealership<br><br>and<br><br>GENERAL MOTORS, LLC<br>c/o Daniel F. Akerson, CEO<br>P.O. Box 33170<br>Detroit, Michigan 48232-5170<br><br>Respondent-Covered Manufacturer | CASE NO. _____<br><br>JUDGE _____<br><br><br>**APPLICATION TO VACATE<br>AN ARBITRATION AWARD**<br><br>**(Hearing and Oral Argument Requested)** |

The Petitioner-Covered Dealership, Rose Chevrolet, Inc. ("Rose"), hereby submits its application to

vacate a June 30, 2010, American Arbitration Association Award ("Award") involving Respondent-Covered

Manufacturer, General Motors, LLC ("GM").

I.    **PARTIES**

1.    Petitioner, Rose Chevrolet, Inc. ("Rose"), is an automobile dealership located at 110

N. Erie Highway, Hamilton, Ohio 45011.  Rose is a "covered dealership" as defined in Section 747(a)(2) of the

Consolidated Appropriations Act of 2010 (Public Law 111-117) (the "Act").  (App. Ex. 1).

2.    Respondent, General Motors, LLC ("GM"), is the current owner of the General Motors

automobile manufacturing business and has its principal place of business in Detroit, Michigan.  GM is a

"covered manufacturer" as defined by Section 747(a)(1) of the Act.  (App. Ex. 1).

II.    **JURISDICTION**

3.    While the Federal Arbitration Act's ("FAA") standards apply to this dispute, the FAA

"bestow[s] no federal jurisdiction but rather requir[es] an independent jurisdictional basis." *Hall St. Assocs.,*

09-50026-mg   Doc 7445-1   Filed 10/19/10   Entered 10/19/10 17:51:14   Exhibit
Case: 1:10-cv-02114-DSO   Doc #: 9   Filed: 08/23/10 2 of 22   PageID #: 2
Exhibit E to Objection   Pg 3 of 23

*L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 1402, 170 L.Ed.2d 254 (2008), citing *Moses H. Cone*, 460 U.S. at 25 n. 32, 103 S.Ct. 927.  The District Court, however, has federal question jurisdiction in this case under 28 U.S.C. § 1331 because it involves Section 747 of the Act, a law enacted December 16, 2010, by Congress (Public Law 111-117).  Additionally, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1).  Finally, the FAA applies because (1) it involves a "binding" arbitration (i.e. final) and (2) the American Arbitration Association ("AAA") commercial rules apply.

III.   **VENUE**

4.       Venue is proper in this Court, pursuant to 9 U.S.C.A. § 10 of the FAA, as the hearing was held and the Award was issued in Cleveland, Ohio, within this Court's geographical district.  Venue is also appropriate because a substantial part of the events giving rise to the claim arose in this district and GM "resides" in the district, subject to personal jurisdiction.  (28 U.S.C. § 1391(a) and (c)).

IV.   **BACKGROUND AND PROCEDURAL FACTS**

A.   **History of Section 747 of the Consolidated Appropriations Act of 2010**

5.       The underlying arbitration proceeding was timely initiated pursuant to Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111.117 (2009)) ("Section 747" or "Act").[1]  The genesis of Section 747 was the voluntary petitions for bankruptcy filed by General Motors Corporation ("GM") and Chrysler Corporation in the summer of 2009.  Both GM and Chrysler applied for and received loans from the U.S. Government through the Troubled Asset Relief Program ("TARP") emergency funding program.

6.       In the bankruptcy proceedings, both GM and Chrysler used a provision in the Bankruptcy Code to circumvent federal and state franchise laws and summarily terminate or "wind down" (under the threat of termination) the franchises of over 2,000 independent auto dealers throughout the United States.

_____

[1]  Attached in Petitioner's Appendix of Exhibits and Authorities ("App. Ex. _____") as App. Ex. 1.

09-50026-mg    Doc 7445-5    Filed 10/19/10    Entered 10/19/20 22:51:14    Exhibit
Case: 1:10-cv-02114-SO    Doc #: 1-9    Filed: 10/19/20    Page 4 of 3 Exhibit
Exhibit E to Objection    Pg 4 of 23

7.    The House of Representatives, Committee on the Judiciary, held three (3) days of hearings on the "*Ramifications of Auto Industry Bankruptcies*." The stated purpose of the hearings was to review "the ramifications of auto bankruptcies and their effect on dealers and other issues." (Emphasis added).[2] Other Congressional committees also conducted investigations, hearings, and gathered evidence regarding the manufacturer's "expedited bankruptcy proceedings."[3] Congress passed Section 747 of the Act because of the "bipartisan concern in Congress of the mass closure of GM and Chrysler dealerships." (Emphasis added) (Id.).

8.    On July 19, 2010, the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") confirmed Congress' concerns in a report entitled "*Factors Effecting the Decisions of General Motors and Chrysler to Reduce Their Dealership Networks*." (App. Ex. 2). SIGTARP concluded that its investigation "demonstrates that GM did not consistently follow its stated criteria" regarding the wind-down and termination of dealerships. (SIGTARP, p. 30). SIGTARP also found, just as troubling, the fact that GM had "little or no documentation of the decision-making process to terminate or retain dealerships ... ." (Id.). The SIGTARP report also held that GM's acceleration of dealership closings "was not done with any explicit cost savings to the manufacturer in mind." (Emphasis added) (SIGTARP, p. 29).

---

[2]  House of Representatives, Subcommittee on Commercial and Administrative Law, Committee of the Judiciary, "**Ramifications of Auto Industry Bankruptcies (Part III),**" Serial No. 111-55, p. 1 (July 22, 2009) [This subcommittee also held hearings on May 21, 2009, and July 21, 2009].

