EXHIBIT H

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROSE CHEVROLET, INC.,<br>HALLEEN CHEVROLET, INC.,<br>ANDY CHEVROLET CO.<br>*doing business as* SIMS<br>CHEVROLET, INC., | ) ) ) ) ) ) | Case Nos.:   1:10 CV 2140<br>                    1:10 CV 2097<br>                    1:10 CV 2153 |
| Petitioners | ) ) | |
| v. | ) ) | JUDGE SOLOMON OLIVER, JR. |
| GENERAL MOTORS, LLC | ) ) ) | |
| Respondent | ) | <u>ORDER</u> |

On October 8, 2010, Petitioners Rose Chevrolet, Inc., Halleen Chevrolet, Inc., and Sims

Chevrolet, Inc. ("Plaintiffs"), each moved for an emergency stay and declaratory judgment through

a temporary restraining order, preliminary injunction, and/or permanent injunction ("TRO"), in their

respective cases because Respondent, General Motors LLC threatened to collaterally attack this

Article III court's federal question and diversity jurisdiction through an Article I Bankruptcy Vourt

in the Southern District of New York by 3:00 p.m. on Friday, October 8. 2010. (ECF No. 5.)[1]

The court held a teleconference with counsel for both parties to this case on October 8, 2010,

during which the court heard oral argument on the TRO Motion. Since that time, the court has also

reviewed the extensive briefing submitted by Petitioners and Respondent, as well as the various

---

[1]    As all the filings are the same in each case, the court will use the numbering in
Case No. 1:10-cv-2097 to represent all of the filings.

exhibits attached to the filings. For the reasons stated below, the Motion for a TRO is denied.

On June 1, 2009, General Motors Corporation n/k/a Motors Liquidation Company ("Old GM"), filed a voluntary Chapter 11 petition for relief from the Bankruptcy Court. (General Motors LLC's Opposition to Emergency Motion for Stay and Declaratory Judgment Through a TRO and Injunction, at 5, ECF No. 7.) In order to preserve the value of its assets, Old GM sold most of its assets to a new company with new ownership. (*Id.*) The alternative to the sale would have been liquidation, which would have created "appalling consequences for [Old GM's] creditors, its employees, and our nation." *In re Gen. Motors Corp.*, 2009 WL 2033079, at *1 (S.D.N.Y. July 9, 2009). Following an evidentiary hearing, the Bankruptcy Court entered an order authorizing sale of assets pursuant to amended and restated master sale and purchase agreement with NGMCO, Inc., authorizing assumption and assignment of certain executory contracts and unexpired leases in connection with the sale, and granting related relief. (GM Opp. at 5.) This order is known as the 363 Sale Order. (*Id.*) The 363 Sale Order authorized and approved the Amended and Restated Master Sale and Purchase Agreement ("MSPA"), by Old GM and General Motors LLC ("New GM"). (*Id.*) The United States Treasury, the Canadian government, a deed of trust, and unsecured claimants of Old GM, made up New GM's ownership. (*Id.*) The Bankruptcy Court found that the purchaser acquired the assets, "free and clear of liens, encumbrances, and other interests (other than Permitted encumbrances)...". (363 Sale Order, Ex. A, at 45-46, ECF No. 7.) The Bankruptcy Court stated that the purchaser would not have entered into the MSPA and proceeded to complete the transaction had the sale of the purchased assets not been free and clear. (*Id.* at 59.)

In order to ensure long-term viability of New GM, the Section 363 Sale allowed New GM to strengthen integral parts of its business, including New GM's dealer network. (GM Opp. at 6.)

-2-

"Old GM, government officials, the Auto Task Force, and industry commentators, determined that the dealer network needed to be reduced, realigned, and modernized to allow New GM to compete more efficiently in the marketplace." (*Id.*) Old GM applied a set of factors to identify poorly performing dealerships that would not become a part of the New GM network. (*Id.*) The dealers that were not retained were offered Wind-Down agreements, "which provided monetary payments that allowed the continuance of selling and servicing GM vehicles under certain conditions until October 31, 2010." (*Id.*) The Bankruptcy Court approved the Wind-Down Agreements and found in the 363 Sale Order that the agreements were "valid and binding contracts, enforceable in accordance with their terms." (*Id.*)

The Wind-Down agreements were used with over 2,000 dealerships throughout the United States. (TRO, at 3.) Concerned by the effects of the auto industry's bankruptcies, the House of Representatives, Committee on the Judiciary, held three days of hearings on these issues. (*Id.*) Congressional committees also conducted investigations, hearings, and gathered evidence. (*Id.*) Because of the concerns over the closures of a significant number of dealerships, the resulting unemployment that would ensue, and damage to the livelihoods of the dealership owners, Congress passed the Dealership Arbitration Act. (*Id.* at 4; GM Opp. at 9.) Section 747 of the Consolidated Appropriations Act of 2010 (Public Law 111-117 (2009)) ("Section 747"), commonly known as the Dealership Arbitration Act, provided dealerships that had been terminated pursuant to a Wind-Down Agreement the opportunity to seek reinstatement to the New GM dealer network through binding arbitration. (GM Opp. at 9.) Prior to arbitration "covered manufacturers"(those auto manufacturers which the United States Government has an ownership interest), such as New GM, were required to provide each "covered dealership" (those affected by Wind-Down Agreements), with a summary

-3-

of terms and the rights given by the statute, as well as the specific criteria used to terminate the

dealership, not renew the dealership contract, or to determine why the contract was not assumed or

assigned by New GM. (Section 747.) All the arbitrations were to be conducted and fully completed

by June 14, 2010, or July 14, 2010, at the latest, if the arbitrator determined an additional 30 days

was warranted. (GM Opp. at 9.; Section 747.)   Under Section 747, Congress mandated that there

would be no depositions in the proceedings and discovery was limited to requests for documents

specific to the dealership. (Section 747.) Congress also stated that the arbitrator could not award

compensatory, punitive, or exemplary damages to any party. (*Id.*) Congress provided criteria to be

used by the arbitrator in determining if the dealership would be reinstated:

> (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009,
> (2) the covered manufacturer's overall business plan, (3) the covered
> dealership's current economic viability, (4) the covered dealership's
> satisfaction of the performance objectives established pursuant to the
> applicable franchise agreement, (5) the demographic and geographic
> characteristics of the covered dealership's market territory, (6) the
> covered dealership's performance in relation to the criteria used by the
> covered manufacturer to terminate, not renew, not assume or not assign
> the covered dealership's franchise agreement, and (7) the length of
> experience of the covered dealership.

