**HEARING DATE AND TIME: November 18, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: November 11, 2010 at 4:00 p.m. (Eastern Time)**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

BINGHAM McCUTCHEN LLP
1 Federal Street
Boston, Massachusetts  02110
Telephone:  (617) 951-8000
Facsimile:  (617) 951-8736
John R. Skelton
Evan J. Benanti

Attorneys for General Motors LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **Case No.:  09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------X

### MOTION OF GENERAL MOTORS LLC
### TO ENFORCE 363 SALE ORDER AND APPROVED DEFERRED
### TERMINATION AGREEMENTS AGAINST RAMP CHEVROLET, INC.

## TABLE OF CONTENTS

Page

I.    REQUESTED RELIEF.................................................................. 1

II.   BACKGROUND ......................................................................... 3

      A.    The Sale of Assets to New GM Pursuant to Section 363 of the Bankruptcy
            Code ........................................................................................ 3

      B.    The Wind Down of Ramp and the Ramp Bankruptcy ........................... 3

      C.    Ignoring This Court's Exclusive Jurisdiction, Ramp Files the Contempt
            Motion ..................................................................................... 7

III.  JURISDICTION .......................................................................... 8

IV.   ARGUMENT ............................................................................... 9

      A.    Ramp's Claims Concerning New GM's Obligations Pursuant to the Wind-
            Down Agreements Are Subject to the Exclusive Jurisdiction of This
            Court. ...................................................................................... 9

            1.    Ramp's claims implicate the 363 Sale Order and the terms of the
                  Wind-Down Agreements ...................................................... 9

            2.    By executing the Wind-Down Agreements, Ramp specifically
                  agreed that this Court had exclusive jurisdiction to adjudicate any
                  disputes concerning the Wind-Down Agreements ................... 12

            3.    The Contempt Motion constitutes a dispute about the parties'
                  rights and obligations under the Wind-Down Agreements....... 13

      B.    The Wind-Down Agreements Specifically Authorize New GM to Reduce
            The Final Wind-Down Payment By Any Monies Owed to It By Ramp. .... 14

            1.    Once assumed, the Wind-Down Agreements are fully enforceable
                  against Ramp.................................................................... 14

            2.    The clear and unambiguous terms of the Wind-Down Agreements
                  allow New GM to reduce the amount of Final Wind-Down
                  Payment by any amounts owed by Ramp ............................... 16

      C.    The Wind-Down Agreements Also Provide That Ramp's Wind-Down
            Payment is Subject to New GM's Recoupment and Reconciliation Rights
            Under the Dealer Agreements................................................... 17

      D.    The Fact that Ramp Filed A Chapter 11 Bankruptcy Petition in October
            2009 Does Not Alter The Rights and Obligations of the Parties Under The
            Wind-Down Agreements. ........................................................ 18

            1.    Ramp assumed the WDAs and all the contractual benefits and
                  burdens........................................................................... 19

            2.    The Wind-Down Agreements also incorporate New GM's valid
                  set-off rights regarding pre-petition debts............................ 20

## TABLE OF CONTENTS
(continued)

Page

    3.    Any payment to Ramp must be made pursuant to the terms of the Wind-Down Agreements, including that Ramp must not owe New GM any amounts ................................................................................. 22

V.    NOTICE ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Able Demolition v. Pontiac,*
739 N.W.2d 696 (Mich. Ct. App. 2007) ...................................................................23

*Back v. AM Gen. Corp. (In re Chateaugay Corp.),*
213 B.R. 633 (S.D.N.Y. 1997) (Lifland, J.).............................................................10

*Balanoff v. Glazier (In re Steffan),*
97 B.R. 741 (Bankr. N.D.N.Y. 1989) (Gerling, J.)..................................................12

*Citizens Bank of Maryland v. Strumpf,*
516 U.S. 16 (1995)....................................................................................................20

*Frank v. ITT Commercial Fin. Corp.*
*(In re Thompson Boat Co.),* 230 B.R. 815 (Bankr. E.D. Mich. 1995)....................24

*In re Bill Heard Enterprises, Inc.,*
400 B.R. 813 (Bankr. N.D. Ala. 2009) .......................................................17, 24, 25

*In re Bob Brest Buick Inc.,*
136 B.R. 322 (Bankr. D. Mass. 1991) ..............................................................18, 25

*In re Cont'l Airlines, Inc.,*
236 B.R. 318 (Bankr. D. Del. 1999), *aff'd,* No. 09-932 ..........................................10

*In Re Flagstaff Realty Assocs.,*
60 F.3d 1031 (3d. Cir. 1995).....................................................................................23

*In re McWilliams,*
384 B.R. 728 (Bankr. D.N.J. 2008) ...........................................................................23

*In re Monroeville Dodge, Ltd.,*
166 B.R. 264 (Bankr. W.D. Pa. 1994) ...............................................................15, 19

*In re Pan Am Corp.,*
175 B.R. 438 (S.D.N.Y. 1994)..................................................................................23

*Lee v. Schweiker,*
739 F.2d 870 (3d Cir. 1984)......................................................................................23

*Mayco Plastics, Inc. v. TRW Vehicle Safety Systems, Inc. (In re Mayco Plastics, Inc.),*
389 B.R. 7 (Bankr. E.D.Mich. 2008) ........................................................................24

*Minority Earth Movers, Inc. v. Walter Toebe Constr. Co.,*
649 N.W.2d 397 (Mich. Ct. App. 2002) ...................................................................24

i

*Mudge v. Macomb County,*
   580 N.W.2d 845 (Mich. 1998) ...........................................................................................24

*NLRB v. Bildisco and Bildisco,*
   465 U.S. 513 (1984) ...........................................................................................13, 15, 19

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas and Elec. Co.,*
   549 U.S. 443 (2007) ...........................................................................................................23

*Travelers Indemn. Co. v. Bailey,*
   129 S. Ct. 2195 (2009) ......................................................................................................10

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.),*
   68 B.R. 690 (Bankr. S.D.N.Y. 1986) (Buschman, J.) ......................................................10

*Ward v. Twp. of Alpine,*
   171 N.W. 446 (Mich. 1919) ..............................................................................................24

## STATUTES

11 U.S.C. § 105(a) ...............................................................................................................10, 25

11 U.S.C. § 362(a)(7) ..................................................................................................................20

11 U.S.C. § 363 .......................................................................................................................3, 20

11 U.S.C. § 365 ..............................................................................................................................1

11 U.S.C. § 542(b) .......................................................................................................................20

11 U.S.C. § 553 .......................................................................................................................20, 23

28 U.S.C. § 157(b) .........................................................................................................................9

28 U.S.C. § 1334 ............................................................................................................................8

28 U.S.C. §§ 1408 and 1409 .........................................................................................................9

## OTHER AUTHORITIES

Fed. R. Bankr. P. 1015(c) ...........................................................................................................25

Fed. R. Bankr. P. 9007 ................................................................................................................25

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC f/k/a General Motors Company ("**New GM**") respectfully represents:

### REQUESTED RELIEF

1.      After notice and a comprehensive, three day evidentiary hearing, on July 5, 2009, this Court entered that certain Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief (the "**363 Sale Order**").  The 363 Sale Order *inter alia* authorized and approved that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "**MSPA**"), by and among the Debtors and the predecessors in interest to the Movant herein, New GM.  Pursuant to the MSPA and the 363 Sale Order, New GM, on July 10, 2009, purchased substantially all of the assets of the Debtors free and clear of the Debtors' liabilities, except as expressly assumed by New GM under the MSPA.

