# **EXHIBIT F**

WILK AUSLANDER LLP
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. | |

**MOTION OF DEBTOR FOR ORDER: (1) FINDING GENERAL MOTORS IN VIOLATION OF THE AUTOMATIC STAY FOR: (A) APPLYING DEBTOR'S POST-PETITION PAYABLES TO ITS PRE-PETITION CLAIM; AND (B) FOR FAILING TO RECEIVE BANKRUPTCY COURT APPROVAL BEFORE EFFECTUATING A SET-OFF; (2) HOLDING GENERAL MOTORS IN CONTEMPT FOR DELIBERATELY VIOLATING THE STAY; (3) COMPELLING GENERAL MOTORS TO REMIT TO THE DEBTOR THE OUTSTANDING WIND-DOWN MONEY, PURSUANT TO WIND-DOWN ORDER ASSUMING THE WIND-DOWN AGREEMENT; AND (4) GRANTING ITS OBJECTION AND RECLASSIFYING AND REDUCING CLAIM #21, THE PROOF OF CLAIM OF GENERAL MOTORS**

TO:   **THE HONORABLE ROBERT E. GROSSMAN,
UNITED STATES BANKRUPTCY JUDGE:**

    Ramp Chevrolet, Inc., the debtor and debtor-in-possession herein ("Debtor"), by

its counsel, submits this motion (the "Motion"), pursuant to Sections 105(a), 362(a)(7) and

502 of Title 11 (the "Bankruptcy Code"), and Bankruptcy Rules 3007, 9014 and 9020,

for an order: (i) finding General Motors LLC ("GM") in violation of the automatic stay

for asserting set-offs without Bankruptcy Court approval; (ii) holding GM in contempt

for deliberately violating the automatic stay; (iii) compelling GM to remit to the Debtor

the sum of $975,459.80, representing the sum outstanding under the Wind-Down

Agreement.; and (iv) reclassifying and reducing Claim #21, the secured proof of claim of

GM from $699,096.01 to $406,571.50. In support of the Motion, the Debtor states as

follows:

### BACKGROUND

1.    On October 5, 2009 (the "Petition Date"), the Debtor filed a voluntary

petition under Chapter 11 of the Bankruptcy Petition Act of 1978, as amended

("Bankruptcy Code").

2.    To the best of the Debtor's knowledge, no Creditors' Committee has been

appointed by the Office of the United States Trustee as of this date, and there have been

no motion for the appointment of a trustee or an examiner.

3.    The Debtor, a New York corporation, owns and operates Chevrolet,

Chevrolet Truck and Hummer franchises (the "Dealerships"), pursuant to franchise

agreements (the "Franchise Agreements") by and between the Debtor and the GM. The

Dealership is located at 1395 Route 112, Port Jefferson, New York.

4.    Subsequent to the Petition Date, the Debtor had continued in the

possession of its property and the operation of the business as a debtor-in-possession,

pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.    On June 12, 2009, the Debtor entered into three agreements (the "Wind-

Down Agreements") with GM to "wind-down" the operations of the Dealerships.

Pursuant to the Wind-Down Agreements, upon the sale of the Debtor's new car inventory

of each franchise, the Debtor is required to close the Dealership. In exchange, GM has

agreed to pay to the Debtor the sum of $1,304,613 (the "Wind-Down Money"), in total,

2

for consideration in terminating the three Dealerships. During August, 2009, 25% of the Wind-Down Amount, $326,154.75, was paid to the Debtor by GM.

6.    For the quarters ending November 30, 2009, February 28, 2009 and May 31, 2009, the Debtor failed to remit sales tax to DTF in the amounts of $1,442,636.09, $639,750.04 and $425,993.96, respectively, totaling $2,508,380.09 (the "DTF Claim"). Of this amount, the sum of $2,082,386.13 ("DTF Secured Claim") is subject to Tax Warrants.

7.    On October 2, 2009, NYS sought to enforce its rights under the Tax Warrants and changed the locks on the Dealership. As a result, the Debtor was compelled to seek Chapter 11 relief.

8.    As part of the Debtor's operations with GM, credits and debits would be posted to the Debtor's Open-Account. As of October 1, 2009, three days prior to the Petition Date, the balance owed to GM equaled $515,787.06. A copy of the Accounts Receivable Statement generated by GM reflecting this is annexed hereto as Exhibit A.

9.    Subsequent to the bankruptcy, GM continued to provide debits and credits to the Debtor on the Open Account. However, instead of starting from zero as of the Petition Date, and adding credits and subtracting debits accordingly, GM continued to reduce its pre-petition claim.

10.    In fact, as of March 5, 2010, the balance owed to GM had been reduced from $515,787.06 to $402,521.78, a difference of $113,265.28 (the "Post-Petition Payable"). A copy of the Open Account Statement reflecting this balance is annexed hereto as Exhibit B.

436771v1

11.    The account statement also reflects that GM posted a debit memo on March 11, 2010 in the amount of $292,524.63 (the "chargeback"). According to an August 4, 2010 letter of GM (see below), this debit memo was on account of an audit completed during May, 2009.

12.    During November, 2009, the Debtor sold the last of its retail vehicles. As a result, under the Wind-Down Agreement, the Debtor became eligible to collect the Wind-Down Money. To this end, the Debtor has requested the commencement of the procedures to terminate the Franchise Agreement by December 31, 2009 and to obtain the Wind-Down Money.

13.    On November 25, 2009, the Debtor filed a motion (the "Assumption Motion") seeking to assume the Wind-Down Agreements. In the Assumption Motion, the Debtor specifically states that the assumption of the Wind-Down Agreement will allow the Debtor to obtain the Wind-Down Money [$1,304,613]. A copy of the Wind-Down Motion is annexed hereto as Exhibit C.

14.    GM did interpose an objection to the Assumption Motion and the Bankruptcy Court entered an order on February 3, 2010, granting the Assumption Motion. A copy of the Order is annexed hereto as Exhibit D.

15.    From December 2009, through July 10, 2010, Debtor repeatedly requested from GM the payment of the Wind-Down Money. Copies of certain emails reflecting these requests during that period are annexed hereto as Exhibit E. GM never responded.

16.    On July 21, 2010, GM filed a proof of claim ("GM POC") in the Debtor's bankruptcy proceeding. In the GM POC, GM asserts a secured claim in the amount of $699,096.01 (the "Set-Off Amount"). According to the attachment (the "Attachment") to

4

the GM POC, "GM has the right to set off this amount, plus any additional charges...,

from any Wind-Down payment due from GM to the Debtor. (Attachment, ¶15). A copy

of the GM POC and the Attachment are annexed hereto as Exhibit F.

17.    On August 4, 2010, counsel for GM forwarded to counsel for the Debtor

describing the basis for the alleged set-off. As set forth in the August 4 Letter, there are

two major charges that make up substantially all of the Set-Off Amount: i) the Debtor's

alleged failure to remit rent to a GM subsidiary, for the period through September, 2009

in the amount of $450,000; and ii) a chargeback based on an audit completed May, 2009.

A copy of the August 4, 2010 letter is annexed hereto as Exhibit G.

18.    Despite the fact that both components of the Set-off Amount cover a

period prior to the Petition Date, GM has not sought to modify the automatic stay to set-

off the Set-Off Amount.

19.    On August 6, 2010, DTF executed a letter, approved in both form and

substance by s member of GM's legal staff,   agreeing to hold GM harmless to the extent

the Wind-Down Money was paid. A copy of this letter is annexed hereto as Exhibit H.

