**HEARING DATE AND TIME: October 26, 2010 at 9:45 a.m.**
**OBJECTION DEADLINE: October 19, 2010 at 4:00 p.m.**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio 43215
Telephone: (614) 469-3939
Facsimile: (614) 461-4198
Jeffrey J. Jones (*admitted pro hac*)

JONES, WALKER, WAECHTER,
  POITEVENT, CARRERE & DENEGRE, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8518
Facsimile: (504) 589-8518
David G. Radlauer (*admitted pro hac*)
Thomas A. Casey, Jr. (*admitted pro hac*)

Attorneys for General Motors LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                              :
In re                                         :
                                              :        Chapter 11
                                              :
MOTORS LIQUIDATION COMPANY, et al.,           :        Case No. 09-50026 (REG)
     f/k/a General Motors Corp., et al.       :
                                              :
                        Debtors.              :        (Jointly Administered)
-------------------------------------------------------------x
```

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF GENERAL
MOTORS LLC TO ENFORCE 363 SALE ORDER AND APPROVED
DEFERRED TERMINATION AGREEMENTS AGAINST ROSE
CHEVROLET, INC., HALLEEN CHEVROLET, INC., ANDY
CHEVROLET COMPANY, AND LESON CHEVROLET COMPANY, INC.**

# TABLE OF CONTENTS

**Page**

Overview ..................................................................................................................................1

Argument ................................................................................................................................6

A.    The Dealers' Jurisdictional Arguments Are Not Well Taken ...............................................6

      1.    The Dealers Cannot Dispute That The Court Retained Exclusive
Jurisdiction To Enforce The Wind-Down Agreements And The 363 Sale
Order .........................................................................................................6

      2.    Numerous Courts, Including The Supreme Court, Have Already Rejected
The Dealers' Argument Regarding Subject Matter Jurisdiction .............................7

      3.    Contrary To The Ohio Dealers' Argument, The Court Has Core
Jurisdiction And Would, In Any Event, Have "Related To" Jurisdiction .............10

      4.    This Court Already Correctly Rejected The Dealers' Claim That The
Dealer Arbitration Altered This Court's Exclusive Jurisdiction ...........................12

      5.    The Fact That Leson Prevailed Does Not Change The Jurisdictional
Analysis .....................................................................................................13

      6.    The Ohio Dealers' Estoppel Argument Has Also Been Adjudicated ...................15

B.    Even If Rose, Halleen And Sims Had Filed In This Court, Their Claims Are
Barred On The Merits ...............................................................................................17

      1.    The FAA Does Not Apply ............................................................................17

      2.    There Is No Other Statutory Basis For Review ...............................................21

      3.    The Ohio Dealers' Constitutional Argument Is Contrary To Supreme
Court Precedent ..........................................................................................21

      4.    Rose, Halleen And Sims Have No Colorable Basis For Asking The Court
To Vacate Or Modify The Arbitration Awards ................................................24

C.    Even If Leson Had Filed In This Court, Leson's Claims Fail On The Merits .................25

      1.    Leson Has Not Met Its Burden Of Proving That The LOI Should Be
Voided .......................................................................................................27

      2.    Even If Leson Had Met Its Burden To Show That The LOI Should Be
Voided, Its "Customary and Usual" Arguments Are Incorrect ...........................29

      3.    Leson's Statements About What The Arbitrator Allegedly Concluded Are
Incorrect ....................................................................................................31

      4.    Leson Is Not Entitled to Discovery ..............................................................32

Relief Requested ...................................................................................................................33

# TABLE OF AUTHORITIES

**Page**

Cases

*Barnett v. Int'l Tennis Corp.*,
263 N.W.2d 908 (Mich. Ct. App. 1978) ...............................................................................28

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004)...............................................................................................12, 13

*Bernhardt v. Polygraphic Co. of Am.*,
350 U.S. 198 (1956)...........................................................................................................18

*Bryson, III v. Gere*,
268 F. Supp. 2d 46 (D.D.C. 2003) .......................................................................................20

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995)....................................................................................................8, 21

*Chic Miller's Chevrolet, Inc. v. Gen. Motors Corp.*,
352 F. Supp. 2d 251 (D. Conn. 2005)..............................................................................26, 27

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986)...........................................................................................................24

*Crowell v. Benson*,
285 U.S. 22 (1932)............................................................................................................22

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)...........................................................................................................18

*EMO Energy Solutions, LLC v. Acre Consultants*,
2008 U.S. Dist. LEXIS 100677 (E.D. La. Nov. 25, 2008) ....................................................20

*Evans v. Dearborn Machinery Movers Co.*,
200 F.2d 125 (6th Cir. 1952) ...............................................................................................8

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
130 S. Ct. 2847 (2010)........................................................................................................18

*Hale Trucks of Md., LLC v. Volvo Trucks N. Am., Inc.*,
224 F. Supp. 2d 1010 (D. Md. 2002) ...................................................................................27

*Haro v. Household Int'l*,
2004 U.S. Dist. LEXIS 25860 (D. Md. Dec. 21, 2004).........................................................7

*Highway Motor Co. v. Int'l Harvester Co.*,
    247 N.W.2d 813 (Mich. 1976) ....................................................................................28

*Idea Nouva, Inc. v. GM Licensing Group, Inc.*,
    617 F.3d 177 (2d Cir. 2010) ......................................................................................20

*In re Allegheny Health, Educ. & Research Found.*,
    383 F.3d 169 (3d Cir. 2004) ......................................................................................11

*In re Eveleth Mines, LLC*,
    312 B.R. 634 (Bankr. D. Minn. 2004) ...................................................................3, 11

*In re Farmland Indus., Inc.*,
    567 F.3d 1010 (8th Cir. 2009) ...................................................................................11

*In re Franklin*,
    802 F.2d 324 (9th Cir. 1986) .....................................................................................10

*In re Gen. Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...............................................................6, 9, 15

*In re Johns-Manville Corp.*,
    7 F.3d 32 (2d Cir. 1993) ............................................................................................12

*In re McLaren*,
    990 F.2d 850 (6th Cir. 1993) .....................................................................................21

*In re Met-L-Wood Corp.*,
    861 F.2d 1012 (7th Cir. 1988) ..............................................................................11, 12

*In re Millenium Seacarriers, Inc.*,
    458 F.3d 92 (2d Cir. 2006) ......................................................................................8, 10

*In re Old Carco LLC*,
    Case No. 1:09-cv-08875, Doc. No. 35 (S.D.N.Y. July 2, 2010) .........................10, 12

*In re Old Carco LLC*,
    Case No. 09-50002, Doc. No. 5372 (Bank. S.D.N.Y. Aug. 31, 2010) .......................9

*In re Petrie Retail, Inc.*,
    304 F.3d 223 (2d Cir. 2002) ....................................................................................8, 10

*In re Skinner*,
    917 F.2d 444 (10th Cir. 1990) ...................................................................................10

*In re Williams*,
    256 B.R. 885 (B.A.P. 8th Cir. 2001) ..........................................................................10

*In re Wolverine Radio Co.*,
    930 F.2d 1132 (6th Cir. 1991) ........................................................................10, 12

*Magnolia v. Conn. Gen. Life Ins. Co.*,
    157 F. Supp. 2d 583 (D. Md. 2001) ......................................................................7

*Maselli v. Portfolio Techs., Inc.*,
    2007 U.S. Dist. LEXIS 17226 (D.N.J. Mar. 12, 2007) ..........................................7

*Megliola v. Maxwell*,
    293 B.R. 443 (N.D. Ill. 2003) ...........................................................................8, 9

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)........................................................................................16, 17

*Okla. City Assocs. v. Wal-Mart Stores, Inc.*,
    923 F.2d 791 (10th Cir. 1991) .........................................................................20, 21

*Preston v. Ferrer*,
    552 U.S. 346 (2008)...........................................................................................18

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)...........................................................................................18

*R.J. O'Brien & Assoc. v. Pipkin*,
    64 F.3d 257 (7th Cir. 1995) ...............................................................................23

*Rainwater v. Nat'l Home Ins. Co.*,
    944 F.2d 190 (4th Cir. 1991) .........................................................................19, 20

*Regions Bank v. J.R. Oil, Co.*,
    387 F.3d 721 (8th Cir. 2004) .............................................................................11

*Rent-A-Center, W., Inc. v. Jackson*,
    130 S. Ct. 2772 (2010)......................................................................................18

*Southland Corp. v. Keating*,
    465 U.S. 1 (1984)..............................................................................................18

*Switchmen's Union of North America v. National Mediation Board*,
    320 U.S. 297 (1943).........................................................................................23

*The Citizens Bank v. Alafabco, Inc.*,
    539 U.S. 52 (2003)............................................................................................18

*Thomas v. Union Carbide Agricultural Products Co.*,
    473 U.S. 568 (1985).................................................................................21, 22, 23

*Travelers Indem. Co. v. Bailey*,
129 S. Ct. 2195 (2009)..........................................................................7, 8, 9, 14, 21

*United Food & Commercial Workers Local 951 v. Mulder*,
31 F.3d 365 (6th Cir. 1994) .......................................................................18, 19

*United States v. Gonzales*,
520 U.S. 1 (1994)........................................................................................13

*United States v. Int'l Bhd. of Teamsters*,
907 F.2d 277 (2d Cir. 1990)............................................................................9

*United States v. LaBonte*,
520 U.S. 751 (1997)..................................................................................12, 13

*Vaden v. Discover Bank*,
129 S. Ct. 1262 (2009).................................................................................18

*Volt Info. Scis. v. Bd. of Trustees*,
489 U.S. 468 (1989)....................................................................................18

*Winget v. JP Morgan Chase Bank, N.A.*,
537 F.3d 565 (6th Cir. 2008) ........................................................................11

## STATUTES

7 U.S.C. § 136..............................................................................................22

9 U.S.C. § 1................................................................................................18

9 U.S.C. § 2............................................................................................17, 18

9 U.S.C. § 9................................................................................................20

11 U.S.C. § 363............................................................................................11

28 U.S.C. § 157............................................................................................10

28 U.S.C. § 1334......................................................................................10, 12

28 U.S.C. § 1441...........................................................................................17

§ 747 of the Consolidated Appropriations Act 2010,
Pub. Law 111-117, 123 Stat. 3034 (2009).........................1-6, 12, 13, 15, 17, 21, 22-26, 30, 31

## OTHER AUTHORITIES

AAA Commercial Rule 48................................................................................19

Cong. Rec. H14477.................................................................................................................21

Fed. R. Civ. P. 9.....................................................................................................................28

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC f/k/a General Motors Company (**"New GM"**) respectfully submits

this reply memorandum:  (i) in support of the Motion of General Motors LLC to Enforce 363

Sale Order and Approved Deferred Termination Agreements Against Rose Chevrolet, Inc.,

Halleen Chevrolet, Inc., Andy Chevrolet Company, and Leson Chevrolet Company, Inc. [Doc.

