**HEARING DATE AND TIME: November 9, 2010 at 2:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
MOTORS LIQUIDATION COMPANY, et al., :    09-50026 (REG)
       f/k/a General Motors Corp., et al. :
                                    :
                        Debtors.    :    (Jointly Administered)
                                    :
------------------------------------------------------------x
```

**DEBTORS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR (I) OBJECTION TO**
**PROOFS OF CLAIM NOS. 1206, 7587, AND 10162 AND, IN THE ALTERNATIVE, (II)**
**MOTION TO ESTIMATE PROOFS OF CLAIM NOS. 1206, 7587, AND 10162**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................................... 1

New Authority and Argument ................................................................................................ 2

Conclusion and Requested Relief .......................................................................................... 4

US_ACTIVE:\43503480\07\72240.0639

# TABLE OF AUTHORITIES

Page

## <u>CASES</u>

*Kiobel v. Royal Dutch Petroleum Co.*,
     Nos. 06-4800-CV, 06-4876-CV,
     2010 WL 3611392 (2d Cir. Sept. 17, 2010) ................................................................1, 2, 3

## <u>STATUTES</u>

28 U.S.C. § 1350.........................................................................................................................1, 2, 3

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

In light of new authority issued by the United States Court of Appeals for the

Second Circuit, Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), submit this

supplemental brief (the "**Supplement**") in support of their objection (the "**Objection**"), dated

May 21, 2010, for an order disallowing and expunging Proofs of Claim Nos. 1206 and 7587 filed

by Tozamile Botha, William Daniel Peters, Msitheli Wellington Nonyukela, Mantoa Dorothy

Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka, Mirriam Mzamo, Mncekeleli

Henyn Simangentloko, and Hans Langford Phiri (the "**Botha Plaintiffs**") and Proof of Claim

No. 10162, filed by Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch, Elsie

Gishi, Lesiba Kekana, Archington Madondo, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile

Sikani (the "**Balintulo Plaintiffs**," and together with the Botha Plaintiffs, the "**Plaintiffs**"), and

respectfully represent:

### **Preliminary Statement**

On September 17, 2010, the United States Court of Appeals for the Second

Circuit issued an opinion, *Kiobel v. Royal Dutch Petroleum Co.*, Nos. 06-4800-CV, 06-4876-CV,

2010 WL 3611392 (2d Cir. Sept. 17, 2010).[1]  In *Kiobel*, the Second Circuit held, as a matter of

first impression, that the Alien Tort Claims Act, 28 U.S.C. § 1350 ("**ATS**") does not give rise to

liability against corporations for violations of customary international law of human rights.  *Id.* at

\*48-50.  As a result, the Second Circuit ruled that the plaintiffs' claims against the defendant

corporations should be dismissed.  The holding in *Kiobel* dictates that the Apartheid-Related

---

[1] The *Kiobel* decision is annexed hereto as **Exhibit "A."**

Putative Class Claims[2] be disallowed and expunged because they similarly seek damages for

alleged violations of customary international law pursuant to the ATS against a corporation,

namely Motors Liquidation Company.[3]

### New Authority and Argument

In the *Kiobel* case, the plaintiffs were residents of Nigeria who claimed that

Dutch, British, and Nigerian corporations engaged in oil exploration and production aided and

abetted the Nigerian government in committing violations of the law of nations.[4]  *Id.* at *5.

Because they sought damages under ATS, their suit could proceed only if the ATS provides

jurisdiction over tort actions brought against corporations under customary international law.[5]

*Id.* at *5.  The Second Circuit held that federal courts lack subject matter jurisdiction under ATS

for claims against corporations because corporate liability is not recognized under the customary

international law of human rights.  *Id.* at *48.  The Second Circuit reasoned that, because

customary international law consists of only those norms that are specific, universal, and

obligatory in the relations of States, inter se, and because "[n]o corporation has ever been subject

to any form of liability (whether civil or criminal) under the customary international law of

human rights," *id.* at *48, "corporate liability is not a discernable – much less universally

recognized – norm of customary international law pursuant to ATS," *id.* at *1-2, and held that

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

[3] As stated in their Objection, the Debtors reserve all rights to object to the Apartheid-Related Class Claims on other substantive and procedural grounds, including, but not limited to, their failure to state a claim.

[4] Specifically, the *Kiobel* plaintiffs brought claims of aiding and abetting (1) extrajudicial killing; (2) crimes against humanity; (3) torture or cruel, inhuman, and degrading treatment; (4) arbitrary arrest and detention; (5) violation of the rights to life, liberty, security, and association; (6) forced exile; and (7) property destruction.  *Id.* at *14.

[5] In determining whether corporations could be held liable under ATS, although the domestic laws of the United States recognize corporate liability, the Second Circuit held that ATS requires federal courts to look beyond the rules of domestic law to examine the specific and universally accepted rules that nations would treat as binding in their dealings with one another.  *Id.* at *6.

the ATS does not give rise to liability against corporations. *Id.* at *48; *see also id.* at *7 ("From the beginning, however, the principle of individual liability for violations of international law has been limited to natural persons – not 'juridical' persons such as corporations – because the moral responsibility for a crime so heinous and unbounded as to rise to the level of an 'international crime' has rested solely with the individual men and women who have perpetrated it."). Thus, the Second Circuit ruled that, to the extent the *Kiobel* plaintiffs asserted claims against corporations only, their complaint must be dismissed. *Id.* at *49.

Here, the sole basis of the Apartheid-Related Putative Class Claims against Motors Liquidation Company is for alleged violations of customary international law of human rights under the ATS.[6] General Motors Corporation, one of the named defendants in the Botha and Balintulo Complaints, was a corporation at the time of the purported violations of international law alleged by the Plaintiffs.[7] General Motors Corporation has since changed its name to Motors Liquidation Company, and Motors Liquidation Company is a Delaware corporation.[8]

---

[6] (*See* Botha Compl. ¶ 1 ("Plaintiffs bring this class action to vindicate violations of the law of nations as authorized by the Alien Tort Statute (ATS) on behalf of themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations."); Balintulo Compl. ¶ 1 ("Plaintiffs bring this class action under the Alien Tort Claims Act, 28 U.S.C. § 1350, against corporations that knowingly aided and abetted the South African security forces . . . in furtherance of the crimes of apartheid, extrajudicial killing, torture, prolonged unlawful detention; and cruel , inhuman, and degrading treatment in violation of international law."); *see also* Botha Compl. ¶ 14 (asserting jurisdiction under ATS); Balintulo Compl. ¶ 4 (same).)

[7] (*See* Botha Compl. ¶ 31 ("Defendant GENERAL MOTORS CORPORATION (GM) is an automobile company incorporated under the laws of Delaware . . . ."); Balintulo Compl. ¶ 1 ("'Plaintiffs bring this class action under the Alien Tort Claims Act, 28 U.S.C. § 1350, **against corporations** . . . ." (emphasis added); *see also* Balintulo Compl. ¶ 33 ("Defendant **General Motors Corporation** ("General Motors"), a leading automobile manufacturer, is organized and incorporated under the laws of Delaware with its principal place of business in Detroit Michigan.") (emphasis in original).)

[8] (*See* Certificate of Incorporation and selected amendments thereto, annexed hereto as **Exhibit "B."**)

Because the Second Circuit has held that corporations are not subject to liability under customary international law of human rights, the Apartheid-Related Putative Class Claims must be disallowed and expunged in their entirety.

### Conclusion and Requested Relief

WHEREFORE, for the reasons set forth above and in the Objection, the Debtors respectfully request that the Court (i) disallow and expunge the Apartheid-Related Putative Class Claims in their entirety; (ii) enter the proposed order submitted to the Court, annexed hereto as **Exhibit "C"**; and (iii) grant MLC such other and further relief as is just.

Dated: New York, New York
      October 21, 2010

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

### *Kiobel v. Royal Dutch Petroleum Co.*

**H**Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
Esther **KIOBEL**, individually and on behalf of her
late husband, Dr. Barinem **Kiobel**, Bishop Augustine
Numene John-Miller, Charles Baridorn Wiwa, Israel
Pyakene Nwidor, Kendricks Dorle Nwikpo, Anthony
B. Kote-Witah, Victor B. Wifa, Dumle J. Kunenu,
Benson Magnus Ikari, Legbara Tony Idigima, Pius
Nwinee, Kpobari Tusima, individually and on behalf
of his late father, Clement Tusima, Plaintiffs-
Appellants-Cross-Appellees,
v.
ROYAL DUTCH PETROLEUM CO., Shell Trans-
port and Trading Company PLC, Defendants-
Appellees-Cross-Appellants,
Shell Petroleum Development Company Of Nigeria,
Ltd., Defendant.
**Docket Nos. 06-4800-cv, 06-4876-cv.**

Argued: Jan. 12, 2009.
Decided: Sept. 17, 2010.

**Background:** Nigerian residents filed putative class
action, under Alien Tort Statute (ATS), claiming that
Dutch, British, and Nigerian corporations engaged in
oil exploration and production aided and abetted Ni-
gerian government in committing human rights
abuses in violation of law of nations. The United
States District Court for the Southern District of New
York, Kimba M. Wood, J., 456 F.Supp.2d 457, dis-
missed claims against corporate defendants in part,
and certified entire order for interlocutory appeal.
Parties cross-appealed.

**Holdings:** The Court of Appeals, José A. Cabranes,
Circuit Judge, held that:
(1) customary international law governs scope of
ATS liability;
(2) in matter of first impression, ATS does not confer
jurisdiction over claims against corporations; and
(3) corporate defendants were not subject to ATS
liability, as they were not subject to liability under
customary international law.

Affirmed in part and reversed in part.

Leval, Circuit Judge, filed opinion concurring only
in judgment.

West Headnotes

**[1] Aliens, Immigration, and Citizenship 24**
**763**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k761 Torts Covered
            24k763 k. Violation of Law of Nations.
Most Cited Cases
The Alien Tort Statute (ATS) provides jurisdiction
over (1) tort actions, (2) brought by aliens only, (3)
for violations of the law of nations, also called cus-
tomary international law, including, as a general mat-
ter, war crimes and crimes against humanity, in other
words, crimes in which the perpetrator can be called
hostis humani generis, an enemy of all mankind. 28
U.S.C.A. § 1350.

**[2] International Law 221 🔑1**

221 International Law
    221k1 k. Nature and Authority in General. Most
Cited Cases
The "law of nations," also called "customary interna-
tional law," includes only those standards, rules or
customs (1) affecting the relationship between states
or between an individual and a foreign state, and (2)
used by those states for their common good and/or in
dealings inter se.

**[3] International Law 221 🔑1**

221 International Law
    221k1 k. Nature and Authority in General. Most
Cited Cases
The fact that a legal norm is found in most or even all
civilized nations does not make that norm a part of
customary international law.

**[4] Federal Courts 170B 🔑776**

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
           170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B 🗝794**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
           170BVIII(K)3 Presumptions
                170Bk794 k. Pleadings. Most Cited
Cases
Court of Appeals reviews de novo a district court's dismissal for failure to state a claim, assuming all well-pleaded, nonconclusory, factual allegations in the complaint to be true. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Courts 170B 🗝776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
           170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews questions of subject matter jurisdiction de novo.

**[6] Courts 106 🗝89**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
           106k88 Previous Decisions as Controlling or as Precedents
                106k89 k. In General. Most Cited Cases
When questions of jurisdiction have been passed on in prior decisions sub silentio, Court of Appeals does not consider itself bound when a subsequent case finally brings the jurisdictional issue before the court; rather, the court addresses the jurisdictional challenge.

**[7] Action 13 🗝3**

13 Action

13I Grounds and Conditions Precedent
    13k3 k. Statutory Rights of Action. Most Cited Cases

**Aliens, Immigration, and Citizenship 24 🗝766**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k766 k. Actions. Most Cited Cases
The Alien Tort Statute (ATS) is a jurisdictional statute only; the ATS creates no cause of action. 28 U.S.C.A. § 1350.

**[8] Aliens, Immigration, and Citizenship 24 🗝763**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k761 Torts Covered
           24k763 k. Violation of Law of Nations. Most Cited Cases
International law, not domestic law, governs the scope of liability for violations of customary international law under the Alien Tort Statute (ATS). 28 U.S.C.A. § 1350.

**[9] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
The "subjects of international law" are those that, to varying extents, have legal status, personality, rights, and duties under international law and whose acts and relationships are the principal concerns of international law. Restatement (Third) of the Foreign Relations Law of the United States, pt. II, at 70 introductory note.

**[10] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
International law does not leave to individual states the responsibility of defining those who are subjects of international law; rather, the concept of international person is derived from international law. Restatement (Third) of the Foreign Relations Law of the United States, pt. II, at 70 introductory note.

**[11] Aliens, Immigration, and Citizenship 24**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

⚿763

24 Aliens, Immigration, and Citizenship
   24IX Alien Tort Claims
      24k761 Torts Covered
         24k763 k. Violation of Law of Nations.
Most Cited Cases
Court of Appeals is required to look to international
law to determine its jurisdiction over Alien Tort Stat-
ute (ATS) claims against a particular class of defend-
ant, such as corporations. 28 U.S.C.A. § 1350.

**[12]** **Aliens, Immigration, and Citizenship 24**
⚿765

24 Aliens, Immigration, and Citizenship
   24IX Alien Tort Claims
      24k765 k. Persons Liable; State Action. Most
Cited Cases
Although the Alien Tort Statute (ATS) limits only the
category of plaintiff who may bring suit, namely,
aliens, the ATS's requirement that a claim be predi-
cated on a violation of the law of nations incorporates
any limitation arising from customary international
law on who can properly be named a defendant. 28
U.S.C.A. § 1350.

**[13]** **Aliens, Immigration, and Citizenship 24**
⚿665

24 Aliens, Immigration, and Citizenship
   24VIII Citizenship and Naturalization
      24VIII(A) Citizenship
         24k664 Proceedings to Determine Citizen-
ship
            24k665 k. In General. Most Cited Cases
For a claim under the Alien Torture Statute (ATS),
federal courts look to customary international law to
determine both whether certain conduct leads to ATS
liability and whether the scope of liability under the
ATS extends to the defendant being sued. 28
U.S.C.A. § 1350.

**[14]** **International Law 221** ⚿1

221 International Law
   221k1 k. Nature and Authority in General. Most
Cited Cases
To attain the status of a rule of customary interna-
tional law, a norm must be specific, universal, and

obligatory. Restatement (Third) of the Foreign Rela-
tions Law of the United States, § 102(2).

**[15]** **International Law 221** ⚿2

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
Customary international law is discerned from myr-
iad decisions made in numerous and varied interna-
tional and domestic arenas.

**[16]** **International Law 221** ⚿2

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
To define norms of customary international law,
where there is no treaty, and no controlling executive
or legislative act or judicial decision, resort must be
had to the customs and usages of civilized nations,
and, as evidence of these, to the works of jurists and
commentators, who by years of labor, research and
experience, have made themselves peculiarly well
acquainted with the subjects of which they treat.

**[17]** **International Law 221** ⚿2

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
Agreements or declarations that are merely aspira-
tional, and that do not of their own force impose ob-
ligations as a matter of international law, are of little
utility in discerning norms of customary international
law.

**[18]** **International Law 221** ⚿2

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
Treaties are proper evidence of customary interna-
tional law because, and insofar as, they create legal
obligations akin to contractual obligations on the
states that are parties to the treaties.

**[19]** **International Law 221** ⚿2

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
Although all treaties ratified by more than one state
provide some evidence of the custom and practice of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

nations, a treaty will only constitute sufficient proof of a norm of customary international law if an over-whelming majority of states have ratified the treaty, and those states uniformly and consistently act in accordance with its principles.

**[20] Treaties 385 🗝7**

385 Treaties
    385k7 k. Construction and Operation in General. Most Cited Cases
So-called "law-making treaties" are treaties that cod-ify existing norms of customary international law or crystallize an emerging rule of customary interna-tional law.

**[21] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
Customary international law does not develop through the logical expansion of existing norms; rather, customary international law develops, if at all, through the custom and practice among civilized na-tions gradually ripening into a rule of international law.

**[22] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
Customary international law is developed through the customs and practices of states, not by what makes sense to a federal judge, by the policy reasons recog-nized by the judge, or by what the judge regards as a bedrock tenet of American law.

**[23] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
Customary international law is not developed through parity of reasoning.

**[24] International Law 221 🗝2**

221 International Law
    221k2 k. Sources and Scope. Most Cited Cases
Affidavits, treatises, or other works of publicists are,

in the nature of things, subsidiary or secondary sources of international law, useful in explicating or clarifying an established legal principle or body of law, by shedding light on a particular question of international law, or on the primary sources of inter-national law, which are the documents or acts prov-ing the consent of states to its rules.

**[25] Aliens, Immigration, and Citizenship 24 🗝765**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k765 k. Persons Liable; State Action. Most Cited Cases
Corporate liability is not a rule of customary interna-tional law applicable under the Alien Tort Statute (ATS), because corporate liability is not recognized as a specific, universal, and obligatory norm; impos-ing liability on corporations for violations of custom-ary international law has not attained a discernible, much less universal, acceptance among nations of the world in their relations. 28 U.S.C.A. § 1350.

**[26] Aliens, Immigration, and Citizenship 24 🗝765**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k765 k. Persons Liable; State Action. Most Cited Cases
Nigerian residents' class action claim that Dutch, British, and Nigerian oil corporations aided and abet-ted Nigerian government in committing human rights abuses in violation of law of nations was not subject to jurisdiction, under Alien Tort Statute (ATS), pro-viding jurisdiction over tort brought by alien alleging violation of law of nations or treaty of United States, since ATS jurisdiction did not extend to civil actions against corporations under law of nations that did not recognize corporate liability as specific, universal, and obligatory norm. 28 U.S.C.A. § 1350.

**[27] Aliens, Immigration, and Citizenship 24 🗝766**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k766 k. Actions. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

**International Law 221 🗝2**

221 International Law
   221k2 k. Sources and Scope. Most Cited Cases
Customary international law arises from the customs
and practices among civilized nations gradually rip-
ening into a rule of international law; accordingly, the
responsibility lies with those who seek to demon-
strate that international law extends the scope of li-
ability for a violation of a given norm to the perpetra-
tor being sued.

**[28] International Law 221 🗝1**

221 International Law
   221k1 k. Nature and Authority in General. Most
Cited Cases
Unlike domestic law, international law does not
maintain a kind of hermetic seal between criminal
and civil law.

**[29] Aliens, Immigration, and Citizenship 24
🗝765**

24 Aliens, Immigration, and Citizenship
   24IX Alien Tort Claims
     24k765 k. Persons Liable; State Action. Most
Cited Cases
Corporate liability is not a norm that is recognizable
and applicable in actions under the Alien Tort Statute
(ATS) because the customary international law of
human rights does not impose any form of liability on
corporations, whether civil, criminal, or otherwise. 28
U.S.C.A. § 1350.

**[30] Action 13 🗝1**

13 Action
   13I Grounds and Conditions Precedent
     13k1 k. Nature and Elements of Cause of Ac-
tion and Suspension of Remedies. Most Cited Cases

**Action 13 🗝14**

13 Action
   13I Grounds and Conditions Precedent
     13k14 k. Persons Liable. Most Cited Cases
The question of the scope of liability, that is, who can
be held liable for wrongful conduct, is not a question
of remedy; rather, "remedies" refer to precisely what

the plaintiff may recover after resorting to the law.

**[31] Action 13 🗝1**

13 Action
   13I Grounds and Conditions Precedent
     13k1 k. Nature and Elements of Cause of Ac-
tion and Suspension of Remedies. Most Cited Cases

**Action 13 🗝14**

13 Action
   13I Grounds and Conditions Precedent
     13k14 k. Persons Liable. Most Cited Cases
Whether a plaintiff is entitled to money damages,
declaratory relief, an injunction, or specific perform-
ance are all questions of remedy, but whether a par-
ticular remedy can be enforced against a certain indi-
vidual or entity is not a question of remedy; it is a
question of the scope of liability.

**[32] Corporations 101 🗝423**

101 Corporations
   101XI Corporate Powers and Liabilities
     101XI(B) Representation of Corporation by
Officers and Agents
       101k423 k. Wrongful Acts or Omissions.
Most Cited Cases

**International Law 221 🗝1**

221 International Law
   221k1 k. Nature and Authority in General. Most
Cited Cases
Corporate liability is determined by a body of rules
determining which actions of an employee or agent
are to be imputed to the corporation; in this important
respect, corporate liability is akin to accessorial li-
ability, which is a subject of international law not left
to individual states.

**[33] Aliens, Immigration, and Citizenship 24
🗝765**

24 Aliens, Immigration, and Citizenship
   24IX Alien Tort Claims
     24k765 k. Persons Liable; State Action. Most
Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Under the Alien Tort Statute (ATS), suits are not foreclosed against a corporation's employees, managers, officers, directors, or any other person who commits, or purposefully aids and abets, violations of international law. 28 U.S.C.A. § 1350.

**[34] Aliens, Immigration, and Citizenship 24**
**☞760**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
        24k760 k. In General. Most Cited Cases
Alien Tort Statute (ATS) does not provide subject matter jurisdiction over claims against corporations. 28 U.S.C.A. § 1350.

Plaintiffs assert claims for aiding and abetting violations of the law of nations against defendants-all of which are corporations-under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, a statute enacted by the first Congress as part of the Judiciary Act of 1789. We hold, under the precedents of the Supreme Court and our own Court over the past three decades, that in ATS suits alleging violations of customary international law, the scope of liability-who is liable for what-is determined by customary international law itself. Because customary international law consists of only those norms that are specific, universal, and obligatory in the relations of States *inter se,* and because no corporation has ever been subject to *any* form of liability (whether civil or criminal) under the customary international law of human rights, we hold that corporate liability is not a discernable-much less universally recognized-norm of customary international law that we may apply pursuant to the ATS. Accordingly, plaintiffs' ATS claims must be dismissed for lack of subject matter jurisdiction.
The order of the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge* ) is **AFFIRMED** insofar as it dismissed plaintiffs' claims against the corporate defendants and **REVERSED** insofar as it declined to dismiss plaintiffs' claims against the corporate defendants.Paul L. Hoffman, Schonbrun DeSimone Seplow Harris & Hoffman, LLP, Venice, CA (Stephen A. Whinston, Carey R. D'Avino, Keino R. Robinson, Berger & Montague, P.C., Philadelphia, PA, on the brief), for Plaintiffs-Appellants-Cross-Appellees.

Rowan D. Wilson (Rory O. Millson, Thomas G. Rafferty, Michael T. Reynolds, on the brief), Cra-

vath, Swaine & Moore LLP, New York, NY, for Defendants-Appellees-Cross-Appellants.

Jeffrey J. Keyes, Briggs and Morgan, P.A., Minneapolis, MN (Mark Girouard, Halleland Lewis Nilan & Johnson, Minneapolis, MN, on the brief), for amici curiae International Law Professors in support of Plaintiffs-Appellants.

Naomi Roht-Arriaza, San Francisco, CA, for amici curiae International Law Scholars Cherif Bassiouni, et al. in support of Plaintiffs-Appellants.

Judith Brown Chomsky (Jennifer M. Green, on the brief), Center for Constitutional Rights, New York, N.Y. (Marcos Simons, Richard Herz, Earthrights International, Washington, DC, on the brief), for amici curiae Wiwa Plaintiffs in support of Plaintiffs-Appellants.

William Aceves, California Western School of Law, San Diego, CA, for amici curiae International Law Scholars in support of Plaintiffs-Appellants.

Before JACOBS, Chief Judge, LEVAL, and CABRANES, Circuit Judges.

Judge LEVAL concurs only in the judgment of the Court dismissing the complaint and files a separate opinion.

JOSÉ A. CABRANES, Circuit Judge:

**\*1 [1]** Once again we consider a case brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350,[FN1] a jurisdictional provision unlike any other in American law and of a kind apparently unknown to any other legal system in the world. Passed by the first Congress in 1789, the ATS laid largely dormant for over 170 years. Judge Friendly called it a "legal Lohengrin"-"no one seems to know whence it came."[FN2] Then, in 1980, the statute was given new life, when our Court first recognized in *Filartiga v. Pena-Irala* that the ATS provides jurisdiction over (1) tort actions, (2) brought by aliens (only), (3) for violations of the law of nations (also called "customary international law" [FN3]) including, as a general matter, war crimes and crimes against humanity-crimes in which the perpetrator can be called "*hostis humani generis,* an enemy of all mankind." [FN4]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Since that time, the ATS has given rise to an abundance of litigation in U.S. district courts. For the first fifteen years after *Filartiga*-that is, from 1980 to the mid-1990s-aliens brought ATS suits in our courts only against notorious foreign *individuals; the* first ATS case alleging, in effect, that a corporation (or "juridical" person) was an "enemy of all mankind" apparently was brought as recently as 1997.[FN5]

Such civil lawsuits, alleging heinous crimes condemned by customary international law, often involve a variety of issues unique to ATS litigation, not least the fact that the events took place abroad and in troubled or chaotic circumstances. The resulting complexity and uncertainty-combined with the fact that juries hearing ATS claims are capable of awarding multibillion-dollar verdicts [FN6]-has led many defendants to settle ATS claims prior to trial.[FN7] Thus, our Court has published only nine significant decisions on the ATS since 1980 (seven of the nine coming in the last decade),[FN8] and the Supreme Court in its entire history has decided only one ATS case.[FN9]

Because appellate review of ATS suits has been so uncommon, there remain a number of unresolved issues lurking in our ATS jurisprudence-issues that we have simply had no occasion to address in the handful of cases we have decided in the thirty years since the revival of the ATS. This case involves one such unresolved issue: Does the jurisdiction granted by the ATS extend to civil actions brought against corporations under the law of nations?[FN10]

Plaintiffs are residents of Nigeria who claim that Dutch, British, and Nigerian corporations engaged in oil exploration and production aided and abetted the Nigerian government in committing violations of the law of nations. They seek damages under the ATS, and thus their suit may proceed only if the ATS provides jurisdiction for tort actions brought against corporations under customary international law.

[2] A legal culture long accustomed to imposing liability on corporations may, at first blush, assume that corporations must be subject to tort liability under the ATS, just as corporations are generally liable in tort under our domestic law (what international law calls "municipal law").[FN11] But the substantive law that determines our jurisdiction under the ATS is neither the domestic law of the United States nor the

domestic law of any other country. By conferring subject matter jurisdiction over a limited number of offenses defined by *international law,* the ATS requires federal courts to look beyond rules of domestic law-however well-established they may be-to examine the specific and universally accepted rules that the nations of the world treat as binding *in their dealings with one another.*[FN12] As Judge Friendly carefully explained, customary international law includes only "those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se.*"[FN13]

**\*2** [3] Our recognition of a norm of liability as a matter of *domestic law,* therefore, cannot create a norm of customary international law. In other words, the fact that corporations are liable as juridical persons under domestic law does not mean that they are liable under international law (and, therefore, under the ATS). Moreover, the fact that a legal norm is found in most or even all "civilized nations" does not make that norm a part of customary international law. As we explained in *Filartiga:*

> [T]he mere fact that every nation's municipal [*i.e.,* domestic] law may prohibit theft does not incorporate "the Eighth Commandment, 'Thou Shalt not steal' ... into the law of nations." It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATS].[FN14]

Accordingly, absent a relevant treaty of the United States-and none is relied on here-we must ask whether a plaintiff bringing an ATS suit against a corporation has alleged a violation of customary international law.

The singular achievement of international law since the Second World War has come in the area of human rights, where the subjects of customary international law-*i.e.,* those with international rights, duties, and liabilities-now include not merely *states,* but also *individuals.* This principle was most famously applied by the International Military Tribunal at Nuremberg. As Justice Robert H. Jackson, chief prosecu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

tor for the United States at Nuremberg, explained:

> [The Nurnberg trials] for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in International Law, namely, that to prepare, incite, or wage a war of aggression ... and that to persecute, oppress, or do violence to individuals or minorities on political, racial, or religious grounds in connection with such a war, or to exterminate, enslave, or deport civilian populations, is an international crime, *and that for the commission of such crimes individuals are responsible.*

Robert H. Jackson, *Final Report to the President Concerning the Nurnberg War Crimes Trial* (1946) (emphasis added), *reprinted in* 20 Temp. L.Q. 338, 342 (1946).[FN15]

From the beginning, however, the principle of individual liability for violations of international law has been limited to natural persons-not "juridical" persons such as corporations-because the moral responsibility for a crime so heinous and unbounded as to rise to the level of an "international crime" has rested solely with the individual men and women who have perpetrated it. As the Nuremberg tribunal unmistakably set forth in explaining the rationale for individual liability for violations of international law: "Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." *The Nurnberg Trial (United States v. Goering),* 6 F.R.D. 69, 110 (Int'l Military Trib. at Nuremberg 1946) (rejecting the argument that only states could be liable under international law).

**\*3** After Nuremberg, as new international tribunals have been created, the customary international law of human rights has remained focused not on abstract entities but on the individual men and women who have committed international crimes universally recognized by the nations of the world. This principle has taken its most vivid form in the recent design of the International Criminal Court ("ICC"). Although there was a proposal at the Rome Conference to grant the ICC jurisdiction over corporations and other "juridical" persons, that proposal was soundly rejected, and the Rome Statute, the ICC's constitutive document, hews to the tenet set forth in Nuremberg that

international norms should be enforced by the punishment of the individual men and women who violate them.[FN16]

In short, because customary international law imposes individual liability for a limited number of international crimes-including war crimes, crimes against humanity (such as genocide), and torture-we have held that the ATS provides jurisdiction over claims in tort against individuals who are alleged to have committed such crimes. As we explain in detail below, however, customary international law has steadfastly rejected the notion of corporate liability for international crimes, and no international tribunal has ever held a corporation liable for a violation of the law of nations.

We must conclude, therefore, that insofar as plaintiffs bring claims under the ATS against corporations, plaintiffs fail to allege violations of the law of nations, and plaintiffs' claims fall outside the limited jurisdiction provided by the ATS.

We emphasize that the question before us is not whether corporations are "immune" from suit under the ATS: That formulation improperly assumes that there is a norm imposing liability in the first place.[FN17] Rather, the question before us, as the Supreme Court has explained, "is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." [FN18] Looking to international law, we find a jurisprudence, first set forth in Nuremberg and repeated by every international tribunal of which we are aware, that offenses against the law of nations (*i.e.,* customary international law) for violations of human rights can be charged against States and against individual men and women but not against juridical persons such as corporations. As a result, although international law has sometimes extended the scope of liability for a violation of a given norm to individuals, it has *never* extended the scope of liability to a corporation. [FN19]

\* \* \*

We pause briefly to acknowledge and reply to the separate opinion of our colleague, Judge Leval. As an initial matter, we are perplexed by Judge Leval's repeated insistence that there is no "basis" for our hold-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

ing because "[n]o precedent of international law endorses" it. *See, e.g.,* Concurring Op. 3. In an ATS suit, we may apply only those international norms that are "specific, universal, and obligatory." [FN20] As a result, the responsibility of establishing a norm of customary international law lies with those wishing to invoke it, and in the absence of sources of international law endorsing (or refuting) a norm, the norm simply cannot be applied in a suit grounded on customary international law under the ATS. Thus, even if there were, as Judge Leval claims, an absence of sources of international law addressing corporate liability,[FN21] that supposed lack of authority would actually *support* our holding. By contrast, to support Judge Leval's proposed rule, there would need to be not only a few, but so many sources of international law calling for corporate liability that the norm could be regarded as "universal." As it happens, no corporation has ever been subject to *any* form of liability under the customary international law of human rights, and thus the ATS, the remedy Congress has chosen, simply does not confer jurisdiction over suits against corporations.[FN22]

**\*4** Although Judge Leval condemns our holding, he in fact agrees with much of our opinion. He concedes, for example, that "[i]t is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities." Concurring Op. 67; *see also id.* (explaining that it "is entirely accurate" that "international law imposes no liabilities on private juridical persons"); *id.* ("[I]t is absolutely correct that the rules of international law ... do not provide for any form of liability of corporations."). He similarly has "no quarrel" with the "premise[ ]" that international law is "the place to look" to determine whether corporations can be held liable for violations of international law. *Id.* at 45-46. He concludes, however, that international law does not supply an answer to that question. In his view, the question of corporate liability is merely a matter of "remedy" that "international law leaves ... to the independent determination of each State." *Id.* at 48.

We agree with Judge Leval that whether to enact a civil remedy for violations of international law is a matter to be determined by each State; the United States has done so in enacting the ATS. But the ATS does not specify who is liable; it imposes liability only for a "violation of the law of nations," 28 U.S.C. § 1350, and thus it leaves the question of the nature and scope of liability-who is liable for what-to customary international law. As we explain in detail below, therefore, whether a defendant is liable under the ATS depends entirely upon whether that defendant is subject to liability under international law. It is inconceivable that a defendant who is *not liable* under customary international law could be *liable* under the ATS.

We will not embark on a lengthy tangent in response to Judge Leval's many "hypothetical cases," Concurring Op. 18, in which corporations would not, under our holding, be liable under the ATS. We note only that nothing in this opinion limits or forecloses suits under the ATS against the individual perpetrators of violations of customary international law-including the employees, managers, officers, and directors of a corporation-as well as anyone who purposefully aids and abets a violation of customary international law. Nor does anything in this opinion limit or foreclose criminal, administrative, or civil actions against *any* corporation under a body of law *other than customary international law*-for example, the domestic laws of any State. And, of course, nothing in this opinion limits or forecloses legislative action by Congress.

\* \* \*

Lastly, we wish to note that we do not take lightly the passion with which Judge Leval disagrees with our holding. We are keenly aware that he calls our reasoning "illogical" on nine separate occasions. *See* Concurring Op. 4, 5, 9, 30, 31 n.18, 36, 28, 46, 68, 69. Nor is it lost on us that he calls our conclusions "strange," *id.* at 3, 57, 59,[FN23] or that he repeatedly criticizes our analysis as "internally inconsistent," *id.* at 6, 7, 46. [FN24] We must, however, leave it to the reader to decide whether any of Judge Leval's charges, individually or in combination, are a fair reading of our opinion. In so doing we are confident that if our effort is misguided, higher judicial authority is available to tell us so.

### BACKGROUND

**\*5** These cross-appeals come to us from the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge*) . At this stage of the proceedings, we accept as true all nonconclusory factual allegations relevant to this decision. *See Ashcroft v. Iqbal,* --- U.S. ----, ---- - ----, 129 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

1937, 1949-50, 173 L.Ed.2d 868 (2009).

## I. Factual Background

Plaintiffs, who are, or were, residents of the Ogoni Region of Nigeria, allege that defendants Royal Dutch Petroleum Company ("Royal Dutch") and Shell Transport and Trading Company PLC ("Shell"), through a subsidiary named Shell Petroleum Development Company of Nigeria, Ltd. ("SPDC"), aided and abetted the Nigerian government in committing human rights abuses directed at plaintiffs. Royal Dutch and Shell are holding companies incorporated respectively in the Netherlands and the United Kingdom.[FN25] SPDC is incorporated in Nigeria. All defendants are corporate entities-that is, "juridical" persons, rather than "natural" persons.

SPDC has been engaged in oil exploration and production in the Ogoni region of Nigeria since 1958. In response to SPDC's activities residents of the Ogoni region organized a group named the "Movement for Survival of Ogoni People" to protest the environmental effects of oil exploration in the region. According to plaintiffs, in 1993 defendants responded by enlisting the aid of the Nigerian government to suppress the Ogoni resistance. Throughout 1993 and 1994, Nigerian military forces are alleged to have shot and killed Ogoni residents and attacked Ogoni villages-beating, raping, and arresting residents and destroying or looting property-all with the assistance of defendants. Specifically, plaintiffs allege that defendants, *inter alia*, (1) provided transportation to Nigerian forces, (2) allowed their property to be utilized as a staging ground for attacks, (3) provided food for soldiers involved in the attacks, and (4) provided compensation to those soldiers.

Plaintiffs brought claims against defendants under the ATS for aiding and abetting the Nigerian government in alleged violations of the law of nations. Specifically plaintiffs brought claims of aiding and abetting (1) extrajudicial killing; (2) crimes against humanity; (3) torture or cruel, inhuman, and degrading treatment; (4) arbitrary arrest and detention; (5) violation of the rights to life, liberty, security, and association; (6) forced exile; and (7) property destruction.

## II. Procedural History

Plaintiffs commenced this lawsuit by filing a putative class action complaint in September 2002, which was amended in May 2004. They alleged that defendants aided and abetted, or were otherwise complicit in, violations of the law of nations by the Nigerian government. Relying on the Supreme Court's June 2004 decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), defendants moved to dismiss.

In September 2006, the District Court dismissed plaintiffs' claims for aiding and abetting property destruction; forced exile; extrajudicial killing; and violations of the rights to life, liberty, security, and association. The District Court reasoned that customary international law did not define those violations with the particularity required by *Sosa. See Kiobel v. Royal Dutch Petroleum Co.,* 456 F.Supp.2d 457, 464-65, 467 (S.D.N.Y.2006). The District Court denied defendants' motion to dismiss with respect to the remaining claims of aiding and abetting arbitrary arrest and detention; crimes against humanity; and torture or cruel, inhuman, and degrading treatment. *See id. at* 465-67. Recognizing the importance of the issues presented and the substantial grounds for difference of opinion, the District Court certified its entire order for interlocutory appeal pursuant to 28 U .S.C. § 1292(b). *See id.* at 467-68.

### DISCUSSION

**\*6** [4][5] We review *de novo* a District Court's dismissal for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), assuming all well-pleaded, nonconclusory factual allegations in the complaint to be true. *See Iqbal,* 129 S.Ct. at 1949-50; *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). We also review questions of subject matter jurisdiction *de novo. See Bank of N.Y. v. First Millennium, Inc.,* 607 F.3d 905, 920 (2d Cir.2010); *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 241 (2d Cir.2003).

[6] As we have explained above, this appeal presents a question that has been lurking for some time in our ATS jurisprudence. Since our first case upholding claims brought under the ATS in 1980, *see Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir.1980), our Court has never directly addressed whether our jurisdiction under the ATS extends to civil actions against corporations, *see Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 261 n. 12 (2d Cir.2009) (assuming, without deciding, that corpora-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

tions may be liable for violations of customary international law); *Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254, 282-83 (2d Cir.2007) (Katzmann, J., concurring) (noting that, because defendants did not raise the issue, the Court need not reach the question of whether corporations may be liable for violations of customary international law); *id.* at 321-25 (Korman, J., concurring in part and dissenting in part) (expressing the view that corporations cannot be held liable under the ATS). We have, in the past, decided ATS cases involving corporations without addressing the issue of corporate liability. *See, e.g., Abdullahi v. Pfizer, Inc.,* 562 F.3d 163 (2d Cir.2009), *cert. denied,* --- S.Ct. ----, No. 09-34, --- U.S. ----, 130 S.Ct. 3541, ---L.Ed.2d ----, 2010 WL 2571888 (June 29, 2010); *Flores,* 414 F.3d 233; *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir.2000). But that fact does not foreclose consideration of the issue here. As the Supreme Court has held, "when questions of *jurisdiction* have been passed on in prior decisions *sub silentio,*" the Court "has never considered itself bound when a subsequent case finally brings the jurisdictional issue before [it]." *Hagans v. Lavine,* 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (emphasis added); *see also Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ( "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Garay v. Slattery,* 23 F.3d 744, 745 n .2 (2d Cir.1994) (finding it necessary to address jurisdictional challenge despite prior cases assuming jurisdiction). The same rule applies here.

In answering the question presented we proceed in two steps. First, we consider which body of law governs the question-international law or domestic law-and conclude that international law governs.[FN26] Second, we consider what the sources of international law reveal with respect to whether corporations can be subject to liability for violations of customary international law. We conclude that those sources lead inescapably to the conclusion that the customary international law of human rights has not to date recognized liability for corporations that violate its norms.

**I. Customary International Law Governs Our Inquiry**

**\*7** [7] The ATS grants federal district courts jurisdiction over claims "by an alien for a tort only, commit-

ted in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.[FN27] In 2004, the Supreme Court held in *Sosa* that the ATS is a jurisdictional statute only; it creates no cause of action, Justice Souter explained, because its drafters understood that "the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." 542 U.S. at 724. Indeed, at the time of its adoption, the ATS "enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 712. These included "three specific offenses against the law of nations addressed by the criminal law of England [and identified by Blackstone]: violation of safe conducts, infringement of the rights of ambassadors, and piracy"-each a rule "binding individuals for the benefit of other individuals[, which] overlapped with the norms of state relationships." *Id.* at 715 (citing 4 W. Blackstone, *Commentaries on the Laws of England* 68 (1769)).

The Supreme Court did not, however, limit the jurisdiction of the federal courts under the ATS to those three offenses recognized by the law of nations in 1789. Instead, the Court in *Sosa* held that federal courts may recognize claims "based on the present-day law of nations" provided that the claims rest on "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Court had] recognized." *Id.* at 725.

[8] The Supreme Court cautioned that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33 (footnote omitted). The Court also observed that "a related consideration is whether *international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual." *Id.* at 732 n. 20 (emphasis added). We conclude-based on international law, *Sosa,* and our own precedents-that international law, and not domestic law, governs the scope of liability for violations of customary international law under the ATS.

**A. International Law Defines the Scope of Liabil-**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

**ity for Violations of Its Norms**

[9][10] International law is not silent on the question of the *subjects* of international law-that is, "those that, to varying extents, have legal status, personality, rights, and *duties* under international law and whose acts and relationships are the principal concerns of international law." Restatement (Third) of the Foreign Relations Law of the United States ("Restatement (Third)"), pt. II, at 70 introductory note (emphasis added); *see* 1 *Oppenheim's International Law* § 33, at 119 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) ("An international person is one who possesses legal personality in international law, meaning one who is a *subject* of international law so as itself to enjoy rights, duties or powers established in international law, and, generally, the capacity to act on the international plane .... " (emphasis added) (footnotes omitted)). Nor does international law leave to individual States the responsibility of defining those subjects. Rather, "[t]he concept of international person is ... derived from international law." 1 *Oppenheim's International Law* § 33, at 120; *see also* Restatement (Third), pt. II, at 70 introductory note ("[I]ndividuals and private juridical entities can have any status, capacity, rights, or duties *given them by international law or agreement* ...." (emphasis added)).[FN28]

**\*8** That the subjects of international law are determined by international law, and not individual States, is evident from the International Military Tribunal at Nuremberg ("Tribunal") in the aftermath of the Second World War. The significance of the judgment of the Tribunal-and of the judgments of the tribunals established pursuant to Allied Control Council Law No. 10-was not simply that it recognized genocide and aggressive war as violations of international law. The defining legal achievement of the Nuremberg trials is that they explicitly recognized *individual liability* for the violation of specific, universal, and obligatory norms of international human rights. In its judgment the Tribunal noted that the defendants had argued that "international law is concerned with the actions of sovereign states, and provides no punishment for individuals." *The Nurnberg Trial (United States v. Goering),* 6 F.R.D. 69, 110 (Int'l Military Trib. at Nuremberg 1946). The Tribunal rejected that view, however, declaring that "*international law* imposes duties and liabilities upon individuals as well as upon states" and that "individuals can be punished

for violations of international law." *Id.* (emphasis added).

The significance of that aspect of the Tribunal's judgment was not lost on observers at the time. Justice Jackson, who served as chief prosecutor for the United States for the trial before the Tribunal, explained in his final report to President Truman that "[the Nurnberg trials] for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in International Law," namely, that the conduct of the leaders of Nazi Germany violated international law, "*and that for the commission of such crimes individuals are responsible.*" Robert H. Jackson, *Final Report to the President Concerning the Nurnberg War Crimes Trial* (1946) (emphasis added), *reprinted in* 20 Temp. L.Q. 338, 342 (1946) (emphasis added). General Telford Taylor, chief prosecutor for the United States for the trials conducted under Allied Control Council Law No. 10, similarly noted in his final report to the Secretary of the Army that "the major legal significance of the Law No. 10 judgments lies ... in those portions of the judgments dealing with the *area of personal responsibility* for international law crimes." Brigadier General Telford Taylor, U.S.A., Chief of Counsel for War Crimes, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 10,* at 109 (1949); *see also* note 36, *post.*[FN29]

**B. *Sosa* and Our Precedents Require Us to Look to International Law to Determine the Scope of Liability**

[11][12] In *Sosa* the Supreme Court instructed the lower federal courts to consider "whether *international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa,* 542 U.S. at 732 n. 20 (emphasis added). That language requires that we look to *international law* to determine our jurisdiction over ATS claims against a particular class of defendant, such as corporations.[FN30] That conclusion is reinforced by Justice Breyer's reformulation of the issue in his concurring opinion: "The norm [of international law] must extend liability to the *type of perpetrator* (*e.g.,* a private actor) the plaintiff seeks to sue." *See id.* at 760 (Breyer, J., concurring) (emphasis added) (citing *id.* at 732 n. 20 majority opinion)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

**\*9** The Supreme Court's instruction to look to international law to determine the scope of liability under the ATS did not involve a revolutionary interpretation of the statute-in fact, it had long been the law of this Circuit. In *Filartiga,* we had looked to international law to determine our jurisdiction and to delineate the type of defendant who could be sued. *See* 630 F.2d at 889 ("[T]he question of federal jurisdiction under the Alien Tort Statute ... requires consideration of the law of nations."); *id.* at 880 ("In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture *committed by a state official* against one held in detention violates established norms of the international law of human rights, and hence the law of nations." (emphasis added)); *see also Khulumani,* 504 F.3d at 269 (Katzmann, J., concurring) ("We have repeatedly emphasized that the scope of the [ATS's] jurisdictional grant should be determined by reference to international law."). Likewise, in *Kadic v. Karadzi* , 70 F.3d 232 (2d Cir.1995) (Newman, J.), and in Judge Harry T. Edwards's notable concurring opinion in *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 775 (D.C.Cir.1984) (Edwards, J., concurring)-both cited with approval by the Supreme Court in *Sosa*-international law provided the rules by which the court decided whether certain conduct violated the law of nations *when committed by non-state actors.* In *Kadic,* we held that a private actor could be liable under the law of nations for genocide, war crimes, and crimes against humanity, 70 F.3d at 239-241, but in *Tel-Oren,* Judge Edwards expressed the view that a private actor could not be liable for torture under the ATS, 726 F.2d at 791-95 (Edwards, J., concurring); *see also, e.g., Flores,* 414 F.3d at 254-66 (looking to customary international law for the applicable norms).

[13] Since *Sosa,* we have continued to adhere to the method prescribed in *Sosa* footnote 20 by looking to customary international law to determine *both* whether certain conduct leads to ATS liability *and* whether the scope of liability under the ATS extends to the defendant being sued. As recently as our decision of 2009 in *Presbyterian Church,* this same panel (including Judge Leval) declared that "footnote 20 of *Sosa,* while nominally concerned with the liability of

non-state actors, supports the broader principle that the scope of liability for ATS violations should be derived from international law." 582 F.3d at 258 (footnote omitted); *see also id.* at 261 n. 12 (noting that the court "need not reach ... the question of 'whether international law extends the scope of liability' to corporations" (quoting *Sosa,* 542 U.S. at 732 n. 20)). In *Presbyterian Church,* we looked to *international law* to determine the circumstances in which aiders and abettors could be liable for violations of the customary international law of human rights. *Id* . at 258-59. We did so because "[r]ecognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place." *Id.* at 259. Thus, our holding today is consistent with *Presbyterian Church,* where we looked to international law to determine not only what conduct is cognizable under the ATS, but also the identity of the persons to whom that conduct is attributable (in that case, aiders and abettors).[FN31]

**\*10** Our interpretation of *Sosa* is also consistent with Judge Katzmann's separate opinion in *Khulumani,* 504 F.3d at 264 (Katzmann, J., concurring), which this same panel (including Judge Leval) adopted as the law of the Circuit in *Presbyterian Church, see* 582 F.3d at 258 ("This opinion draws substantially from Judge Katzmann's concurring opinion, and adopts his proposed rule as the law of this Circuit."). In *Khulumani,* Judge Katzmann observed that aiding and abetting liability-much like corporate liability-" 'does not constitute a discrete criminal offense but only serves as a more particularized way of identifying the persons involved' in the underlying offense." 504 F.3d at 280 (Katzmann, J ., concurring) (quoting *United States v. Smith,* 198 F.3d 377, 383 (2d Cir.1999) (some internal quotation marks omitted)). Judge Katzmann further explained that "[w]hile [footnote 20 of *Sosa* ] specifically concerns the liability of non-state actors, its general principle is equally applicable to the question of where to look to determine whether the scope of liability for a violation of international law should extend to aiders and abettors." *Id.* at 269. He therefore concluded that "to assure itself that it has jurisdiction to hear a claim under the [ATS], [a court] should first determine whether the alleged tort was in fact 'committed in violation of the law of nations,' 28 U.S.C. § 1350, and whether *this law would recognize the defendants' responsibility for that violation.*" *Id.* at 270 (emphasis added); *see also id.* at 281 ("Because aiding and abetting is a generally applicable means of identifying *who should*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

*be held responsible* for a particular act, ... it is ... reasonable to consider whether the theory is accepted as a *general principle of customary international law* ....“ (emphases added)).[FN32]

Significantly, it was only because we looked to international law that we were able to recognize a norm of aiding and abetting liability under the ATS. In *Khulumani,* Judge Katzmann declined to rely on the usual presumption against aiding and abetting liability that applies in the interpretation of domestic statutes. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 182, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). Instead, Judge Katzmann concluded that *Central Bank* had no bearing on aiding and abetting liability under the ATS because, "[u]nder the [ATS] the relevant norm *is provided not by domestic statute but by the law of nations,* and *that law* extends responsibility for violations of its norms to aiders and abettors." 504 F.3d at 282 (Katzmann, J., concurring) (emphases added).[FN33]

* * *

**\*11** In sum, we have little difficulty holding that, under international law, *Sosa,* and our three decades of precedent, we are required to look to international law to determine whether corporate liability for a "violation of the law of nations," 28 U.S.C. § 1350, is a norm "accepted by the civilized world and defined with a specificity" sufficient to provide a basis for jurisdiction under the ATS, *Sosa,* 542 U.S. at 725. We have looked to international law to determine whether state officials, *see Filartiga,* 630 F.2d at 880, private individuals, *see Kadic,* 70 F.3d at 239-41, and aiders and abettors, *see Presbyterian Church,* 582 F.3d at 258-59, can be held liable under the ATS. There is no principled basis for treating the question of corporate liability differently. Like the issue of aiding and abetting liability, whether corporations can be liable for alleged violations of the law of nations "is no less significant a decision than whether to recognize a whole new tort in the first place." *Presbyterian Church,* 582 F.3d at 259. It is, therefore, a decision properly made only by reference to customary international law.

Having concluded that international law controls our inquiry, we next consider what the sources of international law reveal with respect to the existence of a norm of corporate liability under customary international law.

## II. Corporate Liability Is Not a Norm of Customary International Law

[14][15][16][17] To attain the status of a rule of customary international law, a norm must be "specific, universal, and obligatory." *Sosa,* 542 U.S. at 732 (quoting with approval the statement of a lower court) (internal quotation marks omitted); *see also Flores,* 414 F.3d at 248 ("[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."); Restatement (Third) § 102(2) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."). Defining such norms "is no simple task," as "[c]ustomary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas." *Flores,* 414 F.3d at 247. The sources consulted are therefore of the utmost importance. As the Supreme Court re-emphasized in *Sosa,* we look to "those sources we have long, albeit cautiously, recognized":

> "[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the *customs and usages of civilized nations;* and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is."

**\*12** 542 U.S. at 733-34 (emphasis added) (quoting *The Paquete Habana,* 175 U.S. at 700); *see also United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820) (Story, J.) (identifying "the general usage and practice of nations[;] ... judicial decisions recognising and enforcing that law[;]" and "the works of jurists, writing professedly on public law" as proper sources of customary international

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

law); *cf.* *United States v. Yousef,* 327 F.3d 56, 100 n. 33 (2d Cir.2003) (explaining that, "in the parlance of international law," "jurists" and "publicists" are used as synonyms for "scholars"). Agreements or declarations that are merely aspirational, and that "do[ ] not of [their] own force impose obligations as a matter of international law," are of "little utility" in discerning norms of customary international law. *Sosa,* 542 U.S. at 734 (discussing the limited utility of the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948)).[FN34]

In this Circuit we have long recognized as authoritative the sources of international law identified in Article 38 of the Statute of the International Court of Justice ("ICJ Statute").[FN35] *See* *Filartiga,* 630 F.2d at 880-81 & n. 8 (describing Article 38 as consistent with the Supreme Court's historical approach to sources of international law); *see also* J.L. Brierly, *The Law of Nations* 56 (Sir Humphrey Waldock ed., 6th ed.1963) (referring to Article 38 as "a text of the highest authority"); Restatement (Third) § 103 (describing similar sources as evidence of international law). Article 38 provides in relevant part:

> 1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:

> a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

> b. international custom, as evidence of a general practice accepted as law;

> c. the general principles of law recognized by civilized nations;

> d. subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists [*i.e.,* scholars or "jurists"] of the various nations, as *subsidiary means for the determination of rules of law.*

ICJ Statute, art. 38, June 26, 1945, 59 Stat. 1055, 1060, 33 U.N.T .S. 993 (emphasis added). With those principles in mind, we consider whether the sources of international law reveal that corporate liability has attained universal acceptance as a rule of customary

international law.

**A. International Tribunals**

Insofar as international tribunals are established for the specific purpose of imposing obligations on those who violate the law of nations, the history and conduct of those tribunals is instructive. We find it particularly significant, therefore, that no international tribunal of which we are aware has *ever* held a corporation liable for a violation of the law of nations.

**1. The Nuremberg Tribunals**

***13** The Charter of the International Military Tribunal, commonly known as the "London Charter," authorized the punishment of the major war criminals of the European Axis following the Second World War. *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis (the "London Charter"), Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279. The London Charter and the trials at Nuremberg that followed are collectively the single most important source of modern customary international law concerning liability for violations of fundamental human rights.[FN36] As Justice Jackson explained, the London Charter "is a basic charter in the International Law of the future," and the Nuremberg trials took great strides in "ma[king] explicit and unambiguous" the human rights norms that had "theretofore ... [been] implicit in International Law." Jackson, *Final Report, ante,* at 342. And as Judge Katzmann noted in *Khulumani:* "[C]ourts, international bodies, and scholars have recognized that the principles set out in the London Charter and applied by the International Military Tribunal are significant not only because they have garnered broad acceptance, but also because they were viewed as reflecting and crystallizing preexisting customary international law." 504 F.3d at 271 (Katzmann, J., concurring).

It is notable, then, that the London Charter, which established the International Military Tribunal at Nuremberg, granted the Tribunal jurisdiction over *natural persons only. See* London Charter, *ante,* art. 6, 59 Stat. at 1547 (granting the tribunal jurisdiction to "try and punish *persons* ... whether as *individuals* or as *members of organizations*"-*i.e.,* natural persons (emphases added)); *see also* Charter of the International Military Tribunal for the Far East, art. 5, Jan.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

19, 1946, amended Apr. 26, 1946, 4 Bevans 20, 22 (granting the tribunal jurisdiction over "war criminals who as *individuals* or as *members* of organizations are charged with offenses" (emphases added)).

The London Charter also granted the International Military Tribunal the authority to declare organizations "criminal"-and several German government and military organizations, such as the SS and the Gestapo, were, in fact, indicted. London Charter, *ante,* art. 9, 59 Stat. at 1548 ("At the trial of any individual member of any group or organization the Tribunal may declare ... that the group or organization of which the individual was a member was a criminal organization."); Ann Tusa & John Tusa, *The Nuremberg Trial* 425 (1983) (describing the indictment of six organizations). *See generally The* Nurnberg Trial, 6 F.R.D. at 136-43 (describing the structure of the SS and the Gestapo and the criminal activities of their members). Such a declaration following indictment, however, did not result in the organization being punished or having liability assessed against it. Rather, the effect of declaring an organization criminal was merely to facilitate the prosecution of *individuals* who were members of the organization. *See* London Charter, *ante,* art. 10, 59 Stat. at 1548 ("In cases where a group or organization is declared criminal by the Tribunal, the competent national authority of any Signatory shall have the right to bring individuals to trial for membership therein before national, military or occupation courts. *In any such case the criminal nature of the group or organization is considered proved and shall not be questioned.*" (emphasis added)).

**\*14** Echoing the London Charter's imposition of liability on natural persons only, the subsequent United States Military Tribunals, established under Control Council Law No. 10, prosecuted *corporate executives* for their role in violating customary international law during the Second World War, but not the corporate entities themselves. *See generally* Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Against Humanity, *in* 1 *Enactments and Approved Papers of the Control Council and Coordinating Committee, Allied Control Authority Germany* 306 (1945), *available at* http://www.loc.gov/rr/frd/Military_Law/Enactments/ Volume-I.pdf.[FN37] This approach to liability can be seen most clearly in the tribunal's treatment of the notorious I.G. Farben chemical company

("I.G.Farben").

The refusal of the military tribunal at Nuremberg to impose liability on I.G. Farben is not a matter of happenstance or oversight. This corporation's production of, among other things, oil, rubber, nitrates, and fibers was harnessed to the purposes of the Nazi state, and it is no exaggeration to assert that the corporation made possible the war crimes and crimes against humanity perpetrated by Nazi Germany, including its infamous programs of looting properties of defeated nations, slave labor, and genocide:

> The depth of the partnership [between the Nazi state and I.G. Farben] was reached at Auschwitz, the extermination center [in Poland], where four million human beings were destroyed in accordance with the "Final Solution of the Jewish Question," Hitler's plan to destroy an entire people. Drawn by the almost limitless reservoir of death camp labor, I.G. [Farben] chose to build a great industrial complex at Auschwitz for the production of synthetic rubber and oil.

Joseph Borkin, *The Crime and Punishment of I.G. Farben* 2-3 (1978). Auschwitz was an I.G. Farben slave camp where millions were exterminated by Zyklon B, an insecticide knowingly and intentionally manufactured and provided by I.G. Farben and affiliated corporate entities for a new and lethal use as an asphyxiating agent in the gas chambers at Auschwitz. *Id.* at 122-23.

Twenty-four executives of Farben were charged, *inter alia,* with "Planning, Preparation, Initiation, and Waging of Wars of Aggression and Invasions of Other Countries"; "Plunder and Spoliation"; and "Slavery and Mass Murder." *See 7 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* ("*The Farben Case* ") 11-60 (1952); *see also* Borkin, *ante,* at 137 (discussing the indictment of I.G. Farben executives). But the I.G. Farben corporate entity was not charged, nor was it named in the indictment as a criminal organization. In issuing its judgment, the tribunal pointedly observed that "the corporate defendant, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings." 8 *The Farben Case, ante,* at 1153. The Tribunal emphasized:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

**\*15** We have used the term "Farben" as descriptive of the instrumentality of cohesion in the name of which the enumerated acts of spoliation were committed. But corporations act through individuals and, under the conception of *personal individual guilt ...* the prosecution, to discharge the burden imposed upon it in this case, must establish by competent proof beyond a reasonable doubt that an *individual defendant* was either a participant in the illegal act or that, being aware thereof, he authorized or approved it.

*Id.* (emphases added).[FN38] Those statements parallel the oft-cited passage of the Nuremberg judgment, made in response to the argument that international law is concerned only with the actions of sovereign states: "Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." The *Nurnberg Trial,* 6 F.R.D. at 110.

In declining to impose corporate liability under international law in the case of the most nefarious corporate enterprise known to the civilized world, while prosecuting the men who led I.G. Farben, the military tribunals established under Control Council Law No. 10 expressly defined liability under the law of nations as liability that could not be divorced from *individual* moral responsibility. It is thus clear that, at the time of the Nuremberg trials, corporate liability was not recognized as a "specific, universal, and obligatory" norm of customary international law. *See Sosa,* 542 U.S. at 732 (internal quotation marks omitted).

We turn now to international tribunals convened since Nuremberg to determine whether there is any evidence that the concept corporate liability has coalesced into a "specific, universal, and obligatory" norm.

**2. International Tribunals Since Nuremberg**

Since Nuremberg, international tribunals have continually declined to hold corporations liable for violations of customary international law. For example, the charters establishing both the International Criminal Tribunal for the former Yugoslavia, or "ICTY," and the International Criminal Tribunal for Rwanda, or "ICTR," expressly confined the tribunals' jurisdiction to "natural persons." *See* International Criminal Tribunal for the Former Yugoslavia Statute, S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993), *adopting* The Secretary-General, Report Pursuant to Paragraph 2 of Security Council Resolution 808 ("Report of the Secretary-General"), art. 6, U.N. Doc. S/25704 (May 3, 1993) ("The International Tribunal shall have jurisdiction over *natural persons* ...."); Statute of the International Tribunal for Rwanda, art. 5, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994) (same); *cf. Khulumani,* 504 F.3d at 274 (Katzmann, J., concurring) ("[T]he ICTY Statute is particularly significant because the 'Individual Criminal Responsibility' section of that statute was intended to codify existing norms of customary international law.").

**\*16** The commentary contained in the Report of the Secretary-General of the United Nations on the ICTY reveals that jurisdiction over corporations was considered but expressly rejected: "[T]he ordinary meaning of the term 'persons responsible for serious violations of international humanitarian law' would be *naturalpersons to the exclusion of juridical persons.*" Report of the Secretary-General, *ante,* ¶ 50. Moreover, unlike the International Military Tribunal at Nuremberg, the ICTY lacked the authority to declare organizations "criminal." *Id.* ¶ 51 ("The question arises ... whether a juridical person, such as an association or organization, may be considered criminal as such and thus its members, for that reason alone, be made subject to the jurisdiction of the International Tribunal. The Secretary-General believes that this concept should not be retained in regard to the International Tribunal. The criminal acts set out in this statute are carried out by natural persons ...."); *cf.'* London Charter, *ante,* art. 9, 59 Stat. at 1548. Thus, to the extent that the International Military Tribunal at Nuremberg possessed some limited authority to declare corporations criminal-which, as explained above, operated merely as an evidentiary rule for later trials imposing liability on *individuals*-subsequent tribunals have not retained that procedure.

More recently, the Rome Statute of the ICC also limits that tribunal's jurisdiction to "natural persons." *See* The Rome Statute of the International Criminal Court ("Rome Statute") art. 25(1), *opened for signature* July 17, 1998, 37 I.L.M. 1002, 1016; *see also* Albin Eser, *Individual Criminal Responsibility, in* 1 *The Rome Statute of the International Criminal Court* 767, 778 (Antonio Cassese et al. eds., 2002)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

("[W]hen reading paragraphs (1), (2), and (3) of Article 25 of the ICC Statute together, there can be no doubt that by limiting criminal responsibility to individual natural persons, the Rome Statute implicitly negates-at least for its own jurisdiction-the punishability of corporations and other legal entities."). Significantly, a proposal to grant the ICC jurisdiction over corporations and other "juridical" persons was advanced by the French delegation, but the proposal was rejected. *See* Eser, *ante,* at 779. As commentators have explained, the French proposal was rejected in part because "criminal liability of corporations is still rejected in many national legal orders" and thus would pose challenges for the ICC's principle of "complementarity." [FN39] *Id.; see also Draft Report of the Intersessional Meeting from 19 to 30 January 1998* [*Held* ] *in Zuthphen, The Netherlands, in The Statute of the International Criminal Court: A Documentary History* 221, 245 n.79 (M. Cherif Bassiouni ed., 1998) ("There is a deep divergence of views as to the advisability of including criminal responsibility of legal [i.e., juridical] persons in the statute."); Andrew Clapham, *The Question of Jurisdiction Under International Criminal Law Over Legal Persons: Lessons from the Rome Conference on an International Criminal Court, in Liability of Multinational Corporations Under International Law* 139, 157 (Menno T. Kammminga & Saman Zia-Zarifi eds., 2000) ("This proposal was finally withdrawn by the French delegation when it became clear that there was no *possibility that a text could be adopted by consensus* .... For some delegations the whole notion of corporate criminal responsibility was simply 'alien', raising problems of complementarity." (emphasis added)). The history of the Rome Statue therefore confirms the absence of any generally recognized principle or consensus among States concerning corporate liability for violations of customary international law.

**\*17** In sum, modern international tribunals make it abundantly clear that, since Nuremberg, the concept of corporate liability for violations of customary international law has not even begun to "ripen[ ]" into a universally accepted norm of international law. *Cf. The Paquete Habana,* 175 U.S. at 686 (explaining that a practice can "gradually ripen[ ] into a rule of international law" through "usage among civilized nations").

**B. International Treaties**

[18][19] Treaties "are proper evidence of customary international law because, and insofar as, they create *legal obligations* akin to contractual obligations on the States parties to them." *Flores,* 414 F.3d at 256. Although all treaties ratified by more than one State provide *some* evidence of the custom and practice of nations, "a treaty will only constitute *sufficient proof* of a norm of *customary international law* if an overwhelming majority of States have ratified the treaty, *and* those States uniformly and consistently act in accordance with its principles." *Id.* (second emphasis added). Moreover, as one distinguished scholar of international law has explained:

> The ordinary treaty by which two or more states enter into engagements with one another for some *special* object can very rarely be used even as evidence to establish the existence of a rule of *general law;* it is more probable that the very reason of the treaty was to create an obligation which would not have existed by the general law, or to exclude an existing rule which would otherwise have applied.

Brierly, *ante,* at 57 (emphases added). That a provision appears in one treaty (or more), therefore, is not proof of a well-established norm of *customary* international law.

One district court in our Circuit erroneously overvalued the importance of a number of international treaties in finding that corporate liability has attained the status of customary international law. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 316-17 (S.D.N.Y.2003) (denying defendants' motion to dismiss). *But see Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 453 F.Supp.2d 633 (S.D.N.Y.2006) (granting summary judgment to defendants on different grounds), *affirmed by* 582 F.3d 244 (2d Cir.2009). None of the treaties relied upon in the district court's 2003 *Presbyterian Church* opinion has been ratified by the United States, and most of them have not been ratified by other States whose interests would be most profoundly affected by the treaties' terms. [FN40] *Cf. Flores,* 414 F.3d at 256-57 (explaining that a treaty's evidentiary value is dependent, in part, on the number and "relative influence ... in international affairs" of the States that have ratified it). Those treaties are therefore insufficient-considered either individually or collectively-to demonstrate that corporate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

liability is universally recognized as a norm of cus-
tomary international law.

**\*18** [20] Even if those specialized treaties had been
ratified by an "overwhelming majority" of states, *id.
at 256*-as some recent treaties providing for corporate
liability have been, *see, e.g.,* Convention Against
Transnational Organized Crime, art. 10(1), *adopted*
Nov. 15, 2000, S. Treaty Doc. 108-16; Convention on
Combating Bribery of Foreign Public Officials in
International Business Transactions, art. 2, *done* Dec.
17, 1997, S. Treaty Doc. No. 105-43-the fact that
those treaties impose obligations on corporations in
the context of the treaties' particular subject matter
tells us nothing about whether corporate liability for,
say, violations of *human rights,* which are not a sub-
ject of those treaties, is universally recognized as a
norm of *customary international law.* Significantly,
to find that a treaty embodies or creates a rule of cus-
tomary international law would mean that the rule
applies beyond the limited subject matter of the treaty
and *to nations that have not ratified it. See* 1 *Op pen-
heim's International Law* § 626, at 1261. To construe
those treaties as so-called "law-making" treaties-that
is, treaties that codify existing norms of customary
international law or crystalize an emerging rule of
customary international law-would be wholly inap-
propriate and without precedent. *See id.* § 583, at
1203-04 (discussing "law-making" treaties).

As noted above, there is no historical evidence of an
existing or even nascent norm of customary interna-
tional law imposing liability on corporations for vio-
lations of human rights. It cannot be said, therefore,
that those treaties on specialized questions codify an
existing, general rule of customary international law.
Nor can these recent treaties, in light of their limited
number and specialized subject matter, be viewed as
crystalizing an emerging norm of customary interna-
tional law. *See id.* § 583, at 1204 (explaining that
"relatively extensive participation in a treaty, coupled
with a *subject matter of general significance* and
stipulations which accord with the general sense of
the international community, do establish for some
treaties an influence far beyond the limits of formal
participation in them" (footnote omitted)). Further-
more, even if, as a general rule, treaties on a special-
ized subject matter could be viewed as crystalizing a
norm of customary international law (which they
generally cannot), it would be inappropriate to do so
in this case in light of the recent *express rejection* in

major multilateral treaties of a norm of corporate
liability in the context of human rights violations.
*See, e.g.,* Rome Statute, *ante,* art. 25.

Finally, the few specialized treaties imposing liability
on corporations have not had such influence that a
general rule of corporate liability has become a norm
of customary international law. The ICJ in 1969 de-
scribed the process by which that might occur in the
well-known *North Sea Continental Shelf Cases.*
There, Denmark and the Netherlands had argued that
the Federal Republic of Germany was bound by a
particular provision of a treaty, which Germany had
not ratified, because the rule embodied in the multi-
lateral treaty had become a norm of customary inter-
national law. According to the ICJ, accepting that
view would require

**\*19** treating [a particular provision of the 1958 Ge-
neva Continental Shelf Convention] as a norm-
creating provision which has constituted the foun-
dation of, or has generated a rule which, while only
conventional or contractual in its origin, has since
passed into the general *corpus* of international law,
and is now accepted as such by the *opinio juris,* so
as to have become binding even for countries
which have never, and do not, become parties to
the Convention. There is no doubt that this process
is a perfectly possible one and does from time to
time occur: it constitutes indeed one of the recog-
nized methods by which new rules of customary
international law may be formed. At the same time
this result is not lightly to be regarded as having
been attained.

*North Sea Continental Shelf Cases,* [1969] 8 I.L.M.
340, 373-74. For a treaty provision to attain the status
of a norm of customary international law, the ICJ
explained, "[i]t would in the first place be necessary
that the provision concerned should, at all events
potentially, be of a *fundamentally norm-creating
character* such as could be regarded as forming the
basis of a general rule of law." *Id.* at 374 (emphasis
added). Provisions on corporate liability in a handful
of specialized treaties cannot be said to have a "fun-
damentally norm-creating character." Moreover, as
the history of the Rome Statute demonstrates, "still
unresolved controversies as to the exact meaning and
scope of this notion" of corporate liability "raise fur-
ther doubts as to the potentially norm-creating char-
acter of the rule." *Id.* Accordingly, provisions impos-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

ing corporate liability in some recent specialized treaties have not established corporate liability as a norm of customary international law.

[21][22][23] In reaching the contrary conclusion in *Presbyterian Church,* the judge to whom the case was originally assigned in the district court acknowledged that "most treaties *do not* bind corporations" but reasoned that "[i]f corporations can be liable for unintentional torts such as oil spills or nuclear accidents, *logic would suggest* that they can be held liable for intentional torts such as complicity in genocide, slave trading, or torture." *Presbyterian Church,* 244 F.Supp.2d at 317 (emphases added). In addition to the reasons discussed above, the district court's conclusion was flawed by its use of an improper methodology for discerning norms of customary international law: customary international law does not develop through the "logical" expansion of existing norms. *Cf. Yousef,* 327 F.3d at 103-04 ("The strictly limited set of crimes subject to universal jurisdiction cannot be expanded by drawing an analogy between some new crime ... and universal jurisdiction's traditional subjects."). Rather, as the Supreme Court has explained, it develops, if at all, through the custom and practice "among civilized nations ... gradually ripening into a rule of international law." *Sosa,* 542 U.S. at 715 (quoting *The Paquete Habana,* 175 U.S. at 686).[FN41]

**\*20** It bears underscoring that the purpose of the ATS was not to encourage United States courts to create new norms of customary international law unilaterally. *Sosa,* 542 U.S. at 728 (explaining that federal courts have "no congressional mandate to seek out and define new and debatable violations of the law of nations"). Instead, the statute was rooted in the ancient concept of comity among nations and was intended to provide a remedy for violations of customary international law that "threaten[ ] serious consequences in international affairs." *Id.* at 715 (noting that this concern "was probably on the minds of the men who drafted the ATS"). Unilaterally recognizing new norms of customary international law-that is, norms that have not been universally accepted by the rest of the civilized world-would potentially create friction in our relations with foreign nations and, therefore, would contravene the international comity the statute was enacted to promote.[FN42]

We conclude, therefore, that the relatively few inter-

national treaties that impose particular obligations on corporations do not establish corporate liability as a "specific, universal, and obligatory" norm of customary international law. *Id.* at 732 (internal quotation marks omitted). Although those treaties suggest a trend towards imposing corporate liability in *some special* contexts, no trend is detectable outside such narrow applications in specialized treaties, and there is nothing to demonstrate that corporate liability has yet been recognized as a norm of the customary international law of human rights.[FN43]

**C. Works of Publicists**

Although the works of publicists (*i.e.,* scholars or "jurists") can be a relevant source of customary international law, "[s]uch works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." *Sosa,* 542 U.S. at 734 (quoting *The Paquete Habana,* 175 U.S. at 700); *see also* ICJ Statute, *ante,* art. 38(1)(d), 59 Stat. at 1060 (directing the ICJ to apply "judicial decisions and the teachings of the most highly qualified publicists of the various nations, as *subsidiary means for the determination of rules of law .*" (emphasis added)); *see* note 47, *post.*[FN44]

[24] In light of the evidence discussed above, it is not surprising that two renowned professors of international law, Professor James Crawford [FN45] and Professor (now Judge) Christopher Greenwood,[FN46] forcefully declared in litigation argued before this panel on the same day as this case, that customary international law does not recognize liability for corporations that violate its norms. According to Professor Crawford, "no national court [outside of the United States] and no international judicial tribunal has so far recognized corporate liability, as opposed to individual liability, *in a civil or criminal context* on the basis of a violation of the law of nations or customary international law." *See* Declaration of James Crawford ¶ 10, *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* No. 07-0016 (2d Cir. Jan. 22, 2009) (emphasis added); *see also* Second Declaration of Christopher Greenwood ¶ 13, *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* No. 01 Civ. 9882 (S.D.N.Y. July 10, 2002) ("[T]here is not, and never has been, any assertion of the criminal liability of corporations in international law."); Michael Koebele, *Corporate Responsibility Under the*

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

*Alien Tort Statue* 196 (2009) ("[D]espite trends to the contrary, the view that international law primarily regulates States and in limited instances such as international criminal law, individuals, but not [transnational corporations], is still the prevailing one among international law scholars.").[FN47] Even those who favor using the ATS as a means of holding corporations accountable for human rights violations reluctantly acknowledge that "the universe of international criminal law does not reveal any prosecutions of corporations per se." Ratner, note 43, *ante,* at 477.[FN48]

\* \* \*

***21** [25][26] Together, those authorities demonstrate that imposing liability on corporations for violations of customary international law has not attained a discernible, much less universal, acceptance among nations of the world in their relations *inter se.* Because corporate liability is not recognized as a "specific, universal, and obligatory" norm, *see Sosa,* 542 U.S. at 732 (internal quotation marks omitted), it is not a rule of customary international law that we may apply under the ATS. Accordingly, insofar as plaintiffs in this action seek to hold only corporations liable for their conduct in Nigeria (as opposed to individuals within those corporations), and only under the ATS, their claims must be dismissed for lack of subject matter jurisdiction.

### III. The Concurring Opinion

Judge Leval concedes that "international law, of its own force, imposes no liabilities on corporations or other private juridical entities." Concurring Op. 67. In other words, despite his perplexing but forceful contentions otherwise, Judge Leval does not disagree with Part II of our opinion. What he disputes is our conclusion in Part I that customary international law supplies the rule of decision.

Judge Leval admits that international law is "the place to look" to "determine whether a corporation can be held civilly liable for a violation of international law," *id.* at 45, but he maintains that we must accept corporate liability based on principles of domestic law unless "the law of nations [has] spoke[n] on the question [and] provid[ed] that acts of corporations are not covered by the law of nations," *id.* at 46. He then contends that the law of nations has not, in

fact, spoken on the question and that corporate liability is therefore a matter of "remedy" that "international law leaves ... to the independent determination of each State." *Id.* at 48. In doing so Judge Leval dismisses as a source of authoritative guidance the fact that no international tribunal has ever been accorded jurisdiction over corporations because those tribunals have been charged only with the prosecution of crimes. *Id.* at 30-38. Finally, Judge Leval accuses us of rejecting corporate civil liability under the ATS merely because there is no norm of corporate civil liability in customary international law, and he argues that this reasoning is inconsistent with our endorsement of individual liability under the ATS. *Id.* at 6-7.

[27] Judge Leval's criticisms distort our holding and betray several fundamental misunderstandings of customary international law. First, Judge Leval attempts to shift to us the burden of identifying a norm of customary international law that supports our "rule." But it is entirely inappropriate to begin, as Judge Leval apparently begins, with a presumption that a violation of customary international law can be attributed to *any defendant* unless, and until, a norm of customary international law declares otherwise. This reasoning turns customary international law on its head. Customary international law arises from the customs and practices "among civilized nations ... gradually ripening into a rule of international law." *Sosa,* 542 U.S. at 715 (quoting *The Paquete Habana,* 175 U.S. at 686). Accordingly, the responsibility lies with those who seek to demonstrate that "international law extends the scope of liability for a violation of a given norm to the perpetrator being sued." *Id.* at 732 n. 20. Judge Leval produces no evidence that international law extends the scope of liability to corporations, and, in fact, he concedes that it does. Concurring Op. 64 ("It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities."). In any event, although it is not our burden, we have little trouble demonstrating the *absence* of a norm of corporate liability in customary international law. *See* Part II, *ante.*

***22** [28] Second, Judge Leval dismisses the fact that international tribunals have consistently declined to recognize corporate liability as a norm of customary international law; he does so by inventing a distinction between civil and criminal liability in customary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

international law that is contrary to our ATS juris-prudence. As Judge Katzmann explained in his separate opinion in *Khulumani,* "[t]his distinction finds no support in our case law, which has consistently relied on criminal law norms in establishing the content of customary international law for purposes of the [ATS]." 504 F.3d at 270 n. 5. Unlike U.S. domestic law, "international law does not maintain [a] kind of hermetic seal between criminal and civil law." *Id.* (citing *Sosa,* 542 U.S. at 762-63 (Breyer, J., concurring)). Indeed, Judge Katzmann was able to conclude that the scope of customary international law reaches those who aid and abet violations of international law only by looking to the charters of-and the law applied by-the very same international tribunals that Judge Leval ignores. *Id.* at 270 (observing that liability for aiders and abettors was "applied by the war crimes trials following the Second World War" and "has been repeatedly recognized in numerous international treaties, most notably the Rome Statute of the International Criminal Court, and in the statutes creating the International Criminal Tribunal for the Former Yugoslavia ('ICTY') and the International Criminal Tribunal for Rwanda ('ICTR')"); *see also Presbyterian Church,* 582 F.3d at 257 n. 7 ("[C]ustomary international law norms prohibiting genocide, war crimes, and crimes against humanity have been developed largely in the context of criminal prosecutions rather than civil proceedings." (internal quotation marks omitted)). Judge Leval explicitly endorsed Judge Katzmann's reasoning in *Khulumani* by joining the unanimous panel opinion in *Presbyterian Church,* which expressly adopted Judge Katzmann's rule as the law of our Circuit. *Presbyterian Church,* 582 F.3d at 258. Apparently, Judge Leval would have us look to international criminal tribunals only when they supply a norm with which he agrees.

[29] Third, Judge Leval distorts our analysis by claiming that we hold "that the absence of a universal practice among nations of imposing *civil damages* on corporations for violations of international law means that under international law corporations are not liable for violations of the law of nations." Concurring Op. 5 (emphasis added). That is not our holding. We hold that corporate liability is not a norm that we can recognize and apply in actions *under the ATS* because the customary international law of human rights does not impose *any* form of liability on corporations (civil, criminal, or otherwise).

Finally, and most importantly, Judge Leval incorrectly categorizes the scope of liability under customary international law-that is, who can be liable for violations of international law-as merely a question of remedy to be determined independently by each state. *Id.* at 48. As we explained above, *see* Part I.A, *ante,* the *subjects* of international law have always been defined by reference to international law itself. Judge Leval is therefore wrong to suggest that "international law takes no position" on the question of who can be liable for violations of international law. *Id.* at 5.[FN49]

***23** [30][31][32] Although international law does (as Judge Leval explains) leave remedial questions to States, id. at 43, the liability of corporations for the actions of their employees or agents is not a question of remedy.[FN50] Corporate liability imposes responsibility for the actions of a culpable individual on a wholly new defendant-the corporation. In the United States, corporate liability is determined by a body of rules determining which actions of an employee or agent are to be imputed to the corporation.[FN51] In this important respect, corporate liability is akin to accessorial liability, which is a subject of international law not left to individual States. *See Presbyterian Church,* 582 F.3d at 259 (holding that "*Sosa* and our precedents send us to international law to find the standard for accessorial liability" and rejecting the argument that international law relies on domestic law to supply the standard, as a means of enforcement).

The potential for civil damages under the ATS arises only if *customary international law* recognizes that a particular class of defendant is a subject of international law in the first place. *See* 28 U.S.C. § 1350 (providing jurisdiction over "torts ... committed *in violation of the law of nations* " (emphasis added)). Contrary to Judge Leval's suggestion, therefore, *individual liability* under the ATS is wholly consistent with our holding today. Congress chose in the ATS to grant jurisdiction over torts committed "in violation of the law of nations," *id.,* and since the Nuremberg trials, customary international law has recognized *individual liability* for the violation of international human rights. Thus, the ATS merely permits courts to recognize a remedy (civil liability) for heinous crimes universally condemned by the family of nations against individuals already recognized as sub-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

jects of international law. To permit courts to recognize *corporate liability* under the ATS, however, would require, at the very least, a different statute-one that goes beyond providing jurisdiction over torts committed "in violation of the law of nations" to authorize suits against entities that *are not* subjects of customary international law.

### CONCLUSION

The ATS provides federal district courts jurisdiction over a tort, brought by an alien only, alleging a "violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. When an ATS suit is brought under the "law of nations," also known as "customary international law," jurisdiction is limited to those cases alleging a violation of an international norm that is "specific, universal, and obligatory." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting with approval the statement of a lower court); *see also Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 238 (2d Cir.2003) ("[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.").

**\*24** No corporation has ever been subject to *any* form of liability (whether civil, criminal, or otherwise) under the customary international law of human rights. Rather, sources of customary international law have, on several occasions, explicitly rejected the idea of corporate liability. Thus, corporate liability has not attained a discernable, much less universal, acceptance among nations of the world in their relations *inter se,* and it cannot not, as a result, form the basis of a suit under the ATS.

[33] Acknowledging the absence of corporate liability under customary international law is not a matter of conferring "immunity" on corporations. It is, instead, a recognition that the States of the world, in their relations with one another, *see IIT v. Vencap, Ltd. .,* 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.,* --- U.S. ----, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), have determined that moral and legal responsibility for heinous crimes should rest on the individual whose conduct makes him or her "'*hostis humani generis,* an enemy of all mankind.' " *Sosa* 542 U.S. at 732 (quoting *Filartiga v. Pena-*

*Irala,* 630 F.2d 876, 890 (2d Cir.1980)). Nothing in this opinion limits or forecloses suits under the ATS against a corporation's employees, managers, officers, directors, or any other person who commits, or purposefully aids and abets, violations of international law. Moreover, nothing in this opinion limits or forecloses corporate liability under any body of law *other than the ATS*-including the domestic statutes of other States-and nothing in this opinion limits or forecloses Congress from amending the ATS to bring corporate defendants within our jurisdiction. Corporate liability, however, is simply not "accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" recognized as providing a basis for suit under the law prescribed by the ATS, customary international law. *Sosa,* 542 U .S. at 725.

[34] We do not know whether the concept of *corporate* liability will "gradually ripen[ ] into a rule of international law." *Id.* at 715 (quoting The *Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)). It can do so, however, only by achieving universal recognition and acceptance as a norm in the relations of States *inter se.* For now, and for the foreseeable future, the Alien Tort Statute does not provide subject matter jurisdiction over claims against corporations.

To summarize, we hold as follows:

(1) Since *Filartiga,* which in 1980 marked the advent of the modern era of litigation for violations of human rights under the Alien Tort Statute, all of our precedents-and the Supreme Court's decision in *Sosa,* 542 U.S. at 732 n. 20-require us to look to international law to determine whether a particular class of defendant, such as corporations, can be liable under the Alien Tort Statute for alleged violations of the law of nations.

**\*25** (2) The concept of corporate liability for violations of customary international law has not achieved universal recognition or acceptance as a norm in the relations of States with each other. *See Vencap,* 519 F.2d at 1015. Inasmuch as plaintiffs assert claims against corporations only, their complaint must be dismissed for lack of subject matter jurisdiction.

Accordingly, the September 29, 2006 order of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

District Court is **AFFIRMED** insofar as it dismissed some of plaintiffs' claims against the corporate defendants and **REVERSED** insofar as it declined to dismiss plaintiffs' remaining claims against the corporate defendants.

LEVAL, Circuit Judge, concurring only in the judgment:

The majority opinion deals a substantial blow to international law and its undertaking to protect fundamental human rights. According to the rule my colleagues have created, one who earns profits by commercial exploitation of abuse of fundamental human rights can successfully shield those profits from victims' claims for compensation simply by taking the precaution of conducting the heinous operation in the corporate form. Without any support in either the precedents or the scholarship of international law, the majority take the position that corporations, and other juridical entities, are not subject to international law, and for that reason such violators of fundamental human rights are free to retain any profits so earned without liability to their victims.

Adoption of the corporate form has always offered important benefits and protections to business-foremost among them the limitation of liability to the assets of the business, without recourse to the assets of its shareholders. The new rule offers to unscrupulous businesses advantages of incorporation never before dreamed of. So long as they incorporate (or act in the form of a trust), businesses will now be free to trade in or exploit slaves, employ mercenary armies to do dirty work for despots, perform genocides or operate torture prisons for a despot's political opponents, or engage in piracy-all without civil liability to victims. By adopting the corporate form, such an enterprise could have hired itself out to operate Nazi extermination camps or the torture chambers of Argentina's dirty war, immune from civil liability to its victims. By protecting profits earned through abuse of fundamental human rights protected by international law, the rule my colleagues have created operates in opposition to the objective of international law to protect those rights.

Since *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), was decided in 1980, United States courts, acting under the Alien Tort Statute (ATS),[FN1] which was passed by the First Congress in 1789, have been awarding compensatory damages to victims of human rights abuses committed in violation of the law

of nations. Many supporters of the cause of human rights have celebrated the *Filartiga* line of cases as an important advance of civilization. Not all, however, have viewed those cases with favor. Some see them as unwarranted meddling by U.S. judges in events that occurred far away, applying a body of law that we did not make, in circumstances carrying a potential, furthermore, to interfere with the President's conduct of foreign affairs. *See, e.g., Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 805 (D.C.Cir.1984) (Bork, J., concurring). In 2004, a substantial minority of the Supreme Court, in *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718, would have essentially nullified the ATS and overturned the *Filartiga* line, by ruling that the ATS did no more than give courts jurisdiction, and that, absent further legislation establishing a legal claim, courts acting under ATS had no authority to grant any substantive relief. The majority of the Supreme Court, however, rejected that argument. The Court ruled that under the ATS, federal courts could award damages for violations of the law of nations. For those who believe the *Filartiga-Sosa* line represents a meaningful advance in the protection of human rights, the majority's decision here marks a very bad day.

**\*26** To understand this controversy, it is important to understand exactly what is the majority's rule, how it functions, and in what circumstances. To begin, their rule relates to the most abhorrent conduct-those acts that violate norms of the international law of human rights. The ATS gives U.S. courts jurisdiction to award tort damages to aliens who are victims of such atrocities. According to the majority, in cases where the norms of the law of nations were violated by a corporation (or other juridical entity), compensatory damages *may be awarded under the ATS against the corporation's employees,* natural persons who acted in the corporation's behalf, *but not against the corporation* that commanded the atrocities and earned profits by committing them. The corporation, according to my colleagues, has not violated international law, and is indeed incapable of doing so because international law does not apply to the conduct of corporations. Accordingly, a corporation which has earned profits by abuse of fundamental human rights-as by slave trading-is free to retain those profits without liability.

While my colleagues see nothing strange or problem-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

atic in this conclusion, their position is that in any event they have no responsibility for it. They invoke the rule simply because, in their contention, it is commanded by the law of nations.

But there is no basis for this contention. No precedent of international law endorses this rule. No court has ever approved it,[FN*] nor is any international tribunal structured with a jurisdiction that reflects it. (Those courts that have ruled on the question have explicitly rejected can.) No treaty or international convention adopts this principle. And no work of scholarship on international law endorses the majority's rule. Until today, their concept had no existence in international law.

The majority contend, nevertheless, that unambiguous jurisprudence "lead[s] inescapably" to their conclusion. Maj. Op. 17. However, the reasoning that supports the majority's argument is, in my view, illogical, misguided, and based on misunderstandings of precedent.

The argument depends on its observation that international *criminal* tribunals have been established without jurisdiction to impose *criminal punishments* on corporations for their violations of international law. From this fact the majority contend an inescapable inference arises that international law does not govern corporations, which are therefore free to engage in conduct prohibited by the rules of international law with impunity.

There is no logic to the argument. The reasons why international tribunals have been established without jurisdiction to impose *criminal* liability on corporations have to do solely with the theory and the objectives of *criminal punishment,* and have no bearing on civil compensatory liability. The view is widely held among the nations of the world that criminal punishments (under domestic law, as well as international law) are inappropriate for corporations. This view derives from two perceptions: First, that criminal punishment can be theoretically justified only where the defendant has acted with criminal intent-a condition that cannot exist when the defendant is a juridical construct which is incapable of having an intent; and second, that criminal punishments are pointless and counterproductive when imposed on a fictitious juridical entity because they fail to achieve the punitive objectives of criminal punishment. For these

reasons many nations in their domestic laws impose criminal punishments only on natural persons, and not on juridical ones. In contrast, the imposition of civil liability on corporations serves perfectly the objective of civil liability to compensate victims for the wrongs inflicted on them and is practiced everywhere in the world. The fact that international tribunals do not impose *criminal punishment* on corporations in no way supports the inference that corporations are outside the scope of international law and therefore can incur no *civil compensatory liability* to victims when they engage in conduct prohibited by the norms of international law.

**\*27** The majority next contend that international law does not distinguish between criminal and civil liability. This is simply incorrect. International law distinguishes clearly between them and provides differently for the different objectives of criminal punishment and civil compensatory liability.

The majority then argue that the absence of a universal practice among nations of imposing civil damages on corporations for violations of international law means that under international law corporations are not liable for violations of the law of nations. This argument is as illogical as the first and is based on a misunderstanding of the structure of international law. The position of international law on whether civil liability should be imposed for violations of its norms is that international law takes no position and leaves that question to each nation to resolve. International law, at least as it pertains to human rights, consists primarily of a sparse body of norms, adopting widely agreed principles prohibiting conduct universally agreed to be heinous and inhumane. Having established these norms of prohibited conduct, international law says little or nothing about how those norms should be enforced. It leaves the manner of enforcement, including the question of whether there should be private civil remedies for violations of international law, almost entirely to individual nations. While most nations have not recognized tort liability for violations of international law, the United States, through the ATS, has opted to impose civil compensatory liability on violators and draws no distinction in its laws between violators who are natural persons and corporations. The majority's argument that national courts are at liberty to award civil damages for violations of international law solely against natural persons and not against corporations has no basis in

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

international law and, furthermore, nullifies the intention of international law to leave the question of civil liability to be decided separately by each nation.

The majority's asserted rule is, furthermore, at once internally inconsistent and incompatible with Supreme Court authority and with our prior cases that awarded damages for violations of international law. The absence of a universally accepted rule of international law on tort damages is true as to defendants who are natural persons, as well as to corporations. Because international law generally leaves all aspects of the issue of civil liability to individual nations, there is no rule or custom of international law to award civil damages in any form or context, either as to natural persons or as to juridical ones. If the absence of a universally accepted rule for the award of civil damages against corporations means that U.S. courts may not award damages against a corporation, then the same absence of a universally accepted rule for the award of civil damages against natural persons must mean that U.S. courts may not award damages against a natural person. But the majority opinion concedes (as it must) that U.S. courts may award damages against the corporation's employees when a corporation violates the rule of nations. Furthermore, our circuit and others have for decades awarded damages, and the Supreme Court in *Sosa* made clear that a damage remedy does lie under the ATS. The majority opinion is thus internally inconsistent and is logically incompatible with both Second Circuit and Supreme Court authority.

**\*28** If past judges had followed the majority's reasoning, we would have had no Nuremberg trials, which for the first time imposed criminal liability on natural persons complicit in war crimes; no subsequent international tribunals to impose criminal liability for violation of international law norms; and no judgments in U.S. courts under the ATS, compensating victims for the violation of fundamental human rights.

The rule in cases under the ATS is quite simple. The law of nations sets worldwide norms of conduct, prohibiting certain universally condemned heinous acts. That body of law, however, takes no position on whether its norms may be enforced by civil actions for compensatory damages. It leaves that decision to be separately decided by each nation. *See infra* Part III.B. The ATS confers on the U.S. courts jurisdiction to entertain civil suits for violations of the law of

nations. In the United States, if a plaintiff in a suit under the ATS shows that she is the victim of a tort committed in violation of the norms of the law of nations,[FN2] the court has jurisdiction to hear the case and to award compensatory damages against the tortfeasor. That is what the Supreme Court explained in *Sosa.* No principle of domestic or international law supports the majority's conclusion that the norms enforceable through the ATS-such as the prohibition by international law of genocide, slavery, war crimes, piracy, etc.-apply only to natural persons and not to corporations, leaving corporations immune from suit and free to retain profits earned through such acts.[FN3]

I am in full agreement that *this* Complaint must be dismissed. It fails to state a proper legal claim of entitlement to relief. The Complaint alleges that the Appellants-the parent holding companies at the apex of the huge Royal Dutch Shell international, integrated oil enterprise-are liable under the ATS on the theory that their actions aided the government of Nigeria in inflicting human rights abuses on the Ogoni peoples in the jungles of Nigeria. The allegations fall short of mandatory pleading standards. We recently held in *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244 (2d Cir.2009), that liability under the ATS for *aiding and abetting* in a violation of international human rights lies only where the aider and abettor acts *with a purpose* to bring about the abuse of human rights. Furthermore, the Supreme Court ruled in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), that a complaint is insufficient as a matter of law unless it pleads specific facts supporting a plausible inference that the defendant violated the plaintiff's legal rights. Putting together these two rules, the complaint in this action would need to plead specific facts that support a plausible inference that the appellants aided the government of Nigeria *with a purpose* to bring about the Nigerian government's alleged violations of the human rights of the plaintiffs. As explained in greater detail below, *see infra* Part VII, the allegations of the Complaint do not succeed in meeting that test. I therefore agree with the majority that the claims against the Appellants must be dismissed, but not on the basis of the supposed rule of international law the majority has fashioned.

**I. The improbability that the humanitarian law of nations, which is based in moral judgments reflected in legal systems throughout world and**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

**seeks to protect fundamental human rights, would espouse a rule which undermines that objective and lacks any logical justification**

**\*29** *A. The opposition of the majority's rule to the objectives of international law.* Rules of international law are not, like rocks, mountains, and oceans, unexplained natural phenomena found on the surface of the earth. The rules of international law have been created by a collective human agency representing the nations of the world *with a purpose to serve desired objectives.* These rules express the consensus of nations on goals that are shared with virtual unanimity throughout the world.[FN4] Prior to World War II, the enforcement of international law focused primarily on relations among States and problems relating to the sovereign interests of States. It involved, for example, the inviolability of ambassadors in foreign lands, safe conducts, and the outlawing of piracy, which threatened the shared interest of all nations in trade on the high seas. *See Sosa,* 542 U.S. at 715, 720. Worldwide revulsion at the Nazi atrocities in the period of World War II, however, focused attention on humanitarian values-values so fundamental that they were seen as shared by the "civilized nations" of the world. *Filartiga,* 630 F.2d at 881. Beginning with the Nuremberg trials, the focus of international law thus broadened beyond practical concerns of sovereign nations toward universally shared moral objectives. Acts so repugnant that they violated the morality shared by the civilized world were recognized as violations of international law. The law of nations thus came to focus on humanitarian, moral concerns, addressing a small category of particularly "heinous actions-each of which violates definable, universal and obligatory norms"-conduct so heinous that he who commits it is rendered "*hostis humani generis,* an enemy of all mankind." *Sosa,* 542 U.S. at 732 (quoting *Filartiga,* 630 F.2d at 890, and *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984) (Edwards, J., concurring)). These acts are generally understood to include such extreme, universally condemned conduct as genocide, exploitation of slaves, war crimes, and, in certain circumstances, imprisonment without cause and torture.[FN5] The law of nations undertakes an emphatic stance of opposition to such acts.

The majority's interpretation of international law, which accords to corporations a free pass to act in contravention of international law's norms, conflicts with the humanitarian objectives of that body of law. In order to understand the majority's rule, I explore a handful of concrete examples of how it would operate. Because the liability, if any, of a corporation for violations of international law is likely to arise in two somewhat different contexts-that in which the corporation *itself* inflicts humanitarian abuses, and that in which the corporation *aids and abets* a local government's infliction of the abuses-and because the pertinent considerations in these two circumstances are somewhat different, I discuss them separately.

*1) Direct commission of heinous offenses by corporations*

**\*30** *a) Slave trading and exploitation of slaves.* Among the focuses of the Nuremberg trials was the exploitation of slave labor by the I.G. Farbenindustrie Aktiengesellschaft ("Farben") and other German companies. The Farben corporation itself was not on trial, as the proceeding was brought solely against its executives for their complicity in the offenses committed by the corporation. Nevertheless, the tribunal found that Farben's program of exploitation of slave labor violated the standards of international law.[FN6] Because the Nuremberg tribunal was established with only criminal, and not civil, jurisdiction, it never contemplated imposing civil liability on offenders. No civil proceedings of any kind were brought in that tribunal by the victims of Farben's violations against either natural or juridical persons.[FN7] The question thus did not arise at Nuremberg whether international law countenances the imposition of civil liability on a corporation or on any other type of actor for exploitation of slave labor.

Perhaps more pertinent today is commercial exploitation of sex-slavery. Entrepreneurs in child prostitution kidnap unprotected children in poverty stricken areas and hold them in captivity to satisfy sex cravings of customers. Young women, seeking to escape from places where they are oppressed, incur debts to facilitators, who promise to help them, but, when they are unable to pay the entire fee, consign them into sex-slavery, compelling them to perform acts of prostitution a hundred times a day for the profit of their captors until either the debt is considered paid, or, more likely, the woman is so wasted by the abuse she has suffered that she ceases to be a marketable sex object.[FN8] According to the majority's rule, an incorporated entity does not violate international law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

when it conducts such operations, and is free to retain any profit earned through its conduct.

*b) Piracy.* Once thought to have faded into a past remembered only in romanticized children's fables and Gilbert & Sullivan whimsy, piracy now re-emerges as a threat to international trade.[FN9] In Somalia, pirates seize vessels in the Indian Ocean and exact large ransom payments from the owners and insurers. In the port of Lagos, Nigeria, armed pirates board anchored vessels waiting for access to the harbor and steal their cargo. My colleagues' new rule offers secure protection for the profits of piracy so long as the perpetrators take the precaution to incorporate the business.[FN10]

The majority opinion goes still further. Because it claims that juridical entities are not "subjects" of international law and have neither rights nor obligations under it, they can neither sue nor be sued for violations of international law. Accordingly, the seizure by pirates of a vessel *owned by a corporation* (as virtually all commercial vessels are) would not violate international law's prohibition of piracy, and the vessel's corporate owner, from which a ransom had been extorted as the price of freeing its ship, would have no remedy under the ATS or any other comparable provision in any other nation.

**\*31** *c) Genocide.* A number of the cases brought before our courts under the ATS, including this one, are brought against business corporations engaged in extraction of precious resources from mines, wells, or forests in remote, sparsely populated areas. At times, local tribesmen harass and hinder the corporation's operations, resenting the despoliation of their habitat and the failure to share with them the wealth taken from what they see as their land. The corporation solicits the protection of that nation's police or military forces. Most of the suits we have seen, like this one, have accused the defendant corporations of aiding and abetting the local government in the latter's abuse of the rights of those indigenous persons.

Such a company, however, failing to receive adequate protection from the local authorities, might mount its own protective security force and proceed, either independently or working together with forces of the local government, to exterminate the trouble-making tribes. The complaint under ATS in such a case would charge that the corporation *itself* commit-

ted genocide in order to protect its business operations from harassment and increase its profits.

Under the majority's rule, such a corporation would never need to test in court whether it in fact exterminated a tribe, as alleged. It could simply move for the dismissal of the suit, asserting that it is a corporation and therefore by definition could not have violated international law's prohibition of genocide. The plaintiffs could bring a successful ATS suit against the hirelings who carried out the genocide for the corporation (in the unlikely event they could be sued in a court that provided for civil liability). But as for the corporation itself, which committed a genocide to increase its profits, the suit will be dismissed on the ground that the defendant is a corporation.

### 2) Aiding and abetting

As just noted, a number of suits, like this one, charge corporations engaged in the extraction of precious resources in remote places with having *aided and abetted* abuses committed by a foreign government's police or military forces against local populations. In all likelihood, corporations like the defendants in this case, when they ask a relatively impecunious local government to render protection to the corporation's operations, will contribute money and resources to the local government to help it render the protection the corporation needs for its operations. If the government troops then commit atrocities, the victims might sue the corporation on the theory that it aided and abetted the government's brutalities by its contribution of money and resources. Similarly, business corporations engaged in finance or in the sale of food or military supplies might raise funds for, or sell supplies to, a government that is known to violate the law of nations. Victims of that government's abuses might sue the corporation, alleging that the corporation's profit-motivated provision of finance or supplies, done with awareness of the purchasing government's record of atrocities, constitutes aiding and abetting of those atrocities.

**\*32** Many argue with considerable force that imposition of liability in such circumstances would go too far in impeding legitimate business, by making a business corporation responsible for the illegal conduct of local government authorities that is beyond the corporation's control, and which the corporation may even deplore. The shoemaker who makes Hit-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

ler's shoes should not be held responsible for Hitler's atrocities, even if the shoemaker knows that a pair of shoes will help Hitler accomplish his horrendous agenda. Concerns of this nature might well give pause to a court contemplating the imposition of liability on a business corporation for aiding and abetting in a government's infliction of human rights abuses, where the corporation did not promote, solicit, or desire the violation of human rights.

At least in this circuit, however, there is no cause for such concern. In *Khulumani v. Barclay National Bank Ltd.,* 504 F.3d 254 (2d Cir.2007), Judge Katzmann (speaking for himself alone) found that international law does not deem it aiding and abetting in violation of that law to act in a manner that assists a violator unless the assistance is given with a purpose to cause or facilitate the violation. *Id.* at 277 (Katzmann, J., concurring). Then, in *Talisman,* we ruled on whether a corporation could be held liable for aiding and abetting under the standards of international law merely because it knew that supplies it furnished to a local government would be used in the commission of human rights abuses. Although confronted with evidence of shocking human rights violations committed by the government of Sudan, we found that there is no such aiding and abetting liability. Following Judge Katzmann's analysis, we concluded that the standards of international law admit of aiding and abetting liability only when the accused aider acts *with a purpose* to bring about the violations of international law. 582 F.3d at 259. In this circuit, supplying financing or military equipment to a local government will not support the imposition of aiding and abetting liability on the corporation for that government's abuses unless the corporation acted *with a purpose* to promote or advance those violations. (For that reason, and as explained in Part VII below, this Complaint must be dismissed for failure to state a proper claim for aiding and abetting liability.)

A true question of tort liability for corporate aiding and abetting in government atrocities would be raised where such a defendant *purposely* procures the commission of genocide by local government forces. Assume the hypothetical oil exploration company first seeks protection from the local host government from interference with its operations by indigenous tribes. For a period of time, the government forces provide ineffectual protection, but harassment, interference, and sabotage by the tribes continue. Eventually, the

frustrated corporate managers say to the local police chief or military commander: "We have been slipping you very handsome sums, but you have done nothing for us. These protestors continue to cut our pipelines, and sabotage our machinery. The time has come for you to bring this harassment to an end. Wipe them out! There will be a generous bonus for you when it is done." The local government officials comply. Those are facts that *would* raise an issue of corporate liability for aiding and abetting because the alleged aider and abetter intended, solicited, and deliberately procured the primary actor's violations of international law. The rule my colleagues have adopted, however, holds that the corporation has committed no violation and its profits are protected from liability, notwithstanding that it purposely solicited, procured, and caused the genocide in order to render its operations more profitable.

**\*33** Consideration of such examples demonstrates beyond possibility of reasonable disagreement that the rule my colleagues attribute to the law of nations operates to the detriment of the objective of international law to protect fundamental human rights. My colleagues' only response to these examples is that they do not choose to respond to them. Maj. Op. 12. Defenders of the majority opinion might argue that I have chosen extreme and unrepresentative examples to cast the majority's rule in an unreasonably pejorative light. It is true that the hypothetical cases I present for examination involve extraordinarily abhorrent conduct. But the reason I raise such abhorrent conduct is because the law of nations, at least in its humanitarian branch, concerns itself only with extreme abhorrent conduct-conduct that draws the unanimous opprobrium of the entire civilized world. The Supreme Court made clear in *Sosa* that liability is imposed under the ATS for conduct that is condemned throughout the civilized world and that renders one the "enemy of all mankind." *Sosa,* 542 U.S. at 732. Suits alleging ordinary, less repugnant, less universally condemned torts (including the allegations in *Sosa* itself of a temporary abduction of an alleged criminal to bring him to answer criminal charges) will be dismissed whether brought against a natural person or a corporation because of failure to plead a violation of the law of nations. The effect of the majority's rule is to immunize the profits earned from the most heinous acts known to mankind.

I recognize that pointing out the incompatibility of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

the majority's rule with the objectives of international law does not conclude the argument. If the supposed rule the majority relies on in fact reflects the law of nations and international law indeed does not apply to corporate conduct (as the majority claim), then we must apply that rule in a case brought under the ATS regardless of whether we find it illogical or incompatible with the objectives of international law. Law is not always logical.

But neither is the observation irrelevant. Recognition of the humanitarian objectives of the law of nations makes it unlikely that this body of law intends to exempt corporations from its prohibitions or to provide a substantial financial incentive to violate the most fundamental of human rights. *Cf. The Amy Warwick, 67 U.S. (2 Black) 635, 670, 17 L.Ed. 459 (1862)* ("The law of nations is ... founded on the common consent as well as the common sense of the world. It contains no ... anomalous doctrine."). The incompatibility of the majority's rule with the objective of the law of nations to protect fundamental human rights warrants skepticism as to whether international law in fact has such a rule. Before reaching a conclusion whether the majority's "rule" has indeed been adopted by the nations of the world as a rule of international law, we would want to examine whether the rule has any purported justification that might explain its adoption in spite of its apparent incompatibility with the principles and objectives of the law of nations.

**\*34** *B. The absence of any reason, purpose, or objective for which international law might have adopted such a rule.* In asserting that international law exempts corporations from any obligation to comply with its rules, the majority implicitly contend that the nations of the world have some kind of reason, or some shared objective, that might justify the rule. The question then arises what objective the rule would serve. Where a corporation earns profits by exploiting slave labor, or by causing or soliciting a genocide in order to reduce its operating costs, what objective would the nations of the world seek by a rule that subjects the foot soldiers of the enterprise to compensatory liability to the victims but holds that the corporation has committed no offense and is free to retain its profits, shielded from the claims of those it has abused?

Where the legal systems of the world encourage the

establishment of juridical entities, endowing them with legal status by giving them authorization to own property, make contracts, employ labor, and bring suits, treating them as exempt from the law's commands and immune from suit would serve no rational purpose. In fact, nowhere are they so immunized. *E.g.,* Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts,* 6 Nw. J. Int'l Human Rights 304, 322 (2008) ("I am not aware of any legal system in which corporations cannot be sued for damages when they commit legal wrongs that would be actionable if committed by an individual.").

My colleagues do not even suggest any purpose or goal the nations of the world might hope to derive from such a rule, and I can think of none. Before accepting my colleagues' suggestion that a rule so incompatible with the objectives of international law and so lacking in logical justification is in fact a rule of international law, we should demand at least a reasonably persuasive showing based on the precedents of international law. The majority, however, have no such precedents to offer.

**II. The absence of precedent for the majority's rule**

No authoritative source document of international law adopts or in any way approves the majority's view that international law authorizes imposing civil awards of compensatory damages on natural persons but leaves corporations free to violate its rules without legal consequences.[FN11]

*A. No court decisions or other legal precedents espouse the majority's rule.* No court has ever dismissed a civil suit against a corporation, which alleged a violation of the laws of nations, on the ground that juridical entities have no legal responsibility or liability under that law. No court has ever discussed such a rule with even vaguely implied approval. Quite to the contrary, on many occasions courts have ruled in cases involving corporate defendants in a manner that assumed without discussion that corporations could be held liable.[FN12] To my knowledge there is only one opinion by a judge which has spoken favorably of such a principle, and that was a single judge's dissenting opinion. *See Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 292 (2d Cir.2007)* (Korman, J., concurring in part and dissenting in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

part).[FN13] Since that dissenting judge aired his view, numerous corporations have moved for the dismissal of their cases on the ground that juridical entities are exempted from civil liability by the law of nations. Every court that has passed on the question has rejected the contention.[FN14]

**\*35** The majority's view that corporations have neither rights nor obligations under international law is further refuted by two venerable opinions of the Attorney General of the United States. In 1907, the Attorney General rendered an opinion that an American corporation could be held liable under the ATS to Mexican nationals if the defendant's "diversion of the water [of the Rio Grande] was an injury to substantial rights of citizens of Mexico under the principles of international law or by treaty." 26 Op. Att'y Gen. 252, 253 (1907). And in 1795, shortly after the enactment of the ATS, the Attorney General opined that a British corporation could pursue a civil action under the ATS for injury caused to it in violation of international law by American citizens who, in concert with a French fleet, had attacked a settlement managed by the corporation in Sierra Leone in violation of international law. *See* 1 Op. Att'y Gen. 57 (1795). Attorney General William Bradford explained:

> there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States....

*Id.* at 59. *Cf. Sosa*, 542 U.S. at 721 ("Bradford ... made it clear that a federal court was open for the prosecution of a tort action growing out of the episode.").[FN15]

In sum, the principle that my colleagues contend forms a part of the law established by the universal consensus of the nations of the world-that juridical persons have neither rights nor obligations-has never been addressed with favor in any opinion on behalf of any court and has many times been rejected.

*B. No international tribunal is structured with a jurisdiction consistent with the majority's rule.* If there were international tribunals established with jurisdic-

tion to award civil damages against natural persons but not against juridical entities, this would give significant support to the majority's contention that the conventions of international law attach importance to whether a person against whom compensatory liability is sought is a natural person or a juridical entity. But there is no international tribunal established with such jurisdictional restrictions.

The international tribunals that have been established to date with jurisdiction over private persons have concerned themselves only with criminal punishment.[FN16] None has ever had jurisdiction to consider a private civil remedy of any kind-either against a natural person or a juridical entity. No international tribunal furnishes a precedent for the majority's rule. (I discuss below, in Part III, the fallacy of the majority's argument that the restriction of criminal punishments for violations of the law of nations to natural persons reflects an intention in international law to immunize juridical entities from civil compensatory liability .)

**\*36** *C. Quoting out of context from a footnote in the Supreme Court's Sosa opinion, the majority attribute to it a meaning opposite to what it intends.* Quoting a snippet of dictum taken out of context from a footnote in the Supreme Court's *Sosa* opinion, the majority opinion incorrectly attributes to the Court support for the majority's contention that international law distinguishes between natural persons (who can be civilly liable) and corporations (who cannot). To the extent the *Sosa* opinion says anything on the subject, it communicates the opposite of what the majority attribute to it.

The majority assert that in footnote 20 of Justice Souter's opinion, the Supreme Court instructed the lower courts to consider in ruling in ATS claims "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual." Maj. Op. 18, 22. According to the majority opinion, the quoted fragment means that when the defendant is a private actor, such as a natural person or a corporation, a determinative question will be whether well established norms of international law impose liability on such a perpetrator-and the answer may be different depending on whether the actor is a natural person or a corporation. If read in context, however, the passage means the contrary.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

The *Sosa* suit was brought by Alvarez-Machain, a Mexican doctor believed by U.S. government authorities to have participated in the torture and murder by a Mexican drug cartel of an agent of the U.S. Drug Enforcement Administration. The allegation under the ATS asserted that the defendant Sosa, acting on behalf of the U.S. government, had helped to seize Alvarez in Mexico and bring him to the United States to stand trial for his role in the murder. Alvarez was eventually acquitted of the crime. He contended that his abduction violated the law of nations and thus presented a basis for tort liability under the ATS.

The Justices of the Supreme Court all agreed that Alvarez's claims under the ATS should be dismissed because the illegal conduct he asserted did not violate the law of nations. What divided the Justices was whether damages may *ever* be awarded in a suit under the ATS. The minority, taking essentially the position asserted by Judge Bork in *Tel-Oren,* argued that in the absence of further legislation supplying a cause of action, a U.S. court had no basis to award damages because the ATS did no more than confer jurisdiction, and no statute furnished a cause of action. *See Sosa,* 542 U.S. at 750 (Scalia, J., concurring in the judgment).

The majority of the Court rejected the minority view that the ATS can have no practical application unless and until some future Congress passes additional statutes making the law of nations enforceable in a U.S. court. Citing the 1795 opinion of Attorney General Bradford, 1 Op. Att'y Gen. 57, and reaffirming that "the domestic law of the United States recognizes the law of nations," 542 U.S. at 729-30, Justice Souter's opinion construed the intent of the First Congress in passing the ATS as "furnish[ing] jurisdiction for a relatively modest set of actions" by private actors, which implicated the interests of States. *See id.* at 715, 720. The Court majority noted that the ATS originally was meant to authorize litigation of a "narrow set of common law actions derived from the law of nations," *id.* at 721, but that in the present day, federal courts retained authority to decide claims arising under new "international norm[s] intended to protect individuals," *id.* at 730. Recognizing, however, that "good reasons for a restrained conception of the discretion federal courts should exercise in considering a new cause of action of this kind," the Court cautioned that a claim based on the "present-day law

of nations [should] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms." *Id.* at 725.

**\*37** Justice Souter then turned parenthetically to a concern brought into focus by the D.C. Circuit's decision in *Tel-Oren* and this court's decision in *Kadic.*[FN17] Judge Edwards in *Tel-Oren* and this circuit in *Kadic* had each contemplated that certain forms of conduct were violations of international law, as opposed to violations of local law, only when done by a State (or under color of a State's law) and not when done by a private actor acting independently of a State. (This resulted from international law's primary focus on the concerns and conduct of States.) Judge Edwards concluded that, while torture practiced by a State violated the law of nations, there was no wide consensus that torture, *if done independently by a private actor,* constituted a violation of the law of nations. *Tel-Oren,* 726 F.2d at 794-95 (Edwards, J., concurring). *Kadic* reflected on the same question with respect to genocide and concluded that genocide was generally accepted as violating the laws of nations regardless of whether done by a State or by a private actor. *Kadic,* 70 F.3d at 241-42. Nothing in the *Tel-Oren* or *Kadic* opinions suggests in any way that the law of nations might distinguish between conduct of a natural person and of a corporation. They distinguish only between private and State action. The *Sosa* footnote refers to the concern of *Tel-Oren* and *Kadic*-that some forms of noxious conduct are violations of the law of nations when done by or on behalf of a State, but not when done by a private actor independently of a State, while other noxious conduct violates the law of nations regardless of whether done by a State or a private actor. Expressly referring to these discussions in *Tel-Oren* and *Kadic, Sosa's* footnote 20 notes the pertinence of the consideration "whether international law extends the scope of liability for a violation of a given norm for the perpetrator being sued, *if the defendant is a private actor such as a corporation or an individual* " (emphasis added). *See also Sosa,* 542 U.S. at 760 (Breyer, J. concurring) ("The norm must extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue.").

Far from implying that natural persons and corporations are treated *differently* for purposes of civil liability under ATS, the intended inference of the foot-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

note is that they are treated *identically*. If the violated norm is one that international law applies only against States, then "*a private actor, such as a corporation or an individual,*" who acts independently of a State, can have no liability for violation of the law of nations because there has been no violation of the law of nations. On the other hand, if the conduct is of the type classified as a violation of the norms of international law regardless of whether done by a State or a private actor, then "*a private actor, such as a corporation or an individual,*" has violated the law of nations and is subject to liability in a suit under the ATS. The majority's partial quotation out of context, interpreting the Supreme Court as distinguishing between individuals and corporations, misunderstands the meaning of the passage.

### III. The deficiencies of the majority's reasoning

**\*38** In view of the complete absence of precedential support for their rule, the majority's position rests solely on arguments. These arguments rest on illogical propositions and misunderstandings of law and precedent.

*A. The refusal to empower international criminal tribunals to impose criminal punishment on corporations (for reasons which depend solely on the suitability of criminal punishment to corporations) in no way implies that international law exempts corporations from its rules.* The only fact of international law to which the majority can point as evidence of its view that international law does not apply to juridical persons is the fact that international *criminal* tribunals have not exercised authority to impose *criminal* punishments on them. According to the majority, it follows inescapably that juridical entities are not subject to international law. The argument is simply a non sequitur.[FN18]

The majority are absolutely correct that international criminal tribunals have consistently been established without jurisdiction to impose criminal punishments on corporations. At the start of modern prosecution by international tribunals for violations of the law of nations, the military tribunals at Nuremberg, established under the London Charter and Control Council Law No. 10 to punish those responsible for the Nazi atrocities, found that the Farben corporation violated the standards of the law of nations and therefore imposed punishment on the responsible Farben person-

nel, but did not prosecute the corporation. The subsequent international *criminal* tribunals have also been established with jurisdiction over only natural persons. In the recent establishment of the International Criminal Court (ICC) under the Rome Statute, July 17, 1998, 37 I.L.M. 999, 2187 U.N.T.S. 90, a proposal advanced by France to extend the court's jurisdiction to include the prosecution of corporations and other juridical persons was defeated. On this basis the majority declare it "abundantly clear," Maj. Op. 35 (although furnishing no explanation for this abundant clarity), that the prohibitions of international law do not apply to corporations.

The reasons why the jurisdiction of international criminal tribunals has been limited to the prosecution of natural persons, as opposed to juridical entities, relate to the nature and purposes of *criminal* punishment, and have no application to the very different nature and purposes of civil compensatory liability. According to views widely shared in the world, an indispensable element to the justification of criminal punishment is criminal intent.[FN19] Many courts and writers have taken the position that, because criminal intent cannot exist in an artificial entity that exists solely as a juridical construct and can form no intent of any kind, it is an anomaly to view a corporation as criminal.[FN20] In addition, *criminal* punishment does not achieve its principal objectives when it is imposed on an abstract entity that exists only as a legal construct. Criminal punishment seeks to impose meaningful *punishment*-in other words, to inflict, for salutary effect, a measure of *suffering* on persons who have violated society's rules. Charles E. Torcia, 1 *Wharton's Criminal Law* § 1, at 2 (15th ed. 1993) ("The 'criminal' law attempts to force obedience-or to discourage disobedience-by punishing offenders."). The infliction of punitive suffering has several objectives. One is to give society the satisfaction of retribution-of seeing that one who has broken its rules and has caused suffering is required in turn to endure suffering. Another is to disable the offender from further criminal conduct during imprisonment. A third is the hope that the infliction of punitive suffering will change the criminal's conduct, bringing about either his repentance or, at least, his realization that further criminal conduct is likely to result in still more severe punishment. Yet another objective is to dissuade others similarly situated from criminal conduct through the implicit warning that, if they yield to the temptations of illegal conduct, suffering may be inflicted on them.[FN21]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))

**\*39** When criminal punishment is inflicted on an abstract entity that exists only as a legal construct, none of these objectives is accomplished. A corporation, having no body, no soul, and no conscience, is incapable of suffering, of remorse, or of pragmatic reassessment of its future behavior. Nor can it be incapacitated by imprisonment. The only form of punishment readily imposed on a corporation is a fine, and this form of punishment, because its burden falls on the corporation's owners or creditors (or even possibly its customers if it can succeed in passing on its costs in increased prices), may well fail to hurt the persons who were responsible for the corporation's misdeeds. Furthermore, when the time comes to impose punishment for past misdeeds, the corporation's owners, directors, and employees may be completely different persons from those who held the positions at the time of the misconduct. What is more, criminal prosecution of the corporation can *undermine* the objectives of criminal law by misdirecting prosecution away from those deserving of punishment. Because the imposition of criminal punishment on corporations and other juridical entities fails to fulfill the objectives of criminal punishment, the International Military Tribunal at Nuremberg declared, "[O]nly by punishing individuals who commit such crimes [and not by punishing abstract entities] can the provisions of international law be enforced." *The Nurnberg Trial*, 6 F.R.D. 69, 110 (1946); *see* Maj. Op. 7-8. For these reasons, criminal prosecution of corporations is unknown in many nations of the world and is not practiced in international criminal tribunals. *See supra* notes 19-20.

The very sources the majority cite make clear that the reason for withholding criminal jurisdiction over corporations from international tribunals relates to a perceived inappropriateness of imposing *criminal* punishments on corporations. M. Cherif Bassiouni's report on the drafting of the Rome Statute notes the "deep divergence of views as to the advisability of including *criminal responsibility* of legal [i.e., juridical] persons" in the Rome Statute. Maj. Op. 34 (quoting *Draft Report of the Intersessional Meeting from 19 to 30 January 1998 [Held] in Zuthphen, The Netherlands, in The Statute of the International Criminal Court: A Documentary History* 221, 245 n.79 (M. Cherif Bassiouni ed., 1998)). Andrew Clapham's report notes "the whole notion of corporate *criminal responsibility* [is] simply 'alien' " to many

legal systems. Maj. Op. 34 (quoting Andrew Clapham, *The Question of Jurisdiction Under International Criminal Law Over Legal Persons: Lessons from the Rome Conference on an International Criminal Court, in Liability of Multinational Corporations Under International Law* 139, 157 (Menno T. Kamminga & Saman Zia-Zarifi eds., 2000)).

The refusal of international organizations to impose criminal liability of corporations-for reasons having to do solely with a corporation's perceived inability to act with a criminal intent and the inefficacy of criminal punishment to achieve its goals when applied to a corporation-in no way implies that international law deems corporations exempt from international law. As the Chairman of the Rome Statute's Drafting Committee has explained, despite the diversity of views concerning corporate *criminal* liability, "all positions now accept in some form or another the principle that a legal entity, private or public, can, through its policies or actions, transgress a norm for which the law, whether national or international, provides, at the very least damages." M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 379 (2d rev. ed.1999); *see also* 3 Int'l Commission of Jurists, *Corporate Complicity & Legal Accountability: Civil Remedies* 5 (2006) ("[W]hen the legal accountability of a company entity is sought, the law of civil remedies may often provide victims with their only legal avenue to remedy. This is because *the law of civil remedies will always have the ability to deal with the conduct of companies, individuals and state authorities.*" (emphasis added and footnotes omitted)).

**\*40** The purposes of civil tort liability are very different from the purposes of criminal punishment. A principal objective of civil tort liability is to compensate victims of illegal conduct for the harms inflicted on them and to restore to them what is rightfully theirs.[FN22] If a corporation harms victims by conduct that violates the law of nations, imposition of civil liability on the corporation perfectly serves the objectives of civil liability. It compensates the victims for the harms wrongly inflicted on them and restores to them what is rightfully theirs. What is more, in all likelihood, the objectives of civil tort liability cannot be achieved unless liability is imposed *on the corporation.* Because the corporation, and not its personnel, earned the principal profit from the violation of the rights of others, the goal of compensation of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

victims likely cannot be achieved if they have remedies only against the persons who acted on the corporation's behalf-even in the unlikely event that the victims could sue those persons in a court which grants civil remedies for violations of international law. Furthermore, unlike the case with corporate criminal liability, which does not exist in many nations of the world, it is the worldwide practice to impose civil liability on corporations.[FN23]

Thus, the reasons that explain the refusal to endow international criminal tribunals with jurisdiction to impose criminal punishments on corporations suggest if anything the opposite as to civil tort liability. Whereas criminal liability of corporations is unknown in much of the world, civil liability of corporations is enforced throughout the world. Whereas the imposition of criminal punishment on corporations fails to achieve the objective of criminal punishment, the compensatory purposes of civil liability are perfectly served when it is imposed on corporations. Whereas criminal prosecution of a corporation could misdirect prosecutorial attention away from the responsible persons who deserve punishment, imposition of civil compensatory liability on corporations makes possible the achievement of the goal of civil law to compensate victims for the abuses they have suffered. There is simply no logic to the majority's assumption that the withholding from international *criminal* tribunals of jurisdiction to impose *criminal* punishments on corporations (for reasons relating solely to a perception that corporations cannot commit crimes) means that international law's prohibitions of inhumane conduct do not apply to corporations.

*B. The majority incorrectly assert that international law does not distinguish between criminal and civil liability; in fact, international law does distinguish between the two, and leaves issues of private civil liability to individual States.* In an effort to defend their illogical leap from the fact that international tribunals have not exercised criminal jurisdiction over juridical persons to the conclusion that juridical entities cannot violate international law and thus cannot be sued under the ATS, the majority posit that there is no distinction in international law between civil and criminal liability. Maj. Op. 46. The majority cite neither scholarly discussion nor any source document of international law in support of this assertion. In fact, scholarly writings and source documents of international law contradict their assertion. These sources distinguish in many important respects between criminal and civil liability, and demonstrate that imposition of civil liability for violations of international law falls within the general discretion that individual States possess to meet their international obligations.

**\*41** In every instance of the establishment of an international tribunal with jurisdiction over private actors, the tribunal has been given exclusively criminal jurisdiction.[FN24] For instance, the London Charter established the International Military Tribunal at Nuremberg "for the just and prompt *trial and punishment* of the major war criminals of the European Axis." Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis (the "London Charter"), § I, art. 1, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T. S. 279. Control Council Law No. 10 established the U.S. Military Tribunal for the "prosecution" and "punishment" of "war criminals and other similar offenders." Control Council Law 10, preamble, *reprinted in* I *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10,* at xvi (1950). The International Criminal Tribunal for the Former Yugoslavia and the International Criminal Tribunal for Rwanda were established to prosecute and punish war criminals.[FN25] The parties to the Rome Statute of the International Criminal Court "[a]ffirm that the most serious crimes of concern to the international community as a whole must not go unpunished." Rome Statute, preamble, ¶ 4.

Consistent with their constituting charters, international criminal tribunals have exercised only criminal jurisdiction to punish offenders. None has ever exercised a power to make compensatory civil awards to victims.[FN26] These tribunals have on occasion made clear that the criminal violations they found may give rise to a claim for civil compensatory liability, and at times, have explicitly said that conduct which does *not* justify criminal punishment may nonetheless support a claim for compensatory damages.[FN27]

International law not only recognizes differences between criminal and civil liability, but treats them differently. While international institutions have occasionally been established to impose criminal punishments for egregious violations of international law, and treaties often impose on nations the obliga-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

tion to punish criminal violations,[FN28] the basic position of international law with respect to civil liability is that States may impose civil compensatory liability on offenders, or not, as they see fit. As Professor Oscar Schachter explains,[FN29] international law does not ordinarily speak to "the opportunities for private persons to seek redress in domestic courts for breaches of international law by States. There is no general requirement in international law that States provide such remedies. By and large, international law leaves it to them to meet their obligations in such ways as the State determines." [FN30] Oscar Schachter, *International Law in Theory and Practice* 240 (1991).

This feature of international law is largely explained by the diversity of legal systems throughout the world. Because the legal systems of the world differ so drastically from one another, any attempt to dictate the manner in which States implement the obligation to protect human rights would be impractical. "[G]iven the existing array of legal systems within the world, a consensus would be virtually impossible to reach-particularly on the technical accouterments to an action-and it is hard even to imagine that harmony ever would characterize this issue." *Tel-Oren, 726 F.2d at 778* (Edwards, J., concurring).

**\*42** The ceding to States of the fashioning of appropriate remedies to enforce the norms of the law of nations is readily apparent in the source documents. Characteristically, multilateral treaties protecting human rights include few details. They generally define the rights and duties in question, and direct contracting States to protect such rights under their local laws by appropriate means, sometimes, as noted above, commanding criminal punishment, but rarely dictating any aspects of civil liability. For example, in the Genocide Convention, the "crime of genocide" is defined as a number of "*acts* " committed with "intent to destroy, in whole or in part, a national, ethnical, racial or religious group." Convention on the Prevention and Punishment of the Crime of Genocide, arts. I, II, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277. The Convention then provides in Article V that the State parties "undertake to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention and, in particular, to provide effective penalties for persons guilty of genocide." The Convention leaves the details for re-

alizing its objectives to each nation. It says nothing about the nature or form of "effective penalties" to be imposed. It says nothing about civil and administrative remedies. In short, the Convention defines the illegal act of genocide, obligates State parties to enforce its prohibition, and leaves it to each State to devise its own system for giving effect to the Convention's norms.

In this respect, the Convention is typical. The major instruments that codify the humanitarian law of nations define forms of conduct that are illegal under international law, and obligate States to take appropriate steps to prevent the conduct.[FN31] They do not instruct on whether, how, or under what circumstances a State may impose civil compensatory liability. They leave those questions to be resolved by each individual nation.

*C. The majority's next argument-that the absence of widespread agreement among the nations of the world to impose civil liability on corporations means that they can have no liability under international law-misunderstands international law and is furthermore inconsistent with the rulings of the Supreme Court and of this circuit.* For their next argument, the majority construct the following syllogism. 1) To determine whether a corporation can be held civilly liable for violation of international law, the place to look is to international law. 2) Principles of local law, even those accepted throughout the world, are not rules of international law, unless they are generally accepted throughout the civilized world *as obligatory rules of international law.* 3) There is no general acceptance in the world of a rule of international law imposing civil liability on corporate defendants for violations of international law. *Ergo,* international law does not allow for imposition of civil liability on corporations.

**\*43** I have no quarrel with any of the three premises. If properly understood and applied, each is correct. The problem lies in how they are used in the majority opinion and, in particular, the spurious leap from these propositions to the majority's conclusion. Despite the surface plausibility of the majority's argument as it is stated, when one scratches below the surface, the majority's argument is illogical, internally inconsistent, contrary to international law, and incompatible with rulings of both the Supreme Court and this circuit.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

I have no disagreement with the first proposition, that the place to look for answers whether any set of facts constitutes a violation of international law is to international law. As improbable as it may seem that international law would give a free pass to corporations to abuse fundamental human rights, one cannot assume the answers to questions of international law without first exploring its provisions. And if we found that international law in fact exempts corporations from liability for violating its norms, we would be forced to accept that answer whether it seemed reasonable to us or not.

However, when one looks to international law to learn whether it imposes civil compensatory liability on those who violate its norms and whether it distinguishes between natural and juridical persons, the answer international law furnishes is that it takes no position on the question. What international law does is it prescribes norms of conduct. It identifies acts (genocide, slavery, war crimes, piracy, etc.) that it prohibits. At times, it calls for the imposition of criminal liability for violation of the law, whether by vesting a tribunal such as the ICC with jurisdiction to prosecute such crimes or by imposing on States a duty to make the crimes punishable under national law. The majority's proposition that one looks to the law of nations to determine whether there is civil liability for violation of its norms thus proves far less than the majority opinion claims. Yes-the question whether acts of any type violate the law of nations and give rise to civil damages is referable to the law of nations. And if the law of nations spoke on the question, providing that acts of corporations are not covered by the law of nations, I would agree that such a limitation would preclude suits under the ATS to impose liability on corporations.

But international law does not provide that juridical entities are exempt. And as for civil liability of both natural and juridical persons, the answer given by the law of nations (as discussed above) is that each State is free to decide that question for itself. While most nations of the world have not empowered their courts to impose civil liability for violations of law of nations,[FN32] the United States, by enacting the ATS, has authorized civil suits for violation of the law of nations.[FN33]

In short, the majority's contention that there can be no

civil remedy for a violation of the law of nations unless that particular form of civil remedy has been adopted throughout the world misunderstands how the law of nations functions. Civil liability *under the ATS* for violation of the law of nations is not awarded because of a perception that international law commands civil liability throughout the world. It is awarded in U.S. courts because the law of nations has outlawed certain conduct, leaving it to each State to resolve questions of civil liability, and the United States has chosen through the ATS to impose civil liability. The majority's ruling defeats the objective of international law to allow each nation to formulate its own approach to the enforcement of international law.

**\*44** I turn to the majority's second and third propositions in support of its syllogism-that principles of local law, even if accepted throughout the world, are not rules of international law unless they are generally accepted throughout the civilized world as obligatory rules of international law and that there is no widespread practice in the world of imposing civil liability for violation of the rules of international law. These propositions are also true, but they are irrelevant to this controversy. If a damage award under the ATS were premised on the theory that international law commands that violators of its norms be liable for compensatory damages, then we would need to determine whether there is general agreement among the nations of the world to such a rule of international law. But the award of damages under the ATS is not based on a belief that international law commands civil liability. The claim that a tort has been committed is premised on a violation of the law of nations. This follows from a determination that an actor has done what international law prohibits. But international law leaves the manner of remedy to the independent determination of each State. *See supra* notes 29-30 and accompanying text; *cf. Sosa,* 542 U.S. at 730 ("The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts *could properly identify some international norms as enforceable* in the exercise of § 1350 jurisdiction." (emphasis added)). The fact that other nations have not chosen to exercise the discretion left to them by international law in favor of civil liability does not change the fact that international law has left the choice as to civil liability with each individual nation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

A further flaw in the majority's reasoning is its identification of *corporate* civil liability as the principle that has failed to achieve universal approval as a part of the law of nations. The majority's thesis is that when a corporation commits a violation of the law of nations, the victims may sue the natural persons who acted for the corporation, but may not sue the corporation. In the majority's view, that is because there is no widespread acceptance in the world of *corporate* civil liability as a rule of international law. *See* Maj. Op. 10 ("[T]here would need to be not only a few, but so many sources of international law calling for corporate liability that the norm could be regarded as 'universal.' ").

But this is a mistaken description of international law. While it is true that there is no rule of international law making corporations civilly liable, that is merely the inevitable consequence of the fact that there is no rule of international law making any private person civilly liable-regardless of whether the person is natural or juridical, and that international tribunals, which have been established to criminally prosecute violations of international law, have never been vested with authority to impose civil, compensatory liability. If the absence of widespread agreement in the world as to civil liability bars imposing liability on corporations, it bars imposing liability on natural persons as well.

**\*45** The majority's argument thus conflicts with the authority of this court and the Supreme Court. The point of the ATS is to provide a civil remedy to victims of torts committed in violation of the law of nations. In spite of the clear absence of a rule of international law providing for civil liability, we have repeatedly imposed civil liability under the ATS, and the Supreme Court expressly stated in *Sosa,* rejecting the views of the Court minority, that civil tort liability does lie under the ATS. The absence of a wide consensus imposing civil liability has never been construed as barring civil liability. The majority's argument that such absence of wide consensus bars imposition of liability on a corporation places the majority in irreconcilable conflict with the holdings of this court and the teachings of the Supreme Court.

*D. Taking out of context Sosa's reference to a "norm," which must command virtually universal acceptance as a rule of international law to qualify as a rule of international law, the majority opinion*

*attributes to that concept a meaning the Supreme Court could not possibly have intended.* The majority claim to find support for their argument in a passage of the Supreme Court's *Sosa* opinion. The Court cautioned in *Sosa* that, in order to qualify as a rule of international law, a "norm" must command virtually universal acceptance among the civilized nations as a rule of international law. 542 U.S. at 732. The majority opinion, disregarding the context of the Court's discussion, construes the "norm" under discussion as a convention concerning the type of violator of international law upon whom civil tort liability may be imposed. It postulates that, where a corporation has committed a tort prescribed by the law of nations, liability may not be imposed on it unless there is a "norm" generally accepted throughout the world for the imposition of tort liability on such a corporate violator of the law of nations, as opposed to the natural person tortfeasors who acted on the corporations' behalf.

This is not what the Supreme Court meant. What the Court was addressing in its reference to "norms" was standards of conduct. Some norms (or standards)-those prescribing the most egregious and universally condemned forms of conduct, including genocide, war crimes, and slavery-express rules of the law of nations. Other norms of conduct, even though widely accepted and enforced in the world *as rules of local law,* are not rules of the law of nations and are therefore not obligatory on States. What was required was that the particular standard of conduct violated by the defendant be generally accepted *as a mandatory rule of international law.*

A reading of *Sosa,* and of the cases it describes in this discussion as "generally consistent" with its view, makes clear that all of them are discussing the distinctions between *conduct that does, and conduct that does not, violate the law of nations.* Reinforcing this limitation, the *Sosa* opinion quoted with approval this court's reference in *Filartiga* to conduct that renders one "*hostis humani generis,* an enemy of all mankind," 630 F.2d at 890, Judge Edwards' formulation-"a handful of heinous actions-each of which violates definable, universal, obligatory norms," *Tel-Oren,* 726 F.2d at 781 (Edwards, J., concurring), and the Ninth Circuit's similar observation that "[a]ctionable violations of international law must be of a norm that is specific, universal, and obligatory," *In re Estate of Marcos Human Rights Litig., 25 F.3d 1467, 1475*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

(9th Cir.1994). The discussion in *Sosa* used the word "norms" to refer to standards of conduct.

**\*46** To be sure, the distinction between conduct that does and conduct that does not violate the law of nations can turn on whether the conduct is done by or on behalf of a State or by a private actor independently of a State. *Sosa* and *Tel-Oren* both spoke of forms of conduct-arbitrary detention and torture-that might violate the law of nations only if done by or on behalf of a State and not if done by a private actor acting independently of the State. But that is a completely different issue from the majority's proposition. The majority are not speaking of conduct which, because done by an actor of specified character, does *not* violate the law of nations. By definition, when conduct does not violate the law of nations, it cannot be the basis of tort liability under the ATS for violation of the law of nations. The majority's rule encompasses conduct that indisputably *does* violate the law of nations, including for example slavery, genocide, piracy, and official torture (done under color of State law)-conduct for which the natural person tortfeasors will be held liable under ATS, but for which, the majority insist, a corporation that caused the conduct to be done and that profited from it, cannot be held liable. Nothing in *Sosa* inferentially supports or even discusses this question.

The Supreme Court, furthermore, could not have meant what the majority opinion attributes to it. The disagreement in *Sosa* that divided the Court was on the question whether the ATS *in any circumstance* authorizes an award of compensatory tort damages. The minority of the Court argued vigorously that no such damages could be awarded without further authorizing legislation by the Congress. *Sosa,* 542 U.S. at 746-47 (Scalia, J., concurring in the judgment). The majority of the Supreme Court disagreed and found that the ATS authorized awards of tort damages for violations of the norms of the law of nations without need for any further legislation. *Id.* at 730 (maj.op.). Had the Supreme Court meant what my colleagues assume it did in this passage, it could not have maintained its disagreement with the minority. There was no wide adherence among the nations of the world to a rule of civil liability for violation of the law of nations. Had the Supreme Court meant, as my colleagues attribute to it, that no damages may be awarded under ATS absent a universally shared view among the civilized nations that international law

provides such a remedy, the Supreme Court would have been forced to conclude, in *agreement* with the minority, that the *Filartiga* line of cases, which awarded damages, was wrongly decided and that there could be no awards of damages under ATS. The majority of the Court, however, spoke with approval of *Filartiga* and the subsequent cases which had awarded damages and unmistakably concluded that damages were awardable under the ATS upon a showing of violation of the norms of conduct constituting part of the law of nations.

**\*47** The majority's claim to find support for their position in the Supreme Court's reference to the need for a norm to enjoy universal acceptance to qualify as a rule of international law is simply a misunderstanding of the Supreme Court's discussion.[FN34]

## IV. The majority's mistaken claim that corporations are not "subjects" of international law

The majority attempt to bolster their argument by employing the arcane terminology of international law. They assert that a corporation is not a "subject" of international law. Maj. Op. 18. The majority explain the significance of this term to be that only subjects of international law have "rights, duties, and liabilities" under international law. Maj. Op. 7. Because, according to the majority, a corporation is not a subject of the law of nations, it may neither bring suit for violations of the law of nations nor be sued for offenses under the law of nations.

The majority, however, cite no authority in support of their assertion that a corporation is not a subject of international law and is therefore incapable of being a plaintiff or a defendant in an action based on a violation of the law of nations. And there is strong authority to the contrary.

The idea that an entity was or was not a "subject" of international had greatest prominence when the rules of international law focused on the sovereign interests of States in their relations with one another. To the extent that a particular rule of international law pertains only to the relationship among States, it can be correct to say that only States are subjects. However, as the law of nations evolved to recognize that "individuals and private juridical entities can have any status, capacity, rights, or duties given them by international law or agreement," Restatement (Third)

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

of the Foreign Relations Law of the United States, pt. II, introductory note, [FN35] that terminology has come to mean nothing more than asking whether the particular norm applies to the type of individual or entity charged with violating it, as some norms apply only to States and others apply to private non-state actors.

As early as the Nuremberg trials, which represented the dawn of the modern enforcement of the humanitarian component of the law of nations, courts recognized that corporations had obligations under international law (and were therefore subjects of international law). In at least three of those trials, tribunals found that corporations violated the law of nations and imposed judgment on individual criminal defendants based on their complicity in the corporations' violations.[FN36]

For example, in the Farben case, the Farben personnel were charged in five counts with wide-ranging violations of international law, including plunder of occupied properties. VIII *Farben Trial,* at 1129. Nine defendants were found guilty on this count. The tribunal's judgment makes clear that the Farben company itself committed violations of international law. Describing the applicable law, the tribunal stated:

**\*48** Where private individuals, *including juristic persons,* proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified ..., is in violation of international law.... Similarly *where a private individual or a juristic person* becomes a party to unlawful confiscation of public or private property by planning and executing a well-defined design to acquire such property permanently, acquisition under such circumstances subsequent to the confiscation constitutes conduct in violation of [international law].

*Id.* at 1132-33 (emphasis added). Describing Farben's activities, the tribunal wrote:
[W]e find that the proof establishes beyond a reasonable doubt that offenses against property as defined in Control Council Law No. 10 were committed by Farben, and that these offenses were connected with, and an inextricable part of the German policy for occupied countries as above described.... The action of Farben and its representatives, under these circumstances, cannot be differentiated from acts of plunder or pillage committed by officers,

soldiers, or public officials of the German Reich.

*Id.* at 1140. Then-after concluding that Farben violated international law-the tribunal imposed criminal liability on Farben's employees because of their complicity in violations committed by Farben.

As discussed above in Part II.A, two opinions of the Attorney General of the United States further refute the majority's view that corporations have neither rights nor obligations under international law. In 1907, the Attorney General rendered an opinion that an American corporation could be held liable under the ATS to Mexican nationals if the defendant's "diversion of the water [of the Rio Grande] was an injury to substantial rights of citizens of Mexico under the principles of international law or by treaty." 26 Op. Att'y Gen. 252, 253 (1907). And in 1795, shortly after the enactment of the ATS, the Attorney General opined that a British corporation could pursue a civil action under the ATS for injury caused to it in violation of international law by American citizens who, in concert with a French fleet, had attacked a settlement managed by the corporation in Sierra Leone in violation of international law. *See* 1 Op. Att'y Gen. 57 (1795).

This court similarly recognized claims on behalf of juridical entities (a corporation, a trust, and a partnership) against Cuba, premised on Cuba's expropriation of their property in violation of international law.[FN37] These decisions cannot be reconciled with the majority's contention that corporations are not subjects of under international law.

**V. The absence of scholarly support for the majority's rule**

The majority contend that the "teachings of the most highly qualified publicists of the various nations" support their strange view of international law. Maj. Op. 28 n.36. The opinion seems to suggest that all those works of scholarship that discuss the actual state of the law, as opposed to those which advocate for the scholars' aspirational preferences, agree with the majority's view. I have discovered no published work of scholarship that supports the majority's rule. While they cite eminent works of scholarship for many other propositions that I do not dispute, none of those works supports, or even addresses, the majority's claim that corporations are exempted by interna-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

tional law from the obligation to comply with its rules.

**\*49** The majority open their discussion by quoting the Supreme Court's well known observation in *The* [Paquete Habana, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900)](#), that "*the works of* jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat" can furnish valuable "evidence" of customary international law. [*Id.* at 700](#) (emphasis added). The Supreme Court relied on the leading treatises in the field, such as Wharton's *Digest of the International Law of the United States* and Wheaton's treatise on international law, as well as on "leading French treatises on international law," such as De Cussy's *Phases et Causes Celebres du Droit Maritime des Nations,* Ortolan's *Regles Internationales et Diplomatie de la Mer,* and De Boeck's *de la Propriete Privee Ennemie sous Pavillon Ennemi.*

The majority opinion, in contrast, does not cite a single published work of scholarship-no treatise on the law of nations, no published book on the subject, and no article in a scholarly journal-in support of its position. [FN38] If the prescriptions of international law against inhumane acts do not apply to corporations, which are therefore free to disregard them without liability, one would think this would be sufficiently interesting to warrant comment, or at least acknowledgment, in some published work of scholarship. The majority cite none. No reference to this strange view is found for example in *Oppenheim's International Law,* Brierley's *The Law iof Nations* or the American Law Institute's *Restatements of the Foreign Relations Law of the United States,* or in any of the numerous learned works the majority cite.

The majority opinion claims that its view is supported in two unpublished documents-affidavits by law professors submitted in another litigation by corporate defendants in an effort to get the case against them dismissed. [FN39] (The majority opinion ignores opposing affidavits filed in the same litigation.) My colleagues assert that those affidavits by two renowned professors of international law, Professors James Crawford and Christopher Greenwood, "have forcefully declared ... that customary international law does not recognize liability for corporations that violate its norms." Maj. Op. 43. This characterization

is not strictly speaking false but any implication that the professors' affidavits support the majority's view-that corporate violations of international law can give rise to civil liability of the natural persons who acted for the corporation but not of the corporation itself-is completely unwarranted.

Professor Crawford's affidavit, which was filed by the corporate defendant in *Presbyterian Church of the Sudan v. Talisman Energy, Inc.,* Dkt. No. 07-0016, does not discuss, much less espouse, the majority's theory. Its subject matter is very limited. The affidavit was prepared in response to a question put to the litigants during argument of the appeal by Judge Cabranes. Judge Cabranes requested further briefing on the question:

> **\*50** What country or international judicial tribunal has recognized corporate liability, as opposed to individual liability, in a civil or criminal context on the basis of a violation of the law of nations or customary international law?

Professor Crawford makes clear in his affidavit that he limits himself to answering that question-whether any international or foreign judicial decision has imposed liability on a corporation "under international law as such." Crawford Decl. ¶ 5. The Professor answers that he knows of no such decision. [FN40]

I have no quarrel with Professor Crawford's statement that no national court outside the United States or international judicial tribunal has as yet imposed civil liability on a corporation on the basis of a violation of the law of nations. It adds nothing to our debate. To begin with, his observation is particularly without significance as justification of the majority's distinction between liability of natural persons and liability of corporations because Professor Crawford does not state that any nation outside the United States awards civil damages against any category of defendant for violations of the law of nations. If there are no civil judgments outside the United States against natural persons, the fact that there are no civil judgments against corporations either in no way supports the distinction the majority are making.

Professor Crawford's affidavit furthermore does not address the rule the majority attribute to international law. International tribunals do not have jurisdiction to impose civil liability on private actors, and the fact

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

that other nations' courts have not awarded civil dam-ages against corporations does not support the major-ity's theory that the absence of judgments imposing civil liability somehow *bars* a national court, such as a U.S. court acting under the ATS, from imposing civil liability on a corporation for its violation of in-ternational law.

I do not contend that the law of nations imposes civil damages, either on corporations or on natural per-sons. Quite to the contrary, the law of nations does not take a position on civil liability of either natural persons or corporations. It leaves the question of civil liability to each nation to resolve for itself. By pass-ing the ATS, Congress resolved that question for the United States, unlike the great majority of nations, in favor of civil liability. Nothing in Professor Craw-ford's affidavit is to the contrary.

In fact, Professor Crawford's affidavit seems rather to express oblique support for my view. In noting that no national tribunal outside the United States has imposed civil liability on a corporation on the basis of a violation of the law of nations, the Professor notes the need for a "clarification." He then explains,

> When the terms of an international treaty become part of the law of a given state-whether (as in most common law jurisdictions) by being enacted by parliament or (as in many civil law jurisdictions) by virtue of constitutional approval and promulga-tion which give a self-executing treaty the force of law-*corporations may be civilly liable for wrongful conduct contrary to the enacted terms of the treaty* just as they may be liable for any other conduct recognized as unlawful by that legal system.

**\*51** *Id.* ¶ 4 (emphasis added). That is more or less the circumstance when a plaintiff sues in U.S. courts under the ATS to impose civil compensatory liability for a violation international law. The ATS provides jurisdiction over "a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Norms of international law, such as the outlawing of genocide by the Genocide Con-vention, have the force of law in the United States and may be the subject of a suit under the ATS. Be-cause the law of nations leaves each nation free to determine for itself whether to impose civil liability for such violations of the norms of the law of nations, and because the United States by enacting the ATS

has opted for civil tort liability, U.S. courts, as a mat-ter of U.S. law, entertain suits for compensatory damages under the ATS for violations of the law of nations. The ATS confers jurisdiction by virtue of the defendant's violation of the law of nations. Damages are properly awarded under the ATS not because any rule of international law imposes damages, but be-cause the United States has exercised the option left to it by international law to allow civil suits. Nothing in international law bars such an award, and nothing in Professor Crawford's affidavit suggests the con-trary.[FN41]

The majority also quote from an affidavit of Profes-sor Christopher Greenwood, filed in the district court in the *Talisman* case. The majority's quotation from the Greenwood affidavit contributes nothing to this dispute. According to the majority, the Professor's affidavit states, "[T]here is not, and never has been, any assertion of the criminal liability of corporations in international law." Maj. Op. 43. As I have ex-plained above, I have no quarrel with that assertion, but it has no bearing on whether corporations may be held civilly liable under ATS for violations of inter-national law. The reasons international tribunals do not impose *criminal* liability on corporations have to do only with the nature of *criminal* liability and a widespread perception that *criminal liability* is nei-ther theoretically sound nor practically efficacious when imposed on a juridical entity. This says nothing about the imposition of compensatory civil liabil-ity.[FN42]

The majority cite no work of scholarship that sup-ports their position, and fail to acknowledge scholar-ship that rejects their view. Professor Schachter and other scholars assert that international law leaves the question of civil liability to be determined by indi-vidual nations. *See supra* note 29 and accompanying text. A three-volume report of the International Commission of Jurists on the subject of "Corporate Complicity and Legal Accountability"[FN43] distin-guishes between criminal and civil liability and pro-vides as to civil liability that "*the law of civil reme-dies will always have the ability to deal with the con-duct of companies, individuals and state authorities.*" 3 Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* 5 (2008). The report maintains that this is the case notwithstanding that "significant opposition to the imposition of *criminal* sanctions on companies as legal entities remains," for "reasons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

[that] appear to be broadly conceptual, and at times political." [FN44] 2 Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* 57 (2008) (emphasis added). Michael Koebele's work asserts that liability under the ATS "applies equally to natural and legal persons" and that international law does not bar States from imposing liability on a corporation, as international law leaves civil liability to domestic law. Michael Koebele, *Corporate Responsibility Under the Alien Tort Statute: Enforcement of International Law Through U.S. Torts Law* 208 (2009).[FN45] Two treatises on the ATS maintain that a corporation may be held civilly liable for engaging in conduct that violates the law of nations. Beth Stephens et al., *International Human Rights Litigation in U.S. Courts* 310 (2d ed. 2008) ("Nothing in the *Sosa* decision demands more of plaintiffs seeking to hold corporations accountable for human rights violations than the strict evidentiary requirements imposed generally...."); Peter Henner, *Human Rights and the Alien Tort Statute: Law, History, and Analysis* 215 (2009) ("Alleged perpetrators of crimes under international law that do not require any showing of state action, including piracy, genocide, crimes against humanity, enslavement, and slave trading, can be sued under the ATS. Generally, *the prospective private defendants can be individuals, corporations, or other entities.*" (emphasis added)).[FN46]

**\*52** To be sure, the scholarship of international law includes statements of scholars to the effect that international law imposes no liabilities on private juridical persons. This is entirely accurate, but it does not mean what the majority contend. It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities.[FN47] International criminal tribunals, for reasons that relate solely to the nature of criminal liability and punishment, do not exercise jurisdiction over corporations. And as for civil liability of private persons, international law leaves individual nations free to decide whether to implement its norms of conduct by providing civil compensatory liability to victims. *See supra* notes 29-30 and accompanying text. Accordingly, it is absolutely correct that the rules of international law do not provide civil liability against any private actor and do not provide for any form of liability of corporations. In no way, however, does it follow that international law's rules do not apply to corporations.

No work of scholarship cited in the majority opinion supports the majority's rule, and many works of scholarship assert the contrary.

**VI. Response to the majority's criticism of my arguments**

*There is no inconsistency between my present position and my prior endorsement in Talisman of the reasoning set forth by Judge Katzmann in Khulumani.* The majority assert that the position I now take contradicts the position I took in *Talisman* when I approved the reasoning Judge Katzmann set forth in *Khulumani.* They say I now "ignore" the international tribunals whose rulings I and Judge Katzmann previously found controlling, that I ignore "the second step" of Judge Katzmann's approach, and that I "look to international tribunals only when they supply a norm with which [I agree]." Maj. Op. 48. These criticisms misunderstand both Judge Katzmann's arguments and mine. There is no inconsistency between my prior endorsement of the views Judge Katzmann expressed in *Khulumani* and those I express here. I do not ignore the judgments of international tribunals. I merely decline to draw illogical and unwarranted conclusions from them.

In *Khulumani,* one of the main issues in dispute was whether civil liability for violations of international law may be imposed on an actor who participated in the violation of an international law norm as an aider and abetter. The district court had dismissed claims against alleged aiders and abetters on the ground that international law recognized no civil liability for aiding and abetting. *See Ntsebeza v. Citigroup, Inc., 346 F.Supp.2d 538, 554 (S.D.N.Y.2004).* Although numerous judgments in criminal proceedings had imposed criminal liability for aiding and abetting, the district court accorded them no significance, because they were *criminal* judgments which the district court believed were inapplicable to civil liability. Judge Katzmann found this reasoning erroneous and pointed out that we have "consistently relied on criminal law norms in establishing the content of customary international law for purposes of the AT[S]." *Khulumani, 504 F.3d at 270 n. 5.* He concluded that if international criminal tribunals had ruled that aiding and abetting a violation of the law of nations was itself a violation of the law of nations, this answered the question posed in a civil suit under the ATS whether aiding and abetting violated the law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

of nations. He explained, "Once a court determines that the defendants' alleged conduct falls within one of 'the modest number of international law violations with a potential for personal liability' on the defendant's part ... [t]he common law ... permits the 'independent judicial recognition of actionable international norms.' " *Id.* at 269-70 (citations omitted). Judge Katzmann, in other words, looked at the norms of conduct established by international courts as violations of international law and concluded that conduct which constitutes a criminal violation of international law also violates international law for purposes of civil liability under the ATS.

**\*53** I agree completely with Judge Katzmann's reasoning. It does not follow, however, that if international tribunals withhold criminal liability from juridical entities for reasons that have nothing to do with whether they violated the conduct norms of international law, but result only from a perceived inappropriateness of imposing *criminal* judgments on artificial entities, there has been no violation of the norms of international law. Nothing in Judge Katzmann's opinion suggests that he would adopt the majority's position or that he would disagree with mine.

As I have made clear, I do not oppose looking to the instruments of international law to determine whether there has been a violation of international law. That is exactly where one should look. And if they answer the question, that answer is determinative. What I oppose is drawing illogical and unwarranted inferences from the judgments of international tribunals, especially when those inferences are used to support rules that undermine the objectives of international law.

The majority likewise attribute to Judge Katzmann the proposition that there is no distinction in international law between criminal and civil liability. Maj. Op. 46. Once again quoting out of context, the majority misunderstand Judge Katzmann's opinion. As noted above, the district court in *Khulumani* had disregarded the opinions of international tribunals which found violations based on aiding and abetting on the ground that those sources imposed criminal, not civil, responsibility. Judge Katzmann's observation meant nothing more than that the district court was wrong to consider criminal judgments irrelevant to whether conduct constituted a violation of international law for purposes of civil liability. Judge Katz-

mann did not endorse, or even comment on, the majority's new proposition that withholding of criminal liability for a reason having nothing to do with whether the conduct norms of international law have been violated requires the conclusion that there has been no violation of international law. Nothing in Judge Katzmann's opinion suggests that, in considering the norms that may be violated by a private actor without State involvement, international law distinguishes between the liability of natural and juridical persons. *Cf. Khulumani,* 504 F.3d at 282 (Katzmann, J., concurring) ("We have repeatedly treated the issue of whether corporations may be held liable under the AT[S] as indistinguishable from the question of whether private individuals may be.").

To be sure, if international criminal tribunals followed a rule that the acts of juridical persons cannot violate international law because international law does not cover them, I, and presumably Judge Katzmann as well, would regard such rulings as determinative for ATS purposes. But international tribunals have made no such rulings. There is no inconsistency between my earlier endorsement of Judge Katzmann's reasoning and the reasoning I follow here.

**\*54** The majority's other criticisms of my opinion merely restate their arguments. I have answered these above.

**VII. The Complaint must be dismissed because its factual allegations fail to plead a violation of the law of nations.**

Although I do not share my colleagues' understanding of international law, I am in complete agreement that the claims against Appellants must be dismissed. [FN48] That is because the pertinent allegations of the Complaint fall short of mandatory standards established by decisions of this court and the Supreme Court. We recently held in *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244 (2d Cir.2009), that liability under the ATS for *aiding and abetting* in a violation of international human rights lies only where the aider and abettor acts *with a purpose* to bring about the abuse of human rights. *Id.* at 259. Furthermore, the Supreme Court ruled in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), that a complaint is insufficient as a matter of law unless it pleads specific facts that "allow[ ] the court to draw the reasonable inference that the defen-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

dant is liable for the misconduct alleged." *Id.* at 1949. When read together, *Talisman* and *Iqbal* establish a requirement that, for a complaint to properly allege a defendant's complicity in human rights abuses perpetrated by officials of a foreign government, it must plead specific facts supporting a reasonable inference that the defendant acted with a purpose of bringing about the abuses. The allegations against Appellants in these appeals do not satisfy this standard. While the Complaint plausibly alleges that Appellants knew of human rights abuses committed by officials of the government of Nigeria and took actions which contributed indirectly to the commission of those offenses, it does not contain allegations supporting a reasonable inference that Appellants acted with a purpose of bringing about the alleged abuses.

*A. Factual and procedural background*

Because the majority opinion focuses on the legal issue of whether international law allows a U.S. court to impose liability on a corporation, it is necessary to set out the allegations of the Complaint and the history of prior proceedings in detail.

*1) Parties.* As the majority note, Plaintiffs are, or were, residents of the Ogoni region of Nigeria. Plaintiffs allege that they (and others similarly situated whom they undertake to represent as a class) were victims of human rights abuses committed by the government of Nigeria, through its military and police forces, with the aid of Shell. "Shell," as the designation is used in the Complaint and this opinion, refers collectively to the Royal Dutch Petroleum Company and Shell Transport and Trading Company PLC.[FN49] According to the allegations of the Complaint, those two entities are holding companies organized respectively in the Netherlands and the United Kingdom. They conduct petroleum exploration and production operations in Nigeria through a Nigerian subsidiary named Shell Petroleum Development Company of Nigeria, Ltd. (hereinafter "SPDC"). SPDC was named as a defendant, and is not a party to this appeal. The district court dismissed the suit against SPDC for lack of personal jurisdiction on June 21, 2010.

**\*55** *2) Allegations of the complaint.* Plaintiffs' suit asserts the liability of Shell on the ground that Shell aided and abetted Nigerian government forces in the commission of various human rights abuses, directed against Plaintiffs. The Complaint alleges the following:

Since 1958, SPDC, has been engaged in oil exploration and production in the Ogoni region.[FN50] Ogoni residents initiated the Movement for Survival of Ogoni People (MOSOP) to protest environmental damage caused by SPDC's operations. Beginning in 1993, the Nigerian military engaged in a campaign of violence against MOSOP and the Ogoni, which was "instigated, planned, facilitated, conspired, and cooperated in" by Shell and SPDC.

In February 1993, following a demand by MOSOP for royalties for the Ogoni people, Shell and SPDC officials met in the Netherlands and England in February 1993 to "formulate a strategy to suppress MOSOP and to return to Ogoniland." In April 1993, SPDC called for assistance from government troops. The Nigerian government troops fired on Ogoni residents protesting a new pipeline, killing eleven. Later, SPDC's divisional manager wrote to the Governor of Rivers State (in which Ogoni is located) and requested "the usual assistance" to protect the progress of SPDC's further work on the pipeline. In August through October 1993, the Nigerian military attacked Ogoni villages, killing large numbers of civilians. SPDC provided a helicopter and boats for reconnaissance, provided transportation to the Nigerian forces involved, provided SPDC property as a staging area for the attacks, and provided food and compensation to the soldiers involved in the attacks. In an operation in October 1993, SPDC employees accompanied Nigerian military personnel in an SPDC charter bus to a village where the military personnel fired on unarmed villagers.

In December 1993, SPDC's managing director, with the approval of Shell, asked the Nigerian Police Inspector General to increase security in exchange for providing Nigerian forces with salary, housing, equipment, and vehicles. Shortly thereafter, the Nigerian government created the Rivers State Internal Security Task Force (ISTF). Shell and SPDC provided financial support for the ISTF's operations, as well as transportation, food, and ammunition for its personnel. In April 1994, the Rivers State Military Administrator ordered the ISTF to " 'sanitize' Ogoniland, in order to ensure that those 'carrying out ventures ... within Ogoniland are not molested.' "

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))

The head of the ISTF responded in May that "Shell operations still impossible unless ruthless military operations are undertaken for smooth economic activities to commence."

From May to August 1994, the ISTF engaged in numerous nighttime raids on Ogoni towns and villages. During these raids, the ISTF "broke into homes, shooting or beating anyone in their path, including the elderly, women and children, raping, forcing villagers to pay 'settlement fees,' bribes and ransoms to secure their release, forcing villagers to flee and abandon their homes, and burning, destroying or looting property," and killed at least fifty Ogoni residents. Plaintiffs and others were arrested and detained without formal charges and without access to a civilian court system, some for more than four weeks. In the detention facility, Plaintiffs and others were beaten and were provided inadequate medical care, food, and sanitary facilities. SPDC officials "frequently visited the ... detention facility" and "regularly provided food and logistical support for the soldiers" who worked there.

*56 In 1994, the Nigerian military created a "Special Tribunal" to try leaders of MOSOP, including Dr. Barinem Kiobel, a Rivers State politician who objected to the tactics of the ISTF and supported MOSOP. Counsel to those brought before the Special Tribunal were "subjected to actual or threatened beatings or other physical harm." The Complaint alleges also that, with Shell's complicity, witnesses were bribed to give false testimony before the Special Tribunal. In January 1995, the Nigerian military violently put down a protest against Shell's operations and the Special Tribunal, and the protesters who were detained were subjected to "floggings, beatings and other torture[,] and money was extorted to obtain releases." Dr. Kiobel and others were condemned to death by the Special Tribunal and executed in November 1995.

3) Prior proceedings. In September 2002, Plaintiffs filed a putative class action in the United States District Court for the Southern District of New York alleging torts in violation of the law of nations, pursuant to the ATS. The amended complaint filed in May 2004 ("the Complaint") charged seven counts of violations of the law of nations against Shell and SPDC. With respect to each count, the Complaint alleged that Shell and SPDC "aided and abetted,"

"facilitated," "participated in," "conspired with," and/or "cooperated with" the Nigerian military in its violations of the law of nations.

Shell moved to dismiss on several grounds, including that the Complaint failed to state a violation of the law of nations with the specificity required by the Supreme Court's ruling in *Sosa. Kiobel v. Royal Dutch Petroleum Co.*, 456 F.Supp.2d 457, 459 (S.D.N.Y.2006).[FN51] The district court granted the motion in part and denied it in part.

The court first determined that "where a cause of action for violation of an international norm is viable under the ATS, claims for aiding and abetting that violation are viable as well." *Id.* at 463-64. Turning to the substantive counts, the district court dismissed the claims of aiding and abetting property destruction, forced exile, extrajudicial killing, and violation of the rights to life, liberty, security, and association, on the ground that international law did not define those violations, as alleged, with the particularity required by *Sosa*. By contrast, the court denied the motion to dismiss the claims that Shell aided and abetted the Nigerian government's commission of torture, arbitrary arrest and detention, and crimes against humanity, concluding that such acts are clear violations of the law of nations. *Id.* at 464-67.

The district court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 468. On December 27, 2006, we granted Plaintiffs' petition and Shell's cross-petition to entertain the interlocutory appeal. *See Kiobel v. Royal Dutch Petroleum Co.*, Nos. 06-4800-cv, 06-4876-cv (2d Cir. Dec. 27, 2006).

*B. Adequacy of the pleadings against Shell*

*57 Shell contends the Complaint does not sufficiently plead facts that would render it liable for aiding and abetting Nigeria's violations of the law of nations.[FN52] In my view, this argument is dispositive.

*1) Standard of review.* Whether a complaint asserts a claim upon which relief may be granted is a question of law. This court reviews a district court's ruling on a such a question *de novo. See Chapman v. New York State Div. for Youth*, 546 F.3d 230, 235 (2d Cir.2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

as true, to 'state a claim to relief that is *plausible on its face.*' " *Iqbal,* 129 S.Ct. at 1949 (emphasis added) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Facial plausibility" means that the plaintiff's factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that pleads facts that are "merely consistent with" a defendant's liability is not plausible. *Id.*

Conclusory allegations that the defendant violated the standards of law do not satisfy the need for plausible factual allegations. *Twombly,* 550 U.S. at 555 (holding that "courts are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)); *see also Kirch v. Liberty Media Corp.,* 449 F.3d 388, 398 (2d Cir.2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss ." (internal quotation marks and citation omitted) (second alteration in original)). This requirement applies to pleadings of intent as well as conduct. *See Iqbal,* 129 S.Ct. at 1954.

*2) Inadequacy of the pleadings.* The Complaint asserts three theories of Shell's liability. First, it alleges that Shell itself aided and abetted the government of Nigeria in the government's commission of various human rights violations against the Ogoni. Alternatively, it asserts that Shell is liable on either of two theories for the actions of its subsidiary SPDC-either as SPDC's alter ego, or as SPDC's principal on an agency theory. I address each theory in turn.

*a) Shell's direct involvement as aider and abetter.* The Complaint pleads in a general manner that Shell

> willfully ... aided and abetted SPDC and the Nigerian military regime in the joint plan to carry out a deliberate campaign of terror and intimidation through the use of extrajudicial killings, torture, arbitrary arrest and detention, military assault against civilians, cruel, inhuman and degrading treatment, crimes against humanity, forced exile, restrictions on assembly and the confiscation and destruction of private and communal property, all for the purpose of protecting Shell property and enhancing SPDC's ability to explore for and extract oil from areas

where Plaintiffs and members of the Class resided.

**\*58** It pleads also in conclusory form that the Nigerian military's campaign of violence against the Ogoni was "instigated, planned, facilitated, conspired and cooperated in" by Shell. Such pleadings are merely a conclusory accusation of violation of a legal standard and do not withstand the test of *Twombly* and *Iqbal.* They fail to "state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6); *see Twombly,* 550 U.S. at 555; *Kirch,* 449 F.3d at 398.

The Complaint goes on to assert (1) that SPDC and Shell met in Europe in February 1993 and "formulate[d] a strategy to suppress MOSOP and to return to Ogoniland," (2) that "[b]ased on past behavior, Shell and SPDC knew that the means to be used [by the Nigerian military] in that endeavor would include military violence against Ogoni civilians," and (3) that "Shell and SPDC provided direct, physical support to the Nigerian military and police operations conducted against the Ogoni by, for example, providing transportation to the Nigerian forces; utilizing Shell property as a staging area for attacks; and providing food, clothing, gear, and pay for soldiers involved.

These allegations are legally insufficient to plead a valid claim of aiding and abetting because they do not support a reasonable inference that Shell provided substantial assistance to the Nigerian government *with a purpose to advance or facilitate* the Nigerian government's violations of the human rights of the Ogoni people. As outlined in Judge Katzmann's opinion in *Khulumani,* 504 F.3d 254, and adopted as the grounds of our recent decision in *Talisman,* 582 F.3d 244, "a defendant may be held liable under international law for aiding and abetting the violation of that law by another [only if] the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the *purpose* of facilitating the commission of that crime." *Id.* at 258 (emphasis added) (quoting *Khulumani,* 504 F.3d at 277).

The allegation that representatives of Shell and its Nigerian subsidiary met in Europe "to formulate a strategy to suppress MOSOP and to return to Ogoniland" implies neither an intent to violate human rights nor the provision of substantial assistance in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

human rights abuses. Neither of the alleged goals-to "suppress MOSOP" and "return to Ogoniland"-implies that human rights abuses would be involved in carrying them out. The additional allegation that Shell "knew" the Nigerian military would use "military violence against Ogoni civilians" as part of the effort to suppress MOSOP also does not support an inference that Shell *intended* for such violence to occur.[FN53] As *Talisman* made clear, proof that a private defendant knew of the local government's intent to violate the law of nations is not sufficient to support aider and abetter liability. *Talisman,* 582 F.3d at 259.

The further allegations of providing physical support to the operations of the Nigerian military and police, including transportation, use of SPDC property for staying, food, clothing, gear, and pay for soldiers fail for the same reasons as those which compelled the award of judgment to the defendant in *Talisman.* In *Talisman,* the evidence showed that Talisman Energy, an oil developer with operations in Sudan, had improved roads and air strips used by the Sudanese military to stage attacks on civilians, paid royalties to the Sudanese government, and provided fuel for military aircraft that participated in bombing missions. *Talisman,* 582 F.3d at 261-62. We ruled that the suit could not be maintained because the evidence failed to show a *purpose* of facilitating the Sudanese government's human rights abuses. The plaintiffs' evidence showed that the oil company provided assistance to the Sudanese government in order to receive security required for the defendant's oil exploration, and was sufficient to show the assistance was provided with *knowledge* that the Sudanese government would use the defendant's assistance in the infliction of human rights abuses. The evidence, however, was insufficient to support the inference of a *purpose* on the defendant's part to facilitate human rights abuses. *Id.*

**\*59** Similarly, in this case, Shell is alleged to have provided financial support and other assistance to the Nigerian forces with knowledge that they would engage in human rights abuses. But the Complaint fails to allege facts (at least sufficiently to satisfy the *Iqbal* standard) showing a purpose to advance or facilitate human rights abuses. The provision of assistance to the Nigerian military with *knowledge* that the Nigerian military would engage in human rights abuses does not support an inference of a purpose on Shell's

part to advance or facilitate human rights abuses. An enterprise engaged in finance may well provide financing to a government, in order to earn profits derived from interest payments, with the knowledge that the government's operations involve infliction of human rights abuses. Possession of such knowledge would not support the inference that the financier acted with a purpose to advance the human rights abuses. Likewise, an entity engaged in petroleum exploration and extraction may well provide financing and assistance to the local government in order to obtain protection needed for the petroleum operations with knowledge that the government acts abusively in providing the protection. Knowledge of the government's repeated pattern of abuses and expectation that they will be repeated, however, is not the same as a purpose to advance or facilitate such abuses, and the difference is significant for this inquiry.

In sum, the pleadings do not assert facts which support a plausible assertion that Shell rendered assistance to the Nigerian military and police for the purpose of facilitating human rights abuses, as opposed to rendering such assistance *for the purpose* of obtaining protection for its petroleum operations with awareness that Nigerian forces would act abusively. In circumstances where an enterprise requires protection in order to be able to carry out its operations, its provision of assistance to the local government in order to obtain the protection, even with knowledge that the local government will go beyond provision of legitimate protection and will act abusively, does not without more support the inference of a purpose to advance or facilitate the human rights abuses and therefore does not justify the imposition of liability for aiding and abetting those abuses.[FN54]

*b) Vicarious liability of shell for the acts of SPDC.*[FN55] In addition to asserting Shell's liability for its own acts of aiding and abetting in human rights violations, the Complaint asserts that Shell is liable for the acts of its subsidiary SPDC, either as an alter ego or as a principal for the acts of its agent because Shell "dominated and controlled SPDC." "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods,* 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). However, this principle of corporate separateness may be disregarded when a subsidiary acts as an agent of its parent. *See Kingston*

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

*Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir.1929)* (L.Hand, J.). The Restatement (Second) of Agency § 1 defines agency as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." A principal is liable for the acts of an agent acting within the scope of the agency. *See Meyer v. Holley,* 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003); *Karbian v. Columbia University,* 14 F.3d 773, 780 (2d Cir.1994); Restatement (Second) of Agency § 219. A principal may also be liable for the unauthorized acts of its agent if, for example, the agent's conduct is aided by the existence of the agency relationship, Restatement (Second) of Agency § 216 cmt. a, or the principal ratifies the agent's acts, *Phelan v. Local 305 of United Ass'n of Journeymen,* 973 F.2d 1050, 1062 (2d Cir.1992).

*60 A parent corporation may also be held liable for the acts of its subsidiary when the subsidiary is merely an alter ego of the parent. Alter ego liability exists when a parent or owner uses the corporate form "to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own ." *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979) (interpreting New York law). In deciding whether to pierce the corporate veil, "courts look to a variety of factors, including the intermingling of corporate and [shareholder] funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 18 (2d Cir.1996).

The Complaint alleges that, "[s]ince operations began in Nigeria in 1958, Shell has dominated and controlled SPDC." This conclusory allegation does not satisfy the *Iqbal* requirement to plead facts that plausibly support an inference that would justify disregard of the corporate form or a finding of an agency relationship. The further allegations described above-that Shell and SPDC representatives met in Europe after November 1992 to discuss strategies for sup-

pressing MOSOP and that SPDC did certain acts with the approval of Shell-are likewise insufficient.

Ordinarily, subsidiary corporations are not deemed to be the agents of their corporate parents. *See Kingston Dry Dock,* 31 F.2d at 267 ("Control through the ownership of shares does not fuse the corporations, even when the directors are common to each."). The Complaint does not even plead that Shell and SPDC had an agreement establishing an agency relationship. *Cf. Cleveland v. Caplaw Enters.,* 448 F.3d 518, 523 (2d Cir.2006) (finding a pleading of corporate agency adequate where the complaint incorporated by reference an agency agreement). Nor does it plead facts showing that they conducted their operations in an agency relationship.[FN56] The allegations that Shell approved certain conduct undertaken by SPDC does not show an agency relationship.

Similarly, a claim sufficient to "overcome the presumption of separateness afforded to related corporations," *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotation marks omitted), is not established by the bare allegation that one corporation dominated and controlled another. No facts alleged in the Complaint plausibly support the inference that SPDC was a mere instrument of its corporate parents. There is no allegation that SPDC was undercapitalized, failed to maintain corporate formalities, or that its officers ceded control to Shell, from which we might infer domination. *See Bridgestone/Firestone,* 98 F.3d at 18. The mere allegation that "Shell and SPDC" engaged in certain conduct does not plausibly plead specific facts which would justify treating SPDC as the alter ego of Shell.

*61 Accordingly, on the facts alleged, the Complaint fails to plead a basis for a claim of agency or alter ego liability.

## CONCLUSION

For the foregoing reasons, I agree with the majority that all of the claims pleaded against the Appellants must be dismissed. I cannot, however, join the majority's creation of an unprecedented concept of international law that exempts juridical persons from compliance with its rules. The majority's rule conflicts with two centuries of federal precedent on the ATS, and deals a blow to the efforts of international law to protect human rights.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

FN1. "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

FN2. *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.,* --- U.S. ----, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010).

FN3. In this opinion we use the terms "law of nations" and "customary international law" interchangeably. *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 237 n. 2 (2d Cir.2003) (explaining that, in the context of ATS jurisprudence, "we have consistently used the term 'customary international law' as a synonym for the term the 'law of nations' "); *see also The Estrella,* 17 U.S. (4 Wheat.) 298, 307, 4 L.Ed. 574 (1819) (referring to non-treaty-based law of nations as the "the customary ... law of nations").

FN4. *Filartiga v. Pena-Irala,* 630 F.2d 876, 890 (2d Cir.1980); *see also Sosa v. Alvarez-Machain,* 542 U.S. 692, 724-25, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (Souter, J.) (quoting this reference in *Filartiga* with approval and identifying that case as the "birth of the modern line of [ATS] cases"). In light of the universal recognition of *Filartiga* as the font of ATS litigation-including by Judge Leval, *see* Concurring Op. 2 ("Since *Filartiga* ... was decided in 1980, United States courts, acting under the Alien Tort Statute ... have been awarding compensatory damages to the victims of human rights abuses committed in violation of the law of nations.")-we do not understand Judge Leval's assertion that our decision conflicts with "two centuries" of precedent. Concurring Op. 86.

FN5. The first ATS case brought against a corporate defendant appears to have been *Doe v. Unocal Corp.,* 963 F.Supp. 880 (C.D.Cal.1997), *aff'd in part and rev'd in part,* 395 F.3d 932 (9th Cir.2002).

FN6. In one ATS case, for example, a jury considering damages after a default judgment returned a $4.5 billion verdict against Radovan Karadzic, former president of the self-proclaimed Bosnian-Serb republic of Srpska, for "acts of genocide ... committed in Bosnia-Herzegovina by individuals under [his] command and control." *Doe v. Karadzic,* No. 93 Civ. 0878, 2001 U.S. Dist. LEXIS 12928, at *1-2 (S.D.N.Y. Aug. 28, 2001).

FN7. *See, e.g.,* Lisa Girion, *Unocal to Settle Rights Claims,* L.A. Times, Dec. 14, 2004, at A1; Jad Mouawad, *Shell Agrees to Settle Abuse Case for Millions,* N.Y. Times, June 9, 2009, at B1.

FN8. We count among the significant ATS cases decided by our Court: *Filartiga,* 630 F.2d 876; *Kadic v. Karadi,* 70 F.3d 232 (2d Cir.1995), *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir.2000); *Bigio v. Coca-Cola Co.,* 239 F.3d 440 (2d Cir.2000); *Flores,* 414 F.3d 233; *Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254 (2d Cir.2007); *Viet. Assoc. for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104 (2d Cir.2008); *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163 (2d Cir.2009); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244 (2d Cir.2009).

FN9. *Sosa,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718.

FN10. The question of corporate liability has been identified as recently as 2009 in *Presbyterian Church* as an open question in our Circuit. *See* 582 F.3d at 261 n. 12 ("We will also assume, without deciding, that corporations ... may be held liable for the violations of customary international law that plaintiffs allege ."). Others have also acknowledged, either explicitly or implicitly, that the question remains unanswered. *See, e.g.,* Khulumani, 504 F.3d at 282-83 (Katzmann, J., concurring) (noting that, because defendants did not raise the issue, the Court need not reach the question of corporate li-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

ability); *id. at 321-25* (Korman, J., concurring in part and dissenting in part) (expressing the view that corporations cannot be held liable under the ATS); Brief of the United States as *Amicus Curiae* in Opposition to the Petition for a Writ of Certiorari 9 n.2, *Pfizer Inc. v. Abdullahi,* No. 09-34 (May 28, 2010) (urging the Supreme Court not to "grant certiorari in this case to consider whether suits under the ATS can be brought against private corporations" because "[t]hat question was not addressed by the court below" and was not "fairly included in the scope of ... the questions presented" (internal quotation marks omitted)). And at least one district court in another circuit has recently held that there is no corporate liability under the ATS. *Doe v. Nestle,* No. CV 05-5133, slip op. at 120-60 (C.D.Cal. Sept. 8, 2010).

We decline to address several other lurking questions, including whether the ATS applies "extraterritorially," *see* Conditional Cross-Petition for a Writ of Certiorari 14-17, *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* No. 09-1418 (May 20, 2010), or whether exhaustion of domestic remedies is required for claims that arise in a foreign forum, *see Sosa, 542 U.S. at 733 n. 21* (noting that the Supreme Court "would certainly consider this requirement in an appropriate case"). We do not reach those questions here because we conclude that we lack jurisdiction over plaintiffs' claims insofar as they are asserted only against corporations.

FN11. The idea that corporations are "persons" with duties, liabilities, and rights has a long history in American domestic law. *See, e.g., N.Y. Cent. & Hudson River R.R. Co. v. United States,* 212 U.S. 481, 492, 29 S.Ct. 304, 53 L.Ed. 613 (1909) (rejecting the argument that, "owing to the nature and character of its organization and the extent of its power and authority, a corporation cannot commit a crime"). *See generally* Leonard Orland, *Corporate Criminal Liability* § 2.03-2.04 (2006) (discussing the policy behind, and history of, corporate criminal li-

ability). It is an idea that continues to evolve in complex and unexpected ways. *See, e.g., Citizens United v. Fed. Election Comm'n,* --- U.S. ----, 130 S.Ct. 876, --- L.Ed.2d ---- (2010). The history of corporate rights and obligations under *domestic law* is, however, entirely irrelevant to the issue before us-namely, the treatment of corporations as a matter of *customary international law.*

FN12. *See Sosa,* 542 U.S. at 732 (quoting with approval the statement of a lower court that rules of customary international law must be "specific, universal, and obligatory" (internal quotation marks omitted)); *Flores, 414 F.3d at 248* ("[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.").

FN13. *Vencap,* 519 F.2d at 1015 (internal quotation marks omitted).

FN14. 630 F.2d at 888 (quoting *Vencap, 519 F.2d at 1015*) (alteration omitted).

FN15. *See also* Brigadier General Telford Taylor, U.S.A., Chief of Counsel for War Crimes, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 10,* at 109 (1949) ("[T]he major legal significance of the [Nuernberg] judgments lies, in my opinion, in those portions of the judgments dealing with the *area of personal responsibility* for international law crimes." (emphasis in original)).

FN16. *See* The Rome Statute of the International Criminal Court ("Rome Statute") art. 25(1), *opened for signature* July 17, 1998, 37 I.L.M. 1002, 1016 (limiting the ICC's jurisdiction to "natural persons"); *see also* Albin Eser, *Individual Criminal Responsibility, in* 1 *The Rome Statute of the International Criminal Court* 767, 778-79 (Antonio Cassese et al. eds., 2002).

The United States has not ratified the Rome Statute. Under the Clinton Admini-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

stration, the U.S. delegation voted against the text adopted in Rome in 1998, in part because of concerns that the treaty "could inhibit the ability of the United States to use its military to meet alliance obligations and participate in multinational operations, including humanitarian interventions." Diane F. Orentlicher, *Unilateral Multilateralism: United States Policy Toward the International Criminal Court*, 36 Cornell Int'l L.J. 415, 419 (2004) (quoting the testimony, before the Senate Foreign Relations Committee, of David J. Scheffer, Ambassador-at-Large for War Crimes Issues and Head of the U.S. delegation at the Rome Conference). Despite those concerns, the United States signed the Rome Statute on December 31, 2000, the last day it was open for signature, under the outgoing Clinton Administration. *Id.* at 421. *See generally Flores*, 414 F.3d at 256 (explaining the meaning and significance of signing an international agreement); *United States v. Yousef*, 327 F.3d 56, 94 n. 28 (2d Cir.2003) (same). On May 6, 2002, the Bush Administration notified the United Nations that the United States did not intend to become a party, an act popularly referred to as "un sign[ing]." Orentlicher, *ante*, at 421; *see also* Press Release, U.S. Dep't of Def., Secretary Rumsfeld Statement on the ICC Treaty (May 6, 2002) (noting the United States' concern about "the lack of adequate checks and balances on powers of the ICC prosecutors and judges; the dilution of the U.N. Security Council's authority over international criminal prosecutions; and the lack of an effective mechanism to prevent politicized prosecutions of American servicemembers and officials"). However limited the value of the Rome Statute in determining what customary international law *is*, a demonstrated lack of consensus amongst its signatories about a particular norm is valuable evidence of what customary international law *is not*. *See Sosa*, 542 U.S. at 732 (quoting with approval the statement that rules of international law must be "specific, *universal*, and obligatory" (emphasis added) (internal quotation marks omitted)).

**FN17.** Thus it is equally misleading to say that we are giving "a free pass" to corporations. Concurring Op. 11.

**FN18.** *Sosa*, 542 U.S. at 732 n. 20

**FN19.** Our use of the term "corporation"-and our holding-is limited to private juridical entities such as defendants.

**FN20.** *Sosa*, 542 U.S. at 732 (quoting with approval the statement of a lower court) (internal quotation marks omitted). *See generally* Part II, *post*.

**FN21.** In fact, as we discuss below, there are ample sources of international law explicitly *rejecting* corporate liability. *See generally* Part II, *post*.

**FN22.** As we explain in detail below, *see generally* Part II, *post*, every international tribunal to confront the question of whether the liability of non-state actors for violations of customary international law should extend to both natural *and* juridical persons has considered and rejected corporate liability. We do not rest our analysis of customary international law on the district court ATS decisions on which Judge Leval relies. Concurring Op. 23 n.14. Indeed, even if we were to accord those district court cases the merit Judge Leval seems to believe they deserve, the opinions of domestic courts citing domestic courts alone for propositions of customary international law do not constitute evidence of a "specific, universal, and obligatory" norm of the kind necessary to impose judgment under the ATS. *Sosa*, 542 U.S. at 732.

Moreover, contrary to Judge Leval's claim that the Nuremberg "tribunals *found* that corporations violated the law of nations," *see* Concurring Op. 55 & n.36 (emphasis added) (citing 6 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* ("The Flick Case ") (1952); 7, 8 *Trials of War*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

*Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* ("*The Farben Case* ") (1952); 9 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* ("*The Krupp Case* ") (1950)), no tribunal at Nuremberg had the jurisdiction to charge-let alone impose judgment on-a corporation. As Judge Leval correctly points out, this jurisdictional bar did not inhibit the tribunals' ability to bring individual criminal defendants to justice for atrocities committed in violation of the customary international law of human rights. *Id.*

FN23. Although Judge Leval calls our holding "strange" and "illogical," Concurring Op. 3-4, it is, in fact, neither novel nor eccentric. Rather, it appears to be the same rule adopted by Congress in enacting the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note). The TVPA creates a civil damages remedy against "[a]n *individual,* who, under actual or apparent authority, or color of law, of any foreign nation ... subjects *an individual* to torture ... or ... extrajudicial killing." *Id.* § 2(a)(1)-(2) (emphases added); *Bowoto v. Chevron Corp.,* --- F.3d ----, No. 09-15641, 2010 WL 3516437, at *9 (9th Cir. Sept.10, 2010)* (holding that "the TVPA does not apply to corporations"). Indeed, as Judge Korman observed in his separate opinion in *Khulumani:*

Under the TVPA, the term "individual" describes both those who can violate its proscriptions against torture, as well as those who can be victims of torture.... "[B]oth from context and common sense only natural persons can be the 'individual' victims of acts that inflict 'severe pain and suffering.' Because the TVPA uses same term 'individual' to identify offenders, the definition of 'individual' within the statute appears to refer to a human being, suggesting that *only natural persons can violate the Act.*"

504 F.3d at 323-24 (Korman, J., concurring in part and dissenting in part) (emphasis added) (citation omitted) (quoting *In re Agent Orange Prod. Liab. Litig.,* 373 F.Supp.2d 7, 56 (E.D.N.Y.2005)); *accord Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1164, 1176 (C.D.Cal.2005) (holding that corporations are not "individuals" under the TVPA); *cf.* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, *unless context indicates otherwise* ... the word[ ] 'person' ... include[s] corporations ... as well as individuals ...." (emphasis added)).

FN24. Suggesting the panel majority is in league with leading opponents of the modern ATS jurisprudence, Judge Leval even goes so far as to attempt an increasingly popular rhetorical ploy among legal scholars of a certain school of thought: what might be called the "*reductio ad Borkum.*" *See* Concurring Op. 2 (quoting *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 805 (D.C.Cir.1984)* (Bork, J., concurring)); *cf.* Leo Strauss, *Natural Right and History* 42-43 (1950) ("[W]e must avoid the fallacy that in the last decades has frequently been used as a substitute for the *reductio ad absurdum:* the *reductio ad Hitlerum.* A view is not refuted by the fact that it happens to have been shared by Hitler."). We do not adhere to any school of thought on the ATS. In any event, we have faith that our readers will understand that a view is not refuted by the fact that it happens to have been shared by The Honorable Robert H. Bork, sometime Alexander M. Bickel Professor of Law at Yale Law School, Solicitor General of the United States, and United States Circuit Judge for the District of Columbia Circuit.

FN25. Because of changes in corporate form, Shell Petroleum N.V. and Shell Transport and Trading Company, Ltd. are the successors to the named defendants Royal Dutch and Shell.

FN26. The Supreme Court has long recognized that "where there is no treaty and no controlling executive or legislative act or ju-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

dicial decision," customary "[i]nternational law is part of our law." *The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900).* In *Sosa,* the Court explained that the ATS was enacted "on the understanding that the *common law* would provide a cause of action for the modest number of international law violations with a potential for personal liability." 542 U.S. at 724 (emphasis added).

FN27. The statute originally provided that the federal district courts "shall ... have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77. The Supreme Court has attributed no significance to its subsequent amendment. *See Sosa,* 542 U.S. at 713 n. 10.

FN28. The Restatement observes that "[i]ndividuals may be held liable for offenses against international law, such as piracy, war crimes, or genocide" and that "[c]orporations frequently are vehicles through which rights under *international economic law* are asserted." Restatement (Third), pt. II., at 71 introductory note (emphasis added); *cf.* 1 *Oppenheim's International Law* § 33, at 120 ("[T]he subjects of law in any legal system are not necessarily identical in their nature or in the extent of their rights, and their nature depends upon the needs of the community; an international person need not possess all the international rights, duties and powers normally possessed by states." (footnote omitted) (internal quotation marks omitted)). It goes without saying that the question we are dealing with here is whether corporations are subjects of the customary international law of human rights, not whether they are subjects of treaty-based "international economic law." *See generally* Part II.B, *post.*

FN29. Under Judge Leval's approach, the extension of the scope of liability to individuals at Nuremberg was not a detectable

advance of international law. That is because, in his view, international law merely "establish[es] ... norms of prohibited conduct" and leaves individual States to determine the scope of liability. Concurring Op. 6. That view finds no support in international law.

FN30. Although the text of the ATS limits only the category of *plaintiff* who may bring suit (namely, "aliens"), its requirement that a claim be predicated on a "violation of the law of nations" incorporates any limitation arising from customary international law on who properly can be named a *defendant. See* 28 U.S.C. § 1350.

FN31. Judge Leval's assertion that we quote *Sosa* out of context and distort the Supreme Court's reasoning is unwarranted. We interpret *Sosa* here exactly the way we did in *Presbyterian Church, 582 F.3d at 258, 261 n. 12.* We acknowledge that the Court in *Sosa* was not addressing the question of corporate liability under the ATS. Thus, the Court in footnote 20 had no occasion to draw a distinction between natural persons and juridical persons. That fact does not obscure footnote 20's fundamental point: courts must look to customary international law to determine the "scope" of liability under the ATS. That is true not only when a court is questioning whether the scope of liability under the ATS includes private actors (as opposed to state actors), but also when a court is questioning whether the scope of liability under the ATS includes juridical persons (as opposed to natural persons). The proposition that we are required to look to international law to determine whether corporations can be held liable under the ATS is not only compelled by *Sosa* and consistent with our precedent, it is also a proposition with which Judge Leval does not disagree. Concurring Op. 45-46 (explaining that he has "no quarrel" with the premise that "[t]o determine whether a corporation can be held civilly liable for a violation of international law, *the place to look is to international law* " (emphasis added)); *see also id.* at 46 ("[I]f we found that international law in fact ex-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

empts corporations from liability for violating its norms, we would be forced to accept that answer whether it seems reasonable to us or not.").

Not only does Judge Leval agree that we must look to customary international law in resolving the question before us, but he also agrees that the customary international law of human rights imposes no liability on corporations. Concurring Op. 67 ("It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities."). Yet beyond those significant points of agreement our analyses diverge. We believe that the absence of a norm of corporate liability in international law ends our inquiry and deprives us of jurisdiction to consider plaintiffs' claims against corporate defendants. Under Judge Leval's approach, the absence of the relevant norm in international law merely permits a court to proceed a step further, to domestic law, in search of that norm. We respectfully submit that it is Judge Leval's approach, and not our own, that is utterly lacking in support in precedent.

FN32. Judge Leval suggests that Judge Katzmann's approach in *Khulumani* requires a court to look only to whether a defendant's conduct violated customary international law. Concurring Op. 66-67. But that is only the first step of Judge Katzmann's approach. As Judge Katzmann carefully explained: "[T]o assure itself that it has jurisdiction to hear a claim under the [ATS], [a court] should first determine whether the alleged tort was in fact 'committed in violation of the law of nations,' 28 U.S.C. § 1350, *and whether this law would recognize the defendants' responsibility for that violation."* *Khulumani,* 504 F.3d at 270 (emphasis added). In asserting that his views are consistent with his endorsement of Judge Katzmann's concurring opinion in *Khulumani,* Judge Leval simply ignores the second step of Judge Katzmann's approach.

FN33. Judge Katzmann declined to reach

the question of corporate liability in his concurring opinion in *Khulumani* because that question was "not raised by the defendants on appeal and therefore the issue was not briefed by the parties." *Id.* at 282. Judge Katzmann observed, however, that our Court had repeatedly assumed that corporations can be liable under the ATS because private individuals are liable under the statute, *see id.* (citing *Bigio v. Coca-Cola,* 239 F.3d 440, 447 (2d Cir.2000); *Flores,* 414 F.3d at 244), and he suggested that the Supreme Court may have done the same, *id.* at 283 (noting that *Sosa* classified both corporations and individuals as private actors (citing *Sosa,* 542 U.S. at 732 n. 20)). Nonetheless, whatever Judge Katzmann's view on the ultimate question of corporate liability under the ATS, his reasoning in *Khulumani* leads to the inescapable conclusion that customary international law governs the question. We adopted that reasoning in *Presbyterian Church* in deciding the standards for aiding and abetting liability and we employ the same reasoning today in deciding whether corporations can be liable under the ATS.

FN34. Our holding in *Flores* is consistent with the Supreme Court's rejection of the proposition that the Universal Declaration of Human Rights is an authoritative source of customary international law. 414 F.3d at 259-62 (explaining that the Universal Declaration of Human Rights is "not [a] proper source[ ] of customary international law because [it is] merely aspirational and [was] never intended to be binding on member States of the United Nations"). And it is consistent with the views of several of our sister Circuits. *See, e.g., Igartúa- De La Rosa v. United States,* 417 F.3d 145, 150 (1st Cir.2005) (en banc) ("The Universal Declaration of Human Rights is precatory: that is, it creates aspirational goals but not legal obligations, even as between states."); *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 816 n. 17 (D.C.Cir.1987) (noting that the Universal Declaration of Human rights "is merely a nonbinding resolution, not a treaty, adopted by the United Nations General Assembly").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

FN35. The ICJ Statute is an integral part of the United Nations Charter, a treaty ratified by the United States in 1945. *See Flores, 414 F.3d at 250 n. 24* (discussing the United States' ratification of the United Nations Charter). Article 38 sets forth the sources relied upon by the International Court of Justice ("ICJ") to determine international law. *See Yousef, 327 F.3d at 100.* As we explained in *Flores,* "the [ICJ] is a multinational [judicial] body charged with discerning and applying international law." *414 F.3d at 250 n. 24; see also id. at 251 n. 25* (noting that, under Article 59 of the ICJ statute, a "decision of the [ICJ] has no binding force except between the parties and in respect of that particular case").

FN36. Before the Second World War, international law provided few protections of the human rights of individuals. Hersch Lauterpacht, *An International Bill of the Rights of Man* 47 (1945). Such modest recognition of human rights as existed before the First World War involved assertions of a right of humanitarian intervention for the protection of oppressed religious groups. *See* Louis B. Sohn & Thomas Buergenthal, *International Protection of Human Rights* 137-211 (1973); *see also* Brierly, *ante,* at 291-92. In the period after that war the League of Nations undertook for the first time an international regime to protect racial, religious, or linguistic minorities. *See* Sohn & Buergenthal, *ante,* at 213-335; Brierly, *ante,* at 292. As an authoritative work on the *travaux preparatoire,* or "legislative history," of the 1998 Rome Statute of the International Criminal Court has observed:

[T]he first instrument providing general requirements for *individual responsibility* in a binding manner was the Charter of the International Military Tribunal (IMT) in Nuremberg: aside from establishing individual responsibility for certain crimes against peace, war crimes, and crimes against humanity (Article 6), it partially covered the early stages of planning and preparation and certain types of complic-

ity, declared the official position of defendants, including Heads of State or other government officials, as not freeing them from responsibility (Article 7) and recognized superior orders, if at all, as mitigating circumstances at most (Article 8).

Albin Eser, *Individual Criminal Responsibility, in* 1 *The Rome Statute of the International Criminal Court* 767, 774-75 (Antonio Cassese et al. eds., 2002) (emphasis added) (footnote omitted).

We rely here on the "teachings of the most highly qualified publicists of the various nations." ICJ Statute, *ante,* art. 38; *see* note 35, *ante;* note 47, *post.* Professor Cassese, co-editor of a multi-volume work on the history of the Rome Statute, is Professor of International Law at the University of Florence and former President of the International Criminal Tribunal for the former Yugoslavia. Professor Brierly was the Chichele Professor of International Law in the University of Oxford. Sir Hersch Lauterpacht was the Whewell Professor of Public International Law in the University of Cambridge and later would serve as a Judge of the International Court of Justice. *See* Lauterpacht Centre for International Law, Sir Hersch Lauterpacht, 1897-1960, http://www.lcil.cam.ac.uk/about_
the_centre/sir_hersch_lauterpacht.php
(last visited Aug. 20, 2010). Louis B. Sohn was the Bemis Professor of International Law and the John Harvey Gregory Lecturer in International Organization at the Harvard Law School. Thomas Buergenthal was a Professor of International Law at the Law School of the State University of New York (Buffalo) and the George Washington University and now serves as a Judge of the International Court of Justice. Sir Humphrey Waldock, editor of the sixth edition of Brierly's *The Law of Nations,* was at the time of publication the Chichele Professor of Public International Law in the University of Oxford and a member of the International Law Commission. *See* Sir Humphrey

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Waldock, 77; Head of International Court, N.Y. Times, Aug. 18, 1981, at B19. He previously served as president of the European Commission on Human Rights and later became a judge and president of the International Court of Justice. *Id.*

**FN37.** Control Council Law No. 10 was enacted "[i]n order to give effect to the terms of ... the London Agreement of 8 August 1945, and the Charter issued pursuant thereto [*i.e.,* the London Charter] and in order to establish a uniform legal basis in Germany for the prosecution of war criminals and other similar offenders, *other than those dealt with by the International Military Tribunal* ." Control Council Law No. 10, preamble, *ante* (emphasis added).

**FN38.** The tribunal also noted that "one may not utilize the corporate structure to achieve an immunity from criminal responsibility for illegal acts." *Id.* Accordingly, "where private individuals, including juristic persons, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action ... is in violation of international law." *Id.* at 1132. In other words, *individuals* who commit violations of customary international law do not immunize themselves from liability by acting through the corporate form.

**FN39.** "Complementarity" is the principle, embodied in the Rome Statute, by which the ICC declines to exercise jurisdiction over a case that is simultaneously being investigated or prosecuted by a State having jurisdiction over it. *See* Rome Statute, *ante,* art. 17.

**FN40.** The district court relied on the following treaties: (1) Convention Concerning the Application of the Principles of the Right to Organise and to Bargain Collectively, *adopted* July 1, 1949, 96 U.N.T.S. 257 (not ratified by the United States); (2) Convention on Third Party Liability in the Field of Nuclear Energy, *done* July 29, 1960, amended Jan. 28, 1964, 956 U.N.T.S.

263 (not ratified by the United States, China, the Soviet Union, or Germany); (3) International Convention on Civil Liability for Oil Pollution Damage, *done* Nov. 29, 1969, 973 U.N.T.S. 3 (not ratified by the United States, China, or the Soviet Union)); (4) Vienna Convention on Civil Liability for Nuclear Damage, *done* May 21, 1963, 1063 U .N.T.S. 265 (not ratified by the United States, China, France, Germany, or the United Kingdom); (5) Convention Relating to Civil Liability in the Field of Maritime Carriage of Nuclear Material, *done* Dec. 17, 1971, 974 U.N.T.S. 255 (not ratified by the United States, China, the Soviet Union, or the United Kingdom); and (6) Convention on Civil Liability for Oil Pollution Damage Resulting from Exploration and Exploitation of Seabed Mineral Resources, *done* Dec. 17, 1976, *reprinted at* 16 I.L.M. 1450 (signed by six States but ratified by none). *Presbyterian Church,* 244 F.Supp.2d at 317.

**FN41.** Another district court in our Circuit has similarly allowed claims against corporate defendants to proceed under the ATS despite acknowledging the "strength of authority supporting" the argument that corporate liability is *not* recognized as a norm of customary international law. *In re Agent Orange Prod. Liability Litig.,* 373 F.Supp.2d 7, 56 (E.D.N.Y.2005) (Weinstein, J.); *id . at 57* (noting that "in the Nuremberg trials, this point of lack of corporate liability appeared to have been explicitly stated"). Judge Weinstein rejected the argument that corporations cannot be liable under the ATS because, among other things, "[l]imiting civil liability to individuals while exonerating the corporation ... *makes little sense* in today's world," and "[d]efendants present[ed] *no policy reason* why corporations should be uniquely exempt from tort liability under the ATS," and "even if it were not true that international law recognizes corporations as defendants" they could still be sued under the ATS because "an ATS claim is a federal common law claim and it is a bedrock tenet of American law that corporations can be held liable for their torts." *Id. at 58, 59* (emphases added).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Customary international law, however, is developed through the customs and practices of States, not by what "makes ... sense" to a judge, by the "policy reason[s]" recognized by a judge, or by what a judge regards as "a bedrock tenet of American law." *See Sosa,* 542 U.S. at 738 (refusing to accept plaintiff's argument because "in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require"); *accord Nestle,* No. CV 05-5133, slip op. at 135 ("*Sosa* prohibits courts from substituting abstract aspirations-or even pragmatic concerns-in place of specific international rules.").

Nor is customary international law developed through "parity of reasoning," as some scholars have suggested. *See* Harold Hongju Koh, *Separating Myth from Reality About Corporate Responsibility Litigation,* 7 J. Int'l Econ. L. 263, 265 (2004) (suggesting that because corporations may have some "rights" under international law, "by parity of reasoning, they must have duties as well").

FN42. As the Supreme Court recognized in *Sosa,* some ATS litigation has already threatened international comity by prompting objections from foreign governments. 542 U.S. at 733 n. 21 (noting that the government of South Africa had objected to litigation against "various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa"); *see also Khulumani,* 504 F.3d at 297 (Korman, J., concurring in part and dissenting in part) (noting that the governments of the United Kingdom and Canada had also expressed "profound concern" over the apartheid litigation).

FN43. A few words on "general principles of law" are in order. *See* ICJ Statute, *ante,* art. 38(1)(c) (identifying "general principles of law recognized by civilized nations" as a source of customary international law); Restatement (Third) § 102 cmt. *l.* ("General

principles are a *secondary source* of international law, resorted to for developing international law interstitially in special circumstances." (emphasis added)); *see also* Steven R. Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility,* 111 Yale L.J. 443, 451 (2001) ("[D]omestic legal principles matter only to the extent they are shared by many different legal systems and, even then, are *subsidiary to treaties and customary law.*" (emphasis added)). As one leading authority on the subject has observed, for much of the twentieth century corporate criminal liability was a unique feature of American law, with most European legal systems subscribing to the view that "guilt is personal, not vicarious, and that penal sanctions should be directed at culpable corporate people, not the corporate entity." *See* Leonard Orland, *Corporate Criminal Liability* § 5.03[A] (2006) (explaining that the "traditional French model [which was influential throughout Europe] declared that a corporation is incapable of committing a crime-a principle derived from humanitarian concerns of *personal criminal liability* established during the French Revolution." (emphasis added)). The fact that corporate criminal liability has recently obtained greater acceptance in Europe, *see id.* § 5.03[C]-although interesting as a matter of *comparative law*-does not demonstrate that corporate liability has attained the status of a norm *customary international law, see Filartiga,* 630 F.2d at 888 (explaining that customary international law consists of norms that are "of mutual, and not merely several, concern"); *Vencap,* 519 F.2d at 1015 (explaining that international law concerns the dealings of states "*inter se* " and that "[w]e cannot subscribe to the view that the Eighth Amendment 'Thou shalt not steal' is part of the law of nations" simply because "every civilized nation doubtless has this as a part of its legal system" (some internal quotation marks omitted)); *see also Flores,* 414 F.3d at 249 ("Even if conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

We recognize, of course, that customary international law is not a "static" body of law incapable of evolution or growth. As we explained thirty years ago in *Filartiga*, "courts must interpret international law not as it was in 1789, but as it has *evolved* and exists among the nations of the world today." 630 F.2d at 881 (emphasis added). Nevertheless, "[t]he requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one." *Id.* For the reasons stated by Judge Friendly in *Vencap*, 519 F.2d at 1015, the movement towards imposing criminal liability on corporations as a matter of *domestic law* does not, on its own, create a norm of customary international law-particularly in light of the "express international accords," *Filartiga*, 630 F.2d at 888, which categorically reject imposing liability on corporations, *see, e.g.*, Rome Statute, *ante*, art. 25.

FN44. Judge Leval makes much out of two "venerable" opinions of Attorneys General of the United States in which the Attorney General appears to have assumed that corporations can sue or be sued under the ATS. *See* Concurring Op. 24-25. Our reasons for placing little weight on those opinions should be apparent on their face. Most importantly, neither opinion does anything more than baldly declare that a corporation can *sue* under the ATS (in the case of the 1795 opinion of Attorney General William Bradford) or that a corporation can *be sued* under the ATS (in the case of the 1907 opinion of Attorney General Charles L. Bonaparte). Unlike the works of publicists on which we have relied as a secondary source of customary international law, neither opinion gives any *basis* for its assumptions about customary international law.

The 1907 opinion of Attorney General Bonaparte declares (again, without any analysis or citation of authority) that the ATS would "provide a forum *and a right of action* " against a corporation. 26 Op. Att'y Gen. 250, 253 (1907). It is, there-

fore, directly at odds with the Supreme Court's decision in *Sosa*, which held that the ATS is jurisdictional only and does *not* create any kind of right of action. *Sosa*, 542 U.S. at 713-14. In light of that conflict with *Sosa*, the opinion of Attorney General Bonaparte is a dubious authority on which to rely in interpreting the ATS. *Cf. Sosa*, 542 U.S. at 721 (citing the 1795 opinion of Attorney General Bradford because Bradford-unlike, apparently, Attorney General Bonaparte-"understood the ATS to provide jurisdiction over what must have amounted to common law causes of action").

The 1795 opinion of Attorney General Bradford, furthermore, concludes only that a "company" can *bring suit against an individual* under the ATS. *See* 1 Op. Att'y Gen. 57, 58-59 (1795) (opining that "the Sierra Leone Company," which maintained the "colony of Sierra Leone," could bring suit under the ATS against "certain American citizens trading to the coast of Africa" for their actions in "join[ing] ... a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast"). As an initial matter, it is far from clear that the Attorney General's conclusions in 1795 about the "Sierra Leone Company" necessarily apply to modern juridical entities. Even if they do, the question addressed by Attorney General Bradford is whether a "company" could bring suit against certain individuals. We agree that ATS suits can be brought against individuals, and we have no occasion here to determine whether a "company" is an "alien" that can *bring* such a suit. *See* 28 U.S.C. § 1350. ("The district courts shall have original jurisdiction of any civil action *by an alien* for a tort only, committed in violation of the law of nations or a treaty of the United States." (emphasis added)). We hold only that, regardless of who brings it, when a suit is brought for "a tort ... committed in violation of the law of nations," we lack subject matter jurisdiction insofar as the suit is brought *against* a corporation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

In any event, we doubt that Judge Leval truly believes that we should rely on the opinion of Attorney General Bradford, for his interpretation of the ATS could be read to prohibit any ATS suit seeking compensation for violations of international law committed on foreign soil. In concluding that the Sierra Leone Company could bring suit against the American individuals involved in the French attack on the colony, Attorney General Bradford circumscribes his opinion, appearing to conclude that the Company could *not* bring suit for the actions taken by the Americans in a foreign country, but rather, could sue only for the actions taken by the Americans on the "high seas." *See* 1 Op. Att'y Gen. at 58 ("So far, therefore, as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts.... But crimes committed on the high seas are within the jurisdiction of the district and circuit courts of the United States...."). We need not address here the open issue of whether the ATS applies "extraterritorially." *See* note 10, *ante.* Were we to take up that issue, however, and were we to adopt Judge Leval's approach and follow the opinion of Attorney General Bradford, we very well could conclude that the ATS does *not* apply extra territorially, and thus we would dismiss this and the vast majority of recent ATS suits on the ground that the violations of customary international law alleged by plaintiffs "originated or took place in a foreign country." 1 Op. Att'y Gen. at 58. Again, we doubt that Judge Leval truly endorses Attorney General Bradford's approach.

FN45. Professor Crawford is the Whewell Professor of International Law in the University of Cambridge, England, Director of the Lauterpacht Centre for International Law at Cambridge, and co-editor of a preeminent peer-reviewed international law journal, *The British Yearbook of International Law.* He was a member of the International Law

Commission ("ILC") of the United Nations from 1992-2001 and served as its Special Rapporteur on State Responsibility. He was principally responsible for the ILC Draft Statute for an International Criminal Court in 1994. *See* Declaration of James Crawford, *ante,* ¶¶ 2-4; Lauterpacht Centre for International Law, Professor James Crawford, Director, http://www.lcil.cam.ac.uk/people/professor_james_crawford.php (last visited Aug. 20, 2010); note 47, *post.*

FN46. At the time of making his declaration, Professor Greenwood was a professor of international law at the London School of Economics. He has since been appointed as a judge of the ICJ. Judge Greenwood's prior experience includes serving as counsel before the ICJ, the European Court of Human Rights, and the ICTY. *See* note 47, *post.*

FN47. In relying on the affidavits of Professor Crawford and Professor Greenwood, as well as on treatises or other works of "publicists," *see Yousef,* 327 F.3d at 100 n. 33, we are mindful that such works are, in the nature of things, "subsidiary" or secondary sources of international law, "useful in explicating or clarifying an established legal principle or body of law," by "shed[ding] light on a particular question of international law," *id.* at 101, or on the primary sources of international law, which are "the documents or acts proving the consent of States to its rules." Clive Parry, *The Sources and Evidences of International Law* 2 (1965), *quoted with approval in Flores,* 414 F.3d at 252, *and Yousef,* 327 F.3d at 101. It is indisputable that the works of the publicists on which we have relied accurately describe the primary sources of the relevant customary international law-the relevant customs and practices of States. In other words, we have relied on these sources "for trustworthy evidence of what the law really is" and "not for the speculations of their authors concerning what the law ought to be." *The Paquete Habana,* 175 U.S. at 700.

Judge Leval criticizes us for relying on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

affidavits of Professor Crawford and Professor Greenwood because both were expert witnesses hired by the defendants in another case. Yet we fail to see how statements made in an affidavit, under penalty of perjury, are any less reliable than published works whose accuracy is confirmed only by efforts of the student staff of law journals.

We note, moreover, that Judge Leval relies on "Beth Stephens, et al., *International Human Rights Litigation in U.S. Courts* 310 (2d ed.2008)," in support of his contention that corporations can be liable for violations of customary international law under the ATS. Concurring Op. 66. The remaining authors of that text are Judith Chomsky, Jennifer Green, Paul Hoffman, and Michael Ratner. Paul Hoffman happens to be lead counsel to plaintiffs in this very appeal. Judith Chomsky and Jennifer Green have submitted an *amicus* brief on behalf of plaintiffs in this case and, together with Beth Stephens, have directly represented different plaintiffs pursuing ATS claims against Royal Dutch Petroleum (the defendants here) before this court. *See Wiwa v. Royal Dutch Petroleum, 226 F.3d 88, 91 (2d Cir.2000).*

Judge Leval also relies on a publication of the International Commission of Jurists. Concurring Op. 65. That, however, is an *advocacy* organization, in some respects like Amnesty International or Human Rights Watch. *See* Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability,* at ii (2008), *available at* http://icj.org/IMG/Volume_1.pdf ("The International Commission of Jurists ... is a non-governmental organization devoted to promoting the understanding and observance of the rule of law and the legal protection of human rights throughout the world."); *id.* at vii (explaining that members of the "steering group" for the "Corporate Complicity & Legal Accountability" project included representatives from, among other organizations, Amnesty In-

ternational and Human Rights Watch); *see also* http://www.icj.org (follow "About Us" link) (last visited Aug. 20, 2010) ("Through pioneering activities, including inquiry commissions, trial observations, fact-finding missions, public denunciations and quiet diplomacy, the [International Commission of Jurists] has been a powerful advocate for justice.").

In the words of Judge Leval, we think "[i]t is not self-evident" that the works of such advocates are "what the Supreme Court had in mind in *Paquete Habana* when it gave cautious approval to consultation of 'the works of jurists and commentators.' " Concurring Op. 59 n.39 (emphasis omitted) (quoting *The Paquete Habana, 175 U.S. at 700).*

In any event, Judge Leval's criticism of our reliance on the affidavits of Professor Crawford and Professor Greenwood is irrelevant because Judge Leval agrees that "international law, of its own force, imposes no liabilities on corporations or other private juridical entities." Concurring Op. 67.

FN48. Tellingly, most proponents of corporate liability under customary international law discuss the subject as merely a possibility or a goal, rather than an established norm of customary international law. *See, e.g.,* Menno T. Kamminga & Saman Zia-Zarifi, *Introduction* to *Liability of Multinational Corporations Under International Law, ante,* at 1, 8 (acknowledging "the unsatisfactory state of international law regarding the status of [multinational corporations] and their impact" but asserting that "[i]t now seems possible, indeed highly probable, that a regime of international legal liability for [multinational corporations] *can and will be developed* " (emphasis added)); Ratner, note 43, *ante,* at 449 ("This Article posits *a theory* of corporate responsibility for human rights protection. *Building upon the traditional paradigm* whereby international law generally places duties on states and, more recently, individuals, I consider whether and

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

how the international legal process *might provide* for human rights obligations directly on corporations. My thesis is that international law *should* and can provide for such obligations ....“ (emphases added)); Beth Stephens, *The Amorality of Profit: Transnational Corporations and Human Rights,* 20 Berkeley J. Int'l L. 45, 46 (2002) (“Over the fifty years since the Holocaust, the international community has recognized that governments can be held liable for abuses directed at both their own citizens and foreigners, during war and when at peace-and that individuals can be held accountable as well. Today, the abuses of the Holocaust are contributing to the *development of new approaches* to human rights accountability, this time focusing on corporate human rights violations ....“ (emphases added)); *id.* at 47 (“Both domestic governments and international organizations have danced around [the topic of corporate liability], urging *voluntary codes of conduct rather than seeking to impose binding rules of law.*” (emphasis added)).

Others rely on improper sources of customary international law to find a norm of corporate liability. *See e.g.,* Louis Henkin, *The Universal Declaration at 50 and the Challenge of Global Markets,* 25 Brook. J. Int'l L. 17, 25 (1999) (“Every individual and every organ of society excludes no one, no company, no market, no cyberspace. The Universal Declaration applies to them all.”); *cf. Sosa,* 542 U.S. at 734 (explaining that the Universal Declaration of Human Rights “does not of its own force impose obligations as a matter of international law” and, therefore, is of “little utility” in discerning norms of customary international law); note 34, *ante.*

FN49. Judge Leval relies on the works of Oscar Schachter and Louis Henkin for a general and undisputed proposition: “ ‘There is no general requirement in international law that States provide [civil remedies to private persons]. By and large, international law leaves it to them to meet their obligations in such ways as the State determines.’

“ Concurring Op. 42 (quoting Oscar Schachter, *International Law in Theory and Practice* 240 (1991)); *see also id.* at 42 n. 30 (“The international system requires that a State meet its international obligations, but ordinarily the law has not required that a state meet those obligations in a particular way or through particular institutions or laws.” (emphasis omitted) (quoting Louis Henkin, *International Law: Politics, Values and Functions* 88 (1990))). We agree, of course, that nothing in international law prohibits the United States from providing a civil remedy against corporations for violations of the law of nations (nor could it). The Congress of the United States has simply not chosen to do so, opting instead to provide a civil remedy-by conferring jurisdiction over torts committed in violation of the law of nations-but leaving the question of who can be sued to the law of nations. *See* 28 U.S.C. § 1350.

FN50. Even in our domestic law, the question of the scope of liability-that is, *who* can be held liable for wrongful conduct-is not a question of remedy. Remedies refer to “precisely *what* the plaintiff may recover after resorting to the law.” Edward D. Re & Joseph R. Re, *Remedies* 2 (6th ed.2005) (emphasis added) (internal quotation marks omitted). Whether a plaintiff is entitled to money damages, declaratory relief, an injunction, or specific performance are all questions of remedy. *See generally id.* at xi-xiii. Whether a particular remedy-money damages, an injunction, etc.-can be enforced *against* a certain individual or entity is not a question of *remedy;* it is a question of the scope of *liability.*

FN51. We note that, even within our federal system, there are a variety of approaches to determining how the courts are to impute to a corporation the conduct and intent of its employees or agents. *See, e.g.,* 7 U.S.C. § 2(a)(1)(B) (adopting *respondeat superior* principles for regulatory actions brought by the Commodity Exchange Commission); *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

(limiting applicability of *respondeat superior* in civil claims for punitive damages under Title VII); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (limiting applicability of *respondeat superior* in civil actions for sexual harassment); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (same). Yet, in arguing that corporate liability exists under the ATS, Judge Leval does not even explain where that norm of liability derives from (federal statute, federal common law, state law perhaps?), much less attempt to specify which among the different standards of corporate liability courts should apply in ATS cases.

FN1. "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

FN* Since the writing of this opinion, in the few days before filing, a California district court dismissed an ATS action in part on the basis of its acceptance of the majority's view that customary international law does not apply to corporations. *Doe v. Nestle, S.A.,* No. CV 05-5133 SVW (JTLx), slip op. at 120 (C.D.Cal. Sept. 8, 2010). To the extent I note in various places throughout this opinion that no court has ever spoken favorably of the majority's proposition that corporations are exempt from the rules of international law, I modify that statement to except the opinion filed last week in California.

FN2. The majority concede that "federal courts may recognize claims 'based on the present-day law of nations.' " Maj. Op. 17. Where their opinion departs from precedent is its contention that courts may not recognize a claim against "a particular class of defendant" unless international tribunals regularly impose liability on that type of defendant. Maj. Op. 20, 49, 51. As I explain below, there is no legal basis for this novel requirement.

FN3. The majority protest that their rule is

not one of "immunity" but rather one of absence of liability. Maj. Op. 50. Because their rule provides that, when a corporation is sued, it can have the suit dismissed on the ground that it is a corporation, it seems to me to be indistinguishable from an immunity. But nothing turns on whether we call it an immunity, an exemption, a protection, an absence of liability, or any other name. My reasons for rejecting the rule are that there is no support or justification for it in precedent, scholarship, reason, experience, or morality. None of this would change if the rule were called by a different name.

FN4. *See The* Amy Warwick, 67 U.S. (2 Black) 635, 670, 17 L.Ed. 459 (1862) ("The law of nations is also called the law of nature; it is founded on the common consent as well as the common sense of the world. It contains no ... anomalous doctrine."); Oscar Schachter, *International Law in Theory and Practice* 2 (1991) ("[I]nternational law ... is more than a given body of rules and obligations. It involves purposive activities undertaken by governments, directed to a variety of social ends.").

FN5. *See, e.g.,* Sosa, 542 U.S. at 732, 737 (torture, slave trade, prolonged arbitrary detention committed as a matter of state policy, and piracy); *Kadic v. Karadzic,* 70 F.3d 232, 240, 243 (2d Cir.1995) (genocide, war crimes, and torture and summary execution committed in the course of genocide or war crimes); *In re Ferdinand Marcos, Human Rights Litig.,* 25 F.3d 1467, 1475 (9th Cir .1994) (torture); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 404 (1987) (genocide, war crimes, piracy, slave trade, and attacks on or hijacking of aircraft).

FN6. VIII *Trials of War Criminals Before the Nuernberg Military Tribunals* 1173-74 (1952) (the "Farben Trial") ("Charged with the responsibility of meeting fixed production quotas, Farben yielded to the pressure of the Reich Labor Office and utilized involuntary foreign workers in many of its plants. It is enough to say here that the utili-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

zation of forced labor, unless done under such circumstances as to relieve the employer [the Farben company] of responsibility, constitutes a violation of [international law]."); *see also* IX *Trials of War Criminals Before the Nuernberg Military Tribunals* 1375-76 (1950) (the "Krupp Trial") ("[T]hroughout German industry in general, and the firm of Krupp and its subsidiaries in particular, prisoners of war of several nations including French, Belgian, Dutch, Polish, Yugoslav, Russian, and Italian military internees were employed in armament production in violation of the laws and customs of war.").

FN7. The majority contend that the failure of the Nuremberg tribunal to impose civil damages on Farben shows that international law does not impose damages on corporations. Maj. Op. 32. This argument demonstrates the illogic and internal inconsistency of the majority's position. The Nuremberg tribunal also did not impose liability for civil damages on Farben's executives whom it convicted criminally. If the fact that Nuremberg did not impose civil liability on the Farben corporation means that international law does not allow for civil liability of corporations, then the fact that Nuremberg did not impose civil liability on Farben's guilty personnel must mean that international law does not allow for civil liability of natural persons. Yet the majority concede that such natural persons are liable for civil damages. The Nuremberg tribunal simply did not contemplate questions of civil liability, nor has any subsequent international tribunal. As I explain below, the law of nations has simply not ventured into determinations with respect to civil liability. It has left that question to individual nations.

FN8. *See* Trafficking Victims Protection Reauthorization Act of 2005, Pub.L. 109-164, § 2, 119 Stat. 3558), 3558 (Jan. 10, 2006) (noting that an estimated 600,000 to 800,000 individuals are trafficked across international borders each year and exploited through forced labor and commercial sex exploitation, of which 80% are women and

girls); United Nations Office on Drugs and Crime, Global Report on Trafficking in Persons 48-50 (Feb.2009), *available at* http://www.unodc.org/documents/Global_Report_on_TIP .pdf (noting approximately 14,900 incidents of human trafficking were reported in 2006, 79% of which involved sexual exploitation).

FN9. *See generally* Lauren Ploch et al., Cong. Research Serv., *Piracy Off the Horn of Africa* (Sept. 28, 2009); Peter Chalk, *The Maritime Dimension of International Security: Terrorism, Piracy, and Challenges for the United States* 6 (RAND 2008).

FN10. The possibility of pirates operating through the corporate form is not far-fetched. According to a recent United Nations report, Somali pirates essentially operate as limited partnerships, in which investors make investments of money, weaponry, and equipment in exchange for "Class A" and "Class B" participations in the profits of piracy operations. Rep. of the Monitoring Group on Somalia Pursuant to Security Council Resolution 1853 (2008), U.N Doc. No. S/2010/91, at 99 (Mar. 10, 2010). The profits of such an operation can be substantial, as in the case of the MV Faina, which was released in February 2009 for $3.2 million ransom. *See Piracy Off the Horn of Africa, supra,* at 10-11.

FN11. The majority's characterization of the *facts* upon which their theory rests is occasionally subject to dispute. For example, the opinion asserts that "customary international law has steadfastly rejected the notion of corporate liability for international crimes." Maj. Op. 9. The opinion refers to "a jurisprudence, first set forth in Nuremberg and repeated by every international tribunal of which we are aware, that offenses against the law of nations ... can be enforced against States and individual men and women but not against juridical persons such as corporations." *Id.* It maintains, "there are ample sources of international law explicitly *rejecting* corporate liability." Maj. Op. 10 n.21. However, the most that can be asserted as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

fact, as opposed to argument, is that international tribunals have not been empowered to exercise criminal jurisdiction over corporations or civil jurisdiction over any sort of private actor.

The majority opinion further asserts that "no international tribunal has ever held a corporation liable for a violation of the law of nations," Maj. Op. 9, and that "no corporation has ever been subject to *any* form of liability under the customary international law of human rights," Maj. Op. 10. The fact is, however, that no international tribunal has ever considered whether a corporation or a natural person can be held civilly liable in damages for violation of the customary law of nations, because no international tribunal has ever exercised civil jurisdiction over private actors.

The majority describe their ruling as answering a "question that has been lurking for some time in our ATS jurisprudence." Maj. Op. 15. It is not the case, however, that judges have struggled uncomfortably with this problem for decades. While the ATS has been in our law for over 200 years and was held to apply in actions both by and against corporations as early as 1795, 1 Op. Att'y Gen. 57, 59 (1795), and 1907, 26 Op. Att'y Gen. 250, 253 (1907), it was only four years ago that corporate immunity was first argued to our court and only eight years ago that it was first argued to a district court. *See* Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 282 (2d Cir.2007); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 319 (S.D.N.Y.2003).

FN12. *See, e.g.,* Abdullahi v. Pfizer, Inc., 562 F.3d 163 (2d Cir .2009) (holding that allegation that a *corporate* defendant engaged in non-consensual medical experimentation on human subjects stated a claim under the ATS for violations of law of nations), *cert. denied,* --- U.S. ----, 130 S.Ct. 3541, --- L.Ed.2d ----, 78 U.S.L.W. 3049; Sarei v. Rio

Tinto, PLC, 487 F.3d 1193 (9th Cir.2007) (concluding that nonfrivolous claims against international mining corporation for vicarious liability for violations of *jus cogens* norms were sufficient to warrant exercise of federal jurisdiction under the ATS), *vacated in part on other grounds,* 550 F.3d 822 (9th Cir.2008) (en banc); Doe I v. Unocal Corp., 395 F.3d 932 (9th Cir.2002) (concluding that a private party-such as Unocal, a corporation-may be subject to suit under the ATS for aiding and abetting violations of customary international law and for violations of certain *jus cogens* norms without any showing of state action), *reh 'g en banc granted,* 395 F.3d 978 (9th Cir.2003), *appeal dismissed,* 403 F.3d 708 (9th Cir.2005); Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir.2002) (dismissing ATS case against corporate defendant on forum non conveniens grounds, because courts of Ecuador provided adequate alternative forum); Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir.2000) (reversing district court's dismissal of ATS complaint against corporations on forum non conveniens grounds, and affirming district court's ruling that corporations were subject to personal jurisdiction in New York); Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir.1998) (vacating district court's dismissal of ATS case against corporation on forum non conveniens grounds and remanding for further proceedings); Bowoto v. Chevron Corp., 557 F.Supp.2d 1080 (N.D.Cal.2008) (denying oil company defendants' motion for summary judgment on claims that U.S. corporation, acting through its Nigerian subsidiary, aided and abetted violations of laws of nations; case proceeded to trial before jury, which found in favor of defendants); Licea v. Curacao Drydock Co., 584 F.Supp.2d 1355 (S.D.Fla.2008) ($80 million ATS judgment against defendant corporation for human trafficking and forced labor); *Chowdhury v. WorldTel Bangladesh Holding,* Ltd., No. 08 Civ. 1659(BMC) (E.D.N.Y. Aug. 6, 2009), ECF No. 48 ($1.5 million ATS jury verdict entered against defendant holding company for torture), *appeal filed,* No. 09-4483-cv (2d Cir.); *see also* Hilao v. Estate of Marcos, 103 F.3d 767, 776-77 (9th Cir.1996) (affirming $2 billion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

ATS class award against *estate* of former president of Philippines for gross human rights violations committed during his reign). (The majority's rule would immunize an estate or trust equally with a corporation, as it applies to all juridical entities.)

FN13. Judge Katzmann wrote in response, "This argument [that corporations may not be held liable under the ATS] was not raised by the defendants on appeal and therefore the issue was not briefed by the parties. It is perhaps not surprising that neither the defendants nor the United States raised this issue as a bar to liability: We have repeatedly treated the issue of whether corporations may be held liable under the AT [S] as indistinguishable from the question of whether private individuals may be." *Khulumani,* 504 F.3d at 282 (Katzmann, J., concurring).

FN14. *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1263 (11th Cir.2009) ("In addition to private individual liability, we have also recognized corporate defendants are subject to liability under the ATS and may be liable for violations of the law of nations." (citing *Romero v. Drummond Co., Inc.,* 552 F.3d 1303, 1315 (11th Cir.2008) ("The text of the Alien Tort Statute provides no express exception for corporations, and the the law of this Circuit is that [ATS] grants jurisdiction from complaints of torture against corporate defendants.")); *Al-Quraishi v. Nakhla,* No. Civ. No. 08-1696, 2010 WL 3001986, at *39 (D.Md. July 29, 2010) ("There is no basis for differentiating between private individuals and corporations [under the ATS]...."); *In re S. African Apartheid Litig.,* 617 F.Supp.2d 229, 254-55 (S.D.N.Y.2009) (Scheindlin, J.) (rejecting argument that corporate liability cannot be imposed under the ATS); *In re XE Servs. Alien Tort Litig.,* 665 F.Supp.2d 569, 588 (E.D.Va.2009) ("Nothing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations; indeed, *Sosa* simply refers to both individuals and entities as 'private actors.' ... [T]here is no identifiable principle of civil liability which would distinguish between

individual and corporate defendants in these circumstances." (internal citations omitted)); *see also In re Agent Orange Prod. Liab. Litig.,* 373 F.Supp.2d 7, 58 (E.D.N.Y.2005) (Weinstein, J.) ("A corporation is not immune from civil legal action based on international law."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 335 (S.D.N.Y.2005) (Cote, J.) ("Talisman's argument that corporate liability under international law is not ... sufficiently accepted in international law to support an ATS claim is misguided."); *Talisman,* 244 F.Supp.2d 289, 319 (S.D.N.Y.2003) (Schwartz, J.) ("A private corporation is a juridical person and has no *per se* immunity under U.S. domestic or international law.... [W]here plaintiffs allege *jus cogens* violations, corporate liability may follow."); *cf. In re S. African Apartheid Litig.,* No. 02 MDL 1499(SAS), 2009 WL 5177981, at *2 (S.D.N.Y. Dec.31, 2009) (denying motion for certification of interlocutory appeal, because there are not "substantial grounds for disagreement on the issue of whether ATS extends liability to corporations"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* No. 01 Civ. 9882(DLC), 2005 WL 2082847, at *3-*4 (S.D.N.Y. Aug.30, 2005) (same); *but see* discussion of *Doe v. Nestle,* at footnote* on page 3, *supra.*

FN15. Although the Supreme Court relied on Attorney General Bradford's 1795 in *Sosa,* the majority's only response to these Attorney General opinions is that they "do[ no]thing more than baldly declare" conclusions which the majority consider erroneous. Maj. Op. 41 n.44. (They add the irrelevancy that one of the opinions would require dismissal of this suit on a completely different ground.)

FN16. The majority find it "particularly significant" that no international (criminal) tribunal has ever held "a corporation liable for a violation of the law of nations." Maj. Op. 28. This misunderstands the role of such tribunals in the *enforcement* of the law of the nations. The primary, and prior to the twen-

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

tieth century, the exclusive, means of applying and enforcing the requirements of customary international law was the *domestic* law of civilized nations. The very actions that were "uppermost" in the First Congress's mind in passing the ATS-piracy, violations of safe conduct, and offenses against ambassadors-had been punished not by an international tribunal but by the domestic courts of England under the domestic law of England. *See Sosa,* 542 U.S. at 715, 719; 4 William Blackstone, Commentaries *66. Only beginning in World War I, with the advent of the Permanent Court of International Justice, did international law also provide an international court for enforcing these requirements. And, until the establishment of the ICC, it provided courts to enforce international law against individuals only on an ad hoc basis, convening to carry out judgment for particular violations of international law-for example, in Nazi Germany, the former Yugoslavia, and Rwanda. Such tribunals have exercised only criminal jurisdiction. They have never entertained claims of civil liability directed against either corporations or natural persons.

FN17. The European Commission also raised this concern as amicus curiae. *See* Br. of Amicus Curiae the European Comm'n in Supp. of Neither Party, at 10, *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (No. 03-339) ("[O]nly a subset of norms recognized as customary international law applies to non-state actors, such as corporations, and hence only that subset may form the basis of liability against such actors. For example, non-state actors may be liable for genocide, war crimes, and piracy, while torture, summary execution, and prolonged arbitrary detention do not violate the law of nations unless they are committed by state officials or under color of law." (citing, inter alia, *Tel-Oren* or *Kadic)), available at* 2004 WL 177036.

FN18. The majority opinion argues at one point that "customary international law does not develop through 'logical' expansion of existing norms," and that its rules cannot be

extended by "parity of reasoning." Maj Op. 36-37 & n.37. In spite of this assertion, the majority opinion seeks by "parity of reasoning" to extend international law's refusal to exercise criminal jurisdiction over corporations into a principle of refusal to allow imposition of civil liability on corporations. The problem with the exercise is not only the majority's inconsistency on the inappropriateness of logical extension by parity of reasoning, but more importantly that its asserted extension is based on neither logic nor parity of reasoning. Parity of reasoning undertakes to apply the same rule to logically indistinguishable cases. The majority seek by illogical argument to extend a rule justified solely by one set of circumstances into other situations that lack the justifying circumstances. Legal scholarship often extols the virtue of deciding like cases in like fashion. The majority here undertake to decide unlike cases in like fashion.

FN19. *See, e.g.,* 2 Int'l Commission of Jurists, *Corporate Complicity & Legal Accountability* 57-58 (2008) ("National criminal laws were developed many centuries ago, and they are built and framed upon the notion of the individual human being as a conscious being exercising freedom of choice, thought and action. Businesses as legal entities have been viewed as fictitious beings, with no physical presence and no individual consciousness."); L.H. Leigh, *The Criminal Liability of Corporations and Other Groups: A Comparative View,* 80 Mich. L.Rev. 1508, 1509 (1982) ("These arguments [against corporate criminal liability] may be summarized quickly: a corporation has no mind of its own and therefore cannot entertain guilt; it has not body and therefore cannot act *in propia persona;* ....").

FN20. *See, e.g.,* 2 Int'l Commission of Jurists, *supra* note 19, at 58 ("[M]any perceive it to be impossible to prove that a business entity had criminal intent, or knowledge."); V.S. Khanna, *Corporate Criminal Liability: What Purpose Does It Serve?,* 109 Harv. L.Rev. 1477, 1490 (1996) ("Many European jurisdictions initially refused to recognize

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

corporate criminal liability because the notion that a juristic fiction such as a corporation could possess guilt in the sense necessary for the application of the criminal law seemed far-fetched."); Guy Stessens, *Corporate Criminal Liability: A Comparative Perspective,* 43 Int'l & Comp. L.Q. 493, 496 (1994) (describing decisions of the Queen's Bench that "managed to surmount the so-called *'mes rea* hurdle' "); Gerhard O.W. Mueller, *Mens Rea and the Corporation,* 19 U. Pitt. L.Rev. 21, 29 (1957) (discussing mid-century French view that "corporate criminal liability is irreconcilable with the guilt principle"); Robert Phillimore, *Commentaries upon International Law* 50 (1854) ("Criminal law is concerned with a *natural* person; a being of thought, feeling, and will. A *legal* person is not, strictly speaking, a being of these attributes, though, through the medium of representation and of government, the will of certain individuals is considered the will of the corporation; but only for certain purposes.").

FN21. *See, e.g., Prosecutor v. Kayishema & Ruzindana,* Case No. ICTR-95-1-T, Sentence, ¶ 2 (June 1, 2001) ("This Chamber must impose sentences on convicted persons for retribution, deterrence, rehabilitation, and to protect society. As to deterrence, this Chamber seeks to dissuade for good those who will be tempted in the future to perpetrate such atrocities by showing them that the international community is no longer willing to tolerate serious violations of international humanitarian law and human rights."); *Prosecutor v. Nahimana,* Case No. ICTR-99-52-T, Judgement and Sentence, ¶ 1095 (Dec. 3, 2003) ("The Chamber considers that sentencing serves the goals of retribution, deterrence, rehabilitation, and protection of society."); *Prosecutor v. Musema,* Case No. ICTR-96-13, Judgment and Sentence, ¶ 986 (Jan. 27, 2000) ("The penalties imposed by this Tribunal must be directed at retribution, so that the convicted perpetrators see their crimes punished, and, over and above that, at deterrence, to dissuade for ever others who may be tempted to commit atrocities by showing them that the international community does not tolerate serious

violations of international humanitarian law and human rights."); *Prosecutor v. Kupreskic,* Case No. IT-95-16-T, Judgment, ¶ 848 (Jan. 14, 2000) ("[I]n general, retribution and deterrence are the main purposes to be considered when imposing sentences in cases before the International Tribunal."); *Prosecutor v. Naletilic,* Case No. IT-98-34-T, Judgement, ¶ 739 (Mar. 31, 2003) (same).

FN22. André Tunc, Introduction, in 11 *International Encyclopedia of Comparative Law* ¶ 167, at 96 (André Tunc ed., 1983) ("[T]he law of tort should serve the fulfillment of justice, at least if a compensatory justice, not a punishing one, is contemplated."); Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts,* 6 Nw. J. Int'l Human Rights 304, 322-23 (2008) ("[C]ustomary international law has long held that injuries caused by violations of international norms require reparation, including monetary compensation when full restitution is not possible."); *see also infra* note 24 (quoting decisions of the International Court of Justice and Permanent Court of International Justice to the same effect).

FN23. Several international conventions explicitly recognize the diversity in nations' domestic laws regarding the imposition of criminal sanctions on legal or juridical persons. These conventions require State parties to impose criminal sanctions on legal persons, or where that is not possible under the individual nation's domestic law, non-criminal sanctions. *See* Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, May 25, 2000, G.A. Res. 54/263, Annex II, 54 U.N. GAOR Supp. (No. 49) at 6, U.N. Doc. A/54/49, Vol. III (2000), *entered into force* Jan. 18, 2002 ("Subject to the provisions of its national law, each State Party shall take measures ... to establish the liability of legal persons. Subject to the legal principles of the State Party, such liability of legal persons may be criminal, civil or administrative."); Organization for Economic Cooperation and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Development, Convention on Combating Bribery of Foreign Public Officials in International Business transactions, art. 3, Nov. 21, 1997, DAFFE/IME/BR(97)20, *entered into force* Feb. 15, 1999 ("The bribery of a foreign public official shall be punishable by effective, proportionate and dissuasive criminal penalties.... In the event that under the legal system of a Party, criminal responsibility is not applicable to legal persons, that Party shall ensure that legal persons shall be subject to effective, proportional and dissuasive non-criminal sanctions.").

FN24. One international tribunal, the closest thing to a tribunal vested with civil jurisdiction-the International Court of Justice (ICJ), which resolves matters referred to it by treaty or agreement of State parties-does award civil reparations against States, which are juridical entities. Statute of the International Court of Justice, art. 36(1), June 26, 1945, 59 Stat. 1055, 33 U.N.T.S. 993. While that court does not exercise jurisdiction over private actors, *id.* art. 34(1), its precedents involving awards of reparations paid by one State to another demonstrate that an award of damages against a juridical entity is familiar ground in international law. In a line of decisions dating to the 1920s, the ICJ and its predecessor court, the Permanent Court of International Justice, have recognized as "a principle of international law that the breach of an international engagement [a duty imposed by international law] involves an obligation to make reparation in an adequate form." Factory at Chorzów (Jurisdiction) (*Germany v. Poland* ), 1927 P.C.I.J. (ser.A) No. 9, at 3, 21 (July 26); *see also* United States Diplomatic and Consular Staff in Tehran (Judgment) (*United States of America v. Iran* ), 1980 I.C.J. 3, 41-42 (May 24) ("Iran, by committing successive and continuing breaches of [treaty obligations] *and the applicable rules of general international law,* has incurred responsibility towards the United States. [I]t clearly entails an obligation on the part of the Iranian State to make reparation for the injury thereby caused to the United States." (emphasis added)); Corfu Channel Case (Merits), 1949 I.C.J. 4, 23 (April 9) ("The Court therefore

reaches the conclusion that Albania is responsible under international law for the explosions which occurred on October 22nd, 1946, in Albanian waters, and for the damage and loss of human life which resulted from them, and that there is a duty upon Albania to pay compensation to the United Kingdom."); 1 *Oppenheim's International Law* ¶ 155, at 528 n.3 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed.1996) (noting an " 'international engagement' includes any duty under international law").

FN25. *See Prosecutor v. Kayishema & Ruzindana,* Case No. ICTR-95-1-T, Sentence, ¶ 1 (May 21, 1999) (stating that the International Criminal Tribunal for Rwanda was established "to ensure the effective redress of violations of international humanitarian law in Rwanda in 1994. The objective was to *prosecute and punish* the perpetrators of the atrocities in Rwanda in such a way as to put an end to impunity and promote national reconciliation and the restoration of peace." (emphasis added)); *Prosecutor v. Blagojevic & Jokic,* Case No. IT-02-60-T, Judgement, ¶ 814 (Jan. 17, 2005) (stating that the International Tribunal for the Former Yugoslavia seeks to impose punishment that "reflect[s] both the calls for justice from the persons who have-directly or indirectly-been victims of the crimes, as well as respond to the call from the international community as a whole to end impunity for massive human rights violations and crimes committed during armed conflicts").

FN26. The distinction between criminal and civil enforcement of international law is also recognized in many multilateral agreements. Most prominently, the Torture Convention requires each State party to criminally prosecute acts of torture or to extradite the alleged torturers to other States for prosecution. Then, on the subject of compensatory civil liability, it obligates each State party to "ensure in its legal system that the victim of an act of torture ... has an enforceable right to *fair and adequate compensation* including the means for as full rehabilitation as possible." Convention Against Torture and Other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

Cruel, Inhuman or Degrading Treatment or Punishment, art. 14, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

FN27. *See, e.g., Prosecutor v. Furundzija,* Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 155 (Dec. 10, 1998) (explaining that victims of officially sanctioned torture "could bring a civil suit for damage in a foreign court"); VI *Trials of War Criminals Before the Nuernberg Military Tribunals* 1207-08 (1952) ("[T]here may be both civil and criminal liability growing out of the same transaction. In this case Flick's acts and conduct contributed to a violation of Hague Regulation 46[,] that is, that private property must be respected.... But his acts were not within his knowledge intended to contribute to a program of 'systematic plunder' [and therefore cannot be punished criminally].").

FN28. *See, e.g.,* Rome Statute, art. 5 (vesting ICC with jurisdiction over the crime of genocide, crimes against humanity, war crimes, and the crime of aggression); Convention on the Prevention and Punishment of the Crime of Genocide, art. V, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 (obligating state parties "to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention, and, in particular, to provide effective penalties for persons guilty of genocide").

FN29. Upon his death in 2003, former Secretary General Kofi Annan described Professor Schachter as the "architect of the legal framework which has guided United Nations peacekeeping for more than 50 years." Wolfgang Saxon, *Oscar Schachter, 88, Law Professor and U.N. Aide,* N.Y. Times, Dec. 17, 2003, at C15.

FN30. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 422-23, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another. Because of its peculiar nation-to-nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal. Although it is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances, the public law of nations can hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic borders." (citations omitted)); Restatement (Third) of the Foreign Relations Law of the United States § 111, cmt. h (1987) ("In the absence of special agreement, it is ordinarily for the United States to decide how it will carry out its international obligations."); Eileen Denza, *The Relationship Between International Law and National Law, in International Law,* 423, 423 (Malcolm Evans ed., 2d ed. 2006) ("[The law of nations] permeates and radically conditions national legal orders, its rules are applied and enforced by national authorities, and national courts are often asked to resolve its most fundamental uncertainties. *Yet international law does not itself prescribe how it should be applied or enforced at the national level.* It asserts its own primacy over national laws, but without invalidating those laws or intruding into national legal systems. National constitutions are therefore free to choose how they give effect to treaties and to customary international law. *Their choice of methods is extremely varied.*" (emphases added)); Louis Henkin, Richard Crawford Pugh, Oscar Schachter & Hans Smit, *International Law: Cases and Materials* 153 (3d ed. 1993) ("Since a state's responsibility to give effect to international obligations does not fall upon any particular institution of its government, *international law does not require that domestic courts apply and give effect to international obligations* .... States differ as to whether international law is incorporated into domestic law and forms a part of the 'law of the land,' and whether the executive or the courts will give effect to norms of international law or to treaty provisions in the absence of their implementation by domestic

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

legislation." (emphasis added)); Louis Henkin, *International Law: Politics, Values and Functions* 88 (1990) ("The international system requires that a State meet its international obligations, *but ordinarily the law has not required that a State meet those obligations in a particular way or through particular institutions or laws.*" (emphasis added)); *id.* at 251 ("Compliance with international law as to civil and political rights ... takes place within a State and depends on its legal system, on its courts and other official bodies."); Louis Henkin, *Foreign Affairs and the Constitution* 224 (1972) ("International law itself, finally, does not require any particular reaction to violations of law...."); Michael Koebele, *Corporate Responsibility under the Alien Tort Statute: Enforcement of International Law Through U.S. Torts Law* 208 (2009) ("[I]nternational law leaves individual liability ..., be it of a natural or legal person, largely to domestic law."); Eric Mongelard, *Corporate Civil Liability for Violations of International Humanitarian Law,* 88 Int'l Rev. Red Cross 665, 671 (2006) ("Legal persons can ... have obligations under international law, or at least there is a strong tendency to that effect. However, virtually none of the above [human rights] instruments provides for a mechanism for the enforcement of any liability that may arise or lays down any obligation for non-state entities to make reparation; they leave it to the states party to the treaties to choose how to apply the rules.").

FN31. *See, e.g.,* International Covenant on Civil and Political Rights, art. 2(3), Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 ("Each State Party to the present Covenant undertakes ... To ensure that any person whose rights or freedoms are herein recognized are violated shall have an effective remedy...."); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 2(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 ("Each State Party shall take effective *legislative, administrative, judicial or other measures* to prevent acts of torture in any territory under its jurisdiction." (emphasis added)); International Con-

vention to Suppress the Slave Trade and Slavery, art. 6, Sept. 25, 1926, 46 Stat. 2183, 60 L.N.T.S. 253 (providing that State parties undertake "to adopt the necessary measures in order that severe penalties may be imposed in respect of such infractions"); United Nations Convention on the Law of the Sea, art. 105, *opened for signature* Dec. 10, 1982, 21 I.L .M. 1261 (providing that upon seizure of vessel or persons engaged in piracy, "*[t]he courts of the State which carried out the seizure may decide upon the penalties to be imposed, and may also determine the action to be taken with regard to the ships, aircraft or property,* subject to the rights of third parties acting in good faith" (emphasis added)); International Convention on the Suppression and Punishment of the Crime of Apartheid, *opened for signature* Nov. 30, 1973, art. IV(b), 1015 U.N.T.S. 243 (obligating State parties "to adopt *legislative, judicial and administrative measures* to prosecute, bring to trial and punish *in accordance with their jurisdiction* persons responsible for" that offense (emphasis added)).

FN32. Beth Stephens, *Translating* Filártiga: *A Comparative and International Law Analysis of Domestic Remedies for International Human Rights Violations,* 27 Yale J. Int'l L. 1, 17-34 (2002) (reviewing reasons foreign countries have not exercised universal tort jurisdiction over human rights violations).

FN33. The majority mischaracterize my position when they attribute to me the view that corporate liability is "merely a question of remedy." Maj. Op. 48; *see also* Maj. Op. 9, 46. As explained throughout this opinion, international law outlaws certain forms of abhorrent conduct and in general leaves to individual nations how to enforce the proscription.

FN34. The majority's position is also inconsistent with our court's understanding in prior cases of the norms dictated by international law. In prior opinions, we have looked to international law to determine whether the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

defendant's conduct violated *norms of conduct* universally accepted by the nations of the world as rules of international law. Three of our opinions contain extensive discussion of whether particular forms of conduct contravene customary international law. In *Flores v. Southern Peru Copper Corp.,* 414 F.3d 233 (2d Cir.2003), a civil suit brought under the ATS *against a corporate defendant,* we surveyed the sources on international law and concluded that acts of intranational pollution did not violate any norm of international law capable of supporting liability under the ATS. In reaching this conclusion, our opinion speaks repeatedly of the "offenses" or "conduct" the corporation allegedly engaged in, and whether such acts violate customary international law. *See, e.g., id.* at 247 ("The determination of what *offenses* violate customary international law ... is no simple task.." (emphasis added)); *id.* at 249 ("*[O]ffenses* that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the 'nations of the world' have demonstrated that such wrongs are of 'mutual ... concern,' and capable of impairing international peace and security." (citations omitted and emphasis added)); *id.* at 255 ("The precept that '[h]uman beings are ... entitled to a healthy and productive life in harmony with nature,' ... utterly fails to specify what *conduct* would fall within or outside of the law." (emphasis added)); *id.* at 266 ("Because plaintiffs have failed to submit evidence sufficient to establish that *intranational pollution* violates customary international law, the District Court properly granted defendant's motion to dismiss." (emphasis added)). Nothing in the opinion even discussed whether the defendant might be exempt from liability because of its corporate character or whether liability was foreclosed because of the absence of a widely accepted convention among nations for awarding civil damages.

Again in *United States v. Yousef,* 327 F.3d 56 (2d Cir.2003), we concluded that the act of placing a bomb on a airplane operated by a foreign carrier did not support

the exercise of universal criminal jurisdiction, because the nations of the world disagree over which *forms of conduct* constitute "terrorism." Again, our opinion contains an extensive discussion of the forms *of conduct* that are proscribed by international law. *See, e.g., id .* at 104 ("In modern times, the *class of crimes* over which States can exercise universal jurisdiction has been extended to include war crimes and acts identified after the Second World War as 'crimes against humanity.' " (emphasis added)); *id.* at 106 ("Unlike those *offenses* supporting universal jurisdiction under customary international law-that is, piracy, war crimes, and crimes against humanity-that now have fairly precise definitions and that have achieved universal condemnation, 'terrorism' is a term so loosely deployed as it is powerfully charged." (emphasis added)); *id.* at 107 ("[T]here continues to be strenuous disagreement among States *about what actions* do or do not constitute terrorism ...." (emphasis added)).

And in *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 183-84 (2d Cir.2009), *cert. denied,* --- U.S. ----, 130 S.Ct. 3541, --- L.Ed.2d ----, 78 U.S.L.W. 3049, we wrote, "[T]he norm prohibiting nonconsensual medical experimentation on human subjects has become firmly embedded and has secured universal acceptance in the community of nations."

FN35. *See, e.g., Kadic v. Karadzi ,* 70 F.3d 232, 242 (2d Cir.1995) ("[F]rom its incorporation into international law, the proscription of genocide has applied equally to state and non-state actors."); Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, art. 15, G.A. Res. 60/147, U.N. Doc. A/RES/60/147 (Dec. 16, 2005) ("In cases where *a person, a legal person, or other entity is found liable for reparation to a victim,* such party should provide reparation to the victim or compensate the State if

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

the State has already provided reparation to the victim" (emphasis added)).

FN36. *See* VI *Trials of War Criminals Before the Nuernberg Military Tribunals* (1952) (the "Flick Trial"); VII, VIII *Trials of War Criminals Before the Nuernberg Military Tribunals* (1952) (the "Farben Trial"); IX *Trials of War Criminals Before the Nuernberg Military Tribunals* (1950) (the "Krupp Trial").

FN37. *See, e.g., Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.,* 822 F.2d 230, 236-37 (2d Cir.1987); *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 894 (2d Cir.1981); *Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.,* 478 F.2d 191, 193 (2d Cir.1973); *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 170, 185 (2d Cir.1967); *Banco Nacional de Cuba v. Sabbatino,* 307 F.2d 845, 864 (2d Cir.1962), *rev'd on other grounds,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *superseded by statute,* 22 U.S.C. § 2370(e)(2).

FN38. The majority do cite one published book, Michael Koebele, *Corporate Responsibility Under the Alien Tort Statute: Enforcement of International Law Through U.S. Torts Law* (Nijhoff 2009), in a manner suggesting that it supports the majority's analysis, but once again the quotation is out of context. The majority quote this work to the effect that it remains the "prevailing view" among scholars that international law "primarily regulates States and in limited instances such as international criminal law, individuals, but not [transnational corporations]." Maj. Op. 43-44. This quotation appears to support the majority's position, but when one places it in context, the appearance of support disappears. Koebele's book later explains that "the ATS, although incorporating international law, is still governed by and forms part of torts law which applies equally to natural and legal persons unless the text of a statute provides otherwise," and that international law does not prevent a State "from raising its standards by holding

[transnational corporations] which are involved [in] or contribute to violations of international law liable as long as the cause of international law is served because international law leaves individual liability (as opposed to State liability), be it of a natural or a legal person, largely to domestic law." Koebele, *supra,* at 208. Koebele thus recognizes that the imposition of tort liability on a corporation under the ATS is entirely consistent with international law.

FN39. It is not self-evident that unpublished expert affidavits submitted in a different litigation are what the Supreme Court had in mind in *Paquete Habana* when it approved consultation of "*the works of* jurists and commentators" and, under that rubric, cited leading works of published scholarship.

FN40. Professor Crawford's affidavit does not take the position that there is any obstacle to a national court holding a corporation civilly liable-only that no such decision has yet has been rendered. The affidavit notes that a study by the International Commission of Jurists on corporate complicity in human rights violations states that corporations are in a "zone of legal risk," Crawford Decl. ¶ 7, but cites no examples of decisions actually holding them liable. In speaking of the experience of the United Kingdom, Professor Crawford characterizes the question of corporate liability as "largely untested." *Id.* ¶ 8. And as far as international tribunals are concerned, the Professor explains that the reason for the absence of judgments against corporations is that the international tribunals do not have jurisdiction to award such judgments. "None have jurisdiction over corporations as respondents." *Id.* ¶ 9.

FN41. Another aspect of the majority's citation of Professor Crawford's declaration requires clarification. The majority opinion quotes the declaration as saying, "[n]o national court [outside the United States] and no international judicial tribunal has so far recognized corporate liability, *as opposed to individual liability, in a civil or criminal context* on the basis of a violation of the law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

of nations." Maj. Op. 43 (first emphasis added). The manner of presenting the quotation could lead the reader to understand that the Professor, like the majority, is saying that when a corporation violates the law of nations, that law recognizes civil liability *of natural persons who acted for the corporation,* but *not of the corporations.* That is not what the Professor was saying. When Professor Crawford responded that no national court outside the United States or international judicial tribunal had imposed corporate liability, "as opposed to individual liability," he was merely adhering to the precise question asked. He was not suggesting, as the majority opinion does, that civil liability of natural persons is judged differently from civil liability of corporations. His affidavit contains no discussion whatsoever of whether any national court or international judicial tribunal has recognized civil liability of natural persons, and he makes no statement one way or the other on the question of such liability.

One of the main problems with the majority's theory is its incoherence resulting from the fact that it treats the absence of any international law precedent for imposition of damages on corporations as barring such an award under the ATS, while acknowledging that damages are properly awarded against natural persons notwithstanding the very same absence of international law precedent for such awards. The quotation from Professor Crawford's affidavit in the majority opinion sounds as if the Professor is saying that international law distinguishes between civil liability of natural persons, which it allows, and civil liability of corporations, which it does not allow. But the Professor was not saying that. His affidavit does not discuss, much less support, the majority's theory that, when a corporation violates the law of nations, civil liability under the ATS *may be imposed on the natural persons who acted for the corporation* but not on the corporation. The ambiguity in Professor Crawford's sentence does not indicate adoption of the majority's incoherent and inconsistent proposition.

FN42. The majority contend that I criticize them for citing affidavits. They assert that affidavits, because they are made under penalty of perjury, are as reliable a source as law review articles "whose accuracy is confirmed only by efforts of the student staff of law journals." Maj. Op. 44 n.47. I do not criticize the majority for citing the affidavits of learned professors. I have only questioned whether unpublished litigating affidavits are what the Supreme Court had in mind in *Paquete Habana* as the "teachings" of publicists. Regardless, I have no criticism of the affidavits of Professors Crawford and Greenwood. The problem with the majority's citation of those affidavits is that the affidavits do not support the majority's thesis.

FN43. Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* (2008), *available at* http://www.icj.org/default .asp? nodeID=350 & langage=1 & myPage=Publications.

FN44. *See infra* note 46.

FN45. While the majority dismiss Professor Steven R. Ratner's discussion as merely aspirational, they do not acknowledge his assertion, based on a report of the International Council on Human Rights, judgments of the Nuremberg Tribunals, multilateral instruments imposing obligations on corporations, the multimillion dollar settlements agreed to by German companies alleged to have been complicit in the wartime human rights violations of the Third Reich, and the practice of the European Union, that "international law has *already effectively recognized* duties of corporations." Steven R. Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility,* 111 Yale L.J. 443, 475 (2001) (emphasis added).

FN46. The majority criticize the report of the International Commission of Jurists and the Stephens treatise as biased sources. Maj. Op. 44 n.47. They point out that certain authors of the Stephens treatise serve as counsel for the Plaintiffs in this case. That is in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

deed a reason to view the conclusions of the treatise with skepticism. The majority's condemnation of the International Commission of Jurists, on the ground that it "promot[es] the understanding and observance of the rule of law and the legal protection of human rights throughout the world," is less convincing. I do not understand why an organization's commitment to upholding the law justifies the view that the organization is biased as to the content of the law. But in any event, the views expressed in those scholarly works are consistent with the views of scholars the majority have not questioned. In contrast, no work of scholarship, whether interested or not interested, has supported the majority's view.

FN47. Because I agree that international law does not of its own force impose liability on corporations, the majority assert that "Judge Leval does not disagree with Part II" of their opinion. Maj. Op. 45. To the contrary, while certain facts mentioned there are entirely accurate, I disagree with numerous unwarranted inferences and conclusions the majority draw from them.

FN48. By "Complaint," I refer to the amended complaint filed in May 2004. *See infra* Part VII.A.3.

FN49. Because of changes in corporate form unrelated to this lawsuit, Shell Petroleum N.V. and Shell Transport and Trading Company, Ltd. are the successors to the named defendants Royal Dutch Petroleum Company and Shell Transport and Trading Company PLC, respectively.

FN50. The designation "Shell," as noted above, represents holding companies in England and Holland, which wholly own The Shell Petroleum Company Ltd., a holding company, which in turn owns SPDC. SPDC is the sole operator and 30% owner of a joint venture engaged in oil exploration, refinement, and extraction in Nigeria.

FN51. Shell also moved to dismiss on the grounds that Plaintiffs' claims are barred by

the act of state doctrine and by the doctrine of international comity. All of these motions were denied and were not appealed. *Kiobel,* 456 F.Supp.2d at 459.

FN52. Plaintiffs contend we should not consider this question because the district court did not consider it and Shell did not raise the issue in its petition for permission to appeal. On interlocutory appeal pursuant to § 1292(b), however, "our Court 'may address any issue fairly included within the certified order,' as 'it is the order that is appealable, and not the controlling question identified by the district court.' " *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86, 95 (2d Cir.2004) (quoting *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996)); *see also Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 n. 7 (3d Cir.1983) ("On a § 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from."). The issue has been fully briefed and I see no reason not to consider it.

FN53. I note the allegation of the Complaint that "SPDC Managing Director Philip B. Watts, with the approval of Shell, requested the Nigerian Police Inspector General to increase SPDC's security ... to deter and quell community disturbances." Even assuming this allegation suffices to allege action for which Shell would be responsible, a request for increased security and a quelling of disturbances is not a request for human rights violations, such as torture, arbitrary arrest, crimes against humanity, or extrajudicial killing.

FN54. There is an additional reason why the Complaint fails to state a claim on which relief against Shell may be granted: the pleadings do not support a plausible inference that *Shell,* the parent holding companies, themselves rendered assistance to the Nigerian government. To the contrary, the Complaint alleges that the Shell entities are holding companies based in England and the Netherlands, and that they operate in Nigeria only "through" subsidiaries, specifically SPDC.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))
**(Cite as: 2010 WL 3611392 (C.A.2 (N.Y.)))**

In light of these concrete allegations regarding corporate form, the conclusory allegations that Shell was complicit in its subsidiary SPDC's rendition of aid to the Nigerian government does not meet the plausibility threshold of *Iqbal.* On the assumption that the Complaint adequately pleads actions of SPDC sufficient to constitute actionable aiding and abetting of Nigeria's human rights abuses, the mere addition of the name of a European holding company to the allegation does not plausibly plead the holding company's involvement.

FN55. Because we are dealing with the English and Dutch parents of a Nigerian corporation, a full conflict of laws analysis may reveal that common law vicarious liability standards are not applicable. As both parties have argued their positions on the basis of the common law, however, I employ the blackletter common law formulations described below for purposes of determining whether Plaintiffs have adequately stated a claim with respect to vicarious liability. In any event, the Dutch law of veil piercing is similar to common law alter ego doctrine, in that it requires a showing that the corporate form has been disregarded or abused to avoid a legal obligation. *See* Nicola M.C.P. Jägers & Marie-José van der Heijden, *Corporate Human Rights Violations: The Feasibility of Civil Recourse in the Netherlands,* 33 Brook. J. Int'l L. 833, 841-42 & nn. 28, 30 (2008). Likewise, under English law (which is substantially similar to the law of Nigeria), a court will hold a parent corporation liable when the subsidiary is so totally under the control of the parent that it cannot be said to be carrying on its own business or when the subsidiary is a mere sham or facade. *See Creasey v. Breachwood Motors, Ltd.,* [1993] BCLC 480, [1992] BCC 638 (Q.B.); *Jones v. Lipman,* [1962] 1 W.L.R. 832, 835(Ch.) (Eng.).

FN56. Plaintiffs cite to an opinion of the United States District Court for the Northern District of Illinois for the principle that agency is a question that must survive a motion to dismiss. *See Cumis Ins. Soc., Inc. v.*

*Peters,* 983 F.Supp. 787, 796 (N.D.Ill.1997). Plaintiffs' reliance on that case is misplaced. In *Cumis,* the district court noted that, "[w]hile the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss." *Id.* There, the court found that the existence of an agency relationship between the plaintiff and the defendant was sufficiently pleaded where the complaint alleged that the plaintiff had made an agreement with the defendant, a collection agency, that the defendant would pursue claims on the plaintiff's behalf. *Id.* No comparable agreement is alleged in this case.

C.A.2 (N.Y.),2010.
Kiobel v. Royal Dutch Petroleum Co.
--- F.3d ----, 2010 WL 3611392 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

## Exhibit B

***Motors Liquidation Company:***
***Certificate of Incorporation and Selected Amendments Thereto***

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "GENERAL MOTORS CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE THIRTEENTH DAY OF OCTOBER, A.D. 1916, AT 1 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIRST DAY OF MARCH, A.D. 1918, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE THIRD DAY OF SEPTEMBER, A.D. 1918, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE NINETEENTH DAY OF DECEMBER, A.D. 1918, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE THIRTEENTH DAY OF JUNE, A.D. 1919, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE SEVENTH DAY OF JANUARY, A.D. 1920, AT 1 O'CLOCK P.M.

CERTIFICATE OF CHANGE OF REGISTERED AGENT, FILED THE SEVENTH DAY OF DECEMBER, A.D. 1920, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE FIRST DAY OF JULY, A.D.

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

0056825    8100H

081194540

AUTHENTICATION: 7024671

DATE: 12-15-08

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# Delaware

PAGE 2

### The First State

1924, AT 11 O'CLOCK A.M.

CERTIFICATE OF RETIREMENT, FILED THE THIRTIETH DAY OF AUGUST, A.D. 1927, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1927, AT 1 O'CLOCK P.M.

CERTIFICATE OF RETIREMENT, FILED THE SEVENTH DAY OF NOVEMBER, A.D. 1928, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE FOURTEENTH DAY OF DECEMBER, A.D. 1928, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE FIFTH DAY OF JUNE, A.D. 1930, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE EIGHTEENTH DAY OF MAY, A.D. 1931, AT 9 O'CLOCK A.M.

CERTIFICATE OF RETIREMENT, FILED THE EIGHTEENTH DAY OF MAY, A.D. 1931, AT 9 O'CLOCK A.M.

CERTIFICATE OF CHANGE OF REGISTERED AGENT, FILED THE SEVENTEENTH DAY OF MAY, A.D. 1937, AT 11 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE EIGHTH DAY OF JUNE, A.D. 1943, AT 10 O'CLOCK A.M.

CERTIFICATE OF REDUCTION, FILED THE FIFTEENTH DAY OF JUNE,

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7024671

DATE: 12-15-08

0056825   8100H

081194540

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# Delaware

PAGE  3

### The First State

A.D. 1944, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-NINTH DAY OF NOVEMBER, A.D. 1946, AT 11 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE SECOND DAY OF OCTOBER, A.D. 1950, AT 3:01 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 1955, AT 3:35 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE THIRTY-FIRST DAY OF MAY, A.D. 1957, AT 10 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SEVENTH DAY OF MAY, A.D. 1968, AT 10 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE FIFTEENTH DAY OF DECEMBER, A.D. 1971, AT 1 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 1971.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTIETH DAY OF SEPTEMBER, A.D. 1976, AT 10 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE THIRTIETH DAY OF

0056825  8100H

081194540

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7024671

DATE: 12-15-08

# Delaware

PAGE  4

## The First State

SEPTEMBER, A.D. 1976.

    CERTIFICATE OF AMENDMENT, FILED THE THIRTIETH DAY OF MAY, A.D. 1979, AT 10 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE NINTH DAY OF JUNE, A.D. 1981, AT 10 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF JULY, A.D. 1983, AT 10 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE EIGHTH DAY OF JUNE, A.D. 1984, AT 10 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE EIGHTEENTH DAY OF OCTOBER, A.D. 1984, AT 11:40 O'CLOCK A.M.

    CERTIFICATE OF CORRECTION, FILED THE TWENTY-SIXTH DAY OF OCTOBER, A.D. 1984, AT 1:30 O'CLOCK P.M.

    RESTATED CERTIFICATE, FILED THE EIGHTEENTH DAY OF APRIL, A.D. 1985, AT 10 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE TWENTIETH DAY OF DECEMBER, A.D. 1985, AT 11:30 O'CLOCK A.M.

    CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SECOND DAY OF MAY, A.D. 1987, AT 12 O'CLOCK P.M.

    CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7024671

DATE: 12-15-08

0056825  8100H

081194540

You may verify this certificate online at corp.delaware.gov/authver.shtml

# *Delaware*

PAGE 5

## *The First State*

SEPTEMBER, A.D. 1987, AT 3:30 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1987, AT 3:31 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1987, AT 3:32 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1987, AT 3:33 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1987, AT 3:34 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF SEPTEMBER, A.D. 1987, AT 3:35 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-NINTH DAY OF SEPTEMBER, A.D. 1987, AT 12:05 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SIXTH DAY OF JUNE, A.D. 1990, AT 3 O'CLOCK P.M.

CERTIFICATE OF CORRECTION, FILED THE EIGHTEENTH DAY OF JULY, A.D. 1990, AT 12:45 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-EIGHTH DAY OF JUNE, A.D. 1991, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE NINTH DAY OF DECEMBER,

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

0056825   8100H

081194540

AUTHENTICATION: 7024671

DATE: 12-15-08

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# Delaware

PAGE   6

### The First State

A.D. 1991, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTEENTH DAY OF FEBRUARY, A.D. 1992, AT 10 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SIXTH DAY OF MAY, A.D. 1992, AT 3 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FIFTEENTH DAY OF JULY, A.D. 1992, AT 10 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE FIFTEENTH DAY OF DECEMBER, A.D. 1992, AT 4 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SIXTH DAY OF MAY, A.D. 1994, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF MERGER, FILED THE SEVENTH DAY OF JUNE, A.D. 1996, AT 10:15 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, FILED THE FIRST DAY OF JULY, A.D. 1996, AT 10 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, FILED THE SEVENTEENTH DAY OF DECEMBER, A.D. 1997, AT 2:35 O'CLOCK P.M.

CERTIFICATE OF MERGER, FILED THE SEVENTEENTH DAY OF DECEMBER, A.D. 1997, AT 3:10 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE NINTH DAY OF JUNE,

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

0056825   8100H

AUTHENTICATION: 7024671

081194540

DATE: 12-15-08

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# Delaware

PAGE  7

### The First State

A.D. 1998, AT 4 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE TENTH DAY OF JUNE, A.D. 1998, AT 4 O'CLOCK P.M.

CERTIFICATE OF CORRECTION, FILED THE TWENTY-THIRD DAY OF JULY, A.D. 1998, AT 4 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-FOURTH DAY OF JUNE, A.D. 1999, AT 1:20 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE SIXTH DAY OF JUNE, A.D. 2000, AT 11:30 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-SECOND DAY OF OCTOBER, A.D. 2001, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-SECOND DAY OF OCTOBER, A.D. 2001, AT 9:01 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-SECOND DAY OF OCTOBER, A.D. 2001, AT 9:02 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SECOND DAY OF DECEMBER, A.D. 2003, AT 8:59 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SECOND DAY OF DECEMBER, A.D. 2003, AT 1:18 O'CLOCK P.M.

CERTIFICATE OF CORRECTION, FILED THE FIRST DAY OF MARCH,

0056825  8100H

081194540

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7024671

DATE: 12-15-08

# Delaware

PAGE  8

*The First State*

A.D. 2004, AT 6:19 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE FIRST DAY OF MARCH,
A.D. 2004, AT 6:20 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE FIRST DAY OF MARCH, A.D.
2004, AT 6:21 O'CLOCK P.M.

CERTIFICATE OF CORRECTION, FILED THE SIXTEENTH DAY OF
JANUARY, A.D. 2008, AT 4:43 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION, "GENERAL MOTORS CORPORATION".

0056825    8100H

081194540

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7024671

DATE: 12-15-08

## GENERAL MOTORS CORPORATION.

### CERTIFICATE OF INCORPORATION.

WE, the undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of an Act of the Legislature of the State of Delaware, entitled "An Act Providing a General Corporation Law" (approved March 10, 1899), and the acts amendatory thereof and supplemental thereto, do hereby certify as follows:

FIRST: The name of the corporation is

GENERAL MOTORS CORPORATION.

SECOND: The principal office of the corporation is to be located at No. 7 West Tenth Street, in the City of Wilmington, County of New Castle, State of Delaware. The name of its resident agent in charge thereof is the Corporation Trust Company of America, whose address is No. 7 West Tenth Street, in the City of Wilmington, County of New Castle, State of Delaware.

THIRD: The nature of the business of the corporation and the objects and purposes proposed to be transacted, promoted, or carried on by it, are as follows, to-wit:

(a) To manufacture, buy, sell and deal in automobiles, trucks, cars, boats, flying machines and other vehicles, their parts and accessories, and kindred articles, and generally to conduct an automobile business in all its branches.

60002

2

(b) To purchase or otherwise acquire, lease, assign, mortgage, pledge or otherwise dispose of any trade names, trade marks, concessions, inventions, formulæ, improvements, processes of any nature whatsoever, copyrights, and letters patent of the United States and of foreign countries, and to accept and grant licenses thereunder.

(c) To subscribe or cause to be subscribed for, and to purchase or otherwise acquire, hold for investment, sell, assign, transfer, mortgage, pledge, exchange, distribute or otherwise dispose of the whole or any part of the shares of the capital stock, bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations, notes and other evidences of indebtedness of any corporation, stock company or association, now or hereafter existing, and whether created by or under the laws of the State of Delaware, or otherwise; and while owners of any of said shares of capital stock or bonds or other property to exercise all the rights, powers and privileges of ownership of every kind and description, including the right to vote thereon, with power to designate some person for that purpose from time to time to the same extent as natural persons might or could do.

(d) To purchase, hold, sell and reissue the shares of its own capital stock.

(e) To buy, lease, or otherwise acquire, so far as may be permitted by law, the whole or any part of the business, good-will, and assets of any person, firm, association or corporation (either foreign or domestic) engaged in a business of the same general character as that for which this corporation is organized.

(f) To endorse, guarantee and secure the payment and satisfaction of bonds, coupons, mortgages, deeds of

2

60003

3

trust, debentures, securities, obligations and evidences of
indebtedness, and also to guarantee and secure the pay-
ment or satisfaction of interest on obligations and of
dividends on shares of the capital stock of other corpora-
tions; also to assume the whole or any part of the lia-
bilities, existing or prospective, of any person, corpora-
tion, firm or association; and to aid in any manner any
other person or corporation with which it has business
dealings, or whose stocks, bonds, or other obligations are
held or are in any manner guaranteed by the corporation,
and to do any other acts and things for the preservation,
protection, improvement, or enhancement of the value of
such stocks, bonds, or other obligations.

(g) To engage in any other manufacturing or mer-
cantile business of any kind or character whatsoever,
and to that end to acquire, hold, own and dispose of any
and all property, assets, stocks, bonds and rights of any
and every kind.

(h) Without in any particular limiting any of the
objects and powers of the corporation, it is hereby ex-
pressly declared and provided that the corporation shall
have power to do all things hereinbefore enumerated, and
also to issue or exchange stocks, bonds and other obliga-
tions in payment for property purchased or acquired by
it, or for any other object in or about its business; to
borrow money without limit; to mortgage or pledge its
franchises, real or personal property, income and profits
accruing to it, any stocks, bonds or other obligations, or
any property which may be acquired by it, and to secure
any bonds or other obligations by it issued or incurred.

(i) To carry on any business whatsoever which the
corporation may deem proper or convenient in connection
with any of the foregoing purposes or otherwise, or which

00004    3

4

may be calculated, directly or indirectly, to promote the interests of the corporation or to enhance the value of its property; to conduct its business in this State, in other States, in the District of Columbia, in the Territories and Colonies of the United States, and in foreign countries; and to hold, purchase, mortgage and convey real and personal property, either in or out of the State of Delaware; and to have and to exercise all the powers conferred by the laws of Delaware upon corporations formed under the act pursuant to and under which this corporation is formed.

FOURTH: The total authorized capital stock of the corporation is One Hundred and Two Million Six Hundred Thousand Dollars ($102,600,000), divided into one million twenty-six thousand (1,026,000) shares of the par value of One Hundred Dollars ($100) each. Of such total authorized capital stock, two hundred thousand (200,000) shares, amounting to Twenty Million Dollars ($20,000,000) shall be preferred stock, and eight hundred and twenty-six thousand (826,000) shares, amounting to Eighty-two Million Six Hundred Thousand Dollars ($82,600,000) shall be common stock.

From time to time the preferred stock and the common stock may be increased or decreased according to law, and may be issued in such amounts and proportions as shall be determined by the Board of Directors and as may be permitted by law.

The holders of the preferred stock shall be entitled to receive, when and as declared, from the surplus of the corporation, or from the net profits arising from its business, yearly dividends, at the rate of six per centum (6%) per annum, and no more, payable quarterly on dates to be fixed by the By-laws, which dividends shall run from the date of the issue of said preferred stock, provided

00005  4

5

the dividends on any of said preferred stock which shall be issued prior to the first day of November, 1916, shall run from that date only.

The dividends on the preferred stock shall be cumulative and shall be payable before any dividend on the common stock shall be paid or set apart, so that, if in any year dividends amounting to six per centum (6%) shall not have been paid thereon, the deficiency shall be payable before any dividend shall be paid upon or set apart for the common stock.

Whenever all cumulative dividends on the preferred stock shall have been paid, and a sum sufficient for the payment of the next ensuing quarterly dividend on the preferred stock shall have been set aside from its surplus or from the net profits arising from its business, the Board of Directors may declare dividends on the common stock, payable then or thereafter, out of any remaining surplus or net profits. In the event of any liquidation or dissolution or winding-up (whether voluntary or otherwise) of the corporation, the holders of the preferred stock, before any amount shall be paid to the holders of the common stock, shall be entitled either to be paid in full both the par amount of their shares and the unpaid dividends accrued thereon, or, in the absolute and uncontrolled discretion of the Board of Directors, to receive, in lieu of such payment, a distribution in kind of preferred stock of General Motors Company, a New Jersey corporation, on the basis of one (1) share thereof for each one and one-third (1-1/3) shares of preferred stock of this corporation; and after such payment or distribution is made the remaining assets and funds shall be divided among, and paid to the holders of the common stock pro rata according to their respective shares.

The preferred stock at the option of the Board of Directors shall be subject to redemption in whole or in

C0006          5

6

part at One Hundred Ten Dollars ($110) per share and accrued dividends thereon, on the first day of November, 1918, or on any subsequent dividend-paying date in such manner as the Board of Directors may determine.

The holders of preferred stock shall not have any voting power whatsoever, except upon the question of selling, conveying, transferring or otherwise disposing of the property and assets of the Company as an entirety; provided, however, that in the event that the corporation shall fail to pay any dividend upon the preferred stock when it regularly becomes due, and such dividend shall remain in arrears for a period of six (6) months, the holders of the preferred stock shall have the right to vote on all matters in like manner as the holders of the common stock, during the year next ensuing, and during each year thereafter until the corporation shall have paid all accrued dividends upon the preferred stock.

Any issue of preferred stock authorized hereunder or under any amendment hereof shall be offered for sale to the holders of preferred and common stock of the corporation before being offered to any other person or persons; provided, however, that the Directors, in their discretion, may issue such preferred stock, without first offering it to the stockholders of the corporation, either in payment for property or other assets, except cash, necessary or desirable to be purchased or acquired from time to time for the corporation, or as a dividend upon the common stock payable in preferred stock.

The Directors, in their discretion, may sell or otherwise dispose of any common stock authorized hereunder or under any amendment hereof, whether from the treasury of the corporation or from its unissued stock, directly to the common stockholders, or for the purchase of property, or otherwise, without offering the same to the preferred stockholders or affording the preferred

00007

7

stockholders an opportunity to subscribe therefor, or to participate therein.

~ The amount of capital stock with which the corporation will commence business is the sum of One Thousand Five Hundred Dollars ($1,500) being fifteen shares of the common capital stock of the corporation of the par value of One Hundred Dollars ($100) each.

FIFTH: The names and places of residence of each of the original subscribers to the capital stock and the number of shares subscribed for by each are as follows:

| NAME. | RESIDENCE. | NUMBER OF SHARES COMMON STOCK. |
|---|---|---|
| HERBERT E. LATTER, | Wilmington, Delaware | 5 |
| NORMAN P. COFFIN, | Wilmington, Delaware | 5 |
| CLEMENT M. EGNER, | Elkton, Maryland | 5 |

SIXTH: The corporation is to have perpetual existence.

SEVENTH: The private property of the stockholders shall not be subject to the payment of corporate debts to any extent whatever.

EIGHTH: The number of Directors of the corporation, not less than three, shall be fixed from time to time by the By-laws and the number may be altered as therein provided. In case of any increase in the number of Directors, the additional Directors shall be elected as provided by the By-laws, by the Directors, or by the stockholders at an annual or special meeting. In case of any vacancy in the Board of Directors, the remaining Directors, by affirmative vote of a majority thereof, may elect a successor to hold office for the unexpired portion of the term of the Director whose place is vacant and until his successor shall be duly elected and qualified.

7

00008

8

In furtherance, and not in limitation of the powers conferred by law, the Board of Directors are expressly authorized:

(*a*) To make, alter, amend and repeal the By-laws of the corporation.

(*b*) To remove at any time any officer elected or appointed by the Board of Directors but only by the affirmative vote of a majority of the whole Board of Directors. Any other officer or employe of the corporation may be removed at any time by a vote of the Board of Directors, or by any committee or superior officer upon whom such power of removal may be conferred by the By-laws or by the vote of the Board of Directors.

(*c*) To designate, by resolution passed by a majority of the whole Board, two or more of their number to constitute an executive committee, who, to the extent provided in said resolution or in the By-laws of the corporation, shall have and exercise the powers of the Board of Directors in the management of the business and affairs of the corporation, and shall have power to authorize the seal of the corporation to be affixed to all papers which may require it. A majority of such committee shall constitute a quorum for the transaction of business.

(*d*) From time to time to fix and to vary the sum to be reserved over and above its capital stock paid in before declaring any dividends; to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in; to fix the time of declaring and paying any dividend, and, unless otherwise provided in this Certificate or in the By-laws, to determine the amount of any dividend. All sums reserved as working capital or otherwise may be applied from time to time to the acquisition or purchase of its bonds or other obliga-

8

00009

9

tions or shares of its own capital stock or other property
to such extent and in such manner and upon such terms
as the Board of Directors shall deem expedient and
neither the stocks, bonds or other property so acquired
shall be regarded as accumulated profits for the purpose
of declaring or paying dividends unless otherwise de-
termined by the Board of Directors, but shares of such
capital stock so purchased or acquired may be resold,
unless such shares shall have been retired for the purpose
of decreasing the Company's capital stock as provided
by law.

(e) From time to time to determine whether and to
what extent, and at what time and places, and under
what conditions and regulations the accounts and books
of the corporation (other than the stock ledger), or any
of them, shall be open to the inspection of the stockhold-
ers; and no stockholder shall have any right to inspect
any account or book or document of the corporation,
except as conferred by statute or authorized by the Board
of Directors or by a resolution of the stockholders.

(f) With the written assent of the holders of two-
thirds of its issued and outstanding stock, both preferred
and common, without a meeting, or pursuant to the
affirmative vote in person or by proxy of the holders of
two-thirds of its issued and outstanding stock, both pre-
ferred and common, at any meeting, either annual or
special, called as provided in the By-laws, the Board of
Directors may sell, convey, assign, transfer or otherwise
dispose of, any part or all of the property, assets, rights
and privileges of the corporation as an entirety, for the
stock, bonds, obligations or other securities of another
corporation of this or of any other State, Territory,
Colony or foreign country, or for cash, or partly cash,
credit, or property, or for such other consideration as the

9

C0010

10

Board of Directors, in their absolute and uncontrolled discretion, may determine.

(g) The corporation may by its By-laws confer upon the Directors powers and authorities additional to the foregoing and to those expressly conferred upon them by statute.

NINTH: Both the stockholders and the Directors of the corporation may hold their meetings and the corporation may have an office or offices in such place or places outside of the State of Delaware as the By-laws may provide, and the corporation may keep its books outside of the State of Delaware except as otherwise provided by law.

TENTH: The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner, now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF we have hereunto set our hands and seals this 13th day of October, 1916.

*[signatures]*

In the presence of:

*[signature]*

10

C0911

**11**

STATE OF DELAWARE }
County of New Castle } ss:

BE IT REMEMBERED that on this 13th day of October, A. D. 1916, personally came before me William J. Maloney, a Notary Public in and for the County and State aforesaid, Herbert E. Latter, Norman P. Coffin and Clement M. Egner, parties to the foregoing Certificate of Incorporation, known to me personally to be such and simultaneously acknowledged the said certificate to be the act and deed of the signers respectively and that the facts therein stated are truly set forth.

Given under my hand and seal of office the day and year aforesaid.

William J. Maloney

Notary Public.

00012

## RESTATED CERTIFICATE OF INCORPORATION

### OF

### GENERAL MOTORS CORPORATION

General Motors Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), DOES HEREBY CERTIFY AS FOLLOWS:

FIRST:   The date of the filing of the Corporation's original Certificate of Incorporation with the Secretary of State of the State of Delaware was October 13, 1916.

SECOND:   This Restated Certificate of Incorporation was duly adopted in accordance with the provisions of Section 245 of the General Corporation Law of the State of Delaware.

THIRD:   This Restated Certificate of Incorporation only restates and integrates and does not further amend the provisions of the Corporation's Certificate of Incorporation as heretofore amended or supplemented, and there is no discrepancy between those provisions and the provisions of this Restated Certificate of Incorporation.

FOURTH:   The provisions of this Restated Certificate of Incorporation shall be as set forth in Exhibit A attached hereto.

IN WITNESS WHEREOF, the Corporation has caused this Restated Certificate of Incorporation to be executed by its authorized officer on this 1st day of March, 2004.

GENERAL MOTORS CORPORATION

By: _____

Name: Warren G. Andersen

Title: Assistant Secretary

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:19 PM 03/01/2004
FILED 06:21 PM 03/01/2004
SRV 040156054 - 0056825 FILE

## EXHIBIT A

# *GENERAL MOTORS CORPORATION*

---

*RESTATED*
*CERTIFICATE OF INCORPORATION*

*AS AMENDED*
*December 22, 2003*

*GENERAL MOTORS CORPORATION*

*Restated*
*Certificate of Incorporation*

*As Amended*
*December 22, 2003*

## FIRST:

The name of the Corporation is

### GENERAL MOTORS CORPORATION

## SECOND:

The registered office of the Corporation shall be located at 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware. The name of its registered agent in charge thereof is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware.

## THIRD:

The nature of the business of the Corporation and the objects and purposes proposed to be transacted, promoted, or carried on by it, are as follows, to-wit:

(a)    To manufacture, buy, sell and deal in automobiles, trucks, cars, boats, flying machines and other vehicles, their parts and accessories, and kindred articles, and generally to conduct an automobile business in all its branches.

(b)    To purchase or otherwise acquire, lease, assign, mortgage, pledge or otherwise dispose of any trade names, trade marks, concessions, inventions, formulae, improvements, processes of any nature whatsoever, copyrights, and letters patent of the United States and of foreign countries, and to accept and grant licenses thereunder.

(c)    To subscribe or cause to be subscribed for, and to purchase or otherwise acquire, hold for investment, sell, assign, transfer, mortgage, pledge, exchange, distribute or otherwise dispose of the whole or any part of the shares of the capital stock, bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations, notes and other evidences of indebtedness of any corporation, stock company or association, now or hereafter existing, and whether created by or under the laws of the State of Delaware, or otherwise; and while owners of any of said shares of capital stock or bonds or other property to exercise all the rights, powers and privileges of ownership of every kind and description, including the right to vote thereon, with power to designate some person for that purpose from time to time to the same extent as natural persons might or could do.

(d)    To purchase, hold, sell and reissue the shares of its own capital stock.

(e)    To buy, lease, or otherwise acquire, so far as may be permitted by law, the whole or any part of the business, goodwill, and assets of any person, firm, association or corporation (either foreign or domestic) engaged in a business of the same general character as that for which this Corporation is organized.

(f)    To endorse, guarantee and secure the payment and satisfaction of bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations and evidences of indebtedness, and also to guarantee and secure the payment or satisfaction of interest on obligations and of dividends on shares of the capital stock of other corporations; also to assume the whole or any part of the liabilities, existing or prospective, of any person, corporation, firm or association; and to aid in any manner any other person or corporation with which it has business dealings, or whose stocks, bonds, or other obligations are held or are in any manner guaranteed by the Corporation, and to do any other acts and things for the preservation, protection, improvement, or enhancement of the value of such stocks, bonds, or other obligations.

(g)    To engage in any other manufacturing or mercantile business of any kind or character whatsoever, and to that end to acquire, hold, own and dispose of any and all property, assets, stocks, bonds and rights of any and every kind.

(h)    Without in any particular limiting any of the objects and powers of the Corporation, it is hereby expressly declared and provided that the Corporation shall have power to do all things herein before enumerated, and also to issue or exchange stocks, bonds, and other obligations in payment for property purchased or acquired by it, or for any other object in or about its business; to borrow money without limit; to mortgage or pledge its franchises, real or personal property, income and profits accruing to it, any stocks, bonds or other obligations, or any property which may be acquired by it, and to secure any bonds or other obligations by it issued or incurred.

(j)    To carry on any business whatsoever which the Corporation may deem proper or convenient in connection with any of the foregoing purposes or otherwise, or which may be calculated, directly or indirectly, to promote the interests of the Corporation or to enhance the value of its property; to conduct its business in this State, in other States, in the District of Columbia, in the Territories and Colonies of the United States, and in foreign countries; and to hold, purchase, mortgage and convey real and personal property, either in or out of the State of Delaware, and to have and to exercise all the powers conferred by the laws of Delaware upon corporations formed under the act pursuant to and under which this Corporation is formed.

### FOURTH:

The total authorized capital stock of the Corporation is as follows: 2,106,000,000 shares, of which 6,000,000 shares shall be Preferred Stock, without par value ("Preferred Stock"), 100,000,000 shares shall be Preference Stock, $0.10 par value ("Preference Stock"), and 2,000,000,000 shares shall be Common Stock, $1 2/3 par value ("Common Stock").

2

*DIVISION I: COMMON STOCK.*

The privileges and restrictions of the shares of the Common Stock are as follows:

(a)   *Dividend Rights.*

Subject to the express terms of any outstanding series of Preferred Stock or Preference Stock, dividends may be paid in cash or otherwise upon the Common Stock out of the assets of the Corporation and may be declared and paid only to the extent of the assets of the Corporation legally available for the payment of dividends. Subject to the foregoing, the declaration and payment of dividends on the Common Stock, and the amount thereof, shall at all times be solely in the discretion of the Board of Directors of the Corporation.

(b)   *Voting Rights.*

The holders of Common Stock shall be entitled to vote as a single class on all matters to be voted on by the stockholders of the Corporation. Each holder of Common Stock shall be entitled to one vote, in person or by proxy, for each share of Common Stock standing in his name on the stock transfer books of the Corporation.

(c)   *Liquidation Rights.*

In the event of the liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after there shall have been paid or set apart for the holders of Preferred Stock and Preference Stock the full preferential amounts to which they are entitled, the holders of Common Stock shall be entitled to receive the assets of the Corporation remaining for distribution to its stockholders ratably on a per share basis. None of the consolidation or merger of the Corporation into or with any other entity or entities, the sale or transfer by the Corporation of all or any part of its assets, or the reduction of the capital stock of the Corporation, shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of this paragraph.

*DIVISION II: PREFERRED STOCK.*

A statement of the relative rights of the holders of Preferred Stock and a statement of the limits of variation between each series of Preferred Stock as to rate of dividends and price of redemption and a statement of the voting powers and the designations, powers, privileges and rights, and the qualifications, limits or restrictions thereof of the various series thereof, except so far as the Board of Directors is expressly authorized to fix the same by resolution or resolutions for the various series of the Preferred Stock, are as follows:

Preferred Stock of the Corporation may be issued in various series as may be determined from time to time by the Board of Directors, each such series to be distinctly designated. All shares of any one series of Preferred Stock shall be alike in every particular, and all series shall rank equally and be identical in all respects except as to the dividend rate and the amount payable upon the exercise of the right to redeem.

3

The dividend on the Preferred Stock of each series shall be such rate as may be fixed by the Board of Directors in the resolution or resolutions providing for the issuance of the Preferred Stock of such series, and as shall be stated on the face or back of the certificates of stock therefor.

The amount payable on the exercise of the right to redeem Preferred Stock of each series shall be an amount as may be fixed by the Board of Directors in the resolution or resolutions providing for the issuance of the Preferred Stock of such series, and as shall be stated on the face or back of the certificates of stock therefor.

All other provisions herein set forth in respect of the Preferred Stock of the Corporation shall apply to all the Preferred Stock of the Corporation, irrespective of any variations between the Preferred Stock of the different series.

The holders of the Preferred Stock shall be entitled to receive cumulative dividends, when and as declared by the Board of Directors, at the rates fixed for the respective series in the Certificate of Incorporation or in the resolution or resolutions of the Board of Directors providing for the issuance of the respective series, and no more, payable quarterly on the dates to be fixed by the By-Laws. The periods between such dates commencing on such dates are herein designated as "dividend periods." Dividends on all shares of any one series shall commence to accrue and be cumulative from the first day of the current dividend period within which shares of such series are first issued, but in the event of the issue of additional shares of such series subsequent to the date of the first issue of said shares of such series, all dividends paid on the shares of such series prior to the issue of such additional shares and all dividends declared payable to holders of record of shares of such series of a date prior to such issue shall be deemed to have been paid in respect of the additional shares so issued. Such dividends on the Preferred Stock shall be in preference and priority to any payment on any other class of stock of the Corporation.

The dividends on the Preferred Stock shall be cumulative and shall be payable before any dividend on the Common Stock or any series of the Preference Stock shall be paid or set apart so that if in any year dividends at the rates determined for the respective series of the Preferred Stock shall not be paid thereon, the deficiency shall be payable before any dividend shall be paid upon or set apart for the Common Stock or any series of the Preference Stock. Dividends shall not be declared and paid on the shares of Preferred Stock of any one series for any dividend period unless dividends have been or are contemporaneously paid or declared and set apart for payment thereof on the shares of Preferred Stock of all series, for all the dividend periods terminating on the same or an earlier date.

Whenever all cumulative dividends on the Preferred Stock outstanding shall have been paid and a sum sufficient for the payment of the next ensuing quarterly dividend on the Preferred Stock outstanding shall have been set aside from the surplus or net profits, the Board of Directors may declare dividends on the Common Stock or any series of the Preference Stock, payable then or thereafter, out of any remaining surplus or net profits, and no holders of any shares of any series of Preferred Stock, as such, shall be entitled to share therein.

4

At the option of the Board of Directors, the Preferred Stock shall be subject to redemption at the amounts fixed for the respective series in the Certificate of Incorporation or in the resolution or resolutions of the Board of Directors providing for the issuance of the respective series, together, in the case of each class or series, with accrued dividends on the shares to be redeemed, on any dividend paying date in such manner as the Board of Directors may determine.

The holders of the Preferred Stock shall not have any voting power whatsoever, except upon the question of selling, conveying, transferring or otherwise disposing of the property and assets of the Corporation as an entirety and except as otherwise required by law.

*DIVISION III: PREFERENCE STOCK.*

The Board of Directors is authorized, subject to limitations prescribed by law and the provisions of this Article FOURTH, to provide for the issuance of Preference Stock from time to time in one or more series of any number of shares, with a distinctive serial designation for each series, provided that the aggregate number of shares issued and not cancelled of any and all such series shall not exceed the total number of shares of Preference Stock authorized by this Article FOURTH, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors. Subject to said limitations, and provided that each series of Preference Stock shall rank junior to the Preferred Stock with respect to the payment of dividends and distributions in liquidation, each series of Preference Stock (a) may have such voting powers, full or limited, or may be without voting powers; (b) may be subject to redemption at such time or times and at such prices; (c) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (d) may have such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; (e) may be made convertible into, or exchangeable for, shares of any other class or classes of or any other series of the same or any other class or classes of stock of the Corporation or any other issuer, at such price or prices or at such rates of exchange, and with such adjustments; (f) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (g) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Corporation or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Corporation or any subsidiary of any outstanding stock of the Corporation; and (h) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such series of Preference Stock.

Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions of the Board of

5

Directors or as part of any other series of Preference Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preference Stock.

*DIVISION IV: MISCELLANEOUS.*

From time to time, the Preferred Stock, the Preference Stock, and the Common Stock may be increased or decreased according to law, and may be issued in such amounts and proportions as shall be determined by the Board of Directors, and as may be permitted by law.

In the event of any liquidation or dissolution or winding up, whether voluntary or otherwise, of the Corporation, the holders of the Preferred Stock shall be entitled to be paid the redemption price of each series in full, as aforesaid, out of the assets whether capital or surplus, and, in every case, the unpaid dividends accrued on such shares, whether or not earned or declared, before any distribution of the assets to be distributed shall be made to the holders of Common Stock or any series of the Preference Stock; but the holders of such shares shall be entitled to no further participation in such distribution. If the assets distributable on such liquidation, dissolution or winding up shall be insufficient to permit the payment to the holders of the Preferred Stock of the full amount of the redemption price of each series in full as aforesaid and accrued dividends as aforesaid, the said assets shall be distributed pro rata among the holders of the respective series of the Preferred Stock. After all payments are made as aforesaid, any required payments shall be made with respect to the Preference Stock, if any, outstanding, and the remaining assets and funds shall be divided among and paid to the holders of Common Stock ratably on a per share basis. The merger or consolidation of the Corporation into or with any other corporation shall not be or be deemed to be a distribution of assets or a dissolution, liquidation or winding up for the purposes of this paragraph.

Any Preferred Stock, Preference Stock, or Common Stock, authorized hereunder or under any amendment hereof, in the discretion of the Board of Directors, may be issued, except as herein otherwise provided, in payment for property or services, or as bonuses to employees of the Corporation or employees of subsidiary companies, or for other assets or securities including cash, necessary or desirable, in the judgment of the Board of Directors, to be purchased or acquired from time to time for the Corporation, or for any other lawful purpose of the Corporation.

If it seems desirable so to do, the Board of Directors may from time to time issue scrip for fractional shares of stock. Such scrip shall not confer upon the holder any right to dividends or any voting or other rights of a stockholder of the Corporation, but the Corporation shall from time to time, within such time as the Board of Directors may determine or without limit of time if the Board of Directors so determines, issue one or more whole shares of stock upon the surrender of scrip for fractional shares aggregating the number of whole shares issuable in respect of the scrip so surrendered, provided that the scrip so surrendered shall be properly endorsed for transfer if in registered form.

### FIFTH:

The Corporation is to have perpetual existence.

6

### SIXTH:

The private property of the stockholders shall not be subject to the payment of corporate debts to any extent whatever.

### SEVENTH:

The number of Directors of the Corporation, not less than three, shall be fixed from time to time by the Bylaws and the number may be altered as therein provided. In case of any increase in the number of Directors, the additional Directors shall be elected as provided by the Bylaws, by the Directors, or by the stockholders at an annual or special meeting. In case of any vacancy in the Board of Directors, the remaining Directors, by affirmative vote of a majority thereof, may elect a successor to hold office for the unexpired portion of the term of the Director whose place is vacant and until his successor shall be duly elected and qualified.

No Director shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174, or any successor provision thereto, of the Delaware General Corporation Law, or (iv) for any transaction from which the Director derived an improper personal benefit.

In furtherance, and not in limitation of the powers conferred by law, the Board of Directors are expressly authorized:

(a)    To make, alter, amend and repeal the Bylaws of the Corporation.

(b)    To remove at any time any officer elected or appointed by the Board of Directors but only by the affirmative vote of a majority of the whole Board of Directors. Any other officer or employee of the Corporation may be removed at any time by a vote of the Board of Directors, or by any committee or superior officer upon whom such power of removal may be conferred by the Bylaws or by the vote of the Board of Directors.

(c)    To designate, by resolution passed by a majority of the whole Board, two or more of their number to constitute an executive committee, who, to the extent provided in said resolution or in the Bylaws of the Corporation, shall have and exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation, and shall have power to authorize the seal of the Corporation to be affixed to all papers which may require it. A majority of such committee shall constitute a quorum for the transaction of business.

(d)    To designate any other standing committees by the affirmative vote of a majority of the whole Board, and such standing committees shall have and may exercise such powers as shall be conferred or authorized by the Bylaws, including the power to cause the seal of the Corporation to be affixed to any papers which may require it.

(e)    Every right of action by or on behalf of the Corporation or by any stockholder against any past, present or future member of the Board of Directors, officer or employee of the Corporation arising out of or in connection with any bonus, stock option, performance

7

achievement or other incentive plan at any time approved by the stockholders of the Corporation, irrespective of the place where action may be brought and irrespective of the place of residence of any such Director, officer or employee, shall cease and be barred by the expiration of three years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to stockholders an annual report of the Corporation and a proxy statement for the annual meeting of stockholders following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the amount of any credit to a reserve for the purpose of any such plan, and the aggregate bonus, performance achievement or other awards, and the aggregate options or other grants, made under any such plan; and every right of action by any employee (past, present or future) against the Corporation arising out of or in connection with any such plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three years from the date of the act or omission in respect of which such right of action arises.

(f)    From time to time to fix and to vary the sum to be reserved over and above its capital stock paid in before declaring any dividends; to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in; to fix the time of declaring and paying any dividend, and, unless otherwise provided in this Certificate or in the Bylaws, to determine the amount of any dividend. All sums reserved as working capital or otherwise may be applied from time to time to the acquisition or purchase of its bonds or other obligations or shares of its own capital stock or other property to such extent and in such manner and upon such terms as the Board of Directors shall deem expedient and neither the stocks, bonds, or other property so acquired shall be regarded as accumulated profits for the purpose of declaring or paying dividends unless otherwise determined by the Board of Directors, but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the Company's capital stock as provided by law.

(g)    From time to time to determine whether and to what extent, and at what time and places and under what conditions and regulations the accounts and books of the Corporation (other than the stock ledger), or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation, except as conferred by statute or authorized by the Board of Directors or by a resolution of the stockholders.

(h)    With the written assent of the holders of two-thirds of its issued and outstanding stock of all classes without a meeting, or pursuant to the affirmative vote in person or by proxy of the holders of two-thirds of its issued and outstanding stock of all classes, at any meeting, either annual or special, called as provided in the Bylaws, the Board of Directors may sell, convey, assign, transfer or otherwise dispose of, any part or all of the property, assets, rights and privileges of the Corporation as an entirety, for the stock, bonds, obligations or other securities of another corporation of this or of any other State, Territory, Colony or foreign country, or for cash, or partly cash, credit, or property, or for such other consideration as the Board of Directors, in their absolute and uncontrolled discretion, may determine.

(i)    The Corporation may by its Bylaws confer upon the Directors powers and authorities additional to the foregoing and to those expressly conferred upon them by statute.

8

*EIGHTH:*

Both the stockholders and the Directors of the Corporation may hold their meetings and the Corporation may have an office or offices in such place or places outside of the State of Delaware as the Bylaws may provide, and the Corporation may keep its books outside of the State of Delaware except as otherwise provided by law.

*NINTH:*

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner, now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

9

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 04:43 PM 01/16/2008*
*FILED 04:43 PM 01/16/2008*
*SRV 080052934 – 0056825 FILE*

# STATE OF DELAWARE
## CERTIFICATE OF CORRECTION

General Motors Corporation _____, a
corporation organized and existing under and by virtue of the General Corporation Law of
the State of Delaware.

**DOES HEREBY CERTIFY:**

1.  The name of the corporation is General Motors Corporation _____,
2.  That a Certificate of ___Restated Certificate of Incorporation___
        (Title of Certificate Being Corrected)
    was filed by the Secretary of State of Delaware on March 1, 2004 _____
    and that said Certificate requires correction as permitted by Section 103 of the
    General Corporation Law of the State of Delaware.

3.  The inaccuracy or defect of said Certificate is: (must be specific)
    The original Exhibit A title page had the wrong date listed and was titled
    incorrectly. _____

4.  The Certificate is corrected to read as follows:
    See attached Exhibit A in its corrected form. _____
    _____
    _____
    _____

**IN WITNESS WHEREOF,** said corporation has caused this Certificate of Correction
this 16th _____ day of January _____, A.D. 2008 .

By: _____
            Authorized Officer
Name: Barbara A. Lister-Tait _____
            Print or Type
Title: Assistant Secretary _____

*EXHIBIT A*

## *GENERAL MOTORS CORPORATION*

---

*RESTATED*
*CERTIFICATE OF INCORPORATION*

*AS RESTATED AND FILED*
*MARCH 1, 2004*

*GENERAL MOTORS CORPORATION*

*Restated*
*Certificate of Incorporation*

*As Restated and Filed*
*March 1, 2004*

### FIRST:

The name of the Corporation is

GENERAL MOTORS CORPORATION

### SECOND:

The registered office of the Corporation shall be located at 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware. The name of its registered agent in charge thereof is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware.

### THIRD:

The nature of the business of the Corporation and the objects and purposes proposed to be transacted, promoted, or carried on by it, are as follows, to-wit:

(a)    To manufacture, buy, sell and deal in automobiles, trucks, cars, boats, flying machines and other vehicles, their parts and accessories, and kindred articles, and generally to conduct an automobile business in all its branches.

(b)    To purchase or otherwise acquire, lease, assign, mortgage, pledge or otherwise dispose of any trade names, trade marks, concessions, inventions, formulae, improvements, processes of any nature whatsoever, copyrights, and letters patent of the United States and of foreign countries, and to accept and grant licenses thereunder.

(c)    To subscribe or cause to be subscribed for, and to purchase or otherwise acquire, hold for investment, sell, assign, transfer, mortgage, pledge, exchange, distribute or otherwise dispose of the whole or any part of the shares of the capital stock, bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations, notes and other evidences of indebtedness of any corporation, stock company or association, now or hereafter existing, and whether created by or under the laws of the State of Delaware, or otherwise; and while owners of any of said shares of capital stock or bonds or other property to exercise all the rights, powers and privileges of ownership of every kind and description, including the right to vote thereon, with power to designate some person for that purpose from time to time to the same extent as natural persons might or could do.

(d)    To purchase, hold, sell and reissue the shares of its own capital stock.

(e)　　To buy, lease, or otherwise acquire, so far as may be permitted by law, the whole or any part of the business, goodwill, and assets of any person, firm, association or corporation (either foreign or domestic) engaged in a business of the same general character as that for which this Corporation is organized.

(f)　　To endorse, guarantee and secure the payment and satisfaction of bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations and evidences of indebtedness, and also to guarantee and secure the payment or satisfaction of interest on obligations and of dividends on shares of the capital stock of other corporations; also to assume the whole or any part of the liabilities, existing or prospective, of any person, corporation, firm or association; and to aid in any manner any other person or corporation with which it has business dealings, or whose stocks, bonds, or other obligations are held or are in any manner guaranteed by the Corporation, and to do any other acts and things for the preservation, protection, improvement, or enhancement of the value of such stocks, bonds, or other obligations.

(g)　　To engage in any other manufacturing or mercantile business of any kind or character whatsoever, and to that end to acquire, hold, own and dispose of any and all property, assets, stocks, bonds and rights of any and every kind.

(h)　　Without in any particular limiting any of the objects and powers of the Corporation, it is hereby expressly declared and provided that the Corporation shall have power to do all things herein before enumerated, and also to issue or exchange stocks, bonds, and other obligations in payment for property purchased or acquired by it, or for any other object in or about its business; to borrow money without limit; to mortgage or pledge its franchises, real or personal property, income and profits accruing to it, any stocks, bonds or other obligations; or any property which may be acquired by it, and to secure any bonds or other obligations by it issued or incurred.

(i)　　To carry on any business whatsoever which the Corporation may deem proper or convenient in connection with any of the foregoing purposes or otherwise, or which may be calculated, directly or indirectly, to promote the interests of the Corporation or to enhance the value of its property; to conduct its business in this State, in other States, in the District of Columbia, in the Territories and Colonies of the United States, and in foreign countries; and to hold, purchase, mortgage and convey real and personal property, either in or out of the State of Delaware, and to have and to exercise all the powers conferred by the laws of Delaware upon corporations formed under the act pursuant to and under which this Corporation is formed.

### FOURTH:

The total authorized capital stock of the Corporation is as follows: 2,106,000,000 shares, of which 6,000,000 shares shall be Preferred Stock, without par value ("Preferred Stock"), 100,000,000 shares shall be Preference Stock, $0.10 par value ("Preference Stock"), and 2,000,000,000 shares shall be Common Stock, $1 2/3 par value ("Common Stock").

2

*DIVISION I:  COMMON STOCK.*

The privileges and restrictions of the shares of the Common Stock are as follows:

(a)    *Dividend Rights.*

Subject to the express terms of any outstanding series of Preferred Stock or Preference Stock, dividends may be paid in cash or otherwise upon the Common Stock out of the assets of the Corporation and may be declared and paid only to the extent of the assets of the Corporation legally available for the payment of dividends.  Subject to the foregoing, the declaration and payment of dividends on the Common Stock, and the amount thereof, shall at all times be solely in the discretion of the Board of Directors of the Corporation.

(b)    *Voting Rights.*

The holders of Common Stock shall be entitled to vote as a single class on all matters to be voted on by the stockholders of the Corporation.  Each holder of Common Stock shall be entitled to one vote, in person or by proxy, for each share of Common Stock standing in his name on the stock transfer books of the Corporation.

(c)    *Liquidation Rights.*

In the event of the liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after there shall have been paid or set apart for the holders of Preferred Stock and Preference Stock the full preferential amounts to which they are entitled, the holders of Common Stock shall be entitled to receive the assets of the Corporation remaining for distribution to its stockholders ratably on a per share basis.  None of the consolidation or merger of the Corporation into or with any other entity or entities, the sale or transfer by the Corporation of all or any part of its assets, or the reduction of the capital stock of the Corporation, shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of this paragraph.

*DIVISION II:  PREFERRED STOCK.*

A statement of the relative rights of the holders of Preferred Stock and a statement of the limits of variation between each series of Preferred Stock as to rate of dividends and price of redemption and a statement of the voting powers and the designations, powers, privileges and rights, and the qualifications, limits or restrictions thereof of the various series thereof, except so far as the Board of Directors is expressly authorized to fix the same by resolution or resolutions for the various series of the Preferred Stock, are as follows:

Preferred Stock of the Corporation may be issued in various series as may be determined from time to time by the Board of Directors, each such series to be distinctly designated.  All shares of any one series of Preferred Stock shall be alike in every particular, and all series shall rank equally and be identical in all respects except as to the dividend rate and the amount payable upon the exercise of the right to redeem.

3

The dividend on the Preferred Stock of each series shall be such rate as may be fixed by the Board of Directors in the resolution or resolutions providing for the issuance of the Preferred Stock of such series, and as shall be stated on the face or back of the certificates of stock therefor.

The amount payable on the exercise of the right to redeem Preferred Stock of each series shall be an amount as may be fixed by the Board of Directors in the resolution or resolutions providing for the issuance of the Preferred Stock of such series, and as shall be stated on the face or back of the certificates of stock therefor.

All other provisions herein set forth in respect of the Preferred Stock of the Corporation shall apply to all the Preferred Stock of the Corporation, irrespective of any variations between the Preferred Stock of the different series.

The holders of the Preferred Stock shall be entitled to receive cumulative dividends, when and as declared by the Board of Directors, at the rates fixed for the respective series in the Certificate of Incorporation or in the resolution or resolutions of the Board of Directors providing for the issuance of the respective series, and no more, payable quarterly on the dates to be fixed by the By-Laws. The periods between such dates commencing on such dates are herein designated as "dividend periods." Dividends on all shares of any one series shall commence to accrue and be cumulative from the first day of the current dividend period within which shares of such series are first issued, but in the event of the issue of additional shares of such series subsequent to the date of the first issue of said shares of such series, all dividends paid on the shares of such series prior to the issue of such additional shares and all dividends declared payable to holders of record of shares of such series of a date prior to such issue shall be deemed to have been paid in respect of the additional shares so issued. Such dividends on the Preferred Stock shall be in preference and priority to any payment on any other class of stock of the Corporation.

The dividends on the Preferred Stock shall be cumulative and shall be payable before any dividend on the Common Stock or any series of the Preference Stock shall be paid or set apart so that if in any year dividends at the rates determined for the respective series of the Preferred Stock shall not be paid thereon, the deficiency shall be payable before any dividend shall be paid upon or set apart for the Common Stock or any series of the Preference Stock. Dividends shall not be declared and paid on the shares of Preferred Stock of any one series for any dividend period unless dividends have been or are contemporaneously paid or declared and set apart for payment thereof on the shares of Preferred Stock of all series, for all the dividend periods terminating on the same or an earlier date.

Whenever all cumulative dividends on the Preferred Stock outstanding shall have been paid and a sum sufficient for the payment of the next ensuing quarterly dividend on the Preferred Stock outstanding shall have been set aside from the surplus or net profits, the Board of Directors may declare dividends on the Common Stock or any series of the Preference Stock, payable then or thereafter, out of any remaining surplus or net profits, and no holders of any shares of any series of Preferred Stock, as such, shall be entitled to share therein.

4

At the option of the Board of Directors, the Preferred Stock shall be subject to redemption at the amounts fixed for the respective series in the Certificate of Incorporation or in the resolution or resolutions of the Board of Directors providing for the issuance of the respective series, together, in the case of each class or series, with accrued dividends on the shares to be redeemed, on any dividend paying date in such manner as the Board of Directors may determine.

The holders of the Preferred Stock shall not have any voting power whatsoever, except upon the question of selling, conveying, transferring or otherwise disposing of the property and assets of the Corporation as an entirety and except as otherwise required by law.

### DIVISION III: PREFERENCE STOCK.

The Board of Directors is authorized, subject to limitations prescribed by law and the provisions of this Article FOURTH, to provide for the issuance of Preference Stock from time to time in one or more series of any number of shares, with a distinctive serial designation for each series, provided that the aggregate number of shares issued and not cancelled of any and all such series shall not exceed the total number of shares of Preference Stock authorized by this Article FOURTH, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors. Subject to said limitations, and provided that each series of Preference Stock shall rank junior to the Preferred Stock with respect to the payment of dividends and distributions in liquidation, each series of Preference Stock (a) may have such voting powers, full or limited, or may be without voting powers; (b) may be subject to redemption at such time or times and at such prices; (c) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (d) may have such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; (e) may be made convertible into, or exchangeable for, shares of any other class or classes of or any other series of the same or any other class or classes of stock of the Corporation or any other issuer, at such price or prices or at such rates of exchange, and with such adjustments; (f) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (g) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Corporation or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Corporation or any subsidiary of any outstanding stock of the Corporation; and (h) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such series of Preference Stock.

Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions of the Board of

5

Directors or as part of any other series of Preference Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preference Stock.

*DIVISION IV: MISCELLANEOUS.*

From time to time, the Preferred Stock, the Preference Stock, and the Common Stock may be increased or decreased according to law, and may be issued in such amounts and proportions as shall be determined by the Board of Directors, and as may be permitted by law.

In the event of any liquidation or dissolution or winding up, whether voluntary or otherwise, of the Corporation, the holders of the Preferred Stock shall be entitled to be paid the redemption price of each series in full, as aforesaid, out of the assets whether capital or surplus, and, in every case, the unpaid dividends accrued on such shares, whether or not earned or declared, before any distribution of the assets to be distributed shall be made to the holders of Common Stock or any series of the Preference Stock; but the holders of such shares shall be entitled to no further participation in such distribution. If the assets distributable on such liquidation, dissolution or winding up shall be insufficient to permit the payment to the holders of the Preferred Stock of the full amount of the redemption price of each series in full as aforesaid and accrued dividends as aforesaid, the said assets shall be distributed pro rata among the holders of the respective series of the Preferred Stock. After all payments are made as aforesaid, any required payments shall be made with respect to the Preference Stock, if any, outstanding, and the remaining assets and funds shall be divided among and paid to the holders of Common Stock ratably on a per share basis. The merger or consolidation of the Corporation into or with any other corporation shall not be or be deemed to be a distribution of assets or a dissolution, liquidation or winding up for the purposes of this paragraph.

Any Preferred Stock, Preference Stock, or Common Stock, authorized hereunder or under any amendment hereof, in the discretion of the Board of Directors, may be issued, except as herein otherwise provided, in payment for property or services, or as bonuses to employees of the Corporation or employees of subsidiary companies, or for other assets or securities including cash, necessary or desirable, in the judgment of the Board of Directors, to be purchased or acquired from time to time for the Corporation, or for any other lawful purpose of the Corporation.

If it seems desirable so to do, the Board of Directors may from time to time issue scrip for fractional shares of stock. Such scrip shall not confer upon the holder any right to dividends or any voting or other rights of a stockholder of the Corporation, but the Corporation shall from time to time, within such time as the Board of Directors may determine or without limit of time if the Board of Directors so determines, issue one or more whole shares of stock upon the surrender of scrip for fractional shares aggregating the number of whole shares issuable in respect of the scrip so surrendered, provided that the scrip so surrendered shall be properly endorsed for transfer if in registered form.

*FIFTH:*

The Corporation is to have perpetual existence.

6

## *SIXTH:*

The private property of the stockholders shall not be subject to the payment of corporate debts to any extent whatever.

## *SEVENTH:*

The number of Directors of the Corporation, not less than three, shall be fixed from time to time by the Bylaws and the number may be altered as therein provided. In case of any increase in the number of Directors, the additional Directors shall be elected as provided by the Bylaws, by the Directors, or by the stockholders at an annual or special meeting. In case of any vacancy in the Board of Directors, the remaining Directors, by affirmative vote of a majority thereof, may elect a successor to hold office for the unexpired portion of the term of the Director whose place is vacant and until his successor shall be duly elected and qualified.

No Director shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174, or any successor provision thereto, of the Delaware General Corporation Law, or (iv) for any transaction from which the Director derived an improper personal benefit.

In furtherance, and not in limitation of the powers conferred by law, the Board of Directors are expressly authorized:

(a)    To make, alter, amend and repeal the Bylaws of the Corporation.

(b)    To remove at any time any officer elected or appointed by the Board of Directors but only by the affirmative vote of a majority of the whole Board of Directors. Any other officer or employee of the Corporation may be removed at any time by a vote of the Board of Directors, or by any committee or superior officer upon whom such power of removal may be conferred by the Bylaws or by the vote of the Board of Directors.

(c)    To designate, by resolution passed by a majority of the whole Board, two or more of their number to constitute an executive committee, who, to the extent provided in said resolution or in the Bylaws of the Corporation, shall have and exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation, and shall have power to authorize the seal of the Corporation to be affixed to all papers which may require it. A majority of such committee shall constitute a quorum for the transaction of business.

(d)    To designate any other standing committees by the affirmative vote of a majority of the whole Board, and such standing committees shall have and may exercise such powers as shall be conferred or authorized by the Bylaws, including the power to cause the seal of the Corporation to be affixed to any papers which may require it.

(e)    Every right of action by or on behalf of the Corporation or by any stockholder against any past, present or future member of the Board of Directors, officer or employee of the Corporation arising out of or in connection with any bonus, stock option, performance

7

achievement or other incentive plan at any time approved by the stockholders of the Corporation, irrespective of the place where action may be brought and irrespective of the place of residence of any such Director, officer or employee, shall cease and be barred by the expiration of three years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to stockholders an annual report of the Corporation and a proxy statement for the annual meeting of stockholders following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the amount of any credit to a reserve for the purpose of any such plan, and the aggregate bonus, performance achievement or other awards, and the aggregate options or other grants, made under any such plan; and every right of action by any employee (past, present or future) against the Corporation arising out of or in connection with any such plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three years from the date of the act or omission in respect of which such right of action arises.

(f)     From time to time to fix and to vary the sum to be reserved over and above its capital stock paid in before declaring any dividends; to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in; to fix the time of declaring and paying any dividend, and, unless otherwise provided in this Certificate or in the Bylaws, to determine the amount of any dividend.  All sums reserved as working capital or otherwise may be applied from time to time to the acquisition or purchase of its bonds or other obligations or shares of its own capital stock or other property to such extent and in such manner and upon such terms as the Board of Directors shall deem expedient and neither the stocks, bonds, or other property so acquired shall be regarded as accumulated profits for the purpose of declaring or paying dividends unless otherwise determined by the Board of Directors, but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the Company's capital stock as provided by law.

(g)     From time to time to determine whether and to what extent, and at what time and places and under what conditions and regulations the accounts and books of the Corporation (other than the stock ledger), or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation, except as conferred by statute or authorized by the Board of Directors or by a resolution of the stockholders.

(h)     With the written assent of the holders of two-thirds of its issued and outstanding stock of all classes without a meeting, or pursuant to the affirmative vote in person or by proxy of the holders of two-thirds of its issued and outstanding stock of all classes, at any meeting, either annual or special, called as provided in the Bylaws, the Board of Directors may sell, convey, assign, transfer or otherwise dispose of, any part or all of the property, assets, rights and privileges of the Corporation as an entirety, for the stock, bonds, obligations or other securities of another corporation of this or of any other State, Territory, Colony or foreign country, or for cash, or partly cash, credit, or property, or for such other consideration as the Board of Directors, in their absolute and uncontrolled discretion, may determine.

(i)     The Corporation may by its Bylaws confer upon the Directors powers and authorities additional to the foregoing and to those expressly conferred upon them by statute.

8

### EIGHTH:

Both the stockholders and the Directors of the Corporation may hold their meetings and the Corporation may have an office or offices in such place or places outside of the State of Delaware as the Bylaws may provide, and the Corporation may keep its books outside of the State of Delaware except as otherwise provided by law.

### NINTH:

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner, now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

9

# *Delaware*

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "GENERAL MOTORS CORPORATION", CHANGING ITS NAME FROM "GENERAL MOTORS CORPORATION" TO "MOTORS LIQUIDATION COMPANY", FILED IN THIS OFFICE ON THE NINTH DAY OF JULY, A.D. 2009, AT 2:31 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: *7409341*

DATE: *07-09-09*

0056825   8100

090685704

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:31 PM 07/09/2009*
*FILED 02:31 PM 07/09/2009*
*SRV 090685704 – 0056825 FILE*

## CERTIFICATE OF AMENDMENT
### OF
## RESTATED CERTIFICATE OF INCORPORATION
### OF
## GENERAL MOTORS CORPORATION

General Motors Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the **"Corporation"**),

### DOES HEREBY CERTIFY:

**FIRST:**    The name of the Corporation is General Motors Corporation.

**SECOND:**  The date of filing of the Corporation's original Certificate of Corporation with the Secretary of State of the State of Delaware was October 13, 1916.

**THIRD:**    The date of filing of the Corporation's Restated Certificate of Incorporation with the Secretary of State of the State of Delaware was March 1, 2004.

**FOURTH:**   On June 1, 2009, the Corporation and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) (Case Nos. 09-50026 (REG), 09-50027 (REG), 09-50028 (REG) and 09-13558 (REG), respectively).  This Certificate of Amendment to the Restated Certificate of Incorporation of the Corporation has been duly adopted in accordance with the provisions of Sections 242 and 303 of the Delaware General Corporation Law (the **"DGCL"**), pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the transactions contemplated by that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, as amended, by and among the Corporation, certain of its direct and indirect subsidiaries, and NGMCO, Inc., as approved on July 5, 2009 by order (the **"Order"**) of the Bankruptcy Court.  Provision for amending the Restated Certificate of Incorporation of the Corporation to change the name of the Corporation is contained in the Order of the Bankruptcy Court having jurisdiction for the reorganization proceedings of the Corporation under the Federal Bankruptcy Code.

**FIFTH:**    Article First of the Restated Certificate of Incorporation of the Corporation be, and it hereby is, amended to read as follows:

"The name of the Corporation is Motors Liquidation Company"

**SIXTH:** That this Certificate of Amendment shall be effective upon filing.

*[signature page to follow]*

**IN WITNESS WHEREOF**, the undersigned has signed this Certificate of Amendment as of this _9_ day of July, 2009.


GENERAL MOTORS CORPORATION

By: _____
Name: _Niharika Ramdev_
Title: _Assistant Treasurer_

## **Exhibit C**

### ***Proposed Order***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                 :

In re                               :        **Chapter 11 Case No.**
                                 :

**MOTORS LIQUIDATION COMPANY,** *et al.*,  :      **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.*   :
                                 :

                **Debtors.**         :        **(Jointly Administered)**
                                 :
-------------------------------------------------------------x

## ORDER GRANTING DEBTORS' OBJECTION
## TO PROOFS OF CLAIM NOS. 1206, 7587, AND 10162

Upon the Objection dated May 21, 2010 (the "**Objection**") to Proofs of Claim

Nos. 1206 and 7587 filed by Tozamile Botha, William Daniel Peters, Msitheli Wellington

Nonyukela, Mantoa Dorothy Molefi, Nothini Betty Dyonashe, Nonkululeko Sylvia Ngcaka,

Mirriam Mzamo, Mncekeleli Henyn Simangentloko, and Hans Langford Phiri, and to Proof of

Claim No. 10162 filed by Sakwe Balintulo, Dennis Vincent Frederick Brutus, Mark Fransch,

Elsie Gishi, Lesiba Kekana, Archington Madondo, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile

Sikani (collectively, the "**Apartheid-Related Putative Class Claims**") of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to section 502(b) of title 11, United States Code (the

"**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and this Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim

(Including Claims under Bankruptcy Code Section 503(b)(9)), and Procedures Relating Thereto

and Approving the Form and Manner of Notice Thereof [Docket No. 4079], seeking entry of an

order disallowing and expunging claim numbers 1206, 7587, and 10162 because the adjudication

of the Apartheid-Related Putative Class Claims will confer no benefit outside of the bankruptcy

context and hinder the efficiency of the administration of the estate, the claims fail to comply

with Bankruptcy Rules 9014 and 2019 and Federal Rule of Civil Procedure 23, all as more fully

described in the Debtors' Objection; and due and proper notice of the Objection having been

provided, and it appearing that no other or further notice need be provided; and the Court having

found and determined that the relief sought in the Objection is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

forth in the Objection establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted as provided

herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the

Apartheid-Related Putative Class Claims are disallowed and expunged in their entirety; and it is

further

ORDERED that the Debtors shall have no obligation to establish reserves for

claim numbers 1206, 7587, and 10162 for purposes of the confirmation of a chapter 11 plan or

plans in these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2010

 

_____

United States Bankruptcy Judge