Hearing Date and Time:  November 9, 2010 at 9:45 a.m., E.T.
Objection Deadline:  November 2, 2010 at 4:00 p.m., E.T.

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox
Robert S. Walker

JONES DAY
51 Louisiana Avenue NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Andrew M. Kramer

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis

Attorneys for General Motors LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                                :
In re                                           :    Chapter 11
                                                :
MOTORS LIQUIDATION COMPANY, et al.,             :    Case No. 09-50026 (REG)
        f/k/a General Motors Corp., et al.,     :
                                                :    (Jointly Administered)
                Debtors.                        :
                                                :
-----------------------------------------------------------------x
```

# MOTION OF GENERAL MOTORS LLC (F/K/A GENERAL MOTORS COMPANY) TO ENFORCE SALE ORDER

# <u>TABLE OF CONTENTS</u>

<u>Exhibit</u>

Preliminary Statement................................................................................................ 1

Background ................................................................................................................ 4

    Old GM's Historic Relationship with Delphi and Delphi's Bankruptcy Filing................. 4

    The 2007 Delphi Restructuring MOU and the 2008 Implementation Agreement............ 4

    Confirmation of Delphi's Modified Plan ........................................................... 8

    Old GM's Financial Difficulties and Bankruptcy Filing................................................ 10

    Sale of Assets from Old GM to New GM..................................................................... 11

    The UAW Retiree Settlement Agreement ..................................................................... 13

    New GM's Assumption of the UAW Collective Bargaining Agreement ....................... 14

    The Additional VEBA Payment Demand and Lawsuit ................................................. 14

Jurisdiction................................................................................................................. 16

Relief Requested ........................................................................................................ 16

Relevant Provisions of Key Documents ..................................................................... 16

    Relevant Provisions of the 2007 Delphi Restructuring MOU ....................................... 16

    Relevant Provisions of the 2008 Implementation Agreement ........................................ 17

    Relevant Provisions of the UAW Retiree Settlement Agreement .................................. 18

    Relevant Provisions of the MPA.................................................................................. 24

    Relevant Provisions of the Sale Order .......................................................................... 27

Argument ................................................................................................................... 28

    This Court Has the Authority to Enforce the Sale Order ................................................ 29

    The UAW Retiree Settlement Agreement Extinguished Any Contingent
        Obligations of New GM to Make the Additional VEBA Payment .................... 31

    The Conditions Precedent in the 2007 Delphi Restructuring MOU for the
        Additional VEBA Payment Have Not Been Satisfied......................................... 32

    The Sale Order Enjoins the UAW's Pursuit of the VEBA Complaint............................. 36

    The VEBA Complaint Is an Improper Collateral Attack on this Court's Sale Order
        in the Michigan District Court ........................................................................... 37

    New GM Will Continue to Suffer Harm  Should the UAW Continue to Prosecute
        the VEBA Complaint ......................................................................................... 38

Notice ........................................................................................................................ 39

No Prior Request......................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

<u>Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)</u>,
   No. 05-44481, 2010 WL 3817549 (Bankr. S.D.N.Y. Sep. 9, 2010) ................................ 33, 34

<u>Back v. AM Gen. Corp. (In re Chateaugay Corp.)</u>,
   213 B.R. 633 (S.D.N.Y. 1997) ................................................................................... 29, 30, 38

<u>Celotex Corp. v. Edwards</u>,
   514 U.S. 300 (1995) ......................................................................................................... 37, 38

<u>In re Dorsey Trailer Co.</u>,
   No. 04-32662, 2007 WL 4166170 (Bankr. M.D. Ala. Nov. 20, 2007) ................................. 34

<u>In re Chief Exec. Officers Clubs, Inc.</u>,
   359 B.R. 527 (Bankr. S.D.N.Y. 2007) .................................................................................. 29

<u>In re Gen. Motors Corp.</u>,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>In re Motors</u>
   <u>Liquidation Co.</u>, 428 B.R. 43 (S.D.N.Y. 2010) and 430 B.R. 65
   (S.D.N.Y. 2010), <u>reh'g</u> <u>denied</u>, <u>In re Motors Liquidation Co.</u>,
   No. 09 Civ. 7794, 2010 WL 3565494 (S.D.N.Y. Sep. 10, 2010) ............................... 10, 11, 12

<u>In re Geneva Steel Co.</u>,
   236 B.R. 770 (Bankr. D. Utah 1999) .................................................................................... 34

<u>In re Motors Liquidation Co.</u>,
   Case No. 09-50026 (Bankr. S.D.N.Y.)
   Transcript of Hearing, Oct. 4, 2010 ......................................................................... 29, 30, 39

<u>In re Port Royal Land Timber Co.</u>,
   105 B.R. 72 (Bankr. S.D. Ala. 1989), <u>vacated</u> <u>sub</u> <u>nom</u> <u>on</u> <u>other</u> <u>grounds</u>,
   <u>Port Royal Land & Timber Co. v. Berkowitz, Lefkovits, Isom & Kushner</u>,
   924 F.2d 208 (11th Cir. 1991) .............................................................................................. 34

<u>In re Valley View Shopping Ctr. L.P.</u>,
   260 B.R. 10 (Bankr. D. Kan. 2001) ...................................................................................... 34

<u>Int'l Union, United Auto., Aerospace, and Agric.</u>
   <u>Implement Workers of Am. v. Gen. Motors Corp.</u>,
   497 F.3d 615 (6th Cir. 2007) ................................................................................................. 5

<u>Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)</u>,
   304 F.3d 223 (2d Cir. 2002) ................................................................................................. 29

# TABLE OF AUTHORITIES

(continued)

**Page**

Travelers Indem. Co. v. Bailey,
   129 S. Ct. 2195 (2009)........................................................................................29, 30, 38

Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.),
   419 F.3d 83 (2d Cir. 2005)........................................................................................29

## STATUTES

11 U.S.C. § 105........................................................................................................16, 30

11 U.S.C. § 363................................................................................................................16

28 U.S.C. § 157................................................................................................................16

28 U.S.C. § 1334..............................................................................................................16

29 U.S.C. § 1408..............................................................................................................16

29 U.S.C. § 1409..............................................................................................................16

# TABLE OF EXHIBITS

**Exhibit**

UAW Retiree Settlement Agreement (without exhibits) ............................................................. A

Sale Order (with Master Purchase Agreement attached as an exhibit) .........................................B

2007 Delphi Restructuring MOU (without exhibits) ...................................................................C

Delphi-GM Global Settlement Agreement (without exhibits)..................................................... D

Delphi-GM Global Settlement Order (without exhibits) .............................................................E

2008 Implementation Agreement .................................................................................................F

Amended Delphi Disclosure Statement (without exhibits) ........................................................ G

Delphi Modified Plan (without exhibits) .................................................................................... H

VEBA Complaint...........................................................................................................................I

Dispute Notice ...............................................................................................................................J

Dispute Notice Response ............................................................................................................ K

Rally Decision.............................................................................................................................. L

Proposed Order .............................................................................................................................M

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC f/k/a General Motors Company ("**New GM**") hereby moves

for an order enforcing this Court's Order (I) Authorizing Sale of Assets Pursuant to Amended

and Restated Master Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored

Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief, entered on

July 5, 2009 (Docket No. 2968) (the "**Sale Order**"), to enjoin the prosecution of a lawsuit filed

by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers

of America (the "**UAW**") against New GM that violates the terms of the Sale Order and a related

settlement agreement that has been approved by this Court.  In support of this Motion, New GM

respectfully represents as follows:

## **Preliminary Statement**

1.      As part of an overall strategy to reduce operating costs and consummate a

sale of the assets of the debtors and debtors in possession in these chapter 11 cases

(the "**Debtors**"), New GM, as purchaser of those assets, entered into a settlement agreement

(the "**UAW Retiree Settlement Agreement**")[1] with the UAW by which a new Voluntary

Employees' Beneficiary Association trust (a "**VEBA**") was established (the "**New VEBA**") to

satisfy the Debtors' obligations regarding the provision of post-employment medical benefits to

UAW retirees.  New GM, as the buyer of the Debtors' assets, would make substantial

contributions to the New VEBA as outlined in the agreement and in the motion seeking approval

of the sale. See Docket No. 92 at ¶¶ 26-29 and Exhibit F.

---

[1]      A copy of the UAW Retiree Settlement Agreement (without exhibits) is attached hereto as Exhibit A and is
incorporated herein by reference.

2.    New GM's obligations to the New VEBA as detailed in the UAW Retiree

Settlement Agreement consist of an almost immediate transfer of more than $10 billion and

equity in New GM.  A singular component of that agreement, however, was its express and

repeated admonition that New GM's obligations to make contributions to the New VEBA were

"fixed and capped" at the amount and structure of the specific payments denominated in the

agreement — and no more.  Provisions of the UAW Retiree Settlement Agreement evidencing

New GM's fixed payment obligations include:

- "[New GM's] financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement. . . .  Pursuant to this Settlement Agreement, [New GM] shall have the following, and only the following, obligations to the New VEBA and the New Plan . . . ."  (UAW Retiree Settlement Agreement § 8.)

- "The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New GM] to:  (i) provide any additional payments to the New VEBA other than those specifically required by this Settlement Agreement . . . ."  (Id. § 14.)

