# EXHIBIT G

**[Amended Delphi Disclosure Statement]**



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
         In re                        :     Chapter 11
                                              :
DELPHI CORPORATION, <u>et</u> <u>al.</u>,          :     Case No. 05-44481 (RDD)
                                              :
                                              :     (Jointly Administered)
         Debtors.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENT TO FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION
AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

|  |  |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER<br>   & FLOM LLP<br>Four Times Square<br>New York, New York 10036<br>Kayalyn A. Marafioti<br>Thomas J. Matz | Of Counsel<br>DELPHI CORPORATION<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>David M. Sherbin<br>Sean P. Corcoran<br>Karen J. Craft |

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
        June 16, 2009

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF ANY MODIFICATIONS
TO THE PLAN CONFIRMED BY THE BANKRUPTCY COURT ON JANUARY 25, 2008.  THE
BANKRUPTCY COURT WILL DETERMINE UNDER 11 U.S.C § 1127 WHETHER ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS WILL BE SOLICITED, AND ANY ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS MAY NOT BE SOLICITED UNTIL THE
BANKRUPTCY COURT HAS APPROVED THIS SUPPLEMENT TO THE DISCLOSURE
STATEMENT.  THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT IS BEING SUBMITTED
FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

THE INFORMATION CONTAINED IN THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT (HEREAFTER, THE "SUPPLEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) (THE "MODIFIED PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE MODIFIED PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS SUPPLEMENT, REGARDING THE MODIFICATIONS TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE MODIFIED PLAN.

ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS SUPPLEMENT AND THE MODIFIED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE MODIFIED PLAN.  SUMMARIES AND STATEMENTS REGARDING THE MODIFIED PLAN MADE IN THIS SUPPLEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ANNEXED TO THE MODIFIED PLAN AND THIS SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS SUPPLEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS SUPPLEMENT AND THE TERMS OF THE MODIFIED PLAN, THE TERMS OF THE MODIFIED PLAN SHALL GOVERN.

THIS SUPPLEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1127 OF THE UNITED STATES BANKRUPTCY CODE, AS IT INCORPORATES SECTION 1125 AND OTHER PROVISIONS OF THE BANKRUPTCY CODE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS SUPPLEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS SUPPLEMENT AND THE MODIFIED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS SUPPLEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS SUPPLEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE MODIFIED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN- POSSESSION IN THESE CASES.

## EXECUTIVE SUMMARY

This section provides an executive summary of:

- Events affecting Delphi's reorganization efforts since January 25, 2008, including the deterioration of the capital markets in general and the automotive industry in particular, and the commencement of chapter 11 reorganization cases for Chrysler LLC and General Motors Corporation

- The organization of the Supplement

- The background of Delphi's restructuring cases

- Material modifications to Delphi's confirmed plan of reorganization including the transfer of substantially all of the Company's operating businesses to an affiliate of Platinum Equity Capital Partners II, L.P. and the transfer of certain North American operations and the global steering operations to an affiliate of General Motors Corporation

- A hypothetical liquidation analysis

- Material modifications to the distributions to be made under the Confirmed Plan, which under the Modified Plan includes the elimination of consideration to classes other than Classes A-1, C-1, and C-2

On October 8 and 14, 2005, Delphi Corporation ("Delphi") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization that proposes how to treat claims against, and shareholder interests in, such debtor company. A plan of reorganization must be voted on by holders of claims and interests, to the extent the class to which such holder belongs is impaired and receives or retains property under the plan on account of such claims or interests. In addition, the plan of reorganization must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is necessary for a debtor to emerge from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 2007 Plan"), together with a proposed Disclosure Statement with respect to the September 2007 Plan (the "September 2007 Disclosure Statement"). After a series of hearings in the Bankruptcy Court that concluded on December 7, 2007, on December 10, 2007, the Debtors filed the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Disclosure Statement") and the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "December 2007 Plan").

On December 10, 2007, the Bankruptcy Court entered an order approving the Disclosure Statement, and the Debtors commenced solicitation of acceptance or rejection of the December 2007 Plan. On January 16, 2008, Delphi announced that the voting results with respect to the December 2007 Plan illustrated broad-based support for the plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the certain multi-district securities class action litigation (the "MDL"), and holders of equity security interests). One hundred percent of the ballots cast in the GM and MDL classes voted to accept the December 2007 Plan. Seventy-eight percent of voting shareholders voted to accept the December 2007 Plan.

On January 17, 2008, the Bankruptcy Court commenced the confirmation hearing (the "Confirmation Hearing") on the December 2007 Plan. The December 2007 Plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008 (the "Confirmed Plan"), and the confirmation order became final on February 4, 2008.

A key component of the exit financing of the Confirmed Plan was the investment agreement (the "Investment Agreement") that the Debtors entered into with A-D Acquisition Holdings, LLC ("ADAH"), an affiliate of Appaloosa Management L.P. ("Appaloosa"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, UBS Securities LLC, Goldman, Sachs & Co., and Pardus DPH Holding LLC (collectively, the "Plan Investors"). On the terms and subject to the conditions of the Investment Agreement, as amended, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi. In addition, the Investment Agreement, as amended, provided for a $1.575 billion discount rights offering that was made available to Delphi's unsecured creditors and holders of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing and conducting the discount rights offering, the Plan Investors refused to participate in the closing that was commenced and attended by all required parties other than the Plan Investors. On that same date, Appaloosa delivered a letter purportedly terminating the Investment Agreement. On May 16, 2008, Delphi filed complaints against the Plan Investors and related parties seeking redress of the unjustified breach of the Investment Agreement as well as damages related to the consequent delay of the Debtors' emergence from chapter 11.

Although the Debtors are pursuing actions against the Plan Investors, during the time since the Plan Investors' breach, the Debtors have worked diligently with their parties-in-interest, including their postpetition lenders, GM, the official committee of unsecured creditors (the "Creditors' Committee), the official committee of equity security holders (prior to its dissolution) (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees"), and other third parties to take actions that would allow the Debtors to formulate modifications to its Confirmed Plan and to emerge from chapter 11 without waiting for the full resolution of the Debtors' claims against the Plan Investors. The Debtors have now reached agreements with necessary parties that will enable them to emerge from chapter 11 and, through the transactions described herein with affiliates of Platinum Equity Capital Partners II, L.P.

("Platinum") and General Motors Corporation ("GM"), will be able to continue to deliver high-quality products to their customers with the support of their supply base.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both Statutory Committees, to develop modifications to the Confirmed Plan that would allow Delphi to emerge from chapter 11 on a standalone basis, without the support of plan investors.  In September 2008, Delphi reached critical agreements with GM that resulted in an expected net contribution from GM in the approximate amount of $10.6 billion and provided a partial solution to certain of the Debtors' pension funding obligations.  During this same period, however, the U.S. economy continued to weaken and vehicle production forecasts were lowered for the periods covered by the Debtors' business plan, both by third-party forecasting services as well as by the original equipment manufacturers themselves.

Following the effectiveness of the GM agreements on September 29, 2008, and having reaffirmed its business plan to contemplate the anticipated, reduced, automotive production volumes that resulted in reduced emergence funding needs, the Debtors believed they had developed modifications to the Confirmed Plan which would allow the Debtors to emerge from chapter 11.  Thus, on October 3, 2008, the Debtors filed the Plan Modification Approval Motion setting forth the proposed modifications to the Confirmed Plan and the Disclosure Statement, which included a reaffirmed business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity.

That same day, the United States House of Representatives approved the federal bailout plan, now known as the Troubled Asset Relief Program or "TARP."  On the following Monday, October 6, 2008, however, and for much of the rest of the month of October, the global credit markets seized up and the global capital markets experienced one of the five worst bear markets in their history.  On December 19, 2008, the White House announced that the federal government would lend $17.4 billion of the TARP funds to GM and Chrysler, portions of which GM and Chrysler received in December 2008 and the first half of 2009.

Despite the efforts of the federal government to provide stability to the capital markets and banks and to assist the financial viability of the domestic automotive industry, the markets remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for its modifications to the Confirmed Plan.  Moreover, in the fourth quarter of 2008 and the first quarter of 2009, forecasted and actual production volumes and sales at the U.S. original equipment manufacturers precipitously declined.  For example, the financial projections set forth in Delphi's business plan filed on October 3, 2008 were based on, among other factors, then-projected United States light vehicle sales of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, with U.S. sales representing approximately 85% of North American sales.  Just three months later, on January 12, 2009, GM announced that its forecast for 2009 U.S. light vehicle sales would constitute only 10.3 million units, a staggering 3 million fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007.  A more recent U.S. light vehicle sales forecast by third party forecasting service, IHS/Global Insight DRI, has projected an even further reduced sales outlook of 9.6 million units for 2009, while predicting that sales

will rise to 15.6 million units by 2012.  Similarly, as of May 14, 2009, GM projected a downside of 9.3 million light vehicle units will be sold in the United States.  Other OEM projections are similarly reduced.  As shown on the chart below, the U.S. automotive industry has experienced the most precipitous drop in U.S. vehicle sale volumes in half a century.



Annual U.S. Light Vehicle Historical Demand

Source: 1950-1995 AN 100YR Almanac; 1996-1999 & 2008-2012 IHS/Global Insight DRI Sales AI 5-25-09; 2000-2007 Automotive News

As a result of the lack of available credit in the capital markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan.  As a result, the Debtors were forced to remain in chapter 11.  The collapse of the credit markets also made it difficult for the Debtors to refinance or extend the maturity of their DIP credit facility, which matured on December 31, 2008, on terms reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, in December 2008, the Debtors and the DIP Lenders entered into an accommodation agreement, as subsequently amended, to allow the Debtors to continue using certain of the proceeds of the DIP credit facility through June 30, 2009, among other things.  In addition, and in connection with certain amendments to the accommodation agreement with the DIP Lenders, GM agreed to provide the Debtors with additional liquidity and to accelerate payment of certain GM receivables to allow the Debtors to maintain ongoing operations in this challenging economic environment.

During this time, the U.S. government's well-publicized involvement with the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into the

automotive industry, including GM, added yet another key stakeholder to the negotiations with the Debtors regarding their emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an additional $150 million in liquidity under an amendment to the previously-approved liquidity arrangement between Delphi and GM. The U.S. Treasury Department (the "U.S. Treasury"), however, acting pursuant to its authority under GM's loan agreement with the U.S. government, notified the Debtors and GM that it did not approve of the parties' seeking approval of these amendments at that time and requested additional time to consider these agreements and various alternatives with respect to the Debtors' emergence from chapter 11. Since that time, the Debtors and GM have been working on and negotiating a global solution to allow the Debtors to emerge from chapter 11. As part of that solution, the U.S. Treasury has now agreed to allow GM to provide up to an additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.

The formulation of the Modified Plan, the provisions of which are summarized more fully below, was the result of significant diligence on the part of the Debtors, their key stakeholders, and certain additional third parties. These results have all been achieved during a tremendously difficult time in the automotive industry. Because of the debilitating conditions in the automotive industry, more than 75 companies directly related to the automotive industry have sought chapter 11 protection in 2009 including, among others, Fleetwood Enterprises, Hayes-Lemmerz Incorporated, Mark IV Industries, Inc., Metaldyne Corporation, Milacron, Inc., Monaco Coach Corporation, Noble International Ltd., and Visteon Corporation. Moreover, even original equipment manufacturers are struggling, as evidenced by the chapter 11 filing of Chrysler LLC on April 20, 2009 and the chapter 11 filing by GM on June 1, 2009.

Against this backdrop, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, the Debtors have determined to implement their emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum, and GM Components Holdings, LLC ("GM Components"), an affiliate of GM. Ultimately, the emergence structure is similar to that which was contemplated in the Confirmed Plan, but instead of plan investors emerging as the majority owner of the continuing business enterprise through sponsorship of the Confirmed Plan, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global Steering business, are being acquired by GM Components.

In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of their creditors, the Debtors have executed an agreement to reflect the foregoing transactions through a plan of reorganization. The Debtors will emerge with certain residual assets and liabilities which they intend to operate upon emergence but divest over time. Consummation of these transactions through the Modified Plan, which embodies concessions made by all parties-in-interest allowing for the resolution of these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims, as described further herein. Moreover, Delphi's emerging businesses will continue to develop technology and

products and produce them for the benefit of their customers under the guidance of Platinum, a company with experience providing operational support to companies to help them create long term value.

If, however, the Debtors receive any unsolicited alternative transaction proposal, in the exercise of their fiduciary duties, the Debtors will consider such proposal in accordance with the procedures established by the Bankruptcy Court in the Modification Procedures Order. In that event, if any such alternative transaction proposal is deemed by the Debtors to be higher or otherwise better and is approved by the Bankruptcy Court, the Debtors will seek to confirm the Modified Plan and make the distributions provided thereunder on the basis of such approved alternative transaction.

The Debtors are seeking to modify the Confirmed Plan pursuant to section 1127 of the Bankruptcy Code. The Confirmed Plan, with the modifications described herein, will be referred to herein as the "Modified Plan," and this Modified Plan supersedes in its entirety the October 3, 2008 proposed Plan modifications. The purpose of this Supplement is to provide to the holders of Claims against the Debtors adequate information to make an informed judgment about the Modified Plan, which is annexed to this document as Appendix A.

This Supplement contains, among other things, descriptions and summaries of provisions of the Modified Plan. Certain of Delphi's U.S. affiliates are not debtors in these chapter 11 cases (the "Chapter 11 Cases") and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions. Certain provisions of the Modified Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified. Such modifications, however, are not anticipated to have a material adverse effect on the distributions contemplated by the Modified Plan.

## A.    Summary Of Material Modifications To The Confirmed Plan

As set forth above, the Plan Investors' failure to meet their obligations under the Investment Agreement delayed the Debtors' emergence from chapter 11. The loss of this investment, and the resultant exposure to the continued uncertainty of the global capital markets, the current economic climate in the U.S., the depressed state of the global automotive industry, and the combined effect of these factors to depress valuation metrics, have led to a significant decrease in the Debtors' business enterprise value. This result, combined with the Debtors' liquidity issues and the unfavorable economic environment, necessarily has led to significantly reduced recoveries under the Modified Plan for more senior classes and the elimination of recoveries for more junior classes but still maximizes recovery for stakeholders relative to any other alternative explored by the Debtors. The chart below briefly summarizes some of the material modifications to the Confirmed Plan as reflected in the Modified Plan attached hereto as Appendix A, but the Modified Plan and the remainder of this Supplement should be reviewed in their entirety.

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM.  Although the Debtors have sought additional information regarding the treatment of their pension plans prior to the date of this Supplement, the specific arrangements have not been finalized. The Debtors anticipate receiving additional direction from GM, the PBGC, and the U.S. Treasury on the terms of the PBGC Settlement Agreement, which the Debtors will use their best efforts to file by the Plan Exhibit Filing Date<br><br>- The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities.  GM will not receive any distribution on account of its Allowed Claim |

|  | Confirmed Plan | Modified Plan |
|---|---|---|
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |
| **Secured Claims (Excluding DIP Claims)** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points, (ii) receive their collateral free and clear of liens, or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Unsecured Creditors** | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement provided that any distribution to holders of general unsecured claims will be shared ratably with the anticipated general unsecured claim of the PBGC. |
| **Post-petition Interest** | Post-petition Interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| **MDL Litigation Claims** | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| **Equity** | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

**B.    Description Of Organization Of This Supplement And The Modified Plan**

The Supplement is divided into this executive summary and an additional 12 sections, each of which is sub-divided further under descriptive headings to aid in the understanding of the information contained herein. The beginning of each section of the Supplement contains a summary of the information in the section and highlights certain modifications made since the approval of the Disclosure Statement. The paragraphs that follow provide a brief overview of the contents of the Supplement.

The introduction and executive summary contain a general overview of the Debtors, and the events that have occurred since the confirmation of the Confirmed Plan in January 2008, including a summary of the terms of the Modified Plan. The executive summary is qualified in

its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Supplement, the Appendices to the Supplement, including the Modified Plan, and in certain instances, the Disclosure Statement as filed in December 2007. The Modified Plan is attached to the Supplement as <u>Appendix A</u>. All capitalized terms not defined in this Supplement have the meanings ascribed to them in the Modified Plan, unless otherwise noted.

<u>Sections I and II</u> of this Supplement explain the chapter 11 process and provide an overview of voting procedures to accept or reject the Modified Plan.

<u>Section III</u> of this Supplement provides an overview of major events that have occurred during the Chapter 11 Cases since the solicitation of votes on the Confirmed Plan, including a description of various orders entered by the Bankruptcy Court, the debtor-in-possession financing obtained and used, the sales of assets, and the litigation between the Debtors and the Plan Investors. This section also describes the claims process and the Debtors' progress in reconciling claims. To provide information about Delphi's financial performance, historical financial results of the Company are attached to this Supplement as <u>Appendix B</u>.

<u>Section IV</u> of this Supplement contains a summary of the Modified Plan including, among other things, an explanation of the potential substantive consolidation of certain Debtors, the treatment of claims and interests under the Modified Plan, and the releases and exculpations provided by the Modified Plan to the Debtors and certain third parties.

<u>Section V</u> of this Supplement describes general considerations and risk factors to be evaluated in conjunction with the description of the Debtors' Modified Plan.

<u>Sections VI and VII</u> of this Supplement provide information on securities law matters and federal income tax consequences of distributions to be made under the Modified Plan.

<u>Section VIII</u> of this Supplement discusses certain bankruptcy law principles that the Debtors must meet for the Modified Plan to be confirmed by the Bankruptcy Court, including that the Modified Plan is feasible and meets the "best interests" test set forth in the Bankruptcy Code. This section also contains an analysis of the hypothetical liquidation of the Debtors performed in conjunction with the formation of the Modified Plan. Liquidation analyses showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached as <u>Appendix C</u>.

Finally, <u>Sections IX-XII</u> of this Supplement explain, among other things, the process by which confirmation of the Modified Plan may occur, conditions to confirmation and consummation of the Modified Plan and the Effective Date, voting requirements, and details about the hearing on the Modified Plan.

Creditors may vote to accept or reject the Modified Plan. In addition, the modifications must be approved by the Bankruptcy Court before Delphi can consummate the Modified Plan. The Modified Plan is the document that effectuates, among other things, distributions to creditors and shareholders and the releases of certain parties.

## C.        Commencement Of Chapter 11 Cases

Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.    Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company.    Delphi's separation from GM was completed in May 1999.

Precipitating Delphi's entry into chapter 11 was a series of significant net losses for the Company.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.    Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses, both during the prepetition and postpetition periods.

- In calendar year 2004, the Company reported a net loss of approximately $4.8 billion. The reported net loss in calendar year 2004 reflects a $4.1 billion income tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in 2004 was $482 million.
- In 2005, the Company incurred net losses of approximately $2.4 billion (with a net operating loss of $2.0 billion).
- In 2006 the Company incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.    Net operating losses in calendar year 2006 were $4.5 billion.
- In 2007, the Company incurred a net loss of $3.1 billion.  Net operating losses in calendar year 2007 were $1.9 billion.
- In 2008, although the Company recorded net income of $3.0 billion in 2008, which included a gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.
- In the first quarter of 2009, although the Company recorded net income of $556 million, which included a gain of $1.2 billion in connection with the termination of the salaried OPEB plan, the Company's net operating loss of the first quarter was $534 million.

Delphi believes that the Company's financial performance deteriorated in the period prior to the chapter 11 filing because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for U.S. OEMs resulting in the reduced number of motor vehicles that such OEMs, including GM, produce annually in the United States and related pricing pressures, and (c) increasing commodity prices.

In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.    Because discussions with its

major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these Chapter 11 Cases for its U.S. businesses to preserve value for its stakeholders.

**D.**        **Overview Of Delphi's Transformation**

On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations (the "Transformation Plan").  During the course of its Chapter 11 Cases, including the period following April 4, 2008, Delphi implemented many of its key transformation goals, despite the harsh economic climate that began in 2007 and led to the current depressed global capital and equity markets.  Delphi's transformation activities during its Chapter 11 Cases produced an enterprise with more flexibility and a greater capability to respond to changing markets because of its more streamlined enterprise with a more focused product portfolio, reduced U.S. employment costs, the ability to adjust U.S. manufacturing with volume, a significant reduction in high cost production capacity, increasingly shared business processes and IT platforms between operating units, a simplified organizational structure, greater business diversification by customer, and greater business diversification by region.

The Company's stated goals for transforming five key areas of its business and its progress in realizing those goals throughout the cases is summarized below.

**Labor**

Modify the Company's labor agreements to create a competitive arena in which to conduct business

- Agreements with all principal U.S. labor unions that:
  - modified, extended, or terminated provisions of the Company's U.S. existing collective bargaining agreements with its unions;
  - provided that GM would undertake certain financial obligations to Delphi's union-represented retirees; and
  - modified retiree welfare benefits for union-represented retirees
- Negotiated attrition programs with certain of Delphi's unions, implemented with the assistance of GM
- These agreements will be assumed and assigned under the Master Disposition Agreement

**GM**

Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company

- The Global Settlement Agreement, which became effective in September 2008, provided a comprehensive resolution of the claims between Delphi and GM (other than ordinary course claims) in consideration for the 414(l) transaction, GM's assumption of financial responsibility for traditional U.S. hourly OPEB, and GM's commitments to Delphi
- The Master Restructuring Agreement, which became effective in September 2008, addressed GM's forward business commitments to Delphi and the parties' continuing obligations to each other; this agreement will be superseded by the Master Disposition Agreement
- The Master Disposition Agreement, which will become effective upon the Debtors' emergence, pursuant to which an affiliate of GM will acquire certain of the Debtors' North American operations and will assume certain liabilities in accordance therewith

**Product Portfolio And Manufacturing Footprint**

Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus

- Effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it had competitive and technological advantages
- The Company developed a revised operating structure that consisted of the following core business segments:
  - Electrical/Electronic Architecture
  - Powertrain Systems
  - Electronics and Safety
  - Thermal Systems
  - Delphi Product and Service Solutions
- The Company also identified non-core product lines and plants which have been held for sale or windown by Automotive Holdings Group
- During 2006-2009, the Company has worked to maximize the value of non-core assets for all stakeholders, commenced and/or completed the sale of certain bearings, brakes, chassis, catalyst, interiors and closures, power products, and steering businesses
- The Company identified eight core automotive sites in the United States and streamlined its global manufacturing footprint; both the "core" sites and the global operations will now be transferred pursuant to the Master Disposition Agreement

**Cost Structure**

Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint

- The Company made significant progress to ensure that its organizational and cost structure was competitive by entering into various outsourcing agreements, including outsourcing certain of its accounts receivable, accounts payable, and contract administration processes, which significantly reduced the Company's SG&A expenses
- The Company reduced the size of its salaried workforce and implemented benefit reductions for both active salaried employees and retirees
- The Company developed a competitive benchmark executive and non-executive compensation program

**Pension**

Devise a workable solution to the Company's pension funding situation

- The Company froze all but one of its defined benefit programs as of November 30, 2008, but will provide alternative defined contribution programs and will reach an agreement with GM or the PBGC regarding the frozen programs
- On September 29, 2008, the Company effectuated the first transfer under Section 414(l) of the Internal Revenue Code of certain hourly pension liabilities to GM with a subsequent transfer of assets and liabilities related to the hourly plan scheduled to occur upon the effective date of the Modified Plan. These transfers, combined with contributions upon emergence, has assisted the Company in addressing its hourly pension funding situation
- While the defined benefit programs were to be assumed under the Confirmed Plan, the salaried and subsidiary plans are no longer capable of assumption because of the deterioration of the capital markets in 2008 and 2009 and accordingly such plans may be involuntarily terminated by the PBGC

Although the realization of the Debtors' Transformation Plan has not led to an emergence structure that provides value to nearly all stakeholders as originally contemplated, the significant progress the Debtors made in streamlining their businesses throughout the Chapter 11 Cases has resulted in the willingness of third parties to invest in the Debtors' underlying business assets, including significant portions of its operations, through the transactions contemplated in the disposition agreement among the Debtors, Parnassus, GM Components, and certain affiliates thereof (the "Master Disposition Agreement"). The Debtors expect that the go-forward business

will maintain its prominence as one of the world's premier automotive suppliers under the ownership of Parnassus as it continues to supply customers around the world.

## E.    Key Emergence Issues

Following the inability of the Debtors to implement their proposed modifications to the Confirmed Plan in October 2008, the Debtors undertook steps in three primary areas which the Debtors believe have been critical to completing their transformation and positioning the Company to emerge from chapter 11: (i) reaching an agreement with Parnassus and GM Components for the disposition of the Debtors' primary business assets, (ii) resolving the Debtors' financing issues, and (iii) resolving the Debtors' pension issues. Critical to achieving resolution of each of these issues has been garnering the support of the U.S. Treasury for Delphi's plan of reorganization.  As a result of GM accepting TARP funds from the U.S. government, GM's use of capital is subject to significant governmental oversight, particularly for transactions valued at more than $100 million.  Because support from GM in a variety of forms was central to the resolution of each of these three issues, it was essential for the Debtors to attain U.S. Treasury support as well.  Having garnered that support in light of the Debtors' significant relationship with GM, the Debtors have been able to reach a consensual resolution with their parties-in-interest to Delphi's outstanding issues, which discussions have resulted in the agreements underlying the Modified Plan.

### 1.    Master Disposition Agreement

In September 2008, the Debtors reached agreements with GM to accelerate the effectiveness of certain agreements among the Debtors and GM that provided for the settlement of claims between the parties and proscribed the nature of the relationship between the Company and GM going forward.  These agreements contained many benefits inuring to the Debtors and were initially to become effective concurrently with the consummation of the Confirmed Plan. When the effectiveness of the Confirmed Plan was delayed, the Debtors sought and, on September 25, 2008 the Bankruptcy Court approved, the implementation of an Amended and Restated Global Settlement Agreement (the "Amended GSA") and Amended and Restated Master Restructuring Agreement (the "Amended MRA") with GM.  Through the Amended GSA and Amended MRA, the Debtors addressed, at least in part, two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the original global settlement agreement and master restructuring agreement with GM approved in connection with the Confirmed Plan (the "Original GSA" and "Original MRA," respectively).  This estimate included the value of two 414(l) transfers of pension assets and liabilities to GM and the consideration provided by Delphi for both transfers.  The Amended GSA and Amended MRA became effective on September 29, 2008.

When the Amended GSA and Amended MRA were consummated, the Debtors believed that they were on the path to emergence, but due to the increasingly severe global economic downturn and the deterioration in forecasted production volumes from original equipment manufacturers, the Debtors found themselves in need of further liquidity. Thus, the Company was required to continue exploring strategic alternatives. To facilitate the Debtors' emergence from chapter 11 pursuant to the Modified Plan, during the first quarter of 2009, Delphi and GM engaged in extensive discussions with respect to GM's acquisition of Delphi's global steering business as well as certain of Delphi's North American facilities that employ hourly workers represented by the UAW and that are dedicated principally to supplying product to GM.

As the decline of the U.S. automotive industry continued, culminating with the chapter 11 filings of Chrysler LLC and GM, the Debtors continued to negotiate with GM regarding the terms of a potential sale of assets. As a result of this process, certain other potential purchasers also engaged in dialogue with GM and the Debtors. These expanded discussions raised the possibility of a well-capitalized third party purchaser acquiring substantially all of the Debtors' assets, other than those to be purchased by GM, and certain additional assets to remain with a reorganized company, to move the company forward. As a result of these discussions, the Debtors secured the support of Platinum and GM and were able to negotiate the Master Disposition Agreement with GM Components and Parnassus.

Pursuant to Master Disposition Agreement, and subject to the terms described therein, certain of GM's affiliates would purchase certain of the Debtors' U.S. manufacturing facilities that primarily supply product to GM as well as the assets of the Debtors' global Steering business. Concurrently, Parnassus would purchase a substantial portion of the remaining business assets, including the equity of the Debtors' non-U.S. subsidiaries.



From the purchasers, the Debtors would receive, among other things, cash, the assumption of liabilities, assumption of certain administrative claims and/or cash to fund payment of certain administrative claims, and certain deferred consideration. Additionally, as part of the consideration GM would provide, at closing GM would waive its multi-billion dollar claims, including its administrative expense claim under the GM Arrangement, its administrative expense claim under Section 4.04(a)(i) of the Amended GSA, and its prepetition claim.



The Master Disposition Agreement contains typical representation and warranties and sets forth certain covenants relating to bankruptcy actions, employees, intellectual property, operations, and taxes, among others. One of the bankruptcy covenants provides that under certain conditions, in lieu of the sale transactions contemplated under the Master Disposition Agreement being consummated as part of the Debtors' plan of reorganization, such sale transactions would proceed pursuant to section 363 of the Bankruptcy Code. Entry into the Master Disposition Agreement and the conditions precedent to the consummation thereof having been waived or satisfied are conditions to the effectiveness of the Modified Plan.

On June 1, 2009, GM filed a Form 8-K with the Securities Exchange Commission in which it disclosed that it had entered into the Master Disposition Agreement. GM's filing disclosed the business and facilities that it would be acquiring and stated that Delphi employees at each acquired facility will transfer to the company that acquires that facility. In addition, GM stated that in connection with its acquisition, GM would pay or assume approximately $600 million of Delphi obligations related to its Tranche A and Tranche B DIP Loans under the DIP Credit Agreement (each as defined below), including certain secured hedge transactions, approximately $300 million of Delphi obligations related to its Tranche C Loans, and approximately $200 million of other Delphi obligations to be shared with Parnassus, including administrative claims. In addition, GM stated that upon the closing of the transactions contemplated by the Master Disposition Agreement, GM would waive its administrative claims

associated with the GM Arrangement (in the approximate amount of $300 million) and transferred pension costs for hourly employees (in the approximate amount of $1.6 billion).

GM further disclosed that in connection with the Master Disposition Agreement, GM and Delphi amended their existing liquidity agreement (the "GM Arrangement," as defined below) to provide that GM would furnish a $250 million credit facility, subject to certain conditions. Upon the consummation of either the Modified Plan or a sale pursuant to section 363, GM would waive all amounts outstanding under this credit facility.

In addition, GM disclosed generally the capital structure of Parnassus. Specifically, GM will invest $2 billion of cash in consideration for "Class A Membership Interests" in the acquisition company and $500 million in a delayed draw term loan facility. Platinum will invest $250 million in cash in consideration for "Class B Membership Interests" in the acquisition company and $250 million in a delayed draw term loan facility. Finally, GM agreed to carry forward to the end of the related product program all existing Delphi supply agreements (including purchase orders) for North America, and Parnassus agreed to provide GM with certain requested protections to ensure continuity of supply.

As mentioned above, also on June 1, 2009, GM sought protection under chapter 11 of the Bankruptcy Code. Under applicable bankruptcy law, GM must receive Bankruptcy Court approval to enter into and perform under the Master Disposition Agreement. Pursuant to the terms of the Master Disposition Agreement, Bankruptcy Court authorization must be obtained prior to July 15, 2009 or the Master Disposition Agreement terminates automatically. GM is expected to file a motion on or about June 20, 2009 seeking authorization to enter into and perform under the Master Disposition Agreement, and the hearing at which GM's motion will be considered is currently scheduled for July 13, 2009. The Final Modification Approval Hearing is scheduled for July 23, 2009 and the Debtors are hoping to close the transaction on or prior to July 31, 2009.

## 2.    *Funding Issues*

Since April 4, 2008, the Debtors have sought to bolster their liquidity and to obtain commitments to fund their emergence from chapter 11 despite the frozen credit markets. To that end, the Debtors implemented a number of cash conservation measures, including temporary lay-offs and salaried benefit cuts for both active employees and retirees, delay of capital and other expenditures, and permanent salaried work-force reductions, among other cost saving measures, to ensure adequate liquidity for operations while the Company engaged in further restructuring efforts in response to changes in the global automotive industry. In addition, the Debtors have sought additional sources of short-term and long-term funding through their postpetition lenders, GM, the U.S. government, and other third parties, including through legal action against the Plan Investors.

In April 2008, the Debtors amended their postpetition credit facility and extended the maturity to December 31, 2008, which amendment became effective on May 9, 2008. Due to a positive market response and oversubscription for all three tranches of debt, the Debtors were able to increase the principal amount of the tranche C term loan by $254 million. As a result, the Debtors' postpetition credit facility consists of a $1.1 billion first priority revolving credit facility

("Tranche A"), a $500 million first priority term loan ("Tranche B"), and a $2.75 billion second priority term loan ("Tranche C," and collectively with Tranche A and Tranche B, the "DIP Loans," and the lenders thereto, the "DIP Lenders"). The obligations and rights of the Debtors and DIP Lenders are as set forth in the Second Amended and Restated Credit Agreement, which became effective on May 9, 2008 (the "DIP Credit Agreement"). Following the filing of the October 3, 2008 modifications to the Confirmed Plan, when it became clear that the Debtors would not be able to emerge prior to the December 31, 2008 maturity date, the Debtors sought another amendment of the postpetition credit facility. As a result of the market turbulence, however, the Debtors were unable to extend the maturity date on terms reasonably acceptable to them and their other stakeholders. Accordingly, with the support of the administrative agent (the "Administrative Agent") and the requisite lenders to the postpetition credit facility, the Debtors entered into an accommodation agreement (the "Accommodation Agreement") which allowed the Debtors, among other things, to continue using certain of the proceeds of the postpetition credit facility through June 30, 2009, subject to certain milestones, but prevented the further borrowing of funds under the DIP Credit Agreement. The Accommodation Agreement was amended from time to time as the result of delays in meeting the milestones set forth in the Accommodation Agreement, as amended. Absent a further amendment, the Debtors anticipate that on June 20, 2009, the Accommodation Agreement may terminate. In such event, the Debtors will seek to negotiate further accommodations under the DIP Credit Agreement with the Required Lenders under the agreement.

To further support the Debtors' liquidity, since May 2008, GM has provided advances to the Debtors in amounts ranging from $50 million to $650 million (the "GM Arrangement") and accelerated payment of up to $300 million in certain payables to the Debtors through May 2009 (the "Pull-Forward Agreement"). In February 2009, Delphi sought and, subject to U.S. Treasury consent, GM agreed to provide an additional $150 million of advances to Delphi, which would have increased the total advances extended to Delphi to $450 million. On March 23, 2009, however, U.S. Treasury notified GM and the Debtors in writing that U.S. Treasury did not approve the parties' seeking approval of these agreements until U.S. Treasury had a further opportunity to review the details of those transactions and the various alternatives for Delphi's emergence from chapter 11. Thus, since the end of March, the Debtors have been constantly negotiating with their DIP Lenders to maintain needed liquidity while negotiating agreements that would enable them to bring their reorganization to a successful conclusion.

In mid-May, in resolution of U.S. Treasury's earlier objections, Delphi was informed that GM would be permitted to provide interim DIP financing to the Debtors to assist with their operations pending the closing of the Master Disposition Agreement as well as the reimbursement of certain post-closing expenses, in each case in amounts and on terms to be agreed between GM and Delphi. This financing is being provided as an amendment to the GM Arrangement and will make available an aggregate $550 million in advances from GM. Concurrent with its filing for chapter 11 protection, GM filed a motion seeking Bankruptcy Court approval to continue to provide financing to certain of its suppliers, including by lending funds directly to suppliers such as Delphi in the manner as set forth in the GM Arrangement. The Bankruptcy Court granted GM interim approval of its motion and expressly provided that without further Court order, GM could continue payments and accommodations to financially or operationally distressed suppliers whether relating to the period prior to or following the commencement of GM's cases.

In addition, U.S. Treasury has agreed to provide funding to GM for GM Components' acquisition of certain of the Debtors' assets as provided in the Master Disposition Agreement. Finally, the agreement by Parnassus and GM Components to provide liquidity for the payment of (or the assumption of) certain of the Debtors' administrative claims has allowed the Debtors to present a feasible Modified Plan to the Bankruptcy Court for approval.

### 3.     Resolution Of Pension Issues

To emerge from chapter 11, the Debtors have also diligently worked to resolve their pension issues through negotiations with GM, U.S. Treasury, and the Pension Benefit Guaranty Corporation ("PBGC") and by taking action to implement certain cost-saving aspects of their pension transformation.   First, in September 2008, the Debtors received Bankruptcy Court approval to freeze their U.S. hourly and salaried pension plans, with the exception of one relatively small defined benefit plan that remains unfrozen.   Concurrently, through the effectiveness of the Amended GSA and Amended MRA, Delphi transferred a large portion of the hourly pension plan to GM's hourly pension plan by executing a section 414(l) transfer under the Internal Revenue Code (the "IRC"), to which the Debtors have attributed a value of $2.1 billion in net unfunded liabilities.   Further, because the Debtors were making every effort to preserve their pension plans, in December 2008, Delphi filed with the IRS a pension funding waiver request for their salaried pension plan for the plan year ended September 30, 2008 to assist the Debtors in continuing to conserve cash.

In addition, GM has agreed to make certain arrangements, the details of which are still being finalized, such that Delphi will no longer have responsibility for the remainder of its hourly pension plan.  Although the Debtors have explored numerous alternatives for its salaried pension plan and other "subsidiary" plans, none are feasible.  Thus, in connection with the Modified Plan, the PBGC will explore initiating an involuntary termination of those plans.  In light of this outcome, the Debtors, GM, U.S. Treasury, and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined in the IRC and/or ERISA (the "PBGC Settlement Agreement").  Pursuant to that anticipated settlement agreement and as set forth in the Modified Plan, the Debtors expect (a) to grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.4 of the Modified Plan and (b) that the PBGC will receive a cash payment in the amount of $30 million, from certain sources to be disclosed in the PBGC Settlement Agreement.  The Debtors anticipate receiving additional direction from GM, the PBGC, and the U.S. Treasury on the terms of the PBGC Settlement Agreement, which the Debtors will use their best efforts to file by the Plan Exhibit Filing Date.

The cash and claim to be distributed to the PBGC is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's waiver of any and all

liens and claims not otherwise discharged by the Modified Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise.

Finally, as part of the Master Disposition Agreement, GM Components and Parnassus have agreed to explore plan sponsorship alternatives for certain of Delphi's defined contribution plans, including assumption of certain of those plans.

## F.    Events Impacting Reorganization

The Debtors believe the recoveries afforded to all stakeholders under the Modified Plan are the best recoveries available at this time. Although the distributions to be received by certain stakeholders and the currency of such distributions have significantly changed since the confirmation of the Confirmed Plan, in light of the decline in global automotive production volumes, the deepening of the crisis in global debt and equity markets, and the delay in emergence caused by the Plan Investors' breach of the Investment Agreement, the Debtors believe that the Modified Plan should be approved. Delphi believes any further delay in emerging from chapter 11 may lead to further and significant degradation of its total enterprise value and a corresponding reduction in stakeholder recoveries through, for example, the diminution of customer and supplier support, increased financing costs, constrained liquidity, and continued costs of operating under chapter 11 protection.

In addition, if at any time the Debtors become in default under the Accommodation Agreement resulting from their inability to meet the milestones contained therein, there could be a material adverse impact on the Company if the lenders choose to exercise remedies outside the Modified Plan. Moreover, the Debtors believe that the expeditious resolution of these Chapter 11 Cases is paramount to maximize recovery for stakeholders; failure to do so may lead to significantly reduced recoveries. In particular, without near-term resolution of the significant issues in these cases, including approval of the Modified Plan and execution of the agreements contained therein, the Company could be forced to wind down as set forth in the Hypothetical Liquidation Analysis attached as <u>Appendix C</u> hereto. Alternately, the Administrative Agent and the DIP Lenders might seek to take control over all of Delphi's cash and apply it to the DIP Loans and/or take control of other collateral securing the DIP Loans (which comprises substantially all of the assets of Delphi's U.S. Debtor entities), immediately and without further order of or application to the Bankruptcy Court. Should the DIP Lenders take control of the collateral, there may not be any other value remaining for any other stakeholders. To prevent this outcome from occurring and preserve the distributions as set forth in the Modified Plan, the Debtors believe that the Modified Plan should be approved and consummated as soon as it is feasible to preserve value for their stakeholders.

## G.    Structure And Distributions Under The Modified Plan

Each of Delphi and its 41 Affiliate Debtors is a proponent of the Modified Plan within the meaning of section 1129 of the Bankruptcy Code. The Modified Plan provides for the substantive consolidation of certain of the Debtors' Estates for voting and distribution purposes

only.  The Modified Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  After careful review of the Debtors' estimated recoveries in a liquidation scenario, and the recoveries that would be made possible by executing the transactions as set forth in the Modified Plan, the Debtors have concluded that the recovery to the Debtors' creditors will be maximized by the Modified Plan.  The Modified Plan incorporates many of the settlements that Delphi reached with critical stakeholders in these reorganization cases.  The Debtors, GM, and all of the Debtors' principal U.S. labor unions are parties to settlements with the Debtors which allow for various recoveries under the Modified Plan.

As set forth in the Modified Plan and pursuant to the transactions to be effectuated pursuant to the agreement between the Debtors, their non-Debtor affiliates, and the Administrative Agent, which will be deemed to occur on the Effective Date, the DIP Claims will be satisfied in full as provided by law.  In connection with that agreement, holders of DIP Claims will receive the following: (i) Tranche A DIP Lenders and Tranche B DIP Lenders will receive cash (the "Tranche A and B DIP Consideration") and (ii) Tranche C DIP Lenders will receive (a) approximately $291 million in cash, (b) their pro rata portion of the Parnassus Class C Interests (as discussed further below and as defined in the Modified Plan), and (c) up to approximately $146 million of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against Appaloosa Management L.P. and certain other plan investors or other parties arising from or relating to the Equity Purchase and Commitment Agreement to which Delphi is a party (the "Tranche C DIP Consideration," together with the Tranche A and B DIP Consideration, the "DIP Consideration").

The future distributions to be made to holders of Parnassus Class C Interests is set forth in Parnassus's operating agreement.  Under the terms of the operating agreement, holders of Parnassus Class C Interests are entitled to receive 5.0866% of the first $1 billion of distributions made to Parnassus interest holders.  Thereafter, holders of Parnassus Class C Interests are entitled to receive 5.7648% of the next $1,641,757,563 distributed to Parnassus interest holders. The total amount distributable to holders of Parnassus Class C Interests is $145,510,040.  The Parnassus Class C Interests are subject to mandatory redemption on the 10th anniversary of Parnassus's operating agreement for the purchase price equal to $145,510,040 minus any previous distributions made to holders of Parnassus Class C Interests.  In addition, subject to the terms of Parnassus's operating agreement, holders of Parnassus Class C Interests are entitled to receive 8% mandatory quarterly payments on account of the unpaid balance of such interests.

In negotiating the DIP Credit Agreement, the Debtors, the Agent, and the DIP Lenders agreed to certain provisions that authorized the Agent to act upon the instruction of the majority of the two most senior tranches of the DIP facility (the "Required Lenders") for the benefit of all the DIP Lenders.  This negotiated provision was consented to by all the DIP Lenders. Accordingly, individual lenders do not have the right to enforce remedies individually under the DIP Credit Agreement, but rather remedies can only be enforced through collective action.  The remedies available to the DIP Agent upon an event of default are set forth in section 15 of the Security And Pledge Agreement.  Specifically, the parties agreed that, if an Event of Default (as defined in the DIP Credit Agreement) were to occur, the Administrative Agent could, and upon the request of Required Lenders would be required to, exercise the various rights and remedies permitted under section 7.01 of the DIP Credit Agreement and distribute any proceeds realized

from the exercise of remedies in the order of priority set forth in section 15(g).  Accordingly, the DIP Credit Agreement gave the two most senior tranches of lenders the right to vote to direct the Administrative Agent to take certain actions in response to an Event of Default.  The tranche of lenders most junior in priority consented to delegating these rights.

Because the DIP Lenders have all consented to the intercreditor arrangement among themselves, either through direct consent or by purchasing a portion of the debt covered by the DIP Credit Agreement, the Debtors believe that all DIP Lenders are bound by the Administrative Agent's exercise of remedies, including actions to assert control over property and interests under the Uniform Commercial Code (the "UCC"), as adopted by the state of New York, in satisfaction of the DIP Claims.  In fact, the Bankruptcy Court generally endorsed the Debtors' collective action interpretation of the DIP Credit Agreement when it approved the Accommodation Agreement over the objection of certain participants.  In the current economic environment, the Debtors are expecting a similar reaction to the Debtors' and the DIP Lenders' negotiated transfer or sale of collateral (the "Transferred Assets") under the Modified Plan (the "DIP Transfer").  The DIP Transfer is not expected to garner unanimous support of the DIP Lenders.  Nevertheless, the DIP Lenders consented to the collective action principles contained in the DIP Credit Agreement and therefore only the Administrative Agent may enforce remedies – and at the direction of the Required Lenders, the Administrative Agent must enforce remedies.  Pursuant to the Modified Plan, the Administrative Agent will be deemed to have exercised its enforcement rights by pursuing remedies under Article 9 of the UCC in full satisfaction and discharge of the DIP Lenders Claims.  Because the DIP Lenders consented to this enforcement right, among others, the Debtors will have satisfied the requirement set forth in section 1129(a)(9) of the Bankruptcy Code.  In accordance with the requirements of Section 9-620 of the UCC, the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement.  If a party with standing objects to such notice within 20 days, the Debtors will provide those parties who are notified of the proposed transfer under Section 9-620 of the UCC with 10 days notice of a public sale pursuant to Section 9-610 of the UCC.  Such notice also will set forth the procedures to be employed in connection with the public sale.  Parties will then have an opportunity to purchase such the transferred assets in a public sale conducted in accordance with Section 9-610 of the UCC and the procedures set forth in the notice, but only if such parties' offer is selected as the highest or otherwise best competing proposal.

As shown in the diagram below, the first step in consummation of the Modified Plan is the issuance of one share of Reorganized DPH Holdings Co. common stock to the Post-Confirmation Trust and the cancellation of Existing Common Stock.  Next, certain of Delphi's assets will be sold to Parnassus and other assets to GM pursuant to the Master Disposition Agreement.  Then, the Administrative Agent will consummate the DIP Transfer to accept from the Reorganized Debtors certain of the proceeds from the sale of assets – specifically, the DIP Consideration – in satisfaction of the DIP Claims.  Should an objection to the transfer be made or should an alternate party provide a competing proposal providing sufficient consideration whereby, at a minimum, the DIP Lenders would receive payment in cash for their claims, a disposition proceeding would be held.  On the Effective Date, either the Administrative Agent or the party providing the competing proposal with the highest value, as applicable, will receive the disposition proceeds.  In the event a competing proposal bests the amount of the DIP Lenders' credit bid, after payment of the DIP Claims in full and to the extent there are sufficient proceeds

remaining, additional distributions would be made to creditors in compliance with the absolute priority rule. Also on the Effective Date, the Debtors would make provisions for the payment of Administrative Claims (excluding such claims to be assumed by third parties). Further, the Debtors will establish a distribution account for certain deferred consideration under the Master Disposition Agreement from which distributions will be made as described below.



Under the terms of the GM settlement approved by Bankruptcy Court on September 25, 2008, GM holds an allowed administrative claim of $1.628 billion and an allowed general unsecured claim in the amount of $2.5 billion, each of which claims was to be satisfied with preferred stock if certain conditions were met. In addition, GM agreed to subordinate recoveries on its general unsecured claim until other holders of Allowed General Unsecured Claims have received a distribution equal to 20% of their Allowed General Unsecured Claims, if ever. Pursuant to the Master Disposition Agreement, GM has provided even further support and under the agreement, GM's administrative and prepetition claims will be waived or deemed satisfied. As part of the its agreement with the Debtors, in connection with the Modified Plan, GM will receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock.

Pursuant to the Modified Plan, holders of prepetition secured claims may be paid in full in Cash but will be impaired because the payments will be made in payments of equal installments over a period of seven years from the Effective Date rather in a lump sum upon the Effective Date. To the extent that a secured claim is entitled to postpetition interest under section 506 of the Bankruptcy Code, such interest will accrue at the rate equal to the closing seven-year Treasury Bill rate on the Effective Date of the Modified Plan, plus 200 basis points. Alternately, holders of secured claims, at the Debtors' election, may receive their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral was property of the estate. Finally, in certain circumstances, holders of secured claims may receive other treatment

as agreed to by the parties if it is more favorable to the Debtors than the treatment described above.

As required by section 1129(a)(9) of the Bankruptcy Code, as incorporated by section 1127, priority tax claims will not be impaired but will also receive deferred cash payments over a period of six years. Certain states have filed claims in the event that the Debtors do not make workers' compensation payments in those states in which the Debtors are self-insured. In the event that such obligations must be covered by the states, certain states may have claims that could be entitled to priority treatment. To the extent the claims are administrative claims, they will be satisfied under the Master Disposition Agreement or by DPH Holdings Co. Any prepetition claims will be satisfied through application of existing letters of credit, treatment under one of the priority classes, or as general unsecured claims. To the extent no timely claim has been filed, such liabilities will be discharged. To the extent there are any priority claims other than priority tax claims, holders of any such allowed claims will receive payment in full in cash, unless the holder agrees to alternate treatment.

In addition, in connection with actions anticipated to be implemented by the PBGC and the anticipated settlement agreement with the PBGC, which would include a waiver of all liens and claims against members of Delphi's "controlled group," the PBGC is anticipated to receive cash payment and an allowed general unsecured claim in the amount of $30 million and $3 billion, respectively.

As mentioned above, holders of unsubordinated allowed General Unsecured Claims (including the PBGC's allowed claim) will receive their pro rata share of deferred consideration in accordance with the Master Disposition Agreement. Pursuant to section 3.2.3 of the agreement, certain distributions will be made to holders of General Unsecured Claims if the transfer of assets as contemplated in the Master Disposition Agreement is implemented pursuant to the Debtors' Modified Plan. The distributions to holders of General Unsecured Claims will commence once an aggregate amount of $7.2 billion has been distributed to holders of interests in Parnassus (which amount does not include the 8% mandatory payments made to the holders of Parnassus Class C Interests). The operating agreement of Parnassus governs the terms of distributions made to holders of interests in Parnassus. When the $7.2 billion distribution level is reached, Parnassus will pay an amount equal to $3 to holders of General Unsecured Claims for every $97 dollars distributed to holders of interests in Parnassus. The maximum amount that will be distributed to the holders of General Unsecured Claims is $180 million. If the full $180 million is distributed to holders of General Unsecured Claims, the total distributions made to holders of interests of Parnassus would be approximately $13 billion. These recoveries, however, are not guaranteed and there can be no assurance that they will be realized.

Holders of TOPrS Claims will receive no distribution because of their subordinated status. Also, as discussed above, although GM received certain claims in connection with the Amended GSA, those claims will be waived under the terms of the Master Disposition Agreements and GM will receive no distribution on those claims pursuant to the Modified Plan, and thus unsecured creditors will not receive any distributions on account of such claims pursuant to section 4.04 of the Amended GSA.

Because of production declines in the automotive industry that have led to a deterioration in the Debtors' enterprise value (as discussed below), the Modified Plan provides no distribution to holders of existing Delphi common stock or holders of claims in Section 510(b) Note Claims, Section 510(b) Equity Claims, or Section 510(b) ERISA Claims.

Your vote will help to determine whether the Court confirms and approves the Modified Plan and the distributions it provides. The Modified Plan contains many of the same elements as the Confirmed Plan, and thus the merits of certain objections to the Modified Plan's confirmation may depend on the vote on the Modified Plan. **The Bankruptcy Court has determined that as section 1127(d) applies to the facts and circumstances of these Chapter 11 Cases, "holder" means the current holder of a Claim. Thus, if you previously cast a ballot in connection with the Confirmed Plan, your prior vote to approve or reject the Confirmed Plan will not be counted. To the extent you want to vote on the Modified Plan, you must return a ballot.**

In addition, the Debtors have requested that if no holder of a Claim or Interest in a particular class votes to accept or reject the Modified Plan, then the applicable class be deemed to have accepted the Modified Plan. Thus, if you do not want such a presumption to arise, you should timely submit a ballot to accept or reject the Modified Plan. The Bankruptcy Court has indicated that this issue will be considered, if necessary, at the Final Modification Approval Hearing. Thus, your vote is important.

Although the Debtors need only establish under section 1127, as it incorporates section 1129(a)(7) of the Bankruptcy Code, that their stakeholders will receive <u>at least</u> as much under the Modified Plan as in a liquidation under chapter 7 of the Bankruptcy Code, based on the hypothetical liquidation analysis prepared by the Company with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc. (attached hereto as <u>Appendix C</u>) (the "Hypothetical Liquidation Analysis"), the Debtors believe that the value of the Estates of the Debtors is greater in the proposed reorganization than in a liquidation.

As disclosed in the Debtors' Hypothetical Liquidation Analysis, holders of General Unsecured Claims would not receive any recovery on their Claims because Claims senior in priority would not be paid in full. The Debtors are not aware of any transaction other than the transactions proposed in the Modified Plan that would provide the prospect of any recoveries to holders of General Unsecured Claims. Nevertheless, the Creditors' Committee does not endorse the Modified Plan. A letter to stakeholders from the Creditors' Committee regarding their views and recommendation on the Modified Plan is included in the solicitation materials. In its letter, the Creditors' Committee recommends that holders of General Unsecured Claims reject the Modified Plan because "the Committee believes that by rejecting the Plan, unsecured creditors will be exercising the remaining leverage available to them to try to compel the various parties to these transaction to provide unsecured creditors with a better return on their claims." Based on the circumstances, the Debtors believe that if emergence transactions are not achieved through modifications to the Confirmed Plan because of insufficient stakeholder support, such transactions will likely be implemented through an alternative sale under section 363 of the Bankruptcy Code, which will not provide any recovery for holders of General Unsecured Claims, contingent or otherwise. The Debtors urge that you vote in favor of the Modified Plan as it represents the only prospects for any potential recovery by holders of General Unsecured Claims that the Debtors are aware of.

The effectiveness of the Modified Plan, and thus the consummation of the Modified Plan, is subject to a number of conditions precedent.  There can be no assurances that these conditions will be satisfied.  In addition, the Debtors have reserved the right to amend or modify the Modified Plan as it applies to any of the Debtors.

## H.    Summary Of Treatment Of Claims And Interests Under The Modified Plan

The Modified Plan contains separate classes for holders of Claims against and Interests in the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.  The table below summarizes the treatment of certain administrative and priority claims and sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each category.

### DIP Claims, Administrative Claims, And Priority Tax Claims

| Description | Treatment Under Plan |
|---|---|
| **DIP Claims and Hedge Obligations** | DIP Claims, in the original amount of $4.35 billion under the DIP Credit Agreement, consist of the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim.  In addition, the DIP Credit Agreement permits the Debtors to enter into hedging arrangements, pursuant to which the hedge counterparties share collateral pari passu with the Tranche A and Tranche B Lenders up to $350 million (the "Hedge Obligations").  Any hedge obligations above the $350 million threshold share collateral junior to the Tranche C Lenders.  Hedge Obligations currently are estimated to be approximately $200 million.  Under the Modified Plan, holders of the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the Hedge Obligation, will receive a full recovery.  Holders of the DIP Facility Second Priority Term Claim will receive the Tranche C DIP Consideration, which includes cash, equity interests, and portions of the proceeds from the Plan Investor litigation.<br><br>**Estimated Amount Of Claims:       Approximately $3.5 billion** |

| Description | Treatment Under Plan |
|---|---|
| **Administrative Claims (other than GM Claims)** | An administrative claim is a claim for payment of an expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and certain other Claims.  For illustrative purposes, the estimated amounts of Administrative Claims include Cure Claims.  Under the Modified Plan and the procedures provided therein, Administrative Claims will be paid in full in Cash in the ordinary course or as otherwise agreed or assumed by Parnassus or GM Components in the Master Disposition Agreement and subsequently paid in full in Cash in the ordinary course or as otherwise agreed.  The Debtors anticipate that all Allowed Administrative Claims will be paid in full.<br><br>**Estimated Amount Of Claims to be paid on the Effective Date: $142 million to $181 million, which consists primarily of cure amounts and other transaction-related expenses.**<br><br>**Certain Administrative Claims, such as payroll and trade claims not yet due under customary trade terms, will be assumed by Parnassus or GM Components pursuant to the Master Disposition Agreement and will be subsequently paid in the ordinary course of business.  In addition, certain other Administrative Claims that are generally not related to the businesses being transferred to Parnassus or GM Components will be retained by DPH Holdings Co. and will be subsequently paid in the ordinary course of business.** |
| **Priority Tax Claims** | A priority tax claim is a claim for payment of taxes by governmental units as specified in section 507(a)(8) of the Bankruptcy Code.  Under the Plan, Priority Tax Claims will be (1) paid equal cash payments over a period not to exceed six years after the assessment of the tax totaling the aggregate amount of the claim, (2) afforded other treatment that is agreed upon between the Debtors and the holder of the priority tax claim, or (3) paid in full in Cash.<br><br>**Estimated Amount Of Claims:        $17.3 to $17.4 million** |

The table below summarizes the classification and treatment of the principal prepetition Claims and Interests under the Modified Plan.  The classification and treatment for all Classes are described in more detail in <u>Section IV—Summary Of The Reorganization Plan</u>.  The table below also sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each Class based upon the Debtors' review of all proofs of claim and schedules not superseded by proofs of claim, and consideration of the provisions of the Modified Plan that affect the allowance of certain Claims.  No representation can be or is being made with respect to what estimated percentage of recovery will actually be realized by the holders of Allowed Claims in any particular Class.  This summary is qualified in its entirety by reference to the provisions of the Modified Plan, a copy of which is attached hereto as <u>Appendix A</u>.

**Classified Claims**

| Class Description | Treatment Under Plan |
|---|---|
| **Secured Claims** | Secured Claims are claims, other than DIP Lender Claims and Hedge Obligations, that are secured by liens on property in which the Debtors have an interest.  Under the Plan, Allowed Secured Claims will receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code, such interest will accrue at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date, plus 200 basis points; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as may be agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.<br><br>**Estimated Amount Of Claims:        $6.55 million to $6.70 million** |

| Class Description | Treatment Under Plan |
|---|---|
| **Flow-Through Claims** | A Flow-Through Claim is a claim arising from an Employee-Related Obligation asserted by a salaried employee who was (i) employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement for indemnification and (ii) employed as of June 1, 2009 for severance, except that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.  Flow-Through Claims will be unimpaired by the Modified Plan and will be satisfied by the relevant Buyer in accordance with the Master Disposition Agreement (subject to the preservation and flow-through of all Estate rights, claims, and defenses with respect to the Flow-Through Claims) or by the Reorganized Debtors. |
| **Other Priority Claims** | An Other Priority Claims is a claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, Allowed Other Priority Claims will be unimpaired by the Modified Plan and will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable.<br><br>**Estimated Amount Of Claims:    Based on the payments made by the Debtors pursuant to various first day orders, the estimated amount of Other Priority Claims is $0.** |

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims (other than GM's unsecured claim, which is treated below) include claims arising as a result of trade claims, claims arising from Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases.  Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  Under the Modified Plan, holders of Allowed General Unsecured Claims (other than TOPrS Claims) will receive an amount equal to $3 dollars for every $97 dollars in excess of $7.2 billion distributed by Parnassus to its members (which distributions, for the avoidance of doubt, do not include the 8% preferred return payable to holders of Parnassus Class C Interests), if and to the extent any such distributions are made, <u>provided</u>, <u>however</u>, that in no event will the distribution to holders of General Unsecured Claims exceed $180 million in the aggregate.  The value and timing of the distributions that holders of General Unsecured Claims may receive is speculative.<br><br>**Estimated Amount Of Allowed Claims: $3.40 billion to $3.62 billion, including TOPrS Claims of approximately $421 million.**<br><br>**Any distribution to holders of General Unsecured Claims will be shared ratably with the anticipated $3 billion general unsecured claim of the PBGC.**<br><br>**TOPrS Claims are included in General Unsecured class with Senior Notes, trade claims, and SERP claims, but distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims.  Accordingly, holders of TOPrS Claims will not receive a distribution.** |

| Class Description | Treatment Under Plan |
|---|---|
| **PBGC Claims** | PBGC Claims are PBGC General Unsecured Claims and Contingent PBGC Secured Claims, if any.  PBGC General Unsecured Claims are claims against the applicable Debtors or group of Debtors arising from or relating to the Pension Plans that are not secured by valid liens against the assets or property of the Debtors.  Contingent PBGC Secured Claims means any Claims of the PBGC which were granted conditional adequate protection liens pursuant to an order of the Bankruptcy Court.<br><br>On account of its PBGC Claims, the PBGC will receive certain consideration and an allowed general unsecured claim in the amount provided in either the Delphi-PBGC Settlement Agreement or a final order of the Bankruptcy Court, in full satisfaction, settlement, release, and discharge of, and in exchange for, such PBGC Claims.<br><br>**Estimated Amount Of Claims:        $3.03 billion** |
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The amended and restated agreements were approved by the Bankruptcy Court on September 25, 2008.  Pursuant to the Amended GSA and Amended MRA, GM received an allowed administrative claim of $1.628 billion on account of the first 414(l) hourly pension plan transfer and an allowed unsecured claim of $2.5 billion.  In addition, GM has an allowed administrative claim in amounts up to $550 million on account of liquidity provided pursuant to the GM Arrangement, as amended.  GM has agreed to subordinate any recovery on its unsecured claim until other holders of General Unsecured Claims (excluding holders of TOPrS Claims) have received a distribution equal to 20% of their allowed claims.   In addition, GM is party to the Master Disposition Agreement, which will be approved as part of the Modified Plan. Pursuant to the Master Disposition Agreement, GM has agreed to waive its rights to a recovery on account of its Allowed Claims.<br><br>**Amount Of Allowed Claim:        Agreed Compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation pending in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes and TOPrS for damages or rescission in connection with the purchase or sale of those securities. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million.  Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) Note Claims.  Similarly, any holder of a Section 510(b) Note Claim who opts out of the Securities Settlement and has filed a claim that is ultimately allowed in the Chapter 11 Cases will receive no distribution.<br><br>**Amount of Allowed Claim:  Allocated share of $179 million Allowed Claim** |
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business.  Under the Modified Plan and subject to the Master Disposition Agreement, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated.  The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized DPH Holdings Co. and will not affect distributions to other creditors under the Modified Plan.<br><br>**Estimated Amount Of Claims:      N/A** |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date. Holders will receive no distribution under the Modified Plan. |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) Equity Claims arise from the securities actions consolidated in the MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million. Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) Equity Claims.  Similarly, any holder of a Section 510(b) Equity Claim who opts out of the Securities Settlement and has filed a claim that is ultimately allowed in the Chapter 11 Cases will receive no distribution.<br><br>**Amount of Allowed Claim:  Allocated share of $179 million Allowed Claim** |
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) ERISA Claims.<br><br>**Amount of Allowed Claim:  Allocated share of $24.5 million Allowed Claim** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Modified Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Modified Plan on account of such Other Interests. |

| Class Description | Treatment Under Plan |
|---|---|
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Modified Plan, interests in affiliate Debtors will not be impaired or cancelled by the Modified Plan.<br><br>**Estimated Amount Of Interests:    N/A** |

**THE DEBTORS BELIEVE THAT THE MODIFIED PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS <u>STRONGLY</u> <u>RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE MODIFIED PLAN.**

## TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES ...................2
      A.   Definitions....................................................................................................2
      B.   Notice To Holders Of Claims And Interests................................................2
      C.   Solicitation Package.....................................................................................3
      D.   General Voting Procedures, Ballots, And Voting Deadline ........................4
      E.   Questions About Voting Procedures.............................................................4
      F.   Hearing And Deadline For Objections To Modifications Of Confirmed
           Plan ...............................................................................................................5

III.  THE CHAPTER 11 CASES .................................................................................6
      A.   Post-Confirmation Agreements With GM And The Postpetition Lenders
           Approved By The Bankruptcy Court.............................................................7
           1.   Amended GSA And Amended MRA ...............................................7
           2.   GM Arrangement.............................................................................8
           3.   The DIP Credit Agreement, Accommodation Agreement, And
                Matters Related Thereto.................................................................12
      B.   Agreements For Which Approval Is Sought Under The Modified Plan ..............14
           1.   Master Disposition Agreement .....................................................15
           2.   Transfer Of Collateral ..................................................................22
           3.   Pension Actions And Agreement With The PBGC ......................23
      C.   Significant Confirmation And Post-Confirmation Events.........................25
           1.   Confirmation Of The Confirmed Plan ..........................................25
           2.   Investment Agreement And Plan Investor Litigation ..................25
           3.   Complaints Seeking Revocation Of Confirmation Order............27
           4.   Disposition Of Assets ...................................................................28
           5.   Statutory Committees....................................................................29
           6.   Exclusivity....................................................................................29
           7.   Investigations, MDL Proceedings, And Settlements ..................30
           8.   Preserving Estate Causes Of Action .............................................31
           9.   Termination Of Salaried OPEB ....................................................32
      D.   Summary Of Claims Process .....................................................................34
           1.   Schedules Of Assets And Liabilities And Statements Of Financial
                Affairs ............................................................................................34
           2.   Claims Bar Date............................................................................34
           3.   Administrative Claims Bar Date...................................................35
           4.   Proofs Of Claim And Other Claims ..............................................35
           5.   Claims Reconciliation Progress ...................................................36
           6.   Key Classes Of Claims .................................................................36
           7.   Reclamation Claims Program .......................................................39
      E.   Professional Fees .......................................................................................40

IV.   SUMMARY OF THE MODIFIED PLAN ..............................................................41
      A.   Introduction................................................................................................41

B.      Overall Structure Of The Modified Plan ......................................................43
        1.      Settlements During The Chapter 11 Cases ................................43
        2.      DIP Transfer......................................................................................44
C.      Substantive Consolidation Of Certain Debtors.....................................46
D.      Classification Of Claims And Interests........................................................48
        1.      The Debtors......................................................................................48
        2.      Classification Of Claims Against And Equity Interests In The
                Debtors ............................................................................................49
E.      Treatment Of Claims And Interests Under The Modified Plan...........................50
        1.      Treatment Of Unclassified Claims..............................................50
        2.      Treatment Of Classified Claims And Interests .........................52
F.      Means For Implementation Of The Modified Plan...................................58
        1.      Continued Corporate Existence ................................................58
        2.      Restructuring Transactions .........................................................59
        3.      Certificate Of Incorporation And Bylaws.................................59
        4.      Directors And Officers Of Reorganized HoldCo And Affiliate
                Debtors ............................................................................................60
        5.      Consummation Of Disposition Transactions .........................60
        6.      Master Disposition Agreement ..................................................60
        7.      Transfer Of Collateral ...................................................................61
        8.      Post-Confirmation Reorganized DPH Holdings Share Trust ...................62
        9.      Emergence Capital. .......................................................................63
        10.     Management Compensation Plan ..............................................63
        11.     Procedures For Asserting Certain Claims .................................63
        12.     Cancellation Of Existing Securities And Agreements.............................64
        13.     Sources Of Cash For Modified Plan Distributions ...................65
        14.     Establishment Of A General Unsecured Distribution Account .................65
        15.     Collective Bargaining Agreements .............................................65
        16.     Pension Settlement .......................................................................66
        17.     Salaried OPEB Settlement ...........................................................67
        18.     Preservation Of Causes Of Action .............................................67
        19.     Reservation Of Rights ...................................................................68
        20.     Exclusivity Period..........................................................................68
        21.     Dismissal Of Complaints .............................................................68
        22.     Corporate Action............................................................................68
        23.     Effectuating Documents; Further Transactions .........................68
        24.     Consummation Of Divestiture Transaction .............................69
        25.     Exemption From Certain Transfer Taxes And Recording Fees.................69
G.      Unexpired Leases And Executory Contracts .........................................69
        1.      Assumed And Rejected Leases And Contracts.......................69
        2.      Cure Procedures And Payments Related To Assumption Of
                Executory Contracts And Unexpired Leases ...............................70
        3.      Assignment Pursuant To Restructuring Transactions...............................75
        4.      Rejection Damages Bar Date .......................................................76
        5.      Assumption and Assignment of Divestiture-Related Executory
                Contracts and Unexpired Leases................................................76

H.    Provisions Governing Distributions ...................................................76
      1.    Time Of Distributions ..........................................................76
      2.    No Interest On Disputed Claims .............................................76
      3.    Disbursing Agent .................................................................77
      4.    Surrender Of Securities Or Instruments ..................................77
      5.    Services Of Indenture Trustees, Agents, And Servicers ............77
      6.    Claims Administration Responsibility .....................................78
      7.    Delivery Of Distributions .....................................................79
      8.    Procedures For Treating And Resolving Disputed And Contingent
            Claims And Interests ............................................................79
      9.    Section 510(b) Opt Out Claims ..............................................81
      10.   Allocation Of Plan Distributions Between Principal And Interest ...........82
I.    Allowance And Payment Of Certain Administrative Claims ...............82
      1.    DIP Facility Claims .............................................................82
      2.    Pre-Confirmation Administrative Claim Procedures .................82
      3.    Professional Claims .............................................................82
      4.    Substantial Contribution Compensation And Expenses Bar Date ............83
      5.    Other Administrative Claims .................................................84
J.    Effect Of The Modified Plan On Claims And Interests .......................84
      1.    Revesting Of Assets .............................................................84
      2.    Discharge Of Debtors ..........................................................84
      3.    Compromises And Settlements ..............................................85
      4.    Release By Debtors Of Certain Parties ...................................85
      5.    Release By Holders Of Claims And Interests ............................86
      6.    Release By Unions ...............................................................87
      7.    Release Of GM By Debtors And Third Parties .........................88
      8.    Setoffs ................................................................................88
      9.    Subordination Rights ...........................................................88
      10.   Exculpation And Limitation Of Liability ................................88
      11.   Indemnification Obligations .................................................90
      12.   Exclusions And Limitations On Exculpation, Indemnification, And
            Releases .............................................................................91
      13.   Injunction ..........................................................................91

V.   GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED ........91
     A.   General Considerations ...............................................................92
     B.   Certain Bankruptcy Considerations ...............................................92
          1.    The Bankruptcy Court May Not Approve Debtors' Classification
                Of Claims And Interests .......................................................92
          2.    Failure To Satisfy Vote Requirement .....................................92
          3.    The Confirmation Order Approving The Confirmed Plan May Be
                Revoked .............................................................................93
          4.    The DIP Lenders May Fail To Exercise Remedies Under The DIP
                Credit Agreement ................................................................93
          5.    The Debtors May Not Be Able To Secure Confirmation Of The
                Modified Plan .....................................................................93
          6.    Risk Of Non-Occurrence Of The Effective Date .......................93

       7.      Substantive Consolidation Risks.................................................94

       8.      The Integrity Of The Bar Date May Be Challenged.................94

  C.     The Debtors May Be Unable To Close The Transactions Set Forth In The
Master Disposition Agreement ...............................................................94

  D.    Liquidation Under Chapter 7 ...................................................................94

  E.    Business Factors And Competitive Conditions .......................................95

       1.      Consummation Of The Modified Plan Is Dependent On General
Motors Corporation......................................................................95

       2.      The Company Is Reliant On The Amended GM Arrangement To
Provide Liquidity Through Emergence .....................................96

VI.    SECURITIES LAW MATTERS ........................................................................96

VII.   CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES
OF THE MODIFIED PLAN...............................................................................96

  A.     United States Federal Income Tax Consequences To Holders Of Claims
Against The Debtors .................................................................................97

       1.      Holders Of General Unsecured Claims Other Than TOPrS Claims..........98

       2.      Holders of TOPrS Claims ..........................................................100

       3.      Holders of Secured Claims ........................................................100

       4.      Information Reporting And Backup Withholding ...................101

  B.     Importance Of Obtaining Professional Tax Assistance .......................101

VIII.  FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS
TEST .................................................................................................................101

  A.     Feasibility Of The Modified Plan ...........................................................101

  B.    Acceptance Of The Modified Plan .........................................................102

  C.    Best Interests Test....................................................................................102

  D.    Application Of The Best Interests Test To The Liquidation Analysis To
The Modified Plan ...................................................................................103

       1.      Overview.....................................................................................103

IX.    CONFIRMATION .............................................................................................105

  A.     Confirmation Without Acceptance Of All Impaired Classes:  The
"Cramdown" Alternative .......................................................................105

  B.    Conditions To Confirmation And Consummation Of The Modified Plan ..........107

       1.      Confirmation ...............................................................................107

       2.      Conditions To The Effective Date .............................................107

  C.    Waiver Of Conditions Precedent ...........................................................107

  D.    Retention Of Jurisdiction ........................................................................108

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
MODIFIED PLAN.............................................................................................110

XI.    VOTING REQUIREMENTS ...........................................................................110

  A.     Parties-In-Interest Entitled To Vote.....................................................112

  B.    Classes Impaired Under The Modified Plan .......................................113

|   |   | 1. | Voting Impaired Classes Of Claims | 113 |
|   |   | 2. | Unimpaired Classes Of Claims | 113 |
|   |   | 3. | Impaired Classes Of Claims And Interests Deemed To Reject The Modified Plan | 113 |
|   |   | 4. | Presumed Acceptance By Certain Classes Of Interests | 114 |
| XII. | | | CONCLUSION | 114 |
|   | A. | | Hearing On And Objections To Confirmation | 114 |
|   |   | 1. | Final Modification Hearing | 114 |
|   |   | 2. | Date Set For Filing Objections To Confirmation Of The Modified Plan | 114 |
|   | B. | | Recommendation | 114 |

## **APPENDICES**
**Updated as of June 16, 2009**

Appendix A            —            First Amended Joint Plan Of Reorganization Of
                                        Delphi Corporation And Certain Affiliates,
                                        Debtors And Debtors-In-Possession (As Modified)

Appendix B            —            Historical Financial Results

Appendix C            —            Updated Liquidation Analysis

# I.    INTRODUCTION

Delphi and the Affiliate Debtors submit this Supplement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), for use in the solicitation of votes on the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-in-Possession, As Modified (the "Modified Plan"), submitted by the Debtors and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). A copy of the Modified Plan is annexed hereto as <u>Appendix A</u>.

This Supplement sets forth certain information regarding the significant events that have occurred during the Chapter 11 Cases since the solicitation on the Confirmed Plan, and the anticipated emergence structure of Reorganized DPH Holdings Co. and the Reorganized Debtors. This Supplement also describes terms and provisions of the Modified Plan, including certain alternatives to the Modified Plan, certain effects of confirmation of the Modified Plan, and the manner in which distributions will be made under the Modified Plan.    In addition, this Supplement discusses the confirmation process and the voting procedures that holders of Claims in Impaired Classes must follow for their votes to be counted.    Many events that occurred prior to solicitation on the Debtors' Confirmed Plan are not covered in this Supplement but were described in the Disclosure Statement.    The Disclosure Statement is available free of charge at <u>www.delphidocket.com</u>.    In addition, copies of the Disclosure Statement may be made available upon request to KCC at the address set forth in <u>Section II.E. – Questions About Voting Procedures</u>, below.

FOR A DESCRIPTION OF THE MODIFIED PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE MODIFIED PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, SEE <u>SECTION IV – SUMMARY OF THE MODIFIED PLAN</u> AND <u>SECTION V – GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED</u>.

THIS SUPPLEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE MODIFIED PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE MODIFIED PLAN, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES.    ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.    FACTUAL INFORMATION CONTAINED IN THIS SUPPLEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.    THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

---

This section provides information regarding:

• The procedures and deadlines for casting a vote to accept or reject the Modified Plan

• Contact information for questions about voting procedures

• The date and time of the confirmation hearing and the requirements for filing objections to the Modified Plan

The key modifications to this section are as follows:

• The voting deadline for the Modified Plan is July 15, 2009

• Objections to the Modified Plan are due on July 15, 2009

• The Final Modification Hearing on the Modified Plan is July 23, 2009

---

### A.    Definitions

Except as otherwise provided herein, capitalized terms used and not otherwise defined in this Supplement have the meanings ascribed to them in the Modified Plan.  In addition, all references in this Supplement to monetary figures refer to United States of America currency unless otherwise expressly provided.

### B.    Notice To Holders Of Claims And Interests

This Supplement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Modified Plan and to others for informational purposes.  The purpose of this Supplement is to provide adequate information to enable the holder of a Claim against the Debtors to make a reasonably informed decision with respect to the Modified Plan prior to exercising the right to vote to accept or reject the Modified Plan.

The Bankruptcy Court approved this Supplement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims who are entitled to vote on the Modified Plan to make an informed judgment with respect to acceptance or rejection of the Modified Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS SUPPLEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE MODIFIED PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS SUPPLEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE MODIFIED PLAN.  This Supplement contains important information about the Modified Plan, considerations pertinent to acceptance or rejection of the Modified Plan, and

developments concerning the Chapter 11 Cases. **The Bankruptcy Court has determined that as section 1127(d) applies to the facts and circumstances of these Chapter 11 Cases, "holder" means the current holder of a Claim. Thus, if you previously cast a ballot in connection with the Confirmed Plan, your prior vote to approve or reject the Confirmed Plan will not be counted. To the extent you want to vote on the Modified Plan, you must return a ballot.**

THIS SUPPLEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE MODIFIED PLAN. No solicitation of votes may be made except after distribution of this Supplement, and no person has been authorized to distribute any information concerning the Debtors or the Modified Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS SUPPLEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically and expressly stated herein, this Supplement does not reflect any events that may occur subsequent to the date hereof whether or not such events have a material impact on the information contained in this Supplement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes of soliciting votes on the Modified Plan; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Supplement will be distributed to reflect such occurrences. Accordingly, the delivery of this Supplement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

C.      **Solicitation Package**

Accompanying this Supplement are, among other things, copies of (1) the Modified Plan (Appendix A hereto), (2) the notice of, among other things, (i) the hearings set to consider approval of the Modified Plan, (ii) the deadline and procedures for filing objections to approval of the Modified Plan, (iii) the deadline and procedures for temporary allowance of certain claims for voting purposes, (iv) the treatment of certain unliquidated, contingent, or disputed claims for notice, voting, and distribution purposes, (v) the record date, (vi) the voting deadline for receipt of ballots, and (vii) information relating to releases and injunctions contemplated by the Modified Plan (the "Final Modification Hearing Notice"), and (3) for those entitled to vote, one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Modified Plan.

### D.    General Voting Procedures, Ballots, And Voting Deadline

After carefully reviewing the Modified Plan, this Supplement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Modified Plan by checking the appropriate box on the enclosed Ballot.  Please complete and sign your original Ballot (copies will not be accepted), and return it in the envelope provided.  You must provide all of the information requested by the appropriate Ballot.  Failure to do so may result in the disqualification of your vote on such Ballot.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Modified Plan, you must use only the coded Ballot or Ballots sent to you with this Supplement.

TO ENSURE THAT YOUR VOTE IS COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURN IT SO THAT IT IS **ACTUALLY RECEIVED** NO LATER THAN **JULY 15, 2009 AT 7:00 P.M. (PREVAILING EASTERN TIME)** (THE "VOTING DEADLINE") BY THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM OR INTEREST.  **KURTZMAN CARSON CONSULTANTS LLC IS THE VOTING AGENT FOR ALL CREDITORS EXCEPT NOTEHOLDERS.  FINANCIAL BALLOTING GROUP LLC IS THE VOTING AGENT FOR NOTEHOLDERS**.  YOUR BALLOT CONTAINS THE CONTACT INFORMATION FOR THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM.  THE CONTACT INFORMATION FOR BOTH VOTING AGENTS IS ALSO LISTED BELOW.

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, THE CREDITORS' COMMITTEE, COUNSEL TO THE DEBTORS, OR COUNSEL TO THE CREDITORS' COMMITTEE.**

### E.    Questions About Voting Procedures

If (1) you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim holdings or (2) you wish to obtain an additional copy of the Modified Plan, this Supplement, or any appendices or exhibits to such documents, please contact:

All Creditors except Noteholders:          Noteholders:

Kurtzman Carson Consultants LLC          Financial Balloting Group LLC
2335 Alaska Avenue                        757 Third Avenue, 3rd Floor
El Segundo, California 90245              New York, New York 10017
Att'n: Delphi Corporation                 Att'n: Delphi Corporation Ballot
Telephone: (888) 249-2691                 Tabulation
Fax: (310) 751-1856                       Telephone: (866) 486-1727
www.delphidocket.com                      www.fbgllc.com

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>SECTION XI– VOTING REQUIREMENTS</u>.

**F.      Hearing And Deadline For Objections To Modifications Of Confirmed Plan**

Pursuant to section 1127 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the hearing on objections to modifications of the Confirmed Plan (the "Final Modification Hearing") to begin on July 23, 2009, at 10:00 a.m. (prevailing Eastern time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408.  The Final Modification Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Final Modification Hearing or at any subsequent adjourned Final Modification Hearing.  The Bankruptcy Court has directed that objections, if any, to the Modified Plan be filed with the Clerk of the Bankruptcy Court and served so that they are <u>ACTUALLY RECEIVED</u> on or before July 15, 2009, at 4:00 p.m. (prevailing Eastern time) by:

*Counsel for the Debtors*

> Skadden, Arps, Slate, Meagher & Flom LLP
> 333 West Wacker Drive
> Suite 2100
> Chicago, Illinois 60606-1285
> Att'n:    John Wm. Butler, Jr.
>              Ron E. Meisler
>              Nathan L. Stuart
>              Allison K. Verderber Herriott

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Att'n:    Kayalyn A. Marafioti

*United States Trustee*

> The Office of the United States Trustee
> 33 Whitehall Street
> 21st Floor
> New York, New York 10004
> Att'n:    Brian Masumoto

*Counsel for the Creditors' Committee*

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n:    Robert J. Rosenberg
             Mitchell A. Seider
             Mark A. Broude

*Counsel for the Postpetition Lenders*

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10022
Att'n:   Donald S. Bernstein
             Brian M. Resnick

*Counsel for the Master Disposition Agreement Parties*

*For Platinum Equity Capital Partners II, L.P.:*

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Att'n:   Adam C. Harris
             David J. Karp

*For General Motors Corporation:*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Att'n:   Jeffrey L. Tanenbaum
             Robert J. Lemons

# III.    THE CHAPTER 11 CASES

This section provides information regarding:

- Significant events in the Debtors' Chapter 11 Cases since January 2008, including significant orders that were entered, modifications to the Debtors' postpetition financing, and the disposition of certain of the Debtors' assets

- The resolution of certain securities, ERISA, and shareholder derivative litigation and the current status of related MDL Settlements

- Actions taken by the Debtors to preserve estate causes of action

- The claims reconciliation process and the resolution of key classes of claims

The key modifications to this section are as follows:

- The inclusion of a summary of the Master Disposition Agreement

- The description of the reclamation claims program has been modified to reflect a change in how claims of reclamation claimants will be handled

- Certain of the Debtors' statutory deadlines have been modified as follows: the Debtors' exclusive period in which to propose a plan of reorganization has been extended until 30 days after substantial consummation of the Confirmed Plan or any modified plan except as to the Creditors' Committee; the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property is now 30 days after substantial consummation of the Confirmed Plan or any modified Plan; and the current deadline by which the Debtors would be required to serve a summons and complaint upon each defendant under the Avoidance Procedures Order is 30 days after the substantial consummation of the Confirmed Plan or any modified plan

- The inclusion of a description of the investment agreement with certain plan investors that was the basis for the Confirmed Plan and the complaints that were filed after the Plan Investors refused to participate in the scheduled closing on April 4, 2008

- The inclusion of a description of the actions taken by the Debtors to terminate certain liabilities for other post-employment benefits for salaried employees

## A.    Post-Confirmation Agreements With GM And The Postpetition Lenders Approved By The Bankruptcy Court

### 1.    Amended GSA And Amended MRA

On September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended GSA and the Amended MRA.  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to portions of Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations as set forth in the Original GSA and Original MRA, which were approved as part of the Confirmed Plan but were not to become effective until the Debtors' emergence from chapter 11.  At the time that the Amended GSA and Amended MRA became effective in September 2008, Delphi estimated the value of the net consideration to be received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the similar agreements filed as part of the Confirmed Plan).  By transferring nearly $2.1 billion of hourly plan net unfunded pension liabilities to the GM hourly plan through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi believed it had made progress towards achieving its pension funding strategy objectives for hourly employees.

The Amended GSA was intended to resolve outstanding issues among the Debtors and GM that had arisen or might arise before the Effective Date.  It addressed, among other things, commitments by the Debtors and GM regarding other post-employment benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters, releases, and claims treatment.  The Amended GSA was revised, however, to accelerate the effectiveness of the Original GSA and eliminate significant elements of conditionality to the performance of GM's obligations under the agreement.  In addition, GM agreed to consent to, and to waive its right to object to, any Delphi reorganization plan that provides for the GM releases, consideration, and interpretation provisions set forth in the Amended GSA.  GM also agreed to use its reasonable best efforts to satisfy the conditions precedent to the effectiveness of the Amended GSA.  Finally, GM agreed (i) subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if conditions were met for GM to receive preferred stock, but there was insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of new Delphi common stock at "Plan Equity Value," GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims could be reduced proportionally and (ii) that if any condition was not met for GM to receive preferred stock, 50% of distributions that would otherwise be made to GM on account of its administrative expense claims, up to a value of $300 million, would be conveyed to unsubordinated general unsecured creditors.

The Amended MRA addressed, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.  The effectiveness of the Amended MRA was concurrent with the effectiveness of the Amended GSA and GM's obligations under the MRA were not subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy UAW employees would survive any such termination).  Through the Amended MRA, Delphi and GM agreed to certain terms and conditions governing, among other things, the scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and a reorganized Delphi's rights to bid and qualify for new business awards.  Although the Debtors and GM have been operating under the terms of the Amended MRA, the parties have agreed that in connection with the Master Disposition Agreement, the Amended MRA would be terminated.

## 2.    *GM Arrangement*

Pursuant to various orders entered by the Bankruptcy Court during these Chapter 11 Cases, and in anticipation of entering into the Original GSA and Original MRA, the Debtors

expended significant sums that would have otherwise been reimbursed by GM following the effectiveness of these agreements. In connection with the extension of the maturity date of the DIP Credit Agreement, as described below, on April 30, 2008, the Bankruptcy Court authorized the Debtors and GM and/or a GM affiliate to enter into an arrangement under which GM agreed to advance to Delphi up to $650 million in anticipation of the effectiveness of the Original GSA and Original MRA (the "GM Arrangement"). In return, GM would receive an administrative claim for such advances.

On August 7, 2008, GM agreed to amend the GM Arrangement to provide for an additional $300 million of availability above the existing $650 million available under the original agreement. When the Amended GSA and Amended MRA became effective on September 29, 2008, the original $650 million commitment terminated and the outstanding amounts set off against obligations owing from GM to Delphi under the Amended GSA and Amended MRA, but the additional $300 million commitment remained outstanding. The GM Arrangement was subsequently amended several times to extend the availability of the $300 million liquidity support from December 31, 2008 to June 30, 2009, among other things, subject to certain conditions and provisions for earlier termination upon the occurrence of specified events. Concurrently, the Court also approved Delphi's entry into a Partial Temporary Accelerated Payment Agreement with GM (the "Pull-Forward Agreement"), which as subsequently amended, provided for GM to accelerate the payment of up to $300 million in trade accounts payable to Delphi over a three-month period during the first and second quarters of 2009.

On February 27, 2009, Delphi and GM entered into a fourth amendment to the GM Arrangement under which GM agreed to increase the aggregate principal amount under the GM Arrangement from $300 million to $350 million. This $50 million increase in GM's total commitment under the GM Arrangement was accomplished by GM's conversion of a $50 million further accelerated trade payment it paid to the Debtors on January 30, 2009 into commitments under the GM Arrangement. As a result, under the terms of the Pull-Forward Amendment, the trade payments payable by GM to the Debtors that were associated with the $50 million payment were reinstated and scheduled to be paid as if they had never been accelerated. On March 3, 2009, Delphi and GM executed a fifth amendment to the GM Arrangement Amendment, which provided for GM's further increasing its commitments under the GM Arrangement from $350 million to $450 million. This $100 million increase was made in conjunction with GM's exercising the "Unsold Business Option" referred to in Section 4.06(a)(i) of the Amended MRA with respect to Delphi's global steering and halfshaft business, which was the subject of the Option Exercise Agreement. Neither the fourth nor fifth amendments were approved by the Court, in part, because the U.S. Treasury did not approve GM providing the additional funding under the agreements.

On June 1, 2009, the Debtors and GM entered into an amendment to and restatement of the GM Arrangement (the "Amended GM Arrangement") which supplants the fourth and fifth amendments and provides for a $250 million increase of GM's commitments under the GM Arrangement in the form of a new "GM Tranche C Commitment," which increase the U.S. Treasury (Auto Task Force) supports.

The new Tranche C Commitment is scheduled to terminate on the earlier of (i) September 30, 2009 (or October 30, 2009 if the termination date of the Master Disposition Agreement has been extended in accordance with its terms to October 30, 2009), (ii) the date on which the Debtors seek to amend or otherwise modify the plan of reorganization filed on October 3, 2008 in a manner not satisfactory to GM, (iii) the date the DIP Facility is repaid in full, (iv) the effective date of the Modified Plan, (v) the earlier of (a) the date the Court denies the motion seeking approval of the Sale Transactions, (b) July 23, 2009, unless the Court has approved the Sale Transactions by that date, or (c) seven days after the date the Court enters an order enjoining, restraining, or otherwise restricting the Debtors from seeking approval of the Modified Plan or the Stand Alone Sale (as defined below), if such order has not been reversed, (vi) the date on which the Sale Agreement terminates, and (vii) the date on which the Sale Transactions are consummated. Notably, under the Amended GM Arrangement, upon the consummation of the Modified Plan or the Sale Transactions, all $550 million of the loans under the Amended GM Arrangement would be automatically cancelled and the Debtors will not be required to repay such loans.

The effectiveness of the Amended GM Arrangement is subject to certain conditions precedent set forth in Section 4.01 thereof, which include: (i) GM's approval of the terms of any amendments or modifications to the DIP Credit Agreement, Accommodation Agreement, or Confirmed Plan, (ii) this Court's entry of an interim order approving the Amended GM Arrangement, and (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the effective date of the Tranche C Commitments (the "Tranche C Effective Date") as provided in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and (b) the giving of notice and direction by the DIP Lenders to the Agent with respect to actions contemplated under the Modified Plan.

With respect to the Sale Transactions, section 4.01 of the Amended GM Arrangement also requires as a condition to the effectiveness of the agreement that the Debtors have executed the documents in connection with the Sale Transactions and that they seek approval of the Sale Transactions concurrently through a plan of reorganization and a stand-alone section 363 sale. Specifically, on or before June 1, 2009, the Debtors are required to file a motion (the "Solicitation Motion"), in form and substance reasonably satisfactory to GM, which seeks, in the alternative, either (i) to approve, among other things, the modifications under the Modified Plan pursuant to which the Debtors will perform their obligations under the Sale Documents or (ii) approval to enter into and perform their obligations under the Sale Documents under section 363 of the Bankruptcy Code, independent of and not pursuant to or contingent on the effectiveness of, any plan of reorganization (the "Stand Alone Sale"). The Amended GM Arrangement requires that, on or prior to June 10, 2009, the Court enter an order, in form and substance reasonably acceptable to GM, approving the relief sought in the Solicitation Motion and scheduling a hearing for the approval of the Modified Plan or the Stand Alone Sale, to be held on or prior to July 23, 2009.

In addition, as set forth in section 4.04(e) of the Amended GM Arrangement, the Debtors must achieve certain milestones in order to make borrowings with respect to the new GM Tranche C Commitments. These milestones state that on the date of each Tranche C Advance

requested on and after each of the dates set forth in the following clauses (i) – (v), the following conditions must have been satisfied:

- (i) on the tenth date after the Tranche C Effective Date, the interim order approving the Amended GM Arrangement must not be stayed, modified, or reversed or subject to any appeal,
- (ii) the Solicitation Order must have become final and non-appealable within ten days of the Tranche C Effective Date (the "Final Solicitation Order"),
- (iii) by July 2, 2009, the Borrower must have filed the 363 Implementation Agreement with the Bankruptcy Court pursuant to the Solicitation Order,
- (iv) by July 23, 2009, a hearing must have been held to approve the Modified Plan or the Stand Alone Sale, and the Bankruptcy Court must have entered an order, in form and substance reasonably acceptable to GM, approving the Modified Plan or the Stand Alone Sale (in either case, such order referred to herein as the "Sale Transactions Order"), and
- (v) within ten (10) days of the entry after the Sale Transactions Order and in any event no later than August 3, 2009, such Sale Transactions Order must have become final and non-appealable.

Moreover, the Debtors' ability to borrow with respect to the Tranche C Commitment is contingent upon, among other things, (i) no amendment or other modification to the DIP Credit Agreement or the Accommodation Agreement having been made and no motion to approve any such amendment or modification having been filed that is not reasonably acceptable to GM, (ii) no new agreement or amendment, extension, or other modification having been made and no motion to approve any such new agreement, amendment, extension, or other modification having been filed that requires payment of interest on account of the Tranche C loans under the DIP Credit Agreement,  (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the Tranche C Effective Date as provided in the DIP Credit Agreement and the other Loan Documents and (b) the giving of notice and direction by the DIP Lenders to the Agent with respect to actions contemplated under the Modified Plan, (iv) no motion or other pleading having been filed, without GM's consent, seeking approval of or entry of an order confirming a plan of reorganization, other than the Modified Plan (v) no stay, amendment, reversal, or other modification having been made in a manner that is not reasonably acceptable to GM to (a) the interim and/or final order approving the Amended GM Arrangement, (b) the Solicitation Order, or (c) the Sale Transactions Order, (vi) no stay, amendment, reversal, or other modification having been made in a manner that is not reasonably acceptable to GM to any future order relating to or approving amendments to the DIP Credit Agreement or Accommodation Agreement, (vii) no default, material breach (not waived by the applicable party or parties) by Delphi, or termination having occurred under any of the Sale Documents (as defined in the Amended GM Arrangement), and Delphi not having taken any action or filed any motion to terminate, modify, or reject any of the Sale Documents, and (viii) on the date of each advance under the Amended GM Arrangement, no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default having occurred and be continuing under the Amended GM Arrangement.

The Bankruptcy Court entered the interim order approving the Amended GM Arrangement on June 10, 2009 and granted the final order on June 16, 2009.

### 3.    *The DIP Credit Agreement, Accommodation Agreement, And Matters Related Thereto*

Since January 5, 2007, the Debtors have been operating in these Chapter 11 Cases by utilizing the proceeds of a refinanced debtor-in-possession facility (the "DIP Facility") comprised of three tranches:  (i) a first priority revolving credit facility ("Tranche A"), (ii) a first priority term loan ("Tranche B"), and (ii) a second priority term loan ("Tranche C").  On April 30, 2008, the Bankruptcy Court authorized the Debtors to enter into an amendment and restatement of the Refinanced DIP Credit Facility (the "Second Amended and Restated Credit Agreement" or "DIP Credit Agreement"), which became effective on May 9, 2008.  The Second Amended and Restated Credit Agreement extended the term of the loan until December 31, 2008 and modified the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion.  Concurrently with the Bankruptcy Court approving the Second Amended and Restated Credit Agreement, the Debtors also received authority to enter into the GM Arrangement.

Due to a positive market response and oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors anticipated borrowing under the Second Amended and Restated Credit Agreement, on May 9, 2008, the Debtors filed a motion seeking to increase the principal amount of the Tranche C Term Loan by approximately $254 million (the "Supplemental Second DIP Extension Motion").  The Second Amended and Restated Credit Agreement, including the revisions to Tranche A and Tranche B as well as the existing Tranche C, became effective on May 9, 2008.  The increase in the principal amount of the Tranche C Term Loan of approximately $254 million was approved by the Bankruptcy Court on May 29, 2008.

As part of the Supplemental Second DIP Extension Motion, the Debtors stated that they anticipated transferring up to $750 million of repatriated funds from certain non-Debtor global affiliates to DASHI and ultimately to DAS LLC to reduce the borrowings on the DIP Financing Facility.  To resolve concerns of the PBGC, the Debtors reached an agreement with the PBGC to provide adequate protection to the PBGC by granting to the PBGC conditional junior replacement liens in DASHI's assets that are already encumbered by the liens of the Debtors' DIP lenders in the amounts transferred from DASHI to DAS LLC up to $750 million.  The PBGC's replacement liens are valid only to the extent that the PBGC has valid and perfected liens in the cash abroad before the repatriation of such funds.   All of PBGC's claims, defenses, and arguments with respect to any challenges of the PBGC's liens are expressly reserved and preserved.  The repatriation of funds was approved by the Bankruptcy Court on May 29, 2008, subject to the Creditors' Committee's and Wilmington Trust Company's right to (i) object, 10 days prior to a scheduled omnibus hearing for consideration at the omnibus hearing, to the repatriation of funds scheduled to occur during the calendar month following the hearing date and (ii) review repatriation of funds for consistency with cash flow projections.  Nonetheless, pursuant to the Accommodation Agreement (as defined and described below), the Debtors are no longer repatriating cash because the Accommodation Agreement would require repatriated cash

to be paid to the DIP Lenders.  Moreover, as of April 15, 2009, the Debtors believe that the maximum amount assertable by the PBGC in connection with their conditional adequate protections liens was approximately $195 million on account of unpaid contributions.

In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated the Accommodation Agreement with the administrative agent (the "Agent") under the DIP Facility and obtained consent to this agreement from the requisite DIP Lenders.  Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the Tranche C lenders' consent to the Accommodation Agreement, to encourage Tranche C lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those Tranche C lenders which consented to the Accommodation Agreement.   Under the Accommodation Agreement the Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and conditions set forth in that agreement, as amended.  This Court authorized the Debtors to enter into the Accommodation Agreement by order entered on December 3, 2008 (the "DIP Accommodation Order") (Docket No. 14515) and the parties subsequently effectuated the agreement on December 12, 2008.

To remain in compliance with the Accommodation Agreement and maximize available liquidity, the Debtors and the requisite percentage of DIP Lenders who participated in the Accommodation Agreement (the "Participant Lenders") agreed to amend the Accommodation Agreement on January 30, 2009, which amendments were supplemented by agreement dated February 25, 2009 (as supplemented, the "First Accommodation Agreement Amendment").  The Court authorized the Debtors' entry into the First Accommodation Agreement Amendment by order entered on February 25, 2009 (the "First Accommodation Amendment Order") (Docket No. 16377).

As referenced above, on March 4, 2009, the Debtors filed motions seeking this Court's approval of the fourth and fifth amendments to the GM Arrangement and the Option Exercise Agreement.  These two motions were scheduled to be heard at an omnibus hearing on March 24, 2009.  The night before the hearing, however, counsel for the U.S. Treasury notified GM and the Debtors in writing that the U.S. Treasury would not permit GM to enter into these agreements until the U.S. Treasury had a further opportunity to review the details of those transactions and the various alternatives with respect to Delphi's emergence from chapter 11.  The Court thus adjourned the hearing on these motions to a subsequent date.

Because those agreements with GM, which would have provided significant liquidity to the Debtors, were unable to proceed because of the concerns of the U.S. Treasury, additional amendments to the Accommodation Agreement were necessary.  Accordingly, on March 31, 2009, the Debtors reached an agreement with the Participant Lenders to certain additional amendments to the Accommodation Agreement (as supplemented by agreements entered into on April 3 and April 22, 2009, the "Second Accommodation Agreement Amendment").   Among other things, the Second Accommodation Agreement Amendment required the Debtors to deliver to the Agent on or prior to May 4, 2009 a detailed term sheet (the "Term Sheet") agreed to by both GM and the Presidential Task Force on the Auto Industry setting forth the terms of a global resolution of matters relating to GM's contribution to the resolution of these chapter 11 cases.

The Court authorized the Debtors' entry into the Second Accommodation Agreement Amendment by final order entered on April 23, 2009. The Second Accommodation Agreement Amendment, among other things, modified the milestone dates in the Accommodation Agreement and provided interim liquidity by lowering the required cash collateral balances to facilitate continued discussions regarding a consensual resolution of these chapter 11 cases.

Following approval of the Second Accommodation Agreement Amendment, as supplemented, the Debtors continued to seek resolution on a Term Sheet but were unable to reach agreement by May 4, 2009. Thus, the Debtors and the DIP Lenders agreed to further amend the Accommodation Agreement to provide the Debtors additional time and sufficient liquidity to continue negotiations (the "Third Accommodation Agreement Amendment"). Under the Third Accommodation Agreement Amendment, among other things, the DIP Lenders and the Debtors extended the timeline to deliver a Term Sheet to the Agent to May 21, 2009 to avoid an early termination of the Accommodation Period and adjusted certain other termination provisions. In addition to the extension of these milestones, the Third Accommodation Agreement Amendment added a provision whereunder the Debtors agreed to continue to explore strategic alternatives for resolving the chapter 11 cases.

Subsequent to entry into the Third Accommodation Agreement, on June 1, June 8, and June 12, 2009, respectively, the Debtors and the DIP Lenders agreed to three further amendments of the Accommodation Agreement (the "Fourth Accommodation Agreement Amendment," "Fifth Accommodation Agreement Amendment," and "Sixth Accommodation Agreement Amendment"), which, among other things, further extended the date on which the Accommodation Period would end if the requisite DIP Lenders have not delivered a notice indicating approval of the Term Sheet – from June 9, 2009 to June 13, 2009, and currently to June 20, 2009. In addition to above, the Fourth Accommodation Agreement Amendment also waived certain defaults existing under the Accommodation Agreement associated with the delivery of the Term Sheet and extended certain milestones. Moreover, the Fifth Accommodation Agreement Amendment extended the period (from 10 to 25 business days) during which the requisite DIP Lenders may notify the Debtors that any new reorganization plan or any modifications to the Confirmed Plan are not satisfactory.

## B.    Agreements For Which Approval Is Sought Under The Modified Plan

To implement the Modified Plan, the Debtors are seeking approval of three primary agreements (each as defined below): the Master Disposition Agreement, the DIP Transfer, and the PBGC Settlement Agreement. These agreements among the Debtors and GM, Parnassus, the DIP Lenders, and the PBGC, respectively, form the backbone of the Modified Plan. Consequently, pursuant to the Modified Plan, the Debtors are requesting an order approving these three agreements. The Debtors desire to consummate the Modified Plan, including the Master Disposition Agreement, by the end of July 2009.

If, however, the Debtors receive any unsolicited alternative transaction proposal, in the exercise of their fiduciary duties, the Debtors will consider such proposal in accordance with the procedures established by the Bankruptcy Court in the Modification Procedures Order (the "Evaluation Procedures"). In that event, if any such alternative transaction proposal is deemed by the Debtors to be higher or otherwise better and is approved by the Bankruptcy Court, the

Debtors will seek to confirm the Modified Plan and make the distributions provided thereunder on the basis of such approved alternative transaction. The deadlines set forth in the Evaluation Procedures are designed to allow the Debtors to maintain their expected emergence date: (i) due diligence must be completed by July 9, 2009, (ii) any proposed alternative transaction must be submitted by July 10, 2009, (iii) determination of whether any such transaction is a qualified alternative transaction must occur by July 13, 2009, and, if necessary, (iv) any auction with respect to such qualified alternative transaction would take place on July 17, 2009.

The primary terms of the agreements underlying the Modified Plan are described below.

### 1.    *Master Disposition Agreement*

On June 1, 2009, the Debtors, Parnassus Holdings II, LLC ("Parnassus"), and GM Components Holdings, LLC ("GM Components") and certain of its affiliates (together, the "Buyers") reached an agreement regarding the sale and purchase of substantially all of Delphi's and its subsidiaries' businesses (the "Master Disposition Agreement"). Parnassus is an affiliate of Platinum Equity Capital Partners II, L.P. ("Platinum"). Platinum is a global firm specializing in the merger, acquisition, and operation of companies that provide services and solutions to customers in a broad range of business markets, including information technology, telecommunications, logistics, manufacturing, and entertainment distribution. Since its founding in 1995, Platinum has completed nearly 100 acquisitions across a broad range of industry segments.

The Debtors' determination to enter into the Master Disposition Agreement with the Buyers was based in part upon the value proposition that Platinum brings to Delphi and all of its stakeholders. Platinum has spent nearly three years and thousands of hours analyzing the Delphi business. Platinum has completed its due diligence on all major functional areas within Delphi including operations, finance, legal, treasury, human resources, intellectual property, environmental, real estate, tax, and information technology. Platinum has conducted world-wide site tours, held world-wide and domestic meetings with customers, had discussions with third-party service providers, has fully informed and negotiated transaction and supply agreements with Delphi and GM, and has a comprehensive understanding of Delphi's businesses and what is required to successfully transfer the four UAW keep sites and Steering to GM. Platinum has spent significant time with GM, the UAW, and Delphi management to explain to all of them Platinum's operational philosophy with respect to Delphi. The Debtors believe that Platinum's track record of bringing operational resources to assist in the management and growth of Delphi's transformed businesses is transparent and beneficial to the Debtors' stakeholders. The Debtors further believe that Platinum's participation in the Master Disposition Agreement provides Delphi with the benefits of substantial intellectual capital, operational expertise, detailed and comprehensive knowledge of Delphi and the marketplace, and a substantive operating plan to provide for the long-term viability of Delphi.

In terms of pre-closing diligence and transaction planning, the Debtors are informed that Platinum has spent tens of thousands of hours analyzing Delphi from a global, divisional, PBU, and product line perspective. Platinum has analyzed, in detail, Delphi's revenue and capital plans, its programs, commodity exposure, f/x exposure, manufacturing footprint, IT systems, engineering resources, and SG&A resources. In addition, Platinum has invested significant time

evaluating Delphi's allocation methodology for disbursing centralized costs such as engineering and SG&A in the context of understanding true profitability by geographic region. Based on this analysis, Platinum has prepared a complete strategic operating plan for Delphi going forward. This operating plan is not premised on revenues returning to their pre-2008 levels, rather it is a plan that contemplates a significant amount of restructuring and cost reduction initiatives within Delphi. Platinum has committed a large team of dedicated resources, both internal and external, with significant operational expertise to execute on this plan immediately.

Delphi is a large, complex, global organization with many interdependencies among its regions, divisions, and product lines. This dynamic makes a carve-out of any piece of the business very difficult. Based on this work, the Debtors believe that Platinum is well-equipped to manage the transfer of the four UAW keep sites and the Global Steering business to GM as contemplated in this transaction. Platinum has spent a considerable amount of time to understand what corporate functions the four UAW keep sites and the Global Steering business depend on from Delphi and how to create a smooth transition after the closing. Platinum has worked closely with the operational executives at GM and has begun to lay the groundwork for a detailed separation plan. In addition, Platinum and GM have worked extensively to execute a Transition Services Agreement that minimizes the disruption to GM and Delphi. Another key element of the carve-out is effectively transitioning the four UAW keep sites and Global Steering from Delphi's IT systems. Platinum has spent substantial amounts of time and money on information technology consultants working with Delphi to understand the IT transition requirements. Platinum's IT consultants alone have spent over 500 hours, including over 400 hours working with Delphi personnel to develop an overall IT separation strategy plan. Platinum has also worked extensively with Delphi's three main IT suppliers: CSC, HP, and EDS to develop the know-how to manipulate Delphi's IT infrastructure to provide flexibility within Delphi. In short, the Debtors believe that Platinum has an intimate understanding of what is required and the complexities that are involved, and has prepared accordingly to successfully navigate the transfer of the four UAW keep sites and the Global Steering business to GM.

The Master Disposition Agreement signed on June 1, 2009 among Delphi, Platinum, and GM was the result of numerous intensive negotiations. In particular, Platinum worked closely with GM to negotiate a Supply Agreement and other commercial agreements that achieved their goal for protection of supply. The Debtors believe that the transactions represented by the Master Disposition Agreement minimize execution risk and represent a global solution for Delphi.

In connection with the financing of Parnassus, in an equity commitment letter (the "Equity Commitment Letter"), three funds controlled by Platinum have agreed on a joint and several basis to provide $250 million of equity to Parnassus to complete the transaction, subject to the conditions in the Master Disposition Agreement and the Securities Purchase Agreement. Under the Master Disposition Agreement, Parnassus has agreed that it will not terminate the Equity Commitment Letter or amend or otherwise modify the terms of the Equity Commitment Letter in a manner, among other things, that would materially adversely impact the ability of Parnassus to consummate the transactions contemplated by the Master Disposition Agreement.

The parties' obligations under the Master Disposition Agreement are expressly subject to entry of the Modification Approval Order. The primary terms of the Master Disposition

Agreement are as follows. The descriptions of each of the documents set forth herein are a summary and are qualified in their entirety by the actual terms and conditions of the documents which shall govern in all respects. Please note that all capitalized terms used in this section, but not defined herein, have their respective meanings as set forth in the Master Disposition Agreement.

(a)    General Terms

Under the terms of the Master Disposition Agreement, Parnassus would acquire all of the equity and assets primarily related to Delphi's business, other than the GM Business (as defined below), specified excluded assets, and the business relating to certain pending transactions (the "Parnassus Business"). GM Components would acquire all of the equity and assets primarily related to the Delphi's Steering Business and certain UAW Sites, including certain of those facilities located in Grand Rapids, Michigan; Rochester, New York; Kokomo, Indiana; and Lockport, New York (the "GM Business" and, together with the Parnassus Business, the "Sale Businesses").

Certain Delphi assets are specifically excluded from the assets to be acquired by the Buyers, including without limitation, third party assets, certain insurance policies, books and records required to be retained, all of the rights and claims of Delphi and its subsidiaries available under the Bankruptcy Code, personnel records, certain scheduled excluded facilities, tax refunds relating to the excluded assets, inventory disposed of prior to the Closing and in the Ordinary Course of Business, cash pledged for the benefit of Senior DIP Lenders, pending transactions, certain intercompany receivables and wage escrow accounts for certain excluded employees (the "Excluded Assets").

The Master Disposition Agreement provides that GM Components would assume all administrative liabilities and other liabilities relating to the GM Business, certain hedging agreements and certain specified prepetition liabilities. Parnassus would assume all administrative liabilities and certain prepetition liabilities relating to the Parnassus Business as well as specified director, officer, and employee related liabilities, which include assuming employment agreements (at Parnassus' discretion), obtaining insurance and undertaking other obligations under Delphi's policies that in the aggregate provide substantially similar economic benefits to such directors, officers and employees as currently in existence. The prepetition liabilities assumed by Buyers include cure amounts relating to assumed contracts and certain taxes to the extent not discharged pursuant to the Modified Plan, in each case relating to the assets acquired by such Buyer. Finally, Delphi would retain liability for all Excluded Assets and Excluded Facilities, certain Administrative Claims not assumed by Buyers, retained benefit plans, intercompany payables to Filing Affiliates and liabilities related to the DIP Agreement.

(b)    Documentation

The transaction would be effected pursuant to the Master Disposition Agreement and related documentation, including certain ancillary agreements (the "Ancillary Agreements") such as: (i) the necessary transfer agreements to effectuate the transfer of securities to Buyers, (ii) assignment and assumption agreements and bills of sale to effectuate the sale of the Acquired Assets to the Buyers, and (iii) transition services agreements to ensure Delphi's ability to operate

the remaining business and for Buyers to provide each other with the services required to operate their respective acquired businesses. The Closing of the transfer agreements and the assignment and assumption agreements would take place simultaneously with the Closing.

(c)    Purchase Price

The purchase price would be comprised of the following: (i) Buyers would each assume the Assumed Liabilities and Cure Amounts applicable to their respective Businesses for Acquired Contracts and pay 50% of professional fees (in an amount not to exceed $15,000,000 per Buyer, or $30,000,000 in total) that are Administrative Claims required to be paid by certain affiliates, (ii) GM Components would also waive its prepetition claims and administrative clams in Bankruptcy Cases, pay the DIP Priority Payment Amount to Delphi, pay $291,020,079 to Delphi, pay certain scheduled expenses of Delphi and its affiliates, and a proportional post-closing payment to Delphi based on recoveries from the Appaloosa Claim as provided by the Plan of Reorganization, in addition to solicitation costs for approval of the Plan of Reorganization that are Administrative Claims (in an amount not to exceed $12,000,000) and (iii) Parnassus would also pay one dollar and issue its Class C Interest to Delphi, in addition to paying a post-closing amount pursuant to the Modified Plan.

(d)    Representations And Warranties

The Sellers and Delphi, jointly, would provide representations and warranties relating to themselves and the applicable Sale Companies, which are generally standard for a transaction of this type. Significantly, all Seller's representations and warranties are qualified by Delphi's reports filed with the Securities and Exchange Commission and many contain materiality qualifiers or exceptions for matters that would not have a Material Adverse Effect (as defined in the Master Disposition Agreement) on the businesses being sold. Buyers are also required to make standard representations and warranties, as well as GM (solely with respect to transaction financing). The majority of the schedules to the representations and warranties provided by Sellers relate only to the Steering Business and all are provided only as of the date set forth on the schedules. The representations and warranties in the Master Disposition Agreement do not survive Closing and no party would have any liability to the other parties after the Closing for any breaches of the representations and warranties.

(e)    Operational Covenants

The Master Disposition Agreement provides that, between the date of signing the Master Disposition Agreement and the Closing, Delphi would cause the Sellers to reasonably conduct the operations of the Sale Businesses in a manner reasonably intended to preserve the value of the Sale Businesses taking into account the current state of the auto industry and Delphi's liquidity, with limited exceptions. The limited exceptions include items that may be provided for in the Master Disposition Agreement, set forth on a schedule, required by the Bankruptcy Court, or required by a change in applicable law. In addition, Delphi would cause the Sellers to refrain from specified activities without the prior written consent of Buyers (which must not be unreasonably withheld), but only to the extent Delphi can comply by acting reasonably to preserve the value of the Sale Businesses, taking into account the current state of the auto industry and Delphi's liquidity. In addition, and among other agreements, (i) the parties agree to

take actions necessary to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent those assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, which may include certain amendments or modifications to the Master Disposition Agreement (so long as such amendments or modifications do not result in a material adverse effect on Buyers, Acquired Assets or the Businesses or materially increase the Assumed Liabilities), (ii) Parnassus would, as of the Closing Date, enter into agreements, obtain insurance coverage and assume the obligations in connection with the Specified Directors, Officer, and Employee Related Liabilities, (iii) GM would guarantee and Parnassus would provide an equity commitment in favor of the performance and payment of all of their respective obligations under the Master Disposition Agreement until Closing, and (iv) the parties would agree to certain terms with respect to various international subsidiaries (including, Brazil, China, Mexico and Poland).

(f)    Additional Covenants

(i)    Bankruptcy Actions

Delphi will comply with the Bankruptcy Code, seek all applicable approvals, and on or prior to June 1, 2009, file (i) the Master Disposition Agreement with the modified Plan of Reorganization and (ii) a 363 motion seeking approval to enter into and perform their obligations under the Master Disposition Agreement under similar terms.

(ii)    Taxes

The Sellers would be responsible for preparing and filing the tax returns prior to Closing and the Buyers would be responsible for preparing and filing their respective tax returns after the Closing and must provide Sellers with the tax returns 60 days before the due date.  The parties would generally cooperate with respect to tax matters and use commercially reasonable efforts and cooperate to exempt the transaction from any transfer taxes.  Delphi has committed to seeking an exemption from transfer taxes but if such exemption is not granted, transfer taxes would be borne by the relevant Buyer.

(iii)    Employee Matters

At Closing, the applicable Buyer generally (i) would assume the employment contracts for all Non-U.S. Employees, (ii) would employ all active and inactive U.S. Hourly Employees, (iii) may offer employment to the U.S. Salaried Employees on Buyer's terms, and (iv) would assume certain specified collective bargaining agreements.  Pension liabilities will be transferred pursuant to certain transfer agreements for foreign Sellers, and the Buyers will continue to provide benefit plans to the extent required by law and will assume the sponsorship of certain contribution plans.  The severance obligations are generally paid to former U.S. Salaried Employees until Closing and U.S. Salaried Employees terminated after the date of the Master Disposition Agreement or employees at certain facilities will be entitled to severance payments pursuant to a formula set forth in Master Disposition Agreement on and after Closing.

### (iv)    Intellectual Property

The Sellers would grant the respective Buyers non-exclusive licenses to certain shared intellectual property with the applicable sublicense rights pursuant to various IP licensing agreements.  The parties agree to make the shared intellectual property available to other parties and the Buyers would agree not to transfer or assign their respective rights to the shared intellectual property to any third party, subject to certain exceptions.

### (v)    Environmental Permits

As soon as possible after Closing, Sellers must cooperate with Buyers to transfer, assign, or reissue any Environmental Permit necessary to operate the Sale Businesses.

### (vi)    Termination of Certain Contracts

On the Closing Date, certain contracts would be terminated, including without limitation the following: the Amended MRA (except for certain specified provision which shall survive), the Option Exercise Agreement, the GM Arrangement and Amended GM Arrangement, as amended, various tax agreements between Delphi and GM for the allocation and indemnification of taxes, and various assignment and transfer agreements.

### (vii)    Financing

GM is restricted from terminating or amending its financing arrangements for the transaction that would materially adversely impact the ability of GM or the Parnassus to consummate, without the consent of Delphi.

### (viii)    Non-Solicitation

Delphi and the Sellers agree that until either the termination of the Master Disposition Agreement or Closing, they will not knowingly permit their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale of the businesses, provided that nothing in the Master Disposition Agreement will prevent or restrict Delphi's Board of Directors from taking actions which the Board reasonably believes are required by their fiduciary duties or are in accordance with the Modification Procedures Order entered by the Bankruptcy Court.

### (g)    Closing Conditions

The respective obligations of each party to effect the transactions contemplated by the Master Disposition Agreement would be subject to the satisfaction or waiver of customary closing conditions, including an effective plan of reorganization, Bankruptcy Court and other governmental approvals and regulatory matters (including certain competition filings), as well as an amendment of the DIP Agreement as necessary to permit the consummation of the transactions.

In addition, the obligation of each of the Buyers to consummate the transactions contemplated by the Master Disposition Agreement would be subject to the satisfaction, or

waiver by such Buyer, at or prior to the Closing, of the following conditions: (i) the truth and correctness, as of the Closing Date, of the representations and warranties of the Sellers contained in the Master Disposition Agreement, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on the Seller's ability to consummate the transactions contemplated by the Master Disposition Agreement, (ii) the performance and compliance by the Sellers in all material respects with all agreements and obligations required by the Master Disposition Agreement to be performed or complied with by the Sellers at or prior to the Closing for the benefit of such Buyer, (iii) the delivery by the Sellers of duly executed copies of each of the Ancillary Agreements and the DIP Payoff Letters, (iv) the release of certain liens, and (v) their receipt of the requisite financing contemplated in financing agreements being entered into concurrently with the Master Disposition Agreement; and additionally GM Components' obligation to consummate the transaction is also conditioned on the transfer of Environmental Permits.

Finally, the obligation of the Sellers to consummate the transactions contemplated by the Master Disposition Agreement would be subject to the fulfillment at or prior to the Closing of the following conditions, which could be waived by the Sellers: (i) the truth and correctness, as of the Closing Date, of the representations and warranties of the Buyers contained in the Master Disposition Agreement, except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on the Buyers' ability to consummate the transactions contemplated by the Master Disposition Agreement, (ii) the performance and compliance by the Buyers in all material respects with all agreements and obligations required by the Master Disposition Agreement to be performed or complied with at or prior to the Closing, (iii) the delivery by the Buyer of duly executed copies of each of the Ancillary Agreements, (iv) the assumption by Buyers of certain collective bargaining agreements and certain related consents and (v) the satisfaction by Delphi that the hourly pension plans would not be an obligation of Delphi after the Closing.

(h)    Termination

The Master Disposition Agreement would be terminable prior to Closing upon mutual written consent of the Sellers and the Buyers and by any non-breaching party if the Closing has not occurred by September 30, 2009, subject to an automatic 60-day extension if all of the closing conditions are met except for governmental approvals.  In addition, Delphi would have the right to terminate if (i) the Interim Financial Amendments are not delivered by GM on or prior to June 1, 2009, (ii) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009 pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (iii) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10, 2009, or (iv) GM breaches any of its material covenants, obligations, or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

GM would have the right to terminate if (i) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders, (ii) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10,

2009, (iii) Delphi breaches any of its material covenants, obligations or agreements under the GM-Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment, or (iv) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.

GM or Parnassus may terminate if (i) the Modification Approval Order is not entered by July 23, 2009, or (ii) such Modification Approval Order has not become a Final Order within ten days of its entry.

Further, the Master Disposition Agreement would automatically terminate, without further action by any party, on July 15, 2009 if GM becomes subject to a case under the Bankruptcy Code and (i) the required federal court approval of the Master Disposition Agreement and the Ancillary Agreements has not been obtained, or (ii) in the event that certain transfers, assignments and assumptions pursuant to the Master Disposition Agreement are not appropriately approved.

(i)   <u>No Successor Liability</u>

Except where expressly prohibited under applicable law, upon the Closing, the Buyers shall not be deemed to be the successor of the Filing Affiliates, have merged with the Filing Affiliates, be a continuation of the Filing Affiliates, or be liable for acts or omissions of the Filing Affiliates.

<b>2.    <i>Transfer Of Collateral</i></b>

Pursuant to the DIP Transfer, the Agent, on behalf of the DIP Lenders, will receive the DIP Consideration from the Debtors. The transfer of the Transferred Assets will be deemed to be in full satisfaction of the Debtors' obligations under the DIP Credit Agreement in accordance with Section 9-620 of the UCC.

If a party who is entitled to notice under Section 9-621(a) of the UCC or who otherwise has an interest in the Transferred Assets subordinate to the Administrative Agent (as set forth in the Security and Pledge Agreement) (each a "Subordinated Person") objects to the transfer of assets to the Agent, the assets will be sold at a public sale in accordance with Section 9-610 of the UCC. The Debtors will provide Subordinated Persons with at least 10 days notice of a public sale of the Transferred Assets, along with procedures to be employed in connection with the public sale. In the event of a public sale, the Agent will credit bid the full amount of the Debtors' obligations under the DIP Credit Agreement. Parties may submit competing offers pursuant to public sale foreclosure procedures. If there are no competing offers that provide more value than the Agent's credit bid, the Agent will receive the collateral in full satisfaction of the Debtors' obligations under the DIP Credit Agreement. If a higher competing offer is accepted and the Debtors' enter into an alternate transaction, payment to the Agent of proceeds from the sale, up to the full amount of the debt, shall discharge the Debtors' obligations under the DIP Credit Agreement.

Consummation of the DIP Transfer will occur on the Effective Date, following the consummation of the Master Disposition Agreement.

### 3.    *Pension Actions And Agreement With The PBGC*

The final key tenet of the Transformation Plan was to devise a workable solution to the Debtors' current pension situation. Excluding subsidiary plans, Delphi maintains two separate defined benefit pension plans for employees, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") and the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"). Certain of the Delphi's subsidiaries also maintain separate defined benefit plans: (i) the ASEC Manufacturing Retirement Program (the "ASEC Plan"), (ii) the Delphi Mechatronics Retirement Program (the "Mechatronics Plan"), (iii) the Packard-Hughes Interconnect Bargaining Retirement Plan (the "PHI Bargaining Plan") and (iv) the PHI Non-Bargaining Retirement Plan (the "PHI Non-Bargaining Plan") (collectively, the "Subsidiary Plans" and together with the Salaried Plan and the Hourly Plan, the "Pension Plans"). The Debtors' funding obligations under the U.S. pension plans are governed by the IRC and ERISA.

The Debtors' goal throughout these Chapter 11 Cases was to preserve the benefits accrued under the existing defined benefit U.S. pension plans (including the Subsidiary Plans) for both the Debtors' hourly and salaried workforce. The Debtors had originally intended to assume and continue the Pension Plans on a frozen basis upon emergence from chapter 11. As a result of the Plan Investors' breach of the Investment Agreement, the attendant delay in emerging from chapter 11, and the decline in the economy overall and in the automotive industry in particular, however, the Debtors needed to implement certain cost-saving aspects of their pension transformation in the latter half of 2008 rather than wait for emergence. The Debtors accordingly filed the Hourly And Salaried Pension Program Modification Motion on September 12, 2008, which sought authority to freeze the Salaried Plan, the ASEC Plan, the Mechatronics Plan, and the PHI Non-Bargaining Plan effective September 30, 2008 and the Hourly Plan effective as soon as possible following Union consent. The Court approved the motion on September 23, 2008 and the Salaried Plan, the ASEC Plan, the Mechatronics Plan, and the PHI Non-Bargaining Plan were frozen on September 30, 2008. The Debtors obtained Union consent on the terms set forth in the implementation agreements and, after fulfilling the statutory notice requirements, froze the Hourly Plan on November 30, 2008. By freezing the Pension Plans, Delphi halted the accrual of normal cost payments going forward, thereby preserving liquidity.

During the bankruptcy period, the Debtors have needed to obtain relief from the IRS and the PBGC to postpone contributions, to avoid a potential excise tax assessment, and to effectuate the IRC Section 414(l) transfer of Hourly Plan underfunded pension liabilities to the GM Hourly-Rate Employees Pension Plan (the "GM Hourly Plan"). Since the Petition Dates, the Debtors have generally only contributed "normal cost" contributions to the pension plans, or contributions that reflect the amounts related to service provided by plan participants post-filing. These "normal cost" contributions are less than the minimum funding requirements established by the IRC and ERISA. The IRC imposes a 10% excise tax penalty on the amount of any resulting funding deficiency. Under the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected. Although the Debtors believed that they had defenses against such penalties, the Debtors sought a consensual resolution. Thus, the Debtors negotiated with the IRS and the PBGC for conditional waivers of their minimum funding requirements under the Hourly Plan and Salaried Plan for the pension plan year ended September 30, 2006 and for the Hourly Plan for the plan year ended September 30, 2007. As of the filing of this Supplement, Delphi has not sought another extension of the

funding waivers for the Hourly Plan. But, with respect to the Salaried Plan, in December 2008, Delphi filed a funding waiver request with the IRS seeking a waiver of the minimum funding requirement which, if accepted, would waive approximately $61 million in contributions for the plan year ended September 30, 2008. Approvals have not yet been granted for that request.

As previously discussed, on September 12, 2008, Delphi filed a motion for authorization to implement the Amended GSA and Amended MRA, a component of which is the effectuation of the Section 414(l) transfer in connection with the Hourly Plan. Under the Amended GSA and Amended MRA, to alleviate the Hourly Plan underfunding and resolve future contribution needs, the parties agreed that the Debtors would transfer the majority of the Hourly Plan to the GM Hourly Plan in two transfers totaling approximately $5.1 billion in net unfunded liabilities (the "414(l) Transfer"). Delphi completed the first step of the 414(l) Transfer effective on September 29, 2008. Consummating the first step of the 414(l) Transfer prior to September 30, 2008 avoided an accumulated funding deficiency for the Hourly Plan and prevented the potential assessment of the significant excise tax penalties discussed above. The second step of the 414(l) Transfer under the Amended GSA and Amended MRA would have occurred upon the consummation of a plan of reorganization that satisfied certain conditions set forth in the Amended MRA. Due to the state of the economy and the rapid deterioration in the automotive sector, the Debtors could not satisfy those conditions. Nevertheless, GM has agreed to make certain arrangements, the details of which are still under discussion, such that the Debtors shall no longer have responsibility for the Hourly Plan.

Despite the Debtors' effort to preserve their other pension plans, the Debtors were unable to secure sufficient capital to achieve that objective. Consequently, it is expected that the PBGC will terminate the Salaried Plan and the Subsidiary Plans. As a result, participants in those Pension Plans would collect their pension benefits from the PBGC as provided by law.

The Debtors and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined by the IRC and/or ERISA. Pursuant to that settlement agreement and as set forth in the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of the Modified Plan, and the PBGC will receive a cash payment in the amount of $30 million, all of which is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the expected involuntary termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted and/or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise. A copy of the PBGC Settlement Agreement is attached to the Modified Plan substantially in the form of Exhibit 7.17.

Except as provided in the PBGC settlement agreement and as set forth in Article V of the Modified Plan, on the Effective Date, all liens arising from or relating to the Pension Plans will be terminated and discharged.

In addition to the U.S. Pension Plan, Delphi Electronic Overseas Corporation ("DEOC"), a Debtor, maintains a defined benefit pension plan in the United Kingdom (the "DEOC Plan"). The DEOC Plan has an estimated funding deficit of approximately £32 million. Pursuant to the transaction contemplated by the Master Disposition Agreement, DEOC's business will be purchased by Parnassus or an affiliate of Parnassus. In connection with that transaction, if consummated pursuant to an asset purchase, the Debtors expect that the United Kingdom regulator would need to approve any proposed transfer of DEOC's pension plan to the Buyer, which approval is expected to include, among other things, an agreement between the plan trustees and the relevant Buyer providing for periodic pension contributions to fund the deficit over time. The current funding program provides for pension contributions of less than £3 million per year.

### C.    Significant Confirmation And Post-Confirmation Events

#### 1.    Confirmation Of The Confirmed Plan

After a hearing on December 7, 2007 on the adequacy of the proposed disclosure statement (including modifications proposed after September 6, 2007), on December 10, 2007, Delphi filed the December 2007 Plan and the Disclosure Statement. The Court entered an order approving the adequacy of the December 2007 Disclosure Statement that same day. Thereafter, Delphi began solicitation of votes on the December 2007 Plan.

On January 16, 2008, Delphi announced the voting results on the December 2007 Plan, which illustrated broad-based support for the plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the MDL, and holders of interests). Of the total amount voted by all general unsecured creditors classes, 78 percent voted to accept the plan and one hundred percent of the ballots cast in the GM and MDL classes voted to accept the plan. Seventy-eight percent of voting shareholders voted to accept the plan. A hearing on the confirmation of the December 2007 Plan took place on January 17, 18, and 22, 2008. The Bankruptcy Court entered the order confirming the December 2007 Plan (with certain modifications) on January 25, 2008.

#### 2.    Investment Agreement And Plan Investor Litigation

On July 18, 2007, Delphi announced that it had accepted a proposal for an equity purchase and commitment agreement (the "Investment Agreement") with the Plan Investors. Under the terms and subject to the conditions of the Investment Agreement, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Plan Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion discount rights offering that was made available to unsecured creditors. The discount rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund the Investment

Agreement, in April 2008 the Company cancelled the discount rights offering and returned all funds submitted.

An affiliate of Appaloosa had certain termination rights under the Investment Agreement. In the event of certain terminations of the Investment Agreement pursuant to the terms thereof, the Company could be obligated to pay the Investors $83 million plus certain transaction expenses. As described previously, on April 4, 2008, as the Debtors prepared to close the transaction, Appaloosa delivered a letter purporting to terminate the Investment Agreement and asserting that the Plan Investors were entitled to be paid the fee of $83 million plus certain expenses and other amounts. Delphi believes that Appaloosa wrongfully terminated the Investment Agreement and disputes the allegations that Delphi breached the Investment Agreement or failed to satisfy any condition to the Investors' obligations thereunder. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, including the commencement of legal action in the Court to seek all appropriate relief, including specific performance by the Investors of their obligations under the Investment Agreement. On May 16, 2008, Delphi filed complaints in the Bankruptcy Court against the various Plan Investors which asserted claims for breach of contract and fraud, and asked the Bankruptcy Court to enter a judgment of specific performance and to pay compensatory and punitive damages in an amount to be determined in trial. On July 28, 2008, the Bankruptcy Court ruled on certain motions to dismiss, granting the motions in part and denying them in part.

On August 5 and 6, 2008, the parties participated in confidential, non-binding mediation. Subsequent to the mediation, the parties have continued to prepare for litigation, including exchanging significant amounts of discovery material and taking more than 80 depositions of parties on both sides of the litigation. On April 21 and 28, 2009, the defendants filed motions for summary judgment and on May 15 and 22, respectively, Delphi filed its response to the motions. These motions were argued on June 8, 2009. The trial-ready date is currently set for July 20, 2009.

Under the Master Disposition Agreement, upon the closing of the transaction, subject to applicable law, GM (or its affiliate) will acquire the right to benefit from any lawsuit or settlement relating to the litigation described herein and will control the prosecution and settlement of the litigation, including the costs and expenses of such prosecution. Delphi has agreed to cooperate in any prosecution of the litigation and act as the prosecuting party if requested by GM. In such an event, GM will reimburse Delphi for reasonable costs and expenses related thereto. Prior to and after the closing of the Master Disposition Agreement, Delphi will not consent to the entry of any judgment or settlement with respect to the litigation without the prior written consent of GM, which may not be unreasonably withheld.

After the closing of the Master Disposition Agreement, as further provided therein, GM will not consent to the entry of any judgment or settlement with respect to the litigation for an amount less than the maximum distribution to the Tranche C Lenders provided by Article 7.8(e)(iii) of the Modified Plan (the "Threshold") without the prior written consent of Delphi, which may not be unreasonably withheld. Notwithstanding the foregoing, Delphi may not withhold consent unless it agrees to pay all of the fees and expenses associated with continuing the prosecution. Alternately, if as a result of the entry of a judgment or settlement, the Tranche

C DIP Lenders will receive an amount equal to the Threshold,  Delphi will not have a consent right.  Further, GM will not consent to the entry of a judgment or settlement with respect to the litigation unless the resolution contains a full release by the defendants and does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees.  Finally, GM will consult with Delphi regarding any request by Delphi to consent to the entry of any judgment or entry into any settlement with respect to the litigation.

The confirmation of the Modified Plan will not constitute any finding or ruling with respect to any claims, counterclaims, defenses, rights or issues in the adversary proceedings.  The defendants in those adversary proceedings deny any liability to the Debtors and dispute, among other things, that Delphi would be entitled to the remedy of specific performance, or to any recovery exceeding $250 million in total aggregate damages, in the event that Delphi were to prevail on any of its claims of breach of the Investment Agreement. The defendants further believe that they have or may have in the future valid counterclaims against the Debtors that are in excess of $100 million; the Debtors dispute the defendants' counterclaims.

The Debtors' description of facts and legal conclusions relating to the adversary proceedings do not constitute findings of the Court and shall not be deemed admissions of the defendants even if not objected to during plan confirmation proceedings. Further, in order to avoid objections to various documents that may be filed or prepared in connection with the Modified Plan, the Debtors have agreed that they will not assert that the Plan Investors' failure to object to any such document that may be filed with the Bankruptcy Court shall constitute a waiver or consent by the Plan Investors to such document under the Investment Agreement.

### 3.    *Complaints Seeking Revocation Of Confirmation Order*

On July 23, 2008, the Creditors' Committee and Wilmington Trust, as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Bankruptcy Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization on the grounds that it was procured by Appaloosa's and the other Plan Investors' fraud.  The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008.  The Creditors' Committee and Wilmington Trust have entered into a stipulation and consent order with Delphi whereby all activity in respect of the section 1144 complaints will be stayed until the earlier of (i) the service by the Creditors' Committee or Wilmington Trust upon the Debtors of a written notice terminating the stay with respect to the party's complaint or (ii) further order of the Bankruptcy Court.  Upon receipt of a notice of termination of stay, the Debtors will have thirty days, or such other period of time as the parties may agree or as may be ordered by the Bankruptcy Court, to answer or otherwise file a responsive pleading.  Upon the Effective Date of the Modified Plan, the proceedings initiated by the Creditors' Committee and the Wilmington Trust will be closed and the complaints seeking relief therefore will be dismissed as moot.

## 4.    *Disposition Of Assets*

### (a)    Sale Of De Minimis Assets

On October 28, 2005, the Bankruptcy Court entered an order permitting the Debtors to sell certain assets of de minimis value.  The order approved procedures for selling assets, outside the ordinary course of business, without further court approval provided that the purchase price is less than $10 million for each transaction or in the aggregate for a related series of transactions. In connection with this order, the Debtors formulated internal approval procedures to both comply with closing conditions and satisfy the notice procedures set forth in the order.  During these Chapter 11 Cases, the Debtors have disposed of assets under the de minimis assets order.

### (b)    Interiors And Closures

On December 21, 2007, the Bankruptcy Court entered an order approving the sale of substantially all of the tangible assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business (the "Interiors and Closures Business") to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group. On January 25, 2008, the Court entered an order approving the assumption and assignment of the executory contracts covered by certain objections, all of which were resolved prior to the January 25, 2008 hearing. On that date, the Court also approved a compromise with Inteva, which facilitated the closing of the sale of the Interiors and Closures Business with Inteva by modifying the payment structure under the Interiors and Closures Agreement in consideration for the waiver of certain of Inteva's conditions to closing. Delphi closed on the sale of the Interiors and Closures Business to Inteva on February 29, 2008. Delphi received proceeds from the sale of approximately $106 million consisting of $62.5 million of cash paid at closing (of which $35.1 million was paid to non-debtor foreign entities that participated in the sale)and notes at fair value for the remainder of the purchase price (none of which will be paid to non-debtor foreign entities).

### (c)    Exhaust Emissions Business

On November 10, 2008, the Company entered into an agreement to sell substantially all the assets exclusively used in the Debtors' global exhaust emissions business (the "Exhaust Business") to Bienes Turgon S.A. de C.V. and certain of its affiliates for a purchase price of $17 million, subject to certain adjustments. On November 14, 2008, the Debtors filed a sale motion seeking a hearing on November 25, 2008 to approve bidding procedures in connection with the sale and a sale hearing on December 17, 2008.  No qualified bids were received for the Exhaust Business and on December 17, 2008, the Bankruptcy Court entered an order approving the sale. The majority of the closing of the sale occurred on April 30, 2009, with the closing of the transaction in two of the non-U.S. jurisdictions anticipated during the third quarter of 2009.

### (d)    Steering And Halfshaft

On February 19, 2008, the Bankruptcy Court entered an order approving the sale of the Debtors' steering and halfshaft business (the "Steering Business") to Steering Solutions Corporation, a subsidiary of Platinum Equity, LLC, and a transaction facilitation agreement with GM.  Subsequent orders of the Court approved the assumption and assignment of the executory contracts covered by certain objections.  On March 3, 2009, the agreement with Steering

Solutions Corporation was mutually terminated by the parties to the agreement. Concurrently with the termination, the Company entered into an option exercise agreement with GM (the "Option Exercise Agreement"), pursuant to which the parties agreed that the conditions to GM's exercise of its option to purchase the Steering Business under section 4.06(a)(i) of the Amended MRA were satisfied in consideration for (and subject to) revised and supplemented terms of the sale of the Steering Business. As part of the Master Disposition Agreement, the Option Exercise Agreement would be terminated and the sale of the Steering Business to GM Components would proceed pursuant to the Master Disposition Agreement.

(e)    <u>Global Brakes And Ride Dynamics Businesses</u>

On March 30, 2009, the Company entered into an asset sale and purchase agreement with BeijingWest Industries Co., Ltd. for the sale of the Company's remaining brakes and ride dynamics businesses, subject to a competitive bidding process. The preliminary purchase price is $90 million, subject to adjustments, including an estimated upward pre-closing adjustment approximating $18 million. On March 31, 2009, the Debtors filed a sale motion seeking a hearing on April 23, 2009 to approve bidding procedures in connection with the sale and a hearing on May 21, 2009, authorizing and approving the sale of assets. The Bidding Procedures Order was entered on May 1, 2009. No qualified bids were received for the businesses and on May 21, 2009, the Court entered the order approving the sale. The closing of the sale is anticipated to occur in the fourth quarter of 2009. Upon consummation of the Modified Plan, the brakes and ride dynamics businesses will be held and operated by Parnassus until the closing of the sale.

**5.    *Statutory Committees*** 

On October 17, 2005, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the Creditors' Committee, pursuant to section 1102 of the Bankruptcy Code. On April 28, 2006, the United States Trustee appointed an official Committee of Equity Holders pursuant to section 1102 of the Bankruptcy Code to represent the interests of all equity holders in these cases. On April 23, 2009, because of the change of circumstances in the Debtors' Chapter 11 Cases, the Court entered an order directing the U.S. Trustee to disband the Equity Committee, which occurred on April 24, 2009.

**6.    *Exclusivity*** 

Pursuant to an order of the Bankruptcy Court dated January 6, 2006, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan of reorganization (the "Filing Period") through August 5, 2006, and to solicit acceptances of such plan (the "Solicitation Period") to October 4, 2006. Pursuant to further orders of the Bankruptcy Court entered on June 19, 2006, January 23, July 29, and December 20, 2007, and March 19 and April 30, 2008, the current Filing Period, except as to the Statutory Committees, was extended until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the Solicitation Period was extended until 90 days after substantial consummation of the Confirmed Plan or any modified plan. Pursuant to an agreement among the Debtors and the Statutory Committees, and subsequent orders entered on July 31, October 27, and, December 17, 2008 and March 24, 2009, the Filing Period was extended, solely as between the Debtors and the Statutory Committees, to

S-29

May 31, 2009 and the Solicitation Period was extended to July 31, 2009. On April 24, 2009, the Equity Committee was disbanded. Accordingly, pursuant to an agreement among the Debtors and the Creditors' Committee, and an order of the Bankruptcy Court entered on May 21, 2009, the Filing Period was extended, solely as between the Debtors and the Creditors' Committee, to July 31, 2009 and the Solicitation Period was extended to September 30, 2009. The May 21 order preserves the rights of the Creditors' Committee to contest the effect of section 1129(c) if any of the section 1121(d) exclusive periods vis-a-vis the Creditors' Committee expires.

## 7.    *Investigations, MDL Proceedings, And Settlements*

Prior to the Petition Date, Delphi restated earnings for fiscal years 2001-2003 which prompted, among other things, (a) formal investigations by several governmental agencies, (b) the commencement of certain class actions, including actions brought under ERISA and various securities laws, and (c) the review by a special committee of the Company's Board of Directors of certain shareholder derivative demands and related actions. The resolution and settlement of these matters, including the class actions against Delphi, certain potential contingent claims for indemnification against Delphi, and certain potential contingent claims against the insurers which provided Delphi's director and officer liability policies implicated by the earnings restatement was previously described in the Disclosure Statement.

Since April 2008, Delphi has engaged in discussions with the Lead Plaintiffs in the Securities Action, the ERISA Action Plaintiffs, and the various individual director and officer defendants concerning potential modifications to the MDL Settlements in light of the reduced recoveries available to Delphi's stakeholders. Based on these discussions, Delphi intends to enter into and seek approval in both the MDL Court and the Bankruptcy Court for certain amendments to the MDL Settlements which, if approved by a final order of both courts, would involve the following modifications to the MDL Settlements:

The Lead Plaintiffs would continue to be granted a single Allowed Claim in the face amount of $179 million and the ERISA Plaintiffs will continue to be granted a single Allowed Claim in the face amount of $24.5 million but in both cases, the Debtors will no longer be required to guarantee recoveries in the same form, ratio, and treatment as the general unsecured claimholders, but will instead be classified according to the priority scheme of the Bankruptcy Code, including Section 510(b) therein. Moreover, under the modifications as anticipated, Delphi will no longer have the obligation to cause a third party to pay $15 million to the Lead Plaintiffs on behalf of the class and the release of GM contained in the Securities Settlement will also be eliminated. Because they will receive no distribution on account of their claims under the Modified Plan and thus will be deemed to have rejected the Modified Plan, the Lead Plaintiffs and ERISA Action plaintiffs will not be entitled to vote on the Modified Plan.

Despite the treatment of the Lead Plaintiffs' and ERISA Action Plaintiffs' claims in the Chapter 11 Cases, each group of plaintiffs will receive distributions from insurance proceeds. The Lead Plaintiffs will receive a distribution of insurance proceeds up to $88.6 million, and $1.5 million from certain underwriters named as defendants in the MDL proceedings. The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million. Both groups of plaintiffs will also receive accrued interest, if any, which has been earned on these amounts since they were deposited into escrow in late 2007. If approved by both

the MDL Court and the Bankruptcy Court, the proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements upon the effectiveness of the MDL Settlements, which may occur prior to and independent from Delphi's emergence from chapter 11. The releases granted to all parties in the MDL Settlement and the Insurance Settlement will, likewise, be effective and final upon the effectiveness of the MDL Settlements, independent of Delphi's emergence from chapter 11. Thus, the resolution of the MDL Actions, and the related insurance settlement, which in their totality will resolve the various claims and contingent claims with respect to the earnings restatement, will become effective and final independent of Delphi's Modified Plan.

### 8.      *Preserving Estate Causes Of Action*

(a)      Avoidance Procedures Order

On August 16, 2007, the Bankruptcy Court entered an order (the "Avoidance Procedures Order") authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action arising under sections 544, 545, 547, 548, or 553 of the Bankruptcy Code, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action. The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve valuable estate assets in a manner that would not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations. With respect to any avoidance causes of action that the Debtors abandoned in accordance with the procedures, the Debtors have reserved all rights, including the right under section 502(d) of the Bankruptcy Code, to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

Although hundreds of actions subject to these procedures have been commenced, the actions will likely remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11. The Debtors, with the assistance of their advisors and input from the Creditors' Committee, have evaluated the avoidance causes of action and considered the probable defenses the counterparties may raise and the relative merits of such arguments. It is the Debtors' belief that given the nature of the majority of these actions, the availability of defenses to such actions, and the current state of the automotive supply industry, that pursuing these actions would be a costly and protracted process that might not provide significant value to the estate when compared to the harm it might cause to supplier relationships and the operation of the Debtors' businesses. Thus, the Debtors believe it may be appropriate to retain only a limited number of avoidance actions with a higher likelihood of recovery and to discontinue the remaining avoidance actions and allow them to be dismissed. If the Modified Plan becomes effective, certain of these actions will be dismissed as a result of prepetition contracts of suppliers being assumed and assigned to Parnassus and GM Components. Others, however, are likely to be retained. Under the Modified Plan, the Reorganized Debtors will only retain the Causes of Action arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws that are specifically listed on Exhibit 7.18 to the Modified Plan.

Finally, in connection with the terms of the Amended GSA and the Amended MRA, Delphi has dismissed the sealed complaint it filed against GM.

(b)    <u>FICA Claimants' Estate Causes of Action</u>

In 1999 and 2003, Delphi, a predecessor of DAS LLC, and Delphi Automotive Systems Services LLC (the "FICA Claimants") agreed to pay "ratification bonuses" shortly after the effective date of duly ratified collective bargaining agreements to certain union members. The FICA Claimants contend that the payments were not "wages" subject to taxation under the Federal Insurance Contributions Act ("FICA") but nevertheless withheld and paid FICA taxes to the IRS to avoid the possibility of becoming secondarily liable for the FICA taxes owed to the IRS by those union members. On January 18, 2008, the FICA Claimants filed an adversary proceeding against the United States to obtain a refund on their own behalf and on behalf of certain of their employees of certain payroll taxes paid to the IRS. The complaint, which was later transferred to the United States District Court for the Southern District of New York, seeks to recover the amount of FICA taxes paid, estimated to be $26,058,130, as well as interest. These estate causes of action are preserved under the Modified Plan and the Master Disposition Agreement provides that the net proceeds of the litigation will be shared evenly by Parnassus and GM Components.

**9.**     *Termination Of Salaried OPEB*

On February 4, 2009, the Debtors filed a motion (the "OPEB Motion") to cease contributions to the Debtors' medical and life insurance plans for salaried retirees ("Salaried OPEB"), effective April 1, 2009. Assuming an April 1, 2009 effective date, it was anticipated that upon the effectiveness of the proposed terminations there would be cash savings to the Debtors of approximately $200 million in the aggregate from 2009 through 2011 as well as the elimination of balance sheet liabilities in excess of $1.1 billion. The motion was heavily contested but the Bankruptcy Court entered an order in which it determined on a provisional basis, and subsequently on a final basis, among other things, that the Debtors have the authority to cease providing amendable welfare benefits without complying with the procedures of section 1114 of the Bankruptcy Code and that the Debtors had reserved the right to amend or terminate such benefits. As part of its provisional order, the Bankruptcy Court also directed the U.S. Trustee to create an official committee of retired employees (the "Retirees' Committee"), however, for the primary purpose of determining if competent evidence existed to establish whether any individual or group of retirees had vested benefits that would not be amendable at will.

Both the Retirees' Committee and a separate group of retirees (the "Association") appealed the Bankruptcy Court's ruling. On April 2, 2009, the Bankruptcy Court approved the Debtors' motion seeking approval of a settlement with the Retirees' Committee and the Association to resolve the appeals of the OPEB termination orders. The primary terms of the settlement are as follows:

- the Debtors will pay $8.75 million in overall subsidy payments to the Retirees' Committee for the benefit of Delphi's salaried retirees, not subject to reduction because of enrollment levels, and comprised of (i) a $1 million hardship fund,

S-32

payable at the beginning of May 2009; (ii) $500,000 VEBA set-up costs, payable at the beginning of May 2009 (which the Retirees' Committee may also use for the hardship fund or subsidizing retiree medical benefit costs); (iii) $1.25 million per month for five months, payable monthly at the beginning of each of June through October 2009; and (iv) one final payment of $1 million on November 1, 2009;

- through June 30, 2009, the Debtors will offer salaried retirees a non-retroactive benefits reinstatement opportunity as of the first of the following month. The Debtors will reasonably cooperate with retirees who elect to continue benefits on a self-pay continuation basis to permit payment deductions from their pension checks;

- pursuant to section 1129(a)(13) of the Bankruptcy Code, the Debtors' plan of reorganization, as modified, will provide for the continuation after its effective date of the payment of any unpaid subsidies in the amounts and on the schedule outlined above;

- the Debtors will pay up to an additional $250,000 in attorneys' fees to counsel for the Retirees' Committee and the Association (i.e., in addition to the $200,000 cap on attorneys' fees provided for by the Provisional Salaried OPEB Termination Order), subject to reasonableness review by the Debtors, and payable 60 days after submission of statements of account to the Debtors;

- the parties agree to seek authorization from the Court for the Retirees' Committee to establish a VEBA as contemplated by the provisions of 26 U.S.C. § 35(e)(1)(K) as amended by § 1899G of the American Recovery and Reinvestment Act of 2009 (Pub. L. No. 111-5, 123 Stat 115 (Feb. 17, 2009)) extending the Health Coverage Tax Credit to benefits provided through a VEBA set up by a section 1114 committee or authorized by a bankruptcy judge;

- any VEBA established by the Retirees' Committee under 26 U.S.C. § 501(c)(9) will be deemed to meet the Debtors' obligation under paragraph 5 of the Final OPEB Termination Order to establish under certain circumstances a VEBA for the purpose of qualifying covered employees who have retired or will retire for the tax credit available through the American Recovery And Reinvestment Act;

- the Debtors will cause their group life insurance provider, MetLife, to permit retirees to continue their current level of optional term life insurance coverage (as outlined under the program in the notices sent to retirees) without the need to re-qualify by providing medical information, and will request that MetLife return all copies of health questionnaire information provided by the retirees to continue the benefit; and

- upon entry of a final order approving the OPEB Motion and payment of the amounts due at the beginning of May 2009, the Retirees' Committee and the Association caused their appeals of the OPEB Termination Orders, including the motion to stay the effectiveness of the OPEB Termination Orders, to be voluntarily dismissed, with prejudice, and waived any and all rights to appeal the OPEB Termination Orders.

### D.    Summary Of Claims Process

The Debtors' claims administration process in these Chapter 11 Cases is at an advanced stage compared to other large, complex reorganization cases.  The Debtors have made significant progress in reconciling and allowing claims, primarily because one of the conditions in the Confirmed Plan was that the allowed or estimated amount for certain "trade and other unsecured claims" would not exceed $1.45 billion, the dollar threshold negotiated among the Debtors and the Plan Investors.

### 1.    *Schedules Of Assets And Liabilities And Statements Of Financial Affairs*

On January 20, 2006, the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements"). In compliance with the requirements under the Bankruptcy Code, separate Schedules and Statements were filed for the 42 debtors in the jointly-administered Chapter 11 Cases.  The Debtors filed amendments to the Schedules and Statements on February 1 and April 18, 2006, amendments for ten Debtors on October 12, 2007, an amendment for one Debtor on January 17, 2008, and amendments for ten Debtors on October 10, 2008.  The global notes and limitations with respect to the Schedules and Statements are incorporated by reference in, and comprise an integral component of, the Schedules and Statements, and should be referred to and reviewed in connection with the Schedules and Statements.

For financial reporting purposes, the Debtors, along with their subsidiaries which are not the subject of cases under the Bankruptcy Code, prepare consolidated financial statements that are filed with the SEC and that are audited annually.  Unlike the consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of each individual Debtor, except as otherwise noted.  The Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States, nor are they intended to fully reconcile to the consolidated financial statements filed by Delphi.

### 2.    *Claims Bar Date*

On April 12, 2006, the Bankruptcy Court entered an order (the "Bar Date Order") establishing July 31, 2006 as the general deadline for filing proofs of claim against the Debtors (the "Bar Date").  Proofs of claim were not required to be filed by any person or entity who

- agreed with the nature, classification, and amount of its Claim as described in the Schedules and Statements and whose Claim against a Debtor was not listed as "disputed," "contingent," or "unliquidated" in the Schedules,
- already filed a proof of claim against the correct Debtor,
- asserted only an administrative expense claim and not a claim otherwise subject to the Bar Date Order,
- asserted a claim solely on the basis of future pension or other post-employment benefits,

- had a claim that had been allowed by or paid pursuant to a Bankruptcy Court order,
- was the holder of certain notes, or
- held Delphi common stock.

The Bar Date Order also set a new Bar Date for claimants who might be affected by two specific events which might have occurred before or may occur after the Bar Date. First, if the Debtors amend the Schedules and Statements to reduce the undisputed, non-contingent, and liquidated amounts or to change the nature or classification of a particular Claim against a Debtor reflected therein, then the affected claimant has until 30 calendar days after such claimant is served with notice that the Debtors have amended their Schedules to file a proof of claim or to amend any previously filed proof of claim in respect of such amended scheduled claim. Second, holders of claims based on the rejection of executory contracts and unexpired leases have until the later of (i) the Bar Date or (ii) 30 calendar days after the effective date of such rejection to file a claim.

Under the Bar Date Order, any person or entity which was required to file a proof of claim, but failed to do so in a timely manner on or before the applicable Bar Date, is forever barred, estopped, and enjoined from (a) asserting any claim that such person or entity has against the Debtors that (i) is in an amount that exceeds the amount set forth in the Schedules and Statements as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules and Statements and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these Chapter 11 Cases in respect of such a claim, and the Debtors and their property will be forever discharged from any and all indebtedness or liability with respect to such a claim.

### 3.    Administrative Claims Bar Date

Pursuant to the Modified Plan and the Modification Procedures, the Debtors will seek to establish July 10, 2009 as the bar date for asserting Administrative Claims that arose on or prior to June 1, 2009. The Debtors anticipate distributing a bar date notice describing the procedures for asserting an Administrative Claim that arose before June 1, 2009 with the solicitation materials. The Modified Plan also establishes a bar date for Administrative Claims arising between June 1, 2009 and the Effective Date of the Modified Plan. After the Effective Date of the Modified Plan, holders will have 30 days to submit Administrative Claims. No payments will be made on account of Administrative Claims until the claim is Allowed.

### 4.    Proofs Of Claim And Other Claims

As of May 26, 2009 the Debtors had received approximately 16,850 proofs of claim, some of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. Although the Debtors have not completed the process of reconciling these proofs of claim and thus, the ultimate amount of such liabilities is not determinable at this time, the Debtors believe that the aggregate amount of claims filed is likely to exceed the amount that will ultimately be allowed by the Bankruptcy Court.

### 5.    *Claims Reconciliation Progress*

The Debtors have sought to resolve their claims pool on an expedited basis. With $34 billion in liquidated amounts plus certain unliquidated amounts asserted against the Debtors as of May 26, 2009 in approximately 16,850 proofs of claim, and certain scheduled liabilities for which no proof of claim was filed, the Debtors faced a challenging task. Between September 19, 2006 and May 26, 2009, the Debtors filed 33 Omnibus Claims Objections (as defined below). As of May 26, 2009, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,950 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered orders modifying approximately 3,998 claims, reducing the aggregate amounts asserted on those claims by $350 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors and their advisors devoted a significant amount of time to the claims resolution process. For example, the Debtors gained court approval of certain claims objection procedures, which are discussed in more detail below, applicable to claims that become contested when claimants respond to an omnibus objection. Pursuant to these procedures, the Debtors scheduled multiple claims for adjudication in a hearing before the Bankruptcy Court, held multiple "meet-and-confer" discussions and mediations, and ultimately resolved several contested claims during the period from October 2006 through May 26, 2009 before they were scheduled for hearing.

As of May 26, 2009 there are approximately 40 proofs of claim of the approximately 16,850 proofs of claim which still require further reconciliation by the Debtors.  The Debtors anticipate that some of these remaining proofs of claim will be withdrawn as they are reconciled and the Debtors intend to place all remaining proofs of claim that are not withdrawn on future omnibus claims objections

### 6.    *Key Classes Of Claims*

(a)    <u>GM Claims</u>

(i)    GM's Proof Of Claim

On July 31, 2006, GM filed an unliquidated amended proof of claim.  The claims asserted by GM included warranty/recall claims, overpricing and overpayment claims, short shipments claims, damaged goods claims, missed price reduction claims, lease and service contract claims, flowback employee post employment benefits and relocation cost claims, claims arising under the special attrition programs, UAW benefit guarantee claims, personal injury indemnification claims, environmental claims, federal, state, and other tax claims, and intellectual property claims.   For certain portions of its claim, GM provided documentation aggregating approximately $6 billion.  Under the Amended GSA, GM received a $2.5 billion allowed general unsecured claim.  In addition, certain of GM's warranty claims were settled by agreement of the parties as set forth more fully below.  Further, GM received an administrative expense claim in

an amount up to $2.055 billion arising from the IRC Section 414(l) Transfer and an administrative claim for obligations under the GM Arrangement. As part of GM's consideration provided under the Master Disposition Agreement, at closing GM's administrative expense claim under Section 4.04(a)(i) of the Amended GSA, its administrative expense claim under the GM Arrangement, and its prepetition claim will be waived or deemed satisfied.

(ii)    Settlement Of GM Warranty Claims

GM asserted that it incurred costs and suffered damages arising from certain customer warranty claims and/or recall campaigns related to allegedly non-conforming parts and systems supplied by Delphi to GM. These claims were not subject to the general settlement with GM as documented in the Original GSA and Original MRA. During separate negotiations to resolve the warranty claims, GM advised Delphi that the amount of certain warranty claims had substantially increased from those asserted in GM's proof of claim.

On September 27, 2007, the Bankruptcy Court granted Delphi's motion to enter into and perform under a settlement agreement resolving the warranty claims (the "Warranty Settlement Agreement") with GM for a total estimated amount of approximately $200 million. With certain limited exceptions, the agreement (i) settles all outstanding warranty claims and issues related to a component or assembly supplied by Delphi to GM that are (a) known by GM as of August 10, 2007, (b) determined by GM to be Delphi's responsibility in whole or in part, and (c) managed in GM's investigation process, and (ii) limits the liability related to certain other warranty claims that have become known by GM on or after June 5, 2007. Under the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007 (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million as of the date of the Warranty Settlement Agreement or GM believed the claim would exceed $1 million, (iii) the claim, as of the date of the Warranty Settlement Agreement, was in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed as of the date of the Warranty Settlement Agreement, or reasonably should have believed at that time, that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it expected to receive payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Confirmed Plan, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, which favorably impacted Delphi's operating income in July 2008 by $112 million.

(b)    <u>Environmental And Other Regulatory Claims And Investigations</u>

Delphi is subject to the requirements of U.S. federal, state, local, and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating water discharge, waste management, and cleanup of contaminated sites. Delphi has

an environmental management structure designed to facilitate and support its compliance with these requirements.  Historically, Delphi has tried to comply with all such requirements and regulations, although the Debtors cannot provide assurance that they are at all times in compliance.  The Debtors have made and will continue to make expenditures to comply with environmental requirements.  Environmental requirements are complex, change frequently, and have tended to become more stringent over time.  Accordingly, the Debtors cannot assure that environmental requirements will not change or become more stringent over time or that the Debtors' or the Reorganized Debtors (to the extent certain liabilities are not discharged) eventual environmental cleanup costs and liabilities will not be material.

Delphi is also subject to complex laws governing the protection of the environment and requiring investigation and cleanup of environmental contamination.  Delphi is in various stages of investigation and cleanup at its manufacturing sites where contamination has been discovered.  Additionally, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont  Barrel Fill  Site located in Tremont City, Ohio.  In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site.  The Remedial Investigation and Alternatives Array Document were finalized in 2007.  A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009.  Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures, possibly as much as $11-15 million in excess of existing reserves.  Delphi believes, however, that this liability, among others, will be discharged pursuant to the Modified Plan.  Delphi will continue to reassess any potential costs and, as appropriate, its environmental reserve as the investigation proceeds.

When it has been possible to provide reasonable estimates of Delphi's liability with respect to environmental sites, provisions have been made in accordance with U.S. GAAP.  As of March 31, 2009, Delphi's reserve for such environmental investigation and cleanup was approximately $103 million.  The majority of that liability will be discharged.  Also as of March 31, 2009, Delphi believes that Reorganized DPH Holdings Co. will incur approximately $32 million in clean up costs at certain domestic sites.  These liabilities may not be subject to discharge and even if subject to discharge, Reorganized DPH Holdings Co. might be subject to the same liability to the extent it is the owner or operator of such sites.  Nevertheless, Delphi cannot ensure that U.S. environmental requirements will not change or become more stringent over time or that Reorganized DPH Holdings Co.'s eventual environmental cleanup costs and liabilities in the U.S. will not exceed the foregoing amount.  Moreover, facility sales and/or closures relating to the restructuring process could trigger additional and perhaps material environmental remediation costs, as previously unknown conditions may be identified.

Environmental Obligations will either be treated in accordance with the Master Disposition Agreement, retained by Reorganized DPH Holdings Co., or discharged under the Modified Plan.

(c)    Workers' Compensation Claims

In many states where the Debtors conduct business, the Debtors self-insure their workers' compensation programs and, as required by state law, have obtained letters of credit for the benefit of the states in the event that the Debtors default on their obligations to pay workers compensation claims.  Certain states in which the Debtors are self-insured have filed contingent claims for repayment in the event that the Debtors do not satisfy prepetition workers' compensation liabilities.  If the Debtors default on such obligations, such states may allege that their claims for recovery of payments made to workers should be entitled to priority treatment by characterizing such claims as "excise taxes" under section 507(a)(8) of the Bankruptcy Code.  In addition, certain employees who filed contingent claims on account of workers' compensation payments they are receiving may, upon a default by the Debtors, assert that they are entitled to priority under section 507(a)(3) or (4).

The Debtors estimate that allowed claims asserted by states, if any, on account of contingent workers' compensation claims would be in amounts less than $10 million.  First, only a few states filed such claims on or prior to the Bar Date and the Debtors believe that, in the event they are determined to be excise taxes, such priority treatment would be limited to payments for injuries that occurred within three years of the commencement of the Chapter 11 Cases.  Second, priority treatment for timely claims asserted by individuals, in the event they are determined to be employee wage or benefit claims under 507(a)(3) or (4) are capped at $10,000 per individual, and the Debtors have made  payments to employees, including without limitation, workers' compensation payments to employees throughout the duration of the Chapter 11 Cases, in amounts that the Debtors believe likely exhausts the cap.  To the extent asserted workers' compensation claims are administrative expense claims related to their respective acquired assets, such claims will be assumed by one of the Buyers pursuant to the Master Disposition Agreement with remaining administrative claims to be retained and paid by DPH Holdings Co.  Any prepetition claims not barred by the Bar Date will be satisfied through the application of existing letters of credit, pursuant to the treatment set forth for either of the priority classes, or as set forth in Article 5.3 for allowed prepetition general unsecured claims, and will be discharged pursuant to the Modified Plan.  To the extent no timely claim has been filed, such liabilities are barred by the Bar Date Order and will be discharged pursuant to the Modified Plan.

### 7.    Reclamation Claims Program

On November 4, 2005, the Bankruptcy Court approved global procedures for receiving, reviewing, responding to, and resolving reclamation demands.  The Debtors received thousands of reclamation demands, including duplicate demands.  Due to the high volume of reclamation demands received by the Debtors, the Bankruptcy Court granted the Debtors a 45-day extension of the deadline to reconcile all reclamation claims.  After reviewing these demands, the Debtors identified 855 non-duplicate reclamation demands with a total face amount of approximately $282.7 million.

To facilitate the review process of these 855 reclamation demands and the requirement to respond to all reclamation demands within 135 days, the Debtors developed a comprehensive process for responding to all such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim amounts subject to certain reserved defenses.  Reclamation

response statements were sent to all 855 claimants on February 21, 2006. These statements, representing the results of many hours of review of invoices and billing records, identified total reclamation claims of approximately $18.4 million. Since that time as a result of additional negotiations and reconciliations, the current amount of reclamation claims has been reduced to approximately $17.5 million. As a result of almost continual negotiations with reclamation claimants since the Petition Date, 840 of the original 855 non-duplicate claims have now been resolved, subject to reservation of further defenses. Of the 840 resolved reclamation claims, 505 reclamation claims asserting an aggregate amount of approximately $163 million have been resolved in the amount of zero.

On June 5, 2009, the Debtors filed a motion seeking a judicial determination that the remaining 350 reclamation claims are subject to the Debtors' reserved defense that reclamation claims are not entitled to administrative priority status on the grounds that the goods and/or the proceeds from the sale of the goods for which claimants are seeking a reclamation claim are or were subject to a valid security interest (the "Prior Lien Defense"). By this motion, the Debtors sought entry of an order classifying these 350 reclamation claims as general unsecured nonpriority claims for all purposes, including for purposes of distribution under the Modified Plan. Creditors holding reclamation claims will not receive any voting rights on the Modified Plan on account of their reclamation claims but instead will receive voting rights provided for holders of general unsecured claims.

### E.     Professional Fees

At the commencement of these Chapter 11 Cases, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Compensation Order"). The Compensation Order requires professionals retained in these cases to submit monthly fee statements to the Debtors and requires the Debtors to pay 80% of the requested fees and 100% of the requested expenses pending interim approval by the Bankruptcy Court. The remaining 20% of fees requested in such fee statements are paid only upon further order of the Bankruptcy Court (the "Holdback"), which authority has been granted for the first six interim fee periods. The Compensation Order requires the professionals retained in these Chapter 11 Cases to file applications for approval of their fees and expenses for the preceding four-month period approximately every four months.

To monitor costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Chapter 11 Cases, the Debtors, the Creditors' Committee, and the U.S. Trustee negotiated the formation of a joint fee review committee (the "Fee Review Committee") to review, comment on, and, if necessary, object to the various fee applications filed in these Chapter 11 Cases. On May 5, 2006, the Bankruptcy Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the committee, its composition, mandate, and procedures. The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee. On August 17, 2006, the Bankruptcy Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc. as a fee analyst to assist the Fee Review Committee.

The fees approved by the Bankruptcy Court through September 30, 2007 for the Debtors', Creditors' Committee's, and Equity Committee's professionals, and estimated fees and expenses

for the seventh interim fee application period (October 1, 2007 through January 25, 2008), are as follows:

| Period | Dates | Fees | Expenses |
|---|---|---|---|
| First Interim Fee Application Period | 10/8/2005 – 1/31/2006 | $40,116,406 | $2,295,873 |
| Second Interim Fee Application Period | 2/1/2006 – 5/31/2006 | $56,680,150 | $4,081,250 |
| Third Interim Fee Application Period | 6/1/2006 – 9/30/2006 | $49,362,582 | $4,307,390 |
| Fourth Interim Fee Application Period | 10/1/2006 – 1/31/2007 | $49,295,947 | $3,358,907 |
| Fifth Interim Fee Application Period | 2/1/2007 – 5/31/2007 | $62,762,634 | $4,479,310 |
| Sixth Interim Fee Application Period | 6/1/2007 – 9/30/2007 | $45,342,099 | $3,302,078 |
| Seventh Interim Fee Application Period (Estimated) | 10/1/2007-1/25/2008 | $52,605,998 | $4,021,795 |

All fee applications filed in these cases are subject to final approval by the Bankruptcy Court. Pursuant to paragraph 33 of the Confirmation Order post-confirmation fees and expenses incurred are being paid in the ordinary course of business. Accordingly, the Fee Review Committee has not been active since the period following the entry of the Confirmation Order.

## IV.    SUMMARY OF THE MODIFIED PLAN

This section provides a summary of the Modified Plan, including:

- A discussion of the settlements embodied in the Modified Plan

- The classification and treatment of claims and interests

- The operative provisions of the Modified Plan, including the means for electing the board of directors of the reorganized Company, claims reconciliation and distributions, and releases of the Debtors and certain third parties

Key modifications to this section include:

- Changes to plan consideration to be received by unsecured creditors and equity security holders, including the elimination of postpetition interest on unsecured claims

- Procedures for appointment of the initial board of directors of the reorganized Company

- Adjustments to the claims reconciliation, distribution, and cure mechanics

- The elimination of releases and exculpation for the Plan Investors

### A.    Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its

creditors, and its shareholders. In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtors and its assets. In furtherance of these goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and may terminate all rights and interests of equity security holders.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE MODIFIED PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MODIFIED PLAN, WHICH ACCOMPANIES THIS SUPPLEMENT, AND TO THE EXHIBITS ATTACHED TO THE MODIFIED PLAN.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS SUPPLEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE MODIFIED PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS SUPPLEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE MODIFIED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE MODIFIED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE MODIFIED PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE MODIFIED PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST. PLEASE TAKE NOTICE THAT YOUR PREVIOUS ACCEPTANCE OR REJECTION OF THE CONFIRMED PLAN WILL NOT BE COUNTED. THUS, TO THE EXTENT YOU WANT TO VOTE ON THE MODIFIED PLAN, YOU MUST RETURN A BALLOT.

B.        **Overall Structure Of The Modified Plan**

If the modifications to the Confirmed Plan are approved by the Bankruptcy Court and consummated, (1) the Claims in certain Classes may be reinstated or modified and will receive distributions equal to the full amount of such Claims and (2) the Claims and Interests in other Classes will be modified or extinguished and will receive distributions in exchange for such Claims and Interests. At certain times after the Effective Date, the Reorganized Debtors will distribute Cash or other consideration in respect of certain Classes of Claims and Interests as provided in the Modified Plan. The Classes of Claims against and Interests in the Debtors created under the Modified Plan, the treatment of those Classes under the Modified Plan, and the securities and other property to be distributed under the Modified Plan are described below.

*1.        Settlements During The Chapter 11 Cases*

The foundation of Delphi's restructuring is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes. The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, the DIP Lenders, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, and the PBGC (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries, as further modified, of the various holders of claims and interests under the Modified Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases. Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Modified Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests. The Debtors also believe that the recoveries provided to holders of Claims under the Modified Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements. Although certain of the Settlements have already become effected, others will be effected upon consummation of the Modified Plan. In addition, the Amended MRA will be terminated pursuant to and superseded by the Master Disposition Agreement.

The claims and disputes being resolved by the Settlements include, among others:

- Resolution, including through the Amended GSA and Amended MRA, as modified by the Master Disposition Agreement, of Delphi's potential claims against GM, the risk with respect to continuity of supply to GM, the Statutory Committees' request to prosecute such claims, and GM's administrative claims and proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor Unions.

- The claims and causes of action asserted by various plaintiffs against certain defendants including the Debtors in the Multidistrict Litigation in the United States District Court for the Eastern District of Michigan.

- The claims that could be asserted and the liens that are asserted by the PBGC in connection with Delphi's hourly and salaried pension plans to the extent such liabilities are not transferred to GM or Parnassus.

- As described more fully below, the claims of the DIP Lenders and the effectuation of the DIP Transfer under the Modified Plan in satisfaction of the DIP Lender claims.

The substance of each of the Settlements is discussed elsewhere in this Supplement or in the Disclosure Statement. Although the Settlement Negotiation Parties disagree over the relative strengths and weaknesses of the claims and potential defenses asserted by certain parties to the Settlements and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the claims and disputes is crucial to confirmation of any plan. Clearly, any litigation concerning the settled matters would be exceptionally complicated and protracted, and given the magnitude of the values involved and the amount of claims at stake, would be hotly contested and expensive. Such litigation would in turn substantially prolong these Chapter 11 Cases, which all constituencies believe is not in the best interests of the Estates. For these reasons, the Debtors believe that the Settlements reached among the Settlement Negotiation Parties are in the best interests of the Estates and all stakeholders.

## 2.    DIP Transfer

A predicate to the consummation of the Modified Plan is the deemed occurrence of the DIP Transfer in full satisfaction of the DIP Lenders Claims. As previously described, in negotiating the DIP Credit Agreement, the Debtors, the Agent, and the DIP Lenders agreed to certain provisions that authorized the Agent to act upon the instruction of the Required Lenders, which are the majority of the two most senior tranches of the DIP facility, for the benefit of all the DIP Lenders. This negotiated provision was consented to by all the DIP Lenders. Accordingly, individual lenders do not have the right to enforce remedies individually under the DIP Credit Agreement, but rather remedies can only be enforced through collective action. Specifically, the parties agreed that, if an Event of Default (as defined in the DIP Credit Agreement) were to occur, the Administrative Agent may, and upon the request of Required Lenders is required to, exercise the various rights and remedies permitted under section 7.01 of the DIP Credit Agreement. Accordingly, the DIP Credit Agreement gave the two most senior tranches of lenders the right to vote to direct the Administrative Agent to take certain actions in response to an Event of Default. The tranche of lenders most junior in priority consented to delegating these rights.

Because the DIP Lenders have all consented to the intercreditor arrangement among themselves, either through direct consent or by purchasing a portion of the debt covered by the DIP Credit Agreement, the Debtors believe that all DIP Lenders are bound by the Administrative Agent's exercise of remedies, including actions to assert control over property and interests under the Uniform Commercial Code, as adopted by the state of New York, in satisfaction of the DIP Claims. In fact, the Bankruptcy Court generally endorsed the Debtors' collective action interpretation of the DIP Credit Agreement when it approved the Accommodation Agreement over the objection of certain participants. In the current economic environment, the Debtors are

expecting a similar reaction to the Debtors' and the DIP Lenders' negotiated transfer or sale of collateral (the "Transferred Assets") under the Modified Plan (the "DIP Transfer"). The DIP Transfer is not expected to garner unanimous support of the DIP Lenders. Nevertheless, the DIP Lenders consented to the collective action principles contained in the DIP Credit Agreement and therefore only the Administrative Agent may enforce remedies – and at the direction of the Required Lenders, the Administrative Agent <u>must</u> enforce remedies. Pursuant to the Modified Plan, the Administrative Agent will be deemed to have exercised its enforcement rights by pursuing remedies under Article 9 of the UCC in full satisfaction and discharge of the DIP Lenders Claims. Because the DIP Lenders consented to this enforcement right, among others, the Debtors will have satisfied the requirement set forth in section 1129(a)(9) of the Bankruptcy Code. In accordance with the requirements of Section 9-620 of the UCC, the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement. If a Subordinated Person objects to such notice within 20 days, the Debtors will provide those parties who are notified of the proposed transfer under Section 9-620 of the UCC with 10 days notice of a public sale pursuant to Section 9-610 of the UCC. Such notice also will set forth the procedures to be employed in connection with the public sale. Parties will then have an opportunity to purchase such the transferred assets in a public sale conducted in accordance with Section 9-610 of the UCC and the procedures set forth in the notice, but only if such parties' offer is selected as the highest or otherwise best competing proposal.

As shown in the diagram below, the first step in consummation of the Modified Plan is the issuance of one share of Reorganized DPH Holdings Co. common stock to the Post-Confirmation Trust and the cancellation of Existing Common Stock. Next, certain of Delphi's assets will be sold to Parnassus and other assets to GM pursuant to the Master Disposition Agreement. Then, the Administrative Agent will consummate the DIP Transfer to accept from the Reorganized Debtors certain of the proceeds from the sale of assets, specifically, the DIP Consideration, in satisfaction of the DIP Claims. Should an objection to the transfer be made or should an alternate party provide a competing proposal providing sufficient consideration whereby, at a minimum, the DIP Lenders would receive payment in cash for their claims, a disposition proceeding would be held. On the Effective Date, either the Administrative Agent or the party providing the competing proposal with the highest value, as applicable, will receive the disposition proceeds. In the event a competing proposal bests the amount of the DIP Lenders' credit bid, after payment of the DIP Claims in full and to the extent there are sufficient proceeds remaining, additional distributions would be made to creditors in compliance with the absolute priority rule. Also on the Effective Date, the Debtors would make provisions for the payment of Administrative Claims (excluding such claims to be assumed by third parties). Further, the Debtors will establish a distribution account for certain deferred consideration under the Master Disposition Agreement from which distributions will be made as described below.



Following the effectiveness of the Modified Plan, Reorganized DPH Holdings Co. will operate the retained sites. In addition, Reorganized DPH Holdings Co. will make distributions to holders of secured, priority, and unsecured claims, as set forth in detail below.

## C.    Substantive Consolidation Of Certain Debtors

The Modified Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' Estates for purposes of all actions associated with confirmation and consummation of the Modified Plan. The Court may order substantive consolidation in the exercise of its general equitable discretionary powers under section 105(a) of the Bankruptcy Code to ensure the equitable treatment of creditors. The effect of substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund. The Debtors in a particular consolidated Debtor group will be substantively consolidated with each other but not with any other Debtor.

Specifically, under the Modified Plan, the groups of Debtors that will be substantively consolidated with each other and the individual non-consolidated Debtors are as set forth in the diagram below. Each Debtor entity is labeled in the appropriate Debtor group color according to the key on the diagram, and is identified by the number of the group as set forth in the legend below.



In considering whether substantive consolidation of any of the Estates was appropriate, Delphi evaluated whether creditors relied on the separate existence of a particular Debtor when extending credit to that Debtor and whether the financial affairs of any of the Debtors were hopelessly entangled. Taking these and other factors into account, the Debtors determined that on balance, substantive consolidation of the Estates of the Delphi-DAS Debtors (Group 1), the DASHI Debtors (Group 2), the Connection Systems Debtors (Group 3), and the Specialty Electronics Debtors (Group 4) under the Modified Plan is appropriate and in the best interests of the Company's creditors. Moreover, the Debtors concluded that any harm their creditors may suffer from such substantive consolidation is negligible in light of the distributions that such creditors will receive under the Modified Plan.

On the Confirmation Date, and in accordance with the terms of the Modified Plan and the consolidation of the assets and liabilities for voting and distribution purposes of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics

Debtors, respectively, all Claims based upon guaranties of collection, payment, or performance made by the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, as to the obligations of another of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be released and of no further force and effect. Notwithstanding the foregoing, but subject to the Disposition Transactions, the Debtors reserve all rights with respect to their position on substantive consolidation as to any or all of the Debtors.

As part of the Confirmation Order, the Bankruptcy Court approved the Debtors' request for substantive consolidation as outlined above. The Debtors intend to seek the same approval of that substantive consolidation in connection with the Modified Plan. Thus, notwithstanding that the Bankruptcy Court has approved the substantive consolidation of certain of the Debtors' Estates in the Confirmation Order, the Modified Plan will serve as, and will be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If no proper objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served as provided in the Modification Procedures Order, or such other date as may be established by the Bankruptcy Court, the Modification Approval Order will serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Plan, and any objections thereto will be part of the Final Modification Hearing. The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such a hearing.

### D.    Classification Of Claims And Interests

#### 1.    The Debtors

There are a total of 42 Debtors. For the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors, and for balloting purposes, each Debtor or consolidated group of Debtors has been assigned its own number, as set forth in the chart below. The Claims against and Interests in each Debtor, in turn, have been assigned to separate lettered Classes with respect to each Debtor, based on the type of Claim involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted (or in whom such Interest is held) and the type of Claim or Interest in question. The numbers applicable to the various Debtors or consolidated groups of Debtors are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
|---|---|
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|-------------------------------------------|
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

### 2.    *Classification Of Claims Against And Equity Interests In The Debtors*

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders.  The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of such class.  The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

Claims against and Interests in each of the Debtors are divided into lettered Classes.  Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appears in the case of each Debtor.  For purposes of voting, claims within the Class will be counted for each applicable Debtor or group of consolidated Debtors.  Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests will be grouped under the appropriate lettered Class from the following list:

Class A-1    Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors.

Class B    Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors.

Class C-1    Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors.

Class C-2    Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors.

Class D    Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors.

Class E    Class E consists of all Section 510(b) Note Claims against Delphi Corporation.

| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi Corporation. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors. |
| Class I | Class I consists of all Other Interests in Delphi Corporation. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |
| Class K | Class K consists of all Other Priority Claims. |

The Debtors believe that they have classified all Claims and Interests in compliance with the requirements of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Modified Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make reasonable modifications of the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation.

EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE MODIFIED PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE MODIFIED PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS IN WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

## E.    Treatment Of Claims And Interests Under The Modified Plan

The classification and treatment of Claims against and Interests in the various Debtors are set forth in detail in the Modified Plan. A summary is provided below.

### 1.    Treatment Of Unclassified Claims

#### (a)    Administrative Claims

An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

Subject to the Master Disposition Agreement and the provisions of the Modified Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim have agreed upon in writing; except that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim will be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim have agreed upon in writing or as determined by the Bankruptcy Court, which Claims will be satisfied in accordance with Article X of the Modified Plan, (y) holders of hedging claims arising under the DIP Facility will receive the treatment described in the Master Distribution Agreement, and (z) the holder of an Administrative Claim must have filed a proof of claim form no later than July 10, 2009, pursuant to the procedures described in Article 10.2 of the Modified Plan and the Modification Procedures Order, and such Claim must have become an Allowed Claim.   For the avoidance of doubt, the GM Administrative Claim will receive the treatment set forth in Article 2.3 of the Modified Plan.

At the June 10, 2009 hearing on modifications to the Confirmed Plan, certain of the DIP Lenders and the DIP Agent reserved their rights with respect to the Debtors' proposed treatment of the DIP Claims described above and disputed whether such treatment could constitute payment in full, absent Required Lender consent.  Certain DIP Lenders also assert that the transactions proposed in the Master Disposition Agreement and the Modified Plan would require DIP Lender consent to release the liens on the Debtors' collateral that were granted pursuant to the order approving the DIP Credit Agreement.  The Debtors disagree with these stated positions.

(b)    Priority Tax Claims

Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim will be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) of this paragraph, or (iii) payment in full in Cash, except that holders of Priority Tax

Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement will be treated in the manner set forth in the Master Disposition Agreement.

(c)     GM Administrative Claim

For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Delphi-GM Global Settlement Agreement, GM has received and will receive allowed administrative expense claims of no more in the aggregate than $2.055 billion (the "GM 414(l) Administrative Claim").  Upon the Effective Date and the consummation of the Master Disposition Agreement, GM will waive and release the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim, and GM will accordingly receive no distribution on account of such claims.

**2.     *Treatment Of Classified Claims And Interests***

Pursuant to section 1127 of the Bankruptcy Code, as it incorporates section 1122, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Modified Plan and of receiving distributions pursuant to the Modified Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1127 of the Bankruptcy Code, as it incorporates section 1123(a)(1), Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth above.  The Modified Plan, though proposed jointly, constitutes a separate plan proposed by each of the consolidated groups of Debtors and each of the Debtors individually within each group.  Therefore, except as expressly specified herein, the classifications set forth below will be deemed to apply separately with respect to each plan proposed by each such consolidated Debtor group.

**(a)     Classes Of Claims That Are Unimpaired**

(i)     Class B (Flow-Through Claims).

Class B consists of all Flow-Through Claims that may exist against a particular Debtor. A "Flow Through Claim" means a claim arising from an Employee-Related Obligation, except that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.

The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, will be unaltered by the Modified Plan and will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor  is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which will be fully preserved), except that any Flow Through Claim assumed pursuant to the Master Disposition Agreement will receive the treatment specified therein.  The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases will be without prejudice to a Reorganized Debtor's right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court or other court of competent jurisdiction.

(ii)    Class J (Interests In Affiliate Debtors).

Class J consists of all Interests in Affiliate Debtors.  "Interests in Affiliate Debtors" means the legal, equitable, contractual, and other rights of any Person with respect to any equity securities of, or ownership interests in the Affiliate Debtors.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions or the Master Disposition Agreement, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Modified Plan.

(iii)    Class K (Other Priority Claims).

Class K consists of all Other Priority Claims.  "Other Priority Claims" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**(b)    Classes Of Claims That Are Impaired**

(i)    Class A-1 (Secured Claims).

Class A-1 consists of All Secured Claims that may exist against the applicable Debtor.  A "Secured Claim" means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, or  DIP Facility Second Priority Term Claim, that is secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

Except as otherwise provided in and subject to Article 9.8 of the Modified Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim will receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date plus 200 basis points (the "Secured Claim Interest Rate"), and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall have accrued at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Secured Claim; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as to which the Debtors or Reorganized Debtors, as the case may be, and the holder of such Allowed

Secured Claim have agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, with respect to the treatment in clause (i) and clause (iii) above, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied pursuant to the Modified Plan; except that such holder of an Allowed Secured Claim will be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtors are in compliance with Article 5.1 of the Modified Plan. To the extent the Debtors or the Reorganized Debtors elect the treatment set forth in clause (ii) above, all valid liens will be discharged and otherwise satisfied upon the receipt of the claimant's collateral by the holder of such Allowed Secured Claim.

(ii)    Class C-1 (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor. The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Contingent PBGC Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

On the Effective Date, the Disbursing Agent will establish a distribution account to hold the proceeds, if any, of the General Unsecured MDA Distribution. Except as otherwise provided in and subject to Articles 9.8 and 11.10 of the Modified Plan, commencing on the first Periodic Distribution Date occurring after the later of (i) the date when the proceeds of the General Unsecured MDA Distribution may be distributed to holders of General Unsecured Claims, (ii) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim, or (iii) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the proceeds of the General Unsecured MDA Distribution. In addition, if applicable, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the proceeds of the General Unsecured MDA Distribution held in the Supplemental Distribution Account, except that no distribution from the Supplemental Distribution Account will be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient. Distributions made pursuant to Articles 5.3, 5.4, 5.5, and 11.10 of the Modified Plan will be in complete satisfaction of all obligations of GM under Section 4.04 of the Delphi-GM Global Settlement Agreement.

(1)    Future Distributable Value

As mentioned above, holders of unsubordinated allowed General Unsecured Claims (including the PBGC's allowed claim) will receive their pro rata share of deferred consideration in accordance with the Master Disposition Agreement. Pursuant to section 3.2.3 of the agreement, certain distributions will be made to holders of General Unsecured Claims if the transfer of assets as contemplated in the Master Disposition Agreement is implemented pursuant to the Debtors' Modified Plan. The distributions to holders of General Unsecured Claims will commence once an aggregate amount of $7.2 billion has been distributed to holders of interests in Parnassus (which amount does not include the 8% mandatory payments made to the holders of Parnassus Class C Interests). The operating agreement of Parnassus governs the terms of distributions made to holders of interests in Parnassus. When the $7.2 billion distribution level is reached, Parnassus will pay an amount equal to $3 to holders of General Unsecured Claims for every $97 dollars distributed to holders of interests in Parnassus. The maximum amount that will be distributed to the holders of General Unsecured Claims is $180 million. If the full $180 million is distributed to holders of General Unsecured Claims, the total distributions made to holders of interests of Parnassus would be approximately $13 billion. These recoveries, however, are not guaranteed and there can be no assurance that they will be realized.

(2)     Liens Arising From Indenture Trustee Fees

The Debtors will seek to reach a resolution regarding the Indenture Trustee Fees but absent a settlement, the distribution to Senior Noteholders will be subject to the Indenture Trustee's liens which could materially reduce recoveries to holders of senior debt.

(3)     Satisfaction Of TOPrS' Subordination Provisions

The Indenture with respect to the Trust Preferred Securities, or TOPrS, dated as of October 28, 2003 (the "TOPrS Indenture"), provides that the TOPrS are subordinated to "Senior Debt." "Senior Debt" is defined as any obligation of Delphi Corporation to its creditors other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the TOPrS, (ii) obligations evidenced by the TOPrS, and (iii) obligations that are expressly stated in the terms of the TOPrS (or in the TOPrS Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 of the TOPrS Indenture with respect to such TOPrS) not to be Senior Debt. In this regard, Delphi covenanted in the TOPrS Indenture that the TOPrS are subordinate and junior in right of payment to all Senior Debt to the extent provided therein, and each holder of the TOPrS covenanted and agreed to the subordination therein provided.

Article 17.01 of the TOPrS Indenture also provides that, in the event that Delphi shall default on any Senior Debt, no payments shall be made on account of the TOPrS until such default is cured, waived, or shall cease to exist and, in the event of a bankruptcy proceeding all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property (other than securities of Delphi or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the TOPrS, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) which would otherwise

(but for subordination) be payable or deliverable in respect of the TOPrS shall be paid or delivered directly to the Holders of Senior Debt until all Senior Debt shall have been paid in full. This subordination provision essentially provides that, should any payment be made to the TOPrS holders prior to payment in full of Senior Debt (except for certain securities as set forth above), those assets paid shall be held in trust for and turned over to the Senior Debt holders.

The TOPrS Indenture provides that Senior Debt shall not be deemed to have been paid in full unless the holders thereof receive cash, securities, or other property equal to the amount of such Senior Debt then outstanding. Once Senior Debt is paid in full, the holders of the TOPrS are subrogated to Senior Debt's rights to receive further distributions. Distributions to holders of TOPrS Claims will be reallocated and redistributed to holders of other General Unsecured Claims, including Senior Debt.

(iii)    Class C-2 (PBGC Claims)

Class C-2 consists of the Contingent PBGC Secured Claim and the PBGC General Unsecured Claim. A "Contingent PBGC Secured Claim" means any Claim of the PBGC asserted against the applicable Debtors or group of Debtors, which Claims were granted conditional adequate protection liens pursuant to the Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfer Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694) and the Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 And Cash Management Order Authorizing DASHI To Grant Adequate Protection to Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated July 30, 2008 (Docket No. 14005). The phrase "PBGC Unsecured Claim" means any Claim of the PBGC against the applicable Debtors or group of Debtors arising from or relating to the Pension Plans that are not secured by valid, perfected, and enforceable liens against the assets or property of the Debtors.

Pursuant to Article 7.17 of the Modified Plan, and except as otherwise provided in and subject to Articles 9.8 and 11.10 of the Modified Plan, the PBGC will receive, on the Distribution Date on account of its PBGC Claims in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed PBGC Claims, the treatment set forth in Article 7.17 of the Modified Plan.

(iv)    Class D (GM Unsecured Claim).

Class D consists of the GM Unsecured Claim that may exist against a particular Debtor. The phrase "GM Unsecured Claim" means any Claim of GM, excluding the GM Administrative Claim, and all other Claims and amounts to be treated pursuant to the Master Distribution Agreement, but will otherwise include all claims asserted in GM's proof of claim, and was allowed in the amount of $2.5 billion upon the effectiveness of the Amended GSA.

In full settlement, satisfaction, and release of the GM Unsecured Claim, GM will receive releases provided for in section 4.01 of the Amended GSA.

(v)    Class E (Section 510(b) Note Claims).

Class E consists of all Section 510(b) Note Claims that may exist against a particular Debtor.  A "Section 510(b) Note Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

Holders of Section 510(b) Note Claims will not be entitled to, and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) Note Claims.

(vi)    Class F (Intercompany Claims).

Class F consists of all Intercompany Claims that may exist against a particular Debtor. An "Intercompany Claim" means a Claim by a Debtor, an Affiliate of a Debtor, or a non-Debtor Affiliate against another Debtor, Affiliate of a Debtor, or non-Debtor Affiliate.

On the Effective Date, and subject to the Master Disposition Agreement, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, will not receive a distribution on the Effective Date and instead will either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Modified Plan.

(vii)    Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

On the Effective Date, the Existing Common Stock will be cancelled and extinguished. The holders of Existing Common Stock will not be entitled to, and will not, receive or retain any property or interest on account of such Existing Common Stock.

As more fully set forth on the record of the hearing held on December 6, 2007, a reservation of rights was placed on the record regarding the Equity Committee's assertion of claims, interests, defenses, and offsets against any and all holders of equity in these Chapter 11 Cases solely within Class 1G-1 with respect to the allocation of consideration among holders of Existing Common Stock based on the facts and circumstances in these Chapter 11 Cases and a reciprocal reservation of legal, equitable, contractual, and other rights, including rights under the Investment Agreement, was placed on the record regarding the rights reserved by the Plan Investors with respect to the reservation of rights by Equity Committee.

(viii)    Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims.  "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

Holders of Section 510(b) Equity Claims, will not be entitled to, and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) Equity Claims.

(ix)    Class H (Section 510(b) ERISA Claims).

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

The ERISA Settlement disbursing agent, on behalf of all holders of Section 510(b) ERISA Claims, will not be entitled to and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) ERISA Claims.

(x)    Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

## F.    Means For Implementation Of The Modified Plan

### 1.    Continued Corporate Existence

Subject to the Restructuring Transactions and Disposition Transactions contemplated by the Modified Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated by the Modified Plan and the Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases. The continued existence, operation, and ownership of such non Debtor Affiliates is a material component of the business of the Debtors and Reorganized Debtors, as applicable, and, as set forth in Article 11.1 of the Modified Plan but subject to the Restructuring Transactions and Disposition Transactions, all of the Debtors' equity interests and other property interests in such non Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

## 2.    *Restructuring Transactions*

On or following the Modification Approval Date, the Debtors, Reorganized DPH Holdings Co., or the Reorganized Debtors, as the case may be, will take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Restructuring Transaction Notice, including, but not limited to, all actions necessary to execute the Disposition Transactions and any other transactions described in the Modified Plan.  Such actions may include without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Modified Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Modified Plan; (c) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions.  The form of each Restructuring Transaction will be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction.

In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger will cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each merged Debtor under the Modified Plan.  In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) will assume and perform the obligations of such liquidating Debtor.  Implementation of the Restructuring Transactions will not affect the distributions under the Modified Plan.

## 3.    *Certificate Of Incorporation And Bylaws*

The Certificate of Incorporation of Reorganized DPH Holdings Co., substantially in the form attached to the Modified Plan as Exhibit 7.4(a), and Bylaws of Reorganized DPH Holdings Co., substantially in the form as attached to the Modified Plan as Exhibit 7.4(b), will be adopted and amended as may be required so that they are consistent with the provisions of the Modified Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Each Affiliate Debtor will amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 4.   Directors And Officers Of Reorganized HoldCo And Affiliate Debtors

The Debtors will file a notice listing the officers and directors of Reorganized DPH Holdings Co. no later than the Exhibit Filing Date. Unless the Debtors otherwise file a notice on or prior to the Final Modification Hearing, the existing directors and officers of the Affiliate Debtors will continue to serve in their current capacities after the Effective Date.

### 5.   Consummation Of Disposition Transactions

#### (a)   Disposition Transactions To Occur On Effective Date

On the Effective Date, the Debtors will consummate the Disposition Transactions, pursuant to which, among other things, (i) the GM Acquired Assets including the GM Assumed Contracts will be transferred to GM Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, (ii) the Parnassus Acquired Assets including the Parnassus Assumed Contracts will be transferred to Parnassus free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, and (iii) the DIP Lenders will effectuate the DIP Transfer.

#### (b)   Sequence Of Effectuating Disposition Transactions

For purposes of implementing the Disposition Transactions on the Effective Date, such transactions will be deemed to occur on the Effective Date in the following order: (i) Delphi's Existing Common Stock shall be cancelled and New Common Stock of Reorganized DPH Holdings shall be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust, (ii) Reorganized DPH Holdings will sell, transfer, assign, convey, and deliver all assets required to be delivered under the Master Disposition Agreement to the Buyers for the consideration described in the Master Disposition Agreement, and (iii) the DIP Lenders will effectuate the DIP Transfer.

### 6.   Master Disposition Agreement

#### (a)   Approval Of Master Disposition Agreement

The Modified Plan constitutes a request to authorize and approve the Master Disposition Agreement attached to the Modified Plan as Exhibit 7.7.

#### (b)   Sale Of Assets To GM Components

Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors will consummate the transfer, free and clear of any Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to the GM Buyer of the GM Acquired Assets, the GM Assumed Contracts and the GM Assumed Liabilities.

      (c)      <u>Sale Of Assets To Parnassus</u>

Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors will consummate the transfer, free and clear of any Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to Parnassus of the Parnassus Acquired Assets, the Parnassus Assumed Contracts, and the Parnassus Assumed Liabilities.

### 7.    *Transfer Of Collateral*

      (a)      <u>Consensual Foreclosure</u>

The Modified Plan constitutes a request to authorize and approve the transfer of the Transferred Assets under the DIP Credit Agreement to the DIP Agent and to deem such DIP Transfer to be a consensual foreclosure by the DIP Agent in full satisfaction and discharge of the DIP Claims pursuant to Article 9-620 of the UCC. The DIP Transfer is necessary to implement the Modified Plan and is integral to completing the transactions contemplated by the Modified Plan, including without limitation, the Master Disposition Agreement.

      (b)      <u>Alternative Foreclosure Procedures</u>

The Debtors will provide notification of the DIP Lenders' intent to accept the Transferred Assets to all parties entitled to notice pursuant to section 9-621(a) of the UCC (the "Article 9 Notice"). The Article 9 Notice will set forth the parties entitled to file an objection, refer parties to the procedures for submitting a Competing Proposal, and provide the deadline for filing an objection. If the Debtors receive on or prior to the Article 9 Objection Deadline a valid objection to the DIP Agent's acceptance of the Transferred Assets under section 9-620 of the UCC, then the Debtors will promptly file and serve a subsequent notice pursuant to sections 9-611 and 9-613 of the UCC (the "Public Sale Foreclosure Notice"), which notice will set forth the procedures to be employed in connection the public sale of the Transferred Assets to be conducted pursuant to section 9-610 of the UCC (the "Public Sale Foreclosures Procedures"). On or following the tenth day following service of the Public Sale Foreclosure Notice, if ever, the Debtors will conduct the section 9-610 public sale and the DIP Agent will be deemed to have submitted a credit bid at the public sale in the full amount of the Debtors' outstanding obligations that are due and owing under the DIP Credit Agreement. To the extent a successful bidder is selected pursuant to the Public Sale Foreclosure Procedures, then the proceeds of such transaction will be used first to satisfy all outstanding obligations under the DIP Loan Documents in accordance with the terms of the DIP Credit Agreement and the DIP Accommodation Agreement, including, without limitation, the Security And Pledge Agreement, and then any additional proceeds will be transferred to the Reorganized Debtors and distributed as required by applicable law, including the absolute priority rule set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

      (c)      <u>Termination Of DIP Facility Claims And Cancellation Of Liens</u>

Upon the consummation of the DIP Transfer on the Effective Date, (i) the DIP Facility Claims will be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all

Claims, liens, security interests, and obligations related thereto on Collateral wherever located will be fully discharged, released, terminated, and if necessary, deemed waived without need for any further action, (iii) the Debtors and the Reorganized Debtors will be fully discharged and released for all obligations of any kind relating to the DIP Facility, and which discharge and release will be deemed to be effective, pursuant to section 1141 of the Bankruptcy Code, and the Debtors and Reorganized Debtors shall have no further obligation to the DIP Lenders under and relating to the DIP Facility, and (iv) the DIP Lenders will be deemed to be bound to the provisions of Article XI of the Modified Plan and the Modification Approval Order.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, will take any and all commercially reasonable steps requested by the Reorganized Debtors that are necessary to cancel and/or extinguish such publicly filed liens and/or security interests.

        (d)      <u>DIP Facility Revolver Claim and DIP Facility First Priority Term Claim Distribution</u>

Pursuant to the DIP Transfer and Section 15(g) of the Security And Pledge Agreement, the DIP Agent will transfer Cash to the holders of DIP Facility Revolver Claims and DIP Facility First Priority Term Claims in an amount equal to the DIP Priority Payment Amount.

        (e)      <u>DIP Facility Second Priority Term Claim Distributions</u>

Pursuant to the DIP Transfer and Section 15(g) of the Security and Pledge Agreement, the DIP Agent will transfer to the holders of DIP Facility Second Priority Term Claims (i) $291,020,079 million in Cash, (ii) their pro rata portion of Parnassus Class C Interests, and (iii) up to $145,510,040 of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against Appaloosa Management L.P. and certain of the other Plan Investors or other parties arising from or relating to the Investment Agreement to which Delphi is a party.

### 8. *Post-Confirmation Reorganized DPH Holdings Share Trust*

        (a)      <u>Post-Confirmation Reorganized DPH Holdings Share Trust</u>

On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust Agreement, substantially in the form attached as Exhibit 7.9 to the Modified Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Modified Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust will become the sole shareholder of Reorganized DPH Holdings Co.

        (b)      <u>Appointment Of Post-Confirmation Trust Plan Administrator</u>

On the Effective Date,  the Post-Confirmation Trust Plan Administrator will be appointed in accordance with the Post-Confirmation Trust Agreement and the Post-Confirmation

Reorganized DPH Holdings Share Trust will be administered by the Post-Confirmation Trust Plan Administrator in accordance with the Post-Confirmation Trust Agreement.

### 9.    Emergence Capital.

On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors will receive the Emergence Capital sufficient to make payments as may be required on the Effective Date and conduct their post-reorganization operations.

### 10.    Management Compensation Plan

The Debtors or Parnassus will enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors and officers who will continue in such capacities (or similar capacities) after the Effective Date, as more fully stated with respect to the Reorganized Debtors on Exhibit 7.11 to the Modified Plan, except that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, such employee will be required to contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described with respect to the Reorganized Debtors on Exhibit 7.11 to the Modified Plan, may include equity and other incentive plans as components of compensation to be paid to executives after the Effective Date.

### 11.    Procedures For Asserting Certain Claims

(a)    SERP Claims

All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date, except that if (a) a SERP claimant's Original SERP Claim has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim.  All such Original SERP Claims not Scheduled or filed prior to the time set forth above as set forth in Article 7.12 of the Modified Plan will be forever barred from asserting such claims against the Debtors and their estates or the Reorganized Debtors and their property.  Any Claims arising out of the Original SERP after the Effective Date will be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP. In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) will be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

(b)    Prepetition Employee-Related Obligations

Except as set forth in Article 7.12(a) of the Modified Plan, all Persons holding or wishing to assert Prepetition Employee-Related Obligations must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 45 days after the Effective Date, except that such claimant need not file and serve an executed proof of claim to the extent that (a) such claimant's Prepetition Employee-Related Obligation has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) such a claimant already timely and properly filed a proof of claim asserting such Prepetition Employee-Related Obligation.  All Prepetition Employee-Related Obligations not Scheduled or filed prior to the time set forth above in Article 7.12(b) of the Modified Plan will be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.

## 12.    Cancellation Of Existing Securities And Agreements

On the Effective Date, except as otherwise specifically provided for in the Modified Plan (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, will be cancelled, except that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, as the case may be, will be released and discharged.  Any agreement that governs the rights of a holder (including the Indentures) of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer"), however, will continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under the Modified Plan as provided in Article IX of the Modified Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement, except that the preceding proviso will not affect the discharge of Claims or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, the Modified Plan, the Modification Approval Order, or result in any expense or liability to the Reorganized Debtors.  The Reorganized Debtors will not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Modified Plan except as expressly provided in Article 9.5 of the Modified Plan, except, that nothing in Section 7.10 of the Modified Plan will preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

### 13.     Sources Of Cash For Modified Plan Distributions

Except as otherwise provided in the Modified Plan, Confirmation Order, or the Modification Approval Order, all Cash necessary for Reorganized DPH Holdings Co. to make payments pursuant to the Plan will be obtained from the Emergence Capital, existing Cash balances, the operations of the Debtors and the Reorganized Debtors.

### 14.     Establishment Of A General Unsecured Distribution Account

On the Effective Date, the Disbursing Agent will establish a distribution account on behalf of holders of General Unsecured Claims for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims in accordance with Article 5.3 of the Modified Plan and the Master Disposition Agreement.

### 15.     Collective Bargaining Agreements

(a)     UAW

Pursuant to the Modified Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the UAW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(b)     IUE-CWA

Pursuant to the Modified Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the IUE-CWA 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(c)     USW

Pursuant to the Modified Plan and in accordance with the USW 1113/1114 Settlement Approval Order, on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding, a copy of which is attached as Exhibit 2 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(d)    IAM

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, the IAM-Delphi Memorandum of Understanding, a copy of which is attached as Exhibit 6 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IAM-Delphi Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(e)    IBEW

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IBEW E&S Memorandum of Understanding, a copy of which is attached as Exhibit 4 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding, a copy of which is attached as Exhibit 5 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(f)    IUOE

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding, a copy of which is attached as Exhibit 2 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding, a copy of which is attached as Exhibit 3 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

**16.    Pension Settlement**

(a)    Delphi HRP.

Upon the Effective Date, the Delphi HRP will no longer be the responsibility of the Debtors and will be addressed by GM.

(b)    Salaried and Subsidiary Pension Plans.

The Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan will be terminated (the "Salaried and Other Pension Plans").

(c)    PBGC Settlement.

Pursuant to section 1127 as it incorporates section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Modified Plan constitutes the Debtors' request to authorize and approve the settlement with the PBGC (the "PBGC Settlement Agreement"), attached to the Modified Plan substantially in the form of Exhibit 7.17.  Pursuant to the PBGC Settlement Agreement and the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of the Modified Plan and other consideration for (i) no distribution being made on account of the Contingent PBGC Secured Claims other than the distribution to be made as set forth above, (ii) the PBGC's settlement of its claims arising under Title IV of ERISA with respect to the Salaried and Other Pension Plans, (iii) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by the Modified Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (iv) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise.  Except as specifically provided in the PBGC Settlement Agreement and as set forth in Article V of the Modified Plan, on the Effective Date, all liens arising from or relating to the Delphi HRP and/or the Salaried and Other Pension Plans will be terminated and discharged.

### 17.    Salaried OPEB Settlement

The Debtors will continue the payments on the schedule authorized under the Order Pursuant to 11 U.S.C § 363 and Fed. R. Bankr. P. 9019 For Order Approving Debtors' Compromise and Settlement with Committee of Eligible Salaried Retirees and Delphi Salaried Retirees' Association (Docket No. 16545).

### 18.    Preservation Of Causes Of Action

On August 16, 2007, the Bankruptcy Court entered the Avoidance Procedures Order, authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action.  The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve valuable estate assets in a manner that would not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.

With respect to preservation of causes of action, the Modified Plan provides that in accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Modified Plan or the Master Disposition Agreement, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Notwithstanding the foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws will not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.19 of the Modified Plan.

### 19. *Reservation Of Rights*

With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with Article 7.19 of the Modified Plan (Preservation Of Causes Of Action), the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

### 20. *Exclusivity Period*

The Debtors will retain the exclusive right to amend or modify the Modified Plan, and to solicit acceptances of any amendments to or modifications of the Modified Plan, through and until the Effective Date.

### 21. *Dismissal Of Complaints*

Upon the Effective Date of the Modified Plan, the proceedings initiated by the Creditors' Committee and the Senior Notes Indenture Trustee for the revocation of the Confirmation Order will be closed and the complaints seeking relief therefor will be dismissed as moot.

### 22. *Corporate Action*

Each of the matters provided for under the Modified Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided in the Modified Plan, and will be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

### 23. *Effectuating Documents; Further Transactions*

Each of the Chief Executive Officer, Chief Financial Officer, and General Counsel of the Debtors, or their respective designees, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Modified Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors will be authorized to certify or attest to any of the foregoing actions.

### 24.    *Consummation Of Divestiture Transaction*

In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing Debtor(s) to sell assets free and clear of liens, Claims, and encumbrances, such Debtor(s) and or Reorganized Debtor(s), as the case may be, will be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

### 25.    *Exemption From Certain Transfer Taxes And Recording Fees*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or from a Reorganized Debtors or to any other Person or entity pursuant to the Modified Plan, Master Disposition Agreement, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the Reorganized Debtors' real or personal property will not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.    **Unexpired Leases And Executory Contracts**

### 1.    *Assumed And Rejected Leases And Contracts*

(a)    Executory Contracts And Unexpired Leases

All executory contracts and unexpired leases as to which any of the Debtors is a party will be deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) are the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (iii) will be rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (iv) have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached to the Modified Plan as Exhibit 8.1(a) – Rejected Contracts, or (vi) are otherwise rejected pursuant to the terms of the Modified Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement.  Subject to the foregoing sentence and consummation of the Modified Plan, entry of the Plan Modification

Approval Order by the Bankruptcy Court will constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to this Article 8.l(a) will vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms, except as modified by the provisions of the Modified Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  Subject to the Master Disposition Agreement, the Debtors reserve the right to file a motion on or before the Modification Approval Date to reject any executory contract or unexpired lease.

(b)    Real Property Agreements

Each executory contract and unexpired lease that is assumed by the applicable Reorganized Debtor and relates to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Modified Plan.  In the event that the Effective Date does not occur, the Court will retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)    Exhibits Not Admissions

Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) of the Modified Plan nor anything contained in the Modified Plan will constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

2.    **Cure Procedures And Payments Related To Assumption Of Executory Contracts And Unexpired Leases**

(a)    Material Supply Agreements

The provisions (if any) of each Material Supply Agreement to be assumed under the Modified Plan which are or may be in default will be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under the Modified Plan, then any Cure distributed pursuant to section 8.2(a) of the Modified Plan on account of such Material Supply Agreement

will offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)      Cure Amount Notices

Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a Cure Amount Notice to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With respect to reconciling the amount of Cure, the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order and subsequently modified by the Modification Procedures Order, and implemented in accordance therewith will control and accordingly, Cure will be equal to (i) subject to modification by written agreement between the Debtors and the applicable counterparty to reduce the Allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, unless the Debtors send an Amended Cure Amount Notice (as defined below) to an applicable counterparty, in which case Cure will be determined pursuant to the procedures set forth in the Modification Procedures Order, or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty or (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.  The Debtors will send an amended notice with respect to such Cure Amount Notices for which the Debtors have since determined that the Cure Amount Proposal was overstated.  To reduce the overstated Cure amount to its proper amount, the Debtors may, at least 20 days prior to the Effective Date, file with the Court and serve a separate notice (the "Amended Cure Amount Notice") stating the amended Cure amount that the Debtors believe is necessary and proper to cure such contract.  Pursuant to the Modification Procedures Order, if an affected contract counterparty disagrees with the Cure amount listed on the Amended Cure Amount Notice, then the counterparty will file an objection within ten days of receipt of the Amended Cure Amount Notice to object to the amended Cure amount.  If no objection is timely received, each counterparty will be deemed to have consented to the Cure amount set forth on the Amended Cure Amount Notice.  Any unresolved objection to an Amended Cure Amount Notice will be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.

(ii)     Objections To Cure Amount Notices And Payment Of Cure

The Cure Amount Notice provided procedures for contracts that were to be assumed by the Reorganized Debtors (and with respect to contracts to be assumed and assigned to GM or Parnassus pursuant to the Modification Procedures Order, such notice of assumption and assignment will provide procedures) for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract.  The Cure Amount Notice also provided procedures for each counterparty to object to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order, or if the counterparty responded to the Amended Cure Amount Notice in accordance with the procedures herein and in the Modification Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure will be paid, honored, or otherwise occur following the later of a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors or Reorganized Debtors, or a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement, expect that if there is a dispute as to the amount of Cure or adequate assurance that cannot be resolved consensually among the applicable counterparty and the Debtors, Reorganized Debtors, or the Buyers then notwithstanding anything to the contrary herein, in the Confirmation Order, in the Modification Procedures Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Plan.  If the non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order, or even if responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure will be paid in the amount set forth in the Cure Amount Notice or Amended Cure Amount Notice, as applicable, within a reasonable period of time following the Effective Date.

(iii)     Form Of Cure Payments

Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, and supplemented by the Modification Procedures Order, a Cure Amount Notice, the First Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order,

Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply Agreement will be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to the Modified Plan and the Master Disposition Agreement.

(b)    Other Executory Contracts And Other Unexpired Leases

The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed or assumed and assigned under the Modified Plan which are or may be in default will be satisfied solely by Cure. For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease. Any Cure distributed pursuant to this section will offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Other Executory Contract or Other Unexpired Lease so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)    Cure Proposals

Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 of the Modified Plan by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

(ii)    Cure Proposal Objections

The Debtors or Reorganized Debtors will have the right to amend, modify, or supplement the Cure Proposal Objections. Counterparties to an Other Executory Contract or Other Unexpired Lease that failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Modified Plan confirmed on January 25, 2008 will each be deemed to have waived its right to assert a default requiring Cure. Any default existing as of January 25, 2008 will have been deemed cured as of the day following the Cure Proposal Submission Deadline and such party will forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure

Proposal Submission Deadline. Counterparties will assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and will file and serve such claims before the Administrative Claims Bar Date in accordance with the Modification Approval Order and as otherwise set forth in Articles 10.2 and 10.5 of the Modified Plan. If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection, then the disputed matter will be set for hearing in the Bankruptcy Court. Any such hearing will be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon. Cure, if any, will be paid, honored, or otherwise occur following the earlier of a consensual resolution or the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be. Notwithstanding the above, if there is a dispute as to the amount of Cure or regarding adequate assurance that cannot be resolved consensually among the parties, notwithstanding anything to the contrary herein or in the Confirmation Order or the Modification Approval Order, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the assignee of such contract or lease. To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Modified Plan.

(iii)    Payment Of Cure

Except as otherwise provided in Article VIII of the Modified Plan, to the extent a Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, will pay the Cure Proposal, if any, to the counterparty within a reasonable period of time following the Effective Date. Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved consensually or by agreement or Final Order will be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

(c)    <u>Other Executory Contracts And Other Unexpired Leases Assigned
To GM Or Parnassus</u>

Pursuant to the Master Disposition Agreement, the Debtors or Reorganized Debtors, as the case may be, will assign certain Other Executory Contracts and Other Unexpired Leases to GM Buyer or Parnassus. In connection therewith and in accordance with the procedures set forth in the Modification Procedures Order, Delphi will serve each counterparty to a GM Assumed

S-74

Contract or Parnassus Assumed Contract the respective notice (together, the "MDA Assumption and Assignment Notices"), which will identify the respective Buyer as the party to whom all of the Debtors' right, title, and interest in the Other MDA Assumed Contracts will be assigned. Counterparties to Other MDA Assumed Contracts which failed to file and serve an objection to the MDA Assumption and Assignment Notice by the deadline set forth in the Modification Procedures Order will each be deemed to have waived its right to challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease and will be barred from challenging the ability of any Debtor or Reorganized Debtor, as the case may be, or the respective Buyer or its assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, and will be barred from making any other challenge pertaining to assumption. If there is an objection to the MDA Assumption and Assignment Notice and the parties cannot consensually resolve their dispute, then the disputed matter will be set for hearing in the Bankruptcy Court, which hearing will be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, will be paid, honored, and otherwise occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be. Notwithstanding anything to the contrary in the Modified Plan or in the Modification Approval Order, however, the Debtors or Reorganized Debtors, as the case may be, will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing Cure (and must if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) or adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors, as applicable, and the assignee. To the extent that disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Modified Plan. Notwithstanding anything to the contrary in Article 8.2(c), Article 8.2(b)(ii) will control with respect to Cure amounts related to Other MDA Assumed Contracts.

        (d)      <u>Intercompany Executory Contracts And Intercompany Unexpired Leases</u>

Subject to the Master Disposition Agreement, any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease will be Reinstated and will be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

### 3.    *Assignment Pursuant To Restructuring Transactions*

To the extent that any Debtor, which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease will, upon assumption as contemplated in the Modified Plan, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

### 4.    *Rejection Damages Bar Date*

If the rejection by the Debtors (pursuant to the Modified Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

### 5.    *Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases*

In connection with their efforts related to divestiture transactions, the Debtors may seek entry of an order that, among other things, approves the assumption and assignment of certain executory contracts or unexpired leases to the buyer of a certain business or product line.  The Debtors, however, would not consummate the assumption of such contracts and leases until the earlier of the closing of the related divestiture transaction or the Effective Date.  Thus, the Modified Plan provides that if the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor to assume and assign or reject certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor does not assume and assign or reject such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption or rejection will be consummated pursuant to Article VIII of the Modified Plan and service of notice and any Cure payments owed to a non-Debtor counterparty under such contracts and leases will be made pursuant to Article 8.2 of the Modified Plan and (b) a Debtor or Reorganized Debtor, as applicable, will be permitted to either reject or assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.  Because the assumption may be consummated in connection with either the closing of the divestiture transaction or the Modified Plan, the Debtors would provide each non-Debtor counterparty under the applicable contracts and leases with both a cure notice in connection with the divestiture transaction and the Cure Amount Notice.  If the closing of the divestiture transaction occurs before the Effective Date, then the Cure Amount Claim would be paid in cash. If the closing of the divestiture transaction occurs after the Effective Date, then the Cure Amount Claim in accordance with the Master Disposition Agreement or as otherwise provided under the Modified Plan.

## H.    **Provisions Governing Distributions**

### 1.    *Time Of Distributions*

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Modified Plan will be made on a Periodic Distribution Date.

### 2.    *No Interest On Disputed Claims*

Unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest will not accrue or be paid on

Claims or Interests, and no holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 3.    *Disbursing Agent*

The Disbursing Agent will make all distributions required under the Modified Plan except with respect to any holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions will be deposited with the appropriate Servicer, as applicable, who will deliver such distributions to the holders of Claims in accordance with the provisions of the Modified Plan and the terms of any governing agreement.  If any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, will make such distributions.

### 4.    *Surrender Of Securities Or Instruments*

On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") will be required to surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate will be cancelled solely with respect to the Debtors and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments.  This requirement does not apply to any Claims Reinstated pursuant to the terms of the Modified Plan.  No distribution of property under the Modified Plan will be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims in respect of such Certificate and will not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, will revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

### 5.    *Services Of Indenture Trustees, Agents, And Servicers*

The Reorganized Debtors will reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under the Modified Plan to holders of Allowed Claims, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties will report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the

reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

## 6.    *Claims Administration Responsibility*

### (a)    Reorganized Debtors

The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in Article IX of the Modified Plan.

### (b)    Filing Of Objections

Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests must be served and filed on or before the Claims/Interests Objection Deadline or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.  Notwithstanding any authority to the contrary, an objection to a Claim or Interest will be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service by the following means:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel who has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

### (c)    Determination Of Claims

Any Claim determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Modified Plan.  The Modified Plan will not constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

### (d)    Claims Bar Date

Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Article 8.3 of the Modified Plan for the filing of such claims, (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to

Articles 10.2 and 10.5 of the Modified Plan, or (iv) with respect to Claims that are Prepetition Employee Related Obligations, the bar date established pursuant to Article 7.9(b) of the Modified Plan will not be recognized, or recorded on the claims register, by the Claims Agent and will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court. Nothing in the Modified Plan will in any way alter, impair, or abridge the legal effect of the Bar Date Order or the rights of the Debtors, the Reorganized Debtors, or other parties-in-interest to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

### 7.    *Delivery Of Distributions*

#### (a)    Allowed Claims

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

#### (b)    Undeliverable Distributions

If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim, at which time all missed distributions will be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors until such distributions are claimed. The Reorganized Debtors will make reasonable efforts to locate holders of undeliverable distributions. All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim or an Allowed Interest, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

### 8.    *Procedures For Treating And Resolving Disputed And Contingent Claims And Interests*

#### (a)    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has

become an Allowed Claim.   All objections to Claims must be filed on or before the Claims/Interests Objection Deadline.

(b)    Distribution Reserves

The Reorganized Debtors or Disbursing Agent will withhold the Distribution Reserves, if any, from the property to be distributed to particular classes under the Modified Plan based upon the Face Amount of Disputed Claims.   The Reorganized Debtors or Disbursing Agent will withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata basis based upon the Face Amount of such Claims.   The Reorganized Debtors or Disbursing Agent will also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise.   Nothing in the Modified Plan or the Supplement will be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

(i)    Estimation Of Claims For Distribution Reserves

To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors will seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves.   Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors', Reorganized DPH Holdings Co., or the Reorganized Debtors' rejection of an executory contract pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated, however.  If the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(c)    No Recourse To Debtors Or Reorganized Debtors

Any Disputed Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution under the Modified Plan solely from the Distribution Reserve

S-80

established on account of such Disputed Claim.  In no event will any holder of a Disputed Claim have any recourse with respect to distributions made, or to be made, under the Modified Plan to holders of such Claims to any Debtor or Reorganized Debtor on account of such Disputed Claim, regardless of whether such Disputed Claim will ultimately become an Allowed Claim or regardless of whether sufficient Cash or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Modified Plan.

(d)      <u>Distributions After Allowance</u>

Payments and distributions from the Distribution Reserve to each respective holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Modified Plan that govern distributions to such holder of a Claim.  On the first Periodic Distribution Date following the date when a Disputed Claim becomes undisputed, noncontingent, and liquidated, the Disbursing Agent will distribute to the holder of such Allowed Claim any proceeds from the General Unsecured MDA Distribution, or other property, from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim been an Allowed Claim on such dates and will not be limited by the Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims.  Upon such distribution, the Distribution Reserve will be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.

(e)      <u>De Minimis Distributions</u>

Neither the Disbursing Agent nor any Servicer will have any obligation to make a distribution on account of an Allowed Claim from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $25,000, except that the Reorganized Debtors will make, or cause to be made, a distribution on a Periodic Distribution Date of less than $25,000 if the Debtors expect that such Periodic Distribution Date will be the final Periodic Distribution Date or (ii) the amount to be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

**9.      *Section 510(b) Opt Out Claims***

No Section 510(b) Opt Out Claim will be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution that would otherwise have been distributed under the Modified Plan solely from the applicable portion of the Securities Settlement.  In no event will any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to or against any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim will ultimately become an Allowed Claim.

### 10.    *Allocation Of Plan Distributions Between Principal And Interest*

To the extent that any Allowed Claim entitled to a distribution under the Modified Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## I.    **Allowance And Payment Of Certain Administrative Claims**

### 1.    *DIP Facility Claims*

(a)    <u>DIP Transfer</u>

The DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim will be satisfied and discharged in their entirety pursuant to the DIP Transfer.

(b)    <u>Cancellation Of Liens</u>

Upon consummation of the DIP Transfer, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim will be deemed discharged, cancelled, and released and will be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders of the DIP Agent, as the case may be, will take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

### 2.    *Pre-Confirmation Administrative Claim Procedures*

Pursuant to the Modification Procedures Order, all requests for payment of an Administrative Claim through June 1, 2009 (other than as set forth in the Modification Procedures Order, Article 10.1, or Article 10.3 of this Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than July 10, 2009. Any request for payment of an Administrative Claim pursuant to this Article 10.2 that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim request made pursuant to this Article 10.2 without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim.

### 3.    *Professional Claims*

(a)      Final Fee Applications

All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses will be determined by the Bankruptcy Court.

(b)      Payment Of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors, Reorganized DPH Holdings Co., or the Reorganized Debtors will pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Modification Approval Order Date.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Modification Approval Date, the Professionals must estimate fees and expenses due for periods that have not been billed as of the Modification Approval Date and deliver such estimate to the Debtors, counsel for the Creditors' Committee, and the United States Trustee for the Southern District of New York.  Within 45 days after the Effective Date, a Professional receiving payment for the estimated period must submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable.  Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount will be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

(c)      Holdback Amount

On the Effective Date, the Debtors or the Reorganized Debtors will fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent will maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds will not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, will be paid to the Reorganized Debtors.

(d)      Post-Confirmation Date Retention

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business.

**4.      Substantial Contribution Compensation And Expenses Bar Date**

Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

### 5.    *Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of the Modified Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached to the Modified Plan as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors, and the Creditors' Committee no later than 30 days after the Effective Date.  Any request for payment of an Administrative Claim pursuant to Article 10.5 of the Modified Plan that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim.

## J.    **Effect Of The Modified Plan On Claims And Interests**

### 1.    *Revesting Of Assets*

Except as otherwise explicitly provided in the Modified Plan, on the Effective Date, all property comprising the Estates (including Retained Actions and Retained Assets, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court or are the subject of any of the Disposition Transactions) will revest in each of the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Modified Plan, the Confirmation Order, and the Modification Approval Order.

### 2.    *Discharge Of Debtors*

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Modified Plan or in the Confirmation Order, the distributions and rights that are provided in the Modified Plan will be in complete satisfaction, discharge, and release, effective

as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Modified Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Modified Plan.  The Confirmation Order will be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

### 3.    *Compromises And Settlements*

In accordance with Article 9.6 of the Modified Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date.  After the Effective Date, any such right will pass to the Reorganized Debtors as contemplated in Article 11.1 of the Modified Plan, without the need for further approval of the Bankruptcy Court.

### 4.    *Release By Debtors Of Certain Parties*

The releases provided in the Modified Plan and described below discharge and release certain parties from claims arising from prepetition actions and claims (including claims held by third parties, such as creditors and shareholders) and limit the liability against certain parties for acts or omissions arising out of or in connection with these Chapter 11 Cases unless such actions are the result of willful misconduct or gross negligence.  The releases of each of the major constituencies in these cases, including the Debtors' officers, directors, and employees, the Creditors' Committee, the Equity Committee, the DIP Agent, the DIP Lenders, the Buyers, the Unions, and GM, allow the parties to participate in the Debtors' restructuring cases and protect individuals who have contributed to the restructuring process.  The parties for whom releases are provided have participated in complex negotiations with an unprecedented scope.  Moreover, the amounts contributed by each of these parties as part of settlements or other agreements are substantial.  The contributions made by some parties amount to billions of dollars invested in Delphi's reorganization.  Further, these parties conditioned their settlements and agreements on receiving the releases contemplated by the Modified Plan.  Thus, because of the value provided to the Debtors' estates as a result of these critical and necessary settlements and agreements, the Debtors believe it is appropriate to provide the releases described below.

**Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 11.13 of the Modified Plan, effective as of the Effective Date (and with respect to the DIP Lenders,**

the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP Transfer, which will be deemed to occur on the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its respective Estate, will release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Modified Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases.   The Reorganized Debtors, including Reorganized DPH Holdings Co., and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date will be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.  Notwithstanding the foregoing, nothing in the Modified Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or  (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

The term "Released Parties" means, collectively, (a) all officers of each of the Debtors and Reorganized Debtors, all members of the boards of directors of each of the Debtors and Reorganized Debtors, and all employees of each of the Debtors and Reorganized Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) the DIP Steering Committee and all current and former members of the DIP Steering Committee in their respective capacities as such, (g) Parnassus, (h) Platinum, (i) all Professionals, (j) the Unions and current or former members, officers, and committee members of the Unions, (k) the Indenture Trustees, in their capacities as such, and (l) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

5.      *Release By Holders Of Claims And Interests*

On the Effective Date, (a) each Person who votes to accept the Modified Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the

obligations of the Debtors and the Reorganized Debtors under the Modified Plan, and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Modified Plan (each, a "Release Obligor"), will have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Modified Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Modified Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases; provided, however, that (A) Article 11.5 is subject to and limited by Article 11.13 of the Modified Plan and (B) Article 11.5 will not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other U.S. state, city, or municipal tax code, (ii) the environmental laws of the United States or any U.S. state, city, or municipality, (iii) any criminal laws of the United States or any U.S. state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any U.S. state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates will be as set forth in the Amended GSA and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

## 6.    *Release By Unions*

The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference in the Modified Plan in their entirety.

### 7.    *Release Of GM By Debtors And Third Parties*

**On the Effective Date, GM will receive all releases provided for in Section 4.01 of the Amended GSA, which provisions are incorporated by reference herein in their entirety.**

### 8.    *Setoffs*

Subject to Article 11.13 of the Modified Plan, the Debtors or the Reorganized Debtors, as applicable, may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Modified Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

### 9.    *Subordination Rights*

All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Modified Plan to holders of Claims having such subordination rights, and such subordination rights will be deemed waived, released, discharged, and terminated as of the Effective Date; provided, further, that the subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture) will be deemed satisfied through the distributions described in Article 5.4 of the Modified Plan, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims will not receive a distribution under the Modified Plan.    Except as otherwise specifically provided for in the Modified Plan, distributions to the various Classes of Claims under the Modified Plan will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Modified Plan.

Except as otherwise provided in the Modified Plan (including any Modified Plan Exhibits), the Confirmation Order, or the Modification Approval Order, the right of any of the Debtors, or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will be modified to reflect such subordination.    Unless the Modified Plan (including Modified Plan Exhibits), the Confirmation Order, or the Modification Approval Order, otherwise provide, no distributions will be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

### 10.    *Exculpation And Limitation Of Liability*

**Subject to Article 11.13 of the Modified Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent,**

the DIP Lenders in their capacities as such and as holders of Claims and Interests, GM, Parnassus, Platinum, the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents and any of such parties' successors and assigns, will not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Modified Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended, or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Modified Plan. Other than as provided for in Article 11.11 of the Modified Plan and in Article 11.13 of the Modified Plan, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the parties listed in Article 11.11 of the Modified Plan for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the Modified Plan, the Disclosure Statement, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases.  For the avoidance of doubt, the exculpatory provisions of Article 11.11 of the Modified Plan, which apply to postpetition conduct, are not intended, nor will they be construed, to bar any governmental unit from pursuing any police or regulatory action.  Moreover, nothing in the Modified Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Buyers from their obligations under the Master Disposition Agreement, (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment

Agreement or the transactions contemplated thereby, or (iv) any of the Debtors from their obligations under the Modified Plan or the transactions contemplated thereby.

## 11.    *Indemnification Obligations*

The Modified Plan contains provisions concerning the Indemnification Rights of Indemnitees.  The term "Indemnitee" means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.  The term "Indemnification Rights" means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.  The term "Continuing Indemnification Rights" means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

Subject to Article 11.13 of the Modified Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights will be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which will remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and will not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, will maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for the remaining term of such policy and will maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage will be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, will indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.  Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation") the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these Chapter 11 Cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for

legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or setoff by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

### 12.    *Exclusions And Limitations On Exculpation, Indemnification, And Releases*

Notwithstanding anything in the Modified Plan to the contrary, no provision of the Modified Plan, the Confirmation Order, or the Modification Approval Order, including, without limitation, any exculpation, indemnification, or release provision, will modify, release, or otherwise limit the liability of any Person not specifically released under the Modified Plan, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

### 13.    *Injunction*

**Subject to Article 11.13 of the Modified Plan, and except as required and to the limited extent necessary to transfer the Transferred Assets to the DIP Lenders as provided in Article 7.8 of the Modified Plan, the satisfaction, release, and discharge pursuant to Article XI of the Modified Plan will act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Modified Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## V.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

This section provides information regarding:

- Considerations that holders of Claims and Interests should carefully consider before deciding whether to vote to accept or reject the Modified Plan

The key modifications to this section include additional risk factors relating to the following:

- The necessity of closing the transactions set forth in the Master Disposition Agreement and the effect that failure to close may have on the Modified Plan

- The key role of GM in the Debtors' restructuring efforts

- The current state of the capital markets

- Complaints seeking revocation of the Confirmation Order

Every holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Supplement (and the

documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Modified Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Modified Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors.  Certain Claims may receive partial distributions pursuant to the Modified Plan, and in some instances, no distributions at all.  Reorganization of the Debtors' business and operations under the proposed Modified Plan avoids the potentially adverse impact of a chapter 7 liquidation on the Debtors' employees and many of its customers and suppliers.

### B.    Certain Bankruptcy Considerations

If the Modified Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Modified Plan.  If a liquidation or protracted and litigated reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders and that recoveries to holders of General Unsecured Claims and others may be greatly diminished.  See Appendix C attached to this Supplement setting forth hypothetical chapter 7 liquidation scenarios.

### 1.    *The Bankruptcy Court May Not Approve Debtors' Classification Of Claims And Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Modified Plan complies with the requirements set forth in the Bankruptcy Code.  The Debtors created classes of Claims and Interests, each of which encompasses Claims or Interests that are substantially similar to the other Claims or Interests in each such class.  Although the Bankruptcy Court approved a similar classification as part of the Confirmed Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion at this time.

### 2.    *Failure To Satisfy Vote Requirement*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to approve the Modified Plan, the Debtors intend to seek confirmation of the Modified Plan. In the event that sufficient votes are not received, the Debtors will likely be forced to liquidate or sell their assets under unfavorable circumstances, which would not be as beneficial to the holders of General Unsecured Claims as their treatment under the Modified Plan. There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar to or as favorable to the Creditors as those proposed in the Modified Plan.

### 3. *The Confirmation Order Approving The Confirmed Plan May Be Revoked*

Following confirmation of the Confirmed Plan in January 2008, as previously discussed, the Creditors' Committee and Wilmington Trust, as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Bankruptcy Court seeking revocation of the Confirmation Order on the grounds that it was procured by Appaloosa's and the other Plan Investors' fraud. The Creditors' Committee and Wilmington Trust have entered into a stipulation and consent order with Delphi whereby all activity in respect of the section 1144 complaints will be stayed until the earlier of (i) the service by the Creditors' Committee or Wilmington Trust upon the Debtors of a written notice terminating the stay with respect to the party's complaint or (ii) further order of the Bankruptcy Court. Upon receipt of a notice of termination of stay, the Debtors will have thirty days, or such other period of time as the parties may agree or as may be ordered by the Bankruptcy Court, to answer or otherwise file a responsive pleading. Should the Creditors' Committee or Wilmington Trust initiate actions to revoke the Confirmation Order, the Debtors may not be able to confirm the Modified Plan.

### 4. *The DIP Lenders May Fail To Exercise Remedies Under The DIP Credit Agreement*

To effectuate the DIP Transfer, pursuant to which the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement, the Administrative Agent must receive direction to exercise remedies from the Required Lenders. It is uncertain whether the Administrative Agent will receive the direction to effectuate the DIP Transfer, and therefore, whether the DIP Transfer will occur. If the DIP Transfer does not take place as outlined in the Modified Plan, there can be no assurance that the Modified Plan will be consummated.

### 5. *The Debtors May Not Be Able To Secure Confirmation Of The Modified Plan*

There can be no assurance that the requisite acceptances to confirm the Modified Plan will be received. To confirm the Modified Plan, an impaired class must vote to accept the Modified Plan – there is no guarantee of such a result. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Modified Plan. A non-accepting creditor or equity holder of Debtors might challenge the adequacy of this Supplement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Supplement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Modified Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Modified Plan are fair and equitable to non-accepting Classes

### 6. *Risk Of Non-Occurrence Of The Effective Date*

Although the Master Disposition Agreement provides that it may be terminated if the closing has not occurred by September 30, 2009, the Debtors anticipate occurrence of the

Effective Date of the Modified Plan and consummation of the Master Disposition Agreement by July 31, 2009.  There can be no assurance as to such timing, however.  If the Effective Date does not occur by July 31, 2009, at some point prior to September 30, 2009, the Debtors may not have access to sufficient liquidity to fund their operations.

### 7.    *Substantive Consolidation Risks*

The Modified Plan is premised upon substantively consolidating certain of the Debtors as set forth in Article 7.2 of the Modified Plan but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. Although the Bankruptcy Court approved the same substantive consolidation structure as part of the Confirmed Plan, there is no assurance that the Bankruptcy Court would overrule an objection to substantive consolidation at this time or that the Bankruptcy Court would otherwise enter an order granting the Debtors' motion for substantive consolidation as contemplated by the Modified Plan.

### 8.    *The Integrity Of The Bar Date May Be Challenged*

Certain parties may allege that the Bar Date should not apply to their claims as a result of excusable neglect or otherwise.  Accordingly, should the Bankruptcy Court grant leave to file late claims involving a material amount of secured or priority claims, the Debtors may not have sufficient cash to satisfy secured or priority claims under the Modified Plan.  In particular, both the States of New York and Michigan have asserted that they intend to seek leave to file late claims for excise taxes under 11 U.S.C. § 507(a)(8) relating to unpaid prepetition workers compensation claims that, if allowed, could result in priority claims that the Debtors would be unable to pay.  Moreover, should the Bankruptcy Court grant leave to file late claims involving a material amount of prepetition general unsecured claims, recoveries to holders of general unsecured claims could be diluted.

### C.    The Debtors May Be Unable To Close The Transactions Set Forth In The Master Disposition Agreement

The Debtors currently anticipate that they will be able to close the sales to GM and Parnassus in accordance with the Master Disposition Agreement.  There are many factors outside of the Debtors' control, however, including the ability of the Debtors to obtain necessary governmental consents to the sale or transfer of certain of their assets.  Moreover, it is possible that the Debtors may not be able to meet various closing conditions, and that GM and/or Parnassus would elect to cancel the sales as a result of these failures. In addition, as detailed further below, because GM has sought chapter 11 protection, GM may be unable to close the transaction.  Consequently, the Debtors can provide no assurance that they will be successful in consummating the transactions set forth in the Master Disposition Agreement.

### D.    Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation

would have on the recoveries of holders of Claims and Interests and the Debtors' liquidation analysis is set forth below in <u>Section VIII – Feasibility Of The Modified Plan And The Best Interests Test</u> and <u>Appendix C</u>, as attached hereto.

### E.    Business Factors And Competitive Conditions

#### 1.    Consummation Of The Modified Plan Is Dependent On General Motors Corporation

GM is an essential party to the transaction underlying the feasibility of the Modified Plan – the Master Disposition Agreement.  The assets and liabilities that GM is assuming as part of the sale will facilitate Delphi emerging from chapter 11.  GM, however, also has endured a severe liquidity crisis since the fall of 2008 and filed for chapter 11 protection on June 1, 2009.

In SEC filings prior to its chapter 11, GM reported a variety of challenges it is facing, including severe liquidity issues, its relationships with its unions, large shareholders and bondholders, and its cost and pricing structures.  As of May 31, 2009, GM had received $19.4 billion in government loans.  GM had stated that without such government funding under one or more current or future programs or some other form of supplemental liquidity, GM's estimated liquidity during the first two quarters of 2009 would fall significantly short of the minimum amount necessary to operate its business, even if GM successfully implemented all of its planned operating actions substantially within its control, unless economic and automotive industry conditions significantly improve, it received substantial proceeds from asset sales, took more aggressive working capital initiatives, gained access to capital markets and other private sources of funding, receives government funding under one or more current or future programs, or some combination of the foregoing.

Debtor-in-possession financing for GM's chapter 11 is being provided by U.S. Treasury only in the context of GM pursuing an expedited section 363 sale of its assets to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury.  Also as part of its negotiated 363 sale transaction, certain agreements have been reached with the UAW, GM's primary labor union.  Nonetheless, GM must still garner support from other constituents to successfully proceed in its chapter 11 cases.

In particular, as it pertains to the effectiveness of Delphi's Modified Plan, GM must seek Bankruptcy Court approval to perform under the Master Disposition Agreement.  GM and Delphi entered into the Master Disposition Agreement hours after GM filed for chapter 11 protection.  As a postpetition agreement of both GM and Delphi, the Master Disposition Agreement must be approved by the Bankruptcy Court in GM's chapter 11 cases as well as Delphi's.  It is anticipated that GM will move to assume the Master Disposition Agreement during June 2009, but there can be no assurance that GM's stakeholders will not object to such assumption and/or that the Bankruptcy Court will approve GM's motion to proceed with the purchase.  If GM is unable to assume the Master Disposition Agreement in the timeframe set forth therein, the Master Disposition Agreement may immediately terminate and Delphi might be forced to liquidate.  See <u>Appendix C</u> hereto.

**2.    *The Company Is Reliant On The Amended GM Arrangement To Provide Liquidity Through Emergence***

As Delphi continues to operate in chapter 11, Delphi expects that its operations will continue to use cash and that it will have limited flexibility to further restructure its global operations to adapt to a prolonged downturn.  The credit market crisis has delayed the Debtors' emergence from chapter 11, making the Debtors particularly vulnerable to changes in the overall economic climate.  Furthermore, in light of the current economic climate in the global automotive industry, the Company anticipates continued operating challenges due to lower North American production volumes, slowing economic growth, the continuing global recession, related pricing pressures stemming from increasingly competitive markets, and continued commodity price volatility, which may place further pressures on Delphi's liquidity despite the progress of its transformation.  As a result, Delphi is dependant upon the advances provided by the Amended GM Arrangement.  Should Delphi be unable to maintain access to the liquidity provided by the Amended GM Arrangement, it may not be able to sustain operations through the consummation of the Modified Plan, which could result in a liquidation under chapter 7 of the Bankruptcy Code.

## VI.    SECURITIES LAW MATTERS

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors believe that to the extent that any consideration that is received under the Master Disposition Agreement pursuant to the Modified Plan and is subsequently distributed to holders of Claims would be considered securities, that the requirements of section 1145(a)(1) of the Bankruptcy Code would be satisfied and that such securities would be exempt from registration under the Securities Act and state securities laws.

## VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN

A summary description of certain United States federal income tax consequences of the Modified Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Modified Plan as discussed herein. Only the principal United States federal income tax consequences of the Modified Plan to certain holders of Claims who are entitled to vote to accept or reject the Modified Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the

Modified Plan. No rulings or other determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Modified Plan, and the discussion below is not binding upon the IRS or such other authorities. In addition, a substantial amount of time may elapse between the date of this Supplement and the receipt of a final distribution under the Modified Plan. Events occurring after the date of this Supplement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Modified Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Modified Plan to any holder of Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the IRC, Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Modified Plan, nor does it purport to address the United States federal income tax consequences of the Modified Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, partnerships or other pass-through entities, persons whose functional currency is not the United States dollar, the Buyers, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims as compensation for services, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes, and does not address the United States federal income tax consequences of the Modified Plan to holders that own Claims in more than one Class.

Each holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Modified Plan.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (i) any discussion of United States federal tax issues contained or referred to in this Supplement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

A.    **United States Federal Income Tax Consequences To Holders Of Claims Against The Debtors**

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Modified Plan to holders of Claims that are "United States

holders" as defined below. The character of any income, gain, or loss recognized for United States federal income tax purposes by holders of Claims will depend upon, among other things, the manner in which a holder acquired a Claim, the length of time the Claim has been held, whether the Claim was acquired at a discount, and, in the case of holders of General Unsecured Claims, whether such Claims are "securities" for United States federal income tax purposes. Furthermore, the timing and amount of any income, gain, or loss recognized for United States federal income tax purposes by holders of Claims will depend upon, among other things, whether the holder has claimed a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim, the holder's method of tax accounting, and whether the disposition of the Claim is eligible to be taken into account under the installment method defined in IRC Section 453. Therefore, holders of Claims should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Modified Plan. This discussion is written for holders that have not claimed a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and holders whose Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash or other property pursuant to the Modified Plan.

For purposes of the following discussion, a "United States holder" is a holder of Claims that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and elected to be treated as a United States person.

### 1. *Holders Of General Unsecured Claims Other Than TOPrS Claims*

The United States federal income tax consequences of the discharge of General Unsecured Claims for the right to receive General Unsecured MDA Distributions (such right referred to herein as a "General Unsecured MDA Distribution Right") is uncertain and highly complex.

It is anticipated that the Reorganized Debtors will be subject to corporate level income taxes upon their receipt of any General Unsecured MDA Distributions. If the Reorganized Debtors do not have sufficient net operating loss carryovers or other tax attributes ("Tax Attributes") to offset their taxable income resulting from the receipt of General Unsecured MDA Distributions, holders of General Unsecured MDA Distribution Rights may only be entitled to receive the net amount of General Unsecured MDA Distributions after taking into account any corporate level income taxes payable by the Reorganized Debtors resulting from their receipt of such payments. No assurances can be provided that the Reorganized Debtors will have sufficient Tax Attributes to minimize the burden of such income tax liability of the Reorganized Debtors. In particular, the Debtors anticipate that they will undergo an "ownership change" (within the meaning of IRC Section 382) on the Effective Date. As a result, the Debtors' ability to use pre-

Effective Date Tax Attributes to offset any income resulting from the receipt of General Unsecured MDA Distributions may be limited. Furthermore, upon implementation of the Modified Plan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced. In general, the discharge of a debt obligation for no consideration or in exchange for cash and other property having a fair market value that is less than the "adjusted issue price" of the debt discharged gives rise to cancellation of indebtedness ("COD") income to the debtor. Because the debt discharge will occur in a title 11 bankruptcy case, any COD income will not be taxable to the Debtors. However, during the taxable year following the year of the debt discharge, such COD income will reduce certain of the Debtors' Tax Attributes which would otherwise be available to offset taxable income of the Reorganized Debtors resulting from their receipt of General Unsecured MDA Distributions.

The exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights likely constitutes a taxable exchange for United States federal income tax purposes on the Effective Date (the "Sale Treatment"), as discussed in subsection (a) below. However, the exchange of General Unsecured Claims may be eligible for "open transaction" treatment, as described in subsection (b) below (the "Open Transaction Treatment"). Holders of General Unsecured Claims are urged to consult their own tax advisors as to whether the exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights will be subject to Sale Treatment or Open Transaction Treatment.

(a)    <u>Sale Treatment</u>

Under the Sale Treatment, a holder of General Unsecured Claims would generally recognize income, gain, or loss in an amount equal to the difference between (1) the fair market value on the Effective Date of the General Unsecured MDA Distribution Rights and (2) the holder's adjusted tax basis in its General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above. A holder of General Unsecured Claims recognizing a loss as a result of the Modified Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A holder's tax basis in the General Unsecured MDA Distribution Rights received in exchange for its General Unsecured Claims would generally be equal to the fair market value of such General Unsecured MDA Distribution Rights on the Effective Date. The holding period for the General Unsecured MDA Distribution Rights would begin on the date after the Effective Date.

Upon receipt of a General Unsecured MDA Distribution, a holder of General Unsecured MDA Distribution Rights will generally recognize gain or loss equal to the difference, if any, between the amount of the General Unsecured MDA Distribution (net of any imputed interest, as described below) and the holder's tax basis in the General Unsecured MDA Distribution Right. If any General Unsecured MDA Distribution is less than the holder's tax basis in its General Unsecured MDA Distribution Right, the holder will be required to reduce its tax basis by the amount of such General Unsecured MDA Distribution, and such holder may not be allowed a loss until it is determined that no further payments will be made. Where the receipt of a payment terminates all rights to General Unsecured MDA Distributions, any gain or loss attributable to the payment generally would constitute capital gain or loss. It is unclear whether capital gain or

loss treatment would apply to any partial General Unsecured MDA Distributions. A holder of a General Unsecured MDA Distribution Right may be entitled to a loss in any year in which it is determined that its General Unsecured MDA Distribution Right has become worthless. The character of such loss as capital or ordinary loss will be determined by a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above.

Under IRC Section 483, a portion of any General Unsecured MDA Distribution may be deemed to constitute interest income that is subject to tax as ordinary income (subject to an exception relating to a de minimis sales price). The balance of the General Unsecured MDA Distribution will be treated as sales proceeds, with the consequences described above. The amount of such interest income will generally be equal to the excess of the amount received over the present value of such amount discounted back to the Effective Date at a discount rate equal to the applicable Federal rate prevailing on the Effective Date.

(b)     Open Transaction Treatment

The exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights may constitute an "open transaction" for United States federal income tax purposes if the fair market value of the General Unsecured MDA Distribution Rights are not reasonably ascertainable as of the Effective Date. If the exchange constitutes an open transaction, a holder of General Unsecured Claims will not realize any gain or loss until, in the case of a cash method taxpayer, payment is received or, in the case of an accrual method taxpayer, all events occur which fix the right to receive the payment and the amount of such payment can be determined with reasonable accuracy. Any General Unsecured MDA Distributions received by a holder of General Unsecured Claims will be applied first against its basis in the General Unsecured Claim, thereby deferring any gain recognition until its tax basis is fully recovered. A holder of General Unsecured Claims will be required to defer any loss realized upon the receipt of a General Unsecured MDA Distribution if it may be entitled to future General Unsecured MDA Distributions.

2.     *Holders of TOPrS Claims*

Holders of TOPrS Claims will receive no distribution on account of such Claims. A holder who holds TOPrS Claims will generally recognize a capital loss for United States federal income tax purposes in an amount equal to the holder's adjusted tax basis in its TOPrS Claims cancelled under the Modified Plan.

3.     *Holders of Secured Claims*

Pursuant to the Modified Plan, the holders of Secured Claims may receive at the Debtors' discretion (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date, or (ii) their collateral, free and clear of liens, Claims, and encumbrances. The character of any income or loss relating to such payments as capital gain or loss or as ordinary income or loss will be determined based on a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above. Holders of Secured Claims will generally recognize ordinary

income with respect to any postpetition interest received by them in accordance with their regular method of accounting for United States federal income tax purposes.

### 4.    *Information Reporting And Backup Withholding*

Certain payments, including payments in respect of accrued interest, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Modified Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### B.    Importance Of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE MODIFIED PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

## VIII.  FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS TEST

### A.    Feasibility Of The Modified Plan

To confirm the Modified Plan, the Bankruptcy Court must find that confirmation of the Modified Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the plan. This requirement is imposed by section 1127 of the Bankruptcy Code, as it incorporates section 1129(a)(11), and is referred to as the "feasibility" requirement.  The Debtors believe that the Modified Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

B.      **Acceptance Of The Modified Plan**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept a plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code (as incorporated by section 1127) defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Modified Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the plan unless such holders voted in connection with the Confirmed Plan. **The Bankruptcy Court has determined that in light of the circumstances present in these Chapter 11 Cases, under section 1127 of the Bankruptcy Code, it would be equitable to define "holders" as those parties that currently hold the relevant claims. Because of this, your vote is important. Even if you previously returned a ballot in connection with the Confirmed Plan, you must vote again in accordance with the procedures outlined elsewhere herein for your acceptance or rejection to be counted.**

C.      **Best Interests Test**

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, as incorporated by section 1127, requires a bankruptcy court to find either that (i) all members of an impaired class of claims have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code. In the Delphi cases, this "liquidation value" would consist primarily of the proceeds from the forced sale of Delphi's North American operations and rest of world operations.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the

ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

### D.    Application Of The Best Interests Test To The Liquidation Analysis To The Modified Plan

#### 1.    Overview

A liquidation analysis (the "Liquidation Analysis") prepared with respect to the Debtors is attached as <u>Appendix C</u> to this Supplement, and has been updated from the Liquidation Analysis appended to the Disclosure Statement. The Debtors' updated Liquidation Analysis reflects the Debtors' progress in transforming its business operations since the December 2007 Disclosure Statement was approved by the Bankruptcy Court, as well as changes in the macro economic environment and automotive industry. The December 2007 Liquidation Analysis was prepared assuming a December 31, 2007 Liquidation Date and was based on the unaudited book values as of March 31, 2007. The updated Liquidation Analysis assumes a Liquidation Date of June 30, 2009 and is based on the unaudited book values as of December 31, 2008, with the exception of cash and working capital balances which have been estimated as of June 30, 2009.

Since the approval of the December 2007 Disclosure Statement, numerous events occurred that have impacted the Liquidation Analysis, including but not limited to following: (i) the continued wind-down of the AHG Division; (ii) the Debtors' divestitures of Catalyst, Interiors and Closures, North American Brake Product Assets, Brake Product Lines, Bearings Business Products, and Global Suspension Assets; (iii) the effectiveness of the Amended GSA and Amended MRA; (iv) the repatriation of dividends to DASHI under the DASHI Intercompany Transfer Order and subsequent loan of such monies to Delphi Automotive Systems LLC; (v) Corporate Restructuring Transactions involving DASHI and certain of its non-debtor subsidiaries; (vi) refinements to the claim estimates; and, most significantly, (vii) the unprecedented decline of the global automotive market, resulting in the Chapter 11 filing of one major U.S. OEM (Chrysler) and significant concerns regarding the viability of another major OEM (GM), without the implementation of significant restructuring actions.

As more fully described in <u>Appendix C</u>, many factors have contributed to a degradation of the "Net Proceeds Available for Distribution" in a hypothetical liquidation scenario. The decline in Net Proceeds Available for Distribution between the Liquidation Analyses in the Confirmed and Modified Plans is primarily attributable to a decline in estimated recoveries associated with the Debtors' investment in the foreign subsidiaries, as well as other net

reductions to recoverable assets, offset by a decrease in projected wind-down costs, professional fees, and trustee fees. The following chart summarizes the changes in estimated Net Proceeds Available for Distribution in the Liquidation Analysis under the Confirmed Plan and the Modified Plan.

| ($ Billions) | Low Scenario | High Scenario |
|---|---|---|
| Net Proceeds Available for Distribution (Confirmed Plan) | 7.5 | 10.4 |
| Change in Recovery Values: | | |
| Reduction in Net Proceeds Related to Investment in Foreign Subsidiaries | (4.5) | (5.8) |
| Other Net Reductions Including Cash Operating Losses | (3.7) | (4.0) |
| Sub-Total | (8.2) | (9.8) |
| Reduction in Wind-Down Costs and Professional and Trustee Fees | 1.7 | 1.2 |
| Total Change | (6.6) | (8.6) |
| Net Proceeds Available for Distribution (Modified Plan) | 0.9 | 1.8 |

The Debtors believe that any liquidation analysis is speculative. Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtors, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code, as incorporated by section 1127. The Debtors believe that the members of each Impaired Class will receive at least as much under the Modified Plan as they would in a liquidation in a hypothetical chapter 7 case. Holders of Claims will receive a better recovery through the distributions contemplated by the Modified Plan because it is unlikely that any holders of Claims would receive any distribution under hypothetical chapter 7 case due to the liquidation value of the Debtors' assets and the size of the DIP Lenders' Claims.

The following chart summarizes the range of creditor recoveries under the Debtors' updated Liquidation Analysis consistent with Substantive Consolidation under the Plan as well as a Substantive Consolidation – All Debtors. Under either scenario, the general unsecured creditors receive no recovery. The chart below also compares the hypothetical recoveries under the liquidation analysis included in the December 2007 Disclosure Statement.

($Millions)

| Debtor(s) | Net Proceeds Available For Distribution | | All Secured Recovery [1] | | DIP [2] Recovery | | Setoff and Other Secured Recovery [1] | | Post IC Recovery [1] | | Admin & Priority Recovery [1] | | General Unsecured and PBGC Recovery | | GM GUC, TOPrS, and Equity Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lower $ | Higher $ | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower $ | Higher $ |
| **Substantive Consolidation Under The Plan** | | | | | | | | | | | | | | | | |
| **Delphi-DAS Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,781 | 5,338 | 76% | 100% | 100% | 100% | 0% | 100% | 0% | 30% | 0% | 30% | 0% | 0% | - | - |
| Modified Plan | 837 | 1,294 | 18% | 33% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (2,944) | (4,044) | -58% | -67% | -76% | -51% | 0% | -100% | 0% | -30% | 0% | -30% | 0% | 0% | - | - |
| **DASHI Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,564 | 5,036 | 100% | NA | 100% | NA | NA | NA | 100% | 100% | 100% | 100% | 55% | 83% | - | - |
| Modified Plan | 1 | 397 | 1% | 44% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (3,563) | (4,639) | -99% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | -55% | -83% | - | - |
| **Delphi Medical Systems Colorado Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 15 | 20 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 9 | 22 | 15% | 33% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6) | 2 | -85% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Medical Systems Texas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 4 | 6 | 100% | NA | 100% | NA | NA | NA | 0% | 78% | 0% | 78% | 0% | 0% | - | - |
| Modified Plan | - | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (4) | (6) | -100% | NA | -100% | NA | NA | NA | 0% | -78% | 0% | -78% | 0% | 0% | - | - |
| **Delphi Medical Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 0 | 5 | 100% | NA | 100% | NA | NA | NA | 0% | 19% | 0% | 19% | 0% | 0% | - | - |
| Modified Plan | 0 | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (5) | -100% | NA | -76% | NA | NA | NA | 0% | -19% | 0% | -19% | 0% | 0% | - | - |
| **Connection Systems Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 14 | 18 | 100% | NA | 100% | NA | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Modified Plan | 5 | 12 | 11% | 25% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (9) | (7) | -89% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Diesel Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 105 | 137 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 1% | - | - |
| Modified Plan | 10 | 28 | 9% | 23% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (95) | (109) | -91% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | -1% | - | - |
| **Delphi Mechatronic Systems, Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 22 | 29 | 100% | NA | 100% | NA | NA | NA | 0% | 42% | 0% | 42% | 0% | 0% | - | - |
| Modified Plan | 3 | 9 | 2% | 5% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (18) | (20) | -98% | NA | -76% | NA | NA | NA | 0% | -42% | 0% | -42% | 0% | 0% | - | - |
| **Specialty Electronics Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 6 | 7 | 100% | NA | 100% | NA | NA | NA | 100% | 100% | 100% | 100% | 0% | 0% | - | - |
| Modified Plan | 6 | 6 | 24% | 48% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (1) | -76% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | 0% | 0% | - | - |
| **Delco Electronics Overseas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 42 | 47 | 100% | NA | 100% | NA | NA | NA | 12% | 100% | 12% | 100% | 0% | 0% | - | - |
| Modified Plan | 3 | 13 | 16% | 40% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (39) | (34) | -84% | NA | -76% | NA | NA | NA | -12% | -100% | -12% | -100% | 0% | 0% | - | - |
| **MobileAria Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3 | 3 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 5 | 5 | 24% | 49% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 2 | 2 | -76% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Furukawa Wiring Systems LLC** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 5 | 6 | 100% | NA | 100% | NA | NA | NA | 50% | 85% | 50% | 85% | 0% | 0% | - | - |
| Modified Plan | 12 | 14 | 16% | 26% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 8 | 8 | -84% | NA | -76% | NA | NA | NA | -50% | -85% | -50% | -85% | 0% | 0% | - | - |
| **Substantive Consolidation - All Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 7,459 | 10,434 | 100% | 100% | 100% | 100% | 100% | 100% | 65% | 100% | 65% | 100% | 0% | 18% | - | - |
| Modified Plan | 889 | 1,799 | 23% | 46% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6,569) | (8,635) | -77% | -54% | -76% | -51% | -100% | -100% | -65% | -100% | -65% | -100% | 0% | -18% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - The Confirmed Plan "All Secured Recoveries" reflect recoveries against DIP Facility and Setoff Claims, whereas the Modified Plan "All Secured Recoveries" represent recoveries against the DIP Facility, Secured Hedging Obligations, Pre-Petition Non-GM Setoff, and Other Secured Claims, which include postpetition intercompany claims. "Post IC Recoveries" reflect postpetition intercompany claims as Administrative Claims in the Confirmed Plan and as Junior Secured Claims in the Modified Plan.
2 - The Confirmed Plan "DIP Recovery" reflects recoveries against DIP Facility outstandings, whereas the Modified Plan "DIP Recovery" represents blended recoveries against DIP Tranche A and B outstandings, Secured Hedging Obligations (which are pari passu to DIP Tranche A and B claims), DIP Tranche C outstandings, and Pre-Petition Non-GM Setoffs (which are pari passu to DIP Tranche C claims). Modified Plan recoveries specific to each of these four types of claimants are provided in Exhibit E.

# IX.    CONFIRMATION

## A.    Confirmation Without Acceptance Of All Impaired Classes:  The "Cramdown" Alternative

Section 1127 of the Bankruptcy Code, through its incorporation of section 1129(b), provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims, without the consideration of votes of insiders, has accepted it.  The Court may confirm the Modified Plan at the request of the Debtors notwithstanding the Modified Plan's rejection (or deemed rejection) by impaired Classes as long

as the Modified Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Section 510(b) Note Claims, Existing Common Stock, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and Other Interests in Delphi are not being resolicited because such holders are not entitled to receive or retain under the Modified Plan any interest in property on account of their Claims and Interests. Accordingly, the Debtors are seeking confirmation of the Modified Plan pursuant to section 1129(b) of the Bankruptcy Code, with respect to such Classes, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Modified Plan. The Debtors believe that such Classes are being treated fairly and equitably under the Bankruptcy Code and thus believe the Modified Plan may be approved despite the rejection by certain Classes.

B.       **Conditions To Confirmation And Consummation Of The Modified Plan**

1.       *Confirmation*

The Confirmation Order was entered on January 25, 2008 and became a final order on February 4, 2008.

2.       *Conditions To The Effective Date*

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Modified Plan, as described in <u>Section IX.C. – Waiver Of Conditions To Confirmation And Consummation Of The Modified Plan</u> below:

- The Bankruptcy Court must have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Confirmed Plan. (Article 12.2(a) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Master Disposition Agreement, and all conditions precedent to the consummation of the Master Disposition Agreement must have been waived or satisfied in accordance with the terms thereof. (Article 12.2(b) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, and the DIP Agent must have effectuated the DIP Transfer.  (Article 12.2(c) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof.   (Article 12.2(d) of the Modified Plan)

- The Bankruptcy Court must have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Modified Plan. (Article 12.2(e) of the Modified Plan)

- Each Exhibit, document, or agreement to be executed in connection with the Modified Plan must be in form and substance reasonably acceptable to the Debtors. (Article 12.2(f) of the Modified Plan)

C.       **Waiver Of Conditions Precedent**

The conditions set forth in 12.2(e) and 12.2(f) of the Modified Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied

(including any action or inaction by the Debtors in their sole discretion).  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right, which may be asserted at any time.

### D.    Retention Of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Modified Plan, including, among others, the following matters:

- to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

- to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Modified Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

- to adjudicate any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under the Modified Plan;

- to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

- to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

- to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

- to issue orders in aid of execution, implementation, or consummation of the Modified Plan;

- to consider any modifications of the Modified Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order and the Modification Approval Order;

- to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Modified Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

- to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Modified Plan or the Confirmation Order or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Modified Plan; provided that retention of jurisdiction as to disputes involving GM will be as set forth in Article XIII (u) of the Modified Plan;

- to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

- to hear any other matter not inconsistent with the Bankruptcy Code;

- to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- to enter a final decree closing the Chapter 11 Cases;

- to enforce all orders previously entered by the Bankruptcy Court;

- to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim;

- to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents, the Master Disposition Agreement, except as provided in such documents; and

- to hear and determine all matters relating to the Contingent PBGC Secured Claims or the Delphi-PBGC Settlement Agreement.

Notwithstanding anything contained in the Modified Plan to the contrary, the Bankruptcy Court retains exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions. Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## X.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE MODIFIED PLAN

The Debtors believe that the Modified Plan affords holders of Claims the greatest realization on the Debtors' assets available at this time and, therefore, is in the best interests of such holders. If the Modified Plan is not confirmed, however, the likely alternative available would be liquidation of the Debtors. In this event, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code as set forth in the Liquidation Analysis attached hereto as Appendix C. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, as discussed in Section VIII – Feasibility Of The Modified Plan And The Best Interests Test and in Appendix C, the Debtors believe that unsecured creditors would receive no distribution if the Debtors were forced to liquidate and creditors senior to holders of General Unsecured Claims would receive more limited distributions, if any. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of the Debtors' assets.

## XI.      VOTING REQUIREMENTS

On June 16, 2009, the Bankruptcy Court entered the Modification Procedures Order approving, among other things, this Supplement, setting voting procedures, and scheduling the hearing on confirmation of the Modified Plan. A copy of the Final Modification Hearing Notice is enclosed with this Supplement. The Final Modification Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Modified Plan. The Final Modification Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of this Supplement.

If you have any questions about (i) the procedure for voting your Claim with respect to the packet of materials that you have received, (ii) the amount of your Claim holdings, or (iii) if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Modified Plan, this Supplement, any exhibits to such documents, or a copy of the Disclosure Statement as approved in December 2007, please contact:

| | |
|---|---|
| Voting Agent for All Creditors except Noteholders | Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, California 90245<br>Att'n: Delphi Corporation<br>Telephone: (888) 249-2691<br>Fax: (310) 751-1856<br>www.delphidocket.com |
| Voting Agent for Noteholders | Financial Balloting Group LLC<br>757 Third Avenue, 3rd Floor<br>New York, New York 10017<br>Att'n: Delphi Corporation Ballot Tabulation<br>Telephone: (866) 486-1727.<br>www.fbgllc.com |

The Bankruptcy Court may confirm the Modified Plan only if it determines that the Modified Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Modified Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Modified Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Modified Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Modified Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code, as incorporated by section 1127, in spite of the nonacceptance by one or more such Classes, (b) the Modified Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Modified Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Modified Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Modified Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

**THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE MODIFIED PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE MODIFIED PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY**

**COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE MODIFIED PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE MODIFIED PLAN IS FEASIBLE, AND THAT THE MODIFIED PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.**

**UNLESS THE BALLOT (OR MASTER BALLOT ON BEHALF OF A NOTEHOLDER) BEING FURNISHED IS TIMELY RECEIVED BY THE APPROPRIATE VOTING AGENT ON OR PRIOR TO JULY 15, 2009 AT 7:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.**

### A.    Parties-In-Interest Entitled To Vote

Under section 1127 of the Bankruptcy Code, as it incorporates other sections of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party-in-interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan.  If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan, and the plan proponent need not solicit such holder's vote.

The holder of a Claim or Interest that is Impaired under a plan is entitled to vote to accept or reject the plan if (1) the plan provides a distribution in respect of such Claim or Interest and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Claimholder has filed a Proof of Claim as to which no objection has been filed, or (c) such Claimholder has timely filed a motion pursuant to Federal Rule of Bankruptcy Procedure 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtor has not opposed the Motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Court.

A vote may be disregarded if the Court determines that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

The Bankruptcy Court has determined that in light of the circumstances present in these Chapter 11 Cases, under section 1127 of the Bankruptcy Code, it is equitable to define "holders" as those parties that currently hold the relevant claims.  Thus, even if a holder of a Claim or Interest previously returned a ballot in connection with the Confirmed Plan, the holder must cast a new ballot accepting or rejecting the Modified Plan so that such vote can be counted.  Pursuant to section 1127, if a holder of a Claim or Interest does not vote to accept or reject the Modified Plan by the Voting Deadline, that holder's prior vote will count as it was originally cast, but only to the extent that such holder is entitled to vote on the Modified Plan.

In addition, the Debtors have requested that if no holder of a Claim or Interest in a particular class votes to accept or reject the Modified Plan, then the applicable class be deemed to have accepted the Modified Plan.  Thus, if you do not want such a presumption to arise, you should timely submit a ballot to accept or reject the Modified Plan.  The Bankruptcy Court has indicated that this issue will be considered, if necessary, at the Final Modification Approval Hearing.  Thus, once again, your vote is important.

### B.        Classes Impaired Under The Modified Plan

#### 1.        *Voting Impaired Classes Of Claims*

The following Classes of Claims and Interests are Impaired under, and are entitled to vote to accept or reject, the Modified Plan:

| | |
|---|---|
| **Class 1A-1 through Class 12A-1** | (Secured Claims) |
| **Class 1C-1 through Class 12C-1** | (General Unsecured Claims) |
| **Class 1C-2 through Class 12C-2** | (Contingent PBGC General Unsecured Claims) |
| **Class 1D through Class 12D** | (GM Claim) |

#### 2.        *Unimpaired Classes Of Claims*

Classes B and K are Unimpaired under the Modified Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Modified Plan.  Their votes to accept or reject the Modified Plan will not be solicited.  Because all Debtors are proponents of the Modified Plan, Class F Intercompany Claims are deemed to have accepted the Modified Plan. The votes of holders of such Claims therefore will not be solicited.

#### 3.        *Impaired Classes Of Claims And Interests Deemed To Reject The Modified Plan*

Holders of Claims and Interests in Classes E, G-1, G-2, H, and I are not entitled to receive any distribution under the Modified Plan on account of their Claims or Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Classes E, G-1, G-2, H, and I are conclusively presumed to have rejected the Modified Plan, and the votes of holders of Claims or Interests in such Classes therefore will not be solicited.

### 4. Presumed Acceptance By Certain Classes Of Interests

Holders of Class J Interests in the Affiliate Debtors are conclusively presumed to have accepted the Modified Plan as such Interest holders are proponents of the Modified Plan and, as such, the votes of such Interest holders will not be solicited.

## XII.  CONCLUSION

### A.  Hearing On And Objections To Confirmation

#### 1. Final Modification Hearing

The hearing on confirmation of the Modified Plan has been scheduled for July 23, 2009 at 10:00 a.m. (prevailing Eastern time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Modified Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties-in-interest.

#### 2. Date Set For Filing Objections To Confirmation Of The Modified Plan

The time by which all objections to confirmation of the Modified Plan must be filed with the Court and received by the parties listed in the Final Modification Hearing Notice has been set for July 15, 2009 at 4:00 p.m. (prevailing Eastern time).  A copy of the Final Modification Hearing Notice is enclosed with this Supplement.

### B.  Recommendation

The Modified Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of Delphi's business as a going concern, and preserves the jobs of employees.  The Debtors believe that any alternative to confirmation of the Modified Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by the Debtors' employees.  Moreover, the Debtors believe that their creditors will receive greater and earlier recoveries under the Modified Plan than those that would be achieved in liquidation or under an alternative plan.

**FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE MODIFIED PLAN.**

Dated: Troy, Michigan
        June 16, 2009


                                    DELPHI CORPORATION AND THE
                                    AFFILIATE DEBTORS


                          By: /s/ John D. Sheehan
                              John D. Sheehan
                              Vice President, Chief Financial Officer



SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

## EXHIBIT H

**[Modified Plan]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
      In re                      :      Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :      Case No. 05-44481 (RDD)
                                            :
             Debtors.      :      (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**DELPHI CORPORATION AND CERTAIN AFFILIATES,**
**DEBTORS AND DEBTORS-IN-POSSESSION**
**(AS MODIFIED)**

SKADDEN, ARPS, SLATE, MEAGHER &
      FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Toll Free: (800) 718-5305
International: (248) 813-2698
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

SKADDEN, ARPS, SLATE, MEAGHER &
      FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Debtors and Debtors-in-Possession

                                  Of Counsel
                    DELPHI CORPORATION
                        5725 Delphi Drive
                  Troy, Michigan 48098
                      (248) 813-2000
                  David M. Sherbin
                  Sean P. Corcoran
                    Karen J. Craft

Dated:          December 10, 2007

As Modified:  January 25, 2008
                June 16, 2009
                July 30, 2009
                New York, New York

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME ..................................................................................................4
    A.    Scope Of Definitions.................................................................4
    B.    Definitions..............................................................................4
        1.1    "503 Deadline".................................................................4
        ^ 1.2   "Acquired Assets".............................................................4
        ^ 1.3   "Acquired Contracts".........................................................4
        ^ 1.4   "Administrative Claim".......................................................4
        ^ 1.5   "Administrative Claims Bar Date"..........................................4
        1.6    "^ ADR Procedures".........................................................4
        ^ 1.7   "Affiliate Debtors".............................................................5
        1.8    "Affiliates".......................................................................5
        1.^ 9   "Allowed ^ Claim"^..........................................................5
        1.^ 10  "Allowed Class . . . Claim" or "Allowed Class . . . Interest" ..............5^ 6
        ^ 1.11  "Allowed Interest".............................................................5
        ^ 1.12  "Assumed Liabilities".........................................................6
        1.13   "^ Avoidance Claims".......................................................6
        1.14   "Ballot".........................................................................6
        1.^ 15  "Bankruptcy Code".........................................................6
        1.^ 16  "Bankruptcy Court".........................................................6
        1.^ 17  "Bankruptcy Rules".........................................................6^ 6
        1.18   "Bar Date^ " ...................................................................6
        1.19   "^ Bar Date Order"...........................................................6
        1.20   "^ Beneficiaries"..............................................................6
        1.21   "^ Business Day"..............................................................6
        1.22   "^ Buyers".....................................................................7
        1.23   "Cash^ " .......................................................................7^ 7
        ^ 1.24  "Cash Reserve"..............................................................7
        1.25   "Causes of Action"..........................................................7
        1.26   "Certificate^ " .................................................................7
        ^ 1.27  "Certificate of Incorporation and Bylaws" ...............................7
        1.28   "^ Chapter 11 Cases"........................................................7^ 7
        ^ 1.29  "Claim".........................................................................7
        1.30   "Claims Agent"..............................................................7
        1.31   "^ Claims/Interests Objection Deadline" ..................................7
        1.32   "^ Class"........................................................................7
        ^ 1.33  "Company Acquired Assets" ..............................................7^ 8
        ^ 1.34  "Company Assumed Contracts" ...........................................8
        ^ 1.35  "Company Assumed Liabilities"............................................8
        ^ 1.36  "Company Buyer"............................................................8
        1.37   "Company Sales Securities" ................................................8
        ^ 1.38  "Confirmation Date"..........................................................8^ 9
        1.^ 39  "Confirmation Hearing"......................................................8
        ^ 1.40  "Confirmation Order".........................................................8
        ^ 1.41  "Connection Systems Debtors"............................................8

i

1.42    "Contingent PBGC Secured Claim" ...................................................8
1.43    "^ Continuing Indemnification Rights" ...........................................8
1.44    "^ Controlled Affiliate" ..................................................................8
1.45    "^ Credit Bid" ...............................................................................9
1.46    "^ Creditors' Committee" ..............................................................9
1.47    "^ Cure" ........................................................................................9
^ 1.48  "Cure Amount Notice" ..................................................................9
^ 1.49  "Cure Amount Proposal" ..............................................................9
1.50    "^ DASHI Debtors" .......................................................................9
1.51    "^ Debtor" ....................................................................................9
1.52    "^ Debtors" ..................................................................................9
1.53    "Delphi^ " ....................................................................................9
^ 1.54  "Delphi-DAS Debtors" ..................................................................9
1.55    "Delphi-GM Arrangement" ..........................................................10
^ 1.56  "Delphi-GM Definitive Documents" ............................................10
^ 1.57  "Delphi-GM Global Settlement Agreement" ...............................10
^ 1.58  "Delphi-GM Master Restructuring Agreement" ..........................10
^ 1.59  "Delphi HRP" ...............................................................................10
^ 1.60  "Delphi-PBGC Settlement Agreement" ................................10^ 11
1.61    "DIP ^ Accommodation Agreement" ...........................................10
1.62    "DIP Accommodation Agreement Order" ....................................10
1.^ 63  "DIP ^ Agent" .............................................................................10
1.^ 64  "DIP ^ Claims" .............................................................................10
1.65    "DIP Credit Agreement" ..............................................................11
1.^ 66  "DIP ^ Facility" ............................................................................11
^ 1.67  "DIP Facility First Priority Term Claim" ......................................11
1.^ 68  "DIP ^ Facility Order" ..................................................................11
^ 1.69  "DIP Facility Revolver Claim" ......................................................11
1.^ 70  "DIP ^ Facility Second Priority Term Claim" ...............................11
1.^ 71  "DIP Lenders" ..............................................................................11
^ 1.72  "DIP Lenders Steering Committee" .............................................11
^ 1.73  "DIP Loan Documents" ................................................................11
1.74    "DIP Priority Payment Amount" ..................................................11
1.75    "DIP Transfer" .............................................................................12
^ 1.76  "Disallowed Claim" ......................................................................12
^ 1.77  "Disallowed Interest" ..................................................................12
^ 1.78  "Disbursing Agent" ......................................................................12
^ 1.79  "Disclosure Statement" ...............................................................12
^ 1.80  "Disposition Transactions" ..........................................................12
^ 1.81  "Disputed Claim" or "Disputed Interest" ....................................12
^ 1.82  "Distribution Date" ...........................................13^ 13^ 13^ 13^ 13
^ 1.83  "Distribution Reserve" ................................................................13
1.84    "^ Effective Date" ........................................................................13
1.85    "^ Emergence Capital" .................................................................13
1.86    "^ Employee-Related Obligation" ................................................13
^ 1.87  "Equity Committee" .....................................................................13
1.88    "^ ERISA" ......................................................................................13
^ 1.89  "ERISA Plaintiffs" ........................................................................13

ii

1.90     "^ ERISA Settlement" ...................................................................13
1.91     "^ Estates" ......................................................................................13
1.92     "^ Exchange Act" ............................................................................13
1.93     "^ Exhibit" .......................................................................................14
^ 1.94  "Exhibit Filing Date" ......................................................................14
^ 1.95  "Existing Common Stock" ..............................................................14
1.96     "^ Existing Securities" ...................................................................14
1.97     "^ Face Amount" .............................................................................14
^ 1.98  "Final Modification Hearing" ........................................................14
1.99     "Final Order" ..................................................................................14
1.^ 100 "Flow-Through Claim" .................................................................14
^ 1.101 "General Unsecured Claim" .........................................................14
^ 1.102 "General Unsecured MDA Distribution" ......................................14
1.^ 103 "GM^ " ..........................................................................................15
1.^ 104 "GM ^ Acquired Assets" ...............................................................15
1.^ 105 "GM ^ 414(l) Administrative Claim" ...................................15  15  16^  16
^ 1.106 "GM Administrative Claim" ..........................................................15
^ 1.107 "GM Arrangement Administrative Claim" ...................................15
^ 1.108 "GM Assumed Contracts" .............................................................15
^ 1.109 "GM Assumed Liabilities" .............................................................15
^ 1.110 "GM Buyer(s)" ...............................................................................15
^ 1.111 "GMCo." ..........................................................................................15
1.112   "GM-PBGC Agreement" ................................................................15
1.113   "GM Sales Securities" ...................................................................15
1.114   "^ GM Unsecured Claim" ..............................................................15
1.115   "^ Holdback Amount" ...................................................................15
1.116   "Holdback Escrow Account" ........................................................16
1.^ 117 "IAM" .............................................................................................16
^ 1.118 "IAM Memorandum of Understanding" .......................................16
^ 1.119 "IBEW" ...........................................................................................16
^ 1.120 "IBEW E&S Memorandum of Understanding" ............................16
^ 1.121 "IBEW Powertrain Memorandum of Understanding" .................16
^ 1.122 "Impaired" ......................................................................................16
^ 1.123 "Indemnification Rights" ..............................................................16
^ 1.124 "Indemnitee" ..................................................................................16
1.^ 125 "Indenture Trustees" ...................................................................16
^ 1.126 "Indentures" ..................................................................................17
^ 1.127 "Insurance Coverage" ..................................................................17
1.^ 128 "Insurance Settlement^ " ...........................................................17
^ 1.129 "Intercompany Claim" ..................................................................17
^ 1.130 "Intercompany Executory Contract" ..........................................17
^ 1.131 "Intercompany Unexpired Lease" ...............................................17
^ 1.132 "Interest" ........................................................................................17
^ 1.133 "Investment Agreement" ..............................................................17
1.^ 134 "IRC" ..............................................................................................17
^ 1.135 "IRC Section 414(l) Transfer" ..........................................17^  18
1.136   "^ IUE-CWA" ..................................................................................17
1.137   "IUE-CWA 1113/114 Settlement Approval Order" ......................17

iii

1.138   "IUE-CWA Benefit Guarantee"...................................................................17
1.139   "IUE-CWA Benefit Guarantee Term Sheet"...................................................18
^ 1.140 "IUE-CWA-Delphi-GM Memorandum of Understanding" ......................18
^ 1.141 "IUOE"....................................................................................................18
^ 1.142 "IUOE Local 18S Memorandum of Understanding"................................18
^ 1.143 "IUOE Local 101S Memorandum of Understanding"..............................18
^ 1.144 "IUOE Local 832S Memorandum of Understanding".............................18
^ 1.145 "IUOE-IBEW-IAM OPEB Term Sheet" ................................................18
^ 1.146 "IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order" 19 ^ 19 ^ 19 ^ 20
1.147   "^ Lead Plaintiffs"....................................................................................19
^ 1.148 "Management Compensation Plan" .......................................................19
^ 1.149 "Master Disposition Agreement".........................................................19
1.150   "^ Material Supply Agreement ^ "..........................................................19
1.151   "^ MDA Assumption And Assignment Notice" .....................................19
1.152   "^ MDL Actions".....................................................................................19
1.153   "^ MDL Court".......................................................................................19
1.154   "^ MDL Settlements"..............................................................................19
^ 1.155 "Modification Approval Date"..............................................................19
^ 1.156 "Modification Approval Order"............................................................20
^ 1.157 "Modification Procedures Order"..........................................................20
1.158   "^ New Common Stock"........................................................................20
^ 1.159 "Non-Represented Term Sheet"...........................................................20
^ 1.160 "Omitted Material Supply Agreement Objection Deadline" .................20
1.161   "^ OPEB"................................................................................................20
^ 1.162 "Ordinary Course Professionals Order".................................................20
1.163   "^ Other Executory Contract"...............................................................20
1.164   "^ Other Interests"..................................................................................20
^ 1.165 "Other MDA Assumed Contracts"........................................................20
1.166   "^ Other Priority Claim".........................................................................20
^ 1.167 "Other Unexpired Lease" .....................................................................20
1.168   "^ PBGC"................................................................................................20
1.169   "^ PBGC Claims"...................................................................................20
1.170   "^ PBGC General Unsecured Claim" .....................................................20
1.171   "Pension Plans" ......................................................................................21
^ 1.172 "Periodic Distribution Date"................................................................21
^ 1.173 "Person"..................................................................................................21
^ 1.174 "Petition Date".......................................................................................21
^ 1.175 "Plan".....................................................................................................21
^ 1.176 "Plan Investors" ....................................................................................21
^ 1.177 "Plan Objection Deadline"....................................................................21
^ 1.178 "Post-Confirmation Reorganized DPH Holdings Share Trust" .................21
^ 1.179 "Post-Confirmation Trust Agreement"..................................................21
^ 1.180 "Post-Confirmation Trust Plan Administrator" ................................22 ^ 22
1.181   "^ Prepetition Employee-Related Obligation"......................................22
^ 1.182 "Prepetition Employee-Related Obligations Bar Date"..........................22
^ 1.183 "Priority Tax Claim"..............................................................................22
1.184   "^ Pro Rata"...........................................................................................22
1.185   "^ Professional"......................................................................................22

iv

^ 1.186 "Professional Claim" ............................................................................22
1.187 "Professional Fee Order" ......................................................................22
1.188 "Reinstated" or "Reinstatement" ...........................................................22
1.189 "Released Parties" ................................................................................23
1.^ 190 "Reorganized ^ . . . " .........................................................................23
1.^ 191 "Reorganized ^ Debtor" or "Reorganized Debtors" ............................23
^ 1.192 "Reorganized DPH Holdings" ............................................................23
^ 1.193 "Required Lenders" ............................................................................23
1.^ 194 "Restructuring ^ Debtors" .................................................................23
^ 1.195 "Restructuring Transaction(s)" ..........................................................24
^ 1.196 "Restructuring Transaction Notice" ....................................24^ 24^ 24
^ 1.197 "Retained Actions" .............................................................................24
1.198 "^ Retained Assets" ............................................................................24
1.199 "^ Scheduled" .....................................................................................24
1.200 "^ Schedules" .....................................................................................24
1.201 "Section 510(b) ^ Equity Claim" ..........................................................24
1.202 "^ Section 510(b) ERISA Claim" .........................................................24
1.203 "^ Section 510(b) Note Claim" ............................................................24
^ 1.204 "Section 510(b) Opt Out Claim" ........................................................25
1.205 "^ Section 510(b) Opt Out Equity Claim" .............................................25
^ 1.206 "Section 510(b) Opt Out Note Claim" ................................................25
1.207 "^ Secured Claim" ..............................................................................25
1.208 "^ Securities Act" ................................................................................25
^ 1.209 "Securities Settlement" .....................................................................25
1.210 "^ Security" .........................................................................................25
1.211 "^ Security And Pledge Agreement" ....................................................25
1.212 "^ Senior Notes" .................................................................................25
1.213 "^ Senior Notes Claim" .......................................................................25
^ 1.214 "Senior Notes Indenture" ..................................................................25
^ 1.215 "Senior Notes Indenture Trustee" .....................................................25
1.216 "^ SERP" .............................................................................................26
1.217 "^ SERP Claim" ..................................................................................26
1.218 "^ Servicer" .........................................................................................26
^ 1.219 "Solicitation Procedures Order" ........................................................26
^ 1.220 "Specialty Electronics Debtors" ........................................................26
^ 1.221 "Statutory Committees" .......................................................26^ 26^ 26
^ 1.222 "Subordinated Notes" ........................................................................26
1.^ 223 "Subordinated Notes Holder" ............................................................26
^ 1.224 "Subordinated Notes Indenture" ........................................................26
^ 1.225 "Subordinated Notes Indenture Trustee" ...........................................26
^ 1.226 "Supplemental Distribution Account" .................................................26
^ 1.227 "TOPrS" ............................................................................................26
1.^ 228 "TOPrS Claim" ..................................................................................26
1.229 "UAW" ................................................................................................26
1.230 "UAW 1113/1114 Settlement Approval Order" .....................................27
1.231 "^ UAW Benefit Guarantee" ................................................................27
^ 1.232 "UAW Benefit Guarantee Term Sheet" ..............................................27
1.233 "UAW-Delphi-GM Memorandum of Understanding" ............................27

^ 1.234"Unimpaired" ...............................................................................27
1.^ 235"Union Settlement Agreements" ...................................................27
^ 1.236"Unions" ......................................................................................27
1.^ 237"USW^ " ......................................................................................27
^ 1.238"USW 1113/1114 Settlement Approval Order"................................27
^ 1.239"USW Benefit Guarantee" ............................................................27
^ 1.240"USW Benefit Guarantee Term Sheet".........................................28
1.^ 241"USW-^ Delphi-GM Memoranda of Understanding" ...............28
^ 1.242"USW-Home Avenue Memorandum of Understanding" .........28
^ 1.243"USW-Vandalia Memorandum of Understanding" ................28
^ 1.244"Voting Deadline"........................................................................28
^ C.     Rules Of Interpretation ...............................................................28
^ D.     Computation Of Time ..................................................................29
^ E.     References To Monetary Figures ..................................................29
F.       Exhibits ......................................................................................29
^ 29ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS...........29
2.^ 1    Administrative Claims .................................................29^ 30^ 30
^ 2.2    Priority Tax Claims ....................................................................30
^ 2.3    GM Administrative Claim. ..........................................................30
ARTICLE ^ III CLASSIFICATION OF CLAIMS AND INTERESTS^  ...................30
^ 3.1    The Debtors. ...............................................................................30
^ 3.2    ^ Classification Of Claims And Interests........................................31
ARTICLE IV IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS
IMPAIRED AND UNIMPAIRED BY THE PLAN .....................................................32
^ 4.1    Classes Of Claims That Are Unimpaired........................................32
^ 4.2    Impaired Classes Of Claims And Interests. ....................................32
^ ARTICLE V PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ...........33
5.1     Class 1A-1, Class 3A-1, and Class 4A-1 (Secured Claims) .....................33
5.2     Class 1B through Class 12B (Flow-Through Claims) ......................33
5.3     Class 1C-1 through Class 12C-1 (General Unsecured Claims)................33
5.4     Class 1C-2 through Class 12C-2 (PBGC Claims) ...................................34
5.5     Class 1D through Class 12D (GM Unsecured Claim)................34^ 34^ 34
^ 5.6    Class 1E (Section 510(b) Note Claims) .........................................34
5.^ 7    Class ^ 1F through Class 13F (Intercompany Claims) ............................34
^ 5.8    Class 1G-1 (Existing Common Stock)............................................34
^ 5.9    Class 1G-2 (Section 510(b) Equity Claims) ...................................34
^ 5.10  Class 1H and Class 8H (Section 510(b) ERISA Claims) .....................34
5.^ 11   Class ^ 1I (Other ^ Interests) .......................................................35
^ 5.12  Class 1J through Class 12J (Interests In Affiliate Debtors)...................35
^ 5.13  Class 1K through Class 12K (Other Priority Claims)........................35
^ ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS
_____35
6.^ 1    Impaired Classes Of Claims Entitled To Vote..........................................35
6.^ 2    Classes Deemed To ^ Accept The Plan .......................................35
^ 6.3    Acceptance By Impaired Classes. ................................................35
^ 6.4    Classes Deemed To Reject The Plan ............................................35
^ ^ 6.5              Prior Acceptances Or Rejections Of The Plan.........................................36

^ 6.6    Approval of Modifications Subject To Sections 1127 And 1129(b) Of The Bankruptcy Code ................................................36^ 36
^ ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ...........36
    ^ 7.1    Continued Corporate Existence ...............................................36
    ^ 7.2    Substantive Consolidation .......................................................36
    7.^ 3    Restructuring Transactions. .....................................................38
    ^ 7.4    Certificate Of Incorporation And Bylaws. ................................38
    ^ 7.5    Directors And Officers Of Reorganized DPH Holdings And Affiliate Debtors. ....................................................................38
    ^ 7.6    Consummation Of Disposition Transactions To Occur On Effective Date. .........................................................................38
    ^ 7.7    Master Disposition Agreement. ................................................39
    ^ 7.8    DIP Lender Credit Bid. .............................................................39
    ^ 7.9    Post-Confirmation Reorganized DPH Holdings Share Trust ....40
    ^ 7.10  Emergence Capital. ..................................................................40
    ^ 7.11  Management Compensation Plan. .............................................40
    ^ 7.12  Procedures For Asserting Certain Claims .................................41
    ^ 7.13  Cancellation Of Existing Securities And Agreements...............41
    ^ 7.14  Sources of Cash For Plan Distributions....................................42
    ^ 7.15  Establishment Of A General Unsecured Distribution Account. ...42
    ^ 7.16  Collective Bargaining Agreements. ..........................................42
    ^ 7.17  Pension Matters And PBGC Settlement. ..................................44
    ^ 7.18  Salaried OPEB Settlement. ......................................................44
    ^ 7.19  Preservation Of Causes Of Action ...........................................45
    ^ 7.20  Reservation Of Rights...............................................................45
    ^ 7.21  Exclusivity Period.....................................................................45
    ^ 7.22  Dismissal Of Complaints. .........................................................45
    ^ 7.23  Corporate Action.......................................................................45
    ^ 7.24  Effectuating Documents; Further Transactions ........................45
    ^ 7.25  Consummation Of Divestiture Transactions..............................46
    ^ 7.26  Exemption From Certain Transfer Taxes And Recording Fees...46
^ ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS .......46
    ^ 8.1    Assumed And Rejected Contracts And Leases...........................46
    8.^ 2    Cure Procedures and ^ Payments Related To Assumption Of Executory Contracts ^ And Unexpired Leases^ ......................47
    ^ 8.3    Assignment Pursuant To Restructuring Transaction. ................52
    8.4    Rejection Damages Bar Date .....................................................52
    8.5    Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases..............................................52
ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS ...........................53
    9.1    Time Of Distributions. ..............................................................53
    9.2    No Interest On Disputed Claims ...........................53^ 53^ 53^ 54
    ^ 9.3    Disbursing Agent. ......................................................................53
    ^ 9.4    Surrender Of Securities Or Instruments. ..................................53
    ^ 9.5    Services Of Indenture Trustees, Agents, And Servicers............54
    ^ 9.6    Claims Administration Responsibility .......................................54
    9.^ 7    Delivery Of ^ Distributions^ ..................................................55

vii

^ 9.8    Procedures For Treating And Resolving Disputed And Contingent
Claims...................................................................................................56
^ 9.9    Section 510(b) Opt Out Claims.....................................................57
^ 9.10  Allocation Of Plan Distributions Between Principal And Interest...........58
^ ARTICLE X ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE
CLAIMS      58
^ 10.1  DIP Facility Claims.........................................................................58
10.^ 2  Pre-Confirmation Administrative ^ Claim Procedures.....................58
^ 10.3  Professional Claims.........................................................................58
^ 10.4  Substantial Contribution Compensation And Expenses Bar Date...........59
^ 10.5  Other Administrative Claims...........................................................60
^ ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ...........60
^ 11.1  Revesting Of Assets.........................................................................60
^ 11.2  Discharge Of The Debtors...............................................................60
^ 11.3  Compromises And Settlements.........................................................61
11.4    Release By Debtors Of Certain Parties............................................61
11.5    Release By Holders Of Claims And Interests....................................61
11.6    Release By Unions...........................................................................62
11.7    Release Of GM By Debtors And Third Parties..................................62
11.8    ^ Release of GMCo. By Debtors And Third Parties............62^ 63^ 63^ 63
^ 11.9  Setoffs...........................................................................................63
^ 11.10 Subordination Rights.....................................................................63
11.11   Exculpation And Limitation Of Liability........................................63
11.12   Indemnification Obligations...........................................................64
11.13   Exclusions And Limitations On Exculpation, Indemnification, And
Releases..........................................................................................65
11.14   Injunction......................................................................................65
ARTICLE XII CONDITIONS PRECEDENT......................................65^ 66^ 66^ 66
^ 12.1  Confirmation...................................................................................66
^ 12.2  Conditions To The Effective Date Of The Plan................................66
12.3    Waiver Of Conditions Precedent....................................................66
ARTICLE XIII RETENTION OF JURISDICTION.......................................................67
ARTICLE XIV MISCELLANEOUS PROVISIONS......................................................69
14.1    Binding Effect.................................................................................69
14.2    Payment Of Statutory Fees.............................................................69
14.3    Modification And Amendments.......................................................69
14.4    Reserved..............................................................................69^ 69^ 70^ 70
^ 14.5  Withholding And Reporting Requirements.......................................69
^ 14.6  Committees......................................................................................70
14.7    Revocation, Withdrawal, Or Non-Consummation............................70
14.8    Notices............................................................................................70
14.9    Term Of Injunctions Or Stays.........................................................72
14.10   Governing Law...............................................................................72
14.11   No Waiver Or Estoppel...................................................................73
14.12   Conflicts.........................................................................................73

## EXHIBITS

| Exhibit 7.3 | Restructuring Transactions Notice |
| Exhibit 7.4(a) | Certificate Of Incorporation For Reorganized DPH Holdings |
| Exhibit 7.4(b) | Bylaws Of Reorganized DPH Holdings |
| Exhibit 7.7 | Master Disposition Agreement |
| Exhibit 7.9 | Post-Confirmation Reorganized DPH Holdings Share Trust Agreement |
| Exhibit 7.11 | Management Compensation Plan |
| Exhibit 7.17 | Delphi-PBGC Settlement Agreement |
| Exhibit 7.19 | Retained Causes Of Action |
| Exhibit 8.1(a) | Executory Contracts And Unexpired Leases To Be Rejected |
| Exhibit 10.5 | Administrative Claim Request Form |

## **INTRODUCTION**

Delphi Corporation and certain of its direct and indirect subsidiaries, debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 Cases, hereby propose this joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B. of this Plan.

The subsidiaries of Delphi incorporated outside of the United States are not the subject of the Chapter 11 Cases.

These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The distributions to be made to holders of Claims and Interests are set forth herein.

The Debtors' reorganization plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008, and the confirmation order became final on February 4, 2008.  The Debtors met the conditions required to consummate the plan, including obtaining $6.1 billion of exit financing, but on April 4, 2008, the Plan Investors delivered to Delphi a letter stating that such letter "constitutes a notice of immediate termination" of the Investment Agreement.  The financing the Debtors were to receive under the Investment Agreement was an integral element to the consummation of the Plan.  Appaloosa Management L.P.'s ("Appaloosa") April 4 letter alleged that Delphi had breached certain provisions of the Investment Agreement and that Appaloosa was entitled to terminate the Investment Agreement.  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their contractual obligations.  Nevertheless, the termination of the Investment Agreement resulted in the Debtors' inability to consummate the Plan without additional modifications.  The Debtors are now seeking approval of modifications to the Plan pursuant to section 1127 of the Bankruptcy Code.

This Plan provides for the substantive consolidation of certain of the Estates, but only for the purposes of voting and making distributions to holders of Claims under this Plan. Under section 1127 of the Bankruptcy Code, as it incorporates section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Interests.  The Disclosure Statement Supplement (the "Supplement") relating to this Plan was approved by the Bankruptcy Court on June 16, 2009, and has been distributed simultaneously with this Plan to all parties whose votes are being solicited.  The Supplement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, and certain related matters.

1

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN AND THE SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**PLEASE TAKE NOTICE THAT YOUR PREVIOUS ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  CONSEQUENTLY, YOUR VOTE ON THE MODIFICATIONS TO THE PLAN IS IMPORTANT.**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, each of the Debtors expressly reserves its respective rights to alter, amend, modify, revoke, or withdraw this Plan with respect to such Debtor, one or more times, prior to this Plan's substantial consummation.

A complete list of the Debtors is set forth below.  The list identifies each Debtor by its case number in these Chapter 11 Cases.

2

## **THE DEBTORS**

- ASEC Manufacturing General Partnership, 05-44482

- ASEC Sales General Partnership, 05-44484

- Aspire, Inc, 05-44618

- Delco Electronics Overseas Corporation, 05-44610

- Delphi Automotive Systems (Holding), Inc., 05-44596

- Delphi Automotive Systems Global (Holding), Inc., 05-44636

- Delphi Automotive Systems Human Resources LLC, 05-44639

- Delphi Automotive Systems International, Inc., 05-44589

- Delphi Automotive Systems Korea, Inc., 05-44580

- Delphi Automotive Systems LLC, 05-44640

- Delphi Automotive Systems Overseas Corporation, 05-44593

- Delphi Automotive Systems Risk Management Corp., 05-44570

- Delphi Automotive Systems Services LLC, 05-44632

- Delphi Automotive Systems Tennessee, Inc., 05-44558

- Delphi Automotive Systems Thailand, Inc., 05-44586

- Delphi China LLC, 05-44577

- Delphi Connection Systems, 05-44624

- Delphi Corporation, 05-44481

- Delphi Diesel Systems Corp., 05-44612

- Delphi Electronics (Holding) LLC, 05-44547

- Delphi Foreign Sales Corporation, 05-44638

- Delphi Furukawa Wiring Systems LLC, 05-47452

- Delphi Integrated Service Solutions, Inc., 05-44623

- Delphi International Holdings Corp., 05-44591

- Delphi International Services, Inc., 05-44583

- Delphi Liquidation Holding Company, 05-44542

- Delphi LLC, 05-44615

- Delphi Mechatronic Systems, Inc., 05-44567

- Delphi Medical Systems Colorado Corporation, 05-44507

- Delphi Medical Systems Corporation, 05-44529

- Delphi Medical Systems Texas Corporation, 05-44511

- Delphi NY Holding Corporation, 05-44480

- Delphi Receivables LLC, 05-47459

- Delphi Services Holding Corporation, 05-44633

- Delphi Technologies, Inc., 05-44554

- DREAL, Inc., 05-44627

- Environmental Catalysts, LLC, 05-44503

- Exhaust Systems Corporation, 05-44573

- MobileAria, Inc., 05-47474

- Packard Hughes Interconnect Company, 05-44626

- Specialty Electronics International Ltd., 05-44536

- Specialty Electronics, Inc., 05-44539

3

# ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope Of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B. of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

1.1    **"503 Deadline"** has the meaning ascribed to it in Article 10.4 hereof.

1.2    **"Acquired Assets"** means the GM Acquired Assets and the Company Acquired Assets.

1.3    **"Acquired Contracts"** has the meaning ascribed to it in the Master Disposition Agreement.

^ 1.4    **"Administrative Claim"** means a Claim (other than the GM Administrative Claim) for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

^ 1.5    **"Administrative Claims Bar Date"^** means the deadline for filing proofs of or requests for payment of Administrative Claims arising after June 1, 2009, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to Professional Claims, which shall be subject to the provisions of Article 10.3 hereof.

^ 1.6    **"ADR Procedures"** means any alternative dispute resolution procedures approved by the Bankruptcy Court prior to the Effective Date, including, but not limited to, those approved in the Amended And Restated Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R.

Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, entered June 26, 2007.

**^ 1.7**   **"Affiliate Debtors"** means all the Debtors, other than Delphi.

**^ 1.8**   **"Affiliates"** has the meaning given such term by section 101(2) of the Bankruptcy Code.

**^ 1.9**   **"Allowed Claim"** means a Claim, or any portion thereof,

(a)    that has been allowed by a Final Order of the Bankruptcy Court (or such other court or forum as the Reorganized Debtors and the holder of such Claim agree may adjudicate such Claim and objections thereto);

(b)    as to which a proof of claim has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, or is allowed by any Final Order of the Bankruptcy Court or by other applicable non-bankruptcy law, but only to the extent that such claim is identified in such proof of claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been filed, or is intended to be filed, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied by a Final Order;

(c)    as to which no proof of claim has been filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of such liquidated amount and (ii) no objection to its allowance has been filed, or is intended to be filed, by the Debtors or the Reorganized Debtors, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court;

(d)    that is expressly allowed in a liquidated amount in this Plan; or

(e)    that is a Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim; provided that both the Bankruptcy Court and MDL Court shall have approved the MDL Settlements, except to the extent that any such Claim is or becomes a Section 510(b) Opt Out Claim.

**^ 1.10** **"Allowed Class . . . Claim" or "Allowed Class . . . Interest"** means an Allowed Claim or an Allowed Interest in the specified Class.

**^ 1.11** **"Allowed Interest"** means an Interest in any Debtor, which has been or hereafter is listed by such Debtor in its books and records as liquidated in an amount and not disputed or contingent; provided, however, that to the extent an Interest is a Disputed Interest, the determination of whether such Interest shall be allowed and/or the amount of any such Interest shall be determined, resolved, or adjudicated, as the case may be, in the manner in which such Interest would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced; and provided further, however, that proofs of Interest need not and should not be filed in the Bankruptcy Court with respect to any Interests; and provided further, however, that

the Reorganized Debtors, in their discretion, may bring an objection or motion with respect to a Disputed Interest before the Bankruptcy Court for resolution.

1.12    ^ **"Assumed Liabilities"** means GM Assumed Liabilities or Company Assumed Liabilities, as applicable.

^ **1.13** **"Avoidance Claims"** means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute such Causes of Action.

^ **1.14** **"Ballot"** means each of the ballot forms that is distributed with the Disclosure Statement to holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under Article VI of this Plan.

^ **1.15** **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date.

^ **1.16** **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

^ **1.17** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

^ **1.18** **"Bar Date"** means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.  Except as explicitly provided in the Bar Date Order, the Bar Date was July 31, 2006.

^ **1.19** **"Bar Date Order"** means the order entered by the Bankruptcy Court on April 12, 2006, which established the Bar Date, and any subsequent order supplementing such initial order or relating thereto.

^ **1.20** **"Beneficiaries"** means those Holders of Claims that are to be satisfied under the Plan by post-Effective Date distributions to be made by Reorganized DPH Holdings at the direction of the Post-Confirmation Trust Plan Administrator.

^ **1.21** **"Business Day"** means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

^ **1.22** **"Buyers"** means, collectively, GM Buyer and ^ Company Buyer.

^ **1.23** **"Cash"** means legal tender of the United States of America and equivalents thereof.

^ **1.24** **"Cash Reserve"** means the cash reserved, as determined by the Debtors or the Reorganized Debtors in their sole and absolute discretion, sufficient to pay Administrative Claims, Other Secured Claims, Priority Tax Claims, and as otherwise required by this Plan.

^ **1.25** **"Causes of Action"** means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Claims, unless otherwise waived or released by the Debtors or the Reorganized Debtors to the extent such Cause of Action is a Cause of Action held by the Debtors or the Reorganized Debtors.

^ **1.26** **"Certificate"** has the meaning ascribed to it in Article 9.4 hereof.

^ **1.27** **"Certificate of Incorporation and Bylaws"** means the Certificate of Incorporation and Bylaws (or other similar documents) of Reorganized DPH Holdings, in substantially the forms attached hereto as Exhibit 7.4(a) and Exhibit 7.4(b) respectively.

^ **1.28** **"Chapter 11 Cases"** means the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered with one another under Case No. 05-44481, and the phrase "Chapter 11 Case" when used with reference to a particular Debtor means the particular case under chapter 11 of the Bankruptcy Code that such Debtor commenced in the Bankruptcy Court.

^ **1.29** **"Claim"** means a claim against one of the Debtors (or all or some of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

^ **1.30** **"Claims Agent"** means Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Attention: Delphi Corporation.

^ **1.31** **"Claims/Interests Objection Deadline"** means, as applicable (except for Administrative Claims), (a) the day that is the later of (i) the first Business Day that is at least 120 days after the Effective Date and (ii) as to proofs of claim filed after the Bar Date, the first Business Day that is at least 120 days after a Final Order is entered deeming the late filed claim to be treated as timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

^ **1.32** **"Class"** means a category of holders of Claims or Interests as described in Article III of this Plan.

**1.33** **"Company Acquired Assets"** has the meaning ascribed to "Company Acquired Assets" as set forth in the Master Disposition Agreement.

**1.34** **"Company Assumed Contracts"** means those prepetition executory contracts and/or unexpired leases acquired by Company Buyer under the terms of the Master Disposition Agreement.

**1.35** **"Company Assumed Liabilities"** means those liabilities assumed by Company Buyer under the terms of the Master Disposition Agreement.

**1.36** **"Company Buyer"** means DIP Holdco 3, LLC, on behalf of itself and other buyers as set forth in the Master Disposition Agreement, as assignees of the rights of the DIP Agent to the Company Acquired Assets in connection with the Credit Bid.

**1.37** **"Company Sales Securities"** means those outstanding shares and other equity interests acquired by the Company Buyer under the terms of the Master Disposition Agreement.

**^ 1.38** **"Confirmation Date"** means the date of entry of the Confirmation Order.

**^ 1.39** **"Confirmation Hearing"** means the hearing before the Bankruptcy Court commencing on January 17, 2008 held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters.

**^ 1.40** **"Confirmation Order"** means the order entered on January 25, 2008 by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**^ 1.41** **"Connection Systems Debtors"** means, collectively, Packard Hughes Interconnect Company and Delphi Connection Systems, as substantively consolidated for Plan purposes.

**^ 1.42** **"Contingent PBGC Secured Claim"** means any Claim of the PBGC asserted against the applicable Debtors or group of Debtors, which Claims were granted conditional adequate protection liens pursuant to, and in the priority and with the validity set forth in, the Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfer Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694) and the Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated July 30, 2008 (Docket No. 14005).

**^ 1.43** **"Continuing Indemnification Rights"** means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

**^ 1.44** **"Controlled Affiliate"** means any Affiliate in which a Debtor (whether directly or indirectly and whether by ownership or share capital, the possession of voting power, contract or otherwise) has the power to appoint and/or remove the majority of the members of the board of directors or other governing body of such Affiliate or otherwise to direct or cause the direction of the affairs and policies of such Affiliate.

**1.45** **"Credit Bid"** means the payment in an amount equal to 100% of the principal and interest due under the DIP Credit Agreement, as set forth in the Master Disposition Agreement.

**^ 1.46** **"Creditors' Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on October 17, 2005, as reconstituted from time to time.

**^ 1.47** **"Cure"** means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all undisputed, unpaid, and past due monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**^ 1.48** **"Cure Amount Notice"** means the notice of proposed Cure amount provided to counterparties to Material Supply Agreements pursuant to the Solicitation Procedures Order and the Confirmation Order, and such notices provided under the Modification Procedures Order.

**^ 1.49** **"Cure Amount Proposal"** has the meaning ascribed to it in Article 8.2 of this Plan.

**^ 1.50** **"DASHI Debtors"** means, collectively, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc., as substantively consolidated for Plan purposes.

**^ 1.51** **"Debtor"** means, individually, any of Delphi or the Affiliate Debtors.

**^ 1.52** **"Debtors"** means, collectively, Delphi and the Affiliate Debtors.

**^ 1.53** **"Delphi"** means Delphi Corporation, a Delaware corporation, debtor-in-possession in the above-captioned Case No. 05-44481 (RDD) pending in the Bankruptcy Court.

**^ 1.54** **"Delphi-DAS Debtors"** means, collectively, Delphi Corporation, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Global (Holdings), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Services LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi LLC,  Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi

9

Automotive Systems Risk Management Corp., Delphi Automotive Systems Tennessee, Inc., Delphi Technologies, Inc., Delphi Electronics (Holding) LLC, Delphi Liquidation Holding Company, DREAL, Inc., Environmental Catalysts, LLC, and Exhaust Systems Corporation, as substantively consolidated for Plan purposes.

**^ 1.55 "Delphi-GM Arrangement"** means that certain agreement between the Debtors and GM, dated May 9, 2008, as subsequently amended, supplemented, or otherwise modified from time to time, pursuant to which GM agreed to make specified accommodations to enhance the Debtors' liquidity.

**^ 1.56 "Delphi-GM Definitive Documents"** means the Delphi-GM Global Settlement Agreement, the Delphi-GM Master Restructuring Agreement, each as amended and supplemented, and all attachments and exhibits thereto.

**^ 1.57 "Delphi-GM Global Settlement Agreement"** means that certain Amended and Restated Global Settlement Agreement between Delphi Corporation, on behalf of itself and certain subsidiaries and Affiliates, and General Motors Corporation, dated September 12, 2008 and September 25, 2008.

**^ 1.58 "Delphi-GM Master Restructuring Agreement"** means that certain Amended and Restated Master Restructuring Agreement between Delphi Corporation and General Motors Corporation, dated September 12, 2008.

**^ 1.59 "Delphi HRP"** means the Delphi Hourly-Rate Employees Pension Plan.

**^ 1.60 "Delphi-PBGC Settlement Agreement"^** means ^ the agreement ^ dated July 21, 2009 between Delphi and the PBGC that provides for, among other things, resolution of the Debtors' Pension Plans and related Claims, ^ as attached hereto ^ as Exhibit 7.17.

**^ 1.61 "DIP Accommodation Agreement"** means that certain Accommodation Agreement, dated December 12, 2008, by and among the Debtors, the DIP Agent, and the requisite percentage of DIP Lenders, as amended and supplemented.

**^ 1.62 "DIP Accommodation Agreement Order"** means, collectively, the Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, entered by the Bankruptcy Court on December 3, 2008 (Docket No. 14515), the Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With Certain Participating Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith, entered by the Bankruptcy Court on February 25, 2009 (Docket No. 16377), and any and all other orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Accommodation Agreement.

**^ 1.63 "DIP Agent"** means the administrative agent for the DIP Lenders as defined in the DIP Credit Agreement.

**^ 1.64 "DIP Claims"** means, collectively, the DIP Facility First Priority Term Claim, DIP Facility Revolver Claim, and DIP Facility Second Priority Term Claim.

^ **1.65** **"DIP Credit Agreement"** means that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008, by and among the Debtors, the DIP Agent, and the DIP Lenders, which was executed by the Debtors in connection with the DIP Facility, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

^ **1.66** **"DIP Facility"** means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

^ **1.67** **"DIP Facility First Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $500 million term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

^ **1.68** **"DIP Facility Order"** means, collectively, (a) the interim order that was entered by the Bankruptcy Court on October 12, 2005, (b) the final order that was entered by the Bankruptcy Court on October 28, 2005, authorizing and approving the DIP Facility and the agreements related thereto, (c) the order that was entered by the Bankruptcy Court on January 5, 2007, authorizing the Debtors to refinance the DIP Facility, and (d) any and all orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Credit Agreement.

^ **1.69** **"DIP Facility Revolver Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $1.1 billion revolving lending facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

^ **1.70** **"DIP Facility Second Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $2.^ 750 billion term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

^ **1.71** **"DIP Lenders"** means the lenders and issuers from time to time party to the DIP Credit Agreement.

^ **1.72** **"DIP Lenders Steering Committee"** means the committee with members consisting of certain DIP Lenders with DIP Facility First Priority Term Claims, DIP Facility Revolver Claims, and DIP Facility Second Priority Term Claims.

^ **1.73** **"DIP Loan Documents"** means the DIP Facility together with the DIP Accommodation Agreement as authorized by the Bankruptcy Court pursuant to the DIP Accommodation Agreement Order, and all documents relating thereto.

^ **1.74** **"DIP Priority Payment Amount"** means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the closing date of the Master Disposition Agreement, in dollars:  (i) all outstanding and unpaid fees and

11

expenses then due under Section 10.05 of the DIP Credit Agreement (including any counsel and advisor fees payable under Section 10.05 of the DIP Credit Agreement); (ii) accrued and unpaid interest and fees then due on account of DIP Facility Revolver Claims and DIP Facility First Priority Term Claims; (iii) the DIP Facility Revolver Claims and DIP Facility First Priority Term Claims for then outstanding principal amounts; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement for those Hedging Agreements (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement.

^ **1.75** **"DIP Transfer"**^ means the transfer to the DIP Agent of the consideration specified in that certain Assignment Agreement dated July __, 2009 among the DIP Agent, DIP Holdco 3, LLC and GM Components Holdings, LLC to be distributed in accordance with the DIP Loan Documents, in exchange for the DIP Agent's right under the Credit Bid to receive the Company Acquired Assets, Company Sale Securities, GM Acquired Assets, and GM Sales Securities.

^ **1.76** **"Disallowed Claim"** means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

^ **1.77** **"Disallowed Interest"** means an Interest or any portion thereof that has been disallowed by a Final Order or a settlement.

^ **1.78** **"Disbursing Agent"** means Reorganized DPH Holdings, or any Person designated by it, in its sole discretion, to serve as a disbursing agent under this Plan. For purposes of distributions to holders of Allowed General Unsecured Claims, Reorganized DIP Holdings shall, as of the Effective Date, appoint DIP Holdco 3, LLC as the Disbursing Agent, or such other party as may be determined by mutual agreement between Reorganized DIP Holdings and DIP Holdco 3, LLC.

^ **1.79** **"Disclosure Statement"** means the written disclosure statement or any supplements thereto (including the Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

^ **1.80** **"Disposition Transactions"** means those transactions described in the Master Disposition Agreement^ .

^ **1.81** **"Disputed Claim" or "Disputed Interest"** means a Claim or any portion thereof, or an Interest or an portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

^ **1.82** **"Distribution Date"** means the date, selected by the Reorganized Debtors, upon which distributions to holders of Allowed Claims entitled to receive distributions under this Plan shall commence; provided, however, that the Distribution Date shall occur as soon as reasonably practicable after the Effective Date, but in any event no later than 30 days after the Effective Date.

^ **1.83** **"Distribution Reserve"** means, as applicable, one or more reserves of property for distribution to holders of Allowed Claims in the Chapter 11 Cases to be reserved pending allowance of Disputed Claims in accordance with Article 9.8 of this Plan.

^ **1.84** **"Effective Date"** means the Business Day determined by the Debtors on which all conditions to the consummation of this Plan set forth in Article 12.2 of this Plan have been either satisfied or waived as provided in Article 12.3 of this Plan and the day upon which this Plan is substantially consummated.

^ **1.85** **"Emergence Capital"** means that certain amount to be provided to the Reorganized Debtors by ^ GMCo. and DIP Holdco 3, LLC pursuant to Sections 3.1.1, 3.^ 2.1, and 3.2.3 of the Master Disposition Agreement (as each are applicable) related to the post-Effective Date operations of Reorganized DPH Holdings and the Reorganized Debtors.

^ **1.86** **"Employee-Related Obligation"** means a Claim of a salaried employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for (i) severance, provided, however, that such employee was in his or her capacity as an employee of a Debtor on or after June 1, 2009, and (ii) indemnification, provided, however, that such employee was in his or her capacity as an employee of a Debtor as of the date of the commencement of the hearing on the Disclosure Statement.

^ **1.87** **"Equity Committee"** means the official committee of equity security holders that was appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 28, 2006 and disbanded on April 24, 2009.

^ **1.88** **"ERISA"** means Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 and 26 U.S.C. §§ 401-420, as amended.

^ **1.89** **"ERISA Plaintiffs"** means, collectively, Gregory Bartell, Thomas Kessler, Neal Folck, Donald McEvoy, Irene Polito, and Kimberly Chase-Orr on behalf of participants in the Debtors and their subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, as styled in the MDL Actions.

^ **1.90** **"ERISA Settlement"** means that certain settlement of the ERISA-related MDL Actions, as it may be amended or modified.

^ **1.91** **"Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

^ **1.92** **"Exchange Act"** means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

^ **1.93** **"Exhibit"** means an exhibit annexed either to this Plan or as an appendix to the Disclosure Statement.

^ **1.94** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

^ **1.95** **"Existing Common Stock"** means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

^ **1.96** **"Existing Securities"** means, collectively, the Senior Notes, the Subordinated Notes, and the Existing Common Stock.

^ **1.97** **"Face Amount"** means, (a) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount claimed by the holder of a Claim in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (b) when used in reference to an Allowed Claim, the allowed amount of such Claim, and (c) when used in reference to a TOPrS Claim, $0.

^ **1.98** **"Final Modification Hearing"** means the final hearing before the Bankruptcy Court held under section 1127 of the Bankruptcy Code to consider modification of this Plan and related matters.

^ **1.99** **"Final Order"** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

^ **1.100**        **"Flow-Through Claim"** means a claim arising from an Employee-Related Obligation; provided, however, that all Estate Causes of Action and defenses to any Flow-Through Claim shall be fully preserved.

^ **1.101**        **"General Unsecured Claim"** means any Claim, including a Senior Note Claim, TOPrS Claim or a SERP Claim, that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Contingent PBGC Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

^ **1.102**        **"General Unsecured MDA Distribution"** means, if and to the extent ^ Company Buyer makes distributions to its members ^ in accordance with the ^ Company Buyer Operating Agreement, as described in section 3.2.3 of ^ the ^ Master Disposition

14

Agreement, in excess of $7.2 billion, an amount equal to $^ 32.50 for every $^ 67.50 so distributed in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA Distribution exceed $^ 300,000,000 in the aggregate.

**^ 1.103**    **"GM"** means Motors Liquidation Company, formerly known as General Motors Corporation.

**^ 1.104**    **"GM Acquired Assets"** has the meaning set forth in the Master Disposition Agreement.

**^ 1.105**    **"GM 414(l) Administrative Claim"** means the claim of GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in section 2.03(c) of the Delphi-GM Global Settlement Agreement of no more in the aggregate than $2.055 billion.

**^ 1.106**    **"GM Administrative Claim"** means the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim.

**^ 1.107**    **"GM Arrangement Administrative Claim"** means the claim of GM under the Delphi-GM Arrangement.

**^ 1.108**    **"GM Assumed Contracts"** means those prepetition executory contracts and/or unexpired leases acquired by GM (and then assigned to GMCo.) under the terms of the Master Disposition Agreement.

**^ 1.109**    **"GM Assumed Liabilities"** means liabilities assumed by ^ GMCo. under the terms of the Master Disposition Agreement.

**^ 1.110**    **"GM Buyer(s)"** has the meaning set forth in the Master Disposition Agreement.

**1.111**    **"GMCo."** means General Motors Company.

**1.112**    **"GM-PBGC Agreement"** means the Waiver and Release Agreement among PBGC, General Motors Company, and Motors Liquidation Company, dated July 24, 2009, which is appended as Exhibit B to the Delphi-PBGC Settlement Agreement.

**1.113**    **"GM Sales Securities"** means those outstanding shares and other equity interests acquired by the GM Buyer under the terms of the Master Disposition Agreement.

**^ 1.114**    **"GM Unsecured Claim"** means any Claim of GM, excluding the GM Administrative Claim and all other Claims and amounts to be treated pursuant to the Master Disposition Agreement (or any agreements ancillary to the Master Disposition Agreement) or the Delphi-GM Global Settlement Agreement, but shall otherwise include all claims asserted in GM's proof of claim, which was allowed in the amount of $2.5 billion upon the effectiveness of the Delphi-GM Global Settlement Agreement.

**^ 1.115**    **"Holdback Amount"** means the amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

**^ 1.116** **"Holdback Escrow Account"** means the escrow account into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**^ 1.117** **"IAM"** means the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78.

**^ 1.118** **"IAM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IAM, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.119** **"IBEW"** means the International Brotherhood of Electrical Workers and its Local 663.

**^ 1.120** **"IBEW E&S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Electronics and Safety, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.121** **"IBEW Powertrain Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Powertrain, Delphi, and GM, and all attachment and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.122** **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**^ 1.123** **"Indemnification Rights"** means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.

**^ 1.124** **"Indemnitee"** means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.

**^ 1.125** **"Indenture Trustees"** means the Senior Notes Indenture Trustee and the Subordinated Notes Indenture Trustee.

**^ 1.126**    **"Indentures"** means the Senior Notes Indenture and the Subordinated Notes Indenture.

**^ 1.127**    **"Insurance Coverage"** has the meaning ascribed to it in <u>Article 11.12</u> of this Plan.

**^ 1.128**    **"Insurance Settlement"** means that certain agreement among Delphi, certain insured officers and directors, and certain insurance carriers resolving certain insurance claims related to the MDL Actions, as it may be amended or modified.

**^ 1.129**    **"Intercompany Claim"** means a Claim by a Debtor, a Controlled Affiliate of a Debtor, or a non-Debtor Controlled Affiliate against another Debtor, Controlled Affiliate of a Debtor, or non-Debtor Controlled Affiliate.

**^ 1.130**    **"Intercompany Executory Contract"** means an executory contract solely between two or more Debtors or an executory contract solely between one or more Debtors and one or more non-Debtor Controlled Affiliates.

**^ 1.131**    **"Intercompany Unexpired Lease"** means an unexpired lease solely between two or more Debtors or an unexpired lease solely between one or more Debtors and one or more non-Debtor Controlled Affiliates.

**^ 1.132**    **"Interest"** means the legal, equitable, contractual, and other rights of any Person with respect to Existing Common Stock, Other Interests, or any other equity securities of, or ownership interests in, Delphi or the Affiliate Debtors.

**^ 1.133**    **"Investment Agreement"** means that Equity Purchase and Commitment Agreement, dated December 10, 2007, between the Plan Investors and Delphi, as the same may have been amended, modified, or supplemented from time to time, and all documents executed in connection therewith.

**^ 1.134**    **"IRC"** means the Internal Revenue Code of 1986, as amended.

**^ 1.135**    **"IRC Section 414(l) Transfer"** means the transaction or transactions through which the GM Hourly-Rate Employees Pension Plan assumed or shall assume from Delphi Hourly-Rate Employee Pension Plan pension obligations and applicable pensions assets pursuant the terms of the Delphi-GM Definitive Documents, IRC section 414(l), and Section 208 of ERISA.

**^ 1.136**    **"IUE-CWA"** means the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its applicable local unions.

**^ 1.137**    **"IUE-CWA 1113/114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 16, 2007 approving the IUE-CWA-Delphi-GM Memorandum of Understanding.

**^ 1.138**    **"IUE-CWA Benefit Guarantee"** means the benefit guarantee agreement between GM and the IUE-CWA, dated November 13, 1999.

17

**^ 1.139** **"IUE-CWA Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the IUE-CWA-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the IUE-CWA regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the IUE-CWA Benefit Guarantee.

**^ 1.140** **"IUE-CWA-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 5, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUE-CWA, Delphi, and GM, and all attachments and exhibits thereto and all IUE-CWA-Delphi collective bargaining agreements referenced therein as modified; and (ii) the IUE-CWA-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.141** **"IUOE"** means the International Union of Operating Engineers Locals 832S, 18S, and 101S, and their affiliated entities.

**^ 1.142** **"IUOE Local 18S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE 18S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.143** **"IUOE Local 101S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 101S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.144** **"IUOE Local 832S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 832S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.145** **"IUOE-IBEW-IAM OPEB Term Sheet"** means that term sheet, attached as Attachment B to the IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IAM Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding, regarding Delphi's cessation of post-retirement health care benefits and employer-paid post retirement life insurance benefits and GM's agreement to provide certain post retirement benefits to certain retired employees currently receiving such benefits from Delphi and other active employees who may become eligible for OPEB in accordance therewith.

^ **1.146** **"IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 16, 2007 approving the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding.

^ **1.147** **"Lead Plaintiffs"** means, collectively, Teachers' Retirement System of Oklahoma, Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H, and Stichting Pensioenfonds ABP, as styled in the MDL Actions.

^ **1.148** **"Management Compensation Plan"** means those certain plans and/or agreements by which the Reorganized Debtors, as substantially in the forms set forth on Exhibit 7.11 hereto, and ^ Company Buyer shall implement a compensation program for certain members of management and other employees on and after the Effective Date.

^ **1.149** **"Master Disposition Agreement"** means that certain master disposition agreement among Delphi, ^ General Motors Company (Solely With Respect To Article 6 And Sections 3.1.1.C, 9.11, 9.19, 9.37.1, 9.37.2, 9.43, 11.5.1.A , And 12.2.6), Motors Liquidation Company (FKA General Motors Corporation) (Solely With Respect To Sections 3.1.1.C, 9.19 And 11.5.1.A), DIP Holdco 3, LLC^ ,And The Other Sellers ^ And Other Buyers Party ^ Thereto, Dated As Of July 26, 2009.

^ **1.150** **"Material Supply Agreement"** means any agreement to which any of the Debtors is a party and pursuant to which the Debtors purchase materials which are directly incorporated into one or more of the Debtors' products.

^ **1.151** **"MDA Assumption And Assignment Notice"** has the meaning ascribed in Article 8.2(c).

^ **1.152** **"MDL Actions"** means those certain actions consolidated in that certain multi-district litigation proceeding captioned In re Delphi Corporation Securities, Derivative & ERISA Litigation, MDL No. 1725 (GER), pending in the United States District Court for the Eastern District of Michigan, related to certain actions for damages arising from the purchase or sale of the Senior Notes, the TOPrS, the Subordinated Notes, or Existing Common Stock, for violations of the securities laws, for violations of ERISA, misrepresentations, or any similar Claims.

^ **1.153** **"MDL Court"** means the United States District Court for the Eastern District of Michigan.

^ **1.154** **"MDL Settlements"** means, collectively, the ERISA Settlement, the Securities Settlement, and the Insurance Settlement.

^ **1.155** **"Modification Approval Date"** means the date of entry of the Modification Approval Order.

**^ 1.156** **"Modification Approval Order"** means the order entered by the Bankruptcy Court approving the modifications to this Plan under section 1127 of the Bankruptcy Code.

**^ 1.157** **"Modification Procedures Order"** means the order entered by the Bankruptcy Court on June 16, 2009 authorizing the procedures by which votes on the modifications to this Plan are to take place, among other matters.

**^ 1.158** **"New Common Stock"** means the share(s) of new common stock of Reorganized DPH Holdings.

**^ 1.159** **"Non-Represented Term Sheet"** means the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees entered into between Delphi and GM, dated August 3, 2007.

**^ 1.160** **"Omitted Material Supply Agreement Objection Deadline"** means February 8, 2008, the date that was ten days after service of notice upon counterparties to Material Supply Agreements as required by paragraph 24 of the Confirmation Order.

**^ 1.161** **"OPEB"** means other post-employment benefits obligations.

**^ 1.162** **"Ordinary Course Professionals Order"** means the order entered by the Bankruptcy Court on November 4, 2005 authorizing the retention of professionals utilized by the Debtors in the ordinary course of business.

**^ 1.163** **"Other Executory Contract"** means any executory contract, other than a Material Supply Agreement and Other Unexpired Lease, to which any of the Debtors is a party.

**^ 1.164** **"Other Interests"** means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

**^ 1.165** **"Other MDA Assumed Contracts"** means, collectively, Other Executory Contracts and Other Unexpired Leases to be assigned to Buyers pursuant to the MDA.

**^ 1.166** **"Other Priority Claim"** means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.

**^ 1.167** **"Other Unexpired Lease"** means any unexpired lease, other than a Material Supply Agreement and Other Executory Contract, to which any of the Debtors is a party.

**^ 1.168** ^ **"PBGC"** means the Pension Benefit Guaranty Corporation.

**^ 1.169** **"PBGC Claims"** means the Contingent PBGC Secured Claim and PBGC General Unsecured Claim.

**^ 1.170** **"PBGC General Unsecured Claim"** means any Claim of the PBGC against the applicable Debtors or group of Debtors arising from or relating to the Pension

20

Plans that are not secured by valid, perfected, and enforceable liens against the assets or property of the Debtors.

**^ 1.171** **"Pension Plans"** means Delphi Corporation: the Delphi Hourly Rate Employees Pension Plan and the Delphi Retirement Program for Salaried Employees; Delphi Mechatronic Systems, Inc.: the Delphi Mechatronic Systems Retirement Program; ASEC Manufacturing: the ASEC Manufacturing Retirement Program; and Packard-Hughes Interconnect Company: the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan.

**^ 1.172** **"Periodic Distribution Date"** means, as applicable, (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date and (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date, or such other Business Day selected by Reorganized DPH Holdings in its sole and absolute discretion; provided, however, distribution dates shall be no more than quarterly.

**^ 1.173** **"Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

**^ 1.174** **"Petition Date"** means, as applicable, (a) October 8, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date or (b) October 14, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date.

**^ 1.175** **"Plan"** means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as confirmed by the Bankruptcy Court on January 25, 2008 and as may be modified in accordance with the Bankruptcy Code and Bankruptcy Rules, including as modified by the Modification Approval Order, and all exhibits, supplements, appendices, and schedules hereto, either in its or their present form or as the same may be further altered, amended, or modified from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

**^ 1.176** **"Plan Investors"** means A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, Goldman Sachs & Co., and Pardus DPH Holding LLC.

**^ 1.177** **"Plan Objection Deadline"** means July 15, 2009 at 4:00 p.m. prevailing Eastern time.

**^ 1.178** **^ "Post-Confirmation Reorganized DPH Holdings Share Trust"** means that certain trust to be created on the Effective Date in accordance with the provisions of Article 7.9 and the Post-Confirmation Trust Agreement.

**^ 1.179** **"Post-Confirmation Trust Agreement"** means that certain trust agreement that, among other things, (a) establishes and governs the Post-Confirmation

Reorganized DPH Holdings Share Trust, and (b) describes the powers, duties, and responsibilities of the Post-Confirmation Trust Plan Administrator.

**^ 1.180**    **"Post-Confirmation Trust Plan Administrator"** means that Person designated by the Debtors, identified at or prior to the Final Modification Hearing, and retained as of the Effective Date as the employee or fiduciary responsible for implementing the applicable provisions of the Plan and administering the Post-Confirmation Reorganized DPH Holdings Share Trust in accordance with the Plan and the Post-Confirmation Trust Agreement, and any successor appointed in accordance with the Post-Confirmation Trust Agreement.

**^ 1.181**    **"Prepetition Employee-Related Obligation"** means a Claim arising prior to the Petition Date of an hourly employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for post-employment benefits, including, without limitation, retiree health care and life insurance.

**^ 1.182**    **"Prepetition Employee-Related Obligations Bar Date"** means the deadline for filing proofs of claim in accordance with Article 7.12 of this Plan with respect to Prepetition Employee-Related Obligations, which shall be 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

**^ 1.183**    **"Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**^ 1.184**    **"Pro Rata"** means, (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

**^ 1.185**    **"Professional"** means any Person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise; provided, however, that Professional does not include any Person retained pursuant to the Ordinary Course Professionals Order.

**^ 1.186**    **"Professional Claim"** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**^ 1.187**    **"Professional Fee Order"** means the order entered by the Bankruptcy Court on November 4, 2005, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**^ 1.188**    **"Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of a Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim

as such maturity existed before such default; (iii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of a Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve Reinstatement.

^ 1.189        "Released Parties" means, collectively, (a) all officers of each of the Debtors and Reorganized Debtors, all members of the boards of directors of each of the Debtors and Reorganized Debtors, and all employees of each of the Debtors and Reorganized Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) the DIP Steering Committee and all current and former members of the DIP Steering Committee in their respective capacities as such, (g) Parnassus Holdings II, LLC, (h) Platinum Equity Capital Partners II, L.P., (i) DIP Holdco 3, LLC and other buyers party to the Master Disposition Agreement, (j) all Professionals, (^ k) the Unions and current or former members, officers, and committee members of the Unions, (^ l) the Indenture Trustees, in their capacities as such, and (^ m) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

^ 1.190        "Reorganized . . . " means the applicable Debtor from and after the Effective Date.

^ 1.191        "Reorganized Debtor" or "Reorganized Debtors" means, individually, any Debtor and, collectively, all Debtors, in each case from and after the Effective Date.

^ 1.192        "Reorganized DPH Holdings" means Reorganized Delphi from and after the Effective Date, a corporation organized under the laws of Delaware or under such other law as determined by the Debtors, which will be the parent holding company of the Reorganized Debtors, the stock of which will be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust.

1.193    "Required Lenders" has the meaning ascribed in the DIP Credit Agreement.

^ 1.194        "Restructuring Debtors" means those Debtors that shall be the subject of a Restructuring Transaction under this Plan.

**^ 1.195**_____ **"Restructuring Transaction(s)"** means a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate directly owned by a Debtor merges with or transfers some or substantially all of its assets and liabilities to a Reorganized Debtor or its Affiliates, on or following the Confirmation Date, as set forth in the Restructuring Transaction Notice.

**^ 1.196**_____ **"Restructuring Transaction Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date, a copy of which is attached as Exhibit 7.3 to this Plan, describing the anticipated post-Effective Date structure of the Reorganized Debtors.

**^ 1.197**_____ **"Retained Actions"** means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, Claims and Causes of Action brought prior to the Effective Date or identified in the Schedules, other than Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court prior to the date hereof and Claims transferred to the Buyers pursuant to the Master Disposition Agreement. A non-exclusive list of Retained Actions is attached hereto as Exhibit 7.19.

**^ 1.198**_____ **"Retained Assets"** means all assets of the Debtors that are not the GM Acquired Assets or the ^ Company Buyer Acquired Assets.

**^ 1.199**_____ **"Scheduled"** means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**^ 1.200**_____ **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**^ 1.201**_____ **"Section 510(b) Equity Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

**^ 1.202**_____ **"Section 510(b) ERISA Claim"** means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

**^ 1.203**_____ **"Section 510(b) Note Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

**^ 1.204** **"Section 510(b) Opt Out Claim"** means any Section 510(b) Opt Out Note Claim or Section 510(b) Opt Out Equity Claim.

**^ 1.205** **"Section 510(b) Opt Out Equity Claim"** means any Section 510(b) Equity Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**^ 1.206** **"Section 510(b) Opt Out Note Claim"** means any Section 510(b) Note Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**^ 1.207** **"Secured Claim"** means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, or DIP Facility Second Priority Term Claim, secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

**^ 1.208** **"Securities Act"** means the Securities Act of 1933, as now in effect or hereafter amended.

**^ 1.209** **"Securities Settlement"** means that certain stipulation and agreement of settlement of the securities-related MDL Actions, as it may be amended or modified.

**^ 1.210** **"Security"** has the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**^ 1.211** **"Security And Pledge Agreement"** has the meaning specified in the DIP Credit Agreement.

**^ 1.212** **"Senior Notes"** means, collectively, the (a) 6.55% Notes due 2006, (b) 6.5% Notes due 2009, (c) 6.5% Notes due 2013, and (d) 7.125% Notes due 2029, all issued by Delphi under the Senior Notes Indenture.

**^ 1.213** **"Senior Notes Claim"** means a Claim arising under or as a result of the Senior Notes.

**^ 1.214** **"Senior Notes Indenture"** means that certain indenture for the debt securities between Delphi Corporation and the First National Bank of Chicago, as indenture trustee, dated as of April 28, 1999.

**^ 1.215** **"Senior Notes Indenture Trustee"** means the indenture trustee under the Senior Notes Indenture.

**^ 1.216** **"SERP"** means the prepetition supplemental executive retirement program between Delphi and certain employees.

**^ 1.217** **"SERP Claim"** means a Claim of a SERP participant arising out of the SERP.

**^ 1.218** **"Servicer"** has the meaning ascribed to it in Article 7.13 of this Plan.

**^ 1.219** **"Solicitation Procedures Order"** means the order entered by the Bankruptcy Court on December 10, 2007 authorizing the procedures by which solicitation of votes on this Plan is to take place, among other matters.

**^ 1.220** **"Specialty Electronics Debtors"** means, collectively, Specialty Electronics, Inc. and Specialty Electronics International Ltd., as substantively consolidated for Plan purposes.

**^ 1.221** **"Statutory Committees"** means the Creditors' Committee and the Equity Committee.

**^ 1.222** **"Subordinated Notes"** means those notes issued pursuant to the Subordinated Notes Indenture.

**^ 1.223** **"Subordinated Notes Holder"** means a holder of Subordinated Notes.

**^ 1.224** **"Subordinated Notes Indenture"** means that certain indenture for the subordinated debt securities between Delphi Corporation and Bank One Trust Company, N.A., as trustee indenture, dated as of October 28, 2003.

**^ 1.225** **"Subordinated Notes Indenture Trustee"** means the trustee under the Subordinated Notes Indenture.

**^ 1.226** **"Supplemental Distribution Account"** means the property remaining in the applicable Distribution Reserve, if any, to the extent that a Disputed Class C Claim is not allowed or is allowed in an amount less than the amount reserved for such Disputed Claim.

**^ 1.227** **^ "TOPrS"** means (a) those 8.25% Cumulative Trust Preferred Securities issued by Delphi Trust I and (b) those Adjustable Rate Trust Preferred Securities issued by Delphi Trust II.

**^ 1.228** **"TOPrS Claim"** means a Claim of a Subordinated Notes Holder arising under or as a result of the Subordinated Notes.

**^ 1.229** **"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions, and other affiliated entities.

**^ 1.230** **"UAW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on July 19, 2007 approving the UAW-Delphi-GM Memorandum of Understanding.

**^ 1.231** **"UAW Benefit Guarantee"** means the benefit guarantee agreement between GM and the UAW, dated September 30, 1999.

**^ 1.232** **"UAW Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the UAW-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the UAW regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the UAW Benefit Guarantee.

**^ 1.233** **"UAW-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007 among the UAW, Delphi and GM, and all attachments and exhibits thereto and all UAW-Delphi collective bargaining agreements referenced therein as modified; and (ii) the UAW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 26, 2008.

**^ 1.234** ^ **"Unimpaired"** means, with respect to a Claim, any Claim that is not Impaired.

**^ 1.235** **"Union Settlement Agreements"** means, collectively, the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUE-CWA Benefit Guarantee Term Sheet, IUE-CWA-Delphi-GM Memorandum of Understanding, IUOE-IBEW-IAM OPEB Term Sheet, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, IUOE Local 832S Memorandum of Understanding, UAW Benefit Guarantee Term Sheet, UAW-Delphi-GM Memorandum of Understanding, USW Benefit Guarantee Term Sheet, and USW-Delphi-GM Memoranda of Understanding.

**^ 1.236** **"Unions"** means the IAM, the IBEW, the IUOE, the IUE-CWA, the UAW, and the USW.

**^ 1.237** **"USW"** means the United Steel Workers and its applicable local unions.

**^ 1.238** **"USW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 29, 2007 approving the USW-Delphi-GM Memoranda of Understanding.

**^ 1.239** **"USW Benefit Guarantee"** means the benefit guarantee agreement between GM and the USW, dated December 13, 1999, and signed December 16 and 17, 1999.

**^ 1.240** **"USW Benefit Guarantee Term Sheet"** means that certain term sheet attached as Attachment B to each of the USW-Delphi-GM Memoranda of Understanding.

**^ 1.241** **"USW-Delphi-GM Memoranda of Understanding"** means, collectively, the (i) USW-Home Avenue Memorandum of Understanding; (ii) the USW-Vandalia Memorandum of Understanding; and (iii) USW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25-26, 2008.

**^ 1.242** **"USW-Home Avenue Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**^ 1.243** **"USW-Vandalia Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**^ 1.244** **"Voting Deadline"** means July 15, 2009 at 7:00 p.m. prevailing Eastern time.

## C.    <u>Rules Of Interpretation</u>

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

This Plan is the product of extensive discussions and negotiations between and among the Debtors, GM, ^ GMCo., the DIP Agent, the DIP Lenders, the Creditors' Committee, and certain other creditors and constituencies. Each of the foregoing was represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, and the

documents ancillary thereto.  Accordingly, the general rule of contract construction known as "contra preferentem" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, or any contract, instrument, release, indenture, exhibit, or other agreement or document generated in connection herewith.

### D.    Computation Of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

### E.    References To Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### F.    Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date.  After the Exhibit Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), or Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Att'n: Kayalyn A. Marafioti), counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website at www.delphidocket.com.  To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order or Modification Approval Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND
## PRIORITY TAX CLAIMS

**2.1    Administrative Claims.**  Subject to the Master Disposition Agreement and the provisions of Article X of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim shall have agreed

upon in writing; provided, however, that (x) ^ the ^ Claims arising under the DIP Credit Agreement shall be deemed ^ Allowed Administrative Claims as of the Effective Date in such amount as the Debtors^ , the DIP Agent, and the DIP Lenders shall have agreed upon ^ pursuant to the Master Disposition Agreement, which Claims shall be satisfied in accordance with Article 7.8 and Article X of this Plan and the Master Disposition Agreement, (y) holders of hedging claims arising under the DIP Facility shall receive the treatment described in the Master Disposition Agreement, and (z) the holder of ^ any other Administrative Claim shall have filed a proof of claim form no later than the July 15, 2009, pursuant to the procedures described in Article 10.2 and the Modification Procedures Order, and such Claim shall have become an Allowed Claim. For the avoidance of doubt, the GM Administrative Claim shall receive the treatment set forth in Article 2.3 of this Plan.

    **2.2 Priority Tax Claims.**  Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) hereof, or (iii) payment in full in Cash; provided, however, that holders of Priority Tax Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement shall be treated in the manner set forth therein.

    **2.3 GM Administrative Claim.**  For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Delphi-GM Global Settlement Agreement, GM has received and shall receive allowed administrative expense claims of no more in the aggregate than $2.055 billion (the "GM 414(l) Administrative Claim").  Upon the Effective Date and the consummation of the Master Disposition Agreement, GM shall waive and release the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim, and GM shall accordingly receive no distribution on account of such claims.

**ARTICLE III**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

    **3.1 The Debtors.**  There are a total of 42 Debtors.  Certain of the Debtors shall be substantively consolidated for Plan voting and distribution purposes as described in Article 7.2. Each Debtor or group of consolidated Debtors has been assigned a number below for the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors for balloting purposes.  The Claims against and Interests in each Debtor or consolidated group of Debtors, in turn, have been assigned to separate lettered Classes with respect to each

Debtor or consolidated group of Debtors, based on the type of Claim involved.  Accordingly, the classification of any particular Claim or Interest in any of the Debtors or consolidated group of Debtors depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question.  The numbers applicable to the various Debtors or consolidated Debtor groups are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|-------------------------------------------|
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

### 3.2    Classification Of Claims And Interests.

**(a)**    Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

**(b)**    Claims against and Interests in each of the Debtors are divided into lettered Classes.  Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appear in the case of each Debtor.  For purposes of voting, claims within the Class shall be counted for each applicable Debtor or group of consolidated Debtors.  Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests shall be grouped under the appropriate lettered Class from the following list:

| | |
|---|---|
| Class A-1 | Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors. |
| Class B | Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors. |
| Class C-1 | Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors. |

31

| | |
|---|---|
| Class C-2 | Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors. |
| Class D | Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors. |
| Class E | Class E consists of all Section 510(b) Note Claims against Delphi Corporation. |
| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi Corporation. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors. |
| Class I | Class I consists of all Other Interests in Delphi Corporation. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |
| Class K | Class K consists of all Other Priority Claims against the applicable Debtor or consolidated group of Debtors. |

**ARTICLE IV**

**IDENTIFICATION OF CLASSES OF CLAIMS
AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN**

4.1    **Classes Of Claims That Are Unimpaired.**  The following Classes of Claims and Interests are Unimpaired by the Plan:

| | |
|---|---|
| **Class 1B through Class 12B** | (Flow-Through Claims) |
| **Class 1J through Class 12J** | (Interests in the Affiliate Debtors) |
| **Class 1K through Class 12K** | (Other Priority Claims) |

4.2    **Impaired Classes Of Claims And Interests.**  The following Classes of Claims and Interests are Impaired by the Plan:

| | |
|---|---|
| **Class 1A-1, 3A-1, and ^ 4A-1** | (Secured Claims) |
| **Class 1C-1 through Class 12C-1** | (General Unsecured Claims) |
| **Class 1C-2 through Class 12C-2** | (PBGC Claims) |
| **Class 1D through Class 12D** | (GM Unsecured Claim) |
| **Class 1E** | (Section 510(b) Note Claims) |
| **Class 1F through Class 12F** | (Intercompany Claims) |
| **Class 1G-1** | (Existing Common Stock) |
| **Class 1G-2** | (Section 510(b) Equity Claims) |
| **Class 1H, 8H** | (Section 510(b) ERISA Claims) |
| **Class 1I** | (Other Interests) |

**ARTICLE V**

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

**5.1     Class 1A-1, Class 3A-1, and Class ^ 4A-1 (Secured Claims).**  Except as otherwise provided in and subject to Article 9.8 of this Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim shall receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date plus 200 basis points (the "Secured Claim Interest Rate"), and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall have accrued at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Secured Claim; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as to which the Debtors or Reorganized Debtors, as the case may be, and the holder of such Allowed Secured Claim have agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, with respect to the treatment in clause (i) and clause (iii) above, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied pursuant to this Plan; provided, however, that such holder of an Allowed Secured Claim shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtors are in compliance with this Article 5.1. To the extent the Debtors or the Reorganized Debtors elect the treatment set forth in clause (ii) above, all valid liens shall be discharged and otherwise satisfied upon the receipt of the claimant's collateral by the holder of such Allowed Secured Claim.

**5.2     Class 1B through Class 12B (Flow-Through Claims).**  The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, shall be unaltered by the Plan and shall be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which shall be fully preserved); provided, however, that any Flow Through Claim assumed pursuant to the Master Disposition Agreement will receive the treatment specified therein. The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases shall be without prejudice to a Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court or such other court of competent jurisdiction.

**5.3     Class 1C-1 through Class 12C-1 (General Unsecured Claims).**  On the Effective Date, the Disbursing Agent shall establish a distribution account to hold the proceeds, if any, of the General Unsecured MDA Distribution.  Except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, commencing on the first Periodic Distribution Date occurring after the later of (i) the date when the proceeds of the General Unsecured MDA Distribution may be distributed to holders of General Unsecured Claims, (ii) the date when a General Unsecured

Claim becomes an Allowed General Unsecured Claim or (iii) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the proceeds of the General Unsecured MDA Distribution.  In addition, if applicable, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the proceeds of the General Unsecured MDA Distribution held in the Supplemental Distribution Account; provided, however, that no distribution from the Supplemental Distribution Account shall be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient.   Distributions made pursuant to this Article 5.3 and Articles 5.4, 5.5, and 11.10 shall be in complete satisfaction of all obligations of GM under Section 4.04 of the Delphi-GM Global Settlement Agreement.

     **5.4**     **Class 1C-2 through Class 12C-2 (PBGC Claims).**  Pursuant to Article 7.17, and except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, the PBGC shall receive, on the Distribution Date on account of its PBGC Claims in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed PBGC Claims, the treatment set forth in Article 7.17 of this Plan.

     **5.5**     **Class 1D through Class 12D (GM Unsecured Claim).**  In full settlement, satisfaction, and release of the GM Unsecured Claim, GM shall receive the remaining releases provided for in section 4.01 of the Delphi-GM Global Settlement Agreement.

     **5.6**     **Class 1E (Section 510(b) Note Claims)**.  Holders of Section 510(b) Note Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Note Claims.

     **5.7**     **Class 1F through Class 13F (Intercompany Claims).**  On the Effective Date, and subject to the Master Disposition Agreement, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, shall not receive a distribution on the Effective Date and instead shall either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

     **5.8**     **Class 1G-1 (Existing Common Stock).**  On the Effective Date, the Existing Common Stock shall be cancelled and extinguished.  The holders of Existing Common Stock shall not be entitled to, and shall not, receive or retain any property or interest on account of such Existing Common Stock.

     **5.9**     **Class 1G-2 (Section 510(b) Equity Claims)**.  Holders of Section 510(b) Equity Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Equity Claims.

     **5.10**     **Class 1H and Class 8H (Section 510(b) ERISA Claims)**.  The ERISA Settlement disbursing agent, on behalf of all holders of Section 510(b) ERISA Claims, shall not be

entitled to and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) ERISA Claims.

**5.11    Class 1I (Other Interests)**.  On the Effective Date, all Other Interests shall be deemed cancelled and the holders of Other Interests shall not receive or retain any property on account of such Other Interests under this Plan.

**5.12    Class 1J through Class 12J (Interests In Affiliate Debtors)**.  On the Effective Date, except as otherwise contemplated by the Restructuring Transactions or the Master Disposition Agreement, the holders of Interests in the Affiliate Debtors shall retain such Interests in the Affiliate Debtors under the Plan.

**5.13    Class 1K through Class 12K (Other Priority Claims)**.  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

# ARTICLE VI

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS

**6.1    Impaired Classes Of Claims Entitled To Vote.**  Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan and Article 6.2, Article 6.4, and Article 6.5 of this Plan, holders of Claims and Interests in each Impaired Class are entitled to vote in their respective classes as a class to accept or reject this Plan.

**6.2    Classes Deemed To Accept The Plan.**  Classes 1B through 12B, 1J through 12J, and 1K through 12K are Unimpaired under this Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, such Classes are conclusively presumed to have accepted this Plan, and the votes of holders of Claims and Interests in such Classes therefore shall not be solicited.  Because all Debtors are proponents of this Plan, the votes of holders of such Claims in Class 1F through 12F (Intercompany Claims) shall not be solicited.

**6.3    Acceptance By Impaired Classes.**  Classes 1A-1, 3A-1, and ^ 4A-1, Classes 1C-1 through 12C-1, and 1D through 12D are Impaired under this Plan.  In addition, Classes 1C-2 through 12C-2 shall be Impaired to the extent the Claims in such Classes are Allowed.  Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**6.4    Classes Deemed To Reject The Plan**.  Holders of Claims and Interests in Class 1E, 1G-1, 1G-2, 1H, 8H and 1I are not entitled to receive any distribution under the Plan on account of their Claims or Interests.  Since none of the holders of Claims or  Interests in Class 1E, 1G-1, 1G-2, 1H, 8H, and 1I are entitled to receive a distribution under the Plan, pursuant to section

1126(g) of the Bankruptcy Code, each holder of a Claim or Interest in such Class is conclusively presumed to have rejected the Plan, and the votes of such holders of Claims or Interests therefore shall not be solicited.

        **6.5**    **Prior Acceptances Or Rejections Of The Plan.** The previous votes by any holder of a Claim that has accepted or rejected the Plan shall not be counted.

        **6.6**    **Approval of Modifications Subject To Sections 1127 And 1129(b) Of The Bankruptcy Code.** Because Classes 1E, 1G-1, 1G-2, 1H, 8H and 1I are deemed to reject the Plan, the Debtors shall request approval of the modifications to the Plan, as it may be modified from time to time, pursuant to section 1127 and 1129(b) of the Bankruptcy Code.

## ARTICLE VII

## <u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>

        **7.1**    **Continued Corporate Existence**

        **(a)**    Subject to the Restructuring Transactions and Disposition Transactions contemplated by this Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by this Plan and the Certificate of Incorporation and Bylaws without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

        **(b)**    There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases. The continued existence, operation, and ownership of such non-Debtor Affiliates is a material component of the business of the Debtors and Reorganized Debtors, as applicable, and, as set forth in <u>Article 11.1</u> of this Plan but subject to the Restructuring Transactions and Disposition Transactions, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

        **7.2**    **Substantive Consolidation**

        **(a)**    This Plan provides for the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. For purposes of this Plan, the DAS Debtors shall be substantively consolidated; the DASHI Debtors shall be substantively consolidated; the Connection System Debtors shall be substantively consolidated; the Specialty Electronics Debtors

shall be substantively consolidated; and the remaining Debtors shall not be substantively consolidated. None of the substantively consolidated Debtor entities shall be consolidated with each other. Notwithstanding the foregoing, but subject to the Disposition Transactions, the Debtors reserve all rights with respect to the substantive consolidation of any and all of the Debtors.

**(b)** With respect to the consolidated Debtor entities, on the Effective Date, and only as to the consolidated Debtor entities, (i) all assets and third-party liabilities of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be treated as if they were merged, (ii) each Claim against the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be deemed a single Claim against and a single obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, (iii) all Intercompany Claims by, between, and among the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be eliminated, and (iv) any obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, and all guaranties thereof by one or more of the other Delphi-DAS Debtors, DASHI Debtors, Connection Systems Debtors, and Specialty Electronics Debtors, respectively, will be deemed to be one obligation of all of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively. Except as set forth in this Article, and subject to the Disposition Transactions, such substantive consolidation shall not (other than for purposes related to this Plan) (w) affect the legal and corporate structures of the Debtors or Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors to effect the Restructuring Transactions contemplated by this Plan, (x) cause any Debtor to be liable for any Claim or Interest under this Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Interest shall not be affected by such substantive consolidation, (y) except as otherwise stated in this <u>Article 7.2</u>, affect Intercompany Claims of Debtors against Debtors, and (z) affect Interests in the Affiliate Debtors except as otherwise may be required in connection with the Restructuring Transactions contemplated by this Plan.

Notwithstanding that the Bankruptcy Court has already approved the substantive consolidation of certain of the Debtors' Estates in the Confirmation Order, this Plan shall serve as, and shall be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If no objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served by any holder of an impaired Claim affected by the Plan as provided in the Modification Procedures Order, or such other date as may be established by the Bankruptcy Court, the Modification Approval Order shall serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan, and any objections thereto shall be part of the Final Modification Hearing.

### 7.3    Restructuring Transactions.

**(a)**    On or following the Modification Approval Date, the Debtors or Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Restructuring Transaction Notice including, but not limited to, actions necessary to execute the Disposition Transactions and any other transactions described in this Plan, and may take any other actions on or after the Effective Date.   The anticipated post-Effective Date structure of the Reorganized Debtors is attached as Exhibit 7.3.

**(b)**    The Restructuring Transactions may include without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions.   The form of each Restructuring Transaction shall be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction.   In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations of each merged Debtor under this Plan.   In the event that a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Debtor.   Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

### 7.4    Certificate Of Incorporation And Bylaws.  The Certificate of Incorporation of Reorganized DPH Holdings, substantially in the form attached hereto as Exhibit 7.4(a), and Bylaws of Reorganized DPH Holdings, substantially in the form attached hereto as Exhibit 7.4(b), shall be adopted and amended as may be required so that they are consistent with the provisions of this Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Each Affiliate Debtor shall amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 7.5    Directors And Officers Of Reorganized DPH Holdings And Affiliate Debtors.  The Debtors shall file a notice listing the officers and directors of Reorganized DPH Holdings no later than the Exhibit Filing Date.  Unless the Debtors otherwise file a notice on or prior to the Final Modification Hearing, the existing directors and officers of the Affiliate Debtors shall continue to serve in their current capacities after the Effective Date.

### ^ ^ Consummation Of Disposition Transactions^ To Occur On Effective Date.  The DIP Agent, at the direction of the Required Lenders and on behalf of the DIP Lenders,

has effectuated the Credit Bid in accordance with the direction letter from the Required Lenders, the DIP Transfer, and the Master Disposition Agreement. On the Effective Date, the Debtors shall consummate the Disposition Transactions, pursuant to which, among other things, (i) the Company Acquired Assets, including the Company Assumed Contracts, shall be transferred to the Company Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, and (ii) the GM Acquired Assets, including the GM Assumed Contracts, shall be transferred to GM Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order^ .

### 7.7    Master Disposition Agreement.

(a)    **Approval Of Master Disposition Agreement**.  This Plan constitutes a request to authorize and approve the Master Disposition Agreement, attached hereto as Exhibit 7.7.

^ ^ Sale/**Transfer** Of Assets To **Company Buyer And** GM Buyer. Pursuant to the terms of the Master Disposition Agreement, ^ sections 363(k) and 1123(a)(5) of the Bankruptcy Code, the DIP Transfer, and the Modification Approval Order, on the Effective Date, the Debtors shall consummate the transfer, free and clear of any Claims, liens and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to (i) the Company Buyer of the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts, and the Company Sales Securities, and (ii) the GM Buyer of the GM Acquired Assets^ (subject to the GM Assumed ^ Liabilities), the GM Assumed ^ Contracts, and the ^ GM Sales Securities.  To facilitate the transfers set forth in this subsection,  the DIP Agent has assigned, or shall assign, pursuant to the terms of the DIP Transfer (i) to the GM Buyer, the right to receive the GM Acquired Assets (subject to the GM Assumed Liabilities), the GM Assumed Contracts and the GM Sales Securities and (ii) to the Company Buyer, the right to receive the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts and the Company Sales Securities.

### ^ 7.8   ^ DIP Lender Credit ^ Bid.^

(a)    **Required Lender Direction.  The** Required Lenders shall have directed the DIP Agent, on behalf of the DIP Lenders, to take certain actions required to consummate the Master Disposition Agreement, including but not limited to (i) making the Credit Bid, (ii) assigning the right receive the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts, and the Company Sales Securities to the Company Buyer, and (iii) assigning the right to receive the GM Acquired Assets (subject to the GM Assumed Liabilities), the GM Assumed Contracts, and the GM Sales Securities to the GM Buyer.

(b)    **Termination Of DIP Facility Claims And Cancellation Of Liens.**^  Pursuant to the Credit Bid, upon the consummation of the Master Disposition Agreement

on the Effective Date and upon the making of the DIP Transfer^ , except as contemplated by the ^ Master Disposition Agreement, (i) the obligations in respect of loans under the DIP ^ Credit Agreement shall be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all Claims, liens, security interests, and obligations related thereto ^ against Collateral (as defined in the DIP Credit Agreement) wherever located shall be fully discharged, released, terminated, and if necessary, deemed waived without need for any further action, (iii) the Debtors and the Reorganized Debtors shall be fully discharged and released of all obligations of any kind relating to ^ such loans and the Debtors and Reorganized Debtors shall have no further obligation to the DIP Lenders under and relating to ^ such loans, and (iv) the DIP Lenders shall be deemed to be bound to the provisions of Article XI of this Plan and the Modification Approval Order; provided, however, that notwithstanding the above, (w) the letters of credit under the DIP Facility shall receive the treatment set forth in the Master Disposition Agreement, (x) the Reorganized Debtors shall be obligated on an unsecured basis (i) in respect of the indemnity to the DIP Agent to the extent contemplated under the DIP Credit Agreement and section 13(d) of the DIP Facility Order and (ii) for post Effective Date reasonable fees of the DIP Agent and out-of-pocket expenses related to the DIP Documents, including, without limitation, all reasonable fees and out-of-pocket expenses incurred in connection with the cancellation and/or extinguishment of all publicly-filed liens and/or security interests as described below, (y) DIP Lender professional fees that have accrued prior to the Effective Date shall be treated as set forth in the Master Disposition Agreement, and (z) the Assumed Hedging Agreements (as defined in the Master Disposition Agreement) shall be paid or assumed by the GM Buyer as set forth in the Master Disposition Agreement..  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any and all commercially reasonable steps requested by the Company Buyer, GM Buyer, or Reorganized Debtors, at the Reorganized Debtors' reasonable expense, that are necessary to cancel and/or extinguish such publicly filed liens and/or security interests.^

### 7.9    Post-Confirmation Reorganized DPH Holdings Share Trust

(a)    **Post-Confirmation Reorganized DPH Holdings Share Trust.**  On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, shall execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust Agreement, substantially in the form attached as Exhibit 7.9.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust shall become the sole shareholder of Reorganized DPH Holdings.

(b)    **Appointment Of Post-Confirmation Trust Plan Administrator.**  On the Effective Date,  the Post-Confirmation Trust Plan Administrator shall be appointed in accordance with the Post-Confirmation Trust Agreement and the Post-Confirmation Reorganized DPH Holdings Share Trust shall be administered by the Post-Confirmation Trust Plan Administrator in accordance with the Post-Confirmation Trust Agreement.

7.10    **Emergence Capital.**  On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors shall receive the Emergence Capital^ .

7.11    **Management Compensation Plan.**  The Debtors or ^ Company Buyer shall enter into employment^ agreements with ^ and^ /or shall provide new and/or assumed

compensation and benefit arrangements to the Debtors' officers who continue ^ to be employed after the Effective Date, as more fully stated ^ on Exhibit 7.11 attached hereto; provided, however, that to enter into or to obtain the benefits of any such employment^ agreement^ , such ^ executive officer must contractually waive and release ^ all pre-existing claims, including those arising from pre-existing employment, ^ change in control or other employment-related agreements ^ and/or benefits under certain pre-existing compensation and benefit arrangements. The Management Compensation Plan, as more fully described ^ on Exhibit 7.11, may include equity and other incentive plans as components of compensation to be paid to executives after the Effective Date.

### 7.12   Procedures For Asserting Certain Claims.

(a)   **SERP Claims.** All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date; provided, however, that to the extent that (a) a SERP claimant's SERP Claim has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim. All such SERP Claims not Scheduled or filed prior to the time set forth above in this Article 7.12 shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property. Any Claims arising out of the SERP after the Effective Date shall be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim. On the Effective Date, the Debtors shall reject or otherwise terminate the SERP. In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) shall be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

(b)   **Prepetition Employee-Related Obligations.** Except as set forth in Article 7.12(a) above, all Persons holding or wishing to assert Prepetition Employee-Related Obligations must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 45 days after the Effective Date; provided, however, that such claimant need not file and serve an executed proof of claim to the extent that (a) such claimant's Prepetition Employee-Related Obligation has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) such a claimant already timely and properly filed a proof of claim asserting such Prepetition Employee-Related Obligation. All Prepetition Employee-Related Obligations not Scheduled or filed prior to the time set forth above in this Article 7.12(b) shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.

### 7.13   Cancellation Of Existing Securities And Agreements. On the Effective Date, except as otherwise specifically provided for herein (a) the Existing Securities and any other

note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, shall be cancelled; provided, however, that Interests in the Affiliate Debtors shall not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, as the case may be, shall be released and discharged; provided, however, that any agreement (including the Indentures) that governs the rights of a holder of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer") shall continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under this Plan as provided in Article IX of this Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement; provided further, however, that the preceding proviso shall not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, Modification Approval Order, or this Plan, or result in any expense or liability to the Reorganized Debtors. The Reorganized Debtors shall not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Plan except as expressly provided in Article 9.5 hereof; provided further, however, that nothing herein shall preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

7.14    **Sources of Cash For Plan Distributions**.  Except as otherwise provided in the Plan, Confirmation Order, the Master Disposition Agreement, or the Modification Approval Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from the Emergence Capital, ^ and as further described in the ^ Master Disposition Agreement.

7.15    **Establishment Of A General Unsecured Distribution Account.**  On the Effective Date, the Disbursing Agent shall establish a distribution account on behalf of holders of General Unsecured Claims for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims in accordance with Article 5.3 of this Plan and the Master Disposition Agreement.

7.16    **Collective Bargaining Agreements.**

(a)    **UAW.**  Pursuant to this Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, ^ and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding and Exhibit 2 to the UAW 1113/1114

42

Settlement Approval Order, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

      **(b)**   **IUE-CWA.**   Pursuant to this Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, ^ and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

      **(c)**   **USW.**   Pursuant to this Plan and in accordance with the USW 1113/1114 Settlement Approval Order, on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding ^ and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding ^ and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

      **(d)**   **IUOE.**   Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding^ and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding ^ and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding^ and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement^ and the Modification Approval Order.

      **(e)**   **IBEW.**   Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IBEW E&S Memorandum of Understanding^ and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding ^ and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement^ and the Modification Approval Order.

      **(f)**   **IAM.**   Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, the IAM-Delphi Memorandum of Understanding, ^ and all documents described in Attachment A to the IAM-Delphi Memorandum of

Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

### 7.17    Pension Matters And PBGC Settlement.

(a)    **Delphi HRP.**  Upon the entry of the Modification Approval Order, PBGC will determine whether to initiate and/or proceed with an involuntary termination under 29 U.S.C. § 1342 of the Delphi HRP; provided, however, that upon the Effective Date, the Delphi HRP shall no longer be the responsibility of the Debtors ^ or the Reorganized Debtors.

(b)    **Salaried and Subsidiary Pension Plans.**  ^ Upon the entry of the Modification Approval Order, PBGC will determine whether to initiate and/or proceed with an involuntary termination under 29 U.S.C. § 1342 of the Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan shall be terminated (collectively, the "Salaried and Other Pension Plans").

(c)    **PBGC Settlement.**  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan constitutes the Debtors' request to authorize and approve the ^ Delphi-PBGC Settlement Agreement^ , attached hereto ^ as Exhibit 7.17.  Pursuant to the Delphi-PBGC Settlement Agreement and this Plan, the Debtors shall grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim^ ") against each of the Debtors, which shall receive the treatment, as a single claim in the amount of $3 billion, given to holders of General Unsecured Claims pursuant to Article 5.3 of this Plan^ .  The distributions on account of the PBGC General Unsecured Claim, together with the consideration ^ set forth in the GM-PBGC Agreement, shall result in (i) no distribution being made on account of the Contingent PBGC Secured Claims other than ^ those distributions to be made as set forth above, (ii) the PBGC's settlement of its claims arising under Title IV of ERISA with respect to the Salaried and Other Pension Plans, (iii) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, ^ (iv) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise, and (v) the releases set forth in the Delphi-PBGC Settlement Agreement and the GM-PBGC Agreement.  Except as specifically provided in the PBGC Settlement Agreement and as set forth in Article V above, on the Effective Date, all liens arising from or relating to the Delphi HRP and/or the Salaried and Other Pension Plans shall be terminated and discharged.

7.18    **Salaried OPEB Settlement**.  The Debtors will continue the payments on the schedule authorized under the Order Pursuant to 11 U.S.C § 363 and Fed. R. Bankr. P. 9019 For Order Approving Debtors' Compromise and Settlement with Committee of Eligible Salaried Retirees and Delphi Salaried Retirees' Association (Docket No. 16545).

**7.19    Preservation Of Causes Of Action.**  In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan or the Master Disposition Agreement, the Reorganized Debtors shall retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.  Notwithstanding the foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws shall not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.19 hereto.  For the avoidance of doubt, the Appaloosa Claim (as defined in the Master Disposition Agreement) shall be assigned to the applicable Purchasing Entity pursuant to the terms of the Master Disposition Agreement.

**7.20    Reservation Of Rights.**  With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with Article 7.19 of this Plan, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**7.21    Exclusivity Period.**  The Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the Effective Date.

**7.22    Dismissal Of Complaints.**  Upon the Effective Date of this Plan, the proceedings initiated by the Creditors' Committee and the Senior Notes Indenture Trustee for the revocation of the Confirmation Order shall be closed and the complaints seeking relief therefor shall be dismissed as moot.

**7.23    Corporate Action.**  Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

**7.24    Effectuating Documents; Further Transactions.**  Each of the Chief Executive Officer, Chief Financial Officer, and General Counsel of the Debtors, or their respective designees, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**7.25    Consummation Of Divestiture Transactions**.  In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to sell assets free and clear of liens, Claims, and encumbrances, such Debtor(s) and or Reorganized Debtor(s), as the case may be, shall be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

**7.26    Exemption From Certain Transfer Taxes And Recording Fees.**
Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or from a Reorganized Debtor to any other Person or entity pursuant to this Plan, Master Disposition Agreement, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the Reorganized Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.


## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**8.1    Assumed And Rejected Contracts And Leases.**


(a)    **Executory Contracts And Unexpired Leases.**    All executory contracts and unexpired leases as to which any of the Debtors is a party shall be deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (iii) shall be rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (iv) shall have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached hereto as Exhibit 8.1(a)—Rejected Contracts, or (vi) are otherwise rejected pursuant to the terms of this Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement.  Subject to the foregoing sentence and consummation of this Plan, entry of the Plan Modification Approval Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to this Article 8.l(a) shall vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  Subject to the Master Disposition Agreement, the Debtors reserve the right to file a motion on or before the Modification Approval Date to reject any executory contract or unexpired lease.

46

**(b)    Real Property Agreements**.  Each executory contract and unexpired lease that is assumed by the applicable Reorganized Debtor and relates to the use, ability to acquire, or occupancy of real property shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.  In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**(c)    Exhibits Not Admissions.**  Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

**8.2    Cure Procedures and Payments Related To Assumption Of Executory Contracts And Unexpired Leases**.

**(a)    Material Supply Agreements**.  The provisions (if any) of each Material Supply Agreement to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under this Plan, then any Cure distributed pursuant to this section on account of such Material Supply Agreement shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

**(i)    Cure Amount Notices.**  Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a Cure Amount Notice to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With respect to reconciling the amount of Cure, the

procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order and subsequently modified by the Modification Procedures Order, and implemented in accordance therewith shall control and accordingly, Cure shall be equal to (i) subject to modification by written agreement between the Debtors and the applicable counterparty to reduce the Allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, unless the Debtors send an Amended Cure Amount Notice (as defined below) to an applicable counterparty in which case Cure shall be determined pursuant to the procedures set forth in the Modification Procedures Order, or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty or, (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.  The Debtors shall send an amended notice with respect to such Cure Amount Notices for which the Debtors have since determined that the Cure Amount Proposal was overstated.  To reduce the overstated Cure amount to its proper amount, the Debtors may, at least 20 days prior to the Effective Date, file with the Court and serve a separate notice (the "Amended Cure Amount Notice") stating the amended Cure amount that the Debtors believe is necessary and proper to cure such contract. Pursuant to the Modification Procedures Order, if an affected contract counterparty disagrees with the Cure amount listed on the Amended Cure Amount Notice, then the counterparty shall file an objection within ten days of receipt of the Amended Cure Amount Notice to object to the amended Cure amount.  If no objection is timely received, each counterparty shall be deemed to have consented to the Cure amount set forth on the Amended Cure Amount Notice.  Any unresolved objection to an Amended Cure Amount Notice shall be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.

(ii)    **Objections To Cure Amount Notices And Payment Of Cure.** The Cure Amount Notice provided procedures for contracts that were to be assumed by the Reorganized Debtors (and with respect to contracts to be assumed and assigned to GM or ^ Company Buyer pursuant to the Modification Procedures Order, such notice of assumption and ^ assignment shall provide procedures) for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract.  The Cure Amount Notice also provided procedures for each counterparty to object to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order, or if the counterparty responded to the Amended Cure Amount Notice in accordance with the procedures herein and in the Modification Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure shall be paid, honored, or otherwise occur following the later of

48

a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors or Reorganized Debtors, or a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement; provided that if there is a dispute as to the amount of Cure or adequate assurance that cannot be resolved consensually among the applicable counterparty and the Debtors, Reorganized Debtors, or the Buyers then notwithstanding anything to the contrary herein, in the Confirmation Order, in the Modification Procedures Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors, shall have the right (and shall do so if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Material Supply Agreement to be assigned to such Buyer pursuant to the Master Disposition Agreement.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.  If the non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order, or even if responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure shall be paid in the amount set forth in the Cure Amount Notice or Amended Cure Amount Notice, as applicable, within a reasonable period of time following the Effective Date.

> **(iii)      Form Of Cure Payments.**    Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, and supplemented by the Modification Procedures Order, a Cure Amount Notice, the First Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply Agreement shall be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to this Plan and the Master Disposition Agreement.

**(b)    Other Executory Contracts And Other Unexpired Leases**.  The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed, or assumed and assigned, under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease.  Any Cure distributed pursuant to this section shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Other Executory Contract or Other Unexpired Lease so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

**(i)    Cure Proposals.**  Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 hereof by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

**(ii)    Cure Proposal Objections.**  The Debtors or Reorganized Debtors shall have the right to amend, modify, or supplement the Cure Proposal Objections. Counterparties to an Other Executory Contract or Other Unexpired Lease which failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Plan confirmed on January 25, 2008, shall each be deemed to have waived its right to assert a default requiring Cure and any default existing as of January 25, 2008 shall have been deemed cured as of the day following the Cure Proposal Submission Deadline and such party shall forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure Proposal Submission Deadline.  Counterparties shall assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and shall file and serve such claims before the Administrative Claims Bar Date in accordance with the Modification Approval Order and as otherwise set forth in Articles 10.2 and 10.5.  If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, or otherwise occur following the earlier of a consensual resolution or the entry of a Final Order of the Bankruptcy Court

resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure or regarding adequate assurance that cannot be resolved consensually among the parties, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors shall have the right (and shall do so if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the assignee of such contract or lease.  To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Other Executory Contract or Other Unexpired Lease to be assigned to such Buyer pursuant to the Master Disposition Agreement.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.

(iii)    **Payment Of Cure.**  Except as otherwise provided in this Article VIII, to the extent a Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, shall pay the Cure Proposal, if any, to the counterparty within a reasonable period of time following the Effective Date.  Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved consensually or by agreement or Final Order shall be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

(c)    **Other Executory Contracts And Other Unexpired Leases Assigned to Buyers**.  Pursuant to the Master Disposition Agreement, the Debtors or Reorganized Debtors, as the case may be, shall assign certain Other Executory Contracts and Other Unexpired Leases to GM Buyer or ^ Company Buyer.  In connection therewith and in accordance with the procedures set forth in the Modification Procedures Order, Delphi shall serve each counterparty to a GM Assumed Contract or ^ Company Buyer Assumed Contract the respective notice (together, the "MDA Assumption and Assignment Notices"), which shall identify the respective Buyer as the party to whom all of the Debtors' rights, title, and interests in the Other MDA Assumed Contracts shall be assigned.  Counterparties to Other MDA Assumed Contracts which failed to file and serve an objection to the MDA Assumption and Assignment Notice by the deadline set forth in the Modification Procedures Order, shall each be deemed to have waived its right to challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease and shall be barred from challenging the ability of any Debtor or Reorganized Debtor, as the case may be, or the respective Buyer or its assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, and shall be barred from making any other challenge pertaining to assumption.  If there is an objection to the MDA Assumption and Assignment Notice and the parties cannot consensually resolve their dispute, then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing

51

shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, and otherwise occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be, shall have the right to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing Cure (and shall if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) or adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors, as applicable, and the assignee. To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Other MDA Assumed Contracts to be assigned to such Buyer pursuant to the Master Disposition Agreement. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan. Notwithstanding anything to the contrary in this Article 8.2(c), Article 8.2(b)(ii) shall control with respect to Cure amounts related to Other MDA Assumed Contracts.

**(d)    Intercompany Executory Contracts And Intercompany Unexpired Leases.**  Subject to the Master Disposition Agreement, any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease shall be Reinstated and shall be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

**8.3    Assignment Pursuant To Restructuring Transaction.**  To the extent the Debtor which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

**8.4    Rejection Damages Bar Date.**  If the rejection by the Debtors (pursuant to this Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

**8.5    Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases.**  In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign or reject certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor(s) does not assume and assign or reject such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption or rejection shall be consummated pursuant to Article VIII of this Plan and service of notice and any Cure

52

payments owed to a non-Debtor counterparty under such contracts and leases shall be made pursuant to Article 8.2 of the Plan and (b) a Debtor(s) or Reorganized Debtor(s), as the case may be, shall be permitted to either reject or assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.

# ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1    Time Of Distributions.**  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

**9.2    No Interest On Disputed Claims.**  Unless otherwise specifically provided for in this Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**9.3    Disbursing Agent.**  The Disbursing Agent shall make all distributions required under this Plan except with respect to any holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the holders of Claims in accordance with the provisions of this Plan and the terms of any governing agreement; provided, however, that if any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, shall make such distributions.

**9.4    Surrender Of Securities Or Instruments.**  On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") shall surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate shall be cancelled solely with respect to the Debtors and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments; provided, however, that this Article 9.4 shall not apply to any Claims Reinstated pursuant to the terms of this Plan.  No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable

thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

**9.5** **Services Of Indenture Trustees, Agents, And Servicers.** The services, with respect to implementation of the distributions contemplated by this Plan, of Servicers under the relevant agreements that govern the rights of holders of Claims and Interests shall be as set forth elsewhere in this Plan. The Reorganized Debtors shall reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under this Plan to holders of Allowed Claims, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court. To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses. Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

**9.6** **Claims Administration Responsibility.**

**(a)** **Reorganized Debtors.** The Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in this Article IX.

**(b)** **Filing Of Objections.** Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests shall be served and filed on or before the Claims/Interests Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim or Interest shall be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

**(c)** **Determination Of Claims.** Any Claim determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan. Nothing contained in this Article 9.6 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or

Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

        **(d)** **Claims Bar Date.** Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to <u>Article 8.3</u> of this Plan for the filing of such claims, (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to <u>Articles 10.2 and 10.5</u> of this Plan, or (iv) with respect to Claims that are Prepetition Employee Related Obligations, the bar date established pursuant to <u>Article 7.12(b)</u> of this Plan, shall not be recognized, or recorded on the claims register, by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court. Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, or other parties-in-interest to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

### 9.7    Delivery Of Distributions.

        **(a)** **Allowed Claims.** Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

        **(b)** **Undeliverable Distributions.** If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim shall be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable distributions. All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim, after which date all unclaimed property shall revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

**9.8    Procedures For Treating And Resolving Disputed And Contingent Claims.**

(a)    **No Distributions Pending Allowance.**  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims/Interests Objection Deadline.

(b)    **Distribution Reserves.**  The Reorganized Debtors or Disbursing Agent shall withhold the Distribution Reserves, if any, from the property to be distributed to particular classes under this Plan based upon the Face Amount of Disputed Claims.  The Reorganized Debtors or Disbursing Agent shall withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata basis based upon the Face Amount of such Claims.  The Reorganized Debtors or Disbursing Agent shall also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise.  Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

(i)    **Estimation Of Claims For Distribution Reserves.**  To the extent that any General Unsecured Claims remain Disputed Claims as of the ^ first Periodic Distribution Date for such Claims, the Debtors or Reorganized Debtors shall seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves.  Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or the Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; provided, however, that if the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be

56

estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

        **(c)**    **No Recourse To Debtors Or Reorganized Debtors.**  Any Disputed Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim.  In no event shall any holder of a Disputed Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims to any Debtor or Reorganized Debtor on account of such Disputed Claim, regardless of whether such Disputed Claim shall ultimately become an Allowed Claim or regardless of whether sufficient Cash, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

        **(d)**    **Distributions After Allowance.**  Payments and distributions from the Distribution Reserve to each respective holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such holder of a Claim.  On the first Periodic Distribution Date following the date when a Disputed Claim becomes undisputed, noncontingent, and liquidated, the Disbursing Agent shall distribute to the holder of such Allowed Claim any proceeds from the General Unsecured MDA Distribution, or other property, from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim been an Allowed Claim on such dates and shall not be limited by the Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims.  Upon such distribution, the Distribution Reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.

        **(e)**    **De Minimis Distributions.**  Neither the Disbursing Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $25,000; provided that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $25,000 if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date or (ii) the amount to be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

        **9.9**    **Section 510(b) Opt Out Claims.**  No Section 510(b) Opt Out Claim shall be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution that would have otherwise been distributed under the Plan solely from the applicable portion of the Securities Settlement.  In no event shall any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made,

or to be made, under the Securities Settlement to holders of such Claims or Interests to or against any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim shall ultimately become an Allowed Claim.

**9.10    Allocation Of Plan Distributions Between Principal And Interest.**  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

# ARTICLE X

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

**10.1    DIP Facility Claims.**^  Upon consummation of the ^ Master Disposition Agreement, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders ^ or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

**10.2    Pre-Confirmation Administrative Claim Procedures**.  Pursuant to the Modification Procedures Order, all requests for payment of an Administrative Claim through June 1, 2009 (other than claims under the DIP Facility or as set forth in the Modification Procedures Order, Article 10.1, or Article 10.3 of this Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than the July 15, 2009.  Any request for payment of an Administrative Claim pursuant to this Article 10.2 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim request made pursuant to this Article 10.2 without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

**10.3    Professional Claims.**

**(a)    Final Fee Applications.**    All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy

Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

      **(b)    Payment Of Interim Amounts.**  Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Modification Approval Order Date.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Modification Approval Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Modification Approval Date and shall deliver such estimate to the Debtors, counsel for the Creditors' Committee, and the United States Trustee for the Southern District of New York. Within 45 days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable. Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount shall be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

      **(c)    Holdback Amount.**  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

      **(d)    Post-Confirmation Date Retention.**  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business.

      **10.4    Substantial Contribution Compensation And Expenses Bar Date.**  Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

**10.5    Other Administrative Claims.**  All other requests for payment of an Administrative Claim (other than claims under the DIP Facility or as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of this Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached hereto as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Creditors' Committee no later than 30 days after the Effective Date.  Any request for payment of an Administrative Claim pursuant to this Article 10.5 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

# ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Revesting Of Assets.**  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions and Retained Assets, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court or are the subject of any of the Disposition Transactions) shall revest in each of the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan, the Confirmation Order, and the Modification Approval Order.

**11.2    Discharge Of The Debtors.**  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan ^ , Confirmation Order, or Modification Approval Order, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the

holder of such a Claim, right, or Interest accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

**11.3    Compromises And Settlements.** In accordance with <u>Article 9.6</u> of this Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date. After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in <u>Article 11.1</u> of this Plan, without the need for further approval of the Bankruptcy Court.

**11.4    Release By Debtors Of Certain Parties. Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to <u>Article 11.13</u> of this Plan, effective as of the Effective Date (and with respect to the DIP Lenders, the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP ^ <u>Transfer</u>, which shall be deemed to occur on the Effective Date), each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases. The Reorganized Debtors, including Reorganized DPH Holdings, and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above. Notwithstanding the foregoing, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.**

**11.5    Release By Holders Of Claims And Interests . On the Effective Date, (a) each Person who votes to accept this Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor) which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under this Plan and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with this Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of,**

61

or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of this Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Credit Bid, the Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with either this Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 cases; provided, however, that (A) this Article 11.5 is subject to and limited by Article 11.13 of this Plan and (B) this Article 11.5 shall not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

11.6    Release By Unions. The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference herein in their entirety.

11.7    Release Of GM By Debtors And Third Parties. On the Effective Date, GM and the other GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) shall receive all releases provided for in Section 4.01 of the Delphi-GM Global Settlement Agreement, which provisions are incorporated by reference herein in their entirety.

11.8    ^ Release of GMCo. By Debtors And Third Parties. On the Effective Date, GMCo. shall receive the same releases provided for GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) in Section 4.01 of the Delphi-GM Global Settlement Agreement as though it were a party thereto, which provisions are incorporated

**by reference herein in their entirety; provided, however, that for purposes of Section 4.02 of the Delphi-GM Global Settlement Agreement, GMCo. shall grant to the Debtors the same releases provided by GM and the GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement).**

**11.9    Setoffs.**  Subject to Article 11.13 of this Plan, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

**11.10    Subordination Rights.^**

(a)    All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date; provided, further, that the subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture) shall be deemed satisfied through the distributions described in Article 5.4, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims shall not receive a distribution under this Plan.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including any Plan Exhibits), the Confirmation Order, or the Modification Approval Order the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan (including Plan Exhibits), the Confirmation Order, or the Modification Approval Order, otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

**11.11    Exculpation And Limitation Of Liability. Subject to Article 11.13 of this Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such, GM, GMCo., Parnassus Holdings II, LLC, Platinum Equity Capital Partners II, L.P., the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors,**

attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents, and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the **Credit Bid, the** Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Other than as provided for in this Article and in <u>Article 11.13</u>, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this Article for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the **Credit Bid, the** Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases. For the avoidance of doubt, the exculpatory provisions of this Article, which apply to postpetition conduct, are not intended, nor shall they be construed, to bar any governmental unit from pursuing any police or regulatory action. Moreover, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Buyers from their obligations under the Disposition Agreements, (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby, or (v) any of the Debtors from their obligations under this Plan or the transactions contemplated thereby.

**11.12  Indemnification Obligations.**  Subject to <u>Article 11.13</u> of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights shall be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, discharged, or

64

otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, shall maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for the remaining term of such policy and shall maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage shall be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, shall indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.  Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation") the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or set-off by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

**11.13   Exclusions And Limitations On Exculpation, Indemnification, And Releases.**  Notwithstanding anything in this Plan to the contrary, no provision of this Plan, the Confirmation Order, or the Modification Approval Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Person not specifically released hereunder, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**11.14   Injunction.  Subject to <u>Article 11.13</u> of this Plan, ^ the satisfaction, release, and discharge pursuant to this <u>Article XI</u> shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## ARTICLE XII

## <u>CONDITIONS PRECEDENT</u>

65

**12.1    Confirmation.**  The Confirmation Order was entered on January 25, 2008, and became a final order on February 4, 2008.

**12.2    Conditions To The Effective Date Of The Plan.**  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

**(a)**    The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Plan.

**(b)**    The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Master Disposition Agreement, and all conditions precedent to the consummation of the Master Disposition Agreement shall have been waived or satisfied in accordance with the terms thereof.

**^ (c)** ^ The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

**^ (d)** The Bankruptcy Court shall have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of this Plan.

**^ (e)** Each Exhibit, document, or agreement to be executed in connection with this Plan shall be in form and substance reasonably acceptable to the Debtors.

**12.3    Waiver Of Conditions Precedent.** The conditions set forth in 12.2(^ d) and 12.2(^ e) of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XIII

## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan, including, among others, the following matters:

**(a)**    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

**(b)**    to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

**(c)**    to adjudicate any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under this Plan;

**(d)**    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

**(e)**    to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

**(f)**    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

**(g)**    to issue orders in aid of execution, implementation, or consummation of this Plan;

**(h)**    to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order or Modification Approval Order;

67

(i)    to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)    to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan the Confirmation Order, or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan; provided that retention of jurisdiction as to disputes involving GM or GMCo. shall be as set forth in Article XIII (u);

(l)    to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

(m)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)    to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(o)    to hear any other matter not inconsistent with the Bankruptcy Code;

(p)    to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(q)    to enter a final decree closing the Chapter 11 Cases;

(r)    to enforce all orders previously entered by the Bankruptcy Court;

(s)    to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim;

(t)    to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement;

68

**(u)**    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents^ and the Master Disposition Agreement, except as provided in such documents; and

**(v)**    to hear and determine all matters relating to the Contingent PBGC Secured Claims or the Delphi-PBGC Settlement Agreement.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court shall retain exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions.  Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors shall have authority to bring such action in any other court of competent jurisdiction.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1    Binding Effect**.  Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Payment Of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.   The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed.

**14.3    Modification And Amendments**.  The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing.  The Debtors may alter, amend, or modify any Exhibits to this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of this Plan with respect to any Debtor as defined in section 1101(2) of the Bankruptcy Code, any Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.4    Reserved.**

**14.5    Withholding And Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or

foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

    **14.6    Committees**. Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, provided that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Statutory Committees may make applications for Professional Claims and members of the Statutory Committees may make requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases. The Professionals retained by the Creditors' Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with challenges to any order confirming the Plan or any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date and for the other duties and responsibilities of the Statutory Committees set forth in this Section and other services as may be requested by, the Debtors and the Reorganized Debtors shall pay the fees and expenses in respect of such services in the ordinary course of business without further order of the Bankruptcy Court. This Section shall apply for all purposes and to all Debtors and their respective Estates under the Plan.

    **14.7    Revocation, Withdrawal, Or Non-Consummation**.

        **(a)    Right to revoke or withdraw.** Each of the Debtors reserves the right to revoke or withdraw this Plan with respect to such Debtor at any time prior to the Effective Date.

        **(b)    Effect of withdrawal, revocation, or non-consummation.** If any of the Debtors revokes or withdraws this Plan as to such Debtor prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan with respect to such Debtor or Debtors (including the fixing or limiting to an amount certain any Claim or Class of Claims with respect to such Debtor or Debtors, the effect of substantive consolidation for purposes under this Plan, or the allocation of the distributions to be made hereunder), the assumption or rejection of executory contracts or leases effected by this Plan with respect to such Debtor or Debtors, and any document or agreement executed pursuant to this Plan with respect to such Debtor or Debtors shall be null and void as to such Debtor or Debtors. In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against such Debtor or Debtors or any other Person, to prejudice in any manner the rights of any such Debtor or Debtors, the holder of a Claim or Interest, or any Person in any further proceedings involving such Debtor or Debtors or to constitute an admission of any sort by the Debtors or any other Person.

    **14.8    Notices**. Any notice required or permitted to be provided to the Debtors, Creditors' Committee, GM, GMCo., and ^ Company Buyer shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

**If to the Debtors:**

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Att'n:   David M. Sherbin
         General Counsel

with a copy to:

Skadden, Arps, Slate, Meagher &
  Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
Att'n:   John Wm. Butler, Jr.
         Ron E. Meisler

– and –

Skadden, Arps, Slate, Meagher &
  Flom LLP
Four Times Square
New York, New York 10036
Att'n:   Kayalyn A. Marafioti

**If to the Creditors' Committee:**

Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4834
Att'n:   Robert J. Rosenberg
         Mitchell A. Seider
         Mark A. Broude

**If to ^ GM or GMCo.:**

General Motors Corporation
300 GM Renaissance Center
Detroit, Michigan 48265
Attn:  General Counsel

with a copy to:

71

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Att'n:  Jeffrey L. Tanenbaum
            Robert J. Lemons

**If to ^ Company Buyer:**

^ DIP Holdco 3, LLC
^ c/o Elliott Management Corporation
712 Fifth Avenue
New York, New York ^ 10019

With a copy to:

Silver Point Capital, L.P.
Two Greenwich Plaza
Greenwich, Connecticut 06830
Attn:^  Michael Gatto
^
 With a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:  Marc A. Abrams
          Maurice M. Lefkort

and

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Attn:   Glenn E. Siegel
           Charles I. Weissman
           Scott M. Zimmerman

**14.9    Term Of Injunctions Or Stays**.  Unless otherwise provided herein or in the Confirmation Order or the Modification Approval Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date or the Modification Approval Date, shall remain in full force and effect until the Effective Date.

**14.10   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall

72

control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the applicable Debtor.

       **14.11   No Waiver Or Estoppel**.  Upon the Effective Date, each holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, the Equity Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

       **14.12   Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.

Dated:      December 10, 2007

As Modified:  January 25, 2008
              June 16, 2009
              July 30, 2009
              Troy, Michigan

                            DELPHI CORPORATION AND THE AFFILIATE
                                DEBTORS

                        By:  /s/ John D. Sheehan
                            John D. Sheehan
                            Vice President, Chief Financial Officer

73

**Exhibit B**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
151 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
        In re                                           :    Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :    Case No. 05-44481 (RDD)
                                                        :
                                    Debtors.            :    (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF (A) ORDER APPROVING MODIFICATIONS TO THE FIRST
AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI
CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-
IN-POSSESSION AND (B) OCCURRENCE OF THE EFFECTIVE DATE

        1.        **Confirmation Of The Plan.**  On January 25, 2008, the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") entered an order
confirming the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain
Affiliates, Debtors And Debtors-In-Possession, dated January 25, 2008 (the "Confirmed Plan"),

1

in the Chapter 11 Cases of Delphi Corporation and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors").

2.  **Approval Of Modifications To The Confirmed Plan.**  On July __, 2009, the Bankruptcy Court entered an order (the "Modification Approval Order") approving certain modifications to the Confirmed Plan embodied in the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (the "Modified Plan"), attached as Exhibit A to the Modification Approval Order.  Unless otherwise defined in this Notice Of (A) Order Approving Modifications To The First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B) Occurrence Of The Effective Date, capitalized terms and phrases used herein have the meaning(s) given to them in the Modified Plan and the Modification Approval Order.

3.  **Discharge of Claims and Termination of Interests.**  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Modified Plan or in the Confirmation Order, the distributions and rights that are provided in the Modified Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Modified Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Modified Plan. The Modification Approval Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

4.  **Injunctions.**

(a)  Subject to Article 11.13 of the Modified Plan, the satisfaction, release, and discharge pursuant to Article XI of the Modified Planshall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Modified Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

(b)  By accepting distributions pursuant to the Modified Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Article XI of the Modified Plan.

5.        **Release by Debtors Of Certain Parties.**  Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 11.13 of the Modified Plan, effective as of the Effective Date (and with respect to the DIP Lenders, the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP Transfer, which shall be deemed to occur on the Effective Date), each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Modified Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases.  The Reorganized Debtors, including Reorganized DPH Holdings, and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.  Notwithstanding the foregoing, nothing in the Modified Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

6.        **Release by Holders of Claims and Interests.**  On the Effective Date, (a) each Person who votes to accept the Modified Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor) which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Modified Plan and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Modified Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Credit Bid, the Master Disposition Agreement, the Union

3

Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with either the Modified Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 cases; provided, however, that (A) Article 11.5 of the Modified Plan is subject to and limited by Article 11.13 of the Modified Plan and (B) 11.5 of the Modified Plan shall not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

7.    **Assumption of Executory Contracts and Unexpired Leases.**  On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except those executory contracts and unexpired leases that (a) have been rejected by order of the Bankruptcy Court or (b) are the subject of a motion to reject pending on the Effective Date.  Entry of the Modification Approval Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Article VIII of the Modified Plan, other than those executory contracts and unexpired leases that are assumed and assigned to the applicable Buyer as set forth in the Master Disposition Agreement, shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Modified Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

8.    **Bar Dates**

(a)    **Administrative Bar Date.**  Requests for payment of an Administrative Claim (other than as set forth in Article X of the Modified Plan), must be filed with the Claims Agent and served on counsel for the Debtors and/or Reorganized Debtors no later than 45 days after the Effective Date (the "Administrative Claims Bar Date") or shall be disallowed automatically without the need for any objection from the Debtors or Reorganized Debtors. Unless the Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

(b)    **Professional Claims And Final Fee Applications.**  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the

4

Statutory Committees pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date is terminated and the Debtors shall employ and pay Professionals in the ordinary course of business.

(c)     **Substantial Contribution Bar Date.**  Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

9.     **Effective Date.**  On _____ __, 2009, the Effective Date of the Modified Plan occurred.

Dated:  New York, New York
           _____ _, 200_

                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                           FLOM LLP

                                        By:__ _____
                                            John Wm. Butler, Jr.
                                            Ron E. Meisler
                                        151 North Wacker Drive
                                        Chicago, Illinois  60606
                                        (312) 407-0700

                                        By:_____
                                            Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                            Debtors and Debtors-in-Possession

# EXHIBIT I

**[VEBA Complaint]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,**

                Plaintiff,

v.

**GENERAL MOTORS LLC,**

                Defendant.

Case No:  _____

# <u>COMPLAINT</u>

## <u>NATURE OF CASE</u>

1.      This is an action brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for breach of a labor contract to which the plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("the UAW") and the defendant General Motors LLC ("the Company") are parties.  The UAW brings this § 301 action to remedy the Company's failure to honor its obligation under that labor contract to make a specified payment into a Voluntary Employees' Beneficiary Association ("VEBA").

## <u>JURISDICTION AND VENUE</u>

2.      This Court has jurisdiction over this lawsuit pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1331.

3.      Venue lies in this District pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391(b).

Case 2:10-cv-13560-AC-MJH    Document 1    Filed 04/06/2010    Page 2 of 8

<u>PARTIES</u>

4.    The plaintiff UAW is a labor organization that represents the Company's
employees and the employees of various other companies in collective bargaining.  As such, the
UAW is "a labor organization representing employees in an industry affecting commerce" within
the meaning of the statutory provision, LMRA § 301, 29 U.S.C. § 185, authorizing "[s]uits for
violation of contracts" between such a labor organization and "an employer."  The UAW's
principal offices are located at 8000 East Jefferson Avenue, Detroit, Michigan 48214.

5.    The defendant Company is a Delaware Corporation that employs various
individuals represented by the UAW.  As such, the Company is "an employer" within the
meaning of the statutory provision, LMRA § 301, 29 U.S.C. § 185, authorizing "[s]uits for
violation of contracts" between such an employer and "a labor organization representing
employees in an industry affecting commerce."  The Company's principal offices are located at
300 Renaissance Center, Detroit, Michigan, 48265, and the Company also has extensive
operations within this District.

<u>FACTS</u>

6.    On June 22, 2007—during the course of bankruptcy proceedings involving Delphi
Corporation ("Delphi")—the UAW, the Company's predecessor corporation (General Motors
Corporation or "GM") and Delphi entered into a tripartite Memorandum of Understanding
("MOU").  By Order dated July 19, 2007, the MOU was approved by the Bankruptcy Court
presiding over the Delphi bankruptcy proceedings.

7.    GM itself went through bankruptcy proceedings in 2009 from which there
emerged a new operating company—the defendant herein—called "General Motors LLC" ("the
Company").  The Company has assumed all of GM's labor contracts with the UAW, including,

- 3 -

without limitation, the MOU; on information and belief, the Company has done so pursuant to a

sales agreement approved by the Bankruptcy Court in the GM bankruptcy proceedings.

Accordingly, the Company is contractually required to honor all of GM's contractual obligations

under those GM-UAW labor contracts, including, without limitation, GM's contractual

obligations under the MOU.

8.       Section J.2 of the MOU provides as follows:

> The UAW has asserted a claim against Delphi in the amount of
> $450 million as a result of the modifications encompassed by this
> Agreement and various other UAW agreements during the course
> of Delphi's bankruptcy.  Although Delphi has not acknowledged
> this claim, GM has agreed to settle this claim by making a payment
> in the amount of $450 million, which the UAW has directed to be
> paid directly to the DC VEBA established pursuant to the
> settlement agreement approved by the court in the case of Int'l.
> Union, UAW et al v. General Motors Corp., Civil Action No. 05-
> 73991.

9.       Section K.2 of the MOU, in turn, provides an "effective date" provision for

certain terms of the MOU, including Section J.2.  Section K.2 provides as follows:

> The parties acknowledge that the following provisions of this
> Agreement will not become effective until all of the following
> events have occurred and as of the date when the last of such
> events shall have occurred:  (a) execution by Delphi and GM of a
> comprehensive settlement agreement resolving the financial,
> commercial, and other matters between them and (b) the
> substantial consummation of a plan of reorganization proposed by
> Delphi in its Chapter 11 cases and confirmed by the Bankruptcy
> Court which incorporates, approves and is consistent with all of the
> terms of this Agreement and the comprehensive settlement
> agreement between Delphi and GM.

10.      On July 30, 2009, the Bankruptcy Court presiding over the Delphi bankruptcy

proceedings entered an Order confirming a plan of reorganization for Delphi, and on October 6,

2009, the Court entered a further Order explicitly stating that this plan of reorganization "was

substantially consummated" on that October 6, 2009 date.  This judicially-confirmed and

substantially-consummated plan of reorganization incorporated, approved and was consistent

with:  (i) all of the terms of the MOU; and (ii) a comprehensive settlement agreement previously

executed by Delphi and GM resolving the financial, commercial, and other matters between

them.  Accordingly, pursuant to Section K.2 of the MOU, the Company's contractual obligation

to make the payment to the DC VEBA specified in Section J.2 of the MOU became "effective"

*on October 6, 2009*.

11.     By letter dated October 29, 2009, the UAW made a written demand that the

Company honor its contractual obligation to make the foregoing payment to the DC VEBA as

required by the terms of the MOU.  By letter dated November 11, 2009, that UAW demand was

rejected, and since that time the Company has failed and refused to make the contractually-

required payment.  The Company thus stands in breach of its contractual obligation under the

MOU to make that payment.

<u>CLAIM FOR RELIEF</u>
(Breach of Contract, Under 29 U.S.C. § 185)

12.     The allegations in Paragraphs 1 through 11 above are re-alleged and incorporated

herein by reference.

13.     The MOU is a "contract[ ] between an employer and a labor organization

representing employees in an industry affecting commerce" within the meaning of LMRA § 301,

29 U.S.C. § 185.

14.     The Company's failure and refusal to make the payment to the DC VEBA

specified in Section J.2 of the MOU—as demanded by the UAW in its October 29, 2009 letter—

constitutes a breach of the MOU that is remediable in this action brought under LMRA

§ 301, 29 U.S.C. § 185.

- 5 -

PRAYER FOR RELIEF

WHEREFORE, the UAW respectfully requests that this Court:

(1)    Find and declare that the Company is in breach of its contractual

obligation under the MOU to make the payment to the DC VEBA specified in Section J.2 of the

MOU;

(2)    Order the Company to make that contractually-required payment

forthwith; and

(3)    Order such other and further relief as this Court may deem appropriate.


Respectfully submitted,


/s/ JULIA PENNY CLARK
Julia Penny Clark (DC Bar 269609)
jpclark@bredhoff.com
Andrew D. Roth (DC Bar 414038)
aroth@bredhoff.com
**Bredhoff & Kaiser, PLLC**
805 Fifteenth Street, N.W., Suite 1000
Washington, DC  20005
(202) 842-2600


/s/ JEFFREY D. SODKO
Daniel W. Sherrick (P37171)
dsherrick@uaw.net
Jeffrey D. Sodko (P65076)
jsodko@uaw.net
**UAW, Office of General Counsel**
8000 East Jefferson Avenue
Detroit, MI  48214
(313) 926-5216


Counsel for Plaintiff UAW


DATED:   April 6, 2010.

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET    County in which action arose __Wayne__

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America | General Motors LLC |

**(b)**   County of Residence of First Listed Plaintiff ___Wayne___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___Wayne___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)
Julia Penny Clark, Bredhoff & Kaiser, PLLC, 805 Fifteenth Street, NW, Suite 1000, Washington, DC 20005  (202) 842-2600  (see attachment)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☒ 3   Federal Question
        (U.S. Government Not a Party)

☐ 2   U.S. Government
        Defendant

☐ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)     and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☒ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       another district
       (specify)

☐ 6  Multidistrict
       Litigation

☐ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. § 185
Brief description of cause:
Breach of labor contract

## VII. REQUESTED IN
## COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $ Specific Performance     CHECK YES only if demanded in complaint:
of contract
JURY DEMAND:     ☐ Yes     ☒ No

## VIII. RELATED CASE(S)
## IF ANY

(See instructions)     JUDGE _____     DOCKET NUMBER _____

DATE
April 6, 2010

SIGNATURE OF ATTORNEY OF RECORD
_Julia Penny Clark_

FOR OFFICE USE ONLY

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?                    ☐ Yes
                                                                                  ☒ No

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other        ☐ Yes
            court, including state court? (Companion cases are matters in which    ☒ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____


Notes :

# ATTACHMENT

I.(c) Attorneys

Andrew D. Roth
**Bredhoff & Kaiser, PLLC**
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC  20005
(202) 842-2600


Daniel W. Sherrick
Jeffrey D. Sodko
**UAW, Office of General Counsel**
8000 East Jefferson Avenue
Detroit, MI  48214
(313) 926-5216

# **EXHIBIT J**

## **[Dispute Notice]**

**GM**

Francis S. Jaworski
Attorney

General Motors LLC
Legal Staff
300 Renaissance Center
Mail Code: 482-C25-B21
Detroit, Michigan, 48265-3000
Tel 313-665-4914
Fax 248-267-4322
francis.s.jaworski@gm.com

September 30, 2010

**Via Federal Express – Next Day Delivery**
**Facsimile to (313) 926-5240 & (212) 225-3999, and**
**Email to: mnicholson@uaw.net; bsusko@cgsh.com; rlincer@cgsh.com; dgottlieb.com.**

Michael Nicholson, Esq.
General Counsel
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan 48214

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attn:   A. Richard Susko, Esq.
        Richard S. Lincer, Esq.
        David I. Gottlieb, Esq.

Re:  Notice of Dispute Pursuant to Section 26.B
     of UAW Retiree Settlement Agreement

Gentlemen:

This letter provides written notice pursuant to Section 26.B(i) of the July 10, 2009 UAW Retiree
Settlement Agreement (the "Agreement") of a dispute arising out of or relating to the
enforcement, implementation, application and interpretation of the Agreement, as more
particularly described below.

As you know, on or about September 17, 2010, the UAW served GM with the complaint that the
UAW had previously filed on April 6, 2010 (but upon which the parties had agreed to extend the
service deadline until October 4, 2010) (the "VEBA Complaint") in the United States District
Court for the Eastern District of Michigan (the "Michigan District Court"), seeking an additional

September 30, 2010
Page 2

$450 million payment from GM (the "Additional VEBA Payment") to the Voluntary Employees' Beneficiary Association trust (the "New VEBA") established pursuant to the Agreement. Despite our efforts to reach an amicable resolution, it became apparent that we had reached an impasse in our discussions on September 14, 2010 when the UAW formally advised GM of its intention to serve the VEBA Complaint before the extended service deadline expired.

Consequently, GM hereby gives notice that the UAW's pursuit of the Additional VEBA Payment by service of the VEBA Complaint violates, among other things, sections 2, 5.B, 5.D, 8, 14, 26 and 32.C of the Agreement.[1] These sections of the Agreement clearly contemplate that GM's payment obligations to the New VEBA would be "fixed and capped" as expressly set forth in the Agreement and that such payment obligations do not include the Additional VEBA Payment.

Sincerely,

Francis S. Jaworski

cc:    Julia Penny Clark, Esq.

---

[1]    GM reserves its rights to assert that additional sections of the Agreement have been violated and to assert additional defenses and objections to the Additional VEBA Payment request.

# EXHIBIT K

**[Dispute Notice Response]**



Legal Department Phone (313) 926-5216
Legal Department Fax (313) 926-5240

*Solidarity House*

8000 EAST JEFFERSON AVE.
DETROIT, MICHIGAN 48214
PHONE (313) 926-5000
FAX (313) 823-6016

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA – UAW**

BOB KING, *PRESIDENT*                    DENNIS D. WILLIAMS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:   JOE ASHTON  •  CINDY ESTRADA  •  GENERAL HOLIEFIELD  •  JIMMY SETTLES

*Associate General Counsel*

| | | | |
|---|---|---|---|
| Michael Nicholson | Ava Barbour | Michael F. Saggau | Jeffrey D. Sodko |
| *General Counsel* | Carlos F. Bermudez | Maneesh Sharma | Catherine J. Trafton |
| Niraj R. Ganatra | William J. Karges | Blair K. Simmons | Stephen A. Yokich |
| *Deputy General Counsel* | Susanne Mitchell | | |

October 20, 2010

**<u>Overnight Mail</u>**

Diana D. Tremblay
Vice President
North America Manufacturing & Labor Relations
30400 Mound Road
MC 480-108-120
Warren, MI  48090

RE:   GM "Notice of Dispute" Under Section 26.B
<u>of 2009 UAW Retiree Settlement Agreement</u>

Greetings:

The UAW is in receipt of GM's "Notice of Dispute" letter dated September 30, 2010 in the above-referenced matter.

GM states in its letter—and the UAW does not dispute—that the 2009 UAW Retiree Settlement Agreement ("2009 Agreement") fixes and caps GM's "payment obligations" to *the New VEBA* established in 2008 under the court-approved <u>Henry II</u> settlement agreement.  But the UAW does *not* seek in the Eastern District of Michigan lawsuit ("Michigan lawsuit") referenced in GM's letter to enforce a GM "payment obligation" to *the New VEBA*.  Rather, in that Michigan lawsuit, the UAW seeks *only* to enforce a GM "payment obligation" to *the DC VEBA* established in 2005 under the court-approved <u>Henry I</u> settlement agreement—a "payment obligation" to *the DC VEBA* arising, of course, under the 2007 MOU between the UAW, GM and Delphi Corporation ("2007 MOU").

OPEIU494
PRINTED IN U.S.A.

The 2009 Agreement does *not* purport to resolve or otherwise deal in any way with the GM "payment obligation" to the DC VEBA that is the subject of the Michigan lawsuit. Rather, the 2009 Agreement is completely silent on the issue of whether that "payment obligation" to the DC VEBA exists or has been extinguished—thus belying the assertion in GM's letter that the UAW's Michigan lawsuit to enforce that "payment obligation" to the DC VEBA presents a "dispute" regarding "the enforcement, implementation, application [or] interpretation of the [2009] Agreement" that is within the exclusive jurisdiction of the GM bankruptcy court.

The UAW recognizes of course that effective January 16, 2010, the DC VEBA was merged into the New VEBA through a transfer of all of the DC VEBA's assets and liabilities to the New VEBA, such that the GM "payment obligation" to the DC VEBA that is the subject of the Michigan lawsuit is now an asset of the New VEBA. But that asset and liability transfer did not somehow transmute this GM "payment obligation" to the DC VEBA into a GM "payment obligation" to the New VEBA. In any event, under the terms of the 2007 MOU, GM's "payment obligation" to the DC VEBA ripened *on October 6, 2009*, and the UAW made a timely, written demand that GM make that contractually-required payment to the DC VEBA *on October 29, 2009*—a demand which GM promptly rejected in breach of its contractual "payment obligation" to the DC VEBA. Had GM honored its contractual "payment obligation" to the DC VEBA upon the UAW's timely demand, then the payment at issue would have gone into the DC VEBA, which still existed as of that date. GM cannot profit by its own contractual breach by now attempting to recast its "payment obligation" to the DC VEBA as a "payment obligation" to the New VEBA that was extinguished by the 2009 Agreement.

Please do not hesitate to contact me if you have any questions concerning, or would like to engage in further discussions about, the UAW's position on this matter.

Sincerely,

*Jeffrey D. Sodko*

Jeffrey D. Sodko
Associate General Counsel

JDS/ss
opeiu494

cc:    *(Overnight Mail)*
       Francis S. Jaworski, GM LLC
       Cadawalder, Wickersham & Taft LLP
         Attn: R. Ronald Hopkinson/Lisa J. Pauquette/John J. Rapisardi

## EXHIBIT L

[**Rally** Decision]

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026-reg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.

9         f/k/a General Motors Corporation, et al.,

10

11             Debtors.

12

13    - - - - - - - - - - - - - - - - - - - -x

14

15             United States Bankruptcy Court

16             One Bowling Green

17             New York, New York

18

19             October 4, 2010

20             3:06 PM

21

22

23    B E F O R E:

24    HON. ROBERT E. GERBER

25    U.S. BANKRUPTCY JUDGE

Page 2

HEARING re Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce 363 Sale Order and Approved Deferred Termination (Wind-Down) Agreement

Transcribed by: Lisa Bar-Leib

VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

```
                                                    Page 3

 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtors and Debtors-in-Possession

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  EVAN S. LEDERMAN, ESQ.

 9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for the Official Committee of Unsecured

12          Creditors

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16    BY:  JENNIFER SHARRET, ESQ.

17         (TELEPHONICALLY)

18

19    KING & SPALDING LLP

20         Attorneys for General Motors LLC a/k/a New GM

21         1185 Avenue of the Americas

22         New York, NY 10036

23

24    BY:  ARTHUR J. STEINBERG, ESQ.

25         SCOTT DAVIDSON, ESQ.
```

Page 4

1

2    ISAACS CLOUSE CROSE & OXFORD LLP

3         Attorneys for General Motors LLC a/k/a New GM

4         21515 Hawthorne Boulevard

5         Suite 950

6         Torrance, CA 90503

7

8    BY:  GREGORY R. OXFORD, ESQ.

9         (TELEPHONICALLY)

10

11   WILK AUSLANDER LLP

12        Attorneys for Rally Auto Group Inc.

13        675 Third Avenue

14        New York, NY 10017

15

16   BY:  ERIC J. SNYDER, ESQ.

17

18   BELLAVIA GENTILE & ASSOCIATES, LLP

19        Attorneys for Rally Auto Group Inc.

20        200 Old Country Road

21        Mineola, NY 11501

22

23   BY:  STEVEN H. BLATT, ESQ.

24

25

Page 5

1

2  MORGANSTERN, MACADAMS & DEVITO CO., L.P.A.

3      Attorneys for Rally Auto Group Inc.

4      636 West St. Clair Avenue

5      Cleveland, OH 44113

6

7  BY:  CHRISTOPHER M. DEVITO, ESQ.

8      (TELEPHONICALLY)

9

10  U.S. DEPARTMENT OF JUSTICE

11      U.S. Attorney's Office

12      Southern District of New York

13      86 Chambers Street

14      New York, NY 10007

15

16  BY:  DAVID S. JONES, DEPUTY CHIEF, CIVIL DIVISION

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Good morning -- or afternoon.  Have

4    seats, please.  All right.  GM.  Motors Liquidation Company.

5    Rally Motors.  Mr. Lederman, do we have some preliminary

6    matters that I had become unaware of?

7              MR. LEDERMAN:  No, Your Honor, we don't.  The only

8    matter before you is a matter that you just introduced.  So I

9    was just going to introduce the parties and turn over the

10   lectern to them.

11             THE COURT:  All right.  Well, I know Mr. Steinberg

12   and Mr. Snyder.  Why don't the remainder of you folks introduce

13   yourselves.

14             MR. DAVIDSON:  Scott Davidson from King & Spalding --

15             THE COURT:  All right.

16             MR. DAVIDSON:  -- for New GM.

17             MR. OXFORD (TELEPHONICALLY):  Greg Oxford, Isaac

18   Clouse --

19             MR. BLATT:  Steven Blatt from Bellavia --

20             THE COURT:  Just a minute, please.  First, I need the

21   folks in the courtroom to introduce themselves.

22             MR. OXFORD:  Okay, Your Honor.

23             THE COURT:  And then if people are on the phone, I'm

24   going to have to ask that they defer to people in the courtroom

25   unless people in the courtroom hand off to them.

Page 7

1           MR. BLATT:  Steve --

2           THE COURT:  All right.  Just a minute, please,

3    gentlemen.

4           MR. BLATT:  Yes, Your Honor.

5           THE COURT:  All right.  With Mr. Snyder?

6           MR. BLATT:  Yes.

7           MR. SNYDER:  Yes, Your Honor.  I'm sorry.  Go ahead.

8           MR. BLATT:  Steven Blatt, Bellavia Gentile, 200 Old

9    Country Road, Mineola, New York, on behalf of Rally Auto Group.

10          THE COURT:  Right, Mr. Blatt.  Okay.

11          THE COURT:  Now, is there a gentleman on the phone

12   who wanted to introduce himself?

13          MR. OXFORD:  Yes, Your Honor.  It's Greg Oxford,

14   Isaac Clouse Crose & Oxford also appearing with Mr. Steinberg

15   on behalf of General Motors LLC.

16          THE COURT:  All right, Mr. Oxford.  Okay.  Gentlemen,

17   make your presentations as you see fit.  But I'm going to need

18   you to address the following needs and concerns.  But first,

19   let me lay on my frustration with you guys, both sides.  I

20   cannot, for the life of me, understand, Mr. Snyder and Mr.

21   Blatt, why you can't follow the requirements of my case

22   management orders and give me a table of cases and table of

23   authorities as those rules require in baby talk.  When I'm

24   trying to compare the two submissions and see what you guys

25   said about a particular case or, for that matter, how you

Page 8

1    organized your arguments, that is a source of incredible

2    difficulty and frustration for me.  And, Mr. Steinberg and Mr.

3    Oxford -- Mr. Oxford, I think you at least have been in this

4    case before.  How many times have I said that I don't want to

5    use -- see the word "passum" especially when it refers to the

6    most important case in your whole brief on a lot of these

7    issues?  I'm not expecting a response now.  You can address it

8    when it's your turn.

9         Gentlemen -- Mr. Snyder and Mr. Blatt, if you want to

10   make your subject matter jurisdictions, you can, but it doesn't

11   seem to me that this is about subject matter jurisdiction in

12   any way, shape or form.  Frankly, I think you missed the boat

13   when you were talking about related-to jurisdiction.  It seems

14   to me that this is a poster child for arising-in jurisdiction

15   and the principle that bankruptcy judges have the authority to

16   enforce their own orders.  And when an agreement says that the

17   bankruptcy court will have exclusive jurisdiction to deal with

18   a particular matter and then the order implements that, I have

19   some trouble seeing how it can be to the contrary.  If you

20   nevertheless want to continue to the contrary, you got to help

21   me with Petrie Retail and Millenium Seacarriers on those

22   points.

23        Now, I sense that both sides agree that there is no

24   right of judicial review under the Dealer Arbitration Act and

25   that the Federal Arbitration Act applies only to contractual

Page 9

1    agreements to arbitrate.  So therefore, we're on a little bit

2    of -- or totally implied remedies if and to the extent they

3    exist.  Now, Mr. Steinberg, I want to see whether your argument

4    proves too much.  And you can help me with that if I posit to

5    you a situation where the arbitrator is taking bribes or he's

6    taking an ex parte communication because my belly would tell me

7    that even if there weren't an expressed right of judicial

8    review in that situation that Rally Motors, if it were on the

9    losing end of that type of situation and, of course, if it came

10   to me, could come and say, Judge, I need relief from that kind

11   of thing.  But, of course, Mr. Snyder and Mr. Blatt, that isn't

12   what you're alleging here.  In essence, you're alleging that

13   the arbitrator made an error of law.  And you haven't shown me

14   any case in which the arbitrator was told that he had to deal

15   with these franchise agreements double or nothing.  And it

16   strikes me as a garden variety claim of legal error.  So help

17   me if I'm wrong on that.

18          Now, I don't know how many times I and the other

19   bankruptcy judges in this district have had 363 orders and

20   confirmation orders provide for continuing jurisdiction

21   typically to follow up on the implementation of things that

22   were in the sale order and in the plan or agreements that were

23   provided under either.  Counterparties come into the court all

24   the time putting their money on the line to get benefits by

25   dealing with the bankruptcy court.  And that's an important

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 276 of 374

Page 10

 1   reason, as at least one of the cases that was quoted to me

 2   says, why we have provisions of this character.  And I need

 3   your help in understanding why I should say "Never mind" to

 4   provisions of that type.  But if there is authority for some

 5   kind of implied judicial review that I, in contrast to a

 6   district judge exercising diversity jurisdiction, could issue,

 7   or even if it were deemed to be 1331 federal question

 8   jurisdiction -- though I don't see the provision of the U.S.C.

 9   under which the federal right arises.  I mean, I see why you

10   could compel GM to arbitrate but New GM didn't quarrel with

11   your right to arbitrate that I need help on that.

12            So, Mr. Snyder, will it be you or Mr. Blatt?

13            MR. SNYDER:  It'll be me, Your Honor.

14            THE COURT:  Okay.

15        (Pause)

16            MR. SNYDER:  Your Honor, as I think the analogy for

17   our purposes or the point where we start is the AAA commercial

18   rules.  And I focus on those, Your Honor, only because, as the

19   Court pointed out, I don't think anyone disputes that when both

20   parties sat down to the arbitration that the commercial rules

21   apply.  Now, GM states that it objected to the use of the

22   commercial rules.  But be that as it may, the scheduling order,

23   in particular, paragraph 1, which is annexed to our objection

24   as Exhibit F, specifically states that the commercial rules

25   apply.  And one of those rules, Your Honor, is 48(c) which we

Page 11

```
 1    relied on extensively in our papers but it states, and I

 2    quote -- it's short:  "Parties to an arbitration under this

 3    rule shall be deemed to have consented.  A judgment upon the

 4    arbitration award may be entered into any federal, state or

 5    court of competent jurisdiction."  Now it doesn't say they have

 6    to agree.  It says that they've deemed to have consented.  And

 7    so our argument is, Your Honor, that if the AAA commercial

 8    rules apply and GM is deemed to have consented then, naturally,

 9    there is a -- the arbitration award is final and binding and

10    there has to be a right of judicial review under the terms of

11    48(c).  Now we cited to the Idea Nuova case for the proposition

12    that although that was a contract case, where the contract is

13    silent as to whether the rights of judicial review apply, the

14    Courts will impute 48(c) not because the parties agreed to

15    arbitrate, Your Honor, but because by going forward with the

16    arbitration, because the commercial rules themselves apply,

17    they're deemed to have consented to both the arbitration and

18    the entry of a final judgment.  And, Your Honor, that's based

19    solely on facts that are not in dispute.

20           THE COURT:  Mr. Oxford, do you want to mute your

21    phone, please?

22           MR. OXFORD:  I'm not sure I know how to do that.  We

23    could --

24           THE COURT:  All right.  CourtCall, mute them.  Go

25    ahead, Mr. Snyder.
```

Page 12

```
1              MR. OXFORD:  I didn't hear you, Your Honor.  I'm

2     sorry.

3              THE COURT:  I'm telling CourtCall to mute you, Mr.

4     Oxford.  Go ahead, Mr. Snyder.

5              MR. SNYDER:  Thank you, Your Honor.  Now we agree,

6     Your Honor, as GM has pointed out that the Dealer Arbitration

7     Act is silent as to judicial review.  But we contend in

8     addition to the AAA commercial rules giving the federal court

9     subject matter jurisdiction that, as Your Honor pointed out,

10    that if a federal question presents itself under 28 U.S.C. 1331

11    then the California district court can rely on that federal

12    question to possess subject matter jurisdiction.  And that

13    federal question is presented here, to wit.  Is the removal of

14    a Chevrolet brand the granting of a "covered dealership" as

15    that term is defined under 747(a) and (d)?  It's stated

16    specifically, Your Honor, in Rally's statement.  Does the

17    removal of a Chevrolet brand constitute a "covered dealership"?

18    So we have a federal statute that Rally is asking a federal

19    court to interpret and we have the Vaden case which I cite to

20    at -- and -- 129 S. Ct. 1262.  In that case, the Supreme Court

21    held that a federal court could look through the arbitration,

22    Your Honor, to determine whether the controversy in question

23    arises under the federal law so that the court has federal

24    question jurisdiction.  That's all we're asking the federal

25    court to do.  Interpret a federal statute on a federal
```

Page 13

1    question.

2         And in addition, Your Honor, we believe the federal

3    court has jurisdiction for the issue that Your Honor has raised

4    and is the most troubling, at least to me, that there is no

5    right to judicial review.  GM doesn't cite to any federal

6    statute, while may be silent or limited, that did not allow for

7    judicial review.  Which goes right to the due process argument

8    and the constitutionality of the statute itself.

9         Your Honor, the arbitrator didn't have to take

10   bribes.  Let's just say we end this hearing and regardless of

11   what happens GM says, I'm not reinstating you.  I don't care

12   what Judge Gerber says or anyone else says.

13        THE COURT:  Well, isn't that the easier case because

14   wouldn't you, Mr. Snyder, be able to come back to me in about

15   ten minutes and say that New GM isn't complying with the

16   arbitration award?  And to the extent that I understood your

17   48(c) argument, the language is "deemed to have consented to

18   enforcement".  And if you say -- let's take what I understand

19   to be the case.  You won three-quarters of -- or your client

20   won three-quarters of the arbitration before the arbitrator.

21   And suppose GM stiffs you on those three-quarters where you

22   prevailed -- your client prevailed.  I would have thought --

23   and maybe Mr. Steinberg should be heard on this because if he

24   contends to the contrary, I guess I should know it.  But I

25   would have thought that you could come back to me and say make

Page 14

1   GM -- New GM comply with the arbitrator's award.  But you're

2   not trying to enforce the arbitrator's award.  You're trying to

3   attack it.  You're trying to attack the one-quarter of it you

4   don't like.

5           MR. SNYDER:  Your Honor, we're trying to say that if

6   there is judicial review of a statute that does not allow for

7   judicial review that the constitutionality of the statute, the

8   due process argument is the district court possesses

9   jurisdiction to that.  There's a crucial difference, Your Honor

10  -- and to me, this is the crux of our argument.  Putting the

11  core related and Petrie aside for the moment, whether this

12  Court has jurisdiction or not is to me not the issue.  The

13  issue is whether the California court has jurisdiction.  What

14  GM is saying is this Court has sole and exclusive jurisdiction.

15  That means of the 600 dealers that had their claims arbitrated

16  with GM, if they are unhappy with a portion of the award then

17  all 600 nondebtors with New GM, a nondebtor, that this Court

18  has sole and exclusive jurisdiction to determine under the

19  Federal Arbitration Act what a covered dealership is.  And I'm

20  suggesting that the California district court, whether as a

21  federal question or for constitutionality purposes, might also

22  have that jurisdiction because it can't be that as a result of

23  the wind-down agreements, when the Dealer Arbitration Act was

24  passed that the Court was willing to say we're going to pass

25  the Dealer Arbitration Act to give you dealers another bite at

Page 15

1  the apple.  But you have to go back to the bankruptcy court if

2  you want it enforced.  Now maybe this Court does have related-

3  to jurisdiction but it couldn't be, Your Honor, that there is

4  no right of judicial review and Congress' intent was that

5  everybody has to come back here.  And that's --

6        THE COURT:  I don't want to interpret you, Mr.

7  Snyder, but it wasn't related-to jurisdiction that I think is

8  in play here.  I think it's arising-in jurisdiction, the second

9  of the three prongs under 1334.

10        MR. SNYDER:  Understood, Your Honor.  And again, even

11  if this Court has arising-to jurisdiction, that is not what

12  we're arguing.  They are arguing -- and remember, Your Honor,

13  the motion seeks to compel us to withdraw a lawsuit in federal

14  court because the district court does not have jurisdiction.

15  And I think for the three reasons I've stated, the plain

16  language of 48(c), the introduction of a federal question and

17  the constitutionality of a law that does not allow for judicial

18  review, gives the California district court jurisdiction.  It's

19  not to say that this Court doesn't have jurisdiction but we

20  didn't start in this court.  We started in the federal court in

21  California.  They filed an answer.  They didn't move to

22  dismiss.  And then three days later, they filed the motion

23  here.  Not by order to show cause because they were so

24  concerned about the California's court jurisdiction but by

25  regular motion.  The -- we, in deference to this Court, didn't

Page 16

1    go into the California court to seek a stay.  We told them that

2    we would come here and explain to this Court why the Court, the

3    California court, has federal court jurisdiction.  They don't

4    reply to our arguments about Vaden and the ability of a federal

5    court to go through -- look through an arbitration.  The

6    decision is powerful, Your Honor, to the extent it allows you

7    to look through the arbitration and see if a federal question

8    is presented.  That's our issue, that federal questions are

9    presented, constitutionality presented.  Normally not an issue

10   but in a case where a statute is silent as to the right of

11   judicial review, the implication or the logical extension of

12   their argument is that everybody has to come back here.  And it

13   is submitted, Your Honor, that that's not what Congress

14   intended by leaving the statute silent.  We believe what they

15   intended is that the arbitration rules will allow the dealer,

16   the aggrieved dealer, to go into a court of competent

17   jurisdiction to get the relief they seek.

18           And although the judicial estoppel argument has gone

19   up and back, Your Honor, in their complaint, in paragraph 3 in

20   the Santa Monica case, they don't just rely on diversity when

21   they seek to compel Santa Monica to execute the settlement

22   agreement.  They rely on 28 U.S.C. 1331 to get the district

23   court's attention.  They rely on the Dealer Arbitration Act to

24   get the Court to execute -- to restrain Santa Monica.  Then

25   they come here and say this Court has sole and exclusive

Page 17

1   jurisdiction with respect to matters in the Dealer Arbitration

2   Act.  They didn't come here, Your Honor, when Santa Monica

3   sought to exercise jurisdiction and refused to sign that

4   settlement agreement.  They went to the California district

5   court.  And so, to argue that sole and exclusive jurisdiction

6   sits here but to rely on federal jurisdiction not just

7   diversity, 28 U.S.C. 1331 jurisdiction in California, to me,

8   rises to the level of judicial estop.

9           The last argument, Your Honor, which was the first

10  one you raised, is the applicability of Petrie and the ability

11  of the Court to enforce its orders.  And there's no doubt that

12  buyers have expectations and they want this Court to enforce

13  them and they have a right to come in here and seek that.  But

14  they have -- every provision of the wind-down agreement that

15  they have pointed to, other than the covenant to sue, is not

16  being implicated.  We were able to sue, commence an

17  arbitration, because the Dealer Arbitration Act allowed us to.

18  They actually state in their papers that us going into

19  California district court violated the covenant to sue.  Well,

20  how can that be?  How can that be that the statute allows us to

21  go to Califor -- and commence an arbitration but doesn't allow

22  it to enforce it anywhere?

23          The wind-down agreement is still the wind-down

24  agreement.  The dealer, Rally, and the other 600 dealers still

25  have certain obligations that they need to fulfill by October

Page 18

1    31st.  But the covenant not to sue is not one of them because

2    the statute that was codified in December 2009 gave the dealer

3    certain rights.  And they are limited rights.  They're not

4    happy with the outcome.  Rally believes that the definition of

5    covered dealer was inappropriately misinterpreted by the

6    arbitrator.  There is nothing in the wind-down agreement or the

7    363 order, Your Honor, that suggests they would have to come

8    back here for that.

9           Now, it's unfortunate that the statute is silent.

10   But issues of due process and federal question as well as the

11   AAA rules allow Rally to go into court in California to redress

12   those arguments.  That's our position.  Again, we're not

13   suggesting or it's minimally relevant that this Court has

14   jurisdiction.  Our question is does the California court have

15   jurisdiction.  GM thought it did under 28 U.S.C. 1331.  So do

16   we.  And that's the reason we object to them saying this Court

17   has sole and exclusive jurisdiction under the wind-down

18   agreements as if the Dealer Arbitration Act didn't exist.

19           THE COURT:  Well, you hit on something that I'm glad

20   you did, Mr. Snyder, because I want both you and Mr. Steinberg

21   to address it when it's your respective turns.  And, of course,

22   it's your turn now.  I would have thought that the Dealer

23   Arbitration Act trumps my order and the wind-down agreements to

24   the extent they're inconsistent.  But that the duty of any

25   Court is to try to construe them together to achieve harmony

Page 19

1   between them so there is the minimal clashing between the two

2   and that where, of course, the later Dealer Arbitration Act

3   speaks to something, it controls over my order but only to that

4   extent.  Do you think I'm off base from that?

5            MR. SNYDER:  I do not, Your Honor.

6            THE COURT:  All right.  Keep going.

7            MR. SNYDER:  And, Your Honor, I or Rally do not see

8   the ability to confirm a judgment, as that term is defined in

9   48(c), or if the district court should allow, modify or vacate

10  the judgment under the commercial arbitration rules as being

11  anything other than an extension of the arbitration which was

12  codified in the Dealer Arbitration Act.  It isn't a violation

13  of the covenant not to sue under the wind-down agreements

14  because under the wind-down agreements in July 2009, this was

15  not a sparkle in anybody's eye.  No one knew what Congress

16  would end up doing six months later.  They're looking to

17  prohibit us from doing something that wasn't even contemplated

18  at the time Your Honor entered that order.  This came six

19  months later.  And so the rules changed partially.  I'm not

20  suggesting the wind-down agreements are -- they say aggregated

21  -- none of that.  But the covenant to sue was.  And they were

22  allowed to commence arbitrations against New GM in order to get

23  rights back, thumbs up or thumbs down.

24            THE COURT:  Do you think it covers all covenants or

25  all suits or can you harmonize them by saying that if you win

Page 20

1    in the arbitrations that Congress has now given you, of course

2    you have the right to enforce that if your opponent, which in

3    this case is New GM, is so dumb as to try to welsh on the

4    arbitrator's ruling.  But that's really how they -- separate

5    provisions are best read together.

6            MR. SNYDER:  Your Honor, there's a reason why -- you

7    call it dumb, but there's a reason why the fifty states and

8    every federal statute except this one that I've seen has the

9    right of judicial review.  It's because if there is no

10   enforcement of a final or binding arbitration then the other

11   side could say, ha, forget it, I'm not doing anything 'cause

12   you have no place to go.

13           THE COURT:  Again, I remain troubled by the

14   distinction between enforcing the award which my tentative,

15   California style subject to your opponent's right to be heard,

16   is that if New GM hadn't complied with the arbitrator's award,

17   I would make it, and to attack the arbitrator's award which

18   invokes separate policy considerations.

19           MR. SNYDER:  Well, Your Honor, I would say that it

20   seems as if the rules which required findings of fact were set

21   up for judicial review.  If the arbitrator had simply said,

22   Your Honor, we're ruling against Rally because I know Larry

23   Mayle, the president, and I don't like him, where could we go?

24   If the Court is suggesting if that was the ruling that we could

25   go into this court to overturn or vacate an arbitration for

1    manifest disregard of fact and law out of an arbitration coming

2    out of the Dealer Arbitration Act, I don't see it.  I see it as

3    being a federal question that allows judicial review for

4    manifest disregard of facts and law through a federal court.

5    That's what the Supreme Court said in Vaden, that you can look

6    through the arbitration to see if a federal question exists.

7    GM doesn't even cite to Vaden in their reply brief.  But that

8    is uniquely a federal question.  Is Chevy a covered brand as

9    that term is defined under 747(a) and (d)?  What could be more

10   of a federal question than citing to the statute itself.  This

11   is not an abstract referral, Your Honor, where Rally was trying

12   to get around state jurisdiction.  This is questioning the

13   words of a federal statute.  And Rally would have never thought

14   to come to this court, Your Honor, as a result of an

15   arbitration to enforce or to ask this Court to make findings of

16   fact as to whether Chevy is a covered dealership as that term

17   is defined under 747(a) because although this Court might have

18   jurisdiction, the California court certainly has jurisdiction.

19            And, Your Honor, that's what we see as the

20   difference.  When I speak about losing or diminishing

21   jurisdiction in the sales process, I'm not suggesting that

22   buyers can't come back to get the benefit of their bargain.

23   But this was not the benefit of anybody's bargain because the

24   Dealer Arbitration Act wasn't even in existence at the time.

25   They couldn't have said we want this statute because we want no

Page 22

1   judicial review from the dealers.  What are you talking about?

2   There's no right to review anyway.  There's a covenant to not

3   to sue.  The Dealer Arbitration Act hadn't even been introduced

4   yet.  So they can't say they didn't get their expectation

5   'cause there was no expectation.  This was six months later.

6   So I don't see this as an enforcement of an order 'cause there

7   was no expectation that they would have that right.

8       (Pause)

9           THE COURT:  Okay.  Mr. Snyder, I'm going to give you

10  a chance to reply but is this a good time to hear from Mr.

11  Steinberg?

12          MR. SNYDER:  Yes, Your Honor.  Thank you.

13          THE COURT:  Thank you.

14      (Pause)

15          MR. STEINBERG:  Good afternoon, Your Honor.  I think

16  Your Honor's questions were very incisive and I will try to

17  answer them as best as I can and to try to point out why I

18  think my colleague has not fully answered Your Honor's inquiry.

19  I think Your Honor is correct that the real issue here is there

20  was a wind-down agreement.  Your Honor approved the wind-down

21  agreement that was part of the sale process.  And then

22  subsequently, Congress acted under the Dealer Arbitration Act.

23  So how do you mesh what you had done versus the later

24  congressional statute?

25          And I think it's important to distinguish what does

Page 23

1    the Dealer Arbitration Act do and what it specifically did not

2    do.  And the thing that it did, and I think my colleague has

3    agreed with this, is it provided dealers who either signed the

4    wind-down agreements or had their dealership agreements

5    rejected in either the Chrysler or General Motors cases a new

6    right created by a federal statute to be reinstated to the

7    dealer network of the debtor or the purchaser of the debtor's

8    assets.  And in order to avail themselves of that right, they

9    had to file timely notices in accordance with the Dealer

10   Arbitration Act for binding arbitration.  And I think my

11   colleague was correct.  It was either up or down.  Either

12   you're reinstated or you're not reinstated.  And the Dealer

13   Arbitration Act told arbitrators they had seven factors,

14   nonexclusive, to take a look at for purposes of making that

15   determination.  And there was specific and very, very tight

16   deadlines that were put in for the arbitration.  You had to act

17   to ask for arbitration within forty days.  You had six months

18   to complete the arbitration.  The arbitrator had seven days to

19   make its ruling and that everything had to be done by July 14th

20   because the legislative intent of the statute which was to try

21   to create what Congress thought was a better balance between

22   the rights of dealers and the rights of the manufacturers, the

23   legislative intent was we need to have a streamlined process

24   that would not otherwise get bogged down with discovery or

25   litigation.  We both quote -- at least our reply quotes from

Page 24

1    the legislative history to the statute which is fairly sparse.

2    But the legislative history refers to the need to have

3    something streamlined and quick and the statute does not

4    provide for judicial review unlike the Federal Arbitration Act

5    in Section 9, 10, 11 and 12.  There are specific provisions

6    which talk about what a Court can do or not do in connection

7    with something that is governed by the FAA.  This clearly is

8    not governed by the FAA.  The FAA governs agreements where the

9    parties had agreed to arbitrate.  This was not one of those

10   situations.  This was a case where Congress had imposed the

11   obligation or the right for the dealer to seek arbitration

12   under specific circumstances but it wasn't a contractual

13   obligation that the parties had bargained for.  So the FAA,

14   which is leadered (sic), the cases relating to the FAA, the

15   judicial review relating to an FAA, which my adversary recites

16   in his papers, they really have no relevance here.  And I think

17   Your Honor was right.  There is no judicial review.  And that

18   was, I think, intentional.  And I think my adversary says where

19   is it that you can never get judicial review?  You know,

20   Congress passes a statute not -- imposing a new right and then

21   says that's -- we'll have a procedure to implement that statute

22   and that's it.  And there's no more judicial review.

23           THE COURT:  Well, pause, Mr. Steinberg, because I'm

24   wondering if that proves too much.  Suppose the arbitrator's

25   taking bribes.  And suppose the forum is this court and the

Page 25

1    dealer's been victimized by the arbitrator taking bribes.

2    You're telling me that I can't look at that?

3            MR. STEINBERG:  I'm not sure if the right remedy

4    would have been to go to the AAA and say that there was an

5    invalid arbitration and seek the remedy there to invalidate the

6    results of the arbitration.  But --

7            THE COURT:  So you're going to take that and -- bring

8    it down and give it to the marshals and then you can return to

9    the courtroom.

10           MR. STEINBERG:  But I will say, Your Honor, that the

11   hypothetical that you posed which is that if there was a

12   violation of what Congress had enacted because they had bribed

13   the arbiter of the resolution, it would seem to me that there

14   needs to be some kind of review.  And maybe it would be Your

15   Honor who has the review.  I'm not sure whether it would be the

16   AAA that would review it.  But it would seem to me in a bribe

17   circumstance that that would be the case.

18           But I think critical for what my adversary has argued

19   which is that he's raised the potential for the

20   constitutionality of the Dealer Arbitration Act because there

21   is no judicial review, I don't know where that argument goes

22   for him because the Dealer Arbitration Act was a right given to

23   the dealers to potentially seek reinstatement.  If you declare

24   the statute unconstitutional then they don't have that right.

25   If he's asking you to put in to the statute that which doesn't

Page 26

1    exist which is to, in effect, write the judicial review section

2    when Congress didn't write it, I don't think Your Honor has the

3    ability to do that.

4          And I don't think -- you know, they spend ten pages

5    of their brief saying how we didn't comply with provisions that

6    is the judicial standard under the Federal Arbitration Act.

7    And I would say to Your Honor that that's irrelevant because

8    that's not -- there is no standard of judicial review.  And you

9    can't pick something from another statute and say that's what

10   I'm going to use here in order to make it constitutional.

11         Now, there is situations where Congress has given a

12   right to a party and there is no judicial review.  We cited in

13   our papers the Switchmen case which was actually quoted in

14   Thomas.  And we specifically highlighted the language which

15   said that "A review by the federal district court of the

16   board's determination is not necessary to preserve or protect

17   that right."  Congress, for its reasons on its own, decided

18   upon the protection of the right which it created.  And if you

19   look at Thomas itself, they talked about the concept of where

20   Congress has written legislation where it asked an agency to

21   make a decision.  And the issue was if the agency did something

22   wrong, can it get judicial review.  And there are certain

23   statutes that provide that there is no judicial review.  So the

24   Thomas case when it was written referred to Medicare

25   reimbursement and said that an agency's review relating to

09-50026-mg   Doc 7527-2   Filed 10/22/10   Entered 10/22/10 15:05:35   Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 293 of 374

Page 27

1   Medicare reimbursement is not subject to judicial review.

2   So --

3         THE COURT:  And Switchmen dealt with the Railway

4   Labor Act?

5         MR. STEINBERG:  Yes.

6         THE COURT:  And it was at least Thomas that was the

7   use of your "passum" if I recall.

8         MR. STEINBERG:  Yes.  And I apologize for that, Your

9   Honor.

10        So we have a situation here where there was a

11  legislative reason why things were done on a streamlined basis.

12  There is no language that talks about judicial review and there

13  is no issue I believe relating to constitutionality.  But if it

14  is, I don't think it gets them anywhere.  And it was nice that

15  they made this a central part of their oral argument when it

16  was relegated to a footnote in their brief which -- without any

17  real challenge other than just a throw-away that they question

18  whether it could be constitutional if there's no judicial

19  review.

20        Your Honor --

21        THE COURT:  At least it got your attention enough for

22  you to cover it from pages 8 through 10 of your reply.

23        MR. STEINBERG:  Yes, Your Honor, because I did think

24  it was an important issue and that Your Honor would want the

25  benefit of some briefing.  But I did not think that that was

09-50026-mg   Doc 7527-2   Filed 10/22/10   Entered 10/22/10 15:05:35   Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 294 of 374

Page 28

1    the center of the argument.

2         Similarly, you'll notice how their argument is

3    morphed because their papers said Your Honor didn't have

4    jurisdiction, didn't have core jurisdiction, didn't have

5    related jurisdiction, asked you to defer to the public policy

6    of the Federal Arbitration Act, to defer to an arbitration when

7    they weren't prepared to necessarily defer to arbitration.  And

8    now they, today, said well, we really didn't say you didn't say

9    you didn't have jurisdiction.  You just don't have exclusive

10   jurisdiction.  We think it may be concurrent jurisdiction.  So

11   they did move as well on that.

12        But I think, Your Honor, that the reason why you do

13   have exclusive jurisdiction and the reason why the wind-down

14   agreement is implicating is because there is no judicial review

15   of what the arbitrator did.  If there is no judicial review --

16   I think everybody agrees that the statute doesn't provide for

17   it explicitly.  If there isn't then what's left?  Because the

18   other thing that was critical as to the interplay between the

19   Dealer Arbitration Act and the wind-down agreement, the other

20   thing that's critical is that the Dealer Arbitration Act didn't

21   abrogate totally the wind-down agreement.  I think my

22   colleague, my adversary, has agreed that it didn't totally

23   abrogate it.  There are specific provisions that survive.  And

24   so, that if you have an arbitration which has been completed

25   because all the arbitrations had to be completed by July 14th,

Page 29

1    and that's it then what's left on the areas where there was no

2    reinstatement, the thumbs down for the Chevrolet dealership,

3    you're back to being governed by the wind-down agreement.  The

4    wind-down agreement provided that you couldn't sue New General

5    Motors.  That still applies.  There (sic) was abrogated solely

6    to the extent that the Dealer Arbitration Act allowed for this

7    binding arbitration remedy to be afforded to dealers who

8    availed themselves of the opportunity to seek arbitration

9    within forty days of the enactment of the Act.  Otherwise, the

10   wind-down agreement stayed in effect.  And the wind-down

11   agreement stayed in effect now for purposes for this entire

12   period of time that the Rally dealership was not entitled to

13   buy New General Motors vehicles because the wind-down provision

14   for that still stayed in effect.

15          THE COURT:  Mr. Steinberg, do you agree that if New

16   GM hadn't complied with the arbitrator's award on the three

17   brands for which the arbitrator ruled in Rally's favor that

18   Rally could have come back here to enforce it with or without

19   the no-sue clause?

20          MR. STEINBERG:  Yes.

21          THE COURT:  All right.

22          MR. STEINBERG:  Yes.  I agree with that because

23   there, the provision, I believe, is ancillary to the

24   arbitration decision.  They're looking to implement and enforce

25   the arbitration decision.  And I think that if it wasn't being

1    done since the arbitration is over, they do need to have some

2    kind of remedy.  And they should be able to come back to this

3    Court.  But I do think it's this Court because I do think that

4    part and parcel of the reason why there was exclusive

5    jurisdiction language in the sale order, exclusive jurisdiction

6    in the wind-down agreement that everybody who signed the wind-

7    down agreement signed was that New General Motors had bargained

8    for as part of the sale process -- had bargained for one forum,

9    this Court who had approved the transaction, to handle anything

10   relating to an enforcement or dispute relating to these

11   agreements.  And to take it more broadly, to handle anything

12   that related to, in effect, the assignment and the continuation

13   of the dealership network from Old GM to New GM.  And I think

14   that that was what New GM had bargained for here.  And I think

15   Rally understood that because they not only were passive on the

16   entry of the sale order but in the wind-down agreement they

17   specifically recognized the exclusive jurisdiction.  And that

18   didn't change.  That didn't change.  That's what New GM had

19   bargained for.

20           The issue, Your Honor, with regard to judicial

21   estoppel I think could be easily dealt with by the fact that in

22   the case where New General Motors went to a court, it was to

23   enforce a settlement agreement.  The Dealer Arbitration Act

24   specifically says that if you're going to settle then there is

25   no arbitration and that the arbitrator has nothing to do.  So

Page 31

1    when parties settle, they take themselves out of the Dealer

2    Arbitration Act totally based on the expressed language of the

3    statute.  Then if someone --

4            THE COURT:  Why didn't New GM come to me to enforce

5    that order?

6            MR. STEINBERG:  We could have, for sure, Your Honor.

7            THE COURT:  I'm sorry?

8            MR. STEINBERG:  We could have, for sure, done that.

9            Your Honor, the issue with regard to Rule 48(c) of

10   the Commercial Arbitration Rules, we did indicate that we

11   weren't fully adopting the Commercial Arbitration Rules.  The

12   Commercial Arbitration Rule, Rule 48(c), is for purposes of

13   seeking enforcement of an arbitration award and they are not

14   seeking enforcement of an arbitration award.  And the AAA rules

15   itself say that the rules will be applied only to the extent

16   that it's not inconsistent with the Dealer Arbitration Act.

17   And we believe to try to, in effect, implicitly put in a

18   judicial review concept through a rule that says that you can

19   move for enforcement where we had protested it is inconsistent

20   with the Dealer Arbitration Act which didn't provide for

21   judicial review.

22           Now, the fact that -- I think my adversary pointed

23   out to the fact that October 31 is fast approaching.  And under

24   the wind-down agreement, the Chevrolet dealership will be

25   terminated.  And the new dealership that New GM had promised to

Page 32

1  -- an entity that used to be a Saturn dealership that operated

2  in the area is going to be given.  And there are rights that

3  people have because of that unless something happens in this

4  court or another court.  But there is this ticking deadline

5  that is there.  And they never -- they filed a motion -- a

6  complaint in August.  They themselves have never moved for an

7  injunction or for a stay or to try to continue the October 31

8  deadline.  And I don't think that they can.  I think that they

9  had agreed that it would get terminated.  I think even the

10 Dealer Arbitration Act specifically wanted finality to these

11 issues and to have finality because it's not only New GM's

12 rights that are being implicated but we've had a dealer who's

13 effectively been on hold since December of 2009 waiting to go

14 in on November 1st.  And their rights will be implicated as

15 well.

16        I think that, Your Honor, that with regard to the

17 interplay between the wind-down agreement and the Dealer

18 Arbitration Act -- the two most critical things is that there

19 is no judicial review that's specified in the statute.  And

20 because there's no judicial review, you're left with a wind-

21 down agreement that had not been, in effect, modified at all

22 except for the overlay of allowing for binding arbitration on a

23 right given by Congress.  And therefore, the commencement of

24 the lawsuit after the award had been given by the arbitrator is

25 a violation of the wind-down agreement and the provisions that

Page 33

1    say that you should not sue and you should not interfere.

2        I will note, because it hasn't been said, that the

3    arbitrator gave his award in June and New General Motors gave a

4    letter of intent for the other four dealerships that the

5    arbitrator said had to be reinstated.  And Rally has been

6    reinstated for those other four dealerships.  And this --

7        THE COURT:  Oh.  So when I said it won three-

8    quarters, actually it won four-fifths?  Or with respect to four

9    of the five franchises that it once owned?

10       MR. STEINBERG:  That's correct.  So they are

11   operating right now.  And they got their letter of intent which

12   was supposed to be given by New General Motors, I think, with

13   ten days of the arbitration award.  It was only after that they

14   were well down the road to getting the four in place that they

15   decided to sue for the fifth.  And, Your Honor, our brief tries

16   to strip away the layers.  And to some extent when you orally

17   argue, you try to figure out how much of all the arguments you

18   have to make.  But this was even governed by the Federal

19   Arbitration Act.  I'm not even sure whether -- what they're

20   arguing about would be subject to any kind of judicial review

21   anyway.  We do set forth in our brief the arguments that we

22   think show that there was -- that the arbitration award was

23   consistent with what should have been done because there was

24   not one franchise agreement but there were five franchises

25   agreement.  And it's been dealt with because they've taken four

Page 34

1    of the five and we still have one that's outstanding.  And we

2    point to the language of the sales agreement which talk about

3    "General Motors separately on behalf of its division

4    identified" and talk about the "separate" nature of each of

5    these agreements.  The wind-down agreements uses the plural,

6    doesn't use the singular for purposes of talking about these

7    agreements.  And not to be overly cute about the argument, but

8    if they were right that this was one agreement and not five

9    agreements and the arbitrator found a taint with regard to one

10   portion of an integrated agreement then the result would be the

11   same as if it was an executory contract under the Bankruptcy

12   Code with five lease schedules as part of one integrated

13   agreement where the debtor couldn't perform all five.  It's an

14   all-up or nothing.  And if that's the case, there would not

15   have been a reinstatement for all five instead of one.  That's

16   the natural outflow of what their argument is which is that if

17   you've got a taint on an integrated agreement which is

18   nonsoluble then the whole agreement falls not that the whole

19   agreement becomes good.  And so, what you have here is someone

20   who got the benefits of four dealerships.  Then after they got

21   the four dealerships on the reinstatement decided to sue and is

22   now making an argument which is I want my cake, I want to eat

23   it, too, in the context of a statute that doesn't provide for

24   this type of relief.

25              Your Honor, if you'd just bear with me just one

Page 35

1    second, I just want to check my notes to see if I --

2              THE COURT:  Sure.

3              MR. STEINBERG:  -- have answered your questions.

4         (Pause)

5              MR. STEINBERG:  I think, Your Honor, when you said --

6    you asked my adversary the question did the Dealer Arbitration

7    Act trump the wind-down agreement for all purposes and he

8    answered no that it was incumbent on you to try to make the two

9    consistent and coherent that he was essentially making the

10   argument that I'm asking Your Honor to, as well, which is that

11   the wind-down agreement had vitality and it was modified for

12   purposes of the covenant not to sue solely for the purposes of

13   doing the binding arbitration procedure consistent with the

14   statute that Congress had subsequently passed.  Thank you.

15             THE COURT:  Okay.  Thank you.  Mr. Snyder, reply?

16             MR. SNYDER:  Your Honor, to first argue what is a

17   covered dealership, what is a not covered dealership to use

18   executory contract analyses versus using franchise law

19   analyses, using California law versus Title 11 law, that's

20   another reason why the California court has jurisdiction

21   because, again, what Mr. Steinberg is doing is saying well,

22   look, Judge, you have jurisdiction.  You can apply bankruptcy

23   law between two nondebtor parties as to what means a covered

24   dealership under the Federal Arbitration Act.  And any of the

25   600 dealers who applied for arbitration under GM could do that

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 302 of 374

Page 36

1    as well.  And it seems to me that if Congress meant to give

2    dealers and the AAA jurisdiction over these acts then by a

3    natural extension, he meant them to be final and binding.

4    Counsel for New GM sort of takes the car and then he hits a

5    brake.  He says the covenant not to sue was abrogated by the

6    Dealer Arbitration Act but it stops there, that there is no

7    right after the arbitration.  And that is not true and also

8    doesn't address the question of federal question jurisdiction

9    that the federal court can possess jurisdiction over.

10            And he raised the Thomas case, Your Honor, but the

11    statute involved in the Thomas case is the Federal Insecticide

12    Fungicide and Rodenticide Act.  In that statute, Your Honor,

13    and I cite to Section 136a(c)(1)(F)(iii) of Title 7:  "The

14    FIFRA arbitration scheme allows judicial review of 'the

15    findings and determinations of the arbitrator' only in the

16    instance of fraud, misrepresentation or other misconduct by one

17    of the parties to the arbitration or the arbitrator.  This

18    provision protects against arbitrators who abuse or exceed the

19    powers or willfully misconstrue their mandate under the

20    governing law."  So Title 7 allowed for judicial review or

21    allowed for a response to Your Honor's question as to what

22    happens when an arbitrator acts inappropriately.  Those last

23    quotes, by the way, Your Honor, were the Thompson v. Union

24    Carbide, 473 U.S. at 592.

25            Here there's nothing.  There's no ability for Rally

Page 37

1    or any of the 600 dealers to get redress as a direct result of

2    the arbitrator's conduct no matter what it is.  And so what

3    they're saying is everybody, come back here.  And we just don't

4    believe that's appropriate under the case law.  It's not

5    appropriate under Union Carbide.  It's not appropriate under

6    Vaden.  And it's not appropriate, we would suggest, under the

7    Second Circuit law.

8            Your Honor, the statute is less than a year old.  Of

9    course, the cases we need to use are cases by analogy which are

10   the FAA statutes.  So under the FAA -- I'm sorry -- line of

11   cases, there are agreements.  Agreed.  But that doesn't mean

12   the arguments aren't consistent because the AAA rules assume

13   that if you're a party to the arbitration you've agreed to

14   consent to the outcome.  In the Second Circuit case, in the

15   Idea Nuova case, the statute is silent just like the statute --

16   I'm sorry -- the agreement is silent just like the statute here

17   is silent.  AAA rules apply and we're not saying anything else.

18   And the Second Circuit said if the AAA rules apply then

19   whatever the arbitrator says is final and binding and the

20   unhappy party can then go to the district court and try to

21   confirm that arbitration.  Makes sense.  That's all we're

22   seeking to do here.  The statute is silent.  To suggest that we

23   have no right of judicial review of an arbitration belies the

24   fact that every stage plus Title 9 allow for confirmation,

25   vacature, review of arbitrations.

Page 38

1          Now, Mr. Steinberg is right.  The statute 48(c) only

2    speaks to judgment.  And maybe the California district court'll

3    say you can only seek to confirm the judgment.  You can't seek

4    to vacate it.  You can't seek to modify it.  And interprets

5    Rule 48(c) that way as counsel did.  But why can't Rally have

6    the chance to allow California law to do that?

7          Your Honor, this is important.  I'd like to go

8    through the wind-down agreement and the jurisdiction sections

9    because they are not inconsistent with the relief we're seeking

10   here.  This is from GM's own motion.  "The Court retains

11   exclusive jurisdiction to enforce and implement the terms of

12   this order, the MSPA," which is the wind-down agreements, "and

13   each of the agreements executed in connection therewith,

14   including the deferred termination agreement in all respects

15   including, but not limited to, retaining jurisdiction to

16   resolve any disputes with respect to or concerning the deferred

17   termination agreements."

18          There's no dispute regarding the deferred termination

19   agreements at all.  There's a dispute as to whether Chevy is a

20   covered dealership under the Dealer Arbitration Act.  We take

21   no position as to whether this Court -- the sale order speaks

22   for itself.  Section 13 of the wind-down agreement.

23   "Continuing jurisdiction.  By executing this agreement, Dealer

24   hereby consents and agrees that the bankruptcy court shall

25   retain full complete and exclusive jurisdiction to interpret,

Page 39

```
 1    enforce and adjudicate disputes concerning the terms of this

 2    agreement and any matters related therein and survives

 3    termination."

 4            Absolutely.  There's an October 31st deadline.  The

 5    wind-down agreement sets that out.  We're bound to the extent

 6    we're bound under the wind-down agreement.  We've asked GM to

 7    extend the October 31st date because of the late hour.  They've

 8    refused.  So now we have to deal with the October 31st deadline

 9    or get an extension by a court of competent jurisdiction.

10            But we're not addressing any of those provisions.

11    Our -- we are seeking jurisdiction based on the Dealer

12    Arbitration Act and not on the sale order and not on the wind-

13    down agreements.  This Court still has jurisdiction over those.

14            Your Honor, the argument about timing -- no good deed

15    goes unpunished.  They answered on September 7th and came into

16    this court on September 10th.  And then when we tried to get a

17    hearing date as quickly as possible, we agreed we wouldn't go

18    to the court in California to seek a stay if we could get a

19    hearing date on October 4th.  And we've abided by our agreement

20    and we're anxiously awaiting whatever the Court's determination

21    is going to be.  But we deferred to this Court first because

22    that's where New GM went.  And nobody delayed here.  As soon as

23    the motion was filed, we sought a quick hearing and we got one

24    thanks to chambers and Your Honor's courtesy.  But -- I believe

25    I'm finished.
```

Page 40

1           THE COURT:  All right.  Very well.  All right.  We're

2     going to take a recess.  I don't know how long it's going to

3     take me.  But you needn't be here before 4:30.  And I'll come

4     out with a ruling as soon thereafter as I can.  We're in

5     recess.

6           (Recess from 4:04 p.m. until 5:30 p.m.)

7           THE COURT:  Have seats, please.  I apologize for

8     keeping you all waiting.  In these jointly administered cases

9     under Chapter 11 of the Code, General Motors LLC, which I'll

10    normally refer to as New GM, moves for an order enjoining Rally

11    Dealership from interfering with New GM's ability to, as it was

12    put, to reform its dealership platform pursuant to a previous

13    order I entered, from vacating or modifying an arbitration

14    decision and from pursuing that effort in California district

15    court.

16          Rally was a GM dealership that was being closed

17    pursuant to an agreement that was acquired by New GM from Old

18    GM.  The Dealer Arbitration Act, which was subsequently signed

19    into law, provided an opportunity for dealers such as Rally to

20    become reinstated as New GM dealers, if they were successful in

21    a binding arbitration proceeding, with New GM.

22          Rally won its arbitration proceeding with respect to

23    three of its brands but not its Chevrolet brand.  Rally is

24    attempting to have this arbitration award modified or vacated

25    in a federal district court in California.  New GM argues that

Page 41

1    there is no right to modify the arbitration award and,

2    additionally, that my Court is the only forum that can hear

3    this issue.  In addition, New GM argues that Rally has been

4    interfering with New GM's establishment of an alternate Chevy

5    dealership in violation of its agreement with New GM.

6           While I understand the difficulties faced by dealers

7    such as Rally as a consequence of the events of last year, the

8    motion must be granted.  The following are my findings of fact

9    and conclusions of law in connection with this determination.

10          As facts, I find that on July 5th, 2009, I entered

11   the 363 sale order.  That sale order authorized and approved a

12   master purchase agreement dated as June 26, 2009, often

13   referred by the parties as the MPA, between Old GM and an

14   entity that later became New GM.  Pursuant to the MPA and the

15   363 sale order, on July 10, 2009, New GM purchased

16   substantially all of Old GM's assets free and clear of Old GM's

17   liabilities except as expressly assumed by New GM under the

18   MPA.

19          As part of the transactions that were approved under

20   the 363 sale order, Old GM entered into and assigned to New GM

21   certain deferred termination agreements, which we refer to as

22   wind-down agreements, which had originally been entered into

23   between Old GM and certain of its authorized dealers.  These

24   agreements had been offered to dealers as an alternative to

25   outright rejection of their dealer sales and service

Page 42

1    agreements, which we sometimes refer to as dealer agreements

2    under the rights afforded to debtors to reject executory

3    contracts under 365 of the Code.  The wind-down agreements

4    provided, among other things, that in exchange for certain

5    payments and other consideration, the affected dealers' dealer

6    agreements would terminate no later than October 31, 2010.

7          In December 2009, Congress enacted into law a new

8    statute called the Dealer Arbitration Act which gave wind-down

9    dealers such as Rally the opportunity to seek reinstatement to

10   the GM dealer network through a binding arbitration process.

11   Rally timely filed a request for arbitration and an arbitration

12   was held in May before an arbitration -- arbitrator in

13   California.  On June 8, 2010, the arbitrator issued an award

14   directing New GM to reinstate Rally's Buick, Cadillac and GMC

15   dealer agreements but ruling that Rally's Chevrolet dealer

16   agreement should not be reinstated.  New GM is now currently

17   attempting to establish another Chevrolet dealership in the

18   Palmdale, California area where Rally is located.  During this

19   process, the owner of Rally has continued to lobby New GM to

20   reinstate his Chevy dealership.  After various proceedings, New

21   GM determined to relocate the Chevy dealership to Lancaster,

22   California which triggered an action by Palmdale against the

23   city of Lancaster in the Superior Court of California.

24   Palmdale claims that the terms of an agreement between

25   Lancaster and the new Chevy dealership violated a state law

Page 43

1    that prevent cities from engaging in bidding wars to lure auto

2    dealers and other large sales techs generating businesses to

3    relocate them from one city to another.  The owner of Rally,

4    one Mr. Mayle, provided an affidavit on behalf of Palmdale in

5    that action.  New GM argues that Rally, through its agent, Mr.

6    Mayle, is providing assistance in litigation against New GM and

7    is interfering with the establishment of a new dealership in

8    violation of the wind-down agreement.

9          Rally argues that the arbitrator was bound by the

10   Dealer Arbitration Act to either reject or accept the entire

11   dealer contract and that the arbitrator exceeded his authority

12   by not reinstating the Chevy brand as well.  Thus, on August

13   13, 2010, Rally filed suit in California district court seeking

14   to vacate or modify the arbitration award and to prevent

15   termination of his Chevy dealer agreement though presumably

16   wishing to maintain intact the other aspects of the

17   arbitrator's award which maintained his dealerships for the

18   other three brands, Cadillac, Buick and GMC.

19         Rally alleges, in substance, that the arbitrator's

20   award in not giving him a complete victory was erroneous as a

21   matter of law in its failure to accept its position that all of

22   the separate brands had to be considered together in the

23   species of double or nothing.  He has not alleged that the

24   arbitration award was the result of bribery, fraud, corruption,

25   manifest disregard of settled law or any other ground that

Page 44

1    would be a basis for vacating an arbitration award if the

2    Federal Arbitration Act applied.

3              I'll now turn to my conclusions of law.  Turning

4    first to jurisdiction and within the jurisdiction umbrella,

5    first, to subject matter jurisdiction.  First, it's plain that

6    the district courts and bankruptcy courts in this district have

7    subject matter jurisdiction over this controversy.  The

8    applicable subject matter jurisdiction statute is 28 U.S.C.,

9    Section 1334, the section of the judicial code that follows the

10   judicial code sections relating to federal question, diversity

11   and admiralty jurisdiction.  1334 deals with subject matter

12   jurisdiction with respect to bankruptcy cases and proceedings.

13   That section provides, in relevant part, subsection (b), with

14   exceptions not relevant here, "the district courts shall have

15   original but not exclusive jurisdiction of all civil

16   proceedings arising under title 11, or arising in or related to

17   cases under title 11".

18             Rally addresses the issue of "related-to"

19   jurisdiction under 1334 but that isn't the relevant subject

20   matter jurisdiction issue.  Rather it's the "arising in" prong

21   of 1334 where New GM relies on an order I entered last year in

22   this case under which this Court retained exclusive

23   jurisdiction in paragraph 71(f) to "resolve any disputes with

24   respect to or concerning the deferred termination agreements".

25   The deferred termination agreements, which as I noted are also

Page 45

1   referred to as the wind-down agreements, included provisions by

2   which dealers and New GM contractually agreed that this Court

3   retained full and exclusive jurisdiction to enforce them as

4   well as to specifically preclude Rally and other wind-down

5   dealers from filing suit against New GM and taking any action

6   to interfere with New GM's establishment of additional

7   dealerships.  I'll note parenthetically that there was nothing

8   in the Dealer Arbitration Act to modify the subject matter

9   jurisdiction of the federal courts nor to modify any of my

10  earlier orders other than to provide what amounted to a defense

11  to enforcement of the deferred termination agreements if and to

12  the extent that a dealer prevailed in the arbitration process

13  for which Congress provided.

14        Rally did prevail in the arbitration process with

15  respect to three of its franchises and, presumably, would like

16  to avail itself and enforce that part of the arbitration award.

17  But it wishes to upset the arbitration result as to which it

18  didn't prevail and used the hoped-for alternative result, that

19  is, a reinstatement of its Chevy franchise, as a defense to its

20  duties under the deferred termination agreement which duties

21  otherwise obligated it to give up its Chevy dealership, that

22  being a classic "dispute with respect to or concerning the

23  deferred termination agreements".

24        Now, Rally may have come to an agreement by the end

25  of oral argument.  But in any event, I so rule that this Court

Page 46

1    does have subject matter jurisdiction over this controversy.

2            Similarly, I find that this is a core matter.  Under

3    28 U.S.C., Section 157(a)(2)(N), core matters include, with

4    exceptions not relevant here, orders approving the sale of

5    property.  The 363 sale order and my approval of the wind-down

6    agreement documented the outcome of those core proceedings.

7    And a proceeding such as the motion now before me which seeks

8    relief predicated on a "retained jurisdiction" clause in my

9    order resolving a core matter is a core matter as well.  The

10   decision in Eveleth Mines, 312 B.R. at pages 644 to 645, is

11   directly on point.  In that case, the Court noted the motion

12   that barred directly and necessarily comes out of a core

13   proceeding in this case, the debtors' motion for authority to

14   conduct a sale of assets of the estate free and clear of liens.

15   Court proceedings under 28 U.S.C., Section 157(b) fall under

16   the "arising under" or "arising in" jurisdiction of 28 U.S.C.

17   Section 1334(b).  Then the enforcement of orders resulting from

18   core proceedings are themselves considered core proceedings.

19           The Second Circuit has held similarly.  It's held

20   that bankruptcy courts are empowered to enforce the sale orders

21   that they enter and to protect the rights which were

22   established by the sale order.  See Millenium Seacarriers, 419

23   F.3d at 97; and Petrie Retail, 304 F.3d at 229-230.  Petrie

24   Retail is particularly instructive because it also dealt with a

25   dispute between two nondebtors addressing rights that were

Page 47

1    created by the sale order.  Though Petrie Retail was not

2    unanimous, it's no less binding on the lower courts for that

3    reason.

4            Now there can be no dispute what the sale order

5    actually said.  Nor can there be any dispute as to the wind-

6    down agreement said.  Section 13 of the wind-down agreement had

7    that continuing jurisdiction clause providing that the dealer

8    hereby consented to and agreed that the bankruptcy court would

9    retain full complete and exclusive jurisdiction to interpret,

10   enforce and adjudicate disputes concerning the terms of this

11   agreement and any other matter related thereto.

12           Here and to the extent Rally was successful in the

13   arbitration, of course that would be a defense to win any

14   effort to make it terminate its agreement.  And to the extent

15   that it wishes to either enforce the agreement as it has the

16   right to do with the three franchises for which it prevailed or

17   to defeat the agreement with respect to the one agreement where

18   it lost, in any event they concern the terms of the agreement

19   and, in particular, any other matter related thereto.  I don't

20   think that's subject to serious dispute.

21           Finally, I've considered and ultimately rejected

22   Rally's suggestion that I exercise discretionary abstention on

23   that.  Plainly, there is a right to invoke discretionary

24   invention under 1334(c)(1) of the judicial code.  That's 28

25   U.S.C. Section 1334(c)(1) which provides that nothing in this

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 314 of 374

Page 48

1   section prevents a district court in the interest of justice or

2   in the interest of comity with state courts or respect for

3   state law from abstaining or hearing a particular proceeding

4   arising under Title 11 or arising in or related to a case until

5   Title 11.  And while it speaks principally of state courts and

6   state law, I accept for the purposes of this analysis that we,

7   bankruptcy courts have the power to abstain in favor of other

8   federal courts when the circumstances so warrant.  But I don't

9   believe that the factors here so warrant.  Standards that have

10  been articulated for the exercise of discretionary abstention

11  include of the efficient administration of the bankruptcy

12  estate, comity, the degree of relatedness or remoteness of the

13  proceeding to the main bankruptcy case, the existence of the

14  right a trial and prejudice to the involuntarily removed party.

15  Some of these, obviously, come in removal cases.

16          Here, I think the factor that is most important is

17  the effect of the effect deficient administration of the

18  bankruptcy estate.  This was a procedure that needed to be

19  resolved quickly as evidenced by the very tight time frames

20  that Congress imposed.  As important or more so, the bidders of

21  the world that come in to bid for assets in the bankruptcy

22  court must have knowledge that bankruptcy courts will stand by

23  the documents as they were then drafted to give the parties to

24  those agreements the predictability in their relations for

25  which they are binding and upon which they justifiably rely.

Page 49

1    The Court in Eveleth Mines explained "as applied to a sale free

2    and clear of liens, there are also good policy reasons for

3    making a derivative core proceeding classification.  Active

4    bidding on assets from bankruptcy estates will be promoted if

5    prospective purchasers have the assurance that they may go back

6    to the originally forum that authorized the sale for a

7    construction or clarification of the terms of the sale that it

8    approved.  Relegating post-sale disputes to a different forum

9    injects an uncertainty into the sale process which would dampen

10   interest and hinder the maximization of value.  A purchaser

11   that relies on the terms of a bankruptcy court's order and

12   whose title and rights are given life by that order should have

13   a forum in the issuing court."  That is very strong guidance

14   that suggests that a Court, like me, should not abstain in

15   favor of another jurisdiction.

16         Similarly, comity is a factor that I would take into

17   account if there were, as contrasted to here, strong state law

18   concerns.   But here, of course, there are not.  I, no less

19   than a district court, either in New York or California, can

20   determine that which is just in determining whether or not to

21   enforce or, as more relevant here, to undercut an arbitration

22   award.

23         The degree of relatedness or remoteness of the

24   proceeding to the main bankruptcy court is subject to a double

25   entendre.  On the one hand, this is not going to affect the

Page 50

1    assets and order of its liquidation in court.  But the factors

2    articulated in Eveleth Mines likewise cause Courts here to be

3    slow to abstain because giving purchasers of assets the comfort

4    that their needs and concerns are going to be addressed is

5    pretty important.

6              I consider the existence of the right to a jury trial

7    inapplicable because I assume that this would be decided

8    without a jury trial in either events and I also consider

9    prejudice to the involuntary removed party under the facts of

10   this case.

11             So for all of these reasons, I decline to exercise

12   discretionary abstention.

13             Now turning to what I should do with this controversy

14   before me.  Both sides now seem to agree that the Federal

15   Arbitration Act doesn't apply because it implements contractual

16   agreements to arbitrate.  And here, the right to compel

17   arbitration comes not from a contract but from the Dealer

18   Arbitration Act itself.  And it also now appears to be

19   undisputed that the Dealer Arbitration Act doesn't provide for

20   judicial review of arbitration awards issued after the

21   mechanisms for which the Dealer Arbitration Act provides.

22             Nor do I think that I can or should find an applied

23   right to judicial review under that statute.  First, as you

24   know from reading many earlier decisions that I've issued, I

25   start with textural analysis where I note the significant

Page 51

1    absence of such a provision when federal statutes routinely

2    provide for rights to federal -- to judicial review when that

3    is the congressional intent.  If I were to imply such a

4    provision here that would be a species of judicial legislation.

5    Second, assuming without deciding that I could appropriately

6    look at legislative history on a matter where the statute is

7    not in any way ambiguous, judicially in grafting rights under

8    that statute would be particularly inappropriate when they'd be

9    inconsistent with the congressional desire to establish this

10   mechanism to avoid the excessive costs and delays of litigation

11   and to impose tight deadlines to get the arbitration process

12   completed.

13           Nor can I accept Rally's argument that New GM

14   conceded a right to judicial review by reason of its

15   willingness to proceed under the AAA's commercial arbitration

16   rules.  In responding to Rally's arbitration demand, New GM

17   expressly stated that it did not waive any objections it might

18   have to the arbitration or to any of the AAA's commercial

19   arbitration rules including, in particular, where such rules

20   would be inconsistent with the provisions or purposes of the

21   Dealer Arbitration Act.  For that same reason, I can't find a

22   waiver on the part of New GM of its rights based on a failure

23   to protest again after its initial reservation of rights was

24   put on the record.

25           Then even if New GM had agreed to AAA arbitration

Page 52

1    rules, the arbitration rules called for a mechanism to enforce

2    an award not to attack it.  Those rules provided that parties

3    to an arbitration under these rules shall be deemed to have

4    consented the judgment upon the arbitration award may be

5    entered in any federal or state court having jurisdiction

6    thereof.  See Rule 48(c) of the AAA Commercial Rules quoted at

7    paragraph 29 of the Rally brief.

8           But that language conveys a right to enforce the

9    arbitration award not to attack it.  For example, if New GM had

10   failed notwithstanding the arbitration award that Rally doesn't

11   complain about to let Rally keep the three franchises the

12   arbitrator said Rally could keep, Rally could have, at least

13   arguably if not plainly in my view, come back to me and say

14   make New GM do what the arbitrator said it should do.  But this

15   is the exact opposite of what we have here and one that's not

16   authorized by the federal statute.

17          As I indicated in oral argument, and I think both

18   sides agreed, the reasonable course for a judge in my position

19   would be to construe the Court's earlier order and the

20   subsequently enacted federal legislation to achieve as much

21   harmony as possible and to honor the congressional intent to

22   the extent that the federal legislation trumped my earlier

23   order.  But it would also be appropriate in my view to honor

24   the congressional intent only to the extent that the federal

25   legislation trumped my earlier order.  Congress did say, of

Page 53

1    course, with respect to providing for a defense to enforcement

2    of the wind-down agreements with respect to any areas where the

3    arbitrator ruled in the dealer's favor.  And I think that if

4    New GM had failed to honor the arbitrator's award, as I

5    indicated a moment ago, I'd almost certainly enforce it.  But

6    that is the way by which we'd maintain harmony between my

7    earlier order and the new Dealer Arbitration Act providing for

8    the rights of dealers to invoke the arbitration mechanism in

9    the fashion for which Congress provided.  It doesn't provide

10   for a blank check from me to rewrite the Dealer Arbitration

11   Act.

12          Nor do I think that Rally can get around what is, in

13   essence, an effort to achieve a quasi-appellate review of the

14   arbitration award by saying that it's asking the California

15   district court to make a federal question type determination

16   under the Dealer Arbitration Act.  That might be the case if

17   Congress hadn't established the arbitration mechanism and if it

18   had conferred on the district court's jurisdiction to decide

19   issues as to what is or is not a dealership franchise.  But the

20   whole point of the statutory scheme was that New GM and dealers

21   would proceed by arbitration.  And while, if New GM had refused

22   to arbitrate in the first place, I think that at least I would

23   have had jurisdiction to order New GM to do so.  But now that

24   each of New GM and Rally have engaged in the arbitration

25   process, presumably without any Court forcing either to do so,

Page 54

1    we can't make the underlying arbitration award evaporate.  We

2    can only consider the circumstances, if any, under which the

3    arbitration award is subject to judicial review.  And I've

4    already noted, of course, that the statute doesn't provide for

5    such review.

6             Now, in that connection, I do not believe that under

7    the allegations we have here, this construction raises

8    constitutional issues.  I assume without deciding that

9    procedural due process requires a quasi-judicial determination,

10   like an arbitration, to be conducted by a decider who isn't

11   taking bribes or conspiring with one or another of the parties

12   or, though it's more debatable, who ignored facts or binding

13   authority on point.  If there were such a contention, I'd at

14   least have to consider whether I'd address it.  And I think

15   it's better to construe the Dealer Arbitration Act in such a

16   fashion as to avoid any constitutional issues that would

17   otherwise be relevant.

18            But I have no allegations of bribes, conspiracy,

19   fraud or even manifest disregard of existing law in the matter

20   before me.  Though, if there were such allegations, I think I'd

21   have to seriously consider whether there might be some implied

22   right to remedy such a wrong or that in exercising my exclusive

23   to jurisdiction to enforce or, impliedly, deny enforcement of

24   the deferred termination agreements, I should take such facts

25   into account.  But once more, I emphasize that I have no such

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 321 of 374

Page 55

1    allegations here.

2            In the absence of issues of that character, I think

3    that Thomas and, particularly, Switchmen, the two decisions by

4    the Supreme Court, apply to establish a rule that where an

5    arbitrator was given the power to resolve controversies under a

6    statute, that is, the Dealer Arbitration Act, where dealers and

7    New GM were given rights under that statute, reviewed by the

8    federal district courts or, of course, bankruptcy courts that

9    are arms of the district court and have the power to issue

10   final orders on core matters, of the arbitrator's determination

11   is not necessary to protect those rights.  I think I should

12   restate it because I put too many parentheticals in there.

13   Where dealers and New GM were given rights under the statute

14   reviewed by the federal district courts of the arbitrator's

15   determination is not necessary to protect those rights.  And,

16   of course, that's a paraphrase of Thomas, 473 U.S. at 588

17   quoting Switchmen where I'm analytically substituting the

18   Dealer Arbitration Act for the Railroad Labor Act and where I'm

19   substituting arbitrator's determination for board's

20   determination.

21           So I don't believe that judicial review is necessary

22   except in those cases not presented here, and here only

23   arguably, where there are allegations of fraud, corruption or

24   manifest disregard of an existing decision.  And for reasons I

25   described above, I think the exclusive jurisdiction provisions

Page 56

1    of the sale order must stick.

2            First, of course, they're res judicata so they remain

3    binding in the absence of an appellate ruling changing them for

4    a legislative pronouncement that does so.  Second, I assume

5    without deciding that Congress could, if it wished, to have

6    taken my exclusive jurisdiction away just as Congress can take

7    away jurisdiction from the lower federal courts on other

8    matters.  But Congress didn't do that.  If we temporarily put

9    aside issues as to the right to judicial review and decisions

10   as to the merits, I assume, without deciding, that a California

11   district court could under its diversity jurisdiction have

12   subject matter jurisdiction over a controversy like this one.

13   But if it did, it would be foreclosed from exercising its

14   subject matter jurisdiction by reason of the final exclusive

15   jurisdiction order that I entered back in July of 2009.  This

16   is no different analytically than the effect that an exclusive

17   jurisdiction order would have over a state court proceeding.

18   Most state courts don't need an expressed grant of subject

19   matter jurisdiction to hear controversies before them.  They

20   normally have subject matter jurisdiction over whatever comes

21   through their doors.  But that doesn't mean that they can hear

22   controversies when a court order or other federal law, like

23   some federal antitrust laws or securities laws, give a federal

24   court exclusive jurisdiction.  Some federal statutes and the

25   order that I entered into are limits on jurisdiction that might

Page 57

1    otherwise exist.

2            Then Rally makes a judicial estoppel argument noting

3    that in a proceeding against another dealer, New GM brought an

4    action in federal court in California invoking diversity and

5    federal question jurisdiction, the latter under the Dealer

6    Arbitration Act, seeking to require that dealer to comply with

7    a settlement agreement and to drop its efforts to proceed under

8    the Dealer Arbitration Act.  Frankly, I'm not impressed with

9    the wisdom of that approach and, for the life of me, can't

10   understand why New GM sought relief that way instead of coming

11   to me.  But I don't think its effort in that regard rises to a

12   level of a judicial estoppel.

13           Rally depends on three statements to establish its

14   claim of judicial estoppel.  They are that the district court

15   would have jurisdiction under 28 U.S.C. 1332; that the district

16   court would have federal question jurisdiction under 28 U.S.C.

17   1331 because the controversy there allegedly arose under the

18   Dealer Arbitration Act; and that arbitrators would only be

19   empowered to decide whether or not the specific dealership

20   should be added back to the GM dealer network and that "all

21   other issues that arise under the Act must be addressed by a

22   Court of competent jurisdiction".

23           I don't think that any of these are particularly to

24   the point.  I've noted before that I assume that diversity

25   jurisdiction provides subject matter jurisdiction to the

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 324 of 374

Page 58

1    California court here.  But I've also ruled that that can't

2    trump the bankruptcy court's exclusive jurisdiction provision.

3    And while I disagree that there and here would be federal

4    question jurisdiction under the Dealer Arbitration Act for the

5    particular claim there and here asserted, even if there were

6    such federal question jurisdiction, once more, it wouldn't

7    trump the bankruptcy court's exclusive jurisdiction provision.

8    And I don't think there's anything particularly inconsistent

9    between New GM's third point in that Santa Monica action and

10   the points it's making here given the difference between the

11   facts in each of those cases and the context in which New GM

12   made its observations.  There, an attempt to enforce a

13   settlement agreement under which the namees (ph.) agreed to

14   dismiss their arbitration and New GM was saying that

15   arbitration wasn't appropriate at all rather than dealing with

16   the consequences of a completed arbitration in which there was

17   an arbitration award.

18         But even if there were, I'd see other problems in

19   invoking judicial estoppel as well.  As Rally notes, at page 23

20   in its brief, citing the Second Circuit's decision in Uneeda

21   Doll Company, "judicial estoppel prevents a party from

22   asserting a factual position in one legal proceeding that's

23   contrary to a position that it successfully advanced in another

24   proceeding".  Here, aside from the lack of inconsistencies, the

25   positions that have been taken are legal not factual.  And

Page 59

1    there, New GM didn't ask the Santa Monica Motors court to

2    interpret or enforce the wind-down agreement or, indeed, to

3    interpret or enforce the Dealer Arbitration Act at all.  The

4    latter point is why I think that New GM was just wrong when it

5    then tried to invoke the latter as a basis for 1331

6    jurisdiction.  I'm not sure what it was thinking.  But under

7    the standards of New Hampshire v. Maine, I find that the

8    positions are not clearly inconsistent and I cannot find any

9    perception that either the first or the second Court was misled

10   or that New GM would derive an unfair advantage here if not

11   estopped.

12          Finally, I think that even if judicial review were

13   available of the arbitrator's award, I couldn't vacate the

14   arbitrator's award here.  First, even if the arbitrator was

15   wrong, I don't see the arbitrator having been so wrong that the

16   error would warrant bucking fundamental principles limiting the

17   scope of review of arbitration awards.  There was no case

18   supporting Rally on this issue.  Rally is, in substance, asking

19   the Court or the Courts to, in essence, make new law on this

20   point.

21          And assuming, though for reasons I just noted, I

22   think this assumption is unwarranted, that I could provide ab

23   initio review of the arbitrator's decision, I think the

24   arbitrator got it right at least on the arbitrator's assumption

25   that he could rule one way with respect to the Buick, GMC and

Page 60

1    Cadillac franchises and differently with respect to the Chevy

2    franchise.  I think the dealer's sales and service agreements

3    have to be read separately.  Each stated that it was executed

4    by GM "separately" on behalf of its division identified in the

5    specific addendum.  And each dealer agreement provided that the

6    agreement for each line make is independent and separately

7    enforceable by each party and the use of the common form is

8    intended solely to simplify execution of the agreements.  So I

9    think that in light of that, Rally had five franchise

10   agreements under which the arbitrator's ruling focusing on each

11   brand separately would be more than merely reasonable.  If

12   otherwise warranted by the underlying facts, it would be right.

13        For the foregoing reasons, New GM is to settle an

14   order in accordance with the foregoing as quickly as reasonably

15   possible, that order to be settled on no less than two business

16   days' notice by hand, fax or e-mail.  I assume that New GM will

17   use one of those methods so I don't have to provide for an

18   alternative mechanism if it were to use snail mail.  The time

19   to appeal from this determination will run from the time of

20   that order's entry and not from the time of this dictated

21   decision.

22        All right.  Not by way of reargument, are there any

23   matters that I failed to address or any questions?

24        MR. SNYDER:  No, Your Honor.

25        THE COURT:  Hearing none, we're adjourned.  Good

Page 61

1    evening, folks.

2            MR. SNYDER:  Your Honor, if I may just quickly?

3            THE COURT:  Yes, Mr. Snyder?

4            MR. SNYDER:  Your Honor, under Bankruptcy Rule 8005,

5    to the extent we seek a stay pending appeal and that would be a

6    necessary predicate for an award, for the reasons set forth in

7    our papers and in the oral argument, I request -- am making

8    this oral application for a stay of Your Honor's order pending

9    appeal.

10           THE COURT:  I'll accept the oral application for a

11   stay but we'll do it after a ten minute recess.  And each of

12   you can make your points at that point in time.

13           MR. SNYDER:  Thank you, Your Honor.

14      (Recess from 6:19 p.m. until 6:37 p.m.)

15           THE COURT:  Have seats, please.  Okay.  Mr. Snyder,

16   your application for a stay.

17           MR. SNYDER:  Thank you, Your Honor.  Your Honor, in

18   your decision, I believe the Court stated -- and I apologize if

19   I'm putting words in the Court's mouth -- that areas such as

20   manifest disregard for the law and fraud were not areas that

21   were alleged here.  And that might be properly the province if

22   not exclusively the province of the district court in

23   California.  And I would ask the Court to turn to, Your Honor,

24   Exhibit I which is Rally's petition to modify.  And in Exhibit

25   I, Your Honor, starting on page 10, whether appropriately or

Page 62

1    not, Rally uses the Federal Arbitration Act as a guide as to

2    what the district court can look to when determining whether it

3    has jurisdiction.  And it starts at the bottom of page 10, and

4    I'm quoting, "that the arbitrator in this matter was guilty of

5    misconduct, misbehavior and exceeded his power, i.e., manifest

6    disregard by ruling on a matter not submitted for determination

7    and, (2)attempting to fashion a remedy not authorized by

8    Section 747 of the Act."  And the argument goes on and a little

9    farther down, it addresses corruption, fraud and undue means by

10   GM which, again, although it mirrors a section of the FAA, is

11   also grounds that Rally sought in the California district court

12   in order to vacate and modify the arbitration.  So I wanted the

13   record clear that the manifest disregard of the law, fraud and

14   the usual grounds that a party would seek whether under a state

15   statute or the federal arbitration statute to undo the

16   arbitration were pled by Rally in the California action.  And

17   so, I believe that those types of matters, and I believe Your

18   Honor pointed this out, matters of manifest disregard, fact and

19   law as well as fraud, corruption, mistake and exceeding powers

20   are matters that the California district court should hear --

21   can hear, excuse me, and should hear.

22        Your Honor, has basically said that you have sole and

23   exclusive jurisdiction even though the district court may have

24   jurisdiction over these matters.  And as respectfully submitted

25   that the Court may have concurrent jurisdiction but over

Page 63

1    matters such as manifest disregard of the law that the federal

2    district court in California also has jurisdiction over this

3    matter.  And it's properly before it now.

4            With respect to the federal question, again, Your

5    Honor seemed to indicate in his decision that the sole and

6    exclusive jurisdiction was given to the bankruptcy court as a

7    result of the wind-down orders.  The Court did not address as

8    we go through in detail, starting at page 28 of our objection,

9    the decision of the Supreme Court in Vaden v. Discover Bank.

10   And I alluded to it, Your Honor, in the original argument.  But

11   the Supreme Court, overturning, I believe, four circuit courts

12   in Vaden, specifically held that they can look through the

13   petition to look at the parties' underlying substantive

14   controversy.  And, Your Honor -- and this is where the Court

15   and Rally might differ.  The substantive controversy, the

16   predicate of the petition arises under the Dealer Arbitration

17   Act.  It does not arise under the wind-down agreement because

18   it was created not from the wind-down agreement but the Dealer

19   Arbitration Act.  So I think there's compelling reasons as a

20   result of the recent Supreme Court case in Vaden to allow the

21   federal district court to hear a federal controversy arising

22   out of a federal statute.  And I've been practicing here for a

23   long time, Your Honor.  To the extent that it's an issue

24   involving a purchaser wanting to get its -- the value of what

25   it bargained for, we are not saying this Court does not have

Page 64

1    jurisdiction.  The Court has already held that it has arising-

2    to jurisdiction and it may well have that jurisdiction.

3            But I think I've pointed to at least two, the federal

4    question issue as well as the due process constitutionality

5    issue as to why the California district court has strong --

6    strong subject matter -- rights to exercise its subject matter

7    jurisdiction.  This is not a cursory -- a statute that only

8    cursorily affects the federal court, but it directly affects

9    the federal court.  And I believe, Your Honor, for those

10   reasons, the Court not entertaining or analyzing that and then

11   not seeing that the petition itself does seek -- does allege

12   manifest errors of law as well as fraud and improper powers by

13   the arbitrator that we would be successful on the merits.  And

14   we would be able to, Your Honor, obtain a stay of Your Honor's

15   order to the extent it would give us additional time to seek a

16   stay or to seek a determination in either the district court

17   here or in California.

18            THE COURT:  Well, I understand your desire to go to

19   the district court here.  I have more trouble trying to go to

20   the district court in California.  In fact, that walks, talks

21   and quacks a lot about the actions that Judge Weinfeld found so

22   objectionable in Teachers Insurance v. Butler before the Second

23   Circuit said what it said in Teachers Insurance v. Butler where

24   there was never to collaterally attack his judgment by going to

25   another court.  I mean, I don't claim to be infallible, Mr.

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 331 of 374

1    Snyder, but it seems to me that if somebody's going to say that

2    I'm wrong, it's got to be either the district court or the

3    Second Circuit.

4            MR. SNYDER:  Your Honor, we were in front of the

5    California district court before GM was here.  We can always go

6    back to the filing of the bankruptcy case.  But this is clearly

7    different than Teachers.  Here, we have already commenced an

8    action in the California district court.  We're not forum

9    shopping and running to California because we don't like what

10   the Court is saying.  We deferred in this case because they

11   made the motion that we were going to defer to the bankruptcy

12   court before we took any action in California.  But we're not

13   looking around for a second bite of the apple.  We're already

14   in California.  Issues already been joined.  They've already

15   answered.  So we're at summary judgment stage anyway in

16   California and we have a ticking clock of October 31st.  That's

17   very different than going to another Court when you don't like

18   what this Court has to say, Your Honor.  I mean, I don't know

19   if we need to address that here.  But that's not what we're

20   looking to do.  It's for powers other than I to decide whether

21   we seek a stay here or we go back to the Court where there's

22   been a complaint and answer filed and seek a stay there.  I'm

23   being straightforward with the Court.  It's not our intent and

24   I know the Court might have discomfort with that, but the

25   action was already commenced there.  And that's what led to GM

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

Page 66

1    coming here.

2          THE COURT:  Well, forgive me, Mr. Snyder.  The reason

3    that you can truthfully say it's discomfort is because I try

4    very hard to consume my anger and to maintain my demeanor.  I

5    fully understand the rights of any litigant before me to take

6    me up the street.  But going to another Court right after

7    you've litigated before me for the last three hours and I've

8    given you a ruling which may or may not be right but which was

9    after a lot of thought and effort is one that is more than a

10   source of discomfort.

11         Why don't you continue with the remainder of the

12   three bullets on the applicable case law on an entitlement to a

13   stay and address, if you will, what you're prepared to offer in

14   the way of a bond if I grant a stay?

15         MR. SNYDER:  Your Honor, the argument with respect to

16   the constitutionality -- I had made the argument with respect

17   to whether a federal question exists vis-à-vis the

18   interpretation of the federal statute and going behind the

19   arbitration.  I made as well -- I would point out, Your Honor,

20   actually there are four grounds.  The third one is diversity.

21   And I think although GM was silent on it, the Court, I believe,

22   in its decision, admitted that diversity exists but, again,

23   stated that the sale order would trump the district court even

24   though diversity might existed there.  And the fourth argument,

25   Your Honor, is 48(c) and Your Honor is correct.  It does just

Page 67

```
 1   refer to judgment.  It does not refer to the right to vacate or
 2   amend or to modify.  It's respectfully submitted, though, Your
 3   Honor, that the district court can make that decision as well.
 4   Your Honor may be right in all they can do is say thumbs up or
 5   thumbs down with respect to a judgment.  But at least with
 6   respect, I believe, to the fifty state laws, with respect to
 7   arbitration and the FAA, it's not so limited, that applicants
 8   are usually allowed by statute, certainly under the FAA, to not
 9   only seek a judgment but to modify or vacate.  But that's
10   something the California district court may hold as well, Your
11   Honor.
12           And because there are five sep -- four separate
13   grounds, the constitutionality, the federal question, the
14   diversity and Rule 48(c), in Rally's mind, is more than a
15   compelling reason to hold that concurrent jurisdiction exists
16   and not simply exclusive jurisdiction exists.  That Your
17   Honor's sale order says what it says but that the Arbitration
18   Act raises issues that need to be addressed.  And it's
19   submitted by saying diversity exists but the sale order trumps
20   it, Your Honor, I would suggest that the district court in
21   California does have jurisdiction and does also have the
22   authority to hear these issues.  And for those reasons, I think
23   the Court or Rally would be successful in arguing that it would
24   be successful on the merits on those four particular grounds.
25           I would state also, Your Honor, that the judicial
```

Page 68

1    estoppel argument is just fascinating to me.  I -- you asked a

2    question of GM and it was your last question, I believe, which

3    was are you saying you could have gone to New York or

4    California but you decided to go to California.  And they said

5    yes.  And so, what they're basically saying is we can go to

6    California or New York but you can't.  And that argument is, in

7    essence, saying we've waived subject matter jurisdiction by

8    entering into the wind-down agreements.  And I don't believe

9    that's correct.  And I believe if GM can go into New York and

10   California then Rally can go into New York and California.  And

11   to simply say that we're -- our fortunes rise and fall here,

12   well, neither -- GM's fortunes didn't rise and fall here

13   either.  They chose not to come here.  And so I think we should

14   have that same right.

15           And for those reasons, Your Honor, we'd like a stay

16   of Your Honor's order until there is an appropriate order of

17   the district court.

18           THE COURT:  All right.  Mr. Steinberg?

19           MR. STEINBERG:  Your Honor, in the context of the

20   order that you've indicated that you will enter, a stay pending

21   appeal makes no sense.  And the whole oral argument that you

22   heard here before was really a reargument motion and was not a

23   stay pending appeal motion.

24           Your Honor has indicated that it was inappropriate

25   for them to go to California and to continue to prosecute the

Page 69

1    action in California.  So if you're going to stay the entry of

2    the order, what does that mean as a practical matter?  After

3    having ruled that it was improper to go to California, he now

4    is actually asking you to stay that order so he can go to

5    California?  Which is 180 degrees of the relief you just

6    granted?  This is not like he has a judgment and he wants to

7    stop us from enforcing the judgment because he wants to take

8    his appellate rights.  I'm trying to collect on a monetary

9    judgment.  This is started because he shouldn't have gone to

10   California in the first place.  He shouldn't have violated the

11   wind-down agreement.  He should have done -- he didn't have a

12   judicial right.  And now he's asking Your Honor to stay it so

13   he can, in effect, do what he started to do which was the

14   reason why we brought the motion in the first place.

15          But I think he didn't answer your question what are

16   the four prongs for a stay pending appeal.  He did talk about

17   the likelihood of success on the merits.  And I don't think he

18   said anything today other than try to reargue what Your Honor

19   had just ruled upon as to the likelihood of success on the

20   merits.

21          Frankly, the other three grounds all, I think, favor

22   New General Motors.  The harm to the appellant -- well, on the

23   surface, one could say he's harmed because the Chevrolet

24   dealership will be terminated on October 31st.  The actual harm

25   is that he didn't have a judicial right and you're not

09-50026-mg    Doc 7527-2    Filed 10/22/10    Entered 10/22/10 15:05:35    Exhibits G-M
MOTORS LIQUIDATION COMPANY, et al.
Pg 336 of 374

Page 70

1    depriving him of a judicial right.  Conversely, the harm to

2    others being the appellee, which is New General Motors and the

3    new dealership, are dramatic if Your Honor's order is not

4    enforced.  And Your Honor's opinion addressed the public

5    interest element which is the necessity of protecting buyers in

6    a Section 363 order and the Court's exclusive jurisdiction and

7    the public interest that's involved there.

8           I think the only other thing I would add, and it has

9    nothing to do with the stay pending appeal other than the

10   likelihood of success, I'll just point out that he wants to

11   refer to the complaint that was -- the petition that was filed

12   by Rally in California.  On the corruption, fraud and undue

13   means by General Motors, that's just a label that he put on a

14   caption in a petition.  He does not allege one thing about

15   fraud corruption in connection with the arbitration process.

16   He's saying that there were public statements made by Fritz

17   Henderson as to, in general, the importance of a dealership

18   network, and he's saying that that was misleading.  But it has

19   nothing to do with actually what happened in the arbitration

20   and under the Dealer Arbitration Act.  And as far as the

21   misconduct being beyond prec -- established precedent, if you

22   read the paragraph, what he's saying is that the award goes

23   beyond Section 747 because they believe that that statute,

24   which is absolutely silent on the issue, doesn't allow for the

25   assumption of one dealership -- the rejection of one dealership

Page 71

1    agreement and the assumption or the reinstatement for the other

2    three.  That's the misconduct of going beyond what is

3    established precedent.

4          Your Honor's decision ruled that if you had to

5    address the merits, even though you weren't, you thought that

6    New GM and the arbitrator was right on that issue.  So he can

7    point to a petition, which is based on the Federal Arbitration

8    Act, citing standards but have no application to the facts of

9    this case and then everything else on the standards for a stay

10   pending appeal warrant for the denial of the stay.

11         And he purposely didn't answer your question as to a

12   bond because, at this point in time, the bond -- we're not

13   looking for a bond.  We're looking for the relief that we

14   brought our motion for.  And a stay pending appeal is, in

15   effect, a denial of our motion which Your Honor just granted.

16        (Pause)

17         THE COURT:  Stand by, everybody.  Sit in place.

18        (Pause)

19         THE COURT:  Gentlemen, in this supplemental

20   proceeding, Rally moves by oral motion, with my consent, for a

21   stay pending appeal.  And I am granting its motion to the

22   extent of providing for a seven calendar day stay to permit

23   Rally to go to the district court in this district.  And the

24   motion is otherwise denied.  The following are the bases for my

25   exercise of discretion in this regard.

Page 72

1          Though I have no memory of hearing it expressly

2     invoked, a motion of this character is governed by Federal Rule

3     of Bankruptcy Procedure 8005.  It provides in relevant part

4     that "A motion for a stay of the judgment order or decree of a

5     bankruptcy judge for relief pending appeal must ordinarily be

6     presented to the bankruptcy judge in the first instance...A

7     motion for such relief" granted by -- "or for modification or

8     termination of relief granted by a bankruptcy judge may be made

9     to the district court but the motion shall show why the relief,

10    modification or termination was not obtained from the

11    bankruptcy judge.  The district court...may condition the

12    relief it grants under this rule on the filing of a bond or

13    other appropriate security with the bankruptcy court."

14          As the language I just quoted makes clear, the rule

15    is not terribly helpful with respect to the standards for

16    considering a motion of that character.  Rather, for that, we

17    look to the case law which, in the bankruptcy appellate arena,

18    takes a considerable amount of guidance from similar issues

19    presented under the FRAP, the Federal Rules of Appellate

20    Procedure.

21          I exercise my discretion in accordance with my

22    earlier decision, coincidentally in General Motors, at 409 B.R.

23    24, and the affirmants by Judge Kaplan of the district court in

24    2009 U.S. District Court Lexis 61279.  As I stated in my ruling

25    there, in GM, the decision as to whether or not to grant the

Page 73

1    stay of an order pending appeal lies with the sound discretion

2    of the Court.  See, for example, In re Overmyer, 53 B.R. at

3    955.  Though the factors that must have to be satisfied have

4    been stated in slightly different ways and sometimes in a

5    different order, it's established that to get a stay pending

6    appeal under Rule 8005, a litigant must demonstrate it would

7    suffer irreparable injury if a stay were denied; there is a

8    substantial possibility, although less than a likelihood of

9    success on the merits of a movant's appeal; other parties would

10   suffer no substantial injury if the stay were granted; and that

11   the public interest favors a stay.  See, for example,

12   Hirschfeld v. Board of Elections, 984 F.2d at page 39.  It's a

13   decision of the Second Circuit in 1992; In re DJK Residential,

14   2008 U.S. Dist. LEXIS 19801; and 2008 WL 650389, a decision by

15   Judge Lynch back when he was a district judge; and In re

16   Westpoint Stevens, 2007 U.S. Dist. LEXIS 33725, 2007 WL

17   1346616, a decision by Judge Swain of the district court.

18          The burden on the movant is a "heavy one".  See, for

19   example, DJK at *2.  See also U.S. v. Private Sanitation

20   Industrial Assoc., 44 F.3d 1082 at page 1084, another decision

21   of the Second Circuit.  To be successful, the party must "show

22   satisfactory evidence of all four criteria".  In re Turner, 207

23   B.R. at page 375, a decision of the former Second Circuit BAP

24   in 1997.  Moreover, if the movant seeks the imposition of a

25   stay without a bond, the applicant has the burden of

Page 74

1    demonstrating why the Court should deviate from the ordinary

2    full security requirement.  See DJK at *2, Westpoint Stevens at

3    *4.

4            While, as Judge Lynch noted in DJK, the Second

5    Circuit BAP has held that the failure to satisfy any prong of

6    the four-circuit test "will doom the motion," with Jerry Lynch

7    having cited Turner.  The Circuit in more recent cases have

8    engaged in a balancing process with respect to the four factors

9    as opposed to adopting a rigid rule.  In my earlier ruling in

10   GM, I assumed without deciding that the balancing approach

11   would be more appropriate.  And I'm going to do likewise here.

12   I also note that when Judge Kaplan affirmed me in GM in the

13   decision that I described a few minutes ago, I think he took a

14   similar approach.

15           Let me start with injury first.  Obviously, I take

16   the loss of a franchise seriously.  And indeed, early in the

17   decision that I dictated -- I guess it's now an hour or an hour

18   and a half ago -- I did hopefully express my empathy to dealers

19   losing their franchises.  However, what caused the lack of the

20   franchise, or the loss of the franchise, is not the ruling that

21   I issued tonight.  It was the dealer termination agreement that

22   was entered into over a year ago.  What we have here is

23   Congress recognizing the injury to dealers as a consequence of

24   either rejection of dealership agreements, as was the case in

25   Chrysler, or even the soft landing termination agreements that

Page 75

1    we had here, provided dealers with an arbitration remedy to, in

2    essence, undo that which otherwise would happen.  And Rally

3    took advantage of that and it won in three-quarters -- or four-

4    fifths -- Pontiac, I guess, ultimately not being relevant -- of

5    the matters which it took before the arbitrator.  Now, in

6    essence, what it's asking for is to avoid the injury from a

7    year ago and at the same time to avail itself of the benefits

8    of the arbitration to the extent that it won.  With it having

9    won with respect to Buick, Cadillac and GMC, I don't think

10   there is irreparable injury to it by reason of its not having

11   shot the moon in its litigation efforts before the arbitrator.

12          Frankly, folks, I tried very hard to get it right.

13   And we're going to get to a likelihood of success in a minute.

14   But I do not believe that my ruling today causes irreparable

15   injury.  And I think really all we're talking about is the

16   results of an arbitration system that was made available for

17   Rally and for which it only succeeded in part.

18          I will, however, assume that there is a -- at least a

19   peppercorn of irreparable injury.  I'm certainly not going to

20   disqualify Rally for not showing more in the way of irreparable

21   injury.  And I'm not, as I indicated, going to require it to

22   make a strong showing on all fours.  I am going to take a

23   balancing approach so I'm going to turn to that next.

24          So let's talk then about likelihood of success which

25   is where Rally spent the bulk of its argument.  Although we

Page 76

1    talk about likelihood of success, that's a shorthand for a more

2    nuanced analysis.  The technical standard is there is a

3    substantial possibility although less than a likelihood of

4    success on the merits.  Well, let's slice and dice the various

5    aspects of my earlier ruling.

6            First, the propriety of my conclusion that I do have

7    subject matter jurisdiction and that I have core

8    jurisdiction -- core, of course, not being the subject matter

9    jurisdiction issue but talking about the power of a bankruptcy

10   judge in contrast to a district judge to decide.  Those two

11   rulings now seem to be accepted or at least unchallenged.  And

12   although there was no express discussion of my decision not to

13   abstain, I didn't hear any argument on that.  And, frankly,

14   discretionary abstention is called discretionary for a reason.

15   There would have to be an abusive discretion in my electing not

16   to abstain.  And I think that there would not be a material

17   likelihood of success on that and would be far short of a

18   substantial possibility.

19           On the merits, it's undisputed that we're not talking

20   about the Federal Arbitration Act, that the Dealer Arbitration

21   Act provides no right to appeal.  And my ruling did not go so

22   far as to say that under no circumstances under anything that

23   might ever be alleged would I deny the right to appeal.  What I

24   have said is that to the extent, if any, to which there would

25   be such a right, a construction to, in essence, save the

Page 77

1    constitutionality of the statute if it were otherwise put in

2    question, there would have to be something seriously wrong with

3    the arbitration in the way of fraud, corruption, bribery being

4    a species of corruption, or, and I articulated it differently,

5    disregard of applicable authority.  I went on to provide two

6    additional levels -- you can call it dictum; you can call it

7    alternative grounds, whatever, which caused me to believe that

8    it's not likely that there's going to be a reversal.

9            And as far as whether there's a substantial

10   possibility, on the facts that were put before me, I don't

11   think there's even that.  To be sure, words were put before the

12   district judge triggering responses that if this were an action

13   under the Federal Arbitration Act would get a judge's

14   attention.  But as the recent decisions by the Supreme Court in

15   Bell Atlantic v. Twombly and, especially, Ashcroft v. Iqbal

16   tell us, just invoking words making conclusory allegations in a

17   pleading isn't enough.  You can't talk about corruption without

18   giving the Court some facts as to lead the Court to believe

19   there was corruption.  And we're not talking about corruption

20   by GM.  We're talking about corruption by the arbitrator.  I

21   used the example before of taking bribes.  There are no

22   allegations of ex parte communication.  There are no

23   allegations of any irregularities in the proceedings before the

24   arbitrator other than the assertion that, as a matter of law,

25   the arbitrator got it wrong.  And even then, there's no

Page 78

1    allegation that the arbitrator disregarded any particular case

2    that would suggest to the arbitrator that he got it wrong.  So

3    while I think there would be a substantial possibility of

4    success on appeal if I were somehow to rule that there is no

5    right to appeal and that I got to close my eyes to

6    irregularities of the type that I just described if they were

7    shown, it doesn't affect the outcome here because I don't have

8    any facts suggesting any of those things.  Bottom line, folks,

9    I do not find a substantial possibility.

10            Third factor.  Other parties would suffer no

11    substantial injury if the stay were granted.  And here, I think

12    there are potential injuries, at least if we go past October

13    31st, of one type, for sure, and another which more properly

14    may be regarded as being a public interest concern rather than

15    a private prejudice.  For GM's benefit, I'll say that I see no

16    prejudice in staying for five days to allow the district court

17    to second guess me on the stay application.  And for that

18    reason, I am going to grant a stay to the extent of five days.

19            But we have a new dealer who's taking over on the

20    31st of October.  I don't have evidence on it, but I got to

21    assume that the existing franchisee's gain is going to be the

22    new one's loss.  They're either going to be competing with each

23    other or that other guy is going to be made to wait if this

24    thing can't proceed past October -- if this somehow proceeds

25    past October 31st.  And we have a nationwide program which was

Page 79

1    judicially blessed back in July of last year for these dealer

2    unwinds and I think it's prejudicial to New GM to put this

3    system in play to any greater extent than Congress did by its

4    statutory enactment.  And Congress didn't say everything you're

5    doing is undone.  What it did was say well, we're going to set

6    up this arbitration mechanism.  And that's exactly what we got.

7    And it goes without saying that I comply with the congressional

8    but I don't think we should be going beyond what Congress said.

9           Lastly, the public interest favors a stay.  That's

10   the final factor.  While I quoted the language before, and I

11   think Rally acknowledged its importance, that we deliver to the

12   purchasers of assets in bankruptcy sales that which we have

13   promised.  And if and to the extent that the counterparty to a

14   deal with an estate comes back and says I need you to enforce

15   it so I get the benefit of what I had bargained for, we do

16   that.

17          I talked back at the time of the original 363

18   determination and my separate ruling on the stay application

19   that followed my 363 ruling by a couple of days about how

20   important GM's survival is to the public interest and the

21   interest not just of the federal taxpayers but the needs and

22   concerns of the states of Michigan and Ohio and the communities

23   in which GM plants operate.  We made decisions then about that

24   which was necessary to give New GM the maximum opportunity to

25   thrive.  We made rulings then which are res judicata.  I don't

1    think the public interest is served by interfering with what we

2    then put in place in any way.

3            Certainly, there is no public interest in allowing

4    this collateral attack.  It's a private interest to the extent

5    it's any interest.  And when a party that was offered and

6    availed itself the opportunity to arbitrate then wishes to take

7    the portion for which it did not win and put the earlier system

8    in play beyond getting the arbitration opportunity for which

9    Congress provided, that is, at the least, not in the public

10   interest and may fairly be regarded as being contrary to the

11   public interest.  At best, looking at it most favorably to

12   Rally, it is a wash because it is private interests that are

13   being sought to be advanced and not public ones.

14           So, as my discussion indicates, folks, I think we got

15   to go by the book and deal with it as I did in my decision

16   dictated just a moment ago by the four enumerated factors

17   articulated in the case law for the grant of a stay.  And it is

18   stayed to permit a second opportunity to go to the district

19   court for those seven calendar days.  And so as not to put a

20   gun to the head of the district court having to issue a

21   decision, like Judge Kaplan did where he had to work all night

22   on it, I don't want to do that to the district court again if I

23   can avoid it.

24           But beyond that, it is denied.  Rally is authorized

25   and requested, not ordered, but requested to advise the

Page 81

1    district court that an application was made to the bankruptcy

2    court, that the bankruptcy court denied it except to the extent

3    of the five days for the reasons that it dictated into the

4    record and that any further application to the bankruptcy court

5    is dispensed with and waived.  From now on, we're in the

6    district court, folks.

7              Yes, sir?

8              MR. STEINBERG:  Your Honor, I just have some brief

9    moments and I thank you for staying so late for today.  In your

10   presentation in connection with the stay pending appeal, you

11   said seven calendar days but I believe you also said at one

12   point in time five days.  So --

13             THE COURT:  If I did, it was a reference to five

14   business days.  Seven calendar days transposes into five --

15             MR. STEINBERG:  Okay.

16             THE COURT:  -- business days.  And ever since we

17   amended the federal rules of many different types last

18   December, we now go on bunches of seven calendar days.

19             MR. STEINBERG:  The second thing, Your Honor, is that

20   while I'm not exactly sure what I would have otherwise done

21   during the seven calendar day period because the wind-down

22   agreement is fairly passive, I do want to make sure that I'm

23   still able to present to Your Honor the order that you had

24   asked for --

25             THE COURT:  Of course you can.

Page 82

1          MR. STEINBERG:  Okay.  And I think that's it.  I

2    understand that the only activity that will happen from this

3    point on is in the district court of this district.

4          THE COURT:  Correct.  All right.  It's been a long

5    day.  Good evening, gentlemen.  We're adjourned.

6       (Whereupon these proceedings were concluded at 7:23 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 83

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of New GM for an order enjoining Rally | 41 | 8 |
| Dealership from interfering with New GM's | | |
| ability to reform its dealership platform, | | |
| from vacating or modifying an arbitration | | |
| decision and from pursuing that effort in | | |
| California district court granted | | |
| Court declines to exercise its discretionary | 50 | 12 |
| abstention | | |
| Oral motion by Rally Auto for a stay pending | 71 | 21 |
| appeal granted for five business days to permit | | |
| Rally to go to district court; | | |
| but denied in all other respects | 71 | 24 |

Page 84

1

2                        C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 6, 2010

17

18

19

20

21

22

23

24

25

| & |
|---|
| **&**  3:3,10,19 4:2,18 5:2 6:14 7:14 |

| 0 |
|---|
| **09-50026**  1:4 |

| 1 |
|---|
| **1**  10:23 36:13 47:24 47:25 |
| **10**  24:5 27:22 41:15 61:25 62:3 |
| **10007**  5:14 |
| **10017**  4:14 |
| **10036**  3:14,22 |
| **10153**  3:6 |
| **105**  2:3 |
| **1082**  73:20 |
| **1084**  73:20 |
| **10th**  39:16 |
| **11**  2:2 24:5 35:19 40:9 44:16,17 48:4 48:5 |
| **11501**  4:21 84:14 |
| **1177**  3:13 |
| **1185**  3:21 |
| **12**  24:5 83:12 |
| **1262**  12:20 |
| **129**  12:20 |
| **13**  38:22 43:13 47:6 |
| **1331**  10:7 12:10 16:22 17:7 18:15 57:17 59:5 |
| **1332**  57:15 |
| **1334**  15:9 44:9,11 44:19,21 46:17 47:24,25 |
| **1346616**  73:17 |
| **136a**  36:13 |
| **14th**  23:19 28:25 |
| **157**  46:3,15 |
| **180**  69:5 |
| **19801**  73:14 |
| **1992**  73:13 |
| **1997**  73:24 |
| **1st**  32:14 |

| 2 |
|---|
| **2**  46:3 62:7 73:19 74:2 |
| **200**  4:20 7:8 84:12 |
| **2007**  73:16,16 |
| **2008**  73:14,14 |
| **2009**  18:2 19:14 32:13 41:10,12,15 42:7 56:15 72:24 |
| **2010**  1:19 42:6,13 43:13 84:16 |
| **207**  73:22 |
| **21**  83:14 |
| **21515**  4:4 |
| **229-230**  46:23 |
| **23**  58:19 |
| **24**  72:23 83:17 |
| **26**  41:12 |
| **28**  12:10 16:22 17:7 18:15 44:8 46:3,15 46:16 47:24 57:15 57:16 63:8 |
| **29**  52:7 |

| 3 |
|---|
| **3**  16:19 |
| **304**  46:23 |
| **31**  31:23 32:7 42:6 |
| **312**  46:10 |
| **31st**  18:1 39:4,7,8 65:16 69:24 78:13 78:20,25 |
| **33725**  73:16 |
| **363**  2:3,3 9:19 18:7 41:11,15,20 46:5 70:6 79:17,19 |
| **365**  42:3 |
| **375**  73:23 |
| **39**  73:12 |
| **3:06**  1:20 |

| 4 |
|---|
| **4**  1:19 74:3 |
| **409**  72:22 |
| **41**  83:6 |
| **419**  46:22 |
| **44**  73:20 |

| 44113  5:5 |
|---|
| **473**  36:24 55:16 |
| **48**  10:25 11:11,14 13:17 15:16 19:9 31:9,12 38:1,5 52:6 66:25 67:14 |
| **486**  84:9 |
| **4:04**  40:6 |
| **4:30**  40:3 |
| **4th**  39:19 |

| 5 |
|---|
| **50**  83:12 |
| **53**  73:2 |
| **580**  84:13 |
| **588**  55:16 |
| **592**  36:24 |
| **5:30**  40:6 |
| **5th**  41:10 |

| 6 |
|---|
| **6**  84:16 |
| **600**  14:15,17 17:24 35:25 37:1 |
| **61279**  72:24 |
| **636**  5:4 |
| **644**  46:10 |
| **645**  46:10 |
| **650389**  73:14 |
| **675**  4:13 |
| **6:19**  61:14 |
| **6:37**  61:14 |

| 7 |
|---|
| **7**  36:13,20 |
| **71**  44:23 83:14,17 |
| **747**  12:15 21:9,17 62:8 70:23 |
| **767**  3:5 |
| **7:23**  82:6 |
| **7th**  39:15 |

| 8 |
|---|
| **8**  27:22 42:13 83:6 |
| **8005**  61:4 72:3 73:6 |
| **86**  5:13 |

| 9 |
|---|
| **9**  24:5 37:24 |
| **90503**  4:6 |
| **950**  4:5 |
| **955**  73:3 |
| **97**  46:23 |
| **984**  73:12 |

| a |
|---|
| **aaa**  10:17 11:7 12:8 18:11 25:4,16 31:14 36:2 37:12,17,18 51:25 52:6 |
| **aaa's**  51:15,18 |
| **aaert**  84:9 |
| **ab**  59:22 |
| **abided**  39:19 |
| **ability**  16:4 17:10 19:8 26:3 36:25 40:11 83:8 |
| **able**  13:14 17:16 30:2 64:14 81:23 |
| **abrogate**  28:21,23 |
| **abrogated**  29:5 36:5 |
| **absence**  51:1 55:2 56:3 |
| **absolutely**  39:4 70:24 |
| **abstain**  48:7 49:14 50:3 76:13,16 |
| **abstaining**  48:3 |
| **abstention**  47:22 48:10 50:12 76:14 83:13 |
| **abstract**  21:11 |
| **abuse**  36:18 |
| **abusive**  76:15 |
| **accept**  43:10,21 48:6 51:13 61:10 |
| **accepted**  76:11 |
| **account**  49:17 54:25 |
| **accurate**  84:5 |
| **achieve**  18:25 52:20 53:13 |

**acknowledged** 79:11

**acquired** 40:17

**act** 8:24,25 12:7 14:19,23,25 16:23 17:2,17 18:18,23 19:2,12 21:2,24 22:3,22 23:1,10,13 23:16 24:4 25:20,22 26:6 27:4 28:6,19 28:20 29:6,9 30:23 31:2,16,20 32:10,18 33:19 35:7,24 36:6 36:12 38:20 39:12 40:18 42:8 43:10 44:2 45:8 50:15,18 50:19,21 51:21 53:7 53:11,16 54:15 55:6 55:18,18 57:6,8,18 57:21 58:4 59:3 62:1,8 63:17,19 67:18 70:20 71:8 76:20,21 77:13

**acted** 22:22

**action** 42:22 43:5 45:5 57:4 58:9 62:16 65:8,12,25 69:1 77:12

**actions** 64:21

**active** 49:3

**activity** 82:2

**acts** 36:2,22

**actual** 69:24

**add** 70:8

**added** 57:20

**addendum** 60:5

**addition** 12:8 13:2 41:3

**additional** 45:6 64:15 77:6

**additionally** 41:2

**address** 7:18 8:7 18:21 36:8 54:14 60:23 63:7 65:19 66:13 71:5

**addressed** 50:4 57:21 67:18 70:4

**addresses** 44:18 62:9

**addressing** 39:10 46:25

**adjourned** 60:25 82:5

**adjudicate** 39:1 47:10

**administered** 40:8

**administration** 48:11,17

**admiralty** 44:11

**admitted** 66:22

**adopting** 31:11 74:9

**advanced** 58:23 80:13

**advantage** 59:10 75:3

**adversary** 24:15,18 25:18 28:22 31:22 35:6

**advise** 80:25

**affect** 49:25 78:7

**affidavit** 43:4

**affirmants** 72:23

**affirmed** 74:12

**afforded** 29:7 42:2

**afternoon** 6:3 22:15

**agency** 26:20,21

**agency's** 26:25

**agent** 43:5

**aggregated** 19:20

**aggrieved** 16:16

**ago** 53:5 74:13,18 74:22 75:7 80:16

**agree** 8:23 11:6 12:5 29:15,22 50:14

**agreed** 11:14 23:3 24:9 28:22 32:9 37:11,13 39:17 45:2 47:8 51:25 52:18 58:13

**agreement** 2:4 8:16 16:22 17:4,14,23,24 18:6 22:20,21 28:14 28:19,21 29:3,4,10 29:11 30:6,7,16,23

31:24 32:17,21,25 33:24,25 34:2,8,10 34:13,17,18,19 35:7 35:11 37:16 38:8,14 38:22,23 39:2,5,6 39:19 40:17 41:5,12 42:16,24 43:8,15 45:20,24 46:6 47:6 47:6,11,14,15,17,17 47:18 57:7 58:13 59:2 60:5,6 63:17 63:18 69:11 71:1 74:21 81:22

**agreements** 9:1,15 9:22 14:23 18:18,23 19:13,14,20 23:4,4 24:8 30:11 34:5,5,7 34:9 37:11 38:12,13 38:17,19 39:13 41:21,22,24 42:1,1 42:3,6,15 44:24,25 45:1,11,23 48:24 50:16 53:2 54:24 60:2,8,10 68:8 74:24,25

**agrees** 28:16 38:24

**ahead** 7:7 11:25 12:4

**al** 1:8,9

**allegation** 78:1

**allegations** 54:7,18 54:20 55:1,23 77:16 77:22,23

**allege** 64:11 70:14

**alleged** 43:23 61:21 76:23

**allegedly** 57:17

**alleges** 43:19

**alleging** 9:12,12

**allow** 13:6 14:6 15:17 16:15 17:21 18:11 19:9 37:24 38:6 63:20 70:24 78:16

**allowed** 17:17 19:22 29:6 36:20,21 67:8

**allowing** 32:22 80:3

**allows** 16:6 17:20 21:3 36:14

**alluded** 63:10

**alternate** 41:4

**alternative** 41:24 45:18 60:18 77:7

**ambiguous** 51:7

**amend** 67:2

**amended** 81:17

**americas** 3:13,21

**amount** 72:18

**amounted** 45:10

**analogy** 10:16 37:9

**analyses** 35:18,19

**analysis** 48:6 50:25 76:2

**analytically** 55:17 56:16

**analyzing** 64:10

**ancillary** 29:23

**anger** 66:4

**annexed** 10:23

**answer** 15:21 22:17 65:22 69:15 71:11

**answered** 22:18 35:3,8 39:15 65:15

**antitrust** 56:23

**anxiously** 39:20

**anybody's** 19:15 21:23

**anyway** 22:2 33:21 65:15

**apologize** 27:8 40:7 61:18

**appeal** 60:19 61:5,9 68:21,23 69:16 70:9 71:10,14,21 72:5 73:1,6,9 76:21,23 78:4,5 81:10 83:15

**appearing** 7:14

**appears** 50:18

**appellant** 69:22

**appellate** 53:13 56:3 69:8 72:17,19

**appellee** 70:2

apple 15:1 65:13
applicability 17:10
applicable 44:8
66:12 77:5
applicant 73:25
applicants 67:7
application 61:8,10
61:16 71:8 78:17
79:18 81:1,4
applied 31:15 35:25
44:2 49:1 50:22
applies 8:25 29:5
apply 10:21,25 11:8
11:13,16 35:22
37:17,18 50:15 55:4
approach 57:9
74:10,14 75:23
approaching 31:23
appropriate 37:4,5
37:5,6 52:23 58:15
68:16 72:13 74:11
appropriately 51:5
61:25
approval 46:5
approved 2:3 22:20
30:9 41:11,19 49:8
approving 46:4
arbiter 25:13
arbitrate 9:1 10:10
10:11 11:15 24:9
50:16 53:22 80:6
arbitrated 14:15
arbitration 8:24,25
10:20 11:2,4,9,16
11:17 12:6,21 13:16
13:20 14:19,23,25
16:5,7,15,23 17:1
17:17,17,21 18:18
18:23 19:2,10,11,12
20:10,25 21:1,2,6
21:15,24 22:3,22
23:1,10,10,13,16,17
23:18 24:4,11 25:5
25:6,20,22 26:6
28:6,6,7,19,20,24
29:6,7,8,24,25 30:1
30:23,25 31:2,10,11

31:12,13,14,16,20
32:10,18,22 33:13
33:19,22 35:6,13,24
35:25 36:6,7,14,17
37:13,21,23 38:20
39:12 40:13,18,21
40:22,24 41:1 42:8
42:10,11,11,12
43:10,14,24 44:1,2
45:8,12,14,16,17
47:13 49:21 50:15
50:17,18,19,20,21
51:11,15,16,18,19
51:21,25 52:1,3,4,9
52:10 53:7,8,10,14
53:16,17,21,24 54:1
54:3,10,15 55:6,18
57:6,8,18 58:4,14
58:15,16,17 59:3,17
62:1,12,15,16 63:16
63:19 66:19 67:7,17
70:15,19,20 71:7
75:1,8,16 76:20,20
77:3,13 79:6 80:8
83:9
arbitrations 19:22
20:1 28:25 37:25
arbitrator 9:5,13,14
13:9,20 18:6 20:21
23:18 25:1 28:15
29:17 30:25 32:24
33:3,5 34:9 36:15
36:17,22 37:19
42:12,13 43:9,11
52:12,14 53:3 55:5
59:14,15,24 62:4
64:13 71:6 75:5,11
77:20,24,25 78:1,2
arbitrator's 14:1,2
20:4,16,17 24:24
29:16 37:2 43:17,19
53:4 55:10,14,19
59:13,14,23,24
60:10
arbitrators 23:13
36:18 57:18

area 32:2 42:18
areas 29:1 53:2
61:19,20
arena 72:17
arguably 52:13
55:23
argue 17:5 33:17
35:16
argued 25:18
argues 40:25 41:3
43:5,9
arguing 15:12,12
33:20 67:23
argument 9:3 11:7
13:7,17 14:8,10
16:12,18 17:9 25:21
27:15 28:1,2 34:7
34:16,22 35:10
39:14 45:25 51:13
52:17 57:2 61:7
62:8 63:10 66:15,16
66:24 68:1,6,21
75:25 76:13
arguments 8:1 16:4
18:12 33:17,21
37:12
arises 10:9 12:23
63:16
arising 8:14 15:8,11
44:16,16,20 46:16
46:16 48:4,4 63:21
64:1
arms 55:9
arose 57:17
arthur 3:24
articulated 48:10
50:2 77:4 80:17
ashcroft 77:15
aside 14:11 56:9
58:24
asked 26:20 28:5
35:6 39:6 68:1
81:24
asking 12:18,24
25:25 35:10 53:14
59:18 69:4,12 75:6

aspects 43:16 76:5
asserted 58:5
asserting 58:22
assertion 77:24
assets 23:8 41:16
46:14 48:21 49:4
50:1,3 79:12
assigned 41:20
assignment 30:12
assistance 43:6
assoc 73:20
associates 4:18
assume 37:12 50:7
54:8 56:4,10 57:24
60:16 75:18 78:21
assumed 41:17
74:10
assuming 51:3
59:21
assumption 59:22
59:24 70:25 71:1
assurance 49:5
atlantic 77:15
attack 14:3,3 20:17
52:2,9 64:24 80:4
attempt 58:12
attempting 40:24
42:17 62:7
attention 16:23
27:21 77:14
attorney's 5:11
attorneys 3:4,11,20
4:3,12,19 5:3
august 32:6 43:12
auslander 4:11
authorities 7:23
authority 8:15 10:4
43:11 46:13 54:13
67:22 77:5
authorized 41:11
41:23 49:6 52:16
62:7 80:24
auto 4:12,19 5:3 7:9
43:1 83:14
avail 23:8 45:16
75:7

**available** 59:13
  75:16
**availed** 29:8 80:6
**avenue** 3:5,13,21
  4:13 5:4
**avoid** 51:10 54:16
  75:6 80:23
**awaiting** 39:20
**award** 11:4,9 13:16
  14:1,2,16 20:14,16
  20:17 29:16 31:13
  31:14 32:24 33:3,13
  33:22 40:24 41:1
  42:13 43:14,17,20
  43:24 44:1 45:16
  49:22 52:2,4,9,10
  53:4,14 54:1,3
  58:17 59:13,14 61:6
  70:22
**awards** 50:20 59:17

**b**

**b** 1:23 44:13 46:15
  46:17
**b.r.** 46:10 72:22
  73:2,23
**baby** 7:23
**back** 13:14,25 15:1
  15:5 16:12,19 18:8
  19:23 21:22 29:3,18
  30:2 37:3 49:5
  52:13 56:15 57:20
  65:6,21 73:15 79:1
  79:14,17
**balance** 23:21
**balancing** 74:8,10
  75:23
**bank** 63:9
**bankruptcy** 1:2,15
  1:25 8:15,17 9:19
  9:25 15:1 34:11
  35:22 38:24 44:6,12
  46:20 47:8 48:7,11
  48:13,18,21,22 49:4
  49:11,24 55:8 58:2
  58:7 61:4 63:6 65:6
  65:11 72:3,5,6,8,11
  72:13,17 76:9 79:12

81:1,2,4
**bap** 73:23 74:5
**bar** 2:25 84:4,8
**bargain** 21:22,23
**bargained** 24:13
  30:7,8,14,19 63:25
  79:15
**barred** 46:12
**base** 19:4
**based** 11:18 31:2
  39:11 51:22 71:7
**bases** 71:24
**basically** 62:22 68:5
**basis** 27:11 44:1
  59:5
**bear** 34:25
**behalf** 7:9,15 34:3
  43:4 60:4
**belies** 37:23
**believe** 13:2 16:14
  27:13 29:23 31:17
  37:4 39:24 48:9
  54:6 55:21 61:18
  62:17,17 63:11 64:9
  66:21 67:6 68:2,8,9
  70:23 75:14 77:7,18
  81:11
**believes** 18:4
**bell** 77:15
**bellavia** 4:18 6:19
  7:8
**belly** 9:6
**benefit** 21:22,23
  27:25 78:15 79:15
**benefits** 9:24 34:20
  75:7
**best** 20:5 22:17
  80:11
**better** 23:21 54:15
**beyond** 70:21,23
  71:2 79:8 80:8,24
**bid** 48:21
**bidders** 48:20
**bidding** 43:1 49:4
**binding** 11:9 20:10
  23:10 29:7 32:22
  35:13 36:3 37:19

40:21 42:10 47:2
  48:25 54:12 56:3
**bit** 9:1
**bite** 14:25 65:13
**blank** 53:10
**blatt** 4:23 6:19,19
  7:1,4,6,8,8,10,21
  8:9 9:11 10:12
**blessed** 79:1
**board** 73:12
**board's** 26:16 55:19
**boat** 8:12
**bogged** 23:24
**bond** 66:14 71:12
  71:12,13 72:12
  73:25
**book** 80:15
**bottom** 62:3 78:8
**boulevard** 4:4
**bound** 39:5,6 43:9
**bowling** 1:16
**brake** 36:5
**brand** 12:14,17
  21:8 40:23 43:12
  60:11
**brands** 29:17 40:23
  43:18,22
**bribe** 25:16
**bribed** 25:12
**bribery** 43:24 77:3
**bribes** 9:5 13:10
  24:25 25:1 54:11,18
  77:21
**brief** 8:6 21:7 26:5
  27:16 33:15,21 52:7
  58:20 81:8
**briefing** 27:25
**bring** 25:7
**broadly** 30:11
**brought** 57:3 69:14
  71:14
**bucking** 59:16
**buick** 42:14 43:18
  59:25 75:9
**bulk** 75:25
**bullets** 66:12

**bunches** 81:18
**burden** 73:18,25
**business** 60:15
  81:14,16 83:15
**businesses** 43:2
**butler** 64:22,23
**buy** 29:13
**buyers** 17:12 21:22
  70:5

**c**

**c** 3:2 6:1 10:25
  11:11,14 13:17
  15:16 19:9 31:9,12
  36:13 38:1,5 47:24
  47:25 52:6 66:25
  67:14 84:2,2
**ca** 4:6
**cadillac** 42:14 43:18
  60:1 75:9
**cake** 34:22
**calendar** 71:22
  80:19 81:11,14,18
  81:21
**califor** 17:21
**california** 12:11
  14:13,20 15:18,21
  16:1,3 17:4,7,19
  18:11,14 20:15
  21:18 35:19,20 38:2
  38:6 39:18 40:14,25
  42:13,18,22,23
  43:13 49:19 53:14
  56:10 57:4 58:1
  61:23 62:11,16,20
  63:2 64:5,17,20
  65:5,8,9,12,14,16
  67:10,21 68:4,4,6
  68:10,10,25 69:1,3
  69:5,10 70:12 83:11
**california's** 15:24
**call** 20:7 77:6,6
**called** 42:8 52:1
  76:14
**caption** 70:14
**car** 36:4
**carbide** 36:24 37:5

care  13:11
case  1:4 7:21,25 8:4
  8:6 9:14 11:11,12
  12:19,20 13:13,19
  16:10,20 20:3 24:10
  25:17 26:13,24
  30:22 34:14 36:10
  36:11 37:4,14,15
  44:22 46:11,13 48:4
  48:13 50:10 53:16
  59:17 63:20 65:6,10
  66:12 71:9 72:17
  74:24 78:1 80:17
cases  7:22 10:1 23:5
  24:14 37:9,9,11
  40:8 44:12,17 48:15
  55:22 58:11 74:7
cause  15:23 20:11
  22:5,6 50:2
caused  74:19 77:7
causes  75:14
center  28:1
central  27:15
certain  17:25 18:3
  26:22 41:21,23 42:4
certainly  21:18 53:5
  67:8 75:19 80:3
certified  84:9
certify  84:4
cet  84:9
challenge  27:17
chambers  5:13
  39:24
chance  22:10 38:6
change  30:18,18
changed  19:19
changing  56:3
chapter  40:9
character  10:2 55:2
  72:2,16
check  35:1 53:10
chevrolet  12:14,17
  29:2 31:24 40:23
  42:15,17 69:23
chevy  21:8,16 38:19
  41:4 42:20,21,25
  43:12,15 45:19,21

60:1
chief  5:16
child  8:14
chose  68:13
christopher  5:7
chrysler  23:5 74:25
circuit  37:7,14,18
  46:19 63:11 64:23
  65:3 73:13,21,23
  74:5,6,7
circuit's  58:20
circumstance  25:17
circumstances
  24:12 48:8 54:2
  76:22
cite  12:19 13:5 21:7
  36:13
cited  11:11 26:12
  74:7
cities  43:1
citing  21:10 58:20
  71:8
city  42:23 43:3
civil  5:16 44:15
claim  9:16 57:14
  58:5 64:25
claims  14:15 42:24
clair  5:4
clarification  49:7
clashing  19:1
classic  45:22
classification  49:3
clause  29:19 46:8
  47:7
clear  41:16 46:14
  49:2 62:13 72:14
clearly  24:7 59:8
  65:6
clerk  6:2
cleveland  5:5
client  13:19,22
clock  65:16
close  78:5
closed  40:16
clouse  4:2 6:18 7:14
code  34:12 40:9
  42:3 44:9,10 47:24

codified  18:2 19:12
coherent  35:9
coincidentally
  72:22
collateral  80:4
collaterally  64:24
colleague  22:18
  23:2,11 28:22
collect  69:8
come  9:10,23 13:14
  13:25 15:5 16:2,12
  16:25 17:2,13 18:7
  21:14,22 29:18 30:2
  31:4 37:3 40:3
  45:24 48:15,21
  52:13 68:13
comes  46:12 50:17
  56:20 79:14
comfort  50:3
coming  21:1 57:10
  66:1
comity  48:2,12
  49:16
commence  17:16,21
  19:22
commenced  65:7,25
commencement
  32:23
commercial  10:17
  10:20,22,24 11:7,16
  12:8 19:10 31:10,11
  31:12 51:15,18 52:6
committee  3:11
common  60:7
communication  9:6
  77:22
communities  79:22
company  1:8 6:4
  58:21
compare  7:24
compel  10:10 15:13
  16:21 50:16
compelling  63:19
  67:15
competent  11:5
  16:16 39:9 57:22

competing  78:22
complain  52:11
complaint  16:19
  32:6 65:22 70:11
complete  23:18
  38:25 43:20 47:9
completed  28:24,25
  51:12 58:16
complied  20:16
  29:16
comply  14:1 26:5
  57:6 79:7
complying  13:15
conceded  51:14
concept  26:19 31:18
concern  47:18
  78:14
concerned  15:24
concerning  38:16
  39:1 44:24 45:22
  47:10
concerns  7:18 49:18
  50:4 79:22
concluded  82:6
conclusion  76:6
conclusions  41:9
  44:3
conclusory  77:16
concurrent  28:10
  62:25 67:15
condition  72:11
conduct  37:2 46:14
conducted  54:10
conferred  53:18
confirm  19:8 37:21
  38:3
confirmation  9:20
  37:24
congress  15:4 16:13
  19:15 20:1 22:22
  23:21 24:10,20
  25:12 26:2,11,17,20
  32:23 35:14 36:1
  42:7 45:13 48:20
  52:25 53:9,17 56:5
  56:6,8 74:23 79:3,4
  79:8 80:9

**congressional** 22:24
51:3,9 52:21,24
79:7
**connection** 24:6
38:13 41:9 54:6
70:15 81:10
**consent** 37:14 71:20
**consented** 11:3,6,8
11:17 13:17 47:8
52:4
**consents** 38:24
**consequence** 41:7
74:23
**consequences** 58:16
**consider** 50:6,8
54:2,14,21
**considerable** 72:18
**consideration** 42:5
**considerations**
20:18
**considered** 43:22
46:18 47:21
**considering** 72:16
**consistent** 33:23
35:9,13 37:12
**conspiracy** 54:18
**conspiring** 54:11
**constitute** 12:17
**constitutional**
26:10 27:18 54:8,16
**constitutionality**
13:8 14:7,21 15:17
16:9 25:20 27:13
64:4 66:16 67:13
77:1
**construction** 49:7
54:7 76:25
**construe** 18:25
52:19 54:15
**consume** 66:4
**contemplated** 19:17
**contend** 12:7
**contends** 13:24
**contention** 54:13
**context** 34:23 58:11
68:19

**continuation** 30:12
**continue** 8:20 32:7
66:11 68:25
**continued** 42:19
**continuing** 9:20
38:23 47:7
**contract** 11:12,12
34:11 35:18 43:11
50:17
**contracts** 42:3
**contractual** 8:25
24:12 50:15
**contractually** 45:2
**contrary** 8:19,20
13:24 58:23 80:10
**contrast** 10:5 76:10
**contrasted** 49:17
**controls** 19:3
**controversies** 55:5
56:19,22
**controversy** 12:22
44:7 46:1 50:13
56:12 57:17 63:14
63:15,21
**conversely** 70:1
**conveys** 52:8
**core** 14:11 28:4
46:2,3,6,9,9,12,18
46:18 49:3 55:10
76:7,8
**corporation** 1:9
**correct** 22:19 23:11
33:10 66:25 68:9
82:4
**corruption** 43:24
55:23 62:9,19 70:12
70:15 77:3,4,17,19
77:19,20
**costs** 51:10
**counsel** 36:4 38:5
**counterparties** 9:23
**counterparty** 79:13
**country** 4:20 7:9
84:12
**couple** 79:19
**course** 9:9,11 18:21
19:2 20:1 37:9

47:13 49:18 52:18
53:1 54:4 55:8,16
56:2 76:8 81:25
**court** 1:2,15 6:3,11
6:15,20,23 7:2,5,10
7:11,16 8:17 9:23
9:25 10:14,19 11:5
11:20,24 12:3,8,11
12:19,20,21,23,25
13:3,13 14:8,12,13
14:14,17,20,24 15:1
15:2,6,11,14,14,18
15:19,20,20,24,25
16:1,2,2,3,3,5,16,24
16:25 17:5,11,12,19
18:11,13,14,16,19
18:25 19:6,9,24
20:13,24,25 21:4,5
21:14,15,17,18 22:9
22:13 24:6,23,25
25:7 26:15 27:3,6
27:21 29:15,21 30:3
30:3,9,22 31:4,7
32:4,4 33:7 35:2,15
35:20 36:9 37:20
38:10,21,24 39:9,13
39:16,18,21 40:1,7
40:15,25 41:2 42:23
43:13 44:22 45:2,25
46:11,15 47:8 48:1
48:22 49:1,13,14,19
49:24 50:1 52:5
53:15,25 55:4,9
56:11,17,22,24 57:4
57:14,16,22 58:1
59:1,9,19 60:25
61:3,10,15,18,22,23
62:2,11,20,23,25
63:2,6,7,9,11,14,20
63:21,25 64:1,5,8,9
64:10,16,18,19,20
64:25 65:2,5,8,10
65:12,17,18,21,23
65:24 66:2,6,21,23
67:3,10,20,23 68:17
68:18 71:17,19,23
72:9,11,13,23,24

73:2,17 74:1 77:14
77:18,18 78:16
80:19,20,22 81:1,2
81:2,4,6,13,16,25
82:3,4 83:11,12,16
**court'll** 38:2
**court's** 16:23 39:20
49:11 52:19 53:18
58:2,7 61:19 70:6
**courtcall** 11:24 12:3
**courtesy** 39:24
**courtroom** 6:21,24
6:25 25:9
**courts** 11:14 44:6,6
44:14 45:9 46:20
47:2 48:2,5,7,8,22
50:2 55:8,8,14 56:7
56:18 59:19 63:11
**covenant** 17:15,19
18:1 19:13,21 22:2
35:12 36:5
**covenants** 19:24
**cover** 27:22
**covered** 12:14,17
14:19 18:5 21:8,16
35:17,17,23 38:20
**covers** 19:24
**create** 23:21
**created** 23:6 26:18
47:1 63:18
**creditors** 3:12
**criteria** 73:22
**critical** 25:18 28:18
28:20 32:18
**crose** 4:2 7:14
**crucial** 14:9
**crux** 14:10
**ct** 12:20
**currently** 42:16
**cursorily** 64:8
**cursory** 64:7
**cute** 34:7

**d**

**d** 6:1 12:15 21:9
83:2 84:9
**dampen** 49:9

**date** 39:7,17,19
84:16
**dated** 41:12
**david** 5:16
**davidson** 3:25 6:14
6:14,16
**day** 71:22 81:21
82:5
**days** 15:22 23:17,18
29:9 33:13 60:16
78:16,18 79:19
80:19 81:3,11,12,14
81:14,16,18 83:15
**deadline** 32:4,8
39:4,8
**deadlines** 23:16
51:11
**deal** 8:17 9:14 39:8
79:14 80:15
**dealer** 8:24 12:6
14:23,25 16:15,16
16:23 17:1,17,24
18:2,5,18,22 19:2
19:12 21:2,24 22:3
22:22 23:1,7,9,12
24:11 25:20,22
28:19,20 29:6 30:23
31:1,16,20 32:10,12
32:17 35:6 36:6
38:20,23 39:11
40:18 41:25 42:1,5
42:8,10,15,15 43:10
43:11,15 45:8,12
47:7 50:17,19,21
51:21 53:7,10,16
54:15 55:6,18 57:3
57:5,6,8,18,20 58:4
59:3 60:5 63:16,18
70:20 74:21 76:20
78:19 79:1
**dealer's** 25:1 53:3
60:2
**dealers** 14:15,25
17:24 22:1 23:3,22
25:23 29:7 35:25
36:2 37:1 40:19,20
41:6,23,24 42:5,9

43:2 45:2,5 53:8,20
55:6,13 74:18,23
75:1
**dealership** 12:14,17
14:19 21:16 23:4
29:2,12 30:13 31:24
31:25 32:1 35:17,17
35:24 38:20 40:11
40:12,16 41:5 42:17
42:20,21,25 43:7
45:21 53:19 57:19
69:24 70:3,17,25,25
74:24 83:7,8
**dealerships** 33:4,6
34:20,21 43:17 45:7
**dealing** 9:25 58:15
**deals** 44:11
**dealt** 27:3 30:21
33:25 46:24
**debatable** 54:12
**debtor** 23:7 34:13
**debtor's** 23:7
**debtors** 1:11 3:4,4
42:2 46:13
**december** 18:2
32:13 42:7 81:18
**decide** 53:18 57:19
65:20 76:10
**decided** 26:17 33:15
34:21 50:7 68:4
**decider** 54:10
**deciding** 51:5 54:8
56:5,10 74:10
**decision** 16:6 26:21
29:24,25 40:14
46:10 55:24 58:20
59:23 60:21 61:18
63:5,9 66:22 67:3
71:4 72:22,25 73:13
73:14,17,20,23
74:13,17 76:12
80:15,21 83:10
**decisions** 50:24
55:3 56:9 77:14
79:23
**declare** 25:23

**decline** 50:11
**declines** 83:12
**decree** 72:4
**deed** 39:14
**deemed** 10:7 11:3,6
11:8,17 13:17 52:3
**defeat** 47:17
**defense** 45:10,19
47:13 53:1
**defer** 6:24 28:5,6,7
65:11
**deference** 15:25
**deferred** 2:3 38:14
38:16,18 39:21
41:21 44:24,25
45:11,20,23 54:24
65:10
**deficient** 48:17
**defined** 12:15 19:8
21:9,17
**definition** 18:4
**degree** 48:12 49:23
**degrees** 69:5
**delayed** 39:22
**delays** 51:10
**deliver** 79:11
**demand** 51:16
**demeanor** 66:4
**demonstrate** 73:6
**demonstrating** 74:1
**denial** 71:10,15
**denied** 71:24 73:7
80:24 81:2 83:17
**deny** 54:23 76:23
**department** 5:10
**depends** 57:13
**depriving** 70:1
**deputy** 5:16
**derivative** 49:3
**derive** 59:10
**described** 55:25
74:13 78:6
**description** 83:5
**desire** 51:9 64:18
**detail** 63:8
**determination**
23:15 26:16 39:20

41:9 53:15 54:9
55:10,15,19,20
60:19 62:6 64:16
79:18
**determinations**
36:15
**determine** 12:22
14:18 49:20
**determined** 42:21
**determining** 49:20
62:2
**deviate** 74:1
**devito** 5:2,7
**dice** 76:4
**dictated** 60:20
74:17 80:16 81:3
**dictum** 77:6
**differ** 63:15
**difference** 14:9
21:20 58:10
**different** 49:8 56:16
65:7,17 73:4,5
81:17
**differently** 60:1
77:4
**difficulties** 41:6
**difficulty** 8:2
**diminishing** 21:20
**direct** 37:1
**directing** 42:14
**directly** 46:11,12
64:8
**disagree** 58:3
**discomfort** 65:24
66:3,10
**discover** 63:9
**discovery** 23:24
**discretion** 71:25
72:21 73:1 76:15
**discretionary** 47:22
47:23 48:10 50:12
76:14,14 83:12
**discussion** 76:12
80:14
**dismiss** 15:22 58:14
**dispensed** 81:5

**dispute** 11:19 30:10 38:18,19 45:22 46:25 47:4,5,20
**disputes** 10:19 38:16 39:1 44:23 47:10 49:8
**disqualify** 75:20
**disregard** 21:1,4 43:25 54:19 55:24 61:20 62:6,13,18 63:1 77:5
**disregarded** 78:1
**dist** 73:14,16
**distinction** 20:14
**distinguish** 22:25
**district** 1:3 5:12 9:19 10:6 12:11 14:8,20 15:14,18 16:22 17:4,19 19:9 26:15 37:20 38:2 40:14,25 43:13 44:6 44:6,14 48:1 49:19 53:15,18 55:8,9,14 56:11 57:14,15 61:22 62:2,11,20,23 63:2,21 64:5,16,19 64:20 65:2,5,8 66:23 67:3,10,20 68:17 71:23,23 72:9 72:11,23,24 73:15 73:17 76:10 77:12 78:16 80:18,20,22 81:1,6 82:3,3 83:11 83:16
**diversity** 10:6 16:20 17:7 44:10 56:11 57:4,24 66:20,22,24 67:14,19
**division** 5:16 34:3 60:4
**djk** 73:13,19 74:2,4
**documented** 46:6
**documents** 48:23
**doing** 19:16,17 20:11 35:13,21 79:5
**doll** 58:21

**doom** 74:6
**doors** 56:21
**double** 9:15 43:23 49:24
**doubt** 17:11
**drafted** 48:23
**dramatic** 70:3
**drop** 57:7
**due** 13:7 14:8 18:10 54:9 64:4
**dumb** 20:3,7
**duties** 45:20,20
**duty** 18:24

**e**

**e** 1:23,23,24 3:2,2 6:1,1 60:16 83:2 84:2
**earlier** 45:10 50:24 52:19,22,25 53:7 72:22 74:9 76:5 80:7
**early** 74:16
**easier** 13:13
**easily** 30:21
**eat** 34:22
**effect** 26:1 29:10,11 29:14 30:12 31:17 32:21 48:17,17 56:16 69:13 71:15
**effectively** 32:13
**efficient** 48:11
**effort** 40:14 47:14 53:13 57:11 66:9 83:10
**efforts** 57:7 75:11
**either** 9:23 23:3,5 23:11,11 43:10 47:15 49:19 50:8 53:25 59:9 64:16 65:2 68:13 74:24 78:22
**electing** 76:15
**elections** 73:12
**electronic** 84:9
**element** 70:5
**empathy** 74:18

**emphasize** 54:25
**empowered** 46:20 57:19
**enacted** 25:12 42:7 52:20
**enactment** 29:9 79:4
**enforce** 2:3 8:16 14:2 17:11,12,22 20:2 21:15 29:18,24 30:23 31:4 38:11 39:1 45:3,16 46:20 47:10,15 49:21 52:1 52:8 53:5 54:23 58:12 59:2,3 79:14
**enforceable** 60:7
**enforced** 15:2 70:4
**enforcement** 13:18 20:10 22:6 30:10 31:13,14,19 45:11 46:17 53:1 54:23
**enforcing** 20:14 69:7
**engaged** 53:24 74:8
**engaging** 43:1
**enjoining** 40:10 83:6
**entendre** 49:25
**enter** 46:21 68:20
**entered** 11:4 19:18 40:13 41:10,20,22 44:21 52:5 56:15,25 74:22
**entering** 68:8
**entertaining** 64:10
**entire** 29:11 43:10
**entitled** 29:12
**entitlement** 66:12
**entity** 32:1 41:14
**entry** 11:18 30:16 60:20 69:1
**enumerated** 80:16
**eric** 4:16
**erroneous** 43:20
**error** 9:13,16 59:16
**errors** 64:12

**especially** 8:5 77:15
**esq** 3:8,16,24,25 4:8 4:16,23 5:7
**essence** 9:12 53:13 59:19 68:7 75:2,6 76:25
**essentially** 35:9
**establish** 42:17 51:9 55:4 57:13
**established** 46:22 53:17 70:21 71:3 73:5
**establishment** 41:4 43:7 45:6
**estate** 46:14 48:12 48:18 79:14
**estates** 49:4
**estop** 17:8
**estopped** 59:11
**estoppel** 16:18 30:21 57:2,12,14 58:19,21 68:1
**et** 1:8,9
**evan** 3:8
**evaporate** 54:1
**eveleth** 46:10 49:1 50:2
**evening** 61:1 82:5
**event** 45:25 47:18
**events** 41:7 50:8
**everybody** 15:5 16:12 28:16 30:6 37:3 71:17
**evidence** 73:22 78:20
**evidenced** 48:19
**ex** 9:6 77:22
**exact** 52:15
**exactly** 79:6 81:20
**example** 52:9 73:2 73:11,19 77:21
**exceed** 36:18
**exceeded** 43:11 62:5
**exceeding** 62:19
**exceptions** 44:14 46:4

excessive 51:10
exchange 42:4
exclusive 8:17
  14:14,18 16:25 17:5
  18:17 28:9,13 30:4
  30:5,17 38:11,25
  44:15,22 45:3 47:9
  54:22 55:25 56:6,14
  56:16,24 58:2,7
  62:23 63:6 67:16
  70:6
exclusively 61:22
excuse 62:21
execute 16:21,24
executed 38:13 60:3
executing 38:23
execution 60:8
executory 34:11
  35:18 42:2
exercise 17:3 47:22
  48:10 50:11 64:6
  71:25 72:21 83:12
exercising 10:6
  54:22 56:13
exhibit 10:24 61:24
  61:24
exist 9:3 18:18 26:1
  57:1
existed 66:24
existence 21:24
  48:13 50:6
existing 54:19 55:24
  78:21
exists 21:6 66:17,22
  67:15,16,19
expectation 22:4,5
  22:7
expectations 17:12
expecting 8:7
explain 16:2
explained 49:1
explicitly 28:17
express 74:18 76:12
expressed 9:7 31:2
  56:18
expressly 41:17
  51:17 72:1

extend 39:7
extension 16:11
  19:11 36:3 39:9
extensively 11:1
extent 9:2 13:16
  16:6 18:24 19:4
  29:6 31:15 33:16
  39:5 45:12 47:12,14
  52:22,24 61:5 63:23
  64:15 71:22 75:8
  76:24 78:18 79:3,13
  80:4 81:2
eye 19:15
eyes 78:5

**f**

f 1:9,23 10:24 36:13
  44:23 84:2
f.2d 73:12
f.3d 46:23,23 73:20
faa 24:7,8,8,13,14
  24:15 37:10,10
  62:10 67:7,8
faced 41:6
fact 20:20 21:1,16
  30:21 31:22,23
  37:24 41:8 62:18
  64:20
factor 48:16 49:16
  78:10 79:10
factors 23:13 48:9
  50:1 73:3 74:8
  80:16
facts 11:19 21:4
  41:10 50:9 54:12,24
  58:11 60:12 71:8
  77:10,18 78:8
factual 58:22,25
failed 52:10 53:4
  60:23
failure 43:21 51:22
  74:5
fairly 24:1 80:10
  81:22
fall 46:15 68:11,12
falls 34:18
far 70:20 76:17,22
  77:9

farther 62:9
fascinating 68:1
fashion 53:9 54:16
  62:7
fast 31:23
favor 29:17 48:7
  49:15 53:3 69:21
favorably 80:11
favors 73:11 79:9
fax 60:16
federal 8:25 10:7,9
  11:4 12:8,10,11,13
  12:18,18,21,23,23
  12:24,25,25 13:2,5
  14:19,21 15:13,16
  15:20 16:3,4,7,8
  17:6 18:10 20:8
  21:3,4,6,8,10,13
  23:6 24:4 26:6,15
  28:6 33:18 35:24
  36:8,9,11 40:25
  44:2,10 45:9 48:8
  50:14 51:1,2 52:5
  52:16,20,22,24
  53:15 55:8,14 56:7
  56:22,23,23,24 57:4
  57:5,16 58:3,6 62:1
  62:15 63:1,4,21,21
  63:22 64:3,8,9
  66:17,18 67:13 71:7
  72:2,19 76:20 77:13
  79:21 81:17
fifra 36:14
fifth 3:5 33:15
fifths 33:8 75:4
fifty 20:7 67:6
figure 33:17
file 23:9
filed 15:21,22 32:5
  39:23 42:11 43:13
  65:22 70:11
filing 45:5 65:6
  72:12
final 11:9,18 20:10
  36:3 37:19 55:10
  56:14 79:10

finality 32:10,11
finally 47:21 59:12
find 41:10 46:2
  50:22 51:21 59:7,8
  78:9
findings 20:20
  21:15 36:15 41:8
finished 39:25
first 6:20 7:18 17:9
  35:16 39:21 44:4,5
  44:5 50:23 53:22
  56:2 59:9,14 69:10
  69:14 72:6 74:15
  76:6
fit 7:17
five 33:9,24 34:1,8
  34:12,13,15 60:9
  67:12 78:16,18 81:3
  81:12,13,14 83:15
focus 10:18
focusing 60:10
folks 6:12,21 61:1
  75:12 78:8 80:14
  81:6
follow 7:21 9:21
followed 79:19
following 7:18 41:8
  71:24
follows 44:9
footnote 27:16
forcing 53:25
foreclosed 56:13
foregoing 60:13,14
  84:4
forget 20:11
forgive 66:2
form 8:12 60:7
former 73:23
forth 33:21 61:6
fortunes 68:11,12
forty 23:17 29:9
forum 24:25 30:8
  41:2 49:6,8,13 65:8
forward 11:15
found 34:9 64:21
four 33:4,6,8,8,14
  33:25 34:20,21

63:11 66:20 67:12
67:24 69:16 73:22
74:6,8 75:3 80:16
**fours**  75:22
**fourth**  66:24
**frames**  48:19
**franchise**  9:15
33:24 35:18 45:19
53:19 60:2,9 74:16
74:20,20
**franchisee's**  78:21
**franchises**  33:9,24
45:15 47:16 52:11
60:1 74:19
**frankel**  3:10
**frankly**  8:12 57:8
69:21 75:12 76:13
**frap**  72:19
**fraud**  36:16 43:24
54:19 55:23 61:20
62:9,13,19 64:12
70:12,15 77:3
**free**  41:16 46:14
49:1
**fritz**  70:16
**front**  65:4
**frustration**  7:19 8:2
**fulfill**  17:25
**full**  38:25 45:3 47:9
74:2
**fully**  22:18 31:11
66:5
**fundamental**  59:16
**fungicide**  36:12
**further**  81:4

**g**

**g**  6:1 83:4
**gain**  78:21
**garden**  9:16
**general**  1:9 2:2 3:20
4:3 7:15 23:5 29:4
29:13 30:7,22 33:3
33:12 34:3 40:9
69:22 70:2,13,17
72:22
**generating**  43:2

**gentile**  4:18 7:8
**gentleman**  7:11
**gentlemen**  7:3,16
8:9 71:19 82:5
**gerber**  1:24 13:12
**getting**  33:14 80:8
**give**  7:22 14:25 22:9
25:8 36:1 45:21
48:23 56:23 64:15
79:24
**given**  20:1 25:22
26:11 32:2,23,24
33:12 49:12 55:5,7
55:13 58:10 63:6
66:8
**gives**  15:18
**giving**  12:8 43:20
50:3 77:18
**glad**  18:19
**gm**  3:20 4:3 6:4,16
10:10,10,21 11:8
12:6 13:5,11,15,21
14:1,1,14,16,17
18:15 19:22 20:3,16
21:7 29:16 30:13,13
30:14,18 31:4,25
35:25 36:4 39:6,22
40:10,16,17,18,20
40:21,25 41:3,5,13
41:14,15,17,20,20
41:23 42:10,14,16
42:19,21 43:5,6
44:21 45:2,5 51:13
51:16,22,25 52:9,14
53:4,20,21,23,24
55:7,13 57:3,10,20
58:11,14 59:1,4,10
60:4,13,16 62:10
65:5,25 66:21 68:2
68:9 71:6 72:25
74:10,12 77:20 79:2
79:23,24 83:6
**gm's**  32:11 38:10
40:11 41:4,16,16
45:6 58:9 68:12
78:15 79:20 83:7

**gmc**  42:14 43:18
59:25 75:9
**go**  7:7 11:24 12:4
15:1 16:1,5,16
17:21 18:11 20:12
20:23,25 25:4 32:13
37:20 38:7 39:17
49:5 63:8 64:18,19
65:5,21 68:4,5,9,10
68:25 69:3,4 71:23
76:21 78:12 80:15
80:18 81:18 83:16
**goes**  13:7 25:21
39:15 62:8 70:22
79:7
**going**  6:9,24 7:17
11:15 14:24 17:18
19:6 22:9 25:7
26:10 30:24 32:2
39:21 40:2,2 49:25
50:4 64:24 65:1,11
65:17 66:6,18 69:1
71:2 74:11 75:13,19
75:21,22,23 77:8
78:18,21,22,23 79:5
79:8
**good**  6:3 22:10,15
34:19 39:14 49:2
60:25 82:5
**gotshal**  3:3
**governed**  24:7,8
29:3 33:18 72:2
**governing**  36:20
**governs**  24:8
**grafting**  51:7
**grant**  56:18 66:14
72:25 78:18 80:17
**granted**  41:8 69:6
71:15 72:7,8 73:10
78:11 83:11,15
**granting**  12:14
71:21
**grants**  72:12
**greater**  79:3
**green**  1:16
**greg**  6:17 7:13

**gregory**  4:8
**ground**  43:25
**grounds**  62:11,14
66:20 67:13,24
69:21 77:7
**group**  4:12,19 5:3
7:9
**guess**  13:24 74:17
75:4 78:17
**guidance**  49:13
72:18
**guide**  62:1
**guilty**  62:4
**gun**  80:20
**guy**  78:23
**guys**  7:19,24

**h**

**h**  4:23
**ha**  20:11
**half**  74:18
**hampshire**  59:7
**hand**  6:25 49:25
60:16
**handle**  30:9,11
**happen**  75:2 82:2
**happened**  70:19
**happens**  13:11 32:3
36:22
**happy**  18:4
**hard**  66:4 75:12
**harm**  69:22,24 70:1
**harmed**  69:23
**harmonize**  19:25
**harmony**  18:25
52:21 53:6
**hawthorne**  4:4
**head**  80:20
**hear**  12:1 22:10
41:2 56:19,21 62:20
62:21,21 63:21
67:22 76:13
**heard**  13:23 20:15
68:22
**hearing**  2:2 13:10
39:17,19,23 48:3
60:25 72:1

heavy  73:18
held  12:21 42:12
  46:19,19 63:12 64:1
  74:5
help  8:20 9:4,16
  10:3,11
helpful  72:15
henderson  70:17
highlighted  26:14
hinder  49:10
hirschfeld  73:12
history  24:1,2 51:6
hit  18:19
hits  36:4
hold  32:13 67:10,15
hon  1:24
honor  6:7,22 7:4,7
  7:13 10:13,16,18,25
  11:7,15,18 12:1,5,6
  12:9,16,22 13:2,3,9
  14:5,9 15:3,10,12
  16:6,13,19 17:2,9
  18:7 19:5,7,18 20:6
  20:19,22 21:11,14
  21:19 22:12,15,19
  22:20 24:17 25:10
  25:15 26:2,7 27:9
  27:20,23,24 28:3,12
  30:20 31:6,9 32:16
  33:15 34:25 35:5,10
  35:16 36:10,12,23
  37:8 38:7 39:14
  52:21,23 53:4 60:24
  61:2,4,13,17,17,23
  61:25 62:18,22 63:5
  63:10,14,23 64:9,14
  65:4,18 66:15,19,25
  66:25 67:3,4,11,20
  67:25 68:15,19,24
  69:12,18 71:15 81:8
  81:19,23
honor's  22:16,18
  36:21 39:24 61:8
  64:14 67:17 68:16
  70:3,4 71:4
hoped  45:18

hopefully  74:18
hour  39:7 74:17,17
hours  66:7
hypothetical  25:11

**i**

i.e.  62:5
idea  11:11 37:15
identified  34:4 60:4
ignored  54:12
iii  36:13
implement  24:21
  29:24 38:11
implementation
  9:21
implements  8:18
  50:15
implicated  17:16
  32:12,14
implicating  28:14
implication  16:11
implicitly  31:17
implied  9:2 10:5
  54:21
impliedly  54:23
imply  51:3
importance  70:17
  79:11
important  8:6 9:25
  22:25 27:24 38:7
  48:16,20 50:5 79:20
impose  51:11
imposed  24:10
  48:20
imposing  24:20
imposition  73:24
impressed  57:8
improper  64:12
  69:3
impute  11:14
inapplicable  50:7
inappropriate  51:8
  68:24
inappropriately
  18:5 36:22
incisive  22:16
include  46:3 48:11

included  45:1
including  38:14,15
  51:19
inconsistencies
  58:24
inconsistent  18:24
  31:16,19 38:9 51:9
  51:20 58:8 59:8
incredible  8:1
incumbent  35:8
independent  60:6
indicate  31:10 63:5
indicated  52:17
  53:5 68:20,24 75:21
indicates  80:14
industrial  73:20
infallible  64:25
initial  51:23
initio  59:23
injects  49:9
injunction  32:7
injuries  78:12
injury  73:7,10
  74:15,23 75:6,10,15
  75:19,21 78:11
inquiry  22:18
insecticide  36:11
instance  36:16 72:6
instructive  46:24
insurance  64:22,23
intact  43:16
integrated  34:10,12
  34:17
intended  16:14,15
  60:8
intent  15:4 23:20,23
  33:4,11 51:3 52:21
  52:24 65:23
intentional  24:18
interest  48:1,2
  49:10 70:5,7 73:11
  78:14 79:9,20,21
  80:1,3,4,5,10,11
interests  80:12
interfere  33:1 45:6
interfering  40:11
  41:4 43:7 80:1 83:7

interplay  28:18
  32:17
interpret  12:19,25
  15:6 38:25 47:9
  59:2,3
interpretation
  66:18
interprets  38:4
introduce  6:9,12,21
  7:12
introduced  6:8 22:3
introduction  15:16
invalid  25:5
invalidate  25:5
invention  47:24
invoke  47:23 53:8
  59:5
invoked  72:2
invokes  20:18
invoking  57:4 58:19
  77:16
involuntarily  48:14
involuntary  50:9
involved  36:11 70:7
involving  63:24
iqbal  77:15
irregularities  77:23
  78:6
irrelevant  26:7
irreparable  73:7
  75:10,14,19,20
isaac  6:17 7:14
isaacs  4:2
issue  10:6 13:3
  14:12,13 16:8,9
  22:19 26:21 27:13
  27:24 30:20 31:9
  41:3 44:18,20 55:9
  59:18 63:23 64:4,5
  70:24 71:6 76:9
  80:20
issued  42:13 50:20
  50:24 74:21
issues  8:7 18:10
  32:11 53:19 54:8,16
  55:2 56:9 57:21
  65:14 67:18,22

72:18
**issuing** 49:13
**it'll** 10:13
**i'm** 26:10

**j**

**j** 3:24 4:16
**jennifer** 3:16
**jerry** 74:6
**joined** 65:14
**jointly** 40:8
**jones** 5:16
**judge** 1:25 9:10
  10:6 13:12 35:22
  52:18 64:21 72:5,6
  72:8,11,23 73:15,15
  73:17 74:4,12 76:10
  76:10 77:12 80:21
**judge's** 77:13
**judges** 8:15 9:19
**judgment** 11:3,18
  19:8,10 38:2,3 52:4
  64:24 65:15 67:1,5
  67:9 69:6,7,9 72:4
**judicata** 56:2 79:25
**judicial** 8:24 9:7
  10:5 11:10,13 12:7
  13:5,7 14:6,7 15:4
  15:17 16:11,18 17:8
  20:9,21 21:3 22:1
  24:4,15,17,19,22
  25:21 26:1,6,8,12
  26:22,23 27:1,12,18
  28:14,15 30:20
  31:18,21 32:19,20
  33:20 36:14,20
  37:23 44:9,10 47:24
  50:20,23 51:2,4,14
  54:3,9 55:21 56:9
  57:2,12,14 58:19,21
  59:12 67:25 69:12
  69:25 70:1
**judicially** 51:7 79:1
**july** 19:14 23:19
  28:25 41:10,15
  56:15 79:1
**june** 33:3 41:12
  42:13

**jurisdiction** 8:11,13
  8:14,17 9:20 10:6,8
  11:5 12:9,12,24
  13:3 14:9,12,13,14
  14:18,22 15:3,7,8
  15:11,14,18,19,24
  16:3,17 17:1,3,5,6,7
  18:14,15,17 21:12
  21:18,18,21 28:4,4
  28:5,9,10,10,13
  30:5,5,17 35:20,22
  36:2,8,9 38:8,11,15
  38:23,25 39:9,11,13
  44:4,4,5,7,8,11,12
  44:15,19,20,23 45:3
  45:9 46:1,8,16 47:7
  47:9 49:15 52:5
  53:18,23 54:23
  55:25 56:6,7,11,12
  56:14,15,17,19,20
  56:24,25 57:5,15,16
  57:22,25,25 58:2,4
  58:6,7 59:6 62:3,23
  62:24,25 63:2,6
  64:1,2,2,7 67:15,16
  67:21 68:7 70:6
  76:7,8,9
**jurisdictions** 8:10
**jury** 50:6,8
**justice** 5:10 48:1
**justifiably** 48:25

**k**

**k** 1:9 3:20 4:3
**kaplan** 72:23 74:12
  80:21
**keep** 19:6 52:11,12
**keeping** 40:8
**kind** 9:10 10:5
  25:14 30:2 33:20
**king** 3:19 6:14
**knew** 19:15
**know** 6:11 9:18
  11:22 13:24 20:22
  24:19 25:21 26:4
  40:2 50:24 65:18,24
**knowledge** 48:22

**kramer** 3:10

**l**

**l** 83:4
**l.p.a.** 5:2
**label** 70:13
**labor** 27:4 55:18
**lack** 58:24 74:19
**lancaster** 42:21,23
  42:25
**landing** 74:25
**language** 13:17
  15:16 26:14 27:12
  30:5 31:2 34:2 52:8
  72:14 79:10
**large** 43:2
**larry** 20:22
**lastly** 79:9
**late** 39:7 81:9
**law** 9:13 12:23
  15:17 21:1,4 35:18
  35:19,19,23 36:20
  37:4,7 38:6 40:19
  41:9 42:7,25 43:21
  43:25 44:3 48:3,6
  49:17 54:19 56:22
  59:19 61:20 62:13
  62:19 63:1 64:12
  66:12 72:17 77:24
  80:17
**laws** 56:23,23 67:6
**lawsuit** 15:13 32:24
**lay** 7:19
**layers** 33:16
**lead** 77:18
**leadered** 24:14
**lease** 34:12
**leaving** 16:14
**lectern** 6:10
**led** 65:25
**lederman** 3:8 6:5,7
**left** 28:17 29:1
  32:20
**legal** 9:16 58:22,25
**legislation** 26:20
  51:4 52:20,22,25
**legislative** 23:20,23
  24:1,2 27:11 51:6

56:4
**leib** 2:25 84:4,8
**letter** 33:4,11
**level** 17:8 57:12
**levels** 77:6
**levin** 3:10
**lexis** 72:24 73:14,16
**liabilities** 41:17
**liens** 46:14 49:2
**lies** 73:1
**life** 7:20 49:12 57:9
**light** 60:9
**likelihood** 69:17,19
  70:10 73:8 75:13,24
  76:1,3,17
**likewise** 50:2 74:11
**limited** 13:6 18:3
  38:15 67:7
**limiting** 59:16
**limits** 56:25
**line** 9:24 37:10 60:6
  78:8 83:5
**liquidation** 1:8 6:4
  50:1
**lisa** 2:25 84:4,8
**litigant** 66:5 73:6
**litigated** 66:7
**litigation** 23:25
  43:6 51:10 75:11
**little** 9:1 62:8
**llc** 2:2 3:20 4:3 7:15
  40:9
**llp** 3:3,10,19 4:2,11
  4:18
**lobby** 42:19
**located** 42:18
**logical** 16:11
**long** 40:2 63:23
  82:4
**look** 12:21 16:5,7
  21:5 23:14 25:2
  26:19 35:22 51:6
  62:2 63:12,13 72:17
**looking** 19:16 29:24
  65:13,20 71:13,13
  80:11

losing   9:9 21:20
   74:19
loss   74:16,20 78:22
lost   47:18
lot   8:6 64:21 66:9
lower   47:2 56:7
lure   43:1
lynch   73:15 74:4,6

## m

m   5:7
macadams   5:2
mail   60:16,18
main   48:13 49:24
maine   59:7
maintain   43:16
   53:6 66:4
maintained   43:17
making   23:14 34:22
   35:9 49:3 58:10
   61:7 77:16
management   7:22
mandate   36:19
manges   3:3
manifest   21:1,4
   43:25 54:19 55:24
   61:20 62:5,13,18
   63:1 64:12
manufacturers
   23:22
marshals   25:8
master   41:12
material   76:16
matter   1:6 6:8,8
   7:25 8:10,11,18
   12:9,12 37:2 43:21
   44:5,7,8,11,20 45:8
   46:1,2,9,9 47:11,19
   51:6 54:19 56:12,14
   56:19,20 57:25 62:4
   62:6 63:3 64:6,6
   68:7 69:2 76:7,8
   77:24
matters   6:6 17:1
   39:2 46:3 55:10
   56:8 60:23 62:17,18
   62:20,24 63:1 75:5

maximization   49:10
maximum   79:24
mayle   20:23 43:4,6
mean   10:9 37:11
   56:21 64:25 65:18
   69:2
means   14:15 35:23
   62:9 70:13
meant   36:1,3
mechanism   51:10
   52:1 53:8,17 60:18
   79:6
mechanisms   50:21
medicare   26:24
   27:1
memory   72:1
merely   60:11
merits   56:10 64:13
   67:24 69:17,20 71:5
   73:9 76:4,19
mesh   22:23
methods   60:17
michigan   79:22
millenium   8:21
   46:22
mind   10:3 67:14
mineola   4:21 7:9
   84:14
mines   46:10 49:1
   50:2
minimal   19:1
minimally   18:13
minute   6:20 7:2
   61:11 75:13
minutes   13:15
   74:13
mirrors   62:10
misbehavior   62:5
misconduct   36:16
   62:5 70:21 71:2
misconstrue   36:19
misinterpreted   18:5
misleading   70:18
misled   59:9
misrepresentation
   36:16

missed   8:12
mistake   62:19
modification   72:7
   72:10
modified   32:21
   35:11 40:24
modify   19:9 38:4
   41:1 43:14 45:8,9
   61:24 62:12 67:2,9
modifying   40:13
   83:9
moment   14:11 53:5
   80:16
moments   81:9
monetary   69:8
money   9:24
monica   16:20,21,24
   17:2 58:9 59:1
months   19:16,19
   22:5 23:17
moon   75:11
morganstern   5:2
morning   6:3
morphed   28:3
motion   2:2 15:13,22
   15:25 32:5 38:10
   39:23 41:8 46:7,11
   46:13 65:11 68:22
   68:23 69:14 71:14
   71:15,20,21,24 72:2
   72:4,7,9,16 74:6
   83:6,14
motors   1:8,9 2:2
   3:20 4:3 6:4,5 7:15
   9:8 23:5 29:5,13
   30:7,22 33:3,12
   34:3 40:9 59:1
   69:22 70:2,13 72:22
mouth   61:19
movant   73:18,24
movant's   73:9
move   15:21 28:11
   31:19
moved   32:6
moves   40:10 71:20
mpa   41:13,14,18

mspa   38:12
mute   11:20,24 12:3

## n

n   3:2 6:1 46:3 83:2
   83:4 84:2
naftalis   3:10
namees   58:13
nationwide   78:25
natural   34:16 36:3
naturally   11:8
nature   34:4
necessarily   28:7
   46:12
necessary   26:16
   55:11,15,21 61:6
   79:24
necessity   70:5
need   6:20 7:17 9:10
   10:2,11 17:25 23:23
   24:2 30:1 37:9
   56:18 65:19 67:18
   79:14
needed   48:18
needn't   40:3
needs   7:18 25:14
   50:4 79:21
neither   68:12
network   23:7 30:13
   42:10 57:20 70:18
never   10:3 21:13
   24:19 32:5,6 64:24
nevertheless   8:20
new   1:3,17,17 3:6
   3:14,20,22 4:3,14
   5:12,14 6:16 7:9
   10:10 13:15 14:1,17
   19:22 20:3,16 23:5
   24:20 29:4,13,15
   30:7,13,14,18,22
   31:4,25,25 32:11
   33:3,12 36:4 39:22
   40:10,11,17,20,21
   40:25 41:3,4,5,14
   41:15,17,20 42:7,14
   42:16,19,20,25 43:5
   43:6,7 44:21 45:2,5
   45:6 49:19 51:13,16

[new - pause]                                                                                          Page 14

51:22,25 52:9,14
53:4,7,20,21,23,24
55:7,13 57:3,10
58:9,11,14 59:1,4,7
59:10,19 60:13,16
68:3,6,9,10 69:22
70:2,3 71:6 78:19
78:22 79:2,24 83:6
83:7
**nice** 27:14
**night** 80:21
**nondebtor** 14:17
35:23
**nondebtors** 14:17
46:25
**nonexclusive** 23:14
**nonsoluble** 34:18
**normally** 16:9
40:10 56:20
**note** 33:2 45:7
50:25 74:12
**noted** 44:25 46:11
54:4 57:24 59:21
74:4
**notes** 35:1 58:19
**notice** 28:2 60:16
**notices** 23:9
**noting** 57:2
**notwithstanding**
52:10
**november** 32:14
**nuanced** 76:2
**nuova** 11:11 37:15
**ny** 3:6,14,22 4:14
4:21 5:14 84:14

**o**

**o** 1:23 6:1 84:2
**object** 18:16
**objected** 10:21
**objection** 10:23
63:8
**objectionable** 64:22
**objections** 51:17
**obligated** 45:21
**obligation** 24:11,13
**obligations** 17:25

**observations** 58:12
**obtain** 64:14
**obtained** 72:10
**obviously** 48:15
74:15
**october** 1:19 17:25
31:23 32:7 39:4,7,8
39:19 42:6 65:16
69:24 78:12,20,24
78:25 84:16
**offer** 66:13
**offered** 41:24 80:5
**office** 5:11
**official** 3:11
**oh** 5:5 33:7
**ohio** 79:22
**okay** 6:22 7:10,16
10:14 22:9 35:15
61:15 81:15 82:1
**old** 4:20 7:8 30:13
37:8 40:17 41:13,16
41:16,20,23 84:12
**once** 33:9 54:25
58:6
**one's** 78:22
**ones** 80:13
**operate** 79:23
**operated** 32:1
**operating** 33:11
**opinion** 70:4
**opponent** 20:2
**opponent's** 20:15
**opportunity** 29:8
40:19 42:9 79:24
80:6,8,18
**opposed** 74:9
**opposite** 52:15
**oral** 27:15 45:25
52:17 61:7,8,10
68:21 71:20 83:14
**orally** 33:16
**order** 2:3 8:18 9:22
10:22 15:23 18:7,23
19:3,18,22 22:6
23:8 26:10 30:5,16
31:5 38:12,21 39:12
40:10,13 41:11,11

41:15,20 44:21 46:5
46:9,22 47:1,4
49:11,12 50:1 52:19
52:23,25 53:7,23
56:1,15,17,22,25
60:14,15 61:8 62:12
64:15 66:23 67:17
67:19 68:16,16,20
69:2,4 70:3,6 72:4
73:1,5 81:23 83:6
**order's** 60:20
**ordered** 80:25
**orders** 7:22 8:16
9:19,20 17:11 45:10
46:4,17,20 55:10
63:7
**ordinarily** 72:5
**ordinary** 74:1
**organized** 8:1
**original** 44:15
63:10 79:17
**originally** 41:22
49:6
**outcome** 18:4 37:14
46:6 78:7
**outflow** 34:16
**outright** 41:25
**outstanding** 34:1
**overlay** 32:22
**overly** 34:7
**overmyer** 73:2
**overturn** 20:25
**overturning** 63:11
**owned** 33:9
**owner** 42:19 43:3
**oxford** 4:2,8 6:17
6:17,22 7:13,13,14
7:16 8:3,3 11:20,22
12:1,4

**p**

**p** 3:2,2 6:1
**p.m.** 40:6,6 61:14
61:14 82:6
**page** 58:19 61:25
62:3 63:8 73:12,20
73:23 83:5

**pages** 26:4 27:22
46:10
**palmdale** 42:18,22
42:24 43:4
**papers** 11:1 17:18
24:16 26:13 28:3
61:7
**paragraph** 10:23
16:19 44:23 52:7
70:22
**paraphrase** 55:16
**parcel** 30:4
**parenthetically**
45:7
**parentheticals**
55:12
**part** 22:21 27:15
30:4,8 34:12 41:19
44:13 45:16 51:22
72:3 75:17
**parte** 9:6 77:22
**partially** 19:19
**particular** 7:25
8:18 10:23 47:19
48:3 51:19 58:5
67:24 78:1
**particularly** 46:24
51:8 55:3 57:23
58:8
**parties** 6:9 10:20
11:2,14 24:9,13
31:1 35:23 36:17
41:13 48:23 52:2
54:11 63:13 73:9
78:10
**party** 26:12 37:13
37:20 48:14 50:7
58:21 60:7 62:14
73:21 80:5
**pass** 14:24
**passed** 14:24 35:14
**passes** 24:20
**passive** 30:15 81:22
**passum** 8:5 27:7
**pause** 10:15 22:8,14
24:23 35:4 71:16,18

[payments - public]

payments 42:5
pending 61:5,8
  68:20,23 69:16 70:9
  71:10,14,21 72:5
  73:1,5 81:10 83:14
people 6:23,24,25
  32:3
peppercorn 75:19
perception 59:9
perform 34:13
period 29:12 81:21
permit 71:22 80:18
  83:15
petition 61:24 63:13
  63:16 64:11 70:11
  70:14 71:7
petrie 8:21 14:11
  17:10 46:23,23 47:1
ph 58:13
phone 6:23 7:11
  11:21
pick 26:9
place 20:12 33:14
  53:22 69:10,14
  71:17 80:2
plain 15:15 44:5
plainly 47:23 52:13
plan 9:22
plants 79:23
platform 40:12 83:8
play 15:8 79:3 80:8
pleading 77:17
please 6:4,20 7:2
  11:21 40:7 61:15
pled 62:16
plural 34:5
plus 37:24
pm 1:20
point 10:17 22:17
  34:2 46:11 53:20
  54:13 57:24 58:9
  59:4,20 61:12 66:19
  70:10 71:7,12 81:12
  82:3
pointed 10:19 12:6
  12:9 17:15 31:22
  62:18 64:3

points 8:22 58:10
  61:12
policy 20:18 28:5
  49:2
pontiac 75:4
portion 14:16 34:10
  80:7
posed 25:11
posit 9:4
position 18:12
  38:21 43:21 52:18
  58:22,23
positions 58:25 59:8
possess 12:12 36:9
possesses 14:8
possession 3:4
possibility 73:8
  76:3,18 77:10 78:3
  78:9
possible 39:17
  52:21 60:15
post 49:8
poster 8:14
potential 25:19
  78:12
potentially 25:23
power 48:7 55:5,9
  62:5 76:9
powerful 16:6
powers 36:19 62:19
  64:12 65:20
practical 69:2
practicing 63:22
prec 70:21
precedent 70:21
  71:3
preclude 45:4
predicate 61:6
  63:16
predicated 46:8
predictability 48:24
prejudice 48:14
  50:9 78:15,16
prejudicial 79:2
preliminary 6:5
prepared 28:7
  66:13

present 81:23
presentation 81:10
presentations 7:17
presented 12:13
  16:8,9,9 55:22 72:6
  72:19
presents 12:10
preserve 26:16
president 20:23
presumably 43:15
  45:15 53:25
pretty 50:5
prevail 45:14,18
prevailed 13:22,22
  45:12 47:16
prevent 43:1,14
prevents 48:1 58:21
previous 40:12
principally 48:5
principle 8:15
principles 59:16
private 73:19 78:15
  80:4,12
problems 58:18
procedural 54:9
procedure 24:21
  35:13 48:18 72:3,20
proceed 51:15
  53:21 57:7 78:24
proceeding 40:21
  40:22 46:7,13 48:3
  48:13 49:3,24 56:17
  57:3 58:22,24 71:20
proceedings 42:20
  44:12,16 46:6,15,18
  46:18 77:23 82:6
  84:5
proceeds 78:24
process 13:7 14:8
  18:10 21:21 22:21
  23:23 30:8 42:10,19
  45:12,14 49:9 51:11
  53:25 54:9 64:4
  70:15 74:8
program 78:25
prohibit 19:17

promised 31:25
  79:13
promoted 49:4
prong 44:20 74:5
prongs 15:9 69:16
pronouncement
  56:4
properly 61:21 63:3
  78:13
property 46:5
proposition 11:11
propriety 76:6
prosecute 68:25
prospective 49:5
protect 26:16 46:21
  55:11,15
protecting 70:5
protection 26:18
protects 36:18
protest 51:23
protested 31:19
proves 9:4 24:24
provide 9:20 24:4
  26:23 28:16 31:20
  34:23 45:10 50:19
  51:2 53:9 54:4
  59:22 60:17 77:5
provided 9:23 23:3
  29:4 40:19 42:4
  43:4 45:13 52:2
  53:9 60:5 75:1 80:9
provides 44:13
  47:25 50:21 57:25
  72:3 76:21
providing 43:6 47:7
  53:1,7 71:22
province 61:21,22
provision 10:8
  17:14 29:13,23
  36:18 51:1,4 58:2,7
provisions 10:2,4
  20:5 24:5 26:5
  28:23 32:25 39:10
  45:1 51:20 55:25
public 28:5 70:4,7
  70:16 73:11 78:14
  79:9,20 80:1,3,9,11

[public - removed]                                                                            Page 16

80:13
**purchase** 41:12
**purchased** 41:15
**purchaser** 23:7
  49:10 63:24
**purchasers** 49:5
  50:3 79:12
**purposely** 71:11
**purposes** 10:17
  14:21 23:14 29:11
  31:12 34:6 35:7,12
  35:12 48:6 51:20
**pursuant** 2:2 40:12
  40:17 41:14
**pursuing** 40:14
  83:10
**put** 23:16 25:25
  31:17 40:12 51:24
  55:12 56:8 70:13
  77:1,10,11 79:2
  80:2,7,19
**putting** 9:24 14:10
  61:19

**q**

**quacks** 64:21
**quarrel** 10:10
**quarter** 14:3
**quarters** 13:19,20
  13:21 33:8 75:3
**quasi** 53:13 54:9
**question** 10:7 12:10
  12:12,13,22,24 13:1
  14:21 15:16 16:7
  18:10,14 21:3,6,8
  21:10 27:17 35:6
  36:8,8,21 44:10
  53:15 57:5,16 58:4
  58:6 63:4 64:4
  66:17 67:13 68:2,2
  69:15 71:11 77:2
**questioning** 21:12
**questions** 16:8
  22:16 35:3 60:23
**quick** 24:3 39:23
**quickly** 39:17 48:19
  60:14 61:2

**quote** 11:2 23:25
**quoted** 10:1 26:13
  52:6 72:14 79:10
**quotes** 23:25 36:23
**quoting** 55:17 62:4

**r**

**r** 1:23 3:2 4:8 6:1
  83:4 84:2
**railroad** 55:18
**railway** 27:3
**raised** 13:3 17:10
  25:19 36:10
**raises** 54:7 67:18
**rally** 4:12,19 5:3 6:5
  7:9 9:8 12:18 17:24
  18:4,11 19:7 20:22
  21:11,13 29:12,18
  30:15 33:5 36:25
  38:5 40:10,16,19,22
  40:23 41:3,7 42:9
  42:11,18,19 43:3,5
  43:9,13,19 44:18
  45:4,14,24 47:12
  52:7,10,11,12,12
  53:12,24 57:2,13
  58:19 59:18,18 60:9
  62:1,11,16 63:15
  67:23 68:10 70:12
  71:20,23 75:2,17,20
  75:25 79:11 80:12
  80:24 83:6,14,16
**rally's** 12:16 29:17
  42:14,15 47:22
  51:13,16 61:24
  67:14
**read** 20:5 60:3
  70:22
**reading** 50:24
**real** 22:19 27:17
**really** 20:4 24:16
  28:8 68:22 75:15
**reargue** 69:18
**reargument** 60:22
  68:22
**reason** 10:1 18:16
  20:6,7 27:11 28:12
  28:13 30:4 35:20

47:3 51:14,21 56:14
  66:2 67:15 69:14
  75:10 76:14 78:18
**reasonable** 52:18
  60:11
**reasonably** 60:14
**reasons** 15:15 26:17
  49:2 50:11 55:24
  59:21 60:13 61:6
  63:19 64:10 67:22
  68:15 81:3
**recall** 27:7
**recess** 40:2,5,6
  61:11,14
**recites** 24:15
**recognized** 30:17
**recognizing** 74:23
**record** 51:24 62:13
  81:4 84:5
**redress** 18:11 37:1
**refer** 40:10 41:21
  42:1 67:1,1 70:11
**reference** 81:13
**referral** 21:11
**referred** 26:24
  41:13 45:1
**refers** 8:5 24:2
**reform** 40:12 83:8
**refused** 17:3 39:8
  53:21
**reg** 1:4
**regard** 30:20 31:9
  32:16 34:9 57:11
  71:25
**regarded** 78:14
  80:10
**regarding** 38:18
**regardless** 13:10
**regular** 15:25
**reimbursement**
  26:25 27:1
**reinstate** 42:14,20
**reinstated** 23:6,12
  23:12 33:5,6 40:20
  42:16
**reinstatement**
  25:23 29:2 34:15,21

42:9 45:19 71:1
**reinstating** 13:11
  43:12
**reject** 42:2 43:10
**rejected** 23:5 47:21
**rejection** 41:25
  70:25 74:24
**related** 8:13 14:11
  15:2,7 28:5 30:12
  39:2 44:16,18 47:11
  47:19 48:4
**relatedness** 48:12
  49:23
**relating** 24:14,15
  26:25 27:13 30:10
  30:10 44:10
**relations** 48:24
**relegated** 27:16
**relegating** 49:8
**relevance** 24:16
**relevant** 18:13
  44:13,14,19 46:4
  49:21 54:17 72:3
  75:4
**relied** 11:1
**relief** 9:10 16:17
  34:24 38:9 46:8
  57:10 69:5 71:13
  72:5,7,8,9,12
**relies** 44:21 49:11
**relocate** 42:21 43:3
**rely** 12:11 16:20,22
  16:23 17:6 48:25
**remain** 20:13 56:2
**remainder** 6:12
  66:11
**remedies** 9:2
**remedy** 25:3,5 29:7
  30:2 54:22 62:7
  75:1
**remember** 15:12
**remotedness** 49:23
**remoteness** 48:12
**removal** 12:13,17
  48:15
**removed** 48:14 50:9

reply 16:4 21:7
22:10 23:25 27:22
35:15
request 42:11 61:7
requested 80:25,25
require 7:23 57:6
75:21
required 20:20
requirement 74:2
requirements 7:21
requires 54:9
res 56:2 79:25
reservation 51:23
residential 73:13
resolution 25:13
resolve 38:16 44:23
55:5
resolved 48:19
resolving 46:9
respect 17:1 33:8
38:16 40:22 44:12
44:24 45:15,22
47:17 48:2 53:1,2
59:25 60:1 63:4
66:15,16 67:5,6,6
72:15 74:8 75:9
respectfully 62:24
67:2
respective 18:21
respects 38:14
83:17
responding 51:16
response 8:7 36:21
responses 77:12
restate 55:12
restrain 16:24
result 14:22 21:14
34:10 37:1 43:24
45:17,18 63:7,20
resulting 46:17
results 25:6 75:16
retail 8:21 46:23,24
47:1
retain 38:25 47:9
retained 44:22 45:3
46:8

retaining 38:15
retains 38:10
return 25:8
reversal 77:8
review 8:24 9:8
10:5 11:10,13 12:7
13:5,7 14:6,7 15:4
15:18 16:11 20:9,21
21:3 22:1,2 24:4,15
24:17,19,22 25:14
25:15,16,21 26:1,8
26:12,15,22,23,25
27:1,12,19 28:14,15
31:18,21 32:19,20
33:20 36:14,20
37:23,25 50:20,23
51:2,14 53:13 54:3
54:5 55:21 56:9
59:12,17,23
reviewed 55:7,14
rewrite 53:10
right 6:4,11,15 7:2
7:5,10,16 8:24 9:7
10:9,11 11:10,24
13:5,7 15:4 16:10
17:13 19:6 20:2,9
20:15 22:2,7 23:6,8
24:11,17,20 25:3,22
25:24 26:12,17,18
29:21 32:23 33:11
34:8 36:7 37:23
38:1 40:1,1 41:1
47:16,23 48:14 50:6
50:16,23 51:14 52:8
54:22 56:9 59:24
60:12,22 66:6,8
67:1,4 68:14,18
69:12,25 70:1 71:6
75:12 76:21,23,25
78:5 82:4
rights 11:13 18:3,3
19:23 23:22,22 32:2
32:12,14 42:2 46:21
46:25 49:12 51:2,7
51:22,23 53:8 55:7
55:11,13,15 64:6
66:5 69:8

rigid 74:9
rise 6:2 68:11,12
rises 17:8 57:11
road 4:20 7:9 33:14
84:12
robert 1:24
rodenticide 36:12
routinely 51:1
rule 11:3 31:9,12,12
31:18 38:5 45:25
52:6 55:4 59:25
61:4 67:14 72:2,12
72:14 73:6 74:9
78:4
ruled 29:17 53:3
58:1 69:3,19 71:4
rules 7:23 10:18,20
10:22,24,25 11:8,16
12:8 16:15 18:11
19:10,19 20:20
31:10,11,14,15
37:12,17,18 51:16
51:19,19 52:1,1,2,3
52:6 72:19 81:17
ruling 20:4,22,24
23:19 40:4 42:15
56:3 60:10 62:6
66:8 72:24 74:9,20
75:14 76:5,21 79:18
79:19
rulings 76:11 79:25
run 60:19
running 65:9

s

s 3:2,8 5:16 6:1
12:20 83:4
sale 2:3 9:22 22:21
30:5,8,16 38:21
39:12 41:11,11,15
41:20 46:4,5,14,20
46:22 47:1,4 49:1,6
49:7,8,9 56:1 66:23
67:17,19
sales 21:21 34:2
41:25 43:2 60:2
79:12

sanitation 73:19
santa 16:20,21,24
17:2 58:9 59:1
sat 10:20
satisfactory 73:22
satisfied 73:3
satisfy 74:5
saturn 32:1
save 76:25
saying 14:14 18:16
19:25 26:5 35:21
37:3,17 53:14 58:14
63:25 65:10 67:19
68:3,5,7 70:16,18
70:22 79:7
says 8:16 10:2 11:6
13:11,12,12 24:18
24:21 30:24 31:18
36:5 37:19 67:17,17
79:14
schedules 34:12
scheduling 10:22
scheme 36:14 53:20
scope 59:17
scott 3:25 6:14
seacarriers 8:21
46:22
seats 6:4 40:7 61:15
second 15:8 35:1
37:7,14,18 46:19
51:5 56:4 58:20
59:9 64:22 65:3,13
73:13,21,23 74:4
78:17 80:18 81:19
section 24:5 26:1
36:13 38:22 44:9,9
44:13 46:3,15,17
47:6,25 48:1 62:8
62:10 70:6,23
sections 38:8 44:10
securities 56:23
security 72:13 74:2
see 7:17,24 8:5 9:3
10:8,9 16:7 19:7
21:2,2,6,19 22:6
35:1 46:22 52:6
58:18 59:15 73:2,11

73:18,19 74:2 78:15
**seeing** 8:19 64:11
**seek** 16:1,17,21
17:13 24:11 25:5,23
29:8 38:3,3,4 39:18
42:9 61:5 62:14
64:11,15,16 65:21
65:22 67:9
**seeking** 31:13,14
37:22 38:9 39:11
43:13 57:6
**seeks** 15:13 46:7
73:24
**seen** 20:8
**sense** 8:23 37:21
68:21
**sep** 67:12
**separate** 20:4,18
34:4 43:22 67:12
79:18
**separately** 34:3
60:3,4,6,11
**september** 39:15,16
**serious** 47:20
**seriously** 54:21
74:16 77:2
**served** 80:1
**service** 41:25 60:2
**set** 20:20 33:21 61:6
79:5
**sets** 39:5
**settle** 30:24 31:1
60:13
**settled** 43:25 60:15
**settlement** 16:21
17:4 30:23 57:7
58:13
**seven** 23:13,18
71:22 80:19 81:11
81:14,18,21
**shape** 8:12
**sharret** 3:16
**shopping** 65:9
**short** 11:2 76:17
**shorthand** 76:1
**shot** 75:11

**show** 15:23 33:22
72:9 73:21
**showing** 75:20,22
**shown** 9:13 78:7
**sic** 24:14 29:5
**side** 20:11
**sides** 7:19 8:23
50:14 52:18
**sign** 17:3
**signed** 23:3 30:6,7
40:18
**significant** 50:25
**silent** 11:13 12:7
13:6 16:10,14 18:9
37:15,16,17,22
66:21 70:24
**similar** 72:18 74:14
**similarly** 28:2 46:2
46:19 49:16
**simplify** 60:8
**simply** 20:21 67:16
68:11
**singular** 34:6
**sir** 81:7
**sit** 71:17
**sits** 17:6
**situation** 9:5,8,9
27:10
**situations** 24:10
26:11
**six** 19:16,18 22:5
23:17
**slice** 76:4
**slightly** 73:4
**slow** 50:3
**snail** 60:18
**snyder** 4:16 6:12
7:5,7,20 8:9 9:11
10:12,13,16 11:25
12:4,5 13:14 14:5
15:7,10 18:20 19:5
19:7 20:6,19 22:9
22:12 35:15,16
60:24 61:2,3,4,13
61:15,17 65:1,4
66:2,15

**soft** 74:25
**sole** 14:14,18 16:25
17:5 18:17 62:22
63:5
**solely** 11:19 29:5
35:12 60:8
**somebody's** 65:1
**soon** 39:22 40:4
**sorry** 7:7 12:2 31:7
37:10,16
**sort** 36:4
**sought** 17:3 39:23
57:10 62:11 80:13
**sound** 73:1
**source** 8:1 66:10
**southern** 1:3 5:12
**spalding** 3:19 6:14
**sparkle** 19:15
**sparse** 24:1
**speak** 21:20
**speaks** 19:3 38:2,21
48:5
**species** 43:23 51:4
77:4
**specific** 23:15 24:5
24:12 28:23 57:19
60:5
**specifically** 10:24
12:16 23:1 26:14
30:17,24 32:10 45:4
63:12
**specified** 32:19
**spend** 26:4
**spent** 75:25
**st** 5:4
**stage** 37:24 65:15
**stand** 48:22 71:17
**standard** 26:6,8
76:2
**standards** 48:9 59:7
71:8,9 72:15
**start** 10:17 15:20
50:25 74:15
**started** 15:20 69:9
69:13
**starting** 61:25 63:8

**starts** 62:3
**state** 11:4 17:18
21:12 42:25 48:2,3
48:5,6 49:17 52:5
56:17,18 62:14 67:6
67:25
**stated** 12:15 15:15
51:17 60:3 61:18
66:23 72:24 73:4
**statement** 12:16
**statements** 57:13
70:16
**states** 1:2,15 10:21
10:24 11:1 20:7
79:22
**statute** 12:18,25
13:6,8 14:6,7 16:10
16:14 17:20 18:2,9
20:8 21:10,13,25
22:24 23:6,20 24:1
24:3,20,21 25:24,25
26:9 28:16 31:3
32:19 34:23 35:14
36:11,12 37:8,15,15
37:16,22 38:1 42:8
44:8 50:23 51:6,8
52:16 54:4 55:6,7
55:13 62:15,15
63:22 64:7 66:18
67:8 70:23 77:1
**statutes** 26:23 37:10
51:1 56:24
**statutory** 53:20
79:4
**stay** 16:1 32:7 39:18
61:5,8,11,16 64:14
64:16 65:21,22
66:13,14 68:15,20
68:23 69:1,4,12,16
70:9 71:9,10,14,21
71:22 72:4 73:1,5,7
73:10,11,25 78:11
78:17,18 79:9,18
80:17 81:10 83:14
**stayed** 29:10,11,14
80:18

staying 78:16 81:9
steinberg 3:24 6:11
    7:14 8:2 9:3 13:23
    18:20 22:11,15
    24:23 25:3,10 27:5
    27:8,23 29:15,20,22
    31:6,8 33:10 35:3,5
    35:21 38:1 68:18,19
    81:8,15,19 82:1
steve 7:1
steven 4:23 6:19 7:8
stevens 73:16 74:2
stick 56:1
stiffs 13:21
stop 69:7
stops 36:6
straightforward
    65:23
streamlined 23:23
    24:3 27:11
street 5:13 66:6
strikes 9:16
strip 33:16
strong 49:13,17
    64:5,6 75:22
style 20:15
subject 8:10,11
    12:9,12 20:15 27:1
    33:20 44:5,7,8,11
    44:19 45:8 46:1
    47:20 49:24 54:3
    56:12,14,18,20
    57:25 64:6,6 68:7
    76:7,8
submissions 7:24
submitted 16:13
    62:6,24 67:2,19
subsection 44:13
subsequently 22:22
    35:14 40:18 52:20
substance 43:19
    59:18
substantial 73:8,10
    76:3,18 77:9 78:3,9
    78:11
substantially 41:16

substantive 63:13
    63:15
substituting 55:17
    55:19
succeeded 75:17
success 69:17,19
    70:10 73:9 75:13,24
    76:1,4,17 78:4
successful 40:20
    47:12 64:13 67:23
    67:24 73:21
successfully 58:23
sue 17:15,16,19
    18:1 19:13,21 22:3
    29:4,19 33:1,15
    34:21 35:12 36:5
suffer 73:7,10 78:10
suggest 37:6,22
    67:20 78:2
suggesting 14:20
    18:13 19:20 20:24
    21:21 78:8
suggestion 47:22
suggests 18:7 49:14
suit 43:13 45:5
suite 4:5 84:13
suits 19:25
summary 65:15
superior 42:23
supplemental 71:19
supporting 59:18
suppose 13:21
    24:24,25
supposed 33:12
supreme 12:20 21:5
    55:4 63:9,11,20
    77:14
sure 11:22 25:3,15
    31:6,8 33:19 35:2
    59:6 77:11 78:13
    81:20,22
surface 69:23
survival 79:20
survive 28:23
survives 39:2
swain 73:17

switchmen 26:13
    27:3 55:3,17
system 75:16 79:3
    80:7

## t

t 84:2,2
table 7:22,22
taint 34:9,17
take 13:9,18 23:14
    25:7 30:11 31:1
    38:20 40:2,3 49:16
    54:24 56:6 66:5
    69:7 74:15 75:22
    80:6
taken 33:25 56:6
    58:25
takes 36:4 72:18
talk 7:23 24:6 34:2
    34:4 69:16 75:24
    76:1 77:17
talked 26:19 79:17
talking 8:13 22:1
    34:6 75:15 76:9,19
    77:19,20
talks 27:12 64:20
taxpayers 79:21
teachers 64:22,23
    65:7
technical 76:2
techs 43:2
telephonically 3:17
    4:9 5:8 6:17
tell 9:6 77:16
telling 12:3 25:2
temporarily 56:8
ten 13:15 26:4
    33:13 61:11
tentative 20:14
term 12:15 19:8
    21:9,16
terminate 42:6
    47:14
terminated 31:25
    32:9 69:24
termination 2:4
    38:14,17,18 39:3
    41:21 43:15 44:24

44:25 45:11,20,23
    54:24 72:8,10 74:21
    74:25
terms 11:10 38:11
    39:1 42:24 47:10,18
    49:7,11
terribly 72:15
test 74:6
textural 50:25
thank 12:5 22:12,13
    35:14,15 61:13,17
    81:9
thanks 39:24
thereof 52:6
thereto 47:11,19
therewith 38:13
thing 9:11 23:2
    28:18,20 70:8,14
    78:24 81:19
things 9:21 27:11
    32:18 42:4 78:8
think 8:3,12 10:16
    10:19 15:7,8,15
    19:4,24 22:15,18,19
    22:25 23:2,10 24:16
    24:18,18 25:18 26:2
    26:4 27:14,23,25
    28:10,12,16,21
    29:25 30:3,3,13,14
    30:21 31:22 32:8,8
    32:9,16 33:12,22
    35:5 47:20 48:16
    50:22 52:17 53:3,12
    53:22 54:14,20 55:2
    55:11,25 57:11,23
    58:8 59:4,12,22,23
    60:2,9 63:19 64:3
    66:21 67:22 68:13
    69:15,17,21 70:8
    74:13 75:9,15 76:16
    77:11 78:3,11 79:2
    79:8,11 80:1,14
    82:1
thinking 59:6
third 4:13 58:9
    66:20 78:10

**thomas** 26:14,19,24
  27:6 36:10,11 55:3
  55:16
**thompson** 36:23
**thought** 13:22,25
  18:15,22 21:13
  23:21 66:9 71:5
**three** 13:19,20,21
  15:9,15,22 29:16
  33:7 40:23 43:18
  45:15 47:16 52:11
  57:13 66:7,12 69:21
  71:2 75:3
**thrive** 79:25
**throw** 27:17
**thumbs** 19:23,23
  29:2 67:4,5
**ticking** 32:4 65:16
**tight** 23:15 48:19
  51:11
**time** 9:24 19:18
  21:24 22:10 29:12
  48:19 60:18,19,20
  61:12 63:23 64:15
  71:12 75:7 79:17
  81:12
**timely** 23:9 42:11
**times** 8:4 9:18
**timing** 39:14
**title** 35:19 36:13,20
  37:24 44:16,17 48:4
  48:5 49:12
**today** 28:8 69:18
  75:14 81:9
**told** 9:14 16:1 23:13
**tonight** 74:21
**torrance** 4:6
**totally** 9:2 28:21,22
  31:2
**transaction** 30:9
**transactions** 41:19
**transcribed** 2:25
**transcriber** 84:9
**transcript** 84:4
**transposes** 81:14
**trial** 48:14 50:6,8

**tried** 39:16 59:5
  75:12
**tries** 33:15
**triggered** 42:22
**triggering** 77:12
**trouble** 8:19 64:19
**troubled** 20:13
**troubling** 13:4
**true** 36:7 84:5
**trump** 35:7 58:2,7
  66:23
**trumped** 52:22,25
**trumps** 18:23 67:19
**truthfully** 66:3
**try** 18:25 20:3
  22:16,17 23:20
  31:17 32:7 33:17
  35:8 37:20 66:3
  69:18
**trying** 7:24 14:2,2,3
  14:5 21:11 64:19
  69:8
**turn** 6:9 8:8 18:22
  44:3 61:23 75:23
**turner** 73:22 74:7
**turning** 44:3 50:13
**turns** 18:21
**two** 7:24 19:1 32:18
  35:8,23 46:25 55:3
  60:15 64:3 76:10
  77:5
**twombly** 77:15
**type** 9:9 10:4 34:24
  53:15 78:6,13
**types** 62:17 81:17
**typically** 9:21

### u

**u** 83:4
**u.s.** 1:25 5:10,11
  36:24 55:16 72:24
  73:14,16,19
**u.s.c.** 2:2 10:8 12:10
  16:22 17:7 18:15
  44:8 46:3,15,16
  47:25 57:15,16
**ultimately** 47:21
  75:4

**umbrella** 44:4
**unanimous** 47:2
**unaware** 6:6
**uncertainty** 49:9
**unchallenged** 76:11
**unconstitutional**
  25:24
**undercut** 49:21
**underlying** 54:1
  60:12 63:13
**understand** 7:20
  13:18 41:6 57:10
  64:18 66:5 82:2
**understanding** 10:3
**understood** 13:16
  15:10 30:15
**undisputed** 50:19
  76:19
**undo** 62:15 75:2
**undone** 79:5
**undue** 62:9 70:12
**uneeda** 58:20
**unfair** 59:10
**unfortunate** 18:9
**unhappy** 14:16
  37:20
**union** 36:23 37:5
**uniquely** 21:8
**united** 1:2,15
**unpunished** 39:15
**unsecured** 3:11
**unwarranted** 59:22
**unwinds** 79:2
**upset** 45:17
**use** 8:5 10:21 26:10
  27:7 34:6 35:17
  37:9 60:7,17,18
**uses** 34:5 62:1
**usual** 62:14
**usually** 67:8

### v

**v** 36:23 59:7 63:9
  64:22,23 73:12,19
  77:15,15
**vacate** 19:9 20:25
  38:4 43:14 59:13
  62:12 67:1,9

**vacated** 40:24
**vacating** 40:13 44:1
  83:9
**vacature** 37:25
**vaden** 12:19 16:4
  21:5,7 37:6 63:9,12
  63:20
**value** 49:10 63:24
**variety** 9:16
**various** 42:20 76:4
**vehicles** 29:13
**veritext** 84:11
**versus** 22:23 35:18
  35:19
**victimized** 25:1
**victory** 43:20
**view** 52:13,23
**violated** 17:19
  42:25 69:10
**violation** 19:12
  25:12 32:25 41:5
  43:8
**vis** 66:17,17
**vitality** 35:11

### w

**wait** 78:23
**waiting** 32:13 40:8
**waive** 51:17
**waived** 68:7 81:5
**waiver** 51:22
**walks** 64:20
**want** 8:4,9,20 9:3
  11:20 15:2,6 17:12
  18:20 21:25,25
  27:24 34:22,22 35:1
  80:22 81:22
**wanted** 7:12 32:10
  62:12
**wanting** 63:24
**wants** 69:6,7 70:10
**warrant** 48:8,9
  59:16 71:10
**warranted** 60:12
**wars** 43:1
**wash** 80:12
**way** 8:12 36:23 38:5
  51:7 53:6 57:10

[way - à]                                                                                    Page 21

59:25 60:22 66:14
75:20 77:3 80:2
**ways** 73:4
**we've** 32:12 39:6,19
68:7
**weil** 3:3
**weinfeld** 64:21
**welsh** 20:3
**went** 17:4 30:22
39:22 77:5
**west** 5:4
**westpoint** 73:16
74:2
**wilk** 4:11
**willfully** 36:19
**willing** 14:24
**willingness** 51:15
**win** 19:25 47:13
80:7
**wind** 2:4 14:23
17:14,23,23 18:6,17
18:23 19:13,14,20
22:20,20 23:4 28:13
28:19,21 29:3,4,10
29:10,13 30:6,6,16
31:24 32:17,20,25
34:5 35:7,11 38:8
38:12,22 39:5,6,12
41:22 42:3,8 43:8
45:1,4 46:5 47:5,6
53:2 59:2 63:7,17
63:18 68:8 69:11
81:21
**wisdom** 57:9
**wished** 56:5
**wishes** 45:17 47:15
80:6
**wishing** 43:16
**wit** 12:13
**withdraw** 15:13
**wl** 73:14,16
**won** 13:19,20 33:7
33:8 40:22 75:3,8,9
**wondering** 24:24
**word** 8:5
**words** 21:13 61:19
77:11,16

**work** 80:21
**world** 48:21
**write** 26:1,2
**written** 26:20,24
**wrong** 9:17 26:22
54:22 59:4,15,15
65:2 77:2,25 78:2

**x**

**x** 1:5,13 83:2

**y**

**year** 37:8 41:7
44:21 74:22 75:7
79:1
**york** 1:3,17,17 3:6
3:14,22 4:14 5:12
5:14 7:9 49:19 68:3
68:6,9,10

**à**

**à** 66:17

## **<u>EXHIBIT M</u>**

**[Proposed Order]**

Hearing Date and Time: November 9, 2010 at 9:45 a.m., E.T.
Objection Deadline: November 2, 2010 at 4:00 p.m., E.T.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                               :

In re                              :    Chapter 11
                               :

MOTORS LIQUIDATION COMPANY, *et al.,*   :    Case No. 09-50026 (REG)
     f/k/a General Motors Corp., *et al.,*    :
                               :    (Jointly Administered)
                  Debtors.     :
                               :
------------------------------------------------------------x

### ORDER GRANTING MOTION OF GENERAL MOTORS LLC
### (F/K/A GENERAL MOTORS COMPANY) TO ENFORCE SALE ORDER

This matter coming before the Court on the Motion of General Motors LLC

(f/k/a General Motors Company) to Enforce Sale Order (the "Motion"),[1] filed by General

Motors LLC f/k/a General Motors Company ("New GM"); the Court having reviewed the

Motion and having considered the statements of counsel and the evidence adduced with respect

to the Motion at a hearing before the Court (the "Hearing"); the Court finding that

(i)     the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334,

(ii)    this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2),

(iii)   notice of the Motion and the Hearing was sufficient under the circumstances,

(iv)   the Sale Order and the UAW Retiree Settlement Agreement enjoin the pursuit of the Additional VEBA Payment and the VEBA Complaint by the UAW against New GM,

(v)    the terms of the UAW Retiree Settlement Agreement extinguished any obligation that New GM may have had to make the Additional VEBA Payment and

(vi)   the conditions precedent to the Additional VEBA Payment set forth in the 2007 Delphi Restructuring MOU have not been satisfied;

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

and the Court having determined that the legal and factual bases set forth in the Motion and at

the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The UAW shall immediately cease and desist from any further prosecution

of the VEBA Complaint against New GM and may not commence any similar litigation or

proceeding in any forum.  The UAW shall immediately dismiss the VEBA Complaint against

New GM with prejudice.

3.    Any further prosecution of the VEBA Complaint against New GM, or any

similar litigation or proceeding in any forum, shall constitute contempt of this Court.

4.    The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation of this Order.


Dated: _____, 2010
         New York, New York
                                                    _____
                                                    UNITED STATES BANKRUPTCY JUDGE