[3]  June 3, 2009, State Senate Commerce Committee-Full Committee:
   **GM And Chrysler Dealership Closures: Protecting Dealers And Consumers;**
   June 10, 2009, Senate Banking Committee-Full Committee:
   **The State of the Domestic Automobile Industry: Impact of Federal Assistance;**
   June 12, 2009, House Energy and Commerce Committee-Subcommittee on Oversight/
   Investigations: **GM And Chrysler Dealership Closures And Restructuring;**
   September 16, 2009, House Small Business Committee-Subcommittee on Rural Development,
   Entrepreneurship and Trade: **The Role of Automobile Dealerships in Rural
   Economies**

3

09-50026-mg   Doc 7445-3   Filed 10/19/10   Entered 10/19/10 17:51:04   Exhibit
Case: 1:10-cv-02114CEC   Doc #: 9   Filed: 03/03/11   Page: 4 of Exhibit
Exhibit E to Objection   Pg 5 of 23

9.    It is precisely because of the arbitrary and capricious actions of GM and Chrysler in the Bankruptcy Court, after acceptance of Federal TARP loans, that Section 747 mandated that any manufacturer who accepted money from the Federal government had to provide the "specific criteria" for their rejection or wind-down of dealerships.  The Act further required American Arbitration Association ("AAA") proceedings, if a dealer made demand on the manufacturer, for a hearing before a neutral arbitrator to protect the covered dealership's due process rights.

10.   Section 747(b) states "[A] covered dealership that was not lawfully terminated under applicable state law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation or reinstatement of a franchise agreement ... ."  (App. Ex. 1).  The Petitioner herein was not lawfully terminated and sought arbitration.  That legal prerequisite to those proceedings was met.

11.   Section 747(c) provides a legal and factual prerequisite upon the covered manufacturer (i.e. GM):  to provide the covered dealer, within thirty (30) days of the enactment of the Act, "specific criteria" as to why the dealer was terminated.  The Congressional Record explained:

> "We intend this process to provide transparency and avoid the excessive costs and delays of litigation and discovery disputes. **The manufacturer should provide the respective covered dealers with each any every detail and criteria related to the evaluations of the dealership** and the decisions to terminate, not assign, not renew or discontinue. It is anticipated that the manufacturers will be cooperative and forthcoming and that all relevant information will be provided promptly."

(Emphasis added).  Congressional Record-House, H14477 (December 10, 2009).  (App. Ex. 3).  There must be compliance with the legal and factual prerequisites in order to frame the issues at the arbitration hearing.

12.   The Act created a tri-partite balancing test, which had to be performed by the neutral arbitrator, regarding "the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large." Section 747(d).  (App. Ex. 3).  The Act sets

forth seven (7) required factors[4] that the arbitrator must consider AND "that the covered dealership may present any relevant information during the arbitration." Section 747(d). The law provides the remedy of "continuation," as well as "reinstatement" or "addition" of the covered dealership's franchise agreement. Section 747(b) and (d).

13.   Petitioner sought the remedy of "continuation" as well as "reinstatement" or "addition" of the covered dealership's Chevrolet franchise agreement pursuant to Section 747(b) and (e) of the Act.

**B.   Procedural and Factual History in this Matter**

14.   On January 13, 2010, GM provided its required notice regarding the specific criteria which it used to issue the covered dealership a wind-down agreement for the Chevrolet brand. The only criteria GM listed was "2008 overall RSI total dealership score under 70." RSI is GM's acronym for Retail Sales Index, a new vehicle sales performance index based on state average.

15.   Petitioner timely commenced an arbitration with the American Arbitration Association. The matter was assigned AAA Case No. 53-532-000049-10 and Arbitrator Dale A. Crawford. Testimony was heard at "consolidated" hearings held on June 8-11, 2010. The parties submitted closing briefs on June 24, 2010. (App. Ex. 4). Petitioner's post-hearing brief addressed all seven (7) of the enumerated factors for consideration and set forth other relevant facts for the arbitrator to weigh and balance. (App. Ex. 4).

---

[4] "The factors considered by the arbitrator shall include:
(1) the covered dealership's profitability in 2006, 2007, 2008, and 2009,
(2) the covered manufacturer's overall business plan,
(3) the covered dealership's current economic viability,
(4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement,
(5) the demographic and geographic characteristics of the covered dealership's market territory,
(6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and
(7) the length of experience of the covered dealership." (Section 747(d)). (App. Ex. 1).

16.     On June 30, 2010, the American Arbitration Association ("AAA") disseminated Arbitrator Crawford's Award to the parties. (App. Ex. 5). The Award held that the covered dealership (i.e. Rose) "shall not be added to the dealer network of New General Motors." (App. Ex. 1, p. 2). The Award provided an unusually lengthy legal analysis, which demonstrates the arbitrator's multiple errors, bias, and requires the Award to be vacated. The arbitrator failed to follow his Congressional mandate to review and balance the seven factors for consideration. Instead, the arbitrator merely "accepted" GM's overall business plan and only checked GM's "math" regarding performance objectives. (Award, pp. 10 and 12; App. Ex. 5).

C.      **Arbitrator's Methodology of Deferring to the Manufacturer's Overall Business Plan Eviscerated the Act and Made the Arbitration Process Meaningless**

17.     The arbitrator acknowledged that the Act required him to "consider the manufacturer's overall business plan," but then explained he was merely going to "accept" the plan, without any review or analysis. The arbitrator stated that he interpreted the Congressional mandate of "consideration" as his duty to "identify the stated plan, accept the plan, and then determine where this dealer fits in the stated plan." (Award, p. 10; App. Ex. 5). However, nowhere in Section 747 does law state that the arbitrator must "accept the plan." To the contrary, the accuracy and/or viability of the manufacturer's plan should have been "considered", as intended by the Congressional legislation, and as litigated by BOTH parties during the hearing through expert witnesses and documentary evidence.