*(Id.)* Congress also stated that the arbitrator should "balance the economic interest of the covered

dealership, the economic interest of the covered manufacturer, and the economic interest of the

public at large and shall decide, based on that balancing, whether or not the covered dealership

should be added to the dealer network of the covered manufacturer." (*Id.*)  Additionally, Congress

provided the for the arbitrators to be chosen from the list of qualified arbitrators maintained by the

Regional Office of the American Arbitration Association. (*Id.*) It also provided for the time frame

the arbitrator had to reach a decision and  what factors should be included in the written

determination.  (*Id.*)   Further, Congress established the process by which a covered dealership

-4-

should be reinstated, continued, or added to the dealership network, should the arbitrator find in their favor. (*Id.*)

Old GM offered the Petitioners Wind-Down Agreements as an alternative to "outright rejection of the Dealer Agreement". (GM Opp. at 10.) These agreements were accepted, executed, and returned to Old GM in June of 2009. (*Id.*) Under the agreements, each Petitioner agreed to terminate its Dealership Agreement no later than October 31, 2010. (*Id.*) The Petitioners' Wind-Down Agreements were assigned to New GM under the terms of the 363 Sale. (*Id.*)

On January 13, 2010, New GM provided its required notice regarding Section 747 and the criteria it used in deciding to issue Wind-Down Agreements for the Petitioners' dealerships. (TRO at 5.) Each of the Petitioners timely filed a demand for arbitration, and their matters were assigned to Arbitrator Dale A. Crawford, a former state court judge. (*Id.*) Testimony was provided at consolidated hearings on June 8-11, 2010. (GM Opp. at 10.) Closing briefs were submitted on June 24, 2010, and the Arbitrator's award was disseminated to the parties on June 30, 2010. (TRO at 5.) Arbitrator Dale Crawford, heard the claims of four dealerships, one of which was decided against New GM, requiring that dealership to be reinstated. (*Id.*) The arbitrator provided a lengthy legal analysis which contains "multiple errors, bias, and requires the Award to be vacated", according to Petitioners. (*Id.*) On September 20, 2010, Petitioners filed Applications to Vacate with this court. (ECF No. 1.) Petitioners assert this court has federal question jurisdiction stemming from Section 747 and diversity jurisdiction because of the parties are of different states. (TRO at 6.)

New GM filed a motion on September 10, 2010 in the Bankruptcy Court in the Southern District of New York to enforce the 363 Sale Order against Rally Auto Group, Inc., as a result of its arbitration award in its favor, enabling it to enforce the terms of the 363 Sale Order and Wind

-5-

Down Agreement. (Objection of Rally Auto Group, Inc. to Proposed Orders Submitted by General

Motors LLC's Motion to Enforce the 363 Sale Order and For Related Relief and the Order Granting

the Oral Application of Rally for a Stay Pending Appeal of the Order Granting GM's Motion, ECF

No. 9-5.; GM Opp. at 18.) Rally is a dealership that had been seeking to have the arbitration award

vacated or modified in the Central District of California. (Obj. Of Rally, at 2.) Rally submitted a

32 page objection with over 130 pages of exhibits on September 23, 2010. (GM Opp. at 18.) New

GM filed a reply, and a hearing was held on October 4, 2010. (*Id.*) Bankruptcy Judge Gerber issued

a lengthy decision, during which he stated that he had exclusive jurisdiction over the dispute, had

core subject matter jurisdiction, and that there was no right to appeal under the Dealer Arbitration

Act. (*Id.* at 18-19.) He stated that because there was nothing in the Dealer Arbitration Act to

modify the subject matter jurisdiction of the courts or previous orders he had issued, he had core

subject matter jurisdiction over the issue. (*Id.* at 19.) Additionally, as both parties appeared to

agree, the Federal Arbitration Act ("FAA") does not apply because it implicates contractual

agreements to arbitration which is not the case here since arbitration was compelled by Congress.

(*Id.*; *see* 9 U.S.C. § 2.) He also stated that he did not find a right to judicial review under the

Dealership Arbitration Act. He indicated that since federal statutes routinely provide for such

review, its absence was instructive in this instance. (*Id.*) He concluded that Congress chose not to

create a right to judicial review as a means of avoiding the excessive costs and delays of litigation.

(*Id.*) He also disagreed with Rally's conclusion that New GM conceded its right to judicial review

by its willingness to proceed under the American Arbitration Association's ("AAA") commercial

arbitration rules, since New GM expressly stated it was not waiving any objections it may have to

the arbitration or the AAA's rules, by participating in the arbitration. (*Id.* at 20.) Therefore,

-6-

Bankruptcy Judge Gerber found, any issues relating to the 363 Sale Order and Wind Down Agreements, such as the arbitrations stemming from the Dealership Arbitration Act, should be brought in front of his court, and no other court. (*Id.*) Rally requested and was granted a stay of the order in order to appeal to the district court. (*Id.*) The parties have not provided any further information regarding this stay and appeal.

Based on the Rally decision, New GM sent Petitioners a letter on October 6, 2010, requesting that they dismiss their actions in this court in order to comply with the Bankruptcy Court's 363 Sale Order. (Motion of General Motors LLC to Enforce 363 Sale Order and Approved Deferred Termination Agreements Against Rose Chevrolet, Inc., Halleen Chevrolet, Inc., Andy Chevrolet Inc., and Leson Chevrolet Company, Inc., at 2, ECF No. 9-1.) New GM threatened to collaterally attack this court's subject matter jurisdiction in the Bankruptcy Court by Friday, October 8, 2010 at 3:00 p.m, if these actions were not dismissed by Petitioners before that time. (TRO at 6.) The Petitioners' actions herein were not withdrawn and New GM filed their motion in the Bankruptcy Court in the Southern District of New York on October 8, 2010. (Mot. to Enforce 363 Sale Order and Approved Deferred Termination Agreements.) Petitioners were given until Tuesday, October 19, 2010 to make any objections to the motion. The hearing on the motion has been set for October 26, 2010. Petitioners filed a renewed motion for emergency relief with this court on October 18, 2010, requesting an order as soon as possible because of the imminent Tuesday, October 19, 2010 briefing deadline. (ECF No. 16.) Petitioners are requesting that this court enjoin the Bankruptcy Court from proceeding with the matters which are the subject of their actions before this court. They assert that if such relief is not granted they will suffer irreparable harm. For the foregoing reasons, this request is hereby denied.

-7-

The court has grave doubts as to its jurisdiction to hear the current actions in front of it. The Petitioners assert the Federal Arbitration Act ("FAA") and the Dealer Arbitration Act ("DAA") as bases of jurisdiction for the court. The FAA encompasses agreements among parties to arbitrate. This arbitration was not a result of an agreement among parties, rather it was compelled by Congress. Therefore the FAA is likely not a jurisdictional basis for this court to confer subject matter jurisdiction. Similarly, the DAA is likely not a basis either, as it fails to authorize or suggest a right to judicial review, but instead appears to indicate a desire by Congress to avoid the courts, while providing a limited remedy to covered dealerships. Petitioners alternatively claim an implied right to judicial review based on New GM's consent to arbitrate. This argument too is not well taken, as New GM provided in its Answering Statement it was not waiving any objections to the proceedings or the AAA's commercial arbitration rules.