2.      As part of the transactions approved by the 363 Sale Order, the Debtor entered into and assigned to New GM certain Wind-Down and other Deferred Termination Agreements ("**Wind-Down Agreements**" or "**WDAs**") between the Debtor and certain of its authorized new motor vehicle dealers.  The Debtor offered these agreements to dealers as an alternative to outright rejection of their General Motors Dealer Sales and Service Agreements ("**Dealer Agreements**") under section 365 of the Bankruptcy Code.  These agreements provided, among other things, that the dealers' Dealer Agreements would terminate no later than October 31, 2010.

3.      This Court over objection by the Greater New York Automobile Dealers Association approved the Wind-Down and other Deferred Termination Agreements and specifically found in Paragraph 31 of the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable in accordance with their terms."  This Court further has

retained exclusive jurisdiction to enforce and implement these agreements.  As stated in

paragraph 71 of the 363 Sale Order:

> "This Court retains exclusive jurisdiction to enforce and implement
> the terms and provisions of this Order, the MPA, … and each of
> the agreements executed in connection therewith, including the
> Deferred Termination Agreements, in all respects, including, but
> not limited to, retaining jurisdiction to … (f) resolve any disputes
> with respect to or concerning the Deferred Termination
> Agreements."

In Recital JJ of the 363 Sale Order, the term "Deferred Termination Agreements" is defined to

include "Wind-Down Agreements."  Consistent with these provisions, the form of Wind-Down

Agreement approved by the Court provides as follows in Section 7:

> "Continuing Jurisdiction.  By executing this Agreement, Dealer
> hereby consents and agrees that the Bankruptcy Court shall retain,
> full, complete and exclusive jurisdiction to interpret, enforce, and
> adjudicate disputes concerning the terms of this Agreement and
> any other matter related thereto.  The terms of this Section 7 shall
> survive the termination of this Agreement.

Thus, to the extent that a Dealer asserts any claim that it is not required to comply with its

obligations, or any claim regarding New GM's rights and obligations, under the Wind-Down

Agreement, it must assert that claim in this Court, and not elsewhere.

       4.      By this Motion, as described more particularly below, New GM seeks to

enforce the Wind-Down Agreements against Ramp Chevrolet, Inc. ("**Ramp**"), a wind-down

dealer previously located in Port Jefferson, New York, which asserts that New GM has violated

the automatic stay in connection with Ramp's Chapter 11 proceedings by exercising its rights

under the Wind-Down Agreements, which Ramp assumed in its own bankruptcy proceeding.

Ramp has moved to hold New GM in contempt for insisting upon its rights expressly provided

for in the Wind-Down Agreement, as detailed below.

       5.      Because Ramp is refusing to abide by the 363 Sale Order and Wind-Down

Agreements, New GM requests the entry of an order pursuant to sections 105 and 363 of the

Bankruptcy Code: (a) enforcing the 363 Sale Order and the provisions of the Wind-Down

A/73527481.10/0201222-0000351243

Agreements approved by this Court; (b) directing Ramp and all persons acting in concert with it to cease and desist from proceeding with the Contempt Motion pending before the Bankruptcy Court for the Eastern District of New York, Chapter 11 Case No. 09-77513 (REG) until this Court has determined the parties' respective rights and obligations under the WDAs; and (c) granting such further and other relief as may be warranted, all as more fully set forth below.

## BACKGROUND

**A.    The Sale of Assets to New GM Pursuant to Section 363 of the Bankruptcy Code.**

6.    On June 26, 2009, General Motors Corporation (n/k/a/ "**Motors Liquidation Company**") and certain of its affiliates (collectively, the "**Debtors**") entered into the MSPA with New GM.  On July 5, 2009, the Court entered the 363 Sale Order, and on July 10, 2009, the Debtors consummated the sale of substantially all of their assets pursuant thereto to New GM (the "**363 Sale**").  Pursuant to the 363 Sale, New GM acquired substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code.

7.    Paragraph 31 of the 363 Sale Order specifically approved the form of Wind-Down Agreement that Ramp executed and now is attempting to evade and found that it is valid and enforceable in accordance with its terms.

**B.    The Wind Down of Ramp and the Ramp Bankruptcy.**

8.    On October 5, 2009, Ramp filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, which Chapter 11 proceeding is now pending in the United States Bankruptcy Court for the Eastern District of New York, as Case No.  09-77513 (reg) (the "**Ramp Bankruptcy Proceeding**").

9.    As part of the sale process in the GM Bankruptcy, Old GM identified the poorly performing dealers that would no longer be retained.  Although the bankruptcy proceedings would have allowed Old GM to reject these dealers immediately, Old GM instead offered the so-called "Wind-Down Agreements" to the discontinued dealers, giving them more than a year to wind down their operations.  If executed and agreed to by the dealers, the Wind-

A/73527481.10/0201222-0000351243

Down Agreements were then assumed by New GM.  Ramp was one of the dealers who executed Wind-Down Agreements and had its agreements assumed by New GM.

10.     More specifically, the WDAs allowed dealers to continue selling and servicing GM vehicles under certain modified conditions until October 31, 2010 and, relevant here, provided monetary payments.  The entire sale process, including the terms of the Wind-Down Agreements, was approved by this Court.

11.     Because Ramp operated three dealerships (Chevrolet, Chevrolet Medium Duty Truck and Hummer), Ramp executed and this Court approved three Wind-Down Agreements.  True and correct copies of the Wind-Down Agreements are attached hereto as **Exhibits A-C**.  Each provided a "Wind-Down Payment" to be made to Ramp.

12.     Subject to the terms of the Wind-Down Agreements including the determination of the final payment amount for Ramp's Chevrolet operations, New GM agreed to make a Wind-Down Payment totaling $1,261,613.  *See* Exhibit A*, *¶3(a).  The payment for Chevrolet Medium Duty Truck was $19,000, *see* Exhibit B*, *¶3(a), and the payment for Hummer was $24,000.  *See* Exhibit C*, *¶4(a).  Thus, the total potential "Wind-Down Payment" was $1,304,613.

13.     Pursuant to the Dealer Agreements and other applicable New GM policies and procedures, the financial dealings between New GM and its dealers, including Ramp, related to the operations of the dealerships (other than for the purchase of new vehicle inventory) are handled through a series of debits and credits posted to what is commonly referred to as the dealer's Open Account (the "**Open Account**").  The Open Account is normally reconciled or settled on a weekly basis, and if there is a credit balance, such credit balance is paid by New GM to the dealer and, if there is a debit balance, such debit balance is to be paid by the dealer to New GM.