20.    On August 16, 2010, GM forwarded a letter to Debtor's counsel stating

that the Debtor still need to provide proof that it removed its signs from the Dealership

and a copy of the Debtor's customer list. In the August 16 correspondence GM, for the

first time, stated that it was unhappy with the DTF letter of August 6 and now wanted an

actual release from GM. A copy of the August 16, 2010 letter is annexed hereto as

Exhibit I.

21.    On August 18, 2010, the Debtor provided to GM proof regarding the

removal of the signs and a copy of the customer list.

436771v1

5

22.    On August 20, 2010, GM remitted a letter to counsel for the Debtor acknowledging receipt of the aforementioned two remaining items and again requested a release. In that letter, GM also makes it clear that if the Debtor drops its claims to the Set-Off Amount, then the $279,363.79 will be made "promptly.... Otherwise, "the Final Wind-Down Payment "[$279,363.79] will be delayed pending a final resolution and a calculation of GM's indemnity claim." August 20 Letter at p.2. A copy of the August 20, 2010 letter is annexed hereto as Exhibit J.

## RELIEF REQUESTED

23.    Since the Petition Date, GM has taken the following actions: a) reduced its pre-petition claim by at least $113,265.28 by withholding money from the Debtor in violation of the automatic stay; b) remained silent when the Wind-Down Agreement, seeking the payment of $975,459.80, was approved; c) posted a chargeback equal to $279,363.79 during March, 2010 on account of an audit conducted during May, 2009; and d) filed the GM POC asserting rights against the Wind-Down Money, without first seeking leave of the Bankruptcy Court. As shown below, GM's actions violated the Bankruptcy Code, since all the conditions otherwise necessary to obtain the Wind-Down Money has been satisfied by the Debtor the $113,265.28 and $975,459.80 should be remitted to the Debtor immediately.

### A. GM's Failure to Remit the Post-Petition Payable Violates the Automatic Stay.

24.    GM's failure to remit to the Debtor the Post-Petition Payable violates section 362 of the Bankruptcy Code. Section 362 imposes an automatic stay on certain actions after the filing of a voluntary petition for bankruptcy. 11 U.S.C.A. § 362. Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C.A. §

6

362(a)(3). By statute, income generated by Debtor's post-petition conduct is property of the bankruptcy estate, rendering it outside of Audi's control. *See* 11 U.S.C.A. § 541(a)(7).

25.    The work at issue for which Debtor would be seeking reimbursement is maintenance and other service work conducted pursuant to GM's warranties to customers. It was exclusively work occurring after the bankruptcy petition was filed in this case and, as such, the fruits of such labor are exclusively the property of the bankruptcy estate. GM had no right to exercise control over this property or to take possession of this property from the estate. As a result, GM violated the stay by not remitting the Post-Petition Payable to the Debtor for the benefit of its creditors. Nothing more need be said.

**B. GM Attempt to Withhold the Wind-Down Money Based on the POC Violates the Automatic Stay.**

26.    In the GM POC, GM states that it is effectuating the right of set-off. Pursuant to Section 362(a)(7) of the Bankruptcy Code, any attempt to set off amounts owing the debtor prior to the Petition Date against any claim against the Debtor is stayed. GM's own admissions, set forth in the Open Account Statements, reflect that GM's claims against the Debtor arose prior to the Petition Date. If that is what GM is seeking to do, it is violation of the stay and should be held in contempt. *In re Ormond Beach Assocs. Ltd. P'ship,* 185 B.R. 408 (Bankr. D. Conn. 1995).

27.    If the right to collect the Wind-Down Money also arose prior to the Petition Date, GM violated Section 362(a)(7) by not seeking relief from the stay. If GM claims that the Debtor's right to the Wind-Down Money arose post-petition then it has no right of set-off because it cannot set off a post-post obligation against a pre-petition debt.

7

*In re Delta Air Lines*, 341 B.R. 439 (Bank.S.D.N.Y. 2006). In either event, GM acted improperly.

28.     For these reasons, the court should determine that GM violated the stay and that no right to set-off exists.

> **C.     GM's Claims Should be Reclassified as a General Unsecured Claim.**

29.     In light of the aforementioned, ample evidence exists that the GM POC should be reclassified as a general unsecured claim. Absent a right of set-off, GM has no authority to withhold any portion of the Wind-Down Money. Again, GM has been (purposely) unclear as to what position it is taking regarding the mutuality of the obligations, but, nevertheless, the Debtor has met its burden of production as to why the GM POC should be reclassified as a general unsecured claim *In re South Motor Co.*, 161 B.R. 532, 547 (Bankr. S.D. Fla. 1993)(Once the objector produces some evidence disputing the validity of a claim, the burden shifts to the claimant. The claimant bears the ultimate burden of establishing a valid claim by a preponderance of the evidence.)

**D.     GM's Claim should be Reduced by the Sum of $292,524.63 to $406,571.50.**

30.     In addition to GM's improper set-off of the Set-Off Amount, GM's claim should also be reduced by the amount of the Charge-Back GM charged to the Debtor's open account subject to the petition date. This chargeback was not only improperly set-off, as set forth above, it was untimely asserted under Section 461(z) of the New York Vehicle & Traffic Law.

31.     On August 6, 2008, Governor David Paterson signed into law a bill containing several amendments to the New York Franchised Motor Vehicle Dealer Act (the Act), N.Y. Veh. & Traf. Law §§ 461 *et seq.* The amendments bring about substantial

8

changes in areas such as dealer terminations, warranty reimbursements, dealer relocations and the addition of new dealers.

32.    The amendments provide that no franchisor may conduct an audit or charge back on any warranty or sales incentive payment more than one year after the date the franchisor made such payment to the dealer. Timely charge backs may only be charged after a representative of the franchisor has met with the dealer, explained in detail the basis for each proposed charge back and given the dealer a reasonable opportunity to explain its position relating to each. *See* Veh. & Traf. Law §§ 461(z).

33.    In particular, a franchisor may not deny or charge back a payment for warranty work unless the franchisor satisfies its burden of proof that the dealer did not make a good faith effort to comply with the reasonable written procedures of the franchisor or that the dealer did not actually perform the work.

34.    The Chargeback was the result of an audit conducted on 04-21-09 thru 04-29-09; and again on 05-05-09 thru 05-08-09. The audit period for vehicle incentives (customer rebates) was 09-07-07 thru 03-09-09. The chargeback for vehicle incentives for this period was originally $31,524.63, subsequently reduced to $21,524.63.

35.    Simultaneously, GM conducted an audit of SFE (Standards for Excellence) payments made to Ramp Chevrolet. This audit covered the period from the 4th quarter of 2005 thru the 3rd quarter of 2008. The chargeback for this audit was $271,000.00.

36.    At the time of the audit during May, 2009, GM was already foreclosed from charging back any funds the Debtor had received through May, 2008, because the statute required GM to not only audit, but chargeback within one year of the Debtor's

receipt of payment. By the time GM charged back the Chargeback Amount on March 11, 2010 (a period of ten months from when the audit was conducted), GM was out of time on any remaining vehicles, because the audit was conducted through September 30, 2008. Put simply, since GM did not chargeback until more than one year after the end of the audit period, there are no vehicles that are eligible for the chargeback of the SPE incentives.

37.    Furthermore, since GM did not charge back until March 11, 2009, GM is not eligible under the statute to chargeback any of the incentive moneys (where the one year period definitively ended March 9, 2010).