Nos. 7269, 7272, 7273, 7274, 7277, 7278 & 7279] (the "**Motion**"); (ii) in reply to the Objection

of Leson Chevrolet Company, Inc.'s Memorandum in Opposition [Doc. Nos. 7430 & 7435] to

the Motion (the "**Leson Objection**"); and (iii) in reply to the Objection of Rose Chevrolet, Inc.,

Halleen Chevrolet, Inc. and Andy Chevrolet Company [Doc. Nos. 7442, 7443, 7445, 7446 &

7447] to the Motion (the "**Ohio Dealers' Objection**").

<u>Overview</u>

1.      In the Ohio Dealers' Objection and the Leson Objection, Rose Chevrolet, Inc.

("**Rose**"), Halleen Chevrolet, Inc. ("**Halleen**"), Andy Chevrolet Company d/b/a Sims Chevrolet,

Inc. ("**Sims**" and, collectively with Rose and Halleen, the "**Ohio Dealers**"), and Leson Chevrolet

Company, Inc. ("**Leson**" and, collectively with the Ohio Dealers, the "**Dealers**"), rehash the

same arguments that § 747 of the Consolidated Appropriations Act 2010, Pub. Law 111-117, 123

Stat. 3034 (2009) (the "**Dealer Arbitration Act**," attached as Exhibit C to the Motion) divested

this Court of its subject matter jurisdiction to interpret, apply and enforce its own prior orders.

These tired arguments have been considered and rejected by this Court, the United States District

Court for the Northern District of Ohio (the "**Ohio District Court**"), and the United States

District Court for the Northern District of Iowa (the "**Iowa District Court**").  The Dealers'

respective actions, which seek to void their obligations under their respective Deferred

1

Termination Agreements (the "**Wind-Down Agreements**"), should have been brought, if at all, in this Court.[1]

2.      The Dealers seek to conflate the issue of the appropriate forum for their actions with what they perceive to be the merits of their underlying claims.  They are separate issues.  As set forth in *Rally*, previously decided by this Court on October 4, 2010, the starting point for the jurisdictional analysis is not the Dealer Arbitration Act but the Wind-Down Agreements that the Dealers executed and that the Court approved in its 363 Sale Order, finding them to constitute "valid and binding contracts, enforceable in accordance with their terms."  *See* 363 Sale Order, ¶ 31.

3.      Based upon the provisions in the Wind-Down Agreements and the 363 Sale Order, this Court already determined in *Rally* that it has exclusive jurisdiction over any efforts to avoid the Wind-Down Agreements through either challenges to or attempts to enforce arbitration decisions made under the Dealer Arbitration Act:

> I assume without deciding that Congress could, if it wished, to have taken my exclusive jurisdiction away just as Congress can take away jurisdiction from the lower federal courts on other matters.  But Congress didn't do that.  If we temporarily put aside issues as to the right to judicial review and decisions as to the merits, I assume, without deciding, that a California district court could under its diversity jurisdiction have subject matter jurisdiction over a controversy like this one.  But if it did, it would be foreclosed from exercising its subject matter jurisdiction by reason of the final exclusive jurisdiction order that I entered back in July of 2009.

October 4, 2010 Hearing Transcript (the "**Rally Transcript**") at 56:4-15, attached as Exhibit D to the Motion.

---

[1] All capitalized terms not defined in this Reply shall have the meaning given to them in the Motion.

4.      As this Court noted in *Rally*, there are strong policy reasons for vesting exclusive jurisdiction of post-sale disputes over a sale order in the bankruptcy court that approved the sale, because it is important that the purchasers of assets get what they bargained for and it is also important that they have confidence in their ability to do so before committing their funds to a proposed sale. *Id.* at 49:2-13; *see also In re Eveleth Mines, LLC*, 312 B.R. 634, 645 n.14 (Bankr. D. Minn. 2004), *rev'd on other grounds*, 318 B.R. 682 (B.A.P. 8th Cir. 2004).

5.      While the Ohio Dealers implicitly ask the Court to reverse itself without offering any new reasons to do so, Leson claims that the Court's *Rally* decision does not apply to it. According to Leson, "this Court's 363 Sale Order and Old GM's 'Wind-Down' Agreements do not govern Leson's relationship with New GM," and Leson is therefore now free to "challenge[] the 'wind-down' agreement's applicability under Louisiana law." Leson Objection, ¶¶ 2, 5. Leson's position, however, is at odds with the Court's *Rally* decision. This Court concluded that its exclusive jurisdiction extends to actions to enforce arbitration awards made under the Dealer Arbitration Act. Motion, Ex. D, Rally Transcript at 47:4-20, 53:1-53:11. The Court found that a successful arbitration provides "a defense to enforcement of the wind-down agreements with respect to any areas where the arbitrator ruled in the dealer's favor," but it does not otherwise void the 363 Sale Order or the Wind-Down Agreements in their entirety. *Id.* at 51:1-3. Such claimed "defenses"—and the resolution of them—belong in this Court precisely because their outcome determines *whether or not* the dealer has to comply with the Wind-Down Agreements and the 363 Sale Order. Indeed, Leson's argument is premised on its view that its Wind-Down Agreement is not valid. Thus, Leson's open attack on the enforceability of the Wind-Down Agreement clearly belongs in this Court. Leson cannot seek to "invalidate" the Wind-Down Agreement and the Court's 363 Sale Order in another forum.

6.        Recently, the Iowa District Court concluded independently that this Court has core subject matter jurisdiction over an action brought by another dealer allegedly seeking to enforce an arbitration award.  *Thys Chevrolet, Inc. v. General Motors LLC*, No. 10-CV-46-LRR, Doc. No. 36, Order (the "***Thys* Order**"), at p. 17 ("Because Plaintiffs' claims appear contrary to the Wind-Down Agreement and the Bankruptcy Court's Sale Order approving such agreements, they certainly fall within the Bankruptcy Court's reservation of jurisdiction to enforce and implement its Sale Order.").  A true and correct copy of the *Thys* Order is attached as Exhibit A.

7.        While the Dealers claim that the Dealer Arbitration Act altered this Court's exclusive jurisdiction, they fail to point to any language in the Dealer Arbitration Act that supports their position.  Instead, they rely on reasons that purportedly motivated Congress to pass the Dealer Arbitration Act.  But the Dealers cannot rewrite the law to include provisions not there by making claims about what motivated a specific Congressperson to support it.  The statute is straightforward on this point, and its plain language governs here.  So, too, does the Court's 363 Sale Order and the Wind-Down Agreements, absent applicability of the limited defenses to certain provisions of the Wind-Down Agreements that Congress provided to dealers that were successful in their arbitrations, assuming they otherwise qualify to assert such defenses.  Thus, the only appropriate forum for the Dealers' Actions is this Court.  The Court should accordingly enjoin the Dealers from pursuing the claims asserted in the Actions and order the Dealers to dismiss the Actions.

8.        In any court, the claims asserted by the Dealers in the Actions are without merit in any event.  As in *Rally*, the Ohio Dealers, who were *unsuccessful* in their arbitrations, have no right to judicial review of their arbitration decisions.  The Dealer Arbitration Act does not create judicial review for arbitration awards.  Nor does the Federal Arbitration Act (the "**FAA**")

provide an avenue for relief, as New GM did not agree to arbitrate.  Indeed, in denying the Ohio

Dealers' request for an injunction enjoining New GM from even seeking relief from this Court,

the Ohio District Court recently ruled that it, too, had "grave doubts as to its jurisdiction to hear"

the Ohio Actions because the FAA does not apply and the Dealer Arbitration Act does not

otherwise create a right of judicial review:

> The FAA encompasses agreements among parties to arbitrate.
> This arbitration was not a result of an agreement among parties,
> rather it was compelled by Congress.  Therefore the FAA is likely
> not a jurisdictional basis for this court to confer subject matter
> jurisdiction. Similarly, the DAA [Dealer Arbitration Act] is likely
> not a basis either, as it fails to authorize or suggest a right to
> judicial review, but instead appears to indicate a desire by
> Congress to avoid the courts, while providing a limited remedy to
> covered dealerships. Petitioners alternatively claim an implied
> right to judicial review based on New GM's consent to arbitrate.
> This argument too is not well taken, as New GM provided in its
> Answering Statement it was not waiving any objections to the
> proceedings or the AAA's commercial arbitration rules.