- "[A]ll obligations of [New GM] . . . and all provisions of applicable collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with this Settlement Agreement . . . ." (Id. § 5(D).)

- "This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement." (Id. § 32(C).)

- "This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement."  (Id.)

3.    On July 5, 2009, this Court entered the Sale Order, which approved the

sale of substantially all of the Debtors' assets to New GM pursuant to the Amended and Restated

Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "**MPA**").[2]  The

Sale Order provided that the Debtors' assets would be sold to New GM, pursuant to section 363

of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), free and clear of

interests, claims, liens and liabilities that were not expressly assumed by New GM.  The Sale

Order also approved the terms and conditions of the UAW Retiree Settlement Agreement, which,

as described, establishes New GM's sole obligations to the New VEBA.

        4.        The UAW now seeks to force New GM to make an additional

$450 million contribution to the New VEBA (the "**Additional VEBA Payment**"), based not

upon the "fixed and capped" commitments of the integrated UAW Retiree Settlement

Agreement, but upon an entirely separate and contingent alleged obligation contained in an

agreement between the Debtors, Delphi Corporation ("**Delphi**") and the UAW (the "**2007 Delphi

Restructuring MOU**") entered into nearly two years before this Court approved the UAW

Retiree Settlement Agreement.[3]  Any contingent obligation in that 2007 agreement calling for

contributions to a VEBA has been superseded and extinguished by the express terms of the

UAW Retiree Settlement Agreement that establish and limit New GM's payment obligations to

the New VEBA.

        5.        The fact that the UAW's demand for the Additional VEBA Payment is

precluded by the express terms of the UAW Retiree Settlement Agreement is dispositive.

Nevertheless, if the Court were to determine otherwise, as discussed below, the express

conditions precedent to the Additional VEBA Payment have never been satisfied.  For this

independent reason, the UAW's demand for the Additional VEBA Payment must fail.

---

[2]        A copy of the Sale Order, with the MPA included as an exhibit, is attached hereto as <u>Exhibit B</u> and is
incorporated herein by reference.

[3]        A copy of the 2007 Delphi Restructuring MOU (without exhibits) is attached hereto as <u>Exhibit C</u> and is
incorporated herein by reference.

**Background**

***Old GM's Historic Relationship with Delphi and Delphi's Bankruptcy Filing***

      6.      The UAW's request for the Additional VEBA Payment has its roots in the historic relationship between Debtor General Motors Corporation n/k/a Motors Liquidation Company ("**Old GM**") and Delphi.  Prior to January 1, 1999, Old GM conducted Delphi's business through various divisions and subsidiaries.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of Old GM.  Effective as of January 1, 1999, the assets and liabilities of those divisions and subsidiaries were transferred to Delphi.  Delphi's separation from Old GM was completed in May 1999.

      7.      On October 8 and 14, 2005, Delphi and certain of its affiliates (collectively, the "**Delphi Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this District, Case No. 05-44481 (RDD).

***The 2007 Delphi Restructuring MOU and the 2008 Implementation Agreement***

      8.      After Delphi filed for bankruptcy, Old GM engaged in extensive negotiations with the Delphi Debtors to facilitate Delphi's emergence from bankruptcy as a first-tier automotive parts manufacturing entity and major supplier to Old GM.  As part of that effort, Old GM entered into a series of agreements with Delphi and, among others, the UAW, including the 2007 Delphi Restructuring MOU.  Among the key provisions of the 2007 Delphi Restructuring MOU was the express condition that Delphi would emerge from bankruptcy retaining ownership of four manufacturing facilities and continue as a principal supplier to Old GM.  (See 2007 Delphi Restructuring MOU § B.1.)[4]  Other provisions dealt with a division of

---

[4]      Section B.1 of the 2007 Delphi Restructuring MOU provides that the "[s]ites to remain owned and operated by Delphi ('Keep Sites') [include:]  Kokomo[;] Lockport[;] Rochester[; and] Grand Rapids."  (2007 Delphi Restructuring MOU § B.1.)

responsibility between Old GM and Delphi regarding UAW-represented Delphi employees with respect to pension, health care, severance and other employment related benefits and obligations.

9.      In addition, the 2007 Delphi Restructuring MOU acknowledged that the UAW had asserted a claim of $450 million against Delphi "as a result of the modifications encompassed by [the 2007 Delphi Restructuring MOU] and various other UAW agreements during the course of Delphi's bankruptcy."  (2007 Delphi Restructuring MOU § J.2.)  Although the parties did not acknowledge the validity of the UAW's claims, Old GM agreed to settle the claim on Delphi's behalf by agreeing to make the Additional VEBA Payment to the then-existing VEBA (the "**DC VEBA**") that had been established pursuant to a previous settlement agreement approved by the United States District Court for the Eastern District of Michigan (the "**Michigan District Court**") in the case of Int'l Union, UAW et al. v. Gen. Motors Corp., Civil Action No. 05-73991, if certain conditions were met.  (Id.)

10.      Pursuant to the terms of the 2007 Delphi Restructuring MOU, Old GM's obligation to make the $450 million contribution to the DC VEBA expressly was not effective until the occurrence of both of the following:

(a)      Delphi and Old GM executed a comprehensive settlement agreement resolving the financial, commercial and other matters between them; and

(b)      the substantial consummation of a plan of reorganization in Delphi's bankruptcy case "that incorporates, approves and is ***consistent with all of the terms of this Agreement [the 2007 Delphi Restructuring MOU] and the comprehensive settlement agreement between Delphi and [Old] GM***."

(2007 Delphi Restructuring MOU § K.2) (emphasis added).  Delphi filed a motion in its chapter 11 case seeking approval of the 2007 Delphi Restructuring MOU, which the Delphi bankruptcy court granted on July 19, 2007 (Case No. 05-44481; Docket No. 8693).

11.    Shortly after approval of the 2007 Delphi Restructuring MOU, on September 6, 2007, Old GM and Delphi entered into a Global Settlement Agreement (Case No. 05-44481; Docket No. 11386, Exhibit 7.20(a)) (the "**Original GSA**").  The Original GSA and certain related agreements were intended to finalize Old GM's financial support for the Delphi Debtors' legacy and labor costs and to confirm Old GM's business commitment to the Debtors.  Pursuant to the Original GSA, Old GM agreed to satisfy many of the labor commitments set forth in the 2007 Delphi Restructuring MOU.  In return, Old GM was to receive approximately $4 billion from Delphi, including:

(a)    a note from Delphi in the amount of $1.5 billion to be paid promptly in cash following the effective date of Delphi's plan of reorganization; and

(b)    an additional $2.5 billion in consideration consisting of a combination of preferred stock, cash and notes.

(Original GSA §§ 2.03(c)(iv) and 4.04(a).)

12.    On December 10, 2007, the Delphi Debtors filed their first amended joint plan of reorganization (Case No. 05-44481; Docket No. 11386) (the "**Original Plan**").  The Original Plan incorporated many of the provisions set forth in the 2007 Delphi Restructuring MOU and the Original GSA, including the continued existence of Delphi as a reorganized operating entity and Old GM's retention of billions of dollars in claims against the Delphi Debtors (Original Plan §§ 5.4 and 11.1).  The Delphi bankruptcy court entered an order confirming the Original Plan, as modified, on January 25, 2008 (Case No. 05-44481; Docket No. 12359).  Because of deteriorating economic conditions and the loss of exit financing, however, the Delphi Debtors were unable to consummate the Original Plan, and their chapter 11 cases were unexpectedly extended.

13.    In 2008, Delphi again approached Old GM concerning the Delphi Debtors' continuing financial difficulties stemming from their labor and legacy costs.  As a result of those

-6-

negotiations, Delphi and Old GM entered into an amended and restated Global Settlement

Agreement (the "**Delphi-GM Global Settlement Agreement**"),[5] which the Delphi bankruptcy

court approved on September 26, 2008 (Case No. 05-44481; Docket No. 14287)

(the "**Delphi-GM Global Settlement Order**").[6]  Through the Delphi-GM Global Settlement

Agreement, Old GM greatly enhanced its support for Delphi and its employee and retiree

obligations.  The terms of the 2007 Delphi Restructuring MOU, however, remained unchanged.

(See Delphi-GM Global Settlement Agreement § 2.01.)

        14.    The Delphi-GM Global Settlement Order authorized the Delphi Debtors to

implement certain provisions of the Delphi-GM Global Settlement Agreement immediately

pursuant to implementation agreements with the unions.  (Delphi-GM Global Settlement

Order ¶ 9.)  On September 26, 2008, Delphi, Old GM and the UAW entered into an

implementation agreement (the "**2008 Implementation Agreement**"),[7] by which the parties

agreed to the immediate triggering of certain of Old GM's commitments to provide certain

pension and welfare benefits to UAW employees.  While the 2008 Implementation Agreement

accelerated some of Old GM's obligations under the 2007 Delphi Restructuring MOU, the

agreement provided that the Additional VEBA Payment of $450 million by Old GM to the DC

VEBA would remain payable only according to the terms and conditions originally specified in

the 2007 Delphi Restructuring MOU.  (See 2008 Implementation Agreement § 6.)  In other

words, the Additional VEBA Payment was still conditioned on:

        (a)    a comprehensive settlement between Delphi and Old GM; and

---

[5]    A copy of the Delphi-GM Global Settlement Agreement (without exhibits) is attached hereto as Exhibit D and is incorporated herein by reference.