18.     Other AAA arbitration decisions have noted that GM's argument (and this arbitrator's conclusion) to give greater weight to the manufacturer's overall business plan would "**eviscerate**" the purpose of the act and make the AAA proceeding meaningless.[5] (App. Ex. 6). The arbitrator in this matter did "tilt the balance" and undermine the arbitration process. His methodology was **predestined** to be against the

_____

[5] *Layton Dodge, Inc./Cutrubus Chrysler Jeep Dodge and Chrysler Group, LLC*, AAA Case No. 77-532-64-10 (May 25, 2010) ["**To automatically weight the New Chrysler business plan to tilt the balance as suggested would eviscerate the Act and the attendant arbitration process.**"] (App. Ex. 6).

6

09-50026-mg    Doc 7445-1    Filed 10/19/10    Entered 10/19/10 17:51:14    Exhibit
Case: 1:10-cv-02114-JSB    Doc #: 1-Filed: 09/15/10 27 of 14: 7 Exhibit
Exhibit E to Objection    Pg 8 of 23

dealership, because he gave complete deference—without any consideration or review—to the manufacturer's

overall business plan.  The arbitrator failed to consider the voluminous evidence and GM's admissions that

its plan is not reasonable or reliable.  GM's action of reinstating over 661 dealerships exemplifies the plans

LACK of credibility.  The SIGTARP report also confirms GM's plan was <u>not</u> objectively applied and <u>not</u> based

on alleged cost savings.  (App. Ex. 2).

    **D.**    **GM <u>Promised</u> to Allow the Original Dealer to Continue in a Needed Market**

    19.    GM's CEO, Fritz Henderson, testified to Congress that "in the event we need to put

a place—put a location back, one of the things that we committed to the Senate and I'll commit to you today,

is that if we need to relocate a spot there, ***we will provide the existing operator the opportunity to actually***

***look at that first.***"[6] (Emphasis added).

    20.    GM's CEO, Fritz Henderson, testified a <u>second</u> time and reiterated that "if we've made

mistakes in the future, we've concluded we cannot take care of customers in the location and a point needs

to be put back.  ***We would go who whoever the individual was effected and give them the first chance***

***to do that.***"[7] (Emphasis added).

    21.    The undisputed evidence established that GM <u>needs</u> representation in this local

market and <u>plans</u> to have representation of the Chevrolet brand.  (App. Ex. 10).  The Award <u>failed</u> to consider

the evidence that GM <u>plans</u> on having Chevrolet representation and that the covered dealership (i.e. original

dealer) is entitled to continue representation, as the original operator in this local market.

    **E.**    **GM Is Bound by its "Objective" DPS Termination Criteria**

    22.    It is undisputed that the "objective" criteria GM set forth in Bankruptcy Court filings

---

[6] June 12, 2009, House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, ***Hearing on GM and Chrysler Dealership Closures and Restructuring***. (http://energycommerce.house.gov/Press_111/20090612/transcript_20090612_oi.pdf)

[7] (Id.).

and testimony before Congress was the Dealer Performance Summary (DPS) under 70. GM's former CEO

Fritz Henderson explained under oath on May 4, 2010, as follows:

> "The primary metric for identifying a dealer for wind-down was the DPS
> score, which was 50 percent sales, 30 percent CSI, and then 10 percent for
> capitalization and profitability, all outlined in, for example, Mr.
> Toussaint's—his affidavit and my Congressional testimony. Even if the
> dealer failed that test, we then went back and looked at it to see if there were
> other criteria that would suggest that perhaps that was the wrong judgment."[8]

23.      GM's written representation to the bankruptcy court, to terminate certain dealerships

executory contracts, explained in three paragraphs that it used an "objective" criteria of GM's Dealer

Performance Summary ("DPS") below 70.[9] On June 12, 2009, GM also submitted a ten page document to the

Congressional hearings entitled "Dealer Network Analysis" which again described the DPS weighted index that

it used to determine if a dealership's score was below 70.[10] ONLY a dealership with a DPS score under 70

was to be "objectively" terminated by GM.

24.      Reviewing the broader DPS composite index of sales, customer satisfaction, working

capital, and profitability, Petitioner was satisfactorily performing and should not have been issued a wind-down

notice. Petitioner's DPS scores were 2008–**80.10**, 2007–**82.99**, and 2006–**76.89**—ALL ABOVE GM's stated

"objective" DPS standard of 70. (App. Exs. 8 and 9). Rose should continue in GM's dealer network.

F.      **Judicial Estoppel**

25.      GM is judicially estopped from arguing contrary positions since it was successful

during the bankruptcy proceeding and consummated its 363 Sale Order. *Greer-Burger v. Temesi*, 116 Ohio

---

[8]  Henderson Testimony, p. 108 (May 4, 2010) [See also pgs. 15, 22, 60, 109, 207, 210, and 226].
(App. Ex. 7).

[9]  GM's motion regarding the "rejection of executory contracts and unexpired leases with certain
domestic dealers ... ." United States Bankruptcy Court, Chapter 11 Case No. 09-50026, pps. 8-9 (July 9,
2009). (App. Ex. 8).

[10]  June 12th House Energy and Commerce Committee-Subcommittee on Oversight/Investigations:
*GM and Chrysler Dealership Closures and Restructuring*.  (App. Ex. 9).