Given the truncated time frame and the fact that the court has not been provided with authority by the petitioners which support the conclusion that this court may/should enjoin the parallel proceeding in the Bankruptcy Court, the court does not find that it has such authority at this time. While the court has not ruled out the possibility that it may have concurrent jurisdiction, no authority has been provided to this court to support petitioners' claims that this court has exclusive jurisdiction. Additionally, it appears that the challenges to the Wind-Down Agreements and the decisions of the arbitrators under the Dealer Arbitration Act have some relationship to the Bankruptcy Court's orders. Thus, it also appears that if the court were to assert exclusive jurisdiction or seek to prohibit litigation in Bankruptcy Court, this will affect the Wind-Down Agreements and the October 31, 2010 deadlines, part of the 363 Sale Order. Therefore, the Petitioners' Motion for a Temporary Restraining Order (ECF No. 5) and Motion for Temporary

-8-

Restraining Order/Renewed/and Injunction with New Information (ECF No. 16) are denied because

Petitioners have not shown they are likely to succeed on the merits.  Further, they do have an avenue

of review of the orders of the Bankruptcy Court as they may do so in the United States District Court

for the Southern District of New York.  Even if the court were to have concurrent jurisdiction, there

is no showing that the court would have authority to enjoin the Bankruptcy Court's proceedings.

This is without regard to any suggestion that the Bankruptcy Court does or does not have the power

to enjoin proceedings in this court.

      IT IS SO ORDERED.

                                   /S/ SOLOMON OLIVER, JR.
                                   CHIEF JUDGE
                                   UNITED STATES DISTRICT COURT

October 18, 2010

# EXHIBIT I



# FACTORS AFFECTING THE DECISIONS OF GENERAL MOTORS AND CHRYSLER TO REDUCE THEIR DEALERSHIP NETWORKS

SIGTARP-10-008
JULY 19, 2010



**SIGTARP**

July 19, 2010

## Factors Affecting the Decisions of General Motors and Chrysler to Reduce their Dealership Networks

### What SIGTARP Found

Pursuant to their loan agreements with Treasury, as a condition of receiving additional TARP funding, GM and Chrysler were required to submit restructuring plans to the Treasury Auto Team in February 2009. GM's restructuring plan explicitly spelled out its plan to reduce its dealership network gradually, by approximately 300 dealers per year over the next five years. In March 2009, Treasury's Auto Team rejected both companies' restructuring plans. In GM's case, the Auto Team specifically highlighted GM's planned "pace" of dealership closings as one of the obstacles to its viability. In response to the Auto Team's rejection of their restructuring plans and in light of their intervening bankruptcies, GM and Chrysler significantly accelerated their dealership termination timetables, with Chrysler terminating 789 dealerships by June 10, 2009, and GM announcing plans to wind down 1,454 dealerships by October 2010.

The Auto Team's view about the need for GM and Chrysler to reduce their dealership networks and do so rapidly was based on a theory that, with fewer dealerships (and thus less internecine competition), like their smaller networked foreign competitors, the remaining dealerships would be more profitable and thus would permit the dealerships to invest more in their facilities and staff. For GM and Chrysler, the theory goes, this would mean better brand equity and would allow the manufacturers over time to decrease their substantial dealership incentives. In addition, the Auto Team felt the companies' best chance of success required "utilizing the bankruptcy code in a quick and surgical way" and noted further that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy without reducing their networks.

Only time will tell whether and to what extent the rapid reduction of the number of dealerships will improve the manufacturer's profitability over time; SIGTARP's audit found that there are several aspects of how the Auto Team came to have this view about dealership reductions that are worth noting. One, although there was broad consensus that GM and Chrysler generally needed to decrease the number of their dealerships, there was disagreement over where, and *how quickly*, the cuts should have been made. Some experts questioned whether it was appropriate to apply a foreign model to the U.S. automakers, particularly in small markets in which the U.S. companies currently have a competitive advantage, and one expert opined that closing dealerships in an environment already disrupted by the recession could result in an even greater crisis in sales. Two, job losses at terminated dealerships were apparently not a substantial factor in the Auto Team's consideration of the dealership termination issue. Although there is some controversy over how many jobs will be lost per terminated dealership, it is clear that tens of thousands of dealership jobs were immediately put in jeopardy as a result of the terminations by GM and Chrysler. Finally, the acceleration of dealership closings was not done with any explicit cost savings to the manufacturers in mind.

Chrysler decided which dealerships to terminate based on case-by-case, market-by-market determinations, and did not offer an appeals process. SIGTARP did not identify any instances in which Chrysler's termination decision varied from its stated, albeit subjective selection criteria. GM's approach, which was conducted in two phases, was purportedly more objective, and it offered an appeals process. However, SIGTARP found that GM did not consistently follow its stated criteria and that there was little or no documentation of the decision-making process to terminate or retain dealerships with similar profiles, or of the appeals process.

### Lessons Learned

Although perhaps it is inevitable that public ownership of private companies will have the effect of blurring the Government's appropriate role, the fact that Treasury was acting in part as an investor in GM and Chrysler does not insulate Treasury from its responsibility to the broader economy. Treasury should have taken special care given that the Auto Team's determinations had the potential to contribute to job losses, particularly given that one goal of the loan agreements was to "preserve and promote jobs of American workers employed directly by the automakers and subsidiaries and in related industries." This audit concludes that before the Auto Team rejected GM's original, more gradual termination plan as an obstacle to its continued viability and then encouraged the companies to accelerate their planned dealership closures in order to take advantage of bankruptcy proceedings, Treasury (a) should have taken every reasonable step to ensure that accelerating the dealership terminations was truly necessary for the long-term viability of the companies and (b) should have at least considered whether the benefits to the companies from the accelerated terminations outweighed the costs to the economy that would result from potentially tens of thousands of accelerated job losses. Moreover, in light of the way in which the companies selected dealerships for termination, in the future, to the extent that Treasury takes action with respect to a TARP recipient that has the potential to affect so many jobs in so many different communities, Treasury should monitor the recipients' actions to ensure that they are carried out in a fair and transparent manner.

**Special Inspector General for the Troubled Asset Relief Program**

an even greater crisis in sales. Chrysler officials similarly told SIGTARP that closing dealerships too quickly would have an adverse effect on sales from which it would take several years to recover, and, even then, only if new markets were penetrated by opening new dealerships. The fact that, after the mandatory arbitration legislation was passed, GM offered to reinstate 666 dealerships[27] and Chrysler offered to reinstate 50 dealerships with a senior GM official stating that the final number of dealerships won't damage GM's ability to recover or grow the company, suggests, at the very least, that the number and speed of the terminations was not necessarily critical to the manufacturers' viability. It is worth noting that GM's top rival among U.S. automakers, Ford Motor Company, which is also carrying out plans to "aggressively restructure to operate profitably," is closing dealerships at a rate similar to that in GM's original restructuring plan which was rejected by Treasury.[28]

- Two, job losses at terminated dealerships were apparently not a substantial factor in the Auto Team's consideration of the dealership termination issue. Although there is some controversy over how many jobs will be lost per terminated dealership (the National Automobile Dealer Association's estimate of approximately 50 per dealership is challenged by the manufacturers as too high), it is clear that tens of thousands of dealership jobs were immediately put in jeopardy as a result of the terminations by GM and Chrysler. In the face of the worst unemployment crisis in a generation and during the same period in which the Government was spending hundreds of billions of dollars on a stimulus package to spur job growth, the Auto Team rejected GM's original plan (which included gradual dealership terminations), expressly indicated that GM's pace of terminations was too slow, and then encouraged the companies' use of bankruptcy to accelerate dealership terminations. These decisions — all based on the Auto Team's theory that GM and Chrysler would be better off by accelerating dealer terminations — contributed to the accelerated loss of potentially tens of thousands of jobs. Although the restructuring of GM and Chrysler inevitably required an overall reduction in their own workforces (and the termination of a certain number of poorly performing dealerships), it is not at all clear that the greatly accelerated pace of the dealership closings during one of the most severe economic downturns in our Nation's history was either necessary for the sake of the companies' economic survival or prudent for the sake of the Nation's economic recovery.