14.     Pursuant to the terms of the WDAs, the parties agreed that the Wind-Down Payments were to be made in two (2) installments and that both payments are to be made by "crediting Dealer's Open Account in accordance with [New GM's] standard practices."  *See,*

4

*e.g.,* Exhibit A, ¶3(b).  The first installment was 25% of the total (here, $326,153.25) and was to be paid upon, among other things, Ramp's execution of the Wind-Down Agreements and the approval by this Court of the 363 Sale.  The first installment of the Wind-Down Payment was posted to Ramp's Open Account as reflected on the July 24, 2009 Open Account Statement.  By posting the first installment to Ramp's Open Account it was necessarily subject to the standard Open Account reconciliation process whereby the determination of any monies due the dealer is net of any monies the dealer owes New GM or its affiliates.

15.    The remaining payment of 75% (or potentially $978,459.80) (the "**Final Payment**") is to be made upon Ramp's satisfaction of certain conditions.  *See* Wind-Down Agreements, Exs. A-C, ¶3.

16.    The terms and conditions required to be satisfied before New GM is obligated to make the Final Payment include, among others:  Ramp must deliver to New GM a certificate from any applicable taxing authority that it has paid all sales, use and other taxes or provide other evidence reasonably satisfactory to New GM that it will have no liability or obligation to pay any such taxes that remain unpaid.[1]  *See* Wind-Down Agreements, Exs. A-C, ¶3.

17.    The Final Payment was to be made by New GM crediting Ramp's Open Account and, thus, would be subject to the standard Open Account reconciliation process. Moreover, the Wind-Down Agreements specifically provide that in calculating the amount of the final Wind-Down Payment New GM may reduce the amount by any monies owed by Ramp to New GM or its affiliates.  *See* Wind-Down Agreements, ¶3(d), Exs. A-C.  Thus, Ramp is not

---

[1]    The New York State Department of Taxation and Finance (the "**DTF**") sent to New GM a notice of determination seeking to hold New GM responsible for past due taxes owed by Ramp.  Accordingly, New GM has requested that Ramp provide a release in favor of New GM executed by the DTF as a pre-condition to a final Wind-Down Payment.  As of the date of filing of this Motion, Ramp has not provided such release and thus Ramp has not fulfilled all of the pre-conditions to be eligible to receive the final Wind-Down Payment, because Ramp has not provided other evidence reasonably satisfactory to New GM that it will have no liability or obligation to pay any such taxes that remain unpaid.  *See* Wind-Down Agreements, Exs. A-C, ¶3.

A/73527481.10/0201222-0000351243

entitled to a Wind-Down Payment unless it has no amounts due and owing to New GM and its affiliates.

18.    Ramp currently owes New GM a significant balance, which is reflected in Ramp's Open Account.  There are three major items that make up the preponderance of monies owed to New GM and its affiliates.  The first two items ($225,000 each) relate to charges for the dealership's unpaid rent for the months of May-September 2009.  Ramp leased two parcels of property, each with a $45,000 monthly lease payment pursuant to a prime lease/sublease arrangement with New GM's subsidiary Argonaut Holdings, Inc. ("**AHI**").  AHI leased the property from an entity owned by Mr. Rampone, the President of Ramp, and, pursuant to that lease, paid to Mr. Rampone $45,000 per month.  There was then a sublease by AHI to the dealership which obligated Ramp to pay AHI the same $45,000 per month.  Although AHI faithfully paid Mr. Rampone, Ramp did not make the required rent payments to AHI on the two subleases for May-September 2009.  Section 13.2(i) of Ramp's leases specifically authorizes AHI to collect the rent and other charges by posting a charge to Ramp's Open Account and thus Ramp knew that if it did not pay the monthly rent to AHI, those charges would also be posted to the Open Account as provided in the leases.  Ramp also knew and understood that pursuant to the GM Dealer Agreements, any monies due a dealer are net of any monies that dealer owes to New GM or any of its affiliates and subsidiaries.  Dealer Agreements § 17.10.

19.    The third major charge relates to an audit completed in May 2009 which resulted in a charge back of $292,524.63.  A charge back results when Old GM or New GM determines that a dealer improperly requested and received warranty reimbursement payments, sales incentives or other payments.  Old GM notified Ramp of the audit results in May 2009 at the conclusion of the audit and again in June 2009 in connection with the GM bankruptcy.  Thus, Ramp knew the results of the audit and the amount of the pending charge back when it chose to execute the Wind-Down Agreements.

20.    Ramp obviously concluded that even with a significant audit charge back and the charge for any unpaid rent, the prospect of a deferred termination and the potential

6

Wind-Down Payment offered as part of the Wind-Down process was a significantly better option than, for example, pursuing a challenge to the audit and a claim as part of the GM bankruptcy.

21.    AHI and New GM posted the rent charges to the Open Account in September 2009.  By letter dated September 23, 2009, Ramp requested early termination of its Dealer Agreement and that New GM initiate the Wind-Down process.  By letter dated October 14, New GM responded and notified Ramp of the pre-conditions that needed to be satisfied to receive a final Wind-Down Payment.

22.    Ramp filed a voluntary petition for relief under Chapter 11 on October 5, 2009.  On December 3, 2009, Ramp moved to assume the Wind-Down Agreements ("**Assumption Motion**") (Ramp Bankruptcy docket no. 21).  A true and correct copy of the Assumption Motion is attached as **Exhibit D**.  By order dated February 3, 2010, the Ramp Bankruptcy Court approved Ramp's assumption of the Wind-Down Agreements ("**Assumption Order**") (Ramp Bankruptcy docket no. 26).  A true and correct copy of the Assumption Order is attached as **Exhibit E**.  The Assumption Order specifically provided that any payment by New GM to Ramp was to be "pursuant to" the specific terms set forth in the Wind-Down Agreements.  By assuming the Wind-Down Agreements, Ramp is bound by all of its terms, including New GM's rights set forth in ¶3(c) pursuant to which New GM may reduce the final Wind-Down Payment by any monies that Ramp owes to New GM or its affiliates.

C.    **Ignoring This Court's Exclusive Jurisdiction, Ramp Files the Contempt Motion.**

23.    Despite New GM making clear in the Ramp Bankruptcy Proceeding that any dispute concerning the WDAs, including New GM's calculation of the amount of the final Wind-Down Payment, must be adjudicated in this Court, on September 24, 2010, Ramp filed before the Ramp Bankruptcy Court a contempt motion against New GM based on New GM's calculation of the final Wind-Down Payment based on the express terms of the WDAs[2]

---

[2]    "Motion of Debtor for Order: (1) Finding General Motors in Violation of the Automatic Stay for: (A) Applying Debtor's Post-Petition Payables To Its Pre-Petition Claim; and (B) For Failing to Receive Bankruptcy Court Approval Before Effectuating a Set-Off; (2) Holding General Motors in Contempt for Deliberately Violating the Stay; (3) Compelling General Motors to Remit to the Debtor the Outstanding Wind-Down Money, Pursuant to

7

("**Contempt Motion**").  A true and correct copy of the Contempt Motion is attached as **Exhibit F**.  In its Contempt Motion, Ramp seeks, among other relief, (i) a determination that pursuant to the Wind-Down Agreements New GM owes Ramp a Wind-Down Payment of $975,459.80 and that New GM is not entitled to reduce the final Wind-Down Payment by the amount of monies Ramp owes to New GM or its affiliates and (ii) an order requiring that New GM pay over to Ramp the monies Ramp contends are owed pursuant to its interpretation of the Wind-Down Agreements.  *See, e.g.*, Contempt Motion at 6-8.