38.    For these reasons, whether the claim is reclassified as secured or unsecured, it should nonetheless be reduced by $292,524.63 (and the Debtor should receive this sum along with the $279,363.79, that is not the subject of any dispute by GM).

39.    No prior request for the relief sought herein has been made to this or any other Court.

436771v1

## <u>CONCLUSION</u>

For all of the reasons set forth in this Motion, the Debtor respectfully requests that

this Court enter an order: (i) granting the relief sought herein; and (ii) for such other and

further relief as may this Court deems just and proper.

Dated: New York, New York
September 24, 2010

                        WILK AUSLANDER LLP
                        Attorneys for the Debtor


                        By:_____/s/ Eric J. Snyder_____
                            Eric J. Snyder, Esq. (ES-8032)
                        675 Third Avenue
                        New York, New York 10017
                        (212) 421-2233

436771v1

# EXHIBIT A

RARPK022                         ACCOUNTS RECEIVABLE STATEMENT                    20090925

STATEMENT DATE:  09/25/09        STATEMENT PERIOD: 09/19/09 - 09/25/09
SETTLEMENT DATE: 10/01/09                    REMIT TO:
BMD:             13 02107

                                 GENERAL MOTORS COMPANY
RAMP CHEVROLET INC.              P.O. BOX 70595
PO DRAWER 1010                   CHICAGO, IL. 60673
PORT JEFFERSON STATION NY
             11776-0710
*************************************************************************

                                         DOCUMENT         DOCUMENT
                                          NUMBER           AMOUNT
DOCUMENT
DATE     DESCRIPTION                   000077734683       59,285.68
09/18/09  BALANCE FORWARD              000077751296        8,985.18
09/21/09  WARRANTY 042                                    68,270.86
          SUB-TOTAL


13 02107 ACTIVITY:
09/21/09  CSI SPECIAL PROJECTS         000077756866           69.00
09/22/09  TECH LINE (GM)               000077774233          298.05
09/24/09  DEBIT MEMO                   000077791989      225,000.00
09/25/09  GMSPO PARTS SUMMARY          000077808070        3,553.85 CR
09/25/09  CSI SPECIAL PROJECTS         000077826725           69.00
09/25/09  GM POWERSHIFT                000077820059          634.00
          SUB-TOTAL                                     222,516.20


13 02107 ACTIVITY:                                            0.00
          SUB-TOTAL


69 25128 ACTIVITY:                                      225,000.00
09/24/09  DEBIT MEMO                   000077792074      225,000.00
          SUB-TOTAL

          BALANCE DUE ON 10/01/09                       515,787.06


IF EFT HAS BEEN ELECTED BY THIS ACCOUNT DO
NOT REMIT PAYMENT FOR ANY BALANCE DUE






                              PAGE:    1
*************************************************************************

# EXHIBIT B

RARPK022
ACCOUNTS RECEIVABLE STATEMENT
20100312

STATEMENT DATE:  03/12/10          STATEMENT PERIOD: 03/06/10 - 03/12/10
SETTLEMENT DATE: 03/18/10                    REMIT TO:
BMD:             13 02107

RAMP CHEVROLET INC.              GENERAL MOTORS LLC
PO DRAWER 1010                  P.O. BOX 70595
PORT JEFFERSON STATION  NY       CHICAGO,          IL 60673
              11776-0710

**************************************************************

| DOCUMENT DATE | DESCRIPTION | DOCUMENT NUMBER | DOCUMENT AMOUNT |
|---|---|---|---|
| 03/05/10 | BALANCE FORWARD | 000079704592 | 402,521.78 |
|  | SUB-TOTAL |  | 402,521.78 |
|  |  |  |  |
| 13 02107 | ACTIVITY: |  |  |
| 03/11/10 | INFORMATION TECHNOLOGY & SERVS | 000079771342 | 433.52 |
| 03/11/10 | DEBIT MEMO | 000079761990 | 292,524.63 |
|  | SUB-TOTAL |  | 292,958.15 |
|  |  |  |  |
| 13 02107 | ACTIVITY: |  | 0.00 |
|  | SUB-TOTAL |  |  |
|  |  |  |  |
| 69 25128 | ACTIVITY: |  | 0.00 |
|  | SUB-TOTAL |  |  |
|  |  |  |  |
|  | BALANCE DUE ON 03/18/10 |  | 695,479.93 |

IF EFT HAS BEEN ELECTED BY THIS ACCOUNT DO
NOT REMIT PAYMENT FOR ANY BALANCE DUE

PAGE:    1

**************************************************************

# EXHIBIT C

SILLER WILK, LLP
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Proposed Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. |  |

**MOTION OF DEBTOR TO: (I) ASSUME AGREEMENTS WITH GENERAL MOTORS; (II) DISTRIBUTE PROCEEDS RESULTING FROM ASSUMPTION; AND (III) DISMISS THE BANKRUPTCY CASE, IF NECESSARY**

**TO:    THE HONORABLE ROBERT E. GROSSMAN,
        UNITED STATES BANKRUPTCY JUDGE:**

Ramp Chevrolet, Inc., the debtor and debtor-in-possession herein ("Debtor"), by its counsel, submits this motion (the "Motion"), pursuant to Sections 105(a), 365(a) and 1112(b) of Title 11 (the "Bankruptcy Code"), and Bankruptcy Rules 2002 and 6006, for authority to: (i) assume certain Wind-Down Agreement (as defined below), between the Debtor and the General Motors Corporation ("GM"); (ii) remit the Wind-Down Money (as defined below) to the New York State Department of Taxation & Finance ("DTF"); (iii) if necessary, to dismiss the Debtor's bankruptcy case. In support of the Motion, the Debtor states as follows:

## **BACKGROUND**

1.      On October 5, 2009 (the "Petition Date"), the Debtor filed a voluntary

petition under Chapter 11 of the Bankruptcy Petition Act of 1978, as amended

("Bankruptcy Code").

2.      To the best of the Debtor's knowledge, no Creditors' Committee has been

appointed by the Office of the United States Trustee as of this date, and there have been

no motion for the appointment of a trustee or an examiner.

3.      The Debtor, a New York corporation, owns and operates Chevrolet,

Chevrolet Truck and Hummer franchises (the "Dealerships"), pursuant to franchise

agreements (the "Franchise Agreements") by and between the Debtor and the GM. The

Dealership is located at 1395 Route 112, Port Jefferson, New York.

4.      Subsequent to the Petition Date, the Debtor had continued in the

possession of its property and the operation of the business as a debtor-in-possession,

pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      On June 12, 2009, the Debtor entered into three agreements (the "Wind-

Down Agreements") with GM to "wind-down" the operations of the Dealerships.

Pursuant to the Wind-Down Agreements, upon the sale of the Debtor's new car inventory

of each franchise, the Debtor is required to close the Dealership. In exchange, GM has

agreed to pay to the Debtor the sum of $1,304,613 (the "Wind-Down Money"), in total,

for consideration in terminating the three Dealerships. During August, 2009, 25% of the

Wind-Down Amount, $326,154.75, was paid to the Debtor by GM. A copy of the Wind-

Down Agreements are annexed hereto as Exhibit A.[1]

---

[1] Since the Motion also seeks to dismiss the bankruptcy case, all creditors are receiving notice of the
Motion. However, since the Wind-Down Agreements are voluminous, they are not attached to service

367498v1

6.     For the quarters ending November 30, 2009, February 28, 2009 and May 31, 2009, the Debtor failed to remit sales tax to DTF in the amounts of $1,442,636.09, $639,750.04 and $425,993.96, respectively, totaling $2,508,380.09 (the "DTF Claim"). Of this amount, the sum of $2,082,386.13 ("DTF Secured Claim") is subject to Tax Warrants.