*Halleen Chevrolet, Inc. v. General Motors LLC*, No. 1:10-cv-1:10-cv-02097, Doc. No. 17, Order

(the "**Ohio Order**"), at p. 8.  A true and correct copy of the Ohio Order is attached as Exhibit B.[2]

9.      While Leson prevailed in its arbitration, New GM provided, and Leson accepted,

executed and returned to New GM, the letter of intent (the "**LOI**").  Motion, Ex. P, LOI.  Thus,

New GM complied with its obligations under the Dealer Arbitration Act.  *See* Motion, Ex. C,

§ 747(e).  However, by Leson's own admission, Leson has not satisfied the terms of the LOI,

even though New GM has granted multiple extensions of time for it to do so.  Unless Leson

complies with the LOI by October 31, 2010, it will expire by its terms, and Leson will be

governed by the Wind-Down Agreement.  Try as it may, Leson cannot escape the Wind-Down

---

[2] The Ohio Order was entered in all three Ohio Actions, which were all assigned to Chief Judge Solomon
Oliver, Jr.

Agreement and the Court's 363 Sale Order by asking New GM to provide more than the Dealer

Arbitration Act requires or by refusing to do what Leson already agreed to do.

<u>Argument</u>

**A.    <u>The Dealers' Jurisdictional Arguments Are Not Well Taken.</u>**

**1.    The Dealers Cannot Dispute That The Court Retained Exclusive Jurisdiction To Enforce The Wind-Down Agreements And The 363 Sale Order.**

10.    As set forth in prior filings, New GM purchased substantially all of the assets of

General Motors Corporation n/k/a Motors Liquidation Company and certain affiliates ("**Old**

**GM**") "free and clear" of Old GM's liabilities, claims, and encumbrances, except as expressly

assumed under the terms of the 363 Sale Order and the Amended and Restated Master Sale and

Purchase Agreement, dated as of June 26, 2009 (the "**MSPA**").  *See* 363 Sale Order, ¶¶ AA, BB.

The Court found that the purchaser would not have entered into the MSPA without the free and

clear provisions.  *Id.*, ¶ DD; *see also id.*, pp. 22-24; *In re Gen. Motors Corp.*, 407 B.R. 463, 500

(Bankr. S.D.N.Y. 2009) (Gerber, J.), *aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.), *and*

*aff'd*, 403 B.R. 65 (S.D.N.Y 2010) (Sweet, J.).

11.    To help ensure that the purchaser of assets in bankruptcy receives what it

bargained for free and clear of other liabilities or claims, this Court retained exclusive

jurisdiction to enforce and implement the 363 Sale Order, the MSPA, and the Dealers' Wind-

Down Agreements, which the Dealers signed.  363 Sale Order, ¶ 71.  Similarly, the MSPA

provides for exclusive jurisdiction in this Court, as does the Wind-Down Agreement approved by

the Court.  *See* MSPA, § 9.1; Wind-Down Agreement, § 13.  Thus, to the extent that a dealer

challenges the Wind-Down Agreement, or asserts any claim, defense, or allegation that it is not

required to comply with its obligations under the Wind-Down Agreement, it must assert that claim here and not elsewhere.[3]

12.     To ensure compliance with the 363 Sale Order, the Court also enjoined other parties from pursuing claims against New GM seeking to impose successor or transferee obligations on New GM beyond the "free and clear" protections of the Court's orders.  *See* 363 Sale Order, ¶ 47 (enjoins any such action that does "not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof . . ..").  Section 5(d) of the Wind-Down Agreement likewise contains a covenant not to sue New GM on the claims covered by the terms of the agreement.  *See* Wind-Down Agreement, § 5(d).  Thus, the Court sought to ensure that the protections that it found important in its 363 Sale Order would be interpreted, applied, and enforced in a consistent manner and that all such claims would be enforced exclusively in this Court.  The Dealers cannot seriously dispute that.

## 2.     Numerous Courts, Including The Supreme Court, Have Already Rejected The Dealers' Argument Regarding Subject Matter Jurisdiction.

13.     The Dealers continue to dispute this Court's subject matter jurisdiction to enforce its own orders, but that issue has been authoritatively resolved.  Just last year, the Supreme Court confirmed that a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders."  *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009), *on remand to*, 600 F.3d 135 (2d Cir. 2010).  There, the Supreme Court held that Travelers, not the debtor, was

---

[3] When another court has reserved exclusive jurisdiction over a matter, other courts lack subject matter jurisdiction.  *See Maselli v. Portfolio Techs., Inc.*, 2007 U.S. Dist. LEXIS 17226, at *8-14 (D.N.J. Mar. 12, 2007) (dismissing action when it was in the exclusively retained jurisdiction of the bankruptcy court); *Haro v. Household Int'l*, 2004 U.S. Dist. LEXIS 25860, at *2-3 (D. Md. Dec. 21, 2004) (dismissing for lack of subject matter jurisdiction when other federal court had retained exclusive jurisdiction in a final order); *Magnolia v. Conn. Gen. Life Ins. Co.*, 157 F. Supp. 2d 583, 586-87 (D. Md. 2001) (same).  While it is true that the retention of jurisdiction cannot create jurisdiction where none exists, courts can reserve "exclusive jurisdiction" where they have every right to do so.  *See Maselli*, 2007 U.S. Dist. LEXIS 17226, at *8.

entitled to enforce *twenty-three-year-old* bankruptcy court orders entered in Johns-Manville's

bankruptcy. *See id.* at 2200. As to whether the bankruptcy court had subject matter jurisdiction,

the Supreme Court explained that the "answer here is easy":

> Given the Clarifying Order's correct reading of the 1986 Orders,
> the only question left is whether the Bankruptcy Court had subject-
> matter jurisdiction to enter the Clarifying Order. ***The answer here
> is easy***:  as the Second Circuit recognized, and respondents do not
> dispute, the Bankruptcy Court plainly had jurisdiction to interpret
> and enforce its own prior orders. *See Local Loan Co. v. Hunt*, 292
> U.S. 234, 239, 54 S. Ct. 695, 78 L. Ed. 1230 (1934). What is
> more, when the Bankruptcy Court issued the 1986 Orders it
> explicitly retained jurisdiction to enforce its injunctions.

*Id.* at 2205 (emphasis added); *see also In re Millenium Seacarriers, Inc.*, 458 F.3d 92, 95 (2d Cir.

2006) (holding actions seeking to enforce a bankruptcy sale order are core proceedings), *on

remand to*, 354 B.R. 674 (Bankr. S.D.N.Y. 2006) (Peck, J.); *In re Petrie Retail, Inc.*, 304 F.3d

223, 229-30 (2d Cir. 2002) (same).

14.     Included within that jurisdiction is the power to enjoin parties from prosecuting

proceedings in other courts in violation of bankruptcy court orders. *Travelers*, 129 S. Ct. at 2205

(holding bankruptcy court had power to enjoin 27 lawsuits that violated a prior order); *see also

Evans v. Dearborn Machinery Movers Co.*, 200 F.2d 125, 128 (6th Cir. 1952) (A bankruptcy

court "may enjoin the prosecution of an action in state court where facts are averred and

established showing that such relief is necessary to effectuate its orders."). The Bankruptcy

Court may also enforce its orders by enjoining litigants from proceeding with other federal

actions. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (holding that district court

improperly allowed plaintiffs to proceed with action in violation of bankruptcy court injunction),

*on remand to sub nom. Edwards v. Armstrong World Indus., Inc.*, 56 F.3d 24 (5th Cir. 1995);

*Megliola v. Maxwell*, 293 B.R. 443, 448-49 (N.D. Ill. 2003) (affirming bankruptcy injunction of

district court class action); *accord United States v. Int'l Bhd. of Teamsters*, 907 F.2d 277, 279-81

(2d Cir. 1990) (affirming injunction of actions pending in other federal district courts).

15.    Just this summer, the United States District Court for the Southern District of

New York (the "**New York District Court**") adjudicated the very same issues argued here.  In

the *Chrysler* bankruptcy proceedings, Judge Gonzales enjoined *dealers* from proceeding with

other lawsuits against the *purchaser* of assets in Chrysler's bankruptcy, including lawsuits

pending in other *federal* courts (like the Ohio Actions) and proceedings pending in state motor

vehicle agencies (where Leson commenced its challenge to the Wind-Down Agreement).  *See In*

*re Old Carco LLC*, Case No. 09-50002, Doc. No. 5372, at pp. 3-4 (Bankr. S.D.N.Y. Aug. 31,

2010) (the enjoined Wisconsin actions were pending in federal court and the enjoined Crain and

Spitzer actions were pending in Arkansas and Ohio motor vehicle agencies).  This Court has

previously recognized that many issues presented by the Old GM and Chrysler bankruptcies

share common elements.  *See In re Gen. Motors Corp.*, 407 B.R. at 487.

16.    On appeal of Judge Gonzales' decision, the New York District Court affirmed,

finding that Judge Gonzales had jurisdiction to enter his order enforcing the bankruptcy court's

sale and rejection orders against dealers in circumstances similar to those present here.  Finding

that the dealers' jurisdictional arguments were, once again, "easily dismissed," the Court found:

> The Supreme Court has long-recognized the power of courts to
> interpret and enforce their own prior orders.  *See Travelers Indem.*
> *Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009) (*citing Local Loan Co.*
> *v. Hunt*, 292 U.S. 234, 239 (1934)).  Here, as in *Travelers*
> *Indemnity*, the Bankruptcy Court explicitly retained jurisdiction to
> enforce both the Sale and Rejection Orders . . . . Moreover, it is
> difficult for this Court to imagine how the Bankruptcy Court's
> interpretation of its own prior orders, both of which were integral
> to, and issued in due course of, a chapter 11 proceeding, could be
> interpreted ex post facto as anything other than related to the
> Bankruptcy itself.