[6]    A copy of the Delphi-GM Global Settlement Order (without exhibits) is attached hereto as Exhibit E and is incorporated herein by reference.

[7]    A copy of the 2008 Implementation Agreement is attached hereto as Exhibit F and is incorporated herein by reference.

(b)     the consummation of a plan of reorganization by the Delphi Debtors that
was consistent with ***"all of the terms"*** of the 2007 Delphi Restructuring
MOU and the settlement between Delphi and Old GM.

### *Confirmation of Delphi's Modified Plan*

15.     After execution of the Delphi-GM Global Settlement Agreement and the
2008 Implementation Agreement in the Fall of 2008, the U.S. economy plunged into one of the
deepest recessions since the Great Depression of the 1930s.  The auto industry followed the
general economy into decline, and the resulting events were catastrophic to Delphi's efforts to
emerge from bankruptcy as an operating manufacturing entity.  Vehicle production by domestic
original equipment manufacturers collapsed, severely impacting Delphi's revenue.  Delphi's
sources of financing withdrew, and alternatives were unavailable.  By mid-2009, Delphi
acknowledged that it could not reorganize in bankruptcy as the parties to the various agreements
had contemplated, but that it would instead sell its valuable assets to third party buyers and
distribute the proceeds of those sales to its creditors.  Thereafter, it would emerge from
bankruptcy solely to liquidate any remaining assets and wind up its affairs.  See Supplement To
First Amended Disclosure Statement With Respect To First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And
Debtors-In-Possession (As Modified) (Case No. 05-44481; Docket No. 17031) (the "**Amended
Delphi Disclosure Statement**"),[8] at S-V through S-VII.  Thus, Delphi would not fulfill the terms
of the 2007 Delphi Restructuring MOU and emerge from bankruptcy as a first-tier automotive
parts manufacturer to GM, let alone satisfy its shared responsibility for employee benefits set
forth in that agreement.

---

[8]     A copy of the Amended Delphi Disclosure Statement (without exhibits) is attached hereto as Exhibit G and
is incorporated herein by reference.

16.    Accordingly, on June 1, 2009, Delphi filed a supplemental motion (Case

No. 05-44481; Docket No. 16646), which sought approval of:

(a)    certain modifications to the Original Plan (the "**Modified Plan**");[9]

(b)    supplemental disclosures; and

(c)    procedures for re-soliciting votes on the Modified Plan.

The parties did not, however, seek to modify the conditions to Old GM's obligation under the

2007 Delphi Restructuring MOU to make a $450 million VEBA payment.  After holding a final

plan modification hearing on July 29 and 30, 2009, the Delphi bankruptcy court entered an order

(Case No. 05-44481; Docket No. 18707) approving the Modified Plan on July 30, 2009.

17.    On October 6, 2009, the Delphi Debtors substantially consummated the

Modified Plan, and the effective date for the Modified Plan occurred.  As indicated, the Modified

Plan was radically different than Delphi's Original Plan in that, rather than emerging from

bankruptcy as a reorganized entity, Delphi sold most of its assets pursuant to a Master

Disposition Agreement.  (See Modified Plan § 7.7.)  Specifically, a third party acquired

substantially all of Delphi's global core businesses, and an affiliate of New GM acquired the

Debtors' non-core steering business and certain U.S. manufacturing plants.  The Delphi Debtors

emerged from chapter 11 as liquidating entities to dispose of any remaining assets, pay certain

retained liabilities and eventually close their chapter 11 cases.

18.    New GM (as successor in interest to Old GM) received much different

treatment under the Modified Plan from that contemplated by the Original Plan, the 2007 Delphi

Restructuring MOU, the Original GSA and the Delphi-GM Global Settlement Agreement.  For

example, the Delphi-GM Global Settlement Agreement contemplated that Old GM would

---

[9]    A copy of the Modified Plan (without exhibits) is attached hereto as Exhibit H and is incorporated herein
by reference.

receive a $2.1 billion administrative claim and a subordinated $2.5 billion general unsecured

claim.  (Delphi-GM Global Settlement Agreement §§ 4.04(a) and (b).)  Under the Modified Plan,

however, neither Old GM nor New GM received *any* recovery on GM's claims.  (Modified Plan

§§ 2.3 and 5.5.)  Moreover, the 2007 Delphi Restructuring MOU contemplated that Delphi

would continue operating four UAW-Delphi plants, retain the UAW employees at those

locations and continue as a principal supplier to New GM.  (2007 Delphi Restructuring MOU

§ B.1.)  New GM, however, was required to buy back those plants pursuant to the terms of the

Modified Plan and assume the related employment obligations at those facilities.  As a result, the

Modified Plan, and specifically New GM's treatment and recovery thereunder, was not consistent

with any of the 2007 Delphi Restructuring MOU, the Original GSA or the Delphi-GM Global

Settlement Agreement.

### *Old GM's Financial Difficulties and Bankruptcy Filing*

19.    As of March 31, 2009, Old GM's business had deteriorated to the point

that it had assets of approximately $82 billion but liabilities of approximately $172 billion.

See In re Gen. Motors Corp., 407 B.R. 463, 475 (Bankr. S.D.N.Y. 2009), aff'd sub nom., In re

Motors Liquidation Co., 428 B.R. 43 (S.D.N.Y. 2010) and 430 B.R. 65 (S.D.N.Y. 2010), reh'g

denied, In re Motors Liquidation Co., No. 09 Civ. 7794, 2010 WL 3565494 (S.D.N.Y.

Sep. 10, 2010) (the "**Sale Decision**").  These liabilities included more than $44 billion of

unfunded employee benefit obligations, including more than $20 billion of unfunded obligations

to the DC VEBA on account of UAW retiree medical benefits.  Id. at 484.

20.    As a result of these financial difficulties, the Debtors filed these chapter 11

cases on June 1, 2009.  As had been widely reported, the United States Department of Treasury

("**Treasury**") provided billions of dollars of financial assistance to the Debtors in 2009,

including debtor-in-possession financing in these chapter 11 cases.  The financing was provided

to prevent "a systematic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs and the sequential shutdown of hundreds of ancillary businesses." Id. at 477.

### *Sale of Assets from Old GM to New GM*

21.    In conjunction with providing financing, the Treasury asked Old GM to consider "a transaction under which substantially all [Old] GM's assets would be purchased by a Treasury-sponsored purchaser . . . in an expedited process under section 363 of the [Bankruptcy] Code." Id. at 480.  In this regard, a new legal entity, New GM, was created to purchase, free and clear of all liens, claims and encumbrances, substantially all of the assets of the Debtors in a sale under section 363 of the Bankruptcy Code.  In the end, as this Court found, there was no alternative to a section 363 sale other than immediate liquidation. Id. at 485.

22.    Before agreeing to provide the Debtors sufficient financing to avoid immediate liquidation, the federal government recognized the need for a "fresh start" for New GM — free from many of Old GM's liabilities — and conditioned its assistance on "substantial debt reduction," a more aggressive business plan and using the Bankruptcy Code to "restructure quickly and emerge stronger." Id. at 479.  Sacrifices were required from all constituents of the Debtors, including dealers, suppliers, bondholders, stockholders, employees and retirees.

23.    Among the reductions in expenses was that at least half of the $20 billion obligation to the DC VEBA trust for UAW retiree medical benefits had to be in the form of common stock rather than cash. Id. at 478, 483.  This required Old GM and New GM to reach an agreement with the UAW regarding a variety of issues, including the future funding of the New VEBA. Id. at 479 ("But rather than leaving GM to simply go into liquidation, the President stated that the U.S. Government would provide assistance to avoid such a result, *if* GM took the

necessary additional steps to justify that assistance — including reaching agreements with the

UAW, GM's bondholders, and the VEBA Trust.") (emphasis in original).

24.     Ultimately, New GM and the UAW reached an agreement regarding the

funding of a new VEBA for UAW retiree medical benefits:  the UAW Retiree Settlement

Agreement.  This agreement was crucial in allowing New GM to "fix and cap" its contributions

to the New VEBA so that New GM could successfully complete the purchase of the Debtors'

assets.  This Court recognized the importance of this settlement in the Sale Decision:

> In 2007 and 2008, GM settled various controversies with respect to its healthcare obligations by entering into an agreement (the "2008 UAW Settlement Agreement"), generally providing that responsibility for providing retiree healthcare would permanently shift from GM to a new plan that was independent of GM.  GM would no longer have to pay for the benefits themselves, but instead would have to make specified contributions aggregating approximately $20.56 billion to be made by GM into the VEBA Trust.  The 2008 UAW Settlement Agreement, therefore, fixed and capped GM's obligations — but in a very large amount.

> As part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of those benefits.  New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits. And under the "UAW Retiree Settlement Agreement," New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "UAW-Represented Retirees").

Id. at 484.

25.     On June 1, 2009, the Debtors filed a motion (Docket No. 92) seeking to

sell substantially all of their assets to New GM pursuant to the MPA and section 363 of the

Bankruptcy Code and the approval of the UAW Retiree Settlement Agreement.  On July 5, 2009,

the Court issued the Sale Decision and entered the Sale Order approving, among other things:

> (a)     the sale of the Debtors' assets to New GM pursuant to the terms and conditions set forth in the MPA (the "**Sale**"); and

(b)    the UAW Retiree Settlement Agreement.