St.3d 324, 879 N.E.2d 174, 2007-Ohio-6442, ¶ 25 ["Courts apply judicial estoppel in order to 'preserve the

integrity of the courts by preserving a party from abusing the judicial process through cynical gamesmanship,

achieving success on one position, then arguing the opposing to suit an exigency of the moment.'" quoting

*Teledyne Industries, Inc. v. NLRB* (C.A. 6, 1990), 911 F.2d 1214, 1218].

     26.    GM achieved its 363 Sale Order by promising to **"provide the existing operator the**

**opportunity"** and **"and give them the first chance"** to be added back to represent GM in the market.[11] GM

took a contrary position in this arbitration and through "undue means" obtained an arbitration award seeking

to take the Chevrolet brand from Petitioner and give it to a future dealer in the same local market. (See

Affidavit of Petitioner, App. Ex. 10).

     27.    Similarly, GM achieved its 363 Sale Order by representing to the Bankruptcy Court

and Congress that it used an "objective" DPS index standard of below 70 to terminate a covered dealership.[12]

GM took a contrary position during the arbitration by "cherry-picking" the Retail Sales Index ("RSI") from the

Dealer Performance Summary ("DPS") index. (App. Ex. 10). Using GM's "objective" DPS index standard, the

covered dealership's score was **ABOVE** 70 and never should have been terminated. (App. Ex. 10).

Additionally, Congress explained its "intention that the arbitrator should pay special attention to the concerns

expressed by some terminated dealers that there are factors in their market area or states that effect their

performance and render some measurements, such as state averages (RSI), less than accurate in portraying

---

[11] June 12, 2009, House Committee on Energy and Commerce, Subcommittee on Oversight and
Investigations, *Hearing on GM and Chrysler Dealership Closures and Restructuring.*
(http://energycommerce.house.gov/Press_111/20090612/transcript_20090612_oi.pdf)

[12] GM Dealer Network Analysis presented to House Committee on Energy and Commerce,
Subcommittee on Oversight and Investigations on June 12, 2009. (App. Ex. 9).
(http://energycommerce.house.gov/Press_111/20090612/gmnetworkanalysis.pdf)

the true picture of the dealer's operations." (App. Ex. 3). However, the arbitrator only reviewed whether the manufacturer used "proper math" in its calculations. (App. Ex. 5, p. 13).

28.    GM is legally bound to follow its sworn public "objectives" and "stated criteria" regarding the covered dealership. GM intends on filling the market with a dealer and the covered dealership should have the first opportunity. GM's "objective" DPS criteria must be followed and the covered dealership exceeds this standard. The arbitrator refused to consider these undisputed facts and used a flawed methodology, which predetermined the result of the AAA hearing. Specifically, the arbitrator blindly accepted GM's overall business plan and only checked the manufacturer's "math," which eviscerated Section 747 and made the arbitration proceeding superfluous. (App. Ex. 5).

## V.    ARGUMENT OF LAW AND FACTS

### A.    Applicability and Background of Federal Arbitration Act

29.    This matter involves the Federal Arbitration Act ("FAA"), which was Congressionally enacted in 1925 and codified at 9 U.S.C.A. § 1 et. seq. It applies to Petitioner and Respondent's federally mandated automobile industry special "binding" arbitration through the AAA and its commercial rules, pursuant to Section 747 of the Act. (App. Exs. 1 and 3). An arbitration which is final and/or governed by the AAA rules is subject to review under the FAA and/or the Court's equity powers. This matter seeks vacation of a June 30, 2010, Award, based upon 9 U.S.C.A. § 10 and Federal common law.

30.    Congress has limited the ability of Federal courts to review arbitration awards in order to promote the policy of favoring arbitration as an expeditious and relatively inexpensive means of resolving disputes. See 9 U.S.C. § 9; see also, *Schoenduve Corporation v. Lucent Technologies, Inc.*, 442 F.3d 727, 731 (3d Cir. 2006). However, the Circuit Courts[13] have cautioned that the district court is **neither "entitled nor**

_____

[13] *Matteson v. Rider Sys., Inc.*, 99 F.3d 108, 113 (3d Cir. 1996) (citations omitted) (emphasis added); *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746, 760 (6th Cir. 2007); *Metromedia Energy, Inc. v. Ensearch Energy Services*, 409 F.3d 574, 579 (3d Cir.

Case: 1:10-cv-02144 Doc #: 1-5 Filed: 10/19/10 11 of 14. PageID #: 1
09-50026-mg    Doc 7445-1    Filed 10/19/10    Entered 10/19/10 17:35:14    Exhibit
Exhibit E to Objection    Pg 12 of 23

encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." District courts also have common law authority to review arbitration decisions to insure due process, preserve the Constitutional separation of powers, and promote justice through equitable powers of courts.

31.    Recently, the Eighth Circuit explained that the deference owed to arbitration awards "is not the equivalent of a grant of limitless power." *Stark v. Sandberg, Phoenix & von Gontard, P.C.,* 381 F.3d 793, 799 (8th Cir. 2004) (citation omitted) (emphasis added). Congress has enacted specific protections to (1) modify or correct and/or (2) vacate an arbitration award pursuant to certain enumerated circumstances. (9 U.S.C. §§ 10-11). In this matter, valid grounds exist on the face of the arbitration decision to vacate the Award and remand for a new hearing before a neutral arbitrator.