- Finally, the acceleration of dealership closings was not done with any explicit cost savings to the manufacturers in mind. Again, the anticipated benefits to GM and Chrysler from a smaller dealership network were far more amorphous — a better "brand

---

[27] Of these 666 dealerships, 216 were complete wind-downs, and 415 were partial wind-downs.

[28] According to Ford's 2009 annual report, concentrating efforts in its largest 130 metropolitan market areas, Ford closed an average of 200 Ford, Lincoln, and Mercury dealerships per year in calendar 2006, 2007, and 2008, and another 250 in calendar 2009, leaving a total of 3,550 dealerships at the beginning of 2010. Ford has a goal of an average of 1,500 vehicle sales per year for Ford dealerships and 600 per year for Lincoln Mercury dealerships. By focusing on closing dealerships located in metropolitan areas, Ford reflected its philosophy that "our dealers are a source of strength...especially in rural areas and small towns where they represent the face of Ford." This echoed comments industry experts made to SIGTARP advising that GM and Chrysler had less need to reduce the number of rural dealerships and instead should focus on closing dealerships in metropolitan areas.

29

equity" and the potential ability to decrease dealership incentives over time. GM prepared its cost savings estimate only at the request of Congress and only after the decisions to accelerate terminations had already been made. Chrysler provided Congress with estimated cost savings that had been developed three years prior. The disparity in the companies' cost-savings estimates are telling. Chrysler estimated a savings of only $45,500 per terminated dealership. GM, however, estimated cost savings of $1.1 million per terminated dealership. The difference in these estimates alone casts doubt on their credibility. Moreover, despite the fact that Treasury rejected GM's even less optimistic assumptions about their market share and profitability in its Viability Determination, GM's estimate was based on a projection that GM's sales would *double* by 2014. GM acknowledged that its cost savings (assuming the decreases in incentives could be realized) could only be calculated across its entire network and could not be calculated for a single particular closed dealership. Indeed, one GM official emphasized this point by telling SIGTARP that GM would usually save "not one damn cent" by closing any particular dealership.

Once the decisions to accelerate the dealership terminations were made, Chrysler decided which dealerships to terminate based on case-by-case, market-by-market determinations that examined whether the dealership's location was a desirable one, whether it offered all three of Chrysler's brands, the dealership's volume of new vehicle sales, and the dealership's score for Minimum Sales Responsibility, a ratio based on actual sales versus vehicle registrations broken down by market share and market segment. Chrysler did not offer an appeals process. Perhaps not surprisingly in light of the case-by-case nature of the process, SIGTARP did not identify any instances in which Chrysler's termination decision varied from its stated, albeit subjective selection criteria.

GM's approach, which was conducted in two phases, was purportedly more objective. In the first phase, GM claimed that the dealerships subject to termination were those meeting at least one of these criteria: a Dealer Performance Summary ("DPS") Score (a score based on a dealership's sales, customer satisfaction, capitalization and profitability) of less than 70; or annual sales of fewer than 50 new vehicles in 2008. In the second phase, GM stated that dealerships subject to termination were those meeting at least one of these criteria: those with a DPS of 80 or less; those that were unprofitable in 2006, 2007 and 2008; those with a retail sales index (a ratio of actual sales to expected sales based on a market average) below 70; those with non-GM brands in the same facility and a DPS of less than 100; or those interfering with GM's Buick-GMC Truck or Cadillac dealership network restructuring plans.

However, SIGTARP's review demonstrates that GM did not consistently follow its stated criteria. In the first phase, for example, two of the terminated dealerships did not fit into either termination category, and GM retained 364 dealerships that potentially qualified for termination. In phase two, GM terminated 39 dealerships that did not meet any of the objective criteria and retained more than 1,062 dealerships that met one or more criteria for termination. Just as troubling, there was little or no documentation of the decision-making process to terminate or retain dealerships with similar profiles, making it impossible in many cases for SIGTARP to determine the causes of deviations from the supposedly objective criteria. Similarly, although GM did have an appeals process and granted 64 reversals in cases of dealerships that would have

30

EXHIBIT J

Commercial Arbitration Rules and Mediation Procedures

## Commercial Arbitration Rules

### R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs.

Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes

shall
rules,
confl
Dispu

(d) All of
R-1 t

* The AAA app
ments between
application of.
standardized, .
terms, conditio
will have the di
any disputes o
prohibited fro
even in consun

+ A dispute ari
Arbitration Rul

### R-2. AA/

When pa
provide f
under th
arbitratio
agreeme
through
in its disc
offices.

### R-3. Na

The AA/
Commer
arbitrato
rules ref
whether
arbitrato

20

## R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

## R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

## R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c)  A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

## R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

## R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

## R-11. Appointment from National Roster

(a)  If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b)  If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c)  Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

95

edures

lirects that documents or
itrator after the hearing,
l be filed with the AAA for
ties shall be afforded an
to such documents or other


n inspection or investigation
ect the AAA to so advise the
d time and the AAA shall
 may be present at such an
at one or all parties are not
he arbitrator shall make an
ord them an opportunity to


rim measures he or she
elief and measures for
erty and disposition of


irm of an interim award,
 for the costs of such


sed by a party to a judicial
atible with the agreement
arbitrate.

### R-35. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have
any further proofs to offer or witnesses to be heard. Upon receiving
negative replies or if satisfied that the record is complete, the
arbitrator shall declare the hearing closed. If briefs are to be filed,
the hearing shall be declared closed as of the final date set by the
arbitrator for the receipt of briefs. If documents are to be filed as
provided in Section R-32 and the date set for their receipt is later
than that set for the receipt of briefs, the later date shall be the closing
date of the hearing. The time limit within which the arbitrator is
required to make the award shall commence, in the absence of other
agreements by the parties, upon the closing of the hearing.

### R-36. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or
upon application of a party, at any time before the award is made. If
reopening the hearing would prevent the making of the award within
the specific time agreed on by the parties in the contract(s) out of
which the controversy has arisen, the matter may not be reopened
unless the parties agree on an extension of time. When no specific date
is fixed in the contract, the arbitrator may reopen the hearing and
shall have 30 days from the closing of the reopened hearing within
which to make an award.

### R-37. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any
provision or requirement of these rules has not been complied with
and who fails to state an objection in writing shall be deemed to have
waived the right to object.