24.    Ramp's Contempt Motion relates directly to this Court's 363 Sale Order in that it seeks a determination of the parties' rights under the Wind-Down Agreements which this Court has "retained *exclusive* jurisdiction" to enforce and to resolve any disputes.  363 Sale Order, ¶ 71 (emphasis added).  The Wind-Down Agreements, themselves, also provide that this Court retains exclusive jurisdiction "to interpret, enforce, and adjudicate disputes concerning the terms of [the Wind-Down] Agreement and any other matter related thereto."  Wind-Down Agreements, ¶13, Exs. A-C.

25.    Prior to filing this Motion, New GM requested in writing that Ramp comply with this Court's 363 Sale Order and not proceed with the Contempt Motion, including a request that at the very least Ramp defer or continue the Contempt Motion until this Court has had an opportunity to consider New GM's Motion.  Ramp refused.  A true and correct copy of that correspondence is attached at **Exhibit G**.

## JURISDICTION

26.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334, Paragraph 71 of the 363 Sale Order, and Article IX, Section 9.13 of the MSPA, as well as Paragraph 13 of the Wind-Down Agreement approved by the Court.  Specifically, the 363 Sale Order states that:

Wind-Down Order Assuming the Wind-Down Agreement; and (4) Granting Its Objection and Reclassifying and Reducing Claim #21, the Proof of Claim of General Motors" (Ramp Bankruptcy docket no. 63).

A/73527481.10/0201222-0000351243

> This Court retains *exclusive jurisdiction to enforce and implement the terms and provisions of this Order*, the M[S]PA, . . . and each of the agreements executed in connection therewith, including the Deferred Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to . . . (f) *resolve any disputes with respect to or concerning the Deferred Termination Agreements.*

363 Sale Order ¶ 71 (emphasis added).  And the Wind-Down Agreements provide:

> Continuing Jurisdiction.  By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain, full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 13 shall survive the termination of this Agreement.

*See* Wind-Down Agreements, ¶13, Exs. A-C.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### A.    Ramp's Claims Concerning New GM's Obligations Pursuant to the Wind-Down Agreements Are Subject to the Exclusive Jurisdiction of This Court.

27.    Ramp's Contempt Motion must be heard by this Court, and not the Ramp Bankruptcy Court, because (i) Ramp's claims implicate this Court's 363 Sale Order, (ii) Ramp and New GM agreed to this Court's exclusive jurisdiction for any dispute involving the Wind-Down Agreements, and (iii) this Court retained exclusive jurisdiction to adjudicate disputes regarding the Wind-Down Agreements.  New GM raised the issue of this Court's exclusive jurisdiction in Ramp's bankruptcy proceeding, including at the hearing on Ramp's disclosure statement when Ramp stated it challenged New GM's calculation of the final Wind-Down Payment.  Yet, in its Contempt Motion, Ramp fails to address the issue of this Court's exclusive jurisdiction, just as it ignores the operative terms in the Wind-Down Agreements.

### 1.    Ramp's claims implicate the 363 Sale Order and the terms of the Wind-Down Agreements.

28.    Bankruptcy courts have the inherent authority to enforce their orders: "[a]ll courts, whether created pursuant to Article I or Article III, have inherent contempt power

9

to enforce compliance with their lawful orders.  The duty of any court to hear and resolve legal
disputes carries with it the power to enforce the order." *U.S. Lines, Inc. v. GAC Marine Fuels,
Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) (Buschman, J.).
Section 105 of the Bankruptcy Code also provides that "[t]he court may issue any order, process,
or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions and
this section "codif[ies] the bankruptcy court's inherent power to enforce its own orders." *Back v.
AM Gen. Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997) (Lifland, J.); 11
U.S.C. § 105(a).

29.    More specifically, this Court retains subject matter jurisdiction to enforce
the 363 Sale Order, as it "is axiomatic that a court possesses the inherent authority to enforce its
own orders" and agreements approved by the court. *In re Cont'l Airlines, Inc.*, 236 B.R. 318,
326 (Bankr. D. Del. 1999) ("In the bankruptcy context, courts have specifically, and consistently,
held that the bankruptcy court retains jurisdiction, *inter alia*, to enforce its confirmation order."),
*aff'd*, No. 09-932, Adv. 99-47, Civ. A. 99-795-SLR, 2000 WL 1425751 (D. Del. Sep. 12, 2000),
*aff'd*, 279 F.3d 226 (3d Cir. 2002), *cert. denied*, 537 U.S. 944 (2002); *Travelers Indemn. Co. v.
Bailey*, 129 S. Ct. 2195, 2205 (2009) ("as the Second Circuit recognized, . . . the Bankruptcy
Court plainly had jurisdiction to interpret and enforce its own prior orders."), *on remand to*,
___F.3d ___, 2010 WL 1007932 (2d Cir. March 22, 2010).

30.    Additionally, pursuant to Paragraph 71 of the 363 Sale Order and Section
9.13 of the MSPA, this Court retained exclusive jurisdiction "to enforce and implement the terms
and provisions of this [363 Sale] Order, the M[S]PA, … and … the Deferred Termination
Agreements." *See* 363 Sale Order  71; MSPA Art. IX, § 9.13.

31.    This exclusive jurisdiction provision was an important part of the parties'
bargain in implementing the 363 Sale.  As this Court recently stated at the hearing regarding
New GM's motion to enforce the 363 Sale Order and a Wind-Down Agreement with Rally Auto
Group, Inc.:

10

- "[T]he wind-down agreements[] included provisions by which dealers and New GM contractually agreed that this Court retained full and exclusive jurisdiction to enforce them." *In re Motors Liquidation Co. et al.*, October 4, 2010 Hearing Transcript at 45:1-45:3. A true and correct copy of the *Rally* transcript is attached as **Exhibit H**.

- "[T]here can be no dispute what the sale order actually said. Nor can there be any dispute as to the wind-down agreement said. Section 13 of the wind-down agreement had that continuing jurisdiction clause providing that the dealer hereby consented to and agreed that the bankruptcy court would retain full complete and exclusive jurisdiction to interpret, enforce and adjudicate disputes concerning the terms of this agreement and any other matter related thereto." *Id*. at 47:4-47:11.

- "[T]he bidders of the world that come in to bid for assets in the bankruptcy court must have knowledge that bankruptcy courts will stand by the documents as they were then drafted to give the parties to those agreements the predictability in their relations for which they are binding and upon which they justifiably rely." *Id*. at 48:20-48:25.