7.     On October 2, 2009, NYS sought to enforce its rights under the Tax Warrants and changed the locks on the Dealership. As a result, the Debtor was compelled to seek Chapter 11 relief.

8.     During November, 2009, the Debtor sold the last of its retail vehicles. As a result, under the Wind-Down Agreement, the Debtor became eligible to collect the Wind-Down Money. To this end, the Debtor has requested the commencement of the procedures to terminate the Franchise Agreement by December 31, 2009 and to obtain the Wind-Down Money.

## RELIEF REQUESTED

9.     In order to effectuation the terms of the Wind-Down Agreements, the Debtor now seeks their assumption. The assumption of the Wind-Down Agreement will allow the Debtor to obtain the Wind-Down Money.

10.     A decision whether to assume a contract is left to the sound business discretion of the Debtor. *In re Penn Traffic Co,*.524 F.3d 373, 383 (2d Cir. 2008). In the present case, as set forth above, assumption of the Wind-Down Agreements can only benefit the estate. The Debtor no longer has the right to receive new car inventory with respect to any of the three franchises. Therefore, the termination of the franchises with

---

copies of the Motion, but are available, from the Court's docket and from counsel for the Debtor, upon request.

367498v1

GM will not cause it any harm. Indeed, since the termination of the franchises is the triggering mechanism to allow the Debtor to obtain the Wind-Down Money, the termination of the franchise is actually beneficial to the estate. For theses reasons, it is respectfully submitted that the assumption of the Wind-Down Agreements is in the best interest of the estate.

11.     By this Motion, the Debtor also seeks authority to pay the Wind-Down Money to the DTF on account of the DTF Secured Claim. Since the claim of GMAC, the previous floor plan lender for the Debtor, is minimal and can be satisfied from the amount of funds the Debtor presently has on hand, no party with a greater interest in the Wind-Down Money will be prejudiced if the relief requested is granted

12.     Finally, since the DTF shall maintain a security interest in the Debtor's remaining assets (the vehicle parts), and the value of the parts is less than the DTF Secured Claim, after applying the Wind-Down Money, there are no unencumbered assets of the Debtor available to administer for the benefit of unsecured creditors. Therefore, the Debtor requests, to the extent the continuation of the bankruptcy proceeding is not necessary, as of the hearing date of the Motion, that the bankruptcy proceeding be dismissed pursuant to Section 1112(b) of the Bankruptcy Code.

## NOTICE

13.     The Debtor contemplates giving notice of the Motion to: (i) all of the creditors of the Debtor; (ii) counsel for GM and the DTF; (iii) the Office of the United States Trustee; and (iv) all parties that have filed notices of appearance in the Debtor's bankruptcy proceeding. Notice of the Motion in this manner comports with Bankruptcy Rules 2002 and 6006.

14.    No prior request for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

15.    For all of the reasons set forth in this Motion, the Debtor respectfully requests that this Court enter an order (a copy of which is annexed hereto as Exhibit B): (i) authorizing the Debtor to assume the Wind-Down Agreement; (ii) authorizing and directing the Debtor to remit the Wind-Down Money to DTF; (iii) dismissing the bankruptcy case, if necessary; and (iv) for such other and further relief as may this Court deems just and proper.

Dated: New York, New York
          November 25, 2009

SILLER WILK LLP
Proposed Attorneys for the Debtor

By:____/s/ Eric J. Snyder_____
          Eric J. Snyder, Esq. (ES-8032)
675 Third Avenue
New York, New York 10017
(212) 421-2233

367498v1

# EXHIBIT D

SILLER WILK, LLP
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. | |

### ORDER AUTHORIZING THE DEBTOR TO: (I) ASSUME AGREEMENT WITH GENERAL MOTORS; (II) DISTRIBUTE PROCEEDS RESULTING FROM ASSUMPTION AND (III) DISMISS THE BANKRUPTCY CASE, IF NECESSARY

Upon the motion (the "Motion") of Ramp Chevrolet, Inc., the debtor herein (the "Debtor"), pursuant to Sections 105(a), 365(a) and 1112(b) of Title 11 (the "Bankruptcy Code") and Bankruptcy Rules 2002 and 6006, for authority to: (i) assume the Wind-Down Agreement (as defined in the Motion), between the Debtor and the General Motors Corporation ("GM"); (ii) remit the Wind-Down Money (as defined in the Motion) to the New York State Department of Taxation & Finance ("DTF"); and (iii) if necessary, to dismiss the Debtor's bankruptcy case; and where, in the Debtor's business judgment, the assumption of the Wind-Down Agreement is in the best interest of the Debtor's estate; and where the Debtor has cured and satisfied any and all of its obligations under the Wind-Down Agreement; and where DTF maintains a security interest in all of the Debtor's assets including the Wind-Down Money; and where the Debtor's senior security creditor, General Motors Acceptance Corp., will not be prejudiced if the Wind-Down Money is remitted to DTF on account of its secured claim; and where DTF has agreed to allow

for the payment of certain administrative expenses from the Wind-Down Money; and sufficient

cause appearing to me therefore; it is hereby

      **ORDERED**, that the Motion, be, and it hereby is, granted in all respects; and it is further

      **ORDERED**, the Wind-Down Agreement, be and it hereby is, assumed under Section

365(a) of the Bankruptcy Code; and it is further

      **ORDERED**, that GM is directed to remit the Wind-Down Money to the Debtor, pursuant

to the terms of the Wind-Down Agreement:; and it further

      **ORDERED**, that, upon receipt of the Wind-Down Money, the Debtor shall remit the

Wind-Down Money to DTF, after the following sums ~~are~~ *is* paid: ~~(i)~~ the sum of $14,000 to 1581

Holding, LLC, by its attorney Vincent Lentini, Esq.; ~~and (ii) the post-petition fees owed to~~

~~counsel for the Debtor, not to exceed $25,000~~ ; and it is further

      **ORDERED**, that this Bankruptcy Court shall retain jurisdiction regarding the terms of

this Order and payment of the Wind Down Money; and it is further

      **ORDERED**, that the Motion, to the extent it seeks the dismissal of the bankruptcy case,

is adjourned until March 17, 2010 at 1:30 p.m.

Dated: Central Islip, New York
     February 3, 2010

                        */s/ Robert E. Grossman*
                        HONORABLE ROBERT E. GROSSMAN
                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT E

**Eric Snyder**

| | |
|---|---|
| **From:** | John Gentile [JGentile@DealerLaw.com] |
| **Sent:** | Monday, March 15, 2010 2:38 PM |
| **To:** | 'Robert H. Patterson' |
| **Cc:** | Eric Snyder |
| **Subject:** | Ramp Wind Down |

Dear Bob, Please let me know where we are on payment of the balance of the wind down money. I am concerned not only for Ramp, but for all clients as none of my Wind Down dealers have gotten the final installment. With respect to Ramp, I have a bankruptcy hearing on Wednesday and need to tell the court some status. Thanks, John.

JOHN G. GENTILE
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road - Suite 400
Mineola, NY 11501
516-873-3000 - fax 516-873-9032

JGentile@DealerLaw.com

Note: The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, please notify Bellavia Gentile & Associates LLP immediately at (516) 873-3000 or respond to the sender via e-mail and destroy all copies of this message and any attachments. Unintended transmission shall not constitute waiver of the attorney/client or any other privilege.