-9-

*In re Old Carco LLC*, Case No. 1:09-cv-08875, Doc. No. 35, at 16-17 (S.D.N.Y. July 2, 2010).

Thus, this Court has jurisdiction to enforce the 363 Sale Order and the Wind-Down Agreements

that it approved.

### 3.    Contrary To The Ohio Dealers' Argument, The Court Has Core Jurisdiction And Would, In Any Event, Have "Related To" Jurisdiction.

17.    The Ohio Dealers erroneously argue that the Court lacks core jurisdiction over

this dispute, relying on case law that has little or no relevance to the question before the Court.

*See* Ohio Dealers' Objection, ¶¶ 58-66.  The Ohio Dealers do not address the ample and

controlling case law that holds a bankruptcy court has core subject matter jurisdiction under 28

U.S.C. §§ 157 and 1334 to interpret and enforce its own 363 Sale Order.  *See, e.g.*, *In re*

*Millenium Seacarriers*, 458 F.3d at 95 (holding actions seeking to enforce a bankruptcy sale

order are core proceedings); *In re Petrie Retail*, 304 F.3d at 229-30 (same).  Applying that settled

law, this Court already held that a similar matter—the *Rally* matter—was "a core proceeding."

Motion, Ex. D., Rally Transcript at 46:2-47:3.

18.    Matters regarding the 363 Sale Order are core proceedings pursuant to 28 U.S.C.

§ 157(b)(2)(N) ("Core proceedings include . . . orders approving the sale of property.").  "And,

the enforcement of orders resulting from core proceedings are themselves considered core

proceedings."  *In re Williams*, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001); *see also In re Wolverine*

*Radio Co.*, 930 F.2d 1132, 1145 (6th Cir. 1991) (holding motion to enforce free and clear

provisions under 363 was a core proceeding), *cert. dismissed*, 503 U.S. 978 (1992); *In re*

*Skinner*, 917 F.2d 444, 448 (10th Cir. 1990) ("Civil contempt proceedings arising out of core

matters are themselves core matters."); *In re Franklin*, 802 F.2d 324, 326 (9th Cir. 1986)

("Requests for bankruptcy courts to construe their own orders must be considered to arise under

title 11 if the policies underlying the Code are to be effectively implemented."); *In re Eveleth Mines, LLC*, 312 B.R. at 645 n.14.

19.     Even when the dispute between non-debtors is over the legitimacy of an arbitration award, a bankruptcy court has core jurisdiction where the dispute "require[s] the court to interpret and give effect to its previous sale orders." *In re Allegheny Health, Educ. & Research Found.*, 383 F.3d 169, 175-76 (3d Cir. 2004). There, Tenet assumed in connection with a 363 sale certain of the debtor's liabilities under a collective bargaining agreement. *Id.* at 172. After the 363 sale closed, the union and Tenet disputed whether Tenet had assumed the accrued sick leave obligations in the 363 sale. *Id.* at 172-73. The parties submitted their dispute to arbitration and, after losing, Tenet sought review from the bankruptcy court. *Id.* Because the matter required the bankruptcy court to interpret its 363 sale order, the Third Circuit concluded that the bankruptcy court had *core* subject matter jurisdiction and appropriately determined that Tenet had not assumed the accrued sick leave obligations. *Id.* at 175-76. As other courts have found, a "bankruptcy sale order under 11 U.S.C. § 363, free and clear of all liens, is a judgment that is good as against the world, not merely as against [the] parties to the proceedings." *In re Farmland Indus., Inc.*, 567 F.3d 1010, 1015 n.2 (8th Cir. 2009) (quotation omitted), *on remand to*, 408 B.R. 497 (B.A.P. 8th Cir. 2009).

20.     Moreover, even if the Court's reservation of jurisdiction were not supported by ample precedent, which it clearly is, the fact remains that it is a final order entered by a court of competent jurisdiction entitled to *res judicata* effect. *See, e.g.*, *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 579 (6th Cir. 2008) ("[A] sale order is a final order for res judicata purposes."), *cert. denied*, 129 S. Ct. 2159 (2009); *Regions Bank v. J.R. Oil, Co.*, 387 F.3d 721, 731-32 (8th Cir. 2004) (same); *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988)

(same), *cert. denied*, 490 U.S. 1006 (1989).  The Dealers consented to the entry of the 363 Sale

Order and this Court's jurisdiction by signing and delivering their respective Wind-Down

Agreements.  *See* Motion, Exs. E, F, G & N, §§ 1, 13.  There is no basis to support a challenge to

the 363 Sale Order at this late date. [4]

### 4.    This Court Already Correctly Rejected The Dealers' Claim That The Dealer Arbitration Altered This Court's Exclusive Jurisdiction.

21.    The Ohio Dealers and Leson claim that the Dealer Arbitration Act altered this

Court's jurisdiction, but this Court already properly rejected that argument in *Rally*.  *See* Motion,

Ex. D, Rally Transcript at 56:4-8.  So, too, did the Iowa District Court in *Thys*.  As the Iowa

District Court concluded, "the plain language of the statute makes clear it was not intended to

'reverse' or 'overrule' any wind-down agreements or any of the Bankruptcy Court's orders."  Ex.

A, *Thys* Order, at p. 16 n.5.; *see also* Motion, Ex. D., Rally Transcript at 56:4-8.  Not only are the

Dealers' positions at odds with multiple prior holdings, they are also at odds with the plain

language of the statute.

22.    The starting point in statutory interpretation is the text of the statute.  *See BedRoc*

*Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion), *on remand to*, 368 F.3d

1149 (9th Cir. 2004); *United States v. LaBonte*, 520 U.S. 751, 757 (1997), *modification denied*,

---

[4]    The Ohio Dealers also argue that the Court lacks the broader "related to" jurisdiction granted to the Court under 28 U.S.C. § 1334.  *See* Ohio Dealers' Objection, ¶¶ 67-71.  That is both irrelevant and erroneous.  Core jurisdiction exists and, even if that were not the case, the dispute easily satisfies the much broader "related to" test. *See Wolverine Radio*, 930 F.2d at 1142; *see also In re Old Carco LLC*, Case No. 1:09-cv-08875, Doc. No. 35, at 17 (S.D.N.Y. July 2, 2010).  As the New York District Court found in the Chrysler proceedings, "it is difficult for this Court to imagine how the Bankruptcy Court's interpretation of its own prior orders . . . could be interpreted ex post facto as anything other than related to the Bankruptcy itself."  *Id.*  Citing cases from other Circuits, the Ohio Dealers also argue that the entry of the 363 Sale Order somehow "narrowed" this Court's "related to" jurisdiction.  *See* Ohio Dealers' Objection, ¶¶ 75-79.  That, too, is wrong.  The "narrowing" cases that the Ohio Dealers cite refer to disputes arising after a bankruptcy plan was confirmed, and no plan has been confirmed here.  Moreover, the Second Circuit determines a bankruptcy court's post-confirmation jurisdiction by looking at the terms of the plan:  "The bankruptcy court's post-confirmation jurisdiction therefore is defined by reference to the Plan."  *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993).  Thus, even under the rule advocated by the Ohio Dealers, the Court's retention of jurisdiction would preserve this Court's jurisdiction over the dispute.

521 U.S. 1116; *United States v. Gonzales*, 520 U.S. 1, 4 (1994) ("Our analysis begins, as always,

with the statutory text."), *on remand to*, 122 F.3d 1328 (10th Cir. 1997). The Court should

"assume that in drafting this legislation, Congress said what it meant." *See LaBonte*, 520 U.S. at

757-58; *see also BedRoc*, 541 U.S. at 183. Thus, the "inquiry begins with the statutory text, and

ends there as well if the text is unambiguous." *BedRoc*, 541 U.S. at 183.

23.     Where the plain language is unambiguous, it does not matter what the Dealers

may have wanted the law to say or why others supported the bill; rather, all that matters is what

the law, in fact, says. Here, the statute is straightforward on this front, and the plain language

governs.

**5.     The Fact That Leson Prevailed Does Not Change The Jurisdictional Analysis.**

24.     Leson pins its hopes to avoid the terms of the Wind-Down Agreement and the 363

Sale Order to its arbitration victory, claiming that "this Court's 363 Sale Order and Old GM's

'Wind-Down' Agreements do not govern Leson's relationship with New GM." Leson

Objection, ¶ 2; *see also id.*, ¶ 26. In essence, Leson claims that the Dealer Arbitration Act allows

it to pretend that New GM is Old GM and that Old GM never filed for bankruptcy. Nothing in

the Dealer Arbitration Act supports this theory and this Court has already rejected it.

25.     In explaining why it has core jurisdiction over a challenge to an arbitration award,

this Court pointed to language in the 363 Sale Order and Wind-Down Agreements that would

also cover proceedings to *enforce an arbitration award*:

> Now there can be no dispute what the sale order actually said. Nor
> can there be any dispute as to the wind-down agreement said.
> Section 13 of the wind-down agreement had that continuing
> jurisdiction clause providing that the dealer hereby consented to
> and agreed that the bankruptcy court would retain full complete
> and exclusive jurisdiction to interpret, enforce and adjudicate

disputes concerning the terms of this agreement and any other
matter related thereto.

Here and to the extent Rally was successful in the arbitration, of
course that would be a defense to win any effort to make it
terminate its agreement.  And to the extent that it wishes to either
enforce the agreement as it has the right to do with the three
franchises for which it prevailed or to defeat the agreement with
respect to the one agreement where it lost, in any event they
concern the terms of the agreement and, in particular, any other
matter related thereto.  I don't think that's subject to serious
dispute.