The Sale closed on July 10, 2009.

### *The UAW Retiree Settlement Agreement*

26.    As described, New GM entered into the UAW Retiree Settlement

Agreement to fix and cap its contributions to the New VEBA so that it could satisfy the federal

government's mandate to reduce expenses and create a viable cost structure in connection with

the purchase of the Debtors' assets.  Throughout the UAW Retiree Settlement Agreement, the

parties make clear that the agreement sets forth *all* of New GM's obligations to the New VEBA.

The UAW Retiree Settlement Agreement also provides for the termination of the DC VEBA and

the transfer of all of its assets and liabilities to the New VEBA.

27.    The UAW Retiree Settlement Agreement expressly identifies each of New

GM's obligations to the New VEBA, including the issuance of a promissory note and common

stock to the New VEBA, as well as several other items.  Notably, nowhere in the UAW Retiree

Settlement Agreement is the Additional VEBA Payment arising from the 2007 Delphi

Restructuring MOU identified as being excepted from the all-inclusive terms of the UAW

Retiree Settlement Agreement.  The Additional VEBA Payment was clearly and unambiguously

superseded by the "fixed and capped" payments that New GM was to make under the UAW

Retiree Settlement Agreement.  It is clear from the four corners of the UAW Retiree Settlement

Agreement that New GM has no obligation to make the Additional VEBA Payment.  Indeed, the

UAW's claim in this regard is itself a breach of the UAW's commitments under the terms of the

UAW Retiree Settlement Agreement, which expressly preclude it from seeking to impose VEBA

payment obligations upon New GM other than those specified in the agreement itself.[10]

---

[10]        As noted, *supra*, Section 14 of the UAW Retiree Settlement Agreement provides that "[t]he UAW, acting
on its own behalf and as the authorized representative of the Class and the Covered Group, also **agrees not**

### *New GM's Assumption of the UAW Collective Bargaining Agreement*

28.    Pursuant to the terms of the Sale Order and the MPA, New GM assumed the "UAW Collective Bargaining Agreement," which is defined in the MPA as any agreement between Old GM and the UAW involving employees of Old GM and its affiliates, which arguably includes the 2007 Delphi Restructuring MOU.  Any such assumption, however, is subject to the modifications set forth in the UAW Retiree Settlement Agreement which expressly established the "fixed and capped" extent of New GM's VEBA payment obligation and declared any agreement providing otherwise to be "supersed[ed]," "amended," or "terminated." (See UAW Retiree Settlement Agreement, §§ 5(D), 8, 14 and 32(C).)  Accordingly, as set forth in more detail below, any obligation of New GM under the 2007 Delphi Restructuring MOU and/or the 2008 Implementation Agreement to make the Additional VEBA Payment was extinguished by the UAW Retiree Settlement Agreement, because that agreement purposefully limits New GM's payment obligations to the New VEBA to those specifically identified in the UAW Retiree Settlement Agreement.

### *The Additional VEBA Payment Demand and Lawsuit*

29.    Despite entering into the UAW Retiree Settlement Agreement that expressly "fixed and capped" all of New GM's obligations to the New VEBA, and contrary to its own express commitment to refrain from seeking to obligate New GM to contribute more than what is specified in that agreement, on April 6, 2010, the UAW filed a complaint in the Michigan District Court (the "**VEBA Complaint**"), claiming that New GM's refusal to pay $450 million to

---

(continued…)

> to seek to obligate [New GM] to … provide any additional payments to the New VEBA other than those specifically required by this Settlement Agreement . . . ." (UAW Retiree Settlement Agreement § 14) (emphasis added).

the New VEBA constitutes a breach of the 2007 Delphi Restructuring MOU.[11]  Both before and

after the filing of the VEBA Complaint, the parties took a number of steps to discuss the issues

involved in the VEBA Complaint, including, among other things, exchanging letters on

July 27, 2010 and August 31, 2010 and meeting in person on September 14, 2010.  In addition,

pursuant to a stipulation dated July 26, 2010, the parties agreed to extend the UAW's deadline to

serve the VEBA Complaint until October 4, 2010.  Notwithstanding these efforts, however, the

UAW served New GM with the VEBA Complaint on September 17, 2010, and New GM filed an

answer to the VEBA Complaint in the Michigan District Court on October 8, 2010.

       30.    After being served with the VEBA Complaint, on September 30, 2010, in

accordance with Section 26.B(i) of the UAW Retiree Settlement Agreement, New GM issued,

and the UAW received, a written notice of dispute arising out of or relating to the enforcement,

implementation, application and interpretation of the UAW Retiree Settlement Agreement

(the "**Dispute Notice**").[12]  On October 21, 2010, New GM received the UAW's response, which

essentially reiterates the UAW's previous denials with respect to the applicability of the UAW

Retiree Settlement Agreement to its lawsuit for the Additional VEBA Payment (the "**Dispute

Notice Response**").[13]  More than 21 days having passed since the UAW's receipt of New GM's

Dispute Notice, New GM now seeks recourse from this Court.[14]

---

[11]     A copy of the VEBA Complaint is attached hereto as <u>Exhibit I</u> and is incorporated herein by reference.

[12]     A copy of the Dispute Notice is attached hereto as <u>Exhibit J</u> and is incorporated herein by reference.

[13]     A copy of the Dispute Notice Response is attached hereto as <u>Exhibit K</u> and is incorporated herein by reference.

[14]     Section 26(B)(ii) of the UAW Retiree Settlement Agreement provides in relevant part, "[i]f the Dispute Party [here, the UAW] fails to respond within 21 calendar days from its receipt of the notice, the aggrieved party may seek recourse to the Bankruptcy Court …. "  Section 26 is silent as to what happens if the Dispute Party responds by unequivocal denial as to the agreement's applicability, including its dispute resolution provisions.  It is evident from the UAW's continued prosecution of its Michigan District Court action (the UAW recently filed a motion in the Michigan District Court seeking to preclude this Court's

---

-15-

## Jurisdiction

31.     This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334, paragraph 71 of the Sale Order, paragraph 26 of the UAW Retiree

Settlement Agreement and/or supplemental jurisdiction.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

32.     Pursuant to sections 105 and 363 of the Bankruptcy Code, New GM

hereby seeks the entry of an order:

(a)     enforcing the Sale Order and the UAW Retiree Settlement Agreement;

(b)     enjoining the UAW from pursuing the Additional VEBA Payment; and

(c)     declaring that New GM has no obligation to make the Additional VEBA
        Payment.

## Relevant Provisions of Key Documents

### *Relevant Provisions of the 2007 Delphi Restructuring MOU*

33.     Section J.2 of the 2007 Delphi Restructuring MOU states as follows:

> The UAW has asserted a claim against Delphi in the
> amount of $450 million as a result of the modifications
> encompassed by this Agreement and various other UAW
> agreements during the course of Delphi's bankruptcy.  Although
> Delphi has not acknowledged this claim, [Old] GM has agreed to
> settle this claim by making a payment in the amount of
> $450 million, which the UAW has directed to be paid directly to
> the DC VEBA established pursuant to the settlement agreement
> approved by the court in the case of *Int'l Union, UAW et al. v.
> General Motors Corp.*, Civil Action No. 05-73991 ("*Henry I*").

2007 Delphi Restructuring MOU § J.2.

---

(continued…)

review as to whether the UAW Retiree Settlement Agreement precludes its claims) that this matter cannot
be amicably resolved, and that it is appropriate for New GM to seek relief from this Court at this time.

34.    Section K.2 of the 2007 Delphi Restructuring MOU, which sets forth the

conditions to effectiveness for certain obligations in the 2007 Delphi Restructuring MOU

(including the Additional VEBA Payment described in Section J.2), provides in relevant part as

follows:

> The parties acknowledge that the following provisions
> [including Section J.2] of this Agreement **will not become**
> **effective until all of the following events have occurred** and as
> of the date when the last of such events shall have occurred:
> (a) execution by Delphi and GM of a comprehensive settlement
> agreement resolving the financial, commercial, and other matters
> between them and (b) the substantial consummation of a plan of
> reorganization proposed by Delphi in its chapter 11 cases and
> confirmed by the Bankruptcy Court **which incorporates,**
> **approves and is consistent with all of the terms of this**
> **Agreement and the comprehensive settlement agreement**
> **between Delphi and GM**. . . .