### B.    Vacating Arbitration Awards

32.    The FAA delineates the following four (4) grounds for a District Court to vacate an arbitration award in 9 U.S.C. § 10 as follows:

> "§ 10. Same; vacation; grounds; rehearing
>
> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration–
>
> > (1) Where the award was procured by **corruption, fraud, or undue means**;
> >
> > (2) Where there was **evident partiality** or corruption **in the arbitrators**, or either of them;
> >
> > (3) Where the **arbitrators were guilty of misconduct** in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; **or of any other misbehavior**

2005); *Stark v. Sandberg, Phoenix & von Gontard, P.C.,* 381 F.3d 793, 799 (8th Cir. 2004); *Madison Hotel v. Hotel and Restaurant Employees, Local 25, AFL-CIO,* 128 F.3d 743, 749 (C.A. D.C. 1997); *Santa Fe Pacific Corporation v. Centra States, Southeast and Southwest Areas Pension Fund,* 22 F.3d 725 (7th Cir. 1994).

by which the rights of any party have been prejudiced;
or

(4) Where the **arbitrators exceeded their powers, or so
imperfectly executed them** that a mutual, final, and
definite award upon the subject matter submitted was not
made."

In this matter, the covered dealership seeks vacation pursuant to Federal common law equity grounds, the

Court's common law equity powers, and Subsections (a)(1), (2), (3), and (4).

1.    <u>GM's Undue Means, Corruption, and Fraud: § 10(a)(1)</u>

33.    Subsection 10(a)(1) allows for the vacation of an arbitration award if it was procured

by "corruption, fraud, or undue means." Respondent GM procured the Award in its favor through GM's

corruption, fraud, and undue means. Specifically, GM publicly stated to Congress and represented to the

bankruptcy court that it used an "objective" procedure to evaluate and determine which dealerships were

terminated. During the bankruptcy proceeding, GM submitted a motion detailing its primary metric was the

"objective" Dealer Performance Summary ("DPS") of below 70 in order to determine which dealerships it would

terminate.[14] GM's CEO and President, Fritz Henderson, reiterated <u>twice</u> the "objective" DPS standard of below

70 in hearings before Congressional investigations.[15] Respondent GM even submitted a dealer network

analysis document to Congress which, for a **THIRD** time, reiterated GM's "objective" standard of DPS below

70.[16] On May 4, 2010, GM's Fritz Henderson gave sworn testimony that "the primary metric for identifying a

---

[14]  GM Bankruptcy Court Motion. (See App. Ex. 8).

[15]  June 12, 2009, House Committee on Energy and Commerce, Subcommittee on Oversight and
Investigations, *Hearing on GM and Chrysler Dealership Closures and Restructuring*.
(http://energycommerce.house.gov/Press_111/20090612/transcript_20090612_oi.pdf).

[16]  GM Dealer Network Analysis presented to House Committee on Energy and Commerce,
Subcommittee on Oversight and Investigations on June 12, 2009. (App. Ex. 9).
(http://energycommerce.house.gov/Press_111/20090612/gmnetworkanalysis.pdf)

09-50026-mg    Doc 7445-1    Filed 10/19/10    Entered 10/19/10 22:51:14    Exhibit
Case: 1:10-cv-02146-SO   Doc #: 14-6    Exhibit E to Objection    Pg 14 of 23
Exhibit E to Objection    Pg 14 of 23

dealer for wind-down was the DPS score" below 70.[17]

34.    In this matter, GM's only "specific criteria" was the Retail Sales Index ("RSI") as a basis for terminating the covered dealership. GM's use of only the RSI, instead of the "objective" DPS index (which includes RSI, Consumer Satisfaction Index ("CSI"), working capital, and profitability), was a "fraud upon the court" and amounts to corruption, fraud, and undue means, pursuant to § 10(a)(1) of the FAA. Rose's DPS, for 2008, 2007, and 2006 were all **ABOVE** the stated "objective" standard of 70.  (App. Ex. 10).

35.A.    Additionally, GM engaged in corruption, fraud, and undue means when it argued and procured the Award alleging it did not require representation in Rose's market. The evidence was undisputed that there was not an internal **OR** external market analysis done to determine the proper number or location of Chevrolet dealerships in the Cincinnati area of primary responsibility. (App. Ex. 10). GM argued and alleged that it generally had too many dealers in the nation, but it never performed a local market study. (Id.). (App. Ex. 10). The only basis, as set forth and cited by the arbitrator in the Award, was GM's "overall business plan" to reduce the number of dealers and because Rose had an RSI score below 70.  (App. Ex. 5).

35.B.    GM's unsupported arguments directly contradicted its recent dealer network analysis studies. GM also admitted during the arbitration proceeding that it intends to add back or relocate another Chevrolet dealer into Rose's AGSSA. GM needs to maintain representation in order to service past customers and be able to market and sell Chevrolet products in the future to the **LARGE** area of new motor vehicle customers.

36.    GM also used undue means, corruption, and fraud when it argued that its overall business plan to reduce the number of dealerships would result in over $2 billion dollars of cost savings to the manufacturer. GM's argument during the arbitration was merely a conclusory statement not supported by any

---

[17] Henderson Testimony, p. 108 (May 4, 2010) [See also pgs. 15, 22, 60, 109, 207, 210, and 226]. (App. Ex. 7).

reasonable or reliable evidence. (App. Ex. 10). GM merely submitted an affidavit of a corporate representative alleging this conclusory fact. (App. Ex. 10).

37.     However, the recent SIGTARP report reveals GM's fraud and false statement during the arbitration proceeding. The SIGTARP report explained that GM's acceleration of dealership closings "was not done with any explicit cost savings to the manufacturer in mind." (SIGTARP Report, p. 29; App. Ex. 2). The SIGTARP report also explained that "when asked by SIGTARP what GM will save by closing any particular dealership, one GM official stated the answer is usually 'not one damn cent.'" (SIGTARP, p. 25; App. Ex. 2). The SIGTARP report also cited another "GM official stated that removing the dealership from the network does not save money for GM—it might even cost GM money—and that savings cannot be attributed or assigned to any one dealership." (Id.). Finally, the SIGTARP report held that "GM's dealer network and investments team said the cost savings estimate was their effort to quantify savings in response to the negative reaction to GM's plan to terminate dealerships and the Congressional 'drumbeat' of statements that 'this is a bad plan.'" (Id.).