35

on Procedures

may include:

om such date as the arbitrator(s)
d

if all parties have requested such
l by law or their arbitration

ring the course of the arbitration
oitrator may set forth the terms of
" A consent award must include
ncluding administrative fees and
ind expenses.

es

elivery of the award the placing of
the mail addressed to the parties or
own addresses, personal or electron-
; of the award in any other manner

l of an award, any party, upon
quest the arbitrator, through the
raphical, or computational errors
empowered to redetermine the
:d. The other parties shall be given
The arbitrator shall dispose of the
nittal by the AAA to the arbitrator of
eto.

## R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

## R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

## R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

39

# EXHIBIT K

2009 WL 2568332

Not Reported in F.Supp.2d, 2009 WL 2568332 (S.D.N.Y.)

Motions, Pleadings and Filings
Judges and Attorneys
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
IDEA NUOVA, INC., Plaintiff-Respondent,
v.
GM LICENSING GROUP, INC., Defendant-Petitioner.

No. 08 Civ. 8595(PKC).
Aug. 19, 2009.

West KeySummary

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(G) Award
            25Tk327 Mistake or Error
                25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases

Novelty products company was not entitled to vacatur of an arbitration award granted to a consulting company for breach of contract. The arbiter's decision to enforce an oral contract renewal was not a manifest disregard for the law. The novelty products company failed to establish that the parties consented to apply New York law to their arbitral disputes or that the arbiter had knowledge of New York law in order to make a decision. 9 U.S.C.A. § 10(a).

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

*1 Plaintiff-Respondent Idea Nuova, Inc. ("Idea Nuova") brings this action to vacate or modify a Final Arbitration Award (the "Award") issued in favor of Defendant-Petitioner GM Licensing Group, Inc. ("GM"). The question before the arbitrator was whether Idea Nuova had orally renewed its consulting agreement with GM and, if so, whether GM was entitled to monetary and injunctive relief as a result of that renewal. The arbitrator found that Idea Nuova had both renewed and breached its agreement with GM, and the Award granted compensatory damages, attorney's fees and injunctive relief to GM under the renewed agreement. Idea Nuova contends that the Award is unlawful and should be vacated pursuant to section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (2006), or modified pursuant to section 11 of the FAA. (Second Amended Complaint ("Compl."), at ¶ 45.) Idea Nuova also seeks a declaratory judgment that, contrary to the arbitrator's finding, it did not renew its agreement with GM in May 2006. ( Id. ¶ 61.)

Two motions are presently before the Court: GM petitions for confirmation of the Award under section 9 of the FAA and an award, pursuant to the parties' agreement, of its costs, attorney's fees and other expenses in this action. Idea Nuova moves, in the alternative, for summary judgment on the claims in its Second Amended Complaint or for vacatur or modification of the Award. For the reasons explained below, GM's petition is granted and Idea Nuova's motions are denied.[FN1]

    FN1. Idea Nuova is a New York corporation with its principal place of business in New York, New York. (Compl. at ¶ 1.) GM is a California corporation with its principal place of business in the State of California. (Petition to Confirm Arbitration Awards ("Pet."), at 1.) The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

I. *Background*

Idea Nuova is a New York-based company that markets novelty products for the home and specializes in novelty bedding. (Compl.¶ 12.) On December 16, 2002, Idea Nuova entered into a written consulting agreement (the "Agreement") with GM, under which GM would provide Idea Nuova with consulting services to "help ... acquire the licensing rights to comic and cartoon characters, live action, feature films, brands, logos, and other properties." (Agreement at 1, attached at Pet. Ex. A & Compl. Ex. A.) The term of the Agreement was one year, from January 1, 2002 through December 31, 2003, but could be "extended by a written agreement signed by both parties." *Id.* at 2. The parties subsequently renewed the Agreement through 2004 and 2005. (Compl. Ex. B & C.)

The Agreement included the following arbitration clause at section 8, under the heading "Attorneys' fees:"

In the event of a dispute arising hereunder, the parties must attempt to resolve same for a period of forty-five (45) days after which time the dispute shall be submitted to [American Arbitration Association] arbitration for resolution. In such arbitration, the discovery rules of the California Code of Civil Procedure shall apply. If either party succeeds in any legal or other proceeding in connection with the other party's violation of this agreement or other improper act or omission, the prevailing party will be entitled to receive from the losing party reimbursement for the prevailing party's reasonable attorneys' fees and costs and other expenses of such proceedings.

***2** (Agreement at 3.)

The Agreement did not include a choice of law provision other than its specification that arbitration-related discovery would be governed by the California Code of Civil Procedure.

Beginning in late 2005 and early 2006, GM and Idea Nuova exchanged several proposals regarding the renewal and possible modification of the Agreement. According to Idea Nuova, these efforts proved unsuccessful and the parties failed to renew the Agreement past December 31, 2005. GM maintains that the parties orally agreed to a three-year extension of the Agreement during their negotiations. On or about November 27, 2006, GM demanded arbitration pursuant to the Agreement's arbitration clause and sought a determination that: (i) the Agreement had been renewed for a three-year period, from January 1, 2006 through December 31, 2008, during oral negotiations that occurred in May 2006; and (ii) Idea Nuova owed GM certain commissions under the renewed Agreement. *See* Interim Arbitration Award ("Interim Award"), at 4.

Hearings were held before the arbitrator on November 19 and 20, 2007 ("Hearing One"), and the first of three interim awards was issued on December 20, 2007. In that award, the arbitrator found that "the parties did intend that renewals of the Agreement would be reflected in a signed, written agreement." ( *Id.* at 7.) But the arbitrator also concluded that both California contract law and principles of equitable estoppel supported enforcement of an oral agreement to renew, even without subsequent reduction of that agreement to writing, where both parties intended their oral agreement to be binding. ( *Id.* at 8.) Applying these standards to the evidence, the arbitrator found that "the parties renewed the Agreement for the period extending from January 1, 2006 through December 1, 2008 ...." ( *Id.* at 11.) [FN2]

> FN2. The arbitrator later corrected this initial finding to state that the renewed Agreement extended through December 31, 2008 and not December 1, 2008. See Interim Award No. 2 (As Modified), at 1 n. 1.

In March 2008, Idea Nuova moved to terminate the arbitration, arguing that, by reason of the Agreement's "cooling-off period" clause, the parties had resolved all of the issues then eligible for arbitration. (Interim Award No. 2 (As Modified), at 2.) According to Idea Nuova, the arbitration of additional issues, including which, if any, of its outstanding license agreements triggered post-demand

commissions to GM under the Agreement, would violate the Agreement's express requirement that the parties attempt to resolve their claims for forty-five days prior to seeking arbitral relief. ( *Id.*) GM opposed Idea Nuova's motion to terminate and moved for leave to file an Amended Demand for Arbitration. ( *Id.*) The arbitrator heard oral argument of both motions and granted GM leave to amend on March 17, 2008.( *Id.*) Hearings continued in April, May and June of 2008, and the arbitrator issued his Second Interim Award on August 18, 2008. The Second Interim Award formally granted GM's motion to file a supplemental and amended Demand for Arbitration, denied Idea Nuova's March 2008 motion to terminate the arbitration, and identified specific license and special sales agreements under which GM was entitled to commissions. ( *Id.* 18-19.) The Second Interim Award expressly included "license agreements entered into by [Idea Nuova] after September 2006 with licensors to which GM had rendered consulting services in or before September 2006" in its definition of the "Covered Agreements" that entitled GM to related sales commissions. ( *Id.* at 16-17.)