32.    Ramp's Contempt Motion implicates the 363 Sale Order because it challenges the parties' respective rights and obligations as set forth in the Wind-Down Agreements that were approved by the 363 Sale Order. When this Court approved the Wind-Down Agreements it specifically found in Paragraph 31 of the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable in accordance with their terms." By seeking to prevent New GM from exercising its contractual reconciliation rights under the Wind-Down Agreements, Ramp essentially claims that the Wind-Down Agreements are not binding contracts enforceable in accordance with their terms. Thus, because Ramp advocates a position that is contrary to the 363 Sale Order and the terms of the Wind-Down Agreements, this Court should exercise its jurisdiction to enforce the terms of that Order.

11

33.     Ramp's filing of the Contempt Motion is contrary to the 363 Sale Order, and therefore supports this Court's enjoining Ramp from continuing to pursue the Contempt Motion pending this Court's resolution of the parties' dispute on their respective rights and obligations under the Wind-Down Agreements.  Otherwise, New GM will continue to suffer harm and prejudice if the Contempt Motion proceeds against it.  Under settled law, when a party unilaterally violates a Bankruptcy Court order, that violation, standing alone, constitutes the only harm necessary for a renewed injunction.  *See, e.g.*, *Balanoff v. Glazier (In re Steffan)*, 97 B.R. 741, 746 (Bankr. N.D.N.Y. 1989) (Gerling, J.) (noting that "the usual equitable grounds for relief, such as irreparable damage, need not be shown" in injunctions in bankruptcy cases) (quotation omitted).  Further, New GM has been forced to incur unwarranted costs and expenses by needing to address the enforceability of the Wind-Down Agreements.[3]

   **2.     By executing the Wind-Down Agreements, Ramp specifically agreed that this Court had exclusive jurisdiction to adjudicate any disputes concerning the Wind-Down Agreements.**

34.     In the Wind-Down Agreements, Ramp specifically agreed to litigate any disputes concerning the WDAs before this Court.  Ramp agreed that this Court would retain "full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of [the WDA] and any other matter related thereto."  *See* Wind-Down Agreements, ¶13(d), Exs. A-C.  Ramp's Contempt Motion represents just such a dispute.  While Ramp may not agree with New GM's interpretation of the WDAs, and their application with regard to a dealer that has filed for bankruptcy protection, Ramp offers no legitimate basis to assert that the dispute between Ramp and New GM concerning the WDAs is not a dispute about the WDAs.  To the contrary, the issues raised by the Contempt Motion, such as whether in

---

[3] Finally, ¶5 of the Wind-Down Agreements set forth a release, covenant not to sue and indemnification provision in favor of New GM.  Pursuant to those provisions, New GM is entitled to recover from Ramp any losses, damages or costs incurred (including reasonable attorneys' fees) in connection with enforcing the Wind-Down Agreements. While New GM's calculation of the final Wind-Down Payment, at least so far, has not included such costs, New GM reserves its right to recover losses, including attorneys' fees, from Ramp.  *See* Wind-Down Agreements, ¶5(d), Exs. A-C.

12

calculating the final Wind-Down Payment New GM is authorized to reduce the Wind-Down Payment by any amount owed by Ramp to New GM or its affiliates, fall squarely within the exclusive jurisdiction provisions to which Ramp consented.

35.    Further, having assumed the Wind-Down Agreements, Ramp is bound by all of their terms.  *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*.").  Therefore, Ramp is bound by all of the terms of the Wind-Down Agreements, including the provision that this Court has exclusive jurisdiction over disputes regarding the WDAs.

> **3.    The Contempt Motion constitutes a dispute about the parties' rights and obligations under the Wind-Down Agreements**

36.    Regardless of which party's interpretation of the Wind-Down Agreements is correct, there is no question that the Contempt Motion raises a dispute over the parties' respective rights and obligations under the Wind-Down Agreements.  Accordingly, this is a dispute that is within the exclusive jurisdiction of this Court.  The fact that Ramp is currently a Chapter 11 debtor does not change the underlying nature of the dispute.  Nor does Ramp's bankruptcy change the facts that it agreed to the exclusive jurisdiction provision and that the provision is now fully enforceable.  Ramp's voluntary assumption of the Wind-Down Agreement eliminates any possible ambiguity in that regard.

37.    While Ramp makes a number of arguments, as set forth in the Contempt Motion, Ramp essentially argues that the reconciliation provision included in the Wind-Down Agreements is not enforceable as written against Ramp as a dealer who has filed for bankruptcy, notwithstanding the fact that Ramp has assumed the Wind-Down Agreements post-petition. While Ramp seeks to characterize the issues as relating to set off or a pre- versus post-petition analysis of New GM's actions, etc., in the end, the substantive issue raised by the Contempt Motion is whether a bankruptcy debtor who wants to claim the benefit of the Wind-Down Agreements (and, thus, compel New GM to make a Wind-Down Payment) and then assumes the

13

Wind-Down Agreements is subject to all of the provisions in the Wind-Down Agreements, including the specific provision that the final Wind-Down Payment may be reduced by any monies owed to New GM as reflected on the open account or otherwise.

38.    Regardless of the label it may want to attach to its arguments, the Contempt Motion ultimately challenges the enforceability of the provisions of the Wind-Down Agreements and as such, is a dispute that comes within the exclusive jurisdiction provision included in the WDA.  The issues raised by the Contempt Motion are the very issues that the parties specifically agreed would be litigated in this Court.

**B.    The Wind-Down Agreements Specifically Authorize New GM to Reduce The Final Wind-Down Payment By Any Monies Owed to It By Ramp.**

39.    The Wind-Down Agreements expressly provide that in calculating the amount of the final Wind-Down Payment New GM can reduce the amount of the final Wind-Down Payment by any monies owed to it or its affiliates by Ramp.  When Ramp assumed the Wind-Down Agreements, it assumed not only the benefits but also the burdens of the WDAs. While Ramp ignores the operative contract terms in its Contempt Motion, that does not make them any less effective.  They are binding.

**1.    Once assumed, the Wind-Down Agreements are fully enforceable against Ramp.**

40.    Ramp contends that New GM is bound by the terms of the Wind-Down Agreements to make the Wind-Down Payment.  New GM does not dispute that once assumed the WDAs are enforceable.  However, any obligation of New GM to make a final Wind-Down Payment is defined by the express terms of the Wind-Down Agreements, and, as such, New GM is entitled to enforce all of its rights under the Wind-Down Agreements (and the Dealer Agreements), including most significantly, the reconciliation right in Paragraph 3(c).  Ramp cannot seek to enforce New GM's obligation to make a final payment but at the same time disregard its own obligations or New GM's rights under the WDAs, including how to determine the final Wind-Down Payment.

14

41.    It is well established that because Ramp assumed the Wind-Down Agreements *cum onere*, Ramp received both the benefits and burdens of those agreements. *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*."); *In re Monroeville Dodge, Ltd.*, 166 B.R. 264, 267-68 (Bankr. W.D. Pa. 1994) (finding that debtor dealer assumed dealer agreement *cum onere* and therefore, pursuant to dealer agreement's netting provision, manufacturer was permitted to apply post-petition credits owing to debtor against manufacturer's allowed administrative claim).