## Eric Snyder

**From:**    John Gentile [JGentile@DealerLaw.com]
**Sent:**    Monday, May 24, 2010 4:56 PM
**To:**    Eric Snyder
**Subject:** RE: John? You are there?

Eric, sorry about that. I am swamped with these arbitrations. I am also a bit under the weather. I have two calls into GM for a response on the release of the wind down money. I will send another e-mail now. I am leaving the office but will be in tomorrow. Thanks,John.

**From:** Eric Snyder [mailto:esnyder@sillerwilk.com]
**Sent:** Monday, May 24, 2010 3:55 PM
**To:** John Gentile
**Subject:** John? You are there?

Eric J. Snyder
Siller Wilk LLP
675 Third Avenue
New York, New York 10017
Phone: (212) 421-2233
Direct Dial: (212) 981-2328
Facsimile: (212) 752-6380

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of
(1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed within.

NOTES: The contents of this electronic mail message and any attachments are confidential, possibly privileged, and intended for the addressee(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message and any attachments, and any Siller Wilk LLP employee may do so only in accordance with Siller Wilk's email and Internet use policies and procedures from time to time in effect. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone or retaining a copy. Siller Wilk LLP reserves the right to monitor and review the content of all e-mail communications sent to and received by its employees.

Internet communications cannot be guaranteed to be secure or error-free as information could arrive late or contain viruses or be intercepted, corrupted, or lost. The sender, therefore, does not accept liability for any errors or omissions in the content of this message which arise as a result of Internet transmission. If verification is required please request a hard-copy version.

**Eric Snyder**

| | |
|---|---|
| **From:** | John Gentile [JGentile@DealerLaw.com] |
| **Sent:** | Tuesday, June 22, 2010 3:40 PM |
| **To:** | 'Robert H. Patterson' |
| **Cc:** | Eric Snyder |
| **Subject:** | Ramp |

Dear Bob, as you know I have been waiting for a substantive response from GM concerning payment of the balance of the Wind Down money. Unfortunately, GM has not provided same. The delay in payment has prejudiced my client's ability to complete its bankruptcy and pay off its Sales Tax debt. Bankruptcy counsel for Ramp has indicated that if we are unable to confirm that payment will be made by next week, he shall be compelled to seek immediate relief in the bankruptcy court to compel GM to make the payment plus such other relief as may be ordered by the Court. I hope that GM avails itself of this final opportunity to comply with its obligations pursuant to the Wind Down Agreement. Thank you, John Gentile .

JOHN G. GENTILE
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road - Suite 400
Mineola, NY 11501
516-873-3000 - fax 516-873-9032

JGentile@DealerLaw.com

Note: The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, please notify Bellavia Gentile & Associates LLP immediately at (516) 873-3000 or respond to the sender via e-mail and destroy all copies of this message and any attachments. Unintended transmission shall not constitute waiver of the attorney/client or any other privilege.

# EXHIBIT F

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT - EASTERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor:** Ramp Chevrolet, LLC

**Case Number:** 09-77513 (reg)

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
General Motors LLC

**Name and address where notices should be sent:**
John R. Skelton, Esq.
Bingham McCutchen LLP
One Federal Street
Boston, Ma. 02110

**Telephone number:** 617.951.8789

**Name and address where payment should be sent** (if different from above):

**Telephone number:**

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

**Filed on:** _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**   *See Addendum*

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. See Addendum (to the extent permitted by law).

**2. Basis for Claim:** *See Addendum*
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:**   2107

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☒ Other
**Describe:** See Addendum

**Value of Property:** $ *See Addendum*   **Annual Interest Rate** _____ %

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**If any:** $ _____   **Basis for perfection:** *See Addendum*

**Amount of Secured Claim:** $ *See Addendum*   **Amount Unsecured:** $ -0-

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(_____).

**Amount entitled to priority:**

$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|
| | *Maynard L. Timm (by OKS)*   Maynard L. Timm, Esq., Legal Staff   General Motors LLC | |

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

## ADDENDUM TO PROOF OF CLAIM OF
## GENERAL MOTORS LLC

### Background

1.     On October 5, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), which Chapter 11 proceeding is now pending in the United States Bankruptcy Court for the Eastern District of New York, as Case No. 09-77513 (reg) (the "Ramp Bankruptcy Proceeding").

2.     By order dated June 23, 2010, the Bankruptcy Court established July 26, 2010 as the bar date for creditors to file proofs of claim.

### GM Asserts a Secured Claim of $699,096.01 Based on its Set Off and Recoupment Rights

3.     General Motors LLC ("GM") asserts a secured claim of at least $699,096.01. GM's Claim is secured, in full, by its set off and recoupment rights as set forth in (i) the Dealer Sales and Service Agreements between Ramp Chevrolet, LLC (the "Debtor") and GM, pursuant to which the Debtor was authorized to operate a Chevrolet, a Chevrolet Medium Duty Truck and a Hummer dealership (collectively, the "Dealership") at 1395 Route 119, Port Jefferson, New York (the "Dealership Premises"); and as described more fully below, (ii) the "Wind-Down Agreements" executed by the Debtor and approved by the Bankruptcy as part of the "Old GM" bankruptcy proceeding.

4.     As set forth below, pursuant to the Wind-Down Agreements the Debtor's Wind-Down Agreement payment totals $1,304,613 (the "Wind-Down Payment"). GM's claim is secured by its right of set off against the Wind-Down Payment.

### GM's Bankruptcy and The Execution and Approval of the Wind-Down Agreements

5.     On June 1, 2009, General Motors Corporation ("Old GM") filed a petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

A/73444965.2

Southern District of New York, Chapter 11 Case No. 09-50026 (REG) (the "GM Bankruptcy"). That case is still pending.

6.      As part of the GM Bankruptcy, the GM Bankruptcy Court approved the sale of substantially all of Old GM's assets to "New GM". *See generally In re General Motors Corp.*, 407 B.R. 463, (Bankr. S.D.N.Y. 2009).

7.      As part of the sale process, Old GM identified the poorly performing dealers that would no longer be retained. Although the bankruptcy proceedings would have allowed Old GM to reject these dealers immediately, Old GM instead issued the so-called "Wind-Down Agreements" to the discontinued dealers, giving them more than a year to wind down operations. If executed and agreed to by the dealers, those Wind-Down Agreements were then assumed by New GM. The Debtor was among those dealers who executed Wind-Down Agreements and whose agreements were assumed by New GM.

8.      More specifically, the Wind-Down Agreements allowed the Dealers to continue selling and servicing GM vehicles under certain modified conditions until October 31, 2010 and, relevant here, provided monetary payments to the Dealers to wind down their operations. The entire sale process, including the Wind-Down Agreements, were approved by the Bankruptcy Court.

9.      Because the Debtor operated three dealerships (Chevrolet, Chevrolet Medium Duty Truck and Hummer), the Debtor executed and the GM Bankruptcy Court approved three Wind-Down Agreements. The Wind-Down Agreements are attached hereto as Exhibits A-C. Each provided a Wind-Down payment to be made to the Debtor. Pursuant to the Wind-Down Agreements, for the Debtor's Chevrolet operations, GM agreed to make a wind down payment to the Debtor totaling $1,261,613. *See* Exhibit A, §3(a). The payment for Chevrolet Medium Duty Truck was $19,000, Exhibit B, §3(a), and the payment for Hummer was $24,000. *See* Exhibit C, §3(a). The total Wind-Down Payment was $1,304,613.