Motion, Ex. D, Rally Transcript at 47:4-20; *see also id.* at 53:1-11 ("And I think that if New GM

had failed to honor the arbitrator's award, as I indicated a moment ago, I'd almost certainly

enforce it.").

26.     Notably, the Iowa District Court reached the same conclusion.  Contrary to

Leson's claim that its case is somehow unique as to the jurisdictional issues, *see* Objection, ¶ 5

n.1; *id.*, ¶ 49, the Iowa District Court just rejected the same or similar arguments that Leson is

raising here.  In *Thys*, the plaintiffs claimed the covered dealer "won" its arbitration and "that

New GM has ignored the Arbitral Order by refusing to continue Family Auto's Buick franchise

and taking the position that the 'wind-down process remains in effect with respect to the Buick

franchise.'"  Ex. A, *Thys* Order, at p. 11.  The Iowa District Court, however, transferred the

action to this Court, finding that this Court had both "core" and "related to" jurisdiction.  In so

ruling, the Court quoted the *Travelers* case, which explained that "'the Bankruptcy Court plainly

ha[s] jurisdiction to interpret and enforce its own prior orders.'"  *Id.*, at p. 16 (*quoting Travelers*,

129 S. Ct. at 2205).

27.     As Chief Judge Reade found, the plaintiffs' claims "certainly fall within the

Bankruptcy Court's reservation of jurisdiction to enforce and implement its Sale Order and, more

specifically, resolve disputes 'with respect to or concerning' the wind-down agreements.  In

other words, Plaintiffs' claims turn, at least in part, on the interpretation and enforcement of the

-14-

Bankruptcy Court's orders." *Id.*, at p. 17. The Iowa District Court explained that the plaintiffs' § 747 claims did not change the result. The Court found that such claims were "inextricably intertwined with the bankruptcy for a variety of reasons." *Id.* at p. 18. Elsewhere, the Court explained that "[i]t stands to reason that the court responsible for these orders is better positioned to interpret and enforce them. Presumably, that is why the Bankruptcy Court retained exclusive jurisdiction to do so." *Id.* at p. 20 (analyzing transfer).

28.      Leson cannot seek to undo the terms of the Wind-Down Agreement or the 363 Sale Order in other forums. Louisiana law cannot, as Leson suggests, be used to "challenge[] the 'wind-down' agreement's applicability" (¶ 5) or "invalidate" the Wind-Down Agreement (¶ 7). This Court previously held that state laws, like the ones Leson (and the Ohio Dealers) reference, that "impair the ability to reject, or to assume and assign" contracts must be "trumped by federal bankruptcy law." *In re Gen. Motors Corp.*, 407 B.R. at 515; *see also* Ex. A, *Thys* Order, at p. 21 n.8 (noting same). The mere fact that Leson argues it should be entitled to "invalidate" the Wind-Down Agreement speaks volumes as to where this dispute belongs. Under this Court's orders, such claims must be brought here.[5]

### 6.      The Ohio Dealers' Estoppel Argument Has Also Been Adjudicated.

29.      The Ohio Dealers claim, as in *Rally*, that New GM should be judicially estopped from contesting the district court's federal question jurisdiction in the Ohio Actions because it alleged that such jurisdiction (and diversity jurisdiction) existed in another case arising out of a Dealer Arbitration Act proceeding. *See* Objection, ¶¶ 105-107 (*citing General Motors LLC v. Santa Monica Group, Inc.*, United States District Court for the Central District of California, No.

---

[5] Leson's action was originally filed in the Louisiana Motor Vehicle Commission, and then New GM removed it to the United States District Court for the Eastern District of Louisiana. As noted in Leson's objection, the federal court *sua sponte* remanded the case on the basis that administrative actions are not removable. Although the court initially stayed that remand order, the court has indicated that it will remand the matter.

CV 10-4787).  Again, this Court already properly rejected the Dealers' judicial estoppel

argument in *Rally,* as did the Iowa District Court in *Thys.*

30.    As the record makes clear, New GM in the *Santa Monica* case was only

attempting to enforce a separate written settlement agreement (separate and distinct from the

Wind-Down Agreement) and was not asking the district court to enforce or interpret the 363 Sale

Order or Wind-Down Agreement.  The doctrine of judicial estoppel precludes a party only from

taking inconsistent *factual* positions.  This Court found that New GM did not take any

inconsistent factual positions; indeed, the facts in the two cases are entirely different.  Motion,

Ex. D, Rally Transcript at 58:18-59:11.  Nor was New GM asking the district court to conduct a

legal or factual review of any arbitration award, as the Ohio Dealers seek in the Ohio Actions.

*Id*. at 57:2-58:17.  As the Iowa District Court found, "New GM's position in this case is not

clearly inconsistent with its position in the California Action, which did not involve potential

breaches of a wind-down agreement or the Bankruptcy Court's orders.  Simply put, the cases are

not comparable."  Ex. A, *Thys* Order, at p. 24-25.

31.    Given the obvious factual dissimilarities, the Ohio Dealers could not possibly

meet any of the elements necessary for a finding of judicial estoppel, let alone all of them.  For

judicial estoppel to apply, the positions must be "clearly inconsistent," create a risk of

inconsistent court determinations, and give unfair advantage or impose unfair detriment on the

litigants.  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001), *reh'g denied*, 533 U.S. 968.

None of those apply here.  The present cases involve different relief, there is no risk of

"inconsistent court determinations," and GM's successful enforcement of the *Santa Monica*

settlement agreement obviously gave it no "unfair advantage" over the Ohio Dealers or imposed any "unfair detriment" on them.  *Id.* at 750-51.[6]

**B.    Even If Rose, Halleen And Sims Had Filed In This Court, Their Claims Are Barred On The Merits.**

    **1.    The FAA Does Not Apply.**

32.    Independent of the "exclusive jurisdiction" provisions, there can be no doubt that the Ohio Dealers' requests to vacate a Dealer Arbitration Act award are not permitted by law. The FAA, by its terms, has no application to this matter, as this Court previously found.  *See* Motion, Ex. D, Rally Transcript at 50:14-18.  The FAA governs only contractual arbitrations and New GM did not agree to arbitrate.  *See* 9 U.S.C. § 2.  Nor does the Dealer Arbitration Act contain any other right to judicial review of a § 747 award.

33.    In fact, in denying the Ohio Dealers' motion seeking to enjoin New GM from pursuing any relief in this Court, the Ohio District Court recently rejected the Ohio Dealers' arguments that the FAA or Dealer Arbitration Act give the Ohio Dealers the right to appeal their arbitration awards:

> The FAA encompasses agreements among parties to arbitrate. This arbitration was not a result of an agreement among parties, rather it was compelled by Congress.  Therefore the FAA is likely not a jurisdictional basis for this court to confer subject matter jurisdiction. Similarly, the DAA [Dealer Arbitration Act] is likely not a basis either, as it fails to authorize or suggest a right to judicial review, but instead appears to indicate a desire by Congress to avoid the courts, while providing a limited remedy to covered dealerships. Petitioners alternatively claim an implied

---

[6] In their Objection, the Ohio Dealers also try to argue that the Leson Action should "estop" New GM from enforcing this Court's orders.  In *Leson*, however, New GM simply removed a proceeding filed by Leson before the Louisiana Motor Vehicle Commission under 28 U.S.C. § 1441.  *See* Objection, ¶¶ 108-110.  Leson's allegations formed the basis for removal under the well-pleaded complaint rule.  After removing the action, New GM promptly filed this Motion.  New GM did not seek an interpretation of the 363 Sale Order, Wind-Down Agreement or Dealer Arbitration Act from the United States District Court for the Eastern District of Louisiana in *Leson*.  To the contrary, New GM has consistently taken the position this Court is the exclusive forum for the resolution of such controversies.

> right to judicial review based on New GM's consent to arbitrate.
> This argument too is not well taken, as New GM provided in its
> Answering Statement it was not waiving any objections to the
> proceedings or the AAA's commercial arbitration rules.

Ex. B, Ohio Order, at p. 8. The Ohio District Court did not decide the question of concurrent

jurisdiction, but concluded that the Ohio Dealers "have not shown they are likely to succeed on

the merits" for the relief sought. *Id.* at pp. 8-9.

34.    The Ohio Dealers continue to argue that judicial review is available under the

FAA, *see* Ohio Dealers' Objection, ¶¶ 97-103, but, as this Court determined in *Rally* and as the

Ohio District Court found, the FAA is triggered only if there is an arbitration agreement and

here, indisputably, there is not. *See* 9 U.S.C. § 2 (the FAA applies only to "[a] written provision

in any maritime transaction or a contract evidencing a transaction involving commerce to settle

by arbitration a controversy . . .."); Motion, Ex. D, Rally Transcript at 50:14-18.

35.    As the Supreme Court has held, "[t]he FAA covers only contracts involving

interstate commerce or maritime affairs." *Southland Corp. v. Keating*, 465 U.S. 1, 23 (1984); *see
also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967); *Bernhardt v.
Polygraphic Co. of Am.*, 350 U.S. 198, 201 (1956) ("§§ 1 and 2 [of the FAA] define the field in

which Congress was legislating").[7] Thus, "an agreement to arbitrate . . . is required for

jurisdiction under the Federal Arbitration Act." *United Food & Commercial Workers Local 951*

---

[7] Indeed, the Supreme Court has reiterated on countless occasions that arbitration under the FAA is a matter
of agreement. *See, e.g., Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 n.6 (2010)
("[A]rbitration is strictly a matter of consent"); *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010)
("The FAA reflects the fundamental principle that arbitration is a matter of contract."); *Vaden v. Discover Bank*, 129
S. Ct. 1262, 1271 (2009) ("§ 2 provides that arbitration agreements in contracts 'involving commerce' are 'valid,
irrevocable, and enforceable.'"); *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (The FAA "establishes a national
policy favoring arbitration when the parties contract for that mode of dispute resolution."); *The Citizens Bank v.