2007 Delphi Restructuring MOU § K.2 (emphasis added).

### *Relevant Provisions of the 2008 Implementation Agreement*

35.    The 2008 Implementation Agreement affirmed that any obligation of

Old GM to make the $450 million Additional VEBA Payment, as set forth in Section J.2 of the

2007 Delphi Restructuring MOU, remained subject to the conditions described in Section K.2 of

the 2007 Delphi Restructuring MOU, notwithstanding the fact that certain of Old GM's

obligations under the 2007 Delphi Restructuring MOU were being accelerated pursuant to the

terms of the 2008 Implementation Agreement.  Specifically, Section 6 of the

2008 Implementation Agreement provides in relevant part as follows:

> 6.    As of the Implementation Effective Date, all
> provisions of the [2007] MOU are deemed adjusted, conformed or
> modified only to the extent necessary to provide for the
> 404(l) Transfers, the Delphi Pension Freeze, the Delphi Cessation
> of OPEB, the effectiveness of the waivers of claims and the
> releases provided for in section 2.1 of the Term Sheet, and the
> triggering of the Term Sheet as contemplated by this
> Implementation Agreement and Article II of the [Delphi-GM

-17-

Global Settlement Agreement]…. **The payment required by sections J(2) and K(2)(e) shall remain payable as set forth in the [2007 Delphi Restructuring] MOU.**

2008 Implementation Agreement § 6 (emphasis added).

### *Relevant Provisions of the UAW Retiree Settlement Agreement*

36.     The recitals to the UAW Retiree Settlement Agreement set forth the

purposes of the agreement, including the termination of the DC VEBA (which is defined as the

Existing External VEBA in the agreement), the transfer of all assets of the DC VEBA to the

New VEBA and the need to fix and cap New GM's contributions to the New VEBA:

> This Settlement Agreement recognizes and approves on the basis set forth herein: (i) the adoption of the [New Co] Plan; (ii) the amendment of the [New Co] Plan to terminate coverage for and exclude from coverage the Class and the Covered Group; (iii) the transfer of the UAW Related Account of the Existing Internal VEBA to the New VEBA; (iv) the termination of participation by the Class and the Covered Group under the Existing Internal VEBA; (v) **the termination of the Existing External VEBA in conjunction with the establishment of the New Plan, and the transfer to the New VEBA of all assets and liabilities of the Existing External VEBA**; (vi) that all claims for Retiree Medical Benefits incurred after the Implementation Date by the Class and the Covered Group … shall be solely the responsibility and liability of the New Plan and the New VEBA; … (viii) that the New Plan shall replace the [New Co] Plan with respect to the provision of Retiree Medical Benefits to the Class and the Covered Group after the Implementation Date; (ix) that the New VEBA shall receive certain payments as described herein from the Existing Internal VEBA, the Existing External VEBA, and [New Co]; (x) **that [New Co]'s obligation to pay into the New VEBA is fixed and capped as described herein**; and (xi) that the New VEBA shall serve as the exclusive funding mechanism for the New Plan.

UAW Retiree Settlement Agreement p. 2 (emphasis added).

37.     The definitions of the "Class Members" and "Covered Group" in the UAW

Retiree Settlement Agreement make clear that Delphi retirees that were entitled to benefits under

the 2008 Implementation Agreement are included in the group of UAW retirees that are covered

by the UAW Retiree Settlement Agreement:

> <u>Class or Class Members</u>.   The term "Class" or "Class Members" shall mean all persons who are: . . .
>
> (iii)  **UAW retirees of Delphi Corporation ("Delphi")** who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become **entitled to Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008,** and their eligible spouses, surviving spouses and dependents of all such retirees;
>
> (iv)  surviving spouses and dependents of any **UAW-represented employee of Delphi** who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are **eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008**; . . .
>
> <u>Covered Group</u>.  The term "Covered Group" shall mean:
>
> (ii) all **UAW-represented active employees of Delphi** or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become **entitled to Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan, or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008,** and the eligible spouses, surviving spouses and dependents of all such retirees; . . .
>
> (iii)  all surviving spouses and dependents of any **UAW-represented employee of Delphi** or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become **eligible for Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008**;

UAW Retiree Settlement Agreement § 1 (emphasis added).

-19-

38.    In Section 2 of the UAW Retiree Settlement Agreement, the parties agreed

that the *only* obligations of New GM to the New VEBA are those that are expressly set forth in

the UAW Retiree Settlement Agreement.  The relevant provisions of Section 2 are as follows:

> The New Plan and the New VEBA shall, after the Implementation Date, be the employee welfare benefit plan and trust that are exclusively responsible for all Retiree Medical Benefits for which [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan formerly would have been responsible with respect to the Class and the Covered Group…. All obligations of [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan for Retiree Medical Benefits for the Class and the Covered Group arising from any agreement(s) between [New Co] and the UAW shall be forever terminated as of the Implementation Date.  **[New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement….**

UAW Retiree Settlement Agreement § 2 (emphasis added).

39.    Similarly, Section 5.B of the UAW Retiree Settlement Agreement states

that New GM's *sole* obligations to the New VEBA are those set forth in the UAW Retiree

Settlement Agreement.  The relevant provisions of Section 5.B are as follows:

> B.    <u>After the Implementation Date</u>.  With respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be the exclusive source of funds to provide Retiree Medical Benefits for the Class and the Covered Group … where such election is made after retirement.  Neither [New Co], the [New Co] Plan, the Existing Internal VEBA, nor any other [New Co] person, entity, or benefit plan shall have any responsibility or liability for Retiree Medical Benefits for individuals in the Class or in the Covered Group for claims incurred after the Implementation Date.  **[New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement.**

UAW Retiree Settlement Agreement § 5.B (emphasis added).

40.     Section 5.D of the UAW Retiree Settlement Agreement provides that all previous agreements with the UAW are amended so as to be consistent with the UAW Retiree Settlement Agreement.  Section 5.D states as follows:

> D.     Termination of [New Co] Plan and Reimbursement of [New Co].   The Approval Order shall provide that all obligations of [New Co] and all provisions of the [New Co] Plan in any way related to Retiree Medical Benefits for the Class and/or the Covered Group, and **all provisions of applicable collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with this Settlement Agreement and the fundamental understanding that all [New Co] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement.**   Summary Plan Descriptions of the [New Co] Plan shall reflect the termination of the responsibilities of [New Co] and the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein.

UAW Retiree Settlement Agreement § 5.D (emphasis added).

41.     Section 8 of the UAW Retiree Settlement Agreement states that New GM's obligations to the New VEBA are fixed and capped and specifically identifies each of the funding obligations of New GM to the New VEBA.  While Section 8 identifies certain contributions that must be made by New GM to the New VEBA, including a promissory note in the amount of $2.5 billion and a substantial amount of equity in New GM, the Additional VEBA Payment of $450 million is not identified.  The relevant provisions of Section 8 are as follows:

> **8.     [New Co] Payments to New Plan and New VEBA**
>
> **[New Co]'s financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement** …. it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group after the Implementation Date, and that all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the

-21-

Class and the Covered Group shall terminate as of the Implementation Date, as set forth in this Settlement Agreement. All assets shall be transferred or paid by [New Co] free and clear of any liens, claims or other encumbrances. **Pursuant to this Settlement Agreement, [New Co] shall have the following, <u>and only the following</u>, obligations to the New VEBA and the New Plan** … :

      A.   <u>Special Attrition Plan</u>. … [New Co] shall pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the terms of the Special Attrition Plan agreed to by GM and the UAW and ratified on May 29, 2009 (the "SAP")….

      B.   <u>UAW Related Account</u>. … [New Co] shall cause the transfer to the New VEBA of the assets … of the UAW Related Account in the Existing Internal VEBA, net of Existing Internal VEBA trust expenses….

      C.   <u>[New Co] Note</u>. … [New Co] shall execute and deliver to the financial institution that will serve as trustee under the Indenture, if applicable, or to the other counterparty to the Indenture (the "Indenture Trustee") a counterpart signature page to the Indenture (and issue the [New Co] Note to the New VEBA pursuant to the terms and conditions thereof). . . .

      D.   <u>[New Co] Equity</u>. … [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements … and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement. . . .

UAW Retiree Settlement Agreement § 8 (emphasis added).

      42.   Pursuant to Section 14 of the UAW Retiree Settlement Agreement, the UAW agrees that it will not seek to make New GM pay any amounts to the New VEBA other than those expressly set forth in the UAW Retiree Settlement Agreement.  Section 14 states as follows:

## 14.    Future Contributions

      The UAW, the Class and the Covered Group may not negotiate any increase of [New Co]'s funding or payment obligations set out herein.  **The UAW, acting on its own behalf**

**and as the authorized representative of the Class and the
Covered Group, also agrees not to seek to obligate [New Co] to:
(i) provide any additional payments to the New VEBA other
than those specifically required by this Settlement Agreement**;
(ii) make any other payments for the purpose of providing Retiree
Medical Benefits to the Class or the Covered Group; or
(iii) provide or assume the cost of Retiree Medical Benefits for the
Class or the Covered Group through any other means….

UAW Retiree Settlement Agreement § 14 (emphasis added).

43.    Section 26.A of the UAW Retiree Settlement Agreement provides that this

Court shall retain jurisdiction to resolve any disputes involving the enforcement, implementation,

application or interpretation of the agreement.  Section 26.B clarified that such jurisdiction is

exclusive and also set forth certain dispute resolution procedures:

**26.    Dispute Resolution**

A.    <u>Coverage</u>.  Any controversy or dispute arising out
of or relating to, or involving the enforcement, implementation,
application or interpretation of this Settlement Agreement shall be
enforceable only by [New Co], the Committee and the UAW, and
**the Approval Order will provide that the Bankruptcy Court
will retain jurisdiction to resolve any disputes**, and, in the event
that the bankruptcy proceeding has been closed or dismissed, the
parties agree that any necessary litigation to resolve such disputes
shall be brought before the Court….