38.     The arbitration award should be vacated because of GM's undue means, corruption, and fraud. GM failed to follow its "objective" DPS standard to determine whether a dealership should be terminated or not. (For example, the SIGTARP report found that there were 763 GM dealerships with a DPS below 80, which were retained by GM. It was not an objective process implemented by the manufacturer). (SIGTARP, p. 18; App. Ex. 2). GM also did not provide any local market analysis to support the closure of Petitioner's dealership, which is required to be reviewed. (App. Ex. 7, pp. 39, 57). GM also inappropriately argued alleged cost savings, which were non existent and/or only developed after the termination notice was sent and only in response to Congressional investigations. (App. Ex. 2). Therefore, based upon these grounds alone, the arbitration Award should be vacated. However, there exist other bases and reasons to also vacate the Award and require a new arbitration proceeding before a neutral arbitrator.

09-50026-mg    Doc 7445-1    Filed 10/19/10    Entered 10/19/10 17:51:14    Exhibit
Case: 1:10-cv-02140-SO    Doc #: 4    Filed: 09/23/10    16 of 22.    Page ID #: 15
Exhibit E to Objection    Pg 16 of 23

2.    **Evident Partiality by the Arbitrator: § 10(a)(2)**

39.    Subsection 10(a)(2) allows for the vacation of an award "where there was evident partiality or corruption in the arbitrators." In this matter, the arbitrator's twenty-two (22) page determination discloses his "evident partiality" for Respondent GM. The arbitrator's legal and factual analysis specifically demonstrates his bias towards GM. The arbitrator's partiality towards GM resulted in his methodology predetermining the outcome and resulting in an adverse ruling for the covered dealership, no matter what the evidence established at the arbitration hearing.

40.    The arbitrator acknowledged that the Act required him to "consider the manufacturer's overall business plan," but then he explained in the Award that he was going to "accept" GM's plan, without any review or analysis. (Award, p. 10; App. Ex. 5). The arbitrator stated that he interpreted the Congressional mandate to "consider" as his responsibility to "identify the stated plan, **accept the plan**, and then determine where this dealer fits in the stated plan." (Id.). Section 747 does not state that the arbitrator must accept the manufacturer's plan. To the contrary, the accuracy and/or viability of the manufacturer's plan should have been "considered," as intended by the plain language of the Congressional Act, and as litigated by BOTH parties during the hearing through their respective experts and witnesses and documentary evidence.

41.    Other AAA arbitration decisions have recognized that GM's argument (and this arbitrator's methodology and conclusion), to give greater weight to the manufacturer's overall business plan, would "**eviscerate**" the purpose of the Act and make the AAA proceeding meaningless. *Layton Dodge, Inc./Cutrubus Chrysler Jeep Dodge and Chrysler Group, LLC,* AAA Case No. 77-532-64-10 (May 25, 2010) ["To automatically weight the new Chrysler business plan to tilt the balance as suggested would eviscerate the Act and the attendant arbitration process."] (App. Ex. 6).

42.    Similarly, the arbitrator had a legal section entitled "Disputing the Specific Criteria" and concluded he was not going to review the reasonableness of the manufacturer's performance standard and

only determine whether or not the dealership fell below the "specific criteria" established by the manufacturer. The arbitrator explained: **"Put another way, did the manufacturer use the proper math in determining this dealership's 'specific criteria?'"** (Award, p. 12; App. Ex. 5). This arbitrator necessarily made a *fait accompli* by not performing a "consideration" and review of this factor, but rotely checking the manufacturer's "math" calculation. Obviously, the end result was already known and predetermined by his improper methodology. The arbitrator made a sham and mockery of the arbitration process. He did not perform his duties. The arbitrator's undue means, misbehavior, and misconduct occurred because of his failure to "consider" the factors, instead of blindly accepting the manufacturer's calculation and only double-checking GM's math.

43.A.    Another bias disclosed in the Award was the arbitrator's refusal to consider the application of "state law" to these proceedings. The arbitrator determined that "the act is a law in and of itself and will be strictly followed." (Award, p. 14; App. Ex. 5). However, it is uncontested that Section 747 is remedial and must be broadly and liberally construed to promote its purpose.[18]

44.B.    The arbitrator's holding directly conflicts with the plain meaning of the Act and the Congressional intent as explained as follows:

> **"In considering this factor and related factors, it is important for arbitrators to recognize that state law is part and parcel of and modifies automobile dealer franchise agreements. To look only at a franchise agreement, in other words, this is an important contextual element. Accordingly, <u>it is anticipated that the arbitrators will consider state law elements of good faith and fair dealing in this process and that, for example, the franchise agreement's performance standards and a dealer's performance under the original agreement will be evaluated in accordance with state law</u>."[19]**

44.    This arbitrator refused to consider state law "good faith and fair dealing" when reviewing the manufacturer's performance objectives. (Award, p. 12; App. Ex. 5). Many courts have held that

---

[18] *Balt. & Phila. Steamboat Co v. Norton*, 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932).

[19] Congressional Record, House H14477–H14478. (App. Ex. 3).

a manufacturer's state average is illusory because it would result in HALF of the manufacturer's dealerships

being in contractual default.[20]  In fact, in a prior Ohio Motor Vehicle Dealers Board decision, this was the

**EXACT** same legal conclusion reached and should have been applied in this matter also.  *General Motors*

*Corporation v. Halleen Chevrolet* (2008), Franklin Court of Common Pleas Case No. 06-CVF-11739.  (App.