**\*3** The arbitration hearings continued on September 16 and 17, 2008. The arbitrator issued his Third Interim Award on November 24, 2008, finding that Idea Nuova had conceded its breach of the Agreement and calculating specific dollar amounts due to GM as a result of that breach. (Interim Award No. 3, at 19-20.) The Third Interim Award granted compensatory damages to GM and also awarded injunctive relief and reimbursement of the costs incurred by GM in connection with the arbitration. ( *Id.* at 20-23.) <u>FN3</u>

> <u>FN3.</u> The Third Interim Award's injunction provision required Idea Nuova to: (i) timely deliver copies of all Covered Agreements to GM; (ii) render full and accurate accountings to GM, as required under paragraph three of the Agreement; (iii) timely deliver any supporting royalty reports relevant to such accountings; (iv) timely deliver copies of any supporting purchase orders and invoices pertaining to Special Sales; (v) timely pay all commissions due under its accountings; and (vi) pay additional interest payments of one and a half percent (1.5%) on all late commission payments to GM. (Interim Award No. 3, at 21-22.)

The arbitrator issued his Final Arbitration Award on January 21, 2009, reaffirming all three interim awards in their entirety and specifying a fee award of $323,175.53. (Award at 1-3.)

II. *Subsequent procedural history*

Idea Nuova commenced this action on October 8, 2008 and filed an amended complaint on November 25, 2008. (Dkt.Nos.1, 6.) At an initial pre-trial conference on December 5, 2008, the Court granted Idea Nuova permission to further amend its complaint within 20 days of the arbitrator's final award. (Dkt. No. 8) Idea Nuova filed its Second Amended Complaint on January 23, 2009. (Dkt. No. 9.)

On February 24, 2009, GM petitioned for confirmation of the Award and an award of its reasonable costs and attorney's fees. (Dkt. No. 14.) Idea Nuova responded to GM's petition on March 24, 2009 by moving for summary judgment or, in the alternative, for vacatur or modification the Award under sections 10 and 11 of the FAA. (Dkt. No. 23.)

III. *Confirmation and vacatur under the FAA*

"Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court,' and the court 'must grant' the award 'unless the award is vacated, modified, or corrected.' " *D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir.2006)* (quoting *Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir.1984)*, and *9 U.S.C. § 9*). The FAA permits vacatur of an arbitral award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon

sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 90-91 (2d Cir.2008), *cert. granted, --- U.S. ----, 129 S.Ct. 2793, 174 L.Ed.2d 289 (June 15, 2009)* (No. 08-1198) (citing 9 U.S.C. § 10(a)).[FN4]

> FN4. Section 11 of the FAA lists various circumstances in which an award may be modified or corrected, including "where the arbitrators have awarded upon a matter not submitted to them." 9 U.S.C. § 11. Idea Nuova does not cite any specific provisions from this section to support its motion.

District courts may also vacate an arbitral award where the award exhibits "manifest disregard" for the law, but review under this doctrine is "severely limited" and permits vacatur "only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *Id.* at 91-92 (citations omitted). The "manifest disregard" standard requires that an arbitrator be "fully aware of the existence of a clearly defined governing legal principle, but refuse [ ] to apply it, in effect, ignoring it." *Id.* at 96 (alteration in original; citation omitted). Since the Supreme Court's decision in *Hall Street Assocs.., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), the Second Circuit has emphasized that the "manifest disregard" doctrine survives primarily as "a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94.

**\*4** The party moving to vacate an arbitration award bears the burden of proof and "the showing required to avoid confirmation is very high." *D.H. Blair,* 462 F.3d at 110 (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997)). "[A]n arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is 'a barely colorable justification for the outcome reached.' " *Rich v. Spartis,* 516 F.3d 75, 81 (2d Cir.2008) (citations omitted).

IV. *Idea Nuova's cross-motion to vacate or modify*

Idea Nuova argues that the arbitrator exceeded his authority in three ways: by manifestly disregarding governing law, by reviewing claims that were ineligible for arbitration under the Agreement's "cooling-off period" clause, and by awarding excessive attorney's fees to GM. The Court addresses each of these arguments in turn.

A. *Manifest disregard of the law*

"A federal court cannot vacate an arbitral award merely because it is convinced that the [arbitrator] made the wrong call on the law ." *Stolt-Nielsen,* 548 F.3d at 92 (quoting *Wallace v. Buttar,* 378 F.3d 182, 190 (2d Cir.2004)). The "manifest disregard" standard requires that courts vacate arbitration awards only in those "rare instances in which the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." ' *Id.* at 95 (quoting *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 217 (2d Cir.2002)) (alteration in original).

There are three components to a court's application of the "manifest disregard" standard. First, the court must "consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators." *Id.* at 93. Second, the court must find that this "clear and plainly applicable" law "was in fact improperly applied, leading to an erroneous outcome." *Id.* Once the first two inquiries are satisfied, the court looks to "a subjective element, that is, the knowledge actually possessed by the arbitrators. In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him. In determining an arbitrator's awareness of the law," the court imputes "only knowledge of governing law identified by the parties to the arbitration." *Id.* In other words, "[a]n arbitrator (even an arbitrator

who is a lawyer) ... is ordinarily assumed to be a blank slate unless educated in the law by the parties." *Goldman v. Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir.2002).*

Idea Nuova cites four examples of manifest disregard for the law in its motion. *See* Mem. of Law in Support of Plaintiffs Motion for Summary Judgment, or in the Alternative to Vacate or Modify the Arbitration Awards ("Idea Nuova Br."), at 19-24. First, Idea Nuova argues that two of the arbitrator's findings-the recognition and enforcement of an oral renewal under California law, and the conclusion that principles of estoppel support enforcement of such a renewal-conflicted with the New York standards that "must apply" to the instant dispute. (Idea Nuova Br. at 13.) But Idea Nuova does not identify the relevant conflict between New York and California law, and it does not indicate that it raised a choice of law objection to the arbitrator.[FN5] Nor does Idea Nuova identify any provision in the Agreement that indicates consent by the parties to apply New York law in their arbitral disputes.[FN6] Without these showings, Idea Nuova cannot demonstrate that the arbitrator knew that New York law conflicted with California law and that New York law was applicable to GM's renewal claim rather than California law. *See Stolt-Nielsen, 548 F.3d at 93.* Idea Nuova has not, therefore, demonstrated that the arbitrator's analysis of renewal under California law "willfully flouted the governing law by refusing to apply it." *Id. at 95.*

FN5. Preservation of the choice of law issue was raised with Idea Nuova's counsel during the December 5, 2008 initial pre-trial conference. Idea Nuova has not addressed the import of an apparent failure to raise the issue before the arbitrator.