42.    Ramp knew that the only way it could compel New GM to make a Wind-Down Payment was to assume the WDAs. This is why Ramp chose to assume the Wind-Down Agreements. *See, e.g.*, Ramp Assumption Motion at 3 ("The assumption of the Wind-Down Agreement will allow the Debtor to obtain the Wind-Down Money."). Of course, New GM's obligation to make a Wind-Down Payment only arises from the Wind-Down Agreements themselves. As such, the Court must look to the express terms of the WDAs to determine the parties' rights.

43.    While Ramp claims that New GM is obligated to make the final Wind-Down Payment, it asserts that New GM is not entitled to enforce, for example, ¶ 3(c) in calculating the final Wind-Down Payment. Consistent with well established law that a debtor assumes an agreement *cum onere,* the Assumption Order specifically provides that any payment by New GM of the Wind-Down Payment is to be "pursuant to the terms of the Wind-Down Agreement." Assumption Order at 2. Just like Ramp cannot force New GM to make a payment unless it provides documentation satisfactory to New GM that New GM will not have any liability for any unpaid taxes, Ramp cannot force New GM to make a payment so long as it has not paid New GM in full any monies owed to New GM or its affiliates. It would be entirely inequitable to allow Ramp to enforce the benefits of the WDAs without enforcing Ramp's related obligations.

15

2.      **The clear and unambiguous terms of the Wind-Down Agreements allow New GM to reduce the amount of Final Wind-Down Payment by any amounts owed by Ramp.**

44.      The fundamental bargain struck with the so-called "Wind-Down" dealers is that Old GM (and thus New GM after the sale) would offer a "soft-landing" but that it was subject to certain pre-conditions, including as relevant here, that the dealers had to first pay to New GM any monies owed (or those monies would reduce the amount of any final Wind-Down Payment).

45.      In the Contempt Motion, and in asserting that New GM has committed an intentional violation of the automatic stay, Ramp ignores the fundamental terms of the actual WDAs it is seeking to enforce.  First, Ramp ignores the fact that the Wind-Down Agreements specifically provide that the Wind-Down Payment is subject to New GM's right to net any monies owed to New GM or New GM's affiliates and thus the determination or calculation of the final Wind-Down Payment necessarily includes a determination of any monies owed to New GM by Ramp and reduction of the final payment by that amount.  Paragraph 3(c) provides:  "In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer… or their Affiliates."  *See* Wind-Down Agreements, ¶3(c), Exs. A-C.

46.      The intent of this provision is readily apparent.  Old GM (and thus New GM as the buyer) would not agree to make a Wind-Down Payment to the extent the dealer had an offsetting indebtedness.  To ensure that the dealer would be current (or that Old GM or New GM as buyer would not have to make a payment to a dealer who owed it money), the form of Wind-Down Agreement approved by the Court made it express that the calculation of the final Wind-Down Payment was to be net of any monies owed to Old or New GM.  Thus, notwithstanding the "Wind-Down" amount set forth in the WDAs (here a total of $1,304,613),

16

pursuant to the express terms of the WDAs, Ramp is not entitled to receive a final Wind-Down Payment until it has no monies due and owing to New GM and its affiliates.[4]

47.     The amount of monies owed by Ramp to New GM is reflected by the current Open Account balance ($699,096.01 (plus any additional charges that may be posted to the Open Account pursuant to New GM's standard process)).  Under the Wind-Down Agreements as agreed to by Ramp and New GM, and as approved as part of the GM sale process, Ramp simply does not have an enforceable right to a payment so long as it owes New GM (or its affiliates) these monies.  Or, to put it another way, New GM is entitled to net sums owed by Ramp to New GM and its affiliates against sums due and owing to Ramp pursuant to the WDAs.

**C.     The Wind-Down Agreements Also Provide That Ramp's Wind-Down Payment is Subject to New GM's Recoupment and Reconciliation Rights Under the Dealer Agreements.**

48.     Ramp's Contempt Motion also ignores that the WDAs expressly provide that the Wind-Down Payment is to be paid by New GM posting a credit to Ramp's Open Account and thus is also subject to the ongoing reconciliation of monies owed to New GM under the Dealer Agreements and applicable state law.  The Wind Down Agreements specifically provide that payment is to be made by "crediting Dealer's Open Account in accordance with [New GM's] standard practices."  *See* Wind-Down Agreements, ¶3(b), Exs. A-C.  Pursuant to the Dealer Agreements, "all monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries."  Dealer Agreements § 17.10.

49.     This reconciliation through the Open Account was agreed to by Ramp and New GM, as was the netting provision, in both the Dealer Agreements and the Wind-Down Agreements.  These provisions are enforceable contract rights and remedies.  *See, e.g., In re Bill*

---

[4] Ramp still has not met all of the pre-conditions set forth in ¶3(b) of the Wind-Down Agreements required to be satisfied before Ramp is entitled to receive the Final Wind Down Payment.  As noted, Ramp has not submitted to New GM documentation that Ramp has paid all applicable sales taxes or evidence acceptable to New GM that New GM shall not have any liability with respect to any such taxes.

A/73527481.10/0201222-0000351243

*Heard Enterprises, Inc.*, 400 B.R. 813, 823 (Bankr. N.D. Ala. 2009) ("[I]t would be inequitable to allow the debtors, . . . to obtain the funds owed under the dealership franchise agreements without first allowing GM to recoup its damages arising from the dealerships' breaches of the same agreements."); *In re Bob Brest Buick Inc.,* 136 B.R. 322, 323-24 (Bankr. D. Mass. 1991) (holding that Nissan was entitled to recoup charges owed to it by debtor dealer from credits being earned by dealer).

50.    When Ramp decided to execute the Wind-Down Agreements in early June 2009, Ramp knew that (i) Old GM was offering it Wind-Down Agreements and the amounts of the potential Wind-Down Payments, (ii) the results of Old GM's audit resulted in a significant charge back that would ultimately be charged to the Open Account, and (iii)  any other charges it may incur would be posted to the Open Account.  Of course, Ramp knew that the reconciliation provisions in the Dealer Agreements and Wind-Down Agreements authorized Old and New GM to net payments and post charges to the Open Account.

51.    In May 2009, Ramp stopped paying rent, knowing, of course, that charges for any unpaid rent (ultimately at least $450,000 total) and the audit charge back ($292,524.63) would be posted to its Open Account.  Because Ramp knew that these charges would be posted to the Open Account, and that New GM was entitled to reduce the final Wind-Down Payment by the amounts owed, Ramp saw the opportunity to receive a Wind-Down Payment, even as reduced by amounts it owed to New GM, as a better option than filing a claim in the GM Bankruptcy.  Because New GM is authorized to reduce the final Wind-Down Payment by any amounts owed, the terms of the Wind-Down Agreements protect GM from actions such as Ramp choosing not to pay its rent.