2

A/73444965.2

**IN RE RAMP CHEVROLET, LLC**
**CHAPTER 11 CASE NO. 09-77513 (REG)**

10.    Pursuant to the terms of the Wind-Down Agreements, the Wind-Down Payments are to be made in two (2) installments, 25% or $326,153.25 upon, among other things, execution of the Wind-Down Agreements and the approval by the GM Bankruptcy Court of the 363 Sale; and the remaining 75% or $978,459.80, upon the satisfaction by the Debtor of certain conditions. *See* Wind-Down Agreements, Exs. A-C, ¶3(a).

11.    As set forth in the Wind-Down Agreements, GM's obligation to pay and the Debtor's right to receive the Wind-Down Payment is subject to certain specific terms. Indeed, by order dated February 3, 2010, this Court approved the Debtor's assumption of the Wind-Down Agreements, and in doing so recognized that any payment by GM to the Debtor was to be "pursuant to" the specific terms set forth in the Wind-Down Agreements.

**The Wind-Down Agreements Provide That The Debtor's Wind-Down Payment is Subject to GM's Recoupment and Set off Rights and the Reconciliation of the Open Account.**

12.    Pursuant to the Dealer Agreement and other applicable GM policies and procedures, the financial dealings between GM and its dealers, including the Debtor, related to the operations of the Dealership (other than for the purchase of new vehicle inventory but including the payment of warranty reimbursements, sales and other incentives and rebates, etc.) is handled through a series of debits and credits posted to what is commonly referred to as the dealer's Open Account (the "Open Account"). The Open Account is normally reconciled or settled on a weekly basis, and if there is a credit balance, such credit balance is paid by GM to the Dealer and, if there is a debit balance, such debit balance is to be paid by the Dealer to GM. Further, pursuant to the Dealer Agreement, "all monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries."

13.    The terms and conditions set forth in the Wind Down Agreements that must be satisfied before GM is obligated to make the Final Payment include:

(i)    Payment is to be made by crediting the Dealer's Open Account in accordance with GM's standard practices;

3

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

    (ii)    Dealer must have sold all of its new motor vehicle inventory;

    (iii)    Dealer must be in compliance with all "applicable bulk transfer, sales tax transfer or similar laws . . .;"

    (iv)    Dealer must deliver to GM a certificate from any applicable taxing authority that the Dealer has paid all sales, use and other taxes or provide other evidence reasonably satisfactory to GM that it will have no liability or obligation to pay any such taxes that remain unpaid;

    (v)    Dealer's removal of all dealer-owned signs (freestanding or not) from the Dealership Premises, and

    (vi)    Dealer's execution and submission of a fully executed Supplemental Wind-Down Agreement.

    14.    Paragraph 3(c) of the Wind-Down Agreements also specifically provides that in addition to any other rights of set off under the Dealer Agreements, payment of all or any part of the Wind-Down Payment (i) may be reduced by any amount owed by the Dealer to GM or its affiliates; or (ii) it may be delayed if GM has a reasonable basis to believe that there is a competing claim.

**Balance Due Based on Open Account Reconciliation is $699,096.01**

    15.    Attached hereto as Exhibit D is a summary of the weekly Open Account statements provided to the Debtor which show the amounts due and owing to GM. The actual weekly statements are available upon request. The Open Account statements show that as of the statement dated July 16, 2010, the Debtor owes to GM a total of $699,096.01. Pursuant to the terms of the Wind-Down Agreements, GM has the right to set off this amount, plus any additional charges that may be posted to the Open Account pursuant to GM's standard process, from any Wind-Down Payment due from GM to the Debtor. The Wind-Down Payment to be made by GM shall be net of any monies owed by the Debtor to GM (or its affiliates).

**Reservation of Rights**

    16.    Pursuant to the order entered in the GM Bankruptcy, the GM Bankruptcy Court retained exclusive jurisdiction to determine any disputes regarding, among other things, the terms, conditions or enforceability of the Wind-Down Agreements. GM specifically reserves all

A/73444965.2

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

rights to have any dispute between GM and the Debtor concerning the parties' respective rights under the Wind-Down Agreements to be determined as part of the GM Bankruptcy.

17. This Claim is hereby filed to preserve GM's rights with regard to any amounts which are or may be due under the Dealer Agreements or the Wind-Down Agreements.

18. GM reserves the right to amend this Claim from time to time to restate amounts contained in this Claim as it becomes further liquidated or for other lawful purposes, including, without limitation, to file additional proofs of claim for additional claims which may arise based on the respective rights and obligations arising under the Agreements referred to herein, as well as under any other or applicable agreements or events and circumstances described herein. GM reserves its right to claim all amounts due in respect of any post-petition interest, default interest, all rights of and to indemnification, premiums, collection costs, pre- and post-petition fees, costs and expenses, including, without limitation, attorneys' fees, costs and expenses, in amounts as yet undetermined, pursuant to the Agreement and to the extent allowed by applicable law.

19. This Claim is filed under the compulsion of the bar date and is filed to protect GM from a potential forfeiture of claims or rights by reason of said bar date. Filing of this Claim is not and shall not be deemed or construed as: (a) a waiver or release of GM's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by GM to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving GM; (c) a waiver or release of GM's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by GM to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding

5

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

related hereto, pursuant to 28 U.S.C. §157(e) or otherwise; (e) a waiver or release of GM's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving GM; (g) an election of remedies; or (h) a waiver or release of any right of setoff or recoupment that GM may hold. Furthermore, GM reserves the right to attach or bring forth additional documents supporting its claims and additional documents that may become available after further investigation or discovery. The filing of this Claim shall not be deemed a waiver of the GM's right to assert that any or all of the amounts owed to it, if any, are entitled to administrative priority status.

20.    This Claim is filed in addition to and not in lieu of any other claim filed by any division of the subject creditor or by any of its affiliates.

A/73444965.2

# EXHIBIT G

# BINGHAM

John R. Skelton
Direct Phone: 617.951.8789
Direct Fax:    (617) 951-8736
john.skelton@bingham.com

August 4, 2010

<u>Via Email and</u>
<u>First Class Mail</u>

Eric J. Snyder, Esq.
Siller Wilk LLP
675 Third Avenue
New York, NY 10017

RE:    <u>GM/RAMP CHEVROLET</u>

Dear Eric:

I write to follow up on our conversation last week regarding the Proof of Claim filed by GM.

First, attached are the individual weekly open account statements that are summarized in Exhibit D to the GM Proof of Claim. These are the statements that were sent to the dealer each week. Even after Ramp shut down its operations, I understand that hard copies were mailed to the post office box designated by the Debtor. Thus, the Debtor had regular access to these statements on an ongoing basis and was well aware (or should have been well aware) of the ongoing charges and Open Account reconciliation.