Alafabco, Inc.*, 539 U.S. 52, 53 (2003) (per curiam) (holding the FAA applies to agreements "evidencing a
transaction involving commerce"), *on remand to*, 872 So. 2d 809 (Ala. 2003); *Volt Info. Scis. v. Bd. of Trustees*, 489
U.S. 468, 479 (1989) ("Arbitration under the Act is a matter of consent, not coercion, and parties are generally free
to structure their arbitration agreements as they see fit."); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219
(1985) ("The Act, after all, does not mandate the arbitration of all claims, but merely the enforcement—upon the
motion of one of the parties—of privately negotiated arbitration agreements."), *on remand to*, 760 F.2d 238 (9th Cir.
1985).

*v. Mulder*, 31 F.3d 365, 371 (6th Cir. 1994) (affirming dismissal of motion to confirm an

arbitration award for lack of subject matter jurisdiction).  And, contrary to the Ohio Dealers'

claims, federal courts do not have the power to confirm arbitration awards independent of the

FAA or some other statute.  As the Sixth Circuit explained in *Mulder*, "not all the disputants

have agreed to undergo arbitration, and we are unable to find any legal basis to require them to

do so in the absence of an agreement.  Hence, we conclude, as did the district court, that this

action must be dismissed for lack of subject matter jurisdiction."  *Id.*  Even the Ohio Dealers'

own *Rainwater* case confirms this straightforward proposition of law.  *Rainwater v. Nat'l Home

Ins. Co.*, 944 F.2d 190, 192 (4th Cir. 1991) (cited in ¶ 86) ("[A] court has jurisdiction to confirm

an award only if the parties have agreed that the award is final.").  Thus, the FAA simply does

not apply.

36.     Repeating arguments previously made, the Ohio Dealers reargue the implied

consent argument again, claiming that New GM agreed to the American Arbitration

Association's Commercial Arbitration Rules.  *See* Ohio Dealers' Objection, ¶¶ 85-94.  As this

Court found in *Rally*, the premise of this argument fails given New GM's repeated *objections* to

the blanket applicability of the AAA Rules.  *See* Motion, Ex. D, Rally Transcript at 51:13-24;

New GM's Answering Statement, p. 10, attached as Exhibit E to the Motion.  The Ohio District

Court likewise rejected that argument in the Ohio Actions.  Ex. B, Ohio Order, at p. 8.

37.     Moreover, as this Court found in *Rally*, the AAA rule that the Ohio Dealers

reference, Rule 48(c), does not authorize full-scale judicial review of any rulings.  *See* Ex. D,

Rally Transcript at 52:8-9 (It "conveys a right to enforce the arbitration award not attack it.")

Rather, the rule merely implies consent "that judgment upon the arbitration award may be

entered in any federal or state court having jurisdiction thereof," *i.e.*, consent that the award can

be *enforced* if the loser balks at compliance. The Ohio Dealers are not seeking to enforce the arbitrator's awards but to *escape* enforcement.

38.    Finally, *all* of the cases that the Ohio Dealers cite deal with the inapposite situation where the AAA rules were incorporated by reference into *arbitration agreements* otherwise enforceable under the FAA. *See Idea Nouva, Inc. v. GM Licensing Group, Inc.*, 617 F.3d 177, 180-81 (2d Cir. 2010) (reference to AAA in agreement) (cited in ¶¶ 85, 90-93); *EMO Energy Solutions, LLC v. Acre Consultants*, 2008 U.S. Dist. LEXIS 100677, at *3-4 (E.D. La. Nov. 25, 2008) (reference to AAA in agreement) (cited in ¶ 85); *Rainwater*, 944 F.2d at 192 (reference to AAA in agreement) (cited in ¶ 85); *Bryson, III v. Gere*, 268 F. Supp. 2d 46, 52 (D.D.C. 2003) (reference to AAA in agreement) (cited in ¶ 87). Here, again, New GM did not agree to arbitrate, so the FAA does not apply, let alone authorize judicial review.

39.    Even if the FAA applied, New GM's participation in AAA proceedings would not open the door to the FAA's judicial review provisions. *See Okla. City Assocs. v. Wal-Mart Stores, Inc.*, 923 F.2d 791, 794 (10th Cir. 1991). In order to confirm an award under the FAA, a party must show more than the FAA applies. A party must also show that "the parties in their agreement have agreed that a judgment of the court shall be entered upon the award." 9 U.S.C. § 9. Cases finding a reference to the AAA sufficient to satisfy this additional requirement, like the Ohio Dealers' cases, do so when the reference to the AAA is *in the underlying arbitration agreement*. *See* Ohio Dealers' Objection, ¶¶ 85-94. When parties arbitrate before the AAA without such a reference in the underlying agreement, courts lack subject matter jurisdiction to confirm an arbitration award. *Wal-Mart*, 923 F.2d at 795. In *Wal-Mart*, the Court found that whether "Wal-Mart implicitly consented to the AAA Rules during the arbitration" was immaterial because "Section 9 requires *some* manifestation of the agreement to have judgment

entered in the contract itself." *Id.* Thus, there is no legal or factual basis for the Ohio Dealers'

argument that New GM gave its "implied consent" to unauthorized judicial review.

### 2. There Is No Other Statutory Basis For Review.

40. The Dealer Arbitration Act also does not authorize, or even suggest, any right to

judicial review. To the contrary, the Congressional proponents of the Act sought a streamlined

and expeditious binding arbitration procedure culminating in swift reinstatement of dealers who

obtained a favorable award. *See* Remarks of Rep. Van Hollen, Cong. Rec. H14477 (attached to

the Motion as Exhibit F). Given the Act's ringing silence on the issue of judicial review and the

expressed emphasis of its proponents on expedition, the burden plainly falls on the Ohio Dealers

to point to something concrete which would create a right to judicial review *sub silentio*. This

they have failed to do.

### 3. The Ohio Dealers' Constitutional Argument Is Contrary To Supreme Court Precedent.

41. In a last ditch effort to construct a right to judicial review which Congress did not

enact, the Ohio Dealers suggest, in paragraphs 46 through 57 of their Objection, that the

Constitution allows Congress to require binding arbitration, but it must allow for traditional

judicial review of the underlying proceeding, citing *Thomas v. Union Carbide Agricultural

Products Co.*, 473 U.S. 568 (1985). The same issue was already briefed and addressed in *Rally*.

As set forth in those briefs, the holding in *Thomas* supports the right of Congress to create a new

statutory arbitration right *without* providing for full or—as New GM argues in this case—*any*

judicial review.[8]

---

[8] The Ohio Dealers' claim that the current bankruptcy system is unconstitutional under *Northern Pipeline* is also wrong. *See In re McLaren*, 990 F.2d 850, 853 (6th Cir. 1993) (holding Bankruptcy Code constitutional). Congress fixed the constitutional problems with the previous bankruptcy system that the Supreme Court identified in *Northern Pipeline*. *Id.* Subsequent to such reforms, the Supreme Court issued its decisions in *Travelers* and *Celotex* confirming a bankruptcy court's jurisdiction to enforce its own orders, which decisions are controlling here.

42.    *Thomas* involved a "data sharing" provision of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, that allowed the EPA to use data already in its files to review applications for pesticide approval provided that the applicant offered to compensate the party that originally submitted the data.  In place of a prior provision permitting the EPA Administrator to determine the amount of compensation, the applicant and data submitter were required to agree on the amount or, failing agreement, submit the issue to binding arbitration.  *See Thomas*, 473 U.S. at 573-74.  This arbitration requirement was, like the compulsory arbitration at issue in this case, entirely a creature of statute.  Like the parties in this case, the applicant and data submitter in *Thomas* had no pre-existing common law or statutory rights concerning the issues which the statute directed them to arbitrate.  *See id.* at 584.

43.    Thus, in contrast to the issue in *Crowell v. Benson*, 285 U.S. 22 (1932), FIFRA did not "displace[] a traditional cause of action" or "affect a pre-existing relationship based on a common-law contract" which "clearly fell within the range of matters reserved to Article III courts" under the holding of the *Northern Pipeline* case.  *Thomas*, 473 U.S. at 587.  *Thomas* held that under the circumstances, Congress' decision to provide only very limited judicial review of FIFRA arbitration awards did not violate the separation of powers clause of the Constitution. Here, as in *Thomas*, Congress could have dealt with the issue of compensating data submitters entirely legislatively, without involving an Article III court or an arbitrator.  *Id.* at 590 ("Congress, without implicating Article III, could have authorized EPA to charge follow-on registrants fees.").  In such circumstances, "when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced."  *Id.* at 589 (citation omitted).  The same is true of dealer reinstatement under the Dealer Arbitration Act.  Under

Article I of the Constitution, and setting aside any other constitutional objections, Congress

could have simply ordered that dealers be reinstated; the fact that it chose instead to submit

reinstatement decisions to an impartial arbitrator does not implicate any legitimate constitutional

concerns.

44.     This conclusion follows not only from the Supreme Court's analysis in *Thomas*

but, as the Supreme Court there recognized (473 U.S. at 588), from its decision in *Switchmen's*

*Union of North America v. National Mediation Board*, 320 U.S. 297 (1943), which upheld the

constitutionality of a provision of the Railway Labor Act "that established a 'right' of a majority

of any craft or class of employees to choose its bargaining representative and vested the

resolution of disputes concerning representation solely in the National Mediation Board, without

judicial review."  473 U.S. at 588 (review by federal court of Board determination not necessary

to preserve or protect "right" created by Congress).