B.    <u>Attempt at Resolution</u>.  **Although the Bankruptcy
Court retains exclusive jurisdiction to resolve disputes arising
out of or relating to the enforcement, implementation,
application or interpretation of this Settlement Agreement**, the
parties agree that prior to seeking recourse to the Bankruptcy Court,
the parties shall attempt to resolve the dispute through the
following process:

(i)    The aggrieved party shall provide the party
alleged to have violated this Settlement Agreement ("<u>Dispute
Party</u>") with written notice of such dispute, which shall include a
description of the alleged violation and identification of the
Section(s) of the Settlement Agreement allegedly violated. Such
notice shall be provided so that it is received by the Dispute Party
no later than 180 calendar days from the date of the alleged
violation or the date on which the aggrieved party knew or should

-23-

have known of the facts that give rise to the alleged violation, whichever is later, but in no event longer than 3 years from the date of the alleged violation.

(ii)    If the Dispute Party fails to respond within 21 calendar days from its receipt of the notice, the aggrieved party may seek recourse to the Bankruptcy Court; provided however, that the aggrieved party waives all claims related to a particular dispute against the Dispute Party if the aggrieved party fails to bring the dispute before the Bankruptcy Court within 180 calendar days from the date of sending the notice. . . .

UAW Retiree Settlement Agreement §§ 26.A; 26.B (emphasis added).

44.    Finally, Section 32.C of the UAW Retiree Settlement Agreement contains

an integration clause, which states the following:

C.    This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement.    This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

UAW Retiree Settlement Agreement § 32.C.

### *Relevant Provisions of the MPA*

45.    Pursuant to the MPA, New GM assumed the "UAW Collective Bargaining

Agreement."  Specifically, Sections 2.1 through 2.3(a) of the MPA provide in relevant part as

follows:

*Section 2.1    Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, … **at the Closing, Purchaser shall** (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) **assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities**. . . .

*Section 2.2      Purchased and Excluded Assets.*

(a)      The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to …

(x)      … all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, … **the UAW Collective Bargaining Agreement** ….

*Section 2.3      Assumed and Retained Liabilities.*

(a)      The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers: . . .

(ii)      all Liabilities under each Purchased Contract; . . .

(xiii)      … Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered by the **UAW Collective Bargaining Agreement** ….

MPA at §§ 2.1 – 2.3(a) (emphasis added).

46.      The definition of "UAW Collective Bargaining Agreement" under the

MPA includes any agreement between Old GM and the UAW relating to "Employees."  In turn,

the term "Employees" means any current, former or retired employee of Old GM or its affiliates.

The UAW asserts that the term "UAW Collective Bargaining Agreement" includes the

2007 Delphi Restructuring MOU.  (VEBA Complaint ¶ 7.)  The specific definitions of "UAW

Collective Bargaining Agreement" and "Employees" are set forth in Section 1.1 of the MPA as

follows (in relevant part):

"UAW Collective Bargaining Agreement" means any written or oral Contract, understanding or mutually recognized past practice between Sellers and the UAW with respect to Employees, including the UAW Active Labor Modifications, but excluding the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post Retirement Medical Care, dated September 26, 2007, between Parent and the UAW, and the Settlement Agreement.  For purpose of clarity, the term "UAW

Collective Bargaining Agreement" includes all special attrition
programs, divestiture-related memorandums of understanding or
implementation agreements relating to any unit or location where
covered UAW-represented employees remain ….

"Employees" means (i) each employee or officer of any of
Sellers or their Affiliates (including (a) any current, former or
retired employees or officers, (b) employees or officers on
long-term or short-term disability, military leave, sick leave,
family medical leave or some other approved leave of absence and
(c) employees on layoff status or with recall rights); (ii) each
consultant or other service provider of any of Sellers or their
Affiliates who is a former employee, officer or director of any of
Sellers or their Affiliates; and (iii) each individual recognized
under any Collective Bargaining Agreement as being employed by
or having rights to employment by any of Sellers or their Affiliates.
For the avoidance of doubt, Employees includes all employees of
Sellers or any of their Affiliates, whether or not Transferred
Employees.

MPA at § 1.1.

47.    Section 6.17(g) of the MPA also provides that New GM and the UAW

will enter into the UAW Retiree Settlement Agreement, which caps New GM's payment

obligations to the New VEBA as set forth therein.  In particular, Section 6.17(g) of the MPA

states the following:

(g)    *UAW Retiree Settlement Agreement*.  Prior to the
Closing, Purchaser and the UAW shall have entered into the UAW
Retiree Settlement Agreement.

MPA at § 6.17(g).

48.    Similarly, Section 7.2(e) of the MPA provides that the execution of the

UAW Retiree Settlement Agreement is a condition to New GM's obligation to the close the Sale

of Old GM's assets, as set forth below:

*Section 7.2    Conditions to Obligations of Purchaser*.
The obligations of Purchaser to consummate the transactions
contemplated by this Agreement are subject to the fulfillment or
written waiver, prior to or at the Closing, of each of the following
conditions; provided, however, that in no event may Purchaser

waive the conditions contained in Section 7.2(d) or Section 7.2(e): . . .

> (e)    The UAW Retiree Settlement Agreement shall have been executed and delivered by the UAW and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

MPA at § 7.2(e).

### *Relevant Provisions of the Sale Order*

49.    The Court approved the UAW Retiree Settlement Agreement pursuant to

paragraphs 19 and 20 of the Sale Order, as follows (in relevant part):

### Approval of the UAW Retiree Settlement Agreement

> 19.    The UAW Retiree Settlement Agreement, the transactions contemplated therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the retirees, and are approved.  The Debtors, the Purchaser, and the UAW are authorized and directed to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree Settlement Agreement, including the obligation of the Purchaser to reimburse the UAW for certain expenses relating to the 363 Transaction and the transition to the New VEBA arrangements….

> 20.    In accordance with the terms of the UAW Retiree Settlement Agreement, … (II) on the later of December 31, 2009, or the Closing of the 363 Transaction (the "Implementation Date"), (i) the committee and the trustees of the Existing External VEBA (as defined in the UAW Retiree Settlement Agreement) are directed to transfer to the New VEBA all assets and liabilities of the Existing External VEBA and to terminate the Existing External VEBA …, (ii) the trustee of the Existing Internal VEBA is directed to transfer to the New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA …, and, upon the completion of such transfer, the Existing Internal VEBA shall be deemed to be amended to terminate participation and coverage regarding Retiree Medical Benefits for the Class and the Covered Group, effective as of the Implementation Date (each as defined in the UAW Retiree Settlement Agreement); and (III) all obligations of the Purchaser and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group shall be governed by the UAW

-27-

Retiree Settlement Agreement, and, in accordance with section 5.D
of the UAW Retiree Settlement Agreement, all provisions of the
Purchaser's Plan relating to Retiree Medical Benefits for the Class
and/or the Covered Group shall terminate as of the Implementation
Date or otherwise be amended so as to be consistent with the UAW
Retiree Settlement Agreement (as each term is defined in the UAW
Retiree Settlement Agreement), and the Purchaser shall not
thereafter have any such obligations as set forth in Section 5.D of
the UAW Retiree Settlement Agreement.

Sale Order at ¶¶ 19-20.

50.    Finally, pursuant to paragraph 71 of the Sale Order, this Court retained

**exclusive** jurisdiction to enforce and implement the terms of the Sale Order and the MPA:

**71.    This Court retains exclusive jurisdiction to
enforce and implement the terms and provisions of this Order,
the MPA, all amendments thereto, any waivers and consents
thereunder, <u>and each of the agreements executed in connection
therewith</u>,** including the Deferred Termination Agreements, in all
respects, **including, but not limited to, retaining jurisdiction
to** … (c) resolve any disputes arising under or related to the MPA,
except as otherwise provided therein, **(d) interpret, implement,
and enforce the provisions of this Order,** (e) protect the
Purchaser against any of the Retained Liabilities or the assertion of
any lien, claim, encumbrance, or other interest, of any kind or
nature whatsoever, against the Purchased Assets ….

Sale Order at ¶ 71 (emphasis added).

## <u>Argument</u>

51.    The UAW was an active participant in the Sale of the Debtors' assets to

New GM and specifically negotiated the cap on New GM's payment obligations to the

New VEBA contained in the UAW Retiree Settlement Agreement so that the Sale could be

consummated.  Nevertheless, the UAW has filed the VEBA Complaint in the Michigan District

Court seeking to require New GM to make the $450 million Additional VEBA Payment.  This

Court should not permit the UAW to circumvent the Sale Order and the UAW Retiree Settlement

Agreement by seeking the Additional VEBA Payment in direct contravention of the mandates in those documents.

52.     Moreover, pursuant to Section 26 of the UAW Retiree Settlement Agreement, the parties agreed that this Court would retain *exclusive* jurisdiction to resolve any disputes arising out of or relating to the enforcement, implementation, application or interpretation of the UAW Retiree Settlement Agreement.  The UAW's demand for the Additional VEBA Payment and New GM's position that such demand is precluded by the terms of the UAW Retiree Settlement Agreement fall within those parameters.

### *This Court Has the Authority to Enforce the Sale Order*

53.     Bankruptcy courts have the inherent authority to enforce their orders. See, e.g., Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.), 419 F.3d 83, 97 (2d Cir. 2005) ("Bankruptcy courts retain jurisdiction to enforce and interpret their own orders.") (citing Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 230 (2d Cir. 2002)); see also Travelers Indem. Co. v. Bailey, 129 S. Ct. 2195, 2205 (2009) ("as the Second Circuit recognized, . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); Back v. AM Gen. Corp. (In re Chateaugay Corp.), 213 B.R. 633, 637 (S.D.N.Y. 1997) (quoting the lower bankruptcy court opinion that "it had jurisdiction pursuant to its 'inherent or ancillary jurisdiction to interpret and enforce [its] own orders'"); In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 533 (Bankr. S.D.N.Y. 2007) ("Courts have the inherent power to enforce compliance with their lawful orders through civil contempt"); cf. In re Motors Liquidation Co., No. 09-50026 (Bankr. S.D.N.Y.), Transcript of Hr'g, Oct. 4, 2010 (the "**Rally Decision**")[15] at 46:2-18 (holding that the Sale Order was a core proceeding and that

---

[15]     A copy of the Rally Decision is attached hereto as Exhibit L and is incorporated herein by reference.