Ex. 11).

      45.A.    Another example of the arbitrator's evident partiality was his failure to review the

evidence presented and complete deference to GM's false factual statements.  For example, it is undisputed

that Rose Chevrolet does <u>not</u> operate a body shop at its dealership (i.e. the testimony and financial records

presented).  Nevertheless, GM argued in its post-hearing brief that Rose Chevrolet could continue as a used

car operation <u>with a body shop</u>.  The arbitrator, because of his evident partiality and failure to properly consider

the evidence presented, **ADOPTED** GM's spurious argument.  The arbitrator found that "the Larkin family can

continue as a used car dealer <u>with service and body shop facilities</u>."  (Emhasis added).  (App. Ex. 5, p. 23).

      45.B.    Similarly, the arbitrator held that "the exclusion of Claimant's dealership is <u>exactly what</u>

<u>new GM's business plan is all about</u>."  (Emphasis added).  (App. Ex. 5, p. 23).  The arbitrator alleged that the

dealership has underperformed.  (Id.).  However, the Dealer Performance Summary records completely

<u>contradict</u> his conclusion.  Similarly, the arbitrator found that the area in which the dealership is located is

changing and cannot support more than six Chevrolet dealers.  (Id.).  However, again, there was no market

---

[20] *General Motors Corporation v. Samuel Kinlaw dba Knox Olds-Pontiac*, 78 N.C. at 521, 338
S.E.2d 014 (1995); *Austin Chevrolet, Inc. v. Texas Motor Vehicle Board* (2006), 212 S.W.3d 425 [**GM's
state average, product segment adjusted, was NOT "a useful tool for accurately gauging
Chevrolet's performance in the Houston MDA"** because it "unfairly raise[d] the expected average
for the Houston MDA by including in its calculation the routinely higher expected averages enjoyed
by SDA markets."].  See also, *General Motors Corporation v. Illinois Motor Vehicle Review Board* (2007),
224 Ill.2d 1, 862 N.E.2d 209, 224 ["In light of Dr. Matthews' testimony and the other evidence, it was
reasonable for the Board to conclude that Anderson's approach was not as valid a method as Dr.
Matthews' for measuring dealership performance in a multidealer area in a large metropolitan
area."]

study done which set forth the number or proper location of Chevrolet dealerships in the Cincinnati market.

The actual testimony of GM's representative was that GM **NEEDED** representation in the Rose's AGSSA and

GM intended to add or relocate a Chevrolet dealer to service the past and future General Motors' Chevrolet

customers.

3.    <u>Misconduct and Misbehavior, Coupled with Imperfectly Executing Powers, Is
a Manifest Disregard by the Arbitrator:  § 10(a)(3) and (4)</u>

46.    The subsections authorizing vacating an award, when an arbitrator is "guilty of

misconduct" or "misbehavior" (i.e. 10(a)(3)) and/or "exceeded their powers" or "so imperfectly executed them"

(i.e. 10(a)(4)), have <u>collectively</u> been described as the "manifest disregard" of the law by the United States

Supreme Court. *Hall Street Associates, LLC v. Mattel, Inc.,* 552 U.S. 576, 585, 128 S.Ct. 1396, 1404 (2008).

47.    The arbitrator was guilty of misconduct, misbehavior, and exceeding his power (i.e.

"manifest disregard" of the law) by <u>ignoring</u> the mandates of the Act to consider and balance the seven (7)

enumerated factors in Section 747(d) <u>and any other relevant facts</u>.    Although the arbitrator cited and

acknowledged the applicable law and required factors to consider, he arrogantly chose to **defer** to GM's

"overall business plan" and the manufacturer's "math" calculations used in its performance objectives. (Award,

pp. 10 and 12; App. Ex. 5).  The arbitrator's complete deference to GM's rhetoric resulted in a fundamentally

biased proceeding requiring vacation of the Award. (App. Ex. 6).

48.    For example, the arbitrator <u>withheld</u> legal rulings on <u>multiple</u> issues that were briefed

and argued prior to the hearing. (Award, pp. 8-14; App. Ex. 5). The arbitrator also violated his own procedural

orders, which required GM to provide all the specific criteria <u>or</u> be "prohibited from arguing them at the

hearing." The arbitrator's misbehavior, misconduct, and his imperfect execution of review resulted in what the

U.S. Supreme Court has collectively defined as "manifest disregard" for the law, which requires <u>vacation</u> of the

Award.

18

49.    Section 747 of the Act specifically stated that "the covered dealership may present any relevant information during the arbitration." (Section 747(d); App. Ex. 1). Nevertheless, the arbitrator only considered GM's additional argument of poor facilities (i.e. not an enumerated Section 747 factor and not specified in GM's notice). The arbitrator ignored Rose's arguments of other relevant information and stated "there are no other considerations that would weigh in favor of the Claimant." (Award, p. 22; App. Ex. 5).

50.A.    Nevertheless, the Petitioner set forth numerous other relevant factors for the arbitrator to consider, but which he did not. The Petitioner's post-hearing closing brief had a section entitled "Other Relevant Information" which summarized many other facts that should have been weighed and considered by the arbitrator and as required by Section 747(d) of the Act. (App. Ex. 4).

50.B.    The arbitrator also violated Petitioner's due process rights during the hearing. The arbitrator limited the hearing to one day, "consolidated" four (4) separate matters into four consecutive days of hearings, required witnesses to testify about all cases at one time, allowed Respondent to present testimony by affidavit only, etc.