FN6. Idea Nuova concedes in its Second Amended Complaint that the Agreement is "silent" on the choice of law issue. (Compl.¶ 51.)

**\*5** Idea Nuova's third and fourth examples of "manifest disregard" are equally insufficient to demonstrate "egregious impropriety" in the arbitration. Idea Nuova asserts in conclusory fashion that "[t]he [a]rbitrator manifestly disregarded the law since he held that the Agreement was renewed but that GM was completely excused from all contractual obligations." According to Idea Nuova, this finding defied "the fundamental rule of 'mutuality of obligations' " and amounted to "the [a]rbitrator's 'own brand of justice.' " (Idea Nuova Br. at 22.) But Idea Nuova's argument mischaracterizes the arbitrator's finding. The arbitrator concluded only that, because Idea Nuova "terminated GM's consulting services in or around September 2006 and did not allow GM to render consulting services for [Idea Nuova] after that time," GM was "excused from any obligation to render consulting services for [Idea Nuova] from and after September 2006." (Interim Award No. 2 (As Modified), at 16.) This finding does not conflict with the arbitrator's simultaneous finding of renewal in May 2006, and it is not inconsistent with the Agreement's own terms, which contemplated continued commission payments even after termination of GM's consulting services. *See* Agreement at 1 ("Consulting Services").

Idea Nuova also argues that the arbitrator "manifestly disregarded the law because he awarded clearly excessive attorney fees for duplicative and/or clearly unnecessary legal work." (Idea Nuova Br. at 22.) Idea Nuova does not, however, appear to contend that the arbitrator ignored or deliberately rejected reasonableness requirements in reaching the fee award. Instead, Idea Nuova appears to challenge the application of those requirements by repeating its objections and then concluding that "the [a]rbitrator did not appear to even consider any of these issues." ( *Id.* at 24.) "Based on [the] improper uses of attorney resources," Idea Nuova argues, "GM's fee award should have been reduced to *some* extent ." ( *Id.* (emphasis in original).) Apart from this general criticism, Idea Nuova does not articulate a specific objection to the arbitrator's legal analysis and does not explain how that analysis amounted to a deliberate disregard for governing legal standards. The Court has no basis to conclude that the arbitrator's fee award exhibits manifest disregard for the law. The Court also notes that an arbitrator's calculation of a reasonable award necessarily involves findings of fact, "which federal courts may not review even for manifest disregard. " *Stolt-Nielsen, 548 F.3d at 98* (citation omitted).

B. *Arbitrability*

2009 WL 2568332

Idea Nuova's remaining arguments under <u>section 10</u> assert that the arbitrator improperly reached issues outside the scope of the Agreement's arbitration clause. The Court's inquiry under this aspect of <u>section 10(a)(4)</u> focuses on "whether the arbitrator[ ] had the power, based on the parties' submissions or the arbitration agreement, to *reach* a certain issue, not whether the arbitrator correctly decided that issue." *Stolt-Nielsen*, 548 F.3d at 101 (citations omitted; emphasis added). Although Idea Nuova argues that the arbitrator exceeded his authority "by allowing GM to amend its Demand to include a host of additional issues that did not satisfy the required 45-day cooling-off clause" and by awarding attorney's fees for Hearing One (Idea Nuova Br. at 17), the Court concludes that Idea Nuova's arguments do not support vacatur in this case.

1. *The Amended Demand*

  **\*6** According to Idea Nuova, GM improperly added three new issues to the arbitration through its Amended Demand: "(i) damages for non-payment of commissions that allegedly accrued after GM demanded arbitration (i.e.2006 going forward); (ii) injunctive relief to remedy [Idea Nuova]'s alleged failure to provide certain reports; and (iii) attorney fees regarding these additional issues." (Idea Nuova Br. at 17.) Idea Nuova objects to these changes because: "[i]t was of course not possible for [GM] to have satisfied the 45 day requirement for its new claims as defined in its Amended Demand since it alleges that the only good faith attempts took place in 2006 and there was less than 45 days left in 2006 following the November 27 Demand." (Idea Nuova Reply Br. at 5 n. 1.)

  As an initial matter, Idea Nuova has misrepresented the text of GM's Amended Demand, which stated that GM "made repeated good faith attempts *throughout 2006* to resolve the dispute(s) embodied in [its] Demand for Arbitration, and more than forty-five (45) days have passed since [GM] did so." (Amended Demand for Arbitration, at 5) (emphasis added).

  Idea Nuova also appears to have overstated the substance of GM's amendment. The arbitrator's August 2008 finding on damages for non-payment of commissions that accrued after November 2006, for example, fell within a general review of which license or sales agreements between Idea Nuova and its licensors qualified as "Covered Agreements" under the renewed Agreement. *See* Interim Award No. 2 (As Modified), at 16-17.[FN7] This finding may fairly be characterized as an interpretation and application of the Agreement's terms, and does not amount to an impermissible expansion of the original renewal review. In fact, the arbitrator appears to have highlighted this element of the parties' dispute in his first, December 2007 award. *See* Interim Award at 4 ("The parties stipulated that an initial hearing ("Hearing One") would be held, limited to the issues of the existence, nature and term of the agreement between the parties, after which an Interim Award would be rendered on those issues. Additional issues, such as which license agreements were covered by the Agreement and what monies, if any, were owed under the Agreement, were reserved for a later hearing.").

  FN7. The Second Interim Award states as follows:
    Based upon the evidence introduced at Hearings One and Two, the arbitrator finds and declares:

    (a) The term "Covered Agreement" in paragraph 1 of the Agreement means and includes all license agreements and special sales agreements (as that term is defined in paragraph 1 of the agreement) entered into between [Idea Nuova] and licensors during the term of the agreement or within 12 months after expiration of the term, as to which licensors GM rendered consulting services for [Idea Nuova].
    (b) ... The term Covered Agreement includes license agreements entered into by [Idea Nuova] after September 2006 with licensors as to which GM has rendered consulting services in or before September 2006. (Interim Award No. 2 (As Modified), at 16-17.)

The arbitrator's injunction required Idea Nuova to abide by the provisions of the Agreement, with its term extended through December 2008, by delivering certain commission payments and supporting documentation. This appears consistent with the scope of the parties' original dispute. Idea Nuova's post-November 2006 obligations-like its pre-November 2006 obligations-arose out of the

same Agreement,

Idea Nuova does not cite any material from the arbitral record, or from its own submission to the arbitrator in March 2008, to support or explain its contention that the 2008 amendments were improper. Without such support, this Court has no basis to conclude that the amendments cited expanded the scope of the parties' arbitration or circumvented the Agreement's 45-day "cooling-off" provision.