**D.    The Fact that Ramp Filed A Chapter 11 Bankruptcy Petition in October 2009 Does Not Alter The Rights and Obligations of the Parties Under The Wind-Down Agreements.**

52.    The essential argument Ramp makes in its Contempt Motion is that by seeking to enforce its rights under the WDAs (as assumed by Ramp) New GM is purportedly

18

effecting an improper "set-off." According to Ramp, once it filed for bankruptcy protection and then assumed the WDAs, New GM was obligated to make the full Wind-Down Payment regardless of how much money Ramp may owe to New GM. Ramp also argues that its right to a Wind-Down Payment arose post-petition and thus cannot be set off against a pre-petition debt. *See* Contempt Motion at 7.

53.     Ramp's filing of a bankruptcy petition did not change the parties' respective rights and obligations under the Wind-Down Agreements. Most importantly, once Ramp assumed the Wind-Down Agreements those agreements became fully enforceable. In addition, as noted, the claims at issue (i.e., the unpaid rent, the audit charge back, and the claim for a Wind-Down Payment) arose pre-petition and therefore would not constitute improper setoffs. Of course, Ramp's assumption of the Wind-Down Agreements obviated any need for relief from the stay.

### 1.    Ramp assumed the WDAs and all the contractual benefits and burdens.

54.     As discussed above, Ramp assumed the Wind-Down Agreements *cum onere*, and therefore received both the benefits and burdens of those agreements. *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984); *In re Monroeville Dodge, Ltd.*, 166 B.R. 264, 267-68 (Bankr. W.D. Pa. 1994). Once assumed, New GM is bound by the terms of the Wind-Down Agreements to make the Wind-Down Payment. That obligation is defined by the express terms of the Wind-Down Agreements, including the reconciliation right in Paragraph 3(c).

55.     Ramp offers no legitimate basis by which it could, as a Chapter 11 debtor, avoid the very contractual obligations that it specifically decided to assume. Ramp moved to assume the WDAs to force GM to make the Wind-Down Payment. But, as noted, unless and until Ramp has paid all monies owed to New GM and its affiliates, Ramp is not entitled to a payment.

19

**2.      The Wind-Down Agreements also incorporate New GM's valid set-off rights regarding pre-petition debts.**

56.      Further, because the audit charge, the unpaid rent claim, and the WDA payment claim all arose pre-petition, even if applicable, GM's reconciliation is not barred by Section 553 of the Bankruptcy Code.  Section 553 provides, in relevant part, that except as otherwise provided in Sections 362 and 363 of the Bankruptcy Code, "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553.  Section 362, in turn, provides that the automatic stay applies to "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor."  11 U.S.C. § 362(a)(7).

57.      Under *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995), Section 362(a)(7) must be read in concert with Sections 542(b) and 553.  *Strumpf*, 516 U.S. at 19-20.  Section 542(b) requires a creditor to pay amounts owed to the debtor unless the creditor has setoff claims:  "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).  Section 362(a)(7), therefore, should not be read to require the immediate payment of a debt in light of the exception in Section 542(b).  Section 553, in turn, preserves a creditor's setoff rights "[e]xcept as otherwise provided in this section and in sections 362 and 363."  11 U.S.C. § 553.  This exception "is most naturally read as merely recognizing [the Section 362(a)(7)] restriction upon when an actual setoff may be effected - which is to say, not during the automatic stay."  *Strumpf*, 516 U.S. at 20.

58.      A setoff "has not occurred until three steps have been taken:  (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff."  *Strumpf*, 516 U.S. at 19.  This includes an intent "permanently to settle accounts."  *Id.*

20

59.     There is no question that New GM has asserted that in addition to its contract rights under the WDA, that it also has valid reconciliation, recoupment and setoff rights under the Dealer Agreements and applicable law.  However, because there has not been a final payment actually made, New GM has yet to actually exercise those rights and therefore could not be deemed to have violated the automatic stay.

60.     Ramp's Contempt Motion focuses on two alleged violations of the automatic stay:  (i) New GM's reduction of amounts owing to Ramp in the Open Account, and posting charges to the Open Account, and (ii) filing a proof of claim in the Ramp Bankruptcy.  Neither of these acts constitutes an improper setoff.

61.     The mere posting of debits and credits to Ramp's Open Account does not effect a setoff.  This posting of credits or charges to the Open Account is essentially bookkeeping, a means of tracking amounts owing between Ramp and New GM which occurs as part of the ordinary course of dealing between the parties.  Indeed, posting to the open account (which is nothing more nor less than GM's record of accounts with individual dealers), is essential to New GM's determination of its setoff and recoupment rights and any sums actually owed to the dealer.

62.     Further, New GM only filed a proof of claim in the Ramp Bankruptcy to preserve its rights with regard to any amounts which are or may be due under the Dealer Agreements or the Wind-Down Agreements.  The proof of claim specifically stated that the claim was "filed under the compulsion of the bar date and is filed to protect GM from a potential forfeiture of claims or rights by reason of said bar date."  *See* New GM Proof of Claim, Ex. F to Contempt Motion, at 5.[5]

63.     In all events, New GM has valid setoff rights pursuant to the Wind-Down Agreements, Dealer Agreements, and applicable law.  While Ramp's dealership may have

---

[5] The proof of claim also noted that its filing is not and shall not be deemed or construed as "consent by GM to the jurisdiction of [the Ramp Bankruptcy Court] or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving GM."  *See* New GM Proof of Claim, Ex. F to Contempt Motion, at 5.

formally ceased operating post-petition, the Wind-Down Payment does not constitute monies

generated from post-petition operations.  Instead the Wind-Down Payment is based on the WDA

executed in June 2009 to phase out the relationship between Old GM and the dealer under the

pre-petition Dealer Agreement.  It thus represents a pre-petition claim by Ramp.  The

corresponding charges -- the unpaid rent and audit charge back -- also arose pre-petition based

on pre-petition events.  Thus, in "set off" terms New GM is also entitled under applicable law to

setoff against any Wind-Down Payment that may be due, the amounts owed by Ramp to New

GM and its affiliate AHI. [6]

> **3.    Any payment to Ramp must be made pursuant to the terms of the Wind-Down Agreements, including that Ramp must not owe New GM any amounts.**

64.    New GM is prepared to make a final Wind-Down Payment to Ramp in the

amount to which Ramp is entitled, which is not more than $275,000.  The remaining portion of

the full Wind-Down amount, potentially $978,459.80, is to be made upon Ramp's satisfaction of

certain conditions.  *See* Wind-Down Agreements, ¶3, Exs. A-C.  These conditions include that

Ramp must not owe any monies to New GM or its affiliates, regardless of whether the debts

arose pre- or post-petition.  As discussed above, and as previously communicated to Ramp's

counsel, the potential payment of $978,459.80 must be reduced by at least $699,096.01, the

current Open Account balance, which is based in part on (i) $450,000 in unpaid rent owed to

AHI for Ramp's two parcels of property, and (ii) $292,524.63 for the audit charge back.  Thus,

the potential Final Wind-Down Payment is not $978,459.80 but instead is approximately

$275,000.