Second, as you will see from the Open Account statements, and as I mentioned during our call, there are 3 major charges that make up the bulk of the Open Account offset. The first two charges ($225,000 each) relate to Open Account charges for the dealership's unpaid rent for the months of May-September 2009. There were 2 parcels each with a $45,000 monthly lease payment. As I explained, there was a prime lease/sublease arrangement with GM's subsidiary Argonaut Holdings, Inc. ("AHI, Inc."). AHI leased the property from Mr. Rampone and, pursuant to that lease, paid to Mr. Rampone $45,000 per month. There was then a sublease by AHI to the dealership which obligated the Debtor to pay AHI the same $45,000 per month. Although GM faithfully paid Mr. Rampone, the Debtor did not make the required payments to AHI on the 2 subleases for the rent due for May-September 2009. Pursuant to the GM Dealer Agreement, any monies due a dealer are net of any monies that dealer owes to GM or any of its affiliates and subsidiaries. That is why the AHI unpaid rent charges were posted to the Open Account. GM subsequently notified the Debtor that it was terminating the lease and sublease arrangement.

The third major item relates to a $292,524.63 charge back based on an audit completed in May 2009. As you know, a charge back results when GM determines that a dealer improperly requested and received warranty

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110-1726

T 617.951.8000
F 617.951.8736
bingham.com

A/73454880.2

Eric J. Snyder, Esq.
August 4, 2010
Page 2

reimbursements, sales incentives or other payments. Of course, GM notified Mr.
Rampone of the audit results at the conclusion of the audit and again in
June in connection with the GM bankruptcy. Thus, the Debtor knew the results of
the audit and the amount of the pending charge back when it chose to go forward
with the wind down process and execute the Wind-Down Agreements. The
Debtor also knew that the audit charge back would be posted to its Open Account
and, thus, reduce the ultimate wind down payment. Of course, the Debtor also
knew that if it did not pay the monthly rent to AHI, those charges would also be
posted to the Open Account. Mr. Rampone obviously concluded that even with a
significant audit charge back (and the charges from any unpaid rent), the prospect
of a deferred termination and the wind down payment offered as part of the wind
down process was a significantly better option than, for example, pursuing a
challenge to the audit and a rejection damages claim as part of the GM bankruptcy
resulting from what would have been the immediate termination of Ramp's
Dealer Agreements.

Also, please keep in mind that the Wind Down Agreements which were
approved by the GM bankruptcy court as part of the §363 sale included, among
other things, a release of any claims or disputes relating to this audit. The release
included in the Wind Down Agreement (see ¶5) specifically includes any claims
related to SFE payments ($271,000 of the total audit chargeback relates to SFE
payments) as well as the procedure for warranty and sales incentives post wind
down. Because the Debtor has assumed the Wind-Down Agreements, and once
assumed, is bound by all of the provisions, the Debtor cannot assert any claims or
challenges now to pre-GM bankruptcy payments, including any claims relating to
the SFE program. Also, keep in mind that pursuant to ¶5(d) of the Wind-Down
Agreements, the Debtor agreed to indemnify and hold GM harmless for any costs
and expenses incurred defending or litigation released claims.

We also briefly discussed the provision of the New York Dealer Statute
relating to the timing of warranty and sales incentive charge backs. I know that
you deferred to John Gentile on that issue. Here, $271,000 of the $292,000
charge back relates to the Debtor's disqualification for certain SFE payments
because of "CSI interference". In short, the Debtor's employees fraudulently
manipulated the CSI survey process so that the actual retail customers were not
reported to GM but rather the Debtor reported fictitious customer names so that
the CSI surveys were directed, for example, to dealership employees. This is not
a situation where the charge back is because a form was filled out incompletely or
some minor paperwork was missing. Instead, the charge back is the result of
intentional misconduct by the Debtor, conduct that is not protected by the one
year provision in the New York Dealer Statute. Thus, Mr. Gentile's assertion that
this charge back is somehow time barred by the New York Dealer Statute is not
accurate, factually or legally. Most recently, GM has gone back to evaluate

Eric J. Snyder, Esq.
August 4, 2010
Page 3

whether any of the non SFE sales incentive payments would fall outside of the
one-year window. GM determined that if the one-year limit was applied to the
portion of the charge back relating to sales incentives, a total of 7 VINs ($3,500)
would fall outside the one year window. Depending on the Debtor's position
concerning the entire audit process, we can discuss reducing the total audit charge
back by $3500 so as to eliminate any issue concerning the New York Dealer
Statute.

When we spoke, you also stated, among other things, that the Debtor had
taken all steps set forth in ¶3(b) of the Wind Down Agreements to be eligible to
receive the final wind down payment, including (i) notifying GM of an early
termination; and (ii) providing to GM a letter reflecting that GM would have no
liability for any of the unpaid sales taxes. Please provide to me copies of
whatever documentation the Debtor submitted to GM (or that it currently has)
reflecting that it has complied with all of the preconditions set forth in the Wind-
Down Agreements to payment.

You also raised §553 of the Bankruptcy Code. Section 553 simply
confirms the applicability of set off rights in relevant non-bankruptcy law. Here,
that is, among other things, the Dealer Agreements and the Wind-Down
Agreements. And, although your assertion concerning the claim transfer
provisions of § 553 was not clear, here all of the rights and obligations of "Old
GM," as modified by the Wind Down Agreements, vis a vis the Debtor, were
assigned to "New GM" as part of the GM bankruptcy in light of the Debtor's
execution of the Wind Down Agreements. More significantly, if the Debtor
contends that New GM is bound by the terms of the Wind Down Agreements to
make the wind down payment (pursuant to the terms of the Wind Down
Agreements) then New GM is entitled to enforce all of its rights under the Wind
Down Agreements (and the Dealer Agreements), including most significantly, the
right of set off.

Finally, you indicated that you would review the information included in
GM's Proof of Claim as well as the terms and conditions of the Wind-Down
Agreements and let me know what position, if any, the Debtor was going to take
going forward. To the extent that the Debtor complies with and meets all of the
explicit pre-conditions to payments as set forth in the Wind Down Agreements,
GM stands ready to make the final Wind-Down Payment. If, however, the Debtor
challenges the validity of the Wind-Down Agreements, GM's right of set off, or
the amount of that set off, there can be no accurate determination or payment of
any "undisputed" amount.

Eric J. Snyder, Esq.
August 4, 2010
Page 4

Please let me know when you are available to discuss.

Very truly yours,

John R. Skelton

JRS/gbo

Bingham McCutchen LLP
bingham.com          A/73454880.2

# EXHIBIT H

AUG-06-2010 12:01        212 416 8672                                      P.02



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO
ATTORNEY GENERAL

LESLIE G. LEACH
EXECUTIVE DEPUTY ATTORNEY GENERAL
DIVISION OF STATE COUNSEL

JUNE DUFFY
ASSISTANT ATTORNEY GENERAL IN CHARGE
LITIGATION BUREAU

WRITER'S TELEPHONE (212) 416-8666

August 6, 2010

Eric J. Snyder
Wilk Auslander LLP
675 Third Avenue
New York, New York 10017

Re:   In re Ramp Chevrolet Inc. - Case No. 09-77513

Dear Eric:

As you know, the New York State Department of Taxation & Finance ("DTF") asserts a claim against the Debtor in the amount of $3,264,225.03 ("DTF Indebtedness"), as of November 30, 2009. I understand, pursuant to certain agreements (the "Wind-Down Agreements") with the General Motors Corporation ("GM"), the Debtor is seeking to terminate its franchise agreements with GM in exchange for cash payments (the "Wind-Down Payments") that the Debtor has agreed to remit to DTF. However, I also understand that, as a condition to receiving The Wind-Down Payments, the Debtor must provide to GM evidence that GM will have no liability or obligation to pay any portion of the DTF Indebtedness owed by the Debtor to DTF that remains unpaid.