45.     The same is true of Congress' decision not to provide for judicial review of

arbitration awards granting or denying dealer reinstatement.  Having created the new "right" to

reinstatement, Congress chose arbitration without judicial review as the method for determining

the extent of that right.  By electing arbitration, the dealers were entitled to take advantage of

their new right to possible reinstatement, but they were not entitled to seek enlargement of that

right beyond the procedural mechanism that Congress chose to provide.  As in *Thomas*, by

electing to participate in the "data sharing" program, the applicants "explicitly consent[] to have

[their] rights determined by arbitration."  *Id.* at 592; *see also R.J. O'Brien & Assoc. v. Pipkin*, 64

F.3d 257, 261 (7th Cir. 1995).

46.     Finally, even assuming the premise suggested (but not supported) by the Ohio

Dealers—that the Dealer Arbitration Act's failure to authorize judicial review "could implicate

[i.e., throw into doubt] the constitutionality of this federal statute," Objection, ¶ 103 n.19—the

Ohio Dealers cite no case that suggests that this Court is empowered to re-write the statute to

supply such a right.  To the contrary, applicable case law explicitly precludes such action.  *See,*

*e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (the canon of

construction requiring a court to interpret a statute when "fairly possible" in a manner that avoids

the constitutional question "must not and will not [be carried] to the point of perverting the

purpose of the statute … or judicially rewriting it"), *quoting Aptheker v. Sec'y of State*, 378 U.S.

500, 515 (1964) (citations and internal quotation marks omitted).  Thus, if the lack of judicial

review makes the Dealer Arbitration Act unconstitutional, as the Dealers suggest, this Court's

inability to remedy the omission means the Ohio Dealers have no enforceable rights under the

Dealer Arbitration Act, and its claims would fail on those grounds.

   **4.**  **Rose, Halleen And Sims Have No Colorable Basis For Asking The Court To
Vacate Or Modify The Arbitration Awards.**

   47.  As New GM explained in its Motion, there are no factual allegations to support

any claim of "undue means, corruption, and fraud" directed to the arbitrator at all, which would

be the only arguable basis for review.  *See* Motion, ¶¶  34-35 & Ex. D, Rally Transcript at 77:17-

19.  The Ohio Dealers' Objection ignores that issue, as well as the fact that the fourth dealer

(Dunn) at the same omnibus hearing involving Rose, Halleen, and Sims prevailed in its

arbitration in front of the same arbitrator.  *See* Motion, ¶¶ 34-35.

   48.  Abandoning many of their prior "fraud" arguments (*Id.*, ¶¶ 36-37), the Ohio

Dealers now largely argue that the arbitrator's supposed "acceptance" of New GM's business

plan shows that the arbitrator was biased.  In particular, the Ohio Dealers cite another decision

from a different arbitrator in support of their "bias" argument and claim that the arbitrator erred

in declining to apply state law to the arbitration proceedings under the Dealer Arbitration Act.

-24-

*See* Objection, ¶¶ 5-10.  New GM already addressed those issues in detail, and the Ohio Dealers

simply ignore New GM's arguments.  *See* Motion, ¶¶ 38-39.  As New GM explained, the law on

these issues fully supported the arbitrator's conclusions, all of which was fully briefed for the

arbitrator by the parties.  The Dealer Arbitration Act, in fact, directed the arbitrator to consider

the manufacturer's "business plan," not the plan advocated by dealers.  *See* Motion, Ex. C,

§ 747(d)(2).  The Ohio Dealers are simply arguing their disagreements on disputed questions of

law, but that is no basis for overturning an arbitration award.  *See generally* Motion, Ex. D, Rally

Transcript at 77:21-78:2.  Thus, the Ohio Dealers' applications would fail under any scenario.

## C.    Even If Leson Had Filed In This Court, Leson's Claims Fail On The Merits.

49.    New GM provided Leson with New GM's standard "customary and usual letter of

intent," which was the same form agreement that was offered to other dealers nationwide that

prevailed in arbitrations.  Motion, ¶ 22 & Ex. P.  Leson signed the LOI on July 1, 2010.  *See id.*

Among other things, the LOI provides that Leson would be reinstated to the dealer network

"[u]pon compliance with the terms and conditions" in the LOI, one of which is that the

reinstatement would "be accomplished by amending the existing Wind-Down Agreements in

place."  Motion, Ex. P at p. 1.  In addition, the LOI included as an exhibit a form amendment for

the Wind-Down Agreement.  *Id.*, Ex. A.  Unless and until Leson satisfies the terms of the LOI,

the original Wind-Down Agreement remains in full force and effect.

50.    Leson never disputes that it signed the LOI on July 1, 2010.  Leson also never

disputes that it has *failed* to comply with the LOI.  Leson Objection, ¶¶ 59-60.  Instead, Leson

argues that the LOI does not comply with Section 747 because, Leson asserts, "it is a form letter

directed only at dealers that won in arbitration" and other dealers that continued with New GM

or settled arbitrations did not receive the same LOI.  *See id.* at ¶ 67.  As to those dealers that

continued with New GM at the outset, Leson's argument makes no sense.  Dealers that remained

in New GM's dealer network received Participation Agreements.  There was no need for those

dealers to receive LOIs, and Section 747 has no application to those dealers.  As to dealers

whose arbitrations were settled, those dealers were offered LOIs with the same standard terms as

those in Leson's LOI.  Moreover, as to each of the issues in controversy here, the LOI merely

required that Leson be in compliance with the Dealer Sales and Service Agreement, which

defines the requirements for the relationship sought to be reinstated.

51.     Thus, Leson's argument boils down to the assertion that the requirement in the

LOI that Leson have $2.85 million in net working capital is unfair.  But Leson's position is

undermined by two undisputed facts.  First, Leson admits that it *signed* the LOI containing the

net working capital standard.  Second, Leson agrees that the $2.85 million in net working capital

that New GM required in the LOI is the *same* working capital figure Old GM required of Leson

prior to the Wind-Down Agreement under the Dealer Agreement between Old GM and Leson.

*See* Leson Objection, ¶ 18.  Thus, Leson simply does *not* want to be treated the same as every

other GM dealer, nor does it seek reinstatement of the terms of the relationship between Leson

and Old GM as of June 1, 2009; instead, it wants this Court to rewrite the LOI (and, by

implication, the Dealer Agreement) to provide better terms for Leson than it had prior to the

Wind-Down Agreement.  That is untenable.

52.     Moreover, the working capital deficiency is *not* the only barrier to Leson's

reinstatement under the LOI.  Leson has failed to establish the inventory financing (or "floor

plan" financing) required by the LOI and the Dealer Agreement that would enable Leson to

purchase and stock new vehicles in accordance with New GM's standard requirements.  No one

disputes that.  Like the Net Working Capital Standard, the requirement for such financing merely

echoes the requirements of the Dealer Agreement and is manifestly reasonable.  *See, e.g.*, *Chic*

*Miller's Chevrolet, Inc. v. Gen. Motors Corp.*, 352 F. Supp. 2d 251, 257-58 (D. Conn. 2005)

(holding GM was justified in terminating the dealer agreement when the dealer failed to maintain

inventory financing); *Hale Trucks of Md., LLC v. Volvo Trucks N. Am., Inc.*, 224 F. Supp. 2d

1010, 1020 (D. Md. 2002) (same).  A dealer which is unable to purchase and inventory new

motor vehicles is not a compliant new motor vehicle dealer at all.  Thus, all of Leson's

arguments about net working capital are not only erroneous (as set forth below) but also simply

irrelevant.  Based on the undisputed record, Leson has *not complied* with one of the most

fundamental requirements for operating a New GM dealership—*i.e.*, obtaining the requisite

inventory financing for purchasing new vehicles.  The merits of Leson's claims can end there.

### 1.     Leson Has Not Met Its Burden Of Proving That The LOI Should Be Voided.

53.     Leson's new argument that it signed the LOI  under "duress" is nothing more than

a claimed "defense to enforcement" of the Wind-Down Agreement, and Leson thus has the

burden of proving its claim.  Motion at ¶ 22.  Yet, *no evidence* has been submitted to support

such a claim.  In fact, the dealer-operator who signed the LOI stands mute; the only supporting

declaration submitted by Leson comes from the dealer's daughter.  *See* Leson Objection, Ex. Q.

That declaration says nothing about duress.  The first time Leson ever asserted in any tribunal

that it signed the July 1, 2010 LOI under "duress" was a single sentence in Leson's Commission

Complaint filed on September 15, 2010, more than *three months* after executing the LOI, and

that complaint, too, provides no details or evidence to support the conclusory allegation.  *See*

Motion, Ex. Q.  Leson's deadline for providing such evidence has now run.

54.     Moreover, the duress argument would fail under any scenario.  Leson, like other

dealers that prevailed in the arbitrations, was given ten days to decide whether to sign the LOI.