09-50026-mg    Doc 7527    Filed 10/22/10    Entered 10/22/10 15:05:35    Main Document
Pg 35 of 45

"the enforcement of orders resulting from core proceedings are themselves considered core proceedings").

54.    In addition, section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions and it "codif[ies] the bankruptcy court's inherent power to enforce its own orders." <u>Chateaugay</u>, 213 B.R. at 640; <u>see also</u> 11 U.S.C. § 105(a).

55.    Moreover, pursuant to Paragraph 71 of the Sale Order, this Court retained exclusive jurisdiction to, among other things, enforce and implement the terms and provisions of the Sale Order, the MPA and "each of the agreements executed in connection therewith," which would include the UAW Retiree Settlement Agreement.  (<u>See</u> Sale Order ¶ 71.)  <u>See also</u> <u>Travelers</u>, 129 S. Ct. at 2205 ("when the Bankruptcy Court entered the [prior orders,] it explicitly retained jurisdiction to enforce its injunctions").

56.    Similarly, Section 26.A of the UAW Retiree Settlement Agreement provides that this Court "will retain jurisdiction to resolve any disputes" arising out of or relating to, or involving "the enforcement, implementation, application or interpretation of" the UAW Retiree Settlement Agreement, and the UAW specifically agreed that "any necessary litigation to resolve such disputes shall be brought before the Court." (<u>See</u> UAW Retiree Settlement Agreement § 26.A.)  Section 26.B made such jurisdiction exclusive.

57.    Accordingly, this Court has the jurisdiction and authority to enforce its previous Sale Order and the terms of the UAW Retiree Settlement Agreement and to grant the relief sought in this Motion.

***The UAW Retiree Settlement Agreement Extinguished***
***Any Contingent Obligations of New GM to Make the Additional VEBA Payment***

58.     The Sale Order and MPA contain very precise provisions regarding the

"Assumed Liabilities" that were assumed by New GM pursuant to the Sale.  These Assumed

Liabilities include the UAW Collective Bargaining Agreement (which term the UAW asserts

encompasses the 2007 Delphi Restructuring MOU) and the UAW Retiree Settlement Agreement.

(See MPA §§ 2.1-2.3; Sale Order ¶¶ 19, 20, 21.)  In turn, the UAW Retiree Settlement

Agreement contains equally precise provisions regarding New GM's payment obligations to the

New VEBA and the fact that New GM's obligations have been "fixed and capped" at the

obligations specifically enumerated in the UAW Retiree Settlement Agreement.  These

limitations on New GM's obligations to the New VEBA were a prerequisite to the federal

government's financial assistance to the Debtors and were necessary to consummate the Sale of

the Debtors' assets to New GM.

59.     In particular, the express purpose of the UAW Retiree Settlement

Agreement is to establish, once and for all, the absolute extent of New GM's obligations to

provide funding to the New VEBA.  The integrated UAW Retiree Settlement Agreement by its

terms provides that New GM's ***"sole"*** obligations to the New VEBA are ***"fixed and capped"***

and ***"only"*** as set forth in the UAW Retiree Settlement Agreement itself.  (See UAW Retiree

Settlement Agreement §§ 2, 5.B, 8.)  The agreement also declares that it "supersedes any prior

understandings, agreements or representations" and that any contrary agreement is either

"terminated" or "otherwise amended so as to be consistent with" the UAW Retiree Settlement

Agreement.  (See Id. §§ 5(D) and 32(C).)  Indeed, the UAW Retiree Settlement Agreement

provides that the UAW is precluded from even "seek[ing] to obligate" New GM "to … provide

any additional payments to the New VEBA other than those specifically required by" the UAW

Retiree Settlement Agreement.  (See Id. § 14).  It is difficult to imagine a more clear and

conclusive way of expressing that New GM's obligations to make payments to the New VEBA

are only what are specified in the agreement itself, and nothing more.  All other obligations,

regardless of their source and without regard for the fulfillment of any stated conditions, are

extinguished.  This conclusion is buttressed by the fact that nowhere in the UAW Retiree

Settlement Agreement is there mentioned a $450 million VEBA payment predicated upon the

2007 Delphi Restructuring MOU.  The UAW Retiree Settlement agreement is clear — if a

payment is not identified, then it is extinguished.  Indeed, the UAW's filing of the VEBA

Complaint itself constitutes a breach of its expressed agreement not to seek from New GM

payments not called for by the UAW Retiree Settlement Agreement.  (Id.)

### *The Conditions Precedent in the 2007 Delphi Restructuring MOU for the Additional VEBA Payment Have Not Been Satisfied*

60.    Because the UAW Retiree Settlement Agreement extinguished any

obligation contained in the 2007 Delphi Restructuring MOU to make a $450 million Additional

VEBA Payment to the New VEBA, the consideration of this matter should end at this point.

However, if the Court were to find otherwise, the UAW's demand for the Additional VEBA

Payment would still fail because the conditions to its payment under the terms of the

2007 Delphi Restructuring MOU itself have not been, and cannot be, satisfied.

61.    Old GM's obligation to make the Additional VEBA Payment was

expressly conditioned on two events:

    (a)    a comprehensive settlement agreement between Delphi and Old GM; and

    (b)    the substantial consummation of a ***plan of reorganization*** by Delphi that "incorporates, approves and is consistent with ***all of the terms*** of [the 2007 Delphi Restructuring MOU] and the comprehensive settlement agreement between Delphi and GM."

(See 2007 Delphi Restructuring MOU § K.2) (emphasis added).

09-50026-mg    Doc 7527    Filed 10/22/10    Entered 10/22/10 15:05:35    Main Document
Pg 38 of 45

62.     Although Delphi may have consummated a "plan of reorganization" in the technical sense, in no way can its titular emergence from bankruptcy be regarded as fulfilling the condition that its reorganization incorporate, approve and be consistent with "**all of the terms** of [the 2007 Delphi Restructuring MOU] and the comprehensive settlement agreement between Delphi and GM."  (Id.) (emphasis added)  Delphi's Modified Plan is in effect a plan of liquidation and only nominally a plan of reorganization and, even if the Modified Plan were deemed a plan of reorganization (which it should not be), it is plainly inconsistent with virtually all of the terms of the 2007 Delphi Restructuring MOU and the Delphi-GM Global Settlement Agreement.

63.     As described above, at the time that the 2007 Delphi Restructuring MOU and Delphi-GM Global Settlement Agreement were executed, the parties contemplated that Delphi would emerge as a reorganized, rehabilitated operating entity and would continue to own and operate four manufacturing plants and maintain responsibility for a substantial number of UAW-represented employees at those facilities.  (See 2007 Delphi Restructuring MOU § B.1; Original Plan § 11.1.)  Rather than providing for the emergence of the Delphi Debtors as rehabilitated operating entities, however, the Modified Plan provided generally for the liquidation of the Delphi Debtors' estates.  Specifically, pursuant to the Modified Plan, the Delphi Debtors sold substantially all of their operating assets to an affiliate of Platinum Equity Capital Partners II, L.P. and transferred certain other U.S. manufacturing plants (and the related employment obligations) to an affiliate of New GM.  (See Modified Plan § 7.7; Amended Delphi Disclosure Statement, at S-VII.)  The Delphi bankruptcy court itself has described the Modified Plan as a "liquidating plan."  See Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.), No. 05-44481, 2010 WL 3817549, at *6 (Bankr. S.D.N.Y. Sep. 9, 2010) (noting that

-33-

09-50026-mg   Doc 7527   Filed 10/22/10   Entered 10/22/10 15:05:35   Main Document
Pg 39 of 45

"Delphi's plan is a liquidating plan" and that the distribution of the assets of the Delphi Debtors'

estates was "Delphi's sole purpose at this time").

       64.    A plan that provides, for all practical purposes, for the liquidation of the

Delphi Debtors' estates can not be considered a "plan of reorganization," as that phrase is

understood by courts (and as it was employed in the 2007 Delphi Restructuring MOU).

See, e.g., In re Dorsey Trailer Co., No. 04-32662, 2007 WL 4166170, at *1 (Bankr. M.D. Ala.

Nov. 20, 2007) (stating that "[l]iquidation plans are significantly different than plans of

reorganization in that there is no potential income from ongoing operations to fund the plan"); In

re Valley View Shopping Ctr. L.P., 260 B.R. 10, 40 (Bankr. D. Kan. 2001) (acknowledging,

within the context of distinguishing between competing plans, that plans of reorganization and

plans of liquidation are different types of plans; stating "[a]lthough not the exclusive factor in

determining which competing plan to confirm, the type of plan is a key component.