51.    Petitioner's post-hearing brief set forth the additional relevant information that the arbitrator should have weighed and balanced pursuant to the tri-partite balancing test in making his determination as follows:

- GM's business plan is only one (1) of the seven (7) required factors enumerated and cannot be given the weight GM desires in this neutral proceeding; otherwise, the purpose and intent of the act would be eviscerated and render these proceedings meaningless.

- Historically, GM performs market analysis to determine the correct number and location of dealerships, as required by the Dealer Sales and Service Agreement. In these proceedings, GM failed to produce any market study to quantify the proper number of Chevrolet dealers and/or their proper location in the Cincinnati APR.

- GM's outside dealer network expert (Urban Science) was not retained prior to, during, or after the bankruptcy proceeding to evaluate the Cincinnati Chevrolet APR to determine the appropriate

19

number and proper location for the Chevrolet brand in this **local** market.

- GM admitted that its post-bankruptcy business plan is to maintain representation in Rose Chevrolet's AGSSA, which is one of the largest in the State of Ohio.
- GM has already made drastic reduction in the Cincinnati APR Chevrolet dealer network and the impact of those changes should be evaluated before the further reduction, "overshooting," and ruining the viability of the Chevrolet brand in this **local** market.

- GM's reliance on only one metric (i.e. RSI) is not appropriate to evaluate and determine the dealership's overall performance. (Ex. 1, Article 13.2). The numerous other contractual requirements and responsibilities, performed by a new motor vehicle dealership, must be also be considered. (Ex. 1).

- GM's use of the RSI metric is not reasonable nor reliable because 105 of 189 Chevrolet dealerships would be in contractual default during the 2008 time period, as measured by GM. Additionally, RSI is extremely erratic with wide ranges of 100s of units above and below the state average expectancy.

- GM's business plan was not "objectively" applied. Other minority dealerships or dealers who coincidentally made large investments in facility, but who still had RSI scores below 70, were allowed to be kept in GM's dealer network.

- Properly adjusting Rose's oddly shaped AGSSA configuration, from the contractual air mile calculation and inappropriate addition in 2008 of census tracts from the defunct Oxford, Ohio dealership, Rose is satisfactorily selling retail Chevrolet vehicles to the public. (Ex. 23).

- GM admitted that Rose's service volume of Repair Orders (ROs) and Customer Satisfaction Index were well above zone and regional average and properly fulfilling GM's contractual requirements. (Ex. 1).

- Rose was a high volume Chevrolet dealership which was ranked 34th out of 189 dealerships in the State of Ohio.

(Post-Hearing Brief, pp. 26-27; App. Ex. 4).

52.     The arbitrator's use of "car sales" and the "manufacturer's need to reduce dealerships" were **NOT** the "objective" DPS criteria that GM stated it was using to determine which dealership to close. Furthermore, the arbitrator should have considered all of the other "relevant information" as set forth in the hearing and as summarized in the post-hearing brief. (App. Ex. 4). Nevertheless, the arbitrator's **FLAWED** methodology of completely deferring to the manufacturer's overall business plan to reduce the number of dealerships demonstrates his manifest disregard for the law, misbehavior, misconduct, and the undue means used by GM.

53.     As another tribunal has elegantly explained, improperly weighting the manufacturer's "business plan to tilt the balance as suggested would eviscerate the Act and the attendant arbitration process." (*Layton Dodge, Inc.*, supra; App. Ex. 6).  In this matter, the arbitrator did exactly what the manufacturer inappropriately asked:  weighting the overall business plan too heavily, which eviscerated the purpose of the Act and made the arbitration proceeding meaningless.

## VI.   CONCLUSION

54.     Petitioner seeks the expedited remedy of vacating the June 30, 2010, AAA Award because it was procured by undue means, corruption, and fraud on the part of Respondent GM.  There also exists evident partiality on behalf of the arbitrator.  Section 747 of the Act required a neutral arbitrator. However, the arbitrator herein was guilty of misconduct and misbehavior, which prejudiced its Constitutional due process rights of the Petitioner, through his imperfectly executing his powers by failing to follow the plain language of the Act requiring the consideration, weighing, and balancing of the seven enumerated factors and any other relevant information.  The arbitrator's self-described methodology (i.e. complete deference to the manufacturer's overall business plan and mathematical calculations) **eviscerated** the Act and turned the arbitration proceeding into a futile act.  Petitioner also requests any and all other equitable relief the Court deems appropriate and necessary, in order to effectuate its decision.  This includes, but is not limited to,

21

maintaining the *status quo* until a final determination, <u>after</u> a meaningful AAA proceeding—before a <u>neutral</u> arbitrator—as required under Section 747 of the Act and according to Constitutional due process rights.

Respectfully submitted,

/s/ Christopher M. DeVito
Christopher M. DeVito (OH Bar No. 0047118)
**Morganstern, MacAdams & DeVito Co., LPA**
623 West Saint Clair Avenue
Cleveland, OH  44113-1204
(216) 687-1212 or (216) 621-4244
(216) 621-2951 - Facsimile
devitolaw@yahoo.com

*Counsel for Petitioner-Covered Dealership*
*Rose Chevrolet, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2010, a copy of the foregoing **Application to Vacate an Arbitration Award** was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties included on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

/s/ Christopher M. DeVito
Christopher M. DeVito (OH Bar No. 0047118)
**Morganstern, MacAdams & DeVito Co., LPA**

*Counsel for Petitioner-Covered Dealership*
*Rose Chevrolet, Inc.*

W:\Pleading\RoseChevy.GM(AAA)\ApplicationVacate\Application Vacate Rose Arbitration Award.wpd