## 2. Attorney's fees

**\*7** Idea Nuova also contends that the arbitrator "was not permitted to award attorney fees for Hearing One." (Idea Nuova Br. at 17.) According to Idea Nuova, "until the [a]rbitrator held that the parties renewed the Agreement by implication, there simply was no Agreement to violate. As such, it was entirely beyond the scope of the [a]rbitrator's power to award attorney fees pertaining to Hearing One, which was the only hearing that contained arbitrable issues." This argument seems to assume that the Agreement terminated prior to being revived by the arbitrator's finding and that, in the interim, Idea Nuova could not have violated the Agreement's fee award clause. But the arbitrator concluded, based upon the evidence before him, that the parties had renewed the Agreement orally in May 2006. Inherent in this finding is a conclusion that the Agreement's arbitration clause, including its fee provision, also continued in force, uninterrupted, through the renewal period. An award under the attorney's fee provision would not, therefore, be improper.

## V. De novo review

Idea Nuova suggests in its Memorandum of Law that, as an alternative to vacatur or modification under the "restrictions contained in §§ 10 and 11 of the [FAA]," this Court may reject the Award outright and review the parties' dispute de novo. (Idea Nuova Br. at 11-12.) According to Idea Nuova, the absence of language in the Agreement stating that the parties' arbitration would be "final and binding" permits this Court to consider and resolve the underlying dispute independently. ( *Id.* at 11.) Idea Nuova adds that, because "there is no provision [in the Agreement] for the AAA Rules to govern ... the Awards-at most-are merely advisory, and are given whatever 'persuasive weight as the court concludes it deserves.' " ( *Id.* at 12.) Idea Nuova asks the Court to apply its review power to grant Idea Nuova "summary judgment on the merits." ( *Id.*)

The Second Circuit has explained that "a clause [in an arbitration agreement] providing for the settlement of controversies by arbitration pursuant to the rules of the American Arbitration Association [§ 'AAA'] ]" is 'sufficient to incorporate th[ose] rules into the agreement.' " *St. Lawrence Explosives Corp. v. Worthy Bros. Pipeline Corp.,* 111 F.3d 124, 1997 WL 187332, at \*1 (2d Cir.1997) (unpublished opinion) (citing *Varley v. Tarrytown Assocs., Inc.,* 477 F.2d 208, 210 (2d Cir.1973)) (alterations in original). "Therefore, by virtue of Rules 1 and 47(c) [of the AAA Rules], if parties to a contract agree to conduct arbitration in accordance with or pursuant to the AAA Rules, they have satisfied the 'consent-to-confirmation' requirement of section 9 of the FAA." *Id.* (citing *I/S Stavborg v. National Metal Converters, Inc.,* 500 F.2d 424, 426 (2d Cir.1974)).

Idea Nuova has not identified any binding authority to support its contention that the parties' selection of AAA arbitration was insufficient to ensure limited judicial review under the FAA.[FN8] Idea Nuova quotes an Eighth Circuit case as holding that this Court may give the Award "whatever 'persuasive weight as the court concludes it deserves,' " but the same case also states that parties who intend binding arbitration may demonstrate their intent "either by providing that the arbitration award will be 'final and binding,' or to that effect, or by incorporating by reference the rules of the American Arbitration Association or a similar arbitral body that expressly provide for binding arbitration." *Dow Corning Corp. v. Safety Nat'l Cas. Corp.,* 335 F.3d 742, 745 (8th Cir.2003).

FN8. Idea Nuova cites one Second Circuit case as establishing that "[w]here the arbitration is not final and binding, Federal courts have subject matter jurisdiction to decide the underlying dispute." (Idea Nuova Br. at 11 (citing *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. United Technologies Corp.,* 230 F.3d 569, 575 (2d Cir.2000).) The language cited, however, relates exclusively to the review of a presumption, under section 301 of the Labor

Management Relations Act, favoring access to a judicial forum to resolve disputes involving the application and interpretation of collective bargaining agreements. *See* 230 F.3d at 575. Specifically, the Second Circuit states that: "a district court has jurisdiction to review an arbitration award where the [collective bargaining agreement] does not expressly provide that the arbitration is 'final and binding' or the equivalent, but lacks jurisdiction where the [collective bargaining agreement] so states." *Id.* (citations omitted). This Court does not read Aeronautical Industrial as overruling or abrogating the Second Circuit's well-established deference to arbitral awards issued under the FAA. *See Stolt-Nielsen*, 548 F.3d at 95.

VI. *Conclusion*

   ***8*** For the reasons outlined above, GM's petition for confirmation of the Award is granted. Idea Nuova's motion for summary judgment or, in the alternative, for vacatur or modification of the Award, is denied. Because the Court concludes that Idea Nuova has failed to identify any ground for vacatur or modification under the FAA, Idea Nuova's claims for such relief in the Second Amended Complaint are also dismissed.

   As the prevailing party in this dispute, GM is entitled to an award of the reasonable costs, attorney's fees and other expenses that it has incurred in connection with this action. (Agreement at 3.) The parties are directed to meet and confer regarding the amount of that award. Failing agreement with Idea Nuova, GM is directed to submit a specific award request, with supporting documentation, to the Court for review within 20 days of the date of this Order.

   SO ORDERED.

S.D.N.Y.,2009.
Idea Nuova, Inc. v. GM Licensing Group, Inc.
Not Reported in F.Supp.2d, 2009 WL 2568332 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 2009 WL 4838820 (Trial Motion, Memorandum and Affidavit) Defendant-Petitioner's Memorandum of Points and Authorities in Response to the Court's October 23, 2009 Order to Show Cause (Oct. 26, 2009) Original Image of this Document (PDF)
• 2009 WL 4838819 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum of Law (Apr. 14, 2009) Original Image of this Document (PDF)
• 2009 WL 4838818 (Trial Motion, Memorandum and Affidavit) Petitioner's Memorandum of Points and Authorities in Opposition to Respondent's Cross-Motion to Vacate Arbitration Award (Mar. 31, 2009) Original Image of this Document (PDF)
• 2009 WL 4838817 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, or in the Alternative to Vacate or Modify the Arbitration Awards (Mar. 24, 2009) Original Image of this Document (PDF)
• 2009 WL 4834688 (Trial Pleading) Answer to Second Amended Complaint and Counterclaim (Feb. 24, 2009) Original Image of this Document (PDF)
• 2009 WL 4838816 (Trial Motion, Memorandum and Affidavit) Petition to Confirm Arbitration Awards (Feb. 24, 2009) Original Image of this Document (PDF)
• 2009 WL 4864651 (Arbitration Award) Final Arbitration Award (Feb. 24, 2009) Original Image of this Document (PDF)
• 2009 WL 4834689 (Trial Pleading) Second Amended Complaint (Jan. 23, 2009) Original Image of this Document (PDF)

   Exhibit(s) Available

• 2009 WL 5894874 (Exhibit) Consulting Agreement (Jan. 23, 2009) Original Image of this Document (PDF)

- <u>1:08cv08595</u> (Docket) (Oct. 8, 2008)

Judges and Attorneys (Back to top)

Judges

Judges

- **Castel, Hon. P. Kevin**
United States District Court, Southern New York
New York
<u>Litigation History Report</u> | <u>Judicial Motion Report</u> | <u>Judicial Reversal Report</u> | <u>Judicial Expert Challenge Report</u> | <u>Profiler</u>

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.