65.    Pursuant to the express terms of the Wind-Down Agreements, Ramp is not

entitled to the Wind-Down payment so long as Ramp owes New GM and its affiliates monies,

---

[6] There is little question that New GM would be entitled to relief from the automatic stay to exercise a setoff here. Ramp has provided no argument or authority as to why New GM would not be entitled to relief.  As discussed, New GM is exercising a contractual right pursuant to the WDAs that Ramp has assumed.  Particularly in light of these facts, there is no basis for a finding of contempt against New GM, even if its conduct were found to violate the automatic stay.

regardless of whether those obligations arose pre- or post-petition.  This is not a situation where New GM has an independently enforceable payment obligation to Ramp and New GM is seeking to assert as a defense to that payment obligation other monies owed to it by Ramp.  Instead, as reflected in the WDAs, New GM only agreed to make a Wind-Down payment to a dealer if that dealer met all of the pre-conditions, including not owing New GM any monies.  This is a valid and enforceable condition precedent to Ramp's entitlement to payment.  *See, e.g., Able Demolition v. Pontiac*, 739 N.W.2d 696, 700 (Mich. Ct. App. 2007) ("A condition precedent is a fact or event that the parties intend must take place before there is a right to performance.") (quotation omitted).  If "the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies."  *In re Pan Am Corp.*, 175 B.R. 438, 506 (S.D.N.Y. 1994) (quotation omitted).  New GM is not obligated to make a final Wind-Down Payment unless and until Ramp meets the condition that it no longer owes monies to New GM or its affiliates.  While Ramp wants to characterize New GM's conduct as effecting an improper setoff, in reality Ramp is seeking to challenge the contractual pre-conditions to its right to receive a final Wind-Down payment.

66.    Further, Ramp ignores that in order to determine the amount of the Wind-Down Payment (really any payment), New GM has the right to reconcile debits and credits pursuant to the doctrine of recoupment, which is fully enforceable in bankruptcy.  The doctrine of recoupment "allows the creditor to assert that mutual claims extinguish one another in bankruptcy, in spite of the fact that they could not be 'setoff' under 11 U.S.C. Sec. 553."  *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984).  Thus, a creditor with a right of recoupment generally can recoup the full amount owed, to the exclusion of other creditors.  *See In Re Flagstaff Realty Assocs.,* 60 F.3d 1031, 1035 (3d. Cir. 1995) ("A claim subject to recoupment avoids the usual bankruptcy channels and thus, in essence, is given priority over other creditors' claims").  And, the right to exercise recoupment generally is not subject to the automatic stay.  *See, e.g., In re McWilliams*, 384 B.R. 728, 730 (Bankr. D.N.J. 2008) ("[b]ecause recoupment

23

does not involve separate mutual debts, it is an exception to the automatic stay") (*quoting Lee*, 739 F.2d at 875).

   67.  In determining whether a creditor has a right to recoupment, courts look to applicable state law. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas and Elec. Co.*, 549 U.S. 443, 452 (2007) (noting "claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed" by the Bankruptcy Code). Further, the Bankruptcy Code does not limit a party's right to recoupment, and therefore if a right to recoupment exists under state law then a creditor is allowed to exercise that right. *In re Bill Heard Enterprises, Inc.*, 400 B.R. 813, 820-21 (Bankr. N.D. Ala. 2009) (noting that "[i]f a right of recoupment or setoff exists under applicable state law, a creditor will be allowed a preference over other creditors" and that, with regard to Section 553's limitation on setoff rights, "there is no comparable provision in the Bankruptcy Code that limits a creditor's state law right to seek recoupment").

   68.  Michigan law applies to the WDAs and the parties' rights under those agreements. *See* Wind-Down Agreements, ¶15, Exs. A-C. Michigan common law "allows one party to deduct monies owed to it by another party under the doctrine of recoupment as long as the two obligations arise out of the same contract or transaction." *Bill Heard*, 400 B.R. at 822 (*citing Mayco Plastics, Inc. v. TRW Vehicle Safety Systems, Inc. (In re Mayco Plastics, Inc.)*, 389 B.R. 7 (Bankr. E.D.Mich. 2008) (*citing Mudge v. Macomb County*, 580 N.W.2d 845, 855 (Mich. 1998). To invoke a recoupment right, "[i]t is sufficient that the counter-claims arise out of the same subject-matter, and that they are susceptible of adjustment in one action." *Frank v. ITT Commercial Fin. Corp. (In re Thompson Boat Co.)*, 230 B.R. 815, 824 n.11 (Bankr. E.D. Mich. 1995) (*quoting Ward v. Twp. of Alpine*, 171 N.W. 446, 450 (Mich. 1919)); *see also Minority Earth Movers, Inc. v. Walter Toebe Constr. Co.*, 649 N.W.2d 397, 402 (Mich. Ct. App. 2002) (*citing Ward*) (holding that recoupment extends to claims "aris[ing] out of, or ... connected with, the same transaction or contract.").

69.    In the automobile dealer context, the bankruptcy courts that have considered the issue of recoupment have specifically upheld its application.  *See In re Bill Heard Enterprises, Inc.*, 400 B.R. 813, 823 (Bankr. N.D. Ala. 2009); *In re Bob Brest Buick Inc.,* 136 B.R. 322, 323-24 (Bankr. D. Mass. 1991).  In *Bill Heard*,.  The court concluded:  "[I]t would be inequitable to allow the debtors, . . . to obtain the funds owed under the dealership franchise agreements without first allowing GM to recoup its damages arising from the dealerships' breaches of the same agreements."  *Bill Heard*, 400 B.R. at 823.  *See also  Bob Brest*, 136 B.R. at 323-24 (the Bankruptcy Court held that Nissan was entitled to recoup the charges owed to it by the dealer from credits being earned by the dealer).  In sum, New GM has a right of recoupment under governing Michigan law and is authorized to reconcile any credits and charges posted to the Open Account before making any payment to Ramp.

## NOTICE

70.    Notice of this Motion has been provided (a) to counsel for Ramp and (b) parties in interest in accordance with the Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 24, 2010 [Docket No. 6750].  New GM submits that such notice is sufficient and no other or further notice need be provided.

71.    No prior request for the relief sought in this Motion has been made to this or any other Court.

A/73527481.10/0201222-0000351243

WHEREFORE, New GM respectfully requests that this Court: (i) enter an order substantially in the form attached hereto as Exhibit I, granting the relief sought herein; and (ii) grant New GM such other and further relief as the Court may deem proper.

Dated: October 20, 2010
      New York, New York

                              Respectfully submitted,

                              /s/ Arthur Steinberg
                              Arthur Steinberg
                              Scott Davidson
                              KING & SPALDING LLP
                              1185 Avenue of the Americas
                              New York, New York  10036
                              Telephone:  (212) 556-2100
                              Facsimile:  (212) 556-2222

                              BINGHAM McCUTCHEN LLP
                              1 Federal Street
                              Boston, Massachusetts  02110
                              Telephone:  (617) 951-8000
                              Facsimile:  (617) 951-8736
                              John R. Skelton (*pro hac vice* admission pending)
                              Evan J. Benanti

                              Attorneys for General Motors LLC
                              f/k/a General Motors Company

A/73527481.10/0201222-0000351243