Since the Wind-Down Payments are less than DTF Indebtedness, the Debtor will still owe DTF a portion of the DTF Indebtedness after the application of the Wind-Down Payments. Nevertheless, DTF will not assert a claim against GM for any portion of the DTF Indebtedness and DTF further agrees that GM will have no liability or obligation to pay any portion of the DTF Indebtedness owed by the Debtor to DTF that remains unpaid.

Respectfully submitted,

Neal S. Mann
Assistant Attorney General

TOTAL P.02

# EXHIBIT I

## Eric Snyder

| | |
|---|---|
| **From:** | Skelton, John R. [john.skelton@bingham.com] |
| **Sent:** | Monday, August 16, 2010 11:17 AM |
| **To:** | Eric Snyder |
| **Cc:** | Skelton, John R. |
| **Subject:** | GM/Ramp |
| **Attachments:** | General Release for New York Dept of Tax and Finance (00934468-3).DOCX; Scan_Attachment-001.pdf; Scan_Attachment-002.pdf; Scan_Attachment-003.pdf |

Eric

As a further follow up to our recent conversations concerning the Ramp Chevrolet bankruptcy, I attach several documents for your review and consideration.

First, on the issue of the New York State Department of Taxation and Finance ("DTF") release of claims against GM for the Ramp Chevrolet unpaid sales and use tax, attached is a copy of a notice dated May 24, 2010 sent to GM. I was not previously aware of the fact that the DTF had issued a formal notice of determination. Although the letter from the AG's office states that the DTF shall not look to GM for any liability relating to unpaid taxes by Ramp, in order to avoid any bureaucratic issues, GM will want the DTF to execute a formal release that specifically identifies this notice of determination. GM needs to submit in response to this notice of determination by August 22, 2010. As you know, the position taken by the AG's office as part of the Ramp Chevrolet bankruptcy proceeding may not be easily translated to the folks at the DTF responsbile for prosecuting this particular notice of determination. I have attached a form of release to be executed by the DTF.

As set forth in GM's objection to the disclosure statement and plan, there are at least two other preconditions to the Wind-Down Payment that have not been satisfied (assignment of customer lists and verification of sign/trademark removal). Attached is a copy of a December 16, 2009 email from Bob Patterson to John Gentile concerning the submission by Ramp of the customer list. As stated in GM's objection, it has no record of receiving the customer lists. Can you follow up with John Gentile to get a copy of whatever documents were submitted by Ramp transferring and assigning its customer lists (or verification that such information was in fact submitted and to whom).

The second issue is verification that the dealership has removed all of the dealer-owned signs, etc. displaying any GM trademarks. Because the property is controlled by Mr. Rampone, this should not be an issue.

Finally, I attach a copy of GM's October 14, 2009 letter to Ramp Chevrolet acknowledging the September 23, 2009 notice by the Debtor of its early termination under the Wind-Down Agreements. GM's October 14, 2009 letter spells out, very clearly, all of the terms and conditions that must be satisfied before GM would make the final Wind-Down Payment. Note the timing. The Debtor's claim for a final Wind-Down Payment actually occurred pre-petition.

Finally, although GM does not beleive that there is a good faith factual or legal basis to challenge its open account reconciliation in connection with calculating the final wind down payment, please let me know as soon as you determine what, if any, complaint or other request the Debtor intends to file. I assume that it will be a complaint for turnover under Section 542 and trust that you will provide proper notice and ensure that GM has an adequate opportunity to respond.

John

John R. Skelton
T 617.951.8789
F 617.345.5041
john.skelton@bingham.com

9/23/2010

# EXHIBIT J

# BINGHAM

John R. Skelton
Direct Phone: 617.951.8789
Direct Fax:    (617) 951-8736
john.skelton@bingham.com

August 20, 2010

**Via Email and
First Class Mail**

Eric J. Snyder, Esq.
Wilk Auslander LLP
675 Third Avenue
New York, NY 10017

> RE:    IN RE RAMP CHEVROLET
> UNITED STATES BANKRUPTCY COURT FOR THE EASTERN
> DISTRICT OF NEW YORK. CASE NO. 09-77513

Dear Eric:

I write to address the current status of the Debtor's Wind-Down Agreements and its request for a Final Wind-Down Payment as defined in the Wind-Down Agreements.

First, GM acknowledges the Debtor's submission on Wednesday, August 18, 2010, through your office, of (i) a customer list; and (ii) written confirmation that the GM signs and trademarks have been removed from the dealership facilities. GM hereby confirms that submission of the customer list and verification of the trademark/sign removal information satisfies those particular Final Wind-Down Payment preconditions.

Second, as I previously indicated, because the New York Department of Taxation and Finance (the "DTF") has instituted a specific proceeding against GM (Assessment No. L-033979494-2), GM will require execution by the DTF of a release specifically identifying that claim. A copy of that release was previously provided to you. That precondition has not been satisfied.

Third, the Debtor's Amended Disclosure Statement you sent to me yesterday states that the Debtor intends to challenge GM's reduction of the Final Wind-Down Payment Amount by the monies owed by Ramp to GM and its affiliates and that the Debtor will be filing a motion challenging such action. Accordingly, a Final Wind-Down Payment amount cannot be determined and pursuant to the terms of the Wind-Down Agreements GM is not obligated to make the final payment.

Not only does § 3(c) specifically authorize GM to reduce the Wind-Down Payment amount by any amount owed to GM or its affiliates, but it also provides that GM may delay payment of "all or any part of the Wind-Down Payment amount" until any and all competing claims have been "fully and finally

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110-1726

T +1.617.951.8000
F +1.617.951.8736
bingham.com

A/73469691.1

Eric J. Snyder, Esq.
August 20, 2010
Page 2

resolved." A challenge by Ramp, presumably on behalf of the New York DTF as
the intended recipient of any additional wind-down monies, to GM's calculation
of the Final Wind-Down Payment amount and its right of set off, effectively
constitutes a competing claim.    A Final Wind-Down Payment cannot be
calculated until any and all claims are fully and finally resolved. The Wind-Down
Agreements also specifically provide that the Wind-Down Payment is to be paid
in two installments, an interim 25% payment, which was made and a final
payment. Ramp's demand that it be paid a second interim payment based on what
it claims is an "undisputed amount" is itself contrary to the express terms of the
Wind-Down Agreements.

Finally, §5 of the Wind-Down Agreements and §2 of the Supplemental
Wind-Down Agreements set forth a release, covenant not to sue and
indemnification provision in favor of GM. Pursuant to those provisions, GM is
entitled to recover from Ramp any losses, damages or costs incurred (including
reasonable attorneys' fees) in connection with enforcing the Wind-Down
Agreements or the Supplemental Wind-Down Agreements.    While GM's
calculation of the final Wind-Down Payment, at least so far, has not included
costs associated with the *Ramp* bankruptcy proceeding, to the extent GM must
litigate the enforceability of its rights under the Wind-Down Agreements, those
costs will further reduce the Final Wind-Down Payment amount.

As indicated earlier, to the extent that the Debtor agrees to the Final Wind-
Down Payment set forth in GM's objection to the Plan and Disclosure Statement
or in its Proof of Claim, GM is prepared to make the payment promptly in
accordance with the terms of the Wind-Down Agreement. Otherwise, the Final
Wind-Down Payment will be delayed pending a final resolution and a further
calculation of GM's indemnity claim.

Very truly yours,

John R. Skelton

John R. Skelton

JRS/gbo

Bingham McCutchen LLP
bingham.com    A/73469691.1