A week after the LOI was sent to Leson, Leson wrote to complain about some of the terms of the

LOI and to tried to negotiate different terms.  *See* Leson Objection, ¶ 34.  New GM's decision

rejecting such requests does not make out a case for "duress," particularly given that the

conditions in dispute were found in the pre-existing Dealer Agreement between Leson and Old

GM.  *See Barnett v. Int'l Tennis Corp.*, 263 N.W.2d 908, 913 (Mich. Ct. App. 1978) (discussing

treatise indicating that party alleging duress must show that he has been the victim of a *wrongful

or unlawful* act or threat that deprives the victim of his unfettered will; party must have no

adequate legal remedy, among other things).[9]  Instead, New GM simply took the position that the

same terms should apply to all dealers, as it was required to do even under Leson's view of the

law.  Instead of signing the LOI, Leson could have simply sued New GM in this Court over the

LOI.  Leson, which has no shortage of lawyers, chose not to do so.  Rather, it voluntarily signed

the LOI and then, after the fact, proceeded to ask another tribunal to "void" the LOI.  This, it

cannot do.

55.     In addition to duress, Leson alleges in its opposition for the first time that the LOI

should be voided because of New GM's alleged "fraud."  *See* Leson Objection,  ¶¶ 35, 36.

Leson's conclusory statement, without reference to any factual support, does not pass muster

under any pleading standard.  *See, e.g.,* Fed. R. Civ. P. 9(b).  Moreover, the fatal defect in this

allegation is that the universal legal requirement for a fraud claim is "reliance."  *See, e.g.*,

*Highway Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 817 (Mich. 1976) (reversing finding

of fraud when plaintiff failed to prove reliance).  Leson alleges no actions or inactions in reliance

on any statement by New GM, and the LOI itself contains a stipulation by Leson that it is "not

relying on any representations, promises, guarantees, or information provided by GM" when

---

[9]The Wind-Down Agreement that this Court approved and which Leson executed provides that Michigan
law applies to disputes regarding the Wind-Down Agreement.  *See* Motion, Ex. N, Leson Wind-Down Agreement,
§ 15.  The Dealer Agreement also provides that Michigan law applies.  The LOI does not contain a separate choice
of law provision, but it references both the Wind-Down Agreement and the Dealer Agreement.  *See* Motion, Ex. P.
The result would be the same regardless of which law is cited, however, since such principles are neither unusual or
controversial.

signing the LOI. *See* Motion, Ex. P, at p. 3. Thus, as with the duress allegation, Leson has

supplied no law or evidence to support its unpled fraud claim, and both the law and evidence are

to the contrary.

> **2.** **Even If Leson Had Met Its Burden To Show That The LOI Should Be Voided, Its "Customary and Usual" Arguments Are Incorrect.**

56.     Leson must first "void" the LOI before it can assert any other arguments. If the

agreement is valid, the analysis should end there. In this case, Leson has no basis to "void" the

LOI. Thus, the agreement itself bars Leson's remaining arguments. Even assuming for the sake

of argument that Leson's other arguments warrant consideration, they likewise fail on the

undisputed record present here.

57.     Setting aside the obvious fact that Leson signed the LOI, Leson now argues that

the LOI is not "customary and usual" under several theories. First, Leson claims that it is

unreasonable that the LOI is being implemented through an amended Wind-Down Agreement.

Leson Objection, ¶¶ 57-60. Leson's position ignores the reality that the Wind-Down Agreement

is currently in effect and currently controls the relationship between GM and Leson. Even if

Leson were to eventually satisfy the terms of the LOI, certain terms in the Wind-Down

Agreement have to be changed, including, by way of example, the provisions requiring Leson to

cease operations by October 31, 2010 and the provisions requiring New GM to pay Leson a

wind-down payment (which Leson would have to return). Moreover, Leson's argument is a red

herring in any event. The "amendment" to the Wind-Down Agreement has no real significance.

The real complaint is that Leson has to supply the required net working capital and there can be

no argument that such a requirement is "customary and usual." Indeed, the Dealer Agreement

itself obligates every dealer in the country to meet the net working capital requirements

calculated by GM. Thus, *that requirement* clearly is "usual and customary."

58.    Second, Leson argues that the LOI is not "customary and usual" because it included "operational prerequisites" which supposedly are not allowed by § 747.  Leson Objection, ¶ 60.  Leson does not explain this argument and there is nothing in § 747 to support it.  Indeed, the obvious purpose of the LOI—the only remedy permitted by § 747—is to establish the operational prerequisites to a dealer agreement.  Leson's argument would render the statutorily-required LOI without purpose or meaning.

59.    Third, Leson argues that the LOI is not "customary and usual" because the $2.85 million net working capital standard is "commercially unreasonable."  That argument cannot withstand analysis.  There is no dispute that the working capital requirement in the LOI is the same one that GM requires under the Dealer Agreement.  Under Leson's view, every dealer that prevailed in the arbitrations could seek to revise GM's standard capital requirements before reinstatement.  That is untenable.  Leson has agreed to the same level of capitalization for years.  *See* Lesson Objection, ¶ 18.  Moreover, as alleged support for its position, Leson argues that its own calculation of net working capital should be "less than $1.8 million *utilizing the 12-month period from June 2009-May 2010*."  Leson Objection, ¶ 63 (emphasis added).  That argument is facially unsupportable because the benchmark time period chosen by Leson for determining its net working capital figure is *when Leson was in a wind-down status, and not operating as a full-fledged dealer*.[10]  Leson's argument is also wholly inconsistent with its repeated claim that it simply wants to be treated as if it had never been wound down.  *See, e.g.,* Leson Objection, ¶ 56 ("Leson should have been naturally rolled into new GM without any interruption of its dealership"), ¶ 67 (GM is "[t]reating dealers that won reinstatement through arbitration differently" than dealers who were not "wound down").  As noted above, the $2.85 million

---

[10] New GM's Capital Standard Addendum requires that a capital standard be set "based on the dealership operations it is expected to conduct," not on operations it conducted over the limited, unrepresentative, wind-down period.  *See* Motion, Ex. V.

figure was the net working capital required in Leson's Dealer Agreement prior to the Wind-Down Agreement when Leson was a fully operating dealership.  Leson cannot have it both ways.  Leson either wants to be reinstated as a fully operating dealer or it does not.  If it does, then it must comply with the requirements of the LOI.  That is not unreasonable under any analysis.

### 3. Leson's Statements About What The Arbitrator Allegedly Concluded Are Incorrect.

60.     Leson repeatedly argues that the arbitrator has already concluded that Leson's net working capital figure should be less than $2.85 million.  *See, e.g.,* Leson Objection, ¶ 18.  That is both incorrect and irrelevant.  Section 747 empowered the arbitrator to grant specific, limited relief and nothing else.  The arbitrator was not empowered by § 747 to re-write the terms of an LOI or to dictate future terms.  Thus, the arbitrator would not have been empowered to decide what Leson's net working capital should be.  In any event, the arbitrator here did not determine that $2.85 million in net working capital was too high for Leson.  To the contrary, *Leson represented to the arbitrator that "[u]pon reinstatement, Leson foresees no obstacles in being able to meet the required capital needs and maintain working capital **at or above GM's standard**." See* Leson's Prehearing Brief, at 23.  A true and correct copy of an excerpt from Leson's Prehearing Brief is attached as Exhibit C.[11]  Leson also represented to the arbitrator, and the arbitrator found, that the "dealership has secured . . . a commitment letter from a local bank for prospective [floor plan] financing once it is reinstated by General Motors."  Motion, Ex. O, at p. 7.  Yet, Leson now states—after the fact—that it has not been able to obtain a commitment for floor plan financing after all, which independently bars Leson's claims, as set forth above.

---

[11] New GM is not attaching Leson's entire Prehearing Brief because it may contain information subject to a confidentiality agreement entered in the § 747 arbitration.

Without inventory financing, it cannot be disputed that Leson has failed to comply with a "customary and usual" requirement for being a New GM dealer.  *See* Leson Objection, ¶ 65.

### 4.    Leson Is Not Entitled to Discovery.

61.    Leson's request for discovery is unwarranted.  *See* Leson Objection, ¶¶ 50, 51. The central facts are undisputed.  No one disputes that Leson signed the LOI.  No one disputes that Leson failed to challenge the LOI here or elsewhere prior to signing the LOI and agreeing to it.  No one disputes that the Dealer Agreement itself requires (1) inventory financing and (2) working capital in an amount calculated by New GM using its standard formula, and that such requirements have been in place for years.  And no one disputes that New GM calculated its working capital requirement using the same formula that is set forth in the Dealer Agreement. Having chosen to proceed to sign the LOI, Leson cannot now turn around and argue that it should be entitled to discovery in an effort to avoid the very obligation set forth in the Dealer Agreement itself.  As noted above, the threshold issue relates to Leson's attempt to void the LOI that it signed.  Leson has not put forth facts, or even alleged specific facts, sufficient to support its conclusory claims despite that it is Leson's burden to do so.  The bottom line is that Leson signed the LOI and has proven no basis for voiding the LOI.  In any event, Leson's complaint is much ado about nothing.  GM is merely requiring Leson to return to provide inventory financing and also provide the working capital that was set forth in Leson's pre-wind down Dealer Agreement.  Those matters are undisputed.

### Relief Requested

WHEREFORE, New GM respectfully requests that this Court: (i) enter an order

substantially in the form attached to the Motion as Exhibit X, granting the relief sought in the

Motion and herein; and (ii) grant New GM such other and further relief as the Court may deem

just and proper.


Respectfully submitted,


/s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:   (212) 556-2222

Jeffrey J. Jones (*admitted pro hac*)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio  43215-2673
Telephone:  (614) 469-3939
Facsimile:   (614) 461-4198

David G. Radlauer (*admitted pro hac*)
Thomas A. Casey, Jr. (*admitted pro hac*))
JONES, WALKER, WAECHTER,
  POITEVENT, CARRERE & DENEGRE, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8518
Facsimile:   (504) 589-8518

Attorneys for General Motors LLC
f/k/a General Motors Company