A reorganization plan is usually preferable to a liquidation plan"); In re Geneva Steel Co.,

236 B.R. 770, 774 (Bankr. D. Utah 1999) (where emergence bonuses were to be paid to key

employees "upon confirmation and substantial consummation of a plan of reorganization," the

court construed the motion "as proposing to pay the emergence bonus *only in the event that a*

*'plan of reorganization' is confirmed, and not a Chapter 11 liquidating plan*") (emphasis added);

In re Port Royal Land & Timber Co., 105 B.R. 72, 73 (Bankr. S.D. Ala. 1989), vacated sub nom.

on other grounds, Port Royal Land & Timber Co. v. Berkowitz, Lefkovits, Isom & Kushner,

924 F.2d 208 (11th Cir. 1991) ("The term 'liquidating plan of reorganization' is oxymoronic.

Liquidations and reorganizations are divergent concepts…. A reorganization connotes a

financial reconstruction or rehabilitation…. Antipodally, a liquidation connotes an appropriation

of assets towards the discharge of indebtedness."). Accordingly, because the Delphi Debtors did

not confirm a plan of reorganization, a threshold condition for New GM's making the Additional

VEBA Payment was never satisfied.

65.    Moreover, even if the Modified Plan were considered a "plan of

reorganization" within the meaning of the 2007 Delphi Restructuring MOU (which it should not

be), the second condition precedent to the Additional VEBA Payment remains unsatisfied where

the Modified Plan entirely fails to conform to the spirit, intent and express terms of the

2007 Delphi Restructuring MOU and the Delphi-GM Global Settlement Agreement.

66.    Under the Delphi-GM Global Settlement Agreement, Old GM was entitled

to a recovery from the reorganized Delphi Debtors in excess of *$2 billion* in cash on the effective

date of the Delphi Debtors' plan, with the promise of billions more in the event of a successful

reorganization.  Specifically, the Delphi-GM Global Settlement Agreement contemplated that,

under the Delphi Debtors' plan of reorganization, Old GM would receive a $2.1 billion

administrative claim and a subordinated $2.5 billion general unsecured claim against the Delphi

Debtors.  (Delphi-GM Global Settlement Agreement §§ 4.04(a) and (b).)  In fact, Section 5.04 of

the Delphi-GM Global Settlement Agreement specifically states that any Delphi plan must

provide for "the consideration to be received by GM as set forth in section 4.04 hereof . . . ."

67.    The treatment accorded Old GM in the Modified Plan, however, is not

remotely consistent with the treatment of Old GM contemplated in the 2007 Delphi

Restructuring MOU or the Delphi-GM Global Settlement Agreement.  Under the Modified Plan,

neither Old GM nor New GM (as successor in interest to Old GM) recovers *anything*; a

contemplated recovery in the billions of dollars in claims has been completely eliminated.

(See Modified Plan §§ 2.3 and 5.5.)  As a result, the Modified Plan is not consistent with the

2007 Delphi Restructuring MOU or the Delphi-GM Global Settlement Agreement, and the second condition precedent to the Additional VEBA Payment has not occurred.

68.     Accordingly, even if it had not been extinguished by the UAW Retiree Settlement Agreement, the second condition precedent in the 2007 Delphi Restructuring MOU for the $450 million Additional VEBA Payment has not been met, and the Additional VEBA Payment is not owed by New GM to the New VEBA.

### *The Sale Order Enjoins the UAW's Pursuit of the VEBA Complaint*

69.     Paragraphs 9 and 47 of the Sale Order contain injunctions that prohibit parties from commencing or continuing any action based on claims relating to the liabilities released pursuant to the Sale Order.  Paragraph 9 states that "no claims other than Assumed Liabilities, will be assertable against the Purchaser."  Similarly, Paragraph 47 of the Sale Order provides that "all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding . . . against [New GM] . . . with respect to any . . . claim against the Debtors other than Assumed Liabilities."

70.     The Sale Order clearly prohibits the UAW from taking any actions against New GM relating to the Additional VEBA Payment because the obligation to make the Additional VEBA Payment was never assumed by New GM, as discussed above.  The UAW Complaint is inconsistent with the Sale Order because the UAW Retiree Settlement Agreement, which was approved by the Sale Order, limits New GM's obligations to the New VEBA to those obligations specifically identified in the UAW Retiree Settlement Agreement.  Those obligations do not include the Additional VEBA Payment.  Therefore, New GM seeks an order from this Court enforcing the Sale Order and the UAW Retiree Settlement Agreement by enjoining the UAW from pursuing the VEBA Complaint against New GM in the Michigan District Court or commencing or continuing any similar litigation or proceeding in any forum.

-36-

### *The VEBA Complaint Is an Improper Collateral Attack*
### *on this Court's Sale Order in the Michigan District Court*

71.    The VEBA Complaint represents an improper collateral attack in the

Michigan District Court on this Court's Sale Order.  Disregarding the approval of the

UAW Retiree Settlement Agreement and the related injunctions in favor of New GM set forth in

the Sale Order, the UAW seeks to enforce an obligation extinguished by that agreement and

those injunctions against New GM in the Michigan District Court.  This is the exact type of

collateral attack on a bankruptcy court order that the United States Supreme Court rejected in

Celotex Corp. v. Edwards, 514 U.S. 300 (1995).

72.    In Celotex, the United States Bankruptcy Court for the Middle District of

Florida issued an injunction under section 105 of the Bankruptcy Code that prohibited judgment

creditors from proceeding against the debtor's sureties without the bankruptcy court's permission.

Notwithstanding that order, certain judgment creditors filed a motion with the United States

District Court for the Northern District of Texas seeking execution against a surety on a bond in

connection with a lawsuit that the debtor had lost on appeal.  The District Court allowed the

creditors to execute on the bond, and, on appeal, the Fifth Circuit affirmed, reasoning that the

debtor had no present or future interest in the bond.  The Supreme Court reversed the Fifth

Circuit decision and ruled, among other things, that if the judgment creditors thought that the

injunction was improper, they should have challenged the injunction in the bankruptcy court and

then, if necessary, appealed to the district court in Florida and ultimately to the Eleventh Circuit.

Celotex, 514 U.S. at 313.  The Supreme Court then found:

> Respondents chose not to pursue this course of action, but instead
> to *collaterally attack* the Bankruptcy Court's Section 105
> Injunction in the federal courts in Texas.  This they cannot be
> permitted to do without seriously undercutting the orderly process
> of the law.

Id. (emphasis added); see also Travelers, 129 S. Ct at 2205-06 (noting that subject matter jurisdiction of bankruptcy court to enter injunctions in a plan confirmation order was not subject to collateral attack later in federal court; "[e]ven subject-matter jurisdiction . . . may not be attacked collaterally") (citations omitted); Chateaugay, 213 B.R. at 637 (affirming bankruptcy court's finding that state court challenges to bankruptcy court injunctions and orders constituted an improper collateral attack that could be enjoined by the bankruptcy court).

73.    Similarly, in this case, if the UAW did not agree with the fact that all of New GM's obligations to the New VEBA are set forth in the UAW Retiree Settlement Agreement, it should have filed an objection to those provisions of the Sale or at least raised the issue with this Court in the first instance.  Instead, however, the UAW collaterally attacked the Sale Order and UAW Retiree Settlement Agreement by filing the VEBA Complaint in the Michigan District Court.  As the Supreme Court stated in Celotex, such course of action by the UAW seriously undercuts the orderly process of law and cannot be permitted.

**New GM Will Continue to Suffer Harm**
**Should the UAW Continue to Prosecute the VEBA Complaint**

74.    New GM has been harmed by having to defend itself from the UAW's demand for the Additional VEBA Payment.  New GM already has been forced to incur fees and costs in defending the VEBA Complaint in the Michigan District Court and in bringing this Motion.  New GM would be harmed further still in the (unlikely) event that the Michigan District Court were to enter a judgment against New GM in favor of the UAW.  New GM may also have to defend on appeal a dismissal of the VEBA Complaint.  Under all scenarios, New GM is faced with both the threat of liability and the expense of attorneys' fees.  These harms arise from the direct violation of the Sale Order and the UAW Retiree Settlement Agreement.

75.     A court order approving the sale of assets free and clear of claims and approving a comprehensive settlement agreement should not be disregarded.  New GM should be able to rely on the Sale Order, and the UAW Retiree Settlement Agreement that is incorporated therein, and not be subjected to the re-litigation of settled matters in the Michigan District Court. See Rally Decision at 48:20 – 49:10 (stating that "the bidders of the world that come in to bid for assets in the bankruptcy court must have knowledge that bankruptcy courts will stand by the documents as they were then drafted to give the parties to those agreements the predictability in their relations for which they are binding and upon which they justifiably rely").

## **Notice**

76.     Notice of this Motion has been provided to:

(a)     the UAW; and

(b)     parties in interest in accordance with the Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 24, 2010 (Docket No. 6750).

In light of the nature of the relief requested, New GM submits that no other or further notice is necessary.

## **No Prior Request**

77.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, New GM respectfully requests that this Court:

(i)      enter an order substantially in the form attached as <u>Exhibit M</u>, granting the relief sought herein; and

(ii)     grant such other and further relief to New GM as the Court may deem proper.

Dated: October 22, 2010
      New York, New York

Respectfully submitted,


   /s/ Lisa G. Laukitis
Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Andrew M. Kramer
JONES DAY
51 Louisiana Avenue NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Heather Lennox
Robert S. Walker
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR GENERAL MOTORS LLC